Richard M. Cieri
Ray C. Schrock
Justin R. Bernbrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Jeffrey S. Powell
Daniel T. Donovan
Judson D. Brown
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Ste. 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Counsel for Ally Financial Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

------------------------------------------------------------

## NOTICE OF ALLY FINANCIAL INC.'S MOTION FOR AN
## ORDER ENFORCING THE CHAPTER 11 PLAN INJUNCTION

**PLEASE TAKE NOTICE** that a hearing on Ally Financial Inc.'s Motion for Entry of an Order Enforcing the Chapter 11 Plan Injunction (the "***Motion***") will be held before the Honorable Martin Glenn of the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***"), in Room 501, One Bowling Green, New York, New York 10004-1408, on **May 15, 2014, at 10:00 a.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that responses or objections to the Motion and the relief requested therein, if any, must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, shall set forth the basis for the objection and the specific grounds therefore and shall be filed with the Bankruptcy Court electronically in accordance with General Order M-399, by registered users of the Bankruptcy Court's case filing system (the User's Manual for the Electronic Case Filing System can be

found at http://www.nysb.uscourts.gov, the official website for the Bankruptcy Court), with a hard copy delivered directly to Chambers and served, so as to be received no later than **May 5, 2014, at 4:00 p.m. (prevailing Eastern Time)**, upon: (a) counsel to the Debtors and Liquidating Trust, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attention: Gary S. Lee, Norman S. Rosenbaum, and Jordan A. Wishnew); (b) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014 (Attention: Tracy Hope Davis, Linda A. Riffkin, and Brian S. Masumoto); (c) the Office of the United States Attorney General, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-0001 (Attention: US Attorney General, Eric H. Holder, Jr.); (d) the Office of the New York State Attorney General, The Capitol, Albany, NY 12224-0341 (Attention: Nancy Lord, Esq. and 3 Enid N. Stuart, Esq.); (e) the Office of the U.S. Attorney for the Southern District of New York, One St. Andrews Plaza, New York, NY 10007 (Attention: Joseph N. Cordaro, Esq.); (f) counsel for Ally Financial Inc., Kirkland & Ellis LLP, 153 East 53rd Street, New York, NY 10022 (Attention: Richard M. Cieri and Ray Schrock); (g) counsel for the committee of unsecured creditors, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036 (Attention: Kenneth Eckstein and Douglas Mannal); (h) counsel for Ocwen Loan Servicing, LLC, Clifford Chance US LLP, 31 West 52nd Street, New York, NY 10019 (Attention: Jennifer C. DeMarco and Adam Lesman); (i) counsel for Berkshire Hathaway Inc., Munger, Tolles & Olson LLP, 355 South Grand Avenue, Los Angeles, CA 90071 (Attention: Thomas Walper and Seth Goldman); (j) Internal Revenue Service, P.O. Box 7346, Philadelphia, PA 19101-7346 (if by overnight mail, to 2970 Market Street, Mail Stop 5-Q30.133, Philadelphia, PA 19104-5016); (k) Securities and Exchange Commission, New York Regional Office, 3 World Financial Center, Suite 400, New York, NY 10281-1022 (Attention: George S. Canellos, Regional

Director); and (l) special counsel to the Committee, SilvermanAcampora LLP, 100 Jericho Quadrangle, Suite 300, Jericho, NY 11753 (Attention: Ronald J. Friedman).

**PLEASE TAKE FURTHER NOTICE** that if you do not timely file and serve a written response to the relief requested in the Motion, the Bankruptcy Court may deem any opposition waived, treat the Motion as conceded, and enter an order granting the relief requested in the Motion without further notice or hearing.

April 25, 2014
New York, New York

*/s/ Ray C. Schrock*
Richard M. Cieri
Ray C. Schrock
Justin R. Bernbrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

- and -

Jeffrey S. Powell
Daniel T. Donovan
Judson D. Brown
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Ste. 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Richard M. Cieri
Ray C. Schrock
Justin R. Bernbrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Jeffrey S. Powell
Daniel T. Donovan
Judson D. Brown
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Ste. 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Counsel for Ally Financial Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, <u>et</u> <u>a</u>l., | Chapter 11 |
| Debtors. | Jointly Administered |

---

**ALLY FINANCIAL INC.'S MOTION FOR AN**
**ORDER ENFORCING THE CHAPTER 11 PLAN INJUNCTION**

**TO THE HONORABLE JUDGE GLENN,**
**UNITED STATES BANKRUPTCY JUDGE:**

Ally Financial Inc. ("***AFI***," together with Ally Bank and GMAC Mortgage Group LLC collectively, "***Ally***") submits this Motion for entry of an order, substantially in the form attached hereto as **<u>Exhibit A</u>** (the "***Order***"),[1] enforcing the injunction in the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [ECF No. 6065-1] (the "***Plan***"),[2] which was confirmed by the Court on December 11, 2013 [ECF No. 6065]. In support hereof, Ally submits the *Declaration of Rebecca S. Saelao*, which is attached hereto as **<u>Exhibit B</u>** (the "***Saelao Declaration***"), and respectfully states as follows:

---

[1] Although it has not done so as of the date of this Motion, Ally respectfully reserves its rights to seek an expedited hearing on the Motion based upon events that may occur in the underlying lawsuit.

[2] Capitalized terms used but not defined herein have the meanings given to such terms in the Plan.

**INTRODUCTION**

In direct contravention of this Court's order confirming the Plan—which permanently enjoined the pursuit of claims "arising from or related in any way to the Debtors," Plan Art. IX.D—sixty nine plaintiffs (the "*Plaintiffs*") in one case in California state court seek to continue their lawsuit against Ally, asserting that their mortgage-related claims do not fall within the scope of the Plan's Third Party Release and Injunction provisions.

In recognition that their claims are based on the conduct and activities of the Debtors, the Plaintiffs filed proofs of claim in these bankruptcy proceedings. After the Plaintiffs failed to substantively respond to the Debtors' objections, this Court disallowed and expunged the Plaintiffs' claims for failing to state a basis for liability against the Debtors. With this avenue of relief foreclosed, the Plaintiffs now brazenly contend that the Plan's Third Party Release and Injunction does not apply to their claims. The Plaintiffs are mistaken.

The Plaintiffs' claims concern the securitization, servicing, and foreclosure of residential mortgages loans allegedly originated and serviced by GMAC Mortgage, LLC, Homecomings Financial, LLC, Executive Trustee Services, LLC, Home Connects Lending Services, and other Debtor entities. Those claims fall squarely within the Plan's Third Party Release, which applies to "any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to the Debtors." (Plan Art. IX.D.)

Pursuant to the Plan's Injunction, the Plaintiffs are "permanently enjoined and precluded" from continuing to prosecute their claims against Ally. (*See* Plan Art. IX.I.) This Court

therefore should enter the Order enforcing the Plan's Third Party Release and Injunction, enjoining the Plaintiffs from proceeding with their claims against Ally, and awarding Ally its fees and costs incurred in pursuing this relief.

## BACKGROUND

On May 9, 2012, Brookstone Law, PC ("***Brookstone***"), a law firm based in California, filed a 120-page complaint in California state court on behalf of 41 plaintiffs against numerous Debtor entities, including GMAC Mortgage, LLC and Homecomings Financial, LLC, as well as AFI, GMAC Mortgage Group, Inc. and Ally Bank. (Saelao Decl. ¶¶ 3–4.) The Plaintiffs' complaint challenged the securitizations, servicing and foreclosure of residential mortgages originated and serviced by the Debtor entities, including GMAC Mortgage and Homecomings Financial. (*Id.*)

The complaint brought claims for fraudulent concealment, intentional and negligent misrepresentation, unfair competition, wrongful foreclosure, violation of the Truth in Lending Act, and violation of appraisal independence. (*Id.*) The complaint further alleged that Ally was liable as a successor-in-interest, directly and through the actions of its subsidiaries, and as an "alter ego" or as a "single, greater unified whole." (*Id.* ¶ 5.) On June 8, 2012, the action was removed to the United States District Court for the Central District of California. (*Id.* ¶ 6.)

On May 14, 2012, ResCap and many of its direct and indirect subsidiaries—including GMAC Mortgage and Homecomings Financial—filed for bankruptcy protection. Plaintiffs' counsel, Brookstone, was notified about the bankruptcy filing on or about June 12, 2012.[3] On or about September 7, 2012, Plaintiffs' counsel was notified of the claims bar date.[4]

---

[3] *See Affidavit of Service of Melissa Loomis Regarding Notice of Chapter 11 Bankruptcy Cases, Meeting of Creditors, and Deadlines*, Ex. C, p. 616 [ECF No. 336] (listing Brookstone on the Creditor Matrix).

[4] *See Affidavit of Service of Clarissa D. Cu Regarding Notice of Deadlines for Filing Proofs of Claim*, Ex. I, pp. 1189, 1522 [ECF No. 1412].

On October 31, 2012, Plaintiffs filed a 111-page first amended complaint (the "*First Amended Complaint*"), dropping its Truth in Lending Act claim and adding numerous additional plaintiffs, for a total of 62 named plaintiffs. (Saelao Decl. ¶ 7.) The claims asserted otherwise remained the same. (*Id.*) Based on this First Amended Complaint, the Plaintiffs filed proofs of claims in this Court on November 9, 2012.[5] The Plaintiffs in turn voluntarily dismissed the First Amended Complaint in January 2013. (*Id.* ¶ 8.)

The Debtors objected to the Plaintiffs' proofs of claims on July 10, 2013, asserting that the Plaintiffs failed to state a claim against any of the Debtors.[6] The Plaintiffs' deadline to respond was August 9, 2013. Rather than respond or attempt to establish the validity of their claims, fifty-eight of the Plaintiffs filed amended proofs of claim to which they attached a 250-page "Amended Complaint in Support of Amended Proof of Claim" (the "*Second Amended Complaint*") that was never filed in state or federal court.[7] The Second Amended Complaint added a handful of new legal theories, including breach of contract, unfair debt collection practices, and price fixing in violation of the Sherman Act. Despite being twice the length of the First Amended Complaint, the alleged facts that formed the basis of the Plaintiffs' claims remained unchanged.

In response, the Debtors filed additional objections, again arguing that the Second Amended Complaint failed to state a claim against any of the Debtors.[8] The Plaintiffs were ordered to respond by January 23, 2014, but failed to do so. On February 6, 2014, this Court

---

[5] *See Debtors' Obj. to Proofs of Claim Filed by Certain Plaintiffs in California Litigation*, Ex. A [ECF No. 4200].

[6] *See id.*

[7] *See, e.g.*, Proof of Claim No. 6938, Ex. A (Aug. 9, 2013).

[8] *See Debtors' Obj. to Am. Proofs of Claim Filed by Certain Plaintiffs in California Litigation* [ECF No. 6130].

concluded that the Plaintiffs "fail[ed] to state a basis for liability against the Debtors" and disallowed and expunged the Plaintiffs' claims with prejudice.[9]

The Plaintiffs, apparently anticipating this Court's order, filed a separate action in California state court on November 14, 2013 against Ally and various non-Debtor entities (the "***November 2013 Complaint***"). (Saelao Decl. ¶ 9.) Like the Plaintiffs' previous complaints, the November 2013 Complaint alleged fraudulent concealment, intentional misrepresentation, negligent misrepresentation, negligence, and unfair business practices related to the securitization, origination, and servicing of residential mortgages. (*Id.*) The November 2013 Complaint, however, did not name any Debtor entities as direct defendants, in an attempt to comply with the automatic stay.[10] (*Id.*) Tellingly, though, the Ally Complaint continued to list various Debtor entities, including ResCap, Residential Funding Company, and Homecomings Financial—and importantly, it described those entities as the "originator[s] of loans underlying" the Plaintiffs' claims. (*Id.*) That is because the alleged facts that form the basis of the Plaintiffs' claims in the November 2013 Complaint remain tied to the actions of the Debtor entities.

Separately, on December 11, 2013, the Court entered the Confirmation Order confirming the Plan. An "essential component" of the Plan is a broad Third Party Release of "any and all Causes of Action" against Ally "arising from or related in any way to the Debtors." (Plan Art. IX.D.) The Plan further includes an Injunction that "permanently enjoined and precluded" an entity from "commencing or continuing … against any Released Party … on account of or in connection with or with respect to any Released Claims." (Plan Art. IX.I.) The Plaintiffs' counsel, Brookstone, was served notice of the Confirmation Hearing and a copy of the proposed

---

[9] *See Memorandum Opinion and Order Sustaining Debtors' Objections to Proofs of Claim and Amended Proofs of Claim Filed by Certain Plaintiffs in California Litigation* [ECF No. 6439].

[10] Indeed, the November 2013 Complaint alleges that "at this time, Plaintiffs do not name [debtor defendants] in this action due to the automatic stay . . . ." *See e.g.,* Saelao Decl. Ex. 4, Nov. 2013 Compl., at ¶ 33.

Plan, but did not object to the Plan or its Third Party Release.[11]  The Plaintiffs' counsel also received notice of the entry of the Confirmation Order.[12]

On January 30, 2014, Ally's counsel sent a letter to the Plaintiffs' counsel at Brookstone to inform them that this Court entered the Confirmation Order, and further provided copies of the Plan and Confirmation Order.  (Saelao Decl. ¶ 10.)  The letter explained that the Plaintiffs' claims alleged in the November 14, 2013 complaint against Ally fall squarely within the Third Party Release and that, by virtue of the Plan's Injunction, the Plaintiffs were enjoined from pursuing their claims against Ally.  (*Id.*)

On February 24, 2014, after no response from the Plaintiffs' counsel, Ally's counsel in these chapter 11 cases sent Brookstone a second letter reiterating that the Plaintiffs' claims against Ally were subject to the Plan's Third Party Release and Injunction.  (*Id.* ¶ 11.)  Ally repeated its willingness to discuss the matter with the Plaintiffs' counsel and offered to arrange a telephone conference with this Court to discuss the matter.  (*Id.*)  On March 4, 2014, Brookstone contacted Ally's counsel, asserted that the Plaintiffs' claims were not subject to the Third Party Release or Injunction provisions, requested additional time to confer with bankruptcy colleagues about the impact of the Third Party Release and Injunction, and agreed to respond to Ally's counsel promptly.  (*Id.* ¶ 12.)  Ally agreed to give Brookstone time to discuss the issues with bankruptcy colleagues.  After two weeks without a response, Ally's counsel reached out to Brookstone on March 19.  (*Id.* ¶ 13.)  Again, Brookstone failed to respond.  (*Id.*)  Ally's counsel

[11] *Affidavit of Service of P. Joseph Morrow IV Regarding Order (I) Approving Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan Proponents' Joint Chapter 11 Plan, (III) Approving the Form of Ballots, (IV) Scheduling a Hearing on Confirmation of the Plan, (V) Approving Procedures for Notice of the Confirmation Hearing and for Filing Objections to Confirmation of Plan, and (VI) Granting Related Relief*, Ex. G, *passim*, Exh. L, *passim* [ECF No. 5196].

[12] *See Affidavit of Service of Clarissa D. Cu Regarding Notice of Entry of Confirmation Order Confirming the Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors and Occurrence of Effective Date, and Notice of Deadline and Procedures for Filing Certain Administrative Claims*, Ex. E, pp. 649, 1085, 2626, 2631, 3441 [ECF No. 6187].

thus sent Brookstone another letter on April 24, 2013, but the Plaintiffs have nonetheless refused to dismiss their claims against Ally with prejudice.  (*Id.* ¶ 14–15.)

## JURISDICTION

This Court is intimately familiar with the Plan, the issues that were litigated leading to Plan confirmation, the objections previously raised to the Third Party Release, and the purpose of the Third Party Release—which this Court deemed "an essential component and critical to the success of the Plan."  (Plan Art. IX.D.)  This Court is uniquely equipped to interpret and enforce the Plan terms, relevant Bankruptcy Code provisions, and ultimately its own injunction.  Indeed, this Court specifically and broadly retained exclusive jurisdiction to "hear and determine any matter, case, controversy, suit, dispute, or Causes of Action [] regarding the existence, nature, and scope of the releases, injunctions, and exculpation provided under the Plan," to "hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan," to "issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan," and to "[e]nforce all orders previously entered by the Bankruptcy Court."  (Plan Art. XII (c), (k), (s), and (u).)

Pursuant to that exclusive jurisdiction, Ally now seeks this Court's enforcement of the Plan, and its Third Party Release and injunction, against Plaintiffs.  *See, e.g.*, *In re Charter Commc'ns*, 2010 WL 502764, at *3–*4 (Bankr. S.D.N.Y. Feb. 8, 2010).

## RELIEF REQUESTED

By its Motion, Ally respectfully requests entry of the Order enforcing the Plan's Third Party Release and enjoining the Plaintiffs from proceeding against with their claims against Ally. Additionally, Ally respectfully requests that the Court award Ally its reasonable attorneys' fees and costs related to this matter.

**ARGUMENT**

Plaintiffs' claims against Ally fall squarely within the Third Party Release and Injunction provisions in the Plan confirmed by this Court. This Court should enforce the Plan and enjoin the Plaintiffs from continuing their lawsuit against Ally, and award Ally its reasonable attorneys' fees and costs incurred in pursuing this action.

**I.**     **Plaintiffs' Claims Against Ally Are Enjoined By The Express Terms Of The Plan.**

The Plaintiffs' claims against Ally are based on the origination of a residential mortgage loan, the assignment of the recorded mortgage, the servicing of the loan, and the attempts to foreclose upon the loan and the secured real property. Those claims are precisely within the scope of the Plan's Third Party Release. The Plan expressly provides as follows:

> On and as of the Effective Date of the Plan, the holders of Claims and Equity Interests, shall be deemed to provide a full and complete discharge and release to the Ally Released Parties and their respective property from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to the Debtors, including those in any way related to RMBS issued and/or sold by the Debtors or their affiliates and/or the Chapter 11 Cases or the Plan, and any obligations under the DOJ/AG Settlement, the Consent Order, and the Order of Assessment.

(Plan Art. IX.D.)

The Plaintiffs are holders of a "Claim," as that term is defined in the Plan and the Bankruptcy Code. To define the term "Claim," the Plan adopts the definition of that term in Bankruptcy section 101(5). (Plan Art. I.A.53.) Section 101(5), in turn, defines "claim" as any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or

unsecured." 11 U.S.C. § 101(5). As courts have observed, "[t]he definition of 'claim' in the Bankruptcy Code is very broad." *In re Egleston*, 448 F.3d 803, 812 (5th Cir. 2006); *accord Johnson v. Home State Bank*, 501 U.S. 78 (1991). A claim need not have been asserted in litigation, be ripe for litigation, or even be known to the claimant to fall within the scope of Section 101(5). Under the Bankruptcy Code, "'[i]t is well-established that a claim is ... allowable ... in a bankruptcy proceeding even if it is a cause of action that has not yet accrued.'" *In re R.H. Macy & Co.*, 67 F. Appx. 30, 31–32 (2d Cir. 2003) (quoting *In re Cool Fuel, Inc.*, 210 F.3d 999, 1006 (9th Cir. 2000) (collecting cases)).

The Plaintiffs' claims also "arise from [and are] related in any way to the Debtors." The Plaintiffs' claims against Ally are based upon the mortgage business of the Debtors. The Plaintiffs challenge the securitization, origination, servicing, and foreclosure of a residential mortgage loans originated and serviced by the Debtors—not any action by Ally or its non-debtor subsidiaries. Indeed, the Plaintiffs' claims against Ally are based almost exclusively on alter ego theories of liability.

Because Plaintiffs are "holders of [a] Claim[] … arising from or related in any way to the Debtors," they are bound by the Third Party Release. (*See* Plan Art. IX.D.) The express terms of the Plan's injunction therefore "permanently enjoin[] and preclude[]" Plaintiffs from continuing their lawsuits against Ally. (*See* Plan Art. IX.I (enjoining all entities who hold "Claims … from: (a) commencing or continuing in any manner or action of other proceeding of any kind against any Released Party whether directly, derivatively or otherwise, on account of or in connection with or with respect to any Released Claims; … [and] (e) commencing or continuing in any manner or action or other proceeding of any kind against any Released Party on account of or in connection with or with respect to any Released Claims")); *see also In re*

*Charter Commc'ns*, 2010 WL 502764, at *5 (Bankr. S.D.N.Y. Feb. 8, 2010) (enforcing confirmed plan of reorganization to enjoin plaintiffs' lawsuit against non-debtor beneficiaries of third party release).

## II.    Ally Is Entitled To Attorneys' Fees And Costs.

In light of the circumstances under which Ally was forced to seek to enforce the Plan injunction against the Plaintiffs, Ally is entitled to be reimbursed for the attorneys' fees and expenses reasonably incurred because of the conduct of Plaintiffs' counsel. *See In re Cohoes Indus. Terminal, Inc.*, 931, F.2d 222, 230 (2d Cir. 1991) ("A bankruptcy court may impose sanctions pursuant to 28 U.S.C. § 1927 if it finds that '[an] attorney's actions are so completely without merit as to require the conclusion that they must have been taken for some improper purpose such as delay.") (citing *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986)); *In re Gorshtein*, 285 B.R. 118, 124 (Bankr. S.D.N.Y. 2002) (granting sanctions pursuant to 11 U.S.C. § 105(a)); *In re French Bourekas, Inc.*, 175 B.R. 517, 523-525 (Bankr. S.D.N.Y. 1994) (granting sanctions under under 28 U.S.C. § 1927 and 11 U.S.C. § 105(a)).

Plaintiffs' counsel, Brookstone, was repeatedly advised of the Third Party Release and the Injunction in ResCap's Plan of Reorganization.  Brookstone's refusal to acknowledge the Third Party Release or the Injunction against its clients' claims has forced Ally to expend valuable time and effort communicating with Brookstone—both in writing and telephonically—and ultimately filing this motion.  The express terms of the Plan's Injunction make clear that "[a]ny person injured by any willful violation of this injunction shall be entitled to recover actual damages, including costs and attorneys' fees."  (Plan Art. IX.I.)  Ally therefore requests it be awarded its attorneys' fees and costs reasonably incurred to enforce this Court's injunction.

## <u>CONCLUSION</u>

For the foregoing reasons, Ally respectfully requests that the Court enter the Order, enjoining the Plaintiffs from pursuing their claims against Ally and award Ally its attorneys' fees and costs related to this matter, and granting such other and further relief as appropriate.

April 25, 2014
New York, New York

_/s/ Ray C. Schrock_____
Richard M. Cieri
Ray C. Schrock
Noah Ornstein
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

- and -

Jeffrey S. Powell
Daniel T. Donovan
Judson D. Brown
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Ste. 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Counsel to Ally Financial Inc.*

**EXHIBIT A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## ORDER GRANTING ALLY FINANCIAL INC.'S MOTION
## FOR AN ORDER ENFORCING THE CHAPTER 11 PLAN INJUNCTION

Upon consideration of the motion (the "***Motion***")[1] of Ally Financial Inc. ("***AFI***,** together with All Bank, collectively, "***Ally***") for entry of an order enforcing the Third Party Release and Injunction provisions of the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors*, which was confirmed by this Court on December 11, 2013; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of these chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this proceeding on the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b); and sufficient notice of the Motion having been given; and it appearing that no other or further notice need be provided; and after due deliberation and sufficient cause appearing therefor,

### IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.  The Motion is GRANTED to the extent set forth below for the reasons set forth on the record at the hearing on the Motion.

---

[1] Capitalized terms used but not defined herein have the meanings provided to such terms in the Motion.

2.      Not later than fourteen days after the entry of this Order, the Plaintiffs and Brookstone shall take all appropriate actions to dismiss the November 2013 Complaint against Ally with prejudice within such time frame.

3.      If the Plaintiffs and Brookstone fail to dismiss the November 2013 Complaint against Ally or it is not otherwise dismissed within such fourteen-day period, this Court shall issue an order holding the Plaintiffs and Brookstone in contempt of Court for violating the terms of this Order and the Confirmation Order by virtue of the Plaintiffs' actions to attempt to prosecute actions against Ally in violation of the Confirmation Order.

4.      Further, Ally is awarded its reasonable expenses and costs, including attorneys' fees and costs, in connection with this matter in an amount to be determined by this Court.

5.      Ally is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

6.      Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

7.      All objections to the Motion or the relief requested therein, if any, that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits.

8.      This Court shall retain jurisdiction with respect to all matters arising or related to the implementation of this Order.

Dated: _____, 2014
        New York, New York

_____
THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT B

**Saelao Declaration**

Richard M. Cieri
Ray C. Schrock
Justin R. Bernbrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Jeffrey S. Powell
Daniel T. Donovan
Judson D. Brown
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Ste. 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Counsel for Ally Financial Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

## DECLARATION OF REBECCA S. SAELAO

I, Rebecca S. Saelao, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am an attorney licensed to practice law in the State of California.  I am Special Counsel with the law firm of Severson & Werson, APC, attorneys of record for Defendants ALLY BANK (fka GMAC Bank, in turn incorrectly named as "GMAC, a National Banking Association"), ALLY FINANCIAL INC., and GMAC MORTGAGE GROUP LLC (collectively, "Ally") in a federal district court case styled *Hairston et al. v. Ally Bank, N.A.*, No. 12-5016-JAK (C.D. Cal.).

2.      I make this declaration on the basis of my personal knowledge of the facts stated herein, except to the extent that I make reference to documents.  When referencing documents, my knowledge is based upon my review of documents provided to me during the course of my representation of Ally.

07462.0388/3240980.2

3.     On May 9, 2012, Brookstone Law, PC ("***Brookstone***"), a law firm based in California, filed a 120-page complaint (the "***Original Complaint***") in California state court on behalf of forty-one plaintiffs (the "***Plaintiffs***") that challenged the securitizations, servicing and foreclosure of residential mortgages originated and serviced by a number of Debtor entities, including, but not limited to, GMAC Mortgage, LLC, Homecomings Financial, LLC, Executive Trustee Services, LLC and Home Connects Lending Services.  The Original Complaint is attached as **Exhibit 1**.

4.     The Original Complaint also named Ally Bank, N.A., Ally Financial Inc., and GMAC Mortgage Group, Inc. as direct defendants, and it alleged fraudulent concealment, intentional and negligent misrepresentation, unfair competition, wrongful foreclosure, violation of the Truth in Lending Act, and violation of appraisal independence. *See* Original Compl. ¶¶ 8–9, 299–471.

5.     The Original Complaint further alleged that Ally was liable as a successor-in-interest, directly and through the actions of its subsidiaries, and as an "alter ego" or as a "single, greater unified whole." *See, e.g.*, Original Compl. ¶ 28.

6.     On June 8, 2012, the action was removed to the United States District Court for the Central District of California.

7.     On October 31, 2012, Plaintiffs filed a 111-page first amended complaint, which is attached as **Exhibit 2** (the "***First Amended Complaint***") in the Action, dropping its Truth in Lending Act claim—the claims asserted in the Action otherwise remained the same. *See generally* First Am. Compl.

8.     On January 31, 2013, the Plaintiffs voluntarily dismissed their lawsuit.  The voluntary dismissal notice is attached as **Exhibit 3**.

9.      On November 14, 2013, the Plaintiffs filed a complaint in California state court (the "***November 2013 Complaint***"), which is attached as **Exhibit 4**.  The November 2013 Complaint alleged fraudulent concealment, intentional misrepresentation, negligent misrepresentation, negligence, and unfair business practices related to the securitization, origination, and servicing of residential mortgages.  *See generally* Nov. 2013 Compl. Additionally, the November 2013 Complaint names only Ally entities as defendants, along with MTC Financial Inc.  *See id.* ¶¶ 31–32, 34.  Nevertheless, the November 2013 Complaint continued to describe the Debtor entities as the "originator[s] of loans underlying" the Plaintiffs' claims, and to allege that "at this time, Plaintiffs do not name [debtor defendants] in this action due to the automatic stay . . . ."  *See e.g., id.* ¶ 33.

10.      On January 30, 2014, on behalf of Ally, I sent a letter to Brookstone to inform it that this Court entered the Confirmation Order and provided it with copies of the Plan and Confirmation Order.  The letter also explained to Brookstone that its clients' claims were subject to the Third Party Release, and therefore enjoined under the Plan.  A copy of this letter is attached as **Exhibit 5**.

11.      On February 24, 2014, after no response from Brookstone, Ally's counsel in these chapter 11 cases sent Brookstone a second letter reiterating its explanation that the claims asserted against Ally by its clients were subject to the Plan's Third Party Release and Injunction provisions.  A copy of this letter is attached as **Exhibit 6**.

12.      I am informed and believe that on March 4, 2014, Brookstone responded to the letter from Ally's counsel in these chapter 11 cases, and asserted that its clients' fraud claims were not subject to the Third Party Release or Injunction provisions.  Brookstone also requested

additional time to confer with its bankruptcy colleagues and stated that it would get back to Ally's counsel promptly.

13.     I am informed and believe that over two weeks passed with no response from Brookstone, and thus, on March 19, 2014, Ally's counsel was forced to contact Brookstone for an update regarding its position. Brookstone failed to respond.

14.     On April 24, 2013, Ally's counsel sent Brookstone a third letter demanding that it dismiss the Plaintiffs' lawsuit.  The third letter is attached as **Exhibit 7**.

15.     Based on my review of the case docket available at https://www.lasuperiorcourt.org/civilcasesummarynet/ui/casesummary.aspx?CT=CI#DOC    for Case No. BC527712, Brookstone has not dismissed the Action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 25, 2014.


_____
Rebecca S. Saelao

**Exhibit 1**

**Original Complaint**

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

MAY 09 2012

John A. Clarke, Executive Officer/Clerk
By _____ Deputy
DOROTHY SWAIN

1  Vito Torchia, Jr. (SBN244687)
   vjt@brookstonelaw.com
2  Deron M. Colby (SBN 196686)
   dcolby@brookstonelaw.com
3  Sasan Behnood (SBN 250626)
   sbehnood@brookstonelaw.com
4  **BROOKSTONE LAW, PC**
   4000 MacArthur Blvd., Suite 1110
5  Newport Beach, California 92660
   Telephone: (800) 946-8655
6  Facsimile: (866) 257-6172
   E-mail: HairstonvAlly@BrookstoneLaw.com
7
   Attorneys for Plaintiffs
8

9

10           SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                     COUNTY OF LOS ANGELES

12                                        BC484385

13 CAROLYN HAIRSTON, an individual;      Case No.:
   CHRISTINE PETERSEN, an individual;
14 WILLIAM MIMIAGA, an individual;       **COMPLAINT FOR:**
   ROBIN GASTON, an individual;
15  PATRICK GASTON, an individual;        1. **FRAUDULENT CONCEALMENT**
   MARY SERRANO, an individual;             **[VIOLATION OF CIV. CODE §§ 1572,**
16 SARAH SEBAGH, an individual;             **1709 AND 1710];**
17 RICK ALBRITTON, an individual;        2. **INTENTIONAL MISREPRESENTATION**
   DEBORAH ALBRITTON, an individual;       **[VIOLATION OF CIV. CODE §§ 1572,**
18 VERONICA GREY, an individual;           **1709 AND 1710];**
19 BRENDA MELLA, an individual;          3. **NEGLIGENT MISREPRESENTATION**
   JOSELITO MELLA, an individual;          **[VIOLATION OF CIV. CODE §§ 1572,**
20 MICHAEL MAN, an individual;             **1709 AND 1710];**
   JUDY LIM, , an individual;
21 DAVID CRUZ, an individual;           4. **UNFAIR COMPETITION [VIOLATION**
   YESENIA CRUZ, an individual;            **OF BUS. & PROF. CODE §17200 ET**
22 GREGORY BUCK, an individual;            **SEQ.];**
23 CRISTINA PALBICKE, an individual;    5. **WRONGFUL FORECLOSURE**
   KHALIL SUBAT , an individual;           **[VIOLATION OF CIV CODE § 2924];**
24 MANIJA SUBAT, an individual;
25 GENEVIE CABANG, an individual;       6. **VIOLATION OF TRUTH IN LENDING**
   JULIO GONZALEZ, an individual;          **ACT, 15 USC §1601 et seq.**
26 LISA A. SIMONYI , an individual;     7. **VIOLATION OF APPRAISAL**
   RICK EWALD, an individual;              **INDEPENDENCE**
27                                          **[Violation of 12 U.S.C. §1640 et seq.]**

                                 - 1 -
28
                              COMPLAINT

| | |
|---|---|
| 1 | REGINA FAISON, an individual; |
| | ALEX IBARRA, an individual; |
| 2 | MARIA ELENA DEL CID, an individual; |
| | JULIO DEL CID, an individual; |
| 3 | MESBEL MOHAMOUD, an individual; |
| 4 | MICHAEL MOULTRIE, an individual; |
| | WILLIE GILMORE, an individual; |
| 5 | PHYLLIS MCCREA, an individual; |
| | CECILIA CHAUBE, an individual; |
| 6 | MAGDALENA AVILA, an individual; |
| 7 | GRICELDA RUANO, an individual; |
| | ELISA JORDAN, an individual; |
| 8 | LOIS TERRELL SULLIVAN, an |
| 9 | individual; |
| | GLORIA PORTILLO, an individual; |
| 10 | FLORASTENE HOLDEN, an individual; |
| | MARCO BADILLA, an individual; |
| 11 | MANUELA BADILLA, an individual; |
| 12 | Plaintiffs, |
| 13 | |
| | vs. |
| 14 | |
| 15 | ALLY BANK, N.A., f/k/a GMAC BANK, a Utah |
| | Corporation, in its own capacity and as an |
| 16 | acquirer of certain assets and liabilities of GMAC; |
| | GMAC, a National Banking Association; ALLY |
| 17 | FINANCIAL, INC. f/k/a/ GMAC, LLC, a |
| 18 | Delaware Corporation; GMAC MORTGAGE |
| | GROUP, INC., A Delaware Corporation; |
| 19 | RESIDENTITAL CAPITAL, LLC f/k/a |
| | RESIDENTIAL CAPITAL CORPORATION, a |
| 20 | Delaware Corporation; GMAC-RFC HOLDING |
| 21 | COMPANY, LLC d/b/a/ GMAC RESIDENTIAL |
| | FUNDING CORPORATION, A Delaware |
| 22 | Corporation; RESIDENTIAL FUNDING |
| | COMPANY, LLC f/k/a RESIDENTIAL |
| 23 | FUNDING CORPORATION, a Delaware |
| 24 | Corporation; HOMECOMINGS FINANCIAL, |
| | LLC, a Delaware Corporation; EXECUTIVE |
| 25 | TRUSTEE SERVICES DBA ETS SERVICES |
| | ,LLC, a Delaware limited liability company; |
| 26 | HOME CONNECTS LENDING SERVICES, |
| 27 | LLC, a Pennsylvania limited liability company |
| 28 | |

8. **VIOLATION OF APPRAISER INDEPENDENCE**
[Violation of 12 C.F.R. §225.65]

**[JURY TRIAL DEMANDED]**

- 2 -

**COMPLAINT**

and Does 1 through 1000 , inclusive

Defendants.

**COMPLAINT**

## TABLE OF CONTENTS

NATURE OF ACTION ................................................................................................................- 6 -

PARTIES ....................................................................................................................................- 8 -

    Defendants.............................................................................................................................- 8 -

    Relationship Of Defendants ...............................................................................................- 11 -

    Plaintiffs .............................................................................................................................- 15 -

BACKGROUND & HISTORY OF GMAC................................................................................- 16 -

    A Mandate for Growth and More Profit – But At What Cost?............................................- 18 -

ALLY CEASED ACTING AS A CONVENTIONAL MONEY LENDER AND INSTEAD MORPHED INTO AN ENTERPRISE ENGAGED IN SYSTEMATIC FRAUD

    The Fraudulent Appraisal Process........................................................................................- 29 -

    Defendants' Scheme to Fix the Market Through Their Wholly-Owned Appraisal Subsidiary: HCLS - 36 -

    Defendants Systematically Abused & Abandoned Their Underwriting Guidelines To Place Unqualified Borrowers Into Loans They Could Never Afford .......................................................- 38 -

    Defendants Turned Substantial Profit Through Their Borrowers' Default – Furthering Their Incentive to Intentionally Place Plaintiffs Into Impossible and Unaffordable Loans ....................................- 42 -

    Defendants' Liar Loans ........................................................................................................- 45 -

    Defendants Misled the Public – Including Plaintiffs............................................................- 49 -

DEFENDANTS' DECEPTION CONTINUED WITH LOAN MODIFICATIONS................................- 52 -

    Defendants Deceived Borrowers Into Entering Loan Modifications In An Outright Cash-Grab With No Intent Of Ever Modifying, For Fear Of Having Their Own Fraud Discovered By Their Investors.- 52 -

    Defendants Used The Promise Of Loan Modifications As Bait To Damage Plaintiffs' Credit, Preventing Plaintiffs From Obtaining Financing Anywhere Else......................................................- 54 -

    Defendants Used The Promise Of Loan Modifications As Bait For An Outright Cash-Grab With No Intent To Ever Modify Plaintiffs ..............................................................................................- 55 -

- 4 -

**COMPLAINT**

DEFENDANTS THEN INTENTIONALLY STEAMROLLED WRONGFUL FORECLOSURE AFTER
WRONGFUL FORECLOSURE WITHOUT ANY OWNERSHIP INTEREST IN THE NOTES OR DEEDS
OF TRUST TO COLLECT WILDLY INFLATED FEES AND TURN UNIMAGINABLE PROFIT......- 56 -

    Defendants Seek to Enforce Notes & Deeds of Trust Without Evidencing Their Ownership Interest..-
    57 -

    Defendants' Improper Securitization: ...........................................................................................- 58 -

    The Foreclosing Trusts Had No Ownership Interest In Plaintiffs' Notes Or Deeds Of Trust Under
    The Explicit Terms Of Their Own Pooling & Service Agreements.................................................- 58 -

    Understanding MERS – And Its Role In Defendants' Wrongful Foreclosure Process...................- 63 -

    The Aftermath of Defendants' Wrongful Foreclosures...................................................................- 65 -

DEFENDANTS' VIOLATION OF NUMEROUS OTHER LAWS..............................................- 67 -

    Defendants' Pervasive Scheme Of Fraud & Deception .................................................................- 67 -

    The Patriot Act .............................................................................................................................- 70 -

    TILA / Notification of Sale or Transfer of Mortgage Loans.........................................................- 72 -

    Previous Enforcement Actions Evidence Defendants' History Of The Very Wrongdoing Alleged
    Herein – And Their Continued Wrongdoing In Violation Of Explicit Court Orders......................- 74 -

FIRST CAUSE OF ACTION ...............................................................................................- 79 -

SECOND CAUSE OF ACTION ...........................................................................................- 87 -

THIRD CAUSE OF ACTION .............................................................................................- 100 -

FOURTH CAUSE OF ACTION ..........................................................................................- 102 -

FIFTH CAUSE OF ACTION ..............................................................................................- 112 -

SIXTH CAUSE OF ACTION ..............................................................................................- 114 -

SEVENTH CAUSE OF ACTION .........................................................................................- 117 -

EIGHTH CAUSE OF ACTION ...........................................................................................- 118 -

PRAYER FOR RELIEF .....................................................................................................- 119 -

- 5 -

**COMPLAINT**

Plaintiffs, and each of them, hereby demand a jury trial and allege as follows:

## NATURE OF ACTION

1.      Defendant Banks have for the last decade taken the losses of others and used them for their own private gain. That Defendants are in the business of making profit, and are entitled to do so is not at issue. Nor is at issue that Defendants engage in an inherently lucrative business. But it is the lengths to which Defendants have gone, to attain that profit, which is. It is where corporate lust for profit leads corporations and banks to abandon common principles of fair business dealing so well-entrenched in the human consciousness, that they need not even be announced by law, but are inherently apparent to all of us, that the courts *must* intervene – that an example *must* be set. A line must be drawn putting Corporations, Banks, and Defendants herein on notice that where their greed exceeds the extant public need for informed disclosure in business dealings, the law will not sanction.

2.      With greed as their motive, Defendants set out upon a massive and centrally directed fraud by which Defendants placed homeowners into loans which Defendants *knew* Plaintiffs could not afford, abandoned industry standard underwriting guidelines, and intentionally inflated the appraisal values of homes throughout California for the sole purpose of herding as many borrowers as they could into the largest loans possible which Defendants would then sell on the secondary market at inflated values for unimaginable, ill-gotten profit (wildly surpassing the profit they would make by holding the loans), *knowing that their scheme would cause the precipitous decline in values of all homes throughout California*, including those of Plaintiffs herein.

3.      Like cattle, Plaintiff-borrowers were led to slaughter by Defendants and their greed. Borrowers were intentionally placed in loans which Defendants knew Plaintiffs could not afford, and whose default they knew was a mathematical certainty. Their fraudulent inflation of real estate values throughout the State of California, the demise of which sent real estate values spiraling downwards, caused Plaintiffs to be placed in homes that were immediately upside-down, and to instantly lose their

- 6 -

**COMPLAINT**

equity – if not their homes altogether. And as a result of these two schemes coupled together, Borrowers were placed into loans far larger than would be supported by the true value of their property or their income. Then, based on these fraudulently inflated loan amounts, Defendants deceptively extracted excessive and unearned payments, points, fees, and interest from Plaintiffs. And as the final coup-de-grace, Defendants then intentionally steamrolled foreclosures upon those borrowers whose very peril was caused by Defendants' fraud in the first place, by charging grossly excessive "foreclosure fees' to line their pockets with ill-gotten profit.

4. Simply put, Defendants let their greed get in the way of fair business. Where, as here, corporate greed exceeds the extant and imperative public need for informed disclosure, the law must not sanction. This Court must recognize Defendants' duty to disclose. Without such duties, Banks are effectively granted immunity for their continued future wrongs against the borrowing public who have a right to depend on the fundamental notion of good faith and fair dealing in contractual relationships. No business, particularly one as centrally-important to the American economy as banking, should be allowed to so egregiously deceive its consumers. If Banks are to conduct business, their business *must not be* that of fraud and deception.

5. It is admitted that this Complaint alleges great harm. But Defendants should not be granted immunity on the grounds that their fraudulent scheme, which envisioned far-reaching, sweeping and inarticulable harms, succeeded in achieving just that.

6. It bears emphasizing – that the gravamen of the Complaint is not about the harm and frauds that Defendants have perpetrated on 3rd party investors, but rather the harms and frauds perpetrated upon Plaintiffs herein. The fraud described in the Complaint upon the investor, were merely the *incentive* for Defendants' fraud on Plaintiffs, and only one prong, in Defendants' brazen, intertwined and multi-pronged fraudulent scheme.

7. A fair reading of the Complaint, including reasonable inferences from the facts alleged therein, is that the concealment pertained *not only* to the commission of torts and crimes involving third parties, but also to, among other things: (1) the possession of internal reports concluding that if a Plaintiff took a loan from Defendants that Plaintiff would suffer material losses; (2) contrary to its

- 7 -

**COMPLAINT**

1   advertising and other broadly disseminated public statements, (i) Defendants had abandoned their
2   conventional lending business, appraisal, underwriting and lending standards and was now granting
3   credit as part of an overall unlawful scheme based on insider trading and other frauds that Defendants
4   knew and expected would gravely damage Defendants, the mortgage market and home values, and (ii)
5   Defendants now provided mortgages only for the purpose of immediately reselling the mortgage at an
6   inflated value and without regard to laws intended to protect consumers, such as the Truth in Lending
7   Act and Patriot Act; (3) Defendants' systematic and intentional inflation of Plaintiffs' property values in
8   order to approve them for loans which Defendants knew Plaintiffs were not qualified for and would to a
9   certainty default;  (4) undocumented domestic and foreign transfers of multiple interests in the loans and
10  sourcing of money for the loans, without complying with laws intended to protect consumers, including
11  the Patriot Act and Truth in Lending Act; and (5) the fact that Defendant had ceased acting as a
12  conventional money lender and had instead morphed into a fraudulent enterprise. Such information
13  would be highly material to a borrower's decision to enter into a contract with lenders/Defendants.

## **PARTIES**

### Defendants

18      8.      Defendant Ally Bank, Inc. ("Ally Bank") is a multi-national bank that became a bank
19  holding company in December 2008. The bank is headquartered in Detroit, Michigan and incorporated
20  in the State of Utah. The bank is based at 6895 Union Park Center, Midvale, Utah, and is FDIC insured.
21  Since August 2, 2004 it operated two main offices in the United States, one in Utah and one in
22  Pennsylvania, and has 616 employees as of June 2009. It also has a Canadian operation, simply called
23  Ally which operates under Resmor Trust Company, and which is Canadian Deposit Insurance
24  Corporation insured. Ally Bank is a direct bank that markets to customers offering mortgages, savings
25  products, certificates of deposit, online savings accounts, money market accounts and interest checking
26  accounts. Back office operations for Ally Bank and Ally Financial are located in Charlotte, North
27  Carolina. Ally Bank does business in the State of California.

- 8 -

**COMPLAINT**

1    9.    Defendant Ally Financial, Inc. ("Ally"), a leading, multi-national financial services firm
2    with a corporate office center in New York, has approximately $179 billion of assets and operations in
3    approximately 25 countries. Ally is the parent and sole owner of Defendants GMAC Mortgage Group,
4    Inc. and Residential Funding Services, LLC. Prior to 2010, Ally was known as GMAC, LLC. Ally does
5    business in the State of California.

6    10.    Defendant GMAC Mortgage Group, Inc. ("GMACM") is a wholly- owned subsidiary
7    and the mortgage arm of Ally. GMACM is a Delaware corporation with its principal place of business at
8    1100 Virginia Drive, Fort Washington, Pennsylvania 19034. GMACM transacted and is continuing to
9    do business in the State of California.

10    11.    Defendant Residential Capital, LLC ("ResCap") is a wholly-owned subsidiary of
11    GMACM and originates, services, and securitizes mortgage loan in the United States, including
12    California. ResCap was incorporated in the State of Delaware and its principal office is located at One
13    Meridian Crossings, Minneapolis, Minnesota 55423. Prior to 2007, ResCap was known as Residential
14    Capital Corporation. ResCap does business in the State of California.

15    12.    Defendant GMAC-RFC Holding Company, LLC, doing business as GMAC Residential
16    Funding Corporation ("GMAC-RFC"), is a wholly-owned subsidiary of ResCap and acquires residential
17    mortgages and loans, which it then packages as mortgage –backed securities and sells to institutional
18    investors.  GMAC-RFC was incorporated in the State of Delaware and its principal office is located at
19    8400 Normandale Lake Boulevard, Minneapolis, Minnesota 55437. GMAC-RFC transacted business in
20    California.

21    13.    Defendant Residential Funding Company, LLC ("RFC") is a wholly-owned subsidiary of
22    GMAC-RFC. RFC is a Delaware corporation. Prior to October 2006, RFC was known as Residential
23    Funding Corporation. RFC was known as Sponsor of Securitization transactions which involve some of
24    the Plaintiffs in this complaint. Defendant RFC is the parent and sole owner of Homecomings Financial,
25    LLC ("HFN"), the originator of loans underlying some of the Plaintiffs in this complaint. Prior to 2006,
26    HFN was known as Homecomings Financial Network, Inc. RFC does business in the State of California.

27

28                                              - 9 -

                                          **COMPLAINT**

1    14.    Defendant Homecomings Financial, LLC ("HFN") is a wholly-owned subsidiary of RFC.
2    HFN is a Delaware corporation and its principal office is located at 8400 Normandale Lake Boulevard,
3    Minneapolis, Minnesota 55437. Prior to October 2006, HFN was known as Homecomings Financial
4    Network, Inc. HFN is the originator of some of the Plaintiffs loans included in this complaint. HFN
5    continues to do business in the State of California.

6    15.    Defendant Executive Trustee Services, LLC ("ETS") is a wholly-owned subsidiary of
7    ALLY. ETS was and is a limited liability company organized and existing under the laws of the State of
8    Delaware, with its principal place of business in Fort Washington, Pennsylvania, and doing business in
9    the State of California and the County of Los Angeles, and has intentionally and maliciously concealed
10   the true names of entities to which Plaintiffs' home loans were transferred by other Defendants. ETS is
11   one of the Defendants' agents which acts as trustee under the deeds of trust securing real estate loans so
12   as to foreclose on property securing the real estate loans held or serviced by the Defendants. The
13   foregoing is part of a scheme by which the Defendants concealed the transferees of loans and deeds of
14   trust, inter alia in violation of California Civil Code § 2923.5, §2934(a) and 15 U.S.C. § 1641, as more
15   fully described herein.

16   16.    Defendant Home Connects Lending Services, LLC ("HCLS") is a wholly –owned
17   subsidiary of Ally. Home Connects Lending Services is a limited liability company organized and
18   existing under the laws of the state of Pennsylvania, with its principal place of business in Fort
19   Washington, Pennsylvania, and doing business in the State of California and the County of Los Angeles.
20   Home Connects Lending Services, LLC is a settlement service provider for Ally and assigns and
21   reviews all of Ally's appraisals.

22   17.    As used herein the term "ALLY DEFENDANTS" shall refer to all entities owned by Ally
23   Financial. In other words the term "ALLY DEFENDANTS" shall refer to all Defendants in this action
24   with the exception of MERS.

25   18.    As used herein the term "BANK DEFENDANTS" shall refer to all Defendants in this
26   action which are all Defendants that have originated loans, namely, GMAC Bank aka Ally Bank,

27

28                                                    - 10 -

1  GMAC Mortgage, GMAC Residential Funding Corporation, Residentital Funding Corporation,

2  Homecomings Financial, LLC.

3

4                          *Relationship Of Defendants*

5       19.    At all times material hereto, the business of Defendants was operated through a common

6  plan and scheme designed to conceal the material facts set forth herein from Plaintiffs, from the

7  California public, and from regulators, either directly or as successors-in-interest to other Defendants.

8       20.    The concealment was completed, ratified and/or confirmed by each Defendant herein

9  directly or as a successor-in-interest for another Defendant, and each Defendant performed the tortious

10  acts set forth herein for its own monetary gain and as a part of a common plan developed and carried out

11  with the other Defendants, or as a successor-in-interest to a Defendant that did the foregoing.

12       21.    Plaintiffs believe and thereon allege that the agents and co-conspirators through which

13  the named Defendants operated included, without limitation, financial institutions and other firms that

14  originated loans on behalf of the Defendants.  These institutions acted at the behest and direction of the

15  Defendants, or agreed to participate – knowingly or unknowingly - in the fraudulent scheme described

16  herein.

17       22.    Those firms originating loans that knowingly participated in the scheme are jointly and

18  severally liable with the Defendants for their acts in devising, directing, knowingly benefitting from and

19  ratifying the wrongful acts of the knowing participants.  Upon learning the true name of such knowing

20  participants, Plaintiffs may seek leave to amend this Complaint to identify such knowing participants as

21  Doe Defendants.

22       23.    For avoidance of doubt, such knowing participants include, without limitation, legal and

23  natural persons owned in whole or in part by the Defendants or affiliates thereof; legal and natural

24  persons owning directly or through affiliates financial interests in Defendants; legal and natural persons

25  directly or through affiliates acting pursuant to agreements, understandings and arrangements to share in

26  the benefits of the wrongdoing alleged in this Complaint and knowingly, to at least some degree,

27

28                                          - 11 -

                                        **COMPLAINT**

1    committing acts and omissions in support thereof; and legal and natural persons knowingly, to at least
2    some degree, acting in concert with the Defendants.

3         24.     As to those legal and natural persons acting in concert without an express legal
4    relationship with Defendants or their affiliates, on information and belief, Defendants knowingly
5    induced and encouraged the parallel acts and omissions, created circumstances permitting and
6    authorizing the parallel acts and omissions, benefited therefrom and ratified the improper behavior,
7    becoming jointly and severally liable therefore.

8         25.     As to those legal and natural persons whose acts and omissions in support of the
9    Defendants scheme were unwitting, on information and belief, Defendants knowingly induced and
10   encouraged the acts and omissions, created circumstances permitting and authorizing the parallel acts
11   and omissions, benefited therefrom and ratified the improper behavior, becoming liable therefore.

12        26.     To the extent that certain Plaintiffs herein become aware of information that provides a
13   basis for asserting the Defendants herein are liable for the origination of their loans, those Plaintiffs
14   reserve the right to seek leave of this Court to re-assert the appropriate claims herein.

15        27.     The true names and capacities of the Defendants listed herein as DOES 1 through 1,000
16   are unknown to Plaintiffs who therefore sue these Defendants by such fictitious names. Each of the
17   DOE Defendants was the agent of each of the other Defendants herein, named or unnamed, and thereby
18   participated in all of the wrongdoing set forth herein. On information and belief, each such Defendant is
19   responsible for the acts, events and concealment set forth herein and is sued for that reason. Upon
20   learning the true names and capacities of the DOE Defendants, Plaintiffs may amend this Complaint
21   accordingly.

22        28.     Plaintiffs are informed and believe, and thereon allege, that: (1) the Defendants are liable
23   for all wrongful acts of the companies which Ally acquired prior to the date thereof as the successor-in-
24   interest to those companies; (2) Ally directly and through its subsidiaries and other agents sued herein as
25   Does have continued the unlawful practices of the acquired companies since the dates of their
26   acquisition, including, without limitation thereof, writing fraudulent mortgages as set forth above and

27

28

- 12 -

COMPLAINT

concealing wrongful acts that occurred in whole or in part prior thereto, and (3) Ally and its subsidiaries are jointly and severally liable as alter egos and as a single, greater unified whole.

29.     Ally's public disclosures, as reflected in its filings with the SEC, make clear that Ally considers itself both a common enterprise operating as a greater whole and without meaningful distinctions as to its operating units, and the successor to GMAC Mortgage, Homecomings, RFC and its subsidiaries.

30.     More than 36 months before the filing of this Complaint, Ally completed the purchase of the assets and operations and succeeded to the businesses of various mortgage lenders. The assets of these predecessor businesses purportedly included the loans made to Plaintiffs secured by their real estate that are the subject of this action. Ally can have no greater rights in the assets of these prior businesses than their original owners had. No transfer by any predecessor, on the one hand, to Ally, on the other hand, actually or in fact involved any rights in or to mortgages against any of the properties of Plaintiffs, for the reasons previously alleged.

31.     The other Defendants followed Ally's directions because they are or were either subsidiaries of Ally, directly or indirectly owned, controlled and dominated by Ally, or because they are in an unequal economic and/or legal relationship with Ally by which they are beholden to Ally and are thereby controlled and dominated by Ally.

32.     Executive Trustee Services ("ETS") involvement was an essential ingredient in Defendants' conspiracy to defraud (and to commit the other acts alleged herein) in that it was through ETS, the foreclosing trustee, that Defendants were able to force wrongful foreclosures which Defendants knew and intended would be unavoidable, and whose sales resulted in substantial additional profit to Defendants resulting from their assessment of numerous fees associated with initiating or conducting foreclosures including inspection fees, default fees, late fees, advance fees, attorney's fees, and trustee fees. In short Defendants had a motive to wrongfully initiate foreclosures because they made money by doing so through the assessment of excessive, disproportionate and unearned fees, and because Defendants were insured against the losses arising from defaults. ETS was a necessary instrument to make sure that the conspiracy of Defendants got to reap that profit.  In furtherance of

- 13 -

1  these acts ETS wrongfully initiated foreclosures forged recorded documents, executed assignments of

2  deeds of trust without the authority of the previous beneficiary, and effectuated numerous other

3  violations of California's non-judicial foreclosure laws, in order to steamroll foreclosures at the direction

4  of Ally Defendants, and for the benefit of the conspiracy. ETS also violated numerous other laws and

5  statutes in furtherance of this conspiracy. ETS acted intentionally, and with malice in doing these acts,

6  for which ETS was paid by handsomely by Defendants.

7      33.     Defendant Home Connects Lending Services, LLC ("HCLS"), Ally's Appraisal

8  Management Company (AMC) was also a necessary and integral element of Defendants' conspiracy to

9  carry out their fraud. As the owner, Ally exercised its vast influence over HCLS to artificially inflate and

10  manipulate the values of these properties, including the properties of Plaintiffs, to further its fraud and

11  increase their profits, in furtherance of their overall conspiracy to defraud. Their purpose was twofold:

12      a.   First, by falsely inflating said property values, investors were defrauded into

13          believing their investments in these loans were less risky than they actually were.

14          This in turn led to more sales and even more profits on the secondary market.

15      b.   Second, Defendants would then turn around and use these false property valuations to

16          induce Plaintiffs and other borrowers into entering ever-larger loans on increasingly

17          risky terms. The result was, again, more profits

18      34.     Hand-in-hand, and at the direction of the other Defendants, HCLS could carry out the

19  fraud without anyone ever finding out. If the appraisals were done by independent appraisers the

20  homeowners would have found out that the homes they were purchasing or refinancing were being over

21  valued and that the loans they were obtaining was taking every last bit of equity out of their homes. The

22  customer never had a choice as to the settlement providers. Ally Defendants controlled and took the

23  choice out of the customer's hands and directed and collaborated with all their partners to systematically

24  inflate and disgorge the homeowners of their freedom to choose and suck every last bit of equity out of

25  their homes. In furtherance of this act they used the manipulated property valuations to seek premiums

26  on their loans to Plaintiffs, and Secondary Market transactions. Ally Defendants not only defrauded the

27

28

- 14 -

**COMPLAINT**

1  Plaintiffs, but the rating agencies that graded the paper being sold, the insurance companies who
2  assessed the risk of the loans being insured through loan to valuation risk models and their investors.

3      35.    Upon information and belief, though ETS's powers are limited to performing as a trust
4  company, the Defendants, have regularly used ETS to foreclose, as trustee with power of sale, trust
5  deeds on California realty and realty in other states. Such foreclosures are commonly conducted non-
6  judicially. Such foreclosures result in the dispossession of debtors, including certain Plaintiffs herein,
7  and also entail the assertion in certain instances of claims for the deficiency between amounts assertedly
8  owed and the actual sale prices. Such foreclosures are without authority.

9      36.    Upon information and belief, ETS is acting under the direct control of Ally Defendants
10  and is an alter ego of Ally. ETS is personally responsible for robo-signing affidavits, executing
11  assignments, and recording of Notice of Defaults and Trustee Sale Notices which are defective and not
12  in accordance to California Law.

13      37.    This Complaint seeks significant relief from ETS since its conduct under the direction of
14  Ally Defendant's and the key role that they played caused some Plaintiffs to lose their homes. Through a
15  number of wrongful foreclosure actions they conspired with the other defendants to commit assorted
16  violations of California's Unfair Competition Law. All of the violations done by this specific defendant
17  were made in the State of California against California citizens.

18

19                                   ***Plaintiffs***

20      38.    All plaintiffs listed in the above caption are competent adults and individuals residing in the
21  State of California, who borrowed money from one or more of the Defendants or its subsidiaries or affiliates
22  or successors and assigns between January 1, 2003, and December 31, 2008, secured by a deed of trust on
23  his or her California real estate(s). At all material times hereto, one or more of the Defendants have acted as
24  Servicer or some other control or capacity over processing the loan.

25      Based on information now available to them, fewer than 100 plaintiffs are alleging claims in amounts
26      that would, as to them, equal or exceed the jurisdictional amount for federal jurisdiction under 28
27      U.S.C. § 1332(a).

28

- 15 -

**COMPLAINT**

# BACKGROUND & HISTORY OF GMAC

39.    General Motors Corporation set up General Motors Acceptance Corporation (GMAC) to be a provider of financing to automotive customer's in 1919. GMAC branches opened in Detroit, New York, Chicago, San Francisco, and Toronto. Since then, the business has expanded to include insurance, online banking, mortgage operations, and commercial finance.

40.    Prior to 1985 GMAC's lending operations were concerned mostly with auto loans.

41.    In 1985, GMAC formed GMAC Mortgage after it acquired the mortgage loan operations of the Colonial Mortgage Service companies and the servicing arm of the former Norwest Mortgage, Inc. As part of the Norwest purchase, GMAC bought the rights to collect payments on the mortgage portfolio and make payments to investors who own the loans and pay taxes on the loans, collecting fees for the servicing. The portfolio was worth 11 billion at the time and consisted mostly of residential mortgages, though contained a small percentage of commercial mortgages.

42.    After GMAC saw its market share in the mortgage lending arena slip well below that of its competitors in the mid-1990s, GMAC made a conscious decision to up its participation in originations, securitizations and servicing of mortgage loans.

43.    In 1998 it purchased $131.24 billion worth of mortgage servicing rights from Wells Fargo and Capstead mortgage, which brought it back amongst the top ten mortgage lenders. This was part of a trend in the industry which saw the consolidation of mortgage businesses among the major banks. Part of GMAC's effort to expand its market share was to push its products wholesale through mortgage brokers and correspondent banks and to invest heavily in the refinance market which was booming at the time.

44.    In subsequent years, the division acquired additional mortgage-related operations, including ditech.com in 1999 which was one of California's largest mortgage lenders and an aggressive marketer of higher-risk home-equity loans. When the company was acquired then CEO of Ditech.com J. Paul Reddam stated that the sale to GMAC "gives us all the capital we need to grow". In a separate statement he stated "I think it gives us a lot of stability for good times and bad and allows us to be more aggressive in our lending practices."

**COMPLAINT**

1    45.    In 2000, GMAC was given conditional approval to form GMAC Bank.

2    46.    In 2005 the division was reorganized into Residential Capital (ResCap). By this time, the
3    company was heavily into subprime lending.

4    47.    In 2006, General Motors Corporation sold a 51% interest in GMAC to Cerberus Capital
5    Management, a private equity company. (The next year, Cerberus acquired Chrysler Corporation.) Also
6    in 2006, GMAC divested a majority stake of GMAC Commercial Holdings, its real estate division, to a
7    trio of investors — Goldman Sachs, KKR and Five Mile Capital Partners — thereby creating Capmark
8    Financial Group. Capmark later filed for bankruptcy and was acquired in part jointly by Leucadia and
9    Berkshire Hathaway.

10    48.    GMAC Home Services is the parent for GMAC Real Estate, formed by the purchase of
11    Better Homes and gardens Real Estate in 1998, and GHS Mortgage. Brookfield Residential Property
12    Services purchased the GMAC Home Services business in September 2008. Brookfield is a wholly
13    owned subsidiary of Brookfield Asset Management, a global asset manager located in Toronto, Canada.
14    Ally Financials subsidiary bank in the U.S., Ally Bank, offers savings products, including certificates of
15    deposit (CDs), online savings accounts, interest checking accounts and money market accounts. ResMor
16    Trust Company offers Ally-branded deposit products in Canada, including online savings, guaranteed
17    investment certificates (GIC) and tax free products. Ally Bank and ResMor Trust Company are
18    members of the Federal Deposit Insurance Corporation and Canadian Deposit Insurance Corporation
19    respectively.

20    49.    On December 29, 2008, the United States Department of the Treasury invested $5 billion
21    in GMAC from its $700 billion Troubled Asset Relief Program (TARP).

22    50.    On May 15, 2009, GMAC's banking unit changed its name to Ally Bank.

23    51.    On May 21, 2009, the U.S. Treasury announced it would invest an additional $7.5 billion
24    in GMAC LLC, which gave the U.S. government a majority stake in the company.

25    52.    On December 30, 2009, the U.S. Treasury department said that they would invest another
26    $3.8 billion in GMAC because the company had been unable to raise additional funds in the private
27    sector. This raised the total government investment in GMAC to $16.3 billion.

- 17 -

28

**COMPLAINT**

1    53.    On May 10, 2010, GMAC Inc. announced that it re-branded itself as Ally Financial Inc.

2    54.    On December 30, 2010, the U.S. Treasury announced it would be converting $5.5 billion

3    of interest-bearing preferred Ally stock into common equity.

4    55.    On March 31, 2011, Ally Financial filed with the SEC for an initial public

5    offering,[12] although this has reportedly been delayed by the stock market volatility of summer 2011.

6    56.    On November 9, 2011, the bank announced it was considering filing for bankruptcy-

7    protection for its ResCap mortgage unit, after the unit's loan write-downs of around half a billion dollars

8    brought it close to the legally required net asset value threshold of $250 million.

9    57.    As of January, 2012, TARP had about $12 billion invested in Ally.

11    ### *A Mandate for Growth and More Profit – But At What Cost?*

13    58.    In 1991 "we were 100 percent retail," Hughes recalls. The company had traditionally

relied entirely on retail originations through its GMAC Mortgage branches spread across the country.

Loan officers at these branches called on what is probably the world's largest affinity group--the

hundreds of thousands of people who are part of the General Motors (GM) family of employees,

retirees, suppliers and their employees, dealers and their employees, and others that might be reached

through word of mouth. This reliable base of business gives GMAC Mortgage a leg up in retail that no

other mortgage banker can currently duplicate, according to Hughes.

19    59.    It was clear that the company would have to venture into wholesale or correspondent

20    lending if it wanted to be a consolidator, since those channels together constitute roughly 60 percent of

21    the industry's originations, according to Barry J. Bier, executive vice president of business lending at

24    12 Ally Financial files for an IPO Renaissance Capital

- 18 -

GMAC Bank in Horsham. GMAC Bank, started in 2001, is a subsidiary of GMAC Residential. So, in 1998 the company started up a de novo lending unit to offer GMAC mortgage products to correspondent banks and thrifts, mortgage brokers and builders.

60.     Due to their desire to expand and consolidate an ever growing industry they threw caution into the wind and set out to dominate the industry by any means necessary regardless of the homeowners that they hurt.

61.     The reinvention of GMAC Mortgage grew out of changes in the mortgage banking industry in the mid-1990s. During that time it became clear that players in the market would either have to become consolidators or fall quickly behind other major competitors and lose out on the growing advantage of size. In short, it became a market where one either became a consolidator or eventually might be consolidated.

62.     GMAC also did not have a significant consumer-direct channel that would bring in customers outside the GM family by telephone or Internet. To diversify into that lower-cost form of origination, GMAC acquired Ditech in 1999,[38] a web-based platform to offer mortgage products and services online.[39] Ditech was a brand that allowed GMAC to originate loans quicker and at lower cost by dealing directly with the consumer over the phone and internet, according to Ditech.com's general manager.[40] Ditech was a pioneer in offering 125 percent loans, in which the borrower could get more than the property was worth. It specialized in low-documentation mortgages, which became known as "liar's loans" because many loan officers falsified borrower's incomes.[41] GMAC adopted an aggressive marketing strategy with Ditech (with the slogan:"Lost another loan to Ditech!") and in 2003 did $23

---

38 http://www.california-mortgage-loans.us/company-gmac-mortgage.php  "GMAC Mortgage Corporation Historical Information"
39 http://www.findbankonline.com/gmac/  - "GMAC"
40 http://www.thefreelibrary.com/Ilow+GMAC+built+a+lending+powerhouse%3a+GMAC+Mortgage+has+surged+into...-a0116855906
41 http://www.nytimes.com/2008/05/09/business/09norris.html?_r=1&scp=1&sq=ditech&st=nyt&oref=slogin

**COMPLAINT**

1  billion in mortgage originations, from 1.6 million phone calls and millions of daily Web site hits,

2  according to Phil Armstrong, Ditech's vice president of marketing. The CalDirect brand was a second

3  consumer-direct channel, created by GMAC in 2003, to focus on upscale borrowers in California.

4      63.   GMAC's entire mortgage operation was reorganized into Residential Capital (ResCap),

5  created in 2004. The company through its subsidiary, GMAC Mortgage LLC, originates and services

6  residential mortgages under the GMAC Mortgage and Ditech brand names. It also provides capital to

7  other originators of mortgage loans.

8      64.   GMAC was one of the first lenders to securitize and sell "jumbo mortgages" (loans that

9  do not conform to purchasing and securitization guidelines adhered to be Fannie Mae and Freddie Mac)

10  on the secondary mortgage market. In addition to originating its own loans, GMAC purchased these

11  loans on the secondary mortgage market from other originators which it then packed into mortgage

12  backed securities. Jumbo mortgages typically carried higher interest rates and fees and were generally

13  purchased by low income borrowers. Lending to low income borrowers was encouraged in part by the

14  Community Reinvestment Act, which mandated that lenders lend to low income homeowners.

15      65.   For GMAC, the lessons of consolidation came quick and hard. After 1995, the big push

16  for consolidation began to knock GMAC Mortgage out of the ranks of the top 10 mortgage servicers and

17  loan originators. Between 1995 and 1997, for example, GMAC's servicing portfolio ranking fell from

18  eighth place to 13th place, according to data compiled by Inside Mortgage Finance, Bethesda, Maryland.

19  The train was leaving the station for GMAC Mortgage, which had become part of the GMAC family a

20  decade earlier in 1985 with the acquisition of Colonial Mortgage from Philadelphia National Bank and

21  the acquisition of a servicing platform in Waterloo, Iowa, from Norwest Mortgage.

22      66.   After 1995, GMAC fell even further behind in the battle for market share of loan

23  originations, as the consolidators began to expand their lending capabilities through third parties --

24  brokers and correspondents--in order to provide a pipeline of servicing rights to grow their servicing

25  portfolios. In the race to grow the servicing portfolio, GMAC's position fell dramatically, from seventh

26  place in 1995 to somewhere below the top 30 in 1996, according to Inside Mortgage Finance. This

27  happened even though GMAC's originations rose from $2.41 billion in 1995 to $3.7 billion in 1996. In

28

- 20 -

COMPLAINT

1    1997, GMAC crawled back into the top 30 ranks at 28th place, with $5.08 billion in originations,
2    according to Inside Mortgage Finance.

3        67.    Similarly, GMAC Mortgage began to fall behind as a top servicer, falling from third
4    place in 1989, with a servicing portfolio of $29.7 billion, to eighth place in 1995 and 13th in 1997, with
5    a portfolio of $57.9 billion, according to Inside Mortgage Finance. After experiencing its "A-ha!"
6    moment, GMAC set about becoming a serious contender in the servicing consolidation game. In 1997,
7    GMAC acquired enough mortgage servicing rights (MSRs) from Capstead Mortgage and Fargo
8    Mortgage to push it back into sixth place in 1998 with $131.24 billion. It was also helped by the launch
9    of its wholesale operation that year.

10       68.    GMAC Mortgage has remained among the top 10 servicers since 1998, even as
11   consolidation has intensified. At year-end 2003, GMAC's portfolio stood at $201.19 billion, according
12   to Inside Mortgage Finance, putting its rank among servicers at eighth place.

13       69.    Over the last several months, GMAC has migrated its servicing portfolio to what it calls a
14   new debt service utility (DSU). The underlying technology is Mortgage-Serv, from Brookfield,
15   Wisconsin-based Fiserv Inc. The new servicing system will set the stage for more aggressive growth,
16   lower costs and better customer service, according to Tony Renzi, GMAC's vice president of national
17   loan administration. The company has servicing centers at Waterloo, Iowa; Shelton, Connecticut; and
18   Mission Hills, California.

19       70.    GMAC's growth strategy centers on a preference for growing by flipping existing
20   customers and tapping into their vast dealer and employee network to spur their growth. "Flipping"
21   means expanding the level of originations in all channels through an increased sales force and sales
22   effort aimed at all distribution channels mainly existing clients and their employee network..
23   "Acquisitions don't play a big role in our strategy," Applegate says, "We'll look for things selectively
24   going forward [to acquire] to continue to grow the business, but it's going to be more organic growth
25   than it will be an acquisition-based strategy."

26       71.    Applegate notes that acquisitions usually bring with them some level of redundancy,
27   especially now that GMAC has three strong channels: its retail branches, Ditech.com's consumer-direct

28                                          - 21 -

channel and its wholesale channel for correspondents and brokers. "Almost any transaction ends up in my mind being a fairly high risk if it is done on a large scale, because the customer base is global and the infrastructure is not," says Applegate. It also requires the merger of different operational systems and technologies, which distracts the company away from its primary goal of building more sales by expanding the sales force to bring in more customers, Applegate says.

72.     The senior management team views GMAC's corporate culture as essential to its success in mortgage banking, according to Applegate. With large acquisitions, GMAC would face the task of incorporating different corporate cultures. "We have a culture, and the culture's very important. We're very customer service--oriented, and you have to be selective of who you bring into the party," Applegate says. When rates begin to rise, Applegate expects to see regional acquisition opportunities that might be attractive for GMAC, as rising interest rates hit marginal operations and lead to further consolidation of the industry.

73.     Ally announced on May 1, 2009 that it had promoted Thomas (Tom) Marano to CEO of Mortgage Operations and Capital Markets Executive. Mr. Marano is famous for e-mails that were uncovered when he left Bear Stearns a nearly bankrupt investment banking firm at which he worked for nearly 25 years. His infamous e-mails described loans that he personally securitized and packaged to investors as **"Sacks of Shit".**

74.     These so called **"Sacks of Shit"** are now subject to many law suits filed by homeowners who were on the other end of his **"Shitty Loans"**, as described in his e-mails to colleagues.

75.     Advances in technology provided growing economies of scale for larger servicing companies. Lower per-loan costs and greater efficiencies helped improve the ability of consolidators to competitively price mortgages, which, in turn, helped attract more customers and increased the volume of originations. Thus, an industry in which no player held a defining share of the market was on the brink of a battle for the survival of the biggest and fittest.

76.     By focusing on "flipping," GMAC began churning its pipelines to focus on their *existing* clients and targeting them to refinance or move into even larger homes and bigger loans regardless as to whether they could afford to pay it back. Their goal was to become the "Wal-Mart" of banking, catering

- 22 -

**COMPLAINT**

1     to middle and lower income Americans, and "helping" the less well-off buy homes. During this period

2     of time Ally Defendants held itself out to the public, including to Plaintiffs, as a well-run, prudent bank

3     that was a pillar of its community and an example to its employees, but starting about 2003, Ally

4     Defendants formalized a strategy that it had begun to implement as part of a movement from low risk to

5     high risk home loans. That move to high-risk-lending was motivated by three little words: **"Gain on**

6     **Sale."**

7        77.    **Gain on sale** is a measure of the profit when a loan is sold on the secondary markets. In

8     2003, Applegate began his shift to Higher Margin Products and pushed for a consolidation within the

9     banking industry to gain market share. The shift they were referring to was the shift away from less

10     profitable government loans, to the most profitable Option ARM, home equity and subprime loans.

11     Subprime loans, typically priced with an interest rate at least 150 basis points (1.5%) above a bank's

12     borrowing cost are eight times more profitable for a bank than a conventional loan.

13        78.    Rapidly, these intertwined schemes grew into a brazen plan to disregard underwriting

14     standards, fraudulently inflate property values, and induce Plaintiffs into risky mortgage products-

15     county-by-county, city-by-city, person-by-person, in order to take business from legitimate mortgage

16     providers, and moved on to massive securities fraud hand-in-hand with concealment from, and

17     deception of, Plaintiffs and other mortgagees on an unprecedented scale.

18        79.    From as early as 2003, Ally Defendants senior management knew the scheme would

19     cause a liquidity crisis that would devastate Plaintiffs' home values and net worths. But they did not

20     care.

21        80.    GMAC's risky lending in the early years of the 2000's increased from 5% to 30% over

22     the evaluation period for the Office of Thrift Supervision's report on compliance with the CRA in 2003.

23     The evaluation stated that GMAC "significantly exceeded those requirements" in lending to low and

24     moderate income borrowers. During this period GMAC mortgage lending was so profitable that GMAC

25     sought to distance the company's mortgage sector from its trouble auto lending sector, and thus created

26     holding company Residential Capital, LLC. for all of GMAC's mortgage operations.

27

28

**COMPLAINT**

81.    In 2006, General Motors sold a 51% share of GMAC to the Japanese Bank Aozora for $7.4 billion. Aozora itself is owned by the Cerberus investment group. In 2007, GMAC's portfolio of loans held for investment was comprised 62% of subprime mortgages, and because of the mortgage crisis, it was left with no market to off load them. Cerberus reduced its stake in GMAC from 51 percent to its current minority position in December 2008, part of the condition that led to the financing company's conversion to a bank holding company and access to over $5 billion in TARP funds.

82.    With its business lending and consumer-direct arms added to its retail business, GMAC had, in fact, reinvented itself and adopted a new business model that has driven production levels from $5 billion in 1997 to $115 billion last year. The company expects to originate $65 billion this year, as the refinance wave recedes. Meanwhile, the size of GMAC's servicing portfolio has surged to 2 million loans, representing roughly $200 billion in original principal balances.

## ALLY CEASED ACTING AS A CONVENTIONAL MONEY LENDER AND INSTEAD MORPHED INTO AN ENTERPRISE ENGAGED IN SYSTEMATIC FRAUD

83.    During the 1980s and 1990s, the mortgage securitization business grew rapidly, making it possible for mortgage originators to make more loans than would have been possible using only the traditional primary source of funds from deposits. During that period, Ally made loans in accordance with its stated underwriting and appraisal standards.

84.    Under the traditional mortgage model, which Ally and Defendants originally subscribed to, a mortgage originator originated loans to borrowers, *held* the loans to maturity, and therefore retained the credit default risk. As such, under the traditional model, the mortgage originator had a financial incentive to ensure that (i) the borrowers had the financial ability to repay the loans, and (ii) the underlying properties had sufficient value to enable the mortgage originator to recover its principal and interest if the borrowers defaulted on the loans.

- 24 -

COMPLAINT

85. Traditionally, mortgage lenders financed their mortgage business primarily using funds from depositors, retained ownership of the mortgage loans they originated, and received a direct benefit from the income flowing from the mortgages. When a lender held a mortgage through the term of the loan, it received revenue from the borrower's payments of interest and fees, and also bore the risk of loss if the borrower defaulted and the value of collateral was not sufficient to repay the loan. As a result of this **"originate to hold"** model, the lender had an economic incentive to verify the borrower's creditworthiness through prudent underwriting and to obtain an accurate appraisal of the value of the underlying property before issuing the mortgage loan.

86. With the advent of securitization, the traditional "originate to hold" model gave way to the "originate to sell" model, in which mortgage originators sold the mortgages and transferred credit risk to their investors through the issuance and sale of Mortgage Backed Securities. Securitization concurrently provided lenders like Ally with an incentive to increase the number of mortgages they issued and reduced their incentive to ensure the mortgages' credit quality.

87. With the aforementioned mandate for growth as the backdrop and incentive for their fraud, Defendants abandoned the traditional model of **"originate to hold"** and instead adopted the much more lucrative **"originate to sell"** model, and in the early 2000's Ally began to systematically disregard its stated underwriting guidelines in an effort to originate an unprecedented number of loans for securitization.

88. But to feed its investors and continue to make such never-before-seen profits, Defendants needed more borrowers. In turn, Bank Defendants began disregarding their own underwriting standards, and approving borrowers who were grossly under-qualified, in the name of getting as many loans out the door, and sold to investors for a profit, as possible.

89. In fact they *preferred* under qualified borrowers. Because Defendants had taken out insurance policies against the possibility of default, GMAC and its co-conspirators (Defendants herein) would get paid in the event of a borrower's default. In fact, in many cases, Defendants had taken out numerous redundant policies on the same property, so that when default occurred, Defendants were getting paid out multiple times – they weren't just breaking even, they were *actually turning a profit*

- 25 -

when borrowers defaulted. In other words, Defendants had an *incentive* to place borrowers into impossible loans, because by doing so they made a lot of money.

90.　　Rapidly, these two intertwined schemes grew into a brazen plan to disregard underwriting standards and fraudulently inflate property values – county-by-county, city-by-city, person-by-person – in order to take business from legitimate mortgage-providers, and moved on to massive securities fraud hand-in-hand with concealment from, and deception of, Plaintiffs and other mortgagees on an unprecedented scale.

91.　　It is now all too clear that this was the ultimate high-stakes fraudulent investment scheme of the last decade. Couched in banking and securities jargon, the deceptive gamble with consumers' primary assets – their homes – was nothing more than a financial fraud perpetrated by Defendants and others on a scale never before seen.

92.　　To further this scheme, Ally, using its size and prominent market share, began systematically creating false and inflated property appraisals throughout California, hand-in-hand with the other Defendants herein, namely HCLS. The purpose was twofold:

        a.　First, by falsely inflating said property values, investors were defrauded into believing their investments in these loans were less risky than they actually were. This in turn led to more sales and even more profits on the secondary market.

        b.　Second, Defendants would then turn around and use these false property valuations to induce Plaintiffs and other borrowers into entering ever-larger loans on increasingly risky terms.

93.　　In a scathing complaint filed by the Federal Housing Finance Agency on September 2, 2011 they outlined how this brazen planned worked. Ally would use their in-house or contract appraisers at Home Connects Lending Services to artificially inflate Plaintiff's home values in order for their loans to be used in Securitization transactions. According to that complaint, "an inflated appraisal will understate, sometimes greatly, the credit risk associated with a given loan", mainly our Plaintiffs' homes.

**COMPLAINT**

1    94.    These inaccuracies with respect to their Loan-to-Values ratios also indicate that the

2 representations that were made to them were false and that at Ally's direction appraisal practices were

3 unsound. Ally and their affiliates furnished appraisals to the Plaintiff's that they understood were

4 inaccurate and that they knew bore no reasonable relationship to the actual value of the underlying

5 properties.

6    95.    According to the Financial Crisis Inquiry Commission (FCIC), they identified "inflated

7 appraisals" as a pervasive problem at Ally during the period of the Securitizations in the time span

8 mentioned in this complaint, and determined through its investigation that appraisers were often

9 pressured by mortgage originators, among others, to "produce inflated results".

10    96.    From as early as 2005, Ally's senior management *knew* the scheme would cause a

11 liquidity crisis that would devastate Plaintiffs' home values and net worths. But, they didn't care,

12 because their plan was based on insider trading – pumping for as long as they could and then dumping

13 before the truth came out and Plaintiffs' losses were locked in.

14    97.    Defendants, and each of them, wrongfully acted and continue to act as if they are either

15 the owner, beneficiary, successor, assignee or servicer, or have some other right, title, or interest in

16 Plaintiffs' notes and deeds of trust, when, in reality, they have no basis to assert any such right, title or

17 interest.

18    98.    This action seeks remedies for the foregoing improper activities, including a massive

19 fraud perpetrated upon Plaintiffs and other borrowers by the Defendants' business that devastated the

20 values of their residences, in most cases resulting in Plaintiffs' loss of all or substantially all of their net

21 worth.

22    99.    The Defendants' business premise (although concealed from the Plaintiffs) was to leave

23 the borrowers, including Plaintiffs, holding the bag as the Defendants used the Plaintiffs and other

24 borrowers as pawns in massive securities games and fodder to feed its fraud on investors perpetrated on

25 a global scale. This massive fraudulent scheme was a disaster both foreseen by the Defendants and

26 waiting to happen. Defendants knew it, and yet Defendants still induced the Plaintiffs into their scheme

27

28

**COMPLAINT**

1  without telling them. In fact, had the Plaintiffs been aware of the true facts which the Defendants
2  concealed and failed to disclose, they would not have entered into these transactions.

3      100.    At the very least, at the time of entering into the notes and deeds of trust referenced
4  herein with respect to each Plaintiff, the Defendants were bound and obligated to fully and accurately
5  disclose to each borrower, including each Plaintiff herein, that the loan and mortgage being offered to
6  the Plaintiff was, in fact, part of a massive fraud that the Defendants knew would result in the loss of the
7  equity invested by each Plaintiff in his or her home, the severe impairment of each Plaintiff's credit
8  rating, and the other damages described in this Complaint

9      101.    Since the homes of Plaintiffs herein were Ally's main target, this scheme led directly to a
10  mortgage meltdown for Plaintiffs in this complaint that was substantially worse than any economic
11  problems facing Defendants' borrowers in the rest of the United States.

12      102.    As a result of Defendants' improper scheme, Plaintiffs lost their equity in their homes,
13  their credit ratings and histories were damaged or destroyed, and Plaintiffs incurred material other costs
14  and expenses, described herein. At the same time, Defendants took from Plaintiffs and other borrowers
15  billions of dollars in interest payments and fees and generated billions of dollars in illegal and
16  fraudulently obtained profits by selling their loans at inflated values and using the loans as collateral for
17  fraudulent swaps.

18      103.    Further as a result of Defendant's (1) artificial and fraudulent inflation of Plaintiffs'
19  property values, and property values throughout the State of California, as well as (2) Defendants'
20  abandonment of their own as well as industry standard underwriting guidelines, coupled with (3)
21  Defendants incentive to package and sell as many dollars' worth of loans as they could to the secondary
22  market, Defendants placed Plaintiff-borrowers into loans which were considerably larger than were
23  justified by (a) the *true* uninflated valued of their properties, (b) Plaintiffs true uninflated incomes and
24  (c)by Defendants own underwriting guidelines. As a result of Plaintiffs were placed into larger loans
25  than they could afford or should have been placed into. The additional fees, points and interests paid as a
26  result of the higher/inflated loan amounts constitute damages, and legally cognizable sources of
27  restitution.

28

**COMPLAINT**

1    104.   Further, Defendants either directly or through their subsidiaries, including ETS, often
2    charged fees associated with initiating or conducting the foreclosures resulting from their fraudulent
3    lending including inspection fees, default fees, late fees, advance fees, attorney fees, and trustee fees. In
4    short, Defendants made money by wrongfully initiating foreclosures against Plaintiffs herein.   The
5    award of damages or restitution for these unmerited fees obtained through deceit is proper.

6
7                          *THE FRAUDULENT APPRAISAL PROCESS*
8    105.   An accurate appraisal performed pursuant to a legitimate appraisal process is critical to
9    calculating the loan-to-value ("LTV") ratio, a financial metric commonly used to evaluate the risk
10   associated with a mortgage, and which would also be used as part of the valuation of a Mortgage Backed
11   Security (which were sold on the secondary market for profit). The LTV ratio expresses the amount of
12   the mortgage or loan as a percentage of the appraised value of the collateral property. For example, if a
13   borrower seeks to borrow $90,000 to purchase a home appraised for $100,000, the LTV ratio would be
14   $90,000 divided by $100,000, or 90% - which was viewed in the industry as a risky loan. Typically any
15   loan over 80% LTV was considered risky, and would require the purchase of "Mortgage Insurance" to
16   insure against the additional risk associated with such high LTV loans. The idea being that a high LTV
17   means that a borrower has invested little of his own money in the property, and is thus more likely to
18   walk away from the property when things get tough. Now imagine the above scenario with a slight
19   modification - instead of the above property being appraised at $100,000 dollars, the appraisal was
20   manipulated to reflect that the home was instead $112,500, now the Loan-to-Value ratio would appear
21   as a much safer, and less risky 80% LTV ($90,000 Loan divided by $112,500 property value = 80%).

22   106.   From an **investor's perspective**, a high LTV ratio represents a greater risk of default on
23   the loan, which means they are unwilling to pay as much for that loan as they would one which was less
24   risky. This is true for a number of reasons. First borrowers with a small equity position in the
25   underlying property have "less to lose" in the event of default. Second, even a slight drop in housing
26   prices might cause a loan with a high LTV ratio to exceed the value of the underlying collateral, which
27

28                                          - 29 -

1    might cause the borrower to default and would prevent the issuing trust recouping its expected return in
2    the case of foreclosure and subsequent sale of the property.

3    107.    From the **Defendant bank's perspective**, because of their shift from the "originate to
4    hold" model to the "originate to sell" model, Defendant was incentivized to enter into as many loans as
5    possible to sell on to the secondary market for profit. Because they weren't holding these loans anymore,
6    Defendants held no risk – they had no reason to ensure that the borrower was adequately qualified, or
7    more importantly, in the context of *this* discussion, that the property had sufficient value, because
8    Defendants immediately turned around and sold that loan. Here's where things take a turn for the worst
9    – because investors were willing to pay more for less risky loans (lower LTV loans), Defendants were
10   given an incentive to fraudulently inflate the appraisal values of their property, thus making the
11   collateral (the subject property) of the loan seem safer to the investor, and thus more valuable to them.
12   More value to the investors means more money in Defendants pockets. And so it began, Defendants
13   quickly embarked on a scheme to inflate their appraisals, and more broadly, property values throughout
14   the State of California, because, in short, they made a *lot more money by doing so*.

15   108.    At Ally Defendants' behest, and at their direction, Home Connects Lending Services
16   began systematically inflating the valuations they rendered upon the subject properties of each loan,
17   including the loans of Plaintiffs herein. As is common knowledge in the real estate industry, appraisers
18   take the value of other nearby homes (called comparables aka "comps") into account in determining the
19   value of the homes they appraise. **These inflated appraisals and home valuation conducted by Ally**
20   **and HCLS *then* acted as comps upon which numerous *other* appraisers based their valuations of**
21   ***other* homes. The results were a vicious self-feeding exponential cycle, both expected and**
22   **intended by Defendants. Ally's inflated appraisals caused other homes to be valued for more than**
23   **they were worth, which in turn acted as the predicate for even higher appraisals and which caused**
24   **even more homes to be valued for more than they were worth.** The inevitable and intended result of
25   Defendants' conspiracy was the creation of a super-heated pricing bubble in the real estate economy,
26   created by and at the direction of Defendants, designed to manipulate and inflate property values, and
27   effectuated for the sole purpose of lining Ally's (and other Defendants') pockets with money. The harm

28
- 30 -

COMPLAINT

1  it inflicted to Plaintiffs herein, California's real estate economy, and more broadly, the American

2  economy mattered little. Defendants were making money and plenty of it.

3  Defendants had another reason for driving the prices of real estate up – by doing so Defendants created

4  the illusion of a naturally appreciating real economy, which resulted in a purchase *and* refinance boom –

5  which meant more loans for Defendants, and thus more money.

6      109.    From the **Borrower's perspective** (Plaintiffs herein), the harm was five-fold:

7          a.  The hyper-inflated property values intended and caused Plaintiffs to pay more for

8              their homes (or to refinance their homes for more) than they were truly worth. When

9              the market corrected itself, Plaintiffs immediately suffered a substantial loss of

10             equity.

11         b.  The hyper-inflated property values also caused Plaintiffs to pay substantially higher

12             property taxes.

13         c.  Defendants also used these inflated values, to induce Plaintiffs and other borrowers

14             into entering ever-larger loans on increasingly risky terms. The result was more

15             money for Defendants.

16         d.  With the inflated property values as their predicate, Defendants placed Plaintiffs into

17             inflated loan amounts, unjustified by the true *uninflated* value of Plaintiffs' property.

18             Defendants used these intentionally inflated loan amounts to charge Plaintiffs even

19             more interest, points and fees, than would have been proper under the terms of a non-

20             inflated loan value. The result was, shockingly, even more money for Defendants.

21         e.  The resultant higher payments coupled with the housing crash (both known if not

22             intended by Defendants) resulted in Plaintiffs' inevitable default, wreaking havoc

23             with their credit, and upon which Defendants charged a host of excessive fees (trustee

24             fees, default fees, cleanup fees, inspection fees, late fees, advance fees, and attorney

25             fees) all of which were marked up dramatically. In short, Defendants couldn't lose;

26             they were making money no matter what, and were benefitting from Plaintiffs'

27             default. By tossing on so many fees Defendants made it impossible for Plaintiffs to

28
- 31 -

**COMPLAINT**

1   be able to ever pay off their "default" amounts. Why? Because Defendants made

2   money by doing so. By making it impossible for Plaintiffs to pay off their unilaterally

3   imposed default amounts, Defendants could come in and scoop up whatever equity

4   Plaintiffs had left in the property. It was a win win win scenario.

5   110.    Many mortgage loan originators, including Ally and Defendants herein, allowed the sales

6   personnel or account executives to order and control the appraisal process. These personnel were

7   typically on a commission-only pay structure and were therefore motivated to close as many loans as

8   possible. These sales personnel and account executives would pressure appraisers to appraise properties

9   at artificially high levels or they would not be hired again, and were afforded the ability to do so by the

10  very policies and procedures explicitly set forth by Ally and Defendants. According to the April 7, 2010

11  FCIC testimony of Richard Bitner, a former executive of a subprime mortgage originator for 15 years

12  and the author of the book *Confessions of a Subprime Lender*, "the appraisal process [was] highly

13  susceptible to manipulation, lenders had to conduct business as though the broker and appraiser couldn't

14  be trusted, [and] either the majority of appraisers were incompetent or they were influenced by brokers

15  to increase the value." He continued:

16      To put things in perspective, during my company's history, half of all the loans we
17      underwrote were overvalued by as much as 10%. This means one out of two appraisals
        were still within an acceptable tolerance for our end investors. Our experiences showed
18      that 10% was the most an appraisal could be overvalued and still be purchased by
19      investors. Another quarter that we reviewed were overvalued by 11-20%. These loans
        were either declined or we reduced the property to an acceptable tolerance level. The
20      remaining 25% of appraisals that we initially underwrote were so overvalued they defied
        all logic. *Throwing a dart at a board while blindfolded would've produced more accurate*
21      *results*

22  111.    Mr. Bitner testified about the implications of inflated appraisals:

23      **If multiple properties in an area are overvalued by 10%, they become comparable**
        **sales for future appraisals. The process then repeats itself.** We saw it on several
24      occasions. We'd close a loan in January, and see the subject property show up as a
25      comparable sale in the same neighborhood six months later. Except this time, the new
        subject property, which was nearly identical in size and style to the home we financed in
26      January, was being appraised for 10% more. Of course, demand is a key component to
27      driving value, but the defective nature of the appraisal process served as an accelerant.

- 32 -

**COMPLAINT**

28

1    112.    Mr. Bitner testified that the engine behind the increased malfeasance was the Wall Street
2  Banks: "[T]he demand from Wall Street investment banks to feed the securitization machines coupled
3  with an erosion in credit standards led the industry to drive itself off the proverbial cliff."

4    113.    Alan Hummel, Chair of the Appraisal Institute, testified before the Senate Committee on
5  banking that the dynamic between mortgage originators and appraisers created a "terrible conflict of
6  interest" where appraiser "experience[d] systemic problems of coercion" and were "ordered to doctor
7  their reports" or they might be "placed on exclusionary or 'do-not-use' lists." Too often, this pressure
8  succeeded in generating artificially high appraisals and appraisals being doing on a "drive-by" basis
9  which appraisers issued their appraisal without reasonable bases for doing so.

10    114.    A 2007 survey of 1,200 appraisers conducted by October Research Corp., which
11  publishes *Valuation Review* , found that 90% of appraisers reported that mortgage brokers and others
12  pressured them to raise property valuations to enable deals to go through. This figure was nearly double
13  the findings of a similar study conducted just three years earlier. The 2007 study also "found that 75% of
14  appraisers reported 'negative ramifications' if they did not cooperate, alter their appraisal, and provide a
15  higher valuation."

16    115.    Because HCLS was owned by Ally, Ally and Defendants herein directed HCLS as their
17  alter ego to provide the results requested, or engaged in a practice of pressuring and intimidating
18  appraisers into using appraisal techniques that met Ally and Defendants' business objectives even if the
19  use of such appraisal technique was improper and in violation of industry standards. Ally black-listed
20  appraisers who did not provide appraisal reports with Ally's expectations.

21    116.    This coercion to fraudulently inflate appraisal values was particularly rampant in the
22  context of refinance transactions. When a property didn't appraise for a high enough value, a deal
23  wouldn't "go through." This meant that (1) the loan consultant on the transaction wouldn't get a
24  commission, (2) the Area Divisions (sometimes referred to as "Home Loan Centers" – often comprised
25  of hundreds of loan consultants over several cities, and managed by a single manager) which were paid
26  handsomely for each funded loan wouldn't get paid, and (3) Defendants wouldn't be able to sell the loan
27  on the secondary market for profit. Nobody made money. However, the system was set up to allow

28

- 33 -

**COMPLAINT**

1  coercion, bribery, and undue influence over the appraisers. Loan consultants would contact appraiser
2  and direct them specifically as to what value was "needed" to make the deal go through, some even
3  going so far as to give gifts to the appraisers, and many were given outright bribes. Area Division
4  managers who also had a financial incentive as mentioned earlier, would exercise undue influence and
5  contact appraisers and demand certain values from them, abolishing the exercise of independent thought
6  necessary to render an accurate/good faith appraisals. The same Area Division Managers, because of
7  their power and influence within the company, would even go so far as to call the appraisal group's
8  *managers* and request (read "demand") an appraisal to come in at a certain value, or if that appraisal had
9  already been rendered and it was too low, would request the appraisal value to be "bumped" or
10  increased. The Area Division Managers who often had personal or friendly relationships with the
11  Appraisal *managers* would coerce, bribe or influence, give gifts to or "call in favors" from the Appraisal
12  managers to ensure that the appraised value of the subject property was high enough to make the deal
13  "go through," so that all parties could make their money. The Appraisal managers obliged.

14      117.    On other occasions appraisers and/or their managers would be instructed to use
15  overvalued, inflated or out-of-area comps from non-comparable *superior* properties in valuating the
16  subject property for the purpose of arriving at a higher value than would be supported by nearby or
17  appropriate comps. Defendants intended this to artificially inflate the appraised value of the subject
18  property.

19      118.    On the rare occasion when a loan consultant's or Area Division Manager's influence
20  didn't get the appraiser to inflate the value of the appraisal by a sufficient amount, Defendants' policies
21  gave them another, more effective way to fraudulently inflate the amount – they were allowed to hire an
22  *outside appraiser*. It was well known in the industry that outside appraisers would deliver an appraisal in
23  the amount they were told to deliver. Why? Because they were being paid directly by the loan
24  consultant, or the Area Division Manager. In other words, loan consultants and Area Division
25  Manager's had outside appraisers "in their pockets." Outside appraisers would deliver the results
26  (meaning inflated values) they were expected to deliver for two reasons: (1) In the interest of keeping
27  the client happy and hopefully earning future business and (2) for fear of not getting paid on their

- 34 -

28

**COMPLAINT**

1   individual deal if they didn't deliver the results they were expected to deliver. This procedure (allowing

2   the hiring of easily-influenced outside appraises) was explicitly made part of Defendants' own policies,

3   and its use was encouraged by Defendants, as well as their mid-level and upper management.

4       119.   This coercion and influence even existed from the top down – Regional Managers (in

5   charge of entire portions of the country, several states large) would also call in favors and demand

6   appraised values to be inflated or changed to make deals happen in the interest of making money. This

7   pattern was not only tolerated by Defendants, but ratified and encouraged by them, because more funded

8   loans meant more money for Defendants (who as described above, held none of the risk). In fact,

9   Defendants had intentionally set up the appraisal system in such a way as to allow for the exercise of

10   influence over appraisals and the appraisal departments. This influence was intended and foreseen.

11       120.   In short, Defendants intentionally designed an appraisal system which they could

12   manipulate through influence and coercion to further their own ends – namely, profit. By its very design,

13   the independence of thought necessary for a professional appraiser to render a good faith opinion was

14   decimated. (1) Defendants *owned* the very appraisal company which was supposed to render

15   independent appraisals. Then, (2) Defendants through its explicit (as well as unwritten) policies and

16   procedures, intentionally allowed their own employees who made commission/money as a function of

17   every funded loan (managers, loan consultants, etc.), to contact individual appraisers and bribe, exercise

18   influence, call in favors, harass, and coerce appraisers into rendering the exact value they needed. And

19   finally, when all else failed (3) Defendants set up a fail-safe; they created an internal policy which

20   allowed for the hiring of "outside" appraisers who were particularly well known within the industry for

21   being willing to "fudge" the numbers.

22       121.   Moreover, as HCLS was Ally's wholly owned subsidiary, HCLS was specifically

23   directed by Defendants to systematically "bump" or inflate appraisal values of homes throughout

24   California, with the intent of creating housing appreciation, leading to a real estate boom, which

25   Defendants could then capitalize on by selling not only more loans, but more loans at even higher loan

26   amounts. From the very top to the very bottom, Defendants created a system intended to render

27   consistently inflated appraisals. But they knew the 'boom' they were creating, was one stilted up and

- 35 -

28

1  fueled by their fraud – and that when the music stopped playing the house of cards they'd built would
2  come crumbling down destroying any and all equity Plaintiff borrowers had in their home.

3      122.    These artificially inflated appraisal reports and values were then used by homeowners
4  and real estate agents alike in setting sales prices for their homes, resulting in artificially inflated sales,
5  both known and intended by Defendants. Defendants told their borrowers that the value their property
6  appraised for was the true value of their property. Furthermore, Defendants went so far as to furnish the
7  appraisal reports to many of their borrowers, including Plaintiffs herein. **The result was a vicious**
8  **exponential cycle. The artificially inflated sales would act as comps, inflating the sales prices of**
9  **other homes. The cycle would repeat.** And Defendants intended it to repeat because it perpetuated an
10 inflationary real estate economy in California, which resulted in massive profit to the Defendant Banks.

11     123.    Ally and Defendant conspirators perpetrated this systematic appraisal fraud at the
12 direction of the conspiracy, and with the knowledge and acquiescence of their executives and board
13 members.

14     124.    .To carry out this fraud, GMAC, hand-in-hand with the other Defendants herein, used its
15 size and market share as one of the largest lenders in California to systematically create false and
16 inflated property appraisals throughout California, through its wholly-owned subsidiary HOME
17 CONNECTS LENDING SERVICES, LLC. (HOME CONNECTS LENDING SERVICES, LLC is a
18 division of Defendant Ally Bank – hereinafter "HCLS")

19

20                    *Defendants' Scheme to Fix the Market*
21              *Through Their Wholly-Owned Appraisal Subsidiary: HCLS*

22

23     125.    HCLS was created in 1999 as a GMAC brainchild. GMAC figured that if they could
24 control all of the settlement service providers, including appraisers, it would make it easier for Ally
25 Defendants to carry out this fraud. Any borrower, broker or lender that chose to conduct business with
26 GMAC was forced to use their settlement service providers as a standard course of business. If a broker
27 submitted a loan, the appraisal was to be done by someone on the HCLS approved appraiser list. The

28

-36-

homeowners were also required to pay for a secondary appraisal review through HCLS. Since there were two appraisals that were done on each property the aggregator being ResCap was now able to choose which appraisal would suit them best for their multiple transactions. The homeowners would be disclosed one value and the secondary appraisal done by HCLS could be used for Secondary Market purposes.

126. As the owner, GMAC exercised its vast influence over HCLS to artificially inflate and manipulate the values of these properties, including the properties of Plaintiffs, to further its fraud and increase their profits. Their purpose was two fold:

a. First, by falsely inflating said property values, investors were defrauded into believing their investments in these loans were less risky than they actually were. This in turn led to more sales and even more profits on the secondary market.

b. Second, Defendants would then turn around and use these false property valuations to induce Plaintiffs and other borrowers into entering ever-larger loans on increasingly risky terms. The result was, again, more profits.

127. Furthering this scheme, GMAC & Homecomings Financial then struck sweetheart deals with some of the Nation's largest homebuilders in which they collaborated to artificially inflate the values of the properties being built and through a joint venture. Some of the largest homebuilders such as Lennar Homes. The unsuspecting homeowners would be forced to pre-qualify through the builders so called "In-House Lender" and they would be incentivized with offers of free upgrades or credits towards their closing costs only to be overcharged for these loans and artificially inflated purchase price that would cover the incentives. Since GMAC was the in house lender they could easily manipulate the value of the homes since their own appraisers would be appraising the properties, and in fact, they did just that.

128. Hand-in-hand with their builders and Landsafe companies, Defendants could carry out the fraud without anyone ever finding out. If the appraisals were done by independent appraisers the homeowners would have found out that the homes they were purchasing or refinancing were being over valued and that the loans they were obtaining was taking every last bit of equity out of their homes. The

- 37 -

customer never had a choice as to the settlement providers. Ally Defendants controlled and took the choice out of the customer's hands and directed and collaborated with all their partners to systematically inflate and disgorge the homeowners of their freedom to choose and suck every last bit of equity out of their homes. In furtherance of this act they used the manipulated property valuations to seek premiums on Secondary Market transactions. Ally Defendants not only defrauded the Plaintiffs, but the rating agencies that graded the paper being sold, the insurance companies who assessed the risk of the loans being insured through loan to valuation risk models and their investors.

129.    From as early as 2004, GMAC's senior management, and AllyDefendants *knew* the scheme would cause a liquidity crisis that would devastate Plaintiffs' home values and net worths. But, they did not care, because their plan was based on insider trading – pumping for as long as they could and then dumping before the truth came out and Plaintiffs' losses were locked in.

130.    These acts are now subject of numerous complaints and very large scale litigations and settlements. The largest recently announced lawsuit was filed by the Federal Housing Finance Agency as Conservator for Freddie Mac. The complaint alleges that Ally Defendants furnished appraisals that they understood were inaccurate and that they knew bore no reasonable relationship to the actual value of the underlying properties. Some of Plaintiffs loans seeking relief in this complaint are part of these REMIC's as mentioned in the FHFA complaint.

*Defendants Systematically Abused & Abandoned Their Underwriting Guidelines To Place Unqualified Borrowers Into Loans They Could Never Afford*

131.    As mentioned above, however, Defendants' fraud was multipronged. To feed its investors and continue to make such never-before-seen profits, Defendants needed more borrowers. In turn, Defendants Banks systematically and intentionally began disregarding their own underwriting standards, and approving borrowers who were grossly under-qualified, in the name of getting as many loans out the door, and sold to investors for a profit, as possible.

132.    In other words, not only did Defendants inflate appraisal values in the name of making the loans appear safer to investors, and thus more profitable to the banks, but Defendants also abandoned

- 38 -

**COMPLAINT**

their own underwriting guidelines to approve more and more borrowers for loans. In doing so, Defendants intentionally placed borrowers into loans which would imperil their entire livelihoods, and often cases into loans whose default was an absolute mathematical certainty. The result was, once again, more profit obtained through deception.

133. To achieve their fraud, Defendant Banks intentionally and grossly falsified Plaintiffs' salary, income, bank accounts, liquid assets, non-liquid assets, employment, real estate owned values, rental income ad infinitum, and by doing so simultaneously achieved two goals. First, they were able to approve borrowers who could never have been approved under their own published conventional underwriting guidelines (as well as industry standard underwriting guidelines used throughout the United States.) Second, they were able to conceal from the investor the highly risk nature of the loan, which resulted in more profit to the Bank. Investors were willing to pay more money for less risky loans. The translation is that Defendants had every incentive to deceive borrowers into entering loans which they realistically could never afford. The result was that Defendants turned unimaginable ill-gotten profit, *at the sole expense of their borrowers*. When the music stopped, only the borrowers were left without a chair.

134. In fact, Defendants intentionally put mechanisms and programs in place to allow their own employee's/Loan Consultants/Loan Representatives to **falsify** the income, asset and other material information of their borrowers, without a borrower ever knowing that their income or assets had been inflated. One such program was called the **"Stated Income"** program. Under this program, Defendant Banks would take as true any income stated on the application, without requesting any documentation in support. Seizing this unbridled free-for-all, Defendants' own employees who were paid commission based on the number and size of loans they got approved, rampantly falsified material income and asset information of their borrowers. By doing so they were paid more commission. But more importantly, Defendant Banks themselves created more product to be sold on the secondary market for even more profit. In other words, Defendants intentionally put policies and programs into motion which would allow it to place unqualified borrowers into loans – all while maintaining the semblance of propriety,

1   and all without ever having to disclose to their investors that the incomes listed on their loan
2   applications were false.

3       135.    Numerous others similar programs were also adopted such as **"stated assets"**, and **"low**
4   **documentation loans"**. Both of which allowed Defendants to falsify information, and get loans
5   approved which would  never been approved under traditional documentation

6       136.    Even in the absence of these programs Defendants and their employees nevertheless had
7   the ability to and did, falsify their borrower's income and assets through numerous other means. For
8   example, Defendants would inflate a borrower's income by making it appear as though the borrower
9   was earning rental income on of their other properties when in fact they were earning none.  To
10  legitimatize this false income, Defendants would add insult to injury by manufacturing an entirely false
11  rental agreement, showing the false monthly rental income, complete with the forged signature of a non-
12  existent renter.

13      137.    Defendants *regularly* inflated borrowers' incomes by over 50% and on many occasions
14  by as much as a mind-numbing 300%. An egregious number by any measure.

15      138.    Defendants were intentionally turning a blind-eye to the rampant and egregious
16  manipulations of incomes by their own employees, through policies and programs intentionally set forth
17  by Defendants' very own top executives to achieve *just such a result*. The result was that Defendant
18  were able to originate loans which they knew were false, and they intended to be false, but without ever
19  having to *admit* to their secondary market investors that the loans were, in fact, false.

20      139.    Defendant banks knew and intended that their employees would falsify this information,
21  for the very reasons set forth above, and in fact incentivized them through their commission and reward
22  structure to do so.  In other words Defendants intended that this program would be abused. And by
23  doing so, Defendants allowed and intended for their borrowers to be placed into loans which the
24  borrowers had no chance of being able to afford had their true income/asset information been used. .

25      140.    Defendants then told their borrowers, and Plaintiffs herein, that a determination by  the
26  Bank that they were "*qualified*" for a loan meant that the borrowers would be able to "*afford*" their loan

27

28

**COMPLAINT**

141.    Because Defendants held themselves out as (1) experienced professionals (2) with superior knowledge, education, and expertise, (3) a bank their customers and borrowers could trust and rely on[48] Borrower plaintiffs believed them, and justifiably so. Borrower Plaintiffs were deceived into reposing trust into the very company who would defraud them.

142.    . For the purposes of the following paragraphs it is important to define two key terms: **"front-end"** debt to income ratio, and **"back end"** debt to income ratio.

143.    A **"front end"** debt to income ratio compares ONLY the loan payment (as well as taxes and insurance) to a person's income, and does not take into account any other debt whatsoever. For example a person who makes $10,000 per month, and whose mortgage costs $3,000 per month (including tax and interest), has a "front end" debt to income ratio of 30%.

144.    A **"back end"** debt to income ratio, by contrast, takes into account not only a person's loan payment (as well as taxes and insurance) but also *all other* debt reflected on their credit report. If that same person used in the example above, also had an additional $4,000 in monthly expenses such as credit card debt, car loans/payments, other mortgages, student debt, etc. etc., then that person's "back end" ratio would be 70%. ($3,000 per month for her loan, taxes & insurance plus, $4,000 per month for other debts = $7,000 per month in debt. $7,000 of debt divided by $10,000 in monthly income equals, 70% "back end" debt to income ratio).

145.    Industry Standard and Conventional Underwriting guidelines, including those used by Defendants herein, required that loans with a "front end" debt to income ratio higher than **35%** be rejected. They also required that loans with a "back end" debt to income ratio of higher than **45%** be rejected – and that 45% figure was on the on the *very* high end. For a loan with a 45% "back end" debt

---

[48] See Ally's ads – "We make money with you, not off you" - http://www.businessinsider.com/ally-bank-print-ad

**COMPLAINT**

1    to income ratio to be approved, a borrower had to have excellent credentials in all other areas such as

2    720+ median credit score and high liquid asset reserves totaling more than 12 months of their ).

3         146.    However, Defendants in this action regularly approved loans with front end ratios wildly

4    exceeding 35% (and back end ratios wildly exceeding 45%) on a regular basis, and as a matter of course,

5    in violation of their own published underwriting guidelines as well industry standard underwriting

6    guidelines used throughout the banking industry.

7         147.    In many cases, borrowers were approved with front-end debt to income ratios at almost

8    100%. In other words, borrowers were being approved for mortgages, where after spending almost every

9    penny of their monthly income, they would have almost nothing left over to pay for the myriad other life

10   expenses such as electricity, gas, car payments, telephone, insurance, medicine, or even food.

11

12   ***Defendants Turned Substantial Profit Through Their Borrowers' Default –***

13   ***Furthering Their Incentive to Intentionally Place Plaintiffs***

14   ***Into Impossible and Unaffordable Loans***

15        148.    Not only did Defendants approve under qualified borrowers – they preferred them. That's

16   because a defaulting borrower meant profit for Defendants.

17        149.    All of the Defendants managed risk through leverage and derivatives trading. With the

18   advent of "Credit Default Swaps" ("CDS"), they had the protection they needed to push these loans out

19   the door to grossly under qualified borrowers, without any fear of loss whatsoever. The CDS gave

20   defendants *another* incentive to give grossly under qualified borrowers – whose default was virtually

21   certain. Not only (1) were Defendants incentivized to give loans to unqualified borrowers because they

22   were turning other-worldly profit by selling as many loans on the secondary market as possible, *but also*

23   ... (see next paragraph)

24        150.    (2) Because Defendants had taken out these insurance policies – aka Credit Default

25   Swaps - against the possibility of default, GMAC and its co-conspirators (Defendants herein) would get

26   paid in the event of a borrower's default. In fact, in many cases, Defendants had taken out numerous

27   redundant Credit Default Swaps and insurance policies out on the same property, so that when default

28

- 42 -

occurred, Defendants were getting paid out multiple times – they weren't just breaking even, they were *actually turning a profit* when borrowers defaulted. In other words, Defendants had an *incentive* to place borrowers into impossible loans, because by doing so they made a lot of money.

151.   This technique gave these Defendants the insurance they needed to pass the risk along to third party without taking the risk themselves. Since they planned on securitizing all of their loans and not keeping any of them, the Defendants could not care less about quality or who they hurt. They would push insurance on the investors and actually over insure the loan pools, at times betting that the Plaintiffs and other borrowers would default.

152.   Since the Defendants created these pools to begin with, they were fully aware of the lack of quality and lack of due diligence that went into setting up these pools. These "swaps" are life insurance policies that are placed on Plaintiffs' loans. If the loan dies, the Defendants get paid.

153.   These swaps have been considered to be so dangerous that the majority of the financial world has simply stayed away. They are best described by the following prominent experts:

    a.   Nobel prize-winning economist George Akerlof predicted that CDS would cause the next meltdown;

    b.   Warren Buffett called them "weapons of mass destruction";

    c.   Warren Buffett's colleague, Charles T. Munger, has called the CDS prohibition the best solution, and said "it isn't as though the economic world didn't function quite well without it, and it isn't as though what has happened has been so wonderfully desirable that we should logically want more of it;"

    d.   Former Federal Reserve Chairman Alan Greenspan says CDS are dangerous;

    e.   Newsweek called CDS "The Monster that Ate Wall Street"

    f.   President Obama said in a June 17 speech on his plans for finance industry regulatory reform that credit swaps and other derivatives **"have threatened the entire financial system;"**

**COMPLAINT**

g. In a February 9th, 2012 speech, President Obama scolded "irresponsible" and "reckless" lenders, who "sold homes to people who couldn't afford them". He continued:

> "It's well known that millions of Americans who did the right thing and the responsible thing -- shopped for a house, secured a mortgage that they could afford, made their payments on time -- were, nevertheless, hurt badly by the irresponsible actions of others: by lenders who sold loans to people who couldn't afford them; ... by banks that took risky mortgages, packaged them up, and traded them for large profits. "

> "It was wrong and it cost more than 4 million families their homes to foreclosure"

> "Even worse, many companies that handled these foreclosures didn't give people a fighting chance to hold onto their homes. In many cases, they didn't even verify that these foreclosures were actually legitimate. Some of the people they hired to process foreclosures used fake signatures to -- on fake documents to speed up the foreclosure process. Some of them didn't read what they were signing at all."

...

> "The mortgage fraud task force I announced in my State of the Union address retains its full authority to aggressively investigate the packaging and selling of risky mortgages **that led to this crisis**"

h. George Soros says the market is still unsafe, and that credit- default swaps are "toxic" and "a very dangerous derivative" because it's easier and potentially more profitable for investors to bet against companies by purchasing swaps rather than shorting their publicly traded stocks.

**COMPLAINT**

1    154.    But insurance against default wasn't the only way Defendants made money from the
2    losses of their imperiled borrowers. Defendant banks also made money by charging a litany of unearned
3    and egregiously marked up fees associated with the initiation of and conducting (their own wrongful)
4    foreclosures including: inspection fees, default fees, late fees, advance fees, attorney's fees, and trustee
5    fees. In short Defendants had an incentive *to place Plaintiff borrowers into loans they knew their*
6    *borrowers could not afford* because by doing so, the bank would turn a profit. Not only that, but
7    Defendants had an incentive *to wrongfully initiate foreclosures* because they made money by doing so
8    through the assessment of excessive, disproportionate and unearned fees.

### *Defendants' Liar Loans*

12    155.    Ally adopted a strategy it knew would jeopardize its very existence yet the temptation to
13    make money was so great, that they had reckless disregard for its shareholders and their borrowers. Ally
14    began to create fictional income and real losses by defrauding the insurance companies that were the
15    counterparties to their credit default swap hedging. Their primary business was as a market maker for
16    what the trade called "liar loans" and Ally called "Alt-A" loans, handled through its subsidiaries,
17    including, among others, Ally, GMAC Mortgage, RFC, and Homecomings as well as through loans
18    purchased through collateralization channels.

19    156.    Defendants sold toxic mortgages to the public through their origination channels. They
20    were then securitized by Residential Capital, other financial arms of Ally and Ally Defendants, and its
21    executives, and were heavily insured against losses, while essentially shorting their own collateralized
22    debt obligation securities sold to investors. They perpetrated the "Naked Short" the very mortgage
23    backed securities that they had just securitized by buying insurance on securities they had already
24    hedged in other contracts. They reaped illicit profits from this activity and also engaged in the "Double
25    Dip" by forcing the original originators to re-purchase defaulted loans at lower prices.

26    157.    In a complaint filed by the Federal Trade Commission they found Homecomings
27    Financial guilty of violations of the Equal Credit Opportunity Act. The complaint that ensued indicated

- 45 -

that African –American and Hispanic borrowers paid more for mortgage loans that non-Hispanic whites. Based on an extensive investigation done by the FTC, which included obtaining and analyzing Homecomings' full and complete loan date, the staff's statistical analyses of the data show that, on average, Homecomings charged African-American and Hispanic borrowers substantially more for home purchase and refinance loans than similarly-situated non-Hispanic whites. The staff further determined that these disparities were caused by Homecomings' policy and practice of allowing its brokers and loan officers broad discretion to determine the amount of discretionary fees charged to borrowers in addition to the risk-based price.

158. The staff concluded that the disparities in these discretionary charges are substantial, statistically significant, and cannot be explained by any legitimate underwriting or credit characteristics in violation of the ECOA and the FTC Act.

159. By Machiavellian legal maneuvering, Defendants were able to hide this information from the public eye, its shareholders, and customers who were hurt the most by these misgivings.

160. Plaintiffs believe and therefore allege that Defendants, through the actions of their executives, employees, appraisers and current Ally and ResCap CEO's Michael A. Carpenter and Thomas (Tom) Marano, are all largely responsible for the collapse of the real estate market within the State of California.

161. Defendants sold toxic mortgages to the public through their origination channels. They were then securitized by ResCap, RFC and other financial arms of Ally Defendants, and its executives, and were heavily insured against losses, while essentially shorting their own collateralized debt obligation securities sold to investors. They perpetrated the "Naked Short" the very mortgage backed securities that they had just securitized by buying insurance on securities they had already hedged in other contracts. They reaped illicit profits from this activity and also engaged in the "Double Dip" by forcing the original originators to re-purchase defaulted loans at lower prices.

162. This ability to immediately hedge poorly underwritten mortgage loans by purchasing credit default swaps that covered all loss of default, gave the Defendants even less incentive to monitor the performance of existing loans or the quality of new loans. In turn, the Defendants foisted tranches of

- 46 -

**COMPLAINT**

1 | Alt-A mortgage loans off on the market to investors who had every right to expect that the Defendants
2 | were selling securities of assets that had been issued under traditional underwriting standards. This
3 | manipulative and purposeful conduct inflated the inevitable bubble that burst at the expense of Plaintiffs
4 | while the Defendants were protected from loss through a number of mechanisms.

5 |     163.    Using one such technique, Defendants sold toxic mortgage securities secured by the
6 | Plaintiffs' homes to investors, and then sold back the bad loans with early payment defaults to the banks
7 | that originated them at a discount. The traders pocketed the refund, and did not pass it on to the
8 | mortgage trust which is where the Plaintiffs' loans resided. Said mortgage trust is where the refunds
9 | should have gone to be distributed to the investors who owned the bonds. The Defendants instead
10 | collected the insurance from the "Swaps" and pocketed the difference of the buybacks as well, all
11 | without ever notifying the investors. This is now the subject of ongoing litigation with their insurers
12 | including AIG and AMBAC.

13 |     164.    Defendants have shown a pattern of fraud from the inception of these loans all the way
14 | through securitization, and evidently have continued that fraud to this very day, and will not stop until
15 | and unless this Court enjoins them.

16 |     165.    Defendants' attempted to clean up this mess by preying on unsuspecting homeowners and
17 | foreclosing on their homes. As soon as a foreclosure was perfected, then the hidden insurance policies
18 | kicked in. The investors won, the banks won, but the Plaintiffs lost everything that they had ever
19 | worked for, which includes, particularly, their homes.

20 |     166.    Just like in GMAC's Mortgage business, in Ally's loan business, volume was king. Loan
21 | officers got paid per loan, and got paid more per loan if certain volume targets were met and certain loan
22 | products were pushed. Loan processors were given volume incentives as well as were entire loan
23 | processing centers. Even risk managers were evaluated, in part, on the extent to which they supported
24 | revenue growth targets. Not surprisingly, people cut corners to keep the conveyor belt moving and
25 | increase their pay.

26 |     167.    Defendants set out to destroy every last dollar of equity left in Plaintiffs' homes. They
27 | wrote mortgages with total disregard as to whether the Plaintiffs could afford them or not. Through

- 47 -

1   deception and a sleight of hand Plaintiffs were pushed into highly toxic mortgage products that would

2   maximize profits for Defendants, but destroy the Plaintiffs' values.

3       168.   Liar loans produce intense "adverse selection," because Ally had to generate mortgages,

4   without regard to the borrower's creditworthiness. Ally thus became the refuge of those who could not

5   obtain a mortgage elsewhere.

6       169.   Liar loans also are "criminogenic" – they create epidemics of mortgage fraud – because

7   they create strong incentives to encourage borrowers to provide false information on their loan

8   applications.

9       170.   The combination of these two phenomena results in mortgages that have a deeply

10  "negative expected value" to the lender. That means that the average dollar lent on a liar's loan creates a

11  loss. Those losses, however, might not be realized for many years, particularly if the liar loans

12  contribute to creating a "bubble" of rising home prices by expanding the number of individuals who can

13  afford to purchase a home. However, once the time comes to "pay the piper" there is no avoiding severe

14  financial distress and a resulting constriction in funds available for further loans.

15      171.   When a large mortgage provider such as the Defendants go from pouring vast sums of

16  imprudently invested capital into the mortgage market, to bankruptcy and lesser financial distress that

17  cuts off the pipe-line, the foreseeable and inevitable consequences are a reduction in the number of

18  potential home purchasers and the prices that can be afforded by those who remain in the market. It is

19  then a question of simple basic supply and demand economics: pouring vast sums of capital (capital

20  invested for an unlawful purpose) increases demand and creates an artificial bubble. Cutting off the

21  spigot causes a crash.

22      172.   The consequences of the Defendants' acts were foreseeable and known to Defendants

23  from the first moment they stopped lending on fundamentals and started lending to feed their schemes of

24  marketing fraudulent collateralized mortgage pools and engaging in fraudulent swap transactions.

25      173.   In the near term, liar loans increased the reported profits of the lender. As long as the

26  bubble inflates, the liar loans can be refinanced, creating more reported income and delaying (but

27  increasing) the eventual loss. During the S & L debacle, the saying was: "a rolling loan gathers no loss."

- 48 -

**COMPLAINT**

174. In 2008, Defendants faced an unprecedented loss as a result of its large positions in subprime and other lower-rated mortgages, the details of which have been previously alleged.

## Defendants Misled the Public – Including Plaintiffs

175. The Defendants concealed and did not accurately or fully disclose to any Plaintiff herein any of the foregoing facts. Further, Defendants did not disclose or explain their scheme to Plaintiffs at any time. They did the foregoing with the intent to deceive Plaintiffs and the investing public. Plaintiffs did not know the massive scheme Defendants had devised.

176. To the contrary, Defendants affirmatively misrepresented its underwriting processes, the value of its mortgages and the fundamental nature of its business model in its press releases, annual report and securities filings, all of which were widely distributed to the public, including Plaintiffs. Defendants intended the public, including Plaintiffs, to rely upon its misrepresentations and made those misrepresentations to create false confidence in Defendants and to further its fraud on borrowers and investors.

177. Plaintiffs would never have done business with the Defendants if Defendants had disclosed their scheme. Had the Plaintiffs known the facts concealed from them by Defendants, Plaintiffs would have never entered into bogus and predatory transactions with the Defendants designed only to line the pockets of Defendants and their executives and not to actually and justifiably create value and generate capital from the Plaintiffs' equity investments in their primary residences.

178. If the Plaintiffs had later learned the truth, each Plaintiff would have either (1) rescinded the loan transaction under applicable law and/or (2) refinanced the loan transaction with a reputable institution prior to the decline in mortgage values in late 2008. Instead, each Plaintiff reasonably relied on the deceptions of the Defendants in originating their loans and forbearing from exercising their rights to rescind or refinance their loans.

179. After entering into the transactions with each Plaintiff herein as alleged herein, the Defendants sold in securities transactions the notes and deeds of trust pertaining to Plaintiffs' properties. The sales:

-49-

**COMPLAINT**

a. Involved misrepresentations by Defendants to investors and concealment from investors of Plaintiff's true financial condition and the true value of Plaintiff's home and mortgage;

b. Involved misrepresentations by Defendants to investors and concealment from investors of the true financial condition of other borrowers and the true value of their homes and mortgages also included in the pools;

c. Were for consideration greater than the actual value of the said notes and deeds of trust;

d. Were for consideration greater than the income stream that could be generated from the instruments even assuming a 0% default rate thereon; and

e. Were part of schemes by which the Defendants bilked investors by selling collateralized mortgage pools at an inflated value and used the notes and mortgages as collateral for fraudulent swaps, all the while using Plaintiffs as the fodder for Defendants' fraudulent schemes.

180. Defendants hid from Plaintiffs that Defendants were engaged in an effort to increase market share and sustain revenue generation through unprecedented expansions of its underwriting guidelines, taking on ever-increasing credit risk.

181. At the time the Defendants induced Plaintiffs to enter into mortgages, they knew their scheme would lead to a liquidity crisis and grave damage to each Plaintiff's property value and thereby result in each Plaintiff's loss of the equity such Plaintiff invested in his or her house, as well as damaging that Plaintiff's credit rating, thereby causing the Plaintiff additional severe financial damage consisting of the foregoing damages and damages described elsewhere in this Complaint. The Defendants concealed the foregoing from Plaintiffs, and California consumers and regulators.

182. Based upon the Defendants' (1)long term media campaign holding themselves out as a trustworthy and reputable lending institution, (2) position as leading financial institutions,(3)Defendants' expertise, highly specialized training, unique understanding of the highly complicated terms and mathematics of financing as well as Defendant Banks' capacity as an advisor, in addition to their (4)

- 50 -

1  intentionally misleading and/or partially true statements found in omissions, including in their securities
2  filings, numerous documents, advertisements and other media, statements made by their employees and
3  agents with apparent and/or actual authority and their publicly available underwriting guidelines the
4  Plaintiffs reasonably relied upon the statements and omissions made by Defendants and reasonably
5  relied that no material information necessary to their decisions would be withheld or incompletely,
6  inaccurately or otherwise improperly disclosed. In so relying, the Plaintiffs were gravely damaged as
7  described herein. The Defendants acted willfully with the intention to conceal and deceive in order to
8  benefit therefrom at the expense of the Plaintiffs.

9         183.   The other Defendants followed Ally's directions because they are or were either
10  subsidiaries of Ally, directly or indirectly owned, controlled and dominated by Ally, or because they are
11  in an unequal economic and/or legal relationship with Ally by which they are beholden to Ally and are
12  thereby controlled and dominated by Ally.

13         184.   At all relevant times, Defendants falsely assured the public, including Plaintiffs, that they
14  were primarily prime quality mortgage lenders who had avoided the excesses of their competitors. To
15  the contrary, affirmative misrepresentations and material omissions permeated the Defendants' websites,
16  customer and investor materials, and required securities filings and presentations.

17         185.   Defendants concealed and did not accurately or fully disclose to any Plaintiff herein any
18  of the foregoing facts. Defendants neither disclosed nor explained their schemes to Plaintiffs at any
19  time. They did the foregoing with the intent to deceive Plaintiffs, the investing public, the U.S.
20  taxpayer, and California and other regulatory agencies.

21         186.   Defendants affirmatively misrepresented their underwriting processes, the value of its
22  mortgages and the fundamental nature of its business model to their investors and to Plaintiffs in their
23  press releases, annual reports and securities filings, all of which were widely distributed to the public,
24  including Plaintiffs.

25         187.   Defendants fraudulently classified their liar loans as "prime" loans. Defendants'
26  personnel who objected to the liar loans were reprimanded or fired.

27

28                                                    - 51 -

                                               COMPLAINT

1    188.    It is precisely the previously alleged loss of value on which the Defendants now seek to

2  capitalize.  They would transfer a material portion of that wealth to themselves or those in collusion with

3  them.  This scheme includes acquiring the real property at reduced values, collecting U.S. Government

4  money for paper losses, and harvesting the future increase on the value of these artificially depressed

5  homes.  Since its government guarantee to purchase troubled assets Ally has been aggressively

6  foreclosing on Plaintiffs homes.  With Government protection in its hip pocket, any losses incurred will

7  be covered through loss provisions afforded by the tax payer.

8

9

10  **DEFENDANTS' DECEPTION CONTINUED WITH LOAN MODIFICATIONS**

11

12  ***Defendants Deceived Borrowers Into Entering Loan Modifications In An Outright***

13  ***Cash-Grab With No Intent Of Ever Modifying, For Fear Of Having Their Own Fraud***

14  ***Discovered By Their Investors***

15

16    189.    After inducing Plaintiff Borrowers into entering dangerous loans through outright

17  deception and in the name of greed - loans which would threaten their livelihoods - Defendants refused

18  to modify Plaintiff Borrowers' loans despite laws and court orders which required them to make good

19  faith efforts to do. Why? To protect themselves. Not the borrowers, but themselves. Because Defendants

20  were required to buy back loans from their investors if a material misrepresentation was discovered,

21  Defendants refused to modify loans which qualified in every regard for one, for fear of having their own

22  fraud and falsified information discovered by the investor, and having to buy back their fraudulent loans,

23  and incurring massive loss.  In other words, Defendants placed their fiscal interests ahead of borrowers

24  who desperately needed and *qualified* for the modifications, and who would face financial ruin or

25  homelessness without one.  Instead, Defendants chose to line their coffers, rather than offer assistance to

26  the very people they imperiled through their greed – assistance they were under a good faith obligation

27  to provide. Simply put, Defendants were looking out for themselves.

28

**COMPLAINT**

190.    Plaintiffs believe and hereby allege that the servicers would want to use MERS to keep the investor information private is to obscure truth from the Plaintiffs and the Certificate Holders of the Trust.

191.    Every Pooling and Servicing Agreement has strict Warranties and Material Misrepresentation Provisions that must be honored by the Depositors. In the event that a loan has a material misrepresentation or violates the warranties given to certificate holders and the Trustee of the REMIC, the loan must be purchased from the Certificate Holders and whatever insurance was in place is now void due to fraud being detected on the loan.

192.    In the case of loan modifications it benefits the servicer to keep vital information away from the Certificate Holders and the Trustee that oversees the Trust. In the event that fraud is detected on a mortgage loan the "**buy back**" provisions kick in and the servicer or originator, which is sometimes the same company, would be forced to take back the loan. In this case Ally would be forced to put a dead loan on their balance sheet with no hopes of being able to collect on the insurance policy that is in place due to fraud.

193.    When Plaintiffs are desperate for help, Ally refuses to assist them. In the event that Ally forwards the true and accurate financial information to the Trustee overseeing the REMIC or to a third party chosen by the Trustee, they can and sometimes do find material misrepresentations that took place at origination. A Plaintiff supplies current financial information up to and including a signed 4506-T and the investor or Ally through their processing centers find out that the income listed on the initial loan application was not correct.

194.    This leads to a chain of events that Plaintiffs and the Courts are unaware of. Based on evidence Plaintiffs will introduce at trial Ally instructs their employees to decline any application that contains a material misrepresentation for *fear of having to buy back the loan.*

195.    This practice has led to numerous lawsuits including Government lawsuits in which Government Sponsored Enterprises have independently sent out modification requests and have verified fraudulent information was used at the origination of the Plaintiffs loans.

**COMPLAINT**

1    196.    This practice alone has led to millions of American's losing their homes for fear of

2    reprisal from investors that were lied to, when they purchased these *Toxic* loans.

3    197.    Defendants' wrongful acts continue to this day with hardball tactics and deception that

4    continue to threaten Plaintiffs' rights and financial security, as well as the economic future of the State

5    of California. Since 2010, these tactics and Defendants' other wrongful acts have finally been revealed

6    as a result of extensive litigation and Government investigations. .

7

8    *Defendants Used The Promise Of Loan Modifications As Bait To Damage Plaintiffs'*

9    *Credit, Preventing Plaintiffs From Obtaining Financing Anywhere Else*

10

11    198.    Defendants had an unfair and fraudulent pattern on inducing and directing borrowers to

12    fall behind on their payments with the promise that by doing so, they would become eligible for a loan

13    modification. Relying on these representations, Plaintiffs fell behind on their loan payments, but were

14    never offered a loan modification.

15    199.    In doing so, Plaintiffs' credit was substantially damaged, they suffered greatly diminished

16    access to credit and financing, and were penalized with fees, penalties and charges in addition to

17    becoming delinquent on their loan as recommended by the Bank.

18    200.    By recommending that Plaintiffs fall behind, Defendants effectively trapped Plaintiffs

19    into keeping their loan with Defendants, because no other institution would help Plaintiffs after they

20    became delinquent on their mortgage, or after their credit was destroyed.

21    201.    At its most fundamental level, these sorts of unscrupulous business tactics, undermine

22    notions of fair play and good faith in business dealings, and jeopardize the consuming public.

23

24

25

26

27

- 54 -

28

**COMPLAINT**

Defendants Used The Promise Of Loan Modifications As Bait For An Outright Cash-
Grab With No Intent To Ever Modify Plain*tiffs*

202.   Defendants also had an unfair and fraudulent pattern of offering borrowers what appeared to be Loan modification offers (called "Trial Payment Plans"), but in reality these offers were nothing more than "cash grabs." Defendants never intended to permanently modify Plaintiffs' loans. Specifically, Defendants would offer Plaintiffs and homeowners who were already on the brink of default/foreclosure a lower payment called a "trial payment." Defendants promised that if Plaintiffs were able to make the trial payment for 3 (or more) months, Defendants would permanently modify Plaintiffs' payment to be the same amount under the trial payments. But Defendants had a pattern of rejecting these loan modifications despite Plaintiffs' compliance with every term of the loan modification offer. Instead Defendants would use the offer as bait to induce Plaintiffs to make payments which would never be applied to the principal and interest of their loan, but instead would be applied to the mountain of unmerited late charges, and fees, taking what little money the financially imperiled plaintiffs had left, and duping them into spending it on unfairly placed fees and late charges. Defendants never had any intent of modifying their loans, despite Plaintiffs' full compliance with the terms of the offer. Such acts are patently unfair and fraudulent, and Plaintiffs are entitled to remuneration of all payments made under such trial payment plans, as well as an injunction prohibiting Defendants from this deceptive business practice. More specifically, Defendants' unlawful and unfair practices in this regard include, but are not limited to, the following:

   a. failing to make good faith efforts to provide them with a loan modification and breaching their contractual obligations, written and implied promises, loan servicing functions owed to Plaintiffs, who fulfilled their obligations by making timely modified payments;

- 55 -

**COMPLAINT**

b. making false and/or misleading representations that Plaintiffs were eligible and entered into the trial modification period, which would lead to a permanent modification of their mortgage payment;

c. failing to disclose to Plaintiffs that their modified payments may be reported to credit bureaus as default or late payments that would destroy their credit scores;

d. delaying processing, demanding duplicate documentation, and failing to provide adequate information or communication regarding the loan modification programs to Plaintiffs;

e. engaging in conduct that undermines or violates the spirit or intent of the consumer protection laws alleged in this Complaint; and

f. omitting to inform Plaintiffs that they could be rejected from the trial modification period at any point, and that this would result in the immediate demand for a balloon payment consisting of purported delinquency payments and substantial late fees, default fees, foreclosure fees, inspection fees, property preservation fees, trustee fees, trustee sale guarantee fees, mail fees, recording fees, and default servicing fees.

## DEFENDANTS THEN INTENTIONALLY STEAMROLLED
## WRONGFUL FORECLOSURE AFTER WRONGFUL FORECLOSURE
## WITHOUT ANY OWNERSHIP INTEREST IN THE NOTES OR DEEDS OF TRUST
## TO COLLECT WILDLY INFLATED FEES AND TURN UNIMAGINABLE PROFIT

203.    Continuing their chronology of greed-driven deception and intentional wrongdoing, Defendants not only (1) intentionally placed Plaintiffs into egregiously dangerous, unaffordable and impossible loans in the name of profit on the secondary market, and, (2) offered Plaintiffs trial loan modifications in an attempt to grab as much cash as they could before foreclosing – none of which would be applied to the principal or interest of Plaintiff's loans - with no intent of ever actually

**COMPLAINT**

1  modifying Plaintiffs' loans for fear of having their own (Defendants') fraud discovered by their
2  investors and being forced to buy back the loan at a massive loss, but in a final coup-de-grace (3)
3  intentionally foreclosed on plaintiffs despite having no ownership interest in the notes or deeds of trust,
4  in the name of collecting preposterous and unmerited "foreclosure fees" including: inspection fees,
5  default fees, late fees, advance fees, attorney fees, and trustee fees.

6      204.    Defendants charged these ill-defined and ambiguous fees whose amounts were *never*
7  disclosed to Plaintiffs in any writing or contract whatsoever, unilaterally. They decided how much they
8  wanted to charge for whatever reason they wanted to charge it. And the amounts they charged were
9  tantamount to price gauging, often charging double, triple or even quadruple the fair market value for
10  these "services." Needless to say, the outrageous price markups all inured to the benefit of the
11  conspiracy of Defendants. Especially in light of the fact that Defendants did not have an ownership
12  interest in the property upon which to foreclose, these charges and fees were entirely unjustified, and
13  constitute numerous cognizable sources of restitution.

14      205.    In short, Defendants made money by initiating foreclosures, and for this very reason
15  intentionally steamrolled wrongful foreclosures over plaintiffs without having any true possessory or
16  ownership interest in the deed of trust, threatening to wrongfully dispossess Plaintiffs of their homes and
17  placing them on the streets.

18      206.    In the greed-driven world of Defendants, neither law nor ethics would be allowed to
19  stand as an obstacle in their insatiable hunt for profit.

20
21              ***Defendants Seek to Enforce Notes & Deeds of Trust***
22              ***Without Evidencing Their Ownership Interest***

23      207.    Securitizing a loan generally entails the sale of a loan to private investors, together with
24  other loans, in a "pool" of loans. Indeed, as typically executed, a securitization process may result in up
25  to three successive sales of the loan or in interests in the loan. These interests in the same loan are sold
26  in tranches that can be found in many collateralized debt obligation securities. As a result, the ultimate
27  note holders are many, disparate and unrelated entities, no one of which can lawfully enforce the note

28

1  without the participation of all the other anonymous note holders to partial interests in a single home
2  loan.
3      208.  Defendants' continue to demand payment and to foreclose and threaten to foreclose on
4  Plaintiffs, despite the facts that:
5            a.  Defendants have no proof that they own the notes and deeds of trust they seek to
6               enforce;
7            b.  There is considerable evidence that Defendants do not own the notes and deeds of
8               trust they enforce and seek to enforce and based thereon, Plaintiffs allege that they do
9               not; and
10           c.  Whether or not they can demonstrate ownership of the requisite notes and deeds of
11              trust, Defendants lack the legal right to enforce the foregoing because they have not
12              complied with disclosure requirements intended to assure mortgages are funded with
13              monies obtained lawfully.
14     209.  Plaintiffs believe and thereon allege that Defendants have made demand for payment on
15 the Plaintiffs with respect to Plaintiffs' properties at a time when Defendants are incapable of
16 establishing (and do not have any credible knowledge regarding) who owns the promissory notes
17 Defendants are purportedly servicing.  Plaintiffs believe and thereon allege that because Defendants are
18 not the holders of Plaintiffs' notes and deeds of trust and are not operating under a valid power from the
19 various current holders of the notes and deeds of trust, Defendants may not enforce the notes or deeds of
20 trust.
21
22                     ***Defendants' Improper Securitization:***
23 ***The Foreclosing Trusts Had No Ownership Interest In Plaintiffs' Notes Or Deeds Of***
24     ***Trust Under The Explicit Terms Of Their Own Pooling & Service Agreements***
25
26     210.  Almost every Mortgage loan investigated which was produced by a major Banking
27 Institution between the years 2000 - 2008 was securitized. Securitization is the act of producing an

28                     **COMPLAINT**

1  investment vehicle of Mortgage-Backed Securities ("MBS") using the Borrower's Mortgage NOTE as
2  the under-lying corpus, as collateral.

3      211.   In a typical Securitization Transaction, mortgage loans are transferred by loan
4  "Originators" to a "Sponsor." The "Sponsor", in turn, sells the mortgage loans to a "Depositor," a single
5  –purpose entity. When the Sponsor acts in selling capacity, it is often referred to as a "Seller," as well
6  as a Sponsor. The Depositor, in turn, deposits the loans into the securitization trust also known as a
7  "REMIC", pursuant to a Pooling and Servicing Agreement ("PSA") or similarly-named agreement.

8      212.   The parties to the Pooling and Servicing Agreement (PSA) generally are the Seller, the
9  Depositor, the "Master Servicer," which services the mortgage loans and/or monitors the servicing of the
10  mortgage loans by sub-servicers, and the "Trustee" who administers the trust that is established pursuant
11  to the PSA.

12      213.   The reason loans are pooled and placed into these loan trusts named REMIC's is due to
13  income tax purposes. A REMIC is an "SPV" or Special Purpose Vehicle that is treated by the IRS as a
14  "QSPE" or Qualifying Special Purpose Entity. It specifically was designed by Congress to allow the
15  vehicle to not be taxed as the cash flows through the vehicle and distributed to the investor and
16  certificate holders. It is like an S Corp where there is no double taxation.

17      214.   Pooling and Servicing Agreements only allow loans to be placed into a REMIC for **two**
18  **years** after the set-up of the Trust due to tax implications. You can only substitute in loans for two years
19  thereafter, if there is non-compliance with the aforementioned PSA the penalty is 100% of the face value
20  of the asset in tax penalties.

21      215.   Plaintiffs believe that their loans are illegally being substituted in and out of these loan
22  Trusts in direct violation of the PSA's in order to cure deficiencies with the Chain of Title that never
23  should have occurred to begin with. Defendants are attempting to cure these defects with the use of
24  (MERS) Mortgage Electronic Registration System.

25      216.   Moreover, Plaintiffs allege that in numerous instances, Defendants foreclosed on behalf
26  of trusts which had no ownership interest whatsoever in the DOT, **because the trusts had been-long**
27  **closed under the terms of their very own PSA.** In other words, it was impossible for the subject loan

- 59 -

28

1 | to be placed into the trust such that the trust would have any ownership interest in the loan upon which
2 | to foreclose.

3 |     217.    Defendants are defrauding Plaintiff's by transferring or purporting to transfer ownership
4 | of these loans to entities that **can no longer accept these assigned loans**, and thus have no ownership
5 | interest in the loans upon which they could foreclose. Under strict REMIC rules a loan must follow a
6 | specific protocol in order to become property of the Trust.

7 |     a.  Originator/ Lender must endorse the Note in Blank to the Sponsor/Seller

8 |     b.  The Seller assigns the Note to the Depositor/Purchaser who is to insure that all of the
9 |        trust assets are actually deposited into the REMIC.

10 |     c.  The Depositor assigns all of the Notes and Deeds of Trust/Mortgages into the name of
11 |        the Issuing Entity.

12 |     d.  The Issuing Entity is the newly formed REMIC that obtains an issuer number from
13 |        the Securities and Exchange Commission to issue Certificates to Investors.

14 |     e.  The Issuing Entity hires an independent Trustee to become the Custodian of the Trust.
15 |        Trustee's job is to supervise the activities of the Trust and to insure that the
16 |        Certificate Holders/Investors **"True Owner's"** of the loans are paid based on the
17 |        Certificate grades they purchased.

18 |     f.  The Trustee hires a Master Servicer and Sub-Servicers to collect mortgage payments
19 |        and service the loans on behalf of the Trust.

20 |     g.  In the event of a foreclosure action the REMIC Trustee must follow proper
21 |        foreclosure procedures as laid out in the Pooling and Servicing Agreement.

22 |     218.    It is standard in the securitization industry and the secondary markets to endorse a note to
23 | blank. Most often times the pool servicing agreement requires the Depositor to endorse the Note to
24 | Blank, in other words it is not endorsed to a person or entity, it's endorsed in blank making the Note a
25 | bear or bear instrument making it possible for the holder of that instrument to Deposit it into the Trust as
26 | required by the pool agreement. However, with this endorsement the pooling and servicing agreement
27 | requires that the Depositor transfer the Note to the Trustee for the benefit of the certificate holders.

-60-

219. A "Custodian" is sometimes a party to the PSA and sometimes enters into a separate Custodial Agreement with the Trustee or the Trustee can act as both if so designated in the PSA.

220. Pursuant to the Custodial agreement, the Custodian maintains possession of the loan files on behalf of the Trustee.

221. An "Underwriter" typically enters into an Underwriting Agreement with the Depositor pursuant to which the Underwriter commits to purchase certain of the trust certificates and/or notes issued by the trust. In turn, the trust certificates and/or notes are sold to investors by the Underwriter (or Underwriters) pursuant to a Registration Statement or Prospectus filed with the Securities and Exchange Commission ("SEC").

222. When the transaction is complete, the Trust files a Form 8-K with the SEC. The form is accompanied by the documents involved in the securitization transaction.

223. Trust certificates are frequently issued in different classes. The different classes are associated with different payment terms, and different levels of risk. One loan can be placed in multiple classes of securities; these different classes of trust certificates are called "Tranches". The terms, including payment schedule, distribution priority, and allocation of losses, and the level of risk attributable to each class of certificates, or tranche, are defined in the PSA and related exhibits, and in the Prospectus and Prospectus Supplements.

224. When a loan is placed into a Tranche there can be more than one owner of the security since the loan has been chopped up into smaller pieces and listed as security in different classes of certificates based on risk.

225. The relative risk associated with any class, or tranche, of the trust certificates may be set by various devices, including credit enhancements, the subordination of lower level tranches through an agreement to absorb losses first, the over-collateralization of loan pools in excess of the aggregate amount of the trust certificates, or the creation of an excess spread fund to cover the difference between the interest collected from the pooled mortgage notes and the amounts owed to investors who purchase the trust certificates.

COMPLAINT

226.    Subordinating the right of certain of the trust certificates to receive cash flow from the pooled mortgage until senior trust certificates have been paid, or allocating the cash flow from the pooled mortgages until senior certificates have been paid, or allocating the cash flow from the pooled mortgages to different levels of trust certificates may be employed to create a tiered structure known as a **"Waterfall."**

227.    Losses from mortgage defaults, delinquencies, or other factors may be allocated in reverse seniority, with the junior tranches incurring losses first until their interests are reduced to zero. Each class of trust certificates or tranche may have a credit rating issued by one or more nationally recognized statistical rating organizations who rate the likelihood of payment of interest and principal owed to the tranche, based on their internal projections of expected losses from the loan pool.

228.    Securitization transactions involving government sponsored entities such as Fannie Mae and Freddie Mac follow the same general pattern involving the pooling of loans and sale of securities to investors, although the terminology and intermediate entities may be different.

229.    In simple terms, in a securitization transaction, the loan is made by the "originator," and then sold into the market. Ownership of the loan is transferred to a trust. Certain files, including the original note and original deed of trust are maintained by a custodian or the trustee. The loan is serviced by the servicer, who collects the payments, keeps the payment history, and initiates (but typically does not conduct) foreclosure sales. Participants in the trust earn income, and absorb losses, according to the terms of the trust and associated contracts.

230.    Other mortgage notes are owned by the issuing banks and are held in inventory for their own investment purposes.

231.    The following diagram illustrates the various parties involved in the typical securitization transaction, and also evidences custody and ownership of the underlying mortgage note.

**COMPLAINT**

# Appendix A - Understanding Securitization

It is important to have a general familiarity with mortgage securitization in order to understand the foreclosure process. Securitization involves a series of conveyances of the note evidencing the residential loan and assignment of the mortgage or trust deed securing it. Therefore, chain of title and beneficial interest issues frequently turn on the securitization trajectories.

*Securitization* is the process pooling loans into "mortgage-backed securities" or "MBS" for sale to investors. MBS is an investment instrument backed by an undivided interest in a pool of mortgages or trust deeds. Income from the underlying mortgages is used to pay interest and principal on the securities. Figure A below is a simplified schematic depicting the general securitization process and some of the parties involved.

Figure A - Securitization Schematic



The process begins with *Originators*, which are the lenders (such as banks or finance companies) that initially make the loans to homeowners. *Sponsor/Sellers* (or "sponsors") purchase these loans from one or more Originators to form the pool of assets to be securitized. (Most large financial institutions are both Originators and Sponsor/Sellers.) A *Depositor* creates a *Securitization Trust*, a special-purpose entity, for the securitized transaction. The depositor acquires the pooled assets from the Sponsor/Seller and in turn deposits them into the Securitization Trust. An *Issuer* acquires the Securitization Trust and issues certificates to eventually be sold to investors.

232. Defendants, and each of them, wrongfully acted and continue to act as if they are either the owner, beneficiary, successor, assignee or servicer, or have some other right, title, or interest in Plaintiffs' notes and deeds of trust, when, in reality, they have no basis to assert any such right, title or interest.

233. As a result of Defendants' improper scheme, Plaintiffs lost their equity in their homes, their credit ratings and histories were damaged or destroyed, and Plaintiffs incurred material other costs and expenses, described herein. At the same time, Defendants took from Plaintiffs and other borrowers billions of dollars in interest payments and fees and generated billions of dollars in illegal and fraudulently obtained profits by selling their loans at inflated values and using the loans as collateral for fraudulent swaps.

## *Understanding MERS – And Its Role*
## *In Defendants' Wrongful Foreclosure Process*

234. MERS operates an electronic registry designed to track servicing rights and the ownership of mortgages. MERS is sometimes named as the "nominee" for lenders, and at other times MERS is named as the "beneficiary" of the deed of trust on behalf of unknown persons. When a loan is transferred among MERS members, MERS purports to simplify the process by avoiding the requirement to re-record liens and pay county recorder filing fees.

235. For many of the Plaintiffs herein, MERS claims to be the owner of the security interest indicated by the mortgages transferred by lenders, investors and their loan servicers in the county land records. MERS claims its process eliminates the need to file assignments in the county land records which lowers costs for lenders and consumers by reducing county recording revenues from real estate transfers and provides a central source of information and tracking for mortgage loans.

236. Based upon published reports, including MERS' website, Plaintiffs believe and hereon allege, MERS does not: (1) take applications for, underwrite or negotiate mortgage loans; (2) make or

COMPLAINT

1    originate mortgage loans to consumers; (3) extend credit to consumers; (4) service mortgage loans; or
2    (5) invest in mortgage loans.

3        237.    MERS is used by Defendants to facilitate the unlawful transfers of mortgages, unlawful
4    pooling of mortgages and the injection into the United States banking industry of unsourced (i.e.,
5    unknown) funds, including, without limitation, improper off-shore funds.  Plaintiffs are informed and
6    thereon believe and allege that MERS has been listed as beneficial owner of more than half the
7    mortgages in the United States.  MERS is improperly listed as beneficial owner of many of Plaintiffs'
8    mortgages.

9        238.    MERS states in their Quality Assurance and Procedures Manual which protocol to follow
10   on active MERS loans and which protocol to follow for non-MERS member loans. Prior to a MERS
11   member bringing any type of foreclosure action they must prepare and assignment and give it to the
12   Servicer for it to be recorded before first legal action is brought including the filing of Notice of
13   Defaults.

14       239.    If the loan is deactivated from the MERS system, MERS must prepare and record an
15   assignment transferring the beneficial interests of the MERS member loan to the beneficiary and must
16   insure that this assignment is recorded within fourteen calendar days of the Deactivation Date.

17       240.    At all times MERS must disclose who the investor or beneficiary is of the mortgage note
18   in accordance with 15 USC Section 1641 (f)(2), yet when loans are searched in their database they state
19   that the investor has chosen not to display that information or they list the servicer as the investor on the
20   loan. By hiding the true beneficiary they are preventing the Plaintiffs from contacting or negotiating loan
21   modifications or short sales with the "True Party in Interest".

22       241.    On April 13, 2011, the Federal Reserve Board of Governors, the Comptroller of the
23   Currency, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision and the Federal
24   Housing Finance Agency found "certain deficiencies and unsafe or unsound practices by MERS and
25   MERSCORP that present financial, operational, compliance, legal and reputational risks." As a result,
26   the various agencies entered into a Consent Order requiring those practices be audited and corrected.

27

28

1    242.    In 2001, Congress found that "money laundering, and the defects in financial
2   transparency on which money launderers rely, are critical to the financing of global terrorism and the
3   provision of funds for terrorist attacks." Congress specifically found that "money launderers subvert
4   legitimate financial mechanisms and banking relationships by using them as protective covering for the
5   movement of criminal proceeds and the financing of crime and terrorism..." The Defendants in this
6   lawsuit have in this manner subverted financial mechanisms with the intent, or at least the result and
7   callous disregard, of providing such a covering for many illegal activities.

8

9                          *The Aftermath of Defendants' Wrongful Foreclosures*

10    243.    To add further insult to injury, Defendants, knowing of this massive fraud, and sought to
11  swoop in like the Civil War carpetbaggers and profiteer from the carnage that they had wreaked on
12  Plaintiffs.

13    244.    With the proceeds of TARP funds and a voraciousness that has already been chastised by
14  numerous courts, Defendants then sought to obliterate the last vestiges of value held by Plaintiffs, and
15  proceeded to flip distressed assets for a profit.

16    245.    Defendants' other improper acts since 2008 are numerous, including but not limited to:
17  (1) issuing Notices of Default to some Plaintiffs in violation of Cal. Civil Code §2923.5; (2)issuing
18  Notices of Defaults, and initiating foreclosure on behalf of those with no beneficial interest in the note or
19  deed of trust , (3) conducting the unauthorized sale of Plaintiff's property by a trustee who was never
20  properly appointed or substituted as trustee (4) misrepresenting their intention to arrange loan
21  modifications for many Plaintiffs, while in fact creating abusive roadblocks to deprive Plaintiffs of their
22  rights; and (5) failing to respond to most Plaintiffs' communications while often erecting barriers to
23  make it difficult for the Plaintiffs to communicate with them.

24    246.    Defendants continue to demand payment and to threaten to foreclose on Plaintiffs,
25  despite the facts that: (1) Defendants have no proof that they own the notes and deeds of trust they seek
26  to enforce; (2) there is considerable evidence that Defendants *do not* own the notes and deeds of trust
27  they enforce and seek to enforce and based thereon, Plaintiffs allege that they do not; and (3) whether or
28

- 65 -

COMPLAINT

1   not they can demonstrate ownership of the requisite notes and deeds of trust, Defendants lack the legal

2   right to enforce the foregoing because they have not complied with required disclosure requirements

3   intended to assure that mortgages are funded with monies obtained lawfully in addition to California's

4   non-judicial foreclosure statutes codified at Cal.Civ.Code 2924 et seq., with which, it has been

5   repeatedly affirmed by California courts, "*strict compliance*" is required.

6       247.    As a proximate and foreseeable result of the Defendants' sale of the notes and deeds of

7   trust regarding Plaintiffs' properties and others similarly situated for more than the actual value of such

8   instruments, securitization pools lacked the cash flow necessary to maintain the securitization pools in

9   accordance with their indentures. Further, it was only a matter of time before Defendants' fraudulent

10  offshore swaps were uncovered. The unraveling of the Defendants' fraudulent scheme has materially

11  depressed the price of real estate in many parts of California, particularly including the real estate owned

12  by Plaintiffs.

13      248.    Defendants have admitted in their various securities filings that they sold Plaintiffs' notes

14  and mortgages. There is no evidence that Defendants have re-acquired Plaintiffs' notes or deeds of trust.

15  Accordingly, their claims of subsequent ownership appear to be specious.

16      249.    Plaintiffs believe and thereon allege that Defendants have made demand for payment on

17  the Plaintiffs with respect to Plaintiffs' properties at a time when Defendants were incapable of

18  establishing (and did not have any credible knowledge regarding) who owns the promissory notes

19  Defendants were purportedly servicing, and that these acts are continuing. Because Defendants are not,

20  and were not at the relevant times, the holders of Plaintiffs' notes and deeds of trust and are not, and

21  were not at the relevant times, operating under a valid power from the current holders of the notes and

22  deeds of trust, Defendants are not and were not at the relevant times allowed legally to enforce the notes

23  or deeds of trust. Defendants' attempts to enforce these notes were nothing but a sham and a fraud upon

24  the Plaintiffs, the public, and the courts.

25  //

26  //

27

28

**COMPLAINT**

# DEFENDANTS' VIOLATION OF NUMEROUS OTHER LAWS

## *Defendants' Pervasive Scheme Of Fraud & Deception*

250.    Under California Civil Code § 1709 it is unlawful to willfully deceive another "with intent to induce him to alter his position to his injury or risk."

251.    Under California Civil Code § 1710, it a "deceit" to do any one or more of the following: (1) the suggestion, as a fact, of that which is not true, by one who does not believe it to be true; (2) the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; (3) the suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or, (4) a promise, made without any intention of performing it.

252.    Under California Civil Code § 1572, the party to a contract further engages in fraud by committing "any other act fitted to deceive."

253.    At the time of entering into the notes and deeds of trust referenced herein with respect to each Plaintiff, Defendants were bound and obligated to fully and accurately disclose the following and did not do so:

        a.  Who the true lender and mortgagee were.

        b.  That to induce a Plaintiff to enter into a mortgage, the Defendants disregarded their underwriting requirements, thereby causing Plaintiff to falsely believe that Plaintiff was financially capable of performing Plaintiff's obligations under the mortgage, when the Defendants knew that was untrue.

        c.  That Defendants not only had the right to securitize and sell Plaintiff's mortgage to third-party investors, but that they specifically planned and intended to do so as to virtually all mortgages at highly-inflated and unsustainable values.

        d.  That Defendant's intended to use Plaintiffs notes and mortgages as security for fraudulent swap transactions.

- 67 -

**COMPLAINT**

e. That as to the intended sales:

    i. The sales would include sales to nominees who were not authorized under law at the time to own a mortgage, including, among others, MERS, which according to its website, was created by mortgage banking industry participants to be only a front or nominee to "streamline" the mortgage re-sale and securitization process;

    ii. Plaintiff's true financial condition and the true value of Plaintiff's home and mortgage would not be disclosed to investors to whom the note and/or mortgage would be sold or used as collateral;

    iii. Defendants intended to sell the note and mortgage together with other notes and mortgages as to which they also intended not to disclose the true financial condition of the borrowers or the true value of their homes, notes or mortgages;

    iv. The consideration to be sought from investors would be greater than the actual value of the said notes and deeds of trust; and

    v. The consideration to be sought from investors would be greater than the income stream that could be generated from the instruments even assuming a 0% default rate thereon.

f. That the notes and mortgages would thereby be used as part of a scheme by which the Defendants would bilk investors by selling collateralized mortgage pools at an inflated value and/or by entering into swaps at inflated value.

g. That, at the time they did the foregoing, the Defendants knew the foregoing would lead to a liquidity crisis and the likely collapse of Defendants;

h. That the Defendants also knew the foregoing would lead to grave damage to each Plaintiff's property value and thereby result in Plaintiff's loss of the equity Plaintiff invested in his house, as well as damaging Plaintiff's credit rating and resulting in other costs and damages to Plaintiff, thereby causing Plaintiff additional severe

- 68 -

**COMPLAINT**

1      financial damage; and

2      i.   That the Defendants knew at the time of making each loan, but did not disclose to

3         Plaintiffs, that entire communities would become "ghost-town-foreclosure-

4         communities" after a domino effect of foreclosures hit them.

5      j.   That the Defendants did not have documents competent to establish that they were

6         holders in due course of the notes or deeds of trust, or otherwise operating under a

7         valid power of attorney with respect thereto to support the right to enforce the notes

8         and deeds of trust against Plaintiffs property.

9      k.   That the Defendants did not properly source their funds, or report the source of their

10         funds in compliance with all requirements.

11      254.   When property values started falling – just as Defendants knew would occur –

12 Defendants could no longer continue the pretense, concealment and affirmative misrepresentations.

13 Plaintiffs through their losses, and then also the ultimate banker, the U.S. taxpayer, have footed the bill

14 through TARP and other programs.

15      255.   Further, in violation of their own underwriting guidelines, Defendants covertly offered

16 Plaintiffs and others loans at a loan-to-value ratio that was unsustainable and without income

17 verification. The Defendants knew, but concealed from Plaintiffs that they knew, Plaintiffs would soon

18 be unable to afford the loans once introductory discount interest rates ended, and variable interest and

19 balloon payments kicked in.

20      256.   The Defendants knew that when interest payments increased and balloon payments

21 became due, if not before, Plaintiffs and others would begin defaulting on their mortgages and would

22 suffer grievous losses from mortgages for which they were not qualified.

23      257.   The Defendants knew that the scale of the lending – based on inflated property values,

24 without income verification and in violation of numerous other Defendants underwriting guidelines –

25 would lead to widespread declines in property values, thereby putting Plaintiffs and others into extremes

26 through which they would lose the equity invested in their homes and have no means of refinancing or

27 selling, other than at a complete loss. That is precisely what happened to Plaintiffs herein.

28

**COMPLAINT**

## *The Patriot Act*

258.    Enacted in 2001, the USA Patriot Act (Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("Patriot Act") is comprised of nine principal titles, including Title III: International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001.

259.    In the Patriot Act, Congress found that "money laundering, and the defects in financial transparency on which money launderers rely, are critical to the financing of global terrorism and the provision of funds for terrorist attacks." Congress specifically found that "money launderers subvert legitimate financial mechanisms and banking relationships by using them as protective covering for the movement of criminal proceeds and the financing of crime and terrorism..." Title III, § 302.

260.    Congress also noted that correspondent accounts involving off-shore persons were particularly vulnerable to improper use. Title III, § 302 (8).

261.    Title III of the Patriot Act requires each financial institution that establishes, maintains, administers, or manages accounts in the United States for an individual or representative of a non-United States person to establish due diligence policies, procedures and controls reasonably designed to detect and report instances of money laundering through those accounts. Title III, § 312.

262.    Section 327 makes it more difficult for banks to merge if they lack a good track record in combating money laundering. Sections 312, 213, 219 and 325 provide for forfeitures in specified circumstances pertaining to terrorism and money laundering.

263.    Section 326 requires financial institutions to establish procedures to take reasonable and practicable measures to verify the identity of those applying for an account with the institution (31 U.S.C. § 5318(I)(2)(A)) and maintain records of the information used to verify a person's identity, including name, address, and other identifying information (31 U.S.C. § 5318(I)(2)(B)).

264.    These enhanced due diligence policies, procedures, and controls require that each financial institution ascertain the identity of any foreign bank and the nature and extent of the ownership interest of each such owner, conduct enhanced scrutiny to guard against money laundering and report any suspicious transactions, and ascertain whether such foreign bank provides correspondent accounts to

-70-

other foreign banks. Title 3, § 312. The Patriot Act, therefore, places an affirmative burden on United States banks to ascertain the identity and nature of the individuals and the sources of the monies it receives from foreign banks or individuals.

265. Plaintiffs are informed and believe that a significant number of Ally's mortgages were transferred to foreign banks. To be sure, it is well-established that a very significant percentage of TARP bailout funds made their way to foreign banks and financial institutions that were either holders in due course of mortgage-backed securities issued and sold by Defendants, or by entities under their control, or were counter-parties to Defendants' aggressive shorting activities in purchasing credit default swaps against their own loans to Plaintiffs. Under either scenario, Defendants reaped a harvest of income from the sale of those securities or received payment under the swaps for defaulted loans. It was utterly immaterial to Defendants what the source of those funds may have been.

266. To comply with the Patriot Act, Defendants must determine and report the sources of funds used for the mortgages they originate and service, as well as the source of funds used to acquire any mortgages. Ally Financial and Ally Bank also were subject to the Patriot Act.

267. Defendants bundled and resold Plaintiffs' mortgages, without any accountability or notices, as well as the transfer off-shore of records pertaining to the foregoing. This scenario is precisely what Congress sought to prevent in enacting the Patriot Act. Anonymous owners may have used these multiple transactions to launder money, further criminal activity, or even fund terrorist operations.

268. Defendants perpetrated their massive fraud knowing it would result in a crash, including a wave of foreclosures. To the extent non U.S. persons have acquired the mortgages (and can be identified), Plaintiffs' homes could be foreclosed upon by transferees, including persons engaged in activities intended to be quarantined by the Patriot Act.

269. Pursuant to Title III, §319, when an act or omission of a bank results in property being transferred, sold to, or deposited with a third party or placed beyond jurisdiction of the Court, such property is subject to forfeiture.

1    270.    On information and belief, contrary to the Patriot Act, Defendants did not: (1) establish
2  due diligence policies, procedures and controls reasonably designed to detect and report instances of
3  money laundering, (2) establish procedures to take reasonable and practicable measures to verify the
4  identity of those applying for an account and maintain records of the information used to verify a
5  person's identity, including name, address, and other identifying information, (3) determine and report
6  the sources of funds used for the mortgages they originate and service, as well as the source of funds
7  used to acquire any mortgages, or (4) disclose to Plaintiffs the identities, address and telephone numbers
8  of transferees of their mortgages.

9    271.    As a consequence of the foregoing, Defendants may be liable for a forfeiture of any loans
10  or interests in Plaintiffs' homes, and/or other appropriate relief.

11    272.    This Complaint does not allege a cause of action for breach of the Patriot Act. Rather,
12  Defendants actions and omissions are relevant to the causes of action alleged herein for the following
13  reasons: (1) such actions and omissions and the potential consequences thereof were concealed from
14  Plaintiffs, (2) such actions and omissions are relevant to determining the availability of punitive
15  damages, and (3) such actions and omissions are relevant to assessing whether there is liability under the
16  California Unfair Competition Law which is the basis for the fourth cause of action herein.

17
18
19            *TILA* / Notification of Sale or Transfer of Mortgage Loans

20    273.    Effective May 20, 2009, pursuant to an amendment to the Federal Truth in Lending Act
21  ("TILA"), transferors of mortgage loans must disclose to the mortgagee the identify of any transferees.
22  The notice must include the identity, address and telephone number of the new creditor; the date of the
23  transfer; how to reach an agent or party having authority to act on behalf of the new creditor; the
24  location of the place where transfer of ownership of the debt is recorded; and any other relevant
25  information regarding the new creditor.

26    274.    Section 404. Of TILA, NOTIFICATION OF SALE OR TRANSFER OF MORTGAGE
27  LOANS, provides:

28
**COMPLAINT**

(a) IN GENERAL.—Section 131 of the Truth in Lending Act (15 U.S.C. 1641) is amended by adding at the end the following:

"(g) NOTICE OF NEW CREDITOR.—

"(1) IN GENERAL.—In addition to other disclosures required by this title, not later than 30 days after the date on which a mortgage loan is sold or otherwise transferred or assigned to a third party, the creditor that is the new owner or assignee of the debt shall notify the borrower in writing of such transfer, including—

"(A) the identity, address, telephone number of the new creditor;

"(B) the date of transfer;

"(C) how to reach an agent or party having authority to act on behalf of the new creditor;

"(D) the location of the place where transfer of ownership of the debt is recorded; and

"(E) any other relevant information regarding the new creditor.

"(2) DEFINITION.—As used in this subsection, the term 'mortgage loan' means any consumer credit transaction that is secured by the principal dwelling of a consumer.".

(b) PRIVATE RIGHT OF ACTION.—Section 130(a) of the Truth in Lending Act (15 U.S.C. 1640(a)) is amended by inserting "subsection (f) or (g) of section 131," after "section 125,"

275.  The amendment above was signed into law as part of the Helping Families Save Their Homes Act of 2009, with immediate effect from the President's signature. The purpose of the amendment is to ensure that homeowners know who owns their mortgages and to prevent lenders from standing behind nominees. The requirement for "any other relevant information" is particularly strong, underscoring the strong Congressional intent for complete disclosure. Using MERS to foreclose may in and of itself violate 15 U.S.C. § 1641.

276.  The Board of Governors of the Federal Reserve System (the "Board") promulgated an interim final rule (the "Interim Final Rule"). The Interim Final Rule amends Regulation Z by implementing Section 131(g) of TILA. With respect to the content of the notices, the Interim Final Rule provides, among other things:

    a. The party identified as the owner of a mortgage loan must be the actual owner, regardless of whether another person has been appointed as agent or servicer of the owner;

    b. If there are multiple "covered persons" with respect to a mortgage loan, identifying information must be provided for each covered person; however, only one notice is to

- 73 -

**COMPLAINT**

be given, and the covered persons must determine among themselves which one of them will deliver the notices ("covered persons" means, generally, creditors);

c. The date of acquisition of a mortgage loan is the date of acquisition recognized in the books and records of the covered person;

d. The notice must identify the persons who are authorized to receive legal notices on behalf of the covered person and to resolve issues concerning the mortgagor's payments on the mortgage loan; if there are multiple agents performing these functions, the scope of authority for each agent must be specified.

277. Remedies for TILA violations include rescission, damages and equitable relief. 15 U.S.C. §§ 1635 – 1640.

278. This Complaint does not allege a cause of action for breach of TILA. Rather, Defendants actions and omissions are relevant to the causes of action alleged herein for the following reasons: (1) such actions and omissions and the potential consequences thereof were concealed from Plaintiffs, (2) such actions and omissions are relevant to determining the availability of punitive damages, and (3) such actions and omissions are relevant to assessing whether there is liability under the California Unfair Competition Law which is the basis for the seventh cause of action herein.

### *Previous Enforcement Actions Evidence Defendants' History Of The Very Wrongdoing Alleged Herein – And Their Continued Wrondgoing In Violation Of Explicit Court Orders*

279. Some of the Defendants have already been investigated and sued by various governmental agencies and private parties for wrongdoing similar to the wrongful acts alleged in this Complaint. For example, the federal government, via the SEC, recently announced that Ally is under investigation for activities related to the Financial Crisis. According to the 2010 annual report filed by Ally, the company is under investigation by the SEC and other regulators for activities related to its subprime mortgage bond business and the structuring and sale of collateralized debt obligations.

- 74 -

280.     On October 7, 2010 the State of Ohio filed a lawsuit against GMAC Mortgage, alleging that the lender used fraudulent affidavits and documents to mislead courts in proceedings related to home foreclosures.

281.     The law suit mentions a deposition by Jeffrey Stephan, a GMAC employee. In a Maine lawsuit, Stephan said he signed as many as 10,000 foreclosure affidavits a month between 2006 and 2010, without having properly notarized or reviewing the underlying documents as required.

282.     On September 2, 2011 the Federal Housing Finance Agency filed a complaint against Ally Defendants alleging fraud. The complaint alleges false and misleading statements and omissions in registration statements, prospectuses, and other offering materials pursuant to which certain residential mortgage-backed securities ("RMBS") were purchased by Freddie mac.

283.     The complaint alleged that between 2005 and 2007 GMAC sold over $6 billion dollars' worth of securitized loans to Freddie Mac totaling 21 separate securitizations. The majority of the loans contained material misrepresentations in particular, inflated appraisals and inflated incomes which understate the credit risks associated with a given loan.

284.     On February 10, 2012 Ally and other major financial institutions reached a $25 billion settlement with 49 states and the U.S. Government to end a probe of abusive foreclosure practices stemming from the collapse of the housing bubble. Ally has agreed to contribute as much as $5 Billion towards the settlement. The settlement *does not* release Ally from any criminal liability or grant any immunity, *release any private claims by individuals or any mass tort claims*.On March 14, 2012 Five Major U.S. Banks including Ally agreed to settle a law suit with New York Attorney General over the use of the Mortgage Electronic Registration System that the state said resulted in deceptive and illegal practices that led to more than 13,000 foreclosures. Ally agreed to participate in this settlement and contributed $1.25 million dollars to settle the dispute. The lawsuit said the use of MERS resulted in the filing of improper NY foreclosures and created "confusion and uncertainty" over property ownership interests.

285.     The complaint alleged that Ally's misconduct resulted in the issuance of improper mortgages, premature and unauthorized foreclosures, violation of service members'' and other

1  homeowners' rights and protections, the use of false and deceptive affidavits and other documents, and
2  the waste and abuse of taxpayer funds.

3      286.    The Defendants did not just make misrepresentations and conceal material facts from
4  investors. First, each of the foregoing misrepresentations was made in public documents or forums
5  given wide communication to the public, including Plaintiffs herein. Second, the identical affirmative
6  misrepresentations and concealment pertained to the Plaintiffs, and other borrowers. Defendants had to
7  perpetuate their lies by affirmative misrepresentations and by concealing the truth from Plaintiffs and
8  other borrowers because to do otherwise would mean: (1) immediate wash-back into their investor fraud
9  since Plaintiffs and other borrowers are part of the investor public receiving all other investor
10 communications, and (2) decapitation of the source of the supply of mortgages needed for the scheme.

11     287.    Finally, the concealment from borrowers was absolutely essential because the
12 Defendants knew they would soon be delivering Plaintiffs' notes and deeds of trust to investors and their
13 representatives at intentionally inflated values assets in Defendants' fraudulent securities.

14     288.    By not disclosing the truth of their lax lending standards, deficient loan portfolio, shaky
15 secondary market collateralized securities, and overall scheme to its borrowers, as set forth above,
16 Defendants not only made them unwitting accomplices, but put them into a no-win situation in which
17 the price of taking a mortgage from Defendants would be – and has been – cascading defaults and
18 foreclosures that have wiped out billions of dollars in equity value, including the equity invested in their
19 homes by Plaintiffs. Cascading foreclosures in entire cities and counties in California leads to
20 unemployment and economic turmoil. All Plaintiffs have been damaged by the foregoing. Despite
21 billions of dollars of taxpayer-funded relief programs, property values continue to fall and
22 unemployment and underemployment remain terribly high.

23     289.    On April 13, 2011, the Comptroller of the Currency along with the Board of Governors
24 of the Federal Reserve System, the Federal Deposit Insurance Corporation, The Office of Thrift
25 Supervision and the Federal Housing Finance Agency executed a Stipulation and Consent to the
26 Issuance of a Consent Order ("Order") which resulted in a Cease and Desist Order being issued by those
27 agencies requiring that that MERS and its corporate parent, MERSCORP, take "all necessary and

28

1  appropriate steps to remedy the deficiencies and unsafe or unsound practices" that were identified as
2  findings by the respective agencies during a systematic and in-depth review that "present financial,
3  operational, compliance, legal and reputational risks" to MERS and MERSCORP as well as to those
4  members such as Defendants who use the MERS services.

5      290.    Among the findings reported in the Cease and Desist Order were that MERS has "failed
6  to exercise appropriate oversight, management supervision and corporate governance" in order to
7  "ensure proper administration and delivery of services." Moreover, the Order reports that the review
8  revealed that MERS has "failed to establish and maintain adequate internal controls, policies and
9  procedures, compliance risk management, and internal audit and reporting" in connection with its
10 services to Defendants.

11     291.    The 22 page Order sets out detailed action plans on a specified time-line with reporting
12 requirements intended to ensure that "at a minimum" MERS is operated "in a safe and sound manner in
13 accordance with applicable laws."

14     292.    The Order is a damning validation of this Complaint. It reports a failures of
15 management; compliance; inadequate training, skills, abilities and experience of personnel; failures of
16 supervision by the board of directors and senior management; and process deficiencies such as
17 registration and tracking systems as well as data integrity. Recognizing the liability issues such as those
18 raised by Plaintiffs herein, the Order also insists that MERS undertake a review and make regular
19 reports on "outstanding legal issues and pending litigation that affect the interests of MERS,
20 MERSCORP the Defendant members in addition to providing "recommendations concerning litigation
21 contingency reserves."

22     293.    Similarly, on the same date, the Comptroller of the Currency issued a Consent Cease and
23 Desist Order to Defendant Ally ("Ally Order") in which it was reported that Defendant Ally has entered
24 into a Stipulation and Consent to the Issuance of a Consent Order with the Comptroller of the
25 Currency. In that Ally Order, there were published detailed examination findings of the Comptroller
26 with regard to Defendant Ally that identified "certain deficiencies and unsafe or unsound practices in
27 residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings."

- 77 -

28

1    294.    Among those finding were assertions that Defendant Ally had filed affidavits stating that

2    the affiant had "personal knowledge" of crucial details of mortgage notes when, in fact, that was not the

3    case. It was also found that Defendant Ally had made filings in various state and federal courts and

4    local land records of documents that had not been properly notarized.

5    295.    Another finding of the Comptroller of the Currency was that the Defendant Ally had

6    "litigated foreclosure proceeding and initiated non-judicial foreclosure proceedings" without properly

7    endorsed or assigned documents or in the "possession of the appropriate party at the appropriate time."

8    296.    In addition to the other findings, the Ally Order reveals that Defendant Ally did not have

9    adequate staffing or oversight or management of its foreclosure processes and filed to exercise proper

10    "controls, policies and procedures, compliance risk management, internal audit" and

11    training. Moreover, Defendant Ally "failed to sufficiently oversee outside counsel handling these

12    matters."

13    297.    Echoing all of the claims and assertions of Plaintiffs herein, the Comptroller's findings

14    concluded that by reason of the conduct described in the finding, **the Bank (Defendant Ally) engaged**

15    **in unsafe or unsound banking practices"** (emphasis supplied).In the Order, the Defendant Ally has

16    been made subject to 41 pages of severe proscriptions and requirements by the Comptroller of the

17    Currency. Including a requirement that within 45 days, Defendant Ally must:

18    "[S]ubmit to the Deputy Comptroller and the Examiner-in-Charge a plan, acceptable to

19    the OCC, to remediate all financial injury to borrowers caused by any errors,

20    misrepresentations, or other deficiencies identified in the Foreclosure Report, by:

21    a. Reimbursing or otherwise appropriately remediating borrowers for

22    impermissible or excessive penalties, fees, or expenses, or for other financial

23    injury identified in accordance with this Article; and

24    b. Taking appropriate steps to remediate any foreclosure sale where the foreclosure was

25    not authorized as described in this Article."

26

27

28

- 78 -

**COMPLAINT**

298.     Pursuant to the Ally Order, Ally then agreed to submit a comprehensive plan with sixty days to encompass its residential mortgage loan servicing business. Audits will be undertaken to determine whether homeowners were improperly foreclosed on.

# FIRST CAUSE OF ACTION

## *(By All Plaintiffs – Fraudulent Concealment – Against All Defendants)*

299.     The preceding paragraphs and subsequent causes of action are hereby incorporated by reference as though fully set forth herein.

300.     In connection with entering into mortgage contracts with Plaintiffs, from 2003 through 2008, Defendants:

    a.  engaged in a centrally-directed fraud by which they concealed numerous material facts, including that Ally, then one of the nation's largest mortgage lenders, and other Defendants herein, had ceased acting as a conventional money lender and had, instead, morphed into an enterprise engaged in systematic fraud on all of its material constituencies, including Plaintiffs – a fraud their *own internal reports* concluded would cause a liquidity crisis and thereby destroy the equity value of each borrower's home; and

    b.  engaged in widespread disclosure of information that was broadly disseminated to the public, including Plaintiffs, but suppressed contrary material facts relevant to Plaintiffs' decisions regarding whether they should enter into mortgage contracts with the Defendants.

301.     On or about January 2003, Ally Defendants determined that they could not sustain their businesses. So Ally Defendants hatched a simple plan – they would pool their loans, fraudulently inflate the value of these pooled loans and then sell the pools to unsuspecting investors for grossly unmerited profit.

1    302.    But to feed its investors and continue to make such never-before-seen profits, Defendants

2    needed more borrowers. In turn, Ally Defendants began disregarding their own underwriting standards,

3    and approving borrowers who were grossly under-qualified, in the name of getting as many loans out the

4    door, and sold to investors for a profit, as possible. As part of this scheme, Defendants fraudulently

5    inflated the appraisal values of Plaintiffs' properties, as well as the real estate values throughout

6    California, knowing that their scheme would cause the market to crash, and the precipitous decline of

7    real estate values throughout the State.

8    303.    Rapidly, these two intertwined schemes grew into a brazen plot to disregard underwriting

9    standards and fraudulently inflate property values . . . in order to take business from legitimate mortgage

10    providers, and moved on to massive securities fraud hand-in-hand with concealment from, and

11    deception of, Plaintiffs and other mortgag[ors] on an unprecedented scale.

12    304.    To further this scheme, Ally, using its size and influence in California, began

13    systematically creating false and inflated property appraisals throughout California, through its wholly-

14    owned subsidiary Nationwide Appraisals, hand-in-hand with the other Defendants herein. The purpose

15    was two-fold:

16        a.  First, by falsely inflating said property values, investors were defrauded into believing

17            their investments in these loans were less risky than they actually were. This in turn

18            led to more sales and even more profits on the secondary market.

19        b.  Second, Defendants would then turn around and use these false property valuations to

20            induce Plaintiffs and other borrowers into entering ever-larger loans on increasingly

21            risky terms. The result was, again, more profits.

22

23    305.    However, Defendants knew these loans were unsustainable for the borrowers and, to a

24    certainty, would result in a crash that would destroy the equity invested by Plaintiffs and other of

25    Defendants' borrowers.

26

27

28
- 80 -

**COMPLAINT**

1    306.    Defendants expected that the deteriorating quality of the loans that Defendants were

2    writing, and the poor performance over time of those loans, would ultimately curtail Defendants ability

3    to sell those loans in the secondary mortgage market and/or to purchase credit default swaps as hedges.

4    307.    Despite their awareness of and concerns about the increasing risk the Defendants were

5    undertaking, they hid these risks from the Plaintiffs, borrowers, potential borrowers, and investors.

6    308.    Defendants had exclusive knowledge, not available to Plaintiffs, of material facts

7    pertaining to their mortgage lending activities that it did not disclose to Plaintiffs at the time they were

8    entering into contracts with Plaintiffs.

9    309.    The Defendants misled the Plaintiffs, borrowers, potential borrowers and investors by

10   failing to disclose substantial negative information regarding Defendants' loan products, namely that:

11           a.  Defendants were no longer making loans based upon the profitability of their

12               mortgage lending business (but rather instead upon the profitability of sales of these

13               loans to investors and secondary markets);

14           b.  Defendants were selling loans on the secondary market at artificially inflated values to

15               bilk investors – a business practice which was more profitable to them than by

16               holding the loan;

17           c.  Because of this profitable scheme and because their loans were insured, Defendants

18               stood to profit regardless of whether their loans performed and as such had no

19               incentive to insure that borrowers were actually qualified for (or could make payments

20               on) the loans into which they were being placed – in fact they had a disincentive to do

21               so;

22           d.  Because Defendants were selling their loans to investors rather than holding their

23               loans, Defendants had no incentive to insure that the borrowers were actually qualified

24               for (or could make payments on) the loans into which they were being placed – in fact

25               they had a disincentive to do so;

26           e.  Because Defendants were insured against loss in the event of their borrowers' default,

27               Defendants had no incentive to insure that the borrowers were actually qualified for

- 81 -

28

(or could make payments on) the loans into which they were being placed – in fact they had a disincentive to do so.

f. Defendants were in fact dependent on selling loans it originated into the secondary mortgage market, to sustain its business;

g. Defendants were more dependent than many of their competitors on selling loans it originated into the secondary mortgage market

h. Defendants were making loans simply to create sufficient product to sell to investors in fraudulently rated pools;

i. Defendants had ceased acting as conventional money lenders and had, instead, morphed into an enterprise engaged in systematic fraud on all of its material constituencies, including Plaintiffs;

j. Defendants had ceased acting as conventional money lenders who carried their own risk and turned profit through the production of low-risk loans, and instead morphed into a loan conveyor belt, packaging loans with little if any regard for their underwriting standards, and selling those loans at extravagant profit to investors on the secondary market to whom the risk would be passed on, through fraud and misrepresentation – a business enterprise vastly more profitable than the business model of being a conventional money lender.

k. That in furtherance of this scheme, Defendants had in fact abandoned their conventional lending business and prudent lending standards, consistently lending to those who were grossly under-qualified;

l. Defendants internally knew that the borrowers to which they were lending were not qualified and that it was a mathematical certainty they would default;

m. Defendants' qualification process had nothing to do with whether a borrower could actually afford his/her loan.

n. A determination that a borrower is qualified does not mean that borrower could actually afford his/her loan.

- 82 -

o. That in furtherance of this scheme, Defendants intentionally created false appraisals and over-valued the value of Plaintiff/Borrower's homes and or properties;

p. That in furtherance of this scheme and through their wholly-owned subsidiary, HCLS, Defendants systematically and intentionally inflated the value of all or much of American real estate, particularly California;

q. Defendants internally knew that the true value of their borrower's homes were not sufficient to merit the loans which they were giving to the borrower/Plaintiffs;

r. Defendants' appraisal process had nothing to do with the true value of a borrower's home, but was instead solely for the bank's protection

s. Defendants knew these loans were unsustainable for Ally Defendants and the borrowers and to a certainty would result in a crash that would destroy the equity invested by Plaintiffs and other of Defendants' borrowers;

t. Defendants knew the sheer scope of their loan portfolio and fraudulent packaging of the portfolio would cause a liquidity crisis that would devastate home prices and gravely damage Plaintiffs; and

u. Defendants knew Plaintiffs would be materially and substantially harmed by contracting with Defendants.

v. Defendants knew their business model was simply unsustainable.

w. Defendants' pursuit of a matching strategy in which it matched the terms of any loan being offered in the market, even loans offered by primarily subprime originators;

x. The high percentage of loans it originated that were outside its own already widened underwriting guidelines due to loans made as exceptions to guidelines;

y. Defendants' definition of "prime" loans included loans made to borrowers with FICO scores well below any industry standard definition of prime credit quality;

z. The high percentage of Defendants' subprime originations that had a loan to value ratio of 100%; and

aa. Defendants' subprime loans had significant additional risk factors, beyond the

- 83 -

**COMPLAINT**

subprime credit history of the borrower, associated with increased default rates,

including reduced documentation, stated income, piggyback second liens, and LTVs

in excess of 95%.

310.    Defendants knew this negative information from numerous reports they regularly received and from regulators and presentations prepared by Defendants' risk assessment officers. Defendants nevertheless concealed this negative information from the public, including Plaintiffs.

311.    The Plaintiffs did not know the concealed facts.

312.    Defendants intended to deceive Plaintiffs and induce their reliance, by intentionally failing to disclose the above concealments. This deception was essential to their scheme to make extravagant profit by packaging and reselling these loans on the secondary market.

313.    Plaintiffs did in fact rely on each of the aforementioned concealments in deciding to contract with Defendants

314.    Plaintiffs reasonably and foreseeably relied upon the deception of Defendants in deciding to enter into a mortgage contract with Ally Defendants - Defendants were among the nation's leading providers of mortgages. It was highly regarded and by dint of its long-term campaign of deception through securities filings, press releases, public utterances, web sites, advertisements, brokers, loan consultants and branch offices, Bank Defendants had acquired a reputation for performance and quality underwriting.

315.    Moreover, as consumers unfamiliar with the myriad intricacies, terms and mathematics of mortgages (such as amortization calculations, negative amortization, loan recasting, front and back end debt to income ratios, indices, margins, ad nauseum), it was both reasonable and foreseeable (if not entirely intended) that Plaintiffs would rely on the advice of loan professionals and bank representatives (many of whom held the title "Loan CONSULTANT") trained to understand the highly-complicated terms and mathematics of the mortgage world, in deciding to contract with Defendants. The same is true of appraisals. It is reasonable and foreseeable that a consumer would rely upon an appraisal arrived at by

- 84 -

1    a professional appraiser – particularly in light of their complicated nature. Plaintiffs did in fact rely on
2    the representations and concealments of these parties.

3      316.    In reliance on the above concealments and/or material misrepresentations, Plaintiffs
4    entered into mortgage contracts with Defendants they otherwise would not have entered into and as a
5    result thereof were damaged. This damage was not only foreseeable by Defendants, but actually
6    foreseen (and then concealed) by them.

7      317.    The unraveling of Defendants' scheme has caused the material depression of real estate
8    values throughout California, including the real estate of Plaintiffs herein.

9      318.    Defendants expected that the deteriorating quality of the loans that Bank Defendants were
10    writing, and the poor performance over time of those loans, would ultimately curtail Bank Defendants
11    ability to sell those loans in the secondary mortgage market and/or to purchase credit default swaps as
12    hedges.

13      319.    Defendants knew that within a foreseeable period, its investors would discover that
14    Defendants' borrowers could not afford their loans and the result would be foreclosures and economic
15    devastation.

16      320.    Despite their awareness of and concerns about the increasing risk the Defendants were
17    undertaking, they hid these risks from the Plaintiffs, borrowers, potential borrowers, and investors.

18      321.    The unraveling of the Defendants' scheme has materially depressed the price of real
19    estate throughout California, including the real estate owned by the Plaintiffs, resulting in losses to the
20    Plaintiffs.

21      322.    As a proximate result of the foregoing concealments and/or misrepresentations made by
22    Defendants, California property values have precipitously declined and continue to decline, gravely
23    damaging Plaintiffs by materially reducing the value of their primary residences, depriving them of
24    access to equity lines, second mortgages and other financings previously available based upon
25    ownership of a primary residence in California, in numerous instances leading to payments in excess of
26    the value of their properties, thereby resulting in payments with no consideration and often subjecting

27

28

**COMPLAINT**

them to reduced credit scores (increasing credit card and other borrowing costs) and reduced credit availability.

323. Furthermore Plaintiffs were damaged in having their home values artificially inflated by Defendants. Specifically, since down payments are calculated as a percentage of the home value, by over valuating the loans, Defendants were also required to place larger down payments. Defendants knew Plaintiffs would lose their down payments as a result of the fact that Defendants were intentionally placing borrowers into loans for which they were unqualified, (2) the loan products they were being placed into were unsustainable (3) the financial meltdown Defendants knew their actions would cause, (4) for the sake of brevity, for all reasons already mentioned herein. The calculation of these damages would be made as follows: Damages = %Down Payment x (Inflated Value of Home – True Value of Home at the time). For instance, a borrower who was required to put 20% down on a home whose true value was $600,000 but whose appraisal was artificially inflated to $800,000, suffered an additional $40,000 in damages. [D = 20% x (800,000 – 600,000)].

324. Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages arising from this Cause of Action also include loss of equity in their houses, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

325. To this day, the Defendants profess willingness to modify Plaintiffs' loans in accordance with law, but nonetheless they persist to this day in their secret plan to deprive Plaintiffs of their rights.

326. As a result of the foregoing, Plaintiffs' damages herein are exacerbated by a continuing decline in residential property values and further erosion of their credit records.

327. Defendants' concealments and misrepresentations, both as to the their scheme to profiteer from the mortgage melt-down and as to their purported efforts to resolve loan modifications with Plaintiffs, are substantial factors in causing the harm to Plaintiffs described in this Complaint.

328. Defendants acted outrageously and persistently with actual malice in performing the acts alleged herein and continue to do so. Accordingly, Plaintiffs are entitled to exemplary and punitive

**COMPLAINT**

1 damages in a sum according to proof and to such other relief as is set forth below in the section
2 captioned Prayer for Relief which is by this reference incorporated herein

3     329.    These frauds and concealments were unknown to all Plaintiffs referenced herein at the
4 time of loan origination. All Plaintiffs herein discovered these frauds and concealments beginning no
5 more than 3 years prior to the date of filing this action. A reasonable person would have been unable to
6 reasonably discover said frauds any earlier.

## SECOND CAUSE OF ACTION

*(By All Plaintiffs – Intentional Misrepresentation – Against All Defendants)*

11     330.    The preceding paragraphs and subsequent causes of action are hereby incorporated by
12 reference as though fully set forth herein.

13     331.    In addition to said concealments, Defendants also made misrepresentations of material
14 fact but did not disclose and/or suppressed facts which would materially qualify the misrepresentations,
15 or which would render their disclosures likely to mislead. Specifically (through Defendants' securities
16 filings, speeches, advertisements, public utterances, websites, brokers, loan consultants, branches, and
17 communications with clients) Defendants misrepresented that:

18     a.   Defendants only entered into mortgages with qualified borrowers (when in reality
19         Defendants were recklessly ignoring their own underwriting standards, and offering
20         mortgages to substantially under-qualified borrowers, including Plaintiffs herein);

21     b.   Defendants were financially sound (when in reality Defendants were dependent on
22         selling their fraudulently-obtained loans to investors and the secondary market to
23         sustain their business);

24     c.   Defendants held their loans in their own portfolio (when in reality Defendants sold the
25         overwhelming majority of their loans on the secondary market)

26     d.   Defendants were engaged in lending of the highest caliber (when in reality Defendants
27         were disregarding industry standard quality assurance and underwriting guidelines, as

- 87 -

**COMPLAINT**

well as their own underwriting guidelines, and lending to under qualified borrowers upon properties which were intentionally over valued – all in the name of making as much money on the secondary/investor market as quickly as possible).

e.  The loans they offered were safe and secure (when internally Defendants acknowledged and referred to their loans as "dangerous" and "B product loans"

f.  Plaintiffs and other borrowers were qualified for the loans Defendants were placing them into and that Plaintiffs were capable of affording the fully amortized payments on those loans (when internally Defendants knew that Plaintiffs were not qualified for the loan, could not afford the loan, and that it was a mathematical inevitability that the Plaintiffs would default);

g.  Plaintiffs and other borrowers' homes were valued at a sum sufficient to justify the size of the loan with which they were being encumbered (when internally Defendants were inflating appraisal values and knew that the values being used did not justify the size of the loans being placed on the property, and moreover that Defendants knew such valuations would inevitably result in the home going "upside "down followed by inevitable default); and

h.  Plaintiffs would be able to refinance their loans at a later date (when internally Defendants knew that Plaintiffs would not be able to refinance Plaintiffs as a result of the depressed real estate market created by Defendants, the overvaluation of Plaintiffs' property, the damage to Plaintiffs' credit score which defendants knew would ensue, and for the many reasons already set forth above).

i.  Defendants would modify Plaintiffs' loans (when in fact Defendants did not modify Plaintiffs' loans, had no intentions to do so, and it was more profitable for Defendants to leave the loans unmodified)

j.  Defendants' determination that Plaintiffs were "qualified" for their loans could be relied on by Plaintiffs to mean that Plaintiffs could "afford" those loans (when in reality Defendants qualification process had nothing to do with whether Plaintiffs

- 88 -

COMPLAINT

could actually "afford" the loans they were given, and that Defendants' qualification process was for the their own protection, not their borrowers; in fact it was regularly the case that Defendants "qualified" borrowers for loans, when in fact those borrowers could not afford those loans, and Defendants knew that to be the case.)

k. The appraisal rendered by Defendants or their affiliates were accurate representations of the true value of Plaintiffs' property (when in reality, Defendants' appraisals were intentionally inflated, and were not intended to reflect the true value of Plaintiffs' loans but rather to coax Plaintiffs into taking larger loans, and also to make these loans appear safer (i.e. more secure) to those purchasing these loans on the secondary market; by doing so, the loans could be sold for more money. In short, the reality was that Defendants' appraisal process was for Defendants own fraudulent purposes, and had nothing to do with conveying the true value of Plaintiffs' property to them.)

**Authority to Bind**

332. These representations were not made as statements of opinion, but as statements of fact, made by the employees and agents of Defendants charged with the duty of originating loans ("**Loan Representatives**") and who were specifically employed by Defendants to walk Plaintiff borrowers through the loan process, and vested with the authority, both apparent and actual, to bind Defendants.

333. These Loan Representatives were charged with the duties of educating borrowers about the loan process, the various type of loans from which they could choose, the payments that would result for each given type of loan, the pros and cons of each loan, how each loan would amortize, providing truth in lending disclosures, offering interest rate quotes, cost quotes, point quote, and APR quotes, and running all the various payment calculations and debt to income calculations. These Loan Representatives were also charged with properly taking each borrower's loan application, as well as the loan application fee and/or ensuring the accuracy of each loan application filled out, and collecting and analyzing documentation relating to each borrower's income, job stability, assets, creditworthiness,

**COMPLAINT**

1  outgoing debt, as well as collateral as well as giving the necessary Truth in Lending disclosures required
2  under law.
3        334.   These Loan Representatives were charged with the duty of quarterbacking the entire loan
4  process from start to finish, including initiating escrow, acquiring title reports and initiating title
5  insurance, obtaining the loan application from the borrower (or in Defendants' case falsifying the loan
6  application on behalf of the borrower), collecting any and all fees due (such as appraisal fees and
7  application fees) collecting necessary documents (such as paystubs, tax statements, w2's, schedules of
8  real estate owned, etc etc), regularly interfacing between Defendants' underwriting department and each
9  borrower to make sure the loan gets approved, coordinating the appraisal and appraisal dates, rendering
10 estimated HUD or HUD-1 disclosures, through loan document printing, loan signing side by side with a
11 notary, to loan funding, and post-funding issues.
12       335.   It was through these Loan Representatives, *and only through these Loan Representatives*,
13 that borrowers (Plaintiffs herein) came to understand exactly what the bank wanted from them, and
14 whether the bank was going to give them a loan, and on what grounds the loan was going to be granted.
15 Each and every one of these Loan Representatives was vested by the respective bank they work for – the
16 bank/lending institution from which a Plaintiff got his/her loan – with both actual and apparent authority
17 to bind that bank/lending institution. These Loan Representatives were the *sole* interface between the
18 bank/lending institution and the customer/borrower/plaintiff. Defendant banks very much intended to
19 create the distinct perception that the representations made by these Loan Representatives, were factual
20 representations coming directly from the bank, and representations upon which the borrower Plaintiffs
21 could reasonably rely, well above-and-beyond that of mere opinion.
22       336.   Specifically, with regard to subparagraph "f)", above, the representation made by
23 Defendants to Plaintiff borrowers, that they could "afford" the loans they were being given were
24 statements delivered as statements of fact upon which Plaintiffs could reasonably rely, particularly in
25 light of the specialized expertise of the Defendant employees who made the statements. These
26 employees spend months and years, undergoing specialized education, to learn the highly complicated
27 mathematics of lending such as loan amortization, loan re-casting, front end debt to income ratios, back

28

**COMPLAINT**

end debt to income ratios, and loan to value ratios – mathematics which borrowers simply don't understand, nor could they be expected to. Because of their vastly superior knowledge, and because of the actual and apparent authority vested in these employees by the Defendant Banks, as described above, Plaintiffs herein reasonably relied on these statements. By making these false and misleading statements, they incurred a duty to be truthful.

**The Difference Between Being "Qualified" for a Loan and Being able to "Afford" a Loan**

337.   The difference between the term "qualified" and "afford" is a palpable one in this case.

338.   Even despite this difference, it is important to understand that a bank's qualification process is by its very nature designed to measure a borrower's ability to *afford* a loan.

339.   In determining whether a borrower is "qualified" for a loan, banks, including Defendant Banks, use two principal metrics known as **"front-end"** debt to income ratio, and **"back end"** debt to income ratio – both of which are intended to measure a borrower's ability to afford their loan.

340.   A **"front end"** debt to income ratio compares ONLY the loan payment (as well as taxes and insurance) to a person's income, and does not take into account any other debt whatsoever. For example a person who makes $10,000 per month, and whose mortgage costs $3,000 per month (including tax and interest), has a "front end" debt to income ratio of 30%.

341.   A **"back end"** debt to income ratio, by contrast, takes into account not only a person's loan payment (as well as taxes and insurance) but also *all other* debt reflected on their credit report. If that same person used in the example above, also had an additional $4,000 in monthly expenses such as credit card debt, car loans/payments, other mortgages, student debt, etc. etc., then that person's "back end" ratio would be 70%. ($3,000 per month for her loan, taxes & insurance plus $4,000 per month for other debts = $7,000 per month in debt. $7,000 of debt divided by $10,000 in monthly income equals, 70% "back end" debt to income ratio).

342.   Industry Standard and Conventional Underwriting guidelines, including those used by Defendants herein, required that loans with a "front end" debt to income ratio higher than **35%** be

- 91 -

1   rejected. They also required that loans with a "back end" debt to income ratio of higher than **45%** be
2   rejected – and that 45% figure was on the on the *very* high end. For a loan with a 45% "back end" debt
3   to income ratio to be approved, a borrower had to have excellent credentials in all other areas such as
4   720+ median credit score and high liquid asset reserves totaling more than 12 months of their ). In other
5   words, Defendant Banks would not approve borrowers whose loan payment was more than 35% of their
6   total monthly income, or whose total outgoing monthly debt as reflected on their credit report (including
7   the loan payments) was more than 45% of their total monthly income.

8       343.    Intuitively, these two figures seem low. The typical lay borrowers asks "why are these
9   figures so low? Clearly, I'm able to afford a larger loan if I still have **55%** (100% - 45% back end ratio)
10  of my income available to me, after I've paid all my other debts, to pay for that larger loan." **And**
11  **therein lies the fundamental problem**. Borrowers, because of their lack of knowledge, simply don't
12  understand that, in fact, they **cannot** afford more. They often overestimate themselves. By contrast,
13  Banks have made a science of understanding exactly how much a borrower can afford, dedicating
14  millions of dollars, hiring teams of expert statisticians, and spending years formulating underwriting
15  guidelines, predicated on 100's of years of prior underwriting acumen, all to craft underwriting
16  guidelines which reflect what appears to be a deceptively simple question – how much debt can a
17  borrower realistically shoulder without imperiling themselves or their ability to pay back their loan? It
18  is through their detailed efforts, that Banks have settled upon the 35% front-end and 45% back-end debt-
19  to-income ratios as a realistic measure of what borrowers can afford.

20      344.    The answer to the above question ("why are these figures so low?") is that banks, unlike
21  borrowers, have recognized through their detailed research, that borrowers simply cannot *afford* a loan
22  unless they are left with at least 55% of their income (after having paid their mortgage payment as well
23  as all the other debt reflected on their credit report) to account for life's myriad non-credit reported
24  expenditures such as emergency expenditures, unexpected events, non-credit reported debts, as well as
25  one-time (non-recurring) expenses, including: **health care, medical emergencies, educational**
26  **expenses/tuition, food, water, electricity, catastrophic & natural disasters, emergency home**
27  **repairs, medication, doctor's bills, medical insurance, car payments, fuel, auto insurance, phone**
                                                    - 92 -
28

bills, internet, medication– these items are even more expensive if a borrower has children. And this is before even turning to the discussion of a borrower's need set money aside for their savings and/or retirement.

345.    In other words the term *afford* as used herein describes a borrower's ability to shoulder the additional debt burden resulting from the subject loan, in light of the **numerous** other real-life demands placed on that borrower's income such as their...

346.    **Credit-reported debts** (i.e. credit card debt, car loans/payments, other mortgages or financing, installment debt student debt, etc. etc);

347.    **Non-Credit Reported Expenses/Debt** (i.e. health care, medical emergencies, educational expenses/tuition, food, water, electricity, catastrophic & natural disasters, emergency home repairs, medication, doctor's bills, medical insurance, car payments, fuel, auto insurance, phone bills, internet, medication)

348.    Real world need to set aside some of their income into a savings account, such that they are not living month to month.

349.    Thus, the back-end debt to income ratio is a measure of a borrower's ability to afford their loan which takes into account that borrowers have great demands placed on their money outside of their credit reported debts – demands which borrowers typically fail to account for or demands which, because of their lack of expertise, borrowers are not as cognizant of, as banks are.

350.    Moreover, a Bank's qualification/underwriting process is also meant to temper borrowers who overestimate themselves or their ability to pay back/afford their loan.

351.    Because Defendant Banks have seen the pitfalls associated with the loans of *hundreds of thousands* of borrowers, unlike borrowers who only know the pitfalls of their own solitary loan, and because banks enjoy the benefit of 100's of years of underwriting acumen, unlike borrowers who enjoy no such benefit, banks are substantially better positioned to understand the myriad expected and unexpected demands placed on a borrower's income which would jeopardize a borrower's ability to afford the additional debt burden resulting from a loan. Thus, banks, unlike borrowers, are intimately familiar with how much a borrower is truly capable of affording. The sum result of their detailed studies,

- 93 -

**COMPLAINT**

1 | established underwriting principles, and stastical analysis is that a borrower would be imperiled and
2 | likely to default on his loan if their loan payment exceeds more than 35% of their total income (front
3 | end), and that a borrower's loan payments in combination with their credit-reported debts cannot exceed
4 | more than 45% of their income (back end). And for that reason, they have made back end and front end
5 | debt to income ratios - which are intended to measure a borrower's ability to *afford* a loan - a
6 | cornerstone element of their qualification process.

7 |     352. In sum, then, by its own nature Defendants' qualification process is intended to measure
8 | whether a borrower can truly *afford* the loan they're being given.

9 |     353. Yet even despite the fact that the qualification process is implicitly predicated on the
10 | notion that a borrower can afford the loan, Defendants went one step further, and **affirmatively and**
11 | **explicitly** (mis)represented to Plaintiffs that they would be able to *afford* the loans that they were being
12 | given. In part, if not in whole, Defendants did this in order to assuage Plaintiffs of rightful concerns
13 | regarding their ability to shoulder the additional debt burden caused by taking on the loan – and
14 | Defendants did so in an attempt to induce Plaintiffs into accepting financing so that the Loan
15 | Representatives could make their commission, and so that Defendant Banks could make their money by
16 | selling the loan on the secondary market for profit.

17 |     354. Specifically, Plaintiff Borrowers in this action were explicitly told by Defendants and
18 | their employee Loan Representatives that they could *afford* the loans they were being given, and that
19 | they need not worry about whether they would be able to shoulder the additional debt burden.
20 | Defendants told Plaintiffs that their calculations show that the Plaintiffs will be able to afford their loans
21 | and comfortably shoulder the additional debt from the loan, when taking into account all of Plaintiffs'
22 | other monthly debt. These statements were not offered as statements of opinion, but rather as outright
23 | statements of fact.

24 |     355. More specifically, the Plaintiff-borrowers in this action were told by Defendants and their
25 | employee Loan Representatives that they would be able to comfortably afford the fully amortized
26 | payments under the loan, or in some instances they were told that they would be able to comfortably
27 | afford the payments on the loan, but Defendants failed to additionally disclose that the initial payments

- 94 -

were not the permanent payments on the loan, or that those payments would drastically increase in the future, and that the Plaintiffs would not be able to afford such drastically increased payments.

356.    In fact in many instances, Plaintiffs were additionally told by Defendants that a determination that they were qualified indeed meant, and was synonymous with, that Plaintiffs could in fact *afford* their loans.


### Plaintiffs' Reasonable Reliance

357.    Plaintiffs reasonably and foreseeably relied upon the deception of Defendants in deciding to enter into a mortgage contract with Ally and Bank Defendants – Ally and Bank Defendants were among the nation's leading providers of mortgages. It was highly regarded and by dint of its campaign of deception through securities filings, press releases, public utterances, web sites, advertisements, brokers, loan consultants and branch offices, Bank Defendants had acquired a reputation for performance and quality underwriting. Furthermore, Ally, through its advertisements had cultivated a reputation of trustworthiness and that Ally worked in the interests of their client borrowers, and not just in its own interests.[50] Again for these reasons, Plaintiff-borrowers' reliance was reasonable.

358.    By reason of Defendants' prominence and long term campaign of deception as to its business plans and the relationship of trust developed between each of the Defendants and Plaintiffs, Plaintiffs were justified in relying upon Defendants' representations.

359.    Moreover, as consumers unfamiliar with the myriad intricacies, terms and mathematics of mortgages, it was both reasonable and foreseeable (if not entirely intended) that Plaintiffs would rely on the advice of loan professionals and bank representatives (many of whom held the title "Loan

---

[50] See Ally's ads -  "We make money with you, not off you" -
http://www.businessinsider.com/ally-bank-print-ad

- 95 -

**COMPLAINT**

CONSULTANT") trained to understand the highly-complicated terms and mathematics of financing, amortization, indices, margins, and collateralization in the mortgage world, in deciding to contract with Defendants.

360. Further, the fundamental advisory role that a lender takes in a lender-borrower relationship is also grounds for a borrower's reasonable reliance on their statements and advice. The reality is that borrowers simply don't understand the highly complicated mathematics of lending such as amortization, loan re-casting, loan to value ratios, or debt to income ratios, etc. Nor could they be expected to – those mathematics require specialized training and education. The borrower's knowledge is inferior. Teams of highly trained underwriters spend weeks determining whether a borrower can handle their loan. How can it be expected that a single lay-borrower can do the same? It is *frequently* the case that a borrower walks into a lender's office and asks the loan consultant "how much can I afford?" Because of the vast imbalance of knowledge, when a loan consultant tells a borrower that they can afford their loan, borrowers *believe* that – they rely on their lender's knowledge. Though banks might not like to acknowledge it, that *is* the reality – and facts establishing this reality can be readily established at trial through testimony and otherwise. For these very same reasons, a lenders duty to be truthful is implicated as well.

361. The same is true of appraisals. It is reasonable and foreseeable that a consumer would rely upon an appraisal arrived at by a professional licensed appraiser – particularly in light of their *complicated* and highly fact sensitive & contextual nature - particularly where, as here, the appraisers were held out as being employed and/or contracted by Ally and Bank Defendants; Borrowers believed that Bank Defendants, by virtue of its reputation would only work with scrupulous, professional, and ethical appraisers. Additionally, the appraisers delivered their valuations and appraisals as statements of fact, not as statements of opinion. Moreover Bank Defendants ratified the statements and values offered by their appraisers by communicating to Plaintiffs that the values arrived at by their appraisers were in fact the true values of their properties/homes. Plaintiffs did in fact rely on the representations and concealments of these parties.

**COMPLAINT**

362.    For all of the reasons already listed in the second paragraph of this cause of action, all of the above-listed material misreprentations were, in fact, false. Defendants were not financially sound; Defendants did not hold their loans in their own portfolio but rather sold them on the secondary market; Defendants were not engaged in lending of the highest caliber, but quite the contrary;  the loans offered by Defendants were anything but safe and secure; Defendants did not refinance Plaintiffs loans a at a later date ; Defendants did not modify Plaintiffs' loans; Plaintiffs and other borrowers were not qualified for the loans Defendants were placing them into;  Plaintiffs were not capable of affording the fully amortized payments on those loans as represented by Defendants;  Plaintiffs and other borrowers' homes were falsely valued at inflated sums in order to place Plaintiffs into larger loans; Defendants did not utilize a quality underwriting process; and Defendants regularly entered into mortgages with grossly under-qualified borrowers.

363.    From 2003 through 2008, Defendants misled the public, including Plaintiffs, as previously alleged, including by falsely assuring them that Defendants were primarily a prime quality mortgage lender which had avoided the excesses of its competitors. Affirmative misrepresentations and material omissions permeated Defendants' website, customer and investor materials, required securities filings and presentations.

364.    Defendants pursued unprecedented expansion by, among other things, aggressively making loans which were unsupported by documentation, pushed through impotent loan committees, and taken by unworthy borrowers who were destined to be unable to repay the loans at the time the loans were made.

365.    Defendants never made any disclosures to Plaintiffs about the unprecedented expansion of its underwriting guidelines. Instead, Defendants made public statements from 2003 through 2008 that were intended to mislead Plaintiffs about the increasingly aggressive underwriting at Defendants and the financial consequences of those widened underwriting guidelines.

366.    Defendants' strategic plans to shift their portfolios towards higher margin products took place between approximately 2000 through 2007. Basically, with respect to the mortgage business, this strategy involved a change from traditional mortgage lending with fixed interest rates, and under the

- 97 -

traditional "originate-to-hold" model, to alternative lending programs involving adjustable rate mortgages as well as subprime products, and under the "originate-to-sell" model which created a disincentive to proper underwriting, and property valuation in favor of the additional profit reaped on the secondary market. The "Higher Risk Lending Strategy" had been conceived in 2000 and was completed and implemented in 2005.

367. To accomplish this, Defendants shifted its focus away from traditional fixed rate mortgages. Whiles these assets give rise to less credit risk; they contain substantial interest rate risk and offer lower returns. At the same time, the bank increased its exposure to subprime assets, option ARM loans products and home equity loans. These products contain a higher degree of credit risk because there is a greater chance that the borrower will default. To compensate for the increased chance of default, the lender charges the borrower a higher spread over cost of funds for the product. This in turn resulted in initially higher returns when these assets were retained on the balance sheets and greater gain on sale when these products were sold into the secondary markets than was the case for more traditional mortgage products.

368. Nothing disclosed or provided by Defendants informed Plaintiffs that Defendants included in its prime category loans with FICO scores below 620. Nor did Defendants inform Plaintiffs that the prime nonconforming category included loan products with increasing amounts of credit risk, such as (1) reduced and/or no documentation loans; (2) stated income loans; or (3) loans with loan to value or combined loan to value ratios of 95% and higher. Finally, Defendants did not disclose that the enterprise's riskiest loan product, the Pay-Option ARM, was classified as a prime loan.

369. Specifically, Defendants repeatedly emphasized Defendants' underwriting quality in public statements from 2003 through 2008. With an incentive to bundle and sell large quantities of loans as quickly as possible, banks all over the country, including Defendants, became conduits for the securitization and sale of loans to Wall Street. The banking industry began to move away from the traditional model of "originate to hold" towards a new system of banks as loan-conveyor belts under the "originate to sell" model which eviscerated the incentives of a traditional lender to ensure quality loan production, instead replacing those incentives with an incentive to churn out as many loans as possible

- 98 -

1  regardless of loan quality. Notably, the ease with which securitized mortgage products could be sold
2  encouraged poor underwriting and guidelines which had been established to mitigate and control risk
3  were often ignored.

4      370.    Defendants shifted the source of repayment for each mortgage they securitized from the
5  individual and their credit profile, to the value of the home. This philosophy of focusing on the asset
6  rather than on customer considerations ignores the reality that portfolio performance is ultimately
7  determined by customer selection and credit valuation. Even the most rigorous efforts to measure and
8  monitor risk cannot overcome poor underwriting and origination practices. Relying on the value of the
9  property rather that the customer's credit profile resulted in an inflationary spiral of housing prices,
10 especially in states like California where the "Affordability products" were most widely available.

11     371.    Defendants' condition was not sound, but was a house of cards ready to collapse, as
12 Defendants well knew, but Plaintiffs did not.

13     372.    The Defendants represented to multiple Plaintiffs that they would be assisted by the
14 Defendants in a loan modification. As described herein, that representation was false. Defendants knew
15 that representation was false when they made it.

16     373.    Because of new laws pertaining to loan modifications and the Defendants' insistence that
17 they had a genuine interest in complying therewith and in keeping borrowers in their homes, Plaintiffs
18 reasonably relied on the representations.

19     374.    By delaying Plaintiffs from pursuing their rights and by increasing Plaintiffs' costs and
20 the continuing erosion of each Plaintiff's credit rating, each Plaintiff's reliance harmed that Plaintiff,
21 further eroding home values in furtherance of the Defendants' scheme.

22     375.    Each of the misrepresentations described herein were, in fact, false. Defendants were not
23 financially sound; Defendants did not hold their loans in their own portfolio but rather sold them on the
24 secondary market; Defendants were not engaged in lending of the highest caliber, but quite the contrary;
25 the loans offered by Defendants were anything but safe and secure; Defendants did not refinance
26 Plaintiffs loans a at a later date ; Defendants did not modify Plaintiffs' loans; Plaintiffs and other
27 borrowers were not qualified for the loans Defendants were placing them into; Plaintiffs were not

- 99 -

1   capable of affording the fully amortized payments on those loans as represented by Defendants;
2   Plaintiffs and other borrowers' homes were falsely valued at inflated sums in order to place Plaintiffs
3   into larger loans; Defendants did not utilize a quality underwriting process; Defendants regularly entered
4   into mortgages with grossly under-qualified borrowers; Defendants qualification process did not mean
5   that a Plaintiff could afford his or her loan; and Defendants appraised value, despite representations to
6   the contrary, were not the true value of Plaintiffs' property but rather inflated for Defendants own
7   deceptive purposes.

8   376.   The long-term campaign of misinformation described throughout this Complaint and in
9   the First Cause of Action was intended by Defendants to be repeated and broadly disseminated through
10  the media, analyst reports and individual communications, and it was. It was intended to become part of
11  the well-understood "givens" among homeowners and prospective homeowners seeking mortgages, and
12  it was. The campaign of disinformation and the manifestation of that campaign described in the
13  preceding paragraphs of this Second Cause of Action succeeded - Plaintiffs relied upon the
14  misrepresentations and entered into mortgages with Defendants.

15  377.   The foregoing misrepresentations were made with the intention that Plaintiffs rely
16  thereon. It was important to Defendants that Plaintiffs rely on their misrepresentations so that Plaintiffs
17  would come to a false understanding as to the nature of Defendants.

18  378.   In reliance on the above concealments and/or material misrepresentations, Plaintiffs
19  entered into mortgage contracts with Defendants they otherwise would not have entered into and as a
20  result thereof were damaged. This damage was not only foreseeable by Defendants, but actually
21  foreseen (and then concealed) by them.

22

23  ## THIRD CAUSE OF ACTION

24  *(By All Plaintiffs – Negligent Misrepresentation – Against All Defendants)*

25  379.   All preceding and subsequent paragraphs are hereby incorporated by reference as though
26  fully set forth herein.

27

28

- 100 -

**COMPLAINT**

1      380.    Although Defendants may have reasonably believed that some or all of the
2  representations they made, as described in this Complaint, were true, none of them had reasonable
3  grounds for believing such representations to be true at the time: (1) the representations were instructed
4  to be made, as to those Defendants instructing others to make representations, or (2) at the time the
5  representations were made, as to those Defendants making representations and those Defendants
6  instructing others to make the representations, or (3) at the time the representations were otherwise
7  ratified by the Defendants.

8      381.    Such representations, fully set forth in the Second Causes of Action and previous sections
9  of this Complaint, were not true.

10      382.    Defendants intended that Plaintiffs rely upon those misrepresentations.

11      383.    As described herein, Plaintiffs reasonably relied on those representations.

12      384.    By reason of the prominence of Defendants and the campaign of deception as to its
13  business plans and the relationship of trust developed between Defendants and Plaintiffs, Plaintiffs were
14  justified in relying upon Defendants' representations.

15      385.    As a result of relying upon the foregoing misrepresentations, each Plaintiff entered into a
16  mortgage contract with Defendants.

17      386.    As a result of scheme described herein, Plaintiffs could not afford his or her mortgage
18  when its variable rate features and/or balloon payments kicked in.  Further, as a result of the Defendants'
19  continuing scheme, Plaintiffs could not refinance or sell his or her residence without suffering a loss of
20  Plaintiff's equity.

21      387.    Without limiting the damages as described elsewhere in this Complaint, Plaintiffs
22  damages as a result of the foregoing also include loss of equity in their houses, costs and expenses
23  related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit,
24  reduced availability of goods and services tied to credit ratings, increased costs of those services, as well
25  as fees and costs, including, without limitation, attorneys' fees and costs.

**COMPLAINT**

1    388.    Plaintiffs are entitled to such relief as is set forth in this Cause of Action and such further

2   relief as is set forth below in the section captioned Prayer for Relief which is by this reference

3   incorporated herein.

4

5                              **FOURTH CAUSE OF ACTION**

6              *(By All Plaintiffs – Unfair Competition – Against All Defendants)*

7    389.    The preceding paragraphs and subsequent causes of action are incorporated by reference

8   as though fully set forth herein.

9    390.    As it pertains to Unfair Competition Law "the universal test is whether the public is

10  likely to be deceived." (Grant v. California Bench Co. (1946) 76 Cal.App.2d 706, 707-708.)

11   391.    As described in this Complaint, and here in this Cause of Action, Defendants have acted

12  unlawfully, unfairly, and fraudulently. To say the least, their actions were likely to deceive the public.

13   392.    As detailed in the First and Second Causes of Action above (and hereby incorporated by

14  reference), Defendants' fraud upon Plaintiffs was pervasive and multi-pronged. Defendants' material

15  misrepresentations and affirmative concealments, if left unchecked, are highly likely to deceive the

16  public.

17   393.    Defendants' actions in implementing and perpetrating their fraudulent scheme of

18  inducing Plaintiffs to accept mortgages for which they were not qualified based on inflated property

19  valuations and undisclosed disregard of their own underwriting standards and the sale of overpriced

20  collateralized mortgage pools, all the while knowing that the plan would crash and burn, taking the

21  Plaintiffs down and costing them the equity in their homes and other damages, violates numerous federal

22  and state statutes and common law protections enacted for consumer protection, privacy, trade

23  disclosure, and fair trade and commerce. In addition to being fraudulent and violates numerous federal

24  and state statutes and common law protections enacted for consumer protection, privacy, trade

25  disclosure, and fair trade and commerce.

26   394.    These actions were immoral, unethical, oppressive, unscrupulous and substantially

27  injurious to similarly situated borrowers, and Plaintiffs herein. Defendants' conduct had no utility other

28

- 102 -

**COMPLAINT**

than for their own ill-gotten gain, and the harm was great not only to Plaintiffs herein, but also to residents of California, broadly, who have seen a decrease in their home and property values as a result of the bursting of the super-heated pricing bubble created by Defendants' fraudulently inflated appraisal; at the time of their fraud, Defendants *knew* that their conduct would cause the precipitous decline in property values throughout the State of California. Defendant's acts caused substantial consumer injury with no benefits to consumer competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants' intentional deceit, misrepresentation, and omission. Further, Defendants acts significantly threatened harm to competition.

395. The Defendants perpetrated their fraudulent scheme of selling off overpriced loans by making willful and inaccurate credit disclosures regarding Defendants' borrowers, including Plaintiffs, to third parties. This false credit disclosure was critical to the success of Defendants' continued sales of the massive pools of mortgage loans necessary to perpetuate the scheme. The Defendants were aware that if the true credit profiles of the borrowers and the values of their real estate were accurately disclosed, the massive fraudulent scheme would end. As a result, the Defendants repeated, reinforced and embellished their false disclosures.

396. Defendants had an unfair and fraudulent pattern on inducing and directing borrowers to fall behind on their payments with the promise that by doing so, they would become eligible for a loan modification. Relying on these representations, Plaintiffs fell behind on their loan payments, but were never offered a loan modification. In doing so, Plaintiffs' credit was substantially damaged, they suffered greatly diminished access to credit and financing, and were penalized with fees, penalties and charges in addition to becoming delinquent on their loan as recommended by the Bank. By recommending that Plaintiffs fall behind, Defendants effectively trapped Plaintiffs into keeping their loan with Defendants, because no other institution would help Plaintiffs after they became delinquent on their mortgage, or after their credit was destroyed.

397. Defendants also had an unfair and fraudulent pattern of offering borrowers what appeared to be Loan modification offers (called "Trial Payment Plans"), but in reality these offers were nothing more than "cash grabs." Defendants never intended to permanently modify Plaintiffs' loans.

- 103 -

**COMPLAINT**

1   Specifically, Defendants would offer Plaintiffs and homeowners who were already on the brink of

2   default/foreclosure a lower payment called a "trial payment." Defendants promised that if Plaintiffs were

3   able to make the trial payment for 3 (or more) months, Defendants would permanently modify Plaintiffs'

4   payment to be the same amount under the trial payments. But Defendants had a pattern of rejecting these

5   loan modifications despite Plaintiffs' compliance with every term of the loan modification offer. Instead

6   Defendants would use the offer as bait to induce Plaintiffs to make payments which would never be

7   applied to the principal and interest of their loan, but instead would be applied to the mountain of

8   unmerited late charges, and fees, taking what little money the financially imperiled plaintiffs had left,

9   and duping them into spending it on unfairly placed fees and late charges. Defendants never had any

10  intent of modifying their loans, despite Plaintiffs' full compliance with the terms of the offer. Such acts

11  are patently unfair and fraudulent, and Plaintiffs are entitled to remuneration of all payments made under

12  such trial payment plans, as well as an injunction prohibiting Defendants from this deceptive business

13  practice. More specifically, Defendants' unlawful and unfair practices in this regard include, but are not

14  limited to, the following:

15          a.  failing to make good faith efforts to provide them with a loan modification and

16              breaching their contractual obligations, written and implied promises, loan servicing

17              functions owed to Plaintiffs, who fulfilled their obligations by making timely modified

18              payments;

19          b.  making false and/or misleading representations that Plaintiffs were eligible and

20              entered into the trial modification period, which would lead to a permanent

21              modification of their mortgage payment;

22          c.  failing to disclose to Plaintiffs that their modified payments may be reported to credit

23              bureaus as default or late payments that would destroy their credit scores;

24          d.  delaying processing, demanding duplicate documentation, and failing to provide

25              adequate information or communication regarding the loan modification programs to

26              Plaintiffs; and

27

28                                          - 104 -

                                    **COMPLAINT**

1         e.  engaging in conduct that undermines or violates the spirit or intent of the consumer

2             protection laws alleged in this Complaint

3         f.  omitting to inform Plaintiffs that they could be rejected from the trial modification

4             period at any point, and that this would result in the immediate demand for a balloon

5             payment consisting of purported delinquency payments and substantial late fees,

6             default fees, foreclosure fees, inspection fees, property preservation fees, trustee fees,

7             trustee sale guarantee fees, mail fees, recording fees, and default servicing fees.

8

9         398.   TILA, title 15 of the United States Code section 1601 et seq., and its accompanying

10   regulations (Regulation Z), 12 Code of Federal Regulations part 226.1 (2010) et seq., require specific

11   disclosures by businesses offering consumer credit (including mortgage loans). TILA's purpose is to

12   "avoid the uninformed use of credit." (15 U.S.C. § 1601.) TILA grants the Board of Governors of the

13   Federal Reserve System power to prescribe regulations and carry out the purposes of TILA. (15 U.S.C.

14   §§ 1602(b), 1604(a).) Subject to certain exceptions, TILA does not "annul, alter, or affect the laws of

15   any State relating to the disclosure of information in connection with credit transactions, except to the

16   extent that those laws are inconsistent with the provisions of this subchapter, and then only to the extent

17   of the inconsistency." (15 U.S.C. § 1610(a)(1).) Thus, the existence of TILA does not necessarily

18   preempt plaintiffs' state law claims.

19        399.   Regulation Z obligates creditors providing "closed-end credit" (such as a mortgage) to

20   "make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the

21   consumer may keep." (12 C.F.R. § 226.17(a)(1) (2010).) "This standard requires that disclosures be in a

22   reasonably understandable form. For example, while the regulation requires no mathematical

23   progression or format, the disclosures must be presented in a way that does not obscure the relationship

24   of the terms to each other." (12 C.F.R. § 226, Supp. 1, par. 17(a)(1).)

25        400.   Variable rate mortgage borrowers must be provided with "[a] loan program disclosure"

26   that includes "[a]ny rules relating to changes in the index, interest rate, payment amount, and

27   outstanding loan balance including, for example, an explanation of interest rate or payment limitations,

- 105 -

28

**COMPLAINT**

negative amortization, and interest rate carryover." (12 C.F.R. § 226.19(b)(2)(vii) (2010).) "If the initial interest rate will be a discount or a premium rate, creditors must alert the consumer to this fact." (12 C.F.R. § 226, Supp. I par. 19(b)(2)(v)(1).) "A creditor must disclose, where applicable, the possibility of negative amortization. For example, the disclosure might state, 'If any of your payments is not sufficient to cover the interest due, the difference will be added to your loan amount.' . . . If a consumer is given the option to cap monthly payments that may result in negative amortization, the creditor must fully disclose the rules relating to the option, including the effects of exercising the option (such as negative amortization will occur and the principal loan balance will increase). . . ." (12 C.F.R. § 226, Supp. I par. 19(b)(2)(vii)(2).)

401. The Defendants knew the borrowers' credit was inadequate to support continued loan payments, absent unsustainable inflation of property values. These pervasive false credit disclosures to third parties (including purchasers of bundled mortgage pool created by the Defendants) constituted false credit reports in violation of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.,* and these pervasive false disclosures permitted the Defendants to continue their scheme and victimize the Plaintiffs.

402. These pervasive false disclosures also caused the bubble to burst. Once it became known that some of the information provided by Defendants was false, the market for the sale of bundled loans dried up. The Defendants began to issue foreclosure notices, property values began dropping, and then, under the weight of *deflation* in a market that requires *inflation*, the equity investments made by Plaintiffs and others in their homes was lost . . . and then Plaintiffs were lost in the greatest economic recession since the 1930s.

403. As alleged by the SEC, this fraud also violated Federal law, including, without limitation, the antifraud provisions and insider provisions of the Securities Act of 1933 ("*Securities Act*") and the Securities Exchange Act of 1935 ("*Exchange Act*") including, without limitation:

        a. Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), by engaging conduct which acted as a fraud on the purchaser of securities based on collateralized mortgage pools;

        b. Section 10(b) of the Securities Act and Rule 10b-5 thereunder, 15 U.S.C. § 78j(b) and

- 106 -

1    17 C.F.R. 240.10b-5, by making untrue statements of material fact and omitting to

2    state material facts necessary in order to make the statements made, in the light of the

3    circumstances under which they were made, not misleading and/or otherwise

4    engaging in acts, practices, or courses of business which operated as a fraud or deceit

5    upon purchasers of securities based on collateralized mortgage pools; and

6    c. Section 13(a) of the Securities Exchange Act and Rules 12b-20, 13a-1 and 13a-3

7    thereunder, 15 U.S.C. § 78t (e), by filing with the SEC false information for the fiscal

8    years 2005 through 2007.

9

10   404.    The foregoing violations were in furtherance of the fraud perpetrated on Plaintiffs. In

11   fact, Defendants could not have told the truth in their public filings without that truth becoming known

12   to Plaintiffs. Conversely, the false filings gave additional credence and support to omissions,

13   concealment, promises and inducements.

14   405.    Defendants violated the Patriot Act as described above by failing to adequately identify

15   the source of funds used to fund mortgages and fund the securitization pools that purchased mortgages.

16   406.    Defendants further violated by Patriot Act by failing to adopt procedures required

17   thereunder as to the sources of funds and record-keeping pertaining thereto.

18   407.    Defendants further violated the Patriot Act by failing to timely and accurately provide the

19   disclosures required under the Patriot Act pertaining to its sources of funds, thereby depriving Plaintiffs

20   and others of information pertaining possibly money laundering.

21   408.    Defendants violated TILA by failing to provide to Plaintiffs timely and accurate

22   notifications regarding the owners of their mortgages.

23   409.    Defendants herein both in their individual capacity, and in their capacity as co-

24   conspirators with one another and with HLCS (Ally's wholly-owned appraisal management company)

25   have violated 15 USCA §1639e by violating appraiser independence through, among other things,

26   compensation, coercion, extortion, bribery, intimidation of their appraisers, as well as the appraisal

27

28

- 107 -

**COMPLAINT**

1  management company itself, and its management and executives, as described at length in paragraphs
2  105-130 above, and in the seventh cause of action below.

3  410.  Defendants violated Appraiser Independence 12 C.F.R. §225.65 by allowing their staff
4  and fee appraisers to have an indirect financial interest in the results of the transaction, as detailed in
5  paragraphs 105-130 above and as further alleged in the eighth cause of action herein.

6  411.  Defendants violated California common law by pursuing foreclosures through mere
7  nominees, such as MERS, and without proof they owned the notes and deeds of trust underlying their
8  foreclosure actions.

9  412.  While processing the home loans of each Plaintiff herein, the Ally Defendants and other
10 Defendants herein came into possession, custody and control of their Private Information.

11 413.  The guarantee of privacy granted to each Californian is a special personal and property
12 right. Other states may accord privacy rights by way of statute, or otherwise, but the privacy right in
13 California is a unique, fundamental, Constitutional, and *inalienable* right that is also a protectable
14 property interest. The privacy right granted by the California Constitution necessarily includes
15 protection from the release of the Private Information.

16 414.  By foreclosing on Plaintiffs without being "holders" or in possession of their respective
17 Notes, Defendants unlawfully foreclosed on Plaintiffs without having the authority to enforce the debt in
18 violation of UCC 3-301.

19 415.  The Ally Defendants acknowledge and admit that their agents and/or employees
20 disclosed the Private Information of Plaintiffs to outside persons.

21 416.  This Private Information of Plaintiffs was sold or otherwise disclosed to third parties
22 without Plaintiffs' consent, further violating Article 1, § 1 of the California Constitution and the
23 California Financial Information Privacy Act.

24 417.  The Private Information was disclosed and then used unlawfully and fraudulently to
25 apply for and receive multiple credit cards, charge accounts, and other credit from businesses in the
26 mistaken belief that they were dealing with a Plaintiff, and not with an identity thief.

27

28                                          - 108 -

                                        **COMPLAINT**

1     418.    These undeniable disclosures by the Defendants of nonpublic personal information of the

2 Plaintiffs and others also violated the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801 *et seq*.

3     419.    By violating Plaintiffs' right to privacy and by misappropriating nonpublic personal

4 information for their own use, the Defendants thus wrongfully took each Plaintiff's property interest in

5 his or her Private Information and privacy, injuring each Plaintiff, and, as a result, Plaintiffs are eligible

6 for restitution because the Defendants wrongfully acquired the property in which Plaintiffs had an

7 ownership or vested interest.

8     420.    The forgoing fraudulent concealment, material misstatements, and the intentional

9 violations of state and federal statutes cited herein constitute unlawful, unfair and fraudulent business

10 acts or practices and so constitute unfair business practices within the meaning of the California Unfair

11 Practices Act, Cal. Bus. & Prof. Code §§ 17200, 17500. Sections 17200 *et seq*. of the California

12 Business & Professions Code provides, in the disjunctive, for liability in the event of any such

13 "unlawful, unfair or fraudulent business act or practice."

14     421.    The violations described herein are unlawful, in that they violate *inter alia* Article I, § 1

15 of the California Constitution, the California Financial Information Privacy Act, Cal. Civil Code §§

16 1798.80-84, the Fair Credit Reporting Act, the Gramm-Leach-Bliley Act and the Federal laws described

17 herein. These violations are the basis for liability under § 17200 of the Business and Professions Code,

18 as is the unlawful and fraudulent activity described herein.

19     422.    The unfair, unlawful and fraudulent acts and practices of Defendants named herein

20 present a continuing threat to Plaintiff and to members of the public in that these acts and practices are

21 ongoing and are harmful and disruptive to business and financial markets.

22     423.    The actions described herein are unfair and patently fraudulent in that they were

23 conducted for the sole purpose of perpetuating an unlawful and unsustainable investment scheme.

24     424.    As a result of the actions, concealment and deceit described herein, each of the Plaintiffs

25 has suffered material financial injury in fact, including as described elsewhere in this Complaint, loss of

26 equity in their houses, costs and expenses related to protecting themselves, reduced credit scores,

27 unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit

- 109 -

28

1  ratings, increased costs of those services, as well as fees and costs, including, without limitation,
2  attorneys' fees and costs.

3      425.   As a further result of the actions, concealment and deceit described herein, each of the
4  Plaintiffs has lost money or property as a result of such unfair competition, including the loss of
5  Plaintiffs' property interest in their Private Information as a result of the unconscionable invasion of
6  privacy and misappropriation of nonpublic personal information.

7      426.   California Civil Code § 2923.5 requires that each mortgagee, trustee, beneficiary, or
8  authorized agent may not file a notice of default pursuant to California Civil Code § 2924 until 30 days
9  after initial contact is made as required therein, or 30 days after satisfying the due diligence
10 requirements to contact the mortgage described therein. Defendants violated the foregoing law by
11 causing a notice of default to be filed against Plaintiffs without the mandatory notice. Defendants did
12 not diligently endeavor to contact the Plaintiffs as required by § 2923.5(g) and Defendants thereby also
13 violated California Civil Code §§ 2923.5 and 2924.

14     427.   As a result of the foregoing unlawful conduct, Plaintiffs suffered further injury in fact by
15 the filing of notices of default and as such the Plaintiffs suffered monetary and property loss. Such
16 injuries and loss included diminished credit scores with a concomitant increase in borrowing costs and
17 diminished access to credit, fees and costs, including, without limitation, attorneys' fees and costs with
18 respect to wrongful notices of default and loss of some or all of the benefits appurtenant to the
19 ownership and possession of real property.

20     428.   The foregoing unlawful activities were pervasive and violate Business and Professions
21 Code § 17200 *et seq*.

22     429.   As a result of Defendants' unfair competition, Plaintiffs are entitled to restitution for all
23 sums received by Defendants with respect to Defendants' unlawful and/or unfair and/or fraudulent
24 conduct, including, without limitation, interest payments made by Plaintiffs, fees paid to Defendants,
25 including, without limitation, the excessive fees paid at Defendants' direction as alleged by the FTC, and
26 premiums received upon selling the mortgages at an inflated value.

- 110 -

**COMPLAINT**

430. Further as a result of Defendant's (1) artificial and fraudulent inflation of Plaintiffs' property values, and property values throughout the State of California, as well as (2) Defendants' abandonment of their own as well as industry standard underwriting guidelines, coupled with (3) Defendants incentive to package and sell as many dollars' worth of loans as they could to the secondary market, Defendants placed Plaintiff-borrowers into loans which were considerably larger than were justified by (a) the *true* uninflated valued of their properties, (b) Plaintiffs true uninflated incomes and (c)by Defendants own underwriting guidelines. As a result of Plaintiffs were placed into larger loans than they could afford or should have been placed into. The additional fees, points and interests paid as a result of the higher/inflated loan amounts constitute damages, and legally cognizable sources of restitution.

431. Further, Defendants either directly or through their subsidiaries, including CR TITLE (and any other such companies), often charged fees associated with initiating or conducting the foreclosures resulting from their fraudulent lending including inspection fees, default fees, late fees, advance fees, attorney fees, and trustee fees. In short, Defendants made money by wrongfully initiating foreclosures against Plaintiffs herein. The award of damages or restitution for these unmerited fees obtained through deceit is proper.

432. Plaintiffs are also entitled to the issuance of a temporary restraining order, a preliminary injunction, and a permanent injunction restraining and enjoining Defendants from any further concealment with respect to the sale of notes and mortgages, any further violation of § 2923.5, any further violation of Article I, § 1 of the California Constitution, the California Financial Information Privacy Act, Cal. Civil Code § 1798.82, the Fair Credit Reporting Act, and the Gramm-Leach-Bliley Act, and any further disclosure or use of the Private Information, other than as intended by the Plaintiffs.

433. Plaintiffs are entitled to such relief as is set forth in this Cause of Action and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

**COMPLAINT**

# FIFTH CAUSE OF ACTION

*(By Plaintiffs Rick Albritton, Deborah Albritton, David Cruz, Yesenia Cruz & Cristina Palbricke–*

*Wrongful Foreclosure, Violation of Cal. Civil Code § 2924 –Against All Defendants)*

434.   . The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

435.   Defendants have already foreclosed upon the following property owned by the following Plaintiffs:

   a) Rick Albritton
      2030 W Windhaven Dr,
      Rialto Ca 92377

   b) Deborah Albritton
      2030 W Windhaven Dr,
      Rialto Ca 92377

   c) David Cruz
      48159 Sol De Linda,
      Coachella, Ca 92236

   d) Yesenia Cruz
      48159 Sol De Linda,
      Coachella, Ca 92236

   e) Cristina Palbicke
      27949 Harwood Dr,
      Santa Clarita, Ca 91350

436.   Because Defendants are not the holders of the notes and deeds of trust and are not operating under a valid power from the current holders of the notes and deeds of trust, Defendants did not have the right to proceed with the foregoing foreclosures.

437.   The burden of proving an assignment falls upon the party asserting rights thereunder. In an action by an assignee to enforce an assigned right the evidence must not only be sufficient to establish the fact of assignment when that fact is in issue, but the measure of sufficiency requires that the

- 112 -

1    evidence of assignment be clear and positive to protect an obligor from any further claim by the primary

2    obligee. Defendants, they failed to do so and improperly foreclosed by reason of lack of proof that they

3    had the right to proceed.

4        438.    Under the California Uniform Commercial Code, a negotiable instrument, such as a

5    promissory note secured by a mortgage, may only be enforced by the holder or a person with the rights

6    of a holder. Com. Code § 3-301. For instruments payable to an identified person, such as a lender, a

7    holder is generally recognized as the payee or one to whom the negotiable instrument has been

8    negotiated. This requires transfer of possession and endorsement by the prior holder. Com. Code § 3-

9    201. Unless the parties otherwise provide, the mortgage follows the note. Civ. Code § 2936.

10       439.    Though in California, the assignment of a note generally carries with it an assignment of

11   the mortgage (Civ. Code § 2936), it is still required in California that the holder of the note or a person

12   operating with authority from that holder be the foreclosing party and that the mortgage not have been

13   assigned away from that note.

14       440.    Defendants no longer own the notes it originated and there is just no way of knowing

15   who now owns the Plaintiffs' mortgages because the Defendants do not know who owns these

16   mortgages. Indeed, the Defendants do not know where it is that they obtained their alleged rights to

17   collect money from Plaintiffs thereunder.

18       441.    Once separated from the note, the trust deed is unenforceable and of no legal value. For

19   negotiable instruments payable to an identified person, such as a lender, a holder is generally recognized

20   as the payee or one to whom the negotiable instrument has been negotiated. This requires transfer of

21   possession and endorsement by the prior holder. (Com. Code § 3-201). Unless the parties otherwise

22   provide, the mortgage follows the note. (Civ. Code § 2936; see also *Carpenter v. Longan* (1872) 83

23   U.S. 271, 275).

24       442.    Civil Code § 2936 provides: "the assignment of a debt secured by mortgage carries with

25   it the security." Defendants have no evidence that they own the notes or have any power to enforce

26   them from the rightful owners.

27

28

**COMPLAINT**

1   443.   As described above, there is compelling evidence that Defendants are violating TILA and
2   the Patriot Act by failing to provide required information as to the owners of the notes and deeds of trust
3   and the sources of funds used to provide their mortgages and/or acquire their mortgages.

4   444.   Foreclosure was wrongful for each of the following reasons, independent of any of the
5   other following reasons: (1) because Plaintiff's mortgage was obtained through concealment and/or
6   misrepresentation; (2) because Defendants do not own the note and do not have a power of attorney with
7   respect to the note; (3) because the note and deed of trust have become separated; (4) because
8   Defendants do not own the deed of trust and do not have a power of attorney with respect to the deed of
9   trust; (5) because Defendants cannot surmount their burden of demonstrating they own the note or have
10  a power of attorney with respect thereto; and (6) because Defendants cannot surmount their burden of
11  demonstrating they own the deed of trust or have a power of attorney with respect thereto.

12  445.   As a result of the foreclosures, Plaintiff was dispossessed of Plaintiff's property and put
13  to the expense of relocating and securing alternative properties. Plaintiff was further dispossessed of the
14  value of Plaintiff's home and the potential appreciation thereof.

15  446.   Defendants, including Trustee, acted outrageously and persistently with actual malice in
16  performing the acts alleged in this cause of action. Accordingly, Plaintiff is entitled to exemplary and
17  punitive damages in a sum according to proof and to such other relief as is set forth below in the section
18  captioned Prayer for Relief which is by this reference incorporated herein.

19
20
21  ## SIXTH CAUSE OF ACTION

22  *(By All Plaintiffs - Violation of Truth in Lending Act, 15 USC §1601 et seq. – Against Bank*
23  *Defendants)*

24
25  447.   The preceding paragraphs and the paragraphs following this cause of action are
26  incorporated by reference as though fully set forth herein

27
28

**COMPLAINT**

448. The jurisdiction of this court for this cause of action is invoked pursuant to the Truth in Lending Act ("TILA"), 15 U.S.C §1640 and 28 U.S.C. §§1331 and 1337

449. Jurisdiction of this court for the pendent claims is authorized by Fed. R. Civ.P. 18(a).

450. The disclosure statements issued in conjunction with the consumer credit transactions complained of herein violated the requirements of the Truth in Lending Act and Regulation Z in the following and other respects:

    a. By failing to provide the required disclosures prior to consummation of the transaction in violation of 15 USC §1638(b) and Regulation Z (§226.17(b) ("Regulation Z")

    b. By failing to make required disclosures clearly and conspicuously in writing in violation of 15 USC §1632(a) and Regulation Z.

    c. By failing to properly identify property subject to a security interest in violation of 15 USC §1638(a)(9) and Regulation Z.

    d. By failing to disclose certain finance charges imposed by Defendants payable by plaintiff incident to the extension of credit as required by 15 USC §1605 and Regulation Z, thus improperly disclosing the finance charge in violation of 15 USC 1638(a)93) and Regulation Z

    e. In the Context of Option ARM loans, by failing to disclose that paying the amount set forth in the Truth In Lending Disclosure payment schedule, would result in negative amortization/deferred interest to an absolute certainty, rather than a mere possibility.

    f. By failing to properly disclose or fraudulently hiding prepayment penalties, points, origination discounts, kickbacks, commissions, etc. to Plaintiffs oftentimes resulting in Plaintiff being forced to incur or pay unnecessary or unfair charges which they were never aware of, and which they never had an opportunity to contest.

    g. By improperly including certain charges in the amount financed which are finance charges, Defendants improperly disclosed the amount financed in violation of 15 USC §1638(2) and Regulation Z.

**COMPLAINT**

1          h.  By calculating the annual percentage rate (APR) based upon improperly calculated

2              and disclosed finance charges and amount financed, the Defendant understated the

3              disclosed APR in violation of 51 USC §1638(a)(4) and Regulation Z.

4  451.    Defendants knew their disclosures were false, inaccurate, insufficient and/or fraudulent at

5  the time they made them, and did so with the intent to induce Plaintiffs' reliance

6  452.    Plaintiffs herein detrimentally relied on Defendants insufficient, false, and/or fraudulent

7  disclosures.

8  453.    Plaintiffs were actually deceived by Defendants violations of TILA and their failure to

9  disclose the items required under TILA

10  454.    Defendants' actions were misleading not only to Plaintiffs herein, but to consumers

11  generally.

12  455.    By reason of the aforesaid violation of TILA and Regulation Z, Plaintiffs were actually

13  injured and Defendants are liable to Plaintiff in the amount of twice the finance charge, actual damages

14  to be established at trial, and attorney's fees and costs in accordance with 15 USC §1640.

15  456.    These failures to disclose, concealments and misrepresentations were unknown to all

16  Plaintiffs referenced herein at the time of loan origination.

17  457.    All Plaintiffs herein discovered these failures to disclose, concealments and

18  misrepresentations, beginning no more than 1 years prior to the date of filing this action. A reasonable

19  person would have been unable to reasonably discover said failures to disclose, concealments, and

20  misrepresentations any earlier.

21  458.    The doctrine of equitable tolling applies to suspend the limitations period until a

22  Plaintiffs discovery of the fraud or non-disclosures that form the basis of the TILA action. *Appling v.*

23  *Wachovia Mortg., FSB* (N.D. Cal. 2010) 745 F.Supp.2d 961, 969; *Cervantes v. Countrywide Home*

24  *Loans, Inc.,* 656 F.3d 1034, 1045 (9th Cir.2011) and *Ahmad v. World Sav. Bank, FSB* (9th Cir., Jan. 26,

25  2012, 10-16497) 2012 WL 235979.

26

27

28

**COMPLAINT**

1

# SEVENTH CAUSE OF ACTION

2    *(By All Plaintiffs - Violation of Appraisal Independence - 15 USC §1639e –Against All*

3                                        *Defendants)*

4       459.   The preceding paragraphs and the paragraphs following this cause of action are

5    incorporated by reference as though fully set forth herein

6       460.   Defendants herein both in their individual capacity, and in their capacity as co-

7    conspirators with one another and with HLCS (Ally's wholly-owned appraisal management company)

8    have violated 15 USCA §1639e by violating appraiser independence through, among other things,

9    compensation, coercion, extortion, bribery, intimidation of their appraisers, as well as the appraisal

10   management company itself, and its management and executives, as well as other independent, outside,

11   or "fee appraisers" not employed by HLCS.

12      461.   Defendant Co-conspirators herein were in the business of extending credit and providing

13   services related to the extension of credit in the consumer credit transactions secured by the principal

14   dwelling of the customer – Plaintiffs herein.

15      462.   As described throughout this Complaint at length, but particularly at paragraphs 150-170,

16   Ally and Defendants herein as well as their employees, officers, and agents intentionally...

17          a.  Caused the appraisers to  base the value of their appraisals on a factor other than the

18              independent judgment of the appraiser;

19          b.  Mischaracterized and/or suborned the mischaracterization of the appraised value of

20              the property securing the extension of credit

21          c.  Sought to influence the appraiser  to facilitating the making of and pricing of their

22              transactions;

23          d.  Sought to influence the appraiser to achieve a targeted value; and

24          e.  Withheld or threatened to withhold payment for the appraisal services rendered in

25              conformity with the contract between the parties.

26

27

28

**COMPLAINT**

1    463.    Defendants acted with malice and with the intent of artificially inflating California real

2   estate properties generally, as well as the values of Plaintiffs' individual properties and homes.

3    464.    As a result of Defendants' acts, California's real estate economy, and the individual

4   values of Plaintiffs' properties were artificially inflated, resulting in and causing the substantial loss of

5   Plaintiffs' net equity upon the unraveling of their fraudulent scheme.

6

7                              **EIGHTH CAUSE OF ACTION**

8        *(By All Plaintiffs - Violation of Appraiser Independence – 12 C.F.R §225.65 –Against Bank*

9                                    *Defendants and HLCS)*

10   465.    The preceding paragraphs and the paragraphs following this cause of action are

11   incorporated by reference as though fully set forth herein.

12   466.    Bank Defendant Banks, and Ally's wholly-owned appraisal company HLCS violated 12

13   C.F.R §323.5 by allowing their staff appraisers to have an direct or indirect financial or other interest in

14   the property, namely Ally, Bank Defendants, and HLCS often bribed, or incentivized their staff

15   appraisers for who appraised homes whose loans ended up funding, and further by penalizing and

16   denying the appraiser pay for not valuing a property at a high enough value.

17   467.    As to fee appraisers, outside appraisers and independent appraisers, Bank Defendants and

18   HLCS violated 12 C.F.R. §323.5 in failing to directly engage the appraisers, instead allowing their loan

19   consultants, brokers, and other such loan origination employees to engage the appraisers themselves,

20   thereby allowing them to exercise influence over the appraisers. This policy was both foreseen, intended

21   and encouraged by Bank Defendants and HLCS. Further, these fee/outside/independent appraisers were

22   given a direct interest in the transaction – their pay and the possibility of future business would often be

23   contingent on the results they provided, namely high values.

24   468.    Additionally, Bank Defendants and HLCS violated this section as to both Staff and

25   "fee"/outside/independent appraisers by "blacklisting" any appraiser who consistently brought back

26   lower values than expected. In other words, Defendants conditioned the appraiser's very job on their

27

28

**COMPLAINT**

1  willingness to "play ball" – a strong financial interest in the value of the property if ever there were any.
2  Appraisers who would bring back conservative or low values were let go and never re-hired. This was a
3  well-known reality within the appraisal and banking industry and influenced the independence of
4  thought of any appraiser working with a big bank such as Defendant Banks herein. Defendants intended
5  the threat of being blacklisted to deter appraisers from rendering uninhibited good faith appraisals and
6  instead to influence appraisers to exaggerate their values. When taken in the aggregate, Defendants'
7  policies, coercion and acts resulted in the systematic and artificial inflation of California real estate
8  values.

9      469.   The loan transactions alleged in this cause of action qualify as "federally regulated
10 transactions" under the statute because such transactions are defined in the definition section of the
11 statute as "any real-estate-related financial transaction entered into on or after August 9, 1990 that...
12 requires the services of an appraiser."

13     470.   Defendants acted with malice and with the intent of artificially inflating California Real
14 estate properties generally, as well as the values of Plaintiffs' individual properties and homes.

15     471.   As a result of Defendants' acts, California's real estate economy, and the individual
16 values of Plaintiffs' properties were artificially inflated, resulting in and causing the substantial loss of
17 Plaintiffs' net equity upon the unraveling of their fraudulent scheme.

18

19                                  **PRAYER FOR RELIEF**

20 WHEREFORE, Plaintiffs pray for judgment against Defendants and each of them as follows:

21     1.  General, Actual, Compensatory, Special and Exemplary damages according to proof under the
22         First, Second, Third, Fifth, Sixth, Seventh, and Eighth Causes of Action, and any other causes of
23         action for which such relief may be available;

24     2.  Twice the amount of finance charges under the Second Cause of action;

25     3.  Statutory relief according to proof under the Fourth and Fifth Causes of Action and any other
26         causes of action for which such relief may be available;

27

28                             - 119 -

1    4. Restitution under the Fourth Cause of Action and any other causes of action for which such relief
2       may be available;
3    5. Temporary, preliminary, and permanent injunctive relief under the Fourth and Fifth Causes of
4       Action and any other causes of action for which such relief may be available;
5    6. On all causes of action, for costs of suit herein;
6    7. On all causes of action, for pre- and post-judgment interest;
7    8. On all causes of action for which attorney's fees may be awarded pursuant to the governing
8       contract, by statute or otherwise, reasonable attorney's fees; and
9    9. On all causes of action, for such other and further relied as this Court may deem just and proper.
10
11
12   Dated: May 7, 2012                          Respectfully submitted,
                                                 **BROOKSTONE LAW, PC**
13
14                                               By: _____
15                                                   Vito Torchia Jr.
16                                                   Attorneys for Plaintiffs
17
18
19
20
21
22
23
24
25
26
27
                                          - 120 -
28
                                      **COMPLAINT**

## Exhibit 2

## First Amended Complaint



FILED
CLERK, U.S. DISTRICT COURT

OCT 3 1 2012

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

1  Vito Torchia, Jr. (SBN244687)
   vjt@brookstonelaw.com
2  Sasan Behnood (SBN 250626)
   sbehnood@brookstonelaw.com
3  **BROOKSTONE LAW, PC**
   4000 MacArthur Blvd., Suite 1110
4  Newport Beach, California 92660
   Telephone: (800) 946-8655
5  Facsimile: (866) 257-6172
   E-mail: HairstonvAlly@BrookstoneLaw.com
6
   Attorneys for Plaintiffs
7

8               **UNITED STATES DISTRICT COURT**

9       **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

10

11  CAROLYN HAIRSTON, an individual;          Case No.: 12-5016-JAK (AGRx)
                                              Honorable Judge John A. Kronstadt
12  CHRISTINE PETERSEN, an individual;        Courtroom 750
13  WILLIAM MIMIAGA, an individual;
    ROBIN GASTON, an individual;             **FIRST AMENDED COMPLAINT FOR:**
14  PATRICK GASTON, an individual;           **1. FRAUDULENT CONCEALMENT**
15  MARY SERRANO, an individual;                **[VIOLATION OF CIV. CODE §§**
                                                 **1572,**
    SARAH SEBAGH, an individual;                 **1709 AND 1710];**
16  RICK ALBRITTON, an individual;           **2. INTENTIONAL**
17  DEBORAH ALBRITTON, an individual;            **MISREPRESENTATION**
                                                 **[VIOLATION OF CIV. CODE §§**
18  VERONICA GREY, an individual;                **1572, 1709 AND 1710];**
    BRENDA MELLA, an individual;             **3. NEGLIGENT**
19  JOSELITO MELLA, an individual;               **MISREPRESENTATION**
20  MICHAEL MAN, an individual; JUDY             **[VIOLATION OF CIV. CODE §§**
                                                 **1572, 1709 AND 1710];**
    LIM, , an individual;  DAVID  CRUZ, an   **4. UNFAIR COMPETITION**
21  individual; YESENIA CRUZ, an                 **[VIOLATION OF BUS. & PROF.**
22  individual; GREGORY  BUCK, an                **CODE §17200 ET SEQ.];**
    individual;
23                                            **5. WRONGFUL FORECLOSURE**
    CRISTINA PALBICKE, an individual;            **[VIOLATION OF CIV CODE   §**
24  KHALIL  SUBAT , an individual;               **2924];**
25  MANIJA SUBAT, an individual;             **6.  IMPROPER INFLUENCE OVER**
                                                 **APPRAISER [VIOLATION OF**
    GENEVIE CABANG, an individual;               **CAL. CIV. CODE §1090.5]**
26  JULIO GONZALEZ, an individual; LISA
27  SIMONYI , an individual;                 **[JURY TRIAL DEMANDED]**
    RICK  EWALD, an individual;
28  REGINA  FAISON, an individual; ALEX

BY FAX

- 1 -
**FIRST AMENDED COMPLAINT**

IBARRA, an individual; MARIA ELENA
DEL CID, an individual; JULIO DEL
CID, an individual; MESBEL
MOHAMOUD, an individual;
MICHAEL MOULTRIE, an individual;
WILLIE GILMORE, an individual;
PHYLLIS MCCREA, an individual;
CECILIA CHAUBE, an individual;
MAGDALENA AVILA, an individual;
GRICELDA RUANO, an individual;
ELISA JORDAN, an individual; LOIS
TERRELL SULLIVAN, an individual;
GLORIA PORTILLO, an individual;
FLORASTENE HOLDEN, an individual;
MARCO BADILLA, an individual;
MANUELA BADILLA, an individual;
IGNACIO RODRIGUEZ, an individual;
ROSA RODRIGUEZ, an individual;
SALVADOR BARAJAS, an individual;
MARIA BARAJAS, an individual;
BRIAN FOOTE, an individual; OLAN
ROSS, an individual; EVELYN ROSS, an
individual; GARY JOHNSON, an
individual; JOELLYN JOHNSON, an
individual; RODELINA SANTOS, an
individual; JUN O. SANTOS, an
individual; MICHAEL BROWN, an
individual; CLAUDINETTE BROWN, an
individual; MARTIN KASSOWITZ, an
individual; SHIRLEY KAPLAN, an
individual;
HENRY COMPLETO, an individual;
IRMA LAREDO, an individual; MARCIA
WILLOUGHBY, an individual; VICTOR
PAZOS, an individual.

       Plaintiffs,

   vs.

- 2 -

**FIRST AMENDED COMPLAINT**

ALLY BANK, N.A., f/k/a GMAC BANK, a Utah Corporation, in its own capacity and as an acquirer of certain assets and liabilities of GMAC; GMAC, a National Banking Association; ALLY FINANCIAL, INC. f/k/a/ GMAC, LLC, a Delaware Corporation; GMAC MORTGAGE GROUP, INC., A Delaware Corporation; RESIDENTITAL CAPITAL, LLC f/k/a RESIDENTIAL CAPITAL CORPORATION, a Delaware Corporation; GMAC-RFC HOLDING COMPANY, LLC d/b/a/ GMAC RESIDENTIAL FUNDING CORPORATION, a Delaware Corporation; RESIDENTIAL FUNDING COMPANY, LLC f/k/a RESIDENTIAL FUNDING CORPORATION, a Delaware Corporation; HOMECOMINGS FINANCIAL, LLC, a Delaware Corporation; EXECUTIVE TRUSTEE SERVICES DBA ETS SERVICES ,LLC, a Delaware limited liability company; HOME CONNECTS LENDING SERVICES, LLC, a Pennsylvania limited liability company; MTC FINANCIAL INC. d/b/a TRUSTEE CORPS, a California Corporation; and Does 1 through 1000 , inclusive.


        Defendants.

**FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

NATURE OF ACTION ......................................................................... - 7 -

PARTIES ........................................................................................... - 9 -

    *Plaintiffs* ......................................................................................... - 9 -

    *Defendants* ..................................................................................... - 10 -

    *Relationship of Defendants* ........................................................... - 13 -

ALLY CEASED ACTING AS A CONVENTIONAL MONEY LENDER AND
INSTEAD MORPHED INTO AN ENTERPRISE ENGAGED IN
SYSTEMATIC FRAUD ..................................................................... - 18 -

    *The Fraudulent Appraisal Process* ................................................ - 23 -

    *Defendants' Scheme to Fix the Market Through Their Wholly-Owned Appraisal
    Subsidiary: HCLS* .......................................................................... - 32 -

    *Defendants Systematically Abused and Abandoned Their Underwriting Guidelines
    to Place Unqualified Borrowers into Loans They Could Never Afford* ............. - 34 -

    *Defendants Turned Substantial Profits Through Their Borrowers' Default
    Furthering Their Incentive to Intentionally Place Plaintiffs Into Impossible and
    Unaffordable Loans* ........................................................................ - 38 -

    *Defendants Misled the Public – Including Plaintiffs* ........................ - 41 -

DEFENDANTS' DECEPTION CONTINUED WITH LOAN
MODIFICATIONS ............................................................................ - 45 -

    *Defendants Deceived Borrowers Into Entering Loan Modifications In An Outright
    Cash Grab With No Intent Of Ever Modifying, For Fear Of Having Their Own
    Fraud Discovered By Their Investors* ............................................. - 45 -

**FIRST AMENDED COMPLAINT**

*Defendants Used The Promise Of Loan Modifications As Bait To Damage Plaintiffs' Credit, Preventing Plaintiffs From Obtaining Financing Anywhere Else* - 47 -

*Defendants Used The Promise Of Loan Modifications As Bait For An Outright Cash-Grab With No Intent To Ever Modify Plaintiffs* ....................................... - 47 -

**DEFENDANTS THEN INTENTIONALLY STEAMROLLED WRONGFUL FORECLOSURE AFTER WRONGFUL FORECLOSURE WITHOUT ANY OWNERSHIP INTEREST IN THE NOTES OR DEEDS OF TRUST TO COLLECT WILDLY INFLATED FEES AND TURN UNIMAGINABLE PROFIT** ................................................................................................ **- 49 -**

*Defendants Seek to Enforce Notes & Deeds of Trust Without Evidencing Their Ownership Interest* .............................................................................. - 50 -

*Defendants' Improper Securitization: Foreclosing Trusts Had No Ownership Interest In Plaintiffs' Notes Or Deeds Of Trust Under The Explicit Terms Of Their Own Pooling & Service Agreements* ................................................. - 51 -

*The Aftermath of Defendants' Wrongful Foreclosures* ...................................... - 57 -

**BANK DEFENDANTS OWED PLAINTIFFS A DUTY** ....................................... **- 59 -**

**FIRST CAUSE OF ACTION (*By All Plaintiffs – Fraudulent Concealment – Against All Defendants*)** ........................................................................ **- 64 -**

**SECOND CAUSE OF ACTION (*By All Plaintiffs – Intentional Misrepresentation – Against All Defendants*)** ................................................ **- 76 -**

*Authority to Bind* ........................................................................... - 80 -

*The Difference Between Being "Qualified" for a Loan and Being able to "Afford" a Loan* ....................................................................................... - 82 -

**FIRST AMENDED COMPLAINT**

*Plaintiffs' Reasonable Reliance* ............................................................................ - 87 -

**THIRD CAUSE OF ACTION** (*By All Plaintiffs – Negligent Misrepresentation – Against All Defendants*) ............................................................... - 91 -

**FOURTH CAUSE OF ACTION** (*By All Plaintiffs – Unfair Competition – Against All Defendants*) ...................................................................... - 93 -

**FIFTH CAUSE OF ACTION** (*By Plaintiffs Rick Albritton, Deborah Albritton, David Cruz, Yesenia Cruz, Cristina Palbicke, Magdalena Avila, Cecilia Chaube, Florastene Holden, Ignacio Rodriguez, Rosa Rodriguez, Sarah Sebagh, Gricelda Ruano, Elisa Jordan– Wrongful Foreclosure, Violation of Cal. Civil Code § 2924 –Against All Defendants*) ............................................................................. - 103 -

**SIXTH CAUSE OF ACTION** (*By All Plaintiffs – Improper Influence Over Appraisers – Cal. Civ. Code §1090.5 –Against Bank Defendants and HCLS*) .......................... - 107 -

**PRAYER FOR RELIEF** ....................................................................... - 111 -

**FIRST AMENDED COMPLAINT**

Plaintiffs, and each of them, hereby demand a jury trial and allege as follows:

## **NATURE OF ACTION**

1.     Defendant Banks have for the last decade taken the losses of others and used them for their own private gain.  That Defendants are in the business of making profit, and are entitled to do so is not at issue.  Nor is at issue that Defendants engage in an inherently lucrative business.  But it is the lengths to which Defendants have gone, to attain that profit, which is. It is where corporate lust for profit leads corporations and banks to abandon common principles of fair business dealing so well-entrenched in the human consciousness, that they need not even be announced by law, but are inherently apparent to all of us, that the courts *must* intervene – that an example *must* be set.  A line must be drawn putting Corporations, Banks, and Defendants herein on notice that where their greed exceeds the extant public need for informed disclosure in business dealings, the law will not sanction.

2.     With greed as their motive, Defendants set out upon a massive and centrally directed fraud by which Defendants placed homeowners into loans which Defendants *knew* Plaintiffs could not afford, abandoned industry standard underwriting guidelines, and intentionally inflated the appraisal values of homes throughout California for the sole purpose of herding as many borrowers as they could into the largest loans possible which Defendants would then sell on the secondary market at inflated values for unimaginable, ill-gotten profit (wildly surpassing the profit they would make by holding the loans), *knowing that their scheme would cause the precipitous decline in values of all homes throughout California*, including those of Plaintiffs herein.

3.     Like cattle, Plaintiff-borrowers were led to slaughter by Defendants and their greed.  Borrowers were intentionally placed in loans which Defendants knew Plaintiffs could not afford, and whose default they knew was a mathematical certainty. Their fraudulent inflation of real estate values throughout the State of California, the demise of which sent real estate values spiraling downwards,  caused Plaintiffs to be placed in

**FIRST AMENDED COMPLAINT**

homes that were immediately upside-down, and to instantly lose their equity – if not their homes altogether. And as a result of these two schemes coupled together, Borrowers were placed into loans far larger than would be supported by the true value of their property or their income. Then, based on these fraudulently inflated loan amounts, Defendants deceptively extracted excessive and unearned payments, points, fees, and interest from Plaintiffs. And as the final coup-de-grace, Defendants then intentionally steamrolled foreclosures upon those borrowers whose very peril was caused by Defendants' fraud in the first place, by charging grossly excessive "foreclosure fees' to line their pockets with ill-gotten profit.

4.      Simply put, Defendants let their greed get in the way of fair business. Where, as here, corporate greed exceeds the extant and imperative public need for informed disclosure, the law must not sanction. This Court must recognize Defendants' duty to disclose.  Without such duties, Banks are effectively granted immunity for their continued future wrongs against the borrowing public who have a right to depend on the fundamental notion of good faith and fair dealing in contractual relationships. No business, particularly one as centrally-important to the American economy as banking, should be allowed to so egregiously deceive its consumers.  If Banks are to conduct business, their business *must not be* that of fraud and deception.

5.      It is admitted that this Complaint alleges great harm. But Defendants should not be granted immunity on the grounds that their fraudulent scheme, which envisioned far-reaching, sweeping and inarticulable harms, succeeded in achieving just that.

6.      It bears emphasizing – that the gravamen of the Complaint is not about the harm and frauds that Defendants have perpetrated on 3rd party investors, but rather the harms and frauds perpetrated upon Plaintiffs herein. The fraud described in the Complaint upon the investor, were merely the *incentive* for Defendants' fraud on Plaintiffs, and only one prong, in Defendants'   brazen, intertwined and multi-pronged fraudulent scheme.

**FIRST AMENDED COMPLAINT**

7.     A fair reading of the Complaint, including reasonable inferences from the facts alleged therein, is that the concealment pertained *not only* to the commission of torts and crimes involving third parties, but also to, among other things: (1) the possession of internal reports concluding that if a Plaintiff took a loan from Defendants that Plaintiff would suffer material losses; (2) contrary to its advertising and other broadly disseminated public statements, (i) Defendants had abandoned their conventional lending business, appraisal, underwriting and lending standards and was now granting credit as part of an overall unlawful scheme based on insider trading and other frauds that Defendants knew and expected would gravely damage Defendants, the mortgage market and home values, and (ii) Defendants now provided mortgages only for the purpose of immediately reselling the mortgage at an inflated value and without regard to laws intended to protect consumers, such as the Truth in Lending Act and Patriot Act; (3) Defendants' systematic and intentional inflation of Plaintiffs' property values in order to approve them for loans which Defendants knew Plaintiffs were not qualified for and would to a certainty default;  (4) undocumented domestic and foreign transfers of multiple interests in the loans and sourcing of money for the loans, without complying with laws intended to protect consumers, including the Patriot Act and Truth in Lending Act; and (5) the fact that Defendant had ceased acting as a conventional money lender and had instead morphed into a fraudulent enterprise. Such information would be highly material to a borrower's decision to enter into a contract with lenders/Defendants.

## PARTIES

### *Plaintiffs*

8.     All Plaintiffs listed in the above caption are competent adults and individuals residing in the State of California, who borrowed money from one or more of the Defendants or its subsidiaries or affiliates or successors and assigns between January 1, 2003, and December 31, 2008, secured by a deed of trust on his or her California real

estate(s). At all material times hereto, one or more of the Defendants have acted as Servicer or some other control or capacity over processing the loan.

9. Based on information now available to them, fewer than 100 plaintiffs are alleging claims in amounts that would, as to them, equal or exceed the jurisdictional amount for federal jurisdiction under 28 U.S.C. § 1332(a).

10. **IN ADDITION TO THE ALLEGATIONS MADE THROUGHOUT THIS COMPLAINT, WHICH APPLY TO ALL PLAINTIFFS (EXCEPT WHERE OTHERWISE NOTED), <u>APPENDIX "A"</u> ("INDIVIDUALIZED PLAINTIFF ALLEGATIONS") PROVIDES INDIVIDUALIZED ALLEGATIONS AS TO EACH AND EVERY PLAINTIFF IN THIS ACTION AND THE SPECIFIC WRONGS DONE BY EACH DEFENDANT.** By this reference, Plaintiffs hereby incorporate Appendix "A" to this Complaint.

### *<u>Defendants</u>*

11. Defendant Ally Bank, Inc. ("Ally Bank") is a multi-national bank that became a bank holding company in December 2008. The bank is headquartered in Detroit, Michigan and incorporated in the State of Utah. The bank is based at 6895 Union Park Center, Midvale, Utah, and is FDIC insured. Since August 2, 2004 it operated two main offices in the United States, one in Utah and one in Pennsylvania, and has 616 employees as of June 2009. It also has a Canadian operation, simply called Ally which operates under Resmor Trust Company, and which is Canadian Deposit Insurance Corporation insured. Ally Bank is a direct bank that markets to customers offering mortgages, savings products, certificates of deposit, online savings accounts, money market accounts and interest checking accounts. Back office operations for Ally Bank and Ally Financial are located in Charlotte, North Carolina. Ally Bank does business in the State of California.

12. Defendant Ally Financial, Inc. ("Ally"), a leading, multi-national financial services firm with a corporate office center in New York, has approximately $179 billion

of assets and operations in approximately 25 countries.  Ally is the parent and sole owner of Defendants GMAC Mortgage Group, Inc. and Residential Funding Services, LLC. Prior to 2010, Ally was known as GMAC, LLC. Ally does business in the State of California.

13.     Defendant GMAC Mortgage Group, Inc. ("GMACM") is a wholly- owned subsidiary and the mortgage arm of Ally. GMACM is a Delaware corporation with its principal place of business at 1100 Virginia Drive, Fort Washington, Pennsylvania 19034. GMACM transacted and is continuing to do business in the State of California.

14.     Defendant Residential Capital, LLC ("ResCap") is a wholly-owned subsidiary of GMACM and originates, services, and securitizes mortgage loan in the United States, including California. ResCap was incorporated in the State of Delaware and its principal office is located at One Meridian Crossings, Minneapolis, Minnesota 55423. Prior to 2007, ResCap was known as Residential Capital Corporation. ResCap does business in the State of California.

15.     Defendant GMAC-RFC Holding Company, LLC, doing business as GMAC Residential Funding Corporation ("GMAC-RFC"), is a wholly-owned subsidiary of ResCap and acquires residential mortgages and loans, which it then packages as mortgage –backed securities and sells to institutional investors.  GMAC-RFC was incorporated in the State of Delaware and its principal office is located at 8400 Normandale Lake Boulevard, Minneapolis, Minnesota 55437. GMAC-RFC transacted business in California.

16.     Defendant Residential Funding Company, LLC ("RFC") is a wholly-owned subsidiary of GMAC-RFC. RFC is a Delaware corporation. Prior to October 2006, RFC was known as Residential Funding Corporation. RFC was known as Sponsor of Securitization transactions which involve some of the Plaintiffs in this complaint. Defendant RFC is the parent and sole owner of Homecomings Financial, LLC ("HFN"), the originator of loans underlying some of the Plaintiffs in this complaint. Prior to 2006,

**FIRST AMENDED COMPLAINT**

HFN was known as Homecomings Financial Network, Inc. RFC does business in the State of California.

17.     Defendant Homecomings Financial, LLC ("HFN") is a wholly-owned subsidiary of RFC. HFN is a Delaware corporation and its principal office is located at 8400 Normandale Lake Boulevard, Minneapolis, Minnesota 55437. Prior to October 2006, HFN was known as Homecomings Financial Network, Inc. HFN is the originator of some of the Plaintiffs loans included in this complaint. HFN continues to do business in the State of California.

18.     Defendant Executive Trustee Services, LLC ("ETS") is a wholly-owned subsidiary of ALLY. ETS was and is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Fort Washington, Pennsylvania, and doing business in the State of California and the County of Los Angeles, and has intentionally and maliciously concealed the true names of entities to which Plaintiffs' home loans were transferred by other Defendants. ETS is one of the Defendants' agents which acts as trustee under the deeds of trust securing real estate loans so as to foreclose on property securing the real estate loans held or serviced by the Defendants. The foregoing is part of a scheme by which the Defendants concealed the transferees of loans and deeds of trust, inter alia in violation of California Civil Code § 2923.5, §2934(a) and 15 U.S.C. § 1641, as more fully described herein.

19.     Defendant Home Connects Lending Services, LLC ("HCLS") is a wholly – owned subsidiary of Ally. Home Connects Lending Services is a limited liability company organized and existing under the laws of the state of Pennsylvania, with its principal place of business in Fort Washington, Pennsylvania, and doing business in the State of California and the County of Los Angeles. Home Connects Lending Services, LLC is a settlement service provider for Ally and assigns and reviews all of Ally's appraisals.

20.     Defendant MTC Financial Inc., doing business as Trustee Corps ("Trustee Corps"), is a California Corporation with its principal place of business in Irvine,

California, and doing business in the State of California. Plaintiff herein can allege with detailed factual specificity Trustee Corps's involvement as an essential element of Defendants' fraud in executing foreclosures which Defendants knew were wrongful and without right and intended would be unavoidable, and whose sales resulted in additional profit to Defendants, in furtherance of the Defendants' conspiracy described herein.

21. As used herein the term "ALLY DEFENDANTS" shall refer to all entities owned by Ally Financial. In other words the term "ALLY DEFENDANTS" shall refer to all Defendants in this action with the exception of MERS and MTC Financial Inc., d/b/a Trustee Corps.

22. As used herein the term "BANK DEFENDANTS" shall refer to all Defendants in this action which are all Defendants that have originated loans, namely, GMAC Bank aka Ally Bank, GMAC Mortgage, GMAC Residential Funding Corporation, Residential Funding Corporation, Homecomings Financial, LLC.

### *Relationship of Defendants*

23. At all times material hereto, the business of Defendants was operated through a common plan and scheme designed to conceal the material facts set forth herein from Plaintiffs, from the California public, and from regulators, either directly or as successors-in-interest to other Defendants.

24. The concealment was completed, ratified and/or confirmed by each Defendant herein directly or as a successor-in-interest for another Defendant, and each Defendant performed the tortious acts set forth herein for its own monetary gain and as a part of a common plan developed and carried out with the other Defendants, or as a successor-in-interest to a Defendant that did the foregoing.

25. Plaintiffs believe and thereon allege that the agents and co-conspirators through which the named Defendants operated included, without limitation, financial institutions and other firms that originated loans on behalf of the Defendants. These

institutions acted at the behest and direction of the Defendants, or agreed to participate – knowingly or unknowingly - in the fraudulent scheme described herein.

26.     Those firms originating loans that knowingly participated in the scheme are jointly and severally liable with the Defendants for their acts in devising, directing, knowingly benefitting from and ratifying the wrongful acts of the knowing participants. Upon learning the true name of such knowing participants, Plaintiffs may seek leave to amend this Complaint to identify such knowing participants as Doe Defendants.

27.     For avoidance of doubt, such knowing participants include, without limitation, legal and natural persons owned in whole or in part by the Defendants or affiliates thereof; legal and natural persons owning directly or through affiliates financial interests in Defendants; legal and natural persons directly or through affiliates acting pursuant to agreements, understandings and arrangements to share in the benefits of the wrongdoing alleged in this Complaint and knowingly, to at least some degree, committing acts and omissions in support thereof; and legal and natural persons knowingly, to at least some degree, acting in concert with the Defendants.

28.     As to those legal and natural persons acting in concert without an express legal relationship with Defendants or their affiliates, on information and belief, Defendants knowingly induced and encouraged the parallel acts and omissions, created circumstances permitting and authorizing the parallel acts and omissions, benefited therefrom and ratified the improper behavior, becoming jointly and severally liable therefore.

29.     As to those legal and natural persons whose acts and omissions in support of the Defendants scheme were unwitting, on information and belief, Defendants knowingly induced and encouraged the acts and omissions, created circumstances permitting and authorizing the parallel acts and omissions, benefited therefrom and ratified the improper behavior, becoming liable therefore.

30.     To the extent that certain Plaintiffs herein become aware of information that provides a basis for asserting the Defendants herein are liable for the origination of their

**FIRST AMENDED COMPLAINT**

loans, those Plaintiffs reserve the right to seek leave of this Court to re-assert the appropriate claims herein.

31.     The true names and capacities of the Defendants listed herein as DOES 1 through 1,000 are unknown to Plaintiffs who therefore sue these Defendants by such fictitious names. Each of the DOE Defendants was the agent of each of the other Defendants herein, named or unnamed, and thereby participated in all of the wrongdoing set forth herein. On information and belief, each such Defendant is responsible for the acts, events and concealment set forth herein and is sued for that reason. Upon learning the true names and capacities of the DOE Defendants, Plaintiffs may amend this Complaint accordingly.

32.     Plaintiffs are informed and believe, and thereon allege, that: (1) the Defendants are liable for all wrongful acts of the companies which Ally acquired prior to the date thereof as the successor-in-interest to those companies; (2) Ally directly and through its subsidiaries and other agents sued herein as Does have continued the unlawful practices of the acquired companies since the dates of their acquisition, including, without limitation thereof, writing fraudulent mortgages as set forth above and concealing wrongful acts that occurred in whole or in part prior thereto, and (3) Ally and its subsidiaries are jointly and severally liable as alter egos and as a single, greater unified whole.

33.     Ally's public disclosures, as reflected in its filings with the SEC, make clear that Ally considers itself both a common enterprise operating as a greater whole and without meaningful distinctions as to its operating units, and the successor to GMAC Mortgage, Homecomings, RFC and its subsidiaries.

34.     More than 36 months before the filing of this Complaint, Ally completed the purchase of the assets and operations and succeeded to the businesses of various mortgage lenders. The assets of these predecessor businesses purportedly included the loans made to Plaintiffs secured by their real estate that are the subject of this action. Ally can have no greater rights in the assets of these prior businesses than their original

owners had.  No transfer by any predecessor, on the one hand, to Ally, on the other hand, actually or in fact involved any rights in or to mortgages against any of the properties of Plaintiffs, for the reasons previously alleged.

35.    The other Defendants followed Ally's directions because they are or were either subsidiaries of Ally, directly or indirectly owned, controlled and dominated by Ally, or because they are in an unequal economic and/or legal relationship with Ally by which they are beholden to Ally and are thereby controlled and dominated by Ally.

36.    Executive Trustee Services ("ETS") involvement was an essential ingredient in Defendants' conspiracy to defraud (and to commit the other acts alleged herein) in that it was through ETS, the foreclosing trustee,  that Defendants were able to force wrongful foreclosures which Defendants knew and intended would be unavoidable, and whose sales resulted in substantial additional profit to Defendants resulting from their assessment of numerous fees associated with initiating or conducting foreclosures including inspection fees, default fees, late fees, advance fees, attorney's fees, and trustee fees. In short Defendants had a motive to wrongfully initiate foreclosures because they made money by doing so through the assessment of excessive, disproportionate and unearned fees, and because Defendants were insured against the losses arising from defaults. ETS was a necessary instrument to make sure that the conspiracy of Defendants got to reap that profit.   In furtherance of these acts ETS wrongfully initiated foreclosures forged recorded documents, executed assignments of deeds of trust without the authority of the previous beneficiary, and effectuated numerous other violations of California's non-judicial foreclosure laws, in order to steamroll foreclosures at the direction of Ally Defendants, and for the benefit of the conspiracy. ETS also violated numerous other laws and statutes in furtherance of this conspiracy.  ETS acted intentionally, and with malice in doing these acts, for which ETS was paid by handsomely by Defendants.

37.    Defendant Home Connects Lending Services, LLC ("HCLS"), Ally's Appraisal Management Company (AMC) was also a necessary and integral element of Defendants' conspiracy to carry out their fraud. As the owner, Ally exercised its vast

influence over HCLS to artificially inflate and manipulate the values of these properties, including the properties of Plaintiffs, to further its fraud and increase their profits, in furtherance of their overall conspiracy to defraud. Their purpose was twofold:

    a. First, by falsely inflating said property values, investors were defrauded into believing their investments in these loans were less risky than they actually were. This in turn led to more sales and even more profits on the secondary market.

    b. Second, Defendants would then turn around and use these false property valuations to induce Plaintiffs and other borrowers into entering ever-larger loans on increasingly risky terms. The result was, again, more profits

38. Hand-in-hand, and at the direction of the other Defendants, HCLS could carry out the fraud without anyone ever finding out. If the appraisals were done by independent appraisers the homeowners would have found out that the homes they were purchasing or refinancing were being over valued and that the loans they were obtaining was taking every last bit of equity out of their homes. The customer never had a choice as to the settlement providers. Ally Defendants controlled and took the choice out of the customer's hands and directed and collaborated with all their partners to systematically inflate and disgorge the homeowners of their freedom to choose and suck every last bit of equity out of their homes. In furtherance of this act they used the manipulated property valuations to seek premiums on their loans to Plaintiffs, and Secondary Market transactions. Ally Defendants not only defrauded the Plaintiffs, but the rating agencies that graded the paper being sold, the insurance companies who assessed the risk of the loans being insured through loan to valuation risk models and their investors.

39. Upon information and belief, though ETS's powers are limited to performing as a trust company, the Defendants, have regularly used ETS to foreclose, as trustee with power of sale, trust deeds on California realty and realty in other states. Such foreclosures are commonly conducted non-judicially. Such foreclosures result in the

dispossession of debtors, including certain Plaintiffs herein, and also entail the assertion in certain instances of claims for the deficiency between amounts assertedly owed and the actual sale prices. Such foreclosures are without authority.

40. Upon information and belief, ETS is acting under the direct control of Ally Defendants and is an alter ego of Ally. ETS is personally responsible for robo-signing affidavits, executing assignments, and recording of Notice of Defaults and Trustee Sale Notices which are defective and not in accordance to California Law.

41. This Complaint seeks significant relief from ETS since its conduct under the direction of Ally Defendant's and the key role that they played caused some Plaintiffs to lose their homes. Through a number of wrongful foreclosure actions they conspired with the other defendants to commit assorted violations of California's Unfair Competition Law. All of the violations done by this specific defendant were made in the State of California against California citizens.

## ALLY CEASED ACTING AS A CONVENTIONAL MONEY LENDER AND INSTEAD MORPHED INTO AN ENTERPRISE ENGAGED IN SYSTEMATIC FRAUD

42. During the 1980s and 1990s, the mortgage securitization business grew rapidly, making it possible for mortgage originators to make more loans than would have been possible using only the traditional primary source of funds from deposits. During that period, Ally made loans in accordance with its stated underwriting and appraisal standards.

43. Under the traditional mortgage model, which Ally and Defendants originally subscribed to, a mortgage originator originated loans to borrowers, *held* the loans to maturity, and therefore retained the credit default risk. As such, under the traditional model, the mortgage originator had a financial incentive to ensure that (i) the borrowers had the financial ability to repay the loans, and (ii) the underlying properties had

sufficient value to enable the mortgage originator to recover its principal and interest if the borrowers defaulted on the loans.

44.     Traditionally, mortgage lenders financed their mortgage business primarily using funds from depositors, retained ownership of the mortgage loans they originated, and received a direct benefit from the income flowing from the mortgages. When a lender held a mortgage through the term of the loan, it received revenue from the borrower's payments of interest and fees, and also bore the risk of loss if the borrower defaulted and the value of collateral was not sufficient to repay the loan. As a result of this "**originate to hold**" model, the lender had an economic incentive to verify the borrower's creditworthiness through prudent underwriting and to obtain an accurate appraisal of the value of the underlying property before issuing the mortgage loan.

45.     With the advent of securitization, the traditional "originate to hold" model gave way to the "originate to sell" model, in which mortgage originators sold the mortgages and transferred credit risk to their investors through the issuance and sale of Mortgage Backed Securities. Securitization concurrently provided lenders like Ally with an incentive to increase the number of mortgages they issued and reduced their incentive to ensure the mortgages' credit quality.

46.     With the aforementioned mandate for growth as the backdrop and incentive for their fraud, Defendants abandoned the traditional model of "**originate to hold**" and instead adopted the much more lucrative "**originate to sell**" model, and in the early 2000's Ally began to systematically disregard its stated underwriting guidelines in an effort to originate an unprecedented number of loans for securitization.

47.     But to feed its investors and continue to make such never-before-seen profits, Defendants needed more borrowers. In turn, Bank Defendants began disregarding their own underwriting standards, and approving borrowers who were grossly under-qualified, in the name of getting as many loans out the door, and sold to investors for a profit, as possible.

48.     In fact they *preferred* under qualified borrowers.  Because Defendants had taken out insurance policies against the possibility of default, GMAC and its co-conspirators (Defendants herein) would get paid in the event of a borrower's default. In fact, in many cases, Defendants had taken out numerous redundant policies on the same property, so that when default occurred, Defendants were getting paid out multiple times – they weren't just breaking even, they were *actually turning a profit* when borrowers defaulted.  In other words, Defendants had an *incentive* to place borrowers into impossible loans, because by doing so they made a lot of money.

49.     Rapidly, these two intertwined schemes grew into a brazen plan to disregard underwriting standards and fraudulently inflate property values – county-by-county, city-by-city, person-by-person – in order to take business from legitimate mortgage-providers, and moved on to massive securities fraud hand-in-hand with concealment from, and deception of, Plaintiffs and other mortgagees on an unprecedented scale.

50.     It is now all too clear that this was the ultimate high-stakes fraudulent investment scheme of the last decade.  Couched in banking and securities jargon, the deceptive gamble with consumers' primary assets – their homes – was nothing more than a financial fraud perpetrated by Defendants and others on a scale never before seen.

51.     To further this scheme, Ally, using its size and prominent market share, began systematically creating false and inflated property appraisals throughout California, hand-in-hand with the other Defendants herein, namely HCLS. The purpose was twofold:

      a.  First, by falsely inflating said property values, investors were defrauded into believing their investments in these loans were less risky than they actually were. This in turn led to more sales and even more profits on the secondary market.

      b.  Second, Defendants would then turn around and use these false property valuations to induce Plaintiffs and other borrowers into entering ever-larger loans on increasingly risky terms.

52.    In a scathing complaint filed by the Federal Housing Finance Agency on September 2, 2011 they outlined how this brazen planned worked.  Ally would use their in-house or contract appraisers at Home Connects Lending Services to artificially inflate Plaintiff's home values in order for their loans to be used in Securitization transactions. According to that complaint, "an inflated appraisal will understate, sometimes greatly, the credit risk associated with a given loan", mainly our Plaintiffs' homes.

53.    These inaccuracies with respect to their Loan-to-Values ratios also indicate that the representations that were made to them were false and that at Ally's direction appraisal practices were unsound.  Ally and their affiliates furnished appraisals to the Plaintiff's that they understood were inaccurate and that they knew bore no reasonable relationship to the actual value of the underlying properties.

54.    According to the Financial Crisis Inquiry Commission (FCIC), they identified "inflated appraisals" as a pervasive problem at Ally during the period of the Securitizations in the time span mentioned in this complaint, and determined through its investigation that appraisers were often pressured by mortgage originators, among others, to "produce inflated results".

55.    From as early as 2005, Ally's senior management *knew* the scheme would cause a liquidity crisis that would devastate Plaintiffs' home values and net worths.  But, they didn't care, because their plan was based on insider trading – pumping for as long as they could and then dumping before the truth came out and Plaintiffs' losses were locked in.

56.    Defendants, and each of them, wrongfully acted and continue to act as if they are either the owner, beneficiary, successor, assignee or servicer, or have some other right, title, or interest in Plaintiffs' notes and deeds of trust, when, in reality, they have no basis to assert any such right, title or interest.

57.    This action seeks remedies for the foregoing improper activities, including a massive fraud perpetrated upon Plaintiffs and other borrowers by the Defendants'

business that devastated the values of their residences, in most cases resulting in Plaintiffs' loss of all or substantially all of their net worth.

58.     The Defendants' business premise (although concealed from the Plaintiffs) was to leave the borrowers, including Plaintiffs, holding the bag as the Defendants used the Plaintiffs and other borrowers as pawns in massive securities games and fodder to feed its fraud on investors perpetrated on a global scale. This massive fraudulent scheme was a disaster both foreseen by the Defendants and waiting to happen. Defendants knew it, and yet Defendants still induced the Plaintiffs into their scheme without telling them. In fact, had the Plaintiffs been aware of the true facts which the Defendants concealed and failed to disclose, they would not have entered into these transactions.

59.     At the very least, at the time of entering into the notes and deeds of trust referenced herein with respect to each Plaintiff, the Defendants were bound and obligated to fully and accurately disclose to each borrower, including each Plaintiff herein, that the loan and mortgage being offered to the Plaintiff was, in fact, part of a massive fraud that the Defendants knew would result in the loss of the equity invested by each Plaintiff in his or her home, the severe impairment of each Plaintiff's credit rating, and the other damages described in this Complaint

60.     Since the homes of Plaintiffs herein were Ally's main target, this scheme led directly to a mortgage meltdown for Plaintiffs in this complaint that was substantially worse than any economic problems facing Defendants' borrowers in the rest of the United States.

61.     As a result of Defendants' improper scheme, Plaintiffs lost their equity in their homes, their credit ratings and histories were damaged or destroyed, and Plaintiffs incurred material other costs and expenses, described herein. At the same time, Defendants took from Plaintiffs and other borrowers billions of dollars in interest payments and fees and generated billions of dollars in illegal and fraudulently obtained profits by selling their loans at inflated values and using the loans as collateral for fraudulent swaps.

62.     Further as a result of Defendant's (1) artificial and fraudulent inflation of Plaintiffs' property values, and property values throughout the State of California, as well as (2) Defendants' abandonment of their own as well as industry standard underwriting guidelines, coupled with (3) Defendants incentive to package and sell as many dollars' worth of loans as they could to the secondary market, Defendants placed Plaintiff-borrowers into loans which were considerably larger than were justified by (a) the *true* uninflated valued of their properties, (b) Plaintiffs true uninflated incomes and (c)by Defendants own underwriting guidelines. As a result of Plaintiffs were placed into larger loans than they could afford or should have been placed into. The additional fees, points and interests paid as a result of the higher/inflated loan amounts constitute damages, and legally cognizable sources of restitution.

63.     Further, Defendants either directly or through their subsidiaries, including ETS, often charged fees associated with initiating or conducting the foreclosures resulting from their fraudulent lending including inspection fees, default fees, late fees, advance fees, attorney fees, and trustee fees. In short, Defendants made money by wrongfully initiating foreclosures against Plaintiffs herein.   The award of damages or restitution for these unmerited fees obtained through deceit is proper.

### ***The Fraudulent Appraisal Process***

64.     An accurate appraisal performed pursuant to a legitimate appraisal process is critical to calculating the loan-to-value ("LTV") ratio, a financial metric commonly used to evaluate the risk associated with a mortgage, and which would also be used as part of the valuation of a Mortgage Backed Security (which were sold on the secondary market for profit). The LTV ratio expresses the amount of the mortgage or loan as a percentage of the appraised value of the collateral property. For example, if a borrower seeks to borrow $90,000 to purchase a home appraised for $100,000, the LTV ratio would be $90,000 divided by $100,000, or 90% - which was viewed in the industry as a risky loan. Typically any loan over 80% LTV was considered risky, and would require the purchase

**FIRST AMENDED COMPLAINT**

of "Mortgage Insurance" to insure against the additional risk associated with such high LTV loans. The idea being that a high LTV means that a borrower has invested little of his own money in the property, and is thus more likely to walk away from the property when things get tough. Now imagine the above scenario with a slight modification - instead of the above property being appraised at $100,000 dollars, the appraisal was manipulated to reflect that the home was instead $112,500, now the Loan-to-Value ratio would appear as a much safer, and less risky 80% LTV ($90,000 Loan divided by $112,500 property value = 80%).

65.    From an **investor's perspective**, a high LTV ratio represents a greater risk of default on the loan, which means they are unwilling to pay as much for that loan as they would one which was less risky.  This is true for a number of reasons. First borrowers with a small equity position in the underlying property have "less to lose" in the event of default. Second, even a slight drop in housing prices might cause a loan with a high LTV ratio to exceed the value of the underlying collateral, which might cause the borrower to default and would prevent the issuing trust recouping its expected return in the case of foreclosure and subsequent sale of the property.

66.    From the **Defendant bank's perspective**, because of their shift from the "originate to hold" model to the "originate to sell" model, Defendant was incentivized to enter into as many loans as possible to sell on to the secondary market for profit. Because they weren't holding these loans anymore, Defendants held no risk – they had no reason to ensure that the borrower was adequately qualified, or more importantly, in the context of *this* discussion, that the property had sufficient value, because Defendants immediately turned around and sold that loan. Here's where things take a turn for the worst – because investors were willing to pay more for less risky loans (lower LTV loans), Defendants were given an incentive to fraudulently inflate the appraisal values of their property, thus making the collateral (the subject property) of the loan seem safer to the investor, and thus more valuable to them. More value to the investors means more money in Defendants pockets. And so it began, Defendants quickly embarked on a scheme to

**FIRST AMENDED COMPLAINT**

inflate their appraisals, and more broadly, property values throughout the State of California, because, in short, they made a *lot more money by doing so*.

67.    At Ally Defendants' behest, and at their direction, Home Connects Lending Services began systematically inflating the valuations they rendered upon the subject properties of each loan, including the loans of Plaintiffs herein. As is common knowledge in the real estate industry, appraisers take the value of other nearby homes (called comparables aka "comps") into account in determining the value of the homes they appraise. **These inflated appraisals and home valuation conducted by Ally and HCLS *then* acted as comps upon which numerous *other* appraisers based their valuations of *other* homes.   The results were a vicious self-feeding exponential cycle, both expected and intended by Defendants.  Ally's inflated appraisals caused other homes to be valued for more than they were worth, which in turn acted as the predicate for even higher appraisals and which caused even more homes to be valued for more than they were worth**. The inevitable and intended result of Defendants' conspiracy was the creation of a super-heated pricing bubble in the real estate economy, created by and at the direction of Defendants, designed to manipulate and inflate property values, and effectuated for the sole purpose of lining Ally's (and other Defendants') pockets with money. The harm it inflicted to Plaintiffs herein, California's real estate economy, and more broadly, the American economy mattered little. Defendants were making money and plenty of it.

Defendants had another reason for driving the prices of real estate up – by doing so Defendants created the illusion of a naturally appreciating real economy, which resulted in a purchase *and* refinance boom – which meant more loans for Defendants, and thus more money.

68.    From the **Borrower's perspective** (Plaintiffs herein), the harm was five-fold:

    a.  The hyper-inflated property values intended and caused Plaintiffs to pay more for their homes (or to refinance their homes for more) than they

**FIRST AMENDED COMPLAINT**

were truly worth. When the market corrected itself, Plaintiffs immediately suffered a substantial loss of equity.

b. The hyper-inflated property values also caused Plaintiffs to pay substantially higher property taxes.

c. Defendants also used these inflated values, to induce Plaintiffs and other borrowers into entering ever-larger loans on increasingly risky terms. The result was more money for Defendants.

d. With the inflated property values as their predicate, Defendants placed Plaintiffs into inflated loan amounts, unjustified by the true *uninflated* value of Plaintiffs' property. Defendants used these intentionally inflated loan amounts to charge Plaintiffs even more interest, points and fees, than would have been proper under the terms of a non-inflated loan value. The result was, shockingly, even more money for Defendants.

e. The resultant higher payments coupled with the housing crash (both known if not intended by Defendants) resulted in Plaintiffs' inevitable default, wreaking havoc with their credit, and upon which Defendants charged a host of excessive fees (trustee fees, default fees, cleanup fees, inspection fees, late fees, advance fees, and attorney fees) all of which were marked up dramatically. In short, Defendants couldn't lose; they were making money no matter what, and were benefitting from Plaintiffs' default. By tossing on so many fees Defendants made it impossible for Plaintiffs to be able to ever pay off their "default" amounts. Why? Because Defendants made money by doing so. By making it impossible for Plaintiffs to pay off their unilaterally imposed default amounts, Defendants could come in and scoop up whatever equity Plaintiffs had left in the property. It was a win win win scenario.

69. Many mortgage loan originators, including Ally and Defendants herein, allowed the sales personnel or account executives to order and control the appraisal

**FIRST AMENDED COMPLAINT**

process. These personnel were typically on a commission-only pay structure and were therefore motivated to close as many loans as possible. These sales personnel and account executives would pressure appraisers to appraise properties at artificially high levels or they would not be hired again, and were afforded the ability to do so by the very policies and procedures explicitly set forth by Ally and Defendants. According to the April 7, 2010 FCIC testimony of Richard Bitner, a former executive of a subprime mortgage originator for 15 years and the author of the book *Confessions of a Subprime Lender*, "the appraisal process [was] highly susceptible to manipulation, lenders had to conduct business as though the broker and appraiser couldn't be trusted, [and] either the majority of appraisers were incompetent or they were influenced by brokers to increase the value." He continued:

> To put things in perspective, during my company's history, half of all the loans we underwrote were overvalued by as much as 10%. This means one out of two appraisals were still within an acceptable tolerance for our end investors. Our experiences showed that 10% was the most an appraisal could be overvalued and still be purchased by investors. Another quarter that we reviewed were overvalued by 11-20%. These loans were either declined or we reduced the property to an acceptable tolerance level. The remaining 25% of appraisals that we initially underwrote were so overvalued they defied all logic. *Throwing a dart at a board while blindfolded would've produced more accurate results*

70. Mr. Bitner testified about the implications of inflated appraisals:

> **If multiple properties in an area are overvalued by 10%, they become comparable sales for future appraisals. The process then repeats itself.** We saw it on several occasions. We'd close a loan in January, and see the subject property show up as a comparable sale in the same neighborhood six months later. Except this time, the new subject property, which was nearly identical in size and style to the home we financed in January, was being appraised for 10% more. Of course, demand is a key component to driving value, but the defective nature of the appraisal process served as an accelerant.

71.    Mr. Bitner testified that the engine behind the increased malfeasance was the Wall Street Banks:  "[T]he demand from Wall Street investment banks to feed the securitization machines coupled with an erosion in credit standards led the industry to drive itself off the proverbial cliff."

72.    Alan Hummel, Chair of the Appraisal Institute, testified before the Senate Committee on banking that the dynamic between mortgage originators and appraisers created a "terrible conflict of interest" where appraiser "experience[d] systemic problems of coercion" and were "ordered to doctor their reports" or they might be "placed on exclusionary or 'do-not-use' lists." Too often, this pressure succeeded in generating artificially high appraisals and appraisals being doing on a "drive-by" basis which appraisers issued their appraisal without reasonable bases for doing so.

73.    A 2007 survey of 1,200 appraisers conducted by October Research Corp., which publishes *Valuation Review* , found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through. This figure was nearly double the findings of a similar study conducted just three years earlier. The 2007 study also "found that 75% of appraisers reported 'negative ramifications' if they did not cooperate, alter their appraisal, and provide a higher valuation."

74.    Because HCLS was owned by Ally, Ally and Defendants herein directed HCLS as their alter ego to provide the results requested, or engaged in a practice of pressuring and intimidating appraisers into using appraisal techniques that met Ally and Defendants' business objectives even if the use of such appraisal technique was improper and in violation of industry standards. Ally black-listed appraisers who did not provide appraisal reports with Ally's expectations.

75.    This coercion to fraudulently inflate appraisal values was particularly rampant in the context of refinance transactions.  When a property didn't appraise for a high enough value, a deal wouldn't "go through."  This meant that (1) the loan consultant on the transaction wouldn't get a commission, (2) the Area Divisions (sometimes referred

to as "Home Loan Centers" – often comprised of hundreds of loan consultants over several cities, and managed by a single manager) which were paid handsomely for each funded loan wouldn't get paid, and (3) Defendants wouldn't be able to sell the loan on the secondary market for profit. Nobody made money. However, the system was set up to allow coercion, bribery, and undue influence over the appraisers. Loan consultants would contact appraiser and direct them specifically as to what value was "needed" to make the deal go through, some even going so far as to give gifts to the appraisers, and many were given outright bribes. Area Division managers who also had a financial incentive as mentioned earlier, would exercise undue influence and contact appraisers and demand certain values from them, abolishing the exercise of independent thought necessary to render an accurate/good faith appraisals. The same Area Division Managers, because of their power and influence within the company, would even go so far as to call the appraisal group's *managers* and request (read "demand") an appraisal to come in at a certain value, or if that appraisal had already been rendered and it was too low, would request the appraisal value to be "bumped" or increased. The Area Division Managers who often had personal or friendly relationships with the Appraisal *managers* would coerce, bribe or influence, give gifts to or "call in favors" from the Appraisal managers to ensure that the appraised value of the subject property was high enough to make the deal "go through," so that all parties could make their money. The Appraisal managers obliged.

76.     On other occasions appraisers and/or their managers would be instructed to use overvalued, inflated or out-of-area comps from non-comparable *superior* properties in valuating the subject property for the purpose of arriving at a higher value than would be supported by nearby or appropriate comps. Defendants intended this to artificially inflate the appraised value of the subject property.

77.     On the rare occasion when a loan consultant's or Area Division Manager's influence didn't get the appraiser to inflate the value of the appraisal by a sufficient amount, Defendants' policies gave them another, more effective way to fraudulently

inflate the amount – they were allowed to hire an *outside appraiser*. It was well known in the industry that outside appraisers would deliver an appraisal in the amount they were told to deliver. Why? Because they were being paid directly by the loan consultant, or the Area Division Manager. In other words, loan consultants and Area Division Manager's had outside appraisers "in their pockets." Outside appraisers would deliver the results (meaning inflated values) they were expected to deliver for two reasons: (1) In the interest of keeping the client happy and hopefully earning future business and (2) for fear of not getting paid on their individual deal if they didn't deliver the results they were expected to deliver. This procedure (allowing the hiring of easily-influenced outside appraises) was explicitly made part of Defendants' own policies, and its use was encouraged by Defendants, as well as their mid-level and upper management.

78. This coercion and influence even existed from the top down – Regional Managers (in charge of entire portions of the country, several states large) would also call in favors and demand appraised values to be inflated or changed to make deals happen in the interest of making money. This pattern was not only tolerated by Defendants, but ratified and encouraged by them, because more funded loans meant more money for Defendants (who as described above, held none of the risk). In fact, Defendants had intentionally set up the appraisal system in such a way as to allow for the exercise of influence over appraisals and the appraisal departments. This influence was intended and foreseen.

79. In short, Defendants intentionally designed an appraisal system which they could manipulate through influence and coercion to further their own ends – namely, profit. By its very design, the independence of thought necessary for a professional appraiser to render a good faith opinion was decimated. (1) Defendants *owned* the very appraisal company which was supposed to render independent appraisals. Then, (2) Defendants through its explicit (as well as unwritten) policies and procedures, intentionally allowed their own employees who made commission/money as a function of every funded loan (managers, loan consultants, etc.), to contact individual appraisers

and bribe, exercise influence, call in favors, harass, and coerce appraisers into rendering the exact value they needed. And finally, when all else failed (3) Defendants set up a fail-safe; they created an internal policy which allowed for the hiring of "outside" appraisers who were particularly well known within the industry for being willing to "fudge" the numbers.

80.     Moreover, as HCLS was Ally's wholly owned subsidiary, HCLS was specifically directed by Defendants to systematically "bump" or inflate appraisal values of homes throughout California, with the intent of creating housing appreciation, leading to a real estate boom, which Defendants could then capitalize on by selling not only more loans, but more loans at even higher loan amounts. From the very top to the very bottom, Defendants created a system intended to render consistently inflated appraisals. But they knew the 'boom' they were creating, was one stilted up and fueled by their fraud – and that when the music stopped playing the house of cards they'd built would come crumbling down destroying any and all equity Plaintiff borrowers had in their home.

81.     These artificially inflated appraisal reports and values were then used by homeowners and real estate agents alike in setting sales prices for their homes, resulting in artificially inflated sales, both known and intended by Defendants. Defendants told their borrowers that the value their property appraised for was the true value of their property. Furthermore, Defendants went so far as to furnish the appraisal reports to many of their borrowers, including Plaintiffs herein. **The result was a vicious exponential cycle. The artificially inflated sales would act as comps, inflating the sales prices of other homes. The cycle would repeat.** And Defendants intended it to repeat because it perpetuated an inflationary real estate economy in California, which resulted in massive profit to the Defendant Banks.

82.     Ally and Defendant conspirators perpetrated this systematic appraisal fraud at the direction of the conspiracy, and with the knowledge and acquiescence of their executives and board members.

**FIRST AMENDED COMPLAINT**

83.    .To carry out this fraud, GMAC, hand-in-hand with the other Defendants herein, used its size and market share as one of the largest lenders in California to systematically create false and inflated property appraisals throughout California, through its wholly-owned subsidiary HOME CONNECTS LENDING SERVICES, LLC. (HOME CONNECTS LENDING SERVICES, LLC is a division of Defendant Ally Bank – hereinafter "HCLS")

### *Defendants' Scheme to Fix the Market*
### *Through Their Wholly-Owned Appraisal Subsidiary: HCLS*

84.    HCLS was created in 1999 as a GMAC brainchild.  GMAC figured that if they could control all of the settlement service providers, including appraisers, it would make it easier for Ally Defendants to carry out this fraud. Any borrower, broker or lender that chose to conduct business with GMAC was forced to use their settlement service providers as a standard course of business. If a broker submitted a loan, the appraisal was to be done by someone on the HCLS approved appraiser list. The homeowners were also required to pay for a secondary appraisal review through HCLS.  Since there were two appraisals that were done on each property the aggregator being ResCap was now able to choose which appraisal would suit them best for their multiple transactions. The homeowners would be disclosed one value and the secondary appraisal done by HCLS could be used for Secondary Market purposes.

85.    As the owner, GMAC exercised its vast influence over HCLS to artificially inflate and manipulate the values of these properties, including the properties of Plaintiffs, to further its fraud and increase their profits. Their purpose was two-fold:

> a. First, by falsely inflating said property values, investors were defrauded into believing their investments in these loans were less risky than they actually were. This in turn led to more sales and even more profits on the secondary market.

> b. Second, Defendants would then turn around and use these false property

valuations to induce Plaintiffs and other borrowers into entering ever-larger loans on increasingly risky terms. The result was, again, more profits.

86. Furthering this scheme, GMAC & Homecomings Financial then struck sweetheart deals with some of the Nation's largest homebuilders in which they collaborated to artificially inflate the values of the properties being built and through a joint venture. Some of the largest homebuilders such as Lennar Homes. The unsuspecting homeowners would be forced to pre-qualify through the builders so called "In-House Lender" and they would be incentivized with offers of free upgrades or credits towards their closing costs only to be overcharged for these loans and artificially inflated purchase price that would cover the incentives. Since GMAC was the in house lender they could easily manipulate the value of the homes since their own appraisers would be appraising the properties, and in fact, they did just that.

87. Hand-in-hand with their builders and HCLS companies, Defendants could carry out the fraud without anyone ever finding out. If the appraisals were done by independent appraisers the homeowners would have found out that the homes they were purchasing or refinancing were being over valued and that the loans they were obtaining was taking every last bit of equity out of their homes. The customer never had a choice as to the settlement providers. Ally Defendants controlled and took the choice out of the customer's hands and directed and collaborated with all their partners to systematically inflate and disgorge the homeowners of their freedom to choose and suck every last bit of equity out of their homes. In furtherance of this act they used the manipulated property valuations to seek premiums on Secondary Market transactions. Ally Defendants not only defrauded the Plaintiffs, but the rating agencies that graded the paper being sold, the insurance companies who assessed the risk of the loans being insured through loan to valuation risk models and their investors.

88. From as early as 2004, GMAC's senior management, and Ally Defendants *knew* the scheme would cause a liquidity crisis that would devastate Plaintiffs' home

values and net worths. But, they did not care, because their plan was based on insider trading – pumping for as long as they could and then dumping before the truth came out and Plaintiffs' losses were locked in.

89.     These acts are now subject of numerous complaints and very large scale litigations and settlements. The largest recently announced lawsuit was filed by the Federal Housing Finance Agency as Conservator for Freddie Mac. The complaint alleges that Ally Defendants furnished appraisals that they understood were inaccurate and that they knew bore no reasonable relationship to the actual value of the underlying properties. Some of Plaintiffs loans seeking relief in this complaint are part of these REMIC's as mentioned in the FHFA complaint.

### *Defendants Systematically Abused and Abandoned Their Underwriting Guidelines to Place Unqualified Borrowers into Loans They Could Never Afford*

90.     As mentioned above, however, Defendants' fraud was multipronged. To feed its investors and continue to make such never-before-seen profits, Defendants needed more borrowers. In turn, Defendants Banks systematically and intentionally began disregarding their own underwriting standards, and approving borrowers who were grossly under-qualified, in the name of getting as many loans out the door, and sold to investors for a profit, as possible.

91.     In other words, not only did Defendants inflate appraisal values in the name of making the loans appear safer to investors, and thus more profitable to the banks, but Defendants also abandoned their own underwriting guidelines to approve more and more borrowers for loans. In doing so, Defendants intentionally placed borrowers into loans which would imperil their entire livelihoods, and often cases into loans whose default was an absolute mathematical certainty. The result was, once again, more profit obtained through deception.

92.     To achieve their fraud, Defendant Banks intentionally and grossly falsified Plaintiffs' salary, income, bank accounts, liquid assets, non-liquid assets, employment, real estate owned values, rental income ad infinitum, and by doing so simultaneously achieved two goals. First, they were able to approve borrowers who could never have been approved under their own published conventional underwriting guidelines (as well as industry standard underwriting guidelines used throughout the United States.) Second, they were able to conceal from the investor the highly risk nature of the loan, which resulted in more profit to the Bank. Investors were willing to pay more money for less risky loans. The translation is that Defendants had every incentive to deceive borrowers into entering loans which they realistically could never afford.  The result was that Defendants turned unimaginable ill-gotten profit, *at the sole expense of their borrowers*. When the music stopped, only the borrowers were left without a chair.

93.     In fact, Defendants intentionally put mechanisms and programs in place to allow their own employee's/Loan Consultants/Loan Representatives to **falsify** the income, asset and other material information of their borrowers, without a borrower ever knowing that their income or assets had been inflated. One such program was called the **"Stated Income"** program. Under this program, Defendant Banks would take as true any income stated on the application, without requesting any documentation in support. Seizing this unbridled free-for-all, Defendants' own employees who were paid commission based on the number and size of loans they got approved, rampantly falsified material income and asset information of their borrowers. By doing so they were paid more commission. But more importantly, Defendant Banks themselves created more products to be sold on the secondary market for even more profit. In other words, Defendants intentionally put policies and programs into motion which would allow it to place unqualified borrowers into loans – all while maintaining the semblance of propriety, and all without ever having to disclose to their investors that the incomes listed on their loan applications were false.

94.     Numerous others similar programs were also adopted such as **"stated assets"**, and **"low documentation loans".**  Both of which allowed Defendants to falsify information, and get loans approved which would  never been approved under traditional documentation

95.     Even in the absence of these programs Defendants and their employees nevertheless had the ability to and did, falsify their borrower's income and assets through numerous other means. For example, Defendants would inflate a borrower's income by making it appear as though the borrower was earning rental income on of their other properties when in fact they were earning none.  To legitimatize this false income, Defendants would add insult to injury by manufacturing an entirely false rental agreement, showing the false monthly rental income, complete with the forged signature of a non-existent renter.

96.     Defendants *regularly* inflated borrowers' incomes by over 50% and on many occasions by as much as a mind-numbing 300%. An egregious number by any measure.

97.     Defendants were intentionally turning a blind-eye to the rampant and egregious manipulations of incomes by their own employees, through policies and programs intentionally set forth by Defendants' very own top executives to achieve *just such a result*. The result was that Defendant were able to originate loans which they knew were false, and they intended to be false, but without ever having to *admit* to their secondary market investors that the loans were, in fact, false.

98.     Defendant banks knew and intended that their employees would falsify this information, for the very reasons set forth above, and in fact incentivized them through their commission and reward structure to do so.  In other words Defendants intended that this program would be abused. And by doing so, Defendants allowed and intended for their borrowers to be placed into loans which the  borrowers had no chance of being able to afford had their true income/asset information been used. .

99.   Defendants then told their borrowers, and Plaintiffs herein, that a determination by the Bank that they were "*qualified*" for a loan meant that the borrowers would be able to "*afford*" their loan

100.   Because Defendants held themselves out as (1) experienced professionals (2) with superior knowledge, education, and expertise, (3) a bank their customers and borrowers could trust and rely on Borrower plaintiffs believed them, and justifiably so. (See Ally's ads - "We make money with you, not off you": http://www.businessinsider.com/ally-bank-print-ad). Borrower Plaintiffs were deceived into reposing trust into the very company who would defraud them.

101.   For the purposes of the following paragraphs it is important to define two key terms: **"front-end"** debt to income ratio, and "**back end"** debt to income ratio.

102.   A **"front end"** debt to income ratio compares ONLY the loan payment (as well as taxes and insurance) to a person's income, and does not take into account any other debt whatsoever. For example a person who makes $10,000 per month, and whose mortgage costs $3,000 per month (including tax and interest), has a "front end" debt to income ratio of 30%.

103.   A **"back end"** debt to income ratio, by contrast, takes into account not only a person's loan payment (as well as taxes and insurance) but also *all other* debt reflected on their credit report. If that same person used in the example above, also had an additional $4,000 in monthly expenses such as credit card debt, car loans/payments, other mortgages, student debt, etc. etc., then that person's "back end" ratio would be 70%. ($3,000 per month for her loan, taxes & insurance plus, $4,000 per month for other debts = $7,000 per month in debt. $7,000 of debt divided by $10,000 in monthly income equals, 70% "back end" debt to income ratio).

104.   Industry Standard and Conventional Underwriting guidelines, including those used by Defendants herein, required that loans with a "front end" debt to income ratio higher than **35%** be rejected. They also required that loans with a "back end" debt to income ratio of higher than **45%** be rejected – and that 45% figure was on the on the

**FIRST AMENDED COMPLAINT**

*very* high end. For a loan with a 45% "back end" debt to income ratio to be approved, a borrower had to have excellent credentials in all other areas such as 720+ median credit score and high liquid asset reserves totaling more than 12 months of their ).

105.    However, Defendants in this action regularly approved loans with front end ratios wildly exceeding 35% (and back end ratios wildly exceeding 45%) on a regular basis, and as a matter of course, in violation of their own published underwriting guidelines as well industry standard underwriting guidelines used throughout the banking industry.

106.    In many cases, borrowers were approved with front-end debt to income ratios at almost 100%. In other words, borrowers were being approved for mortgages, where after spending almost every penny of their monthly income, they would have almost nothing left over to pay for the myriad other life expenses such as electricity, gas, car payments, telephone, insurance, medicine, or even food.

### *Defendants Turned Substantial Profits Through Their Borrowers' Default Furthering Their Incentive to Intentionally Place Plaintiffs Into Impossible and Unaffordable Loans*

107.    Not only did Defendants approve under qualified borrowers – they preferred them. That's because a defaulting borrower meant profit for Defendants.

108.    All of the Defendants managed risk through leverage and derivatives trading. With the advent of "Credit Default Swaps" ("CDS"), they had the protection they needed to push these loans out the door to grossly under qualified borrowers, without any fear of loss whatsoever. The CDS gave defendants *another* incentive to give grossly under qualified borrowers – whose default was virtually certain. Not only (1) were Defendants incentivized to give loans to unqualified borrowers because they were turning other-worldly profit by selling as many loans on the secondary market as possible, *but also …* (see next paragraph).

109.    (2) Because Defendants had taken out these insurance policies – aka Credit Default Swaps - against the possibility of default, GMAC and its co-conspirators (Defendants herein) would get paid in the event of a borrower's default. In fact, in many cases, Defendants had taken out numerous redundant Credit Default Swaps and insurance policies out on the same property, so that when default occurred, Defendants were getting paid out multiple times – they weren't just breaking even, they were *actually turning a profit* when borrowers defaulted.  In other words, Defendants had an *incentive* to place borrowers into impossible loans, because by doing so they made a lot of money.

110.    This technique gave these Defendants the insurance they needed to pass the risk along to third party without taking the risk themselves.  Since they planned on securitizing all of their loans and not keeping any of them, the Defendants could not care less about quality or who they hurt.  They would push insurance on the investors and actually over insure the loan pools, at times betting that the Plaintiffs and other borrowers would default.

111.    Since the Defendants created these pools to begin with, they were fully aware of the lack of quality and lack of due diligence that went into setting up these pools.  These "swaps" are life insurance policies that are placed on Plaintiffs' loans.  If the loan dies, the Defendants get paid.

112.    These swaps have been considered to be so dangerous that the majority of the financial world has simply stayed away.  They are best described by the following prominent experts:

         a.  Nobel prize-winning economist George Akerlof predicted that CDS would cause the next meltdown;

         b.  Warren Buffett called them "weapons of mass destruction";

         c.  Warren Buffett's colleague, Charles T. Munger, has called the CDS prohibition the best solution, and said "it isn't as though the economic world didn't function quite well without it, and it isn't as though what has

happened has been so wonderfully desirable that we should logically want more of it;"

d. Former Federal Reserve Chairman Alan Greenspan says CDS are dangerous;

e. Newsweek called CDS "The Monster that Ate Wall Street"

f. President Obama said in a June 17 speech on his plans for finance industry regulatory reform that credit swaps and other derivatives "**have threatened the entire financial system;**"

g. In a February 9th, 2012 speech, President Obama scolded "irresponsible" and "reckless" lenders, who "sold homes to people who couldn't afford them". He continued:

> It's well known that millions of Americans who did the right thing and the responsible thing -- shopped for a house, secured a mortgage that they could afford, made their payments on time -- were, nevertheless, hurt badly by the irresponsible actions of others: by lenders who sold loans to people who couldn't afford them; … by banks that took risky mortgages, packaged them up, and traded them for large profits.
> …
> It was wrong and it cost more than 4 million families their homes to foreclosure"
> …
> Even worse, many companies that handled these foreclosures didn't give people a fighting chance to hold onto their homes. In many cases, they didn't even verify that these foreclosures were actually legitimate. Some of the people they hired to process foreclosures used fake signatures to -- on fake documents to speed up the foreclosure process. Some of them didn't read what they were signing at all.
> …
> The mortgage fraud task force I announced in my State of the Union address retains its full authority to aggressively investigate the packaging and selling of risky mortgages **that led to this crisis**

h. George Soros says the market is still unsafe, and that credit- default swaps are "toxic" and "a very dangerous derivative" because it's easier and

**FIRST AMENDED COMPLAINT**

potentially more profitable for investors to bet against companies by
purchasing swaps rather than shorting their publicly traded stocks.

113.    But insurance against default wasn't the only way Defendants made money
from the losses of their imperiled borrowers. Defendant banks also made money by
charging a litany of unearned and egregiously marked up fees associated with the
initiation of and conducting (their own wrongful) foreclosures including:  inspection fees,
default fees, late fees, advance fees, attorney's fees, and trustee fees. In short Defendants
had an incentive *to place Plaintiff borrowers into loans they knew their borrowers could
not afford* because by doing so, the bank would turn a profit. Not only that, but
Defendants had an incentive *to wrongfully initiate foreclosures* because they made
money by doing so through the assessment of excessive, disproportionate and unearned
fees.

### *Defendants Misled the Public – Including Plaintiffs*

114.    The Defendants concealed and did not accurately or fully disclose to any
Plaintiff herein any of the foregoing facts.  Further, Defendants did not disclose or
explain their scheme to Plaintiffs at any time.   They did the foregoing with the intent to
deceive Plaintiffs and the investing public.  Plaintiffs did not know the massive scheme
Defendants had devised.

115.    To the contrary, Defendants affirmatively misrepresented its underwriting
processes, the value of its mortgages and the fundamental nature of its business model in
its press releases, annual report and securities filings, all of which were widely distributed
to the public, including Plaintiffs.  Defendants intended the public, including Plaintiffs, to
rely upon its misrepresentations and made those misrepresentations to create false
confidence in Defendants and to further its fraud on borrowers and investors.

116.    Plaintiffs would never have done business with the Defendants if Defendants
had disclosed their scheme.  Had the Plaintiffs known the facts concealed from them by
Defendants, Plaintiffs would have never entered into bogus and predatory transactions

with the Defendants designed only to line the pockets of Defendants and their executives and not to actually and justifiably create value and generate capital from the Plaintiffs' equity investments in their primary residences.

117.   If the Plaintiffs had later learned the truth, each Plaintiff would have either (1) rescinded the loan transaction under applicable law and/or (2) refinanced the loan transaction with a reputable institution prior to the decline in mortgage values in late 2008.  Instead, each Plaintiff reasonably relied on the deceptions of the Defendants in originating their loans and forbearing from exercising their rights to rescind or refinance their loans.

118.   After entering into the transactions with each Plaintiff herein as alleged herein, the Defendants sold in securities transactions the notes and deeds of trust pertaining to Plaintiffs' properties.  The sales:

   a.   Involved misrepresentations by Defendants to investors and concealment from investors of Plaintiff's true financial condition and the true value of Plaintiff's home and mortgage;

   b.   Involved misrepresentations by Defendants to investors and concealment from investors of the true financial condition of other borrowers and the true value of their homes and mortgages also included in the pools;

   c.   Were for consideration greater than the actual value of the said notes and deeds of trust;

   d.   Were for consideration greater than the income stream that could be generated from the instruments even assuming a 0% default rate thereon; and

   e.   Were part of schemes by which the Defendants bilked investors by selling collateralized mortgage pools at an inflated value and used the notes and mortgages as collateral for fraudulent swaps, all the while using Plaintiffs as the fodder for Defendants' fraudulent schemes.

119.   Defendants hid from Plaintiffs that Defendants were engaged in an effort to increase market share and sustain revenue generation through unprecedented expansions of its underwriting guidelines, taking on ever-increasing credit risk.

120.   At the time the Defendants induced Plaintiffs to enter into mortgages, they knew their scheme would lead to a liquidity crisis and grave damage to each Plaintiff's property value and thereby result in each Plaintiff's loss of the equity such Plaintiff invested in his or her house, as well as damaging that Plaintiff's credit rating, thereby causing the Plaintiff additional severe financial damage consisting of the foregoing damages and damages described elsewhere in this Complaint.  The Defendants concealed the foregoing from Plaintiffs, and California consumers and regulators.

121.   Based upon the Defendants' (1)long term media campaign holding themselves out as a trustworthy and reputable lending institution, (2) position as leading financial institutions,(3)Defendants' expertise, highly specialized training, unique understanding of the highly complicated terms and mathematics of financing  as well as Defendant Banks' capacity as an advisor, in addition to their (4) intentionally misleading and/or partially true statements found in omissions, including in their securities filings, numerous documents, advertisements and other media, statements made by their employees and agents with apparent and/or actual authority and their publicly available underwriting guidelines the Plaintiffs reasonably relied upon the statements and omissions made by Defendants and reasonably relied that no material information necessary to their decisions would be withheld or incompletely, inaccurately or otherwise improperly disclosed.  In so relying, the Plaintiffs were gravely damaged as described herein.  The Defendants acted willfully with the intention to conceal and deceive in order to benefit therefrom at the expense of the Plaintiffs.

122.   The other Defendants followed Ally's directions because they are or were either subsidiaries of Ally, directly or indirectly owned, controlled and dominated by Ally, or because they are in an unequal economic and/or legal relationship with Ally by which they are beholden to Ally and are thereby controlled and dominated by Ally.

**FIRST AMENDED COMPLAINT**

123.    At all relevant times, Defendants falsely assured the public, including Plaintiffs, that they were primarily prime quality mortgage lenders who had avoided the excesses of their competitors.  To the contrary, affirmative misrepresentations and material omissions permeated the Defendants' websites, customer and investor materials, and required securities filings and presentations.

124.    Defendants concealed and did not accurately or fully disclose to any Plaintiff herein any of the foregoing facts.  Defendants neither disclosed nor explained their schemes to Plaintiffs at any time.  They did the foregoing with the intent to deceive Plaintiffs, the investing public, the U.S. taxpayer, and California and other regulatory agencies.

125.    Defendants affirmatively misrepresented their underwriting processes, the value of its mortgages and the fundamental nature of its business model to their investors and to Plaintiffs in their press releases, annual reports and securities filings, all of which were widely distributed to the public, including Plaintiffs.

126.    Defendants fraudulently classified their liar loans as "prime" loans. Defendants' personnel who objected to the liar loans were reprimanded or fired.

127.    It is precisely the previously alleged loss of value on which the Defendants now seek to capitalize.  They would transfer a material portion of that wealth to themselves or those in collusion with them.  This scheme includes acquiring the real property at reduced values, collecting U.S. Government money for paper losses, and harvesting the future increase on the value of these artificially depressed homes. Since its government guarantee to purchase troubled assets Ally has been aggressively foreclosing on Plaintiffs homes.  With Government protection in its hip pocket, any losses incurred will be covered through loss provisions afforded by the tax payer.

//
//
//
//

## DEFENDANTS' DECEPTION CONTINUED WITH LOAN MODIFICATIONS

### *Defendants Deceived Borrowers Into Entering Loan Modifications*
### *In An Outright Cash Grab With No Intent Of Ever Modifying,*
### *For Fear Of Having Their Own Fraud Discovered By Their Investors*

128.    After inducing Plaintiff Borrowers into entering dangerous loans through outright deception and in the name of greed - loans which would threaten their livelihoods - Defendants refused to modify Plaintiff Borrowers' loans despite laws and court orders which required them to make good faith efforts to do. Why? To protect themselves. Not the borrowers, but themselves. Because Defendants were required to buy back loans from their investors if a material misrepresentation was discovered, Defendants refused to modify loans which qualified in every regard for one, for fear of having their own fraud and falsified information discovered by the investor, and having to buy back their fraudulent loans, and incurring massive loss.  In other words, Defendants placed their fiscal interests ahead of borrowers who desperately needed and *qualified* for the modifications, and who would face financial ruin or homelessness without one.  Instead, Defendants chose to line their coffers, rather than offer assistance to the very people they imperiled through their greed – assistance they were under a good faith obligation to provide. Simply put, Defendants were looking out for themselves.

129.    Plaintiffs believe and hereby allege that the servicers would want to use MERS to keep the investor information private is to obscure truth from the Plaintiffs and the Certificate Holders of the Trust.

130.    Every Pooling and Servicing Agreement has strict Warranties and Material Misrepresentation Provisions that must be honored by the Depositors. In the event that a loan has a material misrepresentation or violates the warranties given to certificate holders and the Trustee of the REMIC, the loan must be purchased from the Certificate Holders and whatever insurance was in place is now void due to fraud being detected on the loan.

131. In the case of loan modifications it benefits the servicer to keep vital information away from the Certificate Holders and the Trustee that oversees the Trust. In the event that fraud is detected on a mortgage loan the "**buy back**" provisions kick in and the servicer or originator, which is sometimes the same company, would be forced to take back the loan. In this case Ally would be forced to put a dead loan on their balance sheet with no hopes of being able to collect on the insurance policy that is in place due to fraud.

132. When Plaintiffs are desperate for help, Ally refuses to assist them. In the event that Ally forwards the true and accurate financial information to the Trustee overseeing the REMIC or to a third party chosen by the Trustee, they can and sometimes do find material misrepresentations that took place at origination. A Plaintiff supplies current financial information up to and including a signed 4506-T and the investor or Ally through their processing centers find out that the income listed on the initial loan application was not correct.

133. This leads to a chain of events that Plaintiffs and the Courts are unaware of. Based on evidence Plaintiffs will introduce at trial Ally instructs their employees to decline any application that contains a material misrepresentation for *fear of having to buy back the loan*.

134. This practice has led to numerous lawsuits including Government lawsuits in which Government Sponsored Enterprises have independently sent out modification requests and have verified fraudulent information was used at the origination of the Plaintiffs loans.

135. This practice alone has led to millions of American's losing their homes for fear of reprisal from investors that were lied to, when they purchased these *Toxic* loans. Defendants' wrongful acts continue to this day with hardball tactics and deception that continue to threaten Plaintiffs' rights and financial security, as well as the economic future of the State of California. Since 2010, these tactics and Defendants' other wrongful acts have finally been revealed as a result of extensive litigation and Government investigations.

***Defendants Used The Promise Of Loan Modifications***
***As Bait To Damage Plaintiffs' Credit, Preventing Plaintiffs***
***From Obtaining Financing Anywhere Else***

136. Defendants had an unfair and fraudulent pattern on inducing and directing borrowers to fall behind on their payments with the promise that by doing so, they would become eligible for a loan modification. Relying on these representations, Plaintiffs fell behind on their loan payments, but were never offered a loan modification.

137. In doing so, Plaintiffs' credit was substantially damaged, they suffered greatly diminished access to credit and financing, and were penalized with fees, penalties and charges in addition to becoming delinquent on their loan as recommended by the Bank.

138. By recommending that Plaintiffs fall behind, Defendants effectively trapped Plaintiffs into keeping their loan with Defendants, because no other institution would help Plaintiffs after they became delinquent on their mortgage, or after their credit was destroyed.

139. At its most fundamental level, these sorts of unscrupulous business tactics, undermine notions of fair play and good faith in business dealings, and jeopardize the consuming public.

***Defendants Used The Promise Of Loan Modifications As Bait***
***For An Outright Cash-Grab With No Intent To Ever Modify Plaintiffs***

140. Defendants also had an unfair and fraudulent pattern of offering borrowers what appeared to be Loan modification offers (called "Trial Payment Plans"), but in reality these offers were nothing more than "cash grabs." Defendants never intended to permanently modify Plaintiffs' loans. Specifically, Defendants would offer Plaintiffs and homeowners who were already on the brink of default/foreclosure a lower payment called a "trial payment." Defendants promised that if Plaintiffs were able to make the trial payment for 3 (or more) months, Defendants would permanently modify Plaintiffs'

payment to be the same amount under the trial payments. But Defendants had a pattern of rejecting these loan modifications despite Plaintiffs' compliance with every term of the loan modification offer. Instead Defendants would use the offer as bait to induce Plaintiffs to make payments which would never be applied to the principal and interest of their loan, but instead would be applied to the mountain of unmerited late charges, and fees, taking what little money the financially imperiled plaintiffs had left, and duping them into spending it on unfairly placed fees and late charges. Defendants never had any intent of modifying their loans, despite Plaintiffs' full compliance with the terms of the offer. Such acts are patently unfair and fraudulent, and Plaintiffs are entitled to remuneration of all payments made under such trial payment plans, as well as an injunction prohibiting Defendants from this deceptive business practice. More specifically, Defendants' unlawful and unfair practices in this regard include, but are not limited to, the following:

      a.  failing to make good faith efforts to provide them with a loan modification and breaching their contractual obligations, written and implied promises, loan servicing functions owed to Plaintiffs, who fulfilled their obligations by making timely modified payments;

      b.  making false and/or misleading representations that Plaintiffs were eligible and entered into the trial modification period, which would lead to a permanent modification of their mortgage payment;

      c.  failing to disclose to Plaintiffs that their modified payments may be reported to credit bureaus as default or late payments that would destroy their credit scores;

      d.  delaying processing, demanding duplicate documentation, and failing to provide adequate information or communication regarding the loan modification programs to Plaintiffs;

      e.  engaging in conduct that undermines or violates the spirit or intent of the consumer protection laws alleged in this Complaint; and

**FIRST AMENDED COMPLAINT**

f.  omitting to inform Plaintiffs that they could be rejected from the trial modification period at any point, and that this would result in the immediate demand for a balloon payment consisting of purported delinquency payments and substantial late fees, default fees, foreclosure fees, inspection fees, property preservation fees, trustee fees, trustee sale guarantee fees, mail fees, recording fees, and default servicing fees.

## DEFENDANTS THEN INTENTIONALLY STEAMROLLED WRONGFUL FORECLOSURE AFTER WRONGFUL FORECLOSURE WITHOUT ANY OWNERSHIP INTEREST IN THE NOTES OR DEEDS OF TRUST TO COLLECT WILDLY INFLATED FEES AND TURN UNIMAGINABLE PROFIT

141.   Continuing their chronology of greed-driven deception and intentional wrongdoing, Defendants not only (1) intentionally placed Plaintiffs into egregiously dangerous, unaffordable and impossible loans in the name of profit on the secondary market, and, (2) offered Plaintiffs trial loan modifications in an attempt to grab as much cash as they could before foreclosing – none of which would be applied to the principal or interest of Plaintiff's loans -  with no intent of ever actually modifying Plaintiffs' loans for fear of having their own (Defendants') fraud discovered by their investors and being forced to buy back the loan at a massive loss, but in a final coup-de-grace (3) intentionally foreclosed on plaintiffs despite having no ownership interest in the notes or deeds of trust, in the name of collecting preposterous and unmerited "foreclosure fees" including: inspection fees, default fees, late fees, advance fees, attorney fees, and trustee fees.

142.   Defendants charged these ill-defined and ambiguous fees whose amounts were *never* disclosed to Plaintiffs in any writing or contract whatsoever, unilaterally. They decided how much they wanted to charge for whatever reason they wanted to charge it. And the amounts they charged were tantamount to price gauging, often charging double, triple or even quadruple the fair market value for these "services."

Needless to say, the outrageous price markups all inured to the benefit of the conspiracy of Defendants. Especially in light of the fact that Defendants did not have an ownership interest in the property upon which to foreclose, these charges and fees were entirely unjustified, and constitute numerous cognizable sources of restitution.

143.    In short, Defendants made money by initiating foreclosures, and for this very reason intentionally steamrolled wrongful foreclosures over plaintiffs without having any true possessory or ownership interest in the deed of trust, threatening to wrongfully dispossess Plaintiffs of their homes and placing them on the streets.

144.    In the greed-driven world of Defendants, neither law nor ethics would be allowed to stand as an obstacle in their insatiable hunt for profit.

### *Defendants Seek to Enforce Notes & Deeds of Trust*
### *Without Evidencing Their Ownership Interest*

145.    Securitizing a loan generally entails the sale of a loan to private investors, together with other loans, in a "pool" of loans.  Indeed, as typically executed, a securitization process may result in up to three successive sales of the loan or in interests in the loan.  These interests in the same loan are sold in tranches that can be found in many collateralized debt obligation securities.  As a result, the ultimate note holders are many, disparate and unrelated entities, no one of which can lawfully enforce the note without the participation of all the other anonymous note holders to partial interests in a single home loan.

146.    Defendants' continue to demand payment and to foreclose and threaten to foreclose on Plaintiffs, despite the facts that:

        a. Defendants have no proof that they own the notes and deeds of trust they seek to enforce;

        b. There is considerable evidence that Defendants do not own the notes and deeds of trust they enforce and seek to enforce and based thereon, Plaintiffs allege that they do not; and

c. Whether or not they can demonstrate ownership of the requisite notes and deeds of trust, Defendants lack the legal right to enforce the foregoing because they have not complied with disclosure requirements intended to assure mortgages are funded with monies obtained lawfully.

Plaintiffs believe and thereon allege that Defendants have made demand for payment on the Plaintiffs with respect to Plaintiffs' properties at a time when Defendants are incapable of establishing (and do not have any credible knowledge regarding) who owns the promissory notes Defendants are purportedly servicing. Plaintiffs believe and thereon allege that because Defendants are not the holders of Plaintiffs' notes and deeds of trust and are not operating under a valid power from the various current holders of the notes and deeds of trust, Defendants may not enforce the notes or deeds of trust.

### *Defendants' Improper Securitization: Foreclosing Trusts Had No Ownership Interest In Plaintiffs' Notes Or Deeds Of Trust Under The Explicit Terms of Their Own Pooling & Service Agreements*

147.   Almost every Mortgage loan investigated which was produced by a major Banking Institution between the years 2000 - 2008 was securitized. Securitization is the act of producing an investment vehicle of Mortgage-Backed Securities ("MBS") using the Borrower's Mortgage NOTE as the under-lying corpus, as collateral.

148.   In a typical Securitization Transaction, mortgage loans are transferred by loan "Originators" to a "Sponsor." The "Sponsor", in turn, sells the mortgage loans to a "Depositor," a single –purpose entity. When the Sponsor acts in selling capacity, it is often referred to as a "Seller," as well as a Sponsor. The Depositor, in turn, deposits the loans into the securitization trust also known as a "REMIC", pursuant to a Pooling and Servicing Agreement ("PSA") or similarly-named agreement.

149.   The parties to the Pooling and Servicing Agreement (PSA) generally are the Seller, the Depositor, the "Master Servicer," which services the mortgage loans and/or

**FIRST AMENDED COMPLAINT**

monitors the servicing of the mortgage loans by sub-servicers, and the "Trustee" who administers the trust that is established pursuant to the PSA.

150. The reason loans are pooled and placed into these loan trusts named REMIC's is due to income tax purposes. A REMIC is an "SPV" or Special Purpose Vehicle that is treated by the IRS as a "QSPE" or Qualifying Special Purpose Entity. It specifically was designed by Congress to allow the vehicle to not be taxed as the cash flows through the vehicle and distributed to the investor and certificate holders. It is like an S Corp where there is no double taxation.

151. Pooling and Servicing Agreements only allow loans to be placed into a REMIC for **two years** after the set-up of the Trust due to tax implications. You can only substitute in loans for two years thereafter, if there is non-compliance with the aforementioned PSA the penalty is 100% of the face value of the asset in tax penalties.

152. Plaintiffs believe that their loans are illegally being substituted in and out of these loan Trusts in direct violation of the PSA's in order to cure deficiencies with the Chain of Title that never should have occurred to begin with. Defendants are attempting to cure these defects with the use of (MERS) Mortgage Electronic Registration System.

153. Moreover, Plaintiffs allege that in numerous instances, Defendants foreclosed on behalf of trusts which had no ownership interest whatsoever in the DOT, **because the trusts had been-long closed under the terms of their very own PSA.** In other words, it was impossible for the subject loan to be placed into the trust such that the trust would have any ownership interest in the loan upon which to foreclose.

154. Defendants are defrauding Plaintiff's by transferring or purporting to transfer ownership of these loans to entities that **can no longer accept these assigned loans**, and thus have no ownership interest in the loans upon which they could foreclose. Under strict REMIC rules a loan must follow a specific protocol in order to become property of the Trust.

a. Originator/ Lender must endorse the Note in Blank to the Sponsor/Seller

b. The Seller assigns the Note to the Depositor/Purchaser who is to insure that all of the trust assets are actually deposited into the REMIC.

c. The Depositor assigns all of the Notes and Deeds of Trust/Mortgages into the name of the Issuing Entity.

d. The Issuing Entity is the newly formed REMIC that obtains an issuer number from the Securities and Exchange Commission to issue Certificates to Investors.

e. The Issuing Entity hires an independent Trustee to become the Custodian of the Trust. Trustee's job is to supervise the activities of the Trust and to insure that the Certificate Holders/Investors **"True Owner's"** of the loans are paid based on the Certificate grades they purchased.

f. The Trustee hires a Master Servicer and Sub-Servicers to collect mortgage payments and service the loans on behalf of the Trust.

g. In the event of a foreclosure action the REMIC Trustee must follow proper foreclosure procedures as laid out in the Pooling and Servicing Agreement.

155. It is standard in the securitization industry and the secondary markets to endorse a note to blank. Most often times the pool servicing agreement requires the Depositor to endorse the Note to Blank, in other words it is not endorsed to a person or entity, it's endorsed in blank making the Note a bear or bear instrument making it possible for the holder of that instrument to Deposit it into the Trust as required by the pool agreement. However, with this endorsement the pooling and servicing agreement requires that the Depositor transfer the Note to the Trustee for the benefit of the certificate holders.

156. A "Custodian" is sometimes a party to the PSA and sometimes enters into a separate Custodial Agreement with the Trustee or the Trustee can act as both if so designated in the PSA.

157.    Pursuant to the Custodial agreement, the Custodian maintains possession of the loan files on behalf of the Trustee.

158.    An "Underwriter" typically enters into an Underwriting Agreement with the Depositor pursuant to which the Underwriter commits to purchase certain of the trust certificates and/or notes issued by the trust.  In turn, the trust certificates and/or notes are sold to investors by the Underwriter (or Underwriters) pursuant to a Registration Statement or Prospectus filed with the Securities and Exchange Commission ("SEC").

159.    When the transaction is complete, the Trust files a Form 8-K with the SEC. The form is accompanied by the documents involved in the securitization transaction.

160.    Trust certificates are frequently issued in different classes.  The different classes are associated with different payment terms, and different levels of risk.  One loan can be placed in multiple classes of securities; these different classes of trust certificates are called "Tranches". The terms, including payment schedule, distribution priority, and allocation of losses, and the level of risk attributable to each class of certificates, or tranche, are defined in the PSA and related exhibits, and in the Prospectus and Prospectus Supplements.

161.    When a loan is placed into a Tranche there can be more than one owner of the security since the loan has been chopped up into smaller pieces and listed as security in different classes of certificates based on risk.

162.    The relative risk associated with any class, or tranche, of the trust certificates may be set by various devices, including credit enhancements, the subordination of lower level tranches through an agreement to absorb losses first, the over-collateralization of loan pools in excess of the aggregate amount of the trust certificates, or the creation of an excess spread fund to cover the difference between the interest collected from the pooled mortgage notes and the amounts owed to investors who purchase the trust certificates.

163.    Subordinating the right of certain of the trust certificates to receive cash flow from the pooled mortgage until senior trust certificates have been paid, or allocating the cash flow from the pooled mortgages until senior certificates have been paid, or

allocating the cash flow from the pooled mortgages to different levels of trust certificates may be employed to create a tiered structure known as a **"Waterfall."**

164.   Losses from mortgage defaults, delinquencies, or other factors may be allocated in reverse seniority, with the junior tranches incurring losses first until their interests are reduced to zero.  Each class of trust certificates or tranche may have a credit rating issued by one or more nationally recognized statistical rating organizations who rate the likelihood of payment of interest and principal owed to the tranche, based on their internal projections of expected losses from the loan pool.

165.   Securitization transactions involving government sponsored entities such as Fannie Mae and Freddie Mac follow the same general pattern involving the pooling of loans and sale of securities to investors, although the terminology and intermediate entities may be different.

166.   In simple terms, in a securitization transaction, the loan is made by the "originator," and then sold into the market.  Ownership of the loan is transferred to a trust.  Certain files, including the original note and original deed of trust are maintained by a custodian or the trustee.  The loan is serviced by the servicer, who collects the payments, keeps the payment history, and initiates (but typically does not conduct) foreclosure sales.  Participants in the trust earn income, and absorb losses, according to the terms of the trust and associated contracts.

167.   Other mortgage notes are owned by the issuing banks and are held in inventory for their own investment purposes.

168.   The following diagram illustrates the various parties involved in the typical securitization transaction, and also evidences custody and ownership of the underlying mortgage note.

//

//

//

//

**FIRST AMENDED COMPLAINT**

It is important to have a general familiarity with mortgage securitization in order to understand the foreclosure process. Securitization involves a series of conveyances of the note evidencing the residential loan and assignment of the mortgage or trust deed securing it. Therefore, chain of title and beneficial interest issues frequently turn on the securitization trajectories.

*Securitization* is the process pooling loans into "mortgage-backed securities" or "MBS" for sale to investors. MBS is an investment instrument backed by an undivided interest in a pool of mortgages or trust deeds. Income from the underlying mortgages is used to pay interest and principal on the securities. Figure A below is a simplified schematic depicting the general securitization process and some of the parties involved.



**Figure A - Securitization Schematic**

The process begins with O*riginators,* which are the lenders (such as banks or finance companies) that initially make the loans to homeowners. *Sponsor/Sellers* (or "sponsors") purchase these loans from one or more Originators to form the pool of assets to be securitized. (Most large financial institutions are both Originators and Sponsor/Sellers.) A *Depositor* creates a *Securitization Trust*, a special-purpose entity, for the securitized transaction. The depositor acquires the pooled assets from the Sponsor/Seller and in turn deposits them into the Securitization Trust. An I*ssuer* acquires the Securitization Trust and issues certificates to eventually be sold to investors.

**FIRST AMENDED COMPLAINT**

169.    Defendants, and each of them, wrongfully acted and continue to act as if they are either the owner, beneficiary, successor, assignee or servicer, or have some other right, title, or interest in Plaintiffs' notes and deeds of trust, when, in reality, they have no basis to assert any such right, title or interest.

170.    As a result of Defendants' improper scheme, Plaintiffs lost their equity in their homes, their credit ratings and histories were damaged or destroyed, and Plaintiffs incurred material other costs and expenses, described herein.  At the same time, Defendants took from Plaintiffs and other borrowers billions of dollars in interest payments and fees and generated billions of dollars in illegal and fraudulently obtained profits by selling their loans at inflated values and using the loans as collateral for fraudulent swaps.

### *The Aftermath of Defendants' Wrongful Foreclosures*

171.    To add further insult to injury, Defendants, knowing of this massive fraud, and sought to swoop in like the Civil War carpetbaggers and profiteer from the carnage that they had wreaked on Plaintiffs.

172.    With the proceeds of TARP funds and a voraciousness that has already been chastised by numerous courts, Defendants then sought to obliterate the last vestiges of value held by Plaintiffs, and proceeded to flip distressed assets for a profit.

173.    Defendants' other improper acts since 2008 are numerous, including but not limited to: (1) issuing Notices of Default to some Plaintiffs in violation of Cal. Civil Code §2923.5; (2)issuing Notices of Defaults, and initiating foreclosure on behalf of those with no beneficial interest in the note or deed of trust , (3) conducting the unauthorized sale of Plaintiff's property by a trustee who was never properly appointed or substituted as trustee (4) misrepresenting their intention to arrange loan modifications for many Plaintiffs, while in fact creating abusive roadblocks to deprive Plaintiffs of their rights; and (5) failing to respond to most Plaintiffs' communications while often erecting barriers to make it difficult for the Plaintiffs to communicate with them.

174.   Defendants continue to demand payment and to threaten to foreclose on Plaintiffs, despite the facts that: (1) Defendants have no proof that they own the notes and deeds of trust they seek to enforce; (2) there is considerable evidence that Defendants *do not* own the notes and deeds of trust they enforce and seek to enforce and based thereon, Plaintiffs allege that they do not; and (3) whether or not they can demonstrate ownership of the requisite notes and deeds of trust, Defendants lack the legal right to enforce the foregoing because they have not complied with required disclosure requirements intended to assure that mortgages are funded with monies obtained lawfully in addition to California's non-judicial foreclosure statutes codified at Cal. Civ. Code 2924 et seq., with which, it has been repeatedly affirmed by California courts, "*strict compliance"* is required.

175.   As a proximate and foreseeable result of the Defendants' sale of the notes and deeds of trust regarding Plaintiffs' properties and others similarly situated for more than the actual value of such instruments, securitization pools lacked the cash flow necessary to maintain the securitization pools in accordance with their indentures. Further, it was only a matter of time before Defendants' fraudulent offshore swaps were uncovered.  The unraveling of the Defendants' fraudulent scheme has materially depressed the price of real estate in many parts of California, particularly including the real estate owned by Plaintiffs.

176.   Defendants have admitted in their various securities filings that they sold Plaintiffs' notes and mortgages.  There is no evidence that Defendants have re-acquired Plaintiffs' notes or deeds of trust.  Accordingly, their claims of subsequent ownership appear to be specious.

177.   Plaintiffs believe and thereon allege that Defendants have made demand for payment on the Plaintiffs with respect to Plaintiffs' properties at a time when Defendants were incapable of establishing (and did not have any credible knowledge regarding) who owns the promissory notes Defendants were purportedly servicing, and that these acts are continuing.  Because Defendants are not, and were not at the relevant times, the holders

of Plaintiffs' notes and deeds of trust and are not, and were not at the relevant times, operating under a valid power from the current holders of the notes and deeds of trust, Defendants are not and were not at the relevant times allowed legally to enforce the notes or deeds of trust. Defendants' attempts to enforce these notes were nothing but a sham and a fraud upon the Plaintiffs, the public, and the courts.

## **BANK DEFENDANTS OWED PLAINTIFFS A DUTY**

178.  For seven separate and independent reasons, Bank Defendants owed Plaintiffs a duty.

179.  **First** under California Civil Code §1572, parties to a contract have an unequivocal duty to disclose material facts to one another. (*Walker v. KFC Corp.* (S.D.Cal. 1981) 515 F.Supp. 612, 622 ["[section] 1572 affirmatively imposes the duty not to suppress facts on persons who are parties to a contract or who are inducing others to enter into a contract."]) Here Plaintiffs are engaged in contracts with respective loan contracts with each of the Bank Defendants, and plaintiffs have alleged numerous failure to disclose such material facts. (See paragraph 197, and Appendix A).

180.  **Second,** California Civil Code §§1709 and 1710 establish a separate independent duty of disclosure, even in the absence of a contractual relationship, where, as here, Bank Defendants and HCLS have made partial inaccurate disclosures which are likely to mislead for want of the missing fact, codifying the long-standing rule that the "telling of a half-truth calculated to deceive, is fraud." Plaintiffs have alleged numerous such partially misleading disclosures at paragraph 200, of this Complaint, and in Appendix A. The Supreme Court of California has held the same. (*Warner Constr. Corp., supra,* 2 Cal.3d at 294 [A defendant has a duty of disclosure "when the defendant makes partial representations but also suppresses some material facts."]).

181.  **Third,** Bank Defendants and HCLS had exclusive knowledge of numerous items of highly material information which they did not disclose. Numerous cases including those from the Supreme Court of California hold that a defendant has a duty of

disclosure "when the defendant had exclusive knowledge of material facts not known to plaintiff." *Warner Constr. Corp., supra,* 2 Cal.3d at 294

182.   **Fourth**, a Defendant has a duty to disclose "when it actively conceals a material fact from the plaintiff." *Warner Constr. Corp., supra,* 2 Cal.3d at 294.  This Complaint alleges throughout that Bank Defendants and HCLS embarked on a campaign of active suppression and concealment of numerous material facts.

183.   **Fifth**, Numerous court, including the California Court of Appeal have held that where, as here, the disclosures in Plaintiffs' Option ARM loans discussing negative amortization, only frame negative amortization as a mere *possibility*, rather than the reality which is that when making a minimum payment negative amortization is a *certainty*, the disclosure is insufficient under law, giving rise to a valid cause of action not only for UCL but also for fraud/misrepresentation. (*Boschma v. Home Loan Center, Inc.* (2011) 198 Cal.App.4th 230.)  The court in *Boshcma* explicitly held that Banks have a duty to disclose such material information. Plaintiffs allege that Bank Defendants, identically, failed to disclose the certainty of negative amortization in the Option ARM loans. Plaintiffs have attached supporting documentation. (See Appendix A).

184.   **Sixth,** Defendants have **ceased acting as conventional money lenders**. In conducting the wrongs described above and throughout this Complaint, the Bank Defendants stepped vastly outside of their role as conventional money lenders, and instead morphed into an enterprise engaged in intentional fraud upon their borrowers. Among their numerous departures from the actions of a conventional money lender, Defendants:

a.   **Intentionally falsified the values and appraisals of each of the Plaintiffs' subject properties** – numerous courts have held that such falsification of appraisals "do not fall within a bank's role as a traditional money lender." *Sullivan v. JP Morgan Chase Bank, N.A.* (E.D.Cal. 2010) 725 F.Supp.2d 1087, 1094; *Watkinson v. MortgageIT* (2010) 2010 WL 2196083 at *9

b. Artificially and fraudulently inflated the value of all of the California real estate market, (as opposed to just those of Plaintiffs herein) in **a Price Fixing scheme achieved through pervasive and coordinated falsification of appraisals** conducted hand-in-hand with their wholly-owned-appraisal subsidiary and alter-ego HCLS, knowing that by doing so their fraudulent appraisals would act as comparables which would artificially inflate the rest of the market (as detailed in paragraphs 64-89, above)

c. **Coerced their appraisers to falsify their appraisals through bribery, undue influence, instruction, appraiser selection manipulation, financial pressure, as well as threats – both explicit and implicit** – that if their appraisals didn't return a valuation above that demanded by Bank Defendants (1) future business with the appraiser would either diminish or discontinue altogether or (2) that the individual appraiser would be fired/blacklisted. Specifically, these allegations are found above at paragraphs 67-89,

d. Intentionally and knowingly subjected their appraisers to known conflicts of interest

e. **Intentionally falsifying the income and asset documentation** of their borrowers to place them into loans which Defendants knew Plaintiffs could not afford, and would default upon to a mathematical certainty. Numerous courts have held banks liable for fraud for such identical acts because such acts "do not fall within a bank's traditional role as money lender." (*Sullivan v. JP Morgan Chase Bank, N.A.* (E.D.Cal. 2010) 725 F.Supp.2d 1087, 1094; *Watkinson v. MortgageIT* (2010) 2010 WL 2196083 at *9.)

f. Abandoned the "originate to hold" business model of conventional money lenders, and instead became a **loan packaging and re-selling facility** in

which bank defendants **originated loans for the sole purpose of reselling them on the secondary market for vast profit** –creating an incentive to place borrowers into loans which bank defendants knew they could not afford and simultaneously passing along all risk of default to the purchasers of the loan. (See Paragraphs 45-49).

g. Intentionally abandoned *industry-standard* underwriting guidelines – the hallmark of conventional money lending -  in order to place borrowers into loans they *knew* they could not afford solely in the name of profit;

h. **Originated loans with an eye towards immediately securitizing and re-selling them on the secondary market and becoming the <u>servicer</u> on the loan**, thus creating an incentive to place borrowers into loans they knew their borrowers could not afford because by doing so Defendants-now-turned-servicers would be in a position to collect highly-lucrative fees from their imperiled borrowers, such as late fees, default fees, and indeed foreclosure fees.  In doing so, Defendants became anything but conventional money lenders – **their interests were directly aligned with those of a servicer.**  Numerous courts have held that where, as here, a bank acts as servicer they have exceed their role as a conventional money lender. (*Johnson v. HSBC Bank USA, Nat. Ass'n* (S.D.Cal. 2012) 2012 WL 928433 *4.)

i. **Entered into loan modifications with Plaintiffs**. A lender goes beyond its "role as a silent lender and loan servicer [when it] offer[s] an opportunity to plaintiffs for loan modification and to engage with them concerning the trial period plan. ... [T]his is precisely beyond the domain of a usual money lender ... [and] constitutes sufficient active participation to create a duty of care", as held by numerous courts. (*Garcia v. Ocwen Loan Serv., LLC* (N.D. Cal.) 2010 WL 1881098 at *3; *Ansanelli v. JPMorgan Chase Bank, N.A.,* No. C 10-03892 WHA, 2011 U.S. Dist.

LEXIS 32350, at *21-22 (N.D.Cal. Mar. 28, 2011; *Johnson v. HSBC Bank USA,* (S.D. Cal. 2012) 2012 WL 928433 at *3.)

j. **Engaged in massive intentional fraud upon its borrowers.** While a bank may in the course of conventional lending act negligently from time to time, intentional committed torts cannot be said to be conventional practice for lenders. If Bank Defendants wish to assert that massive intentional fraud on their borrowers is conventional practice for lenders, they should do so at trial. Numerous courts, including the Supreme Court of the United States have recognized that a duty properly attaches to a bank when it acts intentionally, rather than negligently. (*Connor v. Great Western Sav. & Loan Ass'n* (1968) 69 Cal.2d 850, 865; *Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089*; Becker v. Wells Fargo Bank, N.A.* (E.D.Cal. 2011) 2011 WL 3319577; *Dumas, supra,* 2011 WL 4906412; *Champlaie, supra,* 706 F.Supp.2d at 1060; *Watkinson v. MortgageIT, Inc.* (S.D. Cal. 2010) 2010 WL 2196083.)

185. **Seventh**, and finally, even when acting as a conventional money lender, Banks nevertheless owe a duty to their borrowers, when they meet the following test:

> In California, the test for determining whether a financial institution owes a duty of care to a borrower-client " 'involves the balancing of various factors, among which are [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm.

(*Nymark v. Heart Fed. Savings & Loan Assn*. (1991) 231 Cal.App.3d 1089, 1098). Each of the 6 elements are amply alleged throughout this Complaint.

//

//

//

# FIRST CAUSE OF ACTION

### (*By All Plaintiffs – Fraudulent Concealment – Against All Defendants*)

186.   The preceding paragraphs and subsequent causes of action are hereby incorporated by reference as though fully set forth herein.

187.   **IN ADDITION TO THE ALLEGATIONS MADE THROUGHOUT THIS COMPLAINT, WHICH APPLY TO ALL PLAINTIFFS (EXCEPT WHERE OTHERWISE NOTED), APPENDIX "A" ("INDIVIDUALIZED PLAINTIFF ALLEGATIONS") PROVIDES INDIVIDUALIZED ALLEGATIONS AS TO EACH AND EVERY PLAINTIFF IN THIS ACTION AND THE SPECIFIC WRONGS DONE BY EACH DEFENDANT.** By this reference, Plaintiffs hereby incorporate Appendix "A" to this Complaint.

188.   In connection with entering into mortgage contracts with Plaintiffs, from 2003 through 2008, Defendants:

   a.   engaged in a centrally-directed fraud by which they concealed numerous material facts, including that Ally, then one of the nation's largest mortgage lenders, and other Defendants herein, had ceased acting as a conventional money lender and had, instead, morphed into an enterprise engaged in systematic fraud on all of its material constituencies, including Plaintiffs – a fraud their *own internal reports* concluded would cause a liquidity crisis and thereby destroy the equity value of each borrower's home; and

   b.   engaged in widespread disclosure of information that was broadly disseminated to the public, including Plaintiffs, but suppressed contrary material facts relevant to Plaintiffs' decisions regarding whether they should enter into mortgage contracts with the Defendants.

189.   On or about January 2003, Ally Defendants determined that they could not sustain their businesses. So Ally Defendants hatched a simple plan – they would pool

their loans, fraudulently inflate the value of these pooled loans and then sell the pools to unsuspecting investors for grossly unmerited profit.

190.   But to feed its investors and continue to make such never-before-seen profits, Defendants needed more borrowers. In turn, Ally Defendants began disregarding their own underwriting standards, and approving borrowers who were grossly under-qualified, in the name of getting as many loans out the door, and sold to investors for a profit, as possible. As part of this scheme, Defendants fraudulently inflated the appraisal values of Plaintiffs' properties, as well as the real estate values throughout California, knowing that their scheme would cause the market to crash, and the precipitous decline of real estate values throughout the State.

191.   Rapidly, these two intertwined schemes grew into a brazen plot to disregard underwriting standards and fraudulently inflate property values . . . in order to take business from legitimate mortgage providers, and moved on to massive securities fraud hand-in-hand with concealment from, and deception of, Plaintiffs and other mortgag[ors] on an unprecedented scale.

192.   To further this scheme, Ally, using its size and influence in California, began systematically creating false and inflated property appraisals throughout California, through its wholly-owned subsidiary HLCS Appraisals, hand-in-hand with the other Defendants herein. The purpose was two-fold:

      a.  First, by falsely inflating said property values, investors were defrauded into believing their investments in these loans were less risky than they actually were. This in turn led to more sales and even more profits on the secondary market.

      b.  Second, Defendants would then turn around and use these false property valuations to induce Plaintiffs and other borrowers into entering ever-larger loans on increasingly risky terms. The result was, again, more profits.

**FIRST AMENDED COMPLAINT**

193. However, Defendants knew these loans were unsustainable for the borrowers and, to a certainty, would result in a crash that would destroy the equity invested by Plaintiffs and other of Defendants' borrowers.

194. Defendants expected that the deteriorating quality of the loans that Defendants were writing, and the poor performance over time of those loans, would ultimately curtail Defendants ability to sell those loans in the secondary mortgage market and/or to purchase credit default swaps as hedges.

195. Despite their awareness of and concerns about the increasing risk the Defendants were undertaking, they hid these risks from the Plaintiffs, borrowers, potential borrowers, and investors.

196. Defendants had exclusive knowledge, not available to Plaintiffs, of material facts pertaining to their mortgage lending activities that it did not disclose to Plaintiffs at the time they were entering into contracts with Plaintiffs.

197. The Defendants misled the Plaintiffs, borrowers, potential borrowers and investors by failing to disclose substantial negative information regarding Defendants' loan products, namely that:

    a. The fact that Defendants had intentionally abandoned their own as well as industry standard underwriting guidelines;

    b. The fact that Defendants had intentionally abandoned their own as well as industry standard underwriting guidelines *for the purpose of* placing borrowers into loans which they knew borrowers could not afford and upon which they knew borrowers would default to a mathematical certainty;

    c. The fact that Defendants had intentionally and falsely inflated the appraisals on Plaintiffs properties, hand in hand with Defendant HCLS.

    d. The fact that Defendants had systematically, intentionally, and artificially inflated the prices of real estate throughout California (otherwise known as "market fixing") through HCLS, over whom Defendants exercised

**FIRST AMENDED COMPLAINT**

dominion, resulting in:

     i. Plaintiffs being forced to pay much more for their properties than they were truly worth;

     ii. Plaintiffs being forced to take out larger loans to afford the same property, resulting in more profit to Defendant Banks by virtue of additional interest Plaintiffs would have to pay;

e. That Defendants had fixed the real-estate market and systematically driven the prices of property well above what they were worth, with the intent of creating the illusion of a naturally-appreciating real estate economy to spur a purchase and refinance boom resulting in more business and thus more profits for the bank;

f. That Defendants knew that the true uninflated value of Plaintiffs' homes were insufficient to justify the size of the loans Plaintiffs were being given;

g. That Defendants falsely inflated the appraisals of Plaintiffs' properties in order to place Plaintiffs into loans that they would not otherwise be able to obtain or afford, all so Defendants and their employee-Loan Consultants could turn profit;

h. That Defendants falsely inflated the appraisals of Plaintiffs' properties in order to assure them that the property was indeed worth what they were paying for it, such that Plaintiff would move forward with the purchase;

i. That Defendants falsely inflated the appraisals of Plaintiffs' properties to induce plaintiffs to enter into loan and assure them that their collateral was sound;

j. That Defendants had falsified Plaintiffs' income and asset documentation to intentionally place them into loans they could not otherwise afford;

k. That Defendants and co-conspirator HCLS, the appraisal arm of Ally Defendants' fraud, was subject to a massive conflict of interest precluding

**FIRST AMENDED COMPLAINT**

it from being able to render good-faith, accurate, technically proper appraisals in conformity with the standards required in the profession;

l. That Defendants possessed internal reports concluding that if a Plaintiff took a loan from Defendants, that Plaintiff would suffer material losses, including but not limited to the loss of substantial equity;

m. That Defendants knew their scheme would cause a liquidity crisis that would devastate home prices;

n. That Defendants were no longer making loans based on a borrower's qualifications or their ability to afford such a loan and that those ideas were now unimportant to them, but were instead making loans without regard for a borrowers qualifications or ability to afford simply to create sufficient product to sell to investors on the secondary market for profit;

o. That Defendants *knew* Plaintiff-borrowers could not afford the loans they were being placed into and which they knew Plaintiffs would default upon to a mathematical *certainty*, but intentionally placed them into these impossible loans nonetheless in the name of making profit;

p. That Defendants actively concealed the material terms of their loans from their borrowers, including but not limited to the fact a borrower was *certain* to defer interest under an Option ARM loan by making the minimum payment in aims of inducing borrowers to sign a loan they would not have otherwise accepted, so once again Defendants could make a profit by selling such loans;

q. That Defendants were no longer making loans based upon the profitability of their mortgage lending business (but rather instead upon the profitability of sales of these loans to investors and secondary markets);

r. That because of this profitable scheme and because their loans were insured, Defendants stood to profit regardless of whether their loans

**FIRST AMENDED COMPLAINT**

performed and as such had no incentive to insure that borrowers were actually qualified for (or could make payments on) the loans into which they were being placed – in fact they had a disincentive to do so;

s. That because Defendants were selling their loans to investors rather than holding their loans, Defendants had no incentive to insure that the borrowers were actually qualified for (or could make payments on) the loans into which they were being placed – in fact they had a disincentive to do so;

t. That Defendants were in fact dependent on selling loans it originated into the secondary mortgage market, to sustain its business;

u. That Defendants were making loans simply to create sufficient product to sell to investors for profit;

v. That Defendants had ceased acting as conventional money lenders and had, instead, morphed into an enterprise engaged in systematic fraud on all of its material constituencies, including Plaintiffs;

w. That Defendants had ceased acting as conventional money lenders who carried their own risk and turned profit through the production of low-risk loans, and instead morphed into a loan conveyor belt, packaging loans with little if any regard for their underwriting standards, and selling those loans at extravagant profit to investors on the secondary market to whom the risk would be passed on, through fraud and misrepresentation – a business enterprise vastly more profitable than the business model of being a conventional money lender;

x. That in furtherance of this scheme, Defendants had in fact abandoned their conventional lending business and prudent lending standards, consistently lending to those who were grossly under-qualified;

y. Defendants knew these loans were unsustainable for themselves and the borrowers and to a certainty would result in a crash that would destroy the

**FIRST AMENDED COMPLAINT**

equity invested by Plaintiffs and other of Defendants' borrowers;

z.  Defendants, their officers and employees internally referred to these loans as "Sacks of Shit";

aa. Defendants knew the sheer scope of their loan portfolio and fraudulent packaging of the portfolio would cause a liquidity crisis that would devastate home prices and gravely damage Plaintiffs;

bb. Defendants knew Plaintiffs would be materially and substantially harmed by contracting with Defendants;

cc. Defendants knew their business model was simply unsustainable;

dd. Defendants' pursuit of a matching strategy in which it matched the terms of any loan being offered in the market, even loans offered by primarily subprime originators dangerously placed borrowers into loans regardless of whether or not they were actually qualified for the loan or could actually afford the loan, instead ceding their underwriting guidelines to whoever was the most lax lender at the time, regardless of whether or not *that* lenders guidelines were proper, safe, negligent or even dangerous or guided by reason;

ee. The high percentage of loans it originated that were outside its own already widened underwriting guidelines due to loans made as exceptions to guidelines;

ff. Defendants' definition of "prime" loans included loans made to borrowers with FICO scores well below any industry standard definition of prime credit quality;

gg. The high percentage of Defendants' subprime originations that had a loan to value ratio of 100%; and

hh. Defendants' subprime loans had significant additional risk factors, beyond the subprime credit history of the borrower, associated with increased default rates, including reduced documentation, stated income,

piggyback second liens, and LTVs in excess of 95%.

198.   Defendants knew this negative information from numerous reports they regularly received and from regulators and presentations prepared by Defendants' risk assessment officers.  Defendants nevertheless concealed this negative information from the public, including Plaintiffs.

199.   The Plaintiffs did not know the concealed facts.

200.   In addition to said concealments, Defendants, hand-in-hand with one another, further stated numerous half-truths and made partial representations (through Defendants' securities filings, speeches, advertisements, public utterances, websites, brokers, loan consultants, branches, communications with clients, and other media) calculated to deceive Plaintiffs and to create a substantially false impression. By making such partial misrepresentations, Defendants incurred a duty to speak the whole truth such that Defendants did not conceal any facts which would materially qualify those stated. Such **partial misrepresentations** include:

      a.   Representations calculated to make a borrower believe that his or her payment would only be X dollars, when in reality such payment was only available for a limited undisclosed period of time and would then drastically increase;

      b.   Representations that a borrower could afford payments under their loan, calculated to make a borrower believe that the loan payment would always be constant, but made knowing that the such payments would later drastically increase and knowing that the borrower would be *unable* to afford such increased payments;

      c.   Representations that a borrower qualified for a loan, when in reality the borrower's qualification was only obtained through Bank Defendants' falsification of the borrower's income, asset and other documentation, done without the borrower's knowledge;

d. Bank Defendants' intentional publication and dissemination of their underwriting guidelines intended to create the perception that Defendants lent in conformity with those guidelines and that their lending standards were safe, when in reality Defendants had abandoned their underwriting guidelines and were issuing loans which they knew were in unsafe;

e. Representations made by Bank Defendants that a borrower *qualified* for a loan (oftentimes based on documents falsified by Defendants) calculated to induce the borrower's belief they could *afford* their loan, when in reality Defendants knew borrowers would be unable to afford their loan as a matter of fact (oftentimes because Defendants had falsified their income and asset documentation as well as abandoned their own underwriting guidelines);

f. Representations by Bank Defendants to a borrower that his payment would cover both principal and interest, and calculated to induce the borrower to believe that his or her payment would always cover principal and interest, when in reality that same payment would no longer cover any principal after a very short period of time, and indeed would not even cover the minimum interest on the loan resulting in deferred interest;

g. Representations that by making the minimum payment of an Option ARM loan, a party *may* defer interest (aka "negatively amortize"), when in *reality* by making the minimum payment a party was *certain* to defer interest. As the California Court of Appeals in *Boschma* put it, a disclosure of what may happen, is not a sufficient disclosure of what will happen;

h. The provision of an intentionally ambiguous Truth in Lending Disclosure ("TILDS") Payment Schedule which did not make it clear that borrowers could have avoided negative amortization (under an Option ARM loan) by making payments larger than those that were mandated by the payment

schedule, in fact the payment schedule created the materially false impression that by following the recommended payment schedule, Plaintiff borrowers would not negatively amortize their loan;

i. Other partial misrepresentations and half-truths calculated to induce the borrower to fundamentally misunderstand the nature of their loan, such that Plaintiff-borrowers would agree to a loan they would not have otherwise agreed to, such as the meaning of a pre-payment penalty, or whether they had a pre-payment penalty.

201. Defendants intended to deceive Plaintiffs and induce their reliance, by intentionally failing to disclose the above concealments. This deception was essential to their scheme to make extravagant profit by packaging and reselling these loans on the secondary market.

202. Plaintiffs did in fact rely on each of the aforementioned concealments in deciding to contract with Defendants

203. Plaintiffs reasonably and foreseeably relied upon the deception of Defendants in deciding to enter into a mortgage contract with Ally Defendants - Defendants were among the nation's leading providers of mortgages. It was highly regarded and by dint of its long-term campaign of deception through securities filings, press releases, public utterances, web sites, advertisements, brokers, loan consultants and branch offices, Bank Defendants had acquired a reputation for performance and quality underwriting.

204. Moreover, as consumers unfamiliar with the myriad intricacies, terms and mathematics of mortgages (such as amortization calculations, negative amortization, loan recasting, front and back end debt to income ratios, indices, margins, ad nauseum), it was both reasonable and foreseeable (if not entirely intended) that Plaintiffs would rely on the advice of loan professionals and bank representatives (many of whom held the title "Loan CONSULTANT") trained to understand the highly-complicated terms and mathematics of the mortgage world, in deciding to contract with Defendants. The same is true of

appraisals. It is reasonable and foreseeable that a consumer would rely upon an appraisal arrived at by a professional appraiser – particularly in light of their complicated nature. Plaintiffs did in fact rely on the representations and concealments of these parties.

205.   In reliance on the above concealments and/or material misrepresentations, Plaintiffs entered into mortgage contracts with Defendants they otherwise would not have entered into and as a result thereof were damaged. This damage was not only foreseeable by Defendants, but actually foreseen (and then concealed) by them.

206.   The unraveling of Defendants' scheme has caused the material depression of real estate values throughout California, including the real estate of Plaintiffs herein.

207.   Defendants expected that the deteriorating quality of the loans that Bank Defendants were writing, and the poor performance over time of those loans, would ultimately curtail Bank Defendants ability to sell those loans in the secondary mortgage market and/or to purchase credit default swaps as hedges.

208.   Defendants knew that within a foreseeable period, its investors would discover that Defendants' borrowers could not afford their loans and the result would be foreclosures and economic devastation.

209.   Despite their awareness of and concerns about the increasing risk the Defendants were undertaking, they hid these risks from the Plaintiffs, borrowers, potential borrowers, and investors.

210.   The unraveling of the Defendants' scheme has materially depressed the price of real estate throughout California, including the real estate owned by the Plaintiffs, resulting in losses to the Plaintiffs.

211.   As a proximate result of the foregoing concealments and/or misrepresentations made by Defendants, California property values have precipitously declined and continue to decline, gravely damaging Plaintiffs by materially reducing the value of their primary residences, depriving them of access to equity lines, second mortgages and other financings previously  available based upon ownership of a primary residence in California, in numerous instances leading to payments in excess of the value

of their properties, thereby resulting in payments with no consideration and often subjecting them to reduced credit scores (increasing credit card and other borrowing costs) and reduced credit availability.

212.   Furthermore Plaintiffs were damaged in having their home values artificially inflated by Defendants.

213.   The hyper-inflated property values resulting from Defendants' inflated appraisals and market-fixing scheme directly caused Plaintiffs to pay a substantially higher price for their home than they would have otherwise, and then their home was truly worth at the time. The additional amounts Plaintiffs were forced to pay above and beyond the true uninflated value of their property at the time of purchase, constitutes damage to Plaintiffs directly caused by Defendant's scheme. The damage didn't end there however - the unraveling of Defendants' scheme sent the market into a downward spiral, causing Plaintiffs' home value to plummet *much below the true value* of the property at the time of purchase. These two losses in sum constitute Plaintiffs' loss of equity, and can be determined by subtracting the current depressed value of Plaintiffs' property from the artificially inflated price they were forced to purchase it for. Even for those Plaintiffs who did not purchase their property, but rather refinanced it, the demise of Defendants' scheme drove the value of their property far below its original purchase price, once again resulting in the loss of substantial equity;

214.   Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages arising from this Cause of Action also include loss of equity in their houses, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

215.   To this day, the Defendants profess willingness to modify Plaintiffs' loans in accordance with law, but nonetheless they persist to this day in their secret plan to deprive Plaintiffs of their rights.

216.   As a result of the foregoing, Plaintiffs' damages herein are exacerbated by a continuing decline in residential property values and further erosion of their credit records.

217.   Defendants' concealments and misrepresentations, both as to the their scheme to profiteer from the mortgage melt-down and as to their purported efforts to resolve loan modifications with Plaintiffs, are substantial factors in causing the harm to Plaintiffs described in this Complaint.

218.   Defendants acted outrageously and persistently with actual malice in performing the acts alleged herein and continue to do so.  Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum according to proof and to such other relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein

219.   These frauds and concealments were unknown to all Plaintiffs referenced herein at the time of loan origination.  All Plaintiffs herein discovered these frauds and concealments beginning no more than 3 years prior to the date of filing this action.  A reasonable person would have been unable to reasonably discover said frauds any earlier.

## SECOND CAUSE OF ACTION

### (*By All Plaintiffs – Intentional Misrepresentation – Against All Defendants*)

220.   The preceding paragraphs and subsequent causes of action are hereby incorporated by reference as though fully set forth herein.

221.   **IN ADDITION TO THE ALLEGATIONS MADE THROUGHOUT THIS COMPLAINT, WHICH APPLY TO ALL PLAINTIFFS (EXCEPT WHERE OTHERWISE NOTED), <u>APPENDIX "A"</u> ("INDIVIDUALIZED PLAINTIFF ALLEGATIONS") PROVIDES INDIVIDUALIZED ALLEGATIONS AS TO EACH AND EVERY PLAINTIFF IN THIS ACTION AND THE SPECIFIC WRONGS DONE BY EACH DEFENDANT.**  By this reference, Plaintiffs hereby incorporate Appendix "A" to this Complaint.

222.   In addition to the aforementioned partial misrepresentations and half-truths, Defendants, hand in hand with one another, **intentionally and affirmatively misrepresented** the following through Defendants' securities filings, speeches, advertisements, public utterances, websites, brokers, loan consultants, branches, and communications with clients and other media:

a. That Plaintiffs would be able to *afford* the loans they were being given;

b. That Defendants' calculations confirmed that Plaintiffs will be able to afford the loans they were being given;

c. That Defendants calculations confirmed that Plaintiffs would be able to shoulder the additional debt resulting from Defendant's loans, in light of Plaintiffs' other debts and expenses;

d. That the term "qualify" was synonymous with being able to "afford" a loan.

e. That by paying the minimum payment on the Option ARM loan they would not be deferring interest (aka "negatively amortizing"), when in reality, they would be deferring interest;

f. That by paying the minimum payment on the Option ARM loan, Plaintiffs would be paying principal and interest, when in reality the minimum payment did not pay down any principal, and actually resulted in deferred interest (aka negative amortization);

g. That the value arrived at by Defendants' appraisals of Plaintiffs' property was indeed the true value of Plaintiffs' property (when in reality Defendants appraisals' were intentionally and artificially inflated, and moreover when Defendants had engaged in a systematic price fixing scheme which had already falsely inflated the value of Plaintiffs' property);

h. That the value arrived at by Defendants' appraisals of Plaintiffs' property was sufficient to justify the size of the loan they were being given (when

**FIRST AMENDED COMPLAINT**

internally Defendants were inflating appraisal values and knew that the values being used did not justify the size of the loans being placed on the property, and moreover that Defendants knew such valuations would inevitably result in the home going "upside" down followed by inevitable default);

i. The true terms of the their loans, including their interest rate, the terms of their loans, whether the loan was variable or fixed, the duration of any fixed period, and the inclusion of a prepayment penalty;

j. That Defendants only entered into mortgages with qualified borrowers (when in reality Defendants were recklessly and intentionally ignoring their own underwriting standards, and offering mortgages to substantially under-qualified borrowers, including Plaintiffs herein who they knew could not afford their loans);

k. That Defendants were financially sound (when in reality Defendants were dependent on selling their fraudulently-pooled loans to investors and the secondary market to sustain their business);

l. That Defendants held their loans in their own portfolio and did not sell them on the secondary market (when in reality Defendants sold the overwhelming majority of their loans on the secondary market);

m. That Defendants were engaged in lending of the highest caliber. (when in reality Defendants (1)were disregarding industry standard quality assurance and underwriting guidelines as well as their own underwriting guidelines, (2)had ceded their underwriting guidelines to the bottom of the market by virtue policy to match loans of any other lender no matter how unsafe, and (3) were lending to under qualified borrowers upon properties which were intentionally overvalued – all in the name of making as much money on the secondary/investor market as quickly as possible);

n. That the loans they offered were safe and secure (when internally Defendants and their officers were referring to their loans as "SACKS OF SHIT");

o. That Plaintiffs and other borrowers were qualified for the loans Defendants were placing them into and that Plaintiffs were capable of affording the fully amortized payments on those loans (when internally Defendants knew that Plaintiffs were not qualified, that Plaintiffs could not afford the loan, and that, in many instances, it was a mathematical inevitability that the Plaintiffs would default);

p. That Plaintiffs would be able to refinance their loans at a later date (when internally Defendants knew that Plaintiffs would not be able to refinance Plaintiffs as a result of the depressed real estate market created by Defendants, the overvaluation of Plaintiffs' property, the damage to Plaintiffs' credit score which defendants knew would ensue, and for the many reasons already set forth above);

q. Defendants would modify Plaintiffs' loans (when in fact Defendants did not modify Plaintiffs' loans, had no intentions to do so, and it was more profitable for Defendants to leave the loans unmodified).

r. Finally, HLCS, as the wholly-owned subsidiary of Ally, intentionally misrepresented the appraised values of Plaintiffs' subject properties, at the direction and behest of the conspiracy of Defendants, in order to (1) manipulate and fix real estate values throughout California (as described in Paragraph 64-83 of this Complaint, entitled "The Fraudulent Appraisal Process") and (2) falsely assure Plaintiff's that the properties they were purchasing were indeed worth what they were paying for it, thereby inducing Plaintiffs' reliance to enter into a loan contract with Bank Defendants

***Authority to Bind***

2   223.   These representations were not made as statements of opinion, but as

3   statements of fact, made by the employees and agents of Defendants charged with the

4   duty of originating loans ("**Loan Representatives**") and who were specifically employed

5   by Defendants to walk Plaintiff borrowers through the loan process, and vested with the

6   authority, both apparent and actual, to bind Defendants.

7   224.   These Loan Representatives were charged with the duties of educating

8   borrowers about the loan process, the various type of loans from which they could

9   choose, the payments that would result for each given type of loan, the pros and cons of

10  each loan, how each loan would amortize, providing truth in lending disclosures, offering

11  interest rate quotes, cost quotes, point quote, and APR quotes, and running all the various

12  payment calculations and debt to income calculations.  These Loan Representatives were

13  also charged with properly taking each borrower's loan application, as well as the loan

14  application fee and/or ensuring the accuracy of each loan application filled out, and

15  collecting and analyzing documentation relating to each borrower's income, job stability,

16  assets, creditworthiness, outgoing debt, as well as collateral as well as giving the

17  necessary Truth in Lending disclosures required under law.

18  225.   These Loan Representatives were charged with the duty of quarterbacking

19  the entire loan process from start to finish, including initiating escrow, acquiring title

20  reports and initiating title insurance,  obtaining the loan application from the borrower (or

21  in Defendants' case falsifying the loan application on behalf of the borrower),  collecting

22  any and all fees due (such as appraisal fees and application fees) collecting necessary

23  documents (such as paystubs, tax statements, w2's, schedules of real estate owned, etc

24  etc), regularly interfacing between Defendants' underwriting department and each

25  borrower to make sure the loan gets approved, coordinating the appraisal and appraisal

26  dates,  rendering estimated HUD or HUD-1 disclosures, through loan document printing,

27  loan signing side by side with a notary, to loan funding, and post-funding issues.

28

226.   It was through these Loan Representatives, *and only through these Loan Representatives*, that borrowers (Plaintiffs herein) came to understand exactly what the bank wanted from them, and whether the bank was going to give them a loan, and on what grounds the loan was going to be granted. Each and every one of these Loan Representatives was vested by the respective bank they work for – the bank/lending institution from which a Plaintiff got his/her loan – with both actual and apparent authority to bind that bank/lending institution.  These Loan Representatives were the *sole* interface between the bank/lending institution and the customer/borrower/plaintiff. Defendant banks very much intended to create the distinct perception that the representations made by these Loan Representatives, were factual representations coming directly from the  bank, and representations upon which the borrower Plaintiffs could reasonably rely, well above-and-beyond that of mere opinion.

227.   Specifically, with regard to subparagraph "(f)", above, the representation made by Defendants to Plaintiff borrowers, that they could "afford" the loans they were being given were statements delivered as statements of fact upon which Plaintiffs could reasonably rely, particularly in light of the specialized expertise of the Defendant employees who made the statements.  These employees spend months and years, undergoing specialized education, to learn the highly complicated mathematics of lending such as loan amortization, loan re-casting, front end debt to income ratios, back end debt to income ratios, and  loan to value ratios – mathematics which borrowers simply don't understand, nor could they be expected to. Because of their vastly superior knowledge, and because of the actual and apparent authority vested in these employees by the Defendant Banks, as described above, Plaintiffs herein reasonably relied on these statements. By making these false and misleading statements, they incurred a duty to be truthful.

//

//

//

**FIRST AMENDED COMPLAINT**

228.   The difference between the term "qualified" and "afford" is a palpable one in this case.

229.   Even despite this difference, it is important to understand that a bank's qualification process is by its very nature designed to measure a borrower's ability to *afford* a loan.

230.   In determining whether a borrower is "qualified" for a loan, banks, including Defendant Banks, use two principal metrics known as **"front-end"** debt to income ratio, and "**back end**" debt to income ratio – both of which are intended to measure a borrower's ability to afford their loan.

231.   A **"front end"** debt to income ratio compares ONLY the loan payment (as well as taxes and insurance) to a person's income, and does not take into account any other debt whatsoever. For example a person who makes $10,000 per month, and whose mortgage costs $3,000 per month (including tax and interest), has a "front end" debt to income ratio of 30%.

232.   A **"back end"** debt to income ratio, by contrast, takes into account not only a person's loan payment (as well as taxes and insurance) but also *all other* debt reflected on their credit report. If that same person used in the example above, also had an additional $4,000 in monthly expenses such as credit card debt, car loans/payments, other mortgages, student debt, etc. etc., then that person's "back end" ratio would be 70%. ($3,000 per month for her loan, taxes & insurance plus, $4,000 per month for other debts = $7,000 per month in debt. $7,000 of debt divided by $10,000 in monthly income equals, 70% "back end" debt to income ratio).

233.   Industry Standard and Conventional Underwriting guidelines, including those used by Defendants herein, required that loans with a "front end" debt to income ratio higher than **35%** be rejected. They also required that loans with a "back end" debt to income ratio of higher than **45%** be rejected – and that 45% figure was on the on the

*very* high end. For a loan with a 45% "back end" debt to income ratio to be approved, a borrower had to have excellent credentials in all other areas such as 720+ median credit score and high liquid asset reserves totaling more than 12 months of their ). In other words, Defendant Banks would not approve borrowers whose loan payment was more than 35% of their total monthly income, or whose total outgoing monthly debt as reflected on their credit report (including the loan payments) was more than 45% of their total monthly income.

234.    Intuitively, these two figures seem low. The typical lay borrowers ask "why are these figures so low? Clearly, I'm able to afford a larger loan if I still have **55%** (100% - 45% back end ratio) of my income available to me, after I've paid all my other debts, to pay for that larger loan**." And therein lies the fundamental problem.** Borrowers, because of their lack of knowledge, simply don't understand that, in fact, they **cannot** afford more. They often overestimate themselves.  By contrast, Banks have made a science of understanding exactly how much a borrower can afford, dedicating millions of dollars, hiring teams of expert statisticians, and spending years formulating underwriting guidelines, predicated on 100's of years of prior underwriting acumen, all to craft underwriting guidelines which reflect what appears to be a deceptively simple question – how much debt can a borrower realistically shoulder without imperiling themselves or their ability to pay back their loan?  It is through their detailed efforts that Banks have settled upon the 35% front-end and 45% back-end debt-to-income ratios as a realistic measure of what borrowers can afford.

235.    The answer to the above question ("why are these figures so low?") is that banks, unlike borrowers, have recognized through their detailed research, that borrowers simply cannot *afford* a loan unless they are left with at least 55% of their income (after having paid their mortgage payment as well as all the other debt reflected on their credit report)  to account for life's myriad non-credit reported expenditures such as emergency expenditures, unexpected events,  non-credit reported debts, as well as one-time (non-recurring) expenses, including: **health care, medical emergencies, educational**

**expenses/tuition, food, water, electricity, catastrophic & natural disasters, emergency home repairs, medication, doctor's bills, medical insurance, car payments, fuel, auto insurance, phone bills, internet, medication– these items are even more expensive if a borrower has children**. And this is before even turning to the discussion of a borrower's need set money aside for their savings and/or retirement.

236.    In other words the term *afford* as used herein describes a borrower's ability to shoulder the additional debt burden resulting from the subject loan, in light of the **numerous** other real-life demands placed on that borrower's income such as their…

237.    **Credit-reported debts** (i.e. credit card debt, car loans/payments, other mortgages or financing, installment debt student debt, etc. etc);

238.    **Non-Credit Reported Expenses/Debt** (i.e. health care, medical emergencies, educational expenses/tuition, food, water, electricity, catastrophic & natural disasters, emergency home repairs, medication, doctor's bills, medical insurance, car payments, fuel, auto insurance, phone bills, internet, medication)

239.    Real world need to set aside some of their income into a savings account, such that they are not living month to month.

240.    Thus, the back-end debt to income ratio is a measure of a borrower's ability to afford their loan which takes into account that borrowers have great demands placed on their money outside of their credit reported debts – demands which borrowers typically fail to account for or demands which, because of their lack of expertise, borrowers are not as cognizant of, as banks are.

241.    Moreover, a Bank's qualification/underwriting process is also meant to temper borrowers who overestimate themselves or their ability to pay back/afford their loan.

242.    Because Defendant Banks have seen the pitfalls associated with the loans of *hundreds of thousands* of borrowers, unlike borrowers who only know the pitfalls of their own solitary loan,  and because banks enjoy the benefit of  100's of years of underwriting acumen, unlike borrowers who enjoy no such benefit,  banks are substantially better

**FIRST AMENDED COMPLAINT**

positioned to understand the myriad expected and unexpected demands placed on a borrower's income which would jeopardize a borrower's ability to afford the additional debt burden resulting from a loan.  Thus, banks, unlike borrowers, are intimately familiar with how much a borrower is truly capable of affording. The sum result of their detailed studies, established underwriting principles, and statistical analysis is that a borrower would be imperiled and likely to default on his loan if their loan payment exceeds more than 35% of their total income (front end), and that a borrower's loan payments in combination with their credit-reported debts cannot exceed more than 45% of their income (back end). And for that reason, they have made back end and front end debt to income ratios - which are intended to measure a borrower's ability to *afford* a loan - a cornerstone element of their qualification process.

243.   In sum, then, by its own nature Defendants' qualification process is intended to measure whether a borrower can truly *afford* the loan they're being given.

244.   Yet even despite the fact that the qualification process is implicitly predicated on the notion that a borrower can afford the loan, Defendants went one step further, and **affirmatively and explicitly** (mis)represented to Plaintiffs that they would be able to *afford* the loans that they were being given. In part, if not in whole, Defendants did this in order to assuage Plaintiffs of rightful concerns regarding their ability to shoulder the additional debt burden caused by taking on the loan – and Defendants did so in an attempt to induce Plaintiffs into accepting financing so that the Loan Representatives could make their commission, and so that Defendant Banks could make their money by selling the loan on the secondary market for profit.

245.   Specifically, Plaintiff Borrowers in this action were explicitly told by Defendants and their employee Loan Representatives that they could *afford* the loans they were being given, and that they need not worry about whether they would be able to shoulder the additional debt burden. Defendants told Plaintiffs that their calculations show that the Plaintiffs will be able to afford their loans and comfortably shoulder the additional debt from the loan, when taking into account all of Plaintiffs' other monthly

debt. These statements were not offered as statements of opinion, but rather as outright statements of fact.

246.    More specifically, the Plaintiff-borrowers in this action were told by Defendants and their employee Loan Representatives that they would be able to comfortably afford the fully amortized payments under the loan, or in some instances they were told that they would be able to comfortably afford the payments on the loan, but Defendants failed to additionally disclose that the initial payments were not the permanent payments on the loan, or that those payments would drastically increase in the future, and that the Plaintiffs would not be able to afford such drastically increased payments.

247.    In fact in many instances, Plaintiffs were additionally told by Defendants that a determination that they were qualified indeed meant, and was synonymous with, that Plaintiffs could in fact *afford* their loans.

248.    As Plaintiffs' counsel continues to survey Plaintiffs and collect information regarding their reliance upon Defendants' misrepresentations, Plaintiffs will seek leave to amend to allege such supplemental allegations.

249.    For all of the reasons already listed, all of the above-listed material misrepresentations were, in fact, false.  Defendants were not financially sound; Defendants did not hold their loans in their own portfolio but rather sold them on the secondary market; Defendants were not engaged in lending of the highest caliber, but quite the contrary;  the loans offered by Defendants were anything but safe and secure; Defendants did not refinance Plaintiffs loans  at a later date ; Defendants did not modify Plaintiffs' loans; Plaintiffs and other borrowers were not qualified for the loans Defendants were placing them into;  Plaintiffs were not capable of affording the fully amortized payments on those loans as represented by Defendants;  Plaintiffs and other borrowers' homes were falsely valued at inflated sums in order to place Plaintiffs into larger loans; Defendants did not utilize a quality underwriting process; and Defendants regularly entered into mortgages with grossly under-qualified borrowers.

250.    The campaign of misinformation described throughout this complaint and in the First Cause of Action was intended to be repeated and broadly disseminated through the media, analyst reports and individual communications, and it was.  It was intended to become part of the well-understood "givens" among homeowners and prospective homeowners seeking mortgages, and it was.  The campaign of disinformation and the manifestation of that campaign described in the preceding paragraphs of this Second Cause of Action succeeded.  Plaintiffs relied upon the misrepresentations and entered into mortgages with Defendants.

251.    The misrepresentations were made with the intention that Plaintiffs rely thereon.  It was important to Defendants that Plaintiffs rely on its misrepresentations so that Plaintiffs would come to a false understanding as to the nature of their business.  The foregoing misrepresentations were specifically intended to convince Plaintiffs to enter into mortgages with Bank Defendants.

252.    In reliance on the above concealments and/or material misrepresentations, Plaintiffs entered into loan contracts with Defendants they otherwise would not have entered into and as a result thereof were damaged. This damage was not only foreseeable by Defendants, but actually foreseen (and then concealed) by them.

### *Plaintiffs' Reasonable Reliance*

253.    Plaintiffs reasonably and foreseeably relied upon the deception of Defendants in deciding to enter into a mortgage contract with Ally and Bank Defendants – Ally and Bank Defendants were among the nation's leading providers of mortgages.  It was highly regarded and by dint of its campaign of deception through securities filings, press releases, public utterances, web sites, advertisements, brokers, loan consultants and branch offices, Bank Defendants had acquired a reputation for performance and quality underwriting.  Furthermore, Ally, through its advertisements had cultivated a reputation of trustworthiness and that Ally worked in the interests of their client borrowers, and not just in its own interests.  (See Ally's ads - "We make money with you, not off you" -

http://www.businessinsider.com/ally-bank-print-ad). Again for these reasons, Plaintiff-borrowers' reliance was reasonable.

254.   By reason of Ally's prominence and long term campaign of deception as to its business plans and the relationship of trust developed between each of the Defendants and Plaintiffs, Plaintiffs were justified in relying upon Defendants' representations.

255.   Moreover, as consumers unfamiliar with the myriad intricacies, terms and mathematics of mortgages, it was both reasonable and foreseeable (if not entirely intended) that Plaintiffs would rely on the advice of loan professionals and bank representatives (many of whom held the title "Loan CONSULTANT") trained to understand the highly-complicated terms and mathematics of financing, amortization, indices, margins, and collateralization in the mortgage world, in deciding to contract with Defendants.

256.   Further, the fundamental advisory role that a lender takes in a lender-borrower relationship is also grounds for a borrower's reasonable reliance on their statements and advice. The reality is that borrowers simply don't understand the highly complicated mathematics of lending such as amortization, loan re-casting, loan to value ratios, or debt to income ratios, etc. Nor could they be expected to – those mathematics require specialized training and education. The borrower's knowledge is inferior. Teams of highly trained underwriters spend weeks determining whether a borrower can handle their loan. How can it be expected that a single lay-borrower can do the same? It is *frequently* the case that a borrower walks into a lender's office and asks the loan consultant "how much can I afford?"   Because of the vast imbalance of knowledge, when a loan consultant tells a borrower that they can afford their loan, borrowers *<u>believe</u>* that – they rely on their lender's knowledge. Though banks might not like to acknowledge it, that *is* the reality – and facts establishing this reality can be readily established at trial through testimony and otherwise. For these very same reasons, a lenders duty to be truthful is implicated as well.

**FIRST AMENDED COMPLAINT**

257. The same is true of appraisals. It is reasonable and foreseeable that a consumer would rely upon an appraisal arrived at by a professional licensed appraiser – particularly in light of their *complicated* and highly fact sensitive & contextual nature - particularly where, as here, the appraisers were held out as being employed and/or contracted by Ally and Bank Defendants; Borrowers believed that Bank Defendants, by virtue of its reputation would only work with scrupulous, professional, and ethical appraisers. Additionally, the appraisers delivered their valuations and appraisals as statements of fact, not as statements of opinion. Moreover Bank Defendants ratified the statements and values offered by their appraisers by communicating to Plaintiffs that the values arrived at by their appraisers were in fact the true values of their properties/homes. Plaintiffs did in fact rely on the representations and concealments of these parties.

258. Plaintiffs did in fact rely on the representations and concealments of these parties.

259. As a result of Defendants' scheme described herein, Plaintiffs could not afford their mortgage when its variable rate features and/or balloon payments kicked in or its introductory rate expired. In fact, because of Defendants' deception, many Plaintiffs were placed into loans they could not even afford from outset of the loan. Further, as a result of the Defendants' scheme, Plaintiffs could not refinance or sell their residence without suffering a massive loss of their equity investments.

260. As a result of the foregoing, Plaintiffs have lost all or a substantial portion of the equity invested in their houses and suffered reduced credit ratings and increased borrowing costs, among other damages described herein.

261. Bank Defendants represented to multiple Plaintiffs that they would be assisted by Defendants in a loan modification. As described herein, that representation was false. Defendants knew that representation was false when they made it.

262. Because of new laws pertaining to loan modifications and Defendants' insistence that they had a genuine interest in complying therewith and in keeping borrowers in their homes, Plaintiffs reasonably relied on the representations.

263.   By delaying Plaintiffs from pursuing their rights and by increasing Plaintiffs' costs and the continuing erosion of each Plaintiff's credit rating, each Plaintiff's reliance harmed that Plaintiff. .

264.   As a proximate result of the foregoing concealments and/or misrepresentations made by Defendants, California property values have precipitously declined and continue to decline, gravely damaging Plaintiffs by materially reducing the value of their primary residences, depriving them of access to equity lines, second mortgages and other financings previously available based upon ownership of a primary residence in California, in numerous instances leading to payments in excess of the value of their properties, thereby resulting in payments with no consideration and often subjecting them to reduced credit scores (increasing credit card and other borrowing costs) and reduced credit availability.

265.   Furthermore Plaintiffs were damaged in having their homes values artificially inflated by Defendants. Specifically, since down payments are calculated as a percentage of the home value, by over valuating the loans, Defendants were also required to place larger down payments. Defendants knew Plaintiffs would lose their down payments as a result of the fact that Defendants were intentionally placing borrowers into loans for which they were unqualified, (2) the loan products they were being placed into were unsustainable (3) the financial meltdown Defendants knew their actions would cause, (4) for the sake of brevity, for all reasons already mentioned herein.

266.   Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages arising from the matters complained of in this Cause of Action also include loss of equity in their houses, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

267.   Plaintiffs' reliance on the representations made by Defendants was a substantial factor in causing Plaintiffs' harm.

**FIRST AMENDED COMPLAINT**

268. Furthermore, Plaintiffs' reliance on the misrepresentations of the HCLS all directed and ratified by the Ally and Bank Defendants, was a substantial factor in causing Plaintiffs' harm.

269. Plaintiffs are entitled to such relief as is set forth in this Cause of Action and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

270. These frauds and concealments were unknown to all Plaintiffs referenced herein at the time of loan origination. All Plaintiffs herein discovered these frauds and concealments beginning no more than 3 years prior to the date of filing this action. A reasonable would have been unable to reasonably discover said frauds any earlier.

271. Specifically, Defendants repeatedly emphasized Defendants' underwriting quality in public statements from 2003 through 2008. With an incentive to bundle and sell large quantities of loans as quickly as possible, banks all over the country, including Defendants, became conduits for the securitization and sale of loans to Wall Street. The banking industry began to move away from the traditional model of "originate to hold" towards a new system of banks as loan-conveyor belts under the "originate to sell" model which eviscerated the incentives of a traditional lender to ensure quality loan production, instead replacing those incentives with an incentive to churn out as many loans as possible regardless of loan quality. Notably, the ease with which securitized mortgage products could be sold encouraged poor underwriting and guidelines which had been established to mitigate and control risk were often ignored.

## THIRD CAUSE OF ACTION

### (*By All Plaintiffs – Negligent Misrepresentation – Against All Defendants*)

272. All preceding and subsequent paragraphs are hereby incorporated by reference as though fully set forth herein.

273. **IN ADDITION TO THE ALLEGATIONS MADE THROUGHOUT THIS COMPLAINT, WHICH APPLY TO ALL PLAINTIFFS (EXCEPT WHERE**

OTHERWISE NOTED), __APPENDIX "A"__ ("INDIVIDUALIZED PLAINTIFF ALLEGATIONS") PROVIDES INDIVIDUALIZED ALLEGATIONS AS TO EACH AND EVERY PLAINTIFF IN THIS ACTION AND THE SPECIFIC WRONGS DONE BY EACH DEFENDANT.** By this reference, Plaintiffs hereby incorporate Appendix "A" to this Complaint.

274.   Although Defendants may have reasonably believed that some or all of the representations they made, as described in this Complaint, were true, none of them had reasonable grounds for believing such representations to be true at the time: (1) the representations were instructed to be made, as to those Defendants instructing others to make representations, or (2) at the time the representations were made, as to those Defendants making representations and those Defendants instructing others to make the representations, or (3) at the time the representations were otherwise ratified by the Defendants.

275.   Such representations, fully set forth in the Second Causes of Action and previous sections of this Complaint, were not true.

276.   Defendants intended that Plaintiffs rely upon those misrepresentations.

277.   As described herein, Plaintiffs reasonably relied on those representations.

278.   By reason of the prominence of Defendants and the campaign of deception as to its business plans and the relationship of trust developed between Defendants and Plaintiffs, Plaintiffs were justified in relying upon Defendants' representations.

279.   As a result of relying upon the foregoing misrepresentations, each Plaintiff entered into a mortgage contract with Defendants.

280.   As a result of scheme described herein, Plaintiffs could not afford his or her mortgage when its variable rate features and/or balloon payments kicked in.  Further, as a result of the Defendants' continuing scheme, Plaintiffs could not refinance or sell his or her residence without suffering a loss of Plaintiff's equity.

281.   Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages as a result of the foregoing also include loss of equity in their houses,

costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

282.  Plaintiffs are entitled to such relief as is set forth in this Cause of Action and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

## FOURTH CAUSE OF ACTION

### (*By All Plaintiffs – Unfair Competition – Against All Defendants*)

283.  The preceding paragraphs and subsequent causes of action are incorporated by reference as though fully set forth herein.

284.  **IN ADDITION TO THE ALLEGATIONS MADE THROUGHOUT THIS COMPLAINT, WHICH APPLY TO ALL PLAINTIFFS (EXCEPT WHERE OTHERWISE NOTED), APPENDIX "A" ("INDIVIDUALIZED PLAINTIFF ALLEGATIONS") PROVIDES INDIVIDUALIZED ALLEGATIONS AS TO EACH AND EVERY PLAINTIFF IN THIS ACTION AND THE SPECIFIC WRONGS DONE BY EACH DEFENDANT.**  By this reference, Plaintiffs hereby incorporate Appendix "A" to this Complaint.

285.  As it pertains to Unfair Competition Law "the universal test is whether the public is likely to be deceived."  (Grant v. California Bench Co. (1946) 76 Cal.App.2d 706, 707-708.)

286.  As described in this Complaint, and here in this Cause of Action, Defendants have acted unlawfully, unfairly, and fraudulently. To say the least, their actions were likely to deceive the public.

287.  As detailed in the First and Second Causes of Action above (and hereby incorporated by reference), Defendants' fraud upon Plaintiffs was pervasive and multi-

pronged. Defendants' material misrepresentations and affirmative concealments, if left unchecked, are highly likely to deceive the public.

288. Defendants' actions in implementing and perpetrating their fraudulent scheme of inducing Plaintiffs to accept mortgages for which they were not qualified based on inflated property valuations and undisclosed disregard of their own underwriting standards and the sale of overpriced collateralized mortgage pools, all the while knowing that the plan would crash and burn, taking the Plaintiffs down and costing them the equity in their homes and other damages, violates numerous federal and state statutes and common law protections enacted for consumer protection, privacy, trade disclosure, and fair trade and commerce. In addition to being fraudulent and violates numerous federal and state statutes and common law protections enacted for consumer protection, privacy, trade disclosure, and fair trade and commerce.

289. These actions were immoral, unethical, oppressive, unscrupulous and substantially injurious to similarly situated borrowers, and Plaintiffs herein. Defendants' conduct had no utility other than for their own ill-gotten gain, and the harm was great not only to Plaintiffs herein, but also to residents of California, broadly, who have seen a decrease in their home and property values as a result of the bursting of the super-heated pricing bubble created by Defendants' fraudulently inflated appraisal; at the time of their fraud, Defendants *knew* that their conduct would cause the precipitous decline in property values throughout the State of California. Defendant's acts caused substantial consumer injury with no benefits to consumer competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants' intentional deceit, misrepresentation, and omission. Further, Defendants acts significantly threatened harm to competition.

290. The Defendants perpetrated their fraudulent scheme of selling off overpriced loans by making willful and inaccurate credit disclosures regarding Defendants' borrowers, including Plaintiffs, to third parties. This false credit disclosure was critical to the success of Defendants' continued sales of the massive pools of mortgage loans necessary to perpetuate the scheme. The Defendants were aware that if the true credit

profiles of the borrowers and the values of their real estate were accurately disclosed, the massive fraudulent scheme would end. As a result, the Defendants repeated, reinforced and embellished their false disclosures.

291.  Defendants had an unfair and fraudulent pattern on inducing and directing borrowers to fall behind on their payments with the promise that by doing so, they would become eligible for a loan modification. Relying on these representations, Plaintiffs fell behind on their loan payments, but were never offered a loan modification. In doing so, Plaintiffs' credit was substantially damaged, they suffered greatly diminished access to credit and financing, and were penalized with fees, penalties and charges in addition to becoming delinquent on their loan as recommended by the Bank. By recommending that Plaintiffs fall behind, Defendants effectively trapped Plaintiffs into keeping their loan with Defendants, because no other institution would help Plaintiffs after they became delinquent on their mortgage, or after their credit was destroyed.

292.  Defendants also had an unfair and fraudulent pattern of offering borrowers what appeared to be Loan modification offers (called "Trial Payment Plans"), but in reality these offers were nothing more than "cash grabs." Defendants never intended to permanently modify Plaintiffs' loans. Specifically, Defendants would offer Plaintiffs and homeowners who were already on the brink of default/foreclosure a lower payment called a "trial payment." Defendants promised that if Plaintiffs were able to make the trial payment for 3 (or more) months, Defendants would permanently modify Plaintiffs' payment to be the same amount under the trial payments. But Defendants had a pattern of rejecting these loan modifications despite Plaintiffs' compliance with every term of the loan modification offer. Instead Defendants would use the offer as bait to induce Plaintiffs to make payments which would never be applied to the principal and interest of their loan, but instead would be applied to the mountain of unmerited late charges, and fees, taking what little money the financially imperiled plaintiffs had left, and duping them into spending it on unfairly placed fees and late charges. Defendants never had any intent of modifying their loans, despite Plaintiffs' full compliance with the terms of the

offer. Such acts are patently unfair and fraudulent, and Plaintiffs are entitled to remuneration of all payments made under such trial payment plans, as well as an injunction prohibiting Defendants from this deceptive business practice. More specifically, Defendants' unlawful and unfair practices in this regard include, but are not limited to, the following:

a. failing to make good faith efforts to provide them with a loan modification and breaching their contractual obligations, written and implied promises, loan servicing functions owed to Plaintiffs, who fulfilled their obligations by making timely modified payments;

b. making false and/or misleading representations that Plaintiffs were eligible and entered into the trial modification period, which would lead to a permanent modification of their mortgage payment;

c. failing to disclose to Plaintiffs that their modified payments may be reported to credit bureaus as default or late payments that would destroy their credit scores;

d. delaying processing, demanding duplicate documentation, and failing to provide adequate information or communication regarding the loan modification programs to Plaintiffs; and

e. engaging in conduct that undermines or violates the spirit or intent of the consumer protection laws alleged in this Complaint

f. omitting to inform Plaintiffs that they could be rejected from the trial modification period at any point, and that this would result in the immediate demand for a balloon payment consisting of purported delinquency payments and substantial late fees, default fees, foreclosure fees, inspection fees, property preservation fees, trustee fees, trustee sale guarantee fees, mail fees, recording fees, and default servicing fees.

293. Regulation Z obligates creditors providing "closed-end credit" (such as a mortgage) to "make the disclosures required by this subpart clearly and conspicuously in

**FIRST AMENDED COMPLAINT**

writing, in a form that the consumer may keep." (12 C.F.R. § 226.17(a)(1) (2010).) "This standard requires that disclosures be in a reasonably understandable form. For example, while the regulation requires no mathematical progression or format, the disclosures must be presented in a way that does not obscure the relationship of the terms to each other." (12 C.F.R. § 226, Supp. 1, par. 17(a)(1).)

294. Variable rate mortgage borrowers must be provided with "[a] loan program disclosure" that includes "[a]ny rules relating to changes in the index, interest rate, payment amount, and outstanding loan balance including, for example, an explanation of interest rate or payment limitations, negative amortization, and interest rate carryover." (12 C.F.R. § 226.19(b)(2)(vii) (2010).) "If the initial interest rate will be a discount or a premium rate, creditors must alert the consumer to this fact." (12 C.F.R. § 226, Supp. 1 par. 19(b)(2)(v)(1).) "A creditor must disclose, where applicable, the possibility of negative amortization. For example, the disclosure might state, 'If any of your payments is not sufficient to cover the interest due, the difference will be added to your loan amount.' . . . If a consumer is given the option to cap monthly payments that may result in negative amortization, the creditor must fully disclose the rules relating to the option, including the effects of exercising the option (such as negative amortization will occur and the principal loan balance will increase). . . ." (12 C.F.R. § 226, Supp. 1 par. 19(b)(2)(vii)(2).)

295. The Defendants knew the borrowers' credit was inadequate to support continued loan payments, absent unsustainable inflation of property values. These pervasive false credit disclosures to third parties (including purchasers of bundled mortgage pool created by the Defendants) constituted false credit reports in violation of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.,* and these pervasive false disclosures permitted the Defendants to continue their scheme and victimize the Plaintiffs.

296. These pervasive false disclosures also caused the bubble to burst. Once it became known that some of the information provided by Defendants was false, the

market for the sale of bundled loans dried up. The Defendants began to issue foreclosure notices, property values began dropping, and then, under the weight of *deflation* in a market that requires *inflation*, the equity investments made by Plaintiffs and others in their homes was lost . . . and then Plaintiffs were lost in the greatest economic recession since the 1930s.

297.   As alleged by the SEC, this fraud also violated Federal law, including, without limitation,  the antifraud provisions and insider provisions of the Securities Act of 1933 ("*Securities Act*") and the Securities Exchange Act of 1935 ("*Exchange Act*") including, without limitation:

    a.  Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), by engaging conduct which acted as a fraud on the purchaser of securities based on collateralized mortgage pools;

    b.  Section 10(b) of the Securities Act and Rule 10b-5 thereunder, 15 U.S.C. § 78j(b) and 17 C.F.R. 240.10b-5, by making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading and/or otherwise engaging in acts, practices, or courses of business which operated as a fraud or deceit upon purchasers of securities based on collateralized mortgage pools; and

    c.  Section 13(a) of the Securities Exchange Act and Rules 12b-20, 13a-1 and 13a-3 thereunder, 15 U.S.C. § 78t (e), by filing with the SEC false information for the fiscal years 2005 through 2007.

298.   The foregoing violations were in furtherance of the fraud perpetrated on Plaintiffs. In fact, Defendants could not have told the truth in their public filings without that truth becoming known to Plaintiffs. Conversely, the false filings gave additional credence and support to omissions, concealment, promises and inducements.

299. Defendants violated the Patriot Act as described above by failing to adequately identify the source of funds used to fund mortgages and fund the securitization pools that purchased mortgages.

300. Defendants further violated by Patriot Act by failing to adopt procedures required thereunder as to the sources of funds and record-keeping pertaining thereto.

301. Defendants further violated the Patriot Act by failing to timely and accurately provide the disclosures required under the Patriot Act pertaining to its sources of funds, thereby depriving Plaintiffs and others of information pertaining possibly money laundering.

302. Defendants herein both in their individual capacity, and in their capacity as co-conspirators with one another and with HLCS (Ally's wholly-owned appraisal management company) have violated Cal. Civ. Code §1090.5 by improperly influencing appraisers through, among other things, compensation, coercion, extortion, bribery, intimidation of their appraisers, as well as the appraisal management company itself, and its management and executives, as described at length in the sixth cause of action below.

303. Defendants violated California common law by pursuing foreclosures through mere nominees, such as MERS, and without proof they owned the notes and deeds of trust underlying their foreclosure actions.

304. While processing the home loans of each Plaintiff herein, the Ally Defendants and other Defendants herein came into possession, custody and control of their Private Information.

305. The guarantee of privacy granted to each Californian is a special personal and property right. Other states may accord privacy rights by way of statute, or otherwise, but the privacy right in California is a unique, fundamental, Constitutional, and *inalienable* right that is also a protectable property interest. The privacy right granted by the California Constitution necessarily includes protection from the release of the Private Information.

306. By foreclosing on Plaintiffs without being "holders" or in possession of their respective Notes, Defendants unlawfully foreclosed on Plaintiffs without having the authority to enforce the debt in violation of UCC 3-301.

307. The Ally Defendants acknowledge and admit that their agents and/or employees disclosed the Private Information of Plaintiffs to outside persons.

308. This Private Information of Plaintiffs was sold or otherwise disclosed to third parties without Plaintiffs' consent, further violating Article I, § 1 of the California Constitution and the California Financial Information Privacy Act.

309. The Private Information was disclosed and then used unlawfully and fraudulently to apply for and receive multiple credit cards, charge accounts, and other credit from businesses in the mistaken belief that they were dealing with a Plaintiff, and not with an identity thief.

310. These undeniable disclosures by the Defendants of nonpublic personal information of the Plaintiffs and others also violated the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801 *et seq*.

311. By violating Plaintiffs' right to privacy and by misappropriating nonpublic personal information for their own use, the Defendants thus wrongfully took each Plaintiff's property interest in his or her Private Information and privacy, injuring each Plaintiff, and, as a result, Plaintiffs are eligible for restitution because the Defendants wrongfully acquired the property in which Plaintiffs had an ownership or vested interest.

312. The forgoing fraudulent concealment, material misstatements, and the intentional violations of state and federal statutes cited herein constitute unlawful, unfair and fraudulent business acts or practices and so constitute unfair business practices within the meaning of the California Unfair Practices Act, Cal. Bus. & Prof. Code §§ 17200, 17500. Sections 17200 *et seq.* of the California Business & Professions Code provides, in the disjunctive, for liability in the event of any such "unlawful, unfair or fraudulent business act or practice."

**FIRST AMENDED COMPLAINT**

313.    The violations described herein are unlawful, in that they violate *inter alia* Article I, § 1 of the California Constitution, the California Financial Information Privacy Act, Cal. Civil Code §§ 1798.80-84, the Fair Credit Reporting Act, the Gramm-Leach-Bliley Act and the Federal laws described herein.  These violations are the basis for liability under § 17200 of the Business and Professions Code, as is the unlawful and fraudulent activity described herein.

314.    The unfair, unlawful and fraudulent acts and practices of Defendants named herein present a continuing threat to Plaintiff and to members of the public in that these acts and practices are ongoing and are harmful and disruptive to business and financial markets.

315.    The actions described herein are unfair and patently fraudulent in that they were conducted for the sole purpose of perpetuating an unlawful and unsustainable investment scheme.

316.    As a result of the actions, concealment and deceit described herein, each of the Plaintiffs has suffered material financial injury in fact, including as described elsewhere in this Complaint, loss of equity in their houses, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

317.    As a further result of the actions, concealment and deceit described herein, each of the Plaintiffs has lost money or property as a result of such unfair competition, including the loss of Plaintiffs' property interest in their Private Information as a result of the unconscionable invasion of privacy and misappropriation of nonpublic personal information.

318.    California Civil Code § 2923.5 requires that each mortgagee, trustee, beneficiary, or authorized agent may not file a notice of default pursuant to California Civil Code § 2924 until 30 days after initial contact is made as required therein, or 30

days after satisfying the due diligence requirements to contact the mortgage described therein. Defendants violated the foregoing law by causing a notice of default to be filed against Plaintiffs without the mandatory notice. Defendants did not diligently endeavor to contact the Plaintiffs as required by § 2923.5(g) and Defendants thereby also violated California Civil Code §§ 2923.5 and 2924.

319. As a result of the foregoing unlawful conduct, Plaintiffs suffered further injury in fact by the filing of notices of default and as such the Plaintiffs suffered monetary and property loss. Such injuries and loss included diminished credit scores with a concomitant increase in borrowing costs and diminished access to credit, fees and costs, including, without limitation, attorneys' fees and costs with respect to wrongful notices of default and loss of some or all of the benefits appurtenant to the ownership and possession of real property.

320. The foregoing unlawful activities were pervasive and violate Business and Professions Code § 17200 *et seq*.

321. As a result of Defendants' unfair competition, Plaintiffs are entitled to restitution for all sums received by Defendants with respect to Defendants' unlawful and/or unfair and/or fraudulent conduct, including, without limitation, interest payments made by Plaintiffs, fees paid to Defendants, including, without limitation, the excessive fees paid at Defendants' direction as alleged by the FTC, and premiums received upon selling the mortgages at an inflated value.

322. Further as a result of Defendant's (1) artificial and fraudulent inflation of Plaintiffs' property values, and property values throughout the State of California, as well as (2) Defendants' abandonment of their own as well as industry standard underwriting guidelines, coupled with (3) Defendants incentive to package and sell as many dollars' worth of loans as they could to the secondary market, Defendants placed Plaintiff-borrowers into loans which were considerably larger than were justified by (a) the *true* uninflated valued of their properties, (b) Plaintiffs true uninflated incomes and (c)by Defendants own underwriting guidelines. As a result of Plaintiffs were placed into larger

**FIRST AMENDED COMPLAINT**

loans than they could afford or should have been placed into. The additional fees, points and interests paid as a result of the higher/inflated loan amounts constitute damages, and legally cognizable sources of restitution.

323. Further, Defendants either directly or through their subsidiaries, including ETS (and any other such companies), often charged fees associated with initiating or conducting the foreclosures resulting from their fraudulent lending including inspection fees, default fees, late fees, advance fees, attorney fees, and trustee fees. In short, Defendants made money by wrongfully initiating foreclosures against Plaintiffs herein. The award of damages or restitution for these unmerited fees obtained through deceit is proper.

324. Plaintiffs are also entitled to the issuance of a temporary restraining order, a preliminary injunction, and a permanent injunction restraining and enjoining Defendants from any further concealment with respect to the sale of notes and mortgages, any further violation of § 2923.5, any further violation of Article I, § 1 of the California Constitution, the California Financial Information Privacy Act, Cal. Civil Code § 1798.82, the Fair Credit Reporting Act, and the Gramm-Leach-Bliley Act, and any further disclosure or use of the Private Information, other than as intended by the Plaintiffs.

325. Plaintiffs are entitled to such relief as is set forth in this Cause of Action and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

### FIFTH CAUSE OF ACTION
### (*By Plaintiffs listed Below– Wrongful Foreclosure,*
### *Violation of Cal. Civil Code § 2924 –Against All Defendants*)

326. The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

327. **IN ADDITION TO THE ALLEGATIONS MADE THROUGHOUT THIS COMPLAINT, WHICH APPLY TO ALL PLAINTIFFS (EXCEPT WHERE**

**OTHERWISE NOTED), <u>APPENDIX "A"</u> ("INDIVIDUALIZED PLAINTIFF ALLEGATIONS") PROVIDES INDIVIDUALIZED ALLEGATIONS AS TO EACH AND EVERY PLAINTIFF IN THIS ACTION AND THE SPECIFIC WRONGS DONE BY EACH DEFENDANT.** By this reference, Plaintiffs hereby incorporate Appendix "A" to this Complaint.

328. Defendants have already foreclosed upon the following property owned by the following Plaintiffs – allegations establishing the specific factual basis of the wrongful nature of the foreclosure as against each of the Plaintiffs below are set forth in **APPENDIX A**.

    a) Rick Albritton  (Appendix A, ¶7)
       2030 W Windhaven Dr,
       Rialto CA 92377

    b) Deborah Albritton (Appendix A, ¶7)
       2030 W Windhaven Dr,
       Rialto CA 92377

    c) David Cruz (Appendix A, ¶11)
       48159 Sol De Linda,
       Coachella, CA 92236

    d) Yesenia Cruz (Appendix A, ¶11)
       48159 Sol De Linda,
       Coachella, CA 92236

    e) Cristina Palbicke (Appendix A, ¶13)
       27949 Harwood Dr,
       Santa Clarita, CA 91350

    f) Magdalena Avila (Appendix A, ¶25)
       1015 Via Carmelita
       Burbank, CA 91501

    g) Cecilia Chaube (Appendix A, ¶24)
       2617 Ranchwood Dr.

**FIRST AMENDED COMPLAINT**

Brentwood, CA 94513

h) Florastene Holden (Appendix A, ¶29)
2114 Oak Crest Dr.
Riverside, CA 92506

i) Ignacio Rodriguez (Appendix A, ¶31)
2714 Norton Ave.
Lynwood, CA 90262

j) Rosa Rodriguez (Appendix A, ¶31)
2714 Norton Ave.
Lynwood, CA 90262

k) Sarah Sebagh (Appendix A, ¶6)
1233 N. Flores St., Apt. 302
West Hollywood, CA 90069

l) Gricelda Ruano (Appendix A, ¶26)
170 East Street, Unit D9
Chula Vista, CA 91910

m) Elisa Jordan
170 East Street, Unit D9 (Appendix A, ¶26)
Chula Vista, CA 91910

329. Because Defendants are not the holders of the notes and deeds of trust and are not operating under a valid power from the current holders of the notes and deeds of trust, Defendants did not have the right to proceed with the foregoing foreclosures.

330. The burden of proving an assignment falls upon the party asserting rights thereunder. In an action by an assignee to enforce an assigned right the evidence must not only be sufficient to establish the fact of assignment when that fact is in issue, but the measure of sufficiency requires that the evidence of assignment be clear and positive to protect an obligor from any further claim by the primary obligee. Defendants, they failed

to do so and improperly foreclosed by reason of lack of proof that they had the right to proceed.

331. Under the California Uniform Commercial Code, a negotiable instrument, such as a promissory note secured by a mortgage, may only be enforced by the holder or a person with the rights of a holder. Com. Code § 3-301. For instruments payable to an identified person, such as a lender, a holder is generally recognized as the payee or one to whom the negotiable instrument has been negotiated. This requires transfer of possession and endorsement by the prior holder. Com. Code § 3-201. Unless the parties otherwise provide, the mortgage follows the note. Civ. Code § 2936.

332. Though in California, the assignment of a note generally carries with it an assignment of the mortgage (Civ. Code § 2936), it is still required in California that the <u>holder</u> of the note or a person operating with authority from that holder be the foreclosing party and that the mortgage not have been assigned away from that note.

333. Defendants no longer own the notes it originated and there is just no way of knowing who now owns the Plaintiffs' mortgages because the Defendants do not know who owns these mortgages. Indeed, the Defendants do not know where it is that they obtained their alleged rights to collect money from Plaintiffs thereunder.

334. Once separated from the note, the trust deed is unenforceable and of no legal value. For negotiable instruments payable to an identified person, such as a lender, a holder is generally recognized as the payee or one to whom the negotiable instrument has been negotiated. This requires transfer of possession and endorsement by the prior holder. (Com. Code § 3-201). Unless the parties otherwise provide, the mortgage follows the note. (Civ. Code § 2936; see also *Carpenter v. Longan* (1872) 83 U.S. 271, 275).

335. Civil Code § 2936 provides: "the assignment of a debt secured by mortgage carries with it the security." Defendants have no evidence that they own the notes or have any power to enforce them from the rightful owners.

**FIRST AMENDED COMPLAINT**

336.   Foreclosure was wrongful for each of the following reasons, independent of any of the other following reasons: (1) because Plaintiff's mortgage was obtained through concealment and/or misrepresentation; (2) because Defendants do not own the note and do not have a power of attorney with respect to the note; (3) because the note and deed of trust have become separated; (4) because Defendants do not own the deed of trust and do not have a power of attorney with respect to the deed of trust; (5) because Defendants cannot surmount their burden of demonstrating they own the note or have a power of attorney with respect thereto; and (6) because Defendants cannot surmount their burden of demonstrating they own the deed of trust or have a power of attorney with respect thereto.

337.   As a result of the foreclosures, Plaintiff was dispossessed of Plaintiff's property and put to the expense of relocating and securing alternative properties.  Plaintiff was further dispossessed of the value of Plaintiff's home and the potential appreciation thereof.

338.   Defendants, including Trustee, acted outrageously and persistently with actual malice in performing the acts alleged in this cause of action.  Accordingly, Plaintiff is entitled to exemplary and punitive damages in a sum according to proof and to such other relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

### SIXTH CAUSE OF ACTION

**(*By All Plaintiffs – Improper Influence Over Appraisers – Cal. Civ. Code §1090.5 – Against Bank Defendants and HCLS*)**

339.   The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

340.   **IN ADDITION TO THE ALLEGATIONS MADE THROUGHOUT THIS COMPLAINT, WHICH APPLY TO ALL PLAINTIFFS (EXCEPT WHERE OTHERWISE NOTED), APPENDIX "A" ("INDIVIDUALIZED PLAINTIFF**

**ALLEGATIONS") PROVIDES INDIVIDUALIZED ALLEGATIONS AS TO EACH AND EVERY PLAINTIFF IN THIS ACTION AND THE SPECIFIC WRONGS DONE BY EACH DEFENDANT.** By this reference, Plaintiffs hereby incorporate Appendix "A" to this Complaint.

341. California Civil Code §1090.5 "Valuation of real estate; improper influence; violation" forbids the exercise of influence over the valuation of property by any person with an interest in that real estate transaction. Specifically California Civil Code §1090.5 states:

> (a) No person with an interest in a real estate transaction involving a valuation shall improperly influence or attempt to improperly influence the *development*, *reporting*, result, or review of that valuation, through coercion, extortion, bribery, intimidation, compensation, or instruction. For purposes of this section, a valuation is defined as an estimate of the value of real property in written or electronic form, other than one produced solely by an automated valuation model or system. Prohibited acts include, but are not limited to, the following:
>
> > (1) Seeking to influence a person who prepares a valuation to report a minimum or maximum value for the property being valued. Such influence may include, but is not limited to:
> >
> > > (A) Requesting that a person provide a preliminary estimate or opinion of value prior to entering into a contract with that person for valuation services.
> > >
> > > (B) Conditioning whether to hire a person based on an expectation of the value conclusion likely to be returned by that person.
> > >
> > > (C) Conditioning the amount of a person's compensation on the value conclusion returned by that person.
> > >
> > > (D) Providing to a person an anticipated, estimated, encouraged, or desired valuation prior to their completion of a valuation.
> >
> > (2) Withholding or threatening to withhold timely payment to a person or entity that prepares a valuation, or provides valuation management

**FIRST AMENDED COMPLAINT**

functions, because that person or entity does not return a value at or above a certain amount.

(3) Implying to a person who prepares a valuation that current or future retention of that person depends on the amount at which the person estimates the value of real property.

(4) Excluding a person who prepares a valuation from consideration for future engagement because the person reports a value that does not meet or exceed a predetermined threshold.

(5) Conditioning the compensation paid to a person who prepares a valuation on consummation of the real estate transaction for which the valuation is prepared.

(6) Requesting the payment of compensation to achieve higher priority in the assignment of valuation business.

342. Bank Defendants and their Co-conspirators herein had a direct interest in the valuation of real estate transactions at issue, as they were the institution that was lending on the property, and moreover because they stood to profit from the consummation of the real estate transaction – which depended in large part on a sufficient valuation being returned by the appraiser. Their wrongful influence occurred in connection with the "development, reporting, result, or review of that valuation" in accord with the language of the statute.

343. Defendants herein both in their individual capacity, and in their capacity as co-conspirators with one another and with HCLS (Ally's wholly-owned appraisal management company) have violated California Civil Code §1090.5 by violating appraiser independence through, among other things, compensation, coercion, extortion, bribery, intimidation of their appraisers, as well as the appraisal management company itself, and its management and executives, as well as other independent, outside, or "fee appraisers" not employed by HCLS Appraisals.

344. As described throughout this Complaint at length, but particularly at paragraphs 64-89, Ally and Defendants herein as well as their employees, officers, and agents intentionally:

**FIRST AMENDED COMPLAINT**

a. Caused the appraisers to base the value of their appraisals on a factor other than the independent judgment of the appraiser;

b. Mischaracterized and/or suborned the mischaracterization of the appraised value of the property securing the extension of credit;

c. Sought to influence the appraiser to facilitating the making of and pricing of their transactions;

d. Sought to influence the appraiser to achieve a targeted value;

e. Withheld or threatened to withhold payment for the appraisal services rendered in conformity with the contract between the parties;

f. Implied, directly or indirectly or threatened that the future retention of the appraiser was contingent upon their return of a satisfactory valuation;

g. Excluded other appraisers from rendering future valuations based on the return of valuations which did not meet a certain target in the past.

345. Defendants acted with malice and with the intent of artificially inflating California Real estate properties generally, as well as the values of Plaintiffs' individual properties and homes.

346. As alleged at length above, Bank Defendants violated California Civil Code §1090.4 by subjecting, both, their appraisers as well as their appraisal management company, HCLS to coercion, undue influence, bribery, instruction, appraiser selection manipulation, financial pressure, as well as threats – both explicit and implicit – that if their appraisals didn't come back in at value (1) future business with HCLS would either diminish or discontinue altogether or (2) that the individual appraiser would be blacklisted. Specifically, these allegations are found above at paragraphs 64-89, and are hereby incorporated into this cause of action by reference.

347. Defendants acted with malice and with the intent of artificially inflating California Real estate properties generally, as well as the values of Plaintiffs' individual properties and homes.

**FIRST AMENDED COMPLAINT**

1   348. As a result of Defendants' acts, California's real estate economy, and the
2   individual values of Plaintiffs' properties were artificially inflated, resulting in and
3   causing the substantial loss of Plaintiffs' net equity upon the unraveling of their
4   fraudulent scheme.

**PRAYER FOR RELIEF**

6   WHEREFORE, Plaintiffs pray for judgment against Defendants and each of them
7   as follows:

8   1.   General, Actual, Compensatory, Special and Exemplary damages according
9   to proof under the First, Second, Third, Fourth, Fifth, and Sixth Causes of Action, and
10  any other causes of action for which such relief may be available;

11  2.   Twice the amount of finance charges under the Second Cause of action;

12  3.   Statutory relief according to proof under the Fourth and Fifth Causes of
13  Action and any other causes of action for which such relief may be available;

14  4.   Restitution under the Fourth Cause of Action and any other causes of action
15  for which such relief may be available;

16  5.   Temporary, preliminary, and permanent injunctive relief under the Fourth
17  and Fifth Causes of Action and any other causes of action for which such relief may be
18  available;

19  6.   On all causes of action, for costs of suit herein;

20  7.   On all causes of action, for pre- and post-judgment interest;

21  8.   On all causes of action for which attorney's fees may be awarded pursuant to
22  the governing contract, by statute or otherwise, reasonable attorneys' fees; and

23  9.   On all causes of action, for such other and further relied as this Court may
24  deem just and proper.

25  Dated: October 31, 2012

Respectfully submitted,
**BROOKSTONE LAW, PC**

By: _____
Vito Torchia, Jr.
Attorneys for Plaintiffs

- 111 -

**FIRST AMENDED COMPLAINT**

# Exhibit 3

## Voluntary Dismissal

Vito Torchia, Jr. (SBN244687);
Sasan Behnood (SBN 250626)
BROOKSTONE LAW, PC
4000 MacArthur Blvd., Suite 1110
Newport Beach, California 92660
Telephone: (800) 946-8655  Facsimile: (866) 257-6172

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAROLYN HAIRSTON, an individual; et. al.<br><br><br>Plaintiff(s),<br><br>v.<br>ALLY BANK, N.A.; et. al<br><br><br>Defendant(s). | CASE NUMBER<br><br>2:12-cv-05016-JAK (AGRx)<br><br>**NOTICE OF DISMISSAL PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 41(a) or (c)** |

PLEASE TAKE NOTICE: (*Check one*)

☑ This action is dismissed by the Plaintiff(s) in its entirety.

☐ The Counterclaim brought by Claimant(s) _____ is dismissed by Claimant(s) in its entirety.

☐ The Cross-Claim brought by Claimants(s) _____ is dismissed by the Claimant(s) in its entirety.

☐ The Third-party Claim brought by Claimant(s) _____ is dismissed by the Claimant(s) in its entirety.

☐ **ONLY** Defendant(s) _____

_____
is/are dismissed from (*check one*) ☐ Complaint, ☐ Counterclaim, ☐ Cross-claim, ☐ Third-Party Claim brought by _____.

The dismissal is made pursuant to F.R.Civ.P. 41(a) or (c).


| January 31, 2013 | /s/ Vito Torchia, Jr. |
|---|---|
| *Date* | *Signature of Attorney/Party* |


**NOTE:  F.R.Civ.P. 41(a): This notice may be filed at any time before service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs.**

**F.R.Civ.P. 41(c): Counterclaims, cross-claims & third-party claims may be dismissed before service of a responsive pleading or prior to the beginning of trial.**

## Exhibit 4

**November 2013 Complaint**

Vito Torchia, Jr. (SBN244687)
vjt@brookstonelaw.com
**BROOKSTONE LAW, PC**
18831 Von Karman Avenue, Suite 400
Irvine, California 92612
Telephone: (800) 946-8655
Facsimile: (866) 257-6172
E-mail: HairstonvAlly@BrookstoneLaw.com

Attorneys for Plaintiffs

CONFORMED COPY
ORIGINAL FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

NOV 14 2013

John A. Clarke, Executive Officer/Clerk
BY _____ Deputy
Cristina Grijalva

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES**

**BC 527712**

CAROLYN HAIRSTON, an individual;
CHRISTINE PETERSEN, an individual;
WILLIAM MIMIAGA, an individual;
ROBIN GASTON, an individual;
PATRICK GASTON, an individual;
MARY SERRANO, an individual; SARAH
SEBAGH, an individual; RICK
ALBRITTON, an individual; DEBORAH
ALBRITTON, an individual;
VERONICA GREY, an individual;
BRENDA MELLA, an individual;
JOSELITO MELLA, an individual;
MICHAEL MAN, an individual; JUDY
LIM, , an individual; DAVID CRUZ, an
individual; YESENIA CRUZ, an individual;
GREGORY BUCK, an individual;
CRISTINA PALBICKE, an individual;
KHALIL SUBAT , an individual; MANIJA
SUBAT, an individual; GENEVIE
CABANG, an individual; JULIO
GONZALEZ, an individual; LISA
SIMONYI, an individual; RICK EWALD,
an individual; REGINA FAISON, an
individual; ALEX IBARRA, an individual;
MARIA ELENA DEL CID, an individual;
JULIO DEL CID, an individual; MESBEL
MOHAMOUD, an individual;
MICHAEL MOULTRIE, an individual;
WILLIE GILMORE, an individual;
PHYLLIS MCCREA, an individual;
ECILIA CHAUBE, an individual;
MAGDALENA AVILA, an individual;

Case No.:

**COMPLAINT FOR:**

**BY FAX**

1. **INTENTIONAL PLACEMENT OF
   BORROWERS INTO DANGEROUS LOANS
   THEY COULD NOT AFFORD THROUGH
   COORDINATED DECEPTION, IN THE NAME
   OF MAXIMIZING LOAN VOLUME AND THUS
   PROFIT**

   COUNT 1- FRAUDULENT CONCEALMENT

   COUNT 2- INTENTIONAL
   MISREPRESENTATION

   COUNT 3- NEGLIGENT MISREPRESENTATION

   COUNT 4- NEGLIGENCE

   COUNT 5- UNFAIR, UNLAWFUL, AND
   FRAUDULENT BUSINESS PRACTICES
   (VIOLATION OF CAL. BUS. & PROF. CODE
   §17200)

2. **INDIVIDUAL APPRAISAL INFLATION**

   COUNT 6- INTENTIONAL
   MISREPRESENTATION

   COUNT 7- NEGLIGENT MISREPRESENTATION

   COUNT 8- NEGLIGENCE

   COUNT 9- UNFAIR, UNLAWFUL, AND
   FRAUDULENT BUSINESS PRACTICES
   (VIOLATION OF CAL. BUS. & PROF. CODE
   §17200)

3. **MARKET FIXING**

   COUNT 10 – FRAUDULENT CONCEALMENT

   COUNT 11 – NEGLIGENCE

i

**COMPLAINT**

GRICELDA RUANO, an individual; ELISA JORDAN, an individual; LOIS TERRELL SULLIVAN, an individual; GLORIA PORTILLO, an individual; FLORASTENE HOLDEN, an individual; MARCO BADILLA, an individual; MANUELA BADILLA, an individual; IGNACIO RODRIGUEZ, an individual; ROSA RODRIGUEZ, an individual; SALVADOR BARAJAS, an individual; MARIA BARAJAS, an individual; BRIAN FOOTE, an individual; OLAN ROSS, an individual; EVELYN ROSS, an individual; GARY JOHNSON, an individual; JOELLYN JOHNSON, an individual; RODELINA SANTOS, an individual; JUN O. SANTOS, an individual; MICHAEL BROWN, an individual; CLAUDINETTE BROWN, an individual; MARTIN KASSOWITZ, an individual; SHIRLEY KAPLAN, an individual; HENRY COMPLETO, an individual; IRMA Laredo, an individual; MARCIA WILLOUGHBY, an individual; VICTOR PAZOS, an individual, JAMES W. ARNOLD, an individual; GARY GRESHAM, an individual; PEGGY GRESHAM, an individual; JUAN ROJAS, an individual; ELIZABETH ROJAS, an individual; GUSTAVO GONZALES, an individual; SWARAN CHOUHAN, an individual; PARAMJIT CHOUHAN, an individual; MARTIN BROWN, an individual.

Plaintiffs,

vs.

ALLY BANK, N.A., f/k/a GMAC BANK, a Utah Corporation, in its own capacity and as an acquirer of certain assets and liabilities of GMAC; GMAC, a National Banking Association; ALLY FINANCIAL, INC. f/k/a/ GMAC, LLC, a Delaware Corporation; GMAC MORTGAGE GROUP, INC., A Delaware Corporation; MTC FINANCIAL INC. d/b/a Trustee

**COUNT 12**- PRICE FIXING - VIOLATION OF SHERMAN ACT 15 USC §1 ET SEQ.

**COUNT 13**- UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES (VIOLATION OF CAL. BUS. & PROF. CODE §17200)

4. **DECEPTION IN LOAN MODIFICATIONS**

**COUNT 14**- COUNT 14 : VIOLATION OF CAL. CODE CIV. PROC. § 580B AND §726 PROHIBITING COLLECTION OF DEBT AFTER ELECTING TO FORECLOSE

**COUNT 15** – FRAUDULENT CONCEALMENT

**COUNT 16** – INTENTIONAL MISREPRESENTATION

**COUNT 17** – NEGLIGENT MISREPRESENTATION

**COUNT 18**- RESCISSION OF CONTRACT AND/OR RESTITUTION ON THE GROUNDS OF FRAUD, AND/OR UNCONSCIONABILITY

**COUNT 19** – BREACH OF CONTRACT

**COUNT 20**- VIOLATION OF THE CRIER RULE (CAL. CIV. CODE §2994G)

**COUNT 21**- UNFAIR DEBT COLLECTION PRACTICES (VIOLATION OF CAL. CIV. CODE §1788 ET SEQ)

**COUNT 22**- UNLAWFUL, UNFAIR & FRAUDULENT BUSINESS PRACTICES (VIOLATION OF CAL. BUS. & PROF. CODE §17200)

5. **INTENTIONAL UNAUTHORIZED FORECLOSURES PURSUED IN THE NAME OF PROFIT**

**COUNT 23**- WRONGFUL FORECLOSURE

**COUNT 24**- UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES (VIOLATION OF CAL. BUS. & PROF. CODE §17200)

**[JURY TRIAL DEMANDED]**

Corps, a California Corporation; and Does 1
through 1000, inclusive.

Defendants.

## TABLE OF CONTENTS

**NATURE OF ACTION**................................................................................... - 1 -

**PARTIES**.................................................................................................... - 7 -

    Plaintiffs.................................................................................................. - 7 -

    Defendants............................................................................................... - 8 -

    Relationship of Defendants ..................................................................... - 13 -

**FIRST CAUSE OF ACTION: INTENTIONAL PLACEMENT OF BORROWERS INTO
DANGEROUS LOANS THEY COULD NOT AFFORD THROUGH COORDINATED
DECEPTION, IN THE NAME OF MAXIMIZING LOAN VOLUME AND THUS PROFIT** .. - 15 -

    Defendants Systematically Abused and Abandoned Industry Standard Underwriting
    Guidelines to Intentionally Place Unqualified Borrowers into Loans Which
    Defendants Knew They Could Never Afford............................................ - 18 -

    Defendants Turned Substantial Profits Through Their Borrowers' Default
    Furthering Their Incentive to Intentionally Place Plaintiffs Into Impossible
    and Unaffordable Loans ......................................................................... - 21 -

    Defendants Intentionally Misrepresented, Partially Misrepresented, & Concealed
    Highly Material Information In Order To Induce Plaintiffs to Unknowingly
    Take Dangerous Loans So that Defendants Could Profit............................ - 22 -

        Authority to Bind.............................................................................. - 30 -

        Plaintiffs Reasonably Relied on Defendants' Numerous Deceptions in
        Deciding to Enter into Contracts With Them ...................................... - 31 -

        Bank Defendants Owed Plaintiffs a Duty........................................... - 33 -

    COUNT 1: FRAUDULENT CONCEALMENT ....................................... - 38 -

    COUNT 2: INTENTIONAL MISREPRESENTATION ............................ - 39 -

    COUNT 3: NEGLIGENT MISREPRESENTATION................................ - 40 -

iii

**COMPLAINT**

COUNT 4: NEGLIGENCE ..................................................................... - 40 -

COUNT 5 : UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES
(VIOLATION OF CAL. BUS. & PROF. CODE §17200) ...................................... - 41 -

**SECOND CAUSE OF ACTION: INDIVIDUAL APPRAISAL INFLATION** ........................... **- 44 -**

COUNT 6: INTENTIONAL MISREPRESENTATION ........................................... - 50 -

COUNT 7: NEGLIGENT MISREPRESENTATION............................................. - 50 -

COUNT 8: NEGLIGENCE .................................................................. - 51 -

COUNT 9: UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES
(VIOLATION OF CAL. BUS. & PROF. CODE §17200) ...................................... - 52 -

**THIRD CAUSE OF ACTION:  MARKET  FIXING** ............................................. **- 58 -**

COUNT 10: FRAUDULENT CONCEALMENT .............................................. - 68 -

COUNT 11: NEGLIGENCE ................................................................ - 69 -

COUNT 12: PRICE FIXING - VIOLATION OF SHERMAN ACT 15 USC §1 ET SEQ. .... - 69 -

COUNT 13:  UNFAIR, UNLAWFUL, AND FRAUDLENT BUSINESS PRACTICES
(VIOLATION OF CAL. BUS. & PROF. CODE §17200)...................................... - 71 -

**FOURTH CAUSE OF ACTION: DECEPTION IN LOAN MODIFICATIONS** ....................... **- 72 -**

Defendants' Scheme To To Extract Workout Payments From Borrowers In
Distress And Then Foreclosing, As Opposed To Genuinely Offering Loan Modifications .... - 72 -

Bank Defendants' Adhesive Workout Agreements Are Unconscionable.................. - 78 -

Bank Defendants Fail To Withdraw Foreclosure Proceedings Even When Borrowers
Have Made All Plan Payments Under The Workout Agreement ............................... - 79 -

Defendants Used The Promise Of Loan Modifications As Bait To Damage Plaintiffs'
Credit, Preventing Plaintiffs From Obtaining Financing Anywhere Else ..................... - 81 -

Defendants Used The Promise Of Loan Modifications As Bait For An Outright
Cash-Grab With No Intent To Ever Modify Plaintiffs ...................................... - 82 -

**COMPLAINT**

COUNT 14 : VIOLATION OF CAL. CODE CIV. PROC. § 580B AND §726 PROHIBITING COLLECTION OF DEBT AFTER ELECTING TO FORECLOSE............ - 83 -

COUNT 15 : FRAUDULENT CONCEALMENT ................................................ - 84 -

COUNT 16 : INTENTIONAL MISREPRESENTATION ...................................... - 85 -

COUNT 17: NEGLIGENT MISREPRESENTATION.......................................... - 87 -

COUNT 18: RESCISSION OF CONTRACT AND/OR RESTITUTION ON THE GROUNDS OF FRAUD, AND/OR UNCONSCIONABILITY.............................. - 87 -

COUNT 19: BREACH OF CONTRACT ........................................................ - 88 -

COUNT 20: VIOLATION OF THE CRIER RULE (CAL. CIV. CODE §2994G).............. - 88 -

COUNT 21: UNFAIR DEBT COLLECTION PRACTICES (VIOLATION OF CAL. CIV. CODE §1788 ET SEQ)........................................................... - 89 -

COUNT 22: UNLAWFUL, UNFAIR & FRAUDULENT BUSINESS PRACTICES........... - 90 -

FIFTH CAUSE OF ACTION : INTENTIONAL UNAUTHORIZED FORECLOSURES PURSUED IN THE NAME OF PROFIT................................................................ - 92 -

COUNT 23: WRONGFUL FORECLOSURE ................................................... - 93 -

COUNT 24: UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES (VIOLATION OF CAL. BUS. & PROF. CODE §17200)........................................ - 97 -

PRAYER FOR RELIEF ...................................................................................... - 99 -

v

**COMPLAINT**

Plaintiffs, and each of them, hereby demand a jury trial and allege as follows:

### NATURE OF ACTION

1.  **Glossary**. As used herein:

    a.  **"DEFENDANTS"** shall collectively refer to each and every Defendant named in this action; such Defendants are all alleged to have acted in coordinated conspiracy with one another.

    b.  **"BANK DEFENDANTS"** shall refer, collectively, to all Defendants acting to originate or service loans including: ALLY BANK, N.A. f/k/a GMAC BANK (**"Ally Bank"**), GMAC, ALLY FINANCIAL, INC. f/k/a GMAC, LLC (**"Ally"**), and GMAC MORTGAGE GROUP, INC. (**"GMACM"**)

    c.  **"ALLY DEFENDANTS"** shall refer to all entities formerly owned by Ally Financial Brothers Holdings. In other words the term "ALLY DEFENDANTS" shall refer to all Defendants with the exception of MTC Financial Inc., d/b/a Trustee Corps.

    d.  **"TRUSTEE DEFENDANTS"** shall refer, collectively, to Defendant MTC FINANCIAL INC. d/b/a Trustee Corps (**"Trustee Corps"**), collectively with Executive Trustee Services d/b/a ETS Services, LLC (**"ETS"**), who is not named in this complaint as a defendant but who Plaintiffs reserve the right to add as a defendant at a future time.

    e.   **"DOT"** shall act as an abbreviation for the term: Deed of Trust.

2.  This lawsuit arises from Defendants' wrongs and deception in inducing Plaintiffs to enter into mortgages from 2003 through 2008 with the Bank Defendants, as well as deception in loan modifications and wrongful foreclosure activities through current day.

3.  The gravamen of Plaintiffs' Complaint is that Defendants had ceased acting as conventional money lenders and instead morphed into an enterprise engaged in systematic fraud upon its borrowers. With profit as their motive, the conspiracy of Defendants set out upon a massive and centrally-directed fraud by which Defendants (1) placed the Plaintiff-homeowners into loans which Defendants *knew* Plaintiffs could not afford and would default upon to a mathematical certainty, (2)

- 1 -

**COMPLAINT**

abandoned industry-standard underwriting guidelines, (3) concealed/misrepresented the terms of their loans to borrowers to induce their unwitting consent, and (4) intentionally inflated the appraisal values of homes throughout California in a market-fixing scheme – all for the sole purpose of herding as many borrowers as they could into the largest loans possible which Defendants would then sell on the secondary market at inflated values for unimaginable profit (wildly surpassing the profit they would make by holding the loans), *knowing that their scheme would cause the precipitous decline in values of all homes throughout California*, including those of Plaintiffs herein.

4.      Because Bank Defendants stood to reap so much more profit by securitizing and selling these loans on the secondary market, than they would by holding their loans under the conventional "originate to hold model" of traditional banking, Defendants ceased acting as conventional money lenders and instead adopted the "originate to sell" model - originating loans with an eye towards (1) *immediately* selling the loans on the secondary market, while (2) simultaneously becoming a servicer of the loan – both immensely profitable. The result was simple. Because Defendants knew the purchasers of these loans (secondary market investors) would bear all the risk in the event of default, Bank Defendants no longer had any incentive to verify a borrower's creditworthiness, or ensure that the borrower qualified for (or could afford) the loans they were being given. Indeed they had an incentive to do the opposite: the sheer profit made by selling high volumes of these loans.

5.      To feed their investors and continue to make such never-before-seen profits, all of which inured to the benefit of the conspiracy of Defendants, Bank Defendants needed more borrowers. In turn, Bank Defendants began (1) disregarding their own as well as industry-standard underwriting standards, (2) intentionally approving borrowers who they knew were grossly under-qualified, who they knew could not afford their loans and who they knew would default to a mathematical certainty, (3) falsifying the income and asset documentation of Plaintiff-borrowers without their consent, and (4) concealing the material terms of their loans to induce a borrower's unwitting consent - all in the name of getting as many loans out the door, and sold to investors for profit, as possible. (Cause of Action for **"Intentional Placement of Borrowers into Dangerous Loans Which They Could Not Afford"** )

6.      Bank Defendants also ceased acting as a conventional money lender by originating loans **with an eye towards immediately becoming the servicer on the loan.** Servicers earn more money

from initiating foreclosures and collecting various fees and thus have significantly different incentives and motivations than do lenders. Knowing that they would soon become servicers, Bank Defendant Banks had an (additional) incentive to place borrowers into loans they knew their borrowers could not afford and to conceal highly material information regarding the loans, because as servicers they would make more money by collecting fees from borrowers who couldn't afford their loans such as late fees, default fees, and foreclosure fees. In other words, because Bank Defendants made more money collecting fees from borrowers who couldn't afford their loans, Bank Defendants had an incentive to place their borrowers into loans they couldn't afford. In doing so, Bank Defendants became anything but a conventional money lender – their interests were aligned solely with those of a servicer.

7.      Part and parcel with this scheme, the conspiracy of Defendants undertook a scheme to artificially manipulate and inflate California's real estate market through their wholly-owned appraisal subsidiary, Home Connects Lending Services, LLC ("HCLS") over whom Bank Defendants exercised complete dominion. As is common knowledge in the real estate industry, appraisers are required to calculate the value of a home based almost entirely on the value of other nearby homes (called comparables aka "comps"). Defendants, including Bank Defendants seized on this vulnerability in the system. Exercising dominion over HCLS, Defendants directed HCLS to begin systematically inflating the valuations they rendered upon the subject properties of each of their loans (including loans of Plaintiffs herein), *knowing that by doing so* their falsely inflated valuations would act as comps upon which numerous *other* appraisers based their valuations of *other* homes. These inflated appraisals caused other homes to be valued for more than they were worth, which in turn acted as the predicate for even higher appraisals on other homes. The result was a vicious self-feeding exponential cycle, both expected and intended by Defendants - the intentional, systematic, artificial inflation of home values throughout California. Because Bank Defendants had such massive market share, they had the means and the ability to fully manipulate the market on a scale that few others could, and indeed they did. (**The "Market Fixing Scheme Cause of Action" and separately the "Individual Appraisal Fraud Cause of Action"**)

8.      Bank Defendants' reasons for artificially inflating the prices of real estate were simple. First, **by doing so Defendants created the illusion of a naturally-appreciating real economy, which**

**COMPLAINT**

1  **resulted in a purchase *and* refinance boom** – which meant more loans for Defendants, and thus more
2  profit. <u>Second</u>, by doing so, Bank Defendants induced Plaintiffs to enter into contract with them by
3  convincing Plaintiffs that the value of their home was sufficient to justify taking out a loan of that size –
4  or in other words, to assure Plaintiffs that their collateral was sound. <u>Third</u>, by doing so, Bank
5  Defendants intended to induce Plaintiffs to consummate their purchase transactions by falsely reassuring
6  them that they were paying what the home was worth, and not more – the result of which was, once
7  again, more loans generated by Defendants and thus more profit. <u>Fourth</u>, by driving the prices of real
8  estate up, borrowers were forced to take out larger loans to afford the same property, once again
9  resulting in more profit to Bank Defendants. <u>Fifth</u>, then, based on these fraudulently inflated loan
10  amounts, Bank Defendants deceptively extracted excessive and unearned payments, points, fees, and
11  interest from Plaintiffs. All of these profits were shared among the conspiracy of Defendants, and inured
12  to the benefit of the Conspiracy.

13      9.      The inevitable and intended result of Defendants' conspiracy was the creation of a super-
14  heated pricing bubble in the real estate economy, created by and at the direction of the conspiracy of
15  Defendants, designed to manipulate and inflate property values, and effectuated for the sole purpose of
16  lining the conspiracy of Defendant's pockets with money.

17      10.      Ally and Bank Defendants and their co-conspirators conducted their scheme *knowing it*
18  *would cause the wide-spread crash of property values throughout California* and the substantial loss of
19  equity to Plaintiffs, and indeed it did.  As a result of Defendants' market fixing scheme, Plaintiffs were
20  forced to pay much more for their homes, then their true uninflated worth. Even for those Plaintiffs who
21  did not purchase their property, but rather refinanced it, the demise of Defendants' scheme drove the
22  value of their property far below its original purchase price, once again resulting in the loss of
23  substantial equity.

24      11.      From 2008 to the present, Californians' home values decreased by considerably more
25  than most other areas in the United States as a direct and proximate result of the Defendants' scheme set
26  forth herein.

27      12.      As a result, Plaintiffs have lost their equity in their homes, if not their homes themselves,
28  their credit ratings and histories were damaged or destroyed, among a host of other damages and harms

**COMPLAINT**

1    which will be laid out in detail throughout this Complaint.

2        13.      The profit-driven scheme/conspiracy did not end there. To further their profit, the

3 conspiracy of Defendants then intentionally steamrolled wrongful and unauthorized foreclosures upon

4 those borrowers whose very peril was caused by Defendants' fraud in the first place. They intentionally

5 initiated these wrongful foreclosures without regard to whether they had authority to foreclose, or had

6 complied with the requirements under California Law, because foreclosure is a profitable business,

7 creating profit not only for the foreclosing trustee, but also the servicing bank, as well as the owner of

8 the Deed of Trust. By initiating such unauthorized/wrongful foreclosures Bank Defendants and Trustee

9 Defendants were able to charging a host of profitable "foreclosure fees' including trustee fees, attorney

10 fees, late fees, default fees, inspection fees, among many others. **("Intentional Wrongful Foreclosure**

11 **Cause of Action")**

12        14.      Further, in the face of the escalating foreclosure crisis in the United States and especially

13 in California, the Bank Defendants have further victimized and preyed on those struggling to keep by

14 offering and inducing customers into illusory "Loan Modification" or "Workout Agreements," which

15 purport to offer hope of an opportunity to cure loan default, but in truth and fact are merely a ruse

16 through which the Bank Defendants dupe homeowners into paying them thousands of dollars

17 immediately before they foreclose. On information and belief, the Bank Defendants have reaped illicit

18 profits from these actions exceeding $100 million. **(the "Deception in Loan Modification Cause of**

19 **Action")**

20        15.      These activities have been the subject of intense scrutiny, enforcement actions and

21 litigation. As recently as April 13, 2011, multiple Federal regulators entered into stipulated consent

22 orders with other similarly situated banks and related entities such as MERS (described below)

23 describing massive failures and taking the first steps toward requiring Defendants and other banks to

24 refund sums to homeowners improperly foreclosed upon by Defendants and other banks.

25        16.      These illusory work-out agreements were nothing more than a cash-grab designed to

26 circumvent California's prohibition against deficiency judgments. Plaintiffs are entitled to rescind and

27 obtain back from the Bank Defendants their promised (and delivered) consideration, namely the

28 payments that were made to the Bank Defendants under the Workout Agreements and Extended

Workout Agreements. Because California law prohibits deficiency judgments, the Bank Defendants were not entitled to require post-election-to-sell payments and foreclose on the loans. In addition, such payments included attorney and other fees which Plaintiffs had no obligation to pay under their mortgages absent Bank Defendants' Work out Agreement Scheme

17.     Plaintiffs are entitled to rescind and obtain back from the Bank Defendants their promised (and delivered) consideration, namely the payments that were made to the Bank Defendants under the illusory Workout Agreements and Extended Workout Agreements. Because California law prohibits deficiency judgments, Bank Defendants were not entitled to require post-election-to-sell payments and foreclose on the loans. In addition, such payments included legal and other fees which Plaintiffs had no obligation to pay under their mortgages absent the Bank Defendants' Work out Agreement Scheme.

18.     Through this Action, Plaintiffs seek to stop Bank Defendants from preying on their customers through its Workout Agreement Scheme. Where Bank Defendants have exercised their election to sell under non-judicial foreclosure, they must not be permitted to extract thousands of dollars in additional payments with illusory promises and false statements of opportunities to cure defaulted loans. Bank Defendants herein have sold or initiated foreclosures on many of the Plaintiffs in this action. At the very least, Plaintiffs are entitled to a return of the payments they made under the false promise from Bank Defendants, that Plaintiffs would at least have an opportunity to avoid foreclosure.

19.     This Complaint alleges in no uncertain terms that had Plaintiff known the truth of any of these material facts, they would never have entered into any loans and/or modifications with Defendants. If the Plaintiffs had later learned the truth, each Plaintiff would have either (1) rescinded the loan transaction under applicable law and/or (2) refinanced the loan transaction with a reputable institution prior to the decline in mortgage values in late 2008.  Instead, each Plaintiff reasonably relied on the deceptions of the Defendants in entering their loans, "trial" modification agreements (aka Workout Plans), and forbearing from exercising their rights to rescind or refinance their loans.

20.     It bears emphasizing – that this action is not about the harm and frauds that Defendants have perpetrated on third-party investors, but rather the harms and frauds perpetrated upon Plaintiffs herein – the borrowers. The frauds described in the Complaint upon the investor, were merely the

1 | *incentive* for Defendants' fraud on Plaintiff-borrowers. The Complaint brings no action for Defendants'
2 | fraud upon the investors. It only brings an action for fraud upon the borrower-Plaintiffs herein.

3 | 21. No business, particularly one as centrally-important to the American economy as
4 | banking, should be allowed to so egregiously deceive its consumers. If Banks are to conduct business,
5 | their business *must not be* that of fraud and deception.

## PARTIES

### *Plaintiffs*

9 | 22. All Plaintiffs listed in the above caption are competent adults and individuals residing in
10 | the State of California, who borrowed money from one or more of the Defendants or its subsidiaries or
11 | affiliates or successors and assigns between January 1, 2003, and December 31, 2008, secured by a deed
12 | of trust on his or her California real estate(s). At all material times hereto, one or more of the
13 | Defendants have acted as Servicer or some other control or capacity over processing the loan.

14 | 23. Based on information now available to them, fewer than 100 plaintiffs are alleging claims
15 | in amounts that would, as to them, equal or exceed the jurisdictional amount for federal jurisdiction
16 | under 28 U.S.C. § 1332(a).

17 | 24. **IN ADDITION TO THE ALLEGATIONS MADE THROUGHOUT THIS**
18 | **COMPLAINT, WHICH APPLY TO ALL PLAINTIFFS (EXCEPT WHERE OTHERWISE**
19 | **NOTED), APPENDIX "A" ("INDIVIDUALIZED PLAINTIFF ALLEGATIONS") PROVIDES**
20 | **INDIVIDUALIZED ALLEGATIONS AS TO EACH AND EVERY PLAINTIFF IN THIS**
21 | **ACTION AND THE SPECIFIC WRONGS DONE BY EACH DEFENDANT.** By this reference,
22 | Plaintiffs hereby incorporate Appendix "A" to this Complaint.

23 | 25. **Statute of Limitations & Equitable Tolling -** All of the concealments, partial
24 | misrepresentations and affirmative misrepresentations were unknown to all Plaintiffs referenced herein
25 | at the time of loan origination. Defendants' scheme was built on deception and keeping borrowers in the
26 | dark. All Plaintiffs herein discovered these frauds and concealments beginning no more than 3 years
27 | prior to the date of filing this action. A reasonable person would have been unable to reasonably
28 | discover said frauds any earlier. The circumstances, and date of discovery of these wrongs are alleged

with specificity as to each and every Plaintiff in Appendix A.

### *Defendants*

26.     Defendant ALLY BANK, N.A. f/k/a GMAC BANK ("Ally Bank") is a multi-national bank that became a bank holding company in December 2008. The bank is headquartered in Detroit, Michigan and incorporated in the State of Utah. The bank is based at 6895 Union Park Center, Midvale, Utah, and is FDIC insured. Since August 2, 2004 it operated two main offices in the United States, one in Utah and one in Pennsylvania, and has 616 employees as of June 2009. It also has a Canadian operation, simply called Ally which operates under Resmor Trust Company, and which is Canadian Deposit Insurance Corporation insured. Ally Bank is a direct bank that markets to customers offering mortgages, savings products, certificates of deposit, online savings accounts, money market accounts and interest checking accounts. Back office operations for Ally Bank and Ally Financial are located in Charlotte, North Carolina. Ally Bank does business in the State of California.

27.     Defendant ALLY FINANCIAL, INC. f/k/a GMAC, LLC ("Ally"), a leading, multi-national financial services firm with a corporate office center in New York, has approximately $179 billion of assets and operations in approximately 25 countries.  Ally is the parent and sole owner of Defendant GMAC MORTGAGE GROUP, INC.. Prior to 2010, Ally was known as GMAC, LLC. Ally does business in the State of California.

>        a.     Ally's public disclosures, as reflected in its filings with the SEC, make clear that Ally considers itself both a common enterprise operating as a greater whole and without meaningful distinctions as to its operating units, and the successor to GMAC Mortgage, Homecomings, RFC and its subsidiaries.

28.     Defendant GMAC MORTGAGE GROUP, INC. ("GMACM") is a wholly-owned subsidiary and the mortgage arm of Ally. GMACM is a Delaware corporation with its principal place of business at 1100 Virginia Drive, Fort Washington, Pennsylvania 19034. GMACM transacted and is continuing to do business in the State of California.

29.     Residential Capital, LLC ("ResCap") is a wholly-owned subsidiary of GMACM and originates, services, and securitizes mortgage loans in the United States, including California. ResCap

- 8 -
**COMPLAINT**

was incorporated in the State of Delaware and its principal office is located at One Meridian Crossings, Minneapolis, Minnesota 55423. Prior to 2007, ResCap was known as Residential Capital Corporation. ResCap does business in the State of California. Plaintiffs reserve the right to name ResCap as an additional defendant in this action as Plaintiffs believe ResCap to have engaged in the coordinated conspiracy with the other named Defendants as alleged throughout this Complaint. However, at this time, Plaintiffs do not name ResCap as a defendant in this action due to the automatic stay imposed by ResCap's bankruptcy action currently pending in the Southern District of New York (Manhattan), case number 1:12-bk-12020.

30.    GMAC-RFC Holding Company, LLC, doing business as GMAC Residential Funding Corporation ("GMAC-RFC"), is a wholly-owned subsidiary of ResCap and acquires residential mortgages and loans, which it then packages as mortgage –backed securities and sells to institutional investors. GMAC-RFC was incorporated in the State of Delaware and its principal office is located at 8400 Normandale Lake Boulevard, Minneapolis, Minnesota 55437. GMAC-RFC transacted business in California. Plaintiffs reserve the right to name GMAC-RFC as an additional defendant in this action as Plaintiffs believe GMAC-RFC to have engaged in the coordinated conspiracy with the other named Defendants as alleged throughout this Complaint. However, at this time, Plaintiffs do not name GMAC-RFC as a defendant in this action due to the automatic stay imposed by GMAC-RFC's bankruptcy action currently administered jointly with the ResCap bankruptcy action in the Southern District of New York (Manhattan), case number 1:12-bk-12020.

31.    Residential Funding Company, LLC ("RFC") is a wholly-owned subsidiary of GMAC-RFC. RFC is a Delaware corporation. Prior to October 2006, RFC was known as Residential Funding Corporation. RFC was known as Sponsor of Securitization transactions which involve some of the Plaintiffs in this complaint. Defendant RFC is the parent and sole owner of Homecomings Financial, LLC ("HFN"), the originator of loans underlying some of the Plaintiffs in this complaint. Prior to 2006, HFN was known as Homecomings Financial Network, Inc. RFC does business in the State of California. Plaintiffs reserve the right to name RFC as an additional defendant in this action as Plaintiffs believe RFC to have engaged in the coordinated conspiracy with the other named Defendants as alleged throughout this Complaint. However, at this time, Plaintiffs do not name RFC as a defendant in this

action due to the automatic stay imposed by RFC's bankruptcy action currently administered jointly with the ResCap bankruptcy action in the Southern District of New York (Manhattan), case number 1:12-bk-12020.

32.     Homecomings Financial, LLC ("HFN") is a wholly-owned subsidiary of RFC. HFN is a Delaware corporation and its principal office is located at 8400 Normandale Lake Boulevard, Minneapolis, Minnesota 55437. Prior to October 2006, HFN was known as Homecomings Financial Network, Inc. HFN is the originator of some of the Plaintiffs loans included in this complaint. HFN continues to do business in the State of California. Plaintiffs reserve the right to name HFN as an additional defendant in this action as Plaintiffs believe HFN to have engaged in the coordinated conspiracy with the other named Defendants as alleged throughout this Complaint. However, at this time, Plaintiffs do not name HFN as a defendant in this action due to the automatic stay imposed by HFN's bankruptcy action currently administered jointly with the ResCap bankruptcy action in the Southern District of New York (Manhattan), case number 1:12-bk-12020.

33.     Home Connects Lending Services, LLC ("HCLS") is a wholly–owned subsidiary of Ally. Home Connects Lending Services is a limited liability company organized and existing under the laws of the state of Pennsylvania, with its principal place of business in Fort Washington, Pennsylvania, and doing business in the State of California and the County of Los Angeles. Home Connects Lending Services, LLC is a settlement service provider for Ally and assigns and reviews all of Ally's appraisals. Plaintiffs reserve the right to name HCLS as an additional defendant in this action as Plaintiffs believe HCLS to have engaged in the coordinated conspiracy with the other named Defendants as alleged throughout this Complaint. However, at this time, Plaintiffs do not name HCLS as a defendant in this action due to the automatic stay imposed by HCLS's bankruptcy action currently administered jointly with the ResCap bankruptcy action in the Southern District of New York (Manhattan), case number 1:12-bk-12020.

      a.     As Ally's wholly-owned appraisal subsidiary, HCLS was a necessary and integral element of Defendants' fraud. At the direction and behest of the conspiracy of Defendants, HCLS artificially inflated and manipulated values of properties throughout California, including the properties of Plaintiffs, in furtherance of the wrongs described

**COMPLAINT**

1    throughout this Complaint, and to increase the profits inuring to the conspiracy of
2    Defendants.

3        b. The customer (Plaintiffs herein) never had a choice as to the settlement providers. Bank
4            Defendants controlled and took the choice out of the customer's hands and directed and
5            collaborated with all their partners to systematically inflate and disgorge the homeowners
6            of their freedom to choose. In furtherance of this act they used the manipulated property
7            valuations to seek premiums on their loans to Plaintiffs, and Secondary Market
8            transactions.

9        34.    Defendant MTC FINANCIAL, INC., doing business as Trustee Corps ("Trustee Corps"),
10   is a California Corporation with its principal place of business in Irvine, California, and doing business
11   in the State of California. Plaintiff herein can allege with detailed factual specificity Trustee Corps's
12   involvement as an essential element of Defendants' fraud in executing foreclosures which Defendants
13   knew were wrongful and without right and intended would be unavoidable, and whose sales resulted in
14   additional profit to Defendants, in furtherance of the Defendants' conspiracy described herein.

15       35.    Executive Trustee Services ("ETS") is a **wholly-owned subsidiary** of ALLY. ETS was
16   and is a limited liability company organized and existing under the laws of the State of Delaware, with
17   its principal place of business in Fort Washington, Pennsylvania, and doing business in the State of
18   California and the County of Los Angeles, acting as the foreclosing trustee on behalf of the other
19   Defendants named herein. Plaintiffs reserve the right to name ETS as an additional defendant in this
20   action as Plaintiffs believe ETS to have engaged in the coordinated conspiracy with the other named
21   Defendants as alleged throughout this Complaint. However, at this time, Plaintiffs do not name ETS as
22   a defendant in this action due to the automatic stay imposed by ETS's bankruptcy action currently
23   administered jointly with the ResCap bankruptcy action in the Southern District of New York
24   (Manhattan), case number 1:12-bk-12020.

25       36.    ETS and Trustee Corps (collectively "Trustee Defendants") were the vital foreclosing
26   arm of the fraudulent conspiracy of Defendants, intentionally and maliciously foreclosing on Plaintiffs
27   herein knowing they had no authority to do so, at the direction of the conspiracy, in the name of profit.
28   Further ETS and Trustee Corps intentionally and maliciously concealed the true names of entities to

**COMPLAINT**

which Plaintiffs' home loans were transferred by other Defendants. The foregoing is part of a scheme by which the Defendants concealed the transferees of loans and deeds of trust, inter alia in violation of California Civil Code § 2923.5 and 15 U.S.C. § 1641, as more fully described herein. ETS and Trustee Corps are also independently liable as co-conspirators in the broad fraudulent conspiracy among all Defendants.

    a. Upon information and belief, ETS and Trustee Corps are acting under the direct control of Ally Defendants. ETS and Trustee Corps are personally responsible for robo-signing affidavits, executing assignments, and recording of Notice of Defaults and Trustee Sale Notices which are defective and not in accordance to California Law.

    b. This Complaint seeks significant relief, including monetary relief, from ETS and Trustee Corps given the key role that they played caused many of the Plaintiffs herein to lose their homes. Through a number of wrongful foreclosure actions they conspired with the other Defendants to commit assorted violations of California Law. All of the violations done by this specific defendant were made in the State of California against California citizens.

    c. Furthermore it is alleged that ETS's and Trustee Corps' action in moving forward with the foreclosure, and their actions as co-conspirators in the fraud and other harms complained of herein, are done with actual malice and in bad faith – eviscerating any defense of qualified trustee immunity. See *Kachlon v. Markowitz* (2008) 168 Cal.App.4th 316, 341; *Latino v. Wells Fargo Bank, N.A.* (E.D. Cal, Oct. 27 2011) 2011 WL 4928880 at *5

    37. The true names and capacities of the Defendants listed herein as DOES 1 through 1,000 are unknown to Plaintiffs who therefore sue these Defendants by such fictitious names. Each of the DOE Defendants was the agent of each of the other Defendants herein, named or unnamed, and thereby participated in all of the wrongdoing set forth herein. On information and belief, each such Defendant is responsible for the acts, events and concealment set forth herein and is sued for that reason. Upon learning the true names and capacities of the DOE Defendants, Plaintiffs may amend this Complaint accordingly.

**COMPLAINT**

38. Defendants herein acted pursuant to a coordinated conspiracy.

   a. At all times material hereto, the business of Defendants was operated through a common plan and scheme designed to effectuate the wrongs complained of herein, misrepresent and/or conceal material facts set forth herein from Plaintiffs, from the California public, and from regulators, either directly or as successors-in-interest to other Defendants.

   b. These wrongful acts including (but not limited to) misrepresentation and concealment were completed, ratified and/or confirmed by each Defendant herein directly or as a successor-in-interest for another Defendant, and each Defendant performed the tortious acts set forth herein for its own monetary gain and as a part of a common plan developed and carried out with the other Defendants, or as a successor-in-interest to a Defendant that did the foregoing.

   c. Each Defendant herein agreed to participate in the Conspiracy, shared in the profit of the conspiracy, and took tortious action in furtherance of the conspiracy.

   d. Each of the conspirators reached a unity of purpose, common design, and meeting of the minds in the unlawful arrangement and acts alleged throughout this Complaint.

   e. "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although **not actually committing a tort themselves**, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,* 7 Cal.4th 503, 510-11 (1994). "By participation in a civil conspiracy, a coconspirator **effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy.**" *Id.* at 511 (citing *Wyatt v. Union Mortgage Co.,* 24 Cal.3d 773, 784 (1979). "In this way, a coconspirator **incurs tort liability co-equal with the immediate tortfeasors.**" *Id.* See also *Vieux v. East Bay Regional Park District,* 906 F.3d 1330, 1343 (9th Cir. 1990)

   f. As to each and every Cause of Action and Count herein, Plaintiffs allege that such actions were taken at the direction, behest, knowledge, and in furtherance of the conspiracy, with all acts an proceeds inuring to the benefit of the members of the Conspiracy. Defendants knowingly agreed to participate in the conspiracy with one another, and all acted in

furtherance of the conspiracy. Defendants have adopted as their own, the torts of their co-conspirators all of which fell within the ambit of the conspiracy alleged throughout this Complaint. All Defendants knowingly and intentionally conspired with one another. Accordingly all Defendants are liable for each Count and Cause of action under a theory of Conspiracy.

39.     Plaintiffs believe and thereon allege that the agents and co-conspirators through which the named Defendants operated included, without limitation, financial institutions and other firms that originated loans on behalf of the Defendants. These institutions acted at the behest and direction of the Defendants, or agreed to participate – knowingly or unknowingly - in the fraudulent scheme described herein.

40.     Those companies originating loans that knowingly participated in the scheme are jointly and severally liable with the Defendants for their acts in devising, directing, knowingly benefitting from and ratifying the wrongful acts of the knowing participants. Upon learning the true name of such knowing participants, Plaintiffs may seek leave to amend this Complaint to identify such knowing participants as Doe Defendants.

41.     For avoidance of doubt, such knowing participants include, without limitation, legal and natural persons owned in whole or in part by the Defendants or affiliates thereof; legal and natural persons owning directly or through affiliates financial interests in Defendants; legal and natural persons directly or through affiliates acting pursuant to agreements, understandings and arrangements to share in the benefits of the wrongdoing alleged in this Complaint and knowingly, to at least some degree, committing acts and omissions in support thereof; and legal and natural persons knowingly, to at least some degree, acting in concert with the Defendants.

42.     As to those legal and natural persons acting in concert without an express legal relationship with Defendants or their affiliates, on information and belief, Defendants knowingly induced and encouraged the parallel acts and omissions, created circumstances permitting and authorizing the parallel acts and omissions, benefited therefrom and ratified the improper behavior, becoming jointly and severally liable therefore.

43.     As to those legal and natural persons whose acts and omissions in support of the Defendants scheme were unwitting, on information and belief, Defendants knowingly induced and

1  encouraged the acts and omissions, created circumstances permitting and authorizing the parallel acts
2  and omissions, benefited therefrom and ratified the improper behavior, becoming liable therefore.

3      44.     To the extent that certain Plaintiffs herein become aware of information that provides a
4  basis for asserting the Defendants herein are liable for the origination of their loans, those Plaintiffs
5  reserve the right to seek leave of this Court to re-assert the appropriate claims herein. Plaintiffs are
6  informed and believe, and thereon allege, that: (1) the Defendants are liable for all wrongful acts of the
7  companies which Defendants acquired prior to the date thereof as the successor-in-interest to those
8  companies; (2) Ally Defendants directly and through its subsidiaries and other agents sued herein as
9  Does have continued the unlawful practices of the acquired companies since the dates of their
10  acquisition, including, without limitation thereof, writing fraudulent mortgages as set forth above and
11  concealing wrongful acts that occurred in whole or in part prior thereto, and (3) Ally Defendants and its
12  subsidiaries are jointly and severally liable as alter egos and as a single, greater unified whole.

13      45.     Ally's public disclosures, as reflected in its filings with the SEC, make clear that Ally
14  considers itself both a common enterprise operating as a greater whole and without meaningful
15  distinctions as to its operating units.

16      46.     The other Defendants followed Ally's directions because they are or were either
17  subsidiaries of Ally, directly or indirectly owned, controlled and dominated by Ally, or because they are
18  in an unequal economic and/or legal relationship with Ally by which they are beholden to Ally and are
19  thereby controlled and dominated by Ally.

20

21  **FIRST CAUSE OF ACTION:**
22  **INTENTIONAL PLACEMENT OF BORROWERS INTO DANGEROUS LOANS**
23  **THEY COULD NOT AFFORD THROUGH COORDINATED DECEPTION, IN**
24  **THE NAME OF MAXIMIZING LOAN VOLUME AND THUS PROFIT**
25  *(By All Plaintiffs against Ally and Bank Defendants, and all other Defendants as Co-Conspirators)*

26

27      47.     During the 1980s and 1990s, the mortgage securitization business grew rapidly, making it
28  possible for mortgage originators to make more loans than would have been possible using only the

- 15 -

traditional primary source of funds from deposits. During that period, Bank Defendants made loans in accordance with its stated underwriting and appraisal standards.

48. Under the traditional mortgage model, which Ally and Bank Defendants originally subscribed to, a mortgage originator originated loans to borrowers, *held* the loans to maturity, and therefore retained the credit default risk. As such, under the traditional model, the mortgage originator had a financial incentive to ensure that (i) the borrowers had the financial ability to repay the loans, and (ii) the underlying properties had sufficient value to enable the mortgage originator to recover its principal and interest if the borrowers defaulted on the loans.

49. Traditionally, mortgage lenders financed their mortgage business primarily using funds from depositors, retained ownership of the mortgage loans they originated, and received a direct benefit from the income flowing from the mortgages. When a lender held a mortgage through the term of the loan, it received revenue from the borrower's payments of interest and fees, and also bore the risk of loss if the borrower defaulted and the value of collateral was not sufficient to repay the loan. As a result of this **"originate to hold"** model, the lender had an economic incentive to verify the borrower's creditworthiness through prudent underwriting and to obtain an accurate appraisal of the value of the underlying property before issuing the mortgage loan.

50. With the advent of securitization, the traditional "originate to hold" model gave way to the "originate to sell" model, in which mortgage originators sold the mortgages and transferred credit risk to their investors through the issuance and sale of Mortgage Backed Securities. Securitization concurrently provided lenders like Bank Defendants with an incentive to increase the number of mortgages they issued and reduced their incentive to ensure the mortgages' credit quality.

51. With the aforementioned mandate for growth as the backdrop and incentive for their fraud, Bank Defendants abandoned the traditional model of **"originate to hold"** and instead adopted the much more lucrative **"originate to sell"** model, and in the early 2000's Bank Defendants began to systematically disregard its stated underwriting guidelines in an effort to originate an unprecedented number of loans for securitization.

52. But to feed its investors and continue to make such never-before-seen profits, Defendants needed more borrowers. In turn, Ally and Bank Defendants began disregarding their own underwriting

1  standards, and approving borrowers who were grossly under-qualified, in the name of getting as many
2  loans out the door, and sold to investors for a profit, as possible.

3      53.    In fact they *preferred* under qualified borrowers. Because Ally and Bank Defendants had
4  taken out insurance policies against the possibility of default, Ally and Bank Defendants and its co-
5  conspirators (Defendants herein) would get paid in the event of a borrower's default. In fact, in many
6  cases, Defendants had taken out numerous redundant insurance policies on the same property, so that
7  when default occurred, Defendants were getting paid out multiple times -- they weren't just breaking
8  even, they were *actually turning a profit* when borrowers defaulted. In other words, Ally and Bank
9  Defendants had an *incentive* to place borrowers into impossible loans, because by doing so they made
10 profit.

11     54.    With profit as their motive, Ally and Bank Defendants, in conspiracy with the other
12 Defendants herein, set out upon a massive and centrally directed fraud by which Bank Defendants placed
13 homeowners into loans which Defendants *knew* Plaintiffs could not afford, abandoned industry standard
14 underwriting guidelines, and intentionally inflated the appraisal values of homes throughout California for
15 the sole purpose of herding as many borrowers as they could into the largest loans possible which Ally and
16 Bank Defendants would then sell on the secondary market at inflated values for unimaginable, ill-gotten
17 profit (wildly surpassing the profit they would make by holding the loans), *knowing that their scheme would*
18 *cause the precipitous decline in values of all homes throughout California*, including those of Plaintiffs
19 herein.

20     55.    To be clear, it is alleged that Ally and Bank Defendants' actions in intentionally placing
21 borrowers into impossible loans in the pursuit of profit , were a substantial factor in if not *the* cause of
22 the generalized market crash which caused the prices of real estate values throughout California to
23 plummet, damaging Plaintiffs herein.

24     56.    Like cattle, Plaintiff-borrowers were led to slaughter by Defendants and their greed.
25 Borrowers were intentionally placed in loans which Defendants knew Plaintiffs could not afford, and
26 whose default they knew was a mathematical certainty.

27     57.    To achieve this loan volume, Bank Defendants (acting in furtherance of the conspiracy of
28 Defendants), intentionally concealed and misrepresented numerous material terms of their loans, to

**COMPLAINT**

1   induce Plaintiffs' unwitting, uninformed consent to those loans– for instance going to extraordinary

2   lengths to conceal the true negatively amortizing nature of the loan, or in other instances affirmatively

3   misrepresenting that the true payment of a loan, among numerous other deceptions described below.

4       58.    To further increase their loan volume and maximize their profit, Defendants intentionally

5   abandoned industry standard-underwriting guidelines (as well as their own underwriting guidelines) in

6   order to approve borrowers for loans which Bank Defendants knew were dangerous for them.

7

8   *Defendants Systematically Abused and Abandoned Industry Standard Underwriting Guidelines to*

9   *Intentionally Place Unqualified Borrowers into Loans Which Defendants Knew They Could Never*

10  *Afford*

11      59.    As mentioned above, however, Defendants' fraud was multipronged. To feed their

12  investors and continue to make such never-before-seen profits, Bank Defendants needed more

13  borrowers. In turn, Bank Defendants systematically and intentionally began disregarding their own

14  underwriting standards, and approving borrowers who were grossly under-qualified, in the name of

15  getting as many loans out the door, and sold to investors for a profit, as possible.

16      60.    In other words, not only did Bank Defendants inflate appraisal values, hand-in-hand with

17  HCLS, in the name of making the loans appear safer to investors, and thus more profitable to the banks

18  (discussed below in the causes of action for "Individual Appraisal Inflation" and "Market Fixing"), but

19  Bank Defendants also abandoned their own underwriting guidelines to approve more and more

20  borrowers for loans. In doing so, Defendants intentionally placed borrowers into dangerous loans which

21  would imperil their entire livelihoods, and often cases into loans whose default was an absolute

22  mathematical certainty. The result was, once again, more profit obtained through deception.

23      61.    To achieve their fraud, Bank Defendants intentionally and grossly falsified Plaintiffs'

24  salary, income, bank accounts, liquid assets, non-liquid assets, employment, real estate owned values,

25  rental income ad infinitum, and by doing so simultaneously achieved two goals. First, they were able to

26  approve borrowers who could never have been approved under their own published conventional

27  underwriting guidelines (as well as industry standard underwriting guidelines used throughout the

28  United States.) Second, they were able to conceal from the investor the highly risk nature of the loan,

- 18 -

**COMPLAINT**

which resulted in more profit to the Bank. Investors were willing to pay more money for less risky loans. The translation is that Defendants had every incentive to deceive borrowers into entering loans which they realistically could never afford. The result was that Defendants turned profit, *at the sole expense of their borrowers*. When the music stopped, only the borrowers were left without a chair.

62.     Bank Defendants' long-term campaign of misrepresentations, concealments and abandonment of industry standard underwriting guidelines – all of which were designed to maximize loan volume by placing as many borrowers into loans as possible, whether qualified or unqualified – was implemented by the Board, Management and Ownership of the Ally Defendants and Bank Defendants pursuant to a **top-down policy**. Ally and Bank Defendants intentionally put mechanisms and programs in place to allow their own employee's/Loan Consultants/Loan Representatives to **falsify** borrower income, asset and other material information of their borrowers, without a borrower ever knowing that their income or assets had been inflated. One such program was called the **"Stated Income"** program. Under this program, Defendant would take as true any income stated on the application, without requesting any documentation in support. Seizing this unbridled free-for-all, Defendants' **own** employees who were paid commission based on the number and size of loans they got approved, rampantly falsified material income and asset information of their borrowers. By doing so they were paid more commission. But more importantly, Bank Defendant themselves created more products to be sold on the secondary market for even more profit. In other words, Ally and Bank Defendants intentionally put policies and programs into motion which would allow it to place unqualified borrowers into dangerous loans – all while maintaining the semblance of propriety, and all without ever having to disclose to their investors that the incomes listed on their loan applications were false.

63.     Numerous others similar programs were also adopted such as **"stated assets"**, and **"low documentation loans"**. Both of which allowed Bank Defendants to falsify information, and get loans approved which would  never been approved under traditional documentation

64.     Even in the absence of these programs Bank Defendants and their employees nevertheless had the ability to and did, falsify their borrower's income and assets through numerous other means. For example, Defendants would inflate a borrower's income by making it appear as though the borrower was earning rental income on of their other properties when in fact they were earning none.

To legitimatize this false income, Defendants would add insult to injury by manufacturing an entirely false rental agreement, showing the false monthly rental income, complete with the forged signature of a non-existent renter.

65.    Bank Defendants *regularly* inflated borrowers' incomes by over 50% and on many occasions by as much as a mind-numbing 500%.

66.    Bank Defendants were intentionally turning a blind-eye to the rampant and egregious manipulations of incomes by their own employees, through policies and programs intentionally set forth by Defendants' very own top executives to achieve *just such a result*. The result was that Bank Defendants were able to originate loans which they knew were false, and they intended to be false, but without ever having to *admit* to their secondary market investors that the loans were, in fact, false.

67.    Ally and Bank Defendants knew and intended that their employees would falsify this information, for the very reasons set forth above, and in fact incentivized them through their commission and reward structure to do so. In other words Ally and Bank Defendants intended that this program would be abused. And by doing so, allowed and intended for their borrowers to be placed into loans which the borrowers had no chance of being able to afford had their true income/asset information been used .

68.    Bank Defendants then told their borrowers, and Plaintiffs herein, that a determination by the Bank that they were "*qualified*" for a loan meant that the borrowers would be able to "*afford*" their loan.

69.    Industry Standard and Conventional Underwriting guidelines, including those used by Bank Defendants herein, required that loans with a "front end" debt to income ratio higher than **35%** be rejected. They also required that loans with a "back end" debt to income ratio of higher than **45%** be rejected – and that 45% figure was on the on the *very* high end. For a loan with a 45% "back end" debt to income ratio to be approved, a borrower had to have excellent credentials in all other areas such as 720+ median credit score and high liquid asset reserves totaling more than 12 months of their mortgage payment.

70.    However, Bank Defendants in this action regularly approved loans with front end ratios wildly exceeding 35% (and back end ratios wildly exceeding 45%) on a regular basis, and as a matter of

course, in violation of their own published underwriting guidelines as well industry standard underwriting guidelines used throughout the banking industry. Defendant Banks intentionally placed borrowers into these dangerous loans, which fall wildly outside of their own underwriting guidelines – and intentionally did so in the name of profit without any regard for a borrower's safety. Then, to ensure that these wrongs and deceptions went unnoticed Defendants embarked on a campaign of concealments and misrepresentations all of which were designed to conceal the true nature and payments of the loan and designed induce the borrower's belief that they could "afford" the loan.

### *Defendants Turned Substantial Profits Through Their Borrowers' Default Furthering Their Incentive to Intentionally Place Plaintiffs Into Impossible and Unaffordable Loans*

71.     Not only did Ally and Bank Defendants approve under qualified borrowers – they preferred them. That's because a defaulting borrower meant profit for the conspiracy of Defendants.

72.     All of the Defendants managed risk through leverage and derivatives trading. With the advent of "Credit Default Swaps" ("CDS"), an insurance policy of sorts, they had the protection they needed to push these loans out the door to grossly under qualified borrowers, without any fear of loss whatsoever. The CDS gave defendants *another* incentive to give grossly under qualified borrowers – whose default was virtually certain. Not only (1) were Defendants incentivized to give loans to unqualified borrowers because they were turning other-worldly profit by selling as many loans on the secondary market as possible, *but also* ... (see next paragraph).

73.     (2) Because Bank Defendants had taken out these insurance policies – aka Credit Default Swaps - against the possibility of default, Ally and its co-conspirators (Defendants herein) would get paid in the event of a borrower's default. In fact, in many cases, Defendants had taken out numerous redundant Credit Default Swaps and insurance policies out on the same property, so that when default occurred, Defendants were getting paid out multiple times – they weren't just breaking even, they were *actually turning a profit* when borrowers defaulted. In other words, Ally and Bank Defendants had an *incentive* to place borrowers into impossible loans, because by doing so they were making money.

74.     This technique gave these Defendants the insurance they needed to pass the risk along to third party without taking the risk themselves. Since they planned on securitizing all of their loans and not keeping any of them, Ally and Bank Defendants could not care less about quality or who they hurt. They would push insurance on the investors and actually over insure the loan pools, at times betting that

**COMPLAINT**

the Plaintiffs and other borrowers would default.

75.     Since the Defendants created these pools to begin with, they were fully aware of the lack of quality and lack of due diligence that went into setting up these pools. These "swaps" are life insurance policies that are placed on Plaintiffs' loans. If the loan dies, the Defendants get paid.

76.     But insurance against default wasn't the only way Defendants made money from the losses of their imperiled borrowers. Bank Defendants and Trustee Defendants also made money by charging a litany of unearned and egregiously marked up fees associated with the initiation of and conducting (their own wrongful) foreclosures including: inspection fees, default fees, late fees, advance fees, attorney's fees, and trustee fees. In short Bank Defendants had an incentive *to place Plaintiff borrowers into loans they knew their borrowers could not afford* because by doing so, Bank Defendants and Trustee Defendants would turn a profit. Not only that, but Defendants had an incentive *to wrongfully initiate foreclosures* because they made money by doing so through the assessment of excessive, disproportionate and unearned fees. This topic is further developed in the Cause of Action for Wrongful Foreclosure (discussed below).

### *Defendants Intentionally Misrepresented, Partially Misrepresented, & Concealed Highly Material Information In Order To Induce Plaintiffs to Unknowingly Take Dangerous Loans So that Defendants Could Profit*

77.     To maximize their profit, Defendants needed loan volume. In turn, Bank Defendants (acting in furtherance of the conspiracy of Defendants), intentionally concealed and misrepresented numerous material terms of their loans, to induce Plaintiffs' unwitting, uninformed consent to those loans , in order to get as many borrowers into loans as possible – for instance going to extraordinary lengths to conceal the true negatively amortizing nature of the loan, or in other instances affirmatively misrepresenting the true payment and terms of a loan, among numerous other deceptions described below.

78.     To further their fraud, Ally and Bank Defendants, acting at the behest of the Conspiracy of Defendants, operated with the primary imperative of keeping Plaintiffs in the dark about the truth of their scheme and the terms of the loans because Defendants knew that if Plaintiffs knew the truth, Plaintiffs would never have entered into the loans with Bank Defendants.

79.   To that end, Ally and Bank Defendants embarked on a long term campaign of misinformation, including intentional misrepresentations, partial misrepresentations & half-truths calculated to deceive, as well as active suppression of material facts, all in aims of inducing Plaintiffs to enter into a loan contract with Defendant which they would not have otherwise.

80.   Defendants, hand-in-hand with one another, **actively concealed** the following highly material items of information:

a.  The fact that Bank Defendants had intentionally abandoned their own as well as industry standard underwriting guidelines *for the purpose of* placing borrowers into loans which they knew borrowers could not afford and upon which they knew borrowers would default to a mathematical certainty;

b.  That Bank Defendants had abandoned the "originate to hold" business model of conventional money lenders, and instead became **a loan packaging and re-selling facility in which Bank Defendants originated loans for the sole purpose of reselling them on the secondary market for vast profit** –creating an incentive to place borrowers into loans which bank defendants knew they could not afford and simultaneously passing along all risk of default to the purchasers of the loan.

c.  That Bank Defendants had falsified Plaintiffs' income and asset documentation to intentionally place them into loans they could not otherwise afford;

d.  That Bank Defendants internally knew the products they were selling were dangerous and referred to them, among other things as "sacks of shit" as established by numerous internal emails;

e.  That Bank Defendants possessed internal reports concluding that if a Plaintiff took a loan from Defendants, that Plaintiff would suffer material losses, including but not limited to the loss of substantial equity;

f.  That Bank Defendants knew their scheme would cause a liquidity crisis that would devastate home prices;

g.  That Bank Defendants were no longer making loans based on a borrower's qualifications or their ability to afford such a loan and that those ideas were now unimportant to them,

- 23 -
**COMPLAINT**

but were instead making loans without regard for a borrowers qualifications or ability to afford simply to create sufficient product to sell to investors on the secondary market for profit;

h. That Bank Defendants *knew* Plaintiff-borrowers could not afford the loans they were being placed into and which they knew Plaintiffs would default upon to a mathematical *certainty*, but intentionally placed them into these impossible loans nonetheless in the name of making profit;

i. That Bank Defendants actively concealed the material terms of their loans from their borrowers, including but not limited to the fact a borrower was *certain* to defer interest under an Option ARM loan by making the minimum payment

j. That Defendants were no longer making loans based upon the profitability of their mortgage lending business (but rather instead upon the profitability of sales of these loans to investors and secondary markets);

k. That Because of this profitable scheme and because their loans were insured, Defendants stood to profit regardless of whether their loans performed and as such had no incentive to insure that the loans they were placing their borrowers into were safe, or that their borrowers were actually qualified for (or could make payments on) the loans into which they were being placed – in fact they had a disincentive to do so;

l. That Bank Defendants were in fact dependent on selling loans it originated into the secondary mortgage market, to sustain its business;

m. That Bank Defendants were making loans simply to create sufficient product to sell to investors for profit;

n. That Bank Defendants had ceased acting as conventional money lenders and had, instead, morphed into an enterprise engaged in systematic fraud on all of its material constituencies, including Plaintiffs;

o. That Bank Defendants had ceased acting as conventional money lenders who carried their own risk and turned profit through the production of low-risk loans, and instead morphed into a loan conveyor belt, packaging loans with little if any regard for their underwriting

standards, and selling those loans at substantial profit to investors on the secondary market to whom the risk would be passed on, through fraud and misrepresentation – a business enterprise vastly more profitable than the business model of being a conventional money lender;

p. That in furtherance of this scheme, Bank Defendants had in fact abandoned their conventional lending business and prudent lending standards, consistently lending to those who were grossly under-qualified and who they knew could not afford their loans and would default upon to a mathematical certainty;

q. Bank Defendants knew these loans were unsustainable for themselves and the borrowers and to a certainty would result in a crash that would destroy the equity invested by Plaintiffs and other of Defendants' borrowers;

r. Bank Defendants, their officers and employees internally referred to these loans as "Sacks of Shit" and "Garbage Loans";

s. Bank Defendants knew the sheer scope of their loan portfolio and fraudulent packaging of the portfolio would cause a liquidity crisis that would devastate home prices and gravely damage Plaintiffs;

t. Bank Defendants knew Plaintiffs would be materially and substantially harmed by contracting with Defendants;

u. Bank Defendants pursuit of a matching strategy in which it matched the terms of any loan being offered in the market, even loans offered by primarily subprime originators dangerously placed borrowers into loans regardless of whether or not they were actually qualified for the loan or could actually afford the loan, instead ceding their underwriting guidelines to whoever was the most lax lender at the time, regardless of whether or not *that* lenders guidelines were proper, safe, negligent or even dangerous or guided by reason;

v. The high percentage of loans it originated that were outside its own already widened underwriting guidelines due to loans made as exceptions to guidelines;

w. Bank Defendants definition of "prime" loans included loans made to borrowers with

**COMPLAINT**

1    FICO scores well below any industry standard definition of prime credit quality;

2    x.  The high percentage of Bank Defendants subprime originations that had a loan to value

3        ratio of 100%; and

4    y.  Bank Defendants subprime loans had significant additional risk factors, beyond the

5        subprime credit history of the borrower, associated with increased default rates, including

6        reduced documentation, stated income, piggyback second liens, and LTVs in excess of

7        95%.

8    81.  The Plaintiffs did not know any of the concealed facts. Defendants had exclusive

9    knowledge of these facts.

10   82.  Ally and Bank Defendants, at the benefit of the Conspiracy of Defendants, further stated

11   numerous half-truths and made partial representations calculated to deceive Plaintiffs and to create a

12   substantially false impression. (*Boschma v. Home Loan Center, Inc. (2011) 198 Cal.App.4th 230, 250,*

13   ["Defendant [bank] had a common law duty to avoid making partial, misleading representations that

14   effectively concealed material facts"]; ((*Vega v. Jones, Day, Reavis & Pogue* (2004) 121 Cal.App.4th

15   282, 292 ["**Even where no duty to disclose would otherwise exist**, where one **does** speak he must

16   speak the whole truth to the end that he does not conceal any facts which materially qualify those

17   stated." ]).  By making such partial misrepresentations, Defendants incurred a duty to speak the whole

18   truth such that Defendants do not conceal any facts which materially qualify those stated. Such **partial**

19   **misrepresentations** include:

20   a.  Representations calculated to make a borrower believe that his or her payment would

21       only be X dollars, when in reality such payment was only available for a limited

22       undisclosed period of time and would then drastically increase;

23   b.  Representations that a borrower could afford payments under their loan, calculated to

24       make a borrower believe that the loan payment would always be constant, but made

25       knowing that the such payments would later drastically increase and knowing that the

26       borrower would be *unable* to afford such increased payments;

27   c.  Representations that a borrower qualified for a loan, when in reality the borrowers'

28       qualification was only obtained through Defendants falsification of the borrowers'

income, asset and other documentation, done without the borrower's knowledge;

d. Defendants' intentional publication and dissemination of their underwriting guidelines intended to create the perception that Bank Defendants lent in conformity with those guidelines and that their lending standards were safe, when in reality Defendants had abandoned their underwriting guidelines and were issuing loans which they knew were in unsafe;

e. Representations made that a borrower *qualified* for a loan (oftentimes based on documents falsified by Defendants) calculated to induce the borrower's belief they could *afford* their loan, when in reality Defendants knew borrowers would be unable to afford their loan as a matter of fact (oftentimes because Defendants had falsified their income and asset documentation as well as abandoned their own underwriting guidelines);

f. Representations to a borrower that his payment would cover both principal and interest, and calculated to induce the borrower to believe that his or her payment would always cover principal and interest, when in reality that same payment would no longer cover any principal after a very short period of time, and indeed would not even cover the minimum interest on the loan resulting in deferred interest;

g. Representations made in the Loan Documents that by making the minimum payment of an Option ARM loan, a party *may* defer interest (aka "negatively amortize"), when in *reality* by making the minimum payment a party was *certain* to defer interest. **The California Court of Appeals in *Boschma* has held that these identical allegations give rise to an actionable claim for fraudulent concealment.**; The *Boschma* court held that where, as here, the disclosures in Defendants' Option ARM loans discussing negative amortization, only frame negative amortization as a mere **possibility**, rather than the reality which is that when making a minimum payment negative amortization is a **certainty**, the disclosure is insufficient under law, giving rise to a valid cause of action not only for UCL but also for fraudulent concealment . (*Boschma v. Home Loan Center*, Inc. (2011) 198 Cal.App.4th 230.) In so holding the court in *Boschma* explicitly held that Banks have a duty to disclose such material information. Plaintiffs allege that Bank Defendants, identically, failed to disclose the

certainty of negative amortization in the Option ARM loans. Plaintiffs have attached
supporting documentation. (See Appendix A).

h. The provision of an intentionally ambiguous Truth in Lending Disclosure ("TILDS")
Payment Schedule which did not make it clear that borrowers could have avoided
negative amortization (under an Option ARM loan) by making payments larger than
those that were mandated by the payment schedule, in fact the payment schedule created
the materially false impression that by following the payment schedule, Plaintiff
borrowers would not negatively amortize their loan;

i. Other partial misrepresentations and half-truths calculated to induce the borrower to
fundamentally misunderstand the nature of their loan, such that Plaintiff-borrowers would
agree to a loan they would not have otherwise agreed to, such as the meaning of a pre-
payment penalty, or whether they had a pre-payment penalty.

83. Ally and Bank Defendants, hand in hand with one another, **intentionally and
affirmatively misrepresented:**

a. That Plaintiffs would be able to *afford* the loans they were being given;

b. That Defendants' calculations confirmed that Plaintiffs will be able to afford the loans
they were being given;

c. That Defendants calculations confirmed that Plaintiffs would be able to shoulder the
additional debt resulting from Defendant's loans, even in light of Plaintiffs' other debts
and expenses;

d. That the term "qualify" was synonymous with being able to "afford" a loan.

e. That by paying the minimum payment on the Option ARM loan they would not be
deferring interest (aka "negatively amortizing"), when in reality, they would be deferring
interest;

f. That by paying the minimum payment on the Option ARM loan, Plaintiffs would be
paying principal and interest, when in reality the minimum payment did not pay down
any principal, and actually resulted in deferred interest (aka negative amortization);

g. That the value arrived at by Defendants' and HCLS' appraisals of Plaintiffs' property

**COMPLAINT**

was indeed the true value of Plaintiffs' property (when in reality Defendants appraisals' were intentionally and artificially inflated, and moreover when Defendants had engaged in a systematic price fixing scheme which had already falsely inflated the value of Plaintiffs' property);

h. The true terms of the their loans, including their interest rate, the terms of their loans, whether the loan was variable or fixed, the duration of any fixed period, and the inclusion of a prepayment penalty;

i. That Defendants only entered into mortgages with qualified borrowers (when in reality Defendants were recklessly and intentionally ignoring their own underwriting standards, and offering mortgages to substantially under-qualified borrowers, including Plaintiffs herein who they knew could not afford their loans);

j. That Defendants were financially sound (when in reality Defendants were dependent on selling their fraudulently-pooled loans to investors and the secondary market to sustain their business);

k. That Defendants held their loans in their own portfolio and did not sell them on the secondary market (when in reality Defendants sold the overwhelming majority of their loans on the secondary market);

l. That Defendants were engaged in lending of the highest caliber (when in reality Defendants (1)were disregarding industry standard quality assurance and underwriting guidelines as well as their own underwriting guidelines, (2)had ceded their underwriting guidelines to the bottom of the market by virtue policy to match loans of any other lender no matter how unsafe, and (3) were lending to under qualified borrowers upon properties which were intentionally overvalued – all in the name of making as much money on the secondary/investor market as quickly as possible);

m. That the loans they offered were safe and secure (when internally Defendants and their officers were referring to their loans as "SACKS OF SHIT" and "GARBAGE LOANS");

n. That Plaintiffs and other borrowers were qualified for the loans Defendants were placing them into and that Plaintiffs were capable of affording the fully amortized payments on

those loans (when internally Defendants knew that Plaintiffs were not qualified, that Plaintiffs could not afford the loan, and that, in many instances, it was a mathematical inevitability that the Plaintiffs would default);

o. That Plaintiffs would be able to refinance their loans at a later date (when internally Defendants knew that Plaintiffs would not be able to refinance Plaintiffs as a result of the depressed real estate market created by Defendants, the overvaluation of Plaintiffs' property, the damage to Plaintiffs' credit score which defendants knew would ensue, and for the many reasons already set forth above);

p. That Defendants would modify Plaintiffs' loans (when in fact Defendants did not modify Plaintiffs' loans, had no intentions to do so, and it was more profitable for Defendants to leave the loans unmodified).

### *Authority to Bind*

84.     These representations were not made as statements of opinion, but as statements of fact, made by the employees and agents of the Ally and Bank Defendants charged with the duty of originating loans ("**Loan Representatives**") and who were specifically employed by Bank Defendants to walk Plaintiff borrowers through the loan process, and vested with the authority, both apparent and actual, to bind Defendants.

85.     Each and every one of these Loan Representatives was vested by the respective bank they work for – the bank/lending institution from which a Plaintiff got his/her loan – with both actual and apparent authority to bind that bank/lending institution.  These Loan Representatives were the ***primary***, if not sole, interface between the bank/lending institution and the customer/borrower/plaintiff. Defendant banks very much intended to create the distinct perception that the representations made by these Loan Representatives, were factual representations coming directly from the  bank, and representations upon which the borrower Plaintiffs could reasonably rely, well above-and-beyond that of mere opinion.

86.     Specifically, with regard to the representation made by Bank Defendants to Plaintiff borrowers, that they could "afford" the loans they were being given were statements delivered as

**COMPLAINT**

statements of fact upon which Plaintiffs could reasonably rely, particularly in light of the specialized expertise of the Defendant employees who made the statements. These employees spend months and years, undergoing specialized education, to learn the highly complicated mathematics of lending such as loan amortization, loan re-casting, front end debt to income ratios, back end debt to income ratios, and loan to value ratios – mathematics which borrowers simply don't understand, nor could they be expected to. Because of their vastly superior knowledge, and because of the actual and apparent authority vested in these employees by the Defendant Banks, as described above, Plaintiffs herein reasonably relied on these statements. By making these false and misleading statements, they incurred a duty to be truthful.

*Plaintiffs Reasonably Relied on Defendants' Numerous Deceptions in Deciding to Enter into Contracts With Them*

87. Defendants intended to deceive Plaintiffs and induce their reliance, by intentionally misrepresenting and failing to disclose the material facts.

88. Plaintiffs did in fact rely on each of the aforementioned misrepresentations, partial representations and concealments in deciding to contract with Defendants

89. Plaintiffs reasonably and foreseeably relied upon the deception of Defendants in deciding to enter into a Loan contract with Bank Defendants - Defendants were among the nation's leading providers of Loan. It was highly regarded and by dint of its campaign of deception through securities filings, press releases, public utterances, web sites, advertisements, brokers, loan consultants and branch offices, Bank Defendants had acquired a reputation for performance and quality underwriting.

90. Moreover, as consumers unfamiliar with the myriad intricacies, terms and mathematics of mortgages, it was both reasonable and foreseeable (if not entirely intended) that Plaintiffs would rely on the advice of loan professionals and bank representatives (many of whom held the title "Loan CONSULTANT") trained to understand the highly-complicated terms and mathematics of financing, amortization, indices, margins, and collateralization in the mortgage world, in deciding to contract with Bank Defendants. Their knowledge of this process, its details, as well as their loan products was vastly superior to those of Plaintiff borrowers. Indeed, Bank Defendants had exclusive knowledge of these material facts which were not known to Plaintiff.

**COMPLAINT**

91.     The reality is that borrowers simply don't understand the highly complicated mathematics of lending such as amortization, loan re-casting, loan to value ratios, or debt to income ratios, etc. Nor could they be expected to – those mathematics require specialized training and education. The borrower's knowledge is inferior. Because of the vast imbalance of knowledge, when a loan consultant tells a borrower that they can afford their loan, borrowers are put in a position where they must repose their trust on their lender's knowledge.

92.     Indeed, Bank Defendants induce their borrowers (Plaintiffs) to repose trust in them by holding themselves out as (1) experienced professionals with (2) superior knowledge, education and expertise,  and by **offering them financial guidance on how to structure their assets, equity position, and debt – all of which was held out as being for the borrower's (Plaintiffs') benefit**. In many instances Bank Defendants called Borrowers to **solicit loans under the guise of offering them "financial advice" and "investment strategies."**  In so acting, Defendants acted as fiduciaries or quasi-fiduciaries.

93.     Based upon the Defendants' (1)long term media campaign holding themselves out as a trustworthy and reputable lending institution, (2) position as leading financial institutions,(3)Defendants' expertise, highly specialized training, unique understanding of the highly complicated terms and mathematics of financing  as well as Defendant Banks' capacity as an advisor, in addition to their (4) intentionally misleading and/or partially true statements found in omissions, including in their securities filings, numerous documents, advertisements and other media, statements made by their employees and agents with apparent and/or actual authority and their publicly available underwriting guidelines the Plaintiffs reasonably relied upon the statements and omissions made by Defendants and reasonably relied that no material information necessary to their decisions would be withheld or incompletely, inaccurately or otherwise improperly disclosed.  In so relying, the Plaintiffs were gravely damaged as described herein.  The Defendants acted willfully with the intention to conceal and deceive in order to benefit therefrom at the expense of the Plaintiffs.

94.     Further, Plaintiffs had no way of knowing, among other things, that Defendants (1) were secretly departing from their own stated underwriting guidelines to intentionally approve borrowers for loans they couldn't afford in aims of selling as many loans as possible on the secondary market for

profit, or (2) had surreptitiously manipulated the appraised values of their borrower's properties and had

otherwise artificially pumped up values of real estate through California (aka "market fixing").

Defendants' knowledge of these items was exclusive. Their scheme was built on keeping borrowers in

the dark

95.    Furthermore, because of a lender's (2) vastly superior knowledge compared to that of

their borrowers, and because of (3) the highly-advisory role a lender takes in the lending process

(advising borrowers how much they can afford, what type of loan and term they should take, what size

loan to take, how to structure their loan, and what their payments will be), Bank Defendants

intentionally placed their borrowers in a position where they *must* repose trust in their lender.

96.    In reliance on the above concealments and/or material misrepresentations, Plaintiffs

entered into mortgage contracts with Defendants they otherwise would not have entered into and as a

result thereof were damaged. This damage was not only foreseeable by Defendants, but actually

foreseen (and then concealed) by them.

97.    The unraveling of Defendants' scheme has caused the material depression of real estate

values throughout California, including the real estate of Plaintiffs herein.

98.    Defendants knew that within a foreseeable period, its investors would discover that

Defendants' borrowers could not afford their loans and the result would be foreclosures and economic

devastation.

99.    Despite their awareness of and concerns about the increasing risk the Defendants were

undertaking, they hid these risks from the Plaintiffs, borrowers, potential borrowers, and investors.

100.    These frauds and concealments, partial misrepresentations and affirmative

misrepresentations were unknown to all Plaintiffs referenced herein at the time of loan origination. All

Plaintiffs herein discovered these frauds and concealments beginning no more than 3 years prior to the

date of filing this action. A reasonable person would have been unable to reasonably discover said

frauds any earlier.

### Bank Defendants Owed Plaintiffs a Duty

101.    For seven separate and independent reasons, Bank Defendants owed Plaintiffs a duty.

**COMPLAINT**

102.     **First** under California Civil Code §1572, parties to a contract have an unequivocal duty to disclose material facts to one another. (*Walker v. KFC Corp.* (S.D.Cal. 1981) 515 F.Supp. 612, 622 ["[section] 1572 affirmatively imposes the duty not to suppress facts on persons who are parties to a contract or who are inducing others to enter into a contract."]) Here Plaintiffs are engaged in contracts with respective loan contracts with each of the Bank Defendants, and plaintiffs have alleged numerous failures to disclose such material facts. (See paragraph 333, and Appendix A).

103.     **Second**, California Civil Code §§1709 and 1710 establish a separate independent duty of disclosure, even in the absence of a contractual relationship, where, as here, Bank Defendants and HCLS have made partial inaccurate disclosures which are likely to mislead for want of the missing fact, codifying the long-standing rule that the "telling of a half-truth calculated to deceive, is fraud." Plaintiffs have alleged numerous such partially misleading disclosures at paragraph 336, of this Complaint, and in Appendix A. The Supreme Court of California has held the same. (Warner Constr. Corp., supra, 2 Cal.3d at 294 [A defendant has a duty of disclosure "when the defendant makes partial representations but also suppresses some material facts."]).

104.     **Third**, Bank Defendants and HCLS had exclusive knowledge of numerous items of highly material information which they did not disclose. Numerous cases including those from the Supreme Court of California hold that a defendant has a duty of disclosure "when the defendant had exclusive knowledge of material facts not known to plaintiff." *Warner Constr. Corp.*, supra, 2 Cal.3d at 294.

105.     **Fourth**, a Defendant has a duty to disclose "when it actively conceals a material fact from the plaintiff." Warner Constr. Corp., supra, 2 Cal.3d at 294. This Complaint alleges throughout that Bank Defendants and HCLS embarked on a campaign of active suppression and concealment of numerous material facts.

106.     **Fifth**, Numerous court, including the California Court of Appeal have held that where, as here, the disclosures in Plaintiffs' Option ARM loans discussing negative amortization, only frame negative amortization as a mere possibility, rather than the reality which is that when making a minimum payment negative amortization is a certainty, the disclosure is insufficient under law, giving rise to a valid cause of action not only for UCL but also for fraud/misrepresentation. (Boschma v. Home Loan Center, Inc. (2011) 198 Cal.App.4th 230.) The court in Boshcma explicitly held that Banks have a

duty to disclose such material information. Plaintiffs allege that Bank Defendants, identically, failed to disclose the certainty of negative amortization in the Option ARM loans. Plaintiffs have attached supporting documentation. (See Appendix A).

107. **Sixth**, Defendants have **ceased acting as conventional money lenders**. In conducting the wrongs described above and throughout this Complaint, the Bank Defendants stepped vastly outside of their role as conventional money lenders, and instead morphed into an enterprise engaged in intentional fraud upon their borrowers. Among their numerous departures from the actions of a conventional money lender, Defendants:

 a. **Intentionally falsified the values and appraisals of each of the Plaintiffs' subject properties** – numerous courts have held that such falsification of appraisals "do not fall within a bank's role as a traditional money lender." (*Sullivan v. JP Morgan Chase Bank, N.A.* (E.D.Cal. 2010) 725 F.Supp.2d 1087, 1094; *Watkinson v. MortgageIT* (2010) 2010 WL 2196083 at *9.)

 b. Artificially and fraudulently inflated the value of all of the California real estate market, (as opposed to just those of Plaintiffs herein) in **a Price Fixing scheme achieved through pervasive and coordinated falsification of appraisals**, knowing that by doing so their fraudulent appraisals would act as comparables which would artificially inflate the rest of the market (as detailed in the Causes of Action for "Individual Appraisal Inflation" and "Market Fixing" below)

 c. **Coerced their appraisers to falsify their appraisals through bribery, undue influence, instruction, appraiser selection manipulation, financial pressure, as well as threats – both explicit and implicit** – that if their appraisals didn't return a valuation above that demanded by Bank Defendants (1) future business with the appraiser would either diminish or discontinue altogether or (2) that the individual appraiser would be fired/blacklisted.

 d. Intentionally and knowingly subjected their appraisers to known conflicts of interest.

 e. **Intentionally falsifying the income and asset documentation** of their borrowers to place them into loans which Defendants knew Plaintiffs could not afford, and would

**COMPLAINT**

default upon to a mathematical certainty. Numerous courts have held banks liable for fraud for such identical acts because such acts "do not fall within a bank's traditional role as money lender." (*Sullivan v. JP Morgan Chase Bank, N.A.* (E.D.Cal. 2010) 725 F.Supp.2d 1087, 1094; *Watkinson v. MortgageIT* (2010) 2010 WL 2196083 at *9.)

f.  Abandoned the "originate to hold" business model of conventional money lenders, and instead became **a loan packaging and re-selling facility in which bank defendants originated loans for the sole purpose of reselling them on the secondary market for vast profit** –creating an incentive to place borrowers into loans which bank defendants knew they could not afford and simultaneously passing along all risk of default to the purchasers of the loan.

g.  Intentionally abandoned industry-standard underwriting guidelines – the hallmark of conventional money lending - in order to place borrowers into loans they knew they could not afford solely in the name of profit;

h.  **Originated loans with an eye towards immediately securitizing and re-selling them on the secondary market and becoming the servicer on the loan**, thus creating an incentive to place borrowers into loans they knew their borrowers could not afford because by doing so Defendants-now-turned-servicers would be in a position to collect highly-lucrative fees from their imperiled borrowers, such as late fees, default fees, and indeed foreclosure fees. In doing so, Defendants became anything but conventional money lenders – **their interests were directly aligned with those of a servicer**. Numerous courts have held that where, as here, a bank acts as servicer they have exceed their role as a conventional money lender. (*Johnson v. HSBC Bank USA, Nat. Ass'n* (S.D.Cal. 2012) 2012 WL 928433 *4.)

i.  **Entered into loan modifications with Plaintiffs.** A lender goes beyond its "role as a silent lender and loan servicer [when it] offer[s] an opportunity to plaintiffs for loan modification and to engage with them concerning the trial period plan. ... [T]his is precisely beyond the domain of a usual money lender ... [and] constitutes sufficient active participation to create a duty of care", as held by numerous courts. (*Garcia v. Ocwen*

**COMPLAINT**

1  *Loan Serv.*, LLC (N.D. Cal.) 2010 WL 1881098 at *3; *Ansanelli v. JPMorgan Chase*

2  *Bank, N.A.*, No. C 10-03892 WHA, 2011 U.S. Dist. LEXIS 32350, at *21-22 (N.D.Cal.

3  Mar. 28, 2011; *Johnson v. HSBC Bank USA*, (S.D. Cal. 2012) 2012 WL 928433 at *3.)

4  j.  **Engaged in massive intentional fraud upon its borrowers**. While a bank may in the

5     course of conventional lending act negligently from time to time, intentional committed

6     torts cannot be said to be conventional practice for lenders. If Bank Defendants wish to

7     assert that massive intentional fraud on their borrowers is conventional practice for

8     lenders, they should do so at trial. Numerous courts, including the Supreme Court of the

9     United States have recognized that a duty properly attaches to a bank when it acts

10    intentionally, rather than negligently. (*Connor v. Great Western Sav. & Loan Ass'n*

11    (1968) 69 Cal.2d 850, 865; *Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231

12    Cal.App.3d 1089; *Becker v. Wells Fargo Bank, N.A.* (E.D.Cal. 2011) 2011 WL 3319577;

13    Dumas, supra, 2011 WL 4906412; *Champlaie, supra*, 706 F.Supp.2d at 1060; *Watkinson*

14    *v. MortgageIT, Inc.* (S.D. Cal. 2010) 2010 WL 2196083.)

15    k.  **Seventh**, and finally, even when acting as a conventional money lender, Banks

16    nevertheless owe a duty to their borrowers, when they meet the following test:

17       In California, the test for determining whether a financial institution owes
         a duty of care to a borrower-client " 'involves the balancing of various
18       factors, among which are [1] the extent to which the transaction was
         intended to affect the plaintiff, [2] the foreseeability of harm to him, [3]
19       the degree of certainty that the plaintiff suffered injury, [4] the closeness
         of the connection between the defendant's conduct and the injury suffered,
20       [5] the moral blame attached to the defendant's conduct, and [6] the policy
21       of preventing future harm.

22       (*Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1098). Each
23       of the 6 elements is amply alleged throughout this Complaint.

24    108.  Defendants' profit-driven scheme to herd as many borrowers into loans at any cost

25  through coordinate deception was implemented pursuant to a top down policy ratified at the highest

26  levels of each of Bank Defendants, and done at the behest of the Conspiracy.

27    109.  Defendants' actions in intentionally placing borrowers into impossible loans in the

28  pursuit of profit , were a substantial factor in if not *the* cause of the generalized market crash which

- 37 -

**COMPLAINT**

1  caused the prices of Real Estate values throughout California to plummet, damaging Plaintiffs herein.

2  110.  The unraveling of the Defendants' scheme has materially depressed the price of real

3  estate throughout California, including the real estate owned by the Plaintiffs, resulting in losses to the

4  Plaintiffs.

5  111.  As a result of the foregoing, Plaintiffs' damages herein are exacerbated by a continuing

6  decline in residential property values and further erosion of their credit records.

7  112.  Defendants' concealments and misrepresentations, both as to the their scheme to profiteer

8  from the mortgage melt-down and as to their purported efforts to resolve loan modifications with

9  Plaintiffs, are substantial factors in causing the harm to Plaintiffs described in this Complaint.

10  113.  Without limiting the damages as described elsewhere in this Complaint, Plaintiffs

11  damages arising from this Cause of Action also include loss of equity in their houses, costs and expenses

12  related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit,

13  reduced availability of goods and services tied to credit ratings, increased costs of those services, as well

14  as fees and costs, including, without limitation, attorneys' fees and costs.

15  114.  Counts 1 – 5 arise under this Cause of Action, and are brought by all Plaintiffs named in

16  this Cause of Action, against all Defendants named in this Cause of Action.

17

18  **COUNT 1: FRAUDULENT CONCEALMENT**

19  115.  The preceding paragraphs and the paragraphs following this cause of action are

20  incorporated by reference as though fully set forth herein

21  116.  Ally and Bank Defendants, at the direction, behest, and on behalf of the Conspiracy of

22  Defendants intentionally concealed the material facts alleged above at Paragraph 76 and 78, in order to

23  induce Plaintiffs reliance into entering into Loan Contracts with Ally and Bank Defendants

24  117.  Plaintiffs did in fact rely on the non-existence of the concealed facts in deciding to enter

25  into Loan Contracts with Ally and Bank Defendants.  Had Plaintiffs known the truth, they would not

26  have entered into the Loan Contracts.

27  118.  Defendants had exclusive knowledge of the truth.  Their scheme was built on keeping

28  their borrowers (Plaintiffs herein) in the dark.

**COMPLAINT**

1    119.    Defendants had a duty to disclose such material information but intentionally failed to do so.

2    120.    As a result of such concealments Plaintiffs were damaged as described in this Cause of

3    Action. Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages

4    arising from this Cause of Action also include loss of equity in their houses, growth in their loan

5    balances resulting from concealed negative amortization, costs and expenses related to protecting

6    themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability

7    of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs,

8    including, without limitation, attorneys' fees and costs.

9    121.    Defendants' actions in intentionally placing borrowers into impossible loans in the

10   pursuit of profit , were a substantial factor in if not *the* cause of the generalized market crash which

11   caused the prices of Real Estate values throughout California to plummet, damaging Plaintiffs herein.

12   122.    Defendants' intentional, wide-scale, fraudulent conduct also merits the imposition of

13   punitive damages. Plaintiffs respectfully request the award of such punitive damages and any other relief

14   this court shall deem just and proper.

15

16   **COUNT 2: INTENTIONAL MISREPRESENTATION**

17   123.    The preceding paragraphs and the paragraphs following this cause of action are

18   incorporated by reference as though fully set forth herein

19   124.    Ally and Bank Defendants, at the direction, behest, and on behalf of the Conspiracy of

20   Defendants intentionally misrepresented the material facts alleged above at Paragraphs 77 and 78, in

21   order to induce Plaintiffs reliance into entering into Loan Contracts with Ally and Bank Defendants

22   125.    Plaintiffs did in fact rely on the truth of the misrepresented facts in deciding to enter into

23   Loan Contracts with Ally and Bank Defendants.  Had Plaintiffs known the truth, they would not have

24   entered into the Loan Contracts.

25   126.    Defendants had exclusive knowledge of the truth.  Their scheme was built on keeping

26   their borrowers (Plaintiffs herein) in the dark.

27   127.    As a result of such intentional misrepresentations Plaintiffs were damaged as described in

28   this Cause of Action. Without limiting the damages as described elsewhere in this Complaint, Plaintiffs

- 39 -

**COMPLAINT**

1  damages arising from this Cause of Action also include loss of equity in their houses, loan payments
2  falsely represented to be much lower than what they truly were, growth in their loan balances resulting
3  from negative amortization which Defendants represented would not occur,  costs and expenses related
4  to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit,
5  reduced availability of goods and services tied to credit ratings, increased costs of those services, as well
6  as fees and costs, including, without limitation, attorneys' fees and costs.

7      128.    Defendants' actions in intentionally placing borrowers into impossible loans in the
8  pursuit of profit , were a substantial factor in if not *the* cause of the generalized market crash which
9  caused the prices of Real Estate values throughout California to plummet, damaging Plaintiffs herein.

10     129.    Defendants' intentional, wide-scale, fraudulent conduct also merits the imposition of
11  punitive damages. Plaintiffs respectfully request the award of such punitive damages and any other relief
12  this court shall deem just and proper.

13

14              **COUNT 3: NEGLIGENT MISREPRESENTATION**

15     130.    The preceding paragraphs and the paragraphs following this cause of action are
16  incorporated by reference as though fully set forth herein.

17     131.    The allegations of this Count are identical to those above in the previous Count except
18  that the degree of intent herein is that of negligence. Put another way, at the time Ally and Bank
19  Defendants made the misrepresentations described in this Cause of Action, they did not have reasonable
20  grounds to believe them to be true.

21

22                    **COUNT 4: NEGLIGENCE**

23     132.    The preceding paragraphs and the paragraphs following this cause of action are
24  incorporated by reference as though fully set forth herein

25     133.    Ally and Bank Defendants had a duty to act reasonably, and further had duties of care
26  imposed upon them by law and statute as alleged above at paragraphs 96-102

27     134.    In undertaking to place as many borrowers into loans as possible in the pursuit of profit
28  without regard for their ability to afford them, their creditworthiness, or the distinct risk of default

**COMPLAINT**

1  (either a known likelihood of default or reckless disregard thereof) and the commensurate effects such
2  wide scale defaults would have on property values and the economic system, Ally and Bank Defendants
3  breached that duty.

4       135.    Ally and Bank Defendants further breached their duty by abandoning industry standard
5  underwriting guidelines.

6       136.    Ally and Bank Defendants breached their duty in numerous other fashions as described
7  throughout this Complaint, whose allegations in their entirety are incorporated by reference as to all
8  Causes of Action and all Counts.

9       137.    In breaching their duty, Ally and Bank Defendants, acting in conspiracy with the other
10  Defendants herein, caused grave damage to Plaintiffs herein and numerous others.

11       138.    These harms were foreseeable if not actually foreseen by Defendants.

12       139.    Further, Defendants' actions in intentionally placing borrowers into impossible loans in
13  the pursuit of profit , were a substantial factor in if not *the* cause of the generalized market crash which
14  caused the prices of Real Estate values throughout California to plummet, damaging Plaintiffs herein

15       140.    Without limiting the damages as described elsewhere in this Complaint, Plaintiffs
16  damages arising from this Cause of Action also include loss of equity in their houses, costs and expenses
17  related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit,
18  reduced availability of goods and services tied to credit ratings, increased costs of those services, as well
19  as fees and costs, including, without limitation, attorneys' fees and costs.

20

21          **COUNT 5 : UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES**
22                 **(VIOLATION OF CAL. BUS. & PROF. CODE §17200)**

23       141.    The preceding paragraphs and the paragraphs following this cause of action are
24  incorporated by reference as though fully set forth herein.

25       142.    Ally and Bank Defendants' acts, hand-in-hand with the conspiracy of Defendants, as
26  described in this Cause of Action are Fraudulent as set forth above

27       143.    In addition to being fraudulent, Ally and Bank Defendants' actions are also unlawful.
28  Defendants' actions in implementing and perpetrating their fraudulent scheme of inducing Plaintiffs to

accept mortgages for which they were not qualified based on inflated property valuations and undisclosed disregard of their own underwriting standards and the sale of overpriced collateralized mortgage pools, all the while knowing that the plan would crash and burn, taking the Plaintiffs down and costing them the equity in their homes and other damages, violates numerous federal and state statutes and common law protections enacted for consumer protection, privacy, trade disclosure, and fair trade and commerce. In addition to being fraudulent and violates numerous federal and state statutes and common law protections enacted for consumer protection, privacy, trade disclosure, and fair trade and commerce.

a. Ally and Bank Defendants violated the Truth in Lending Act ("**TILA**") by failing to make the necessary disclosures under Law, including the failure to sufficiently disclose the certainty of negative amortization in their Loan Documents as well as the accompanying Truth In Lending Disclosure Statement. These identical allegations have been recognized by the California Court of Appeal in *Boschma*, to give rise to an actionable claim for Fraudulent Concealment, Violation of TILA & Violation of the UCL.

b. Defendants further violated TILA by failing to properly disclose or fraudulently hiding prepayment penalties, points, origination discounts, kickbacks, commissions, etc. to Plaintiffs oftentimes resulting in Plaintiff being forced to incur or pay unnecessary or unfair charges which they were never aware of, and which they never had an opportunity to contest.

144. The acts of the Conspiracy of Defendants are also patently unfair as more fully set forth above. Without limiting the allegations above which are fully incorporated herein, Defendants acts are unfair insofar as they intentionally place unsuspecting borrowers into loans which jeopardize their financial livelihoods and risk potential homelessness. Simply put, Defendants' scheme is to use borrowers as pawns to increase their profit. It speaks for itself that such acts are patently unfair.

145. Such acts and practices violate established public policy and the harm they cause to consumers in California greatly outweighs any benefits associated with those practices.

146. These actions were immoral, unethical, oppressive, unscrupulous and substantially injurious to similarly situated borrowers, and Plaintiffs herein. Defendants' conduct had no utility other

**COMPLAINT**

than for their own ill-gotten gain, and the harm was great not only to Plaintiffs herein, but also to residents of California, broadly, who have seen a decrease in their home and property values as a result of the bursting of the super-heated pricing bubble created by Defendants' fraudulently inflated appraisal; at the time of their fraud, Defendants *knew* that their conduct would cause the precipitous decline in property values throughout the State of California. Defendant's acts caused substantial consumer injury with no benefits to consumer competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants' intentional deceit, misrepresentation, and omission. Further, Defendants acts significantly threatened harm to competition.

147. The unfair, unlawful and fraudulent acts and practices of Defendants named herein present a continuing threat to Plaintiff and to members of the public in that these acts and practices are ongoing and are harmful and disruptive to business and financial markets.

148. Defendant's acts caused substantial consumer injury with no benefits to consumer competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants' intentional deceit, misrepresentation, and omission. Further, Defendants acts significantly threatened harm to competition.

149. Plaintiffs are entitled to restitution of the loan payments obtained by Defendants pursuant to their unlawful, unfair, and fraudulent business practices.

150. Further, as a result of the foregoing conduct, Plaintiffs suffered injury in fact including diminished credit scores with a concomitant increase in borrowing costs and diminished access to credit, fees and costs, including, without limitation, attorneys' fees and costs.

151. As a result of Defendants' unfair competition, Plaintiffs are entitled to restitution for all sums received by Defendants with respect to Defendants' unlawful and/or unfair and/or fraudulent conduct, including, without limitation, interest payments made by Plaintiffs, fees paid to Defendants, including, without limitation, the excessive fees paid at Defendants' direction, and premiums received upon selling the mortgages at an inflated value.

152. Finally, as a result of Plaintiffs were placed into larger loans than they could afford or should have been placed into. The additional fees, points and interests paid as a result of the higher/inflated loan amounts constitute damages, and legally cognizable sources of restitution.

**COMPLAINT**

153. Plaintiffs hereby also request injunctive relief against future violation of the same.

## SECOND CAUSE OF ACTION: INDIVIDUAL APPRAISAL INFLATION

*(By All Plaintiffs against Ally Defendants and Bank Defendants, and all other Defendants as Co-Conspirators)*

154. An accurate appraisal performed pursuant to a legitimate appraisal process is critical to calculating the loan-to-value ("LTV") ratio, a financial metric commonly used to evaluate the risk associated with a mortgage, and which would also be used as part of the valuation of a Mortgage Backed Security (which were sold on the secondary market for profit). The LTV ratio expresses the amount of the mortgage or loan as a percentage of the appraised value of the collateral property. For example, if a borrower seeks to borrow $90,000 to purchase a home appraised for $100,000, the LTV ratio would be $90,000 divided by $100,000, or 90% - which was viewed in the industry as a risky loan. Typically any loan over 80% LTV was considered risky, and would require the purchase of "Mortgage Insurance" to insure against the additional risk associated with such high LTV loans. The idea being that a high LTV means that a borrower has invested little of his own money in the property, and is thus more likely to walk away from the property when things get tough. Now imagine the above scenario with a slight modification - instead of the above property being appraised at $100,000 dollars, the appraisal was manipulated to reflect that the home was instead $112,500, now the Loan-to-Value ratio would appear as a much safer, and less risky 80% LTV ($90,000 Loan divided by $112,500 property value = 80%).

155. From an **investor's perspective**, a high LTV ratio represents a greater risk of default on the loan, which means they are unwilling to pay as much for that loan as they would one which was less risky. This is true for a number of reasons. First borrowers with a small equity position in the underlying property have "less to lose" in the event of default. Second, even a slight drop in housing prices might cause a loan with a high LTV ratio to exceed the value of the underlying collateral, which might cause the borrower to default and would prevent the issuing trust recouping its expected return in the case of foreclosure and subsequent sale of the property.

156. From the **Defendants' perspective**, Because of their shift from the "originate to hold"

model to the "originate to sell" model, Bank Defendants (and the conspiracy of Defendants) were incentivized to enter into as many loans as possible to sell on to the secondary market for profit. Because Bank Defendants weren't holding these loans anymore, they held no risk – they had no reason to ensure that the borrower was adequately qualified, or more importantly, in the context of *this* discussion, that the property had sufficient value, because Bank Defendants immediately turned around and sold that loan. Because investors were willing to pay more for less risky loans (lower LTV loans), Defendants were given an incentive to fraudulently inflate the appraisal values of their property, thus making the collateral (the subject property) of the loan seem safer to the investor, and thus more valuable to them. More value to the investors means more profit to Defendants. And so it began, Bank Defendants acting to the benefit of the conspiracy quickly embarked on a scheme to inflate their appraisals, and more broadly, property values throughout the State of California (discussed below in the Market Fixing Cause of Action), because, in short, they made a *lot more money by doing so.*

157. To maximize their loan volume and accordingly profit, Bank Defendants began falsely inflating and intentionally misrepresenting the appraised values of the Plaintiff's subject properties. Their purpose was three-fold :

    a. **First,** by doing so, Bank Defendants induced Plaintiffs to consummate their purchase transactions by falsely and intentionally reassuring them that they were paying what the home was worth, and not more – the result of which was, once again, more loans generated by Defendants and thus more profit. Put another way, Defendants falsely inflated the appraisals of Plaintiffs' properties in order to assure them that the property was indeed worth what they were paying for it, such that Plaintiff would move forward with the purchase and loan, and not back out. For those who were refinancing, the fraudulent appraisal inflation acted to falsely assure them that sufficient equity existed in their home, to merit incurring additional debt.

    b. **Second,** by doing so, Bank Defendants induced Plaintiffs to consummate their transactions by falsely and intentionally reassuring them that their collateral was sound.

    c. Third, **because investors were willing to pay more for less risky loans (lower LTV loans), Defendants were given an incentive to fraudulently inflate the appraisal**

**values of their property**, thus making the collateral (the subject property) of the loan seem safer to the investor, and thus more valuable to them. This in turn led to more sales and even more profits on the secondary market.

158.    To achieve this, Ally and Bank Defendants exercised dominion over Ally's wholly-owned appraisal subsidiary HCLS, directing them to provide the results requested, or engaged in a practice of pressuring and intimidating HCLS into using appraisal techniques that met Ally and Bank Defendants' business objectives even if the use of such appraisal technique was improper and in violation of industry standards. Ally and Bank Defendant black-listed appraisers who did not provide appraisal reports with their expectations.

159.    In a scathing complaint filed by the Federal Housing Finance Agency on September 2, 2011 they outlined how this brazen planned worked. Ally would use their in-house or contract appraisers at Home Connects Lending Services (HCLS) to artificially inflate Plaintiff's home values in order for their loans to be used in Securitization transactions.

160.    According to the Financial Crisis Inquiry Commission (FCIC), they identified "inflated appraisals" as a pervasive problem at Ally during the period of the Securitizations in the time span mentioned in this complaint, and determined through its investigation that appraisers were often pressured by mortgage originators, among others, to "produce inflated results."

161.    This coercion by Defendants to fraudulently inflate appraisal values was particularly rampant in the context of refinance transactions. When a property didn't appraise for a high enough value, a deal wouldn't "go through" this meant that (1) the loan consultant on the transaction wouldn't get a commission, (2) the Area Divisions (sometimes referred to as "Home Loan Centers" – often comprised of hundreds of loan consultants over several cities, and managed by a single manager) which were paid handsomely for each funded loan wouldn't get paid, and (3) Ally and Bank Defendants wouldn't be able to sell the loan on the secondary market for profit. Nobody made money. However, the system was set up to allow coercion, bribery, and undue influence over the appraisers. Loan consultants would contact appraiser and direct them specifically as to what value was "needed" to make the deal go through, some even going so far as to give gifts to the appraisers, and many were given outright bribes. Area Division managers who also had a financial incentive as mentioned earlier, would

**COMPLAINT**

1 exercise undue influence and contact appraisers and demand certain values from them, abolishing the

2 exercise of independent thought necessary to render an accurate/good faith appraisals. The same Area

3 Division Managers, because of their power and influence within the company, would even go so far as

4 to call the appraisal group's *managers* and request (read "demand") an appraisal to come in at a certain

5 value, or if that appraisal had already been rendered and it was too low, would request the appraisal

6 value to be "bumped" or increased. The Area Division Managers who often had personal or friendly

7 relationships with HCLS' Appraisal *managers* would coerce, bribe or influence, give gifts to or "call in

8 favors" from the Appraisal managers to ensure that the appraised value of the subject property was high

9 enough to make the deal "go through," so that all parties could make their money. The Appraisal

10 managers obliged.

11     162.    On other occasions Bank Defendants, hand-in-hand with HCLS, would use overvalued,

12 inflated or out-of-area comps from non-comparable *superior* properties in valuating the subject property

13 for the wrongful purpose of arriving at a higher value than would be supported by nearby or appropriate

14 comps. Bank Defendants intended this to artificially inflate the appraised value of the subject property.

15     163.    On the rare occasion when a loan consultant's or Area Division Manager's influence

16 didn't get the appraiser to inflate the value of the appraisal by a sufficient amount, Defendants' policies

17 gave them another, more effective way to fraudulently inflate the amount – they were allowed to hire an

18 *outside appraiser*. It was well known in the industry that outside appraisers would deliver an appraisal in

19 the amount they were told to deliver. Why? Because they were being paid directly by the loan

20 consultant, or the Area Division Manager. In other words, loan consultants and Area Division

21 Manager's had outside appraisers "in their pockets." Outside appraisers would deliver the results

22 (meaning inflated values) they were expected to deliver for two reasons: (1) In the interest of keeping

23 the client happy and hopefully earning future business and (2) for fear of not getting paid on their

24 individual deal if they didn't deliver the results they were expected to deliver. This procedure (allowing

25 the hiring of easily-influenced outside appraises) was explicitly made part of Defendants' own policies,

26 and its use was encouraged by Defendants, as well as their mid-level and upper management.

27     164.    This coercion and influence even existed from the **top down** – Regional Managers (in

28 charge of entire portions of the country, several states large) would also call in favors and demand

appraised values to be inflated or changed to make deals happen in the interest of making money. This pattern was not only tolerated by Defendants, but ratified and encouraged by them, because more funded loans meant more money for Defendants (who as described above, held none of the risk). In fact, Defendants had intentionally set up the appraisal system in such a way as to allow for the exercise of influence over appraisals and the appraisal departments. This influence was intended and foreseen.

165. In short, Ally and Bank Defendants intentionally designed an appraisal system which they could manipulate through influence and coercion to further their own ends – namely, profit. By its very design, the independence of thought necessary for a professional appraiser to render a good faith opinion was decimated. (1) Defendants held dominion over the very appraisal company which was supposed to render independent appraisals, HCLS. Then, (2) Bank Defendants through its explicit (as well as unwritten) policies and procedures, intentionally allowed their own employees who made commission/money as a function of every funded loan (managers, loan consultants, etc.), to contact individual appraisers and bribe, exercise influence, call in favors, harass, and coerce appraisers into rendering the exact value they needed. And finally, when all else failed (3) Defendants set up a fail-safe; they created an internal policy which allowed for the hiring of "outside" appraisers who were particularly well known within the industry for being willing to "fudge" the numbers.

166. Alan Hummel, Chair of the Appraisal Institute, testified before the Senate Committee on banking that the dynamic between mortgage originators and appraisers created a "terrible conflict of interest" where appraiser "experience[d] systemic problems of coercion" and were "ordered to doctor their reports" or they might be "placed on exclusionary or 'do-not-use' lists." Too often, this pressure succeeded in generating artificially high appraisals and appraisals being doing on a "drive-by" basis which appraisers issued their appraisal without reasonable bases for doing so.

167. A 2007 survey of 1,200 appraisers conducted by October Research Corp., which publishes *Valuation Review* , found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through. This figure was nearly double the findings of a similar study conducted just three years earlier. The 2007 study also "found that 75% of appraisers reported 'negative ramifications' if they did not cooperate, alter their appraisal, and provide a higher valuation.

**COMPLAINT**

168. Through their intentional misrepresentations and fraudulent appraisal inflation Ally and Bank Defendants, and HCLS intended to induce Plaintiffs' reliance on the truth of their valuations and representations, and to induce them to move forward with their loan transactions, which were profitable to Bank Defendants and the conspiracy of Defendants – and did indeed induce such reliance.

169. A professional appraiser's (such as those used by Defendants) knowledge of property valuation is vastly superior to that of the lay borrower. The complicated mathematics and calculations of appraisals require highly specialized education. Their training and knowledge is so specialized, in fact, that one cannot act as an appraiser without being properly trained and licensed. It is reasonable and foreseeable that a consumer would rely upon an appraisal arrived at by a professional appraiser – particularly in light of their complicated nature. Plaintiffs did in fact rely on the representations and concealments of these parties.

170. Ally Defendants, Bank Defendants and HCLS knew that it was foreseeable that Plaintiffs would rely on their appraisals and/or (mis)representations of values.

171. These misrepresentations were material to Plaintiffs decision to enter into the Loans

172. Plaintiffs did rely on the truth of such (mis)representations and, in doing so, entered into Loan Contracts with Defendants. Had Plaintiffs known the truth they would not have moved forward with the purchase transactions, or loan transactions.

173. Ally and Bank Defendants, together with HCLS, perpetrated this systematic appraisal fraud at the direction of and for the benefit of the conspiracy, and with the knowledge, ratification, and acquiescence of their executives and board members.

174. As a result of such Appraisal Inflation, Plaintiffs were induced to pay more for their homes than their true value, induced to take larger loans than would have been necessary, pay larger down payments, pay additional interest, fees, and pay additional property taxes.

175. Counts 6 through 9 arise under this (Second) Cause of Action for Individual Appraisal Inflation, and are brought by all Plaintiffs named in this Cause of Action, against all Defendants named in this Cause of Action.

**COMPLAINT**

## COUNT 6: INTENTIONAL MISREPRESENTATION

176.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

177.    Ally and Bank Defendants and HCLS, at the direction, behest, and on behalf of the Conspiracy of Defendants intentionally inflated and misrepresented the true values of Plaintiffs' homes, in order to induce Plaintiffs reliance into entering into Loan Contracts with Ally and Bank Defendants, as described at length throughout this Cause of Action.

178.    Plaintiffs did in fact rely on the truth of the misrepresented facts in deciding to enter into Loan Contracts with Ally and Bank Defendants. Had Plaintiffs known the truth, they would not have entered into the Loan Contracts.

179.    Defendants had exclusive knowledge of the truth. Their scheme was built on keeping their borrowers (Plaintiffs herein) in the dark.

180.    As a result of such Appraisal Inflation, Plaintiffs were induced to pay more for their homes than their true value, induced to take larger loans than would have been necessary, pay larger down payments, pay additional interest, fees, and pay additional property taxes. Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages arising from this Cause of Action also include loss of equity in their houses, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

181.    Defendants' intentional, wide-scale, fraudulent conduct also merits the imposition of punitive damages. Plaintiffs respectfully request the award of such punitive damages and any other relief this court shall deem just and proper.

## COUNT 7: NEGLIGENT MISREPRESENTATION

182.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

183.    The allegations of this Count are identical to those above in the previous Count except

**COMPLAINT**

1 | that the degree of intent herein is that of negligence. Put another way, at the time of the
2 | misrepresentations described in this Cause of Action (and listed in part above), Ally and Bank
3 | Defendants and HCLS did not have reasonable grounds to believe them to be true.

4

5 | <u>**COUNT 8**: **NEGLIGENCE**</u>

6 |      184.    The preceding paragraphs and the paragraphs following this cause of action are
7 | incorporated by reference as though fully set forth herein

8 |      185.    Ally Defendants, Bank Defendants and HCLS had a duty to act reasonably, and further
9 | had duties of care imposed upon them by law and statute as alleged above at paragraphs 97-103 to
10 | provide accurate appraisals. Such duties are also established by the applicable standards of care within
11 | the profession.

12 |      186.    In falsely inflating and causing to be inflated the appraisals of Plaintiffs herein Ally
13 | Defendants, HCLS and Bank Defendants breached that duty.

14 |      187.    In (recklessly, knowingly, or intentionally) placing borrowers into loans upon which they
15 | would be instantly upside down and be instantly upside down by virtue of inflated valuations – all so that the
16 | Conspiracy of Defendants could profit - Ally and Bank Defendants further breached their duty.

17 |      188.    In (recklessly, knowingly, or intentionally) furnishing false and inflated appraisals – all so
18 | that the Conspiracy of Defendants could profit – Ally Defendants, Bank Defendants, and HCLS further
19 | breached their duty.

20 |      189.    In (recklessly, knowingly, or intentionally) failing to observe the standards of care in the
21 | appraisal profession, HCLS breached its duty.

22 |      190.    In undertaking to place as many borrowers into loans as possible in the pursuit of profit
23 | without regard for their ability to afford them, their creditworthiness, or the distinct risk of default
24 | (either a known likelihood of default or reckless disregard thereof) and the commensurate effects such
25 | wide scale defaults would have on property values and the economic system, Ally and Bank Defendants
26 | breached that duty.

27 |      191.    Ally and Bank Defendant additionally breached their duty by coercing and bribing their
28 | appraisers, as well as subjecting their appraisers to conflicts of interest, as more fully set forth in this

**COMPLAINT**

1    Cause of Action.

2    192.    HCLS additionally breached their duty by accepting such bribes, and/or acting under

3    known conflicts of interest, as more fully set forth in this Cause of Action.

4    193.    Ally Defendants, Bank Defendants and HCLS breached their duty in numerous other

5    fashions as described throughout this Complaint, whose allegations in their entirety are incorporated by

6    reference as to all Causes of Action and all Counts.

7    194.    In breaching that duty Ally and Bank Defendants, and HCLS acting in conspiracy with

8    the other Defendants herein, caused grave damage to Plaintiffs herein and numerous others.

9    195.    These harms were foreseeable if not actually foreseen by Defendants.

10   196.    Defendants' actions in intentionally manipulating and inflating appraised property values,

11   were a substantial factor in if not *the* cause of the generalized market crash which caused the prices of

12   Real Estate values throughout California to plummet, damaging Plaintiffs herein.

13   197.    Further, Defendants' actions in intentionally placing borrowers into impossible loans in

14   the pursuit of profit , were a substantial factor in if not *the* cause of the generalized market crash which

15   caused the prices of Real Estate values throughout California to plummet, damaging Plaintiffs herein

16   198.    Without limiting the damages as described elsewhere in this Complaint, Plaintiffs

17   damages arising from this Cause of Action also include loss of equity in their houses, costs and expenses

18   related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit,

19   reduced availability of goods and services tied to credit ratings, increased costs of those services, as well

20   as fees and costs, including, without limitation, attorneys' fees and costs.

21

22   **COUNT 9: UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES**

23   **(VIOLATION OF CAL. BUS. & PROF. CODE §17200)**

24   199.    The preceding paragraphs and the paragraphs following this cause of action are

25   incorporated by reference as though fully set forth herein.

26   200.    Ally and Bank Defendants' acts in intentionally causing falsely inflated appraisals in

27   order to induce their borrowers to move forward with Loans were unlawful, unfair, **and** fraudulent – all

28   in the disjunctive.

201.     Such acts are **fraudulent** for all of the reasons described above, whose allegations are hereby incorporated by reference.

202.     These acts are also **unlawful**.

203.     California Civil Code §1090.5 "Valuation of real estate; improper influence; violation" forbids the exercise of influence over the valuation of property by any person with an interest in that real estate transaction. Defendants have violated this law.

    a.   Bank Defendants and their Co-conspirators herein had a direct interest in the valuation of real estate transactions at issue, as they were the institution that was lending on the property, and moreover because they stood to profit from the consummation of the real estate transaction – which depended in large part on a sufficient valuation being returned by the appraiser. Their wrongful influence occurred in connection with the "development, reporting, result, or review of that valuation" in accord with the language of the statute.

    b.   Defendants herein both in their individual capacity, and in their capacity as co-conspirators with one another and with HCLS (Ally's wholly-owned appraisal management company) have violated California Civil Code §1090.5 by violating appraiser independence through, among other things, compensation, coercion, extortion, bribery, intimidation of their appraisers, as well as the appraisal management company itself, and its management and executives, as well as other independent, outside, or "fee appraisers" not employed by HCLS.

    c.   As described throughout this Complaint at length, Bank Defendants herein as well as their employees, officers, and agents intentionally:

    d.   Caused the appraisers to base the value of their appraisals on a factor other than the independent judgment of the appraiser;

    e.   Mischaracterized and/or suborned the mischaracterization of the appraised value of the property securing the extension of credit;

    f.   Sought to influence the appraiser to facilitating the making of and pricing of their transactions;

    g.   Sought to influence the appraiser to achieve a targeted value;

h. Withheld or threatened to withhold payment for the appraisal services rendered in conformity with the contract between the parties;

i. Implied, directly or indirectly or threatened that the future retention of the appraiser was contingent upon their return of a satisfactory valuation; and

j. Excluded other appraisers from rendering future valuations based on the return of valuations which did not meet a certain target in the past.

k. Defendants acted with malice and with the intent of artificially inflating California Real estate properties generally, as well as the values of Plaintiffs' individual properties and homes.

204. As alleged at length above, Bank Defendants violated California Civil Code §1090.4 by subjecting, both, their appraisers as well as their appraisal management company, to coercion, undue influence, bribery, instruction, appraiser selection manipulation, financial pressure, as well as threats – both explicit and implicit – that if their appraisals didn't come back in at value (1) future business with the appraisers would either diminish or discontinue altogether or (2) that the individual appraiser would be blacklisted.

205. Ally and Bank Defendants also violated 15 U.S.C. §1639e (entitled "Violation of Appraiser Independence") by violating appraiser independence through, among other things, compensation, coercion, extortion, bribery, intimidation of their appraisers, as well as the appraisal management company itself, and its management and executives, as well as other independent, outside, or "fee appraisers" not employed by their Appraisal management company.

a. Ally and Bank Defendants herein were in the business of extending credit and providing services related to the extension of credit in the consumer credit transactions secured by the principal dwelling of the customer – Plaintiffs herein.

b. As described throughout this Complaint at length, Ally and Bank Defendants herein as well as their employees, officers, and agents, while acting for the benefit of the Conspiracy of Defendants intentionally:

i. Caused the appraisers to base the value of their appraisals on a factor other than the independent judgment of the appraiser;

**COMPLAINT**

ii.   Mischaracterized and/or suborned the mischaracterization of the appraised value
      of the property securing the extension of credit

iii.  Sought to influence the appraiser to facilitating the making of and pricing of their
      transactions;

iv.   Sought to influence the appraiser to achieve a targeted value; and

v.    Withheld or threatened to withhold payment for the appraisal services rendered in
      conformity with the contract between the parties.

206.    Ally and Bank Defendants and HCLS, acting on behalf of the Conspiracy also violated
12 C.F.R §323.5 by allowing their staff appraisers to have an direct or indirect financial or other interest
in the property, namely Ally and Bank Defendants and HCLS often bribed, or incentivized their staff
appraisers for who appraised homes whose loans ended up funding, and further by penalizing and
denying the appraiser pay for not valuing a property at a high enough value.

a.    As to fee appraisers, outside appraisers and independent appraisers, Ally and Bank
      Defendants and HCLS also violated 12 C.F.R. §323.5 in knowingly allowing their loan
      consultants, brokers, and other such loan origination employees to engage the appraisers
      themselves directly, knowing that such employees would exercise influence over the
      appraisers. Further, these fee/outside/independent appraisers were given a direct interest
      in the transaction – their pay and the possibility of future business would often be
      contingent on the results they provided, namely high values.

b.    Additionally, Ally and Bank Defendants and HCLS violated this section as to both Staff
      and "fee"/outside/independent appraisers by "blacklisting" any appraiser who
      consistently brought back lower values than expected. In other words, Defendants
      conditioned the appraiser's very job on their willingness to "play ball" – a strong
      financial interest in the value of the property if ever there were any. Appraisers who
      would bring back conservative or low values were let go and never re-hired. This was a
      well-known reality within the appraisal and banking industry and influenced the
      independence of thought of any appraiser working with a big bank such as bank
      Defendant Banks herein. Defendants intended the threat of being blacklisted to deter

**COMPLAINT**

appraisers from rendering uninhibited good faith appraisals and instead to influence appraisers to exaggerate their values. When taken in the aggregate, Defendants' policies, coercion and acts resulted in the systematic and artificial inflation of California real estate values (as discussed below in the **"Market Fixing"** Cause of Action).

c. The loan transactions alleged in this cause of action qualify as "federally regulated transactions" under the statute because such transactions are defined in the definition section of the statute as "any real-estate-related financial transaction entered into on or after August 9, 1990 that… requires the services of an appraiser."

207. Further, Defendants acts in tricking borrowers to enter into Loans with them by intentionally misleading them about the value of their homes, are fundamentally **unfair** and deceptive. Defendants knowingly placed Plaintiffs borrowers in a position of peril, for their own personal gain.

208. No business, particularly one as centrally-important to the American economy as banking, should be allowed to so egregiously deceive its consumers. If Banks are to conduct business, their business *must not be* that of fraud and deception.

209. Without limiting the allegations above which are fully incorporated herein, Bank Defendants' acts are **unfair** insofar as they intentionally place unsuspecting borrowers into loans which jeopardize their financial livelihoods and risk potential homelessness. Simply put, Defendants' scheme is to use borrowers as pawns to increase their profit. It speaks for itself that such acts are patently unfair.

210. Such acts and practices violate established public policy and the harm they cause to consumers in California greatly outweighs any benefits associated with those practices.

211. These actions were immoral, unethical, oppressive, unscrupulous and substantially injurious to similarly situated borrowers, and Plaintiffs herein. Ally and Bank Defendants' and HCLS's conduct had no utility other than for their own personal gain, and the harm was great not only to Plaintiffs herein, but also to residents of California, broadly, who have seen a decrease in their home and property values as a result of the bursting of the super-heated pricing bubble created by Defendants' fraudulently inflated appraisal; at the time of their fraud, Defendants *knew* that their conduct would cause the precipitous decline in property values throughout the State of California. Defendant's acts caused substantial consumer injury with no benefits to consumer competition. Plaintiffs could not have

1  reasonably avoided these injuries occasioned by Defendants' intentional deceit, misrepresentation, and
2  omission. Further, Defendants acts significantly threatened harm to competition.

3      212.    Defendant's acts caused substantial consumer injury with no benefits to consumer
4  competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants'
5  intentional deceit, misrepresentation, and omission. Further, Defendants acts significantly threatened
6  harm to competition.

7      213.    Defendants acted with malice and with the intent of artificially inflating California Real
8  estate properties generally, as well as the values of Plaintiffs' individual properties and homes.

9      214.    As a result of Defendants' unfair competition, Plaintiffs are entitled to restitution for all
10  sums received by Defendants with respect to Defendants' unlawful and/or unfair and/or fraudulent
11  conduct, including, without limitation, interest payments made by Plaintiffs, fees paid to Defendants,
12  including, without limitation, the excessive fees paid at Defendants' direction, and premiums received
13  upon selling the mortgages at an inflated value.

14      215.    Plaintiffs are entitled to restitution of the loan payments obtained by Defendants pursuant
15  to their unlawful, unfair, and fraudulent business practices.

16      216.    Further, as a result of the foregoing conduct, Plaintiffs suffered injury in fact including
17  diminished credit scores with a concomitant increase in borrowing costs and diminished access to credit,
18  fees and costs, including, without limitation, attorneys' fees and costs.

19      217.    Finally, as a result of these acts, Plaintiffs were placed into larger loans than they could
20  afford or should have been placed into. The additional fees, points and interests paid as a result of the
21  higher/inflated loan amounts constitute damages, and legally cognizable sources of restitution.

22      218.    The unfair, unlawful and fraudulent acts and practices of Defendants named herein present a
23  continuing threat to Plaintiff and to members of the public in that these acts and practices are ongoing and are
24  harmful and disruptive to business and financial markets and merit the award of injunctive relief.

25
26
27
28

**COMPLAINT**

# THIRD CAUSE OF ACTION: MARKET FIXING

### (By All Plaintiffs against Ally Defendants, Bank Defendants, and all other Defendants as Co-Conspirators)

219.    To further the wrongs alleged throughout this Complaint (and its profit), Ally and Bank Defendants, using its size and prominent market share, began **systematically** creating false and inflated property appraisals **throughout California**, hand-in-hand with their wholly-owned appraisal subsidiary HCLS, in a Market Fixing Scheme designed to inflate the property values of homes throughout California. (The "Market Fixing Scheme").

220.    Though conceptually related to the Cause of Action for Individual Appraisal Inflation, the harms, actions, and reasons behind the Market Fixing Scheme were unique.

221.    The cause of action for the broad *market fixing scheme* alleges that Defendants in conspiracy with their wholly-owned appraisal subsidiary, NATS , manipulated/inflated the prices of *all* California real estate prices as compared to their true value.  **Everybody**, even people who didn't originate their loans through or get an appraisal from Defendants, were forced to purchase their homes for a higher price than they should have as a result of Defendants' Market Fixing activities – the additional amounts they were forced to pay constitute damage to Plaintiffs. Indeed, these damages accrued to people who didn't even have their properties appraised by Defendants.

222.    Plaintiffs reasonably relied on the fact that the market was operating normally and thus the prices people were paying for their homes were uninflated.  Defendants however failed to disclose that the market was not operating normally – that they had manipulated it.

223.    From **Bank Defendants' perspective**, their reasons (in other words, their intent) for fraudulently inflating Plaintiff's appraisals and engaging in the Market Fixing Scheme was three-fold:

   a.   **First, by doing so Bank Defendants created the illusion of a naturally appreciating real economy, which resulted in a purchase *and* refinance boom** – which meant more loans for Bank Defendants, and thus more profit for the conspiracy of Defendants. And so it began, Defendants together with HCLS quickly embarked on a scheme to inflate their appraisals, and more broadly, property values throughout the State of California, because, in short, they made a *lot more money by doing so.*

**COMPLAINT**

b. **Second**, by systematically driving the prices of real estate up, borrowers were required to take out larger loans to afford the same property, once again resulting in more profit to Defendants. The damages to Plaintiffs resulting from these larger loans are discussed below.

c. **Third**, Defendants falsely inflated the appraised values, because by doing so Defendants were able to turn more profit on the sale of these loans to investors. Because investors were willing to pay more for less risky loans (lower Loan-to-Value loans), Ally Defendants, Bank Defendants and HCLS were given an incentive to fraudulently inflate the appraisal values of their property, thus making the collateral (the subject property) of the loan seem safer to the investor, resulting in more profit to Defendants.

224.    To carry out this fraud, Ally and Bank Defendants used its size and market share as one of the largest lenders in California to systematically create false and inflated property appraisals throughout California, hand-in-hand with their wholly-owned appraisal subsidiary, HCLS.

225.    At Ally and Bank Defendants' direction, HCLS began systematically and wrongfully inflating the valuations of properties throughout California – not just on the properties of Plaintiffs herein, but on all properties throughout California. As is common knowledge in the real estate industry, appraisers take the value of other nearby homes (called comparables aka "comps") into account in determining the value of the homes they appraise. **These inflated appraisals and home valuation conducted by Ally and Bank Defendants and their subsidiaries *then* acted as comps upon which numerous *other* appraisers based their valuations of *other* homes. The results were a vicious self-feeding exponential cycle, both expected and intended by Defendants. These inflated appraisals caused other homes to be valued for more than they were worth, which in turn acted as the predicate for even higher appraisals and which caused even more homes to be valued for more than they were worth**. The inevitable and intended result of Defendants' conspiracy was the creation of a super-heated pricing bubble in the real estate economy, created by and at the direction of Defendants, designed to manipulate and inflate property values, and effectuated for the sole purpose of lining Defendants' pockets with money. The harm it inflicted to Plaintiffs herein, California's real estate economy, and more broadly, the American economy mattered little. Defendants were making money

1    and plenty of it.

2        226.    Moreover, as Ally's wholly owned subsidiary, HCLS was specifically directed by

3    Defendants to systematically "bump" or inflate appraisal values of homes throughout California, with

4    the intent of creating housing appreciation, leading to a real estate boom, which Defendants could then

5    capitalize on by selling not only more loans, but more loans at even higher loan amounts.  From the very

6    top to the very bottom, Defendants created a system intended to render consistently inflated appraisals.

7    But they knew the 'boom' they were creating, was one stilted up and fueled by their fraud – and that

8    when the music stopped playing the house of cards they'd built would come crumbling down destroying

9    any and all equity Plaintiff borrowers had in their home.

10        227.    Rapidly, these two intertwined schemes (the Market Fixing Scheme [Third Cause of

11    Action], and the Scheme to place borrowers into loans they could not afford [First Cause of Action]) grew

12    into a brazen plan to disregard underwriting standards and fraudulently inflate property values – county-

13    by-county, city-by-city, person-by-person – in order to take business from legitimate mortgage-providers,

14    and moved on to massive securities fraud hand-in-hand with concealment from, and deception of,

15    Plaintiffs and other mortgagees on an unprecedented scale.

16        228.    According to the April 7, 2010 FCIC testimony of Richard Bitner, a former executive of

17    a subprime mortgage originator for 15 years and the author of the book *Confessions of a Subprime*

18    *Lender*, "the appraisal process [was] highly susceptible to manipulation, lenders had to conduct business

19    as though the broker and appraiser couldn't be trusted, [and] either the majority of appraisers were

20    incompetent or they were influenced by brokers to increase the value." He continued:

21            To put things in perspective, during my company's history, half of all the loans we
             underwrote were overvalued by as much as 10%. This means one out of two appraisals
22           was still within an acceptable tolerance for our end investors. Our experiences showed
             that 10% was the most an appraisal could be overvalued and still be purchased by
23           investors. Another quarter that we reviewed was overvalued by 11-20%. These loans
             were either declined or we reduced the property to an acceptable tolerance level. The
24           remaining 25% of appraisals that we initially underwrote were so overvalued they defied
             all logic. *Throwing a dart at a board while blindfolded would've produced more accurate*
25           *results*

26        229.    Mr. Bitner testified about the implications of inflated appraisals:

27            **If multiple properties in an area are overvalued by 10%, they become comparable
             sales for future appraisals. The process then repeats itself.** We saw it on several

occasions. We'd close a loan in January, and see the subject property show up as a comparable sale in the same neighborhood six months later. Except this time, the new subject property, which was nearly identical in size and style to the home we financed in January, was being appraised for 10% more. Of course, demand is a key component to driving value, but the defective nature of the appraisal process served as an accelerant.

230. Mr. Bitner testified that the engine behind the increased malfeasance was the Wall Street Banks: "[T]he demand from Wall Street investment banks to feed the securitization machines coupled with an erosion in credit standards led the industry to drive itself off the proverbial cliff."

231. In a scathing complaint filed by the Federal Housing Finance Agency on September 2, 2011 they outlined how this brazen planned worked. Ally and Bank Defendants would use their in-house or contract appraisers to artificially inflate Plaintiff's home values in order for their loans to be used in Securitization transactions. According to that complaint, "an inflated appraisal will understate, sometimes greatly, the credit risk associated with a given loan", mainly our Plaintiffs' homes.

232. According to the Financial Crisis Inquiry Commission (FCIC), they identified "inflated appraisals" as a pervasive problem at Ally during the period of the Securitizations in the time span mentioned in this complaint, and determined through its investigation that appraisers were often pressured by mortgage originators, among others, to "produce inflated results".

233. Since California homes (including those of Plaintiffs herein) were Ally and Bank Defendants' main target, this scheme led directly to a mortgage meltdown for Plaintiffs in this complaint that was substantially worse than any economic problems facing Defendants' borrowers in the rest of the United States.

234. At the time of their respective Purchase and/or Loan Transactions Plaintiffs relied on the fact that the real estate market was operating normally, and thus the prices Plaintiffs were paying were naturally occurring, uninflated prices – a reasonable reliance.

235. Ally and Bank Defendants and HCLS however intentionally failed to disclose the material fact that the market was not operating normally – but rather that they had systematically and intentionally manipulated the market hand-in-hand with their co-conspirators, to inflate real estate prices for their own profit.

236. Specifically, Ally Defendants, Bank Defendants and HCLS intentionally **concealed** the material facts that they:

- 61 -

a. had intentionally and falsely inflated the appraisals on Plaintiffs properties throughout California;

b. had subjected their appraisers over whom they exercised complete dominion to a massive conflict of interest precluding them from being able to render good-faith, accurate, technically proper appraisals in conformity with the standards required in the profession;

c. had systematically, intentionally, and artificially inflated the prices of real estate throughout California (otherwise known as "market fixing"), resulting in:

d. had fixed the real-estate market and systematically driven the prices of property well above what they were worth, with the intent of creating the illusion of a naturally-appreciating real estate economy to spur a purchase and refinance boom resulting in more business and thus more profits for the bank;

e. knew that the true uninflated value of Plaintiffs' homes were insufficient to justify the size of the loans Plaintiffs were being given;

f. falsely inflated the appraisals of Plaintiffs' properties in order to place Plaintiffs into loans that they would not otherwise be able to obtain or afford, all so Defendants and their employee-Loan Consultants could turn profit;

g. falsely inflated the appraisals of Plaintiffs' properties in order to assure them that the property was indeed worth what they were paying for it, such that Plaintiff would move forward with the purchase;

h. falsely inflated the appraisals of Plaintiffs' properties to induce plaintiffs to enter into loan and assure them that their collateral was sound;

i. knew that the values being used did not justify the size of the loans being placed on the property, and moreover that Defendants knew such valuations would inevitably result in the home going "upside" down followed by inevitable default;

j. knew their scheme would cause a liquidity crisis that would devastate home prices.

237. As a result everybody, even people who didn't originate their loans through or get an appraisal from Defendants, were forced to purchase their homes for a higher price than they should absent Defendants' Market Fixing activities – the additional amounts they were forced to pay constitute

substantial damage to Plaintiffs.

238. This underscores the difference between the Broad Market Fixing Scheme and the Cause of Action for Individual Appraisal Inflation. Yes, they are conceptually related in the sense that Defendants' individual appraisal inflations when taken in the aggregate had the intended cumulative effect of further bolstering their market manipulation/inflation. But their conceptual relationship does not make them the same fraud. Unlike the Broad Market Fixing fraud which involved the fraudulent **concealment** of the material fact that they had **manipulated the market** for the reasons listed in paragraph 221 of this Complaint , the Individual Appraisal inflation was an **affirmative intentional misrepresentation** of the **individual values of Plaintiffs' homes** for the reasons listed in paragraph 157 of this Complaint (i.e "with the intent of inducing Plaintiffs to enter into their loans... and with the intent of assuring them their collateral was sound", *inter alia*).

239. The following table briefly details some (not all) of the differences between the Market Fixing Cause of Action and the Individual Appraisal Inflation Cause of Action. This table below is not intended to be an exhaustive list of the differences between the two actions. (Table appears on following page).

//

//

//

/

/

/

/

/

/

/

/

/

/

**COMPLAINT**

|  | **Broad Market Fixing Scheme** | **Individual Appraisal Inflation** |
|---|---|---|
| Act | the fraudulent **concealment** of the material fact that Defendants had manipulated the market, | affirmative intentional **misrepresentation** of the individual values of Plaintiffs' homes |
| Intent | (1)To create the illusion of a naturally appreciating real estate economy to stimulate a purchase and refinance boom,<br><br>(2)By systematically driving the prices of real estate up, borrowers were required to take out larger loans to afford the same property | (1)With the intent of inducing Plaintiffs to enter into their loans…<br>(2)With the intent of assuring them their collateral was sound<br>(3)With the intent of falsely assuring Plaintiffs that the property was indeed worth what they were paying for it such that they would consummate the purchase |
| Plaintiffs' Reliance | Plaintiffs' reliance was on the fact that the market was operating normally and thus the prices people were paying for their homes were uninflated. Defendants however **failed to disclose** that the market was not operating normally – that they had manipulated it | On the truth of the home value represented by Defendants |
| Damages | Being forced to purchase property at an inflated property value;<br><br>Being forced to take out larger loans, pay more interest points, fees, taxes, etc.<br><br>More damages listed below in ¶240 | Fraudulently induced to enter into loan contract<br><br>Being forced to take out larger loans, pay more interest points, fees, taxes, etc. |

**COMPLAINT**

240. As a result of Ally Defendants, Bank Defendants and HCLS' Market Fixing Activities, in furtherance of the Conspiracy of Defendants, Plaintiffs were harm harmed in each of the following manners:

    a. **First,** the hyper-inflated property values resulting from Defendants' inflated appraisals and market-fixing scheme directly caused Plaintiffs to pay a substantially higher price for their home than they would have otherwise, and then their home was truly worth at the time. The additional amounts Plaintiffs were forced to pay above and beyond the true uninflated value of their property at the time of purchase, constitutes damage to Plaintiffs directly caused by Defendant's scheme.

    b. **Second,** the damage didn't end there however - the unraveling of Defendants' scheme caused the market to be sent into a downward spiral, which Defendants knew and foresaw would be the result of their actions, and caused Plaintiffs' home value to plummet *much below the true value* of the property at the time of purchase. **To be clear, it is alleged that Defendants' Appraisal Inflation and Market Fixing Activities, were a substantial factor in if not *the* cause of the generalized market crash which caused the prices of Real Estate values throughout California to plummet.** This is a separate and distinct loss from item number "a" – item "a" deals with false inflation, while item "b" alleges diminution in value/depression. These two losses in sum constitute Plaintiffs' loss of equity, and can be determined by subtracting the current depressed value of Plaintiffs' property from the artificially inflated price they were forced to purchase it for. Even for those Plaintiffs who did not purchase their property, but rather refinanced it, the demise of Defendants' scheme drove the value of their property far below its original purchase price, once again resulting in the loss of substantial equity;

    c. **Third,** another intended effect of Defendants' silent market-fixing/appraisal inflation fraud was that Plaintiffs were forced to take out larger loans to purchase the inflated-value homes. Not only were Plaintiffs forced to pay additional principal on this artificially created-value, but additional interest as well. As an example, let's say that because of Defendants' market inflation, Plaintiffs purchased a home for $600,000 (when

in reality its true uninflated value would have been $500,000), and took a loan from Defendants at 6% interest. Not only were Plaintiffs forced to pay $100,000 more for this home than they should have had to, but they were also forced to pay interest on that additional $100,000 in false value, in the amount of $500 dollars per month. Had Defendants abstained from conducting their fraud, Plaintiffs would never have needed to pay the interest on this falsely created value. The additional interest Plaintiffs were forced to pay constitutes damage to Plaintiffs;

d. **Fourth,** for the same reason as directly above (in sub-paragraph "b"), Plaintiffs were also forced to pay additional fees and points (all of which are a function of the inflated loan size). As is common knowledge throughout the industry, lenders, including Defendants herein, often charge what are known as "points" to originate a loan. Charging one "point" is another way of saying that the bank will charge you 1% of your loan amount. Two points would be 2% of the loan amount. Now, using the above example (of a 500k home, artificially inflated to 600k), let's say a borrower was forced to pay 2 points (or in other words 2% of his total loan amount). Because the loan amount was inflated he was forced to pay 2% of 600k ($12,000), when in reality, had Defendants not embarked on their scheme, he would only have had to pay 2% of 500k ($10,000). The additional $2,000 paid ($12,000 - $10,000) constitutes additional damage.

e. **Fifth,** the falsely-inflated property values also caused Plaintiffs to pay substantially higher property taxes.

f. **Sixth,** Bank Defendants also used these inflated values, to induce Plaintiffs and other borrowers into entering ever-larger loans on increasingly risky terms. The result was more money for the conspiracy of Defendants.

g. **Seventh,** The resultant higher payments coupled with the housing crash (both known if not intended by Defendants) resulted in Plaintiffs' inevitable default, wreaking havoc with their credit, and upon which Bank Defendants and Trustee Defendants charged a host of excessive fees (trustee fees, default fees, cleanup fees, inspection fees, late fees, advance fees, and attorney fees) all of which were marked up dramatically. In short,

Defendants couldn't lose; they were making money no matter what, and were benefitting from Plaintiffs' default. By tossing on so many fees Defendants made it impossible for Plaintiffs to be able to ever pay off their "default" amounts. Why? Because Defendants made money by doing so. Recall, that by this time, Defendant Banks had already sold these loans to their investors, and were only acting as servicers. Servicers have significantly different motivations than do lenders. Servicers earn more from foreclosing even when the noteholder (investors) may benefit financially in the long-term by modifying Plaintiffs' loans. And because they were servicers (rather than note-holders), Bank Defendants' incentives were not to preserve the loans and prevent default, but rather to the contrary, they made money initiating foreclosures and charging fees. In other words Defendant Banks' interests as a servicer were exactly the opposite of those when they originated the loan and were note-holders. Their interests were aligned directly with those of a servicer. They had become anything but a conventional money lender. By making it impossible for Plaintiffs to pay off their unilaterally imposed default amounts, Defendants could come in and scoop up whatever equity Plaintiffs had left in the property. It was a win, win, win scenario.

241. Bank Defendants', Ally Defendants', and HCLS's fraudulent inflation and manipulation of real estate values throughout the State of California, the demise of which sent real estate values spiraling downwards, caused Plaintiffs to be placed in homes that were immediately upside-down, and to instantly lose their equity – if not their homes altogether. And as a result of these two schemes coupled together (the scheme to place borrowers into loans they could not afford, and the Market Fixing Scheme), Plaintiff-borrowers were placed into loans far larger than would be supported by the true value of their property or their income. Then, based on these fraudulently inflated loan amounts, Defendants deceptively extracted excessive and unearned payments, points, fees, and interest from Plaintiffs – all of which comprise damage to Plaintiffs.

242. As a result of the improper scheme undertaken by Ally Defendants, Bank Defendants and HCLS, at the behest and benefit of the Conspiracy, Plaintiffs paid more for their homes then they should have, then adding insult to injury lost their equity in their homes, their credit ratings and histories were

1   damaged or destroyed, and Plaintiffs incurred material other costs and expenses, described herein.  At

2   the same time, Defendants took from Plaintiffs and other borrowers billions of dollars in interest

3   payments and fees and generated billions of dollars in illegal and fraudulently obtained profits by selling

4   their loans at inflated values and using the loans as collateral for fraudulent swaps.

5         243.   Ally Defendants, Bank Defendants and HCLS perpetrated this systematic individual

6   appraisal inflation and market fixing scheme at the direction of and for the benefit of the conspiracy, and

7   with the knowledge and acquiescence of their executives and board members.

8         244.   Defendants had exclusive knowledge of their silent scheme to inflate appraisals and fix

9   the market.

10        245.   Counts 10-13 arise under this (Third) Cause of Action for Market Fixing, and are brought

11   by all Plaintiffs named in this Cause of Action, against all Defendants named in this Cause of Action.

12

13                   **COUNT 10: FRAUDULENT CONCEALMENT**

14        246.   All preceding and following paragraphs of this Complaint are incorporated by reference

15   as though fully set forth herein

16        247.   Ally Defendants, Bank Defendants, and HCLS, at the direction, behest, and on behalf of

17   the Conspiracy of Defendants intentionally concealed the material facts alleged above at Paragraph 234

18   (a)-(j), (namely their systematic market fixing activities) in order to induce Plaintiffs reliance into

19   entering into Loan Contracts with Ally and Bank Defendants

20        248.   Plaintiffs did in fact rely on the non-existence of the concealed facts in deciding to enter

21   into Loan Contracts with Ally and Bank Defendants.  Had Plaintiffs known the truth, they would not

22   have entered into the Loan Contracts.

23        249.   Defendants had exclusive knowledge of the truth.  Their scheme was built on keeping

24   their borrowers (Plaintiffs herein) in the dark.

25        250.   Bank Defendants, Ally Defendants, and HCLS, had a duty to disclose such material

26   information but intentionally failed to do so.

27        251.   As a result of such concealments Plaintiffs were damaged as described in this Cause of

28   Action as set forth above in Paragraph 237(a)-(g)

252.     Further, without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages arising from this Cause of Action also include loss of equity in their houses,, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

253.     Defendants' actions in systematically and falsely pumping up real estate values throughout California, were a substantial factor in if not *the* cause of the generalized market crash which caused the prices of Real Estate values throughout California to plummet, damaging Plaintiffs herein.

254.     These harms were both known and foreseen, if not intended, by the Conspiracy of Defendants.

255.     Defendants' intentional, wide-scale, fraudulent conduct also merits the imposition of punitive damages. Plaintiffs respectfully request the award of such punitive damages and any other relief this court shall deem just and proper.

## COUNT 11: NEGLIGENCE

256.     All preceding paragraphs and following paragraphs are hereby incorporated as though fully set forth herein.

257.     Specifically, each and every allegation of Count 8 (for Negligence) arising under the *previous* Cause of Action for Individual Appraisal Inflation, are set forth identically  herein and realleged here, in the interest of brevity. All of the wrongs and harms alleged in that Count are specifically brought here in this Count as well.

258.     In addition to the allegations of Count 8, Plaintiffs further allege as follows.

259.     Ally Defendants, Bank Defendants, and HCLS additionally breached their duty by maliciously (or alternatively, knowingly, or recklessly) inflating values of real estate throughout California in a Market Fixing Scheme, as described throughout this Cause of Action.

## COUNT 12: PRICE FIXING - VIOLATION OF SHERMAN ACT 15 USC §1 ET SEQ.

260.     All preceding paragraphs and following paragraphs are hereby incorporated as though

1  fully set forth herein.

2      261.    The Market Fixing Scheme alleged throughout this Cause of Action falls within the

3  definition of a price fixing conspiracy under 15 USC §1 et seq.

4      262.    Plaintiffs herein bring this count for injuries occurring as a direct result of Ally and Bank

5  Defendants' and HCLS's (and their Co-Conspirator's) Price Fixing conspiracy, as described throughout

6  this Cause of Action ("Market Fixing").

7      263.    Ally and Bank Defendants herein were among the leading lenders at all times alleged

8  herein and had sizeable market share, individually and collectively.

9      264.    The purpose and effect of this anti-competitive conspiracy was to fix, raise, and stabilize

10  the prices of homes throughout California, in order to bolster and increase Defendants' profits at the

11  expense and injury of their borrowers, as well as other fairly competing lending institutions. These

12  actions led to commensurate inflation of real estate values in states contiguous to California.

13      265.    Ally Defendants, Bank Defendants and HCLS collusively and affirmatively conspired

14  with one another to artificially raise the values of real estate throughout California, with effects

15  spreading throughout contiguous states, because in doing so, all parties would see significantly more

16  profit. The Bank Defendants were able to charge higher loan amounts, higher interest, and higher fees

17  and points, while simultaneously able to increase their sales on the secondary market by creating the

18  substantially false impression that the loans being sold were less risky than they were. Because of the

19  intentionally increased danger of their loans, and increased likelihood of default the Servicing

20  Defendants were able to collect highly lucrative late fees, default fees, and other such fees. Both

21  Lending and Servicing Defendants turned additional profit when their borrowers, through their

22  coordinated acts of deception and Market Fixing inevitably defaulted and were foreclosed upon, because

23  Lending and Servicing Defendants were profitably insured against loss. Finally the Trustee Defendants

24  also profited through this price fixing scheme in that more foreclosures allowed them to collect lucrative

25  foreclose fees, trustee fees, inspection fees, and numerous other such fees.

26      266.    Ally Defendants, Bank Defendants and HCLS acted intentionally and with the specific

27  intent of fixing the market, and inhibiting fair competition.

28      267.    Ally Defendants, Bank Defendants and HCLS succeeded in inflating, fixing, and raising

- 70 -

**COMPLAINT**

real estate prices throughout the areas described, to the grave detriment of their consumers all of whom were unknowingly forced to pay substantially more for their homes than they would have absent such price/market fixing. Defendants' acts were the direct and proximate causes of Plaintiffs' harms.

268.    As a result of such acts Plaintiffs have been damaged as set forth in Paragraph 237 (a)-(g)

269.    Further, without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages arising from this Cause of Action also include loss of equity in their houses, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

## COUNT 13: UNFAIR, UNLAWFUL, AND FRAUDLENT BUSINESS PRACTICES
## (VIOLATION OF CAL. BUS. & PROF. CODE §17200)

270.    All preceding paragraphs and following paragraphs are hereby incorporated as though fully set forth herein.

271.    Specifically, each and every allegation of Count 9 (for violation of the UCL) arising under the *previous* Cause of Action for Individual Appraisal Inflation, are set forth identically  herein and realleged here, in the interest of brevity. All of the wrongs and harms alleged in that Count are specifically brought here in this Count as well.

272.    In addition to the allegations of Count 9, Plaintiffs further allege as follows.

273.    Ally Defendants, Bank Defendants and HCLS acts are additionally **fraudulent** as set forth throughout this Third Cause of Action and the preceding Counts, all of which are hereby incorporated by reference.

274.    Ally Defendants, Bank Defendants and HCLS's acts are additionally **unfair** in that the intentional systematic manipulation and inflation of real estate values throughout California, causing Plaintiffs (and numerous others) to have to pay substantially more for their homes, loans, taxes, and numerous other fees – all so that the Conspiracy of Defendants could profit is patently unfair.

275.    Ally Defendants, Bank Defendants and HCLS acts are additionally **unlawful** in that

    a.  their market and price fixing activities constitute violation of Anti-Trust law under the

Sherman Act.

276. Further as a result of Defendant's (1) artificial and fraudulent inflation of Plaintiffs' property values, and property values throughout the State of California, as well as (2) Defendants' abandonment of their own as well as industry standard underwriting guidelines, coupled with (3) Defendants incentive to package and sell as many dollars' worth of loans as they could to the secondary market, Defendants placed Plaintiff-borrowers into loans which were considerably larger than were justified by (a) the *true* uninflated valued of their properties, (b) Plaintiffs true uninflated incomes and (c)by Defendants own underwriting guidelines. As a result of Plaintiffs were placed into larger loans than they could afford or should have been placed into. The additional fees, points and interests paid as a result of the higher/inflated loan amounts constitute damages, and legally cognizable sources of restitution.

## FOURTH CAUSE OF ACTION: DECEPTION IN LOAN MODIFICATIONS

*(By Plaintiffs David Cruz, Yesenia Cruz, Rick Albritton, Deborah Albritton, and Sarah Sebagh – Against Bank Defendants and all other Defendants as Co-Conspirators)*

*Defendants' Scheme To Extract Workout Payments From Borrowers In Distress And Then Foreclosing, As Opposed To Genuinely Offering Loan Modifications – Violating California's Prohibition Against Collecting Deficiency Judgments After Electing to Non-Judicially Foreclose*

277. In the face of the escalating foreclosure crisis in the United States and especially in California, Bank Defendants have further victimized and preyed on those struggling to keep by offering and inducing customers into illusory "Workout Agreements," (also known as "Trial Payment Plans") or "TPP"s) which purport to offer hope of (1) a permanent loan modification and/or (2) an opportunity to cure loan default, but in truth and fact are merely a ruse through which Bank Defendants dupes homeowners into paying them thousands of dollars immediately before they foreclose. On information and belief, Bank Defendants have reaped illicit profits from these actions exceeding $100 million.

278. Under these Workout Agreements, Bank Defendants promise to (1) permanently modify the borrower's loan, (2)refrain from foreclosing during the pendency of the Workout Agreement, and (3) an opportunity to otherwise cure loan default, if a borrower pays three (sometimes more) "trial

- 72 -

**COMPLAINT**

payments" to the lender. Despite their promises to the contrary, Bank Defendants have not fulfilled their promises under the Agreement (breach of contract), and indeed never intend to (fraud). Instead, as alleged below, these Workout agreements are a sham designed to extract payments from borrowers immediately before Bank Defendants foreclose (violation of California's prohibition against collecting deficiency judgments after electing to non-judicially foreclose; *See* Cal. Code Civ. Proc. § 580b and Cal. Code Civ. Proc. § 726).

279. In their capacity as loan servicers, Bank Defendants are paid by and beholden to the investors that hold the principal and interest rights to the loan being serviced. The larger the face value of the pools of loan Bank Defendants service, the more it makes. Quality of servicing and responsiveness to borrowers are irrelevant to the bottom line. In fact, for loans in default, past due, and/ or on the brink of foreclosure, Bank Defendants makes ***more money*** in fees. As such, it is in Bank Defendants interest to have loans in default and arrears for as long as possible prior to foreclosure, then foreclosing. Bank Defendants stand only to lose revenue by giving loan modifications to borrowers instead of foreclosing.

280. Bank Defendants' servicing agreements with investors provide that the Bank Defendants gets a set percentage of every dollar it collects from borrowers. If a borrower is in default and not making any payments, Bank Defendants then receive no compensation for servicing the loan. In addition, most of Bank Defendants' loan servicing agreements requires them to advance to investors the monthly payments that defaulted borrowers do not make. This requires Bank Defendants to borrow money from its parent bank to cover such advances. It is thus disastrous to Bank Defendants' profitability to have defaulted loan where no payments are being made.

281. As a result, Bank Defendants designed the "Workout Agreements" at issue here to convert non-performing loans that only cost it money into "cash-flowing" loans that made it money. Its policies from the outset of its use of the Workout Agreements require any borrower asking for a modification to first sign-up for a Workout Agreement, and it financially incentivized its call center employees to push the Workout Agreements on all defaulted borrowers. It is in Defendants interest to delay – but not prevent- foreclosure when by doing so it can avoid making the payment advances to its investors and collect additional sums from distressed borrowers prior to foreclosure.

282.    Under California's non-judicial foreclosure rules, by electing to foreclose, a party loses the right to collect any amount owed on the loan that exceeds the amount recovered through the foreclosure process. Thus, when a home is worth less than the amount owed, after an election is made to non-judicially foreclose on the borrower, that borrower does not have to repay any deficiecncy, and Bank Defendants has no legal authority to collect, any arrearage or missed payments on the loan(s). Importantly, once a foreclosure has been initiated, a borrower has no legal obligation to make payments on the loan and the lender has no legal ability to collect any such payments.

283.    These activities have been the subject of intense scrutiny, enforcement actions and litigation. As recently as April 13, 2011, multiple Federal regulators entered into stipulated consent orders with certain Defendants herein and related entities such as MERS (described below) describing massive failures and taking the first steps toward requiring Defendants and other banks to refund sums to homeowners improperly foreclosed upon by Defendants and other banks.

284.    Some Plaintiffs entered into "Workout Agreements" with Bank Defendants in which Plaintiffs promised to pay and paid thousands of dollars- including legal and other fees which were not owed under their mortgages- on the seeming return promise of a review for a loan modification and an opportunity to cure their default at the end of a review period. But Bank Defendants' promises in return were empty: At the end of the Workout Agreements it told borrowers to continue to make monthly payments as it "considered" modification. Then it foreclosed on Plaintiffs' homes *without allowing borrowers access to any "cure method" despite its promises in the Workout Agreements to do so*.

285.    In fact, Bank Defendants' internal policies and procedures were *not* to render a modification decision during the term of the Workout Agreements and its policy was *not* to provide cure information to the borrower at the end of the Workout Agreement absent a specific request from the borrower. As a result, Bank Defendants fraudulently induced their customers to enter the Workout Agreements and pay them thousands of dollars, while making no legally binding promise in return to Plaintiffs. The Plaintiffs in this action are entitled to rescind. In the alternative, Plaintiffs allege that Defendants breached their duty of good faith and fair dealing when it foreclosed on Plaintiffs' homes without first giving an opportunity to cure the default.

286.    In return for Plaintiffs' promises to make monthly payments, under the "workout

agreements", which included legal and other fees not required to be paid under Plaintiffs' mortgages, Bank Defendants promised: (a)to permanently modify Plaintiff's loans (b) not to foreclose for the duration of the Workout Agreement; and (c) at the end of the Workout Agreements to provide an opportunity for Plaintiffs to "cure: their loan deficiency through: (1)reinstatement (*i.e.,* bring the loan current); (2) payoff( i.e., refinancing with another lender to pay off the serviced loan); (3) modification; or (4) another workout "option" at the discretion of Bank Defendants.

287. The Workout Agreements signed and offered to Plaintiffs by Bank Defendants were a sham. They were illusory because Bank Defendants made materially false statements in the Workout Agreements and made no legally binding promises in exchange for the borrowers' promises to make payments. The (1) promise of permanent loan modification and (2) "other" workout options were entirely at Bank Defendants' discretion, and thus not a binding promise. Defendants never permanently modified Plaintiffs as promised despite their compliance with every term of the workout offer, including their payment of all trial payments. The options to cure by (3) reinstatement or (4) payoff were also illusory because Bank Defendants' policy was to foreclose on properties *without providing the opportunity to cure* default through another means to avoid foreclosure. Borrowers had no opportunity to cure through reinstatement or pay-off their loan because they were not told at least five days before the Trustee's sale date that a modification other workout plan was denied. As a result, Plaintiffs' consent to the Workout Agreements was fraudulently obtained and Bank Defendants' consideration for the Workout Agreements failed, rendering such agreements *void ab initio* and subject to rescission. In addition, under the black letter California law, Plaintiffs are entitled to punitive damages where, as here, consent to a contract is fraudulently induced *See Mahon v. Berg*, 267 Cal. App. 2d 588, 589 (1968).

288. Plaintiffs herein have complied with each and every term of the Workout Agreements. Plaintiffs have made all payments required under such agreements. Plaintiff's representations made in connection with such Workout Agreements remain true and correct. Defendants however have not delivered the promised consideration, and are therefore in breach of contract. Defendants have not permanently modified Plaintiffs loans as promised. No opportunity to cure default or deficiency as above described was offered. And in many instances Bank Defendants foreclosed on Plaintiffs while Plaintiffs were still making "trial payments" under the Workout Agreements.

289.　Though the language of the Workout Agreements requires them to do so in order to reject a Plaintiff, Bank Defendants never notified any of the Plaintiffs herein, in writing or otherwise, that they were ineligible for a permanent loan modification after they made all of the trial payments during the "trial period".

290.　California law requires that if a borrower complies with all the terms of a Workout Agreement/TPP, then the lender *must offer* a permanent loan modification.

291.　The Workout Agreements signed and offered to Plaintiffs by Bank Defendants were a sham. They were illusory because Bank Defendants made materially false statements in the Workout Agreements and made no legally binding promises in exchange for the borrowers' promises to make payments. The (1) loan modification and (2) "other" workout options were entirely at Bank Defendants' discretion, and thus not a binding promise. The options to cure by (3) reinstatement or (4) payoff were also illusory because Bank Defendants' policy was to foreclose on properties *without providing the opportunity to cure* default through another means to avoid foreclosure. Borrowers had no opportunity to cure through reinstatement or pay-off their loan because they were not told at least five days before the Trustee's sale date that a modification other workout plan was denied. As a result, Plaintiffs' consent to the Workout Agreements was fraudulently obtained and Bank Defendants' consideration for the Workout Agreements failed, rendering such agreements *void ab initio* and subject to rescission. In addition, under the black letter California law, Plaintiffs are entitled to punitive damages where, as here, consent to a contract is fraudulently induced. *See Mahon v. Berg*, 267 Cal. App. 2d 588, 589 (1968).

292.　Plaintiffs are entitled to rescind and obtain back from Bank Defendants their promised (and delivered) consideration, namely the payments that were made to Defendants under the Workout Agreements and Extended Workout Agreements. Because California law prohibits deficiency judgments, Defendants were not entitled to require, post-election-to-sell payments and foreclose on the loans. Nor were Plaintiffs required to make such payments. These payments were new consideration. Such payments included legal and other fees which Plaintiffs had no obligation to pay under their mortgages absent Bank Defendants' Work out Agreement Scheme.

293.　In the alternative, should the Workout Agreements and/or Extended Workout Agreements be deemed enforceable, Bank Defendants has breached its duty of good faith and fair

dealing by foreclosing on Plaintiffs' properties without providing the opportunity to cure the loan default at least five days prior to the Trustee's sale. Plaintiffs complied with all of their obligations under the Workout Agreements and Extended Workout Agreements. At the very least, Bank Defendants were required by good faith and fair dealing to provide notice to Plaintiffs that had been rejected and that Plaintiffs needed to invoke another of the permitted means to cure their defaults.

294.    Irrespective of validity of the Workout Agreements and Extended Workout Agreements, Bank Defendants has violated the Rosenthal Fair Debt Collections Practices Act, Cal. Civ. Code § 1788, *et seq.*, by using false, deceptive and misleading statements in connection with their collection of Plaintiffs' mortgage debt – namely the false promise of modification.

295.    Through this Action, Plaintiffs seek to stop Bank Defendants from preying on their customers through its Workout Agreement Scheme. Where Bank Defendants intend to foreclose on a property, and after it has exercised its election to sell under non-judicial foreclosure, it must not be permitted to extract thousands of dollars in additional payments with illusory promises and false statements of opportunities to cure defaulted loans. Bank Defendants have sold or initiated foreclosures on many of the Plaintiffs in this action. At the very least, Plaintiffs are entitled to a return of the payments they made under the false promise from Bank Defendants that Plaintiffs would at least have an opportunity to avoid foreclosure.

296.    Once a lender invokes its power to sell the underlying security for a mortgage (through providing its "Notice of Default and Election to Sell"), it cannot also seek to collect on the underlying note any amount owed in excess of the amount it recovers through the trustee's sale.

        a.    California law forbids deficiency judgments in non-judicial foreclosure of residential mortgages. *See* Cal. Code Civ. Proc. § 580b. Once a lender invokes its power to sell the underlying security for a mortgage (through providing its "Notice of Default and Election to Sell"), it cannot also seek to collect on the underlying note any amount owed in excess of the amount it recovers through the trustee's sale.

        b.    The notion that a mortgage lender must elect his remedy is also codified in the "Security First Rule," Cal. Code Civ. Proc. § 726. It provides that where Cal Code Civ. Proc. § 580b applies; an action in foreclosure is the *only* means by which a mortgagor can

**COMPLAINT**

1          forcibly collect on a note secured by a deed of trust.

2      297.    California law provides that a Trustee's sale can be postponed by mutual agreement. *See*

3 Cal. Civ. Code § 2994g. However, the new date and time of the postponed sale must be provided by the

4 trustee (and can be "cried") at the time of the prior scheduled sale. *See* Cal. Civ. Code § 2994g (d).

5 Bank Defendants herein count on the crier rule in the design and implementation of its Workout

6 Agreement Scheme. It knows that borrowers will not be present at the first scheduled Trustee's sale

7 because it tells them that such sale is "suspended" or "on hold." Thus, it knows that Plaintiffs will have

8 no way to know whether a new date and time has been set for the foreclosure and will have to rely on

9 Defendants' assurances that such sales will not occur if Defendants' demands for payment are met.

10

11                ***Bank Defendants' Adhesive Workout Agreements Are Unconscionable***

12      298.    Plaintiffs have entered in Workout Agreements with Bank Defendants. The terms of

13 Bank Defendants' Workout Agreements are contained in a standard form, which is drafted by Bank

14 Defendants.

15      299.    Moreover, Plaintiffs are not in a bargaining position with respect to the imposition of

16 Defendants' from Workout Agreement. Defendants are large lenders and loan servicers with substantial

17 assets and resources. Plaintiffs are individual homeowners under financial hardship and have

18 substantially less bargaining power.

19      300.    Bank Defendants prepare the Workout Agreements and presents them to borrowers for

20 their signature.

21      301.    Bank Defendants thus requires borrowers to agree to the Workout Agreement as

22 presented. It does not provide an opportunity to negotiate or opt-out of the unconscionable terms at issue

23 herein. The inequality of bargaining power this results in no real negotiation and absence of a

24 meaningful choice on the part of Plaintiffs.

25      302.    Bank Defendants' form Workout Agreements contain multiple provisions that are

26 unfairly one-sided, overly harsh and punitive to borrowers, and thus substantively unconscionable.

27 Under the terms of the form Workout Agreement, Bank Defendants systematically (1) fail to withdraw

28 foreclosure proceedings against borrowers who are in "Workout Agreements" and who make payments

under the Workout Agreement; (2) create payment plans whereby the aggregate payments are insufficient to cure the borrower's deficiency; and (3) initiate foreclosures with no notice and opportunity for the borrower to cure any alleged default.

### *Bank Defendants Fail To Withdraw Foreclosure Proceedings Even When Borrowers Have Made All Plan Payments Under The Workout Agreement*

303.     Bank Defendants' Workout Agreements purport to obtain the borrower's agreement that foreclosure proceedings commenced by Bank Defendants will not be withdrawn unless Bank Defendants determines to do so. In this regard, the Workout Agreement Provides:

> **Section 2.B.** Except as set forth in Section 2.C. below, the Lender will suspend any scheduled foreclosure sale, provided I continue to meet the obligations under this Plan, but any pending foreclosure will not be dismissed and may be immediately resumed from the point at which it was suspended if this Plan terminates, and no new notice of default, notice of intent to accelerate, notice of acceleration, or similar notice will be necessary to continue the foreclosure action, all rights to such notices being hereby waived unless prohibited by law;

(See Exhibit "A" to Complaint, p.2)

304.     Relying on the above provision, Bank Defendants fails to withdraw foreclosure proceedings while borrowers are supposedly being considered for a loan modification. Once borrowers begin making payments under the Workout Agreement, Bank Defendants unilaterally postpone any pending foreclosure sales date without obtaining the borrowers mutual consent and without informing borrowers of the reset foreclosure dates. It does so *even if* borrowers make all Plan Payments under the Workout Agreement.

305.     Bank Defendants' policy of failing to withdraw foreclosure proceedings and resetting the foreclosure sale date without the mutual agreement of, or notice to, borrowers in unfair, unlawful, and injurious to such borrowers. This practice is calculated to ultimately allow Bank Defendants to foreclose without notice or an opportunity to cure after obtaining payments under the Workout Agreement.

306.     After inducing Plaintiff Borrowers into entering dangerous loans through outright deception and in the name of greed - loans which would threaten their livelihoods - Defendants refused to modify Plaintiff Borrowers' loans despite laws and court orders which required them to make good

faith efforts to do. Why? To protect themselves. Not the borrowers, but themselves. Because Defendants were required to buy back loans from their investors if a material misrepresentation was discovered, Bank Defendants refused to modify loans which qualified in every regard for one, for fear of having their own fraud and falsified information discovered by the investor, and having to buy back their fraudulent loans, and incurring massive loss. In other words, Bank Defendants placed their fiscal interests ahead of borrowers who desperately needed and *qualified* for the modifications, and who would face financial ruin or homelessness without one. Instead, Defendants chose to line their coffers, rather than offer assistance to the very people they imperiled through their greed -- assistance they were under a good faith obligation to provide. Simply put, Bank Defendants were looking out for themselves.

307. Plaintiffs believe and hereby allege that the servicers would want to use MERS to keep the investor information private is to obscure truth from the Plaintiffs and the Certificate Holders of the Trust.

308. Every Pooling and Servicing Agreement has strict Warranties and Material Misrepresentation Provisions that must be honored by the Depositors. In the event that a loan has a material misrepresentation or violates the warranties given to certificate holders and the Trustee of the REMIC, the loan must be purchased from the Certificate Holders and whatever insurance was in place is now void due to fraud being detected on the loan.

309. In the case of loan modifications it benefits the servicer to keep vital information away from the Certificate Holders and the Trustee that oversees the Trust. In the event that fraud is detected on a mortgage loan the "**buy back**" provisions kick in and the servicer or originator, which is sometimes the same company, would be forced to take back the loan. In this case Bank Defendants would be forced to put a dead loan on their balance sheet with no hopes of being able to collect on the insurance policy that is in place due to fraud.

310. When Plaintiffs are desperate for help, Bank Defendants refuses to assist them. In the event that Bank Defendants forwards the true and accurate financial information to the Trustee overseeing the REMIC or to a third party chosen by the Trustee, they can and sometimes do find material misrepresentations that took place at origination. A Plaintiff supplies current financial information up to and including a signed 4506-T and the investor or Defendants through their processing centers find out that the income listed on the initial loan application was not correct.

311.    This leads to a chain of events that Plaintiffs and the Courts are unaware of. Based on evidence Plaintiffs will introduce at trial Bank Defendants instructs their employees to decline any application to modify a loan that contains a material misrepresentation for *fear of having to buy back the loan.*

312.    This practice has led to numerous lawsuits including Government lawsuits in which Government Sponsored Enterprises have independently sent out modification requests and have verified fraudulent information was used at the origination of the Plaintiffs loans.

313.    This practice alone has led to millions of American's losing their homes for fear of reprisal from investors that were lied to, when they purchased these *Toxic* loans.

Defendants' wrongful acts continue to this day with hardball tactics and deception that continue to threaten Plaintiffs' rights and financial security, as well as the economic future of the State of California. Since 2010, these tactics and Defendants' other wrongful acts have been revealed as a result of extensive litigation and Government investigations.


### *Defendants Used The Promise Of Loan Modifications As Bait To Damage Plaintiffs' Credit, Preventing Plaintiffs From Obtaining Financing Anywhere Else*

314.    Bank Defendants had an unfair and fraudulent pattern on inducing and directing borrowers to fall behind on their payments with the promise that by doing so, they would become eligible for a loan modification. Relying on these representations, Plaintiffs fell behind on their loan payments, but were never offered a loan modification.

315.    In doing so, Plaintiffs' credit was substantially damaged, they suffered greatly diminished access to credit and financing, and were penalized with fees, penalties and charges in addition to becoming delinquent on their loan as recommended by the Bank.

316.    By recommending that Plaintiffs fall behind, Bank Defendants effectively trapped Plaintiffs into keeping their loan with Defendants, because no other institution would help Plaintiffs after they became delinquent on their mortgage, or after their credit was destroyed.

317.    At its most fundamental level, these sorts of unscrupulous business tactics, undermine notions of fair play and good faith in business dealings, and jeopardize the consuming public.

*Defendants Used The Promise Of Loan Modifications As Bait For An Outright Cash-Grab With No Intent To Ever Modify Plaintiffs*

318.    Bank Defendants also had an unfair and fraudulent pattern of offering borrowers what appeared to be Loan modification offers (called "Trial Payment Plans"), but in reality these offers were nothing more than "cash grabs." Defendants never intended to permanently modify Plaintiffs' loans. Specifically, Bank Defendants would offer Plaintiffs and homeowners who were already on the brink of default/foreclosure a lower payment called a "trial payment" or "Workout Agreement". Bank Defendants promised that if Plaintiffs were able to make the trial payment for 3 (or more) months, Defendants would permanently modify Plaintiffs' payment to be the same amount under the trial payments. But Defendants had a pattern of rejecting these loan modifications despite Plaintiffs' compliance with every term of the loan modification offer. Instead Bank Defendants would use the offer as bait to induce Plaintiffs to make payments which would never be applied to the principal and interest of their loan, but instead would be applied to the mountain of unmerited late charges, and fees, taking what little money the financially imperiled plaintiffs had left, and duping them into spending it on unfairly placed fees and late charges. Bank Defendants never had any intent of modifying their loans, despite Plaintiffs' full compliance with the terms of the offer. Such acts are patently unfair and fraudulent, and Plaintiffs are entitled to remuneration of all payments made under such trial payment plans, as well as an injunction prohibiting Defendants from this deceptive business practice. More specifically, Bank Defendants unlawful and unfair practices in this regard include, but are not limited to, the following:

      a.   failing to make good faith efforts to provide them with a loan modification and breaching their contractual obligations, written and implied promises, loan servicing functions owed to Plaintiffs, who fulfilled their obligations by making timely modified payments;

      b.   making false and/or misleading representations that Plaintiffs were eligible and entered into the trial modification period, which would lead to a permanent modification of their mortgage payment;

**COMPLAINT**

c. failing to disclose to Plaintiffs that their modified payments may be reported to credit bureaus as default or late payments that would destroy their credit scores;

d. delaying processing, demanding duplicate documentation, and failing to provide adequate information or communication regarding the loan modification programs to Plaintiffs;

e. engaging in conduct that undermines or violates the spirit or intent of the consumer protection laws alleged in this Complaint; and

f. omitting to inform Plaintiffs that they could be rejected from the trial modification period at any point, and that this would result in the immediate demand for a balloon payment consisting of purported delinquency payments and substantial late fees, default fees, foreclosure fees, inspection fees, property preservation fees, trustee fees, trustee sale guarantee fees, mail fees, recording fees, and default servicing fees

319. Counts 14 through 22 arise under this (Fourth) Cause of Action for Deception in Loan Modifications, and are brought by all Plaintiffs named in this Cause of Action, against all Defendants named in this Cause of Action.

## COUNT 14 : VIOLATION OF CAL. CODE CIV. PROC. § 580B AND §726 PROHIBITING COLLECTION OF DEBT AFTER ELECTING TO FORECLOSE

320. The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

321. As described above, California law forbids deficiency judgments in non-judicial foreclosure of residential mortgages. *See* Cal. Code Civ. Proc. § 580b. Once a lender invokes its power to sell the underlying security for a mortgage (through providing its "Notice of Default and Election to Sell"), it cannot also seek to collect on the underlying note any amount owed in excess of the amount it recovers through the trustee's sale.

322. As alleged throughout this Cause of Action, Bank Defendants have entered into Workout Agreements with Plaintiffs after initiating foreclosures on their properties, under which it has intentionally extracted thousands of dollars of payments from each of the Plaintiffs named herein in

**COMPLAINT**

explicit and *knowing* violation of Cal. Code Civ. Proc §580(b) and §726 prohibiting the collection of payments on the note after the election to foreclose.

323.    Bank Defendants' acts comprise a scheme to circumvent the statutory bar against seeking a deficiency judgment. These acts were taken in furtherance of the conspiracy among all Defendants alleged throughout this Complaint.

324.    Such unlawfully extracted payments constitute damage to Plaintiffs herein. These payments must be returned to Plaintiffs, plus pre-judgment interest.  Further, Bank Defendants should be enjoined from continuing to violate this rule in the future.

### COUNT 15: FRAUDULENT CONCEALMENT

325.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein

326.    Plaintiffs and Bank Defendants were parties to the Loan Workout Agreements described above in this Cause of Action.

327.    By intentionally failing to disclose the material information described above in this Cause of Action, Defendants fraudulently induced Plaintiffs to enter into such Workout Agreements. To reiterate, *in part* here, Bank Defendants intentionally concealed the materials facts:

       a.  that the true purpose of such Loan Workout Agreements were to extract additional payments from Plaintiffs, and

       b.  that Plaintiffs would not be modified despite their exact compliance with the terms of the agreement

       c.  that such payments would not be applied to their loan balance,

       d.  that Bank Defendants would report Plaintiffs as delinquent to credit reporting agencies, when making the exact payments required under the Bank Defendants' Trial Payment Plans.

328.    Bank Defendants were under a duty to disclose this information to Plaintiffs

329.    By intentionally failing to disclose such information Bank Defendants intended to induce Plaintiffs reliance to enter in the illusory Workout Agreements, and to induce their payments made

**COMPLAINT**

thereunder

330. Plaintiffs under this Cause of Action did rely on Bank Defendants' failure to disclose such information in deciding to enter into the Workout Agreements and Extended Workout Agreements

331. If Plaintiffs had known the truth, they would not have entered into the Workout Agreements and Extended Workout Agreements

332. As a result, Plaintiffs were damaged in amount to be determined at trial. At minimum Plaintiffs must be returned all amounts paid by Plaintiffs under the Workout Agreements, as well as pre-judgment interest. Plaintiffs have also been damaged in the form of reduced credit scores, and the unavailability of financing.

333. Plaintiffs are further entitled to an award of punitive damages for Defendants intentional fraudulent conduct.

## COUNT 16: INTENTIONAL MISREPRESENTATION

334. The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein

335. Plaintiffs and Bank Defendants were parties to the Loan Workout Agreements discussed in this Cause of Action.

336. By intentionally misrepresenting the material information described above in this Cause of Action, Bank Defendants fraudulently induced Plaintiffs to enter into such Workout Agreements. To reiterate, *in part* here, Bank Defendants intentionally misrepresented the materials facts:

  a. it wanted to help Plaintiffs maintain ownership of their homes. In particular, Bank Defendants sent the letters and made the statements described herein;

  b. that by complying with the Workout Agreements, Plaintiffs loans would be permanently modified ;

  c. that their homes would not be foreclosed as long as Plaintiffs continued to make payments under the Workout Agreements and Extended Workout Agreements. In particular, Plaintiffs were repeatedly told to continue to make payments and that their homes would not be foreclosed, as described herein;

- 85 -

d.  whether they were approved for a loan modification and would have a genuine opportunity to cure their loan defaults prior to the execution of a Trustee's sale on their homes. Plaintiffs were never given such an opportunity;

e.  that upon the expiration of the Work out Agreements, Plaintiffs would have an opportunity to cure their defaults through: (1) reinstatement; (2) payoff; (3) HAMP sponsored Loan Modification; or (4) Investor Sponsored internal modification;

f.  that plaintiff-borrowers must miss payments (and thus damage their credit) in order to be eligible for modifications;

g.  that plaintiff-borrowers' homes would not be foreclosed upon while their requests for modifications were pending, but sending foreclosure notices, scheduling auction dates, and even selling consumers' homes while they waited for decisions;

h.  that their foreclosures would continue to be on hold after the expiration of the Workout Agreements if Plaintiffs continued to make payments to Defendants;

i.  regarding the eligibility criteria for modifications and providing consumers with inaccurate and deceptive reasons for denying their requests for modifications.

337.  At the time Bank Defendants made these representations to the Plaintiffs, Bank Defendants knew they were not true. Bank Defendants intended to and did foreclose during the time period for which the Plaintiffs had already made payments under their Extended Workout Agreements.

338.  Bank Defendants made these representations with the purpose of inducing Plaintiffs reliance to enter into the Workout Agreements, and Extended workout Agreements, and to continue to make payments of thousands of dollars per month.

339.  Plaintiffs relied on these representations in entering the Workout Agreements, and extended Workout agreements, and in continuing to make payments thereunder.

340.  Plaintiffs would not have entered into the Workout Agreements and Extended Workout Agreements had they known that these representations were not true. That is, had they known that they would not have a genuine opportunity to save their homes and to cure, and that Bank Defendants could and would foreclose on their properties without any notice that modifications were denied and after they had paid thousands of dollars to Bank Defendants, Plaintiffs would not have entered into the Workout

COMPLAINT

1  Agreements to begin with and would not have made the payments during the terms of the Workout

2  Agreements and the Extended Workout Agreements.

3      341.    As a result, Plaintiffs were damaged in amount to be determined at trial. At minimum

4  Plaintiffs must be returned all amounts paid by Plaintiffs under the Workout Agreements, as well as pre-

5  judgment interest. Plaintiffs have also been damaged in the form of reduced credit scores, and the

6  unavailability of financing.

7      342.    Plaintiffs are further entitled to an award of punitive damages for Defendants intentional

8  fraudulent conduct.

9

10              **COUNT 17: NEGLIGENT MISREPRESENTATION**

11      343.    The preceding paragraphs and the paragraphs following this cause of action are

12  incorporated by reference as though fully set forth herein

13      344.    The allegations of this Count are identical to those above in the previous Count except

14  that the degree of intent herein is that of negligence. Put another way, at the time Bank Defendants made

15  the misrepresentations described in this Cause of Action (and listed in part above), Bank Defendants did

16  not have reasonable grounds to believe them to be true.

17

18  **COUNT 18: RESCISSION OF CONTRACT AND/OR RESTITUTION ON THE GROUNDS OF**

19                  **FRAUD, AND/OR UNCONSCIONABILITY**

20      345.    All preceding paragraphs and the paragraphs following this cause of action are

21  incorporated by reference as though fully set forth herein

22      346.    As described throughout this Cause of Action, consent to the Workout Agreements and

23  Extended Workout Agreements was not real or free in that it was obtained solely through fraud and

24  misrepresentations as herein alleged.

25      347.    As described throughout this Cause of Action, the Workout Agreements were both

26  procedurally and substantively unconscionable. Rescission is appropriate for this separate and

27  independent reason.

28      348.    Plaintiffs thus seek to rescind the agreements under California Civil Code § 1689 (b)(1).

**COMPLAINT**

1    Plaintiffs have retained no consideration provided by Bank Defendants that can be tendered back to

2    Bank Defendants prior to rescission.

3

4                           **COUNT 19: BREACH OF CONTRACT**

5        349.    The preceding paragraphs and the paragraphs following this cause of action are

6    incorporated by reference as though fully set forth herein.

7        350.    Plaintiffs and Bank Defendants were parties to the Loan Workout Agreements discussed

8    in this Cause of Action.

9        351.    Plaintiffs furnished consideration under the Loan Workout Agreement in the form of

10   thousands of dollars of payments

11       352.    Bank Defendants breached their obligations to Plaintiffs under Contract as set forth above

12   in this Cause of action, including but not limited to:

13           a.  Breaching its obligations to modify plaintiffs upon their compliance with the terms of the

14               Workout agreement

15           b.  Breaching its obligation to not foreclose while Plaintiffs made payments under the

16               Workout Agreement

17           c.  Breaching its obligation to allow Plaintiffs an opportunity to cure under the Workout

18               Agreement

19       353.    Separately Bank Defendants has breached the **duty of good faith and fair dealing**

20   implicit in all contracts, as alleged above.

21       354.    As a result, Plaintiffs have been damaged in an amount to be proven at trial. At minimum

22   Plaintiffs must be returned all amounts paid by Plaintiffs under the Workout Agreements, as well as pre-

23   judgment interest.

24       355.    Alternatively Plaintiffs request enforcement of the Workout Agreement. Specifically

25   Plaintiffs request enforcement of the promise of Loan Modification pursuant to the terms and payments

26   made thereunder, and any other legal or equitable remedies which this Court may deem just and proper.

27

28                **COUNT 20: VIOLATION OF THE CRIER RULE (CAL. CIV. CODE §2994G)**

**COMPLAINT**

356.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

357.    California law provides that a Trustee's sale can be postponed by mutual agreement. *See* Cal. Civ. Code § 2994g. However, the new date and time of the postponed sale must be provided by the trustee (and can be "cried") at the time of the prior scheduled sale. *See* Cal. Civ. Code § 2994g (d).

358.    Bank Defendants have violated this law by failing to provide the time of the new postponed sale at the time of the prior scheduled sale.

359.    In doing so, Defendants have failed to comply with the fundamental notice requirements of California's non-judicial foreclosure statutes, with which "strict compliance" is required. *Ung v. Koehler* (2005) 37 Cal.App.4th 186, 202. Without proper notice, there is no power of sale, and accordingly the foreclosure sales at issue are void.   .

## COUNT 21: UNFAIR DEBT COLLECTION PRACTICES
### (VIOLATION OF CAL. CIV. CODE §1788 ET SEQ)

360.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

361.    Bank Defendants, in their capacity as servicers, are "debt collector" engaging in "debt collection" practices under the Rosenthal Fair Debt Collection Practices Act (the "Rosenthal Act"). See Cal. Civ. Code § 1788.2 (c).

362.    Bank Defendants violated the Rosenthal Act by using false, deceptive, and misleading statements and deceptive omissions in connection with its collection of Plaintiffs' mortgage debt, as alleged herein. See Cal. Civ. Code § 1788.17, incorporating 15 U.S.C. § 1692(e). For example(and without limitation), Plaintiffs were consistently led to believe that modification review was pending under the Workout Agreements and that the requests for additional documents and receipt thereof would continue the review process and Workout Agreements. But Bank Defendants unilaterally ceased the review process and foreclosed on dates previously represented as being postponed.

363.    The Rosenthal Act was also violated because the Workout Agreements were themselves deceptive in that they ambiguously appeared to offer an opportunity for borrowers to cure their arrearage

**COMPLAINT**

and save their homes from foreclosure *and* stated that the arrearage would not be cured at the end of the Workout Agreement. The Rosenthal Act allows for a private right of action to the same extent permitted under the federal Fair Debt Collection Practices Act ("FDCPA"). *See* Cal. Civ. Code § 1788.17; *Gonzales v. Arrow Financial Services, LLC*, 233 F.R.D. 577, 581 (S.D. Cal. 2006).

364.    Plaintiffs have suffered damages and harm as a result of Bank Defendants' unfair debt collection practices, including irreparable harm to their credit and the amounts paid under the Workout Agreements and Extended Workout Agreements.

## COUNT 22: UNLAWFUL, UNFAIR & FRAUDULENT BUSINESS PRACTICES
## (VIOLATION OF CAL. BUS. & PROF. CODE §17200)

365.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

366.    Bank Defendants' acts described in this action are **Unlawful** in that they violate:

   a.    The prohibition against collection of deficiency judgments after electing to foreclose (Cal. Code Civ. Proc. § 580b)

   b.    The Security First Rule (Cal. Code Civ. Proc. § 726)

   c.    The Crier rule (Cal. Civ. Code §2994(g)

   d.    The Rosenthal Fair Debt Collection Practices Act (Cal. Civ. Code §1788 et seq)

367.    Separately, Bank Defendants' acts as described in this Cause of Action are **Fraudulent** as set forth above (in Counts 15, 16, and 17 *inter alia*).

368.    Bank Defendants' acts are also patently **unfair** as more fully set forth above. Without limiting the allegations above which are fully incorporated herein, Defendants acts are unfair insofar as:

   a.    they unfairly bait Plaintiffs to make thousands of dollars of monthly payments under the false promise of having their loan modified, when in reality Defendants have no intent of modifying.  These illusory work-out agreements were nothing more than unfair, and fraudulent cash-grabs

   b.    they used the promise of Loan Modification as bait to damage plaintiffs' credit preventing them from obtaining financing anywhere else.

**COMPLAINT**

a. they are designed a subterfuge to the crier rule, and are designed to allow Defendants to foreclose on Plaintiffs without their knowledge and without giving them notice.

369. The Bank Defendants' acts and practices violate established public policy and the harm they cause to consumers in California greatly outweighs any benefits associated with those practices.

370. Bank Defendants' conduct offends public policy and/or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Bank Defendants' conduct in this regard includes, but is not necessarily limited to, the following:

a. Bank Defendants have commonly failed to withdraw foreclosure proceedings against borrowers who made all Plan Payments under Workout Agreement;

b. Bank Defendants have initiated foreclosure proceedings without providing borrowers notice or opportunity to cure their remaining arrearage or default;

c. Bank Defendants have engaged in conduct that constitutes systematic breach of contract and breach of the implied covenant of good faith and fair dealing.

371. Bank Defendants' conduct as set forth herein resulted in loss of money or property to Plaintiffs, including (1) principal and interest that they were not obligated to pay after Bank Defendants elected to exercise non-judicial foreclosure and to which Bank Defendants had no ability to collect after foreclosure; and (2) legal and other fees that Plaintiffs paid to Bank Defendants under the Workout Agreements and Extended Workout Agreements.

372. Defendant's acts caused substantial consumer injury with no benefits to consumer competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants' intentional deceit, misrepresentation, and omission. Further, Defendants acts significantly threatened harm to competition

373. Plaintiffs' payments made under the Workout Agreements constitute cognizable restitution which must be returned to Plaintiffs as well as pre-judgment interest thereon.

374. The unfair, unlawful and fraudulent acts and practices of Defendants named herein present a continuing threat to Plaintiff and to members of the public in that these acts and practices are ongoing and are harmful and disruptive to business and financial markets. Accordingly, Plaintiffs request injunctive relief to preclude the actions/wrongs described above by Bank Defendants.

## FIFTH CAUSE OF ACTION:
## INTENTIONAL UNAUTHORIZED FORECLOSURES PURSUED IN THE
## NAME OF PROFIT

*(By Plaintiffs James W. Arnold, , Gustavo Gonzales, Rick Albritton, Deborah Albritton, David Cruz, Yesenia Cruz, Cristina Palbicke, Ignacio Rodriguez, Rosa Rodriguez, and Lisa Simonyi —Against All Defendants)*

375.     Continuing their chronology of profit-driven deception and intentional wrongdoing, Defendants not only (1) intentionally placed Plaintiffs into known dangerous and impossible loans in the name of profit on the secondary market, and, (2) offered Plaintiffs trial loan modifications in an attempt to grab as much cash as they could before foreclosing – none of which would be applied to the principal or interest of Plaintiff's loans -  with no intent of ever actually modifying Plaintiffs' loans, but in a final coup-de-grace (3) intentionally foreclosed on plaintiffs despite having no ownership interest in the notes or deeds of trust, in the name of collecting preposterous and unmerited "foreclosure fees" including: inspection fees, default fees, late fees, advance fees, attorney fees, and trustee fees – hand in hand with the Trustee Defendants, who while purporting to act merely in their capacity as trustee, act intentionally and maliciously to foreclose knowing they have no authority to do so, and in knowing violation of California foreclosure statutes.  As discussed above, Trustee Defendants are the vital foreclosure arm of Defendants' fraudulent scheme alleged throughout this Complaint.

376.     Bank Defendants along with Trustee Defendants unilaterally charged these ill-defined and ambiguous fees whose amounts were *never* disclosed, nor consented to Plaintiffs in any writing or contract whatsoever. They decided how much they wanted to charge for whatever reason they wanted to charge it. The amounts they charged were tantamount to price gauging, often charging double, triple or even quadruple the fair market value for these "services."  The outrageous price markups all inured to the benefit of the conspiracy of Defendants. As Defendants did not have an ownership interest in the property upon which to foreclose, these charges and fees were entirely unjustified, and constitute numerous cognizable sources of restitution.

377.     In short, Bank Defendants together with Trustee Defendants made money by initiating

foreclosures, and for this very reason intentionally steamrolled wrongful foreclosures over plaintiffs without having any true possessory or ownership interest in the deed of trust – the document which confers the power of foreclosure - threatening to wrongfully dispossess Plaintiffs of their homes and placing them on the streets.

378. In the greed-driven world of Defendants, neither law nor ethics would be allowed to stand as an obstacle in their insatiable hunt for profit.

379. Counts 23 through 24 arise under this (Fifth) Cause of Action for "Intentional Unauthorized Foreclosure in the Pursuit of Profit" and are brought by all Plaintiffs named in this Cause of Action, against all Defendants named in this Cause of Action.

## COUNT 23: WRONGFUL FORECLOSURE

380. Bank Defendants' continue to demand payment and to foreclose and threaten to foreclose on Plaintiffs (through co-conspirator Trustee Defendants), despite the facts that:

   a. The Foreclosing Defendants have no proof that they own the notes and deeds of trust they seek to enforce;

   b. The Foreclosing Defendants have never received a proper assignment of the Deed of Trust (**"DOT"**) - the document which confers the power of foreclosure. Accordingly, they have no authority to foreclose.

   c. There is considerable evidence that the Foreclosing Defendants do not own the notes and deeds of trust they enforce and seek to enforce and based thereon, Plaintiffs allege that they do not; and

381. As alleged with further detail in Appendix A, in many instances, the foreclosing Bank Defendants never properly received an assignment of the DOT (and therefore had no authority to foreclose) because the trusts they were being assigned into had been closed long prior, and therefore could not legally accept assignment of the Loans and DOTs.

   a. The reason loans are pooled and placed into these loan trusts named REMIC's is due to income tax purposes. A REMIC is an "SPV" or Special Purpose Vehicle that is treated by the IRS as a "QSPE" or Qualifying Special Purpose Entity. It specifically was designed by Congress to allow the vehicle to not be taxed as the cash flows through the vehicle and

distributed to the investor and certificate holders. It is like an S Corp where there is no double taxation.

    b. Pooling and Servicing Agreements only allow loans to be placed into a REMIC for **two years** after the set-up of the Trust due to tax implications. A loan substituted in or out of such trust after the two year period, results in a massive tax penalty of 100% of the face value of *all the assets in the trust*.

382. The trusts which foreclosed on many of the Plaintiffs never received assignment of the DOT – the document which confers the power of foreclosure. Specifically, Bank Defendants foreclosed on numerous Plaintiffs herein on behalf of trusts which had no ownership interest whatsoever in the DOT, **because the trusts had been-long closed under the terms of their very own PSA.** In other words Defendants had no authority whatsoever to foreclose on Plaintiffs herein. The foreclosing trust had no ownership interest in the DOT which would give it the power to foreclose.

383. Established authority makes clear that a Plaintiff states a claim for wrongful foreclosure when it is alleged that the assignment to the trust was executed after the closing date of the trust. *Vogan v. Wells Fargo Bank, N.A.* (E.D. Cal., Nov. 17, 2011,) 2011 WL 5826016 at *7; *Johnson v. HSBC Bank USA, Nat. Ass'n* (S.D. Cal., Mar. 19, 2012) 2012 WL 928433at *3.

384. As to other Plaintiffs, Bank Defendants and Trustee Defendants foreclosed on them despite having no ownership interest in the DOT, because the DOT was **never endorsed to them.** In other words, they never had the authority to foreclose. A Plaintiff states a viable claim for wrongful foreclosure when it is alleged that the Defendants are "not the proper parties to foreclose." *Ohlendorf v. Am. Home Mortg.,* (E.D.Cal. 2010) 2010 U.S. Dist. LEXIS 31098, at *21–24; *Tamburri v. Suntrust Mortgage (N.D. Cal, 2011) 2011 WL 6294472* *11' [same] *Sacchi v. Mortgage Electronic Registration Systems, Inc. (C.D.Cal. June 24, 2011) 2011 WL 253302* at *8; *Castillo v. Skoba* (S.D.Cal. 2010) 2010 WL 3986953, at*2 [same].

385. As to other Plaintiffs herein, Bank Defendants and Trustee Defendants had no authority to foreclose because *at the time* they initiated foreclosure (by filing a Notice of Default), they had not yet received an assignment of the DOT. In other words, at the time they initiated foreclosure, they had no authority to foreclose. ""[S]ince the plaintiffs had alleged facts **suggesting the foreclosing party had**

1 **no legal interest in the deed <u>at the appropriate time</u>**, there [is] a valid cause of action." *Tamburri v.*
2 *Suntrust Mortgage (N.D. Cal, 2011) 2011 WL 6294472* \*11, citing *Sacchi v. Mortgage Electronic*
3 *Registration Systems, Inc. (C.D.Cal. June 24, 2011) 2011 WL 253302* at \*8 [[holding plaintiff had stated
4 a valid cause of action for wrongful foreclosure where the foreclosing entity had no authority to
5 foreclose because it had "**no beneficial interest in the Deed of Trust <u>when</u> it acted to foreclose** on
6 Plaintiffs' home."]; *Castillo v. Skoba* (S.D.Cal. 2010) 2010 WL 3986953, at\*2 [same]. Foreclosures
7 initiated by or on behalf of a party, who at the time had no authority to foreclose are *void ab initio.*
8 *Tamburri; Castillo.*

9     386. As to other Plaintiffs still, Bank Defendants and Trustee Defendants had no authority to
10 foreclose because they had failed to comply with Cal. Civ. Code §2923.5 – a necessary prerequisite to
11 foreclosure – which requires a lender to contact its borrower to disclose alternatives to foreclosure.
12 Foreclosing Bank Defendants have failed to, and continue to fail to comply with this legal requirement.

13     387. Still, as to other Plaintiffs, Bank Defendants' and Trustee Defendants' foreclosures were
14 void because the trustee who conducted the foreclosure sale was an unauthorized trustee who had never
15 been properly substituted as trustee. Under California Law, a foreclosure sale conducted by an
16 unauthorized trustee is void as a matter of law. *Dimock v. Emerald Properties* (2000) 198 Cal.App.4th
17 868.

18     388. Finally, such foreclosures were additionally wrongful insofar as they were intentionally
19 occasioned by the Frauds of Defendants who (1) concealed the true terms, payments, and nature of the
20 loans in order to induce borrowers into entering them, knowing that such loans would be impossible for
21 them to afford, and would result in their default to a *mathematical certainty*, and (2) falsely tampered
22 with the appraised values of their homes – so that Bank Defendants, Trustee Defendants, and their
23 conspirators could collect lucrative fees, including **foreclosure fees**. Causing the foreclosure of their
24 borrowers was an intentional part of their fraudulent scheme. It meant more money.

25     389. Whether or not they can demonstrate ownership of the requisite notes and deeds of trust,
26 Defendants lack the legal right to enforce the foregoing because they have not complied with disclosure
27 requirements intended to assure mortgages are funded with monies obtained lawfully.

28     390. Plaintiffs allege that Bank Defendants have made demand for payment on the Plaintiffs

**COMPLAINT**

with respect to Plaintiffs' properties at a time when Defendants are incapable of establishing (and do not have any credible knowledge regarding) who owns the promissory notes Defendants are purportedly servicing. Plaintiffs believe and thereon allege that because Defendants are not the holders of Plaintiffs' notes and deeds of trust and are not operating under a valid power from the various current holders of the notes and deeds of trust, Defendants may not enforce the notes or deeds of trust.

391. Bank Defendants have already foreclosed upon the following property owned by the following Plaintiffs – allegations establishing the specific factual basis of the wrongful nature of the foreclosure as against each of the Plaintiffs below are set forth in **APPENDIX A**.

a) James W. Arnold (Appendix A, ¶ 42)
2082 Rockpound Court
Cool, CA 95614

b) James W. Arnold (Appendix A, ¶ 43)
3452 Old Lantern Drive
Redding CA 96003

c) Gustavo Gonzales (Appendix A, ¶ 47)
6939 West Hall Blvd.
Winton CA 95388

d) Rick Albritton and Deborah Albritton (Appendix A, ¶ 7)
2030 West Windhaven Drive
Rialto CA 92377

e) David Cruz and Yesenia Cruz (Appendix A, ¶ 11)
48159 Sol De Linda
Coachella CA 92236

f) Cristina Palbicke (Appendix A, ¶ 13)
27949 Harwood Drive
Santa Clarita CA 91350

g) Ignacio Rodriguez and Rosa Rodriguez (Appendix A, ¶ 30)
2714 Norton Avenue
Lynwood CA 90262

h) Lisa Simonyi (Appendix A, ¶ 17)
14442 Rancho Del Prado Trail
San Diego CA 92127

392.    Because the foreclosing Bank Defendants are not the holders of the notes and deeds of trust and are not operating under a valid power from the current holders of the notes and deeds of trust, Defendants did not have the right to proceed with the foregoing foreclosures.

393.    Bank Defendants, and Trustee Defendants, acted outrageously, persistently, intentionally and with actual malice in performing the acts alleged in this cause of action.  Accordingly, Plaintiff is entitled to exemplary and punitive damages in a sum according to proof and to such other relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

394.    As a result of the foregoing unlawful acts Plaintiffs have been damaged in being wrongfully deprived of their homes, losing equity, being forced to incur relocation expenses,  suffering emotional distress, being forced to pay foreclosure fees, attorney's fees, trustee fees, suffering damage to their credit scores, experiencing reduced availability of financing, among the other damages described throughout this Complaint.

## COUNT 24: UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES
## (VIOLATION OF CAL. BUS. & PROF. CODE §17200)

395.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

396.    Bank Defendants' and Trustee Defendants' acts described in this action are **Unlawful** in that they violate:

    a.  The requirement to make contact with a defaulting borrower prior to foreclosure in order to explore alternatives to foreclosure (Cal. Civ. Code §2923.5)

    b.  The requirement that the party on behalf of whom foreclosure is being instituted must first have an ownership interest in the Deed of Trust before acting to foreclose. (Cal. Civ. Code §2924 et seq.)

    c.  The Requirement that a trustee must first be authorized as a trustee before it can conduct a trustee/foreclosure sale (Cal. Civ. Code §2924 et seq.)

    d.  The Requirement that a party must first record an NOD before they have the power to foreclose (Cal. Civ. Code §2924 et seq).

    e.  The Crier Rule (Cal. Civ. Code §2994(g)

f.    The Rosenthal Fair Debt Collection Practices Act (Cal. Civ. Code §1788 et seq)

397.    Separately, Bank Defendants' acts as described in this Cause of Action are **Fraudulent** as set forth above.

398.    Such foreclosures were **additionally** wrongful insofar as they were intentionally occasioned by the Frauds of Defendants who concealed the true terms, payments, and nature of the loans in order to induce borrowers into entering them, knowing that such loans would be impossible for them to afford, and would result in their default to a *mathematical certainty* – so that Plaintiffs and their conspirators and could collect lucrative fees, including **foreclosure fees**. Causing the foreclosure of their borrowers was an intentional part of their fraudulent scheme. It meant more money.

399.    Bank Defendants' and Trustee Defendants' acts in intentionally foreclosing upon their borrowers in the name of profit, and/or without authority, as described above are also unfair.

400.    Such acts and practices violate established public policy and the harm they cause to consumers in California greatly outweighs any benefits associated with those practices.

401.    These actions were immoral, unethical, oppressive, unscrupulous and substantially injurious to similarly situated borrowers, and Plaintiffs herein. Bank Defendants' and Trustee Defendants' conduct had no utility other than for their own ill-gotten gain, and the harm was great not only to Plaintiffs herein, but also to residents of California, broadly, who have seen a decrease in their home and property values as a result of the bursting of the super-heated pricing bubble created by Defendants' intentional wrongful foreclosure which now devastate real estate values.

402.    At the time of their fraud, Defendants *knew* that their conduct would cause the precipitous decline in property values throughout the State of California.

403.    Defendant's acts caused substantial consumer injury with no benefits to consumer competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants' intentional deceit, misrepresentation, and omission.  Further, Defendants acts significantly threatened harm to competition.

404.    Defendant's acts caused substantial consumer injury with no benefits to consumer competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants' intentional deceit, misrepresentation, and omission.  Further, Defendants acts significantly threatened

harm to competition.

405.   Ally and Bank Defendants acted with malice and with the intent of artificially inflating California Real estate properties generally, as well as the values of Plaintiffs' individual properties and homes.

406.   As a result of Defendants' unfair competition, Plaintiffs are entitled to restitution for all sums received by Defendants with respect to Defendants' unlawful and/or unfair and/or fraudulent conduct, including, without limitation, interest payments made by Plaintiffs, fees paid to Defendants, including, without limitation, trustee fees, and the excessive fees paid at Defendants' direction, and premiums received upon selling the mortgages at an inflated value.

407.   As a result of the foregoing unfair, unlawful, and fraudulent acts Plaintiffs have been damaged in being wrongfully deprived of their homes, losing equity, being forced to incur relocation expenses, suffering emotional distress, being forced to pay foreclosure fees, attorney's fees, trustee fees, suffering damage to their credit scores, experiencing reduced availability of financing, among the other damages described throughout this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants and each of them as follows:

1.   General, Actual, Compensatory, Special and Exemplary damages according to proof under the First, Second, Third,  Fourth,  Sixth, Seventh, Eighth, Tenth, Eleventh, Twelfth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth,  Twenty-First, and Twenty-Third Counts, and any other Counts for which such relief may be available;

2.   Punitive Damages under the First, Second, Sixth, Tenth, Fifteenth, and Sixteenth Counts and any other Counts for which such relief may be available;

3.   Statutory relief according to proof under the Twelfth, Fourteenth, Twentieth, and Twenty-First Counts and any other Counts for which such relief may be available;

4.   Restitution and Injunctive Relief under the Ninth, Thirteenth, Eighteenth, Twenty-Second and Twenty Fourth Counts and any other Counts for which such relief may be available;

5.   Rescission  under the Eighteenth Count;

**COMPLAINT**

1    6.    On all Counts, for costs of suit herein;

2    7.    On all Counts, for pre- and post-judgment interest;

3    8.    On all Counts for which attorney's fees may be awarded pursuant to the governing

4  contract, by statute or otherwise, reasonable attorneys' fees; and

5    9.    On all Counts, for such other and further relief as this Court may deem just and proper.

6

7  Dated: November 1, 2013                     Respectfully submitted,
                                              **BROOKSTONE LAW, PC**
8

9
                                         By: _____
10                                           Vito Torchia, Jr.
                                             Attorneys for Plaintiffs
11

**COMPLAINT**

## Exhibit 5

**January 30, 2014 Letter**



Rebecca S. Saelao
Attorney
Direct Line: (415) 677-5684
rss@severson.com

Severson
&Werson
A Professional Corporation

One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: (415) 398-3344
Facsimile: (415) 956-0439

January 30, 2014

Via E-Mail and U.S. Mail
Vito Torchia, Jr.
BROOKSTONE LAW, PC
18831 Von Karman Avenue, Ste. 400
Irvine, California 92612

Re:   *Hairston et al v. Ally Bank et al.*, BC527712 (L.A. Superior Court)

Dear Mr. Torchia:

Please be advised that on December 11, 2013, the U.S. Bankruptcy Court for the Southern District of New York in *In re Residential Capital, LLC*, case no. 12-12020 MG ("*ResCap Bankruptcy*"), confirmed a Chapter 11 plan that directly bears on *Hairston et al v. Ally Bank et al.*, Case No. BC527712, filed November 14, 2013 in Los Angeles County Superior Court ("*Hairston*"). Copies of the Plan and Confirmation Order are attached.

As described below, the claims brought by Hairston and her co-plaintiffs (collectively, "Plaintiffs") against Ally Financial Inc. and related entities (collectively, "Ally")[1] are included in a third party release confirmed by the bankruptcy court, and Plaintiffs are permanently enjoined from asserting these claims in California state court or any other venue. Ally therefore requests that you dismiss *Hairston* no later than one week from today, or it will seek to enforce the injunction in the bankruptcy court.

Article IX(D) of the Plan, entitled "Third Party Release," provides a release of all claims against the Ally Released Parties (which include Ally Financial Inc. and each of its non-debtor affiliates named in this action), including claims for "tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to the Debtors." (*See* Confirmed Plan,

---

[1] The complaint names as defendants the following Ally-related entities: "Ally Bank, N.A., f/k/a GMAC Bank, a Utah Corporation, in its own capacity and as an acquirer of certain assets and liabilities of GMAC; GMAC, a National Banking Association, Ally Financial, Inc. f/k/a/ GMAC, LLC, a Delaware Corporation; and GMAC Mortgage Group, Inc., a Delaware Corporation." (Complaint, November 14, 2013, at ¶¶ 1(b)-(c), 26-28).) The Complaint also names as a defendant MTC Financial Inc. d/b/a Trustee Corps.



*ResCap Bankruptcy*, Dkt. No. 6065-1, Art. IX(D) (release) and Art. 1(A)(21) (defining "Ally Released Parties" to include "Ally, and each of Ally's and the Debtors' respective members, shareholders, partners, non-Debtor affiliates, and Representatives[.]").)

Article IX(I) of the Plan further provides that "all Entities," which the Bankruptcy Code defines to include individuals, "are permanently enjoined and precluded" from "commencing or continuing" any action against any Released Party based on any Released Claims. (*See id.* Art. IX(I).) Plaintiffs' claims in this action are within the scope of the release and must be dismissed.

In addition to suing Ally, Plaintiffs purport to "reserve the right" to sue the following entities, all of whom are subject to the Plan: Residential Capital, LLC, GMAC-RFC Holding Company, LLC, Residential Funding Company, LLC, Homecomings Financial, LLC, Home Connects Lending Services, LLC, and Executive Trustee Services (collectively, "Debtors"). (Complaint, ¶¶ 29-33, 35.) Plaintiffs further allege that they have only not sued the Debtors "due to the automatic stay imposed by [the *ResCap Bankruptcy*]." (Complaint, ¶¶ 29-33, 35.)

The Complaint's attempted "reservation" of the right to sue Debtors, along with pervasive allegations of Ally's liability for Debtor's alleged acts makes clear beyond doubt that Plaintiffs' claims are barred by the Third Party Release. (*See, e.g.*, Complaint, ¶ 7 (alleging "Defendants undertook a scheme to artificially manipulate and inflate California's real estate market through their wholly-owned appraisal subsidiary Home Connect Lending Services, LLC over whom Bank Defendants exercised complete dominion"); *id.* ¶ 36 (alleging ETS was the "vital foreclosing arm of the fraudulent conspiracy of Defendants"); ¶ 36(a) (alleging ETS was "under the direct control of Ally Defendants"); ¶ 36(b) (purporting to seek "significant relief, including monetary relief, from ETS"); ¶ 41 (alleging participants in an alleged conspiracy included "legal and natural persons owned in whole or in part by the Defendants or affiliates thereof"); ¶ 44 (alleging Ally is liable for alleged wrongful acts of its subsidiaries, including "writing fraudulent mortgages"); *id.* ¶ 44 (alleging "Ally Defendants and its subsidiaries are jointly and severally liable as alter egos and as a single, greater, unified whole.").)

The bankruptcy court's order confirming the Plan provides for that court's exclusive jurisdiction to enforce the Plan, including the Third Party Release. *See* Section I(A), (XX).

Again, Ally requests that Plaintiffs dismiss this action no later than February 6, 2014. Please note that in the event that Ally is forced to seek enforcement of the permanent injunction in the bankruptcy court, it will also request reasonable attorneys' fees and costs against Plaintiffs.

Please contact me at (415) 677-5684 if you have any questions.

Sincerely,

Rebecca S. Saelao

## Exhibit 6

### February 24, 2014 Letter

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Judson D. Brown
To Call Writer Directly:
(202) 879-5082
judson.brown@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

February 24, 2014

Via Federal Express

Vito Torchia, Jr.
Brookstone Law, PC
Irvine, California 92612

**Re:** *Hairston, et al. v. Ally Bank, et al.*
**BC527714, Los Angeles County Superior Court**

Dear Mr. Torchia:

I am counsel to Ally Financial Inc. and its non-debtor subsidiaries (collectively, "Ally") in the Residential Capital, LLC, et al. ("ResCap") Chapter 11 bankruptcy proceedings pending in the United States Bankruptcy Court for the Southern District of New York.

As you know, in December 2013, the Bankruptcy Court overseeing the ResCap bankruptcy confirmed ResCap's Chapter 11 Plan of Reorganization—and I understand you have received a copy of that Plan and the Court's Confirmation Order. ResCap's Plan includes a Third Party Release that releases all claims against Ally "arising from or related in any way to the Debtors," including ResCap, GMAC Mortgage, LLC, Homecomings Financial, Residential Funding Company, and Home Connects Lending Services. (*See* Plan Art. IX.D.) ResCap's Plan also includes an Injunction which "permanently enjoined and precluded" the continuation of any claims against Ally that were released pursuant to the Third Party Release, and the Injunction further states that "[a]ny person injured by any willful violation of this injunction shall be entitled to recover actual damages, including costs and attorneys' fees." (*See* Plan Art. IX.I.)

I understand that you represent Plaintiffs in the above-captioned lawsuit asserting claims against Ally and other defendants in California state court concerning mortgage origination-related claims. The claims against Ally arise from and relate to the business of ResCap and its subsidiaries, including GMAC Mortgage, LLC, Homecomings Financial, Residential Funding Company, and Home Connects Lending Services. Those claims, therefore, are subject to the Third Party Release and the Injunction in ResCap's Plan of Reorganization. As a result, we request that you voluntarily dismiss, with prejudice, the claims asserted against Ally in the above-referenced action.

KIRKLAND & ELLIS LLP

Vito Torchia, Jr.
February 24, 2014
Page 2

We are happy to discuss these issues if that would be helpful. And we would be willing to arrange a telephone conference with the Bankruptcy Court, yourself, and Ally's counsel to discuss these issues. However, if we do not hear from you and you have not dismissed the claims against Ally with prejudice by **Monday, March 3**, Ally will be forced to seek relief in the Bankruptcy Court, including seeking to enforce the Injunction and for fees and costs.

Sincerely,

Judson D. Brown

## Exhibit 7

## April 24, 2014 Letter

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

Judson D. Brown
To Call Writer Directly:
(202) 879-5082
judson.brown@kirkland.com

655 Fifteenth Street, N.W.
Washington, D.C. 20005

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

April 24, 2014

Via FedEx and Email

Vito Torchia, Jr. (vtorchia@brookstonelaw.com)
Brookstone Law, PC
Irvine, California 92612

**Re: *Hairston, et al. v. Ally Bank, et al.*
BC527714, Los Angeles County Superior Court**

Dear Mr. Torchia:

I write to follow up on your clients' persistent refusal to dismiss their mortgage-related claims against Ally. As I explained in my February 24 letter, your clients' claims against Ally arise from and relate to the business of ResCap and its subsidiaries, including GMAC Mortgage, LLC, Homecomings Financial, Residential Funding Company, and Home Connects Lending Services, and therefore are subject to the Third Party Release and the Injunction in ResCap's Plan of Reorganization.

Following that letter, you called me on March 4, expressing a need to discuss with your bankruptcy colleagues the impact of the Court-ordered Third Party Release and Injunction on your clients' claims against Ally, and I agreed to give you time to do so. After not hearing from your for two weeks, I reached out on March 19 but still have not heard back from you.

In the interim, the Bankruptcy Court has three times agreed to enforce the Third Party Release and Injunction against other plaintiffs who—like you and your clients—had refused to dismiss their claims against Ally with prejudice. In all three instances, Ally had to move to enforce the Third Party Release and Injunction. In two cases, brought by pro se plaintiffs, the Bankruptcy Court issued orders directing the plaintiffs to dismiss their claims against Ally with prejudice within 14 days—and failure to do so would result in the plaintiffs being in contempt of Court and would entitle Ally to fees and costs from those pro se plaintiffs. *See* Mar. 26, 2014 Order [Dkt. 6702], attached as Ex. A; Apr. 21, 2014 Order [Dkt 6806], attached as Ex. B.

In the third instance, Ally moved to enforce the Third Party Release and Injunction with respect to three separate class actions against Ally brought by the same law firm, and Ally requested its fees and costs incurred in seeking such relief as permitted by the terms of the Injunction. *See* Mar. 28, 2014 Motion at Dkt. 6723. Rather than contest the motion and risk

Vito Torchia, Jr.
April 24, 2014
Page 2

having to pay Ally's fees and costs, the plaintiffs agreed to immediately dismiss their claims against Ally with prejudice, in exchange for Ally agreeing not to seek fees and costs. The Bankruptcy Court entered that joint stipulation on April 14. *See* Apr. 14, 2014 Joint Stipulation [Dkt. 6784], attached as Ex. C.

Ally reiterates its demand that you voluntarily dismiss with prejudice your clients' claims against Ally. If you have not done so **by 5 p.m. EDT tomorrow, Friday, April 25**, Ally will move to enforce the Third Party Release and Injunction, and Ally will seek the fees and costs it has incurred in pursuing such relief.

Sincerely,

Judson D. Brown

Enclosures

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | Chapter 11 |
| Debtors. | Jointly Administered |

### ORDER GRANTING ALLY FINANCIAL INC.'S MOTION
### FOR AN ORDER ENFORCING THE CHAPTER 11 PLAN INJUNCTION

Upon consideration of the motion (the "***Motion***")[1] of Ally Financial Inc. ("***Ally***") for entry of an order enforcing the Third Party Release and Injunction provisions of the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors*, which was confirmed by this Court on December 11, 2013; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of these chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this proceeding on the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b); and sufficient notice of the Motion having been given; and it appearing that no other or further notice need be provided; and the Court having found that the relief requested in the Joint Motion is in the best interests of the Debtors' estates and their creditors; and after due deliberation and sufficient cause appearing therefor and for the reasons set forth on the record at the hearing on the Motion,

### IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1. The Motion is GRANTED to the extent set forth below for the reasons set forth on the record at the hearing on the Motion.

---

[1]    Capitalized terms used but not defined herein have the meanings provided to such terms in the Motion.

EXHIBIT A

2.      Not later than fourteen days after entry of this Order, Lahrman shall take all appropriate actions to dismiss the Action against Ally with prejudice within such time frame.

3.      If Lahrman fails to dismiss the Action against Ally or the Action is not otherwise dismissed against Ally within such fourteen-day period, this Court shall issue an order holding Lahrman in contempt of Court for violating the terms of this Order and the Confirmation Order by virtue of Lahrman's actions to attempt to prosecute an action against Ally in violation of the Confirmation Order.

4.      Further, in connection with any contempt proceeding against Lahrman, Ally shall be permitted to seek sanctions against Lahrman in this Court for reasonable fees and costs incurred by Ally after the date of this Order in connection with this matter.

5.      Ally shall cause service of this Order to be made upon Lahrman in accordance with Bankruptcy Rules 9014 and 7004.

6.      Ally is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

7.      Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

8.      All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits.

EXHIBIT A

9.       This Court shall retain jurisdiction with respect to all matters arising under or

related to the implementation of this Order.

**IT IS SO ORDERED.**

Dated: March 26, 2014
          New York, New York

_____**/s/Martin Glenn**_____
MARTIN GLENN
United States Bankruptcy Judge

EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

       RESIDENTIAL CAPITAL, LLC, *et al.*

                        Debtors.

FOR PUBLICATION

Case No. 12-12020 (MG)

Jointly Administered

**MEMORANDUM OPINION AND ORDER DENYING MOTION TO LIFT THE**
**AUTOMATIC STAY AND ENFORCING RELEASE OF CLAIMS AGAINST ALLY**
**FINANCIAL INC.**

*A P P E A R A N C E S:*

YOSEF LE ROI MUSTAFANOS
*Pro Se*
5400 Railroad Street
Silver Springs, Nevada 89429
By:    Yosef Le Roi Mustafanos

MORRISON & FOERSTER LLP
*Counsel for the Liquidating Trust*
1290 Avenue of the Americas
New York, New York 10104
By:    Daniel J. Harris, Esq.

KIRKLAND & ELLIS LLP
*Counsel for Ally Financial Inc.*
655 15th Street, N.W., Ste. 1200
Washington, D.C. 20005
By:    Judson D. Brown, Esq.

WILLIAMS KASTNER
*Counsel for Ally Financial Inc.*
888 SW Fifth Avenue, Ste. 600
Portland, Oregon 97204
By:    Rachel A. Robinson, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

       Yosef Le Roi Mustafanos ("Mustafanos"), on behalf of the estate of his deceased father,

James Jackson Marshall ("Marshall"), wants to prosecute claims in an Oregon state court against

EXHIBIT B

Debtors GMAC Mortgage LLC ("GMACM") and Residential Capital LLC ("ResCap"), and against non-debtor Ally Financial Inc. ("AFI").  All claims against the Debtors (defined below), except for claims that are allowed in Debtors' chapter 11 cases, were discharged as part of the Debtors' confirmed chapter 11 Plan (defined below), which became effective on December 17, 2013.  Mustafanos did not file any proof of claim in the bankruptcy case, and he is barred from doing so now.  The effect of the Plan is to bar Mustafanos from proceeding with claims against GMACM and ResCap.

Furthermore, the confirmed Plan includes release and injunction provisions that bar assertion of any covered claims against AFI.  The third-party release and injunction provisions in favor of AFI are enforceable against Mustafanos, and he will be enjoined from proceeding with his claims against AFI.

## I.    BACKGROUND

### A.    The Pending Requests for Relief

Pending before the Court is the *Ex Parte Motion of the Movant Yosef Le Roi Mustafanos for an Order Shortening the Notice Period for Certain Emergency Relief from the Automatic Stay* (the "Motion," ECF Doc. # 6535), which Mustafanos filed on behalf of Marshall, his deceased father.[1]  Mustafanos seeks relief from the automatic stay to pursue foreclosure-related claims against non-debtor AFI and Debtors GMACM and ResCap in a foreclosure action commenced by non-debtor EverBank, Inc. ("EverBank") in the District Court in Multnomah County, Oregon (the "State Court").

The ResCap Liquidating Trust (the "Liquidating Trust") submitted a *Statement of the Liquidating Trust in Connection with Motion of Movant Yosef Le Roi Mustafanos for an Order*

---

[1]    Mustafanos also sought to have his Motion heard on shortened notice.  The Court denied his request and the Motion was scheduled for April 10, 2014—the next ResCap omnibus date that would allow Mustafanos time to serve notice on the Debtors and AFI.

EXHIBIT B

*Shortening Notice Period for Certain Emergency Relief from the Automatic Stay* (the

"Statement," ECF Doc. # 6747).  In support of the Statement, the Liquidating Trust submitted

the Declaration of Lauren Graham Delehey (the "Delehey Decl.," Statement Ex. 1).  The

Liquidating Trust contends that there is no basis to grant Mustafanos relief from the automatic

stay because (1) GMACM acted only as servicer of Marshall's loan and transferred the servicing

rights to Everhome Mortgage Company ("Everhome") in 2008 and (2) neither GMACM nor

ResCap received notice of the state court proceeding.

AFI submitted *Ally Financial Inc.'s Objection to Ex Parte Motion of the Movant Yosef Le

Roi Mustafanos for an Order Shortening the Notice Period for Certain Emergency Relief from

the Automatic Stay* (the "Objection," ECF Doc. # 6748, and together with the Statement, the

"Responses").  In support of the Objection, AFI submitted the Declaration of Rachel A.

Robinson (the "Robinson Decl.," Objection Ex. A).  Also attached to the Objection are:  (1) the

original counterclaim in the underlying state court action (the "Original Counterclaim,"

Objection Ex. 1); (2) the February 10, 2014 letter from AFI's local counsel informing

Mustafanos of the Third Party Release and Plan Injunctions (defined below) (Objection Ex. 2);

(3) Mustafanos' amended counterclaim in the state court action (the "Amended Counterclaim,"

Objection Ex. 3); (4) the February 14, 2014 letter from AFI's local counsel to Mustafanos

regarding the Amended Counterclaim (Objection Ex. 4); and (5) the February 24, 2014 letter

from AFI's counsel in these chapter 11 cases, Kirkland & Ellis LLP ("Kirkland"), again

informing Mustafanos of the Third Party Release and Plan Injunctions (Objection Ex. 5).  While

styled as an objection to the Motion, the Court permitted AFI to request affirmative relief as part

of its Objection—specifically, enforcement of the Third Party Release and Plan Injunction (as

defined below).  AFI contends that Mustafanos' state court action against AFI is barred by the

EXHIBIT B

Court's order confirming the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* (the "Plan," ECF Doc. # 6065-1). The Plan released and enjoined the pursuit of claims against AFI "arising from or related in any way to the Debtors." (Plan Art. IX.D.) AFI timely served the Objection on Mustafanos, and the Court considers the Objection as a cross-motion for relief seeking enforcement of the Third Party Release and Injunction provisions of the Plan.

As explained below, Mustafanos's Motion for relief from stay is **DENIED** and Mustafanos is **ENJOINED** from proceeding against GMACM and ResCap. Furthermore, AFI's request for relief is **GRANTED** and Mustafanos is **ENJOINED** from prosecuting his claims against AFI and he is **ORDERED** to dismiss with prejudice his claims against AFI in the State Court no later than fourteen (14) days from the date of this Order. Should Mustafanos fail to dismiss his claims, AFI may seek further relief from this Court with a motion to hold Mustafanos in contempt under Bankruptcy Rule 9020. Nothing in the Court's ruling affects the defenses to foreclosure or counterclaims that Mustafanos may assert against parties other than GMACM, ResCap and Ally; those issues are controlled by state law.

### B.    Marshall's Mortgage Loan

On March 3, 2004, Marshall entered into a mortgage loan (the "Mortgage Loan") with Mortgage Investors Corporation. (Delehey Decl. ¶ 4.) GMACM serviced the Mortgage Loan from March 3, 2004 until it transferred its servicing responsibilities to Everhome in November 2008.[2] (*Id.*)

---

[2]      At the hearing on the Motion, the Liquidating Trust indicated that GMAC Corp., predecessor in interest to GMACM, originally serviced the Mortgage Loan. (*See* Apr. 10, 2014 Tr. at 7:5–6.)

EXHIBIT B

On March 3, 2007, Mortgage Investors Corporation "funded a refinance" of the

mortgage.  (Original Counterclaim ¶ 6; *see also* Robinson Decl. ¶ 5 (indicating that the mortgage

was refinanced in 2007).)  Mortgage Investors Corporation is unrelated to the Debtors or Ally.

Mustafanos alleges that on March 3, 2004, GMACM "went to Mr. Marshall's house[,] picked

him up[,] and [t]ransported him to the GMAC Mortgage office and had him sign the mortgage

deed of Trust without aid and attendance from his children."  (Motion ¶ 4.)  At its office,

Mustafanos alleges, GMACM had Marshall replace a "first position loan" financed by Sierra

Pacific Mortgage at a five percent interest rate with an adjustable interest rate loan that "became

toxic, considering that Mr. Marshall was on a fixed income."  (*Id*. at 9.)  Additionally,

Mustafanos argues that the loan note and adjustable rate rider agreement may not have been

signed on the same date "due to the absence of a notary Certification."  (*Id.* ¶ 4.)  He appears to

allege that Marshall's signature may have been copied and pasted into the relevant documents.

(*Id.*)  Additionally, Mustafanos argues that GMACM "should have clearly noticed that Mr.

Marshall would hallucinate, was unable to hold his attention and would drift off into sleep."  (*Id.*

¶ 5.)  Mustafanos further alleges that he "discovered senior abuse and fraud in the transactions

involving GMAC Mortgage and began a counterclaim against EverBank."  (*Id.* ¶ 13.)  According

to the Debtors, however, GMACM did not act as broker for the Mortgage Loan, and after it

transferred its servicing duties in 2008, GMACM no longer had any involvement with Marshall

or the Mortgage Loan.  (Delehey Decl. ¶ 4.)  Mustafanos disputes this alleged fact, asserting that

GMACM "brokered" the refinance transaction.  Because of the Court's disposition of the

pending matters, this factual dispute is not material.

Mustafanos additionally claims to have made various discoveries in February 2014

related to AFI that he believes impact his counterclaims.  First, he purportedly discovered that

5

EXHIBIT B

AFI "settled and consented to the charges of fraud and unfair lending against the United States

consumers by its subsidiaries and daughter companies as well as GMAC Mortgage, Inc. and

settled for $25 billion dollars with the United States Attorneys General on April 4, 2012." (*Id.*

¶ 17.)  Second, he claims to have "discovered that Ally Financial, Inc. consented to permit

lawsuits and claims being brought against them by individuals, class action and associations for

injurious conduct inflicted by GMAC Mortgage, Residential Capital, Inc."[3]  (*Id.* ¶ 18.)  Third, he

learned that GMACM and ResCap filed for bankruptcy on May 14, 2012.  (*Id.* ¶ 19.)  Finally, he

received a phone call from counsel for AFI "threatening to contact the bankruptcy court and have

Judge Glenn to hold him in contempt" if he failed to dismiss his claims against AFI with

prejudice.  (*Id.* ¶ 20.)

Marshall died on March 20, 2010.  (Motion ¶ 10.)  After Marshall's death, Mustafanos,

Marshall's son and the representative of Marshall's estate, was listed as the Successor of the

Estate.  (*See* Original Counterclaim, Letter from Everhome Mortgage.)  Mustafanos contacted

Everhome to request payment assistance in December 2010 and was approved for a permanent

loan modification.  (*Id.*)  But Mustafanos did not return the signed modification agreement to

Everhome, so Everhome closed his file on February 17, 2011.  (*Id.*)

### C.    State Court Foreclosure Proceedings and Mustafanos' Counterclaims

On May 10, 2012, EverBank filed a complaint for judicial foreclosure against Mustafanos

and others[4] in the State Court.  (Robinson Decl. ¶ 3.)  The State Court entered a default order as

---

[3]        As the Court noted at the April 10, 2014 hearing, some of Mr. Mustafanos's "discoveries" are based on his
erroneous interpretation of the Consent Order settling the Federal Reserve Board investigation and the state
attorneys general action.  *See* Apr. 10, 2014 Tr. 27:8–21.

[4]        Though it is not entirely clear, the "others" presumably include those listed as defendants (in addition to
Mustafanos) in Mustafanos' Original Counterclaim—Tonny D. Marshall, James M. Marshall, Don E. Marshall,
Cherry Bush Lane Homeowners' Association, Inc., NW Professional Judgment Recovery, and occupants of the
premises.  (*See* Original Counterclaim at 1.)

6

EXHIBIT B

to all named defendants except Mustafanos on August 28, 2012.  (*Id.*)  Mustafanos filed the

Original Counterclaim in March 2013.  (*Id.* ¶ 4.)  In the Original Counterclaim, Mustafanos

alleges that GMACM "is the mortgage broker who prepared all documents and shopped and

secured the Lender (Mortgage Investors Corporation)" for Marshall.  (Original Counterclaim

¶ 6.)  The majority of Mustafanos's claims in the Original Counterclaim are related to the

origination of the Mortgage Loan.  Mustafanos claims that his father was "incompetent" for

various reasons, including that he "suffered from:  Type 2 Diabetes, High blood pressure,

obesity, cataracts, dementia, paranoid schitzophrenia [*sic*], obsessive compulsion [*sic*] disorder,

disorientation, fainting spells, kidney and liver dialysis dependency."  (*Id.* ¶ 14.)

On August 22, 2013, Mustafanos filed his first amended counterclaim,[5] naming AFI as a

counterclaim defendant.[6]  (Robinson Decl. ¶ 6.)  AFI moved to dismiss the first amended

counterclaim on December 5, 2013, on the grounds that the first amended counterclaim did not

include specific allegations against AFI.  (*Id.* ¶ 7.)  The State Court granted AFI's motion to

dismiss on January 28, 2014, but granted Mustafanos leave to amend his counterclaim to

describe the relationship between AFI and GMACM.  (*Id.*)

AFI's local counsel in Oregon sent Mustafanos a letter on February 10, 2014, informing

Mustafanos that this Court had confirmed the Plan, and providing Mustafanos with copies of the

Confirmation Order and the Plan.  (*Id.*; *see also* Objection Ex. 2.)  Mustafanos filed the

Amended Counterclaim on February 14, 2014, alleging that AFI "does business as" GMACM

---

[5]       It appears that GMACM was never served with the first (or second) amended counterclaim(s).  At the
hearing on April 10, 2014, Mustafanos indicated that he believed GMACM was "adequately served" because he had
served AFI's agent, and believed AFI and GMACM share the same agent, "CT Corporation."  (*See* Apr. 10, 2014
Tr. 26:12–14.)  The Court need not resolve this dispute.  In any event, the Court was not provided a copy of the first
amended counterclaim.

[6]       Although Mustafanos did not initially list AFI as a counterclaim defendant in the version of the first
amended counterclaim that he filed with the State Court, he did add AFI to the caption in the version that he served
on AFI in October 2013.  (Robinson Decl. ¶ 6 n.1.)

EXHIBIT B

and EverBank.  (Amended Counterclaim at 1, ¶ 6.)  Also on February 14, 2014, AFI's local

counsel sent Mustafanos a second letter, highlighting the Plan's Third Party Release and

Injunction provisions.  (Robinson Decl. ¶ 10; Objection Ex. 4.)  Finally, after no response from

Mustafanos, Kirkland sent Mustafanos a third letter on February 24, 2014, explaining that the

Third Party Release bars Mustafanos's claims against AFI and warning Mustafanos that if he did

not dismiss his claims against AFI with prejudice by March 3, 2014, AFI would seek relief in

this Court.  (Objection Ex. 5 at 2.)  Mustafanos has not dismissed his claims against AFI; instead,

after he received the letter from Kirkland, Mustafanos filed the instant Motion seeking to lift the

automatic stay.

> **D.    ResCap Bankruptcy Plan Confirmation**

ResCap and various related entities (the "Debtors") filed chapter 11 bankruptcy petitions

on May 14, 2012 (the "Petition Date").  On August 29, 2012, the Court entered an order setting

the bar date of November 9, 2012 for filing non-governmental proofs of claim in the chapter 11

cases.  (ECF Doc. # 1309.)  The Court thereafter entered an Order Extending the Bar Date for

Filing Proofs of Claim to November 16, 2012 (the "Bar Date").  (ECF Doc. # 2093.)  Mustafanos

did not file a proof of claim.

On December 11, 2013, the Court confirmed the Plan.  (ECF Doc. # 6065.)  Pursuant to

the Plan,

> Except as otherwise agreed by the Debtors, the Liquidating Trust, or the
> Borrower Claims Trust, as applicable, or ordered by the Bankruptcy
> Court, any and all proofs of claim filed after the applicable Bar Date shall
> be deemed disallowed, discharged, released, and expunged as of the
> Effective Date without any further notice to or action, order, or approval
> of the Bankruptcy Court, and holders of such Claims may not receive any
> distributions on account of such Claims, unless such late proof of claim is
> deemed timely filed by a final order of the Bankruptcy Court.

(Plan Art. VIII.B (formatting altered from original).)

EXHIBIT B

To define the term "Claim," the Plan adopts the definition contained in Bankruptcy Code section 101(5).  (Plan Art. I.A.53.)  Section 101(5), in turn, defines a "claim" as the "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5).

The Plan also includes the release of the Debtors' parent company AFI (the "Third Party Release") in exchange for a contribution from AFI of $2.1 billion to the Debtors' estate (the "AFI Contribution").  (*See* Plan Art. IV.A.)  The Third Party Release extends to

> **any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to the Debtors.**

(Plan Art. IX.D.)[7]  The Third Party Release further provides:

> **On and as of the Effective Date of the Plan . . ., the holders of Claims and Equity Interests shall be deemed to provide a full and complete discharge and release to the Ally Released Parties and their respective property from any and all Causes of Action . . . arising from or related in any way to the Debtors, including those in any way related to RMBS issued and/or sold by the Debtors or their affiliates and/or the Chapter 11 Cases or the Plan, the Consent Order, and the Order of Assessment.**

(*Id.*)  A "Cause of Action" under the Plan is defined as:

> any and all Claims, actions, causes of action, choses in action, rights, demands, suits, claims, liabilities, encumbrances, lawsuits, adverse consequences, debts, damages, dues, sums of money, accounts, reckonings, deficiencies, bonds, bills, disbursements, expenses, losses, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims,

---

[7]    Capitalized terms used but not defined herein have the meanings given to such terms in the Plan.

9

EXHIBIT B

indemnity claims, counterclaims, and cross-claims (including those of the Debtors, and/or the bankruptcy estate of any Debtor created pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases), including, without limitation, any claims, causes of action, objections, rights, remedies arising under Chapter 5 of the Bankruptcy Code pursuant to, among others, sections 502, 510, 542 through 545 and 547 through 553 or 558 thereof, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, whether held in a personal or representative capacity, that are or may be pending as of the date hereof or instituted hereafter against any entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date hereof.

(*Id.* Art. I.A.50.)  Thus, Claims or Causes of Action asserted against AFI "arising from or related in any way related to the Debtors" are "Released Claims" under the Plan.  (*See id.* Art. I.A.242; *see also id.* IX.D.)

The Plan "**permanently enjoin[s] and preclude[s]**" all parties

> **who have held, hold or may hold Claims, . . . [or] Causes of Action . . . that constitute Released Claims . . . from and after the effective date of the Plan, from:  (a) commencing or continuing in any manner or action or other proceeding of any kind against any Released Party whether directly, derivatively or otherwise, on account of or in connection with or with respect to any Released Claims; . . . [and] (e) commencing or continuing in any manner or action or other proceeding of any kind against any Released Party on account of or in connection with or respect to any Released Claims . . .**

(*Id.* Art. IX.I.)

The Plan became effective on December 17, 2013 (the "Effective Date").  (*See* ECF Doc. # 6137.)

10

EXHIBIT B

## II.    DISCUSSION

### A.    The Debtors' Discharge Under the Plan

Section 1141 of the Bankruptcy Code, titled "Effect of Confirmation," generally provides

that a plan of reorganization is binding upon a broad list of entities once it is confirmed.  *See* 8

COLLIER ON BANKRUPTCY ¶ 1141.02 (16th ed. rev. 2013).

> Under [section 1141], subject to compliance with the requirements of due
> process under the Fifth Amendment, a confirmed plan of reorganization is
> binding upon every entity that holds a claim against or interest in the
> debtor even though a holder of a claim or interest is not scheduled, has not
> filed a claim, does not receive a distribution under the plan or is not
> entitled to retain an interest under such plan.  *In other words, a confirmed
> plan precludes parties from raising claims or issues that could have or
> should have been raised before confirmation but were not*.

*Id.* (emphasis added) (footnotes omitted).

Section 1141(d)(1)(A) provides:

> (1) Except as otherwise provided in this subsection, in the plan, or
> in the order confirming the plan, the confirmation of a plan—
>> (A) *discharges the debtor* from any debt that arose before
>> the date of such confirmation, and any debt of a kind
>> specified in section 502(g), 502(h), or 502(i) of this title,
>> *whether or not*—
>>> (i) a *proof of the claim based on such debt is filed* or
>>> deemed filed under section 501 of this title;
>>> (ii) such claim is allowed under section 502 of this
>>> title; or
>>> (iii) the holder of such claim has accepted the plan.

11 U.S.C. § 1141(d)(1)(A) (emphasis added).

Confirmation of a plan operates as a final judgment for *res judicata* purposes.  *See First

Union Commercial Corp. v. Nelson, Mullins, Riley & Scarborough (In re Varat Enters., Inc.)*, 81

F.3d 1310, 1315 (4th Cir. 1996).  "Under the doctrine [of *res judicata*], questions concerning the

treatment of any creditor under the plan, discharge of liabilities, or disposition of property, may

no longer be raised after plan confirmation.  These issues must be raised in the context of

11

EXHIBIT B

objections to confirmation of the plan." 8 COLLIER ON BANKRUPTCY ¶ 1141.02[4] (footnotes omitted).

Since he is asserting a right of payment, Mustafanos is a holder of a "Claim" pursuant to the Plan and the Bankruptcy Code. *See* 11 U.S.C. § 101(5); 8 COLLIER ON BANKRUPTCY ¶ 1141.02 n.2. Mustafanos did not file a proof of claim in these chapter 11 cases, and did not object to confirmation.

The Plan clearly provides that

> Any and all proofs of claim filed after the applicable Bar Date shall be deemed disallowed, discharged, released, and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless such late proof of claim is deemed timely filed by a final order of the Bankruptcy Court.

(Plan Art. VIII.B (formatting altered from original).)

Despite the fact that Mustafanos did not file a claim before the Bar Date, he later sought to bring a claim against the Debtors and AFI in the form of counterclaims to the foreclosure action—initiated by EverBank, a non-debtor that is unrelated to any of the Debtors or AFI—raising allegations of misconduct related to the origination, securitization, servicing, and foreclosure of the Mortgage Loan, and seeking to recover monetary damages for the alleged misconduct. A review of the Amended Counterclaim makes clear that Mustafanos seeks to sidestep the confirmed chapter 11 Plan to pursue his claim in another forum. If Mustafanos had a claim, he should have timely filed it in these bankruptcy cases; he did not do so, and it is too late to do so now. Any unasserted claims Mustafanos had against the Debtors' estate were discharged pursuant to the Plan. Consequently, for the reasons explained in the next section, his Motion for relief from the automatic stay is **DENIED**; the relief he seeks from GMACM and ResCap in the State Court is precluded under the Plan.

EXHIBIT B

### B.    Mustafanos Has Not Established Cause to Lift the Automatic Stay

Mustafanos has not established cause to lift the stay.  Section 362(a)(1) of the Bankruptcy

Code provides that the filing of a bankruptcy petition automatically stays

> the commencement or continuation, including the issuance of employment
> of process, of a judicial, administrative, or other action or proceeding
> against the debtor that was or could have been commenced before the
> commencement of the case under this title, or to recover a claim against
> the debtor that arose before the commencement of the case under this title.

11 U.S.C. § 362(a)(1).

The automatic stay affords "one of the fundamental debtor protections provided by the

bankruptcy laws."  *Midlantic Nat'l Bank v. New Jersey Dep't of Evntl. Prot.*, 474 U.S. 494, 503

(1986).  The stay maintains the status quo and protects the debtor's ability to formulate a plan for

the sale or other disposition of property of the estate.  3 COLLIER ON BANKRUPTCY ¶ 362.03.

Section 362(d)(1) of the Bankruptcy Code provides that "[o]n request of a party in

interest and after notice and a hearing, the court shall grant relief from the stay . . . (1) for cause,

including the lack of adequate protection of an interest in property of such party in interest . . . ."

11 U.S.C. § 362(d)(1).  The Bankruptcy Code does not, however, define the phrase "for cause."

In determining whether "cause" exists to lift the stay for prepetition litigation, courts consider the

so-called "*Sonnax* Factors."  *See Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re

Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286 (2d Cir. 1990); *In re Residential Capital, LLC*, 501

B.R. 624, 643 (Bankr. S.D.N.Y. 2013); *In re New York Medical Grp., PC*, 265 B.R. 408, 413

(Bankr. S.D.N.Y. 2001).

Not all of the *Sonnax* Factors are relevant in every case, and "cause" is a broad and

flexible concept that must be determined on a case-by-case basis.  *Spencer v. Bogdanovich (In re

Bogdanovich)*, 292 F.3d 104, 110 (2d Cir. 2002) (citing *Mazzeo v. Lenhart (In re Mazzeo)*, 167

13

EXHIBIT B

F.3d 139, 143 (2d Cir. 1999)).  The moving party bears the initial burden to demonstrate that

"cause" exists to lift the stay.  *See Sonnax*, 907 F.2d at 1285; *Capital Comm. Fed. Credit Union*

*v. Boodrow* (*In re Boodrow*), 126 F.3d 43, 48 (2d Cir. 1997) ("We have emphasized that a

bankruptcy court should deny relief from the stay if the movant fails to make an initial showing

of cause.") (internal quotation marks omitted).  "If the movant is an unsecured creditor, the

policies of the automatic stay weigh against granting the relief requested.  [T]he general rule is

that claims that are not viewed as secured in the context of § 362(d)(1) should not be granted

relief from the stay unless extraordinary circumstances are established to justify such relief."

*Residential Capital*, 501 B.R. at 643–44 (alteration in original) (internal quotation marks

omitted).  Under section 362(d)(1), Mustafanos bears the initial burden of showing "cause" to lift

the stay.  *See id.* at 1285 ("If the movant fails to make an initial showing of cause, however, the

court should deny relief without requiring any showing from the debtor that it is entitled to

continued protection.").

    Since the claims Mustafanos seeks to assert against GMACM and ResCap are barred and

discharged by the Plan, Mustafanos cannot establish cause to lift the stay—litigating those claims

in *any* forum would be futile.  Therefore, Mustafanos's Motion to lift the stay is **DENIED**.  This

ruling does not prevent Mustafanos from asserting any equitable or legal defenses or

counterclaims he may have in the foreclosure action against EverBank, or against any of the

other non-debtor defendants, except for AFI.  What he cannot do is drag GMACM or ResCap

into the foreclosure action in support of his defenses to foreclosure.  And as explained below, he

also cannot assert any counterclaims against AFI.

EXHIBIT B

C.    **Enforcement of Third Party Release and Plan Injunction**

The Court considers AFI's Objection as a cross-motion for relief under the Third Party

Release and Injunction provisions of the Plan.  Mustafanos received fair notice of AFI's

requested relief and it is properly before the Court even though Mustafanos initiated the current

Motion.

1.    *The Third Party Release and Plan Injunction are Appropriate in these Cases*

In the Second Circuit, non-debtor releases are permissible under certain circumstances.

"[A] bankruptcy court only has jurisdiction to enjoin third party non-debtor claims that directly

affect the res of the bankruptcy estate."  *In re Johns-Manville Corp.*, 600 F.3d 135, 152 (2d Cir.

2010) (citation omitted).  Because AFI filed proofs of claim for indemnification against the

Debtors, and because AFI and the Debtors shared insurance policies, third-party claims such as

the ones asserted by Mustafanos would affect the *res* of the estate, satisfying the jurisdictional

underpinnings for the third-party release approved by the Court.

In *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992), the

Second Circuit noted that "[i]n bankruptcy cases, a court may enjoin a creditor from suing a third

party, provided the injunction plays an important part in the debtor's reorganization plan."  In its

decision in *In re Metromedia Fiber Network Inc.*, 416 F.3d 136 (2d Cir. 2005), the Second

Circuit further clarified the standard under which it is appropriate to grant non-debtor releases.

The court identified two factors that are necessary for court approval of a non-debtor release:

(1) the release must itself be important to the plan; and (2) the scope of the release must be

necessary to the plan.  *Id.* at 143.  Thus, a non-debtor release is not justifiable simply on the

ground that it was offered in exchange for a monetary contribution.  *Id.*

EXHIBIT B

During the Plan confirmation hearing, the Court considered all of the factors under *Metromedia* and *Johns-Manville* and their progeny and determined that the Court had the jurisdiction to enter the third party non-debtor release in favor of AFI.  (*See* ECF Doc. # 6065, *Order Confirming Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* (the "Confirmation Order"), ¶ UU.)  The Court found that the *Metromedia* factors, which establish a high burden before a court will grant non-debtor releases, were satisfied in this case.  The AFI Contribution was the "lynchpin of the Plan, without which the cases would devolve into endless litigation, the Plan would not be confirmable or feasible, and the recoveries currently contemplated by the Plan would not exist."  (*Id.* ¶ RR.)  As stated in the Plan, the Third Party Release was "an essential component and critical to the success of the Plan."  (Plan Art. IX.D.)  The Court found that "[t]hese facts are unprecedented and justify the approval of the Third Party Releases." (Confirmation Order ¶ RR.)

> 2.    *The Court Has Authority to Enforce the Third Party Release and Plan Injunction Against Mustafanos*

"All courts retain the jurisdiction to interpret and enforce their own orders."  *In re Charter Commc'ns*, No. 09-11435, 2010 WL 502764, at *4 (Bankr. S.D.N.Y. Feb. 8, 2010); *see also Travelers Indem. Co. v. Bailey,* 557 U.S. 137, 151 (2009) ("[A]s the Second Circuit recognized . . . the Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders.").  While a bankruptcy court's jurisdiction diminishes in importance following plan confirmation, *In re Gen. Media, Inc.*, 335 B.R. 66 (S.D.N.Y. 2005), the action in this case is "sufficiently close in time to confirmation of the Plan and sufficiently critical to the integrity of the Plan's structure that it is proper for this Court to take firm control and decide" the Motion. *Charter Commc'ns*, 2010 WL 502764, at *4.

16

EXHIBIT B

As the court explained in *Charter Communications*, where a motion seeks to "prevent the prosecution of causes of action expressly prohibited by the confirmation order," it would be "difficult to identify judicial acts that are any more critical to the orderly functioning of the bankruptcy process or more closely tethered to core bankruptcy jurisdiction." *Id.* (citing *In re Petrie Retail, Inc.*, 304 F.3d 223, 230 (2d Cir. 2002) (finding that bankruptcy court retained core jurisdiction post-confirmation "to interpret and enforce its own orders, particularly when disputes arise over a bankruptcy plan of reorganization")).[8]

The $2.1 billion AFI Contribution to the successful Plan in this case was a significant factor to achieving Plan confirmation and a global resolution of the Debtors' bankruptcies. A key component of Ally's willingness to provide the Contribution was the Plan Injunction and Third Party Release. The Court carefully considered the record and weighed the relevant factors. Initially, the U.S. Trustee, which rigorously enforces the law with respect to third party non-debtor releases, had objected to the Third Party Release. That objection was withdrawn. By the time of confirmation, there were no objections to the non-debtor release included in the Plan. After considering the applicable case law and the U.S. Trustee's withdrawal of its objection, the Court approved the Plan, which included the Third Party Release and Injunction.

Mustafanos did not name AFI as a counter-defendant in his foreclosure proceeding until August 22, 2013; he did not serve AFI with the Amended Counterclaim until October 2013. He did not object to the Third Party Release or Injunction contained in the Plan.

---

[8]       While both this Court and the Oregon state court are competent to rule on the Plan Injunction and Third Party Release, the "bankruptcy court is more closely connected to the current dispute and is the proper forum to rule with respect to" enforcement of third party releases pursuant to the Plan. *Charter Commc'ns*, 2010 WL 502764, at *3 (explaining that the bankruptcy court was the appropriate court to interpret the plan releases in that case, for reasons that apply equally here:  (1) the bankruptcy court had natural familiarity with the full record of the confirmation hearing and process; and (2) if the bankruptcy court interprets the plan confirmation order, there is a much smaller risk of erosion of its provisions and the injunction due to inconsistent interpretations across courts).

EXHIBIT B

Mustafanos's claims against AFI in the Amended Counterclaim relate to the origination of the Mortgage Loan, the assignment of the recorded mortgage, the securitization of the Mortgage Loan, the servicing of the Loan, and attempts to foreclose upon the Loan and the secured real property.  Mustafanos names AFI as a counter-defendant in the case, describing AFI as "*doing Business as* GMAC Mortgage Corporation"; he uses "Ally" and "GMAC Mortgage" interchangeably in his pleadings.  (Amended Counterclaim ¶ 6 (emphasis added).)  The asserted bases for AFI's purported liability are derivative of the alleged misconduct of GMACM and ResCap.  Mustafanos does not allege any independent actions taken by AFI or its non-debtor subsidiaries.[9]  Such claims fall squarely within the Plan's Third Party Release, which releases AFI from claims "arising from or related in any way to the Debtors."  (Plan Art. IX.D.)

Consequently, Mustafanos is bound by the Third Party Release and is therefore "permanently enjoin[ed] and preclude[ed]" from continuing his lawsuit against AFI.  (*See* Plan Art. IX.I (enjoining all entities who hold "Claims . . . from:  (a) commencing or continuing in any manner or action or other proceeding of any kind against any Released Party whether directly, derivatively or otherwise, on account of or in connection with or with respect to any Released Claims; . . . [and] (e) commencing or continuing in any manner or action or other proceeding of any kind against any Released Party on account of or in connection with or with respect to any Released Claims").)

After Mustafanos filed the Amended Counterclaim, AFI's counsel served him with copies of the Plan and Confirmation Order, as well as letters explaining the Plan's Third Party

---

[9]        At the hearing on April 10, 2014, Mustafanos alleged that AFI had "confessed" to acting in collusion with its subsidiaries, apparently including GMACM, as well as to fraud and racketeering, in July 2012.  As the Court explained on the record, to the extent Mustafanos is basing his action against AFI on these allegations, he is mistaken in his interpretation of the agreement AFI signed at the conclusion of the Attorney General's investigation. *See* Apr. 10, 2014 Tr. 27:8–21.  However, it is not necessary for the Court to consider the merits of these allegations to resolve the Motion or AFI's request for relief.

18

EXHIBIT B

Release and Injunction.  Mustafanos has failed to dismiss his counterclaims against AFI.

Instead, he filed the current Motion.  Mustafanos is bound by the Third Party Release since he is

a "holder[] of [a] Claim[] . . . arising from or related in any way to the Debtors."

The Court hereby **ORDERS** Mustafanos to dismiss his claims against AFI with prejudice

no later than fourteen (14) days from the date of this Order.  If Mustafanos fails to do so, AFI

may file a motion seeking to hold Mustafanos in contempt.

### III.    CONCLUSION

For the foregoing reasons, the Court **DENIES** the Motion to lift the stay, and **ENJOINS**

Mustafanos from pursuing claims in the State Court against GMACM and ResCap.

Additionally, Mustafanos is **ENJOINED** from prosecuting his claims against AFI.  The Court

also **ORDERS** that Mustafanos shall dismiss his claims in the State Court against AFI with

prejudice no later than fourteen (14) days from the date of this Order.  As noted above, the

Court's ruling does not affect the defenses to foreclosure or claims against other parties that

Mustafanos may be permitted to assert; such issues are controlled by state law.

**IT IS SO ORDERED.**

Dated:  April 21, 2014
        New York, New York

_Martin Glenn_

MARTIN GLENN
United States Bankruptcy Judge

EXHIBIT B

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |

_____)

### JOINT STIPULATION REGARDING ALLY FINANCIAL INC.'S MOTION FOR AN ORDER ENFORCING THE CHAPTER 11 PLAN INJUNCTION FILED AT ECF 6723

COME NOW the Movant, Ally Financial, and Respondents, McCallum, Methvin and Terrell and their respective clients in the underlying state court actions, by and through their undersigned counsel, and file herewith their Joint Stipulation regarding the issues raised by Movant in its motion at ECF No. 6723.  The parties stipulate as follows:

1.     Respondents have filed three class action lawsuits against Ally Financial. The lawsuits are: *Donaldson, et al v. GMAC Mortgage, LLC*, SU 09 CV 3359D, Superior Court of Muscogee County, Georgia (the "Georgia Action"); *Chatman, et al v. GMAC Mortgage Corporation*, et al, CV-2008-9000015, Barbour County Circuit Court, Eufaula, Alabama (the "Chatman Action"); and *Robinson, et al v. Homecomings Financial, LLC*, et al, CV-2008-900007, Barbour County Circuit Court, Eufaula, Alabama (the "Robinson Action," together with the Chatman Action the "Alabama Actions") (the Alabama Actions and the Georgia Action are collectively referred to as the "Actions").

2.     On March 28, 2014, Ally Financial filed a motion [ECF No. 6723] to enforce the Third Party Release and Injunction set forth in Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors [ECF No. 6065-1] (the "Plan"),[1] which was confirmed by the Court on December 11, 2013 [ECF No.

_____

[1] Capitalized terms used but not defined herein have the meanings given to such terms in the Plan.

EXHIBIT C

6065], asserting that the claims against Ally in the Actions are covered by the Third Party Release and that the Injunction enjoins the Respondents from prosecuting their claims against Ally.

3.      Respondents agree to move the respective State Courts to dismiss Ally Financial with prejudice from all the Actions on April 11, 2014.

4.      Respondents stipulate that the motions for the Alabama Actions can be filed electronically, that motions to dismiss Ally Financial with prejudice from the Alabama Actions will be filed electronically on April 11, 2014, and that Respondents will provide as-filed copies of the dismissal motions to Movant's counsel on April 11, 2014.

5.      Respondents further stipulate that the Georgia Court is a paper filing Court, that the Respondents will mail to the Georgia Court a motion to dismiss Ally Financial with prejudice from the Georgia Action on April 11, 2014, and that Respondents will provide an as-mailed copy of the dismissal motion to Movant's counsel on April 11, 2014.

6.      Respondents further stipulate that they will provide electronic copies of the orders entered by the State Courts granting their motions to dismiss to Movant's counsel upon receipt.

7.      In exchange for Respondents dismissing Ally Financial from the Actions with prejudice and delivering to Movant's counsel the copies of the dismissal motions and the State Court orders granting those motions, Ally Financial and its counsel agree not to seek the entry of any fees and expenses related to the filing of the Movant's motion at ECF No. 6723.

8.      Upon receiving the Orders dismissing all the Actions from the respective State Courts, the Movant agrees to withdraw its motion filed at ECF No. 6723.

9.      Respondents and Movant further agree that if Respondents fail to comply with the requirements of paragraphs 3 through 6 above, the hearing for Movant's motion at ECF No.

EXHIBIT C

6723 shall go forward on April 24, 2014, as scheduled.  However, the parties agree that Movant

or the parties jointly may later seek a continuance of the hearing if the Orders dismissing all the

Actions have not been received by the hearing date of April 24, 2014.

10.     Respondents agree to be bound by the terms of the Third Party Release and the

Injunction set forth in the Plan.

11.     It is the parties' intention that this agreement will resolve the Movant's motion at

ECF 6723 upon dismissal of Ally from all the Actions with prejudice.

[*Remainder of page intentionally left blank*]

EXHIBIT C

Done this 11th day of April 2014.

Respectfully submitted,

/s/Nick Wooten
Nick Wooten - Bar No. WOO084
NICK WOOTEN, LLC
P.O. Box 3389
Auburn, AL  36831
(334) 887-3000
Fax (334) 821-7720
Email:  nick@nickwooten.com
*Attorneys for Respondents*

/s/ Judson Brown
    Judson D. Brown
Kirkland & Ellis LLP
655 Fifteenth Street, NW
Washington D.C. 20005
(202) 879-5082 DIRECT
(202) 879-5200 FAX
 judson.brown@kirkland.com
*Attorney for Ally Financial Inc.*

**IT IS SO ORDERED.**

Dated:  April 14, 2014
        New York, New York

        **_/s/Martin Glenn_**
            MARTIN GLENN
        United States Bankruptcy Judge

4

EXHIBIT C