**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>., | Chapter 11 |
| Debtors. | Jointly Administered |
| RESCAP LIQUIDATING TRUST, | |
| Plaintiff, | Adv. Case No. 14-_____-mg |
| v. | |
| CITIZENS FIRST WHOLESALE MORTGAGE CO., | **COMPLAINT** |
| Defendant. | |

Plaintiff Rescap Liquidating Trust (the "Trust" or "Plaintiff"), as successor to Residential Funding Company, LLC f/k/a Residential Funding Corporation ("RFC"), by and through its attorneys, alleges for its Complaint against defendant Citizen's First Wholesale Mortgage Co. ("Citizens First" or "Defendant"), as follows:

## NATURE OF ACTION

1.      This case arises in substantial part from the billions of dollars in liabilities and losses incurred by RFC as one of the Debtors in the above-captioned chapter 11 cases. Those liabilities and losses, in turn, arose from defective residential mortgage loans sold to RFC by mortgage loan sellers, including Defendant Citizens First, who are legally and contractually responsible for the liabilities and losses caused by the poor quality of the mortgage loans in question.

2.      RFC was, at times prior to its bankruptcy in May 2012, in the business of acquiring and securitizing residential mortgage loans.

3.      RFC's business model was built on acquiring loans from "correspondent lenders," such as Defendant Citizens First, and distributing those loans by either pooling them together with other similar mortgage loans to sell into residential mortgage-backed securitization ("RMBS") trusts, or selling them to whole loan purchasers.

4.      Over the course of the parties' relationship, Citizens First sold over 125 mortgage loans, with an original principal balance in excess of $32.8 million, to RFC.

5.      Critical to RFC's business success was the quality of the loans it purchased.  To that end, RFC required its correspondent lenders, including Citizens First, to abide by stringent loan-level contractual representations and warranties designed to protect RFC from the risks of borrower fraud, appraisal fraud, failure to comply with state and federal law, and other credit and compliance factors that could negatively impact the performance and value of the loans it purchased.

6.      Over the course of RFC's business relationship with Defendant Citizens First, RFC identified loans that contained material defects violating one or more of Citizens First's contractual representations and warranties.  The parties' Agreement entitles RFC to ask that Citizens First repurchase loans with defects, it also authorizes RFC to recovery of the additional liabilities and losses it incurred due to Citizens First's breaches.

7.      Ultimately, due in significant part to the failure of correspondent lenders, including Citizens First, to honor their contractual representations and warranties, RFC was sued by numerous counterparties and investors in its RMBS, based on allegations that the loans contained numerous defects and were rife with fraud and compliance problems.

8.      By the time RFC and the other above-captioned debtors (collectively, the "Debtors") filed their above-captioned bankruptcy cases in May 2012, RFC was facing over two dozen lawsuits around the country, all alleging that the loans RFC had securitized were defective, as well as claims by investors in hundreds of its RMBS seeking tens of billions of dollars in damages based on loan-level problems.

9.      During these cases, hundreds of proofs of claim were filed against RFC by dozens of claimants, including investors alleging securities fraud claims, class action plaintiffs, monoline insurers, RMBS holders and indenture trustees acting at their direction claiming breaches of representations and warranties, whole loan investors, and non-debtor co-defendants (such as underwriters of the RMBS offerings).  Collectively, these claims alleged tens of billions of dollars of damages stemming from defective loans, including those sold to RFC by Citizens First.

10.      Following a lengthy and intensive mediation presided over by sitting bankruptcy judge James M. Peck, and related proceedings, RFC was able to resolve its RMBS-related liabilities for over $10 billion of allowed claims.  This agreed resolution of RFC's RMBS-related liabilities was set forth in a global settlement, which formed the cornerstone of a liquidating chapter 11 plan for RFC and its affiliated Debtors.  On December 11, 2013, after a five-day confirmation trial, this Court approved the global settlement, finding it to be fair and reasonable and in the best interests of each of the Debtors, and confirmed the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital LLC, et al. and the Official Committee of Unsecured Creditors*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y.) [D.I. 6065-1] (the "Plan").  Under paragraphs 24 and 48 of the *Order Confirming Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors*,

3

Case No. 12-12020 (MG) (Bankr. S.D.N.Y.) [D.I. 6065] and Article IV of the Plan, the Trust is responsible for monetizing many of the Debtors' remaining assets and pursuing litigation claims and distributing the proceeds to the Debtors' creditors, including RFC's rights against Citizens First and other parties who sold mortgages to RFC.

