**Hearing Date: June 10, 2014 at 10:00 a.m. (ET)**
**Objection Deadline: June 2, 2014 at 4:00 p.m. (ET)**

Richard M. Cieri
Ray C. Schrock
Justin R. Bernbrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Jeffrey S. Powell
Daniel T. Donovan
Judson D. Brown
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Ste. 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Counsel for Ally Financial Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**NOTICE OF ALLY FINANCIAL INC.'S MOTION FOR
AN ORDER ENFORCING THE COURT'S ORDER GRANTING
DEBTORS' MOTION FOR AN ORDER UNDER BANKRUPTCY
CODE SECTIONS 105(A) AND 363(B) AUTHORIZING THE DEBTORS
TO ENTER INTO A PLAN SUPPORT AGREEMENT WITH ALLY FINANCIAL
INC., THE CREDITORS' COMMITTEE, AND CERTAIN CONSENTING CLAIMANTS**

**PLEASE TAKE NOTICE** that a hearing on Ally Financial Inc.'s Motion for an Order Enforcing the Court's Order Granting Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into a Plan Support Agreement With Ally Financial Inc., the Creditors' Committee, and Certain Consenting Claimants (the "***Motion***") will be held before the Honorable Martin Glenn of the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***"), in Room 501, One Bowling Green, New York, New York 10004-1408, on **June 10, 2014, at 10:00 a.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that responses or objections to the Motion and the relief requested therein, if any, must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, shall set forth the basis for the objection and the specific grounds therefore and shall be filed with the Bankruptcy Court electronically in accordance with General Order M-399, by registered users of the Bankruptcy Court's case filing system (the User's Manual for the Electronic Case Filing System can be found at http://www.nysb.uscourts.gov, the official website for the Bankruptcy Court), with a hard copy delivered directly to Chambers and served, so as to be received no later than **June 2, 2014, at 4:00 p.m. (prevailing Eastern Time)**, upon: (a) counsel to the Debtors and Liquidating Trust, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attention: Gary S. Lee, Norman S. Rosenbaum, and Jordan A. Wishnew); (b) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014 (Attention: Tracy Hope Davis, Linda A. Riffkin, and Brian S. Masumoto); (c) the Office of the United States Attorney General, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-0001 (Attention: US Attorney General, Eric H. Holder, Jr.); (d) the Office of the New York State Attorney General, The Capitol, Albany, NY 12224-0341 (Attention: Nancy Lord, Esq. and 3 Enid N. Stuart, Esq.); (e) the Office of the U.S. Attorney for the Southern District of New York, One St. Andrews Plaza, New York, NY 10007 (Attention: Joseph N. Cordaro, Esq.); (f) counsel for Ally Financial Inc., Kirkland & Ellis LLP, 153 East 53rd Street, New York, NY 10022 (Attention: Richard M. Cieri and Ray Schrock); (g) counsel for the committee of unsecured creditors, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036 (Attention: Kenneth Eckstein and Douglas Mannal); (h) counsel for Ocwen Loan Servicing, LLC, Clifford Chance US LLP, 31 West 52nd Street, New York, NY 10019 (Attention: Jennifer C. DeMarco and Adam Lesman); (i) counsel for Berkshire Hathaway Inc.,

Munger, Tolles & Olson LLP, 355 South Grand Avenue, Los Angeles, CA 90071 (Attention: Thomas Walper and Seth Goldman); (j) Internal Revenue Service, P.O. Box 7346, Philadelphia, PA 19101-7346 (if by overnight mail, to 2970 Market Street, Mail Stop 5-Q30.133, Philadelphia, PA 19104-5016); (k) Securities and Exchange Commission, New York Regional Office, 3 World Financial Center, Suite 400, New York, NY 10281-1022 (Attention: George S. Canellos, Regional Director); and (l) special counsel to the Committee, SilvermanAcampora LLP, 100 Jericho Quadrangle, Suite 300, Jericho, NY 11753 (Attention: Ronald J. Friedman).

**PLEASE TAKE FURTHER NOTICE** that if you do not timely file and serve a written response to the relief requested in the Motion, the Bankruptcy Court may deem any opposition waived, treat the Motion as conceded, and enter an order granting the relief requested in the Motion without further notice or hearing.

May 21, 2014
New York, New York

*/s/ Ray C. Schrock*
Richard M. Cieri
Ray C. Schrock
Justin R. Bernbrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

- and -

Jeffrey S. Powell
Daniel T. Donovan
Judson D. Brown
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Ste. 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Richard M. Cieri                              Jeffrey S. Powell
Ray C. Schrock                                Daniel T. Donovan
Justin R. Bernbrock                           Judson D. Brown
KIRKLAND & ELLIS LLP                          KIRKLAND & ELLIS LLP
601 Lexington Avenue                          655 15th Street, N.W., Ste. 1200
New York, New York 10022                      Washington, D.C. 20005
Telephone: (212) 446-4800                     Telephone: (202) 879-5000
Facsimile: (212) 446-4900                     Facsimile: (202) 879-5200

*Counsel for Ally Financial Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------
                                    )
In re:                              )  Case No. 12-12020 (MG)
                                    )
RESIDENTIAL CAPITAL, LLC, et al.,   )  Chapter 11
                                    )
                    Debtors.        )  Jointly Administered
                                    )
---------------------------------------------------------

**ALLY FINANCIAL INC.'S MOTION FOR AN**
**ORDER ENFORCING THE COURT'S ORDER GRANTING**
**DEBTORS' MOTION FOR AN ORDER UNDER BANKRUPTCY**
**CODE SECTIONS 105(A) AND 363(B) AUTHORIZING THE DEBTORS**
**TO ENTER INTO A PLAN SUPPORT AGREEMENT WITH ALLY FINANCIAL**
**INC., THE CREDITORS' COMMITTEE, AND CERTAIN CONSENTING CLAIMANTS**

**TO THE HONORABLE JUDGE GLENN,**
**UNITED STATES BANKRUPTCY JUDGE:**

Ally Financial Inc. ("***AFI***," together with its non-debtor subsidiaries and affiliates,

collectively, "***Ally***") submits this motion (the "***Motion***")[1] for entry of an order, substantially in

the form attached hereto as **Exhibit A** (the "***Order***"), enforcing the Court's *Order Granting*

*Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing*

*the Debtors to Enter Into a Plan Support Agreement with Ally Financial Inc., the Creditors'*

---

[1]        Capitalized terms used but not defined in this Motion have the meanings given to them in the *Second
Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of
Unsecured Creditors* [ECF No. 6065-1] (the "***Plan***").

*Committee, and Certain Consenting Claimants* [ECF No. 4098] (the "***PSA Order***").  In support

hereof, Ally submits the *Declaration of Talley R. Parker, Esq.*, which is attached hereto as

**Exhibit B** (the "***Parker Declaration***"), and respectfully states as follows:

## INTRODUCTION

This Motion presents a straightforward question:  If a prepetition plan support agreement

was (a) expressly superseded by a subsequent, postpetition plan support agreement that was

approved by the Court, and (b) if the prepetition plan support agreement expired pursuant to its

terms, can a party rely on the prepetition plan support agreement to support a breach of contract

action after the Court confirmed a plan that embodies the terms set forth in the postpetition plan

support agreement?  The answer is "no."  But Mr. Philip Roger Flinn II ("***Flinn***") and his

counsel contend otherwise.  Flinn maintains that Ally is in breach of contract for allegedly

violating the terms of the prepetition plan support agreement executed in connection with the

Debtors' commencement of these chapter 11 cases.  Despite its good-faith efforts to resolve this

matter informally through letters, e-mails, and phone calls, Ally has been left with no alternative

but to bring this matter to the Court, which retains jurisdiction over the PSA Order.[2]

## BACKGROUND

### A.    The Underlying Litigation

Debtor GMAC Mortgage, LLC ("***GMACM***") employed Flinn as a Systems Engineering

Manager at a data center in Lewisville, Texas (the "***Lewisville Data Center***").  (Parker Decl. ¶ 3.)

On or about August 9, 2012, Ally's Global Security Department obtained information

that Flinn and an associate were engaged in an inappropriate procurement kickback scheme.

(*Id.* ¶ 4.)  The scheme involved the misappropriation of goods and services invoiced to the

---

[2]    *See* PSA Order, ¶ 13 ("This Court shall retain jurisdiction with respect to all matters arising or related to the implementation of this Order.").

Lewisville Data Center. (*Id.*) After learning of the kickback scheme, two individuals in Ally's Global Security Department questioned Flinn and his associate about their dealings with various vendors. (*Id.* ¶ 5.) As a result of Ally's investigation, Flinn's employment was terminated on or about September 14, 2012. (*Id.*)

Ally and GMACM initially filed suit against Flinn on September 20, 2012, in the U.S. District Court for the Eastern District of Texas, Civil Action No. 4:12-CV-600 (the "***Texas Action***"). (*Id.* ¶ 6.) After the initial filing, Ally and GMACM learned more information about Flinn's scheme, so they amended their initial complaint on October 24, 2012. (*Id.* ¶ 7.) Debtor ResCap joined Ally and GMACM (collectively, the "***Plaintiffs***") through the first amended complaint, and the Plaintiffs also added additional defendants. (*Id.*) On January 22, 2013, the Plaintiffs filed their second amended complaint, alleging that Flinn, among other things, tortuously interfered with contracts and business relations, breached his duty of loyalty to the Plaintiffs, converted the Plaintiffs' property, committed fraud on the Plaintiffs, and participated in a conspiracy. (*Id.* ¶ 8.) The Plaintiffs filed a third amended complaint on March 27, 2013, and it is the operative complaint in the Texas Action. (*Id.* ¶ 9.)

In a bizarre turn, Flinn's counsel sent Plaintiffs' counsel a letter on October 17, 2013, asserting that Ally was in breach of contract. (*Id.* ¶ 10.) Flinn's counsel contended that Ally breached the plan support agreement between the Debtors and Ally that was executed in connection with the Debtors' chapter 11 filing (the "***Original PSA***").[3] (*Id.*) To complete the folly, Flinn filed a counterclaim against Ally on this same theory. (*Id.*)

---

[3] The Original PSA was filed in these chapter 11 cases as Exhibit 8 to the *Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings* [ECF No. 6] (the "***First Day Declaration***").

3

At this point in the Texas Action, fact discovery has closed and the parties are due to file summary judgment motions on May 23, 2014.  (*Id.* ¶ 11.)

### B.    The Debtors' Plan Support Agreements

As the Court knows, the Debtors commenced these chapter 11 cases on May 14, 2012. The Debtors entered chapter 11 with a deal—namely, the Original PSA—with their ultimate parent, Ally.

Among a host of other things, the Original PSA contained the following provision, which is the alleged basis of Flinn's breach of contract claim against Ally:

> Subject to the Debtors' satisfaction of their obligations set forth in Section 3.1, on the Effective Date of the Plan, Ally shall release the Debtors and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates, and representatives and their respective properties from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, arising from or related in any way to the Debtors, including those that any Ally entity would have been legally entitled to assert against any of the parties above in their own right (whether individually or collectively), other than the Allowed Claims.

Original PSA § 2.3.[4]  The plan contemplated by the Original PSA, however, never came to fruition.  In fact, the Original PSA terminated in accordance with its terms on or around February 28, 2013—approximately eight months before Flinn's counsel notified Ally that the latter had allegedly breached a contract.[5]  Contrary to Flinn's understanding, the Debtors' chapter 11 cases were much more storied.

---

[4]    Capitalized terms used in the above block quotation have the meanings given to them in the Original PSA.

[5]    *See Debtors' Omnibus Reply to Responses to (I) Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing the Debtors to Appoint Lewis Kruger as Chief Restructuring Officer and (II) Debtors' Motion for the Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof*, ¶ 16 (Mar. 1, 2013) [ECF No. 3074] (the "**Debtors' CRO Reply**").

For the first five months of 2013, the Debtors, Ally, the Creditors' Committee, and dozens of other parties in interest were engaged in intensive mediation surrounding the Debtors' chapter 11 plan process.  Ultimately, the mediator brokered a consensual deal that was made manifest in a *new* plan support agreement among the Debtors, the Creditors' Committee, Ally, and certain consenting claimants (the "***Operative PSA***").  The Operative PSA was filed with the Court on May 13, 2013, and was approved by the Court on June 26, 2013.[6]  Critically, the Operative PSA plainly states that it "***supersedes in all respects*** the [Original PSA]."[7]

On December 11, 2013, the Court confirmed the Plan, the material terms of which were based on the Operative PSA—not the Original PSA.  Importantly, neither the Operative PSA nor the confirmed Plan contains a provision similar to section 2.3 of the Original PSA.  Instead, the Ally Release in the confirmed Plan provides:

> Except with respect to the Ally Contract Claims, on and as of the Effective Date of the Plan, the Ally Released Parties shall release the Creditors' Committee, the Debtors, and the Consenting Claimants and their respective successors and assigns, members, partners, advisors, and Representatives, in their capacities as such, from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise arising from or related to the Debtors' liquidation, including the negotiation, formulation, or preparation of the Plan Support Agreement, the Plan, the Disclosure Statement, and any other Plan Documents and related disclosures, as well as any counterclaims in commenced or tolled litigation with the Debtors or the Consenting Claimants.

(Plan Art. IX.F.)  Notably, Ally did not release the Debtors' employees, including Flinn, in the confirmed Plan.

---

[6]    *See Order Granting Debtors' Motion for an Order Under Bankruptcy Code Sections 105(A) and 363(B) Authorizing the Debtors to Enter Into a Plan Support Agreement with Ally Financial Inc., the Creditors' Committee, and Certain Consenting Claimants* (June 26, 2013) [ECF No. 4098].

[7]    *See* Operative PSA, § 7.2 (emphasis added).

Finally, it is important to note that Flinn and his counsel participated in the Debtors'

chapter 11 cases.  Flinn filed, among other things, a lift-stay motion on February 13, 2014 [ECF

No. 3134], a proof of claim against Debtor ResCap on November 5, 2012 [Claim No. 2401], and

an objection to the Plan on October 22, 2013 [ECF No. 5422].[8]

## JURISDICTION

The Court has jurisdiction over this matter pursuant to the terms of the PSA Order and 28

U.S.C. §§ 157 and 1334.  Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.  The

statutory predicates for the relief sought herein are section 105(a) of the Bankruptcy Code and

Bankruptcy Rule 9020.

## RELIEF REQUESTED

By its Motion, Ally respectfully requests entry of the Order enforcing the PSA Order and

clarifying that the Original PSA was superseded in all respects.

## ARGUMENT

Flinn's reliance on the Original PSA is completely misplaced.  The Court, therefore,

should enforce the PSA Order by making clear that the Original PSA was superseded.

## I.    Flinn's Reliance On The Original PSA Is Misplaced.

Flinn's misguided contention is that, through the Original PSA, Ally released claims

against the Debtors' employees, including Flinn.  As such, Flinn argues that the Plaintiffs' suit

against him is in breach of the Original PSA.  As explained more fully below, however, Flinn

woefully misunderstands the legal effect of the Original PSA and the Court's PSA Order.

Ally does not dispute that the Original PSA, as quoted above, contained a release of the

Debtors' employees.  *See* Original PSA, § 2.3.  Nevertheless, the Original PSA was contingent

---

[8]    Flinn's objection to the Plan was consensually resolved and subsequently withdrawn.

and at all times subject to the conditions precedent in section 5.1 of that agreement. *See id.* The most significant conditions precedent were: (a) confirmation of a chapter 11 plan in accordance with the plan term sheet that was attached to the Original PSA; and (b) occurrence of the plan effective date contemplated under the Original PSA and associated milestones.

As even a casual observer of the Debtors' chapter 11 cases knows, however, the plan contemplated by the Original PSA ***was never*** confirmed. Flinn and his counsel know this—Ally has told them numerous times. Moreover, as the Debtors stated in a pleading on March 1, 2013, the Original PSA terminated in accordance with its terms on or around February 28, 2013.[9] Instead, as described above, the Debtors and their stakeholders engaged in a months-long mediation process that yielded the Operative PSA.

The Court approved the Operative PSA on June 26, 2013. The Operative PSA clearly and unambiguously states that it "***supersedes in all respects*** the [Original PSA]." Operative PSA, § 7.2. When it approved the Operative PSA via the PSA Order, the Court paved the way for the Debtors to propose a plan pursuant to that plan support agreement—***not*** the Original PSA as Flinn posits. And that is precisely what the Debtors and Creditors' Committee did: they proposed the Plan, which was confirmed by the Court on December 12, 2013, that contains a release substantially different than the Ally release in the Original PSA. Stated differently, Ally has not released Flinn for his tortious conduct at the Lewisville Data Center. Therefore, Ally respectfully requests that the Court enter the Order, in furtherance of the PSA Order, making clear that the Original PSA was superseded by the Operative PSA.[10]

---

[9]    *See* Debtors' CRO Reply, ¶ 16.

[10]    Ally has not, at this stage, sought to recover its fees and costs related to this matter. Nevertheless, Ally reserves its rights to do so in the future if it must take further action to resolve this matter.

## CONCLUSION

For the foregoing reasons, Ally respectfully requests that the Court enter the Order,

making clear that the Original PSA was superseded in all respects and granting such other and

further relief as appropriate.

May 21, 2014                                    _/s/ Ray C. Schrock_____
New York, New York                             Richard M. Cieri
                                               Ray C. Schrock
                                               Justin R. Bernbrock
                                               KIRKLAND & ELLIS LLP
                                               601 Lexington Avenue
                                               New York, New York 10022
                                               Telephone: (212) 446-4800
                                               Facsimile: (212) 446-4900

                                               - and -

                                               Jeffrey S. Powell
                                               Daniel T. Donovan
                                               Judson D. Brown
                                               KIRKLAND & ELLIS LLP
                                               655 15th Street, N.W., Ste. 1200
                                               Washington, D.C. 20005
                                               Telephone: (202) 879-5000
                                               Facsimile: (202) 879-5200

                                               *Counsel to Ally Financial Inc.*

## EXHIBIT A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**ORDER GRANTING ALLY FINANCIAL INC.'S MOTION FOR**
**AN ORDER ENFORCING THE COURT'S ORDER GRANTING**
**DEBTORS' MOTION FOR AN ORDER UNDER BANKRUPTCY**
**CODE SECTIONS 105(A) AND 363(B) AUTHORIZING THE DEBTORS**
**TO ENTER INTO A PLAN SUPPORT AGREEMENT WITH ALLY FINANCIAL**
**INC., THE CREDITORS' COMMITTEE, AND CERTAIN CONSENTING CLAIMANTS**

Upon consideration of the motion (the "***Motion***")[1] of Ally Financial Inc. ("***AFI***,"

together with its non-debtor subsidiaries and affiliates, collectively, "***Ally***") for entry of an order

enforcing this Court's *Order Granting Debtors' Motion for an Order Under Bankruptcy Code*

*Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into a Plan Support Agreement*

*with Ally Financial Inc., the Creditors' Committee, and Certain Consenting Claimants*

[ECF No. 4098] (the "***PSA Order***"); and it appearing that this Court has jurisdiction to consider

the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of these

chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and

1409; and it appearing that this proceeding on the Motion is a core proceeding pursuant to

28 U.S.C. § 157(b); and sufficient notice of the Motion having been given; and it appearing that

no other or further notice need be provided; and after due deliberation and sufficient cause

appearing therefor,

---

[1]     Capitalized terms used but not defined herein have the meanings provided to such terms in the Motion.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED to the extent set forth below for the reasons set forth on the record at the hearing on the Motion.

2.      For the avoidance of doubt, the Operative PSA superseded the Original PSA in all respects.

3.      Ally will be entitled to recover its costs, including reasonable attorneys' fees, if it must take further action to enforce this Order.

4.      Ally is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

5.      Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

6.      All objections to the Motion or the relief requested therein, if any, that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits.

7.      This Court shall retain jurisdiction with respect to all matters arising or related to the implementation of this Order.

Dated: _____, 2014
            New York, New York

                                        _____
                                        THE HONORABLE MARTIN GLENN
                                        UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

**Parker Declaration**

Richard M. Cieri
Ray C. Schrock
Justin R. Bernbrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Jeffrey S. Powell
Daniel T. Donovan
Judson D. Brown
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Ste. 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Counsel for Ally Financial Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------
                                            )
In re:                                      )    Case No. 12-12020 (MG)
                                            )
RESIDENTIAL CAPITAL, LLC, et al.,           )    Chapter 11
                                            )
                            Debtors.        )    Jointly Administered
                                            )
------------------------------------------------------------

**DECLARATION OF TALLEY R. PARKER, ESQ.**

_____

I, Talley R. Parker, Esq., pursuant to 28 U.S.C. § 1746, hereby declare as follows:[1]

1.     I make this declaration on the basis of my personal knowledge of the facts stated

herein, except to the extent that I make reference to documents.  When referencing documents,

my knowledge is based upon my review of documents provided to me during the course of my

representation of Ally Financial Inc.

2.     I am an attorney based in Texas.

3.     Debtor GMAC Mortgage, LLC ("**GMACM**") employed Mr. Philip Roger Flinn II

("**Flinn**") as a Systems Engineering Manager at a data center in Lewisville, Texas

(the "***Lewisville Data Center***").

---

[1]     Capitalized terms used but not defined in this Declaration have the meanings given to them in the Motion
to which this Declaration is attached as Exhibit B.

4.      On or about August 9, 2012, Ally's Global Security Department obtained information that Flinn and an associate were engaged in an inappropriate procurement kickback scheme.  The scheme involved the misappropriation of goods and services invoiced to the Lewisville Data Center.

5.      After learning of the kickback scheme, two individuals in Ally's Global Security Department questioned Flinn and his associate about their dealings with various vendors.  As a result of Ally's investigation, Flinn's employment was terminated on or about September 14, 2012.

6.      On behalf of Ally and GMACM, I initially filed suit against Flinn on September 20, 2012, in the U.S. District Court for the Eastern District of Texas, Civil Action No. 4:12-CV-600 (the "***Texas Action***").  The original complaint is attached hereto at **Exhibit 1**.

7.      After the initial filing, Ally and GMACM learned more information about Flinn's scheme, so I amended the initial complaint on October 24, 2012, by filing a first amended complaint.  Debtor ResCap joined Ally and GMACM (collectively, the "***Plaintiffs***") through the first amended complaint, and the Plaintiffs also added additional defendants, including Flinn's associate.  The first amended complaint is attached hereto as **Exhibit 2**.

8.      On January 22, 2013, I caused the Plaintiffs' second amended complaint to be filed, alleging that Flinn, among other things, tortuously interfered with contracts and business relations, breached his duty of loyalty to the Plaintiffs, converted the Plaintiffs' property, committed fraud on the Plaintiffs, and participated in a conspiracy.  The second amended complaint is attached hereto as **Exhibit 3**.

9.      On March 27, 2013, I caused the Plaintiffs' third amended complaint to be filed, and that complaint is the operative complaint in the Texas Action.  A copy of the third amended complaint is attached hereto as **<u>Exhibit 4</u>**.

10.     On October 17, 2013, I received a letter from Flinn's counsel, who asserted that Ally was in breach of contract.  Flinn's counsel contended that Ally breached the plan support agreement between the Debtors and Ally that was executed in connection with the Debtors' chapter 11 filing.  Flinn has also filed a counterclaim in the Texas Action based on this breach of contract theory.  A copy of the October 17, 2013 letter is attached hereto as **<u>Exhibit 5</u>**.

11.     At this point in the Texas Action, fact discovery has closed and the parties are due to file summary judgment motions on May 23, 2014.

*[Remainder of page intentionally left blank]*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 21, 2014.

Talley R. Parker, Esq.

**Exhibit 1**

**Original Complaint**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| ALLY FINANCIAL INC. and its | § | |
| indirectly wholly-owned subsidiary, | § | |
| GMAC MORTGAGE, LLC, | § | |
| | § | |
| Plaintiffs, | § | Civil Action No. 4:12-CV-600 |
| | § | |
| v. | § | |
| | § | |
| PHILLIP ROGER FLINN, II, | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFFS' COMPLAINT

Plaintiffs Ally Financial Inc. and its indirectly wholly-owned subsidiary, GMAC Mortgage, LLC (collectively, "Ally" or the "Company"), bring this Complaint against Defendant Phillip Roger Flinn, II ("Flinn").

## I.  PARTIES

1.      Ally Financial Inc. is a Delaware corporation with its principal place of business at 200 Renaissance Center, Detroit, Michigan 48265.

2.      GMAC Mortgage, LLC is a Delaware limited liability company with its principal place of business at 1100 Virginia Drive, Fort Washington, Pennsylvania 19034.

3.      Flinn is a natural person who resides at 10401 Samantha Drive, Frisco, Texas 75035 and is a citizen of the State of Texas.  Flinn may be served with process at the foregoing address or wherever he may be found.

## II.  JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1).  Ally Financial Inc. is a citizen of Delaware and Michigan, GMAC Mortgage, LLC is

a citizen of Delaware and Pennsylvania, and Flinn is a citizen of Texas. The amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      This Court has personal jurisdiction over Flinn because he is a resident of Texas.

6.      Venue is proper pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to Ally's claims occurred in the Eastern District of Texas.

### III. THE FACTS

7.      Ally is one of the world's largest automotive financial services companies. As the official preferred source of financing for General Motors, Chrysler, Saab, Suzuki, Fiat and Thor Industries vehicles, Ally offers a full suite of automotive financing products and services in key markets around the world. Ally's other business units include mortgage operations and commercial finance, and the Company's subsidiary, Ally Bank, offers online retail banking products.

8.      Flinn joined Ally in 2001 as an Operations Manager at the Company's Lewisville, Texas data center. In his role as Operations Manager, Flinn was responsible for the maintenance and upkeep at the Company's two data centers. Flinn was entrusted with an $8.754 million budget to ensure that the Company's data centers were, at all times, functioning and fully operational.

9.      On or about August 9, 2012, Ally's Global Security Department was provided information that suggested that Flinn was engaged in an inappropriate procurement kickback scheme. The scheme involved the misappropriation of goods and services invoiced to the Company's Lewisville data center.

10.     After learning of the kickback scheme, two individuals in Ally's Global Security Department flew from Charlotte, North Carolina to Dallas, Texas and questioned Flinn at the

Lewisville data center about his dealings with various vendors, including but not limited to Sandstrom Electrical Company ("Sandstrom Electrical").

11.     During these interviews, Ally discovered that Flinn and John Sandstrom ("Sandstrom"), the Vice President of Sandstrom Electrical, have been friends for more than 25 years, that Flinn and Sandstrom often go hunting and fishing together, that Flinn received 10 acres of land from Sandstrom for a purchase price of $10.00, that Flinn is currently three years into building a house on the land sold to him by Sandstrom, and that Flinn and Sandstrom own a twin engine plane together.  Ally's Global Security Department also discovered that Sandstrom regularly submits invoices for work performed on days that he visits the Lewisville data center but does not actually provide any services, that Sandstrom has been paid for work that he started but did not complete, that Sandstrom has performed services at inflated prices, that most of Sandstrom's invoices provide little to no description of the services allegedly provided to Ally, and that Flinn has directed subordinate employees to approve all of these invoices for payment.

12.     Flinn allegedly created a barter system with Sandstrom and possibly other vendors whereby the vendors provide goods and perform services for Flinn's personal use and, in turn, Flinn ensures that the vendors' invoices are paid by Ally.  Flinn may also be receiving a financial benefit from monies paid by Ally.

13.     A number of products purchased by the Company purportedly for use at the Lewisville data center were delivered to Flinn's ranch.  As an example, night vision security cameras were purchased by Ally.  Flinn has admitted that he charged the cameras to Ally's account with a local vendor and diverted them to his ranch house for his personal use.

14.     Ally's investigation remains ongoing and in its initial stages, but the Company has terminated Flinn's employment.  Flinn has ceased cooperating in the investigation and will likely

Case 4:12-cv-00600-ALM    Document 1    Filed 09/20/12    Page 4 of 7    PageID #: 4

"take the fifth" regarding the scope and extent of his wrongdoing.  Ally is therefore pursuing its
civil remedies in this action.

## IV. CAUSES OF ACTION

### A.    <u>Misappropriation</u>

15.    Ally incorporates and adopts by reference each and every allegation in the
preceding paragraphs of this Complaint.

16.    During his employment with Ally, Flinn was entrusted with Ally's confidential
information, vendor relationships, credit relationships, employee relationships and the goods and
services associated with these relationships and information.  While employed by Ally, Flinn
used this confidential information for personal gain without Ally's authorization or consent.  In
addition to misappropriating the confidential information, Flinn also misappropriated vendor and
credit relationships to divert goods and services to himself for his personal gain.  He further
misappropriated the services of Ally's employees to facilitate the diversion of goods and services
for his own personal gain.  Flinn's misappropriation is the proximate cause of damages to Ally.

### B.    <u>Tortious Interference with Business Relations</u>

17.    Ally incorporates and adopts by reference each and every allegation in the
preceding paragraphs of this Complaint.

18.    Flinn willfully and intentionally interfered with the business relationships between
Ally and its employees and Ally and its vendors.  More specifically, he had vendors bill the
Company for goods or services that were either diverted to him for his personal use, that were not
performed for Ally, or that were performed or provided at inflated prices.  Flinn interfered with
Ally's relationships with its employees by using them to facilitate the transactions complained of
with the vendors.  Ally's employment relationship with these employees included an
understanding that these employees were being paid to work for the benefit of Ally and that they

would act in the best interests of Ally and safeguard Ally's assets, and ensure that Ally received

what it paid for in transactions with vendors.  Flinn abused his authority by interfering with these

relationships and by directing employees to take actions inconsistent with these duties.  Flinn's

actions are willful and malicious and intended to interfere with the relationships between Ally

and its employees and vendors.  These actions were without privilege or excuse and were the

proximate cause of damages to Ally.

### C.   <u>Breach of Fiduciary Duty and Duty of Loyalty</u>

19.   Ally incorporates and adopts by reference each and every allegation in the

preceding paragraphs of this Complaint.

20.   Flinn owed a fiduciary duty and a duty of loyalty to Ally.  Flinn was placed in a

position of trust and confidence at Ally.  As Operations Manager responsible for several

facilities, he was entrusted with company assets, vendor relationships, employees, and

purchasing authority.  Flinn breached his fiduciary duty and duty of loyalty by using Ally

employees and vendors for his personal gain.  Further, Flinn breached his fiduciary duty and duty

of loyalty by failing to safeguard company funds and assets.  He also diverted goods and services

paid for by Ally for his personal gain.  Flinn also breached his fiduciary duty and duty of loyalty

by attempting to destroy evidence relating to his conduct.  Flinn's breaches of his fiduciary duty

and duty of loyalty are the proximate cause of damages to Ally.

### D.   <u>Conversion</u>

21.   Ally incorporates and adopts by reference each and every allegation in the

preceding paragraphs of this Complaint.

22.   Flinn intentionally committed acts which constitute unlawful conversion of Ally's

property.  Specifically, Flinn had Ally pay for goods and services which were diverted to Flinn.

