1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-12020-mg

5  - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  RESIDENTIAL CAPITAL, LLC, et al.,

9

10             Debtors.

11

12  - - - - - - - - - - - - - - - - - - - - -x

13

14             United States Bankruptcy Court

15             One Bowling Green

16             New York, New York

17

18             May 15, 2014

19             10:04 AM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

2

1

2  Doc# 6827 Motion to Approve/Ally Financial Inc.'s Motion for an

3  Order Enforcing the Chapter 11 Plan Injunction

4

5  (CC: Doc. No. 6743) Motion of the ResCap Borrower Claims

6  Trust's Objection to Proofs of Claim Filed by Gregory C. Morse

7  Pursuant to Section 502(b) of the Bankruptcy Code and

8  Bankruptcy Rule 3007, filed by Norman Scott Rosenbaum on behalf

9  of ResCap Borrower Claims Trust

10

11  (CC: Doc# 6778) Hearing re: Notice of the ResCap Borrower

12  Claims Trust's Objection to Claim No. 4664 of James C. Jackson

13

14  (CC: Doc# 6763) Motion for Objection to Claim(s) Number 386

15

16  Doc# 6779 Notice of Objection to Claims/Notice of Objection of

17  the ResCap Borrower Claims Trust to Claim Number 4167

18

19

20  Transcribed by:  Sharona Shapiro

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

3

1    A P P E A R A N C E S :

2    MORRISON & FOERSTER LLP

3         Attorneys for Debtors

4         250 West 55th Street

5         New York, NY 10019

6

7    BY:    JORDAN A. WISHNEW, ESQ.

8         NORMAN S. ROSENBAUM, ESQ.

9

10

11    MORRISON & FOERSTER LLP

12         Attorneys for Debtors

13         425 Market Street

14         San Francisco, CA 94105

15

16    BY:    ADAM A. LEWIS, ESQ.

17

18

19    DAVID F. GARBER, P.A.

20         Attorneys for Mack Creditors

21         700 Eleventh Street South

22         Suite 202

23         Naples, FL 34102

24

25    BY:    DAVID F. GARBER, ESQ.

4

1    BRADLEY ARANT BOULT CUMMINGS LLP

2        Attorneys for ResCap Liquidating Trust & ResCap Borrower

3         Claims Trust

4        One Federal Place

5        1819 Fifth Avenue North

6        Birmingham, AL 35203

7

8    BY:   PRESTON H. NEEL, ESQ. (TELEPHONICALLY)

9        JOHN W. SMITH T, ESQ. (TELEPHONICALLY)

10

11

12    KIRKLAND & ELLIS LLP

13        Attorneys for Ally Financial and Ally Bank

14        300 North LaSalle

15        Chicago, IL 60654

16

17    BY:   JUSTIN R. BERNBROCK, ESQ.

18

19

20    KIRKLAND & ELLIS LLP

21        Attorneys for Ally Financial and Ally Bank

22        655 Fifteenth Street, N.W.

23        Washington, DC 20005

24

25    BY:   JUDSON D. BROWN, ESQ.

**RESIDENTIAL CAPITAL, LLC, et al.**

5

1                    P R O C E E D I N G S

2            THE COURT:  All right, please be seated.  We're here

3    in Residential Capital, number 12-12020.

4            Mr. Wishnew?

5            MR. WISHNEW:  Good morning, Your Honor.  Jordan

6    Wishnew, Morrison & Foerster, for the ResCap Borrower Claims

7    Trust.

8            Your Honor, the first matter going forward this

9    morning is on page 4, item 1:  Ally Financial's motion for an

10   order enforcing the Chapter --

11           THE COURT:  Actually, what I'd like to do,

12   Mr. Wishnew, because I think we can deal with it quickly --

13           MR. WISHNEW:  Sure.

14           THE COURT:  -- I'd first like to hear the ResCap

15   Borrower Trust -- Claims Trust objection, the proofs of claim

16   filed by Gregory C. Morse.

17           MR. WISHNEW:  Okay.  For that, Your Honor, I will --

18           THE COURT:  Where is that on the agenda that --

19           MR. WISHNEW:  That item, Your Honor, is item number 1

20   on page 4, under Claims Objections.

21           THE COURT:  Okay.

22           MR. WISHNEW:  And I will turn over the podium to my

23   colleague, Adam Lewis.

24           THE COURT:  All right.  Mr. Lewis.  Now, let me ask;

25   as I understand --

**RESIDENTIAL CAPITAL, LLC, et al.**

6

 1            Mr. Morse, are you on the telephone?

 2            Mr. Morse, you're not in the court.

 3            All right, Mr. Lewis, I previously entered an order in

 4     connection with this claims objection in response to

 5     Mr. Morse's motion to adjourn the hearing; I denied that motion

 6     to adjourn the hearing.  And I won't recite the whole order,

 7     but I indicated that if he did not appear by telephone that the

 8     Court would take the matter under submission on the papers,

 9     without hearing argument from the Borrower Claims Trust, and

10     that is what I'm going to do.  So --

11            MR. LEWIS:  Very well, Your Honor.  Thank you.

12            THE COURT:  -- you do not need to argue, and we're

13     all -- thank you very much.

14            MR. LEWIS:  For the record, Adam Lewis for the ResCap

15     Borrower Claims Trust.

16            THE COURT:  Thank you very much.

17            Okay, Mr. Wishnew.

18            MR. WISHNEW:  Going back to the agenda, Your Honor,

19     number 1 on page 4 is Ally Financial's motion for an order

20     enforcing a plan injunction.  I will turn the podium over to

21     counsel for Ally Financial --

22            THE COURT:  All right.

23            MR. WISHNEW:  -- to address that matter.

24            THE COURT:  Thank you.

25            MR. BROWN:  Good morning, Your Honor.  Judson Brown

12-12020-mg   Doc 6998   Filed 05/18/14   Entered 05/23/14 12:16:07   Main Document
Pg 7 of 96
**RESIDENTIAL CAPITAL, LLC, et al.**

7

1    from Kirkland & Ellis, on behalf of Ally.

2              Your Honor, we're here today on an uncontested motion

3    to enforce this Court's confirmation order.  We've laid out the

4    complaint issues and the basis for the relief we seek, in our

5    papers.

6              THE COURT:  Mr. Brown, just, I left one memo on my

7    desk.  Just give me --

8              Everybody stay seated.  I'll be right back.

9              MR. BROWN:  Absolutely.

10        (Pause)

11             THE COURT:  Okay.

12             MR. BROWN:  So, thank you, Your Honor.  As I said,

13   we've laid out the basis for the relief we seek, in the papers.

14   Happy to address any issue you want, Your Honor.  I don't

15   believe --

16             THE COURT:  Is anyone appearing for the responding

17   party with respect to Ally's motion to enforce the Chapter 11

18   plan injunction?

19             No.

20             What I would like you to go over for me is service;

21   service of the papers.  I want to be sure that it was properly

22   served.

23             MR. BROWN:  Absolutely, Your Honor.  Let me walk

24   through all of the service, just so the record's clear.  The

25   law firm representing the plaintiffs here was served with

**RESIDENTIAL CAPITAL, LLC, et al.**

8

1  notice of the bankruptcy filing; that's at ECF 336.  That firm

2  was also served with notice of the deadline for filing a proof

3  of claim; that's at ECF 1412.  In fact, they actually filed a

4  proof of claim and then amended proof of claim that Your Honor

5  adjudicated earlier this year.  The firm was also served with

6  notice of the disclosure statement, the confirmation hearing,

7  the objection deadline; that's at ECF 5196.  They were also

8  served with notice of the confirmation order, Your Honor;

9  that's at ECF 6187.  All of these are in our papers as well,

10  Your Honor.

11        Following that confirmation order, Ally, as has been

12  its practice in other lawsuits like this, tried to resolve the

13  matter without coming to court, Your Honor.  And we sent the

14  firm numerous letters, e-mails, and reached out via phone

15  numerous times; I'll walk through those briefly for the Court.

16  On January 30, 2014, Ally's counsel in the underlying lawsuit

17  sent a letter to the plaintiffs' firm here, articulating the

18  basis for the firm to dismiss its claims against Ally with

19  prejudice, pointing to the third-party release and the

20  injunction and the confirmation order.

21        Hearing no response to that letter, Ally's counsel in

22  this case --

23        THE COURT:  The counsel's Brookstone Law Group (sic),

24  is it?

25        MR. BROWN:  That's the plaintiffs' firm, Your Honor,

**RESIDENTIAL CAPITAL, LLC, et al.**

9

1  yes.

2      THE COURT:  All right, go ahead.

3      MR. BROWN:  An individual there is taking the lead for

4  them; I think it's Mr. Vito Torchia.  I've talked -- spoken to

5  Mr. Torchia once; traded a voicemail with him two times.

6      THE COURT:  Okay.

7      MR. BROWN:  I'm not aware of anyone else there

8  handling the case.

9      Mr. Torchia and the Brookstone firm did not respond to

10 the January 30 letter from Ally's counsel in the underlying

11 case, so Kirkland & Ellis sent Mr. Torchia a letter on February

12 24, to which Mr. Torchia actually responded -- called me

13 actually, Your Honor -- and said, you know what, I need to talk

14 to my bankruptcy colleagues.  We said, that's fine, talk to

15 your bankruptcy colleagues.  He never got back to us.  So we

16 followed up on March 19th; again never heard anything.  We

17 followed up with another letter on April 24; didn't hear

18 anything immediately, so Ally filed their motion on April 25,

19 the following day, Your Honor, and served that via e-mail.  In

20 this case we didn't have a pro se plaintiff, so we didn't do

21 any more formal notice than that.  I do know, however --

22     THE COURT:  What, there're sixty-one plaintiffs in the

23 California state-court action?

24     MR. BROWN:  Honestly, Your Honor, it changes with

25 every complaint.  Right now I think that that's correct; I

**RESIDENTIAL CAPITAL, LLC, et al.**

10

 1    think it's sixty-one.

 2              THE COURT:  Started out with a smaller number and then

 3    additional --

 4              MR. BROWN:  Then it got bigger.

 5              THE COURT:  -- parties appeared.  And I don't think --

 6              MR. BROWN:  That's right.

 7              THE COURT:  I think the last I saw, I think there were

 8    sixty-one --

 9              MR. BROWN:  I think that's right, Your Honor.

10              THE COURT:  -- all represented by Brookstone.

11              MR. BROWN:  That's correct, Your Honor, although I

12    will admit, according to Ally's counsel in the underlying case,

13    a number of those plaintiffs apparently didn't even know they

14    were represented by Brookstone.  They reached out to Ally's

15    counsel and were confused as to who their lawyer was.  But our

16    understanding is they're all represented by Brookstone; there's

17    no other law firm representing the plaintiffs in the case.

18              Following the April 24 letter from Kirkland to

19    Mr. Torchia, and then the April 25 motion, Mr. Torchia reached

20    out to me the following Monday -- I think that was April 28th,

21    Your Honor -- and indicated that his clients were going to

22    dismiss their claims with prejudice.  We thought that was a

23    great development.  But nothing happened.

24              A few days later, May 1, we reached out to Mr. Torchia

25    again, this time via e-mail, indicated, look, if you're going

**RESIDENTIAL CAPITAL, LLC, et al.**

11

1   to dismiss your claims, that's great, we'll take the motion off

2   the bankruptcy court calendar, but if you haven't dismissed

3   your claims, we're going to have to go forward with our motion.

4   That was on May 1, Your Honor.  We never heard from the

5   plaintiffs' firm.

6           A number of phone calls later, e-mails later, still

7   haven't heard from Mr. Torchia; he never contested the motion.

8   My understanding is no one from Brookstone or on behalf of the

9   plaintiffs is here or on the phone today, Your Honor.

10          THE COURT:  So the case was filed in state court -

11          MR. BROWN:  It was, Your Honor.

12          THE COURT:  -- in California.  In which county?  Do

13  you know?  Do you -- because I know it was removed to federal

14  court.

15          MR. BROWN:  Yeah, so, Your Honor, it's --

16          Okay, thank you.

17          They started off with a lawsuit against debtor

18  entities and Ally --

19          THE COURT:  Right.

20          MR. BROWN:  -- filed a first amended complaint against

21  those same entities, bringing effectively the same claims; then

22  filed a proof of claim in this court, pursued that proof of

23  claim in this court and, in January of 2013, dismissed their

24  claims --

25          THE COURT:  Yeah, when it initially came on for

**RESIDENTIAL CAPITAL, LLC, et al.**

12

1    hearing on the objection, there was a late-filed response.  I

2    wound up scheduling -- setting out a schedule for further

3    proceedings, and then they ultimately didn't --

4              MR. BROWN:  That's right.

5              THE COURT:  -- respond to that.

6              MR. BROWN:  That's right, Your Honor.  But meanwhile,

7    they had dismissed their claims in California court, the

8    federal action, after it had been removed.  But then in

9    November of 2013 they filed a complaint in Los Angeles County

10   against nondebtor entities Ally, Ally Bank.  The complaint --

11   it is Exhibit 4 to the declaration attached to our motion, Your

12   Honor; the November 2013 complaint against Ally and Ally Bank

13   also identifies a number of debtor entities; doesn't bring

14   direct claims --

15             THE COURT:  Right.

16             MR. BROWN:  -- against them; frankly, reserves the

17   right to do so; but acknowledges, by its own terms, that those

18   various debtor entities -- Homecomings, GMAC Mortgage -- were

19   the originators of the loans at issue.  And it is that November

20   2013 complaint, Your Honor, that is still live in Los

21   Angeles --

22             THE COURT:  But --

23             MR. BROWN:  -- County.

24             THE COURT:  -- that's in state court?

25             MR. BROWN:  It is, Your Honor.

**RESIDENTIAL CAPITAL, LLC, et al.**

13

1          THE COURT:  Is it before a specific judge?

2          MR. BROWN:  Your Honor, I'll admit, I do not know

3    whether it is appointed to a specific judge; I don't know how

4    California and Los Angeles County works with respect to that.

5    And for this one, Your Honor, we don't have our local counsel

6    here, and I don't believe she's on the phone either.

7          THE COURT:  Okay.

8          MR. BROWN:  Based on the complaint, it doesn't look

9    like it's been assigned to a particular judge, though, but I

10   can't state for certain, Your Honor.

11         THE COURT:  Okay, and the current complaint was filed

12   on what date in California Superior Court?

13         MR. BROWN:  November 14, 2013.

14         THE COURT:  Okay.  So it's before the plan was

15   confirmed and then, of course, became effective December

16   17th --

17         MR. BROWN:  That's correct.

18         THE COURT:  -- 2013?

19         MR. BROWN:  That's correct, Your Honor.

20         THE COURT:  All right.

21         MR. BROWN:  And as I stated before, Your Honor, the

22   plaintiffs' firm had notice of a disclosure statement, the

23   plan, the opportunity to object; nonetheless filed this

24   complaint; never objected to the third-party release.  And then

25   in December, Your Honor approved the plan and confirmed the

**RESIDENTIAL CAPITAL, LLC, et al.**

14

1    plan through the confirmation order, which the plaintiffs' firm

2    here received notice of.

3           THE COURT:  Okay.  Not that you were required to do

4    so, but I just inquire whether you sent the firm copies of the

5    written opinions that I've already rendered enforcing the

6    third-party release against Ally.

7           MR. BROWN:  We did, Your Honor.  We did.  Let me make

8    sure, but I believe it was our April 24 letter, Your Honor.

9           Yes, Your Honor.

10          We, as you well know, have been in front of you three

11   times now.  We actually had to go forward on two motions

12   against pro se plaintiffs; Your Honor entered orders as to each

13   of those.  We sent both of those on April 24 to the plaintiffs'

14   firm in this case.  In a third instance, a plaintiffs' firm had

15   three class-action lawsuits against Ally; we filed a motion

16   but, thankfully, we were able to resolve that before coming

17   before Your Honor to enforce our motion.  And Your Honor

18   so-ordered the stipulation that we reached with the plaintiffs'

19   firm in that case.  We sent all three of those to the

20   Brookstone firm in this case on April 24, so he received a

21   notice of Your Honor's rulings -- your prior rulings.

22          THE COURT:  Okay.  You seek to recover attorney's fees

23   in connection with the motion.  I'd like to hear your argument

24   about the statutory or rule basis for the award of sanctions

25   and whether it should be against the law firm or against the

**RESIDENTIAL CAPITAL, LLC, et al.**

15

1    claimants -- the plaintiffs in the action.

2          MR. BROWN:  Yeah, Your Honor, to start out, the

3    confirmation order and the injunction contained in that

4    confirmation order gives Ally clear right to its fees and

5    costs, and that's what we're seeking here.  And we think that,

6    Your Honor, the appropriate basis is fees and costs as to the

7    plaintiffs' firm or their conduct forcing Ally to go through

8    the process of being here before Your Honor --

9          THE COURT:  Okay --

10          MR. BROWN:  -- not the individual plaintiffs.

11          THE COURT:  -- and is there a statutory or rule basis

12    for what you're seeking under 28 U.S.C. 1927?  Do I understand

13    that?  Or what's -- I'd like to know the specific statutory or

14    rule basis for the award of attorney's fees and costs in

15    connection with this motion.

16          MR. BROWN:  I think it's Section 105, Your Honor.

17    That's between the confirmation order and the terms of the

18    order and the powers invested in this Court, through Section

19    105.  That's the basis for the fees and costs that Ally seeks,

20    Your Honor.

21          Your Honor, we fully recognize that the plaintiffs'

22    firm is not present, but we do feel strongly that Ally is

23    entitled to its fees and costs under the terms of the plan that

24    your order entered.  And the plaintiffs' firm here has had

25    clear notice for, frankly, six months at this point, Your

**RESIDENTIAL CAPITAL, LLC, et al.**

16

1    Honor, of the terms of the third-party release and the

2    injunction and, nonetheless, have refused for six months to

3    discuss their claims with prejudice.  Frankly, they haven't

4    even engaged on a discussion of why their claims may not be

5    covered by the third-party release, and it's that very conduct

6    that, pursuant to the terms of your order and the inherent

7    powers vested in the Court in 105, warrant fees and costs here,

8    Your Honor.

9         THE COURT:  Well, I'm not familiar with case law that

10    supports the award of sanctions under Section 105.  Certainly

11    under --

12         MR. BROWN:  So, Your Honor, we cite --

13         THE COURT:  -- 9011 or Section 1927 --

14         MR. BROWN:  So, Your Honor, I stand corrected.  We

15    cite three cases, two of which award sanctions under 1927, one

16    of which under Section 105; it is an SDNY case, Your Honor,

17    from 2002, granting sanctions pursuant to 105.  And so through

18    either vehicle, we view there to be a basis for the Court to

19    award sanctions.

20         Your Honor, in addition to fees and costs, which

21    certainly would -- the reasonable amount will be determined by

22    Your Honor -- the plaintiffs' firm here -- I don't want to call

23    it an advertisement, but they, on their Web site, are

24    effectively touting their claims against my client.  And they

25    have included on their Web site our logos and marks and --

**RESIDENTIAL CAPITAL, LLC, et al.**

17

1       THE COURT:  I'm not sanctioning them for having a Web

2   site that touts their claims against your client.

3       MR. BROWN:  Your Honor, I'm not --

4       THE COURT:  The issue before me is whether -- with

5   respect to the complaint that's on file in state court in Los

6   Angeles and their refusal to dismiss it, whether they have

7   violated the terms of the injunction.  I'm not getting into

8   whatever First Amendment rights or any other rights they might

9   have to post advertisements, true, false or otherwise.

10      MR. BROWN:  Your Honor, and we're not asking you to

11  sanction them for that conduct.  What I was actually going to

12  request, Your Honor, is, if you do order them to dismiss their

13  claim, with that, I think Your Honor could rightfully, if you

14  so chose, order them to remove the Ally mark or Ally logos from

15  their Web site.  But --

16      THE COURT:  I --

17      MR. BROWN:  -- I'll leave that to Your Honor.

18      THE COURT:  If you have a trademark or copyright or

19  false-advertising claim that you wish to assert against

20  Brookstone, it isn't going to be before me.

21      MR. BROWN:  For sure, Your Honor.

22      THE COURT:  Okay.  What I am going to do for now --

23  I'm taking the matter under submission, but I'm going to enter

24  an order today.  How much time do you want to submit time

25  records establishing how much you're seeking in attorney's fees

**RESIDENTIAL CAPITAL, LLC, et al.**

18

1  and costs in connection with making of a motion?  I mean,

2  because what I'm going to do is I'm going to give you -- you

3  tell me how much time you want.  I'm going to give them seven

4  days to respond to that.  I'm going to require that you serve

5  the order on them and file a proof of service that you served

6  an order on -- you served a copy of the order on them.  And

7  after I -- I'm going to take the whole issue of whether to

8  enter an order enforcing the injunction, as I've done in three

9  other cases -- or two or three other cases so far.  And the

10 relief I've provided in those cases was to set a deadline for

11 those other matters to be dismissed against Ally.  And if I

12 grant relief, it would be along those lines.

13       But in the past you haven't sought attorney's fees,

14 and I think that was proper that you did not.  This I think is

15 a more brazen instance, so I still have to decide whether the

16 circumstances are such that I should enter an order enforcing

17 the injunction and then, of course, deciding whether to award

18 fees and costs.  But I'm not going to award fees and costs

19 without having a declaration with supporting information about

20 the fees and costs incurred and to give them a short time to

21 respond to that.

22       I had a question, though.  Maybe not.  I guess not.

23       How much time do you want, Mr. Brown?

24       MR. BROWN:  Your Honor, I think within seven days we

25 can --

**RESIDENTIAL CAPITAL, LLC, et al.**

19

1          THE COURT:  Okay.

2          MR. BROWN:  -- compile our records and submit --

3          THE COURT:  All right.

4          MR. BROWN:  -- a declaration.

5          THE COURT:  So I'm going to enter a short order today

6    that says this matter was heard, opposing party did not appear

7    in person or by telephone, the Court took under submission the

8    issue of whether to enter an order enforcing the Chapter 11

9    plan injunction and directing Ally's counsel to submit, within

10   seven days from the date of the order, a declaration and

11   supporting information detailing the amount of fees and costs

12   that it seeks to recover in connection with the making of the

13   motion, and providing Brookstone Law with seven days to file a

14   response.  I will then resolve the matter without any further

15   hearing, based on the papers before me.  Okay?

16          MR. BROWN:  Thank you, Your Honor.

17          THE COURT:  Thank you very much, Mr. Brown.

18          MR. BROWN:  Your Honor, those are all the matters that

19   Ally had.

20          THE COURT:  Okay.

21          MR. BROWN:  May we be excused, Your Honor?

22          THE COURT:  Absolutely.

23          MR. BROWN:  Thank you, Your Honor.

24          THE COURT:  Mr. Wishnew?

25          MR. WISHNEW:  Thank you, Your Honor.  The next matter

**RESIDENTIAL CAPITAL, LLC, et al.**

20

1    on the calendar is a contested claims objection matter, matter

2    number 2 on page 4 of the agenda:  ResCap Borrower Claims Trust

3    objection to proof of claim number 386, filed by Barry and

4    Cheryl Mack.  And I'll again defer the podium to my colleague,

5    Adam Lewis.

6            THE COURT:  Thank you.

7            Is anybody here for Barry and Cheryl Mack?

8            MR. GARBER:  Your Honor, David Garber from the State

9    of Florida, on behalf of Barry and Cheryl Mack.

10            THE COURT:  Thank you.  Nice to have you here,

11    Mr. Garber.

12            MR. GARBER:  Thank you.

13            THE COURT:  Go ahead, Mr. Lewis.

14            MR. LEWIS:  Good morning, Your Honor.  Adam Lewis of

15    Morrison & Foerster, for the ResCap Borrower Claims Trust.  And

16    I think on the line is John W. Smith T from Bradley Arant Boult

17    & (sic) Cummings.

18            THE COURT:  Okay.

19            MR. LEWIS:  They were our local counsel.

20            THE COURT:  Yes, and I was asked if I would permit him

21    to appear by telephone, and I agreed that they could.

22            MR. LEWIS:  And we appreciate that, Your Honor.

23            Your Honor, this is a case in which essentially what's

24    going on is the plaintiffs -- now the plaintiff -- recovered in

25    a lawsuit in Florida for the events that they describe.  We

**RESIDENTIAL CAPITAL, LLC, et al.**

21

1  don't deny those events occurred, although we have questions

2  about some of the --

3           THE COURT:  Not one of the prettier pictures I've --

4           MR. LEWIS:  Not at all, Your Honor.

5           THE COURT:  -- seen in this whole case.

6           MR. LEWIS:  Not at all.  But I guess local counsel

7  there was busy doing the same thing in a lot of situations,

8  unfortunately.

9           THE COURT:  If he was doing the same thing, I hope he

10  doesn't still have a license to practice law.

