**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------

)

In re:                      )      Case No. 12-12020 (MG)

)

RESIDENTIAL CAPITAL, LLC, <u>et al.</u>,    )      Chapter 11

)

Debtors.           )      Jointly Administered

---------------------------------------------------------------

)

### DECLARATION OF DEANNA HORST IN SUPPORT OF THE RESCAP BORROWER CLAIMS TRUST'S REPLY IN SUPPORT OF ITS SIXTY-FIRST OMNIBUS OBJECTION TO CLAIMS (NO-LIABILITY BORROWER CLAIMS) <u>AS TO CLAIM NOS. 1467 AND 6423</u>

I, Deanna Horst, hereby declare as follows:

         1.       I am the Chief Claims Officer for The ResCap Liquidating Trust (the

"<u>Liquidating Trust</u>"), and previously served as Chief Claims Officer for Residential Capital, LLC

and its affiliates ("<u>ResCap</u>"), a limited liability company organized under the laws of the state of

Delaware and the parent of the other debtors in the above-captioned Chapter 11 Cases[1]

(collectively, the "<u>Debtors</u>"). I have been employed by affiliates of ResCap since August of

2001. In June 2012, I became Senior Director of Claims Management for ResCap and in

October of 2013, I became Chief Claims Officer of ResCap. I began my association with

ResCap in 2001 as the Director, Responsible Lending Manager, charged with managing the

Debtors' responsible lending on-site due diligence program. In 2002, I became the Director of

Quality Asset Management, managing Client Repurchase, Quality Assurance and Compliance—

a position I held until 2006, at which time I became the Vice President of the Credit Risk Group,

managing Correspondent and Broker approval and monitoring. In 2011, I became the Vice

---

[1]    Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Objection.

1

President, Business Risk and Controls, and supported GMAC Mortgage, LLC and Ally Bank in this role.  In my current position, I am responsible for Claims Management and Reconciliation and Client Recovery.  I am authorized to submit this declaration (the "Declaration") in support of *ResCap Borrower Claims Trust's Reply in Support of Its Sixty-First Omnibus Objection to Claims (No-Liability Borrower Claims) as to Claim Nos. 1467 and 6423* (the "Reply").[2]

2.    Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents and information I have received through my discussions with other former members of the Debtors' management or other former employees of the Debtors, the Liquidating Trust's employees, professionals and consultants, and/or Kurtzman Carson Consultants LLC ("KCC"), the Debtors' noticing and claims agent.  If I were called upon to testify, I could and would testify competently to the facts set forth in the Objection on that basis.

3.    In my capacity as Chief Claims Officer, I am intimately familiar with the claims reconciliation process in these Chapter 11 Cases.  Except as otherwise indicated, all statements in this Declaration are based upon my familiarity with the Debtors' books and records that were prepared and kept in the course of their regularly conducted business activities (the "Books and Records"), the Debtors' schedules of assets and liabilities and statements of financial affairs filed in these Chapter 11 Cases (collectively, the "Schedules"), my review and reconciliation of claims, and/or my review of relevant documents.  I or other Liquidating Trust personnel under my supervision have reviewed and analyzed the proof of claim forms and supporting documentation filed by the Respondents.  Since the Plan went effective and the Borrower Trust was established, I, along with other members of the Liquidating Trust have

---

[2]    Capitalized terms not defined herein shall have the meanings ascribed to them in the Reply.

2

consulted with the Borrower Trust to continue the claims reconciliation process, analyze claims, and determine the appropriate treatment of the same.  In connection with such review and analysis, where applicable, I or other Liquidating Trust personnel, together with professional advisors, have reviewed (i) information supplied or verified by former personnel in departments within the Debtors' various business units, (ii) the Books and Records, (iii) the Schedules, (iv) other filed proofs of claim, and/or (v) the official claims register maintained in the Debtors' Chapter 11 Cases.

4.    In connection with the claims reconciliation process, the Borrower Trust identified certain claims filed by Borrowers that are not liabilities of the Debtors (together, the "No Liability Borrower Clams").

5.    The Debtors sent a Request Letter to certain Borrowers, including the Respondents, requesting additional documentation in support of the No Liability Borrower Claims.[3]  Copies of the form Request Letters are attached hereto as Exhibit A-1 and Exhibit A-2. The Request Letters state that the claimant must respond within 30 days with an explanation that states the legal and factual reasons why the claimant believes he is owed money or is entitled to other relief from the Debtors, and the claimant must provide copies of any and all documentation that the claimant believes supports the basis for his claim.  The Request Letters further state that if the claimant does not provide the requested explanation and supporting documentation within 30 days, the Debtors or the Borrower Trust, as applicable, may file a formal objection to the claimant's claim, seeking to have the claim disallowed and permanently expunged.

6.    The Debtors received responses to the Request Letters from both of the Respondents (the "Diligence Responses"), copies of which are attached hereto as Exhibit B-1

---

[3] A Request Letter was sent to Mr. Larkins on November 13, 2013 by email and to Mr. Tobias on May 24,  2013 by mail.

ny-1143211

and Exhibit B-2.[4]  However, the Diligence Responses failed to allege bases for claims against the

Debtors' estates.  Further, for the reasons stated in the Objection, the Books and Records do not

show any liability due and owing to the Respondents.

**The Larkins Claim**

7.    In connection with the claims reconciliation process, the Borrower Trust

identified Mr. Larkins' Claim No. 6423, attached hereto as Exhibit C (the "Larkins Claim"), as a

claim that did not identify a liability of the Debtors.   The Larkins Claim, filed on or around

January 11, 2013, asserts a $150,000.00 administrative priority claim against Residential Capital,

LLC ("ResCap").  See Larkins Claim. In Box 2 of the proof of claim form (Basis for Claim), the

Larkins Claim provides that the basis for the claim is "Mortgage Note not put into Trust RALI -

2006-QS14 by closing date.   Basis is fraud, severe tax penalties not notified that GMAC-

ResCap." See id. Appended to the proof of claim is a letter stating that Mr. Larkins is asserting

his right to "rescind the loan transaction in its entirety," as well as other documents related to the

origination, assignment, and servicing of his loan. See id.

8.    Upon my review of the Books and Records, I confirmed that no Debtor

ever serviced the Larkins Loan; the Larkins Loan was and continues to be serviced by PNC

Mortgage.  In addition, no Debtor ever possessed the Larkins Loan other than the brief period

from July 24 to October 30, 2006.

9.    According to the Books and Records, National City Bank of Indiana

originated Mr. Larkins Loan (the "Larkins Loan") on May 4, 2006.  National City Bank of

---

[4] A Diligence Response was received from Mr. Larkins on November 18, 2013 and from Mr. Tobias on June 20, 2013.

ny-1143211

Indiana endorsed the Larkins Loan to National City Mortgage Co.[5], who then endorsed the Larkins Loan to RFC.    RFC then transferred its interest in the Larkins Loan to Residential Accredit Loans, Inc. ("RALI") on October 30, 2006.    See Assumption and Assignment Agreement dated October 30, 2006, which is attached hereto as Exhibit F.[6]    That same day, RALI transferred the Larkins Loan to the RALI 2006-QS14 Trust (the "RALI Trust"), where Deutsche Bank Company Americas ("Deutsche") was appointed as Trustee.    See Series Supplement, attached hereto as Exhibit G.[7]    Accordingly, assignments of the Deed of Trust were recorded transferring the Deed of Trust from National City Bank of Indiana to National City Mortgage Co, from National City Mortgage Co. to MERS and its successors and assigns; and finally from MERS to Deutsche.    See Assignment Documents, attached hereto as Exhibit H.

            10.    Intermediate transfers of the Deed of Trust, including the transfer to RFC, were made within the MERS system[8] and are not recorded in the land records.    The final assignment out of MERS on August 24, 2011 was completed by MERS to Deutsche Bank National Trust Company Americas, as Trustee.    See Assignment Documents.    Based on my time working with the Debtors it has been my experience that this and any other recordings in the land records subsequent to the closing date of the RALI Trust is not indicative or dispositive of an untimely transfer from RFC to Deutsche.

---

[5] To the best of the Debtors' knowledge National City Mortgage Co. is a subsidiary of National City Bank of Indiana.

[6] In the Larkins Response, Mr. Larkins references October 1, 2006 as the "closing date" for the RALI Trust.    As evidenced by the Assumption and Assignment Agreement, this is incorrect.

[7] Attached to the Series Supplement is a page from the schedule identifying the loans to be transferred from RALI to Deutsche.    The attached page identifies the Larkins Loan as one of the loans being transferred.

**The Tobias Claim**

11.    As stated in the Reply, in connection with the claims reconciliation process, the Borrower Trust identified Mr. Tobias' Claim No. 6423, attached hereto as <u>Exhibit I</u> (the "<u>Tobias Claim</u>"), as a claim that did not identify a liability of the Debtors.  The Tobias Claim, filed on or around October 22, 2012, asserts a $1,000,000.00 general unsecured claim against ResCap.  <u>See</u> Tobias Claim.  In Box 2 of the proof of claim form (Basis for Claim), the Tobias Claim provides that the basis for the claim is "Damages based on Consumer Fraud or other claim/affirmative defense to foreclosure requesting monetary relief."  <u>See</u> <u>id.</u>  In Box 8 of the proof of claim form (Documents), Mr. Tobias wrote "Complaint has not yet been filed."  <u>See</u> <u>id.</u>  Nothing was attached to the proof of claim.  <u>See</u> <u>id.</u>

12.    According to the Books and Records, on or around May 9, 2003, Debtor GMAC Mortgage Corporation, n/k/a GMAC Mortgage, LLC ("<u>GMACM</u>") originated a loan to Mr. Tobias in the amount of $320,000.00 (the "<u>Tobias Loan</u>").  <u>See</u> Tobias Note, attached hereto as <u>Exhibit J.</u>  According to the Books and Records, GMACM transferred its interest in the Tobias Loan to Fannie Mae in or around June 2003.[9]  GMACM serviced the Tobias Loan from May 9, 2003 until servicing was transferred to Green Tree Servicing ("<u>Green Tree</u>") on February 1, 2013.  <u>See</u> Servicing Notes, attached hereto as <u>Exhibit K.</u>

13.    Prior to filing the Tobias Claim, Mr. Tobias never disputed the terms of the Tobias Loan with GMACM.  <u>See</u> Servicing Notes.  According to the Debtors' servicing notes for the Tobias Loan, the Tobias Loan was never referred to foreclosure and the only delinquency ever reported on the account was a 30-day late payment in 2004.  <u>See</u> <u>id.</u>

---

[9] Pursuant to the Fannie Mae servicing guide, the Debtors, as servicer, only maintained temporary possession of the note for the Tobias Loan and did not maintain actual ownership of the Tobias Loan after it was transferred to Fannie Mae

14.     Attached to the Tobias Response is a complaint that Mr. Tobias filed on October 25, 2013 in the United States District Court for the District of New Jersey (the "Complaint").  Mr. Tobias did not seek relief from the automatic stay, nor has Mr. Tobias ever sought to amend the Tobias Claim.

15.     Accordingly, based upon this detailed review of the Books and Records, together with a review of the Claims and the Responses, the Borrower Trust determined that the Responses fails to substantiate the validity of Respondents' claims against ResCap.

*(Signature Page to Follow)*

ny-1143211

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  May 23, 2014

 /s/ Deanna Horst
Deanna Horst
Chief Claims Officer for ResCap
Liquidating Trust

8

**<u>Exhibit A-1</u>**
**Form of Request Letter Sent to Mr. Larkins**

    MORRISON | FOERSTER

Claim Number: XXXX

Dear Claimant:

You are receiving this letter because you or someone on your behalf filed a Proof of Claim form in the jointly-administered chapter 11 bankruptcy cases of Residential Capital, LLC ("ResCap"), GMAC Mortgage, LLC, and other affiliated debtors and debtors in possession (collectively, the "Debtors"), pending before the United States Bankruptcy Court for the Southern District of New York, Case No. 12-12020 (MG) (the "ResCap bankruptcy case") and we need additional information from you regarding the claim(s) you are asserting against the Debtors.

**The Information we Need From You Regarding Your Proof of Claim**:
We received and reviewed a copy of the Proof of Claim form filed on your behalf, and noticed that it did not have any supporting documents attached to it.  In order to evaluate your claim, we need to specifically understand why you believe you are owed money or are entitled to other relief from one or more of the Debtors.  Although you may have stated the factual or legal basis for your claim on the first page of the Proof of Claim form, you have not provided any documentation to support this claim.  Therefore, we need you to provide us with documents that support the basis for your asserted claim.  A copy of your Proof of Claim form is enclosed for your reference.

**You Must Respond to this Letter by no Later Than June 24, 2013**:
In accordance with the Order of the Bankruptcy Court (Docket No. 3294, filed March 21, 2013), you **must** respond to this letter by no later than June 24, 2013 with an explanation that states the legal and factual reasons why you believe you are owed money or are entitled to other relief from one or more of the Debtors as of May 14, 2012 (the date the Debtors filed their bankruptcy cases), and you **must** provide copies of any and all documentation that you believe supports the basis for your claim.   Included with this letter is a form to assist you in responding to our request.

**Consequences of Failing to Respond**:
If you do not provide the supporting documentation by June 24, 2013, the Debtors may file a formal objection to your Proof of Claim on one or more bases, including the basis that you failed to provide sufficient information and documentation to support your claim, and your claim may be disallowed and permanently expunged.  If your claim is disallowed and expunged, you will not receive any payment for your claim and any other requests you may have made for non-monetary relief in your Proof of Claim will be denied.  Therefore, it is very important that you respond by the date stated above with the requested information and documentation supporting the basis for your claim.

If your claim relates to a mortgage loan that you believe was originated or serviced by one of the Debtors, please be sure to include the loan number and property address that the loan relates to in the information and documentation that you send us, so that we can effectively search our records for information on your property and loan, and evaluate your claim(s).

**Questions**:

If you have any questions about this letter, or need help in providing the requested information and document(s), you should contact an attorney.  You may also contact the Special Counsel to the Official Committee of Unsecured Creditors[1] with questions (contact information provided below):

**SPECIAL COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
SILVERMANACAMPORA LLP
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
Telephone: 866-259-5217
Website: http://silvermanacampora.com
E-mail address: rescapborrower@silvermanacampora.com

**You must send the requested information and document(s) supporting your claim(s) on or before the date provided in this letter to either:**

    (i)    **Claims.Management@gmacrescap.com; or**

    (ii)    **Residential Capital, LLC**
        **P.O. Box 385220**
        **Bloomington, Minnesota 55438**

**Please mark each piece of correspondence with the Claim Number referenced above.**

Sincerely,

Claims Management
Residential Capital, LLC

---

[1] Please be advised that SilvermanAcampora LLP does not represent you individually, and therefore, cannot provide you with legal advice.

**<u>Exhibit A-2</u>**
**Form of Request Letter Sent to Mr. Tobias**

    MORRISON | FOERSTER

June 21, 2013

**Claim Number:** <mark>XXX</mark>

Dear Claimant:

You are receiving this letter because you or someone on your behalf filed a Proof of Claim form in the jointly-administered chapter 11 bankruptcy cases of Residential Capital, LLC ("ResCap"), GMAC Mortgage, LLC and other affiliated debtors and debtors in possession (collectively, the "Debtors") pending before the United States Bankruptcy Court for the Southern District of New York, Case No. 12-12020 (MG) (the "ResCap bankruptcy case"), and we need additional information from you regarding the claim(s) ("claim") you are asserting against one or more of the Debtors.

**The Information we Need From You Regarding Your Proof of Claim**:
We reviewed a copy of the Proof of Claim form and documents, if any, that you filed in the ResCap bankruptcy case. A copy of your Proof of Claim form is enclosed for your reference. After reviewing the Proof of Claim form and any documents you submitted, we have determined that you did not provide sufficient information to support your "Basis for Claim" and we do not have sufficient information to understand the calculations you used to determine the amount you claim to be owed. In order to evaluate your claim, we need to understand the specific reasons as to why you believe you are owed money or are entitled to other relief from one or more of the Debtors. Please reply using the attached form and provide a written explanation, with supporting documentation, and include a detailed explanation of how you calculated the amount of your claim.

**You Must Respond to this Letter by no Later Than July 22, 2013**:
In accordance with the Order of the Bankruptcy Court (Docket No. 3294, filed March 21, 2013), you **must** respond to this letter by no later than July 22, 2013 with an explanation stating the legal and factual reasons why you believe you are owed money or are entitled to other relief from one or more of the Debtors as of May 14, 2012 (the date the Debtors filed their bankruptcy cases). You **must** provide copies of any and all documentation that you believe supports the basis for and amount of your claim. A form is included with this letter to assist you in responding to our request for additional information.

**Consequences of Failing to Respond**:
If you do not provide the requested information regarding the basis for and amount of your claim and the supporting documentation by July 22, 2013, the Debtors may file a formal objection to your Proof of Claim on one or more bases, including that you failed to provide sufficient information and documentation to support your claim. If the Debtors file such an objection and it is successful, your claim may be disallowed and permanently expunged. If your claim is disallowed and expunged, you will not receive any payment for your claim and any other requests you may have made for non-monetary relief in your Proof of Claim will be denied. Therefore, it is very important that you respond by the date stated above with the requested information and documentation supporting the basis for and amount of your claim.

**For Those With a Mortgage Loan Originated or Serviced by One of the Debtors**:

If your claim relates to a mortgage loan that you believe was originated or serviced by one of the Debtors, please be sure to include the loan number and property address that the loan relates to in the information and any documentation that you send us, so that we can effectively search our records for information on your property and loan, and evaluate your claim.

**Questions**:

If you have any questions about this letter, or need help in providing the requested information and document(s), you should contact an attorney. You may also contact the Special Counsel to the Official Committee of Unsecured Creditors[1] with general questions (contact information provided below):

**SPECIAL COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
SILVERMANACAMPORA LLP
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
Telephone: 866-259-5217
Website: http://silvermanacampora.com
E-mail address: rescapborrower@silvermanacampora.com


**You must send the requested information and document(s) supporting your claim on or before the date provided in this letter to either;**

       **(i)**      **Claims.Management@gmacrescap.com**; or
       **(ii)**     **Residential Capital, LLC**
              **P.O. Box 385220**
              **Bloomington, Minnesota 55438**


**Please mark each document you send with the Claim Number referenced above.**



Sincerely,

Claims Management
Residential Capital, LLC

---

[1] Please be advised that SilvermanAcampora LLP does not represent you individually and, therefore, cannot provide you with legal advice.

**<u>Exhibit B-1</u>**
**Diligence Response from Mr. Larkins**

**Windler, Melissa**

| | |
|---|---|
| **From:** | ████████████████ |
| **Sent:** | Monday, November 18, 2013 6:30 PM |
| **To:** | Claims Management |
| **Subject:** | Re: ResCap Proof of Claim |

Dear Claims Management for RES CAP..

Received your e-mail regarding this claim 6423.

The copy of documents you e-mail dated Nov. 13, 2013 does not represent what I had sent to you back in Nov. 2013.

There are several pages missing which would make it very hard to determine if there is suffiecient evidence to move forward regarding this claim. The rescission letter alone has 3 pages, what you sent me in the e-mail shows only one page. There were several other pages of evidence that we sent you, that was not provided in your e-mail. Please confirm. If you do not for some reason have these additional pages I will be happy to forward them to you.
Neil

---

**From:** Claims Management <Claims.Management@gmacrescap.com>
**To:** ████████████████
**Cc:** Claims Management <Claims.Management@gmacrescap.com>
**Sent:** Wednesday, November 13, 2013 2:21 PM
**Subject:** FW: ResCap Proof of Claim

Dear Claimant,

Please review the attached documents.

Thank you,

*Claims Management*

 *RESCAP*

*Residential Capital, LLC*
P. O. Box 385220
Bloomington, Minnesota 55438
Fax - 866-501-6436
Claims.Management@gmacrescap.com

The information contained in this communication is confidential and intended only for the individual or entity to whom it is addressed.  If you are not the addressee indicated in this message (or an agent responsible for delivery of the message to such person), you are hereby notified that you have received this communication in error and that any review, dissemination, copying or unauthorized use of this message is strictly prohibited.  In such case, you should destroy this message and kindly notify the sender by reply email.

**<u>Exhibit B-2</u>**
**Diligence Response from Mr. Tobias**



Sent/Received

# RESCAP

JUN 2 5 2013

To_____
By_____

MORRISON | FOERSTER

## Claim Information

| Claim Number | 1467 |
|---|---|
| **Basis of Claim**<br><br>Explanation that states the legal and factual reasons why you believe you are owed money or are entitled to other relief from one of the Debtors as of May 14, 2012 (the date the Debtors filed their bankruptcy cases) and, you **must** provide copies of any and all documentation that you believe supports the basis for your claim. | See Attached |

If your claim relates to a mortgage loan that you believe was originated or serviced by one of the Debtors, please be sure to include the following loan information, so that we can effectively search our records for information on your property and loan, and evaluate your claim.

| Loan Number: | ████████ | | |
|---|---|---|---|
| **Address of property related to the above loan number:**<br>75 Princeton Oval | | | |
| City:<br>Freehold | State:<br>NJ | | ZIP Code:<br>07728 |

Additional resources may be found at  -  http://www.kccllc.net/rescap

Residential Capital, LLC     P.O. Box 385220  Bloomington, MN  55438

Claim Number: 1467
Suzanne Koegler and Edward Tobias

# Law Offices of Edward N. Tobias, L.L.C.

## 75 Princeton Oval
## Freehold, NJ 07728
Tel./Fax (732) 462-6672

www.tobiaslaw.com

June 20, 2013

Residential Capital, LLC
P.O. Box 385220
Bloomington, Minnesota 55438

> Via Regular Mail and E-Mail to:
> Claims.Management@gmacrescap.com

Re:   Suzanne Koegler & Edward N. Tobias
      Claim No. 1466
      Premises:     93 Wisconsin St., Long Beach, NY 11561
      Claim No. 1467
      Premises:     75 Princeton Oval, Freehold, NJ 07728

Dear Sir or Madam:

Thank you for your recent correspondence regarding the above-referenced claims and requesting supporting information regarding the Proof(s) of Claim.

At the time of the bankruptcy filing of GMAC Mortgage, LLC and other related entities (GMAC), claimants were current loan customers based on loans originated and serviced by one of the debtors for the above-referenced properties. Per Claim Nos. 1466 and 1467, dated October 17, 2012 and marked as filed on October 22, 2012, claimants advised that claims for damages based on Consumer Fraud or other claim / affirmative defenses to foreclosure requesting monetary relief were being made in the amount of $1,000,000.00 for each property. At the time of filing, documents were not available because the Complaint in the matter(s) had not yet been filed.

To date, Complaints have still not yet been filed on Claimants' individual behalf. However, information has been gathered regarding legal filings for similar claims and/or class actions. For reference purposes only, pdf copies of representative cases have been attached to the e-mail submission of this letter. Reference is also made to the Consent Judgment between GMAC and the Justice Department, the Department of Housing and Urban Development (HUD) and 49 state attorneys general to address mortgage loan servicing and foreclosure abuses. The original signed letter is forwarded without attachments. Upon actual filing of Complaints detailing the legal sufficiency of claimants' damages, same will be provided.

As you may know, servicing of the above-referenced accounts has been transferred from GMAC Mortgage, LLC to Ocwen Loan Servicing, LLC and Green Tree Servicing, LLC, respectively. Claimants hereby reserve any and all rights against these entities, individually and as successors to the debtors and/or other capacity. Additionally, Claimants reserve any and all rights against Ally Bank, NA, individually and as acquirer of certain assets and liabilities of GMAC.

If you have any questions or need further information, please call me at 732-462-6672. Please note that I am writing this letter in my capacity as Claimant and as attorney for Claimants.

Thank you for your continued courtesies and assistance herein.

Very truly yours,

LAW OFFICES OF EDWARD N. TOBIAS, L.L.C.

By:  Edward N. Tobias, Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

APR - 4 2012

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

|                                      |   |                          |
|--------------------------------------|---|--------------------------|
| UNITED STATES OF AMERICA, *et al.*,  | ) |                          |
|                                      | ) |                          |
| Plaintiffs,                          | ) |                          |
|                                      | ) | **12 0361**              |
| v.                                   | ) |                          |
|                                      | ) | Civil Action No. _____ |
| BANK OF AMERICA CORP. *et al.*,      | ) |                          |
|                                      | ) |                          |
| Defendants.                          | ) |                          |
|                                      | ) |                          |

**CONSENT JUDGMENT**

WHEREAS, Plaintiffs, the United States of America and the States of Alabama, Alaska,

Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii,

Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota,

Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico,

New York, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, South

Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, Wisconsin, Wyoming,

the Commonwealths of Kentucky, Massachusetts, Pennsylvania and Virginia, and the District of

Columbia filed their complaint on March 12, 2012, alleging that Residential Capital, LLC, Ally

Financial, Inc., and GMAC Mortgage, LLC (collectively, "Defendant") violated, among other

laws, the Unfair and Deceptive Acts and Practices laws of the Plaintiff States, the False Claims

Act, the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, the

Servicemembers Civil Relief Act, and the Bankruptcy Code and Federal Rules of Bankruptcy Procedure;

WHEREAS, the parties have agreed to resolve their claims without the need for litigation; ·

WHEREAS, Defendant, by its attorneys, has consented to entry of this Consent Judgment without trial or adjudication of any issue of fact or law and to waive any appeal if the Consent Judgment is entered as submitted by the parties;

WHEREAS, Defendant, by entering into this Consent Judgment, does not admit the allegations of the Complaint other than those facts deemed necessary to the jurisdiction of this Court;

WHEREAS, the intention of the United States and the States in effecting this settlement is to remediate harms allegedly resulting from the alleged unlawful conduct of the Defendant;

AND WHEREAS, Defendant has agreed to waive service of the complaint and summons and hereby acknowledges the same;

NOW THEREFORE, without trial or adjudication of issue of fact or law, without this Consent Judgment constituting evidence against Defendant, and upon consent of Defendant, the Court finds that there is good and sufficient cause to enter this Consent Judgment, and that it is therefore ORDERED, ADJUDGED, AND DECREED:

## I.    JURISDICTION

1.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, 1355(a), and 1367, and under 31 U.S.C. § 3732(a) and (b), and over Defendant. The Complaint states a claim upon which relief may be granted against Defendant. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) and 31 U.S.C. § 3732(a).

1  Mitchell J. Stein    SBN # 121750
   MITCHELL J. STEIN & ASSOCIATES
2  2950 Buskirk Avenue, Third Floor
   Walnut Creek, CA  94597
3  Tel: (914) 843-7957
   Fax: (914) 652-2431
4  Email:  oceibod@gmail.com

5  Theodore R. Maloney    SBN #125094
6  FINANCE LAW GROUP
   5023 North Parkway Calabasas
7  Calabasas, CA  91302
   Tel: (424) 234-5446
8  Fax: (424) 238-2162
   Email:  trm@financelawgroup.com

9
   Attorneys for Plaintiffs
10

11          SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                  COUNTY OF LOS ANGELES

| | |
|---|---|
| 13  JAMES W. LOCKER, an individual;<br>DOUGLAS LIZARDI, an individual;<br>14  DEBBIE LIZARDI, an individual;<br>JOSE ALFREDO SEGOVIA, an individual;<br>15  LISA M. ROSA, an individual;<br>RAYMOND TRAN, an individual;<br>16  ROBERT ROSS, an individual;<br>ESME ROSS, an individual;<br>17  TONY TRUJILLO, an individual;<br>DONNA TRUJILLO, an individual;<br>18  JAMES SHIPMAN, an individual;<br>CHRISTINE SHIPMAN, an individual;<br>19  and others similarly situated named herein as<br>ROES 1 through 10,000, inclusive,<br>20<br>21                  Plaintiffs,<br>22        vs.<br>23  ALLY BANK, N.A., a Utah corporation, in<br>its own capacity and as an acquirer of certain<br>24  assets and liabilities of GMAC; GMAC, a<br>national banking association; WESTERN<br>25  NATIONAL APPRAISALS, a business<br>entity; CALIFORNIA RECONVEYANCE<br>26  COMPANY, a California corporation;<br>CASAS & HIPOTECAS, a California<br>27  corporation; and DOES 1 through 1000,<br>28  inclusive, | Case No.<br><br>**COMPLAINT FOR:**<br><br>1.    **FRAUDULENT<br>CONCEALMENT<br>[VIOLATION OF CAL. CIV.<br>CODE §§ 1572, 1709 AND<br>1710] (INCLUDING<br>DECLARATORY AND<br>INJUNCTIVE RELIEF TO<br>VOID MORTGAGE);**<br>2.    **INTENTIONAL<br>MISREPRESENTATION<br>[VIOLATION OF CAL. CIV.<br>CODE §§ 1572, 1709 AND<br>1710] (INCLUDING<br>DECLARATORY AND<br>INJUNCTIVE RELIEF TO<br>VOID MORTGAGE);**<br>3.    **NEGLIGENT<br>MISREPRESENTATION<br>[VIOLATION OF CAL. CIV.<br>CODE §§ 1572, 1709 AND<br>1710] (INCLUDING<br>DECLARATORY AND** |

COMPLAINT

Defendants )
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

INJUNCTIVE RELIEF TO
VOID MORTGAGE);
4.    VIOLATION OF CAL. CIVIL
CODE § 2923.5;
5.    UNFAIR COMPETITION
[VIOLATIONS OF CAL. BUS.
& PROF. CODE § 17200 ET
SEQ.] (INCLUDING
INJUNCTIVE RELIEF TO
VOID MORTGAGE)
6.    BREACH OF CONTRACT

[JURY TRIAL DEMANDED]

COMPLAINT

Law Offices of Edward N. Tobias, L.L.C.
75 Princeton Oval
Freehold, NJ 07728

Residential Capital, LLC
P.O. Box 385220
Bloomington, Minnesota 55438



U.S. POSTAGE
$.66
FCM LETTER
07728
Date of Sale
06/20/13
06  2S00
08343201
APC
FC0022600 X05649

**<u>Exhibit C</u>**
**Larkins Claim**

B 10 Modified (Official Form 10) (12/11)

Claim #6423   Date Filed: 1/11/2013

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
| --- | --- |

Name of Debtor and Case Number: **Residential Capital, LLC, Case No. 12-12020**

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
**Neil Larkins**

Name and address where notices should be sent:

**Neil Larkins
P.O. Box 12
Keno, Oregon**

Telephone number: 541-884-3055          email: neiljenifer@yahoo.com

Name and address where payment should be sent (if different from above):

Telephone number:          email:

- ☐ Check this box if this claim amends a previously filed claim.

**Court Claim Number:** _____
*(If known)*

Filed on: _____

- ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:** $ **150,000**

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** Mortgage Note Not put intoTrust Rali-2006-QS14 by closing date. Basis is Fraud, severe tax penalties not notified that GMAC-RESCAP i.
(See instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:**
**4118**

**3a. Debtor may have scheduled account as:**
PNC MORTGAGE
(See instruction #3a)

**3b. Uniform Claim Identifier (optional):**
(See instruction #3b)

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☑Real Estate ☐Motor Vehicle ☐Other
Describe:
Value of Property: $ **150,000**   Annual Interest Rate **8** %☑Fixed ☐Variable
(when case was filed)
Amount of arrearage and other charges, as of the time case was filed, included in secured claim,
if any: $ **150,000**          Basis for perfection: _____

Amount of Secured Claim: $ **150,000**          Amount Unsecured: $_____

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$ **150,000**          (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**9. Signature:** (See instruction #9) Check the appropriate box.
☑ I am the creditor.   ☐ I am the creditor's authorized agent.   ☐ I am the trustee, or the debtor, or   ☐ I am a guarantor, surety,
(Attach copy of power of attorney, if any.)     their authorized agent.     indorsor, or other codebtor.
                    (See Bankruptcy Rule 3004.)   (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name: Neil Larkins
Title: Owner real property under Fraud committed by Residential Funding
Company:
Address and telephone number (if different from notice address above):

x _Neil Larkins_ (Signature)   12/3/2012 (Date)

Telephone number:          Email:

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

- ☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

- ☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

- ☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

- ☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

- ☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

- ☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$_____

* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**RECEIVED**
JAN 1 1 2013
KURTZMAN CARSON CONSULTANTS

1212020130111100000000000010

General Claims Rescission Letter to All Parties


1-6-13

Neil Larkins
4801 Lorrayne Place
Klamath Falls, Oregon
541-884-3055
Re: loan number █████████
Purchase price $150,000

Mailing address:
Po Box 12
Keno, Oregon 97627

Dear Trustee,

I exercise my right to rescind the loan transaction in its entirety under usury and general claims theory and causes of action. By failing to disclose the true lender and using subterfuge to hide the fact that the "lender" at closing was paid to pose as lender in fact when in fact an undisclosed third party had rented the charter or lending license of the "lender" the limitation on my right to rescind was extended indefinitely under state and federal law, the mortgage is now extinguished, and your rights under the trust deed have terminated. I hereby rescind the above referenced loan and/or declare it to be null and void and demand treble damages for the face value of the note, on grounds set forth below;

1. Appraisal fraud: The original loan transaction and application were falsified by the "lender", (the party named at closing as the beneficiary under the Trustee or mortgage or mortgagee, and the party named on the promissory note that was allegedly secured by the mortgage or terms of the deed of trust) its agents, servants, and employees as to fair market value of the property, the borrowers ability to repay and prospective terms and fees associated with the loan. At the behest and direction of the "lender" the property was appraised at a much higher amount than was warranted by good appraisal practices, conforming with industry standards. All parties at the loan closing, other than the borrower, were aware of the appraisal fraud, and directly and intentional withheld this vital information from the borrower. The borrower reasonably relied on the appraisal, believing that the "lender" was at risk and had performed due diligence and conformed with underwriting practices conforming with industry standards when in fact the "lender" was not at risk, the loan was essentially "table funded" and the real lender was hidden from the borrower, not only did the borrower not know about the existence of the real lender, but the real lender's identity and contact information were withheld at the loan closing so that the borrower was unaware of any of the realities of the closing, nor that the "loan closing" was in fact part of a scheme to issue a negotiable instrument that would be issued by the borrower (through trick and deception) and later converted to other uses and terms, including allocation of payments inconsistent with the reasonable expectations of the borrower. The over appraisal conformed with an illegal scheme to

defraud investors in certificates of asset-backed securities that were similarly overvalued. In both instances, the appraisal of the property, and the appraisal of the certificates, the true party to the entire transaction paid and "directed" third parties to lie about the quality and value of the "investment". For the borrower the scheme shortened the expected life or duration of the loan transaction, and taking the appraisal fraud into consideration, along with the many undisclosed fees , resulted in exponentially higher cost of the loan than what was estimated or disclosed prior to or at closing. Borrower was induced to pay more for the property, than the property was worth.

2. Fraud and Inducement: Borrower reasonable relied, to borrowers, detriment upon representations and good faith estimates and duty to act within their duties as fiduciaries and representatives of the borrower in executing a loan that was vastly different from the loan that borrower was promised or reasonable believed to be the case at loan closing.

3. Fraud in Execution: Borrower reasonable relied upon the representations and good faith estimate of the parties at the loan closing and was tricked into issuing what became a negotiable security from which the participants received fees and profits far in excess of their normal remuneration. The participants at the loan closing knew that the borrower believed that the borrower was merely entering into a loan closing when the borrower without his knowledge or consent was in fact issuing what would be used as a negotiable security to commit fraud upon other third parties.

4. Usury: The appraisal fraud resulted in an undisclosed cost of the loan, in addition to the loss of earnest money, costs of closing and after purchase expenses and costs that raised the cost of the loan well above standards set in the state for usury. No exemptions apply because (1) the real lender was not a bank or other register or chartered lender nor even a party registered to do business within this state and (2) the transaction was in fact a securities transaction in which the rights of rescission were ignored and undisclosed.

5. Payment: The "lender" was paid in full, before, during, or immediately following the loan closing by an agent of the real lender. To this was added a fee of approximately 2.5 %. If there was or is a party that is a holder of due course of the note and has not been paid in full by reserves, overcollaterlization, credit default swaps, insurance, or cross guarantees, then demand is herewith made for the name(s) of such holders and their contact information.

As material fact, in addition to the above on August 24, 2011 Mortgage Electronic Registration Systems, Inc. as Nominee for Lender and assigns (different from previous assignment, and handwritten next to it) National City Bank of Indiana (who was not on the previous assignment) recorded an assignment in Klamath County Recorders office an Assignment Of Deed Of Trust for value received, the undersigned hereby grants, assigns and transfers to Deutsch Bank Trust Company Americas as Trustee RALI 2006-QS14, located at 2255 North Ontario street #400, Burbank, Ca 91504, all beneficial interest under that certain Deed of Trust dated 5/1/2006. See attached

This attempted securitization assignment failed to adhere to requirements of the trust agreement necessary to properly assign the mortgage loan into the trust as the "closing date" set forth in the trust agreement for the Mortgage Asset-backed Pass through Certificates,Series RALI 2006-QS14 was October 1, 2006. As a result the borrower was not paying the true creditor because there was no valid assignment that allowed "lender" to collect on the debt obligation, this puts the legal rights of the Trustee that derive from

the Trust Agreement in question, since the Deed of Trust and promissory note were never properly assigned to the RALI 2006 QS14. Due to the failure of the entities involved to adhere to the requirements set forth in the Trust Agreement, the note and DOT are not part of the trust.  Borrower contends that the current creditors have no legal, equitable or pecuniary right in this debt collection and has suffered damages that include costs related to negative reports to borrowers credit.

On November 2, 2012 borrower sent a qualified written request, under RESPA to uncover material facts pertaining to this loan to servicer PNC Mortgage. On November 19, 2012 a partial answer was received documenting the fact that the investor for this loan is GMAC Residential Capital 2255 N. Ontario St. Suite 400, Burbank, CA 91504 866-582-5438 .

The existence of a duty of care to a borrower for negligence arises only when the lender "actively participates" in the financed enterprise "beyond the domain of the usual money lender." Under TILA borrower had a right to know that Residential Capital was an investor of a loan pool who is funding the loan, who is not identified at any stage of the loan process, and who expects a return on their investment.  This hidden investor is the true "lender" who is the source of funds for borrowers loan. See SEC Prospectus dated October 26, 2006 and Prospectus supplement dated October 27, 2006. As borrowers loan is listed in one of the Settlement Trusts ( Deutsch Bank Trust Co. as trustee RALI QS14) as listed in the Chapter 11 bankruptcy we petition the court to make borrower whole and grant  treble damages. Borrower is available to supply further information as needed in this regard.



2011-010156
Klamath County, Oregon

0010705020110010156001001 7
09/07/2011 01:07:53 PM                    Fee: $37.00

Parcel

SPACE ABOVE THIS LINE FOR RECORDER'S USE

NCM#:

MIN and MERS Phone: 100269610105226583            888-679-6377

LARKINS, NEIL
Recording District: KLAMATH

## ASSIGNMENT Of Deed of Trust

For value received, the undersigned, hereby grants, assigns and transfers to: Deutsche Bank Trust Company Americas as Trustee RALI 2006-QS14 located at 2255 North Ontario Street #400, Burbank, CA 91504, all beneficial interest under that certain Deed of Trust dated 5/1/2006 executed by:

Trustor(s)    NEIL LARKINS

to AMERITITLE for National City Bank of Indiana, in the amount of: $142,500, recorded 5/11/2006 as Instrument No.: M06-09525 in Book/Volume: Page: of the Official Records of KLAMATH County, Oregon describing the land therein:

Property Address:    4801 LORRAYNE PL, KLAMATH FALLS, OR 97603

LOT 1 IN BLOCK 6 OF FIRST ADDITION TO KELENE GARDENS, ACCORDING TO THE OFFICIAL PLAT THEREOF ON FILE IN THE OFFICE OF THE COUNTY CLERK OF KLAMATH COUNTY, OREGON.

Together with the Note or Notes therein described or referenced to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Deed of Trust.

Effective date    ~~5/1/2006~~
8/24/2011

Mortgage Electronic Registration Systems, Inc. as nominee for Lender and it's successors and assigns ~~a National City Bank of Indiana~~

Renee Durham, Assistant Secretary

State of OHIO    County of MONTGOMERY

On 8/24/2011 before me, Toni Suel the undersigned, a Notary Public in and for the State of Ohio, personally appeared Renee Durham, Assistant Secretary of Mortgage Electronic Registration Systems, Inc. as nominee for Lender and it's successors and assigns personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that for her signature on the instrument the person, or the entity upon behalf of which she acted, executed the instrument.

This Instrument Prepared By:
Sandra Van Zandbergen

After Recording Return To:

PNC Mortgage
P.O. Box 8800
Dayton, OH  45401-8800
(937) 910-1323

Toni Suel, Notary Public in and for the State of Ohio

My Commission Expires: 3/26/2012    My County of Residence: Butler



TONI SUEL
Notary Public, State of Ohio
My Commission Expires
March 26, 2012

This Instrument Prepared By:
Todd Schaney, Delivery Shipper
National City Mortgage Co.
3232 Newmark Drive
Miamisburg, OH 45342

**2006-024193**
Klamath County, Oregon

0001038120060024193010017

12/06/2006 10:57:18 AM                    Fee: $21.00

Recording Requested by &
When Recorded Return To:
    US Recordings, Inc.
    2925 Country Drive Ste 201
    St. Paul, MN 55117
Parcel:

SPACE ABOVE THIS LINE FOR RECORDER'S USE

NCM#:                POOL#: 0001158736          4                              LARKINS, NEIL
MIN and MERS Phone:                  *Please Record and*        Recording District: Klamath

### Assignment Of Deed of Trust

For value received, the undersigned, hereby grants, assigns and transfers to:

Mortgage Electronic Registration Systems, Inc., its successors
and assigns, PO Box 2026 Flint, Michigan 48501-2026    *(assignee)*

All beneficial interest under that certain Deed of Trust dated 5/1/2006 executed by:
Trustor(s)   NEIL LARKINS

to the Trustee for National City Bank of Indiana  recorded 5/11/2006 as   Instrument No.:
_____ in Book/Volume:  MO6 ____ Page: 09525 ____ of the Official Records of
Klamath County, Oregon describing the land therein:

Property Address:   4801 LORRAYNE PL, KLAMATH FALLS, OR  97603

Legal Description As Per Deed of Trust Referred to Herein

Together with the Note or Notes therein described or referenced to, the money due and to become due thereon with
interest, and all rights accrued or to accrue under said Deed of Trust.

Assignment Executed to be Effective as of 7/24/2006

        * National City Mortgage Co.,  *(assignor)*

        a subsidiary of National City Bank of Indiana

                        *Angela Tegtmeyer*

                        ANGELA TEGTMEYER
                        DELIVERY SHIPPER

**State of Ohio    County of Montgomery**

On 6/29/2006 before me, KATHLEEN LEWIS the undersigned, a Notary Public in and for the State of Ohio,
personally appeared  ANGELA TEGTMEYER, DELIVERY SHIPPER of National City Mortgage Co., a subsidiary
of National City Bank of Indiana  personally known to me to be the person whose name is subscribed to the within
instrument and acknowledged to me that she executed the same in her authorized capacity, and that for her signature
on the instrument the person, or the entity upon behalf of which she acted, executed the instrument.

MERS Phone: 1-888-679-6377  KATHLEEN LEWIS, Notary Public in and for the State of Ohio
                My Commission Expires: 1/6/2009  My County of Residence: Montgomery

(NOTARIAL SEAL STATE OF OHIO)

This Instrument Prepared By:
Gary M. Bellio

After Recording Return To:
National City Mortgage
P.O Box 8800    Dayton,
OH  45401-8800

**2006-024192**
Klamath County, Oregon



000103802006002419200100010

12/08/2006 10:56:13 AM    Fee: $21.00

Recording Requested by &
When Recorded Return To:
US Recordings, Inc.
2925 Country Drive Ste 201
St. Paul, MN 55117

Parcel:

NCM#:    00010

MIN and MERS Phone:

**SPACE ABOVE THIS LINE FOR RECORDER'S USE**

*Please Record 1st*

LARKINS, NEIL

Recording District:  Klamath

## ASSIGNMENT OF Deed of Trust

*(assignee)*

For value received, the undersigned, hereby grants, assigns and transfers to:  NATIONAL CITY MORTGAGE
CO, A SUBSIDIARY OF NATIONAL CITY BANK OF INDIANA located at  3232 NEWMARK DR,
MIAMISBURG, OH 45342.  All beneficial interest under that certain Deed of Trust dated 5/1/2006 executed by:

Trustor(s)    NEIL LARKINS

to Trustee for NATIONAL CITY BANK OF INDIANA    recorded 5/11/2006    Instrument No.:    in
Book/Volume: M06    Page: 09525 of the Official Records of Klamath County, Oregon describing the land therein:

Property Address:    4801 LORRAYNE PL, KLAMATH FALLS, OR  97603

~~Legal Description As Per Deed of Trust Referred To Herein~~

Together with the Note or Notes therein described or referenced to, the money due and to become due thereon with
interest, and all rights accrued or to accrue under said Deed of Trust.

5/11/2006 to be executed the Date of Filing/Recording

*(assignor)*

NATIONAL CITY BANK OF INDIANA



Angela Tegtmeyer, Delivery Shipper

State of OHIO    County of MONTGOMERY

On 6/20/2006 before me, Kathleen Lewis the undersigned, a Notary Public in and for the State of OHIO, personally
appeared Angela Tegtmeyer, Delivery Shipper of NATIONAL CITY BANK OF INDIANA personally known to
me to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed
the same in her authorized capacity, and that for her signature on the instrument the person, or the entity upon behalf
of which she acted, executed the instrument.

Kathleen Lewis, Notary Public in and for the State of OHIO

My Commission Expires:  1/6/2009    My County of Residence:  MONTGOMERY



**PNC**
MORTGAGE℠

November 19, 2012

Neil Larkins
PO Box 12
Keno OR 97627

RE:  Loan No. ███████████
Borrower:  Neil Larkins
Property Address: 4801 Lorrayne Pl., Klamath Falls, OR 97603

Dear Mr. Larkins:

PNC Mortgage is in receipt of your correspondence dated November 2, 2012, concerning a RESPA Qualified Written Request (QWR) and validation of debt on the above referenced loan.

Federal regulations and statutes make it clear that a QWR must outline a specific loan servicing dispute or discrepancy and request investigation by the servicer or mortgagee. Under 12 U.S.C. § 2605(i)(3), "the term 'servicing' means receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan...and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." It is not a mechanism to request blanket information or receive confidential, proprietary, or other non-servicing related information on a particular loan. Therefore, PNC Mortgage objects to your purported QWR as it contains no identifiable servicing error and the scope of inquiry exceeds that which is available through the statute.

Without waiving this objection, I am authorized to enclose copies of the following documents: Note, Deed of Trust, Good Faith Estimate, HUD1 Settlement Statement, Truth-In-Lending Disclosure, Payment History, and Payment Transaction Code Sheet. I have also enclosed a copy of the October 2009 letter previously sent informing you of the name change from National City Mortgage to PNC Mortgage.

PNC Mortgage affirms the validity of the debt and will continue to service the referenced loan per the terms of the Note and Deed of Trust until all debt is paid in full.

The Note and Deed of Trust documents that you executed during loan origination, clearly explain the obligations when borrowing the funds secured by the Deed of Trust. Please be aware that the original note is held as collateral for the loan and will be provided to you after the loan is paid in full.

**PNC**
MORTGAGE℠

Page 2
November 19, 2012

PNC Mortgage adheres to and is compliant with all federal and state lending laws.
Pursuant to the terms of your Deed in Trust and all applicable laws, PNC Mortgage will
continue to service the above referenced loan and any collection and foreclosure efforts
will continue.

The investor for this loan is GMAC-ResCap, 2255 N. Ontario St., Suite 400, Burbank, CA
91504, at 866.582.5438; however, PNC Mortgage is the servicer of this loan and you
should continue to contact us for any concerns regarding your mortgage.

We trust this response will resolve your concerns.

Please call your Single Point of Contact (SPOC), Crystal C., at 1-888-224-4702,
extension 9370721137, for any questions regarding this loan.

Sincerely,

Sanita Webb
Excellent Servicing Solutions

Enclosures

- Note
- Deed of Trust
- Good Faith Estimate
- HUD1 Settlement Statement
- Truth-In-Lending Disclosure
- Name Change Letter
- Payment History
- Payment Transaction Codes Sheet

# TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER OR LENDER'S AGENT:
**National City Bank of Indiana**

☐ Preliminary ☒ Final
*DATE:* 5/01/2006
*LOAN NO.:* ▇▇▇▇▇▇▇
*Type of Loan:* CONV    UNINS
Fixed

BORROWERS: NEIL LARKINS

ADDRESS:      9643 HIGHWAY 116
CITY/STATE/ZIP: FORESTVILLE, CA 95436
PROPERTY:     4801 LORRAYNE PL
              KLAMATH FALLS, OR 97603

INDEX:
INTEREST RATE: 8.000

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 8.359 % | $ 239,593.10 | $ 136,821.72 | $ 376,414.82 |

**PAYMENT SCHEDULE:**

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 359 | 1,045.62 | 7/01/2006 | | | |
| 1 | 1,037.24 | 6/01/2036 | | | |

**DEMAND FEATURE:** ☒ This loan does not have a Demand Feature.    ☐ This loan has a Demand Feature as follows:

**VARIABLE RATE FEATURE:**
☐ This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

**SECURITY:** You are giving a security interest in the property located at: 4801 LORRAYNE PL
KLAMATH FALLS, OR 97603

**ASSUMPTION:** Someone buying this property ☒ cannot assume the remaining balance due under original mortgage terms
☐ may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

**FILING / RECORDING FEES:** $      SEE HUD-1 SETTLEMENT STATEMENT

**PROPERTY INSURANCE:** ☒ Property hazard insurance with a mortgage clause to the lender is a required condition of this loan. Borrower may purchase this insurance from any insurance company acceptable to the lender.
Hazard insurance ☐ is ☒ is not available through the lender at an estimated cost of $          for a          year term.

**LATE CHARGES:** If your payment is more than 15 days late, you will be charged a late charge of 5.00 % of the overdue payment.

**PREPAYMENT:** If you pay off your loan early, you
☐ may ☒ will not    have to pay a penalty.
☐ may ☒ will not    be entitled to a refund of part of the finance charge.

**See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.**
e means estimate

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_NEIL LARKINS_                    5/4/06
NEIL LARKINS                     BORROWER / DATE                                        BORROWER / DATE

BORROWER / DATE                                                                         BORROWER / DATE

**IF APPLICABLE:** ADDITIONAL BORROWERS SIGNATURE LINES ON REVERSE SIDE
NATL795 (9805).01                    VMP Mortgage Solutions, Inc. (800)521-7291          Page 1 of 2          5/98

U06D006

## DEFINITION OF TRUTH-IN-LENDING TERMS

### ANNUAL PERCENTAGE RATE

This is not the Note rate for which the borrower applied. The Annual Percentage Rate (APR) is the cost of the loan in percentage terms taking into account various loan charges of which interest is only one such charge. Other charges which are used in calculation of the Annual Percentage Rate are Private Mortgage Insurance or FHA Mortgage Insurance Premium (when applicable) and Prepaid Finance Charges (loan discount, origination fees, prepaid interest and other credit costs). The APR is calculated by spreading these charges over the life of the loan which results in a rate higher than the interest rate shown on your Mortgage/Deed of Trust Note. If interest was the only Finance Charge, then the interest rate and the Annual Percentage Rate would be the same.

### PREPAID FINANCE CHARGES

Prepaid Finance Charges are certain charges made in connection with the loan and which must be paid upon the close of the loan. These charges are defined by the Federal Reserve Board in Regulation Z and the charges must be paid by the borrower. Non-Inclusive examples of such charges are: Loan origination fee, "Points" or Discount, Private Mortgage Insurance or FHA Mortgage Insurance, Tax Service Fee. Some loan charges are specifically excluded from the Prepaid Finance Charge such as appraisal fees and credit report fees.

Prepaid Finance Charges are totaled and then subtracted from the Loan Amount (the face amount of the Deed of Trust/Mortgage Note). The net figure is the Amount Financed as explained below.

### FINANCE CHARGE

The amount of interest, prepaid finance charge and certain insurance premiums (if any) which the borrower will be expected to pay over the life of the loan.

### AMOUNT FINANCED

The Amount Financed is the loan amount applied for less the prepaid finance charges. Prepaid finance charges can be found on the Good Faith Estimate/Settlement Statement (HUD-1 or 1A). For example if the borrower's note is for $100,000 and the Prepaid Finance Charges total $5,000, the Amount Financed would be $95,000. The Amount Financed is the figure on which the Annual Percentage Rate is based.

### TOTAL OF PAYMENTS

This figure represents the total of all payments made toward principal, interest and mortgage insurance (if applicable) over the life of the loan.

### PAYMENT SCHEDULE

The dollar figures in the Payment Schedule represent principal, interest, plus Private Mortgage Insurance (if applicable) over the life of the loan. These figures will not reflect taxes and insurance escrows or any temporary buydown payments contributed by the seller.

Date: 4/4/2006    National City Bank of Indiana
Loan #                **GOOD FAITH ESTIMATE OF CLOSING COSTS**    Revised date: 5/1/2006

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates - the actual charges may be more or less. Your transaction may not involve a fee for every item listed. The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 or HUD-1A settlement statement which you will be receiving at settlement. The HUD-1 or HUD-1A settlement statement will show you the actual cost for the items paid at settlement.

You are applying for **National City Bank of Indiana**
for a mortgage loan. We estimate that you as the applicant and your seller are likely to incur the following settlement charges. You, as the applicant, are responsible for informing the seller that the charges they must pay are a condition of closing the loan.

| ESTIMATED CLOSING COSTS | Applicant | Seller | Lender Pd * |
|---|---|---|---|
| 801 Loan Origination Fee 1.000 % | 1,425.00 | 0.00 | — |
| 802 Loan Discount 0.875 % | 1,246.88 | 0.00 | — |
| 803 Appraisal Fee ** | 400.00 | 0.00 | — |
| 804 Credit Report Fee ** | 15.50 | 0.00 | — |
| 806 Broker Processing Fee | 685.00 | 0.00 | — |
| 807 Express Mail Fee | 0.00 | 0.00 | — |
| 809 Tax Service Fee | 21.00 | 0.00 | — |
| Tax Research Fee | 56.00 | 0.00 | — |
| 810 Loan Processing Fee | 635.00 | 0.00 | — |
| 811 Underwriting Fee | 0.00 | 0.00 | — |
| 812 Buydown Funds | 0.00 | 0.00 | — |
| 813 Application Fee ** | 0.00 | 0.00 | — |
| 814 Inspection fee - Appraiser | 0.00 | 0.00 | — |
| 815 Flood Certification Fee | 7.50 | 0.00 | — |
| 1101 Settlement/Closing Fee | 650.00 | 0.00 | — |
| 1102 Abstract to Title Search | 0.00 | 0.00 | — |
| 1103 Title Examination | 0.00 | 0.00 | — |
| 1104 Title Insurance Binder | 0.00 | 0.00 | — |
| 1105 Document Prep - Closing Agent | 0.00 | 0.00 | — |
| 1106 Notary Fees | 0.00 | 0.00 | — |
| 1107 Attorney's Fees (includes above item nos. | 0.00 | 0.00 | — |
| 1108 Title Insurance (includes above item nos. | 0.00 | 0.00 | — |
| 1113 Document Review Fee | 0.00 | 0.00 | — |
| 1201 Recording Fees | 0.00 | 0.00 | — |
| 1202 City/County Tax/Stamps | 0.00 | 0.00 | — |
| 1203 State Tax/Stamps | 0.00 | 0.00 | — |
| 1204 Wire Fee | 15.00 | 0.00 | — |
| 1205 Escrow Waiver Fee | 0.00 | 0.00 | — |
| 1301 Survey | 0.00 | 0.00 | — |
| 1302 Pest Inspection Fee | 0.00 | 0.00 | — |
| 1304 RECORDING FEE | 150.00 | 0.00 | — |
| 1305 TITLE INSURANCE FEE | 1,100.00 | 0.00 | — |
| 1306 | 0.00 | 0.00 | — |
| 1307 | 0.00 | 0.00 | — |
| Estimated Closing Costs (f) | $ 5,160.00 | 0.00 | — |
| Discount Points | 1,246.88 | 0.00 | — |
| Total Closing Costs | $ 6,406.88 | 0.00 | — |

**National City Bank of Indiana**

One National City Center Ste 4
Indianapolis, Indiana 46255

Borrower(s): NEIL LARKINS

Property: 4801 LORRAYNE PL
KLAMATH FALLS, Oregon 97603

Loan Program: CONV, Fixed, Purchase
Buydown: Non-Buydown
Balloon in months:
Note Rate: 8.000%
Term in months: 360
Loan to Value: 95.00%
Cumulative LTV: 95.00%
Mtg. Broker Fee $ 0.00

DETAILS OF TRANSACTION
| | |
|---|---|
| a. Purchase Price | $ 150,000.00 |
| b. Alterations, improvements, repairs | 0.00 |
| c. Land (if acquired separately) | 0.00 |
| d. Refinance (incl. debts to be paid off) | 0.00 |
| e. Estimated Prepaid items | 1,780.32 |
| f. Estimated Closing Costs | 4,468.38 |
| g. PMI, MIP, VA Funding fee | 0.00 |
| h. Discount (if borrower to pay) | 1,246.88 |
| i. Total Costs (items a-h) | 157,495.58 |
| j. Subordinate financing | |
| k. Closing costs paid by Seller | 0.00 |
| l. Other Credits | |
| Earnest Money | 0.00 |
| MIP Refund | 0.00 |
| | |
| Broker Paid Fee | 0.00 |
| m. Loan Amount (ex. Financed MIP,PMI) | 142,500.00 |
| n. PMI/MIP/VA Funding Financed | 0.00 |
| o. Loan Amount (m + n) | |
| p. Cash from/(to) Borrower | $ 12,995.58 |
| (subtract j, k, l & o from i) | |

PROPOSED PAYMENT (PITI)
| | |
|---|---|
| First Mortgage (P & I) | 1,045.62 |
| Other financing (P&I) | 0.00 |
| Hazard Insurance | 28.64 |
| Flood Insurance | 0.00 |
| Real Estate Taxes | 75.75 |
| Mortgage Insurance | 0.00 |
| Homeowner Asc. Dues | 0.00 |
| Leasehold Ground Rent | 0.00 |
| Other | 0.00 |
| Total Payment (PITI) | $ 1,150.01 |

| ESTIMATED PREPAID ITEMS | | Applicant | Seller |
|---|---|---|---|
| 901 Interest for 30 days @ 31.230 | | 936.90 | 0.00 |
| 902 PMI/UFMIP/VA Funding fee (Financed) | | 0.00 | |
| 903 Hazard Insurance Premium | | 0.00 | 0.00 |
| 904 Flood Insurance Premium | | 0.00 | 0.00 |
| 1001 Hazard Ins. 3 mths @ 28.64 | | 85.92 | 0.00 |
| 1002 PMI/UFMIP 0 mths @ 0.00 | | 0.00 | 0.00 |
| 1004 Co property tax 10 mths @ 75.75 | | 757.50 | 0.00 |
| 1005 Ann. assessment 0 mths @ 0.00 | | 0.00 | 0.00 |
| 1006 Flood Ins. 0 mths @ | | 0.00 | 0.00 |
| 1007 0 mths @ 0.00 | | 0.00 | 0.00 |
| 1008 MISC. ESCROWS | | 0.00 | 0.00 |
| Estimated Prepaid Items (e) | | $ 1,780.32 | 0.00 |
| PMI/UFMIP/VA Funding Fee (Pd in Cash) | | 0.00 | 0.00 |
| Total Prepaid Items (e) | | $ 1,780.32 | 0.00 |

You have the right to receive a copy of the appraisal report used in connection with your application for credit, provided such a report is retained by us. If you wish a copy, please write to us at the mailing address we have provided. Please contact us after we notify you of the action taken on your credit application or you withdraw your application. In your letter give us your name, the date the loan application was taken, the date the loan application was taken, and the name of the branch office or department that processed your loan application.

Use of the particular provider listed below is required and the estimate is based on charges of the provider. The providers' services have been used in the past 12 months.

| NAME & ADDRESS OF PROVIDER | | | TELEPHONE | ITEM |
|---|---|---|---|---|
| First American Real Estate Tax Service | 8435 N. Stemmons Freeway | Dallas, TX 75270-3907 | 214-879-5000 | Tax Service |
| Land America National Lender Services | 1123 S. Parkview Drive | Covina, CA 91724 | 626-332-1942 | Tax Service |
| Z C Real Estate Tax Solutions | 210 Interstate N Parkway #400 | Atlanta, GA 30339 | 800-962-9654 | Tax Service |
| First American Flood Data Services, Inc | 11902 Burnet Road, #400 | Austin, TX 78758 | 800-447-1772 | Flood Service |

Applicant(s) acknowledge receipt of the Good Faith Estimate, The Consumer Handbook on Adjustable Rate Mortgages (if applicable), **National City Bank of Indiana** Privacy Notice and the Settlement Cost Guide, also known as the Special Information Booklet and have read the full disclosure. Under the Fair Credit Reporting Act, there is certain credit information that cannot be shared among **National City Bank of Indiana** owned companies, if you are in writing. Such a request should be addressed to **National City Bank of Indiana** , Office of Consumer Privacy, P.O. Box 4068, Kalamazoo, MI 49009 and must include your name, address, account number and social security number.

Borrower    NEIL LARKINS        Date 5/1/06

Co-Borrower        Date

WHLGFE1                Page 1 Of 2                (12/04)

ADDENDUM TO: National City Mortgage, Page 39 of 277

## GOOD FAITH ESTIMATE OF CLOSING COSTS

Date: _____ 5/1/2006

Loan Number: ▇▇▇▇▇▇▇

The interest calculation as seen in item 901 represents the average amount of interest you could be required to pay at settlement. The actual amount will be determined by which day of the month your settlement is conducted.

\* L = Lender Paid  C=Broker/Correspondent

\*\* A nonrefundable application fee may be charged for the initial cost of processing, verifying and preparing your loan package to submit for commitment. The fee for the credit report and/or appraisal may be included in the application fee. Nonrefundable fees are subject to the applicable limitations of State or Federal law. Ask your Loan Officer or Mortgage Broker for specific details regarding your transaction.

\*\*\*For Rhode Island Residents Only: You have received a good faith estimate or other itemization of fees and charges showing the loan fees and similar charges you are likely to pay to obtain this loan. As provided in Rhode Island General laws Section 34-23-6, none of these or other fees and charges will be refunded in the event the loan is prepaid in whole or in part.

There may be additional settlement service providers who are required; however, the exact providers have yet to be selected for your real estate transaction. As a lender, we maintain an approved list of providers and the amount listed on the first page is an estimate based on the charges of the particular service. At the time of settlement, you will be provided a Settlement Statement, which will identify the required providers and the exact cost of the settlement services provided.

If an item(s) listed on the first page of the Good Faith Estimate requires the use of a particular settlement provider, the provider is listed below or on the first page. The estimate is based on the charges of the named provider.

| | |
|---|---|
| Item:    Appraisal Service | Item:    Credit Report |
| Name:    Network Appraisal Services, Inc. | Name:    CSC Credit Service/Equifax |
| Address: 124 West Gates Ste 204 Romeo, MI 48065 | Address: 205 W. Fourth St Suite 400 Cincinnati, OH 45202 |
| Telephone: 586-336-9580 | Telephone: 800-753-1325 |
| Relationship: | Relationship: |
| Mortgage Co. has used/required provider's services during past 12 months. | Mortgage Co. has used/required providers services during past 12 months. |

### APPRAISAL DISCLOSURE

You have the right to receive a copy of the appraisal report used in connection with your loan application for credit, provided such a report is retained by us. If you wish a copy, please write to us at the mailing address we have provided. Please contact us after we notify you about the action taken on your credit application or you withdraw your application. We must be notified in writing. In your letter, please give us your name, address, the date the loan application was taken and the name of the branch office, department that processed your loan application or broker who arranged your financing.

The Address is:    **National City Mortgage Co., Wholesale Support,
3232 Newmark Dr., Miamisburg, OH 45342**

### NOTICE OF RIGHT TO CHOOSE INSURER

In connection with your loan, **National City Bank of Indiana**
(the "Lender") may be requiring the purchase of insurance against the loss or damage to the mortgaged property.

Please be advised that with regard to any insurance provided by the Lender: You have the option of providing the required insurance through an existing policy of insurance or through a policy to be purchased from an insurer, agent or broker of your choice. The Lender, reserves the right to reject a given insurer or agent based on reasonable standards, uniformly applied, relating to the extent of coverage required and the financial soundness and the services of the insurer.

### IMPORTANT INFORMATION ABOUT PRODECURES FOR OBTAINING A MORTGAGE LOAN

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all mortgage bankers to obtain, verify, and record information that identifies each person who applies for a mortgage loan. What this means for you: When you apply for a mortgage loan, we will ask for your name, address, date of birth, and other information that will allow us to identify you. At closing, our agent will also ask to see your driver's license or other identifying documents.

THIS GOOD FAITH ESTIMATE MAY NOT COVER ALL ITEMS YOU WILL BE REQUIRED TO PAY IN CASH AT SETTLEMENT. YOU MAY WISH TO INQUIRE AS TO THE AMOUNT OF SUCH OTHER ITEMS. YOU MAY BE REQUIRED TO PAY OTHER ADDITIONAL AMOUNTS AT SETTLEMENT.

THIS GOOD FAITH ESTIMATE IS PROVIDED TO YOU IN COMPLIANCE WITH THE REAL ESTATE SETTLEMENT PROCEDURES ACT OF 1974, AS AMENDED (RESPA). IT IS NOT AN APPROVAL OF YOUR MORTGAGE LOAN APPLICATION NOR A COMMITMENT TO MAKE YOU A LOAN.

Applicants acknowledge receipt of the Good Faith Estimate of Closing along with this Addendum.

Borrower: _[signature]_____    Date: _5/1/06_____
          NEIL LARKINS

Borrower: _____    Date: _____

Co-Borrower: _____    Date: _____

Co-Borrower: _____    Date: _____



**AmeriTitle**
*Part Of The JELD-WEN Family*

300 Klamath Avenue                          Bus (541) 883-3401
Klamath Falls, OR 97601                     Fax (541) 882-0628

## BUYER'S FINAL CLOSING STATEMENT

RE: YOUR ESCROW NO: MT73867-MS              DATE: 05/11/2006
                                            CLOSE OF ESCROW: 05/11/2006

Neil Larkins (the "Buyer") is/are buying the subject property described herein from: Judith A. McCullick (the "Seller").

SUBJECT PROPERTY:  4801 Lorrayne Place, Klamath Falls, OR 97603

TITLE ORDER NO.: ███

| PRORATE DATE: 05/15/2006 | CHARGE | CREDIT |
|---|---|---|
| PURCHASE PRICE | $150,000.00 | |
| | | |
| BUYER DEPOSITS: | | |
| NEIL LARKINS | | 500.00 |
| Neil Larkins | | 14,453.00 |
| PRORATIONS AS OF Close of Escrow : | | |
| Real Prop. Tax @ 908.99  paid to  07/01/2006 | 117.05 | |
| KLAMATH IRRIGATION DISTRICT @ 36.00  paid to 01/01/2007 | 22.78 | |
| SOUTH SUBURBAN SANITARY DISTRICT @ 54.12  paid to  07/01/2006 | 27.88 | |
| | | |
| NEW ENCUMBRANCE | | |
| National City Bank of Indiana | | 142,500.00 |
| Interest from 05/11/2006 to 06/01/2006 | 655.83 | |
| DISCOUNT POINTS | 1,246.88 | |
| TAX SERVICE FEE | 21.00 | |
| TAX RESEARCH FEE | 56.00 | |
| FLOOD DETERMINATION FEE | 7.50 | |
| ADMIN FEE | 635.00 | |
| Wire Fee | 15.00 | |
| TAXES:10 mo @$75.75  per mo | 757.50 | |
| FIRE INS.:3 mo @$28.64  per mo | 85.92 | |
| AGGREGATE ACCOUNTING ADJUSTMENT | 143.22CR | |
| Fees Paid to: | | |
| Mission Hills Mortgage Bankers | | |
| ORIGINATION FEE | 1,425.00 | |
| APPRAISAL | 400.00 | |
| CREDIT REPORT | 15.50 | |
| Processing Fee Broker | 685.00 | |
| DEPOSIT TO BROKER | | 450.00 |
| Fees Paid to: | | |
| Norm Ehlers Insurance Agency | | |
| HAZARD INSURANCE PREMIUM | 343.66 | |
| | | |
| ESCROW FEES: | | |
| AMERITITLE | | |
| ESCROW CLOSING FEE AMERITITLE | 255.00 | |
| SERVICE FEE AMERITITLE | 30.00 | |
| MAILING SERVICES AMERITITLE | 70.00 | |
| TITLE CHARGES: | | |
| | | |
| AMERITITLE | | |
| ALTA RESIDENTIAL EXTENDED (SIMULTANEOUS) | 217.25 | |
| ENDORSEMENTS 100, 116, & 8.1 | 50.00 | |
| RECORDING SERVICES | 175.00 | |
| ADDITIONAL CHARGES & CREDITS: | | |
| | 731.47 | |
| CHECK TO Neil Larkins | | |
| BALANCE NEEDED TO CLOSE | | |
| TOTALS | $157,903.00 | $157,903.00 |

This statement delivered to buyer/borrower is certified to be a true and actual copy of the original

**M06-09525**
Klamath County, Oregon
05/11/2006 03:04:18 PM
Pages  16   Fee: $96.00

Until a change is requested all tax statements shall be
sent to the following address.

*unf.*
*#*
(17)

WHEN RECORDED MAIL TO

National City Bank of Indiana
P.O. BOX 8800
DAYTON, OH  45401-8800

TAX ACCOUNT NUMBER                                           0004644118

True and Actual Consideration is:
$         142,500.00

——— [Space Above This Line For Recording Data] ———

# DEED OF TRUST

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections
3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided
in Section 16.

(A) "Security Instrument" means this document, which is dated    **May 1, 2006**
together with all Riders to this document.
(B) "Borrower" is
NEIL LARKINS

Borrower is the trustor under this Security Instrument.
(C) "Lender" is  National City Bank of Indiana

Lender is a    National Banking Association
organized and existing under the laws of    United States
Lender's address is   One National City Center Ste 4, Indianapolis, Indiana   46255

Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is    AMERITITTLE

OREGON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                Form 3038 1/01

-6(OR) (0510)
Page 1 of 15                              Initials:
                VMP Mortgage Solutions, Inc.

**(E) "Note"** means the promissory note signed by Borrower and dated    **May 1, 2006**
The Note states that Borrower owes Lender

(U.S. $   **ONE HUNDRED FORTY TWO THOUSAND FIVE HUNDRED & 00/100**                Dollars
        **142,500.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than    **June 1, 2036**

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☒ Other(s) [specify] Occup Rider |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property;
(iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or
condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the
Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time,
or any additional or successor legislation or regulation that governs the same subject matter. As used in this
Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County** of **Klamath** :
[Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]

LOT 1 IN BLOCK 6 OF FIRST ADDITION TO KELENE GARDENS, ACCORDING TO THE OFFICIAL PLAT THEREOF ON FILE IN THE OFFICE OF THE COUNTY CLERK OF KLAMATH COUNTY, OREGON

which currently has the address of

**4801 LORRAYNE PL,**
**KLAMATH FALLS**                                                    [Street]
("Property Address"):                [City] , Oregon   **97603**   [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

VMP-6(OR) (0510)          Page 3 of 15          Initials:          Form 3038  1/01

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees, and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower

VMP®-6(OR) (0510)                          Page 4 of 15                    Initials: _____                    Form 3038  1/01

shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays. Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10

Initials

days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to

Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a

notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall give notice of sale in the manner prescribed by Applicable Law to Borrower and to other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Attorneys' Fees.** As used in this Security Instrument and in the Note, attorneys' fees shall include those awarded by an appellate court.

**26. Protective Advances.** This Security Instrument secures any advances Lender, at its discretion, may make under Section 9 of this Security Instrument to protect Lender's interest in the Property and rights under this Security Instrument.

**27. Required Evidence of Property Insurance.**

### WARNING

Unless you provide us with evidence of the insurance coverage as required by our contract or loan agreement, we may purchase insurance at your expense to protect our interest. This insurance may, but need not, also protect your interest. If the collateral becomes damaged, the coverage we purchase may not pay any claim you make or any claim made against you. You may later cancel this coverage by providing evidence that you have obtained property coverage elsewhere.

You are responsible for the cost of any insurance purchased by us. The cost of this insurance may be added to your contract or loan balance. If the cost is added to your contract or loan balance, the interest rate on the underlying contract or loan will apply to this added amount. The effective date of coverage may be the date your prior coverage lapsed or the date you failed to provide proof of coverage.

The coverage we purchase may be considerably more expensive than insurance you can obtain on your own and may not satisfy any need for property damage coverage or any mandatory liability insurance requirements imposed by Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                        NEIL LARKINS              -Borrower


_____          _____ (Seal)
                                                                 -Borrower


_____ (Seal)   _____ (Seal)
                -Borrower                                        -Borrower


_____ (Seal)   _____ (Seal)
                -Borrower                                        -Borrower


_____ (Seal)   _____ (Seal)
                -Borrower                                        -Borrower

VMP®-6(OR) (0510)              Page 14 of 15              Form 3038  1/01

CAlifornia

STATE OF ~~OREGON~~,

On this 4th    day of May, 2006

County ss: SONOMA

, personally appeared the above named

Neil Larkins

and acknowledged the foregoing instrument to be his/her/their voluntary act and deed.

My Commission Expires: 2/21/2008

(Official Seal)

Before me: Aleia Coate

~~Notary Public for Oregon~~ CAlifornia

OFFICIAL SEAL - 1471381
ALEIA L. COATE
NOTARY PUBLIC - CALIF.
COUNTY OF SONOMA
My Comm. Exp. Feb. 21, 2008

NCR-1

VMP -6(OR) (0510)

Page 15 of 15

Initials:

Form 3038   1/01

CERTIFIED TO BE A TRUE &
CORRECT COPY OF THE ORIGINAL
AmeriTitle
BY_____

# NOTE

May 1 , 2006
[Date]

[City]

[State]

4801 LORRAYNE PL, KLAMATH FALLS, Oregon 97603
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $      142,500.00   (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
**National City Bank of Indiana**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of     8.000    %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the   1st     day of each month beginning on   July 1 , 2006          . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on    June 1, 2036          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at    **National City Mortgage Co.**
**P O Box 54828, Los Angeles, CA 90054-0828**
or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $       1,045.62  .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**MULTISTATE FIXED RATE NOTE**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

VMP®-5N (0207)          **Form 3200 1/01**
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3          Initials: _____



## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of      15      calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be      5.00      % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)           _____ (Seal)
NEIL LARKINS                    -Borrower                                         -Borrower
562250612

_____ (Seal)           _____ (Seal)
                                -Borrower                                         -Borrower

_____ (Seal)           _____ (Seal)
                                -Borrower                                         -Borrower

_____ (Seal)           _____ (Seal)
                                -Borrower                                         -Borrower

*[Sign Original Only]*



10/30/2012                    http://www.sec.gov/Archives/edgar/da...

<FILENAME>e25384-424b2.txt
<DESCRIPTION>PROSPECTUS SUPPLEMENT
<TEXT>

Prospectus supplement dated October 27, 2006
(to prospectus dated October 26, 2006)

$743,878,961

RALI Series 2006-QS14 Trust
Issuing Entity

Residential Accredit Loans, Inc.
Depositor

Residential Funding Company, LLC
Master Servicer and Sponsor

Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS14

The trust will hold a pool of one- to four-family residential first lien mortgage loans.

The trust will issue these classes of certificates that are offered under this prospectus supplement:

> o    34 classes of senior certificates designated Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class A-6, Class A-7, Class A-8, Class A-9, Class A-10, Class A-11, Class A-12, Class A-13, Class A-14, Class A-15, Class A-16, Class A-17, Class A-18, Class A-19, Class A-20, Class A-21, Class A-22, Class A-23, Class A-24, Class A-25, Class A-26, Class A-27, Class A-28, Class A-29, Class A-30, Class A-P, Class A-V, Class R-I and Class R-II Certificates, and

> o    3 classes of subordinated certificates designated Class M-1, Class M-2 and Class M-3 Certificates

all as more fully described in the table on pages S-8 and S-9 of this prospectus supplement.

Credit enhancement for all of these certificates will be provided by additional classes of subordinated certificates which are not offered hereby.

Distributions on the certificates will be on the 25th of each month or, if the 25th is not a business day, on the next business day, beginning November 27, 2006.

- ------------------------------------------------------------------------

You should consider carefully the risk factors beginning on page S-18 in this prospectus supplement.

- ------------------------------------------------------------------------

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the offered certificates or determined

Pool # PSA

| | | | | | |
|---|---|---|---|---|---|
| **10522658** | **286/286** | **F** | | **142,500.00** | **ZZ** |
| | 360 | | 142,113.67 | 1 | |
| | 8.0000 | | 1045.62 | 95 | |
| 7.1420 | | 1045.62 | | | |
| **KLAMATH FALLS OR 97603** | | **1** | | **05/01/06** | **26** |
| 0004644118 | | 05 | | 07/01/06 | 30.0000 |
| **0004644118** | | **O** | | **06/01/36** | |
| 0 | | | | | |



**<u>Exhibit D</u>**
**Deed of Trust**

ny-1143211

Identifi[REDACTED]   Doc Type:MTGR

hTC-738647 MS

**M06-09525**
Klamath County, Oregon
05/11/2006 03:04:18 PM
Pages  16   Fee: $96.00



unf,
#
(17)

**Until a change is requested all tax statements shall be
sent to the following address.**

**WHEN RECORDED MAIL TO**

National City Bank of Indiana
P.O. BOX 8800
DAYTON, OH  45401-8800

**TAX ACCOUNT NUMBER**                                         0004644118

**True and Actual Consideration is:**
$          142,500.00              ———— [Space Above This Line For Recording Data] ————

# DEED OF TRUST

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections
3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided
in Section 16.

**(A) "Security Instrument"** means this document, which is dated   **May 1, 2006**
together with all Riders to this document.
**(B) "Borrower"** is
**NEIL LARKINS**

Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is  **National City Bank of Indiana**

Lender is a  **National Banking Association**
organized and existing under the laws of   **United States**
Lender's address is   **One National City Center Ste 4, Indianapolis, Indiana  46255**

Lender is the beneficiary under this Security Instrument.
**(D) "Trustee"** is   **AMERITITLE**

**OREGON** - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**         **Form 3038  1/01**



-6(OR) (0510)
Page 1 of 15         Initials: _____
VMP Mortgage Solutions, Inc.



**(E) "Note"** means the promissory note signed by Borrower and dated **May 1, 2006**
The Note states that Borrower owes Lender

(U.S. $ **ONE HUNDRED FORTY TWO THOUSAND FIVE HUNDRED & 00/100** Dollars
**142,500.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **June 1, 2036**

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☒ Other(s) [specify] **Occup Rider** |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property;
(iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or
condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the
Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time,
or any additional or successor legislation or regulation that governs the same subject matter. As used in this
Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County** of **Klamath** :
[Type of Recording Jurisdiction]      [Name of Recording Jurisdiction]

**LOT 1 IN BLOCK 6 OF FIRST ADDITION TO KELENE GARDENS, ACCORDING TO THE OFFICIAL PLAT THEREOF ON FILE IN THE OFFICE OF THE COUNTY CLERK OF KLAMATH COUNTY, OREGON**

which currently has the address of

**4801 LORRAYNE PL,**                                  [Street]
**KLAMATH FALLS**                  [City] , Oregon   **97603**    [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

Initials:

-6(OR) (0510)                  Page 3 of 15                  Form 3038  1/01

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees, and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower



shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10

days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to

 -6(OR) (0510)          Page 6 of 15          Initials:           **Form 3038  1/01**

Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

Initials:

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b)** Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials:

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a

notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Initials: _____

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall give notice of sale in the manner prescribed by Applicable Law to Borrower and to other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Attorneys' Fees.** As used in this Security Instrument and in the Note, attorneys' fees shall include those awarded by an appellate court.

**26. Protective Advances.** This Security Instrument secures any advances Lender, at its discretion, may make under Section 9 of this Security Instrument to protect Lender's interest in the Property and rights under this Security Instrument.

**27. Required Evidence of Property Insurance.**

### WARNING

Unless you provide us with evidence of the insurance coverage as required by our contract or loan agreement, we may purchase insurance at your expense to protect our interest. This insurance may, but need not, also protect your interest. If the collateral becomes damaged, the coverage we purchase may not pay any claim you make or any claim made against you. You may later cancel this coverage by providing evidence that you have obtained property coverage elsewhere.

You are responsible for the cost of any insurance purchased by us. The cost of this insurance may be added to your contract or loan balance. If the cost is added to your contract or loan balance, the interest rate on the underlying contract or loan will apply to this added amount. The effective date of coverage may be the date your prior coverage lapsed or the date you failed to provide proof of coverage.

The coverage we purchase may be considerably more expensive than insurance you can obtain on your own and may not satisfy any need for property damage coverage or any mandatory liability insurance requirements imposed by Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                          NEIL LARKINS                   -Borrower

_____          _____ (Seal)
                                                                         -Borrower

_____ (Seal)    _____ (Seal)
                        -Borrower                                        -Borrower

_____ (Seal)    _____ (Seal)
                        -Borrower                                        -Borrower

_____ (Seal)    _____ (Seal)
                        -Borrower                                        -Borrower

CAlifornia

**STATE OF ~~OREGON~~,**                          County ss: SONOMA

On this 4th      day of MAY, 2006        , personally appeared the above named

Neil Larkins

and acknowledged the foregoing instrument to be his/her/their voluntary act and deed.

My Commission Expires: 2/21/2008        Before me: AleIa COAte

(Official Seal)                                  Alea COATe

                                        Notary Public for ~~Oregon~~ CAlifornia



OFFICIAL SEAL - 1471381
NCR-1   ALEIA L. COATE   NCR-1
NOTARY PUBLIC - CALIF.
COUNTY OF SONOMA
My Comm. Exp. Feb. 21, 2008

Initials: _____

# BORROWER OCCUPANCY RIDER

This Borrower Occupancy Rider is made this <u>1st</u> day of <u>May</u>, <u>2006</u>, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure said borrower's Note to _____
<u>National City Bank of Indiana</u> _____ (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

<u>4801 LORRAYNE PL</u> _____

<u>KLAMATH FALLS, Oregon 97603</u> _____

**Additional Covenants.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## BORROWER OCCUPANCY COVENANT

Borrower agrees to occupy the property as borrower's principal residence within sixty (60) days after the date of the Security Instrument. If Borrower does not so occupy the property, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by law as of the date of the Security Instrument.

By signing below, Borrower accepts and agrees to the terms and covenants contained in this Borrower Occupancy Rider.

_____          _____
Borrower NEIL LARKINS                        Borrower

_____          _____
Borrower                                     Borrower

_____          _____
Borrower                                     Borrower

_____          _____
Borrower                                     Borrower

OCCRIDER                                                          (04/05)

**<u>Exhibit E</u>**
**Larkins Note**

# NOTE

May 1 , 2006
[Date]                                          [City]     **ORIGINAL NOTE**     [State]

4801 LORRAYNE PL, KLAMATH FALLS, Oregon 97603
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 142,500.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
**National City Bank of Indiana**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **8.000** %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the **1st** day of each month beginning on **July 1 , 2006**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **June 1, 2036**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **National City Mortgage Co.**
**P O Box 54828, Los Angeles, CA 90054-0828** or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ **1,045.62** .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**MULTISTATE FIXED RATE NOTE**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

VMP®-5N (0207)          **Form 3200 1/01**
VMP MORTGAGE FORMS · (800)521-7291
Page 1 of 3          Initials:

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    **15**    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    **5.00**    % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)                    _____ (Seal)
NEIL LARKINS                           -Borrower                                                   -Borrower

_____ (Seal)                    _____ (Seal)
                                       -Borrower                                                   -Borrower

_____ (Seal)          PAY TO THE ORDER OF                    _____ (Seal)
                                       -Borrower   RESIDENTIAL FUNDING COMPANY, LLC                                       -Borrower

PAY TO THE ORDER OF                                WITHOUT RECOURSE
NATIONAL CITY MORTGAGE CO                           NATIONAL CITY MORTGAGE CO
A SUBSIDIARY OF NATIONAL CITY BANK OF INDIANA       A SUBSIDIARY OF NATIONAL CITY BANK
NATIONAL CITY MORTGAGE A DIVISION OF                OF INDIANA

_____ (Seal)                    _____ (Seal)
                                       -Borrower                                                   -Borrower


PAY TO THE ORDER OF                 *[Sign Original Only]*
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Company, LLC

BY  *Judy Faber*
Judy Faber, Vice President

**Exhibit F**
**Assumption and Assignment Agreement**

EX-10 3 qs14aa.htm EX 10.2

Execution Copy

ASSIGNMENT AND ASSUMPTION AGREEMENT

ASSIGNMENT AND ASSUMPTION AGREEMENT, dated October 30, 2006, between Residential Funding Company, LLC, a Delaware corporation ("RFC"), and Residential Accredit Loans, Inc., a Delaware corporation (the "Company").

Recitals

A. RFC has entered into contracts ("Seller Contracts") with various seller/servicers, pursuant to which such seller/servicers sell to RFC mortgage loans.

B. The Company wishes to purchase from RFC certain Mortgage Loans (as hereinafter defined) sold to RFC pursuant to the Seller Contracts.

C. The Company, RFC, as master servicer, and Deutsche Bank Trust Company Americas, as trustee (the "Trustee"), are entering into a Series Supplement, dated as of October 30, 2006 (the "Series Supplement"), and the Standard Terms of Pooling and Servicing Agreement, dated as of March 1, 2006 (collectively, the "Pooling and Servicing Agreement"), pursuant to which the Company proposes to issue Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS14 (the "Certificates") consisting of thirty-four classes designated as Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class A-6, Class A-7, Class A-8, Class A-9, Class A-10, Class A-11, Class A-12, Class A-13, Class A-14, Class A-15, Class A-16, Class A-17, Class A-18, Class A-19, Class A-20, Class A-21, Class A-22, Class A-23, Class A-24, Class A-25, Class A-26, Class A-27, Class A-28, Class A-29, Class A-30, Class A-P, Class A-V, Class R-I and Class R-II Certificates; and six classes designated as Class M-1, Class M-2, Class M-3 (collectively the "Class M Certificates"), Class B-1, Class B-2 and Class B-3 Certificates (collectively the "Class B Certificates") representing beneficial ownership interests in a trust fund consisting primarily of a pool of Mortgage Loans identified in Exhibit One to the Series Supplement (the "Mortgage Loans").

D. In connection with the purchase of the Mortgage Loans, the Company will assign to RFC the Class A-P Certificates and Class A-V Certificates and a de minimis portion of each of the Class R-I and Class R-II Certificates.

E. In connection with the purchase of the Mortgage Loans and the issuance of the Certificates, RFC wishes to make certain representations and warranties to the Company.

F. The Company and RFC intend that the conveyance by RFC to the Company of all its right, title and interest in and to the Mortgage Loans pursuant to this Agreement shall constitute a purchase and sale and not a loan.

NOW THEREFORE, in consideration of the recitals and the mutual promises herein and other good and valuable consideration, the parties agree as follows:

1. All capitalized terms used but not defined herein shall have the meanings assigned thereto in the Pooling and Servicing Agreement.

2. Concurrently with the execution and delivery hereof, RFC hereby assigns to the Company without recourse all of its right, title and

interest in and to the Mortgage Loans, including all interest and principal, and with respect to the Sharia Mortgage Loans, all amounts in respect of profit payments and acquisition payments, received on or with respect to the Mortgage Loans after October 1, 2006 (other than payments of principal and interest, and with respect to the Sharia Mortgage Loans, all amounts in respect of profit payments and acquisition payments due on the Mortgage Loans on or before October 31, 2006). In consideration of such assignment, RFC or its designee will receive from the Company in immediately available funds an amount equal to $754,099,422.61, the Class A-P Certificates, the Class A-V Certificates and a de minimis portion of each of the Class R-I and Class R-II Certificates. In connection with such assignment and at the Company's direction, RFC has in respect of each Mortgage Loan endorsed the related Mortgage Note (other than any Destroyed Mortgage Note) to the order of the Trustee and delivered an assignment of mortgage or security instrument, as applicable, in recordable form to the Trustee or its agent.

RFC and the Company agree that the sale of each Pledged Asset Loan pursuant to this Agreement will also constitute the assignment, sale, setting-over, transfer and conveyance to the Company, without recourse (but subject to RFC's covenants, representations and warranties specifically provided herein), of all of RFC's obligations and all of RFC's right, title and interest in, to and under, whether now existing or hereafter acquired as owner of such Pledged Asset Loan with respect to any and all money, securities, security entitlements, accounts, general intangibles, payment intangibles, instruments, documents, deposit accounts, certificates of deposit, commodities contracts, and other investment property and other property of whatever kind or description consisting of, arising from or related, (i) the Credit Support Pledge Agreement, the Funding and Pledge Agreement among the Mortgagor or other Person pledging the related Pledged Assets (the "Customer"), Combined Collateral LLC and National Financial Services Corporation, and the Additional Collateral Agreement between GMAC Mortgage, LLC and the Customer (collectively, the "Assigned Contracts"), (ii) all rights, powers and remedies of RFC as owner of such Pledged Asset Loan under or in connection with the Assigned Contracts, whether arising under the terms of such Assigned Contracts, by statute, at law or in equity, or otherwise arising out of any default by the Mortgagor under or in connection with the Assigned Contracts, including all rights to exercise any election or option or to make any decision or determination or to give or receive any notice, consent, approval or waiver thereunder, (iii) the Pledged Amounts and all money, securities, security entitlements, accounts, general intangibles, payment intangibles, instruments, documents, deposit accounts, certificates of deposit, commodities contracts, and other investment property and other property of whatever kind or description and all cash and non-cash proceeds of the sale, exchange, or redemption of, and all stock or conversion rights, rights to subscribe, liquidation dividends or preferences, stock dividends, rights to interest, dividends, earnings, income, rents, issues, profits, interest payments or other distributions of cash or other property that secures a Pledged Asset Loan, (iv) all documents, books and records concerning the foregoing (including all computer programs, tapes, disks and related items containing any such information) and (v) all insurance proceeds (including proceeds from the Federal Deposit Insurance Corporation or the Securities Investor Protection Corporation or any other insurance company) of any of the foregoing or replacements thereof or substitutions therefor, proceeds of proceeds and the conversion, voluntary or involuntary, of any thereof. The foregoing transfer, sale, assignment and conveyance does not constitute and is not intended to result in the creation, or an assumption by the Company, of any obligation of RFC, or any other Person in connection with the Pledged Assets or under any agreement or instrument relating thereto, including any obligation to the Mortgagor, other than as owner of the Pledged Asset Loan.

The Company and RFC intend that the conveyance by RFC to the Company of all its right, title and interest in and to the Mortgage Loans pursuant to this Section 2 shall be, and be construed as, a sale of the Mortgage Loans by RFC to the Company. It is, further, not intended that such conveyance be deemed to be a pledge of the Mortgage Loans by RFC to the Company to secure a debt or other obligation of RFC. Nonetheless, (a) this Agreement is intended to be and hereby is a security agreement within the meaning of Articles 8 and 9 of the Minnesota Uniform Commercial Code and the Uniform Commercial Code of any other applicable jurisdiction; (b) the conveyance provided for in this Section shall be deemed to be, and hereby is, a grant by RFC to the Company of a security interest in all of RFC's right, title and interest, whether now owned or hereafter acquired, in and to any and all general intangibles, payment intangibles, accounts, chattel paper, instruments, documents, money, deposit accounts, certificates of deposit, goods, letters of credit, advices of credit and investment property consisting of, arising from or relating to any of the following: (A) the Mortgage Loans, including (i) with respect to each Cooperative Loan, the related Mortgage Note, Security Agreement, Assignment of Proprietary Lease, Cooperative Stock Certificate, Cooperative Lease, any insurance policies and all other documents in the related Mortgage File, (ii) with respect to each Sharia Mortgage Loan, the related Sharia Mortgage Loan Security Instrument, Sharia Mortgage Loan Co-Ownership Agreement, Obligation to Pay, Assignment Agreement and Amendment of Security Instrument, any insurance policies and all other documents in the related Mortgage File and (iii) with respect to each Mortgage Loan other than a Cooperative Loan or a Sharia Mortgage Loan, the related Mortgage Note, the Mortgage, any insurance policies and all other documents in the related Mortgage File, (B) all monies due or to become due pursuant to the Mortgage Loans in accordance with the terms thereof and (C) all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, including without limitation all amounts from time to time held or invested in the Certificate Account or the Custodial Account, whether in the form of cash, instruments, securities or other property; (c) the possession by the Trustee, the Custodian or any other agent of the Trustee of Mortgage Notes or such other items of property as constitute instruments, money, payment intangibles, negotiable documents, goods, deposit accounts, letters of credit, advices of credit, investment property or chattel paper shall be deemed to be "possession by the secured party," or possession by a purchaser or a person designated by such secured party, for purposes of perfecting the security interest pursuant to the Minnesota Uniform Commercial Code and the Uniform Commercial Code of any other applicable jurisdiction (including, without limitation, Sections 8-106, 9-313 and 9-106 thereof); and (d) notifications to persons holding such property, and acknowledgments, receipts or confirmations from persons holding such property, shall be deemed notifications to, or acknowledgments, receipts or confirmations from, securities intermediaries, bailees or agents of, or persons holding for, (as applicable) the Trustee for the purpose of perfecting such security interest under applicable law. RFC shall, to the extent consistent with this Agreement, take such reasonable actions as may be necessary to ensure that, if this Agreement were determined to create a security interest in the Mortgage Loans and the other property described above, such security interest would be determined to be a perfected security interest of first priority under applicable law and will be maintained as such throughout the term of this Agreement. Without limiting the generality of the foregoing, RFC shall prepare and deliver to the Company not less than 15 days prior to any filing date, and the Company shall file, or shall cause to be filed, at the expense of RFC, all filings necessary to maintain the effectiveness of any original filings necessary under the Uniform Commercial Code as in effect in any jurisdiction to perfect the Company's security interest in or lien on the Mortgage Loans, including without limitation

(x) continuation statements, and (y) such other statements as may be occasioned by (1) any change of name of RFC or the Company, (2) any change of location of the state of formation, place of business or the chief executive office of RFC, or (3) any transfer of any interest of RFC in any Mortgage Loan.

Notwithstanding the foregoing, (i) the Master Servicer shall retain all servicing rights (including, without limitation, primary servicing and master servicing) relating to or arising out of the Mortgage Loans, and all rights to receive servicing fees, servicing income and other payments made as compensation for such servicing granted to it under the Pooling and Servicing Agreement pursuant to the terms and conditions set forth therein (collectively, the "Servicing Rights") and (ii) the Servicing Rights are not included in the collateral in which RFC grants a security interest pursuant to the immediately preceding paragraph.

3. Concurrently with the execution and delivery hereof, the Company hereby assigns to RFC without recourse all of its right, title and interest in and to the Class A-P Certificates, the Class A-V Certificates and a de minimis portion of each of the Class R-I and Class R-II Certificates as part of the consideration payable to RFC by the Company pursuant to this Agreement.

4. RFC represents and warrants to the Company that on the date of execution hereof (or, if otherwise specified below, as of the date so specified):

(a) The information set forth in Exhibit One to the Series Supplement with respect to each Mortgage Loan or the Mortgage Loans, as the case may be, is true and correct in all material respects, at the date or dates respecting which such information is furnished;

(b) Each Mortgage Loan is required to be covered by a standard hazard insurance policy. Each Mortgage Loan with a Loan-to-Value Ratio at origination in excess of 80% will be insured by a Primary Insurance Policy covering at least 35% of the principal balance of the Mortgage Loan at origination if the Loan-to-Value Ratio is between 100.00% and 95.01%, at least 30% of the principal balance of the Mortgage Loan at origination if the Loan-to-Value Ratio is between 95.00% and 90.01%, at least 25% of the balance if the Loan-to-Value Ratio is between 90.00% and 85.01% and at least 12% of the balance if the Loan-to-Value Ratio is between 85.00% and 80.01%. To the best of the Company's knowledge, each such Primary Insurance Policy is in full force and effect and the Trustee is entitled to the benefits thereunder;

(c) Each Primary Insurance Policy insures the named insured and its successors and assigns, and the issuer of the Primary Insurance Policy is an insurance company whose claims-paying ability is currently acceptable to the Rating Agencies;

(d) Immediately prior to the assignment of the Mortgage Loans to the Company, RFC had good title to, and was the sole owner of, each Mortgage Loan free and clear of any pledge, lien, encumbrance or security interest (other than rights to servicing and related compensation and, with respect to certain Mortgage Loans, the monthly payment due on the first Due Date following the Cut-off Date), and no action has been taken or failed to be taken by RFC that would materially adversely affect the enforceability of any Mortgage Loan or the interests therein of any holder of the Certificates;

(e) No Mortgage Loan was 30 or more days delinquent in payment of principal and interest as of the Cut-off Date and no Mortgage Loan has

been so delinquent  more than once in the 12-month period prior to the Cut-off Date;

(f)    Subject  to  clause  (e)  above  as  respects  delinquencies, there is no  default,  breach,  violation  or event of  acceleration  existing under any  Mortgage  Note  or  Mortgage  and no event  which,  with  notice and expiration of any grace or cure period,  would  constitute a default,  breach, violation or event of acceleration,  and no such default, breach, violation or event of  acceleration  has been  waived by the Seller or by any other  entity involved in originating or servicing a Mortgage Loan;

(g)    There is no delinquent  tax or  assessment  lien against any Mortgaged Property;

(h)    No  Mortgagor  has any  right  of  offset,  defense or counterclaim  as to the related  Mortgage  Note or  Mortgage  except as may be provided  under the  Servicemembers  Civil Relief Act,  formerly  known as the Soldiers' and Sailors'  Civil Relief Act of 1940, as amended,  and except with respect to any buydown agreement for a Buydown Mortgage Loan;

(i)    There are no mechanics' liens or claims for work,  labor or material  affecting  any Mortgaged  Property which are or may be a lien prior to, or equal with,  the lien of the related  Mortgage,  except such liens that are  insured or  indemnified  against by a title  insurance  policy  described under clause (aa) below;

(j)    Each  Mortgaged  Property is  free  of  damage  and in good repair and no notice of  condemnation  has been given with respect thereto and RFC knows of nothing  involving any Mortgaged  Property that could  reasonably be expected to materially  adversely  affect the value or marketability of any Mortgaged Property;

(k)    Each  Mortgage  Loan at the time it was made complied in all material  respects with applicable local,  state, and federal laws,  including, but not limited to, all applicable anti-predatory lending laws;

(l)    Each Mortgage contains customary and enforceable  provisions which  render the rights and  remedies  of the holder  adequate to realize the benefits of the security against the Mortgaged Property,  including (i) in the case of a  Mortgage  that is a deed  of  trust,  by  trustee's  sale,  (ii) by summary  foreclosure,  if available  under  applicable law, and (iii) otherwise by foreclosure,  and there is no homestead or other exemption available to the Mortgagor that would  interfere with such right to sell at a trustee's sale or right to  foreclosure,  subject in each case to  applicable  federal and state laws and  judicial  precedents  with  respect  to  bankruptcy  and  right  of redemption;

(m)    With  respect to each  Mortgage  that is a deed of trust,  a trustee  duly  qualified  under  applicable  law to serve as such is  properly named,  designated and serving, and except in connection with a trustee's sale after  default by a  Mortgagor,  no fees or expenses are payable by the Seller or RFC to the trustee under any Mortgage that is a deed of trust;

(n)    The  Mortgage  Loans  are  conventional,  fixed  rate, fully-amortizing,  first  mortgage  loans having terms to maturity of not more than 30 years  from the  date of  origination  or  modification  with  monthly payments due, with respect to a majority of the Mortgage  Loans,  on the first day of each month;

(o)    No Mortgage Loan provides for deferred  interest or negative

amortization;

(p)    If any of the  Mortgage  Loans are  secured  by a  leasehold
interest, with  respect to each  leasehold  interest: the use of  leasehold
estates for residential  properties is an accepted  practice in the area where
the related Mortgaged Property is located;  residential  property in such area
consisting of leasehold estates is readily  marketable;  the lease is recorded
and no party is in any way in  breach of any  provision of such  lease;  the
leasehold  is in full force and effect and is not subject to any prior lien or
encumbrance  by which the  leasehold  could be  terminated  or  subject to any
charge or  penalty;  and the  remaining  term of the lease does not  terminate
less than ten years after the maturity date of such Mortgage Loan;

(q)    Each Assigned  Contract  relating to each Pledged  Asset Loan
is a  valid,  binding  and  legally enforceable  obligation  of  the  parties
thereto,  enforceable  in  accordance  with their terms,  except as limited by
bankruptcy,  insolvency  or  other  similar  laws  affecting  generally  the
enforcement of creditor's rights;

(r)    The  Assignor  is the holder of all of the right,  title and
interest as owner of each  Pledged  Asset Loan in and to each of the  Assigned
Contracts  delivered  and sold to the Company  hereunder,  and the  assignment
hereof by RFC validly transfers such right,  title and interest to the Company
free and clear of any pledge,  lien, or security interest or other encumbrance
of any Person;

(s)    The full amount of the Pledged  Amount with  respect to such
Pledged  Asset Loan has been  deposited  with the  custodian  under the Credit
Support  Pledge  Agreement  and is on deposit in the  custodial  account  held
thereunder as of the date hereof;

(t)    RFC is a member of MERS,  in good  standing,  and current in
payment of all fees and  assessments  imposed by MERS,  and has complied  with
all rules and  procedures  of MERS in  connection  with its  assignment to the
Trustee  as  assignee  of the  Depositor  of the  Mortgage  relating  to each
Mortgage Loan that is  registered  with MERS,  including,  among other things,
that RFC shall have confirmed the transfer to the Trustee,  as assignee of the
Depositor,  of the Mortgage on the MERS(R)System;

(u)    No  instrument  of release or waiver has been  executed  in
connection  with the Mortgage  Loans,  and no Mortgagor has been  released,  in
whole or in part from its obligations in connection with a Mortgage Loan;

(v)    With respect to each Mortgage Loan,  either (i) the Mortgage
Loan is  assumable  pursuant to the terms of the  Mortgage  Note,  or (ii) the
Mortgage  Loan  contains a customary  provision  for the  acceleration  of the
payment of the unpaid principal  balance of the Mortgage Loan in the event the
related Mortgaged  Property is sold without the prior consent of the mortgagee
thereunder;

(w)    The  proceeds  of the  Mortgage  Loan  have been  fully
disbursed,  there is no requirement for future advances thereunder and any and
all requirements as to completion of any on-site or off-site  improvements and
as to disbursements  of any escrow funds therefor  (including any escrow funds
held to make Monthly Payments pending  completion of such  improvements)  have
been complied with. All costs, fees and expenses  incurred in making,  closing
or recording the Mortgage Loans were paid;

(x)    Except with  respect to  approximately  1.5% of the Mortgage
Loans,  the  appraisal  was  made  by an  appraiser  who meets  the  minimum

qualifications for appraisers as specified in the Program Guide;

(y)   To the best of RFC's knowledge, any escrow arrangements established with respect to any Mortgage Loan are in compliance with all applicable local, state and federal laws and are in compliance with the terms of the related Mortgage Note;

(z)   Each Mortgage Loan was originated (1) by a savings and loan association, savings bank, commercial bank, credit union, insurance company or similar institution that is supervised and examined by a federal or state authority, (2) by a mortgagee approved by the Secretary of HUD pursuant to Sections 203 and 211 of the National Housing Act, as amended, or (3) by a mortgage broker or correspondent lender in a manner such that the Certificates would qualify as "mortgage related securities" within the meaning of Section 3(a)(41) of the Securities Exchange Act of 1934, as amended;

(aa)   All improvements which were considered in determining the Appraised Value of the Mortgaged Properties lie wholly within the boundaries and the building restriction lines of the Mortgaged Properties, or the policy of title insurance affirmatively insures against loss or damage by reason of any violation, variation, encroachment or adverse circumstance that either is disclosed or would have been disclosed by an accurate survey;

(bb)   Each Mortgage Note and Mortgage constitutes a legal, valid and binding obligation of the borrower, or the consumer in the case of the Sharia Mortgage Loans, enforceable in accordance with its terms except as limited by bankruptcy, insolvency or other similar laws affecting generally the enforcement of creditor's rights;

(cc)   None of the Mortgage Loans are subject to the Home Ownership and Equity Protection Act of 1994;

(dd)   None of the Mortgage Loans are loans that, under applicable state or local law in effect at the time of origination of such loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees;

(ee)   None of the Mortgage Loans secured by a property located in the State of Georgia were originated on or after October 1, 2002 and before March 7, 2003;

(ff)   No Mortgage Loan is a High Cost Loan or Covered Loan, as applicable (as such terms are defined in the then current Standard & Poor's LEVELS(R)Glossary which is now Version 5.7 Revised, Appendix E (attached hereto as Exhibit A)); provided that no representation and warranty is made in this clause (ff) with respect to 0.03% and 0.03% of the Mortgage Loans (by outstanding principal balance as of the Cut-off Date) secured by property located in the States of West Virginia and Kansas, respectively;

(gg)   With respect to each Sharia Mortgage Loan, mortgage pass-through certificates or notes representing interests in mortgage loans that are in all material respects of the same type as the Mortgage Loans, and which are structured to be permissible under Islamic law utilizing a declining balance co-ownership structure, have been, for a least one year prior to the date hereof, (a) held by investors other than employee benefit plans, and (b) rated at least BBB- or Baa3, as applicable, by a Rating Agency; and

(hh)  No fraud or misrepresentation  has taken place in connection with the origination of any Mortgage Loan.

RFC shall  provide  written  notice to GMAC  Mortgage,  LLC of the sale of each Pledged  Asset Loan to the Company  hereunder  and by the Company to the Trustee under the Pooling and Servicing  Agreement,  and shall maintain the  Schedule of  Additional  Owner  Mortgage  Loans (as defined in the Credit Support Pledge  Agreement),  showing the Trustee as the  Additional  Owner of each such Pledged Asset  Loan,  all in  accordance  with  Section 7.1 of the Credit Support Pledge Agreement.

Upon  discovery by RFC or upon notice from the Company or the Trustee of a breach of the  foregoing  representations  and  warranties in respect of any Mortgage  Loan which  materially  and  adversely  affects the interests of any holders of the  Certificates  or of the Company in such  Mortgage  Loan or upon the occurrence of a Repurchase Event  (hereinafter  defined),  notice of which breach or  occurrence  shall be given to the Company by RFC,  if it  discovers the same,  RFC shall,  within 90 days after the  earlier of its  discovery  or receipt of notice thereof,  either cure such breach or Repurchase Event in all material  respects or, either (i) purchase such Mortgage Loan from the Trustee or the  Company,  as the case may be, at a price equal to the  Purchase  Price for such Mortgage  Loan or (ii)  substitute a Qualified  Substitute  Mortgage Loan or  Loans  for such  Mortgage  Loan in the  manner  and  subject  to the limitations  set forth in  Section 2.04 of the  Pooling  and  Servicing Agreement.  If the breach of  representation  and  warranty  that gave rise to the  obligation  to  repurchase or substitute a Mortgage Loan pursuant to this Section 4 was the  representation and warranty set forth in clause (k) or (hh) of this  Section 4, then RFC shall pay to the Trust Fund,  concurrently  with and in addition to the remedies provided in the preceding sentence,  an amount equal to any  liability,  penalty or expense  that was  actually  incurred  and paid out of or on behalf of the Trust Fund,  and that  directly  resulted from such  breach,  or if  incurred  and  paid  by  the  Trust  Fund  thereafter, concurrently with such payment.

5. With respect to each  Mortgage  Loan,  a first lien  repurchase event  ("Repurchase  Event")  shall have occurred if it is discovered  that, as of the date  thereof,  the related  Mortgage was not a valid first lien on the related  Mortgaged  Property subject  only to (i) the  lien of real  property taxes and  assessments not yet due and payable,  (ii)  covenants,  conditions, and restrictions,  rights of way, easements and other matters of public record as of the  date of  recording  of such  Mortgage  and such  permissible  title exceptions  as are  listed in the  Program  Guide and (iii)  other  matters to which like properties are commonly  subject which do not materially  adversely affect the value, use,  enjoyment or marketability of the Mortgaged  Property. In  addition,  with  respect  to any  Mortgage  Loan as to which  the  Company delivers to the Trustee or the  Custodian  an  affidavit  certifying  that the original  Mortgage  Note has been  lost or  destroyed,  if such  Mortgage  Loan subsequently  is in default  and the  enforcement  thereof  or of the  related Mortgage is  materially  adversely  affected  by the  absence of  the  original Mortgage  Note,  a Repurchase Event shall be deemed to have  occurred and RFC will be  obligated to repurchase  or  substitute  for such Mortgage Loan in the manner set forth in Section 4 above.

6. This  Agreement  shall  inure to the  benefit of and be binding upon the parties hereto and their  respective  successors and assigns,  and no other person shall have any right or obligation hereunder.

IN WITNESS WHEREOF, the parties have entered into this Assignment and Assumption Agreement on the date first written above.

                                    RESIDENTIAL FUNDING COMPANY, LLC


                                    By: /s/Heather Anderson
                                        Name: Heather Anderson
                                        Title: Associate



                                    RESIDENTIAL ACCREDIT LOANS, INC.


                                    By:  /s/Christopher Martinez
                                        Name:  Christopher Martinez
                                        Title:  Vice President


EXHIBIT A


APPENDIX E OF THE STANDARD & POOR'S GLOSSARY FOR
FILE FORMAT FOR LEVELS(R) VERSION 5.7 REVISED

                                            REVISED July 1, 2006

APPENDIX E - Standard & Poor's Predatory Lending Categories

Standard & Poor's has categorized loans governed by anti-predatory lending laws in the Jurisdictions listed below into three categories based upon a combination of factors that include (a) the risk exposure associated with the assignee liability and (b) the tests and thresholds set forth in those laws. Note that certain loans classified by the relevant statute as Covered are included in Standard & Poor's High Cost Loan Category because they included thresholds and tests that are typical of what is generally considered High Cost by the industry.

Standard & Poor's High Cost Loan Categorization

| State/Jurisdiction | Name of Anti-Predatory Lending Law/Effective Date | Category under Applicable Anti-Predatory Lending Law |
|---|---|---|

--------------------------------------------------------------------------------

| State/Jurisdiction | Name of Anti-Predatory Lending Law/Effective Date | Category under Applicable Anti-Predatory Lending Law |
|---|---|---|
| Arkansas | Arkansas Home Loan Protection Act, Ark. Code Ann.ss.ss.23-53-101 et seq. Effective July 16, 2003 | High Cost Home Loan |
| Cleveland Heights, OH | Ordinance No. 72-2003 (PSH), Mun. Codess.ss.757.01 et seq. Effective June 2, 2003 | Covered Loan |
| Colorado | Consumer Equity Protection, Colo. Stat. Ann.ss.ss.5-3.5-101 et seq. Effective for covered loans offered or entered into on or after January 1, 2003. Other provisions of the Act took effect on June 7, 2002 | Covered Loan |
| Connecticut | Connecticut Abusive Home Loan Lending Practices Act, Conn. Gen. Stat. ss.ss.36a-746 et seq. Effective October 1, 2001 | High Cost Home Loan |
| District of Columbia | Home Loan Protection Act, D.C. Code ss.ss.26-1151.01 et seq. Effective for loans closed on or after January 28, 2003 | Covered Loan |
| Florida | Fair Lending Act, Fla. Stat. Ann.ss.ss. 494.0078 et seq. Effective October 2, 2002 | High Cost Home Loan |

--------------------------------------------------------------------------------

| State/Jurisdiction | Name of Anti-Predatory Lending Law/Effective Date | Category under Applicable Anti-Predatory Lending Law |
|---|---|---|

```
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
Georgia (Oct. 1, 2002 -  Georgia Fair Lending Act, Ga.   High Cost Home Loan
Mar. 6, 2003)            Code
                         Ann.ss.ss.7-6A-1 et seq.

                         Effective October 1, 2002 -
                         March 6 2003
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
Georgia as amended       Georgia Fair Lending Act, Ga.   High Cost Home Loan
(Mar. 7, 2003 -          Code
current)                 Ann.ss.ss.7-6A-1 et seq.

                         Effective for loans closed on or
                         after
                         March 7, 2003
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
HOEPA Section 32         Home Ownership and Equity        High Cost Loan
                         Protection
                         Act of 1994, 15 U.S.C.ss.1639, 12
                         C.F.R.ss.ss.226.32 and 226.34

                         Effective October 1, 1995,
                         amendments
                         October 1, 2002
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
Illinois                 High Risk Home Loan Act, Ill.    High Risk Home Loan
                         Comp.
                         Stat. tit. 815,ss.ss.137/5 et seq.

                         Effective January 1, 2004 (prior
                         to this date, regulations under
                         Residential
                         Mortgage License Act effective
                         from May 14, 2001)
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
Kansas                   Consumer Credit Code, Kan. Stat. High Loan to Value
                         Ann.                             Consumer Loan (id.ss.
                         ss.ss.16a-1-101 et seq.           16a-3-207) and;

                         Sections 16a-1-301 and 16a-3-207
                         became effective April 14, 1999;
                         Section 16a-3-308a became
                         effective July 1, 1999
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
                                                          High APR Consumer
                                                          Loan (id.ss.
                                                          16a-3-308a)
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
Kentucky                 2003 KY H.B. 287 - High Cost Home High Cost Home Loan
                         Loan Act, Ky. Rev. Stat.ss.ss.
                         360.100 et seq.

                         Effective June 24, 2003
```

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

| Maine | Truth in Lending, Me. Rev. Stat. tit. 9-A,ss.ss.8-101 et seq. | High Rate High Fee Mortgage |
| | Effective September 29, 1995 and as amended from time to time | |

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

| State/Jurisdiction | Name of Anti-Predatory Lending Law/Effective Date | Category under Applicable Anti-Predatory Lending Law |
|---|---|---|

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

| Massachusetts | Part 40 and Part 32, 209 C.M.R. ss.ss. 32.00 et seq. and 209 C.M.R.ss.ss. 40.01 et seq. | High Cost Home Loan |
| | Effective March 22, 2001 and amended from time to time | |

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

| Nevada | Assembly Bill No. 284, Nev. Rev. Stat. ss.ss.598D.010 et seq. | Home Loan |
| | Effective October 1, 2003 | |

--------------------------------------------------------------------------------

--------------------------------------------------------------------------------

| New Jersey | New Jersey Home Ownership Security Act of 2002, N.J. Rev. Stat.ss.ss. 46:10B- 22 et seq. | High Cost Home Loan |
| | Effective for loans closed on or after November 27, 2003 | |

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

| New Mexico | Home Loan Protection Act, N.M. Rev. Stat.ss.ss.58-21A-1 et seq. | High Cost Home Loan |
| | Effective as of January 1, 2004; Revised as of February 26, 2004 | |

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

| New York | N.Y. Banking Law Article 6-1 | High Cost Home Loan |
| | Effective for applications made on or after April 1, 2003 | |

| State/Jurisdiction | Name of Anti-Predatory Lending Law/Effective Date | Category under Applicable Anti-Predatory Lending Law |
|---|---|---|
| North Carolina | Restrictions and Limitations on High Cost Home Loans, N.C. Gen. Stat. ss.ss.24-1.1E et seq.<br><br>Effective July 1, 2000; amended October 1, 2003 (adding open-end lines of credit) | High Cost Home Loan |
| Ohio | H.B. 386 (codified in various sections of the Ohio Code), Ohio Rev. Code Ann.ss.ss.1349.25 et seq.<br><br>Effective May 24, 2002 | Covered Loan |
| Oklahoma | Consumer Credit Code (codified in various sections of Title 14A)<br><br>Effective July 1, 2000; amended effective January 1, 2004 | Subsection 10 Mortgage |

| State/Jurisdiction | Name of Anti-Predatory Lending Law/Effective Date | Category under Applicable Anti-Predatory Lending Law |
|---|---|---|
| South Carolina | South Carolina High Cost and Consumer Home Loans Act, S.C. Code Ann.ss.ss.37-23-10 et seq.<br><br>Effective for loans taken on or after January 1, 2004 | High Cost Home Loan |
| West Virginia | West Virginia Residential Mortgage Lender, Broker and Servicer Act, W. Va. Code Ann.ss.ss.31-17-1 et seq.<br><br>Effective June 5, 2002 | West Virginia Mortgage Loan Act Loan |

Standard & Poor's Covered Loan Categorization

| State/Jurisdiction | Name of Anti-Predatory Lending Law/Effective Date | Category under Applicable Anti-Predatory Lending Law |
|---|---|---|
| Georgia (Oct. 1, 2002 - Mar. 6, 2003) | Georgia Fair Lending Act, Ga. Code Ann.ss.ss.7-6A-1 et seq. | Covered Loan |

```
                          Effective October 1, 2002 -
                          March 6, 2003
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
New Jersey                New Jersey Home Ownership      Covered Home Loan
                          Security
                          Act of 2002, N.J. Rev. Stat.ss.ss.
                          46:10B 22 et seq.

                          Effective November 27, 2003 -
                          July 5, 2004
--------------------------------------------------------------------------------


        Standard & Poor's Home Loan Categorization

--------------------------------------------------------------------------------
   State/Jurisdiction     Name of Anti-Predatory Lending        Category under
                                                            Applicable Anti-
                          Law/Effective Date             Predatory Lending Law
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
Georgia (Oct. 1, 2002 - Georgia Fair Lending Act, Ga.    Home Loan
Mar. 6, 2003)           Code
                        Ann.ss.ss.7-6A-1 et seq.

                        Effective October 1, 2002 -
                        March 6, 2003
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
New Jersey                New Jersey Home Ownership      Home Loan
                          Security
                          Act of 2002, N.J. Rev. Stat.ss.ss.
                          46:10B- 22 et seq.

                          Effective for loans closed on or
                          after November 27, 2003
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
New Mexico                Home Loan Protection Act, N.M.  Home Loan
                          Rev. Stat.ss.ss.58-21A-1 et seq.

                          Effective as of January 1, 2004;
                          Revised as of February 26, 2004
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
North Carolina            Restrictions and Limitations on  Consumer Home Loan
                          High Cost Home Loans, N.C. Gen.
                          Stat.ss.ss.
                          24-1.1E et seq.

                          Effective July 1, 2000; amended
                          October 1, 2003 (adding open-end
                          lines of credit)
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
South Carolina            South Carolina High Cost and    Consumer Home Loan
                          Consumer Home Loans Act, S.C.
                          Code Ann.ss.ss.37-23-10 et seq.

                          Effective for loans taken on or
```

after January 1, 2004
--------------------------------------------------------------------------------

**<u>Exhibit G</u>**
**Series Supplement**

EX-10 2 qs14ssfinal.htm EX 10.1

EXECUTION COPY

====================================================================================================

RESIDENTIAL ACCREDIT LOANS, INC.,

Company,

RESIDENTIAL FUNDING COMPANY, LLC,

Master Servicer,

and

DEUTSCHE BANK TRUST COMPANY AMERICAS,

Trustee

SERIES SUPPLEMENT,

DATED AS OF OCTOBER 30, 2006,

TO

STANDARD TERMS OF
POOLING AND SERVICING AGREEMENT
dated as of October 30, 2006

Mortgage Asset-Backed Pass-Through Certificates

Series 2006-QS14

====================================================================================================

Article I      DEFINITIONS...............................................................................11

        Section 1.01.    Definitions. .....................................................................11

        Section 1.02.    Use of Words and Phrases.........................................................28

        Section 1.03.    Determination of LIBOR...........................................................28

Article II     CONVEYANCE OF MORTGAGE LOANS; ORIGINAL ISSUANCE OF CERTIFICATES.............................30

        Section 2.01.    Conveyance of Mortgage Loans.....................................................30

        Section 2.02.    Acceptance by Trustee............................................................30

        Section 2.03.    Representations, Warranties and Covenants of the Master Servicer and the Company....30

        Section 2.04.    Representations and Warranties of Sellers. (See Section 2.04 of the Standard Terms).33

        Section 2.05.    Execution and Authentication of Certificates/Issuance of Certificates Evidencing
                         Interests in REMIC I Certificates...............................................33

        Section 2.06.    Conveyance of Uncertificated REMIC I Regular Interests; Acceptance by the Trustee...33

        Section 2.07.    Issuance of Certificates Evidencing Interest in REMIC II.........................33

        Section 2.08.    Purposes and Powers of the Trust. (See Section 2.08 of the Standard Terms).........33

Article III    ADMINISTRATION AND SERVICING OF MORTGAGE LOANS.............................................34

        Section 3.01 Master Servicer to Act as Servicer. (See Section 3.01 of the Standard Terms)............34

        Section 3.02    Subservicing Agreements Between Master Servicer and Subservicers; Enforcement of
                        Subservicers' and Sellers' Obligations. (See Section 3.02 of the Standard Terms)....34

        Section 3.03    Successor Subservicers. (See Section 3.03 of the Standard  Terms)...................34

        Section 3.04    Liability of the Master Servicer. (See Section 3.04 of the Standard Terms).........34

        Section 3.05    No Contractual Relationship Between Subservicer Agreements by Trustee. (See Section
                        3.06 of the Standard Terms).....................................................34

        Section 3.06    Assumption or Termination of Subservicing Agreements by Trustee. (See Section 3.06
                        of the Standard Terms)..........................................................34

        Section 3.07    Collection of Certain Mortgage Loan Payments; Deposits to Custodial Account. (See
                        Section 3.07 of the Standard Terms).............................................34

        Section 3.08    Subservicing Accounts; Servicing Accounts. (See Section 3.08 of the Standard Terms).34

        Section 3.09    Access to Certain Documentation and Information Regarding the Mortgage Loans. (See
                        Section 3.09 of the Standard Terms).............................................34

| | | |
|---|---|---|
| Section 3.10 | Permitted Withdrawals from the Custodial Account. (See Section 3.10 of the Standard Terms) | 34 |
| Section 3.11 | Maintenance of the Primary Insurance Policies; Collections Thereunder. (See Section 3.11 of the Standard Terms) | 34 |
| Section 3.12 | Maintenance of Fire Insurance and Omissions and Fidelity Coverage. (See Section 3.12 of the Standard Terms) | 34 |
| Section 3.13 | Enforcement of Due-on-Sale Clauses; Assumption and Modification Agreements; Certain Assignments. (See Section 3.13 of the Standard Terms) | 34 |
| Section 3.14 | Realization Upon Defaulted Mortage Loans. (See Section 3.14 of the Standard Terms) | 34 |
| Section 3.15 | Trustee to Cooperate; Release of Custodial Files. | 35 |
| Section 3.16 | Servicing and Other Compensation; Compensating Interest. (See Section 3.16 of the Standard Terms) | 35 |
| Section 3.17 | Reports to the Trustee and to the Company. (See Section 3.17 of the Standard Terms) | 35 |
| Section 3.18 | Annual Statement as to Compliance and Servicing Assessment. (See Section 3.18 of the Standard Terms) | 35 |
| Section 3.19 | Annual Independent Public Accountants' Servicing Assessment. (See Section 3.19 of the Standard Terms) | 35 |
| Section 3.20 | Rights of the Company in Respect of the Master Servicer. (See Section 3.20 of the Standard Terms) | 35 |
| Section 3.21 | Administration of Buydown Funds. (See Section 3.21 of the Standard Terms) | 35 |
| Section 3.22 | Advance Facility. (See Section 3.22 of the Standard Terms) | 35 |
| Article IV | PAYMENTS TO CERTIFICATEHOLDERS | 36 |
| Section 4.01. | Certificate Account. (See Section 4.01 of the Standard Terms) | 36 |
| Section 4.02. | Distributions | 36 |
| Section 4.03. | Statements to Certificateholders; Statements to the Rating Agencies; Exchange Act Reporting. (See Section 4.03 of the Standard Terms) | 48 |
| Section 4.04. | Distribution of Reports to the Trustee and the Company; Advances by the Master Servicer. (See Section 4.04 of the Standard Terms) | 48 |
| Section 4.05. | Allocation of Realized Losses | 48 |
| Section 4.06. | Reports of Foreclosures and Abandonment of Mortgaged Property. (See Section 4.06 of the Standard Terms) | 50 |
| Section 4.07. | Optional Purchase of Defaulted Mortgage Loans. (See Section 4.07 of the Standard Terms) | 50 |
| Section 4.08. | Surety Bond. (See Section 4.08 of the Standard Terms) | 50 |
| Article V | THE CERTIFICATES | 51 |
| Article VI | THE COMPANY AND THE MASTER SERVICER | 52 |
| Section 6.01. | Respective Liabilities of the Company and Master Servicer. (See Section 6.01 of the Standard Terms) | 52 |
| Section 6.02. | Merger or Consolidation of the Company or Master Servicer; Assignment of Rights and Delegation of Duties by the Master Servicer. | 52 |
| Section 6.03. | Limitation on Liability of the Company, Master Servicer and Others (See Section 6.03 of the Standard Terms). | 52 |
| Section 6.04. | Company and Master Servicer Not to Resign (See Section 6.04 of the Standard Terms). | 52 |
| Article VII | DEFAULT | 53 |
| Article VIII | CONCERNING THE TRUSTEE | 54 |
| Section 8.01 | Duties of Trustee. (See Section 8.01 of the Standard Terms) | 54 |
| Section 8.02 | Certain Matters Affecting the Trustee. (See Section 8.02 of the Standard Terms) | 54 |
| Section 8.03 | Trustee Not Liable for Certificates or Mortgage Loans. (See Section 8.03 of the Standard Terms) | 54 |
| Section 8.04 | Trustee May Own Certificates. (See Section 8.04 of the Standard Terms) | 54 |
| Section 8.05 | Master Servicer to Pay Trustee's Fees and Expenses; Indemnification. (See Section 8.05 of the Standard Terms) | 54 |
| Section 8.06 | Eligibility Requirements for Trustee. (See Section 8.06 of the Standard Terms) | 54 |
| Section 8.07 | Resignation and Removal of Trustee. (See Section 8.07 of the Standard Terms) | 54 |

Section 8.08    Successor Trustee. ...................................................54

Section 8.09    Merger or Consolidation of Trustee. (See Section 8.09 of the Standard Terms) .......54

Section 8.10    Appointment of Co-Trustee or Separate Trustee. (See Section 8.10 of the Standard Terms)...................................................................54

Section 8.11    Appointment of Custodian. ..........................................................54

Section 8.12    Appointment of Office or Agency. (See Section 8.12 of the Standard Terms)..........54

Article IX    TERMINATION...........................................................................55

Section 9.01.    Optional Purchase by the Master Servicer of All Certificates; Termination Upon Purchase by the Master Servicer or Liquidation    of All Mortgage Loans.........55

Section 9.02.    Additional Termination Requirements (See Section 9.02 of the Standard Terms). ....58

Section 9.03.    Termination of Multiple REMICs. (See Section 9.03 of the Standard Terms)...........58

Article X    REMIC PROVISIONS.........................................................................59

Section 10.01.    REMIC Administration.  (See Section 10.01 of the Standard Terms)...................59

Section 10.02.    Master Servicer; REMIC Administrator and Trustee Indemnification. (See Section 10.02 of the Standard Terms)..........................................................................59

Section 10.03.    Designation of REMICs..........................................................................59

Section 10.04.    Distributions on the Uncertificated REMIC I Regular Interests and the Uncertificated REMIC II Regular Interests Z.....................................................................59

Section 10.05.    Compliance with Withholding Requirements............................................61

Article XI    MISCELLANEOUS PROVISIONS.................................................................63

Section 11.01.    Amendment.  (See Section 11.01 of the Standard Terms)..............................63

Section 11.02.    Recordation of Agreement;  Counterparts. (See Section 11.02 of the Standard Terms)..63

Section 11.03.    Limitation on Rights of Certificateholders. (See Section 11.03 of the Standard Terms)...................................................................63

Section 11.04.    Governing Law. (See Section 11.04 of the Standard Terms)..........................63

Section 11.05.    Notices................................................................................63

Section 11.06.    Required Notices to Rating Agency and Subservicer.                    (See Section 11.06 of the Standard Terms).........................................64

Section 11.07.    Severability of Provisions. (See Section 11.07 of the Standard    Terms)........64

Section 11.08.    Supplemental Provisions for Resecuritization. (See Section 11.08 of the Standard Terms)........................................................64

Section 11.09.    Allocation of Voting Rights...........................................................64

Section 11.10.    No Petition...........................................................................64

EXHIBITS

Exhibit One:        Mortgage Loan Schedule
Exhibit Two:        Schedule of Discount Fractions
Exhibit Three:      Information to be Included in
                    Monthly Distribution Date Statement
Exhibit Four:       Standard Terms of Pooling and Servicing
                    Agreement Dated as of October 30, 2006

Exhibit Five:       Planned Principal Balances, Aggregate Planned Principal Balances, Targeted Principal
                    Balances and Aggregate Targeted Principal Balances

This is a Series Supplement, dated as of October 30, 2006 (the "Series Supplement"), to the Standard Terms of Pooling and Servicing  Agreement,  dated as of October 30, 2006 and  attached as Exhibit Four hereto (the "Standard Terms" and, together with this Series Supplement, the "Pooling and Servicing Agreement" or "Agreement"), among RESIDENTIAL  ACCREDIT LOANS,  INC., as the company (together with its permitted  successors and assigns,  the "Company"),  RESIDENTIAL  FUNDING  COMPANY,  LLC, as master  servicer  (together with its permitted  successors and assigns,  the  "Master  Servicer"),  and  DEUTSCHE  BANK  TRUST  COMPANY  AMERICAS,  as Trustee  (together  with its permitted successors and assigns, the "Trustee").

PRELIMINARY STATEMENT:

The  Company  intends  to  sell  mortgage  asset-backed  pass-through  certificates  (collectively,  the "Certificates"),  to be issued  hereunder in multiple classes, which in the  aggregate  will  evidence the entire beneficial  ownership  interest  in  the  Mortgage  Loans  (as  defined  herein).  As  provided  herein,  the  REMIC Administrator  will make an election to treat the entire  segregated pool of assets  described in the definition of Trust Fund, and subject to this Agreement  (including the Mortgage Loans),  as two real estate mortgage  investment

conduits (each, a "REMIC") for federal income tax purposes.

The terms and provisions of the Standard Terms are hereby incorporated by reference herein as though set forth in full herein. If any term or provision contained herein shall conflict with or be inconsistent with any provision contained in the Standard Terms, the terms and provisions of this Series Supplement shall govern. All capitalized terms not otherwise defined herein shall have the meanings set forth in the Standard Terms. The Pooling and Servicing Agreement shall be dated as of the date of this Series Supplement.

The following table sets forth the designation, type, Pass-Through Rate, aggregate Initial Certificate Principal Balance, Maturity Date, initial ratings and certain features for each Class of Certificates comprising the interests in the Trust Fund created hereunder.

| DESIGNATION | PASS-THROUGH RATE | AGGREGATE INITIAL CERTIFICATE PRINCIPAL BALANCE | FEATURES(1) | MATURITY DATE | FITCH/MOODY'S/ S&P | MINIMUM DENOMINATIONS(2) |
|---|---|---|---|---|---|---|
| Class A-1 | 6.50% | $50,000,000.00 | Senior/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-2 | 6.50% | $0.00(4) | Senior/Interest Only/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | $2,000,000.00 |
| Class A-3 | 5.90% | $15,000,000.00 | Senior/Lockout/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-4 | Adjustable Rate(3) | $100,000,000.00 | Senior/Floater/Adjustable Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-5 | Adjustable Rate(3) | $15,384,616.00 | Senior/Inverse Floater/Adjustable Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-6 | 6.50% | $24,353,000.00 | Senior/Super Senior/Lockout/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-7 | 6.00% | $50,000,000.00 | Senior/Super Senior/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-8 | 6.00% | $3,763,000.00 | Senior/Senior Support/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-9 | 6.50% | $0.00(4) | Senior/Interest Only/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | $2,000,000.00 |
| Class A-10 | Adjustable Rate(3) | $5,547,285.00 | Senior/Floater/Adjustable Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-11 | 6.50% | $32,141,000.00 | Senior/Accretion Directed/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-12 | 6.25% | $35,150,000.00 | Senior/Super Senior/Lockout/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-13 | 6.50% | $70,376,000.00 | Senior/ PAC/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-14 | 6.25% | $75,000,000.00 | Senior/Accretion Directed/ PAC/TAC/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-15 | Adjustable Rate(3) | $18,750,000.00 | Senior/Accretion Directed/ PAC/TAC/Floater/Adjustable Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-16 | 6.50% | $946,000.00 | Senior/PAC/Accrual/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-17 | 6.50% | $5,951,000.00 | Senior/Companion/Accrual/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-18 | 6.25% | $30,113,677.00 | Senior/Lockout/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-19 | 6.50% | $34,850,000.00 | Senior/Accretion Directed/TAC/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-20 | 6.50% | $818,000.00 | Senior/Senior Support/Lockout/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-21 | 6.25% | $1,181,000.00 | Senior/Senior Support/Lockout/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-22 | Adjustable Rate(3) | $0.00(4) | Senior/Interest Only/Inverse Floater/Adjustable Rate | November 25, 2036 | AAA/Aaa/AAA | $2,000,000.00 |
| Class A-23 | 6.50% | $25,000.00 | Senior/Accrual/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-24 | 6.50% | $41,200,000.00 | Senior/PAC/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-25 | 6.50% | $59,215,000.00 | Senior/Super Senior/Accretion Directed/ PAC/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-26 | 6.50% | $2,000,000.00 | Senior/Accretion Directed/ PAC/Senior Support/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-27 | 6.50% | $25,000.00 | Senior/Accrual/PAC/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-28 | Adjustable Rate(3) | $26,013,656.00 | Senior/Companion/ Floater/Adjustable Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-29 | Adjustable Rate(3) | $2,001,051.00 | Senior/Companion/Inverse Floater/Adjustable Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-30 | Adjustable Rate(3) | $426,715.00 | Senior/Inverse Floater/Adjustable Rate | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-P | 0.00% | $2,571,661.04 | Senior/Principal Only | November 25, 2036 | AAA/Aaa/AAA | $25,000.00 |
| Class A-V | Variable Rate(5) | $0.00(6) | Senior/Interest Only/Variable Rate | November 25, 2036 | AAA/Aaa/AAA | $2,000,000.00 |
| Class R-I | 6.50% | $100.00 | Senior/Residual/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | (7) |
| Class R-II | 6.50% | $100.00 | Senior/Residual/Fixed Rate | November 25, 2036 | AAA/Aaa/AAA | (7) |
| Class M-1 | 6.50% | $27,133,000.00 | Mezzanine/Fixed Rate | November 25, 2036 | AA/NA/NA | $25,000.00 |
| Class M-2 | 6.50% | $7,913,600.00 | Mezzanine/Fixed Rate | November 25, 2036 | A/NA/NA | $250,000.00 |

| Class M-3 | 6.50% | $6,029,500.00 | Mezzanine/Fixed Rate | November 25, 2036 | BBB/NA/NA | $250,000.00 |
| Class B-1 | 6.50% | $3,768,300.00 | Subordinate/Fixed Rate | November 25, 2036 | BB/NA/NA | $250,000.00 |
| Class B-2 | 6.50% | $3,014,700.00 | Subordinate/Fixed Rate | November 25, 2036 | B/NA/NA | $250,000.00 |
| Class B-3 | 6.50% | $3,014,801.66 | Subordinate/Fixed Rate | November 25, 2036 | NA/NA/NA | $250,000.00 |

The Mortgage Loans have an aggregate principal balance as of the Cut-off Date of $753,676,762.70.

(1) The Certificates, other than the Class B Certificates and Class R Certificates, shall be Book-Entry Certificates. The Class B Certificates and the Class R Certificates shall be delivered to the holders thereof in physical form.

(2) The Certificates, other than the Class R Certificates, shall be issuable in minimum dollar denominations as indicated above (by Certificate Principal Balance or Notional Amount, as applicable) and integral multiples of $1 (or $1,000 in the case of the Class A-3, Class B-1, Class B-2 and Class B-3 Certificates) in excess thereof, except that one Certificate of any of the Class B-1, Class B-2 and Class B-3 Certificates that contains an uneven multiple of $1,000 shall be issued in a denomination equal to the sum of the related minimum denomination set forth above and such uneven multiple for such Class or the sum of such denomination and an integral multiple of $1,000.

(3)

| Adjustable Rates: | Initial | Formula | Maximum | Minimum |
| --- | --- | --- | --- | --- |
| Class A-4 | 5.67% | LIBOR + 0.35% | 7.50% | 0.35% |
| Class A-5 | 11.89499978% | 46.4749984% - (LIBOR multiplied by 6.49999974) | 46.4749984% | 0.00% |
| Class A-10 | 6.07% | LIBOR + 0.75% | 7.00% | 0.75% |
| Class A-15 | 5.62% | LIBOR + 0.30% | 7.50% | 0.30% |
| Class A-22 | 1.88% | 7.20% - LIBOR | 7.20% | 0.00% |
| Class A-28 | 5.92% | LIBOR + 0.60% | 7.00% | 0.60% |
| Class A-29 | 14.03999798% | 83.19997936% - LIBOR multiplied by 12.9999965) | 83.19997936% | 0.00% |
| Class A-30 | 12.08998989% | 81.24986524% - (LIBOR multiplied by 12.99997657) | 81.24986524% | 0.00% |

(4) Each of the Class A-2, Class A-9 and Class A-22 Certificates do not have a Certificate Principal Balance. For the purpose of calculating interest payments, (i) interest on the Class A-2 Certificates will accrue on a notional amount equal to the sum of (1) the Certificate Principal Balance of the Class A-3 Certificates immediately prior to the related Distribution Date multiplied by 0.60% and divided by 6.50%, (2) the Certificate Principal Balance of the Class A-12 Certificates immediately prior to the related Distribution Date multiplied by 0.25% and divided by 6.50%, (3) the Certificate Principal Balance of the Class A-18 Certificates immediately prior to the related Distribution Date multiplied by 0.25% and divided by 6.50% and (4) the Certificate Principal Balance of the Class A-21 Certificates immediately prior to the related Distribution Date multiplied by 0.25% and divided by 6.50%, which is initially equal to approximately $3,940,180, and (ii) interest on the Class A-9 Certificates will accrue on a notional amount equal to the sum of (1) the Certificate Principal Balance of the Class A-7 Certificates immediately prior to the related Distribution Date multiplied by 0.50% and divided by 6.50% and (2) the Certificate Principal Balance of the Class A-8 Certificates immediately prior to the related Distribution Date multiplied by 0.50% and divided by 6.50%, which is initially equal to approximately $4,135,615, and (iii) interest on the Class A-22 Certificates will accrue on a notional amount equal to the Certificate Principal Balance of the Class A-15 Certificates immediately prior to the related Distribution Date, which is initially equal to approximately $18,750,000.

(5) The initial Pass-Through Rate on the Class A-V Certificates is 0.4929%.

(6) The Class A-V Certificates do not have a principal balance. For the purpose of calculating interest payments, interest on the Class A-V Certificates will accrue on a notional amount equal to the aggregate stated principal balance of the mortgage loans, which is initially equal to approximately $753,676,762.70.

(7) Each class of the Class R Certificates shall be issuable in minimum denominations of not less than a 20% Percentage Interest; provided, however, that one Class R Certificate of each Class will be issuable to Residential Funding as "tax matters person" pursuant to Sections 10.01(c) and (e) in a minimum denomination representing a Percentage Interest of not less than 0.01%.

In consideration of the mutual agreements herein contained, the Company, the Master Servicer and the Trustee agree as follows:

ARTICLE I

DEFINITIONS

Section  1.01 ...Definitions.

Whenever used in this Agreement,  the following words and phrases,  unless the context otherwise requires, shall have the meanings specified in this Article.

Accretion  Directed  Certificates:  Any of the Class A-11,  Class A-14, Class A-15, Class A-19, Class A-25 and Class A-26 Certificates.

Accretion  Termination  Date: With respect to any Class of Accrual  Certificates,  the earlier to occur of (i) the Distribution Date on which the aggregate  Certificate  Principal Balance of the related Accretion  Directed Certificates  has been reduced to zero,  and (ii) the occurrence of the Credit  Support  Depletion  Date. The Class A-25 Certificates and Class A-26 Certificates  relate to the Class A-27  Certificates.  The Class A-11 Certificates relate to the Class A-23  Certificates.  The Class A-14 Certificates  and Class  A-15  Certificates  relate to the Class A-16 Certificates.  The Class A-19 Certificates relate to the Class A-17 Certificates.

Accrual Certificates:  Any of the Class A-16, Class A-17, Class A-23 or Class A-27 Certificates.

Accrual  Distribution  Amount:  The Class A-16 Accrual  Distribution  Amount, Class A-17 Accrual Distribution  Amount,  Class  A-23 Accrual Distribution  Amount or Class A-27 Accrual Distribution  Amount, as applicable.

Adjustable  Rate  Certificates:  Any of the Class A-4,  Class A-5,  Class A-10,  Class A-15,  Class A-22, Class A-28, Class A-29 or Class A-30 Certificates.

Aggregate  Planned  Principal  Balance:  With respect  to  the  applicable  PAC  Certificates  and any Distribution Date, the amount set forth in the table  entitled  "Planned  Principal  Balances, Aggregate  Planned Principal  Balances,  Targeted Principal  Balances and Aggregate Targeted  Principal  Balances" in Exhibit Five to this Series Supplement for such Certificates opposite such Distribution Date.

Aggregate Targeted Principal Balance:    With respect to the A-14  Certificates  and Class  A-15 Certificates  and any Distribution  Date,  the  amount set forth in  Schedule V of the table  entitled  "Planned Principal  Balances,  Aggregate Planned Principal Balances,  Targeted  Principal Balances and Aggregate Targeted Principal  Balances" in Exhibit Five to this Series  Supplement  for  certificates  opposite  that  Distribution Date.

Bankruptcy  Amount: As of any date of determination  prior to the first  anniversary of the Cut-off Date, an amount  equal to the excess,  if any, of (A)  $280,304  over (B) the  aggregate  amount of Bankruptcy  Losses allocated  solely to one or more specific  Classes of  Certificates in accordance with Section 4.05 of this Series Supplement.  As of any date of  determination  on or after the first  anniversary of the Cut-off  Date, an amount equal to the excess, if any, of

(1) the  lesser  of (a) the  Bankruptcy  Amount  calculated  as of the close of  business  on the Business Day  immediately  preceding the most recent  anniversary of the Cut-off  Date  coinciding  with or preceding such date of  determination  (or, if such date of determination is an anniversary of the Cut-off Date, the  Business  Day  immediately  preceding  such  date  of  determination)  (for  purposes  of  this definition, the "Relevant Anniversary") and (b) the greatest of:

(A)    (i) if the aggregate  principal  balance of the Non-Primary  Residence Loans as of the  Relevant  Anniversary  is less than 10% of the Stated  Principal  Balance of the Mortgage Loans as of the Relevant  Anniversary,  $0.00, or (ii) if the aggregate  principal balance of the Non-Primary  Residence  Loans as of the Relevant  Anniversary  is equal to or greater than 10% of the Stated  Principal  Balance of the Mortgage Loans as of the Relevant  Anniversary,  the sum of (I) the aggregate  principal  balance of the Non-Primary  Residence  Loans with a  Loan-to-Value Ratio of greater than  80.00% but less than or equal to 90.00% (other than  Additional  Collateral Loans),  times 0.25%, (II) the aggregate  principal  balance of the Non-Primary  Residence Loans with a  Loan-to-Value  Ratio of greater than 90.00% but less than or equal to 95.00%  (other than Additional  Collateral  Loans),  times 0.50%, and (III) the aggregate  principal  balance of the Non-Primary  Residence  Loans with a  Loan-to-Value  Ratio of greater  than  95.00%  (other  than Additional Collateral loans) times 0.75%, in each case as of the Relevant Anniversary;

(B)    the  greater of (i) the  product  of  (x)  an amount  equal to the  largest difference in the related  Monthly  Payment for any  Non-Primary  Residence Loan remaining in the Mortgage Pool (other than  Additional  Collateral  Loans) which had an original  Loan-to-Value Ratio of 80% or greater  that would  result if the Net Mortgage  Rate  thereof  was equal to the weighted  average  (based on the  principal  balance of the  Mortgage  Loans as of the  Relevant Anniversary)  of the Net  Mortgage  Rates of all Mortgage  Loans as of the  Relevant  Anniversary less 1.25% per annum, (y) a number equal to the weighted average  remaining  term to maturity,  in months,  of all  Non-Primary  Residence  Loans  remaining in the Mortgage Pool as of the Relevant Anniversary,  and (z) one plus the  quotient  of the number of all  Non-Primary  Residence  Loans remaining in the Mortgage Pool divided by the total number of  Outstanding  Mortgage Loans in the Mortgage Pool as of the Relevant Anniversary; and (ii)  $50,000; and

(C)    the  greater of (i) 0.0006  times the  aggregate  principal  balance of all the Mortgage  Loans in the  Mortgage  Pool as of the Relevant  Anniversary  having a  Loan-to-Value Ratio  (other  than  Additional  Collateral  Loans) at  origination  which  exceeds  75% and (ii) $100,000,

over (2) the  aggregate  amount of  Bankruptcy  Losses allocated  solely to one or more specific Classes of Certificates in accordance with Section 4.05 since the Relevant Anniversary.

The  Bankruptcy  Amount may be further reduced by the Master  Servicer  (including  accelerating  the manner in which such  coverage  is reduced)  provided  that prior to any such  reduction,  the Master  Servicer  shall (i) obtain written  confirmation  from each Rating Agency that such reduction  shall not reduce the rating  assigned to any Class of Certificates by such Rating Agency below the lower of the  then-current  rating or the rating assigned to such  Certificates  as of the  Closing  Date by such  Rating  Agency and (ii)  provide  a copy of such  written confirmation to the Trustee.

Certificate:   Any Class A, Class M, Class B or Class R Certificate.

Certificate  Account:  The separate  account or accounts  created and maintained  pursuant to Section 4.01 of the Standard Terms,  which shall be entitled  "Deutsche  Bank Trust Company  Americas, as trustee,  in trust for the registered  holders of Residential  Accredit  Loans,  Inc.,  Mortgage  Asset-Backed  Pass-Through  Certificates, Series 2006-QS14" and which must be an Eligible Account.

Certificate Policy:    None.

Class A  Certificate:  Any one of the Class A-1,  Class A-2,  Class A-3,  Class A-4, Class A-5, Class A-6, Class A-7, Class A-8, Class A-9, Class A-10, Class A-11, Class A-12, Class A-13, Class A-14, Class A-15, Class A-16, Class A-17, Class A-18, Class A-19, Class A-20, Class A-21, Class A-22, Class A-23, Class A-24, Class A-25, Class A-26, Class A-27, Class A-28, Class A-29, Class A-30, Class A-V or Class A-P Certificates, executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed to the Standard Terms as Exhibit A.

Class A-3/A-18 Lockout Amount--With respect to any  Distribution  Date, an amount equal to (A) the product of (i) the Class A-3/A-18 Lockout Percentage for that Distribution Date, (ii) a fraction, the numerator of which is the aggregate Certificate Principal Balance of the Class A-3 Certificates and Class A-18 Certificates for that Distribution Date and the denominator of which is the aggregate Certificate  Principal  Balance of the Class A-1, Class A-3, Class A-18, Class A-24, Class A-25, Class A-26, Class A-27, Class A-28 and Class A-29 Certificates for that Distribution Date, (iii) the aggregate of the collections  described in clauses (A), (B), (D) and (E) (net of amounts  set forth in clause  (F)) of Section  4.02(a)(ii)(Y)  with application of the Senior  Percentage  or the Senior Accelerated Distribution Percentage and (iv) 32.2134244271%, plus (B) the product of (i) a fraction, the numerator of which is the aggregate  Certificate  Principal Balance of the Class A-3 Certificates  and Class A-18 Certificates  for that  Distribution  Date and the denominator of which is the aggregate  Certificate  Principal Balance of the Class A-1, Class A-3, Class A-18,  Class A-24,  Class A-25,  Class A-26,  Class A-27, Class A-28 and Class A-29 Certificates for that  Distribution  Date, (ii) the Class A-3/A-18 Prepayment Lockout  Percentage for that  Distribution  Date,  (iii) the  aggregate  of all  collections  described in Section  4.02(a)(ii)(Y)(C)  with application of the Senior Accelerated Distribution Percentage and (iv) 32.2134244271%.

Class A-3/A-18  Lockout  Percentage--For  any Distribution  Date occurring prior to the Distribution Date in November 2015, 0%, and for any Distribution Date thereafter, 100%.

Class  A-3/A-18  Prepayment Lockout  Percentage--For any Distribution  Date  occurring  prior to  the Distribution Date in November 2015, 0%, and for any Distribution Date thereafter, 100%.

Class A-6/A-20 Lockout Amount--With respect to any  Distribution  Date, an amount equal to (A) the product of (i) the Class A-6/A-20 Lockout  Percentage for that Distribution Date, (ii) a fraction, the numerator of which is the aggregate  Certificate  Principal Balance of the Class A-6 Certificates and Class A-20 Certificates for that Distribution  Date and the denominator of which is the aggregate Certificate  Principal  Balance of the Class A-6, Class A-7,  Class A-8,  Class A-11,  Class A-20, Class A-23 and Class A-30  Certificates  for that Distribution  Date,  (iii) the aggregate of the  collections  described  in clauses (A),  (B), (D) and (E) (net of amounts  set forth in clause  (F)) of Section  4.02(a)(ii)(Y)  with application of the Senior  Percentage  or the Senior Accelerated  Distribution  Percentage and (iv) 16.7193397607%, plus (B) the product of (i) a fraction, the numerator of which is the aggregate  Certificate  Principal Balance of the Class A-6  Certificates  and Class A-20 Certificates  for that Distribution Date and the  denominator  of which is the aggregate  Certificate  Principal Balance of the Class A-6,  Class A-7,  Class A-8,  Class A-10,  Class A-11,  Class A-20,  Class A-23 and Class A-30 Certificates  for that  Distribution  Date,  (ii) the  Class  A-6/A-20  Prepayment Lockout  Percentage  for that Distribution Date, (iii) the aggregate of all collections described in Section  4.02(a)(ii)(Y)(C)  with application of the Senior Accelerated Distribution Percentage and (iv) 16.7193397607%.

Class A-6/A-20  Lockout  Percentage--For any Distribution  Date occurring prior to the Distribution Date in November 2011, 0%, and for any Distribution Date thereafter, 100%.

Class  A-6/A-20  Prepayment Lockout  Percentage--For any Distribution  Date  occurring  prior to the Distribution Date in November 2011, 0%. For any Distribution  Date occurring  thereafter,  as follows:  30% for any Distribution  Date on or after November 2011 and prior to November 2012; 40% for any Distribution  Date on or after November 2012 and prior to November  2013; 60% for any  Distribution  Date on or after November 2013 and prior to November  2014;  80% for any  Distribution  Date on or after November 2014 and prior to November 2015; and 100% for any Distribution Date thereafter.

Class A-12/A-21 Lockout  Amount--With  respect to any Distribution Date, an amount equal to (A) the product of (i) the Class A-12/A-21 Lockout Percentage for that Distribution Date, (ii) a fraction,  the numerator of which is the aggregate  Certificate  Principal  Balance of the Class A-12  Certificates  and Class A-21 Certificates  for that  Distribution  Date and the denominator of which is the aggregate  Certificate  Principal Balance of the Class A-12, Class A-13,  Class A-14,  Class A-15, Class A-16, Class A-17, Class A-19 and Class A-21 Certificates for that Distribution  Date,  (iii) the aggregate  of the  collections  described in clauses (A),  (B), (D) and (E) (net of amounts  set forth in clause  (F)) of Section  4.02(a)(ii)(Y)  with application of the Senior  Percentage  or the Senior Accelerated  Distribution  Percentage and (iv) 34.5891570068%, plus (B) the product of (i) a fraction, the numerator of which is the aggregate  Certificate  Principal Balance of the Class A-12  Certificates and Class A-21 Certificates  for that  Distribution  Date and the  denominator  of which is the aggregate  Certificate  Principal Balance of the Class A-12, Class A-13, Class A-14, Class A-15, Class A-16, Class A-17, Class A-19 and Class A-21 Certificates for that  Distribution  Date,  (ii) the Class  A-12/A-21  Prepayment Lockout  Percentage for that Distribution Date, (iii) the aggregate of all collections described in Section  4.02(a)(ii)(Y)(C)  with application of the Senior Accelerated Distribution Percentage and (iv) 34.5891570068%.

Class A-12/A-21  Lockout  Percentage--For any Distribution  Date occurring prior to the Distribution  Date in November 2011, 0%, and for any Distribution Date thereafter, 100%.

Class  A-12/A-21  Prepayment Lockout  Percentage--For any Distribution  Date occurring  prior to  the Distribution Date in November 2011, 0%. For any Distribution  Date occurring  thereafter,  as follows:  30% for any Distribution  Date on or after November 2011 and prior to November 2012; 40% for any Distribution  Date on or after November 2012 and prior to November  2013;  60% for any  Distribution  Date on or after  November 2013 and prior to November  2014;  80% for any  Distribution  Date on or after November 2014 and prior to November 2015; and 100% for any Distribution Date thereafter.

Class A-16 Accrual  Distribution  Amount--On each  Distribution  Date preceding  the related  Accretion Termination  Date,  an amount equal to the amount of Accrued  Certificate  Interest on the Class A-16  Certificates for  that  Distribution  Date which will be added to the  Certificate  Principal Balance of the Class A-16 Certificates  and distributed to the holders of the Class A-14  Certificates and Class A-15  Certificates  pursuant to Section 4.02(h).

Class A-17 Accrual  Distribution  Amount--On each  Distribution  Date preceding  the related  Accretion Termination  Date,  an amount equal to the amount of Accrued  Certificate  Interest on the Class A-17  Certificates for that date  which  will be added to the  Certificate  Principal Balance of the Class A-17  Certificates  and distributed to the holders of the Class A-19 Certificates pursuant to Section 4.02(h).

Class A-23 Accrual  Distribution  Amount--On each  Distribution  Date preceding  the related  Accretion Termination  Date,  an amount equal to the amount of Accrued  Certificate  Interest on the Class A-23  Certificates for that date  which  will be added to the  Certificate  Principal Balance of the Class A-23  Certificates  and distributed to the holders of the Class A-11 Certificates pursuant to Section 4.02(h).

Class A-27 Accrual  Distribution  Amount--On each  Distribution  Date preceding  the related  Accretion Termination  Date,  an amount equal to the amount of Accrued  Certificate  Interest on the Class A-27  Certificates for that date  which  will be added to the  Certificate  Principal Balance of the Class  A-27  Certificates  and distributed to the holders of the Class A-25 Certificates and Class A-26 Certificates pursuant to Section 4.02(h).

Class R Certificate:  Any one of the Class R-I Certificates or Class R-II Certificates.

Class R-I  Certificate:  Any one of the Class R-I Certificates executed by the Trustee and  authenticated by the Certificate  Registrar  substantially  in the form annexed to the Standard Terms as Exhibit D and evidencing an interest designated as a "residual interest" in REMIC I for purposes of the REMIC Provisions.

Class R-II  Certificate:  Any one of  the  Class  R-II  Certificates  executed  by  the  Trustee  and authenticated  by the Certificate  Registrar  substantially  in the form annexed to the Standard Terms as Exhibit D and evidencing an interest designated as a "residual interest" in REMIC II for purposes of the REMIC Provisions.

Closing Date:  October 30, 2006.

Corporate Trust Office:  The principal office of the Trustee at  which at any particular  time its corporate  trust business with respect to this Agreement  shall be  administered,  which office at the date of the execution  of this  instrument  is located at 1761 East St.  Andrew Place,  Santa Ana,  California  92705-4934, Attention:  Residential Funding Company, LLC Series 2006-QS14.

Custodial  File:  Any mortgage  loan document in the Mortgage File that is required to be delivered to the Trustee or Custodian pursuant to Section 2.01(b) of this Agreement.

Cut-off Date:  October 1, 2006.

Determination  Date:  With  respect  to any  Distribution  Date,  the  second  Business  Day prior to such Distribution Date.

Discount Net Mortgage Rate:  6.50% per annum.

Due Period:  With respect to each  Distribution  Date, the calendar month in which such  Distribution Date occurs.

Eligible  Funds:  On any  Distribution  Date,  the  excess,  if any, of the Available  Distribution  Amount over the sum of (i) the  aggregate  amount of Accrued  Certificate  Interest on the Senior  Certificates,  (ii) the Senior Principal  Distribution Amount (determined without regard to Section  4.02(a)(ii)(Y)(D)  hereof), (iii) the Class A-P Principal  Distribution  Amount  (determined  without regard to clause (E) of the definition of Class A-P Principal  Distribution  Amount)  and (iv) the  aggregate  amount of Accrued  Certificate  Interest on the Class M, Class B-1 and Class B-2 Certificates.

Floater Certificates:  Any one of the Class A-4, Class A-10, Class A-15 or Class A-28  Certificates.

Fraud Loss  Amount:  As of any date of  determination  after the Cut-off  Date,  an amount  equal to: (X) prior to the  first  anniversary  of the  Cut-off  Date an amount  equal to  3.00%  of the aggregate  outstanding principal  balance of all of the Mortgage  Loans as of the Cut-off Date minus the aggregate  amount of Fraud Losses allocated  solely to one or more specific  Classes of  Certificates  in accordance with Section 4.05 of this Series Supplement since the Cut-off Date up to such date of determination,  (Y) from the first to, but not including, the second  anniversary  of the Cut-off  Date, an amount equal to (1) the lesser of (a) the Fraud Loss Amount as of the most recent  anniversary  of the Cut-off Date and (b)  2.00% of the aggregate  outstanding  principal  balance of all of the Mortgage  Loans as of the most recent  anniversary  of the Cut-off Date minus (2)  the  aggregate  amount of Fraud Losses allocated  solely to one or more specific  Classes of  Certificates  in accordance  with Section 4.05 since the most recent  anniversary  of the Cut-off Date up to such date of  determination,  and (Z) from the second to, but not  including,  the fifth  anniversary  of the Cut-off  Date, an amount equal to (1) the lesser of (a) the Fraud  Loss  Amount  as of the most  recent  anniversary  of the  Cut-off  Date and (b)  1.00% of the aggregate outstanding  principal  balance of all of the Mortgage Loans as of the most recent  anniversary  of the Cut-off Date minus (2) the aggregate  amount of Fraud Losses  allocated  solely to one or more specific  Classes of Certificates in  accordance  with Section  4.05 since the most  recent  anniversary  of the Cut-off  Date up to such date of determination. On and after the fifth anniversary of the Cut-off Date, the Fraud Loss Amount shall be zero.

The Fraud Loss Amount may be further reduced by the Master  Servicer  (including  accelerating  the manner in which such  coverage  is reduced) provided  that prior to any such  reduction,  the Master  Servicer  shall (i) obtain written  confirmation  from each Rating Agency that such reduction  shall not reduce the rating  assigned to any Class of Certificates by such Rating Agency below the lower of the  then-current  rating or the rating assigned to such  Certificates  as of the  Closing  Date by such  Rating  Agency and (ii)  provide  a copy of such  written confirmation to the Trustee.

Initial Monthly Payment Fund: $0.00,  representing  scheduled  principal  amortization and interest at the Net Mortgage  Rate payable  during the November  2006 Due Period,  for those  Mortgage  Loans for which the Trustee will not be entitled to receive such payment.

Initial  Notional  Amount:  With  respect to the Class A-2  Certificates,  $3,940,179.00.  With respect to the Class A-9  Certificates,  $4,135,615.00.  With  respect to the Class A-22  Certificates,  $18,750,000.00.  With respect to the Class A-V  Certificates  or Subclass  thereof  issued pursuant to Section  5.01(c) of the Standard Terms,  the aggregate  Cut-off Date Principal  Balance of the Mortgage  Loans  corresponding  to the Uncertificated REMIC I Regular Interests Z represented by such Class or Subclass on such date.

Initial  Subordinate  Class Percentage:  With  respect to each Class of  Subordinate  Certificates,  an amount which is equal to the initial  aggregate  Certificate  Principal  Balance of such Class of  Subordinate Certificates  divided by the aggregate  Stated  Principal  Balance of all the Mortgage Loans as of the Cut-off Date as follows:

|          |       |          |       |
|----------|-------|----------|-------|
| Class M-1: | 3.60% | Class B-1: | 0.50% |
| Class M-2: | 1.05% | Class B-2: | 0.40% |
| Class M-3: | 0.80% | Class B-3: | 0.40% |

Interest Accrual Period:  With  respect to any Class of  Certificates  (other  than the  Adjustable  Rate Certificates)  and any Distribution  Date, the calendar month preceding the month in which such  Distribution  Date occurs.  With respect to the Adjustable Rate  Certificates and any  Distribution  Date, the period beginning on the 25th day of the month  preceding  the month in which such  Distribution  Date  occurs and ending on the 24th day of the month in which such Distribution Date occurs.

Interest Only  Certificates:  Any one of the Class A-2, Class A-9,  Class A-22 or Class A-V  Certificates. The Interest Only Certificates will have no Certificate Principal Balance.

Inverse  Floater  Certificates:  Any  one of the  Class  A-5,  Class  A-22,  Class  A-29  or  Class  A-30 Certificates.

LIBOR:  With respect to any Distribution  Date, the arithmetic mean of the London  interbank  offered rate quotations  for one-month  U.S.  Dollar  deposits,  expressed  on a per annum basis,  determined in accordance  with Section 1.03.

Lockout  Certificates:  Any one of the Class A-3, Class A-6, Class A-12,  Class A-18,  Class A-20 or Class

A-21 Certificates.

Maturity Date: November 25, 2036, the Distribution Date immediately following the latest scheduled maturity date of any Mortgage Loan.

Mortgage: With respect to each Mortgage Note related to a Mortgage Loan which is not a Cooperative Loan, the mortgage, deed of trust or other comparable instrument creating a first lien on an estate in fee simple or leasehold interest in real property securing a Mortgage Note. With respect to each Obligation to Pay related to a Sharia Mortgage Loan, the Sharia Mortgage Loan Security Instrument.

Mortgage Loan Schedule: The list or lists of the Mortgage Loans attached hereto as Exhibit One (as amended from time to time to reflect the addition of Qualified Substitute Mortgage Loans), which list or lists shall set forth the following information as to each Mortgage Loan:

(i)        the Mortgage Loan identifying number ("RFC LOAN #");

(ii)       the maturity of the Mortgage Note ("MATURITY DATE");

(iii)      the Mortgage Rate ("ORIG RATE");

(iv)       the Subservicer pass-through rate ("CURR NET");

(v)        the Net Mortgage Rate ("NET MTG RT");

(vi)       the Pool Strip Rate ("STRIP");

(vii)      the initial scheduled monthly payment of principal, if any, and interest ("ORIGINAL P & I");

(viii)     the Cut-off Date Principal Balance ("PRINCIPAL BAL");

(ix)       the Loan-to-Value Ratio at origination ("LTV");

(x)        the rate at which the Subservicing Fee accrues ("SUBSERV FEE") and at which the Servicing Fee accrues ("MSTR SERV FEE");

(xi)       a code "T," "BT" or "CT" under the column "LN FEATURE," indicating that the Mortgage Loan is secured by a second or vacation residence; and

(xii)      a code "N" under the column "OCCP CODE," indicating that the Mortgage Loan is secured by a non-owner occupied residence.

Such schedule may consist of multiple reports that collectively set forth all of the information required.

Mortgage Loans: Such of the mortgage loans, including any Sharia Mortgage Loans, transferred and assigned to the Trustee pursuant to Section 2.01 as from time to time are held or deemed to be held as a part of the Trust Fund, the Mortgage Loans originally so held being identified in the initial Mortgage Loan Schedule, and Qualified Substitute Mortgage Loans held or deemed held as part of the Trust Fund including, without limitation, (i) with respect to each Cooperative Loan, the related Mortgage Note, Security Agreement, Assignment of Proprietary Lease, Cooperative Stock Certificate, Cooperative Lease and Mortgage File and all rights appertaining thereto, (ii) with respect to each Sharia Mortgage Loan, the related Obligation to Pay, Sharia Mortgage Loan Security Instrument, Sharia Mortgage Loan Co-Ownership Agreement, Assignment and Amendment of Security Instrument and Mortgage File and all rights appertaining thereto and (iii) with respect to each Mortgage Loan other than a Cooperative Loan or a Sharia Mortgage Loan, each related Mortgage Note, Mortgage and Mortgage File and all rights appertaining thereto.

Mortgage Note: The originally executed note or other evidence of indebtedness evidencing the indebtedness of a Mortgagor under a Mortgage Loan, together with any modification thereto. With respect to each Sharia Mortgage Loan, the related Obligation to Pay.

Mortgage Rate: As to any Mortgage Loan, the interest rate borne by the related Mortgage Note, or any modification thereto other than a Servicing Modification. As to any Sharia Mortgage Loan, the profit factor described in the related Obligation to Pay, or any modification thereto other than a Servicing Modification.

Mortgagor: The obligor on a Mortgage Note, or with respect to a Sharia Mortgage Loan, the consumer on an Obligation to Pay.

Notional Amount: As of any Distribution Date, (i) with respect to the Class A-2 Certificates, an amount equal to the sum of (1) the Certificate Principal Balance of the Class A-3 Certificates immediately prior to such date multiplied by 0.60% and divided by 6.50%, (2) the Certificate Principal Balance of the Class A-12 Certificates immediately prior to such date multiplied by 0.25% and divided by 6.50%, (3) the Certificate Principal Balance of the Class A-18 Certificates immediately prior to such date multiplied by 0.25% and divided by 6.50% and (4) the Certificate Principal Balance of the Class A-21 Certificates immediately prior to such date multiplied by 0.25% and divided by 6.50%; provided, however, for federal income tax purposes, as of any Distribution Date, with respect to the Class A-2 Certificates, the equivalent of the foregoing, expressed as the aggregate Uncertificated Principal Balance of Uncertificated REMIC I Regular Interests R-1 and R-2 immediately prior to that date; (ii) with respect to the Class A-9 Certificates, an amount equal to the sum of (1) the Certificate Principal Balance of the Class A-7 Certificates immediately prior to such date multiplied by 0.50% and divided by 6.50% and (2) the Certificate Principal Balance of the Class A-8 Certificates immediately prior to such date multiplied by 0.50% and divided by 6.50%; provided, however, for federal income tax purposes, as of any Distribution Date, with respect to the Class A-9 Certificates, the equivalent of the foregoing, expressed as the Uncertificated Principal Balance of Uncertificated REMIC I Regular Interest T immediately prior to that date; (iii) with respect to the Class A-22 Certificates, an amount equal to the Certificate Principal Balance of the Class A-15 Certificates immediately prior to such date; provided, however, for federal income tax purposes, as of any Distribution Date, with respect to the Class A-22 Certificates, the equivalent of the foregoing, expressed as the Uncertificated Principal Balance of Uncertificated REMIC I Regular Interest W immediately prior to that date; with respect to any Class A-V Certificates or Subclass thereof issued pursuant to Section 5.01(c) of the Standard Terms, the aggregate Stated Principal Balance of the Mortgage Loans corresponding to the Uncertificated REMIC I Regular Interests Z represented by such Class or Subclass immediately prior to such date.

PAC Certificates: Any one of the Class A-13, Class A-14, Class A-15, Class A-16, Class A-24, Class A-25, Class A-26 or Class A-27 Certificates.

Pass-Through Rate: With respect to the Senior Certificates (other than the Adjustable Rate, Class A-V and Class A-P Certificates), Class M Certificates and Class B Certificates and any Distribution Date, the per annum rates set forth in the Preliminary Statement hereto.

o          With respect to the Class A-4 Certificates and the initial Interest Accrual Period, 5.67% per annum, and as to any Interest Accrual Period thereafter, a per annum rate equal to LIBOR plus 0.35%, with a maximum rate of 7.50% per annum and a minimum rate of 0.35% per annum.

o      With respect to the Class A-5 Certificates and the initial Interest Accrual Period, 11.89499978% per annum, and as to any Interest Accrual Period thereafter, a per annum rate equal to 46.4749984% minus the product of (i) LIBOR and (ii) 6.49999974, with a maximum rate of 46.4749984% per annum and a minimum rate of 0.00% per annum.

o      With respect to the Class A-10 Certificates and the initial Interest Accrual Period, 6.07% per annum, and as to any Interest Accrual Period thereafter, a per annum rate equal to LIBOR plus 0.75%, with a maximum rate of 7.00% per annum and a minimum rate of 0.75% per annum.

o      With respect to the Class A-15 Certificates and the initial Interest Accrual Period, 5.62% per annum, and as to any Interest Accrual Period thereafter, will be a per annum rate equal to LIBOR plus 0.30%, with a maximum rate of 7.50% per annum and a minimum rate of 0.30% per annum.

o      With respect to the Class A-22 Certificates and the initial Interest Accrual Period, 1.88% per annum, and as to any Interest Accrual Period thereafter, a per annum rate equal to 7.20% minus LIBOR, with a maximum rate of 7.20% per annum and a minimum rate of 0.00% per annum.

o      With respect to the Class A-28 Certificates and the initial Interest Accrual Period, 5.92% per annum, and as to any Interest Accrual Period thereafter, will be a per annum rate equal to LIBOR plus 0.60%, with a maximum rate of 7.00% per annum and a minimum rate of 0.60% per annum.

o      With respect to the Class A-29 Certificates and the initial Interest Accrual Period, 14.03999798% per annum, and as to any Interest Accrual Period thereafter, will be a per annum rate equal to 83.19997936% minus the product of (i) LIBOR and (ii) 12.9999965, with a maximum rate of 83.19997936% per annum and a minimum rate of 0.00% per annum.

o      With respect to the Class A-30 Certificates and the initial Interest Accrual Period, 12.08999898% per annum, and as to any Interest Accrual Period thereafter, will be a per annum rate equal to 81.24986524% minus the product of (i) LIBOR and (ii) 12.99997657, with a maximum rate of 81.24986524% per annum and a minimum rate of 0.00% per annum.

With respect to the Class A-V Certificates (other than any Subclass thereof) and any Distribution Date, a rate equal to the weighted average, expressed as a percentage, of the Pool Strip Rates of all Mortgage Loans as of the Due Date in the related Due Period, weighted on the basis of the respective Stated Principal Balances of such Mortgage Loans as of the day immediately preceding such Distribution Date (or, with respect to the initial Distribution Date, at the close of business on the Cut-off Date). With respect to the Class A-V Certificates and the initial Distribution Date the Pass-Through Rate is equal to 0.4929% per annum. With respect to any Subclass of Class A-V Certificates and any Distribution Date, a rate equal to the weighted average, expressed as a percentage, of the Pool Strip Rates of all Mortgage Loans corresponding to the Uncertificated REMIC Z Regular Interests Z represented by such Subclass as of the Due Date in the related Due Period, weighted on the basis of the respective Stated Principal Balances of such Mortgage Loans as of the day immediately preceding such Distribution Date (or with respect to the initial Distribution Date, at the close of business on the Cut-off Date). The Principal Only Certificates have no Pass-Through Rate and are not entitled to Accrued Certificate Interest.

Planned Principal Balance: With respect to the applicable PAC Certificates and any Distribution Date, the amount set forth in the table entitled "Planned Principal Balances, Aggregate Planned Principal Balances, Targeted Principal Balances and Aggregate Targeted Principal Balances" in Exhibit Five to this Series Supplement for such Certificates opposite such Distribution Date.

Prepayment Assumption: The prepayment assumption to be used for determining the accrual of original issue discount and premium and market discount on the Certificates for federal income tax purposes, which assumes a constant prepayment rate of 6.0% per annum of the then outstanding principal balance of the related Mortgage Loans in the first month of the life of such Mortgage Loans and an additional approximately 1.27272727% per annum in each month thereafter until the twelfth month, and beginning in the twelfth month and in each month thereafter during the life of the Mortgage Loans, a constant prepayment rate of 20.0% per annum.

Prepayment Distribution Percentage: With respect to any Distribution Date and each Class of Subordinate Certificates, under the applicable circumstances set forth below, the respective percentages set forth below:

(i)      For any Distribution Date prior to the Distribution Date in November 2011 (unless the Certificate Principal Balances of the Senior Certificates (other than the Class A-P Certificates) have been reduced to zero), 0%.

(ii)      For any Distribution Date not discussed in clause (i) above on which any Class of Subordinate Certificates are outstanding:

(a)      in the case of the Class of Subordinate Certificates then outstanding with the Highest Priority and each other Class of Subordinate Certificates for which the related Prepayment Distribution Trigger has been satisfied, a fraction, expressed as a percentage, the numerator of which is the Certificate Principal Balance of such Class immediately prior to such date and the denominator of which is the sum of the Certificate Principal Balances immediately prior to such date of (1) the Class of Subordinate Certificates then outstanding with the Highest Priority and (2) all other Classes of Subordinate Certificates for which the respective Prepayment Distribution Triggers have been satisfied; and

(b)      in the case of each other Class of Subordinate Certificates for which Prepayment Distribution Triggers have not been satisfied, 0%.

Notwithstanding the foregoing, if the application of the foregoing percentages on any Distribution Date as provided in Section 4.02 of this Series Supplement (determined without regard to the proviso to the definition of "Subordinate Principal Distribution Amount") would result in a distribution in respect of principal of any Class or Classes of Subordinate Certificates in an amount greater than the remaining Certificate Principal Balance thereof (any such class, a "Maturing Class"), then: (a) the Prepayment Distribution Percentage of each Maturing Class shall be reduced to a level that, when applied as described above, would exactly reduce the Certificate Principal Balance of such Class to zero; (b) the Prepayment Distribution Percentage of each other Class of Subordinate Certificates (any such Class, a "Non-Maturing Class") shall be recalculated in accordance with the provisions in paragraph (ii) above, as if the Certificate Principal Balance of each Maturing Class had been reduced to zero (such percentage as recalculated, the "Recalculated Percentage"); (c) the total amount of the reductions in the Prepayment Distribution Percentages of the Maturing Class or Classes pursuant to clause (a) of this sentence, expressed as an aggregate percentage, shall be allocated among the Non-Maturing Classes in proportion to their respective Recalculated Percentages (the portion of such aggregate reduction so allocated to any Non-Maturing Class, the "Adjustment Percentage"); and (d) for purposes of such Distribution Date, the Prepayment Distribution Percentage of each Non-Maturing Class shall be equal to the sum of (1) the Prepayment Distribution Percentage thereof, calculated in accordance with the provisions in paragraph (ii) above as if the Certificate Principal Balance of each Maturing Class had not been reduced to zero, plus (2) the related Adjustment Percentage.

Principal Only Certificates: The Class A-P Certificates.

Record Date: With respect to each Distribution Date and each Class of Certificates (other than the Adjustable Rate Certificates for so long as the Adjustable Rate Certificates are in book-entry form), the close of business on the last Business Day of the month preceding the month in which the related Distribution Date occurs. With respect to each Distribution Date and the Adjustable Rate Certificates (so long as they are Book-Entry Certificates), the close of business on the Business Day prior to such Distribution Date.

Related Classes: As to any Uncertificated REMIC I Regular Interest, those classes of Certificates identified as "Related Classes of Certificates" to such Uncertificated REMIC I Regular Interest in the definition of Uncertificated REMIC I Regular Interest.

REMIC I: The segregated pool of assets with respect to which a REMIC election is to be made, consisting of:

    (i)    the Mortgage Loans and the related Mortgage Files,

    (ii)    all payments and collections in respect of the Mortgage Loans due after the Cut-off Date (other than Monthly Payments due in the month of the Cut-off Date) as shall be on deposit in the Custodial Account or in the Certificate Account and identified as belonging to the Trust Fund, including the proceeds from the liquidation of Additional Collateral for any Additional Collateral Loan, but not including amounts on deposit in the Initial Monthly Payment Fund,

    (iii)    property which secured a Mortgage Loan and which has been acquired for the benefit of the Certificateholders by foreclosure or deed in lieu of foreclosure,

    (iv)    the hazard insurance policies and Primary Insurance Policies, if any, the Pledged Assets with respect to each Pledged Asset Mortgage Loan, and the interest in the Surety Bond transferred to the Trustee pursuant to Section 2.01 herein, and

    (v)    all proceeds of clauses (i) through (iv) above.

REMIC I Certificates: The Class R-I Certificates.

REMIC II: The segregated pool of assets consisting of the Uncertificated REMIC I Regular Interests conveyed in trust to the Trustee for the benefit of the holders of each Class of Certificates (other than the Class R-I Certificates) pursuant to Section 2.06, with respect to which a separate REMIC election is to be made.

Senior Certificate: Any one of the Class A Certificates or Class R Certificates, executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed to the Standard Terms as Exhibit A and Exhibit D.

Senior Interest Distribution Amount: With respect to any Distribution Date, the aggregate amount of Accrued Certificate Interest to be distributed to the Holders of the Senior Certificates for that Distribution Date, including the Accrual Distribution Amount.

Senior Percentage: As of any Distribution Date, the lesser of 100% and a fraction, expressed as a percentage, the numerator of which is the aggregate Certificate Principal Balance of the Senior Certificates (other than the Class A-P Certificates) immediately prior to such Distribution Date and the denominator of which is the aggregate Stated Principal Balance of all of the Mortgage Loans (or related REO Properties) (other than the related Discount Fraction of each Discount Mortgage Loan) immediately prior to such Distribution Date.

Senior Principal Distribution Amount: With respect to any Distribution Date, the lesser of (a) the balance of the Available Distribution Amount remaining after the distribution of all amounts required to be distributed therefrom pursuant to Section 4.02(a)(i) and Section 4.02(a)(ii)(W) (excluding any amount distributable pursuant to clause (E) of the definition of "Class A-P Principal Distribution Amount") and (b) the sum of the amounts required to be distributed to the Senior Certificateholders on such Distribution Date pursuant to Sections 4.02(a)(ii)(Y), 4.02(a)(xvi) and 4.02(a)(xvii).

Senior Support Certificates: Any of the Class A-8, Class A-20, Class A-21 or Class A-26 Certificates.

Special Hazard Amount: As of any Distribution Date, an amount equal to $7,536,768 minus the sum of (i) the aggregate amount of Special Hazard Losses allocated solely to one or more specific Classes of Certificates in accordance with Section 4.05 of this Series Supplement and (ii) the Adjustment Amount (as defined below) as most recently calculated. For each anniversary of the Cut-off Date, the Adjustment Amount shall be equal to the amount, if any, by which the amount calculated in accordance with the preceding sentence (without giving effect to the deduction of the Adjustment Amount for such anniversary) exceeds the greater of (A) the greater of (i) the product of the Special Hazard Percentage for such anniversary multiplied by the outstanding principal balance of all the Mortgage Loans on the Distribution Date immediately preceding such anniversary and (ii) twice the outstanding principal balance of the Mortgage Loan with the largest outstanding principal balance as of the Distribution Date immediately preceding such anniversary and (B) the greater of (i) the product of 0.50% multiplied by the outstanding principal balance of all Mortgage Loans on the Distribution Date immediately preceding such anniversary multiplied by a fraction, the numerator of which is equal to the aggregate outstanding principal balance (as of the immediately preceding Distribution Date) of all of the Mortgage Loans secured by Mortgaged Properties located in the State of California divided by the aggregate outstanding principal balance (as of the immediately preceding Distribution Date) of all of the Mortgage Loans, expressed as a percentage, and the denominator of which is equal to 18.49% (which percentage is equal to the percentage of Mortgage Loans by aggregate principal balance initially secured by Mortgaged Properties located in the State of California) and (ii) the aggregate outstanding principal balance (as of the immediately preceding Distribution Date) of the largest Mortgage Loan secured by a Mortgaged Property (or, with respect to a Cooperative Loan, the related Cooperative Apartment) located in the State of California.

The Special Hazard Amount may be further reduced by the Master Servicer (including accelerating the manner in which coverage is reduced) provided that prior to any such reduction, the Master Servicer shall (i) obtain written confirmation from each Rating Agency that such reduction shall not reduce the rating assigned to any Class of Certificates by such Rating Agency below the lower of the then-current rating or the rating assigned to such Certificates as of the Closing Date by such Rating Agency and (ii) provide a copy of such written confirmation to the Trustee.

Special Hazard Percentage: As of each anniversary of the Cut-off Date, the greater of (i) 1.0% and (ii) the largest percentage obtained by dividing the aggregate outstanding principal balance (as of immediately preceding Distribution Date) of the Mortgage Loans secured by Mortgaged Properties located in a single, five-digit zip code area in the State of California by the outstanding principal balance of all the Mortgage Loans as of the immediately preceding Distribution Date.

Subordinate Principal Distribution Amount: With respect to any Distribution Date and each Class of Subordinate Certificates, (a) the sum of (1) the product of (x) the related Subordinate Class Percentage for such Class and (y) the aggregate of the amounts calculated (without giving effect to the related Senior Percentage) for such Distribution Date under clauses (1), (2) and (3) of Section 4.02(a)(ii)(Y)(A); (ii) such Class's pro rata share, based on the Certificate Principal Balance of each Class of Subordinate Certificates then outstanding, of the principal collections described in Section 4.02(a)(ii)(Y)(B)(b) (without giving effect to the

Senior Accelerated Distribution Percentage) to the extent such collections are not otherwise distributed to the Senior Certificates; (iii) the product of (x) the related Prepayment Distribution Percentage and (y) the aggregate of all Principal Prepayments in Full received in the related Prepayment Period and Curtailments received in the preceding calendar month (other than the related Discount Fraction of such Principal Prepayments in Full and Curtailments with respect to a Discount Mortgage Loan) to the extent not payable to the Senior Certificates; (iv) if such Class is the Class of Subordinate Certificates with the Highest Priority, any Excess Subordinate Principal Amount for such Distribution Date not paid to the Senior Certificates; and (v) any amounts described in clauses (i), (ii) and (iii) as determined for any previous Distribution Date, that remain undistributed to the extent that such amounts are not attributable to Realized Losses which have been allocated to a Class of Subordinate Certificates; minus (b) the sum of (i) with respect to the Class of Subordinate Certificates with the Lowest Priority, any Excess Subordinate Principal Amount for such Distribution Date; and (ii) the Capitalization Reimbursement Amount for such Distribution Date, other than the related Discount Fraction of any portion of that amount related to each Discount Mortgage Loan, multiplied by a fraction, the numerator of which is the Subordinate Principal Distribution Amount for such Class of Subordinate Certificates, without giving effect to this clause (b)(ii), and the denominator of which is the sum of the principal distribution amounts for all Classes of Certificates other than the Class A-P Certificates, without giving effect to any reductions for the Capitalization Reimbursement Amount.

Super Senior Certificates: Any of the Class A-6, Class A-7, Class A-12 or Class A-25 Certificates.

Targeted Principal Balance: With respect to the Class A-19 Certificates and any Distribution Date, the amount set forth in Schedule VI of the table entitled "Planned Principal Balances, Aggregate Planned Principal Balances, Targeted Principal Balances and Aggregate Targeted Principal Balances" in Exhibit Five to this Series Supplement for such Certificates opposite such Distribution Date.

Uncertificated Accrued Interest: With respect to each Distribution Date, (i) as to each Uncertificated REMIC I Regular Interest other than each Uncertificated REMIC I Regular Interest Z, an amount equal to the aggregate amount of Accrued Certificate Interest that would result under the terms of the definition thereof on the Related Classes of Certificates (excluding any Interest Only Certificates) if the Pass-Through Rate on such Classes were equal to the Uncertificated Pass-Through Rate on such Uncertificated REMIC I Regular Interest, (ii) as to each Uncertificated REMIC I Regular Interest Z and each Uncertificated REMIC II Regular Interest Z, an amount equal to one month's interest at the Pool Strip Rate of the related Mortgage Loan on the principal balance of such Mortgage Loan reduced by such Interest's pro-rata share of any prepayment interest shortfalls or other reductions of interest allocable to the Class A-V Certificates.

Uncertificated Pass-Through Rate: With respect to each of the Uncertificated REMIC I Regular Interests, other than the Uncertificated REMIC I Regular Interests Z, the per annum rate specified in the definition of Uncertificated REMIC I Regular Interests. With respect to each Uncertificated REMIC I Regular Interest Z and each Uncertificated REMIC II Regular Interest Z, the Pool Strip Rate for the related Mortgage Loan.

Uncertificated Principal Balance: With respect to each Uncertificated REMIC I Regular Interest, as defined in the definition of Uncertificated REMIC I Regular Interests.

Uncertificated REMIC I Regular Interests: The Uncertificated REMIC I Regular Interests Z together with the interests identified in the table below, each representing an undivided beneficial ownership interest in REMIC I, and having the following characteristics:

1.  The principal balance from time to time of each Uncertificated REMIC I Regular Interest identified in the table below shall be the amount identified as the Initial Principal Balance thereof in such table, minus the sum of (x) the aggregate of all amounts previously deemed distributed with respect to such interest and applied to reduce the Uncertificated Principal Balance thereof pursuant to Section 10.04(a)(ii) and (y) the aggregate of all reductions in Certificate Principal Balance deemed to have occurred in connection with Realized Losses that were previously deemed allocated to the Uncertificated Principal Balance of such Uncertificated REMIC I Regular Interest pursuant to Section 10.04(d), which equals the aggregate principal balance of the Classes of Certificates identified as related to such Uncertificated REMIC I Regular Interest in such table.

2.  The Uncertificated Pass-Through Rate for each Uncertificated REMIC I Regular Interest identified in the table below shall be the per annum rate set forth in the Pass-Through Rate column of such table.

3.  The Uncertificated REMIC I Distribution Amount for each Uncertificated REMIC I Regular Interest identified in the table below shall be, for any Distribution Date, the amount deemed distributed with respect to such Uncertificated REMIC I Regular Interest on such Distribution Date pursuant to the provisions of Section 10.04(a).

| Uncertificated REMIC I Regular Interest | Related Classes of Certificates | Pass-Through Rate | Initial Principal Balance |
|---|---|---|---|
| Q | A-1, A-6, A-11, A-13, A-16, A-17, A-19, A-20, A-23, A-24, A-25, A-26, A-27, R-II, M-1, M-2, M-3, B-1, B-2, B-3 | 6.50% | $372,774,001.66 |
| R-1 | A-2, A-3 | 6.50% | $15,000,000.00 |
| R-2 | A-2, A-12, A-18, A-21 | 6.50% | $66,444,677.00 |
| S | A-4, A-5 | 6.50% | $115,384,616.00 |
| T | A-7, A-8, A-9 | 6.50% | $53,763,000.00 |
| U | A-10, A-30 | 6.50% | $5,974,000.00 |
| V | A-14 | 6.25% | $75,000,000.00 |
| W | A-15, A-22 | 7.50% | $18,750,000.00 |
| X | A-28, A29 | 6.50% | $28,014,707.00 |

```
------------------------------- ------------------------- ------------------------ --------------------
------------------------------- ------------------------- ------------------------ --------------------
         Y                 A-P                                0.00%                  $2,571,661.04
------------------------------- ------------------------- ------------------------ --------------------
```

Uncertificated REMIC I Regular Interests Z: Each of the 3,026 uncertificated partial undivided beneficial ownership interests in the Trust Fund, numbered sequentially from 1 to 3,026, each relating to the particular Mortgage Loan identified by such sequential number on the Mortgage Loan Schedule, each having no principal balance, and each bearing interest at the respective Pool Strip Rate on the Stated Principal Balance of the related Mortgage Loan.

Uncertificated REMIC I Regular Interests Z Distribution Amount: With respect to any Distribution Date, the sum of the amounts deemed to be distributed on the Uncertificated REMIC I Regular Interests Z for such Distribution Date pursuant to Section 10.04(a).

Uncertificated REMIC I Regular Interest Distribution Amounts: With respect to each Uncertificated REMIC I Regular Interest, other than the Uncertificated REMIC I Regular Interests Z, the amount specified as the Uncertificated REMIC I Regular Interest Distribution Amount with respect thereto in the definition of Uncertificated REMIC I Regular Interests. With respect to the Uncertificated REMIC I Regular Interests Z, the Uncertificated REMIC I Regular Interests Z Distribution Amount.

Uncertificated REMIC II Regular Interests Z: Each of the 3,026 uncertificated partial undivided beneficial ownership interests in REMIC II numbered sequentially from 1 through 3,026, each relating to the identically numbered Uncertificated REMIC I Regular Interests Z, each having no principal balance and bearing interest at a rate equal to the related Pool Strip Rate on the Stated Principal Balance of the Mortgage Loan related to the identically numbered Uncertificated REMIC I Regular Interests Z, comprising such Uncertificated REMIC II Regular Interests Z's pro rata share of the amount distributed pursuant to Section 10.04(a).

Uncertificated REMIC II Regular Interests Distribution Amount: With respect to any Distribution Date, the sum of the amounts deemed to be distributed on the Uncertificated REMIC I Regular Interests Z for such Distribution Date pursuant to Section 10.04(a).

Underwriters: Barclays Capital Inc. and Bear, Stearns & Co. Inc.

Section 1.02    Use of Words and Phrases.

"Herein," "hereby," "hereunder," "hereof," "hereinbefore," "hereinafter" and other equivalent words refer to the Pooling and Servicing Agreement as a whole. All references herein to Articles, Sections or Subsections shall mean the corresponding Articles, Sections and Subsections in the Pooling and Servicing Agreement. The definitions set forth herein include both the singular and the plural.

References in the Pooling and Servicing Agreement to "interest" on and "principal" of the Mortgage Loans shall mean, with respect to the Sharia Mortgage Loans, amounts in respect profit payments and acquisition payments, respectively.

Section 1.03.    Determination of LIBOR.

LIBOR applicable to the calculation of the Pass-Through Rates on the Adjustable Rate Certificates for any Interest Accrual Period (other than the initial Interest Accrual Period) will be determined as described below:

On each Distribution Date, LIBOR shall be established by the Trustee and, as to any Interest Accrual Period, will equal the rate for one month United States dollar deposits that appears on the Telerate Screen Page 3750 of the Moneyline Telerate Capital Markets Report as of 11:00 a.m., London time, on the second LIBOR Business Day prior to the first day of such Interest Accrual Period ("LIBOR Rate Adjustment Date"). "Telerate Screen Page 3750" means the display designated as page 3750 on the Telerate Service (or such other page as may replace page 3750 on that service for the purpose of displaying London interbank offered rates of major banks). If such rate does not appear on such page (or such other page as may replace that page on that service, or if such service is no longer offered, any other service for that purpose) if LIBOR or comparable rates as may be selected by the Trustee after consultation with the Master Servicer), the rate will be the Reference Bank Rate. The "Reference Bank Rate" will be determined on the basis of the rates at which deposits in U.S. Dollars are offered by the reference banks (which shall be any three major banks that are engaged in transactions in the London interbank market, selected by the Trustee after consultation with the Master Servicer) as of 11:00 a.m., London time, on the day that is one LIBOR Business Day prior to the immediately preceding Distribution Date to prime banks in the London interbank market for a period of one month in amounts approximately equal to the aggregate Certificate Principal Balance of the Adjustable Rate Certificates then outstanding. The Trustee will request the principal London office of each of the reference banks to provide a quotation of its rate. If at least two such quotations are provided, the rate will be the arithmetic mean of the quotations rounded up to the next multiple of 1/16%. If on such date fewer than two quotations are provided as requested, the rate will be the arithmetic mean of the rates quoted by one or more major banks in New York City, selected by the Trustee after consultation with the Master Servicer, as of 11:00 a.m., New York City time, on such date for loans in U.S. Dollars to leading European banks for a period of one month in amounts approximately equal to the aggregate Certificate Principal Balance of the Adjustable Rate Certificates then outstanding. If no such quotations can be obtained, the rate will be LIBOR for the prior Distribution Date, or, in the case of the first LIBOR Rate Adjustment Date, 5.32% per annum; provided, however, if, under the priorities described above, LIBOR for a Distribution Date would be based on LIBOR for the previous Distribution Date for the third consecutive Distribution Date, the Trustee shall, after consultation with the Master Servicer, select an alternative comparable index (over which the Trustee has no control), used for determining one-month Eurodollar lending rates that is calculated and published (or otherwise made available) by an independent party. "LIBOR Business Day" means any day other than (i) a Saturday or a Sunday or (ii) a day on which banking institutions in the city of London, England are required or authorized by law to be closed.

The establishment of LIBOR by the Trustee on any LIBOR Rate Adjustment Date and the Master Servicer's subsequent calculation of the Pass-Through Rates applicable to each of the Adjustable Rate Certificates for the relevant Interest Accrual Period, in the absence of manifest error, will be final and binding.

Promptly following each LIBOR Rate Adjustment Date the Trustee shall supply the Master Servicer with the results of its determination of LIBOR on such date. Furthermore, the Trustee will supply the Pass-Through Rates on each of the Adjustable Rate Certificates for the current and the immediately preceding Interest Accrual Period via the Trustee's internet website, which may be obtained by telephoning the Trustee at (800) 735-7777.

ARTICLE II

CONVEYANCE OF MORTGAGE LOANS;

ORIGINAL ISSUANCE OF CERTIFICATES

Section  2.01        Conveyance of Mortgage Loans. (See Section 2.01 of the Standard Terms)

Section  2.02        Acceptance by Trustee. (See Section 2.02 of the Standard Terms)

Section  2.03        Representations, Warranties and Covenants of the Master Servicer and the Company.

(a)        (See Section 2.03(a) of the Standard Terms)

        (b) The Company  hereby  represents  and  warrants  to the  Trustee for the benefit of  Certificateholders that as of the Closing Date (or, if otherwise specified below, as of the date so specified):

(i)        No Mortgage  Loan is 30 or more days  Delinquent  in payment of  principal  and interest as of the Cut-off Date and no  Mortgage  Loan has been so  Delinquent  more than once in the  12-month  period  prior to the Cut-off Date;

(ii)        The  information  set forth in Exhibit  One hereto  with  respect to each  Mortgage  Loan or the  Mortgage Loans,  as the case may be, is true and correct in all material  respects at the date or dates  respecting which such information is furnished;

(iii)        The Mortgage Loans are  fully-amortizing  (subject to interest only periods,  if  applicable),  fixed-rate mortgage loans with level Monthly  Payments due, with respect to a majority of the Mortgage Loans, on the first day of each month and terms to maturity at origination or modification of not more than 30 years;

(iv)        To the best of the  Company's  knowledge,  except in the case of 0.6% of the  aggregate  Stated  Principal Balance of the Mortgage Loans, if a Mortgage Loan is secured by a Mortgaged  Property with a Loan-to-Value Ratio at  origination in excess of 80%, such Mortgage Loan is the subject of a Primary  Insurance  Policy that insures (a) at least 35% of the Stated  Principal  Balance of the Mortgage Loan at origination if the Loan-to-Value  Ratio is between 100.00% and 95.01%,  (b) at least 30% of the Stated  Principal  Balance of the Mortgage Loan at origination if the  Loan-to-Value  Ratio is between 95.00% and 90.01%,  (c) at least 25% of such balance if the  Loan-to-Value  Ratio is between  90.00% and 85.01% and (d) at least 12% of such balance  if the  Loan-to-Value  Ratio  is  between  85.00%  and  80.01%.  To  the  best  of  the  Company's knowledge,  each such Primary  Insurance Policy is in full force and effect and the Trustee is entitled to the benefits thereunder;

(v)        The  issuers of the Primary Insurance Policies are insurance  companies whose  claims-paying  abilities are currently acceptable to each Rating Agency;

(vi)        No more than 0.7% of the Mortgage Loans by aggregate Stated  Principal  Balance as of the Cut-off Date are secured by Mortgaged  Properties  located in any one zip code area in California  and no more than 0.5% of the Mortgage Loans by aggregate Stated  Principal  Balance as of the Cut-off Date are secured by Mortgaged Properties located in any one zip code area outside California;

(vii)        The  improvements  upon the Mortgaged  Properties  are insured  against loss by fire and other hazards as required by the Program Guide,  including  flood  insurance if required under the National Flood Insurance Act of 1968, as amended.  The Mortgage  requires the Mortgagor to maintain such casualty  insurance at the Mortgagor's  expense,  and on the Mortgagor's  failure to do so,  authorizes the holder of the Mortgage to obtain and maintain such  insurance at the  Mortgagor's  expense and to seek  reimbursement  therefor from the Mortgagor;

(viii)        Immediately  prior to the assignment of the Mortgage Loans to the Trustee,  the Company had good title to, and was the sole  owner of,  each  Mortgage  Loan  free and  clear of any  pledge,  lien,  encumbrance  or security interest (other than rights to servicing and related  compensation)  and such assignment  validly transfers ownership of the Mortgage Loans to the Trustee free and clear of any pledge,  lien,  encumbrance or security interest;

(ix)        No more than 47.5% of the Mortgage Loans by aggregate Stated  Principal  Balance as of the Cut-off Date were underwritten  under a reduced loan  documentation  program,  no more than 12.8% of the Mortgage Loans by aggregate Stated Principal  Balance as of the Cut-off Date were  underwritten  under a no-stated income program,  and no more than 13.9% of the Mortgage  Loans by aggregate  Stated  Principal  Balance as of the Cut-off Date were underwritten under a no income/no asset program;

(x)        Except with respect to no more than 15.5% of the Mortgage Loans by aggregate Stated  Principal  Balance as of the Cut-off  Date,  the  Mortgagor  represented  in its loan  application  with  respect to the related Mortgage Loan that the Mortgaged  Property would be owner-occupied;

(xi)        None of the Mortgage Loans is a Buy-Down Mortgage Loan;

(xii)        Each Mortgage Loan constitutes a qualified  mortgage under Section  860G(a)(3)(A) of the Code and Treasury Regulations  Section  1.860G-2(a)(1),  (2),  (4),  (5) and (6),  without reliance on the provisions of Treasury  Regulation Section  1.860G-2(a)(3) or Treasury Regulation  Section  1.860G-2(f)(2) or any other provision  that would allow a Mortgage Loan to be treated as a "qualified  mortgage"  notwithstanding  its failure to meet the  requirements of Section  860G(a)(3)(A)  of the Code and Treasury  Regulation Section 1.860G-2(a)(1),  (2),  (4),  (5) and (6);

(xiii)        A policy of title  insurance  was  effective  as of the  closing of each  Mortgage  Loan and is valid and binding and remains in full force and effect,  unless the  Mortgaged  Properties  are located in the State of Iowa and an attorney's  certificate has been provided as described in the Program Guide;

(xiv)        No more than 0.1% of the Mortgage Loans by aggregate Stated  Principal  Balance as of the Cut-off Date are Cooperative Loans;

(xv)        With respect to each Mortgage Loan originated  under a "streamlined"  Mortgage  Loan program (through which no new or updated  appraisals  of Mortgaged  Properties  are obtained in connection with the  refinancing thereof),  the related Seller has represented that either (a) the value of the related Mortgaged  Property as of the date the Mortgage Loan was  originated  was not less than the  appraised  value of such property at the  time of  origination of the  refinanced  Mortgage  Loan or (b) the  Loan-to-Value  Ratio of the Mortgage  Loan as of the  date of  origination of the  Mortgage Loan generally meets the  Company's underwriting  guidelines;

(xvi)        Interest on each Mortgage  Loan is  calculated on the basis of a 360-day year  consisting of twelve 30-day months;

(xvii)        None of the Mortgage Loans contain in the related Mortgage File a Destroyed Mortgage Note;

(xviii)        None of the Mortgage Loans has been made to an International  Borrower,  and no such Mortgagor is a member of a foreign diplomatic mission with diplomatic rank;

(xix)   No Mortgage Loan provides for payments that are subject to reduction by withholding taxes levied by any foreign (non-United States) sovereign government; and

(xx)    None of the Mortgage Loans is an Additional Collateral Loan and none of the Mortgage Loans is a Pledged Asset Loan.

It is understood and agreed that the representations and warranties set forth in this Section 2.03(b) shall survive delivery of the respective Custodial Files to the Trustee or the Custodian.

Upon discovery by any of the Company, the Master Servicer, the Trustee or the Custodian of a breach of any of the representations and warranties set forth in this Section 2.03(b) that materially and adversely affects the interests of the Certificateholders in any Mortgage Loan, the party discovering such breach shall give prompt written notice to the other parties (the Custodian being so obligated under a Custodial Agreement); provided, however, that in the event of a breach of the representation and warranty set forth in Section 2.03(b)(xii), the party discovering such breach shall give such notice within five days of discovery. Within 90 days of its discovery or its receipt of notice of breach, the Company shall either (i) cure such breach in all material respects or (ii) purchase such Mortgage Loan from the Trust Fund at the Purchase Price and in the manner set forth in Section 2.02; provided that the Company shall have the option to substitute a Qualified Substitute Mortgage Loan or Loans for such Mortgage Loan if such substitution occurs within two years following the Closing Date; provided that if the omission or defect would cause the Mortgage Loan to be other than a "qualified mortgage" as defined in Section 860G(a)(3) of the Code, any such substitution must occur within 90 days from the date such breach was discovered. Any such substitution shall be effected by the Company under the same terms and conditions as provided in Section 2.04 for substitutions by Residential Funding. It is understood and agreed that the obligation of the Company to cure such breach or to so purchase or substitute for any Mortgage Loan as to which such a breach has occurred and is continuing shall constitute the sole remedy respecting such breach available to the Certificateholders or the Trustee on behalf of the Certificateholders.

Section 2.04     Representations and Warranties of Sellers. (See Section 2.04 of the Standard Terms)

Section 2.05     Execution and Authentication of Certificates/Issuance of Certificates Evidencing Interests in REMIC I Certificates.

The Trustee acknowledges the assignment to it of the Mortgage Loans and the delivery of the Custodial Files to it, or the Custodian on its behalf, subject to any exceptions noted, together with the assignment to it of all other assets included in the Trust Fund and/or the applicable REMIC, receipt of which is hereby acknowledged. Concurrently with such delivery and in exchange therefor, the Trustee, pursuant to the written request of the Company executed by an officer of the Company, has executed and caused to be authenticated and delivered to or upon the order of the Company the Class R-I Certificates in authorized denominations which together with the Uncertificated REMIC I Regular Interests, evidence the beneficial interest in REMIC I.

Section 2.06     Conveyance of Uncertificated REMIC I Regular Interests; Acceptance by the Trustee.

The Company, as of the Closing Date, and concurrently with the execution and delivery hereof, does hereby assign without recourse all the right, title and interest of the Company in and to the Uncertificated REMIC I Regular Interests to the Trustee for the benefit of the Holders of each Class of Certificates (other than the Class R-I Certificates). The Trustee acknowledges receipt of the Uncertificated REMIC I Regular Interests and declares that it holds and will hold the same in trust for the exclusive use and benefit of all present and future Holders of each Class of Certificates (other than the Class R-I Certificates). The rights of the Holders of each Class of Certificates (other than the Class R-I Certificates) to receive distributions from the proceeds of REMIC II in respect of such Classes, and all ownership interests of the Holders of such Classes in such distributions, shall be as set forth in this Agreement.

Section 2.07     Issuance of Certificates Evidencing Interest in REMIC II.

The Trustee acknowledges the assignment to it of the Uncertificated REMIC I Regular Interests and, concurrently therewith and in exchange therefor, pursuant to the written request of the Company executed by an officer of the Company, the Trustee has executed and caused to be authenticated and delivered to or upon the order of the Company, all Classes of Certificates (other than the Class R-I Certificates) in authorized denominations, which evidence the ownership in the entire REMIC II.

Section 2.08     Purposes and Powers of the Trust. (See Section 2.08 of the Standard Terms)

---

ARTICLE III

ADMINISTRATION AND SERVICING

OF MORTGAGE LOANS

Section 3.01     Master Servicer to Act as Servicer. (See Section 3.01 of the Standard Terms)

Section 3.02     Subservicing Agreements Between Master Servicer and Subservicers; Enforcement of Subservicers' and Sellers' Obligations. (See Section 3.02 of the Standard Terms)

Section 3.03     Successor Subservicers. (See Section 3.03 of the Standard Terms)

Section 3.04     Liability of the Master Servicer. (See Section 3.04 of the Standard Terms)

Section 3.05     No Contractual Relationship Between Subservicer and Trustee or Certificateholders. (See Section 3.05 of the Standard Terms)

Section 3.06     Assumption or Termination of Subservicing Agreements by Trustee. (See Section 3.06 of the Standard Terms)

Section 3.07     Collection of Certain Mortgage Loan Payments; Deposits to Custodial Account. (See Section 3.07 of the Standard Terms)

Section 3.08     Subservicing Accounts; Servicing Accounts. (See Section 3.08 of the Standard Terms)

Section 3.09     Access to Certain Documentation and Information Regarding the Mortgage Loans. (See Section 3.09 of the Standard Terms)

          Section 3.10    Permitted Withdrawals from the Custodial Account.  (See Section 3.10 of the
Standard Terms)

          Section 3.11    Maintenance of the Primary Insurance Policies; Collections Thereunder.  (See
Section 3.11 of the Standard Terms)

          Section 3.12    Maintenance of Fire Insurance and Omissions and Fidelity Coverage.  (See
Section 3.12 of the Standard Terms)

          Section 3.13    Enforcement of Due-on-Sale Clauses; Assumption and Modification Agreements;
Certain Assignments.  (See Section 3.13 of the Standard Terms)

          Section 3.14    Realization Upon Defaulted Mortgage Loans.  (See Section 3.14 of the Standard
Terms)

          Section 3.15    Trustee to Cooperate; Release of Custodial Files (See Section 3.15 of the
Standard Terms).

          Section 3.16    Servicing and Other Compensation; Compensating Interest.  (See Section 3.16 of
the Standard Terms)

          Section 3.17    Reports to the Trustee and the Company.  (See Section 3.17 of the Standard
Terms)

          Section 3.18    Annual Statement as to Compliance and Servicing Assessment.  (See Section 3.18
of the Standard Terms)

          Section 3.19    Annual Independent Public Accountants' Servicing Report.  (See Section 3.19 of
the Standard Terms)

          Section 3.20    Rights of the Company in Respect of the Master Servicer.  (See Section 3.20 of
the Standard Terms)

          Section 3.21    Administration of Buydown Funds.  (See Section 3.21 of the Standard Terms)

          Section 3.22    Advance Facility.  (See Section 3.22 of the Standard Terms)

---

ARTICLE IV

PAYMENTS TO CERTIFICATEHOLDERS

Section  4.01    Certificate Account.  (See Section 4.01 of the Standard Terms)

Section  4.02    Distributions.

          (a)    On each Distribution Date the Master Servicer on behalf of the Trustee (or the Paying
Agent appointed by the Trustee) shall distribute to the Master Servicer, in the case of a distribution pursuant
to Section 4.02(a)(iii) below, and to each Certificateholder of record on the next preceding Record Date (other
than as provided in Section 9.01 of the Standard Terms respecting the final distribution) either in immediately
available funds (by wire transfer or otherwise) to the account of such Certificateholder at a bank or other
entity having appropriate facilities therefor, if such Certificateholder has not so notified the Master Servicer or
the Paying Agent, as the case may be, or, if such Certificateholder has not so notified the Master Servicer or
the Paying Agent by the Record Date, by check mailed to such Certificateholder at the address of such Holder
appearing in the Certificate Register such Certificateholder's share (which share (A) with respect to each Class
of Certificates (other than any Subclass of the Class A-V Certificates), shall be based on the aggregate of the
Percentage Interests represented by Certificates of the applicable Class held by such Holder or (B) with respect
to any Subclass of the Class A-V Certificates, shall be equal to the amount (if any) distributed pursuant to
Section 4.02(a)(i) below to each Holder of a Subclass thereof) of the following amounts, in the following order
of priority (subject to the provisions of Section 4.02(b), (c) and (e) below), in each case to the extent of the
Available Distribution Amount:

          (i)    to the Senior Certificates (other than the Class A-P Certificates and on and
prior to the Accretion Termination Date, the Accrual Certificates to the extent of Accrual Distribution
Amount), on a pro rata basis based on Accrued Certificate Interest payable on such Certificates with
respect to such Distribution Date, Accrued Certificate Interest on such Classes of Certificates (or
Subclasses, if any, with respect to the Class A-V Certificates) for such Distribution Date, plus any
Accrued Certificate Interest thereon remaining unpaid from any previous Distribution Date except as
provided in the last paragraph of this Section 4.02(a); and

          (ii)    (W)    to the Class A-P Certificates, the Class A-P Principal Distribution
Amount (applied to reduce the Certificate Principal Balance of such Senior Certificates);

          (X)    to the Class A-11, Class A-14, Class A-15, Class A-19, Class A-25 and Class
A-26 Certificates, in the priorities and amounts set forth in Section 4.02(b)(ii), 4.02(b)(iii),
4.02(b)(iv) and 4.02(b)(v), respectively, the related Accrual Distribution Amounts; and

          (Y)    to the Senior Certificates (other than the Class A-P, Class A-2, Class A-9,
Class A-22 and Class A-V Certificates), in the priorities and amounts set forth in Section 4.02(b) and
(c), the sum of the following (applied to reduce the Certificate Principal Balances of such Senior
Certificates, as applicable):

(A)    the Senior Percentage for such Distribution Date times the sum of the following:

(1)    the principal portion of each Monthly Payment due during the related Due Period on each Outstanding
          Mortgage Loan (other than the related Discount Fraction of the principal portion of
          such payment with respect to a Discount Mortgage Loan), whether or not received on or
          prior to the related Determination Date, minus the principal portion of any Debt
          Service Reduction (other than the related Discount Fraction of the principal portion
          of such Debt Service Reductions with respect to each Discount Mortgage Loan) which
          together with other Bankruptcy Losses exceeds the Bankruptcy Amount;

(2)    the Stated Principal Balance of any Mortgage Loan repurchased during the preceding calendar month (or
          deemed to have been so repurchased in accordance with Section 3.07(b) of the Standard
          Terms) pursuant to Section 2.02, 2.03, 2.04 or 4.07 and the amount of any shortfall

deposited in the Custodial Account in connection with the substitution of a Deleted Mortgage Loan pursuant to Section 2.03 or 2.04 during the preceding calendar month (other than the related Discount Fraction of such Stated Principal Balance or shortfall with respect to each Discount Mortgage Loan); and

(3)     the principal portion of all other unscheduled collections (other than Principal Prepayments in Full and Curtailments and amounts received in connection with a Cash Liquidation or REO Disposition of a Mortgage Loan described in Section 4.02(a)(ii)(Y)(B) of this Series Supplement, including without limitation Insurance Proceeds, Liquidation Proceeds and REO Proceeds), including Subsequent Recoveries, received during the preceding calendar month (or deemed to have been so received in accordance with Section 3.07(b) of the Standard Terms) to the extent applied by the Master Servicer as recoveries of principal of the related Mortgage Loan pursuant to Section 3.14 of the Standard Terms (other than the related Discount Fraction of the principal portion of such unscheduled collections, with respect to each Discount Mortgage Loan);

(B)     with respect to each Mortgage Loan for which a Cash Liquidation or a REO Disposition occurred during the preceding calendar month (or was deemed to have occurred during such period in accordance with Section 3.07(b) of the Standard Terms) and did not result in any Excess Special Hazard Losses, Excess Fraud Losses, Excess Bankruptcy Losses or Extraordinary Losses, an amount equal to the lesser of (a) the Senior Percentage for such Distribution Date times the Stated Principal Balance of such Mortgage Loan (other than the related Discount Fraction of such Stated Principal Balance, with respect to each Discount Mortgage Loan) and (b) the Senior Accelerated Distribution Percentage for such Distribution Date times the related unscheduled collections (including without limitation Insurance Proceeds, Liquidation Proceeds and REO Proceeds) to the extent applied by the Master Servicer as recoveries of principal of the related Mortgage Loan pursuant to Section 3.14 of the Standard Terms (in each case other than the portion of such unscheduled collections, with respect to a Discount Mortgage Loan, included in clause (C) of the definition of Class A-P Principal Distribution Amount);

(C)     the Senior Accelerated Distribution Percentage for such Distribution Date times the aggregate of all Principal Prepayments in Full received in the related Prepayment Period and Curtailments received in the preceding calendar month (other than the related Discount Fraction of such Principal Prepayments in Full and Curtailments, with respect to each Discount Mortgage Loan);

(D)     any Excess Subordinate Principal Amount for such Distribution Date;

(E)     any amounts described in subsection (ii)(Y), clauses (A), (B) and (C) of this Section 4.02(a), as determined for any previous Distribution Date, which remain unpaid after application of amounts previously distributed pursuant to this clause (E) to the extent that such amounts are not attributable to Realized Losses which have been allocated to the Subordinate Certificates; minus

(F)     the Capitalization Reimbursement Amount for such Distribution Date, other than the related Discount Fraction of any portion of that amount related to each Discount Mortgage Loan, multiplied by a fraction, the numerator of which is the Senior Principal Distribution Amount, without giving effect to this clause (F), and the denominator of which is the sum of the principal distribution amounts for all Classes of Certificates other than the Class A-P Certificates, without giving effect to any reductions for the Capitalization Reimbursement Amount;

(iii)     if the Certificate Principal Balances of the Subordinate Certificates have not been reduced to zero, to the Master Servicer or a Sub-Servicer, by remitting for deposit to the Custodial Account, to the extent of and in reimbursement for any Advances or Sub-Servicer Advances previously made with respect to any Mortgage Loan or REO Property which remain unreimbursed in whole or in part following the Cash Liquidation or REO Disposition of such Mortgage Loan or REO Property, minus any such Advances that were made with respect to delinquencies that ultimately constituted Excess Special Hazard Losses, Excess Fraud Losses, Excess Bankruptcy Losses or Extraordinary Losses;

(iv)     to the Holders of the Class M-1 Certificates, the Accrued Certificate Interest thereon for such Distribution Date, plus any Accrued Certificate Interest thereon remaining unpaid from any previous Distribution Date, except as provided below;

(v)     to the Holders of the Class M-1 Certificates, an amount equal to (x) the Subordinate Principal Distribution Amount for such Class of Certificates for such Distribution Date, minus (y) the amount of any Class A-P Collection Shortfalls for such Distribution Date or remaining unpaid for all previous Distribution Dates, to the extent the amounts available pursuant to clause (x) of Sections 4.02(a)(vii), (ix), (xi), (xiii), (xiv) and (xv) of this Series Supplement are insufficient therefor, applied in reduction of the Certificate Principal Balance of the Class M-1 Certificates;

(vi)     to the Holders of the Class M-2 Certificates, the Accrued Certificate Interest thereon for such Distribution Date, plus any Accrued Certificate Interest thereon remaining unpaid from any previous Distribution Date, except as provided below;

(vii)     to the Holders of the Class M-2 Certificates, an amount equal to (x) the Subordinate Principal Distribution Amount for such Class of Certificates for such Distribution Date, minus (y) the amount of any Class A-P Collection Shortfalls for such Distribution Date or remaining unpaid for all previous Distribution Dates, to the extent the amounts available pursuant to clause (x) of Sections 4.02(a) (ix), (xi), (xiii), (xiv) and (xv) are insufficient therefor, applied in reduction of the Certificate Principal Balance of the Class M-2 Certificates;

(viii)     to the Holders of the Class M-3 Certificates, the Accrued Certificate Interest thereon for such Distribution Date, plus any Accrued Certificate Interest thereon remaining unpaid from any previous Distribution Date, except as provided below;

(ix)     to the Holders of the Class M-3 Certificates, an amount equal to (x) the Subordinate Principal Distribution Amount for such Class of Certificates for such Distribution Date minus (y) the amount of any Class A-P Collection Shortfalls for such Distribution Date or remaining unpaid for all previous Distribution Dates, to the extent the amounts available pursuant to clause (x) of Sections 4.02(a)(xi), (xiii), (xiv) and (xv) are insufficient therefor, applied in reduction of the Certificate Principal Balance of the Class M-3 Certificates;

(x)     to the Holders of the Class B-1 Certificates, the Accrued Certificate Interest thereon for such Distribution Date, plus any Accrued Certificate Interest thereon remaining unpaid from any previous Distribution Date, except as provided below;

(xi)     to the Holders of the Class B-1 Certificates, an amount equal to (x) the Subordinate Principal Distribution Amount for such Class of Certificates for such Distribution Date minus (y) the amount of any Class A-P Collection Shortfalls for such Distribution Date or remaining unpaid for all previous Distribution Dates, to the extent the amounts available pursuant to clause (x) of Sections 4.02(a)(xiii), (xiv) and (xv) are insufficient therefor, applied in reduction of the Certificate Principal Balance of the Class B-1 Certificates;

(xii)    to the Holders of the Class B-2 Certificates, the Accrued Certificate Interest thereon for such Distribution Date, plus any Accrued Certificate Interest thereon remaining unpaid from any previous Distribution Date, except as provided below;

(xiii)    to the Holders of the Class B-2 Certificates, an amount equal to (x) the Subordinate Principal Distribution Amount for such Class of Certificates for such Distribution Date minus (y) the amount of any Class A-P Collection Shortfalls for such Distribution Date or remaining unpaid for all previous Distribution Dates, to the extent the amounts available pursuant to clause (x) of Sections 4.02(a)(xiv) and (xv) are insufficient therefor, applied in reduction of the Certificate Principal Balance of the Class B-2 Certificates;

(xiv)    to the Holders of the Class B-3 Certificates, an amount equal to (x) the Accrued Certificate Interest thereon for such Distribution Date, plus any Accrued Certificate Interest thereon remaining unpaid from any previous Distribution Date, except as provided below, minus (y) the amount of any Class A-P Collection Shortfalls for such Distribution Date or remaining unpaid for all previous Distribution Dates, to the extent the amounts available pursuant to clause (x) of Section 4.02(a)(xv) are insufficient therefor;

(xv)    to the Holders of the Class B-3 Certificates, an amount equal to (x) the Subordinate Principal Distribution Amount for such Class of Certificates for such Distribution Date minus (y) the amount of any Class A-P Collection Shortfalls for such Distribution Date or remaining unpaid for all previous Distribution Dates applied in reduction of the Certificate Principal Balance of the Class B-3 Certificates;

(xvi)    to the Senior Certificates, on a pro rata basis in accordance with their respective outstanding Certificate Principal Balances, the portion, if any, of the Available Distribution Amount remaining after the foregoing distributions applied to reduce the Certificate Principal Balances of such Senior Certificates, but in no event more than the aggregate of the outstanding Certificate Principal Balances of each such Class of Senior Certificates, and thereafter, to each Class of Subordinate Certificates then outstanding beginning with such Class with the Highest Priority, any portion of the Available Distribution Amount remaining after the Senior Certificates have been retired, applied to reduce the Certificate Principal Balance of each such Class of Subordinate Certificates, but in no event more than the outstanding Certificate Principal Balance of each such Class of Subordinate Certificates; and

(xvii)    to the Class R-II Certificates, the balance, if any, of the Available Distribution Amount.

Notwithstanding the foregoing, on any Distribution Date, with respect to the Class of Subordinate Certificates outstanding on such Distribution Date with the Lowest Priority, or in the event the Subordinate Certificates are no longer outstanding, the Senior Certificates, Accrued Certificate Interest thereon remaining unpaid from any previous Distribution Date will be distributable only to the extent that (1) a shortfall in the amounts available to pay Accrued Certificate Interest on any Class of Certificates results from an interest rate reduction in connection with a Servicing Modification, or (2) such unpaid Accrued Certificate Interest was attributable to interest shortfalls relating to the failure of the Master Servicer to make any required Advance, or the determination by the Master Servicer that any proposed Advance would be a Nonrecoverable Advance with respect to the related Mortgage Loan where such Mortgage Loan has not yet been the subject of a Cash Liquidation or REO Disposition or the related Liquidation Proceeds, Insurance Proceeds and REO Proceeds have not yet been distributed to the Certificateholders.

(b)    Distributions of principal on the Senior Certificates on each Distribution Date will be made as follows:

(i)    the Class A-P Principal Distribution Amount shall be distributed to the Class A-P Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

(ii)    an amount equal to the Class A-27 Accrual Distribution Amount shall be distributed to the Class A-25 Certificates and Class A-26 Certificates concurrently, on a pro rata basis in accordance with their respective Certificate Principal Balances, until the Certificate Principal Balances thereof have been reduced to zero;

(iii)    an amount equal to the Class A-23 Accrual Distribution Amount shall be distributed to the Class A-11 Certificates until the Certificate Principal Balance thereof has been reduced to zero;

(iv)    an amount equal to the Class A-16 Accrual Distribution Amount shall be distributed first to the Class A-14 Certificates and Class A-15 Certificates, concurrently, on a pro rata basis in accordance with their respective Certificate Principal Balances, until the Certificate Principal Balances thereof have been reduced to the Aggregate Targeted Principal Balance for the Class A-14 Certificates and Class A-15 Certificates for that Distribution Date, and second to the Class A-16 Certificates until the Certificate Principal Balance thereof has been reduced to zero;

(v)    an amount equal to the Class A-17 Accrual Distribution Amount shall be distributed first to the Class A-19 Certificates until the Certificate Principal Balance thereof has been reduced to the Targeted Principal Balance for the Class A-19 Certificates for that Distribution Date, and second to the Class A-17 Certificates until the Certificate Principal Balance thereof has been reduced to zero;

(vi)    the Senior Principal Distribution Amount shall be distributed to the Class R-I Certificates and Class R-II Certificates, on a pro rata basis in accordance with their respective Certificate Principal Balances, until the Certificate Principal Balances thereof have been reduced to zero;

(vii)    the balance of the Senior Principal Distribution Amount remaining after the distributions, if any, described in Section 4.02(b)(vi) above shall be distributed, concurrently, as follows:

(1)    32.2134244271% of such amount shall be distributed in the following manner and priority:

i.    first, concurrently, to the Class A-3 Certificates and Class A-18 Certificates, an amount equal to the Class A-3/A-18 Lockout Amount, on a pro rata basis in accordance with their respective Certificate Principal Balances, until the Certificate Principal Balances thereof have been reduced to zero;

ii.    second, any remaining amount shall be distributed concurrently as follows:

1)    27.7077837598% of such amount shall be distributed to the Class A-1 Certificates until the Certificate Principal Balance of the Class A-1 Certificates has been reduced to zero; and

2)    72.2922162402% of such amount shall be distributed in the following manner and priority:

a)    first, to the Class A-24 Certificates until the Certificate Principal Balances thereof has been reduced to the Planned Principal Balance for the Class A-24 Certificates for that Distribution

Date;

b)    second, any remaining amount to the Class A-25, Class A-26 and Class A-27 Certificates until the aggregate Certificate Principal Balance thereof has been reduced to the Aggregate Planned Principal Balance for the Class A-25, Class A-26 and Class A-27 Certificates for that Distribution Date as follows:

i)    first, concurrently, to the Class A-25 Certificates and Class A-26 Certificates, on a pro rata basis in accordance with their respective Certificate Principal Balances, until the Certificate Principal Balances thereof have been reduced to zero; and

ii)    second, to the Class A-27 Certificates, until the Certificate Principal Balance of the Class A-27 Certificates has been reduced to zero;

c)    third, any remaining amount shall be distributed to the Class A-28 Certificates and Class A-29 Certificates, on a pro rata basis in accordance with their respective Certificate Principal Balances, until the Certificate Principal Balances thereof have been reduced to zero;

d)    fourth, any remaining amount shall be distributed to the Class A-25, Class A-26 and Class A-27 Certificates without regard to the Aggregate Planned Principal Balance for the Class A-25, Class A-26 and Class A-27 Certificates for that Distribution Date as follows:

i)    first, concurrently, to the Class A-25 Certificates and Class A-26 Certificates, on a pro rata basis in accordance with their respective Certificate Principal Balances, until the Certificate Principal Balances thereof have been reduced to zero; and

ii)    second, to the Class A-27 Certificates, until the Certificate Principal Balance of the Class A-27 Certificates has been reduced to zero; and

e)    fifth, any remaining amount shall be distributed to the Class A-24 Certificates without regard to the Planned Principal Balance for the Class A-24 Certificates until the Certificate Principal Balance thereof has been reduced to zero; and

iii.    third, concurrently, to the Class A-3 Certificates and Class A-18 Certificates, on a pro rata basis in accordance with their respective Certificate Principal Balances, until the Certificate Principal Balances thereof have been reduced to zero;

(2)    16.4780788054% of such amount shall be distributed concurrently to the Class A-4 Certificates and Class A-5 Certificates, on a pro rata basis in accordance with their respective Certificate Principal Balances, until the Certificate Principal Balances thereof have been reduced to zero;

(3)    16.7193397607% of such amount shall be distributed in the following manner and priority:

i.    first, concurrently, to the Class A-6 Certificates and Class A-20 Certificates, an amount equal to the Class A-6/A-20 Lockout Amount, on a pro rata basis in accordance with their respective Certificate Principal Balances, until the Certificate Principal Balances thereof have been reduced to zero;

ii.    second, any remaining amount, up to $331,710, shall be distributed in the following manner and priority:

1)    first, concurrently, to the Class A-7 Certificates and Class A-8 Certificates, on a pro rata basis in accordance with their respective Certificate Principal Balances, until the Certificate Principal Balances thereof have been reduced to zero; and

2)    second, concurrently to the Class A-10 Certificates and Class A-30 Certificates, on a pro rata basis in accordance with their respective Certificate Principal Balances, until the Certificate Principal Balances thereof have been reduced to zero;

iii.    third, any remaining amount shall be distributed in the following manner and priority:

1)    first, to the Class A-11 Certificates, until the Certificate Principal Balance of the Class A-11 Certificates has been reduced to zero; and

2)    second, to the Class A-23 Certificates, until the Certificate Principal Balance of the Class A-23 Certificates has been reduced to zero;

iv.    fourth, any remaining amount shall be distributed concurrently to the Class A-7 Certificates and Class A-8 Certificates, on a pro rata basis in accordance with their respective Certificate Principal Balances, until the Certificate Principal Balances thereof have been reduced to zero;

v.    fifth, any remaining amount shall be distributed concurrently to the Class A-10 Certificates and Class A-30 Certificates, on a pro rata basis in accordance with their respective Certificate Principal Balances, until the Certificate Principal Balances thereof have been reduced to zero; and

vi.    sixth, any remaining amount shall be distributed concurrently to the Class A-6 Certificates and Class A-20 Certificates, on a pro rata basis in accordance with their respective Certificate Principal Balances, until the Certificate Principal Balances thereof have been reduced to zero; and

(4)    34.5891570068% of such amount shall be distributed in the following manner and priority:

i.    first, concurrently, to the Class A-12 Certificates and Class A-21 Certificates, an amount equal to the Class A-12/A-21 Lockout Amount, on a pro rata basis in accordance with their respective Certificate Principal Balances, until the Certificate Principal Balances thereof have been reduced to zero;

ii.    second, any remaining amount shall be distributed to the Class A-13 Certificates until the Certificate Principal Balance thereof has been reduced to the Planned Principal Balance for the Class A-13 Certificates for that Distribution Date;

iii.    third, any remaining amount shall be distributed to the Class A-14, Class A-15 and Class A-16 Certificates until the aggregate Certificate Principal Balance thereof has been reduced to the Aggregate Planned Principal Balance for the Class A-14, Class A-15 and Class A-16 Certificates for that Distribution Date as follows:

1)    first, concurrently to the Class A-14 Certificates and Class A-15 Certificates, on a pro rata basis in accordance with their respective Certificate Principal Balances, until the aggregate Certificate Principal Balances thereof have been reduced to the Aggregate Targeted

Principal Balance for the Class A-14 Certificates and Class A-15 Certificates for that Distribution Date;

2)    second, to the Class A-16 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; and

3)    third, concurrently to the Class A-14 Certificates and Class A-15 Certificates, on a pro rata basis in accordance with their respective Certificate Principal Balances, without regard to the Aggregate Targeted Principal Balance for the Class A-14 Certificates and Class A-15 Certificates for that Distribution Date, until the Certificate Principal Balances thereof have been reduced to the zero;

iv.    fourth, any remaining amount shall be distributed to the Class A-19 Certificates until the Certificate Principal Balance thereof has been reduced to the Targeted Principal Balance for the Class A-19 Certificates for that Distribution Date;

v.    fifth, to the Class A-17 Certificates, until the Certificate Principal Balance of the Class A-17 Certificates has been reduced to zero;

vi.    sixth, to the Class A-19 Certificates, without regard to the Targeted Principal Balance for the Class A-19 Certificates for that Distribution Date, until the Certificate Principal Balance thereof has been reduced to zero;

vii.    seventh, any remaining amount shall be distributed to the Class A-14, Class A-15 and Class A-16 Certificates, without regard to the Aggregate Planned Principal Balance for the Class A-14, Class A-15 and Class A-16 Certificates, as follows:

1)    first, concurrently, to the Class A-14 Certificates and Class A-15 Certificates, on a pro rata basis in accordance with their respective Certificate Principal Balances, until the aggregate Certificate Principal Balance thereof has been reduced to the Aggregate Targeted Principal Balance for the Class A-14 Certificates and Class A-15 Certificates for that Distribution Date; and

2)    second, to the Class A-16 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; and

3)    third, concurrently, to the Class A-14 Certificates and Class A-15 Certificates, without regard to the Aggregate Targeted Principal Balance for the Class A-14 and Class A-15 Certificates, on a pro rata basis in accordance with their respective Certificate Principal Balances, until the Certificate Principal Balances thereof have been reduced to zero;

viii.    eighth, to the Class A-13 Certificates, without regard to the Planned Principal Balance for the Class A-13 Certificates, until the Certificate Principal Balance of the Class A-13 Certificates has been reduced to zero; and

ix.    ninth, concurrently, to the Class A-12 Certificates and Class A-21 Certificates, on a pro rata basis in accordance with their respective Certificate Principal Balances, until the Certificate Principal Balances thereof have been reduced to zero.

(c)    Notwithstanding Section 4.02(b), on or after the Credit Support Depletion Date, an amount equal to the Class A-P Principal Distribution Amount will be distributed to the Class A-P Certificates and then the Senior Principal Distribution Amount will be distributed to the remaining Senior Certificates (other than the Class A-P Certificates and the Class A-V Certificates) pro rata in accordance with their respective outstanding Certificate Principal Balances.

(d)    After the reduction of the Certificate Principal Balances of the Senior Certificates (other than the Class A-P Certificates) to zero but prior to the Credit Support Depletion Date, the Senior Certificates (other than the Class A-P Certificates) will be entitled to no further distributions of principal thereon and the Available Distribution Amount will be distributed solely to the holders of the Class A-P, Class A-V and Subordinate Certificates, in each case as described herein.

(e)    In addition to the foregoing distributions, with respect to any Subsequent Recoveries, the Master Servicer shall deposit such funds into the Custodial Account pursuant to Section 3.07(b)(iii) of the Standard Terms. If, after taking into account such Subsequent Recoveries, the amount of a Realized Loss is reduced, the amount of such Subsequent Recoveries will be applied to increase the Certificate Principal Balance of the Class of Subordinate Certificates with a Certificate Principal Balance greater than zero with the highest payment priority to which Realized Losses, other than Excess Bankruptcy Losses, Excess Fraud Losses, Excess Special Hazard Losses and Extraordinary Losses, have been allocated, but not by more than the amount of Realized Losses previously allocated to that Class of Certificates pursuant to Section 4.05. The amount of any remaining Subsequent Recoveries will be applied to increase from zero the Certificate Principal Balance of the Class of Certificates with the next lower payment priority, up to the amount of Realized Losses previously allocated to that Class of Certificates pursuant to Section 4.05. Any remaining Subsequent Recoveries will in turn be applied to increase from zero the Certificate Principal Balance of the Class of Certificates with the next lower payment priority up to the amount of Realized Losses previously allocated to that Class of Certificates pursuant to Section 4.05, and so on. Holders of such Certificates will not be entitled to any payment in respect of Accrued Certificate Interest on the amount of such increases for any Interest Accrual Period preceding the Interest Accrual Period that relates to the Distribution Date on which such increase occurs. Any such increases shall be applied to the Certificate Principal Balance of each Certificate of such Class in accordance with its respective Percentage Interest.

(f)    Each distribution with respect to a Book-Entry Certificate shall be paid to the Depository, as Holder thereof, and the Depository shall be solely responsible for crediting the amount of such distribution to the accounts of its Depository Participants in accordance with its normal procedures. Each Depository Participant shall be responsible for disbursing such distribution to the Certificate Owners that it represents and to each indirect participating brokerage firm (a "brokerage firm") for which it acts as agent. Each brokerage firm shall be responsible for disbursing funds to the Certificate Owners that it represents. None of the Trustee, the Certificate Registrar, the Company or the Master Servicer shall have any responsibility therefor.

(g)    Except as otherwise provided in Section 9.01 of the Standard Terms, if the Master Servicer anticipates that a final distribution with respect to any Class of Certificates will be made on the next Distribution Date, the Master Servicer shall, no later than the Determination Date in the month of such final distribution, notify the Trustee and the Trustee shall, no later than two (2) Business Days after such Determination Date, mail on such date to each Holder of such Class of Certificates a notice to the effect that: (i) the Trustee anticipates that the final distribution with respect to such Class of Certificates will be made on such Distribution Date but only upon presentation and surrender of such Certificates at the office of the Trustee or as otherwise specified therein, and (ii) no interest shall accrue on such Certificates from and after the end of the related Interest Accrual Period. In the event that Certificateholders required to surrender their Certificates pursuant to Section 9.01(c) of the Standard Terms do not surrender their Certificates for final

cancellation, the Trustee shall cause funds distributable with respect to such Certificates to be withdrawn from the Certificate Account and credited to a separate escrow account for the benefit of such Certificateholders as provided in Section 9.01(d) of the Standard Terms.

(h)    On each Distribution Date preceding the related Accretion Termination Date, the Accrued Certificate Interest that would otherwise be distributed to the Class A-16 Certificates will be added to the Certificate Principal Balance of the Class A-16 Certificates and will be distributed to the Holders of the Class A-14 Certificates and Class A-15 Certificates as distributions of principal pursuant to Section 4.02(b)(iv) in reduction of the Certificate Principal Balances of the Class A-14 Certificates and Class A-15 Certificates. Any distributions of the related Accrual Distribution Amount to the Class A-14 Certificates and Class A-15 Certificates will reduce the Certificate Principal Balances of the Class A-14 Certificates and Class A-15 Certificates by such amount. The amount that is added to the Certificate Principal Balance of the Class A-16 Certificates will accrue interest at a rate of 6.50% per annum. On each Distribution Date on or after the related Accretion Termination Date, the entire Accrued Certificate Interest on the Class A-16 Certificates for such date will be payable to the holders of the Class A-16 Certificates, as interest, to the extent not required to be paid to the Class A-14 Certificates and Class A-15 Certificates in order to fully reduce the aggregate Certificate Principal Balance of the Class A-14 Certificates and Class A-15 Certificates to the Aggregate Targeted Principal Balance for the Class A-14 Certificates and Class A-15 Certificates for that Distribution Date on the Accretion Termination Date; provided, however, that if the Accretion Termination Date is the Credit Support Depletion Date, the entire Accrual Distribution Amount for such date will be payable as interest to the holders of the Class A-16 Certificates.

On each Distribution Date preceding the related Accretion Termination Date, the Accrued Certificate Interest that would otherwise be distributed to the Class A-17 Certificates will be added to the Certificate Principal Balance of the Class A-17 Certificates and will be distributed to the Holders of the Class A-19 Certificates as distributions of principal pursuant to Section 4.02(b)(v) in reduction of the Certificate Principal Balances of the Class A-19 Certificates. Any distributions of the related Accrual Distribution Amount to the Class A-19 Certificates will reduce the Certificate Principal Balances of the Class A-19 Certificates by such amount. The amount that is added to the Certificate Principal Balance of the Class A-17 Certificates will accrue interest at a rate of 6.50% per annum. On each Distribution Date on or after the related Accretion Termination Date, the entire Accrued Certificate Interest on the Class A-17 Certificates for such date will be payable to the Holders of the Class A-17 Certificates, as interest, to the extent not required to be paid to the Class A-19 Certificates in order to fully reduce the Certificate Principal Balance of the Class A-19 Certificates to the Targeted Principal Balance for the Class A-19 Certificates for that Distribution Date on the Accretion Termination Date; provided, however, that if the Accretion Termination Date is the Credit Support Depletion Date, the entire Accrual Distribution Amount for such date will be payable as interest to the holders of the Class A-17 Certificates.

On each Distribution Date preceding the related Accretion Termination Date, the Accrued Certificate Interest that would otherwise be distributed to the Class A-23 Certificates will be added to the Certificate Principal Balance of the Class A-23 Certificates and will be distributed to the Holders of the Class A-11 Certificates as distributions of principal pursuant to Section 4.02(b)(iii) in reduction of the Certificate Principal Balances of the Class A-11 Certificates. Any distributions of the related Accrual Distribution Amount to the Class A-11 Certificates will reduce the Certificate Principal Balance of the Class A-11 Certificates by such amount. The amount that is added to the Certificate Principal Balance of the Class A-23 Certificates will accrue interest at a rate of 6.50% per annum. On each Distribution Date on or after the related Accretion Termination Date, the entire Accrued Certificate Interest on the Class A-23 Certificates for such date will be payable to the Holders of the Class A-11 Certificates, as interest, to the extent not required to be paid to the Class A-11 Certificates in order to fully reduce the Certificate Principal Balance of the Class A-11 Certificates to zero on the Accretion Termination Date; provided, however, that if the Accretion Termination Date is the Credit Support Depletion Date, the entire Accrual Distribution Amount for such date will be payable as interest to the holders of the Class A-23 Certificates.

On each Distribution Date preceding the related Accretion Termination Date, the Accrued Certificate Interest that would otherwise be distributed to the Class A-27 Certificates will be added to the Certificate Principal Balance of the Class A-27 Certificates and will be distributed to the Holders of the Class A-25 Certificates and Class A-26 Certificates as distributions of principal pursuant to Section 4.02(b)(ii) in reduction of the Certificate Principal Balances of the Class A-25 Certificates and Class A-26 Certificates. Any distributions of the related Accrual Distribution Amount to the Class A-25 Certificates and Class A-26 Certificates will reduce the Certificate Principal Balances of the Class A-25 Certificates and Class A-26 Certificates by such amount. The amount that is added to the Certificate Principal Balance of the Class A-27 Certificates will accrue interest at a rate of 6.50% per annum. On each Distribution Date on or after the related Accretion Termination Date, the entire Accrued Certificate Interest on the Class A-27 Certificates for such date will be payable to the Holders of the Class A-27 Certificates, as interest, to the extent not required to be paid to the Class A-25 Certificates and Class A-26 Certificates in order to fully reduce the aggregate Certificate Principal Balance of the Class A-25 Certificates and Class A-26 Certificates to zero on the Accretion Termination Date; provided, however, that if the Accretion Termination Date is the Credit Support Depletion Date, the entire Accrual Distribution Amount for such date will be payable as interest to the holders of the Class A-27 Certificates.

Section 4.03    Statements to Certificateholders; Statements to the Rating Agencies; Exchange Act Reporting. (See Section 4.03 of the Standard Terms)

Section 4.04    Distribution of Reports to the Trustee and the Company; Advances by the Master Servicer. (See Section 4.04 of the Standard Terms)

Section 4.05    Allocation of Realized Losses.

Prior to each Distribution Date, the Master Servicer shall determine the total amount of Realized Losses, if any, that resulted from any Cash Liquidation, Servicing Modification, Debt Service Reduction, Deficient Valuation or REO Disposition that occurred during the related Prepayment Period or, in the case of a Servicing Modification that constitutes a reduction of the interest rate on a Mortgage Loan, the amount of the reduction in the interest portion of the Monthly Payment due during the related Due Period. The amount of each Realized Loss shall be evidenced by an Officers' Certificate. All Realized Losses, other than Excess Special Hazard Losses, Extraordinary Losses, Excess Bankruptcy Losses or Excess Fraud Losses, shall be allocated as follows: first, to the Class B-3 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; second, to the Class B-2 Certificates until the Certificate Principal Balance thereof has been reduced to zero; third, to the Class B-1 Certificates until the Certificate Principal Balance thereof has been reduced to zero; fourth, to the Class M-3 Certificates until the Certificate Principal Balance thereof has been reduced to zero; fifth, to the Class M-2 Certificates until the Certificate Principal Balance thereof has been reduced to zero; sixth, to the Class M-1 Certificates until the Certificate Principal Balance thereof has been reduced to zero; and, thereafter, if any such Realized Loss is on a Discount Mortgage Loan, to the Class A-P Certificates in an amount equal to the related Discount Fraction of the principal portion of the Realized Loss until the Certificate Principal Balance of the Class A-P Certificates has been reduced to zero, and the remainder of such Realized Losses on the Discount Mortgage Loans and the entire amount of such Realized Losses on the Non-Discount Mortgage Loans shall be allocated among all Senior Certificates (other than the Class A-P Certificates) on a pro rata basis, as described below; provided, however, that Realized Losses otherwise allocable to the Class A-6 Certificates will be allocated to the Class A-20 Certificates, until the Certificate Principal Balance of the Class A-20 Certificates has been reduced to zero, Realized Losses otherwise allocable to the Class A-7 Certificates will be allocated to the Class A-8 Certificates, until the Certificate Principal Balance of the

Class A-8 Certificates has been reduced to zero, Realized Losses otherwise allocable to the Class A-12 Certificates will be allocated to the Class A-21 Certificates, until the Certificate Principal Balance of the Class A-21 Certificates has been reduced to zero, and Realized Losses otherwise allocable to the Class A-25 Certificates will be allocated to the Class A-26 Certificates, until the Certificate Principal Balance of the Class A-26 Certificates has been reduced to zero. The principal portion of any Excess Special Hazard Losses, Excess Bankruptcy Losses, Excess Fraud Losses and Extraordinary Losses on the Discount Mortgage Loans shall be allocated to the Class A-P Certificates in an amount equal to the related Discount Fraction thereof and the remainder of the principal portion and the entire interest portion of such Realized Losses on the Discount Mortgage Loans and the entire principal and interest portion of such Realized Losses on Non-Discount Mortgage Loans will be allocated among the Senior Certificates (other than the Class A-P Certificates) and the Subordinate Certificates, on a pro rata basis, as described below.

As used herein, an allocation of a Realized Loss on a "pro rata basis" among two or more specified Classes of Certificates means an allocation on a pro rata basis, among the various Classes so specified, to each such Class of Certificates, on the basis of their then outstanding Certificate Principal Balances prior to giving effect to distributions to be made on such Distribution Date in the case of the principal portion of a Realized Loss or based on the Accrued Certificate Interest thereon payable on such Distribution Date (without regard to any Compensating Interest for such Distribution Date) in the case of an interest portion of a Realized Loss. Except as provided in the following sentence, any allocation of the principal portion of Realized Losses (other than Debt Service Reductions) to a Class of Certificates shall be made by reducing the Certificate Principal Balance thereof by the amount so allocated, which allocation shall be deemed to have occurred on such Distribution Date; provided that no such reduction shall reduce the aggregate Certificate Principal Balance of the Certificates below the aggregate Stated Principal Balance of the Mortgage Loans; provided further, that the Certificate Principal Balance of the Accrual Certificates for purposes of this Section 4.05 shall be the lesser of (a) the Certificate Principal Balance of the Accrual Certificates as of the Closing Date, and (b) the Certificate Principal Balance of the Accrual Certificates prior to giving effect to distributions to be made on such Distribution Date. Any allocation of the principal portion of Realized Losses (other than Debt Service Reductions) to the Subordinate Certificates then outstanding with the Lowest Priority shall be made by operation of the definition of "Certificate Principal Balance" and by operation of the provisions of Section 4.02(a). Allocations of the interest portions of Realized Losses (other than any interest rate reduction resulting from a Servicing Modification) shall be made in proportion to the amount of Accrued Certificate Interest and by operation of the definition of "Accrued Certificate Interest" and by operation of the provisions of Section 4.02(a). Allocations of the interest portion of a Realized Loss resulting from an interest rate reduction in connection with a Servicing Modification shall be made by operation of the provisions of Section 4.02(a). Allocations of the principal portion of Debt Service Reductions shall be made by operation of the provisions of Section 4.02(a). All Realized Losses and all other losses allocated to a Class of Certificates hereunder will be allocated among the Certificates of such Class in proportion to the Percentage Interests evidenced thereby; provided that if any Subclasses of the Class A-V Certificates have been issued pursuant to Section 5.01(c) of the Standard Terms, such Realized Losses and other losses allocated to the Class A-V Certificates shall be allocated among such Subclasses in proportion to the respective amounts of Accrued Certificate Interest payable on such Distribution Date that would have resulted absent such reductions.

Section 4.06     Reports of Foreclosures and Abandonment of Mortgaged Property. (See Section 4.06 of the Standard Terms)

Section 4.07     Optional Purchase of Defaulted Mortgage Loans. (See Section 4.07 of the Standard Terms)

Section 4.08     Surety Bond. (See Section 4.08 of the Standard Terms)

---

ARTICLE V

THE CERTIFICATES

(SEE ARTICLE V OF THE STANDARD TERMS)

---

ARTICLE VI

THE COMPANY AND THE MASTER SERVICER

Section 6.01     Respective Liabilities of the Company and Master Servicer. (See Section 6.01 of the Standard Terms.)

Section 6.02     Merger or Consolidation of the Company or Master Servicer; Assignment of Rights and Delegation of Duties by the Master Servicer (See Section 6.02 of the Standard Terms)..

Section 6.03     Limitation on Liability of the Company, Master Servicer and Others. (See Section 6.03 of the Standard Terms.)

Section 6.04     Company and Master Servicer Not to Resign. (See Section 6.04 of the Standard Terms.)

---

ARTICLE VII

DEFAULT

(SEE ARTICLE VII OF THE STANDARD TERMS)

ARTICLE VIII

CONCERNING THE TRUSTEE

Section 8.01     Duties of Trustee.  (See Section 8.01 of the Standard Terms)

Section 8.02     Certain Matters Affecting the Trustee.  (See Section 8.02 of the Standard Terms)

Section 8.03     Trustee Not Liable for Certificates or Mortgage Loans.  (See Section 8.03 of the Standard Terms)

Section 8.04     Trustee May Own Certificates.  (See Section 8.04 of the Standard Terms)

Section 8.05     Master Servicer to Pay Trustee's Fees and Expenses; Indemnification.  (See Section 8.05 of the Standard Terms)

Section 8.06     Eligibility Requirements for Trustee.  (See Section 8.06 of the Standard Terms)

Section 8.07     Resignation and Removal of Trustee.  (See Section 8.07 of the Standard Terms)

Section 8.08     Successor Trustee.  (See Section 8.08 of the Standard Terms)

Section 8.09     Merger or Consolidation of Trustee.  (See Section 8.09 of the Standard Terms)

Section 8.10     Appointment of Co-Trustee or Separate Trustee.  (See Section 8.10 of the Standard Terms)

Section 8.11     Appointment of Custodian. (See Section 8.11 of the Standard Terms)

Section 8.12     Appointment of Office or Agency.  (See Section 8.12 of the Standard Terms).

ARTICLE IX

TERMINATION

Section 9.01     Optional Purchase by the Master Servicer of All Certificates; Termination Upon Purchase by the Master Servicer or Liquidation of All Mortgage Loans.

(a)     Subject to Section 9.02, the respective obligations and responsibilities of the Company, the Master Servicer and the Trustee created hereby in respect of the Certificates (other than the obligation of the Trustee to make certain payments after the Final Distribution Date to Certificateholders and the obligation of the Company to send certain notices as hereinafter set forth) shall terminate upon the last action required to be taken by the Trustee on the Final Distribution Date pursuant to this Article IX following the earlier of:

(i)     the later of the final payment or other liquidation (or any Advance with respect thereto) of the last Mortgage Loan remaining in the Trust Fund or the disposition of all property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan, or

(ii)     the purchase by the Master Servicer of all Mortgage Loans and all property acquired in respect of any Mortgage Loan remaining in the Trust Fund at a price equal to 100% of the unpaid principal balance of each Mortgage Loan or, if less than such unpaid principal balance, the fair market value of the related underlying property of such Mortgage Loan with respect to Mortgage Loans as to which title has been acquired if such fair market value is less than such unpaid principal balance (net of any unreimbursed Advances attributable to principal) on the day of repurchase plus accrued interest thereon at the Net Mortgage Rate (or Modified Net Mortgage Rate in the case of any Modified Mortgage Loan) to, but not including, the first day of the month in which such repurchase price is distributed, provided, however, that in no event shall the trust created hereby continue beyond the expiration of 21 years from the death of the last survivor of the descendants of Joseph P. Kennedy, the late ambassador of the United States to the Court of St. James, living on the date hereof and provided further that the purchase price set forth above shall be increased as is necessary, as determined by the Master Servicer, to avoid disqualification of any portion of any REMIC formed under the Series Supplement as a REMIC. The purchase price paid by the Master Servicer shall also include any amounts owed by Residential Funding pursuant to the last paragraph of Section 4 of the Assignment Agreement in respect of any liability, penalty or expense that resulted from a breach of the Compliance With Laws Representation, that remain unpaid on the date of such purchase.

The right of the Master Servicer to purchase all the assets of the Trust Fund pursuant to clause (ii) above is conditioned upon the Pool Stated Principal Balance as of the Final Distribution Date, prior to giving effect to distributions to be made on such Distribution Date, being less than ten percent of the Cut-off Date Principal Balance of the Mortgage Loans.

If such right is exercised by the Master Servicer, the Master Servicer shall be deemed to have been reimbursed for the full amount of any unreimbursed Advances theretofore made by it with respect to the Mortgage Loans. In addition, the Master Servicer shall provide to the Trustee the certification required by Section 3.15 and the Trustee and the Custodian shall, promptly following payment of the purchase price, release to the Master Servicer the Custodial Files pertaining to the Mortgage Loans being purchased.

In addition to the foregoing, on any Distribution Date on which the Pool Stated Principal Balance, prior to giving effect to distributions to be made on such Distribution Date, is less than ten percent of the Cut-off Date Principal Balance of the Mortgage Loans, the Master Servicer shall have the right, at its option, to purchase the Certificates in whole, but not in part, at a price equal to the outstanding Certificate Principal Balance of such Certificates plus the sum of Accrued Certificate Interest thereon for the related Interest Accrual Period and any previously unpaid Accrued Certificate Interest. If the Master Servicer exercises this right to purchase the outstanding Certificates, the Master Servicer will promptly terminate the respective

obligations and responsibilities created hereby in respect of the Certificates pursuant to this Article IX.

(b)     The Master Servicer shall give the Trustee not less than 40 days' prior notice of the Distribution Date on which the Master Servicer anticipates that the final distribution will be made to Certificateholders (whether as a result of the exercise by the Master Servicer of its right to purchase the assets of the Trust Fund or otherwise) or on which the Master Servicer anticipates that the Certificates will be purchased (as a result of the exercise by the Master Servicer to purchase the outstanding Certificates). Notice of any termination specifying the anticipated Final Distribution Date (which shall be a date that would otherwise be a Distribution Date) upon which the Certificateholders may surrender their Certificates to the Trustee (if so required by the terms hereof) for payment of the final distribution and cancellation or notice of any purchase of the outstanding Certificates, specifying the Distribution Date upon which the Holders may surrender their Certificates to the Trustee for payment, shall be given promptly by the Master Servicer (if it is exercising its right to purchase the assets of the Trust Fund or to purchase the outstanding Certificates), or by the Trustee (in any other case) by letter. Such notice shall be prepared by the Master Servicer (if it is exercising its right to purchase the assets of the Trust Fund or to purchase the outstanding Certificates), or by the Trustee (in any other case) and mailed by the Trustee to the Certificateholders not earlier than the 15th day and not later than the 25th day of the month next preceding the month of such final distribution specifying:

(i)     the anticipated Final Distribution Date upon which final payment of the Certificates is anticipated to be made upon presentation and surrender of Certificates at the office or agency of the Trustee therein designated where required pursuant to this Agreement or, in the case of the purchase by the Master Servicer of the outstanding Certificates, the Distribution Date on which such purchase is to be made,

(ii)    the amount of any such final payment, or in the case of the purchase of the outstanding Certificates, the purchase price, in either case, if known, and

(iii)   that the Record Date otherwise applicable to such Distribution Date is not applicable, and in the case of the Senior Certificates, or in the case of all of the Certificates in connection with the exercise by the Master Servicer of its right to purchase the Certificates, that payment will be made only upon presentation and surrender of the Certificates at the office or agency of the Trustee therein specified.

If the Master Servicer is obligated to give notice to Certificateholders as aforesaid, it shall give such notice to the Certificate Registrar at the time such notice is given to Certificateholders and, if the Master Servicer is exercising its rights to purchase the outstanding Certificates, it shall give such notice to each Rating Agency at the time such notice is given to Certificateholders. As a result of the exercise by the Master Servicer of its right to purchase the assets of the Trust Fund, the Master Servicer shall deposit in the Certificate Account, before the Final Distribution Date in immediately available funds an amount equal to the purchase price for the assets of the Trust Fund, computed as provided above. As a result of the exercise by the Master Servicer of its right to purchase the outstanding Certificates, the Master Servicer shall deposit in an Eligible Account, established by the Master Servicer on behalf of the Trustee and separate from the Certificate Account in the name of the Trustee in trust for the registered holders of the Certificates, before the Distribution Date on which such purchase is to occur in immediately available funds an amount equal to the purchase price for the Certificates, computed as above provided, and provide notice of such deposit to the Trustee. The Trustee will withdraw from such account the amount specified in subsection (c) below.

(c)     In the case of the Senior Certificates, upon presentation and surrender of the Certificates by the Certificateholders thereof, and in the case of the Class M and Class B Certificates, upon presentation and surrender of the Certificates by the Certificateholders thereof in connection with the exercise by the Master Servicer of its right to purchase the Certificates, and otherwise in accordance with Section 4.01(a), the Trustee shall distribute to the Certificateholders (i) the amount otherwise distributable on such Distribution Date, if not in connection with the Master Servicer's election to repurchase the assets of the Trust Fund or the outstanding Certificates, or (ii) if the Master Servicer elected to so repurchase the assets of the Trust Fund or the outstanding Certificates, an amount determined as follows: (A) with respect to each Certificate the outstanding Certificate Principal Balance thereof, plus Accrued Certificate Interest for the related Interest Accrual Period thereon and any previously unpaid Accrued Certificate Interest, subject to the priority set forth in Section 4.02(a), and (B) with respect to the Class R Certificates, any excess of the amounts available for distribution (including the repurchase price specified in clause (ii) of subsection (a) of this Section) over the total amount distributed under the immediately preceding clause (A). Notwithstanding the reduction of the Certificate Principal Balance of any Class of Subordinate Certificates to zero, such Class will be outstanding hereunder until the termination of the respective obligations and responsibilities of the Company, the Master Servicer and the Trustee hereunder in accordance with Article IX.

(d)     If any Certificateholders shall not surrender their Certificates for final payment and cancellation on or before the Final Distribution Date (if so required by the terms hereof), the Trustee shall on such date cause all funds in the Certificate Account not distributed in final distribution to Certificateholders to be withdrawn therefrom and credited to the remaining Certificateholders by depositing such funds in a separate non-interest bearing escrow account for the benefit of such Certificateholders, and the Master Servicer (if it exercised its right to purchase the assets of the Trust Fund), or the Trustee (in any other case) shall give a second written notice to the remaining Certificateholders to surrender their Certificates for cancellation and receive the final distribution with respect thereto. If within six months after the second notice any Certificate shall not have been surrendered for cancellation, the Trustee shall take appropriate steps as directed by the Master Servicer to contact the remaining Certificateholders concerning surrender of their Certificates. The costs and expenses of maintaining the escrow account and of contacting Certificateholders shall be paid out of the assets which remain in the escrow account. If within nine months after the second notice any Certificates shall not have been surrendered for cancellation, the Trustee shall pay to the Master Servicer all amounts distributable to the holders thereof and the Master Servicer shall thereafter hold such amounts until distributed to such Holders. No interest shall accrue or be payable to any Certificateholder on any amount held in the escrow account or by the Master Servicer as a result of such Certificateholder's failure to surrender its Certificate(s) for final payment thereof in accordance with this Section 9.01.

(e)     If any Certificateholders do not surrender their Certificates on or before the Distribution Date on which a purchase of the outstanding Certificates is to be made, the Trustee shall on such date cause all funds in the Certificate Account deposited therein by the Master Servicer pursuant to Section 9.01(b) to be withdrawn therefrom and deposited in a separate non-interest bearing escrow account for the benefit of such Certificateholders, and the Master Servicer shall give a second written notice to such Certificateholders to surrender their Certificates for payment of the purchase price therefor. If within six months after the second notice any Certificate shall not have been surrendered for cancellation, the Trustee shall take appropriate steps as directed by the Master Servicer to contact the Holders of such Certificates concerning surrender of their Certificates. The costs and expenses of maintaining the escrow account and of contacting Certificateholders shall be paid out of the assets which remain in the escrow account. If within nine months after the second notice any Certificates shall not have been surrendered for cancellation in accordance with this Section 9.01, the Trustee shall pay to the Master Servicer all amounts distributable to the Holders thereof and the Master Servicer shall thereafter hold amounts until distributed to such Holders. No interest shall accrue or be payable to any Certificateholder on any amount held in the escrow account or by the Master Servicer as a result of such Certificateholder's failure to surrender its Certificate(s) for payment in accordance with this Section 9.01. Any Certificate that is not surrendered on the Distribution Date on which a purchase pursuant to this Section 9.01 occurs as provided above will be deemed to have been purchased and the Holder as of such date will have no rights with respect thereto except to receive the purchase price therefor minus any costs and expenses associated with such escrow account and notices allocated thereto. Any Certificates so purchased or deemed to have been purchased on such Distribution Date shall remain outstanding hereunder until the Master Servicer has

terminated the respective obligations and responsibilities created hereby in respect of the Certificates pursuant to this Article IX. The Master Servicer shall be for all purposes the Holder thereof as of such date.

Section 9.02    Additional Termination Requirements. (See Section 9.02 of the Standard Terms).

Section 9.03    Termination of Multiple REMICs. (See Section 9.03 of the Standard Terms).

---

ARTICLE X

REMIC PROVISIONS

Section 10.01    REMIC Administration. (See Section 10.01 of the Standard Terms)

Section 10.02    Master Servicer; REMIC Administrator and Trustee Indemnification. (See Section 10.02 of the Standard Terms)

Section 10.03    Designation of REMICs.

The REMIC Administrator shall make an election to treat the entire segregated pool of assets described in the definition of REMIC I, and subject to this Agreement (including the Mortgage Loans) as a REMIC ("REMIC I") and shall make an election to treat the pool of assets comprised of the Uncertificated REMIC I Regular Interests as a REMIC ("REMIC II") for federal income tax purposes.

The Uncertificated REMIC I Regular Interests will be "regular interests" in REMIC I and the Class R-I Certificates will be the sole class of "residual interests" in REMIC I for purposes of the REMIC Provisions (as defined herein) under the federal income tax law.

The Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class A-6, Class A-7, Class A-8, Class A-9, Class A-10, Class A-11, Class A-12, Class A-13, Class A-14, Class A-15, Class A-16, Class A-17, Class A-18, Class A-19, Class A-20, Class A-21, Class A-22, Class A-23, Class A-24, Class A-25, Class A-26, Class A-27, Class A-28, Class A-29, Class A-30, Class A-P, Class M-1, Class M-2, Class M-3, Class B-1, Class B-2 and Class B-3 Certificates and the Uncertificated REMIC II Regular Interests Z, the rights in and to which will be represented by the Class A-V Certificates, will be "regular interests" in REMIC II, and the Class R-II Certificates will be the sole class of "residual interests" therein for purposes of the REMIC Provisions (as defined herein) under federal income tax law. On and after the date of issuance of any Subclass of Class A-V Certificates pursuant to Section 5.01(c) of the Standard Terms, any such Subclass will represent the Uncertificated REMIC II Regular Interest or Interests Z specified by the initial Holder of the Class A-V Certificates pursuant to said Section.

Section 10.04    Distributions on the Uncertificated REMIC I Regular Interests and the Uncertificated REMIC II Regular Interests Z.

(a)  On each Distribution Date the Trustee shall be deemed to distribute to itself, as the holder of the Uncertificated REMIC I Regular Interests, the Uncertificated REMIC I Regular Interest Distribution Amounts in the following order of priority to the extent of the Available Distribution Amount reduced by distributions made to the Class R-I Certificates pursuant to Section 4.02(a):

(i)    Uncertificated Accrued Interest on the Uncertificated REMIC I Regular Interests for such Distribution Date, plus any Uncertificated Accrued Interest thereon remaining unpaid from any previous Distribution Date; and

(ii)    In accordance with the priority set forth in Section 10.04(b), an amount equal to the sum of the amounts in respect of principal distributable on each Class of Certificates (other than the Class R-I Certificates) under Section 4.02(a), as allocated thereto pursuant to Section 4.02(b).

(b)  The amount described in Section 10.04(a)(ii) shall be deemed distributed to the Uncertificated REMIC I Regular Interests (other than the Uncertificated REMIC I Regular Interests Z) with the amount to be distributed allocated among such interests in accordance with the priority assigned to each Related Class of Certificates (other than the Class R-I Certificates), respectively, under Section 4.02(b) until the Uncertificated Principal Balance of each such interest is reduced to zero.

(c)  The portion of the Uncertificated REMIC I Regular Interest Distribution Amounts described in Section 10.04(a)(ii) shall be deemed distributed by REMIC I to REMIC II in accordance with the priority assigned to the Uncertificated REMIC I Regular Interests relative to that assigned to the Certificates under Section 4.02(b).

(d)  In determining from time to time the Uncertificated REMIC I Regular Interest Distribution Amounts and Uncertificated REMIC II Regular Interest Distribution Amounts:

(i)    Realized Losses allocated to the Class A-V Certificates under Section 4.05 shall be deemed allocated to the Uncertificated REMIC II Regular Interests Z pro rata according to the respective amounts of Uncertificated Accrued Interest that would have accrued on such Uncertificated REMIC II Regular Interests Z for the Distribution Date for which such allocation is being made in the absence of such allocation;

(ii)    Realized Losses allocated to the Class A-1, Class A-6, Class A-11, Class A-13, Class A-16, Class A-17, Class A-19, Class A-20, Class A-23, Class A-24, Class A-25, Class A-26, Class A-27, Class R-II, Class M-1, Class M-2, Class M-3, Class B-1, Class B-2 and Class B-3 Certificates under Section 4.05 shall be deemed allocated to Uncertificated REMIC I Regular Interest Q;

(iii)  (A)    Realized Losses allocated to the Class A-3 Certificates under Section 4.05 shall be deemed allocated to Uncertificated REMIC I Regular Interest R-1;

(B)    Realized Losses allocated to the Class A-12, Class A-18 and Class A-24 Certificates under Section 4.05 shall be deemed allocated to Uncertificated REMIC I Regular Interest R-2; and

(C)    Realized Losses allocated to the Class A-2 Certificates under Section 4.05 shall be deemed allocated to Uncertificated REMIC I Regular Interests R-1 and R-2, pro rata according to their respective Uncertificated Principal Balances;

(iv)   Realized Losses allocated to the Class A-4 Certificates and Class A-5 Certificates under Section 4.05 shall be deemed allocated to Uncertificated REMIC I Regular Interest S;

(v)    Realized Losses allocated to the Class A-7, Class A-8 and Class A-9 Certificates under Section 4.05 shall be deemed allocated to Uncertificated REMIC I Regular Interest T;

(vi)    Realized Losses allocated to the Class A-10 Certificates and Class A-30 Certificates under Section 4.05 shall be deemed allocated to Uncertificated REMIC I Regular Interest U;

(vii)    Realized Losses allocated to the Class A-14 Certificates under Section 4.05 shall be deemed allocated to Uncertificated REMIC I Regular Interest V;

(viii)    Realized Losses allocated to the Class A-15 Certificates and Class A-22 Certificates under Section 4.05 shall be deemed allocated to Uncertificated REMIC I Regular Interest W;

(ix)    Realized Losses allocated to the Class A-28 Certificates and Class A-29 Certificates under Section 4.05 shall be deemed allocated to Uncertificated REMIC I Regular Interest X;

(x)    Realized Losses allocated to the Class A-P Certificates under Section 4.05 shall be deemed allocated to Uncertificated REMIC I Regular Interest Y; and

(xi)    Realized Losses allocated to the Uncertificated REMIC II Regular Interests Z under clause (i), above, shall be deemed allocated, in each case, to the related Uncertificated REMIC I Regular Interest Z.

(e)    On each Distribution Date the Trustee shall be deemed to distribute from REMIC II, in the priority set forth in Sections 4.02(a) and (b), to the Holders of each Class of Certificates (other than the Class R-I Certificates) the amounts distributable thereon from the Uncertificated REMIC I Regular Interest Distribution Amounts deemed to have been received by REMIC II from REMIC I under this Section 10.04. The amounts deemed distributed hereunder with respect to the Class A-V Certificates shall be deemed to have been distributed in respect of the Uncertificated REMIC II Regular Interests Z in accordance with their respective Uncertificated REMIC II Regular Interest Distribution Amounts, as such Uncertificated REMIC II Regular Interests Z comprise the Class A-V Certificates.

(f)    Notwithstanding the deemed distributions on the Uncertificated REMIC I Regular Interests described in this Section 10.04, distributions of funds from the Certificate Account shall be made only in accordance with Section 4.02.

Section 10.05    Compliance with Withholding Requirements.

Notwithstanding any other provision of this Agreement, the Trustee or any Paying Agent, as applicable, shall comply with all federal withholding requirements respecting payments to Certificateholders, including interest or original issue discount payments or advances thereof that the Trustee or any Paying Agent, as applicable, reasonably believes are applicable under the Code. The consent of Certificateholders shall not be required for such withholding. In the event the Trustee or any Paying Agent, as applicable, does withhold any amount from interest or original issue discount payments or advances thereof to any Certificateholder pursuant to federal withholding requirements, the Trustee or any Paying Agent, as applicable, shall indicate the amount withheld to such Certificateholder pursuant to the terms of such requirements.

---

ARTICLE XI

MISCELLANEOUS PROVISIONS

Section 11.01    Amendment.  (See Section 11.01 of the Standard Terms)

Section 11.02    Recordation of Agreement; Counterparts.  (See Section 11.02 of the Standard Terms)

Section 11.03    Limitation on Rights of Certificateholders.  (See Section 11.03 of the Standard Terms)

Section 11.04    Governing Law.  (See Section 11.04 of the Standard Terms)

Section 11.05    Notices.  All demands and notices hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by registered mail, postage prepaid (except for notices to the Trustee which shall be deemed to have been duly given only when received), to the appropriate address for each recipient listed in the table below or, in each case, such other address as may hereafter be furnished in writing to the Master Servicer, the Trustee and the Company, as applicable:

| RECIPIENT | ADDRESS |
| --- | --- |
| Company | 8400 Normandale Lake Boulevard Suite 250, Minneapolis, Minnesota  55437, Attention:  President |
| Master Servicer | 2255 N. Ontario Street, Suite 400 Burbank, California 91504-2130, Attention:  Managing Director/Master Servicing |
| Trustee | Corporate Trust Office 1761 East St. Andrew Place Santa Ana, California 92705-4934, Attention:  Residential Accredit Loans, Inc. Series 2006-QS14<br><br>The Trustee designates its offices located at DB Services Tennessee, 648 Grassmere Park Road, Nashville, TN 37211-3658, Attn:  Transfer Unit, for the purposes of Section 8.12 of the Standard Terms |

---------------------------------------------    --------------------------------------------------------------------
Fitch Ratings                                    One State Street Plaza
                                                 New York, New York 10004

---------------------------------------------    --------------------------------------------------------------------
---------------------------------------------    --------------------------------------------------------------------
Moody's Investors Service, Inc.                  99 Church Street, 4th Floor
                                                 New York, New York 10004

---------------------------------------------    --------------------------------------------------------------------
---------------------------------------------    --------------------------------------------------------------------
Standard & Poor's                                55 Water Street
Ratings Services, a division of The              New York, New York 10041
McGraw-Hill Companies, Inc.
---------------------------------------------    --------------------------------------------------------------------

Any notice required or permitted to be mailed to a Certificateholder shall be given by first class mail, postage prepaid, at the address of such holder as shown in the Certificate Register. Any notice so mailed within the time prescribed in this Agreement shall be conclusively presumed to have been duly given, whether or not the Certificateholder receives such notice.

Section 11.06    Required Notices to Rating Agency and Subservicer. (See Section 11.06 of the Standard Terms)

Section 11.07    Severability of Provisions. (See Section 11.07 of the Standard Terms)

Section 11.08    Supplemental Provisions for Resecuritization. (See Section 11.08 of the Standard Terms)

Section 11.09    Allocation of Voting Rights.

Ninety-five percent of all Voting Rights will be allocated among all Holders of the Certificates, other than the Interest Only Certificates and Class R Certificates, in proportion to their then outstanding Certificate Principal Balances of their respective Certificates, in accordance with each Class's Percentage Interests; 1.0% of all Voting Rights will be allocated among the Holders of the Class A-2 Certificates, in accordance with their respective Percentage Interests; 1.0% of all voting rights will be allocated among the Holders of the Class A-9 Certificates, in accordance with their respective Percentage Interests; 1.0% of all Voting Rights will be allocated among the Holders of the Class A-22 Certificates, in accordance with their respective Percentage Interests; 1.0% of all Voting Rights shall be allocated among the Holders of the Class A-V Certificates, in accordance with their respective Percentage Interests; 0.5% of all Voting Rights shall be allocated among the Holders of the Class R-I Certificates, in accordance with their respective Percentage Interests; and 0.5% of all Voting Rights shall be allocated among the Holders of the Class R-II Certificates, in accordance with their respective Percentage Interests.

Section 11.10    No Petition.

The Company, Master Servicer and the Trustee, by entering into this Agreement, and each Certificateholder, by accepting a Certificate, hereby covenant and agree that they will not at any time institute against the Trust Fund, or join in any institution against the Trust Fund of, any bankruptcy proceedings under any United States federal or state bankruptcy or similar law in connection with any obligation with respect to the Certificates or this Agreement.

---

IN WITNESS WHEREOF, the Company, the Master Servicer and the Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized and their respective seals, duly attested, to be hereunto affixed, all as of the day and year first above written.

RESIDENTIAL ACCREDIT LOANS, INC.

[Seal]

By:        /s/Christopher Martinez
           Name: Christopher Martinez
           Title:   Vice President

Attest: /s/Heather Anderson
       Name:    Heather Anderson
       Title:  Vice President

RESIDENTIAL FUNDING COMPANY, LLC

[Seal]

By:        /s/Heather Anderson
           Name:  Heather Anderson
           Title:   Associate

Attest:/s/Christopher Martinez
       Name:   Christopher Martinez
       Title:  Associate

DEUTSCHE BANK TRUST COMPANY AMERICAS, as Trustee

[Seal]

By:    /s/Amy Stoddard
       Name:  Amy Stoddard
       Title:  Authorized Signer

By:    /s/Melissa Wilman
       Name:  Melissa Wilman
       Title:  Vice President

Attest:/s/Karlene Benvenuto
    Name:  Karlene Benvenuto
    Title:  Authorized Signer

---

STATE OF MINNESOTA
                         )
                         ) ss.:
COUNTY OF HENNEPIN          )
             On the 30th day of  October,  2006 before me, a notary  public in and for said State,  personally appeared Christopher  Martinez, known to me to be a Vice President of Residential Accredit Loans, Inc., one of the corporations that executed the within  instrument,  and also known to me to be the person who executed it on behalf of said corporation, and acknowledged to me that such corporation executed the within instrument.

             IN WITNESS  WHEREOF,  I have  hereunto set my hand and affixed my official  seal the day and year in this certificate  first above written.

                      /s/ Amy Sue Olson
                      Notary Public

[Notarial Seal]

---

STATE OF MINNESOTA
                         )
                         ) ss.:
COUNTY OF HENNEPIN          )
             On the 30th day of  October,  2006 before me, a notary  public in and for said State,  personally appeared  Heather  Anderson,  known to me to be an  Associate of  Residential  Funding  Company,  LLC, the Delaware limited liability company that executed the within  instrument,  and also known to me to be the person who executed it on behalf of said  limited  liability  company,  and acknowledged  to me that such  limited  liability  company executed the within instrument.

             IN WITNESS  WHEREOF,  I have  hereunto set my hand and affixed my official  seal the day and year in this certificate first above written.

                      /s/Amy Sue Olson
                      Notary Public

[Notarial Seal]

---

STATE OF CALIFORNIA
                        )
                         ) ss.:
COUNTY OF ORANGE          )
             On the 30th day of  October,  2006 before me, a notary  public in and for said State,  personally appeared Amy Stoddard,  known to me to be a(n) Authorized Signer of Deutsche Bank Trust Company  Americas,  the New York banking  corporation that executed the within  instrument,  and also known to me to be the person who executed it on behalf of said banking corporation and acknowledged to me that such banking  corporation  executed the within instrument.

             IN WITNESS  WHEREOF,  I have  hereunto set my hand and affixed my official  seal the day and year in this certificate first above written.

                      /s/David Johnson
                      Notary Public

[Notarial Seal]

---

STATE OF CALIFORNIA          )
                         ) ss.:
COUNTY OF ORANGE          )
             On the 30th day of  October,  2006 before me, a notary  public in and for said State,  personally appeared  Melissa Wilman,  known to me to be a(n) Vice President of Deutsche Bank Trust Company  Americas,  the New York banking  corporation that executed the within  instrument,  and also known to me to be the person who executed it on behalf of said banking corporation and acknowledged to me that such banking  corporation  executed the within instrument.

             IN WITNESS  WHEREOF,  I have  hereunto set my hand and affixed my official  seal the day and year in this certificate first above written.

                      /s/David Johnson
                      Notary Public

[Notarial Seal]

EXHIBIT ONE

MORTGAGE LOAN SCHEDULE

[On File at RFC]

EXHIBIT TWO

SCHEDULE OF DISCOUNT FRACTIONS

[On File at RFC]

EXHIBIT THREE

INFORMATION TO BE INCLUDED IN
MONTHLY DISTRIBUTION DATE STATEMENT

(i)       the applicable Record Date, Determination Date and Distribution Date;

(ii)      the aggregate amount of payments received with respect to the Mortgage Loans, including prepayment amounts;

(iii)     the Servicing Fee and Subservicing Fee payable to the Master Servicer and the Subservicer;

(iv)      the amount of any other fees or expenses paid;

(v)       (a) the amount of such distribution to the Certificateholders of such Class applied to reduce the Certificate Principal Balance thereof, and (b) the aggregate amount included therein representing Principal Prepayments;

(vi)      the amount of such distribution to Holders of such Class of Certificates allocable to interest;

(vii)     if the distribution to the Holders of such Class of Certificates is less than the full amount that would be distributable to such Holders if there were sufficient funds available therefor, the amount of the shortfall;

(viii)    the aggregate Certificate Principal Balance of each Class of Certificates and each of the Senior Percentage and Subordinate Class Percentage, before and after giving effect to the amounts distributed on such Distribution Date, separately identifying any reduction thereof due to Realized Losses other than pursuant to an actual distribution of principal;

(ix)      the aggregate Certificate Principal Balance of each of the Class A Certificates, Class M Certificates and Class B Certificates as of the Closing Date;

(x)       the weighted average remaining term to maturity of the Mortgage Loans after giving effect to the amounts distributed on such Distribution Date;

(xi)      the weighted average Mortgage Rates of the Mortgage Loans after giving effect to the amounts distributed on such Distribution Date;

(xii)     if applicable, the Special Hazard Amount, Fraud Loss Amount and Bankruptcy Amount and as of the close of business on the applicable Distribution Date;

(xiii)    the Pool Stated Principal Balance and number of the Mortgage Loans after giving effect to the distribution of principal on such Distribution Date and the number of Mortgage Loans at the beginning and end of the related Due Period;

(xiv)     on the basis of the most recent reports furnished to it by Sub-Servicers, the number and Stated Principal Balances of Mortgage Loans that are Delinquent (A) 30-59 days, (B) 60-89 days and (C) 90 or more days and the number and Stated Principal Balances of Mortgage Loans that are in foreclosure;

(xv)      the aggregate amount of Realized Losses for such Distribution Date;

(xvi)     the amount, terms and general purpose of any Advance by the Master Servicer pursuant to Section 4.04;

(xvii)    any material modifications, extensions or waivers to the terms of the Mortgage Loans during the Due Period or that have cumulatively become material over time;

(xviii)   any material breaches of Mortgage Loan representations or warranties or covenants in the Agreement;

(xix)     the related Subordinate Principal Distribution Amount;

(xx)      the number, aggregate principal balance and Stated Principal Balances of any REO Properties;

(xxi)     the aggregate Accrued Certificate Interest remaining unpaid, if any, for each Class of Certificates, after giving effect to the distribution made on such Distribution Date;

(xxii)   the Pass-Through Rate with respect to the Class A-V Certificates;

(xxiii)  the Pass-Through Rates on the Floater Certificates and Inverse Floater Certificates for such Distribution Date, separately identifying LIBOR for such Distribution Date;

        (xxiv)   the Notional Amount with respect to each class of Interest Only Certificates;

        (xxv)    the occurrence of the Credit Support Depletion Date;

        (xxvi)   the related Senior Accelerated Distribution Percentage applicable to such distribution;

        (xxvii)  the related Senior Percentage for such Distribution Date; and

        (xxviii) the aggregate amount of any recoveries on previously foreclosed loans from Sellers.

     In the case of information furnished pursuant to clauses (i) and (ii) above, the amounts shall be expressed as a dollar amount per Certificate with a $1,000 denomination.

     The Trustee's internet website is www.tss.db.com/invr.

---

EXHIBIT FOUR

STANDARD TERMS OF POOLING AND SERVICING
AGREEMENT DATED AS OF OCTOBER 30, 2006

===================================================================

STANDARD TERMS OF
POOLING AND SERVICING AGREEMENT

Dated as of October 30, 2006

Residential Accredit Loans, Inc.
Mortgage Asset-Backed Pass-Through Certificates

===================================================================

TABLE OF CONTENTS

                            PAGE

ARTICLE I     DEFINITIONS...................................................2

    Section 1.01. Definitions..............................................2

    Section 1.02. Use of Words and Phrases...............................35

ARTICLE II    CONVEYANCE OF MORTGAGE LOANS; ORIGINAL ISSUANCE OF
              CERTIFICATES...............................................36

    Section 2.01. Conveyance of Mortgage Loans...........................36

    Section 2.02. Acceptance by Trustee..................................43

    Section 2.03. Representations, Warranties and Covenants of the
              Master Servicer and the Company......................44

    Section 2.04. Representations and Warranties of Residential
              Funding..............................................45

    Section 2.05. Execution and Authentication of
              Certificates/Issuance of Certificates Evidencing
              Interests in REMIC I Certificates....................47

    Section 2.06. Conveyance of Uncertificated REMIC I and REMIC II
              Regular Interests; Acceptance by the Trustee.........47

Section 2.07.  Issuance of Certificates Evidencing Interests in
               REMIC II................................................47

Section 2.08.  Purposes and Powers of the Trust........................48

ARTICLE III    ADMINISTRATION AND SERVICING OF MORTGAGE LOANS...............48

Section 3.01.  Master Servicer to Act as Servicer......................48

Section 3.02.  Subservicing Agreements Between Master Servicer
               and Subservicers; Enforcement of Subservicers' and
               Sellers' Obligations...................................50

Section 3.03.  Successor Subservicers..................................51

Section 3.04.  Liability of the Master Servicer........................51

Section 3.05.  No Contractual Relationship Between Subservicer
               and Trustee or Certificateholders......................51

Section 3.06.  Assumption or Termination of Subservicing
               Agreements by Trustee..................................52

Section 3.07.  Collection of Certain Mortgage Loan Payments;
               Deposits to Custodial Account..........................52

Section 3.08.  Subservicing Accounts; Servicing Accounts..............55

Section 3.09.  Access to Certain Documentation and  Information
               Regarding the Mortgage Loans..........................56

Section 3.10.  Permitted Withdrawals from the Custodial Account.......57

Section 3.11.  Maintenance of the Primary Insurance  Policies;
               Collections Thereunder.................................59

Section 3.12.  Maintenance of Fire Insurance and  Omissions and
               Fidelity Coverage......................................59

Section 3.13.  Enforcement of Due-on-Sale Clauses; Assumption
               and  Modification Agreements; Certain Assignments......61

Section 3.14.  Realization Upon Defaulted Mortgage Loans..............63

Section 3.15.  Trustee to Cooperate; Release of Custodial Files.......66

Section 3.16.  Servicing and Other Compensation; Compensating
               Interest...............................................68

Section 3.17.  Reports to the Trustee and the Company.................69

Section 3.18.  Annual Statement as to Compliance and Servicing
               Assessment.............................................69

Section 3.19.  Annual Independent Public Accountants' Servicing
               Report.................................................69

Section 3.20.  Rights of the Company in Respect of the Master
               Servicer...............................................70

Section 3.21.  Administration of Buydown Funds........................70

Section 3.22.  Advance Facility.......................................71

ARTICLE IV     PAYMENTS TO CERTIFICATEHOLDERS.............................75

Section 4.01.  Certificate Account....................................75

Section 4.02.  Distributions.    ....................................75

Section 4.03.  Statements to Certificateholders; Statements to
               Rating Agencies; Exchange Act Reporting................75

Section 4.04.  Distribution of Reports to the Trustee and  the
               Company; Advances by the Master Servicer...............78

Section 4.05.  Allocation of Realized Losses..........................79

Section 4.06.  Reports of Foreclosures and Abandonment of
               Mortgaged Property.....................................79

Section 4.07.  Optional Purchase of Defaulted Mortgage Loans..........79

Section 4.08.  Surety Bond............................................80

ARTICLE V      THE CERTIFICATES..........................................81

Section 5.01.  The Certificates.......................................81

Section 5.02.  Registration of Transfer and Exchange of
               Certificates...........................................83

Section 5.03.  Mutilated, Destroyed, Lost or Stolen Certificates......89

Section 5.04.  Persons Deemed Owners..................................89

Section 5.05.  Appointment of Paying Agent............................89

Section 5.06.  U.S.A. Patriot Act Compliance..........................90

ARTICLE VI       THE COMPANY AND THE MASTER SERVICER..........................91

        Section 6.01.   Respective Liabilities of the Company and the
                        Master Servicer.......................................91

        Section 6.02.   Merger or Consolidation of the Company or the
                        Master Servicer; Assignment of Rights and
                        Delegation of Duties by Master Servicer...............91

        Section 6.03.   Limitation on Liability of the Company,  the
                        Master Servicer and Others............................92

        Section 6.04.   Company and Master Servicer Not to Resign.............93

ARTICLE VII      DEFAULT......................................................94

        Section 7.01.   Events of Default.....................................94

        Section 7.02.   Trustee or Company to Act; Appointment of Successor....96

        Section 7.03.   Notification to Certificateholders....................97

        Section 7.04.   Waiver of Events of Default...........................97

ARTICLE VIII     CONCERNING THE TRUSTEE.......................................98

        Section 8.01.   Duties of Trustee.....................................98

        Section 8.02.   Certain Matters Affecting the Trustee.................99

        Section 8.03.   Trustee Not Liable for Certificates or Mortgage
                        Loans................................................101

        Section 8.04.   Trustee May Own Certificates.........................101

        Section 8.05.   Master Servicer to Pay Trustee's Fees  and
                        Expenses; Indemnification............................101

        Section 8.06.   Eligibility Requirements for Trustee.................102

        Section 8.07.   Resignation and Removal of the Trustee...............103

        Section 8.08.   Successor Trustee....................................104

        Section 8.09.   Merger or Consolidation of Trustee...................104

        Section 8.10.   Appointment of Co-Trustee or Separate Trustee........104

        Section 8.11.   Appointment of the Custodian.........................105

        Section 8.12.   Appointment of Office or Agency......................106

ARTICLE IX       TERMINATION OR OPTIONAL PURCHASE OF ALL CERTIFICATES........107

        Section 9.01.   Optional Purchase by the Master Servicer of All
                        Certificates; Termination Upon Purchase by the
                        Master Servicer or Liquidation of All Mortgage
                        Loans................................................107

        Section 9.02.   Additional Termination Requirements..................110

        Section 9.03.   Termination of Multiple REMICs.......................111

ARTICLE X        REMIC PROVISIONS............................................112

        Section 10.01.  REMIC Administration.................................112

        Section 10.02.  Master Servicer, REMIC Administrator and Trustee
                        Indemnification......................................115

        Section 10.03.  Designation of REMIC(s)..............................116

        Section 10.04.  Distributions on the Uncertificated REMIC I and
                        REMIC II Regular Interests...........................116

        Section 10.05.  Compliance with Withholding Requirements............116

ARTICLE XI       MISCELLANEOUS PROVISIONS....................................117

        Section 11.01.  Amendment............................................117

        Section 11.02.  Recordation of Agreement; Counterparts...............119

        Section 11.03.  Limitation on Rights of Certificateholders...........120

        Section 11.04.  Governing Law........................................120

        Section 11.05.  Notices..............................................121

        Section 11.06.  Required Notices to Rating Agency and Subservicer.....121

        Section 11.07.  Severability of Provisions...........................122

        Section 11.08.  Supplemental Provisions for Resecuritization.........122

        Section 11.09.  Allocation of Voting Rights..........................122

        Section 11.10.  No Petition..........................................122

ARTICLE XII    COMPLIANCE WITH REGULATION AB............................123

    Section 12.01. Intent of the Parties; Reasonableness................123

    Section 12.02. Additional Representations and Warranties of the
                   Trustee.............................................123

    Section 12.03. Information to Be Provided by the Trustee............124

    Section 12.04. Report on Assessment of Compliance and Attestation....124

    Section 12.05. Indemnification; Remedies...........................125

                            EXHIBITS

Exhibit A:        Form of Class A Certificate
Exhibit A-I:      Form of Class X Certificate
Exhibit B:        Form of Class M Certificate
Exhibit C:        Form of Class B Certificate
Exhibit C-I:      Form of Class P Certificate
Exhibit C-II:     Form of Class SB Certificate
Exhibit D:        Form of Class R Certificate
Exhibit E:        Form of Seller/Servicer Contract
Exhibit F:        Forms of Request for Release
Exhibit G-1:      Form of Transfer Affidavit and Agreement
Exhibit G-2:      Form of Transferor Certificate
Exhibit H:        Form of Investor Representation Letter
Exhibit I:        Form of Transferor Representation Letter
Exhibit J:        Form of Rule 144A Investment Representation Letter
Exhibit K:        Text of Amendment to Pooling and Servicing Agreement
                  Pursuant to Section 11.01(e) for a Limited Guaranty
Exhibit L:        Form of Limited Guaranty
Exhibit M:        Form of Lender Certification for Assignment of Mortgage Loan
Exhibit N:        Request for Exchange Form
Exhibit O:        Form of Form 10-K Certification
Exhibit P:        Form of Back-Up Certification to Form 10-K Certificate
Exhibit Q:        Information to be Provided by the Master Servicer to the
                  Rating Agencies Relating to Reportable Modified Mortgage Loans
Exhibit R:        Servicing Criteria

        This is the Standard Terms of Pooling and Servicing Agreement, dated as
of October 30, 2006 (the "Standard Terms", and as incorporated by reference
into a Series Supplement dated as of the Cut-off Date, the "Pooling and
Servicing Agreement" or "Agreement"), among RESIDENTIAL ACCREDIT LOANS, INC.,
as the company (together with its permitted successors and assigns, the
"Company"), RESIDENTIAL FUNDING COMPANY, LLC, as master servicer (together
with its permitted successors and assigns, the "Master Servicer"), and the
trustee named in the applicable Series Supplement (together with its
permitted successors and assigns, the "Trustee").

                        PRELIMINARY STATEMENT:

        The Company intends to sell certain mortgage asset-backed pass-through
certificates (collectively, the "Certificates"), to be issued under the
Agreement in multiple classes, which in the aggregate will evidence the
entire beneficial ownership interest in the Mortgage Loans.

        In consideration of the mutual agreements herein contained, the
Company, the Master Servicer and the Trustee agree as follows:

ARTICLE I

                            DEFINITIONS

Section 1.01    Definitions.

        Whenever used in this Agreement, the following words and phrases,
unless the context otherwise requires, shall have the meanings specified in
this Article.

        Accretion Termination Date:  As defined in the Series Supplement.

        Accrual Certificates:  As defined in the Series Supplement.

        Accrued Certificate Interest:  With respect to each Distribution Date,

as to any Class or Subclass of Certificates (other than any Principal Only Certificates), interest accrued during the related Interest Accrual Period at the related Pass-Through Rate on the Certificate Principal Balance or Notional Amount thereof immediately prior to such Distribution Date. Accrued Certificate Interest will be calculated on the basis of a 360-day year, consisting of twelve 30-day months. In each case Accrued Certificate Interest on any Class or Subclass of Certificates will be reduced by the amount of:

(i)    Prepayment Interest Shortfalls on all Mortgage Loans or, if the Mortgage Pool is comprised of two or more Loan Groups, on the Mortgage Loans in the related Loan Group (to the extent not offset by the Master Servicer with a payment of Compensating Interest as provided in Section 4.01),

(ii)   the interest portion (adjusted to the Net Mortgage Rate (or the Modified Net Mortgage Rate in the case of a Modified Mortgage Loan)) of Realized Losses on all Mortgage Loans or, if the Mortgage Pool is comprised of two or more Loan Groups, on the Mortgage Loans in the related Loan Group (including Excess Special Hazard Losses, Excess Fraud Losses, Excess Bankruptcy Losses and Extraordinary Losses) not allocated solely to one or more specific Classes of Certificates pursuant to Section 4.05,

(iii)      the interest portion of Advances that were (A) previously made with respect to a Mortgage Loan or REO Property on all Mortgage Loans or, if the Mortgage Pool is comprised of two or more Loan Groups, on the Mortgage Loans in the related Loan Group, which remained unreimbursed following the Cash Liquidation or REO Disposition of such Mortgage Loan or REO Property and (B) made with respect to delinquencies that were ultimately determined to be Excess Special Hazard Losses, Excess Fraud Losses, Excess Bankruptcy Losses or Extraordinary Losses, and

(iv)   any other interest shortfalls not covered by the subordination provided by the Class M Certificates and Class B Certificates, including interest that is not collectible from the Mortgagor pursuant to the Servicemembers Civil Relief Act of 1940, as amended, or similar legislation or regulations as in effect from time to time,

with all such reductions allocated (A) among all of the Certificates in proportion to their respective amounts of Accrued Certificate Interest payable on such Distribution Date absent such reductions or (B) if the Mortgage Pool is comprised of two or more Loan Groups, the related Senior Percentage of such reductions among the related Senior Certificates in proportion to the amounts of Accrued Certificate Interest payable from the related Loan Group on such Distribution Date absent such reductions, with the remainder of such reductions allocated among the holders of the Class M Certificates and Class B Certificates in proportion to their respective amounts of Accrued Certificate Interest payable on such Distribution Date absent such reductions. In addition to that portion of the reductions described in the preceding sentence that are allocated to any Class of Class B Certificates or any Class of Class M Certificates, Accrued Certificate Interest on such Class of Class B Certificates or such Class of Class M Certificates will be reduced by the interest portion (adjusted to the Net Mortgage Rate) of Realized Losses that are allocated solely to such Class of Class B Certificates or such Class of Class M Certificates pursuant to Section 4.05.

Addendum and Assignment Agreement: The Addendum and Assignment Agreement, dated as of January 31, 1995, between MLCC and the Master Servicer.

Additional Collateral: Any of the following held, in addition to the related Mortgaged Property, as security for a Mortgage Loan: (i) all money, securities, security entitlements, accounts, general intangibles, payment rights, instruments, documents, deposit accounts, certificates of deposit, commodities contracts and other investment property and other property of whatever kind or description now existing or hereafter acquired which is pledged as security for the repayment of such Mortgage Loan, (ii) third-party guarantees, and (A) all money, securities, security entitlements, accounts, general intangibles, payment rights, instruments, documents, deposit accounts, certificates of deposit, commodities contracts and other investment property and other property of whatever kind or description now existing or hereafter acquired which is pledged as collateral for such guarantee or (B) any mortgaged property securing the performance of such guarantee, or (iii) such other collateral as may be set forth in the Series Supplement.

Additional Collateral Loan: Each Mortgage Loan that is supported by Additional Collateral.

Adjusted Mortgage Rate: With respect to any Mortgage Loan and any date of determination, the Mortgage Rate borne by the related Mortgage Note, less the rate at which the related Subservicing Fee accrues.

Advance: As to any Mortgage Loan, any advance made by the Master Servicer, pursuant to Section 4.04.

Advance Facility: As defined in Section 3.22.

Advance Facility Notice: As defined in Section 3.22.

Advance Facility Trustee: As defined in Section 3.22.

Advancing Person: As defined in Section 3.22.

Advance Reimbursement Amounts: As defined in Section 3.22.

Affiliate: With respect to any Person, any other Person controlling, controlled by or under common control with such first Person. For the purposes of this definition, "control" means the power to direct the

management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

Ambac: Ambac Assurance Corporation (formerly known as AMBAC Indemnity Corporation).

Amount Held for Future Distribution: As to any Distribution Date and, with respect to any Mortgage Pool that is comprised of two or more Loan Groups, each Loan Group, the total of the amounts held in the Custodial Account at the close of business on the preceding Determination Date on account of (i) Liquidation Proceeds, Subsequent Recoveries, Insurance Proceeds, Curtailments, Mortgage Loan purchases made pursuant to Section 2.02, 2.03, 2.04 or 4.07 and Mortgage Loan substitutions made pursuant to Section 2.03 or 2.04 received or made in the month of such Distribution Date (other than such Liquidation Proceeds, Insurance Proceeds and purchases of Mortgage Loans that the Master Servicer has deemed to have been received in the preceding month in accordance with Section 3.07(b)), and Principal Prepayments in Full made after the related Prepayment Period, and (ii) payments which represent early receipt of scheduled payments of principal and interest due on a date or dates subsequent to the related Due Date.

Appraised Value: As to any Mortgaged Property, the lesser of (i) the appraised value of such Mortgaged Property based upon the appraisal made at the time of the origination of the related Mortgage Loan, and (ii) the sales price of the Mortgaged Property at such time of origination, except in the case of a Mortgaged Property securing a refinanced or modified Mortgage Loan as to which it is either the appraised value determined above or the appraised value determined in an appraisal at the time of refinancing or modification, as the case may be.

Assigned Contracts: With respect to any Pledged Asset Loan: the Credit Support Pledge Agreement; the Funding and Pledge Agreement, among GMAC Mortgage, LLC, National Financial Services Corporation and the Mortgagor or other person pledging the related Pledged Assets; the Additional Collateral Agreement, between GMAC Mortgage, LLC and the Mortgagor or other person pledging the related Pledged Assets; or such other contracts as may be set forth in the Series Supplement.

Assignment: An assignment of the Mortgage, notice of transfer or equivalent instrument, in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect of record the sale of the Mortgage Loan to the Trustee for the benefit of Certificateholders, which assignment, notice of transfer or equivalent instrument may be in the form of one or more blanket assignments covering Mortgages secured by Mortgaged Properties located in the same county, if permitted by law and accompanied by an Opinion of Counsel to that effect.

Assignment Agreement: The Assignment and Assumption Agreement, dated the Closing Date, between Residential Funding and the Company relating to the transfer and assignment of the Mortgage Loans.

Assignment Agreement and Amendment of Security Instrument: With respect to a Sharia Mortgage Loan, the agreement between the consumer and the co-owner pursuant to which all of the co-owner's interest as a beneficiary under the related Sharia Mortgage Loan Security Instrument and the co-owner's interest in the related Mortgaged Property is conveyed to a subsequent owner, which may take the form of an "Assignment Agreement" and an "Amendment of Security Instrument" or an "Assignment Agreement and Amendment of Security Instrument", as applicable.

Assignment of Proprietary Lease: With respect to a Cooperative Loan, the assignment of the related Cooperative Lease from the Mortgagor to the originator of the Cooperative Loan.

Available Distribution Amount: As to any Distribution Date and, with respect to any Mortgage Pool comprised of two or more Loan Groups, each Loan Group, an amount equal to (a) the sum of (i) the amount relating to the Mortgage Loans on deposit in the Custodial Account as of the close of business on the immediately preceding Determination Date, including any Subsequent Recoveries, and amounts deposited in the Custodial Account in connection with the substitution of Qualified Substitute Mortgage Loans, (ii) the amount of any Advance made on the immediately preceding Certificate Account Deposit Date, (iii) any amount deposited in the Certificate Account on the related Certificate Account Deposit Date pursuant to the second paragraph of Section 3.12(a), (iv) any amount deposited in the Certificate Account pursuant to Section 4.07 or Section 9.01, (v) any amount that the Master Servicer is not permitted to withdraw from the Custodial Account or the Certificate Account pursuant to Section 3.16(e), (vi) any amount received by the Trustee pursuant to the Surety Bond in respect of such Distribution Date and (vii) the proceeds of any Pledged Assets received by the Master Servicer, reduced by (b) the sum as of the close of business on the immediately preceding Determination Date of (w) aggregate Foreclosure Profits, (x) the Amount Held for Future Distribution, and (y) amounts permitted to be withdrawn by the Master Servicer from the Custodial Account in respect of the Mortgage Loans pursuant to clauses (ii)-(x), inclusive, of Section 3.10(a). Such amount shall be determined separately for each Loan Group. Additionally, with respect to any Mortgage Pool that is comprised of two or more Loan Groups, if on any Distribution Date Compensating Interest provided pursuant to this Section 3.16(e) is less than Prepayment Interest Shortfalls incurred on the Mortgage Loans in connection with Principal Prepayments in Full and Curtailments made in the prior calendar month, such Compensating Interest shall be allocated on such Distribution Date to the Available Distribution Amount for each Loan Group on a pro rata basis in accordance with the respective amounts of such Prepayment Interest Shortfalls incurred on the Mortgage Loans in such Loan Group in respect of such Distribution Date.

Bankruptcy Code: The Bankruptcy Code of 1978, as amended.

Bankruptcy Loss:  With respect to any Mortgage Loan, a Deficient Valuation or Debt Service Reduction; provided, however, that neither a Deficient Valuation nor a Debt Service Reduction shall be deemed a Bankruptcy Loss hereunder so long as the Master Servicer has notified the Trustee in writing that the Master Servicer is diligently pursuing any remedies that may exist in connection with the representations and warranties made regarding the related Mortgage Loan and either (A) the related Mortgage Loan is not in default with regard to payments due thereunder or (B) delinquent payments of principal and interest under the related Mortgage Loan and any premiums on any applicable primary hazard insurance policy and any related escrow payments in respect of such Mortgage Loan are being advanced on a current basis by the Master Servicer or a Subservicer, in either case without giving effect to any Debt Service Reduction.

Book-Entry Certificate:  Any Certificate registered in the name of the Depository or its nominee, and designated as such in the Preliminary Statement to the Series Supplement.

Business Day:  Any day other than (i) a Saturday or a Sunday or (ii) a day on which banking institutions in the State of New York, the State of Michigan, the State of California, the State of Illinois or the State of Minnesota (and such other state or states in which the Custodial Account or the Certificate Account are at the time located) are required or authorized by law or executive order to be closed.

Buydown Funds:  Any amount contributed by the seller of a Mortgaged Property, the Company or other source in order to enable the Mortgagor to reduce the payments required to be made from the Mortgagor's funds in the early years of a Mortgage Loan.  Buydown Funds are not part of the Trust Fund prior to deposit into the Custodial or Certificate Account.

Buydown Mortgage Loan:  Any Mortgage Loan as to which a specified amount of interest is paid out of related Buydown Funds in accordance with a related buydown agreement.

Calendar Quarter:  A Calendar Quarter shall consist of one of the following time periods in any given year:  January 1 through March 31, April 1 through June 30, July 1 through September 30, and October 1 through December 31.

Capitalization Reimbursement Amount: With respect to any Distribution Date and, with respect to any Mortgage Pool comprised of two or more Loan Groups, each Loan Group, the amount of Advances or Servicing Advances that were added to the Stated Principal Balance of all Mortgage Loans or, if the Mortgage Pool is comprised of two or more Loan Groups, on the Mortgage Loans in the related Loan Group, during the prior calendar month and reimbursed to the Master Servicer or Subservicer on or prior to such Distribution Date pursuant to Section 3.10(a)(vii), plus the Capitalization Reimbursement Shortfall Amount remaining unreimbursed from any prior Distribution Date and reimbursed to the Master Servicer or Subservicer on or prior to such Distribution Date.

Capitalization Reimbursement Shortfall Amount:  With respect to any Distribution Date and, with respect to any Mortgage Pool comprised of two or more Loan Groups, each Loan Group, the amount, if any, by which the amount of Advances or Servicing Advances that were added to the Stated Principal Balance of all Mortgage Loans (or, if the Mortgage Pool is comprised of two or more Loan Groups, on the Mortgage Loans in the related Loan Group) during the preceding calendar month exceeds the amount of principal payments on the Mortgage Loans included in the Available Distribution Amount (or, if the Mortgage Pool is comprised of two or more Loan Groups, Available Distribution Amount for the related Loan Group) for that Distribution Date.

Cash Liquidation:  As to any defaulted Mortgage Loan other than a Mortgage Loan as to which an REO Acquisition occurred, a determination by the Master Servicer that it has received all Insurance Proceeds, Liquidation Proceeds and other payments or cash recoveries which the Master Servicer reasonably and in good faith expects to be finally recoverable with respect to such Mortgage Loan.

Certificate Account Deposit Date:  As to any Distribution Date, the Business Day prior thereto.

Certificateholder or Holder:  The Person in whose name a Certificate is registered in the Certificate Register, and, in respect of any Insured Certificates, the Certificate Insurer to the extent of Cumulative Insurance Payments, except that neither a Disqualified Organization nor a Non-United States Person shall be a holder of a Class R Certificate for purposes hereof and, solely for the purpose of giving any consent or direction pursuant to this Agreement, any Certificate, other than a Class R Certificate, registered in the name of the Company, the Master Servicer or any Subservicer or any Affiliate thereof shall be deemed not to be outstanding and the Percentage Interest or Voting Rights evidenced thereby shall not be taken into account in determining whether the requisite amount of Percentage Interests or Voting Rights necessary to effect any such consent or direction has been obtained. All references herein to "Holders" or "Certificateholders" shall reflect the rights of Certificate Owners as they may indirectly exercise such rights through the Depository and participating members thereof, except as otherwise specified herein; provided, however, that the Trustee shall be required to recognize as a "Holder" or "Certificateholder" only the Person in whose name a Certificate is registered in the Certificate Register.

Certificate Insurer: As defined in the Series Supplement.

Certificate Owner:  With respect to a Book-Entry Certificate, the Person who is the beneficial owner of such Certificate, as reflected on the books of an indirect participating brokerage firm for which a Depository Participant acts as agent, if any, and otherwise on the books of a Depository Participant, if any, and otherwise on the books of the Depository.

Certificate Principal Balance:  With respect to each Certificate (other than any Interest Only Certificate), on any date of determination, an amount equal to:

  (i)   the Initial Certificate Principal Balance of such Certificate as specified on the face thereof, plus

  (ii)  any Subsequent Recoveries added to the Certificate Principal Balance of such Certificate pursuant to Section 4.02, plus

  (iii) in the case of each Accrual Certificate, an amount equal to the aggregate Accrued Certificate Interest added to the Certificate Principal Balance thereof prior to such date of determination, minus

  (iv)     the sum of (x) the aggregate of all amounts previously distributed with respect to such Certificate (or any predecessor Certificate) and applied to reduce the Certificate Principal Balance thereof pursuant to Section 4.02(a) and (y) the aggregate of all reductions in Certificate Principal Balance deemed to have occurred in connection with Realized Losses which were previously allocated to such Certificate (or any predecessor Certificate) pursuant to Section 4.05;

provided, that the Certificate Principal Balance of each Certificate of the Class of Subordinate Certificates with the Lowest Priority at any given time shall be further reduced by an amount equal to the Percentage Interest represented by such Certificate multiplied by the excess, if any, of (A) the then aggregate Certificate Principal Balance of all Classes of Certificates then outstanding over (B) the then aggregate Stated Principal Balance of the Mortgage Loans.

Certificate Register and Certificate Registrar:  The register maintained and the registrar appointed pursuant to Section 5.02.

Class:  Collectively, all of the Certificates bearing the same designation.  The initial Class A-V Certificates and any Subclass thereof issued pursuant to Section 5.01(c) shall be a single Class for purposes of this Agreement.

Class A-P Certificate:  Any one of the Certificates designated as a Class A-P Certificate.

Class A-P Collection Shortfall:  With respect to the Cash Liquidation or REO Disposition of a Discount Mortgage Loan, any Distribution Date and, with respect to any Mortgage Pool comprised of two or more Loan Groups, each Loan Group, the excess of the amount described in clause (C)(1) of the definition of Class A-P Principal Distribution Amount (for the related Loan Group, if applicable) over the amount described in clause (C)(2) of such definition.

Class A-P Principal Distribution Amount: With respect to any Distribution Date and, with respect to any Mortgage Pool comprised of two or more Loan Groups, each Loan Group, an amount equal to the aggregate of:

     (A)   the related Discount Fraction of the principal portion of each Monthly Payment on each Discount Mortgage Loan (or, with respect to any Mortgage Pool comprised of two or more Loan Groups, each Discount Mortgage Loan in the related Loan Group) due during the related Due Period, whether or not received on or prior to the related Determination Date, minus the Discount Fraction of the principal portion of any related Debt Service Reduction which together with other Bankruptcy Losses exceeds the Bankruptcy Amount;

     (B)   the related Discount Fraction of the principal portion of all unscheduled collections on each Discount Mortgage Loan (or, with respect to any Mortgage Pool comprised of two or more Loan Groups, each Discount Mortgage Loan in the related Loan Group) received during the preceding calendar month or, in the case of Principal Prepayments in Full, during the related Prepayment Period (other than amounts received in connection with a Cash Liquidation or REO Disposition of a Discount Mortgage Loan described in clause (C) below), including Principal Prepayments in Full, Curtailments, Subsequent Recoveries and repurchases (including deemed repurchases under Section 3.07(b)) of such Discount Mortgage Loan (or, in the case of a substitution of a Deleted Mortgage Loan, the Discount Fraction of the amount of any shortfall deposited in the Custodial Account in connection with such substitution);

     (C)   in connection with the Cash Liquidation or REO Disposition of a Discount Mortgage Loan (or, with respect to any Mortgage Pool comprised of two or more Loan Groups, each Discount Mortgage Loan in the related Loan Group) that occurred during the preceding calendar month (or was deemed to have occurred during such period in accordance with Section 3.07(b)) that did not result in any Excess Special Hazard Losses, Excess Fraud Losses, Excess Bankruptcy Losses or Extraordinary Losses, an amount equal to the lesser of (1) the applicable Discount Fraction of the Stated Principal Balance of such Discount Mortgage Loan immediately prior to such Distribution Date and (2) the aggregate amount of the collections on such Mortgage Loan to the extent applied as recoveries of principal;

     (D)   any amounts allocable to principal for any previous Distribution Date (calculated pursuant to clauses (A) through (C) above) that remain undistributed; and

     (E)   the amount of any Class A-P Collection Shortfalls for such Distribution Date and the related Loan Group, if applicable, and the amount of any Class A-P Collection Shortfalls (for the related Loan

Group, if applicable) remaining unpaid for all previous Distribution Dates, but only to the extent of the Eligible Funds for such Distribution Date; minus

(F)    the related Discount Fraction of the portion of the Capitalization Reimbursement Amount (for such Distribution Date, if applicable) for such Distribution Date, if any, related to each Discount Mortgage Loan (in the related Loan Group, if applicable).

Notwithstanding the foregoing, with respect to any Distribution Date on and after the Credit Support Depletion Date, the Class A-P Principal Distribution Amount (for a Loan Group, if applicable) shall equal the excess of (i) the sum of (a) the related Discount Fraction of the principal portion of each Monthly Payment on each Discount Mortgage Loan (in the related Loan Group, if applicable) received or advanced prior to the related Determination Date and not previously distributed minus the Discount Fraction of the principal portion of any related Debt Service Reduction which together with other Bankruptcy Losses exceeds the Bankruptcy Amount and (b) the related Discount Fraction of the aggregate amount of unscheduled collections described in clauses (B) and (C) above over (ii) the amount calculated pursuant to clause (F) above.

Class A-V Certificate:  Any one of the Certificates designated as a Class A-V Certificate, including any Subclass thereof.

Class B Certificate:  Any one of the Certificates designated as a Class B-1 Certificate, Class B-2 Certificate or Class B-3 Certificate.

Class M Certificate:  Any one of the Certificates designated as a Class M-1 Certificate, Class M-2 Certificate or Class M-3 Certificate.

Class P Certificate:  Any one of the Certificates designated as a Class P Certificate.

Class SB Certificate:  Any one of the Certificates designated as a Class SB Certificate.

Class X Certificate:  Any one of the Certificates designated as a Class X Certificate.

Closing Date:  As defined in the Series Supplement.

Code:  The Internal Revenue Code of 1986, as amended.

Combined Collateral LLC:  Combined Collateral LLC, a Delaware limited liability company.

Commission:  The Securities and Exchange Commission.

Compensating Interest:  With respect to any Distribution Date, an amount equal to Prepayment Interest Shortfalls resulting from Principal Prepayments in Full during the related Prepayment Period and Curtailments during the prior calendar month and included in the Available Distribution Amount for such Distribution Date, but not more than the lesser of (a) one-twelfth of 0.125% of the Stated Principal Balance of the Mortgage Loans immediately preceding such Distribution Date and (b) the sum of the Servicing Fee and all income and gain on amounts held in the Custodial Account and the Certificate Account and payable to the Certificateholders with respect to such Distribution Date; provided that for purposes of this definition the amount of the Servicing Fee will not be reduced pursuant to Section 7.02(a) except as may be required pursuant to the last sentence of such Section.

Compliance With Laws Representation:  The following representation and warranty (or any representation and warranty that is substantially similar) made by Residential Funding in Section 4 of Assignment Agreement: "Each Mortgage Loan at the time it was made complied in all material respects with applicable local, state, and federal laws, including, but not limited to, all applicable anti-predatory lending laws".

Cooperative:  A private, cooperative housing corporation which owns or leases land and all or part of a building or buildings, including apartments, spaces used for commercial purposes and common areas therein and whose board of directors authorizes, among other things, the sale of Cooperative Stock.

Cooperative Apartment:  A dwelling unit in a multi-dwelling building owned or leased by a Cooperative, which unit the Mortgagor has an exclusive right to occupy pursuant to the terms of a proprietary lease or occupancy agreement.

Cooperative Lease:  With respect to a Cooperative Loan, the proprietary lease or occupancy agreement with respect to the Cooperative Apartment occupied by the Mortgagor and relating to the related Cooperative Stock, which lease or agreement confers an exclusive right to the holder of such Cooperative Stock to occupy such apartment.

Cooperative Loans:  Any of the Mortgage Loans made in respect of a Cooperative Apartment, evidenced by a Mortgage Note and secured by (i) a Security Agreement, (ii) the related Cooperative Stock Certificate, (iii) an assignment of the Cooperative Lease, (iv) financing statements and (v) a stock power (or other similar instrument), and ancillary thereto, a recognition agreement between the Cooperative and the originator of the Cooperative Loan, each of which was transferred and assigned to the Trustee pursuant to Section 2.01 and are from time to time held as part of the Trust Fund.

Cooperative Stock:  With respect to a Cooperative Loan, the single outstanding class of stock, partnership interest or other ownership instrument in the related Cooperative.

Cooperative Stock Certificate:  With respect to a Cooperative Loan, the

stock certificate or other instrument evidencing the related Cooperative Stock.

Credit Repository:  Equifax, Transunion and Experian, or their successors in interest.

Credit Support Depletion Date:  The first Distribution Date on which the Certificate Principal Balances of the Subordinate Certificates have been reduced to zero.

Credit Support Pledge Agreement:  The Credit Support Pledge Agreement, dated as of November 24, 1998, among the Master Servicer, GMAC Mortgage, LLC, Combined Collateral LLC and The First National Bank of Chicago (now known as Bank One, National Association), as custodian.

Cumulative Insurance Payments:  As defined in the Series Supplement.

Curtailment:  Any Principal Prepayment made by a Mortgagor which is not a Principal Prepayment in Full.

Custodial Account:  The custodial account or accounts created and maintained pursuant to Section 3.07 in the name of a depository institution, as custodian for the holders of the Certificates, for the holders of certain other interests in mortgage loans serviced or sold by the Master Servicer and for the Master Servicer, into which the amounts set forth in Section 3.07 shall be deposited directly.  Any such account or accounts shall be an Eligible Account.

Custodial Agreement:  An agreement that may be entered into among the Company, the Master Servicer, the Trustee and a Custodian pursuant to which the Custodian will hold certain documents relating to the Mortgage Loans on behalf of the Trustee.

Custodial File:  Any mortgage loan document in the Mortgage File that is required to be delivered to the Trustee or Custodian pursuant to Section 2.01(b) of this Agreement.

Custodian:  A custodian appointed pursuant to a Custodial Agreement.

Cut-off Date Principal Balance:  As to any Mortgage Loan, the unpaid principal balance thereof at the Cut-off Date after giving effect to all installments of principal due on or prior thereto (or due during the month of the Cut-off Date), whether or not received.

Debt Service Reduction:  With respect to any Mortgage Loan, a reduction in the scheduled Monthly Payment for such Mortgage Loan by a court of competent jurisdiction in a proceeding under the Bankruptcy Code, except such a reduction constituting a Deficient Valuation or any reduction that results in a permanent forgiveness of principal.

Deficient Valuation:  With respect to any Mortgage Loan, a valuation by a court of competent jurisdiction of the Mortgaged Property in an amount less than the then outstanding indebtedness under the Mortgage Loan, or any reduction in the amount of principal to be paid in connection with any scheduled Monthly Payment that constitutes a permanent forgiveness of principal, which valuation or reduction results from a proceeding under the Bankruptcy Code.

Definitive Certificate:  Any Certificate other than a Book-Entry Certificate.

Deleted Mortgage Loan:  A Mortgage Loan replaced or to be replaced with a Qualified Substitute Mortgage Loan.

Delinquent:  As used herein, a Mortgage Loan is considered to be: "30 to 59 days" or "30 or more days" delinquent when a payment due on any scheduled due date remains unpaid as of the close of business on the last business day immediately prior to the next following monthly scheduled due date; "60 to 89 days" or "60 or more days" delinquent when a payment due on any scheduled due date remains unpaid as of the close of business on the last business day immediately prior to the second following monthly scheduled due date; and so on. The determination as to whether a Mortgage Loan falls into these categories is made as of the close of business on the last business day of each month. For example, a Mortgage Loan with a payment due on July 1 that remained unpaid as of the close of business on July 31 would then be considered to be 30 to 59 days delinquent. Delinquency information as of the Cut-off Date is determined and prepared as of the close of business on the last business day immediately prior to the Cut-off Date.

Depository:  The Depository Trust Company, or any successor Depository hereafter named.  The nominee of the initial Depository for purposes of registering those Certificates that are to be Book-Entry Certificates is Cede & Co.  The Depository shall at all times be a "clearing corporation" as defined in Section 8-102(a)(5) of the Uniform Commercial Code of the State of New York and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended.

Depository Participant:  A broker, dealer, bank or other financial institution or other Person for whom from time to time a Depository effects book-entry transfers and pledges of securities deposited with the Depository.

Destroyed Mortgage Note:  A Mortgage Note the original of which was permanently lost or destroyed and has not been replaced.

Destroyed Obligation to Pay:  An Obligation to Pay the original of which was permanently lost or destroyed and has not been replaced.

Determination Date: As defined in the Series Supplement.

Discount Fraction:  With respect to each Discount Mortgage Loan, the fraction expressed as a percentage, the numerator of which is the Discount

Net Mortgage Rate minus the Net Mortgage Rate (or the initial Net Mortgage Rate with respect to any Discount Mortgage Loans as to which the Mortgage Rate is modified pursuant to 3.07(a)) for such Mortgage Loan and the denominator of which is the Discount Net Mortgage Rate. The Discount Fraction with respect to each Discount Mortgage Loan is set forth as an exhibit attached to the Series Supplement.

Discount Mortgage Loan: Any Mortgage Loan having a Net Mortgage Rate (or the initial Net Mortgage Rate) of less than the Discount Net Mortgage Rate per annum and any Mortgage Loan deemed to be a Discount Mortgage Loan pursuant to the definition of Qualified Substitute Mortgage Loan.

Discount Net Mortgage Rate: As defined in the Series Supplement.

Disqualified Organization: Any organization defined as a "disqualified organization" under Section 860E(e)(5) of the Code, and if not otherwise included, any of the following: (i) the United States, any State or political subdivision thereof, any possession of the United States, or any agency or instrumentality of any of the foregoing (other than an instrumentality which is a corporation if all of its activities are subject to tax and, except for Freddie Mac, a majority of its board of directors is not selected by such governmental unit), (ii) a foreign government, any international organization, or any agency or instrumentality of any of the foregoing, (iii) any organization (other than certain farmers' cooperatives described in Section 521 of the Code) which is exempt from the tax imposed by Chapter 1 of the Code (including the tax imposed by Section 511 of the Code on unrelated business taxable income), (iv) rural electric and telephone cooperatives described in Section 1381(a)(2)(C) of the Code, (v) any "electing large partnership," as defined in Section 775(a) of the Code and (vi) any other Person so designated by the Trustee based upon an Opinion of Counsel that the holding of an Ownership Interest in a Class R Certificate by such Person may cause the Trust Fund or any Person having an Ownership Interest in any Class of Certificates (other than such Person) to incur a liability for any federal tax imposed under the Code that would not otherwise be imposed but for the Transfer of an Ownership Interest in a Class R Certificate to such Person. The terms "United States", "State" and "international organization" shall have the meanings set forth in Section 7701 of the Code or successor provisions.

Distribution Date: The 25th day of any month beginning in the month immediately following the month of the initial issuance of the Certificates or, if such 25th day is not a Business Day, the Business Day immediately following such 25th day.

Due Date: With respect to any Distribution Date and any Mortgage Loan, the day during the related Due Period on which the Monthly Payment is due.

Due Period: With respect to any Distribution Date, the one-month period set forth in the Series Supplement.

Eligible Account: An account that is any of the following: (i) maintained with a depository institution the debt obligations of which have been rated by each Rating Agency in its highest rating available, or (ii) an account or accounts in a depository institution in which such accounts are FDIC insured to the limits established by the FDIC, provided that any deposits not so insured shall, to the extent acceptable to each Rating Agency, as evidenced in writing, be maintained such that (as evidenced by an Opinion of Counsel delivered to the Trustee and each Rating Agency) the registered Holders of Certificates have a claim with respect to the funds in such account or a perfected first security interest against any collateral (which shall be limited to Permitted Investments) securing such funds that is superior to claims of any other depositors or creditors of the depository institution with which such account is maintained, or (iii) in the case of the Custodial Account, a trust account or accounts maintained in the corporate trust department of the Trustee, or (iv) in the case of the Certificate Account, a trust account or accounts maintained in the corporate trust department of the Trustee, or (v) an account or accounts of a depository institution acceptable to each Rating Agency (as evidenced in writing by each Rating Agency that use of any such account as the Custodial Account or the Certificate Account will not reduce the rating assigned to any Class of Certificates by such Rating Agency below the then-current rating assigned to such Certificates).

Event of Default: As defined in Section 7.01.

Excess Bankruptcy Loss: Any Bankruptcy Loss, or portion thereof, which exceeds the then applicable Bankruptcy Amount.

Excess Fraud Loss: Any Fraud Loss, or portion thereof, which exceeds the then applicable Fraud Loss Amount.

Excess Special Hazard Loss: Any Special Hazard Loss, or portion thereof, that exceeds the then applicable Special Hazard Amount.

Excess Subordinate Principal Amount: With respect to any Distribution Date on which the aggregate Certificate Principal Balance of the Class of Subordinate Certificates then outstanding with the Lowest Priority is to be reduced to zero and on which Realized Losses are to be allocated to such class or classes, the excess, if any, of (i) the amount that would otherwise be distributable in respect of principal on such class or classes of Certificates on such Distribution Date over (ii) the excess, if any, of the aggregate Certificate Principal Balance of such class or classes of Certificates immediately prior to such Distribution Date over the aggregate amount of Realized Losses to be allocated to such classes of Certificates on such Distribution Date as reduced by any amount calculated pursuant to clause (E) of the definition of Class A-P Principal Distribution Amount. With respect to any Mortgage Pool that is comprised of two or more Loan Groups, the Excess Subordinate Principal Amount will be allocated between each Loan Group on a pro rata basis in accordance with the amount of Realized Losses attributable to each Loan Group and allocated to the Certificates on such

Distribution Date.

Exchange Act:  The Securities and Exchange Act of 1934, as amended.

Extraordinary Events:  Any of the following conditions with respect to a Mortgaged Property (or, with respect to a Cooperative Loan, the Cooperative Apartment) or Mortgage Loan causing or resulting in a loss which causes the liquidation of such Mortgage Loan:

(a)    losses that are of the type that would be covered by the fidelity bond and the errors and omissions insurance policy required to be maintained pursuant to Section 3.12(b) but are in excess of the coverage maintained thereunder;

(b)    nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, and whether such loss be direct or indirect, proximate or remote or be in whole or in part caused by, contributed to or aggravated by a peril covered by the definition of the term "Special Hazard Loss";

(c)    hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack:

1.              by any government or sovereign power, de jure or de facto, or by any authority maintaining or using military, naval or air forces; or

2.              by military, naval or air forces; or

3.              by an agent of any such government, power, authority or forces;

(d)    any weapon of war employing atomic fission or radioactive force whether in time of peace or war; or

(e)    insurrection, rebellion, revolution, civil war, usurped power or action taken by governmental authority in hindering, combating or defending against such an occurrence, seizure or destruction under quarantine or customs regulations, confiscation by order of any government or public authority; or risks of contraband or illegal transportation or trade.

Extraordinary Losses:  Any loss incurred on a Mortgage Loan caused by or resulting from an Extraordinary Event.

Fannie Mae:  Federal National Mortgage Association, a federally chartered and privately owned corporation organized and existing under the Federal National Mortgage Association Charter Act, or any successor thereto.

FDIC:  Federal Deposit Insurance Corporation or any successor thereto.

Final Distribution Date:  The Distribution Date on which the final distribution in respect of the Certificates will be made pursuant to Section 9.01, which Final Distribution Date shall in no event be later than the end of the 90-day liquidation period described in Section 9.02.

Fitch:  Fitch Ratings or its successor in interest.

Foreclosure Profits:  As to any Distribution Date or related Determination Date and any Mortgage Loan, the excess, if any, of Liquidation Proceeds, Insurance Proceeds and REO Proceeds (net of all amounts reimbursable therefrom pursuant to Section 3.10(a)(ii)) in respect of each Mortgage Loan or REO Property for which a Cash Liquidation or REO Disposition occurred in the related Prepayment Period over the sum of the unpaid principal balance of such Mortgage Loan or REO Property (determined, in the case of an REO Disposition, in accordance with Section 3.14) plus accrued and unpaid interest at the Mortgage Rate on such unpaid principal balance from the Due Date to which interest was last paid by the Mortgagor to the first day of the month following the month in which such Cash Liquidation or REO Disposition occurred.

Form 10-K Certification:  As defined in Section 4.03(e).

Fraud Losses:  Realized Losses on Mortgage Loans as to which there was fraud in the origination of such Mortgage Loan.

Freddie Mac:  Federal Home Loan Mortgage Corporation, a corporate instrumentality of the United States created and existing under Title III of the Emergency Home Finance Act of 1970, as amended, or any successor thereto.

Highest Priority: As of any date of determination, the Class of Subordinate Certificates then outstanding with a Certificate Principal Balance greater than zero, with the earliest priority for payments pursuant to Section 4.02(a), in the following order: Class M-1, Class M-2, Class M-3, Class B-1, Class B-2 and Class B-3 Certificates.

Independent:  When used with respect to any specified Person, means such a Person who (i) is in fact independent of the Company, the Master Servicer and the Trustee, or any Affiliate thereof, (ii) does not have any direct financial interest or any material indirect financial interest in the Company, the Master Servicer or the Trustee or in an Affiliate thereof, and (iii) is not connected with the Company, the Master Servicer or the Trustee as an officer, employee, promoter, underwriter, trustee, partner, director or person performing similar functions.

Initial Certificate Principal Balance:  With respect to each Class of Certificates, the Certificate Principal Balance of such Class of Certificates as of the Cut-off Date, as set forth in the Series Supplement.

Initial Monthly Payment Fund: An amount representing scheduled principal amortization and interest at the Net Mortgage Rate for the Due Date

in the first Due Period commencing subsequent to the Cut-off Date for those Mortgage Loans for which the Trustee will not be entitled to receive such payment, and as more specifically defined in the Series Supplement.

Initial Notional Amount: With respect to any Class or Subclass of Interest Only Certificates, the amount initially used as the principal basis for the calculation of any interest payment amount, as more specifically defined in the Series Supplement.

Initial Subordinate Class Percentage: As defined in the Series Supplement.

Insurance Proceeds: Proceeds paid in respect of the Mortgage Loans pursuant to any Primary Insurance Policy or any other related insurance policy covering a Mortgage Loan (excluding any Certificate Policy (as defined in the Series Supplement)), to the extent such proceeds are payable to the mortgagee under the Mortgage, any Subservicer, the Master Servicer or the Trustee and are not applied to the restoration of the related Mortgaged Property (or, with respect to a Cooperative Loan, the related Cooperative Apartment) or released to the Mortgagor in accordance with the procedures that the Master Servicer would follow in servicing mortgage loans held for its own account.

Insurer: Any named insurer under any Primary Insurance Policy or any successor thereto or the named insurer in any replacement policy.

Interest Accrual Period: As defined in the Series Supplement.

Interest Only Certificates: A Class or Subclass of Certificates not entitled to payments of principal, and designated as such in the Series Supplement. The Interest Only Certificates will have no Certificate Principal Balance.

Interim Certification: As defined in Section 2.02.

International Borrower: In connection with any Mortgage Loan, a borrower who is (a) a United States citizen employed in a foreign country, (b) a non-permanent resident alien employed in the United States or (c) a citizen of a country other than the United States with income derived from sources outside the United States.

Junior Certificateholder: The Holder of not less than 95% of the Percentage Interests of the Junior Class of Certificates.

Junior Class of Certificates: The Class of Subordinate Certificates outstanding as of the date of the repurchase of a Mortgage Loan pursuant to Section 4.07 herein that has the Lowest Priority.

Late Collections: With respect to any Mortgage Loan, all amounts received during any Due Period, whether as late payments of Monthly Payments or as Insurance Proceeds, Liquidation Proceeds or otherwise, which represent late payments or collections of Monthly Payments due but delinquent for a previous Due Period and not previously recovered.

Liquidation Proceeds: Amounts (other than Insurance Proceeds) received by the Master Servicer in connection with the taking of an entire Mortgaged Property by exercise of the power of eminent domain or condemnation or in connection with the liquidation of a defaulted Mortgage Loan through trustee's sale, foreclosure sale or otherwise, other than REO Proceeds.

Loan Group: Any group of Mortgage Loans designated as a separate loan group in the Series Supplement. The Certificates relating to each Loan Group will be designated in the Series Supplement.

Loan-to-Value Ratio: As of any date, the fraction, expressed as a percentage, the numerator of which is the current principal balance of the related Mortgage Loan at the date of determination and the denominator of which is the Appraised Value of the related Mortgaged Property.

Lower Priority: As of any date of determination and any Class of Subordinate Certificates, any other Class of Subordinate Certificates then outstanding with a later priority for payments pursuant to Section 4.02 (a).

Lowest Priority: As of any date of determination, the Class of Subordinate Certificates then outstanding with a Certificate Principal Balance greater than zero, with the latest priority for payments pursuant to Section 4.02(a), in the following order: Class B-3, Class B-2, Class B-1, Class M-3, Class M-2 and Class M-1 Certificates.

Maturity Date: The latest possible maturity date, solely for purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, by which the Certificate Principal Balance of each Class of Certificates (other than the Interest Only Certificates which have no Certificate Principal Balance) and each Uncertificated REMIC Regular Interest would be reduced to zero, as designated in the Series Supplement.

MERS: Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

MERS(R) System: The system of recording transfers of Mortgages electronically maintained by MERS.

MIN: The Mortgage Identification Number for Mortgage Loans registered with MERS on the MERS(R) System.

MLCC: Merrill Lynch Credit Corporation, or its successor in interest.

Modified Mortgage Loan: Any Mortgage Loan that has been the subject of a Servicing Modification.

Modified Net Mortgage Rate: As to any Mortgage Loan that is the subject of a Servicing Modification, the Net Mortgage Rate minus the rate per annum by which the Mortgage Rate on such Mortgage Loan was reduced.

MOM Loan: With respect to any Mortgage Loan, MERS acting as the mortgagee of such Mortgage Loan, solely as nominee for the originator of such Mortgage Loan and its successors and assigns, at the origination thereof.

Monthly Payment: With respect to any Mortgage Loan (including any REO Property) and any Due Date, the payment of principal and interest due thereon in accordance with the amortization schedule at the time applicable thereto (after adjustment, if any, for Curtailments and for Deficient Valuations occurring prior to such Due Date but before any adjustment to such amortization schedule by reason of any bankruptcy, other than a Deficient Valuation, or similar proceeding or any moratorium or similar waiver or grace period and before any Servicing Modification that constitutes a reduction of the interest rate on such Mortgage Loan).

Moody's: Moody's Investors Service, Inc., or its successor in interest.

Mortgage: With respect to each Mortgage Note related to a Mortgage Loan which is not a Cooperative Loan, the mortgage, deed of trust or other comparable instrument creating a first lien on an estate in fee simple or leasehold interest in real property securing a Mortgage Note. With respect to each Obligation to Pay related to a Sharia Mortgage Loan, the Sharia Mortgage Loan Security Instrument.

Mortgage File: The mortgage documents listed in Section 2.01 pertaining to a particular Mortgage Loan and any additional documents required to be added to the Mortgage File pursuant to this Agreement.

Mortgage Loans: Such of the mortgage loans, including any Sharia Mortgage Loans, transferred and assigned to the Trustee pursuant to Section 2.01 as from time to time are held or deemed to be held as a part of the Trust Fund, the Mortgage Loans originally so held being identified in the initial Mortgage Loan Schedule, and Qualified Substitute Mortgage Loans held or deemed held as part of the Trust Fund including, without limitation, (i) with respect to each Cooperative Loan, the related Mortgage Note, Security Agreement, Assignment of Proprietary Lease, Cooperative Stock Certificate, Cooperative Lease and Mortgage File and all rights appertaining thereto, (ii) with respect to each Sharia Mortgage Loan, the related Obligation to Pay, Sharia Mortgage Loan Security Instrument, Sharia Mortgage Loan Co-Ownership Agreement, Assignment Agreement and Amendment of Security Instrument and Mortgage File and all rights appertaining thereto and (iii) with respect to each Mortgage Loan other than a Cooperative Loan or a Sharia Mortgage Loan, each related Mortgage Note, Mortgage and Mortgage File and all rights appertaining thereto.

Mortgage Loan Schedule: As defined in the Series Supplement.

Mortgage Note: The originally executed note or other evidence of indebtedness evidencing the indebtedness of a Mortgagor under a Mortgage Loan, together with any modification thereto. With respect to each Sharia Mortgage Loan, the related Obligation to Pay.

Mortgage Pool: The pool of mortgage loans, including all Loan Groups, if any, consisting of the Mortgage Loans.

Mortgage Rate: As to any Mortgage Loan, the interest rate borne by the related Mortgage Note, or any modification thereto other than a Servicing Modification. As to any Sharia Mortgage Loan, the profit factor described in the related Obligation to Pay, or any modification thereto other than a Servicing Modification.

Mortgaged Property: The underlying real property securing a Mortgage Loan or, with respect to a Cooperative Loan, the related Cooperative Lease and Cooperative Stock.

Mortgagor: The obligor on a Mortgage Note, or with respect to a Sharia Mortgage Loan, the consumer on an Obligation to Pay.

Net Mortgage Rate: As to each Mortgage Loan, a per annum rate of interest equal to the Adjusted Mortgage Rate less the per annum rate at which the Servicing Fee is calculated.

Non-Discount Mortgage Loan: A Mortgage Loan that is not a Discount Mortgage Loan.

Non-Primary Residence Loans: The Mortgage Loans designated as secured by second or vacation residences, or by non-owner occupied residences, on the Mortgage Loan Schedule.

Non-United States Person: Any Person other than a United States Person.

Nonrecoverable Advance: Any Advance previously made or proposed to be made by the Master Servicer or Subservicer in respect of a Mortgage Loan (other than a Deleted Mortgage Loan) which, in the good faith judgment of the Master Servicer, will not, or, in the case of a proposed Advance, would not, be ultimately recoverable by the Master Servicer from related Late Collections, Insurance Proceeds, Liquidation Proceeds, REO Proceeds or amounts reimbursable to the Master Servicer pursuant to Section 4.02(a) hereof. To the extent that any Mortgagor is not obligated under the related Mortgage documents to pay or reimburse any portion of any Servicing Advances that are outstanding with respect to the related Mortgage Loan as a result of a modification of such Mortgage Loan by the Master Servicer, which forgives amounts which the Master Servicer or Subservicer had previously advanced, and the Master Servicer determines that no other source of payment or reimbursement for such advances is available to it, such Servicing Advances shall be deemed to be Nonrecoverable Advances. The determination by the

Master Servicer that it has made a Nonrecoverable Advance or that any proposed Advance would constitute a Nonrecoverable Advance, shall be evidenced by an Officers' Certificate delivered to the Company, the Trustee and any Certificate Insurer.

Nonsubserviced Mortgage Loan: Any Mortgage Loan that, at the time of reference thereto, is not subject to a Subservicing Agreement.

Notional Amount: With respect to any Class or Subclass of Interest Only Certificates, an amount used as the principal basis for the calculation of any interest payment amount, as more specifically defined in the Series Supplement.

Obligation to Pay: The originally executed obligation to pay or similar agreement evidencing the obligation of the consumer under a Sharia Mortgage Loan, together with any modification thereto.

Officers' Certificate: A certificate signed by the Chairman of the Board, the President or a Vice President or Assistant Vice President, or a Director or Managing Director, and by the Treasurer, the Secretary, or one of the Assistant Treasurers or Assistant Secretaries of the Company or the Master Servicer, as the case may be, and delivered to the Trustee, as required by this Agreement.

Opinion of Counsel: A written opinion of counsel acceptable to the Trustee and the Master Servicer, who may be counsel for the Company or the Master Servicer, provided that any opinion of counsel (i) referred to in the definition of "Disqualified Organization" or (ii) relating to the qualification of any REMIC formed under the Series Supplement or compliance with the REMIC Provisions must, unless otherwise specified, be an opinion of Independent counsel.

Outstanding Mortgage Loan: As to any Due Date, a Mortgage Loan (including an REO Property) which was not the subject of a Principal Prepayment in Full, Cash Liquidation or REO Disposition and which was not purchased, deleted or substituted for prior to such Due Date pursuant to Section 2.02, 2.03, 2.04 or 4.07.

Ownership Interest: As to any Certificate, any ownership or security interest in such Certificate, including any interest in such Certificate as the Holder thereof and any other interest therein, whether direct or indirect, legal or beneficial, as owner or as pledgee.

Pass-Through Rate: As defined in the Series Supplement.

Paying Agent: The Trustee or any successor Paying Agent appointed by the Trustee.

Percentage Interest: With respect to any Certificate (other than a Class R Certificate), the undivided percentage ownership interest in the related Class evidenced by such Certificate, which percentage ownership interest shall be equal to the Initial Certificate Principal Balance thereof or Initial Notional Amount (in the case of any Interest Only Certificate) thereof divided by the aggregate Initial Certificate Principal Balance or the aggregate of the Initial Notional Amounts, as applicable, of all the Certificates of the same Class. With respect to a Class R Certificate, the interest in distributions to be made with respect to such Class evidenced thereby, expressed as a percentage, as stated on the face of each such Certificate.

Permitted Investments: One or more of the following:

(i)    obligations of or guaranteed as to timely payment of principal and interest by the United States or any agency or instrumentality thereof when such obligations are backed by the full faith and credit of the United States;

(ii)   repurchase agreements on obligations specified in clause (i) maturing not more than one month from the date of acquisition thereof, provided that the unsecured short-term debt obligations of the party agreeing to repurchase such obligations are at the time rated by each Rating Agency in its highest short-term rating available;

(iii)  federal funds, certificates of deposit, demand deposits, time deposits and bankers' acceptances (which shall each have an original maturity of not more than 90 days and, in the case of bankers' acceptances, shall in no event have an original maturity of more than 365 days or a remaining maturity of more than 30 days) denominated in United States dollars of any U.S. depository institution or trust company incorporated under the laws of the United States or any state thereof or of any domestic branch of a foreign depository institution or trust company; provided that the debt obligations of such depository institution or trust company at the date of acquisition thereof have been rated by each Rating Agency in its highest short-term rating available; and, provided further that, if the original maturity of such short-term obligations of a domestic branch of a foreign depository institution or trust company shall exceed 30 days, the short-term rating of such institution shall be A-1+ in the case of Standard & Poor's if Standard & Poor's is a Rating Agency;

(iv)   commercial paper and demand notes (having original maturities of not more than 365 days) of any corporation incorporated under the laws of the United States or any state thereof which on the date of acquisition has been rated by each Rating Agency in its highest short-term rating available; provided that such commercial paper shall have a remaining maturity of not more than 30 days;

(v)    any mutual fund, money market fund, common trust fund or other pooled investment vehicle, the assets of which are limited to instruments that otherwise would constitute Permitted Investments hereunder and have

been rated by each Rating Agency in its highest short-term rating available (in the case of Standard & Poor's such rating shall be either AAAm or AAAm-G), including any such fund that is managed by the Trustee or any affiliate of the Trustee or for which the Trustee or any of its affiliates acts as an adviser; and

(vi)    other obligations or securities that are acceptable to each Rating Agency as a Permitted Investment hereunder and will not reduce the rating assigned to any Class of Certificates by such Rating Agency (without giving effect to any Certificate Policy in the case of Insured Certificates (as defined in the Series Supplement) in the case of Insured Certificates (as defined in the Series Supplement) below the lower of the then-current rating assigned to such Certificates by such Rating Agency, as evidenced in writing;

provided, however, no instrument shall be a Permitted Investment if it represents, either (1) the right to receive only interest payments with respect to the underlying debt instrument or (2) the right to receive both principal and interest payments derived from obligations underlying such instrument and the principal and interest payments with respect to such instrument provide a yield to maturity greater than 120% of the yield to maturity at par of such underlying obligations.  References herein to the highest rating available on unsecured long-term debt shall mean AAA in the case of Standard & Poor's and Fitch and Aaa in the case of Moody's, and for purposes of this Agreement, any references herein to the highest rating available on unsecured commercial paper and short-term debt obligations shall mean the following: A-1 in the case of Standard & Poor's, P-1 in the case of Moody's and F-1 in the case of Fitch; provided, however, that any Permitted Investment that is a short-term debt obligation rated A-1 by Standard & Poor's must satisfy the following additional conditions: (i) the total amount of debt from A-1 issuers must be limited to the investment of monthly principal and interest payments (assuming fully amortizing collateral); (ii) the total amount of A-1 investments must not represent more than 20% of the aggregate outstanding Certificate Principal Balance of the Certificates and each investment must not mature beyond 30 days; (iii) the terms of the debt must have a predetermined fixed dollar amount of principal due at maturity that cannot vary; and (iv) if the investments may be liquidated prior to their maturity or are being relied on to meet a certain yield, interest must be tied to a single interest rate index plus a single fixed spread (if any) and must move proportionately with that index.  Any Permitted Investment may be held by or through the Trustee or its Affiliates.

    Permitted Transferee:  Any Transferee of a Class R Certificate, other than a Disqualified Organization or Non-United States Person.

    Person:  Any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

    Pledged Amount: With respect to any Pledged Asset Loan, the amount of money remitted to Combined Collateral LLC, at the direction of or for the benefit of the related Mortgagor.

    Pledged Asset Loan:  Any Mortgage Loan supported by Pledged Assets or such other collateral, other than the related Mortgaged Property, set forth in the Series Supplement.

    Pledged Assets:  With respect to any Mortgage Loan, all money, securities, security entitlements, accounts, general intangibles, payment intangibles, instruments, documents, deposit accounts, certificates of deposit, commodities contracts and other investment property and other property of whatever kind or description pledged by Combined Collateral LLC as security in respect of any Realized Losses in connection with such Mortgage Loan up to the Pledged Amount for such Mortgage Loan, and any related collateral, or such other collateral as may be set forth in the Series Supplement.

    Pledged Asset Mortgage Servicing Agreement: The Pledged Asset Mortgage Servicing Agreement, dated as of February 28, 1996 between MLCC and the Master Servicer.

    Pooling and Servicing Agreement or Agreement:  With respect to any Series, this Standard Terms together with the related Series Supplement.

    Pool Stated Principal Balance:  As to any Distribution Date, the aggregate of the Stated Principal Balances of each Mortgage Loan.

    Pool Strip Rate:  With respect to each Mortgage Loan, a per annum rate equal to the excess of (a) the Net Mortgage Rate of such Mortgage Loan over (b) the Discount Net Mortgage Rate (but not less than 0.00%) per annum.

    Prepayment Distribution Trigger:  With respect to any Distribution Date and any Class of Subordinate Certificates (other than the Class M-1 Certificates), a test that shall be satisfied if the fraction (expressed as a percentage) equal to the sum of the Certificate Principal Balances of such Class and each Class of Subordinate Certificates with a Lower Priority than such Class immediately prior to such Distribution Date divided by the aggregate Stated Principal Balance of all of the Mortgage Loans (or related REO Properties) immediately prior to such Distribution Date is greater than or equal to the sum of the related Initial Subordinate Class Percentages of such Classes of Subordinate Certificates.

    Prepayment Interest Shortfall:  As to any Distribution Date and any Mortgage Loan (other than a Mortgage Loan relating to an REO Property) that was the subject of (a) a Principal Prepayment in Full during the portion of the related Prepayment Period that falls during the prior calendar month, an amount equal to the excess of one month's interest at the Net Mortgage Rate (or Modified Net Mortgage Rate in the case of a Modified Mortgage Loan) on the Stated Principal Balance of such Mortgage Loan over the amount of

interest (adjusted to the Net Mortgage Rate (or Modified Net Mortgage Rate in the case of a Modified Mortgage Loan) paid by the Mortgagor for such month to the date of such Principal Prepayment in Full or (b) a Curtailment during the prior calendar month, an amount equal to one month's interest at the Net Mortgage Rate (or Modified Net Mortgage Rate in the case of a Modified Mortgage Loan) on the amount of such Curtailment.

Prepayment Period:  As to any Distribution Date and Principal Prepayment in Full, the period commencing on the 16th day of the month prior to the month in which that Distribution Date occurs and ending on the 15th day of the month in which such Distribution Date occurs.

Primary Insurance Policy:  Each primary policy of mortgage guaranty insurance or any replacement policy therefor referred to in Section 2.03(b)(iv) and (v).

Principal Only Certificates:  A Class of Certificates not entitled to payments of interest, and more specifically designated as such in the Series Supplement.

Principal Prepayment:  Any payment of principal or other recovery on a Mortgage Loan, including a recovery that takes the form of Liquidation Proceeds or Insurance Proceeds, which is received in advance of its scheduled Due Date and is not accompanied by an amount as to interest representing scheduled interest on such payment due on any date or dates in any month or months subsequent to the month of prepayment.

Principal Prepayment in Full:  Any Principal Prepayment of the entire principal balance of a Mortgage Loan that is made by the Mortgagor.

Program Guide:  Collectively, the Client Guide and the Servicer Guide for Residential Funding's Expanded Criteria Mortgage Program.

Purchase Price:  With respect to any Mortgage Loan (or REO Property) required to be or otherwise purchased on any date pursuant to Section 2.02, 2.03, 2.04 or 4.07, an amount equal to the sum of (i) 100% of the Stated Principal Balance thereof plus the principal portion of any related unreimbursed Advances and (ii) unpaid accrued interest at the Adjusted Mortgage Rate (or Modified Net Mortgage Rate the rate per annum at which the Servicing Fee is calculated in the case of a Modified Mortgage Loan) or at the Net Mortgage Rate (or Modified Net Mortgage Rate in the case of a Modified Mortgage Loan) in the case of a purchase made by the Master Servicer) on the Stated Principal Balance thereof to the Due Date in the Due Period related to the Distribution Date occurring in the month following the month of purchase from the Due Date to which interest was last paid by the Mortgagor.

Qualified Substitute Mortgage Loan:  A Mortgage Loan substituted by Residential Funding or the Company for a Deleted Mortgage Loan which must, on the date of such substitution, as confirmed in an Officers' Certificate delivered to the Trustee, with a copy to the Custodian,

(i)    have an outstanding principal balance, after deduction of the principal portion of the monthly payment due in the month of substitution (or in the case of a substitution of more than one Mortgage Loan for a Deleted Mortgage Loan, an aggregate outstanding principal balance, after such deduction), not in excess of the Stated Principal Balance of the Deleted Mortgage Loan (the amount of any shortfall to be deposited by Residential Funding in the Custodial Account in the month of substitution);

(ii)   have a Mortgage Rate and a Net Mortgage Rate no lower than and not more than 1% per annum higher than the Mortgage Rate and Net Mortgage Rate, respectively, of the Deleted Mortgage Loan as of the date of substitution;

(iii)      have a Loan-to-Value Ratio at the time of substitution no higher than that of the Deleted Mortgage Loan at the time of substitution;

(iv)   have a remaining term to stated maturity not greater than (and not more than one year less than) that of the Deleted Mortgage Loan;

(v)    comply with each representation and warranty set forth in Sections 2.03 and 2.04 hereof and Section 4 of the Assignment Agreement; and

(vi)   have a Pool Strip Rate equal to or greater than that of the Deleted Mortgage Loan.

Notwithstanding any other provisions herein, (x) with respect to any Qualified Substitute Mortgage Loan substituted for a Deleted Mortgage Loan which was a Discount Mortgage Loan, such Qualified Substitute Mortgage Loan shall be deemed to be a Discount Mortgage Loan and to have a Discount Fraction equal to the Discount Fraction of the Deleted Mortgage Loan and (y) in the event that the "Pool Strip Rate" of any Qualified Substitute Mortgage Loan as calculated pursuant to the definition of "Pool Strip Rate" is greater than the Pool Strip Rate of the related Deleted Mortgage Loan

(i)    the Pool Strip Rate of such Qualified Substitute Mortgage Loan shall be equal to the Pool Strip Rate of the related Deleted Mortgage Loan for purposes of calculating the Pass-Through Rate on the Class A-V Certificates and

(ii)   the excess of the Pool Strip Rate on such Qualified Substitute Mortgage Loan as calculated pursuant to the definition of "Pool Strip Rate" over the Pool Strip Rate on the related Deleted Mortgage Loan shall be payable to the Class R Certificates pursuant to Section 4.02 hereof.

Rating Agency:  Each of the statistical credit rating agencies specified in the Preliminary Statement of the Series Supplement.  If any agency or a successor is no longer in existence, "Rating Agency" shall be such statistical credit rating agency, or other comparable Person, designated by the Company, notice of which designation shall be given to the Trustee and the Master Servicer.

Realized Loss:  With respect to each Mortgage Loan (or REO Property):

(a)     as to which a Cash Liquidation or REO Disposition has occurred, an amount (not less than zero) equal to (i) the Stated Principal Balance of the Mortgage Loan (or REO Property) as of the date of Cash Liquidation or REO Disposition, plus (ii) interest (and REO Imputed Interest, if any) at the Net Mortgage Rate from the Due Date as to which interest was last paid or advanced to Certificateholders up to the Due Date in the Due Period related to the Distribution Date on which such Realized Loss will be allocated pursuant to Section 4.05 on the Stated Principal Balance of such Mortgage Loan (or REO Property) outstanding during each Due Period that such interest was not paid or advanced, minus (iii) the proceeds, if any, received during the month in which such Cash Liquidation (or REO Disposition) occurred, to the extent applied as recoveries of interest at the Net Mortgage Rate and to principal of the Mortgage Loan, net of the portion thereof reimbursable to the Master Servicer or any Subservicer with respect to related Advances, Servicing Advances or other expenses as to which the Master Servicer or Subservicer is entitled to reimbursement thereunder but which have not been previously reimbursed,

(b)     which is the subject of a Servicing Modification, (i) (1)  the amount by which the interest portion of a Monthly Payment or the principal balance of such Mortgage Loan was reduced or (2) the sum of any other amounts owing under the Mortgage Loan that were forgiven and that constitute Servicing Advances that are reimbursable to the Master Servicer or a Subservicer, and (ii) any such amount with respect to a Monthly Payment that was or would have been due in the month immediately following the month in which a Principal Prepayment or the Purchase Price of such Mortgage Loan is received or is deemed to have been received,

(c)     which has become the subject of a Deficient Valuation, the difference between the principal balance of the Mortgage Loan outstanding immediately prior to such Deficient Valuation and the principal balance of the Mortgage Loan as reduced by the Deficient Valuation, or

(d)     which has become the object of a Debt Service Reduction, the amount of such Debt Service Reduction.

Notwithstanding the above, neither a Deficient Valuation nor a Debt Service Reduction shall be deemed a Realized Loss hereunder so long as the Master Servicer has notified the Trustee in writing that the Master Servicer is diligently pursuing any remedies that may exist in connection with the representations and warranties made regarding the related Mortgage Loan and either (A) the related Mortgage Loan is not in default with regard to payments due thereunder or (B) delinquent payments of principal and interest under the related Mortgage Loan and any premiums on any applicable primary hazard insurance policy and any related escrow payments in respect of such Mortgage Loan are being advanced on a current basis by the Master Servicer or a Subservicer, in either case without giving effect to any Debt Service Reduction.

To the extent the Master Servicer receives Subsequent Recoveries with respect to any Mortgage Loan, the amount of the Realized Loss with respect to that Mortgage Loan will be reduced to the extent such recoveries are applied to reduce the Certificate Principal Balance of any Class of Certificates on any Distribution Date.

Record Date:  With respect to each Distribution Date, the close of business on the last Business Day of the month next preceding the month in which the related Distribution Date occurs.

Regular Certificate:  Any of the Certificates other than a Class R Certificate.

Regulation AB:  Subpart 229.1100 - Asset Backed Securities (Regulation AB), 17 C.F.R.ss.ss.229.1100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,531 (January 7, 2005)) or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

Reimbursement Amounts: As defined in Section 3.22.
REMIC:  A "real estate mortgage investment conduit" within the meaning of Section 860D of the Code.

REMIC Administrator:  Residential Funding Company, LLC.  If Residential Funding Company, LLC is found by a court of competent jurisdiction to no longer be able to fulfill its obligations as REMIC Administrator under this Agreement the Master Servicer or Trustee acting as Master Servicer shall appoint a successor REMIC Administrator, subject to assumption of the REMIC Administrator obligations under this Agreement.

REMIC Provisions:  Provisions of the federal income tax law relating to real estate mortgage investment conduits, which appear at Sections 860A through 860G of Subchapter M of Chapter 1 of the Code, and related provisions, and temporary and final regulations (or, to the extent not

inconsistent with such temporary or final regulations, proposed regulations) and published rulings, notices and announcements promulgated thereunder, as the foregoing may be in effect from time to time.

REO Acquisition:  The acquisition by the Master Servicer on behalf of the Trustee for the benefit of the Certificateholders of any REO Property pursuant to Section 3.14.

REO Disposition:  As to any REO Property, a determination by the Master Servicer that it has received all Insurance Proceeds, Liquidation Proceeds, REO Proceeds and other payments and recoveries (including proceeds of a final sale) which the Master Servicer expects to be finally recoverable from the sale or other disposition of the REO Property.

REO Imputed Interest:  As to any REO Property, for any period, an amount equivalent to interest (at the Net Mortgage Rate that would have been applicable to the related Mortgage Loan had it been outstanding) on the unpaid principal balance of the Mortgage Loan as of the date of acquisition thereof for such period.

REO Proceeds:  Proceeds, net of expenses, received in respect of any REO Property (including, without limitation, proceeds from the rental of the related Mortgaged Property or, with respect to a Cooperative Loan, the related Cooperative Apartment) which proceeds are required to be deposited into the Custodial Account only upon the related REO Disposition.

REO Property:  A Mortgaged Property acquired by the Master Servicer through foreclosure or deed in lieu of foreclosure in connection with a defaulted Mortgage Loan.

Reportable Modified Mortgage Loan:  Any Mortgage Loan that (i) has been subject to an interest rate reduction, (ii) has been subject to a term extension or (iii) has had amounts owing on such Mortgage Loan capitalized by adding such amount to the Stated Principal Balance of such Mortgage Loan; provided, however, that a Mortgage Loan modified in accordance with clause (i) above for a temporary period shall not be a Reportable Modified Mortgage Loan if such Mortgage Loan has not been delinquent in payments of principal and interest for six months since the date of such modification if that interest rate reduction is not made permanent thereafter.

Request for Release:  A request for release, the forms of which are attached as Exhibit F hereto, or an electronic request in a form acceptable to the Custodian.

Required Insurance Policy:  With respect to any Mortgage Loan, any insurance policy which is required to be maintained from time to time under this Agreement, the Program Guide or the related Subservicing Agreement in respect of such Mortgage Loan.

Required Surety Payment:  With respect to any Additional Collateral Loan that becomes a Liquidated Mortgage Loan, the lesser of (i) the principal portion of the Realized Loss with respect to such Mortgage Loan and (ii) the excess, if any, of (a) the amount of Additional Collateral required at origination with respect to such Mortgage Loan over (b) the net proceeds realized by the Subservicer from the related Additional Collateral.

Residential Funding:  Residential Funding Company, LLC, a Delaware limited liability company, in its capacity as seller of the Mortgage Loans to the Company and any successor thereto.

Responsible Officer:  When used with respect to the Trustee, any officer of the Corporate Trust Department of the Trustee, including any Senior Vice President, any Vice President, any Assistant Vice President, any Assistant Secretary, any Trust Officer or Assistant Trust Officer, or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers to whom, with respect to a particular matter, such matter is referred, in each case with direct responsibility for the administration of the Agreement.

Retail Certificates:  A Senior Certificate, if any, offered in smaller minimum denominations than other Senior Certificates, and designated as such in the Series Supplement.

Schedule of Discount Fractions:  The schedule setting forth the Discount Fractions with respect to the Discount Mortgage Loans, attached as an exhibit to the Series Supplement.

Securitization Transaction:  Any transaction involving a sale or other transfer of mortgage loans directly or indirectly to an issuing entity in connection with an issuance of publicly offered or privately placed, rated or unrated mortgage-backed securities.

Security Agreement:  With respect to a Cooperative Loan, the agreement creating a security interest in favor of the originator in the related Cooperative Stock.

Seller:  As to any Mortgage Loan, a Person, including any Subservicer, that executed a Seller's Agreement applicable to such Mortgage Loan.

Seller's Agreement:  An agreement for the origination and sale of Mortgage Loans generally in the form of the Seller Contract referred to or contained in the Program Guide, or in such other form as has been approved by the Master Servicer and the Company, each containing representations and warranties in respect of one or more Mortgage Loans consistent in all material respects with those set forth in the Program Guide.

Senior Accelerated Distribution Percentage:  With respect to any Distribution Date occurring on or prior to the 60th Distribution Date and, with respect to any Mortgage Pool comprised of two or more Loan Groups, any Loan Group, 100%.  With respect to any Distribution Date thereafter and any

such Loan Group, if applicable, as follows:

(i)    for any Distribution Date after the 60th Distribution Date but on or
       prior to the 72nd Distribution Date, the related Senior Percentage for
       such Distribution Date plus 70% of the related Subordinate Percentage
       for such Distribution Date;

(ii)   for any Distribution Date after the 72nd Distribution Date but on or
       prior to the 84th Distribution Date, the related Senior Percentage for
       such Distribution Date plus 60% of the related Subordinate Percentage
       for such Distribution Date;

(iii)  for any Distribution Date after the 84th Distribution Date but on or
       prior to the 96th Distribution Date, the related Senior Percentage for
       such Distribution Date plus 40% of the related Subordinate Percentage
       for such Distribution Date;

(iv)   for any Distribution Date after the 96th Distribution Date but on or
       prior to the 108th Distribution Date, the related Senior Percentage for
       such Distribution Date plus 20% of the related Subordinate Percentage
       for such Distribution Date; and

(v)    for any Distribution Date thereafter, the Senior Percentage for such
       Distribution Date;

provided, however,

       (i) that any scheduled reduction to the Senior Accelerated Distribution
Percentage described above shall not occur as of any Distribution Date unless
either

              (a)(1)(X) the outstanding principal balance of the Mortgage Loans
       delinquent 60 days or more (including Mortgage Loans which are in
       foreclosure, have been foreclosed or otherwise liquidated, or with
       respect to which the Mortgagor is in bankruptcy and any REO Property)
       averaged over the last six months, as a percentage of the aggregate
       outstanding Certificate Principal Balance of the Subordinate
       Certificates, is less than 50% or (Y) the outstanding principal balance
       of Mortgage Loans delinquent 60 days or more (including Mortgage Loans
       which are in foreclosure, have been foreclosed or otherwise liquidated,
       or with respect to which the Mortgagor is in bankruptcy and any REO
       Property) averaged over the last six months, as a percentage of the
       aggregate outstanding principal balance of all Mortgage Loans averaged
       over the last six months, does not exceed 2% and (2) Realized Losses on
       the Mortgage Loans to date for such Distribution Date if occurring
       during the sixth, seventh, eighth, ninth or tenth year (or any year
       thereafter) after the Closing Date are less than 30%, 35%, 40%, 45% or
       50%, respectively, of the sum of the Initial Certificate Principal
       Balances of the Subordinate Certificates or

              (b)(1) the outstanding principal balance of Mortgage Loans
       delinquent 60 days or more (including Mortgage Loans which are in
       foreclosure, have been foreclosed or otherwise liquidated, or with
       respect to which the Mortgagor is in bankruptcy and any REO Property)
       averaged over the last six months, as a percentage of the aggregate
       outstanding principal balance of all Mortgage Loans averaged over the
       last six months, does not exceed 4% and (2) Realized Losses on the
       Mortgage Loans to date for such Distribution Date, if occurring during
       the sixth, seventh, eighth, ninth or tenth year (or any year
       thereafter) after the Closing Date are less than 10%, 15%, 20%, 25% or
       30%, respectively, of the sum of the Initial Certificate Principal
       Balances of the Subordinate Certificates, and

       (ii) that for any Distribution Date on which the Senior Percentage is
greater than the Senior Percentage as of the Closing Date, the Senior
Accelerated Distribution Percentage for such Distribution Date shall be 100%,
or, if the Mortgage Pool is comprised of two or more Loan Groups, for any
Distribution Date on which the weighted average of the Senior Percentages for
each Loan Group, weighted on the basis of the Stated Principal Balances of
the Mortgage Loans in the related Loan Group (excluding the Discount Fraction
of the Discount Mortgage Loans in such Loan Group) exceeds the weighted
average of the initial Senior Percentages (calculated on such basis) for each
Loan Group, each of the Senior Accelerated Distribution Percentages for such
Distribution Date will equal 100%.

Notwithstanding the foregoing, upon the reduction of the Certificate
Principal Balances of the related Senior Certificates (other than the Class
A-P Certificates, if any) to zero, the related Senior Accelerated
Distribution Percentage shall thereafter be 0%.

       Senior Certificate:  As defined in the Series Supplement.

       Senior Percentage: As defined in the Series Supplement.

       Senior Support Certificate:  A Senior Certificate that provides
additional credit enhancement to certain other classes of Senior Certificates
and designated as such in the Preliminary Statement of the Series Supplement.

       Series:  All of the Certificates issued pursuant to a Pooling and
Servicing Agreement and bearing the same series designation.

       Series Supplement:  The agreement into which this Standard Terms is
incorporated and pursuant to which, together with this Standard Terms, a
Series of Certificates is issued.

       Servicing Accounts:  The account or accounts created and maintained
pursuant to Section 3.08.

       Servicing Criteria:  The "servicing criteria" set forth in Item 1122(d)
of Regulation AB, as such may be amended from time to time.

Servicing Advances:  All customary, reasonable and necessary "out of pocket" costs and expenses incurred in connection with a default, delinquency or other unanticipated event by the Master Servicer or a Subservicer in the performance of its servicing obligations, including, but not limited to, the cost of (i) the preservation, restoration and protection of a Mortgaged Property or, with respect to a Cooperative Loan, the related Cooperative Apartment, (ii) any enforcement or judicial proceedings, including foreclosures, including any expenses incurred in relation to any such proceedings that result from the Mortgage Loan being registered on the MERS System, (iii) the management and liquidation of any REO Property, (iv) any mitigation procedures implemented in accordance with Section 3.07, and (v) compliance with the obligations under Sections 3.01, 3.08, 3.11, 3.12(a) and 3.14, including, if the Master Servicer or any Affiliate of the Master Servicer provides services such as appraisals and brokerage services that are customarily provided by Persons other than servicers of mortgage loans, reasonable compensation for such services.

Servicing Advance Reimbursement Amounts: As defined in Section 3.22.

Servicing Fee:  With respect to any Mortgage Loan and Distribution Date, the fee payable monthly to the Master Servicer in respect of master servicing compensation that accrues at an annual rate designated on the Mortgage Loan Schedule as the "MSTR SERV FEE" for such Mortgage Loan, as may be adjusted with respect to successor Master Servicers as provided in Section 7.02.

Servicing Modification: Any reduction of the interest rate on or the outstanding principal balance of a Mortgage Loan, any extension of the final maturity date of a Mortgage Loan, and any increase to the outstanding principal balance of a Mortgage Loan by adding to the Stated Principal Balance unpaid principal and interest and other amounts owing under the Mortgage Loan, in each case pursuant to a modification of a Mortgage Loan that is in default, or for which, in the judgment of the Master Servicer, default is reasonably foreseeable in accordance with Section 3.07(a).

Servicing Officer:  Any officer of the Master Servicer involved in, or responsible for, the administration and servicing of the Mortgage Loans whose name and specimen signature appear on a list of servicing officers furnished to the Trustee by the Master Servicer, as such list may from time to time be amended.

Sharia Mortgage Loan: A declining balance co-ownership transaction, structured so as to comply with Islamic religious law.

Sharia Mortgage Loan Co-Ownership Agreement: The agreement that defines the relationship between the consumer and co-owner and the parties' respective rights under a Sharia Mortgage Loan, including their respective rights with respect to the indicia of ownership of the related Mortgaged Property.

Sharia Mortgage Loan Security Instrument: The mortgage, security instrument or other comparable instrument creating a first lien on an estate in fee simple or leasehold interest in real property securing an Obligation to Pay.

Special Hazard Loss:  Any Realized Loss not in excess of the cost of the lesser of repair or replacement of a Mortgaged Property (or, with respect to a Cooperative Loan, the related Cooperative Apartment) suffered by such Mortgaged Property (or Cooperative Apartment) on account of direct physical loss, exclusive of (i) any loss of a type covered by a hazard policy or a flood insurance policy required to be maintained in respect of such Mortgaged Property pursuant to Section 3.12(a), except to the extent of the portion of such loss not covered as a result of any coinsurance provision and (ii) any Extraordinary Loss.

Standard & Poor's:  Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or its successor in interest.

Stated Principal Balance:  With respect to any Mortgage Loan or related REO Property, as of any Distribution Date, (i) the sum of (a) the Cut-off Date Principal Balance of the Mortgage Loan plus (b) any amount by which the Stated Principal Balance of the Mortgage Loan has been increased pursuant to a Servicing Modification, minus (ii) the sum of (a) the principal portion of the Monthly Payments due with respect to such Mortgage Loan or REO Property during each Due Period ending with the Due Period related to the previous Distribution Date which were received or with respect to which an Advance was made, and (b) all Principal Prepayments with respect to such Mortgage Loan or REO Property, and all Insurance Proceeds, Liquidation Proceeds and REO Proceeds, to the extent applied by the Master Servicer as recoveries of principal in accordance with Section 3.14 with respect to such Mortgage Loan or REO Property, in each case which were distributed pursuant to Section 4.02 on any previous Distribution Date, and (c) any Realized Loss allocated to Certificateholders with respect thereto for any previous Distribution Date.

Subclass: With respect to the Class A-V Certificates, any Subclass thereof issued pursuant to Section 5.01(c). Any such Subclass will represent the Uncertificated Class A-V REMIC Regular Interest or Interests specified by the initial Holder of the Class A-V Certificates pursuant to Section 5.01(c).

Subordinate Certificate:  Any one of the Class M Certificates or Class B Certificates, executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit B and Exhibit C, respectively.

Subordinate Class Percentage:  With respect to any Distribution Date and any Class of Subordinate Certificates, a fraction, expressed as a percentage, the numerator of which is the aggregate Certificate Principal Balance of such Class of Subordinate Certificates immediately prior to such date and the denominator of which is the aggregate Stated Principal Balance

of all of the Mortgage Loans (or related REO Properties) (other than the related Discount Fraction of each Discount Mortgage Loan) immediately prior to such Distribution Date.

Subordinate Percentage: As of any Distribution Date and, with respect to any Mortgage Pool comprised of two or more Loan Groups, any Loan Group, 100% minus the related Senior Percentage as of such Distribution Date.

Subsequent Recoveries: As of any Distribution Date, amounts received by the Master Servicer (net of any related expenses permitted to be reimbursed pursuant to Section 3.10) or surplus amounts held by the Master Servicer to cover estimated expenses (including, but not limited to, recoveries in respect of the representations and warranties made by the related Seller pursuant to the applicable Seller's Agreement and assigned to the Trustee pursuant to Section 2.04) specifically related to a Mortgage Loan that was the subject of a Cash Liquidation or an REO Disposition prior to the related Prepayment Period that resulted in a Realized Loss.

Subserviced Mortgage Loan: Any Mortgage Loan that, at the time of reference thereto, is subject to a Subservicing Agreement.

Subservicer: Any Person with whom the Master Servicer has entered into a Subservicing Agreement and who generally satisfied the requirements set forth in the Program Guide in respect of the qualification of a Subservicer as of the date of its approval as a Subservicer by the Master Servicer.

Subservicer Advance: Any delinquent installment of principal and interest on a Mortgage Loan which is advanced by the related Subservicer (net of its Subservicing Fee) pursuant to the Subservicing Agreement.

Subservicing Account: An account established by a Subservicer in accordance with Section 3.08.

Subservicing Agreement: The written contract between the Master Servicer and any Subservicer relating to servicing and administration of certain Mortgage Loans as provided in Section 3.02, generally in the form of the servicer contract referred to or contained in the Program Guide or in such other form as has been approved by the Master Servicer and the Company. With respect to Additional Collateral Loans subserviced by MLCC, the Subservicing Agreement shall also include the Addendum and Assignment Agreement and the Pledged Asset Mortgage Servicing Agreement. With respect to any Pledged Asset Loan subserviced by GMAC Mortgage, LLC, the Addendum and Assignment Agreement, dated as of November 24, 1998, between the Master Servicer and GMAC Mortgage, LLC, as such agreement may be amended from time to time.

Subservicing Fee: As to any Mortgage Loan, the fee payable monthly to the related Subservicer (or, in the case of a Nonsubserviced Mortgage Loan, to the Master Servicer) in respect of subservicing and other compensation that accrues at an annual rate equal to the excess of the Mortgage Rate borne by the related Mortgage Note over the rate per annum designated on the Mortgage Loan Schedule as the "CURR NET" for such Mortgage Loan.

Successor Master Servicer: As defined in Section 3.22.

Surety: Ambac, or its successors in interest, or such other surety as may be identified in the Series Supplement.

Surety Bond: The Limited Purpose Surety Bond (Policy No. AB0039BE), dated February 28, 1996 in respect to Mortgage Loans originated by MLCC, or the Surety Bond (Policy No. AB0240BE), dated March 17, 1999 in respect to Mortgage Loans originated by Novus Financial Corporation, in each case issued by Ambac for the benefit of certain beneficiaries, including the Trustee for the benefit of the Holders of the Certificates, but only to the extent that such Surety Bond covers any Additional Collateral Loans, or such other Surety Bond as may be identified in the Series Supplement.

Tax Returns: The federal income tax return on Internal Revenue Service Form 1066, U.S. Real Estate Mortgage Investment Conduit Income Tax Return, including Schedule Q thereto, Quarterly Notice to Residual Interest Holders of REMIC Taxable Income or Net Loss Allocation, or any successor forms, to be filed on behalf of any REMIC formed under the Series Supplement and under the REMIC Provisions, together with any and all other information, reports or returns that may be required to be furnished to the Certificateholders or filed with the Internal Revenue Service or any other governmental taxing authority under any applicable provisions of federal, state or local tax laws.

Transaction Party: As defined in Section 12.02(a).

Transfer: Any direct or indirect transfer, sale, pledge, hypothecation or other form of assignment of any Ownership Interest in a Certificate.

Transferee: Any Person who is acquiring by Transfer any Ownership Interest in a Certificate.

Transferor: Any Person who is disposing by Transfer of any Ownership Interest in a Certificate.

Trust Fund: The segregated pool of assets related to a Series, with respect to which one or more REMIC elections are to be made pursuant to this Agreement, consisting of:

(i)    the Mortgage Loans and the related Mortgage Files and collateral securing such Mortgage Loans,

(ii)   all payments on and collections in respect of the Mortgage Loans due after the Cut-off Date as shall be on deposit in the Custodial Account or in the Certificate Account and identified as belonging to the Trust Fund, including the proceeds from the liquidation of Additional Collateral for any Additional Collateral Loan or Pledged Assets for any

Pledged Asset Loan, but not including amounts on deposit in the Initial
Monthly Payment Fund,

(iii) property that secured a Mortgage Loan and that has been acquired for
the benefit of the Certificateholders by foreclosure or deed in lieu of
foreclosure,

(iv) the hazard insurance policies and Primary Insurance Policies, if any,
the Pledged Assets with respect to each Pledged Asset Loan, and the
interest in the Surety Bond transferred to the Trustee pursuant to
Section 2.01, and

(v) all proceeds of clauses (i) through (iv) above.

Trustee Information:  As specified in Section 12.05(a)(i)(A).

Uninsured Cause:  Any cause of damage to property subject to a Mortgage
such that the complete restoration of such property is not fully reimbursable
by the hazard insurance policies.

United States Person or U.S. Person: (i) A citizen or resident of the
United States, (ii) a corporation, partnership or other entity treated as a
corporation or partnership for United States federal income tax purposes
organized in or under the laws of the United States or any state thereof or
the District of Columbia (unless, in the case of a partnership, Treasury
regulations provide otherwise), provided that, for purposes solely of the
restrictions on the transfer of residual interests, no partnership or other
entity treated as a partnership for United States federal income tax purposes
shall be treated as a United States Person or U.S. Person unless all persons
that own an interest in such partnership either directly or indirectly
through any chain of entities no one of which is a corporation for United
States federal income tax purposes are required by the applicable operating
agreement to be United States Persons,  (iii) an estate the income of which
is includible in gross income for United States tax purposes, regardless of
its source, or (iv) a trust if a court within the United States is able to
exercise primary supervision over the administration of the trust and one or
more United States persons have authority to control all substantial
decisions of the trust.  Notwithstanding the preceding sentence, to the
extent provided in Treasury regulations, certain Trusts in existence on
August 20, 1996, and treated as United States persons prior to such date,
that elect to continue to be treated as United States persons will also be a
U.S. Person.

U.S.A. Patriot Act:  Uniting and Strengthening America by Providing
Appropriate Tools to Intercept and Obstruct Terrorism Act of 2001, as amended.

Voting Rights:  The portion of the voting rights of all of the
Certificates which is allocated to any Certificate, and more specifically
designated in Article XI of the Series Supplement.

Section 1.02    Use of Words and Phrases.

"Herein," "hereby," "hereunder," `hereof," "hereinbefore,"
"hereinafter" and other equivalent words refer to the Pooling and Servicing
Agreement as a whole.  All references herein to Articles, Sections or
Subsections shall mean the corresponding Articles, Sections and Subsections
in the Pooling and Servicing Agreement.  The definitions set forth herein
include both the singular and the plural.

References in the Pooling and Servicing Agreement to "interest" on and
"principal" of the Mortgage Loans shall mean, with respect to the Sharia
Mortgage Loans, amounts in respect profit payments and acquisition payments,
respectively.

ARTICLE II

CONVEYANCE OF MORTGAGE LOANS;

ORIGINAL ISSUANCE OF CERTIFICATES

Section 2.01    Conveyance of Mortgage Loans.

(a)    The Company, concurrently with the execution and delivery hereof, does
hereby assign to the Trustee for the benefit of the Certificateholders
without recourse all the right, title and interest of the Company in and to
the Mortgage Loans, including all interest and principal received on or with
respect to the Mortgage Loans after the Cut-off Date (other than payments of
principal and interest due on the Mortgage Loans in the month of the Cut-off
Date).  In connection with such transfer and assignment, the Company does
hereby deliver to the Trustee the Certificate Policy (as defined in the
Series Supplement), if any for the benefit of the Holders of the Insured
Certificates (as defined in the Series Supplement).

(b)    In connection with such assignment, except as set forth in Section
2.01(c) and subject to Section 2.01(d) below, the Company does hereby (1)
with respect to each Mortgage Loan (other than a Cooperative Loan or a Sharia
Mortgage Loan), deliver to the Master Servicer (or an Affiliate of the Master
Servicer) each of the documents or instruments described in clause (I)(ii)
below (and the Master Servicer shall or cause such Affiliate to hold)
such documents or instruments in trust for the use and benefit of all present
and future Certificateholders), (2) with respect to each MOM Loan, deliver to
and deposit with the Trustee, or the Custodian on behalf of the Trustee, the

documents or instruments described in clauses (I)(i) and (v) below, (3) with
respect to each Mortgage Loan that is not a MOM Loan but is registered on the
MERS(R)System, deliver to and deposit with the Trustee, or to the Custodian on
behalf of the Trustee, the documents or instruments described in clauses
(I)(i), (iv) and (v) below, (4) with respect to each Mortgage Loan that is
not a MOM Loan and is not registered on the MERS(R)System, deliver to and
deposit with the Trustee, or to the Custodian on behalf of the Trustee, the
documents or instruments described in clauses (I)(i), (iii), (iv) and (v)
below, and (5) with respect to each Cooperative Loan and Sharia Mortgage
Loan, the documents and instruments described in clause (II) and clause (III)
below:

       (I) with respect to each Mortgage Loan so assigned (other than a
Cooperative Loan or a Sharia Mortgage Loan):

(i)          The original Mortgage Note, endorsed without recourse in
      blank or to the order of the Trustee, and showing an unbroken chain of
      endorsements from the originator thereof to the Person endorsing it to
      the Trustee, or with respect to any Destroyed Mortgage Note, an
      original lost note affidavit from the related Seller or Residential
      Funding stating that the original Mortgage Note was lost, misplaced or
      destroyed, together with a copy of the related Mortgage Note;

(ii)  The original Mortgage, noting the presence of the MIN of the Mortgage
      Loan and language indicating that the Mortgage Loan is a MOM Loan if
      the Mortgage Loan is a MOM Loan, with evidence of recording indicated
      thereon or a copy of the Mortgage with evidence of recording indicated
      thereon;

(iii) The original Assignment of the Mortgage to the Trustee with evidence of
      recording indicated thereon or a copy of such assignment with evidence
      of recording indicated thereon;

(iv)  The original recorded assignment or assignments of the Mortgage showing
      an unbroken chain of title from the originator thereof to the Person
      assigning it to the Trustee (or to MERS, if the Mortgage Loan is
      registered on the MERS(R)System and noting the presence of a MIN) with
      evidence of recordation noted thereon or attached thereto, or a copy of
      such assignment or assignments of the Mortgage with evidence of
      recording indicated thereon; and

(v)   The original of each modification, assumption agreement or preferred
      loan agreement, if any, relating to such Mortgage Loan or a copy of
      each modification, assumption agreement or preferred loan agreement.

       (II) with respect to each Cooperative Loan so assigned:

(i)   The original Mortgage Note, endorsed without recourse to the order of
      the Trustee and showing an unbroken chain of endorsements from the
      originator thereof to the Person endorsing it to the Trustee, or with
      respect to any Destroyed Mortgage Note, an original lost note affidavit
      from the related Seller or Residential Funding stating that the
      original Mortgage Note was lost, misplaced or destroyed, together with
      a copy of the related Mortgage Note;

(ii)  A counterpart of the Cooperative Lease and the Assignment of
      Proprietary Lease to the originator of the Cooperative Loan with
      intervening assignments showing an unbroken chain of title from such
      originator to the Trustee or a copy of such Cooperative Lease and
      Assignment of Proprietary Lease and copies of such intervening
      assignments;

(iii) The related Cooperative Stock Certificate, representing the related
      Cooperative Stock pledged with respect to such Cooperative Loan,
      together with an undated stock power (or other similar instrument)
      executed in blank or copies thereof;

(iv)  The original recognition agreement by the Cooperative of the interests
      of the mortgagee with respect to the related Cooperative Loan or a copy
      thereof;

(v)   The Security Agreement or a copy thereof;

(vi)  Copies of the original UCC-1 financing statement, and any continuation
      statements, filed by the originator of such Cooperative Loan as secured
      party, each with evidence of recording thereof, evidencing the interest
      of the originator under the Security Agreement and the Assignment of
      Proprietary Lease;

(vii) Copies of the filed UCC-3 assignments of the security interest
      referenced in clause (vi) above showing an unbroken chain of title from
      the originator to the Trustee, each with evidence of recording thereof,
      evidencing the interest of the originator under the Security Agreement
      and the Assignment of Proprietary Lease;

(viii)    An executed assignment of the interest of the originator in the
      Security Agreement, Assignment of Proprietary Lease and the recognition
      agreement referenced in clause (iv) above, showing an unbroken chain of
      title from the originator to the Trustee, or a copy thereof;

(ix)  The original of each modification, assumption agreement or preferred
      loan agreement, if any, relating to such Cooperative Loan or a copy of
      each modification, assumption agreement or preferred loan agreement; and

(x)   A duly completed UCC-1 financing statement showing the Master Servicer
      as debtor, the Company as secured party and the Trustee as assignee and
      a duly completed UCC-1 financing statement showing the Company as
      debtor and the Trustee as secured party, each in a form sufficient for
      filing, evidencing the interest of such debtors in the Cooperative
      Loans or copies thereof.

(III) with respect to each Sharia Mortgage Loan so assigned:

(i)    The original  Obligation to Pay, endorsed  without recourse in blank or to the order of the Trustee  and  showing an unbroken  chain of endorsements  from the originator  thereof to the Person endorsing it to the Trustee, or with respect to any Destroyed  Obligation to Pay, an original affidavit  from the related  Seller or  Residential  Funding stating  that the original  Obligation  to Pay was lost, misplaced or destroyed, together with a copy of the related Obligation to Pay;

(ii)    The original Sharia Mortgage Loan Security Instrument,  with evidence  of  recording  indicated  thereon  or a copy of  the Sharia Mortgage Loan Security  Instrument with evidence of recording  indicated thereon;

(iii) An  original  Assignment  and Amendment  of  Security Instrument,  assigned  to the  Trustee  with  evidence  of  recording indicated  thereon or a copy of such Assignment  and Amendment  of Security Instrument with evidence of recording indicated thereon;

(iv)    The original recorded  assignment  or  assignments  of the Sharia  Mortgage Loan Security  Instrument  showing an unbroken  chain of title from the  originator  thereof to the Person assigning  it to the Trustee with evidence of recordation  noted thereon or attached thereto, or a copy of such  assignment or assignments of the Sharia Mortgage Loan Security Instrument with evidence of recording indicated thereon;

(v)    The original  Sharia  Mortgage Loan Co-Ownership  Agreement with respect  to the  related  Sharia  Mortgage  Loan or a copy of such Sharia Mortgage Loan Co-Ownership Agreement; and

(vi)    The original of each  modification or assumption  agreement, if any, relating  to such  Sharia Mortgage Loan  or a copy of each modification or assumption agreement.

(c)    The Company may, in lieu of delivering the original of the documents set forth in Sections 2.01(b)(I)(iii), (iv) and (v), Sections 2.01 (b)(II)(ii), (iv), (vii), (ix) and (x) and Sections 2.01 (b)(III)(ii), (iii), (iv), (v) and vi) (or copies thereof) to the Trustee or to the Custodian on behalf of the Trustee, deliver such documents to the Master Servicer, and the Master Servicer shall hold such documents in trust for the use and benefit of all present and future Certificateholders until such time as is set forth in the next sentence.  Within thirty Business Days following the earlier of (i) the receipt of the original of all of the documents or instruments set forth in Sections 2.01(b)(I)(iii), (iv) and v), Sections 2.01 (b)(II)(ii), (iv), (vii), (ix) and (x) and Sections 2.01 (b)(III)(ii), (iii), (iv), (v) and vi) (or copies thereof) for any Mortgage Loan and (ii) a written request by the Trustee to deliver those documents with respect to any or all of the Mortgage Loans then being held by the Master Servicer, the Master Servicer shall deliver a complete set of such documents to the Trustee or to the Custodian on behalf of the Trustee.

The parties hereto agree that it is not intended that any Mortgage Loan be included in the Trust Fund that is either (i) a "High-Cost Home Loan" as defined in the New Jersey Home Ownership Act effective November 27, 2003, (ii) a "High-Cost Home Loan" as defined in the New Mexico Home Loan Protection Act effective January 1, 2004, (iii) a "High Cost Home Mortgage Loan" as defined in the Massachusetts Predatory Home Loan Practices Act effective November 7, 2004 or (iv) a "High-Cost Home Loan" as defined in the Indiana House Enrolled Act No. 1229, effective as of January 1, 2005.

(d)    Notwithstanding the provisions of Section 2.01(c), in connection with any Mortgage Loan, if the Company cannot deliver the original of the Mortgage, any assignment, modification, assumption agreement or preferred loan agreement (or copy thereof as permitted by Section 2.01(b)) with evidence of recording thereon concurrently with the execution and delivery of this Agreement because of (i) a delay caused by the public recording office where such Mortgage, assignment, modification, assumption agreement or preferred loan agreement as the case may be, has been delivered for recordation, or (ii) a delay in the receipt of certain information necessary to prepare the related assignments, the Company shall cause to be delivered to the Trustee or to the Custodian on behalf of the Trustee a copy of such Mortgage, assignment, modification, assumption agreement or preferred loan agreement.

The Company shall promptly cause to be recorded in the appropriate public office for real property records the Assignment referred to in clause (I)(iii) of Section 2.01(b),  except (a) in states where, in the opinion of counsel acceptable to the Trustee and the Master Servicer, such recording is not required to protect the Trustee's interests in the Mortgage Loan against the claim of any subsequent transferee or any successor to or creditor of the Company or the originator of such Mortgage Loan or (b) if MERS is identified on the Mortgage or on a properly recorded assignment of the Mortgage as the mortgagee of record solely as nominee for the Seller and its successors and assigns, (ii) shall promptly cause to be filed the Form UCC-3 assignment and UCC-1 financing statement referred to in clauses (II)(vii) and (x), respectively, of Section 2.01(b) and (iii) shall promptly cause to be recorded in the appropriate public recording office for real property records the Assignment Agreement and Amendment of Security Instrument referred to in clause (III)(iii) of Section 2.01(b).  If any Assignment, Assignment Agreement and Amendment of Security Instrument, Form UCC-3 or Form UCC-1, as applicable, is lost or returned unrecorded to the Company because of any defect therein, the Company shall prepare a substitute Assignment, Assignment Agreement and Amendment of Security Instrument, Form UCC-3 or Form UCC-1, as applicable, or cure such defect, as the case may be, and cause such Assignment or Assignment Agreement and Amendment of Security Instrument to be recorded in accordance with this paragraph.  The Company shall promptly deliver or cause to be delivered to the applicable person described in Section 2.01(b), any Assignment, substitute Assignment, Assignment Agreement and Amendment of Security Instrument or Form UCC-3 or Form UCC-1, as

applicable, (or copy thereof) recorded in connection with this paragraph, with evidence of recording indicated thereon at the time specified in Section 2.01(c).  In connection with its servicing of Cooperative Loans, the Master Servicer will use its best efforts to file timely continuation statements with regard to each financing statement and assignment relating to Cooperative Loans as to which the related Cooperative Apartment is located outside of the State of New York.

If the Company delivers to the Trustee or to the Custodian on behalf of the Trustee any Mortgage Note, Obligation to Pay, Assignment Agreement and Amendment of Security Instrument or Assignment of Mortgage in blank, the Company shall, or shall cause the Custodian to, complete the endorsement of the Mortgage Note, Obligation to Pay, Assignment Agreement and Amendment of Security Instrument and Assignment of Mortgage in the name of the Trustee in conjunction with the Interim Certification issued by the Custodian, as contemplated by Section 2.02.

In connection with the assignment of any Mortgage Loan registered on the MERS(R)System, the Company further agrees that it will cause, at the Company's own expense, within 30 Business Days after the Closing Date, the MERS(R)System to indicate that such Mortgage Loans have been assigned by the Company to the Trustee in accordance with this Agreement for the benefit of the Certificateholders by including (or deleting, in the case of  Mortgage Loans which are repurchased in accordance with this Agreement) in such computer files (a) the code in the field which identifies the specific Trustee and (b) the code in the field "Pool Field" which identifies the series of the Certificates issued in connection with such Mortgage Loans. The Company further agrees that it will not, and will not permit the Master Servicer to, and the Master Servicer agrees that it will not, alter the codes referenced in this paragraph with respect to any Mortgage Loan during the term of this Agreement unless and until such Mortgage Loan is repurchased in accordance with the terms of this Agreement.

(e)   Residential Funding hereby assigns to the Trustee its security interest in and to any Additional Collateral or Pledged Assets, its right to receive amounts due or to become due in respect of any Additional Collateral or Pledged Assets pursuant to the related Subservicing Agreement and its rights as beneficiary under the Surety Bond in respect of any Additional Collateral Loans.  With respect to any Additional Collateral Loan or Pledged Asset Loan, Residential Funding shall cause to be filed in the appropriate recording office a UCC-3 statement giving notice of the assignment of the related security interest to the Trust Fund and shall thereafter cause the timely filing of all necessary continuation statements with regard to such financing statements.

(f)   It is intended that the conveyance by the Company to the Trustee of the Mortgage Loans as provided for in this Section 2.01 be and the Uncertificated REMIC Regular Interests, if any (as provided for in Section 2.06), be construed as a sale by the Company to the Trustee of the Mortgage Loans and any Uncertificated REMIC Regular Interests for the benefit of the Certificateholders.  Further, it is not intended that such conveyance be deemed to be a pledge of the Mortgage Loans and any Uncertificated REMIC Regular Interests by the Company to the Trustee to secure a debt or other obligation of the Company.  Nonetheless, (a) this Agreement is intended to be and hereby is a security agreement within the meaning of Articles 8 and 9 of the New York Uniform Commercial Code and the Uniform Commercial Code of any other applicable jurisdiction; (b) the conveyance provided for in Section 2.01 shall be deemed to be, and hereby is, (1) a grant by the Company to the Trustee of a security interest in all of the Company's right (including the power to convey title thereto), title and interest, whether now owned or hereafter acquired, in and to any and all general intangibles, payment intangibles, accounts, chattel paper, instruments, documents, money, deposit accounts, certificates of deposit, goods, letters of credit, advices of credit and investment property and other property of whatever kind or description now existing or hereafter acquired consisting of, arising from or relating to any of the following: (A) the Mortgage Loans, including (i) with respect to each Cooperative Loan, the related Mortgage Note, Security Agreement, Assignment of Proprietary Lease, Cooperative Stock Certificate and Cooperative Lease, (ii) with respect to each Sharia Mortgage Loan, the related Sharia Mortgage Loan Security Instrument, Sharia Mortgage Loan Co-Ownership Agreement, Obligation to Pay and Assignment Agreement and Amendment of Security Instrument, (iii) with respect to each Mortgage Loan other than a Cooperative Loan or a Sharia Mortgage Loan, the related Mortgage Note and Mortgage, and (iv) any insurance policies and all other documents in the related Mortgage File, (B) all amounts payable pursuant to the Mortgage Loans in accordance with the terms thereof, (C) any Uncertificated REMIC Regular Interests and (D) all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, including without limitation all amounts from time to time held or invested in the Certificate Account or the Custodial Account, whether in the form of cash, instruments, securities or other property and (2) an assignment by the Company to the Trustee of any security interest in any and all of Residential Funding's right (including the power to convey title thereto), title and interest, whether now owned or hereafter acquired, in and to the property described in the foregoing clauses (1)(A), (B), (C) and (D) granted by Residential Funding to the Company pursuant to the Assignment Agreement; (c) the possession by the Trustee, any Custodian on behalf of the Trustee or any other agent of the Trustee of Mortgage Notes or such other items of property as constitute instruments, money, payment intangibles, negotiable documents, goods, deposit accounts, letters of credit, advices of credit, investment property, certificated securities or chattel paper shall be deemed to be "possession by the secured party," or possession by a purchaser or a person designated by such secured party, for purposes of perfecting the security interest pursuant to the Minnesota Uniform Commercial Code and the Uniform Commercial Code of any other applicable jurisdiction as in effect (including, without limitation, Sections 8-106, 9-313, 9-314 and 9-106 thereof); and (d) notifications to persons holding such property, and acknowledgments, receipts or confirmations from persons holding such property, shall be deemed notifications to, or acknowledgments, receipts or

confirmations from, securities intermediaries, bailees or agents of, or persons holding for (as applicable) the Trustee for the purpose of perfecting such security interest under applicable law.

The Company and, at the Company's direction, Residential Funding and the Trustee shall, to the extent consistent with this Agreement, take such reasonable actions as may be necessary to ensure that, if this Agreement were determined to create a security interest in the Mortgage Loans, any Uncertificated REMIC Regular Interests and the other property described above, such security interest would be determined to be a perfected security interest of first priority under applicable law and will be maintained as such throughout the term of this Agreement. Without limiting the generality of the foregoing, the Company shall prepare and deliver to the Trustee not less than 15 days prior to any filing date and, the Trustee shall forward for filing, or shall cause to be forwarded for filing, at the expense of the Company, all filings necessary to maintain the effectiveness of any original filings necessary under the Uniform Commercial Code as in effect in any jurisdiction to perfect the Trustee's security interest in or lien on the Mortgage Loans and any Uncertificated REMIC Regular Interests, as evidenced by an Officers' Certificate of the Company, including without limitation (x) continuation statements, and (y) such other statements as may be occasioned by (1) any change of name of Residential Funding, the Company or the Trustee (such preparation and filing shall be at the expense of the Trustee, if occasioned by a change in the Trustee's name), (2) any change of type or jurisdiction of organization of Residential Funding or the Company, (3) any transfer of any interest of Residential Funding or the Company in any Mortgage Loan or (4) any transfer of any interest of Residential Funding or the Company in any Uncertificated REMIC Regular Interest.

(g)    The Master Servicer hereby acknowledges the receipt by it of the Initial Monthly Payment Fund. The Master Servicer shall hold such Initial Monthly Payment Fund in the Custodial Account and shall include such Initial Monthly Payment Fund in the Available Distribution Amount for the initial Distribution Date. Notwithstanding anything herein to the contrary, the Initial Monthly Payment Fund shall not be an asset of any REMIC. To the extent that the Initial Monthly Payment Fund constitutes a reserve fund for federal income tax purposes, (1) it shall be an outside reserve fund and not an asset of any REMIC, (2) it shall be owned by the Seller and (3) amounts transferred by any REMIC to the Initial Monthly Payment Fund shall be treated as transferred to the Seller or any successor, all within the meaning of Section 1.860G-2(h) of the Treasury Regulations.

(h)    The Company agrees that the sale of each Pledged Asset Loan pursuant to this Agreement will also constitute the assignment, sale, setting-over, transfer and conveyance to the Trustee, without recourse (but subject to the Company's covenants, representations and warranties specifically provided herein), of all of the Company's obligations and all of the Company's right, title and interest in, to and under, whether now existing or hereafter acquired as owner of the Mortgage Loan with respect to any and all money, securities, security entitlements, accounts, general intangibles, payment intangibles, instruments, documents, deposit accounts, certificates of deposit, commodities contracts, and other investment property and other property of whatever kind or description consisting of, arising from or related to (i) the Assigned Contracts, (ii) all rights, powers and remedies of the Company as owner of such Mortgage Loan under or in connection with the Assigned Contracts, whether arising under the terms of such Assigned Contracts, by statute, at law or in equity, or otherwise arising out of any default by the Mortgagor under or in connection with the Assigned Contracts, including all rights to exercise any election or option or to make any decision or determination or to give or receive any notice, consent, approval or waiver thereunder, (iii) the Pledged Amounts and all money, securities, security entitlements, accounts, general intangibles, payment intangibles, instruments, documents, deposit accounts, certificates of deposit, commodities contracts, and other investment property and other property of whatever kind or description and all cash and non-cash proceeds of the sale, exchange, or redemption of, and all stock or conversion rights, rights to subscribe, liquidation dividends or preferences, stock dividends, rights to interest, dividends, earnings, income, rents, issues, profits, interest payments or other distributions of cash or other property that secures a Pledged Asset Loan, (iv) all documents, books and records concerning the foregoing (including all computer programs, tapes, disks and related items containing any such information) and (v) all insurance proceeds (including proceeds from the Federal Deposit Insurance Corporation or the Securities Investor Protection Corporation or any other insurance company) of any of the foregoing or replacements thereof or substitutions therefor, proceeds of proceeds and the conversion, voluntary or involuntary, of any thereof. The foregoing transfer, sale, assignment and conveyance does not constitute and is not intended to result in the creation, or an assumption by the Trustee, of any obligation of the Company, or any other person in connection with the Pledged Assets or under any agreement or instrument relating thereto, including any obligation to the Mortgagor, other than as owner of the Mortgage Loan.

Section 2.02.    Acceptance by Trustee.

The Trustee acknowledges receipt (or, with respect to Mortgage Loans subject to a Custodial Agreement, and based solely upon a receipt or certification executed by the Custodian, receipt by the respective Custodian as the duly appointed agent of the Trustee) of the documents referred to in Section 2.01(b)(i) above (except that for purposes of such acknowledgement only, a Mortgage Note may be endorsed in blank) and declares that it, or the Custodian as its agent, holds and will hold such documents and the other documents constituting a part of the Custodial Files delivered to it, or a Custodian as its agent, and the rights of Residential Funding with respect to any Pledged Assets, Additional Collateral and the Surety Bond assigned to the Trustee pursuant to Section 2.01, in trust for the use and benefit of all present and future Certificateholders. The Trustee or Custodian (the Custodian being so obligated under a Custodial Agreement) agrees, for the benefit of Certificateholders, to review each Custodial File delivered to it pursuant to Section 2.01(b) within 45 days after the Closing Date to

ascertain that all required documents (specifically as set forth in Section
2.01(b)), have been executed and received, and that such documents relate to
the Mortgage Loans identified on the Mortgage Loan Schedule, as supplemented,
that have been conveyed to it, and to deliver to the Trustee a certificate
(the "Interim Certification") to the effect that all documents required to be
delivered pursuant to Section 2.01(b) above have been executed and received
and that such documents relate to the Mortgage Loans identified on the
Mortgage Loan Schedule, except for any exceptions listed on Schedule A
attached to such Interim Certification.  Upon delivery of the Custodial Files
by the Company or the Master Servicer, the Trustee shall acknowledge receipt
(or, with respect to Mortgage Loans subject to a Custodial Agreement, and
based solely upon a receipt or certification executed by the Custodian,
receipt by the respective Custodian as the duly appointed agent of the
Trustee) of the documents referred to in Section 2.01(c) above.

     If the Custodian, as the Trustee's agent, finds any document or
documents constituting a part of a Custodial File to be missing or defective,
the Trustee shall promptly so notify the Master Servicer and the Company.
Pursuant to Section 2.3 of the Custodial Agreement, the Custodian will notify
the Master Servicer, the Company and the Trustee of any such omission or
defect found by it in respect of any Custodial File held by it in respect of
the items reviewed by it pursuant to the Custodial Agreement.  If such
omission or defect materially and adversely affects the interests of the
Certificateholders, the Master Servicer shall promptly notify Residential
Funding of such omission or defect and request Residential Funding to correct
or cure such omission or defect within 60 days from the date the Master
Servicer was notified of such omission or defect and, if Residential Funding
does not correct or cure such omission or defect within such period, require
Residential Funding to purchase such Mortgage Loan from the Trust Fund at its
Purchase Price, within 90 days from the date the Master Servicer was notified
of such omission or defect; provided that if the omission or defect would
cause the Mortgage Loan to be other than a "qualified mortgage" as defined in
Section 860G(a)(3) of the Code, such cure or repurchase must occur within
90 days from the date such breach was discovered.  The Purchase Price for any
such Mortgage Loan shall be deposited by the Master Servicer in the Custodial
Account maintained by it pursuant to Section 3.07 and, upon receipt by the
Trustee of written notification of such deposit signed by a Servicing
Officer, the Master Servicer, the Trustee or the Custodian, as the case may
be, shall release the contents of any related Mortgage File in its possession
to the owner of such Mortgage Loan (or such owners' designee) and the Trustee
shall execute and deliver such instruments of transfer or assignment prepared
by the Master Servicer, in each case without recourse, as shall be necessary
to vest in Residential Funding or its designee any Mortgage Loan released
pursuant hereto and thereafter such Mortgage Loan shall not be part of the
Trust Fund.  It is understood and agreed that the obligation of Residential
Funding to so cure or purchase any Mortgage Loan as to which a material and
adverse defect in or omission of a constituent document exists shall
constitute the sole remedy respecting such defect or omission available to
Certificateholders or the Trustee on behalf of the Certificateholders.

Section 2.03.     Representations, Warranties and Covenants
                  of the Master Servicer and the Company.

(a)   The Master Servicer hereby represents and warrants to the Trustee for
the benefit of the Certificateholders that as of the Closing Date:

(i)    The Master Servicer is a limited liability company duly organized,
       validly existing and in good standing under the laws governing its
       creation and existence and is or will be in compliance with the laws of
       each state in which any Mortgaged Property is located to the extent
       necessary to ensure the enforceability of each Mortgage Loan in
       accordance with the terms of this Agreement;

(ii)   The execution and delivery of this Agreement by the Master Servicer and
       its performance and compliance with the terms of this Agreement will
       not violate the Master Servicer's Certificate of Formation or Limited
       Liability Company Agreement or constitute a material default (or an
       event which, with notice or lapse of time, or both, would constitute a
       material default) under, or result in the material breach of, any
       material contract, agreement or other instrument to which the Master
       Servicer is a party or which may be applicable to the Master Servicer
       or any of its assets;

(iii)  This Agreement, assuming due authorization, execution and delivery by
       the Trustee and the Company, constitutes a valid, legal and binding
       obligation of the Master Servicer, enforceable against it in accordance
       with the terms hereof subject to applicable bankruptcy, insolvency,
       reorganization, moratorium and other laws affecting the enforcement of
       creditors' rights generally and to general principles of equity,
       regardless of whether such enforcement is considered in a proceeding in
       equity or at law;

(iv)   The Master Servicer is not in default with respect to any order or
       decree of any court or any order, regulation or demand of any federal,
       state, municipal or governmental agency, which default might have
       consequences that would materially and adversely affect the condition
       (financial or other) or operations of the Master Servicer or its
       properties or might have consequences that would materially adversely
       affect its performance hereunder;

(v)    No litigation is pending or, to the best of the Master Servicer's
       knowledge, threatened against the Master Servicer which would prohibit
       its entering into this Agreement or performing its obligations under
       this Agreement;

(vi)   The Master Servicer will comply in all material respects in the
       performance of this Agreement with all reasonable rules and
       requirements of each insurer under each Required Insurance Policy;

(vii)  No information, certificate of an officer, statement furnished in

writing or report delivered to the Company, any Affiliate of the
Company or the Trustee by the Master Servicer will, to the knowledge of
the Master Servicer, contain any untrue statement of a material fact or
omit a material fact necessary to make the information, certificate,
statement or report not misleading;

(viii)      The Master Servicer has examined each existing, and will examine
each new, Subservicing Agreement and is or will be familiar with the
terms thereof.  The terms of each existing Subservicing Agreement and
each designated Subservicer are acceptable to the Master Servicer and
any new Subservicing Agreements will comply with the provisions of
Section 3.02; and

(ix)    The Master Servicer is a member of MERS in good standing, and will
comply in all material respects with the rules and procedures of MERS
in connection with the servicing of the Mortgage Loans that are
registered with MERS.

It is understood and agreed that the representations and warranties set forth
in this Section 2.03(a) shall survive delivery of the respective Custodial
Files to the Trustee or the Custodian.

Upon discovery by either the Company, the Master Servicer, the Trustee
or the Custodian of a breach of any representation or warranty set forth in
this Section 2.03(a) which materially and adversely affects the interests of
the Certificateholders in any Mortgage Loan, the party discovering such
breach shall give prompt written notice to the other parties (the Custodian
being so obligated under a Custodial Agreement).  Within 90 days of its
discovery or its receipt of notice of such breach, the Master Servicer shall
either (i) cure such breach in all material respects or (ii) to the extent
that such breach is with respect to a Mortgage Loan or a related document,
purchase such Mortgage Loan from the Trust Fund at the Purchase Price and in
the manner set forth in Section 2.02; provided that if the omission or defect
would cause the Mortgage Loan to be other than a "qualified mortgage" as
defined in Section 860G(a)(3) of the Code, any such cure or repurchase must
occur within 90 days from the date such breach was discovered.  The
obligation of the Master Servicer to cure such breach or to so purchase such
Mortgage Loan shall constitute the sole remedy in respect of a breach of a
representation and warranty set forth in this Section 2.03(a) available to the
Certificateholders or the Trustee on behalf of the Certificateholders.

(b)    Representations and warranties relating to the Mortgage Loans are set
forth in Section 2.03(b) of the Series Supplement.

Section 2.04.      Representations and Warranties of Residential Funding.

The Company, as assignee of Residential Funding under the Assignment
Agreement, hereby assigns to the Trustee for the benefit of
Certificateholders all of its right, title and interest in respect of the
Assignment Agreement applicable to a Mortgage Loan.  Insofar as the
Assignment Agreement relates to the representations and warranties made by
Residential Funding in respect of such Mortgage Loan and any remedies
provided thereunder for any breach of such representations and warranties,
such right, title and interest may be enforced by the Master Servicer on
behalf of the Trustee and the Certificateholders.  Upon the discovery by the
Company, the Master Servicer, the Trustee or the Custodian of a breach of any
of the representations and warranties made in the Assignment Agreement
(which, for purposes hereof, will be deemed to include any other cause giving
rise to a repurchase obligation under the Assignment Agreement) in respect of
any Mortgage Loan which materially and adversely affects the interests of the
Certificateholders in such Mortgage Loan, the party discovering such breach
shall give prompt written notice to the other parties (the Custodian being so
obligated under a Custodial Agreement).  The Master Servicer shall promptly
notify Residential Funding of such breach and request that Residential
Funding either (i) cure such breach in all material respects within 90 days
from the date the Master Servicer was notified of such breach or (ii)
purchase such Mortgage Loan from the Trust Fund at the Purchase Price and in
the manner set forth in Section 2.02; provided that Residential Funding shall
have the option to substitute a Qualified Substitute Mortgage Loan or Loans
for such Mortgage Loan if such substitution occurs within two years following
the Closing Date; provided that if the breach would cause the Mortgage Loan
to be other than a "qualified mortgage" as defined in Section 860G(a)(3) of
the Code, any such cure, repurchase or substitution must occur within 90 days
from the date the breach was discovered.  If a breach of the Compliance With
Laws Representation has given rise to the obligation to repurchase or
substitute a Mortgage Loan pursuant to Section 4 of the Assignment Agreement,
then the Master Servicer shall request that Residential Funding pay to the
Trust Fund, concurrently with and in addition to the remedies provided in the
preceding sentence, an amount equal to any liability, penalty or expense that
was actually incurred and paid out of or on behalf of the Trust Fund, and
that directly resulted from such breach, or if incurred and paid by the Trust
Fund thereafter, concurrently with such payment. In the event that
Residential Funding elects to substitute a Qualified Substitute Mortgage Loan
or Loans for a Deleted Mortgage Loan pursuant to this Section 2.04,
Residential Funding shall deliver to the Trustee or the Custodian for the
benefit of the Certificateholders with respect to such Qualified Substitute
Mortgage Loan or Loans, the original Mortgage Note, the Mortgage, an
Assignment of the Mortgage in recordable form, if required pursuant to
Section 2.01, and such other documents and agreements as are required by
Section 2.01, with the Mortgage Note endorsed as required by Section 2.01.
No substitution will be made in any calendar month after the Determination
Date for such month.  Monthly Payments due with respect to Qualified
Substitute Mortgage Loans in the month of substitution shall not be part of
the Trust Fund and will be retained by the Master Servicer and remitted by
the Master Servicer to Residential Funding on the next succeeding
Distribution Date.  For the month of substitution, distributions to the
Certificateholders will include the Monthly Payment due on a Deleted Mortgage
Loan for such month and thereafter Residential Funding shall be entitled to
retain all amounts received in respect of such Deleted Mortgage Loan. The
Master Servicer shall amend or cause to be amended the Mortgage Loan

Schedule, and, if the Deleted Mortgage Loan was a Discount Mortgage Loan, the Schedule of Discount Fractions, for the benefit of the Certificateholders to reflect the removal of such Deleted Mortgage Loan and the substitution of the Qualified Substitute Mortgage Loan or Loans and the Master Servicer shall deliver the amended Mortgage Loan Schedule, and, if the Deleted Mortgage Loan was a Discount Mortgage Loan, the amended Schedule of Discount Fractions, to the Trustee. Upon such substitution, the Qualified Substitute Mortgage Loan or Loans shall be subject to the terms of this Agreement and the related Subservicing Agreement in all respects, Residential Funding shall be deemed to have made the representations and warranties with respect to the Qualified Substitute Mortgage Loan contained in the related Assignment Agreement, and the Company and the Master Servicer shall be deemed to have made with respect to any Qualified Substitute Mortgage Loan or Loans, as of the date of substitution, the covenants, representations and warranties set forth in this Section 2.04, in Section 2.03 hereof and in Section 4 of the Assignment Agreement, and the Master Servicer shall be obligated to repurchase or substitute for any Qualified Substitute Mortgage Loan as to which a Repurchase Event (as defined in the Assignment Agreement) has occurred pursuant to Section 4 of the Assignment Agreement.

In connection with the substitution of one or more Qualified Substitute Mortgage Loans for one or more Deleted Mortgage Loans, the Master Servicer will determine the amount (if any) by which the aggregate principal balance of all such Qualified Substitute Mortgage Loans as of the date of substitution is less than the aggregate Stated Principal Balance of all such Deleted Mortgage Loans (in each case after application of the principal portion of the Monthly Payments due in the month of substitution that are to be distributed to the Certificateholders in the month of substitution). Residential Funding shall deposit the amount of such shortfall into the Custodial Account on the day of substitution, without any reimbursement therefor. Residential Funding shall give notice in writing to the Trustee of such event, which notice shall be accompanied by an Officers' Certificate as to the calculation of such shortfall and (subject to Section 10.01(f)) by an Opinion of Counsel to the effect that such substitution will not cause (a) any federal tax to be imposed on the Trust Fund, including without limitation, any federal tax imposed on "prohibited transactions" under Section 860F(a)(1) of the Code or on "contributions after the startup date" under Section 860G(d)(1) of the Code or (b) any portion of any REMIC to fail to qualify as such at any time that any Certificate is outstanding.

It is understood and agreed that the obligation of Residential Funding to cure such breach or purchase, or to substitute for, a Mortgage Loan as to which such a breach has occurred and is continuing and to make any additional payments required under the Assignment Agreement in connection with a breach of the Compliance With Laws Representation shall constitute the sole remedy respecting such breach available to the Certificateholders or the Trustee on behalf of Certificateholders. If the Master Servicer is Residential Funding, then the Trustee shall also have the right to give the notification and require the purchase or substitution provided for in the second preceding paragraph in the event of such a breach of a representation or warranty made by Residential Funding in the Assignment Agreement. In connection with the purchase of or substitution for any such Mortgage Loan by Residential Funding, the Trustee shall assign to Residential Funding all of the Trustee's right, title and interest in respect of the Assignment Agreement applicable to such Mortgage Loan.

Section 2.05.        Execution and Authentication of Certificates/Issuance of Certificates Evidencing Interests in REMIC I Certificates.

As provided in Section 2.05 of the Series Supplement.

Section 2.06.        Conveyance of Uncertificated REMIC I and REMIC II Regular Interests; Acceptance by the Trustee.

As provided in Section 2.06 of the Series Supplement.

Section 2.07.        Issuance of Certificates Evidencing Interests in REMIC II.

As provided in Section 2.07 of the Series Supplement.

Section 2.08.        Purposes and Powers of the Trust.

The purpose of the trust, as created hereunder, is to engage in the following activities:

(a)     to sell the Certificates to the Company in exchange for the Mortgage Loans;

(b)     to enter into and perform its obligations under this Agreement;

(c)     to engage in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith; and

(d)     subject to compliance with this Agreement, to engage in such other activities as may be required in connection with conservation of the Trust Fund and the making of distributions to the Certificateholders.

The trust is hereby authorized to engage in the foregoing activities. Notwithstanding the provisions of Section 11.01, the trust shall not engage in any activity other than in connection with the foregoing or other than as required or authorized by the terms of this Agreement while any Certificate is outstanding, and this Section 2.08 may not be amended, without the consent of the Certificateholders evidencing a majority of the aggregate Voting Rights of the Certificates.

ARTICLE III

ADMINISTRATION AND SERVICING
OF MORTGAGE LOANS

Section 3.01.    Master Servicer to Act as Servicer.

(a)    The Master Servicer shall service and administer the Mortgage Loans in accordance with the terms of this Agreement and the respective Mortgage Loans and shall have full power and authority, acting alone or through Subservicers as provided in Section 3.02, to do any and all things which it may deem necessary or desirable in connection with such servicing and administration. Without limiting the generality of the foregoing, the Master Servicer in its own name or in the name of a Subservicer is hereby authorized and empowered by the Trustee when the Master Servicer or the Subservicer, as the case may be, believes it appropriate in its best judgment, to execute and deliver, on behalf of the Certificateholders and the Trustee or any of them, any and all instruments of satisfaction or cancellation, or of partial or full release or discharge, or of consent to assumption or modification in connection with a proposed conveyance, or of assignment of any Mortgage and Mortgage Note in connection with the repurchase of a Mortgage Loan and all other comparable instruments, or with respect to the modification or re-recording of a Mortgage for the purpose of correcting the Mortgage, the subordination of the lien of the Mortgage in favor of a public utility company or government agency or unit with powers of eminent domain, the taking of a deed in lieu of foreclosure, the commencement, prosecution or completion of judicial or non-judicial foreclosure, the conveyance of a Mortgaged Property to the related Insurer, the acquisition of any property acquired by foreclosure or deed in lieu of foreclosure, or the management, marketing and conveyance of any property acquired by foreclosure or deed in lieu of foreclosure with respect to the Mortgage Loans and with respect to the Mortgaged Properties. The Master Servicer further is authorized and empowered by the Trustee, on behalf of the Certificateholders and the Trustee, in its own name or in the name of the Subservicer, when the Master Servicer or the Subservicer, as the case may be, believes it appropriate in its best judgment to register any Mortgage Loan on the MERS(R)System, or cause the removal from the registration of any Mortgage Loan on the MERS(R)System, to execute and deliver, on behalf of the Trustee and the Certificateholders or any of them, any and all instruments of assignment and other comparable instruments with respect to such assignment or re-recording of a Mortgage in the name of MERS, solely as nominee for the Trustee and its successors and assigns.  Any expenses incurred in connection with the actions described in the preceding sentence shall be borne by the Master Servicer in accordance with Section 3.16(c), with no right of reimbursement; provided, that if, as a result of MERS discontinuing or becoming unable to continue operations in connection with the MERS System, it becomes necessary to remove any Mortgage Loan from registration on the MERS System and to arrange for the assignment of the related Mortgages to the Trustee, then any related expenses shall be reimbursable to the Master Servicer.  Notwithstanding the foregoing, subject to Section 3.07(a), the Master Servicer shall not permit any modification with respect to any Mortgage Loan that would both constitute a sale or exchange of such Mortgage Loan within the meaning of Section 1001 of the Code and any proposed, temporary or final regulations promulgated thereunder (other than in connection with a proposed conveyance or assumption of such Mortgage Loan that is treated as a Principal Prepayment in Full pursuant to Section 3.13(d) hereof) and cause any REMIC formed under the Series Supplement to fail to qualify as a REMIC under the Code. The Trustee shall furnish the Master Servicer with any powers of attorney and other documents necessary or appropriate to enable the Master Servicer to service and administer the Mortgage Loans.  The Trustee shall not be liable for any action taken by the Master Servicer or any Subservicer pursuant to such powers of attorney. In servicing and administering any Nonsubserviced Mortgage Loan, the Master Servicer shall, to the extent not inconsistent with this Agreement, comply with the Program Guide as if it were the originator of such Mortgage Loan and had retained the servicing rights and obligations in respect thereof.  In connection with servicing and administering the Mortgage Loans, the Master Servicer and any Affiliate of the Master Servicer (i) may perform services such as appraisals and brokerage services that are not customarily provided by servicers of mortgage loans, and shall be entitled to reasonable compensation therefor in accordance with Section 3.10 and (ii) may, at its own discretion and on behalf of the Trustee, obtain credit information in the form of a "credit score" from a credit repository.

(b)    All costs incurred by the Master Servicer or by Subservicers in effecting the timely payment of taxes and assessments on the properties subject to the Mortgage Loans shall not, for the purpose of calculating monthly distributions to the Certificateholders, be added to the amount owing under the related Mortgage Loans, notwithstanding that the terms of such Mortgage Loan so permit, and such costs shall be recoverable to the extent permitted by Section 3.10(a)(ii).

(c)    The Master Servicer may enter into one or more agreements in connection with the offering of pass-through certificates evidencing interests in one or more of the Certificates providing for the payment by the Master Servicer of amounts received by the Master Servicer as servicing compensation hereunder and required to cover certain Prepayment Interest Shortfalls on the Mortgage Loans, which payment obligation will thereafter be an obligation of the Master Servicer hereunder.

Section 3.02.    Subservicing Agreements Between Master Servicer and
                 Subservicers; Enforcement of Subservicers' and Sellers'
                 Obligations.

(a)    The Master Servicer may continue in effect Subservicing Agreements entered into by Residential Funding and Subservicers prior to the execution and delivery of this Agreement, and may enter into new Subservicing Agreements with Subservicers, for the servicing and administration of all or

some of the Mortgage Loans. Each Subservicer of a Mortgage Loan shall be
entitled to receive and retain, as provided in the related Subservicing
Agreement and in Section 3.07, the related Subservicing Fee from payments of
interest received on such Mortgage Loan after payment of all amounts required
to be remitted to the Master Servicer in respect of such Mortgage Loan.  For
any Mortgage Loan that is a Nonsubserviced Mortgage Loan, the Master Servicer
shall be entitled to receive and retain an amount equal to the Subservicing
Fee from payments of interest.  Unless the context otherwise requires,
references in this Agreement to actions taken or to be taken by the Master
Servicer in servicing the Mortgage Loans include actions taken or to be taken
by a Subservicer on behalf of the Master Servicer.  Each Subservicing
Agreement will be upon such terms and conditions as are generally required or
permitted by the Program Guide and are not inconsistent with this Agreement
and as the Master Servicer and the Subservicer have agreed.  A representative
form of Subservicing Agreement is attached hereto as Exhibit E.  With the
approval of the Master Servicer, a Subservicer may delegate its servicing
obligations to third-party servicers, but such Subservicer will remain
obligated under the related Subservicing Agreement.  The Master Servicer and
a Subservicer may enter into amendments thereto or a different form of
Subservicing Agreement, and the form referred to or included in the Program
Guide is merely provided for information and shall not be deemed to limit in
any respect the discretion of the Master Servicer to modify or enter into
different Subservicing Agreements; provided, however, that any such
amendments or different forms shall be consistent with and not violate the
provisions of either this Agreement or the Program Guide in a manner which
would materially and adversely affect the interests of the
Certificateholders.  The Program Guide and any other Subservicing Agreement
entered into between the Master Servicer and any Subservicer shall require
the Subservicer to accurately and fully report its borrower credit files to
each of the Credit Repositories in a timely manner.

(b)     As part of its servicing activities hereunder, the Master Servicer, for
the benefit of the Trustee and the Certificateholders, shall use its best
reasonable efforts to enforce the obligations of each Subservicer under the
related Subservicing Agreement and of each Seller under the related Seller's
Agreement insofar as the Company's rights with respect to Seller's obligation
has been assigned to the Trustee hereunder, to the extent that the
non-performance of any such Seller's obligation would have a material and
adverse effect on a Mortgage Loan, including, without limitation, the
obligation to purchase a Mortgage Loan on account of defective documentation,
as described in Section 2.02, or on account of a breach of a representation
or warranty, as described in Section 2.04.  Such enforcement, including,
without limitation, the legal prosecution of claims, termination of
Subservicing Agreements or Seller's Agreements, as appropriate, and the
pursuit of other appropriate remedies, shall be in such form and carried out
to such an extent and at such time as the Master Servicer would employ in its
good faith business judgment and which are normal and usual in its general
mortgage servicing activities.  The Master Servicer shall pay the costs of
such enforcement at its own expense, and shall be reimbursed therefor only
(i) from a general recovery resulting from such enforcement to the extent, if
any, that such recovery exceeds all amounts due in respect of the related
Mortgage Loan or (ii) from a specific recovery of costs, expenses or
attorneys fees against the party against whom such enforcement is directed.
For purposes of clarification only, the parties agree that the foregoing is
not intended to, and does not, limit the ability of the Master Servicer to be
reimbursed for expenses that are incurred in connection with the enforcement
of a Seller's obligations (insofar as the Company's rights with respect to
such Seller's obligations have been assigned to the Trustee hereunder) and
are reimbursable pursuant to Section 3.10(a)(viii).

Section 3.03.     Successor Subservicers.

       The Master Servicer shall be entitled to terminate any Subservicing
Agreement that may exist in accordance with the terms and conditions of such
Subservicing Agreement and without any limitation by virtue of this
Agreement; provided, however, that in the event of termination of any
Subservicing Agreement by the Master Servicer or the Subservicer, the Master
Servicer shall either act as servicer of the related Mortgage Loan or enter
into a Subservicing Agreement with a successor Subservicer which will be
bound by the terms of the related Subservicing Agreement.  If the Master
Servicer or any Affiliate of Residential Funding acts as servicer, it will
not assume liability for the representations and warranties of the
Subservicer which it replaces.  If the Master Servicer enters into a
Subservicing Agreement with a successor Subservicer, the Master Servicer
shall use reasonable efforts to have the successor Subservicer assume
liability for the representations and warranties made by the terminated
Subservicer in respect of the related Mortgage Loans and, in the event of any
such assumption by the successor Subservicer, the Master Servicer may, in the
exercise of its business judgment, release the terminated Subservicer from
liability for such representations and warranties.

Section 3.04.     Liability of the Master Servicer.

       Notwithstanding any Subservicing Agreement, any of the provisions of
this Agreement relating to agreements or arrangements between the Master
Servicer or a Subservicer or reference to actions taken through a Subservicer
or otherwise, the Master Servicer shall remain obligated and liable to the
Trustee and the Certificateholders for the servicing and administering of the
Mortgage Loans in accordance with the provisions of Section 3.01 without
diminution of such obligation or liability by virtue of such Subservicing
Agreements or arrangements or by virtue of indemnification from the
Subservicer or the Company and to the same extent and under the same terms
and conditions as if the Master Servicer alone were servicing and
administering the Mortgage Loans.  The Master Servicer shall be entitled to
enter into any agreement with a Subservicer or Seller for indemnification of
the Master Servicer and nothing contained in this Agreement shall be deemed
to limit or modify such indemnification.

Section 3.05.     No Contractual Relationship Between Subservicer and
                  Trustee or Certificateholders.

Any Subservicing Agreement that may be entered into and any other transactions or services relating to the Mortgage Loans involving a Subservicer in its capacity as such and not as an originator shall be deemed to be between the Subservicer and the Master Servicer alone and the Trustee and the Certificateholders shall not be deemed parties thereto and shall have no claims, rights, obligations, duties or liabilities with respect to the Subservicer in its capacity as such except as set forth in Section 3.06. The foregoing provision shall not in any way limit a Subservicer's obligation to cure an omission or defect or to repurchase a Mortgage Loan as referred to in Section 2.02 hereof.

Section 3.06.    Assumption or Termination of Subservicing Agreements by Trustee.

(a)    If the Master Servicer shall for any reason no longer be the master servicer (including by reason of an Event of Default), the Trustee, its designee or its successor shall thereupon assume all of the rights and obligations of the Master Servicer under each Subservicing Agreement that may have been entered into. The Trustee, its designee or the successor servicer for the Trustee shall be deemed to have assumed all of the Master Servicer's interest therein and to have replaced the Master Servicer as a party to the Subservicing Agreement to the same extent as if the Subservicing Agreement had been assigned to the assuming party except that the Master Servicer shall not thereby be relieved of any liability or obligations under the Subservicing Agreement.

(b)    The Master Servicer shall, upon request of the Trustee but at the expense of the Master Servicer, deliver to the assuming party all documents and records relating to each Subservicing Agreement and the Mortgage Loans then being serviced and an accounting of amounts collected and held by it and otherwise use its best efforts to effect the orderly and efficient transfer of each Subservicing Agreement to the assuming party.

Section 3.07.    Collection of Certain Mortgage Loan Payments; Deposits to Custodial Account.

(a)    The Master Servicer shall make reasonable efforts to collect all payments called for under the terms and provisions of the Mortgage Loans, and shall, to the extent such procedures shall be consistent with this Agreement and the terms and provisions of any related Primary Insurance Policy, follow such collection procedures as it would employ in its good faith business judgment and which are normal and usual in its general mortgage servicing activities. Consistent with the foregoing, the Master Servicer may in its discretion (i) waive any late payment charge or any prepayment charge or penalty interest in connection with the prepayment of a Mortgage Loan and (ii) extend the Due Date for payments due on a Mortgage Loan in accordance with the Program Guide; provided, however, that the Master Servicer shall first determine that any such waiver or extension will not impair the coverage of any related Primary Insurance Policy or materially adversely affect the lien of the related Mortgage. Notwithstanding anything in this Section to the contrary, the Master Servicer shall not enforce any prepayment charge to the extent that such enforcement would violate any applicable law. In the event of any such arrangement, the Master Servicer shall make timely advances on the related Mortgage Loan during the scheduled period in accordance with the amortization schedule of such Mortgage Loan without modification thereof by reason of such arrangements unless otherwise agreed to by the Holders of the Classes of Certificates affected thereby; provided, however, that no such extension shall be made if any such advance would be a Nonrecoverable Advance. Consistent with the terms of this Agreement, the Master Servicer may also waive, modify or vary any term of any Mortgage Loan or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to any Mortgagor if in the Master Servicer's determination such waiver, modification, postponement or indulgence is not materially adverse to the interests of the Certificateholders (taking into account any estimated Realized Loss that might result absent such action); provided, however, that the Master Servicer may not modify materially or permit any Subservicer to modify any Mortgage Loan, including without limitation any modification that would change the Mortgage Rate, forgive the payment of any principal or interest (unless in connection with the liquidation of the related Mortgage Loan or except in connection with prepayments to the extent that such reamortization is not inconsistent with the terms of the Mortgage Loan), capitalize any amounts owing on the Mortgage Loan by adding such amount to the outstanding principal balance of the Mortgage Loan, or extend the final maturity date of such Mortgage Loan, unless such Mortgage Loan is in default or, in the judgment of the Master Servicer, such default is reasonably foreseeable; provided, further, that (1) no such modification shall reduce the interest rate on a Mortgage Loan below one-half of the Mortgage Rate as in effect on the Cut-off Date, but not less than the sum of the rates at which the Servicing Fee and the Subservicing Fee with respect to such Mortgage Loan accrues plus the rate at which the premium paid to the Certificate Insurer, if any, accrues, (2) the final maturity date for any Mortgage Loan shall not be extended beyond the Maturity Date, (3) the Stated Principal Balance of all Reportable Modified Mortgage Loans subject to Servicing Modifications (measured at the time of the Servicing Modification and after giving effect to any Servicing Modification) can be no more than five percent of the aggregate principal balance of the Mortgage Loans as of the Cut-off Date, unless such limit is increased from time to time with the consent of the Rating Agencies and the Certificate Insurer, if any. In addition, any amounts owing on a Mortgage Loan added to the outstanding principal balance of such Mortgage Loan must be fully amortized over the remaining term of such Mortgage Loan, and such amounts may be added to the outstanding principal balance of a Mortgage Loan only once during the life of such Mortgage Loan. Also, the addition of such amounts described in the preceding sentence shall be implemented in accordance with the Program Guide and may be implemented only by Subservicers that have been approved by the Master Servicer for such purpose. In connection with any Curtailment of a Mortgage Loan, the Master Servicer, to the extent not inconsistent with the terms of the Mortgage Note and local law and practice, may permit the Mortgage Loan to be reamortized such that the

Monthly Payment is recalculated as an amount that will fully amortize the remaining Stated Principal Balance thereof by the original Maturity Date based on the original Mortgage Rate; provided, that such re-amortization shall not be permitted if it would constitute a reissuance of the Mortgage Loan for federal income tax purposes, except if such reissuance is described in Treasury Regulation Section 1.860G-2(b)(3).

(b)    The Master Servicer shall establish and maintain a Custodial Account in which the Master Servicer shall deposit or cause to be deposited on a daily basis, except as otherwise specifically provided herein, the following payments and collections remitted by Subservicers or received by it in respect of the Mortgage Loans subsequent to the Cut-off Date (other than in respect of principal and interest on the Mortgage Loans due on or before the Cut-off Date):

(i)    All payments on account of principal, including Principal Prepayments made by Mortgagors on the Mortgage Loans and the principal component of any Subservicer Advance or of any REO Proceeds received in connection with an REO Property for which an REO Disposition has occurred;

(ii)    All payments on account of interest at the Adjusted Mortgage Rate on the Mortgage Loans, including Buydown Funds, if any, and the interest component of any Subservicer Advance or of any REO Proceeds received in connection with an REO Property for which an REO Disposition has occurred;

(iii)    Insurance Proceeds, Subsequent Recoveries and Liquidation Proceeds (net of any related expenses of the Subservicer);

(iv)    All proceeds of any Mortgage Loans purchased pursuant to Section 2.02, 2.03, 2.04 or 4.07 (including amounts received from Residential Funding pursuant to the last paragraph of Section 4 of the Assignment Agreement in respect of any liability, penalty or expense that resulted from a breach of the Compliance With Laws Representation and all amounts required to be deposited in connection with the substitution of a Qualified Substitute Mortgage Loan pursuant to Section 2.03 or 2.04;

(v)    Any amounts required to be deposited pursuant to Section 3.07(c) or 3.21;

(vi)    All amounts transferred from the Certificate Account to the Custodial Account in accordance with Section 4.02(a);

(vii)    Any amounts realized by the Subservicer and received by the Master Servicer in respect of any Additional Collateral; and

(viii)    Any amounts received by the Master Servicer in respect of Pledged Assets.

The foregoing requirements for deposit in the Custodial Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments on the Mortgage Loans which are not part of the Trust Fund (consisting of payments in respect of principal and interest on the Mortgage Loans due on or before the Cut-off Date) and, unless otherwise set forth in the series supplement, payments or collections in the nature of prepayment charges or late payment charges or assumption fees may but need not be deposited by the Master Servicer in the Custodial Account. In the event any amount not required to be deposited in the Custodial Account is so deposited, the Master Servicer may at any time withdraw such amount from the Custodial Account, any provision herein to the contrary notwithstanding.  The Custodial Account may contain funds that belong to one or more trust funds created for mortgage pass-through certificates of other series and may contain other funds respecting payments on mortgage loans belonging to the Master Servicer or serviced or master serviced by it on behalf of others.  Notwithstanding such commingling of funds, the Master Servicer shall keep records that accurately reflect the funds on deposit in the Custodial Account that have been identified by it as being attributable to the Mortgage Loans.

With respect to Insurance Proceeds, Liquidation Proceeds, REO Proceeds and the proceeds of the purchase of any Mortgage Loan pursuant to Sections 2.02, 2.03, 2.04 and 4.07 received in any calendar month, the Master Servicer may elect to treat such amounts as included in the Available Distribution Amount for the Distribution Date in the month of receipt, but is not obligated to do so.  If the Master Servicer so elects, such amounts will be deemed to have been received (and any related Realized Loss shall be deemed to have occurred) on the last day of the month prior to the receipt thereof.

(c)    The Master Servicer shall use its best efforts to cause the institution maintaining the Custodial Account to invest the funds in the Custodial Account attributable to the Mortgage Loans in Permitted Investments which shall mature not later than the Certificate Account Deposit Date next following the date of such investment (with the exception of the Amount Held for Future Distribution) and which shall not be sold or disposed of prior to their maturities.  All income and gain realized from any such investment shall be for the benefit of the Master Servicer as additional servicing compensation and shall be subject to its withdrawal or order from time to time.  The amount of any losses incurred in respect of any such investments attributable to the investment of amounts in respect of the Mortgage Loans shall be deposited in the Custodial Account by the Master Servicer out of its own funds immediately as realized without any right of reimbursement.

(d)    The Master Servicer shall give notice to the Trustee and the Company of any change in the location of the Custodial Account and the location of the Certificate Account prior to the use thereof.

Section 3.08.    Subservicing Accounts; Servicing Accounts.

(a)    In those cases where a Subservicer is servicing a Mortgage Loan pursuant to a Subservicing Agreement, the Master Servicer shall cause the

Subservicer, pursuant to the Subservicing Agreement, to establish and maintain one or more Subservicing Accounts which shall be an Eligible Account or, if such account is not an Eligible Account, shall generally satisfy the requirements of the Program Guide and be otherwise acceptable to the Master Servicer and each Rating Agency.  The Subservicer will be required thereby to deposit into the Subservicing Account on a daily basis all proceeds of Mortgage Loans received by the Subservicer, less its Subservicing Fees and unreimbursed advances and expenses, to the extent permitted by the Subservicing Agreement.  If the Subservicing Account is not an Eligible Account, the Master Servicer shall be deemed to have received such monies upon receipt thereof by the Subservicer.  The Subservicer shall not be required to deposit in the Subservicing Account payments or collections in the nature of prepayment charges or late charges or assumption fees.  On or before the date specified in the Program Guide, but in no event later than the Determination Date, the Master Servicer shall cause the Subservicer, pursuant to the Subservicing Agreement, to remit to the Master Servicer for deposit in the Custodial Account all funds held in the Subservicing Account with respect to each Mortgage Loan serviced by such Subservicer that are required to be remitted to the Master Servicer.  The Subservicer will also be required, pursuant to the Subservicing Agreement, to advance on such scheduled date of remittance amounts equal to any scheduled monthly installments of principal and interest less its Subservicing Fees on any Mortgage Loans for which payment was not received by the Subservicer.  This obligation to advance with respect to each Mortgage Loan will continue up to and including the first of the month following the date on which the related Mortgaged Property is sold at a foreclosure sale or is acquired by the Trust Fund by deed in lieu of foreclosure or otherwise.  All such advances received by the Master Servicer shall be deposited promptly by it in the Custodial Account.

(b)    The Subservicer may also be required, pursuant to the Subservicing Agreement, to remit to the Master Servicer for deposit in the Custodial Account interest at the Adjusted Mortgage Rate (or Modified Net Mortgage Rate plus the rate per annum at which the Servicing Fee accrues in the case of a Modified Mortgage Loan) on any Curtailment received by such Subservicer in respect of a Mortgage Loan from the related Mortgagor during any month that is to be applied by the Subservicer to reduce the unpaid principal balance of the related Mortgage Loan as of the first day of such month, from the date of application of such Curtailment to the first day of the following month.  Any amounts paid by a Subservicer pursuant to the preceding sentence shall be for the benefit of the Master Servicer as additional servicing compensation and shall be subject to its withdrawal or order from time to time pursuant to Sections 3.10(a)(iv) and (v).

(c)    In addition to the Custodial Account and the Certificate Account, the Master Servicer shall for any Nonsubserviced Mortgage Loan, and shall cause the Subservicers for Subserviced Mortgage Loans to, establish and maintain one or more Servicing Accounts and deposit and retain therein all collections from the Mortgagors (or advances from Subservicers) for the payment of taxes, assessments, hazard insurance premiums, Primary Insurance Policy premiums, if applicable, or comparable items for the account of the Mortgagors.  Each Servicing Account shall satisfy the requirements for a Subservicing Account and, to the extent permitted by the Program Guide or as is otherwise acceptable to the Master Servicer, may also function as a Subservicing Account.  Withdrawals of amounts related to the Mortgage Loans from the Servicing Accounts may be made only to effect timely payment of taxes, assessments, hazard insurance premiums, Primary Insurance Policy premiums, if applicable, or comparable items, to reimburse the Master Servicer or Subservicer out of related collections for any payments made pursuant to Sections 3.11 (with respect to the Primary Insurance Policy) and 3.12(a) (with respect to hazard insurance), to refund to any Mortgagors any sums as may be determined to be overages, to pay interest, if required, to Mortgagors on balances in the Servicing Account or to clear and terminate the Servicing Account at the termination of this Agreement in accordance with Section 9.01 or in accordance with the Program Guide.  As part of its servicing duties, the Master Servicer shall, and the Subservicers will, pursuant to the Subservicing Agreements, be required to pay to the Mortgagors interest on funds in this account to the extent required by law.

(d)    The Master Servicer shall advance the payments referred to in the preceding subsection that are not timely paid by the Mortgagors or advanced by the Subservicers on the date when the tax, premium or other cost for which such payment is intended is due, but the Master Servicer shall be required so to advance only to the extent that such advances, in the good faith judgment of the Master Servicer, will be recoverable by the Master Servicer out of Insurance Proceeds, Liquidation Proceeds or otherwise.

Section 3.09.        Access to Certain Documentation and
                     Information Regarding the Mortgage Loans.

    If compliance with this Section 3.09 shall make any Class of Certificates legal for investment by federally insured savings and loan associations, the Master Servicer shall provide, or cause the Subservicers to provide, to the Trustee, the Office of Thrift Supervision or the FDIC and the supervisory agents and examiners thereof access to the documentation regarding the Mortgage Loans required by applicable regulations of the Office of Thrift Supervision, such access being afforded without charge but only upon reasonable request and during normal business hours at the offices designated by the Master Servicer.  The Master Servicer shall permit such representatives to photocopy any such documentation and shall provide equipment for that purpose at a charge reasonably approximating the cost of such photocopying to the Master Servicer.

Section 3.10.        Permitted Withdrawals from the Custodial Account.

(a)    The Master Servicer may, from time to time as provided herein, make withdrawals from the Custodial Account of amounts on deposit therein pursuant to Section 3.07 that are attributable to the Mortgage Loans for the following purposes:

(i)    to make deposits into the Certificate Account in the amounts and in the manner provided for in Section 4.01;

(ii)    to reimburse itself or the related Subservicer for previously unreimbursed Advances, Servicing Advances or other expenses made pursuant to Sections 3.01, 3.07(a), 3.08, 3.11, 3.12(a), 3.14 and 4.04 or otherwise reimbursable pursuant to the terms of this Agreement, such withdrawal right being limited to amounts received on the related Mortgage Loans (including, for this purpose, REO Proceeds, Insurance Proceeds, Liquidation Proceeds and proceeds from the purchase of a Mortgage Loan pursuant to Section 2.02, 2.03, 2.04 or 4.07) which represent (A) Late Collections of Monthly Payments for which any such advance was made in the case of Subservicer Advances or Advances pursuant to Section 4.04 and (B) recoveries of amounts in respect of which such advances were made in the case of Servicing Advances;

(iii)    to pay to itself or the related Subservicer (if not previously retained by such Subservicer) out of each payment received by the Master Servicer on account of interest on a Mortgage Loan as contemplated by Sections 3.14 and 3.16, an amount equal to that remaining portion of any such payment as to interest (but not in excess of the Servicing Fee and the Subservicing Fee, if not previously retained) which, when deducted, will result in the remaining amount of such interest being interest at the Net Mortgage Rate (or Modified Net Mortgage Rate in the case of a Modified Mortgage Loan) on the amount specified in the amortization schedule of the related Mortgage Loan as the principal balance thereof at the beginning of the period respecting which such interest was paid after giving effect to any previous Curtailments;

(iv)    to pay to itself as additional servicing compensation any interest or investment income earned on funds and other property deposited in or credited to the Custodial Account that it is entitled to withdraw pursuant to Section 3.07(c);

(v)    to pay to itself as additional servicing compensation any Foreclosure Profits, any amounts remitted by Subservicers as interest in respect of Curtailments pursuant to Section 3.08(b), and any amounts paid by a Mortgagor in connection with a Principal Prepayment in Full in respect of interest for any period during the calendar month in which such Principal Prepayment in Full is to be distributed to the Certificateholders;

(vi)    to pay to itself, a Subservicer, a Seller, Residential Funding, the Company or any other appropriate Person, as the case may be, with respect to each Mortgage Loan or property acquired in respect thereof that has been purchased or otherwise transferred pursuant to Section 2.02, 2.03, 2.04, 4.07 or 9.01, all amounts received thereon and not required to be distributed to the Certificateholders as of the date on which the related Stated Principal Balance or Purchase Price is determined;

(vii)    to reimburse itself or the related Subservicer for any Nonrecoverable Advance or Advances in the manner and to the extent provided in subsection (c) below, and any Advance or Servicing Advance made in connection with a modified Mortgage Loan that is in default or, in the judgment of the Master Servicer, default is reasonably foreseeable pursuant to Section 3.07(a), to the extent the amount of the Advance or Servicing Advance was added to the Stated Principal Balance of the Mortgage Loan in a prior calendar month, or any Advance reimbursable to the Master Servicer pursuant to Section 4.02(a);

(viii)    to reimburse itself or the Company for expenses incurred by and reimbursable to it or the Company pursuant to Section 3.01(a), 3.11, 3.13, 3.14(c), 6.03, 10.01 or otherwise, or in connection with enforcing, in accordance with this Agreement, any repurchase, substitution or indemnification obligation of any Seller (other than an Affiliate of the Company) pursuant to the related Seller's Agreement;

(ix)    to reimburse itself for Servicing Advances expended by it (a) pursuant to Section 3.14 in good faith in connection with the restoration of property damaged by an Uninsured Cause, and (b) in connection with the liquidation of a Mortgage Loan or disposition of an REO Property to the extent not otherwise reimbursed pursuant to clause (ii) or (viii) above; and

(x)    to withdraw any amount deposited in the Custodial Account that was not required to be deposited therein pursuant to Section 3.07.

(b)    Since, in connection with withdrawals pursuant to clauses (ii), (iii), (v) and (vi), the Master Servicer's entitlement thereto is limited to collections or other recoveries on the related Mortgage Loan, the Master Servicer shall keep and maintain separate accounting, on a Mortgage Loan by Mortgage Loan basis, for the purpose of justifying any withdrawal from the Custodial Account pursuant to such clauses.

(c)    The Master Servicer shall be entitled to reimburse itself or the related Subservicer for any advance made in respect of a Mortgage Loan that the Master Servicer determines to be a Nonrecoverable Advance by withdrawal from the Custodial Account of amounts on deposit attributable to the Mortgage Loans on any Certificate Account Deposit Date succeeding the date of such determination.  Such right of reimbursement relating to a Nonrecoverable Advance relating to an Advance pursuant to Section 4.04 on any such Certificate Account Deposit Date shall be limited to an amount not exceeding the portion of such Advance previously paid to Certificateholders (and not theretofore reimbursed to the Master Servicer or the related Subservicer).

Section 3.11.        Maintenance of the Primary Insurance Policies; Collections Thereunder.

(a)    The Master Servicer shall not take, or permit any Subservicer to take, any action which would result in non-coverage under any applicable Primary Insurance Policy of any loss which, but for the actions of the Master Servicer or Subservicer, would have been covered thereunder.  To the extent coverage is available, the Master Servicer shall keep or cause to be kept in full force and effect each such Primary Insurance Policy until the principal balance of the related Mortgage Loan secured by a Mortgaged Property is reduced to 80% or less of the Appraised Value in the case of such a Mortgage Loan having a Loan-to-Value Ratio at origination in excess of 80%, provided that such Primary Insurance Policy was in place as of the Cut-off Date and the Company had knowledge of such Primary Insurance Policy.  The Master Servicer shall be entitled to cancel or permit the discontinuation of any Primary Insurance Policy as to any Mortgage Loan, if the Stated Principal Balance of the Mortgage Loan is reduced below an amount equal to 80% of the appraised value of the related Mortgaged Property as determined in any appraisal thereof after the Closing Date, or if the Loan-to-Value Ratio is reduced below 80% as a result of principal payments on the Mortgage Loan after the Closing Date.  In the event that the Company gains knowledge that as of the Closing Date, a Mortgage Loan had a Loan-to-Value Ratio at origination in excess of 80% and is not the subject of a Primary Insurance Policy (and was not included in any exception to the representation in Section 2.03(b)(iv)) and that such Mortgage Loan has a current Loan-to-Value Ratio in excess of 80% then the Master Servicer shall use its reasonable efforts to obtain and maintain a Primary Insurance Policy to the extent that such a policy is obtainable at a reasonable price.  The Master Servicer shall not cancel or refuse to renew any such Primary Insurance Policy applicable to a Nonsubserviced Mortgage Loan, or consent to any Subservicer canceling or refusing to renew any such Primary Insurance Policy applicable to a Mortgage Loan subserviced by it, that is in effect at the date of the initial issuance of the Certificates and is required to be kept in force hereunder unless the replacement Primary Insurance Policy for such canceled or non-renewed policy is maintained with an insurer whose claims-paying ability is acceptable to each Rating Agency for mortgage pass-through certificates having a rating equal to or better than the lower of the then-current rating or the rating assigned to the Certificates as of the Closing Date by such Rating Agency.

(b)    In connection with its activities as administrator and servicer of the Mortgage Loans, the Master Servicer agrees to present or to cause the related Subservicer to present, on behalf of the Master Servicer, the Subservicer, if any, the Trustee and Certificateholders, claims to the related Insurer under any Primary Insurance Policies, in a timely manner in accordance with such policies, and, in this regard, to take or cause to be taken such reasonable action as shall be necessary to permit recovery under any Primary Insurance Policies respecting defaulted Mortgage Loans.  Pursuant to Section 3.07, any Insurance Proceeds collected by or remitted to the Master Servicer under any Primary Insurance Policies shall be deposited in the Custodial Account, subject to withdrawal pursuant to Section 3.10.

Section 3.12.    Maintenance of Fire Insurance and
                 Omissions and Fidelity Coverage.

(a)    The Master Servicer shall cause to be maintained for each Mortgage Loan (other than a Cooperative Loan) fire insurance with extended coverage in an amount which is equal to the lesser of the principal balance owing on such Mortgage Loan or 100 percent of the insurable value of the improvements; provided, however, that such coverage may not be less than the minimum amount required to fully compensate for any loss or damage on a replacement cost basis.  To the extent it may do so without breaching the related Subservicing Agreement, the Master Servicer shall replace any Subservicer that does not cause such insurance, to the extent it is available, to be maintained.  The Master Servicer shall also cause to be maintained on property acquired upon foreclosure, or deed in lieu of foreclosure, of any Mortgage Loan (other than a Cooperative Loan), fire insurance with extended coverage in an amount which is at least equal to the amount necessary to avoid the application of any co-insurance clause contained in the related hazard insurance policy. Pursuant to Section 3.07, any amounts collected by the Master Servicer under any such policies (other than amounts to be applied to the restoration or repair of the related Mortgaged Property or property thus acquired or amounts released to the Mortgagor in accordance with the Master Servicer's normal servicing procedures) shall be deposited in the Custodial Account, subject to withdrawal pursuant to Section 3.10.  Any cost incurred by the Master Servicer in maintaining any such insurance shall not, for the purpose of calculating monthly distributions to the Certificateholders, be added to the amount owing under the Mortgage Loan, notwithstanding that the terms of the Mortgage Loan so permit.  Such costs shall be recoverable by the Master Servicer out of related late payments by the Mortgagor or out of Insurance Proceeds and Liquidation Proceeds to the extent permitted by Section 3.10. It is understood and agreed that no earthquake or other additional insurance is to be required of any Mortgagor or maintained on property acquired in respect of a Mortgage Loan other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance.  Whenever the improvements securing a Mortgage Loan (other than a Cooperative Loan) are located at the time of origination of such Mortgage Loan in a federally designated special flood hazard area, the Master Servicer shall cause flood insurance (to the extent available) to be maintained in respect thereof.  Such flood insurance shall be in an amount equal to the lesser of (i) the amount required to compensate for any loss or damage to the Mortgaged Property on a replacement cost basis and (ii) the maximum amount of such insurance available for the related Mortgaged Property under the national flood insurance program (assuming that the area in which such Mortgaged Property is located is participating in such program).

       If the Master Servicer shall obtain and maintain a blanket fire insurance policy with extended coverage insuring against hazard losses on all of the Mortgage Loans, it shall conclusively be deemed to have satisfied its obligations as set forth in the first sentence of this Section 3.12(a), it being understood and agreed that such policy may contain a deductible clause, in which case the Master Servicer shall, in the event that there shall not have been maintained on the related Mortgaged Property a policy complying with the first sentence of this Section 3.12(a) and there shall have been a

loss which would have been covered by such policy, deposit in the Certificate Account the amount not otherwise payable under the blanket policy because of such deductible clause. Any such deposit by the Master Servicer shall be made on the Certificate Account Deposit Date next preceding the Distribution Date which occurs in the month following the month in which payments under any such policy would have been deposited in the Custodial Account. In connection with its activities as administrator and servicer of the Mortgage Loans, the Master Servicer agrees to present, on behalf of itself, the Trustee and the Certificateholders, claims under any such blanket policy.

(b)   The Master Servicer shall obtain and maintain at its own expense and keep in full force and effect throughout the term of this Agreement a blanket fidelity bond and an errors and omissions insurance policy covering the Master Servicer's officers and employees and other persons acting on behalf of the Master Servicer in connection with its activities under this Agreement. The amount of coverage shall be at least equal to the coverage that would be required by Fannie Mae or Freddie Mac, whichever is greater, with respect to the Master Servicer if the Master Servicer were servicing and administering the Mortgage Loans for Fannie Mae or Freddie Mac. In the event that any such bond or policy ceases to be in effect, the Master Servicer shall obtain a comparable replacement bond or policy from an issuer or insurer, as the case may be, meeting the requirements, if any, of the Program Guide and acceptable to the Company. Coverage of the Master Servicer under a policy or bond obtained by an Affiliate of the Master Servicer and providing the coverage required by this Section 3.12(b) shall satisfy the requirements of this Section 3.12(b).

Section 3.13.        Enforcement of Due-on-Sale Clauses; Assumption and
                    Modification Agreements; Certain Assignments.

(a)   When any Mortgaged Property is conveyed by the Mortgagor, the Master Servicer or Subservicer, to the extent it has knowledge of such conveyance, shall enforce any due-on-sale clause contained in any Mortgage Note or Mortgage, to the extent permitted under applicable law and governmental regulations, but only to the extent that such enforcement will not adversely affect or jeopardize coverage under any Required Insurance Policy. Notwithstanding the foregoing:

(i)    the Master Servicer shall not be deemed to be in default under this
       Section 3.13(a) by reason of any transfer or assumption which the
       Master Servicer is restricted by law from preventing; and

(ii)   if the Master Servicer determines that it is reasonably likely that any
       Mortgagor will bring, or if any Mortgagor does bring, legal action to
       declare invalid or otherwise avoid enforcement of a due-on-sale clause
       contained in any Mortgage Note or Mortgage, the Master Servicer shall
       not be required to enforce the due-on-sale clause or to contest such
       action.

(b)   Subject to the Master Servicer's duty to enforce any due-on-sale clause to the extent set forth in Section 3.13(a), in any case in which a Mortgaged Property is to be conveyed to a Person by a Mortgagor, and such Person is to enter into an assumption or modification agreement or supplement to the Mortgage Note or Mortgage which requires the signature of the Trustee, or if an instrument of release signed by the Trustee is required releasing the Mortgagor from liability on the Mortgage Loan, the Master Servicer is authorized, subject to the requirements of the sentence next following, to execute and deliver, on behalf of the Trustee, the assumption agreement with the Person to whom the Mortgaged Property is to be conveyed and such modification agreement or supplement to the Mortgage Note or Mortgage or other instruments as are reasonable or necessary to carry out the terms of the Mortgage Note or Mortgage or otherwise to comply with any applicable laws regarding assumptions or the transfer of the Mortgaged Property to such Person; provided, however, none of such terms and requirements shall either (i) both (A) constitute a "significant modification" effecting an exchange or reissuance of such Mortgage Loan under the REMIC Provisions and (B) cause any portion of any REMIC formed under the Series Supplement to fail to qualify as a REMIC under the Code or (subject to Section 10.01(f)), result in the imposition of any tax on "prohibited transactions" or (ii) constitute "contributions" after the start-up date under the REMIC Provisions. The Master Servicer shall execute and deliver such documents only if it reasonably determines that (i) its execution and delivery thereof will not conflict with or violate any terms of this Agreement or cause the unpaid balance and interest on the Mortgage Loan to be uncollectible in whole or in part, (ii) any required consents of insurers under any Required Insurance Policies have been obtained and (iii) subsequent to the closing of the transaction involving the assumption or transfer (A) the Mortgage Loan will continue to be secured by a first mortgage lien pursuant to the terms of the Mortgage, (B) such transaction will not adversely affect the coverage under any Required Insurance Policies, (C) the Mortgage Loan will fully amortize over the remaining term thereof, (D) no material term of the Mortgage Loan (including the interest rate on the Mortgage Loan) will be altered nor will the term of the Mortgage Loan be changed and (E) if the seller/transferor of the Mortgaged Property is to be released from liability on the Mortgage Loan, such release will not (based on the Master Servicer's or Subservicer's good faith determination) adversely affect the collectability of the Mortgage Loan. Upon receipt of appropriate instructions from the Master Servicer in accordance with the foregoing, the Trustee shall execute any necessary instruments for such assumption or substitution of liability as directed in writing by the Master Servicer. Upon the closing of the transactions contemplated by such documents, the Master Servicer shall cause the originals or true and correct copies of the assumption agreement, the release (if any), or the modification or supplement to the Mortgage Note or Mortgage to be delivered to the Trustee or the Custodian and deposited with the Mortgage File for such Mortgage Loan. Any fee collected by the Master Servicer or such related Subservicer for entering into an assumption or substitution of liability agreement will be retained by the Master Servicer or such Subservicer as additional servicing compensation.

(c)   The Master Servicer or the related Subservicer, as the case may be,

shall be entitled to approve a request from a Mortgagor for a partial release
of the related Mortgaged Property, the granting of an easement thereon in
favor of another Person, any alteration or demolition of the related
Mortgaged Property (or, with respect to a Cooperative Loan, the related
Cooperative Apartment) without any right of reimbursement or other similar
matters if it has determined, exercising its good faith business judgment in
the same manner as it would if it were the owner of the related Mortgage
Loan, that the security for, and the timely and full collectability of, such
Mortgage Loan would not be adversely affected thereby and that any portion of
any REMIC formed under the Series Supplement would not fail to continue to
qualify as a REMIC under the Code as a result thereof and (subject to Section
10.01(f)) that no tax on "prohibited transactions" or "contributions" after
the startup day would be imposed on any such REMIC as a result thereof.  Any
fee collected by the Master Servicer or the related Subservicer for
processing such a request will be retained by the Master Servicer or such
Subservicer as additional servicing compensation.

(d)    Subject to any other applicable terms and conditions of this Agreement,
the Trustee and Master Servicer shall be entitled to approve an assignment in
lieu of satisfaction with respect to any Mortgage Loan, provided the obligee
with respect to such Mortgage Loan following such proposed assignment
provides the Trustee and Master Servicer with a "Lender Certification for
Assignment of Mortgage Loan" in the form attached hereto as Exhibit M, in
form and substance satisfactory to the Trustee and Master Servicer, providing
the following: (i) that the substance of the assignment is, and is intended
to be, a refinancing of such Mortgage; (ii) that the Mortgage Loan following
the proposed assignment will have a rate of interest at least 0.25 percent
below or above the rate of interest on such Mortgage Loan prior to such
proposed assignment; and (iii) that such assignment is at the request of the
borrower under the related Mortgage Loan.  Upon approval of an assignment in
lieu of satisfaction with respect to any Mortgage Loan, the Master Servicer
shall receive cash in an amount equal to the unpaid principal balance of and
accrued interest on such Mortgage Loan and the Master Servicer shall treat
such amount as a Principal Prepayment in Full with respect to such Mortgage
Loan for all purposes hereof.

Section 3.14.    Realization Upon Defaulted Mortgage Loans.

(a)    The Master Servicer shall foreclose upon or otherwise comparably
convert (which may include an REO Acquisition) the ownership of properties
securing such of the Mortgage Loans as come into and continue in default and
as to which no satisfactory arrangements can be made for collection of
delinquent payments pursuant to Section 3.07.  Alternatively, the Master
Servicer may take other actions in respect of a defaulted Mortgage Loan,
which may include (i) accepting a short sale (a payoff of the Mortgage Loan
for an amount less than the total amount contractually owed in order to
facilitate a sale of the Mortgaged Property by the Mortgagor) or permitting a
short refinancing (a payoff of the Mortgage Loan for an amount less than the
total amount contractually owed in order to facilitate refinancing
transactions by the Mortgagor not involving a sale of the Mortgaged
Property), (ii) arranging for a repayment plan or (iii) agreeing to a
modification in accordance with Section 3.07.  In connection with such
foreclosure or other conversion, the Master Servicer shall, consistent with
Section 3.11, follow such practices and procedures as it shall deem necessary
or advisable, as shall be normal and usual in its general mortgage servicing
activities and as shall be required or permitted by the Program Guide;
provided that the Master Servicer shall not be liable in any respect
hereunder if the Master Servicer is acting in connection with any such
foreclosure or other conversion in a manner that is consistent with the
provisions of this Agreement.  The Master Servicer, however, shall not be
required to expend its own funds or incur other reimbursable charges in
connection with any foreclosure, or attempted foreclosure which is not
completed, or towards the restoration of any property unless it shall
determine (i) that such restoration and/or foreclosure will increase the
proceeds of liquidation of the Mortgage Loan to Holders of Certificates of
one or more Classes after reimbursement to itself for such expenses or
charges and (ii) that such expenses or charges will be recoverable to it
through Liquidation Proceeds, Insurance Proceeds, or REO Proceeds (respecting
which it shall have priority for purposes of withdrawals from the Custodial
Account pursuant to Section 3.10, whether or not such expenses and charges
are actually recoverable from related Liquidation Proceeds, Insurance
Proceeds or REO Proceeds).  In the event of such a determination by the
Master Servicer pursuant to this Section 3.14(a), the Master Servicer shall
be entitled to reimbursement of such amounts pursuant to Section 3.10.

        In addition to the foregoing, the Master Servicer shall use its
best reasonable efforts to realize upon any Additional Collateral for such of
the Additional Collateral Loans as come into and continue in default and as
to which no satisfactory arrangements can be made for collection of
delinquent payments pursuant to Section 3.07; provided that the Master
Servicer shall not, on behalf of the Trustee, obtain title to any such
Additional Collateral as a result of or in lieu of the disposition thereof or
otherwise; and provided further that (i) the Master Servicer shall not
proceed with respect to such Additional Collateral in any manner that would
impair the ability to recover against the related Mortgaged Property, and
(ii) the Master Servicer shall proceed with any REO Acquisition in a manner
that preserves the ability to apply the proceeds of such Additional
Collateral against amounts owed under the defaulted Mortgage Loan.  Any
proceeds realized from such Additional Collateral (other than amounts to be
released to the Mortgagor or the related guarantor in accordance with
procedures that the Master Servicer would follow in servicing loans held for
its own account, subject to the terms and conditions of the related Mortgage
and Mortgage Note and to the terms and conditions of any security agreement,
guarantee agreement, mortgage or other agreement governing the disposition of
the proceeds of such Additional Collateral) shall be deposited in the
Custodial Account, subject to withdrawal pursuant to Section 3.10. Any other
payment received by the Master Servicer in respect of such Additional
Collateral shall be deposited in the Custodial Account subject to withdrawal
pursuant to Section 3.10.

For so long as the Master Servicer is the Master Servicer under the Credit Support Pledge Agreement, the Master Servicer shall perform its obligations under the Credit Support Pledge Agreement in accordance with such Agreement and in a manner that is in the best interests of the Certificateholders. Further, the Master Servicer shall use its best reasonable efforts to realize upon any Pledged Assets for such of the Pledged Asset Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments pursuant to Section 3.07; provided that the Master Servicer shall not, on behalf of the Trustee, obtain title to any such Pledged Assets as a result of or in lieu of the disposition thereof or otherwise; and provided further that (i) the Master Servicer shall not proceed with respect to such Pledged Assets in any manner that would impair the ability to recover against the related Mortgaged Property, and (ii) the Master Servicer shall proceed with any REO Acquisition in a manner that preserves the ability to apply the proceeds of such Pledged Assets against amounts owed under the defaulted Mortgage Loan. Any proceeds realized from such Pledged Assets (other than amounts to be released to the Mortgagor or the related guarantor in accordance with procedures that the Master Servicer would follow in servicing loans held for its own account, subject to the terms and conditions of the related Mortgage and Mortgage Note and to the terms and conditions of any security agreement, guarantee agreement, mortgage or other agreement governing the disposition of the proceeds of such Pledged Assets) shall be deposited in the Custodial Account, subject to withdrawal pursuant to Section 3.10. Any other payment received by the Master Servicer in respect of such Pledged Assets shall be deposited in the Custodial Account subject to withdrawal pursuant to Section 3.10.

Concurrently with the foregoing, the Master Servicer may pursue any remedies that may be available in connection with a breach of a representation and warranty with respect to any such Mortgage Loan in accordance with Sections 2.03 and 2.04. However, the Master Servicer is not required to continue to pursue both foreclosure (or similar remedies) with respect to the Mortgage Loans and remedies in connection with a breach of a representation and warranty if the Master Servicer determines in its reasonable discretion that one such remedy is more likely to result in a greater recovery as to the Mortgage Loan. Upon the occurrence of a Cash Liquidation or REO Disposition, following the deposit in the Custodial Account of all Insurance Proceeds, Liquidation Proceeds and other payments and recoveries referred to in the definition of "Cash Liquidation" or "REO Disposition," as applicable, upon receipt by the Trustee or Custodian of written notification of such deposit signed by a Servicing Officer, the Trustee or the Custodian, as the case may be, shall release to the Master Servicer the related Custodial File and the Trustee shall execute and deliver such instruments of transfer or assignment prepared by the Master Servicer, in each case without recourse, as shall be necessary to vest in the Master Servicer or its designee, as the case may be, the related Mortgage Loan, and thereafter such Mortgage Loan shall not be part of the Trust Fund. Notwithstanding the foregoing or any other provision of this Agreement, in the Master Servicer's sole discretion with respect to any defaulted Mortgage Loan or REO Property as to either of the following provisions, (i) a Cash Liquidation or REO Disposition may be deemed to have occurred if substantially all amounts expected by the Master Servicer to be received in connection with the related defaulted Mortgage Loan or REO Property have been received, and (ii) for purposes of determining the amount of any Liquidation Proceeds, Insurance Proceeds, REO Proceeds or any other unscheduled collections or the amount of any Realized Loss, the Master Servicer may take into account minimal amounts of additional receipts expected to be received or any estimated additional liquidation expenses expected to be incurred in connection with the related defaulted Mortgage Loan or REO Property.

(b)    If title to any Mortgaged Property is acquired by the Trust Fund as an REO Property by foreclosure or by deed in lieu of foreclosure, the deed or certificate of sale shall be issued to the Trustee or to its nominee on behalf of Certificateholders. Notwithstanding any such acquisition of title and cancellation of the related Mortgage Loan, such REO Property shall (except as otherwise expressly provided herein) be considered to be an Outstanding Mortgage Loan held in the Trust Fund until such time as the REO Property shall be sold. Consistent with the foregoing for purposes of all calculations hereunder so long as such REO Property shall be considered to be an Outstanding Mortgage Loan it shall be assumed that, notwithstanding that the indebtedness evidenced by the related Mortgage Note shall have been discharged, such Mortgage Note and the related amortization schedule in effect at the time of any such acquisition of title (after giving effect to any previous Curtailments and before any adjustment thereto by reason of any bankruptcy or similar proceeding or any moratorium or similar waiver or grace period) remain in effect.

(c)    If the Trust Fund acquires any REO Property as aforesaid or otherwise in connection with a default or imminent default on a Mortgage Loan, the Master Servicer on behalf of the Trust Fund shall dispose of such REO Property as soon as practicable, giving due consideration to the interests of the Certificateholders, but in all cases within four years after the taxable year of its acquisition by the Trust Fund for purposes of Section 860G(a)(8) of the Code (or such shorter period as may be necessary under applicable state (including any state in which such property is located) law to maintain the status of any portion of any REMIC formed under the Series Supplement as a REMIC under applicable state law and avoid taxes resulting from such property failing to be foreclosure property under applicable state law) or, at the expense of the Trust Fund, request, more than 60 days before the day on which such grace period would otherwise expire, an extension of such grace period unless the Master Servicer (subject to Section 10.01(f)) obtains for the Trustee an Opinion of Counsel, addressed to the Trustee and the Master Servicer, to the effect that the holding by the Trust Fund of such REO Property subsequent to such period will not result in the imposition of taxes on "prohibited transactions" as defined in Section 860F of the Code or cause any REMIC formed under the Series Supplement to fail to qualify as a REMIC (for federal (or any applicable State or local) income tax purposes) at any time that any Certificates are outstanding, in which case the Trust Fund may continue to hold such REO Property (subject to any conditions contained

in such Opinion of Counsel). The Master Servicer shall be entitled to be reimbursed from the Custodial Account for any costs incurred in obtaining such Opinion of Counsel, as provided in Section 3.10. Notwithstanding any other provision of this Agreement, no REO Property acquired by the Trust Fund shall be rented (or allowed to continue to be rented) or otherwise used by or on behalf of the Trust Fund in such a manner or pursuant to any terms that would (i) cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code or (ii) subject the Trust Fund to the imposition of any federal income taxes on the income earned from such REO Property, including any taxes imposed by reason of Section 860G(c) of the Code, unless the Master Servicer has agreed to indemnify and hold harmless the Trust Fund with respect to the imposition of any such taxes.

(d)    The proceeds of any Cash Liquidation, REO Disposition or purchase or repurchase of any Mortgage Loan pursuant to the terms of this Agreement, as well as any recovery resulting from a collection of Liquidation Proceeds, Insurance Proceeds or REO Proceeds, will be applied in the following order of priority: first, to reimburse the Master Servicer or the related Subservicer in accordance with Section 3.10(a)(ii); second, to the Certificateholders to the extent of accrued and unpaid interest on the Mortgage Loan, and any related REO Imputed Interest, at the Net Mortgage Rate (or the Modified Net Mortgage Rate in the case of a Modified Mortgage Loan) to the Due Date prior to the Distribution Date on which such amounts are to be distributed; third, to the Certificateholders as a recovery of principal on the Mortgage Loan (or REO Property); fourth, to all Servicing Fees and Subservicing Fees payable therefrom (and the Master Servicer and the Subservicer shall have no claims for any deficiencies with respect to such fees which result from the foregoing allocation); and fifth, to Foreclosure Profits.

(e)    In the event of a default on a Mortgage Loan one or more of whose obligors is not a United States Person, in connection with any foreclosure or acquisition of a deed in lieu of foreclosure (together, "foreclosure") in respect of such Mortgage Loan, the Master Servicer will cause compliance with the provisions of Treasury Regulation Section 1.1445-2(d)(3) (or any successor thereto) necessary to assure that no withholding tax obligation arises with respect to the proceeds of such foreclosure except to the extent, if any, that proceeds of such foreclosure are required to be remitted to the obligors on such Mortgage Loan.

Section 3.15.    Trustee to Cooperate; Release of Custodial Files.

(a)    Upon becoming aware of the payment in full of any Mortgage Loan, or upon the receipt by the Master Servicer of a notification that payment in full will be escrowed in a manner customary for such purposes, the Master Servicer will immediately notify the Trustee (if it holds the related Custodial File) or the Custodian by a certification of a Servicing Officer (which certification shall include a statement to the effect that all amounts received or to be received in connection with such payment which are required to be deposited in the Custodial Account pursuant to Section 3.07 have been or will be so deposited), substantially in one of the forms attached hereto as Exhibit F, or, in the case of the Custodian, an electronic request in a form acceptable to the Custodian, requesting delivery to it of the Custodial File. Within two Business Days of receipt of such certification and request, the Trustee shall release, or cause the Custodian to release, the related Custodial File to the Master Servicer. The Master Servicer is authorized to execute and deliver to the Mortgagor the request for reconveyance, deed of reconveyance or release or satisfaction of mortgage or such instrument releasing the lien of the Mortgage, together with the Mortgage Note with, as appropriate, written evidence of cancellation thereon and to cause the removal from the registration on the MERS(R)System of such Mortgage and to execute and deliver, on behalf of the Trustee and the Certificateholders or any of them, any and all instruments of satisfaction or cancellation or of partial or full release. No expenses incurred in connection with any instrument of satisfaction or deed of reconveyance shall be chargeable to the Custodial Account or the Certificate Account.

(b)    From time to time as is appropriate for the servicing or foreclosure of any Mortgage Loan, the Master Servicer shall deliver to the Custodian, with a copy to the Trustee, a certificate of a Servicing Officer substantially in one of the forms attached as Exhibit F hereto, or, in the case of the Custodian, an electronic request in a form acceptable to the Custodian, requesting that possession of all, or any document constituting part of, the Custodial File be released to the Master Servicer and certifying as to the reason for such release and that such release will not invalidate any insurance coverage provided in respect of the Mortgage Loan under any Required Insurance Policy. Upon receipt of the foregoing, the Trustee shall deliver, or cause the Custodian to deliver, the Custodial File or any document therein to the Master Servicer. The Master Servicer shall cause each Custodial File or any document therein so released to be returned to the Trustee, or the Custodian as agent for the Trustee when the need therefor by the Master Servicer no longer exists, unless (i) the Mortgage Loan has been liquidated and the Liquidation Proceeds relating to the Mortgage Loan have been deposited in the Custodial Account or (ii) the Custodial File or such document has been delivered directly or through a Subservicer to an attorney, or to a public trustee or other public official as required by law, for purposes of initiating or pursuing legal action or other proceedings for the foreclosure of the Mortgaged Property either judicially or non-judicially, and the Master Servicer has delivered directly or through a Subservicer to the Trustee a certificate of a Servicing Officer certifying as to the name and address of the Person to which such Custodial File or such document was delivered and the purpose or purposes of such delivery. In the event of the liquidation of a Mortgage Loan, the Trustee shall deliver the Request for Release with respect thereto to the Master Servicer upon deposit of the related Liquidation Proceeds in the Custodial Account.

(c)    The Trustee or the Master Servicer on the Trustee's behalf shall execute and deliver to the Master Servicer, if necessary, any court pleadings, requests for trustee's sale or other documents necessary to the foreclosure or trustee's sale in respect of a Mortgaged Property or to any

legal action brought to obtain judgment against any Mortgagor on the Mortgage
Note or Mortgage or to obtain a deficiency judgment, or to enforce any other
remedies or rights provided by the Mortgage Note or Mortgage or otherwise
available at law or in equity.  Together with such documents or pleadings (if
signed by the Trustee), the Master Servicer shall deliver to the Trustee a
certificate of a Servicing Officer requesting that such pleadings or
documents be executed by the Trustee and certifying as to the reason such
documents or pleadings are required and that the execution and delivery
thereof by the Trustee will not invalidate any insurance coverage under any
Required Insurance Policy or invalidate or otherwise affect the lien of the
Mortgage, except for the termination of such a lien upon completion of the
foreclosure or trustee's sale.

Section 3.16.    Servicing and Other Compensation; Compensating Interest.

(a)    The Master Servicer, as compensation for its activities hereunder,
shall be entitled to receive on each Distribution Date the amounts provided
for by clauses (iii), (iv), (v) and (vi) of Section 3.10(a), subject to
clause (e) below.  The amount of servicing compensation provided for in such
clauses shall be accounted for on a Mortgage Loan-by-Mortgage Loan basis.  In
the event that Liquidation Proceeds, Insurance Proceeds and REO Proceeds (net
of amounts reimbursable therefrom pursuant to Section 3.10(a)(ii)) in respect
of a Cash Liquidation or REO Disposition exceed the unpaid principal balance
of such Mortgage Loan plus unpaid interest accrued thereon (including REO
Imputed Interest) at a per annum rate equal to the related Net Mortgage Rate
(or the Modified Net Mortgage Rate in the case of a Modified Mortgage Loan),
the Master Servicer shall be entitled to retain therefrom and to pay to
itself and/or the related Subservicer, any Foreclosure Profits and any
Servicing Fee or Subservicing Fee considered to be accrued but unpaid.

(b)    Additional servicing compensation in the form of prepayment charges,
assumption fees, late payment charges, investment income on amounts in the
Custodial Account or the Certificate Account or otherwise shall be retained
by the Master Servicer or the Subservicer to the extent provided herein,
subject to clause (e) below.

(c)    The Master Servicer shall be required to pay, or cause to be paid, all
expenses incurred by it in connection with its servicing activities hereunder
(including payment of premiums for the Primary Insurance Policies, if any, to
the extent such premiums are not required to be paid by the related
Mortgagors, and the fees and expenses of the Trustee and any co-trustee (as
provided in Section 8.05) and the fees and expense of the Custodian) and
shall not be entitled to reimbursement therefor except as specifically
provided in Sections 3.10 and 3.14.

(d)    The Master Servicer's right to receive servicing compensation may not
be transferred in whole or in part except in connection with the transfer of
all of its responsibilities and obligations of the Master Servicer under this
Agreement.

(e)    Notwithstanding any other provision herein, the amount of servicing
compensation that the Master Servicer shall be entitled to receive for its
activities hereunder for the period ending on each Distribution Date shall be
reduced (but not below zero) by an amount equal to Compensating Interest (if
any) for such Distribution Date.  Such reduction shall be applied during such
period as follows: first, to any Servicing Fee or Subservicing Fee to which
the Master Servicer is entitled pursuant to Section 3.10(a)(iii), and second,
to any income or gain realized from any investment of funds held in the
Custodial Account or the Certificate Account to which the Master Servicer is
entitled pursuant to Sections 3.07(c) or 4.01(b), respectively.  In making
such reduction, the Master Servicer (i) will not withdraw from the Custodial
Account any such amount representing all or a portion of the Servicing Fee to
which it is entitled pursuant to Section 3.10(a)(iii), and (ii) will not
withdraw from the Custodial Account or Certificate Account any such amount to
which it is entitled pursuant to Section 3.07(c) or 4.01(b).

Section 3.17.    Reports to the Trustee and the Company.

    Not later than fifteen days after it receives a written request from
the Trustee or the Company, the Master Servicer shall forward to the Trustee
and the Company a statement, certified by a Servicing Officer, setting forth
the status of the Custodial Account as of the close of business on the
immediately preceding Distribution Date as it relates to the Mortgage Loans
and showing, for the period covered by such statement, the aggregate of
deposits in or withdrawals from the Custodial Account in respect of the
Mortgage Loans for each category of deposit specified in Section 3.07 and
each category of withdrawal specified in Section 3.10.

Section 3.18.    Annual Statement as to Compliance and Servicing Assessment.

    The Master Servicer will deliver to the Company and the Trustee on or
before the earlier of (a) March 31 of each year or (b) with respect to any
calendar year during which the Company's annual report on Form 10-K is
required to be filed in accordance with the Exchange Act and the rules and
regulations of the Commission, the date on which the annual report on Form
10-K is required to be filed in accordance with the Exchange Act and the
rules and regulations of the Commission, (i) a servicing assessment as
described in Section 4.03(f)(ii) and (ii) a servicer compliance statement,
signed by an authorized officer of the Master Servicer, as described in Items
1122(a), 1122(b) and 1123 of Regulation AB, to the effect that:

    (A)    A review of the Master Servicer's activities during the reporting
period and of its performance under this Agreement has been made under such
officer's supervision.

    (B)    To the best of such officer's knowledge, based on such review,
the Master Servicer has fulfilled all of its obligations under this Agreement
in all material respects throughout the reporting period or, if there has
been a failure to fulfill any such obligation in any material respect,
specifying each such failure known to such officer and the nature and status

thereof.

The Master Servicer shall use commercially reasonable efforts to obtain from all other parties participating in the servicing function any additional certifications required under Item 1122 and Item 1123 of Regulation AB to the extent required to be included in a Report on Form 10-K; provided, however, that a failure to obtain such certifications shall not be a breach of the Master Servicer's duties hereunder if any such party fails to deliver such a certification.

Section 3.19.    Annual Independent Public Accountants' Servicing Report.

On or before the earlier of (a) March 31 of each year or (b) with respect to any calendar year during which the Company's annual report on Form 10-K is required to be filed in accordance with the Exchange Act and the rules and regulations of the Commission, the date on which the annual report on Form 10-K is required to be filed in accordance with the Exchange Act and the rules and regulations of the Commission, the Master Servicer at its expense shall cause a firm of independent public accountants, which shall be members of the American Institute of Certified Public Accountants, to furnish to the Company and the Trustee the attestation required under Item 1122(b) of Regulation AB. In rendering such statement, such firm may rely, as to matters relating to the direct servicing of mortgage loans by Subservicers, upon comparable statements for examinations conducted by independent public accountants substantially in accordance with standards established by the American Institute of Certified Public Accountants (rendered within one year of such statement) with respect to such Subservicers.

Section 3.20.    Rights of the Company in Respect of the Master Servicer.

The Master Servicer shall afford the Company, upon reasonable notice, during normal business hours access to all records maintained by the Master Servicer in respect of its rights and obligations hereunder and access to officers of the Master Servicer responsible for such obligations.  Upon request, the Master Servicer shall furnish the Company with its most recent financial statements and such other information as the Master Servicer possesses regarding its business, affairs, property and condition, financial or otherwise.  The Master Servicer shall also cooperate with all reasonable requests for information including, but not limited to, notices, tapes and copies of files, regarding itself, the Mortgage Loans or the Certificates from any Person or Persons identified by the Company or Residential Funding. The Company may, but is not obligated to, enforce the obligations of the Master Servicer hereunder and may, but is not obligated to, perform, or cause a designee to perform, any defaulted obligation of the Master Servicer hereunder or exercise the rights of the Master Servicer hereunder; provided that the Master Servicer shall not be relieved of any of its obligations hereunder by virtue of such performance by the Company or its designee.  The Company shall not have any responsibility or liability for any action or failure to act by the Master Servicer and is not obligated to supervise the performance of the Master Servicer under this Agreement or otherwise.

Section 3.21.    Administration of Buydown Funds

(a)   With respect to any Buydown Mortgage Loan, the Subservicer has deposited Buydown Funds in an account that satisfies the requirements for a Subservicing Account  (the "Buydown Account").   The Master Servicer shall cause the Subservicing Agreement to require that upon receipt from the Mortgagor of the amount due on a Due Date for each Buydown Mortgage Loan, the Subservicer will withdraw from the Buydown Account the predetermined amount that, when added to the amount due on such date from the Mortgagor, equals the full Monthly Payment and transmit that amount in accordance with the terms of the Subservicing Agreement to the Master Servicer together with the related payment made by the Mortgagor or advanced by the Subservicer.

(b)   If the Mortgagor on a Buydown Mortgage Loan prepays such loan in its entirety during the period (the "Buydown Period") when Buydown Funds are required to be applied to such Buydown Mortgage Loan, the Subservicer shall be required to withdraw from the Buydown Account and remit any Buydown Funds remaining in the Buydown Account in accordance with the related buydown agreement.  The amount of Buydown Funds which may be remitted in accordance with the related buydown agreement may reduce the amount required to be paid by the Mortgagor to fully prepay the related Mortgage Loan.  If the Mortgagor on a Buydown Mortgage Loan defaults on such Mortgage Loan during the Buydown Period and the property securing such Buydown Mortgage Loan is sold in the liquidation thereof (either by the Master Servicer or the insurer under any related Primary Insurance Policy), the Subservicer shall be required to withdraw from the Buydown Account the Buydown Funds for such Buydown Mortgage Loan still held in the Buydown Account and remit the same to the Master Servicer in accordance with the terms of the Subservicing Agreement for deposit in the Custodial Account or, if instructed by the Master Servicer, pay to the insurer under any related Primary Insurance Policy if the Mortgaged Property is transferred to such insurer and such insurer pays all of the loss incurred in respect of such default.  Any amount so remitted pursuant to the preceding sentence will be deemed to reduce the amount owed on the Mortgage Loan.

Section 3.22.    Advance Facility

(a)   The Master Servicer is hereby authorized to enter into a financing or other facility (any such arrangement, an "Advance Facility") under which (1) the Master Servicer sells, assigns or pledges to another Person (an "Advancing Person") some or all of the Master Servicer's rights under this Agreement to be reimbursed for any Advances or Servicing Advances and/or (2) an Advancing Person agrees to fund some or all Advances and/or Servicing Advances required to be made by the Master Servicer pursuant to this Agreement.  No consent of the Depositor, the Trustee, the Certificateholders or any other party shall be required before the Master Servicer may enter into an Advance Facility. Notwithstanding the existence of any Advance Facility under which an Advancing Person agrees to fund Advances and/or Servicing Advances on the Master Servicer's behalf, the Master Servicer  shall remain obligated

pursuant to this Agreement to make Advances and Servicing Advances pursuant
to and as required by this Agreement.  If the Master Servicer enters into an
Advance Facility, and for so long as an Advancing Person remains entitled to
receive reimbursement for any Advances including Nonrecoverable Advances
("Advance Reimbursement Amounts") and/or Servicing Advances including
Nonrecoverable Advances ("Servicing Advance Reimbursement Amounts" and
together with Advance Reimbursement Amounts, "Reimbursement Amounts") (in
each case to the extent such type of Reimbursement Amount is included in the
Advance Facility), as applicable, pursuant to this Agreement, then the Master
Servicer shall identify such Reimbursement Amounts consistent with the
reimbursement rights set forth in Section 3.10(a)(ii) and (vii) and remit
such Reimbursement Amounts in accordance with this Section 3.22 or otherwise
in accordance with the documentation establishing the Advance Facility to
such Advancing Person or to a trustee, agent or custodian (an "Advance
Facility Trustee") designated by such Advancing Person in an Advance Facility
Notice described below in Section 3.22(b).  Notwithstanding the foregoing, if
so required pursuant to the terms of the Advance Facility, the Master
Servicer may direct, and if so directed in writing the Trustee is hereby
authorized to and shall pay to the Advance Facility Trustee the Reimbursement
Amounts identified pursuant to the preceding sentence.  An Advancing Person
whose obligations hereunder are limited to the funding of Advances and/or
Servicing Advances shall not be required to meet the qualifications of a
Master Servicer or a Subservicer pursuant to Section 3.02(a) or 6.02(c)
hereof and shall not be deemed to be a Subservicer under this Agreement.
Notwithstanding anything to the contrary herein, in no event shall Advance
Reimbursement Amounts or Servicing Advance Reimbursement Amounts be included
in the Available Distribution Amount or distributed to Certificateholders.

     (b)   If the Master Servicer enters into an Advance Facility and makes the
election set forth in Section 3.22(a), the Master Servicer and the related
Advancing Person shall deliver to the Certificate Insurer and the Trustee a
written notice and payment instruction (an "Advance Facility Notice"),
providing the Trustee with written payment instructions as to where to remit
Advance Reimbursement Amounts and/or Servicing Advance Reimbursement Amounts
(each to the extent such type of Reimbursement Amount is included within the
Advance Facility) on subsequent Distribution Dates.  The payment instruction
shall require the applicable Reimbursement Amounts to be distributed to the
Advancing Person or to an Advance Facility Trustee designated in the Advance
Facility Notice.  An Advance Facility may only be terminated by the
joint written direction of the Master Servicer and the related Advancing
Person (and any related Advance Facility Trustee).  The Master Servicer shall
provide the Certificate Insurer, if any, with notice  of any termination of
any Advance Facility pursuant to this Section 3.22(b).

     (c)   Reimbursement Amounts shall consist solely of amounts in respect of
Advances and/or Servicing Advances made with respect to the Mortgage Loans
for which the Master Servicer would be permitted to reimburse itself in
accordance with Section 3.10(a)(ii) and (vii) hereof, assuming the Master
Servicer or the Advancing Person had made the related Advance(s) and/or
Servicing Advance(s). Notwithstanding the foregoing, except with respect to
reimbursement of Nonrecoverable Advances as set forth in Section 3.10(c) of
this Agreement, no Person shall be entitled to reimbursement from funds held
in the Collection Account for future distribution to Certificateholders
pursuant to this Agreement. Neither the Company nor the Trustee shall have
any duty or liability with respect to the calculation of any Reimbursement
Amount, nor shall the Company or the Trustee have any responsibility to track
or monitor the administration of the Advance Facility or have any
responsibility to track, monitor or verify the payment of Reimbursement
Amounts to the related Advancing Person or Advance Facility Trustee. The
Master Servicer shall maintain and provide to any Successor Master Servicer a
detailed accounting on a loan-by-loan basis as to amounts advanced by, sold,
pledged or assigned to, and reimbursed to any Advancing Person. The Successor
Master Servicer shall be entitled to rely on any such information provided by
the Master Servicer and the Successor Master Servicer shall not be liable for
any errors in such information.

     (d)   Upon the direction of and at the expense of the Master Servicer, the
Trustee agrees to execute such acknowledgments, certificates and other
documents reasonably satisfactory to the Trustee provided by the Master
Servicer recognizing the interests of any Advancing Person or Advance
Facility Trustee in such Reimbursement Amounts as the Master Servicer may
cause to be made subject to Advance Facilities pursuant to this Section 3.22.

     (e)   Reimbursement Amounts collected with respect to each Mortgage Loan
shall be allocated to outstanding unreimbursed Advances or Servicing Advances
(as the case may be) made with respect to that Mortgage Loan on a "first-in,
first out" ("FIFO") basis, subject to the qualifications set forth below:

          (i)   Any successor Master Servicer to Residential Funding (a
     "Successor Master Servicer") and the Advancing Person or Advance
     Facility Trustee shall be required to apply all amounts available in
     accordance  with this Section 3.22(e) to the reimbursement of Advances
     and Servicing Advances in the manner provided for herein; provided,
     however,  that after the succession of a Successor Master Servicer, (A)
     to the extent that any Advances or Servicing Advances with respect to
     any particular Mortgage Loan are reimbursed from payments or
     recoveries, if any, from the related Mortgagor, and Liquidation
     Proceeds or Insurance Proceeds, if any, with respect to that Mortgage
     Loan, reimbursement shall be made, first, to the Advancing Person or
     Advance Facility Trustee in respect of Advances and/or Servicing
     Advances related to that Mortgage Loan to the extent of the interest of
     the Advancing Person or Advance Facility Trustee in such Advances
     and/or Servicing Advances, second to the Master Servicer in respect of
     Advances and/or Servicing Advances related to that Mortgage Loan in
     excess of those in which the Advancing Person or Advance Facility
     Trustee Person has an interest, and third, to the Successor Master
     Servicer in respect of any other Advances and/or Servicing Advances
     related to that Mortgage Loan, from such sources as and when collected,
     and (B) reimbursements of Advances and Servicing Advances that are
     Nonrecoverable  Advances shall be made pro rata to the Advancing Person

or Advance Facility Trustee, on the one hand, and any such Successor Master Servicer, on the other hand, on the basis of the respective aggregate outstanding unreimbursed Advances and Servicing Advances that are Nonrecoverable Advances owed to the Advancing Person, Advance Facility Trustee or Master Servicer pursuant to this Agreement, on the one hand, and any such Successor Master Servicer, on the other hand, and without regard to the date on which any such Advances or Servicing Advances shall have been made. In the event that, as a result of the FIFO allocation made pursuant to this Section 3.22(e), some or all of a Reimbursement Amount paid to the Advancing Person or Advance Facility Trustee relates to Advances or Servicing Advances that were made by a Person other than Residential Funding or the Advancing Person or Advance Facility Trustee, then the Advancing Person or Advance Facility Trustee shall be required to remit any portion of such Reimbursement Amount to the Person entitled to such portion of such Reimbursement Amount. Without limiting the generality of the foregoing, Residential Funding shall remain entitled to be reimbursed by the Advancing Person or Advance Facility Trustee for all Advances and Servicing Advances funded by Residential Funding to the extent the related Reimbursement Amount(s) have not been assigned or pledged to an Advancing Person or Advance Facility Trustee. The documentation establishing any Advance Facility shall require Residential Funding to provide to the related Advancing Person or Advance Facility Trustee loan by loan information with respect to each Reimbursement Amount distributed to such Advancing Person or Advance Facility Trustee on each date of remittance thereof to such Advancing Person or Advance Facility Trustee, to enable the Advancing Person or Advance Facility Trustee to make the FIFO allocation of each Reimbursement Amount with respect to each Mortgage Loan.

(ii)   By way of illustration, and not by way of limiting the generality of the foregoing, if the Master Servicer resigns or is terminated at a time when the Master Servicer is a party to an Advance Facility, and is replaced by a Successor Master Servicer, and the Successor Master Servicer directly funds Advances or Servicing Advances with respect to a Mortgage Loan and does not assign or pledge the related Reimbursement Amounts to the related Advancing Person or Advance Facility Trustee, then all payments and recoveries received from the related Mortgagor or received in the form of Liquidation Proceeds with respect to such Mortgage Loan (including Insurance Proceeds collected in connection with a liquidation of such Mortgage Loan) will be allocated first to the Advancing Person or Advance Facility Trustee until the related Reimbursement Amounts attributable to such Mortgage Loan that are owed to the Master Servicer and the Advancing Person, which were made prior to any Advances or Servicing Advances made by the Successor Master Servicer, have been reimbursed in full, at which point the Successor Master Servicer shall be entitled to retain all related Reimbursement Amounts subsequently collected with respect to that Mortgage Loan pursuant to Section 3.10 of this Agreement. To the extent that the Advances or Servicing Advances are Nonrecoverable Advances to be reimbursed on an aggregate basis pursuant to Section 3.10 of this Agreement, the reimbursement paid in this manner will be made pro rata to the Advancing Person or Advance Facility Trustee, on the one hand, and the Successor Master Servicer, on the other hand, as described in clause (i)(B) above.

(f)   The Master Servicer shall remain entitled to be reimbursed for all Advances and Servicing Advances funded by the Master Servicer to the extent the related rights to be reimbursed therefor have not been sold, assigned or pledged to an Advancing Person.

(g)   Any amendment to this Section 3.22 or to any other provision of this Agreement that may be necessary or appropriate to effect the terms of an Advance Facility as described generally in this Section 3.22, including amendments to add provisions relating to a successor Master Servicer, may be entered into by the Trustee, the Certificate Insurer, Company and the Master Servicer without the consent of any Certificateholder, with written confirmation from each Rating Agency that the amendment will not result in the reduction of the ratings on any class of the Certificates below the lesser of the then current or original ratings on such Certificates, and an opinion of counsel as required by Section 11.01(c), notwithstanding anything to the contrary in Section 11.01 of or elsewhere in this Agreement.

(h)   Any rights of set-off that the Trust Fund, the Trustee, the Company, any Successor Master Servicer or any other Person might otherwise have against the Master Servicer under this Agreement shall not attach to any rights to be reimbursed for Advances or Servicing Advances that have been sold, transferred, pledged, conveyed or assigned to any Advancing Person.

(i)   At any time when an Advancing Person shall have ceased funding Advances and/or Servicing Advances (as the case may be) and the Advancing Person or related Advance Facility Trustee shall have received Reimbursement Amounts sufficient in the aggregate to reimburse all Advances and/or Servicing Advances (as the case may be) the right to reimbursement for which were assigned to the Advancing Person, then upon the delivery of a written notice signed by the Advancing Person and the Master Servicer or its successor or assign) to the Trustee terminating the Advance Facility Notice (the "Notice of Facility Termination"), the Master Servicer or its Successor Master Servicer shall again be entitled to withdraw and retain the related Reimbursement Amounts from the Custodial Account pursuant to Section 3.10.

(j)   After delivery of any Advance Facility Notice, and until any such Advance Facility Notice has been terminated by a Notice of Facility Termination, this Section 3.22 may not be amended or otherwise modified without the prior written consent of the related Advancing Person.

ARTICLE IV

PAYMENTS TO CERTIFICATEHOLDERS

Section 4.01.    Certificate Account.

(a)    The Master Servicer on behalf of the Trustee shall establish and
maintain a Certificate Account in which the Master Servicer shall cause to be
deposited on behalf of the Trustee on or before 2:00 P.M. New York time on
each Certificate Account Deposit Date by wire transfer of immediately
available funds an amount equal to the sum of (i) any Advance for the
immediately succeeding Distribution Date, (ii) any amount required to be
deposited in the Certificate Account pursuant to Section 3.12(a), (iii) any
amount required to be deposited in the Certificate Account pursuant to
Section 3.16(c) or Section 4.07, (iv) any amount required to be paid pursuant
to Section 9.01 and (v) all other amounts constituting the Available
Distribution Amount for the immediately succeeding Distribution Date.

(b)    The Trustee shall, upon written request from the Master Servicer,
invest or cause the institution maintaining the Certificate Account to invest
the funds in the Certificate Account in Permitted Investments designated in
the name of the Trustee for the benefit of the Certificateholders, which
shall mature or be payable on demand not later than the Business Day next
preceding the Distribution Date following the date of such investment
(except that (i) any investment in the institution with which the Certificate
Account is maintained may mature or be payable on demand on such Distribution
Date and (ii) any other investment may mature or be payable on demand on such
Distribution Date if the Trustee shall advance funds on such Distribution
Date to the Certificate Account in the amount payable on such investment on
such Distribution Date, pending receipt thereof to the extent necessary to
make distributions on the Certificates) and shall not be sold or disposed of
prior to maturity.  Subject to Section 3.16(e), all income and gain realized
from any such investment shall be for the benefit of the Master Servicer and
shall be subject to its withdrawal or order from time to time.  The amount of
any losses incurred in respect of any such investments shall be deposited in
the Certificate Account by the Master Servicer out of its own funds
immediately as realized without any right of reimbursement.  The Trustee or
its Affiliates are permitted to receive compensation that could be deemed to
be in the Trustee's economic self-interest for (i) serving as investment
adviser (with respect to investments made through its Affiliates),
administrator, shareholder servicing agent, custodian or sub-custodian with
respect to certain of the Permitted Investments, (ii) using Affiliates to
effect transactions in certain Permitted Investments and (iii) effecting
transactions in certain Permitted Investments.

Section 4.02.    Distributions.

As provided in Section 4.02 of the Series Supplement.

Section 4.03.    Statements to Certificateholders; Statements to Rating
Agencies; Exchange Act Reporting.

(a)    Concurrently with each distribution charged to the Certificate Account
and with respect to each Distribution Date the Master Servicer shall forward
to the Trustee and the Trustee shall either forward by mail or make available
to each Holder and the Company, via the Trustee's internet website, a
statement (and at its option, any additional files containing the same
information in an alternative format) setting forth information as to each
Class of Certificates, the Mortgage Pool and, if the Mortgage Pool is
comprised of two or more Loan Groups, each Loan Group, to the extent
applicable.  This statement will include the information set forth in an
exhibit to the Series Supplement.  The Trustee shall mail to each Holder that
requests a paper copy by telephone a paper copy via first class mail.  The
Trustee may modify the distribution procedures set forth in this Section
provided that such procedures are no less convenient for the
Certificateholders.  The Trustee shall provide prior notification to the
Company, the Master Servicer and the Certificateholders regarding any such
modification.  In addition, the Master Servicer shall provide to any manager
of a trust fund consisting of some or all of the Certificates, upon
reasonable request, such additional information as is reasonably obtainable
by the Master Servicer at no additional expense to the Master Servicer.
Also, at the request of a Rating Agency, the Master Servicer shall provide
the information relating to the Reportable Modified Mortgage Loans
substantially in the form attached hereto as Exhibit Q to such Rating Agency
within a reasonable period of time; provided, however, that the Master
Servicer shall not be required to provide such information more than four
times in a calendar year to any Rating Agency.

(b)    Within a reasonable period of time after it receives a written request
from a Holder of a Certificate, other than a Class R Certificate, the Master
Servicer shall prepare, or cause to be prepared, and shall forward, or cause
to be forwarded, to each Person who at any time during the calendar year was
the Holder of a Certificate, other than a Class R Certificate, a statement
containing the information set forth in clauses (v) and (vi) of the exhibit
to the Series Supplement referred to in subsection (a) above aggregated for
such calendar year or applicable portion thereof during which such Person was
a Certificateholder.  Such obligation of the Master Servicer shall be deemed
to have been satisfied to the extent that substantially comparable
information shall be provided by the Master Servicer pursuant to any
requirements of the Code.

(c)    Within a reasonable period of time after it receives a written request
from a Holder of a Class R Certificate, the Master Servicer shall prepare, or
cause to be prepared, and shall forward, or cause to be forwarded, to each

Person who at any time during the calendar year was the Holder of a Class R Certificate, a statement containing the applicable distribution information provided pursuant to this Section 4.03 aggregated for such calendar year or applicable portion thereof during which such Person was the Holder of a Class R Certificate.  Such obligation of the Master Servicer shall be deemed to have been satisfied to the extent that substantially comparable information shall be provided by the Master Servicer pursuant to any requirements of the Code.

(d)    Upon the written request of any Certificateholder, the Master Servicer, as soon as reasonably practicable, shall provide the requesting Certificateholder with such information as is necessary and appropriate, in the Master Servicer's sole discretion, for purposes of satisfying applicable reporting requirements under Rule 144A.

(e)    The Master Servicer shall, on behalf of the Company and in respect of the Trust Fund, sign and cause to be filed with the Commission any periodic reports required to be filed under the provisions of the Exchange Act, and the rules and regulations of the Commission thereunder including, without limitation, reports on Form 10-K, Form 10-D and Form 8-K.  In connection with the preparation and filing of such periodic reports, the Trustee shall timely provide to the Master Servicer (I) a list of Certificateholders as shown on the Certificate Register as of the end of each calendar year, (II) copies of all pleadings, other legal process and any other documents relating to any claims, charges or complaints involving the Trustee, as trustee hereunder, or the Trust Fund that are received by a Responsible Officer of the Trustee, (III) notice of all matters that, to the actual knowledge of a Responsible Officer of the Trustee, have been submitted to a vote of the Certificateholders, other than those matters that have been submitted to a vote of the Certificateholders at the request of the Company or the Master Servicer, and (IV) notice of any failure of the Trustee to make any distribution to the Certificateholders as required pursuant to the Series Supplement. Neither the Master Servicer nor the Trustee shall have any liability with respect to the Master Servicer's failure to properly prepare or file such periodic reports resulting from or relating to the Master Servicer's inability or failure to obtain any information not resulting from the Master Servicer's own negligence or willful misconduct.

(f)    Any Form 10-K filed with the Commission in connection with this Section 4.03 shall include, with respect to the Certificates relating to such 10-K:

(i)    A certification, signed by the senior officer in charge of the servicing functions of the Master Servicer, in the form attached as Exhibit O hereto or such other form as may be required or permitted by the Commission (the "Form 10-K Certification"), in compliance with Rules 13a-14 and 15d-14 under the Exchange Act and any additional directives of the Commission.

(ii)   A report regarding its assessment of compliance during the preceding calendar year with all applicable servicing criteria set forth in relevant Commission regulations with respect to mortgage-backed securities transactions taken as a whole involving the Master Servicer that are backed by the same types of assets as those backing the certificates, as well as similar reports on assessment of compliance received from other parties participating in the servicing function as required by relevant Commission regulations, as described in Item 1122(a) of Regulation AB.  The Master Servicer shall obtain from all other parties participating in the servicing function any required assessments.

(iii)  With respect to each assessment report described immediately above, a report by a registered public accounting firm that attests to, and reports on, the assessment made by the asserting party, as set forth in relevant Commission regulations, as described in Regulation 1122(b) of Regulation AB and Section 3.19.

(iv)   The servicer compliance certificate required to be delivered pursuant Section 3.18.

(g)    In connection with the Form 10-K Certification, the Trustee shall provide the Master Servicer with a back-up certification substantially in the form attached hereto as Exhibit P.

(h)    This Section 4.03 may be amended in accordance with this Agreement without the consent of the Certificateholders.

(i)    The Trustee shall make available on the Trustee's internet website each of the reports filed with the Commission by or on behalf of the Company under the Exchange Act, as soon as reasonably practicable after delivery of such reports to the Trustee.

Section 4.04.    Distribution of Reports to the Trustee and the Company; Advances by the Master Servicer.

(a)    Prior to the close of business on the Determination Date, the Master Servicer shall furnish a written statement to the Trustee, any Paying Agent and the Company (the information in such statement to be made available to any Certificate Insurer and Certificateholders by the Master Servicer on request) setting forth (i) the Available Distribution Amount and (ii) the amounts required to be withdrawn from the Custodial Account and deposited into the Certificate Account on the immediately succeeding Certificate Account Deposit Date pursuant to clause (iii) of Section 4.01(a).  The determination by the Master Servicer of such amounts shall, in the absence of obvious error, be presumptively deemed to be correct for all purposes hereunder and the Trustee shall be protected in relying upon the same without any independent check or verification.

(b)    On or before 2:00 P.M. New York time on each Certificate Account Deposit Date, the Master Servicer shall either (i) deposit in the Certificate

Account from its own funds, or funds received therefor from the Subservicers, an amount equal to the Advances to be made by the Master Servicer in respect of the related Distribution Date, which shall be in an aggregate amount equal to the aggregate amount of Monthly Payments (with each interest portion thereof adjusted to the Net Mortgage Rate), less the amount of any related Servicing Modifications, Debt Service Reductions or reductions in the amount of interest collectable from the Mortgagor pursuant to the Servicemembers Civil Relief Act, as amended, or similar legislation or regulations then in effect, on the Outstanding Mortgage Loans as of the related Due Date, which Monthly Payments were not received as of the close of business as of the related Determination Date; provided that no Advance shall be made if it would be a Nonrecoverable Advance, (ii) withdraw from amounts on deposit in the Custodial Account and deposit in the Certificate Account all or a portion of the Amount Held for Future Distribution in discharge of any such Advance, or (iii) make advances in the form of any combination of (i) and (ii) aggregating the amount of such Advance.  Any portion of the Amount Held for Future Distribution so used shall be replaced by the Master Servicer by deposit in the Certificate Account on or before 11:00 A.M. New York time on any future Certificate Account Deposit Date to the extent that funds attributable to the Mortgage Loans that are available in the Custodial Account for deposit in the Certificate Account on such Certificate Account Deposit Date shall be less than payments to Certificateholders required to be made on the following Distribution Date.  The Master Servicer shall be entitled to use any Advance made by a Subservicer as described in Section 3.07(b) that has been deposited in the Custodial Account on or before such Distribution Date as part of the Advance made by the Master Servicer pursuant to this Section 4.04.  The amount of any reimbursement pursuant to Section 4.02(a) in respect of outstanding Advances on any Distribution Date shall be allocated to specific Monthly Payments due but delinquent for previous Due Periods, which allocation shall be made, to the extent practicable, to Monthly Payments which have been delinquent for the longest period of time.  Such allocations shall be conclusive for purposes of reimbursement to the Master Servicer from recoveries on related Mortgage Loans pursuant to Section 3.10.

The determination by the Master Servicer that it has made a Nonrecoverable Advance or that any proposed Advance, if made, would constitute a Nonrecoverable Advance, shall be evidenced by an Officers' Certificate of the Master Servicer delivered to the Company and the Trustee.

If the Master Servicer determines as of the Business Day preceding any Certificate Account Deposit Date that it will be unable to deposit in the Certificate Account an amount equal to the Advance required to be made for the immediately succeeding Distribution Date, it shall give notice to the Trustee of its inability to advance (such notice may be given by telecopy), not later than 3:00 P.M., New York time, on such Business Day, specifying the portion of such amount that it will be unable to deposit.  Not later than 3:00 P.M., New York time, on the Certificate Account Deposit Date the Trustee shall, unless by 12:00 Noon, New York time, on such day the Trustee shall have been notified in writing (by telecopy) that the Master Servicer shall have directly or indirectly deposited in the Certificate Account such portion of the amount of the Advance as to which the Master Servicer shall have given notice pursuant to the preceding sentence, pursuant to Section 7.01, (a) terminate all of the rights and obligations of the Master Servicer under this Agreement in accordance with Section 7.01 and (b) assume the rights and obligations of the Master Servicer hereunder, including the obligation to deposit in the Certificate Account an amount equal to the Advance for the immediately succeeding Distribution Date.

The Trustee shall deposit all funds it receives pursuant to this Section 4.04 into the Certificate Account.

Section 4.05.     Allocation of Realized Losses.

As provided in Section 4.05 of the Series Supplement.

Section 4.06.     Reports of Foreclosures and Abandonment of Mortgaged
                  Property.

The Master Servicer or the Subservicers shall file information returns with respect to the receipt of mortgage interests received in a trade or business, the reports of foreclosures and abandonments of any Mortgaged Property and the information relating to cancellation of indebtedness income with respect to any Mortgaged Property required by Sections 6050H, 6050J and 6050P, respectively, of the Code, and deliver to the Trustee an Officers' Certificate on or before March 31 of each year stating that such reports have been filed.  Such reports shall be in form and substance sufficient to meet the reporting requirements imposed by Sections 6050H, 6050J and 6050P of the Code.

Section 4.07.     Optional Purchase of Defaulted Mortgage Loans.

(a)     With respect to any Mortgage Loan that is delinquent in payment by 90 days or more, the Master Servicer may, at its option, purchase such Mortgage Loan from the Trustee at the Purchase Price therefor; provided, that such Mortgage Loan that becomes 90 days or more delinquent during any given Calendar Quarter shall only be eligible for purchase pursuant to this Section during the period beginning on the first Business Day of the following Calendar Quarter, and ending at the close of business on the second-to-last Business Day of such following Calendar Quarter; and provided, further, that such Mortgage Loan is 90 days or more delinquent at the time of repurchase. Such option if not exercised shall not thereafter be reinstated as to any Mortgage Loan, unless the delinquency is cured and the Mortgage Loan thereafter again becomes delinquent in payment by 90 days or more in a subsequent Calendar Quarter.

(b)     If at any time the Master Servicer makes a payment to the Certificate Account covering the amount of the Purchase Price for such a Mortgage Loan as provided in clause (a) above, and the Master Servicer provides to the Trustee a certification signed by a Servicing Officer stating that the amount of such

payment has been deposited in the Certificate Account, then the Trustee shall execute the assignment of such Mortgage Loan at the request of the Master Servicer, without recourse, to the Master Servicer, which shall succeed to all the Trustee's right, title and interest in and to such Mortgage Loan, and all security and documents relative thereto.  Such assignment shall be an assignment outright and not for security.  The Master Servicer will thereupon own such Mortgage, and all such security and documents, free of any further obligation to the Trustee or the Certificateholders with respect thereto.

If, however, the Master Servicer shall have exercised its right to repurchase a Mortgage Loan pursuant to this Section 4.07 upon the written request of and with funds provided by the Junior Certificateholder and thereupon transferred such Mortgage Loan to the Junior Certificateholder, the Master Servicer shall so notify the Trustee in writing.

Section 4.08.    Surety Bond.

(a)    If a Required Surety Payment is payable pursuant to the Surety Bond with respect to any Additional Collateral Loan, the Master Servicer shall so notify the Trustee as soon as reasonably practicable and the Trustee shall promptly complete the notice in the form of Attachment 1 to the Surety Bond and shall promptly submit such notice to the Surety as a claim for a Required Surety.  The Master Servicer shall upon request assist the Trustee in completing such notice and shall provide any information requested by the Trustee in connection therewith.

(b)    Upon receipt of a Required Surety Payment from the Surety on behalf of the Holders of Certificates, the Trustee shall deposit such Required Surety Payment in the Certificate Account and shall distribute such Required Surety Payment, or the proceeds thereof, in accordance with the provisions of Section 4.02.

(c)    The Trustee shall (i) receive as attorney-in-fact of each Holder of a Certificate any Required Surety Payment from the Surety and (ii) disburse the same to the Holders of such Certificates as set forth in Section 4.02.

_____

ARTICLE V

THE CERTIFICATES

Section 5.01.    The Certificates.

(a)    The Senior, Class X, Class M, Class B, Class P, Class SB and Class R Certificates shall be substantially in the forms set forth in Exhibits A, A-I, B, C, C-I, C-II and D, respectively, or such other form or forms as shall be set forth in the Series Supplement, and shall, on original issue, be executed and delivered by the Trustee to the Certificate Registrar for authentication and delivery to or upon the order of the Company upon receipt by the Trustee or the Custodian of the documents specified in Section 2.01.  The Certificates shall be issuable in the minimum denominations designated in the Preliminary Statement to the Series Supplement.

The Certificates shall be executed by manual or facsimile signature on behalf of an authorized officer of the Trustee.  Certificates bearing the manual or facsimile signatures of individuals who were at any time the proper officers of the Trustee shall bind the Trustee, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Certificate or did not hold such offices at the date of such Certificates.  No Certificate shall be entitled to any benefit under this Agreement, or be valid for any purpose, unless there appears on such Certificate a certificate of authentication substantially in the form provided for herein executed by the Certificate Registrar by manual signature, and such certificate upon any Certificate shall be conclusive evidence, and the only evidence, that such Certificate has been duly authenticated and delivered hereunder.  All Certificates shall be dated the date of their authentication.

(b)    Except as provided below, registration of Book-Entry Certificates may not be transferred by the Trustee except to another Depository that agrees to hold such Certificates for the respective Certificate Owners with Ownership Interests therein.  The Holders of the Book-Entry Certificates shall hold their respective Ownership Interests in and to each of such Certificates through the book-entry facilities of the Depository and, except as provided below, shall not be entitled to Definitive Certificates in respect of such Ownership Interests.  All transfers by Certificate Owners of their respective Ownership Interests in the Book-Entry Certificates shall be made in accordance with the procedures established by the Depository Participant or brokerage firm representing such Certificate Owner.  Each Depository Participant shall transfer the Ownership Interests only in the Book-Entry Certificates of Certificate Owners it represents or of brokerage firms for which it acts as agent in accordance with the Depository's normal procedures.

The Trustee, the Master Servicer and the Company may for all purposes (including the making of payments due on the respective Classes of Book-Entry Certificates) deal with the Depository as the authorized representative of the Certificate Owners with respect to the respective Classes of Book-Entry Certificates for the purposes of exercising the rights of Certificateholders hereunder.  The rights of Certificate Owners with respect to the respective Classes of Book-Entry Certificates shall be limited to those established by law and agreements between such Certificate Owners and the Depository Participants and brokerage firms representing such Certificate Owners.

Multiple requests and directions from, and votes of, the Depository as Holder of any Class of Book-Entry Certificates with respect to any particular matter shall not be deemed inconsistent if they are made with respect to different Certificate Owners. The Trustee may establish a reasonable record date in connection with solicitations of consents from or voting by Certificateholders and shall give notice to the Depository of such record date.

If (i)(A) the Company advises the Trustee in writing that the Depository is no longer willing or able to properly discharge its responsibilities as Depository and (B) the Company is unable to locate a qualified successor or (ii) the Company notifies the Depository and the Trustee of its intent to terminate the book-entry system and, upon receipt of notice of such intent from the Depository, the Depository Participants holding beneficial interests in the Book-Entry Certificates agree to such termination through the Depository, the Trustee shall notify all Certificate Owners, through the Depository, of the occurrence of any such event and of the availability of Definitive Certificates to Certificate Owners requesting the same. Upon surrender to the Trustee of the Book-Entry Certificates by the Depository, accompanied by registration instructions from the Depository for registration of transfer, the Trustee shall execute, authenticate and deliver the Definitive Certificates. In addition, if an Event of Default has occurred and is continuing, each Certificate Owner materially adversely affected thereby may at its option request a Definitive Certificate evidencing such Certificate Owner's Percentage Interest in the related Class of Certificates. In order to make such a request, such Certificate Owner shall, subject to the rules and procedures of the Depository, provide the Depository or the related Depository Participant with directions for the Certificate Registrar to exchange or cause the exchange of the Certificate Owner's interest in such Class of Certificates for an equivalent Percentage Interest in fully registered definitive form. Upon receipt by the Certificate Registrar of instructions from the Depository directing the Certificate Registrar to effect such exchange (such instructions shall contain information regarding the Class of Certificates and the Certificate Principal Balance being exchanged, the Depository Participant account to be debited with the decrease, the registered holder of and delivery instructions for the Definitive Certificate, and any other information reasonably required by the Certificate Registrar), (i) the Certificate Registrar shall instruct the Depository to reduce the related Depository Participant's account by the aggregate Certificate Principal Balance of the Definitive Certificate, (ii) the Trustee shall execute and the Certificate Registrar shall authenticate and deliver, in accordance with the registration and delivery instructions provided by the Depository, a Definitive Certificate evidencing such Certificate Owner's Percentage Interest in such Class of Certificates and (iii) the Trustee shall execute and the Certificate Registrar shall authenticate a new Book-Entry Certificate reflecting the reduction in the aggregate Certificate Principal Balance of such Class of Certificates by the Certificate Principal Balance of the Definitive Certificate.

None of the Company, the Master Servicer or the Trustee shall be liable for any actions taken by the Depository or its nominee, including, without limitation, any delay in delivery of any instructions required under Section 5.01 and may conclusively rely on, and shall be protected in relying on, such instructions. Upon the issuance of Definitive Certificates, the Trustee and the Master Servicer shall recognize the Holders of the Definitive Certificates as Certificateholders hereunder.

(c)     If the Class A-V Certificates are Definitive Certificates, from time to time Residential Funding, as the initial Holder of the Class A-V Certificates, may exchange such Holder's Class A-V Certificates for Subclasses of Class A-V Certificates to be issued under this Agreement by delivering a "Request for Exchange" substantially in the form attached to this Agreement as Exhibit N executed by an authorized officer, which Subclasses, in the aggregate, will represent the Uncertificated Class A-V REMIC Regular Interests corresponding to the Class A-V Certificates so surrendered for exchange. Any Subclass so issued shall bear a numerical designation commencing with Class A-V-1 and continuing sequentially thereafter, and will evidence ownership of the Uncertificated REMIC Regular Interest or Interests specified in writing by such initial Holder to the Trustee. The Trustee may conclusively, without any independent verification, rely on, and shall be protected in relying on, Residential Funding's determinations of the Uncertificated Class A-V REMIC Regular Interests corresponding to any Subclass, the Initial Notional Amount and the initial Pass-Through Rate on a Subclass as set forth in such Request for Exchange and the Trustee shall have no duty to determine if any Uncertificated Class A-V REMIC Regular Interest designated on a Request for Exchange corresponds to a Subclass which has previously been issued. Each Subclass so issued shall be substantially in the form set forth in Exhibit A and shall, on original issue, be executed and delivered by the Trustee to the Certificate Registrar for authentication and delivery in accordance with Section 5.01(a). Every Certificate presented or surrendered for exchange by the initial Holder shall (if so required by the Trustee or the Certificate Registrar) be duly endorsed by, or be accompanied by a written instrument of transfer attached to such Certificate and shall be completed to the satisfaction of the Trustee and the Certificate Registrar duly executed by, the initial Holder thereof or his attorney duly authorized in writing. The Certificates of any Subclass of Class A-V Certificates may be transferred in whole, but not in part, in accordance with the provisions of Section 5.02.

Section 5.02.     Registration of Transfer and Exchange of Certificates.

(a)     The Trustee shall cause to be kept at one of the offices or agencies to be appointed by the Trustee in accordance with the provisions of Section 8.12 a Certificate Register in which, subject to such reasonable regulations as it may prescribe, the Trustee shall provide for the registration of Certificates and of transfers and exchanges of Certificates as herein provided. The Trustee is initially appointed Certificate Registrar for the purpose of registering Certificates and transfers and exchanges of Certificates as herein provided. The Certificate Registrar, or the Trustee, shall provide the Master Servicer with a certified list of Certificateholders as of each

Record Date prior to the related Determination Date.

(b)    Upon surrender for registration of transfer of any Certificate at any office or agency of the Trustee maintained for such purpose pursuant to Section 8.12 and, in the case of any Class M, Class B, Class P or Class R Certificate, upon satisfaction of the conditions set forth below, the Trustee shall execute and the Certificate Registrar shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Certificates of a like Class (or Subclass) and aggregate Percentage Interest.

(c)    At the option of the Certificateholders, Certificates may be exchanged for other Certificates of authorized denominations of a like Class (or Subclass) and aggregate Percentage Interest, upon surrender of the Certificates to be exchanged at any such office or agency.  Whenever any Certificates are so surrendered for exchange the Trustee shall execute and the Certificate Registrar shall authenticate and deliver the Certificates of such Class which the Certificateholder making the exchange is entitled to receive.  Every Certificate presented or surrendered for transfer or exchange shall (if so required by the Trustee or the Certificate Registrar) be duly endorsed by, or be accompanied by a written instrument of transfer in form satisfactory to the Trustee and the Certificate Registrar duly executed by, the Holder thereof or his attorney duly authorized in writing.

(d)    No transfer, sale, pledge or other disposition of a Class B Certificate or Class P Certificate shall be made unless such transfer, sale, pledge or other disposition is exempt from the registration requirements of the Securities Act of 1933, as amended, and any applicable state securities laws or is made in accordance with said Act and laws.  In the event that a transfer of a Class B Certificate or Class P Certificate is to be made either (i)(A) the Trustee shall require a written Opinion of Counsel acceptable to and in form and substance satisfactory to the Trustee and the Company that such transfer may be made pursuant to an exemption, describing the applicable exemption and the basis therefor, from said Act and laws or is being made pursuant to said Act and laws, which Opinion of Counsel shall not be an expense of the Trustee, the Company or the Master Servicer (except that, if such transfer is made by the Company or the Master Servicer or any Affiliate thereof, the Company or the Master Servicer shall provide such Opinion of Counsel at their own expense); provided that such Opinion of Counsel will not be required in connection with the initial transfer of any such Certificate by the Company or any Affiliate thereof to the Company or an Affiliate of the Company and (B) the Trustee shall require the transferee to execute a representation letter, substantially in the form of Exhibit H (with respect to any Class B Certificate) or Exhibit G-1 (with respect to any Class P Certificate) hereto, and the Trustee shall require the transferor to execute a representation letter, substantially in the form of Exhibit I hereto, each acceptable to and in form and substance satisfactory to the Company and the Trustee certifying to the Company and the Trustee the facts surrounding such transfer, which representation letters shall not be an expense of the Trustee, the Company or the Master Servicer; provided, however, that such representation letters will not be required in connection with any transfer of any such Certificate by the Company or any Affiliate thereof to the Company or an Affiliate of the Company, and the Trustee shall be entitled to conclusively rely upon a representation (which, upon the request of the Trustee, shall be a written representation) from the Company, of the status of such transferee as an Affiliate of the Company or (ii) the prospective transferee of such a Certificate shall be required to provide the Trustee, the Company and the Master Servicer with an investment letter substantially in the form of Exhibit J attached hereto (or such other form as the Company in its sole discretion deems acceptable), which investment letter shall not be an expense of the Trustee, the Company or the Master Servicer, and which investment letter states that, among other things, such transferee (A) is a "qualified institutional buyer" as defined under Rule 144A, acting for its own account or the accounts of other "qualified institutional buyers" as defined under Rule 144A, and (B) is aware that the proposed transferor intends to rely on the exemption from registration requirements under the Securities Act of 1933, as amended, provided by Rule 144A. The Holder of any such Certificate desiring to effect any such transfer, sale, pledge or other disposition shall, and does hereby agree to, indemnify the Trustee, the Company, the Master Servicer and the Certificate Registrar against any liability that may result if the transfer, sale, pledge or other disposition is not so exempt or is not made in accordance with such federal and state laws.

(e)    (i)    In the case of any Class B, Class P or Class R Certificate presented for registration in the name of any person, either (A) the Trustee shall require an Opinion of Counsel addressed to the Trustee, the Company and the Master Servicer, acceptable to and in form and substance satisfactory to the Trustee to the effect that the purchase or holding of such Class B, Class P or Class R Certificate is permissible under applicable law, will not constitute or result in any non-exempt prohibited transaction under Section 406 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the Code (or comparable provisions of any subsequent enactments), and will not subject the Trustee, the Company or the Master Servicer to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in this Agreement, which Opinion of Counsel shall not be an expense of the Trustee, the Company or the Master Servicer or (B) the prospective Transferee shall be required to provide the Trustee, the Company and the Master Servicer with a certification to the effect set forth in paragraph six of Exhibit H (with respect to any Class B Certificate) or paragraph fifteen of Exhibit G-1 (with respect to any Class R Certificate or Class P Certificate), which the Trustee may rely upon without further inquiry or investigation, or such other certifications as the Trustee may deem desirable or necessary in order to establish that such Transferee or the Person in whose name such registration is requested either (a) is not an employee benefit plan or other plan subject to the prohibited transaction

provisions of ERISA or Section 4975 of the Code, or any Person (including an investment manager, a named fiduciary or a trustee of any such plan) who is using "plan assets" of any such plan to effect such acquisition (each, a "Plan Investor") or (b) in the case of any Class B Certificate, the following conditions are satisfied: (i) such Transferee is an insurance company, (ii) the source of funds used to purchase or hold such Certificate (or interest therein) is an "insurance company general account" (as defined in U.S. Department of Labor Prohibited Transaction Class Exemption ("PTCE") 95-60, and (iii) the conditions set forth in Sections I and II of PTCE 95-60 have been satisfied (each entity that satisfies this clause (b), a "Complying Insurance Company").

(ii)  Any Transferee of a Class M Certificate will be deemed to have represented by virtue of its purchase or holding of such Certificate (or interest therein) that either (a) such Transferee is not a Plan Investor, (b) it has acquired and is holding such Certificate in reliance on Prohibited Transaction Exemption ("PTE") 94-29, as most recently amended, PTE 2002-41, 67 Fed. Reg. 54487 (August 22, 2002) (the "RFC Exemption"), and that it understands that there are certain conditions to the availability of the RFC Exemption including that such Certificate must be rated, at the time of purchase, not lower than "BBB-" (or its equivalent) by Standard & Poor's, Fitch or Moody's or (c) such Transferee is a Complying Insurance Company.

(iii) (A)  If any Class M Certificate (or any interest therein) is acquired or held by any Person that does not satisfy the conditions described in paragraph (ii) above, then the last preceding Transferee that either (i) is not a Plan Investor, (ii) acquired such Certificate in compliance with the RFC Exemption, or (iii) is a Complying Insurance Company shall be restored, to the extent permitted by law, to all rights and obligations as Certificate Owner thereof retroactive to the date of such Transfer of such Class M Certificate.  The Trustee shall be under no liability to any Person for making any payments due on such Certificate to such preceding Transferee.

       (B)   Any purported Certificate Owner whose acquisition or holding of any Class M Certificate (or interest therein) was effected in violation of the restrictions in this Section 5.02(e) shall indemnify and hold harmless the Company, the Trustee, the Master Servicer, any Subservicer, the Underwriters and the Trust Fund from and against any and all liabilities, claims, costs or expenses incurred by such parties as a result of such acquisition or holding.

(f)   (i)  Each Person who has or who acquires any Ownership Interest in a Class R Certificate shall be deemed by the acceptance or acquisition of such Ownership Interest to have agreed to be bound by the following provisions and to have irrevocably authorized the Trustee or its designee under clause (iii)(A) below to deliver payments to a Person other than such Person and to negotiate the terms of any mandatory sale under clause (iii)(B) below and to execute all instruments of transfer and to do all other things necessary in connection with any such sale.  The rights of each Person acquiring any Ownership Interest in a Class R Certificate are expressly subject to the following provisions:

(A)   Each Person holding or acquiring any Ownership Interest in a Class R Certificate shall be a Permitted Transferee and shall promptly notify the Trustee of any change or impending change in its status as a Permitted Transferee.

(B)   In connection with any proposed Transfer of any Ownership Interest in a Class R Certificate, the Trustee shall require delivery to it, and shall not register the Transfer of any Class R Certificate until its receipt of, (I) an affidavit and agreement (a "Transfer Affidavit and Agreement," in the form attached hereto as Exhibit G-1) from the proposed Transferee, in form and substance satisfactory to the Master Servicer, representing and warranting, among other things, that it is a Permitted Transferee, that it is not acquiring its Ownership Interest in the Class R Certificate that is the subject of the proposed Transfer as a nominee, trustee or agent for any Person who is not a Permitted Transferee, that for so long as it retains its Ownership Interest in a Class R Certificate, it will endeavor to remain a Permitted Transferee, and that it has reviewed the provisions of this Section 5.02(f) and agrees to be bound by them, and (II) a certificate, in the form attached hereto as Exhibit G-2, from the Holder wishing to transfer the Class R Certificate, in form and substance satisfactory to the Master Servicer, representing and warranting, among other things, that no purpose of the proposed Transfer is to impede the assessment or collection of tax.

(C)   Notwithstanding the delivery of a Transfer Affidavit and Agreement by a proposed Transferee under clause (B) above, if a Responsible Officer of the Trustee who is assigned to this Agreement has actual knowledge the proposed Transferee is not a Permitted Transferee, no Transfer of an Ownership Interest in a Class R Certificate to such proposed Transferee shall be effected.

(D)   Each Person holding or acquiring any Ownership Interest in a Class R Certificate shall agree (x) to require a Transfer Affidavit and Agreement from any other Person to whom such Person attempts to transfer its Ownership Interest in a Class R Certificate and (y) not to transfer its Ownership Interest unless it provides a certificate to the Trustee in the form attached hereto as Exhibit G-2.

(E)   Each Person holding or acquiring an Ownership Interest in a Class R

Certificate, by purchasing an Ownership Interest in such Certificate, agrees to give the Trustee written notice that it is a "pass-through interest holder" within the meaning of Temporary Treasury Regulations Section 1.67-3T(a)(2)(i)(A) immediately upon acquiring an Ownership Interest in a Class R Certificate, if it is, or is holding an Ownership Interest in a Class R Certificate on behalf of, a "pass-through interest holder."

(ii)    The Trustee shall register the Transfer of a Class R Certificate only if it shall have received the Transfer Affidavit and Agreement, a certificate of the Holder requesting such transfer in the form attached hereto as Exhibit G-2 and all of such other documents as shall have been reasonably required by the Trustee as a condition to such registration. Transfers of the Class R Certificates to Non-United States Persons and Disqualified Organizations (as defined in Section 860E(e)(5) of the Code) are prohibited.

(iii)    (A)    If any Disqualified Organization shall become a holder of a Class R Certificate, then the last preceding Permitted Transferee shall be restored, to the extent permitted by law, to all rights and obligations as Holder thereof retroactive to the date of registration of such Transfer of such Class R Certificate. If a Non-United States Person shall become a holder of a Class R Certificate, then the last preceding United States Person shall be restored, to the extent permitted by law, to all rights and obligations as Holder thereof retroactive to the date of registration of such Transfer of such Class R Certificate. If a transfer of a Class R Certificate is disregarded pursuant to the provisions of Treasury Regulations Section 1.860E-1 or Section 1.860G-3, then the last preceding Permitted Transferee shall be restored, to the extent permitted by law, to all rights and obligations as Holder thereof retroactive to the date of registration of such Transfer of such Class R Certificate. The Trustee shall be under no liability to any Person for any registration of Transfer of a Class R Certificate that is in fact not permitted by this Section 5.02(f) or for making any payments due on such Certificate to the holder thereof or for taking any other action with respect to such holder under the provisions of this Agreement.

(B)    If any purported Transferee shall become a Holder of a Class R Certificate in violation of the restrictions in this Section 5.02(f) and to the extent that the retroactive restoration of the rights of the Holder of such Class R Certificate as described in clause (iii)(A) above shall be invalid, illegal or unenforceable, then the Master Servicer shall have the right, without notice to the holder or any prior holder of such Class R Certificate, to sell such Class R Certificate to a purchaser selected by the Master Servicer on such terms as the Master Servicer may choose. Such purported Transferee shall promptly endorse and deliver each Class R Certificate in accordance with the instructions of the Master Servicer. Such purchaser may be the Master Servicer itself or any Affiliate of the Master Servicer. The proceeds of such sale, net of the commissions (which may include commissions payable to the Master Servicer or its Affiliates), expenses and taxes due, if any, shall be remitted by the Master Servicer to such purported Transferee. The terms and conditions of any sale under this clause (iii)(B) shall be determined in the sole discretion of the Master Servicer, and the Master Servicer shall not be liable to any Person having an Ownership Interest in a Class R Certificate as a result of its exercise of such discretion.

(iv)    The Master Servicer, on behalf of the Trustee, shall make available, upon written request from the Trustee, all information necessary to compute any tax imposed (A) as a result of the Transfer of an Ownership Interest in a Class R Certificate to any Person who is a Disqualified Organization, including the information regarding "excess inclusions" of such Class R Certificates required to be provided to the Internal Revenue Service and certain Persons as described in Treasury Regulations Sections 1.860D-1(b)(5) and 1.860E-2(a)(5), and (B) as a result of any regulated investment company, real estate investment trust, common trust fund, partnership, trust, estate or organization described in Section 1381 of the Code that holds an Ownership Interest in a Class R Certificate having as among its record holders at any time any Person who is a Disqualified Organization. Reasonable compensation for providing such information may be required by the Master Servicer from such Person.

(v)    The provisions of this Section 5.02(f) set forth prior to this clause (v) may be modified, added to or eliminated, provided that there shall have been delivered to the Trustee the following:

(A)    written notification from each Rating Agency to the effect that the modification, addition to or elimination of such provisions will not cause such Rating Agency to downgrade its then-current ratings, if any, of any Class of the Senior (in the case of the Insured Certificates (as defined in the Series Supplement), such determination shall be made without giving effect to the Certificate Policy (as defined in the Series Supplement)), Class M or Class B Certificates below the lower of the then-current rating or the rating assigned to such Certificates as of the Closing Date by such Rating Agency; and

(B)    subject to Section 10.01(f), an Officers' Certificate of the Master Servicer stating that the Master Servicer has received an Opinion of Counsel, in form and substance satisfactory to the Master Servicer, to the effect that such modification, addition to or absence of such provisions will not cause any portion of any REMIC formed under the Series Supplement to cease to qualify as a REMIC and will not cause (x) any portion of any REMIC formed under the Series Supplement to be subject to an entity-level tax

caused by the Transfer of any Class R Certificate to a Person
that is a Disqualified Organization or (y) a Certificateholder or
another Person to be subject to a REMIC-related tax caused by the
Transfer of a Class R Certificate to a Person that is not a
Permitted Transferee.

(g)    No service charge shall be made for any transfer or exchange of
Certificates of any Class, but the Trustee may require payment of a sum
sufficient to cover any tax or governmental charge that may be imposed in
connection with any transfer or exchange of Certificates.

(h)    All Certificates surrendered for transfer and exchange shall be
destroyed by the Certificate Registrar.

Section 5.03.    Mutilated, Destroyed, Lost or Stolen Certificates.

If (i) any mutilated Certificate is surrendered to the Certificate
Registrar, or the Trustee and the Certificate Registrar receive evidence to
their satisfaction of the destruction, loss or theft of any Certificate, and
(ii) there is delivered to the Trustee and the Certificate Registrar such
security or indemnity as may be required by them to save each of them
harmless, then, in the absence of notice to the Trustee or the Certificate
Registrar that such Certificate has been acquired by a bona fide purchaser,
the Trustee shall execute and the Certificate Registrar shall authenticate
and deliver, in exchange for or in lieu of any such mutilated, destroyed,
lost or stolen Certificate, a new Certificate of like tenor, Class and
Percentage Interest but bearing a number not contemporaneously outstanding.
Upon the issuance of any new Certificate under this Section, the Trustee may
require the payment of a sum sufficient to cover any tax or other
governmental charge that may be imposed in relation thereto and any other
expenses (including the fees and expenses of the Trustee and the Certificate
Registrar) connected therewith.  Any duplicate Certificate issued pursuant to
this Section shall constitute complete and indefeasible evidence of ownership
in the Trust Fund, as if originally issued, whether or not the lost, stolen
or destroyed Certificate shall be found at any time.

Section 5.04.    Persons Deemed Owners.

Prior to due presentation of a Certificate for registration of
transfer, the Company, the Master Servicer, the Trustee, any Certificate
Insurer, the Certificate Registrar and any agent of the Company, the Master
Servicer, the Trustee, any Certificate Insurer or the Certificate Registrar
may treat the Person in whose name any Certificate is registered as the owner
of such Certificate for the purpose of receiving distributions pursuant to
Section 4.02 and for all other purposes whatsoever, except as and to the
extent provided in the definition of "Certificateholder," and neither the
Company, the Master Servicer, the Trustee, any Certificate Insurer, the
Certificate Registrar nor any agent of the Company, the Master Servicer, the
Trustee, any Certificate Insurer or the Certificate Registrar shall be
affected by notice to the contrary except as provided in Section 5.02(f).

Section 5.05.    Appointment of Paying Agent.

The Trustee may appoint a Paying Agent for the purpose of making
distributions to the Certificateholders pursuant to Section 4.02.  In the
event of any such appointment, on or prior to each Distribution Date the
Master Servicer on behalf of the Trustee shall deposit or cause to be
deposited with the Paying Agent a sum sufficient to make the payments to the
Certificateholders in the amounts and in the manner provided for in Section
4.02, such sum to be held in trust for the benefit of the Certificateholders.

The Trustee shall cause each Paying Agent to execute and deliver to the
Trustee an instrument in which such Paying Agent shall agree with the Trustee
that such Paying Agent shall hold all sums held by it for the payment to the
Certificateholders in trust for the benefit of the Certificateholders
entitled thereto until such sums shall be distributed to such
Certificateholders.  Any sums so held by such Paying Agent shall be held only
in Eligible Accounts to the extent such sums are not distributed to the
Certificateholders on the date of receipt by such Paying Agent.

Section 5.06.    U.S.A. Patriot Act Compliance.

In order for it to comply with its duties under the U.S.A. Patriot Act,
the Trustee may obtain and verify certain information from the other parties
hereto, including but not limited to such parties' name, address and other
identifying information.

ARTICLE VI

THE COMPANY AND THE MASTER SERVICER

Section 6.01.    Respective Liabilities of the Company and the Master
                 Servicer.

The Company and the Master Servicer shall each be liable in accordance
herewith only to the extent of the obligations specifically and respectively
imposed upon and undertaken by the Company and the Master Servicer herein.
By way of illustration and not limitation, the Company is not liable for the
servicing and administration of the Mortgage Loans, nor is it obligated by
Section 7.01 or Section 10.01 to assume any obligations of the Master
Servicer or to appoint a designee to assume such obligations, nor is it
liable for any other obligation hereunder that it may, but is not obligated
to, assume unless it elects to assume such obligation in accordance herewith.

Section 6.02.        Merger or Consolidation of the Company or the Master
                    Servicer; Assignment of Rights and Delegation of Duties by
                    Master Servicer.

(a)    The Company and the Master Servicer shall each keep in full effect its
existence, rights and franchises as a corporation under the laws of the state
of its incorporation and as a limited liability company under the laws of the
state of its organization, respectively, and shall each obtain and preserve
its qualification to do business as a foreign corporation or other Person in
each jurisdiction in which such qualification is or shall be necessary to
protect the validity and enforceability of this Agreement, the Certificates
or any of the Mortgage Loans and to perform its respective duties under this
Agreement.

(b)    Any Person into which the Company or the Master Servicer may be merged
or  converted or with which it may be consolidated, or any Person resulting
from any merger, conversion or consolidation to which the Company or the
Master Servicer shall be a party, or any Person succeeding to the business of
the Company or the Master Servicer, shall be the successor of the Company or
the Master Servicer, as the case may be, hereunder, without the execution or
filing of any paper or any further act on the part of any of the parties
hereto, anything in this Section 6.02(b) to the contrary notwithstanding;
provided, however, that the successor or surviving Person to the Master
Servicer shall be qualified to service mortgage loans on behalf of Fannie Mae
or Freddie Mac; and provided further that the Master Servicer (or the
Company, as applicable) shall notify each Rating Agency and the Trustee in
writing of any such merger, conversion or consolidation at least 30 days
prior to the effective date of such event.

(c)    Notwithstanding anything else in this Section 6.02 and Section 6.04 to
the contrary, the Master Servicer may assign its rights and delegate its
duties and obligations under this Agreement; provided that the Person
accepting such assignment or delegation shall be a Person which is qualified
to service mortgage loans on behalf of Fannie Mae or Freddie Mac, is
reasonably satisfactory to the Trustee and the Company, is willing to service
the Mortgage Loans and executes and delivers to the Company and the Trustee
an agreement, in form and substance reasonably satisfactory to the Company
and the Trustee, which contains an assumption by such Person of the due and
punctual performance and observance of each covenant and condition to be
performed or observed by the Master Servicer under this Agreement; provided
further that each Rating Agency's rating of the Classes of Certificates (in
the case of the Insured Certificates (as defined in the Series Supplement),
such determination shall be made without giving effect to the Certificate
Policy (as defined in the Series Supplement)) that have been rated in effect
immediately prior to such assignment and delegation will not be qualified,
reduced or withdrawn as a result of such assignment and delegation (as
evidenced by a letter to such effect from each Rating Agency).  In the case
of any such assignment and delegation, the Master Servicer shall be released
from its obligations under this Agreement, except that the Master Servicer
shall remain liable for all liabilities and obligations incurred by it as
Master Servicer hereunder prior to the satisfaction of the conditions to such
assignment and delegation set forth in the next preceding sentence.
Notwithstanding the foregoing, in the event of a pledge or assignment by the
Master Servicer solely of its rights to purchase all assets of the Trust Fund
under Section 9.01(a) (or, if so specified in Section 9.01(a), its rights to
purchase the Mortgage Loans and property acquired related to such Mortgage
Loans or its rights to purchase the Certificates related thereto), the
provisos of the first sentence of this paragraph will not apply.

Section 6.03.        Limitation on Liability of the Company,
                    the Master Servicer and Others.

        Neither the Company, the Master Servicer nor any of the directors,
officers, employees or agents of the Company or the Master Servicer shall be
under any liability to the Trust Fund or the Certificateholders for any
action taken or for refraining from the taking of any action in good faith
pursuant to this Agreement, or for errors in judgment; provided, however,
that this provision shall not protect the Company, the Master Servicer or any
such Person against any breach of warranties or representations made herein
or any liability which would otherwise be imposed by reason of willful
misfeasance, bad faith or gross negligence in the performance of duties or by
reason of reckless disregard of obligations and duties hereunder.  The
Company, the Master Servicer and any director, officer, employee or agent of
the Company or the Master Servicer may rely in good faith on any document of
any kind prima facie properly executed and submitted by any Person respecting
any matters arising hereunder.  The Company, the Master Servicer and any
director, officer, employee or agent of the Company or the Master Servicer
shall be indemnified by the Trust Fund and held harmless against any loss,
liability or expense incurred in connection with any legal action relating to
this Agreement or the Certificates, other than any loss, liability or expense
related to any specific Mortgage Loan or Mortgage Loans (except as any such
loss, liability or expense shall be otherwise reimbursable pursuant to this
Agreement) and any loss, liability or expense incurred by reason of willful
misfeasance, bad faith or gross negligence in the performance of duties
hereunder or by reason of reckless disregard of obligations and duties
hereunder.

        Neither the Company nor the Master Servicer shall be under any
obligation to appear in, prosecute or defend any legal or administrative
action, proceeding, hearing or examination that is not incidental to its
respective duties under this Agreement and which in its opinion may involve
it in any expense or liability; provided, however, that the Company or the
Master Servicer may in its discretion undertake any such action, proceeding,
hearing or examination that it may deem necessary or desirable in respect to
this Agreement and the rights and duties of the parties hereto and the
interests of the Certificateholders hereunder.  In such event, the legal
expenses and costs of such action, proceeding, hearing or examination and any
liability resulting therefrom shall be expenses, costs and liabilities of the
Trust Fund, and the Company and the Master Servicer shall be entitled to be

reimbursed therefor out of amounts attributable to the Mortgage Loans on deposit in the Custodial Account as provided by Section 3.10 and, on the Distribution Date(s) following such reimbursement, the aggregate of such expenses and costs shall be allocated in reduction of the Accrued Certificate Interest on each Class entitled thereto in the same manner as if such expenses and costs constituted a Prepayment Interest Shortfall.

Section 6.04.     Company and Master Servicer Not to Resign.

     Subject to the provisions of Section 6.02, neither the Company nor the Master Servicer shall resign from its respective obligations and duties hereby imposed on it except upon determination that its duties hereunder are no longer permissible under applicable law.  Any such determination permitting the resignation of the Company or the Master Servicer shall be evidenced by an Opinion of Counsel to such effect delivered to the Trustee. No such resignation by the Master Servicer shall become effective until the Trustee or a successor servicer shall have assumed the Master Servicer's responsibilities and obligations in accordance with Section 7.02.

ARTICLE VII

DEFAULT

Section 7.01.     Events of Default.

     Event of Default, wherever used herein, means any one of the following events (whatever reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(i)     the Master Servicer shall fail to deposit or cause to be deposited into the Certificate Account any amounts required to be so deposited therein at the time required pursuant to Section 4.01 or otherwise or the Master Servicer shall fail to distribute or cause to be distributed to the Holders of Certificates of any Class any distribution required to be made under the terms of the Certificates of such Class and this Agreement and, in each case, such failure shall continue unremedied for a period of 5 days after the date upon which written notice of such failure, requiring such failure to be remedied, shall have been given to the Master Servicer by the Trustee or the Company or to the Master Servicer, the Company and the Trustee by the Holders of Certificates of such Class evidencing Percentage Interests aggregating not less than 25%; or

(ii)    the Master Servicer shall fail to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in the Certificates of any Class or in this Agreement and such failure shall continue unremedied for a period of 30 days (except that such number of days shall be 15 in the case of a failure to pay the premium for any Required Insurance Policy) after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Master Servicer by the Trustee or the Company, or to the Master Servicer, the Company and the Trustee by the Holders of Certificates of any Class evidencing, in the case of any such Class, Percentage Interests aggregating not less than 25%; or

(iii)   a decree or order of a court or agency or supervisory authority having jurisdiction in the premises in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law or appointing a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Master Servicer and such decree or order shall have remained in force undischarged or unstayed for a period of 60 days; or

(iv)    the Master Servicer shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities, or similar proceedings of, or relating to, the Master Servicer or of, or relating to, all or substantially all of the property of the Master Servicer; or

(v)     the Master Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of, or commence a voluntary case under, any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

(vi)    the Master Servicer shall notify the Trustee pursuant to Section 4.04(b) that it is unable to deposit in the Certificate Account an amount equal to the Advance.

     If an Event of Default described in clauses (i)-(v) of this Section shall occur, then, and in each and every such case, so long as such Event of Default shall not have been remedied, either the Company or the Trustee may, and at the direction of Holders of Certificates entitled to at least 51% of the Voting Rights, the Trustee shall, by notice in writing to the Master Servicer (and to the Company if given by the Trustee or to the Trustee if given by the Company), terminate all of the rights and obligations of the Master Servicer under this Agreement and in and to the Mortgage Loans and the proceeds thereof, other than its rights as a Certificateholder hereunder.  If

an Event of Default described in clause (vi) hereof shall occur, the Trustee shall, by notice to the Master Servicer and the Company, immediately terminate all of the rights and obligations of the Master Servicer under this Agreement and in and to the Mortgage Loans and the proceeds thereof, other than its rights as a Certificateholder hereunder as provided in Section 4.04(b). On or after the receipt by the Master Servicer of such written notice, all authority and power of the Master Servicer under this Agreement, whether with respect to the Certificates (other than as a Holder thereof) or the Mortgage Loans or otherwise, shall subject to Section 7.02 pass to and be vested in the Trustee or the Trustee's designee appointed pursuant to Section 7.02; and, without limitation, the Trustee is hereby authorized and empowered to execute and deliver, on behalf of the Master Servicer, as attorney-in-fact or otherwise, any and all documents and other instruments, and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Mortgage Loans and related documents, or otherwise. The Master Servicer agrees to cooperate with the Trustee in effecting the termination of the Master Servicer's responsibilities and rights hereunder, including, without limitation, the transfer to the Trustee or its designee for administration by it of all cash amounts which shall at the time be credited to the Custodial Account or the Certificate Account or thereafter be received with respect to the Mortgage Loans. No such termination shall release the Master Servicer for any liability that it would otherwise have hereunder for any act or omission prior to the effective time of such termination.

Notwithstanding any termination of the activities of Residential Funding in its capacity as Master Servicer hereunder, Residential Funding shall be entitled to receive, out of any late collection of a Monthly Payment on a Mortgage Loan which was due prior to the notice terminating Residential Funding's rights and obligations as Master Servicer hereunder and received after such notice, that portion to which Residential Funding would have been entitled pursuant to Sections 3.10(a)(ii), (vi) and (vii) as well as its Servicing Fee in respect thereof, and any other amounts payable to Residential Funding hereunder the entitlement to which arose prior to the termination of its activities hereunder. Upon the termination of Residential Funding as Master Servicer hereunder the Company shall deliver to the Trustee a copy of the Program Guide.

Section 7.02.    Trustee or Company to Act; Appointment of Successor.

(a)    On and after the time the Master Servicer receives a notice of termination pursuant to Section 7.01 or resigns in accordance with Section 6.04, the Trustee or, upon notice to the Company and with the Company's consent (which shall not be unreasonably withheld) a designee (which meets the standards set forth below) of the Trustee, shall be the successor in all respects to the Master Servicer in its capacity as servicer under this Agreement and the transactions set forth or provided for herein and shall be subject to all the responsibilities, duties and liabilities relating thereto placed on the Master Servicer (except for the responsibilities, duties and liabilities contained in Sections 2.02 and 2.03(a), excluding the duty to notify related Subservicers or Sellers as set forth in such Sections, and its obligations to deposit amounts in respect of losses incurred prior to such notice or termination on the investment of funds in the Custodial Account or the Certificate Account pursuant to Sections 3.07(c) and 4.01(b) by the terms and provisions hereof; provided, however, that any failure to perform such duties or responsibilities caused by the preceding Master Servicer's failure to provide information required by Section 4.04 shall not be considered a default by the Trustee hereunder. As compensation therefor, the Trustee shall be entitled to all funds relating to the Mortgage Loans which the Master Servicer would have been entitled to charge to the Custodial Account or the Certificate Account if the Master Servicer had continued to act hereunder and, in addition, shall be entitled to the income from any Permitted Investments made with amounts attributable to the Mortgage Loans held in the Custodial Account or the Certificate Account. If the Trustee has become the successor to the Master Servicer in accordance with Section 6.04 or Section 7.01, then notwithstanding the above, the Trustee may, if it shall be unwilling to so act, or shall, if it is unable to so act, appoint, or petition a court of competent jurisdiction to appoint, any established housing and home finance institution, which is also a Fannie Mae- or Freddie Mac-approved mortgage servicing institution, having a net worth of not less than $10,000,000 as the successor to the Master Servicer hereunder in the assumption of all or any part of the responsibilities, duties or liabilities of the Master Servicer hereunder. Pending appointment of a successor to the Master Servicer hereunder, the Trustee shall become successor to the Master Servicer and shall act in such capacity as hereinabove provided. In connection with such appointment and assumption, the Trustee may make such arrangements for the compensation of such successor out of payments on Mortgage Loans as it and such successor shall agree; provided, however, that no such compensation shall be in excess of that permitted the initial Master Servicer hereunder. The Company, the Trustee, the Custodian and such successor shall take such action, consistent with this Agreement, as shall be necessary to effectuate any such succession. The Servicing Fee for any successor Master Servicer appointed pursuant to this Section 7.02 will be lowered with respect to those Mortgage Loans, if any, where the Subservicing Fee accrues at a rate of less than 0.20% per annum in the event that the successor Master Servicer is not servicing such Mortgage Loans directly and it is necessary to raise the related Subservicing Fee to a rate of 0.20% per annum in order to hire a Subservicer with respect to such Mortgage Loans. The Master Servicer shall pay the reasonable expenses of the Trustee in connection with any servicing transition hereunder.

(b)    In connection with the termination or resignation of the Master Servicer hereunder, either (i) the successor Master Servicer, including the Trustee if the Trustee is acting as successor Master Servicer, shall represent and warrant that it is a member of MERS in good standing and shall agree to comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans that are registered with MERS, in which case the predecessor Master Servicer shall cooperate with the successor Master Servicer in causing MERS to revise its

records to reflect the transfer of servicing to the successor Master Servicer as necessary under MERS' rules and regulations, or (ii) the predecessor Master Servicer shall cooperate with the successor Master Servicer in causing MERS to execute and deliver an assignment of Mortgage in recordable form to transfer the Mortgage from MERS to the Trustee and to execute and deliver such other notices, documents and other instruments as may be necessary or desirable to effect a transfer of such Mortgage Loan or servicing of such Mortgage Loan on the MERS(R)System to the successor Master Servicer.  The predecessor Master Servicer shall file or cause to be filed any such assignment in the appropriate recording office.  The predecessor Master Servicer shall bear any and all fees of MERS, costs of preparing any assignments of Mortgage, and fees and costs of filing any assignments of Mortgage that may be required under this subsection (b).  The successor Master Servicer shall cause such assignment to be delivered to the Trustee or the Custodian promptly upon receipt of the original with evidence of recording thereon or a copy certified by the public recording office in which such assignment was recorded.

Section 7.03.    Notification to Certificateholders.

(a)    Upon any such termination or appointment of a successor to the Master Servicer, the Trustee shall give prompt written notice thereof to the Certificateholders at their respective addresses appearing in the Certificate Register.

(b)    Within 60 days after the occurrence of any Event of Default, the Trustee shall transmit by mail to all Holders of Certificates notice of each such Event of Default hereunder known to the Trustee, unless such Event of Default shall have been cured or waived.

Section 7.04.    Waiver of Events of Default.

    The Holders representing at least 66% of the Voting Rights affected by a default or Event of Default hereunder may waive such default or Event of Default; provided, however, that (a) a default or Event of Default under clause (i) of Section 7.01 may be waived only by all of the Holders of Certificates affected by such default or Event of Default and (b) no waiver pursuant to this Section 7.04 shall affect the Holders of Certificates in the manner set forth in Section 11.01(b)(i) or (ii).  Upon any such waiver of a default or Event of Default by the Holders representing the requisite percentage of Voting Rights affected by such default or Event of Default, such default or Event of Default shall cease to exist and shall be deemed to have been remedied for every purpose hereunder.  No such waiver shall extend to any subsequent or other default or Event of Default or impair any right consequent thereon except to the extent expressly so waived.

ARTICLE VIII

CONCERNING THE TRUSTEE

Section 8.01.    Duties of Trustee.

(a)    The Trustee, prior to the occurrence of an Event of Default and after the curing or waiver of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Agreement.  In case an Event of Default has occurred (which has not been cured or waived), the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent investor would exercise or use under the circumstances in the conduct of such investor's own affairs.

(b)    The Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Trustee which are specifically required to be furnished pursuant to any provision of this Agreement, shall examine them to determine whether they conform to the requirements of this Agreement.  The Trustee shall notify the Certificateholders of any such documents which do not materially conform to the requirements of this Agreement in the event that the Trustee, after so requesting, does not receive satisfactorily corrected documents.

    The Trustee shall forward or cause to be forwarded in a timely fashion the notices, reports and statements required to be forwarded by the Trustee pursuant to Sections 4.03, 4.06, 7.03 and 10.01.  The Trustee shall furnish in a timely fashion to the Master Servicer such information as the Master Servicer may reasonably request from time to time for the Master Servicer to fulfill its duties as set forth in this Agreement.  The Trustee covenants and agrees that it shall perform its obligations hereunder in a manner so as to maintain the status of any portion of any REMIC formed under the Series Supplement as a REMIC under the REMIC Provisions and (subject to Section 10.01(f)) to prevent the imposition of any federal, state or local income, prohibited transaction, contribution or other tax on the Trust Fund to the extent that maintaining such status and avoiding such taxes are reasonably within the control of the Trustee and are reasonably within the scope of its duties under this Agreement.

(c)    No provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct; provided, however, that:

(i)    Prior to the occurrence of an Event of Default, and after the curing or waiver of all such Events of Default which may have occurred, the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement, the Trustee shall not be liable

except for the performance of such duties and obligations as are specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee and, in the absence of bad faith on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee by the Company or the Master Servicer and which on their face, do not contradict the requirements of this Agreement;

(ii)   The Trustee shall not be personally liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts;

(iii)  The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in accordance with the direction of Certificateholders of any Class holding Certificates which evidence, as to such Class, Percentage Interests aggregating not less than 25% as to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Agreement;

(iv)   The Trustee shall not be charged with knowledge of any default (other than a default in payment to the Trustee) specified in clauses (i) and (ii) of Section 7.01 or an Event of Default under clauses (iii), (iv) and (v) of Section 7.01 unless a Responsible Officer of the Trustee assigned to and working in the Corporate Trust Office obtains actual knowledge of such failure or event or the Trustee receives written notice of such failure or event at its Corporate Trust Office from the Master Servicer, the Company or any Certificateholder; and

(v)    Except to the extent provided in Section 7.02, no provision in this Agreement shall require the Trustee to expend or risk its own funds (including, without limitation, the making of any Advance) or otherwise incur any personal financial liability in the performance of any of its duties as Trustee hereunder, or in the exercise of any of its rights or powers, if the Trustee shall have reasonable grounds for believing that repayment of funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(d)    The Trustee shall timely pay, from its own funds, the amount of any and all federal, state and local taxes imposed on the Trust Fund or its assets or transactions including, without limitation, (A) "prohibited transaction" penalty taxes as defined in Section 860F of the Code, if, when and as the same shall be due and payable, (B) any tax on contributions to a REMIC after the Closing Date imposed by Section 860G(d) of the Code and (C) any tax on "net income from foreclosure property" as defined in Section 860G(c) of the Code, but only if such taxes arise out of a breach by the Trustee of its obligations hereunder, which breach constitutes negligence or willful misconduct of the Trustee.

Section 8.02.     Certain Matters Affecting the Trustee.

(a)    Except as otherwise provided in Section 8.01:

(i)    The Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, Officers' Certificate, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(ii)   The Trustee may consult with counsel and any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such Opinion of Counsel;

(iii)  The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by this Agreement or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of any of the Certificateholders, pursuant to the provisions of this Agreement, unless such Certificateholders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which may be incurred therein or thereby; nothing contained herein shall, however, relieve the Trustee of the obligation, upon the occurrence of an Event of Default (which has not been cured or waived), to exercise such of the rights and powers vested in it by this Agreement, and to use the same degree of care and skill in their exercise as a prudent investor would exercise or use under the circumstances in the conduct of such investor's own affairs;

(iv)   The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement;

(v)    Prior to the occurrence of an Event of Default hereunder and after the curing or waiver of all Events of Default which may have occurred, the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing so to do by Holders of Certificates of any Class evidencing, as to such Class, Percentage Interests, aggregating not less than 50%; provided, however, that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not

reasonably assured to the Trustee by the security afforded to it by the terms of this Agreement, the Trustee may require reasonable indemnity against such expense or liability as a condition to so proceeding. The reasonable expense of every such examination shall be paid by the Master Servicer, if an Event of Default shall have occurred and is continuing, and otherwise by the Certificateholder requesting the investigation;

(vi)  The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys; and

(vii) To the extent authorized under the Code and the regulations promulgated thereunder, each Holder of a Class R Certificate hereby irrevocably appoints and authorizes the Trustee to be its attorney-in-fact for purposes of signing any Tax Returns required to be filed on behalf of the Trust Fund. The Trustee shall sign on behalf of the Trust Fund and deliver to the Master Servicer in a timely manner any Tax Returns prepared by or on behalf of the Master Servicer that the Trustee is required to sign as determined by the Master Servicer pursuant to applicable federal, state or local tax laws, provided that the Master Servicer shall indemnify the Trustee for signing any such Tax Returns that contain errors or omissions.

(b)   Following the issuance of the Certificates, the Trustee shall not accept any contribution of assets to the Trust Fund unless (subject to Section 10.01(f)) it shall have obtained an Opinion of Counsel to the effect that such contribution will not (i) cause any portion of any REMIC formed under the Series Supplement to fail to qualify as a REMIC at any time that any Certificates are outstanding or (ii) cause the Trust Fund to be subject to any federal tax as a result of such contribution (including the imposition of any federal tax on "prohibited transactions" imposed under Section 860F(a) of the Code).

Section 8.03.     Trustee Not Liable for Certificates or Mortgage Loans.

      The recitals contained herein and in the Certificates (other than the execution of the Certificates and relating to the acceptance and receipt of the Mortgage Loans) shall be taken as the statements of the Company or the Master Servicer as the case may be, and the Trustee assumes no responsibility for their correctness. The Trustee makes no representations as to the validity or sufficiency of this Agreement or of the Certificates (except that the Certificates shall be duly and validly executed and authenticated by it as Certificate Registrar) or of any Mortgage Loan or related document, or of MERS or the MERS(R)System. Except as otherwise provided herein, the Trustee shall not be accountable for the use or application by the Company or the Master Servicer of any of the Certificates or of the proceeds of such Certificates, or for the use or application of any funds paid to the Company or the Master Servicer in respect of the Mortgage Loans or deposited in or withdrawn from the Custodial Account or the Certificate Account by the Company or the Master Servicer.

Section 8.04.     Trustee May Own Certificates.

      The Trustee in its individual or any other capacity may become the owner or pledgee of Certificates with the same rights it would have if it were not Trustee.

Section 8.05.     Master Servicer to Pay Trustee's Fees
                  and Expenses; Indemnification.

(a)   The Master Servicer covenants and agrees to pay to the Trustee and any co-trustee from time to time, and the Trustee and any co-trustee shall be entitled to, reasonable compensation (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) for all services rendered by each of them in the execution of the trusts hereby created and in the exercise and performance of any of the powers and duties hereunder of the Trustee and any co-trustee, and the Master Servicer will pay or reimburse the Trustee and any co-trustee upon request for all reasonable expenses, disbursements and advances incurred or made by the Trustee or any co-trustee in accordance with any of the provisions of this Agreement (including the reasonable compensation and the expenses and disbursements of its counsel and of all persons not regularly in its employ, and the expenses incurred by the Trustee or any co-trustee in connection with the appointment of an office or agency pursuant to Section 8.12) except any such expense, disbursement or advance as may arise from its negligence or bad faith.

(b)   The Master Servicer agrees to indemnify the Trustee for, and to hold the Trustee harmless against, any loss, liability or expense incurred without negligence or willful misconduct on the Trustee's part, arising out of, or in connection with, the acceptance and administration of the Trust Fund, including the costs and expenses (including reasonable legal fees and expenses) of defending itself against any claim in connection with the exercise or performance of any of its powers or duties under this Agreement and the Custodial Agreement, and the Master Servicer further agrees to indemnify the Trustee for, and to hold the Trustee harmless against, any loss, liability or expense arising out of, or in connection with, the provisions set forth in the second paragraph of Section 2.01(c) hereof, including, without limitation, all costs, liabilities and expenses (including reasonable legal fees and expenses) of investigating and defending itself against any claim, action or proceeding, pending or threatened, relating to the provisions of this paragraph, provided that:

(i)   with respect to any such claim, the Trustee shall have given the Master Servicer written notice thereof promptly after the Trustee shall have actual knowledge thereof;

(ii)  while maintaining control over its own defense, the Trustee shall cooperate and consult fully with the Master Servicer in preparing such

defense; and

(iii) notwithstanding anything in this Agreement to the contrary, the Master Servicer shall not be liable for settlement of any claim by the Trustee entered into without the prior consent of the Master Servicer which consent shall not be unreasonably withheld.

No termination of this Agreement shall affect the obligations created by this Section 8.05(b) of the Master Servicer to indemnify the Trustee under the conditions and to the extent set forth herein.

Notwithstanding the foregoing, the indemnification provided by the Master Servicer in this Section 8.05(b) shall not be available (A) for any loss, liability or expense of the Trustee, including the costs and expenses of defending itself against any claim, incurred in connection with any actions taken by the Trustee at the direction of the Certificateholders pursuant to the terms of this Agreement or (B) where the Trustee is required to indemnify the Master Servicer pursuant to Section 12.05(a).

Section 8.06.    Eligibility Requirements for Trustee.

The Trustee hereunder shall at all times be a corporation or a national banking association having its principal office in a state and city acceptable to the Company and organized and doing business under the laws of such state or the United States of America, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $50,000,000, subject to supervision or examination by federal or state authority and the short-term rating of such institution shall be A-1 in the case of Standard & Poor's if Standard & Poor's is a Rating Agency. If such corporation or national banking association publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. In case at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, the Trustee shall resign immediately in the manner and with the effect specified in Section 8.07.

Section 8.07.    Resignation and Removal of the Trustee.

(a)    The Trustee may at any time resign and be discharged from the trusts hereby created by giving written notice thereof to the Company. Upon receiving such notice of resignation, the Company shall promptly appoint a successor trustee by written instrument, in duplicate, one copy of which instrument shall be delivered to the resigning Trustee and one copy to the successor trustee. If no successor trustee shall have been so appointed and have accepted appointment within 30 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee.

(b)    If at any time the Trustee shall cease to be eligible in accordance with the provisions of Section 8.06 and shall fail to resign after written request therefor by the Company, or if at any time the Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then the Company may remove the Trustee and appoint a successor trustee by written instrument, in duplicate, one copy of which instrument shall be delivered to the Trustee so removed and one copy to the successor trustee. In addition, in the event that the Company determines that the Trustee has failed (i) to distribute or cause to be distributed to the Certificateholders any amount required to be distributed hereunder, if such amount is held by the Trustee or its Paying Agent (other than the Master Servicer or the Company) for distribution or (ii) to otherwise observe or perform in any material respect any of its covenants, agreements or obligations hereunder, and such failure shall continue unremedied for a period of 5 days (in respect of clause (i) above) or 30 days (in respect of clause (ii) above other than any failure to comply with the provisions of Article XII, in which case no notice or grace period shall be applicable) after the date on which written notice of such failure, requiring that the same be remedied, shall have been given to the Trustee by the Company, then the Company may remove the Trustee and appoint a successor trustee by written instrument delivered as provided in the preceding sentence. In connection with the appointment of a successor trustee pursuant to the preceding sentence, the Company shall, on or before the date on which any such appointment becomes effective, obtain from each Rating Agency written confirmation that the appointment of any such successor trustee will not result in the reduction of the ratings on any class of the Certificates below the lesser of the then current or original ratings on such Certificates.

(c)    The Holders of Certificates entitled to at least 51% of the Voting Rights may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, in triplicate, signed by such Holders or their attorneys-in-fact duly authorized, one complete set of which instruments shall be delivered to the Company, one complete set to the Trustee so removed and one complete set to the successor so appointed.

(d)    Any resignation or removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section shall become effective upon acceptance of appointment by the successor trustee as provided in Section 8.08.

Section 8.08.    Successor Trustee.

(a)    Any successor trustee appointed as provided in Section 8.07 shall execute, acknowledge and deliver to the Company and to its predecessor trustee an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor trustee shall become effective and

such successor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with the like effect as if originally named as trustee herein.  The predecessor trustee shall deliver to the successor trustee all Custodial Files and related documents and statements held by it hereunder (other than any Custodial Files at the time held by a Custodian, which shall become the agent of any successor trustee hereunder), and the Company, the Master Servicer and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

(b)    No successor trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor trustee shall be eligible under the provisions of Section 8.06.

(c)    Upon acceptance of appointment by a successor trustee as provided in this Section, the Company shall mail notice of the succession of such trustee hereunder to all Holders of Certificates at their addresses as shown in the Certificate Register.  If the Company fails to mail such notice within 10 days after acceptance of appointment by the successor trustee, the successor trustee shall cause such notice to be mailed at the expense of the Company.

Section 8.09.    Merger or Consolidation of Trustee.

    Any corporation or national banking association into which the Trustee may be merged or converted or with which it may be consolidated or any corporation or national  banking association resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation or national banking association succeeding to the business of the Trustee, shall be the successor of the Trustee hereunder, provided such corporation or national banking association shall be eligible under the provisions of Section 8.06, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.  The Trustee shall mail notice of any such merger or consolidation to the Certificateholders at their address as shown in the Certificate Register.

Section 8.10.    Appointment of Co-Trustee or Separate Trustee.

(a)    Notwithstanding any other provisions hereof, at any time, for the purpose of meeting any legal requirements of any jurisdiction in which any part of the Trust Fund or property securing the same may at the time be located, the Master Servicer and the Trustee acting jointly shall have the power and shall execute and deliver all instruments to appoint one or more Persons approved by the Trustee to act as co-trustee or co-trustees, jointly with the Trustee, or separate trustee or separate trustees, of all or any part of the Trust Fund, and to vest in such Person or Persons, in such capacity, such title to the Trust Fund, or any part thereof, and, subject to the other provisions of this Section 8.10, such powers, duties, obligations, rights and trusts as the Master Servicer and the Trustee may consider necessary or desirable.  If the Master Servicer shall not have joined in such appointment within 15 days after the receipt by it of a request so to do, or in case an Event of Default shall have occurred and be continuing, the Trustee alone shall have the power to make such appointment.  No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 8.06 hereunder and no notice to Holders of Certificates of the appointment of co-trustee(s) or separate trustee(s) shall be required under Section 8.08 hereof.

(b)    In the case of any appointment of a co-trustee or separate trustee pursuant to this Section 8.10 all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee, and such separate trustee or co-trustee jointly, except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed (whether as Trustee hereunder or as successor to the Master Servicer hereunder), the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the Trust Fund or any portion thereof in any such jurisdiction) shall be exercised and performed by such separate trustee or co-trustee at the direction of the Trustee.

(c)    Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them.  Every instrument appointing any separate trustee or co-trustee shall refer to this Agreement and the conditions of this Article VIII.  Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Agreement, specifically including every provision of this Agreement relating to the conduct of, affecting the liability of, or affording protection to, the Trustee.  Every such instrument shall be filed with the Trustee.

(d)    Any separate trustee or co-trustee may, at any time, constitute the Trustee, its agent or attorney-in-fact, with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Agreement on its behalf and in its name.  If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

Section 8.11.    Appointment of the Custodian.

    The Trustee may, with the consent of the Master Servicer and the Company, or shall, at the direction of the Company and the Master Servicer,

appoint custodians who are not Affiliates of the Company, the Master Servicer or any Seller to hold all or a portion of the Custodial Files as agent for the Trustee, by entering into a Custodial Agreement. Subject to Article VIII, the Trustee agrees to comply with the terms of each Custodial Agreement with respect to the Custodial Files and to enforce the terms and provisions thereof against the related custodian for the benefit of the Certificateholders. Each custodian shall be a depository institution subject to supervision by federal or state authority, shall have a combined capital and surplus of at least $15,000,000 and shall be qualified to do business in the jurisdiction in which it holds any Custodial File. Each Custodial Agreement, with respect to the Custodial Files, may be amended only as provided in Section 11.01. The Trustee shall notify the Certificateholders of the appointment of any custodian (other than the custodian appointed as of the Closing Date) pursuant to this Section 8.11.

Section 8.12.     Appointment of Office or Agency.

     The Trustee will maintain an office or agency in the United States at the address designated in Section 11.05 of the Series Supplement where Certificates may be surrendered for registration of transfer or exchange. The Trustee will maintain an office at the address stated in Section 11.05 of the Series Supplement where notices and demands to or upon the Trustee in respect of this Agreement may be served.

ARTICLE IX


                    TERMINATION OR OPTIONAL PURCHASE OF ALL CERTIFICATES

Section 9.01.     Optional Purchase by the Master Servicer of All
                  Certificates; Termination Upon Purchase by the Master
                  Servicer or Liquidation of All Mortgage Loans.

(a)    Subject to Section 9.02, the respective obligations and responsibilities of the Company, the Master Servicer and the Trustee created hereby in respect of the Certificates (other than the obligation of the Trustee to make certain payments after the Final Distribution Date to Certificateholders and the obligation of the Company to send certain notices as hereinafter set forth) shall terminate upon the last action required to be taken by the Trustee on the Final Distribution Date pursuant to this Article IX following the earlier of:

(i)    the later of the final payment or other liquidation (or any Advance
       with respect thereto) of the last Mortgage Loan remaining in the Trust
       Fund or the disposition of all property acquired upon foreclosure or
       deed in lieu of foreclosure of any Mortgage Loan, or

(ii)   the purchase by the Master Servicer of all Mortgage Loans and all
       property acquired in respect of any Mortgage Loan remaining in the
       Trust Fund at a price equal to 100% of the unpaid principal balance of
       each Mortgage Loan or, if less than such unpaid principal balance, the
       fair market value of the related underlying property of such Mortgage
       Loan with respect to Mortgage Loans as to which title has been acquired
       if such fair market value is less than such unpaid principal balance
       (net of any unreimbursed Advances attributable to principal) on the day
       of repurchase plus accrued interest thereon at the Net Mortgage Rate
       (or Modified Net Mortgage Rate in the case of any Modified Mortgage
       Loan) to, but not including, the first day of the month in which such
       repurchase price is distributed, provided, however, that in no event
       shall the trust created hereby continue beyond the expiration of 21
       years from the death of the last survivor of the descendants of Joseph
       P. Kennedy, the late ambassador of the United States to the Court of
       St. James, living on the date hereof and provided further that the
       purchase price set forth above shall be increased as is necessary, as
       determined by the Master Servicer, to avoid disqualification of any
       portion of any REMIC formed under the Series Supplement as a REMIC.
       The purchase price paid by the Master Servicer shall also include any
       amounts owed by Residential Funding pursuant to the last paragraph of
       Section 4 of the Assignment Agreement in respect of any liability,
       penalty or expense that resulted from a breach of the Compliance With
       Laws Representation, that remain unpaid on the date of such purchase.

     The right of the Master Servicer to purchase all the assets of the Trust Fund pursuant to clause (ii) above is conditioned upon the Pool Stated Principal Balance as of the Final Distribution Date, prior to giving effect to distributions to be made on such Distribution Date, being less than ten percent of the Cut-off Date Principal Balance of the Mortgage Loans.

     If such right is exercised by the Master Servicer, the Master Servicer shall be deemed to have been reimbursed for the full amount of any unreimbursed Advances theretofore made by it with respect to the Mortgage Loans. In addition, the Master Servicer shall provide to the Trustee the certification required by Section 3.15 and the Trustee and any Custodian shall, promptly following payment of the purchase price, release to the Master Servicer the Custodial Files pertaining to the Mortgage Loans being purchased.

     In addition to the foregoing, on any Distribution Date on which the Pool Stated Principal Balance, prior to giving effect to distributions to be made on such Distribution Date, is less than ten percent of the Cut-off Date Principal Balance of the Mortgage Loans, the Master Servicer shall have the right, at its option, to purchase the Certificates in whole, but not in part, at a price equal to the outstanding Certificate Principal Balance of such

Certificates plus the sum of Accrued Certificate Interest thereon for the related Interest Accrual Period and any previously unpaid Accrued Certificate Interest.  If the Master Servicer exercises this right to purchase the outstanding Certificates, the Master Servicer will promptly terminate the respective obligations and responsibilities created hereby in respect of the Certificates pursuant to this Article IX.

(b)    The Master Servicer shall give the Trustee not less than 40 days' prior notice of the Distribution Date on which the Master Servicer anticipates that the final distribution will be made to Certificateholders (whether as a result of the exercise by the Master Servicer of its right to purchase the assets of the Trust Fund or otherwise) or on which the Master Servicer anticipates that the Certificates will be purchased (as a result of the exercise by the Master Servicer to purchase the outstanding Certificates). Notice of any termination specifying the anticipated Final Distribution Date (which shall be a date that would otherwise be a Distribution Date) upon which the Certificateholders may surrender their Certificates to the Trustee (if so required by the terms hereof) for payment of the final distribution and cancellation or notice of any purchase of the outstanding Certificates, specifying the Distribution Date upon which the Holders may surrender their Certificates to the Trustee for payment, shall be given promptly by the Master Servicer (if it is exercising its right to purchase the assets of the Trust Fund or to purchase the outstanding Certificates), or by the Trustee (in any other case) by letter.  Such notice shall be prepared by the Master Servicer (if it is exercising its right to purchase the assets of the Trust Fund or to purchase the outstanding Certificates), or by the Trustee (in any other case) and mailed by the Trustee to the Certificateholders not earlier than the 15th day and not later than the 25th day of the month next preceding the month of such final distribution specifying:

(i)    the anticipated Final Distribution Date upon which final payment of the Certificates is anticipated to be made upon presentation and surrender of Certificates at the office or agency of the Trustee therein designated where required pursuant to this Agreement or, in the case of the purchase by the Master Servicer of the outstanding Certificates, the Distribution Date on which such purchase is to be made,

(ii)   the amount of any such final payment, or in the case of the purchase of the outstanding Certificates, the purchase price, in either case, if known, and

(iii)  that the Record Date otherwise applicable to such Distribution Date is not applicable, and in the case of the Senior Certificates, or in the case of all of the Certificates in connection with the exercise by the Master Servicer of its right to purchase the Certificates, that payment will be made only upon presentation and surrender of the Certificates at the office or agency of the Trustee therein specified.

If the Master Servicer is obligated to give notice to Certificateholders as aforesaid, it shall give such notice to the Certificate Registrar at the time such notice is given to Certificateholders and, if the Master Servicer is exercising its rights to purchase the outstanding Certificates, it shall give such notice to each Rating Agency at the time such notice is given to Certificateholders. As a result of the exercise by the Master Servicer of its right to purchase the assets of the Trust Fund, the Master Servicer shall deposit in the Certificate Account, before the Final Distribution Date in immediately available funds an amount equal to the purchase price for the assets of the Trust Fund, computed as provided above.  As a result of the exercise by the Master Servicer of its right to purchase the outstanding Certificates, the Master Servicer shall deposit in an Eligible Account, established by the Master Servicer on behalf of the Trustee and separate from the Certificate Account in the name of the Trustee in trust for the registered holders of the Certificates, before the Distribution Date on which such purchase is to occur in immediately available funds in an amount equal to the purchase price for the Certificates, computed as above provided, and provide notice of such deposit to the Trustee.  The Trustee will withdraw from such account the amount specified in subsection (c) below.

(c)    In the case of the Senior Certificates, upon presentation and surrender of the Certificates by the Certificateholders thereof, and in the case of the Class M and Class B Certificates, upon presentation and surrender of the Certificates by the Certificateholders thereof in connection with the exercise by the Master Servicer of its right to purchase the Certificates, and otherwise in accordance with Section 4.01(a), the Trustee shall distribute to the Certificateholders (i) the amount otherwise distributable on such Distribution Date, if not in connection with the Master Servicer's election to repurchase the assets of the Trust Fund or the outstanding Certificates, or (ii) if the Master Servicer elected to so repurchase the assets of the Trust Fund or the outstanding Certificates, an amount determined as follows:  (A) with respect to each Certificate the outstanding Certificate Principal Balance thereof, plus Accrued Certificate Interest for the related Interest Accrual Period thereon and any previously unpaid Accrued Certificate Interest, subject to the priority set forth in Section 4.02(a), and (B) with respect to the Class R Certificates, any excess of the amounts available for distribution (including the repurchase price specified in clause (ii) of subsection (a) of this Section) over the total amount distributed under the immediately preceding clause (A).  Notwithstanding the reduction of the Certificate Principal Balance of any Class of Subordinate Certificates to zero, such Class will be outstanding hereunder until the termination of the respective obligations and responsibilities of the Company, the Master Servicer and the Trustee hereunder in accordance with Article IX.

(d)    If any Certificateholders shall not surrender their Certificates for final payment and cancellation on or before the Final Distribution Date (if so required by the terms hereof), the Trustee shall on such date cause all funds in the Certificate Account not distributed in final distribution to Certificateholders to be withdrawn therefrom and credited to the remaining Certificateholders by depositing such funds in a separate escrow account for the benefit of such Certificateholders, and the Master Servicer (if it

exercised its right to purchase the assets of the Trust Fund), or the Trustee (in any other case) shall give a second written notice to the remaining Certificateholders to surrender their Certificates for cancellation and receive the final distribution with respect thereto.  If within six months after the second notice any Certificate shall not have been surrendered for cancellation, the Trustee shall take appropriate steps as directed by the Master Servicer to contact the remaining Certificateholders concerning surrender of their Certificates.  The costs and expenses of maintaining the escrow account and of contacting Certificateholders shall be paid out of the assets which remain in the escrow account.  If within nine months after the second notice any Certificates shall not have been surrendered for cancellation, the Trustee shall pay to the Master Servicer all amounts distributable to the holders thereof and the Master Servicer shall thereafter hold such amounts until distributed to such Holders.  No interest shall accrue or be payable to any Certificateholder on any amount held in the escrow account or by the Master Servicer as a result of such Certificateholder's failure to surrender its Certificate(s) for final payment thereof in accordance with this Section 9.01.

(e)    If any Certificateholders do not surrender their Certificates on or before the Distribution Date on which a purchase of the outstanding Certificates is to be made, the Trustee shall on such date cause all funds in the Certificate Account deposited therein by the Master Servicer pursuant to Section 9.01(b) to be withdrawn therefrom and deposited in a separate escrow account for the benefit of such Certificateholders, and the Master Servicer shall give a second written notice to such Certificateholders to surrender their Certificates for payment of the purchase price therefor.  If within six months after the second notice any Certificate shall not have been surrendered for cancellation, the Trustee shall take appropriate steps as directed by the Master Servicer to contact the Holders of such Certificates concerning surrender of their Certificates.  The costs and expenses of maintaining the escrow account and of contacting Certificateholders shall be paid out of the assets which remain in the escrow account.  If within nine months after the second notice any Certificates shall not have been surrendered for cancellation in accordance with this Section 9.01, the Trustee shall pay to the Master Servicer all amounts distributable to the Holders thereof and the Master Servicer shall thereafter hold such amounts until distributed to such Holders.  No interest shall accrue or be payable to any Certificateholder on any amount held in the escrow account or by the Master Servicer as a result of such Certificateholder's failure to surrender its Certificate(s) for payment in accordance with this Section 9.01.  Any Certificate that is not surrendered on the Distribution Date on which a purchase pursuant to this Section 9.01 occurs as provided above will be deemed to have been purchased and the Holder as of such date will have no rights with respect thereto except to receive the purchase price therefor minus any costs and expenses associated with such escrow account and notices allocated thereto.  Any Certificates so purchased or deemed to have been purchased on such Distribution Date shall remain outstanding hereunder until the Master Servicer has terminated the respective obligations and responsibilities created hereby in respect of the Certificates pursuant to this Article IX.  The Master Servicer shall be for all purposes the Holder thereof as of such date.

Section 9.02.    Additional Termination Requirements.

(a)    Each REMIC that comprises the Trust Fund shall be terminated in accordance with the following additional requirements, unless (subject to Section 10.01(f)) the Trustee and the Master Servicer have received an Opinion of Counsel (which Opinion of Counsel shall not be an expense of the Trustee) to the effect that the failure of each such REMIC to comply with the requirements of this Section 9.02 will not (i) result in the imposition on the Trust  Fund of taxes on "prohibited transactions," as described in Section 860F of the Code, or (ii) cause any such REMIC to fail to qualify as a REMIC at any time that any Certificate is outstanding:

(i)    The Master Servicer shall establish a 90-day liquidation period for each such REMIC and specify the first day of such period in a statement attached to the Trust Fund's final Tax Return pursuant to Treasury regulations Section 1.860F-1.  The Master Servicer also shall satisfy all of the requirements of a qualified liquidation for a REMIC under Section 860F of the Code and regulations thereunder;

(ii)   The Master Servicer shall notify the Trustee at the commencement of such 90-day liquidation period and, at or prior to the time of making of the final payment on the Certificates, the Trustee shall sell or otherwise dispose of all of the remaining assets of the Trust Fund in accordance with the terms hereof; and

(iii)  If the Master Servicer or the Company is exercising its right to purchase the assets of the Trust Fund, the Master Servicer shall, during the 90-day liquidation period and at or prior to the Final Distribution Date, purchase all of the assets of the Trust Fund for cash.

(b)    Each Holder of a Certificate and the Trustee hereby irrevocably approves and appoints the Master Servicer as its attorney-in-fact to adopt a plan of complete liquidation for each REMIC at the expense of the Trust Fund in accordance with the terms and conditions of this Agreement.

Section 9.03.    Termination of Multiple REMICs.

If the REMIC Administrator makes two or more separate REMIC elections, the applicable REMIC shall be terminated on the earlier of the Final Distribution Date and the date on which it is deemed to receive the last deemed distributions on the related Uncertificated REMIC Regular Interests and the last distribution due on the Certificates is made.

ARTICLE X

REMIC PROVISIONS

Section 10.01.    REMIC Administration.

(a)    The REMIC Administrator shall make an election to treat the Trust Fund
as one or more REMICs under the Code and, if necessary, under applicable
state law.  The assets of each such REMIC will be set forth in the Series
Supplement.  Such election will be made on Form 1066 or other appropriate
federal tax or information return (including Form 8811) or any appropriate
state return for the taxable year ending on the last day of the calendar year
in which the Certificates are issued.  For the purposes of each REMIC
election in respect of the Trust Fund, Certificates and interests to be
designated as the "regular interests" and the sole class of "residual
interests" in the REMIC will be set forth in Section 10.03 of the Series
Supplement.  The REMIC Administrator and the Trustee shall not permit the
creation of any "interests" (within the meaning of Section 860G of the Code)
in any REMIC elected in respect of the Trust Fund other than "regular
interests" and "residual interests" so designated.

(b)    The Closing Date is hereby designated as the "startup day" of the Trust
Fund within the meaning of Section 860G(a)(9) of the Code.

(c)    The REMIC Administrator shall hold a Class R Certificate representing a
0.01% Percentage Interest each Class of the Class R Certificates and shall be
designated as "the tax matters person" with respect to each REMIC in the
manner provided under Treasury regulations section 1.860F-4(d) and Treasury
regulations section 301.6231(a)(7)-1. The REMIC Administrator, as tax matters
person, shall (i) act on behalf of each REMIC in relation to any tax matter
or controversy involving the Trust Fund and (ii) represent the Trust Fund in
any administrative or judicial proceeding relating to an examination or audit
by any governmental taxing authority with respect thereto.  The legal
expenses, including without limitation attorneys' or accountants' fees, and
costs of any such proceeding and any liability resulting therefrom shall be
expenses of the Trust Fund and the REMIC Administrator shall be entitled to
reimbursement therefor out of amounts attributable to the Mortgage Loans on
deposit in the Custodial Account as provided by Section 3.10 unless such
legal expenses and costs are incurred by reason of the REMIC Administrator's
willful misfeasance, bad faith or gross negligence.  If the REMIC
Administrator is no longer the Master Servicer hereunder, at its option the
REMIC Administrator may continue its duties as REMIC Administrator and shall
be paid reasonable compensation not to exceed $3,000 per year by any
successor Master Servicer hereunder for so acting as the REMIC Administrator.

(d)    The REMIC Administrator shall prepare or cause to be prepared all of
the Tax Returns that it determines are required with respect to each REMIC
created hereunder and deliver such Tax Returns in a timely manner to the
Trustee and the Trustee shall sign and file such Tax Returns in a timely
manner.  The expenses of preparing such returns shall be borne by the REMIC
Administrator without any right of reimbursement therefor.  The REMIC
Administrator agrees to indemnify and hold harmless the Trustee with respect
to any tax or liability arising from the Trustee's signing of Tax Returns
that contain errors or omissions.  The Trustee and Master Servicer shall
promptly provide the REMIC Administrator with such information as the REMIC
Administrator may from time to time request for the purpose of enabling the
REMIC Administrator to prepare Tax Returns.

(e)    The REMIC Administrator shall provide (i) to any Transferor of a Class
R Certificate such information as is necessary for the application of any tax
relating to the transfer of a Class R Certificate to any Person who is not a
Permitted Transferee, (ii) to the Trustee, and the Trustee shall forward to
the Certificateholders, such information or reports as are required by the
Code or the REMIC Provisions including reports relating to interest, original
issue discount and market discount or premium (using the Prepayment
Assumption) and (iii) to the Internal Revenue Service the name, title,
address and telephone number of the person who will serve as the
representative of each REMIC.

(f)    The Master Servicer and the REMIC Administrator shall take such actions
and shall cause each REMIC created hereunder to take such actions as are
reasonably within the Master Servicer's or the REMIC Administrator's control
and the scope of its duties more specifically set forth herein as shall be
necessary or desirable to maintain the status of each REMIC as a REMIC under
the REMIC Provisions (and the Trustee shall assist the Master Servicer and
the REMIC Administrator, to the extent reasonably requested by the Master
Servicer and the REMIC Administrator to do so).  The Master Servicer and the
REMIC Administrator shall not knowingly or intentionally take any action,
cause the Trust Fund to take any action or fail to take or fail to cause to
be taken) any action reasonably within their respective control that, under
the REMIC Provisions, if taken or not taken, as the case may be, could (i)
endanger the status of any portion of any REMIC formed under the Series
Supplement as a REMIC or (ii) result in the imposition of a tax upon any such
REMIC (including but not limited to the tax on prohibited transactions as
defined in Section 860F(a)(2) of the Code and the tax on contributions to a
REMIC set forth in Section 860G(d) of the Code) (either such event, in the
absence of an Opinion of Counsel or the indemnification referred to in this
sentence, an "Adverse REMIC Event") unless the Master Servicer or the REMIC
Administrator, as applicable, has received an Opinion of Counsel (at the
expense of the party seeking to take such action or, if such party fails to

pay such expense, and the Master Servicer or the REMIC Administrator, as applicable, determines that taking such action is in the best interest of the Trust Fund and the Certificateholders, at the expense of the Trust Fund, but in no event at the expense of the Master Servicer, the REMIC Administrator or the Trustee) to the effect that the contemplated action will not, with respect to each REMIC created hereunder, endanger such status or, unless the Master Servicer, the REMIC Administrator or both, as applicable, determine in its or their sole discretion to indemnify the Trust Fund against the imposition of such a tax, result in the imposition of such a tax. Wherever in this Agreement a contemplated action may not be taken because the timing of such action might result in the imposition of a tax on the Trust Fund, or may only be taken pursuant to an Opinion of Counsel that such action would not impose a tax on the Trust Fund, such action may nonetheless be taken provided that the indemnity given in the preceding sentence with respect to any taxes that might be imposed on the Trust Fund has been given and that all other preconditions to the taking of such action have been satisfied. The Trustee shall not take or fail to take any action (whether or not authorized hereunder) as to which the Master Servicer or the REMIC Administrator, as applicable, has advised it in writing that it has received an Opinion of Counsel to the effect that an Adverse REMIC Event could occur with respect to such action. In addition, prior to taking any action with respect to any REMIC created hereunder or any related assets thereof, or causing any such REMIC to take any action, which is not expressly permitted under the terms of this Agreement, the Trustee will consult with the Master Servicer or the REMIC Administrator, as applicable, or its designee, in writing, with respect to whether such action could cause an Adverse REMIC Event to occur with respect to any such REMIC, and the Trustee shall not take any such action or cause any such REMIC to take any such action as to which the Master Servicer or the REMIC Administrator, as applicable, has advised it in writing that an Adverse REMIC Event could occur. The Master Servicer or the REMIC Administrator, as applicable, may consult with counsel to make such written advice, and the cost of same shall be borne by the party seeking to take the action not expressly permitted by this Agreement, but in no event at the expense of the Master Servicer or the REMIC Administrator. At all times as may be required by the Code, the Master Servicer will to the extent within its control and the scope of its duties more specifically set forth herein, maintain substantially all of the assets of each REMIC created hereunder as "qualified mortgages" as defined in Section 860G(a)(3) of the Code and "permitted investments" as defined in Section 860G(a)(5) of the Code.

(g)    In the event that any tax is imposed on "prohibited transactions" of any REMIC created hereunder as defined in Section 860F(a)(2) of the Code, on "net income from foreclosure property" of any such REMIC as defined in Section 860G(c) of the Code, on any contributions to any such REMIC after the Startup Day therefor pursuant to Section 860G(d) of the Code, or any other tax is imposed by the Code or any applicable provisions of state or local tax laws, such tax shall be charged (i) to the Master Servicer, if such tax arises out of or results from a breach by the Master Servicer of any of its obligations under this Agreement or the Master Servicer has in its sole discretion determined to indemnify the Trust Fund against such tax, (ii) to the Trustee, if such tax arises out of or results from a breach by the Trustee of any of its obligations under this Article X, or (iii) otherwise against amounts on deposit in the Custodial Account as provided by Section 3.10 and on the Distribution Date(s) following such reimbursement the aggregate of such taxes shall be allocated in reduction of the Accrued Certificate Interest on each Class entitled thereto in the same manner as if such taxes constituted a Prepayment Interest Shortfall.

(h)    The Trustee and the Master Servicer shall, for federal income tax purposes, maintain books and records with respect to each REMIC created hereunder on a calendar year and on an accrual basis or as otherwise may be required by the REMIC Provisions.

(i)    Following the Startup Day, neither the Master Servicer nor the Trustee shall accept any contributions of assets to any REMIC created hereunder unless (subject to Section 10.01(f)) the Master Servicer and the Trustee shall have received an Opinion of Counsel (at the expense of the party seeking to make such contribution) to the effect that the inclusion of such assets in such REMIC will not cause the REMIC to fail to qualify as a REMIC at any time that any Certificates are outstanding or subject the REMIC to any tax under the REMIC Provisions or other applicable provisions of federal, state and local law or ordinances.

(j)    Neither the Master Servicer nor the Trustee shall (subject to Section 10.01(f)) enter into any arrangement by which any REMIC created hereunder will receive a fee or other compensation for services nor permit any such REMIC to receive any income from assets other than "qualified mortgages" as defined in Section 860G(a)(3) of the Code or "permitted investments" as defined in Section 860G(a)(5) of the Code.

(k)    Solely for the purposes of Section 1.860G-1(a)(4)(iii) of the Treasury Regulations, the "latest possible maturity date" by which the Certificate Principal Balance of each Class of Certificates (other than the Interest Only Certificates) representing a regular interest in the applicable REMIC and the Uncertificated Principal Balance of each Uncertificated REMIC Regular Interest (other than each Uncertificated REMIC Regular Interest represented by a Class A-V Certificate, if any) and the rights to the Interest Only Certificates and Uncertificated REMIC Regular Interest represented by a Class A-V Certificate would be reduced to zero is the Maturity Date for each such Certificate and Interest.

(l)    Within 30 days after the Closing Date, the REMIC Administrator shall prepare and file with the Internal Revenue Service Form 8811, "Information Return for Real Estate Mortgage Investment Conduits (REMIC) and Issuers of Collateralized Debt Obligations" for each REMIC created hereunder.

(m)    Neither the Trustee nor the Master Servicer shall sell, dispose of or substitute for any of the Mortgage Loans (except in connection with (i) the default, imminent default or foreclosure of a Mortgage Loan, including but not limited to, the acquisition or sale of a Mortgaged Property acquired by

deed in lieu of foreclosure, (ii) the bankruptcy of any REMIC created hereunder, (iii) the termination of any such REMIC pursuant to Article IX of this Agreement or (iv) a purchase of Mortgage Loans pursuant to Article II or III of this Agreement) nor acquire any assets for any such REMIC, nor sell or dispose of any investments in the Custodial Account or the Certificate Account for gain nor accept any Contributions to any such REMIC after the Closing Date unless it has received an Opinion of Counsel that such sale, disposition, substitution or acquisition will not (a) affect adversely the status of such REMIC as a REMIC or (b) unless the Master Servicer has determined in its sole discretion to indemnify the Trust Fund against such tax, cause such REMIC to be subject to a tax on "prohibited transactions" or "contributions" pursuant to the REMIC Provisions.

Section 10.02.    Master Servicer, REMIC Administrator and Trustee
                  Indemnification.

(a)    The Trustee agrees to indemnify the Trust Fund, the Company, the REMIC Administrator and the Master Servicer for any taxes and costs including, without limitation, any reasonable attorneys fees imposed on or incurred by the Trust Fund, the Company or the Master Servicer, as a result of a breach of the Trustee's covenants set forth in Article VIII or this Article X.

(b)    The REMIC Administrator agrees to indemnify the Trust Fund, the Company, the Master Servicer and the Trustee for any taxes and costs (including, without limitation, any reasonable attorneys' fees) imposed on or incurred by the Trust Fund, the Company, the Master Servicer or the Trustee, as a result of a breach of the REMIC Administrator's covenants set forth in this Article X with respect to compliance with the REMIC Provisions, including without limitation, any penalties arising from the Trustee's execution of Tax Returns prepared by the REMIC Administrator that contain errors or omissions; provided, however, that such liability will not be imposed to the extent such breach is a result of an error or omission in information provided to the REMIC Administrator by the Master Servicer in which case Section 10.02(c) will apply.

(c)    The Master Servicer agrees to indemnify the Trust Fund, the Company, the REMIC Administrator and the Trustee for any taxes and costs (including, without limitation, any reasonable attorneys' fees) imposed on or incurred by the Trust Fund, the Company, the REMIC Administrator or the Trustee, as a result of a breach of the Master Servicer's covenants set forth in this Article X or in Article III with respect to compliance with the REMIC Provisions, including without limitation, any penalties arising from the Trustee's execution of Tax Returns prepared by the Master Servicer that contain errors or omissions.

Section 10.03.    Designation of REMIC(s).

    As provided in Section 10.03 of the Series Supplement.

Section 10.04.    Distributions on the Uncertificated REMIC I and REMIC II
                  Regular Interests.

    As provided in Section 10.04 of the Series Supplement.

Section 10.05.    Compliance with Withholding Requirements.

    As provided in Section 10.05 of the Series Supplement.

---

ARTICLE XI


                         MISCELLANEOUS PROVISIONS

Section 11.01.    Amendment.

(a)    This Agreement or any Custodial Agreement may be amended from time to time by the Company, the Master Servicer and the Trustee, without the consent of any of the Certificateholders:

(i)    to cure any ambiguity,

(ii)   to correct or supplement any provisions herein or therein, which may be inconsistent with any other provisions herein or therein or to correct any error,

(iii)  to modify, eliminate or add to any of its provisions to such extent as shall be necessary or desirable to maintain the qualification of the Trust Fund as a REMIC at all times that any Certificate is outstanding or to avoid or minimize the risk of the imposition of any tax on the Trust Fund pursuant to the Code that would be a claim against the Trust Fund, provided that the Trustee has received an Opinion of Counsel to the effect that (A) such action is necessary or desirable to maintain such qualification or to avoid or minimize the risk of the imposition of any such tax and (B) such action will not adversely affect in any material respect the interests of any Certificateholder,

(iv)   to change the timing and/or nature of deposits into the Custodial Account or the Certificate Account or to change the name in which the Custodial Account is maintained, provided that (A) the Certificate Account Deposit Date shall in no event be later than the related Distribution Date, (B) such change shall not, as evidenced by an Opinion of Counsel, adversely affect in any material respect the interests of any Certificateholder and (C) such change shall not result

in a reduction of the rating assigned to any Class of Certificates below the lower of the then-current rating or the rating assigned to such Certificates as of the Closing Date (in the case of the Insured Certificates (as defined in the Series Supplement), such determination shall be made without giving effect to the Certificate Policy (as defined in the Series Supplement)), as evidenced by a letter from each Rating Agency to such effect,

(v)     to modify, eliminate or add to the provisions of Section 5.02(f) or any other provision hereof restricting transfer of the Class R Certificates, by virtue of their being the "residual interests" in a REMIC, provided that (A) such change shall not result in reduction of the rating assigned to any such Class of Certificates below the lower of the then-current rating or the rating assigned to such Certificates as of the Closing Date (in the case of the Insured Certificates (as defined in the Series Supplement), such determination shall be made without giving effect to the Certificate Policy (as defined in the Series Supplement)), as evidenced by a letter from each Rating Agency to such effect, and (B) such change shall not (subject to Section 10.01(f)), as evidenced by an Opinion of Counsel (at the expense of the party seeking so to modify, eliminate or add such provisions), cause any REMIC created hereunder or any of the Certificateholders (other than the transferor) to be subject to a federal tax caused by a transfer to a Person that is not a Permitted Transferee,

(vi)    to make any other provisions with respect to matters or questions arising under this Agreement or such Custodial Agreement which shall not be materially inconsistent with the provisions of this Agreement, provided that such action shall not, as evidenced by an Opinion of Counsel, adversely affect in any material respect the interests of any Certificateholder or

        (vii) to amend any provision herein or therein that is not material to any of the Certificateholders.

(b)     This Agreement or any Custodial Agreement may also be amended from time to time by the Company, the Master Servicer and the Trustee with the consent of the Holders of Certificates evidencing in the aggregate not less than 66% of the Percentage Interests of each Class of Certificates with a Certificate Principal Balance greater than zero affected thereby for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement or such Custodial Agreement or of modifying in any manner the rights of the Holders of Certificates of such Class; provided, however, that no such amendment shall:

(i)     reduce in any manner the amount of, or delay the timing of, payments which are required to be distributed on any Certificate without the consent of the Holder of such Certificate,

(ii)    reduce the aforesaid percentage of Certificates of any Class the Holders of which are required to consent to any such amendment, in any such case without the consent of the Holders of all Certificates of such Class then outstanding.

(c)     Notwithstanding any contrary provision of this Agreement, the Trustee shall not consent to any amendment to this Agreement unless it shall have first received an Opinion of Counsel (subject to Section 10.01(f) and at the expense of the party seeking such amendment) to the effect that such amendment or the exercise of any power granted to the Master Servicer, the Company or the Trustee in accordance with such amendment is permitted hereunder and will not result in the imposition of a federal tax on the Trust Fund or cause any REMIC created under the Series Supplement to fail to qualify as a REMIC at any time that any Certificate is outstanding.

(d)     Promptly after the execution of any such amendment the Trustee shall furnish written notification of the substance of such amendment to the Custodian and each Certificateholder.  It shall not be necessary for the consent of Certificateholders under this Section 11.01 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent shall approve the substance thereof.  The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Certificateholders shall be subject to such reasonable regulations as the Trustee may prescribe.

(e)     The Company shall have the option, in its sole discretion, to obtain and deliver to the Trustee any corporate guaranty, payment obligation, irrevocable letter of credit, surety bond, insurance policy or similar instrument or a reserve fund, or any combination of the foregoing, for the purpose of protecting the Holders of the Class B Certificates against any or all Realized Losses or other shortfalls.  Any such instrument or fund shall be held by the Trustee for the benefit of the Class B Certificateholders, but shall not be and shall not be deemed to be under any circumstances included in the Trust Fund.  To the extent that any such instrument or fund constitutes a reserve fund for federal income tax purposes, (i) any reserve fund so established shall be an outside reserve fund and not an asset of the Trust Fund, (ii) any such reserve fund shall be owned by the Company, and (iii) amounts transferred by the Trust Fund to any such reserve fund shall be treated as amounts distributed by the Trust Fund to the Company or any successor, all within the meaning of Treasury Regulations Section 1.860G-2(h) as it reads as of the Cut-off Date.  In connection with the provision of any such instrument or fund, this Agreement and any provision hereof may be modified, added to, deleted or otherwise amended in any manner that is related or incidental to such instrument or fund or the establishment or administration thereof, such amendment to be made by written instrument executed or consented to by the Company but without the consent of any Certificateholder and without the consent of the Master Servicer or the Trustee being required unless any such amendment would impose any additional obligation on, or otherwise adversely affect the interests of the Senior Certificateholders, the Class M Certificateholders, the Master Servicer or the Trustee, as applicable; provided that the Company obtains (subject to

Section 10.01(f)) an Opinion of Counsel (which need not be an opinion of Independent counsel) to the effect that any such amendment will not cause (a) any federal tax to be imposed on the Trust Fund, including without limitation, any federal tax imposed on "prohibited transactions" under Section 860F(a)(1) of the Code or on "contributions after the startup date" under Section 860G(d)(1) of the Code and (b) any REMIC created hereunder to fail to qualify as a REMIC at any time that any Certificate is outstanding. In the event that the Company elects to provide such coverage in the form of a limited guaranty provided by GMAC LLC, the Company may elect that the text of such amendment to this Agreement shall be substantially in the form attached hereto as Exhibit K (in which case Residential Funding's Subordinate Certificate Loss Obligation as described in such exhibit shall be established by Residential Funding's consent to such amendment) and that the limited guaranty shall be executed in the form attached hereto as Exhibit L, with such changes as the Company shall deem to be appropriate; it being understood that the Trustee has reviewed and approved the content of such forms and that the Trustee's consent or approval to the use thereof is not required.

Section 11.02.     Recordation of Agreement; Counterparts.

(a)    To the extent permitted by applicable law, this Agreement is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any or all of the properties subject to the Mortgages are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Master Servicer and at its expense on direction by the Trustee (pursuant to the request of Holders of Certificates entitled to at least 25% of the Voting Rights), but only upon direction accompanied by an Opinion of Counsel to the effect that such recordation materially and beneficially affects the interests of the Certificateholders.

(b)    For the purpose of facilitating the recordation of this Agreement as herein provided and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

Section 11.03.     Limitation on Rights of Certificateholders.

(a)    The death or incapacity of any Certificateholder shall not operate to terminate this Agreement or the Trust Fund, nor entitle such Certificateholder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust Fund, nor otherwise affect the rights, obligations and liabilities of any of the parties hereto.

(b)    No Certificateholder shall have any right to vote (except as expressly provided herein) or in any manner otherwise control the operation and management of the Trust Fund, or the obligations of the parties hereto, nor shall anything herein set forth, or contained in the terms of the Certificates, be construed so as to constitute the Certificateholders from time to time as partners or members of an association; nor shall any Certificateholder be under any liability to any third person by reason of any action taken by the parties to this Agreement pursuant to any provision hereof.

(c)    No Certificateholder shall have any right by virtue of any provision of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee a written notice of default and of the continuance thereof, as hereinbefore provided, and unless also the Holders of Certificates of any Class evidencing in the aggregate not less than 25% of the related Percentage Interests of such Class, shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby, and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity, shall have neglected or refused to institute any such action, suit or proceeding it being understood and intended, and being expressly covenanted by each Certificateholder with every other Certificateholder and the Trustee, that no one or more Holders of Certificates of any Class shall have any right in any manner whatever by virtue of any provision of this Agreement to affect, disturb or prejudice the rights of the Holders of any other of such Certificates of such Class or any other Class, or to obtain or seek to obtain priority over or preference to any other such Holder, or to enforce any right under this Agreement, except in the manner herein provided and for the common benefit of Certificateholders of such Class or all Classes, as the case may be.   For the protection and enforcement of the provisions of this Section 11.03, each and every Certificateholder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

Section 11.04.     Governing Law.

This agreement and the Certificates shall be governed by and construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

Section 11.05.     Notices.

As provided in Section 11.05 of the Series Supplement.

Section 11.06.     Required Notices to Rating Agency and Subservicer.

The Company, the Master Servicer or the Trustee, as applicable, (i) shall notify each Rating Agency at such time as it is otherwise required pursuant to this Agreement to give notice of the occurrence of, any of the events described in clause (a), (b), (c), (d), (g), (h), (i) or (j) below, (ii) shall notify the Subservicer at such time as it is otherwise required

pursuant to this Agreement to give notice of the occurrence of, any of the events described in clause (a), (b), c)(1), (g)(1), or (i) below, or (iii) provide a copy to each Rating Agency at such time as otherwise required to be delivered pursuant to this Agreement of any of the statements described in clauses (e) and (f) below:

(a)    a material change or amendment to this Agreement,

(b)    the occurrence of an Event of Default,

(c)    (1) the termination or appointment of a successor Master Servicer or (2) the termination or appointment of a successor Trustee or a change in the majority ownership of the Trustee,

(d)    the filing of any claim under the Master Servicer's blanket fidelity bond and the errors and omissions insurance policy required by Section 3.12 or the cancellation or modification of coverage under any such instrument,

(e)    the statement required to be delivered to the Holders of each Class of Certificates pursuant to Section 4.03,

(f)    the statements required to be delivered pursuant to Sections 3.18 and 3.19,

(g)    (1) a change in the location of the Custodial Account or (2) a change in the location of the Certificate Account,

(h)    the occurrence of any monthly cash flow shortfall to the Holders of any Class of Certificates resulting from the failure by the Master Servicer to make an Advance pursuant to Section 4.04,

(i)    the occurrence of the Final Distribution Date, and

(j)    the repurchase of or substitution for any Mortgage Loan,

provided, however, that with respect to notice of the occurrence of the events described in clauses (d), (g) or (h) above, the Master Servicer shall provide prompt written notice to each Rating Agency and the Subservicer, if applicable, of any such event known to the Master Servicer.

Section 11.07.    Severability of Provisions.

    If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or of the Certificates or the rights of the Holders thereof.

Section 11.08.    Supplemental Provisions for Resecuritization.

    This Agreement may be supplemented by means of the addition of a separate Article hereto (a "Supplemental Article") for the purpose of resecuritizing any of the Certificates issued hereunder, under the following circumstances.  With respect to any Class or Classes of Certificates issued hereunder, or any portion of any such Class, as to which the Company or any of its Affiliates (or any designee thereof) is the registered Holder (the "Resecuritized Certificates"), the Company may deposit such Resecuritized Certificates into a new REMIC, grantor trust or custodial arrangement (a "Restructuring Vehicle") to be held by the Trustee pursuant to a Supplemental Article.  The instrument adopting such Supplemental Article shall be executed by the Company, the Master Servicer and the Trustee; provided, that neither the Master Servicer nor the Trustee shall withhold their consent thereto if their respective interests would not be materially adversely affected thereby.  To the extent that the terms of the Supplemental Article do not in any way affect any provisions of this Agreement as to any of the Certificates initially issued hereunder, the adoption of the Supplemental Article shall not constitute an "amendment" of this Agreement.

    Each Supplemental Article shall set forth all necessary provisions relating to the holding of the Resecuritized Certificates by the Trustee, the establishment of the Restructuring Vehicle, the issuing of various classes of new certificates by the Restructuring Vehicle and the distributions to be made thereon, and any other provisions necessary for the purposes thereof. In connection with each Supplemental Article, the Company shall deliver to the Trustee an Opinion of Counsel to the effect that (i) the Restructuring Vehicle will qualify as a REMIC, grantor trust or other entity not subject to taxation for federal income tax purposes and (ii) the adoption of the Supplemental Article will not endanger the status of the Trust Fund as a REMIC or (subject to Section 10.01(f)) result in the imposition of a tax upon the Trust Fund (including but not limited to the tax on prohibited transactions as defined in Section 860F(a)(2) of the Code and the tax on contributions to a REMIC as set forth in Section 860G(d) of the Code).

Section 11.09.    Allocation of Voting Rights.

    As provided in Section 11.09 of the Series Supplement.

Section 11.10.    No Petition.

    As provided in Section 11.10 of the Series Supplement.

ARTICLE XII

COMPLIANCE WITH REGULATION AB

Section 12.01.    Intent of the Parties; Reasonableness.

The Company, the Trustee and the Master Servicer acknowledge and agree that the purpose of this Article XII is to facilitate compliance by the Company with the provisions of Regulation AB and related rules and regulations of the Commission. The Company shall not exercise its right to request delivery of information or other performance under these provisions other than in good faith, or for purposes other than compliance with the Securities Act, the Exchange Act and the rules and regulations of the Commission under the Securities Act and the Exchange Act. Each of the Master Servicer and the Trustee acknowledges that interpretations of the requirements of Regulation AB may change over time, whether due to interpretive guidance provided by the Commission or its staff, consensus among participants in the mortgage-backed securities markets, advice of counsel, or otherwise, and agrees to comply with reasonable requests made by the Company in good faith for delivery of information under these provisions on the basis of evolving interpretations of Regulation AB. Each of the Master Servicer and the Trustee shall cooperate reasonably with the Company to deliver to the Company (including any of its assignees or designees), any and all disclosure, statements, reports, certifications, records and any other information necessary in the reasonable, good faith determination of the Company to permit the Company to comply with the provisions of Regulation AB.

Section 12.02.    Additional Representations and Warranties of the Trustee.

(a)    The Trustee shall be deemed to represent and warrant to the Company as of the Closing Date and on each date on which information is provided to the Company under Sections 12.01, 12.02(b) or 12.03 that, except as disclosed in writing to the Company prior to such date: (i) it is not aware and has not received notice that any default, early amortization or other performance triggering event has occurred as to any other Securitization Transaction due to any default of the Trustee; (ii) there are no aspects of its financial condition that could have a material adverse effect on the performance by it of its trustee obligations under this Agreement or any other Securitization Transaction as to which it is the trustee; (iii) there are no material legal or governmental proceedings pending (or known to be contemplated) against it that would be material to Certificateholders; (iv) there are no relationships or transactions (as described in Item 1119(b) of Regulation AB) relating to the Trustee with respect to the Company or any sponsor, issuing entity, servicer, trustee, originator, significant obligor, enhancement or support provider or other material transaction party (as each of such terms are used in Regulation AB) relating to the Securitization Transaction contemplated by the Agreement, as identified by the Company to the Trustee in writing as of the Closing Date (each, a "Transaction Party") that are outside the ordinary course of business or on terms other than would be obtained in an arm's length transaction with an unrelated third party, apart from the Securitization Transaction, and that are material to the investors' understanding of the Certificates; and (v) the Trustee is not an affiliate (as contemplated by Item 1119(a) of Regulation AB) of any Transaction Party. The Company shall notify the Trustee of any change in the identity of a Transaction Party after the Closing Date.

(b)    If so requested by the Company on any date following the Closing Date, the Trustee shall, within five Business Days following such request, confirm in writing the accuracy of the representations and warranties set forth in paragraph (a) of this Section or, if any such representation and warranty is not accurate as of the date of such confirmation, provide the pertinent facts, in writing, to the Company. Any such request from the Company shall not be given more than once each calendar quarter, unless the Company shall have a reasonable basis for questioning the accuracy of any of the representations and warranties.

Section 12.03.    Information to Be Provided by the Trustee.

For so long as the Certificates are outstanding, for the purpose of satisfying the Company's reporting obligation under the Exchange Act with respect to any class of Certificates, the Trustee shall provide to the Company a written description of (a) any litigation or governmental proceedings pending against the Trustee as of the last day of each calendar month that would be material to Certificateholders, and (b) any affiliations or relationships (as described in Item 1119 of Regulation AB) that develop following the Closing Date between the Trustee and any Transaction Party of the type described in Section 12.02(a)(iv) or 12.02(a)(v) as of the last day of each calendar year. Any descriptions required with respect to legal proceedings, as well as updates to previously provided descriptions, under this Section 12.03 shall be given no later than five Business Days prior to the Determination Date following the month in which the relevant event occurs, and any notices and descriptions required with respect to affiliations, as well as updates to previously provided descriptions, under this Section 12.03 shall be given no later than January 31 of the calendar year following the year in which the relevant event occurs. As of the related Distribution Date with respect to each Report on Form 10-D with respect to the Certificates filed by or on behalf of the Company, and as of March 15 preceding the date each Report on Form 10-K with respect to the Certificates is filed, the Trustee shall be deemed to represent and warrant that any information previously provided by the Trustee under this Article XII is materially correct and does not have any material omissions unless the Trustee has provided an update to such information. The Company will allow the Trustee to review any disclosure relating to material litigation against the Trustee prior to filing such disclosure with the Commission to the extent the Company changes the information provided by the Trustee.

Section 12.04.    Report on Assessment of Compliance and Attestation.

On or before March 15 of each calendar year, the Trustee shall:

(a)   deliver to the Company a report (in form and substance reasonably satisfactory to the Company) regarding the Trustee's assessment of compliance with the applicable Servicing Criteria during the immediately preceding calendar year, as required under Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122 of Regulation AB.  Such report shall be signed by an authorized officer of the Trustee, and shall address each of the Servicing Criteria specified on Exhibit R hereto; and

(b)   deliver to the Company a report of a registered public accounting firm satisfying the requirements of Rule 2-01 of Regulation S-X under the Securities Act and the Exchange Act that attests to, and reports on, the assessment of compliance made by the Trustee and delivered pursuant to the preceding paragraph.  Such attestation shall be in accordance with Rules 1-02(a)(3) and 2-02(g) of Regulation S-X under the Securities Act and the Exchange Act.

Section 12.05.   Indemnification; Remedies.

(a)   The Trustee shall indemnify the Company, each affiliate of the Company, the Master Servicer and each affiliate of the Master Servicer, and the respective present and former directors, officers, employees and agents of each of the foregoing, and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon:

         (i)(A)   any untrue   statement   of a material   fact contained   or  alleged to  be  contained  in  any  information,  report, certification,  accountants' attestation or other material provided under this Article XII by or on behalf of the Trustee (collectively, the "Trustee Information"),  or (B) the  omission  or alleged  omission  to state  in the Trustee  Information  a material  fact required  to be stated in the  Trustee Information  or necessary  in order to make  the statements  therein,  in the light of the circumstances under which they were made, not misleading; or

         (ii)   any  failure  by  the  Trustee  to  deliver  any information,  report,  certification  or other  material  when and as required under this  Article  XII,  other  than a failure by the  Trustee to deliver an accountants' attestation.

(b)   In the case of any failure of performance described in clause (ii) of Section 12.05(a), as well as a failure to deliver an accountants' attestation, the Trustee shall (i) promptly reimburse the Company for all costs reasonably incurred by the Company in order to obtain the information, report, certification, accountants' attestation or other material not delivered by the Trustee as required and (ii) cooperate with the Company to mitigate any damages that may result from such failure.

(c)   The Company and the Master Servicer shall indemnify the Trustee, each affiliate of the Trustee and the respective present and former directors, officers, employees and agents of the Trustee, and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon (i) any untrue statement of a material fact contained or alleged to be contained in any information provided under this Agreement by or on behalf of the Company or Master Servicer for inclusion in any report filed with Commission under the Exchange Act (collectively, the "RFC Information"), or (ii) the omission or alleged omission to state in the RFC Information a material fact required to be stated in the RFC Information or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(d)   Notwithstanding any provision in this Section 12.05 to the contrary, the parties agree that none of the Trustee, the Company or the Master Servicer shall be liable to the other for any consequential or punitive damages whatsoever, whether in contract, tort (including negligence and strict liability), or any other legal or equitable principle; provided, however, that such limitation shall not be applicable with respect to third party claims made against a party.

EXHIBIT A

FORM OF CLASS A CERTIFICATE, [PRINCIPAL ONLY/CLASS A-P] CERTIFICATE AND
[INTEREST ONLY/CLASS A-V] CERTIFICATE

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED  REPRESENTATIVE OF THE DEPOSITORY  TRUST COMPANY, A NEW YORK CORPORATION  ("DTC"), TO ISSUER OR ITS  AGENT  FOR  REGISTRATION  OF  TRANSFER,  EXCHANGE,  OR  PAYMENT,  AND ANY CERTIFICATE  ISSUED IS  REGISTERED  IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED  REPRESENTATIVE  OF DTC (AND ANY PAYMENT

IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN
AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF
FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE
REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]

[THE FOLLOWING INFORMATION IS PROVIDED SOLELY FOR THE PURPOSES OF
APPLYING THE U.S. FEDERAL INCOME TAX ORIGINAL ISSUE DISCOUNT ("OID") RULES TO
THIS CERTIFICATE. THE ISSUE DATE OF THIS CERTIFICATE IS _____,
___. ASSUMING THAT THE MORTGAGE LOANS PREPAY AT [___]% OF THE PREPAYMENT
SPEED ASSUMPTION (AS DESCRIBED IN THE PROSPECTUS SUPPLEMENT), [AND ASSUMING A
CONSTANT PASS-THROUGH RATE EQUAL TO THE INITIAL PASS-THROUGH RATE,] THIS
CERTIFICATE HAS BEEN ISSUED WITH NO MORE THAN $[        ] OF OID PER
[$1,000] [$100,000] OF [INITIAL CERTIFICATE PRINCIPAL BALANCE] [NOTIONAL
AMOUNT], THE YIELD TO MATURITY IS [    ]% AND THE AMOUNT OF OID
ATTRIBUTABLE TO THE INITIAL ACCRUAL PERIOD IS NO MORE THAN $[                ]
PER [$1,000] [$100,000] OF [INITIAL CERTIFICATE PRINCIPAL BALANCE] [NOTIONAL
AMOUNT], COMPUTED USING THE APPROXIMATE METHOD. NO REPRESENTATION IS MADE
THAT THE MORTGAGE LOANS WILL PREPAY AT A RATE BASED ON THE PREPAYMENT SPEED
ASSUMPTION OR AT ANY OTHER RATE OR AS TO THE CONSTANCY OF THE PASS-THROUGH
RATE.]

| | |
|---|---|
| Certificate No. | [        %][Variable] Pass-Through Rate [based on a Notional Amount] |
| Class A-    Senior | |
| Date of Pooling and Servicing Agreement and Cut-off Date: | [Percentage Interest:       %] |
| _____ 1, ____ | Aggregate Initial [Certificate Principal Balance] [[Interest Only/Class A-V] Notional Amount] |
| First Distribution Date: | [Subclass Notional Amount] of the |
| _____ 25, ____ | Class A-    Certificates: |
| Master Servicer: | |
| Residential Funding Company, LLC | [Initial] [Certificate Principal Balance] [Interest Only/Class A-V] [Subclass] |
| Assumed Final Distribution Date: | Notional Amount] of this Certificate: |
| _____ 25, ____ | $[                ] |

CUSIP 76110F·
MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATE
SERIES ____-___

evidencing a percentage interest in the distributions
allocable to the Class A-    Certificates with
respect to a Trust Fund consisting primarily of a
pool of [conventional one- to four-family fixed
interest rate first mortgage loans] formed and sold
by RESIDENTIAL ACCREDIT LOANS, INC.

This Certificate is payable solely from the assets of the Trust
Fund, and does not represent an obligation of or interest in Residential
Accredit Loans, Inc., the Master Servicer, the Trustee referred to below or
GMAC Mortgage Group, LLC or any of their affiliates. Neither this
Certificate nor the underlying Mortgage Loans are guaranteed or insured by
any governmental agency or instrumentality or by Residential Accredit Loans,
Inc., the Master Servicer, the Trustee or GMAC Mortgage Group, LLC or any of
their affiliates. None of the Company, the Master Servicer, GMAC Mortgage
Group, LLC or any of their affiliates will have any obligation with respect
to any certificate or other obligation secured by or payable from payments on
the Certificates.

This certifies that _____ is the registered
owner of the Percentage Interest evidenced by this Certificate [(obtained by
dividing the [Initial Certificate Principal Balance] [Initial [Interest
Only/Class A-V] Notional Amount] of this Certificate by the aggregate
[Initial Certificate Principal Balance of all Class A-    Certificates]
[Initial [Interest Only/Class A-V] Notional Amounts of all [Interest
Only/Class A-V] Certificates], both as specified above)] in certain
distributions with respect to the Trust Fund consisting primarily of an
interest in a pool of [conventional one- to four-family fixed interest rate
first mortgage loans] (the "Mortgage Loans"), formed and sold by Residential
Accredit Loans, Inc. (hereinafter called the "Company," which term includes
any successor entity under the Agreement referred to below). The Trust Fund
was created pursuant to a Pooling and Servicing Agreement dated as specified
above (the "Agreement") among the Company, the Master Servicer and
_____, as trustee (the "Trustee"), a summary of certain of the
pertinent provisions of which is set forth hereafter. To the extent not
defined herein, the capitalized terms used herein have the meanings assigned
in the Agreement. This Certificate is issued under and is subject to the
terms, provisions and conditions of the Agreement, to which Agreement the
Holder of this Certificate by virtue of the acceptance hereof assents and by
which such Holder is bound.

Pursuant to the terms of the Agreement, a distribution will be
made on the 25th day of each month or, if such 25th day is not a Business
Day, the Business Day immediately following (the "Distribution Date"),
commencing as described in the Agreement, to the Person in whose name this
Certificate is registered at the close of business on the last day (or if
such last day is not a Business Day, the Business Day immediately preceding
such last day) of the month immediately preceding the month of such
distribution (the "Record Date"), from the Available Distribution Amount in
an amount equal to the product of the Percentage Interest evidenced by this
Certificate and the amount [of interest and principal, if any)] required to
be distributed to Holders of Class A-    Certificates on such Distribution
Date. [The [Interest Only/Class A-V] Certificates as of any date of
determination is equal to the aggregate Stated Principal Balance of the
Mortgage Loans corresponding to the Uncertificated REMIC Regular Interests
represented by such [Interest Only/Class A-V] Certificates.] [The Subclass Notional Amount of the [Interest
Only/Class A-V]·   Certificates as of any date of determination is equal to

the aggregate Stated Principal Balance of the Mortgage Loans corresponding to the Uncertificated REMIC Regular Interests represented by such [Interest Only/Class A-V]- Certificates immediately prior to such date.] [The [Interest Only/Class A-V][- ] Certificates have no Certificate Principal Balance.]

Distributions on this Certificate will be made either by the Master Servicer acting on behalf of the Trustee or by a Paying Agent appointed by the Trustee in immediately available funds (by wire transfer or otherwise) for the account of the Person entitled thereto if such Person shall have so notified the Master Servicer or such Paying Agent, or by check mailed to the address of the Person entitled thereto, as such name and address shall appear on the Certificate Register.

Notwithstanding the above, the final distribution on this Certificate will be made after due notice of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Trustee for that purpose. The [Initial Certificate Principal Balance] [Initial [Interest Only/Class A-V] Notional Amount] [initial Subclass Notional Amount] of this Certificate is set forth above.] [The Certificate Principal Balance hereof will be reduced to the extent of distributions allocable to principal and any Realized Losses allocable hereto.]

This Certificate is one of a duly authorized issue of Certificates issued in several Classes designated as Mortgage Asset-Backed Pass-Through Certificates of the Series specified hereon (herein collectively called the "Certificates").

The Certificates are limited in right of payment to certain collections and recoveries respecting the Mortgage Loans, all as more specifically set forth herein and in the Agreement. In the event Master Servicer funds are advanced with respect to any Mortgage Loan, such advance is reimbursable to the Master Servicer, to the extent provided in the Agreement, from related recoveries on such Mortgage Loan or from other cash that would have been distributable to Certificateholders.

As provided in the Agreement, withdrawals from the Custodial Account and/or the Certificate Account created for the benefit of Certificateholders may be made by the Master Servicer from time to time for purposes other than distributions to Certificateholders, such purposes including without limitation reimbursement to the Company and the Master Servicer of advances made, or certain expenses incurred, by either of them.

The Agreement permits, with certain exceptions therein provided, the amendment of the Agreement and the modification of the rights and obligations of the Company, the Master Servicer and the Trustee and the rights of the Certificateholders under the Agreement at any time by the Company, the Master Servicer and the Trustee with the consent of the Holders of Certificates evidencing in the aggregate not less than 66% of the Percentage Interests of each Class of Certificates affected thereby. Any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange herefor or in lieu hereof whether or not notation of such consent is made upon the Certificate. The Agreement also permits the amendment thereof in certain circumstances without the consent of the Holders of any of the Certificates and, in certain additional circumstances, without the consent of the Holders of certain Classes of Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registrable in the Certificate Register upon surrender of this Certificate for registration of transfer at the offices or agencies appointed by the Trustee, duly endorsed by, or accompanied by an assignment in the form below or other written instrument of transfer in form satisfactory to the Trustee and the Certificate Registrar duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates of authorized denominations evidencing the same Class and aggregate Percentage Interest will be issued to the designated transferee or transferees.

The Certificates are issuable only as registered Certificates without coupons in Classes and in denominations specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, Certificates are exchangeable for new Certificates of authorized denominations evidencing the same Class and aggregate Percentage Interest, as requested by the Holder surrendering the same.

No service charge will be made for any such registration of transfer or exchange, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company, the Master Servicer, the Trustee and any agent of the Company, the Master Servicer, the Trustee or the Certificate Registrar and any agent of the Company, the Master Servicer, the Trustee or the Certificate Registrar may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and neither the Company, the Master Servicer, the Trustee nor any such agent shall be affected by notice to the contrary.

This Certificate shall be governed by and construed in accordance with the laws of the State of New York.

The obligations created by the Agreement in respect of the Certificates and the Trust Fund created thereby shall terminate upon the payment to Certificateholders of all amounts held by or on behalf of the Trustee and required to be paid to them pursuant to the Agreement following the earlier of (i) the maturity or other liquidation of the last Mortgage Loan subject thereto or the disposition of all property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan and (ii) the

purchase by the Master Servicer from the Trust Fund of all remaining Mortgage Loans and all property acquired in respect of such Mortgage Loans, thereby effecting early retirement of the Certificates.  The Agreement permits, but does not require, the Master Servicer to (i) purchase at a price determined as provided in the Agreement all remaining Mortgage Loans and all property acquired in respect of any Mortgage Loan or (ii) purchase in whole, but not in part, all of the Certificates from the Holders thereof; provided, that any such option may only be exercised if the Pool Stated Principal Balance of the Mortgage Loans as of the Distribution Date upon which the proceeds of any such purchase are distributed is less than ten percent of the Cut-off Date Principal Balance of the Mortgage Loans.

        Reference is hereby made to the further provisions of this Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

        Unless the certificate of authentication hereon has been executed by the Certificate Registrar, by manual signature, this Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose.

_____

        IN WITNESS WHEREOF, the Trustee has caused this Certificate to be duly executed.

Dated:                          [_____],
                                  as Trustee


                        By:  _____
                             Authorized Signatory


            CERTIFICATE OF AUTHENTICATION

        This is one of the Class A-    Certificates referred to in the within-mentioned Agreement.


                                [_____],
                                  as Certificate Registrar


                        By:  _____
                             Authorized Signatory

_____

                    ASSIGNMENT

        FOR VALUE RECEIVED, the undersigned hereby sell(s),  assign(s) and transfer(s) unto _____

(Please  print or  typewrite name and  address  including  postal zip code of assignee) a Percentage Interest evidenced by the within Mortgage  Asset-Backed Pass-Through  Certificate  and hereby  authorizes the transfer of registration of such interest to assignee on the Certificate Register of the Trust Fund.

        I (We)  further  direct the  Certificate  Registrar to issue a new Certificate of a like  denomination and Class, to the above named assignee and deliver such Certificate to the following address:


                                _____
Dated: _____          Signature by or on behalf of assignor


                                _____
                                Signature Guaranteed

            DISTRIBUTION INSTRUCTIONS

        The  assignee  should  include  the  following  for  purposes  of distribution:

        Distributions shall be made, by wire transfer or otherwise,  in immediately available  funds  to  _____  for  the  account  of

_____ account number _____, or, if mailed by
check, to _____.

    Applicable    statements    should    be    mailed    to
_____.

        This information is provided by _____,
the assignee named above, or _____, as its agent.

---

EXHIBIT A-1

FORM OF CLASS X CERTIFICATE

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "REGULAR
INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE
DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE
OF 1986.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE
DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO ISSUER OR ITS
AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE
ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS
REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO
CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED
REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE
OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER
HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

---

Certificate No. ____                Variable Pass-Through Rate
Class X Senior

Date of Pooling and Servicing Agreement    Percentage Interest: 100%
and Cut-off Date: _____ 1, ____

Master Servicer:                    Aggregate Initial Notional Amount of
Residential Funding Company, LLC    the Class X Certificates: $_____

First Distribution Date:            Initial Notional Amount of this
_____ 25, ____                   Certificate: $_____

Assumed Final Distribution Date:    CUSIP _____
_____

            MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATE
                    SERIES ____-____

        Evidencing a percentage interest in the distributions allocable
    to the Class X Certificates with respect to a Trust Fund
    consisting primarily of a pool of [one- to four-family
    residential, payment-option, adjustable-rate with a negative amortization
    loans with a negative amortization feature] formed and sold by
    RESIDENTIAL ACCREDIT LOANS, INC.

        This Certificate is payable solely from the assets of the Trust Fund,
    and does not represent an obligation of or interest in Residential Accredit
    Loans, Inc., the Master Servicer, the Trustee referred to below or GMAC
    Mortgage Group, LLC or any of their affiliates. Neither this Certificate nor
    the underlying Mortgage Loans are guaranteed or insured by any governmental
    agency or instrumentality or by Residential Accredit Loans, Inc., the Master
    Servicer, the Trustee or GMAC Mortgage Group, LLC or any of their
    affiliates. None of the Company, the Master Servicer, GMAC Mortgage Group,
    LLC or any of their affiliates will have any obligation with respect to any
    certificate or other obligation secured by or payable from payments on the
    Certificates.

        This certifies that _____ is the registered owner
    of the Percentage Interest evidenced by this Certificate (obtained by
    dividing the Initial Notional Amount of this Certificate by the Aggregate
    Notional Amount of all Class X Certificates, both as specified above) in
    certain distributions with respect to the Trust Fund consisting primarily of
    an interest in a pool of [one- to four-family residential, payment-option,
    adjustable-rate first lien mortgage loans with a negative amortization
    feature] (the "Mortgage Loans"), formed and sold by Residential Accredit
    Loans, Inc. (hereinafter called the "Company," which term includes any
    successor entity under the Agreement referred to below). The Trust Fund was
    created pursuant to a Pooling and Servicing Agreement dated as specified
    above (the "Agreement") among the Company, the Master Servicer and
    _____, as trustee (the "Trustee"), a summary of certain of
    the pertinent provisions of which is set forth hereafter. To the extent not
    defined herein, the capitalized terms used herein have the meanings assigned
    in the Agreement. This Certificate is issued under and is subject to the
    terms, provisions and conditions of the Agreement, to which Agreement the
    Holder of this Certificate by virtue of the acceptance hereof assents and by
    which such Holder is bound.

Pursuant to the terms of the Agreement, a distribution will be made on the 25th day of each month or, if such 25th day is not a Business Day, the Business Day immediately following (the "Distribution Date"), commencing as described in the Agreement, to the Person in whose name this Certificate is registered at the close of business on the last day (or if such last day is not a Business Day, the Business Day immediately preceding the month immediately preceding the month of such distribution (the "Record Date"), from the Available Distribution Amount in an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount required to be distributed to Holders of Class X Certificates on such Distribution Date. The Class X Certificates have no Certificate Principal Balance.

Distributions on this Certificate will be made either by the Master Servicer acting on behalf of the Trustee or by a Paying Agent appointed by the Trustee in immediately available funds (by wire transfer or otherwise) for the account of the Person entitled thereto if such Person shall have so notified the Master Servicer or such Paying Agent, or by check mailed to the address of the Person entitled thereto, as such name and address shall appear on the Certificate Register.

Notwithstanding the above, the final distribution on this Certificate will be made after due notice of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Trustee for that purpose. The Initial Notional Amount of this Certificate is set forth above.

This Certificate is one of a duly authorized issue of Certificates issued in several Classes designated as Mortgage Asset-Backed Pass-Through Certificates of the Series specified hereon (herein collectively called the "Certificates").

The Certificates are limited in right of payment to certain collections and recoveries respecting the Mortgage Loans, all as more specifically set forth herein and in the Agreement. In the event Master Servicer funds are advanced with respect to any Mortgage Loan, such advance is reimbursable to the Master Servicer, to the extent provided in the Agreement, from related recoveries on such Mortgage Loan or from other cash that would have been distributable to Certificateholders.

As provided in the Agreement, withdrawals from the Custodial Account and/or the Certificate Account created for the benefit of Certificateholders may be made by the Master Servicer from time to time for purposes other than distributions to Certificateholders, such purposes including, without limitation reimbursement to the Company and the Master Servicer of advances made, or certain expenses incurred, by either of them.

The Agreement permits, with certain exceptions therein provided, the amendment of the Agreement and the modification of the rights and obligations of the Company, the Master Servicer and the Trustee and the rights of the Certificateholders under the Agreement at any time by the Company, the Master Servicer and the Trustee with the consent of the Holders of Certificates evidencing in the aggregate not less than 66% of the Percentage Interests of each Class of Certificates affected thereby. Any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange herefor or in lieu hereof whether or not notation of such consent is made upon the Certificate. The Agreement also permits the amendment thereof in certain circumstances without the consent of the Holders of any of the Certificates and, in certain additional circumstances, without the consent of the Holders of certain Classes of Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registrable in the Certificate Register upon surrender of this Certificate for registration of transfer at the offices or agencies appointed by the Trustee, duly endorsed by, or accompanied by an assignment in the form below or other written instrument of transfer in form satisfactory to the Trustee and the Certificate Registrar duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates of authorized denominations evidencing the same Class and aggregate Percentage Interest will be issued to the designated transferee or transferees.

The Certificates are issuable only as registered Certificates without coupons in Classes and in denominations specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, Certificates are exchangeable for new Certificates of authorized denominations evidencing the same Class and aggregate Percentage Interest, as requested by the Holder surrendering the same.

No service charge will be made for any such registration of transfer or exchange, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company, the Master Servicer, the Trustee and the Certificate Registrar and any agent of the Company, the Master Servicer, the Trustee or the Certificate Registrar may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and neither the Company, the Master Servicer, the Trustee nor any such agent shall be affected by notice to the contrary.

This Certificate shall be governed by and construed in accordance with the laws of the State of New York.

The obligations created by the Agreement in respect of the Certificates and the Trust Fund created thereby shall terminate upon the payment to Certificateholders of all amounts held by or on behalf of the Trustee and required to be paid to them pursuant to the Agreement following the earlier of (i) the maturity or other liquidation of the last Mortgage Loan subject

thereto or the disposition of all property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan and (ii) the purchase by the Master Servicer from the Trust Fund of all remaining Mortgage Loans and all property acquired in respect of such Mortgage Loans, thereby effecting early retirement of the Certificates. The Agreement permits, but does not require, the Master Servicer to (i) purchase at a price determined as provided in the Agreement all remaining Mortgage Loans and all property acquired in respect of any Mortgage Loan or (ii) purchase in whole, but not in part, all of the Certificates from the Holders thereof; provided, that any such option may only be exercised if the Pool Stated Principal Balance of the Mortgage Loans as of the Distribution Date upon which the proceeds of any such purchase are distributed is less than ten percent of the Cut-off Date Principal Balance of the Mortgage Loans.

Reference is hereby made to the further provisions of this Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication hereon has been executed by the Certificate Registrar, by manual signature, this Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose.

---

IN WITNESS WHEREOF, the Trustee has caused this Certificate to be duly executed.

Dated:                                  [_____],
                                            as Trustee


                                   By: _____
                                        Authorized Signatory


CERTIFICATE OF AUTHENTICATION

This is one of the Class A-    Certificates referred to in the within-mentioned Agreement.


                                   [_____],
                                        as Certificate Registrar


                                   By: _____
                                        Authorized Signatory

---

ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto _____

(Please print or typewrite name and address including postal zip code of assignee) a Percentage Interest evidenced by the within Mortgage Asset-Backed Pass-Through Certificate and hereby authorizes the transfer of registration of such interest to assignee on the Certificate Register of the Trust Fund.

I (We) further direct the Certificate Registrar to issue a new Certificate of a like denomination and Class, to the above named assignee and deliver such Certificate to the following address:


                                   _____
Dated: _____              Signature by or on behalf of assignor


                                   _____
                                   Signature Guaranteed


DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available funds to _____ for the account of _____ account number _____, or, if mailed by

check, to _____.

Applicable        statements        should        be        mailed        to
_____.

    This  information  is provided by _____,
the assignee named above, or _____ , as its agent.

_____

EXHIBIT B

FORM OF CLASS M CERTIFICATE

THIS CERTIFICATE IS SUBORDINATED IN RIGHT OF PAYMENT TO THE SENIOR
CERTIFICATES [CLASS M-1 CERTIFICATES] [AND CLASS M-2 CERTIFICATES] AS
DESCRIBED IN THE AGREEMENT (AS DEFINED BELOW).

    SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A
"REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE
TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL
REVENUE CODE OF 1986 (THE "CODE").

    UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF
THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO ISSUER OR
ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY
CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER
NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT
IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN
AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF
FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE
REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

    THE FOLLOWING INFORMATION IS PROVIDED SOLELY FOR THE PURPOSES OF
APPLYING THE U.S. FEDERAL INCOME TAX ORIGINAL ISSUE DISCOUNT ("OID") RULES TO
THIS CERTIFICATE.  THE ISSUE DATE OF THIS CERTIFICATE IS _____,
_.  ASSUMING THAT THE MORTGAGE LOANS PREPAY AT [__]% OF THE PREPAYMENT
SPEED ASSUMPTION (AS DESCRIBED IN THE PROSPECTUS SUPPLEMENT), THIS
CERTIFICATE HAS BEEN ISSUED WITH NO MORE THAN $[____] OF OID PER $[1,000] OF
INITIAL CERTIFICATE PRINCIPAL BALANCE, THE YIELD TO MATURITY IS [____]% AND
THE AMOUNT OF OID ATTRIBUTABLE TO THE INITIAL ACCRUAL PERIOD IS NO MORE THAN
$[____] PER $[1,000] OF INITIAL CERTIFICATE PRINCIPAL BALANCE, COMPUTED UNDER
THE APPROXIMATE METHOD.  NO REPRESENTATION IS MADE THAT THE MORTGAGE LOANS
WILL PREPAY AT A RATE BASED ON THE PREPAYMENT SPEED ASSUMPTION OR AT ANY
OTHER RATE.

    ANY TRANSFEREE OF THIS CERTIFICATE WILL BE DEEMED TO HAVE
REPRESENTED BY VIRTUE OF ITS PURCHASE OR HOLDING OF THIS CERTIFICATE
(OR INTEREST HEREIN) THAT EITHER (A) SUCH TRANSFEREE IS NOT AN
INVESTMENT MANAGER, A NAMED FIDUCIARY OR A TRUSTEE OF ANY PLAN, OR ANY
OTHER PERSON, ACTING, DIRECTLY OR INDIRECTLY, ON BEHALF OF OR
PURCHASING ANY CERTIFICATE WITH "PLAN ASSETS" OF ANY PLAN (A "PLAN
INVESTOR"), (B) IT HAS ACQUIRED AND IS HOLDING SUCH CERTIFICATE IN
RELIANCE ON PROHIBITED TRANSACTION EXEMPTION ("PTE") 94-29, AS MOST
RECENTLY AMENDED, PTE 2002-41, 67 FED. REG. 54487 (AUGUST 22, 2002)
(THE "RFC EXEMPTION"), AND THAT IT UNDERSTANDS THAT THERE ARE CERTAIN
CONDITIONS TO THE AVAILABILITY OF THE RFC EXEMPTION INCLUDING THAT SUCH
CERTIFICATE MUST BE RATED, AT THE TIME OF PURCHASE, NOT LOWER THAN
"BBB-" (OR ITS EQUIVALENT) BY STANDARD & POOR'S, FITCH OR MOODY'S OR
(C) (I) THE TRANSFEREE IS AN INSURANCE COMPANY, (II) THE SOURCE OF
FUNDS TO BE USED BY IT TO PURCHASE THE CERTIFICATE IS AN "INSURANCE
COMPANY GENERAL ACCOUNT" (WITHIN THE MEANING OF U.S. DEPARTMENT OF
LABOR PROHIBITED TRANSACTION CLASS EXEMPTION ("PTCE") 95-60), AND (III)
THE CONDITIONS SET FORTH IN SECTIONS I AND III OF PTCE 95-60 HAVE BEEN
SATISFIED (EACH ENTITY THAT SATISFIES THIS CLAUSE (C), A "COMPLYING
INSURANCE COMPANY).

    IF THIS CERTIFICATE (OR ANY INTEREST HEREIN) IS ACQUIRED OR HELD
BY ANY PERSON THAT DOES NOT SATISFY THE CONDITIONS DESCRIBED IN THE
PRECEDING PARAGRAPH, THEN THE LAST PRECEDING TRANSFEREE THAT EITHER (I)
IS NOT A PLAN INVESTOR, (II) ACQUIRED SUCH CERTIFICATE IN COMPLIANCE
WITH THE RFC EXEMPTION, OR (III) IS A COMPLYING INSURANCE COMPANY SHALL
BE RESTORED, TO THE EXTENT PERMITTED BY LAW, TO ALL RIGHTS AND
OBLIGATIONS AS CERTIFICATE OWNER THEREOF RETROACTIVE TO THE DATE OF
SUCH TRANSFER OF THIS CERTIFICATE.  THE TRUSTEE SHALL BE UNDER NO
LIABILITY TO ANY PERSON FOR MAKING ANY PAYMENTS DUE ON THIS CERTIFICATE
TO SUCH PRECEDING TRANSFEREE.

    ANY PURPORTED CERTIFICATE OWNER WHOSE ACQUISITION OR HOLDING OF THIS
CERTIFICATE (OR INTEREST HEREIN) WAS EFFECTED IN VIOLATION OF THE
RESTRICTIONS IN SECTION 5.02(e) OF THE POOLING AND SERVICING AGREEMENT SHALL
INDEMNIFY AND HOLD HARMLESS THE COMPANY, THE TRUSTEE, THE MASTER SERVICER,
ANY SUBSERVICER, AND THE TRUST FUND FROM AND AGAINST ANY AND ALL LIABILITIES,
CLAIMS, COSTS OR EXPENSES INCURRED BY SUCH PARTIES AS A RESULT OF SUCH
ACQUISITION OR HOLDING.

Certificate No.                    [    ]% Pass-Through Rate

Class M-   Subordinate             Aggregate Certificate
                                   Principal Balance
Date of Pooling and Servicing      of the Class M Certificates:
Agreement and Cut-off Date:        $
_____ 1, ____

First Distribution Date:
_____ 25, ____

Initial Certificate Principal
Balance of this Certificate:
$

Master Servicer:
Residential Funding Company, LLC

CUSIP: 76110F-

Assumed Final Distribution Date:
_____ 25, ____

MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATE,
SERIES ____-___

    evidencing a percentage interest in any distributions allocable
to the Class M-     Certificates with respect to the Trust Fund
consisting primarily of a pool of [conventional one- to
four-family fixed interest rate first mortgage loans] formed and
sold by RESIDENTIAL ACCREDIT LOANS, INC.

    This Certificate is payable solely from the assets of the Trust
Fund, and does not represent an obligation of or interest in Residential
Accredit Loans, Inc., the Master Servicer, the Trustee referred to below or
GMAC Mortgage Group, LLC or any of their affiliates.  Neither this
Certificate nor the underlying Mortgage Loans are guaranteed or insured by
any governmental agency or instrumentality or by Residential Accredit Loans,
Inc., the Master Servicer, the Trustee or GMAC Mortgage Group, LLC or any of
their affiliates.  None of the Company, the Master Servicer, GMAC Mortgage
Group, LLC or any of their affiliates will have any obligation with respect
to any certificate or other obligation secured by or payable from payments on
the Certificates.

    This certifies that _____ is the registered owner of
the Percentage Interest evidenced by this Certificate (obtained by dividing
the Certificate Principal Balance of this Certificate by the aggregate
Certificate Principal Balance of all Class M-     Certificates, both as
specified above) in certain distributions with respect to a Trust Fund
consisting primarily of a pool of [conventional one- to four-family fixed
interest rate first mortgage loans] (the "Mortgage Loans"), formed and sold
by Residential Accredit Loans, Inc. (hereinafter called the "Company," which
term includes any successor entity under the Agreement referred to below).
The Trust Fund was created pursuant to a Pooling and Servicing Agreement
dated as specified above (the "Agreement") among the Company, the Master
Servicer and _____, as trustee (the "Trustee"), a summary of
certain of the pertinent provisions of which is set forth hereafter.  To the
extent not defined herein, the capitalized terms used herein have the
meanings assigned in the Agreement.  This Certificate is issued under and is
subject to the terms, provisions and conditions of the Agreement, to which
Agreement the Holder of this Certificate by virtue of the acceptance hereof
assents and by which such Holder is bound.

    Pursuant to the terms of the Agreement, a distribution will be
made on the 25th day of each month or, if such 25th day is not a Business
Day, the Business Day immediately following (the "Distribution Date"),
commencing as described in the Agreement, to the Person in whose name this
Certificate is registered at the close of business on the last day (or if
such last day is not a Business Day, the Business Day immediately preceding
such last day) of the month immediately preceding the month of such
distribution (the "Record Date"), from the Available Distribution Amount in
an amount equal to the product of the Percentage Interest evidenced by this
Certificate and the amount (of interest and principal, if any) required to be
distributed to Holders of Class M-     Certificates on such Distribution Date.

    Distributions on this Certificate will be made either by the
Master Servicer acting on behalf of the Trustee or by a Paying Agent
appointed by the Trustee in immediately available funds (by wire transfer or
otherwise) for the account of the Person entitled thereto if such Person
shall have so notified the Master Servicer or such Paying Agent, or by check
mailed to the address of the Person entitled thereto, as such name and
address shall appear on the Certificate Register.

    Notwithstanding the above, the final distribution on this
Certificate will be made after due notice of the pendency of such
distribution and only upon presentation and surrender of this Certificate at
the office or agency appointed by the Trustee for that purpose.  The Initial
Certificate Principal Balance of this Certificate is set forth above.  The
Certificate Principal Balance hereof will be reduced to the extent of the
distributions allocable to principal and any Realized Losses allocable hereto.

    Any transferee of this Certificate will be deemed to have
represented by virtue of its purchase or holding of this Certificate (or
interest herein) that either (a) such transferee is not an investment
manager, a named fiduciary or a trustee of any plan, or any other person,
acting, directly or indirectly, on behalf of or purchasing any Certificate
with "plan assets" of any plan (a "plan investor"), (b) it has acquired and
is holding such Certificate in reliance on the prohibited transaction exemption
("PTE") 94-29, as most recently amended, PTE 2002-41, 67 fed. Reg. 54487
(August 22, 2002) (the "RFC Exemption"), and that it understands that there
are certain conditions to the availability of the RFC Exemption including
that such Certificate must be rated, at the time of purchase, not lower than
"BBB-" (or its equivalent) by Standard & Poor's, Fitch or Moody's or (c) (i)
the transferee is an insurance company, (ii) the source of funds to be used
by it to purchase the Certificate is an "insurance company general account"
(within the meaning of U.S. Department of Labor prohibited transaction class
exemption ("PTCE") 95-60), and (iii) the conditions set forth in Sections I
and III of PTCE 95-60 have been satisfied (each entity that satisfies this
clause (c), a "complying insurance company").

    If this Certificate (or any interest herein) is acquired or held
by any person that does not satisfy the conditions described in the preceding
paragraph, then the last preceding transferee that either (i) is not a plan

investor, (ii) acquired such Certificate in compliance with the RFC Exemption, or (iii) is a complying insurance company shall be restored, to the extent permitted by law, to all rights and obligations as Certificate owner thereof retroactive to the date of such transfer of this Certificate. The Trustee shall be under no liability to any person for making any payments due on this Certificate to such preceding transferee.

This Certificate is one of a duly authorized issue of Certificates issued in several Classes designated as Mortgage Asset-Backed Pass-Through Certificates of the Series specified hereon (herein collectively called the "Certificates").

The Certificates are limited in right of payment to certain collections and recoveries respecting the Mortgage Loans, all as more specifically set forth herein and in the Agreement. In the event Master Servicer funds are advanced with respect to any Mortgage Loan, such advance is reimbursable to the Master Servicer, to the extent provided in the Agreement, from related recoveries on such Mortgage Loan or from other cash that would have been distributable to Certificateholders.

As provided in the Agreement, withdrawals from the Custodial Account and/or the Certificate Account created for the benefit of Certificateholders may be made by the Master Servicer from time to time for purposes other than distributions to Certificateholders, such purposes including without limitation reimbursement to the Company and the Master Servicer of advances made, or certain expenses incurred, by either of them.

The Agreement permits, with certain exceptions therein provided, the amendment of the Agreement and the modification of the rights and obligations of the Company, the Master Servicer and the Trustee and the rights of the Certificateholders under the Agreement at any time by the Company, the Master Servicer and the Trustee with the consent of the Holders of Certificates evidencing in the aggregate not less than 66% of the Percentage Interests of each Class of Certificates affected thereby. Any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange herefor or in lieu hereof whether or not notation of such consent is made upon the Certificate. The Agreement also permits the amendment thereof in certain circumstances without the consent of the Holders of any of the Certificates and, in certain additional circumstances, without the consent of the Holders of certain Classes of Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registrable in the Certificate Register upon surrender of this Certificate for registration of transfer at the offices or agencies appointed by the Trustee, duly endorsed by, or accompanied by an assignment in the form below or other written instrument of transfer in form satisfactory to the Trustee and the Certificate Registrar duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates of authorized denominations evidencing the same Class and aggregate Percentage Interest will be issued to the designated transferee or transferees.

The Certificates are issuable only as registered Certificates without coupons in Classes and in denominations specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, Certificates are exchangeable for new Certificates of authorized denominations evidencing the same Class and aggregate Percentage Interest, as requested by the Holder surrendering the same.

No service charge will be made for any such registration of transfer or exchange, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company, the Master Servicer, the Trustee and the Certificate Registrar and any agent of the Company, the Master Servicer, the Trustee or the Certificate Registrar may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and neither the Company, the Master Servicer, the Trustee nor any such agent shall be affected by notice to the contrary.

This Certificate shall be governed by and construed in accordance with the laws of the State of New York.

The obligations created by the Agreement in respect of the Certificates and the Trust Fund created thereby shall terminate upon the payment to Certificateholders of all amounts held by or on behalf of the Trustee and required to be paid to them pursuant to the Agreement following the earlier of (i) the maturity or other liquidation of the last Mortgage Loan subject thereto or the disposition of all property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan and (ii) the purchase by the Master Servicer from the Trust Fund of all remaining Mortgage Loans and all property acquired in respect of such Mortgage Loans, thereby effecting early retirement of the Certificates. The Agreement permits, but does not require, the Master Servicer to (i) purchase at a price determined as provided in the Agreement all remaining Mortgage Loans and all property acquired in respect of any Mortgage Loan or (ii) purchase in whole, but not in part, all of the Certificates from the Holders thereof; provided, that any such option may only be exercised if the Pool Stated Principal Balance of the Mortgage Loans as of the Distribution Date upon which the proceeds of any such purchase are distributed is less than ten percent of the Cut-off Date Principal Balance of the Mortgage Loans.

Unless the certificate of authentication hereon has been executed by the Certificate Registrar, by manual signature, this Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose.

IN WITNESS WHEREOF, the Trustee has caused this Certificate to be duly executed.

Dated:                              [_____],
                                         as Trustee


                              By: _____
                                       Authorized Signatory


CERTIFICATE OF AUTHENTICATION

This is one of the Class A-    Certificates referred to in the within-mentioned Agreement.


                              [_____],
                                   as Certificate Registrar



                              By: _____
                                       Authorized Signatory


ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto _____

(Please print or typewrite name and address including postal zip code of assignee) a Percentage Interest evidenced by the within Mortgage Asset-Backed Pass-Through Certificate and hereby authorizes the transfer of registration of such interest to assignee on the Certificate Register of the Trust Fund.

I (We) further direct the Certificate Registrar to issue a new Certificate of a like denomination and Class, to the above named assignee and deliver such Certificate to the following address:


                              _____
Dated: _____        Signature by or on behalf of assignor


                              _____
                                   Signature Guaranteed

DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available funds to _____ for the account of _____ account number _____, or, if mailed by check, to _____.

Applicable statements should be mailed to _____.

This information is provided by _____, the assignee named above, or _____ , as its agent.


EXHIBIT C


FORM OF CLASS B CERTIFICATE

THIS CERTIFICATE IS SUBORDINATED IN RIGHT OF PAYMENT TO THE SENIOR CERTIFICATES AND CLASS M CERTIFICATES [AND CLASS B-1] [CLASS B-2 CERTIFICATES] DESCRIBED IN THE AGREEMENT (AS DEFINED HEREIN).

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE RESOLD OR TRANSFERRED UNLESS IT IS REGISTERED PURSUANT TO SUCH ACT AND LAWS OR IS SOLD OR TRANSFERRED IN TRANSACTIONS WHICH ARE EXEMPT FROM REGISTRATION UNDER SUCH ACT AND UNDER APPLICABLE STATE LAW AND IS TRANSFERRED IN ACCORDANCE WITH THE PROVISIONS OF SECTION 5.02 OF THE AGREEMENT.

NO TRANSFER OF THIS CERTIFICATE MAY BE MADE TO ANY PERSON, UNLESS THE TRANSFEREE PROVIDES EITHER A CERTIFICATION PURSUANT TO SECTION 5.02(e) OF THE AGREEMENT OR AN OPINION OF COUNSEL SATISFACTORY TO THE TRUSTEE THAT THE PURCHASE OF THIS CERTIFICATE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR SECTION 4975 OF THE CODE AND WILL NOT SUBJECT THE MASTER SERVICER, THE COMPANY OR THE TRUSTEE TO ANY OBLIGATION OR LIABILITY IN ADDITION TO THOSE UNDERTAKEN IN THE AGREEMENT.

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE CODE. THE FOLLOWING INFORMATION IS PROVIDED SOLELY FOR THE PURPOSES OF APPLYING THE U.S. FEDERAL INCOME TAX ORIGINAL ISSUE DISCOUNT ("OID") RULES TO THIS CERTIFICATE. THE ISSUE DATE OF THIS CERTIFICATE IS _____. ASSUMING THAT THE MORTGAGE LOANS PREPAY AT 100% OF THE PREPAYMENT SPEED ASSUMPTION (AS DESCRIBED IN THE PROSPECTUS SUPPLEMENT), THIS CERTIFICATE HAS BEEN ISSUED WITH NO MORE THAN $[    ] OF OID PER $[1,000] OF INITIAL CERTIFICATE PRINCIPAL BALANCE, THE YIELD TO MATURITY IS [    ]% AND THE AMOUNT OF OID ATTRIBUTABLE TO THE INITIAL ACCRUAL PERIOD IS NO MORE THAN $[    ] PER $[1,000] OF INITIAL CERTIFICATE PRINCIPAL BALANCE, COMPUTED UNDER THE APPROXIMATE METHOD. NO REPRESENTATION IS MADE THAT THE MORTGAGE LOANS WILL PREPAY AT A RATE BASED ON THE PREPAYMENT SPEED ASSUMPTION OR AT ANY OTHER RATE.

Certificate No.                          [    ]% Pass-Through Rate

Class B-    Subordinate                  Aggregate Certificate
                                         Principal Balance
Date of Pooling and Servicing            of the Class B-
Agreement and Cut-off Date:              Certificates as of
_____ 1, ____                     the Cut-off Date:
                                         $
First Distribution Date:
_____ 25, ____                    Initial Certificate Principal
                                         Balance of this Certificate:
Master Servicer:                         $
Residential Funding Company, LLC

Assumed Final Distribution Date:
_____ 25, ____


               MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATE,
                            SERIES ____-____

        evidencing a percentage interest in any distributions allocable
        to the Class B-    Certificates with respect to the Trust Fund
        consisting primarily of a pool of [conventional one- to
        four-family fixed interest rate first mortgage loans] formed and
        sold by RESIDENTIAL ACCREDIT LOANS, INC.

        This Certificate is payable solely from the assets of the Trust
Fund, and does not represent an obligation of or interest in Residential
Accredit Loans, Inc., the Master Servicer, the Trustee referred to below or
GMAC Mortgage Group, LLC or any of their affiliates. Neither this
Certificate nor the underlying Mortgage Loans are guaranteed or insured by
any governmental agency or instrumentality or by Residential Accredit Loans,
Inc., the Master Servicer, the Trustee or GMAC Mortgage Group, LLC or any of
their affiliates. None of the Company, the Master Servicer, GMAC Mortgage
Group, LLC or any of their affiliates will have any obligation with respect
to any certificate or other obligation secured by or payable from payments on
the Certificates.

        This certifies that Residential Accredit Loans, Inc. is the
registered owner of the Percentage Interest evidenced by this Certificate
(obtained by dividing the Certificate Principal Balance of this Certificate
by the aggregate Certificate Principal Balance of all Class B-
Certificates, both as specified above) in certain distributions with respect
to a Trust Fund consisting primarily of a pool of [conventional one- to
four-family fixed interest rate first mortgage loans] (the "Mortgage Loans"),
formed and sold by Residential Accredit Loans, Inc. (hereinafter called the
"Company," which term includes any successor entity under the Agreement
referred to below). The Trust Fund was created pursuant to a Pooling and
Servicing Agreement dated as specified above (the "Agreement") among the
Company, the Master Servicer and _____, as trustee (the
"Trustee"), a summary of certain of the pertinent provisions of which is set
forth hereafter. To the extent not defined herein, the capitalized terms
used herein have the meanings assigned in the Agreement. This Certificate is
issued under and is subject to the terms, provisions and conditions of the
Agreement, to which Agreement the Holder of this Certificate by virtue of the
acceptance hereof assents and by which such Holder is bound.

        Pursuant to the terms of the Agreement, a distribution will be
made on the 25th day of each month or, if such 25th day is not a Business
Day, the Business Day immediately following (the "Distribution Date"),
commencing on the first Distribution Date specified above, to the Person in
whose name this Certificate is registered at the close of business on the
last day (or if such last day is not a Business Day, the Business Day

immediately preceding such last day) of the month next preceding the month of such distribution (the "Record Date"), from the Available Distribution Amount in an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount (of interest and principal, if any) required to be distributed to Holders of Class B Certificates on such Distribution Date.

Distributions on this Certificate will be made either by the Master Servicer acting on behalf of the Trustee or by a Paying Agent appointed by the Trustee in immediately available funds (by wire transfer or otherwise) for the account of the Person entitled thereto if such Person shall have so notified the Master Servicer or such Paying Agent, or by check mailed to the address of the Person entitled thereto, as such name and address shall appear on the Certificate Register.

Notwithstanding the above, the final distribution on this Certificate will be made after due notice of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Trustee for that purpose. The Initial Certificate Principal Balance of this Certificate is set forth above. The Certificate Principal Balance hereof will be reduced to the extent of the distributions allocable to principal and any Realized Losses allocable hereto.

No transfer of this Class B Certificate will be made unless such transfer is exempt from the registration requirements of the Securities Act of 1933, as amended, and any applicable state securities laws or is made in accordance with said Act and laws. In the event that transfer is to be made, (i) the Trustee or the Company may require an opinion of counsel acceptable to and in form and substance satisfactory to the Trustee and the Company that such transfer is exempt (describing the applicable exemption and the basis therefor) from or is being made pursuant to the registration requirements of the Securities Act of 1933, as amended, and of any applicable statute of any state and (ii) the transferee shall execute an investment letter in the form described by the Agreement. The Holder hereof desiring to effect such transfer shall, and does hereby agree to, indemnify the Trustee, the Company, the Master Servicer and the Certificate Registrar acting on behalf of the Trustee against any liability that may result if the transfer is not so exempt or is not made in accordance with such Federal and state laws. In connection with any such transfer, the Trustee will also require either (i) an opinion of counsel addressed to the Trustee, the Company and the Master Servicer, acceptable to and in form and substance satisfactory to the Trustee with respect to the permissibility of such transfer under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and Section 4975 of the Internal Revenue Code (the "Code") and stating, among other things, that the transferee's acquisition of a Class B Certificate will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or (ii) a representation letter, in the form as described by Section 5.02(e) of the Agreement, either stating that the transferee is not an employee benefit or other plan subject to the prohibited transaction provisions of ERISA or Section 4975 of the Code (a "Plan"), or any other person (including an investment manager, a named fiduciary or a trustee of any Plan) acting, directly or indirectly, on behalf of or purchasing any Certificate with "plan assets" of any Plan, or stating that the transferee is an insurance company, the source of funds to be used by it to purchase the Certificate is an "insurance company general account" (within the meaning of Department of Labor Prohibited Transaction Class Exemption ("PTCE") 95-60), and the purchase is being made in reliance upon the availability of the exemptive relief afforded under Sections I and III of PTCE 95-60.

This Certificate is one of a duly authorized issue of Certificates issued in several Classes designated as Mortgage Asset-Backed Pass-Through Certificates of the Series specified hereon (herein collectively called the "Certificates").

The Certificates are limited in right of payment to certain collections and recoveries respecting the Mortgage Loans, all as more specifically set forth herein and in the Agreement. In the event Master Servicer funds are advanced with respect to any Mortgage Loan, such advance is reimbursable to the Master Servicer, to the extent provided in the Agreement, from related recoveries on such Mortgage Loan or from other cash that would have been distributable to Certificateholders.

As provided in the Agreement, withdrawals from the Custodial Account and/or the Certificate Account created for the benefit of Certificateholders may be made by the Master Servicer from time to time for purposes other than distributions to Certificateholders, such purposes including without limitation reimbursement to the Company and the Master Servicer of advances made, or certain expenses incurred, by either of them.

The Agreement permits, with certain exceptions therein provided, the amendment of the Agreement and the modification of the rights and obligations of the Company, the Master Servicer and the Trustee and the rights of the Certificateholders under the Agreement at any time by the Company, the Master Servicer and the Trustee with the consent of the Holders of Certificates evidencing in the aggregate not less than 66% of the Percentage Interests of each Class of Certificates affected thereby. Any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange herefor or in lieu hereof whether or not notation of such consent is made upon the Certificate. The Agreement also permits the amendment thereof in certain circumstances without the consent of the Holders of any of the Certificates and, in certain additional circumstances, without the consent of the Holders of certain Classes of Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registrable in the Certificate Register upon surrender of this Certificate for registration of transfer at the offices or agencies appointed by the Trustee, duly endorsed

by, or accompanied by an assignment in the form below or other written instrument of transfer in form satisfactory to the Trustee and the Certificate Registrar duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates of authorized denominations evidencing the same Class and aggregate Percentage Interest will be issued to the designated transferee or transferees.

The Certificates are issuable only as registered Certificates without coupons in Classes and in denominations specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, Certificates are exchangeable for new Certificates of authorized denominations evidencing the same Class and aggregate Percentage Interest, as requested by the Holder surrendering the same.

No service charge will be made for any such registration of transfer or exchange, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company, the Master Servicer, the Trustee and the Certificate Registrar and any agent of the Company, the Master Servicer, the Trustee or the Certificate Registrar may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and neither the Company, the Master Servicer, the Trustee nor any such agent shall be affected by notice to the contrary.

This Certificate shall be governed by and construed in accordance with the laws of the State of New York.

The obligations created by the Agreement in respect of the Certificates and the Trust Fund created thereby shall terminate upon the payment to Certificateholders of all amounts held by or on behalf of the Trustee and required to be paid to them pursuant to the Agreement following the earlier of (i) the maturity or other liquidation of the last Mortgage Loan subject thereto or the disposition of all property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan and (ii) the purchase by the Master Servicer from the Trust Fund of all remaining Mortgage Loans and all property acquired in respect of such Mortgage Loans, thereby effecting early retirement of the Certificates.  The Agreement permits, but does not require, the Master Servicer to (i) purchase at a price determined as provided in the Agreement all remaining Mortgage Loans and all property acquired in respect of any Mortgage Loan or (ii) purchase in whole, but not in part, all of the Certificates from the Holders thereof; provided, that any such option may only be exercised if the Pool Stated Principal Balance of the Mortgage Loans as of the Distribution Date upon which the proceeds of any such purchase are distributed is less than ten percent of the Cut-off Date Principal Balance of the Mortgage Loans.

Unless the certificate of authentication hereon has been executed by the Certificate Registrar, by manual signature, this Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose.

---

IN WITNESS WHEREOF, the Trustee has caused this Certificate to be duly executed.

Dated:                          [_____],
                                      as Trustee


                           By: _____
                                   Authorized Signatory


CERTIFICATE OF AUTHENTICATION

This is one of the Class A-    Certificates referred to in the within-mentioned Agreement.


                                [_____],
                                      as Certificate Registrar



                           By: _____
                                   Authorized Signatory

---

ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sell(s),  assign(s) and

transfer(s) unto _____

(Please print or typewrite name and address including postal zip code of assignee) a Percentage Interest evidenced by the within Mortgage Asset-Backed Pass-Through Certificate and hereby authorizes the transfer of registration of such interest to assignee on the Certificate Register of the Trust Fund.

I (We) further direct the Certificate Registrar to issue a new Certificate of a like denomination and Class, to the above named assignee and deliver such Certificate to the following address:


_____
Dated: _____    Signature by or on behalf of assignor



_____
Signature Guaranteed

DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available funds to _____ for the account of _____ account number _____, or, if mailed by check, to _____.

Applicable statements should be mailed to _____.

This information is provided by _____, the assignee named above, or _____ , as its agent.


EXHIBIT C-I

FORM OF CLASS P CERTIFICATE

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE RESOLD OR TRANSFERRED UNLESS IT IS REGISTERED PURSUANT TO SUCH ACT AND LAWS OR IS SOLD OR TRANSFERRED IN TRANSACTIONS WHICH ARE EXEMPT FROM REGISTRATION UNDER SUCH ACT AND UNDER APPLICABLE STATE LAW AND IS TRANSFERRED IN ACCORDANCE WITH THE PROVISIONS OF SECTION 5.02 OF THE AGREEMENT).

NO TRANSFER OF THIS CERTIFICATE MAY BE MADE TO ANY PERSON, UNLESS THE TRANSFEREE PROVIDES EITHER A CERTIFICATION PURSUANT TO SECTION 5.02(e) OF THE AGREEMENT OR AN OPINION OF COUNSEL SATISFACTORY TO THE THE TRUSTEE THAT THE PURCHASE OF THIS CERTIFICATE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR SECTION 4975 OF THE CODE AND WILL NOT SUBJECT THE MASTER SERVICER, THE COMPANY OR THE TRUSTEE TO ANY OBLIGATION OR LIABILITY IN ADDITION TO THOSE UNDERTAKEN IN THE AGREEMENT.


Certificate No. ____          Prepayment Charge

Class P - Prepayment Charge    Aggregate Certificate Principal Balance
                              of the Class P
Date of Pooling and Servicing  Certificates as of
Agreement and Cut-off Date:    the Cut-off Date:
_____ 1, ____            $0.00

First Distribution Date:       Initial Certificate Principal Balance
_____ 25, ____           of this Certificate: $____

Master Servicer:               Percentage Interest of this
Residential Funding Company, LLC  Certificate:
                              100%
Assumed Final Distribution Date:
_____ 25, ____           CUSIP: _____

MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATE,
SERIES ____-___

evidencing a percentage interest in any distributions allocable
to the Class P Certificates with respect to the Trust Fund
consisting primarily of a pool of [one- to four-family
residential, payment-option, adjustable-rate first lien mortgage
loans with a negative amortization feature] formed and sold by
RESIDENTIAL ACCREDIT LOANS, INC.

This Certificate is payable solely from the assets of the Trust
Fund, and does not represent an obligation of or interest in Residential
Accredit Loans, Inc., the Master Servicer, the Trustee referred to below or
GMAC Mortgage Group, LLC or any of their affiliates.  Neither this
Certificate nor the underlying Mortgage Loans are guaranteed or insured by
any governmental agency or instrumentality or by Residential Accredit Loans,
Inc., the Master Servicer, the Trustee or GMAC Mortgage Group, LLC or any of
their affiliates.  None of the Company, the Master Servicer, GMAC Mortgage
Group, LLC or any of their affiliates will have any obligation with respect
to any certificate or other obligation secured by or payable from payments on
the Certificates.

This certifies that _____ is the
registered owner of the Percentage Interest evidenced by this Certificate (as
specified above) in certain distributions with respect to a Trust Fund
consisting primarily of a pool of [one- to four-family residential,
payment-option, adjustable-rate first lien mortgage loans with a negative
amortization feature] (the "Mortgage Loans"), formed and sold by Residential
Accredit Loans, Inc. (hereinafter called the "Company," which term includes
any successor entity under the Agreement referred to below).  The Trust Fund
was created pursuant to a Pooling and Servicing Agreement dated as specified
above (the "Agreement") among the Company, the Master Servicer and
_____, as trustee (the "Trustee"), a summary of certain of the
pertinent provisions of which is set forth hereafter.  To the extent not
defined herein, the capitalized terms used herein have the meanings assigned
in the Agreement.  This Certificate is issued under and is subject to the
terms, provisions and conditions of the Agreement, to which Agreement the
Holder of this Certificate by virtue of the acceptance hereof assents and by
which such Holder is bound.

Pursuant to the terms of the Agreement, a distribution will be
made on the 25th day of each month or, if such 25th day is not a Business
Day, the Business Day immediately following (the "Distribution Date"),
commencing on the first Distribution Date specified above, to the Person in
whose name this Certificate at the close of business on the last day (or if
such last day is not a Business Day, the Business Day immediately preceding
such last day) of the month immediately preceding the month of such
distribution (the "Record Date"), in an amount equal to the product of the
Percentage Interest evidenced by this Certificate and the amount required to
be distributed to Holders of Class P Certificates on such Distribution Date.

Distributions on this Certificate will be made either by the
Master Servicer acting on behalf of the Trustee or by a Paying Agent
appointed by the Trustee in immediately available funds (by wire transfer or
otherwise) for the account of the Person entitled thereto if such Person
shall have so notified the Master Servicer or such Paying Agent, or by check
mailed to the address of the Person entitled thereto, as such name and
address shall appear on the Certificate Register.

Notwithstanding the above, the final distribution on this
Certificate will be made after due notice of the pendency of such
distribution and only upon presentation and surrender of this Certificate at
the office or agency appointed by the Trustee for that purpose.

No transfer of this Class P Certificate will be made unless such
transfer is exempt from the registration requirements of the Securities Act
of 1933, as amended, and any applicable state securities laws or is made in
accordance with said Act and laws.  In the event that such a transfer is to
be made, (i) the Trustee or the Company may require an opinion of counsel
acceptable to and in form and substance satisfactory to the Trustee and the
Company that such transfer is exempt (describing the applicable exemption and
the basis therefor) from or is being made pursuant to the registration
requirements of the Securities Act of 1933, as amended, and of any applicable
statute of any state and (ii) the transferee shall execute an investment
letter in the form described by the Agreement.  The Holder hereof desiring to
effect such transfer shall, and does hereby agree to, indemnify the Trustee,
the Company, the Master Servicer and the Certificate Registrar acting on
behalf of the Trustee against any liability that may result if the transfer
is not so exempt or is not made in accordance with such Federal and state
laws. In connection with any such transfer, the Trustee will also require
either (i) an opinion of counsel addressed to the Trustee, the Company and
the Master Servicer, acceptable to and in form and substance satisfactory to
the Trustee with respect to the permissibility of such transfer under the
Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and
Section 4975 of the Internal Revenue Code (the "Code") and stating, among
other things, that the transferee's acquisition of a Class P Certificate will
not constitute or result in a non-exempt prohibited transaction under Section
406 of ERISA or Section 4975 of the Code or (ii) a representation letter, in
the form as described by Section 5.02(e) of the Agreement, either stating
that the transferee is not an employee benefit or other plan subject to the
prohibited transaction provisions of ERISA or Section 4975 of the Code (a
"Plan"), or any other person (including an investment manager, a named
fiduciary or a trustee of any Plan) acting, directly or indirectly, on behalf
of or purchasing any Certificate with "plan assets" of any Plan.

This Certificate is one of a duly authorized issue of
Certificates issued in several Classes designated as Mortgage Asset-Backed
Pass-Through Certificates of the Series specified hereon (herein collectively
called the "Certificates").

The Certificates are limited in right of payment to certain collections and recoveries respecting the Mortgage Loans, all as more specifically set forth herein and in the Agreement.  In the event Master Servicer funds are advanced with respect to any Mortgage Loan, such advance is reimbursable to the Master Servicer, to the extent provided in the Agreement, from related recoveries on such Mortgage Loan or from other cash that would have been distributable to Certificateholders.

As provided in the Agreement, withdrawals from the Custodial Account and/or the Certificate Account created for the benefit of Certificateholders may be made by the Master Servicer from time to time for purposes other than distributions to Certificateholders, such purposes including without limitation reimbursement to the Company and the Master Servicer of advances made, or certain expenses incurred, by either of them.

The Agreement permits, with certain exceptions therein provided, the amendment of the Agreement and the modification of the rights and obligations of the Company, the Master Servicer and the Trustee and the rights of the Certificateholders under the Agreement at any time by the Company, the Master Servicer and the Trustee with the consent of the Holders of Certificates evidencing in the aggregate not less than 66% of the Percentage Interests of each Class of Certificates affected thereby.  Any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange herefor or in lieu hereof whether or not notation of such consent is made upon the Certificate.  The Agreement also permits the amendment thereof in certain circumstances without the consent of the Holders of any of the Certificates and, in certain additional circumstances, without the consent of the Holders of certain Classes of Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registrable in the Certificate Register upon surrender of this Certificate for registration of transfer at the offices or agencies appointed by the Trustee, duly endorsed by, or accompanied by an assignment in the form below or other written instrument of transfer in form satisfactory to the Trustee and the Certificate Registrar duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates of authorized denominations evidencing the same Class and aggregate Percentage Interest will be issued to the designated transferee or transferees.

The Certificates are issuable only as registered Certificates without coupons in Classes and in denominations specified in the Agreement.  As provided in the Agreement and subject to certain limitations therein set forth, Certificates are exchangeable for new Certificates of authorized denominations evidencing the same Class and aggregate Percentage Interest, as requested by the Holder surrendering the same.

No service charge will be made for any such registration of transfer or exchange, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company, the Master Servicer, the Trustee and the Certificate Registrar and any agent of the Company, the Master Servicer, the Trustee or the Certificate Registrar may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and neither the Company, the Master Servicer, the Trustee nor any such agent shall be affected by notice to the contrary.

This Certificate shall be governed by and construed in accordance with the laws of the State of New York.

The obligations created by the Agreement in respect of the Certificates and the Trust Fund created thereby shall terminate upon the payment to Certificateholders of all amounts held by or on behalf of the Trustee and required to be paid to them pursuant to the Agreement following the earlier of (i) the maturity or other liquidation of the last Mortgage Loan subject thereto or the disposition of all property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan and (ii) the purchase by the Master Servicer from the Trust Fund of all remaining Mortgage Loans and all property acquired in respect of such Mortgage Loans, thereby effecting early retirement of the Certificates.  The Agreement permits, but does not require, the Master Servicer to (i) purchase at a price determined as provided in the Agreement all remaining Mortgage Loans and all property acquired in respect of any Mortgage Loan or (ii) purchase in whole, but not in part, all of the Certificates from the Holders thereof; provided, that any such option may only be exercised if the Pool Stated Principal Balance of the Mortgage Loans as of the Distribution Date upon which the proceeds of any such purchase are distributed is less than ten percent of the Cut-off Date Principal Balance of the Mortgage Loans.

Unless the certificate of authentication hereon has been executed by the Certificate Registrar, by manual signature, this Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose.

---

IN WITNESS WHEREOF, the Trustee has caused this Certificate to be duly executed.

Dated:                    [_____],
                             as Trustee

By: _____
     Authorized Signatory

CERTIFICATE OF AUTHENTICATION

     This is one of the Class A-   Certificates referred to in the within-mentioned Agreement.

[_____],
     as Certificate Registrar

By: _____
     Authorized Signatory

ASSIGNMENT

     FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto _____

(Please print or typewrite name and address including postal zip code of assignee) a Percentage Interest evidenced by the within Mortgage Asset-Backed Pass-Through Certificate and hereby authorizes the transfer of registration of such interest to assignee on the Certificate Register of the Trust Fund.

     I (We) further direct the Certificate Registrar to issue a new Certificate of a like denomination and Class, to the above named assignee and deliver such Certificate to the following address:

                       _____

Dated: _____     Signature by or on behalf of assignor

                       _____
                       Signature Guaranteed

DISTRIBUTION INSTRUCTIONS

     The assignee should include the following for purposes of distribution:

     Distributions shall be made, by wire transfer or otherwise, in immediately available funds to _____ for the account of _____ account number _____, or, if mailed by check, to _____.

     Applicable statements should be mailed to _____.

     This information is provided by _____, the assignee named above, or _____ , as its agent.

EXHIBIT C-II

CLASS SB-[ ] CERTIFICATE

     THIS CERTIFICATE IS SUBORDINATED IN RIGHT OF PAYMENT TO THE SENIOR CERTIFICATES, THE CLASS M-1, CLASS M-2, CLASS M-3, [CLASS M-4, CLASS M-5, CLASS M-6, CLASS M-7, CLASS M-8, CLASS M-9 AND CLASS M-10] CERTIFICATES AS DESCRIBED IN THE AGREEMENT (AS DEFINED HEREIN).

     SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986. COUPLED WITH INTERESTS IN THE SWAP AGREEMENT AND THE SB-AM SWAP AGREEMENT.

     THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE RESOLD OR TRANSFERRED UNLESS IT IS REGISTERED PURSUANT TO SUCH ACT

AND LAWS OR IS SOLD OR TRANSFERRED IN TRANSACTIONS WHICH ARE EXEMPT FROM REGISTRATION UNDER SUCH ACT AND UNDER APPLICABLE STATE LAW AND IS TRANSFERRED IN ACCORDANCE WITH THE PROVISIONS OF SECTION 5.02 OF THE POOLING AND SERVICING AGREEMENT (THE "AGREEMENT").

NO TRANSFER OF THIS CERTIFICATE OR ANY INTEREST HEREIN SHALL BE MADE TO ANY PLAN SUBJECT TO TITLE I OF ERISA OR SECTION 4975 OF THE CODE, ANY PERSON ACTING, DIRECTLY OR INDIRECTLY, ON BEHALF OF ANY SUCH PLAN OR ANY PERSON ACQUIRING SUCH CERTIFICATES WITH "PLAN ASSETS" OF A PLAN WITHIN THE MEANING OF THE DEPARTMENT OF LABOR REGULATION PROMULGATED AT 29 C.F.R.SS.2510.3-101, AS MODIFIED BY SECTION 3(42) OF ERISA ("PLAN ASSET REGULATIONS"), UNLESS THE DEPOSITOR, THE TRUSTEE AND THE MASTER SERVICER ARE PROVIDED WITH AN OPINION OF COUNSEL WHICH ESTABLISHES TO THE SATISFACTION OF THE TRUSTEE THAT THE PURCHASE OF THIS CERTIFICATE IS PERMISSIBLE UNDER APPLICABLE LAW, WILL NOT CONSTITUTE OR RESULT IN ANY PROHIBITED TRANSACTION UNDER TITLE I OF ERISA OR SECTION 4975 OF THE CODE AND WILL NOT SUBJECT THE DEPOSITOR, THE MASTER SERVICER, THE TRUSTEE OR THE TRUST FUND TO ANY OBLIGATION OR LIABILITY (INCLUDING OBLIGATIONS OR LIABILITIES UNDER TITLE I OF ERISA OR SECTION 4975 OF THE CODE) IN ADDITION TO THOSE UNDERTAKEN IN THE AGREEMENT, WHICH OPINION OF COUNSEL SHALL NOT BE AN EXPENSE OF. THE DEPOSITOR, THE MASTER SERVICER, THE TRUSTEE OR THE TRUST FUND.

---

Class SB-[ ] Subordinate                    Certificate No. ___

Date of Pooling and Servicing Agreement    Percentage Interest: _____%
and Cut-off Date:
_____ 1, ____

First Distribution Date:                    Aggregate Initial Notional Principal
_____ 25, ____                         Balance of the Class SB-[ ]
                                            Certificates:
                                            $_____

Master Servicer:                            Initial Notional Balance
Residential Funding Company, LLC            of this Class SB-2 Certificate:
                                            $_____

Maturity Date:                              CUSIP: _____
_____ 25, ____


              MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATE,
                        Series _____-____

              evidencing a percentage interest in any distributions
              allocable to the Class SB-[ ] Certificates with
              respect to the Trust Fund consisting primarily of a
              pool of [one- to four-family residential, hybrid
              adjustable-rate first lien mortgage loans with a
              negative amortization feature] formed and sold by
              RESIDENTIAL ACCREDIT LOANS, INC.

This Certificate is payable solely from the assets of the Trust Fund, and does not represent an obligation of or interest in Residential Accredit Loans, Inc., the Master Servicer, the Trustee or GMAC Mortgage Group, LLC or any of their affiliates. Neither this Certificate nor the underlying Mortgage Loans are guaranteed or insured by any governmental agency or instrumentality or by Residential Accredit Loans, Inc., the Master Servicer, the Trustee or GMAC Mortgage Group, LLC or any of their affiliates. None of the Depositor, the Master Servicer, GMAC Mortgage Group, LLC or any of their affiliates will have any obligation with respect to any certificate or other obligation secured by or payable from payments on the Certificates.

This certifies that PRAMWAVE & CO. is the registered owner of the Percentage Interest evidenced by this Certificate in certain distributions with respect to the Trust Fund consisting primarily of an interest in a pool of [one- to four-family adjustable rate first lien mortgage loans] (the "Mortgage Loans"), sold by Residential Accredit Loans, Inc. (hereinafter called the "Depositor," which term includes any successor entity under the Agreement referred to below). The Trust Fund was created pursuant to a Pooling and Servicing Agreement dated as specified above (the "Agreement") among the Depositor, the Master Servicer and _____, as trustee (the "Trustee"), a summary of certain of the pertinent provisions of which is set forth hereafter. To the extent not defined herein, the capitalized terms used herein have the meanings assigned in the Agreement. This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of the acceptance hereof, assents and by which such Holder is bound.

Pursuant to the terms of the Agreement, a distribution will be made on the 25th day of each month or, if such 25th day is not a Business Day, the Business Day immediately following (the "Distribution Date"), commencing as described in the Agreement, to the Person in whose name this Certificate is registered at the close of business on the last Business Day of the month immediately preceding the month of such distribution (the "Record Date"), from the Available Distribution Amount in an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount of interest and principal, if any, required to be distributed to Holders of Class SB-[ ] Certificates on such Distribution Date.

Distributions on this Certificate will be made either by the Master

Servicer acting on behalf of the Trustee or by a Paying Agent appointed by the Trustee in immediately available funds (by wire transfer or otherwise) for the account of the Person entitled thereto if such Person shall have so notified the Master Servicer or such Paying Agent, or by check mailed to the address of the Person entitled thereto, as such name and address shall appear on the Certificate Register.

Notwithstanding the above, the final distribution on this Certificate will be made after due notice of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Trustee for that purpose. The Notional Amount of this Class SB-[ ] Certificate as of any date of determination will be calculated as described in the Agreement. This Class SB-[ ] Certificate will accrue interest at the Pass-Through Rate on the Notional Amount as indicated in the definition of Accrued Certificate Interest in the Agreement. This Class SB-[ ] Certificate will not accrue interest on its Certificate Principal Balance.

No transfer of this Class SB-[ ] Certificate will be made unless such transfer is exempt from the registration requirements of the Securities Act of 1933, as amended, and any applicable state securities laws or is made in accordance with said Act and laws. In the event that such a transfer is to be made, (i) the Trustee or the Depositor may require an opinion of counsel acceptable to and in form and substance satisfactory to the Trustee and the Depositor that such transfer is exempt (describing the applicable exemption and the basis therefor) from or is being made pursuant to the registration requirements of the Securities Act of 1933, as amended, and of any applicable statute of any state and (ii) the transferee shall execute an investment letter in the form described by the Agreement. The Holder hereof desiring to effect such transfer shall, and does hereby agree to, indemnify the Trustee, the Depositor, the Master Servicer and the Certificate Registrar acting on behalf of the Trustee against any liability that may result if the transfer is not so exempt or is not made in accordance with such Federal and state laws.

No transfer of this Certificate or any interest herein shall be made to any Plan subject to Title I of ERISA or Section 4975 of the Code, any Person acting, directly or indirectly, on behalf of any such Plan or any Person acquiring such Certificates with "plan assets" of a Plan within the meaning of the Department of Labor regulation promulgated at 29 C.F.R.ss.2510.3-101, as modified by Section 3(42) of ERISA ("Plan Asset Regulations"), unless the Depositor, the Trustee and the Master Servicer are provided with an Opinion of Counsel which establishes to the satisfaction of the Trustee that the purchase of this Certificate is permissible under applicable law, will not constitute or result in any prohibited transaction under Title I of ERISA or Section 4975 of the Code and will not subject the Depositor, the Master Servicer, the Trustee or the Trust Fund to any obligation or liability (including obligations or liabilities under Title I of ERISA or Section 4975 of the Code) in addition to those undertaken in the Agreement, which Opinion of Counsel shall not be an expense of the Depositor, the Master Servicer, the Trustee or the Trust Fund.

This Certificate is one of a duly authorized issue of Certificates issued in several Classes designated as Mortgage Asset-Backed Pass-Through Certificates of the Series specified hereon (herein collectively called the "Certificates").

The Certificates are limited in right of payment to certain collections and recoveries respecting the Mortgage Loans, all as more specifically set forth herein and in the Agreement. In the event Master Servicer funds are advanced with respect to any Mortgage Loan, such advance is reimbursable to the Master Servicer, to the extent provided in the Agreement, from related recoveries on such Mortgage Loan or from other cash that would have been distributable to Certificateholders.

As provided in the Agreement, withdrawals from the Custodial Account and/or the Certificate Account created for the benefit of Certificateholders may be made by the Master Servicer from time to time for purposes other than distributions to Certificateholders, such purposes including without limitation reimbursement to the Depositor and the Master Servicer of advances made, or certain expenses incurred, by either of them.

The Agreement permits, with certain exceptions therein provided, the amendment of the Agreement and the modification of the rights and obligations of the Depositor, the Master Servicer and the Trustee and the rights of the Certificateholders under the Agreement from time to time by the Depositor, the Master Servicer and the Trustee with the consent of the Holders of Certificates evidencing in the aggregate not less than 66% of the Percentage Interests of each Class of Certificates affected thereby. Any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange herefor or in lieu hereof whether or not notation of such consent is made upon the Certificate. The Agreement also permits the amendment thereof in certain circumstances without the consent of the Holders of any of the Certificates and, in certain additional circumstances, without the consent of the Holders of certain Classes of Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registrable in the Certificate Register upon surrender of this Certificate for registration of transfer at the offices or agencies appointed by the Trustee, duly endorsed by, or accompanied by an assignment in the form below or other written instrument of transfer in form satisfactory to the Trustee and the Certificate Registrar duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates of authorized denominations evidencing the same Class and aggregate Percentage Interest will be issued to the designated transferee or transferees.

The Certificates are issuable only as registered Certificates without coupons in Classes and in denominations specified in the Agreement. As

provided in the Agreement and subject to certain limitations therein set forth, Certificates are exchangeable for new Certificates of authorized denominations evidencing the same Class and aggregate Percentage Interest, as requested by the Holder surrendering the same.

No service charge will be made for any such registration of transfer or exchange, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Depositor, the Master Servicer, the Trustee, the Certificate Registrar and any agent of the Depositor, the Master Servicer, the Trustee or the Certificate Registrar may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and neither the Depositor, the Master Servicer, the Trustee nor any such agent shall be affected by notice to the contrary.

This Certificate shall be governed by and construed in accordance with the laws of the State of New York.

The obligations created by the Agreement in respect of the Certificates and the Trust Fund created thereby shall terminate upon the payment to Certificateholders of all amounts held by or on behalf of the Trustee and required to be paid to them pursuant to the Agreement following the earlier of (i) the maturity or other liquidation of the last Mortgage Loan subject thereto or the disposition of all property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan, and (ii) the purchase by the Master Servicer from the Trust Fund of all remaining Mortgage Loans and all property acquired in respect of such Mortgage Loans, thereby effecting early retirement of the Certificates. The Agreement permits, but does not require, the Master Servicer (i) to purchase, at a price determined as provided in the Agreement, all remaining Mortgage Loans and all property acquired in respect of any Mortgage Loan or (ii) to purchase in whole, but not in part, all of the Certificates from the Holders thereof, provided, that any such option may only be exercised if the Stated Principal Balance before giving effect to the distributions to be made on such Distribution Date of the Mortgage Loans, as of the Distribution Date upon which the proceeds of any such purchase are distributed is less than ten percent of the Cut-off Date Principal Balance of the Mortgage Loans.

Unless the certificate of authentication hereon has been executed by the Certificate Registrar by manual signature, this Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose.

[Signature Page Follows]

---

IN WITNESS WHEREOF, the Trustee has caused this Certificate to be duly executed.

Dated:                         [_____],
                                    as Trustee


                               By: _____
                                        Authorized Signatory


CERTIFICATE OF AUTHENTICATION

This is one of the Class A-    Certificates referred to in the within-mentioned Agreement.


                               [_____],
                                    as Certificate Registrar


                               By: _____
                                        Authorized Signatory

---

ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto _____

(Please print or typewrite name and address including postal zip code of assignee) a Percentage Interest evidenced by the within Mortgage Asset-Backed Pass-Through Certificate and hereby authorizes the transfer of registration of such interest to assignee on the Certificate Register of the Trust Fund.

I (We) further direct the Certificate Registrar to issue a new Certificate of a like denomination and Class, to the above named assignee and deliver such Certificate to the following address:

Dated: _____          _____
                                Signature by or on behalf of assignor


                                _____
                                Signature Guaranteed

                        DISTRIBUTION INSTRUCTIONS

        The assignee should include the following for purposes of distribution:

        Distributions shall be made, by wire transfer or otherwise, in immediately available funds to _____ for the account of _____ account number _____, or, if mailed by check, to _____.

        Applicable statements should be mailed to _____.

        This information is provided by _____, the assignee named above, or _____ , as its agent.


                                EXHIBIT D

                    FORM OF CLASS R CERTIFICATE

THIS CERTIFICATE MAY NOT BE HELD BY OR TRANSFERRED TO A NON-UNITED STATES PERSON OR A DISQUALIFIED ORGANIZATION (AS DEFINED BELOW).

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "RESIDUAL INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT" AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986 (THE "CODE").

NO TRANSFER OF THIS CERTIFICATE MAY BE MADE TO ANY PERSON, UNLESS THE TRANSFEREE PROVIDES EITHER A CERTIFICATION PURSUANT TO SECTION 5.02(e) OF THE AGREEMENT OR AN OPINION OF COUNSEL SATISFACTORY TO THE TRUSTEE THAT THE PURCHASE OF THIS CERTIFICATE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR SECTION 4975 OF THE CODE AND WILL NOT SUBJECT THE MASTER SERVICER, THE COMPANY OR THE TRUSTEE TO ANY OBLIGATION OR LIABILITY IN ADDITION TO THOSE UNDERTAKEN IN THE AGREEMENT.

ANY RESALE, TRANSFER OR OTHER DISPOSITION OF THIS CERTIFICATE MAY BE MADE ONLY IF THE PROPOSED TRANSFEREE PROVIDES A TRANSFER AFFIDAVIT TO THE MASTER SERVICER AND THE TRUSTEE THAT (1) SUCH TRANSFEREE IS NOT (A) THE UNITED STATES, ANY STATE OR POLITICAL SUBDIVISION THEREOF, ANY POSSESSION OF THE UNITED STATES, OR ANY AGENCY OR INSTRUMENTALITY OF ANY OF THE FOREGOING (OTHER THAN AN INSTRUMENTALITY WHICH IS A CORPORATION IF ALL OF ITS ACTIVITIES ARE SUBJECT TO TAX AND EXCEPT FOR FREDDIE MAC, A MAJORITY OF ITS BOARD OF DIRECTORS IS NOT SELECTED BY SUCH GOVERNMENTAL UNIT), (B) A FOREIGN GOVERNMENT, ANY INTERNATIONAL ORGANIZATION, OR ANY AGENCY OR INSTRUMENTALITY OF EITHER OF THE FOREGOING, (C) ANY ORGANIZATION (OTHER THAN CERTAIN FARMERS' COOPERATIVES DESCRIBED IN SECTION 521 OF THE CODE) WHICH IS EXEMPT FROM THE TAX IMPOSED BY CHAPTER 1 OF THE CODE UNLESS SUCH ORGANIZATION IS SUBJECT TO THE TAX IMPOSED BY SECTION 511 OF THE CODE (INCLUDING THE TAX IMPOSED BY SECTION 511 OF THE CODE ON UNRELATED BUSINESS TAXABLE INCOME), (D) RURAL ELECTRIC AND TELEPHONE COOPERATIVES DESCRIBED IN SECTION 1381(a)(2)(C) OF THE CODE, (E) AN ELECTING LARGE PARTNERSHIP UNDER SECTION 775(a) OF THE CODE (ANY SUCH PERSON DESCRIBED IN THE FOREGOING CLAUSES (A), (B), (C), (D) OR (E) BEING HEREIN REFERRED TO AS A "DISQUALIFIED ORGANIZATION"), OR (F) AN AGENT OF A DISQUALIFIED ORGANIZATION, (2) NO PURPOSE OF SUCH TRANSFER IS TO IMPEDE THE ASSESSMENT OR COLLECTION OF TAX AND (3) SUCH TRANSFEREE SATISFIES CERTAIN ADDITIONAL CONDITIONS RELATING TO THE FINANCIAL CONDITION OF THE PROPOSED TRANSFEREE. NOTWITHSTANDING THE REGISTRATION IN THE CERTIFICATE REGISTER OR ANY TRANSFER, SALE OR OTHER DISPOSITION OF THIS CERTIFICATE TO A DISQUALIFIED ORGANIZATION OR AN AGENT OF A DISQUALIFIED ORGANIZATION, SUCH REGISTRATION SHALL BE DEEMED TO BE OF NO LEGAL FORCE OR EFFECT WHATSOEVER AND SUCH PERSON SHALL NOT BE DEEMED TO BE A CERTIFICATEHOLDER FOR ANY PURPOSE HEREUNDER, INCLUDING, BUT NOT LIMITED TO, THE RECEIPT OF DISTRIBUTIONS ON THIS CERTIFICATE. EACH HOLDER OF THIS CERTIFICATE BY ACCEPTANCE OF THIS CERTIFICATE SHALL BE DEEMED TO HAVE CONSENTED TO THE PROVISIONS OF THIS PARAGRAPH.

Certificate No.                 [    ]% Pass-Through Rate

Class R Senior                  Aggregate Initial Certificate
                                Principal Balance of the
Date of Pooling and Servicing   Class R Certificates:
Agreement and Cut-off Date:     $100.00
_____ 1, ____

|                                      |                                                                 |
|--------------------------------------|-----------------------------------------------------------------|
|                                      | Initial Certificate Principal                                   |
| First Distribution Date:             | Balance of this Certificate:                                    |
| _____ 25, ____                    | $                                                               |
|                                      |                                                                 |
| Master Servicer:                     | Percentage Interest:                                            |
| Residential Funding Company, LLC     | %                                                               |
|                                      |                                                                 |
| Assumed Final Distribution Date:     | CUSIP 76110F-                                                   |
| _____ 25, ____                  |                                                                 |

MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATE,
SERIES ____-____

evidencing a percentage interest in any distributions allocable to the Class R Certificates with respect to the Trust Fund consisting primarily of a pool of [conventional one- to four-family fixed interest rate first mortgage loans] formed and sold by RESIDENTIAL ACCREDIT LOANS, INC.

This Certificate is payable solely from the assets of the Trust Fund, and does not represent an obligation of or interest in Residential Accredit Loans, Inc., the Master Servicer, the Trustee referred to below or GMAC Mortgage Group, LLC or any of their affiliates.  Neither this Certificate nor the underlying Mortgage Loans are guaranteed or insured by any governmental agency or instrumentality or by Residential Accredit Loans, Inc., the Master Servicer, the Trustee or GMAC Mortgage Group, LLC or any of their affiliates.  None of the Company, the Master Servicer, GMAC Mortgage Group, LLC or any of their affiliates will have any obligation with respect to any certificate or other obligation secured by or payable from payments on the Certificates.

This certifies that _____ is the registered owner of the Percentage Interest evidenced by this Certificate (obtained by dividing the Initial Certificate Principal Balance of this Certificate by the aggregate Initial Certificate Principal Balance of all Class R Certificates, both as specified above) in certain distributions with respect to the Trust Fund consisting primarily of a pool of [conventional one- to four-family fixed interest rate first mortgage loans] (the "Mortgage Loans"), formed and sold by Residential Accredit Loans, Inc. (hereinafter called the "Company," which term includes any successor entity under the Agreement referred to below).  The Trust Fund was created pursuant to a Pooling and Servicing Agreement dated as specified above (the "Agreement") among the Company, the Master Servicer and _____, as trustee (the "Trustee"), a summary of certain of the pertinent provisions of which is set forth hereafter.  To the extent not defined herein, the capitalized terms used herein have the meanings assigned in the Agreement.  This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of the acceptance hereof assents and by which such Holder is bound.

Pursuant to the terms of the Agreement, a distribution is made on the 25th day of each month or, if such 25th day is not a Business Day, the Business Day immediately following (the "Distribution Date"), commencing as described in the Agreement, to the Person in whose name this Certificate is registered at the close of business on the last day (or if such last day is not a Business Day, the Business Day immediately preceding such last day) of the month immediately preceding the month of such distribution (the "Record Date"), from the Available Distribution Amount in an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount (of interest and principal, if any) required to be distributed to Holders of Class R Certificates on such Distribution Date.

Each Holder of this Certificate will be deemed to have agreed to be bound by the restrictions set forth in the Agreement to the effect that (i) each person holding or acquiring any Ownership Interest in this Certificate must be a United States Person and a Permitted Transferee, (ii) the transfer of any Ownership Interest in this Certificate will be conditioned upon the delivery to the Trustee of, among other things, an affidavit to the effect that it is a United States Person and Permitted Transferee, (iii) any attempted or purported transfer of any Ownership Interest in this Certificate in violation of such restrictions will be absolutely null and void and will vest no rights in the purported transferee, and (iv) if any person other than a United States Person and a Permitted Transferee acquires any Ownership Interest in this Certificate in violation of such restrictions, then the Company will have the right, in its sole discretion and without notice to the Holder of this Certificate, to sell this Certificate to a purchaser selected by the Company, which purchaser may be the Company, or any affiliate of the Company, on such terms and conditions as the Company may choose.

Notwithstanding the above, the final distribution on this Certificate will be made after due notice of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Trustee for that purpose.  The Initial Certificate Principal Balance of this Certificate is set forth above.  The Certificate Principal Balance hereof will be reduced to the extent of distributions allocable to principal and any Realized Losses allocable hereto.  Notwithstanding the reduction of the Certificate Principal Balance hereof to zero, this Certificate will remain outstanding under the Agreement and the Holder hereof may have additional obligations with respect to this Certificate, including tax liabilities, and may be entitled to certain additional distributions hereon, in accordance with the terms and provisions of the Agreement.

No transfer of this Class R Certificate will be made unless the Trustee has received either (i) an opinion of counsel addressed to the Trustee, the Company and the Master Servicer, acceptable to and in form and substance satisfactory to the Trustee with respect to the permissibility of such transfer under the Employee Retirement Income Security Act of 1974, as

amended ("ERISA"), and Section 4975 of the Internal Revenue Code (the "Code") and stating, among other things, that the transferee's acquisition of a Class R Certificate will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or (ii) a representation letter, in the form as described by the Agreement, stating that the transferee is not an employee benefit or other plan subject to the prohibited transaction provisions of ERISA or Section 4975 of the Code (a "Plan"), or any other person (including an investment manager, a named fiduciary or a trustee of any Plan) acting, directly or indirectly, on behalf of or purchasing any Certificate with "plan assets" of any Plan.

This Certificate is one of a duly authorized issue of Certificates issued in several Classes designated as Mortgage Asset-Backed Pass-Through Certificates of the Series specified hereon (herein collectively called the "Certificates").

The Certificates are limited in right of payment to certain collections and recoveries respecting the Mortgage Loans, all as more specifically set forth herein and in the Agreement.  In the event Master Servicer funds are advanced with respect to any Mortgage Loan, such advance is reimbursable to the Master Servicer, to the extent provided in the Agreement, from related recoveries on such Mortgage Loan or from other cash that would have been distributable to Certificateholders.

As provided in the Agreement, withdrawals from the Custodial Account and/or the Certificate Account created for the benefit of Certificateholders may be made by the Master Servicer from time to time for purposes other than distributions to Certificateholders, such purposes including without limitation reimbursement to the Company and the Master Servicer of advances made, or certain expenses incurred, by either of them.

The Agreement permits, with certain exceptions therein provided, the amendment of the Agreement and the modification of the rights and obligations of the Company, the Master Servicer and the Trustee and the rights of the Certificateholders under the Agreement at any time by the Company, the Master Servicer and the Trustee with the consent of the Holders of Certificates evidencing in the aggregate not less than 66% of the Percentage Interests of each Class of Certificates affected thereby.  Any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange herefor or in lieu hereof whether or not notation of such consent is made upon the Certificate.  The Agreement also permits the amendment thereof in certain circumstances without the consent of the Holders of any of the Certificates and, in certain additional circumstances, without the consent of the Holders of certain Classes of Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registrable in the Certificate Register upon surrender of this Certificate for registration of transfer at the offices or agencies appointed by the Trustee, duly endorsed by, or accompanied by an assignment in the form below or other written instrument of transfer in form satisfactory to the Trustee and the Certificate Registrar duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates of authorized denominations evidencing the same Class and aggregate Percentage Interest will be issued to the designated transferee or transferees.

The Certificates are issuable only as registered Certificates without coupons in Classes and in denominations specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, Certificates are exchangeable for new Certificates of authorized denominations evidencing the same Class and aggregate Percentage Interest, as requested by the Holder surrendering the same.

No service charge will be made for any such registration of transfer or exchange, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company, the Master Servicer, the Trustee and the Certificate Registrar and any agent of the Company, the Master Servicer, the Trustee or the Certificate Registrar may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and neither the Company, the Master Servicer, the Trustee nor any such agent shall be affected by notice to the contrary.

This Certificate shall be governed by and construed in accordance with the laws of the State of New York.

The obligations created by the Agreement in respect of the Certificates and the Trust Fund created thereby shall terminate upon the payment to Certificateholders of all amounts held by or on behalf of the Trustee and required to be paid to them pursuant to the Agreement following the earlier of (i) the maturity or other liquidation of the last Mortgage Loan subject thereto or the disposition of all property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan and (ii) the purchase by the Master Servicer from the Trust Fund of all remaining Mortgage Loans and all property acquired in respect of such Mortgage Loans, thereby effecting early retirement of the Certificates.  The Agreement permits, but does not require, the Master Servicer to (i) purchase at a price determined as provided in the Agreement all remaining Mortgage Loans and all property acquired in respect of any Mortgage Loan or (ii) purchase in whole, but not in part, all of the Certificates from the Holders thereof; provided, that any such option may only be exercised if the Pool Stated Principal Balance of the Mortgage Loans as of the Distribution Date upon which the proceeds of any such purchase are distributed is less than ten percent of the Cut-off Date Principal Balance of the Mortgage Loans.

Reference is hereby made to the further provisions of this

Certificate set forth on the reverse hereof, which further provisions shall for all purpose have the same effect as if set forth at this place.

Unless the certificate of authentication hereon has been executed by the Certificate Registrar, by manual signature, this Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose.

IN WITNESS WHEREOF, the Trustee has caused this Certificate to be duly executed.

Dated:                    [_____],
                              as Trustee


                    By: _____
                        Authorized Signatory


CERTIFICATE OF AUTHENTICATION

This is one of the Class A-    Certificates referred to in the within-mentioned Agreement.


                    [_____],
                       as Certificate Registrar


                    By: _____
                        Authorized Signatory


ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto _____

(Please print or typewrite name and address including postal zip code of assignee) a Percentage Interest evidenced by the within Mortgage Asset-Backed Pass-Through Certificate and hereby authorizes the transfer of registration of such interest to assignee on the Certificate Register of the Trust Fund.

I (We) further direct the Certificate Registrar to issue a new Certificate of a like denomination and Class, to the above named assignee and deliver such Certificate to the following address:


                    _____
Dated: _____    Signature by or on behalf of assignor


                    _____
                       Signature Guaranteed

DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available funds to _____ for the account of _____ account number _____, or, if mailed by check, to _____.

Applicable statements should be mailed to _____.

This information is provided by _____, the assignee named above, or _____ , as its agent.

EXHIBIT E

FORM OF SELLER/SERVICER CONTRACT

This Seller/Servicer Contract (as may be amended, supplemented or otherwise modified from time to time, this "Contract") is made this _____ day of _____, 20 _____ , by and between Residential Funding Company, LLC, its successors and assigns ("Residential Funding") and _____ (the "Seller/Servicer," and, together with Residential Funding, the "parties" and each, individually, a "party").

WHEREAS, the Seller/Servicer desires to sell Loans to, and/or service Loans for, Residential Funding, and Residential Funding desires to purchase Loans from the Seller/Servicer and/or have the Seller/Servicer service various of its Loans, pursuant to the terms of this Contract and the Residential Funding Seller and Servicer Guides incorporated herein by reference, as amended, supplemented or otherwise modified, from time to time (together, the "Guides").

NOW, THEREFORE, in consideration of the premises, and the terms, conditions and agreements set forth below, the parties agree as follows:

1.       INCORPORATION OF GUIDES BY REFERENCE.

The Seller/Servicer acknowledges that it has received and read the Guides.  All provisions of the Guides are incorporated by reference into and made a part of this Contract, and shall be binding upon the parties; provided, however, that the Seller/Servicer shall be entitled to sell Loans to and/or service Loans for Residential Funding only if and for so long as it shall have been authorized to do so by Residential Funding in writing. Specific reference in this Contract to particular provisions of the Guides and not to other provisions does not mean that those provisions of the Guides not specifically cited in this Contract are not applicable.  All terms used herein shall have the same meanings as such terms have in the Guides, unless the context clearly requires otherwise.

2.       AMENDMENTS.

This Contract may not be amended or modified orally, and no provision of this Contract may be waived or amended except in writing signed by the party against whom enforcement is sought.  Such a written waiver or amendment must expressly reference this Contract.  However, by their terms, the Guides may be amended or supplemented by Residential Funding from time to time.  Any such amendment(s) to the Guides shall be binding upon the parties hereto.

3.       REPRESENTATIONS AND WARRANTIES.

a.       Reciprocal Representations and Warranties.

The Seller/Servicer and Residential Funding each represents and warrants to the other that as of the date of this Contract:

(1)  Each party is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization, is qualified, if necessary, to do business and in good standing in each jurisdiction in which it is required to be so qualified, and has the requisite power and authority to enter into this Contract and all other agreements which are contemplated by this Contract and to carry out its obligations hereunder and under the Guides and under such other agreements.

(2)  This Contract has been duly authorized, executed and delivered by each party and constitutes a valid and legally binding agreement of each party enforceable in accordance with its terms.

(3)  There is no action, proceeding or investigation pending or threatened, and no basis therefor is known to either party, that could affect the validity or prospective validity of this Contract.

(4)  Insofar as its capacity to carry out any obligation under this Contract is concerned, neither party is in violation of any charter, articles of incorporation, bylaws, certificates of formation, limited liability company agreement, mortgage, indenture, indebtedness, agreement, instrument, judgment, decree, order, statute, rule or regulation and none of the foregoing adversely affects its capacity to fulfill any of its obligations under this Contract.  Its execution of, and performance pursuant to, this Contract will not result in a violation of any of the foregoing.

b.       Seller/Servicer's Representations, Warranties and Covenants.

In addition to the representations, warranties and covenants made by the Seller/Servicer pursuant to subparagraph (a) of this paragraph 3, the Seller/Servicer makes the representations, warranties and covenants set forth in the Guides and, upon request, agrees to deliver to Residential Funding the certified Resolution of Board of Directors which authorizes the execution and delivery of this Contract.

4.       REMEDIES OF RESIDENTIAL FUNDING.

If an Event of Seller Default or an Event of Servicer Default shall occur, Residential Funding may, at its option, exercise one or more of those remedies set forth in the Guides.

5.      SELLER/SERVICER'S STATUS AS INDEPENDENT CONTRACTOR.

At no time shall the Seller/Servicer represent that it is acting as an agent of Residential Funding.  The Seller/Servicer shall, at all times, act as an independent contractor.

6.      PRIOR AGREEMENTS SUPERSEDED.

This Contract restates, amends and supersedes any and all prior Seller Contracts or Servicer Contracts between the parties except that any subservicing agreement executed by the Seller/Servicer in connection with any loan-security exchange transaction shall not be affected.

7.      ASSIGNMENT.

This Contract may not be assigned or transferred, in whole or in part, by the Seller/Servicer without the prior written consent of Residential Funding.  Residential Funding may sell, assign, convey, hypothecate, pledge or in any other way transfer, in whole or in part, without restriction, its rights under this Contract and the Guides with respect to any Commitment or Loan.

8.      NOTICES.

All notices, requests, demands or other communications that are to be given under this Contract shall be in writing, addressed to the appropriate parties and sent by telefacsimile or by overnight courier or by United States mail, postage prepaid, to the addresses and telefacsimile numbers specified below.  However, another name, address and/or telefacsimile number may be substituted by the Seller/Servicer pursuant to the requirements of this paragraph 8, or Residential Funding pursuant to an amendment to the Guides.

If to Residential Funding, notices must be sent to the appropriate address or telefacsimile number specified in the Guides.

If to the Seller/Servicer, notice must be sent to:


Attention:
Telefacsimile Number:  (      )

9.      JURISDICTION AND VENUE.

Each of the parties irrevocably submits to the jurisdiction of any state or federal court located in Hennepin County, Minnesota, over any action, suit or proceeding to enforce or defend any right under this Contract or otherwise arising from any loan sale or servicing relationship existing in connection with this Contract, and each of the parties irrevocably agrees that all claims in respect of any such action or proceeding may be heard or determined in such state or federal court.  Each of the parties irrevocably waives the defense of an inconvenient forum to the maintenance of any such action or proceeding and any other substantive or procedural rights or remedies it may have with respect to the maintenance of any such action or proceeding in any such forum.  Each of the parties agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment or in any other manner provided by law.  Each of the parties further agrees not to institute any legal actions or proceedings against the other party or any director, officer, employee, attorney, agent or property of the other party, arising out of or relating to this Contract in any court other than as hereinabove specified in this paragraph 9.

10.     MISCELLANEOUS.

This Contract, including all documents incorporated by reference herein, constitutes the entire understanding between the parties hereto and supersedes all other agreements, covenants, representations, warranties, understandings and communications between the parties, whether written or oral, with respect to the transactions contemplated by this Contract.  All paragraph headings contained herein are for convenience only and shall not be construed as part of this Contract.  Any provision of this Contract that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction, and, to this end, the provisions hereof are severable.  This Contract shall be governed by, and construed and enforced in accordance with, applicable federal laws and the laws of the State of Minnesota.

IN WITNESS WHEREOF, the duly authorized officers of the Seller/Servicer and Residential Funding have executed this Seller/Servicer Contract as of the date first above written.

ATTEST:                         SELLER/SERVICER

[Corporate Seal]

```
                                   (Name of Seller/Servicer)
By:                      By:
      (Signature)                  (Signature)
By:                      By:
      (Typed Name)                 (Typed Name)
Title:                   Title:
===============================================================================

ATTEST:                  RESIDENTIAL FUNDING COMPANY, LLC
[Corporate Seal]

By:                      By:
      (Signature)                  (Signature)
By:                      By:
      (Typed Name)                 (Typed Name)
Title:                   Title:
```

                            EXHIBIT F
                   FORMS OF REQUEST FOR RELEASE

DATE:

TO:

RE:          REQUEST FOR RELEASE OF DOCUMENTS

In connection with the administration of the pool of Mortgage Loans held by
you for the referenced pool, we request the release of the Mortgage Loan File
described below.

Pooling and Servicing Agreement Dated:
Series#:
Account#:
Pool#:
Loan#:
MIN#:
Borrower Name(s):
Reason for Document Request:                 (circle one)

        Mortgage Loan Prepaid in Full      Mortgage Loan Repurchased

"We hereby certify that all amounts received or to be received in connection
with such payments which are required to be deposited have been or will be so
deposited as provided in the Pooling and Servicing Agreement."


Residential Funding Company, LLC
Authorized Signature

****************************************************************************

TO CUSTODIAN/TRUSTEE:  Please acknowledge this request, and check off
documents being enclosed with a copy of this form.  You should retain this
form for your files in accordance with the terms of the Pooling and Servicing
Agreement.

Enclosed Documents:     [ ]  Promissory Note
                        [ ]  Primary Insurance Policy
                        [ ]  Mortgage or Deed of Trust
                        [ ]  Assignment(s) of Mortgage or Deed of Trust
                        [ ]  Title Insurance Policy
                        [ ]  Other:

Name:
Title:
Date:


                            EXHIBIT G-1

                 FORM OF TRANSFER AFFIDAVIT AND AGREEMENT

STATE OF               )
                       )  ss.:
COUNTY OF              )
            [NAME OF OFFICER], being first duly sworn, deposes and says:

1.         That he is [Title of Officer] of [Name of Owner] (record or
beneficial owner of the Mortgage Asset-Backed Pass-Through Certificates,
Series ____-__, Class R (the "Owner")), a [savings institution]
[corporation] duly organized and existing under the laws of [the State of
                       ] [the United States], on behalf of which
he makes this affidavit and agreement.

2.      That the Owner (i) is not and will not be a "disqualified organization" or an electing large partnership as of [date of transfer] within the meaning of Sections 860E(e)(5) and 775, respectively, of the Internal Revenue Code of 1986, as amended (the "Code") or an electing large partnership under Section 775(a) of the Code, (ii) will endeavor to remain other than a disqualified organization for so long as it retains its ownership interest in the Class R Certificates, and (iii) is acquiring the Class R Certificates for its own account or for the account of another Owner from which it has received an affidavit and agreement in substantially the same form as this affidavit and agreement. (For this purpose, a "disqualified organization" means an electing large partnership under Section 775 of the Code, the United States, any state or political subdivision thereof, any agency or instrumentality of any of the foregoing (other than an instrumentality all of the activities of which are subject to tax and, except for the Federal Home Loan Mortgage Corporation, a majority of whose board of directors is not selected by any such governmental entity) or any foreign government, international organization or any agency or instrumentality of such foreign government or organization, any rural electric or telephone cooperative, or any organization (other than certain farmers' cooperatives) that is generally exempt from federal income tax unless such organization is subject to the tax on unrelated business taxable income).

3.      That the Owner is aware (i) of the tax that would be imposed on transfers of Class R Certificates to disqualified organizations or electing large partnerships, under the Code, that applies to all transfers of Class R Certificates after March 31, 1988; (ii) that such tax would be on the transferor (or, with respect to transfers to electing large partnerships, on each such partnership), or, if such transfer is through an agent (which person includes a broker, nominee or middleman) for a disqualified organization, on the agent; (iii) that the person (other than with respect to transfers to electing large partnerships) otherwise liable for the tax shall be relieved of liability for the tax if the transferee furnishes to such person an affidavit that the transferee is not a disqualified organization and, at the time of transfer, such person does not have actual knowledge that the affidavit is false; and (iv) that the Class R Certificates may be "noneconomic residual interests" within the meaning of Treasury regulations promulgated pursuant to the Code and that the transferor of a noneconomic residual interest will remain liable for any taxes due with respect to the income on such residual interest, unless no significant purpose of the transfer was to impede the assessment or collection of tax.

4.      That the Owner is aware of the tax imposed on a "pass-through entity" holding Class R Certificates if either the pass-through entity is an electing large partnership under Section 775 of the Code or if at any time during the taxable year of the pass-through entity a disqualified organization is the record holder of an interest in such entity.  (For this purpose, a "pass through entity" includes a regulated investment company, a real estate investment trust or common trust fund, a partnership, trust or estate, and certain cooperatives.)

5.      The Owner is either (i) a citizen or resident of the United States, (ii) a corporation, partnership or other entity treated as a corporation or a partnership for U.S. federal income tax purposes and created or organized in or under the laws of the United States, any state thereof or the District of Columbia (other than a partnership that is not treated as a United States person under any applicable Treasury regulations), (iii) an estate that is described in Section 7701(a)(30)(D) of the Code, or (iv) a trust that is described in Section 7701(a)(30)(E) of the Code.

6.      The Owner hereby agrees that it will not cause income from the Class R Certificates to be attributable to a foreign permanent establishment or fixed base (within the meaning of an applicable income tax treaty) of the Owner or another United States taxpayer.

7.      That the Owner is aware that the Trustee will not register the transfer of any Class R Certificates unless the transferee, or the transferee's agent, delivers to it an affidavit and agreement, among other things, in substantially the same form as this affidavit and agreement.  The Owner expressly agrees that it will not consummate any such transfer if it knows or believes that any of the representations contained in such affidavit and agreement are false.

8.      That the Owner has reviewed the restrictions set forth on the face of the Class R Certificates and the provisions of Section 5.02(f) of the Pooling and Servicing Agreement under which the Class R Certificates were issued (in particular, clause (iii)(A) and (iii)(B) of Section 5.02(f) which authorize the Trustee to deliver payments to a person other than the Owner and negotiate a mandatory sale by the Trustee in the event the Owner holds such Certificates in violation of Section 5.02(f)).  The Owner expressly agrees to be bound by and to comply with such restrictions and provisions.

9.      That the Owner consents to any additional restrictions or arrangements that shall be deemed necessary upon advice of counsel to constitute a reasonable arrangement to ensure that the Class R Certificates will only be owned, directly or indirectly, by an Owner that is not a disqualified organization.

10.     The Owner's Taxpayer Identification Number is_____.

11.     This affidavit and agreement relates only to the Class R Certificates held by the Owner and not to any other holder of the Class R Certificates.  The Owner understands that the liabilities described herein relate only to the Class R Certificates.

12.     That no purpose of the Owner relating to the transfer of any of the Class R Certificates by the Owner is or will be to impede the assessment or collection of any tax; in making this representation, the Owner warrants that the Owner is familiar with (i) Treasury Regulation Section 1.860E-1(c) and recent amendments thereto, effective as of July 19, 2002, and (ii) the

preamble describing the adoption of the amendments to such regulation, which is attached hereto as Exhibit 1.

13.      That the Owner has no present knowledge or expectation that it will be unable to pay any United States taxes owed by it so long as any of the Certificates remain outstanding.  In this regard, the Owner hereby represents to and for the benefit of the person from whom it acquired the Class R Certificate that the Owner intends to pay taxes associated with holding such Class R Certificate as they become due, fully understanding that it may incur tax liabilities in excess of any cash flows generated by the Class R Certificate.

14.      That the Owner has no present knowledge or expectation that it will become insolvent or subject to a bankruptcy proceeding for so long as any of the Class R Certificates remain outstanding.

15.      The Purchaser is not an employee benefit plan or other plan subject to the prohibited transaction provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the Code, or an investment manager, named fiduciary or a trustee of any such plan, or any other Person acting, directly or indirectly, on behalf of or purchasing any Certificate with "plan assets" of any such plan.

---

            IN WITNESS WHEREOF, the Owner has caused this instrument to be executed on its behalf, pursuant to the authority of its Board of Directors, by its [Title of Officer] and its corporate seal to be hereunto attached, attested by its [Assistant] Secretary, this _____ day of _____, 200 ___.


                    [NAME OF OWNER]


                        By: _____
                            [Name of Officer]
                            [Title of Officer]
[Corporate Seal]

ATTEST:


[Assistant] Secretary

            Personally appeared before me the above-named [Name of Officer], known or proved to me to be the same person who executed the foregoing instrument and to be the [Title of Officer] of the Owner, and acknowledged to me that he executed the same as his free act and deed and the free act and deed of the Owner.

            Subscribed and sworn before me this _____ day of _____, 200 __.


                    NOTARY PUBLIC


                    COUNTY OF _____
                    STATE OF _____
                    My Commission expires the _____ day of _____, 20__ .

---


                    EXHIBIT 1

DEPARTMENT OF THE TREASURY

Internal Revenue Service

26 CFR Parts 1 and 602

[TD 9004]
RIN 1545-AW98


Real Estate Mortgage Investment Conduits

AGENCY: Internal Revenue Service (IRS), Treasury.

ACTION: Final regulations.

-----------------------------------------------------------------

SUMMARY: This document contains final regulations relating to safe harbor transfers of noneconomic residual interests in real estate mortgage investment conduits (REMICs). The final regulations provide additional limitations on the circumstances under which transferors may claim safe harbor treatment.

DATES: Effective Date: These regulations are effective July 19, 2002.
    Applicability Date: For dates of applicability, see Sec. 1.860E-1(c)(10).

FOR FURTHER INFORMATION CONTACT: Courtney Shepardson at (202) 622-3940 (not a toll-free number).

SUPPLEMENTARY INFORMATION:

Paperwork Reduction Act

    The collection of information in this final rule has been reviewed and, pending receipt and evaluation of public comments, approved by the Office of Management and Budget (OMB) under 44 U.S.C. 3507 and assigned control number 1545-1675.
    The collection of information in this regulation is in Sec. 1.860E-1(c)(5)(ii). This information is required to enable the IRS to verify that a taxpayer is complying with the conditions of this regulation. The collection of information is mandatory and is required. Otherwise, the taxpayer will not receive the benefit of safe harbor treatment as provided in the regulation. The likely respondents are businesses and other for-profit institutions.
    Comments on the collection of information should be sent to the Office of Management and Budget, Attn: Desk Officer for the Department of the Treasury, Office of Information and Regulatory Affairs, Washington, DC, 20503, with copies to the Internal Revenue Service, Attn: IRS Reports Clearance Officer, W:CAR:MP:FP:S, Washington, DC 20224. Comments on the collection of information should be received by September 17, 2002. Comments are specifically requested concerning:
    Whether the collection of information is necessary for the proper performance of the functions of the Internal Revenue Service, including whether the information will have practical utility;
    The accuracy of the estimated burden associated with the collection of information (see below);
    How the quality, utility, and clarity of the information to be collected may be enhanced;
    How the burden of complying with the collection of information may be minimized, including through the application of automated collection techniques or other forms of information technology; and
    Estimates of capital or start-up costs and costs of operation, maintenance, and purchase of service to provide information.
    An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid control number assigned by the Office of Management and Budget.
    The estimated total annual reporting burden is 470 hours, based on an estimated number of respondents of 470 and an estimated average annual burden hours per respondent of one hour.
    Books or records relating to a collection of information must be retained as long as their contents may become material in the administration of any internal revenue law. Generally, tax returns and tax return information are confidential, as required by 26 U.S.C. 6103.

Background

    This document contains final regulations regarding the proposed amendments to 26 CFR part 1 under section 860E of the Internal Revenue Code (Code). The regulations provide the circumstances under which a transferor of a noneconomic REMIC residual interest meeting the investigation and representation requirements may avail itself of the safe harbor by satisfying either the formula test or the asset test.
    Final regulations governing REMICs, issued in 1992, contain rules governing the transfer of noneconomic REMIC residual interests. In general, a transfer of a noneconomic residual interest is disregarded for all tax purposes if a significant purpose of the transfer is to

[[Page 47452]]

enable the transferor to impede the assessment or collection of tax. A purpose to impede the assessment or collection of tax (a wrongful purpose) exists if the transferor, at the time of the transfer, either knew or should have known that the transferee would be unwilling or unable to pay taxes due on its share of the REMIC's taxable income.
    Under a safe harbor, the transferor of a REMIC noneconomic residual interest is presumed not to have a wrongful purpose if two requirements are satisfied: (1) the transferor conducts a reasonable investigation of the transferee's financial condition (the investigation requirement); and (2) the transferor secures a representation from the transferee to the effect that the transferee understands the tax obligations associated with holding a residual interest and intends to pay those taxes (the representation requirement).
    The IRS and Treasury have been concerned that some transferors of noneconomic residual interests claim they satisfy the safe harbor even in situations where the economics of the transfer clearly indicate the transferee is unwilling or unable to pay the tax associated with holding the interest. For this reason, on February 7, 2000, the IRS published in the Federal Register (65 FR 5807) a notice of proposed rulemaking (REG-100276-97; REG-122450-98) designed to clarify the safe harbor by adding the "formula test," an economic test. The proposed regulation provides that the safe harbor is unavailable unless the present value of the anticipated tax liabilities associated with holding the residual interest does not exceed the sum of: (1) The present value of any consideration given to the transferee to acquire the interest; (2) the present value of the expected future distributions on the interest; and (3) the present value of the

anticipated tax savings associated with holding the interest as the REMIC generates losses.

The notice of proposed rulemaking also contained rules for FASITs. Section 1.860H-6(g) of the proposed regulations provides rules for transfers of FASIT ownership interests and adopts a safe harbor by reference to the safe harbor provisions of the REMIC regulations.

In January 2001, the IRS published Rev. Proc. 2001-12 (2001-3 I.R.B. 335) to set forth an alternative safe harbor that taxpayers could use while the IRS and the Treasury considered comments on the proposed regulations. Under the alternative safe harbor, if a transferor meets the investigation requirement and the representation requirement but the transfer fails to meet the formula test, the transferor may invoke the safe harbor if the transferee meets a two-prong test (the asset test). A transferee generally meets the first prong of this test if, at the time of the transfer, and in each of the two years preceding the year of transfer, the transferee's gross assets exceed $100 million and its net assets exceed $10 million. A transferee generally meets the second prong of this test if it is a domestic, taxable corporation and agrees in writing not to transfer the interest to any person other than another domestic, taxable corporation that also satisfies the requirements of the asset test. A transferor cannot rely on the asset test if the transferor knows, or has reason to know, that the transferee will not comply with its written agreement to limit the restrictions on subsequent transfers of the residual interest.

Rev. Proc. 2001-12 provides that the asset test fails to be satisfied in the case of a transfer or assignment of a noneconomic residual interest to a foreign branch of an otherwise eligible transferee. If such a transfer or assignment were permitted, a corporate taxpayer might seek to claim that the provisions of an applicable income tax treaty would resource excess inclusion income as foreign source income, and that, as a consequence, any U.S. tax liability attributable to the excess inclusion income could be offset by foreign tax credits. Such a claim would impede the assessment or collection of U.S. tax on excess inclusion income, contrary to the congressional purpose of assuring that such income will be taxable in all events. See, e.g., sections 860E(a)(1), (b), (e) and 860G(b) of the Code.

The Treasury and the IRS have learned that certain taxpayers transferring noneconomic residual interests to foreign branches have attempted to rely on the formula test to obtain safe harbor treatment in an effort to impede the assessment or collection of U.S. tax on excess inclusion income. Accordingly, the final regulations provide that if a noneconomic residual interest is transferred to a foreign permanent establishment or fixed base of a U.S. taxpayer, the transfer is not eligible for safe harbor treatment under either the asset test or the formula test. The final regulations also require a transferee to represent that it will not cause income from the noneconomic residual interest to be attributable to a foreign permanent establishment or fixed base.

Section 1.860E-1(c)(8) provides computational rules that a taxpayer may use to qualify for safe harbor status under the formula test. Section 1.860E-1(c)(8)(i) provides that the transferee is presumed to pay tax at a rate equal to the highest rate of tax specified in section 11(b). Some commentators were concerned that this presumed rate of taxation was too high because it does not take into consideration taxpayers subject to the alternative minimum tax rate. In light of the comments received, this provision has been amended in the final regulations to allow certain transferees that compute their taxable income using the alternative minimum tax rate to use the alternative minimum tax rate applicable to corporations.

Additionally, Sec. 1.860E-1(c)(8)(iii) provides that the present values in the formula test are to be computed using a discount rate equal to the applicable Federal short-term rate prescribed by section 1274(d). This is a change from the proposed regulation and Rev. Proc. 2001-12. In those publications the provision stated that "present values are computed using a discount rate equal to the applicable Federal rate prescribed in section 1274(d) compounded semiannually" and that "[a] lower discount rate may be used if the transferee can demonstrate that it regularly borrows, in the course of its trade or business, substantial funds at such lower rate from an unrelated third party." The IRS and the Treasury Department have learned that, based on this provision, certain taxpayers have been attempting to use unrealistically low or zero interest rates to satisfy the formula test, frustrating the intent of the test. Furthermore, the Treasury Department and the IRS believe that a rule allowing for a rate other than a rate based on an objective index would add unnecessary complexity to the safe harbor. As a result, the rule in the proposed regulations that permits a transferee to use a lower discount rate, if the transferee can demonstrate that it regularly borrows substantial funds at such lower rate, is not included in the final regulations; and the Federal short-term rate has been substituted for the applicable Federal rate. To simplify taxpayers' computations, the final regulations allow use of any of the published short-term rates, provided that the present values are computed with a corresponding period of compounding. With the exception of the provisions relating to transfers to foreign branches, these changes generally have the proposed applicability date of February 4, 2000, but taxpayers may choose to apply the interest rate formula set forth in the proposed regulation and Rev. Proc. 2001-12 for transfers occurring before August 19, 2002.

It is anticipated that when final regulations are adopted with respect to

[[Page 47453]]

FASITs, Sec. 1.860H-6(g) of the proposed regulations will be adopted in substantially its present form, with the result that the final regulations contained in this document will also govern transfers of FASIT ownership interests with substantially the same applicability date as is contained in this document.

Effect on Other Documents

    Rev. Proc. 2001-12 (2001-3 I.R.B. 335) is obsolete for transfers of
noneconomic residual interests in REMICs occurring on or after August
19, 2002.

Special Analyses

    It is hereby certified that these regulations will not have a
significant economic impact on a substantial number of small entities.
This certification is based on the fact that it is unlikely that a
substantial number of small entities will hold REMIC residual
interests. Therefore, a Regulatory Flexibility Analysis under the
Regulatory Flexibility Act (5 U.S.C. chapter 6) is not required. It has
been determined that this Treasury decision is not a significant
regulatory action as defined in Executive Order 12866. Therefore, a
regulatory assessment is not required. It also has been determined that
sections 553(b) and 553(d) of the Administrative Procedure Act (5
U.S.C. chapter 5) do not apply to these regulations.

Drafting Information

    The principal author of these regulations is Courtney Shepardson.
However, other personnel from the IRS and Treasury Department
participated in their development.

List of Subjects

26 CFR Part 1

    Income taxes, Reporting and record keeping requirements.

26 CFR Part 602

    Reporting and record keeping requirements.

Adoption of Amendments to the Regulations

    Accordingly, 26 CFR parts 1 and 602 are amended as follows:

PART 1--INCOME TAXES

    Paragraph 1. The authority citation for part 1 continues to read in
part as follows:

    Authority: 26 U.S.C. 7805 * * *

_____

                        EXHIBIT G-2

                  FORM OF TRANSFEROR CERTIFICATE

                          ____ , 20__

Residential Accredit Loans, Inc.
8400 Normandale Lake Boulevard
Suite 250
Minneapolis, Minnesota  55437

_____
_____
_____

Attention:  Residential Funding Company, LLC Series ____-___

              Re:  Mortgage Asset-Backed Pass-Through
                   Certificates,
                   Series ____-___, Class R

Ladies and Gentlemen:

          This letter is delivered to you in connection with the transfer
by                                                           (the
"Seller") to _____
(the "Purchaser") of $ _____ Initial Certificate
Principal Balance of Mortgage Asset-Backed Pass-Through Certificates, Series
____-___, Class R (the "Certificates"), pursuant to Section 5.02 of the
Pooling and Servicing Agreement (the "Pooling and Servicing Agreement"),
dated as of _____ 1, ____ among Residential Accredit Loans, Inc., as
seller (the "Company"), Residential Funding Company, LLC, as master servicer
(the "Master Servicer"), and _____, as trustee (the "Trustee").
All terms used herein and not otherwise defined shall have the meanings set
forth in the Pooling and Servicing Agreement.  The Seller hereby certifies,
represents and warrants to, and covenants with, the Company and the Trustee
that:

1.        No purpose of the Seller relating to the transfer of the
Certificate by the Seller to the Purchaser is or will be to impede the
assessment or collection of any tax.

2.        The Seller understands that the Purchaser has delivered to the
Trustee and the Master Servicer a transfer affidavit and agreement in the
form attached to the Pooling and Servicing Agreement as Exhibit G-1.  The
Seller does not know or believe that any representation contained therein is
false.

3.        The Seller has at the time of the transfer conducted a reasonable
investigation of the financial condition of the Purchaser as contemplated by
Treasury Regulations Section 1.860E-1(c)(4)(i) and, as a result of that
investigation, the Seller has determined that the Purchaser has historically
paid its debts as they become due and has found no significant evidence to
indicate that the Purchaser will not continue to pay its debts as they become
due in the future.  The Seller understands that the transfer of a Class R
Certificate may not be respected for United States income tax purposes (and
the Seller may continue to be liable for United States income taxes
associated therewith) unless the Seller has conducted such an investigation.

4.        The Seller has no actual knowledge that the proposed Transferee
is not both a United States Person and a Permitted Transferee.


                         Very truly yours,


                         (Seller)


                         By: _____
                         Name:
                         Title:


_____


                    EXHIBIT H


          FORM OF INVESTOR REPRESENTATION LETTER


                         _____ , 20 ___

Residential Accredit Loans, Inc.
8400 Normandale Lake Boulevard
Suite 250
Minneapolis, MN 55437

_____
_____
_____

Residential Funding Company, LLC
8400 Normandale Lake Boulevard
Suite 250
Minneapolis, MN  55437

Attention:  Residential Funding Company, LLC Series ____-___

          RE:   Mortgage Asset-Backed Pass-Through
                Certificates,
                Series ____-___, [Class B-]

Ladies and Gentlemen:

_____ (the"Purchaser") intends to purchase from
_____(the "Seller")$_____ Initial Certificate Principal Balance of Mortgage
Asset-Backed Pass-Through Certificates, Series ____-___, Class    (the
"Certificates"), issued pursuant to the Pooling and Servicing Agreement (the
"Pooling and Servicing Agreement"), dated as of _____ 1,_____ among
Residential Accredit Loans, Inc., as seller (the "Company"), Residential
Funding Company, LLC, as master servicer (the "Master Servicer"), and
_____, as trustee (the "Trustee").  All terms used herein and
not otherwise defined shall have the meanings set forth in the Pooling and
Servicing Agreement.  The Purchaser hereby certifies, represents and warrants
to, and covenants with, the Company, the Trustee and the Master Servicer that:

1.        The Purchaser understands that (a) the Certificates have not been
          and will not be registered or qualified under the Securities Act
          of 1933, as amended (the "Act") or any state securities law, (b)
          the Company is not required to so register or qualify the
          Certificates, (c) the Certificates may be resold only if
          registered and qualified pursuant to the provisions of the Act or
          any state securities law, or if an exemption from such
          registration and qualification is available, (d) the Pooling and
          Servicing Agreement contains restrictions regarding the transfer
          of the Certificates and (e) the Certificates will bear a legend
          to the foregoing effect.

2.        The Purchaser is acquiring the Certificates for its own account
          for investment only and not with a view to or for sale in
          connection with any distribution thereof in any manner that would
          violate the Act or any applicable state securities laws.

3.  The Purchaser is (a) a substantial, sophisticated institutional investor having such knowledge and experience in financial and business matters, and, in particular, in such matters related to securities similar to the Certificates, such that it is capable of evaluating the merits and risks of investment in the Certificates, (b) able to bear the economic risks of such an investment and (c) an "accredited investor" within the meaning of Rule 501(a) promulgated pursuant to the Act.

4.  The Purchaser has been furnished with, and has had an opportunity to review (a) [a copy of the Private Placement Memorandum, dated _____, 20___, relating to the Certificates (b)] a copy of the Pooling and Servicing Agreement and [b] [c] such other information concerning the Certificates, the Mortgage Loans and the Company as has been requested by the Purchaser from the Company or the Seller and is relevant to the Purchaser's decision to purchase the Certificates. The Purchaser has had any questions arising from such review answered by the Company or the Seller to the satisfaction of the Purchaser. [If the Purchaser did not purchase the Certificates from the Seller in connection with the initial distribution of the Certificates and was provided with a copy of the Private Placement Memorandum (the "Memorandum") relating to the original sale (the "Original Sale") of the Certificates by the Company, the Purchaser acknowledges that such Memorandum was provided to it by the Seller, that the Memorandum was prepared by the Company solely for use in connection with the Original Sale and the Company did not participate in or facilitate in any way the purchase of the Certificates by the Purchaser from the Seller, and the Purchaser agrees that it will look solely to the Seller and not to the Company with respect to any damage, liability, claim or expense arising out of, resulting from or in connection with (a) error or omission, or alleged error or omission, contained in the Memorandum, or (b) any information, development or event arising after the date of the Memorandum.]

5.  The Purchaser has not and will not nor has it authorized or will it authorize any person to (a) offer, pledge, sell, dispose of or otherwise transfer any Certificate, any interest in any Certificate or any other similar security to any person in any manner, (b) solicit any offer to buy or to accept a pledge, disposition of other transfer of any Certificate, any interest in any Certificate or any other similar security from any person in any manner, (c) otherwise approach or negotiate with respect to any Certificate, any interest in any Certificate or any other similar security with any person in any manner, (d) make any general solicitation by means of general advertising or in any other manner or (e) take any other action, that (as to any of (a) through (e) above) would constitute a distribution of any Certificate under the Act, that would render the disposition of any Certificate a violation of Section 5 of the Act or any state securities law, or that would require registration or qualification pursuant thereto. The Purchaser will not sell or otherwise transfer any of the Certificates, except in compliance with the provisions of the Pooling and Servicing Agreement.

6.  The Purchaser

(a)  is not an employee benefit or other plan subject to the prohibited transaction provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the Internal Revenue Code of 1986, as amended (a "Plan"), or any other person (including an investment manager, a named fiduciary or a trustee of any Plan) acting, directly or indirectly, on behalf of or purchasing any Certificate with "plan assets" of any Plan within the meaning of the Department of Labor ("DOL") regulation at 29 C.F.R.ss.2510.3-101, as modified by Section 3(42) of ERISA; or

(b)  is an insurance company, the source of funds to be used by it to purchase the Certificates is an "insurance company general account" (within the meaning of DOL Prohibited Transaction Class Exemption ("PTCE") 95-60), and the purchase is being made in reliance upon the availability of the exemptive relief afforded under Sections I and III of PTCE 95-60.

In addition, the Purchaser hereby certifies, represents and warrants to, and covenants with, the Company, the Trustee and the Master Servicer that the Purchaser will not transfer such Certificates to any Plan or person unless such Plan or person meets the requirements set forth in either 6(a) or (b) above.

Very truly yours,

By: _____
Name:
Title:

EXHIBIT I

FORM OF TRANSFEROR REPRESENTATION LETTER

_____ , 20__

Residential Accredit Loans, Inc.
8400 Normandale Lake Boulevard
Suite 250
Minneapolis, MN 55437

_____
_____
_____

Attention: Residential Funding Company, LLC Series ____-___

    Re:   Mortgage Asset-Backed Pass-Through
         Certificates,
         Series ____-___, [Class B-]

Ladies and Gentlemen:

       In connection with the sale by _____ (the "Seller") to _____ (the "Purchaser") of $ _____ Initial Certificate Principal Balance of Mortgage Asset-Backed Pass-Through Certificates, Series ____-___, Class   (the "Certificates"), issued pursuant to the Pooling and Servicing Agreement (the "Pooling and Servicing Agreement"), dated as of 1, ____ among Residential Accredit Loans, Inc., as seller (the "Company"), Residential Funding Company, LLC, as master servicer, and _____, as trustee (the "Trustee").  The Seller hereby certifies, represents and warrants to, and covenants with, the Company and the Trustee that:

       Neither the Seller nor anyone acting on its behalf has (a) offered, pledged, sold, disposed of or otherwise transferred any Certificate, any interest in any Certificate or any other similar security to any person in any manner, (b) has solicited any offer to buy or to accept a pledge, disposition or other transfer of any Certificate, any interest in any Certificate or any other similar security from any person in any manner, (c) has otherwise approached or negotiated with respect to any Certificate, any interest in any Certificate or any other similar security with any person in any manner, (d) has made any general solicitation by means of general advertising or in any other manner, or (e) has taken any other action, that (as to any of (a) through (e) above) would constitute a distribution of the Certificates under the Securities Act of 1933 (the "Act"), that would render the disposition of any Certificate a violation of Section 5 of the Act or any state securities law, or that would require registration or qualification pursuant thereto.  The Seller will not act, in any manner set forth in the foregoing sentence with respect to any Certificate.  The Seller has not and will not sell or otherwise transfer any of the Certificates, except in compliance with the provisions of the Pooling and Servicing Agreement.

                    Very truly yours,

                    (Seller)

                    By: _____
                    Name:
                    Title:

---

EXHIBIT J

[FORM OF RULE 144A INVESTMENT REPRESENTATION]

Description of Rule 144A Securities, including numbers:

       The undersigned  seller, as registered holder (the "Seller"), intends to transfer the Rule 144A Securities described above to the undersigned buyer (the "Buyer").

1.       In connection with such transfer and in accordance with the agreements pursuant to which the Rule 144A Securities were issued, the Seller

hereby certifies the following facts:  Neither the Seller nor anyone acting on its behalf has offered, transferred, pledged, sold or otherwise disposed of the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security to, or solicited any offer to buy or accept a transfer, pledge or other disposition of the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security from, or otherwise approached or negotiated with respect to the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security with, any person in any manner, or made any general solicitation by means of general advertising or in any other manner, or taken any other action, that would constitute a distribution of the Rule 144A Securities under the Securities Act of 1933, as amended (the "1933 Act"), or that would render the disposition of the Rule 144A Securities a violation of Section 5 of the 1933 Act or require registration pursuant thereto, and that the Seller has not offered the Rule 144A Securities to any person other than the Buyer or another "qualified institutional buyer" as defined in Rule 144A under the 1933 Act.

2.         The Buyer warrants and represents to, and covenants with, the Seller, the Trustee and the Master Servicer (as defined in the Pooling and Servicing Agreement (the "Agreement"), dated as of _____ 1, ____ among Residential Funding Company, LLC as Master Servicer, Residential Accredit Loans, Inc. as depositor pursuant to Section 5.02 of the Agreement and _____, as trustee, as follows:

(a)        The Buyer understands that the Rule 144A Securities have not been registered under the 1933 Act or the securities laws of any state.

(b)        The Buyer considers itself a substantial, sophisticated institutional investor having such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Rule 144A Securities.

(c)        The Buyer has been furnished with all information regarding the Rule 144A Securities that it has requested from the Seller, the Trustee or the Servicer.

(d)        Neither the Buyer nor anyone acting on its behalf has offered, transferred, pledged, sold or otherwise disposed of the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security to, or solicited any offer to buy or accept a transfer, pledge or other disposition of the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security from, or otherwise approached or negotiated with respect to the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security with, any person in any manner, or made any general solicitation by means of general advertising or in any other manner, or taken any other action, that would constitute a distribution of the Rule 144A Securities under the 1933 Act or that would render the disposition of the Rule 144A Securities a violation of Section 5 of the 1933 Act or require registration pursuant thereto, nor will it act, nor has it authorized or will it authorize any person to act, in such manner with respect to the Rule 144A Securities.

(e)        The Buyer is a "qualified institutional buyer" as that term is defined in Rule 144A under the 1933 Act and has completed either of the forms of certification to that effect attached hereto as Annex 1 or Annex 2.  The Buyer is aware that the sale to it is being made in reliance on Rule 144A.  The Buyer is acquiring the Rule 144A Securities for its own account or the accounts of other qualified institutional buyers, understands that such Rule 144A Securities may be resold, pledged or transferred only (i) to a person reasonably believed to be a qualified institutional buyer that purchases for its own account or for the account of a qualified institutional buyer to whom notice is given that the resale, pledge or transfer is being made in reliance on Rule 144A, or (ii) pursuant to another exemption from registration under the 1933 Act.

      [3.   The Buyer

         [(a)   is not an employee benefit or other plan subject to the prohibited transaction provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the Internal Revenue Code of 1986, as amended (a "Plan"), or any other person (including an investment manager, a named fiduciary or a trustee of any Plan) acting, directly or indirectly, on behalf of or purchasing any Certificate with "plan assets" of any Plan within the meaning of the Department of Labor ("DOL") regulation at 29 C.F.R.ss.2510.3-101, as modified by Section 3(42) of ERISA](1); or

         (b)   is an insurance company, the source of funds to be used by it to purchase the Certificates is an "insurance company general account" (within the meaning of DOL Prohibited Transaction Class Exemption ("PTCE") 95-60), and the purchase is being made in reliance upon the availability of the exemptive relief afforded under Sections I and III of PTCE 95-60.](2)

      4.   This document may be executed in one or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same document.

      IN WITNESS WHEREOF, each of the parties has executed this document as of the date set forth below.


Print Name of Seller              Print Name of Buyer
By:                               By:
   Name:                             Name:
   Title:                            Title:

Taxpayer Identification                    Taxpayer Identification:
No.                                        No:
Date:                                      Date:

ANNEX 1 TO EXHIBIT J

QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A

[For Buyers Other Than Registered Investment Companies]

The undersigned hereby certifies as follows in connection with the Rule 144A Investment Representation to which this Certification is attached:

1.      As indicated below, the undersigned is the President, Chief Financial Officer, Senior Vice President or other executive officer of the Buyer.

2.      In connection with purchases by the Buyer, the Buyer is a "qualified institutional buyer" as that term is defined in Rule 144A under the Securities Act of 1933 ("Rule 144A") because (i) the Buyer owned and/or invested on a discretionary basis $_____ in securities (except for the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year (such amount being calculated in accordance with Rule 144A) and (ii) the Buyer satisfies the criteria in the category marked below.

--      Corporation, etc.  The Buyer is a corporation (other than a bank, savings and loan association or similar institution), Massachusetts or similar business trust, partnership, or charitable organization described in Section 501(c)(3) of the Internal Revenue Code.

--      Bank.  The Buyer (a) is a national bank or banking institution organized under the laws of any State, territory or the District of Columbia, the business of which is substantially confined to banking and is supervised by the State or territorial banking commission or similar official or is a foreign bank or equivalent institution, and (b) has an audited net worth of at least $25,000,000 as demonstrated in its latest annual financial statements, a copy of which is attached hereto.

--      Savings and Loan.  The Buyer (a) is a savings and loan association, building and loan association, cooperative bank, homestead association or similar institution, which is supervised and examined by a State or Federal authority having supervision over any such institutions or is a foreign savings and loan association or equivalent institution and (b) has an audited net worth of at least $25,000,000 as demonstrated in its latest annual financial statements.

--      Broker-Dealer.  The Buyer is a dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

--      Insurance Company.  The Buyer is an insurance company whose primary and predominant business activity is the writing of insurance or the reinsuring of risks underwritten by insurance companies and which is subject to supervision by the insurance commissioner or a similar official or agency of a State or territory or the District of Columbia.

--      State or Local Plan.  The Buyer is a plan established and maintained by a State, its political subdivisions, or any agency or instrumentality of the State or its political subdivisions, for the benefit of its employees.

--      ERISA Plan.  The Buyer is an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974.

--      Investment Adviser.  The Buyer is an investment adviser registered under the Investment Advisers Act of 1940.

--      SBIC.  The Buyer is a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

--      Business Development Company.  The Buyer is a business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

--      Trust Fund.  The Buyer is a trust fund whose trustee is a bank or trust company and whose participants are exclusively (a) plans established and maintained by a State, its political subdivisions, or any agency or instrumentality of the State or its political subdivisions, for the benefit of its employees, or (b) employee benefit plans within the meaning of Title I of the Employee Retirement Income Security Act of 1974, but is not a trust fund that includes as participants individual retirement accounts or H.R. 10 plans.

3.      The term "securities" as used herein does not include (i)

securities of issuers that are affiliated with the Buyer, (ii) securities that are part of an unsold allotment to or subscription by the Buyer, if the Buyer is a dealer, (iii) bank deposit notes and certificates of deposit, (iv) loan participations, (v) repurchase agreements, (vi) securities owned but subject to a repurchase agreement and (vii) currency, interest rate and commodity swaps.

4.      For purposes of determining the aggregate amount of securities owned and/or invested on a discretionary basis by the Buyer, the Buyer used the cost of such securities to the Buyer and did not include any of the securities referred to in the preceding paragraph.  Further, in determining such aggregate amount, the Buyer may have included securities owned by subsidiaries of the  Buyer,  but only if such subsidiaries are consolidated with the Buyer in its financial statements prepared in accordance with generally accepted accounting principles and if the investments of such subsidiaries are managed under the Buyer's direction.  However, such securities were not included if the Buyer is a majority-owned, consolidated subsidiary of another enterprise and the Buyer is not itself a reporting company under the Securities Exchange Act of 1934.

5.      The Buyer acknowledges that it is familiar with Rule 144A and understands that the seller to it and other parties related to the Certificates are relying and will continue to rely on the statements made herein because one or more sales to the Buyer may be in reliance on Rule 144A.

                      Will the Buyer be purchasing the Rule 144A
Yes      No      Securities only for the Buyer's own account?

6.      If the answer to the foregoing question is "no", the Buyer agrees that, in connection with any purchase of securities sold to the Buyer for the account of a third party (including any separate account) in reliance on Rule 144A, the Buyer will only purchase for the account of a third party that at the time is a "qualified institutional buyer" within the meaning of Rule 144A.  In addition, the Buyer agrees that the Buyer will not purchase securities for a third party unless the Buyer has obtained a current representation letter from such third party or taken other appropriate steps contemplated by Rule 144A to conclude that such third party independently meets the definition of "qualified institutional buyer" set forth in Rule 144A.

7.      The Buyer will notify each of the parties to which this certification is made of any changes in the information and conclusions herein.  Until such notice is given, the Buyer's purchase of Rule 144A Securities will constitute a reaffirmation of this certification as of the date of such purchase.


                          Print Name of Buyer


                          By:_____
                               Name:
                               Title:


                          Date:  _____



ANNEX 2 TO EXHIBIT J

QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A

[For Buyers That Are Registered Investment Companies]

        The undersigned hereby certifies as follows in connection with the Rule 144A Investment Representation to which this Certification is attached:

8.      As indicated below, the undersigned is the President, Chief Financial Officer or Senior Vice President of the Buyer or, if the Buyer is a "qualified institutional buyer" as that term is defined in Rule 144A under the Securities Act of 1933 ("Rule 144A") because Buyer is part of a Family of Investment Companies (as defined below), is such an officer of the Adviser.

9.      In connection with purchases by Buyer, the Buyer is a "qualified institutional buyer" as defined in SEC Rule 144A because (i) the Buyer is an investment company registered under the Investment Company Act of 1940, and (ii) as marked below, the Buyer alone, or the Buyer's Family of Investment Companies, owned at least $100,000,000 in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year.  For purposes of determining the amount of securities owned by the Buyer or the Buyer's Family of Investment Companies, the cost of such securities was used.

--      The Buyer owned $                          in securities
                (other than the excluded securities referred to below) as of the
                end of the Buyer's most recent fiscal year (such amount being
                calculated in accordance with Rule 144A).

--    The Buyer is part of a Family of Investment Companies which owned in
      in the aggregate $_____ in securities (other
      than the excluded securities referred to below) as of the end of
      the Buyer's most recent fiscal year (such amount being calculated
      in accordance with Rule 144A).

10.    The term "Family of Investment Companies" as used herein means
two or more registered investment companies (or series thereof) that have the
same investment adviser or investment advisers that are affiliated (by virtue
of being majority owned subsidiaries of the same parent or because one
investment adviser is a majority subsidiary of the other).

11.    The term "securities" as used herein does not include (i)
securities of issuers that are affiliated with the Buyer or are part of the
Buyer's Family of Investment Companies, (ii) bank deposit notes and
certificates of deposit, (iii) loan participations, (iv) repurchase
agreements, (v) securities owned but subject to a repurchase agreement and
(vi) currency, interest rate and commodity swaps.

12.    The Buyer is familiar with Rule 144A and understands that each of
the parties to which this certification is made are relying and will continue
to rely on the statements made herein because one or more sales to the Buyer
will be in reliance on Rule 144A.  In addition, the Buyer will only purchase
for the Buyer's own account.

13.    The undersigned will notify each of the parties to which this
certification is made of any changes in the information and conclusions
herein.  Until such notice, the Buyer's purchase of Rule 144A Securities will
constitute a reaffirmation of this certification by the undersigned as of the
date of such purchase.




                              Print Name of Buyer


                          By: _____
                               Name:
                               Title:


                          IF AN ADVISER:



                              Print Name of Buyer


                          Date: _____


---


                          EXHIBIT K


                    [TEXT OF AMENDMENT TO POOLING AND SERVICING
                    AGREEMENT PURSUANT TO SECTION 11.01(E) FOR A
                              LIMITED GUARANTY]

                              ARTICLE XIII

              Subordinate Certificate Loss Coverage; Limited Guaranty


              Section 13.01.  Subordinate Certificate Loss Coverage; Limited
Guaranty.  (a) Subject to subsection (c) below, prior to the later of the
third Business Day prior to each Distribution Date or the related
Determination Date, the Master Servicer shall determine whether it or any
Sub-Servicer will be entitled to any reimbursement pursuant to Section
4.02(a) on such Distribution Date for Advances or Sub-Servicer Advances
previously made, (which will not be Advances or Sub-Servicer Advances that
were made with respect to delinquencies which were subsequently determined to
be Excess Special Hazard Losses, Excess Fraud Losses, Excess Bankruptcy
Losses or Extraordinary Losses) and, if so, the Master Servicer shall demand
payment from Residential Funding of an amount equal to the amount of any
Advances or Sub-Servicer Advances reimbursed pursuant to Section 4.02(a), to
the extent such Advances or Sub-Servicer Advances have not been included in
the amount of the Realized Loss in the related Mortgage Loan,  and shall
distribute the same to the Class B Certificateholders in the same manner as
if such amount were to be distributed pursuant to Section 4.02(a).


              (b)    Subject to subsection (c) below, prior to the later of the
third Business Day prior to each Distribution Date or the related
Determination Date, the Master Servicer shall determine whether any Realized
Losses (other than Excess Special Hazard Losses, Excess Bankruptcy Losses,
Excess Fraud Losses and Extraordinary Losses) will be allocated to the Class
B Certificates on such Distribution Date pursuant to Section 4.05, and, if
so, the Master Servicer shall demand payment from Residential Funding of the
amount of such Realized Loss and shall distribute the same to the Class B
Certificateholders in the same manner as if such amount were to be
distributed pursuant to Section 4.02(a); provided, however, that the amount
of such demand in respect of any Distribution Date shall in no event be
greater than the sum of (i) the additional amount of Accrued Certificate
Interest that would have been paid for the Class B Certificateholders on such
Distribution Date had such Realized Loss or Losses not occurred plus (ii) the
amount of the reduction in the Certificate Principal Balances of the Class B

Certificates on such Distribution Date due to such Realized Loss or Losses. Notwithstanding such payment, such Realized Losses shall be deemed to have been borne by the Certificateholders for purposes of Section 4.05. Excess Special Hazard Losses, Excess Fraud Losses, Excess Bankruptcy Losses and Extraordinary Losses allocated to the Class B Certificates will not be covered by the Subordinate Certificate Loss Obligation.

(c)    Demands for payments pursuant to this Section shall be made prior to the later of the third Business Day prior to each Distribution Date or the related Determination Date by the Master Servicer with written notice thereof to the Trustee.    The maximum amount that Residential Funding will be required to pay pursuant to this Section on any Distribution Date (the "Amount Available") shall be equal to the lesser of (X) minus the sum of (i) all previous payments made under subsections (a) and (b) hereof and (ii) all draws under the Limited Guaranty made in lieu of such payments as described below in subsection (d) and (Y) the then outstanding Certificate Principal Balances of the Class B Certificates, or such lower amount as may be established pursuant to Section 13.02.    Residential Funding's obligations as described in this Section are referred to herein as the "Subordinate Certificate Loss Obligation."

(d)    The Trustee will promptly notify GMAC LLC of any failure of Residential Funding to make any payments hereunder and shall demand payment pursuant to the limited guaranty (the "Limited Guaranty"), executed by GMAC LLC, of Residential Funding's obligation to make payments pursuant to this Section, in an amount equal to the lesser of (i) the Amount Available and (ii) such required payments, by delivering to GMAC LLC a written demand for payment by wire transfer, not later than the second Business Day prior to the Distribution Date for such month, with a copy to the Master Servicer.

(e)    All payments made by Residential Funding pursuant to this Section or amounts paid under the Limited Guaranty shall be deposited directly in the Certificate Account, for distribution on the Distribution Date for such month to the Class B Certificateholders.

(f)    The Company shall have the option, in its sole discretion, to substitute for either or both of the Limited Guaranty or the Subordinate Certificate Loss Obligation another instrument in the form of a corporate guaranty, an irrevocable letter of credit, a surety bond, insurance policy or similar instrument or a reserve fund; provided that (i) the Company obtains (subject to the provisions of Section 10.01(f) as if the Company was substituted for the Master Servicer solely for the purposes of such provision) an Opinion of Counsel (which need not be an opinion of Independent counsel) to the effect that obtaining such substitute corporate guaranty, irrevocable letter of credit, surety bond, insurance policy or similar instrument or reserve fund will not cause either (a) any federal tax to be imposed on the Trust Fund, including without limitation, any federal tax imposed on "prohibited transactions" under Section 860(F)(a)(l) of the Code or on "contributions after the startup date" under Section 860(G)(d)(l) of the Code or (b) the Trust Fund to fail to qualify as a REMIC at any time that any Certificate is outstanding, and (ii) no such substitution shall be made unless (A) the substitute Limited Guaranty or Subordinate Certificate Loss Obligation is for an initial amount not less than the then current Amount Available and contains provisions that are in all material respects equivalent to the original Limited Guaranty or Subordinate Certificate Loss Obligation (including that no portion of the fees, reimbursements or other obligations under any such instrument will be borne by the Trust Fund), (B) the long term debt obligations of any obligor of any substitute Limited Guaranty or Subordinate Certificate Loss Obligation (if not supported by the Limited Guaranty) shall be rated at least the lesser of (a) the rating of the long term debt obligations of GMAC LLC as of the date of issuance of the Limited Guaranty and (b) the rating of the long term debt obligations of GMAC LLC at the date of such substitution and (C) the Company obtains written confirmation from each nationally recognized credit rating agency that rated the Class B Certificates at the request of the Company that such substitution shall not lower the rating on the Class B Certificates below the lesser of (a) the then-current rating assigned to the Class B Certificates by such rating agency and (b) the original rating assigned to the Class B Certificates by such rating agency.    Any replacement of the Limited Guaranty or Subordinate Certificate Loss Obligation pursuant to this Section shall be accompanied by a written Opinion of Counsel to the substitute guarantor or obligor, addressed to the Master Servicer and the Trustee, that such substitute instrument constitutes a legal, valid and binding obligation of the substitute guarantor or obligor, enforceable in accordance with its terms, and concerning such other matters as the Master Servicer and the Trustee shall reasonably request.    Neither the Company, the Master Servicer nor the Trustee shall be obligated to substitute for or replace the Limited Guaranty or Subordinate Certificate Loss Obligation under any circumstance.

Section 13.02.    Amendments Relating to the Limited Guaranty. Notwithstanding Sections 11.01 or 13.01: (i) the provisions of this Article XIII may be amended, superseded or deleted, (ii) the Limited Guaranty or Subordinate Certificate Loss Obligation may be amended, reduced or canceled, and (iii) any other provision of this Agreement which is related or incidental to the matters described in this Article XIII may be amended in any manner; in each case by written instrument executed or consented to by the Company and Residential Funding but without the consent of any Certificateholder and without the consent of the Master Servicer or the Trustee being required unless any such amendment would impose any additional obligation on, or otherwise adversely affect the interests of, the Master Servicer or the Trustee, as applicable; provided that the Company shall also obtain a letter from each nationally recognized credit rating agency that rated the Class B Certificates at the request of the Company to the effect that such amendment, reduction, deletion or cancellation will not lower the rating on the Class B Certificates below the lesser of (a) the then-current rating assigned to the Class B Certificates by such rating agency and (b) the original rating assigned to the Class B Certificates by such rating agency, unless (A) the Holder of 100% of the Class B Certificates is Residential Funding or an Affiliate of Residential Funding, or (B) such amendment, reduction, deletion or cancellation is made in accordance with Section

11.01(e) and, provided further that the Company obtains (subject to the provisions of Section 10.01(f) as if the Company was substituted for the Master Servicer solely for the purposes of such provision), in the case of a material amendment or supercession (but not a reduction, cancellation or deletion of the Limited Guaranty or the Subordinate Certificate Loss Obligation), an Opinion of Counsel (which need not be an opinion of Independent counsel) to the effect that any such amendment or supercession will not cause either (a) any federal tax to be imposed on the Trust Fund, including without limitation, any federal tax imposed on "prohibited transactions" under Section 860F(a)(1) of the Code or on "contributions after the startup date" under Section 860G(d)(1) of the Code or (b) the Trust Fund to fail to qualify as a REMIC at any time that any Certificate is outstanding.  A copy of any such instrument shall be provided to the Trustee and the Master Servicer together with an Opinion of Counsel that such amendment complies with this Section 13.02.

EXHIBIT L

[FORM OF LIMITED GUARANTY]

LIMITED GUARANTY

RESIDENTIAL ACCREDIT LOANS, INC.

Mortgage Asset-Backed Pass-Through Certificates
Series ____-___

_____ , 200

_____
_____
_____

Attention:  Residential Funding Company, LLC Series ____-___

Ladies and Gentlemen:

        WHEREAS, Residential Funding Company, LLC, a Delaware limited liability company ("Residential Funding"), an indirect wholly-owned subsidiary of GMAC LLC, a Delaware limited liability company ("GMAC"), plans to incur certain obligations as described under Section 13.01 of the Pooling and Servicing Agreement dated as of _____ 1, ____ (the "Servicing Agreement"), among Residential Accredit Loans, Inc. (the "Company"), Residential Funding and _____ (the "Trustee") as amended by Amendment No. _____ thereto, dated as of _____ , with respect to the Mortgage Asset-Backed Pass-Through Certificates, Series ____-___ (the "Certificates"); and

        WHEREAS, pursuant to Section 13.01 of the Servicing Agreement, Residential Funding agrees to make payments to the Holders of the Class B Certificates with respect to certain losses on the Mortgage Loans as described in the Servicing Agreement; and

        WHEREAS, GMAC desires to provide certain assurances with respect to the ability of Residential Funding to secure sufficient funds and faithfully to perform its Subordinate Certificate Loss Obligation;

        NOW THEREFORE, in consideration of the premises herein contained and certain other good and valuable consideration, the receipt of which is hereby acknowledged, GMAC agrees as follows:

1.        Provision of Funds.  (a) GMAC agrees to contribute and deposit in the Certificate Account on behalf of Residential Funding (or otherwise provide to Residential Funding, or to cause to be made available to Residential Funding), either directly or through a subsidiary, in any case prior to the related Distribution Date, such moneys as may be required by Residential Funding to perform its Subordinate Certificate Loss Obligation when and as the same arises from time to time upon the demand of the Trustee in accordance with Section 13.01 of the Servicing Agreement.

        (b)   The agreement set forth in the preceding clause (a) shall be absolute, irrevocable and unconditional and shall not be affected by the transfer by GMAC or any other person of all or any part of its or their interest in Residential Funding, by any insolvency, bankruptcy, dissolution or other proceeding affecting Residential Funding or any other person, by any defense or right of counterclaim, set-off or recoupment that GMAC may have against Residential Funding or any other person or by any other fact or circumstance.  Notwithstanding the foregoing, GMAC's obligations under clause (a) shall terminate upon the earlier of (x) substitution for this Limited Guaranty pursuant to Section 13.01(f) of the Servicing Agreement, or (y) the termination of the Trust Fund pursuant to the Servicing Agreement.

2.        Waiver.  GMAC hereby waives any failure or delay on the part of Residential Funding, the Trustee or any other person in asserting or enforcing any rights or in making any claims or demands hereunder.  Any defective or partial exercise of any such rights shall not preclude any other or further exercise of that or any other such right.  GMAC further waives demand, presentment, notice of default, protest, notice of acceptance and any other notices with respect to this Limited Guaranty, including, without

limitation, those of action or nonaction on the part of Residential Funding or the Trustee.

3.        Modification, Amendment and Termination.  This Limited Guaranty may be modified, amended or terminated only by the written agreement of GMAC and the Trustee and only if such modification, amendment or termination is permitted under Section 13.02 of the Servicing Agreement.  The obligations of GMAC under this Limited Guaranty shall continue and remain in effect so long as the Servicing Agreement is not modified or amended in any way that might affect the obligations of GMAC under this Limited Guaranty without the prior written consent of GMAC.

4.        Successor.  Except as otherwise expressly provided herein, the guarantee herein set forth shall be binding upon GMAC and its respective successors.

5.        Governing Law.  This Limited Guaranty shall be governed by the laws of the State of New York.

6.        Authorization and Reliance.  GMAC understands that a copy of this Limited Guaranty shall be delivered to the Trustee in connection with the execution of Amendment No. 1 to the Servicing Agreement and GMAC hereby authorizes the Company and the Trustee to rely on the covenants and agreements set forth herein.

7.        Definitions.  Capitalized terms used but not otherwise defined herein shall have the meaning given them in the Servicing Agreement.

8.        Counterparts.  This Limited Guaranty may be executed in any number of counterparts, each of which shall be deemed to be an original and such counterparts shall constitute but one and the same instrument.

        IN WITNESS WHEREOF, GMAC has caused this Limited Guaranty to be executed and delivered by its respective officers thereunto duly authorized as of the day and year first above written.


                    GMAC LLC


                    By: _____
                    Name:
                    Title:


Acknowledged by:


_____,
    as Trustee


By: _____
Name:
Title:


RESIDENTIAL ACCREDIT LOANS, INC.


By: _____
Name:
Title:


_____


                    EXHIBIT M


        FORM OF LENDER CERTIFICATION FOR ASSIGNMENT OF MORTGAGE LOAN


                    _____, 20


Residential Accredit Loans, Inc.
8400 Normandale Lake Boulevard
Suite 250
Minneapolis, Minnesota  55437

_____
_____
_____

Attention:  Residential Funding Company, LLC Series ____-___

        Re:   Mortgage Asset-Backed Pass-Through
              Certificates, Series ____-___ Assignment
              of Mortgage Loan

Ladies and Gentlemen:

This letter is delivered to you in connection with the assignment by _____ (the "Trustee") to_____ (the "Lender") of _____ (the "Mortgage Loan") pursuant to Section 3.13(d) of the Pooling and Servicing Agreement (the "Pooling and Servicing Agreement"), dated as of _____ 1, ____ among Residential Accredit Loans, Inc., as seller (the "Company"), Residential Funding Company, LLC, as Master Servicer, and the Trustee.  All terms used herein and not otherwise defined shall have the meanings set forth in the Pooling and Servicing Agreement.  The Lender hereby certifies, represents and warrants to, and covenants with, the Master Servicer and the Trustee that:

(i)       the Mortgage Loan is secured by Mortgaged Property located in a jurisdiction in which an assignment in lieu of satisfaction is required to preserve lien priority, minimize or avoid mortgage recording taxes or otherwise comply with, or facilitate a refinancing under, the laws of such jurisdiction;

(ii)      the substance of the assignment is, and is intended to be, a refinancing of such Mortgage Loan and the form of the transaction is solely to comply with, or facilitate the transaction under, such local laws;

(iii)     the Mortgage Loan following the proposed assignment will be modified to have a rate of interest at least 0.25 percent below or above the rate of interest on such Mortgage Loan prior to such proposed assignment; and

(iv)      such assignment is at the request of the borrower under the related Mortgage Loan.

Very truly yours,

(Lender)

By: _____
Name:
Title:

---

EXHIBIT N

FORM OF REQUEST FOR EXCHANGE

[DATE]

_____
_____
_____
_____

Re:   Residential Accredit Loans, Inc.,
      Mortgage Asset-Backed Pass-Through
      Certificates,
      Series ____-___

Residential Funding Company, LLC, as the Holder of a ____% Percentage Interest of the [Interest Only/Class A-V][-1] Certificates, hereby requests the Trustee to exchange the above-referenced Certificates for the Subclasses referred to below:

1.    [Interest Only/Class A-V]-  Certificates, corresponding to the
                 following Uncertificated REMIC Regular Interests: [List
                 numbers corresponding to the related loans and Pool Strip
                 Rates from the Mortgage Loan Schedule].  The initial
                 Subclass Notional Amount and the Initial Pass-Through Rate
                 on the [Interest Only/Class A-V]-  Certificates will be
                 $ _____ and _____%, respectively.

2.    [Repeat as appropriate.]

The Subclasses requested above will represent in the aggregate all of the Uncertificated REMIC Regular Interests represented by the [Interest Only/Class A-V][-1] Certificates surrendered for exchange.

All capitalized terms used but not defined herein shall have the meanings set forth in the Pooling and Servicing Agreement, dated as of _____ 1, ____, among Residential Accredit Loans, Inc., Residential Funding Company, LLC and _____, as trustee.

RESIDENTIAL FUNDING COMPANY, LLC

By: _____
Name:
Title:

EXHIBIT O

Form of Form 10-K Certification

I, [identify the certifying individual], certify that:

1.    I have reviewed this report on Form 10-K and all reports on Form 10-D required to be filed in respect of the period covered by this report on Form 10-K of the trust (the "Exchange Act periodic reports") created pursuant to the Series Supplement dated _____ to the Standard Terms of Pooling and Servicing Agreement dated _____ (together, the "P&S Agreement") among Residential Accredit Loans, Inc., Residential Funding Company, LLC (the "Master Servicer") and [Name of Trustee] (the "Trustee");

2.    Based on my knowledge, the Exchange Act periodic reports, taken as a whole, do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, all of the distribution, servicing and other information required to be provided under Form 10-D for the period covered by this report is included in the Exchange Act periodic reports;

4.    I am responsible for reviewing the activities performed by the Master Servicer and based on my knowledge and the compliance review conducted in preparing the servicer compliance statement required in this report under Item 1123 of Regulation AB, and except as disclosed in the Exchange Act periodic reports, the Master Servicer has fulfilled its obligations under the P&S Agreement; and

5.    All of the reports on assessment of compliance with servicing criteria for asset-backed securities and their related attestation reports on assessment of compliance with servicing criteria for asset-backed securities required to be included in this report in accordance with Item 1122 of Regulation AB and Exchange Act Rules 13a-18 and 15d-18 have been included as an exhibit to this report, except as otherwise disclosed in this report. Any material instances of noncompliance described in such reports have been disclosed in this report on Form 10-K.

In giving the certifications above, I have reasonably relied on the information provided to me by the following unaffiliated parties: [the Trustee].

Date:_____


_____*
[Signature]
[Title:]

* to be signed by the senior officer in charge of the servicing functions of the Master Servicer

---

EXHIBIT P

[FORM OF BACK-UP CERTIFICATION TO FORM 10-K CERTIFICATE]

The undersigned, a Responsible Officer of [_____] (the "Trustee") certifies that:

(a)    The Trustee has performed all of the duties specifically required to be performed by it pursuant to the provisions of the Pooling and Servicing Agreement dated as of [_____], 20[__] (the "Agreement") by and among [_____], as depositor, Residential Funding Company, LLC, as Master Servicer, and the Trustee in accordance with the standards set forth therein.

(b)    Based on my knowledge, the list of Certificateholders as shown on the Certificate Register as of the end of each calendar year that is provided by the Trustee pursuant to the  Agreement is accurate as of the last day of the 20[__] calendar year.

Capitalized terms used and not defined herein shall have the meanings given such terms in the Agreement.


IN WITNESS WHEREOF, I have duly executed this certificate as of _____, 20__.]


Name:_____
Title:

EXHIBIT Q

INFORMATION TO BE PROVIDED BY THE MASTER SERVICER TO THE RATING AGENCIES
RELATING TO REPORTABLE MODIFIED MORTGAGE LOANS

Account number

Transaction Identifier
Unpaid Principal Balance prior to Modification
Next Due Date
Monthly Principal and Interest Payment
Total Servicing Advances
Current Interest Rate
Original Maturity Date
Original Term to Maturity (Months)
Remaining Term to Maturity (Months)
Trial Modification Indicator
Mortgagor Equity Contribution
Total Servicer Advances
Trial Modification Term (Months)
Trial Modification Start Date
Trial Modification End Date
Trial Modification Period Principal and Interest Payment
Trial Modification Interest Rate
Trial Modification Term
Rate Reduction Indicator
Interest Rate Post Modification
Rate Reduction Start Date
Rate Reduction End Date
Rate Reduction Term

Term Modified Indicator
Modified Amortization Period
Modified Final Maturity Date
Total Advances Written Off
Unpaid Principal Balance Written Off
Other Past Due Amounts Written Off
Write Off Date
Unpaid Principal Balance Post Write Off
Capitalization Indicator
Mortgagor Contribution
Total Capitalized Amount
Modification Close Date
Unpaid Principal Balance  Post Capitalization Modification
Next Payment Due Date per Modification Plan
Principal and Interest Payment Post Modification

Interest Rate Post Modification
Payment Made Post Capitalization
Delinquency Status to Modification Plan

EXHIBIT R

SERVICING CRITERIA TO BE ADDRESSED IN ASSESSMENT OF COMPLIANCE

The assessment of compliance to be delivered by the Trustee shall
address, at a minimum, the criteria identified as below as "Applicable
Servicing Criteria":

| SERVICING CRITERIA | APPLICABLE SERVICING CRITERIA |
| --- | --- |
| REFERENCE            CRITERIA | |
| GENERAL SERVICING CONSIDERATIONS | |
| 1122(d)(1)(i) Policies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements. | |
| 1122(d)(1)(ii)If any material servicing activities are outsourced to third parties, policies and procedures are instituted to monitor the third party's performance and compliance with such servicing activities. | |
| 1122(d)(1)(iiiAny requirements in the transaction agreements to maintain a back-up servicer for the pool | |

```
                  assets are maintained.
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
1122(d)(1)(iv)A fidelity bond and errors and omissions
              policy is in effect on the party participating
              in the servicing function throughout the
              reporting period in the amount of coverage
              required by and otherwise in accordance with
              the terms of the transaction agreements.
--------------------------------------------------------------------------------
              CASH COLLECTION AND ADMINISTRATION
--------------------------------------------------------------------------------
1122(d)(2)(i)  Payments on pool assets are deposited into the     |X| (as to
              appropriate custodial bank accounts and             accounts held
              related bank clearing accounts no more than         by Trustee)
              two business days following receipt, or such
              other number of days specified in the
              transaction agreements.
--------------------------------------------------------------------------------
1122(d)(2)(ii)Disbursements made via wire transfer on behalf      |X| (as to
              of an obligor or to an investor are made only        investors only)
              by authorized personnel.
--------------------------------------------------------------------------------
1122(d)(2)(iiiAdvances of funds or guarantees regarding
              collections, cash flows or distributions, and
              any interest or other fees charged for such
              advances, are made, reviewed and approved as
              specified in the transaction agreements.
--------------------------------------------------------------------------------
              The related accounts for the transaction, such
              as cash reserve accounts or accounts
              established as a form of                            |X| (as to
              overcollateralization, are separately              accounts held
              maintained (e.g., with respect to commingling      by Trustee)
              of cash) as set forth in the transaction
1122(d)(2)(iv)agreements.
--------------------------------------------------------------------------------
1122(d)(2)(v) Each custodial account is maintained at a
              federally insured depository institution as
              set forth in the transaction agreements. For
              purposes of this criterion, "federally insured
              depository institution" with respect to a
              foreign financial institution means a foreign
              financial institution that meets the
              requirements of Rule 13k-1(b)(1) of the
              Securities Exchange Act.
--------------------------------------------------------------------------------
1122(d)(2)(vi)Unissued checks are safeguarded so as to
              prevent unauthorized access.
--------------------------------------------------------------------------------
1122(d)(2)(viiReconciliations are prepared on a monthly
              basis for all asset-backed securities related
              bank accounts, including custodial accounts
              and related bank clearing accounts. These
              reconciliations are (A) mathematically
              accurate; (B) prepared within 30 calendar days
              after the bank statement cutoff date, or such
              other number of days specified in the
              transaction agreements; (C) reviewed and
              approved by someone other than the person who
              prepared the reconciliation; and (D) contain
              explanations for reconciling items. These
              reconciling items are resolved within 90
              calendar days of their original
              identification, or such other number of days
              specified in the transaction agreements.
--------------------------------------------------------------------------------
              INVESTOR REMITTANCES AND REPORTING
--------------------------------------------------------------------------------
1122(d)(3)(i) Reports to investors, including those to be
              filed with the Commission, are maintained in
              accordance with the transaction agreements and
              applicable Commission requirements.
              Specifically, such reports (A) are prepared in
              accordance with timeframes and other terms set
              forth in the transaction agreements; (B)
              provide information calculated in accordance
              with the terms specified in the transaction
              agreements; (C) are filed with the Commission
              as required by its rules and regulations; and
              (D) agree with investors' or the trustee's
              records as to the total unpaid principal
              balance and number of pool assets serviced by
              the servicer.
--------------------------------------------------------------------------------
1122(d)(3)(ii)Amounts due to investors are allocated and          |X|
              remitted in accordance with timeframes,
              distribution priority and other terms set
              forth in the transaction agreements.
```

```
-------------------------------------------------------------------------------
-------------------------------------------------------------------------------
              Disbursements made to an investor are posted
              within two business days to the servicer's
              investor records, or such other number of days    |X|
1122(d)(3)(iii)specified in the transaction agreements.
-------------------------------------------------------------------------------
-------------------------------------------------------------------------------
              Amounts remitted to investors per the investor
              reports agree with cancelled checks, or other      |X|
1122(d)(3)(iv)form of payment, or custodial bank statements.
-------------------------------------------------------------------------------
-------------------------------------------------------------------------------
                        POOL ASSET ADMINISTRATION
-------------------------------------------------------------------------------
-------------------------------------------------------------------------------
1122(d)(4)(i)  Collateral or security on pool assets is
               maintained as required by the transaction
               agreements or related asset pool documents.
-------------------------------------------------------------------------------
-------------------------------------------------------------------------------
               Pool assets and related documents are
               safeguarded as required by the transaction
1122(d)(4)(ii)agreements
-------------------------------------------------------------------------------
-------------------------------------------------------------------------------
1122(d)(4)(iii)Any additions, removals or substitutions to
               the asset pool are made, reviewed and approved
               in accordance with any conditions or
               requirements in the transaction agreements.
-------------------------------------------------------------------------------
-------------------------------------------------------------------------------
1122(d)(4)(iv)Payments on pool assets, including any
               payoffs, made in accordance with the related
               pool asset documents are posted to the
               servicer's obligor records maintained no more
               than two business days after receipt, or such
               other number of days specified in the
               transaction agreements, and allocated to
               principal, interest or other items (e.g.,
               escrow) in accordance with the related pool
               asset documents.
-------------------------------------------------------------------------------
-------------------------------------------------------------------------------
1122(d)(4)(v)  The servicer's records regarding the pool
               assets agree with the servicer's records with
               respect to an obligor's unpaid principal
               balance.
-------------------------------------------------------------------------------
-------------------------------------------------------------------------------
1122(d)(4)(vi)Changes with respect to the terms or status of
               an obligor's pool asset  (e.g., loan
               modifications or re-agings) are made, reviewed
               and approved by authorized personnel in
               accordance with the transaction agreements and
               related pool asset documents.
-------------------------------------------------------------------------------
-------------------------------------------------------------------------------
1122(d)(4)(vii)Loss mitigation or recovery actions (e.g.,
               forbearance plans, modifications and deeds in
               lieu of foreclosure, foreclosures and
               repossessions, as applicable) are initiated,
               conducted and concluded in accordance with the
               timeframes or other requirements established
               by the transaction agreements.
-------------------------------------------------------------------------------
-------------------------------------------------------------------------------
1122(d)(4)(viii)Records documenting collection efforts are
               maintained during the period a pool asset is
               delinquent in accordance with the transaction
               agreements. Such records are maintained on at
               least a monthly basis, or such other period
               specified in the transaction agreements, and
               describe the entity's activities in monitoring
               delinquent pool assets including, for example,
               phone calls, letters and payment rescheduling
               plans in cases where delinquency is deemed
               temporary (e.g., illness or unemployment).
-------------------------------------------------------------------------------
-------------------------------------------------------------------------------
1122(d)(4)(ix)Adjustments to interest rates or rates of
               return for pool assets with variable rates are
               computed based on the related pool asset
               documents.
-------------------------------------------------------------------------------
-------------------------------------------------------------------------------
1122(d)(4)(x)  Regarding any funds held in trust for an
               obligor (such as escrow accounts): (A) such
               funds are analyzed, in accordance with the
               obligor's pool asset documents, on at least an
               annual basis, or such other period specified
               in the transaction agreements; (B) interest on
               such funds is paid, or credited, to obligors
               in accordance with applicable pool asset
               documents and state laws; and (C) such funds
               are returned to the obligor within 30 calendar
               days of full repayment of the related pool
               asset, or such other number of days specified
               in the transaction agreements.
-------------------------------------------------------------------------------
```

```
--------------------------------------------------------------------------------
1122(d)(4)(xi)Payments made on behalf of an obligor (such as
              tax or insurance payments) are made on or
              before the related penalty or expiration
              dates, as indicated on the appropriate bills
              or notices for such payments, provided that
              such support has been received by the servicer
              at least 30 calendar days prior to these
              dates, or such other number of days specified
              in the transaction agreements.
--------------------------------------------------------------------------------
1122(d)(4)(xii)Any late payment penalties in connection with
              any payment to be made on behalf of an obligor
              are paid from the servicer's funds and not
              charged to the obligor, unless the late
              payment was due to the obligor's error or
              omission.
--------------------------------------------------------------------------------
              Disbursements made on behalf of an obligor are
              posted within two business days to the
              obligor's records maintained by the servicer,
              or such other number of days specified in the
1122(d)(4)(xiii)transaction agreements.
--------------------------------------------------------------------------------
1122(d)(4)(xiv)Delinquencies, charge-offs and uncollectible
              accounts are recognized and recorded in
              accordance with the transaction agreements.
--------------------------------------------------------------------------------
              Any external enhancement or other support,
              identified in Item 1114(a)(1) through (3) or
              Item 1115 of Regulation AB, is maintained as    |X|
1122(d)(4)(xv)set forth in the transaction agreements.
--------------------------------------------------------------------------------

--------------------------------------------------------------------------------
```

(1) Only paragraph (a) for Class P Certificates.

(2) Class B Certificateholders may represent to either (a) or (b).

EXHIBIT FIVE

Planned Principal Balances, Aggregate Planned Principal Balances, Targeted Principal Balances and Aggregate
Targeted Principal Balances

| DISTRIBUTION DATE | SCHEDULE I PLANNED PRINCIPAL BALANCES FOR CLASS A-13 CERTIFICATES | SCHEDULE II AGGREGATE PLANNED PRINCIPAL BALANCES FOR THE CLASS A-14, CLASS A-15 AND CLASS A-16 CERTIFICATES | SCHEDULE III PLANNED PRINCIPAL BALANCES FOR CLASS A-24 CERTIFICATES | SCHEDULE IV AGGREGATE PLANNED PRINCIPAL BALANCES FOR THE CLASS A-25, CLASS A-26 AND CLASS A-27 CERTIFICATES | SCHEDULE V AGGREGATE TARGETED PRINCIPAL BALANCES FOR CLASS A-14 CERTIFICATES AND CLASS A-15 CERTIFICATES | TA BA A |
|---|---|---|---|---|---|---|
| Initial Balance | $70,376,000.00 | $94,696,000.00 | $41,200,000.00 | $61,240,000.00 | $93,750,000.00 | |
| November 2006 | 70,194,142.30 | 94,486,291.24 | 41,069,004.46 | 61,137,304.60 | 93,535,167.07 | |
| December 2006 | 69,968,303.79 | 94,171,112.78 | 40,908,344.05 | 60,983,034.51 | 93,214,836.69 | |
| January 2007 | 69,698,511.38 | 93,750,345.02 | 40,718,087.86 | 60,777,158.62 | 92,788,889.10 | |
| February 2007 | 69,384,814.32 | 93,224,100.49 | 40,498,273.51 | 60,519,742.90 | 92,257,436.69 | |
| March 2007 | 69,027,284.24 | 92,592,726.21 | 40,248,953.68 | 60,210,951.23 | 91,620,826.31 | |
| April 2007 | 68,626,015.13 | 91,856,805.51 | 39,970,196.17 | 59,851,045.91 | 90,879,641.15 | |
| May 2007 | 68,181,123.41 | 91,017,158.96 | 39,662,083.89 | 59,440,387.95 | 90,034,701.63 | |
| June 2007 | 67,692,747.83 | 90,074,844.85 | 39,324,714.82 | 58,979,437.15 | 89,087,065.87 | |
| July 2007 | 67,161,049.50 | 89,031,158.70 | 38,958,201.98 | 58,468,751.90 | 88,038,029.26 | |
| August 2007 | 66,586,211.77 | 87,887,632.27 | 38,562,673.43 | 57,908,988.71 | 86,889,123.37 | |
| September 2007 | 65,968,440.19 | 86,646,031.66 | 38,138,272.17 | 57,300,901.51 | 85,027,759.90 | |
| October 2007 | 65,307,962.43 | 85,308,354.74 | 37,685,156.07 | 56,645,340.74 | 81,376,597.32 | |
| November 2007 | 64,605,028.11 | 83,876,827.89 | 37,203,497.81 | 55,943,252.10 | 77,857,733.61 | |
| December 2007 | 63,859,908.70 | 82,353,901.89 | 36,693,484.80 | 55,195,675.04 | 74,469,036.35 | |
| January 2008 | 63,072,897.37 | 80,742,247.17 | 36,155,319.03 | 54,403,741.15 | 71,208,389.83 | |
| February 2008 | 62,244,308.81 | 79,044,748.28 | 35,589,216.96 | 53,568,672.12 | 68,073,694.45 | |
| March 2008 | 61,374,479.05 | 77,264,497.64 | 34,995,409.44 | 52,691,777.47 | 65,062,866.17 | |
| April 2008 | 60,463,765.21 | 75,404,788.65 | 34,374,141.50 | 51,774,452.21 | 62,173,835.97 | |
| May 2008 | 59,512,545.32 | 73,469,108.04 | 33,725,672.20 | 50,818,174.09 | 59,404,549.25 | |
| June 2008 | 58,521,218.07 | 71,461,127.55 | 33,050,274.51 | 49,824,500.62 | 56,752,965.44 | |
| July 2008 | 57,490,202.50 | 69,384,695.05 | 32,348,235.09 | 48,795,065.96 | 54,217,057.50 | |
| August 2008 | 56,419,937.78 | 67,243,824.94 | 31,619,854.08 | 47,731,577.58 | 51,794,811.52 | |
| September 2008 | 55,310,882.87 | 65,042,688.03 | 30,865,444.94 | 46,635,812.59 | 49,484,226.30 | |
| October 2008 | 54,163,516.20 | 62,785,600.86 | 30,085,334.21 | 45,509,614.01 | 47,283,313.08 | |
| November 2008 | 52,978,335.38 | 60,477,414.40 | 29,279,861.27 | 44,354,886.79 | 45,190,095.10 | |
| December 2008 | 51,755,856.80 | 58,121,502.42 | 28,449,378.12 | 43,173,593.64 | 43,202,607.42 | |
| January 2009 | 50,496,615.29 | 55,723,749.29 | 27,594,249.11 | 41,967,750.72 | 41,318,896.58 | |
| February 2009 | 49,201,163.72 | 53,288,537.43 | 26,714,850.72 | 40,739,423.11 | 39,537,020.39 | |
| March 2009 | 47,870,072.63 | 50,820,734.35 | 25,811,571.21 | 39,490,720.30 | 37,855,047.74 | |
| April 2009 | 46,545,824.78 | 48,419,019.50 | 24,912,932.85 | 38,270,262.87 | 36,229,163.40 | |
| May 2009 | 45,228,385.45 | 46,082,040.16 | 24,018,912.10 | 37,077,578.75 | 34,658,097.17 | |

| | | | | |
|---|---|---|---|---|
| June 2009 | 43,917,720.12 | 43,808,469.72 | 23,129,485.59 | 35,912,203.13 | 33,140,605.64 |
| July 2009 | 42,613,794.44 | 41,597,007.25 | 22,244,630.04 | 34,773,678.49 | 31,675,471.63 |
| August 2009 | 41,316,574.24 | 39,446,376.98 | 21,364,322.31 | 33,661,554.38 | 30,261,503.69 |
| September 2009 | 40,026,025.54 | 37,355,327.84 | 20,488,539.37 | 32,575,387.33 | 28,897,535.49 |
| October 2009 | 38,742,114.53 | 35,322,632.95 | 19,617,258.31 | 31,514,740.81 | 27,582,425.36 |
| November 2009 | 37,464,807.58 | 33,347,089.21 | 18,750,656.35 | 30,479,185.04 | 26,315,055.77 |
| December 2009 | 36,194,071.23 | 31,427,516.83 | 17,888,110.82 | 29,468,296.95 | 25,094,332.82 |
| January 2010 | 34,929,872.20 | 29,562,758.85 | 17,030,199.19 | 28,481,660.02 | 23,919,185.75 |
| February 2010 | 33,672,177.40 | 27,751,680.76 | 16,176,699.02 | 27,518,864.24 | 22,788,566.44 |
| March 2010 | 32,420,953.88 | 25,993,170.05 | 15,327,588.00 | 26,579,506.00 | 21,701,449.00 |
| April 2010 | 31,176,168.90 | 24,286,135.77 | 14,482,843.95 | 25,663,187.93 | 20,656,829.23 |
| May 2010 | 29,937,789.86 | 22,629,508.16 | 13,642,444.79 | 24,769,518.90 | 19,653,724.25 |
| June 2010 | 28,705,784.35 | 21,022,238.22 | 12,806,368.55 | 23,898,113.87 | 18,691,171.98 |
| July 2010 | 27,480,120.13 | 19,463,297.31 | 11,974,593.41 | 23,048,593.78 | 17,768,230.77 |
| August 2010 | 26,260,765.12 | 17,951,676.78 | 11,147,097.63 | 22,220,585.51 | 16,883,978.96 |
| September 2010 | 25,047,687.42 | 16,486,387.59 | 10,323,859.59 | 21,413,721.77 | 16,037,514.42 |
| October 2010 | 23,840,855.29 | 15,066,459.90 | 9,504,857.80 | 20,627,641.00 | 15,227,954.21 |
| November 2010 | 22,640,237.15 | 13,690,942.78 | 8,690,070.87 | 19,861,987.29 | 14,454,434.16 |
| December 2010 | 21,445,801.61 | 12,358,903.74 | 7,879,477.54 | 19,116,410.28 | 13,716,108.46 |
| January 2011 | 20,257,517.42 | 11,069,428.48 | 7,073,056.63 | 18,390,565.11 | 13,012,149.28 |
| February 2011 | 19,075,353.51 | 9,821,620.50 | 6,270,787.10 | 17,684,112.33 | 12,341,746.43 |
| March 2011 | 17,899,278.96 | 8,614,600.75 | 5,472,358.59 | 16,996,818.33 | 11,703,954.25 |
| April 2011 | 16,729,263.04 | 7,447,507.32 | 4,678,041.23 | 16,328,257.41 | 11,098,156.35 |
| May 2011 | 15,565,275.14 | 6,319,495.11 | 3,887,814.28 | 15,678,105.74 | 10,523,593.07 |
| June 2011 | 14,407,284.84 | 5,229,735.49 | 3,101,657.14 | 15,046,044.52 | 9,979,520.91 |
| July 2011 | 13,255,261.89 | 4,195,721.54 | 2,319,549.30 | 14,431,759.99 | 9,465,212.25 |
| August 2011 | 12,109,176.17 | 3,221,087.88 | 1,541,470.36 | 13,834,943.32 | 8,979,955.01 |
| September 2011 | 10,968,997.75 | 2,303,931.59 | 767,400.03 | 13,255,290.49 | 8,523,052.29 |
| October 2011 | 9,834,696.82 | 1,442,406.73 | | 12,689,776.92 | 8,093,789.19 |
| November 2011 | 8,814,267.97 | 1,103,987.26 | 0.00 | 11,428,675.75 | 7,983,355.32 |
| December 2011 | 7,799,557.87 | 813,834.79 | 0.00 | 10,187,506.64 | 7,897,265.62 |
| January 2012 | 6,790,537.48 | 570,335.06 | 0.00 | 8,965,965.25 | 7,834,900.71 |
| February 2012 | 5,787,177.93 | 371,925.34 | 0.00 | 7,773,216.35 | 7,795,654.98 |
| March 2012 | 4,789,450.48 | 217,093.07 | 0.00 | 6,610,633.93 | 7,778,936.37 |
| April 2012 | 3,797,326.57 | 104,374.44 | 0.00 | 5,477,485.52 | 7,771,656.59 |
| May 2012 | 2,810,777.77 | 32,353.14 | 0.00 | 4,373,056.16 | 7,764,337.37 |
| June 2012 | 1,829,775.81 | 0.00 | 0.00 | 3,296,648.01 | 7,756,978.51 |
| July 2012 | 859,600.76 | 0.00 | 0.00 | 2,247,579.75 | 7,749,579.79 |
| August 2012 | 0.00 | 0.00 | 0.00 | 1,225,187.17 | 7,742,140.99 |
| September 2012 | 0.00 | 0.00 | 0.00 | 228,820.80 | 7,039,941.62 |
| October 2012 | 0.00 | 0.00 | 0.00 | 0.00 | 6,206,318.75 |
| November 2012 | 0.00 | 0.00 | 0.00 | 0.00 | 5,503,611.55 |
| December 2012 | 0.00 | 0.00 | 0.00 | 0.00 | 4,822,060.54 |
| January 2013 | 0.00 | 0.00 | 0.00 | 0.00 | 4,161,181.58 |
| February 2013 | 0.00 | 0.00 | 0.00 | 0.00 | 3,520,501.19 |
| March 2013 | 0.00 | 0.00 | 0.00 | 0.00 | 2,899,556.25 |
| April 2013 | 0.00 | 0.00 | 0.00 | 0.00 | 2,297,893.86 |
| May 2013 | 0.00 | 0.00 | 0.00 | 0.00 | 1,715,071.11 |
| June 2013 | 0.00 | 0.00 | 0.00 | 0.00 | 1,150,654.87 |
| July 2013 | 0.00 | 0.00 | 0.00 | 0.00 | 604,221.59 |
| August 2013 | 0.00 | 0.00 | 0.00 | 0.00 | 75,357.12 |
| September 2013 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| October 2013 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| November 2013 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| December 2013 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| January 2014 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| February 2014 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| March 2014 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| April 2014 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| May 2014 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| June 2014 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| July 2014 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| August 2014 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| September 2014 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| October 2014 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| November 2014 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| December 2014 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| January 2015 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| February 2015 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| March 2015 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| April 2015 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| May 2015 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| June 2015 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| July 2015 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| August 2015 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| September 2015 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| October 2015 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| November 2015 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| December 2015 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| January 2016 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| February 2016 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| March 2016 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| April 2016 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| May 2016 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| June 2016 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| July 2016 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| August 2016 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| September 2016 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| October 2016 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| November 2016 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| December 2016 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| January 2017 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| February 2017 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| March 2017 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| April 2017 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| May 2017 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| June 2017 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| July 2017 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| August 2017 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| September 2017 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

| | | | | |
|---|---|---|---|---|
| October 2017 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| November 2017 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| December 2017 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| January 2018 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| February 2018 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| March 2018 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| April 2018 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| May 2018 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| June 2018 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| July 2018 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| August 2018 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| September 2018 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| October 2018 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| November 2018 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| December 2018 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| January 2019 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| February 2019 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| March 2019 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| April 2019 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| May 2019 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| June 2019 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| July 2019 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| August 2019 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| September 2019 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| October 2019 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| November 2019 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| December 2019 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| January 2020 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| February 2020 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| March 2020 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| April 2020 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| May 2020 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| June 2020 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| July 2020 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| August 2020 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| September 2020 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| October 2020 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| November 2020 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| December 2020 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| January 2021 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| February 2021 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| March 2021 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| April 2021 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| May 2021 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| June 2021 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| July 2021 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| August 2021 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| September 2021 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| October 2021 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| November 2021 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| December 2021 and thereafter | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |



```
10522658        286/286      F              142,500.00       ZZ
                             360            142,113.67       1
                             8.0000         1045.62          95
                             7.1420         1045.62
KLAMATH FALLS OR 97603       1              05/01/06         26
0004644118                   05             07/01/06         30.0000
0004644118                   O              06/01/36
0
```

**<u>Exhibit H</u>**
**Assignment Documents**

This Instrument Prepared By:
Gary M. Rullio
After Recording Return To:
National City Mortgage
P.O Box 8800    Dayton,
OH  45401-8800

**2006-024192**
Klamath County, Oregon

0001038020060024192000110010

12/06/2006 10:56:13 AM          Fee: $21.00

Recording Requested by &
When Recorded Return To:
    US Recordings, Inc.
    2925 Country Drive Ste 201
    St. Paul, MN 55117
Parcel:

SPACE ABOVE THIS LINE FOR RECORDER'S USE

NCM#:  ████  00010                            LARKINS, NEIL
MIN and MERS Phone:        *Please Record 1st*    Recording District: Klamath

## ASSIGNMENT OF Deed of Trust

*(assignee)*

For value received, the ~~undersigned~~, hereby grants, assigns and transfers to:  NATIONAL CITY MORTGAGE
CO, A SUBSIDIARY OF NATIONAL CITY BANK OF INDIANA located at  3232 NEWMARK DR,
MIAMISBURG, OH 45342.  All beneficial interest under that certain Deed of Trust dated 5/1/2006 executed by:

    Trustor(s)   NEIL LARKINS

to  Trustee for NATIONAL CITY BANK OF INDIANA   recorded 5/11/2006  Instrument No.:     in
Book/Volume: **M06**  Page: **09525** of the Official Records of Klamath County, Oregon describing the land therein:

Property Address:    4801 LORRAYNE PL, KLAMATH FALLS, OR  97603
~~Legal Description As Per Deed of Trust Referred To Herein~~

Together with the Note or Notes therein described or referenced to, the money due and to become due thereon with
interest, and all rights accrued or to accrue under said Deed of Trust.

5/11/2006 to be executed the Date of Filing/Recording          *(assignor)*

✱  NATIONAL CITY BANK OF INDIANA


Angela Tegtmeyer, Delivery Shipper

*State of* OHIO      *County of* MONTGOMERY

On 6/20/2006 before me, Kathleen Lewis the undersigned, a Notary Public in and for the State of OHIO, personally
appeared Angela Tegtmeyer, Delivery Shipper of NATIONAL CITY BANK OF INDIANA personally known to
me to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed
the same in her authorized capacity, and that for her signature on the instrument the person, or the entity upon behalf
of which she acted, executed the instrument.

Kathleen Lewis, Notary Public in and for the State of OHIO
My Commission Expires:  1/6/2009   My County of Residence:  MONTGOMERY



This instrument Prepared by:
Todd Schaney, Delivery Shipper
National City Mortgage Co.
3232 Newmark Drive
Miamisburg, OH 45342

**2006-024193**
Klamath County, Oregon


00010381200600241930010017

12/06/2006 10:57:16 AM                    Fee: $21.00

Recording Requested by &
When Recorded Return To:
    US Recordings, Inc.
    2925 Country Drive Ste 201
    St. Paul, MN 55117
Parcel:

SPACE ABOVE THIS LINE FOR RECORDER'S USE

NCM#: [redacted]    POOL#: 0001155736    4                    LARKINS, NEIL

MIN and MERS Phone:                        Recording District: Klamath

*Please Record and*

### Assignment Of Deed of Trust

For value received, the ~~undersigned~~, hereby grants, assigns and transfers to:

Mortgage Electronic Registration Systems, Inc., its successors
and assigns, PO Box 2026 Flint, Michigan 48501-2026    *(assignee)*

All beneficial interest under that certain Deed of Trust dated 5/1/2006 executed by:
Trustor(s)    **NEIL LARKINS**

to the Trustee for National City Bank of Indiana    recorded  5/11/2006  as  Instrument No.:
_____ in Book/Volume:  M06  Page:  09525  of the Official Records of
Klamath County, Oregon describing the land therein:

Property Address:    **4801 LORRAYNE PL, KLAMATH FALLS, OR  97603**

~~Legal Description As Per Deed of Trust Referred to Herein~~

Together with the Note or Notes therein described or referenced to, the money due and to become due thereon with
interest, and all rights accrued or to accrue under said Deed of Trust.

Assignment Executed to be Effective as of  7/24/2006

**National City Mortgage Co.,**    *(assignor)*
a subsidiary of National City Bank of Indiana

*Angela Tegtmeyer*

ANGELA TEGTMEYER
DELIVERY SHIPPER

*State of Ohio    County of Montgomery*

On 6/29/2006 before me, KATHLEEN LEWIS the undersigned, a Notary Public in and for the State of Ohio,
personally appeared  ANGELA TEGTMEYER, DELIVERY SHIPPER of National City Mortgage Co., a subsidiary
of National City Bank of Indiana  personally known to me to be the person whose name is subscribed to the within
instrument and acknowledged to me that she executed the same in her authorized capacity, and that for her signature
on the instrument the person, or the entity upon behalf of which she acted, executed the instrument.

MERS Phone: 1-888-679-6377  KATHLEEN LEWIS, Notary Public in and for the State of Ohio
My Commission Expires: 1/6/2009    My County of Residence: Montgomery





*D 6*

**2011-010156**
Klamath County, Oregon



0010705020110010156001 0017

09/07/2011 01:07:53 PM                     Fee: $37.00



Parcel _____

SPACE ABOVE THIS LINE FOR RECORDER'S USE

NCM#: ████                                          LARKINS, NEIL

MIN and MERS Phone: 100269610105226583          888-679-6377     Recording District: KLAMATH

## ASSIGNMENT OF Deed of Trust

For value received, the undersigned, hereby grants, assigns and transfers to:  Deutsche Bank Trust Company
Americas as Trustee RALI 2006-QS14  located at   2255 North Ontario Street #400, Burbank, CA  91504, all
beneficial interest under that certain Deed of Trust dated 5/1/2006 executed by:

   Trustor(s)   NEIL LARKINS

to AMERITITLE for National City Bank of Indiana, in the amount of: $142,500, recorded 5/11/2006 as
Instrument No.: M06-09525 in Book/Volume:   Page:   of the Official Records of KLAMATH County, Oregon
describing the land therein:

Property Address:    4801 LORRAYNE PL, KLAMATH FALLS, OR  97603

LOT 1 IN BLOCK 6 OF FIRST ADDITION TO KELENE GARDENS, ACCORDING TO THE OFFICIAL
PLAT THEREOF ON FILE IN THE OFFICE OF THE COUNTY CLERK OF KLAMATH COUNTY,
OREGON.

Together with the Note or Notes therein described or referenced to, the money due and to become due thereon with
interest, and all rights accrued or to accrue under said Deed of Trust.

Effective date          ~~5/1/2006~~
                         8/24/2011

                    Mortgage Electronic Registration Systems, Inc. as nominee
                    for Lender and it's successors and assigns  & National City
                    Bank of Indiana
                    Renee Durham, Assistant Secretary

*State of OHIO          County of* MONTGOMERY
8/24/2011 IS
On 8/19/2011 before me, Toni Suel the undersigned, a Notary Public in and for the State of Ohio, personally
appeared Renee Durham, Assistant Secretary of Mortgage Electronic Registration Systems, Inc. as nominee for
Lender and it's successors and assigns personally known to me to be the person whose name is subscribed to the
within instrument and acknowledged to me that she executed the same in her authorized capacity, and that for her
signature on the instrument the person, or the entity upon behalf of which she acted, executed the instrument.

This Instrument Prepared By:
Sandra Van Zandbergen

After Recording Return To:
                    Toni Suel, Notary Public in and for the State of Ohio
PNC Mortgage          My Commission Expires:  3/26/2012  My County of Residence:  Butler
P.O. Box 8800
Dayton, OH  45401-8800
(937) 910-1323



**TONI SUEL**
Notary Public, State of Ohio
My Commission Expires
March 26, 2012

**<u>Exhibit I</u>**
**Tobias Claim**

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | |
|---|---|

Name of Debtor and Case Number: **Residential Capital, LLC, Case No. 12-12020**

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>Suzanne Koegler and Edward Tobias | ☐ Check this box if this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br><br>Suzanne Koegler and Edward Tobias<br>75 Princeton Oval<br>Freehold, NJ  07728<br><br>Telephone number: 732-462-6672        email: tobiaslaw@optonline.net | **Court Claim Number:** _____<br>*(If known)*<br><br>Filed on: _____ |
| Name and address where payment should be sent (if different from above):<br><br><br><br>Telephone number:        email: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars. |

| | |
|---|---|
| **1. Amount of Claim as of Date Case Filed: $** 1,000,000.00<br><br>If all or part of the claim is secured, complete item 4.<br><br>If all or part of the claim is entitled to priority, complete item 5.<br><br>☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges. | **5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**<br><br>☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| **2. Basis for Claim:** Damages based on Consumer Fraud or other claim / affirmative defenses to foreclosure requesting monetary relief<br>(See instruction #2) Property Address: 75 Princeton Oval, Freehold NJ 07728 | ☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4). |
| **3. Last four digits of any number by which creditor identifies debtor:**<br>1234 | **3a. Debtor may have scheduled account as:**<br>Alison Tearnen<br>(See instruction #3a) | **3b. Uniform Claim Identifier (optional):**<br><br>(See instruction #3b) | ☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5). |

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
Describe:

Value of Property: $_____  Annual Interest Rate_____%  ☐ Fixed ☐ Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim,
if any: $_____        Basis for perfection: _____

Amount of Secured Claim: $_____        Amount Unsecured: $_____

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$_____        (See instruction #6)

**Amount entitled to priority:**

$_____

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:  Complaint has not yet been filed

\* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**9. Signature:** (See instruction #9) Check the appropriate box.
☐ I am the creditor.  ☐ I am the creditor's authorized agent.  ☐ I am the trustee, or the debtor, or  ☐ I am a guarantor, surety,
(Attach copy of power of attorney, if any.)  their authorized agent.  indorser, or other codebtor.
(See Bankruptcy Rule 3004.)  (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name: Edward N. Tobias and Suzanne Koegler
Title:
Company:        (Signature)        10/17/12        (Date)
Address and telephone number (if different from notice address above):

RECEIVED
OCT 2 2 2012
KURTZMAN CARSON CONSULTANTS
COURT USE ONLY

Telephone number:        Email:

*Penalty for presenting fraudulent claim: Fine of up to $500*



1212020121022000000000031

**<u>Exhibit J</u>**
**Tobias Note**

# NOTE

| May 9, 2003 | East Brunswick | New Jersey |
|---|---|---|
| [Date] | [City] | [State] |

75 Princeton Oval, Freehold, NJ   07728

[Property Address]

## 1.   BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 320,000.00                 (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is  GMAC Mortgage Corporation

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.   INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of 4.750                %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3.   PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making payments every month.

I will make my monthly payments on the First        day of each month beginning on July 1                ,
2003        . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on June 1                ,2018             , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "maturity date."

I will make my monthly payments at 17595 Harvard Ave C1002, Irvine, CA 92614
or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $ 2,489.07

## 4.   BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 6.   BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of Fifteen        calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000                % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.






**8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10.  UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
Suzanne Koegler                            -Borrower

_____ (Seal)
Edward Tobias                             -Borrower

_____ (Seal)
                                          -Borrower

_____ (Seal)
                                          -Borrower

*[Sign Original Only]*

**<u>Exhibit K</u>**
**Servicing Notes**

ny-1143211

| Account Number | 1 |
| --- | --- |
| ██████ | |

# Loan History

Date Data as-of:  March 5, 2014

| Account Number | Name Primary Borrower | Name Secondary Borrower | Property Address | Mailing Address |
|---|---|---|---|---|
| ■■■■■ | SUZANNE KOEGLER | EDWARD TOBIAS | 75 PRINCETON OVAL | 75 PRINCETON OVAL |
| | | | FREEHOLD | FREEHOLD |
| | | | NJ | NJ |
| | | | 07728 | 07728 |

**Investor Info**

| | |
|---|---|
| Investor Acct No - Prim | ■■■■■ |
| Investor Number | 10025 |
| Investor Name Full | FANNIE MAE |
| Investor Id | |

**Previous Servicer Info**

| | |
|---|---|
| Previous Account Number | |
| Seller Company Name | |

**Loan Info**

| | |
|---|---|
| Arm Flag | N |
| Loan Type | Conventional |
| Lien Position | 01 |
| Interest Rate | 4.750% |
| Collection Status | PO |

**Dates**

| | |
|---|---|
| Int Collected To | 01/01/2013 |
| Next Due | 02/01/2013 |
| Last Payment | 01/15/2013 |
| Last Activity | 02/01/2013 |
| Setup Date | 05/15/2003 |
| Maturity Date | 06/01/2018 |

**Current Balances**

| | |
|---|---|
| Principal | $0.00 |
| Escrow | $0.00 |
| Unapplied | $0.00 |
| Buydown | $0.00 |

**Uncollected**

| | |
|---|---|
| Late Charges | $0.00 |
| Interest | $0.00 |
| Fees | $0.00 |
| Opt | $0.00 |

**Year-To-Date**

| | |
|---|---|
| Interest | $0.00 |
| Taxes | $0.00 |

**Financial**

| Account Number | Trans Added Date | Date Interest Paid Current | Prin Bal after trans | Transaction Description | Transaction Reason Code | Trans Type | Teller ID | Trans Amount | To Principal | To Interest Amt | To Escrow Amt | To Fee Amt | To Unapplied Funds Amt | To Credit Insurance Amt | To Late Charge Amt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ■ | 02/01/2013 | 01/01/2013 | $0.00 | Service Release | | SV | 32580 | $0.00 | $140,735.34 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $373.35 |
| ■ | 02/01/2013 | 01/01/2013 | $140,735.34 | Service Release | | SVT | 32580 | ($1,986.71) | $0.00 | $0.00 | ($1,986.71) | $0.00 | $0.00 | $0.00 | $0.00 |
| ■ | 02/01/2013 | 01/01/2013 | $0.00 | Unapplied | | UI | 32580 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $373.35 |
| ■ | 01/15/2013 | 01/01/2013 | $140,735.34 | PAYMENT | | AP | 00601 | $3,724.58 | $1,924.38 | $564.69 | $1,235.51 | $0.00 | $0.00 | $0.00 | $0.00 |
| ■ | 01/14/2013 | 12/01/2012 | $142,659.72 | Escrow Disb-Tax City | | E91 | 32687 | ($3,055.48) | $0.00 | $0.00 | ($3,055.48) | $0.00 | $0.00 | $0.00 | $0.00 |
| ■ | 12/17/2012 | 12/01/2012 | $142,659.72 | PAYMENT | | AP | 00601 | $3,724.58 | $1,916.79 | $572.28 | $1,235.51 | $0.00 | $0.00 | $0.00 | $0.00 |
| ■ | 11/15/2012 | 11/01/2012 | $144,576.51 | PAYMENT | | AP | 00601 | $3,724.58 | $1,909.23 | $579.84 | $1,235.51 | $0.00 | $0.00 | $0.00 | $0.00 |
| ■ | 10/15/2012 | 10/01/2012 | $146,485.74 | PAYMENT | | AP | 00601 | $3,724.58 | $1,901.70 | $587.37 | $1,235.51 | $0.00 | $0.00 | $0.00 | $0.00 |
| ■ | 10/11/2012 | 09/01/2012 | $148,387.44 | Escrow Disb-Tax City | | E91 | 32687 | ($3,130.43) | $0.00 | $0.00 | ($3,130.43) | $0.00 | $0.00 | $0.00 | $0.00 |
| ■ | 09/17/2012 | 09/01/2012 | $148,387.44 | PAYMENT | | AP | 00601 | $3,724.58 | $1,894.21 | $594.86 | $1,235.51 | $0.00 | $0.00 | $0.00 | $0.00 |
| ■ | 08/15/2012 | 08/01/2012 | $150,281.65 | PAYMENT | | AP | 00601 | $3,724.58 | $1,886.74 | $602.33 | $1,235.51 | $0.00 | $0.00 | $0.00 | $0.00 |
| ■ | 07/23/2012 | 07/01/2012 | $152,168.39 | Escrow Disb-Tax City | | E91 | 32687 | ($3,130.44) | $0.00 | $0.00 | ($3,130.44) | $0.00 | $0.00 | $0.00 | $0.00 |

# Loan History

Date Data as-of:  March 5, 2014

| Account Number | Trans Added Date | Date Interest Paid Current | Prin Bal after trans | Transaction Description | Transaction Reason Code | Trans Type | Teller ID | Trans Amount | To Principal | To Interest Amt | To Escrow Amt | To Fee Amt | To Unapplied Funds Amt | To Credit Insurance Amt | To Late Charge Amt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 07/16/2012 | 07/01/2012 | $152,168.39 | PAYMENT | | AP | 00601 | $3,724.58 | $1,879.30 | $609.77 | $1,235.51 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 06/15/2012 | 06/01/2012 | $154,047.69 | PAYMENT | | AP | 00601 | $3,724.58 | $1,871.89 | $617.18 | $1,235.51 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 05/15/2012 | 05/01/2012 | $155,919.58 | PAYMENT | | AP | 00601 | $3,724.58 | $1,864.51 | $624.56 | $1,235.51 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/24/2012 | 04/01/2012 | $157,784.09 | Escrow Disb-Fire | | E20 | 32022 | ($2,327.00) | $0.00 | $0.00 | ($2,327.00) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/16/2012 | 04/01/2012 | $157,784.09 | PAYMENT | | AP | 00601 | $3,724.58 | $1,857.16 | $631.91 | $1,235.51 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/12/2012 | 03/01/2012 | $159,641.25 | Escrow Disb-Tax City | | E91 | 32687 | ($2,980.51) | $0.00 | $0.00 | ($2,980.51) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 03/15/2012 | 03/01/2012 | $159,641.25 | PAYMENT | | AP | 00601 | $3,724.58 | $1,849.83 | $639.24 | $1,235.51 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 02/15/2012 | 02/01/2012 | $161,491.08 | PAYMENT | | AP | 00601 | $3,724.58 | $1,842.54 | $646.53 | $1,235.51 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 01/16/2012 | 01/01/2012 | $163,333.62 | PAYMENT | | AP | 00601 | $3,612.75 | $1,835.28 | $653.79 | $1,123.68 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 01/09/2012 | 12/01/2011 | $165,168.90 | Escrow Disb-Tax City | | E91 | 32687 | ($2,980.51) | $0.00 | $0.00 | ($2,980.51) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 12/15/2011 | 12/01/2011 | $165,168.90 | PAYMENT | | AP | 00601 | $3,612.75 | $1,828.04 | $661.03 | $1,123.68 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 11/15/2011 | 11/01/2011 | $166,996.94 | PAYMENT | | AP | 00601 | $3,612.75 | $1,820.83 | $668.24 | $1,123.68 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 10/17/2011 | 10/01/2011 | $168,817.77 | PAYMENT | | AP | 00601 | $3,612.75 | $1,813.65 | $675.42 | $1,123.68 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 10/07/2011 | 09/01/2011 | $170,631.42 | Escrow Disb-Tax City | | E91 | 32687 | ($3,085.46) | $0.00 | $0.00 | ($3,085.46) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 09/15/2011 | 09/01/2011 | $170,631.42 | PAYMENT | | AP | 00601 | $3,612.75 | $1,806.50 | $682.57 | $1,123.68 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 08/15/2011 | 08/01/2011 | $172,437.92 | PAYMENT | | AP | 00601 | $3,612.75 | $1,799.38 | $689.69 | $1,123.68 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 08/04/2011 | 07/01/2011 | $174,237.30 | Escrow Disb-Tax City | | E91 | 32687 | ($3,085.46) | $0.00 | $0.00 | ($3,085.46) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 07/15/2011 | 07/01/2011 | $174,237.30 | PAYMENT | | AP | 00601 | $3,612.75 | $1,792.29 | $696.78 | $1,123.68 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 06/15/2011 | 06/01/2011 | $176,029.59 | PAYMENT | | AP | 00601 | $3,612.75 | $1,785.22 | $703.85 | $1,123.68 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 05/16/2011 | 05/01/2011 | $177,814.81 | PAYMENT | | AP | 00601 | $3,612.75 | $1,778.18 | $710.89 | $1,123.68 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/26/2011 | 04/01/2011 | $179,592.99 | Escrow Disb-Fire | | E20 | 32022 | ($2,130.00) | $0.00 | $0.00 | ($2,130.00) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/15/2011 | 04/01/2011 | $179,592.99 | PAYMENT | | AP | 00601 | $3,612.75 | $1,771.17 | $717.90 | $1,123.68 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/07/2011 | 03/01/2011 | $181,364.16 | Escrow Disb-Tax City | | E91 | 32687 | ($2,875.56) | $0.00 | $0.00 | ($2,875.56) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 03/15/2011 | 03/01/2011 | $181,364.16 | PAYMENT | | AP | 00601 | $3,612.75 | $1,764.19 | $724.88 | $1,123.68 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 02/15/2011 | 02/01/2011 | $183,128.35 | PAYMENT | | AP | 00601 | $3,612.75 | $1,757.23 | $731.84 | $1,123.68 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 01/17/2011 | 01/01/2011 | $184,885.58 | PAYMENT | | AP | 00601 | $3,576.52 | $1,750.30 | $738.77 | $1,087.45 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 01/06/2011 | 12/01/2010 | $186,635.88 | Escrow Disb-Tax City | | E91 | 32687 | ($2,875.56) | $0.00 | $0.00 | ($2,875.56) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 12/15/2010 | 12/01/2010 | $186,635.88 | PAYMENT | | AP | 00601 | $3,576.52 | $1,743.40 | $745.67 | $1,087.45 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 12/09/2010 | 11/01/2010 | $188,379.28 | Escrow Disb | | E01 | 32262 | ($823.12) | $0.00 | $0.00 | ($823.12) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 11/15/2010 | 11/01/2010 | $188,379.28 | PAYMENT | | AP | 00601 | $3,576.52 | $1,736.53 | $752.54 | $1,087.45 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 10/15/2010 | 10/01/2010 | $190,115.81 | PAYMENT | | AP | 00601 | $3,576.52 | $1,729.68 | $759.39 | $1,087.45 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 10/07/2010 | 09/01/2010 | $191,845.49 | Escrow Disb-Tax City | | E91 | 32687 | ($2,952.02) | $0.00 | $0.00 | ($2,952.02) | $0.00 | $0.00 | $0.00 | $0.00 |

# Loan History

Date Data as-of:  March 5, 2014

| Account Number | Trans Added Date | Date Interest Paid Current | Prin Bal after trans | Transaction Description | Transaction Reason Code | Trans Type | Teller ID | Trans Amount | To Principal | To Interest Amt | To Escrow Amt | To Fee Amt | To Unapplied Funds Amt | To Credit Insurance Amt | To Late Charge Amt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 09/15/2010 | 09/01/2010 | $191,845.49 | PAYMENT | | AP | 00601 | $3,576.52 | $1,722.86 | $766.21 | $1,087.45 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 08/16/2010 | 08/01/2010 | $193,568.35 | PAYMENT | | AP | 00601 | $3,576.52 | $1,716.07 | $773.00 | $1,087.45 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 07/22/2010 | 07/01/2010 | $195,284.42 | Escrow Disb-Tax City | | E91 | 32687 | ($2,952.02) | $0.00 | $0.00 | ($2,952.02) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 07/19/2010 | 07/01/2010 | $0.00 | FEE | 171 | FB | 00606 | $7.50 | $0.00 | $0.00 | $0.00 | $7.50 | $0.00 | $0.00 | $0.00 |
| | 07/19/2010 | 07/01/2010 | $0.00 | FEE | 171 | FEA | 00606 | $7.50 | $0.00 | $0.00 | $0.00 | $7.50 | $0.00 | $0.00 | $0.00 |
| | 07/19/2010 | 07/01/2010 | $195,284.42 | PAYMENT | | AP | 00606 | $3,576.52 | $1,709.30 | $779.77 | $1,087.45 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 07/19/2010 | 07/01/2010 | $0.00 | Unapplied | | UI | 00606 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($124.45) |
| | 07/17/2010 | 06/01/2010 | $0.00 | Comment | | SLC | 00000 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 06/18/2010 | 06/01/2010 | $196,993.72 | PAYMENT | | AP | 00330 | $3,576.52 | $1,702.56 | $786.51 | $1,087.45 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 06/18/2010 | 06/01/2010 | $0.00 | Unapplied | | UI | 00330 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($124.45) |
| | 06/17/2010 | 05/01/2010 | $0.00 | Comment | | SLC | 00000 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 05/18/2010 | 04/01/2010 | $0.00 | Comment | | SLC | 00000 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 05/18/2010 | 05/01/2010 | $198,696.28 | PAYMENT | | AP | 00330 | $3,700.97 | $1,695.85 | $793.22 | $1,087.45 | $0.00 | $0.00 | $0.00 | $124.45 |
| | 04/26/2010 | 04/01/2010 | $200,392.13 | Escrow Disb-Fire | | E20 | 32022 | ($1,982.00) | $0.00 | $0.00 | ($1,982.00) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/19/2010 | 04/01/2010 | $200,392.13 | PAYMENT | | AP | 00330 | $3,576.52 | $1,689.16 | $799.91 | $1,087.45 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/19/2010 | 04/01/2010 | $0.00 | Unapplied | | UI | 00330 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($124.45) |
| | 04/17/2010 | 03/01/2010 | $0.00 | Comment | | SLC | 00000 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/05/2010 | 03/01/2010 | $202,081.29 | Escrow Disb-Tax City | | E91 | 32687 | ($2,799.10) | $0.00 | $0.00 | ($2,799.10) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 03/12/2010 | 03/01/2010 | $202,081.29 | PAYMENT | | AP | 00330 | $3,576.52 | $1,682.50 | $806.57 | $1,087.45 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 02/01/2010 | 02/01/2010 | $203,763.79 | PAYMENT | | AP | 00330 | $3,576.52 | $1,675.87 | $813.20 | $1,087.45 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 01/19/2010 | 01/01/2010 | $205,439.66 | Escrow Disb-Tax City | | E91 | 32687 | ($2,799.10) | $0.00 | $0.00 | ($2,799.10) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 12/21/2009 | 01/01/2010 | $205,439.66 | Curtailment | | CWA | 00330 | $124.15 | $124.15 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 12/21/2009 | 01/01/2010 | $205,563.81 | PAYMENT | | AP | 00330 | $3,852.85 | $1,668.77 | $820.30 | $1,363.78 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 12/10/2009 | 12/01/2009 | $207,232.58 | Escrow Disb | | E01 | 32262 | ($1,529.37) | $0.00 | $0.00 | ($1,529.37) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 11/23/2009 | 12/01/2009 | $207,232.58 | Curtailment | | CWA | 00330 | $124.45 | $124.45 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 11/23/2009 | 12/01/2009 | $207,357.03 | PAYMENT | | AP | 00330 | $3,852.85 | $1,661.70 | $827.37 | $1,363.78 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 10/19/2009 | 11/01/2009 | $209,018.73 | PAYMENT | | AP | 00330 | $3,852.85 | $1,655.15 | $833.92 | $1,363.78 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 10/14/2009 | 10/01/2009 | $210,673.88 | Escrow Disb-Tax City | | E91 | 32687 | ($2,141.85) | $0.00 | $0.00 | ($2,141.85) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 10/03/2009 | 10/01/2009 | $210,673.88 | PAYMENT | | AP | 00330 | $3,852.85 | $1,648.63 | $840.44 | $1,363.78 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 09/17/2009 | 08/01/2009 | $0.00 | Comment | | SLC | 00000 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 09/17/2009 | 09/01/2009 | $212,322.51 | PAYMENT | | AP | 00330 | $3,977.30 | $1,642.13 | $846.94 | $1,363.78 | $0.00 | $0.00 | $0.00 | $124.45 |
| | 08/06/2009 | 08/01/2009 | $213,964.64 | Escrow Disb-Tax City | | E91 | 32687 | ($2,141.85) | $0.00 | $0.00 | ($2,141.85) | $0.00 | $0.00 | $0.00 | $0.00 |

**Loan History**

Date Data as-of: March 5, 2014

| Account Number | Trans Added Date | Date Interest Paid Current | Prin Bal after trans | Transaction Description | Transaction Reason Code | Trans Type | Teller ID | Trans Amount | To Principal | To Interest Amt | To Escrow Amt | To Fee Amt | To Unapplied Funds Amt | To Credit Insurance Amt | To Late Charge Amt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 08/06/2009 | 08/01/2009 | $213,964.64 | PAYMENT | | AP | 00330 | $3,852.85 | $1,635.65 | $853.42 | $1,363.78 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 07/04/2009 | 07/01/2009 | $215,600.29 | PAYMENT | | AP | 00330 | $3,852.85 | $1,629.20 | $859.87 | $1,363.78 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 06/08/2009 | 06/01/2009 | $217,229.49 | PAYMENT | | AP | 00330 | $3,852.85 | $1,622.78 | $866.29 | $1,363.78 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 05/09/2009 | 05/01/2009 | $218,852.27 | Curtailment | | CWA | 00330 | $124.45 | $124.45 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 05/09/2009 | 05/01/2009 | $218,976.72 | PAYMENT | | AP | 00330 | $3,852.85 | $1,615.89 | $873.18 | $1,363.78 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/24/2009 | 04/01/2009 | $220,592.61 | Escrow Disb-Fire | | E20 | 32022 | ($1,853.00) | $0.00 | $0.00 | ($1,853.00) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/09/2009 | 04/01/2009 | $220,592.61 | Escrow Disb-Tax City | | E91 | 32687 | ($3,456.35) | $0.00 | $0.00 | ($3,456.35) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/09/2009 | 04/01/2009 | $220,592.61 | PAYMENT | | AP | 00330 | $3,852.85 | $1,609.52 | $879.55 | $1,363.78 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 03/02/2009 | 03/01/2009 | $222,202.13 | PAYMENT | | AP | 00330 | $3,852.85 | $1,603.17 | $885.90 | $1,363.78 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 02/06/2009 | 02/01/2009 | $223,805.30 | PAYMENT | | AP | 00330 | $3,852.85 | $1,596.85 | $892.22 | $1,363.78 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 01/09/2009 | 01/01/2009 | $225,402.15 | Escrow Disb-Tax City | | E91 | 32687 | ($3,456.35) | $0.00 | $0.00 | ($3,456.35) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 12/30/2008 | 01/01/2009 | $225,402.15 | PAYMENT | | AP | 00330 | $3,809.79 | $1,590.56 | $898.51 | $1,320.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 11/18/2008 | 12/01/2008 | $226,992.71 | PAYMENT | | AP | 00427 | $3,784.79 | $1,584.29 | $904.78 | $1,295.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 11/18/2008 | 12/01/2008 | $226,992.71 | PAYMENT | | SR | 01622 | $25.00 | $0.00 | $0.00 | $25.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 10/17/2008 | 11/01/2008 | $228,577.00 | PAYMENT | | AP | 00330 | $3,809.79 | $1,578.04 | $911.03 | $1,320.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 10/14/2008 | 10/01/2008 | $230,155.04 | Escrow Disb-Tax City | | E91 | 32687 | ($3,197.73) | $0.00 | $0.00 | ($3,197.73) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 09/20/2008 | 10/01/2008 | $230,155.04 | PAYMENT | | AP | 00330 | $3,809.79 | $1,571.82 | $917.25 | $1,320.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 08/21/2008 | 09/01/2008 | $231,726.86 | PAYMENT | | AP | 00330 | $3,809.79 | $1,565.62 | $923.45 | $1,320.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 07/31/2008 | 08/01/2008 | $233,292.48 | PAYMENT | | AP | 00330 | $3,809.79 | $1,559.45 | $929.62 | $1,320.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 07/17/2008 | 07/01/2008 | $234,851.93 | Escrow Disb-Tax City | | E91 | 32687 | ($3,769.41) | $0.00 | $0.00 | ($3,769.41) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 06/24/2008 | 07/01/2008 | $234,851.93 | PAYMENT | | AP | 00330 | $3,809.79 | $1,553.30 | $935.77 | $1,320.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 05/24/2008 | 06/01/2008 | $236,405.23 | PAYMENT | | AP | 00330 | $3,809.79 | $1,547.18 | $941.89 | $1,320.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/28/2008 | 05/01/2008 | $237,952.41 | PAYMENT | | AP | 00330 | $3,809.79 | $1,541.07 | $948.00 | $1,320.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/24/2008 | 04/01/2008 | $239,493.48 | Escrow Disb-Fire | | E20 | 32022 | ($1,522.00) | $0.00 | $0.00 | ($1,522.00) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/16/2008 | 04/01/2008 | $239,493.48 | Escrow Disb-Tax City | | E91 | 32687 | ($3,429.12) | $0.00 | $0.00 | ($3,429.12) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 03/24/2008 | 04/01/2008 | $239,493.48 | PAYMENT | | AP | 00330 | $3,809.79 | $1,535.00 | $954.07 | $1,320.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 02/22/2008 | 03/01/2008 | $241,028.48 | PAYMENT | | AP | 00330 | $3,809.79 | $1,528.95 | $960.12 | $1,320.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 02/04/2008 | 02/01/2008 | $0.00 | FEE | 171 | FB | 00607 | $7.50 | $0.00 | $0.00 | $0.00 | $7.50 | $0.00 | $0.00 | $0.00 |
| | 02/04/2008 | 02/01/2008 | $0.00 | FEE | 171 | FEA | 00607 | $7.50 | $0.00 | $0.00 | $0.00 | $7.50 | $0.00 | $0.00 | $0.00 |
| | 02/04/2008 | 02/01/2008 | $242,557.43 | PAYMENT | | AP | 00607 | $3,809.79 | $1,522.92 | $966.15 | $1,320.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 01/23/2008 | 01/01/2008 | $244,080.35 | Escrow Disb-Tax City | | E91 | 32687 | ($3,429.13) | $0.00 | $0.00 | ($3,429.13) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 01/05/2008 | 01/01/2008 | $244,080.35 | PAYMENT | | AP | 00303 | $3,777.29 | $1,516.91 | $972.16 | $1,288.22 | $0.00 | $0.00 | $0.00 | $0.00 |

# Loan History

Date Data as-of:  March 5, 2014

| Account Number | Trans Added Date | Date Interest Paid Current | Prin Bal after trans | Transaction Description | Transaction Reason Code | Trans Type | Teller ID | Trans Amount | To Principal | To Interest Amt | To Escrow Amt | To Fee Amt | To Unapplied Funds Amt | To Credit Insurance Amt | To Late Charge Amt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12/11/2007 | 12/01/2007 | $245,597.26 | PAYMENT | | PR1 | 19327 | ($3,777.29) | ($1,516.91) | ($972.16) | ($1,288.22) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 12/10/2007 | 01/01/2008 | $244,080.35 | PAYMENT | | AP | 00316 | $3,777.29 | $1,516.91 | $972.16 | $1,288.22 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 12/03/2007 | 12/01/2007 | $245,597.26 | PAYMENT | | AP | 00099 | $3,777.29 | $1,510.93 | $978.14 | $1,288.22 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 11/01/2007 | 11/01/2007 | $247,108.19 | PAYMENT | | AP | 00099 | $3,777.29 | $1,504.98 | $984.09 | $1,288.22 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 10/17/2007 | 10/01/2007 | $248,613.17 | Escrow Disb-Tax City | | E91 | 32687 | ($3,554.54) | $0.00 | $0.00 | ($3,554.54) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 10/01/2007 | 10/01/2007 | $248,613.17 | PAYMENT | | AP | 00099 | $3,777.29 | $1,499.04 | $990.03 | $1,288.22 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 09/03/2007 | 09/01/2007 | $250,112.21 | PAYMENT | | AP | 00099 | $3,777.29 | $1,493.13 | $995.94 | $1,288.22 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 08/09/2007 | 08/01/2007 | $251,605.34 | PAYMENT | | PR1 | 19327 | ($3,777.29) | ($1,493.13) | ($995.94) | ($1,288.22) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 08/08/2007 | 09/01/2007 | $250,112.21 | PAYMENT | | AP | 00321 | $3,777.29 | $1,493.13 | $995.94 | $1,288.22 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 08/01/2007 | 08/01/2007 | $251,605.34 | PAYMENT | | AP | 00099 | $3,777.29 | $1,487.25 | $1,001.82 | $1,288.22 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 07/25/2007 | 07/01/2007 | $253,092.59 | Escrow Disb-Tax City | | E91 | 32687 | ($3,554.54) | $0.00 | $0.00 | ($3,554.54) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 07/02/2007 | 07/01/2007 | $253,092.59 | PAYMENT | | AP | 00099 | $3,777.29 | $1,481.38 | $1,007.69 | $1,288.22 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 06/01/2007 | 06/01/2007 | $254,573.97 | PAYMENT | | AP | 00099 | $3,777.29 | $1,475.54 | $1,013.53 | $1,288.22 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 05/01/2007 | 05/01/2007 | $256,049.51 | PAYMENT | | AP | 00099 | $3,777.29 | $1,469.72 | $1,019.35 | $1,288.22 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/24/2007 | 04/01/2007 | $257,519.23 | Escrow Disb-Fire | | E20 | 32022 | ($1,153.00) | $0.00 | $0.00 | ($1,153.00) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/05/2007 | 04/01/2007 | $257,519.23 | Escrow Disb-Tax City | | E91 | 32687 | ($3,303.71) | $0.00 | $0.00 | ($3,303.71) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/02/2007 | 04/01/2007 | $257,519.23 | PAYMENT | | AP | 00099 | $3,777.29 | $1,463.93 | $1,025.14 | $1,288.22 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 03/01/2007 | 03/01/2007 | $258,983.16 | PAYMENT | | AP | 00099 | $3,777.29 | $1,458.16 | $1,030.91 | $1,288.22 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 02/01/2007 | 02/01/2007 | $260,441.32 | PAYMENT | | AP | 00099 | $3,777.29 | $1,452.41 | $1,036.66 | $1,288.22 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 01/18/2007 | 01/01/2007 | $261,893.73 | Escrow Disb-Tax City | | E91 | 32687 | ($3,303.71) | $0.00 | $0.00 | ($3,303.71) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 01/01/2007 | 01/01/2007 | $261,893.73 | PAYMENT | | AP | 00099 | $3,681.78 | $1,446.68 | $1,042.39 | $1,192.71 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 12/01/2006 | 12/01/2006 | $263,340.41 | PAYMENT | | AP | 00099 | $3,681.78 | $1,440.98 | $1,048.09 | $1,192.71 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 11/01/2006 | 11/01/2006 | $264,781.39 | PAYMENT | | AP | 00099 | $3,681.78 | $1,435.30 | $1,053.77 | $1,192.71 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 10/03/2006 | 10/01/2006 | $266,216.69 | Escrow Disb-Tax City | | E91 | 32687 | ($3,480.65) | $0.00 | $0.00 | ($3,480.65) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 10/02/2006 | 10/01/2006 | $266,216.69 | PAYMENT | | AP | 00099 | $3,681.78 | $1,429.64 | $1,059.43 | $1,192.71 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 09/01/2006 | 09/01/2006 | $267,646.33 | PAYMENT | | AP | 00099 | $3,681.78 | $1,424.00 | $1,065.07 | $1,192.71 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 08/01/2006 | 08/01/2006 | $269,070.33 | PAYMENT | | AP | 00099 | $3,681.78 | $1,418.39 | $1,070.68 | $1,192.71 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 07/27/2006 | 07/01/2006 | $270,488.72 | Escrow Disb-Tax City | | E91 | 32687 | ($3,480.66) | $0.00 | $0.00 | ($3,480.66) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 07/03/2006 | 07/01/2006 | $270,488.72 | PAYMENT | | AP | 00099 | $3,681.78 | $1,412.79 | $1,076.28 | $1,192.71 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 06/01/2006 | 06/01/2006 | $271,901.51 | PAYMENT | | AP | 00099 | $3,681.78 | $1,407.22 | $1,081.85 | $1,192.71 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 05/01/2006 | 05/01/2006 | $273,308.73 | PAYMENT | | AP | 00099 | $3,681.78 | $1,401.67 | $1,087.40 | $1,192.71 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/25/2006 | 04/01/2006 | $274,710.40 | Escrow Disb-Fire | | E20 | 32022 | ($1,040.00) | $0.00 | $0.00 | ($1,040.00) | $0.00 | $0.00 | $0.00 | $0.00 |

# Loan History

Date Data as-of:  March 5, 2014

| Account Number | Trans Added Date | Date Interest Paid Current | Prin Bal after trans | Transaction Description | Transaction Reason Code | Trans Type | Teller ID | Trans Amount | To Principal | To Interest Amt | To Escrow Amt | To Fee Amt | To Unapplied Funds Amt | To Credit Insurance Amt | To Late Charge Amt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06/2006 | 04/01/2006 | $274,710.40 | Escrow Disb-Tax City | | E91 | 32687 | ($3,126.76) | $0.00 | $0.00 | ($3,126.76) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/03/2006 | 04/01/2006 | $274,710.40 | PAYMENT | | AP | 00099 | $3,681.78 | $1,396.15 | $1,092.92 | $1,192.71 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 03/01/2006 | 03/01/2006 | $276,106.55 | PAYMENT | | AP | 00099 | $3,681.78 | $1,390.64 | $1,098.43 | $1,192.71 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 02/01/2006 | 02/01/2006 | $277,497.19 | PAYMENT | | AP | 00099 | $3,681.78 | $1,385.16 | $1,103.91 | $1,192.71 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 01/17/2006 | 01/01/2006 | $278,882.35 | Escrow Disb-Tax City | | E91 | 32687 | ($3,126.76) | $0.00 | $0.00 | ($3,126.76) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 01/02/2006 | 01/01/2006 | $278,882.35 | PAYMENT | | AP | 00099 | $3,553.08 | $1,379.70 | $1,109.37 | $1,064.01 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 12/01/2005 | 12/01/2005 | $280,262.05 | PAYMENT | | AP | 00099 | $3,553.08 | $1,374.26 | $1,114.81 | $1,064.01 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 11/01/2005 | 11/01/2005 | $281,636.31 | PAYMENT | | AP | 00099 | $3,553.08 | $1,368.84 | $1,120.23 | $1,064.01 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 10/17/2005 | 10/01/2005 | $283,005.15 | Escrow Disb-Tax City | | E91 | 32687 | ($3,269.68) | $0.00 | $0.00 | ($3,269.68) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 10/03/2005 | 10/01/2005 | $283,005.15 | PAYMENT | | AP | 00099 | $3,553.08 | $1,363.44 | $1,125.63 | $1,064.01 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 09/01/2005 | 09/01/2005 | $284,368.59 | PAYMENT | | AP | 00099 | $3,553.08 | $1,358.07 | $1,131.00 | $1,064.01 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 08/01/2005 | 08/01/2005 | $285,726.66 | PAYMENT | | AP | 00099 | $3,553.08 | $1,352.71 | $1,136.36 | $1,064.01 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 07/22/2005 | 07/01/2005 | $287,079.37 | Escrow Disb-Tax City | | E91 | 32687 | ($3,269.68) | $0.00 | $0.00 | ($3,269.68) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 07/01/2005 | 07/01/2005 | $287,079.37 | PAYMENT | | AP | 00099 | $3,553.08 | $1,347.38 | $1,141.69 | $1,064.01 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 06/01/2005 | 06/01/2005 | $288,426.75 | PAYMENT | | AP | 00099 | $3,553.08 | $1,342.07 | $1,147.00 | $1,064.01 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 05/02/2005 | 05/01/2005 | $289,768.82 | PAYMENT | | AP | 00099 | $3,553.08 | $1,336.78 | $1,152.29 | $1,064.01 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/26/2005 | 04/01/2005 | $291,105.60 | Escrow Disb-Fire | | E20 | 32022 | ($861.00) | $0.00 | $0.00 | ($861.00) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/05/2005 | 04/01/2005 | $291,105.60 | Escrow Disb-Tax City | | E91 | 32687 | ($2,983.83) | $0.00 | $0.00 | ($2,983.83) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/01/2005 | 04/01/2005 | $291,105.60 | PAYMENT | | AP | 00099 | $3,553.08 | $1,331.51 | $1,157.56 | $1,064.01 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 03/01/2005 | 03/01/2005 | $292,437.11 | PAYMENT | | AP | 00099 | $3,553.08 | $1,326.26 | $1,162.81 | $1,064.01 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 02/01/2005 | 02/01/2005 | $293,763.37 | PAYMENT | | AP | 00099 | $3,553.08 | $1,321.03 | $1,168.04 | $1,064.01 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 01/28/2005 | 01/01/2005 | $295,084.40 | PAYMENT | | SRA | 00405 | $828.89 | $0.00 | $0.00 | $828.89 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 01/06/2005 | 01/01/2005 | $295,084.40 | Escrow Disb-Tax City | | E91 | 32687 | ($2,983.84) | $0.00 | $0.00 | ($2,983.84) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 01/03/2005 | 01/01/2005 | $295,084.40 | PAYMENT | | AP | 00099 | $3,583.79 | $1,315.82 | $1,173.25 | $1,094.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 12/01/2004 | 12/01/2004 | $296,400.22 | PAYMENT | | AP | 00099 | $3,583.79 | $1,310.63 | $1,178.44 | $1,094.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 11/30/2004 | 11/01/2004 | $297,710.85 | PAYMENT | | SR | 01661 | $124.45 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $124.45 |
| | 11/30/2004 | 11/01/2004 | $0.00 | Unapplied | | UI | 01661 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $124.45 |
| | 11/01/2004 | 11/01/2004 | $297,710.85 | PAYMENT | | AP | 00099 | $3,583.79 | $1,305.46 | $1,183.61 | $1,094.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 10/25/2004 | 10/01/2004 | $0.00 | FEE | 099 | FB | 00802 | $16.00 | $0.00 | $0.00 | $0.00 | $16.00 | $0.00 | $0.00 | $0.00 |
| | 10/25/2004 | 10/01/2004 | $0.00 | FEE | 099 | FEA | 00802 | $16.00 | $0.00 | $0.00 | $0.00 | $16.00 | $0.00 | $0.00 | $0.00 |
| | 10/25/2004 | 10/01/2004 | $299,016.31 | PAYMENT | | AP | 00802 | $3,583.79 | $1,300.32 | $1,188.75 | $1,094.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 10/25/2004 | 10/01/2004 | $0.00 | Unapplied | | UI | 00802 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($124.45) |

# Loan History

Date Data as-of:  March 5, 2014

| Account Number | Trans Added Date | Date Interest Paid Current | Prin Bal after trans | Transaction Description | Transaction Reason Code | Trans Type | Teller ID | Trans Amount | To Principal | To Interest Amt | To Escrow Amt | To Fee Amt | To Unapplied Funds Amt | To Credit Insurance Amt | To Late Charge Amt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 10/15/2004 | 09/01/2004 | $300,316.63 | PAYMENT | | PR1 | 20001 | ($3,583.79) | ($1,300.32) | ($1,188.75) | ($1,094.72) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 10/13/2004 | 10/01/2004 | $299,016.31 | Escrow Disb-Tax City | | E91 | 32687 | ($3,492.78) | $0.00 | $0.00 | ($3,492.78) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 10/01/2004 | 10/01/2004 | $299,016.31 | PAYMENT | | AP | 00099 | $3,583.79 | $1,300.32 | $1,188.75 | $1,094.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 09/01/2004 | 09/01/2004 | $300,316.63 | PAYMENT | | AP | 00099 | $3,583.79 | $1,295.19 | $1,193.88 | $1,094.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 08/02/2004 | 08/01/2004 | $301,611.82 | PAYMENT | | AP | 00099 | $3,583.79 | $1,290.08 | $1,198.99 | $1,094.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 07/28/2004 | 07/01/2004 | $302,901.90 | Escrow Disb-Tax City | | E91 | 32074 | ($3,019.82) | $0.00 | $0.00 | ($3,019.82) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 05/28/2004 | 07/01/2004 | $302,901.90 | PAYMENT | | AP | 00001 | $3,583.79 | $1,285.00 | $1,204.07 | $1,094.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 05/06/2004 | 05/01/2004 | $305,900.46 | PAYMENT | | AP | 00001 | $3,583.79 | $1,273.17 | $1,215.90 | $1,094.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 05/06/2004 | 06/01/2004 | $304,186.90 | Curtailment | | CWA | 00001 | $435.35 | $435.35 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 05/06/2004 | 06/01/2004 | $304,622.25 | PAYMENT | | AP | 00001 | $3,583.79 | $1,278.21 | $1,210.86 | $1,094.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/30/2004 | 03/01/2004 | $308,441.78 | PAYMENT | | AP | 00802 | $3,583.79 | $1,263.15 | $1,225.92 | $1,094.72 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/30/2004 | 03/01/2004 | $0.00 | Unapplied | | UI | 00802 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($124.45) |
| | 04/30/2004 | 04/01/2004 | $307,173.63 | PAYMENT | | AP | 00802 | $435.35 | $1,268.15 | $1,220.92 | $1,094.72 | $0.00 | ($3,397.34) | $0.00 | $248.90 |
| | 04/30/2004 | 04/01/2004 | $0.00 | PREPAY PENALTY | 099 | FWC | 00802 | $16.00 | $0.00 | $0.00 | $0.00 | $16.00 | $0.00 | $0.00 | $0.00 |
| | 04/30/2004 | 04/01/2004 | $0.00 | Unapplied | | UFU | 00802 | ($3,397.34) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/30/2004 | 04/01/2004 | $0.00 | Unapplied | | UI | 00802 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $124.45 |
| | 04/26/2004 | 02/01/2004 | $309,704.93 | Escrow Disb-Fire | | E20 | 32022 | ($768.00) | $0.00 | $0.00 | ($768.00) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 04/09/2004 | 02/01/2004 | $309,704.93 | Escrow Disb-Tax City | | E91 | 32074 | ($2,743.76) | $0.00 | $0.00 | ($2,743.76) | $0.00 | $0.00 | $0.00 | $0.00 |
| | 02/05/2004 | 02/01/2004 | $309,704.93 | PAYMENT | | SRA | 00001 | $3,397.34 | $0.00 | $0.00 | $0.00 | $0.00 | $3,397.34 | $0.00 | $0.00 |
| | 02/05/2004 | 02/01/2004 | $0.00 | Unapplied | | UFU | 00001 | $3,397.34 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Comments:

| Transactions Account Number | Area ID | Trans Added Date | Trans Type | Transaction Message | Trans User Name |
|---|---|---|---|---|---|
| | | 12/20/2013 | LIT | added litigation codes per Legal Manager | ALEXANDRA FECHT |
| | | 03/18/2013 | CBR | SERVICE RELEASE: EFFECTIVE DATE =02/01/13 | SYSTEM ID |
| | | 02/14/2013 | CBR | CURRENT:  < 30 DAYS | SYSTEM ID |
| | | 01/16/2013 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| | | 01/10/2013 | CBR | CURRENT:  < 30 DAYS | SYSTEM ID |
| | | 01/07/2013 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| | | 12/18/2012 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| | | 12/14/2012 | CBR | CURRENT:  < 30 DAYS | SYSTEM ID |
| | | 12/05/2012 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |

# Loan History

| Transactions Account Number | Area ID | Trans Added Date | Trans Type | Transaction Message | Trans User Name |
|---|---|---|---|---|---|
| ██████ | | 11/27/2012 | DM | BREACH HOLD REMOVED MANUALLY | JAYSON DELEON |
| ██████ | | 11/16/2012 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ██████ | CSH | 11/15/2012 | NT | "Late Charges Bypassed November 2012, December | API CSRV |
| ██████ | CSH | 11/15/2012 | NT | 2012, and January 2013 due to Hurricane Sandy " | API CSRV |
| ██████ | | 11/09/2012 | CBR | CURRENT:   < 30 DAYS | SYSTEM ID |
| ██████ | | 11/06/2012 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ██████ | DIS | 11/01/2012 | NT | FEMA declaration due to Hurricane Sandy. | API CSRV |
| ██████ | DIS | 11/01/2012 | NT | Individual assistance declared on 10/30/12. | API CSRV |
| ██████ | | 11/01/2012 | DM | BREACH HOLD PLACED-EXPIRATION DATE 01/28/13 | API CSRV |
| ██████ | | 10/16/2012 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ██████ | | 10/05/2012 | DM | EARLY IND: SCORE 067 MODEL EI16C | SYSTEM ID |
| ██████ | | 09/18/2012 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ██████ | | 09/05/2012 | DM | EARLY IND: SCORE 067 MODEL EI16C | SYSTEM ID |
| ██████ | | 08/16/2012 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ██████ | | 08/07/2012 | DM | EARLY IND: SCORE 067 MODEL EI16C | SYSTEM ID |
| ██████ | | 07/17/2012 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ██████ | | 07/05/2012 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ██████ | | 06/18/2012 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ██████ | | 06/12/2012 | DM | BREACH HOLD PLACED-EXPIRATION DATE 06/30/12 | LORI HILMER |
| ██████ | | 06/05/2012 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ██████ | | 05/16/2012 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ██████ | | 05/07/2012 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ██████ | | 04/17/2012 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ██████ | | 04/05/2012 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ██████ | | 03/16/2012 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ██████ | | 03/06/2012 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ██████ | | 02/16/2012 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ██████ | | 02/07/2012 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ██████ | | 01/17/2012 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ██████ | | 01/05/2012 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ██████ | | 12/16/2011 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ██████ | DIS | 12/13/2011 | NT | FEMA moratorium has expired. | DAVID NISSEN |
| ██████ | DIS | 12/13/2011 | NT | Disaster coding being removed. | DAVID NISSEN |
| ██████ | | 12/06/2011 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ██████ | | 11/16/2011 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |

**Loan History**

Date Data as-of:  March 5, 2014

| Transactions Account Number | Area ID | Trans Added Date | Trans Type | Transaction Message | Trans User Name |
|---|---|---|---|---|---|
| ■■■■ | | 11/07/2011 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ■■■■ | | 10/18/2011 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■■■■ | | 10/17/2011 | DMD | 00/00/00 00:00:00 | DAVOX INCOMING FILE |
| ■■■■ | | 10/17/2011 | DMD | 00/00/00 00:00:00 | DAVOX INCOMING FILE |
| ■■■■ | | 10/17/2011 | DMD | 10/15/11 12:35:04 AUTOVOICE | DAVOX INCOMING FILE |
| ■■■■ | | 10/05/2011 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ■■■■ | | 09/16/2011 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■■■■ | DIS | 09/08/2011 | NT | FEMA declaration due to Hurricane Irene. | API CSRV |
| ■■■■ | DIS | 09/08/2011 | NT | Individual assistance declared on 8/31/11. | API CSRV |
| ■■■■ | | 09/08/2011 | DM | BREACH HOLD PLACED-EXPIRATION DATE 11/29/11 | API CSRV |
| ■■■■ | | 09/06/2011 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ■■■■ | | 08/16/2011 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■■■■ | | 08/05/2011 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ■■■■ | | 07/18/2011 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■■■■ | | 07/05/2011 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ■■■■ | | 06/16/2011 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■■■■ | | 06/07/2011 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ■■■■ | | 05/17/2011 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■■■■ | | 05/05/2011 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ■■■■ | | 04/18/2011 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■■■■ | | 04/05/2011 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ■■■■ | | 03/16/2011 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■■■■ | | 03/07/2011 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ■■■■ | | 02/16/2011 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■■■■ | | 02/07/2011 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ■■■■ | | 01/18/2011 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■■■■ | | 01/05/2011 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ■■■■ | | 12/16/2010 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■■■■ | | 12/07/2010 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ■■■■ | | 11/16/2010 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■■■■ | | 11/05/2010 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ■■■■ | | 10/18/2010 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■■■■ | | 10/06/2010 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ■■■■ | | 09/16/2010 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■■■■ | | 09/07/2010 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |

# Loan History

Date Data as-of:  March 5, 2014

| Transactions Account Number | Area ID | Trans Added Date | Trans Type | Transaction Message | Trans User Name |
|---|---|---|---|---|---|
| ▮ | | 08/17/2010 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 08/05/2010 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ▮ | | 07/20/2010 | D28 | FORCED BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 06/21/2010 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 06/16/2010 | DMD | 00/00/00 00:00:00 | DAVOX INCOMING FILE |
| ▮ | | 06/16/2010 | DMD | 00/00/00 00:00:00 | DAVOX INCOMING FILE |
| ▮ | | 06/16/2010 | DMD | 06/15/10 17:09:06 ANSWERING MACHINE | DAVOX INCOMING FILE |
| ▮ | | 06/15/2010 | DMD | 00/00/00 00:00:00 | DAVOX INCOMING FILE |
| ▮ | | 06/15/2010 | DMD | 00/00/00 00:00:00 | DAVOX INCOMING FILE |
| ▮ | | 06/15/2010 | DMD | 06/15/10 17:09:06 ANSWERING MACHINE | DAVOX INCOMING FILE |
| ▮ | | 06/07/2010 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ▮ | | 05/19/2010 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 05/14/2010 | CBR | AFFECTED BY NATURAL DISASTER | SYSTEM ID |
| ▮ | | 05/05/2010 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ▮ | | 05/05/2010 | DMD | 00/00/00 00:00:00 | DAVOX INCOMING FILE |
| ▮ | | 05/05/2010 | DMD | 00/00/00 00:00:00 | DAVOX INCOMING FILE |
| ▮ | | 05/05/2010 | DMD | 04/14/10 14:40:42 Answering Machine | DAVOX INCOMING FILE |
| ▮ | | 04/20/2010 | D28 | FORCED BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 04/15/2010 | DMD | 00/00/00 00:00:00 | DAVOX INCOMING FILE |
| ▮ | | 04/15/2010 | DMD | 00/00/00 00:00:00 | DAVOX INCOMING FILE |
| ▮ | | 04/15/2010 | DMD | 04/14/10 14:40:42 ANSWERING MACHINE | DAVOX INCOMING FILE |
| ▮ | | 04/14/2010 | DMD | 00/00/00 00:00:00 | DAVOX INCOMING FILE |
| ▮ | | 04/14/2010 | DMD | 00/00/00 00:00:00 | DAVOX INCOMING FILE |
| ▮ | | 04/14/2010 | DMD | 04/14/10 14:40:42 ANSWERING MACHINE | DAVOX INCOMING FILE |
| ▮ | DIS | 04/07/2010 | NT | FEMA declaration due to severe storms & | TEMP USER 2 |
| ▮ | DIS | 04/07/2010 | NT | flooding, individual assistance, 4/2/10 | TEMP USER 2 |
| ▮ | | 04/07/2010 | DM | BREACH HOLD PLACED-EXPIRATION DATE 07/01/10 | TEMP USER 2 |
| ▮ | | 04/06/2010 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ▮ | | 03/15/2010 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 03/05/2010 | DM | EARLY IND: SCORE 099 MODEL EI16C | SYSTEM ID |
| ▮ | | 02/02/2010 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 01/04/2010 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 12/02/2009 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 11/03/2009 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 10/06/2009 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |

# Loan History

Date Data as-of:  March 5, 2014

| Transactions Account Number | Area ID | Trans Added Date | Trans Type | Transaction Message | Trans User Name |
|---|---|---|---|---|---|
| ■ | | 09/18/2009 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 09/07/2009 | DM | EARLY IND: SCORE 097 MODEL EI16C | SYSTEM ID |
| ■ | | 08/07/2009 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 08/05/2009 | DM | EARLY IND: SCORE 068 MODEL EI16C | SYSTEM ID |
| ■ | | 07/07/2009 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 06/09/2009 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 06/05/2009 | DM | EARLY IND: SCORE 068 MODEL EI16C | SYSTEM ID |
| ■ | | 05/12/2009 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 05/05/2009 | DM | EARLY IND: SCORE 068 MODEL EI16C | SYSTEM ID |
| ■ | | 04/10/2009 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 04/07/2009 | DM | EARLY IND: SCORE 097 MODEL EI16C | SYSTEM ID |
| ■ | | 03/03/2009 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 02/09/2009 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 02/05/2009 | DM | EARLY IND: SCORE 068 MODEL EI16C | SYSTEM ID |
| ■ | | 01/02/2009 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 12/10/2008 | ARC | AUTO RESET NSF COUNTER = 0 | SYSTEM ID |
| ■ | | 12/02/2008 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 11/04/2008 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 10/02/2008 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 09/02/2008 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 08/08/2008 | ARC | AUTO RESET NSF COUNTER = 0 | SYSTEM ID |
| ■ | | 08/04/2008 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 07/02/2008 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 06/03/2008 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 05/02/2008 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 04/02/2008 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 03/04/2008 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 03/03/2008 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ■ | | 02/05/2008 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 02/04/2008 | NT | PBP VRU12  CONF # 2008020445272904  AMT $3809.79 | API VRU |
| ■ | | 01/30/2008 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ■ | INQ20 | 01/25/2008 | CIT | 001 DONE 01/25/08 BY TLR 01340 | MARCHELL HARMON |
| ■ | INQ20 | 01/25/2008 | CIT | TSK TYP 189-ON-LINE LETTERS | MARCHELL HARMON |
| ■ | INQ20 | 01/25/2008 | CIT | 001 closing cit 189 ltr snt thnks mh 4110 | MARCHELL HARMON |
| ■ | | 01/25/2008 | OL | WDOYCSH - MNTH/BWK/BIMNTH CANCEL | MARCHELL HARMON |

# Loan History

Date Data as-of:  March 5, 2014

| Transactions Account Number | Area ID | Trans Added Date | Trans Type | Transaction Message | Trans User Name |
|---|---|---|---|---|---|
| ▮▮▮▮ | CSH | 01/22/2008 | NT | b2 ci asked for ach be cancelled. almab/73754 | ALMA BOTOR |
| ▮▮▮▮ | INQ95 | 01/22/2008 | CIT | 001 Open CIT 189 to request letter 7:08 | ALMA BOTOR |
| ▮▮▮▮ | | 01/08/2008 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮▮▮▮ | | 01/07/2008 | ARC | AUTO RESET STOP CODE 2 = 4 | SYSTEM ID |
| ▮▮▮▮ | | 01/07/2008 | DM | EARLY IND: SCORE 097 MODEL EI16C | SYSTEM ID |
| ▮▮▮▮ | | 01/03/2008 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ▮▮▮▮ | STOP | 12/18/2007 | NT | stop code 2-4 added. b1 skip an ach draft in 1/08, | JERDAIN SENIOR |
| ▮▮▮▮ | STOP | 12/18/2007 | NT | will send pymt in by check. kims4028 | JERDAIN SENIOR |
| ▮▮▮▮ | | 12/12/2007 | D19 | CSH - NSF/REVERSAL LETTER (10010) | SYSTEM ID |
| ▮▮▮▮ | | 12/11/2007 | NT | CHECK DATED 12/07/07 FOR 3777.29 | HEBER SIERRA |
| ▮▮▮▮ | | 12/11/2007 | NT | RETURNED-NSF | HEBER SIERRA |
| ▮▮▮▮ | | 12/11/2007 | ET | 10010 NON-SUFFICIENT FUNDS -NSF    12/11 | HEBER SIERRA |
| ▮▮▮▮ | | 12/04/2007 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮▮▮▮ | | 12/03/2007 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ▮▮▮▮ | | 11/02/2007 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ▮▮▮▮ | | 11/02/2007 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮▮▮▮ | | 10/15/2007 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ▮▮▮▮ | | 10/02/2007 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮▮▮▮ | | 09/11/2007 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ▮▮▮▮ | | 09/04/2007 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮▮▮▮ | | 08/10/2007 | D19 | CSH - NSF/REVERSAL LETTER (10010) | SYSTEM ID |
| ▮▮▮▮ | | 08/09/2007 | NT | CHECK DATED 08/07/07 FOR 3777.29 | HEBER SIERRA |
| ▮▮▮▮ | | 08/09/2007 | NT | RETURNED-NSF | HEBER SIERRA |
| ▮▮▮▮ | | 08/09/2007 | ET | 10010 NON-SUFFICIENT FUNDS -NSF    08/09 | HEBER SIERRA |
| ▮▮▮▮ | | 08/02/2007 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ▮▮▮▮ | | 08/02/2007 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮▮▮▮ | CSH | 08/01/2007 | NT | b2 adv ach may not drft this mo adv he can pbpadv | SCRIPT TERA BROWN |
| ▮▮▮▮ | CSH | 08/01/2007 | NT | of fees or mail pmt w/cpn.  faithh/4090 | SCRIPT TERA BROWN |
| ▮▮▮▮ | | 07/11/2007 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ▮▮▮▮ | | 07/03/2007 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮▮▮▮ | | 06/12/2007 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ▮▮▮▮ | | 06/04/2007 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮▮▮▮ | | 05/04/2007 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ▮▮▮▮ | | 05/02/2007 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮▮▮▮ | | 04/03/2007 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |

**Loan History**

Date Data as-of:  March 5, 2014

| Transactions Account Number | Area ID | Trans Added Date | Trans Type | Transaction Message | Trans User Name |
|---|---|---|---|---|---|
| ■ | | 04/02/2007 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ■ | | 03/13/2007 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ■ | | 03/02/2007 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 02/02/2007 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 01/31/2007 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ■ | | 01/02/2007 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 12/29/2006 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ■ | | 12/04/2006 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 11/30/2006 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ■ | | 11/06/2006 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ■ | | 11/02/2006 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 10/09/2006 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ■ | | 10/03/2006 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 09/04/2006 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 08/03/2006 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ■ | | 08/02/2006 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 07/21/2006 | ARC | AUTO RESET NSF COUNTER = 0 | SYSTEM ID |
| ■ | | 07/04/2006 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 07/03/2006 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ■ | | 06/02/2006 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 05/31/2006 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ■ | | 05/02/2006 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 04/28/2006 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ■ | | 04/04/2006 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ■ | | 04/04/2006 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 03/08/2006 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ■ | | 03/02/2006 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 02/02/2006 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 01/31/2006 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ■ | | 01/05/2006 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ■ | | 01/03/2006 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 12/06/2005 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ■ | | 12/02/2005 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ■ | | 11/03/2005 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ■ | | 11/02/2005 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |

# Loan History

Date Data as-of:  March 5, 2014

| Transactions Account Number | Area ID | Trans Added Date | Trans Type | Transaction Message | Trans User Name |
|---|---|---|---|---|---|
| ▮ | | 10/04/2005 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 10/03/2005 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ▮ | | 09/02/2005 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ▮ | | 09/02/2005 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 08/02/2005 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 08/01/2005 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ▮ | | 07/05/2005 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ▮ | | 07/04/2005 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 06/02/2005 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 05/06/2005 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ▮ | | 05/03/2005 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 04/04/2005 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 03/02/2005 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 02/02/2005 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 01/04/2005 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 12/30/2004 | DM | RISK PROFILER SCORE 001 | SYSTEM ID |
| ▮ | | 12/02/2004 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 11/02/2004 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | CSH | 10/25/2004 | NT | PBP FOR 10/4-103430999-JOANNE B-4134 | JOANNE BERNARD |
| ▮ | | 10/18/2004 | D19 | CSH - NSF/REVERSAL LETTER (10010) | SYSTEM ID |
| ▮ | | 10/15/2004 | NT | CHECK NUMBER APP 10 CHECK DATED 10/01/04 FOR | ZOILA ESCALANTE |
| ▮ | | 10/15/2004 | NT | 3583.79     RETURNED-NSF | ZOILA ESCALANTE |
| ▮ | | 10/15/2004 | ET | 10010 NON-SUFFICIENT FUNDS -NSF     10/15 | ZOILA ESCALANTE |
| ▮ | | 10/04/2004 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 09/02/2004 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 08/30/2004 | DM | RISK PROFILER SCORE 001 | SYSTEM ID |
| ▮ | | 08/03/2004 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 07/02/2004 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 06/02/2004 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 05/24/2004 | OL | WDOYCSH - NEW ACH LETTER | API VRU |
| ▮ | | 05/14/2004 | CBR | PREVIOUSLY REPORTED DELINQUENT:NOW CURRENT | SYSTEM ID |
| ▮ | | 05/07/2004 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ▮ | | 05/05/2004 | DM | EARLY IND: SCORE 020 MODEL EI16C | SYSTEM ID |
| ▮ | | 05/03/2004 | DM | COMMENT...AMENDED MARCH CREDIT. | JESSICA BULLERMAN |
| ▮ | | 05/03/2004 | DM | ACTION/RESULT CD CHANGED FROM OAAI TO OAAI | JESSICA BULLERMAN |

# Loan History

| Transactions Account Number | Area ID | Trans Added Date | Trans Type | Transaction Message | Trans User Name |
|---|---|---|---|---|---|
| ███████ | | 04/30/2004 | DM | PROMISE KEPT 04/30/04 PROMISE DT 04/30/04 | SYSTEM ID |
| ███████ | | 04/30/2004 | DM | PROMISE KEPT 04/30/04 PROMISE DT 04/30/04 | SYSTEM ID |
| ███████ | | 04/30/2004 | DM | AUTOMATED INTEREST ACCRUAL HOLD INACTIVE | SYSTEM ID |
| ███████ | | 04/30/2004 | DM | FOR MARCH SINCE CONFUSION ABOUT PMT INCREASE. | JESSICA BULLERMAN |
| ███████ | | 04/30/2004 | DM | DID PBP FOR 4019.14 W/FEE CONF 103008243.VER ALL | JESSICA BULLERMAN |
| ███████ | | 04/30/2004 | DM | ACTION/RESULT CD CHANGED FROM BTPP TO OAAI | JESSICA BULLERMAN |
| ███████ | | 04/30/2004 | DM | CLD TT MR ABOUT PMTS.MR SAID THAT HE RECVD HIS CK | JESSICA BULLERMAN |
| ███████ | | 04/30/2004 | DM | BCK THAT HE SNT IN.ADV MR B/C AMTS WERE DIFF.ADV | JESSICA BULLERMAN |
| ███████ | | 04/30/2004 | DM | MR 4019.14 WILL BRING LOAN CURRENT TODAY.ADV OF | JESSICA BULLERMAN |
| ███████ | | 04/30/2004 | DM | FUNDS IN UNAPPLIED B/C SNT SHORT PMT WHEN PMTS | JESSICA BULLERMAN |
| ███████ | | 04/30/2004 | DM | INCREASED.MR ?ED IF WNT AGAINST CREDIT.ADV MR | JESSICA BULLERMAN |
| ███████ | | 04/30/2004 | DM | YES.ADV IF WILL DO PBP TODAY WILL AMEND CREDIT | JESSICA BULLERMAN |
| ███████ | | 04/30/2004 | DM | DFLT REASON 1 CHANGED TO: PAYMENT ADJUSTMENT | JESSICA BULLERMAN |
| ███████ | | 04/30/2004 | DM | ACTION/RESULT CD CHANGED FROM     TO BTPP | JESSICA BULLERMAN |
| ███████ | | 04/29/2004 | DM | AUTOMATED INTEREST ACCRUAL HOLD ACTIVE | SYSTEM ID |
| ███████ | | 04/27/2004 | DM | RISK PROFILER SCORE 000 | SYSTEM ID |
| ███████ | | 04/21/2004 | D19 | DEF - OPTIONS TO AVOID FORECLOSURE | SYSTEM ID |
| ███████ | | 04/20/2004 | D28 | FORCED BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ███████ | | 04/20/2004 | D19 | BREACH EDWARD TOBIAS  07003311000016060394 | SYSTEM ID |
| ███████ | | 04/20/2004 | D19 | BREACH SUZANNE KOEGLER07003311000016060393 | SYSTEM ID |
| ███████ | | 04/20/2004 | D19 | BREACH EDWARD TOBIAS  07003311000016060392 | SYSTEM ID |
| ███████ | | 04/20/2004 | D19 | BREACH SUZANNE KOEGLER07003311000016060391 | SYSTEM ID |
| ███████ | | 04/16/2004 | CBR | DELINQUENT:  30  DAYS | SYSTEM ID |
| ███████ | | 04/02/2004 | DM | EARLY IND: SCORE 399 MODEL EI30C | SYSTEM ID |
| ███████ | | 04/01/2004 | OL | WDOYCSH - RETURNING CHECK TO CUSTOMER | TAMMY HASTINGS |
| ███████ | CSH | 04/01/2004 | NT | RETURNING PCK #3440 FOR $3,904.69.  BOX AMT IS | TAMMY HASTINGS |
| ███████ | CSH | 04/01/2004 | NT | 3,894.69 BUT WRITTEN IS FOR MORE--$3,904.69. | TAMMY HASTINGS |
| ███████ | | 03/19/2004 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ███████ | | 03/05/2004 | DM | EARLY IND: SCORE 097 MODEL EI16C | SYSTEM ID |
| ███████ | | 02/04/2004 | D28 | BILLING STATEMENT FROM REPORT R628 | SYSTEM ID |
| ███████ | | 02/01/2004 | NT | ----- CONVERTED  HISTORY  ENDS  02/01/04 ------ | |