## Exhibit 1-B

**Proof of Claim No. 3759**

Claim #3759  Date Filed: 11/8/2012

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Name of Debtor and Case Number: **GMAC Mortgage, LLC, Case No. 12-12032**

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):

**Frank Reed**

Name and address where notices should be sent:

**Frank Reed**
**817 Matlack Drive**
**Moorestown, NJ 08057**

Telephone number: 856.956.6950          email: FrankReedVA@aol.com

Name and address where payment should be sent (if different from above):

Telephone number:                    email:

☐ Check this box if this claim amends a previously filed claim.

**Court Claim Number:** _____
(*If known*)

Filed on: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:** $ 2,953,000⁰⁰

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** Negligence — Unjust Enrichment — Constructive Trust
(See instruction #2)

| **3. Last four digits of any number by which creditor identifies debtor:** 7464 | **3a. Debtor may have scheduled account as:** (See instruction #3a) | **3b. Uniform Claim Identifier (optional):** (See instruction #3b) |
|---|---|---|

**4. Secured Claim** (See instruction #4)

Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ■ Real Estate  ☐ Motor Vehicle  ☐ Other

Describe:

**Value of Property:** $ 1,650,000 **Annual Interest Rate** _____ % ☐ Fixed ☐ Variable
(when case was filed)

**Amount of arrearage and other charges, as of the time case was filed, included in secured claim,**

if any: $ _____          **Basis for perfection:** constructive trust

**Amount of Secured Claim:** $ 1,650,000          **Amount Unsecured:** $ 1,303,000

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**

Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$ _____ (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are *redacted* copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and *redacted* copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**9. Signature:** (See instruction #9) Check the appropriate box.

■ I am the creditor.   ☐ I am the creditor's authorized agent.   ☐ I am the trustee, or the debtor, or   ☐ I am a guarantor, surety,
                         (Attach copy of power of attorney, if any.)   their authorized agent.   indorser, or other codebtor.
                                    (See Bankruptcy Rule 3004.)   (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: Frank Reed

Title: _____

Company: _____          (Signature)          (Date)   11/7/12

Address and telephone number (if different from notice address above): _____

Telephone number: _____

*Penalty for presenting fraudulent claim:* Fine of up to $

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$ _____

* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**RECEIVED**

NOV 0 8 2012

KURTZMAN CARSON CONSULTANTS

COURT USE ONLY

121203121110800000000020

Frank Reed
817 Matlack Drive
Moorestown, NJ 08057

*Pro Se Creditor*


**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12032 |
|  | ) |  |
| GMAC MORTGAGE, LLC | ) | Chapter 11 |
|  | ) |  |
| Debtor | ) | Jointly Administered |
|  | ) |  |

**CERTIFICATION OF CREDITOR IN SUPPORT OF ITS SECURED AND PRIORITY
CLAIMS LISTED IN CREDITOR'S PROOF OF CLAIM**

I, Frank Reed, being of full age, certify and state the following:

1. In 2008 GMAC Mortgage, ResCap, et al and / or their agents, (the Debtor),

   violated New Jersey State foreclosure law in a grossly negligent manner

   (represented by, but not limited to:  Exhibit A  - Order and Judicial Decision

   dismissing the Debtor's foreclosure for violation of state law).

2. The Debtor's gross negligence was the direct and proximate cause of the

   Debtor's unjust retention of a mortgage lien on the property commonly known

   as 817 Matlack Drive Moorestown, Burlington County, NJ 08057, (the

   Property), (represented by, but not limited to:  Exhibits B and C - indicating

that but for the Debtor's gross negligence, the Debtor would have been paid off, which would have resulted in the extinguishment of its mortgage lien).

3. The Debtor's actions were the direct and proximate cause of an additional approximately $2,953,000 in damages. (represented by, but not limited to: Exhibits D, E, F, G, H, I and J - complaint, amended complaint and various financial proofs).

4. The Debtor's actions were perpetrated against and to the detriment of myself, Frank Reed, (the Creditor).

5. Subsequently, as the owner and mortgagor of the property, the Creditor commenced civil action against the Debtor (ref: Exhibit D -  complaint).

6.  Pursuant to that litigation, the Creditor's claim was ruled to be valid under New Jersey Law, (see:  Exhibits K, L and E - Debtor's denied motion to dismiss for failure to state a proper claim and the Creditor's brief and the Creditor's Amended complaint approved by the Court with the Creditor's brief in support of its Amended Complaint).

7. Contemporaneous to the Creditor's litigation, the Debtor was subject to a joint investigation and enforcement action of and by the Federal Reserve and the Federal Deposit Insurance Corporation. (see: Exhibit  M - Interagencey Review of Foreclosure Policies and Practices)

8. As a result of these actions by the Federal Reserve and the Federal Deposit Insurance Corporation, the Debtor entered into a consent order (see: Exhibit N and O), in which it admitted to and agreed to, several relevant things:

a) that the Debtor conducted the illegal behavior which was the very subject of the Creditor's litigation with them,

b) that the Debtor's behavior can cause individuals such as the Creditor financial harm, and

c) that the Debtor agreed to make fully whole all those who have been financially harmed by their acts.

9. It is the Debtor's admissions and assumption of liability in conjunction with the facts, including the timing of the Debtor's grossly negligent acts, which perfect the Creditor's equitable secured interest vis-à-vis the constructive trust, as the Debtor's acts and admissions substantially predate the Debtor's bankruptcy petition by years and do not conflict with the equities of federal bankruptcy law, as represented by, but not limited to, *In re Howard's Appliance Corp.*, 874 F.2d 88, 93 (2d Cir. 1989).

10. Now, since real property has long been recognized as containing such unique attributes and characteristics rendering it beyond the realm of mere legal damage valuations, and it is clearly traceable and discrete, a constructive trust should be recognized, pursuant to bankruptcy and common law, as existing over both the mortgage instrument and the real property on which the mortgage instrument exists, again, the Property.

11. Recognizing this trust would appropriately declare the Creditor's position as a *secured* creditor, as the beneficiary of the constructive trust, properly estopping the Debtor from unjustly remaining as, and therefore being enriched by, its position as lien holder on the property.

12. To do otherwise would result in the Debtor being unjustly enriched at the Creditor's expense despite the Debtor's grossly negligent acts.

13. In addition to Debtor being stripped of their lien position vis-à-vis the imposition of the Constructive Trust, the financial damages claims sought by the Creditor should be placed in *priority* pursuant to, but not limited to the authority of the provisions of 11 U.S.C. §507 (a)(3), as the Debtor has agreed to pay them under the consent decree that they have entered into with the Federal Reserve and the Federal Deposit Insurance Company, *and* which were also found, res judicata, to be valid claims by the Court in the Creditor's private civil action.

I certify the foregoing statements made by me are true based upon my present information and belief and realize if any are willfully false I am subject to punishment.

Frank Reed

# EXHIBIT A

XCZ 102962/wb
ZUCKER, GOLDBERG & ACKERMAN, LLC
Attorneys for Plaintiff
200 Sheffield Street, Suite 301
P.O. Box 1024
Mountainside, New Jersey 07092-0024
1-908-233-8500

THIS RELIEF SET FORTH BELOW
IS ORDERED AND FILED

FEB 06 2009

MICHAEL J. HOGAN, P.J.Ch.

GMAC MORTGAGE, LLC

       Plaintiff,

      vs.

Frank J. Reed, III, et al.,

       Defendants.

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION
BURLINGTON COUNTY
GENERAL EQUITY PART
DOCKET NO. F-19177-08

Civil Action

ORDER GRANTING SUMMARY
JUDGMENT TO STRIKE
DEFENDANT'S ANSWER, TO ENTER
DEFAULT AND TRANSFER CASE TO
THE FORECLOSURE UNIT

THIS MATTER having been opened to the Court By ZUCKER, GOLDBERG &

ACKERMAN, LLC, Esqs., Richard P. Haber, Esq., attorneys for plaintiff, GMAC MORTGAGE, LLC

on notice to Frank J. Reed, III, Pro Se Defendant, for an Order to strike the contesting answer, and the

Court having considered the submissions of the parties, and for good cause shown;

      IT IS ON THIS   9th   day of   February      , 2008;

      ORDERED:

      1. That the Answer and defenses filed on behalf of defendant be and are hereby stricken and that

the Clerk of this Court is hereby instructed to enter default against defendant as though no answering

pleading has been filed; and

      2. That this matter shall be transferred to the Foreclosure Unit of the Superior Court in Trenton,

~~New Jersey to proceed as an uncontested matter; and~~

3. That plaintiff serve a copy of this Order on Frank J. Reed, III, ~~Pro Se~~ Defendant and to

counsel for all parties of interest within ___7___ days of plaintiff's counsel's receipt of the Order.

✱ Defendant's cross-motion for summary
judgment is GRANTED, per the
attached written decision

Honorable Ronald E. Bookbinder, P.J.Ch.
Michael J. Hogan

This matter was:

Opposed ___✓___

Unopposed. _____

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE COMMITTEE ON OPINIONS

PREPARED BY THE COURT

| | |
|---|---|
| **GMAC MORTGAGE, LLC,** | : SUPERIOR COURT OF NEW JERSEY<br>: BURLINGTON COUNTY<br>: CHANCERY DIVISION |
| Plaintiff, | :<br>: DOCKET NO.: BUR-F-19177-08 |
| v. | : |
| **FRANK J. REED, III, et al.,** | : DECISION |
| Defendants. | :<br>: Dated: February 6, 2009 |

Christopher G. Ford, Esq., Attorney for Plaintiff, GMAC Mortgage, LLC (Zucker, Goldberg and Ackerman)

Linda L. Campbell, Esq., Attorney for Defendant, Frank J. Reed, III (Kearney & Assocs.)

*HOGAN, P.J. Ch.*

Plaintiff GMAC Mortgage, LLC brings this present Motion for Summary Judgment to Strike Defendant's Answer, Enter Default, and transfer the matter to the Foreclosure Unit to proceed as an uncontested matter. Defendant Frank J. Reed, III has filed a Cross-motion for Summary Judgment before the Court to dismiss the Complaint for failure to provide a proper notice of intent ("NOI") as required under the New Jersey Fair Foreclosure Act ("FFA"). The court has considered those papers submitted. Proof of service has been furnished. The Court now holds, for the following reasons, Plaintiff's motion is hereby **DENIED** and Defendant's cross-motion is hereby **GRANTED**. Plaintiff's Foreclosure Complaint is dismissed without prejudice.

## FACTS

On May 31, 2006, Defendant Frank J. Reed, III executed a Note in favor of MERS, as nominee for Metrocities Mortgage, LLC for the amount of $1,000,000.00. To secure that obligation, Defendant executed a Mortgage in the same amount for real property located at 817 Matlack Drive, Moorestown, New Jersey. The Mortgage was recorded in the Burlington County Clerk's Office on Sept. 25, 2006. The Mortgage was subsequently assigned to Plaintiff GMAC Mortgage, LLC, who is alleged to be the current holder of both the Note and Mortgage. Defendant subsequently defaulted under the terms of the Note by failing and neglecting to make payments that were due on Feb. 1, 2008 and all payments due thereafter. As such, Plaintiff filed a Foreclosure Complaint on May 19, 2008.

Defendant asserts that Plaintiff failed to send a written Notice of Intent to Foreclose

pursuant to the FAA at least thirty (30) days prior to the filing of the Foreclosure Complaint.

Plaintiff asserts that it has not been able to locate a copy of the NOI that was sent to Defendant or the certified mailing receipt for the same. Plaintiff further asserts that the Answer filed by Defendant is merely a delay tactic and presents no material issue of fact that contests Plaintiff's right to foreclose.

Accordingly, Plaintiff seeks for this Court to enter an Order striking the Answer, entering default and transferring the case back to the Foreclosure Unit to proceed as an uncontested matter. Defendant seeks to dismiss the Foreclosure Complaint.

## LEGAL DISCUSSION

### Summary Judgment Standard

Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). "A party may defeat a motion for summary judgment by demonstrating that the evidential materials relied upon by the moving party, considered in light of the applicable burden of proof, raise sufficient credibility issues to permit a rational factfinder to resolve the alleged disputed issued in favor of the non-moving party." D'Amato v. D'Amato, 305 N.J. Super. 109, 114, 701 A.2d 970 (App. Div. 1997) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523, 666 A.2d 146 (1995)).

The trial court's "function is not . . . to weigh the evidence and determine the truth . . . but to determine whether there is a genuine issue for trial." Brill, supra, 142 N.J. at 540, 666 A.2d 146 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202, 212 (1986)). The trial judge must consider "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Id. When the facts present "a single, unavoidable resolution" and the evidence "is so one-sided that one party must prevail as a matter of law," then a trial court should grant summary judgment. Id.

Here, the parties' submissions do not contest the relevant material facts. Therefore, no genuine questions of material fact are presented in this case, such that summary judgment is appropriate in this matter.

### Notice of Intent to Foreclose

The FFA requires a residential mortgage lender to serve a written notice of intention to file foreclosure proceedings, by registered or certified mail, return receipt requested, at least thirty (30) days prior to commencing suit. N.J.S.A. 2A:50-56(a)-(b).

This duty of the lender "to serve notice of intention to foreclose is independent of any other duty to give notice under the common law, principles of equity, state or federal statute, or rule of court and of any other right or remedy the debtor may have as a result of the failure to give such notice." N.J.S.A. 2A:50-56(e). Compliance with this rule must be set forth in the pleadings of a Foreclosure Complaint. N.J.S.A. 2A:50-56(f).

Plaintiff states that, even if this Court determines that Defendant was not properly served

with a NOI in accordance with the FFA, dismissal or denial of summary judgment is not the appropriate remedy. Citing GE Capital Mortgage Servs., Inc. v. Weisman, 339 N.J. Super. 590 (Ch.Div. 2000), Plaintiff alleges that the appropriate remedy for failure to provide a proper NOI is for the foreclosure to be stayed for thirty (30) days, while the lender or its counsel sends out a letter that conforms with N.J.S.A. 2A:50-56, and that this solution provides a defendant with all the protections he or she would have had if the notice was properly sent out in the first instance. In Weisman, the foreclosing mortgagee was unable to locate its records demonstrating service of the NOI on the debtor. 339 N.J. Super. at 592. The Chancery Division found that, because total non-compliance with the FFA or bad faith were not involved, dismissal of the foreclosure action was not the appropriate remedy. Rather, that court held that the appropriate remedy in light of mortgagee's inability to demonstrate its compliance with FFA was order directing mortgagee to forward a new NOI within ten (10) days, with mortgagors entitled to thirty (30) days from the mailing of a NOI during which they could reinstate the mortgage without liability for costs and attorney fees. Id. at 595.

However, this Court notes that Plaintiff fails to cite current law, which has overturned Weisman. In EMC Mortgage Corp. v. Chaudhri, 400 N.J. Super. 126 (App.Div. 2008), the Appellate Division disapproved of the remedy employed in Weisman and held that a violation of the FFA's pre-suit notice requirement cannot be cured by proper mailing during pendency of suit, as an alternative to dismissal of action without prejudice. Id. at 587.

The Court also notes that a dismissal of a foreclosure action without prejudice has no effect on the underlying contractual obligations of the parties and does not bar reinstitution of the same claims in a later action. R. 4:37-2(a).

The Court, having considered the Plaintiff's Motion for Summary Judgment, the Defendant's Cross-Motion for Summary Judgment, and the Plaintiff's Opposition to Cross-Motion, now finds that Plaintiff failed to comply with the notice requirements of N.J.S.A. 2A:50-56 and has neglected to state such compliance in its Complaint as required under N.J.S.A. 2A:50-56(f). Accordingly, Plaintiff's Motion for Summary Judgment is hereby **DENIED** and Defendant's Cross-motion for Summary Judgment is **GRANTED**. Plaintiff's Foreclosure Complaint is dismissed without prejudice.

# EXHIBIT B

# Frank Reed

### 817 Matlack Drive
### Moorestown, NJ 08057
### P: 856.956.6950
### E: FrankReedNJ@aol.com

August 20, 2012

Robert E. Curley, III
SJ Market President
TD Bank
1701 Rt. 70 E.
Cherry Hill, NJ 08034

Re: Declination of Cash out Refinance on 817 Matlack Drive Moorestown, NJ 08057

Dear Mr. Curley:

During the spring of 2008 your office was processing a cash-out refinance on my primary residence located at 817 Matlack Drive Moorestown, NJ 08057.

An appraisal for this loan was done for this transaction by your bank on the house and the value was established at $2,040,000. However, the loan in question was declined in the first week of June.

It is my recollection that the reason for this loan declination was that our primary residence had just gone into foreclosure.

I am writing you now as I cannot find a copy of any written correspondence from your bank citing the reason for the loan's declination although I do remember it being given to me verbally.

Can you now please provide to me a written correspondence confirming my recollection as to the reason for the loan's declination?

I thank you for your time and assistance in this matter.

Sincerely,

Frank Reed



# EXHIBIT C

**Thomas J Tartamosa**
253 Jackson Road Berlin, NJ 08009
Phone: 856-296-0392
Fax: 856-768-3282

# F A X

| | | |
|---|---|---|
| To: | **Frank Reed** | Fax: ~~856-778-5675~~ 804-359-4124 |
| From: | Thomas Tartamosa | Date: 11/30, 2010 |
| RE: | REFI | Pages including covers: 2 |

11/20/2010

To Whom It May Concern:

This letter is to verify that back in March of 2008 I Thomas J Tartamosa was a Loan Officer for Allied Mortgage Group of Cherry Hill NJ 08003 and had worked on situating financing for Mr. Frank Reed. Mr. Reed was able to qualify for a number of different loan programs at that time. At the time that Mr. Reed had contacted me he had his home in Moorestown NJ for sale and under a sales contact. Mr. Reed was exploring his options incase he was unable to complete that sale. These options that I presented to Mr. Reed had become null and void when his property at 817 Matlack Dr. Moorestown NJ 08057 was placed into foreclosure.

If you have any questions on this matter please feel free to contact me at 856-296-0392.

Sincerely
Thomas J Tartamosa

# EXHIBIT D

**LAW OFFICES OF JEFFREY S. WALTERS, LLC**
3000 Atrium Way Suite 2201
Mount Laurel, NJ 08054
Telephone: (856) 552-1045
Telecopier: (856) 974-8859
Attorneys for Plaintiffs

|  |  |
|---|---|
| FRANK J. REED III and CHRISTINA A. REED,<br><br>             Plaintiff,<br><br>         v.<br><br>GMAC MORTGAGE LLC, RESIDENTIAL FUNDING CORP. and JOHN DOES 1-30, Individually, Jointly, Severally and in the alternative,<br><br>             Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION<br><br>BURLINGTON COUNTY<br><br>Docket No: BUR-L-1526-10<br><br>CIVIL ACTION<br><br>COMPLAINT AND DEMAND FOR JURY TRIAL |

RECEIVED 2008 MAY 10  11:17
DEPUTY
SUPERIOR
BURLINGTON

Plaintiffs, whose post office address is 9717 Old Dell Trace, Richmond, VA 23238, by way of Complaint against the Defendants say:

**FIRST COUNT**

1.     At all times pertinent hereto, Defendant GMAC Mortgage LLC was a Limited Liability Company duly organized and existing under and by virtue of the laws of one of the fifty states, and authorized to do business in the State of New Jersey, having an address of 1100 Virginia Drive, Fort Washington, Pennsylvania 19034.

2.     At all times pertinent hereto, Defendant Residential Funding Corp. was a corporation duly organized and existing under and by virtue of the laws of one of the fifty states, and authorized to do business in the State of New Jersey, having an address of 1 Meridian Crossings Suite 100, Minneapolis, Minnesota 55423.

3.    At all times pertinent hereto, Defendants John Doe 1-30 were individuals or entities

who were employees, agents or subcontractors of the non-John Doe Defendants, or employees,

agents or subcontractors of such agents or subcontractors, and who, as employees, agents or in any

other capacity, were responsible for insuring that the non-John Doe Defendants were in compliance

with their statutory duties, including but not limited to their duty to provide Plaintiffs with the

"notice of intention" required by the Fair Foreclosure Act and to refrain from failing to provide

Plaintiffs with the "notice of intention" required by the Fair Foreclosure Act.

4.    At all times pertinent hereto, Defendant GMAC Mortgage LLC was the owner of a

mortgage executed by Plaintiffs which encumbered real property owned by Plaintiffs, said property

being known as 817 Matlack Drive, Moorestown, New Jersey 08057 ("the Property").

5.    At the time the causes of action stated herein arose, Plaintiffs resided at the Property.

6.    On or about December 30, 2009, Defendant GMAC Mortgage LLC transferred

ownership of said mortgage to Defendant Residential Funding Corp.

7.    The mortgage which encumbered the Property was a "Residential Mortgage" as that

term is defined in the Fair Foreclosure Act, NJSA 2A:50-53 et seq.

8.    Under the Fair Foreclosure Act, Defendant GMAC Mortgage LLC was statutorily

prohibited from commencing any foreclosure action to take possession of the Property until

Defendant provided Plaintiffs with a "notice of intention" in form and content as provided in the Fair

Foreclosure Act, and over 30 days in advance of commencing any foreclosure action.

9.    On or about May 19, 2008, Defendant GMAC Mortgage LLC filed a Complaint for

Foreclosure in the Superior Court of New Jersey, Chancery Division, General Equity Part, Docket

No. F-19177-08, seeking to foreclose Plaintiffs' equity of redemption in the Property.

2

10.    On or about May 28, 2008, Defendant GMAC Mortgage LLC, through its agents, caused a Lis Pendens to be recorded with the Burlington County Clerk.

11.    Defendant GMAC Mortgage LLC failed to provide Plaintiffs with the "notice of intention" required by the Fair Foreclosure Act prior to filing its Complaint for Foreclosure on or about May 19, 2008.

12.    At all times herein, Defendant GMAC Mortgage LLC had a statutory duty to refrain from filing a Complaint for Foreclosure against the Property and Plaintiffs until such time as Defendant properly served Plaintiffs with "notice of intention" required by the Fair Foreclosure Act.

13.    At all times herein, Defendant GMAC Mortgage LLC had a duty to Plaintiffs to exercise care to refrain from violating Defendant's statutory duty as set forth above.

14.    Defendant GMAC Mortgage LLC failed to exercise the required standard of care, and negligently and/or recklessly filed a Complaint for Foreclosure and recorded a Lis Pendens against the Property and Plaintiffs without first discharging its statutory duty to provide a "notice of intention" as required by the Fair Foreclosure Act.

15.    At the time Defendant GMAC Mortgage LLC improperly and negligently filed its Complaint for Foreclosure and Lis Pendens, Plaintiffs were in the process of consummating financial transactions which, as a proximate result of Defendant's negligent and/or reckless conduct, were not consummated and which, but for Defendant's negligent and/or reckless conduct, would have been consummated.

16.    At all relevant times herein, Defendant GMAC Mortgage LLC knew or should have known that a foreclosure filing and Lis Pendens recording would severely compromise Plaintiffs' financial dealings, including but not limited to Plaintiffs' ability to obtain credit in the future.

3

17.    As a direct and proximate result of said Defendant's negligent and/or reckless conduct, Plaintiffs suffered damages and continue to suffer damages.

**WHEREFORE,** Plaintiffs demand judgment against Defendants for such sum of money as would reasonably and properly compensate Plaintiffs in accordance with the laws of the State of New Jersey, attorney's fees, costs, interest, and any other relief as the court may deem proper.

## SECOND COUNT

1.    The prior Count is referred to herein and made a part of this Count, but for the sake of brevity is not repeated in its entirety.

2.    The financial transaction secured by the mortgage on the Property was a contractual agreement between Defendant GMAC Mortgage LLC and Plaintiffs.

3.    The statutory obligation to provide the "notice of intention" required by the Fair Foreclosure Act was a term of the contractual agreement between Defendant GMAC Mortgage LLC and Plaintiffs.

4.    In failing to provide Plaintiffs with the "notice of intention" required by the Fair Foreclosure Act prior to filing its Complaint for Foreclosure on or about May 19, 2008, Defendant GMAC Mortgage LLC breached the aforesaid contractual agreement.

5.    As a direct and proximate result of said Defendant's breach of the contractual agreement, Plaintiffs suffered damages and continue to suffer damages.

**WHEREFORE,** Plaintiffs demand judgment against Defendants for such sum of money as would reasonably and properly compensate Plaintiffs in accordance with the laws of the State of New Jersey, attorney's fees, costs, interest, and any other relief as the court may deem proper.

4

## THIRD COUNT

1.      The prior Counts are referred to herein and made a part of this Count, but for the sake of brevity are not repeated in their entirety.

2.      Defendant Residential Funding Corp., as the owner of the mortgage as of December 30, 2009, undertook liability for the actions of its predecessor-in-interest Defendant GMAC Mortgage LLC as described herein, or is otherwise liable for the actions thereof as described herein.

**WHEREFORE,** Plaintiffs demand judgment against Defendants for such sum of money as would reasonably and properly compensate Plaintiffs in accordance with the laws of the State of New Jersey, attorney's fees, costs, interest, and any other relief as the court may deem proper.

## FOURTH COUNT

1.      The prior Counts are referred to herein and made a part of this Count, but for the sake of brevity are not repeated in their entirety.

2.      At all times pertinent hereto, Defendants John Doe 1-30 were individuals or entities who, as employees, agents or in any other capacity, were responsible for insuring that the non-John Doe Defendants were in compliance with their statutory duties, including but not limited to their duty to provide Plaintiffs with the "notice of intention" required by the Fair Foreclosure Act and to refrain from failing to provide Plaintiffs with the "notice of intention" required by the Fair Foreclosure Act.

3.      At all times pertinent hereto, Defendants John Doe 1-30 committed certain actions and/or failed to take certain actions in a careless, negligent and reckless manner and thereby caused harm and injuries to the Plaintiffs.

5

4.    As a direct and proximate result of the aforesaid negligence, carelessness and recklessness of Defendants John Doe 1-30, and/or their employees and/or agents, Plaintiffs suffered damages and continue to suffer damages.

**WHEREFORE,** Plaintiffs demand judgment against Defendants for such sum of money as would reasonably and properly compensate Plaintiffs in accordance with the laws of the State of New Jersey, attorney's fees, costs, interest, and any other relief as the court may deem proper.

**FIFTH COUNT**

1.    The prior Counts are referred to herein and made a part of this Count, but for the sake of brevity are not repeated in their entirety.

