KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Gregory A. Horowitz
Douglas H. Mannal
1177 Avenue of the Americas
New York, New York  10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the ResCap Liquidating Trust*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Case No. 12-12020 (MG) |
| | ) |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) Chapter 11 |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

<u>**NOTICE OF APPEAL**</u>

PLEASE TAKE NOTICE that the ResCap Liquidating Trust, as successor to the debtors

(the "**<u>Debtors</u>**") in the above-captioned cases, hereby appeals to the United States District Court

for the Southern District of New York pursuant to 28 U.S.C. § 158(a) from this Court's

*Memorandum Opinion and Order Granting Citibank's Motion for Default Interest and Counsel*

*Fees and Expenses*, dated April 22, 2014 (the "**<u>Opinion</u>**") [Docket No. 6811] and the *Judgment*

*(I) Determining that Citibank is Entitled to Post-Petition Interest on its Oversecured MSR*

*Facility Claims at the Contractual Default Rate, and (II) Directing Debtors to Pay Such Interest*

*as Well as Citibank's Due and Unpaid Counsel Fees and Expenses*, dated May 20, 2014 (the

"**<u>Judgment</u>**") [Docket No. 6971].  A copy of the Opinion and Judgment appealed from are

attached hereto as **<u>Exhibit 1</u>**.

The names of all parties to the Opinion and Judgment appealed from and the names,

addresses, and telephone numbers of their respective attorneys are as follows:

| | |
|---|---|
| **Appellant**: | **Attorneys for the Appellant**: |
| RESCAP LIQUIDATING TRUST | KRAMER LEVIN NAFTALIS & FRANKEL LLP |
| | 1177 Avenue of the Americas |
| | New York, New York  10036 |
| | Telephone: (212) 715-9100 |
| | Facsimile: (212) 715-8000 |
| | Kenneth H. Eckstein |
| | Gregory A. Horowitz |
| | Douglas H. Mannal |
| | |
| **Appellee**: | **Attorneys for the Appellee**: |
| CITIBANK, N.A. | SHEARMAN & STERLING LLP |
| | 599 Lexington Avenue |
| | New York, New York  10022 |
| | Telephone: (212) 484-4000 |
| | Facsimile: (212) 484-7179 |
| | Fredric Sosnick |
| | William J.F. Roll, III |
| | Edmund M. Emrich |

Dated:  New York, New York
         May 30, 2014

> KRAMER LEVIN NAFTALIS & FRANKEL LLP
>
> /s/ Gregory A. Horowitz
> Kenneth H. Eckstein
> Gregory A. Horowitz
> Douglas H. Mannal
> 1177 Avenue of the Americas
> New York, New York  10036
> Telephone: (212) 715-9100
> Facsimile: (212) 715-8000
>
> *Counsel for the ResCap Liquidating Trust*

## **EXHIBIT 1**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

RESIDENTIAL CAPITAL, LLC, *et al.*,

Debtors.

**FOR PUBLICATION**

Case No. 12-12020 (MG)

Jointly Administered

---

**MEMORANDUM OPINION AND ORDER GRANTING CITIBANK'S MOTION FOR**
**DEFAULT INTEREST AND COUNSEL FEES AND EXPENSES**

*A P P E A R A N C E S:*

SHEARMAN & STERLING LLP
*Attorneys for Citibank N.A.*
599 Lexington Avenue
New York, NY  10022
By:    William J.F. Roll, III, Esq.
       Fredric Sosnick, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Attorneys for ResCap Liquidating Trust*
1177 Avenue of the Americas
New York, NY 10036
By:    Gregory A. Horowitz, Esq.
       Joseph A. Shifer, Esq.
       Douglas H. Mannal, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

The Bankruptcy Code entitles oversecured creditors to postpetition interest, but the Code does not describe how to calculate it.  As an oversecured creditor, Citibank seeks postpetition interest at the default rate governed by its contract (the "Agreement") with two Debtor entities. The ResCap Liquidating Trust (the "Trust") opposes the contract default rate, arguing that it is inequitable because it would harm unsecured creditors and because Citibank was protected in the bankruptcy and was adequately compensated both before and during the bankruptcy.  The parties agree that the right to postpetition interest does not arise from the contract itself; the right arises

from the Bankruptcy Code.  The parties have stipulated to the facts and seek a decision without the necessity of an evidentiary hearing.  *See Stipulated Facts in Connection with the Motion of Citibank, N.A. for an Order (I) Determining That It Is Entitled to Post-Petition Interest on its Oversecured MSR Facility Claims at the Contractual Default Rate, and (II) Directing Debtors to Pay Such Interest as Well as Citibank's Due and Unpaid Counsel Fees and Expenses*, dated March 17, 2014 ("Stip.," ECF Doc. # 6658).

