GODFREY & KAHN, S.C.
One East Main Street, Suite 500
P.O. Box 2719
Madison, Wisconsin  53701-2719
(608) 257-3911

*Attorneys for ResCap Liquidating Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------- | x | |
| In re: | : | Chapter 11 |
| | : | |
| RESIDENTIAL CAPITAL, LLC, *et al.,* | : | Case No. 12-12020 (MG) |
| | : | |
| Debtors. | : | Joint Administration |
| ------------------------------- | x | |

**LIMITED OBJECTION OF THE RESCAP LIQUIDATING TRUST**
**TO THE "FOURTH AND FINAL" AND "FIFTH AND FINAL" FEE APPLICATIONS**
**OF MESIROW FINANCIAL CONSULTING, LLC FOR COMPENSATION AND**
**REIMBURSEMENT OF EXPENSES AS FINANCIAL ADVISOR TO THE EXAMINER**

**TO:    THE HONORABLE MARTIN GLENN**
**        UNITED STATES BANKRUPTCY JUDGE**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

SUMMARY STATEMENT ............................................................................................ 1

INTRODUCTION ........................................................................................................... 1

OBJECTIONS................................................................................................................... 3

BACKGROUND .............................................................................................................. 4

APPLICABLE STANDARDS ........................................................................................ 9

ARGUMENT .................................................................................................................... 9

SPECIFIC OBJECTIONS ............................................................................................ 11

    Duplicate Time Entries ........................................................................................... 11

    Rate Increases .......................................................................................................... 11

    Improper Time Increments and Rounding of Time Entries................................... 12

    Routine Billing Activities ....................................................................................... 12

    Budgeting Activities ............................................................................................... 13

    Vague Task Descriptions ........................................................................................ 13

    Administrative Tasks .............................................................................................. 14

    Non-Working Travel Time ..................................................................................... 14

    Typesetting Fees ..................................................................................................... 15

    Unnecessarily High Billing Rates.......................................................................... 16

    Clawbacks ............................................................................................................... 17

    Multiple Attendees at Meetings ............................................................................. 19

CONCLUSION................................................................................................................ 20

i

# TABLE OF AUTHORITIES

**Page**

## CASES

*CT Commc'ns, Inc.*, No. 07-10210, 2010 WL 3386947 (Bankr. S.D.N.Y. Aug. 24, 2010) ........................................................................................................................ 13

*In re Asarco, L.L.C.*, No. 12-40997, ___ F.3d ___, 2014 WL 1698072 (5th Cir. Apr. 30, 2014) .................................................................................................... 13

*In re Busy Beaver Bldg. Ctrs.*, 19 F.3d 833 (3d Cir. 1994) ............................................. 9

*In re Mesa Air Group, Inc.*, 449 B.R. 441 (Bankr. S.D.N.Y. 2011) ............................... 13

*In re West End Fin. Advisors*, *L.L.C.*, No. 11152, 2012 WL 2590613 (Bankr. S.D.N.Y. July 3, 2012) .............................................................................................. 12

## OTHER AUTHORITIES

11 U.S.C. § 101 *et seq* ..................................................................................................... 1

11 U.S.C. § 330 .............................................................................................................. 10

11 U.S.C. § 330(a) ......................................................................................................... 13

11 U.S.C. § 1106(3) ......................................................................................................... 7

11 U.S.C. § 1106(4) ......................................................................................................... 7

*Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under 11 U.S.C. § 330*, 28 C.F.R. Part 58, Appendix A (June 4, 2004) ........................................................................................................... 9, 12

The ResCap Liquidating Trust (the "**Trust**"), by its counsel, Godfrey & Kahn, S.C., submits this *Limited Objection* in connection with the *Fourth and Final Fee Application of Mesirow Financial Consulting, LLC for Compensation and Reimbursement of Expenses as Financial Advisor to the Examiner for the Period July 24, 2012 through October 31, 2013* [Docket No. 5848] and the *Fifth and Final Fee Application of Mesirow Financial Consulting, LLC for Compensation and Reimbursement of Expenses as Financial Advisor to the Examiner for the Period July 24, 2012 Through December 17, 2013* [Docket No. 6578] (together, the "**Final Fee Application**").

## SUMMARY STATEMENT

With this objection, the Trust requests an order disallowing $5,281,484.00 in fees for the period from the firm's retention (*nunc pro tunc*) on July 24, 2012 through December 17, 2013 (the "**Final Fee Period**").

