**Hearing Date: June 26, 2014 at 10:00 a.m. (Eastern Time)**
**Objection Deadline: June 19, 2014 at 4:00 p.m. (Eastern Time)**

**POLSINELLI PC**
Daniel J. Flanigan
Jason A. Nagi
900 Third Avenue
21st Floor
New York, NY 10022
Telephone: (212) 644-2092
Facsimile: (212) 684-0197

*Counsel for ResCap Borrower Claims Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Case No. 12-12020 (MG) |
| | ) |
| RESIDENTIAL CAPITAL, LLC, et al., | ) Chapter 11 |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**NOTICE OF RESCAP BORROWER CLAIMS TRUST'S MOTION FOR ORDER**
**ESTIMATING CLAIMS AND ESTABLISHING DISPUTED CLAIMS RESERVE**

   **PLEASE TAKE NOTICE** that the undersigned has filed the attached *ResCap Borrower*

*Claims Trust's Motion for Order Estimating Claims and Establishing Disputed Claims Reserve*

(the "Motion").

   **PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion will take place on

**June 26, 2014, at 10:00 a.m. (prevailing Eastern Time)** before the Honorable Martin Glenn, at

the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton

Custom House, One Bowling Green, New York, New York 10004-1408, Room 501.

   **PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion must be

made in writing, conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy

47603379.2

Rules for the Southern District of New York, and the Notice, Case Management, and Administrative Procedures approved by the Bankruptcy Court on May 23, 2012 [Docket No. 141], be filed electronically by registered users of the Bankruptcy Court's electronic case filing system, and be served, so as to be received no later than **June 19, 2014, at 4:00 p.m. (Prevailing Eastern Time)**, upon (a) counsel to the Debtors, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attention: Gary S. Lee, Norman S. Rosenbaum, Jordan A. Wishnew and Samantha Martin); (b) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014 (Attention: Tracy Hope Davis, Linda A. Riffkin, and Brian S. Masumoto); (c) the Office of the United States Attorney General, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-0001 (Attention: US Attorney General, Eric H. Holder, Jr.); (d) Office of the New York State Attorney General, The Capitol, Albany, NY 12224¬0341 (Attention: Nancy Lord, Esq. and Enid N. Stuart, Esq.); (e) Office of the U.S. Attorney for the Southern District of New York, One St. Andrews Plaza, New York, NY 10007 (Attention: Joseph N. Cordaro, Esq.); (f) counsel for Ally Financial Inc., Kirkland & Ellis LLP, 153 East 53rd Street, New York, NY 10022 (Attention: Richard M. Cieri and Ray Schrock); (g) counsel for the committee of unsecured creditors, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036 (Attention: Kenneth Eckstein, Douglas Mannal, Stephen D. Zide and Joseph A. Shifer); (h) counsel for Ocwen Loan Servicing, LLC, Clifford Chance US LLP, 31 West 52nd Street, New York, NY 10019 (Attention: Jennifer C. DeMarco and Adam Lesman); (i) counsel for Berkshire Hathaway Inc., Munger, Tolles & Olson LLP, 355 South Grand Avenue, Los Angeles, CA 90071 (Attention: Thomas Walper and Seth Goldman); (j) Internal Revenue Service, P.O. Box 7346, Philadelphia, PA 19101-7346 (if by overnight mail, to

2

2970 Market Street, Mail Stop 5-Q30.133, Philadelphia, PA 19104-5016); (k) Securities and

Exchange Commission, New York Regional Office, 3 World Financial Center, Suite 400, New

York, NY 10281-1022 (Attention: George S. Canellos, Regional Director); and (l) counsel for

Borrowers Claims Trust, Polsinelli, 900 Third Avenue, 21st Floor, New York, NY 10022

(Attention:  Daniel J. Flanigan and Jason A. Nagi).

      **PLEASE TAKE FURTHER NOTICE** that if you do not timely file and serve a written

objection to the relief requested in the Motion, the Bankruptcy Court may deem any opposition

waived, treat the Motion as conceded, and enter an order granting the relief requested in the

Motion without further notice or hearing.

*[Remainder of Page Intentionally Left Blank]*

47603379.2

Dated:  June 2, 2014
     New York, New York

/s/ Daniel J. Flanigan
Daniel J. Flanigan
Jason A. Nagi
POLSINELLI PC
900 3rd Avenue, 21st Floor
New York, NY 10022
Telephone: (212) 644-2090
Facsimile: (212) 684-0197

*Counsel for ResCap Borrower Claims Trust*

47603379.2

**Hearing Date: June 26, 2014 at 10:00 a.m. (Eastern Time)**
**Objection Deadline: June 19, 2014 at 4:00 p.m. (Eastern Time)**

**POLSINELLI**
Daniel J. Flanigan
Jason A. Nagi
900 Third Avenue
21st Floor
New York, NY  10022
(212) 644-2092
(212) 684-0197 Fax

*Counsel for ResCap Borrower Claims Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Case No. 12-12020 (MG) |
| | ) |
| RESIDENTIAL CAPITAL, LLC, et al., | ) Chapter 11 |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**MOTION OF RESCAP BORROWER CLAIMS TRUST**
**FOR ORDER ESTIMATING CLAIMS**
**AND ESTABLISHING DISPUTED CLAIMS RESERVE**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................. 2