11.     Defendant Citizens First is contractually obligated to indemnify RFC for all liabilities and losses incurred by RFC as a result of breaches of Defendant's representations and warranties.

12.     Accordingly, the Trust brings this action for breach of contract, and for indemnification of all liabilities and losses RFC has incurred due to Defendant's breaches of its representations and warranties.

## PARTIES

13.     Plaintiff the ResCap Liquidating Trust is a Delaware Statutory Trust.  RFC is a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota.  RFC was formerly known as Residential Funding Corporation.  When the above-captioned bankruptcy cases were commenced, RFC was a wholly owned subsidiary of GMAC-RFC Holding Company, LLC, a Delaware limited liability company.  GMAC-RFC Holding Company, LLC was a wholly owned subsidiary of Residential Capital, LLC, a Delaware limited liability company.  Residential Capital, LLC was a wholly owned subsidiary of GMAC Mortgage Group LLC, a Delaware limited liability company, which in turn was a wholly owned subsidiary of Ally Financial, Inc., a Delaware corporation with its principal place of business in Michigan. Pursuant to the Plan, on December 17, 2013, GMAC-RFC Holding Company, LLC's interest in RFC was cancelled and the Trust succeeded to all of RFC's rights and interests under RFC's Agreement with Citizens First.

4

14.     Defendant Citizens First Wholesale Mortgage Co. is a Florida corporation with its principal place of business at 560 Fieldcrest Drive, The Villages, Florida 32162.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, in that the matter arises under title 11 or arises in or is related to the Debtors' bankruptcy proceedings. This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, in that the parties are citizens of different states and the amount in controversy exceeds $75,000. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(C) in that Citizens First filed proof of claim number 1895 against Debtor Residential Capital LLC (but based on Citizen First's relationship with RFC) and 28 U.S.C. § 157(b)(2)(O) in that it affects the liquidation of the assets of the estate. The Trust hereby consents to the entry of final orders or judgment by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

16.     Venue is proper in this Court because these claims relate to the bankruptcy cases of the Debtors; the liquidation of these claims will impact the assets available to distribute to RFC's creditors under the Plan approved by the Bankruptcy Court; and litigating the case in the Bankruptcy Court is necessary to ensure the prompt administration of justice for all parties, including RFC's creditors.

## FACTUAL BACKGROUND

### The Agreement Between RFC and Citizens First

17.     Over the course of the parties' relationship, Citizens First sold over 125 mortgage loans to RFC pursuant to the Seller Contract attached as Exhibit A (the "Contract").

18.     The Contract incorporates into its terms and conditions the RFC Client Guide, exemplary excerpts of which are attached as Exhibit B-5 through B-15 (the "Client Guide"). (The complete versions of the Client Guide are known to the parties and too voluminous to attach in their entirety; the omitted portions of the Client Guides do not affect the obligations set forth in this Complaint.)  The Contract and Client Guide collectively form the parties' Agreement, and set the standards to which Citizens First's loans sold to RFC were expected to adhere.

19.     A preliminary list of the loans sold by Citizens First to RFC pursuant to the Agreement, and subsequently securitized by RFC, is attached hereto as Exhibit C.  The original principal balance of these loans exceeds $32 million.

20.     As a correspondent lender, Citizens First had the initial responsibility for collecting information from the borrower, verifying its accuracy, and underwriting the loan. Citizens First had primary responsibility for all aspects of the underwriting of the loan, and it was understood between the parties that RFC would generally *not* be re-underwriting the loan.  It was Citizens First, or others from whom Citizens First purchased mortgages, that actually closed the loans with the borrowers.

21.     As Citizens First was well aware, once the loans were sold to RFC, RFC pooled groups of loans with similar characteristics, and the pool of loans would be sold into a special-purpose securitization Trust.  The pool of loans formed the collateral underlying the Trust's mortgage-backed securities, which were in turn sold to investors.