Flinn used his position of trust with Ally to derive financial benefits which belonged to Ally. These acts of conversion by Flinn are the proximate cause of damages to Ally.

**E.      Exemplary Damages**

23.      Ally incorporates and adopts by reference each and every allegation in the preceding paragraphs of this Complaint.

24.      Flinn's conduct complained of herein was willful and done with malice, and in reckless disregard to the rights of Ally.  Flinn was further grossly negligent in his actions.  Ally is therefore entitled to recover exemplary damages.

**F.      Constructive Trust**

25.      Ally incorporates and adopts by reference each and every allegation in the preceding paragraphs of this Complaint.

26.      Flinn arranged for the transactions complained of herein.  The goods and services were diverted to Flinn for his personal benefit.  Further, Flinn caused Ally to pay money to vendors for which no adequate explanation has been provided by the vendors to insure that Ally received anything in return.  There are, therefore, funds paid and unaccounted for.  With respect to all goods and services diverted to Flinn, and to the extent any of the funds paid were diverted to Flinn, and he retained them for his own personal gain, Ally requests that the Court impose a constructive trust on all of the funds, goods and services obtained by Flinn.  Ally requests that the constructive trust extend to all real estate and personal property (including, but not limited to Flinn's airplane) to which funds, goods, or services were diverted.

## V.  PRAYER FOR RELIEF

Ally respectfully prays that judgment be entered in its favor against Flinn and that it be granted the following relief:

(a)    Actual damages;

(b)    Exemplary damages;

(c)    An order disgorging Flinn of his salary for the period of time he was breaching fiduciary duties and duties of loyalty;

(d)    Costs of Court;

(e)    Pre-judgment interest;

(f)    Post-judgment interest;

(g)    A constructive trust;

(h)    Attorneys fees;

(i)    And such other relief to which Ally has shown itself justly entitled.

Dated:  September 20, 2012                              Respectfully submitted,


By: /s/ William L. Davis
    William L. Davis, Esq.
    Texas Bar No. 05563800
    davisw@jacksonlewis.com
    Talley R. Parker, Esq.
    Texas Bar No. 24065872
    talley.parker@jacksonlewis.com

JACKSON LEWIS LLP
500 N. Akard, Suite 2500
Dallas, Texas 75201
Telephone:  (214) 520-2400
Fax:  (214) 520-2008

**ATTORNEYS FOR PLAINTIFFS
ALLY FINANCIAL INC. and
GMAC MORTGAGE, LLC**

JS 44 (Rev. 09/11)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Ally Financial Inc., and its indirectly wholly-owned subsidiary, GMAC Mortgage, LLC

**(b)** County of Residence of First Listed Plaintiff   Wayne, Michigan
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
William L. Davis and Talley R. Parker, Jackson Lewis LLP, 500 N. Akard, Suite 2500, Dallas, TX 75201, (214) 520-2400

## DEFENDANTS
Phillip Roger Flinn, II

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Richard C. Jenkins, 5641 Monticello Avenue, Dallas, TX 75206, (214) 748-5800

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☒ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | **Habeas Corpus:** | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district *(specify)*
- ☐ 6  Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332(a)(1)
Brief description of cause:
Suit against former employee who misappropriated goods & services from employer & approved invoices for work not performed.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*   JUDGE                        DOCKET NUMBER

DATE
09/20/2012

SIGNATURE OF ATTORNEY OF RECORD
/s/ William L. Davis

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

Case 4:12-cv-00609-ALM   Document 1-1   Filed 09/26/12   Page 2 of 2   PageID #: 9

JS 44 Reverse  (Rev. 09/11)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.        (a) Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

        **(b) County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

        **(c) Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.        Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.

United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; federal question actions take precedence over diversity cases.)

**III.        Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.        Nature of Suit**.  Place an "X" in the appropriate box.  If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit.  If the cause fits more than one nature of suit, select the most definitive.

**V.        Origin**.  Place an "X" in one of the seven boxes.

Original Proceedings.  (1) Cases which originate in the United States district courts.

Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.

Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.

Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.

Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment.  (7) Check this box for an appeal from a magistrate judge's decision.

**VI.        Cause of Action**.  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity**.        Example:        U.S. Civil Statute: 47 USC 553
                                Brief Description: Unauthorized reception of cable service

**VII.        Requested in Complaint**.  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand.  In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.        Related Cases**.  This section of the JS 44 is used to reference related pending cases if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature**.  Date and sign the civil cover sheet.

## <u>Exhibit 2</u>

**First Amended Complaint**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| ALLY FINANCIAL INC., | § | |
| RESIDENTIAL CAPITAL, LLC, and | § | |
| GMAC MORTGAGE, LLC, | § | |
| | § | |
| Plaintiffs, | § | Civil Action No. 4:12-CV-600-RC-ALM |
| | § | |
| v. | § | |
| | § | |
| PHILLIP ROGER FLINN, II | § | |
| RALPH "RUSTY" CAVES, | § | |
| JOHN W. SANDSTROM, and | § | |
| SANDSTROM ELECTRICAL COMPANY | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs Ally Financial Inc. ("Ally"), Ally's wholly-owned subsidiary Residential Capital, LLC ("ResCap"), and ResCap's wholly-owned subsidiary GMAC Mortgage, LLC ("GMAC") (collectively, "Plaintiffs") bring this First Amended Complaint against Defendants Phillip Roger Flinn, II ("Flinn"), Ralph "Rusty" Caves ("Caves"), John W. Sandstrom ("Sandstrom"), and Sandstrom Electrical Company ("Sandstrom Electrical") (collectively, "Defendants").[1]

## I.  PARTIES

1.      Ally is a Delaware corporation with its principal place of business at 200 Renaissance Center, Detroit, Michigan 48265.

2.      ResCap is a Delaware limited liability company with its principal place of business at One Meridian Crossings, Minneapolis, Minnesota 55423.

---

[1] Pursuant to FED. R. CIV. P. 15(a)(1)(B), this amended pleading is being filed within 21 days of service of Flinn's Rule 12(b) motion to dismiss, which was filed and served on October 3, 2012.

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

3. GMAC is a Delaware limited liability company with its principal place of business at 1100 Virginia Drive, Fort Washington, Pennsylvania 19034.

4. Flinn is a natural person who resides at 10401 Samantha Drive, Frisco, Texas 75035 and is a citizen of the State of Texas. Flinn has been served with process, and he has appeared in this lawsuit.

5. Caves is a natural person who resides at 2311 Castle Rock Road, Arlington, Texas 76006 and is a citizen of the State of Texas. Caves can be served with process at the foregoing address or wherever he may be found.

6. Sandstrom is a natural person who resides at 6736 County Road 156, Bluff Dale, Texas 76433 and is a citizen of the State of Texas. Sandstrom can be served with process at the foregoing address or wherever he may be found.

7. Sandstrom Electrical is a Texas corporation with its principal place of business at 13231 Bee Street, Farmers Branch, Texas 75234. It may be served with process by serving its registered agent, Sandra Sandstrom, 13231 Bee Street, Farmers Branch, Texas 75234.

## II. JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1). Ally is a citizen of Delaware and Michigan, ResCap is a citizen of Delaware and Minnesota, GMAC is a citizen of Delaware and Pennsylvania, Flinn is a citizen of Texas, Caves is a citizen of Texas, Sandstrom is a citizen of Texas, and Sandstrom Electrical is a citizen of Texas. The amount in controversy exceeds $75,000, exclusive of interest and costs.

9. On May 14, 2012, ResCap and each of its subsidiaries, including GMAC, filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York. ResCap and GMAC do not need the approval of the bankruptcy court to pursue their claims against the Defendants because the filing of a petition in bankruptcy operates as a

stay only as to claims brought against the debtor, i.e. claims where the debtor is in a defensive posture. *See, e.g.*, *In re Versoy*, 306 Fed. App'x 65, 68 (5th Cir. 2009) ("By the terms of 11 U.S.C. § 362(a), the automatic stay only applies to proceedings „against the debtor.‟"); *McMillan v. MBank Fort Worth, N.A.*, 4 F.3d 362, 366 (5th Cir. 1993) (same); *see also* 10 Collier on Bankruptcy P 6009.04 (16th ed. rev 2012) ("Under section 362(a), the filing of the petition operates as a stay, applicable to all entities, of actions taken *against* the debtor.  Thus, the automatic stay does not apply to actions *initiated by the debtor* or the trustee such that the trustee may proceed and the defendant may defend those actions without need for relief from the stay.").

10.     This Court has personal jurisdiction over Flinn, Caves, Sandstrom, and Sandstrom Electrical because they are each residents of Texas.

11.     Venue is proper pursuant to 28 U.S.C. § 1391(a) because, as set forth more fully below, a substantial part of the events or omissions giving rise to Plaintiffs‟ claims in this matter occurred in the Eastern District of Texas.  As a result, a significant number of the material witnesses and relevant documents are in the Eastern District of Texas.

### III. THE FACTS

12.     Ally is one of the world‟s largest automotive financial services companies.  Ally offers a full suite of automotive financing products and services in key markets around the world.

13.     ResCap is the holding company for most of the residential mortgage operations of Ally.  The company originates, services, and securitizes mortgage loans in the US and abroad.  It also issues mortgage- and asset-backed securities and provides lines of credit to other residential mortgage writers.

14.     GMAC is one of the largest residential mortgage servicing companies in the US.  The company offers consumers purchasing and refinancing, FHA loans, and flexible down payment options.  GMAC is part of the ResCap mortgage arm of Ally.

15.     Flinn joined GMAC in 2001 as an Operations Manager at ResCap and GMAC"s Lewisville, Texas data center.  In his role as Operations Manager, Flinn was responsible for the maintenance and upkeep at ResCap and GMAC"s two data centers.[2]  Flinn was entrusted with an $8.754 million budget to ensure that the data centers were, at all times, functioning and fully operational.

16.     Caves started working as a Project Manager for GMAC in 2002.  He was initially tasked with moving servers and applications to the Lewisville, Texas data center.  Eventually, Caves was promoted into the Data Center Manager position.  Caves reported to Flinn in this role and assisted Flinn with his job responsibilities.  One of Caves" main functions was to review and approve vendor invoices for payment.

17.     On or about August 9, 2012, Ally"s Global Security Department was provided information that suggested that Flinn and Caves were engaged in an inappropriate procurement kickback scheme.  The scheme involved the misappropriation of goods and services invoiced to the Lewisville, Texas data center.

18.     After learning of the kickback scheme, two individuals in Ally"s Global Security Department flew from Charlotte, North Carolina to Dallas, Texas and questioned Flinn and Caves at the Lewisville, Texas data center about their dealings with various vendors, including but not limited to Sandstrom and Sandstrom Electrical.

19.     During these interviews, Ally discovered that Flinn and Sandstrom, the Vice President of Sandstrom Electrical, have been friends for more than 25 years, that Flinn and Sandstrom often go hunting and fishing together, that Flinn received 10 acres of land from Sandstrom with a stated purchase price in a deed of $10.00, that Flinn is currently three years

---

[2] The two data centers are located in Lewisville, Texas and Fort Washington, Pennsylvania.

into building a house on the land sold to him by Sandstrom, and that Flinn and Sandstrom own a twin engine plane together.

20.     Ally"s Global Security Department also discovered that Sandstrom Electrical regularly submits invoices for work performed on days that Sandstrom visits the Lewisville, Texas data center but does not actually provide any services, that Sandstrom Electrical has been paid for work that it started but did not complete, that Sandstrom Electrical has performed services at inflated prices, that most of Sandstrom Electrical"s invoices provide little to no description of the services allegedly provided to Plaintiffs, and that Flinn has directed Caves to approve all of these invoices for payment.

21.     Since filing this lawsuit on September 20, 2012, Plaintiffs have learned that, in addition to the fraudulent activities described above, Sandstrom Electrical has submitted multiple invoices for what appears on the invoices to be the same work, that Flinn and Caves approved several unnecessary meal and lodging expenses for Sandstrom Electrical, and that Flinn and Caves approved an invoice purportedly for Sandstrom, an electrician licensed in Texas, to travel to Canada to perform routine electrical work.[3]

22.     Plaintiffs have also learned that a number of products purchased by Plaintiffs purportedly for use at the Lewisville, Texas data center were diverted to Flinn"s ranch house.  As an example, night vision security cameras were purchased by GMAC.  Flinn charged the cameras to GMAC"s account with a local vendor and diverted them to his ranch house for his personal use.  In addition, Caves approved thousands of dollars of purchases through this vendor for items that were clearly not for use at the Lewisville, Texas data center.  Caves observed several of these

---

[3] Plaintiffs have confirmed that the work allegedly performed by Sandstrom Electrical in Canada was in fact never performed.

**PLAINTIFFS' FIRST AMENDED COMPLAINT**                                                      **PAGE 5**

items, including tile and two front doors, at Flinn''s ranch house. Other building materials and equipment were also diverted to Flinn''s ranch house.

23.    Caves also benefited from the vendor invoicing improprieties. Caves, for example, obtained a microwave oven through a vendor and gave it to his daughter as a graduation gift. Caves approved the invoice from the vendor showing that the microwave was paid for by GMAC, not the vendor. Caves also claims that his personal computer was given to him as a gift by Flinn. Caves, however, approved an invoice showing that the computer was purchased by GMAC. Caves also purchased a power washer and expensed it to GMAC, having Flinn approve the reimbursement. The power washer was not for use by Plaintiffs and was never provided to Plaintiffs.

24.    With regard to the payment of invoices, Caves has advised the Ally investigators that he was not authorized to reject invoices submitted by Sandstrom Electrical and other vendors, and that if he did not immediately approve them, Flinn became agitated and demanded that they be approved and paid regardless of whether Caves knew what goods or services were provided.

25.    Caves told Ally''s investigators that he believes Flinn had created a barter system with Sandstrom Electrical and other vendors whereby the vendors provided goods and performed services at Flinn''s ranch house and, in turn, Flinn ensured that the vendors'' invoices were paid by Plaintiffs. It appears that Caves was complicit in this scheme.

26.    The Plaintiffs'' investigation remains ongoing, but GMAC has terminated Flinn and Caves'' employment. Thousands of dollars of materials and equipment purchased by Plaintiffs through Flinn''s and Caves'' efforts remain missing. Flinn and Caves have tried to cover up their wrongdoing with evasive responses to inquiries by the investigators.

# IV. CAUSES OF ACTION

## COUNT 1:
## MISAPPROPRIATION
## (FLINN AND CAVES)

27.     Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this First Amended Complaint.

28.     During their employment with GMAC, Flinn and Caves were entrusted with Plaintiffs" confidential information, vendor relationships, credit relationships, employee relationships and the goods and services associated with these relationships and information. While employed by GMAC, Flinn and Caves used this confidential information for personal gain without Plaintiffs" authorization or consent.  In addition to misappropriating the confidential information, Flinn and Caves also misappropriated vendor and credit relationships to divert goods and services to themselves for their personal gain.  They further misappropriated the services of the Plaintiffs" employees and vendors to facilitate the diversion of goods and services for their own personal gain.  They have also misappropriated the property ordered through the vendors and paid for by Plaintiffs.  Flinn and Caves" misappropriation is the proximate cause of damages to Plaintiffs.

## COUNT 2:
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
## (FLINN AND CAVES)

29.     Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this First Amended Complaint.

30.     Flinn and Caves willfully and intentionally interfered with the business relationships between Plaintiffs and their employees and Plaintiffs and their vendors.  More specifically, they had vendors bill the Plaintiffs for goods or services that were either diverted to them for their personal use, that were not performed for Plaintiffs, or that were performed or

provided at inflated prices. Flinn and Caves interfered with Plaintiffs" relationships with their employees by using them to facilitate the transactions complained of with the vendors. Plaintiffs" employment relationship with these employees included an understanding that these employees were being paid to work for the benefit of Plaintiffs and that they would act in the best interests of Plaintiffs and safeguard Plaintiffs" assets, and ensure that Plaintiffs received what they paid for in transactions with vendors. Flinn and Caves abused their authority by interfering with these relationships and by directing employees to take actions inconsistent with these duties. Flinn and Caves" actions are willful and malicious and intended to interfere with the relationships between Plaintiffs and their employees and vendors. These actions were without privilege or excuse and were the proximate cause of damages to Plaintiffs.

<u>COUNT 3:</u>
**BREACH OF DUTY OF LOYALTY AND FIDUCIARY DUTIES
(FLINN AND CAVES)**

31. Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this First Amended Complaint.

32. As employees, Flinn and Caves had a common law duty to serve Plaintiffs faithfully and honestly. Flinn and Caves were placed in positions of trust and confidence at GMAC. As Operations Manager responsible for several facilities, Flinn was entrusted with company assets, vendor relationships, employees, and purchasing authority. As the Data Center Manager, Caves also was entrusted with company assets, vendor relationships, employees, and purchasing authority. Flinn and Caves breached the duty of loyalty and their fiduciary duties by using the Plaintiffs" employees and vendors for their personal gain. Further, Flinn and Caves breached their duty of loyalty and fiduciary duties by failing to safeguard company funds and assets. Flinn and Caves also diverted goods and services paid for by Plaintiffs for their personal

gain. Flinn also breached his fiduciary duty and duty of loyalty by attempting to destroy evidence relating to his conduct.

33.     As a direct and proximate result of Flinn and Caves" breaches of their fiduciary duties and duties of loyalty, Plaintiffs have been damaged and are entitled to recover actual and punitive damages.  Plaintiffs are further entitled to restitution of compensation paid to Flinn and Caves during any period of breach.  Flinn and Caves" breaches, furthermore, were willful, malicious and intentional, entitling Plaintiffs to punitive damages.

### COUNT 4:
### CONVERSION
### (FLINN AND CAVES)

34.     Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this First Amended Complaint.

35.     Flinn and Caves intentionally committed acts which constitute unlawful conversion of Plaintiffs" property.  Specifically, Flinn and Caves had Plaintiffs pay for goods and services which were diverted to Flinn and Caves.  Flinn and Caves used their position of trust with Plaintiffs to derive financial benefits which belonged to Plaintiffs.  These acts of conversion by Flinn and Caves are the proximate cause of damages to Plaintiffs.

### COUNT 5:
### TEXAS THEFT LIABILITY ACT
### (FLINN AND CAVES)

36.     Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this First Amended Complaint.

37.     This cause of action is brought by Plaintiffs against Flinn and Caves pursuant to the Texas Theft Liability Act, TEX. CIV. PRAC. REM. CODE §§ 134.001 *et seq.*

38.     Plaintiffs are the owners of certain personal property that has value.  Flinn and Caves have knowingly, and without Plaintiffs effective consent, unlawfully appropriated,

secured, or stolen thousands of dollars of personal property from Plaintiffs.  In addition, Flinn and Caves had control over the disposition of services to which they were not entitled, and they knowingly diverted the services to their own benefit.

39.     As a result of this unlawful appropriation of Plaintiffs'' property and services, Plaintiffs have suffered actual damages.   Pursuant to TEX. CIV. PRAC. REM. CODE § 134.005(a)(1), Plaintiffs are entitled to recover such actual damages, together with an additional award of $1,000.00.  Pursuant to TEX. CIV. PRAC. REM. CODE § 134.005(b), Plaintiffs are also entitled to recover their court costs and reasonable and necessary attorney''s fees.

### <u>COUNT 6</u>:
### FRAUD
### (ALL DEFENDANTS)

40.     Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this First Amended Complaint.

41.     As delineated in more detail above, Sandstrom and Sandstrom Electrical made numerous representations to Plaintiffs while Sandstrom Electrical was serving as a vendor. Among other things, they  represented that Sandstrom Electrical actually performed the work that it requested to be paid for.   Flinn and Caves also made representations to the Plaintiffs. Specifically, Flinn and Caves represented that the Plaintiffs were receiving the benefit of the good and services they paid for when they approved the vendor invoices.  At the time Defendants made the above-referenced representations Defendants knew they were false, made them in bad faith or made them with a conscious indifference to their truth or falsity.  Defendants made these fraudulent misrepresentations and/or misrepresentations of material fact to induce Plaintiffs, among other things, pay for goods and services that Plaintiffs did not receive or benefit from.

42.     Plaintiffs reasonably relied on these misrepresentations and/or omissions and, as a result thereof, paid monies to various vendors, including Sandstrom Electrical.  Plaintiffs would

not have taken these actions, among others, had Plaintiffs known the falsity of and intentions behind Defendants" representations and/or Defendants" omissions of material fact. No reasonable person or entity would have interpreted the representations made by Defendants in any different way than Plaintiffs did.

43.  As a proximate result of Defendants" inducement to cause Plaintiffs to pay monies to vendors for goods and services that it did not receive or benefit from, Plaintiffs have suffered actual damages.

### COUNT 7:
### CONSPIRACY
### (ALL DEFENDANTS)

44.  Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this First Amended Complaint.

45.  As more particularly described above, Defendants entered into an agreement to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. One or more of the Defendants has, furthermore, committed an unlawful and overt act, as more thoroughly described above, in furtherance of the object or course of action of the conspiracy.

46.  Defendants" conspiracy has proximately caused Plaintiffs to incur actual damages.

### COUNT 8:
### BREACH OF CONTRACT
### (CAVES)

47.  Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this First Amended Complaint.

48.  Following the termination of his employment, Caves entered into a written agreement with Ally and GMAC that required him to, among other things, fully and completely cooperate with the Plaintiffs" investigation of vendor invoicing improprieties and to return all of Ally and GMAC"s property, including items that were purchased by Ally or GMAC.

49.     Caves has violated, and continues to violate, this written agreement because he has failed to perform his affirmative obligations thereunder.  Specifically, Caves has failed to disclose all information he knows about the transactions which are the subject of the Plaintiffs'' investigation and he has failed to provide truthful information.  In addition, there are numerous items of property purchased by the Plaintiffs that remain in Caves'' possession, including but not limited to a microwave oven, a phone headset, and a camera, each of which was purchased by one of the Plaintiffs.

50.     By failing to fully and completely cooperate with the Plaintiffs'' investigation and to return all of the Plaintiffs'' property, Caves has breached paragraphs 12 and 13 of his written agreement with Ally and GMAC.  Caves'' breaches of the written agreement are a proximate cause of damages to Plaintiffs.  As a result of Caves'' wrongful actions described above, Plaintiffs retained counsel to prosecute this claim.  Plaintiffs are, therefore, entitled to recover reasonable and necessary attorneys'' fees and costs incurred in the prosecution of this claim pursuant to, *inter alia*, TEX. CIV. PRAC. & REM. CODE § 38.001(8).

## FORFEITURE AND DISGORGEMENT

51.     Flinn and Caves breached their duty of loyalty to Plaintiffs, for which breach they are required to forfeit the compensation paid to them by Plaintiffs during the period of divided loyalties.  Flinn and Caves are also required to forfeit and income or property received by them "on the side" without disclosing their disloyal activities to Plaintiffs.  Such forfeiture should consist of all funds and property received by Flinn and Caves as a result of their breaches of fiduciary duty owed to Plaintiffs.

## PUNITIVE DAMAGES

52.     The tortious conduct committed by Defendants was aggravated by the willfulness, wantonness, and malice for which the law allows the imposition of punitive damages.  Their conduct was intentional, willful, wanton and without justification or excuse.

53.     Defendants engaged in the malicious, intentional, and unjustified actions described above with gross indifference to Plaintiffs" rights and with the conscious desire to interfere with Plaintiffs" employee and business relationships.  To punish such action and to deter others from similar wrongdoing, Defendants should be assessed punitive damages in an amount determined by the trier of fact.

54.     Defendants" conduct complained of herein was willful and done with malice, and in reckless disregard to the rights of Plaintiffs.  Defendants were further grossly negligent in their actions.  Plaintiffs are therefore entitled to recover punitive damages.

## CONSTRUCTIVE TRUST

55.     Flinn and Caves arranged for the transactions complained of herein.  The goods and services were diverted to Flinn and Caves for their personal benefit.  Further, Flinn and Caves caused Plaintiffs to pay money to vendors, including Sandstrom Electrical, for which no adequate explanation has been provided by the vendors to insure that Plaintiffs received anything in return.  There are, therefore, funds paid and unaccounted for.  With respect to all goods and services diverted to Flinn and Caves, and to the extent any of the funds paid were diverted to Flinn and Caves, and they retained them for their own personal gain, Plaintiffs request that the Court impose a constructive trust on all of the funds, goods and services obtained by Flinn and Caves.  Plaintiffs also request that the Court impose a constructive trust on all of the funds that were paid to Sandstrom Electrical for work that it was paid for but never performed, for work that it started but did not complete, for duplicate invoicing, and for work that it performed at

inflated prices.  Plaintiffs request that the constructive trust extend to all real estate and personal property (including, but not limited to Sandstrom and Flinn"s airplane) to which funds, goods, or services were diverted.

## V.  PRAYER FOR RELIEF

Plaintiffs respectfully pray that judgment be entered in their favor against Defendants and that they be granted the following relief:

(a)      Actual damages;

(b)      Punitive damages;

(c)      An order disgorging Flinn and Caves of their salary for the period of time they was breaching fiduciary duties and duties of loyalty;

(d)      Costs of Court;

(e)      Pre-judgment interest;

(f)      Post-judgment interest;

(g)      A constructive trust;

(h)      Attorneys" fees; and

(i)      Such other relief to which Plaintiffs have shown themselves justly entitled.

Dated:  October 24, 2012                          Respectfully submitted,


                                                 By: /s/ William L. Davis
                                                    William L. Davis, Esq.
                                                    Texas Bar No. 05563800
                                                    davisw@jacksonlewis.com
                                                    Talley R. Parker, Esq.
                                                    Texas Bar No. 24065872
                                                    talley.parker@jacksonlewis.com

                                                 JACKSON LEWIS LLP
                                                 500 N. Akard, Suite 2500
                                                 Dallas, Texas 75201
                                                 Telephone:  (214) 520-2400
                                                 Fax:  (214) 520-2008

                                                 **ATTORNEYS FOR PLAINTIFFS
                                                 ALLY FINANCIAL INC.,
                                                 RESIDENTIAL CAPITAL, LLC, and
                                                 GMAC MORTGAGE, LLC**


                              **<u>CERTIFICATE OF SERVICE</u>**


        On October 24, 2012, I electronically submitted the foregoing document with the Clerk of
Court for the U.S. District Court, Eastern District of Texas, using the electronic case filing
system of the Court.  I hereby certify that I have served all counsel of record electronically or by
another manner authorized by Federal Rule of Civil Procedure 5(b)(2), including the following:

        Judith P. Kenney
        Nat M. Kenney
        Judith P. Kenney & Associates, P.C.
        16475 Dallas Parkway, Suite 330
        Addison, Texas 75001


                                                 /s/ William L. Davis
                                                 William L. Davis

## Exhibit 3

**Second Amended Complaint**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| ALLY FINANCIAL INC., | § | |
| RESIDENTIAL CAPITAL, LLC, and | § | |
| GMAC MORTGAGE, LLC, | § | |
| | § | |
| Plaintiffs, | § | Civil Action No. 4:12-CV-600-RC-ALM |
| | § | |
| v. | § | |
| | § | |
| PHILLIP ROGER FLINN, II | § | |
| RALPH "RUSTY" CAVES, | § | |
| JOHN W. SANDSTROM, and | § | |
| SANDSTROM ELECTRIC COMPANY | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

Plaintiffs Ally Financial Inc. ("Ally"), Ally's wholly-owned subsidiary Residential Capital, LLC ("ResCap"), and ResCap's wholly-owned subsidiary GMAC Mortgage, LLC ("GMAC") (collectively, "Plaintiffs") bring this Second Amended Complaint against Defendants Phillip Roger Flinn, II ("Flinn"), Ralph "Rusty" Caves ("Caves"), John W. Sandstrom ("Sandstrom"), and Sandstrom Electric Company ("Sandstrom Electric") (collectively, "Defendants").[1]

## I. PARTIES

1. Ally is a Delaware corporation with its principal place of business at 200 Renaissance Center, Detroit, Michigan 48265.

2. ResCap is a Delaware limited liability company with its principal place of business at 1177 Avenue of the Americas, New York, NY 10036. Its sole member, GMAC

---

[1] This amended pleading is being filed in accordance with the Court's January 14, 2013 Order on Caves' Amended Fed. R. Civ. P. 12(e) Motion for More Definite Statement (Dkt. #50).

Mortgage Group, LLC, is a Delaware limited liability company with its principal place of business at 200 Renaissance Center, Detroit, Michigan 48265.

3. GMAC is a Delaware limited liability company with its principal place of business at 1100 Virginia Drive, Fort Washington, Pennsylvania 19034. Its sole member, GMAC Residential Holding Company, LLC is a Delaware limited liability company with its principal place of business at 3993 Howard Hughes Parkway, Suite 250, Las Vegas, Nevada 89169.

4. Flinn is a natural person who resides at 10401 Samantha Drive, Frisco, Texas 75035 and is a citizen of the State of Texas. Flinn has been served with process, and he has appeared in this lawsuit.

5. Caves is a natural person who resides at 2311 Castle Rock Road, Arlington, Texas 76006 and is a citizen of the State of Texas. Caves has been served with process, and he has appeared in this lawsuit.

6. Sandstrom is a natural person who resides at 6736 County Road 156, Bluff Dale, Texas 76433 and is a citizen of the State of Texas. Sandstrom's attorney has accepted service on behalf of Sandstrom, and Sandstrom has appeared in this lawsuit.

7. Sandstrom Electric is a Texas corporation with its principal place of business at 13231 Bee Street, Farmers Branch, Texas 75234. Sandstrom Electric's attorney has accepted service on behalf of Sandstrom Electric, and Sandstrom Electric has appeared in this lawsuit.

## II. JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1). Ally is a citizen of Delaware and Michigan. ResCap is a citizen of Delaware, New York, and Michigan. GMAC is a citizen of Delaware, Pennsylvania, and Nevada. Flinn is a citizen of Texas, Caves is a citizen of Texas, Sandstrom is a citizen of Texas, and Sandstrom

Electric is a citizen of Texas.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

9.      On May 14, 2012, ResCap and each of its subsidiaries, including GMAC, filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York.  ResCap and GMAC do not need the approval of the bankruptcy court to pursue their claims against the Defendants because the filing of a petition in bankruptcy operates as a stay only as to claims brought against the debtor, i.e. claims where the debtor is in a defensive posture.  *See, e.g.*, *In re Versoy*, 306 Fed. App'x 65, 68 (5th Cir. 2009) ("By the terms of 11 U.S.C. § 362(a), the automatic stay only applies to proceedings 'against the debtor.'"); *McMillan v. MBank Fort Worth, N.A.*, 4 F.3d 362, 366 (5th Cir. 1993) (same); *see also* 10 Collier on Bankruptcy P 6009.04 (16th ed. rev 2012) ("Under section 362(a), the filing of the petition operates as a stay, applicable to all entities, of actions taken *against* the debtor.  Thus, the automatic stay does not apply to actions *initiated by the debtor* or the trustee such that the trustee may proceed and the defendant may defend those actions without need for relief from the stay.").

10.     This Court has personal jurisdiction over Flinn, Caves, Sandstrom, and Sandstrom Electric because they are each residents of Texas.