11          MR. LEWIS:  I think he's in a lot of trouble in

12  Florida, Your Honor.  But the fact is we chose him, and he --

13          THE COURT:  Yep.

14          MR. LEWIS:  -- did what he did.  And we --

15          THE COURT:  He was on your watch --

16          MR. LEWIS:  And we made the --

17          THE COURT:  -- not you personally, Mr. Lewis --

18          MR. LEWIS:  Yes.

19          THE COURT:  -- obviously.

20          MR. LEWIS:  Yes, Your Honor.  And we made the decision

21  to initiate the foreclosure, but I want to emphasize we also

22  quickly tried to reverse that, and that didn't happen without

23  our knowledge.  But the plaintiffs, in their counterclaim,

24  ultimately recovered, after an evidentiary hearing, on their

25  claims arising out of that conduct in those events.  And what's

**RESIDENTIAL CAPITAL, LLC, et al.**

22

1    going on now essentially is they're trying to recover a second

2    time.  The first time they recovered from Deutsche Bank, which

3    was the trustee on the bonds, and not GMAC Mortgage, LLC --

4    GMACM -- which was the servicer and is our client here, which

5    actually initiated the foreclosure.  Deutsche Bank had no clue

6    what was going on, as far as I know; it has now, of course.

7            But really, Deutsche Bank's liability is --

8            THE COURT:  Who paid the judgment?

9            MR. LEWIS:  Pardon me?

10           THE COURT:  Who paid the judgment?

11           MR. LEWIS:  A surety paid the judgment, Your Honor.

12   So when there was an appeal of the judgment, a bond was posted

13   with a surety, and then the surety ultimately paid the judgment

14   in -- I think it was March of last year.  So the judgment is

15   paid.  I don't quite know what's going on, if anything, between

16   the surety and Deutsche Bank, or Deutsche Bank and GMACM, but

17   the fact is the judgment was paid.

18           THE COURT:  Steiner was the name of the lawyer?  Is

19   that --

20           MR. LEWIS:  Pardon me?

21           THE COURT:  Steiner was the name of the lawyer, I

22   think?

23           MR. LEWIS:  Stern.

24           THE COURT:  Stern.  Excuse me.

25           MR. LEWIS:  David Stern.

**RESIDENTIAL CAPITAL, LLC, et al.**

23

1              THE COURT:  I'm sorry.

2              MR. LEWIS:  Yes.

3              THE COURT:  Yeah.

4              MR. LEWIS:  Other labels may apply, but that's his

5      name.

6              THE COURT:  Okay.

7              MR. LEWIS:  So the judgment's been paid.  And the

8      litigation below was really about wrongful commencement of the

9      foreclosure, and the aftermath, the fallout.  And it's clear

10     that Deutsche Bank's liability was completely depending on what

11     GMAC did.  Deutsche Bank's conduct was totally innocent and yet

12     it ended up paying a judgment.  Now what's happening is that

13     the plaintiff --

14             THE COURT:  Well, they were chargeable with conduct of

15     their agent.

16             MR. LEWIS:  Yeah, agent -- joint tortfeasor, if you

17     will.  I mean, that's one of the theories that we saw in the

18     response here.  But I don't think it matters, because in all

19     those instances the liability is derivative and, when one pays,

20     that's the end of it.  And there's case law that we cite

21     repeatedly, both in the opening objection and in our reply, to

22     that effect.

23             The only real issue on the res judicata question -- I

24     mean the issues are, you know, is it the same thing sued for,

25     and the answer is yes; it's money.  That's what Florida looks

**RESIDENTIAL CAPITAL, LLC, et al.**

24

1    at, not what kind of money or what kind of theory the money is

2    sought under, but whether it's money or some other kind of

3    relief.  The answer clearly is it was money.

4         THE COURT:  Well, and I'm going to ask Mr. Garber

5    about this as well; so this claim asserts a wrongful-death

6    claim for Mrs. Mack's unfortunate death, whether any of the

7    defendants were responsible for it or not.  I mean, it's not a

8    pretty picture; let's put it that way, okay?  The original

9    award -- I guess it was in state court?

10        MR. LEWIS:  Yes, Your Honor.

11        THE COURT:  The original award in state court, while

12   Mrs. Mack was still alive, included, what, 150,000 dollars

13   for -- attributable to what, personal injury, emotional

14   distress.  And that portion of the judgment was reversed -- was

15   vacated.  The judgment was reduced by -- and one of you will

16   correct me; I thought that that 150,000-dollar award was on the

17   RESPA claim.

18        MR. LEWIS:  It was.

19        THE COURT:  And I thought that the court determined

20   that such damages are not recoverable under RESPA.

21        MR. LEWIS:  That's correct.

22        THE COURT:  And in fact, because there had been no

23   violation of RESPA, because GMAC always was the servicer -- the

24   note had transferred but the servicer remained the same.  So

25   the RESPA award was vacated, is that --

**RESIDENTIAL CAPITAL, LLC, et al.**

25

1              MR. LEWIS:  That's correct, Your Honor.

2              THE COURT:  Okay.

3              MR. LEWIS:  But I think -- if I can anticipate what I

4    think the Court's getting at, the fact is they could have sued

5    for emotional damages for the other conduct.  And whether they

6    did or not, the fact is that's what res judicata is all about;

7    one suit on the underlying nucleus of facts, so we don't have

8    to keep coming back to court again and again and again, taking

9    new bites of the apple, revising and refitting our theories

10   because the last one didn't work.  That's what this is all --

11   that's what res judicata is all about, and that fits like a

12   glove here, Your Honor.  This is a claim --

13             THE COURT:  If -- I'm not saying you're wrong, but the

14   wrinkle, from my standpoint, is that GMAC wasn't a defendant;

15   Deutsche Bank was the defendant.

16             So let me ask you, hypothetically, if GMAC committed

17   conduct that could, under some theory, give rise to a wrongful-

18   death claim, and that conduct wasn't chargeable to Deutsche

19   Bank, would this claim withstand your res judicata objection?

20   Look, if GMAC had been a party in the underlying action, it

21   fits squarely -- you know, how many decisions on res judicata

22   have I already written in ResCap?  A lot.  And if it's a claim

23   that was or could have been asserted, it's barred, okay?  Here

24   the wrinkle is GMAC wasn't a party.

25             I know your argument that the only basis for liability

**RESIDENTIAL CAPITAL, LLC, et al.**

26

1    of Deutsche Bank was because GMAC was its agent.  But that's

2    what I'm -- that's where I'm focusing, okay?  Is there some --

3    does a wrongful-death claim now, against -- assuming it was

4    timely and not barred by a statute of limitations or anything

5    like that -- a personal-injury claim was tacked onto the RESPA

6    claim against Deutsche Bank, and that gets vacated, is there a

7    separate basis -- have they at least alleged a separate basis

8    that would support a wrongful-death claim for Mrs. Mack's

9    demise against GMAC?

10            MR. LEWIS:  Your Honor, my understanding of the

11   doctrine of res judicata, and particularly the last two

12   elements that are applicable in Florida, is that it's not

13   whether you allege something; it's whether you could have

14   alleged it.  And so the question becomes --

15            THE COURT:  Well, clearly, if GMAC had been in there,

16   I --

17            MR. LEWIS:  No, it --

18            THE COURT:  -- crystal clear.

19            MR. LEWIS:  My point is if it could have been alleged

20   against the party who is your privy -- and that's our

21   argument -- whether it was alleged or not doesn't matter.  So

22   the question, I believe, is:  Could the Macks have made this

23   claim against Deutsche Bank?  And I don't see why not.  I mean,

24   we've seen the law that says that they couldn't have.  And

25   everything else that Deutsche Bank didn't do, but GMAC did,

**RESIDENTIAL CAPITAL, LLC, et al.**

27

1    Deutsche Bank was held liable for and sued for.  I don't see

2    why it would be any different with a wrongful-death action than

3    anything else.

4            THE COURT:  Okay.

5            MR. LEWIS:  And that's the basic point.  So if you

6    believe -- if you agree with us that res judicata's basic

7    principles, with respect to privity, quality of person

8    identity, and all that, apply, it applies just as much.

9            It's -- the same thing too, Your Honor, is true of the

10   new RESPA 2605(e) claim about, you know, they weren't

11   responsive.  It's true that that couldn't have been made

12   against Deutsche Bank, on a direct basis, because it can only

13   be made -- it's only the receiver's -- it's only GMAC's conduct

14   that could be at issue.  But that doesn't mean it couldn't --

15   they couldn't have sued Deutsche Bank for the same thing.  They

16   didn't.

17           And from our perspective, a 2605(e) claim under RESPA

18   is barred for the same reason.  So I think the RESPA claim,

19   2605(e), and the wrongful-death claim both are claims that I

20   have seen nothing that says couldn't have been alleged against

21   Deutsche Bank, even though it was totally innocent of the

22   conduct involved.  In fact, it was totally innocent of all the

23   conduct involved for which it was held liable.  And I think

24   that's the key to the res judicata argument.

25           THE COURT:  Just give me a second.

**RESIDENTIAL CAPITAL, LLC, et al.**

28

1            MR. LEWIS:  Sure.

2            THE COURT:  I want to see if I have other questions

3    for you.

4        (Pause)

5            THE COURT:  Okay.

6            MR. LEWIS:  So Your Honor, we think that res

7    judicata's all four elements apply here.  The fundamental issue

8    for the third and fourth elements is, essentially, were the

9    interests closely enough tied, between GMAC and Deutsche Bank,

10   for Deutsche Bank's -- the judgment against Deutsche Bank to

11   apply as res judicata with respect to GMAC -- and we think --

12   you know, however you look at it, whether it's respondeat

13   superior, the court having found that Deutsche Bank was the

14   agent, or whether it's -- I mean, GMAC was the agent, or

15   whether it's joint tortfeasors, the same rules apply; it's

16   whether the interests are sufficiently intertwined for the

17   defense of the one to be applicable to the other.  And clearly

18   they were, because Deutsche Bank was innocent of all the

19   wrongdoing, so it had every reason to defend GMAC's conduct.

20   Now, in fact, it didn't get much of a chance to do that, but

21   that's not the test here.

22            THE COURT:  Just because the lawyer --

23            MR. LEWIS:  Yeah.

24            THE COURT:  -- GMAC hired to --

25            MR. LEWIS:  Right.  Yeah, that's right.  Yeah, I mean,

**RESIDENTIAL CAPITAL, LLC, et al.**

29

1    that's right.

2            But that's the key, and whatever label you apply, the

3    fact is that the Macks tried to hold Deutsche Bank liable for,

4    exclusively, GMAC's conduct, and succeeded on some of their

5    theories.

6            THE COURT:  All right.  Let me hear from Mr. Garber.

7            MR. LEWIS:  Thank you, Your Honor.

8            THE COURT:  Thank you, Mr. Lewis.

9            Mr. Garber?

10            MR. GARBER:  Your Honor, if it pleases the Court.

11    David Garber on behalf of Barry and Cheryl Mack.

12            I understand the Court's time is limited.  This is a

13    long case that's been going on for five years.

14            THE COURT:  This is an important matter for me; you've

15    got as much time as you -- within limits, you have as much

16    time --

17            MR. GARBER:  Okay.

18            THE COURT:  -- as you want, okay?

19            MR. GARBER:  Let me briefly go over the facts, because

20    I think this case will be decided on the facts of this

21    particular thing.  In the summer of 2009, my clients were

22    experiencing some financial difficulty.  They contacted GMAC,

23    to whom they had been making their mortgage payments, because

24    they were notified in 2006, soon after they took out their

25    loan, that GMAC was the person they had to pay for it.  And in

**RESIDENTIAL CAPITAL, LLC, et al.**

30

1  fact, GMAC -- GMAC Mortgage was the owner and the servicer of

2  the note.  My clients were making those payments, but they were

3  making them out of savings.  They had savings of about 2- or

4  300,000 dollars when they started.  They were drawing it down.

5  It was maybe 86,000 when they realized that they had to do

6  something.

7           On April 17th, they called up GMAC to ask if there was

8  some government program like HAMP to help them, and GMAC said

9  yes there was.  On the notes that have, since the suit, been

10 given to us, in the post-judgment proceedings, we found out

11 that on April 17th, GMAC found my clients to be directed

12 towards foreclosure, on the same day that they called.  Now, my

13 clients, of course, knew none of this inner working.  In August

14 they were served with a suit by Deutsche Bank.  They had never

15 had anything to do with Deutsche Bank; they didn't know who

16 Deutsche Bank was.  First thing they did was call up GMAC, to

17 whom they had been talking to for years.

18           THE COURT:  Just pull the microphone closer.

19           MR. GARBER:  Yes.

20           THE COURT:  I just want -- I hear you fine; I just

21 want to make sure we're getting a clear record, okay?  Go

22 ahead.

23           MR. GARBER:  I understand.  So the first thing they

24 did was call GMAC, and they talked to GMAC.  GMAC told them

25 there's no problem here, you're not in default, there's nothing

**RESIDENTIAL CAPITAL, LLC, et al.**

31

1    wrong, don't pay any attention to this lawsuit.  But the

2    lawsuit stayed.

3          And they came to an attorney, and when I read the

4    complaint, I saw the complaint said that Deutsche Bank was the

5    owner of this loan and was going to record an assignment

6    showing that they had bought the loan.  And so the theory that

7    we operated on was that GMAC had sold the loan to Deutsche

8    Bank.  But not having been notified, the Macks continued to pay

9    GMAC, who got all the money.  Deutsche Bank didn't get any

10   money, because they never notified the Macks, as they would

11   have been required to do under RESPA, that they should now get

12   the payments.

13         That was the basis on the counter-claim.  It was

14   divided into two parts: number one, under Florida law, was

15   slander of title.  Slander of title is when you record a

16   instrument or take some action to disparage a person's property

17   so that its value has been reduced.  It is somewhat different

18   than the slander that we're normally used to in the law,

19   because --

20         THE COURT:  I've had quite a few slander of title

21   matters in connection with ResCap, so I'm familiar with it.

22         MR. GARBER:  And the distinguishing factor that I want

23   to bring up here is that there's only one type of damages,

24   special damages, not general damages.  You don't get personal-

25   injury damages; you don't get anything except you show how much

**RESIDENTIAL CAPITAL, LLC, et al.**

1    that property was damaged in its value.

2              THE COURT:  On the slander of title?

3              MR. GARBER:  On the slander of title.  So that was

4    count I.  Count II they filed was under RESPA.  RESPA was under

5    that section of RESPA that says that when a servicer is

6    handling a loan, when it sells the loan, it's got to notify the

7    borrowers within fifteen days of the transfer so that the

8    payments can all be made properly.  And there was never any

9    notice on that.  Deutsche Bank, as the new responsible bank, as

10   they indicated they were on their suit that was filed by Mr.

11   Stern, had filed this improperly, because in fact the Macks had

12   made the payments.  And so they would have been liable under

13   RESPA.  And that was pled, in some detail, in the suit.

14             The suit was dismissed as to the foreclosure in

15   December, some three months later.  It was dismissed by Mr.

16   Stern.  Mr. Stern handles many cases down there; he's been a

17   lot of trouble on a lot of cases.  But he did not dismiss it

18   until December.  He had a right to do so, under Florida law, to

19   dismiss his claim.  He could not dismiss the counter-claim, but

20   he could dismiss his claim.  He declared that his client,

21   Deutsche Bank, was the prevailing party, they were entitled to

22   fees and costs, and they were leaving that open but the claim

23   itself was dismissed.

24             Over the course of the next eighteen months, not only

25   my firm, but also the Court itself, made numerous attempts to

**RESIDENTIAL CAPITAL, LLC, et al.**

33

1  get Mr. Stern to respond to the counter-claim.

2        THE COURT:  Is he still practicing law?

3        MR. GARBER:  I can tell you what I've heard.

4        THE COURT:  Okay.

5        MR. GARBER:  No.  I've heard that he may live in

6  Tahiti, that he may have six million dollars and that he's

7  doing the best he can with a difficult situation.

8        MR. SMITH T:  He's been disbarred by the Florida bar,

9  Judge.

10        THE COURT:  May I ask who's speaking?

11        MR. SMITH T:  That was John Smith T for ResCap.  I'm

12  sorry.

13        THE COURT:  Okay.  No, that's okay.

14        MR. GARBER:  Okay.  And John --

15        THE COURT:  I'm not surprised.

16        MR. GARBER:  I did not know that, so that's new.

17        But in any case, for eighteen months, we tried to get

18  Mr. Stern to come to court, and the judge sent out notices,

19  notices of trials, orders to appear.  Mr. Stern did none of

20  this, and so the judge went ahead and set a trial; it was on

21  May 5th of 2011.  And the only person that appeared was the

22  Macks -- the Macks, their attorney, the witnesses.  The trial

23  lasted perhaps four hours.  Documents were submitted, testimony

24  was taken, and they showed that, in fact, Mrs. Mack had taken

25  an overdose of alcohol and sleeping pills in October of 2009,

**RESIDENTIAL CAPITAL, LLC, et al.**

34

1   then she was hospitalized for two weeks, and that she suffered

2   permanent residual kidney damage as a result of doing that.

3   However, she was stabilized by the time of the trial.

4           And so we asked, under RESPA -- RESPA will allow

5   personal-injury damages in some jurisdictions of the country.

6   I think in the Ninth Circuit they don't recognize that; I

7   believe in the Fourth Circuit they may recognize it.  We

8   informed that to the judge of the Eleventh Circuit, which is

9   where we are.  There had not been a ruling, and so the judge

10  elected to award personal-injury damages of 150,000 dollars.

11          After the appeal time ran, which was thirty days, so

12  it went until June 5th of 2011, the Macks, through me, began

13  collection procedures.  We sent out subpoenas, not only to

14  Deutsche Bank, but we sent subpoenas to GMAC, because GMAC, we

15  thought, new all about the transfer to Deutsche Bank and could

16  tell us what assets that Deutsche Bank had.  It was only in

17  response to those collection efforts that we suddenly received

18  a motion to vacate the judgment, and it was done under a

19  provision of law which says that if a -- if a judge --

20          THE COURT:  Filed by Deutsche Bank --

21          MR. GARBER:  By --

22          THE COURT:  -- because they were the party -- Deutsche

23  Bank --

24          MR. GARBER:  On behalf of Deutsche Bank.

25          There is a wrinkle here, and that is Mr. Smith T, a

**RESIDENTIAL CAPITAL, LLC, et al.**

35

1   distinguished and able attorney, appeared on behalf, not only

2   of Deutsche Bank, but also GMAC.

3         THE COURT:  Right.

4         MR. GARBER:  But GMAC was not a party.  GMAC --

5         THE COURT:  I understand.

6         MR. GARBER:  -- did not file a motion to intervene.

7   GMAC was never recognized as before the Court by the Court in

8   these proceedings.  But he also represented Deutsche Bank.  And

9   they had another local attorney that was there that represented

10  only Deutsche Bank.

11        And so the Court conducted numerous hearings into

12  this, permitted a large amount of discovery and evidence,

13  during which we got a better picture of this relationship that

14  existed between Deutsche Bank and GMAC.  And Deutsche Bank --

15  or GMAC, who was the active participant -- we did not hear from

16  many witnesses from Deutsche Bank -- GMAC maintained that in

17  fact they were the servicer, had been the servicer before,

18  continued to be the servicer after the suit was filed; they

19  hired Mr. Stern, they made the mistake, and so on.  And they

20  gave us numerous documents, some of which are in our brief here

21  today.

22        Nowhere in these proceedings did the post-judgment

23  court ever find that GMAC was an agent, or affiliated, in any

24  way, with Deutsche Bank, because our suit, the Mack suit, was

25  against Deutsche Bank, not in a vicarious liability, but in an

**RESIDENTIAL CAPITAL, LLC, et al.**

36

1  active liability of having personally directed their attorney

2  to file this lawsuit.

3        Now whether they got on the telephone and talked to

4  him or whether they talked to somebody at GMAC and they got on

5  the telephone and talked to him, to this day, I can't answer

6  that question.  But the lawsuit was not against him

7  vicariously.  As a matter of fact, quite to the contrary, my

8  clients, at all times, maintained that GMAC was helpful to them

9  in trying to work this out, and was telling them that they

10 would try to call up Deutsche Bank to see if it could be fixed.

11       THE COURT:  Little did they know that Mr. Stern wasn't

12 paying any attention to anybody.

13       MR. GARBER:  Mr. Stern wasn't paying attention to

14 anybody.

15       So my clients would have never authorized a suit

16 against GMAC.  They were not mad against GMAC.  Had they

17 authorized a suit, had I filed it, I think that the Macks would

18 have been subject to our equivalent -- state equivalent of your

19 Rule 11 sanctions because there was absolutely no basis to

20 believe that GMAC had anything to do with this whatsoever.

21       In the post-judgment proceedings that --

22       THE COURT:  Well, they knew that they were sending

23 their mortgage payments to GMAC.

24       MR. GARBER:  They continued to do that.

25       THE COURT:  Yeah, but they -- so they -- I mean, GMAC

**RESIDENTIAL CAPITAL, LLC, et al.**

                                                                                       **37**

1    was not a stranger to the Macks.  They --

2              MR. GARBER:  Yes.  Yes.

3              THE COURT:  They were making their mortgage payments

4    to GMAC, and they understood that GMAC was the loan servicer?

5              MR. GARBER:  No, they did not.  They continued to pay

6    GMAC, because that's who they thought they had the deal with.

7    They thought that Deutsche Bank was an interloper.

8              THE COURT:  All right.  So tell me about -- so it's in

9    the enforcement of judgment proceeding that Deutsche Bank makes

10   a motion to vacate a portion of the judgment?  Is that --

11             MR. GARBER:  Yes.

12             THE COURT:  All right.  And tell me about that.

13             MR. GARBER:  And it was made on numerous grounds, one

14   of which was an equitable ground that since their attorney

15   didn't keep them informed of anything they shouldn't be held

16   liable.  And the judge, for various reasons --

17             THE COURT:  That didn't take --

18             MR. GARBER:  It -- it did not.

19             THE COURT:  -- the judge very long to dispose of.

20             MR. GARBER:  But there was also an attack made that

21   the slander of title was not pled properly, and not having been

22   pled properly, if it is fatally defective on the pleading, then

23   you cannot get a judgment against them, and it must go.  The

24   judge denied that.

25             THE COURT:  Right.

**RESIDENTIAL CAPITAL, LLC, et al.**

38

1          MR. GARBER:  They also made the grounds that the RESPA

2     claim was not pled properly.  And so the judge believed that

3     the RESPA claim was not pled properly, and he declared that to

4     be a nullity.

5          THE COURT:  And that's how the 150,000-dollar pain and

6     suffering went away?

7          MR. GARBER:  Yes, Your Honor, and so it went away.  It

8     was --

9          THE COURT:  And it --

10          MR. GARBER:  -- never then litigated.

11          THE COURT:  Okay.  So -- well, that's not true.

12          MR. GARBER:  Well, yes --

13          THE COURT:  That's not true.

14          MR. GARBER:  -- that's a matter of interpretation.

15          THE COURT:  It was litigated, and he vacated it

16     because, as I -- if I'm reading the papers correctly, GMAC,

17     having been the loan servicer from the start and throughout, he

18     concluded that there was no violation of the disclosure

19     requirements of RESPA.  It would have required notice of the

20     change in the loan servicer but not of the owner of the note.

21     Am I right on that?

22          MR. GARBER:  Well, I think the reason that he did it

23     was because we alleged there was a transfer from GMAC to

24     Deutsche Bank, and we did not say that there was a transfer of

25     servicer, because RESPA --

**RESIDENTIAL CAPITAL, LLC, et al.**

39

1          THE COURT:  Okay.

2          MR. GARBER:  -- does not apply to a transfer of

3     ownership.

4          THE COURT:  Right.

5          MR. GARBER:  It only applies to a transfer of

6     servicer.

7          THE COURT:  That's my point.  The fact that there may

8     have been a transfer of the ownership of the note does not --

9     and no disclosure of that, does not give rise to a RESPA claim.

10    RESPA relates to disclosure of who the loan servicer is.

11         MR. GARBER:  That's true.

12         THE COURT:  Okay.

13         MR. GARBER:  But had we put the word "servicer" in

14    there, then the Court would have had no authority, even it

15    wasn't true -- it doesn't matter if it was true or not; it was

16    litigated, it was decided --

17         THE COURT:  So tell me what's the --

18         MR. GARBER:  -- you know, the whole --

19         THE COURT:  -- what is the underlying basis for your

20    wrongful-death portion of the proof of claim here?