2.    But for the negligent and reckless conduct of Defendants in prematurely filing a Complaint for Foreclosure and recording a Lis Pendens, Plaintiffs would have consummated a refinance transaction with another lender which would have paid off Defendant's mortgage.

3.    Defendants, by its/their negligent and reckless actions in prematurely filing a Complaint for Foreclosure and recording of a Lis Pendens, made it impossible for Plaintiffs to procure the funds to pay off Defendant's mortgage, and furthermore, destroyed Plaintiffs' credit and future ability to reinstate or pay off the mortgage loan as is permitted by the Fair Foreclosure Act.

4.    As a result of Defendants' actions in negligently and recklessly destroying Plaintiffs' credit and rendering Plaintiffs without the ability to take advantage of Plaintiffs' statutory rights, Defendant GMAC Mortgage LLC, its successor-in-interest Defendant Residential Funding Corp. and any other successor-in-interest should be estopped from instituting another foreclosure action against Plaintiffs and the Property.

**WHEREFORE,** Plaintiffs demand judgment against Defendants estopping them from instituting another foreclosure action against Plaintiffs and the Property, and for such sum of money as would reasonably and properly compensate Plaintiffs in accordance with the laws of the State of New Jersey, attorney's fees, costs, interest, and any other relief as the court may deem proper.

LAW OFFICES OF JEFFREY S. WALTERS, LLC
Attorney for Plaintiffs

BY: _____

DATED:  May 7, 2010          JEFFREY S. WALTERS

## DESIGNATION OF TRIAL COUNSEL

Pursuant to New Jersey Court Rule 4:25-4, Jeffrey S. Walters, Esq. is designated as trial counsel for the Plaintiffs in the above matter.

## JURY DEMAND

Plaintiffs demand trial by a jury on all of the triable issues of this complaint, pursuant to New Jersey Court Rules 1:8-2(b) and 4:35-1(a).

LAW OFFICES OF JEFFREY S. WALTERS, LLC
Attorneys for Plaintiffs

Dated:  May 7, 2010          By: _____
JEFFREY S. WALTERS

## CERTIFICATION

Pursuant to New Jersey Court Rule 4:5-1, the plaintiffs hereby certify that the matter in controversy is not the subject of any other action pending in any court and is likewise not the subject of any pending arbitration proceeding, to the best of plaintiff's knowledge or belief. The plaintiffs further certify that plaintiffs have no knowledge of any contemplated action or arbitration proceeding regarding the subject matter of this action and that, other than the parties set forth in this pleading, the plaintiffs are not aware of any other parties who should be joined in this action. In addition, plaintiffs recognize the continuing obligation of each party to file and serve on all parties and the court an amended certification if there is a change in the facts stated in this original certification.

LAW OFFICES OF JEFFREY S. WALTERS, LLC
Attorneys for Plaintiffs

Dated:  May 7, 2010          By: _____
JEFFREY S. WALTERS

# EXHIBIT E

**LAW OFFICES OF JEFFREY S. WALTERS, LLC**
3000 Atrium Way Suite 2201
Mount Laurel, NJ 08054
Telephone: (856) 552-1045
Telecopier: (856) 974-8859
Attorneys for Plaintiff

FILED WITH THE COURT

JAN 0 6 2012

Susan L. Claypoole, J.S.C.

FRANK J. REED III,

           Plaintiff,

      v.

GMAC MORTGAGE LLC,
RESIDENTIAL FUNDING CORP. and
JOHN DOES 1-30, Individually, Jointly,
Severally and in the alternative,

           Defendants.

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION

BURLINGTON COUNTY

Docket No: L-1526-10

CIVIL ACTION

ORDER

This matter having been opened to the Court by Law Offices of Jeffrey S. Walters, LLC, attorneys for the Plaintiff, Jeffrey S. Walters, Esq. appearing, for entry of an Order granting leave to amend complaint pursuant to Rule 4:9-1, and the Court having reviewed the moving papers and the Certification supporting the Motion, and any opposition, and good cause having been shown:

It is on this _6th_ day of January, 2012

**ORDERED**, that leave is hereby granted for Plaintiff to amend complaint pursuant to R. 4:9-1; and

**IT IS FURTHER ORDERED**, Plaintiff shall file the Amended Complaint within 7 days of the date hereof consistent with the proposed amended complaint which was attached to Plaintiff's motion, and if Defendants wish to file an Answer to same, Defendants shall file an Answer to said Amended Complaint within the time period contemplated by R. 4:9-1.

**IT IS FURTHER ORDERED**, that a copy of this Order be served upon all parties within 7 days of the date hereof.

\\ Opposed
___ Unopposed

_Susan L. Claypoole_

Susan L. Claypoole, J.S.C.

**LAW OFFICES OF JEFFREY S. WALTERS, LLC**
3000 Atrium Way Suite 2201
Mount Laurel, NJ 08054
Telephone: (856) 552-1045
Telecopier: (856) 974-8859
Attorneys for Plaintiff

|  |  |
|---|---|
| **FRANK J. REED III,** | **SUPERIOR COURT OF NEW JERSEY** |
| | **LAW DIVISION** |
| Plaintiff, | **BURLINGTON COUNTY** |
| v. | **Docket No: L-1526-10** |
| **GMAC MORTGAGE LLC, RESIDENTIAL FUNDING CORP. and JOHN DOES 1-30, Individually, Jointly, Severally and in the alternative,** | **CIVIL ACTION** |
| | **AMENDED COMPLAINT** |
| Defendants. | |

Plaintiff, whose post office address is 817 Matlack Drive, Moorestown, New Jersey 08057, by way of Amended Complaint against the Defendants says:

## FIRST COUNT THROUGH FIFTH COUNT

1.     All paragraphs of the First Count through the Fifth Count of the Initial Complaint are repeated herein and made the First Count through Fifth Count of this Amended Complaint, but for the sake of brevity, same is not repeated in their entirety.

**WHEREFORE,** Plaintiff demands judgment against Defendants for such sum of money as would reasonably and properly compensate Plaintiff in accordance with the laws of the State of New Jersey, attorney's fees, costs, interest, and any other relief as the court may deem proper, and as more fully set forth in the Initial Complaint.

## SIXTH COUNT

2.      The prior Counts are referred to herein and made a part of this Count, but for the sake of brevity are not repeated in their entirety.

3.      Pursuant to the Fair Foreclosure Act, NJSA 2A:50-53 et seq., Defendant was obliged to inform Plaintiff, in a properly prepared and served "Notice of Intention to Foreclose" as defined in that Act, that Plaintiff had the right to cure any mortgage default at any time prior to the entry of a final foreclosure judgment.

4.      Defendant failed to provide Plaintiff with the "Notice of Intention to Foreclose" required by the Fair Foreclosure Act prior to filing its Complaint for Foreclosure on or about May 19, 2008.

5.      Instead, Defendant filed a Complaint for Foreclosure containing a provision that the mortgage was being accelerated and falsely leading Plaintiff to believe that Plaintiff's only option was to remit the entire principal balance and interest, which at that time was over $1,000,000.

6.      At that time, Plaintiff was approximately 3 months in arrears and could have easily cured the default if Defendant had not deceived Plaintiff into believing that he did not have this right.

7.      By the time Defendant's Foreclosure Complaint was dismissed by the Court on February 9, 2009 for Defendant's failure to comply with the Fair Foreclosure Act, nine (9) months had elapsed during which the improper and illegal foreclosure action had subsisted.

8.      During the nine (9) months that Defendant's improper and illegal foreclosure action subsisted, Plaintiff's credit was destroyed and Plaintiff was paralyzed of any ability to obtain any loans to preserve and conduct his real estate business and to earn an income from same as he had historically done.

2

9.    Due to the financial paralysis caused by Plaintiff's improper and illegal foreclosure action, and its detrimental affect on Plaintiff's ability to obtain credit to earn an income from his real estate business, Plaintiff fell behind on his other financial obligations, further harming his credit and causing him to deplete all of his savings and cash reserves in order to live and support his household.

10.    By the time Defendant's Foreclosure Complaint was dismissed by the Court on February 9, 2009 for Defendant's failure to comply with the Fair Foreclosure Act, Plaintiff's credit and income-producing ability was destroyed and his savings and cash reserves depleted, leaving no meaningful ability to: (1) cure the mortgage arrears which by then were substantial; and (2) resume his income-producing endeavors which had been ongoing up until the point of Defendant's filing of its improper and illegal foreclosure complaint.

11.    As a direct and proximate result of Defendants' conduct as aforesaid, Plaintiff suffered economic injury, including but not limited to (1) economic injury stemming from Plaintiff's inability to consummate income-producing transactions which were in progress at the time Defendant filed its improper and illegal foreclosure action; (2) economic injury stemming from Plaintiff's inability to resume his income-producing endeavors which he had conducted for many years prior to Defendants' improper conduct; (3) economic injury from the loss of at least 3 income-producing rental properties to foreclosure due to Plaintiff's inability to service the mortgages as a result of his compromised income-producing ability; (4) economic injury stemming from the general destruction to Plaintiff's credit, and his compromised ability to obtain and use credit and/or the increase in cost of credit as a consequence of the direct and indirect damage done to his credit score; (5) economic injury stemming from the awareness by third-parties of the improper foreclosure and filed lis pendens as Plaintiff attempted to market his house, resulting in "lowball" offers from

3

potential buyers who otherwise would have made legitimate offers were it not for the perceived desperation caused by Defendant's actions; and (6) non-economic damages suffered by Plaintiff, including but not limited to the distress that goes with powerlessly watching his income-producing abilities being destroyed after many years of hard work, his inability to support his family in the manner they were accustomed to, the indignity of relying on others for financial assistance for basic needs, and the general destruction of his goals and aspirations for his family.

**WHEREFORE,** Plaintiff demands judgment against Defendants for such sum of money as would reasonably and properly compensate Plaintiff in accordance with the laws of the State of New Jersey, including punitive damages, attorney's fees, costs, interest, and any other relief as the court may deem proper.

## SEVENTH COUNT

1.    The prior Counts are referred to herein and made a part of this Count, but for the sake of brevity are not repeated in their entirety.

2.    The actions and conduct of the Defendants were actuated by actual malice, and/or accompanied by a wanton and willful disregard of the injuries which might be suffered by Plaintiff.

3.    Defendants are liable for punitive damages.

**WHEREFORE,** Plaintiff demands judgment against Defendants for such sum of money as would reasonably and properly compensate Plaintiff in accordance with the laws of the State of New Jersey, including punitive damages, attorney's fees, costs, interest, and any other relief as the court may deem proper.

## EIGHTH COUNT

4.      The prior Counts are referred to herein and made a part of this Count, but for the sake of brevity are not repeated in their entirety.

5.      At all times hereinafter mentioned, Plaintiff was a "Person" as defined in the New Jersey Consumer Fraud Act.

6.      At all times pertinent hereto, Defendants were corporations and/or Limited Liability Companies duly organized and existing under and by virtue of the laws of the State of New Jersey or another State, and as such, were "Persons" as defined in the New Jersey Consumer Fraud Act.

7.      Defendants in all ways engaged in the act, use and employment of an unconscionable commercial practice, deception, fraud, false promise, misrepresentation, and the knowing concealment of material facts with the intent that Plaintiff rely upon such concealment, suppression or omission, in contravention of N.J.S.A. 56:8-2 and the Consumer Fraud Act.

8.      As a proximate result of Defendants' actions, Plaintiff has suffered an ascertainable loss under the Consumer Fraud Act.

**WHEREFORE,** Plaintiff demands judgment against Defendants for such sum of money as would reasonably and properly compensate Plaintiff in accordance with the laws of the State of New Jersey, and in accordance with N.J.S.A. 56:8-1 et seq., treble damages, attorney's fees, costs, interest, and any other relief as the court may deem proper.

LAW OFFICES OF JEFFREY S. WALTERS, LLC
Attorney for Plaintiff

BY:_____
DATED: January 6, 2012              JEFFREY S. WALTERS

5

## CERTIFICATION OF SERVICE

In accordance with N.J.S.A. 56:8-20, the Plaintiff mailed a copy of this complaint to the Attorney General at Office of the Attorney General, PO Box 080, Trenton, NJ 08625-0080 on the date of filing of this Complaint with the Court.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to New Jersey Court Rule 4:25-4, Jeffrey S. Walters, Esq. is designated as trial counsel for the Plaintiff in the above matter.

## JURY DEMAND

Plaintiff demands trial by a jury on all of the triable issues of this complaint, pursuant to New Jersey Court Rules 1:8-2(b) and 4:35-1(a).

LAW OFFICES OF JEFFREY S. WALTERS, LLC
Attorneys for Plaintiff

Dated: January 6, 2012                By:_____
                                            JEFFREY S. WALTERS

## CERTIFICATION

Pursuant to New Jersey Court Rule 4:5-1, the plaintiff hereby certifies that the matter in controversy is not the subject of any other action pending in any court and is likewise not the subject of any pending arbitration proceeding, to the best of plaintiff's knowledge or belief. The plaintiffs further certify that plaintiffs have no knowledge of any contemplated action or arbitration proceeding regarding the subject matter of this action and that, other than the parties set forth in this pleading, the plaintiffs are not aware of any other parties who should be joined in this action. In addition, plaintiffs recognize the continuing obligation of each party to file and serve on all parties and the court an amended certification if there is a change in the facts stated in this original certification.

LAW OFFICES OF JEFFREY S. WALTERS, LLC
Attorneys for Plaintiff

Dated: January 6, 2012                By:_____
                                            JEFFREY S. WALTERS

6

# EXHIBIT F



## "Real SERVICE in Real Estate"

June 25, 2012

**Re: Below Market Offer - Reed Home - 817 Matlack Drive Moorestown, NJ 08057**

To Whom It May Concern:

I am Naoji Moriuchi.  I am a Realtor for BT Edgar & Son in Moorestown, NJ.

On March 20, 2010 I submitted an offer to Frank Reed's listing agent, Louise Carter.  This offer was an offer to purchase Mr. Reed's house at 817 Matlack Drive Moorestown, NJ 08057.

My client became interested in purchasing Mr. Reed's house after seeing his house listed for sale. However, upon investigating the house in preparation for making an offer, my client and I became aware via the County Court House and public records that GMAC had executed a lispendens on Mr. Reed's property at 817 Matlack Drive Moorestown, NJ indicating that it was in foreclosure litigation. This placed Mr. Reed's house in the category of a "distressed" property.

Therefore, based on the comparable properties and the fact that this was a "distressed" property and in consideration of the associated risks with a "distressed" property, my client submitted an offer below fair market value.

A copy of my profile, the offer and the lispendens is attached to assist in the matter.

If there are any questions please contact me.

Sincerely,

NaojiMoriuchi
Realtor Associate
BT Edgar & Son Realtors

Enclosed: Attachments



# EXHIBIT G



*"Real SERVICE in Real Estate"*

**REALTORS**

July 2, 2012

**Re: Below Market Offers - Reed Home - 817 Matlack Drive Moorestown, NJ 08057**

To Whom It May Concern:

I am Louise Carter. I am a Realtor for BT Edgar & Son in Moorestown, NJ, and I have been a realtor representing both buyers and sellers in Moorestown, NJ since 1986. (Please see my professional biography attached hereto). As a result, I am very familiar with the Moorestown real estate market.

In this role, I came to be the listing agent for Frank Reed's home at 817 Matlack Drive Moorestown, NJ 08057. I sold Mr. Reed that property as well, and knowing the Moorestown real estate market, Mr. Reed's property and its history, it is my professional opinion, that Mr. Reed's house value has been impacted negatively by a foreclosure action filed against him by GMAC.

Prior to GMAC's foreclosure action, Mr. Reed had a contract for sale on his house for the amount of $2,040,000, (see: contract attached hereto). However, this sale did not close.

Unfortunately for Mr. Reed, every offer on his property AFTER GMAC filed its foreclosure against him, was substantially under market value, (see: offers attached hereto); and since the potential buyers actually disclosed that the reason for their under market offer was due to their concern over the property's foreclosure status, it is clear to me that this devalued Mr. Reed's home.

Since, Mr. Reed's last offer was for $1,100,000 and his home was valued at $2,040,000 just before the GMAC foreclosure action, (see: Appraisal and sales contract attached hereto) it is my professional opinion that Mr. Reed has lost a value of $940,000.

If you have any questions, please contact me.

Sincerely,

*Louise Carter*

Louise Carter
Realtor, GRI
B.T. Edgar & Sons, Realtors

---

*27 E. Main St.   Moorestown, NJ 08057    (856) 235-0101*
*Fax (856) 722-9190    Email: info@EdgarRealEstate.com*        *www.EdgarRealEstate.com*



# EXHIBIT H



**Stevie Watson**
Tuckahoe Sales
Long and Foster Real Estate
8804 Patterson Avenue
Richmond, VA 23229-6361

June 20, 2012

**Re: Lost Sale Profit for 9717 Old Dell Trace Richmond, Virginia 23238**

To Whom It May Concern:

I am Stevie Watson. I am, and continue to be, a succesful realtor in the Richmond, Virgina marketplace. Some of my credentials of note are:

- **Award-Winning Top-Producer**
- **Ranked in the TOP 1% of all Realtors in America**
- **A TOP TEAM for Long and Foster in the Richmond area**

*(see: published bio attached)*

For a number of years now, I have known Frank Reed. During this time, I have known him to purchase, renovate and / or build and sell for a profit both residential and commercial property. I have also participated in several transactions with Mr. Reed as either the buyer's and/or seller's agent.

As a result, I have a first-hand familiarity with Mr. Reed's property located at 9717 Old Dell Trace Richmond, Virginia 23238. This property in particular has even been featured in a published article about "Notable Neighborhoods" in the Richmond, Virginia area, *(see: article attached).*

Now, I am aware that during 2008 Mr. Reed was in the middle of an extensive expansion and capital renovation of this property. I am also aware that Mr. Reed intended to sell the property for a profit as it had recently appraised for a minimum of $1,725,000. *(see: appraisal attached)* Unfortunately, Mr. Reed did not finish this project and the market has since drastically declined. The current 100% assessed value of Mr. Reed's property is $608,400 *(see both: Henrico County Tax Department Value attached and Henrico County valuation methodology indicating 100% market valuation process attached).*

However, if Mr. Reed had finished the work on his house at 9717 Old Dell Trace Richmond, Virginia 23238, and had offered it for sale from June 2008 through the summer of 2009, it is my opinion that the house would have sold for the appraised value of $1,725,000. Therefore, it is my estimation that Mr. Reed has currently lost a value of at least $1,116,600.

If you have any questions please feel free to contact me.

Sincerely,

*Stevie Watson*

Stevie Watson
Associate Broker, GRI, RRI
Long and Foster Real Estate, Inc.

# EXHIBIT I

## PLAINTIFF'S EXPERT WITNESS REPORT OF
## EVAN HENDRICKS

I, Evan Hendricks, provide the following Expert Report in connection with the action entitled Frank J. Reed III v. GMAC Mortgage LLC, et al., Superior Court of New Jersey, Burlington County (Docket No. L-1526-10). **Part 1** of this report addresses issues that are specific to this case, including a context and history that robustly put Defendants on notice of the problems in this case and why Defendants should have prevented them. **Part 2** includes my qualifications, list of prior cases in which I have testified, my fee, and more general opinions, such as the nature and purpose of credit scores and credit reports, and damages. It is likely that Defendants will disclose additional evidence after I have completed this expert report. If appropriate, and if justified by the production of additional evidence in discovery, I reserve the right to supplement this report at a future date.

### Summary of Opinions

- This case is the result of Defendant GMAC ("GMAC") abusing both the foreclosure process and the credit reporting system to block the ability of Plaintiff Frank Reed ("Plaintiff" or "Mr. Reed") to avoid foreclosure by ruining his credit.

- GMAC abused the foreclosure process by failing to adhere to the all-important notice provisions in the Fair Foreclosure Act. It abused the credit reporting system by filing the foreclosure action, and instructing the credit reporting agencies (CRAs) to portray Mr. Reed as being in foreclosure, when the foreclosure action should never have been filed prior to providing a Notice of Intent to Mr. Reed.

- This set off a highly damaging chain reaction. The foreclosure on Mr. Reed's credit stood out as a "scarlet letter" and scuttled his soon-to-be-completed efforts to refinance his mortgage and avoid foreclosure. That in turn further worsened Mr. Reed's credit, making it impossible for him to obtain any meaningful credit, either to avoid foreclosure, extract equity from his home, or to continue Mr. Reed's real estate business.

- All of this caused Mr. Reed both economic and non-economic damages. The economic damages stemmed from the ruined credit that ended Mr. Reed's ability to continue his real estate business.

- Mr. Reed's economic damages include, but likely are not limited to, the losses from being unable to refinance his home mortgage, the losses stemming from his inability to sell his Moorestown property at the peak of the market, the losses and foreseeable losses stemming from Mr. Reed's inability to continue his real estate business and the loss of time and opportunity stemming from dealing with the unfair and incomplete/inaccurate credit reporting.

- The non-economic damages related to the stress, humiliation, mental anguish and frustration stemming from being blindsided by GMAC's non-compliant foreclosure, from watching his credit being ruined and knowing the consequences for his and his family's economic plans and aspirations, and from the consequential loss of reasonable control over such crucial personal information, making him a victim of chronic credit report inaccuracy.

- Given that this occurred during a period in which wrongful foreclosures were a growing, foreseeable problem, and that the damages stemming from wrongful foreclosures were potentially devastating, GMAC's actions in regard to Mr. Reed were reckless.

- From 1996 to the present, GMAC was put on notice by a variety of events of the importance of credit report accuracy.

- It is well known in our field that victims of chronic credit report inaccuracy endure a common pattern of harms. The damages suffered by Mr. Reed was consistent with those experienced by other victims. As mentioned above, Mr. Reed suffered damages that were peculiar to his situation.

### Impact of 'Foreclosure' On Creditworthiness

It's logical that a foreclosure is devastating to a consumer's creditworthiness. After all, a home mortgage is often the most important credit obligation of an American consumer, and a foreclosure typically means that the consumer has defaulted on the mortgage to the point that the bank has to foreclose on the home and take possession of it.

Most lenders, like TD Bank in the case of Mr. Reed, have a policy of not approving (or even reviewing) credit applications from consumers who are in foreclosure. In addition, most lenders run automated scans of applicants' credit reports for key derogatory terms, and "foreclosure" is one of them. This is because underwriters typically will not give final approval to a credit application for someone who is in foreclosure.

The State of New Jersey has recognized foreclosure's devastating impact on the consumer through enactment of the Fair Foreclosure Act, which seeks to ensure that proper and timely notice is given to potential targets of foreclosure so they will have adequate opportunity to make things right and avoid losing their home. ("Institution of foreclosure is traumatic to the debtor-mortgagor and creates a permanent court record which can be injurious to the debtor's credit. The notice of intention is meant to give the debtor a chance to prevent acceleration and institution of foreclosure." See Myron C. Weinstein, "Law of Mortgages: Chapter 24: New Jersey's Fair Foreclosure Act. B. Notice of Intention." New Jersey Practice Series ™.)

GMAC knew or should have known all of this. GMAC's rushed and allegedly improper foreclosure action against Mr. Reed came during a period in which GMAC

allegedly was falsifying documents in order to foreclose on other properties. (See Paul Kiel, "Internal Doc Reveals GMAC Filed False Document in Bid to Foreclose," ProPublica, July 27, 2011. (www.foreclosuredefenseblog.com/2011/08/firm-commentary-readers-should.html)

Thus, GMAC's reckless and highly damaging improper foreclosure against Mr. Reed coincided with other reckless and presumably highly damaging improper foreclosures against other Americans, and appeared to be part of a pattern and practice of a declining mortgage lender desperate to salvage itself by trampling on its customers' rights.

### GMAC's Foreclosure Doomed Mr. Reed's Re-finance, His Path To Normalcy, & Doomed Him To 'Credit Jail'

Mr. Reed had a long-standing relationship with the TD Bank President, who had been involved with numerous loans over a period of many years as part of Mr. Reed's ongoing business of buying, improving and selling real estate. In the Spring of 2008, the TD Bank President had visited one of Mr. Reed's properties and had ordered and received an appraisal.

The approval of this loan, and the consummation of this transaction, would have enabled Mr. Reed to catch up on his debts, including the GMAC mortgage, and extract equity from his home in order to conduct his business ventures.

That is when the key moment occurred. GMAC improperly moved to foreclose on Mr. Reed's home, figuratively hanging a "scarlet letter" around his creditworthiness, and scuttling the ability to consummate a loan transaction.

This in turn set off a horrific chain reaction that resulted in Mr. Reed, figuratively, being thrown into "credit jail." Unable to complete the planned transaction and obtain the necessary funds to become current on his credit obligations (and to continue his ongoing real estate endeavors), Mr. Reed suddenly could not meet his other credit obligations and quickly fell behind. Within months, his credit report was marred with a plethora of derogatory credit accounts which further doomed any hope he had of restoring his creditworthiness and returning to a normal economic life.[1] This chain reaction was caused directly by GMAC's improper foreclosure, and it devastated Mr. Reed's life.

This caused profound economic and non-economic damages to Mr. Reed. His other expert will opine on his economic damages.

---

[1] According to one of Mr. Reed's credit reports, a quick review indicated that eight accounts where rendered derogatory in 2008 alone.

3

Mr. Reed's non-economic damages relate to the stress, humiliation, mental anguish and frustration stemming from being blindsided by GMAC's non-compliant foreclosure, from watching his credit being ruined and knowing the consequences for his and his family's economic plans and aspirations, and from the consequential loss of reasonable control over such crucial personal, financial information, making him the victim of chronic credit report inaccuracy.

I have served as an expert in several cases in which consumers/plaintiffs have been victims of chronic credit report inaccuracy. In these cases, the juries recognized the profound damage to the plaintiffs. In some of the earlier cases in which I was involved, the minimum damage award was $200,000. In more recent cases, the jury awards for actual damages have been closer to $350,000.[2]

Because the chronic inaccuracy caused by GMAC cut right to the heart of Mr. Reed's ability to continue earning a living, it heightened the stress, humiliation, mental anguish and frustration he experienced from being blindsided by GMAC's non-compliant foreclosure, and from watching his credit being ruined.

---

[2] Eric Robert Drew  vs. Equifax Information Services, LLC, et al., U.S. District Court for the Northern District of California , Case No.  CV 07-00726-SI. $700,000 in punitive damages, $315,000 in emotional distress damages, and $6,326.60 in economic damages, for a total of $1,021,326.60; July 20, 2010

Suzanne Sloane vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272.  $351,000 –   $106,000 in economic damages and $245,000 in mental anguish, humiliation, and emotional distress damages.  (August 2006)

Angela Williams v. Equifax Information Solutions, LLC:  Circuit Ct. or 9th Judicial Circuit, Orange County, Florida – No. 48-2003-CA-9035-O; jury verdict, Nov. 30, 2007; ($219,000 in actual damages and $2.7 million in punitive damages).