In determining the interest to be awarded to an oversecured creditor, two guiding principles apply:  (1) courts in this circuit apply a rebuttable presumption that the contract default rate applies; and (2) a court has only limited discretion—which it should exercise "sparingly"—to modify the contract interest rate.  Case law has identified non-exclusive factors to consider in exercising this discretion.  The factors do not all point in one direction here.  For the reasons explained below, the Court concludes that Citibank should recover postpetition interest at the contract default rate, but only after the loan's maturity date.  For the period between the Debtors' bankruptcy filings and the loan's maturity date, interest at the contract non-default interest rate—already paid to Citibank—is appropriate.

Citibank also seeks to recover the unpaid portion of its legal fees and expenses in pursuing default interest at the contract rate.  The Agreement provides that Citibank is entitled to recover its fees and expenses, most of which were paid by the Debtors during the case; at some point the Debtors stopped paying, so Citibank now seeks to recover the unpaid balance.  Because Citibank's Motion was pursued in good faith, its request to recover attorneys' fees and expenses that were not previously reimbursed is **GRANTED,** subject to the Trust having an opportunity to review and challenge the reasonableness of the requested fees and expenses.

# I.    BACKGROUND

On May 14, 2012 (the "Petition Date"), each of the Debtors filed a voluntary petition for

relief under chapter 11 of the Bankruptcy Code.  Before the Petition Date, Citibank entered into a

revolving credit facility (the "MSR Loan Facility") with GMAC Mortgage, LLC ("GMACM")

as borrower and Residential Capital, LLC ("ResCap," and together with GMACM the

"Obligors") as guarantor, evidenced by the Agreement.  (Stip. ¶ 2.)  That MSR Loan Facility

allowed GMACM to borrow up to $700 million, secured by mortgage servicing rights ("MSRs")

for loans in Fannie Mae and Freddie Mac securitization pools.  (*Id.* ¶¶ 2–3.)  Loan proceeds

provided GMACM with financing to fund the origination or acquisition of mortgage loan

servicing rights for Fannie- and Freddie-funded home mortgage loans.  The MSR Loan Facility

was subject to acknowledgment agreements by Citibank with Fannie and Freddie, providing that

Fannie and Freddie could terminate their servicing contracts with GMACM without cause at any

time and transfer the servicing rights for the underlying loans.  (*Id.* ¶¶ 4–6.)  These MSRs only

retained value as collateral as long as Fannie and Freddie did not terminate servicing contracts

for GMACM to service the underlying mortgages.

Originally, the MSR Loan Facility had a maturity date of August 31, 2010 (*id.* ¶ 7), but

the parties amended the Agreement ten times, extending the maturity date and making other

changes.  (*Id.* ¶¶ 9–10.)  The last amendment ("Amendment Ten") extended the maturity date

until May 30, 2012—after the Petition Date.  (*Id.* ¶ 10.)  Citibank was paid an extension fee for

each extension, ranging from $104,166.67 for a ten-day extension to $3,687,500 for an eleven-

month extension.  (*Id.* ¶ 9.)  Amendment Ten extended the maturity date by two months, for

which the Obligors paid Citibank a $3,160,000 extension fee.  (*Id.* ¶ 11.)  The parties entered into

Amendment Ten understanding that the Obligors were preparing to file bankruptcy petitions.

(*Id.* ¶ 12.)  If, as the parties contemplated, bankruptcy petitions were filed, they understood the loans would probably not be repaid at maturity, but agreed that any order approving the sale of the collateral "shall provide for the repayment of Loans with proceeds of Collateral received by the Borrower from such sale . . . ."  (*Id.*)  The substantial extension fee for Amendment Ten no doubt recognized that the loans in all likelihood were going to remain outstanding for more than two months while the Debtors marketed their assets and obtained necessary approvals for the sales (including from the Court).

The original Agreement established a non-default interest rate of LIBOR plus six percent, and a default rate that was four percent higher.  (*Id.* ¶ 8.)  Amendment Ten increased the non-default interest rate to LIBOR plus eight and one-half percent; the default rate still added four percent to the non-default rate.  (*Id.* ¶ 11.)  The original MSR Loan Facility provided a $700 million loan commitment, but the commitment was reduced over the course of the amendments.  (*See id.* Exs. C-2, C-4, C-5, C-9, C-10.)  Amendment Ten reduced the commitment from $300 million to $158 million.  (*Id.* ¶ 11.)  Before Amendment Ten, the outstanding balance under the MSR Loan Facility was $282 million; as part of Amendment Ten, the Obligors repaid $124 million, reducing the outstanding balance to $158 million.  (*Id.*)

On the Petition Date, the outstanding principal balance under the MSR Loan Facility was approximately $152 million.  (*See id.* ¶ 36.)  Despite the many amendments to the Agreement, one provision relevant to this Motion never changed (including in Amendment Ten):  the filing of a bankruptcy petition always constituted an event of default.  (*Id.* ¶¶ 12–13; *id.* Exs. C-1–C-10.)  Therefore, filing the bankruptcy petitions was an event of default.  (*Id.* ¶ 15.)  Additionally, Citibank was not repaid on the May 30, 2012 maturity date, and that was also an event of default.  (*Id.* ¶ 15.)