## INTRODUCTION

The professional fees and expenses reviewable under the Bankruptcy Code in this 20-month long bankruptcy case total nearly $400 million.  Of that amount, 22 percent, or nearly $90 million in fees and expenses, were incurred by just two professionals over a period of approximately 10 months—the legal counsel and the financial advisor for the court-appointed Chapter 11 Examiner.  The fees require the Court's approval, no less than and under no different standards than the fees and expenses submitted by the counsel and advisors for the Debtor and for the Creditors' Committee.  This limited objection addresses a discrete portion of the fees and expenses of Mesirow Financial Consulting, LLC ("**Mesirow**") because they do not meet the "reasonable and necessary" requirements of 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**").

Under the Second Amended Plan of Reorganization, confirmed on December 11, 2013, the Trust has been deemed a representative of the Debtors' estates for the purposes of reviewing

1

all claims—including claims for professional fees—and prosecuting any objections. Taking that fiduciary responsibility seriously, the Trust has reviewed the final fee applications of more than 40 professional firms. The Trust had no objection to many of the fee applications and for those that were subject to a potential objection, the Trust has reached agreement with all but five professionals.[1] While the Trust remains open to a negotiated resolution with each of the applicants before the June 18, 2014 hearing date on final fee applications, to date, the Trust has been unable to achieve a consensual resolution with Mesirow, and thus, is required to file this objection.

All of the Trust's objections are supported by data drawn directly from the materials submitted in support of the Final Fee Application.[2] Some of the fee objections are typical and will be familiar to the Court — vague entries, mathematical errors, too many professionals at meetings. Others, however, are unique to the facts and circumstances of this case. For example, the examination process here culminated in a 2,245-page commercially printed report. That report no doubt provided some value to the Court and all of the parties interested in this case, but the decision to typeset the report (with the attendant charges for professionals to repeatedly proofread typeset drafts), instead of using standard software and reproduction methods, cost the estate more than $2 million.

The applications of professionals providing support to a court-appointed examiner are not submitted or reviewed in a vacuum. This district has seen other significant cases, to be sure,

---

[1] These professionals include Chadbourne & Parke LLP; Mesirow Financial Consulting, LLC; Bradley Arant Boult Cummings ("**Bradley Arant**"); Morrison Cohen LLP ("**Morrison Cohen**"); and Carpenter Lipps & Leland LLP ("**Carpenter Lipps**"). Bradley Arant, Morrison Cohen, and Carpenter Lipps have granted the Trust an eight-day extension of the June 2, 2014 objection bar date to facilitate further discussions.

[2] The itemized exhibits to this objection are voluminous and will not be electronically filed. Complete sets of exhibits are being provided to the Court, the Examiner's professionals, and to all of the notice parties listed in paragraph 2(a) of the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 0797] (the "**Interim Compensation Order**"). The itemized exhibits are available to any party in interest that requests them.

with significant professional fees incurred to support an examiner.  Indeed, in the *Lehman Brothers* Chapter 11 cases, the court-appointed examiner, Anton Valukas, completed and filed a report similar in length and detail to the one filed here.  Ultimately, the Court in the *Lehman* cases approved $51 million in attorneys' fees and $42 million in financial advisory fees for Mr. Valukas.[3]  Relative comparisons are not dispositive, but they are helpful in providing context for the category-by-category review and line-by-line analysis of the professional compensation submitted for approval here, compensation only slightly less than that approved for the examiner's professionals in the *Lehman* case, the largest bankruptcy case ever filed.

The Trust's concerns are significant, both for their fiscal impact on the estate and for their reflection of the professionals' compliance (or non-compliance) with the Bankruptcy Code, the Court's billing guidelines, and the judicial decisions that have applied them.

## OBJECTIONS

The Final Fee Application requests approval under the Bankruptcy Code for a total of $39,492,705 in fees and $344,747 in expenses for the Final Fee Period.  Summarized in the **Summary Exhibit**, filed with this limited objection, the Trust identifies $5,281,484.00 in fees to which it objects.

The Trust objects, in part, to Court approval of the Final Fee Application, include:

- $3,589.00 in fees attributable to duplicate billed entries; and

- $229,378.00 in fees attributable to hourly rate increases; and

- $76,308.75 in fees charged for time improperly recorded in half-hour or whole-hour increments; and

- $268,410.50 in fees to prepare routine billing statements and/or to respond to U.S. Trustee inquiries about fee applications; and

---

[3] Both the examiner's counsel and financial advisor in the *Lehman* cases provided services at a discount of 10 percent off their regularly-stated rates.  Mr. Valukas's bills to the estates included his own time as well as that of his counsel, Jenner & Block.