JURISDICTION AND VENUE ........................................................................................... 4

BACKGROUND ................................................................................................................ 4

THE CLAIMS PROCESS .................................................................................................. 8

RELIEF REQUESTED ....................................................................................................10

    A.     DCR Analysis ................................................................................................10

            Base Case Scenario 1:  DCR Analysis Based On True-Up Analysis Update .......10

            Scenario 2 ..................................................................................................11

            Scenario 3 ..................................................................................................12

    B.     The DCR Will be Cumulative ........................................................................12

BASIS FOR RELIEF .......................................................................................................14

NOTICE ........................................................................................................................19

CONCLUSION................................................................................................................20

47603297

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Adelphia Bus. Solutions, Inc. v. Abnos,
  482 F.3d 602 (2d Cir. 2007) ...............................................................................16

In re Adelphia Commc'ns Corp.,
  368 B.R. 140 (Bankr. S.D.N.Y. 2003) ................................................................15

In re Bally Total Fitness of Greater N.Y., Inc.,
  No. 08-14818 (BRL) (Bankr. S.D.N.Y. Oct. 5, 2009) .........................................14

In re Chemtura Corp.,
  No. 09¬11233 (REG) (Bankr. S.D.N.Y. Oct. 29, 2010) .....................................19

In re Dana Corp.,
  No. 06-10354 (BRL) (Bankr. S.D.N.Y. Nov. 28, 2007) .....................................15

In re Delphi Corp.,
  No. 05-44481 (RDD) (Bankr. S.D.N.Y. Sept. 28, 2007) ....................................19

In re Enron Corp.,
  No. 01-16034, 2006 Bankr. LEXIS 4294 (Bankr. S.D.N.Y. Jan. 17, 2006) ...................15, 16

Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.),
  10 F.3d 944 (2d Cir. 1993) .................................................................................15

In re General Maritime Corp.,
  No. 11¬15285 (MG) (Bankr. S.D.N.Y. Apr. 26, 2012) ......................................19

In re Lomas Fin. Corp.,
  172 B.R. 3 (S.D.N.Y. 1994).................................................................................14

In re Lyondell Chem. Co.,
  No. 09-10023 (REG) (Bankr. S.D.N.Y. Nov. 23, 2010) .....................................19

Maxwell v. Seaman Furniture Co. (In re Seaman Furniture Co. of Union Square,
  Inc.),
  160 B.R. 40 (S.D.N.Y. 1993)...............................................................................15

In re Motors Liquidation Co.,
  No. 09-50026 (REG) (Bankr. S.D.N.Y. Mar. 23, 2011) .....................................19

In re N.Y. Med. Grp., P.C.,
  265 B.R. 408 (Bankr. S.D.N.Y. 2001) ................................................................15

ii

Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs.,
   LLC),
   423 F.3d 166 (2d Cir. 2005) ............................................................................ 1, 16

**Statutes**

11 U.S.C. § 105(a), 502(c), 1142(b) ....................................................... 1, 4, 11, 14, 16

11 U.S.C. § 1142(b) .......................................................................................... 15

28 U.S.C. §§ 157 and 1334 .................................................................................. 4

28 U.S.C. § 157(b) .............................................................................................. 4

28 U.S.C. §§ 1408 and 1409 ............................................................................... 4

Bankruptcy Code sections 1107(a) and 1108 ..................................................... 4

**Other Authorities**

Bankruptcy Rule 1015(b) .................................................................................... 4

Bankruptcy Rule 3021 ............................................................................ 1, 4, 11, 14

Fed. R. Bankr. P. 3021 ...................................................................................... 14

iii

**TO THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE:**

The ResCap Borrower Claims Trust (the "**Borrower Claims Trust**," "**Borrower Trust**," or "**Trust**"), as successor to the debtors and debtors in possession in the above-captioned cases  (the "**Debtors**"), hereby submit this motion (the "**Motion**") for entry of an order in substantially the form annexed hereto as **Exhibit A** (the "**Proposed Order**") pursuant to sections 105(a), 502(c) and 1142(b) of title 11 of the United States Code, as amended (the "**Bankruptcy Code**"), Rule 3021 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 5993] (as may be amended or modified from time to time, the "**Plan**"), and the *ResCap Borrower Claims Trust Agreement*, dated December 17, 2013, by and among Peter S. Kravitz, as Borrower Claims Trustee, Province East LLC, as Delaware Trustee, and each of the Debtors [Docket No. 6136] (as amended, the "**Trust Agreement**"),[1] establishing a Disputed Claims Reserve (the "**DCR**") for Disputed Claims in Classes R-5 (ResCap Unsecured Borrower Claims), GS-5 (GMACM Unsecured Borrower Claims), RS-5 (RFC Unsecured Borrower Claims), and Executive Trustee Services, LLC ("**ETS**") (collectively, the "**Disputed Class 5 Claims and Disputed ETS Borrower Claims**") in connection with distributions to be made under the Plan.  In support of the Motion, the Borrower Trust relies upon and incorporates by reference the Declaration of Michael J. Talarico (the "**Talarico Declaration**"), a copy of which is annexed hereto as **Exhibit B**, and represent as follows:

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning set forth in the Trust Agreement. Capitalized terms not otherwise defined herein or in the Trust Agreement shall have the meaning set forth in the Plan.