22.     As Citizens First was also well aware, RFC from time to time sold pools of loans to whole loan investors.

23.     Citizens First knew of RFC's intention to securitize and/or sell the loans. Specifically, Defendant Citizens First acknowledged, in the Client Guide, that it "recognize[d] that it is [RFC's] intent to securitize some or all of the Loans sold to [RFC]," and agreed to provide RFC with "all such information … as may be reasonably requested by [RFC] for inclusion in a prospectus or private placement memorandum published in connection with such securitization," including all information necessary to comply with the disclosures required by Regulation AB (governing asset-backed securities) and other applicable federal securities laws. (See Client Guide at A202(II); 206(D).)

24.     Pursuant to the Agreement, Defendant Citizens First made a number of representations and warranties with respect to the loans, including, but not limited to, the following:

a.   Defendant's "origination and servicing of the Loans have been legal, proper, prudent and customary and have conformed to the highest standards of the residential mortgage origination and servicing business."   (Client Guide A201(K).)

b.   Defendant "will comply with all provisions of this Client Guide and the Program Documents, and will promptly notify GMAC-RFC of any occurrence, act, or omission regarding [Defendant], the Loan, the Mortgaged Property or the Mortgagor of which [Defendant] has knowledge, which … may materially affect [Defendant], the Loan, the Mortgaged Property or the Mortgagor." (Client Guide A201(M).)

c.   "All information relating to each Loan delivered and sold to GMAC-RFC is true, complete and accurate and there are no omissions of material facts.  All data provided by the Client to GMAC-RFC relating to any Loan, whether in electronic format, or otherwise, is true and complete and accurately reflects the information in the related Loan file."  (Client Guide A202(A).)

d.   "All Loan Documents, Funding Documents and Final Documents are genuine, have been completed, duly and properly executed, are in recordable form and delivered in the form and manner specified in this Client Guide," and "[a]ll originals and copies of such documents and all other documents, materials, and other information required to be submitted to GMAC-RFC have been so submitted, and are complete and accurate."  (Client Guide A202(D).)

e. "All Loan Documents, Funding Documents and Final Documents and all other documents describing or otherwise relating thereto are in compliance with all local and State laws, regulations and orders."  (Client Guide A202(D).)

f. "There is no default, breach, violation or event of acceleration existing under any Note or Security Instrument transferred to GMAC-RFC, and no event exists which, with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and no such default, breach, violation or event of acceleration has been waived by [Defendant] or any other entity involved in originating or servicing the Loan." (Client Guide A202(G).)

g. "[E]ach Loan has been originated, closed, and transferred in compliance with all applicable local, State and federal laws and regulations, including, but not limited to, the Real Estate Settlement Procedures Act, the Fair Credit Reporting Act, the Equal Credit Opportunity Act, the Truth-in-Lending Act, the Fair Housing Act, and the National Flood Insurance Act.  This warranty is made by [Defendant] with respect to each GMAC-RFC Loan Application taken and processed for each Loan and with respect to each Loan made by the [Defendant] or any other entity."  (Client Guide A202(I).)

h. "No Loan is a … loan considered a 'high-cost,' covered, 'high-risk,' 'predatory' or any other similar designation under any State or local law in effect at the time of the closing of the loan if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees."  (Client Guide A202(J)(1)(d).)

i. "[N]o circumstances exist involving the Loan Documents, the Mortgaged Premises or the Borrower's credit standing that could:  (i) cause private institutional investors to regard the Loan as an unacceptable investment, (ii) cause the Loan to become delinquent, or (iii) adversely affect the Value or marketability of the Mortgaged Premises or the Loan."   (Client Guide A202(Q).)

j. "The Loan is of investment quality, has been prudently originated and has been underwritten in compliance with all requirements of this Client Guide." (Client Guide A202(T).)

k. "For each Loan for which an appraisal is required or obtained under this Client Guide, the appraisal was made by an appraiser who meets the minimum qualifications for appraisers as specified in this Client Guide."  (Client Guide A202(T).)

l. "For each Loan, as of the Funding Date, the market Value of the Mortgaged Premises is at least equal to the appraised value stated on the Loan appraisal, or if an Automated Valuation Model (AVM) is permitted, the Value on the

8

AVM, except to the extent that the market Value of the Mortgaged Premises is lower … due to the effect of any toxic materials or other environmental hazards of which neither the appraiser nor the [Defendant] has actual knowledge of reasonable grounds to suspect."  (Client Guide A202(T).)

m. "No fraud or misrepresentation by the Borrower or by the [Defendant], broker, correspondent, appraiser or any independent contractor retained by the [Defendant], broker, correspondent, appraiser or any employee of any of the foregoing occurred with respect to or in connection with the origination or underwriting of any Loan and all information and documents provided to GMAC-RFC in connection with the Loan are complete and accurate."  (Client Guide A202(KK).)