11.     Venue is proper pursuant to 28 U.S.C. § 1391(a) because, as set forth more fully below, a substantial part of the events or omissions giving rise to Plaintiffs' claims in this matter occurred in the Eastern District of Texas.  As a result, a significant number of the material witnesses and relevant documents are in the Eastern District of Texas.

### III.   THE FACTS

12.     Ally is one of the world's largest automotive financial services companies.  Ally offers a full suite of automotive financing products and services in key markets around the world.

13.     ResCap is the holding company for most of the residential mortgage operations of Ally.  The company originates, services, and securitizes mortgage loans in the US and abroad.  It also issues mortgage- and asset-backed securities and provides lines of credit to other residential mortgage writers.

14.     GMAC is one of the largest residential mortgage servicing companies in the US.  The company offers consumers purchasing and refinancing, FHA loans, and flexible down payment options.  GMAC is part of the ResCap mortgage arm of Ally.

15.     Flinn joined GMAC in 2001 as an Operations Manager at ResCap and GMAC's Lewisville, Texas data center.  In his role as Operations Manager, Flinn was responsible for the maintenance and upkeep at ResCap and GMAC's two data centers.[2]  Flinn was entrusted with an approximately $5 million budget to ensure that the data centers were, at all times, functioning and fully operational.

16.     Caves started working as a Project Manager for GMAC in 2002.  He was initially tasked with moving servers and applications to the Lewisville, Texas data center.  Eventually, Caves was promoted into the Data Center Manager position.  Caves reported to Flinn in this role and assisted Flinn with his job responsibilities.  One of Caves' main functions was to review and approve vendor invoices for payment.

17.     On or about August 9, 2012, Ally's Global Security Department was provided information that suggested that Flinn and Caves were engaged in an inappropriate procurement kickback scheme.  The scheme involved the misappropriation of goods and services invoiced to the Lewisville, Texas data center.

18.     After learning of the kickback scheme, two individuals in Ally's Global Security Department flew from Charlotte, North Carolina to Dallas, Texas and questioned Flinn and

---

[2] The two data centers are located in Lewisville, Texas and Fort Washington, Pennsylvania.

Caves at the Lewisville, Texas data center about their dealings with various vendors, including but not limited to Sandstrom and Sandstrom Electric.

19.     During these interviews, Ally discovered that Flinn and Sandstrom, the Vice President of Sandstrom Electric, have been friends for more than 25 years, that Flinn and Sandstrom often go hunting and fishing together, that Flinn received 10 acres of land from Sandstrom with a stated purchase price in a deed of $10.00, that Flinn is currently three years into building a house on the land sold to him by Sandstrom, and that Flinn and Sandstrom own a twin engine plane together.

20.     Ally's Global Security Department also discovered that Sandstrom Electric regularly submits invoices for work performed on days that Sandstrom visits the Lewisville, Texas data center but does not actually provide any services, that Sandstrom Electric has been paid for work that it started but did not complete, that Sandstrom Electric has performed services at inflated prices, that most of Sandstrom Electric's invoices provide little to no description of the services allegedly provided to Plaintiffs, and that Flinn has directed Caves to approve all of these invoices for payment.

21.     Since filing this lawsuit on September 20, 2012, Plaintiffs have learned that, in addition to the fraudulent activities described above, Sandstrom Electric has submitted multiple invoices for what appears on the invoices to be the same work, that Flinn and Caves approved several unnecessary meal and lodging expenses for Sandstrom Electric, and that Flinn and Caves approved an invoice purportedly for Sandstrom, an electrician licensed in Texas, to travel to Canada to perform routine Electric work.  Demand has been made on Sandstrom and Sandstrom Electric to explain the questionable invoices, but they have not responded.

22.     Plaintiffs have also learned that a number of products purchased by Plaintiffs purportedly for use at the Lewisville, Texas data center were diverted to Flinn's ranch house or

Frisco house.  As an example, night vision security cameras were purchased by GMAC.  Flinn charged the cameras to GMAC's account with a local vendor and diverted them to his ranch house for his personal use.  In addition, Caves and Flinn approved thousands of dollars of purchases through this vendor for items that were clearly not for use at the Lewisville, Texas data center.  Caves observed several of these items, including tile and doors, at Flinn's ranch house.  Other building materials and equipment were also diverted to Flinn's ranch house or Frisco house.

23.     Caves also benefited from the vendor invoicing improprieties.  Caves, for example, obtained a microwave oven through a vendor and gave it to his daughter as a graduation gift.  Caves approved the invoice from the vendor showing that the microwave was paid for by GMAC, not the vendor.  Caves also claims that his personal computer was given to him as a gift by Flinn.  Caves, however, approved an invoice showing that the computer was purchased by GMAC.  Caves also purchased a power washer and expensed it to GMAC, having Flinn approve the reimbursement.  The power washer was not for use by Plaintiffs and was never provided to Plaintiffs.  Caves was asked in the investigation for an explanation of the power washer, but had none.

24.     With regard to the payment of invoices, Caves has advised the Ally investigators that he was not authorized to reject invoices submitted by Sandstrom Electric and other vendors, and that if he did not immediately approve them, Flinn became agitated and demanded that they be approved and paid regardless of whether Caves knew what goods or services were provided.  Caves reported that Flinn controlled all of these types of expenses and that Flinn, rather than Caves, is ultimately responsible for approvals.

25.     In order to avoid being detected in their scheme, Flinn and Caves worked together to install non-standard computer equipment for their use at the Lewisville Data Center that could

**PLAINTIFFS' SECOND AMENDED COMPLAINT**                                      **PAGE 6**

not be detected on the Ally network.  By way of example, they installed a DSL line for their use with a direct connection to the internet.  They were able to avoid using the VPN protocol established by Ally.  They also altered computer software on their computers to avoid being monitored by Ally security.

26.     Flinn and Caves also worked together to circumvent the expense reporting policy. By way of example, Flinn would attend meal events as the most senior manager, but have a subordinate pay for the meal and submit the expense report.  Instead of Flinn paying and having to have his manager approve the expense, Flinn would approve the subordinate's expense report, in effect approving his own expenses.  Similar schemes were used to purchase computer equipment and building supplies.  Sandstrom was also the beneficiary of these schemes.  By way of example, he and his wife, along with Caves and his wife, expensed a hotel stay on the Riverwalk in San Antonio along with meals.  Sandstrom also benefitted from the scheme through a markup of his invoices for a purported general contractor fee.

27.     Caves told Ally's investigators that he believes Flinn had created a barter system with Sandstrom Electric and other vendors whereby the vendors provided goods and performed services at Flinn's ranch house or Frisco, Texas home and, in turn, Flinn ensured that the vendors' invoices were paid by Plaintiffs.  It appears that Caves was complicit in this scheme.

28.     Caves also told Ally's investigators that he could not explain many of the Sandstrom Electric invoices and could not verify what, if any, work was performed.  Caves also told Ally's investigators that Flinn was responsible for asking Sandstrom Electric to perform work at the Lewisville Data Center.

29.     The Plaintiffs' investigation remains ongoing, but GMAC has terminated Flinn and Caves' employment.  Thousands of dollars of materials and equipment purchased by Plaintiffs through Flinn's and Caves' efforts remain missing.  Flinn and Caves have tried to cover

up their wrongdoing with evasive responses to inquiries by the investigators. Demand has been made on Sandstrom to explain his invoices, but he has not responded.

## IV. CAUSES OF ACTION

### COUNT 1:
### MONEY HAD AND RECEIVED
### (ALL DEFENDANTS)

30.     Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Second Amended Complaint.

31.     Defendants each hold money they obtained from Plaintiffs. Defendants are not entitled to retain the money in equity and good conscience. The money came in to Defendants' possession through the scheme described above. Sandstrom and Sandstrom Electric obtained money by submitting fraudulent invoices and otherwise being overpaid. Flinn and Caves obtained the money through expense reimbursements and purchases of property through manipulating the vendors. Defendants' conduct resulting in money had and received is the proximate cause of damages to Plaintiffs.

### COUNT 2:
### TORTIOUS INTERFERENCE WITH CONTRACTS
### AND BUSINESS RELATIONS
### (FLINN AND CAVES)

32.     Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Second Amended Complaint.

33.     Flinn and Caves willfully and intentionally interfered with contracts and business relations with Plaintiffs' suppliers and vendors. More specifically, they had vendors bill the Plaintiffs for goods or services that were either diverted to them for their personal use, that were not performed for Plaintiffs, or that were performed or provided at inflated prices. The contract with Peloton provided that Peloton would make purchases for, and invoice for, materials and

supplies for use in Plaintiffs' facilities. Flinn and Caves interfered with this agreement by having a Peloton employee make purchases for their personal use. They also interfered with the delivery of the materials and supplies to the facility. In addition, Flinn and Caves interfered with the contract with Sandstrom Electric by working with Sandstrom to cause Sandstrom Electric to submit invoices for work not performed or materials not delivered as well as overcharging. They are also interfering with the MSA Agreement to facilitate the breaches set forth in Count 12 of this Second Amended Complaint.

34.     Flinn and Caves interfered with Plaintiffs' relationships with their employees by using them to facilitate the transactions complained of with the vendors. Plaintiffs' employment relationship with these employees included an understanding that these employees were being paid to work for the benefit of Plaintiffs and that they would act in the best interests of Plaintiffs and safeguard Plaintiffs' assets, and ensure that Plaintiffs received what they paid for in transactions with vendors. Flinn and Caves abused their authority by interfering with these relationships and by directing employees to take actions inconsistent with these duties. Flinn and Caves' actions are willful and malicious and intended to interfere with the relationships between Plaintiffs and their employees and vendors. These actions were without privilege or excuse and were the proximate cause of damages to Plaintiffs.

<u>**COUNT 3:**</u>
**BREACH OF DUTY OF LOYALTY AND FIDUCIARY DUTIES**
**(FLINN AND CAVES)**

35.     Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Second Amended Complaint.

36.     As employees, Flinn and Caves had a common law duty to serve Plaintiffs faithfully and honestly. Flinn and Caves were placed in positions of trust and confidence at GMAC. As an Operations Manager responsible for several facilities, Flinn was entrusted with

<u>**PLAINTIFFS' SECOND AMENDED COMPLAINT**</u>                                                    **PAGE 9**

company assets, vendor relationships, employees, and purchasing authority. As the Data Center Manager, Caves also was entrusted with company assets, vendor relationships, employees, and purchasing authority. Flinn and Caves breached the duty of loyalty and their fiduciary duties by using the Plaintiffs' employees and vendors for their personal gain. Further, Flinn and Caves breached their duty of loyalty and fiduciary duties by failing to safeguard company funds and assets. Flinn and Caves also diverted goods and services paid for by Plaintiffs for their personal gain. Flinn also breached his fiduciary duty and duty of loyalty by attempting to destroy evidence relating to his conduct.

37.     As a direct and proximate result of Flinn and Caves' breaches of their fiduciary duties and duties of loyalty, Plaintiffs have been damaged and are entitled to recover actual and punitive damages. Plaintiffs are further entitled to restitution of compensation paid to Flinn and Caves during any period of breach. Flinn and Caves' breaches, furthermore, were willful, malicious and intentional, entitling Plaintiffs to punitive damages.

## COUNT 4:
## CONVERSION
## (FLINN AND CAVES)

38.     Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Second Amended Complaint.

39.     Flinn and Caves intentionally committed acts which constitute unlawful conversion of Plaintiffs' property. Specifically, Flinn and Caves had Plaintiffs pay for goods and services which were diverted to Flinn and Caves. Flinn and Caves used their position of trust with Plaintiffs to derive financial benefits which belonged to Plaintiffs. These acts of conversion by Flinn and Caves are the proximate cause of damages to Plaintiffs.

## COUNT 5:
### TEXAS THEFT LIABILITY ACT
### (FLINN AND CAVES)

40.     Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Second Amended Complaint.

41.     This cause of action is brought by Plaintiffs against Flinn and Caves pursuant to the Texas Theft Liability Act, TEX. CIV. PRAC. REM. CODE §§ 134.001 *et seq.*

42.     Plaintiffs are the owners of certain personal property that has value.  Flinn and Caves have knowingly, and without Plaintiffs' effective consent, unlawfully appropriated, secured, or stolen thousands of dollars of personal property from Plaintiffs.  In addition, Flinn and Caves had control over the disposition of services to which they were not entitled, and they knowingly diverted the services to their own benefit.

43.     As a result of this unlawful appropriation of Plaintiffs' property and services, Plaintiffs have suffered actual damages.   Pursuant to TEX. CIV. PRAC. REM. CODE § 134.005(a)(1), Plaintiffs are entitled to recover such actual damages, together with an additional award of $1,000.00.  Pursuant to TEX. CIV. PRAC. REM. CODE § 134.005(b), Plaintiffs are also entitled to recover their court costs and reasonable and necessary attorney's fees.

## COUNT 6:
### FRAUD
### (SANDSTROM ELECTRIC)

44.     Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Second Amended Complaint.

45.     As delineated in more detail above, Sandstrom Electric made numerous representations to Plaintiffs while Sandstrom Electric was serving as a vendor.  Specifically, it represented through invoices that work had been performed or materials delivered and requested payment of the invoices based on these representations.  By way of example, Sandstrom Electric

Invoice No. 10-803 represents that Sandstrom Electric performed Data Cabling in Toronto, Ontario, demanding payment of $13,653.14. This representation was false because Sandstrom Electric performed no data cabling work in Toronto, Ontario. Sandstrom Electric also made misrepresentations regarding the dates that services were performed. Copies of these invoices have been provided to Sandstrom Electric with a request for records required to be maintained by Sandstrom Electric under its Master Services Agreement. Sandstrom Electric has not provided the information demonstrating that the work was performed or the materials were delivered.

46.      At the time Sandstrom Electric made the above-referenced representations, Sandstrom Electric knew they were false, made them in bad faith or made them with a conscious indifference to their truth or falsity. Sandstrom Electric made these fraudulent misrepresentations and/or misrepresentations of material fact to induce Plaintiffs to, among other things, pay for goods and services that Plaintiffs did not receive or benefit from.

47.      Plaintiffs reasonably relied on these misrepresentations and/or omissions and, as a result thereof, paid monies to Sandstrom Electric. Plaintiffs would not have taken these actions, among others, had Plaintiffs known the falsity of and intentions behind Sandstrom Electric's representations and/or Sandstrom Electric's omissions of material fact. No reasonable person or entity would have interpreted the representations made by Sandstrom Electric in any different way than Plaintiffs did.

48.      Plaintiffs suffered damages proximately caused by Sandstrom Electric's fraud.

## COUNT 7
## FRAUD
## (SANDSTROM)

49.      Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Second Amended Complaint.

50.     Sandstrom submitted the Sandstrom Electric invoices at issue to Plaintiff.  He was therefore personally representing that work had been performed or materials delivered and requested payment of the invoices based on these representations.   By way of example, Sandstrom Electric Invoice No. 10-803 represents that Sandstrom Electric performed Data Cabling in Toronto, Ontario, demanding payment of $13,653.14.  This representation was false because neither Sandstrom nor Sandstrom Electric performed any data cabling work in Toronto, Ontario.  Upon information and belief, Sandstrom may have travelled to Canada for personal business and tried to use this invoice to have Plaintiffs pay for the trip.  Sandstrom also made misrepresentations regarding the dates that services were performed.  Copies of these invoices have been provided to Sandstrom Electric with a request for records required to be maintained by Sandstrom Electric under its Master Services Agreement.  Neither Sandstrom, nor Sandstrom Electric, has provided the information demonstrating that the work was performed or the materials were delivered.

51.     At the time Sandstrom made the above-referenced representations Sandstrom knew they were false, made them in bad faith or made them with a conscious indifference to their truth or falsity.  Sandstrom made these fraudulent misrepresentations and/or misrepresentations of material fact to induce Plaintiffs to, among other things, pay for goods and services that Plaintiffs did not receive or benefit from.

52.     Plaintiffs reasonably relied on these misrepresentations and/or omissions and, as a result thereof, paid monies to Sandstrom Electric.  Sandstrom likely benefitted from or ultimately received the money paid.  Plaintiffs would not have taken these actions, among others, had Plaintiffs known the falsity of and intentions behind Sandstrom's representations and/or Sandstrom's omissions of material fact.  No reasonable person or entity would have interpreted the representations made by Sandstrom in any different way than Plaintiffs did.

53. Plaintiffs suffered damages proximately caused by Sandstrom's fraud.

## COUNT 8
## FRAUD
## (FLINN)

54. Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Second Amended Complaint.

55. Flinn represented that the Plaintiffs were receiving the benefit of the goods and services they paid for when he approved the vendor invoices. Flinn also represented that expense reports submitted or approved by him were for legitimate business expenses. His submission or approval of invoices or expense reports was a representation to Plaintiffs that the submissions were proper and the amounts should be paid. He failed to disclose the fact that he was receiving a personal benefit from payment of the invoices. By way of example, as a result of payments made to Sandstrom Electric on invoices he approved, he received the personal benefit of free electrical work at his ranch house, free land upon which to build the house, and building supplies purchased by Sandstrom. He also received goods purchased through Peloton for invoices he approved and a free heating and air conditioning from Venture Mechanical. At the time Flinn made the above-referenced representations, or material omissions of fact, he knew they were false, made them in bad faith or made them with a conscious indifference to their truth or falsity. Flinn made these fraudulent misrepresentations and/or omissions of material fact to induce Plaintiffs, among other things, pay for goods and services that Plaintiffs did not receive or benefit from.

56. At the time Flinn made the above-referenced representations, or omissions of material fact, Flinn knew they were false, made them in bad faith or made them with a conscious indifference to their truth or falsity. Flinn made these fraudulent misrepresentations and/or omissions of material fact to induce Plaintiffs to, among other things, pay for goods and services

PLAINTIFFS' SECOND AMENDED COMPLAINT                                    PAGE 14

that Plaintiffs did not receive or benefit from.  Flinn knew that if he disclosed to Plaintiffs that he was receiving free electrical work, free heating and air conditioning systems, goods purchased through Peloton, and was expensing personal expenses, Plaintiffs would not have paid the invoices or the expense reimbursements.

57.     Plaintiffs reasonably relied on these misrepresentations and/or omissions and, as a result thereof, paid monies to the vendors and to Flinn, or others for the benefit of Flinn, through expense reimbursements.  Plaintiffs would not have taken these actions, among others, had Plaintiffs known the falsity of, and intentions behind Flinn's representations and/or Flinn's omissions of material fact.  No reasonable person or entity would have interpreted the representations made by Flinn in any different way than Plaintiffs did.

58.     Plaintiffs suffered damages proximately caused by Flinn's fraud.

### COUNT 9
### FRAUD
### (CAVES)

59.     Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Second Amended Complaint.

60.     Caves represented that the Plaintiffs were receiving the benefit of the goods and services they paid for when he approved the vendor invoices.  Caves also represented that expense reports submitted by him were for legitimate business expenses.  One example of a misrepresentation in an expense report was his request for reimbursement for a power washer. He also took a template Sandstrom Electric invoice and increased the amount to be paid to Sandstrom, misrepresenting to Plaintiffs the amount Sandstrom was requesting to be paid.

61.     Caves' submission or approval of invoices or expense reports was a representation to Plaintiffs that the submissions were proper and the amounts should be paid.  He failed to disclose the fact that he was receiving a personal benefit from payment of the invoices.  By way

of example, as a result of payments made to Sandstrom Electric on invoices he approved, he received the personal benefit of free travel expenses for a trip to San Antonio for his wife. Upon information and belief, Caves also stayed at a property belonging to Sandstrom on the Gulf Coast. He also received goods purchased through Peloton for invoices he approved. At the time Caves made the above-referenced representations, or material omissions of fact, he knew they were false, made them in bad faith or made them with a conscious indifference to their truth or falsity. Caves made these fraudulent misrepresentations and/or omissions of material fact to induce Plaintiffs to, among other things, pay for goods and services that Plaintiffs did not receive or benefit from.

62.     At the time Caves made the above-referenced representations, or omissions of material fact, Caves knew they were false, made them in bad faith or made them with a conscious indifference to their truth or falsity. Caves made these fraudulent misrepresentations and/or omissions of material fact to induce Plaintiffs to, among other things, pay for goods and services that Plaintiffs did not receive or benefit from. Caves knew that if he disclosed to Plaintiffs that he was receiving free goods purchased through Peloton, stays at Sandstrom's Gulf Coast property, and was expensing personal expenses, Plaintiffs would not have paid the invoices or the expense reimbursements.

63.     Plaintiffs reasonably relied on these misrepresentations and/or omissions and, as a result thereof, paid monies to the vendors and to Caves, or others for the benefit of Caves, through expense reimbursements. Plaintiffs would not have taken these actions, among others, had Plaintiffs known the falsity of, and intentions behind Caves representations and/or Caves' omissions of material fact. No reasonable person or entity would have interpreted the representations made by Caves in any different way than Plaintiffs did.

64.     Plaintiffs suffered damages proximately caused by Caves' fraud.

## COUNT 10:
## CONSPIRACY
## (ALL DEFENDANTS)

65.     Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Second Amended Complaint.

66.     As more particularly described above, Defendants entered into various agreements to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.  The ultimate goal of each of these agreements was to funnel money, goods, or services to each of them through a scheme of submitting invoices or expense reimbursement requests for payment by Plaintiffs.  By way of example, Flinn and Caves agreed that certain of Flinn's personal expenses would be submitted on Caves' expense reports, then approved by Flinn, to essentially allow Flinn to approve his own expenses and circumvent expense approval policies.  Flinn and Caves also agreed that fraudulent expense reports would be submitted so they could both be reimbursed for personal expenses Plaintiffs would not have approved.  Flinn and Caves also conspired to have Peloton purchase goods for Flinn and Caves' personal use and to have Plaintiffs pay the invoices.  Caves and Sandstrom also agreed on at least one occasion to take an invoice submitted by Sandstrom Electric, and to increase the amount to have Plaintiffs pay even more money than Sandstrom Electric originally requested.  Flinn and Sandstrom agreed that Sandstrom would perform free electrical work at Flinn's ranch house, Sandstrom would give Flinn land, and fraudulent invoices would be submitted to Plaintiffs to funnel money to Sandstrom.  Sandstrom, Sandstrom Electric, Flinn and Caves further conspired to push though payment of Sandstrom Electric invoices for services not performed or goods not delivered.

67.     Flinn, Caves and Sandstrom have further conspired after demands were made for preservation of evidence to thwart Plaintiffs' efforts to obtain information.  They have all agreed

to a strategy involving either silence, refusing to turn over information, or claiming they have no explanations for fraudulent invoices.

68.     Defendants' conspiracy has proximately caused Plaintiffs to incur actual damages.

<u>COUNT 11:</u>
**BREACH OF CONTRACT**
**(CAVES)**

69.     Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Second Amended Complaint.

70.     Following the termination of his employment, Caves entered into a written agreement with Ally and GMAC that required him to, among other things, fully and completely cooperate with the Plaintiffs' investigation of vendor invoicing improprieties and to return all of Ally and GMAC's property, including items that were purchased by Ally or GMAC.

71.     Caves has violated, and continues to violate, this written agreement because he has failed to perform his affirmative obligations thereunder.  Specifically, Caves has failed to disclose all information he knows about the transactions which are the subject of the Plaintiffs' investigation and he has failed to provide truthful information.  In addition, there are numerous items of property purchased by the Plaintiffs that remain in Caves' possession, including but not limited to a microwave oven, a phone headset, and a camera, each of which was purchased by one of the Plaintiffs.

72.     By failing to fully and completely cooperate with the Plaintiffs' investigation and to return all of the Plaintiffs' property, Caves has breached paragraphs 12 and 13 of his written agreement with Ally and GMAC.  Caves' breaches of the written agreement are a proximate cause of damages to Plaintiffs.  As a result of Caves' wrongful actions described above, Plaintiffs retained counsel to prosecute this claim.  Plaintiffs are, therefore, entitled to recover reasonable

and necessary attorneys' fees and costs incurred in the prosecution of this claim pursuant to, *inter alia*, Tex. Civ. Prac. & Rem. Code § 38.001(8).

## COUNT 12
## BREACH OF CONTRACT
## (SANDSTROM ELECTRIC)

73.     Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Second Amended Complaint.

74.     Sandstrom Electric entered into a Master Services Agreement dated January 14, 2011, with Ally (the "MSA Agreement").   Pursuant to paragraph 8.2 of the Agreement, Sandstrom Electric was required to provide Ally a contact list containing the names, telephone numbers, fax numbers, mobile and pager numbers, e-mail or internet addresses for Supplier Agents.   Pursuant to paragraphs 15.1, 15.4, 15.5, 15.6, and 15.8 of the Agreement, Sandstrom Electric was required to obtain certain insurance policies and provide Ally with the Certificates of Insurance for all insurance policies required by the Agreement.   Pursuant to paragraph 17 of the Agreement, Sandstrom Electric was required to provide Ally with access to, and assistance and information about, the services under the Agreement.   Specifically, Sandstrom Electric was required, pursuant to subsection (i) of paragraph 17, to allow Ally to examine all records and materials of Sandstrom Electric and "Supplier Agents" about the services.   Sandstrom Electric was also required, pursuant to subsection (ii) of paragraph 17, to permit an inspection of Sandstrom's house and Flinn's Ranch House as Supplier Agents.   Pursuant to subsection (x) of paragraph 17, Sandstrom Electric was required to provide Ally with an inventory of all of Sandstrom Electric's internal and external audit reports about the services.   Sandstrom Electric was also required to preserve all documents related to the services.   All such records were required to be made available to Ally for inspection.

75.     Sandstrom Electric has breached these provisions in the Agreement, most likely to cover up the fact that it submitted invoices for services not performed or goods not delivered, which is also a breach of the MSA Agreement.  Demand has been made for Sandstrom Electric to comply with the MSA Agreement, but the demand has been refused.  Sandstrom is liable for all costs and expenses incurred in the investigation of these invoices pursuant to paragraph 12.3(f) of the MSA Agreement.

76.     Ally is entitled to recover all damages proximately caused by all breaches of the MSA Agreement.

## COUNT 13
## ALTER EGO
## (SANDSTROM)

77.     Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Second Amended Complaint.

78.     Sandstrom is liable for the actions and agreements of Sandstrom Electric under an alter ego theory.  Specifically, Sandstrom used the corporate entity of Sandstrom Electric for the purpose of perpetrating and did perpetrate an actual fraud on Plaintiffs.

## COUNT 14
## FORFEITURE AND DISGORGEMENT
## (FLINN AND CAVES)

79.     Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Second Amended Complaint.

80.     Flinn and Caves breached their duty of loyalty to Plaintiffs, for which breach they are required to forfeit the compensation paid to them by Plaintiffs during the period of divided loyalties.  Flinn and Caves are also required to forfeit any income or property received by them "on the side" without disclosing their disloyal activities to Plaintiffs.  Such forfeiture should

consist of all funds and property received by Flinn and Caves as a result of their breaches of fiduciary duty owed to Plaintiffs.

## COUNT 15
## PUNITIVE DAMAGES
## (ALL DEFENDANTS)

81.     The tortious conduct committed by Defendants was aggravated by the willfulness, wantonness, and malice for which the law allows the imposition of punitive damages.  Their conduct was intentional, willful, wanton and without justification or excuse.

82.     Defendants engaged in the malicious, intentional, and unjustified actions described above with gross indifference to Plaintiffs' rights and with the conscious desire to interfere with Plaintiffs' employee and business relationships.  To punish such action and to deter others from similar wrongdoing, Defendants should be assessed punitive damages in an amount determined by the trier of fact.

83.     Defendants' conduct complained of herein was willful and done with malice, and in reckless disregard to the rights of Plaintiffs.  Defendants were further grossly negligent in their actions.  Plaintiffs are therefore entitled to recover punitive damages.

## COUNT 16
## CONSTRUCTIVE TRUST
## (ALL DEFENDANTS)

84.     Flinn and Caves arranged for the transactions complained of herein.  The goods and services were diverted to Flinn and Caves for their personal benefit.  Further, Flinn and Caves caused Plaintiffs to pay money to vendors, including Sandstrom Electric, for which no adequate explanation has been provided by the vendors to insure that Plaintiffs received anything in return.  There are, therefore, funds paid and unaccounted for.  With respect to all goods and services diverted to Flinn and Caves, and to the extent any of the funds paid were diverted to Flinn and Caves and they retained them for their own personal gain, Plaintiffs request that the

Court impose a constructive trust on all of the funds, goods, and services obtained by Flinn and Caves. Plaintiffs also request that the Court impose a constructive trust on all of the funds that were paid to Sandstrom Electric for work that it was paid for but never performed, for work that it started but did not complete, for duplicate invoicing, and for work that it performed at inflated prices. Plaintiffs further request a constructive trust on all funds paid to Sandstrom Electric which Sandstrom paid himself. Plaintiffs request that the constructive trust extend to all real estate and personal property (including, but not limited to Sandstrom and Flinn's airplane) to which funds, goods, or services were diverted.

## COUNT 17
## MISAPPROPRIATION
## (FLINN AND CAVES)

85. Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Second Amended Complaint.

86. During their employment with GMAC, Flinn and Caves were entrusted with Plaintiffs' confidential information, vendor relationships, credit relationships, employee relationships and the goods and services associated with these relationships and information. While employed by GMAC, Flinn and Caves used this confidential information for personal gain without Plaintiffs' authorization or consent. In addition to misappropriating the confidential information, Flinn and Caves also misappropriated vendor and credit relationships to divert goods and services to themselves for their personal gain. They further misappropriated the services of the Plaintiffs' employees and vendors to facilitate the diversion of goods and services for their own personal gain. They have also misappropriated the property ordered through the vendors and paid for by Plaintiffs. Flinn and Caves' misappropriation is the proximate cause of damages to Plaintiffs.

## COUNT 18:
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
## (SANDSTROM)

87.    Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Second Amended Complaint.

88.    Sandstrom willfully and intentionally interfered with the business relationships between Plaintiffs and its employees, Flinn and Caves.  Sandstrom submitted invoices for Sandstrom Electric for goods or services that were either not delivered or performed for Plaintiffs, or that were delivered or provided at inflated prices.  He used Flinn and Caves to facilitate the transactions complained of in this Second Amended Petition, as well as breaches of the MSA Agreement.  Plaintiffs' employment relationship with Flinn and Caves included an understanding that these employees were being paid to work for the benefit of Plaintiffs and that they would act in the best interests of Plaintiffs and safeguard Plaintiffs' assets, and ensure that Plaintiffs received what they paid for in transactions with vendors.  Sandstrom interfered with these relationships by inducing them to take actions inconsistent with these duties.  Sandstrom's actions are willful and malicious and intended to interfere with the relationships between Plaintiffs and their employees.  These actions were without privilege or excuse and were the proximate cause of damages to Plaintiffs.

## COUNT 19
## ATTORNEYS' FEES
## (CAVES, SANDSTROM ELECTRIC, AND SANDSTROM)

89.    Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Second Amended Complaint.

90.    Pursuant to the express terms of the MSA Agreement and pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code, Sandstrom Electric is liable for reasonable attorneys' fees and costs.