21         MR. GARBER:  Okay.  Now, during the post-judgment

22    procedures, which went on for almost two years, Mrs. Mack

23    experienced a crisis, in the spring of 2012, because her

24    kidneys were shutting down.  And for reasons, which I don't

25    know and will not represent to the Court, dialysis was not

**RESIDENTIAL CAPITAL, LLC, et al.**

**40**

1  effective for her.  She was put into hospice, under hospice

2  care, and she lingered until, I believe, September of 2013,

3  when she died.  The death certificate lists renal failure as a

4  contributing cause; it does not say it's the only cause, but

5  it's a contributing cause.  So whether she died of renal

6  failure or liver failure, I can't -- I'm not going to represent

7  that to the Court.

8          THE COURT:  Okay.

9          MR. GARBER:  But it was a cause.

10          THE COURT:  Um-hum.

11          MR. GARBER:  That did not occur until after we had

12  filed the proof of claim.  When we filed the proof of claim,

13  which I believe was probably in the spring of 2000 and --

14          THE COURT:  I'm sure I have the date, but --

15          MR. GARBER:  -- 13, maybe.

16          THE COURT:  -- yeah --

17          MR. LEWIS:  August 8 of 2012, Your Honor.

18          MR. GARBER:  Okay.  August --

19          THE COURT:  It was a timely filed proof of claim.

20          MR. GARBER:  Yes.

21          THE COURT:  There's no issue --

22          MR. GARBER:  No issue.  Okay.  When that was filed, of

23  course, we didn't know if Deutsche Bank was going to be

24  absolved of all liability, because they were trying to do it;

25  it was still before the Court.  If they were absolved of all

**RESIDENTIAL CAPITAL, LLC, et al.**

41

1    liability, or at least the judgment knocked out, that would

2    have then resulted in a remand; we would have had to amend our

3    complaint, and we would have had to recognize -- if there was a

4    relationship between Deutsche Bank and GMAC, we would have had

5    to have recognized that.

6          And so we filed a proof of claim, recognizing fully

7    that we may ultimately have to retry everything.  Well, as it

8    turned out, we're now precluded.  We can't sue Deutsche Bank

9    for RESPA time --

10          THE COURT:  Let me ask you this.

11          MR. GARBER:  Sure.

12          THE COURT:  Okay.  And then I'll let you go on.  So if

13    you file a personal-injury -- the plaintiff's still alive and

14    you file a personal-injury case, you take it to judgment, you

15    recover -- let's assume the judgment's vacated, but you take it

16    to judgment.  And your client subsequently dies, and the cause

17    of death is related to the underlying injury that was part of

18    your claim -- you know, personal-injury claim.

19          You don't get to file a new case -- I believe this is

20    right.  Because the plaintiff ultimately dies, after the case

21    has been resolved by a judgment, you don't get to file a new

22    case for wrongful death based on the same acts, events or

23    causes that gave the underlying claims that you did try and

24    recover on.  Am I right on that?  Do you agree with that?

25          MR. GARBER:  I would agree with that, under Florida

**RESIDENTIAL CAPITAL, LLC, et al.**

42

1    law, yes, Your Honor.  You --

2              THE COURT:  I think that's probably true everywhere.

3    You don't -- it's unfortunate -- I'll assume for now that Mrs.

4    Mack's death is attributable to the stress caused by everything

5    that went on, okay?  I'm not -- let me assume that for now,

6    okay?  In your claims against Deutsche Bank, and in the portion

7    of the judgment that you recovered for personal inj -- you

8    know, emotional distress, the 150,000 dollars that was

9    attributable to that -- let me assume that the judge didn't

10   vacate the RESPA award, okay?  Let's assume that it remained

11   and it was paid.  Would you agree that Mr. Mack couldn't bring

12   a wrongful-death action against Deutsche Bank when Mrs. Mack

13   subsequently died from whatever enabled you to recover that

14   150,000-dollar judgment in the first place.  Do you agree with

15   that?

16             MR. GARBER:  I would agree that I would not be the

17   attorney to bring that.

18             THE COURT:  Well --

19             MR. GARBER:  I don't think that would be proper.

20             THE COURT:  Okay.  All right.  So why is your claim

21   against GMAC -- why isn't it -- the fact of her death is

22   unfortunate, and when I read these papers, it's a horrible

23   story.  I don't -- I'm glad to hear that Mr. Stern's been

24   disbarred.  Okay?

25             But where I'm having the problem is in understanding

**RESIDENTIAL CAPITAL, LLC, et al.**

43

1    why when Deutsche Bank is held liable, as they were, and paid a

2    judgment -- somebody paid the judgment, how -- why isn't

3    this -- why are you trying to get a second bite at the apple

4    for the same acts, events, et cetera, that gave rise to the

5    claim?  Would your -- if you had a good claim against GMAC, you

6    had a good claim against Deutsche Bank.  It was the principal;

7    GMAC was the agent.  Whether GMAC was a party to the action or

8    not, you don't get to decide, um, I'm not happy with that first

9    judgment I got; I may have been paid, but I'm not happy with

10   it, so let me now go against the agent.

11           MR. GARBER:  Okay.  And that, I think, brings us to

12   the gravamen of the objection to this claim --

13           THE COURT:  It is.

14           MR. GARBER:  -- here today.

15           THE COURT:  It is.

16           MR. GARBER:  And to address that.  Under Florida law

17   we also recognize res judicata and collateral estoppel --

18           THE COURT:  And it's a given, and I think I've written

19   enough -- you know, res judicata has come up quite often in

20   ResCap, all right?  And I have -- I don't know; I haven't tried

21   to keep track of the number of opinions dealing specifically.

22   And I -- because this originates from Florida, I have to apply

23   Florida law -- the Florida rules with respect to res judicata.

24   The trust doesn't disagree with that.  So it's Florida law

25   that's controlling on this issue.

**RESIDENTIAL CAPITAL, LLC, et al.**

44

1          MR. GARBER:  And Your Honor, were the facts such that

2    Deutsche Bank had been sued, in its vicarious liability as

3    principal, for acts that actually were done by the servant --

4          THE COURT:  Does the suit have to have alleged --

5    that's where I'm having problems, Mr. Garber.  I don't think it

6    matters one iota whether the suit alleged that we're suing

7    Deutsche Bank for the acts of GMAC, its agent as loan servicer,

8    for hiring Stern as the lawyer; I don't think that matters.

9          MR. GARBER:  And Your Honor, I don't know the answer

10   to that.  I can say that where we have respondeat superior

11   situations, that we have master-servant situations --

12         THE COURT:  Sure.

13         MR. GARBER:  -- that the law in Florida is kind of

14   over the board, and the --

15         THE COURT:  What do you mean by that?

16         MR. GARBER:  -- debtor -- well, the debtor has quoted

17   some -- I think some pretty good cases in here.  And there are

18   a line of cases that I will -- let me see if I can get them --

19   Atlantic Cylinder, Aerojet, Hinton; those are good cases.

20   Those cases, though, were decided in -- most of them in 1975.

21   Florida is divided up into five different appellate --

22         THE COURT:  Believe it or not, actually, when I was a

23   practicing lawyer, I actually litigated in Florida in one of

24   your appellate districts and had to struggle with looking at

25   the appellate opinions from each of the districts, et cetera.

**RESIDENTIAL CAPITAL, LLC, et al.**

45

1    So I had some first-hand --

2                MR. GARBER:  And it does --

3                THE COURT:    -- experience, not as much as you,

4    obviously have, but I did have some first-hand experience with

5    them.

6                MR. GARBER:  It does make a difference, because were

7    the Second DCA -- which is where I am, which is where this case

8    came from -- were they to have a decision on point from the

9    First DCA, all lower courts are bound to accept that First DCA

10   opinion.  Second DCA is not bound to accept it.

11               THE COURT:  Right.

12               MR. GARBER:  And you may have a conflict because of

13   this.  So these cases that were decided by -- or cited by GMAC,

14   in this particular case, I think most of them came out of the

15   First District.  There is one out of the Second District, which

16   is where I am from.  I think that's the 1975 case.

17               THE COURT:  You know, but what a federal court is

18   supposed to do, where there are intermediate state appellate

19   decisions and no -- if there's a circumstance where there's no

20   binding decisions of the highest court of the state, it's to

21   predict how that issue would be decided by the Florida Supreme

22   Court, and I apply what I think is the right rule.  I may be

23   wrong; I may be right.  But that's where -- you know, this

24   issue comes up in New York from time to time.  We've got

25   different Appellate Districts; sometimes there are different

**RESIDENTIAL CAPITAL, LLC, et al.**

46

1     rules.  What a federal court, bankruptcy court or district

2     court does is, if there's no settled law by the highest court

3     of the state is to essentially apply the rule that it predicts

4     would be the result, if the difference makes -- it may not make

5     a difference, okay, on -- but that's what my understanding of

6     what a federal court is supposed to do.  I don't decide, well,

7     this case emanated from the First District of Florida so I'll

8     apply its rule.  The rule is different in the Second District.

9     That's not -- I don't know any case law that suggests that's

10    what I'm supposed to do.

11           MR. GARBER:  And I don't know that either.  And the

12    only reason I would suggest that would be that if this case

13    were to be remanded to the Second District, it would be decided

14    under Second District law.

15           THE COURT:  I understand that.  Until the Florida

16    Supreme Court decided that the rule should be something

17    otherwise.

18           MR. GARBER:  Exactly, Your Honor, until they clarify

19    the point.

20           In 1992, the Second District court issued an opinion

21    in the case of Mitchell v. Edge and Battaglia, and let me see

22    if I can outline the facts briefly.  Mr. Mitchell apparently

23    wanted something built, a building built for him.  And he

24    wanted it built by a company called G & R Builders.  G & R

25    Builders had two principals, one of which was an actual

**RESIDENTIAL CAPITAL, LLC, et al.**

47

1    licensed builder, and the other, I guess was the financier.

2    The property was not built properly and so he reached a

3    settlement with G & R, the company.  Mr. Battaglia, who was the

4    financial contributor, then got into a dispute with the actual

5    builder, who was Mr. Edge.  Mr. Mitchell then sued Edge and

6    Battaglia, individually, and it went to court.  And the

7    Court -- these defenses of res judicata were raised because

8    they said G & R Builders was the principal; these people were

9    the servants, and therefore a judgment against the master

10   released the servants.  That was the principle on which Edge

11   defended.  And this court -- I don't know if I gave you a copy

12   of the case.  This court --

13            THE COURT:  Are you talking about Mitchell?

14            MR. GARBER:  Pardon?

15            THE COURT:  Mitchell?

16            MR. GARBER:  Yeah, Mitchell v. Edge and Battaglia.

17            THE COURT:  Yeah, I've got Mitchell.

18            MR. GARBER:  Okay.  This court went over to review the

19   cases -- many of the cases cited today by GMAC in their case,

20   and they found, on page 3 of their decision -- actually 3 of my

21   printout --

22            THE COURT:  I've read it in the Southern Reporter.

23            MR. GARBER:  Okay.  Okay.  But if I could just

24   briefly --

25            THE COURT:  Go ahead.

**RESIDENTIAL CAPITAL, LLC, et al.**

48

1          MR. GARBER:  -- read what they say.  "Those cases also

2    hold, citing the 'weight of authority,' that a plaintiff is

3    barred from relitigating his claim against the second of two

4    persons responsible for the wrong to plaintiff where the

5    plaintiff has recovered a collectible judgment against another

6    responsible party.  The rule and its application, as stated in

7    those cases, is contrary to the 'more modern rule' stated in

8    Restatement (Second)" --

9          THE COURT:  Right, Section 49, comment A.

10          MR. GARBER:  Exactly, Your Honor.  And you have that

11    before you, and there is no need for me to read the rest of it

12    to you.

13          Now, we think that the rationale --

14          THE COURT:  But the court in Mitchell said it is "not

15    now required to decide whether the more modern version of the

16    rule as stated in the Restatement (Second) of Judgments is now

17    the 'weight of authority' and should cause us to recede" from

18    earlier holdings.  That's at --

19          MR. GARBER:  Because actually --

20          THE COURT:  -- 589 So.2d at page 128.

21          MR. GARBER:  Yeah, and that's because there was an

22    earlier court -- an earlier decision out of the second DCA as

23    well -- I think it came out in 1969 --

24          THE COURT:  It's the Gerardi case.

25          MR. GARBER:  -- which they found justification in that

**RESIDENTIAL CAPITAL, LLC, et al.**

**49**

1  case.

2         THE COURT:  The Gerardi case.

3         MR. GARBER:  Yes, Your Honor, exactly.  Exactly.  So

4  they believed that that was sufficient enough not to have to --

5         THE COURT:  Yeah, but the court there -- in Gerardi,

6  because the judgment hadn't been satisfied, the court permitted

7  the plaintiff to sue the joint tortfeasor.  Here, the judgment

8  was satisfied.

9         MR. GARBER:  Well, that's a good point, Your Honor.

10  That's a good point.

11         THE COURT:  It's Gerardi 232 So.2d at pages 37 and 38.

12         MR. GARBER:  Yes.  That portion of the judgment that

13  had to do with the --

14         THE COURT:  And Gerardi --

15         MR. GARBER:  -- damages to the property --

16         THE COURT:  -- has been subsequently questioned by

17  other courts in Florida.  See Hinton, 317 So.2d 832; it's a

18  1975 case.

19         MR. GARBER:  Yes, it is true --

20         THE COURT:  I read -- this is -- look, I don't know

21  what I'm going to do yet on this; I'm taking it under

22  submission.  It's a troublesome case.  I'm not taking this

23  lightly at all; I want to assure you of it.  But I'm immersed

24  in the Florida jurisprudence about res judicata.

25         MR. GARBER:  I understand.  Can I make one other

**RESIDENTIAL CAPITAL, LLC, et al.**

50

1    point?

2              THE COURT:  Yes, you can.

3              MR. GARBER:  And this is a factual point.

4              THE COURT:  Go ahead.

5              MR. GARBER:  There has never been a determination by

6    any court in the state of Flor -- in my case, anyway, that GMAC

7    was the agent of Deutsche Bank.

8              THE COURT:  You're not really thinking you want to

9    dispute that, do you?

10             MR. GARBER:  Yes, Your Honor, I do.  And that's the

11   point that I want to get to.  GMAC and Deutsche Bank have a

12   very complicated relationship, and --

13             THE COURT:  It's not complicated at all.  It's not

14   complicated at all.  Deutsche Bank is the trustee for a

15   securitization trust.  There's a pooling and servicing

16   agreement.  There's servicing rights which GMAC held; it

17   serviced the loan.  The fact that it was securitized and in the

18   trust -- I mean, I've been living this for a long time, Mr.

19   Garber.

20             MR. GARBER:  Yes, Your Honor, there is -- they entered

21   into a contract, and the contract defined their relationship;

22   they chose to do it that way.  And I want to --

23             THE COURT:  Do you know how many cases there are that

24   say that a loan servicer is the agent for the principal?

25             MR. GARBER:  Well, I know, contractually, they have

**RESIDENTIAL CAPITAL, LLC, et al.**

51

1   agreed that GMAC is an independent contractor and not an agent

2   able to bind or commit Deutsche Bank to their actions.

3   　　　　THE COURT:  What --

4   　　　　MR. GARBER:  And that is found in the submissions that

5   were made on behalf of GMAC in this action, if I can briefly

6   find -- client contract dated March 6th, 2006.  And it says,

7   under that client contract -- that is under (B)(3), page 23 of

8   their exhibits, paragraph 9, the relationship of the parties,

9   that is, between GMAC, who sold loans, and RFC, which was

10  Residential Funding Corporation --

11  　　　　THE COURT:  Yeah, RFC typically winds up -- puts the

12  loans into a securitization pool, sells them to its trust; the

13  servicing rights stay behind.  GMAC, or one of the other ResCap

14  entities services the loans, and sometimes they sell those

15  servicing rights.  When this court approved the sale to Ocwen,

16  the balance of all the servicing rights transferred to Ocwen.

17  That's what's happened here.

18  　　　　MR. GARBER:  Exactly, and I do understand that part of

19  it.  Probably the rest of it is too complicated for me, but --

20  　　　　THE COURT:  No, I'm sure not.

21  　　　　MR. GARBER:  They do define their relationship as "The

22  relationship between the client" -- the client in this case was

23  GMAC Mortgage -- "and GMAC RFC", which is really RFC, "is

24  limited to that of seller on the part of the client", GMAC

25  Mortgage, "and that of buyer on the part of GMAC RFC", which is

**RESIDENTIAL CAPITAL, LLC, et al.**

52

1    really just RFC.

2            THE COURT:  That's as to the loan, not as to the

3    servicing rights.

4            MR. GARBER:  No, it goes on to say -- I think they

5    retained for themselves when they did this.  When they said,

6    RFC, we own the loan; we'll sell it to you, but we're not

7    selling all of it to you.

8            THE COURT:  No, we're --

9            MR. GARBER:  We are keeping for ourselves -- we own

10   the servicing rights.

11           THE COURT:  Yeah, but with respect to the servicing

12   rights, they're an agent for the owner of the loans.

13           MR. GARBER:  And I can understand that argument.

14           THE COURT:  It may be that they're selling the loan

15   without recourse and all of that.

16           Go ahead; I'm sorry.

17           MR. GARBER:  Okay.  Well, that was the point that I

18   wanted to make, that they declared themselves to be an

19   independent contractor.  It would --

20           THE COURT:  For what purpose?

21           MR. GARBER:  That would show there was no privity.

22           THE COURT:  For what purpose?  For the purpose of

23   selling the loan?

24           MR. GARBER:  No, this goes to servicing the loan.

25           THE COURT:  Okay.

**RESIDENTIAL CAPITAL, LLC, et al.**

53

1          MR. GARBER:  This is the contract that goes to

2     servicing the loan.

3          THE COURT:  All right.

4          MR. GARBER:  So I think that if that were true, if

5     there was no privity between the two, then the entire argument

6     on res judicata: because you have a judgment against the

7     master, it must fail if you seek a judgment against the

8     servant -- I do think -- if the Court does not agree with me on

9     that, I do think that there is enough Florida law out there

10    that says that a party is not necessarily barred from suing a

11    servant on matters not actually litigated, where they have

12    taken a judgment against the master.

13         THE COURT:  What's the underlying theory for wrongful-

14    death liability against GMACM?

15         MR. GARBER:  It would be that in October of 2006,

16    after we filed a counter-claim, Mrs. Mack wrote a letter to

17    GMAC, because she still could not understand why she was being

18    sued, and she said:  Please help us; we are being sued.  We

19    don't know what to do; please help us.

20         And there is a section under RESPA that says where a

21    qualifying written inquiry is made of a servicer, and that

22    qualified written inquiry is not responded to and answered,

23    then the servicer will be liable for damages.  And that has a

24    three-year statute of limitations under that.  That is -- I can

25    cite the Code section to you, if you want me to.

**RESIDENTIAL CAPITAL, LLC, et al.**

54

1          THE COURT:  No, the qualified written request is --

2      yes, I know about that requirement.

3          MR. GARBER:  Yes, Your Honor.  And by the way, that

4      was, of course, after the counter-claim had been filed.  They

5      had no suit against GMAC, no reason to believe that Deutsche

6      Bank had anything --

7          THE COURT:  And --

8          MR. GARBER:  -- to do with the qualified written

9      request.

10          THE COURT:  And when was the request made?

11          MR. GARBER:  It was made October 26th, 2009.

12          THE COURT:  And when was the claim filed?

13          MR. GARBER:  I believe it was made August of 2012,

14      that we filed our proof of claim.  Bankruptcy, I think, filed

15      May --

16          THE COURT:  May --

17          MR. GARBER:  -- of 2000 --

18          THE COURT:  -- yeah.

19          MR. GARBER:  Okay.

20          THE COURT:  Okay.

21          MR. GARBER:  Your Honor, I imposed upon the Court's

22      time.

23          THE COURT:  No.

24          MR. GARBER:  I thank you for listening.

25          THE COURT:  Thank you very much, Mr. Garber.

**RESIDENTIAL CAPITAL, LLC, et al.**

55

1          Mr. Lewis?

2          MR. LEWIS:  Yes, thank you, Your Honor.

3          THE COURT:  So what establishes that GMAC was the

4     agent for Deutsche Bank?

5          MR. LEWIS:  Well, Your Honor, let me start with what I

6     think is the most decisive point.  There are others, but let me

7     start with the first one.

8          Counsel's wrong in saying that no court in which he's

9     been involved in this case in Florida has ever said that GMAC

10    was the agent of Deutsche Bank.  If you look at the final

11    judgment -- the final order; that's the order that was entered

12    after the motion to vacate, to this is the order that's entered

13    in 2013, and if you look at paragraph 2 on the first page of

14    that order -- and we mention this in our reply.

15         THE COURT:  Yes.

16         MR. LEWIS:  "Evidence was adduced at the hearing" --

17    and this is evidence from the Macks, both at the original

18    prove-up hearing and at this hearing -- "that the final

19    judgment entered on May 5th, 2011 was received by plaintiff on

20    or about May 11, 2011, and that GMAC Mortgage, LLC, hereinafter

21    GMAC, as agent for plaintiff -- ".  The Court found we were --

22    that GMAC was the agent for Deutsche Bank, which was the

23    plaintiff.  It's just simple as that.  I mean, there are other

24    arguments.  Whatever the contract may say, you look at the

25    relationship.  People disclaim relationships all the time.

**RESIDENTIAL CAPITAL, LLC, et al.**

56

1    And --

2            THE COURT:  Let me ask you this.  What about Mr.

3    Garber's argument, near the end of his argument, that Mrs.

4    Garber (sic) sent a qualified written request to GMAC, as

5    servicer, which they never responded to, and that gives rise to

6    a RESPA claim?

7            MR. LEWIS:  Well, Your Honor --

8            THE COURT:  And that would be -- I think that -- well,

9    address that, and I'll go further.

10           MR. LEWIS:  Your Honor, that conflicts, first of all,

11   with the proof of claim, which says that GMAC did respond to

12   their inquiries; it just didn't give them the answer that they

13   wanted or that was correct, as it turns out.  But that's what

14   it says if you read the rider.  Now all of a sudden it becomes

15   convenient, because we've pointed out that the limitations

16   periods, and the other sections that might apply with private

17   rights of action under RESPA, would bar their claims.

18           THE COURT:  So what was the date of Mrs. Garber's

19   (sic) letter?

20           MR. LEWIS:  Well, I understand from counsel it was in

21   October --

22           THE COURT:  So --

23           MR. LEWIS:  -- of 2009.  So maybe I could give the

24   Court just a little bit of a calendar that might help the Court

25   follow --

**RESIDENTIAL CAPITAL, LLC, et al.**

57

1          THE COURT:  Yeah, and I just want to focus on this

2     last piece -- when I say the last piece, Mr. Garber's argument

3     that he's got a good RESPA claim against GMACM, because in

4     October 2009, Mrs. Garber (sic) sent a written request for

5     information to GMACM, and they didn't respond.  And he's saying

6     that -- you're saying there's nothing in the proof of claim

7     that --

8          MR. LEWIS:  That's right.

9          THE COURT:  -- addresses it?

10          MR. LEWIS:  And furthermore, Your Honor --

11          THE COURT:  It would be -- would you agree -- so he

12     says they filed their proof of claim -- give me the date again,

13     Mr. Garber.  I could find it in my own notes --

14          MR. GARBER:  August the 26th, 2009, Your Honor.

15          MR. LEWIS:  The proof of claim?

16          THE COURT:  No, the proof of claim.

17          MR. GARBER:  Oh, the proof of claim.

18          MR. LEWIS:  August 8th of 2012, I think it was.

19          THE COURT:  August 8th, 2012?

20          MR. LEWIS:  Yeah.

21          THE COURT:  Okay.  So it would have been within the

22     three-year statute of limitations; you're not disputing that.

23          MR. LEWIS:  It would have been.  The other answer to

24     the argument is, however, that they knew about GMACM,

25     obviously, and they knew about Deutsche Bank by the time

**RESIDENTIAL CAPITAL, LLC, et al.**

58

1    Deutsche Bank sued them.  And that was in late 2009.

2              THE COURT:  But let me ask -- Mr. Garber, do you have

3    a copy of that letter?  Can I see it?  I've got a lot of paper

4    up here, and it may be in what I have.

5              MR. GARBER:  Yes, Your Honor.

6              THE COURT:  Well, let me ask, Mr. Lewis, do I have it

7    in the binder?

8              MR. GARBER:  I have it in my binder.

9              THE COURT:  No, but I mean --

10             MR. LEWIS:  Not in ours, no, Your Honor.

11             THE COURT:  Okay.  May I just see that.  I'll give it

12    back to you, so --

13             MR. GARBER:  Yes, Your Honor.  Let me see if I can

14    find it.

15             MR. LEWIS:  While he's finding that, Your Honor --

16             THE COURT:  Well, let's wait --

17             MR. LEWIS:  Okay.

18             THE COURT:  -- because I want him to be able to pay

19    attention to your argument --

20             MR. LEWIS:  Sure.

21             THE COURT:  -- while he's looking for something for

22    me.