Rebecca L. Valentine v. Equifax Information Services, LLC: U.S. District Court for the District of Oregon – No. 05-cv-0801; jury verdict Oct. 12, 2007; ($200,000 in actual damages.)

Nicole M. Robinson v. Equifax Information Services, LLC: USDC-Eastern Dist. Of Virginia – No. 06-CV-1336; jury award Aug. 17, 2007; ($200,000 in actual damages.)

Sandra Cortez vs. Trans Union, LLC., U.S. District Court for the Eastern District of Pennsylvania: No. 2:05-cv-05684-JF.  (jury verdict April 26, 2007; $50,000 actual damages, $750,000 in punitive damages.)

Matthew Kirkpatrick v. Equifax, U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO; 2005 $210,000 in actual damages.

Thomas v. Trans Union, U.S. District Court for the District of Oregon.   $5million punitive, $300,000 actual damages for emotional distress. (2001)

Soghomonian v. TransUnion, (U.S. District Court for the Northern District of California, 2004) $330,000 actual damages and $660,000 punitive damages.

Cortez v. TransUnion, LLC, U.S. District Court for the Eastern District of Pennsylvania, Case Number: 2:05-cv-5684 (April 2007); $50,000 actual damages, and $750,000.00 in punitive damages.

Therefore, in accordance with my experience as an expert in the field of chronic credit report inaccuracy, I would value his non-economic damages, at a minimum, at $350,000.[3]

## Underlying Incentive For Furnishing

Many people do not realize that creditors' furnishing of their customers' data to credit reporting agencies (CRAs) is entirely voluntary. A fundamental incentive for large creditors such as GMAC in this case is that credit reporting is a cost-effective means of enhancing debt collection.

GMAC is keenly aware that credit reporting is a "powerful tool designed, in part, to wrench compliance with payment terms." (Rivera v. Bank One, 145 F.R.D. 64, 623 (D.P.R. 1993)). Creditors' collection letters and debt-collecting operators often advise customer-debtors that if they don't pay their debt it will result in highly derogatory data being entered on that customer's credit report which may remain for up to seven years. Creditors' collection letters often advise customer-debtors that, "Any potential employer, mortgage company, car dealership or creditor is likely to see this remark. Such a condition is far more damaging than the delinquent status you now maintain."

When a consumer applies for a mortgage, or other major form of credit, the mortgage or credit often is not granted until all outstanding unpaid debts listed on the credit report are resolved. Thus, a creditor that is owed money, or that still hopes to collect money whether or not it is actually owed by the consumer, enhances its ability to garner payment by reporting the debt to that consumer's credit report. This practice is highly problematic and damaging to the consumer when the consumer in fact does not actually owe the amount being reported to her credit report. However, it is conceivable that such practices would cause consumers, particularly those who did not know their rights, to consider paying off debts that they did not owe in order to remove serious derogatory data from their credit reports.

As I wrote in my book, "Credit Scores and Credit Reports,"

> … Creditors view credit reporting as an arm of debt collection – a sort of last resort that will catch up with non-paying consumers sooner or later. This practice "crosses the line" when creditors and collectors threaten to report debts – or actually report debts – that they know or should know are not the responsibility of the consumer. [Page 31 – Second Edition]

---

[3] I am sometimes reluctant to place a dollar value on non-economic damages for fear of "low-balling" what a future jury would decide. But I believe this initial estimate provides a reasonable basis for understanding Mr. Reed's minimum non-economic damages.

## Potential Areas of Testimony: Damages Known & Common To Victims of Chronic Credit Report Inaccuracy

It is important that the trier of fact understands that victims of chronic credit report inaccuracy often experience a series of several known and common types of negative impacts.

### Some Categories of Typical Negative Impacts of ID Theft & Chronic Inaccuracy

(1) Inaccurately described as not creditworthy and/or less creditworthy to third parties
(2) Improperly denied credit because of inaccurate data, or only able to obtain credit at less favorable rates
(3) Expended time and energy to correct errors not of one's making; in addition to loss of time and energy, loss of opportunity
(4) Wrongfully received debt collection calls
(5) Chilled from applying for credit
(6) Sleeplessness, physical symptoms
(7) Sense of helplessness, loss of control over personal data
(8) The emotional distress stemming from, and associated, with all of the above

The following factors could be used to gauge the severity of damage within each category.

### Key Factors To Consider When Assessing Severity of Negative Impact

The nature and substance of the category of damage
Time & energy to solve the immediate problem
The expectation that the problem was solved
The number of recurrences
The period of time over which the problem persist

### Mr. Reed's Damages Were Consistent with Other Victims of Chronic Credit Report Inaccuracy

Mr. Reed's damages were consistent with other victims of chronic credit report inaccuracy. His experiences touched on many of the eight categories cited above. In addition to the categories above, it is important for the trier of fact to understand that it can be very stressful not knowing everyone who may have associated you with highly derogatory credit data. Moreover, in my opinion, it can be difficult to maintain constructive personal relationships under stress.[4] It can be difficult to perform adequately at one's job.

### Defendant Knew or Should Have Known It Actions Would Have Negative Impact

The history of credit reporting cited below, which includes years of Congressional testimony and legislative actions, Federal and State enforcement actions, abundant media coverage and targeted books, such as mine, should have made it abundantly clear to GMAC

---

[4] In fact, the insurance industry says that stress, stemming from financial problems, can cause auto accidents, and therefore justifying its use of credit reports in setting insurance rates.

that failing to prevent Mr. Reed from becoming a victim of chronic inaccuracy would have a highly negative impact on him.

## Context

Context is extremely important in this type of case, in part because credit reporting, along with inaccuracies stemming from identity theft, is a long-standing and well-known problem. An important role of experts in FCRA cases is to help the trier of fact understand the relevant context.[5] Accordingly, I provide a brief history. An important theme emerging from this history is that a furnisher like GMAC was consistently provided notice in one form or another of the importance of ensuring the accuracy of information it reports and promptly restoring accuracy when the consumer disputes inaccuracies. This history also notified GMAC of the potential damage to consumers of both reporting erroneous information and then failing to correct it.

## History of Significant Inaccuracy Problems

It is essential that the trier of fact understand that there is a long-standing problem of significant inaccuracy rates in credit reporting data. Since 1990, several non-industry studies have concluded that credit report inaccuracy is a problem of significant proportions that can have a major negative impact on the victims of inaccuracy, and that can potentially be detrimental to the credit system as well.[6] This history is covered in Chapter 10 of my book, "Credit Scores and

---

[5] Kirkpatrick v. Equifax, U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO; In rejecting Defendant Equifax's motion to exclude Mr. Hendricks' testimony, Judge Michael W. Mosman, ruling from the bench, stated: "As a general statement, what I'm allowing and the reason I'm allowing it is testimony that puts the particular actions of the defendant in particular here in context, in the context of the nationwide problem of identity theft, in the context of the congressional reaction to that and other issues in the credit-reporting industry, when he can by virtue of his study and his prior testimony, both in court and to Congress, make comparisons, then that's something that's helpful to the jury." (January 18, 2005; Transcript available upon request.)

[6] Williams, James (CIS), "Credit File Errors, A Report," August 7, 1989 -- The first survey of 1,500 consumer reports and found serious error rate of 42% to 47%;

Consumers Union, "What Are They Saying About Me? The Results of A review of 161 Credit Reports From The Three Major Credit Bureaus, April 29, 1991 -- 48% contained "serious errors," defined as meaning those that could, or did, cause the denial of credit, employment or insurance.

U.S. Public Interest Research Group (US PIRG), "Nightmare On Credit Street (Or How The Credit Bureau Ruined My Life): Case Studies Documenting Consumer Complaints and Recommendation For Amending the FCRA," June 12, 1990

U.S. Public Interest Research Group (US PIRG), "Don't Call; Don't Write; We Don't Care." 1991 -- Review of 156 consumer report complaints on file at the FTC revealed that the average duration of complaints against a CRA was 22.5 weeks, or almost 6 months

U.S. Public Interest Research Group (US PIRG), "Public Enemy #1 At The FTC " October 1993, Based upon a Freedom of Information Act request, the 1993 report found that between 1990-93, problems with credit bureaus was the leading cause of complaints to the FTC (30,901, 20.6%). The 1993 PIRG

7

Credit Reports." As that Chapter notes, in the early 1990s, problems with inaccuracy and
"mixed files," CRA non-responsiveness and inadequate reinvestigations became the cause of
complaints to the FTC.

Of particular note was the 1993 study done by the U.S. Public Interest Research Group
(US PIRG), "Public Enemy #1 At The FTC." Based upon a Freedom of Information Act
request, the 1993 report found that between 1990-93, problems with credit bureaus was the
leading cause of complaints to the FTC (30,901, 20.6%). The 1993 PIRG found that 44% of
complaints concerned mixed files, and that among those, 64% involved the mixing of data with
total strangers.

These and other complaints prompted the FCRA's oversight authorities – the FTC and
State Attorneys General – to launch investigations and take enforcement actions. These actions
resulted in a series of separate consent decrees involving Equifax, Experian and Trans Union in
which each pledged to do a better job of maintaining accuracy, avoiding mixed files and the
reappearance of previously deleted data, being more responsive and conducting adequate
reinvestigations.

### History: Increased Attention on Role of Furnisher

This Consent Agreements are also relevant because (1) they created widespread publicity
about the problems of credit report inaccuracy, (2) they articulated (an agreed upon) higher and
more specific standard of care to ensure accuracy and fairness, and (3) they formed the
foundation for the 1996 Amendments to the FCRA. However, Congress knew that to ensure
accuracy, it needed to go beyond the Consent Agreements by placing duties on furnishers to
report information accurately.

The April 1994 House Banking Committee Report on the proposed amendments
explained why, despite the consent agreements, and subsequent industry guidelines, legislation
was necessary: "Moreover, because the industry guidelines are simply voluntary, they are
unenforceable and may be changed or revoked at any time. Many of the provisions in the

---

found that 44% of complaints concerned mixed files, and that among those, 64% involved the mixing of
data with total strangers.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: Credit Report Errors Mean
Consumers Lose," March 1998

"Credit Reports: How Do Potential Lenders See You?" *ConsumerReports.org,* July 2000.

Consumer Federation of America and National Credit Reporting Association, *Credit Score
Accuracy and Implications for Consumers*, December 2002.

Robert Avery, Paul Calem, Glenn Canner, and Raphael Bostic, "An Overview of Consumer
Data and Credit Reporting," *Federal Reserve Bulletin*, February 2003.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: A Look at Credit Report Errors,"
June 2004

consent agreements expire after a short period of time, are not enforceable by consumers, and do not apply in every state. ***Additionally, these agreements do not impose any reinvestigation obligations on furnishers of information or on credit bureaus other than the three largest. Because of these limitations, federal legislation is necessary to improve accuracy-related protections for consumers. Consequently, the bill contains new reinvestigation procedures which are intended to cut down on the number of errors in consumer reports and to reduce the delay in correcting those errors.***"  [Emphasis Added]

Importantly, the Consent Agreements' language on preventing reinsertion was incorporated and expanded upon in the 1996 Amendments to the FCRA. Under Sect. 1681 (a)(5)(B), information cannot be reinserted unless it is "certified" as complete and accurate by the furnisher. Moreover, a CRA, five business days prior to any reinsertion, must notify the consumer, and also provide the name and address of the furnisher and inform him or her of his right to add a statement.

Despite these Consent Decrees, the problems of mixed files, inadequate reinvestigations and reappearance did not go away. Throughout the early 1990s, Congress held a series of hearings in which numerous consumers and consumer advocates described problems with inaccuracy, mixed files, CRA non-responsiveness, and inadequate reinvestigations. This resulted in the 1996 legislative amendments to the FCRA.

I cite this brief history because it makes clear that for many years, a furnisher like GMAC has been on notice from Congress, the FTC, State AGs, the media and the public that it is important to ensure accuracy, and to reasonably investigate consumer disputes, and that it can be highly damaging when inaccurate information is not removed.

## Part 2

### Potential Areas of Testimony: General Issues, Context

A.    **The Nature and Purpose of Credit Scores**
B.    **The Nature and Purpose of Credit Reports**

### Nature & Purpose of Credit Scores

It is possible that the trier of fact is not intimately familiar with either the credit reporting or credit scoring systems. If this is the case, I can provide expert testimony on the nature of both systems, how to read and understand credit reports and how to dispute errors, the parameters of credit scoring, the general impact that derogatory data have on a credit score, the interplay between identify theft, credit scoring and credit reporting, and other related matters.

A credit score is a number that reflects a consumer's creditworthiness at a given point in time. The FICO model credit score, which is used by 75 percent of lenders, is based entirely on information in a consumer's credit report. The model was developed by Fair, Isaac & Co., which

licenses it to Equifax, Experian and Trans Union and others. The scoring range for the FICO "classic" model is 300-850. The various types of "Beacon" scores sold by Equifax, and "Classic FICOs" sold by Trans Union,[7] are based upon the FICO model. The higher the credit score, the less risky the consumer is viewed by creditors. Consequently, consumers with higher-end credit scores (720 and above) often can obtain the most favorable rates for mortgages, refinancing, personal and auto loans and auto and homeowners insurance, and also often receive solicitations for the best quality credit cards. Conversely, the lower the score, the less favorable the rate. A credit score of 620 and below is widely regarded as "sub-prime."

Maintaining a good credit score is important because of a fundamental rule: the lower one's score, the more one pays for credit, including higher interest on mortgages, auto loans, installment loans and credit cards.

For example, the Web site of Fair Isaac Corp., www.myfico.com,[8] gives this example of the difference that credit scores make in terms of interest and monthly payments, on a $300,000 30-year, fixed-rate mortgage:

| Your FICO® Score | Your Interest Rate | Your Monthly Payment |
|---|---|---|
| 760 - 850 | 6.148% | $1,827 |
| 700 - 759 | 6.370% | $1,871 |
| 680 - 699 | 6.654% | $1,927 |
| 660 - 679 | 7.464% | $2,090 |
| 640 - 659 | 8.816% | $2,374 |
| 620 - 639 | 9.782% | $2,584 |

A similar chart exists for auto loans. Moreover, about half of the major credit card companies practice "Universal Default," meaning that these companies will raise their cardholders' interest rates if those cardholders' credit scores drop below certain levels -- even if the cardholder never had a late payment with the company.[9]

1. The precise workings of the FICO score are highly proprietary and therefore closely guarded. However, the general parameters are publicly available:[10]

**35% -- Payment history.** Late payments, particularly major or serious derogatories, like 90-days late or worse, and particularly on important accounts like mortgages, are very damaging to one's credit score.

---

[7] In previous years, the Trans Union FICO Score was called "Empirica"
[8] Visited September 21, 2005
[9] Universal default is described in detail in Chapter 22 of the 2nd Edition of "Credit Scores and Credit Reports," op. cit.
[10] These parameters are published in Chpr 1 of both Editions of "Credit Scores and Credit Reports," op. cit.

**30% -- Credit Utilization.** The ratio between available "revolving" credit and how much is actually used (credit card balances vs. credit card limits).

**15% -- Length of Credit History.** The longer you maintain a positive credit history, the better it is for your credit score.

**10% -- How Much New Credit?.** This relates to "inquiries" that creditors make when you apply for credit.

**5% -- Healthy Mix of Credit?** The scoring model prefers to see a "healthy mix" of mortgage, credit cards and perhaps other kinds of credit.

2.    It is important to understand that consumers are most severely penalized when they have a serious derogatory within the past eleven months. The "importance of being recent" is illustrated by the following Fair Isaac chart, which shows, in a proportional sense, that a major delinquency in the past year has a 93% negative impact, while a major delinquency between 1-2 years-old has about a 60% negative impact; a major delinquency between 2-3 years-old has a 44% negative impact; a 3-4 year old delinquency has a 33% impact; any delinquency older than 4 years has only a 22% negative impact.



There is growing public awareness about credit scoring, but it is by no means complete. A September 2004 survey by Opinion Research Corporation Intl. sponsored by the Consumer Federation of America (CFA) and Providian Financial, a major credit card issuer, found that:

Few consumers know what constitutes a good score. Only 12% correctly identified the low 600s as the level below which they would be denied credit or have to pay a higher, sub-prime rate. (One-third thought this level was the low

11

500s, and 30% said they didn't know.) And, only 13% correctly understand that scores above the low 700s usually qualify them for the lowest rates. http://www.consumerfed.org/092104creditscores.PDF

A March 2005 General Accounting Office study found that about one-third of respondents had obtained their credit scores. While 70 percent of respondents correctly identified the definition of a credit score and understood many of the factors that could impact credit scores, only 28 percent could provide a number within a range of possible credit scores. In addition, consumers were more familiar with some of the factors that affected credit scores than with others. For example, while most consumers knew that skipping loan payments or making late credit card payments had a negative effect on credit scores, about half did not know that using all the credit available to them, such as reaching the maximum limit on a credit card or home equity loan, had a negative effect. Also, when asked about information that had no effect on credit scores (such as a low checking account balance), about half of consumers answered the questions incorrectly or said that they did not know, the GAO found.[11]

### Nature & Purpose Of Credit Reports

Similar to credit scoring, there is growing public awareness about the credit reporting system, but it is not universal.

According to a July 2003 survey by the Consumer Federation of America, "Only 25 percent of Americans – and less than 20 percent of those with incomes below $35,000 – said they knew what their credit score was. But only three percent of Americans could, unprompted, name the three main credit bureaus-Experian, Equifax, and Trans Union-that provide both lenders and consumers with information from credit reports. Forty-three percent of Americans (35 percent of those with incomes below $35,000) said they had obtained a copy of their credit report from the three credit bureaus in the past two years."

A March 2005 General Accounting office report concluded that the public's understanding of credit reports and credit scores was improving, but that a federal education campaign was needed to better inform those segments of the population that remain unfamiliar with the systems. The report found that 60 percent of respondents had seen their credit reports, most often because they were making a large purchase or refinancing a loan. Most of these consumers said that they understood their reports. However, about half (53 percent) did not know that information could stay on their report for 7 or 10 years.[12]

It is important that the trier of fact have an accurate understanding of the nature and purpose of credit reports. Accordingly, a brief description of the consumer report is fundamental to my opinions in this case.

---

[11] General Accounting Office, "Credit Reporting Literacy: Consumers Understood the Basics but Could Benefit from Targeted Educational Efforts" (GAO-05-223). www.gao.gov/new.items/d05223.pdf
[12] *Ibid.*

A consumer report, sometimes referred to as a credit report, consists of highly sensitive and personal information, containing a compilation of a consumer's current credit relationships, their credit history, their employment history, estimated income and identifying information, such as name, address, phone number and Social Security Number (SSN). There are three major repositories known as credit bureaus or consumer reporting agencies (CRAs) -- Equifax, Trans Union and Experian. The CRAs regularly receive updates on a consumer's credit relationships from credit grantors -- banks, mortgage companies, credit card issuers, department stores and others. The consumer report typically contains highly sensitive details about a consumer's finances, including account numbers, loan amounts, credit limits and payment history. It also can contain information on the consumer's interaction with the judicial system, including paid or unpaid civil judgments or bankruptcies.

The Credit Report consists of three (or four) basic sections:

(1)    A section with the consumer's *identifying information*-name, address, Social Security number, date of birth, previous address, employer, and sometimes phone number.

(2)    A section with the consumer's *payment history*, including mortgage, auto and installment loans, credit cards and department store cards, collections, and public records like bankruptcy and court judgments.

(3)    If applicable, a section showing *public record* information, like bankruptcies, court judgments and tax liens.

(4)    A section showing *inquiries*, in other words, those companies which accessed the report and for what purposes.

In addition, attached to the credit report is

(1) A form for disputing errors, and
(2) A statement of your rights under the FCRA

Each of the Big Three CRAs uses a slightly different format. A fundamental purpose of the credit report is to describe a consumer's creditworthiness. For example, the Equifax report lists the codes showing how consumers are classified when they don't pay their bills on time. Along with these numeric codes, a credit report can have a letter showing the type of credit, i.e., "R" for revolving (credit card) and "I" for installment (personal loan). The code for someone who always paid her credit card on time would be "R1." Here are the numeric codes:

- 2 : 30-59 Days Past Due
- 3 : 60-89 Days Past Due
- 4 : 90-119 Days Past Due
- 5 : Over 120 Days Past Due
- 7 : Included in Wage Earner Plan
- 8 : Repossession
- 9 : Charge Off
- Blank : No Data available for that month
- 0 : Too new to rate, or unrated
- 1 :  On Time

13

The Trans Union and Experian credit reports describe similar categories with a text narrative, rather than with an alpha-numeric code.

It is important to note that public record information like bankruptcy, judgments and tax liens, and charge-offs (R-9) and collections, are considered some of the most negative entries. It is also important to note that when a creditor reports a negative tradeline as disputed, that tradeline typically is not scored and therefore does not negatively impact the credit score.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit, whether it is a loan or a credit card. Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness. This is known as an "Account Review." Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers. Some employers use consumer reports to evaluate job applicants. Insurers use credit reports for underwriting purposes, and also use credit scores, but presumably only where not prohibited by State law.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit. Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness. This is known as an "Account Review." Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers. Some employers use consumer reports to evaluate job applicants. Insurers also can use credit reports for underwriting purposes. Landlords also use credit reports for tenant screening.

14

**Background & Qualifications (Curriculum Vitae Attached)**

My expertise in credit reporting stems from several of my professional activities, including:

(1) Editor/Publisher of a specialty news reporting service that covers credit reporting, Fair Information practices and related matters;

(2) Author of the book Credit Scores and Credit Reports: How The System Really Works, What You Can Do, 3rd Edition, (Privacy Times 2005), and co-author of a book with a chapter on credit reporting;

(3) An expert witness qualified by Federal and State courts in Fair Credit Reporting Act (FCRA) litigation:

(4) an expert on credit reporting who has testified before Congress on numerous occasions, including four hearings in 2003, and who has testified twice before the California legislature in regards to legislation on the use of financial data, and who regularly presents at Continuing Legal Education and other professional events; and

(5) an expert consultant to government agencies and private corporations, a member of the Consumer Advisory Council of Experian (one of the three national Credit Reporting Agencies (CRAs), and as one who has earned FCRA Certification from the National Credit Reporting Association (NCRA).

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

I am author of the book, Credit Scores and Credit Reports: How The System Really Works, What You Can Do (3rd Edition, Privacy Times 2007. The book has 23 Chapters, 399 pages and 415 footnotes. As the title indicates, it describes how the credit scoring and credit reporting systems work and what consumers can do to obtain their reports, read and understand them, correct errors in them and enforce their rights. I also am co-author of Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society (2nd Edition, Southern Illinois University Press, 1990), which has a chapter on credit reporting.

Since the early 1990s, I have served as an expert witness in numerous FCRA cases and have been qualified by the federal courts. As an expert witness, I have had the opportunity to read thousands of pages of deposition testimony by consumer reporting agency officials and by credit grantor personnel responsible for reporting data to CRAs. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and

15

practices for handling personal data. In fact, CRAs typically consider such procedures and practices to be proprietary and/or trade secrets. To my knowledge, the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation. Due to my access to this information, I have augmented my specialized body of knowledge on practices and procedures related to credit scoring and credit reporting.

I have testified numerous times before Congress – always by invitation – on issues related to the collection, maintenance, security, use and disclosure of sensitive personal data, including credit reports and other financial information. (Consult CV for list of hearings and Web links to testimony.)

In 2003, the year in which Congress was dedicated to a major upgrade of the FCRA, I testified twice before the Senate and twice before the House, and presented once before the FTC. The hearings covered a wide range of credit reporting issues, accuracy, fairness, privacy, CRA procedures and security:

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003[13]

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003[14]

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003[15]

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003[16]

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

Some of my recommendations were reflected in the final FCRA Amendments approved by Congress and signed by President Bush in December 2003.

On December 3, 2002, I testified before the California State Senate Insurance Committee. On January 29, 2003, I testified before the California State Assembly Insurance Committee. Both Committees were considering financial privacy legislation (SB 1), which ultimately was enacted by the legislature and signed into law in September 2003.

---

[13] http://banking.senate.gov/03_07hrg/071003/index.htm
[14] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=229
[15] http://judiciary.senate.gov/testimony.cfm?id=983&wit_id=2790
[16] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=202

I regularly present at Continuing Legal Education or professional seminars related to the FCRA. (Consult CV.)

Two of the three major CRAs have acknowledged that I am an expert on credit reporting as it relates to "Fair Information Practices." First developed in the United States in the late 1960s, Fair Information Practices (FIPs) standards are at the core of the FCRA and most other U.S. and European privacy and data protection laws, and serve as an internationally accepted standard for gauging privacy policy and practices.

In 1990, Equifax published "The Equifax Report on Consumers In the Information Age," a nationwide opinion survey and analysis by Louis Harris and Associates and Prof. Alan F. Westin. The report listed me as a privacy expert to whom the authors expressed appreciation for my advice on survey coverage.

In April 2002, I accepted Experian's invitation to serve on the Experian Consumer Advisory Council of Experian (formerly TRW), a national CRA and vendor of other information services. Before being disbanded in 2004, the Council met twice a year to offer non-binding advice and to discuss a host of credit reporting, marketing and other privacy-related topics.

In 2004, I passed an industry examination, thereby earning "FCRA Certification" from the National Credit Reporting Association.

Since August 1998, I have served under contract as a member of the Social Security Administration's Panel Of Privacy Experts advising the agency on a host of issues.

(Please consult the attached CV for additional information.)

17

### Testimony & Expert Reports

Within recent years, I have testified at trial, or been deposed as an expert, in the following cases:

Andrews v. Trans Union Corp. et al., Case No. 96-7369, (USDC-C.D. Calif.), concerning theft-of-identity and consumer report inaccuracies. Expert report, deposition, trial testimony. Judge Lourdes Baird presiding. The U.S. Court of Appeals for the Ninth Circuit specifically found that my opinion on the prevalence of identity theft was relevant to the reasonableness of CRA procedures. (see 225 F.3d 1063 (2000)).

Angela P. Williams vs. Equifax Information Services, LLC, et al., Circuit Court for the Ninth Judicial Circuit, Orange County Florida. Credit Reporting. Expert disclosure and report. Deposition. Trial Testimony. Judge George A. Sprinkel IV presiding.