4

After the Petition Date, Citibank entered into an agreement allowing the Debtors to use Citibank's cash collateral. (*Id.* ¶¶ 16–17.) The Court approved that agreement on an interim basis on May 15, 2012 (ECF Doc. # 79), and on a final basis on June 20, 2013 (the "Citibank Order," ECF Doc. # 471). The Citibank Order included a finding that "Citibank is oversecured and, accordingly, is entitled to interest and fees with respect to the Prepetition [MSR Loan Facility] Obligations in accordance with the Prepetition [Agreement]." (*Id.* ¶ G(iv).) No party challenged that finding within the 120-day challenge period. (Stip. ¶ 20.) The Citibank Order required the Debtors to pay (1) interest on the prepetition MSR Loan Facility obligations at the non-default rate, (2) fees required by the Agreement at the times specified in the Agreement, and (3) Citibank's reasonable fees and costs, including fees and expenses for Citibank's professionals. (Citibank Order ¶ 6(a).)

On November 21, 2012, the Court entered an order approving the sale of the Debtors' mortgage origination and servicing platform to Ocwen Loan Servicing LLC and Walter Investment Management Corp. (the "Sale Order," ECF Doc. # 2246). That Sale Order required the Debtors to obtain the consent of Fannie Mae and Freddie Mac, both of which had objected to the sale. (Stip. ¶¶ 31–33.) The parties settled those objections in January 2013. (*Id.* ¶ 34.) As required by Amendment Ten, the Sale Order authorized the Debtors to apply a portion of the sale proceeds to satisfy the Debtors' "obligations under the [Agreement]." (*Id.* ¶ 31.) On January 31, 2013, the date the sale closed, the Debtors paid Citibank the outstanding principal of $152 million plus interest at the contractual non-default rate. (*Id.* ¶¶ 24, 36.)

Citibank argued that the Sale Order required the Debtors to pay Citibank accrued interest at the contract default rate. (Motion ¶ 13.) The Debtors disagreed and refused to pay interest at the contract default rate. The parties agreed to reserve the default interest issue for a later time.

5

(Stip. ¶ 36.)  The Debtors and Citibank agreed that at the close of the asset sale to Walter (the

"Walter Sale"), (1) the Debtors would pay Citibank the $152 million outstanding principal,

together with interest at the *non-default* rate, and (2) the default interest issue would remain open

for later resolution.  (*Id.*)

On December 11, 2013, the Court entered an order (ECF Doc. # 6065) confirming the

joint chapter 11 plan in these cases (the "Plan," ECF Doc. # 6065-1.)  The Plan became effective

on December 17, 2013.  Under the Plan, unsecured creditors will receive recoveries between

nine percent and just over thirty-six percent of their claims. (Stip. ¶¶ 38, 40.)  The Disclosure

Statement (ECF Doc. # 4819-1) described the dispute between Citibank and the Debtors and

explained that if Citibank prevails and obtains postpetition interest at the contract default rate, "it

would be entitled to an Allowed Other Secured Claim of approximately $4.5 million in addition

to the amounts already paid."  (Disclosure Statement at 55.)  With the passage of time since the

Motion was filed, Citibank now calculates the differential between the non-default interest which

it received and the default interest it claims as $5.04 million.  (*See* Mar. 26, 2014 Tr. at 17:3–7.)

Citibank also argues that the Debtors wrongly stopped paying Citibank's legal fees.

(Motion ¶¶ 45–47.)  In its Objection, the Trust asserts that the Debtors paid approximately $1.21

million in Citibank's legal fees before repayment of the MSR Loan Facility, and an additional

$136,000 after repayment.  (Objection at 2 n.2.)  Unpaid fees claimed by Citibank allegedly total

$351,935.20, plus $5,233.34 as of January 31, 2014.  (Stip ¶ 47.)  The Trust opposes any further

payment of legal fees, stating at the March 26, 2014 hearing on the Motion that "under these

circumstances, which . . . are really rather extreme . . . it was inequitable to pursue the default

interest."  (Mar. 26, 2014 Tr. at 47:1–6.)

# II.    DISCUSSION

### A.    Default Interest

Bankruptcy Code section 506(b) provides that an oversecured creditor is entitled to interest on its secured claim, "and any reasonable fees, costs or charges provided under the agreement under which such claim arose."  The oversecured creditor may receive postpetition interest up to the value of its equity cushion, i.e., the difference between the value of the allowed claim and the value of the collateral securing the claim.  *See In re SW Boston Hotel Venture, LLC*, Nos. 12-9008, 12-9009, 12-9011, 12-9012, 2014 WL 1339418, *6 (1st Cir. Apr. 11, 2014). Section 506(b) governs a court's determination of postpetition interest; state law governs a creditor's claim for prepetition interest.  *See In re 785 Partners LLC*, 470 B.R. 126, 133 (Bankr. S.D.N.Y. 2012).