- $148,557.50 in fees to prepare an engagement budget and track budget to actual fees and expenses; and

- $289,249.00 in fees for vaguely-described tasks; and

- $52,366.50 in fees charged for administrative tasks that should be absorbed as part of the firm's administrative overhead; and

- $282,700.75 in fees for non-working travel by Mesirow timekeepers outside of New York that should be treated as administrative overhead; and

- $2,548,340.50 in fees for additional drafting and revisions necessitated by the decision to typeset the Examiner's report; and

- $211,400.00 in fees charged at director rates for routine research; and

- $98,143.00 in fees charged for tasks performed at a Vice President level that should have been performed by a paraprofessional or analyst; and

- $21,218.00 in fees charged for tasks performed at a Senior Vice President level that should have been performed by an associate; and

- $388,844.00 in fees charged for services related to "clawback" requests; and

- $662,978.50 in fees for having an excessive number of timekeepers at meetings.

In each instance, Mesirow has failed to sustain its burden of proof under the Bankruptcy Code to demonstrate that the work described in the Final Fee Application was necessary and that the charges for that work are reasonable.

## BACKGROUND

1.     Commencing on May 14, 2012, Residential Capital, LLC and 50 of its affiliates (the "**Debtors**") filed in the Court voluntary cases under chapter 11 of the Bankruptcy Code.  On December 6, 2013, the Debtors and the Official Committee of Unsecured Creditors filed the *Revised Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 6030-1] (the "**Plan**").  The Plan was confirmed on December 11, 2013 [Docket No. 6065] with an effective date of December 17, 2013.

4

2.      On July 3, 2012, the Court entered the *Notice of Appointment of Examiner* [Docket No. 0665] (the "**Examiner Order**") appointing retired Judge Arthur J. Gonzalez as Examiner.

3.      On August 29, 2012, the Court entered the *Order Authorizing the Employment and Retention of Mesirow Financial Consulting, LLC as Financial Advisor to the Examiner Nunc Pro Tunc to July 24, 2012* [Docket No. 1310] (the "**Retention Order**").

4.      On October 19, 2012, Mesirow filed the *First Interim Fee Application of Mesirow Financial Consulting, LLC for Compensation and Reimbursement of Expenses as Financial Advisor to the Examiner for the Period July 24, 2012 Through August 31, 2012* (the "**First Fee Application**") [Docket No. 1906], seeking fees in the amount of $3,007,275 and expenses in the amount of $30,048.

5.      On December 28, 2012, the Court entered the *Order Granting Applications for Allowance of Interim Compensation and Reimbursement of Expenses* [Docket No. 2530]. Through that order, the Court approved the First Fee Application in the amount of $2,979,917 in fees and $28,557 in expenses, authorizing payment of $2,680,434.30 in fees and $28,557 in expenses, and requiring a continued holdback of 10 percent of Mesirow's requested fees (but not expenses).

6.      On March 14, 2013, Mesirow filed the *Second Interim Fee Application of Mesirow Financial Consulting, LLC for Compensation and Reimbursement of Expenses as Financial Advisor to the Examiner for the Period September 1, 2012 Through December 31, 2012* (the "**Second Fee Application**") [Docket No. 3193], seeking fees in the amount of $10,671,089 and expenses in the amount of $68,482.

7.     On April 29, 2013, the Court entered an *Order Granting Applications for Allowance of Interim Compensation and Reimbursement of Expenses* [Docket No. 3556]. Through that order, the Court approved the Second Fee Application in the amount of $10,547,256 in fees and $68,178 in expenses, authorizing payment of $9,492,226.40 in fees and $68,178 in expenses, and requiring a continued holdback of 10 percent of Mesirow's requested fees.

8.     On August 7, 2013, Mesirow filed the *Third Interim Fee Application of Mesirow Financial Consulting, LLC for Compensation and Reimbursement of Expenses as Financial Advisor to the Examiner for the Period January 1, 2013 Through April 30, 2013* (the "**Third Fee Application**") [Docket No. 4562], seeking fees in the amount of $23,210,644 and expenses in the amount of $299,682.

9.     On September 25, 2013, the Court entered an *Order Granting Applications for Allowance of Interim Compensation and Reimbursement of Expenses* [Docket No. 5205]. Through that order, the Court approved the Third Fee Application in the amount of $23,108,667 in fees and $235,261 in expenses, authorizing payment of $20,733,379.30 in fees and $235,261 in expenses, and requiring a continued holdback of 10 percent of Mesirow's requested fees.