1

## PRELIMINARY STATEMENT

1.      The Borrower Claims Trust was established by the Plan and the Trust Agreement for the primary purpose of resolving Borrower Claims and making distributions to Borrowers from a fund transferred to the Trust under the Plan.

2.      Article VIII, Section 4 of the Plan provides that ". . . the Liquidating Trust or Borrower Claims Trust (to the extent provided for in the Borrower Claims Trust Agreement), as applicable, following the Effective Date, may request that the Bankruptcy Court estimate any disputed, contingent, or unliquidated Claim to the extent permitted by Bankruptcy Code Section 502(c) . . ."  Section 4.3(a) of the Trust Agreement provides that any distribution "shall be made pro rata to all holders of Borrower Claims Trust Beneficial Interests; provided that in connection with such distribution the Disputed Claims Reserve shall be deemed to have a Borrower Claims Trust Beneficial Interest corresponding to the Estimated Amount of all Disputed Borrower Claims as of the relevant time."  Section 1.2(ee) of the Trust Agreement provides that the "Estimated Amount" of one or more Disputed Borrower Claims, either individually or in one or more groupings or in the aggregate, may be the filed amount of the Claims or "such amount as estimated by the Bankruptcy Court at the request of the Debtors or the Borrower Claims Trust including pursuant to Bankruptcy Code sections 105 and 502(c) . . ."

3.      The Trust desires to make a distribution to the holders of Allowed Borrower Claims but will be unable to do so unless the Court grants this Motion.  Although the Debtors had settled or otherwise resolved almost all Borrower Class Claims and prosecuted objections to many individual Borrower Claims (and the Court had approved the great majority of those objections) as of confirmation of the Plan, there remained 597 unresolved Borrower Claims as of

2

the Effective Date (Talarico Decl. at ¶ 8). Moreover, the objections prosecuted by the Debtors were objections that could be the subject of Omnibus Objections. Most of the largest, most contentious Borrower Claims, held by the most tenacious Borrowers, remained unresolved as of the Effective Date. Most if not all of these claims should not be allowed and in many if not all cases are inflated to an astonishing degree, so that if the Trust must use the filed amounts of such Claims to establish the DCR, it will not be possible to make any meaningful distribution for a very long time. For example, Borrowers have filed Claims in the following amounts: $450,000,000; $100,000,000; $32,850,000; $26,500,000, etc. Accordingly, the Borrower Trust must seek the Court's assistance in estimating claims in connection with establishing a realistic and prudent DCR so that a distribution can be made rather sooner than much later.

4.    The Trust seeks to establish the DCR with a cash reserve in the amount of $8,640,000 (Talarico Decl. ¶ 11). For the reasons discussed herein, the Trust believes that the actual Allowed amounts of the Disputed Class 5 Claims and Disputed ETS Borrower Claims will be far lower than the amount for which they are reserved. Thus, the requested Reserve is conservative and will ensure that holders of Disputed Class 5 Claims and Disputed ETS Borrower Claims will receive the treatment under the Plan to which they are entitled if and when their claims are Allowed.

5.    The Court is not being asked to estimate any particular Disputed Class 5 and ETS Claim pursuant to this Motion. Rather, the purpose of this Motion is to obtain approval of the estimate for the total amount of the DCR established for all Disputed Class 5 Claims and Disputed ETS Borrower Claims, thereby enabling the Trust to allocate an appropriate rather than an absurdly inflated Beneficial Interest to the DCR. That will, in turn, enable the Trust to make a

47603297

Cash distribution to those with Allowed Claims as soon as practicable so they will not be held hostage by the excessive amounts claimed by certain holders of Borrower Claims.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

7.     The statutory and legal predicates for the relief requested herein are Bankruptcy Code sections 105(a), 502(c) and 1142(b) and Bankruptcy Rule 3021.

## BACKGROUND

8.     On May 14, 2012 (the "**Petition Date**"), each of the Debtors filed a voluntary petition with the Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors managed and operated their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108 until the effective date of the Plan, which established the Liquidating Trust and the Borrower Trust as successors to the Debtors in certain respects.  These cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).   No trustee has been appointed in these Chapter 11 cases.

9.     On August 29, 2012, the Bankruptcy Court entered an order establishing: (i) November 9, 2012 as the deadline for Creditors to file proofs of claim against the Debtors (the "**General Bar Date**"), and (ii) November 30, 2012 as the deadline for governmental units to file proofs of claim [Docket No. 1309]. Due to events precipitated by Hurricane Sandy, the Bankruptcy Court approved an extension of the General Bar Date to November 16, 2012 [Docket No. 2093].

47603297

10.    On March 21, 2013, the Bankruptcy Court entered an order approving certain omnibus claim objection procedures [Docket No. 3294] (the "**Claims Procedures Order**").

11.    On July 3, 2013, the Debtors and the Official Committee of Unsecured Creditors filed their Joint Chapter 11 Plan [Docket No. 4153] and related Disclosure Statement [Docket No. 4157] (as amended, the "**Disclosure Statement**").    On August 16, 2013, the Plan Proponents filed a revised Disclosure Statement, which included a revised copy of the plan filed on July 3, 2013 [Docket No. 4733], each of which were further revised on August 20, 2013 [Docket No. 4770] and August 23, 2013 [Docket No. 4819].