25.    These representations and warranties were material terms in RFC's agreement to acquire the mortgage loans from Citizens First.  Citizens First's contractual warranty of the quality of the loans was important because RFC in turn sold these loans to RMBS trusts and whole loan purchasers, making its own representations and warranties to the trusts and investors. If any of Citizens First's representations and warranties turned out to be false, RFC could have exposure to these third parties, and thus RFC required contractual protection from Citizens First under which RFC would have recourse for its liabilities and losses on account of defective loans.

26.    Pursuant to the Client Guide, Citizens First's failure to comply with its representations and warranties or any of the other requirements, terms or conditions of the Client Guide constitutes an "Event of Default," as does its failure to provide RFC with true, accurate and complete information in a timely manner.  (See Client Guide A208.)

27.    Similarly, it is an "Event of Default" if a "[b]orrower or any other person or entity involved in the loan transaction or its underwriting or documentation (including any appraiser, broker, third-party originator, credit reporting agency, or other provider of underwriting information) has made any false representation and/or has failed to provide information that is true, complete and accurate in connection with" the loan transaction, regardless of whether Citizens First knew of the misrepresentation or incorrect information.  (See Client Guide A208.)

9

28.    Citizens First expressly agreed that RFC was permitted to exercise any remedy "allowed by law or in equity" in connection with such Events of Default.    (See Client Guide A209.)  Moreover, the Client Guide specified that RFC's exercise of one or more remedies in connection with a particular Event of Default "will not prevent it from exercising … [o]ne or more other remedies in connection with the same Event of Default," or "[a]ny other rights which it may have at law or in equity."  (Id.)  RFC's remedies expressly survived the sale of the loans and the termination of the ongoing business relationship between RFC and Citizens First.  (Id. at A209(C).)

29.    The Client Guide further specified the remedies available to RFC in case of an Event of Default, including a breach of any loan-level representation or warranty.  The available remedies included, but were expressly not limited to, repurchase of the defective loan, substitution of another loan for the defective one, or indemnification against liabilities resulting from such breaches.  (See Client Guide A210.)  The Client Guide expressly stated that RFC was "not required to demand repurchase within any particular period of time, and may elect not to require immediate repurchase."  (Id.)  Further indemnification remedies are set forth in Sections A202 and A212 of the Client Guide.  Section A209 of the Client Guide, in turn, makes clear that all of these remedies are non-exclusive and cumulative.

30.    Moreover, RFC alone retained the sole discretion to declare an Event of Default, and to choose what remedy or remedies to pursue.  Nothing in the Agreement required RFC to provide Citizens First with notice and an opportunity to cure the defects, to make a repurchase demand, or in any way restricted RFC from pursuing recovery for materially defective loans at any time.  In fact, the United States Court of Appeals for the Eighth Circuit recently confirmed that, under the Client Guide, RFC has the sole discretion to declare an Event of Default, and

correspondent lenders such as Citizens First have contractually bargained away any right to challenge RFC's determination regarding such an Event of Default.  See Residential Funding Co., LLC v. Terrace Mortg. Co., 725 F.3d 910 (8th Cir. 2013).

31.     The repurchase provision required Citizens First to compensate RFC for defective loans according to a formula specified in the Client Guide that is based on the original principal balance of the loan.  If RFC determined that repurchase was not appropriate, Citizens First would nonetheless contractually be obligated to pay RFC "all losses, costs and expenses incurred by [RFC] and/or the loan's servicer as a result of an Event of Default," including "all reasonable attorneys' fees and other costs and expenses incurred in connection with enforcement efforts undertaken." (See Client Guide A210.)

32.     Under the terms of the Agreement, Citizens First is obligated to repurchase loans and/or pay RFC the repurchase price even if the loan has already been foreclosed upon.  (See Client Guide A210(B).)