91.     Pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code, Caves is liable for reasonable attorneys' fees and costs as a result of his breach of the contract set forth above.

92.     Sandstrom is liable for attorneys' fees under the MSA Agreement because he is the alter ego of Sandstrom Electric.

## V.  <u>PRAYER FOR RELIEF</u>

Plaintiffs respectfully pray that judgment be entered in their favor against Defendants and that they be granted the following relief:

(a)     Actual damages;

(b)     Punitive damages;

(c)     An order disgorging Flinn and Caves of their salary for the period of time they was breaching fiduciary duties and duties of loyalty;

(d)     Costs of Court;

(e)     Pre-judgment interest;

(f)     Post-judgment interest;

(g)     A constructive trust;

(h)     Attorneys' fees; and

(i)     Such other relief to which Plaintiffs have shown themselves justly entitled.

Dated: January 22, 2013                          Respectfully submitted,


                                        By: /s/ William L. Davis
                                            William L. Davis, Esq.
                                            Texas Bar No. 05563800
                                            davisw@jacksonlewis.com
                                            Talley R. Parker, Esq.
                                            Texas Bar No. 24065872
                                            talley.parker@jacksonlewis.com

                                        JACKSON LEWIS LLP
                                        500 N. Akard, Suite 2500
                                        Dallas, Texas 75201
                                        Telephone: (214) 520-2400
                                        Fax: (214) 520-2008

                                        **ATTORNEYS FOR PLAINTIFFS**
                                        **ALLY FINANCIAL INC.,**
                                        **RESIDENTIAL CAPITAL, LLC, and**
                                        **GMAC MORTGAGE, LLC**


                           <u>**CERTIFICATE OF SERVICE**</u>

        On January 22, 2013, I electronically submitted the foregoing document with the Clerk of
Court for the U.S. District Court, Eastern District of Texas, using the electronic case filing
system of the Court. I hereby certify that I have served all counsel of record electronically or by
another manner authorized by Federal Rule of Civil Procedure 5(b)(2), including the following:

    Judith P. Kenney
    Nat M. Kenney
    Judith P. Kenney & Associates, P.C.
    16475 Dallas Parkway, Suite 330
    Addison, Texas 75001

    William J. Dunleavy
    825 Market Street
    Building M, Suite 250
    Allen, Texas 75013

    Ryan K. Geddie
    Martin, Disiere, Jefferson & Wisdom, LLP
    16000 N. Dallas Parkway, Suite 800
    Dallas, Texas 75248

                                        /s/ William L. Davis
                                        William L. Davis

## Exhibit 4

**Third Amended Complaint**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| ALLY FINANCIAL INC., | § | |
| RESIDENTIAL CAPITAL, LLC, and | § | |
| GMAC MORTGAGE, LLC, | § | |
| | § | |
| Plaintiffs, | § | Civil Action No. 4:12-CV-600-RC-ALM |
| | § | |
| v. | § | |
| | § | |
| PHILLIP ROGER FLINN, II | § | |
| RALPH "RUSTY" CAVES, | § | |
| JOHN W. SANDSTROM, and | § | |
| SANDSTROM ELECTRIC COMPANY | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' THIRD AMENDED COMPLAINT

Plaintiffs Ally Financial Inc. ("Ally"), Ally's wholly-owned subsidiary Residential Capital, LLC ("ResCap"), and ResCap's wholly-owned subsidiary GMAC Mortgage, LLC ("GMAC") (collectively, "Plaintiffs") bring this Third Amended Complaint against Defendants Phillip Roger Flinn, II ("Flinn"), Ralph "Rusty" Caves ("Caves"), John W. Sandstrom ("Sandstrom"), and Sandstrom Electric Company ("Sandstrom Electric") (collectively, "Defendants").

## I.  PARTIES

1.      Ally is a Delaware corporation with its principal place of business at 200 Renaissance Center, Detroit, Michigan 48265.

2.      ResCap is a Delaware limited liability company with its principal place of business at 1177 Avenue of the Americas, New York, New York 10036.  Its sole member, GMAC Mortgage Group, LLC, is a Delaware limited liability company with its principal place of business at 200 Renaissance Center, Detroit, Michigan 48265.

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                      **PAGE 1**

3.      GMAC is a Delaware limited liability company with its principal place of business at 1100 Virginia Drive, Fort Washington, Pennsylvania 19034.  Its sole member, GMAC Residential Holding Company, LLC is a Delaware limited liability company with its principal place of business at 3993 Howard Hughes Parkway, Suite 250, Las Vegas, Nevada 89169.

4.      Flinn is a natural person who resides at 10401 Samantha Drive, Frisco, Texas 75035 and is a citizen of the State of Texas.  Flinn has been served with process, and he has appeared in this lawsuit.

5.      Caves is a natural person who resides at 2311 Castle Rock Road, Arlington, Texas 76006 and is a citizen of the State of Texas.  Caves has been served with process, and he has appeared in this lawsuit.

6.      Sandstrom is a natural person who resides at 6736 County Road 156, Bluff Dale, Texas 76433 and is a citizen of the State of Texas.  Sandstrom's attorney accepted service on behalf of Sandstrom, and Sandstrom has appeared in this lawsuit.

7.      Sandstrom Electric is a Texas corporation with its principal place of business at 13231 Bee Street, Farmers Branch, Texas 75234.  Sandstrom Electric's attorney accepted service on behalf of Sandstrom Electric, and Sandstrom Electric has appeared in this lawsuit.

## II.  <u>JURISDICTION AND VENUE</u>

8.      The Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C § 1331 because a federal statute is at issue. More specifically, Plaintiffs allege that Defendants violated the Racketeer Influenced and Corrupt Organizations (RICO) statute, which grants subject-matter jurisdiction to the Court pursuant to 18 U.S.C. § 1964(c).  The Court also has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1).  Ally is a citizen of

<u>**PLAINTIFFS' THIRD AMENDED COMPLAINT**</u>                                        **PAGE 2**

Delaware and Michigan; ResCap is a citizen of Delaware, New York, and Michigan; and GMAC is a citizen of Delaware, Pennsylvania, and Nevada. Flinn is a citizen of Texas, Caves is a citizen of Texas, Sandstrom is a citizen of Texas, and Sandstrom Electric is a citizen of Texas. The amount in controversy exceeds $75,000, exclusive of interest and costs.

9.      On May 14, 2012, ResCap and each of its subsidiaries, including GMAC, filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York. ResCap and GMAC do not need the approval of the bankruptcy court to pursue their claims against the Defendants because the filing of a petition in bankruptcy operates as a stay only as to claims brought against the debtor, i.e. claims where the debtor is in a defensive posture. *See, e.g.*, *In re Versoy*, 306 Fed. App'x 65, 68 (5th Cir. 2009) ("By the terms of 11 U.S.C. § 362(a), the automatic stay only applies to proceedings 'against the debtor.'"); *McMillan v. MBank Fort Worth, N.A.*, 4 F.3d 362, 366 (5th Cir. 1993) (same); *see also* 10 Collier on Bankruptcy P 6009.04 (16th ed. rev 2012) ("Under section 362(a), the filing of the petition operates as a stay, applicable to all entities, of actions taken *against* the debtor. Thus, the automatic stay does not apply to actions *initiated by the debtor* or the trustee such that the trustee may proceed and the defendant may defend those actions without need for relief from the stay.").

10.     This Court has personal jurisdiction over Flinn, Caves, Sandstrom, and Sandstrom Electric because they are each residents of Texas.

11.     Venue is proper pursuant to 28 U.S.C. § 1391(a) because, as set forth more fully below, a substantial part of the events or omissions giving rise to Plaintiffs' claims in this matter occurred in the Eastern District of Texas. As a result, a significant number of the material witnesses and relevant documents are in the Eastern District of Texas.

### III.  **THE FACTS**

12.     Ally is one of the world's largest automotive financial services companies.  Ally

offers a full suite of automotive financing products and services in key markets around the world.

13.     ResCap is the holding company for most of the residential mortgage operations of

Ally.  The Company originates, services, and securitizes mortgage loans in the US and abroad.  It

also issues mortgage- and asset-backed securities and provides lines of credit to other residential

mortgage writers.

14.     GMAC is one of the largest residential mortgage servicing companies in the US.

The company offers consumers purchasing and refinancing, FHA loans, and flexible down

payment options.  GMAC is part of the ResCap mortgage arm of Ally.

15.     Flinn joined GMAC in 2001 as an Operations Manager at ResCap and GMAC's

Lewisville, Texas data center.  In his role as Operations Manager, Flinn was responsible for the

maintenance and upkeep at ResCap and GMAC's two data centers.[1]  Flinn was entrusted with an

approximately $5 million budget to ensure that the data centers were, at all times, functioning

and fully operational.

16.     Caves started working as a Project Manager for GMAC in 2002.  He was initially

tasked with moving servers and applications to the Lewisville, Texas data center.  Eventually,

Caves was promoted into the Data Center Manager position.  Caves reported to Flinn in this role

and assisted Flinn with his job responsibilities.  One of Caves' main functions was to review and

approve vendor invoices for payment.

17.     On or about August 9, 2012, Ally's Global Security Department was provided

information that suggested that Flinn and Caves were engaged in an inappropriate procurement

---

[1] The two data centers are located in Lewisville, Texas and Fort Washington, Pennsylvania.

kickback scheme. The scheme involved the misappropriation of goods and services invoiced to the Lewisville, Texas data center.

18. After learning of the kickback scheme, two individuals in Ally's Global Security Department flew from Charlotte, North Carolina to Dallas, Texas and questioned Flinn and Caves at the Lewisville, Texas data center about their dealings with various vendors, including but not limited to Sandstrom and Sandstrom Electric.

19. During these interviews, Ally discovered that Flinn and Sandstrom, the Vice President of Sandstrom Electric, have been friends for more than 25 years, that Flinn and Sandstrom often go hunting and fishing together, that Flinn received 10 acres of land from Sandstrom with a stated purchase price in a deed of $10.00, that Flinn is currently three years into building a house on the land sold to him by Sandstrom, and that Flinn and Sandstrom own a twin engine plane together.[2]

20. Ally's Global Security Department also discovered that Sandstrom Electric regularly submits invoices for work performed on days that Sandstrom visits the Lewisville, Texas data center but does not actually provide any services, that Sandstrom Electric has been paid for work that it started but did not complete, that Sandstrom Electric has performed services at inflated prices, that most of Sandstrom Electric's invoices provide little to no description of the services allegedly provided to Plaintiffs, and that Flinn has directed Caves to approve all of these invoices for payment.

21. Since filing this lawsuit on September 20, 2012, Plaintiffs have learned that, in addition to the fraudulent activities described above, Sandstrom Electric has submitted multiple invoices for what appears on the invoices to be the same work, that Flinn and Caves approved

---

[2] Plaintiffs have since learned that Flinn used his employee discount to obtain a Cadillac for Sandstrom's wife.

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                                    **PAGE 5**

several unnecessary meal and lodging expenses for Sandstrom Electric, and that Flinn and Caves approved invoices for Sandstrom for purchases for merchandise that was for personal use and not delivered to Plaintiffs. Demand has been made on Sandstrom and Sandstrom Electric to explain the questionable invoices, but they have not responded.

22.     Plaintiffs have also learned that a number of products purchased by Plaintiffs – purportedly for use at the Lewisville, Texas data center – were diverted to Flinn's ranch house or Frisco house. As an example, night vision security cameras were purchased by GMAC. Flinn charged the cameras to GMAC's account with a local vendor and diverted them to his ranch house for his personal use. In addition, Caves and Flinn approved thousands of dollars of purchases through this vendor for items that were clearly not for use at the Lewisville, Texas data center. Caves observed several of these items, including tile and doors, at Flinn's ranch house. Other building materials and equipment were also diverted to Flinn's ranch house or Frisco house.

23.     Caves also benefited from the vendor invoicing improprieties. Caves, for example, obtained a microwave oven through a vendor and gave it to his daughter as a graduation gift. Caves approved the invoice from the vendor showing that the microwave was paid for by GMAC, not the vendor. Caves also claims that his personal computer was given to him as a gift by Flinn. Caves, however, approved an invoice showing that the computer was purchased by GMAC. Caves also purchased a power washer and expensed it to GMAC, having Flinn approve the reimbursement. The power washer was not for use by Plaintiffs and was never provided to Plaintiffs. Caves was asked in the investigation for an explanation of the power washer, but had none. There are also thousands of dollars of receipts from Home Depot with Caves' signature on them. Caves denied any knowledge of the purchases during the

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                         **PAGE 6**

investigation, but the receipts obtained in discovery show he was not being truthful. There are also thousands of dollars of purchases from Walmart. Sandstrom claims Caves purchased these items and asked Sandstrom to bill Plaintiffs.

24.     With regard to the payment of invoices, Caves advised the Ally investigators that he was not authorized to reject invoices submitted by Sandstrom Electric and other vendors, and that if he did not immediately approve them, Flinn became agitated and demanded that they be approved and paid, regardless of whether Caves knew what goods or services were provided. Caves reported that Flinn controlled all of these types of expenses and that Flinn, rather than Caves, is ultimately responsible for approvals. Flinn denies this and claims that since Caves was approving the invoices, he must have been getting the kickbacks.

25.     In order to avoid being detected in their scheme, Flinn and Caves worked together to install non-standard computer equipment for their use at the Lewisville, Texas Data Center that could not be detected on the Ally network. By way of example, they installed a DSL line for their use with a direct connection to the internet. They were able to avoid using the VPN protocol established by Ally. They also altered computer software on their computers to avoid being monitored by Ally security. They also gave Sandstrom access to the facility without following proper security protocols.

26.     Flinn and Caves also worked together to circumvent the expense reporting policy. By way of example, Flinn would attend meal events as the most senior manager, but have a subordinate pay for the meal and submit the expense report. Instead of Flinn paying and having to have his manager approve the expense, Flinn would approve the subordinate's expense report, in effect approving his own expenses. Similar schemes were used to purchase computer equipment and building supplies. Sandstrom was also the beneficiary of these schemes. By way

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                                    **PAGE 7**

of example, he and his wife, along with Caves and his wife, expensed a hotel stay on the Riverwalk in San Antonio, along with meals. Sandstrom also benefitted from the scheme through a markup of his invoices for a purported general contractor fee. Caves also submitted receipts for meals and would cut off the address. He did this to cover up the fact that the restaurant was in a city where he was vacationing, and the expense was unrelated to work.

27. Caves told Ally's investigators that he believes Flinn had created a barter system with Sandstrom Electric and other vendors whereby the vendors provided goods and performed services at Flinn's ranch house or Frisco, Texas home and, in turn, Flinn ensured that the vendors' invoices were paid by Plaintiffs. It appears that Caves was complicit in this scheme because Sandstrom claims that Caves was the one purchasing the thousands of dollars of merchandise from Walmart and Home Depot.

28. Caves also told Ally's investigators that he could not explain many of the Sandstrom Electric invoices and could not verify what, if any, work was performed. Caves also told Ally's investigators that Flinn was responsible for asking Sandstrom Electric to perform work at the Lewisville, Texas Data Center. Documents uncovered to date show that both of them were involved in approving Sandstrom's invoices.

29. The Plaintiffs' investigation remains ongoing, but GMAC has terminated Flinn and Caves' employment. Thousands of dollars of materials and equipment purchased by Plaintiffs through Flinn and Caves' efforts remain missing. Flinn and Caves have tried to cover up their wrongdoing with evasive responses to inquiries by the investigators. Demand has been made on Sandstrom to explain his invoices, but he has not produced complete information. With their scheme unraveling and thousands of dollars of payments and merchandise unaccounted for, they have started pointing fingers at each other.

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                           **PAGE 8**

## IV. <u>CAUSES OF ACTION</u>

### <u>COUNT 1:</u>
### MONEY HAD AND RECEIVED
### (ALL DEFENDANTS)

30.     Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Third Amended Complaint.

31.     Defendants each hold money they obtained from Plaintiffs.  Defendants are not entitled to retain the money in equity and good conscience.  The money came in to Defendants' possession through the scheme described above.  Sandstrom and Sandstrom Electric obtained money by submitting fraudulent invoices and otherwise being overpaid.  Flinn and Caves obtained the money through expense reimbursements and purchases of property through manipulating the vendors.  Defendants' conduct resulting in money had and received is the proximate cause of damages to Plaintiffs.

### <u>COUNT 2:</u>
### TORTIOUS INTERFERENCE WITH CONTRACTS
### AND BUSINESS RELATIONS
### (ALL DEFENDANTS)

32.     Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Third Amended Complaint.

33.     Flinn and Caves willfully and intentionally interfered with contracts and business relations with Plaintiffs' suppliers and vendors.  More specifically, they had vendors bill the Plaintiffs for goods or services that were either diverted to them for their personal use, that were not performed for Plaintiffs, or that were performed or provided at inflated prices.  The contract with Peloton Real Estate Management ("Peloton") provided that Peloton would make purchases for, and invoice for, materials and supplies for use in Plaintiffs' facilities.  Flinn and Caves

interfered with this agreement by having a Peloton employee make purchases for their personal use. They also interfered with the delivery of the materials and supplies to the facility. In addition, Flinn and Caves interfered with the contract with Sandstrom Electric by working with Sandstrom to cause Sandstrom Electric to submit invoices for work not performed or materials not delivered as well as overcharging. They are also interfering with Plaintiffs' Master Services Agreement (MSA) with Sandstrom Electric to facilitate the breaches set forth in Count 12 of this Third Amended Complaint.

34.     Flinn and Caves interfered with Plaintiffs' relationships with their employees by using them to facilitate the transactions complained of with the vendors. Plaintiffs' employment relationship with these employees included an understanding that these employees were being paid to work for the benefit of Plaintiffs and that they would act in the best interests of Plaintiffs and safeguard Plaintiffs' assets, and ensure that Plaintiffs received what they paid for in transactions with vendors. Flinn and Caves abused their authority by interfering with these relationships and by directing employees to take actions inconsistent with these duties. Flinn and Caves' actions are willful and malicious and intended to interfere with the relationships between Plaintiffs and their employees and vendors. These actions were without privilege or excuse and were the proximate cause of damages to Plaintiffs.

35.     Sandstrom, Sandstrom Electric, and Flinn have also interfered with Plaintiffs' contract with Caves described in the breach of contract claim against Caves asserted below. Specifically, Caves entered into a written agreement with Ally and GMAC that required him to, among other things, fully and completely cooperate with the Plaintiffs' investigation of vendor invoicing improprieties. Caves initially began to cooperate, but then began to refuse to provide truthful and complete information. Flinn, Sandstrom, and Sandstrom Electric contacted Caves

regarding the investigation and have advised him not to provide information to Plaintiffs. Caves has honored their request and has failed to provide information regarding his knowledge of the transactions at issue. By way of example, Flinn told Caves what to purchase on trips to Home Depot with James Grant. Caves knew these purchases were for Flinn's personal use but would be billed to Plaintiffs. Caves also knew that the "WM" and "HD" invoices submitted by Sandstrom and Sandstrom Electric were for purchases at Walmart and Home Depot of items that were never delivered to Plaintiffs, and that Sandstrom was invoicing Plaintiffs for these items, along with a markup. Caves has failed to provide complete information regarding his knowledge as a result of influence by Flinn, Sandstrom, and Sandstrom Electric to thwart Plaintiffs' efforts to prove their claims against them. This tortious interference has significantly increased the costs of the investigation, including attorneys' fees. Their actions are willful and malicious and intended to interfere with the relationships between Plaintiffs and their employees and vendors. These actions were without privilege or excuse and were the proximate cause of damages to Plaintiffs.

<u>**COUNT 3:**</u>
**BREACH OF DUTY OF LOYALTY AND FIDUCIARY DUTIES**
**(FLINN AND CAVES)**

36. Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Third Amended Complaint.

37. As employees, Flinn and Caves had a common law duty to serve Plaintiffs faithfully and honestly. Flinn and Caves were placed in positions of trust and confidence at GMAC. As an Operations Manager responsible for several facilities, Flinn was entrusted with company assets, vendor relationships, employees, and purchasing authority. As the Data Center Manager, Caves also was entrusted with company assets, vendor relationships, employees, and

purchasing authority.  Flinn and Caves breached the duty of loyalty and their fiduciary duties by using the Plaintiffs' employees and vendors for their personal gain.  Further, Flinn and Caves breached their duty of loyalty and fiduciary duties by failing to safeguard company funds and assets.  Flinn and Caves also diverted goods and services paid for by Plaintiffs for their personal gain.  Flinn also breached his fiduciary duty and duty of loyalty by attempting to destroy evidence relating to his conduct.

38.     As a direct and proximate result of Flinn and Caves' breaches of their fiduciary duties and duties of loyalty, Plaintiffs have been damaged and are entitled to recover actual and punitive damages.  Plaintiffs are further entitled to restitution of compensation paid to Flinn and Caves during any period of breach.  Flinn and Caves' breaches, furthermore, were willful, malicious and intentional, entitling Plaintiffs to punitive damages.

### COUNT 4:
### CONVERSION
### (ALL DEFENDANTS)

39.     Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Third Amended Complaint.

40.     Flinn and Caves intentionally committed acts which constitute unlawful conversion of Plaintiffs' property.  Specifically, Flinn and Caves had Plaintiffs pay for goods and services which were diverted to Flinn and Caves.  Flinn and Caves used their positions of trust with Plaintiffs to derive financial benefits which belonged to Plaintiffs.  Sandstrom and Sandstrom Electric also had Plaintiffs pay for goods that Sandstrom purchased from Home Depot and Walmart.  Plaintiffs paid Sandstrom Electric, but the items purchased from Home Depot and Walmart were never delivered to Plaintiffs.  One or more of the Defendants retained the goods purchased from Walmart and Home Depot which Sandstrom and Sandstrom Electric billed to

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                    **PAGE 12**

Plaintiffs. These acts of conversion by Defendants are the proximate cause of damages to Plaintiffs.

## <u>COUNT 5</u>:
## TEXAS THEFT LIABILITY ACT
## (ALL DEFENDANTS)

41.     Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Third Amended Complaint.

42.     This cause of action is brought by Plaintiffs against Flinn and Caves pursuant to the Texas Theft Liability Act, TEX. CIV. PRAC. REM. CODE §§ 134.001 *et seq.*

43.     Plaintiffs are the owners of certain personal property that has value. Specifically, the property at issue was purchased through Peloton or by Sandstrom and Sandstrom Electric and billed to Plaintiffs. By way of example, the property purchased at Home Depot and Walmart by Sandstrom and/or Sandstrom Electric is detailed in the fraud claims below. Each purchase was an individual theft. Defendants knowingly, and without Plaintiffs' effective consent, unlawfully appropriated, secured, or stole thousands of dollars of personal property from Plaintiffs. In addition, Flinn and Caves had control over the disposition of services to which they were not entitled, and they knowingly diverted the services to their own benefit.

44.     As a result of this unlawful appropriation of Plaintiffs' property and services, Plaintiffs have suffered actual damages. Pursuant to TEX. CIV. PRAC. REM. CODE § 134.005(a)(1), Plaintiffs are entitled to recover such actual damages, together with an additional award of $1,000.00 for each individual theft. Although still incomplete, Sandstrom has produced over 100 receipts from Home Depot bearing Caves' signature. Although billed to Plaintiffs, none of the items have been accounted for. Although Defendants have thus far refused to answer which one of them ultimately received the property, if each trip to Home Depot is considered an

individual violation of the statute, each Defendant who participated in the thefts are each liable for at least $100,000.00. Defendants have not produced the Walmart receipts, but Plaintiffs further request the statutory penalty for each purchase which was stolen. Pursuant to TEX. CIV. PRAC. REM. CODE § 134.005(b), Plaintiffs are also entitled to recover their court costs and reasonable and necessary attorney's fees.

<u>**COUNT 6:**</u>
**FRAUD**
**(SANDSTROM AND SANDSTROM ELECTRIC)**

45.     Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Third Amended Complaint.

46.     As delineated in more detail above, Sandstrom and Sandstrom Electric made numerous representations to Plaintiffs while Sandstrom Electric was serving as a vendor. Specifically, they represented through invoices that work had been performed or materials delivered and requested payment of the invoices based on these representations. Sandstrom and Sandstrom Electric also made misrepresentations regarding the dates that services were performed. Copies of these invoices have been provided to Sandstrom Electric with a request for records required to be maintained by Sandstrom Electric under its MSA. Sandstrom Electric has not provided complete information demonstrating that the work was performed or the materials were delivered. From the incomplete information that has been provided, the following invoices contain misrepresentations:

47.     Sandstrom and Sandstrom Electric submitted **Invoice No. 09-807**, dated October 9, 2009, making the false representation that $16,237.50 is owed by GMAC for "Data Center Support" on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on October 6, 2009, from

Sandstrom's personal e-mail account "jsand13231@gmail.com" to Flinn and Caves. Although the description is vague, and Sandstrom and Sandstrom Electric have refused repeated requests for backup documents for the work, the work represented to have been performed appears to be the same work performed by others. If Sandstrom was billing for work performed by another contractor, the entire invoice was fraudulent because GMAC did not receive the services alleged to have been performed. Sandstrom Electric's failure to provide the proof regarding the work that was performed, despite repeated demands and a contractual obligation to do so, is likely part of the scheme of fraudulent markups, as was done on the invoices relating to purchases at Walmart and Home Depot. To the extent any work was performed, there was a fraudulent representation as to the amount and value of the work and Plaintiffs believe this invoice was part of the fraudulent kickback scheme to obtain payments to Sandstrom and Sandstrom Electric. In the event the sales taxes collected were not remitted to the State of Texas, they misrepresented that sales taxes were being paid. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales taxes. Plaintiffs have suffered damages as a result of their reliance on the false representation.

48. Sandstrom and Sandstrom Electric submitted **Invoice No. 09-809**, dated September 15, 2009, making the false representation that $3,017.27 is owed by GMAC for "Substation Repair, September 2009" on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on December 21, 2009, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to Flinn and Caves. The e-mail misrepresents that he was resubmitting the invoice because it may have been lost. Sandstrom and Sandstrom Electric have refused repeated requests for backup documents for the work, most likely because no work was performed and the original invoice

was never submitted.  Sandstrom Electric's failure to provide the proof regarding the work that was performed, despite repeated demands and a contractual obligation to do so, is likely part of the scheme of fraudulent markups and kickbacks, as was done on the invoices relating to purchases at Walmart and Home Depot.  This is evidenced by the fact that Caves responded to Sandstrom's email stating that he was increasing the amount of the invoice by over 50% to $4,641.02.  To the extent any work was performed, there was a fraudulent representation as to the amount and value of the work and Plaintiffs believe this invoice was part of the fraudulent kickback scheme to obtain payments for Sandstrom and Sandstrom Electric.  In the event the sales taxes collected were not remitted to the State of Texas, they misrepresented that sales taxes were being paid.  Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales taxes.  Plaintiffs have suffered damages as a result of their reliance on the false representation.

49.  Sandstrom and Sandstrom Electric submitted **Invoice No. 10-817**, dated October 4, 2010, making the false representation that $1,356.37 is owed by GMAC for "PTZ Camera." This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on December 4, 2010, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and to Caves.  Although the description is vague, and Sandstrom and Sandstrom Electric have refused repeated requests for backup documents for the work, they have not provided any proof that either a camera was purchased by them, or how much work was required to install the camera.  Sandstrom Electric's failure to provide the proof regarding the work that was performed, despite repeated demands and a contractual obligation to do so, is likely part of the scheme of fraudulent markups as was done on the invoices relating to purchases at Walmart and Home Depot.  To the extent any work

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                          **PAGE 16**

was performed, there was a fraudulent representation as to the amount and value of the work and Plaintiffs believe this invoice was part of the fraudulent kickback scheme to obtain payments to Sandstrom and Sandstrom Electric. The invoice also contains a representation that state sales tax was owed in the amount of $103.37. In the event the sales taxes collected were not remitted to the State of Texas, they misrepresented that sales taxes were being paid. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales taxes. Plaintiffs have suffered damages as a result of their reliance on the false representation.

50.     Sandstrom and Sandstrom Electric submitted **Invoice No. 10-818**, dated October 4, 2010, making the false representation that $5,953.75 is owed by GMAC for "Planned power outage planning and support" on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on December 4, 2010, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and to Caves. Although the description is vague, and Sandstrom and Sandstrom Electric have refused repeated requests for backup documents for the work, the work represented to have been performed appears to be the same work performed by others. If Sandstrom was billing for work performed by another contractor, the entire invoice was fraudulent because GMAC did not receive the services alleged to have been performed. Sandstrom Electric's failure to provide the proof regarding the work that was performed, despite repeated demands and a contractual obligation to do so, is likely part of the scheme of fraudulent markups, as was done on the invoices relating to purchases at Walmart and Home Depot. To the extent any work was performed, there was a fraudulent representation as to the amount and value of the work and Plaintiffs believe this invoice was part of the fraudulent kickback scheme to obtain payments to Sandstrom and Sandstrom Electric. In the event the sales taxes collected

were not remitted to the State of Texas, they misrepresented that sales taxes were being paid. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales taxes. Plaintiffs have suffered damages as a result of their reliance on the false representation.

51.     Sandstrom and Sandstrom Electric submitted **Invoice No. 10-819**, dated October 4, 2010, making the false representation that $1,884.90 is owed by GMAC for "shelving and powder coating" on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on December 4, 2010, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and to Caves. The "shelving" appears to be for an expense related to an expense reimbursement request Caves submitted to Plaintiffs on September 5, 2010. Specifically, Caves submitted an expense report requesting reimbursement for "shelving for storage room" in the amount of $543.20. He attached an invoice for C&H Distributors, LLC, with a "bill to" of GMAC Mortgage. Plaintiff's reimbursed Caves for this purchase. On October 29, 2010, Caves e-mailed that same invoice to Sandstrom stating "can you bill us for this and reimburse me" and falsely representing that Plaintiffs were not going to reimburse him. Sandstrom then submitted an invoice on December 4, 2010, via e-mail, claiming reimbursement for $778.75 for "shelving" and added sales tax (which was likely never remitted to the State of Texas). Although the description of "powder coating" is vague, and Sandstrom and Sandstrom Electric have refused repeated requests for backup documents for the work, the work represented to have been performed appears to be the same work performed by others. If Sandstrom was billing for work performed by another contractor, the entire invoice was fraudulent because GMAC did not receive the services alleged to have been performed. Sandstrom Electric's failure

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                          **PAGE 18**

to provide the proof regarding the work that was performed, despite repeated demands and a contractual obligation to do so, is likely part of the scheme of fraudulent markups, as was done on the invoices relating to purchases at Walmart and Home Depot. To the extent any work was performed, there was a fraudulent representation as to the amount and value of the work and Plaintiffs believe this invoice was part of the fraudulent kickback scheme to obtain payments to Sandstrom and Sandstrom Electric. In the event the sales taxes collected were not remitted to the State of Texas, they misrepresented that sales taxes were being paid. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales taxes. Plaintiffs have suffered damages as a result of their reliance on the false representation.