23             MR. LEWIS:  Be one of the few people who don't want to

24    pay attention to my argument.

25             MR. GARBER:  It's Exhibit C in our binder.  May I pull

**RESIDENTIAL CAPITAL, LLC, et al.**

59

1    out a copy of it --

2            THE COURT:  Yes, please, just -- and I'll give it back

3    to you when we finish the argument, okay?

4            MR. GARBER:  May I approach, Your Honor?

5            THE COURT:  Yes, please, come on up.

6            Okay.  Mr. Lewis, you have a copy as well?

7            MR. LEWIS:  I do, Your Honor.

8            THE COURT:  Okay.  Let me read it, and then -- okay.

9        (Pause)

10            THE COURT:  Okay, so let me ask you first, Mr. Lewis,

11    would you agree that Exhibit C, which is at ECF 6834-3, which

12    was filed on April 29th, 2014 here, that that letter would

13    satisfy the requirements of a qualified written request?

14            MR. LEWIS:  Yes, I do, Your Honor.

15            THE COURT:  Okay.  And let's put aside for a minute --

16    I understand your argument that the proof of claim does not

17    allege, as a basis for the claim, a QWR and failure to respond.

18    I'm not rejecting your argument --

19            MR. LEWIS:  I understand, Your Honor.

20            THE COURT:  -- about it, but I just want to probe

21    further.  Okay.

22            MR. LEWIS:  Sure.

23            THE COURT:  Do you agree, for purposes of argument,

24    that GMACM -- that you've agreed that this would satisfy the

25    requirements for a qualified written request, that GMAC was

**RESIDENTIAL CAPITAL, LLC, et al.**

60

1    required to respond to the borrower?

2         MR. LEWIS:  If it satisfied the requirements, yes, it

3    would be required to respond.

4         THE COURT:  And do you agree that GMACM didn't

5    respond?

6         MR. LEWIS:  That I don't know, Your Honor, for sure.

7       (Pause)

8         THE COURT:  So assume hypothetically that this Exhibit

9    C is a qualified written request and that GMACM didn't respond.

10   I know you say you don't know.  Let's just assume --

11        MR. LEWIS:  All right.

12        THE COURT:  -- for purposes of the discussion --

13        MR. LEWIS:  Uh-huh.

14        THE COURT:  -- they didn't respond.  Would you agree,

15   if those two statements I just made were true, that the Macks

16   could assert a claim against GMACM for violation of RESPA?

17        MR. LEWIS:  Yes.

18        THE COURT:  And that -- under RESPA, that would

19   properly be a claim against GMACM and not against Deutsche

20   Bank?

21        MR. LEWIS:  Because Deutsche Bank's not the servicer.

22        THE COURT:  Correct.  Okay.

23        MR. LEWIS:  Yes.

24        THE COURT:  So -- all right.  So with respect to this

25   prong of Mr. Garber's argument, I guess we have the

**RESIDENTIAL CAPITAL, LLC, et al.**

61

1    uncertainty; you don't know whether GMACM responded to it.

2           Mr. Garber, your contention -- your representation is

3    they did not, correct?

4           MR. GARBER:  Your Honor, they did not.  And we've

5    discussed this many times in our post-judgment thing.  I don't

6    think they --

7           THE COURT:  Okay.  Okay, I --

8           MR. GARBER:  -- even allege they had it.

9           THE COURT:  Okay.  I guess the issue would then

10   become -- Mr. Garber, you agree it's not in the proof of claim,

11   this contention?

12          MR. GARBER:  I did not specify that in the proof of

13   claim, but the proof of claim is just a brief itemization; it

14   was not the details that we have of everything required to

15   prove a case.

16          THE COURT:  Okay.  And, Mr. Lewis, was the request for

17   additional information served on the Macks?  I know this is not

18   an omni -- well, I guess this was part of an omnibus objection.

19          MR. LEWIS:  No, Your Honor, it wasn't.

20          THE COURT:  Okay.  So as to this aspect, the Court

21   would have to decide whether to permit the late filing of a

22   claim and whether this -- I got to read the claim again.  I

23   must say, I've read a lot of stuff, I've read a lot of cases; I

24   haven't gone back to read the proof of claim.  I got to go back

25   and read the proof of claim, see whether this prong -- when I

**RESIDENTIAL CAPITAL, LLC, et al.**

62

1    say "this prong", whether GMAC violated RESPA in failing to

2    respond.  I got to go back and look at that, among other

3    things.

4         I guess -- would you agree the analysis, in the first

5    instance, has to be whether this argument is fairly raised by

6    the proof of claim?  And in other cases I've held, I

7    essentially apply Rule 8, Federal Rule of Civil Procedure --

8         MR. LEWIS:  Yeah, it would be the same test.

9         THE COURT:  Okay.

10         MR. LEWIS:  I mean, we've been through the late-claim

11    issue a number of times --

12         THE COURT:  We have.

13         MR. LEWIS:  -- with the Court.

14         THE COURT:  We have.  And if it's not encompassed

15    within the claim, I'd have to decide whether to permit it as an

16    amendment, a late-filed claim, correct?

17         MR. LEWIS:  Yes.

18         THE COURT:  Something I'm not prepared to decide now.

19         MR. LEWIS:  Understood, Your Honor.  And there is

20    another answer here --

21         THE COURT:  Okay, go ahead and give it to me.

22         MR. LEWIS:  -- and the other answer here is, this

23    occurred -- this incident occurred in October of 2009.  The

24    Macks didn't get their final, final judgment until 2013.  And

25    there's no reason why they could not have added this claim to

**RESIDENTIAL CAPITAL, LLC, et al.**

63

1    their claims against Deutsche Bank; not because Deutsche Bank

2    was guilty of it.

3             THE COURT:  Well, but --

4             MR. LEWIS:  But just like every claim that --

5             THE COURT:  No, but Deutsche Bank would have been

6    argu -- Deutsche Bank came back to vacate the judgment on the

7    grounds, it can't be RESPA judgment against us, RESPA doesn't

8    apply to us, we're not the loan servicer.

9             So to amend a complaint against Deutsche Bank to

10   assert a RESPA claim that you would have to acknowledge

11   couldn't be asserted against Deutsche Bank --

12            MR. LEWIS:  I don't think that's true, Your Honor.

13            THE COURT:  You don't?

14            MR. LEWIS:  Yeah.  Just like -- there is no reason why

15   they couldn't have tried to hold Deutsche Bank liable for

16   GMAC's RESPA conduct, just as they tried to hold Deutsche Bank

17   liable for a lot of other things that --

18            THE COURT:  Well, Deutsche Bank was successful in

19   getting the RESPA claim --

20            MR. LEWIS:  Well, then it's done.

21            THE COURT:  -- vacated.

22            MR. LEWIS:  It's precluded.

23            THE COURT:  Well, you may think so, but that's what

24   I've got to decide.  I mean, that argument I find much less

25   appealing that the Macks had to assert an invalid RESPA claim

**RESIDENTIAL CAPITAL, LLC, et al.**

64

1    against Deutsche Bank in order to save a RESPA claim against

2    the party against whom it properly could be asserted:  GMACM.

3    And then of course -- so if everything other than this was

4    disposed of, okay -- I mean, you have strong res judicata

5    arguments; very strong res judicata arguments, okay?  But a

6    little different as to this qualified written request.  I mean,

7    this I haven't looked at, okay?  But Mr. Garber acknowledged a

8    split of authority among the circuits, as to whether personal-

9    injury, emotional-distress damages are recoverable in

10   connection with a RESPA claim.  I have no idea.  That's one

11   that has not -- I've had a lot of RESPA, TILA, but not this,

12   okay, and I'm not prepared to rule on it.

13           Go ahead if you want to say something else, Mr. Lewis.

14           MR. LEWIS:  Your Honor, the other thing I want to say

15   is kind of related to the last point on a larger scale, which

16   is, part of counsel's pitch was that they never would have sued

17   GMAC because they didn't know what GMAC's role --

18           THE COURT:  I don't know whether they would have sued

19   GMAC --

20           MR. LEWIS:  It doesn't matter.

21           THE COURT:  No, I don't care about that.

22           MR. LEWIS:  Yeah.

23           THE COURT:  That I don't think --

24           MR. LEWIS:  Yeah.

25           THE COURT:  When I say I don't care about it, that's

**RESIDENTIAL CAPITAL, LLC, et al.**

65

1    just not important to --

2             MR. LEWIS:  Yeah.

3             THE COURT:  -- what I have to decide.

4             MR. LEWIS:  Yeah.  What matters is what was sued

5    for --

6             THE COURT:  Just --

7             MR. LEWIS:  -- or could have been sued for.

8             THE COURT:  I don't get any traction from your

9    argument that they should have asserted a RESPA claim against

10   Deutsche Bank for not responding to a qualified written request

11   to GMACM.

12            MR. LEWIS:  Well, if I can impose on the Court just a

13   little bit more --

14            THE COURT:  Go ahead.

15            MR. LEWIS:  -- on that?  Thank you.  I mean, the fact

16   that Deutsche Bank can't be liable on a RESPA claim directly

17   doesn't mean they could not have argued for -- and frankly, I

18   don't know whether they did argue this -- for Deutsche Bank's

19   liability not as the wrongdoer itself but as the --

20            THE COURT:  Well --

21            MR. LEWIS:  -- agent -- as the -- because they already

22   knew --

23            THE COURT:  Look, if they had alleged that Deutsche

24   Bank was liable in a RESPA claim as the principal for GMACM,

25   its agent, and the Court had ruled on that aspect of the claim,

**RESIDENTIAL CAPITAL, LLC, et al.**

66

1    I have very little problem determining that res judicata

2    applied to it.  But there was nothing -- there's nothing in the

3    pleadings, that I saw -- and I think you acknowledge that they

4    didn't allege --

5            MR. LEWIS:  But they could have --

6            THE COURT:  Well --

7            MR. LEWIS:  -- and they should have.  And that's --

8            THE COURT:  Okay, I have your --

9            MR. LEWIS:  -- what res jud --

10           THE COURT:  I have your argument.

11           MR. LEWIS:  Okay.  -- because that's what res

12    judicata's all about.

13           THE COURT:  I have your argument.  All right.

14           MR. LEWIS:  Thank you, Your Honor.

15           THE COURT:  Thank you very much --

16           MR. LEWIS:  I appreciate the time.

17           THE COURT:  -- Mr. Lewis.

18           MR. GARBER:  Your Honor, may I make two quick

19    observations?

20           THE COURT:  Yes, and you can come back up and I'll

21    give you this --

22           MR. GARBER:  Okay.

23           THE COURT:  -- back, okay?

24           MR. GARBER:  You granted us far too much time for your

25    schedule, so I want to be as brief as I possibly can.  Number

**RESIDENTIAL CAPITAL, LLC, et al.**

67

1    one, a violation of RESPA is purely statutory; there's no

2    common-law RESPA violations.  And the RESPA code says that the

3    duty of the loan servicer to respond to borrower inquiries, if

4    any servicer of a federally-related mortgage loan receives a

5    qualified written response --

6           THE COURT:  Request.

7           MR. GARBER:  -- they -- a qualified written request,

8    they shall file a response within twenty days.  And there is no

9    statutory authority for suing a principal; only --

10          THE COURT:  Okay.

11          MR. GARBER:  The other point that I want to bring up

12    is that under the final-final judgment that they were talking

13    about -- that was the one where the Court confirmed the slander

14    of title but denied the RESPA -- this is the language -- and

15    the language is confusing but I do think it is clear -- says

16    this:  "Evidence was adduced at that hearing" -- that's the

17    hearing to overturn the loan -- the judgment -- "that the final

18    judgment entered on May 5th, 2011 was received by the

19    plaintiff", that is, Deutsche Bank, "on or about May 11th, 2011

20    and that GMAC Mortgage, as agent for Plaintiff, had the

21    responsibility to investigate the final judgment."  I don't

22    know that that was a finding of fact.  That was the evidence

23    that was presented.  If it was a finding of fact, they were the

24    agent to investigate the judgment.

25          THE COURT:  Well, I don't think that's what it says,

**RESIDENTIAL CAPITAL, LLC, et al.**

68

1   but anyway.

2           MR. GARBER:  Okay.

3           THE COURT:  Okay, here's what I'm going to require;

4   we're not going to be done with this yet:  Mr. Garber, I'm

5   going to permit each side to file a supplemental brief on the

6   issue of whether the proof of claim on file properly raises the

7   issue of GMACM committing a RESPA violation in failing to

8   respond to a qualified written request, your Exhibit C.

9           You should also address, if the Court concludes that

10  the proof of claim does not fairly raise the issue, whether the

11  Court should permit an amendment to assert a late-filed claim

12  for this RESPA violation.  That's second.

13          And third -- and, Mr. Lewis, what I'm asking him I'm

14  asking you as well -- to address whether damages for wrongful

15  death, emotional distress, personal injury, are recoverable for

16  a RESPA violation, for this RESPA violation, assuming it was a

17  violation.  Okay.

18          What I'd ask the two of you to do is this:  when we

19  break very soon, confer on a briefing schedule.  I'd be

20  perfectly happy to get simultaneous submissions but, if you

21  want -- if the parties agree to do it otherwise with Garber-

22  Lewis-Garber, I'll go along with that, okay?  But I want those

23  three issues addressed.

24          I generally impose page limits, and one should never

25  feel compelled to use every page that I say you can use, okay?

**RESIDENTIAL CAPITAL, LLC, et al.**

69

1    All right.  With some reluctance I'm going to impose twenty-

2    page limits.  It could be a lot shorter.  I don't think you'll

3    be -- I read -- okay, put it this way, Mr. Garber:  I actually

4    read the cases you cite, okay?  So you don't have to feel like

5    you got to spend three pages discussing everything about every

6    case you cite, okay, because I really do read the cases.  All

7    right.  So, shorter is better than longer.  Frequently I set,

8    on supplemental briefings, something a lot less than twenty

9    pages, but I'm going to allow either side -- each side to do

10   twenty pages.

11          After I get -- you'll agree on a schedule; you can

12   submit it to me in a letter -- you don't have to file a

13   pleading, okay; just so I know what the timing's going to be.

14   When I get those briefs, I'll decide whether I want to hear

15   more argument.

16          I'll permit you to appear by telephone, Mr. Garber, if

17   you want to do that.  I do that with -- usually in argument I

18   prefer that lawyers be here, but I'm not going to have you come

19   from Florida for -- so I'll permit you to appear by telephone.

20          I may decide, after I review the briefs, that I'm just

21   going to take it under submission on the papers and go ahead

22   and decide the matters.  Okay?

23          MR. LEWIS:  Your Honor, does the Court have, sort of,

24   deadlines or whatever the initial filing's going to be, in

25   mind?

**RESIDENTIAL CAPITAL, LLC, et al.**

70

1          THE COURT:  No, I want -- look, your -- the briefing

2    was extensive and good on this.  I'm going to let the two of

3    you work out a schedule.  I've moved my calendar along, so I'm

4    not talking about a really extended --

5          MR. LEWIS:  Sure.

6          THE COURT:  -- schedule.  But in the first instance,

7    I'll believe you'll both act in good faith and try and come up

8    with a schedule that works for both of you, okay?

9          MR. LEWIS:  Thank you, Your Honor.

10          MR. GARBER:  Okay.  Thank you.

11          THE COURT:  All right.  And then, so -- I mean, you

12    can file the letter on ECF, but also e-mail a copy to my

13    chambers, because otherwise -- I don't look at every post --

14    everything that gets filed on ECF, okay?  So you'll e-mail a

15    copy of the letter to chambers.  And when you file the briefs,

16    you'll file them on ECF but you'll send a copy to the Court,

17    okay?

18          MR. LEWIS:  Okay.

19          THE COURT:  And, Mr. Garber, I'd permit you to e-mail

20    a copy of the brief to my law clerk so that -- you know, you'll

21    file on ECF but send a copy of the brief to chambers as well,

22    okay --

23          MR. GARBER:  Yes, Your Honor.

24          THE COURT:  -- courtesy copy.

25          MR. GARBER:  Your Honor, it is -- the Court has been

**RESIDENTIAL CAPITAL, LLC, et al.**

71

1    kind enough to allow me to appear pro hac vice, and I

2    understood it was for this hearing.

3            THE COURT:  Yeah.  Yeah.

4            MR. GARBER:  Will you extend that --

5            THE COURT:  Did you file an application for pro hac?

6            MR. GARBER:  Yes, Your Honor, I did.

7            THE COURT:  Did I sign it?

8            MR. GARBER:  Yes, Your Honor, you did that.

9            THE COURT:  Well, it's nice to have you here.

10           MR. GARBER:  Okay, thank you.  So I can continue on --

11           THE COURT:  Absolutely.

12           MR. GARBER:  -- in this case?

13           THE COURT:  Once you're here for this case, you're

14   here.

15           MR. GARBER:  Okay.

16           THE COURT:  Okay?

17           MR. GARBER:  Thank you, Your Honor.

18           THE COURT:  All right.  Thank you very much.

19           One last comment:  As always, I urge both sides to see

20   whether you can resolve this matter consensually by settlement;

21   I think that ought to be the first order of business.  If you

22   believe you're in -- so I'm letting you send me a letter -- I'd

23   like a letter within about a week, with the schedule.  If

24   you're engaged -- if you believe you're engaged in good-faith

25   settlement talks, put that in the letter, and the schedule can

**RESIDENTIAL CAPITAL, LLC, et al.**

72

1   be adjusted accordingly.  Before both sides spend money with

2   your time researching and writing a brief, I think you ought to

3   see whether you can resolve -- if you can't, I'll go ahead and

4   decide it, but I -- okay?

5           MR. GARBER:  Thank you, Your Honor.

6           THE COURT:  Thank you very much, Mr. Garber.

7           Okay, thanks, Mr. Wishnew.

8           Thanks, Mr. Lewis.

9           MR. WISHNEW:  Your Honor --

10          THE COURT:  All right, we're adjourned.  Wait, we --

11          MR. WISHNEW:  I'm sorry.

12          THE COURT:  -- we have more.  Oh, we have the omnibus.

13   Sorry.

14          MR. WISHNEW:  No, no, no.  No omnibus today, Your

15   Honor.

16          THE COURT:  No, no, but --

17          MR. WISHNEW:  Just --

18          THE COURT:  -- we do have --

19          MR. WISHNEW:  -- two uncontested objections.

20          THE COURT:  Thought we had the fiftieth, fifty-eighth

21   and fifty-ninth omnibus objections.

22          MR. WISHNEW:  We resolved those or pushed them to

23   further hearings, Your Honor.  The two matters that are also

24   going forward today are items --

25          THE COURT:  Yeah, there were two object -- the James

**RESIDENTIAL CAPITAL, LLC, et al.**

73

1   Jackson is uncontested, and the Gerald Gandrup.

2            MR. WISHNEW:  That's correct, Your Honor.  Right.

3            THE COURT:  Okay, those were part of the -- one of the

4   omnibus --

5            MR. WISHNEW:  Actually, Your Honor, just by way of

6   background, James Jackson was originally part of the fiftieth

7   omnibus.  You had denie -- or -- sorry -- the Court had denied

8   without prejudice the objection, because in the reply -- the

9   omnibus reply we filed on the fiftieth objection --

10           THE COURT:  It was a mistake; you had the wrong

11   argument --

12           MR. WISHNEW:  We kind of changed --

13           THE COURT:  Yes.  Okay.

14           MR. WISHNEW:  -- the argument a little bit.  And so

15   we --

16           THE COURT:  I know.

17           MR. WISHNEW:  -- essentially refiled the objection

18   on -- making similar arguments.  Mr. Jackson has not replied --

19   or not responded to our objection, so we're --

20           THE COURT:  Okay.  Is Mr. Jackson on the phone?

21           Objection's sustained.

22           MR. WISHNEW:  Thank you, Your Honor.  Similarly with

23   the Gerald --

24           THE COURT:  And when I say -- I ruled quickly.  I did

25   review the papers.  I've considered it.  I believe the

**RESIDENTIAL CAPITAL, LLC, et al.**

74

1  objection's well taken.  The objection's sustained.

2          MR. LEWIS:  Thank you, Your Honor.  We'll submit an

3  order to chambers.

4          With regards to Mr. Gandrup's claim, a similar

5  instance where there was a previously filed objection; we

6  withdrew it because our earlier basis was that it should be --

7  the claim should be dismissed because he dismissed his

8  litigation, when in fact what we realized was that he dismissed

9  his litigation because he sought to preserve it through his

10 claim.  So we refiled an objection to his claim, addressed the

11 substantive bases and the counts within his complaint that was

12 stayed by the bankruptcy filing.  And again, Mr. Gandrup did

13 not reply, and so we would move to have that objection granted

14 as well, Your Honor.

15         THE COURT:  All right.

16     (Pause)

17         THE COURT:  All right, I'm going to read my decision

18 into the record.  Okay, I'm going to sustain the objection to

19 the Gandrup claim.  Gerald Gandrup filed claim 4167 against

20 ResCap in the amount of one million dollars, based on claims

21 originally asserted by Gandrup in a wrongful-foreclosure action

22 in federal court in the Northern District of California.

23 Gandrup initiated the foreclosure action in 2011, asserting

24 claims against Debtors GMACM and ETS, along with other

25 defendants, stemming from the foreclosure sale of his home.

**RESIDENTIAL CAPITAL, LLC, et al.**

1    The debtor defendants filed a motion to dismiss Gandrup's

2    amended complaint, which the district court granted on

3    September 12th, 2012, granting Gandrup leave to amend certain

4    claims.

5              On October 1, 2012, Gandrup filed a second amended

6    complaint asserting six causes of action:  one, violations of

7    TILA; two, violations of RESPA; three, fraud; four, civil RICO

8    violations; five, rescission, mistake, void agreement; and six,

9    invasion of his constitutional right to privacy.  The debtor

10   defendants filed a motion to dismiss the second amended

11   complaint.

12             On October 22, 2012, Gandrup filed a notice of

13   voluntary dismissal, indicating that he was voluntarily

14   dismissing the Gandrup litigation without prejudice to all

15   defendants, including the debtor defendants.

16             On November 9, 2012, Gandrup filed the Gandrup claim

17   as a general unsecured claim against ResCap in the amount of

18   one million dollars.  As the basis for the claim, the proof of

19   claim attached a reference to the foreclosure action; that was

20   the Northern District of California, the first action.

21             The debtors objected to the Gandrup claim in the

22   debtors' fiftieth omnibus objection to claims, no-liability

23   claims, books and records.  The omnibus objection was at ECF

24   docket number 5162, stating as the reason for disallowance,

25   "Litigation voluntarily dismissed".  Gandrup filed a response

12-12020-mg    Doc 6998    Filed 05/18/14    Entered 05/23/14 12:16:07    Main Document
Pg 76 of 96
**RESIDENTIAL CAPITAL, LLC, et al.**

76

1   to the omnibus objection -- the response is at ECF docket

2   5541 -- explaining that they dismissed the foreclosure action

3   with prejudice because that action would have been stayed due

4   to the filing of these Chapter 11 cases.  Gandrup explained

5   that the causes of action asserted in the foreclosure action

6   formed the basis of his claims here, and he attached to the

7   response a copy of the second amended complaint.

8        On January 23, 2014, the trust and Mr. Gandrup entered

9   into a stipulation to withdraw without prejudice the omnibus

10  objection to the Gandrup claim.  The debtors now object to

11  Gandrup's claim, on the grounds that Gandrup has failed to

12  state a basis for liability against the debtors for the

13  following reasons:

14       One, Gandrup's right to challenge the foreclosure was

15  terminated because in California a properly conducted

16  nonjudicial foreclosure sale constitutes a final adjudication

17  of the rights of the borrower and the lender.  See Moeller v.

18  Lien, 25 Cal.App.4th 822 at 831 (1994) (citing Smith v. Allen,

19  68 Cal.2d 93 at 96 (1968)).  And Gandrup did not proffer any

20  facts to establish that the foreclosure sale was not properly

21  conducted sufficient to overcome the presumption.

22       Two, Gandrup failed to rebut the presumption that the

23  foreclosure sale was proper.

24       Three, Gandrup did not tender the loan amount, as

25  required under California law, in order to challenge a

**RESIDENTIAL CAPITAL, LLC, et al.**

77

1  foreclosure sale, and his complaint therefore fails.  It's the
2  so-called tender rule.

3      Four, securitizing a loan is not improper.  See Lane
4  v. Vitek Real Estate Industries Group, 713 F.Supp.2d 1092 at
5  1099 (E.D. Cal. 2010) ("The argument that parties lose their
6  interest in a loan when it is assigned to a trust pool has also
7  been rejected by many district courts.")