Eric Robert Drew  vs. Equifax Information Services, LLC, et al., U.S. District Court for the Northern District of California, Case No.  CV 07-00726-SI. Expert report, deposition. Trial testimony. Judge Susan Illston presiding.

Direct Data Solutions, Inc., v. Bailey & Associates Advertising, Inc.: Circuit Court of the Eleventh Judicial Circuit, Miami-Dade County, Florida; Case No.: 07-9322 CA 09. Judge Jerald Bagley presiding.

Brenda F. Campbell v. Experian: U.S. District Court for the Western District of Missouri (No. 07-2514). FCRA. Expert report, deposition. Trial Testimony. Judge Nanette K. Laughrey presiding.

Harold & Beryllin Gamby v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Michigan [Southern Div.] (CV-06-11020-MO). FCRA, identity theft. Expert report. Deposition. Trial Testimony. Judge Marianne O. Battani presiding.

Deborah Adams v. National Engineering Service Corp./Verifications Inc.,: U.S. District Court for the District of Connecticut. 3:07-cv-01035-JCH. FCRA. Expert report, deposition. Trial Testimony. Judge Warren W. Eginton presiding.

Patricia Holmes vs. TeleCheck Intl., Inc., U.S. District Court for the Middle District of Tennessee (Nashville Div.). FCRA. Expert report. Deposition. Trial Testimony. Chief District Judge Todd J. Campbell presiding.

Rebecca L. Valentine. v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. CV 05-801-JO. FCRA, identity theft. Expert report. Deposition. Trial Testimony. Judge Robert E. Jones presiding.

Nicole Robinson vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272. Expert reports. Deposition. Trial Testimony  Judge Walter H. Rice presiding.

Suzanne Sloane vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272. Expert reports. Deposition. Trial Testimony   Judge Leonie M. Brinkema presiding.

Matthew Kirkpatrick v. Equifax, LLC,  U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO.  FCRA   Expert report. Trial Testimony. Judge Michael W. Mosman presiding.

Sandra Cortez vs. Trans Union, LLC., U.S. District Court for the Eastern District of Pennsylvania: No. 2:05 –cv—05684-JF.  FCRA.  Expert Report. Daubert Hearing. Trial Testimony.  Senior Judge John P. Fullam qualified me to testify at trial.

Federal Trade Commission vs. Accusearch, Inc., et al., U.S. District Court for the District of Wyoming, Case No. 06CV0105-D.  FTC Section 5. Expert Report. U.S. Magistrate Judge William C. Beaman rejected Defendant's motion to exclude my testimony.

Eddie Silva, et al. v. Haynes Furniture Co., Inc.: U.S. District Court for the Eastern District of Virginia:  No. 4:04CV82. FCRA.  Fairness hearing testimony. Judge Walter D. Kelley, Jr. presiding.

Joi Helmes v. Wachovia Bank N.A.:  U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 01-81277-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony. Judge Robert G. Mayer presiding.

Alex Campos and Michael York v. ChoicePoint Services, Inc.: U.S. District Court for the District of Georgia (Atlanta), Civ. Action No. 1-03-CV-3577-WSD. FCRA. Expert Declaration. Fairness hearing testimony. Judge William S. Duffey, Jr. presiding.

Denis W. Stasulis v. Suntrust: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 04-12542-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony. Judge Robert G. Mayer presiding.

Dwaine Perry, et al. v. FleetBoston Financial Corp.: U.S. District Court for the Eastern District of Pennsylvania: No. 04-507. FCRA. Expert Report. Fairness hearing testimony. Judge Berle M. Schiller presiding.

Tammy Cochran v. C&M Motors, LLC, dba I-10 Toyota, et al: U.S. District Court for the Central District of California, No. CV-03-3568FMC. FCRA. Expert Report. Trial Testimony Judge Florence-Marie Cooper presiding.

Myra Coleman v. Trans Union LLC, CA4: 98-CV-169B-B (USDC-Mississippi) FCRA. Expert report, deposition, trial testimony.  Judge Neal B. Biggers presiding.

19

Arthur Spengler v. Sears Roebuck & Co., Case No. C-03-0557. (Circuit Court, Wicomico County, Maryland). Tort, Interference with Business Relationships. Trial Testimony. Judge D. Davis qualified me as expert on credit scoring, credit reporting and FCRA-related issues.

Judy C. Thomas v. Trans Union LLC, U.S. District Court for the District of Oregon; Case No. 00-1150-JE. FCRA. Expert report, deposition, trial testimony. Magistrate Judge John Jelderks presiding.

Scott E. Campbell v. G.E. Capital Auto Lease, Circuit Court For St. Mary's County, Maryland, Case No. 99-522. FCRA, invasion of privacy. Expert report, deposition. Judge Karen Abrams qualified me to testify, but the case settled one week before trial.

Franklin F. Grizzard, Jr. v. Trans Union, L.L.C., & Equifax Information Services L.L.C., et al.: U.S. District Court for the District of Virginia (Richmond Div.); Nos. 04-CV-625 & 04-CV-626, respectively. Expert report. Affidavit. Deposition. On the eve of trial, Judge Richard Williams rejected Defendant's motion to disqualify me. The case settled shortly thereafter.

Catherine Smith, et al. v. Progressive Corporation, et al.: U.S. District Court for the Middle District of Florida (Gainesville), Case No.1:00-CV-210-MMP. Expert Report, Declaration of Value, Fairness Hearing testimony. Judge Maurice M. Paul presiding.

Franklin E. Clark, et al. v. Experian, et al.: U.S. District Court for the District of South Carolina, Case Nos. 8:00-1217-22, 8:00-1218-22, 8:00-1219-22. Affidavit, Supplemental Affidavit (both affidavits were admitted into evidence without objection). Judge Cameron McGowan Currie presiding.

Alana Valerie Sheldon v. Trans Union, LLC., LVNV Funding, LLC, & Resurgent Capital Services L.P.: U.S. District Court for the District of Maryland; 8:08-cv-00057-PJM. Expert report, deposition.

In Re: Cellphone Termination Fee Cases, Superior Court of the State of California, Alameda County, JCCP No. 4332. Deposition.

Karl Benedikt v. ChoicePoint, Inc.,: U.S. District Court for the District of New Jersey [Newark Vicinage]; 07-2569. Expert report, deposition.

Abdirizak Gayre v. CSC Credit Services, Inc., Equifax Information Services, LLC, and Afni, Inc.: U.S. District Court for the District of Minnesota (C.A. No. 07-CV-0622 [JRT/FLN]). FCRA. Expert report, deposition.

Erin Ayles v. Experian Information Solutions, Inc.: U.S. District Court for the Eastern District of Virginia (Alexandria Division); 1:07cv 662. Expert report, deposition.

Maria D. v. Comcast Corp., Sacramento Superior Court, Case No. 03AS05745. Deposition.

In Re: Farmers Insurance Co., Inc., FCRA Litigation, U.S. District Court for the Western District of Oklahoma, Case No. CIV 03-158-F.  FCRA. Expert report, deposition.

Steven E. Beck v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Virginia: No. 1-05cv347. FCRA.  Expert report, deposition.

Ford Motor Credit Co. v. Sudesh Agrawal, Court of Common Pleas, Cuyahoga Country, Ohio; Case No. CV04536588.  Credit reporting and credit scoring. Deposition.

Larry Alabran v. Capital One Services, Inc.,: U.S. District Court for the Eastern District of Virginia (Richmond Division); Case No. 3:04-CV-935. Expert report, deposition.

Gail Cope v. MBNA American Bank NA: U.S. District Court for the District of Oregon; No. 04-CV-493-JE. Expert report, deposition.

Robert Gordon Peoples v. Experian Services Corp., et al.: U.S. District Court for the Central District of California: No. CV-04-1378 CAS (Ex). Expert report. Deposition.

Lottie Robertson v. Experian Information Services, Inc. & Capital One Bank: U.S. District Court for the Eastern District of Michigan (Southern Div.) No. 04-72308. Expert report. Deposition.

Barbara A. Harris v. Experian Information Solutions, Inc., and Equifax Credit Information Services, Inc: U.S. District Court for the District of Oregon, Civil No. 01-1728-JE. FCRA. Expert reports. Deposition

Bruce Danielson v. Experian Information Solutions:  U.S. District Court for the Northern District of Texas, Case No: 3-04CV-1722N. FCRA. Expert report. Deposition.

Stacy Lawton Guin, et al. v. Brazos Higher Education Service Corporation, Inc.: USDC-Minnesota – No. CV 05-668 RHK/JSM. Negligence. Security Breach. Affidavit. Deposition.

Anthony Chin v. State Dept. Federal Credit Union: Circ. Ct. Prince George's County (Maryland); Civ. Act. No. CAL04-12778; Tort. Deposition.  Trial testimony.

James M. McKeown v. Sears Roebuck & Co., et al: U.S. District Court for the Western District of Wisconsin, Civil No. Case No. 03-CV-0528 C.  Expert Report, deposition.

Paulette Field v. Trans Union LLC, et al., Case No. 01 C 6390 (USDC-N.D. Illinois - Eastern Div. FCRA. Expert report. Deposition.

Earle E. Ausherman, et al. v. Bank of America Corporation et al.: U.S. District Court for the District of Maryland, Civil Action No. MJG-01-438. FCRA. Expert report. Deposition.

Jesse Klco v. Elmhurst Dodge, U.S. District Court for the Northern District of Illinois (Eastern Division) Civil Action No. 01 C 0433.  FCRA.  Expert report, deposition.

(David & Ruthie Keefner v. Webb Ford, Inc. & Deon L. Willis.: U.S. District Court for the Northern District of Illinois (Eastern Division), Civil Action No. 02C-4643. FCRA. Expert report. Deposition.

Anthony & Alethea Preston v. MGIC, U.S. District Court for the Middle District of Florida (Ocala), Case No. 5:03-cv-111-Oc-10GRJ. FCRA. Expert report, deposition.

Bruce Butcher and Pam Butcher v. Chase Manhattan Bank, U.S.A., Inc., U.S. District Court for District of South Carolina, Case No. 8:03-3184-26. FCRA. Expert report, deposition.

## FEE

My fee is $300 per hour for consulting and for the expert report; $300 per hour, or a minimum of $1,200 per day, for deposition or trial testimony, plus reasonable travel time, plus travel costs and expenses.

# *Evan D. Hendricks*

## *CURRICULUM VITAE*

**Professional Activities**

1981- Present        **Editor/Publisher** of ***Privacy Times***

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

**1992 – Present        Expert Witness**

Qualified by the federal courts in FCRA and identity theft cases. (Complete list attached). I have read extensive deposition testimony by credit bureau and credit grantor personnel. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data, and the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation.

**1998 – Present        Privacy Expert Consultant, U.S. Social Security Administration**

Regularly review policies and practices in relation to the collection, use and disclosure of personal data and Social Security numbers and provide feedback and recommendations.

**2002 – 2004    Member, Experian Consumer Advisory Council**

Along with other Council members, I provide an outsider's view on credit reporting, marketing and other privacy issues.

**July – October 2002        Consultant to U.S. Postal Service**

Working with the USPS's Chief Privacy Officer, I assisted in reviewing and editing the re-write of the USPS's Privacy Act notices, with an emphasis on "Plain English."

---

**Evan Hendricks        P.O. Box 302        Cabin John, MD 20818**
**(301) 229 7002  (301) 229 8011 [fax]  evan@privacytimes.com**

---

23

**Recent Testimony Before Congress & The FTC**

"Credit Reports: Consumers' Ability to Dispute and Change Information," House Financial Services Committee, June 19, 2007.[17]

"Privacy in the Commercial World II," House Energy & Commerce Subcommittee On Commerce, Trade, and Consumer Protection, June 20, 2006[18]

"Financial Data Protection Act of 2005," House Financial Services Subcommittee on Financial Institutions and Consumer Credit, November 9, 2005[19]

"Credit Card Data Processing: How Secure Is It?" House Financial Services Subcommittee on Oversight and Investigations, July 21, 2005[20]

"Identity Theft: Recent Developments Involving the Security of Sensitive Consumer Information,"[21] Senate Banking Committee, March 15, 2005
"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003[22]
"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003[23]
"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003[24]
"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003[25]
"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

**Books**

Credit Scores and Credit Reports: How The System Really Works, What You Can Do [3rd Edition] (Privacy Times, 2007)

Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society (2nd Edition, Southern Illinois University Press, 1990), (Includes a chapter on credit reporting)

Former Secrets: Government Records Made Public Through The Freedom of Information Act (Campaign For Political Rights, 1982)

---

[17] www.house.gov/apps/list/hearing/financialsvcs_dem/ht061907.shtml
[18] http://energycommerce.house.gov/108/Hearings/06202006hearing1938/Hendricks.pdf
[19] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=425
[20] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=407
[21] http://banking.senate.gov/index.cfm?Fuseaction=Hearings.Detail&HearingID=144
[22] http://banking.senate.gov/03_07hrg/071003/index.htm
[23] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=229
[24] http://judiciary.senate.gov/testimony.cfm?id=983&wit_id=2790
[25] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=202

**International Lectures**

24th International Conference of Data Protection & Privacy Commissioners (Cardiff, Wales – Presentation published in conference proceedings, 2002)

The 23rd International Conference of Data Protection Commissioners (Paris, La Sorbonne – Presentation published in conference proceedings, 2001)

The 22nd Annual Conference on Data Protection (Venice, Italy -- 2000)

The 16th Annual Conference on Data Protection (The Hague, The Netherlands -- 1994).

In the 1980s, served as an expert consultant to both the Privacy Commissioner of Canada and Privacy Commissioner of Australia.

**Presentations/Instruction At Recent CLE & Professional Seminars**

"Second Law and Information Society Symposium: Enforcement, Compliance and Remedies in the Information Society," Presenter, "Credit Report Cases – Effective Remedies?" Center on Law and Information Policy (CLIP), Fordham Law School, New York, May 29-30, 2008.)[26]

"The 1st Annual Privacy Law Scholars Conference," Presenter, "Assessing Privacy Harm: How can victims of privacy violations prove that they have been harmed? The George Washington University Law School, Washington, DC, June 12-13, 2008.[27]

"11th Annual Consumer Financial Services Litigation," Practicing Law Institute, March 20-21, 2006 (New York City)

"Bankruptcy Roundtable," and, "Fair Credit Reporting Act Roundtable," National Consumer Law Center, October 27, 2005

"Advanced Consumer Litigation," Texas Bar CLE, Feb. 10-11, 2005

"Financial Privacy Litigation," (Impact of FACT Act), Practicing Law Institute, February 28- March 1, 2005 (New York City)

"The New FACT Act: Challenge & Oppty.," Privacy & American Business, Feb. 9-10, 2004

"Understanding the FACT Act And The Impact of Multi-Agency Rulewriting Process," Glasser LegalWorks, Sept. 28-29. 2004

"12th Annual National Conference," National Credit Reporting Association, Nov. 10-12, 2004

**Professional Societies**

Past President & Board Member, American Society of Access Professionals www.accesspro.org

**Industry Certification**

FCRA Certification, National Credit Reporting Association (www.ncrainc.org).

**Media**

In addition to being a paid consultant and special guest on CNN's IMPACT news in 1996, I am quoted regularly by major and small newspapers (including The Washington Post, New York Times, Wall Street Journal, Chicago Tribune, Los Angeles Times, Newsweek and Money Magazine), regarding issues of privacy generally and the privacy implications of consumer reporting specifically. I have appeared on National Public Radio, PBS NewsHour with Jim Lehrer, ABC Nightline and World News Tonight, NBC Nightly News, CBS Evening News, CNN News Watch, CNBC, MSNBC, Fox News, various local affiliates, and the Oprah Winfrey Show and Geraldo, regarding these issues as well.

**Education**

Bachelor of Arts, Columbia College, Columbia University, New York, N.Y. (1979)

---

[26] http://law.fordham.edu/ihtml/eventitemPP.ihtml?id=37&idc=8943&template=clip

[27] http://privacyscholars.com

**MATERIALS CONSIDERED**

In specific preparation for this case, I have reviewed the following:

Plaintiffs' Complaint & Attached Exhibits
Plaintiffs' credit reports
Plaintiff's deposition
Documents cited in this report

I also generally rely upon:

The Fair Credit Reporting Act & Consumer Credit Reporting Reform Act of 1996
Fair Credit Reporting Act (w/ Companion Disk & 2000 Cumulative Supplement,
National Consumer Law Center, 1998 (Boston)
Credit Scores and Credit Reports: How The System Really Works, What You Can
Do (3rd Edition, Privacy Times 2007),

My opinions in this case are also based on my 31-year profession of following
privacy developments including those relating to the consumer reporting and information
broker industry and the criminal justice system as a journalist, editor, publisher and
privacy expert. My experience includes listening to and participating in dozens of hours
of Congressional testimony, hearings before the Federal Trade Commission, media
coverage, studies by independent groups, my own personal observations and numerous
contacts, and my previous work preparing to be an expert witness in other FCRA cases.

**Executed This The 9th Day of November 2011 in Bethesda, Maryland**

**/s/ Evan D. Hendricks**
**Evan D. Hendricks**
PO Box 302
Cabin John, MD 20818
(301) 229 7002

# EXHIBIT J

# Oxford House, Inc.

1010 Wayne Avenue, Suite 300
Silver Spring, Maryland 20910

July 10, 2012

Re:  Frank Reed's Oxford House Rental Properties

To Whom It May Concern:

I am J. Paul Molloy, Chief Executive Officer and founder of Oxford House World
Services, a national, private, not-profit organization comprised of Self-Run, Self-
Supported, Addiction Recovery Houses.

Let it be hereby known that Frank Reed had been a landlord of Oxford Houses since 1993
for the properties at:

  52 Stone Hollow Drive Sicklerville, NJ

  318 Columbia Avenue Stratford, NJ

  21 Darien Drive Cherry Hill, NJ

Oxford House would most likely have continued to rent those houses from Mr. Reed but
for foreclosure action.

If you have any questions or comments, please contact me.

Sincerely,

Paul Molloy

Paul Molloy
Co-founder and CEO

Telephone (301) 587-2916 • Facsimile (301) 589-0302 • Writer's Direct Telephone (301) 589-0539
A 501(c)(3) Nonprofit Corporation • # 11535 Combined Federal Campaign United Way
Winner of the Harry V. McNeill Award by the American Psychological Association
Email: Paul.Molloy@oxfordhouse.org • Visit www.oxfordhouse.org

# EXHIBIT K

# Superior Court of New Jersey
# Civil Motion Calendar Case Detail



## Civil Part, Special Civil Part and Chancery-General Equity

Available data from 6/30/2010 to 8/11/2010, Last Update as of 7/14/2010.

This is the expanded version of your query.
To refine your results, return to the main calendar page, click on the "Search" button.
Email comments about this page

| Search | Back | Help? |

| | | | | |
|---|---|---|---|---|
| **Venue** | BURLINGTON | **Docket #** L -001526-10 | **Court** | LCV |
| **Proceeding Date** | 7/9/2010 | **Proceeding Time** 900 A M | **Court Room** | 4B |
| **Proceeding Status** | COMPLETE | **Case Filed Date** 5/10/2010 | | |
| **Calendar Type** | MOTION HEARING | **Judge Name** MARC M BALDWIN | | |
| **Caption** | REED VS GMAC MORTGAGE LLC | | | |

**Motion Type**    MOTION FOR DISMISSAL

**Motion Status**    DENIED **Scheduled Hearing Date**  7/9/2010

**Oral Argument Requested**  N    **Granted**  N    **Granted Date**

**Motion Comment**  FAILURE TO STATE A CLAIM

| Atty Name | Party Name | Party Type | Filing Party |
|---|---|---|---|
| JEFFREY S. WALTERS | FRANK J. REED | PF | |
| FLEISCHER & FLEISCHER | GMAC MORTGAGE LLC | DF | F |
| JEFFREY S. WALTERS | CHRISTINA A. REED | PF | |
| FLEISCHER & FLEISCHER | CORP RESIDENTIAL FUNDING | DF | F |
| (ATTORNEY REQUIRED) | DOES 1-30 JOHN | DF | |

# EXHIBIT L

**LAW OFFICES OF JEFFREY S. WALTERS, LLC**
3000 Atrium Way Suite 2201
Mount Laurel, NJ 08054
Telephone: (856) 552-1045
Telecopier: (856) 974-8859
Attorneys for Plaintiffs

|  |  |
|---|---|
| FRANK J. REED III and CHRISTINA A. REED, | **SUPERIOR COURT OF NEW JERSEY LAW DIVISION** |
| Plaintiff, | **BURLINGTON COUNTY** |
| v. | **Docket No: L-1526-10** |
| GMAC MORTGAGE LLC, RESIDENTIAL FUNDING CORP. and JOHN DOES 1-30, Individually, Jointly, Severally and in the alternative, | **CIVIL ACTION** |
| Defendants. | **BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

## STATEMENT OF FACTS

On or about May 19, 2008, Defendant filed a Complaint for Foreclosure in the Superior Court of New Jersey, Chancery Division, General Equity Part, Docket No. F-19177-08, seeking to foreclose Plaintiffs' equity of redemption in their home. On or about May 28, 2008, Defendant, through its agents, caused a Lis Pendens to be recorded with the Burlington County Clerk. Defendant failed to provide Plaintiffs with the "notice of intention" required by the Fair Foreclosure Act prior to filing its Complaint for Foreclosure on or about May 19, 2008. As a result, the Court dismissed the foreclosure case. Plaintiff has filed the instant case, which asserts a cause of action against Defendants for negligence and breach of contract. Defendants have moved to dismiss, contending that the Complaint fails to state a claim.

## LEGAL ARGUMENT

POINT I:   **DEFENDANTS' ASSERTION THAT THE COMPLAINT FAILS TO STATE A CLAIM IS CLEARLY WITHOUT MERIT**

Defendants' motion can be easily rejected. Plaintiffs' cause of action is for negligence. Specifically, Plaintiffs contend that Defendant had a legal duty to exercise care and to refrain from filing a foreclosure complaint prior to providing Plaintiffs with the Notice of Intent to Foreclose required by the Fair Foreclosure Act. The Fair Foreclosure Act requires that such Notice of Intent be served, by both regular and certified mail, before instituting such proceedings. N.J.S.A. 2A:50-56. Defendant failed to serve the Notice before filing its Complaint. Furthermore, Defendant filed a Lis Pendens after improperly filing the Complaint. Plaintiffs allege that Defendant deviated from the standard of care owed to them, and that Defendant's negligence proximately caused them economic injury. Defendant's assertion that negligence is not a viable claim simply lacks merit.

While the violation of a statute is not necessarily negligence per se, a statute creates standards of conduct, the "violation of which a jury in a negligence action should take into consideration in arriving at their ultimate determination of negligence." Horbal v. McNeil, 66 N.J. 99, 103 (1974). It has also been said that statutory violations are "evidence of negligence." Id. The question of whether Defendants were negligent, that is, whether they deviated from their standard of care, and whether such deviation was the proximate cause of Plaintiffs' economic damages, is one for a jury. There is simply no basis for Defendants to assert that the Complaint fails to state a claim. Notably, Defendants fail to cite any law for their proposition.

Furthermore, the Complaint asserts a cause of action in contract; that is, that Defendants had a contractual duty to first serve a Notice of Intent to Foreclose before proceeding with a foreclosure action.

Defendants observe that our courts have dismissed foreclosure actions when the lender could not demonstrate that a Notice of Intent to Foreclose was duly served on the borrower. See EMC Mortgage Corp. v. Chaudri, 400 N.J. Super. 126 (App. Div. 2008). While that is correct, it is patently irrelevant to the issue at hand, and certainly does not support Defendants assertion that Plaintiff has failed to state a claim. Defendant seems to be saying that the dismissal of the foreclosure action is sufficient relief for a borrower, and that a borrower should not be able to bring a civil action against the lender for negligence. Defendants apparently make the grand leap to that conclusion, with absolutely no support whatsoever. Defendants do not cite any law whatsoever for their conclusion.

In fact, the Fair Foreclosure Act on its face contradicts Defendants' argument. Specifically, it provides:

> The duty of the lender under this section to serve notice of intention to foreclose is independent of any other duty to give notice under the common law, principles of equity, State or federal statute, or rule of court *and of any other right or remedy the debtor may have as a result of the failure to give such notice.* N.J.S.A. 2A:50-56(e) (emphasis added).

Clearly, Plaintiffs are perfectly justified in prosecuting a civil action for negligence as a "right or remedy" for Defendant's failure to give notice.

Plaintiffs assert in their Complaint that Defendants failed to exercise the required standard of care, and negligently and/or recklessly filed a Complaint for Foreclosure and recorded a Lis Pendens against Plaintiffs' property without first discharging its statutory duty to provide a "notice of intention" as required by the Fair Foreclosure Act. Plaintiffs further assert that at the time of such improper filing, Plaintiffs were in the process of consummating financial transactions which, as a proximate result of Defendants' negligent and/or reckless conduct, were not consummated and which, but for Defendant's negligent and/or reckless conduct, would have been consummated. Plaintiffs further assert that at all relevant times, Defendants knew or should have known that  a

foreclosure filing and Lis Pendens recording would severely compromise Plaintiffs' financial dealings, including but not limited to Plaintiffs' ability to obtain credit. Plaintiffs had a reasonable expectation that until such time as they would receive the proper statutory notice followed by the passage of the thirty (30) day period required by law, that they would have the ability to pursue their financial dealings in peace, free from the devastating effects that a foreclosure filing and Lis Pendens would inflict upon them. As further set forth in the Complaint, but for the negligent and reckless conduct of Defendants in prematurely filing a Complaint for Foreclosure and recording a Lis Pendens, Plaintiffs would have consummated a refinance transaction with another lender which would have paid off the mortgage and allowed them to cash out equity. Defendants' negligent and reckless actions made it impossible for Plaintiffs to consummate their financial transactions which had been pending, and destroyed Plaintiffs' credit and future ability to reinstate or pay off the mortgage loan as is permitted by the Fair Foreclosure Act. The fact that the foreclosure was ultimately dismissed nearly a year later did nothing to undo the catastrophic damage caused by Defendants' negligence. Clearly, these are triable issues of fact for a jury.

## CONCLUSION

For all of the foregoing reasons, the Plaintiffs respectfully submit that Defendants' motion to dismiss for failure to state a claim should be denied.