### B.    The Rebuttable Presumption

While the Bankruptcy Code governs postpetition interest, there is a rebuttable presumption that the parties' contract rate should apply.  *Id*. at 134 ("[A] debtor bears the burden of rebutting the presumption that the contract rate of interest applies post-petition."); *see also In re Terry Ltd. P'ship*, 27 F.3d 241, 243 (7th Cir. 1994) (describing rebuttable presumption in favor of contract default rates of interest); *In re Madison 92nd St. Assocs*. LLC, 472 B.R. 189, 198 (Bankr. S.D.N.Y. 2012) ("The great majority of courts have concluded that the appropriate rate of interest should be the . . . so-called 'contract rate' of interest."); *Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P.*, 394 B.R. 325, 338 (S.D.N.Y. 2008) (same).

Citibank asserts that the Supreme Court's holding in *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co*., 549 U.S. 443 (2007), favors applying the contract default rate here.  *Travelers* held that a creditor's rights in bankruptcy derive from the substantive law

creating those rights, subject to "qualifying or contrary provisions of the Bankruptcy Code." *Id.*
at 450. Citibank would have been entitled to enforce the contract default rate had the Debtors
defaulted outside of bankruptcy, and nothing in the Code precludes applying the contract default
rate. The First Circuit recently emphasized the relevance of *Travelers* and its progeny in this
context, holding that "enforcing the contract rate is consistent with the general premise that
creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive
law creating the debtor's obligation . . . ." *See SW Boston*, 2014 WL 1399418 at *13 (quoting
*Gen. Elec. Capital Corp. v. Future Media Prods. Inc.*, 536 F.3d 969, 974 (9th Cir. 2008)
(quoting *Travelers*, 549 at 450)) (internal quotation marks omitted).

The Trust argues that *Travelers* does not control here because post-*Travelers* courts have
denied postpetition interest at the contract default rate on equitable grounds. *See, e.g.*, *In re
Bownetree, LLC*, No. 08-45854 (DEM), 2009 WL 2226107 (Bankr. E.D.N.Y. July 24, 2009)
("The [c]ourt finds that application of the default rate under these circumstances would be
inequitable . . . ."); *In re Nw. Airlines Corp.*, No. 05-17930 (ALG), 2007 WL 3376895, at *6
(Bankr. S.D.N.Y. Nov. 9, 2007) ("[T]he equitable considerations embodied in § 506(b) are
sufficient to support disallowance of the additional interest requested by [the creditor].").
Indeed, the rebuttable presumption applied in this Circuit is subject to equitable considerations.
*See 785 Partners*, 470 B.R. at 134 (noting that presumption is "subject to adjustment based on
equitable considerations"); *Urban Communicators*, 394 B.R. at 338 ("The courts adopt a
presumption in favor of applying a contractual default rate of interest, subject to equitable
considerations."). Courts should only modify the contract rate "sparingly," for example where
"the secured creditor is guilty of misconduct, the application of the contractual interest rate
would harm the unsecured creditors or impair the debtor's fresh start or the contractual interest

8

rate constitutes a penalty." *785 Partners*, 470 B.R. at 134. The Trust has not argued that

Citibank engaged in any misconduct; the Debtors are liquidating so a fresh start will not be

impaired; and the Trust has not argued that the contract default rate is an impermissible penalty.

Therefore, the only factor at issue here is the potential harm to unsecured creditors.

Trying to seize on this factor, the Trust argues that the rebuttable presumption is

overcome here because the Debtors are insolvent, meaning that unsecured creditors will be

harmed by an award of the contract rate for Citibank. *See, e.g.*, *Nw. Airlines*, 2007 WL 3376895,

at *6 (noting debtors' insolvency); *In re Vest Assocs.*, 217 B.R. 696, 703 (Bankr. S.D.N.Y. 1998)

(requiring affirmative showing of solvency before awarding default interest); *cf. SW Boston*,

2014 WL 1399418 at *13 (affirming bankruptcy court's finding that contract default rate was

equitable because "other creditors would not be harmed," among other factors). In support of

that position, the Trust notes that no Second Circuit cases involving insolvent debtors have

awarded oversecured creditors contractual default interest.

Whether the debtor is insolvent is certainly an important factor courts consider in

deciding whether to award an oversecured creditor postpetition interest at the contract default

rate. But no court has adopted a bright line rule that the contract default rate should be refused in

all insolvent debtor cases. As the court noted in *Madison 92nd St. Assocs.*, the presumptive

contract default rate should not necessarily be adjusted downward in insolvent debtor cases even

though the unsecured creditors will not be paid in full: "Most chapter 11 cases involve insolvent

debtors, and such an exception would swallow up the rule that the oversecured creditor is

presumptively entitled to the 'contract rate.'" 472 B.R. at 200 n.7. The precise issue in *Madison

92nd St. Assocs.* was whether the state law statutory judgment interest rate (9%) or the federal

judgment rate (0.2%) should apply in awarding postpetition interest. The court explained that

"[t]he great majority of courts have concluded that the appropriate rate should be the one

provided in the parties' agreement or the applicable law under which the claim arose, the so-

called 'contract rate' of interest."  *Id*. at 197.  While the parties in *Madison* disputed whether the

debtor was insolvent (indeed, possibly, administratively insolvent), the court concluded that the

contract rate or state law rate should apply.  *Id*. at 199.  Solvency *vel non* is an important factor,

but not the determinative factor.