10.     On November 18, 2013, Mesirow filed the *Fourth and Final Fee Application of Mesirow Financial Consulting, LLC for Compensation and Reimbursement of Expenses as Financial Advisor to the Examiner for the Period July 24, 2012 Through October 31, 2013* (the "**Fourth Fee Application**") [Docket No. 5848], seeking fees in the amount of $2,899,686 and expenses in the amount of $12,752.

11.     On December 26, 2013, the Court entered an *Order Granting Applications for Allowance of Interim Compensation and Reimbursement of Expenses* [Docket No. 6193].

Through that order, the Court approved the Fourth Fee Application in the amount of $2,799,686

in fees and $12,752 in expenses, authorizing payment of $2,519,717.40 in fees and $12,752 in

expenses, and requiring a continued holdback of 10 percent of Mesirow's requested fees.

12.    On March 3, 2014, Mesirow filed the *Fifth and Final Fee Application of Mesirow*

*Financial Consulting, LLC for Compensation and Reimbursement of Expenses as Financial*

*Advisor to the Examiner for the Period July 24, 2012 Through December 17, 2013* (the "**Fifth**

**Fee Application**") [Docket No. 6578] in the amount of $39,492,705 in fees and $344,747 in

expenses for the Final Fee Period.

13.    With the Final Fee Application, Mesirow reports having been paid $37,189,438 in

fees and $344,748 in expenses—with $2,590,835 in fees remaining unpaid.  No expenses remain

unpaid.  *See* Final Fee Application at p. 3.

14.    Mesirow served as financial advisor to Arthur Gonzalez in carrying out the

statutory duties of an examiner under Section 1106(3) and (4) of the Bankruptcy Code and

performing the tasks itemized in the Examiner Order and in the *Work Plan of Arthur J. Gonzalez,*

*Examiner* [Docket No. 1010] (the "**Work Plan**"), as subsequently amended.  In the August 6,

2012 Work Plan, Examiner Gonzalez estimated—with caveats—that his professionals' fees

would "range from $29 million to $36 million."  *Id.* ¶ 28.

15.    The Examiner stated in the Work Plan that he would "*promptly* advise the Court

and the parties as the Investigation proceeds if costs are expected to vary significantly from this

preliminary estimate."  *Id.* (emphasis added).

16.    In the *Supplement to Work Plan of Arthur J. Gonzalez, Examiner* [Docket

No. 1240] (the "**Work Plan Supplement**"), dated August 23, 2012, the Examiner clarified his

earlier fee estimates:

> [T]he Examiner hereby supplements paragraph 28 of the Work
> Plan to state that the aggregate fee and expense range of $29 to
> $36 million set forth therein comprises the following component
> ranges: (i) for the Examiner, $300,000 to $500,000, (ii) for the
> Examiner's counsel, $16.7 million to $19 million, and (iii) for the
> Examiner's financial advisor, $12 million to $16.5 million.

Work Plan Supplement ¶ 1.

17.    The Examiner filed three more supplements to the original Work Plan, each

extending the original engagement period from six months—and each stipulating that "[t]he

extension of time to complete the Examiner's report will have a correlative effect upon the

estimated budget for fees and expenses to be incurred by the Examiner as provided in the Work

Plan." [Docket Nos. 2263, 2868, and 3361].

18.    On April 5, 2013, nearly nine months after the appointment of the Examiner and

only one month before the work was completed, the *Fourth Supplement to Work Plan of

Arthur J. Gonzalez, Examiner* [Docket No. 3361] quantified the "correlative effect" of the

four-month expansion of his engagement:

> (a)  for the Examiner's counsel (both primary counsel and conflicts
>      counsel): $44,000,000;
>
> (b)  for the Examiner's financial advisor: $38,200,000; and
>
> (c)  for the Examiner: $550,000.

*Id.* ¶ 4.

19.    The Examiner filed his final report under seal about a month later, on May 13,

2013 [Docket No. 3698], and—along with his professionals—was discharged from service on

September 24, 2013 [Docket No. 5187].

20.    Notably, the Examiner's own fees increased by only $50,000 from the initial

estimate to the final estimate.

8

21.     On May 26, 2014, the Trust voluntarily sent Mesirow a detailed letter summarizing the grounds for this limited objection.