12.    The Plan created the Borrower Trust for the primary purpose of resolving Borrower Claims and making distributions thereon. In furtherance of that purpose, the Plan provided that the Borrower Trust would succeed to the rights and duties of the Debtors under the Claims Procedures Order with respect to Borrower Claims. The Plan further provided for the transfer by the Debtors to the Borrower Trust of $57.6 million (which, as of confirmation, was reduced to $56.1 million due to certain credits for pre-confirmation payments made by Debtors to certain Borrower Claimants in settlement of their claims) ("**Borrower Trust Fund**").[2]

13.    The amount of the Borrower Trust Fund was established pursuant to the Global Settlement memorialized in the *Plan Support Agreement* among the Debtors, the Creditors' Committee, Ally Financial, Inc. ("**AFI**"), and the Consenting Claimants, dated May 23, 2013 [Docket No. 3814] ("**PSA**"), which furnished the basic blueprint for the Plan, in an amount estimated to be sufficient to provide Borrower Claimants with recoveries at least equal to recoveries of the respective non-Borrower Unsecured Creditors at the applicable Debtor Group, primarily the Residential Funding Company ("**RFC**") and GMAC Mortgage, LLC ("**GMACM**")

---

[2]   The additional amount of $3,200,000 was transferred to the Trust for the intended purpose of covering the Trust's estimated expenses of administration.

47603297

groups ("**Comparable Recoveries**").[3]  Borrower Claimants were classified as follows under the Plan: (i) Class R-5 (ResCap Unsecured Claims)[4]; (ii) Class GS-5 (GMACM Unsecured Claims); (iiii) Class RS-5 (RFC Unsecured Claims), and (iv) ETS.   The respective Comparable Recovery percentages, which for all purposes of the Borrower Trust were finally fixed under the Plan and not subject to further modification for any reason including subsequent developments in the administration of the Liquidating Trust, were as follows:  Residential Capital, LLC ("**ResCap**") – 36.3%, GMACM – 30.1%, ETS – 100.0% and RFC– 9.0% ("**Comparable Recovery Percentages**").

14.    Since the $57.6 million allocated to the Borrower Trust was a preliminary estimate and thus somewhat uncertain, the parties to the PSA also agreed that the estimated amount would be further tested by a Borrower Trust True-Up analysis to be conducted prior to confirmation of the Plan.  The PSA contemplated that if the analysis showed that the initial agreed amount of the Borrower Trust Fund was not sufficient to provide holders of Borrower Claims Comparable Recovery Percentages, additional funds would be provided in order to "true up" the Borrower Trust Fund by an amount sufficient to achieve Comparable Recovery Percentages ("**True-up**").  However, the only practical approach for the Borrower Trust was to fix the Comparable Recovery Percentages in the Plan at the time of confirmation, which, as a necessary consequence, meant the Borrower Claimants would not be eligible to share in any increase in the Comparable Recovery Percentages that might later occur based on the actual

---

[3]  The discussion herein is based on the Plan, the Disclosure Statement, the Talarico Declaration, and the thorough discussion of the creation and funding of the Borrower Trust and the True-Up process contained in the *Direct Testimony of William R. Thompson* [Docket No. 5713] ("**Thompson Testimony**").

[4]  While these are identified as a possible class in the Plan, the Borrower Trust believes, based on representations made by the Debtor and Committee professionals, that there are no valid Borrower claims against ResCap.  The Debtor and Committee professionals' representations are reflected in the fact that there is no discussion at all in the Plan or Disclosure Statement of any Borrower Claims against ResCap, no funds were allocated for payment of those Claims, and the Borrower Claims True-Up analysis identified no such Claims.  The absence of such Claims is also evidenced by the fact that there have been no such Claims Allowed to date.

experience of the Liquidating Trust; accordingly, the PSA parties also agreed that if the True-Up analysis showed that the estimated amount of $57.6 million was more than sufficient to provide the Comparable Recoveries, that  amount would not be reduced even if the recoveries on the Allowed Claims of the General Unsecured Creditors proved to be less, on a percentage basis, than the Borrower Claimants.

15.    The True-Up analysis was performed by the Debtors who, in turn, sought the assistance of the Debtors' Court-approved financial advisory professionals, FTI.   The FTI employee responsible for analyzing whether a True-up was required was Michael J. Talarico.[5]

16.    The analysis divided Borrower Claims into two classes, Class Action Claims and Individual Claims.  All Borrower Class Action Claims had been resolved at the time of the True-Up.   The True-Up analysis determined that 2,991 Individual Claims were filed against the Debtors in a total filed or asserted amount of over $12.7 billion, an average amount filed or asserted per claim of $4.3 million.   However, the Debtors and FTI analyzed the Debtors' historical litigation and settlement experience with respect to individual borrower claims and determined that approximately 10% of such claims resulted in a cash payment and that such payments averaged approximately $16,700.  The analysis then classified the pending Borrower Claims into various analytical categories, made certain very conservative assumptions concerning the percentage of objections seeking to expunge Borrower Claims that would be sustained in each of the analytical categories, the number of Borrower Claims that would be allowed, and the average amount of Borrower Claims that would be allowed ( approximately 3 or

---

[5]  FTI's and Mr. Talarico's qualifications are set forth in the Talarico Declaration.  Again, the discussion herein is based on the Talarico Declaration, the Plan, the Disclosure Statement, and the Thompson Testimony.