33.     Defendant Citizens First also expressly agreed to broad indemnification provisions, including the following:

> [Defendant] shall indemnify GMAC-RFC from all losses, damages, penalties, fines, forfeitures, court costs and reasonable attorneys' fees, judgments, and any other costs, fees and expenses … includ[ing], without limitation, liabilities arising from (i) any act or failure to act, (ii) any breach of warranty, obligation or representation contained in the Client Guide, (iii) any claim, demand, defense or assertion against or involving GMAC-RFC based on or resulting from such breach, (iv) any breach of any representation, warranty or obligation made by GMAC-RFC in reliance upon any warranty, obligation or representation made by [Defendant] contained by the Client Contract and (v) any untrue statement of a material fact, omission to state a material fact, or false or misleading information provided by the [Defendant] in information required under Regulation AB or any successor regulation.
>
> In addition, [Defendant] shall indemnify GMAC-RFC against any and all losses, damages, penalties, fines, forfeitures, judgments, and any other costs, fees and expenses (including court costs and reasonable attorneys'

fees) incurred by GMAC-RFC in connection with any litigation or governmental proceeding that alleges any violation of local, State or federal law by [Defendant], or any of its agents, or any originator or broker in connection with the origination or servicing of a Loan.

(Client Guide A212.)  Citizens First further agreed:

to indemnify and hold GMAC-RFC harmless from and against any loss, damage, penalty, fine, forfeiture, court cost, reasonable attorneys' fees, judgment, cost, fee, expense or liability incurred by GMAC-RFC as a result of any material misstatement in or omission from any information provided by [Defendant] to GMAC-RFC; or from any claim, demand, defense or assertion against or involving GMAC-RFC based on or grounded upon, or resulting from such misstatement or omission or a breach of any representation, warranty or obligation made by GMAC-RFC in reliance upon such misstatement or omission.

(Client Guide A202.)   The Client Guide also entitles RFC to recover all court costs, attorney's fees and any other costs, fees and expenses incurred by RFC in enforcing the Agreement or Client Guide.

34.    RFC at all times performed all of its obligations to Citizens First, if any, under the Agreement, and all conditions precedent to the relief sought in this action, if any, have been satisfied.

**Defendant Materially Breached Numerous Loan-Level Representations and Warranties.**

35.    As noted above, the loans RFC acquired from Citizens First and other correspondent lenders were sold, either into RMBS trusts that issued certificates to outside investors, or in "whole loan" portfolios to other mortgage companies and banks.

36.    The loans Citizens First sold RFC were eventually deposited in 34 RMBS Trusts. When RFC sold the loans, it passed on a more limited set of representations and warranties to the Trusts, and, as required by SEC regulations, disclosed pertinent information about the loans to investors in the RMBS.   In making those representations and warranties, RFC relied on

information provided to it by Citizens First and other correspondent lenders.  That information in many cases violated Citizens First's representations and warranties to RFC.

37.    Citizens First materially breached its extensive contractual representations and warranties by delivering loans that were not originated or underwritten in accordance with the requirements of the Agreement; did not meet the representations and warranties made as to those loans; and/or failed to comply with applicable state and federal law.

38.    Over time, many of the loans sold to RFC by Citizens First defaulted or became seriously delinquent.   The loans Citizens First sold RFC and RFC securitized eventually sustained losses exposing RFC to claims from investors, monoline insurers, and others.

39.    These delinquency and default rates far exceed what would normally be expected in a given population of mortgage loans.

40.    Internal reviews conducted by RFC determined that loans sold to RFC by Citizens First violated the Client Guide and/or other representations or warranties made by Citizens First, resulting in an Event of Default under the Agreement.

41.    The types of defects varied, but included occupancy misrepresentations, appraisal misrepresentations or inaccuracies, undisclosed debt, and missing or inaccurate documents, among others.  Additional material defects are likely contained throughout the loan population sold to RFC by Citizens First.

42.    An example of the loans sold to RFC by Citizens First that had significant and material defects violating the Client Guide representations and warranties was Loan ID # 5874670. When the loan file for this loan was reviewed, it was discovered to be missing significant pieces of necessary documentation.  Despite the appraisal indicating that the property was in a flood zone, the mortgage file contained no information regarding flood insurance.  The

HUD-1 for this loan showed hazard insurance being paid, but there was no information regarding the hazard insurance in the mortgage file  There were also issues with the appraisal using properties as comparables that were over five miles away and had garages when the subject property did not.  The missing information regarding insurance meant both that there was a risk regarding the property not being adequately insured and that the borrower may have been charged incorrect amounts, which could lead to a counterclaim if the property was foreclosed on. The significant discrepancies in the comparables used for the appraisals also meant that there was an increased risk that the collateral was worth less than represented by Citizens First.  All of these issues made the loan riskier.