52.     Sandstrom and Sandstrom Electric submitted **Invoice Nos. 11-801 and 802**, dated January 14, 2011. **Invoice 11-801** represents that $2,897.85 is owed for "material for battery cable support." **Invoice 11-802** represents that $4,722.95 is owed for the same thing – "material for battery cable support." These representations were made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on January 16, 2011, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves. With such vague descriptions, Sandstrom and Sandstrom Electric have been asked to provide the backup for both the materials supplied and any work performed. To date, Sandstrom has only provided an invoice for materials purportedly purchased for $1,496.39. Without any backup for any work performed, amounts billed to GMAC reflect a markup on the materials purportedly purchased of over 500%. If Sandstrom is unable to substantiate the fair market value of the work performed, these invoices are fraudulent because Sandstrom and Sandstrom Electric misrepresented the amount of work performed or materials provided. Sandstrom Electric's failure to provide the proof regarding the work that was

performed, despite repeated demands and a contractual obligation to do so, is likely part of the scheme of fraudulent markups, and double billing, as was done on the invoices relating to purchases at Walmart and Home Depot. To the extent any work was performed, there was a fraudulent representation as to the amount and value of the work and Plaintiffs believe this invoice was part of the fraudulent kickback scheme to obtain payments to Sandstrom and Sandstrom Electric. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales taxes. Plaintiffs have suffered damages as a result of their reliance on the false representation.

53. Sandstrom and Sandstrom Electric submitted **Invoice No. 11-803**, dated January 14, 2011, making the false representation that $541.68 was owed by GMAC for either goods or services provided to GMAC on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on January 16, 2011, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves. The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric. Sandstrom and Sandstrom Electric have only provided Home Depot receipts and invoices reflecting the purchase of $240.32, including sales tax, from Home Depot. It is likely that the items purchased from Home Depot and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn. They were not for use at any of Plaintiffs' facilities. An additional unexplained amount for $200.00 and $60.08 was added to the invoice to GMAC. Although Sandstrom and Sandstrom Electric have failed to provide the backup for these amounts, they appear to be a $200.00 markup and an additional 25% of the $240.32. The invoice is further fraudulent because the markup on goods never

delivered to Plaintiffs was over 100%. The representation that these amounts were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts. Sales tax in the amount of $41.28 was added to the GMAC invoice. The representation regarding sales tax being owed is false because sales tax was already included in the $240.32 invoice. Sandstrom and Sandstrom Electric were, therefore, billing for sales tax twice. It is unlikely that they actually remitted the additional sales tax to the State of Texas. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales tax not owed. Plaintiffs have suffered damages as a result of their reliance on the false representations.

54.     Sandstrom and Sandstrom Electric submitted **Invoice No. 11-804**, dated January 14, 2011, making the false representation that $1,169.71 was owed by GMAC for either goods or services provided to GMAC on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on January 16, 2011, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves. The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric. Sandstrom and Sandstrom Electric have only provided Home Depot receipts and invoices reflecting the purchase of $704.45, including sales tax, from Home Depot. It is likely that the items purchased from Home Depot and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn. They were not for use at any of Plaintiffs' facilities. An additional unexplained amount for $200.00 and $176.05 was added to the invoice to GMAC. Although Sandstrom and Sandstrom Electric have failed to provide the backup for these amounts, they appear to be a $200.00 markup and an additional

25% of the $704.45. The invoice is further fraudulent because the markup on goods never delivered to Plaintiffs was over 100%. The representation that these amounts were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts. Sales tax in the amount of $89.15 was added to the GMAC invoice. The representation regarding sales tax being owed is false because sales tax was already included in the $704.45 invoice. Sandstrom and Sandstrom Electric were, therefore, billing for sales tax twice. It is unlikely that they actually remitted the additional sales tax to the State of Texas. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales tax not owed. Plaintiffs have suffered damages as a result of their reliance on the false representations.

55. Sandstrom and Sandstrom Electric submitted **Invoice No. 11-805**, dated March 14, 2011, making the false representation that $1,296.43 was owed by GMAC for either goods or services provided to GMAC on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on March 14, 2011, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves. The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric. Sandstrom and Sandstrom Electric have only provided Home Depot receipts and invoices reflecting the purchase of $798.11, including sales tax, from Home Depot. It is likely that the items purchased from Home Depot and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn. They were not for use at any of Plaintiffs' facilities. An additional unexplained amount for $200.00 and $199.52 was added to the invoice to GMAC. Although Sandstrom and Sandstrom Electric have failed to

provide the backup for these amounts, they appear to be a $200.00 markup and an additional 25% of the $798.11. The invoice is further fraudulent because the markup on goods never delivered to Plaintiffs was over 100%. The representation that these amounts were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts. Sales tax in the amount of $98.80 was added to the GMAC invoice. The representation regarding sales tax being owed is false because sales tax was already included in the $798.11 invoice. Sandstrom and Sandstrom Electric were, therefore, billing for sales tax twice. It is unlikely that they actually remitted the additional sales tax to the State of Texas. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales tax not owed. Plaintiffs have suffered damages as a result of their reliance on the false representations.

56. Sandstrom and Sandstrom Electric submitted **Invoice No. 11-806**, dated March 14, 2011, making the false representation that $385.86 was owed by GMAC for either goods or services provided to GMAC on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on March 14, 2011, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves. The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric. Sandstrom and Sandstrom Electric have only provided Home Depot receipts and invoices reflecting the purchase of $125.16, including sales tax, and a late fee of $30.00, from Home Depot. It is likely that the items purchased from Home Depot and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn. They were not for use at any of Plaintiffs' facilities. An additional unexplained amount for

$200.00 and $31.29 was added to the invoice to GMAC. Although Sandstrom and Sandstrom Electric have failed to provide the backup for these amounts, they appear to be a $200.00 markup and an additional 25% of the $125.16. The invoice is further fraudulent because the markup on goods never delivered to Plaintiffs was over 300%. Further, Sandstrom attempted to bill GMAC for the $30.00 late fee incurred by Sandstrom for failing to pay his credit card bill timely before Sandstrom had even submitted the invoice to GMAC. To add insult to injury, Sandstrom and Sandstrom Electric added the 25% markup to the late fee. The representation that these amounts were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts. Further, GMAC never agreed to pay Sandstrom's personal credit card late fees nor the 25% markup on the late fees. Sandstrom was trying to make a profit on his failure to pay his credit card bill timely. Sales tax in the amount of $29.41 was added to the GMAC invoice. The representation regarding sales tax being owed is false because sales tax was already included in the $95.16 invoice. Sandstrom and Sandstrom Electric were, therefore, billing for sales tax twice. Further, there was no basis to attempt to collect sales tax on the late fee charged by Home Depot. It is unlikely that they actually remitted the additional sales tax to the State of Texas. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales tax not owed. Plaintiffs have suffered damages as a result of their reliance on the false representations.

57.     Sandstrom and Sandstrom Electric submitted **Invoice No. 11-807**, dated March 14, 2011, making the false representation that $1,004.69 was owed by GMAC for either goods or services provided to GMAC on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on November March 14, 2011, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to

"fss.rescappayables@ally.com" and to Caves. The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric. A portion of the amount billed to GMAC, $582.50, was for purchases by Sandstrom and/or Sandstrom Electric at Walmart. Although they have not provided any receipts from Walmart showing the individual items purchased, it is likely that the items purchased from Walmart and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn. They were not for use at any of Plaintiffs' facilities. The statement produced in discovery by Sandstrom for his Walmart Discover card shows a total of $582.50, to which Sandstrom added an additional $200.00 and $145.62 for which no backup has been provided. The $200.00 is likely a markup by Sandstrom and Sandstrom Electric. The $145.62 appears to be a 25% markup of the $582.50 Walmart purchases. The representation that these additional amounts added were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts being placed on the GMAC invoice. Further, although sales taxes were likely already paid at Walmart and included in the $1004.69, Sandstrom and Sandstrom Electric made the false representation that an additional $76.57 was owed in sales taxes and added it to the GMAC invoice. They were, therefore, billing GMAC twice for sales taxes. It is unlikely that they remitted the additional sales taxes to the State of Texas. If they failed to do so, they misrepresented that sales taxes were being paid. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales taxes not owed. Plaintiffs have suffered damages as a result of their reliance on the false representation.

58.    Sandstrom and Sandstrom Electric submitted **Invoice No. 11-821**, dated May 25, 2011, making the false representation that $663.27 was owed by GMAC for either goods or

services provided to GMAC on a date unknown.  This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on May 25, 2011, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves.  The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric.  Sandstrom and Sandstrom Electric have only provided Home Depot receipts, with no account statements reflecting the purchase of $330.18, including sales tax, from Home Depot.  It is likely that the items purchased from Home Depot and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn.  They were not for use at any of Plaintiffs' facilities.  An additional unexplained amount for $200.00 and $82.54 was added to the invoice to GMAC.  Although Sandstrom and Sandstrom Electric have failed to provide the backup for these amounts, they appear to be a $200.00 markup and an additional 25% of the $330.18.  The invoice is further fraudulent because the markup on goods never delivered to Plaintiffs was over 100%.  The representation that these amounts were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts.  Sales tax in the amount of $50.55 was added to the GMAC invoice.  The representation regarding sales tax being owed is false because sales tax was already included in the $330.18 invoice.  Sandstrom and Sandstrom Electric were, therefore, billing for sales tax twice.  It is unlikely that they actually remitted the additional sales tax to the State of Texas.  Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales tax not owed.  Plaintiffs have suffered damages as a result of their reliance on the false representations.

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                             **PAGE 26**

59.     Sandstrom and Sandstrom Electric submitted **Invoice No. 11-822**, dated May 25, 2011, making the false representation that $1,947.53 was owed by GMAC for either goods or services provided to GMAC on a date unknown.  This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on May 25, 2011, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and to Caves.  The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric.  Despite repeated demands, Sandstrom and Sandstrom Electric have not provided the receipts, invoices or any other backup for the amounts billed, but they are believed to be part of the same scheme to make purchases at Walmart, mark them up, add on sales tax, and bill them to GMAC.  Plaintiffs reserve the right to plead further once the documents are provided.

60.     Sandstrom and Sandstrom Electric submitted **Invoice No. 11-823**, dated June 26, 2011, making the false representation that $1,677.12 was owed by GMAC for either goods or services provided to GMAC on a date unknown.  This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on June 22, 2011, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and to Caves.  The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric.  Despite repeated demands, Sandstrom and Sandstrom Electric have not provided the receipts, invoices or any other backup for the amounts billed, but they are believed to be part of the same scheme to make purchases at

Walmart, mark them up, add on sales tax, and bill them to GMAC.  Plaintiffs reserve the right to plead further once the documents are provided.

61.     Sandstrom and Sandstrom Electric submitted **Invoice No. 11-824**, dated June 26, 2011, making the false representation that $550.86 was owed by GMAC for either goods or services provided to GMAC on a date unknown.  This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on July 28, 2011, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves.  The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric.  Sandstrom and Sandstrom Electric have only provided Home Depot receipts, with no account statements reflecting the purchase of $247.11, including sales tax, from Home Depot.  It is likely that the items purchased from Home Depot and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn.  They were not for use at any of Plaintiffs' facilities.  An additional unexplained amount for $200.00 and $61.77 was added to the invoice to GMAC.  Although Sandstrom and Sandstrom Electric have failed to provide the backup for these amounts, they appear to be a $200.00 markup and an additional 25% of the $247.11.  The invoice is further fraudulent because the markup on goods never delivered to Plaintiffs was over 100%.  The representation that these amounts were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts.  Sales tax in the amount of $41.98 was added to the GMAC invoice.  The representation regarding sales tax being owed is false because sales tax was already included in the $247.11 invoice.  Sandstrom and Sandstrom Electric were, therefore, billing for sales tax twice.  It is unlikely that they actually remitted the additional sales tax to the State of Texas.

Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales tax not owed. Plaintiffs have suffered damages as a result of their reliance on the false representations.

62.     Sandstrom and Sandstrom Electric submitted **Invoice No. 11-828**, dated July 28, 2011, making the false representation that $2,881.14 was owed by GMAC for either goods or services provided to GMAC on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on July 28, 2011, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves. The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric. Sandstrom and Sandstrom Electric have only provided Home Depot receipts, with no account statements. The receipts do not match the invoice, but Plaintiffs believe the same formula and markups were used as in other Home Depot invoices. The representation that these amounts were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts. Sales tax in the amount of $219.58 was added to the GMAC invoice. The representation regarding sales tax being owed is false because sales tax was likely already paid at the register at Home Depot. Sandstrom and Sandstrom Electric were, therefore, billing for sales tax twice. It is unlikely that they actually remitted the additional sales tax to the State of Texas. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales tax not owed. Plaintiffs have suffered damages as a result of their reliance on the false representations.

63.     Sandstrom and Sandstrom Electric submitted **Invoice No. 11-829**, dated July 28, 2011, making the false representation that $1,817.90 was owed by GMAC for either goods or services provided to GMAC on a date unknown.  This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on July 28, 2011, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and to Caves.  The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric.  Despite repeated demands, Sandstrom and Sandstrom Electric have not provided the receipts, invoices or any other backup for the amounts billed, but they are believed to be part of the same scheme to make purchases at Walmart, mark them up, add on sales tax, and bill them to GMAC.  Plaintiffs reserve the right to plead further once the documents are provided.

64.     Sandstrom and Sandstrom Electric submitted **Invoice No. 11-830**, dated August 15, 2011, making the false representation that $1,916.80 was owed by GMAC for either goods or services provided to GMAC on a date unknown.  This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail to Caves on August 15, 2011.  The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric.  Sandstrom and Sandstrom Electric have only provided Home Depot receipts during this time frame, but they do not match the invoice.  Plaintiffs believe that Sandstrom applied the same markup scheme.  The merchandise reflected in the receipts provided was not for use at any of Plaintiffs' facilities.  The representation that these amounts were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts.

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                    **PAGE 30**

Sales tax in the amount of $146.08 was added to the GMAC invoice. The representation regarding sales tax being owed is false because sales tax was likely already paid at the register at Home Depot. Sandstrom and Sandstrom Electric were, therefore, billing for sales tax twice. It is unlikely that they actually remitted the additional sales tax to the State of Texas. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales tax not owed. Plaintiffs have suffered damages as a result of their reliance on the false representations.

65.     Sandstrom and Sandstrom Electric submitted **Invoice No. 11-831**, dated August 15, 2011, making the false representation that $4,683.76 was owed by GMAC for either goods or services provided to GMAC on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on August 15, 2011, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and to Caves. The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric. Despite repeated demands, Sandstrom and Sandstrom Electric have not provided the receipts, invoices or any other backup for the amounts billed, but they are believed to be part of the same scheme to make purchases at Walmart, mark them up, add on sales tax, and bill them to GMAC. Plaintiffs reserve the right to plead further once the documents are provided.

66.     Sandstrom and Sandstrom Electric submitted **Invoice No. 11-835**, dated September 19, 2011, making the false representation that $1,382.42 was owed by GMAC for either goods or services provided to GMAC on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail

to Caves on March 1, 2012.  The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric.  Sandstrom and Sandstrom Electric have only provided Home Depot receipts and invoices reflecting the purchase of $861.65, including sales tax, from Home Depot.  It is likely that the items purchased from Home Depot and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn.  The items were not for use at any of Plaintiffs' facilities.  An additional unexplained amount for $200.00 and $215.41 was added to the invoice to GMAC.  Although Sandstrom and Sandstrom Electric have failed to provide the backup for these amounts, they appear to be a $200.00 markup and an additional 25% of the $861.65.  The representation that these amounts were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts.  Sales tax in the amount of $105.36 was added to the GMAC invoice.  The representation regarding sales tax being owed is false because sales tax was already included in the $861.65 invoice.  Sandstrom and Sandstrom Electric were, therefore, billing for sales tax twice.  It is unlikely that they actually remitted the additional sales tax to the State of Texas.  Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales tax not owed.  Plaintiffs have suffered damages as a result of their reliance on the false representations.

67.     Sandstrom and Sandstrom Electric submitted **Invoice No. 11-836**, dated September 19, 2011, making the false representation that $2,619.62 was owed by GMAC for either goods or services provided to GMAC on a date unknown.  This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on September 19, 2011, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to

"fss.rescappayables@ally.com" and Caves.  The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric.  Despite repeated demands, Sandstrom and Sandstrom Electric have not provided the receipts, invoices or any other backup for the amounts billed, but they are believed to be part of the same scheme to make purchases at Walmart, mark them up, add on sales tax, and bill them to GMAC.  Plaintiffs reserve the right to plead further once the documents are provided.

68.    Sandstrom and Sandstrom Electric submitted **Invoice No. 11-837**, dated November 20, 2011, making the false representation that $1,512.27 was owed by GMAC for either goods or services provided to GMAC on a date unknown.  This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail to Caves on November 24, 2011.  The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric.  Sandstrom and Sandstrom Electric have only provided Home Depot receipts with no invoices or backup for the difference between the amount of the receipts and the amount of the Sandstrom invoice. It is likely that the items purchased from Home Depot and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn. They were not for use at any of Plaintiffs' facilities. The unexplained markups were likely the same 15% and $200.00 as was done with other invoices.  The representation that these amounts were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts.  Sales tax in the amount of $115.94 was added to the GMAC invoice.  The representation regarding sales tax being owed is false because sales tax was already included in the register receipts.  Sandstrom and Sandstrom Electric were, therefore, billing for

sales tax twice.  It is unlikely that they actually remitted the additional sales tax to the State of Texas.  Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales tax not owed.  Plaintiffs have suffered damages as a result of their reliance on the false representations.

69.     Sandstrom and Sandstrom Electric submitted **Invoice No. 11-838**, dated November 20, 2011, making the false representation that $1,931.01 was owed by GMAC for either goods or services provided to GMAC on a date unknown.  This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on November 24, 2011, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves.  The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric.  A portion of the amount billed to GMAC, $1,267.07, was for purchases by Sandstrom and/or Sandstrom Electric at Walmart.  Although they have not provided any receipts from Walmart showing the individual items purchased, it is likely that the items purchased from Walmart and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn.  The items were not for use at any of Plaintiffs' facilities.  The statement produced in discovery by Sandstrom for his Walmart Discover card shows a total of $1,267.09, to which Sandstrom added an additional $200.00 and $316.77 for which no backup has been provided.  The $200.00 is likely a markup by Sandstrom and Sandstrom Electric.  The $316.77 appears to be a 25% markup of the $1,267.09 Walmart purchases.  The representation that these additional amounts added were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts being placed on the GMAC invoice.  Further, although sales taxes were likely already paid at Walmart, and included in the

$1,267.07, Sandstrom and Sandstrom Electric made the false representation that an additional $147.17 was owed in sales taxes and added it to the GMAC invoice. They were, therefore, billing GMAC twice for sales taxes. It is unlikely that they remitted the additional sales taxes to the State of Texas. If they failed to do so, they misrepresented that sales taxes were being paid. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales taxes not owed. Plaintiffs have suffered damages as a result of their reliance on the false representation.

70.     Sandstrom and Sandstrom Electric submitted **Invoice No. 11-839**, dated November 20, 2011, making the false representation that $449.11 was owed by GMAC for either goods or services provided to GMAC on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on November 24, 2011, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves. The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric. Sandstrom and Sandstrom Electric have only provided Home Depot receipts and invoices reflecting the purchase of $171.91, including sales tax, from Home Depot. It is likely that the items purchased from Home Depot and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn. They were not for use at any of Plaintiffs' facilities. An additional unexplained amount for $200.00 and $42.97 was added to the invoice to GMAC. Although Sandstrom and Sandstrom Electric have failed to provide the backup for these amounts, they appear to be a $200.00 markup and an additional 25% of the $171.91. The representation that these amounts were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts. Sales

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                                **PAGE 35**

tax in the amount of $34.23 was added to the GMAC invoice. The representation regarding sales tax being owed is false because sales tax was already included in the $171.91 invoice. Sandstrom and Sandstrom Electric were, therefore, billing for sales tax twice. It is unlikely that they actually remitted the additional sales tax to the State of Texas. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales tax not owed. The markup on the $171.91 paid at Home Depot was over 250%. Plaintiffs have suffered damages as a result of their reliance on the false representations.

71.     Sandstrom and Sandstrom Electric submitted **Invoice No. 11-840**, dated November 20, 2011, making the false representation that $499.80 was owed by GMAC for either goods or services provided to GMAC on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on November 24, 2011, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves. The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric. Sandstrom and Sandstrom Electric have only provided Walmart receipts and invoices reflecting the purchase of $209.37, including sales tax, from Walmart. It is likely that the items purchased from Walmart and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn. They were not for use at any of Plaintiffs' facilities. Additional unexplained amounts for $200.00 and $52.34 were added to the invoice to GMAC. Although Sandstrom and Sandstrom Electric have failed to provide the backup for these amounts, they appear to be a $200.00 markup and an additional 25% of the $209.37. The representation that these amounts were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts. Sales tax in

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                            **PAGE 36**

the amount of $38.09 was added to the GMAC invoice. The representation regarding sales tax being owed is false because sales tax was already included in the $209.37 invoice. Sandstrom and Sandstrom Electric were, therefore, billing for sales tax twice. It is unlikely that they actually remitted the additional sales tax to the State of Texas. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales tax not owed. The markup on the $209.37 paid at Walmart was over 200%. Plaintiffs have suffered damages as a result of their reliance on the false representations.

72. Sandstrom and Sandstrom Electric submitted **Invoice Nos. 11-841 and 842**, dated November 20, 2011. **Invoice 11-841** represents that $2,993.43 is owed for "storage lighting." **Invoice 11-842** represents that $1,987.73 is owed for "meeting area power." These representations were made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on November 24, 2011 from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves. With such vague descriptions, Sandstrom and Sandstrom Electric have been asked to provide the backup for both the materials supplied and any work performed. To date, Sandstrom has only provided an invoice for materials – $367.12 purportedly for Invoice 11-842 and $237.66 for Invoice 11-841. Without any backup for any work performed, amounts billed to GMAC reflect markups of over 500% and 1,000% respectively. If Sandstrom is unable to substantiate the fair market value of the work performed, these invoices are fraudulent because Sandstrom and Sandstrom Electric misrepresented the amount of work performed or materials provided. Sandstrom Electric's failure to provide the proof regarding the work that was performed, despite repeated demands and a contractual obligation to do so, is likely part of the scheme of fraudulent markups, and double billing, as was done on the invoices relating to purchases at Walmart and Home Depot.

To the extent any work was performed, there was a fraudulent representation as to the amount and value of the work and Plaintiffs believe this invoice was part of the fraudulent kickback scheme to obtain payments to Sandstrom and Sandstrom Electric. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales taxes. Plaintiffs have suffered damages as a result of their reliance on the false representation.

73. Sandstrom and Sandstrom Electric submitted **Invoice No. 11-843**, dated December 19, 2011, making the false representation that $564.53 was owed by GMAC for either goods or services provided to GMAC on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on December 19, 2011, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves. The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric. Sandstrom and Sandstrom Electric have only provided Home Depot receipts and invoices reflecting the purchase of $257.21, including sales tax, from Home Depot. It is likely that the items purchased from Home Depot and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn. They were not for use at any of Plaintiffs' facilities. Additional unexplained amounts for $200.00 and $64.30 were added to the invoice to GMAC. Although Sandstrom and Sandstrom Electric have failed to provide the backup for these amounts, they appear to be a $200.00 markup and an additional 25% of the $257.21. The representation that these amounts were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts. Sales tax in the amount of $43.02 was added to the GMAC invoice. The representation regarding sales tax being owed is false because sales tax was already included in the $257.21 invoice. Sandstrom

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                    **PAGE 38**

and Sandstrom Electric were, therefore, billing for sales tax twice. It is unlikely that they actually remitted the additional sales tax to the State of Texas. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales tax not owed. The markup on the $257.21 paid at Home Depot was over 200%. Plaintiffs have suffered damages as a result of their reliance on the false representations.

74. Sandstrom and Sandstrom Electric submitted **Invoice No. 11-846**, dated December 19, 2011, making the false representation that $823.24 was owed by GMAC for either goods or services provided to GMAC on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on December 19, 2011, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves. The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric. A portion of the amount billed to GMAC, $448.40, was for purchases by Sandstrom and/or Sandstrom Electric at Walmart. Although they have not provided any receipts from Walmart showing the individual items purchased, it is likely that the items purchased from Walmart and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn. They were not for use at any of Plaintiffs' facilities. The statement produced in discovery by Sandstrom for his Walmart Discover card shows a total of $448.40, to which Sandstrom added an additional $200.00 and $112.10 for which no backup has been provided. The $200.00 is likely a markup by Sandstrom and Sandstrom Electric. The $112.10 appears to be a 25% markup of the $448.40 Walmart purchases. The representation that these additional amounts added were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts being placed on the GMAC invoice. Further,

although sales taxes were likely already paid at Walmart and included in the $448.40, Sandstrom and Sandstrom Electric made the false representation that an additional $62.74 was owed in sales taxes and added it to the GMAC invoice.  They were, therefore, billing GMAC twice for sales taxes.  It is unlikely that they remitted the additional sales taxes to the State of Texas.  If they failed to do so, they misrepresented that sales taxes were being paid.  Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales taxes not owed.  Plaintiffs have suffered damages as a result of their reliance on the false representation.

75.     Sandstrom and Sandstrom Electric submitted **Invoice No. 12-806**, dated February 28, 2012, making the false representation that $1,285.99 was owed by GMAC for either goods or services provided to GMAC on a date unknown.  This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on February 28, 2012, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves.  The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric.  Sandstrom and Sandstrom Electric have only provided Home Depot receipts and invoices reflecting the purchase of $790.39, including sales tax, from Home Depot.  It is likely that the items purchased from Home Depot and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn.  They were not for use at any of Plaintiffs' facilities.  Additional unexplained amounts for $200.00 and $197.59 were added to the invoice to GMAC.  Although Sandstrom and Sandstrom Electric have failed to provide the backup for these amounts, they appear to be a $200.00 markup and an additional 25% of the $790.39.  The representation that these amounts were owed by GMAC is false

because Sandstrom did not provide any services to GMAC to justify billing these amounts. Sales tax in the amount of $98.01 was added to the GMAC invoice. The representation regarding sales tax being owed is false because sales tax was already included in the $790.39 invoice. Sandstrom and Sandstrom Electric were, therefore, billing for sales tax twice. It is unlikely that they actually remitted the additional sales tax to the State of Texas. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales tax not owed. Plaintiffs have suffered damages as a result of their reliance on the false representations.

76. Sandstrom and Sandstrom Electric submitted **Invoice No. 12-807**, dated February 28, 2012, making the false representation that $1,540.56 is owed by GMAC for either goods or services provided to GMAC on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on February 28, 2012, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves. The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric. A portion of the amount billed to GMAC, $987.52, was for purchases by Sandstrom and/or Sandstrom Electric at Walmart. Although they have not provided any receipts from Walmart showing the individual items purchased, it is likely that the items purchased from Walmart and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn. They were not for use at any of Plaintiffs' facilities. The statement produced in discovery by Sandstrom for his Walmart Discover card shows a total of $978.52, to which Sandstrom added an additional $200.00 and $244.63 for which no backup has been provided. The $200.00 is likely a markup by Sandstrom and Sandstrom Electric. The $244.63

appears to be a 25% markup of the $987.52 Walmart purchases. The representation that these additional amounts added were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts being placed on the GMAC invoice. Further, although sales taxes were likely already paid at Walmart and included in the $978.52, Sandstrom and Sandstrom Electric made the false representation that an additional $117.41 was owed in sales taxes and added it to the GMAC invoice. They were, therefore, billing GMAC twice for sales taxes. It is unlikely that they remitted the additional sales taxes to the State of Texas. If they failed to do so, they misrepresented that sales taxes were being paid. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales taxes not owed. Plaintiffs have suffered damages as a result of their reliance on the false representation.

77.     Sandstrom and Sandstrom Electric submitted **Invoice No. 12-810**, dated February 28, 2012, making the false representation that $801.05 is owed by GMAC for "cooling containment door removal/installation" on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on February 28, 2012, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and to Caves. The work involved removing and replacing approximately six screws in a door, while the invoice represents that $740.00 worth of work was performed. The representation was false because GMAC did not receive $740.00 worth of electrical services. Further, Sandstrom has failed to provide the proof regarding the work that was performed despite repeated demands and a contractual obligation to do so. In light of the fraudulent markups and double billing on sales tax on the invoices relating to purchases at Walmart and Home Depot for goods never provided to any of Plaintiffs' facilities, coupled with

the personal benefits received by Flinn and Caves from Sandstrom and Sandstrom Electric in exchange for approving invoices, Plaintiffs believe this invoice was part of the fraudulent scheme to obtain payments to Sandstrom and Sandstrom Electric as part of the kickback scheme. In the event the sales taxes collected were not remitted to the State of Texas, they misrepresented that sales taxes were being paid. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales taxes. Plaintiffs have suffered damages as a result of their reliance on the false representation.

78.     Sandstrom and Sandstrom Electric submitted **Invoice No. 12-811**, dated February 28, 2012, making the false representation that $2,598.00 is owed by GMAC for "cut raised floor tile for new CRAC" on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on February 28, 2012 from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves. Although the description is vague, and Sandstrom and Sandstrom Electric have refused repeated requests for backup documents for the work, the work represented to have been performed appears to be the same work another contractor was supposed to perform. If Sandstrom was billing for work performed by another contractor, the entire invoice was fraudulent because GMAC did not receive the services alleged to have been performed. Sandstrom Electric's failure to provide the proof regarding the work that was performed, despite repeated demands and a contractual obligation to do so, is likely part of the scheme of fraudulent markups, and double billing on sales tax, as was done on the invoices relating to purchases at Walmart and Home Depot. The cost of cutting tile is approximately $27 per tile and Sandstrom's bill reflects $150 per tile. To the extent any work was performed, there was a fraudulent representation as to the amount and value of the work and Plaintiffs believe this

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                    **PAGE 43**

invoice was part of the fraudulent kickback scheme to obtain payments to Sandstrom and Sandstrom Electric. In the event the sales taxes collected were not remitted to the State of Texas, they misrepresented that sales taxes were being paid. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales taxes. Plaintiffs have suffered damages as a result of their reliance on the false representation.

79.     Sandstrom and Sandstrom Electric submitted **Invoice No. 12-815**, dated March 1, 2012, making the false representation that $777.30 was owed by GMAC for either goods or services provided to GMAC on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail to Caves on March 26, 2012. The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric. Sandstrom and Sandstrom Electric have only provided Home Depot receipts with no invoices or backup for the difference between the amount of the receipts and the amount of the Sandstrom invoice. It is likely that the items purchased from Home Depot and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn. They were not for use at any of Plaintiffs' facilities. The unexplained markups were likely the same 25% and $200.00 as was done with other invoices. The representation that these amounts were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts. Sales tax in the amount of $59.24 was added to the GMAC invoice. The representation regarding sales tax being owed is false because sales tax was already included in the register receipts. Sandstrom and Sandstrom Electric were, therefore, billing for sales tax twice. It is unlikely that they actually remitted the additional sales tax to the State of Texas. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales

tax not owed. Plaintiffs have suffered damages as a result of their reliance on the false representations.