8      Five, Gandrup's claim for TILA violations fails
9  because GMACM was not the original lender of his loan and, even
10  if it were, his claims are time-barred.  The state-court action
11  was not filed until four years after the loan was originated,
12  and damage claims under TILA have a one-year statute of
13  limitations.  See 15 U.S.C. Section 1640(e).

14      Six, Gandrup cannot receive his loan based upon
15  alleged TILA violations, because of the three-year statute of
16  limitations in 15 U.S.C. Section 1635(f), and he brought his
17  claim more than three years after loan origination, and he also
18  did not return the loan principal minus all interest and fees
19  paid to the creditor after closing, as required by TILA.

20      Seven, Gandrup's claims under RESPA fail because
21  they're time-barred.  See 12 U.S.C. Section 2614.  And his
22  second amended complaint is devoid of any factual allegations
23  specific to the debtors.

24      Eight, Gandrup's fraud claim fails because it is time-
25  barred and not pled with sufficient particularity.

**RESIDENTIAL CAPITAL, LLC, et al.**

78

1        Nine, Gandrup's claim for civil RICO violations fails

2   because he does not plead the required elements (conduct of an

3   enterprise, through a pattern of racketeering activity,

4   establishing that the defendant caused injury to the

5   plaintiff's business or property).

6        Ten, Gandrup's rescission claim fails because he could

7   not void the deed of trust without paying his debt.

8        Eleven, Gandrup's invasion of constitutional right to

9   privacy under the California Constitution, that claim fails

10  because, one, it is insufficiently pled and, two, a credit

11  check does not qualify as a serious invasion of privacy

12  interest sufficient to establish a claim under the California

13  Constitution.  See Smith v. Capital One Finance Corp., number

14  C 11-3425 (PJH) (2012 WL 3138024 at *3) (N.D. Cal. Aug. 1,

15  2012) ("Because plaintiff concedes that she incurred a

16  financial obligation, she impliedly consented for the creditor

17  to take reasonable steps to pursue payment, even though it may

18  result in actual, though not actionable, invasion of privacy.")

19        And twelve, the amount of the Gandrup claim is not

20  supported by sufficient documentation.

21        The debtors' objection is supported by the declaration

22  of Lauren Graham Delehey, which attaches supporting

23  documentation, including, one, the request letter sent by the

24  debtors to Gandrup -- it's a request for more information; two,

25  the deed of trust; three, the substitution of trustee; four,

**RESIDENTIAL CAPITAL, LLC, et al.**

1    payment records; five, the notice of default; six, the notice

2    of trustee's sale; seven, the trustee's deed upon sale; eight,

3    the dismissal order; nine, Gandrup's second amended complaint;

4    and ten, a notice of voluntary dismissal; and eleven, the

5    voluntary-dismissal order.

6           The debtors' objection is well taken and supported by

7    relevant evidence.  Through the Gandrup objection, the debtors

8    shifted the burden to Gandrup to prove the validity of the

9    claim by a preponderance of the evidence; Gandrup failed to

10   respond.  The Court therefore concludes that the Borrowers'

11   Trust's objection to the Gandrup claim is sustained and the

12   claim is expunged.

13          MR. WISHNEW:  Thank you very much, Your Honor.  That

14   is the last matter going forward today, and so --

15          THE COURT:  What you should do with respect to the

16   ruling on the Gandrup claim is prepare a separate order

17   indicating that the objection to the Gandrup claim is sustained

18   and the claim is expunged for the reasons stated on the record

19   during the hearing.

20          MR. WISHNEW:  I will do that, Your Honor, and submit

21   something electronically to chambers.

22          THE COURT:  Okay.  Thank you very much --

23          MR. WISHNEW:  Thank you very much --

24          THE COURT:  -- Mr. Wishnew.

25          MR. WISHNEW:  -- for your time, Your Honor.

**RESIDENTIAL CAPITAL, LLC, et al.**

80

1          THE COURT:  Thank you.

2          Have a safe trip home, Mr. Garber.

3          MR. GARBER:  Thank you, Your Honor.

4      (Whereupon these proceedings were concluded at 11:47 AM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

81

I N D E X

RULINGS

|  | Page | Line |
|---|---|---|
| Ally Financial Inc.'s motion for an order enforcing the Chapter 11 plan injunction will be taken under submission the issue, and Ally's counsel is directed to submit, within seven days from the date of the order, a declaration and supporting information detailing the amount of fees and costs that it seeks to recover in connection with the making of the motion, and providing Brookstone Law with seven days to file a response. | 19 | 5 |
| As to the Macks' objection, each side is permitted to file a supplemental brief on the issue of whether the proof of claim on file properly raises the issue of GMACM committing a RESPA violation in failing to respond to a qualified written request. | 68 | 5 |
| The ResCap Borrower Claims Trust's Objection to Claim No. 4664 of James C. Jackson, sustained. | 74 | 1 |
| The ResCap Borrow Claims Trust objection to Claim No. 4167 filed by Gerald Gandrup, sustained, and the claim is expunged. | 79 | 11 |

82

1

2                    C E R T I F I C A T I O N

3

4   I, Sharona Shapiro, certify that the foregoing transcript is a

5   true and accurate record of the proceedings.

6

7

8

9

10

11   _____

12   SHARONA SHAPIRO

13   AAERT Certified Electronic Transcriber CET**D 492

14

15

16   eScribers

17   700 West 192nd Street, Suite #607

18   New York, NY 10040

19

20   Date:  May 18, 2014

21

22

23

24

25

**#**

**#607 (1)**
2:22

**\***

**\*3 (1)**
78:14

**A**

**able (4)**
14:16;35:1;51:2;
58:18
**Absolutely (5)**
7:9,23;19:22;
36:19;71:11
**absolved (2)**
40:24,25
**accept (2)**
45:9,10
**according (1)**
10:12
**accordingly (1)**
72:1
**acknowledge (2)**
63:10;66:3
**acknowledged (1)**
64:7
**acknowledges (1)**
12:17
**act (1)**
70:7
**action (20)**
9:23;12:8;15:1;
25:20;27:2;31:16;
42:12;43:7;51:5;
56:17;74:21,23;75:6,
19,20;76:2,3,5,5;
77:10
**actionable (1)**
78:18
**actions (1)**
51:2
**active (2)**
35:15;36:1
**activity (1)**
78:3
**acts (4)**
41:22;43:4;44:3,7
**actual (3)**
46:25;47:4;78:18
**Actually (15)**
5:11;8:3;9:12,13;
14:11;17:11;22:5;
44:3,22,23;47:20;
48:19;53:11;69:3;
73:5
**Adam (4)**
5:23;6:14;20:5,14
**added (1)**

**62:25**
**addition (1)**
16:20
**additional (2)**
10:3;61:17
**address (6)**
6:23;7:14;43:16;
56:9;68:9,14
**addressed (2)**
68:23;74:10
**addresses (1)**
57:9
**adduced (2)**
55:16;67:16
**adjourn (2)**
6:5,6
**adjourned (1)**
72:10
**adjudicated (1)**
8:5
**adjudication (1)**
76:16
**adjusted (1)**
72:1
**admit (2)**
10:12;13:2
**advertisement (1)**
16:23
**advertisements (1)**
17:9
**Aerojet (1)**
44:19
**affiliated (1)**
35:23
**aftermath (1)**
23:9
**again (9)**
9:16;10:25;20:4;
25:8,8,8;57:12;
61:22;74:12
**against (58)**
8:18;11:17,20;
12:10,12,16;14:6,12,
15,25,25;16:24;17:2,
19;18:11;26:3,6,9,20,
23;27:12,20;28:10;
35:25;36:6,16,16;
37:23;42:6,12,21;
43:5,6,10;47:9;48:3,
5;53:6,7,12,14;54:5;
57:3;60:16,19,19;
63:1,7,9,11;64:1,1,2;
65:9;74:19,24;75:17;
76:12
**agenda (3)**
5:18;6:18;20:2
**agent (21)**
23:15,16;26:1;
28:14,14;35:23;43:7,
10;44:7;50:7,24;
51:1;52:12;55:4,10,
21,22;65:21,25;
67:20,24

**agree (16)**
27:6;41:24,25;
42:11,14,16;53:8;
57:11;59:11,23;60:4,
14;61:10;62:4;68:21;
69:11
**agreed (3)**
20:21;51:1;59:24
**agreement (2)**
50:16;75:8
**ahead (12)**
9:2;20:13;30:22;
33:20;47:25;50:4;
52:16;62:21;64:13;
65:14;69:21;72:3
**AL (1)**
4:6
**alcohol (1)**
33:25
**alive (2)**
24:12;41:13
**allegations (1)**
77:22
**allege (4)**
26:13;59:17;61:8;
66:4
**alleged (10)**
26:7,14,19,21;
27:20;38:23;44:4,6;
65:23;77:15
**Allen (1)**
76:18
**allow (3)**
34:4;69:9;71:1
**Ally (26)**
4:13,13,21,21;5:9;
6:19,21;7:1;8:11,18;
9:18;11:18;12:10,10,
12,12;14:6,15;15:4,7,
19,22;17:14,14;
18:11;19:19
**Ally's (7)**
7:17;8:16,21;9:10;
10:12,14;19:9
**almost (1)**
39:22
**along (4)**
18:12;68:22;70:3;
74:24
**although (2)**
10:11;21:1
**always (2)**
24:23;71:19
**amend (3)**
41:2;63:9;75:3
**amended (8)**
8:4;11:20;75:2,5,
10;76:7;77:22;79:3
**Amendment (3)**
17:8;62:16;68:11
**among (2)**
62:2;64:8
**amount (7)**

**16:21;19:11;35:12;**
**74:20;75:17;76:24;**
**78:19**
**analysis (1)**
62:4
**Angeles (4)**
12:9,21;13:4;17:6
**answered (1)**
53:22
**anticipate (1)**
25:3
**apparently (2)**
10:13;46:22
**appeal (2)**
22:12;34:11
**appealing (1)**
63:25
**appear (7)**
6:7;19:6;20:21;
33:19;69:16,19;71:1
**appeared (3)**
10:5;33:21;35:1
**appearing (1)**
7:16
**appellate (5)**
44:21,24,25;45:18,
25
**apple (2)**
25:9;43:3
**applicable (2)**
26:12;28:17
**application (2)**
48:6;71:5
**applied (1)**
66:2
**applies (2)**
27:8;39:5
**apply (14)**
23:4;27:8;28:7,11,
15;29:2;39:2;43:22;
45:22;46:3,8;56:16;
62:7;63:8
**appointed (1)**
13:3
**appreciate (2)**
20:22;66:16
**approach (1)**
59:4
**appropriate (1)**
15:6
**Approve/Ally (1)**
2:2
**approved (2)**
13:25;51:15
**April (11)**
9:17,18;10:18,19,
20;14:8,13,20;30:7,
11;59:12
**ARANT (2)**
4:1;20:16
**argu (1)**
63:6
**argue (2)**

**6:12;65:18**
**argued (1)**
65:17
**argument (28)**
6:9;14:23;25:25;
26:21;27:24;52:13;
53:5;56:3,3;57:2,24;
58:19,24;59:3,16,18,
23;60:25;62:5;63:24;
65:9;66:10,13;69:15,
17;73:11,14;77:5
**arguments (4)**
55:24;64:5,5;73:18
**arising (1)**
21:25
**articulating (1)**
8:17
**aside (1)**
59:15
**aspect (2)**
61:20;65:25
**assert (5)**
17:19;60:16;63:10,
25;68:11
**asserted (6)**
25:23;63:11;64:2;
65:9;74:21;76:5
**asserting (2)**
74:23;75:6
**asserts (2)**
24:5
**assets (1)**
34:16
**assigned (2)**
13:9;77:6
**assignment (1)**
31:5
**assume (7)**
41:15;42:3,5,9,10;
60:8,10
**assuming (2)**
26:3;68:16
**assure (1)**
49:23
**Atlantic (1)**
44:19
**attached (3)**
12:11;75:19;76:6
**attaches (1)**
78:22
**attack (1)**
37:20
**attempts (1)**
32:25
**attention (5)**
31:1;36:12,13;
58:19,24
**attorney (7)**
31:3;33:22;35:1,9;
36:1;37:14;42:17
**Attorneys (3)**
4:2,13,21
**attorney's (4)**

12-12020-mg    Doc 6998    Filed 05/18/14    Entered 05/23/14 12:16:07    Main Document
RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

Pg 84 of 96

May 15, 2014

14:22;15:14;17:25;
18:13
**attributable (3)**
24:13;42:4,9
**Aug (1)**
78:14
**August (7)**
30:13;40:17,18;
54:13;57:14,18,19
**authority (3)**
39:14;64:8;67:9
**authority' (2)**
48:2,17
**authorized (2)**
36:15,17
**Avenue (1)**
4:5
**award (13)**
14:24;15:14;16:10,
15,19;18:17,18;24:9,
11,16,25;34:10;42:10
**aware (1)**
9:7
**away (2)**
38:6,7

**B**

**B3 (1)**
51:7
**back (12)**
6:18;7:8;9:15;
25:8;58:12;59:2;
61:24,24;62:2;63:6;
66:20,23
**background (1)**
73:6
**balance (1)**
51:16
**Bank (84)**
4:13,21;12:10,12;
22:2,5,16,16;25:15,
19;26:1,6,23,25;27:1,
12,15,21;28:9,10,13,
18;29:3;30:14,15,16;
31:4,8,9;32:9,9,21;
34:14,15,16,20,23,
24;35:2,8,10,14,14,
16,24,25;36:10;37:7,
9;38:24;40:23;41:4,
8;42:6,12;43:1,6;
44:2,7;50:7,11,14;
51:2;54:6;55:4,10,
22;57:25;58:1;60:20;
63:1,1,5,6,9,11,15,16,
18;64:1;65:10,16,24;
67:19
**Bankruptcy (9)**
2:7,8;8:1;9:14,15;
11:2;46:1;54:14;
74:12
**Bank's (6)**
22:7;23:10,11;

28:10;60:21;65:18
**bar (2)**
33:8;56:17
**barred (6)**
25:23;26:4;27:18;
48:3;53:10;77:25
**Barry (4)**
20:3,7,9;29:11
**Based (5)**
13:8;19:15;41:22;
74:20;77:14
**bases (1)**
74:11
**basic (2)**
27:5,6
**basis (21)**
7:4,13;8:18;14:24;
15:6,11,14,19;16:18;
25:25;26:7,7;27:12;
31:13;36:19;39:19;
59:17;74:6;75:18;
76:6,12
**Battaglia (4)**
46:21;47:3,6,16
**became (1)**
13:15
**become (1)**
61:10
**becomes (2)**
26:14;56:14
**began (1)**
34:12
**behalf (8)**
2:8;7:1;11:8;20:9;
29:11;34:24;35:1;
51:5
**behind (1)**
51:13
**below (1)**
23:8
**BERNBROCK (1)**
4:17
**best (1)**
33:7
**better (2)**
35:13;69:7
**bigger (1)**
10:4
**bind (1)**
51:2
**binder (3)**
58:7,8,25
**binding (1)**
45:20
**Birmingham (1)**
4:6
**bit (3)**
56:24;65:13;73:14
**bite (1)**
43:3
**bites (1)**
25:9
**board (1)**

44:14
**bond (1)**
22:12
**bonds (1)**
22:3
**books (1)**
75:23
**Borrower (14)**
2:5,9,11,17;4:2;
5:6,15;6:9,15;20:2,
15;60:1;67:3;76:17
**borrowers (1)**
32:7
**Borrowers' (1)**
79:10
**both (8)**
14:13;23:21;27:19;
55:17;70:7,8;71:19;
72:1
**bought (1)**
31:6
**BOULT (2)**
4:1;20:16
**bound (2)**
45:9,10
**BRADLEY (2)**
4:1;20:16
**brazen (1)**
18:15
**break (1)**
68:19
**brief (7)**
35:20;61:13;66:25;
68:5;70:20,21;72:2
**briefing (2)**
68:19;70:1
**briefings (1)**
69:8
**briefly (5)**
8:15;29:19;46:22;
47:24;51:5
**briefs (3)**
69:14,20;70:15
**bring (5)**
12:13;31:23;42:11,
17;67:11
**bringing (1)**
11:21
**brings (1)**
43:11
**Brookstone (9)**
8:23;9:9;10:10,14,
16;11:8;14:20;17:20;
19:13
**brought (1)**
77:16
**BROWN (48)**
4:25;6:25,25;7:6,9,
12,23;8:25;9:3,7,24;
10:4,6,9,11;11:11,15,
20;12:4,6,16,23,25;
13:2,8,13,17,19,21;
14:7;15:2,10,16;

16:12,14;17:3,10,17,
21;18:23,24;19:2,4,
16,17,18,21,23
**builder (2)**
47:1,5
**Builders (3)**
46:24,25;47:8
**building (1)**
46:23
**built (4)**
46:23,23,24;47:2
**burden (1)**
79:8
**business (2)**
71:21;78:5
**busy (1)**
21:7
**buyer (1)**
51:25

**C**

**Cal (2)**
77:5;78:14
**Cal2d (1)**
76:19
**CalApp4th (1)**
76:18
**calendar (4)**
11:2;20:1;56:24;
70:3
**California (11)**
9:23;11:12;12:7;
13:4,12;74:22;75:20;
76:15,25;78:9,12
**call (4)**
16:22;30:16,24;
36:10
**called (4)**
9:12;30:7,12;46:24
**calls (1)**
11:6
**came (6)**
11:25;31:3;45:8,
14;48:23;63:6
**can (27)**
5:12;18:25;25:3;
27:12;32:8;33:3,7;
44:10,18;46:22;
49:25;50:2;51:5;
52:13;53:24;58:3,13;
65:12;66:20,25;
68:25;69:11;70:12;
71:10,20,25;72:3
**Capital (2)**
5:3;78:13
**care (3)**
40:2;64:21,25
**case (43)**
8:22;9:8,11,20;
10:12,17;11:10;
14:14,19,20;16:9,16;
20:23;21:5;23:20;

29:13,20;33:17;
41:14,19,20,22;45:7,
14,16;46:7,9,12,21;
47:12,19;48:24;49:1,
2,18,22;50:6;51:22;
55:9;61:15;69:6;
71:12,13
**cases (21)**
16:15;18:9,9,10;
32:16,17;44:17,18,
19,20;45:13;47:19,
19;48:1,7;50:23;
61:23;62:6;69:4,6;
76:4
**cause (6)**
40:4,4,5,9;41:16;
48:17
**caused (2)**
42:4;78:4
**causes (3)**
41:23;75:6;76:5
**CC (3)**
2:5,11,14
**certain (2)**
13:10;75:3
**Certainly (2)**
16:10,21
**certificate (1)**
40:3
**cetera (2)**
43:4;44:25
**challenge (2)**
76:14,25
**chambers (5)**
70:13,15,21;74:3;
79:21
**chance (1)**
28:20
**change (1)**
38:20
**changed (1)**
73:12
**changes (1)**
9:24
**Chapter (5)**
2:3;5:10;7:17;
19:8;76:4
**chargeable (2)**
23:14;25:18
**check (1)**
78:11
**Cheryl (4)**
20:4,7,9;29:11
**Chicago (1)**
4:15
**chose (3)**
17:14;21:12;50:22
**Circuit (3)**
34:6,7,8
**circuits (1)**
64:8
**circumstance (1)**
45:19

12-12020-mg    Doc 6998    Filed 05/18/14    Entered 05/23/14 12:16:07    Main Document

RESIDENTIAL CAPITAL, LLC, et al.
Pg 85 of 96

Case No. 12-12020-mg

May 15, 2014

**circumstances (1)**
18:16
**cite (6)**
16:12,15;23:20;
53:25;69:4,6
**cited (2)**
45:13;47:19
**citing (2)**
48:2;76:18
**Civil (3)**
62:7;75:7;78:1
**Claim (112)**
2:6,12,17;5:15;8:3,
4,4;11:22,23;17:13,
19;20:3;24:5,6,17;
25:12,18,19,22;26:3,
5,6,8,23;27:10,17,18,
19;32:19,20,22;38:2,
3;39:9,20;40:12,12,
19;41:6,18,18;42:20;
43:5,5,6,12;48:3;
54:12,14;56:6,11;
57:3,6,12,15,16,17;
59:16,17;60:16,19;
61:10,13,13,22,22,24,
25;62:6,15,16,25;
63:4,10,19,25;64:1,
10;65:9,16,24,25;
68:6,10,11;74:4,7,10,
10,19,19;75:16,17,
18,19,21;76:10,11;
77:8,17,24;78:1,6,9,
12,19;79:9,11,12,16,
17,18
**claimants (1)**
15:1
**Claims (42)**
2:5,9,12,14,17;4:3;
5:6,15,20;6:4,9,15;
8:18;10:22;11:1,3,21,
24;12:7,14;16:3,4,24;
17:2;20:1,2,15;
21:25;27:19;41:23;
42:6;56:17;63:1;
74:20,24;75:4,22,23;
76:6;77:10,12,20
**Claims/Notice (1)**
2:16
**clarify (1)**
46:18
**class-action (1)**
14:15
**clear (7)**
7:24;15:4,25;23:9;
26:18;30:21;67:15
**clearly (3)**
24:3;26:15;28:17
**clerk (1)**
70:20
**client (10)**
16:24;17:2;22:4;
32:20;41:16;51:6,7,
22,22,24

**clients (7)**
10:21;29:21;30:2,
11,13;36:8,15
**closely (1)**
28:9
**closer (1)**
30:18
**closing (1)**
77:19
**clue (1)**
22:5
**Code (3)**
2:7;53:25;67:2
**collateral (1)**
43:17
**colleague (2)**
5:23;20:4
**colleagues (2)**
9:14,15
**collectible (1)**
48:5
**collection (2)**
34:13,17
**coming (3)**
8:13;14:16;25:8
**commencement (1)**
23:8
**comment (2)**
48:9;71:19
**commit (1)**
51:2
**committed (1)**
25:16
**committing (1)**
68:7
**common-law (1)**
67:2
**company (2)**
46:24;47:3
**compelled (1)**
68:25
**compile (1)**
19:2
**complaint (23)**
7:4;9:25;11:20;
12:9,10,12,20;13:8,
11,24;17:5;31:4,4;
41:3;63:9;74:11;
75:2,6,11;76:7;77:1,
22;79:3
**completely (1)**
23:10
**complicated (4)**
50:12,13,14;51:19
**concedes (1)**
78:15
**concluded (2)**
38:18;80:4
**concludes (2)**
68:9;79:10
**conduct (16)**
15:7;16:5;17:11;
21:25;23:11,14;25:5,

17,18;27:13,22,23;
28:19;29:4;63:16;
78:2
**conducted (3)**
35:11;76:15,21
**confer (1)**
68:19
**confirmation (9)**
7:3;8:6,8,11,20;
14:1;15:3,4,17
**confirmed (3)**
13:15,25;67:13
**conflict (1)**
45:12
**conflicts (1)**
56:10
**confused (1)**
10:15
**confusing (1)**
67:15
**connection (7)**
6:4;14:23;15:15;
18:1;19:12;31:21;
64:10
**consensually (1)**
71:20
**consented (1)**
78:16
**considered (1)**
73:25
**constitutes (1)**
76:16
**Constitution (2)**
78:9,13
**constitutional (2)**
75:9;78:8
**contacted (1)**
29:22
**contained (1)**
15:3
**contention (2)**
61:2,11
**contested (2)**
11:7;20:1
**continue (1)**
71:10
**continued (4)**
31:8;35:18;36:24;
37:5
**contract (6)**
50:21,21;51:6,7;
53:1;55:24
**contractor (2)**
51:1;52:19
**contractually (1)**
50:25
**contrary (2)**
36:7;48:7
**contributing (2)**
40:4,5
**contributor (1)**
47:4
**controlling (1)**

43:25
**convenient (1)**
56:15
**copies (1)**
14:4
**copy (12)**
18:6;47:11;58:3;
59:1,6;70:12,15,16,
20,21,24;76:7
**copyright (1)**
17:18
**Corp (1)**
78:13
**Corporation (1)**
51:10
**corrected (1)**
16:14
**correctly (1)**
38:16
**costs (13)**
15:5,6,14,19,23;
16:7,20;18:1,18,18,
20;19:11;32:22
**counsel (11)**
6:21;8:16,21;9:10;
10:12,15;13:5;19:9;
20:19;21:6;56:20
**counsel's (3)**
8:23;55:8;64:16
**count (2)**
32:4,4
**counterclaim (1)**
21:23
**counter-claim (5)**
31:13;32:19;33:1;
53:16;54:4
**country (1)**
34:5
**counts (1)**
74:11
**county (4)**
11:12;12:9,23;13:4
**course (8)**
13:15;18:17;22:6;
30:13;32:24;40:23;
54:4;64:3
**COURT (363)**
5:2,11,14,18,21,24;
6:2,8,12,16,22,24;
7:6,11,16;8:13,15,23;
9:2,6,22;10:2,5,7,10;
11:2,10,10,12,14,19,
22,23,25;12:5,7,15,
22,24,24;13:1,7,11,
12,14,18,20;14:3,22;
15:9,11,18;16:7,9,13,
18;17:1,4,5,16,18,22;
19:1,3,5,7,17,20,22,
24;20:6,10,13,18,20;
21:3,5,9,13,15,17,19;
22:8,10,18,21,24;
23:1,3,6,14;24:4,9,
11,11,19,19,22;25:2,