Respectfully submitted,

LAW OFFICES OF JEFFREY S. WALTERS, LLC

Dated: June 30, 2010          By:_____
                                   JEFFREY S. WALTERS

4

# EXHIBIT M

# Interagency Review
# of Foreclosure Policies
# and Practices

Federal Reserve System

Office of the Comptroller of the Currency

Office of Thrift Supervision





WASHINGTON, D.C.    •    APRIL 2011

# Interagency Review of Foreclosure Policies and Practices

Federal Reserve System

Office of the Comptroller of the Currency

Office of Thrift Supervision

  

WASHINGTON, D.C.    •    APRIL 2011

i

# Contents

Executive Summary ................................................................................ 1
   Review Scope and Objectives ........................................................ 1
   Summary of Review Findings .......................................................... 2
   Summary of Supervisory Response ............................................... 4

Part 1: Background and Risks Associated
with Weak Foreclosure Process and Controls ............................. 5
   Impact on Borrowers ...................................................................... 5
   Impact on the Industry and Investors ........................................... 6
   Impact on the Judicial Process ...................................................... 6
   Impact on the Mortgage Market and Communities ..................... 6

Part 2: Review Findings ...................................................................... 7
   Foreclosure Process Governance ................................................ 7
   Organizational Structure and Availability of Staffing .................. 8
   Affidavit and Notarization Practices .............................................. 8
   Documentation Practices ............................................................... 8
   Third-party Vendor Management .................................................... 9
      Arrangements with Outside Law Firms ..................................... 9
      Arrangements with Default Management Service Providers (DMSPs) ........ 10
      Arrangements with Mortgage Electronic Registration Systems, Inc. .......... 10
   Ineffective Quality Control (QC) and Audit .................................. 11

Part 3: Supervisory Response ......................................................... 13

Part 4: Industry Reforms ................................................................... 15
   Governance and Oversight ........................................................... 15
   Organizational Structure, Staffing, and Technology ................... 15
   Accountability and Responsiveness Dealing with Consumers ... 15

# Executive Summary

The Federal Reserve System, the Office of the Comptroller of the Currency (OCC), the Federal Deposit Insurance Corporation (FDIC), and the Office of Thrift Supervision (OTS), referred to as the agencies, conducted on-site reviews of foreclosure processing at 14 federally regulated mortgage servicers during the fourth quarter of 2010.[1]

This report provides a summary of the review findings and an overview of the potential impacts associated with instances of foreclosure-processing weaknesses that occurred industrywide. In addition, this report discusses the supervisory response made public simultaneous with the issuance of this report, as well as expectations going forward to address the cited deficiencies. The supervisory measures employed by the agencies are intended to ensure safe and sound mortgage-servicing and foreclosure-processing business practices are implemented. The report also provides an overview of how national standards for mortgage servicing can help address specific industrywide weaknesses identified during these reviews.

## Review Scope and Objectives

The primary objective of each review was to evaluate the adequacy of controls and governance over servicers' foreclosure processes and assess servicers' authority to foreclose. The reviews focused on issues related to foreclosure-processing functions. While the reviews uncovered significant problems in foreclosure processing at the servicers included in the report, examiners reviewed a relatively small number of files from among the volumes of foreclosures processed by the servicers. Therefore, the reviews could not provide a reliable estimate of the number of foreclosures that should not have proceeded. The agencies, therefore, are requiring each servicer to retain an independent firm to conduct a thorough review of foreclosure actions that were pending at any time from January 1, 2009, through December 31, 2010, to, among other things, 1) identify borrowers that have been financially harmed by deficiencies identified in the independent review and 2) provide remediation to those borrowers where appropriate. These independent reviews will be subject to supervisory oversight to ensure that the reviews are comprehensive and the results are reliable.

For the reviews discussed in this report, examiners evaluated each servicer's self-assessments of their foreclosure policies and processes; assessed each servicer's foreclosure operating procedures and controls; interviewed servicer staff involved in the preparation of foreclosure documents; and reviewed, collectively for all servicers, approximately 2,800 borrower foreclosure files that were in various stages of the foreclosure process between January 1, 2009, and December 31, 2010.[2]

Examiners focused on foreclosure policies and procedures; quality control and audits; organizational structure and staffing; and vendor management,

---

[1] Agencies conducted foreclosure-processing reviews at Ally Bank/GMAC, Aurora Bank, Bank of America, Citibank, EverBank, HSBC, JPMorgan Chase, MetLife, OneWest, PNC, Sovereign Bank, SunTrust, U.S. Bank, and Wells Fargo. The reviews included mortgage-servicing activities conducted by insured banks and thrifts, as well as by several nonbank affiliates of these organizations. The 14 servicers were selected based on the concentration of their mortgage-servicing and foreclosure-processing activities. The agencies typically do not disclose examinations or examination findings regarding particular institutions. In light of the formal enforcement actions entered into by these 14 servicers, which are being made public, the agencies have determined that it is appropriate to identify the servicers (whether a bank or a bank affiliate) that were reviewed. The bank and thrift holding company parents of Ally Bank/GMAC, Bank of America, Citibank, Everbank, HSBC, JPMorgan Chase, MetLife, OneWest, PNC, SunTrust, U.S. Bank, and Wells Fargo also entered into formal enforcement actions.

[2] Foreclosure files at each servicer were selected from the population of in-process and completed foreclosures during 2010. The foreclosure file sample at each servicer included foreclosures from both judicial states and nonjudicial states. Review teams independently selected foreclosure file samples based on pre-established criteria (such as files for which consumer complaints had been raised, or those in geographic areas with high volumes of foreclosures) with the balance of the files selected based on examiner judgment.

2     April 2011

including use of third-party vendors such as foreclo-
sure attorneys, Lender Processing Services (LPS) and
other default-service providers, and MERSCORP
and its wholly owned subsidiary, Mortgage Elec-
tronic Registration Systems, Inc. (MERS). Based on
their reviews of the limited number of foreclosure-file
samples, examiners also assessed the accuracy of
foreclosure-related documentation, including note
endorsements and the assignments of mortgages and
deeds of trust, and loan document control.[3] With
respect to those files, examiners also assessed whether
fees charged in connection with the foreclosures
exceeded the amounts reflected in the servicers' inter-
nal records. In addition, the Federal Reserve and the
OCC solicited views from consumer groups to help
detect problems at specific servicers, and the Federal
Reserve expanded the file sample to include borrow-
ers who were delinquent, but not yet in foreclosure.

The file reviews did not include a complete analysis
of the payment history of each loan prior to foreclo-
sure or potential mortgage-servicing issues outside of
the foreclosure process. Accordingly, examiners may
not have uncovered cases of misapplied payments or
unreasonable fees, particularly when these actions
occurred prior to the default that led to the foreclo-
sure action. The foreclosure-file reviews also may not
have uncovered certain facts related to the processing
of a foreclosure that would lead an examiner to con-
clude that a foreclosure otherwise should not have
proceeded, such as undocumented communications
between a servicer employee and the borrower in
which the employee told the borrower he or she had
to be delinquent on the loan to qualify for a modifi-
cation. In addition, the reviews did not focus on
loan-modification processes, but when reviewing
individual foreclosure files, examiners checked for
evidence that servicers were in contact with borrow-
ers and had considered alternative loss-mitigation
efforts, including loan modifications.

To ensure consistency in the reviews, the agencies
used standardized work programs to guide the
assessment and to document findings pertaining to
each servicer's corporate governance process and the
individual foreclosure-file reviews. The work pro-
grams were organized into the following categories:

- **Policies and procedures**. Examiners reviewed the
  servicers' policies and procedures to see if they

provided adequate controls over the foreclosure
process and whether those policies and procedures
were sufficient for compliance with applicable laws
and regulations.

- **Organizational structure and staffing**. Examiners
  reviewed the functional unit(s) responsible for fore-
  closure processes, including their staffing levels,
  their staff's qualifications, and their training
  programs.

- **Management of third-party service providers**.
  Examiners reviewed the servicers' oversight of key
  third parties used throughout the foreclosure pro-
  cess, with a focus on foreclosure attorneys, MERS,
  and default-service providers such as LPS.

- **Quality control and internal audits**. Examiners
  assessed quality-control processes in foreclosures.
  Examiners also reviewed internal and external
  audit reports, including government-sponsored
  enterprise (GSE) and investor audits and reviews
  of foreclosure activities as well as servicers'
  self-assessments.

- **Compliance with applicable laws**. Examiners
  checked the adequacy of the governance, audits,
  and controls that servicers had in place to ensure
  compliance with applicable laws.

- **Loss mitigation**. Examiners determined if servicers
  were in direct communication with borrowers and
  whether loss-mitigation actions, including loan
  modifications, were considered as alternatives to
  foreclosure.

- **Critical documents**. Examiners evaluated servicers'
  control over critical documents in the foreclosure
  process, including the safeguarding of original
  loan documentation. Examiners also determined
  whether critical foreclosure documents were in the
  foreclosure files that they reviewed, and whether
  notes were endorsed and mortgages assigned.

- **Risk management**. Examiners assessed whether
  servicers appropriately identified financial, reputa-
  tional, and legal risks and whether these risks were
  communicated to the board of directors and
  senior management of the servicer.

## Summary of Review Findings

The reviews found critical weaknesses in servicers'
foreclosure governance processes, foreclosure docu-
ment preparation processes, and oversight and moni-
toring of third-party vendors, including foreclosure
attorneys. While it is important to note that findings

---

[3] For purposes of this report, default management services gener-
ally include administrative support and services provided to the
servicers by third-party vendors to manage and perform the
tasks associated with foreclosures.

varied across institutions, the weaknesses at each ser-
vicer, individually or collectively, resulted in unsafe
and unsound practices and violations of applicable
federal and state law and requirements.[4] The results
elevated the agencies' concern that widespread risks
may be presented—to consumers, communities, vari-
ous market participants, and the overall mortgage
market. The servicers included in this review repre-
sent more than two-thirds of the servicing market.
Thus, the agencies consider problems cited within
this report to have widespread consequences for the
national housing market and borrowers.

Based on the deficiencies identified in these reviews
and the risks of additional issues as a result of weak
controls and processes, the agencies at this time are
taking formal enforcement actions against each of
the 14 servicers subject to this review to address those
weaknesses and risks. The enforcement actions
require each servicer, among other things, to conduct
a more complete review of certain aspects of foreclo-
sure actions that occurred between January 1, 2009,
and December 31, 2010. The specific supervisory
responses are summarized in Part 3 of this report.

The loan-file reviews showed that borrowers subject
to foreclosure in the reviewed files were seriously
delinquent on their loans. As previously stated, the
reviews conducted by the agencies should not be
viewed as an analysis of the entire lifecycle of the
borrowers' loans or potential mortgage-servicing
issues outside of the foreclosure process. The reviews
also showed that servicers possessed original notes
and mortgages and, therefore, had sufficient docu-
mentation available to demonstrate authority to fore-
close. Further, examiners found evidence that ser-
vicers generally attempted to contact distressed bor-
rowers prior to initiating the foreclosure process to
pursue loss-mitigation alternatives, including loan
modifications. However, examiners did note cases in
which foreclosures should not have proceeded due to
an intervening event or condition, such as the bor-
rower (a) was covered by the Servicemembers Civil
Relief Act, (b) filed for bankruptcy shortly before the
foreclosure action, or (c) qualified for or was paying
in accordance with a trial modification.[5]

The interagency reviews identified significant weak-
nesses in several areas.

- **Foreclosure process governance.** Foreclosure gover-
nance processes of the servicers were under-
developed and insufficient to manage and control
operational, compliance, legal, and reputational
risk associated with an increasing volume of fore-
closures. Weaknesses included:
  - inadequate policies, procedures, and indepen-
dent control infrastructure covering all aspects
of the foreclosure process;
  - inadequate monitoring and controls to oversee
foreclosure activities conducted on behalf of
servicers by external law firms or other third-
party vendors;
  - lack of sufficient audit trails to show how infor-
mation set out in the affidavits (amount of
indebtedness, fees, penalties, etc.) was linked to
the servicers' internal records at the time the
affidavits were executed;
  - inadequate quality control and audit reviews to
ensure compliance with legal requirements, poli-
cies and procedures, as well as the maintenance
of sound operating environments; and
  - inadequate identification of financial, reputa-
tional, and legal risks, and absence of internal
communication about those risks among boards
of directors and senior management.

- **Organizational structure and availability of staff-
ing.** Examiners found inadequate organization and
staffing of foreclosure units to address the
increased volumes of foreclosures.

- **Affidavit and notarization practices.** Individuals
who signed foreclosure affidavits often did not per-
sonally check the documents for accuracy or pos-
sess the level of knowledge of the information that
they attested to in those affidavits. In addition,
some foreclosure documents indicated they were
executed under oath, when no oath was adminis-
tered. Examiners also found that the majority of
the servicers had improper notary practices which
failed to conform to state legal requirements.
These determinations were based primarily on ser-
vicers' self-assessments of their foreclosure pro-
cesses and examiners' interviews of servicer staff
involved in the preparation of foreclosure
documents.

- **Documentation practices.** Examiners found some—
but not widespread—errors between actual fees
charged and what the servicers' internal records
indicated, with servicers undercharging fees as fre-
quently as overcharging them. The dollar amount

---

[4] This report captures only the significant issues found across the
servicers reviewed, not necessarily findings at each servicer.

[5] Servicemembers Civil Relief Act, 50 USC App. sections. 501–
596, Public Law 108-189.

4    April 2011

of overcharged fees as compared with the ser-
vicers' internal records was generally small.

- **Third-party vendor management.** Examiners gener-
ally found adequate evidence of physical control
and possession of original notes and mortgages.
Examiners also found, with limited exceptions,
that notes appeared to be properly endorsed and
mortgages and deeds of trust appeared properly
assigned.[6] The review did find that, in some cases,
the third-party law firms hired by the servicers
were nonetheless filing mortgage foreclosure com-
plaints or lost-note affidavits even though proper
documentation existed.

- **Quality control (QC) and audit.** Examiners found
weaknesses in quality control and internal auditing
procedures at all servicers included in the review.

## Summary of Supervisory Response

The agencies recognize that a number of supervisory
actions and industry reforms are required to address
these weaknesses in a way that will hold servicers
accountable for establishing necessary governance
and controls. Measures that the servicers are being
required to implement are designed to ensure compli-
ance with applicable laws, promote foreclosure pro-
cessing in a safe and sound manner, and establish
responsible business practices that provide account-
ability and appropriate treatment to borrowers.

---

[6]   The agencies expect federally regulated servicers to have the nec-
essary policies and procedures in place to ensure that notes are
properly endorsed and mortgages are properly assigned, so that
ownership can be determined at the time of foreclosure. Where
federally regulated servicers serve as document custodians for
themselves or other investors, the agencies require controls and
tracking systems to properly safeguard the physical security and
maintenance of critical loan documents.

At this time, the agencies are taking formal enforce-
ment action against each of the 14 servicers and par-
ent bank holding companies because the deficiencies
and weaknesses identified during the reviews repre-
sent unsafe or unsound practices and violations of
applicable law. The foreclosure-file reviews showed
that borrowers in the sampled pool were seriously
delinquent. The reviews also showed that the appro-
priate party brought the foreclosure action. However,
a limited number of mortgages should not have pro-
ceeded to foreclosure because of an intervening event
or condition. Nevertheless, the weaknesses in ser-
vicers' foreclosure processes, as confirmed by the
reviews, present significant risk to the safety and
soundness of mortgage activities. The failures and
deficiencies identified as part of the reviews must be
remedied swiftly and comprehensively.

The agencies will continue to assess and monitor cor-
rective actions and will address servicers' failures to
correct identified deficiencies where necessary.

Going forward, servicers must develop and demon-
strate effective risk management of servicing opera-
tions to prevent a recurrence of deficiencies cited in
this report. The agencies are currently engaged in an
effort to establish national mortgage-servicing stan-
dards to promote the safe and sound operation of
mortgage-servicing and foreclosure processing,
including standards for accountability and respon-
siveness to borrower concerns. Such an effort will
include engaging the Government Sponsored Enter-
prises, private investors, consumer groups, the servic-
ing industry, and other regulators. Part 4 of this
report provides a general overview of the core prin-
ciples that should be included in future national
mortgage-servicing standards.

# Part 1: Background and Risks Associated with Weak Foreclosure Process and Controls

Mortgage servicing plays a central role in the management of mortgage loans from origination to final disposition. The mortgage servicer is the intermediary between borrowers and their lenders. When the borrower is paying as agreed, the servicer's duties are ministerial: collecting payments, distributing payments to investors, managing cash and administering funds in escrow, and reporting to investors. When a loan is in default, the demands on the servicer necessarily expand, requiring additional resources and much more sophisticated risk management. A necessary consequence of the growth in foreclosures since 2007 is increased demands on servicers' foreclosure processes.

The residential mortgage-servicing market is highly concentrated among a few servicers. The five largest mortgage servicers by activity volume—included among the 14 servicers subject to the reviews addressed in this report—account for 60 percent of the industry's total servicing volume.[7] The 14 servicers included in the interagency review collectively represent more than two-thirds of the servicing industry (see **figure 1**), or nearly 36.7 million mortgages.[8]

At the end of the fourth quarter of 2010, nearly 54 million first-lien mortgage loans were outstanding, 2.4 million of which were at some point in the foreclosure process. Additionally, two million mortgages were 90 or more days past due and at an elevated risk of foreclosure. New foreclosures are on pace to approach 2.5 million by the end of 2011. In light of the number of foreclosures and continued weakness in overall mortgage performance, the agencies are concerned that the deficiencies in foreclosure



**Figure 1. Concentration of the mortgage-servicing industry**

68%

32%

■ 14 examined servicers
▨ All other servicers

Source: Federal Reserve staff estimates of the concentration of servicing volume, based on data from Inside Mortgage Finance.

processing observed among these major servicers may have widespread consequences for the housing market and borrowers.

## Impact on Borrowers

Weaknesses in foreclosure processes and controls present the risk of foreclosing with inaccurate documentation, or foreclosing when another intervening circumstance should intercede. Even if a foreclosure action can be completed properly, deficiencies can result (and have resulted) in violations of state foreclosure laws designed to protect consumers. Such weaknesses may also result in inaccurate fees and charges assessed against the borrower or property, which may make it more difficult for borrowers to bring their loans current. In addition, borrowers can find their loss-mitigation options curtailed because of dual-track processes that result in foreclosures even when a borrower has been approved for a loan modification. The risks presented by weaknesses in foreclosure processes are more acute when those processes are aimed at speed and quantity instead of quality and accuracy.

---

[7]  The five largest mortgage servicers in order are Bank of America, Wells Fargo, JPMorgan Chase, Citibank, and Ally Bank/GMAC.

[8]  Federal Reserve staff estimates 54 million first-lien mortgages outstanding as of December 31, 2010.

6      April 2011

## Impact on the Industry and Investors

Weaknesses in foreclosure processes pose a variety of risks to the financial services industry and investors. These risks extend beyond the financial cost of remedying procedural errors and re-filing affidavits and other foreclosure documents. Servicers may also bear legal costs related to disputes over note ownership or authority to foreclose, and to allegations of procedural violations through the use of inaccurate affidavits and improper notarizations. Servicers may be subject to claims by investors as a result of delays or other damages caused by the weaknesses. Furthermore, concerns about the prevalence of irregularities in the documentation of ownership may cause uncertainty for investors of securitized mortgages. Servicers and their affiliates also face significant reputational risk with their borrowers, with the court system, and with regulators.

## Impact on the Judicial Process

Weaknesses in foreclosure processes have resulted in increased demands on judicial resources to resolve a variety of foreclosure-related matters, including note ownership. In addition, courts rely extensively on affidavits (usually affidavits of indebtedness) submitted by servicers to decide foreclosure actions on a summary basis without requiring in-person testimony.[9] If such affidavits were not properly prepared or executed, courts may lose confidence in the reliability of the affidavits as persuasive evidence filed on behalf of servicers.[10]

## Impact on the Mortgage Market and Communities

Weaknesses in foreclosure processes led several servicers to slow, halt, or suspend foreclosure proceedings in late 2010, and, in many cases, re-file foreclosure documents. Delays in foreclosure processing, which averaged 450 days in the fourth quarter of 2010, slow the clearing of excess inventory of foreclosed properties and lead to extended periods of depressed home prices.[11] Such delays also impede the efficient disposition of foreclosed homes and the clearing of seriously delinquent mortgages, particularly in geographic regions with greater concentrations of vacant and abandoned properties. This outcome acts as an impediment for communities working to stabilize local neighborhoods and housing markets.[12]

Moreover, local property values may be adversely affected if foreclosed homes remain vacant for extended periods, particularly if such homes are not properly maintained.[13] Widely publicized weaknesses in foreclosure processes also adversely affect home buyer and investor confidence. Assuring robust and credible remedial programs for mortgage servicers so that foreclosure processes can operate and markets can clear without impediments or interventions contributes to attaining a stable national housing market.

---

[9] The basic affidavit of indebtedness typically sets forth the name of the party that owns the loan, the default status, and the amounts due for principal, interest, penalties (such as late charges), and fees. This affidavit is frequently the principal basis upon which a court is permitted to order a foreclosure without requiring in-person testimony. Similar documentation may be required in bankruptcy proceedings.

[10] Mortgage foreclosures occur under either a judicial or a nonjudicial process. Judicial foreclosures are court-supervised and require the lender to bring a court action to foreclose. Nonjudicial foreclosures (also known as "power of sale") involve little or no court oversight and generally are governed by state statutes. Even foreclosures that are instituted outside the judicial process can be challenged in court, however, and then become subject to court actions.

[11] See *Lender Processing Services Applied Analytics* (December 2010, www.lpsvcs.com/RiskMgmt). Current time frames to move a property to foreclosure sale have increased from an average of 250 days in first quarter 2008 to 450 days by fourth quarter 2010.

[12] Industry data show approximately four million properties currently listed that have been foreclosed in the past few years. See Mortgage Bankers Association, *National Delinquency Survey*, (November 18, 2010, www.mbaa.org/NewsandMedia/PressCenter/74733.htm).

[13] Campbell, John Y., Stefano Giglio and Parag Pathak (July 2010) *Forced Sales and House PricesManuscript*, Harvard University Department of Economics (kuznets.fas.harvard.edu/~campbell/papers/forcedsales072410.pdf).

# Part 2: Review Findings

The reviews found critical weaknesses in foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party law firms and other vendors. These weaknesses involve unsafe and unsound practices and violations of applicable federal and state laws and requirements, and they have had an adverse effect on the functioning of the mortgage markets. By emphasizing speed and cost efficiency over quality and accuracy, examined servicers fostered an operational environment contrary to safe and sound banking practices.

In connection with the reviews of sampled files and assessments of servicers' custodial activities, examiners found that borrowers whose files were reviewed were seriously delinquent on their mortgage payments at the time of foreclosure and that servicers generally had sufficient documentation available to demonstrate authority to foreclose on those borrowers' mortgages.[14] Nevertheless, examiners noted instances where documentation in the foreclosure file alone may not have been sufficient to prove ownership of the note at the time the foreclosure action commenced without reference to additional information. When additional information was requested and provided to examiners, it generally was sufficient to determine ownership.

In addition, review of the foreclosure files showed that servicers were in contact with the delinquent borrowers and had considered loss-mitigation alternatives, including loan modifications. Examiners also noted a small number of foreclosure sales, however, that should not have proceeded because of an inter-

vening event or condition, such as the borrower: (a) was covered by the Servicemembers Civil Relief Act, (b) filed bankruptcy shortly before the foreclosure action, or (c) was approved for a trial modification.

A summary of the major findings identified during the reviews is set forth below.

## Foreclosure Process Governance

Examiners found governance at each examined servicer in need of substantial improvement, and often cited the absence of sound controls and ineffective management of foreclosure processes. Foreclosure policies and procedures at many of the servicers were either weak or needed substantial expansion to provide effective guidance, control, and ongoing monitoring. As noted above, examiners concluded that the majority of servicers reviewed had inadequate affidavit and notary-signing processes that did not ensure proper attestation (or verification) of the underlying documents.

Examiners found that most servicers had inadequate staffing levels and training programs throughout the foreclosure-processing function and that a large percentage of the staff lacked sufficient training in their positions. The reviews also revealed that all of the servicers relied heavily on outsourcing arrangements with outside counsel and other third-party vendors to carry out foreclosure processes without adequate oversight of those arrangements. Some servicers failed to enter into contracts with the foreclosure law firms performing critical steps in the foreclosure process, including affidavit- and notary-preparation and signing processes. Audit and quality-assurance controls and self-assessment reviews at all of the examined servicers lacked comprehensiveness and failed to identify specific weaknesses and process gaps. Details on these areas of weakness are included below.

---

[14] As previously noted, examiners were limited to the documents in the foreclosure files. Those documents may not have disclosed certain facts that might have led examiners to conclude that a foreclosure should not have proceeded, such as misapplication of payments that could have precipitated a foreclosure action or oral communications between the borrower and servicer staff that were not documented in the foreclosure file.

8    April 2011

## Organizational Structure and Availability of Staffing

At the time of the review, a majority of the servicers had inadequate staffing levels or had recently added staff with limited servicing experience. In most instances, servicers maintained insufficient staff to appropriately review documents for accuracy, and provided inadequate training for affidavit signers, notaries, and quality-control staff. Examiners also noted weak controls, undue emphasis on quantitative production and timelines, and inadequate workload monitoring.

## Affidavit and Notarization Practices

Deficiencies in servicers' processes, procedures, controls, and staffing resulted in numerous inaccurate affidavits and other foreclosure-related documents. Examiners found that most servicers had affidavit signing protocols that expedited the processes for signing foreclosure affidavits without ensuring that the individuals who signed the affidavits personally conducted the review or possessed the level of knowledge of the information that they attested to in those affidavits. Examiners confirmed these deficiencies through interviews with individuals who signed documents, as well as through a review of servicers' self-assessments. Examiners also found the majority of the servicers had improper notary practices that failed to conform to state legal requirements. Examiners noted some servicers failed to maintain an accurate list of approved and acceptable notaries that individuals signing documents did not do so in the presence of a notary when required, and that documents often were executed in a manner contrary to the notary's acknowledgement and verification of those documents. In addition, some foreclosure documents indicated they were executed under oath when no oath was administered. Again, examiners confirmed these deficiencies by interviewing notaries and reviewing servicers' self-assessments.