Adopting a bright-line rule refusing to enforce contract default interest for oversecured

creditors of insolvent debtors would likely increase the cost of credit for all high-risk borrowers

if the creditor cannot protect itself from "unforeseeable costs involved with collecting from

debtors in default."  *In re Terry*, 27 F.3d at 243 (7th Cir. 1994); *see also Citibank, N.A. v. Nyland

(CF8) Ltd*., 878 F.2d 620, 625 (2d Cir. 1989) (stating that "debtors might fare worse in the future

if creditors were not allowed to impose variable rates, because creditors would then impose

higher rates for the full life of the loan in order to reallocate risk"); *Ruskin v. Griffiths*, 269 F.2d

827, 832 (2d Cir. 1959) ("A variable interest [rate] . . . can be beneficial to a debtor in that it may

enable him to obtain money at a lower rate of interest than he could otherwise obtain it, for if a

creditor had to anticipate a possible loss in value of the loan due to his debtor's bankruptcy or

reorganization, he would need to exact a higher uniform interest rate over the life of the loan.");

*785 Partners*, 470 B.R. at 131–32 (explaining, in connection with prepetition default interest,

that "[a] higher default interest rate reflects allocation of risk as part of the bargain struck

between the parties, a bargain that benefits the obligor as well as the obligee").

Where prepetition interest is in question, the answer is clear:  state law controls and

contract default interest is awarded so long as state law permits it.  When it comes to postpetition

interest, though, the Bankruptcy Code controls payment of default interest to oversecured

creditors, but the potential economic consequences in the credit markets remain. Refusing to enforce bargained-for default interest for oversecured creditors raises the risk that lenders will demand higher interest rates from all high risk borrowers to compensate for the potentially higher costs of collection and greater risk of loss once bankruptcy begins.

That doesn't mean that the contract default rate should be awarded to all oversecured creditors in insolvent debtor cases. The Supreme Court in the seminal case of *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156 (1947), applied equitable considerations based on the purpose of bankruptcy favoring "ratable distribution of assets among the bankrupt's creditors." *Id*. at 161. While the creditor in that case was oversecured, and the contract entitled the creditor to interest on interest, the Court rejected awarding that relief: "The general rule in bankruptcy and in equity receivership has been that interest on the debtors' obligations ceases to accrue at the beginning of the proceedings." *Id*. at 163. If all creditors are to be repaid in full, equitable considerations permit payment of the additional interest to the secured creditor rather than to the debtor. *Id*. at 164. "It is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been the balance of equities between creditor and creditor or between creditors and the debtor." *Id*. at 165.

The issue then is the balance of the equities. *See, e.g.*, *SW Boston*, 2014 WL 1399418 at *14 (affirming bankruptcy court's consideration of various equitable factors, including some unique to the case). In many or even most cases involving insolvent debtors, the balance may well fall on the side of the junior secured or unsecured creditors—they are the ones that will have their distributions reduced when the oversecured creditor is awarded postpetition interest at the contract default rate. While the issue is a close one here, the Court concludes in the exercise of

11

discretion that the balance of equities favors the award to Citibank of contract default interest,

except for the period between the Petition Date of May 14, 2012 and Amendment Ten's Maturity

Date of May 30, 2012, which will be discussed below.

### C. The Harm to Unsecured Creditors in this Case Does Not Overcome the Rebuttable Presumption Favoring the Contract Default Rate

#### 1. *The Harm to Unsecured Creditors Is Not Inequitable When Viewed in the Context of the Distributable Asset Pool*

The Trust argues that the Court should not grant Citibank default interest at the contract

rate because that award would diminish recovery to unsecured creditors.  Citing the Disclosure

Statement, the Trust notes that general unsecured creditor recoveries will range from nine

percent to just over thirty-six percent.  (Objection ¶ 9; Stip. ¶ 38.)  Awarding Citibank the

contract default rate further diminishes unsecured creditor recoveries.  Harm to unsecured

creditors is unquestionably a factor counseling against the award of default contract interest.  *See*

*Urban Communicators*, 394 B.R. at 340 (directing bankruptcy court to reduce default interest so

unsecured creditors could recover in full).  But, as explained below, if Amendment Ten is

viewed as one piece of the Debtors' postpetition financing that enabled the Debtors to continue

operating as a going concern, it is not clear that unsecured creditor recoveries were diminished

from what they would have been if the Debtors had been forced to liquidate soon after the cases

were filed if they had been unable to obtain sufficient postpetition financing.  While it is easy to

conclude that every dollar paid to Citibank today is one dollar less for unsecured creditors, what

is more difficult to say is that this result today is inequitable.  All creditors benefited as a result

of the Debtors' ability to continue to operate as a going concern—a result that was only possible

when the Debtors obtained sufficient financing to conduct their business.