## APPLICABLE STANDARDS

22.     The Final Fee Application has been evaluated for compliance with all pertinent provisions of the Bankruptcy Code, the Interim Compensation Order, the Court's Administrative Orders M-104, M-151, and M-388 (the "**Local Guidelines**"), and the United States Trustee *Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under 11 U.S.C. § 330*, 28 C.F.R. Part 58, Appendix A (June 4, 2004) (the "**U.S.T. Guidelines**").

23.     Mesirow and the Trust participated in preliminary discussions about fees and expenses, with the assistance of a fee consultant, Professor Nancy Rapoport, from March through early May of this year.  Though similar discussions yielded consensual resolutions with most of the retained professionals in this proceeding, they did not result in a consensual resolution with Mesirow.

## ARGUMENT

24.     Quantifying the value of any examiner's report is undoubtedly imprecise. However, one of the indicia of reasonableness under the Bankruptcy Code and precedent is the cost of comparable services in the market.  *See, e.g.*, *In re Busy Beaver Bldg. Ctrs.*, 19 F.3d 833, 849 (3d Cir. 1994).

25.     Others have served as examiner and professionals in recent large, complex, and high profile Chapter 11 cases; those engagements provide, at the least, a point of reference for any reasonableness analysis.

26.     Duff & Phelps LLC in the *Lehman* cases served as financial advisor to the examiner there, Anton Valukas, for a period of 18 months (compared to 10 months from Mesirow's retention to the filing of the report here).

9

27.     During the *Lehman* examiner engagement, Duff & Phelps billed just over
$42 million (83,832 hours) at an overall blended hourly rate of $505 to complete the financial
analysis necessary to generate a 2,208-page report.

28.     Here, Mesirow's engagement consumed 63,942.5 hours.  The blended hourly
billing rates reflected in Mesirow's final fee application are $874 for Directors and above, $694
for Vice Presidents and Senior Vice Presidents, $414 for Associates and Senior Associates, $212
for Analysts and Senior Analysts, and $632 for all timekeepers.  The overall blended rate for all
timekeepers in Duff & Phelps' final application in the *Lehman* cases was $505, compared to
Mesirow's $632 overall blended rate here.

29.     The *Lehman* examiner and his staff reviewed roughly 35 million pages of
documents and interviewed more than 250 witnesses, compared to nine million documents
reviewed and 83 witness interviews here.  Total pre-filing assets disclosed in the *Lehman* cases
were approximately $640 billion.  Total pre-filing assets disclosed here were approximately
$15 billion.

30.     While the circumstances of each Chapter 11 case undoubtedly vary in complexity
and the circumstances of each examiner's engagement will differ, if the examiner in the largest
and perhaps most complex Chapter 11 case in history can complete his work for so much less
(proportionately), at the very least the comparison suggests a need to evaluate carefully the
professional services charged to the estate here.

31.     The Trust's evaluation of the Final Fee Application has identified substantial fees
and charges that do not conform to the basic standards of reasonableness under section 330 of the
Bankruptcy Code.

32.      Through this objection, the Trust seeks disallowance of more than $5 million in

fees, most of which have been previously identified to Mesirow in correspondence sent on behalf

of the Trust and in the discussions that preceded the correspondence.

## SPECIFIC OBJECTIONS

### *Duplicate Time Entries*

33.      The Trust identifies several instances of duplicate billing that have resulted in

$3,589 in overcharges to the estate. Those charges are itemized on **Exhibit A-1**.[4]

> *The Trust requests a disallowance of $3,589.00 in timekeeping and
> billing errors.*

### *Rate Increases*

34.      The financial advisory fees for which the applicant seeks final approval include

$229,378 in rate increases—that is, fees solely attributable to increases in hourly rates above the

rates charged by each timekeeper on the date they first performed work for the Debtors.  The fees

attributable to rate increases during Mesirow's retention are itemized on **Exhibit A-2**.

35.      Mesirow represented in communications with the Trust that it had not raised rates

during its retention in these cases, apparently referring to what Mesirow terms "structural" rate

increases.  Mesirow did, however, impose "maturation increases" on April 1, 2013.

36.      Perhaps a "maturation increase" could, in some cases, be justified in light of the

marginal increase in skill and experience providing increased value to the estates.  Here, it is

unlikely that the estates obtained any such benefit during the short six-week period that passed

between the rate increases and the filing of the Examiner's report.

> *The Trust requests a disallowance of $229,378.00 in rate
> increases.*

---

[4] For purposes of the Mesirow Exhibits, some time entries that appear in more than one objection category will show
a zero in the proposed reduction column to avoid double counting.  After the Court rules on the objections, the Trust
will reconcile all objection amounts and proposed reductions.