4 times the historical average of $16,700), and then calculated possible final Borrower Claims pools based on those assumptions.[6]

17.     The True-Up analysis concluded that, notwithstanding the very conservative assumptions set forth above, the Borrower Trust Fund contained a cushion of $8.4 million, i.e. the total Allowed Borrower Claims would receive the respective Comparable Recovery Percentages plus their respective pro rata shares of $8.4 million.  To fully appreciate just how conservative the Borrower True-Up analysis was, the actual success rate of the Debtors pre-confirmation and the Trust post-confirmation with respect to Objections has been 97% rather than the assumed 50%.  (Talarico Decl., ¶ 15 and 30).  And the conservative nature of the True-Up analysis has been resoundingly reaffirmed by the Trust's post-confirmation experience.  As part of the DCR analysis described below, FTI determined that, based on the Borrower Claims Objection experience post-confirmation, the cushion has now increased to $15.7 million, almost double the projected cushion at the time of Plan confirmation.

## THE CLAIMS RESOLUTION PROCESS

18.     As noted above, the Debtors had made substantial progress resolving Borrower Claims prior to confirmation of the Plan and the Borrower Trust has continued this process post-confirmation.   The Trust has continued the pre-confirmation process of diligent and comprehensive review and reconciliation of all unresolved Borrower Claims with the assistance, pursuant to a Cooperation Agreement between the Liquidating Trust and the Borrower Trust, of former employees of the Debtor, including key management, administrative, and legal personnel previously involved in the Borrower Claims reconciliation process, such as Deanna Horst and Nicholas Kosinski and, on the legal side, William Thompson, Kathy Priore, and Lauren Delehey.

---

[6]  Detailed discussion of this methodology can be found in the Thompson Testimony and the Talarico Declaration.

For further continuity the Trust has employed Morrison Foerster and the team of lawyers who were involved in the Borrower Claims reconciliation and claim objection process prior to confirmation. As the Court knows, the Borrower Trust has filed and will continue to file and prosecute objections to Borrower Claims.

19.    Over 3,000 Borrower Claims were filed in these cases. To date approximately 2,300 Borrower Claims have been expunged through Court rulings on objections, settlements, and withdrawals of Claims. All Class Claims have been substantially settled or otherwise resolved, although the settlement of one of them, Rothstein, still needs to be finalized. 78 Individual Borrower Claims have been allowed at an average of $22,584 per Allowed Claim. (See Talarico Decl., especially ¶ 16 and p. 9 of (Key Observations) Exhibit 4 thereto.)

20.    Yet, as noted above and further discussed below, there are still 597[7] Borrower Claims to be resolved. These include most of the large, controversial, and hotly contested Claims, which are in every instance asserted in absurdly inflated amounts. For the most part, such Claims will need to be resolved by individual rather than omnibus objections. Those individual objections will take time to push through to conclusion. Meanwhile, one of the main reasons for the creation of the Borrower Trust—the desire for prompt distributions to Borrower Claimants, perhaps the neediest of all the creditors—is being thwarted.[8] Although the Borrower Trust and its professionals, with the support and assistance of the Liquidating Trust pursuant to the Cooperation Agreement, continue to vigorously prosecute both omnibus and individual objections, it will take many more months to fully resolve all Borrower Claims and it will be

---

[7]  131 of these claims meet the criteria of Borrower Convenience Class.

[8]  As stated in the Thompson Testimony, ¶ 15: "The purpose of the Borrower Claims Trust is to streamline and expedite the process of making distributions to Borrowers."

47603297

possible to make a timely distribution to deserving holders of Allowed Borrower Claims only if the relief requested herein is granted.

## RELIEF REQUESTED

21.     By this Motion, the Borrower Trust requests, pursuant to Bankruptcy Code sections 105(a), 502(c) and 1142(b) and Bankruptcy Rule 3021, that the Court enter the Proposed Order establishing a DCR of $8,640,000.00 (the " **DCR**" or **Reserve Amount"**). (Talarico Decl. ¶ 11).  The Borrower Trust believes that this amount will comfortably allow the Borrower Trust to make meaningful distributions of Cash to holders of Allowed Class 5 Claims without jeopardizing the potential recoveries of holders of Class 5 Claims that are presently disputed, unliquidated, contingent, or otherwise not Allowed but that may be subsequently Allowed.

### A.      DCR Analysis

22.     In order to calculate the amount of the DCR, the Trust employed FTI and Mr. Talarico to extend the Borrower True-Up analysis and apply its methodology and procedures, as appropriate, to the determination of a realistic but conservative DCR.  The extended True-Up Analysis is referred to as "Scenario 1" in the Talarico Declaration.  In addition, the Trust requested FTI and Mr. Talarico to perform <u>additional</u> analyses focusing on the Debtors' and the Trust's experience in the Claims resolution process following the Petition Date as opposed to the Debtors' historical pre-petition experience resolving Borrower Claims.   These alternative analyses are referred to as "Scenario 2" and "Scenario 3" in the Talarico Declaration.