43.    The above example is not intended to be an exhaustive list of the loans sold by Citizens First to RFC that contained material breaches of representations and warranties.  Rather, these loans represent just one example of the material defects found in the loans Citizens First sold to RFC.  Many more of the loans sold to RFC by Citizens First contained material defects that violated the representations and warranties Citizens First made in the Agreement.

44.    As detailed below, these defects constituted material breaches of Defendant's representations and warranties, contributing to RFC's exposure to billions of dollars in liability and tens of millions of dollars in legal expenses.

**RFC's Liabilities and Losses Stemming from Defendant's Breaches.**

45.    As a direct result of Defendant Citizens First's breaches, RFC has incurred obligations, liabilities, damages, and losses for which it is entitled to recovery from Citizens First.

46.    First, RFC has incurred billions of dollars in liabilities and losses stemming from defective loans, including those sold to RFC by Citizens First.

47.     In addition, RFC has expended tens of millions of dollars litigating the quality of the loans sold to it by Citizens First and others in extensive federal and state court litigation in which plaintiffs claimed the loans were rife with borrower or originator fraud, or failed to comply with applicable state and/or federal law.

48.     Beginning in 2008 and continuing until RFC filed for bankruptcy protection with this Court on May 14, 2012, RFC faced a growing number of claims and dozens of lawsuits stemming from the defective loans sold to it by Citizens First and others.

49.     For example, the RFC-sponsored RMBS offerings containing loans sold to RFC by Citizens First included a number of RMBS that became the subject of ten lawsuits brought by investors and other participants in the securitizations, alleging that many of the loans contained in the RMBS offerings were defective in one or more ways.

50.     RFC ordinarily received a limited number of repurchase demands, primarily from whole loan investors.

51.     However, in early 2008, MBIA Insurance Corp., a bond insurer that issued insurance policies guaranteeing the performance of certain mortgage-backed securities issued by RFC, began questioning the quality of large numbers of loans in the securitizations it had insured.  MBIA hired a team to begin reviewing loan files, and in May 2008, based on the *less-stringent* representations and warranties RFC had made to MBIA, demanded that RFC repurchase many allegedly defective loans.

52.     Beginning in October 2008, RFC was sued in literally dozens of lawsuits stemming from allegedly defective mortgage loans, including those sold to it by Citizens First.

53.     The first of these lawsuits was filed by bond insurer MBIA in October 2008.  The MBIA lawsuit covered five RFC second-lien securitizations that included thousands of mortgage

loans.  For the first time, RFC learned that MBIA's analysis had concluded that over 80% of the

loans in the pools it insured were defective.

54.    The MBIA lawsuit was followed shortly by a class action suit filed by the New

Jersey Carpenters pension funds.

55.    The New Jersey Carpenters' lawsuit purported to cover 59 mortgage-backed

securities offerings issued through RFC's RALI shelf in 2006 and 2007, which consisted of first-

lien Alt-A loans.  These securitizations were identified by names that included the letters "QA,"

"QH," "QO," and "QS."  As shown in Exhibit C, over 70 Citizens First loans were included in

the offerings that were the subject of the New Jersey Carpenters' lawsuit.

56.    The New Jersey Carpenters' complaint alleged that 38% of the mortgage loans

underlying the securitizations were in delinquency, default, foreclosure or repossession when

New Jersey Carpenters filed its class action complaint, and that much of RFC's mortgage loan

data "was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower

income inflation, and the other facets of defective underwriting" described throughout the

Complaint.  (NJ Carpenters First Am. Compl. ¶¶ 9, 110 in *New Jersey Carpenters et al. v.

Residential Capital, LLC et al.* Case No. 08-cv-08781 (HB) (S.D.N.Y.).)  Of course, that data

was provided to RFC—and represented and warranted to be accurate—by Citizens First and

other correspondent lenders.

57.    On February 18, 2011, the Allstate Insurance Company and its various

subsidiaries and affiliates sued RFC and numerous other defendants in Hennepin County District

Court, Minnesota.  Allstate sued RFC about its role in some 23 securitizations.  One of these

securitizations was the 2006-QS14 securitization, which contained numerous loans bought from

Citizens First.  Allstate supported its allegations in this complaint with a loan-level review of

over 30,000 loans.  For the 2006-QS14 transaction which Citizens First sold loans into, Allstate reviewed a sample of 800 defaulted loans and 800 loans tested at random.  Allstate alleged that its review of these loans showed significant misstatements concerning owner-occupancy and loan-to-value ratios, both of which under the Client Guide Citizens First was responsible for reviewing.