80.     Sandstrom and Sandstrom Electric submitted **Invoice No. 12-816**, dated March 1, 2012, making the false representation that $800.68 was owed by GMAC for either goods or services provided to GMAC on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on March 26, 2012, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves. The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric. Despite repeated demands, Sandstrom and Sandstrom Electric have not provided the receipts, invoices or any other backup for the amounts billed, but they are believed to be part of the same scheme to make purchases at Walmart, mark them up, add on sales tax, and bill them to GMAC. Plaintiffs reserve the right to plead further once the documents are provided.

81.     Sandstrom and Sandstrom Electric submitted **Invoice No. 12-821**, dated April 1, 2012, making the false representation that $1,664.76 was owed by GMAC for either goods or services provided to GMAC on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on April 19, 2012, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves. The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric. Despite repeated demands, Sandstrom and Sandstrom Electric have not provided the receipts, invoices or any other backup for the

<u>**PLAINTIFFS' THIRD AMENDED COMPLAINT**</u>                                            **PAGE 45**

amounts billed, but they are believed to be part of the same scheme to make purchases at Walmart, mark them up, add on sales tax, and bill them to GMAC. Plaintiffs reserve the right to plead further once the documents are provided.

82.     Sandstrom and Sandstrom Electric submitted **Invoice No. 12-822**, dated April 1, 2012, making the false representation that $1,796.31 was owed by GMAC for either goods or services provided to GMAC on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail to Caves on April 19, 2012. The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric. Sandstrom and Sandstrom Electric have only provided Home Depot receipts, with no invoices or backup for the difference between the amount of the receipts and the amount of the Sandstrom invoice. It is likely that the items purchased from Home Depot and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn. They were not for use at any of Plaintiffs' facilities. The unexplained markups were likely the same 25% and $200.00 as was done with other invoices. The representation that these amounts were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts. Sales tax in the amount of $136.90 was added to the GMAC invoice. The representation regarding sales tax being owed is false because sales tax was already included in the register receipts. Sandstrom and Sandstrom Electric were, therefore, billing for sales tax twice. It is unlikely that they actually remitted the additional sales tax to the State of Texas. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales tax not owed. Plaintiffs have suffered damages as a result of their reliance on the false representations.

83.     Sandstrom and Sandstrom Electric submitted **Invoice No. 12-824**, dated June 1, 2012, making the false representation that $1,724.26 was owed by GMAC for either goods or services provided to GMAC on a date unknown.  This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on June 5, 2012, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves.  The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric.  Despite repeated demands, Sandstrom and Sandstrom Electric have not provided the receipts, invoices or any other backup for the amounts billed, but they are believed to be part of the same scheme to make purchases at Walmart, mark them up, add on sales tax, and bill them to GMAC.  Plaintiffs reserve the right to plead further once the documents are provided.

84.     Sandstrom and Sandstrom Electric submitted **Invoice No. 12-825**, dated June 1, 2012, making the false representation that $777.30 was owed by GMAC for either goods or services provided to GMAC on a date unknown.  This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail to Caves on June 5, 2012.  The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric.  Sandstrom and Sandstrom Electric have only provided Home Depot receipts, with no invoices or backup for the difference between the amount of the receipts and the amount of the Sandstrom invoice.  It is likely that the items purchased from Home Depot and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn.  They were not for use at any of Plaintiffs' facilities.  The unexplained markups were likely the same 25% and

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                    **PAGE 47**

$200.00 as was done with other invoices. The representation that these amounts were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts. Sales tax in the amount of $98.78 was added to the GMAC invoice. The representation regarding sales tax being owed is false because sales tax was already included in the register receipts. Sandstrom and Sandstrom Electric were, therefore, billing for sales tax twice. It is unlikely that they actually remitted the additional sales tax to the State of Texas. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales tax not owed. Plaintiffs have suffered damages as a result of their reliance on the false representations.

85. Sandstrom and Sandstrom Electric submitted **Invoice No. 12-826**, dated June 1, 2012, making the false representation that $1,485.64 was owed by GMAC for either goods or services provided to GMAC on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail to Caves on June 5, 2012. The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric. Sandstrom and Sandstrom Electric have only provided Home Depot receipts, with no invoices or backup for the difference between the amount of the receipts and the amount of the Sandstrom invoice. It is likely that the items purchased from Home Depot and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn. They were not for use at any of Plaintiffs' facilities. The unexplained markups were likely the same 25% and $200.00 as was done with other invoices. The representation that these amounts were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts. Sales tax in the amount of $113.22 was added to the GMAC invoice. The

representation regarding sales tax being owed is false because sales tax was already included in the register receipts. Sandstrom and Sandstrom Electric were, therefore, billing for sales tax twice. It is unlikely that they actually remitted the additional sales tax to the State of Texas. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales tax not owed. Plaintiffs have suffered damages as a result of their reliance on the false representations.

86.     Sandstrom and Sandstrom Electric submitted **Invoice No. 12-834**, dated July 2, 2012, making the false representation that $2,394.63 is owed by GMAC for either goods or services provided to GMAC on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on July 16, 2012, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and to Caves. The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric. A portion of the amount billed to GMAC, $1,609.71, was for purchases by Sandstrom and/or Sandstrom Electric at Walmart. Although they have not provided any receipts from Walmart showing the individual items purchased, it is likely that the items purchased from Walmart and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn. They were not for use at any of Plaintiffs' facilities. The statement produced in discovery by Sandstrom for his Walmart Discover card shows a total of $1,609.71, to which Sandstrom added an additional $200.00 and $404.42 for which no backup has been provided. The $200.00 is likely a markup by Sandstrom and Sandstrom Electric. The $404.42 appears to be a 25% markup of the $1,609.71 Walmart purchases. The representation that these additional amounts added were owed by GMAC is false because Sandstrom did not

provide any services to GMAC to justify billing these amounts being placed on the GMAC invoice. Further, although sales taxes were likely already paid at Walmart and included in the $1,609.71, Sandstrom and Sandstrom Electric made the false representation that an additional $182.50 was owed in sales taxes and added it to the GMAC invoice. They were, therefore, billing GMAC twice for sales taxes. It is unlikely that they remitted the additional sales taxes to the State of Texas. If they failed to do so, they misrepresented that sales taxes were being paid. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales taxes not owed. Plaintiffs have suffered damages as a result of their reliance on the false representation.

87.     Sandstrom and Sandstrom Electric submitted **Invoice No. 12-835**, dated July 2, 2012, making the false representation that $2,127.42 is owed by GMAC for either goods or services provided to GMAC on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on July 16, 2012, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves. The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric. A portion of the amount billed to GMAC, $1,412.23, was for purchases by Sandstrom and/or Sandstrom Electric at Walmart. Although they have not provided any receipts from Walmart showing the individual items purchased, it is likely that the items purchased from Walmart and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn. They were not for use at any of Plaintiffs' facilities. The statement produced in discovery by Sandstrom for his Walmart Discover card shows a total of $1,412.23, to which Sandstrom added an additional $200.00 and $353.05 for which no backup

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                    **PAGE 50**

has been provided. The $200.00 is likely a markup by Sandstrom and Sandstrom Electric. The $353.05 appears to be a 25% markup of the $1,412.23 Walmart purchases. The representation that these additional amounts added were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts being placed on the GMAC invoice. Further, although sales taxes were likely already paid at Walmart and included in the $1,412.23, Sandstrom and Sandstrom Electric made the false representation that an additional $162.14 was owed in sales taxes and added it to the GMAC invoice. They were, therefore, billing GMAC twice for sales taxes. It is unlikely that they remitted the additional sales taxes to the State of Texas. If they failed to do so, they misrepresented that sales taxes were being paid. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales taxes not owed. Plaintiffs have suffered damages as a result of their reliance on the false representation.

88.     Sandstrom and Sandstrom Electric submitted **Invoice No. 12-841**, dated August 16, 2012, making the false representation that $1,340.75 is owed by GMAC for either goods or services provided to GMAC on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on August 16, 2012, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves. The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric. A portion of the amount billed to GMAC, $830.86, was for purchases by Sandstrom and/or Sandstrom Electric at Walmart. Although they have not provided any receipts from Walmart showing the individual items purchased, it is likely that the items purchased from Walmart and billed to GMAC were either retained by Sandstrom

or given to Caves or Flinn. They were not for use at any of Plaintiffs' facilities. The statement produced in discovery by Sandstrom for his Walmart Discover card shows a total of $830.86, to which Sandstrom added an additional $200.00 and $207.71 for which no backup has been provided. The $200.00 is likely a markup by Sandstrom and Sandstrom Electric. The $207.71 appears to be a 25% markup of the $830.86 Walmart purchases. The representation that these additional amounts added were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts being placed on the GMAC invoice. Further, although sales taxes were likely already paid at Walmart and included in the $803.86, Sandstrom and Sandstrom Electric made the false representation that an additional $102.18 was owed in sales taxes and added it to the GMAC invoice. They were, therefore, billing GMAC twice for sales taxes. It is unlikely that they remitted the additional sales taxes to the State of Texas. If they failed to do so, they misrepresented that sales taxes were being paid. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales taxes not owed. Plaintiffs have suffered damages as a result of their reliance on the false representation.

89.     Sandstrom and Sandstrom Electric submitted **Invoice No. 12-842**, dated August 16, 2012, making the false representation that $835.33 was owed by GMAC for either goods or services provided to GMAC on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on August 16, 2012, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves. The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric. Sandstrom and Sandstrom Electric have

only provided Home Depot receipts and invoices reflecting the purchase of $457.34, including sales tax, from Home Depot. It is likely that the items purchased from Home Depot and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn. They were not for use at any of Plaintiffs' facilities. An additional unexplained amount for $200.00 and $114.33 was added to the invoice to GMAC. Although Sandstrom and Sandstrom Electric have failed to provide the backup for these amounts, they appear to be a $200.00 markup and an additional 25% of the $457.34. The representation that these amounts were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts. Sales tax in the amount of $63.66 was added to the GMAC invoice. The representation regarding sales tax being owed is false because sales tax was already included in the $457.34 invoice. Sandstrom and Sandstrom Electric were, therefore, billing for sales tax twice. It is unlikely that they actually remitted the additional sales tax to the State of Texas. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales tax not owed. Plaintiffs have suffered damages as a result of their reliance on the false representations.

90.     Sandstrom and Sandstrom Electric submitted **Invoice No. 12-836**, dated July 2, 2012, making the false representation that $783.73 was owed by GMAC for either goods or services provided to GMAC on a date unknown. This representation was made by Sandstrom and Sandstrom Electric through the submission of the invoice to GMAC via e-mail on July 16, 2012, from Sandstrom's personal e-mail account "jsand13231@gmail.com" to "fss.rescappayables@ally.com" and Caves. The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric. Sandstrom and Sandstrom Electric have

only provided Home Depot receipts and invoices reflecting the purchase of $419.20, including sales tax, from Home Depot. It is likely that the items purchased from Home Depot and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn. They were not for use at any of Plaintiffs' facilities. Additional unexplained amounts for $200.00 and $104.80 were added to the invoice to GMAC. Although Sandstrom and Sandstrom Electric have failed to provide the backup for these amounts, they appear to be a $200.00 markup and an additional 25% of the $419.20. The representation that these amounts were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts. Sales tax in the amount of $59.73 was added to the GMAC invoice. The representation regarding sales tax being owed is false because sales tax was already included in the $419.20 invoice. Sandstrom and Sandstrom Electric were, therefore, billing for sales tax twice. It is unlikely that they actually remitted the additional sales tax to the State of Texas. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales tax not owed. Plaintiffs have suffered damages as a result of their reliance on the false representations.

91.    **Invoice Nos. 12-839 and 12-840** were submitted twice. The first invoice was submitted with the "sold to" as GMAC, and was dated August 16, 2012. It was later altered to change the "sold to," representing that the work was performed for Ally, with a different address. Although it was also dated August 16, 2012, it was mailed with a cover letter dated November 8, 2012, stating that the invoice was a "true and correct" copy and the invoice and was for materials supplied to Ally. Sandstrom submitted this invoice after the conspiracy to submit invoices through Caves was discovered, so Sandstrom altered the invoice in an attempt to obtain payment through the threat of a lien on the property.

<u>**PLAINTIFFS' THIRD AMENDED COMPLAINT**</u>                                                                  **PAGE 54**

92.     There are numerous other invoices submitted by Sandstrom and Sandstrom Electric in the same manner – an e-mail to fss.rescappayables@ally.com, with a copy to Caves or sometimes to Caves and Flinn.  Plaintiffs have provided Sandstrom and Sandstrom Electric with a list of the invoices at issue to give them an opportunity to explain what services were performed or what goods were delivered.  They have yet to provide the information so Plaintiffs reserve the right to amend to plead additional fraudulent invoices.

93.     At the time Sandstrom and Sandstrom Electric made the above-referenced representations, Sandstrom and Sandstrom Electric knew they were false, made them in bad faith or made them with a conscious indifference to their truth or falsity.  Sandstrom and Sandstrom Electric made these fraudulent misrepresentations and/or misrepresentations of material fact to induce Plaintiffs to, among other things, pay for goods and services that Plaintiffs did not receive or benefit from.

94.     Plaintiffs reasonably relied on these misrepresentations and/or omissions and, as a result thereof, paid monies to Sandstrom and Sandstrom Electric.  Plaintiffs would not have taken these actions, among others, had Plaintiffs known the falsity of and intentions behind Sandstrom and Sandstrom Electric's representations and/or Sandstrom Electric's omissions of material fact.  No reasonable person or entity would have interpreted the representations made by Sandstrom and Sandstrom Electric in any different way than Plaintiffs did.

95.     Plaintiffs suffered damages proximately caused by Sandstrom Electric's fraud.

## COUNT 7
## DISGORGEMENT OF PROFITS
## (ALL DEFENDANTS)

96.     Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Third Amended Complaint.

97.     As set forth in Count 6, Sandstrom and Sandstrom Electric submitted fraudulent invoices to obtain payment for goods not provided and services not performed.  They likely also collected sales taxes which were not remitted to the State of Texas.  Sandstrom claims that the Walmart and Home Depot purchases were made by Caves and when asked where the merchandise went, claims Plaintiffs should ask Caves.  Caves claims he does not know and that Plaintiffs should ask Flinn.  Someone is not telling the truth.  If Sandstrom or Sandstrom Electric kept the merchandise, the profited in the full amount of the invoices.

98.     Additional invoices are still under investigation, but it is likely that Sandstrom and Sandstrom Electric engaged in the same type of markup scheme to be paid for work not performed or goods not delivered.

99.     If Flinn or Caves kept the merchandise, Sandstrom and Sandstrom Electric still profited in the amount of the 25% and $200 markup and possibly the sales tax.  If Flinn or Caves kept the merchandise, they profited in the amount of the value of the merchandise.

100.     Caves further profited from submitting expense reimbursements for his personal purchases, such as the meals while on vacation at Sandstrom's condo, the power washer, and the microwave.

101.     Although all Defendants are refusing to fully respond to discovery on these issues, Plaintiffs are entitled to an equitable award for disgorgement of profits from all Defendants who benefitted from this scheme.  The breaches of duties owed to Plaintiffs – Caves and Flinn as employees and Sandstrom and Sandstrom Electric as contractors who were given access to Plaintiffs facilities – were willful and deliberate and they are not entitled to compensation even for properly performed services for which no compensation is apportioned.  "[T]he possibility of forfeiture of compensation discourages an agent from taking personal advantage of his position

of trust in every situation no matter the circumstances, whether the principal may be injured or not. The remedy of forfeiture removes any incentive for an agent to stray from his duty of loyalty based on the possibility that the principal will be unharmed or may have difficulty proving the existence or amount of damages." *Burrow v. Arce*, 997 S.W.2d 229, 237-45 (Tex. 1999).

102. Plaintiffs request that the Court consider the equitable factors within the Court's discretion such as gravity and timing of the breach of duty, the level of intent or fault, as well as the adequacy of other remedies, including any punitive damages award. The Court should fashion the remedy to fit the circumstances and work to serve the ultimate goal of protecting relationships of trust.

## COUNT 8
## FRAUD
## (FLINN)

103. Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Third Amended Complaint.

104. Flinn represented that the Plaintiffs were receiving the benefit of the goods and services they paid for when he approved the vendor invoices. Flinn also represented that expense reports submitted or approved by him were for legitimate business expenses. His submission or approval of invoices or expense reports was a representation to Plaintiffs that the submissions were proper and the amounts should be paid. He failed to disclose the fact that he was receiving a personal benefit from payment of the invoices. By way of example, as a result of payments made to Sandstrom Electric on invoices he approved, Flinn received the personal benefit of free electrical work at his ranch house, free land upon which to build the house, and building supplies purchased by Sandstrom. He also received goods purchased through Peloton for invoices he approved and a free heating and air conditioning from Venture Mechanical. At the time Flinn

made the above-referenced representations, or material omissions of fact, he knew they were false, made them in bad faith or made them with a conscious indifference to their truth or falsity. Flinn made these fraudulent misrepresentations and/or omissions of material fact to induce Plaintiffs, among other things, to pay for goods and services that Plaintiffs did not receive or benefit from.

105.    At the time Flinn made the above-referenced representations, or omissions of material fact, Flinn knew they were false, made them in bad faith or made them with a conscious indifference to their truth or falsity.  Flinn made these fraudulent misrepresentations and/or omissions of material fact to induce Plaintiffs to, among other things, pay for goods and services that Plaintiffs did not receive or benefit from.  Flinn knew that if he disclosed to Plaintiffs that he was receiving free electrical work, free heating and air conditioning systems, goods purchased through Peloton, and was expensing personal expenses, Plaintiffs would not have paid the invoices or the expense reimbursements.

106.    On October 3, 2002, Flinn sent an email to Tim Tarsi, Troy Dechant and Nona DePaul (Ally/Flinn 1548), with a copy to Sandstrom, proposing that Price Edwards, n/k/a Peloton provide maintenance for the Data Center.  He represented that parts purchased by the maintenance provider would be included in the invoice with no markup.  Flinn knew this representation was false because he would use Peloton and Sandstrom to make purchases for his personal use.  Further, Sandstrom placed a substantial markup on purchases from Home Depot and Walmart.

107.    On October 28, 2010, Flinn was asked via e-mail to confirm that he had reviewed expenses submitted by Caves for reimbursement and that they were valid and in accordance with company policy.  Flinn represented that the expenses were in order.  Flinn knew this

representation was false because Caves had been submitting expenses for purchases of items not for use in the facility.

108.    On June 8, 2011, Flinn sent a memo to Ally managers representing that certain security measures would be followed at Data Centers. (DEF 0858). He represented that visitors (which would have included Sandstrom) would have to sign in at the Security Desk. This representation was false because Flinn allowed Sandstrom to enter and leave the Data Center without following this procedure. Flinn also represented that the issuance of access cards would be done in accordance with HR new hire procedures. This representation was false because Sandstrom was provided an access card without following these procedures.

109.    Caves told Ally's investigator that Flinn represented to Caves (on dates and times known to Caves) that he must approve Sandstrom Electric invoices and not question them. If Flinn made this representation to Caves, the representation was false. Plaintiffs incorporate by reference the factual allegations below in the fraud claim against Caves regarding specific approvals of the Sandstrom Electric invoices. Plaintiff relied on the representations that the invoices were approved and suffered damages when it paid them.

110.    Plaintiffs reasonably relied on these misrepresentations and/or omissions and, as a result thereof, paid monies to the vendors and to Flinn, or others for the benefit of Flinn, through expense reimbursements. Plaintiffs would not have taken these actions, among others, had Plaintiffs known the falsity of, and intentions behind Flinn's representations and/or Flinn's omissions of material fact. No reasonable person or entity would have interpreted the representations made by Flinn in any different way than Plaintiffs did.

111.    Plaintiffs suffered damages proximately caused by Flinn's fraud.

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                                    **PAGE 59**

## COUNT 9
### FRAUD
### (CAVES)

112.  Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Third Amended Complaint.

113.  Caves represented that the Plaintiffs were receiving the benefit of the goods and services they paid for when he approved the vendor invoices.  Caves also represented that expense reports submitted by him were for legitimate business expenses.  One example of a misrepresentation in an expense report was his request for reimbursement for a power washer.  He also took a template Sandstrom Electric invoice and increased the amount to be paid to Sandstrom, misrepresenting to Plaintiffs the amount Sandstrom was requesting to be paid.  He also submitted a receipt for $124.19 for "Moby Dick's" restaurant dated July 20, 2010, representing that it was for "meals with employees" for "Little Rock Plannings" in Dallas.  This representation was false because the restaurant is in Port Aransas, and the meal was with his family in connection with their free stay at Sandstrom's condo.  Caves made a similar misrepresentation in submitting his expense report requesting reimbursement for $178.12 for "meals with client" for "electrical design review" at Trout Street Bar & Grill.  This representation was false because the restaurant is in Port Aransas and the meal was in connection with his free stay at Sandstrom's condo.

114.  Caves' submission or approval of invoices or expense reports was a representation to Plaintiffs that the submissions were proper and the amounts should be paid.  He failed to disclose the fact that he was receiving a personal benefit from payment of the invoices.  By way of example, as a result of payments made to Sandstrom Electric on invoices he approved, he received the personal benefit of free travel expenses for a trip to San Antonio for his wife.  Upon

information and belief, Caves also stayed at a property belonging to Sandstrom on the Gulf Coast. He also received goods purchased through Peloton for invoices he approved. At the time Caves made the above-referenced representations, or material omissions of fact, he knew they were false, made them in bad faith or made them with a conscious indifference to their truth or falsity. Caves made these fraudulent misrepresentations and/or omissions of material fact to induce Plaintiffs to, among other things, pay for goods and services that Plaintiffs did not receive or benefit from. Caves knew that if he disclosed to Plaintiffs that he was receiving free goods purchased through Peloton, stays at Sandstrom's Gulf Coast property, and was expensing personal expenses, Plaintiffs would not have paid the invoices or the expense reimbursements.

115. Further examples of fraudulent representations by Caves are his approval of Sandstrom invoices:

116. Sandstrom and Sandstrom Electric submitted **Invoice No. 09-809**, dated September 15, 2009, for $3,017.27 to Flinn and Caves. Caves altered the invoice, increasing the amount of the invoice by over 50% to $4,641.02. Caves e-mailed the altered invoice to Raushanah Green on December 21, 2009, requesting that it be paid. To the extent any work was performed, there was a fraudulent representation as to the amount and value of the work and Plaintiffs believe this invoice was part of the fraudulent kickback scheme to obtain payments to Sandstrom and Sandstrom Electric. In the event the sales taxes collected were not remitted to the State of Texas, they misrepresented that sales taxes were being paid. Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales taxes. Plaintiffs have suffered damages as a result of their reliance on the false representation.

a. As set forth in more detail above, Sandstrom and Sandstrom Electric submitted **Invoice No. 11-803**, dated January 14, 2011, making the false representation that

**PLAINTIFFS' THIRD AMENDED COMPLAINT** **PAGE 61**

$541.68 was owed by GMAC for either goods or services provided to GMAC on a date unknown. On January 19, 2011, Caves was asked via e-mail by Nikunj Chauhan, an employee of Ally Finance Shared Services, to review the invoice and check it for accuracy and code it to the proper cost center. He was asked to respond via e-mail to Nikunj Chauhan with a copy to the same e-mail address where Sandstrom and Sandstrom Electric originally sent the invoice – "fss.rescappayables@ally.com." Caves responded on January 19 via e-mail, representing that the invoice was approved and should be charged against GMAC's account and the cost center. Caves' representation was false because, as explained in more detail above in the fraud claims asserted against Sandstrom and Sandstrom Electric, the invoice was bogus, but Caves falsely represented that it was approved and should be paid. The representation was false because the amount billed was for the purchasing of goods which were not delivered to GMAC, plus additional amounts added by Sandstrom and Sandstrom Electric. Sandstrom and Sandstrom Electric have only provided Home Depot receipts and invoices reflecting the purchase of $240.32, including sales tax, from Home Depot. It is likely that the items purchased from Home Depot and billed to GMAC were either retained by Sandstrom or given to Caves or Flinn. They were not for use at any of Plaintiffs' facilities. An additional unexplained amount for $200.00 and $60.08 was added to the invoice to GMAC. Although Sandstrom and Sandstrom Electric have failed to provide the backup for these amounts, they appear to be a $200.00 markup and an additional 25% of the $240.32. The invoice is further fraudulent because the markup on goods never delivered to Plaintiffs was over 100%. The representation that these amounts were owed by GMAC is false because Sandstrom did not provide any services to GMAC to justify billing these amounts. Sales tax in the amount of $41.28 was added to the GMAC invoice. The representation regarding sales tax being owed is false because sales tax was already included in

**PLAINTIFFS' THIRD AMENDED COMPLAINT** **PAGE 62**

the $240.32 invoice.  Sandstrom and Sandstrom Electric were, therefore, billing for sales tax twice.  It is unlikely that they actually remitted the additional sales tax to the State of Texas.  Plaintiffs relied on the representations of Sandstrom and Sandstrom Electric and paid the invoice, including sales tax not owed.  Plaintiffs have suffered damages as a result of their reliance on the false representations.

        b.     As evidenced by Def 253, and Ally/Flinn 003336 through 003459, Caves followed this same approval process for all of the Sandstrom invoices described in the fraud claim above asserted against Sandstrom and Sandstrom Electric.  On most of the e-mails, Caves even noted that it was "urgent" to get the Sandstrom invoices approved.

        117.    Caves also misrepresented to Jim Magee, VP Senior Finance Officer – ITG, that the Data Center needed funding to pay Sandstrom $146,000.00, and to pay Peloton the sum of $218,790 for "Data Hardware."  On August 12, 2010, he sent an e-mail to Mr. Magee stating that the budget should be approved.  Caves knew that the representation was false because he had been involved in the scheme to purchase items from Walmart and Home Depot that were never delivered to Plaintiffs and did not constitute "Data Hardware."  This occurred shortly after Caves stayed in Sandtrom's "condo" in Port Aransas.

        118.    On September 5, 2010, Caves submitted an expense report requesting reimbursement for "shelving for storage room" in the amount of $543.20.  He attached an invoice from C&H Distributors, LLC, with a "bill to" of GMAC Mortgage.  Plaintiffs reimbursed Caves for this purchase.  On October 29, 2010, Caves e-mailed that same invoice to Sandstrom stating "can you bill us for this and reimburse me" and falsely represented that Plaintiffs were not going to reimburse him.  Sandstrom then submitted an invoice on December 4, 2010, via e-mail, claiming reimbursement for $778.75 for "shelving" and added sales tax (which was likely never

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                          **PAGE 63**

remitted to the State of Texas). On December 9, 2010, Caves e-mailed Ally's Finance Shared Services Department stating that the invoice was "approved."

119.    On August 26, 2012, Caves submitted an expense report and attendee list for a $500.70 meal at Bohanan's Prime Steaks. In the attendee list, he represented that 17 people attended the dinner. This representation was false because the only attendees were Caves, his wife, Sandstrom and his wife.

120.    Plaintiffs reasonably relied on these misrepresentations and/or omissions and, as a result thereof, paid monies to the vendors and to Caves, or others for the benefit of Caves, through expense reimbursements. Plaintiffs would not have taken these actions, among others, had Plaintiffs known the falsity of, and intentions behind Caves representations and/or Caves' omissions of material fact. No reasonable person or entity would have interpreted the representations made by Caves in any different way than Plaintiffs did.

121.    Plaintiffs suffered damages proximately caused by Caves' fraud.

## COUNT 10:
## CONSPIRACY
## (ALL DEFENDANTS)

122.    Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Third Amended Complaint.

123.    As more particularly described above, Defendants entered into various agreements to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. The ultimate goal of each of these agreements was to funnel money, goods, or services to each of them through a scheme of submitting invoices or expense reimbursement requests for payment by Plaintiffs. By way of example, Flinn and Caves agreed that certain of Flinn's personal expenses would be submitted on Caves' expense reports, then approved by Flinn, to essentially

allow Flinn to approve his own expenses and circumvent expense approval policies. Flinn and Caves also agreed that fraudulent expense reports would be submitted so they could both be reimbursed for personal expenses Plaintiffs would not have approved. Flinn and Caves also conspired to have Peloton purchase goods for Flinn and Caves' personal use and to have Plaintiffs pay the invoices. Caves and Sandstrom also agreed on at least one occasion to take an invoice submitted by Sandstrom Electric and to increase the amount to have Plaintiffs pay even more money than Sandstrom Electric originally requested. Caves and Sandstrom conspired regarding the Home Depot and Walmart purchases which were subsequently billed to Plaintiffs with markups going to Sandstrom and Sandstrom Electric. Flinn and Sandstrom agreed that Sandstrom would perform free electrical work at Flinn's ranch house, Sandstrom would give Flinn land, and fraudulent invoices would be submitted to Plaintiffs to funnel money to Sandstrom. Sandstrom, Sandstrom Electric, Flinn and Caves further conspired to push though payment of Sandstrom Electric invoices for services not performed or goods not delivered.

124. Flinn, Caves and Sandstrom have further conspired after demands were made for preservation of evidence to thwart Plaintiffs' efforts to obtain information. They have all agreed to a strategy involving either silence, refusing to turn over information, or claiming they have no explanations for fraudulent invoices.

125. Defendants' conspiracy has proximately caused Plaintiffs to incur actual damages.

## <u>COUNT 11</u>:
## BREACH OF CONTRACT
## (CAVES)

126. Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Third Amended Complaint.

127.    Following the termination of his employment, Caves entered into a written agreement with Ally and GMAC that required him to, among other things, fully and completely cooperate with the Plaintiffs' investigation of vendor invoicing improprieties and to return all of Ally and GMAC's property, including items that were purchased by Ally or GMAC.

128.    Caves has violated, and continues to violate, this written agreement because he has failed to perform his affirmative obligations thereunder.  Specifically, Caves has failed to disclose all information he knows about the transactions which are the subject of the Plaintiffs' investigation and he has failed to provide truthful information.  In addition, there are numerous items of property purchased by the Plaintiffs that remain in Caves' possession, including but not limited to a microwave oven, a phone headset, and a camera, each of which was purchased by one of the Plaintiffs.  Further, according to Sandstrom, Caves purchased thousands of dollars of merchandise from Home Depot and Walmart and requested that they be billed to Plaintiffs.  Caves was confronted regarding the "WM" and "HD" invoices noted above and claimed to have no knowledge of them.  He has failed to disclose the location or distribution of these purchases.  To the extent Caves retained the merchandise, he has breached the agreement by failing to return the property to Plaintiffs.