8,13;26:15,18;27:4,
25;28:2,5,13,22,24;
29:6,8,10,14,18;
30:18,20;31:20;32:2,
25;33:2,4,10,13,15,
18;34:20,22;35:3,5,7,
7,11,23;36:11,22,25;
37:3,8,12,17,19,25;
38:5,9,11,13,15;39:1,
4,7,12,14,17,19,25;
40:7,8,10,14,16,19,
21,25;41:10,12;42:2,
18,20;43:13,15,18;
44:4,12,15,22;45:3,
11,17,17,20,22;46:1,
1,2,2,6,15,16,20;47:6,
7,11,12,13,15,17,18,
22,25;48:9,14,14,20,
22,24;49:2,5,5,6,11,
14,16,20;50:2,4,6,8,
13,23;51:3,11,15,20;
52:2,8,11,14,20,22,
25;53:3,8,13;54:1,7,
10,12,16,18,20,23,25;
55:3,8,15,21;56:2,8,
18,22,24,24;57:1,9,
11,16,19,21;58:2,6,9,
11,16,18,21;59:2,5,8,
10,15,20,23;60:4,8,
12,14,18,22,24;61:7,
9,16,20,20;62:9,12,
13,14,18,21;63:3,5,
13,18,21,23;64:18,
21,23,25;65:3,6,8,12,
14,20,23,25;66:6,8,
10,13,15,17,20,23;
67:6,10,13,25;68:3,9,
11;69:23;70:1,6,11,
16,19,24,25;71:3,5,7,
9,11,13,16,18;72:5,
10,12,16,18,20,25;
73:3,7,10,13,16,20,
24;74:15,17,22;75:2;
79:10,15,22,24;80:1
**courtesy (1)**
70:24
**courts (3)**
45:9;49:17;77:7
**Court's (2)**
7:3;25:4;29:12;
54:21
**covered (1)**
16:5
**credit (1)**
78:10
**creditor (2)**
77:19;78:16
**crisis (1)**
39:23
**crystal (1)**
26:18
**CUMMINGS (2)**
4:1;20:17

**current (1)**
13:11
**Cylinder (1)**
44:19

**D**

**damage (2)**
34:2;77:12
**damaged (1)**
32:1
**damages (12)**
24:20;25:5;31:23,
24,24,25;34:5,10;
49:15;53:23;64:9;
68:14
**date (5)**
13:12;19:10;40:14;
56:18;57:12
**dated (1)**
51:6
**David (3)**
20:8;22:25;29:11
**day (3)**
9:19;30:12;36:5
**days (8)**
10:24;18:4,24;
19:10,13;32:7;34:11;
67:8
**DC (1)**
4:23
**DCA (5)**
45:7,9,9,10;48:22
**deadline (3)**
8:2,7;18:10
**deadlines (1)**
69:24
**deal (2)**
5:12;37:6
**dealing (1)**
43:21
**death (9)**
24:6;25:18;40:3;
41:17,22;42:4,21;
53:14;68:15
**debt (1)**
78:7
**debtor (8)**
11:17;12:13,18;
44:16,16;75:1,9,15
**Debtors (7)**
74:24;75:21;76:10,
12;77:23;78:24;79:7
**debtors' (3)**
75:22;78:21;79:6
**December (4)**
13:15,25;32:15,18
**decide (13)**
18:15;43:8;46:6;
48:15;61:21;62:15,
18;63:24;65:3;69:14,
20,22;72:4
**decided (7)**

29:20;39:16;44:20;
45:13,21;46:13,16
**deciding (1)**
18:17
**decision (5)**
21:20;45:8;47:20;
48:22;74:17
**decisions (2)**
25:21;45:19,20
**decisive (1)**
55:6
**declaration (5)**
12:11;18:19;19:4,
10;78:21
**declared (1)**
32:20;38:3;52:18
**deed (3)**
78:7,25;79:2
**default (2)**
30:25;79:1
**defective (1)**
37:22
**defend (1)**
28:19
**defendant (3)**
25:14,15;78:4
**defendants (6)**
24:7;74:25;75:1,
10,15,15
**defended (1)**
47:11
**defense (1)**
28:17
**defenses (1)**
47:7
**defer (1)**
20:4
**define (1)**
51:21
**defined (1)**
50:21
**Delehey (1)**
78:22
**demise (1)**
26:9
**denie (1)**
73:7
**denied (4)**
6:5;37:24;67:14;
73:7
**deny (1)**
21:1
**depending (1)**
23:10
**derivative (1)**
23:19
**describe (1)**
20:25
**desk (1)**
7:7
**detail (1)**
32:13
**detailing (1)**

19:11
**details (1)**
61:14
**determination (1)**
50:5
**determined (2)**
16:21;24:19
**determining (1)**
66:1
**Deutsche (85)**
22:2,5,7,16,16;
23:10,11;25:15,18;
26:1,6,23,25;27:1,12,
15,21;28:9,10,10,13,
18;29:3;30:14,15,16;
31:4,7,9;32:9,21;
34:14,15,16,20,22,
24;35:2,8,10,14,14,
16,24,25;36:10;37:7,
9;38:24;40:23;41:4,
8;42:6,12;43:1,6;
44:2,7;50:7,11,14;
51:2;54:5;55:4,10,
22;57:25;58:1;60:19,
21;63:1,1,5,6,9,11,15,
16,18;64:1;65:10,16,
18,23;67:19
**development (1)**
10:23
**devoid (1)**
77:22
**dialysis (1)**
39:25
**died (3)**
40:3,5;42:13
**dies (2)**
41:16,20
**difference (3)**
45:6;46:4,5
**different (7)**
27:2;31:17;44:21;
45:25,25;46:8;64:6
**difficult (1)**
33:7
**difficulty (1)**
29:22
**direct (2)**
12:14;27:12
**directed (2)**
30:11;36:1
**directing (1)**
19:9
**directly (1)**
65:16
**disagree (1)**
43:24
**disallowance (1)**
75:24
**disbarred (2)**
33:8;42:24
**disclaim (1)**
55:25
**disclosure (5)**

8:6;13:22;38:18;
39:9,10
**discovery (1)**
35:12
**discuss (1)**
16:3
**discussed (1)**
61:5
**discussing (1)**
69:5
**discussion (2)**
16:4;60:12
**dismiss (11)**
8:18;10:22;11:1;
17:6,12;32:17,19,19,
20;75:1,10
**dismissal (3)**
75:13;79:3,4
**dismissed (12)**
11:2,23;12:7;
18:11;32:14,15,23;
74:7,7,8;75:25;76:2
**dismissing (1)**
75:14
**disparage (1)**
31:16
**dispose (1)**
37:19
**disposed (1)**
64:4
**dispute (2)**
47:4;50:9
**disputing (1)**
57:22
**distinguished (1)**
35:1
**distinguishing (1)**
31:22
**distress (3)**
24:14;42:8;68:15
**District (12)**
45:15,15;46:1,7,8,
13,14,20;74:22;75:2,
20;77:7
**districts (3)**
44:24,25;45:25
**divided (2)**
31:14;44:21
**Doc (1)**
2:5
**Doc# (4)**
2:2,11,14,16
**docket (2)**
75:24;76:1
**doctrine (1)**
26:11
**documentation (2)**
78:20,23
**Documents (2)**
33:23;35:20
**dollars (7)**
24:12;30:4;33:6;
34:10;42:8;74:20;

75:18
**done (5)**
18:8;34:18;44:3;
63:20;68:4
**down (3)**
30:4;32:16;39:24
**drawing (1)**
30:4
**due (1)**
76:3
**during (3)**
35:13;39:21;79:19
**duty (1)**
67:3

**E**

**earlier (5)**
8:5;48:18,22,22;
74:6
**ECF (11)**
8:1,3,7,9;59:11;
70:12,14,16,21;
75:23;76:1
**ED (1)**
77:5
**Edge (5)**
46:21;47:5,5,10,16
**effect (1)**
23:22
**effective (2)**
13:15;40:1
**effectively (2)**
11:21;16:24
**efforts (1)**
34:17
**Eight (2)**
77:24;79:2
**eighteen (2)**
32:24;33:17
**either (4)**
13:6;16:18;46:11;
69:9
**elected (1)**
34:10
**electronically (1)**
79:21
**elements (4)**
26:12;28:7,8;78:2
**Eleven (2)**
78:8;79:4
**Eleventh (1)**
34:8
**ELLIS (4)**
4:12,20;7:1;9:11
**else (3)**
9:7;26:25;27:3;
64:13
**e-mail (5)**
9:19;10:25;70:12,
14,19
**e-mails (2)**
8:14;11:6

**emanated (1)**
46:7
**emotional (1)**
24:13;25:5;42:8;
68:15
**emotional-distress (1)**
64:9
**emphasize (1)**
21:21
**enabled (1)**
42:13
**encompassed (1)**
62:14
**end (2)**
23:20;56:3
**ended (1)**
23:12
**enforce (1)**
7:3,17;14:17
**enforcement (1)**
37:9
**Enforcing (7)**
2:3;5:10;6:20;
14:5;18:8,16;19:8
**engaged (3)**
16:4;71:24,24
**enough (5)**
28:9;43:19;49:4;
53:9;71:1
**enter (5)**
17:23;18:8,16;
19:5,8
**entered (9)**
6:3;14:12;15:24;
50:20;55:11,12,19;
67:18;76:8
**enterprise (1)**
78:3
**entire (1)**
53:5
**entities (6)**
11:18,21;12:10,13,
18;51:14
**entitled (2)**
15:23;32:21
**equitable (1)**
37:14
**equivalent (2)**
36:18,18
**eScribers (1)**
2:21
**ESQ (4)**
4:8,9,17,25
**essentially (6)**
20:23;22:1;28:8;
46:3;62:7;73:17
**establish (2)**
76:20;78:12
**establishes (1)**
55:3
**establishing (2)**
17:25;78:4
**Estate (1)**

77:4
**estoppel (1)**
43:17
**et (2)**
43:4;44:25
**ETS (1)**
74:24
**even (7)**
10:13;16:4;27:21;
39:14;61:8;77:9;
78:17
**events (5)**
20:25;21:1,25;
41:22;43:4
**Everybody (1)**
7:8
**everywhere (1)**
42:2
**evidence (7)**
35:12;55:16,17;
67:16,22;79:7,9
**evidentiary (1)**
21:24
**Exactly (5)**
46:18;48:10;49:3,
3;51:18
**except (1)**
31:25
**exclusively (1)**
29:4
**Excuse (1)**
22:24
**excused (1)**
19:21
**Exhibit (5)**
12:11;58:25;59:11;
60:8;68:8
**exhibits (1)**
51:8
**existed (1)**
35:14
**experience (2)**
45:3,4
**experienced (1)**
39:23
**experiencing (1)**
29:22
**explained (1)**
76:4
**explaining (1)**
76:2
**expunged (2)**
79:12,18
**extend (1)**
71:4
**extended (1)**
70:4
**extensive (1)**
70:2

**F**

**fact (21)**

8:3;21:12;22:17;
24:22;25:4,6;27:22;
28:20;29:3;30:1;
32:11;33:24;35:17;
36:7;39:7;42:21;
50:17;65:15;67:22,
23;74:8
**factor (1)**
31:22
**facts (6)**
25:7;29:19,20;
44:1;46:22;76:20
**factual (2)**
50:3;77:22
**fail (2)**
53:7;77:20
**failed (3)**
76:11,22;79:9
**failing (2)**
62:1;68:7
**fails (6)**
77:1,8,24;78:1,6,9
**failure (4)**
40:3,6,6;59:17
**fairly (2)**
62:5;68:10
**faith (1)**
70:7
**fallout (1)**
23:9
**false (1)**
17:9
**false-advertising (1)**
17:19
**familiar (2)**
16:9;31:21
**far (3)**
18:9;22:6;66:24
**fatally (1)**
37:22
**February (1)**
9:11
**Federal (8)**
4:4;11:13;12:8;
45:17;46:1,6;62:7;
74:22
**federally-related (1)**
67:4
**feel (3)**
15:22;68:25;69:4
**fees (16)**
14:22;15:4,6,14,19,
23;16:7,20;17:25;
18:13,18,18,20;
19:11;32:22;77:18
**few (3)**
10:24;31:20;58:23
**fifteen (1)**
32:7
**Fifteenth (1)**
4:22
**Fifth (1)**
4:5

**fiftieth (4)**
72:20;73:6,9;75:22
**fifty-eighth (1)**
72:20
**fifty-ninth (1)**
72:21
**file (18)**
17:5;18:5;19:13;
35:6;36:2;41:13,14,
19,21;67:8;68:5,6;
69:12;70:12,15,16,
21;71:5
**Filed (42)**
2:6,8;5:16;8:3;
9:18;11:10,20,22;
12:9;13:11,23;14:15;
20:3;32:4,10,11;
34:20;35:18;36:17;
40:12,12,19,22;41:6;
53:16;54:4,12,14,14;
57:12;59:12;70:14;
73:9;74:5,19;75:1,5,
10,12,16,25;77:11
**filing (5)**
8:1,2;61:21;74:12;
76:4
**filing's (1)**
69:24
**final (8)**
55:10,11,18;62:24,
24;67:17,21;76:16
**final-final (1)**
67:12
**Finance (1)**
78:13
**Financial (7)**
2:2;4:13,21;6:21;
29:22;47:4;78:16
**Financial's (2)**
5:9;6:19
**financier (1)**
47:1
**find (5)**
35:23;51:6;57:13;
58:14;63:24
**finding (3)**
58:15;67:22,23
**fine (2)**
9:14;30:20
**finish (1)**
59:3
**firm (23)**
7:25;8:1,5,14,17,
18,25;9:9;10:17;
11:5;13:22;14:1,4,14,
14,19,20,25;15:7,22,
24;16:22;32:25
**first (21)**
5:8,14;11:20;17:8;
22:2;30:16,23;42:14;
43:8;45:9,9,15;46:7;
55:7,13;56:10;59:10;
62:4;70:6;71:21;

75:20
**first-hand (2)**
45:1,4
**fits (2)**
25:11,21
**five (5)**
29:13;44:21;75:8;
77:8;79:1
**fixed (1)**
36:10
**Flor (1)**
50:6
**Florida (25)**
20:9,25;21:12;
23:25;26:12;31:14;
32:18;33:8;41:25;
43:16,22,23,23,24;
44:13,21,23;45:21;
46:7,15;49:17,24;
53:9;55:9;69:19
**focus (1)**
57:1
**focusing (1)**
26:2
**Foerster (2)**
5:6;20:15
**follow (1)**
56:25
**followed (2)**
9:16,17
**Following (5)**
8:11;9:19;10:18,
20;76:13
**forcing (1)**
15:7
**foreclosure (15)**
21:21;22:5;23:9;
30:12;32:14;74:23,
25;75:19;76:2,5,14,
16,20,23;77:1
**formal (1)**
9:21
**formed (1)**
76:6
**forward (5)**
5:8;11:3;14:11;
72:24;79:14
**found (7)**
28:13;30:10,11;
47:20;48:25;51:4;
55:21
**four (6)**
28:7;33:23;75:7;
77:3,11;78:25
**fourth (2)**
28:8;34:7
**frankly (4)**
12:16;15:25;16:3;
65:17
**fraud (2)**
75:7;77:24
**Frequently (1)**
69:7

**front (1)**
14:10
**FSupp2d (1)**
77:4
**fully (2)**
15:21;41:6
**fundamental (1)**
28:7
**Funding (1)**
51:10
**further (5)**
12:2;19:14;56:9;
59:21;72:23
**furthermore (1)**
57:10

## G

**Gandrup (30)**
73:1;74:12,19,19,
21,23;75:3,5,12,14,
16,16,21,25;76:4,8,
10,11,19,22,24;
77:14;78:19,24;79:7,
8,9,11,16,17
**Gandrup's (11)**
74:4;75:1;76:11,
14;77:8,20,24;78:1,6,
8;79:3
**Garber (149)**
20:8,8,11,12;24:4;
29:6,9,10,11,17,19;
30:19,23;31:22;32:3;
33:3,5,14,16;34:21,
24;35:4,6;36:13,24;
37:2,5,11,13,18,20;
38:1,7,10,12,14,22;
39:2,5,11,13,18,21;
40:9,11,15,18,20,22;
41:11,25;42:16,19;
43:11,14,16;44:1,5,9,
13,16;45:2,6,12;
46:11,18;47:14,16,
18,23;48:1,10,19,21,
25;49:3,9,12,15,19,
25;50:3,5,10,19,20,
25;51:4,18,21;52:4,9,
13,17,21,24;53:1,4,
15;54:3,8,11,13,17,
19,21,24,25;56:4;
57:4,13,14,17;58:2,5,
8,13,25;59:4;61:2,4,
8,10,12;64:7;66:18,
22,24;67:7,11;68:2,4;
69:3,16;70:10,19,23,
25;71:4,6,8,10,12,15,
17;72:5,6;80:2,3
**Garber- (1)**
68:21
**Garber's (4)**
56:3,18;57:2;60:25
**gave (4)**
35:20;41:23;43:4;

47:11
**general (2)**
31:24;75:17
**generally (1)**
68:24
**Gerald (3)**
73:1,23;74:19
**Gerardi (5)**
48:24;49:2,5,11,14
**gets (2)**
26:6;70:14
**given (2)**
30:10;43:18
**gives (2)**
15:4;56:5
**glad (1)**
42:23
**glove (1)**
25:12
**GMAC (84)**
12:18;22:3;23:11;
24:23;25:14,16,20,
24;26:1,9,15,25;28:9,
11,14,24;29:22,25;
30:1,1,7,8,11,16,24,
24,24;31:7,9;34:14,
14;35:2,4,4,7,14,15,
16,23;36:4,8,16,16,
20,23,25;37:4,4,10,
38:16,23;41:4;42:21;
43:5,7,7;44:7;45:13;
47:19;50:6,11,16;
51:1,5,9,13,23,23,24,
25;53:17;54:5;55:3,
9,20,21,22;56:4,11;
59:25;62:1;64:17,19;
67:20
**GMACM (18)**
22:4,16;53:14;
57:3,5,24;59:24;60:4,
9,16,19;61:1;64:2;
65:11,24;68:7;74:24;
77:9
**GMAC's (5)**
27:13;28:19;29:4;
63:16;64:17
**goes (3)**
52:4,24;53:1
**Good (12)**
5:5;6:25;20:14;
43:5,6;44:17,19;49:9,
10;57:3;70:2,7
**good-faith (1)**
71:24
**government (1)**
30:8
**Graham (1)**
78:22
**grant (1)**
18:12
**granted (6)**
66:24;74:13;75:2
**granting (2)**

16:17;75:3
**gravamen (1)**
43:12
**great (2)**
10:23;11:1
**Gregory (2)**
2:6;5:16
**ground (1)**
37:14
**grounds (4)**
37:13;38:1;63:7;
76:11
**Group (2)**
8:23;77:4
**guess (8)**
18:22;21:6;24:9;
47:1;60:25;61:9,18;
62:4
**guilty (1)**
63:2

## H

**hac (2)**
71:1,5
**HAMP (1)**
30:8
**handles (1)**
32:16
**handling (2)**
9:8;32:6
**happen (1)**
21:22
**happened (2)**
10:23;51:17
**happening (1)**
23:12
**Happy (4)**
7:14;43:8,9;68:20
**hear (8)**
5:14;9:17;14:23;
29:6;30:20;35:15;
42:23;69:14
**heard (6)**
9:16;11:4,7;19:6;
33:3,5
**Hearing (16)**
2:11;6:5,6,9;8:6,
21;12:1;19:15;21:24;
55:16,18,18;67:16,
17;71:2;79:19
**hearings (2)**
35:11;72:23
**held (6)**
27:1,23;37:15;
43:1;50:16;62:6
**help (4)**
30:8;53:18,19;
56:24
**helpful (1)**
36:8
**hereinafter (1)**
55:20

here's (1)
68:3
**highest (1)**
45:20;46:2
**Hinton (2)**
44:19;49:17
**hired (2)**
28:24;35:19
**hiring (1)**
44:8
**hold (4)**
29:3;48:2;63:15,16
**holdings (1)**
48:18
**home (2)**
74:25;80:2
**Homecomings (1)**
12:18
**Honestly (1)**
9:24
**Honor (138)**
5:5,8,17,19;6:11,
18,25;7:2,12,14,23;
8:4,8,10,13,25;9:13,
19,24;10:9,11,21;
11:4,9,11,15;12:6,12,
20,25;13:2,5,10,19,
21,25;14:7,8,9,12,17,
17;15:2,6,8,16,20,21;
16:1,8,12,14,16,20,
22;17:3,10,12,13,17,
21;18:24;19:16,18,
21,23,25;20:8,14,22,
23;21:4,12,20;22:11;
24:10;25:1,12;26:10;
27:9;28:6;29:7,10;
38:7;40:17;42:1;
44:1,9;46:18;48:10;
49:3,9;50:10,20;54:3,
21;55:2,5;56:7,10;
57:10,14;58:5,10,13,
15;59:4,7,14,19;60:6;
61:4,19;62:19;63:12;
64:14;66:14,18;
69:23;70:9,23,25;
71:6,8,17;72:5,9,15,
23;73:2,5,22;74:2,14;
79:13,20,25;80:3
**Honor's (1)**
14:21
**hope (1)**
21:9
**horrible (1)**
42:22
**hospice (2)**
40:1,1
**hospitalized (1)**
34:1
**hours (1)**
33:23
**hypothetically (2)**
25:16;60:8

## I

**idea (1)**
64:10
**identifies (1)**
12:13
**identity (1)**
27:8
**II (1)**
32:4
**IL (1)**
4:15
**immediately (1)**
9:18
**immersed (1)**
49:23
**impliedly (1)**
78:16
**important (2)**
29:14;65:1
**impose (3)**
65:12;68:24;69:1
**imposed (1)**
54:21
**improper (1)**
77:3
**improperly (1)**
32:11
**incident (1)**
62:23
**included (2)**
16:25;24:12
**including (2)**
75:15;78:23
**Inc's (1)**
2:2
**incurred (2)**
18:20;78:15
**independent (2)**
51:1;52:19
**indicated (4)**
6:7;10:21,25;32:10
**indicating (2)**
75:13;79:17
**individual (2)**
9:3;15:10
**individually (1)**
47:6
**Industries (1)**
77:4
**information (5)**
18:19;19:11;57:5;
61:17;78:24
**informed (2)**
34:8;37:15
**inherent (1)**
16:6
**initial (1)**
69:24
**initially (1)**
11:25
**initiate (1)**

21:21
**initiated (2)**
22:5;74:23
**inj (1)**
42:7
**Injunction (10)**
2:3;6:20;7:18;
8:20;15:3;16:2;17:7;
18:8;17;19:9
**injury (6)**
24:13;31:25;41:17;
64:9;68:15;78:4
**inner (1)**
30:13
**innocent (4)**
23:11;27:21,22;
28:18
**inquire (1)**
14:4
**inquiries (2)**
56:12;67:3
**inquiry (2)**
53:21,22
**instance (5)**
14:14;18:15;62:5;
70:6;74:5
**instances (1)**
23:19
**instrument (1)**
31:16
**insufficiently (1)**
78:10
**interest (3)**
77:6,18;78:12
**interests (2)**
28:9,16
**interloper (1)**
37:7
**intermediate (1)**
45:18
**interpretation (1)**
38:14
**intertwined (1)**
28:16
**intervene (1)**
35:6
**into (10)**
17:7;31:14;35:11;
40:1;44:21;47:4;
50:21;51:12;74:18;
76:9
**invalid (1)**
63:25
**invasion (4)**
75:9;78:8,11,18
**invested (1)**
15:18
**investigate (2)**
67:21,24
**involved (3)**
27:22,23;55:9
**iota (1)**
44:6

**issue (18)**
7:14;12:19;17:4;
18:7;19:8;23:23;
27:14;28:7;40:21,22;
43:25;45:21,24;61:9;
62:11;68:6,7,10
**issued (1)**
46:20
**issues (3)**
7:4;23:24;68:23
**item (3)**
5:9,19,19
**itemization (1)**
61:13
**items (1)**
72:24