At the examined servicers, anywhere from 100 to more than 25,000 foreclosure actions occurred per month between January 1, 2009, and December 31, 2010, with the quantity depending upon the size of the servicer's operations. It was common to find an insufficient number of staff assigned to review, sign, and notarize affidavits. At some of the servicers, examiners found that insufficient staff—or the lack of specified guidance to staff or external law firms on

affidavit completion—contributed to the preparation and filing of inaccurate affidavits. In the sample of foreclosure files reviewed, examiners compared the accuracy of the amounts listed on affidavits of indebtedness to the documentation in the paper foreclosure file or computerized loan servicing systems. Although borrowers whose foreclosure files were reviewed were seriously in default at the time of the foreclosure action, some servicers failed to accurately complete or validate itemized amounts owed by those borrowers. At those servicers, this failure resulted in differences between the figures in the affidavit and the information in the servicing system or paper file. In nearly half of those instances, the differences—which were typically less than $500—were adverse to the borrower. While the error rates varied among the servicers, the percentage of errors at some servicers raises significant concerns regarding those servicers' internal controls governing foreclosure-related documentation.

## Documentation Practices

During the foreclosure-file reviews, examiners compared the accuracy of amounts listed on the servicers' affidavits of indebtedness with documentation on file or maintained within the electronic servicing system of record. For most of the servicers, examiners cited the lack of a clear auditable trail in reconciling foreclosure filings to source systems of record. In some cases, examiners directed servicers to further audit foreclosure filings to verify the accuracy of information and compliance with legal requirements. Likewise, in connection with the file review, examiners also determined whether critical foreclosure documents were in the foreclosure files, and whether notes appeared properly endorsed and mortgages appeared properly assigned. Examiners noted instances where documentation in the foreclosure file alone may not have been sufficient to prove authority to foreclose without reference to additional information.[15] When more information was requested and provided, it generally was sufficient to determine authority. With some exceptions, examiners found that notes appeared properly endorsed, and mortgages appeared properly assigned.[16] Examiners also trav-

---

[15] Servicers frequently maintained custody of original mortgage documents, although in some cases third-party trustees or custodians held original documents. Custodians are entrusted to manage the original documents that establish note ownership, and, when necessary, produce the original documents for a foreclosure action.

[16] Only in rare instances were custodians unable to produce origi-

eled to servicers' document repository locations to assess custodial activities. Examiners found that servicers generally had possession and control over critical loan documents such as the promissory notes and mortgages. The review did find that, in some cases prior to 2010, the third-party law firms hired by the servicers were nonetheless filing lost-note affidavits or mortgage foreclosure complaints in which they claimed that the mortgage note had either been lost or destroyed, even though proper documentation existed.

## Third-party Vendor Management

The agencies found that the servicers reviewed generally did not properly structure, carefully conduct, or prudently manage their third-party vendor relationships with outside law firms and other third-party foreclosure services providers. Failure to effectively manage third-party vendors resulted in increased reputational, legal, and financial risks to the servicers.

### Arrangements with Outside Law Firms

Servicers typically used third-party law firms to prepare affidavits and other legal documents, to file complaints and other pleadings with courts, and to litigate on their behalf in connection with foreclosure and foreclosure-related bankruptcy proceedings. The servicers reviewed generally showed insufficient guidance, policies, or procedures governing the initial selection, management, or termination of the law firms that handled their foreclosures. Many servicers, rather than conducting their own due diligence, relied on the fact that certain firms had been designated as approved or accepted by investors. Servicers often did not govern their relationships with these law firms by formal contracts. Instead, servicers frequently relied on informal engagements with law firms, at times relying on investors' business relationships with the law firms or the law firms' contractual relationships with default management service providers.

#### Inadequate Oversight

Servicers also did not provide adequate oversight of third-party vendor law firms, including monitoring for compliance with the servicers' standards. Several

servicers exempted third-party law firms from the servicers' vendor management programs or did not identify them as third-party vendors subject to those programs. In some cases, servicers assumed that investors performed such oversight, in which case oversight was limited to ensuring that the law firms were on the investors' lists of approved or accepted providers. Where monitoring of law firms was conducted, it was often limited to things such as responsiveness and timeliness, checking for liability insurance, or determining if any power of attorney given to the firm remained valid rather than assessing the accuracy and adequacy of legal documents or compliance with state law or designated fee schedules.

#### Document Retention Weaknesses

Examiners also found that the servicers did not always retain originals or copies of the documents maintained by the third-party law firms that conducted their foreclosures. Instead, the servicers relied on the firms to maintain those documents. The absence of central and well-organized foreclosure files by the servicers and the consequent need for the examiners to collect foreclosure documentation derived from numerous sources made it difficult at times for examiners to conduct full foreclosure-file reviews while on-site.

#### Inadequate guidance, policies, procedures, and contracts

In addition, examiners generally found an absence of formal guidance, policies, or procedures governing the selection, ongoing management, and termination of law firms used to handle foreclosures. This deficiency resulted in a lack of clarity regarding roles, responsibilities, and performance parameters. Examiners also observed an absence of written contracts between certain servicers and law firms, which left those servicers with no contractual recourse for liability against the firms for performance issues. These deficiencies, coupled with the overall lack of adequate oversight, contributed to instances in which servicers and law firms failed to identify problems with the firms' foreclosure practices, thereby exposing the servicers to a variety of significant risks.

Those problems include instances in which law firms signed documents on behalf of servicers without having the authority to do so, or they changed the format and content of affidavits without the knowledge of the servicers. These defects could, depending upon the circumstances, raise concerns regarding the legality and propriety of the foreclosure even if the ser-

---

nal loan documentation, and in those instances the servicers generally were able to provide adequate explanations, including that copies in the possession of the custodian were acceptable under applicable law.

10     April 2011

vicer had sufficient documentation available to dem-
onstrate authority to foreclose.

## Arrangements with Default Management Service Providers (DMSPs)

In connection with the on-site reviews of servicers,
the agencies also conducted an on-site review of
Lender Processing Services, Inc. (LPS), which pro-
vides significant services to support mortgage-
servicing and foreclosure processing across the indus-
try. The review of LPS involved a number of issues
that are similar to those raised in the reviews of the
servicers, and the LPS review covered issues that are
unique to the operations, structure and corporate
governance of LPS. During the review of LPS, the
agencies found deficient practices related primarily to
the document execution services that LPS, through
its DocX, LLC, and LPS Default Solutions, Inc. sub-
sidiaries had provided to servicers in connection with
foreclosures. To address these issues, the agencies are
taking formal enforcement action against LPS under
section 7(d) of the Bank Service Company Act, 12
USC § 1867(d), and section 8(b) of the Federal
Deposit Insurance Act, 12 USC § 1818(b).

### *Inadequate Contracts*

During the review of servicers, examiners assessed
servicers' relationships with third-party vendor
DMSPs, focusing primarily on DMSPs that sup-
ported the execution of foreclosure-related docu-
ments, such as affidavits of indebtedness, lost-note
affidavits, and assignments of mortgages.[17] Examin-
ers found that contracts between the servicers and
DMSPs generally were inadequate, often omitting
significant matters such as service-level agreements.
Contracts did not provide for an appropriate level of
oversight of third-party vendor law firms in situa-
tions where the servicers relied on the DMSPs to
conduct such oversight.

### *Inadequate Oversight*

Examiners also observed that servicers generally
demonstrated an overall lack of adequate oversight
of DMSPs. At times, the servicers failed to identify
DMSPs as vendors subject to the servicers' vendor
management programs and demonstrated an inabil-
ity to provide the examiners with sufficient evidence
of due diligence. Examiners found no evidence that
servicers conducted audits of the document execu-
tion operations of their DMSPs.

[17] Not all of the servicers engaged the services of third-party
vendor DMSPs to perform document execution services.

The lack of sufficient oversight of DMSPs, coupled
with the contractual deficiencies, led to instances in
which employees of those DMSPs signed foreclosure
affidavits without personally conducting the review
or possessing the level of knowledge of information
that they attested to in those affidavits. Employees of
DMSPs, like the employees of the servicers them-
selves, executed documents in a manner contrary to
the notary's acknowledgement and verification of
those documents. In addition, in limited instances,
employees of DMSPs signed foreclosure-related
documents on behalf of servicers without proper
authority. Because some of the servicers relied on
DMSPs to oversee their third-party vendor law
firms, the contractual deficiencies and lack of over-
sight of DMSPs contributed to the weaknesses iden-
tified above regarding the oversight of third-party
vendor law firms.

## Arrangements with Mortgage Electronic Registration Systems, Inc.

In connection with the on-site reviews of servicers,
the agencies, together with the Federal Housing
Finance Agency (FHFA), also conducted an on-site
review of MERSCORP and its wholly owned subsid-
iary, Mortgage Electronic Registration Systems, Inc.
(collectively, MERS), which, as detailed below, pro-
vides significant services to support mortgage-
servicing and foreclosure processing across the indus-
try. The review of MERS involved a number of
issues that are similar to those raised in the reviews of
the servicers, and the MERS review covered issues
that are unique to the operations, structure and cor-
porate governance of MERS. During the review of
MERS, the agencies and FHFA found significant
weaknesses in, among other things, oversight, man-
agement supervision and corporate governance. To
address these issues, the agencies, together with
FHFA, are taking formal enforcement action against
MERS under section 7(d) of the Bank Service Com-
pany Act, 12 USC § 1867(d), and section 8(b) of the
Federal Deposit Insurance Act, 12 USC § 1818(b).

MERS streamlines the mortgage recording and
assignment process in two ways. First, it operates a
centralized computer database or registry of mort-
gages that tracks the servicing rights and the benefi-
cial ownership of the mortgage note. Each mortgage
registered in the database is assigned a Mortgage
Identification Number (MIN). Second, MERS can
be designated by a member (and its subsequent
assignees) to serve in a nominee capacity as the mort-
gagee of record in public land records. Designating

MERS as the mortgagee is intended to eliminate the need to prepare and record successive assignments of mortgages each time ownership of a mortgage is transferred. Rather, changes in beneficial ownership of the mortgage note (and servicing rights) are tracked in the MERS registry using the MIN.[18] All of the examined servicers had relationships with MERS.

### Inadequate Oversight

Servicers exercised varying levels of oversight of the MERS relationship, but none to a sufficient degree. Several of the servicers did not include MERS in their vendor management programs. In these instances, the servicers failed to conduct appropriate due diligence assessments and failed to monitor, evaluate, and appropriately manage the MERS contractual relationship. Deficiencies included failure to assess the internal control processes at MERS, failure to ensure the accuracy of servicing transfers, and failure to ensure that servicers' records matched MERS' records.

### Inadequate Quality Control

Examiners also determined that servicers' quality-control processes pertaining to MERS were insufficient. In some cases, servicers lacked any quality-assurance processes and relied instead on the infrequent and limited audits that MERS periodically conducted. Other deficiencies included the failure to conduct audit reviews to independently verify the adequacy of and adherence to quality-assurance processes by MERS, and the need for more frequent and complete reconciliation between the servicers' systems and the MERS registry. Several servicers did not include MERS activities in the scope of their audit coverage.

## Ineffective Quality Control (QC) and Audit

Examiners found weaknesses in quality-control procedures at all servicers, which resulted in servicers not

performing one or more of the following functions at a satisfactory level:

- ensuring accurate foreclosure documentation, including documentation pertaining to the fees assessed;

- incorporating mortgage-servicing activities into the servicers' loan-level monitoring, testing, and validation programs;

- evaluating and testing compliance with applicable laws and regulations, court orders, pooling and servicing agreements, and similar contractual arrangements; and

- ensuring proper controls to prevent foreclosures when intervening events or conditions occur that warrant stopping the foreclosure process (e.g., bankruptcy proceedings, applicability of the Servicemembers Civil Relief Act, or adherence to a trial or permanent loan modification program).

Examiners also found weaknesses in internal auditing procedures at all the servicers included in the review. When performed, the few internal audits conducted by servicers failed to identify fundamental control issues that led to the foreclosure process breakdowns. Failures to perform internal audits effectively resulted in servicers' inability to identify, address, and internally communicate foreclosure-processing risks. The failures to identify and communicate these risks resulted in servicers not strengthening the quality of risk-management processes to a level consistent with the nature, increasing size, and complexity of the servicer's foreclosure activities. Moreover, failure to conduct comprehensive audits to identify weaknesses in foreclosure processes resulted in servicers not taking sufficient corrective action to strengthen policy and procedural gaps, increase staffing levels, and improve training in response to sharply rising foreclosure volumes prior to the agencies' foreclosure reviews. The failure to identify the risks associated with foreclosure processing also resulted in servicers not taking action to improve foreclosure documentation-related processes ranging from custody and control of documents to proper notarization processes, or to enhance oversight of third parties managing foreclosure activities on their behalf.

---

[18] While MERS maintains a registry of the beneficial ownership of the mortgage note, this registry is not a system of legal record. The ownership of the note is determined by the Uniform Commercial Code, and, if a change in ownership of a note is not recorded in MERS or is recorded incorrectly, the transfer is still valid.

This page left intentionally blank.

# Part 3: Supervisory Response

At this time, the agencies are taking formal enforcement actions against each of the 14 servicers under the authority of section 8(b) of the Federal Deposit Insurance Act, 12 USC § 1818(b). The deficiencies and weaknesses identified by examiners during their reviews involved unsafe or unsound practices and violations of law, which have had an adverse impact on the functioning of the mortgage markets. Furthermore, the mortgage servicers' deficient foreclosure processes confirmed during the reviews have compromised the public trust and confidence in mortgage servicing and have consequences for the housing market and borrowers. The formal enforcement actions will require servicers, among other things, to:

- **Compliance program:** Establish a compliance program to ensure mortgage-servicing and foreclosure operations, including loss mitigation and loan modification, comply with all applicable legal requirements and supervisory guidance, and assure appropriate policies and procedures, staffing, training, oversight, and quality control of those processes.

- **Foreclosure review:** Retain an independent firm to conduct a review of residential foreclosure actions that were pending at any time from January 1, 2009, through December 31, 2010, to determine any financial injury to borrowers caused by errors, misrepresentations, or other deficiencies identified in the review, and to remediate, as appropriate, those deficiencies.

- **Dedicated resources for communicating with borrowers/single point of contact:** Ensure the following: effective coordination of communication with borrowers related to foreclosure, loss mitigation, and loan modification activities; assurance that communications are timely and appropriate and designed to avoid borrower confusion; continuity in the handling of borrower cases during the loan modification and foreclosure processes; reasonable and good faith efforts, consistent with applicable law and contracts, to engage in loss mitigation and foreclosure prevention for delin-

quent loans where appropriate; and assurances that decisions concerning loss mitigation or loan modifications will be made and communicated in a timely manner.

- **Third-party management:** Establish policies and procedures for outsourcing foreclosure or related functions to ensure appropriate oversight and that activities comply with all applicable legal requirements, supervisory guidance, and the servicer's policies and procedures, including the appropriate selection and oversight of all third-party service providers, including external legal counsel, DMSPs, and MERS.

- **Management information systems:** Improve management information systems for foreclosure, loss mitigation, and loan modification activities that ensure timely delivery of complete and accurate information to facilitate effective decision making.

- **Risk assessment:** Retain an independent firm to conduct a written, comprehensive assessment of risks in servicing operations, particularly in the areas of foreclosure, loss mitigation, and the administration and disposition of other real estate owned, including but not limited to operational, compliance, transaction, legal, and reputational risks.

In addition to the actions against the servicers, the Federal Reserve and the OTS have issued formal enforcement actions against the parent holding companies to require that they enhance on a consolidated basis their oversight of mortgage-servicing activities, including compliance, risk management, and audit.

The agencies will monitor and assess, on an ongoing basis, the corrective actions taken by the servicers and holding companies that are required by the enforcement actions and take further action, when necessary, to address failures. Enforcement actions and more frequent monitoring will remain in place at each servicer until that servicer has demonstrated that its weaknesses and deficiencies have been cor-

14    April 2011

rected, including that adequate policies, procedures, and controls are in place. The agencies will continue to explore ways to improve their supervisory frame-works to identify more promptly and effectively the potential risks in mortgage-servicing and other banking operations.

# Part 4: Industry Reforms

Financial regulatory agencies are developing standards within their authority to improve the transparency, oversight, and regulation of mortgage-servicing and foreclosure processing and to set additional thresholds for responsible management and operation of mortgage-servicing activities. Moreover, a uniform set of national mortgage-servicing and foreclosure-processing standards would help promote accountability and appropriateness in dealing with consumers and strengthen the housing finance market.

Industry reforms that could improve the oversight and regulation of mortgage-servicing and foreclosure processing should generally include standards that require servicers to address major areas of weaknesses highlighted in the review, including in the following general areas:

## Governance and Oversight

- implement and routinely audit sound enterprise-wide policies and procedures to govern and control mortgage-servicing and foreclosure processes

- develop quality controls for effective management of third-party vendors who support mortgage-servicing and foreclosure processing

- strengthen the governance standards intended to ensure compliance with applicable federal and state laws and company policies and procedures

- develop company standards that emphasize accuracy and quality in the processing and validation

of foreclosure and other servicing-related documents throughout the entire foreclosure process

## Organizational Structure, Staffing, and Technology

- increase staffing to adequate levels and provide them with requisite training to effectively manage the volume of default loans and foreclosures

- upgrade information systems and practices to better store, track, and retrieve mortgage-related documents

## Accountability and Responsiveness Dealing with Consumers

- ensure borrowers are offered appropriate loss-mitigation options

- ensure proper custody and control of borrower documents related to the servicing of the mortgage

- increase coordination between loss mitigation and foreclosure-processing units to prevent inappropriate foreclosures

- improve communication with borrowers and establish measurable goals and incentives for delivering accurate information and responsive assistance

- develop complaint-resolution processes that are routinely monitored and measured for quality assurance

# EXHIBIT N

UNITED STATES OF AMERICA
BEFORE THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
WASHINGTON, D.C.

FEDERAL DEPOSIT INSURANCE CORPORATION
WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of<br><br>ALLY FINANCIAL INC.<br>Detroit, Michigan<br><br>ALLY BANK<br>Midvale, Utah<br><br>RESIDENTIAL CAPITAL, LLC<br>Minneapolis, Minnesota<br><br>and<br><br>GMAC MORTGAGE, LLC<br>Fort Washington, Pennsylvania | FRB Docket No. 11-020-B-HC<br>11-020-B-DEO<br><br>FDIC-11-123b |

## CONSENT ORDER

WHEREAS, Ally Financial Inc., Detroit, Michigan ("Ally Financial"), a registered bank

holding company, indirectly owns and controls Ally Bank (f/k/a GMAC Bank), Midvale, Utah, a

state nonmember bank, and numerous direct and indirect nonbank subsidiaries, including

Residential Capital, LLC, Minneapolis, Minnesota ("ResCap"), and its direct and indirect

subsidiaries, including GMAC Mortgage, LLC, Fort Washington, Pennsylvania ("GMAC

Mortgage"), and its subsidiaries. Ally Financial, f/k/a GMAC LLC, became a bank holding

company on December 24, 2008, following approval by the Board of Governors of the Federal

Reserve System (the "Board of Governors") pursuant to section 3(a)(1) of the Bank Holding

Company Act (12 U.S.C. § 1842(a)(1)), and conversion of Ally Bank from an industrial loan company to a state-chartered insured nonmember bank;

WHEREAS, Ally Financial engages in the business of servicing residential mortgage loans through various indirect subsidiaries, including GMAC Mortgage and its subsidiaries (collectively, the "Mortgage Servicing Companies"). The Mortgage Servicing Companies service residential mortgage loans that are held in the portfolios of (a) Ally Bank and GMAC Mortgage; (b) the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, and the Government National Mortgage Association (collectively, the "GSEs"); and (c) various investors, including securitization trusts pursuant to Pooling and Servicing Agreements and similar agreements (collectively, the "Servicing Portfolio"). The Mortgage Servicing Companies have substantial responsibilities with respect to the Servicing Portfolio for the initiation and handling of foreclosure proceedings, and loss mitigation activities ("Loss Mitigation" or "Loss Mitigation Activities" include activities related to special forbearances, repayment plans, modifications, short refinances, short sales, cash-for-keys, and deeds-in-lieu of foreclosure);

WHEREAS, Ally Bank has entered into agreements with the Mortgage Servicing Companies with respect to the servicing of residential mortgage loans owned by Ally Bank, as well as sub-servicing agreements with respect to loans where Ally Bank retained servicing rights;

WHEREAS, the Mortgage Servicing Companies collectively are the fifth largest servicer of residential mortgages in the United States and service a portfolio of 2.5 million residential mortgage loans. During the recent financial crisis, a substantially larger number of residential mortgage loans became past due than in earlier years. Many of the past due mortgages have

2

resulted in foreclosure actions. From January 1, 2009 to December 31, 2010, the Mortgage Servicing Companies completed 89,998 foreclosure actions, representing less than 4 percent of the Servicing Portfolio over such time period;

WHEREAS, in connection with the process leading to certain foreclosures involving the Servicing Portfolio, the Mortgage Servicing Companies allegedly:

(a)    Filed or caused to be filed in state courts and in connection with bankruptcy proceedings in federal courts numerous affidavits executed by employees of the Mortgage Servicing Companies or employees of third-party providers making various assertions, such as the ownership of the mortgage note and mortgage, the amount of principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such knowledge or review;

(b)    Filed or caused to be filed in courts in various states and in connection with bankruptcy proceedings in federal courts or in the local land record offices, numerous affidavits and other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary;

(c)    Litigated foreclosure and bankruptcy proceedings and initiated non-judicial foreclosures without always confirming that documentation of ownership was in order at the appropriate time, including confirming that the promissory note and mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party;

(d)    Failed to respond in a sufficient and timely manner to the increased level of

foreclosures by increasing financial, staffing, and managerial resources to ensure that the

Mortgage Servicing Companies adequately handled the foreclosure process; and

failed to respond in a sufficient and timely manner to the increased level of Loss

Mitigation Activities to ensure timely, effective and efficient communication with

borrowers with respect to Loss Mitigation Activities and foreclosure activities; and

(e)    Failed to have adequate internal controls, policies and procedures, compliance

risk management, internal audit, training, and oversight of the foreclosure process,

including sufficient oversight of outside counsel and other third-party providers handling

foreclosure-related services with respect to the Servicing Portfolio.

WHEREAS, the practices set forth above allegedly constitute unsafe or unsound banking

practices;

WHEREAS, as part of a horizontal review of various major residential mortgage

servicers conducted by the Board of Governors, the Federal Deposit Insurance Corporation

(the "FDIC"), the Office of the Comptroller of the Currency, and the Office of Thrift

Supervision, examiners from the Federal Reserve Bank of Chicago (the "Reserve Bank") and the

FDIC have reviewed foreclosure-related processes at the Mortgage Servicing Companies;

WHEREAS, it is the common goal of the Board of Governors, the Reserve Bank,

Ally Financial, ResCap, and the Mortgage Servicing Companies to ensure that the Mortgage

Servicing Companies operate in a safe and sound manner and in compliance with the terms of

mortgage loan documentation and related agreements with borrowers, all applicable state and

federal laws (including the U.S. Bankruptcy Code and the Servicemembers Civil Relief Act),

rules, regulations, and court orders, as well as the Membership Rules of MERSCORP, Inc. and

MERS, Inc. (collectively, "MERS"), servicing guides with GSEs or investors, and other

contractual obligations, including those with the Federal Housing Administration and those

required by the Home Affordable Modification Program ("HAMP"), and loss share agreements

with the Federal Deposit Insurance Corporation(collectively, "Legal Requirements");

WHEREAS, it is the common goal of the FDIC and Ally Bank to ensure that the

residential mortgages owned or serviced by Ally Bank are serviced or sub-serviced in a safe and

sound manner and in compliance with all Legal Requirements;

WHEREAS, after the conduct set forth above became known, Ally Financial, Ally Bank,

ResCap, and the Mortgage Servicing Companies have been taking steps to remediate the filing of

and reliance on inaccurate affidavits in foreclosure and bankruptcy proceedings;

WHEREAS, the boards of directors of Ally Financial, ResCap, and GMAC Mortgage, at

duly constituted meetings, adopted resolutions authorizing and directing Michael A. Carpenter,

Thomas Marano, and Steven M. Abreu to enter into this Consent Order to Cease and Desist (the

("Order") on behalf of Ally Financial, ResCap, and GMAC Mortgage, respectively, and

consenting to compliance with each and every applicable provision of this Order by Ally

Financial, ResCap, and GMAC Mortgage, and their institution-affiliated parties, as defined in

sections 3(u) and 8(b)(3) of the Federal Deposit Insurance Act, as amended (the "FDI Act")

(12 U.S.C. §§ 1813(u) and 1818(b)(3)), and waiving any and all rights that Ally Financial,

ResCap, and GMAC Mortgage may have pursuant to section 8 of the FDI Act (12 U.S.C.

§ 1818), including, but not limited to: (i) the issuance of a notice of charges; (ii) a hearing for the

purpose of taking evidence on any matters set forth in this Order; (iii) judicial review of this

Order; (iv) contest the issuance of this Order by the Board of Governors; and (v) challenge or

contest, in any manner, the basis, issuance, validity, terms, effectiveness or enforceability of this

Order or any provision hereof; and

WHEREAS, the board of directors of Ally Bank, at a duly constituted meeting adopted a

resolution authorizing and directing Mark B. Hales to enter into this Order on behalf of Ally

Bank and consenting to compliance with each and every applicable provision of this Order by

Ally Bank and its institution-affiliated parties, as defined in section 3(u) of the FDI Act, and

waiving any and all rights that Ally Bank may have pursuant to section 8 of the FDI Act,

including, but not limited to: (i) the issuance of a notice of charges; (ii) a hearing for the purpose

of taking evidence on any matters set forth in this Order; (iii) judicial review of this Order;

(iv) contest the issuance of this Order by the FDIC; and (v) challenge or contest, in any manner,

the basis, issuance, validity, terms, effectiveness or enforceability of this Order or any provision

hereof.

NOW, THEREFORE, before the filing of any notices, or taking of any testimony or

adjudication of or finding on any issues of fact or law herein, and without this Order constituting

an admission by Ally Financial, Ally Bank, ResCap, or GMAC Mortgage or its subsidiaries of

any allegation made or implied by the Board of Governors or the FDIC in connection with this

matter, and solely for the purpose of settling this matter without a formal proceeding being filed

and without the necessity for protracted or extended hearings or testimony, it is hereby ordered

by the Board of Governors that, pursuant to sections 8(b)(1) and (3) of the FDI Act (12 U.S.C.