Citibank argues that, when put in context, granting the contract rate here would only have

a "miniscule" impact on recovery by unsecured creditors because on the whole, those creditors

are recovering from a $2.462 billion pool.  (Motion ¶ 27; Stip. ¶ 23.)   To be sure, the Court

rejects Citibank's argument that $5 million is "miniscule."  Nevertheless, because this is an

equitable inquiry, the Court must consider the impact that awarding the contract default rate has

on unsecured creditors.  It would diminish the pool of distributable assets by roughly two-tenths

of a percent.  (*See* Mar. 26 2014 Tr. at 13:21–25.)  That reduction in distributable assets is not—

on its own—sufficient to overcome the rebuttable presumption in favor of the contractual default

rate.

### 2.    *Unsecured Creditors Benefited From Amendment Ten, Including the Protections Citibank Secured to Protect its Interests*

In this case, Amendment Ten—entered in contemplation of bankruptcy—already hiked

the non-default interest rate from LIBOR plus six percent to LIBOR plus eight and one-half

percent, with the default rate set four percent higher.  If an oversecured lender knew that the

contract default rate would not be enforced postpetition, it could have demanded a higher non-

default interest rate—for example, LIBOR plus twelve and one-half percent from the date of the

amendment.  That would have been a steep rate, particularly when all of the fees associated with

the extension were added, but not unenforceable under state law.  The risk of higher rates across

the board for distressed borrowers does not mean that the default rate should be enforced in all

cases, but a court should pause before barring collection of default interest, even when it reduces

recoveries for unsecured creditors.  All of the facts and circumstances of the case should be

examined.

Negotiating Amendment Ten in contemplation of bankruptcy raises other relevant

considerations.  The Debtors arranged a large, complicated package of debtor-in-possession

financing (the "DIP Loan"), with Barclays Bank as the agent and loan availability totaling up to

$1.450 billion in three tranches, including an interest rate of LIBOR plus 4% for two tranches

13

($200 million and $1.050 billion) and LIBOR plus 6% for one tranche ($200 million).  (Stip.

¶ 26.)  The Debtors arranged additional postpetition financing from their non-debtor parent, Ally

Financial Inc., eventually totaling $200 million (the "Ally Loan").  (*See* ECF Doc. ## 89, 491.)

The Court approved the DIP Loan and the Ally Loan on an interim basis on May 15, 2012, and

on a final basis on June 25, 2012.  (*Id*. ¶ 27; ECF Doc. ## 80, 89, 490, 491.)  The Debtors used a

portion of the DIP Loan to refinance two other prepetition secured lending facilities.  (Stip. ¶ 28

("Both the GSAP Facility and the BMMZ repo Facility were refinanced with the proceeds of the

DIP Facility.").)

In effect, the MSR Loan Facility (as amended by Amendment Ten) was a piece of the

Debtors' postpetition financing structure, negotiated in the immediate run-up to the bankruptcy

filing.  Were the terms of Amendment Ten too steep when measured against other available DIP

financing alternatives?  If the Debtors believed the terms that Citibank demanded were

unreasonable, the Debtors could have sought an increased DIP Loan or other postpetition

financing and then requested court approval to pay off the secured MSR Loan Facility at

maturity using funds from the DIP Loan or other loan proceeds as was done in refinancing other

prepetition secured debt.  Viewing Amendment Ten in the context of ResCap arranging

substantial postpetition financing—including the Barclays DIP Loan and the Ally Loan, all of

which enabled ResCap and its debtor-affiliates to continue operating as a going concern during

bankruptcy—the steep terms of Amendment Ten do not appear unreasonable.  By enabling

ResCap to continue operating as a going concern, the post-bankruptcy-filing financing package

allowed ResCap to maximize proceeds from the sales of its main businesses, thereby maximizing

recoveries for all secured and unsecured creditors.  Viewed in that light, the Court cannot

conclude that enforcing the contractual default rate treats unsecured creditors inequitably.

All of ResCap's creditor constituencies benefitted by ResCap being able to continue operating as a going concern while it negotiated the many complex issues requiring resolution before ResCap could close the sales of its major businesses, including the MSRs that were Citibank's collateral.[1]  The extension of maturity of the MSR Loan Facility, even at a reduced commitment and higher interest rate, was a piece of the financing puzzle that ultimately resulted in the completed picture—successful sales of most of the Debtors' assets, maximizing recoveries for all creditors.  The potential adverse effects on the terms and availability of credit for high risk borrowers, particularly when negotiated in contemplation of a bankruptcy filing, is a factor that supports enforcing the terms of the consensual agreement establishing a default interest rate that would be enforceable under state law.