### *Improper Time Increments and Rounding of Time Entries*

37.     "[P]roper time record keeping is necessary to enable the court to determine the reasonableness of the work that has been performed....  Any uncertainties due to poor record keeping are resolved against the applicant." *In re West End Fin. Advisors*, *L.L.C.*, No. 11152, 2012 WL 2590613, at *4 (Bankr. S.D.N.Y. July 3, 2012).

38.     Pursuant to the U.S.T. Guidelines and the Local Guidelines, timekeepers must record their time contemporaneously in tenth-of-an-hour increments.

39.     Time entries repeatedly billed in whole- and half-hour increments—significantly in excess of the 20 percent that might be expected in a statistically perfect sample—raise at least two adverse inferences.

> A.     First, that the timekeeper's minimum increment was a half-hour, ignoring the express requirement under the Local Guidelines and U.S.T. Guidelines that the minimum increment be one-tenth of an hour.

> B.     Second, that the timekeeper failed to keep accurate and contemporaneous records, leading to estimating or rounding.

40.     The Trust identified one Mesirow timekeeper who billed at least 40 percent of his time in whole- or half-hour increments at a cost to the estates of more than $152,617.50.  The time entries subject to objection, are itemized on **Exhibit B**.

> *The Trust requests a disallowance of $76,308.75, or 50 percent of the fees recorded and charged in improper time increments.*

### *Routine Billing Activities*

41.     The Trust objects to Mesirow's request for compensation for time devoted to routine billing activities.  The review and editing of time entries are not compensable—at any rate or in any amount.  *See, e.g., In re Mesa Air Group, Inc.*, 449 B.R. 441, 446 (Bankr. S.D.N.Y.

2011) (citing *CT Commc'ns, Inc.*, No. 07-10210, 2010 WL 3386947, at *9 (Bankr. S.D.N.Y.

Aug. 24, 2010)).  Time spent defending a fee applicant's request for fees and expenses is not

compensable under section 330(a) of the Bankruptcy Code.  *In re Asarco, L.L.C.*, No. 12-40997,

___ F.3d ___, 2014 WL 1698072 (5th Cir. Apr. 30, 2014).

42.    Mesirow billed $268,410.50, itemized on **Exhibit C**, for the preparation and

review of its own invoices (*not* including compensable time spent preparing fee applications,

which is compensable) and responding to inquiries from the U.S. Trustee's office about

professional fees.

> *The Trust requests a disallowance of $268,410.50 in fees charged*
> *for these routine billing activities.*

**Budgeting Activities**

43.    The Trust Objects to Mesirow's request for compensation for time devoted to

preparing an engagement budget, routinely tracking budget to actual fees and expenses, and

updating the budget.

44.    Mesirow billed $148,557.50 itemized on **Exhibit D**, for the preparation and

review of an engagement budget, with continuing updates and comparisons of budget to actual

fees and expenses.

> *The Trust requests a disallowance of $148,557.50 for internal*
> *budgeting and tracking.*

**Vague Task Descriptions**

45.    To be compensable, "[t]ime records must be set forth in reasonable detail and

appropriate narrative description of the services rendered.  Without limiting the foregoing, the

description should include indications of the participants in, as well as the scope, identification,

and purpose of the activity that is reasonable in the circumstances, especially in relation to the

hours sought to be charged to the estate for that particular activity."  Administrative Order

M-104, § B ¶ 2.  The Trust identified $289,249.00 in fees for tasks that were so vaguely

described that the Trust could not determine the benefit to the estate derived from that work.  The

vaguely-described tasks are itemized on **Exhibit E**.

> *The Trust requests a disallowance of $289,249.00 for inadequately detailed time entries.*

### *Administrative Tasks*

46.    A few Mesirow professionals recorded significant time performing clerical and

administrative tasks such as scheduling meetings, preparing, and distributing materials.

47.    These charges, totaling $52,366.50 and itemized on **Exhibit F**, are most

appropriate for secretarial staff and should be considered part of a professional firm's overhead

expense.

> *The Trust requests a disallowance of $52,366.50 for improperly billed administrative tasks.*

### *Non-Working Travel Time*

48.    Mesirow recorded $565,401.50 for travel by Mesirow professionals principally

located in offices outside of New York.  This travel time is itemized on **Exhibit G**.  The Court

previously ruled that, for retained professional firms that choose to staff this case with

timekeepers from the firm's non-New York offices, the airfare and hotel expenses associated

with travel to New York should be considered part of the firm's overhead.  Consistent with that

ruling, the hourly billing for non-working travel to New York by Mesirow professionals from

Chicago and other Mesirow offices, should be considered overhead.  The Trust objects to

payment of the corresponding fees for Mesirow's professionals to travel to and from New York

to work on these cases.