### Scenario 1 (Borrower Trust True-up Methodology)

23.     As described in ¶'s 26-30 of the Talarico Declaration and p. 10 of Exhibit 4 thereto, the True-Up analysis was extended and applied to the particular characteristics of the remaining 597 unresolved Claims.  Conservative features of the extended analysis, similar to the

47603297

original True-Up, included assumption of only a 50% objection success rate when 97% has been the actual experience and an assumed average Allowed Claim of approximately three to four times the historical settlement amount.[9]

24.    The Scenario 1 analysis also applies the $60k per claim estimate to the five largest claims ($10 million and above) on the theory that outrageously exaggerated asserted Claim amounts should not be allowed to skew the results and cause unjustified hardship to other Claimants.    (Already two of these Claims have been expunged by Order of the Bankruptcy Court, but since they have been appealed, continue to be included in the analysis.)

25.    The Scenario 1 analysis concluded that a DCR of $8.64 million was more than sufficient and that an immediate distribution of $45.96 million could comfortably be made to holders of Allowed Borrower Claims.

### Scenario 2 (Average Allowed Claim Methodology)

26.    As noted above, each of the alternate Scenarios took into account not just the Debtors' historical claims resolution experience but also the actual resolution experience following the Petition Date.    Scenario 2 used the actual average amount of settlements of Borrower Claims in the case to date--$27,584.[10] (See ¶'s 16, 31-32 of the Talarico Declaration and p. 11 of Exhibit 4 thereto.)    As with Scenario 1, Scenario 2 assumes that 50% of the objections to those Claims will be sustained.  The Scenario 2 analysis concluded that an even smaller DCR - $4,980,000 - would be required under the Scenario 2 assumptions and analysis.

---

[9]  For liquidated claims asserting a liquidated amount less than $60,000 ,  the asserted amount is assumed to be the Allowed Amount.  See ¶ 29 of Talarico Declaration.

[10]  For claims asserting a liquidated amount less than $27,584, the asserted amount is assumed to be the Allowed Amount.

11

**Scenario 3 (Percentage of Allowed Claim to Asserted Claim Methodology)**

27.    Scenario 3 addressed the issue from yet another perspective, computing the weighted average of actual Allowed Claims vs. the filed or asserted amounts of Claims following the Petition Date (again excluding Convenience Class Claims).  The weighted average was only 6.22% which, incidentally, dramatically demonstrates the inflated nature of the great majority of Borrower Claims as filed.   (See ¶'s 16, 33-34 of the Talarico Decl. and p. 12 of Exhibit 4 thereto.).   In this analysis the five largest Claims as filed or asserted (each in excess of $10 million) were conservatively reduced to $6.475 million (which amount was used because it is the largest filed claim other than the five claims asserted in excess of $10 million.  These amounts are still ridiculously high but FTI and the Trust determined to take a super-conservative approach while somewhat limiting the outrageously inflated amounts of the largest Claims (not that a $6 million claim itself has any basis whatsoever in reality).[11]  After multiplying the asserted or filed Claim amount by 6.22% to arrive at an Allowed Claim Amount,[12] the application of the Scenario 3 assumptions and analysis indicated a DCR of $5.31 million.

28.    Although the Trust could make a persuasive case to establish the DCR at the lower levels indicated by Scenarios 2 and 3, or even lower, the Borrower Trust once again chose the more conservative approach.

**B.    The DCR Will be Cumulative**

29.    Although the Trust calculated the proposed DCR Reserve Amount by reference to the various categories of Claims listed above, the Trust proposes to create an aggregate reserve

---

[11]   Nothing contained in this Motion or in an accompanying paper is intended to, and shall not be deemed to be, an admission against interest or other admission by the Trust with respect to any particular Claim or group or class of Claims.

[12]   For Claims where the analysis has indicated the Claims should be expunged, the result obtained by applying the 6.22% formula to the asserted amount is further refined by assuming that 50% of this amount will become an Allowed Claim.

of Cash for all of the Disputed Class 5 Claims and Disputed ETS Borrower Claims. Thus, Cash held in the DCR is not allocated to specific Claims, and all Cash is available for the satisfaction of all subsequently Allowed Claims, irrespective of the categories described herein. To the extent the Trust has underestimated the amount that should be attributed to one category of Claims, or, for that matter, due to averaging, particular Claims within a category, the overestimation with respect to another category will mean that sufficient Cash should be available to address all Disputed Class 5 Claims and Disputed ETS Borrower Claims that later become Allowed Claims. (See Talarico Decl. ¶ 37.)    The Trust believes this framework, together with the overly conservative Reserve Amount, ensures that all Disputed Class 5 Claims and Disputed ETS Borrower Claims will receive fair and equal treatment under the Plan.

30.    The proposed Reserve Amount represents eminently reasonable and conservative estimates for the Disputed Class 5 Borrower Claims that will ultimately be Allowed in these cases. The Borrower Trust further believes that the proposed Reserve Amount strikes a careful and reasonable balance between enabling the Borrower Trust to make meaningful distributions now to the holders of Allowed Claims while not jeopardizing the potential recoveries to Claimants holding Disputed Class 5 Claims and Disputed ETS Borrower Claims in the event such Claims subsequently are Allowed. Once the DCR is established, no additional Cash will be added to the DCR.  If at any time the Cash remaining in the DCR is insufficient to satisfy all of the Disputed Class 5 Claims and Disputed ETS Borrower Claims that at the time have become Allowed, then the Allowed Disputed Class 5 Claims and Disputed ETS Borrower Claims that at the time are unsatisfied will be satisfied pro rata from the remaining Cash in the DCR.  After all Cash in the DCR has been distributed, no further distributions will thereafter be made in respect of Disputed Class 5 Claims and Disputed ETS Borrower Claims.  Notwithstanding, it is the

13

Borrower Trust's belief that the aggregate reserve proposed and described in greater detail herein utilizes an extremely conservative methodology that adequately protects the Claimants' interests and ensures that the Reserve is more than sufficient to provide the Disputed Class 5 Claims and Disputed ETS Borrower Claims with sufficient Cash.