58.    Numerous other lawsuits followed on through RFC's bankruptcy filing in May 2012, including over fifteen lawsuits brought by private investors in its RMBS securities, and more than a dozen lawsuits brought by monoline insurers.

59.    All of these lawsuits alleged that the loans RFC sold into RMBS securitizations were defective in a variety of ways, including because of borrower fraud, missing or inaccurate documentation, fraudulent or inflated appraisals, misrepresentations concerning owner-occupancy, or failure to comply with applicable state and federal law.

60.    Collectively, these lawsuits involved more than one hundred RMBS securitizations, and a combined original principal balance of more than $100 billion.

61.    Across the dozens of securitizations involved in these lawsuits, Citizens First was responsible for over 100 of the loans.

62.    As of May 2012, RFC had already repurchased millions of dollars worth of defective loans from its RMBS securitizations and from whole loan purchasers, either at the request of a bond insurer or trustee, or because RFC itself discovered a defect and affirmatively took steps to repurchase the loan.  As described in more detail above, these included numerous loans sold to RFC by Citizens First.

63.     In May 2012, RFC and certain of its affiliates—partly because of the enormous exposure stemming from the pending mortgage-related lawsuits described above—filed for Chapter 11 bankruptcy protection in this Court.

64.     In connection with the bankruptcy proceeding, hundreds of proofs of claim were filed by investors in RMBS, monoline insurers, whole loan purchasers, indenture trustees, and an array of co-defendants in the above-described loan-related litigation.   These proofs of claim, many of which mirrored the litigation filed prior to the bankruptcy, sought damages in the tens of billions of dollars, all stemming from allegedly defective mortgage loans, including those sold to RFC by Citizens First.   By way of example, the following represents a small sampling of the hundreds of proofs of claim filed on the basis of defective loans:

a.   The indenture trustees for each of the RFC-sponsored securitizations (Deutsche Bank, Bank of New York, U.S. Bank, HSBC Bank, Law Trust and Wells Fargo, and Wells Fargo) collectively filed more than two dozen proofs of claim at the direction of two substantial groups of institutional investors. The institutional investors collectively asserted that loan-level defects (including in the loans sold to RFC by Citizens First and securitized) were responsible for more than $19.5 billion in repurchase obligations.

b.   Allstate, an investor in 25 Debtor-sponsored securitizations (a number of which included Citizens First loans), filed 20 proofs of claim based on the allegation that the loans were defective.   The proofs of claim were based in part on analyses of the individual loan-level data for these loans.

c.   John Hancock, an investor in over 50 Debtor-sponsored securitizations (a number of which included Citizens First loans), filed 43 proofs of claim asserting similar allegations.

65.     Many whole loan purchasers also filed proofs of claim in the bankruptcy proceedings, collectively seeking millions of dollars in recovery.

66.     These proofs of claim, lawsuits, and demands all alleged, among other things, that the securitized or purchased loans were defective, improperly underwritten, and breached representations and warranties made by RFC to investors, purchasers, and other contractual

parties. Those representations and warranties were, in most cases, identical to or less stringent than those that RFC had received from Citizens First, and on which RFC had relied.

67.     The Debtors initially proposed to settle portions of their RMBS-related liabilities for an aggregate $8.7 billion allowed claim in the bankruptcy case.   Subsequently, after protracted litigation over the reasonableness and propriety of that settlement, this Court appointed the Hon. James M. Peck, a United States Bankruptcy Judge for the Southern District of New York, to serve as a mediator and to attempt to achieve a negotiated resolution of the Debtors' RMBS-related liabilities and of other disputed issues in the chapter 11 cases. A lengthy mediation process ensued, which, together with related proceedings, resulted in a global settlement that, among other things, provided for the resolution of all of the Debtors' RMBS-related liabilities for more than $10 billion in allowed claims granted to the various RMBS trusts, monoline insurers, FHFA, securities law claimants, and others.