129.    By failing to fully and completely cooperate with the Plaintiffs' investigation and to return all of the Plaintiffs' property, Caves has breached paragraphs 12 and 13 of his written agreement with Ally and GMAC.  Caves' breaches of the written agreement are a proximate cause of damages to Plaintiffs.  As a result of Caves' wrongful actions described above, Plaintiffs retained counsel to prosecute this claim.  Plaintiffs are, therefore, entitled to recover reasonable and necessary attorneys' fees and costs incurred in the prosecution of this claim pursuant to, *inter alia*, TEX. CIV. PRAC. & REM. CODE § 38.001(8).

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                      **PAGE 66**

## COUNT 12
## BREACH OF CONTRACT
## (SANDSTROM ELECTRIC)

130.    Plaintiffs incorporate and adopt by reference each and every allegation in the

preceding paragraphs of this Third Amended Complaint.

131.    Sandstrom Electric entered into a Master Services Agreement dated January 14,

2011, with Ally (the "MSA Agreement").   Pursuant to paragraph 8.2 of the Agreement,

Sandstrom Electric was required to provide Ally a contact list containing the names, telephone

numbers, fax numbers, mobile and pager numbers, e-mail or internet addresses for Supplier

Agents.   Pursuant to paragraphs 15.1, 15.4, 15.5, 15.6, and 15.8 of the MSA Agreement,

Sandstrom Electric was required to obtain certain insurance policies and provide Ally with the

Certificates of Insurance for all insurance policies required by the Agreement.   Pursuant to

paragraph 17 of the MSA Agreement, Sandstrom Electric was required to provide Ally with

access to, and assistance and information about, the services under the MSA Agreement.

Specifically, Sandstrom Electric was required, pursuant to subsection (i) of paragraph 17, to

allow Ally to examine all records and materials of Sandstrom Electric and "Supplier Agents"

about the services.   Sandstrom Electric was also required, pursuant to subsection (ii) of paragraph

17, to permit an inspection of Sandstrom's house and Flinn's Ranch House as Supplier Agents.

Pursuant to subsection (x) of paragraph 17, Sandstrom Electric was required to provide Ally with

an inventory of all of Sandstrom Electric's internal and external audit reports about the services.

Sandstrom Electric was also required to preserve all documents related to the services.   All such

records were required to be made available to Ally for inspection.

132.    Sandstrom Electric has breached these provisions in the MSA Agreement, most

likely to cover up the fact that it submitted invoices for services not performed or goods not

delivered, which is also a breach of the MSA Agreement.  It also breached the MSA Agreement

by billing Plaintiffs for goods not provided, services not performed, and marking up purchases.

Demand has been made for Sandstrom Electric to comply with the MSA Agreement, but the

demand has been refused.  Sandstrom Electric is liable for all costs and expenses incurred in the

investigation of these invoices pursuant to paragraph 12.3(f) of the MSA Agreement.

133.    Ally is entitled to recover all damages proximately caused by all breaches of the

MSA Agreement.

## COUNT 13
## ALTER EGO
## (SANDSTROM)

134.    Plaintiffs incorporate and adopt by reference each and every allegation in the

preceding paragraphs of this Third Amended Complaint.

135.    Sandstrom is liable for the actions and agreements of Sandstrom Electric under an

alter ego theory.  Specifically, Sandstrom used the corporate entity of Sandstrom Electric for the

purpose of perpetrating and did perpetrate an actual fraud on Plaintiffs.

## COUNT 14
## FORFEITURE AND DISGORGEMENT
## (FLINN AND CAVES)

136.    Plaintiffs incorporate and adopt by reference each and every allegation in the

preceding paragraphs of this Third Amended Complaint.

137.    Flinn and Caves breached their duty of loyalty to Plaintiffs, for which breach they

are required to forfeit the compensation paid to them by Plaintiffs during the period of divided

loyalties.  Flinn and Caves are also required to forfeit any income or property received by them

"on the side" without disclosing their disloyal activities to Plaintiffs.  Such forfeiture should

consist of all funds and property received by Flinn and Caves as a result of their breaches of fiduciary duty owed to Plaintiffs.

## COUNT 15
## PUNITIVE DAMAGES
## (ALL DEFENDANTS)

138.     The tortious conduct committed by Defendants was aggravated by the willfulness, wantonness, and malice for which the law allows the imposition of punitive damages.  Their conduct was intentional, willful, wanton and without justification or excuse.

139.     Defendants engaged in the malicious, intentional, and unjustified actions described above with gross indifference to Plaintiffs' rights and with the conscious desire to interfere with Plaintiffs' employee and business relationships.  To punish such action and to deter others from similar wrongdoing, Defendants should be assessed punitive damages in an amount determined by the trier of fact.

140.     Defendants' conduct complained of herein was willful and done with malice, and in reckless disregard to the rights of Plaintiffs.  Defendants were further grossly negligent in their actions.  Plaintiffs are therefore entitled to recover punitive damages.

## COUNT 16
## CONSTRUCTIVE TRUST
## (ALL DEFENDANTS)

141.     Flinn and Caves arranged for the transactions complained of herein.  The goods and services were diverted to Flinn and Caves for their personal benefit.  Further, although Sandstrom claims Caves took the Walmart and Home Depot purchases, the Home Depot account used to make the purchases is in Sandstrom Electric's name.  The Walmart account is in the name of Sandstrom's wife, Sandra Sandstrom.  Further, Flinn and Caves caused Plaintiffs to pay money to vendors, including Sandstrom Electric, for which no adequate explanation has been

provided by the vendors to insure that Plaintiffs received anything in return. There are, therefore, funds paid and unaccounted for. With respect to all goods and services diverted to Flinn and Caves, and any merchandise retained by Sandstrom or his wife, Plaintiffs are entitled to a constructive trust for the value of the merchandise retained. With respect to the overpayments to Sandstrom and Sandstrom Electric, and to the extent any of the funds paid were diverted to Flinn and Caves and they retained them for their own personal gain, Plaintiffs request that the Court impose a constructive trust on all of the funds paid to these Defendants. Plaintiffs also request that the Court impose a constructive trust on all of the funds that were paid to Sandstrom Electric for work that it was paid for but never performed, for work that it started but did not complete, for duplicate invoicing, and for work that it performed at inflated prices. Plaintiffs further request a constructive trust on all funds paid to Sandstrom Electric which Sandstrom paid himself or to his wife. Plaintiffs request that the constructive trust extend to all real estate and personal property (including, but not limited to Sandstrom and Flinn's airplane) to which funds, goods, or services were diverted.

## COUNT 17
## MISAPPROPRIATION
## (FLINN AND CAVES)

142. Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Third Amended Complaint.

143. During their employment with GMAC, Flinn and Caves were entrusted with Plaintiffs' confidential information, vendor relationships, credit relationships, employee relationships and the goods and services associated with these relationships and information. While employed by GMAC, Flinn and Caves used this confidential information for personal gain without Plaintiffs' authorization or consent. In addition to misappropriating the confidential

information, Flinn and Caves also misappropriated vendor and credit relationships to divert goods and services to themselves for their personal gain. They further misappropriated the services of the Plaintiffs' employees and vendors to facilitate the diversion of goods and services for their own personal gain. They have also misappropriated the property ordered through the vendors and paid for by Plaintiffs. Flinn and Caves' misappropriation is the proximate cause of damages to Plaintiffs.

<u>**COUNT 18:**</u>
**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**
**(SANDSTROM)**

144. Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Third Amended Complaint.

145. Sandstrom willfully and intentionally interfered with the business relationships between Plaintiffs and its employees, Flinn and Caves. Sandstrom submitted invoices for Sandstrom Electric for goods or services that were either not delivered or performed for Plaintiffs, or that were delivered or provided at inflated prices. He used Flinn and Caves to facilitate the transactions complained of in this Third Amended Petition, as well as breaches of the MSA Agreement. Plaintiffs' employment relationship with Flinn and Caves included an understanding that these employees were being paid to work for the benefit of Plaintiffs and that they would act in the best interests of Plaintiffs and safeguard Plaintiffs' assets and ensure that Plaintiffs received what they paid for in transactions with vendors. Sandstrom interfered with these relationships by inducing them to take actions inconsistent with these duties. Sandstrom's actions were willful and malicious and intended to interfere with the relationships between Plaintiffs and their employees. These actions were without privilege or excuse and were the proximate cause of damages to Plaintiffs.

<u>**PLAINTIFFS' THIRD AMENDED COMPLAINT**</u>                                                    **PAGE 71**

## COUNT 19
### ATTORNEYS' FEES
### (ALL DEFENDANTS)

146.    Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Third Amended Complaint.

147.    Pursuant to the express terms of the MSA Agreement and pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code, Sandstrom Electric is liable for reasonable attorneys' fees and costs.

148.    Pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code, Caves is liable for reasonable attorneys' fees and costs as a result of his breach of the contract set forth above.

149.    Sandstrom is liable for attorneys' fees under the MSA Agreement because he is the alter ego of Sandstrom Electric.

150.    Under 28 U.S.C. § 1927, an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." The conduct of Defendants is indefensible. The most egregious examples are the purchases at Walmart (on Sandstrom's wife's credit card) and Home Depot (either through Peloton or on Sandstrom's credit card). Defendants essentially went on shopping sprees and then tried to disguise the purchases as business related and had Plaintiffs pay for them. Plaintiffs' counsel has made numerous attempts to determine who kept the property and where the money went in an effort to streamline the issues in the case. Defendants' counsel have responded with hundreds of discovery requests, Rule 30(b)(6) deposition notices with over 100 topics, and numerous letters trying to annoy Plaintiffs to the point of not wanting to proceed with the litigation. They have

also refused to completely answer discovery to avoid their clients having to admit what should have never been disputed in the first place.  At the conclusion of this case, Plaintiffs will present the proof regarding this conduct and request an award under 28 U.S.C. § 1927.

<u>**COUNT 20**</u>
**VIOLATIONS OF RICO, 18 U.S.C. §1962 (C)**
**(ALL DEFENDANTS)**

151.    Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Third Amended Complaint.

152.    At all relevant times, Plaintiffs were persons within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

153.    At all relevant times, each RICO Defendant was a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).  The RICO Defendants, for purposes of these claims for relief, are Defendants Flinn, Caves, Sandstrom and Sandstrom Electric.

*<u>The RICO Enterprise</u>*

154.    The RICO Defendants are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Third Amended Complaint: namely through a campaign of lies, fraud, and deception, to induce the Plaintiffs into paying substantial sums of money to the RICO Defendants by submitting and approving invoices that purported to reflect charges for services performed and goods purchased for the benefit of the Plaintiffs.  In actuality, the invoices submitted, processed and approved by these Defendants were fictitious, in that the services were never performed or were grossly inflated in value, and the goods were, likewise, either never provided to the Plaintiffs or were grossly inflated in value.  The proceeds of the fraud – in the form of payments, kickbacks, and the conversion of goods – were used to enrich the RICO Defendants.  The RICO

Defendants have organized their operation into a cohesive group with specific responsibilities and a continuing structure for accomplishing their goals. Over the years, they have executed their scheme, with only minor changes in the roles that each played in defrauding the Plaintiffs. While some of the details of the fraudulent scheme have differed in fine detail amongst the individual acts of deception, the criminal enterprise generally has been structured to operate as a unit in order to accomplish the goals of their criminal scheme:

(a)      Defendants Sandstrom and Sandstrom Electric would prepare and submit invoices through Defendants Flinn and Caves to the Plaintiff companies, in order to obtain payment for goods and services purportedly provided to the Plaintiffs. In fact, the invoices were fictitious, requesting payment for services that, depending on the circumstances, were not performed or were grossly inflated in value, and for goods that were, likewise, either not provided to the Plaintiffs or were grossly inflated in value. Defendants Sandstrom and Sandstrom Electric would provide kickbacks in the form of payments and goods to Defendants Flinn and Caves after Plaintiffs paid the invoices processed and approved by Flinn and Caves.

(b)      Defendant Flinn, utilizing his position as an Operations Manager employed by the Plaintiffs, would direct and ensure that the invoices submitted by Defendants Sandstrom and Sandstrom Electric, that Flinn knew to be false, were processed and approved for payment, with the assistance of Caves. Flinn would receive payments from Sandstrom and Sandstrom Electric, in the form of a land transfer and free electrical work. Since many of the goods purchased and billed to Plaintiffs have not been accounted for, some of them may have been given to Flinn.

(c)      Defendant Caves, at first at the direction of Flinn and later upon his own initiation, as well as at Flinn's direction, utilized his position as Data Center Manager for the

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                    **PAGE 74**

Plaintiffs to process invoices from Sandstrom and Sandstrom Electric that he knew to be false, and approved their payment by the Plaintiffs. Caves would then receive payments from Sandstrom and Sandstrom Electric, in the form of goods fraudulently claimed to have been purchased for the Plaintiffs, for free use of Sandstrom's vacation home, as well as good and other valuable consideration.

155. The RICO Defendants constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and in 1962(c), referred to hereinafter as the "enterprise." Each of the RICO Defendants participated in the conduct, operation or management of the enterprise.

156. At all relevant times, the enterprise was engaged in and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

*Pattern of Racketeering Activity*

157. The RICO Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961 (5) and in violation of 18 U.S.C. § 1962 (c), to wit:

*Pattern of Racketeering Activity: Multiple Instance of Mail Fraud and Wire Fraud in Violation of 18 U.S.C. §§ 1341,1343*

158. At all times material to this Third Amended Complaint, Plaintiffs were engaged in interstate commerce and in an industry that affects interstate commerce.

159. As described herein, the RICO Defendants have executed a well-organized scheme in which Sandstrom and Sandstrom Electric would submit false and fraudulent invoices, requesting payment for services and goods that they claimed had been provided for the Plaintiffs'

benefit.  In fact such services were, depending on the specific act, either not provided or the value of such services was grossly inflated, and the goods, likewise, were either never provided to the Plaintiffs or their costs were grossly inflated in value.

160.    The intent of the RICO Defendants in this scheme was to defraud the Plaintiffs by having an outside vendor submit fraudulent and fictitious invoices requesting payment from the company, and then utilizing insiders – managerial employees of the Plaintiffs, who knowingly and intentionally abused their positions of trust – to process and approve the fictitious invoices, knowing that the Plaintiffs would rely on their representations in paying the invoices.  The ultimate goal of the RICO Defendants' scheme or artifice to defraud was to deceive the Plaintiffs into making payments that would directly benefit the individual and organizational RICO Defendants.

161.    The RICO Defendants conspired with one another in the preparation, submission, processing and ultimate approval of the fraudulent invoices, the receipt and distribution of the proceeds or goods purchased from the unlawful activity, and acts intended to conceal the true nature of the transactions from the Plaintiffs.

162.    In furtherance of their scheme, and as described herein, the RICO Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, communications, writings, documents, images, and instruments, and also caused matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, including, but not limited to, the following:

**PLAINTIFFS' THIRD AMENDED COMPLAINT**                                                    **PAGE 76**

(a)     Mailings and/or wirings, including emails and attachments incorporating

false and misleading statements regarding services provided for or goods obtained, purportedly

for the benefit of the Plaintiffs.

(b)     Wirings and/or mailings between the RICO Defendants concerning the

preparation of false and fraudulent invoices and/or proceeds wrongfully obtained from the

Plaintiffs;

(c)     Funds transferred by the Plaintiffs to Sandstrom and Sandstrom Electric in

the mistaken belief that they were payment for legitimate services or goods based on

representations not known by the Plaintiffs to be false, that were made by the RICO Defendants.

163.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1-125,

which set forth particular uses of the mail, wire and cable communications in furtherance of the

RICO Defendants' scheme or artifice to defraud that constitute violations of 18 U.S.C. §§ 1341

and 1343, and describes which individual Defendant caused the communication to be mailed or

wired, when the communication was made, and how it furthered the fraudulent scheme.

164.    The RICO Defendants participated in the scheme or artifice knowingly, willfully,

and with the specific intent to deceive and/or defraud Plaintiffs into paying the RICO Defendants

and their co-conspirators.

165.    As the RICO Defendants intended, the Plaintiffs relied upon the false statements

in the invoices prepared by Sandstrom and Sandstrom Electric, as well as the wrongful

statements made by Defendants Flinn and Caves in approving the payment of invoices, which

they knew to be false and fraudulent.

166.    As a direct result of the RICO Defendants' scheme or artifice to defraud, the

Plaintiffs have suffered an injury to their business and property.  The injuries to Plaintiffs caused

by reason of the violations of 18 USC § 1962(c) include but are not limited to the funds wrongfully obtained by the RICO Defendants, and the fees and costs incurred to investigate and recover the sums wrongfully obtained.

167.    Each of the RICO Defendants have engaged in multiple predicate acts, as described in paragraphs 19 through 149.  The conduct of each of the RICO Defendants described in paragraphs 19 through 149 constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

168.    Further, these injuries to Plaintiffs were a direct, proximate, and reasonably foreseeable result of the violation of 18 U.S.C. § 1962.  Plaintiffs are the ultimate victims of the RICO Defendants' unlawful enterprise.  Plaintiffs have been and will continue to be injured in their business and property in an amount to be determined at trial.

169.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

## COUNT 21
## CONSPIRACY TO VIOLATE OF RICO, 18 U.S.C. § 1962 (D)
## (ALL DEFENDANTS)

170.    Plaintiffs incorporate and adopt by reference each and every allegation in the preceding paragraphs of this Third Amended Complaint.

171.    The RICO Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) has described above, in violation of 18 U.S.C. § 1962(d).

172.    The RICO Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this

pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. §
1962(c), in violation of 18 U.S.C. § 1962(d).

173.    Upon information and belief that the RICO Defendants agreed to conduct or
participate, directly or indirectly, in the conduct, management or operation of the enterprise's
affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

174.    Each RICO Defendant knew about and agreed to facilitate the enterprise's scheme
to obtain property from Plaintiffs. It was part of the conspiracy that the RICO Defendants and
their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs
of the enterprise, including the acts of racketeering set forth in the above paragraphs.

175.    As a direct and proximate result of the RICO Defendants' conspiracy, the acts of
racketeering activity of the enterprise, the overt acts taken in furtherance of that conspiracy, and
violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property,
including money and property wrongfully obtained by the Defendants, and the attorneys' fees and
costs in this litigation.

176.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages
plus costs and attorneys' fees from the RICO Defendants.

## V.  <u>PRAYER FOR RELIEF</u>

Plaintiffs respectfully pray that judgment be entered in their favor against Defendants and
that they be granted the following relief:

(a)    Actual damages;

(b)    Punitive damages;

(c)    An order disgorging Flinn and Caves of their salary for the period of time
they was breaching fiduciary duties and duties of loyalty;

(d)     An equitable award for unjust enrichment and disgorgement of profits from all Defendants;

(e)     Costs of Court;

(f)     Pre-judgment interest;

(g)     Post-judgment interest;

(h)     A constructive trust;

(i)     Treble damages under RICO;

(j)     Attorneys' fees; and

(k)     Such other relief to which Plaintiffs have shown themselves justly entitled.

Dated: March 27, 2013              Respectfully submitted,


By: /s/ William L. Davis
    William L. Davis, Esq.
    Texas Bar No. 05563800
    davisw@jacksonlewis.com
    Talley R. Parker, Esq.
    Texas Bar No. 24065872
    talley.parker@jacksonlewis.com

JACKSON LEWIS LLP
500 N. Akard, Suite 2500
Dallas, Texas 75201
Telephone: (214) 520-2400
Fax: (214) 520-2008

**ATTORNEYS FOR PLAINTIFFS
ALLY FINANCIAL INC.,
RESIDENTIAL CAPITAL, LLC, and
GMAC MORTGAGE, LLC**

## CERTIFICATE OF SERVICE

On March 27, 2013, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the Court. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2), including the following:

Judith P. Kenney
Nat M. Kenney
Judith P. Kenney & Associates, P.C.
16475 Dallas Parkway, Suite 330
Addison, Texas 75001

William J. Dunleavy
825 Market Street
Building M, Suite 250
Allen, Texas 75013

Ryan K. Geddie
Martin, Disiere, Jefferson & Wisdom, LLP
16000 N. Dallas Parkway, Suite 800
Dallas, Texas 75248

/s/ William L. Davis
William L. Davis

## **Exhibit 5**

**October 17, 2014 Letter**



**Judith P. Kenney**
Board Ce tified
Estate Planning and Probate Law
Texas Board of Legal Specialization
judith@judithkenneylaw.com

**Nat M. Kenney, III**
nat@judithkenneylaw.com

**Judith P. & Kenney** Associates, P.C.

October 17, 2013

**CERTIFIED MAIL RETURN RECEIPT REQUESTED**
William L. Davis
Jackson Lewis, LLP
Lincoln Plaza
500 North Akard
Suite 2500
Dallas, Texas 75201

> In re:  Cause No. 4:12-CV-600, in the United States District Court for the Eastern
> District of Texas, Sherman Division, *Ally Financial, Inc., Residential
> Capital, LLC and GMAC Mortgage, LLC, Plaintiffs v. Phillip Roger Flinn, II,
> Ralph "Rusty" Caves, John W. Sandstrom and Sandstrom Electrical
> Corporation, Defendants,* Our File No. 12-1302

Dear Mr. Davis:

Your client, Ally Financial, Inc., is hereby notified that it breached its contract
agreement to release GMAC Residential, LLC and Residential Capital, LLC, including their
employees and agents by agreement dated May 14, 2012 in the Federal Bankruptcy Court
in the Southern District of New York, in section 2.3. Doc. No. Exhibit 6-8 of the bankruptcy
proceedings of GMAC Residential, LLC and Residential Capital, LLC in Cause No. 12-
12012 (MG). A copy of this contract is enclosed herewith. All conditions precedent for the
release agreement have been satisfied. This breach occurred when your client filed suit
against Philip Roger Flinn, II, an employee of GMAC Residential, LLC, in Cause No. 4:12-
CV-600, in the United States District Court for the Eastern District of Texas, Sherman
Division on September 20, 2012.

As a result of your client's breach of contract, Defendant Philip Roger Flinn, II, has
incurred damages, including attorneys fees incurred to date in the amount of $128,220.95.
While the attorneys fees are not all of the damages, they are a portion of Flinn's damages,
and demand is hereby made for the payment of the amount of such attorneys fees within
thirty (30) days from today. This demand or presentment is made pursuant to Chapter 38
of the Texas Civil Practice and Remedies Code.

Sincerely

JUDITH P. KENNEY & ASSOCIATES, P.C.

Judith P. Kenney
Judith P. Kenney

JPK/le
Enclosure

330  Attorneys and Counselors
One Bent Tree Tower • 16475 Dallas Parkway, Suite 700 • Addison, TX 75001-6870 • 972.713.6133 voice • 800.862.3663 • 972.818.0388 fax
www.judithkenneylaw.com

William L. Davis
October 17, 2013
Page 2

Z:\12-1302\Ltrs\Davis\2013\2013_10-12_Ally demandl.wpd

## **EXHIBIT 8**

*EXECUTION VERSION*

*TO BE SIGNED BY THE PARTIES
IMMEDIATELY FOLLOWING THE PETITION DATE*

## SETTLEMENT AND PLAN SPONSOR AGREEMENT

THIS SETTLEMENT AND PLAN SPONSOR AGREEMENT (the "Agreement"), dated as of May 14, 2012 (the "Execution Date"), is made and entered into by and among Residential Capital, LLC and certain of its direct and indirect subsidiaries, as debtors and debtors-in-possession on behalf of each such entity and its estate (collectively, the "Debtors"),[1] and Ally Financial Inc. ("AFI"), on behalf of its direct and indirect subsidiaries and affiliates other than the Debtors and the Debtors' direct and indirect subsidiaries (collectively, "Ally") (each of the Debtors and Ally is a "Party," and collectively, the "Parties").

## RECITALS

WHEREAS, on the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") commencing cases (the "Chapter 11 Cases"), which are proposed to be jointly administered for procedural purposes;

WHEREAS, the Debtors believe certain claims exist against Ally related to the corporate relationship between the Debtors and Ally, including with respect to certain transactions between the Debtors and Ally, including equitable subordination, debt recharacterization, fraudulent conveyance, avoidance liability under federal or state laws, and other causes of action under theories of veil piercing and alter ego liability;

WHEREAS, Ally denies each allegation of the Debtors and has substantial claims against the Debtors;

---

[1] The Debtors are: Ditech, LLC; DOA Holding Properties, LLC; DOA Holdings NoteCo, LLC; DOA Properties IX (Lots-Other), LLC; EPRE LLC; Equity Investment I, LLC; ETS of Virginia, Inc.; ETS of Washington, Inc.; Executive Trustee Services, LLC; GMAC Model Home Finance I, LLC; GMAC Mortgage USA Corporation; GMAC Mortgage, LLC; GMAC Residential Holding Company, LLC; GMACM Borrower LLC; GMACM REO LLC; GMACR Mortgage Products, LLC; GMAC-RFC Holding Company, LLC; GMACRH Settlement Services, LLC; HFN REO SUB II, LLC; Home Connects Lending Services, LLC; Homecomings Financial, LLC; Homecomings Financial Real Estate Holdings, LLC; Ladue Associates, Inc.; Passive Asset Transactions, LLC; PATI A, LLC; PATI B, LLC; PATI Real Estate Holdings, LLC; RAHI A, LLC; RAHI B, LLC; RAHI Real Estate Holdings, LLC; RCSFJV2004, LLC; Residential Accredit Loans, Inc.; Residential Asset Mortgage Products, Inc.; Residential Asset Securities Corporation; Residential Capital, LLC; Residential Consumer Services of Alabama, LLC; Residential Consumer Services of Ohio, LLC; Residential Consumer Services of Texas, LLC; Residential Consumer Services, LLC; Residential Funding Company, LLC; Residential Funding Mortgage Exchange, LLC; Residential Funding Mortgage Securities I, Inc.; Residential Funding Mortgage Securities II, Inc.; Residential Funding Real Estate Holdings, LLC; Residential Mortgage Real Estate Holdings, LLC; RFC Asset Holdings II, LLC; RFC Asset Management, LLC; RFC Borrower LLC; RFC Construction Funding, LLC; RFC REO LLC; RFC SFJV-2002, LLC; and RFC-GSAP Servicer Advance, LLC.

WHEREAS, certain entities, including AFI, GMAC Mortgage Group LLC, Ally Securities LLC, and Ally Bank have been named as defendants in lawsuits brought by third parties in connection with, or arising from, the Debtors' business activities, including with respect to residential mortgage backed securities issued and/or sold by the Debtors; and

WHEREAS, the Debtors and Ally have resolved all issues and disputes between and among the Parties, and have agreed upon a term sheet for a chapter 11 plan of reorganization for the Debtors' restructuring and to implement the terms of the settlement contained herein.

NOW, THEREFORE, in consideration of the promises and mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I

## Definitions

Section 1.1 *Terms Defined in the Preamble and Recitals.* The following terms shall have the meaning ascribed thereto in the preamble and recitals of this Agreement: Ally; AFI; Bankruptcy Code; Bankruptcy Court; Chapter 11 Cases; Debtors; Execution Date; Parties and Party; and Petition Date.

Section 1.2 *Other Defined Terms.* The following definitions shall apply and constitute a part of this Agreement and all annexes and exhibits hereto:

"Ally Bank MSR" means the mortgage servicing rights held by Ally Bank.

"Allowed Claims" means the claims to be allowed under the Plan pursuant to Section 3.1(e).

"Ally Claims" means the Claims of Ally against the Debtors as described in Section 3.1(e) of this Agreement.

"Ally Contribution" means such term as defined in Section 2.1.

"Ally DIP Financing Facility" means the debtor-in-possession financing facility to be provided to the Debtors, attached to the Plan Term Sheet as Exhibit 3.

"Ally LOC" means such term as defined in Section 3.1(e).

"Ally Revolver" means such term as defined in Section 3.1(e).

"Bankruptcy Court Order" means an order of the Bankruptcy Court entered after notice and a hearing.

"Barclays DIP Financing Facility" means the debtor-in-possession financing facility to be provided to the Debtors, attached to the Plan Term Sheet as Exhibit 6.

*EXECUTION VERSION*

"Cash" means legal tender of the United States of America.

"Cash Collateral Order" means the order attached hereto as Exhibit 1.

"Cash Contribution" means such term as defined in Section 2.1(a).

"Causes of Action" means any and all Claims, actions, causes of action, choses in action, rights, demands, suits, claims, liabilities, encumbrances, lawsuits, adverse consequences, debts, damages, dues, sums of money, accounts, reckonings, deficiencies, bonds, bills, disbursements, expenses, losses, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross-  ns (including those of the Debtors, and/or the bankruptcy estate of any Debtor created pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases), whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, whether held in a personal or representative capacity, that are or may be pending on the Effective Date or instituted after the Effective Date against any entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order.

"Claim" means a claim, as such term is defined in section 101(5) of the Bankruptcy Code.

"Confirmation Order" means an order, in form and substance satisfactory to both Parties, confirming the Plan.

"Consent Materials" means (a) the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment entered by the District Court for the District of Columbia, dated February 9, 2012, and (c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012.

"Consumer Lending Origination Support" means Ally's support of ResCap's consumer origination channel through Ally Bank's continued (a) origination of conforming loans brokered by ResCap to Ally Bank pursuant to the Client Agreement governing broker activity, (b) performance under the GNMA Origination Agreement, and (c) offering of such other products, such as the origination of jumbo loans and the Purchase Power lending program, consistent with current practices.

"Current Program" means such term as defined in Section 2.2(b).

"Data Center Transaction" means that certain sale and buy-back transaction between AFI and the Debtors of the Debtors' real estate interests in the data center property known as "Shady Oak" (MN) and the data center in Lewisville, TX as set forth in Exhibit 2.

"Debtors' Obligations" means such term as defined in Section 3.1.

"Disclosure Statement," means the disclosure statement for the Plan, as amended, supplemented or modified from time to time, in form and substance reasonably acceptable to both Parties, including all exhibits and schedules thereto, and as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

"Effective Date" means the date of substantial consummation of the Plan, which shall be the first business day upon which all conditions precedent to the effectiveness of the Plan are satisfied or waived in accordance with the Plan.

"Final Order" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction), which has not been modified, amended, reversed, vacated, or stayed, is in full force and effect, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause an order not to be a Final Order.

"GNMA Origination Agreement" means the Amended and Restated Master Mortgage Loan Purchase and Sale Agreement with respect to the FHA, USDA, and VA Residential Mortgage Loans (as such terms are defined therein) between Ally Bank, as Seller, and GMAC Mortgage, LLC, as Purchaser.

"GNMA Origination Order" means the Bankruptcy Court Order approving the GNMA Origination Agreement.

"Governing Documents" means articles or certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnerships, or other forms of entity).

"HFS APA" means such term as defined in Section 2.1(b).

"HFS Portfolio" means ResCap's held-for-sale portfolio of mortgage loans, which are the subject of the HFS APA.

"HFS Sale Price" means such term as defined in Section 2.1(b).

"Interest" means any "Equity Security," as defined in section 101(16) of the Bankruptcy Code, of a Debtor existing immediately prior to the Effective Date.