### J

**Jackson (5)**
2:12;73:1,6,18,20
**James (3)**
2:12;72:25;73:6
**January (4)**
8:16;9:10;11:23;
76:8
**JOHN (4)**
4:9;20:16;33:11,14
**joint (3)**
23:16;28:15;49:7
**Jordan (1)**
5:5
**jud (1)**
66:9
**judge (14)**
13:1,3,9;33:9,18,
20;34:8,9,19;37:16,
19,24;38:2;42:9
**judgment (42)**
22:8,10,11,12,13,
14,17;23:12;24:14,
15;28:10;34:18;37:9,
10,23;41:1,14,16,21;
42:7,14;43:2,2,9;
47:9;48:5;49:6,7,12;
53:6,7,12;55:11,19;
62:24;63:6,7;67:12,
17,18,21,24
**Judgments (1)**
48:16
**judgment's (2)**
23:7;41:15
**judicata (17)**
23:23;25:6,11,19,
21;26:11;27:24;
28:11;43:17,19,23;
47:7;49:24;53:6;
64:4,5;66:1
**judicata's (3)**
27:6;28:7;66:12
**JUDSON (2)**
4:25;6:25
**June (1)**

34:12
**jurisdictions (1)**
34:5
**jurisprudence (1)**
49:24
**justification (1)**
48:25
**JUSTIN (1)**
4:17

### K

**keep (3)**
25:8;37:15;43:21
**keeping (1)**
52:9
**key (2)**
27:24;29:2
**kidney (1)**
34:2
**kidneys (1)**
39:24
**kind (7)**
24:1,1,2;44:13;
64:15;71:1;73:12
**KIRKLAND (5)**
4:12,20;7:1;9:11;
10:18
**knew (5)**
30:13;36:22;57:24,
25;65:22
**knocked (1)**
41:1
**knowledge (1)**
21:23

### L

**label (1)**
29:2
**labels (1)**
23:4
**laid (2)**
7:3,13
**Lane (1)**
77:3
**language (2)**
67:14,15
**large (1)**
35:12
**larger (1)**
64:15
**LaSalle (1)**
4:14
**last (9)**
10:7;22:14;25:10;
26:11;57:2,2;64:15;
71:19;79:14
**lasted (1)**
33:23
**late (2)**
58:1;61:21
**late-claim (1)**

62:10
**late-filed (3)**
12:1;62:16;68:11
**later (7)**
10:24;11:6,6;32:15
**Lauren (1)**
78:22
**law (25)**
7:25;8:23;10:17;
14:25;16:9;19:13;
21:10;23:20;26:24;
31:14,18;32:18;33:2;
34:19;42:1;43:16,23,
24;44:13;46:2,9,14;
53:9;70:20;76:25
**lawsuit (7)**
8:16;11:17;20:25;
31:1,2;36:2,6
**lawsuits (2)**
8:12;14:15
**lawyer (6)**
10:15;22:18,21;
28:22;44:8,23
**lawyers (1)**
69:18
**lead (1)**
9:3
**least (2)**
26:7;41:1
**leave (2)**
17:17;75:3
**leaving (1)**
32:22
**left (1)**
7:6
**lender (2)**
76:17;77:9
**less (2)**
63:24;69:8
**letter (18)**
8:17,21;9:10,11,
17;10:18;14:8;53:16;
56:19;58:3;59:12;
69:12;70:12,15;
71:22,23,25;78:23
**letters (1)**
8:14
**letting (1)**
71:22
**Lewis (116)**
5:23,24;6:3,11,14,
14;20:5,13,14,14,19,
22;21:4,6,11,14,16,
17,18,20;22:9,11,20,
23,25;23:2,4,7,16;
24:10,18,21;25:1,3;
26:10,17,19;27:5;
28:1,6,23,25;29:7,8;
40:17;55:1,2,5,16;
56:7,10,20,23;57:8,
10,15,18,20,23;58:6,
10,15,17,20,23;59:6,
7,10,14,19,22;60:2,6,

11,13,17,21,23;
61:16,19;62:8,10,13,
17,19,22;63:4,12,14,
20,22;64:13,14,20,
22,24;65:2,4,7,12,15,
21;66:5,7,9,11,14,16,
17;68:13;69:23;70:5,
9,18;72:8;74:2
**Lewis-Garber (1)**
68:22
**liability (12)**
22:7;23:10,19;
25:25;35:25;36:1;
40:24;41:1;44:2;
53:14;65:19;76:12
**liable (11)**
27:1,23;29:3;
32:12;37:16;43:1;
53:23;63:15,17;
65:16,24
**license (1)**
21:10
**licensed (1)**
47:1
**Lien (1)**
76:18
**lightly (1)**
49:23
**limitations (6)**
26:4;53:24;56:15;
57:22;77:13,16
**limited (1)**
29:12;51:24
**limits (3)**
29:15;68:24;69:2
**line (2)**
20:16;44:18
**lines (1)**
18:12
**lingered (1)**
40:2
**Liquidating (1)**
4:2
**listening (1)**
54:24
**lists (1)**
40:3
**litigated (5)**
38:10,15;39:16;
44:23;53:11
**litigation (5)**
23:8;74:8,9;75:14,
25
**Little (6)**
36:11;56:24;64:6;
65:13;66:1;73:14
**live (2)**
12:20;33:5
**liver (1)**
40:6
**living (1)**
50:18
**LLC (3)**

2:21;22:3;55:20
**LLP (3)**
  4:1,12,20
**loan (31)**
  29:25;31:5,6,7;
  32:6,6;37:4;38:17,
  20;39:10;44:7;50:17,
  24;52:2,6,14,23,24;
  53:2;63:8;67:3,4,17;
  76:24;77:3,6,9,11,14,
  17,18
**loans (5)**
  12:19;51:9,12,14;
  52:12
**local (4)**
  13:5;20:19;21:6;
  35:9
**logos (2)**
  16:25;17:14
**long (3)**
  29:13;37:19;50:18
**longer (1)**
  69:7
**look (12)**
  10:25;13:8;25:20;
  28:12;49:20;55:10,
  13,24;62:2;65:23;
  70:1,13
**looked (1)**
  64:7
**looking (2)**
  44:24;58:21
**looks (1)**
  23:25
**Los (4)**
  12:9,20;13:4;17:5
**lose (1)**
  77:5
**lot (12)**
  21:7,11;25:22;
  32:17,17;58:3;61:23,
  23;63:17;64:11;69:2,
  8
**lower (1)**
  45:9

**M**

**Mack (11)**
  20:4,7,9;24:12;
  29:11;33:24;35:24;
  39:22;42:11,12;
  53:16
**Macks (15)**
  26:22;29:3;31:8,
  10;32:11;33:22,22;
  34:12;36:17;37:1;
  55:17;60:15;61:17;
  62:24;63:25
**Mack's (3)**
  24:6;26:8;42:4
**mad (1)**
  36:16

**maintained (2)**
  35:16;36:8
**makes (2)**
  37:9;46:4
**making (7)**
  18:1;19:12;29:23;
  30:2,3;37:3;73:18
**many (7)**
  25:21;32:16;35:16;
  47:19;50:23;61:5;
  77:7
**March (3)**
  9:16;22:14;51:6
**mark (1)**
  17:14
**marks (1)**
  16:25
**master (3)**
  47:9;53:7,12
**master-servant (1)**
  44:11
**matter (18)**
  5:8;6:8,23;8:13;
  17:23;19:6,14,25;
  20:1,1;26:21;29:14;
  36:7;38:14;39:15;
  64:20;71:20;79:14
**matters (10)**
  18:11;19:18;23:18;
  31:21;44:6,8;53:11;
  65:4;69:22;72:23
**May (33)**
  10:24;11:4;16:4;
  19:21;23:4;33:5,6,10,
  21;34:7;39:7;41:7;
  43:9;45:12,22,23;
  46:4;52:14;54:15,16;
  55:19,20,24;58:4,11,
  25;59:4;63:23;66:18;
  67:18,19;69:20;
  78:17
**Maybe (4)**
  18:22;30:5;40:15;
  56:23
**mean (20)**
  18:1;23:17,24;
  24:7;26:23;27:14;
  28:14,25;36:25;
  44:15;50:18;55:23;
  58:9;62:10;63:24;
  64:4,6;65:15,17;
  70:11
**meanwhile (1)**
  12:6
**memo (1)**
  7:6
**mention (1)**
  55:14
**microphone (1)**
  30:18
**might (3)**
  17:8;56:16,24
**million (3)**

33:6;74:20;75:18
**mind (1)**
  69:25
**minus (1)**
  77:18
**minute (1)**
  59:15
**mistake (3)**
  35:19;73:10;75:8
**Mitchell (8)**
  46:21,22;47:5,13,
  15,16,17;48:14
**modern (2)**
  48:7,15
**Moeller (1)**
  76:17
**Monday (1)**
  10:20
**money (8)**
  23:25;24:1,1,2,3;
  31:9,10;72:1
**months (5)**
  15:25;16:2;32:15,
  24;33:17
**more (9)**
  9:21;18:15;48:7,
  15;65:13;69:15;
  72:12;77:17;78:24
**morning (4)**
  5:5,9;6:25;20:14
**Morrison (2)**
  5:6;20:15
**Morse (4)**
  2:6;5:16;6:1,2
**Morse's (1)**
  6:5
**Mortgage (11)**
  12:18;22:3;29:23;
  30:1;36:23;37:3;
  51:23,25;55:20;67:4,
  20
**most (3)**
  44:20;45:14;55:6
**Motion (28)**
  2:2,2,5,14;5:9;6:5,
  5,19;7:2,17;9:18;
  10:19;11:1,3,7;
  12:11;14:15,17,23;
  15:15;18:1;19:13;
  34:18;35:6;37:10;
  55:12;75:1,10
**motions (1)**
  14:11
**move (1)**
  74:13
**moved (1)**
  70:3
**Mrs (11)**
  24:6,12;26:8;
  33:24;39:22;42:3,12;
  53:16;56:3,18;57:4
**much (22)**
  6:13,16;17:24,25;

18:3,23;19:17;27:8;
  28:20;29:15,15;
  31:25;45:3;54:25;
  63:24;66:15,24;
  71:18;72:6;79:13,22,
  23
**must (3)**
  37:23;53:7;61:23

**N**

**name (3)**
  22:18,21;23:5
**ND (1)**
  78:14
**near (1)**
  56:3
**necessarily (1)**
  53:10
**need (3)**
  6:12;9:13;48:11
**NEEL (1)**
  4:8
**New (9)**
  2:23;25:9;27:10;
  32:9;33:16;34:15;
  41:19,21;45:24
**next (2)**
  19:25;32:24
**Nice (2)**
  20:10;71:9
**Nine (2)**
  78:1;79:3
**Ninth (1)**
  34:6
**no-liability (1)**
  75:22
**nondebtor (1)**
  12:10
**none (2)**
  30:13;33:19
**nonetheless (2)**
  13:23;16:2
**nonjudicial (1)**
  76:16
**normally (1)**
  31:18
**Norman (1)**
  2:8
**North (2)**
  4:5,14
**Northern (2)**
  74:22;75:20
**note (4)**
  24:24;30:2;38:20;
  39:8
**notes (2)**
  30:9;57:13
**Notice (17)**
  2:11,16;8:1,2,6,8;
  9:21;13:22;14:2,21;
  15:25;32:9;38:19;
  75:12;79:1,1,4

**notices (2)**
  33:18,19
**notified (5)**
  29:24;31:8,10
**notify (1)**
  32:6
**November (5)**
  12:9,12;19:13;13;
  75:16
**Nowhere (1)**
  35:22
**nucleus (1)**
  25:7
**nullity (1)**
  38:4
**Number (17)**
  2:14,17;5:3,19;
  6:19;10:2,13;11:6;
  12:13;20:2,3;31:14;
  43:21;62:11;66:25;
  75:24;78:13
**numerous (6)**
  8:14,15;32:25;
  35:11,20;37:13
**NW (1)**
  4:22
**NY (1)**
  2:23

**O**

**object (3)**
  13:23;72:25;76:10
**objected (2)**
  13:24;75:21
**Objection (32)**
  2:6,12,14,16,16;
  5:15;6:4;8:7;12:1;
  20:1,3;23:21;25:19;
  43:12;61:18;73:8,9,
  17,19;74:5,10,13,18;
  75:22,23;76:1,10;
  78:21;79:6,7,11,17
**Objections (3)**
  5:20;72:19,21
**Objection's (3)**
  73:21;74:1,1
**obligation (1)**
  78:16
**observations (1)**
  66:19
**obviously (3)**
  21:19;45:4;57:25
**occur (1)**
  40:11
**occurred (2)**
  21:1;62:23,23
**October (8)**
  33:25;53:15;54:11;
  56:21;57:4;62:23;
  75:5,12
**Ocwen (2)**
  51:15,16

**off (2)**
11:1,17
**often (1)**
43:19
**omni (1)**
61:18
**omnibus (11)**
61:18;72:12,14,21;
73:4,7,9;75:22,23;
76:1,9
**once (2)**
9:5;71:13
**One (36)**
4:4;7:6;11:8;13:5;
16:15;21:3;23:17,19;
24:15;25:7,10;28:17;
31:14,23;37:13;44:6,
23;45:15;46:25;
49:25;51:13;55:7;
58:23;64:10;67:1,13;
68:24;71:19;73:3;
74:20;75:6,18;76:14;
78:10,13,23
**one-year (1)**
77:12
**only (16)**
23:23;25:25;27:12,
13,13;31:23;32:24;
33:21;34:13,16;35:1,
10;39:5;40:4;46:12;
67:9
**onto (1)**
26:5
**open (1)**
32:22
**opening (1)**
23:21
**operated (1)**
31:7
**operations@escribersnet (1)**
2:25
**opinion (2)**
45:10;46:20
**opinions (3)**
14:5;43:21;44:25
**opportunity (1)**
13:23
**opposing (1)**
19:6
**Order (38)**
2:3;5:10;6:3,6,19;
7:3;8:8,11,20;14:1;
15:3,4,17,18,24;16:6;
17:12,14,24;18:5,6,6,
8,16;19:5,8,10;55:11,
11,12,14;64:1;71:21;
74:3;76:25;79:3,5,16
**orders (2)**
14:12;33:19
**original (4)**
24:8,11;55:17;77:9
**originally (2)**
73:6;74:21

**originated (1)**
77:11
**originates (1)**
43:22
**origination (1)**
77:17
**originators (1)**
12:19
**others (1)**
55:6
**otherwise (4)**
17:9;46:17;68:21;
70:13
**ought (2)**
71:21;72:2
**ours (1)**
58:10
**ourselves (1)**
52:9
**out (27)**
7:3,13;8:14;10:2,
14,20,24;12:2;15:2;
21:25;29:24;30:3,10;
33:18;34:13;36:9;
41:1,8;45:14,15;
48:22,23;53:9;56:13,
15;59:1;70:3
**outline (1)**
46:22
**over (7)**
5:22;6:20;7:20;
29:19;32:24;44:14;
47:18
**overcome (1)**
76:21
**overdose (1)**
33:25
**overturn (1)**
67:17
**own (4)**
12:17;52:6,9;57:13
**owner (4)**
30:1;31:5;38:20;
52:12
**ownership (2)**
39:3,8

**P**

**page (11)**
5:9;20:6;19:20:2;
47:20;48:20;51:7;
55:13;68:24,25;69:2
**pages (4)**
49:11;69:5,9,10
**paid (12)**
22:8,10,11,13,15,
17;23:7;42:11;43:1,
2,9;77:19
**pain (1)**
38:5
**paper (1)**
58:3

**papers (10)**
6:8;7:5,13,21;8:9;
19:15;38:16;42:22;
69:21;73:25
**paragraph (2)**
51:8;55:13
**Pardon (3)**
22:9,20;47:14
**part (8)**
41:17;51:18,24,25;
61:18;64:16;73:3,6
**participant (1)**
35:15
**particular (3)**
13:9;29:21;45:14
**particularity (1)**
77:25
**particularly (1)**
26:11
**parties (4)**
10:5;51:8;68:21;
77:5
**parts (1)**
31:14
**party (12)**
7:17;19:6;25:20,
24;26:20;32:21;
34:22;35:4;43:7;
48:6;53:10;64:2
**past (1)**
18:13
**pattern (1)**
78:3
**Pause (5)**
7:10;28:4;59:9;
60:7;74:16
**pay (6)**
29:25;31:1,8;37:5;
58:18,24
**paying (4)**
23:12;36:12,13;
78:7
**payment (2)**
78:17;79:1
**payments (7)**
29:23;30:2;31:12;
32:8,12;36:23;37:3
**pays (1)**
23:19
**people (3)**
47:8;55:25;58:23
**perfectly (1)**
68:20
**perhaps (1)**
33:23
**periods (1)**
56:16
**permanent (1)**
34:2
**permit (8)**
20:20;61:21;62:15;
68:5,11;69:16,19;
70:19

**permitted (2)**
35:12;49:6
**person (4)**
19:7;27:7;29:25;
33:21
**personal (3)**
24:13;42:7;68:15
**personal- (2)**
31:24;64:8
**personal-injury (6)**
26:5;34:5,10;
41:13,14,18
**personally (2)**
21:17;36:1
**persons (1)**
48:4
**person's (1)**
31:16
**perspective (1)**
27:17
**phone (5)**
8:14;11:6,9;13:6;
73:20
**picture (2)**
24:8;35:13
**pictures (1)**
21:3
**piece (2)**
57:2,2
**pills (1)**
33:25
**pitch (1)**
64:16
**PJH (1)**
78:14
**Place (2)**
4:4;42:14
**plaintiff (14)**
9:20;20:24;23:13;
41:20;48:2,4,5;49:7;
55:19,21,23;67:19,
20;78:15
**plaintiffs (10)**
7:25;9:22;10:13,
17;11:9;14:12;15:1,
10;20:24;21:23
**plaintiffs' (12)**
8:17,25;11:5;
13:22;14:1,13,14,18;
15:7,21,24;16:22
**plaintiff's (2)**
41:13;78:5
**Plan (9)**
2:3;6:20;7:18;
13:14,23,25;14:1;
15:23;19:9
**plead (1)**
78:2
**pleading (2)**
37:22;69:13
**pleadings (1)**
66:3
**please (5)**

**5:2;53:18,19;59:2,**
5
**pleases (1)**
29:10
**pled (7)**
32:13;37:21,22;
38:2,3;77:25;78:10
**podium (3)**
5:22;6:20;20:4
**point (15)**
15:25;26:19;27:5;
39:7;45:8;46:19;
49:9,10;50:1,3,11;
52:17;55:6;64:15;
67:11
**pointed (1)**
56:15
**pointing (1)**
8:19
**pool (2)**
51:12;77:6
**pooling (1)**
50:15
**portion (5)**
24:14;37:10;39:20;
42:6;49:12
**possibly (1)**
66:25
**post (2)**
17:9;70:13
**posted (1)**
22:12
**post-judgment (5)**
30:10;35:22;36:21;
39:21;61:5
**powers (2)**
15:18;16:7
**practice (2)**
8:12;21:10
**practicing (2)**
33:2;44:23
**precluded (2)**
41:8;63:22
**predict (1)**
45:21
**predicts (1)**
46:3
**prefer (1)**
69:18
**prejudice (7)**
8:19;10:22;16:3;
73:8;75:14;76:3,9
**prepare (1)**
79:16
**prepared (2)**
62:18;64:12
**preponderance (1)**
79:9
**present (1)**
15:22
**presented (1)**
67:23
**preserve (1)**

74:9
**PRESTON (1)**
4:8
**presumption (2)**
76:21,22
**prettier (1)**
21:3
**pretty (2)**
24:8;44:17
**prevailing (1)**
32:21
**previously (2)**
6:3;74:5
**principal (7)**
43:6;44:3;47:8;
50:24;65:24;67:9;
77:18
**principals (1)**
46:25
**principle (1)**
47:10
**principles (1)**
27:7
**printout (1)**
47:21
**prior (1)**
14:21
**privacy (4)**
75:9;78:9,11,18
**private (1)**
56:16
**privity (3)**
27:7;52:21;53:5
**privy (1)**
26:20
**pro (4)**
9:20;14:12;71:1,5
**probably (3)**
40:13;42:2;51:19
**probe (1)**
59:20
**problem (3)**
30:25;42:25;66:1
**problems (1)**
44:5
**Procedure (1)**
62:7
**procedures (2)**
34:13;39:22
**proceeding (1)**
37:9
**proceedings (6)**
12:3;30:10;35:8,
22;36:21;80:4
**process (1)**
15:8
**proffer (1)**
76:19
**program (1)**
30:8
**prong (3)**
60:25;61:25;62:1
**proof (29)**

8:2,4,4;11:22,22;
18:5;20:3;39:20;
40:12,12,19;41:6;
54:14;56:11;57:6,12,
15,16,17;59:16;
61:10,12,13,24,25;
62:6;68:6,10;75:18
**Proofs (2)**
2:6;5:15
**proper (3)**
18:14;42:19;76:23
**properly (12)**
7:21;32:8;37:21,
22;38:2,3;47:2;
60:19;64:2;68:6;
76:15,20
**property (5)**
31:16;32:1;47:2;
49:15;78:5
**prove (2)**
61:15;79:8
**prove-up (1)**
55:18
**provided (1)**
18:10
**providing (1)**
19:13
**provision (1)**
34:19
**pull (2)**
30:18;58:25
**purely (1)**
67:1
**purpose (3)**
52:20,22,22
**purposes (2)**
59:23;60:12
**Pursuant (3)**
2:7;16:6,17
**pursue (1)**
78:17
**pursued (1)**
11:22
**pushed (1)**
72:22
**put (6)**
24:8;39:13;40:1;
59:15;69:3;71:25
**puts (1)**
51:11

## Q

**qualified (12)**
53:22;54:1,8;56:4;
59:13,25;60:9;64:6;
65:10;67:5,7;68:8
**qualify (1)**
78:11
**qualifying (1)**
53:21
**quality (1)**
27:7

**quick (1)**
66:18
**quickly (3)**
5:12;21:22;73:24
**quite (4)**
22:15;31:20;36:7;
43:19
**quoted (1)**
44:16
**QWR (1)**
59:17

## R

**racketeering (1)**
78:3
**raise (1)**
68:10
**raised (2)**
47:7;62:5
**raises (1)**
68:6
**ran (1)**
34:11
**rationale (1)**
48:13
**re (1)**
2:11
**reached (6)**
8:14;10:14,19,24;
14:18;47:2
**read (17)**
31:3;42:22;47:22;
48:1,11;49:20;56:14;
59:8;61:22,23,23,24,
25;69:3,4,6;74:17
**reading (1)**
38:16
**real (2)**
23:23;77:4
**realized (2)**
30:5;74:8
**really (7)**
22:7;23:8;50:8;
51:23;52:1;69:6;70:4
**reason (8)**
27:18;28:19;38:22;
46:12;54:5;62:25;
63:14;75:24
**reasonable (2)**
16:21;78:17
**reasons (4)**
37:16;39:24;76:13;
79:18
**rebut (1)**
76:22
**recede (1)**
48:17
**receive (1)**
77:14
**received (5)**
14:2,20;34:17;
55:19;67:18

**receiver's (1)**
27:13
**receives (1)**
67:4
**recite (1)**
6:6
**recognize (5)**
15:21;34:6,7;41:3;
43:17
**recognized (2)**
35:7;41:5
**recognizing (1)**
41:6
**record (6)**
6:14;30:21;31:5,
15;74:18;79:18
**records (4)**
17:25;19:2;75:23;
79:1
**record's (1)**
7:24
**recourse (1)**
52:15
**recover (6)**
14:22;19:12;22:1;
41:15,24;42:13
**recoverable (3)**
24:20;64:9;68:15
**recovered (5)**
20:24;21:24;22:2;
42:7;48:5
**reduced (2)**
24:15;31:17
**reference (1)**
75:19
**refiled (2)**
73:17;74:10
**refitting (1)**
25:9
**refusal (1)**
17:6
**refused (1)**
16:2
**regards (1)**
74:4
**rejected (1)**
77:7
**rejecting (1)**
59:18
**related (2)**
41:17;64:15
**relates (1)**
39:10
**relationship (8)**
35:13;41:4;50:12,
21;51:8,21,22;55:25
**relationships (1)**
55:25
**release (5)**
8:19;13:24;14:6;
16:1,5
**released (1)**
47:10