§§1818(b)(1) and 1818(b)(3)), Ally Financial, ResCap, GMAC Mortgage, and their institution-

affiliated parties shall cease and desist and take affirmative action, and it is hereby ordered by the

FDIC that, pursuant to section 8(b)(1) of the FDI Act (12 U.S.C. §§1818(b)(1)), Ally Bank and

its institution-affiliated parties, shall cease and desist and take affirmative action, as follows:

**Source of Strength**

1.      The board of directors of Ally Financial shall take appropriate steps to fully utilize Ally Financial's financial and managerial resources, pursuant to section 225.4(a) of Regulation Y of the Board of Governors (12 C.F.R. § 225.4(a)), to serve as a source of strength to Ally Bank, including, but not limited to, taking steps to ensure that Ally Bank complies with the applicable provisions of this Order that is issued by the FDIC.

**Board Oversight**

2.      Within 60 days of this Order, the boards of directors of Ally Financial and ResCap, for itself and on behalf of the Mortgage Servicing Companies shall submit to the Reserve Bank an acceptable written plan to strengthen the boards' oversight of the Mortgage Servicing Companies, including the boards' oversight of risk management, internal audit, and compliance programs concerning residential mortgage loan servicing, Loss Mitigation, and foreclosure activities conducted by the Mortgage Servicing Companies. The plan shall also describe the actions that the boards of directors will take to improve the Mortgage Servicing Companies' residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations, and a timeline for actions to be taken. The plan shall, at a minimum, address, consider, and include:

(a)      Policies to be adopted by the board of directors of Ally Financial that are designed to ensure that Ally Financial's enterprise-wide risk management ("ERM") program provides proper risk management with respect to the Mortgage Servicing Companies' residential mortgage loan servicing, Loss Mitigation, and foreclosure activities particularly with respect to compliance with the Legal Requirements, and supervisory standards and guidance of the Board of Governors as they develop;

(b)    policies and procedures adopted by Ally Financial to ensure that the ERM

program provides proper risk management of independent contractors, consulting firms, law

firms, or other third parties who are engaged to support residential mortgage loan servicing, Loss

Mitigation, or foreclosure activities or operations, including their compliance with the Legal

Requirements and Ally Financial's and GMAC Mortgage's internal policies and procedures,

consistent with supervisory guidance of the Board of Governors;

(c)    steps to ensure that Ally Financial's ERM, audit, and compliance

programs have adequate levels and types of officers and staff dedicated to overseeing the

Mortgage Servicing Companies' residential mortgage loan servicing, Loss Mitigation, and

foreclosure activities, and that these programs have officers and staff with the requisite

qualifications, skills, and ability to comply with the requirements of this Order;

(d)    steps to improve the information and reports that will be regularly

reviewed by the board of directors or authorized committee of the board of directors of Ally

Financial regarding residential mortgage loan servicing, Loss Mitigation, and foreclosure

activities and operations, including, compliance risk assessments, and the status and results of

measures taken, or to be taken, to remediate deficiencies in residential mortgage loan servicing,

Loss Mitigation, and foreclosure activities, and to comply with this Order;

(e)    funding for personnel, systems, and other resources as are needed to carry

out the Mortgage Servicing Companies' residential mortgage loan servicing, Loss Mitigation,

and foreclosure activities and operations in full compliance with the Legal Requirements and the

requirements of this Order, taking into consideration the current and expected volume of past due

loans;

8

(f)      funding for personnel, systems, and other resources as are needed to operate risk management and compliance programs that are safe and sound and that are commensurate with the risk profile of the Mortgage Servicing Companies;

(g)      steps to ensure that the Mortgage Servicing Companies have adequate levels and types of officers and staff to carry out residential mortgage loan servicing, Loss Mitigation, and foreclosure activities in compliance with Legal Requirements and the requirements of this Order, and taking into account the size and complexity of the Servicing Portfolio; that they have officers and staff with the requisite qualifications, skills, and ability to comply with the requirements of this Order; and a timetable for hiring any necessary additional officers and staff.

(h)      periodic reviews of the adequacy of the levels and types of officers and staff to carry out residential mortgage loan servicing, Loss Mitigation, and foreclosure activities in light of changes in the Servicing Portfolio or the Legal Requirements.  To conduct this review, the plan shall establish metrics to measure and ensure the adequacy of staffing levels relative to existing and future Loss Mitigation and foreclosure activities, such as limits for the number of loans assigned to a Loss Mitigation employee, including the single point of contact as hereinafter defined, and deadlines to review loan modification documentation, make loan modification decisions, and provide responses to borrowers;

(i)      steps to ensure that the risk management, audit, and compliance programs for the Mortgage Servicing Companies have adequate levels and types of officers and staff and that they have officers and staff with the requisite qualifications, skills, and ability to comply with the requirements of this Order, and a timetable for hiring any necessary additional officers and staff;

(j)      workload reviews of residential mortgage loan servicing, Loss Mitigation, and foreclosure personnel who are responsible for handling individual loan issues (including single point of contact personnel), including an initial review within 90 days of this Order, and then annual reviews thereafter. Such reviews, at a minimum, shall assess whether the workload levels are appropriate to ensure compliance with the requirements of paragraphs 2(g) and 5 of this Order. Promptly following completion of such reviews, the Mortgage Servicing Companies shall adjust workload levels to ensure compliance with the requirements of paragraphs 2(g) and 5 of this Order;

(k)      policies to ensure that the risk management, audit, and compliance programs have the requisite authorities and status within the organization to effectively operate the programs, and that there is adequate coordination with respect to these programs to ensure that any problems or deficiencies that are identified in the Mortgage Servicing Companies' residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations are comprehensively reviewed and remedied; and

(l)      steps to improve the information and reports that will be regularly reviewed by Ally Financial's and ResCap's boards of directors to assess the performance of residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations, as well as the risk management and compliance programs and associated functions including, compliance risk assessments, and the status and results of measures taken, or to be taken, to remediate mortgage servicing, Loss Mitigation, and foreclosure deficiencies, and to comply with this Order.

**Foreclosure Review**

3.    (a)    Within 45 days of this Order, GMAC Mortgage shall retain one or more independent consultant(s) acceptable to the Reserve Bank to conduct an independent review of certain residential mortgage foreclosure actions (including judicial and non-judicial foreclosures and related bankruptcy proceedings, and other related litigation) regarding individual borrowers with respect to the Servicing Portfolio. The review shall include actions or proceedings (including foreclosures that were in process or completed) for loans serviced by the Mortgage Servicing Companies, whether brought in the name of the Ally Bank, the Mortgage Servicing Companies, the investor, or any agent for the mortgage note holder (including MERS) that have been pending at any time from January 1, 2009 to December 31, 2010, as well as residential foreclosure sales that occurred during this time period ("Foreclosure Review"). The purpose of the Foreclosure Review shall be to determine, at a minimum:

(i)    whether, at the time the foreclosure action was initiated or the pleading or affidavit filed (including in bankruptcy proceedings and in defending suits brought by borrowers), the foreclosing party or agent of the party had properly documented ownership of the promissory note and mortgage (or deed of trust) under relevant state law, or was otherwise a proper party to the action as a result of agency or other similar status;

(ii)    whether the foreclosure was in accordance with applicable state and federal laws, including but not limited to, the Servicemembers Civil Relief Act and the U.S. Bankruptcy Code;

(iii)    whether, with respect to non-judicial foreclosures, the procedures followed with respect to the foreclosure sale (including the calculation of the default period, the

11

amounts due, and compliance with notice periods) and post-sale confirmation were in

accordance with the terms of the mortgage loan and state law requirements;

          (iv)     whether a foreclosure sale occurred when the borrower had

requested a loan modification or other loss mitigation and the request was under consideration;

when the loan was performing in accordance with a trial or permanent loan modification; or

when the loan had not been in default for a sufficient period to authorize foreclosure pursuant to

terms of the mortgage loan documentation and related agreements;

          (v)     whether any delinquent borrower's account was charged fees or

penalties that were not permissible under the terms of the borrower's loan documents, state or

federal law, or were otherwise unreasonable.  For purposes of this Order, a fee or penalty is

"otherwise unreasonable" if it was assessed: (i) for the purpose of protecting the secured party's

interest in the mortgaged property, and the fee or penalty was assessed at a frequency or rate,

was of a type or amount, or was for a purpose that was in fact not needed to protect the secured

party's interest; (ii) for services performed and the fee charged was substantially in excess of the

fair market value of the service; (iii) for services performed, and the services were not actually

performed; or (iv) at an amount or rate that exceeds what is customarily charged in the market

for such a fee or penalty, and the mortgage instruments or other documents executed by the

borrower did not disclose the amount or rate that the lender or servicer would charge for such a

fee or penalty;

          (vi)     whether Loss Mitigation Activities with respect to foreclosed loans

were handled in accordance with the requirements of HAMP, if applicable, and consistent with

the policies and procedures applicable to the Mortgage Servicing Companies' proprietary loan

modifications or other Loss Mitigation programs, such that each borrower had an adequate

opportunity to apply for a Loss Mitigation option or program, any such application was handled appropriately, and a final decision was made on a reasoned basis and was communicated to the borrower before the foreclosure sale; and

(vii)    whether any errors, misrepresentations, or other deficiencies identified in the Foreclosure Review resulted in financial injury to the borrower or the owner of the mortgage loan.

(b)    The independent consultant(s) shall prepare a written report detailing the findings of the Foreclosure Review (the "Foreclosure Report"). GMAC Mortgage shall provide to the Reserve Bank a copy of the Foreclosure Report at the same time that the report is provided to it. Simultaneously, a copy of the portion of the Foreclosure Report that addresses Ally Bank's Servicing Portfolio shall be furnished to Ally Bank and the FDIC.

(c)    Within 45 days of receipt of the Foreclosure Report, GMAC Mortgage shall submit to the Reserve Bank an acceptable plan to:

(i)    remediate, as appropriate, errors, misrepresentations, or other deficiencies in any foreclosure filing or other proceeding;

(ii)    reimburse or otherwise provide appropriate remediation to the borrower for any impermissible or otherwise unreasonable penalties, fees or expenses, or for other financial injury identified in paragraph 3 of this Order;

(iii)    make appropriate adjustments for the account of Ally Bank, the GSEs, or any investor; and

(iv)    take appropriate steps to remediate any foreclosure sale where the foreclosure was not authorized as described in paragraph 3.

(d)    Within 60 days after the Reserve Bank accepts the plan described in

paragraph 3(c), the Mortgage Servicing Companies shall make all reimbursement and

remediation payments and provide all credits required by such plan, and provide the

Reserve Bank with a report detailing such payments and credits.

4.    Within 15 days of the engagement of the independent consultant(s) described in

paragraph 3 of this Order, but prior to the commencement of the Foreclosure Review,

GMAC Mortgage shall submit to the Reserve Bank for approval an engagement letter that sets

forth:

(a)    The methodology for conducting the Foreclosure Review, including:

(i) a description of the information systems and documents to be reviewed, including the

selection criteria for cases to be reviewed; (ii) the criteria for evaluating the reasonableness of

fees and penalties under paragraph 3(a)(v); (iii) other procedures necessary to make the required

determinations (such as through interviews of employees and third parties and a process for the

receipt and review of borrower claims and complaints); and (iv) any proposed sampling

techniques.  In setting the scope and review methodology, the independent consultant may

consider any work already done by Ally Financial, GMAC Mortgage, or other third-parties on

behalf of Ally Financial or GMAC Mortgage.  With respect to sampling techniques, the

engagement letter shall contain a full description of the statistical basis for the sampling methods

chosen, as well as procedures to increase the size of the sample depending on the results of initial

sampling;

(b)    the expertise and resources to be dedicated to the Foreclosure Review;

(c)    completion of the Foreclosure Review and the Foreclosure Report within

120 days of the start of the engagement; and

   (d) a written commitment that any workpapers associated with the
Foreclosure Review will be made available to the Reserve Bank upon request.

**Single Point of Contact**

   5. Within 60 days of this Order, GMAC Mortgage shall submit to the Reserve Bank
an acceptable plan, along with a timeline for actions to be taken, for strengthening coordination
of communications between the Mortgage Servicing Companies and borrowers, both oral and
written, related to Loss Mitigation and foreclosure activities to ensure: (i) that communications
are timely and effective, and are designed to avoid confusion to borrowers; (ii) continuity in the
handling of borrowers' loan files during the Loss Mitigation and foreclosure processes by
personnel knowledgeable about the borrower's situation; and (iii) that decisions concerning Loss
Mitigation options or programs continue to be made and communicated in a timely fashion.
Prior to submitting the plan, the Mortgage Servicing Companies shall conduct a review to
determine: (i) whether processes involving past due mortgage loans or foreclosures overlap in
such a way that they may impair or impede a borrower's efforts to effectively pursue a
Loss Mitigation option or program, and (ii) that employee incentive compensation practices do
not discourage Loss Mitigation. The plan shall, at a minimum, provide for:

   (a) Measures to ensure that staff processing a borrower's Loss Mitigation
request routinely communicates and coordinates with staff processing the foreclosure on the
borrower's property;

   (b) appropriate deadlines for responses to borrower communications and
requests for consideration of Loss Mitigation, including deadlines for decisionmaking on
Loss Mitigation Activities, with the metrics established not being less responsive than the
timelines in HAMP;

(c)    establishment of an accessible and reliable single point of contact for the borrower so that the borrower has access to an employee of the Mortgage Servicing Companies to obtain information throughout the Loss Mitigation and foreclosure processes;

(d)    a requirement that written communications with the borrower identify by name the primary single point of contact along with one or more direct means of communication with the primary single point of contact, together with information about secondary points of contact in the event that the primary single point of contact is unavailable;

(e)    measures to ensure that the single point of contact has access to current information and personnel (in-house or third-party) sufficient to timely, accurately, and adequately inform the borrower of the current status of the Loss Mitigation and foreclosure activities;

(f)    procedures and controls to ensure that a final decision regarding a borrower's Loss Mitigation request (whether on a trial or permanent basis) is made and communicated to the borrower in writing, including the reason(s) why the borrower did not qualify for the trial or permanent modification and, if applicable, the net present value calculations utilized by the Mortgage Servicing Companies, and that involve the single point of contact within a reasonable time before any foreclosure sale occurs;

(g)    procedures and controls to ensure that when the borrower's loan has been approved for modification on a trial or permanent basis, (i) no foreclosure or further legal action predicate to foreclosure occurs, unless the borrower is past due on two or more payments post-dating the trial or permanent modification; and (ii) the single point of contact remains available to the borrower and continues to be referenced on all written communications with the borrower;

(h)      policies and procedures to enable borrowers to make complaints regarding the Loss Mitigation process, denial of Loss Mitigation requests, the foreclosure process, or foreclosure activities that prevent a borrower from pursuing Loss Mitigation options, and a process for making borrowers aware of the complaint procedures;

(i)      procedures for the prompt review, escalation, and resolution of borrower complaints, including a process to communicate the results of the review to the borrower on a timely basis;

(j)      policies and procedures to consider loan modification or other Loss Mitigation Activities with respect to junior lien loans owned by Ally Financial, ResCap, the Mortgage Servicing Companies, or Ally Bank where the Mortgage Servicing Companies service the associated first lien mortgage and become aware that such first lien mortgage is delinquent or has been modified;

(k)      policies and procedures to ensure that timely information about Loss Mitigation options is sent to the borrower in the event of a delinquency or default, including plain language notices about the pendency of loan modification and foreclosure proceedings; and

(l)      policies and procedures to ensure that foreclosure and related documents provided to borrowers and third parties are appropriately maintained and tracked, and that borrowers generally will not be required to resubmit the same documented information that has already been provided, and that borrowers are notified promptly of the need for additional information.

17

**Third Party Management**

6.      Within 60 days of this Order, GMAC Mortgage shall submit to the Reserve Bank

acceptable policies and procedures for the outsourcing of any residential mortgage loan

servicing, Loss Mitigation, or foreclosure functions, by the Mortgage Servicing Companies to

any independent contractor, consulting firm, law firm, property manager, or other third party

(including any subsidiary or affiliate of Ally Financial) (collectively, "Third-Party Providers").

Third-Party Providers include local counsel in foreclosure or bankruptcy proceedings retained to

represent the interests of owners of mortgages in the Servicing Portfolio ("Foreclosure

Counsel"). The policies and procedures shall, at a minimum, address, consider, and include:

(a)      Appropriate oversight of Third-Party Providers to ensure that they comply

with the Legal Requirements, supervisory guidance of the Board of Governors, and GMAC

Mortgage's policies and procedures;

(b)      processes to prepare contingency and business continuity plans that ensure

the continuing availability of critical third-party services and business continuity of the Mortgage

Servicing Companies, consistent with supervisory guidance of the Board of Governors, both to

address short-term and long-term service disruptions and to ensure an orderly transition to new

service providers should that become necessary;

(c)      measures to ensure that all original records transferred by the Mortgage

Servicing Companies to Third-Party Providers (including the originals of promissory notes and

mortgage documents) remain within the custody and control of the Third-Party Provider (unless

filed with the appropriate court or the loan is otherwise transferred to another party), and are

returned to the Mortgage Servicing Companies or designated custodians at the conclusion of the

performed service, along with all other documents necessary for the Mortgage Servicing Companies' files;

(d)    measures to ensure the accuracy of all documents filed or otherwise utilized on behalf of the Mortgage Servicing Companies or the owners of mortgages in the Servicing Portfolio in any judicial or non-judicial foreclosure proceeding, related bankruptcy proceeding, or in other foreclosure-related litigation, including, but not limited to, documentation sufficient to establish ownership of the note and right to foreclose at the time the foreclosure action is commenced;

(e)    processes to perform appropriate due diligence on potential and current Third-Party Provider qualifications, expertise, capacity, reputation, complaints, information security, document custody practices, business continuity, and financial viability; and measures to ensure the adequacy of Third-Party Provider staffing levels, training, work quality, and workload balance;

(f)    processes to ensure that contracts provide for adequate oversight, including requiring Third-Party Provider adherence to GMAC Mortgage foreclosure processing standards, measures to enforce Third-Party Provider contractual obligations, and processes to ensure timely action with respect to Third-Party Provider performance failures;

(g)    processes to ensure periodic reviews of Third-Party Provider work for timeliness, competence, completeness, and compliance with all applicable Legal Requirements, and GMAC Mortgage's contractual obligations to GSEs and investors, and to ensure that foreclosures are conducted in a safe and sound manner;

(h)    processes to review customer complaints about Third-Party Provider services;

19

   (i)  a review of fee structures for Third-Party Providers to ensure that the method of compensation considers the accuracy, completeness, and legal compliance of foreclosure filings and is not based solely on increased foreclosure volume or meeting processing timelines; and

   (j)  a periodic certification process for law firms (and recertification of existing law firm providers) that provide residential mortgage foreclosure and bankruptcy services for the Mortgage Servicing Companies as qualified to serve as Third-Party Providers to the Mortgage Servicing Companies, including that attorneys are licensed to practice in the relevant jurisdiction and have the experience and competence necessary to perform the services requested.

**Compliance Program**

   7.  Within 60 days of this Order, Ally Financial shall submit to the Reserve Bank an acceptable written plan to enhance its enterprise-wide compliance program ("ECP") with respect to its oversight of residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations.  The plan shall be based on an evaluation of the effectiveness of Ally Financial's current ECP in the areas of residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations, and recommendations to strengthen the ECP in these areas.  The plan shall, at a minimum, be designed to:

   (a)  Ensure that the fundamental elements of the ECP and any enhancements or revisions thereto, including a comprehensive annual risk assessment, encompass residential mortgage loan servicing, Loss Mitigation, and foreclosure activities;

   (b)  ensure compliance with the Legal Requirements and supervisory guidance of the Board of Governors; and

(c)      ensure that policies, procedures, and processes are updated on an ongoing basis as necessary to incorporate new or changes to the Legal Requirements and supervisory guidance of the Board of Governors.

8.      Within 60 days of this Order, GMAC Mortgage shall submit to the Reserve Bank an acceptable compliance program and timeline for implementation to ensure that the operations of the Mortgage Servicing Companies, including, but not limited to, residential mortgage loan servicing, Loss Mitigation, and foreclosure, comply with the Legal Requirements, as well as the Mortgage Servicing Companies' internal policies, procedures, and processes and are conducted in a safe and sound manner. The program shall, at a minimum, address, consider, and include:

(a)      The duties and responsibilities of line of business staff, other staff, and Third-Party Providers regarding compliance;

(b)      policies for developing and communicating compliance-related roles and responsibilities across the Mortgage Servicing Companies' organization and to Third-Party Providers;

(c)      policies, procedures, and processes to ensure that the Mortgage Servicing Companies have the ability to locate and secure all documents, including original promissory notes, necessary to perform mortgage servicing, Loss Mitigation, and foreclosure functions and to comply with contractual obligations;

(d)      compliance with supervisory guidance of the Board of Governors, including, but not limited to, the guidance entitled, "Compliance Risk Management Programs and Oversight at Large Banking Organizations with Complex Compliance Profiles," dated October 16, 2008 (SR 08-08/CA 08-11);

(e)     compliance with Legal Requirements, including:

(i)     processes to ensure that all factual assertions made in pleadings, declarations, affidavits, or other sworn statements filed by or on behalf of the Mortgage Servicing Companies are accurate, complete, and reliable; and that affidavits and declarations are based on personal knowledge or a review of the Mortgage Servicing Companies' books and records when the affidavit or declaration so states;

(ii)     processes to ensure that affidavits filed in foreclosure proceedings and other foreclosure-related documents are executed and notarized in accordance with applicable state legal requirements, including jurat requirements;

(iii)     processes to ensure that the Mortgage Servicing Companies have properly documented ownership of the promissory note and mortgage (or deed of trust) under applicable state law, or are otherwise a proper party to the action (as a result of agency or other similar status) at all stages of foreclosure and bankruptcy litigation; and

(iv)     processes to ensure that a clear and auditable trail exists for all factual information contained in each affidavit or declaration, in support of each of the charges that are listed, including whether the amount is chargeable to the borrower or claimable by the investor;

(f)     policies and procedures to ensure that payments are credited in a prompt and timely manner; that payments, including partial payments to the extent permissible under the terms of applicable legal instruments, are applied to scheduled principal, interest, and escrow before fees, and that any misapplication of borrower funds is corrected in a prompt and timely manner;

(g)    compliance with contractual obligations to the owners of the mortgages in the Servicing Portfolio;

(h)    compliance with the contractual limitations in the underlying mortgage note, mortgage, or other customer authorization with respect to the imposition of fees, charges and expenses, and compliance with Legal Requirements concerning the imposition of fees, charges, and expenses;

(i)    processes to ensure that foreclosure sales (including the calculation of the default period, the amounts due, and compliance with notice requirements) and post-sale confirmation are in accordance with the terms of the mortgage loan and applicable state and federal law requirements;

(j)    procedures to ensure compliance with bankruptcy law requirements, including a prohibition on collection of fees in violation of bankruptcy's automatic stay (11 U.S.C. § 362), the discharge injunction (11 U.S.C. § 524), or any applicable court order;

(k)    the scope and frequency of independent testing for compliance with the Legal Requirements, supervisory guidance of the Board of Governors, and the requirements of the Mortgage Servicing Companies' internal policies, procedures, and processes by qualified parties with requisite knowledge and ability (which may include internal audit) who are independent of the Mortgage Servicing Companies' business lines and compliance function;

(l)    measures to ensure that policies, procedures, and processes are updated on an ongoing basis as necessary to incorporate new or changes to Legal Requirements and supervisory guidance of the Board of Governors; and

(m)      the findings and conclusions of the independent consultant(s) engaged by GMAC Mortgage under paragraph 3 to review the Mortgage Servicing Companies' foreclosure processes.

**Mortgage Electronic Registration System**

9.      Within 60 days of this Order, the GMAC Mortgage shall submit an acceptable plan to ensure appropriate controls and oversight of the Mortgage Servicing Companies' activities with respect to MERS and compliance with MERS' membership rules, terms, and conditions ("MERS Requirements") ("MERS Plan").  The MERS Plan shall include, at a minimum:

(a)      Processes to ensure that all mortgage assignments and endorsements with respect to mortgage loans serviced or owned by the Mortgage Servicing Companies out of MERS' name are executed only by a certifying officer authorized by MERS and approved by the Mortgage Servicing Companies;

(b)      processes to ensure that all other actions that may be taken by MERS certifying officers (with respect to mortgage loans serviced or owned by the Mortgage Servicing Companies) are executed by a certifying officer authorized by MERS and approved by the Mortgage Servicing Companies;

(c)      processes to ensure that the Mortgage Servicing Companies maintain up-to-date corporate resolutions from MERS for all Mortgage Servicing Companies employees and third-parties who are certifying officers authorized by MERS, and up-to-date lists of MERS certifying officers;

(d)      processes to ensure compliance with all MERS Requirements and with the requirements of the MERS Corporate Resolution Management System;

24

(e)     processes to ensure the accuracy and reliability of data reported to MERS, including monthly system-to-system reconciliations for all MERS mandatory reporting fields, and daily capture of all rejects/warnings reports associated with registrations, transfers, and status updates on open-item aging reports.  Unresolved items must be maintained on open-item aging reports and tracked until resolution.  The Mortgage Servicing Companies shall determine and report whether the foreclosures for loans serviced by the Mortgage Servicing Companies that are currently pending in MERS' name are accurate and how many are listed in error, and describe how and by when the data on the MERS system will be corrected;

(f)     an appropriate MERS quality assurance workplan, which clearly describes all tests, test frequency, sampling methods, responsible parties, and the expected process for open-item follow-up, and includes an annual independent test of the control structure of the system-to-system reconciliation process, the reject/warning error correction process, and adherence to the MERS Plan; and

(g)     inclusion of MERS in the Mortgage Servicing Companies' third-party vendor management process, which shall include a detailed analysis of potential vulnerabilities, including information security, business continuity, and vendor viability assessments.