### D.    Other Equitable Factors Unique to this Case Are Also Insufficient to Overcome the Rebuttable Presumption

The Trust argues that additional equitable factors also weigh against default interest here.  Even after the Petition Date, Citibank received timely payments of interest at the non-default rate.  *See In re Vest Assocs.*, 217 B.R. 696, 703–04 (Bankr. S.D.N.Y. 1998) (holding that where creditor received adequate protection payments within three months of bankruptcy filing, and debtor had only missed one prepetition payment, default interest was inappropriate).  Even though Citibank did not receive the proceeds of the Walter Sale until seven months past the loan maturity date, the Trust argues that Citibank knowingly accepted this risk by negotiating Amendment Ten understanding that the Obligors would file for bankruptcy.  The Trust also argues that repayment was never seriously at risk due to the stalking horse contracts that the

---

[1]       *See Official Committee of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital, LLC)*, 501 B.R. 549, 569 (Bankr. S.D.N.Y. 2013) ("During the prepetition auction process, the Debtors regularly communicated with the GSEs concerning the proposed agreement and plans for maintaining the Debtors' origination and servicing operations as a going concern until the closing of the final sale to preserve the value of the MSRs and associated advances. . . .  The stakes were high:  if the GSEs had concluded that ResCap could not operate or credibly pursue an orderly sale of the mortgage servicing assets, and that the GSE-related assets might therefore have been subject to liquidation, the GSEs would raise the cost of doing business and seize their assets.").

Debtors secured before filing for bankruptcy. *See In re Kalian*, 178 B.R. 308, 16 (Bankr. D.R.I.

1995) (denying default interest where oversecured creditor was adequately protected, and

"[t]here was never any cognizable risk that [the creditor] would go unpaid"). Moreover, by

agreeing to a lower commitment amount and paying down $124 million under the loan facility

before Amendment Ten, the Obligors lessened Citibank's exposure to any superpriority claims

by Fannie Mae or Freddie Mac. All of this is true, but the bargain that Citibank struck for

assuming these risks, whether real or exaggerated, included interest at the contract default rate.

The Debtors agreed, and not in a vacuum, but in the context of negotiations with many

sophisticated parties aimed at helping the Debtors proceed into bankruptcy with a semblance of

order, to the benefit of secured and unsecured creditors.

Offering another reason to deny the Motion, the Trust argues that this case involves only

a technical default. According to the Trust, the bankruptcy filing did not prejudice Citibank

since Citibank continued to receive timely payments and was adequately protected. (Objection

¶ 16.) The Trust likens the default event clause to an *ipso facto* clause.[2] Such clauses are

generally disfavored, although not *per se* invalid in this circuit. *See U.S. Bank Trust Nat'l Ass'n*

*v. Am. Airlines, Inc.* (*In re AMR Corp.*), 485 B.R. 279, 296 (Bankr. S.D.N.Y. 2013) ("*[I]pso*

*facto* clauses are not *per se* invalid in [this jurisdiction] except where contained in an executory

contract or unexpired lease.") (internal quotation marks omitted). The Court concludes that

solely as it relates to the sixteen day period in May 2012 between the Petition Date and the loan

maturity date, granting the contract default rate would be inequitable. During that time, the

Debtors were current on the loan, and assuming that Citibank was oversecured, it was entitled to

recover its costs, fees and expenses. While the contract provision making the filing of a

bankruptcy petition an event of default is not invalid as an impermissible *ipso facto* clause, *see*

---

[2]      *See* Mar. 26, 2014 Tr. at 37:21–38:6.

11 U.S.C. § 365(e)(2)(B), bankruptcy policy should not penalize a debtor for filing by awarding default interest when the only default was the filing itself.  Other courts have rejected default interest where the only event of default was a bankruptcy filing.  *See, e.g.*, *Bownetree*, 2009 WL 2226107, at *5 ("[T]he [c]ourt cannot permit the default rate to be applied based on a technical default . . . triggered by the debtor's filing of bankruptcy."); *cf. Vanston*, 329 U.S. at 163 (barring recovery of interest on interest in an insolvent debtor case based on bankruptcy policy).  But the Debtors defaulted in a more meaningful sense later by failing to pay Citibank at the maturity date, so Citibank is entitled to recover postpetition interest at the contract default rate for the period after the maturity date.

Citibank's request for postpetition interest at the contractual default rate is therefore **GRANTED** for the period beginning on June 1, 2012 until the loan was repaid in full.

### E.    Legal Fees

Having found that Citibank is entitled to recover interest at the contract default rate, the Court easily concludes that Citibank should be awarded its legal fees in pursuing that relief. Even if the Court ruled against Citibank with respect to default interest, the Court would nevertheless conclude that Citibank pursued the Motion in good faith and is entitled to recover its legal fees as provided for in the Agreement.  Citibank's request for legal fees incurred in pursuing postpetition interest at the contractual default rate is **GRANTED**.

### III.    <u>CONCLUSION</u>

For the reasons explained above, the Court concludes that Citibank is entitled to recover interest at the contract default rate for the period after the Loan Facility matured and when it was paid.  The parties shall confer within twenty-one (21) days from the date of this Order and seek to agree on that figure, reflected in the form of a judgment; if they cannot agree on the amount,

17

counsel shall contact chambers and the Court will schedule a conference to schedule further proceedings.

With respect to recovery of legal fees and expenses, the Trust requested in its Objection that it be given the opportunity to review invoices and object to the reasonableness of fees. Counsel for the parties shall confer twenty-one (21) days from the date of this Order and seek to agree on that amount of reimbursable fees and expenses; if they cannot agree on the amount, counsel shall contact chambers and the Court will schedule a conference to schedule further proceedings.