*The Trust requests a disallowance of $282,700.75 for time billed
for travel to New York by out-of-town professionals.* [5]

## Typesetting Fees

49.     Together, the Examiner's professionals charged several million dollars in
additional expenses and billing for additional proofreading and quality control apparently
necessitated by the decision to typeset the Examiner's report.  In addition to the thousands of
hours Chadbourne professionals spent revising and editing the report, Mesirow's fees for all time
spent drafting, reviewing, formatting, and revising the report after the initial typeset draft total
more than $2.5 million.  These charges are itemized on the attached **Exhibit H**.

50.     Typsetting was unnecessary; generating the report using commercially-available
word processing software[6] and copying it using a photocopying vendor would have achieved the
same result at a much lower cost to the estates.

51.     The number of hours expended by Mesirow on the report after initial typeset
(3,827 hours) suggests that the report may have been typeset while still in a relatively
preliminary draft format, a luxury that—because of the cost of revision—would not have resulted
in the same additional costs with a word-processed report.  This Court has articulated the
standard in the Southern District of New York for determining whether services are necessary.

> [W]hether services are necessary is determined from the
> perspective of the time at which the services were rendered.  *See*
> 3 Collier on Bankruptcy ¶ 330.04 (1)(b)(iii).
>
>         In the Second Circuit, the "necessary" standard in
> Section 330 is given a broad interpretation.  Services are
> "necessary" if they benefit the estate.  *See In re Keene*

---

[5] This figure represents 50 percent of the total recorded for non-working travel to New York by Mesirow
timekeepers with offices outside of New York.  Mesirow previously discounted the charges for travel time by
50 percent.

[6] As part of the fee review process, the Trust asked Mr. Valukas what method he chose to print and reproduce the
*Lehman* examiner's report.  His answer: Microsoft Word.

*Corporation*, 205 B.R. 690 at 695, Bankruptcy Court, Southern District of New York, 1997.  It's a decision by Judge Bernstein.

The test considers whether services provided were "reasonably likely to benefit the estate" and is an objective test, considering the services that a reasonable lawyer would have performed in the same circumstances.  *See In re Ames Department Store, Inc.*, 76 F.3d 66 at 72, Second Circuit, 1996.

The Court has an independent duty to review fee applications and evaluate the compensation requested.  *See In re Keene*, 206 B.R. at 695.

The Court may reduce or disallow or [sic] request if the services provided no real benefit to the estate.  And that's *Keene* at page 696.

*Transcript Regarding Hearing Held on Thursday April 11, 2013 at 10:02 a.m.* [Docket No. 3444] at 45-46.

52.    Evaluated under this standard, the printing method chosen by the examiner in *Lehman* demonstrates that a reasonable professional representing an examiner would not have incurred extra time and expense to typeset an examiner's report when production using readily-available word processing software and photocopying services would have achieved the same result at far less cost.

> *The Trust requests a disallowance of $2,548,340.50 in typesetting-related fees.*

### Unnecessarily High Billing Rates

53.    A financially and legally complex Chapter 11 case undoubtedly requires the contributions of highly skilled professionals with specialized expertise in many different areas of the law.  These experienced and specialized professionals may, if justified, command comparatively higher billing rates than an "average" Chapter 11 practitioner.

54.    Mesirow, however, chose to staff even routine aspects of this engagement using senior financial professionals at very high rates.  Many routine tasks such as research, document

review, proofreading, editing, and redacting were performed by more experienced professionals when associates, analysts, or paraprofessionals could have completed the work. This staffing pattern resulted in an overall blended hourly rate of $632.

55.     The Trust has identified $500,232.50 in charges, itemized on **Exhibit I-1**, for initial research ranging from market conditions and the mortgage industry to citation sources for the Examiner's report, billed at an average rate of $857 per hour. These services should have been performed by associates.

> *The Trust requests a disallowance of $211,400.00, reflecting an adjustment from the existing $857 per hour blended rate to a senior associate rate of $495 per hour.*

56.     The Trust has identified $144,217.00 in charges for creating and updating lists, locating documents requested, uploading documents, and preparing source citations for the Examiner's report. Mesirow billed these routine tasks, itemized on **Exhibit I-2**, at an average rate of $657 per hour. These services should have been performed by a paraprofessional or analyst at much lower billing rates.