31.     The proposed Reserve Amount is not indicative of the Borrower Trust's estimate of the ultimate Allowed amount of such Claims. Rather, the Reserve Amount represents the Borrower Trust' estimate of the maximum liability that has been or could possibly, even unreasonably, be successfully asserted by the Claimants on account of the Disputed Class 5 Claims and Disputed ETS Borrower Claims.  By this Motion the Borrower Trust is not proposing to allow all or any of the Disputed Class 5 Claims and Disputed ETS Borrower Claims at the Reserve Amount, and objections have been and will continue to be filed against a substantial number of these Claims that will result in the disallowance of such Claims. The Borrower Trust reserves all rights, both for themselves and their successors, to object to any or all Disputed Class 5 Claims and Disputed ETS Borrower Claims, either in whole or in part, or to seek to estimate, Disputed Class 5 Claims and Disputed ETS Borrower Claims at lesser amounts.

## BASIS FOR RELIEF

32.     Bankruptcy Rule 3021 provides that after a plan is confirmed, a distribution "shall be made to creditors whose claims have been allowed . . . ." Fed. R. Bankr. P. 3021. To effectuate distributions under the Plan on account of Allowed Claims, the Borrower Trust seeks authorization to establish the DCR pursuant to sections 502(c), 1142(b), and 105(a) of the Bankruptcy Code, as contemplated by the Plan and Borrower Trust Agreement.

33.     Section 502(c) of the Bankruptcy Code provides for the estimation of contingent or unliquidated claims:

47603297

(c) There shall be estimated for purpose of allowance under this section—

(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or

(2) any right to payment arising from a right to an equitable remedy for breach of performance.

11 U.S.C. § 502(c).

34.    Although Section 502(c) refers to the estimation of claims for the purposes of allowance, courts have estimated claims for other purposes, including to establish reserves for plan distributions. See, e.g., In re Lomas Fin. Corp., 172 B.R. 3, 4 (S.D.N.Y. 1994) (noting that the court had estimated a claim to set a reserve and cap recovery on the claim); In re Bally Total Fitness of Greater N.Y., Inc., No. 08-14818 (BRL) (Bankr. S.D.N.Y. Oct. 5, 2009) (approving the debtors' motion to estimate claims for purposes of establishing claims reserves) [Docket No. 1547]; In re Dana Corp., No. 06-10354 (BRL) (Bankr. S.D.N.Y. Nov. 28, 2007) (same) [Docket No. 7236]; In re Enron Corp., No. 01-16034, 2006 Bankr. LEXIS 4294 (Bankr. S.D.N.Y. Jan. 17, 2006) (approving the debtors' motion to estimate claims for purposes of establishing reserves and setting the reserve amount as the maximum amount of recovery).

35.    Section 502(c) does not prescribe the method for estimating a claim, and the Court therefore has discretion to utilize any valuation model that best suits the circumstances of the case at hand. See, e.g., Maxwell v. Seaman Furniture Co. (In re Seaman Furniture Co. of Union Square, Inc.), 160 B.R. 40, 42 (S.D.N.Y. 1993) (stating that a bankruptcy court may use whatever method is best suited to the circumstances). "When estimating claims, bankruptcy courts may use whatever method is best suited to the contingencies of the case, so long as the procedure is consistent with the fundamental policy of Chapter 11 that a reorganization must be accomplished quickly and efficiently." In re Adelphia Commc'ns Corp., 368 B.R. 140, 278 (Bankr. S.D.N.Y. 2003) (citation and internal quotations omitted).  Indeed, the clearly stated

15

purpose for allowing the estimation of claims is to "avoid undue delay in the administration of bankruptcy proceedings." Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.), 10 F.3d 944, 957 (2d Cir. 1993); In re N.Y. Med. Grp., P.C., 265 B.R. 408, 415 (Bankr. S.D.N.Y. 2001) ("Under 11 U.S.C. § 502(c), a claim may be estimated for purposes of allowance if it is unliquidated and liquidation would unduly delay the administration of the case.").

36.    In addition, the Court has broad authority under sections 1142(b) and 105(a) of the Bankruptcy Code over the property of the estate administered under the Plan to issue any order necessary to implement the provisions of the Plan and the Bankruptcy Code. See 11 U.S.C. § 1142(b) ("The court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan."); 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."). See also Adelphia Bus. Solutions, Inc. v. Abnos, 482 F.3d 602, 609 (2d Cir. 2007) ("Section 105(a) grants broad equitable power to the bankruptcy courts to carry out the provisions of the Bankruptcy Code so long as that power is exercised within the confines of the Bankruptcy Code."); Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC), 423 F.3d 166, 183 (2d Cir. 2005) ("Section 105 grants the bankruptcy court equitable powers to implement the provisions of the Bankruptcy Code."); In re Enron Corp., 2006 Bankr. LEXIS 4294, at *3 (estimating, pursuant to sections 105(a), 502(c), and 1142 of the Bankruptcy Code, certain claims at $0 for purposes of establishing reserve claim amounts).