68.     This Court ultimately approved the global settlement, including the $10 billion-plus settlement of RMBS-related liabilities, finding it to be fair and reasonable and in the best interests of each of the Debtors, and confirmed the plan.  (See Case No. 12-12020-mg, Doc. 6066 (Findings of Fact), at ¶¶ 98 to 176.)  The Plan became effective on December 17, 2013. Pursuant to the Plan, the Trust succeeded to all of RFC's rights and interests, including its right to bring litigation claims against Citizens First.

69.     Pursuant to its express contractual obligations, Citizens First is obligated to compensate the Trust (as successor to RFC under the Plan) for the portion of the global settlement associated with its breaches of representations and warranties, as well as for the portion of RFC's other liabilities and losses (including the tens of millions of dollars that RFC

has paid in attorneys' fees to defend against, negotiate, and ultimately settle claims relating to allegedly defective loans) associated with those breaches.

## COUNT ONE
### (BREACH OF CONTRACT)

70.     The Trust realleges each and every allegation set forth in Paragraphs 1 through 69, above, as if fully rewritten herein.

71.     RFC and Defendant Citizens First entered into a valid and enforceable Agreement pursuant to which RFC acquired over 130 mortgage loans from Citizens First.

72.     Pursuant to the parties' Agreement, Citizens First made representations and warranties to RFC regarding the quality and characteristics of the mortgage loans Defendant sold to RFC.

73.     RFC complied with all conditions precedent, if any, and all of its obligations under the Agreement.

74.     Defendant materially breached its representations and warranties to RFC inasmuch as the mortgage loans materially did not comply with the representations and warranties.

75.     Defendant's material breaches constitute Events of Default under the Agreement.

76.     RFC has suffered loss, harm, and financial exposure directly attributable to Defendant's material breaches, including liabilities and losses stemming from the defective loans, as well as attorneys' fees, litigation-related expenses, and other costs associated with both defending dozens of lawsuits and proofs of claim filed against RFC stemming in part from materially defective loans sold to RFC by Defendant, and fees and costs incurred in prosecuting this action.

77.     Accordingly, the Trust is entitled to compensation in an amount to be proven at trial, which exceeds $75,000, together with an award of attorneys' fees, interest, and costs.

## COUNT TWO
## (INDEMNIFICATION)

78.     The Trust realleges each and every allegation set forth in Paragraphs 1 through 77, above, as if fully rewritten herein.

79.     RFC has incurred substantial liabilities, losses and damages arising from and relating to material defects in the mortgage loans Citizens First sold to RFC, including over $10 billion in allowed claims approved by this Court, as well as tens of millions of dollars in attorneys' fees, litigation-related expenses, and other costs associated with defending dozens of lawsuits and proofs of claim filed against RFC stemming in part from materially defective loans sold to RFC by Citizens First.

80.     Defendant expressly agreed to indemnify RFC for the liabilities, losses and damages, including attorneys' fees and costs, which RFC has incurred.

81.     Accordingly, the Trust is entitled to indemnification in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest, and costs.

WHEREFORE, the Trust demands judgment in its favor and against Defendant as follows:

(A)     On Count One (Breach of Contract), contractual repurchase compensation and/or damages in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest, and costs; and

(B)     On Count Two (Indemnification), a declaratory judgment that Defendant is responsible to indemnify the Trust against liabilities, losses, expenses and/or other damages paid or to be paid in settlements or otherwise stemming from Defendant's conduct, an order for

21

damages sufficient to reimburse the Trust for RFC's liabilities, losses, costs and expenses caused

by Defendant's actions in excess of $75,000 and in an amount to be proven at trial, and an award

of attorneys' fees, interest, and costs; and

    (C)    All such further relief, as the Court deems necessary or proper.


Dated:  May 13, 2014

<div style="margin-left:40%">

By: /s/ Peter E. Calamari
    Peter E. Calamari
    Isaac Nesser
    Alex Rossmiller
    John Sullivan
    QUINN EMANUEL URQUHART & SULLIVAN,
    LLP
    51 Madison Avenue, 22nd Floor
    New York, New York  10010
    Telephone:  (212) 849-7000
    Facsimile:  (212) 849-7100
    PeterCalamari@quinnemanuel.com
    IsaacNesser@quinnemanuel.com
    AlexRossmiller@quinnemanuel.com
    JohnSullivan@quinnemanuel.com


    COUNSEL TO RESCAP LIQUIDATING TRUST

</div>