"Milestones" means the deadlines and conditions set forth in Exhibit A attached hereto.

*EXECUTION VERSION*

"Person" means such term as defined in section 101(41) of the Bankruptcy Code.

"Plan" means the Debtors' chapter 11 plan, together will all addenda, exhibits, schedules, or other attachments, if any, including the Plan Supplement, and as may be amended, modified, or supplemented from time to time, in form and substance satisfactory to the Debtors and Ally, as set forth in more detail in the Plan Term Sheet.

"Plan Supplement" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan to be filed with the Bankruptcy Court on notice to parties-in-interest, and additional documents to be filed before the Effective Date as supplements or amendments to the Plan Supplement.

"Plan Term Sheet" means the chapter 11 plan term sheet, dated May 14, 2012, which is Exhibit 4 to this Agreement.

"Purchaser" means the buyer of certain of the Debtors' assets in the ResCap Asset Sale.

"Released Parties" means Ally, and each of theirs and the Debtors' respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates, and representatives.

"Reorganized Debtors" means the Debtors, or any successors thereto by merger, consolidation, or otherwise, on and after the Effective Date.

"ResCap Asset Sale" means the sale of certain of the Debtors' assets pursuant to an Asset Purchase Agreement between the Debtors and Nationstar Mortgage LLC, or such other higher or better offer as may be selected by the Debtors pursuant to the bidding procedures established pursuant to such agreement.

"Restructuring" means the Plan and the transactions contemplated in relation thereto.

"Run Off Period" means such term as defined in Section 2.2(b).

"Section 363 Sale" means a sale under section 363 of the Bankruptcy Code prior to, and outside of, the Plan.

"Shared Services Agreement" means the shared services agreement, dated May 13, 2012, by and between AFI and the Debtors, to be approved by the Bankruptcy Court.

"Solicitation Procedures" means the procedures for soliciting acceptance or rejection of the Plan from each holder of an impaired Claim or Interest that is entitled to vote to accept or reject the Plan.

"Subservicing Agreement" means the Amended and Restated Servicing Agreement, dated May 13, 2012, by and between Ally Bank, as owner, and GMAC Mortgage, LLC, as Servicer.

*EXECUTION VERSION*

"Subservicing Agreement Order" means a Bankruptcy Court Order approving the Subservicing Agreement.

"Stalking Horse Bidder" means Nationstar Mortgage LLC, as the initially designated bidder for the assets to be purchased in connection with the ResCap Asset Sale.

"Third Party Release" means such term as defined in the section entitled Third Party Releases.

"Transition Services Agreement" means the transition services agreement to be negotiated with the Purchaser in connection with the ResCap Asset Sale.

## ARTICLE II

## Ally Obligations

Section 2.1    *Ally Contribution.* Ally hereby agrees to make the following contributions to the Debtors:

(a)    **Cash Contribution.** Upon satisfaction of the conditions set forth in Section 5.2 hereof, AFI will make a Cash contribution to the Debtors in the amount of $750,000,000 (the "Cash Contribution"); paid to fund the settlement of pending and future claims and to secure the releases in favor of the Released Parties set forth in Section 3.1(d), including third party releases under Section 3.1(d)(ii); provided that if AFI, in its sole discretion, agrees upon an acceptable purchase price for the Ally Bank MSR to be sold in conjunction with the Plan (via a contribution of the Ally Bank MSR by Ally to the Debtors immediately before the Effective Date), Ally shall negotiate with the Debtors in good faith to provide the Debtors with additional consideration from the sale of the Ally Bank MSR.

(b)    **HFS Stalking Horse Bid.**

(i)    Subject to the conditions set forth in Section 5.2 hereof, AFI will serve as a stalking horse bidder for the HFS Portfolio in the amount (the "HFS Sale Price") set forth in the asset purchase agreement attached as Exhibit 5 hereto (the "HFS APA"). Ally shall not receive any break-up fee or other bid protections in the event ResCap receives a higher or better offer for the HFS Portfolio.

(ii)    Notwithstanding the foregoing, if the conditions set forth in Section 5.2 hereof are not satisfied and the ResCap Asset Sale is consummated pursuant to the Section 363 Sale, AFI shall purchase the HFS Portfolio for 87.5% of the HFS Sale Price, subject to higher or better offers, all as set forth in the HFS APA.

6

*EXECUTION VERSION*

(c)    **Shared Services Agreement**. Subject to Bankruptcy Court approval, AFI will enter into and perform under the Shared Services Agreement with the Debtors during the Chapter 11 Cases attached hereto as Exhibit 7.

(d)    **Cash Collateral Order**. Subject to Bankruptcy Court approval, Ally shall provide ResCap with use of Cash Collateral pursuant to the terms of the Cash Collateral Order.

(e)    **Transition Services Agreement**. Subject to Bankruptcy Court approval, AFI will negotiate and, upon agreement of the parties, enter into a Transition Services Agreement with the Purchaser in connection with the ResCap Asset Sale.

(f)    **Debtor-in-Possession Financing**. Subject to Bankruptcy Court approval, AFI will provide up to $220,000,000 of debtor-in-possession financing to the Debtors in accordance with the terms and conditions set forth in the Ally DIP Term Sheet attached hereto as Exhibit 3.

(g)    **Support of Pension**. AFI will honor in the ordinary course of business, obligations under the Employees' Retirement Plan sponsored by GMAC Mortgage Group LLC.

(h)    **Continued Consumer Lending Origination Support**. Subject to Bankruptcy Court approval, Ally Bank will provide Consumer Lending Origination Support to the Debtors during the Chapter 11 Cases through and until the closing of the ResCap Asset Sale.

Section 2.2    *ResCap Director and Officer Issues.*

(a)    **Indemnification**. AFI stands by and re-affirms its indemnification obligations under its Amended and Restated Certificate of Incorporation regarding ResCap's current and former Directors and Officers to the full extent of Delaware law.

(b)    **Insurance**. Ally will use commercially reasonable efforts to continue to renew its current blended directors and officers liability and fiduciary liability insurance program (the "Current Program"), for a period of six years following the Effective Date (the "Run Off Period"), on substantially the same terms and conditions as the Current Program and including prior acts coverage with respect to claims arising from acts or omissions that occurred prior to the Effective Date; provided that if Ally is unable to continue the Current Program for the entire Run Off Period despite its commercially reasonable efforts it shall promptly notify the Debtors and use best efforts to obtain run off coverage for the balance of the Run Off Period.

Section 2.3    *Ally Release.* Subject to the Debtors' satisfaction of their obligations set forth in Section 3.1, on the Effective Date of the Plan, Ally shall release the Debtors and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates, and representatives and their respective properties from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, arising from or related in any way to the Debtors, including

7

*EXECUTION VERSION*

those that any Ally entity would have been legally entitled to assert against any of the parties above in their own right (whether individually or collectively), other than the Allowed Claims.

Section 2.4    *Ally Plan Sponsor Obligations.*

(a)    **Support of Restructuring.**  As long as this Agreement has not been terminated in accordance with Article VII, AFI agrees to:

(i)    support the relief requested in each of the Debtors' first day pleadings (including interim and final relief thereof, as applicable);

(ii)    support the Debtors' efforts to pursue the Restructuring contemplated by the Plan Term Sheet;

(iii)    support the Debtors' prosecution of their Chapter 11 Cases consistent with this Agreement and the Plan Term Sheet;

(iv)    support entry of an order approving the Disclosure Statement to permit solicitation of the Plan;

(v)    vote to accept the Plan, provided that (i) the Bankruptcy Court has entered an order approving the Disclosure Statement, (ii) the Consenting Claimants have been properly solicited pursuant to section 1125 of the Bankruptcy Code, (iii) the material terms of the Plan and the Disclosure Statement are consistent with the terms of the Plan Term Sheet and incorporate the terms of the AFI Settlement Agreement, and (iv) the Plan and the Disclosure Statement are satisfactory to the Consenting Claimants; and

(vi)    support confirmation of the Plan and approval of this Agreement incorporated therein.

(b)    **Transfer of Claims.**  AFI hereby agrees, for so long as this Agreement shall remain in effect, not to sell, assign, transfer, pledge, hypothecate or otherwise dispose of, directly or indirectly, any of the Ally Claims or any right related thereto and including any voting rights associated with such Ally Claims.

(c)    **Further Acquisition of Claims.**  This Agreement shall in no way be construed to preclude AFI or any of its affiliates (as defined in section 101(2) of the Bankruptcy Code) from acquiring additional claims following its execution of this Agreement; provided, that any such additional claims acquired by AFI shall automatically be deemed to be subject to the terms of this Agreement unless AFI does not have the authority to make any such additional claim subject to the Agreement.  AFI further agrees that it will not create any subsidiary or affiliate for the sole purpose of acquiring any claims against or interests in any of the Debtors without causing such affiliate to become a Party hereto prior to such acquisition.

(d)    **Representations of AFI's Holdings.**  AFI represents that, as of the date hereof (i) it is the legal owner of the Ally Claims; and (ii) it has full power to vote, dispose of, and compromise the Ally Claims.

8

*EXECUTION VERSION*

# ARTICLE III

## Debtors' Obligations

Section 3.1    *Debtors' Obligations*.  The Debtors hereby agree to do the following and to use good faith efforts to do the following:

(a)    **Agreement**.  The Debtors shall file this Agreement on the Petition Date and shall use commercially reasonable efforts to obtain approval of the Debtors' obligations under this Agreement contemporaneously with approval of the Disclosure Statement.

(b)    **Plan**.  The Debtors shall use good faith efforts to file and prosecute the Plan as set forth in the Plan Term Sheet.

(c)    **Regulatory Obligations**.  The Debtors shall perform all of the obligations required under the Consent Materials, and fund any and all costs related to such performance during the Chapter 11 Cases through and until the closing of the ResCap Asset Sale.  The Debtors shall (i) escrow proceeds from the ResCap Asset Sale in an amount to be agreed upon between Ally and Debtors (or determined by the Bankruptcy Court to the extent no agreement can be reached) for the purpose of funding any and all remaining obligations under the Consent Materials following the ResCap Asset Sale, or (ii) the Purchaser shall assume such obligations as part of the ResCap Asset Sale on terms reasonably acceptable to Ally.

(d)    **Plan Releases**.  The Confirmation Order and Plan shall include the following provisions in the Plan and the Confirmation Order or such other release provisions as are acceptable to Ally.

(i)    Debtor Releases  On and as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties, including: (a) the discharge of debt and all other good and valuable consideration provided pursuant to the Plan; (b) pursuant to the terms of this Agreement; and (c) the services of the Debtors' present officers and directors in facilitating the expeditious implementation of the restructuring contemplated by the Plan, each of the Debtors shall provide a full discharge and release to the Released Parties (and each such Debtor Releasee so released shall be deemed released and discharged by the Debtors)) and their respective properties from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, including those Causes of Action based on avoidance liability under federal or state laws, veil piercing or alter-ego theories of liability, a theory of debt recharacterization, or equitable subordination liability, arising from or related in any way to the Debtors, including those that any of the Debtors or Reorganized Debtors would have been legally entitled to assert against a Released Party in their own right (whether individually or collectively) or that any holder of a Claim or Interest or other entity, would have been legally entitled to assert on behalf of any of the Debtors or any of their Estates, including those in any way related to the Bankruptcy Cases or the Plan to the fullest extent of the law; provided that Ally shall reaffirm its obligations under Section 2.2 in conjunction with the Plan; provided, further, that the Debtors' rights to any insurance shall not be adversely affected.

9

*EXECUTION VERSION*

(ii)     Third Party Releases.  On and as of the Effective Date, the holders of Claims and Interests shall be deemed to provide a full discharge and release to the Released Parties and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, or otherwise, arising from or related in any way to the Debtors, including those in any way related to residential mortgage backed securities issued and/or sold by Debtors and/or the Chapter 11 Cases or the Plan; provided that claims of the Debtors' directors and officers against Ally pursuant to Ally's indemnification obligations and Section 2.2 hereof (as well as any applicable insurance related thereto) shall not be released.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in this Section 3.1(d)(ii) (the "Third Party Releases"), and further, shall constitute its finding that the Third Party Releases are: (a) in exchange for the good, valuable, and substantial consideration provided by the Released Parties; (b) in the best interests of the Debtors and all holders of Claims; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; (e) justified by truly unusual circumstances; (f) an essential component and important to the success of the Plan; (g) resulted in increased distributions to the creditors that would otherwise have been unavailable; (h) the result of an identity of interest between the Debtors and the Released Parties regarding the restructuring; and (i) a bar to any party asserting any claim released by the Third Party Release against any of the Released Parties.  The Confirmation Order will permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, damages, demands, debts, rights, suits, Causes of Action, judgments, or liabilities released pursuant to the Plan.

(e)     **Allowed Claims.**  The Confirmation Order shall allow all Claims in full that arise (i) under the Amended and Restated Credit Agreement, dated as of December 30, 2009 (as amended, supplemented, or otherwise modified), among the GMAC Mortgage, LLC and Residential Funding Company, LLC, as borrowers, Residential Capital, LLC, GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC, and Homecomings Financial, LLC, as guarantors, AFI as initial lender and agent, and Wells Fargo Bank, N.A., as first priority collateral agent  (the "Ally Revolver"), (ii) under the Amended and Restated Loan Agreement, dated as of December 30, 2009 (as amended, supplemented, or otherwise modified), by and among GMAC Mortgage, LLC and Residential Funding Company, LLC, as borrowers, Residential Capital, LLC, RFC Asset Holdings II, LLC, Passive Asset Transactions, LLC, GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC, Homecomings Financial, LLC, and Equity Investment I, LLC, as guarantors, and AFI as lender and agent (the "Ally LOC"), and (iii) claims from and after the Petition Date, which are held by Ally against the Debtors and arise in the ordinary course of business or otherwise agreed to by the Debtors and Ally.

Section 3.2   *Debtors Plan Support Obligations.*

(a)     **Implementation of the Restructuring.**  As long as this Agreement has not been terminated in accordance with Article VII, the Debtors agree to:

10

*EXECUTION VERSION*

(i)    effectuate and consummate the Restructuring contemplated by the Plan Term Sheet in accordance with the Milestones;

(ii)    obtain any and all required regulatory approvals and material third-party approvals for the Restructuring; and

(iii)    take any and all reasonably necessary actions in furtherance of the Restructuring.

(b)    **Representation of the Debtors.**  None of the materials and information provided by or on behalf of the Debtors to AFI in connection with the Restructuring, when read or considered together, contains any untrue statement of a material fact or omits to state a known material fact necessary in order to prevent the statements made therein from being materially misleading.

(c)    **Alternative Restructuring.**  Notwithstanding anything contained in this Agreement to the contrary, following the good faith determination by the Debtors and their respective Boards of Directors that a proposal or offer for a chapter 11 plan or other restructuring transaction that is not consistent with the Plan Term Sheet (an "Alternative Restructuring") constitutes a proposal that is reasonably likely to be more favorable to the Debtors' estates, their creditors, and other parties to whom the Debtors owe fiduciary duties than the Restructuring, and receipt of approval by the Boards of Directors to pursue such Alternative Restructuring, the Debtors may immediately terminate their obligations under this Agreement (and Ally shall have similar termination rights as set forth in section 7.3) by written notice to Ally.

## ARTICLE IV

## Mutual Plan Support Obligations

Section 4.1    *Mutual Plan Support Obligations.*  As long as this Agreement has not been terminated in accordance with Article VII, each of the Parties agrees that it:

(a)    shall negotiate in good faith the Definitive Documents (as defined in the Plan Term Sheet), including the Plan and Disclosure Statement, both of which shall contain the same terms set forth in, and be consistent with, the Plan Term Sheet and this Agreement;

(b)    shall not directly or indirectly seek, solicit, support, or vote in favor of any alternative restructuring that could reasonably be expected to prevent, delay, or impede the Restructuring contemplated by the Plan Term Sheet or that is inconsistent with this Agreement, unless the Debtors and AFI have agreed, in writing, to pursue an alternative restructuring;

(c)    shall not directly nor indirectly (i) engage in, continue, or otherwise participate in any negotiations regarding any alternative restructuring, (ii) enter into a letter of intent, memorandum of understanding, agreement in principle, or other agreement relating to any alternative restructuring or (iii) withhold, withdraw, qualify, or

11

*EXECUTION VERSION*

modify its approval or recommendation of this Agreement, the Plan Term Sheet, the Plan, or the Restructuring;

(d)    shall not encourage any other entity to object to, delay, impede, appeal, or take any other action, directly or indirectly, to interfere with the Restructuring; and

(e)    shall not take any action that is inconsistent with this Agreement, the Plan Term Sheet, or the Plan, or that would obstruct or delay approval of the Disclosure Statement or confirmation and consummation of the Plan.

## ARTICLE V

### Conditions to Effectiveness of the Agreement

Section 5.1    *Conditions to Effectiveness.*  This Agreement is effective immediately upon satisfaction of the following conditions precedent:

(a)    **Bankruptcy Filing.**  The Debtors shall have filed cases under chapter 11 of the Bankruptcy Code on or before May 15, 2012.

(b)    **Data Center Transaction.**  The Data Center Transaction shall have been executed on or before the date that the Debtors file their cases under chapter 11 of the Bankruptcy Code.

Section 5.2    *Additional Conditions to Effectiveness.*  Ally's obligations pursuant to Section 2.1(a), Section 2.2(b)(i) and Section 2.3 shall only apply upon the satisfaction of the following conditions precedent:

(a)    **Plan and Confirmation Order.**  The Plan and the Confirmation Order shall incorporate the terms and conditions of this Agreement and shall include the Third Party and Debtor Releases.

(b)    **Bankruptcy Court Approval.**  The Bankruptcy Court shall have entered the Confirmation Order, which shall have become a Final Order.

(c)    **Plan Effective Date.**  The Effective Date shall have occurred.

## ARTICLE VI

### Representations And Warranties Of The Parties

The Parties, solely on behalf of themselves and their respective subsidiaries, represent and warrant as of the Effective Date:

Section 6.1    *Due Organization, Standing, and Authority.*  Such Party is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its formation. Subject to entry of the Bankruptcy Court Orders set forth herein, such Party has all necessary power and

*EXECUTION VERSION*

authority to execute, deliver, and perform its obligations under this Agreement as contemplated by its Governing Documents.

Section 6.2    *Authorization and Validity of the Agreement.*   Subject to entry of the Bankruptcy Court Orders set forth herein, the execution, delivery, and performance of this Agreement (a) are within such Party's powers, (b) have been duly authorized by all necessary action on its behalf and all necessary consents or approvals have been obtained and are in full force and effect, and (c) do not violate any of the terms and conditions of (i) such Party's Governing Documents, (ii) any applicable law, or (iii) any contract to which it is a party.

Section 6.3    *Enforceability.*   This Agreement has been duly executed and delivered on behalf of such Party and constitutes a legal, valid, and binding obligation of such Party enforceable against it in accordance with its terms and the terms of the Plan and Confirmation Order.

Section 6.4    *Acknowledgment of Party.*   Each Party acknowledges that, except with respect to the representations and warranties made in this Agreement: (a) it has relied on its own independent investigation, and has not relied on any information or representations furnished by any Party or any representative or agent thereof in determining whether or not to enter into this Agreement; (b) it has conducted its own due diligence as well as undertaken the opportunity to review information, ask questions, and receive satisfactory answers concerning the terms and conditions of this Agreement; and (c) it possesses the knowledge, experience, and sophistication to allow it to fully evaluate and accept the merits and risks of entering into the transactions contemplated by this Agreement.

## ARTICLE VII

## Termination of the Agreement

Section 7.1    *Termination of the Agreement by Ally.*   This Agreement shall automatically terminate upon failure to satisfy any of the conditions set forth in Article III, Article IV or Article V hereof, any breach of the Debtors of their obligations under this Agreement, or in the event satisfaction of such conditions becomes a legal impossibility; provided that Ally may waive conditions or a breach by the Debtors in its sole discretion.

Section 7.2    *Termination of the Agreement by the Debtors.*   This Agreement may be terminated by the Debtors upon failure to satisfy any of the conditions set forth in Article V or the breach of any of Ally's obligations under Article II hereof; provided that Ally shall have 15 days to cure any such alleged breach of Article II or the Debtors' exercise of their rights pursuant to Section 3.2(c).

Section 7.3    *Additional Termination Events.*   Unless waived in writing by Ally, this Agreement shall terminate automatically if:

(a)    any material modification is made to the Plan Term Sheet or the Plan that is not in form and substance satisfactory to AFI and the Debtors;

13

*EXECUTION VERSION*

(b)    any of the Definitive Documents (as defined in the Plan Term Sheet), including the Plan, is filed with the Bankruptcy Court by the Debtors and is inconsistent with the Plan Term Sheet in any material respects, unless otherwise acceptable to AFI;

(c)    the Bankruptcy Court has entered an order in any of the Debtors' chapter 11 cases appointing (i) a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, (ii) a responsible officer or (iii) an examiner, in each case with enlarged powers relating to the operation of the business (powers beyond those set forth in sub-clauses (3) and (4) of section 1106(a) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code;

(d)    the obligations of the Debtors under any debtor-in-possession credit facility are accelerated;

(e)    any of the Debtors' chapter 11 cases is dismissed;

(f)    the Debtors publicly announce their intention not to support the Restructuring or provide written notice to AFI of their intention to do so;

(g)    the Debtors' Boards of Directors approve an Alternative Restructuring or the Debtors execute a letter of intent (or similar document) indicating their intention to pursue an Alternative Restructuring;

(h)    any court has entered a final, non-appealable judgment or order declaring this Agreement or any material portion hereof to be unenforceable; and

(i)    the Debtors fail to achieve any of the Milestones.

Section 7.4    *Automatic Termination.*  Unless extended in writing by the Debtors, Ally and Purchaser, this Settlement Agreement shall terminate automatically if (i) the Confirmation Order has not been entered on or before October 31, 2012, or (ii) any of the conditions set forth in Article V have not been satisfied on or before December 15, 2012.

Section 7.5    *Termination Event Procedure.*  The Parties hereby waive any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder solely in connection with giving any termination notice (and agree not to object to any non-breaching Party seeking to lift the automatic stay solely in connection with giving any such notice, if necessary), subject to all rights of the Party to contest any such alleged Termination.

Section 7.6    *Survival.*  Notwithstanding termination of this Agreement pursuant to this Article VII, Ally's obligations in Section 2.1(b)(ii)-(h), and Section 2.2 shall survive; provided that Ally shall have no remaining obligations under this Agreement to the extent of a breach by the Debtors of Section 3.1(a) or 3.1(b) hereof unless such breach was as a result of the Debtors' determination to pursue an Alternative Restructuring in accordance with the terms hereof, in which case Ally's only remaining obligations shall be those set forth in Section 2.1(c) and (d); provided further that, notwithstanding anything in this Agreement to the contrary, in the event of any Alternative Restructuring or any termination of this Agreement on account thereof, Ally's only remaining obligations shall be those set forth in Section 2.1(c) and (d) hereof.

14

*EXECUTION VERSION*

# ARTICLE VIII

## Miscellaneous

Section 8.1    *Notices.* All notices, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given:  (a) when personally delivered; (b) upon actual receipt (as established by confirmation of receipt or otherwise) during normal business hours, otherwise on the first business day thereafter, if transmitted by facsimile, e-mail, or telecopier with confirmation of receipt; (c) five business days after being mailed by certified mail, return receipt requested, first class postage prepaid; or (d) one business day after being sent by nationally recognized overnight courier; in each case, to the following addresses, or to such other addresses as a Party may from time to time specify by notice to the other Parties given pursuant hereto.

If to the Debtors, to:

> Tammy Hamzehpour
> Residential Capital LLC
> 1100 Virginia Drive
> Fort Washington, PA  19034

And with a copy to (which copy shall not constitute notice):

> Mr. Larren M. Nashelsky
> Mr. Gary S. Lee
> Morrison & Foerster
> 1290 Avenue of the Americas
> New York, NY 10100

If to Ally, to:

> Mr. William B. Solomon Jr.
> Ally Financial Inc.
> 200 Renaissance Center
> Mail Code 482-B09-B11
> Detroit, Michigan 48265

And with a copy to (which copy shall not constitute notice):

> Mr. Richard M. Cieri
> Mr. Ray C. Schrock
> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, NY 10022

Section 8.2    *Specific Performance.* Each Party acknowledges that the other Party would be irreparably damaged if this Agreement were not performed in accordance with its

15

*EXECUTION VERSION*

specific terms or were otherwise breached. Accordingly, each Party's sole remedy shall be to seek an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically the terms of this Agreement.

Section 8.3    *Governing Law/Jurisdiction.* This Agreement, the rights and duties of the Parties and all other matters arising out of or relating to this Agreement (whether in contract, tort, or otherwise) will be governed by and construed, enforced, and performed in accordance with the laws of the State of New York, without giving effect to principles of conflicts of laws that would require the application of laws of another jurisdiction. The Parties acknowledge and agree that the Bankruptcy Court shall have the exclusive jurisdiction over this Agreement and that any claims arising out of or related to the interpretation and enforcement of this Agreement shall be properly brought only before the Bankruptcy Court. If and to the extent that the Chapter 11 Cases are closed or dismissed, the United States District Court located in the borough of Manhattan in New York City shall have exclusive jurisdiction over this Agreement and any such claims. This provision shall not constitute a consent by any Party to personal jurisdiction over it for any purpose, other than with respect to the enforcement of this Agreement.

Section 8.4    *Entire Agreement.* This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof and there are no agreements, understandings, representations, or warranties between the Parties other than those set forth or referred to herein.

Section 8.5    *Acknowledgement.* THIS AGREEMENT, THE PLAN TERM SHEET, AND THE TRANSACTIONS CONTEMPLATED HEREIN AND THEREIN, ARE THE PRODUCT OF NEGOTIATIONS BETWEEN THE PARTIES AND THEIR RESPECTIVE REPRESENTATIVES.    EACH PARTY HEREBY ACKNOWLEDGES THAT THIS AGREEMENT IS NOT AND SHALL NOT BE DEEMED TO BE A SOLICITATION OF VOTES FOR THE ACCEPTANCE OF A CHAPTER 11 PLAN FOR THE PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR OTHERWISE.    THE DEBTORS WILL NOT SOLICIT ACCEPTANCES OF THE PLAN FROM AFI UNTIL AFI HAS BEEN PROVIDED WITH COPIES OF A DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. EACH PARTY FURTHER ACKNOWLEDGES THAT NO SECURITIES OF ANY DEBTOR ARE BEING OFFERED OR SOLD HEREBY AND THAT THIS AGREEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OF ANY DEBTOR.

Section 8.6    *Amendment and Waiver.* This Agreement may not be amended, and no right or obligation under this Agreement may be waived, except by written instrument signed by the Parties.

Section 8.7    *Severability.* Each of the provisions of this Agreement is an integrated, essential and non-severable part of this Agreement. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic and legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to the Parties. Upon any determination that any term or other provision is invalid, illegal, or incapable of being enforced, each Party hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a

*EXECUTION VERSION*

mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 8.8    *Reliance on Representations.*  All representations, warranties, agreements, covenants, and obligations herein are material, and shall be deemed to have been relied upon by the other Parties.

Section 8.9    *Successors and Assigns.*  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns, and is intended to be binding upon any chapter 11 or chapter 7 trustee, any successor trustee, and the estates of any or all of the Debtors.  Without in any manner limiting the scope, extent, or effect of the foregoing, no Party hereto shall transfer, assign, or otherwise dispose of their right, title, and interests in and to any claims or causes of action of such Party that are the subject of this Agreement, and any such transfer shall be void and of no force and effect unless and until such transferee or assignee agrees in writing at the time of such transfer or assignment to be bound by this Agreement in its entirety without revision.

Section 8.10    *No Admission of Liability.*  This Agreement is not an admission of any liability, but is a compromise and settlement and this Agreement shall not be treated as an admission of liability.  All communications (whether oral or in writing) between and/or among the Parties, their counsel, and/or their respective representatives relating to, concerning, or in connection with this Agreement, or the matters covered hereby and thereby, shall be governed and protected in accordance with the Federal Rule of Evidence 408 and New York Civil Practice Law and Rules Section 4547 to the fullest extent permitted by law.

Section 8.11    *Interpretation.*  This Agreement has been jointly drafted by the Parties at arm's-length and each Party has had ample opportunity to consult with independent legal counsel.  No provision or ambiguity in this Agreement shall be resolved against any Party solely by virtue of its participation in the drafting of this Agreement.

Section 8.12    *Expenses.*  Except as specifically provided otherwise, the Parties shall be responsible for the payment of their own respective costs and expenses (including reasonable attorneys' fees) in connection with the negotiation, participation, execution, and delivery of, and the observance or performance of their obligations under, this Agreement.  Nevertheless, in any action or proceeding to enforce this Agreement, the prevailing Party shall be entitled to payment of its reasonable costs and expenses (including reasonable attorneys' fees).  The Parties agree that claims for enforcement of this Agreement shall not be released by any of the provisions contained herein.

Section 8.13    *Captions.*  The captions of this Agreement are for convenience only and are not a part of this Agreement and do not in any way limit or amplify the terms and provisions of this Agreement and shall have no effect on its interpretation.

Section 8.14    *Counterparts.*  This Agreement may be executed in counterparts, by either an original signature or signature transmitted by facsimile transmission, other electronic copy, or other similar process and each copy so executed shall be deemed to be an original and all copies so executed shall constitute one and the same agreement.

*EXECUTION VERSION*

Section 8.15 *Further Assurances.* From time to time, upon request, the Parties shall, without further consideration, promptly execute, deliver, acknowledge, and file all such further documents, agreements, certificates, and instruments and do such further acts as the persons or entities entitled to the benefit of this Agreement may reasonably require to effectuate the transactions contemplated by this Agreement.

Section 8.16 *Taxes.* It is acknowledged and agreed to by each of the Parties hereto that each such Party shall be responsible for paying all taxes, if any, arising out of any payments or transfers made to it pursuant hereto and that it shall pay all such taxes in accordance with applicable law.

Section 8.17 *Construction of Agreement.* Each of the functional words "each", "every", "any", and "all" shall be deemed to include each of the other functional words. This Agreement or any uncertainty or ambiguity herein shall not be construed against any one party but shall be construed as if all parties to this Agreement jointly prepared all aspects of this Agreement.

[SIGNATURE PAGE FOLLOWS]

18

EXECUTION COPY

**RESIDENTIAL CAPITAL, LLC for itself and its debtor subsidiaries**

By: _____

    Name:  Jonathan Ilany
    Title:  Independent Director

By: _____

    Name:  John E. Mack
    Title:  Independent Director

**ALLY FINANCIAL INC. on behalf of itself and its subsidiaries and affiliates (excluding the Debtors and their direct and indirect subsidiaries)**

By: _____

    Name:
    Title:

*EXECUTION VERSION*

**ALLY FINANCIAL INC. on behalf of itself and its subsidiaries and affiliates (excluding the Debtors and their direct and indirect subsidiaries)**

By: _____

Name: Michael A. Carpenter
Title: Chief Executive Officer