**relevant (1)**
79:7
**relief (5)**
7:4,13;18:10,12;
24:3
**relitigating (1)**
48:3
**reluctance (1)**
69:1
**remained (2)**
24:24;42:10
**remand (1)**
41:2
**remanded (1)**
46:13
**remove (1)**
17:14
**removed (2)**
11:13;12:8
**renal (2)**
40:3,5
**rendered (1)**
14:5
**repeatedly (1)**
23:21
**replied (1)**
73:18
**reply (5)**
23:21;55:14;73:8,
9;74:13
**Reporter (1)**
47:22
**represent (2)**
39:25;40:6
**representation (1)**
61:2
**represented (5)**
10:10,14,16;35:8,9
**representing (2)**
7:25;10:17
**request (17)**
17:12;54:1,9,10;
56:4;57:4;59:13,25;
60:9;61:16;64:6;
65:10;67:6,7;68:8;
78:23,24
**require (2)**
18:4;68:3
**required (10)**
14:3;31:11;38:19;
48:15;60:1,3;61:14;
76:25;77:19;78:2
**requirement (1)**
54:2
**requirements (4)**
38:19;59:13,25;
60:2
**res (21)**
23:23;25:6,11,19,
21;26:11;27:6,24;
28:6,11;43:17,19,23;
47:7;49:24;53:6;
64:4,5;66:1,9,11

**ResCap (18)**
2:5,9,11,17;4:2,2;
5:6,14;6:14;20:2,15;
25:22;31:21;33:11;
43:20;51:13;74:20;
75:17
**rescission (2)**
75:8;78:6
**researching (1)**
72:2
**reserves (1)**
12:16
**Residential (2)**
5:3;51:10
**residual (1)**
34:2
**resolve (5)**
8:12;14:16;19:14;
71:20;72:3
**resolved (2)**
41:21;72:22
**RESPA (52)**
24:17,20,23,25;
26:5;27:10,17,18;
31:11;32:4,4,5,13;
34:4,4;38:1,3,19,25;
39:9,10;41:9;42:10;
53:20;56:6,17;57:3;
60:16,18;62:1;63:7,7,
10,16,19,25;64:1,10,
11;65:9,16,24;67:1,2,
2,14;68:7,12,16,16;
75:7;77:20
**respect (9)**
7:17;13:4;17:5;
27:7;28:11;43:23;
52:11;60:24;79:15
**respond (17)**
9:9;12:5;18:4,21;
33:1;56:11;57:5;
59:17;60:1,3,5,9,14;
62:2;67:3;68:8;79:10
**respondeat (2)**
28:12;44:10
**responded (5)**
9:12;53:22;56:5;
61:1;73:19
**responding (2)**
7:16;65:10
**response (11)**
6:4;8:21;12:1;
19:14;23:18;34:17;
67:5,8;75:25;76:1,7
**responsibility (1)**
67:21
**responsible (4)**
24:7;32:9;48:4,6
**responsive (1)**
27:11
**rest (2)**
48:11;51:19
**Restatement (2)**
48:8,16

**result (3)**
34:2;46:4;78:18
**resulted (1)**
41:2
**retained (1)**
52:5
**retry (1)**
41:7
**return (1)**
77:18
**reverse (1)**
21:22
**reversed (1)**
24:14
**review (3)**
47:18;69:20;73:25
**revising (1)**
25:9
**RFC (7)**
51:9,11,23,23,25;
52:1,6
**RICO (2)**
75:7;78:1
**rider (1)**
56:14
**right (52)**
5:2,24;6:3,22;7:8;
9:2,25;10:6,9;11:19;
12:4,6,15,17;13:20;
15:4;19:3;28:25,25;
29:1,6;32:18;35:3;
37:8,12,25;38:21;
39:4;41:20,24;42:20;
43:20;45:11,22,23;
48:9;53:3;57:8;
60:11,24;66:13;69:1;
7,70:11;71:18;72:10;
73:2;74:15,17;75:9;
76:14;78:8
**rightfully (1)**
17:13
**rights (11)**
17:8,8;50:16;
51:13,15,16;52:3,10,
12;56:17;76:17
**rise (4)**
25:17;39:9;43:4;
56:5
**role (1)**
64:17
**Rosenbaum (1)**
2:8
**Rule (16)**
2:8;14:24;15:11,
14;36:19;45:22;46:3,
8,8,16;48:6,16;62:7,
7;64:12;77:2
**rule' (1)**
48:7
**ruled (2)**
65:25;73:24
**rules (3)**
28:15;43:23;46:1

**ruling (2)**
34:9;79:16
**rulings (2)**
14:21,21

**S**

**safe (1)**
80:2
**sale (8)**
51:15;74:25;76:16,
20,23;77:1;79:2,2
**same (14)**
11:21,21;21:7,9;
23:24;24:24;27:9,15,
18;28:15;30:12;
41:22;43:4;62:8
**sanction (1)**
17:11
**sanctioning (1)**
17:1
**sanctions (6)**
14:24;16:10,15,17,
19;36:19
**satisfied (3)**
49:6,8;60:2
**satisfy (2)**
59:13,24
**save (1)**
64:1
**savings (2)**
30:3,3
**saw (4)**
10:7;23:17;31:4;
66:3
**saying (4)**
25:13;55:8;57:5,6
**scale (1)**
64:15
**schedule (9)**
12:2;66:25;68:19;
69:11;70:3,6,8;71:23,
25
**scheduling (1)**
12:2
**Scott (1)**
2:8
**SDNY (1)**
16:16
**se (2)**
9:20;14:12
**seated (2)**
5:2;7:8
**second (20)**
22:1;27:25;43:3;
45:7,10,15;46:8,13,
14,20;48:3,8,16,22;
68:12;75:5,10;76:7;
77:22;79:3
**Section (13)**
2:7;15:16,18;
16:10,13,16;32:5;
48:9;53:20,25;77:13,

16,21
**sections (1)**
56:16
**securitization (2)**
50:15;51:12
**securitized (1)**
50:17
**securitizing (1)**
77:3
**seek (4)**
7:4,13;14:22;53:7
**seeking (3)**
15:5,12;17:25
**seeks (2)**
15:19;19:12
**sell (2)**
51:14;52:6
**seller (1)**
51:24
**selling (3)**
52:7,14,23
**sells (2)**
32:6;51:12
**send (3)**
70:16,21;71:22
**sending (1)**
36:22
**sent (12)**
8:13,17;9:11;14:4,
13,19;33:18;34:13,
14;56:4;57:4;78:23
**separate (3)**
26:7,7;79:16
**September (2)**
40:2;75:3
**serious (1)**
78:11
**servant (3)**
44:3;53:8,11
**servants (2)**
47:9,10
**serve (2)**
18:4
**served (10)**
7:22,25;8:2,5,8;
9:19;18:5,6;30:14;
61:17
**service (4)**
7:20,21,24;18:5
**serviced (1)**
50:17
**servicer (24)**
22:4;24:23,24;
30:1;32:5;35:17,17,
18;37:4;38:17,20,25;
39:6,10,13;44:7;
50:24;53:21,23;56:5;
60:21;63:8;67:3,4
**services (1)**
51:14
**servicing (10)**
50:15,16;51:13,15,
16;52:3,10,11,24;

53:2
**set (3)**
18:10;33:20;69:7
**setting (1)**
12:2
**settled (1)**
46:2
**settlement (3)**
47:3;71:20,25
**seven (6)**
18:3,24;19:10,13;
77:20;79:2
**shall (1)**
67:8
**Shapiro (1)**
2:20
**Sharona (1)**
2:20
**shifted (1)**
79:8
**short (2)**
18:20;19:5
**shorter (1)**
69:2,7
**show (3)**
31:25;52:21
**showed (1)**
33:24
**showing (1)**
31:6
**shutting (1)**
39:24
**sic (5)**
8:23;20:17;56:4,
19;57:4
**side (3)**
68:5;69:9,9
**sides (2)**
71:19;72:1
**sign (1)**
71:7
**similar (2)**
73:18;74:4
**Similarly (1)**
73:22
**simple (1)**
55:23
**simultaneous (1)**
68:20
**site (4)**
16:23,25;17:2,15
**situation (1)**
33:7
**situations (3)**
21:7;44:11,11
**six (7)**
15:25;16:2;33:6;
75:6,8;77:14;79:1
**sixty-one (3)**
9:22;10:1,8
**slander (3)**
31:15,15,18,20;
32:2,3;37:21;67:13

**sleeping (1)**
33:25
**smaller (1)**
10:2
**SMITH (8)**
4:9;20:16;33:8,11,
11;34:25;76:18;
78:13
**So2d (3)**
48:20;49:11,17
**so-called (1)**
77:2
**sold (2)**
31:7;51:9
**somebody (2)**
36:4;43:2
**sometimes (2)**
45:25;51:14
**somewhat (1)**
31:17
**soon (2)**
29:24;68:19
**so-ordered (1)**
14:18
**sorry (6)**
23:1;33:12;52:16;
72:11,13;73:7
**sort (1)**
69:23
**sought (3)**
18:13;24:2;74:9
**Southern (1)**
47:22
**speaking (1)**
33:10
**special (1)**
31:24
**specific (4)**
13:1,3;15:13;77:23
**specifically (1)**
43:21
**specify (1)**
61:12
**spend (2)**
69:5;72:1
**split (1)**
64:8
**spoken (1)**
9:4
**spring (2)**
39:23;40:13
**squarely (1)**
25:21
**stabilized (1)**
34:3
**stand (1)**
16:14
**standpoint (1)**
25:14
**start (4)**
15:2;38:17;55:5,7
**Started (3)**
10:2;11:17;30:4

**state (13)**
11:10;12:24;13:10;
17:5;20:8;24:9,11;
36:18;45:18,20;46:3;
50:6;76:12
**state-court (2)**
9:23;77:10
**stated (5)**
13:21;48:6,7,16;
79:18
**statement (2)**
8:6;13:22
**statements (1)**
60:15
**stating (1)**
75:24
**statute (5)**
26:4;53:24;57:22;
77:12,15
**statutory (5)**
14:24;15:11,13;
67:1,9
**stay (2)**
7:8;51:13
**stayed (3)**
31:2;74:12;76:3
**Steiner (2)**
22:18,21
**stemming (1)**
74:25
**steps (1)**
78:17
**Stern (13)**
22:23,24,25;32:11,
16,16;33:1,18,19;
35:19;36:11,13;44:8
**Stern's (1)**
42:23
**still (9)**
11:6;12:20;18:15;
21:10;24:12;33:2;
40:25;41:13;53:17
**stipulation (2)**
14:18;76:9
**story (1)**
42:23
**stranger (1)**
37:1
**Street (2)**
2:22;4:22
**stress (1)**
42:4
**strong (2)**
64:4,5
**strongly (1)**
15:22
**struggle (1)**
44:24
**stuff (1)**
61:23
**subject (1)**
36:18
**submission (5)**

6:8;17:23;19:7;
49:22;69:21
**submissions (2)**
51:4;68:20
**submit (6)**
17:24;19:2,9;
69:12;74:2;79:20
**submitted (1)**
33:23
**subpoenas (2)**
34:13,14
**subsequently (3)**
41:16;42:13;49:16
**substantive (1)**
74:11
**substitution (1)**
78:25
**succeeded (1)**
29:4
**successful (1)**
63:18
**sudden (1)**
56:14
**suddenly (1)**
34:17
**sue (2)**
41:8;49:7
**sued (13)**
23:24;25:4;27:1,
15;44:2;47:5;53:18,
18;58:1;64:16,18;
65:4,7
**suffered (1)**
34:1
**suffering (1)**
38:6
**sufficient (5)**
49:4;76:21;77:25;
78:12,20
**sufficiently (1)**
28:16
**suggest (1)**
46:12
**suggests (1)**
46:9
**suing (3)**
44:6;53:10;67:9
**suit (14)**
25:7;30:9,14;
32:10,13,14;35:18,
24,24;36:15,17;44:4,
6;54:5
**Suite (1)**
2:22
**summer (1)**
29:21
**Superior (3)**
13:12;28:13;44:10
**supplemental (2)**
68:5;69:8
**support (1)**
26:8
**supported (3)**

78:20,21;79:6
**supporting (3)**
18:19;19:11;78:22
**supports (1)**
16:10
**supposed (3)**
45:18;46:6,10
**Supreme (2)**
45:21;46:16
**Sure (14)**
5:13;7:21;14:8;
17:21;28:1;30:21;
40:14;41:11;44:12;
51:20;58:20;59:22;
60:6;70:5
**surety (4)**
22:11,13,13,16
**surprised (1)**
33:15
**sustain (1)**
74:18
**sustained (4)**
73:21;74:1;79:11,
17

**T**

**tacked (1)**
26:5
**Tahiti (1)**
33:6
**talk (2)**
9:13,14
**talked (5)**
9:4;30:24;36:3,4,5
**talking (4)**
30:17;47:13;67:12;
70:4
**talks (1)**
71:25
**telephone (8)**
6:1,7;19:7;20:21;
36:3,5;69:16,19
**TELEPHONICALLY (2)**
4:8,9
**telling (1)**
36:9
**Ten (2)**
78:6;79:4
**tender (2)**
76:24;77:2
**terminated (1)**
76:15
**terms (6)**
12:17;15:17,23;
16:1,6;17:7
**test (2)**
28:21;62:8
**testimony (1)**
33:23
**thankfully (1)**
14:16
**thanks (2)**

72:7,8
**theories (3)**
23:17;25:9;29:5
**theory (4)**
24:1;25:17;31:6;
53:13
**therefore (3)**
47:9;77:1;79:10
**there're (1)**
9:22
**thinking (1)**
50:8
**third (3)**
14:14;28:8;68:13
**third-party (5)**
8:19;13:24;14:6;
16:1,5
**thirty (1)**
34:11
**though (6)**
13:9;18:22;27:21;
44:20;78:17,18
**thought (7)**
10:22;24:16,19;
34:15;37:6,7;72:20
**three (13)**
14:10,15,19;16:15;
18:8;9:32:15;68:23;
69:5;75:7;76:24;
77:17;78:25
**three-year (3)**
53:24;57:22;77:15
**throughout (1)**
38:17
**tied (1)**
28:9
**TILA (6)**
64:11;75:7;77:8,
12,15,19
**time- (1)**
77:24
**time-barred (2)**
77:10,21
**timely (2)**
26:4;40:19
**times (6)**
8:15;9:5;14:11;
36:8;61:5;62:11
**timing's (1)**
69:13
**title (7)**
31:15,15,20;32:2,
3;37:21;67:14
**today (10)**
7:2;11:9;17:24;
19:5;35:21;43:14;
47:19;72:14,24;
79:14
**told (1)**
30:24
**took (2)**
19:7;29:24
**Torchia (9)**

9:4,5,9,11,12;
10:19,19,24;11:7
**tortfeasor (2)**
23:16;49:7
**tortfeasors (1)**
28:15
**totally (3)**
23:11;27:21,22
**touting (1)**
16:24
**touts (1)**
17:2
**towards (1)**
30:12
**track (1)**
43:21
**traction (1)**
65:8
**traded (1)**
9:5
**trademark (1)**
17:18
**Transcribed (1)**
2:20
**transfer (7)**
32:7;34:15;38:23,
24;39:2,5,8
**transferred (2)**
24:24;51:16
**trial (3)**
33:20,22;34:3
**trials (1)**
33:19
**tried (7)**
8:12;21:22;29:3;
33:17;43:20;63:15,
16
**trip (1)**
80:2
**trouble (2)**
21:11;32:17
**troublesome (1)**
49:22
**true (13)**
17:9;27:9,11;
38:11,13;39:11,15,
15;42:2;49:19;53:4;
60:15;63:12
**Trust (19)**
2:9,17;4:2,3;5:7,
15,15;6:9,15;20:2,15;
43:24;50:15,18;
51:12;76:8;77:6;
78:7,25
**trustee (3)**
22:3;50:14;78:25
**trustee's (2)**
79:2,2
**Trust's (3)**
2:6,12;79:11
**try (3)**
36:10;41:23;70:7
**trying (4)**

22:1;36:9;40:24;
43:3
**turn (2)**
5:22;6:20
**turned (1)**
41:8
**turns (1)**
56:13
**twelve (1)**
78:19
**twenty (3)**
67:8;69:8,10
**twenty- (1)**
69:1
**two (22)**
9:5;14:11;16:15;
18:9;26:11;31:14;
34:1;39:22;46:25;
48:3;53:5;60:15;
66:18;68:18;70:2;
72:19,23,25;75:7;
76:22;78:10,24
**type (1)**
31:23
**typically (1)**
51:11

**U**

**ultimately (5)**
12:3;21:24;22:13;
41:7,20
**um (1)**
43:8
**Um-hum (1)**
40:10
**uncertainty (1)**
61:1
**uncontested (3)**
7:2;72:19;73:1
**under (40)**
5:20;6:8;15:12,23;
16:10,11,15,16;
17:23;19:7;24:2,20;
25:17;27:17;31:11,
14;32:4,4,12,18;34:4,
18;40:1;41:25;43:16;
46:14;49:21;51:7,7;
53:20,24;56:17;
60:18;67:12;69:21;
76:25;77:12,20;78:9,
12
**underlying (9)**
8:16;9:10;10:12;
25:7,20;39:19;41:17,
23;53:13
**understood (3)**
37:4;62:19;71:2
**unfortunate (3)**
24:6;42:3,22
**unfortunately (1)**
21:8
**unsecured (1)**

75:17
**up (17)**
9:16,17;12:2;
23:12;30:7,16;31:23;
36:10;43:19;44:21;
45:24;51:11;58:4;
59:5;66:20;67:11;
70:7
**upon (3)**
54:21;77:14;79:2
**urge (1)**
71:19
**USC (4)**
15:12;77:13,16,21
**use (2)**
68:25,25
**used (1)**
31:18
**usually (1)**
69:17

**V**

**vacate (5)**
34:18;37:10;42:10;
55:12;63:6
**vacated (6)**
24:15,25;26:6;
38:15;41:15;63:21
**validity (1)**
79:8
**value (2)**
31:17;32:1
**various (2)**
12:18;37:16
**vehicle (1)**
16:18
**version (1)**
48:15
**vested (1)**
16:7
**via (3)**
8:14;9:19;10:25
**vicarious (2)**
35:25;44:2
**vicariously (1)**
36:7
**vice (1)**
71:1
**view (1)**
16:18
**violated (2)**
17:7;62:1
**violation (9)**
24:23;38:18;60:16;
67:1;68:7,12,16,16,
17
**violations (7)**
67:2;75:6,7,8;77:8,
15;78:1
**Vitek (1)**
77:4
**Vito (1)**

9:4
**voicemail (1)**
9:5
**void (2)**
75:8;78:7
**voluntarily (2)**
75:13,25
**voluntary (2)**
75:13;79:4
**voluntary-dismissal (1)**
79:5

**W**

**wait (2)**
58:16;72:10
**walk (2)**
7:23;8:15
**warrant (1)**
16:7
**Washington (1)**
4:23
**watch (1)**
21:15
**way (6)**
24:8;35:24;50:22;
54:3;69:3;73:5
**Web (4)**
16:23,25;17:1,15
**week (1)**
71:23
**weeks (1)**
34:1
**weight (2)**
48:2,17
**weren't (1)**
27:10
**West (1)**
2:22
**what's (8)**
15:13;20:23;21:25;
22:15;23:12;39:17;
51:17;53:13
**whatsoever (1)**
36:20
**Whereupon (1)**
80:4
**whole (4)**
6:6;18:7;21:5;
39:18
**who's (1)**
33:10
**winds (1)**
51:11
**wish (1)**
17:19
**Wishnew (31)**
5:4,5,6,12,13,17,
19,22;6:17,18,23;
19:24,25;72:7,9,11,
14,17,19,22;73:2,5,
12,14,17,22;79:13,
20,23,24,25

**withdraw (1)**
76:9
**withdrew (1)**
74:6
**within (9)**
18:24;19:9;29:15;
32:7;57:21;62:15;
67:8;71:23;74:11
**without (10)**
6:9;8:13;18:19;
19:14;21:22;52:15;
73:8;75:14;76:9;78:7
**withstand (1)**
25:19
**witnesses (2)**
33:22;35:16
**WL (1)**
78:14
**word (1)**
39:13
**work (3)**
25:10;36:9;70:3
**working (1)**
30:13
**works (2)**
13:4;70:8
**wound (1)**
12:2
**wrinkle (3)**
25:14,24;34:25
**writing (1)**
72:2
**written (17)**
14:5;25:22;43:18;
53:21,22;54:1,8;
56:4;57:4;59:13,25;
60:9;64:6;65:10;
67:5,7;68:8
**wrong (6)**
25:13;31:1;45:23;
48:4;55:8;73:10
**wrongdoer (1)**
65:19
**wrongdoing (1)**
28:19
**wrongful (3)**
23:8;41:22;68:14
**wrongful- (2)**
25:17;53:13
**wrongful-death (7)**
24:5;26:3,8;27:2,
19;39:20;42:12
**wrongful-foreclosure (1)**
74:21
**wrote (1)**
53:16

**Y**

**year (2)**
8:5;22:14
**years (5)**
29:13;30:17;39:22;

12-12020-mg    Doc 6998    Filed 05/18/14    Entered 05/23/14 12:16:07    Main Document

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

Pg 96 of 96

May 15, 2014

77:11,17
**Yep (1)**
21:13
**York (2)**
2:23;45:24

---

**1**

**1 (7)**
5:9,19;6:19;10:24;
11:4;75:5;78:14
**10040 (1)**
2:23
**105 (6)**
15:16,19;16:7,10,
16,17
**1092 (1)**
77:4
**1099 (1)**
77:5
**11 (6)**
2:3;7:17;19:8;
36:19;55:20;76:4
**11:47 (1)**
80:4
**11-3425 (1)**
78:14
**11th (1)**
67:19
**12 (1)**
77:21
**12-12020 (1)**
5:3
**128 (1)**
48:20
**12th (1)**
75:3
**13 (1)**
40:15
**14 (1)**
13:13
**1412 (1)**
8:3
**15 (2)**
77:13,16
**150,000 (3)**
24:12;34:10;42:8
**150,000-dollar (3)**
24:16;38:5;42:14
**1635f (1)**
77:16
**1640e (1)**
77:13
**17th (3)**
13:16;30:7,11
**1819 (1)**
4:5
**1927 (3)**
15:12;16:13,15
**192nd (1)**
2:22
**1968 (1)**
76:19

**1969 (1)**
48:23
**1975 (3)**
44:20;45:16;49:18
**1992 (1)**
46:20
**1994 (1)**
76:18
**19th (1)**
9:16

---

**2**

**2 (2)**
20:2;55:13
**2- (1)**
30:3
**2000 (2)**
40:13;54:17
**20005 (1)**
4:23
**2002 (1)**
16:17
**2006 (3)**
29:24;51:6;53:15
**2009 (8)**
29:21;33:25;54:11;
56:23;57:4,14;58:1;
62:23
**2010 (1)**
77:5
**2011 (7)**
33:21;34:12;55:19,
20;67:18,19;74:23
**2012 (11)**
39:23;40:17;54:13;
57:18,19;75:3,5,12,
16;78:14,15
**2013 (9)**
11:23;12:9,12,20;
13:13,18;40:2;55:13;
62:24
**2014 (3)**
8:16;59:12;76:8
**22 (1)**
75:12
**23 (2)**
51:7;76:8
**232 (1)**
49:11
**24 (6)**
9:12,17;10:18;
14:8,13,20
**25 (3)**
9:18;10:19;76:18
**2605e (3)**
27:10,17,19
**2614 (1)**
77:21
**26th (2)**
54:11;57:14
**28 (1)**
15:12

**28th (1)**
10:20
**29th (1)**
59:12

---

**3**

**3 (2)**
47:20,20
**30 (2)**
8:16;9:10
**300 (1)**
4:14
**300,000 (1)**
30:4
**3007 (1)**
2:8
**3138024 (1)**
78:14
**317 (1)**
49:17
**336 (1)**
8:1
**35203 (1)**
4:6
**37 (1)**
49:11
**38 (1)**
49:11
**386 (2)**
2:14;20:3

---

**4**

**4 (5)**
5:9,20;6:19;12:11;
20:2
**4167 (2)**
2:17;74:19
**4664 (1)**
2:12
**49 (1)**
48:9

---

**5**

**502b (1)**
2:7
**5162 (1)**
75:24
**5196 (1)**
8:7
**5541 (1)**
76:2
**589 (1)**
48:20
**5th (4)**
33:21;34:12;55:19;
67:18

---

**6**

**60654 (1)**

**4:15**
**6187 (1)**
8:9
**655 (1)**
4:22
**6743 (1)**
2:5
**6763 (1)**
2:14
**6778 (1)**
2:11
**6779 (1)**
2:16
**68 (1)**
76:19
**6827 (1)**
2:2
**6834-3 (1)**
59:11
**6th (1)**
51:6

---

**7**

**700 (1)**
2:22
**713 (1)**
77:4

---

**8**

**8 (2)**
40:17;62:7
**822 (1)**
76:18
**831 (1)**
76:18
**832 (1)**
49:17
**86,000 (1)**
30:5
**8th (2)**
57:18,19

---

**9**

**9 (2)**
51:8;75:16
**9011 (1)**
16:13
**93 (1)**
76:19
**96 (1)**
76:19
**973406-2250 (1)**
2:24