**Management Information Systems**

10.     Within 60 days of this Order, GMAC Mortgage shall submit to the Reserve Bank an acceptable plan and timeline for the review and remediation, as necessary, of the Mortgage Servicing Companies' management information systems ("MIS") for their residential mortgage loan servicing, Loss Mitigation, and foreclosure activities to ensure the timely delivery of complete and accurate information to permit effective decision-making.  The plan shall, at a minimum, provide for:

25

       (a)     A description of the various MIS used or to be used by the Mortgage Servicing Companies;

       (b)     a timetable for completion of the review;

       (c)     a timetable for the remediation of any identified deficiencies; and

       (d)     new systems or enhancements to the MIS to:

       (i)     monitor compliance with the Legal Requirements, supervisory guidance of the Board of Governors, and the requirements of this Order;

       (ii)     ensure the ongoing accuracy of records for all serviced mortgages, including, but not limited to, records necessary to establish ownership and the right to foreclose by the appropriate party for all serviced mortgages, outstanding balances, and fees assessed to the borrower;

       (iii)     ensure that the Loss Mitigation and foreclosure staffs have sufficient and timely access to information provided by the borrower regarding Loss Mitigation and foreclosure activities; and

       (iv)     ensure that the single point of contact has sufficient and timely access to information provided by the borrower regarding Loss Mitigation and foreclosure activities; and

       (e)     testing the integrity and accuracy of the new or enhanced MIS to ensure that reports generated by the system provide necessary information for adequate monitoring and quality controls.

**Training**

     11.     Within 60 days of this Order, GMAC Mortgage shall submit to the Reserve Bank an acceptable written plan, and timeline for implementation, to improve the training of all

appropriate officers and staff of the Mortgage Servicing Companies regarding the Legal

Requirements, supervisory guidance of the Board of Governors, and the Mortgage Servicing

Companies' internal policies and procedures regarding residential mortgage servicing,

Loss Mitigation, and foreclosure, and the policies and procedures adopted regarding a single

point of contact described in paragraph 5 of this Order. The plan shall also include:

        (a)     A requirement that training be conducted and documented no less

frequently than annually; and

        (b)     procedures to timely inform appropriate officers and staff of any new or

changes to the Legal Requirements and supervisory guidance of the Board of Governors related

to residential mortgage loan servicing, Loss Mitigation, or foreclosure.

**Risk Assessment**

        12.     Within 10 days of this Order, Ally Financial and ResCap, for itself and on behalf

of the Mortgage Servicing Companies, shall retain an independent consultant acceptable to the

Reserve Bank to conduct a comprehensive assessment of the Mortgage Servicing Companies'

risks, including, but not limited to, operational, compliance, transaction, legal, and reputational

risks particularly in the areas of residential mortgage loan servicing, Loss Mitigation, and

foreclosure. The independent consultant shall prepare a written risk assessment and provide it to

Ally Financial and ResCap within 90 days of this Order, and Ally Financial and ResCap shall

provide it to the Reserve Bank at the same time that it is provided to Ally Financial and ResCap.

The risk assessment shall, at a minimum, address, consider, and include:

        (a)     The scope and complexity of the Mortgage Servicing Companies'

activities and operations regarding residential mortgage loan servicing, Loss Mitigation, and

foreclosure, including functions outsourced to Third-Party Providers;

27

(b)    an evaluation of risk exposures, taking into account risks inherent in the Mortgage Servicing Companies' business activities and in outsourcing to Third-Party Providers;

(c)    an assessment of the effectiveness of established controls designed to mitigate each type of risk and identify residual risks; and

(d)    recommendations for improving risk management.

13.    Within 5 days of the engagement of the independent consultant described in paragraph 12 of this Order, but prior to the commencement of the comprehensive risk assessment, Ally Financial and ResCap shall submit to the Reserve Bank for approval an engagement letter that sets forth:

(a)    The scope and methodology for conducting the risk assessment, including a detailed description of the areas to be reviewed;

(b)    the expertise and resources to be dedicated to the risk assessment; and

(c)    a commitment that any or workpapers associated with the risk assessment will be made available to the Reserve Bank upon request.

**Risk Management**

14.    Within 60 days of submission of the comprehensive risk assessment conducted pursuant to paragraph 12 of this Order, Ally Financial shall submit to the Reserve Bank an acceptable written plan to enhance its ERM program with respect to its oversight of residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations.  The plan shall be based on an evaluation of the effectiveness of Ally Financial's current ERM program in the areas of residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations, and recommendations to strengthen the risk management program in these areas. The plan shall, at a minimum, be designed to:

28

(a)    Ensure that the fundamental elements of the risk management program and any enhancements or revisions thereto, including a comprehensive annual risk assessment, encompass residential mortgage loan servicing, Loss Mitigation, and foreclosure activities;

(b)    ensure that the risk management program complies with supervisory guidance of the Board of Governors, including, but not limited to, the guidance entitled, "Compliance Risk Management Programs and Oversight at Large Banking Organizations with Complex Compliance Profiles," dated October 16, 2008 (SR 08-08/CA 08-11); and

(c)    establish limits for compliance, legal, and reputational risks and provide for regular review of risk limits by appropriate senior management and the board of directors or an authorized committee of the board of directors.

15.    Within 60 days of submission of the comprehensive risk assessment conducted pursuant to paragraph 12 of this Order, Ally Financial and ResCap shall jointly submit to the Reserve Bank an acceptable, comprehensive risk management program for the Mortgage Servicing Companies.  The program shall provide for the oversight by Ally Financial's senior risk managers and ResCap's boards of directors and senior management of the development and implementation of formalized policies and mitigation processes for all identified risks to the Mortgage Servicing Companies.  The program shall, at a minimum, address, consider, and include:

(a)    The structure and composition of ResCap's board risk management committees and a determination of the optimum structure and composition needed to provide adequate oversight of Mortgage Servicing Companies' firm-wide risk management;

(b)    a detailed description of the responsibilities of (i) the line-of-business staff, compliance staff, and the legal department regarding risk assessment and management,

including, but not limited to, compliance and legal risks, and (ii) the internal audit department

regarding the evaluation of the effectiveness of such risk assessment and management;

        (c)     written policies, procedures, and risk management standards;

        (d)     processes to adequately identify risk levels and trends;

        (e)     processes to adequately identify and control risks arising from incentive

compensation programs;

        (f)     processes to document, measure, assess, and report key risk indicators;

        (g)     controls to mitigate risks;

        (h)     procedures for the escalation of significant matters related to risks to

appropriate senior officers and board committees;

        (i)     the scope and frequency of comprehensive risk assessments;

        (j)     a formal method to ensure effective communication of established risk

management policies, procedures, and standards to all appropriate business line and other staff;

        (k)     periodic testing of the effectiveness of the risk management program; and

        (l)     the findings and recommendations of the independent consultant described

in paragraph 12 of this Order regarding risk management.

**Audit**

     16.     Within 60 days of this Order, Ally Financial shall submit to the Reserve Bank an

acceptable written plan to enhance the internal audit program with respect to residential

mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations. The plan

shall be based on an evaluation of the effectiveness of Ally Financial's current internal audit

program in the areas of residential mortgage loan servicing, Loss Mitigation, and foreclosure

activities and operations, and shall include recommendations to strengthen the internal audit

program in these areas. The plan shall, at a minimum, be designed to:

(a)    Ensure that the internal audit program encompasses residential mortgage

loan servicing, Loss Mitigation, and foreclosure activities;

(b)    periodically review the effectiveness of the ECP and ERM with respect to

residential mortgage loan servicing, Loss Mitigation, and foreclosure activities, and  compliance

with the Legal Requirements and supervisory guidance of the Board of Governors;

(c)    ensure that adequate qualified staffing of the audit function is provided for

residential mortgage loan servicing, Loss Mitigation, and foreclosure activities;

(d)    ensure timely resolution of audit findings and follow-up reviews to ensure

completion and effectiveness of corrective measures;

(e)    ensure that comprehensive documentation, tracking, and reporting of the

status and resolution of audit findings are submitted to Ally Financial's audit committee; and

(f)    establish escalation procedures for resolving any differences of opinion

between audit staff and management concerning audit exceptions and recommendations, with

any disputes to be resolved by the audit committee.

17.    Within 60 days of this Order, Ally Financial and ResCap shall submit to the

Reserve Bank an acceptable enhanced written internal audit program to periodically review

compliance with applicable Legal Requirements and supervisory guidance of the Board of

Governors at the Mortgage Servicing Companies that shall, at a minimum, provide for:

(a)    An annual written, risk-based audit plan approved by ResCap's board of

directors that encompasses all appropriate areas of audit coverage;

(b)    the scope and frequency of audits;

   (c)  the independence of the internal auditor, audit staff, and ResCap's audit committee;

   (d)  inclusion in the audit scope of reviews of internal controls, MIS, and compliance with GMAC Mortgage's internal policies, procedures, and processes, including, but not limited to, the Loss Mitigation and foreclosure processes;

   (e)  adequate testing and review of MIS used in servicing, Loss Mitigation, and foreclosure activities to ensure compliance with the Legal Requirements;

   (f)  controls to ensure that audits are completed on a timely basis in accordance with the approved audit plan;

   (g)  adequate staffing of the audit function by qualified staff;

   (h)  timely resolution of audit findings and follow-up reviews to ensure completion and effectiveness of corrective measures;

   (i)  comprehensive documentation, tracking, and reporting of the status and resolution of audit findings to ResCap's audit committee, at least quarterly; and

   (j)  establishment of escalation procedures for resolving any differences of opinion between audit staff and management concerning audit exceptions and recommendations, with any disputes to be resolved by ResCap's audit committee.

**Servicing Management and Oversight**

  18.  Within 60 days of this Order, Ally Bank shall implement a mortgage servicing management and oversight program which shall, at a minimum:

   (a)  Establish policies and procedures to create and maintain a reserve sufficient to cover identified servicing risks;

(b)    establish policies and procedures, including, but not limited to, revising servicing guidelines and/or contractual arrangements, to ensure that any Third Party Provider performing a mortgage servicing, Loss Mitigation or foreclosure activity or operation for a second lien on its behalf, encourages and facilitates sustainable first lien modifications, within the terms of the Legal Requirements, by performing timely financial cost-benefit analysis, taking into account various economic and market factors such as the amount of potential equity in the property and the borrower's financial strength;

(c)    establish policies and procedures for oversight and risk management of agreements with Third-Party Providers of servicing, Loss Mitigation or foreclosure activities or operations to Ally Bank, including, but not limited to, the Mortgage Servicing Companies, sufficient to ensure that mortgage servicing, Loss Mitigation or foreclosure activities and/or operations are performed in accordance with the Legal Requirements and this Order;

(d)    establish policies and procedures for oversight and risk management of agreements with Third-Party Providers of servicing, Loss Mitigation or foreclosure activities or operations to Ally Bank, including, but not limited to, the Mortgage Servicing Companies, sufficient to ensure that such Third-Party Providers have adequate levels and types of officers and staff as well as sufficient funding for personnel, systems, including, but not limited to, MIS, training and other resources to perform mortgage servicing, Loss Mitigation or foreclosure activities and/or operations on behalf of Ally Bank in a manner that complies with the Legal Requirements, satisfactorily mitigates servicing risks, is safe and sound and appropriately complies with this Order;

(e)    establish policies and procedures for oversight and risk management of agreements with Third-Party Providers of servicing, Loss Mitigation or foreclosure activities or

33

operations to Ally Bank, including, but not limited to, the Mortgage Servicing Companies,
sufficient to ensure that Ally Bank is in compliance with the "Guidance for Managing
Third-Party Risk" (FIL-44-2008, June 6, 2008);

       (f)    establish policies and procedures to enhance the information and reports
regularly provided for review by the board of directors of Ally Bank regarding agreements or
arrangements whereby any mortgage servicing, Loss Mitigation or foreclosure activity or
operation is performed on its behalf by a Third-Party Provider, including, but not limited to, one
or more of the Mortgage Servicing Companies, to include, at a minimum, compliance risk
assessments, the reserve for mortgage servicing risks, as well as the status and results of
measures taken, or to be taken, to remediate servicing, Loss Mitigation and foreclosure
deficiencies and to comply with this Order; and

       (g)    establish policies and procedures to periodically determine and provide
Ally Bank with adequate levels and types of officers and staff, systems, training and other
resources for compliance with the oversight and risk management requirements of this Order.

**Approval, Implementation, and Progress Reports**

      19.    (a)    GMAC Mortgage, Ally Financial, and ResCap, as applicable, shall submit
written plans, programs, policies, procedures, and engagement letters that are acceptable to the
Reserve Bank within the applicable time periods set forth in paragraphs 2, 3(c), 4, 5, 6, 7, 8, 9,
10, 11, 13, 14, 15, 16, and 17 of this Order.  Independent consultants acceptable to the Reserve
Bank shall be retained by GMAC Mortgage within the applicable periods set forth in paragraphs
3(a) and 12 of this Order.

       (b)    Within 10 days of approval by the Reserve Bank, GMAC Mortgage,
Ally Financial, and ResCap, as applicable, shall adopt the approved plans, programs, policies,

and procedures. Upon adoption, GMAC Mortgage, Ally Financial, and ResCap, as applicable,
shall implement the approved plans, programs, policies, and procedures, and thereafter fully
comply with them.

      (c)     During the term of this Order, the approved plans, programs, policies,
procedures, and engagement letters shall not be amended or rescinded without the prior written
approval of the Reserve Bank.

      (d)     During the term of this Order, GMAC Mortgage, Ally Financial, and
ResCap, as applicable, shall revise the approved plans, programs, policies, and procedures as
necessary to incorporate new or changes to the Legal Requirements and supervisory guidance of
the Board of Governors. The revised plans, programs, policies, and procedures shall be
submitted to the Reserve Bank for approval at the same time as the progress reports described in
paragraph 21 of this Order.

20.    (a)     Ally Bank shall submit a written program that is acceptable to the FDIC
within the applicable time period set forth in paragraph 18 of this Order.

      (b)     Within 10 days of approval by FDIC, Ally Bank shall adopt the approved
program. Upon adoption, Ally Bank shall implement the approved program, and thereafter fully
comply with it.

      (c)     During the term of this Order, the approved program shall not be amended
or rescinded without the prior written approval of the FDIC.

      (d)     During the term of this Order, Ally Bank shall revise the approved
program as necessary to incorporate new or changes to the Legal Requirements and supervisory
guidance of the FDIC. The revised plan shall be submitted to the FDIC for approval at the same
time as the progress reports described in paragraph 23 of this Order.

21.    Within 30 days after the end of each calendar quarter following the date of this

Order, Ally Financial's and ResCap's, boards of directors shall jointly submit to the Reserve

Bank written progress reports detailing the form and manner of all actions taken to secure

compliance with the provisions of this Order and the results thereof. The Reserve Bank may, in

writing, discontinue the requirement for progress reports or modify the reporting schedule.

22.    Within 15 months after the date of this Order, Ally Financial, ResCap and GMAC

Mortgage shall submit a validation report prepared by an independent third-party consultant with

respect to compliance with the Order during the first year after the Order becomes effective. The

independent third-party consultant shall be acceptable to the Reserve Bank, and shall be engaged

not more than nine months after the effective date of this Order. The engagement letter retaining

the independent third-party consultant shall be subject to the Reserve Bank's approval. At a

minimum the validation report shall include the results of a testing program acceptable to the

Reserve Bank that, among other things, will evaluate the effectiveness of the various programs,

policies and procedures implemented as a result of this Order.

23.    Within 30 days after the end of each calendar quarter following the date of this

Order, Ally Bank's board of directors shall submit to the FDIC written progress reports detailing

the form and manner of all actions taken to secure compliance with paragraph 18 of this Order

and the results thereof. The FDIC may, in writing, discontinue the requirement for progress

reports or modify the reporting schedule.

**Notices**

24.    All communications regarding this Order shall be sent to:

(a)    Mr. James W. Nelson
Senior Vice President
Supervision and Regulation Department
Federal Reserve Bank of Chicago
230 South LaSalle Street
Chicago, Illinois 60604-1413

(b)    Regional Director
Federal Deposit Insurance Corporation
New York Regional Office
350 Fifth Avenue
New York, NY 10118-0110

(c)    Ms. Barbara A. Yastine
Chief Administrative Officer
Ally Financial Inc.
1177 Avenue of the Americas
New York, New York 10036

with copies to:

Mr. Daniel Soto
Chief Compliance Officer
Ally Financial Inc.
440 South Church Street
Charlotte, NC  28202

William B. Solomon, Jr., Esq.
General Counsel
Ally Financial Inc.
200 Renaissance Center
9th Floor
Detroit, MI  48265

(d)    Mr. Thomas F. Marano
Chairman & Chief Executive Officer - ResCap
Residential Capital, LLC
1177 Avenue of the Americas
New York, NY  10036

with copies to:

Mr. Daniel Soto
Chief Compliance Officer
Ally Financial Inc.
440 South Church Street
Charlotte, NC  28202

Tammy P. Hamzehpour, Esq.
General Counsel - ResCap
1100 Virginia Drive
Fort Washington, PA  19034

(e)    GMAC Mortgage, Inc.
c/o Mr. Thomas F. Marano
Chairman & Chief Executive Officer - ResCap
Residential Capital, LLC
1177 Avenue of the Americas
New York, NY  10036

with copies to:

Mr. Daniel Soto
Chief Compliance Officer
Ally Financial Inc.
440 South Church Street
Charlotte, NC  28202

Tammy P. Hamzehpour, Esq.
General Counsel - ResCap
1100 Virginia Drive
Fort Washington, PA  19034

(f)    Ms. Barbara A. Yastine
Chair
Ally Bank
1177 Avenue of the Americas
New York, NY  10036

with copies to:

Mr. Daniel Soto
Chief Compliance Officer
Ally Financial Inc.
440 South Church Street
Charlotte, NC  28202

Hu Benton, Esq.
Ally Bank
5425 Wisconsin Avenue, Suite 600
Bethesda, MD  20815

**Miscellaneous**

25.    The provisions of this Order shall be binding on Ally Financial, Ally Bank,

ResCap, GMAC Mortgage and each of their institution-affiliated parties in their capacities as

such, and their successors and assigns.

26.    Each provision of this Order shall remain effective and enforceable until stayed,

modified, terminated, or suspended in writing by the Reserve Bank or the FDIC, as applicable.

27.    Notwithstanding any provision of this Order, the Reserve Bank may, in its sole

discretion, grant written extensions of time to Ally Financial, ResCap and GMAC Mortgage to

comply with any provision of this Order, and the FDIC may in its sole discretion, grant written

extensions of time to Ally Bank to comply with provisions 18 and 23 of this Order.

28.    If Ally Financial, ResCap or GMAC Mortgage believes that compliance with any

provision of paragraphs 5, 6, 8, or 9 of this Order would not be legally permissible or would

require it to breach any existing contractual obligation to an investor, Ally Financial, ResCap or

GMAC Mortgage, as applicable, may make a written submission to the Board of Governors and

the Reserve Bank.  The written submission shall include the following: (1) specific identification

of the legal requirement or contractual or obligation that would be breached, and the likely

consequences of any such breach; (2) a complete description of all good faith efforts undertaken to secure a modification of the contractual obligation or a waiver of its applicability in order to avoid any conflict between the requirements of this Order and the contractual obligation; and (3) any alternative approaches to satisfying the intent of the provision of the Order involved that would not cause a breach of the legal requirement or contractual obligation. Any such submission shall include a detailed opinion of experienced counsel with respect to the asserted conflict between compliance with this Order and the legal requirement or contractual obligation, a copy of the contract involved, and such other information as is necessary to evaluate the submission. A submission pursuant to this paragraph shall be made no later than 30 days before the deadline for submitting an otherwise acceptable plan, policies and procedures, or program with respect to the applicable paragraph. Such a submission in no way relieves Ally Financial, ResCap, and GMAC Mortgage from fully complying with this Order, including the applicable paragraph. Following review of the submission, the Board of Governors, in its discretion, pursuant to authority delegated to the Director of the Division of Banking Supervision and Regulation, and the General Counsel, may modify this Order or may require that Ally Financial, ResCap or GMAC Mortgage, as applicable, comply with this Order.

29.    The provisions of this Order shall not bar, estop, or otherwise prevent the Board of Governors, the FDIC, the Reserve Bank, or any other federal or state agency from taking any further or other action affecting Ally Financial, Ally Bank, ResCap, GMAC Mortgage, or any of their current or former institution-affiliated parties or their successors or assigns.

30.    Nothing in this Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any benefit or any legal or equitable right, remedy, or claim under this Order.

By Order of the Board of Governors effective this 13th day of April, 2011.

By Order of the Federal Deposit Insurance Corporation effective this 13th day of April, 2011.

| | |
|---|---|
| ALLY FINANCIAL INC. | BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM |

By:  /s/ Michael A. Carpenter
      Michael A. Carpenter
      Chief Executive Officer

By:  /s/ Jennifer J. Johnson
      Jennifer J. Johnson
      Secretary of the Board

ALLY BANK

FEDERAL DEPOSIT INSURANCE CORPORATION

By:  /s/ Mark B. Hales
      Mark B. Hales
      Chief Executive Officer

By:  /s/ Daniel E. Frye
      Daniel E. Frye
      Acting Regional Director
      New York Region

RESIDENTIAL CAPITAL, LLC

By:  /s/ Thomas Marano
      Thomas Marano
      Chairman & Chief Executive
      Officer

GMAC MORTGAGE, LLC

By:  /s/ Steven M. Abreu
      Steven M. Abreu
      President

# EXHIBIT O

The following is a relevant excerpt from:

TESTIMONY OF
JULIE L. WILLIAMS
FIRST SENIOR DEPUTY COMPTROLLER AND CHIEF COUNSEL
OFFICE OF THE COMPTROLLER OF THE CURRENCY
Before the
SUBCOMMITTEE ON HOUSING, TRANSPORTATION, AND COMMUNITY
DEVELOPMENT
Of the
COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS
UNITED STATES SENATE
DECEMBER 13, 2011

### Financial Injury and Remediation

*When independent consultants find errors, misrepresentations, or other deficiencies, their next steps are to determine whether financial injury occurred and to recommend remediation when it does. Financial injury is defined as monetary harm directly caused by a servicer error.*

**Examples of financial injury identified in joint OCC-Federal Reserve guidance that was provided to the independent consultants include, but are not limited to, the following:**

*1.*
*The borrower was not in default pursuant to the terms of the note and mortgage at the time the servicer initiated the foreclosure action.*

*2.*
*The servicer **initiated foreclosure** or conducted a foreclosure sale **in advance of the time allowed for foreclosure under** the terms of the note and mortgage **or applicable state law.***

*3.*
*The borrower submitted payment to the servicer sufficient to cure the default pursuant to the terms of the note and mortgage, but the servicer returned the payment in contravention of the terms of the note or mortgage, state or federal law, or the servicer's stated policy covering payments when in default.*

*4.*
*The servicer misapplied borrower payments, did not timely credit borrower payments (including failure to properly account for funds in suspense), or did not correctly calculate the amount actually due from the borrower, in contravention of the terms of the note and mortgage, state or federal law, investor requirements, or the servicer's stated policy covering application of payments.*
*5.*
*The borrower paid a fee or penalty that was impermissible.*
*6.*
*A deficiency judgment was obtained against the borrower that included the assessment of a fee or penalty that was impermissible.*
*7.*
*The servicer placed an escrow account on the mortgage and the placement resulted in monies paid by the borrower into escrow in contravention of the terms of the note or mortgage, state or federal law, or the servicer's stated policy covering escrow accounts.*
*13*
*8.*
*The servicer placed insurance on the mortgage and the placement resulted in monies paid by the borrower towards insurance in contravention of the terms of the note or mortgage, state or federal law, or the servicer's stated policy covering placed insurance.*
*9.*
*The servicer miscalculated the amount due on the mortgage and secured a judgment against the borrower for an amount greater than the borrower owed.*
*10.*

*A borrower's remittance of funds to a third party acting on behalf of the servicer was not credited to the borrower's account.*
11.
*The borrower was performing under the terms of an approved trial loan modification or an approved permanent loan modification, but the servicer proceeded to foreclosure in contravention of the terms of the modification offered by the servicer to the borrower.*
12.
*A borrower was denied a modification in contravention of the terms of the governing modification program or the servicer's stated policy covering modifications.*
13.
*There is evidence that the borrower provided or made efforts to provide complete documentation necessary to qualify for a modification within the period such documentation was required to be provided by the governing modification program and the servicer denied the loan modification in contravention of the terms of the governing modification program or the servicer's stated policy covering modifications.*
14.
**The servicer initiated foreclosure** *or completed a foreclosure sale* **without providing adequate notice as required under applicable state law.**
15.
*The servicer foreclosed on or sold real property owned by an active military servicemember in violation of SCRA.*
16.
*The servicer did not lower the interest rate on a mortgage loan entered into by a military servicemember, or by the servicemember and his or her spouse jointly, in accordance with the requirements of SCRA.*
17.
*The servicer failed to honor a borrower's bona fide efforts to redeem a sale under applicable state law during the redemption period.*
18.
*The borrower was protected by the automatic stay under the bankruptcy code and a court had not granted a request for relief from the automatic stay or other appropriate exception under the bankruptcy code.*
19.
*The borrower was making timely pre-petition arrearage payments required under an approved bankruptcy plan and was current with their post-petition payments.*
20.
*The borrower purchased a payment protection plan; was or should have been receiving benefits under the plan; and those benefits were not applied pursuant to the contract.*

21.
*The servicer was not the proper party, or authorized to act on behalf of the proper party, under the applicable state law to foreclose on the borrower's home, and this resulted in or may result in multiple foreclosure actions or proceedings.*
22.
*The servicer failed to comply with applicable legal requirements, including those governing the form and content of affidavits, pleadings, or other foreclosure-related documents, where such failure directly contributed to: (a) the borrower paying fees, charges, or costs, or making other expenditures that otherwise would not have been paid or made; or (b) the initiation of a foreclosure action or proceeding against a borrower who otherwise would not have met the requirements for initiating such an action.*

*If the independent consultants determine that financial injury occurred as a result of errors, misrepresentations, or other deficiencies, they will develop recommendations for remediating that injury. In addition to providing guidance in the form of 22 scenarios where financial injury might be present, we are also considering guidance that will clarify expectations as to the amount and type of compensation recommended for certain categories of harm. Any such baseline expectations would not, however, override the independent judgment of the independent consultants. Rather the objective would be to help ensure remediation recommendations are consistent across the twelve OCC-supervised servicers for similarly situated borrowers who suffered similar harms. The independent consultants will always have the flexibility to take account of the facts and circumstances of individual borrowers to arrive at compensation tailored to the borrower's individual situation where the independent consultants determines a different amount of compensation is appropriate.*

*The reviews are expected to take several months to complete. However, independent consultants and servicers have implemented a process to escalate the review of borrowers' cases where foreclosure sale is imminent. The independent consultants and servicers have identified loans that have been scheduled for near term foreclosure sale. Requests for review from in-scope borrowers in those cases are subject to special processes: prioritized review by the postpone the foreclosure action. To assure speed and consistency in the servicers review, we plan to provide direction on minimum criteria for this review.*