**IT IS SO ORDERED.**

Dated:  April 22, 2014
         New York, New York

_____
*Martin Glenn*
MARTIN GLENN
United States Bankruptcy Judge

18

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------
                                          )
In re:                                    )    Case No. 12-12020 (MG)
                                          )
RESIDENTIAL CAPITAL, LLC, <u>et al</u>.,  )    Chapter 11
                                          )
                    Debtors.              )    Jointly Administered
                                          )
-------------------------------------------------------------------------  BC 14,0066

### JUDGMENT (I) DETERMINING THAT CITIBANK IS ENTITLED TO POST-PETITION INTEREST ON ITS OVERSECURED MSR FACILITY CLAIMS AT THE CONTRACTUAL DEFAULT RATE, AND (II) DIRECTING DEBTORS TO PAY SUCH INTEREST AS WELL <u>AS CITIBANK'S DUE AND UNPAID COUNSEL FEES AND EXPENSES</u>

Upon (a) the *Motion of Citibank, N.A. for an Order (I) Determining that it is Entitled to Post-Petition Interest on its Oversecured MSR Facility Claims at the Contractual Default Rate, and (II) Directing Debtors to Pay Such Interest as Well as Citibank's Due and Unpaid Counsel Fees and Expenses*, dated December 23, 2013 (the "**Motion**") [Docket No. 6174], (b) the *Objection of the Liquidating Trust to Motion of Citibank, N.A. for an Order (i) Determining that it is Entitled to Post-Petition Interest on its Oversecured MSR Facility Claims at the Contractual Default Rate, and (ii) Directing Debtors to Pay such Interest as Well as Citibank's Due and Unpaid Counsel Fees and Expenses*, dated January 15, 2014 (the "**Objection**") [Docket No. 6276], (c) the *Reply of Citibank to Liquidating Trust's Objection to Citibank's Motion for an Order (i) Determining that it is Entitled to Post-Petition Interest on its Oversecured MSR Facility Claims at the Contractual Default Rate, and (ii) Directing Debtors to Pay such Interest as Well as Citibank's Due and Unpaid Counsel Fees and Expenses*, dated January 24, 2014 (the "**Citibank Reply**") [Docket No. 6352], (d) the *Stipulated Facts in Connection with the Motion of Citibank, N.A. for an Order (I) Determining that it is Entitled to Post-Petition Interest on its Oversecured MSR Facility Claims at the Contractual Default Rate, and (II) Directing Debtors to*

*Pay Such Interest as Well as Citibank's Due and Unpaid Counsel Fees and Expenses*, dated
March 17, 2014 (the "**Stipulated Facts**") [Docket No. 6658]; and the Court having considered
the Motion, the Objection, the Citibank Reply, the Stipulated Facts and the record of the hearing
held before this Court on March 26, 2014 (the "**Hearing**") and having rendered its *Memorandum
Opinion and Order Granting Citibank's Motion for Default Interest and Counsel Fees and
Expenses*, dated April 22, 2014 (the "**Opinion and Order**") [Docket No. 6811];

**THE COURT HEREBY FINDS, ADJUDGES AND DECREES** as follows:

1.      This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157
and 1334.  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2).  Venue of this
proceeding in this district is proper pursuant to 28 U.S.C. § 1409.

2.      In accordance with the terms of the Opinion and Order, Citibank, N.A.
("**Citibank**"), as an oversecured creditor, is entitled under section 506(b) of the Bankruptcy
Code to receive, and the Liquidating Trust, on behalf of the estates of the above-captioned
debtors, is directed to pay or cause to be paid to Citibank in cash from the Administrative
Priority, Secured and Convenience Distribution Reserve (as defined in the *Second Amended
Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee
of Unsecured Creditors* [Docket No. 6030] confirmed by Order of this Court on December 11,
2013 [Docket No. 6065]), within ten (10) business days following the entry of this Judgment,
post-petition interest at the contractual default rate specified in the Prepetition MSR Credit
Documents (as defined in the Motion) from the period covering May 31, 2012 through and
including the date on which the Obligations under the Citibank MSR Facility (as defined in the
Motion) have been fully paid (which is in the amount of $4,811,011.04 through May 7, 2014,
plus per diem interest at the applicable contractual rate thereafter), as well as Citibank's unpaid

12-12020-mg    Doc 6971    Filed 05/20/14    Entered 05/20/14 12:37:04    Main Document
Pg 3 of 3

legal fees and expenses (which are in the collective amounts of $462,302.80 and $5,992.90,

respectively, through March 31, 2014, plus any additional reasonable fees and expenses incurred

thereafter through and including the date on which the Obligations under the Citibank MSR

Facility have been fully paid and any further litigation (including appeals) is concluded).


Dated:  May 20, 2014
        New York, New York


                                    _____/s/Martin Glenn_____
                                         MARTIN GLENN
                                    United States Bankruptcy Judge