> *The Trust requests a disallowance of $98,143.00 in fees, reflecting an adjustment from the existing $657 per hour blended rate to a paraprofessional/analyst rate of $210 per hour.*

57.     The Trust has identified $65,817.50 in charges, itemized on **Exhibit I-3**, for initial document review, research for citations, and adding users to the Synthesis system, billed at an average rate $730 per hour. These services should have been performed by associates.

> *The Trust requests a disallowance of $21,218.00 in fees, reflecting an adjustment from the existing $730 per hour blended rate to a senior associate rate of $495 per hour.*

***Clawbacks***

58.     The Examiner requested expansive document production from many interested parties and third parties as part of his investigation. Most of these parties provided discovery

responses to the Examiner through attorneys at Chadbourne & Parke LLP.  Mesirow was

responsible for uploading the documents into a database, and both Chadbourne and Mesirow

reviewed them in detail.

59.    Occasionally, parties would notify the Examiner's professionals that certain

documents or portions of documents (typically identified by the producing party by Bates

number or range) had been inadvertently produced.

60.    Forty Mesirow professionals spent over 600 hours, at a cost of $388,844.00 to:

A.    Initially identify documents requested for clawback for return to the

producing party;

B.    Search for alternative documents to cite in the Examiner's report in lieu of

clawed back documents; and

C.    Review clawed back documents for content, privilege, or to challenge

clawback requests.

61.    As the Trust understands it, the document production was designed to save time

and expense by permitting producing parties to release very broad and inclusive production sets

initially.  This arrangement was accompanied by an understanding and an expectation that

clawback requests would generally be honored promptly if the producing party later discovered

that it had inadvertently produced privileged or non-responsive information.

62.    Instead of allowing the liberal use of clawback requests to streamline the

document discovery process, both Chadbourne and Mesirow assumed the burden of using their

professionals—at high billing rates— to independently verify claims of privilege and, in some

instances, inappropriately challenge justified clawback requests.

63.    While time constraints may have driven some of this document related activity,

Mesirow has not met its burden to establish the need for $388,844.00 in financial professional

time, itemized on **Exhibit J**, in connection with the removal and analysis of clawed back

documents from the database of production materials.

> *The Trust requests disallowance of $388,844.00 in fees charged*
> *for unnecessary privilege review and other time spent responding*
> *to clawback requests.*

### *Multiple Attendees at Meetings*

64.    Mesirow staffed this engagement using a team structure, branching from a leader

and including members at all levels of the billing structure.  The leadership team appears to have

held daily (later, weekly) leadership meetings, with some team members attending separate

meetings and calls to coordinate with Chadbourne Parke and the Examiner.  Four members of the

leadership team held regular sub-team meetings and workstream meetings.

65.    The Trust has identified significant charges for meetings—attended by four or

more Mesirow timekeepers.  These meetings and corresponding charges are itemized on

**Exhibit K**.

66.    The Court applied the following standards to Debtor's counsel for the attendance

of multiple attorneys at omnibus hearings:

> [N]o more than three lawyers per firm may charge for the entire
> length of the hearing.  Other lawyers for the firm, who are arguing
> or appearing, or specifically supported work on particular matters,
> may charge for the time in connection with those matters.  We've
> had long agendas, and I understand lawyers are here.  They're
> sitting here for a whole morning, and it may only be ten minutes
> that their matter is argued.  That's what I'm going to permit them
> to charge for.

*April 11, 2013 Hearing Transcript* at 51.  The same standard should apply to the Examiner's

professionals at internal meetings.

67.     Mesirow has not met its burden to articulate the need for four or more

timekeepers to prepare for and attend dozens of meetings.

> *The Trust seeks a disallowance of $662,978.50 in charges for more than three timekeepers' attendance at meetings.*

## CONCLUSION

WHEREFORE, the Trust respectfully submits this *Limited Objection* to the Final Fee

Application and requests a total disallowance of $5,281,484.00 in requested professional fees.

Dated:  June 2, 2014.

**GODFREY & KAHN, S.C.**

By:     /s/ *Katherine Stadler*
        Katherine Stadler (KS-6831)

GODFREY & KAHN, S.C.
One East Main Street, Suite 500
P.O. Box 2719
Madison, Wisconsin  53701-2719
(608) 257-3911

*Attorneys for ResCap Liquidating Trust*

11567638.1