37.    The relief being sought in this Motion is similar to relief granted by courts in this District in recent cases, including in this case by the Court pursuant to the Plan Proponents

47603297

Motion [Dockets 6020 (Motion) and 6166 (Order)].  See, also e.g., In re General Maritime Corp.,

No. 11¬15285 (MG) (Bankr. S.D.N.Y. Apr. 26, 2012) [Docket No. 770] (estimating the

maximum aggregate amount of unsecured claims for purposes of establishing an unsecured

claims reserve); In re Motors Liquidation Co., No. 09-50026 (REG) (Bankr. S.D.N.Y. Mar. 23,

2011) [Docket No. 9877] (estimating the maximum amount of individual claims for purposes of

establishing a claims reserve under a plan); In re Lyondell Chem. Co., No. 09-10023 (REG)

(Bankr. S.D.N.Y. Nov. 23, 2010) [Docket No. 5356] (setting and establishing a DCR); In re

Chemtura Corp., No. 09¬11233 (REG) (Bankr. S.D.N.Y. Oct. 29, 2010) [Docket No. 4383]

(setting and approving the establishment of a distribution reserve); In re Delphi Corp., No. 05-

44481 (RDD) (Bankr. S.D.N.Y. Sept. 28, 2007) [Docket No. 9685] (estimating the maximum

amount of individual claims for purposes of establishing a claims reserve and establishing claim

estimation procedures).

      38.     Article VIII, Section 4 of the Plan provides that ". . . the Liquidating Trust or

Borrower Claims Trust (to the extent provided for in the Borrower Claims Trust Agreement), as

applicable, following the Effective Date, may request that the Bankruptcy Court estimate any

disputed, contingent, or unliquidated Claim to the extent permitted by Bankruptcy Code Section

502(c) . . ."   Section 4.3(a) of the Trust Agreement provides that any distribution "shall be made

pro rata to all holders of Borrower Claims Trust Beneficial Interests; provided that in connection

with such distribution the Disputed Claims Reserve shall be deemed to have a Borrower Claims

Trust Beneficial Interest corresponding to the Estimated Amount of all Disputed Borrower

Claims as of the relevant time."   The Estimated Amount of a Borrower Claim may be the filed

amount of the Claim or "such amount as estimated by the Bankruptcy Court at the request of the

Debtors or the Borrower Claims Trust pursuant to Bankruptcy Code Section 502(c) . . ."

47603297

39. As described herein, the Borrower Trust determined the Reserve Amount in good faith, conservatively, and based on an appropriate review and analysis of the claims at issue.

40. During the Chapter 11 cases, the Debtors or Borrower Trust have expunged, caused to be withdrawn and/or reduced in amount more than 2,400 Individual and Class Borrower Claims, resulting in a reduction of more than $14.3 billion in asserted Claims. The original True-Up analysis has proved to be extremely conservative and continues to be so, producing a recommended DCR of almost twice as much as Scenarios 2 and 3, which are arguably more realistic since they are based on actual experience in the bankruptcy case rather than the arguably different circumstances prevailing pre-bankruptcy. These efforts and their results demonstrate the Trust's ability, guided by essentially the same Debtor professionals and employees (now employed by the Liquidating Trust) that have been engaged in the process throughout the case, to properly and accurately estimate the Disputed Class 5 Borrower Claims. Accordingly, the Court can confidently rely upon the Trust's estimate of the Disputed Class 5 Borrower Claims for distribution and reserve purposes under the Plan and Borrower Trust Agreement.

41. Due to the magnitude (caused by absurdly inflated filed or asserted Claim amounts) and the complexity of the remaining unresolved Borrower Claims filed against the Debtors' Estates, establishing the DCR using the Reserve Amount is necessary to make distributions to holders of Allowed Borrower Claims as soon as practicable. The Reserve Amount balances the need to make prompt and material distributions to holders of Borrower Claims who deserve not to be held hostage by a relatively small group of grossly overreaching Borrower Claimants, while ensuring that a sufficient amount of Cash will be available for the

47603297

benefit of holders of the Disputed Class 5 Claims and Disputed ETS Borrower Claims to the extent that such Claims are ultimately Allowed.

## NOTICE

42.     The Borrower Trust has provided notice of this Motion in accordance with the Case Management Procedures Order, approved by this Court on May 23, 2012 [Docket No. 141], as well as to all holders of both Allowed and Disputed Class 5 Borrower Claims and Disputed ETS Borrower Claims. The Borrower Trust submits that no other or further notice need be provided.

*[Remainder of Page Intentionally Left Blank]*

47603297

## **CONCLUSION**

WHEREFORE, the Borrower Trust respectfully requests that this Court enter the

Proposed Order granting the relief requested in this Motion, and such other and further relief as

may be just and proper.

Dated:  June 2, 2014                                        /s/ Daniel J. Flanigan
       New York, New York                            Daniel J. Flanigan
                                         Jason A. Nagi
                                         **POLSINELLI**
                                         900 3rd Avenue
                                         21st Floor
                                         New York, New York 10022
                                         Telephone: (212) 644-2090
                                         Facsimile: (212) 684-0197

                                         *Counsel for Borrower Claims Trust*

47603297