## Exhibit 2

**Delehey Declaration**

MORRISON & FOERSTER LLP
250 West 55th St.
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Norman S. Rosenbaum
Jordan A. Wishnew
Erica J. Richards

BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street, NW, Suite 1350
Washington, DC 20036
Telephone: (202) 393-7150
Facsimile: (202) 347-1684
Steven A. Pozefsky
Eric A. Frechtel

*Counsel for the ResCap Borrower
Claims Trust*

*Special Counsel for the ResCap Borrower
Claims Trust*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ )
In re:                                                        )   Case No. 12-12020 (MG)
                                                             )
RESIDENTIAL CAPITAL, LLC, et al.,                            )   Chapter 11
                                                             )
                              Debtors.                        )   Jointly Administered
------------------------------------------------------------ )

**DECLARATION OF LAUREN GRAHAM DELEHEY IN SUPPORT OF
OBJECTION OF THE RESCAP BORROWER CLAIMS TRUST
<u>TO CLAIM NUMBER 392 FILED BY KEVIN J. MATTHEWS</u>**

I, Lauren Graham Delehey, declare as follows:

**A.    Background and Qualifications**

1.    I serve as Chief Litigation Counsel for the ResCap Liquidating Trust (the

"<u>Liquidating Trust</u>") established pursuant to the terms of the *Second Amended Joint Chapter 11*

*Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured*

*Creditors* [Docket No. 6030] in the above-captioned Chapter 11 Cases.[1]  During the Chapter 11

Cases, I served as Chief Litigation Counsel in the legal department at Residential Capital, LLC

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Objection (as defined below).

("ResCap"), a limited liability company organized under the laws of the state of Delaware and

the parent of the other debtors in the above-captioned Chapter 11 Cases (collectively, the

"Debtors").  I joined ResCap on August 1, 2011 as in-house litigation counsel.

2.        In my role as Chief Litigation Counsel at ResCap, I was responsible for the

management of litigation, including, among others, residential mortgage-related litigation.  In

connection with ResCap's chapter 11 filing, I also assisted the Debtors and their professional

advisors in connection with the administration of the Chapter 11 Cases, including the borrower

litigation matters pending before this Court.  In my current position as Chief Litigation Counsel

to the Liquidating Trust, among my other duties, I continue to assist the Liquidating Trust and

the Borrower Claims Trust (the "Borrower Trust") in connection with the claims reconciliation

process.[1]  I am authorized to submit this declaration (the "Declaration") in support of the

*Objection of the ResCap Borrower Claims Trust to Claim Number 392 Filed by Kevin J.*

*Matthews* (the "Objection").

3.        Except as otherwise indicated, all facts set forth in this Declaration are based upon

my personal knowledge of the Debtors' operations, information learned from my review of

relevant documents and information I have received through my discussions with other former

members of the Debtors' management or other former employees of the Debtors, the Liquidating

Trust's and the Borrower Trust's professionals and consultants.  If I were called upon to testify, I

could and would testify competently to the facts set forth in the Objection on that basis.

---

[1] The Liquidating Trust and the Borrower Trust are parties to an Access and Cooperation Agreement, dated
December 17, 2013, which, among other things, provides the Borrower Trust with access to the books and records
held by the Liquidating Trust and the Liquidating Trust's personnel to assist the Borrower Trust in performing its
obligations.

4.      In my current and former capacities as Chief Litigation Counsel to the Liquidating Trust and ResCap, I am intimately familiar with the Debtors' claims reconciliation process. Except as otherwise indicated, all statements in this Declaration are based upon my familiarity with the Debtors' Books and Records (the "Books and Records"), as well as the Debtors' schedules of assets and liabilities and statements of financial affairs filed in these Chapter 11 Cases (collectively, the "Schedules"), my review and reconciliation of claims, and/or my review of relevant documents.  I or other Liquidating Trust personnel have reviewed and analyzed the proof of claim form and supporting documentation filed by Kevin J. Matthews ("Matthews"). Since the Plan went effective and the Borrower Trust was established, I, along with other members of the Liquidating Trust have consulted with the Borrower Trust to continue the claims reconciliation process, analyze claims, and determine the appropriate treatment of the same.  In connection with such review and analysis, where applicable, I or other Liquidating Trust personnel, together with the Liquidating Trust's professional advisors, have reviewed (i) information supplied or verified by former personnel in departments within the Debtors' various business units, (ii) the Books and Records, (iii) the Schedules, (iv) other filed proofs of claim, and/or (vi) the official claims register maintained in the Debtors' Chapter 11 Cases.

5.      In connection with the Claim (as defined below) filed by Matthews, the Liquidating Trust, on behalf of the Borrower Trust, reviewed the Matthews loan file, as well as the various pleadings filed in the litigation between the Debtors and Matthews.  Based on my experience as Chief Litigation Counsel for ResCap and my understanding of GMACM's general practices, GMACM's interactions with Matthews as servicer for the Loan were undertaken in the ordinary course of GMACM's operations as an authorized agent of the investor.

6.      Matthews filed proof of claim 392 against GMACM (the "<u>Claim</u>"), a copy of
which is attached hereto as **<u>Exhibit A</u>**.

### B.      The Matthews Loan and Foreclosure Actions

7.      Matthews was a borrower under a mortgage loan (the "<u>Loan</u>") that was originated
by USAA Federal Savings Bank on February 14, 2008.  The Loan was evidenced by a note in the
amount of $150,000.00 (the "<u>Note</u>"), which was secured by real property located at 3216 East
Northern Parkway, Baltimore, Maryland 21214 (the "<u>Property</u>") pursuant to a security deed (the
"<u>Deed of Trust</u>") executed contemporaneously with the Note.  <u>Id.</u>  (Copies of the Note and Deed
of Trust are attached hereto as **<u>Exhibits B</u>** and **<u>C</u>**, respectively.)  GMACM serviced the Loan
from its inception until servicing transferred to Ocwen Loan Servicing, LLC on February 15,
2013.

8.      Matthews defaulted on the Note by failing to make his August 1, 2009 payment.
As of the date of transfer to Ocwen, he had yet to make any subsequent payments on the Note.

9.      On March 29, 2010, GMACM, acting in its capacity as servicer for the Loan,
instituted foreclosure proceedings (the "<u>First Foreclosure Action</u>") against Matthews in the
Circuit Court for Baltimore City, Maryland (the "<u>Maryland Court</u>"), and the Property was sold at
a foreclosure sale on May 21, 2010.  On January 14, 2011, upon motion of GMACM and its
agents, the Maryland Court entered a consent order (the "<u>Dismissal Order</u>") dismissing the First
Foreclosure Action without prejudice and rescinding the May 21, 2010 foreclosure sale.  (A copy
of the Dismissal Order is attached hereto as **<u>Exhibit D.</u>**)

10.      On or about February 10, 2012, GMACM filed a new complaint with the
Maryland Court commencing foreclosure proceedings against Matthews, under the caption
<u>O'Sullivan, et al. v. Matthews</u>, Case No. 24-O-12000286 (Balt. City Cir. Ct., Md.) (the "<u>Second</u>

Foreclosure Action"). (A copy of the Docket Sheet in the Second Foreclosure Action is attached hereto as **Exhibit E.**)

11.      On or about March 19, 2012, Matthews filed a Counter Complaint & Jury Demand in the Second Foreclosure Action. (A copy of the Counter Complaint is annexed to the Claim, attached hereto as **Exhibit A.**)

12.      On or about April 26, 2012, GMACM filed a motion to dismiss (the "Motion to Dismiss") the Counter Complaint in its entirety on both procedural and substantive grounds. (See **Exhibit E** at Dkt No. 18.)

13.      On or about June 26, 2012, Matthews filed a *Motion for Direction Concerning The Automatic Stay As To Counter Defendants Carrie Ward And Jeffrey Stephan And Potential Other Parties By Amendment* ("Motion for Direction") in the Second Foreclosure Action, pursuant to which Matthews requested clarification regarding the application of the Supplemental Servicing Order to the Second Foreclosure Action and sought the Maryland Court's advice as to how to proceed in the face of GMACM's bankruptcy. (See **Exhibit E** at Dkt No. 22.)

14.      On or about June 27, 2012, Matthews filed a *Motion For Extension For Counter Plaintiff To Respond To Defendants GMAC's & Carrie Ward's Motion To Dismiss Due To The Automatic Stay Of Counter Defendant GMAC* ("Motion for Extension") in the Second Foreclosure Action. (See **Exhibit E** at Dkt No. 23.)

15.      On July 9, 2012, a foreclosure mediation took place in the Second Foreclosure Action between Matthews and GMACM. The foreclosure mediation was continued until October 9, 2012. Thereafter, on October 10, 2012, the mediator filed the following report of the

mediation proceedings: "The parties participated in the mediation but no agreement was reached." (See **Exhibit E** at Dkt No. 35.)

16.       A hearing was held on the Motion for Direction and the Motion for Extension before the Maryland Court on July 30, 2012. At the conclusion of the hearing, the Maryland Court ruled that, regardless of whether or not Matthews's Monetary Claims can be parsed from the non-monetary relief sought by Matthews under the Counter Complaint, the Maryland Court was permitted to entertain the Motion to Dismiss under the Supplemental Servicing Order. (A copy of the Maryland Court's July 30, 2012 order is attached hereto as **Exhibit F.**)

17.       On or about September 4, 2012, Matthews filed an opposition to the Motion to Dismiss and a Notice of Dismissal of Count I of the Counter Complaint with the Maryland Court. (See **Exhibit E** at Dkt No. 34.)

18.       On or about October 24, 2012, Matthews voluntarily dismissed his remaining counter claims against GMACM (but not against the other counter defendants) in the Second Foreclosure Action. (See **Exhibit E** at Dkt. No. 38.)

19.       A review of the Docket Sheet in the Second Foreclosure Action reveals that Matthews' claims against the two other counter-defendants have since been dismissed. (See **Exhibit E** at Dkt. Nos. 42/2, 57, and 58/2.) Accordingly, none of Matthews' claims against any counter-defendant remain pending in the Second Foreclosure Action.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Dated:  June 12, 2014                              /s/ Lauren Graham Delehey
                                                   Lauren Graham Delehey
                                                   Chief Litigation Counsel for the
                                                   ResCap Liquidating Trust

### Exhibit A to Declaration

B 10 (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT Southern DISTRICT OF New York | | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor: <br> In re Residential Capital, LLC (Joint Administration) <br> GMAC Mortgage LLC | Case Number: <br> 12-12020 |
|---|---|

**NOTE:** *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

RECEIVED

AUG 1 3 2012

KURTZMAN CARSON CONSULTANTS

Name of Creditor (the person or other entity to whom the debtor owes money or property):

Kevin J. Matthews

**COURT USE ONLY**

Name and address where notices should be sent:

c/o Legg Law Firm LLC
5500 Buckeystown Road, Francis Scott Key Mall
Frederick, MD  21703

Telephone number:                 email:
301-620-1016              probinson@legglaw.com

☐ Check this box if this claim amends a previously filed claim.

**Court Claim Number:**_____
   (*If known*)

Filed on:_____

Name and address where payment should be sent (if different from above):



Telephone number:                 email:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:**        $   3,000,000.00

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim.  Attach a statement that itemizes interest or charges.

**2. Basis for Claim:**   Violation of state and federal consumer protection statutes (see Counter Complaint
   (See instruction #2) filed in O'SULLIVAN v. MATTHEWS, Baltimore City Circuit Court, Case No. 24012000286)

| **3. Last four digits of any number by which creditor identifies debtor:** 6456 _ _ _ _ | **3a. Debtor may have scheduled account as:** <br><br> (See instruction #3a) | **3b. Uniform Claim Identifier (optional):** <br> _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ <br> (See instruction #3b) |
|---|---|---|

**4. Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
**Describe:**

**Value of Property: $**_____

**Annual Interest Rate**_____% ☐ Fixed  or  ☐ Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:
                                        $_____

**Basis for perfection:**_____

**Amount of Secured Claim:**    $_____

**Amount Unsecured:**          $_____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).  If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$_____

*Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)



121203212081300000000001

B 10 (Official Form 10) (12/11) 2

**7. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #7, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**RECEIVED**

**8. Signature:** (See instruction #8)

AUG 1 3 2012

Check the appropriate box.

**KURTZMAN CARSON CONSULTANTS**

☐ I am the creditor.  ☒ I am the creditor's authorized agent. (Attach copy of power of attorney, if any.)  ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)  ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:  Phillip Robinson
Title:  Attorney
Company:  Legg Law Firm LLC
Address and telephone number (if different from notice address above):
5500 Buckeystown Pike
Frederick, MD 21703
301-620-1016
Telephone number:          email:

(Signature)          (Date)

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

---

### INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

**Items to be completed in Proof of Claim form**

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of the claim falls into any one category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**8. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, attach a complete copy of any power of attorney, and provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

## LEGG LAW FIRM, LLC

*A Consumers Rights Firm*

Janet Legg
Scott C. Borison*

5500 Buckeystown Pike
Frederick, Maryland 21703

Of Counsel:
Donald A. Dunbar
Phillip R. Robinson
e mail info@legglaw.com

Attorneys are Admitted
in MD unless noted
* Admitted in MD & DC

Telephone (301) 620-1016
Fax (301) 620-1018
www.legglaw.com

August 6, 2012

**ResCap Claims Processing Center**
c/o KCC
2335 Alaska Ave
El Segundo, CA 90245

Re.:    Kevin J. Matthews Proof of Claim

To Whom It May Concern:

Please accept the attached proof of claim and supporting material on behalf of Kevin J. Matthews
who is a creditor of Debtor GMAC Mortgage LLC.  As evidence of his proof of claim, Mr.
Matthews has attached a copy of his pre-petition Counter Complaint against GMAC Mortgage
LLC and its agents and employees that is presently pending in the Circuit Court for Baltimore
City, Maryland.

Should you have any questions, please feel free to contact me.

Sincerely,

Phillip Robinson

## IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

**LAURA H.G. O'SULLIVAN,** *et al.*

    **Plaintiffs**

**v.**

**KEVIN J. MATTHEWS**

    **Defendant**

Case No. **24O12000286**

---

**KEVIN J. MATTHEWS**

    **Counter Plaintiff**

**v.**

**GMAC MORTGAGE LLC**
**SERVE ON:**
**CSC-Lawyers Incorporating Service**
    **Company, Resident Agent**
**7 St. Paul Street, Suite 1660**
**Baltimore, MD 21202**

**And**

**CARRIE WARD**
**4520 East West Highway, Suite 200**
**Bethesda, MD 20814**

**And**

**JEFFREY STEPHAN**
**42 Lenape Drive**
**Sellersville, PA 18960-1568**

    **Counter Defendants**

## COUNTER COMPLAINT

### &

### JURY DEMAND

1

## I.    Introduction

1. The claims outlined herein exemplify the abusive fast-track foreclosure and abusive debt collection practices that have rocked our headlines and economy for the past year and half by certain so-called professionals who have thumbed their nose to the rule of law and in which the Plaintiff, Kevin Matthews ("Matthews" or "Plaintiff") has and continues to suffer damages and losses. Further, Counter Defendants GMAC Mortgage LLC ("GMAC"), Carrie Ward ("Ward"), and Jeffery Stephan ("Stephan")(collectively "Counter Defendants") have levied similar unfair, deceptive, and knowingly bogus or fraudulent practices against hundreds of other similar Maryland homeowners for the sake of expediency and profit by disregarding and ignoring the rule of law. Matthews and every other Maryland homeowner relied upon the representations of GMAC, Ward, and Stephan to be truthful and honest because that is what a reasonable person expects of witnesses and parties in our courts.

2. After returning from military service in Iraq in 2006 with a medical discharge from the Maryland Army National Guard, Matthews had a number of service-related health problems including post-traumatic stress and a herniated disk. While serving in our armed forces Matthews was recognized with the Army commendation for his meritorious service and mission miles.

2

3.  Upon his return from Iraq, Matthews used his GI benefits and qualified for a
    VA mortgage in which he purchased his home and property on February
    14, 2008 which is subject to this action.

4.  Sometime about December 2008 Matthews was injured in a car accident
    which exasperated certain injuries he had sustained in Iraq and he had a
    significant reduction of income as a result.  He later exhausted his savings
    keeping his mortgage current and then fell into default when those savings
    were used up.

5.  However, acting as a responsible homeowner, Matthews anticipated his
    default before it occurred and attempted to seek appropriate loss mitigation
    options while he was even in the hospital recovering from his accident.  In
    taking this action he relied upon the terms of his VA loan that GMAC would
    work with him.  GMAC, however, omitted offering Matthews the meaningful
    loss mitigation alternatives he was entitled to receive pursuant to his VA
    loan.  GMAC also ignored requests made on his behalf by his housing
    counselor.  Matthews also sought and has improved his earning capacity
    through increased job skills by obtaining a Bachelor of Science degree in
    biology from Coppin State University.

6.  In its debt collection efforts against Matthews, GMAC, Ward, and Stephan
    worked together to collect upon his mortgage, by filing a bogus foreclosure
    action and improperly acquiring the jurisdiction of this Court with those
    bogus documents (i) before GMAC had properly considered Matthews for

3

all the applicable loss mitigation programs available him and (ii) before it
had the right to do so under Maryland law since had not complied with the
mandatory requirements established by the Maryland General Assembly
before the commencement of the foreclosure action.

7. To add insult to injury, the true owner of the mortgage loan, GMAC,
   neglected to honor protections afforded to Mr. Matthews by the Veterans
   Administration HAMP program to which Mr. Matthews relied, and
   proceeded instead to an illegal foreclosure action.  It also subsequently
   evicted Matthews without the legal right to do so while Matthews was away
   on a school research and training trip without even advising his counsel of
   record who by then had properly and timely objected to the illegal
   foreclosure sale.   When Matthews returned to his home after the bogus
   foreclosure action was dismissed, Matthews found that his house was
   damaged by GMAC's failure to properly winterize it.

8. While fighting to undue the original foreclosure sale (which had occurred
   without the right to do so), GMAC's illegal robo-signing practices, including
   those knowingly carried out by Stephan and Ward against Matthews,
   became nationally known. After first attempting to defend these practices,
   GMAC later received leave to dismiss its bogus foreclosure action before
   this Court could rule upon their bogus practices.

9. Now, Mr. Matthews stands before the Court with a host of losses and
   damages as a result of the actions of the Counter Defendants and their

4

authorized agents and affiliates.  Not only has he lost and regained his
legal rights to his property, but he has also lost his belongings in the
eviction, he incurred legal expenses to defend the illegal debt collection
action, had to pay for temporary rental housing, and has suffered physical
property damage to his home by the improper seizure and weatherization
of his home at the time of the illegal eviction.  Alongside these financial
injuries, his health and emotional well-being has been further damaged due
to the stress of the illegal foreclosure action against him.

## II. THE PARTIES

10. Counter Plaintiff Kevin Matthews is a resident of Baltimore City Maryland
    whose address is 3216 East Northern Parkway, Baltimore, Maryland 21214
    ("Matthews Property").

11. Counter Defendant GMAC Mortgage, LLC ("GMAC") engages in originating
    and servicing residential mortgages and is a wholly-owned subsidiary and the
    mortgage arm of Ally. GMAC is a Delaware corporation with its principal place
    of business at 1100 Virginia Drive, Fort Washington, Pennsylvania 19034.
    GMAC transacts business in Maryland during all operative periods of this
    action.  GMAC is also a Maryland licensed mortgage lender/servicer (Lic.
    Number 15813).  GMAC is also the employer of Defendant Jeffrey Stephan
    who is a resident of the Commonwealth of Pennsylvania.  At all times
    described herein Stephan acted with direct and apparent authority of GMAC.
    GMAC is further liable for the acts of its authorized employee.

12. Counter Defendant Carrie Ward (Ward) was a member of the law firm
Bierman, Geesing, Ward & Wood LLC (hereinafter "the Firm") located at 4250
East West Highway, Suite 200, Bethesda, MD 20814 during the operative
period of this action. Defendant Carrie Ward was an authorized Substitute
Trustee acting on of GMAC Mortgage, LLC and improperly instituted
foreclosure proceedings against Mr. Matthews on April 2, 2010 by the filing an
Order to Docket in the Circuit Court of Maryland for Baltimore City with legally
deficient and improper papers. GMAC is presumed to have knowledge of all
of its substitute trustees'/attorneys' actions taken on its behalf in the state
foreclosure proceeding against Mr. Matthews even if GMAC never reviewed
what its substitute trustees did on its behalf. *Putnam v. Day*, 89 U.S. 60, 22
L. Ed. 764 (1874); *Salisbury Beauty Sch. v. State Bd. of Cosmetologists*, 268
Md. 32, 300 A.2d 367 (1973); *Bob Holding Corp. v. Normal Realty Corp.*, 223
Md. 260, 266, 164 A.2d 457, 460 (Md. 1960).

13. Not named as a party to this action, the USAA Federal Savings Bank (USAA
Bank) is an affiliated lender of the United State Automobile Association, a
Fortune 500 financial services company offering banking, investing, and
insurance to people and families that serve, or served, in the United States
Military. USAA Bank is located 9800 Fredericksburg Road in San Antonio,
Texas 78288.

14. Not named as a party to this action, Ally Financial Inc. ("Ally") is a registered
bank holding company business affiliate of GMAC and is a leading, multi-

6

national financial services firm with a corporate center in New York.  Ally has approximately $179 billion of assets and operations in approximately 25 countries.  Ally engages in the business of servicing residential mortgage loans through GMAC.

## JURISDICTION & VENUE

15. This Court has jurisdiction asserted herein for the following reasons:

    a.  The Maryland Rules expressly provide that a party in a civil action in this Court may bring a Counter Complaint (Rule 2-331);

    b.  The Maryland Rules expressly provide that a Counter Plaintiff may add additional parties as Counter Defendants if they are not already parties to the action (Rule 2-331(c));

    c.  The Maryland Rules specifically state that "Title 2 [of the Maryland Rules] applies to civil matters in the circuit courts" (Rule 1-101(b));

    d.  The Maryland Court of Appeals has expressly held that a party is permitted to file a counter complaint in a foreclosure action such as this action (see *Fairfax Sav., F.S.B. v. Kris Jen Ltd. Partnership*, 338 Md. 1, 21 (1995));

    e.  This Court has jurisdiction asserted because Defendants transact business and perform work and services in Maryland and each has availed themselves to the jurisdiction of this Court through their appointed agents, the Plaintiffs and the firm of Shapiro & Burson LLP, in this Court.

    f.  Declaratory and injunctive relief are available pursuant to Md. Code Ann., §§ 3-401-3-415.

16. Venue is appropriate in this Court because the Counter Defendants conduct business within the Baltimore City, Maryland, have an interest in real property in Baltimore City, Maryland, and because the conduct complained of occurred in Baltimore City, Maryland.

**FACTS**

A.    **The Foreclosure Crisis**

17. Over the last four years, Maryland and, indeed, the United States have been in a foreclosure crisis. Recent news reports have established that one in ten American homes is at risk of foreclosure.

18. The number of Maryland properties with foreclosure filings has increased substantially throughout the last four years.

19. Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the homes surrounding a foreclosure and, perhaps, neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

20. The foreclosure crisis is far from over. Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith for another five years or more.

21. Since the commencement of the crisis, revelations of bogus, false, and deceptive "robo signing" have come to light involving national lenders and

8

mortgage servicers.   In Maryland the illegal "robo-signing" issue has even come to the forefront because attorneys and substitute trustees, including those acting on behalf of GMAC, have admitted that they filed bogus documents in hundreds of foreclosure cases filed in state courts.

**B. Maryland's Response to the Foreclosure Crisis**

22. In 2007 at the beginning of the crisis, Governor O'Malley convened a task force of representatives to address the crisis that was then underway.   The Maryland Homeownership Preservation Task Force produced a report which aptly summarized the devastating effect of foreclosures on the community as follows:

> Foreclosures have a devastating effect on homeowners and the communities in which they live. Frequently, a homeowner who loses his or her home to foreclosure loses the accrued equity. A property sold in a foreclosure sale typically draws a lower price than it would in a regular market sale. In the first half of 2005, Maryland's "foreclosure discount" was 18.8 percent, according the St. Ambrose Housing Aid Center, Inc. This is a tragedy for a growing number of Maryland families.

> Extensive damage is felt in neighborhoods and communities across Maryland. Research shows that with every foreclosure on a single family home, the value of homes within an eighth of a mile declines by about nine-tenths of a percent. Property tax revenues decline proportionally, causing a negative impact on state and local governments. A study of foreclosures in Chicago in 2005 estimated that a single foreclosure costs city government up to $5,000 or more.

> Foreclosures also bring with them the potential for more violent crime. Research indicates that for every single percentage point increase in the foreclosure rate in a neighborhood, violent crime in that neighborhood increases by about two percent. Foreclosures can lead to vacant or neglected properties, which create an eyesore and become targets for vandalism. This can tip a

9

community from one dominated by homeowners to one dominated
by investors.

Of course, the lending industry and investors also take a hit from
rising foreclosure rates. Some major lenders have closed their
doors, declared bankruptcy or shuttered their subprime lending
arms as a result of the waning demand for risky mortgage products
in investor markets. Lenders typically lose $50,000 or more on a
single foreclosure, according to information from St. Ambrose
Housing Aid Center, Inc. The banking industry cites a figure well
over $60,000.

Maryland Homeownership Preservation Task Force Report at 12

(November 29, 2007) *available at*

http://www.gov.state.md.us/documents/HomePreservationReport.pdf

(footnotes omitted).

23. To reasonably address and avoid some of the negative consequences of

foreclosure, the Task Force Report made nine general recommendations that

are relevant to the issues before the Court. *See Id*. at 40-43.

24. In response to the expanding foreclosure crisis and the Task Force Report,

the General Assembly introduced and passed several bills during the 2008

legislative session to change Maryland's foreclosure process and curb certain

predatory real estate processes.  These bills were passed with nearly

complete bi-partisan support. As summarized in the General Assembly's 90

Day Report for the 2008 session:

Until [2008], Maryland's foreclosure process, from the first foreclosure
filing to final sale, had been among the shortest in the nation.
Maryland is a quasi-judicial State, meaning that the authority for a
foreclosure sale is derived from the mortgage or deed of trust, but a
court has oversight over the foreclosure sale process. Most
mortgages or deeds of trust include a "power of sale" (a provision
authorizing a foreclosure sale of the property after a default) or an

10

"assent to decree" (a provision declaring an assent to the entry of an order for a foreclosure sale after a default). Under the Maryland Rules, it was not necessary to serve process or hold a hearing prior to a foreclosure sale pursuant to a power of sale or an assent to a decree. Consumer advocates contended that the short timeframes and weak notice provisions in State law seriously limited a homeowner's options to avoid foreclosure by, for example, working out a payment plan with the lender or selling the house. In addition, filing a request for an injunction to stop the sale is expensive, time consuming, and not a realistic option for most homeowners.

***Senate Bill 216 (Ch. 1)/House Bill 365 (Ch. 2)***, emergency legislation that took effect April 4, 2008, make a number of significant changes to the foreclosure process in Maryland for residential real property. "Residential property" is defined under the Acts to mean real property improved by four or fewer single-family dwelling units. Except under specified circumstances, the Acts prohibit the filing of an action to foreclose a mortgage or deed of trust on residential property until the later of 90 days after a default in a condition on which the mortgage or deed of trust states that a sale may be made or 45 days after the notice of intent to foreclose required under the Acts is sent.

. . . .

***Senate Bill 217/House Bill 360*** define "mortgage fraud" as any action by a person made with the intent to defraud that involves:
• knowingly making, using, or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that it will be relied upon by a mortgage lender, borrower, or any other party to the lending process;
• receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from the aforementioned actions;
• conspiring to violate either of the preceding provisions; or
• filing or causing to be filed in the land records in the county where a residential real property is located any document relating to a mortgage loan that the person knows to contain a deliberate misstatement, misrepresentation, or omission.
Under the Acts, the "mortgage lending process" includes the solicitation, application, origination, negotiation, servicing, underwriting, signing, closing, and funding of a mortgage loan, as well as the notarizing of any document in connection with a mortgage loan.

Md. Dept. of Legislative Services, The 90 Day Report, A Review of the 2008

Legislative    Session,    F16-18    (April    11,    2008)    *available    at*

http://mlis.state.md.us/2008rs/90-Day-report/index.htm.

25. The Maryland Court of Appeals recently adopted in October 2010 an

emergency rule to deal with the robo-signing issue based upon the

recommendation of the Standing Committee on Rules of Practice and

Procedure.    Writing for the Committee the Honorable Alan M. Wilner

explained:

> The need for these changes emanates from recent revelations
> regarding the filing in residential foreclosure actions of affidavits as to
> which the affiant either did not have sufficient knowledge of the facts
> stated in the affidavit to validly attest to their accuracy or did not
> actually read or personally sign the affidavit. Preliminary audits have
> shown that hundreds of such affidavits have been filed in Maryland
> circuit courts. Up to this point, courts, with good reason and really of
> necessity, have relied on the accuracy of affidavits, especially when
> filed by attorneys, unless there is something on the face of the
> document to suggest otherwise or the validity of the affidavit is
> challenged. Evidence that has recently come to light, largely through
> admissions under oath by the affiants themselves, has shaken the
> confidence that the courts have traditionally given to those kinds of
> affidavits.
>
> In the Committee's view, the use of bogus affidavits to support actions
> to foreclose liens on property, apart from prejudice to the homeowners,
> constitutes an assault on the integrity of the judicial process itself.
>
> Letter from A. Wilner to the Court of Appeals, Oct. 15, 2010.

26. In further response to the foreclosure crisis, Maryland Commissioner of

Financial Regulation required for its licensees "a duty of good faith and fair

dealing in communications, transactions, and course of dealings with a

borrower in connection with the...servicing...of any mortgage loan, including,

but not limited to...(3) The duty when servicing mortgage loans to: (a)

12

Promptly provide borrowers with an accurate accounting of the debt owed

when borrowers request an accounting; (b) Make borrowers in default aware

of loss mitigation options and services offered by the licensee; (c) Provide

trained personnel and telephone facilities sufficient to promptly answer and

respond to borrower inquiries regarding their mortgage loans; and (d) Pursue

loss mitigation when possible."    Md. Code Regs. 09.03.06.20.    As a

Maryland licensed mortgage servicer and lender GMAC has contractually

agreed to this duty and as discussed below has utterly failed in fulfilling its

responsibilities.

### C.  Scrutiny of GMAC's, Ward's, and Stephan's Foreclosure Practices

27.  In depositions given under oath on December 10, 2009 and June 7, 2010,

Stephan testified that he signed affidavits were prepared by attorneys, that he

was given anywhere from 5,000 to 10,000 of these documents to sign each

month, that he did not read much of the information on the documents before

signing them, and that he did not have any personal knowledge of many of

the facts attested to in the affidavits. Stephan Dep. 7:9-20, 10:1-13:4, Dec.

10, 2009; Stephan Dep. 29:11-30:17, 38:7-40:21, 43:12-45:21, 46:9-48:17,

54:12-25, 57:20-63:23, June 7, 2010.

28. On April 13, 2011, in response to revelations of irregular, improper, and

bogus foreclosure and servicing practices of GMAC, the Board of Governors

of the Federal Reserve System ("Board of Governors"), the Federal Deposit

Insurance Corporation ("FDIC"), GMAC, and Alley entered into a Consent

Order concerning GMAC's loss mitigation and foreclosure servicing practices (hereinafter "Consent Order"). The Consent Order came about as a result of a horizontal review of various major residential mortgage servicers conducted by the Board of Governors, the Office of the Comptroller of the Currency, and the Office of Thrift Supervision, examiners from the Federal Reserve Bank of Chicago and the FDIC.

29. The Consent Order recognized the following improper practices, relevant to the facts alleged herein, allegedly performed by GMAC when:

    a. It "[f]iled or caused to be filed in state courts...numerous affidavits executed by employees of [GMAC] or employees of third-party providers making various assertions, such as the ownership of the mortgage note and mortgage, the amount of principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such knowledge or review;"

    b. It ["f]iled or caused to be filed in courts in various states...or in the local land record offices, numerous affidavits and other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary;"

    c. It "[l]itigated foreclosure...proceedings...without always confirming that documentation of ownership was in order at the appropriate time, including confirming that the promissory note and mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party;"

    d. It "[f]ailed to respond in a sufficient and timely manner to the increased level of foreclosures by increasing financial, staffing, and managerial resources to ensure that the [GMAC] adequately handled the foreclosure process;"

    e. It "[f]ailed to respond in a sufficient and timely manner to the increased level of Loss Mitigation Activities to ensure timely,

14

effective and efficient communication with borrowers with respect to
Loss Mitigation Activities and foreclosure activities;" and

f.  It "[f]ailed to have adequate internal controls, policies and
procedures, compliance risk management, internal audit, training,
and oversight of the foreclosure process, including sufficient
oversight of outside counsel and other third-party providers
handling foreclosure-related services with respect to the Servicing
Portfolio."

Consent Order at Pages 3-4.

30. GMAC and Ally did not admit to any facts in the Consent Order but did agree

that the practices described in the preceding paragraph were "unsafe and

unsound banking practices." *Id.* at Page 4.

31. In a judicial statement by its authorized counsel to Superior Court of New

Jersey Chancery Division, GMAC represented *In the Matter of Residential*

*Mortgage Foreclosure Pleading and Document Irregularities*, Doc. No. F-

059553-10 (Sept. 2, 2011), GMAC stated as follows:

GMAC entered into a "mortgage and Purchasing Agreement with
USAA...[which] provides that [GMAC] 'shall Service all Mortgage
Loans in accordance with the Servicing Agreements, the Mortgage
Loan Requirements, the Service Level Objectives as set forth in
Section 12.3, and the terms and conditions of the this Agreement.'
'Service' or to engage in 'Servicing' is defined in the Agreement and
specifically encompasses 'foreclosure services.' ...Moreover, [GMAC]
would like to make it clear that if a default occurs pursuant to Mortgage
Purchasing and Servicing Agreement between [GMAC] and
USAA...that any foreclosure action would be institute with USAA...as
the named party, not [GMAC]."

32. In the Fall of 2010 Ward and her firm became subject to numerous

foreclosure investigations after an investigative story appeared in the

Baltimore Sun about her and her firm's robo-signing practices. The Maryland

Secretary of State began investigating the improper certification and attestation of documents Ward's firm and as result of that investigation, the Secretary of State decommissioned no less than four notaries employed by Ward and her firm.

33. Subsequent to public discovery of Ward's and her firm's signature practices, and the initiation of State agency investigations, the Ward and her partners asserted to numerous state courts, including this Court, that they have changed their procedures to comply with Maryland law and court rules. Ward also filed multiple, "so-called" corrective affidavits in the state courts where they admitted that the purported signatures on the original testimony used to improperly acquire the jurisdiction of the state courts, were not actually her signatures.

34. Ward's irregular signature and affidavit practices were also rebuked by the courts. For example, the Honorable Diane O. Leasure found Ward's practices to be improper for a Maryland foreclosure case. Specifically, Judge Leasure found and ruled, in a final order, that it was improper of Ward to initiate a Maryland foreclosure action based upon an affidavit or declaration (i.e. testimony) which lists each of the attorneys/substitute trustees at Ward's firm as the affiant but contains only a single indecipherable signature. *See Geesing v. Willson* (Circuit Court for Howard County, Case No. 13-C-10-082594).

35. Upon information and belief, on or about March 9, 2012, GMAC and Ally

entered into a final settlement agreement related to the Multistate/ Federal

Settlement Of Foreclosure Misconduct Claims with a coalition of state

attorneys general ("National Mortgage Settlement").

36. The National Mortgage Settlement

"follow[ed] ten months of intensive negotiations between the five banks and a coalition of state attorneys general and federal agencies, including the Departments of Justice, Treasury, and Housing and Urban Development. The investigation began in October 2010 following revelations of widespread use of "robo-signed" affidavits in foreclosure proceedings across the country. State attorneys general formed a working group to investigate the problem and to confront the banks about the allegations. The major mortgage servicing banks soon acknowledged that individuals had been signing thousands of foreclosure affidavits without reviewing the validity or accuracy of the sworn statements. Several national banks then agreed to stop their foreclosure filings and sales until corrective action could be taken.

While the robo-signing issue received the most attention, other servicer-related problems were identified, including deceptive practices in the offering of loan modifications (for example, telling consumers that a loan modification was imminent while simultaneously foreclosing). The performance failures resulted in more than just poor customer service. Unnecessary foreclosures occurred due to failure to process homeowners' requests for modified payment plans. And where foreclosures should have been concluded, shoddy documentation led to protracted delays. This misconduct threatened the integrity of the legal system and had a negative impact on communities and the overall housing market."

Executive Summary of the National Mortgage Settlement at Page 1 (http://www.atg.wa.gov/uploadedFiles/Home/About_the_Office/Cases/Nationa l_Mortgage_Settlement/National_Settlement_Executive_Summary.pdf)

## D.   Background Leading to Mr. Matthews' Foreclosure Crisis

37. Plaintiff Kevin Jerron Matthews enlisted in the U.S. Air Force on July 31,

1998 after graduating Baltimore Polytechnic Institute.    After multiple

deployments, Mr. Matthews was discharged in 2001 due to a family hardship.

38. In 2002, Mr. Matthews enlisted in the Maryland Army National Guard as a

reserve, stationed out of Towson, Maryland.

39. In May 2005, Mr. Matthews was selected to be deployed to Iraq with the 243rd
Engineering Company. Mr. Matthews was officially deployed in August 2005
Kuwait and Iraq where his duties involved transportation missions.

40. Mr. Matthews returned home from Iraq in 2006 when his tour was completed.
At the time when he returned, Mr. Matthews began to experience adverse
effects from his deployment. Specifically, Mr. Matthews suffered from chronic
back pain, post-traumatic stress disorder, and migraine headaches.

41. Despite Mr. Matthews' ailments, he continued to work for Baltimore City,
Maryland.

42. In 2006 Mr. Matthews was married and in 2007 his son Kevin was born.

43. On or about February 14, 2008, Mr. Matthews purchased his home on 3216
East Northern Parkway with the assistance of the VA Guaranty Loan
Program. Mr. Matthews obtained his mortgage from USAA Bank.

44. When Mr. Matthews purchased his home, he was employed as a contractor
at Fort Meade in the field of waste water management.

45. In December 2008, Mr. Matthews was involved in a serious car accident
caused by a third party that further aggravated his pre-existing injuries. Due
to these new, aggravated injuries, Mr. Matthews was continually absent from
work and had difficulty performing the physical work required of him. As a
result, he was laid off from his job in February 2009.

46. Until October 30, 2010 Matthews believed at all times when he was applying

18

for a loan modification and seeking loss mitigation alternatives discussed in the proceeding paragraphs that he was communicating with USAA. However, on October 30, 2010 he was learned for the first time that he actually was communicating with GMAC and not USAA representatives.  This knowledge came from an admission by USAA in the Washington Post reported as follows, "Roger Wildermuth, a USAA spokesman, said his firm was no longer responsible for Matthews's loan because it had been sold to GMAC, though GMAC employees in his case would have identified themselves as USAA workers 'to create a seamless customer experience.'"

    a. Is further evidence of GMAC's concealment of the true facts concerning its interest in Mr. Matthews' loan throughout the operative time period of this complaint, on March 7, 2012 GMAC sent Matthews a letter acknowledging to him for the first time that GMAC actually retained the servicing rights of his loan at the time he closed on his loan.

47. The events surrounding Mr. Matthew's foreclosure and illegal eviction took place while the VA HAMP program was in effect.  GMAC failed to take actions required by the Veterans Administration prior to commencing and then actually foreclosing on Mr. Matthew's VA-guaranteed loan.  As such, the foreclosure and eviction were conducted in violation of the VA HAMP program.

48. The VA HAMP program was established on January 8, 2010 when the

Veterans Benefits Administration issued Circular 26-10-02 (hereinafter "VA Circular"). This circular provided lenders with authority and instructions for modifying VA-guaranteed home loans in accordance with the President's Making Home Affordable (MHA) program. The circular stated that the new procedures would become effective on February 1, 2010.

49. The Home Affordable Modification Program ("HAMP") is one of the main features of the MHA program. The purpose of HAMP is to help borrowers avoid foreclosure by modifying loans to increase affordability relative to borrower income. The VA Circular laid out the framework for outline the procedures that servicers of VA-guaranteed loans are required to follow before proceeding with a foreclosure.

50. Specifically, the VA Circular required all servicers to first evaluate defaulted mortgages for traditional loss mitigation actions, including repayment plans, special forbearances, and traditional loan modifications. If none of these traditional mitigation options provided the borrower with an affordable payment, the servicer would then be required to evaluate the loan for a VA HAMP modification *before* deciding that the borrower's default is insoluble and exploring alternatives to foreclosure.

51. If, after completing the HAMP evaluation, the servicer determines that the loan meets HAMP eligibility requirements, the servicer *must* execute the modification pursuant to the HAMP guidelines.

52. GMAC never offered Mr. Matthews a traditional home retention loss

20

mitigation option, to which we was owed and relied upon in taking out his loan, during the period in which he was in default of his mortgage. Upon information and belief, Mr. Matthews' loan was never properly evaluated by GMAC for a VA HAMP modification as required by the VA Circular.

53. Prior to missing any payments on his mortgage, Mr. Matthews contacted GMAC, d/b/a USAA, to inform them of his circumstances, including his hospitalization, disability, and his anticipated financial hardships and he requested GMAC's assistance in exploring loss mitigation options relying upon the terms of his VA loan.

54. From December 2008 through August 2009, Mr. Matthews contacted GMAC d/b/a USAA by telephone after being released from the hospital and throughout his rehabilitation in an effort to keep them apprised of his current situation sometimes multiple times in a week. The continued communications demonstrates Matthews' reliance that GMAC would help him explore loss mitigation options.

55. Mr. Matthews made every reasonable effort to stay current on his mortgage, including draining his savings (approximately $6,000) and 401k (approximately $5,500) as well as applying his tax return refunds (approximately $4,000) and short-term disability benefits (approximately $1,500) towards his monthly mortgage payments and reasonably relied upon GMAC's duty to meaningfully consider him for loss mitigation options. Mr. Matthews chose not to pay some of his other bills so that he could use all his

21

available funds to pay off his mortgage first.  However while he was current on the mortgage, GMAC never offered him any meaningful loss mitigation options given his unfortunate situation.

56. Mr. Matthews finally ran out of funds in July 2009, and became thirty days delinquent on his mortgage in August 2009.

57. Mr. Matthews continued to contact GMAC after defaulting on the mortgage, calling approximately twice a week and faxing over hardship letters.  Mr. Matthews explained to GMAC that he had applied for disability benefits in March 2009 which he hoped would permit him to make a modified payment.

58. At no time during this period of communications with GMAC was Mr. Matthews ever offered a repayment plan, special forbearance, loan modification, compromise claim, deed-in-lieu, refinance, assumption, or refunding.  In fact GMAC intentionally concealed these loss mitigation options from him since it had no risk in the loan.

59. In August 2009, Mr. Matthews contacted GMAC again and specifically requesting information about a deed-in-lieu as an alternative to foreclosure.  A representative of GMAC told him to draft a letter stating his financial situation and asking that a deed-in-lieu be accepted.  In reliance of that representation, Mr. Matthews faxed the letter as instructed to GMAC but never received any response.

60. The stress of the mortgage situation took a toll on Mr. Matthew's family, and he and his wife divorced which was approved by this Court in July 2010.

22

61. Finally after months of applications and waiting, in February 2010 Mr.
Matthews was approved for Social Security disability ($1,620 per month). He
also had at the time his VA disability payment ($1,298 per month).

**E.   Maryland Changed Its Foreclosure Law in 2008**

62. The foreclosure laws in the State of Maryland were substantially changed by
the Maryland Legislature in 2008 in emergency legislation changing 200
years of Maryland foreclosure procedure. The legislature imposed specific
prerequisites before any owner of a security instrument had the right to initiate
a foreclosure proceeding before a Maryland Court. Among these other
prerequisites, a homeowner is entitled to a Notice of Intent to Foreclose
("NOITF"). MD. ANN. CODE, REAL PROP. § 7-105.1. The NOITF must include
specific information including the name of the secured party. MD. ANN. CODE,
REAL PROP. § 7-105.1(c)(4)(ii)(1)(A).

63. The simple reason for this requirement was that the legislature intended for
the homeowners to know the name of the secured party who owned their
mortgage because the servicers were not responding to calls from
homeowners for assistance or in many instances even answering the phones
in a reasonable time period. In addition, many servicers falsely claimed, all
too frequently, that the owner of the loan would not permit a sustainable
modification. To verify these representations and ensure homeowners had
knowledge of who owned their loan, the legislature required that a standard,
uniform NOITF be sent to each homeowner which identified the secured party

23

so that the homeowner could have some other party to contact when the
servicer failed to help.

64. The GMAC retains various agents, substitute trustees, and attorneys
including the Plaintiffs in this action and Ward previously, to perform
foreclosure services on its behalf in the State of Maryland.   The agents,
substitute trustees, and attorneys act with GMAC's express authority in the
foreclosure actions filed on its behalf and at its request.

65. A foreclosure proceeding based upon a bogus NOITF is improper because it
does not provide the information required by the legislature.

66. Instead of providing the name and address of the true secured party, the
GMAC routinely and regularly relies on a NOITF that sets forth a bogus party
as the secured party because it does not want its borrowers to complain to
the true owners of their loans that GMAC is not providing the services it is
required to provide.

67. Under Maryland law a servicer is "a person responsible for collection and
payment of principal, interest, escrow, and other moneys under an original
mortgage." MD. ANN. CODE, COMM. LAW ART. § 13-316(a)(3).  Maryland law
also defines a servicer as "a person who: (1) Engages in whole or in part in
the business of servicing mortgage loans for others; or (2) Collects or
otherwise receives payments on mortgage loans directly from borrowers for
distribution to any other person." MD. ANN. CODE, FIN. INST. § 11-501(n).

68. The servicer in these instances is not the secured party since it does not own

24

any interest in the property of the mortgagors.

69. GMAC knows that it does not hold an interest in the mortgagor's property and that its client holds an interest in the property.

70. GMAC and Ward have engaged in a deceptive artifice to avoid the requirements of the Maryland foreclosure laws to the detriment of Matthews.

71. GMAC has authorized and actually proceeded to file foreclosure proceedings in Maryland courts knowing that the NOITF it provided to Matthews and other Maryland residents does not set forth the true secured party.

72. Because GMAC and Ward send bogus NOITFs to Matthews and other Maryland homeowners these homeowners have no way of knowing whether the party identified as the secured party on the NOITF is accurate or not.

73. GMAC intends to proceed to foreclosure with the intent and goal that the inaccurate NOITF will not be discovered by Matthews and other Maryland homeowners.  This pattern and practice is also consistent with the many inconsistent practices identified recently by the Inspector General of the Federal Housing Finance Agency's recent audit and report entitled "FHFA's Oversight of Fannie Mae's Default-Related Legal Services" (available at http://www.fhfaoig.gov/Content/Files/AUD-2011-004.pdf).

74. The filing a foreclosure proceedings when GMAC and Ward knows that the Matthews has not been provided the information that the legislature mandated is unfair or deceptive.

75. The filing of a foreclosure proceeding under the above circumstances is an

25

assertion of a legal right when the right does not exist.

**F.  The First Illegal and Improper Matthews Foreclosure Action**

76. Around the time of his divorce, Mr. Matthews received a Notice of Intent to
    Foreclosure dated February 3, 2010.  The Notice of Intent falsely stated that
    the Secured Party was Government National Mortgage Association ("Ginny
    Mae") and that the servicer of his loan was GMAC.  However, up to this time
    Mr. Matthews never had any knowledge of either GMAC or Ginny Mae's
    involvement with his loan since the statements he was sent and the
    representatives he had spoken to identified themselves on behalf of USAA.
    GMAC.

77. Without actual knowledge to Mr. Matthews on February 4, 2010, USAA
    assigned Mr. Matthew's Note and Deed of Trust to GMAC effective January
    23, 2010 for all purposes related to the foreclosure.

78. On February 4, 2010, GMAC, appointed Carrie Ward, Howard Bierman, and
    Jacob Geesing as its authorized Substitute Trustees in the Matthews matter.
    At all times thereafter Ward was an authorized agent of GMAC and acted
    within the scope of apparent and actual authority by GMAC.

79. On or about April 2, 2010, Mr. Matthews was served with an Order to Docket
    via posting on his front door. The Order to Docket was filed in this Court on
    March 29, 2010 by the law firm of Bierman, Geesing, Ward & Wood, LLC and
    Ward  in  their  capacity  as  Substitute  Trustees  GMAC  (Case  No.
    24O10001394)("First  Foreclosure  Action").      In  support  of  the  First

26

Foreclosure Action, Ward and Stephan on behalf of GMAC provided the
following bogus affidavits and papers in order to acquire this Court's
jurisdiction:

a. The Order to Docket contained an single indecipherable signature
of one of three substitute trustees.

b. The Affidavit, Pursuant to Md. Rule 14-207(b)(4) Regarding Copy of
Deed of Appointment of Substitute Trustee contained single
indecipherable signature but listed one of three possible affiants
including Ward—a practice held to be improper in the matter of
*Geesing v. Willson* (Circuit Court for Howard County, Case No. 13-
C-10-082594).

c. The Deed of Appointment signed by Stephan was done so without
the authorization of Ginny Mae but represented something different.
Further Stephan signed the document without any knowledge of the
truth of any of the statements contained therein. . It also contained
a false notarization to make it appear to be a legitimate document.

d. The Affidavit, Pursuant to Md. Rule 14-207(b)(1) Regarding Copy of
Lien Instrument contained single indecipherable signature but listed
one of three possible affiants including Ward—a practice held to be
improper in the matter of *Geesing v. Willson* (Circuit Court for
Howard County, Case No. 13-C-10-082594).

e. The Affidavit Certifying Ownership of Debt Instrument and Truth

27

and Accuracy of Copy Filed Herein was signed by Stephan even though he lacked an personal knowledge of the facts contained within it and certain of those facts were clearly false.  It also contained a false notarization to make it appear to be a legitimate document.

f.  The Affidavit of Deed of Trust Debt and Right to Foreclose contained single indecipherable signature but listed one of three possible affiants including Ward—a practice held to be improper in the matter of *Geesing v. Willson* (Circuit Court for Howard County, Case No. 13-C-10-082594).

g.  The Affidavit Pursuant to Service Members Civil Relief Act contained single indecipherable signature but listed one of three possible affiants including Ward—a practice held to be improper in the matter of *Geesing v. Willson* (Circuit Court for Howard County, Case No. 13-C-10-082594).

h.  The Affidavit of Default and Mailing of Notice of Intent to Foreclose signed by Stephan was done so without any knowledge of the truth of any of the statements contained therein.  It also contained a false notarization to make it appear to be a legitimate document.

i.  The Affidavit of Mailing of Notice to Occupant(s) contained single indecipherable signature but listed one of three possible affiants including Ward—a practice held to be improper in the matter of

28

*Geesing v. Willson* (Circuit Court for Howard County, Case No. 13-C-10-082594).

j.  The Statement Designating Secured Property "Residential Real Property" contained single indecipherable signature but listed one of three possible affiants including Ward—a practice held to be improper in the matter of *Geesing v. Willson* (Circuit Court for Howard County, Case No. 13-C-10-082594).

80. In April 2010, in reliance to Ward's and GMAC's efforts to foreclose on his home and property, Mr. Matthews engaged the housing counseling services of Belair-Edison Neighborhoods, Inc. to assist him with his efforts to mitigate his loan situation and seek alternatives to foreclosure that were required and allowed under his VA loan.  His case was assigned to Roy Miller, who was authorized by Mr. Matthews to contact GMAC and negotiate on Mr. Matthews' behalf.

81. Prior to his engagement of Mr. Miller, Mr. Matthews had contacted GMAC on many occasions but had not received any modification or forbearance or any other loss mitigation services or consideration from GMAC.

82. A foreclosure sale of Mr. Matthews' home was scheduled on May 21, 2010 by Ward and her firm even though the papers and documents she presented to this Court were not legally correct.  Since Ward is an attorney and officer of the Court, Matthews relied upon her representations to this Court and himself as being truthful and correct.

83. On or about May 6, 2010, Mr. Matthews contacted GMAC regarding the status of his modification he had previously sought by application. GMAC falsely stated he was denied a modification because he to reduce did not have sufficient income.

84. On behalf of Mr. Matthews, Miller contacted USAA by telephone on May 10, 2010 and confirmed that Mr. Matthews was denied a modification due to an incorrect determination that Mr. Matthews did not have sufficient income. The GMAC loss mitigation specialist that Miller spoke with said that Matthews could apply again on Mr. Matthews' behalf.

85. Like Mr. Matthews, when Miller contacted what he thought was USAA on behalf of Mr. Matthews it was in fact was GMAC using the name USAA.

86. In response and reliance to GMAC's representation to Miller, he proceeded to prepare a new loan modification/hardship application with updated documents and materials on behalf of Mr. Matthews following the directions from USAA's website.

87. On May 13, 2010, Mr. Matthews and Miller met to complete his new modification request package. The package all the required documents as described on USAA's website.

88. On May 14, 2010, Miller faxed the completed hardship package to GMAC d/b/a USAA. Mr. Miller called GMAC d/b/a USAA on May 21, 2010 to confirm receipt of the package. The representative confirmed receipt of the package, but informed Miller the foreclosure sale had not been postponed. Miller

specifically asked for the foreclosure sale to be put on hold so the package
may be reviewed per VA HAMP guidelines.  The representative from USAA
said he would request a hold.

89. Following the May 21, 2010 conversation with GMAC d/b/a USAA, Matthews
contacted GMAC d/b/a USAA throughout the day to see if the sale had been
postponed.

90. On May 24, 2010, Miller contacted the office of Bierman, Geesing, & Ward to
and confirmed that that GMAC had purchased the property at the May 21,
2010 foreclosure sale.

91. Following the foreclosure sale, and in reliance of Ward's firm's representation
that it had the legal right to conduct a foreclosure sale of his home and
property, Mr. Matthews retained legal counsel to determine his legal rights
related to the improper foreclosure action and sale given that (i) he had not
received any meaningful and correct loss mitigation related to his mortgage
loan despite numerous, good faith attempts prior to the sale; and (ii) GMAC
and Ward had not complied with a mandatory, condition precedent by
sending a correct and accurate Notice of Intent to Foreclose prior to the
commencement of the action.   Mr. Matthews incurred legal expenses to
respond to the illegal First Foreclosure Action.

92. Prior to Mr. Matthews engaging counsel in First Foreclosure Action, neither
Mr. Matthews nor Miller actually knew GMAC was involved in Mr. Matthews
loan since in all communications it pretended and represented it was USAA.

Had GMAC's role been properly disclosed to Mr. Matthews or even Miller, they could have forwarded Mr. Matthews's mitigation requests to escalation representatives at GMAC.    However, since the true relationship and ownership interests in Mr. Matthews' loan were concealed from him by GMAC, he did not have the option of mitigating his options and was limited to dealing with GMAC d/b/a USAA.

93. When Matthews contacted Ginny Mae through counsel, Ginny Mae would not respond because it was never the secured party or owner of his loan as represented by GMAC and Ward on the NOITF used to commence the First Matthews Foreclosure Action.

94. Mr. Matthews' counsel appeared on his behalf in the First Foreclosure Action and timely filed exceptions to the foreclosure sale on July 19, 2010 with this Court.    In those exceptions, Mr. Matthews objected to the right of GMAC and Ward to have conducted the foreclosure sale and to have even brought this action.

95. However, without the right to do so and while it knew Mr. Matthews was represented by counsel in the First Foreclosure Action, GMAC through its authorized representative RM Property Services illegally seized control of the Matthews Property.    At the time Mr. Matthews was out-of-town on a school required internship.    When Mr. Matthews returned he discovered that his home had been taken over by GMAC and a lockbox was now on his front door, and all personal property, including his son's possessions, had been

illegally removed from the premises and disposed of.

96. In addition, upon return Mr. Matthews found an eviction notice was taped to his door, unfairly and deceptively stating that Mr. Matthews had 24 hours to contact RM Property Services, or the locks would be changed and the property secured. Since Mr. Matthews was out of town at the time, he had no knowledge of this notice and no opportunity to remove his property—even though GMAC and RM Property Services had no legal right to seize the Matthews Property since his timely exceptions were still pending in this Court in the First Foreclosure Action. Neither GMAC nor RM Property Services ever contacted Mr. Matthews counsel concerning the locks or Mr. Matthews possession at the Matthews Property.

97. Due to this illegal eviction, Mr. Matthews immediately had to find an apartment to live in, and attempt to replace the belongings confiscated by the lender's agents. These belongings included but were not limited to: family clothes, tools, furniture, expensive furniture, lawn mower, a safe, tv, etc.

98. To date, Mr. Matthews has not received any of his belongings back from the lender's agents. The approximate value of what was stolen by the eviction was about $4,250.

99. As a result of the illegal eviction, Mr. Matthews incurred expenses for the apartment in the sum of about $7,000 since he was illegally evicted from his home and needed a place to live.

100. In the fall of 2010, when the national and state robo-signing scandals

33

came to light, Mr. Matthews learned for the first time that Stephan had

admitted in several depositions, under oath, that he had signed tens of

thousands of bogus affidavits that were used to initiate foreclosure

proceedings, including the First Foreclosure Action, on behalf of GMAC.

101.    On October 28, 2010 in the First Foreclosure Action, Mr. Matthews' sought

to certify a class of defendants similar to him in then pending GMAC

foreclosure cases based upon the bogus Stephan affidavits and other papers.

102.    Rather than defend the use of its bogus affidavits and papers in the First

Foreclosure Action, GMAC and Ward sought to dismiss the action without

prejudice.   Mr. Matthews objected since GMAC did not state (at that time)

that it would dismiss all the foreclosure actions using bogus Stephan affidavits

and it had not offered to rescind the report of sale which creates a cloud on

the Matthews Property.

103.    This Court scheduled a hearing on the pending motions to take place on

January 14, 2011.  At that hearing, GMAC's new counsel, William Murphy,

made the following representations to this Court on behalf of GMAC:

    a.  For the first time, GMAC explained that it was willing to rescind the

       foreclosure sale of the Matthews Property.

    b.  GMAC was in the process of dismissing cases, which had not been

       ratified, similarly situated to First Foreclosure Action which were

       based upon Stephan affidavits and papers

    c.  This promise to voluntary dismiss all then pending cases applied to

34

all cases carried out by Ward and her firm as well as two other

firms then representing GMAC in Maryland foreclosure actions.

d. That the costs of the dismissed foreclosures would not be passed

on to the borrowers.

104.  Based upon the representations of GMAC's counsel William Murphy

described in the above paragraph, this Court dismissed the First Foreclosure

Action.

**E.  Following the First Matthews Foreclosure Action**

105.  Following the dismissal of the foreclosure, Mr. Matthews attempted to

secure the keys to the home from Ward's firm.  However, no one at Ward's

firm ever responded and the keys were never provided.

106.  Left with no other option, Mr. Matthews had to break into the Matthews

Property on or about March 25 2011 to regain possession since GMAC and

its agents and attorneys refused to provide him the keys.  Matthews had to

break the lock with a hammer.  When he did a neighbor he did not know

called the police.  The police arrived and would not allow Matthews enter

enter the house that he owned and required him to return to his apartment to

obtain and this Court's Order rescinding the foreclosure sale.

107.  Matthews was angry and embarrassed that the police did not accept his

representations that he was the owner of the Matthews Property.  He was

worried about this was just another roadblock toward his attempts to get a

fresh start and utilize his GI benefits.

108.   Upon entering the Matthews Property after having to get, he realized that the home had not been properly winterized by GMAC's agents prior to the discontinuation of the utilities.  As a result, Mr. Matthews' sewage pipe and hot water heater cracked from the water expanding in the cold weather. These known damages equaled a sum of out $2,000.  Additional damages and mold have also occurred as a result.

109.   On July 27, 2011, GMAC d/b/a USAA sent Matthews a false and bogus Notice of Intent to Foreclose identifying USAA as both the secured party and the servicer of the Matthews loan.

110.   Even though GMAC had dismissed the First Foreclosure Action, Mr. Matthews continued to receive notices from GMAC d/b/a USAA demanding action on his behalf and threatening to take his property.   These notices are completely unsubstantiated, have required significant time to respond to by Mr. Matthews counsel which constitute additional damages incurred by Matthews, and placed undue stress on Mr. Matthews.

111.   On July 23, 2011, GMAC d/b/a USAA mailed Mr. Matthews a letter indicating that it believed the Matthews Property was vacant and that it would be taking steps to secure the property if not otherwise informed.   Mr. Matthews' attorneys responded on August 22, 2011, and informed GMAC d/b/a USAA that the property was not vacant and is currently occupied.  Mr. Matthews incurred the expense of this communication by his attorneys.

112.   Despite the proof of his occupancy, Mr. Matthews then received another

notice by the mails on August 31, 2011 stating that GMAC d/b/a USAA
believed the property to be vacant and would be taking steps to change the
locks on the property.    Mr. Matthews' attorneys again responded on
September 7, 2011 to again clarify this discrepancy.  GMAC d/b/a USAA then
acknowledged that the property is owner occupied in a notice sent on October
4, 2011. Mr. Matthews incurred the expense of this communication by his
attorneys.

113.    In spite of GMAC's (d/b/a USAA) acknowledgment, notices stating that the
property is vacant and that USAA seeks to change the locks have persisted.

114.    On November 8, 2011, Mr. Matthews received another notice on his door
from GMAC d/b/a USAA indicating that the Property was still considered
vacant and the locks would be changed despite the fact his car was in the
driveway, the lights were on in the house, and there was substantial furniture
inside and outside the house.  Mr. Matthews' attorneys again responded on
November 9, 2011 and again notified GMAC that the property was not vacant
and is owner-occupied.    Mr. Matthews incurred the expense of this
communication by his attorneys.

**E.  Second Matthews Foreclosure Action**

115.    On behalf of GMAC, Plaintiffs commenced this action on February 10,
2011 by filing an Order to Docket. The Order to Docket falsely states that the
Matthews Property is not owner occupied when GMAC knows this allegation
to be untrue.  In reliance of this false statement and other described in the

37

next paragraph, Matthews has engaged counsel to object to the sale of his
home and property in the Court.

116.    GMAC provided the Plaintiffs with certain affidavits to support the Order
to Docket filed by the Plaintiffs in this action to acquire the Court's jurisdiction.
Included among these was an Affidavit Certifying Ownership of Debt
Instrument and that the Copy of the Note is a True and Accurate Copy.  In
this affidavit, GMAC's Authorized Officer Kimberly Fritz falsely testified "that
Ginnie Mae is the owner of the [Matthews] loan."  This statement is false
based upon the following facts:

    a. On Ginnie Mae's website it explains, "Borrowers are sometimes
       mistakenly advised that Ginnie Mae is the owner or investor in a
       loan because government-insured or guaranteed loans (FHA, VA,
       RD) serve as collateral for Ginnie Mae-guaranteed securities.
       Ginnie Mae guarantees the security, and it carries Ginnie Mae's
       name; therefore, borrowers are often mistakenly advised that
       Ginnie      Mae      owns      their      loan."              See
       http://www.ginniemae.gov/media/consumer_web.pdf.

    b. The Notice of Intent to Foreclose sent to Mr. Matthews on October
       7, 2011 which is required as a mandatory prerequisite for every
       foreclosure filed in Maryland and was presented to the Court by the
       Plaintiffs did not identify Ginnie Mae as the secured party.

    c. Despite Ms. Fritz's testimony to the contrary, nothing on the copy of

the Note presented to the Court by the Plaintiffs on behalf of GMAC
indicates any ownership interest by Ginnie Mae.    Rather, an
examination of the Note identifies an assignment by USAA to
GMAC.

d. USAA by Deed of Assignment recorded in the land records of
Baltimore City, Maryland, through its purported nominee Mortgage
Electronic Registration Systems Inc., granted, assigned, and
transferred to GMAC "all beneficial interest" under the Matthews
Deed of Trust to GMAC on January 18, 2012 (recorded at Book
14058, Page 19).

e. On February 10, 2012 the Plaintiffs in this action wrote to Mr.
Matthews and explained that his mortgage loan was with GMAC.
This correspondence never identified any interest in the loan by
USAA or Ginnie Mae.

**F.  Mr. Matthews' Damages**

117.    Having nowhere else to turn for help, Mr. Matthews is left to seek
this Court's help in preventing injustice by GMAC, Stephan, and Ward of
the unconscionable, illegal, unfair and deceptive acts of each described
herein and ongoing.  These acts have damaged Mr. Matthews by:

a. Statutory damages available under the FDCPA,

b. Incurring legal fees defending the bogus First Foreclosure Action
when GMAC did not have the right to so in the manner it attempted
to pursue,

c. fees and costs assessed to his mortgage account based upon the
bogus and otherwise improper foreclosure actions,

d. damage to his credit through the public reporting of foreclosure
collection actions filed in a manner to which Ward and GMAC had
no right to pursue,

e. lost opportunity time trying to deal with the illegal debt collection
practices of the Defendants which dramatically reduced his
academic GPA while he was in fear of losing his home during the
First Foreclosure Action and at risk of being put on academic
probation which would have jeopardized his academic assistance
package, and

f. emotional damages manifested by irritability, anger, sleeping
problems, stress, worry, and decreased socialization.

118.    Matthews is prepared to offset whatever damages he receives as a
result of these Counter Claims from the sums claimed to be owed by the
true, bona fide owner of his loan.   He also has established an escrow
account during the pendency of these Counter Claims representing the
accruing interest (i.e. profit on the loan) and taxes and insurance on the
Matthews Property.

## COUNT I:  FRAUD & FRAUDULENT CONCEALMENT

### (Against GMAC & WARD)

119.    Counter Plaintiff re-alleges the previous paragraphs as if fully restated herein.

120.    As a Maryland licensed mortgage lender/servicer, GMAC owed a duty of good faith and fair dealing to Matthews even though he did not know he was communicating with GMAC (and thought he was communicating with USAA) to disclose material facts to Matthews.  Md. Code Regs. 09.03.06.20.  Further, GMAC's duty is also exemplified and based upon the following:

a. GMAC has a duty to disclose its servicing interests in Mr. Matthews' loan to him and to respond to his qualified written requests pursuant to RESPA, 12 USC 2605.

b.  Md. Code Ann., Crim. Law § 9-101 provides that is a crime to "willfully and falsely make an oath or affirmation as to a material fact: (1) if the false swearing is perjury at common law; (2) in an affidavit required by any state, federal, or local law; (3) in an affidavit made to induce a court or officer to pass an account or claim; (4) in an affidavit required by any state, federal, or local government or governmental official with legal authority to require the issuance of an affidavit; or (5) in an affidavit or affirmation made

41

under the Maryland Rules." *See also* Md. Code Ann., Crim. Law §
9-306.

c. "[I]t is generally prudent for a 'purchasing lender to review the'
applicable land records or other registry to determine whether all
assignments of the loan and the related security interest are in
proper form and ensure that the document assigning the security
interest in the underlying collateral is properly filed or recorded such
that the lender has record title to the loan and related security. In a
securitization transaction, the trustee is often charged with ensuring
that the' securitization trust, holds record title to the loan."
Katherine A. Burroughs & Robert E. Grady, Mortgage and Asset
Backed Securities Litigation Handbook 8:43 (April 2008).

121.    As a witness and party to litigation in this Court, including the First
Foreclosure Action, Ward had duty to Matthews to present truthful and
accurate testimony (i.e. material facts) to the Court and Matthews (a party
to that litigation)—to say otherwise is simply an assault upon our judicial
system and Matthews right to a fair and just administration of justice
concerning his home and property. *See* Md. Code Ann., Crim. Law § 9-
101; Md. Code Ann., Crim. Law § 9-306; Md. Rules 1-304 & 5-603.

122.    Despite the duties it owes to Matthews, GMAC concealed and
failed to disclose material facts to Matthews as described above and

42

including ¶¶ 1, 6, 7-8, 22, 27-31, 35-36, 46, 52, 55, 58, 72, 76-77, 77, 85, 88, 92, 95-96, 100, 105, 109-110, 115-116.

123.    Despite the duties she owed to Matthews, Ward concealed and failed to disclose material facts to Matthews as described above and including ¶¶ 1, 6, 8, 22, 32-34, 72, 79.

124.    GMAC either knew the representations as described above and including ¶¶ 1, 6, 7-8, 22, 27-31, 35-36, 46, 52, 55, 58, 72, 76-77, 77, 85, 88, 92, 95-96, 100, 105, 109-110, 115-116 were false or were made with reckless indifference as to their truth.

125.    Ward either knew the representations as described above and including ¶¶ 1, 6, 8, 22, 32-34, 72, 79 were false or were made with reckless indifference as to their truth.

126.    GMAC's concealment was intentional and effective since its actions as described above and including ¶¶ 1, 6, 7-8, 22, 27-31, 35-36, 46, 52, 55, 58, 72, 76-77, 77, 85, 88, 92, 95-96, 100, 105, 109-110, 115-116. created or continued a false impression as to its rights to collect a debt in false and fraudulent the manner in sought to do so.

127.    Ward's concealment was intentional and effective since its actions as described above and including ¶¶ 1, 6, 8, 22, 32-34, 72, 79 created or continued a false impression as to its rights to collect a debt in false and fraudulent the manner she sought to collect against Matthews.

43

128.    GMAC's concealment was knowing, intentional, and effective since its actions described above and including ¶¶ 1, 6, 7-8, 22, 27-31, 35-36, 46, 52, 55, 58, 72, 76-77, 77, 85, 88, 92, 95-96, 100, 105, 109-110, 115-116 created or continued a false impression as to its rights to collect a debt in false and fraudulent manner in attempted in this Court against Matthews.

129.    Ward's concealment was knowing, intentional, and effective since its actions as described above and including ¶¶ 1, 6, 8, 22, 32-34, 72, 79 created or continued a false impression as to her right to collect a debt in false and fraudulent the manner she sought to collect against Matthews.

130.    Matthews took action in justifiable reliance of GMAC's concealment as described above and including ¶¶ 1, 5, 7, 52-55, 57, 59, 66, 80, 86, 115.

131.    Matthews took action in justifiable reliance of Ward's concealment as above and including ¶¶ 1, 80, 82, 84, 85.

132.    Matthews has suffered damages as a result of GMAC's and Ward's fraudulent concealment as described above including ¶¶ 1, 7, 9, 97-99, 107-108, 117-118 .

WHEREFORE, Counter Plaintiff respectfully requests that judgment be entered against Counter Defendants GMAC and Ward for:

a. Compensatory economic and non-economic damages in the amount of no less than $500,000.

44

b. Punitive Damages in the amount of $1,000,000.

c. Counter Plaintiff's costs and attorneys fees.

d. Such further relief as the Court deems just and proper.

## COUNT II: VIOLATIONS OF THE MARYLAND
## CONSUMER PROTECTION ACT
## (Against All Counter Defendants)

133.    Counter Plaintiff re-alleges the previous paragraphs as if fully restated herein.

134.    The Maryland Consumer Protection Act ("MCPA"), MD CODE ANN., COMM. LAW §§ 13-101 *et seq.*, prohibits a person from engaging in unfair or deceptive trade practices in the collection of a consumer debt.   MD CODE ANN., COMM. LAW § 13-303(4).

135.    The MCPA includes in its definition of "unfair or deceptive trade practices" the following:

i.    Any false, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers.  MD CODE ANN., COMM. LAW § 13-301(1).

ii.    Any failure to state a material fact if the failure deceives or tends to deceive.  MD CODE ANN., COMM. LAW § 13-301(3).

iii. Any violation of a provision of Title 14, Subtitle 2 of this article, the Maryland Consumer Debt Collection Act.   MD

45

CODE ANN., COMM. LAW § 13-301(14)(iii).

136.    Section 13-303 prohibits unfair or deceptive trade practices in the
extension of consumer credit or collection of consumer debts.

137.    The consideration of a loan modification and threat of a foreclosure
action involves both the extension of credit and the collection of debts.
Section 13-316 requires servicers GMAC to respond to inquiries from
consumers within 15 days.

138.    The Maryland Consumer Protection Act defines unfair or deceptive
trade practices to include, inter alia, the following: (a) False, falsely
disparaging, or misleading oral or written statement, visual description, or
other representation of any kind which has the capacity, tendency, or
effect of deceiving or misleading consumers; and (b) Failure to state a
material fact if the failure deceives or tends to deceive.

139.    By engaging in the acts and omissions set forth above, by making
the misrepresentations set forth above, and by failing to disclose material
facts where the failure to do so deceived or tended to deceive, the
Counter Defendants has committed unlawful or deceptive trade practices
in violation of the Maryland Consumer Protection Act. Sec. 13-301(1) and
(3), Sec. 13-303(4), Sec. 13-316, and Sec. 13-301(14)(iii) of the MCPA.

140.    The Counter Defendants' conduct, as set forth above, had the
capacity, tendency or effect of deceiving Mr. Matthews who in fact was
deceived or misled, causing injury and loss through the unfair or deceptive

46

prosecution, based upon incomplete and bogus responses to their requests for modifications of their loans, or threat of prosecution of a bogus foreclosure action by Defendants directly and indirectly.

141.   Under the MCPA, a "person" can be "an individual, corporation, business trust, statutory trust, estate, trust, partnership, association, two or more persons having a joint or common interest, or any other legal or commercial entity." MD CODE ANN., COMM. LAW § 13-101(d).

142.   Defendants GMAC, Ward, and Stephan are persons as defined by the MCPA.

143.   Matthews reasonable relied upon the representations and actions of the Counter Defendants as stated in ¶¶ 1, 5, 7, 52-55, 57, 59, 66, 80, 82, 84-86, 115.

144.   The MCPA defines a "consumer" as "an actual or prospective purchaser, lessee, or recipient of consumer goods, consumer services, consumer realty, or consumer credit." MD CODE ANN., COMM. LAW § 13-101(c)(1). Matthews is a consumer.

145.   The MCPA defines "consumer credit" and "consumer debts" as credit and debts that are "primarily for personal, family, household, or agricultural purposes." MD CODE ANN., COMM. LAW § 13-101(d).

146.   Matthews' mortgage serviced and collected by GMAC, Ward, and Stephan, is a consumer debt.

147.   Mr. Matthews' financial obligations to GMAC are also consumer debts

47

under the MCPA because Mr. Matthews' mortgage debt was primarily for personal, family, and household purposes.

148.   Counter Defendant GMAC, acting through its authorized substitute trustee/attorney, Ward, and employee, Stephan, initiated the foreclosure action against Mr. Matthews using robo-signed or otherwise bogus affidavits. These affidavits contained false written statements that the affiant had personal knowledge of the information sworn to in the affidavit. The affidavits filed in Mr. Matthews' foreclosure case were fraudulent because they contained either false signatures of Ward and Stephan or because the affiant lacked the personal knowledge necessary to swear to the accuracy of their contents.

149.   But for the bogus paperwork presented by GMAC, Stephan, and Ward, this Court would not have had jurisdiction for the foreclosure action that was filed against Mr. Matthews.   Matthews would not have incurred attorney's fees, losses and damages, charges, and other costs related to the foreclosure process.

150.   The use of the bogus affidavits in Mr. Matthews' foreclosure violated the MCPA's prohibition against the use of false or misleading written statements or other representations that have the capacity, tendency, or effect of misleading consumers like Mr. Matthews.   As such, GMAC, Ward, and Stephan are directly liable to Mr. Matthews under the MCPA. MD CODE ANN., COMM. LAW § 13-303(4).

48

151.    In addition to its direct liability pursuant to this claim, GMAC is alternatively responsible as the substitute trustees' principal in the foreclosure action brought on its behalf.  Under Maryland law, "'[a] principal is *prima facie* liable for the acts of his agent done in the general course of business authorized by him.' *Carroll*, 3 A. at 29." *Winemiller v. Worldwide Asset Purchasing, LLC*, 1:09-CV-02487, 2011 WL 1465571, *3 (D. Md. Apr. 15, 2011).

152.    Additionally, during its communications with Mr. Matthews, GMAC failed to tell Mr. Matthews that he was not speaking with USAA but was speaking with GMAC.  This fact was material.  Had Mr. Matthews known that GMAC was the true owner, he would have escalated his situation to the appropriate contacts at GMAC or even the true owner of his loan, whoever that was at the time.

153.    GMAC's failure to inform Mr. Matthews that GMAC, and not USAA, was the true servicer of his loan tended to and did in fact deceive Mr. Matthews.

154.    Because GMAC failed to inform Mr. Matthews of this material fact, and because this failure had the tendency of and in fact did deceive Mr. Matthews, GMAC committed an unfair or deceptive trade practice in violation of the MCPA.  MD CODE ANN., COMM. LAW § 13-301(3).

155.    Finally, GMAC's violation of the Maryland Consumer Debt Collection Act, detailed in Count III, also constituted a violation of the MCPA.  MD CODE ANN., COMM. LAW § 13-301(14)(iii).

156.    Mr. Matthews damages and losses as alleged herein were proximately

caused by GMAC, Stephan's and Ward's actions including damages for emotional distress or mental anguish suffered with or without accompanying physical injury as well as those damages described above.

WHEREFORE, Counter Plaintiff respectfully requests that judgment be entered against Counter Defendants GMAC, Stephan, and Ward for:

    a. Compensatory economic and non-economic damages in the amount of no less than $500,000.

    b. Additional compensatory damages pursuant to Sec. 13-316.

    c. Plaintiff's costs and attorneys fees pursuant to MD CODE ANN., COMM. LAW § 13-408(b).

    d. Such further relief as the Court deems just and proper.

### COUNT III: VIOLATIONS OF MARYLAND MORTGAGE FRAUD PROTECTION ACT
### (Against All Counter Defendants)

157.   Counter Plaintiff re-alleges the previous paragraphs as if fully restated herein.

158.   The Maryland Mortgage Fraud Protection Act, MD CODE ANN., REAL PROP. LAW § 7-401, *et seq.* ("MMFPA") governs the relationship between the Counter Defendants and Mr. Matthews.

159.   The MMFPA defines a "homeowner" as a record owner of residential property. MD CODE ANN., REAL PROP. LAW § 7-401(c). Mr. Matthews is the record owner of the Matthews Property and is therefore a homeowner under the Act.

160.  The MMFPA defines "mortgage lending process" to include the
solicitation, application, origination, negotiation, servicing, underwriting,
signing, closing, and funding of a mortgage loan. MD CODE ANN., REAL PROP.
LAW § 7-401(e).

161.  Under the MMFPA, a "mortgage loan" means any loan or other extension
of credit that is (1) secured, in whole or in part, by any interest in residential
real property in Maryland, and (2) is primarily for personal, household, or
family purposes. MD CODE ANN., FINANCIAL INSTITUTIONS LAW § 11-501(l). The
loan extended to Mr. Matthews was primarily for his personal, household, and
family use and was secured by an interest in the residential real property
located at 3216 East Northern Parkway, and is therefore a "mortgage loan" as
defined by the MMFPA.

162.  The MMFPA defines "Mortgage fraud" (MD CODE ANN., REAL PROP. LAW §
7-401(d)) as any action by a person made with the intent to defraud that
involves:

  a.  Knowingly making any deliberate misstatement, misrepresentation,
      or omission during the mortgage lending process with the intent
      that the misstatement, misrepresentation, or omission be relied on
      by a mortgage lender, borrower, or any other party to the mortgage
      lending process;

  b.  Knowingly creating or producing a document for use during the
      mortgage lending process that contains a deliberate misstatement,

misrepresentation, or omission with the intent that the document
containing the misstatement, misrepresentation, or omission be
relied on by a mortgage lender, borrower, or any other party to the
mortgage lending process; and

c. Knowingly using or facilitating the use of any deliberate
misstatement, misrepresentation, or omission during the mortgage
lending process with the intent that the misstatement,
misrepresentation, or omission be relied on by a mortgage lender,
borrower, or any other party to the mortgage lending process;

163.    Counter Defendants GMAC, Stephan, and Ward has committed Mortgage
Fraud by engaging in acts described above.

WHEREFORE, Plaintiff respectfully requests that judgment be entered
against Counter Defendants GMAC, Stephan, and Ward for:

a. Compensatory economic and non-economic damages in the
amount of no less than $500,000

b. Treble damages in the amount of no less than $1,500,000 as
authorized by MD CODE ANN., REAL PROP. § 7-406(c).

c. Plaintiff's costs and attorneys fees pursuant to MD CODE ANN., REAL
PROP. § 7-406(b).

d. Such further relief as the Court deems just and proper.

**COUNT IV: VIOLATION OF MARYLAND CONSUMER
DEBT COLLECTION ACT
(Against GMAC and Ward)**

164.   Counter Plaintiff re-alleges the previous paragraphs as if fully restated
herein.

165.   GMAC and Ward's institution of foreclosure proceedings based upon
bogus documents was an attempt to collect a consumer debt, and was
therefore governed by the Maryland Consumer Debt Collection Act, MD CODE
ANN., COMM. LAW §§ 1-201 *et seq.* ("MCDCA").

166.   The MCDCA defines a "consumer transaction" as "any transaction
involving a person seeking or acquiring real or personal property, services,
money, or credit for personal, family, or household purposes."   MD CODE
ANN., COMM. LAW § 14-201(c).

167.   The servicing of the Matthews mortgage loan was a consumer transaction
under the MCDCA.   Counter Plaintiff used the mortgage loan for personal,
family, and household purposes.

168.   The MCDCA defines a "collector" as "a person collecting or attempting to
collect an alleged debt arising out of a consumer transaction."   MD CODE
ANN., COMM. LAW § 14-201(b).

169.   Counter Defendant Carrie Ward is a "person" as defined by MD CODE
ANN., COMM. LAW § 14-201(d).

170.   Under the MCDCA, a "person" may be a corporation or any other legal or
commercial entity.   MD CODE ANN., COMM. LAW § 14-201(d).   GMAC is a
person under the MCDCA.

171.   GMAC's and Ward's institution of foreclosure proceedings against the

53

Plaintiff and their subsequent actions taken pursuant to that foreclosure were attempts to collect the debt that Plaintiff owed on his mortgage. GMAC and Ward are therefore "collectors" as defined by the MCDCA.

172.   The MCDCA states that, in collecting or attempting to collect an alleged debt, a collector may not "claim, attempt, or threaten to enforce a right with knowledge that the right does not exist." MD CODE ANN., COMM. LAW § 14-202(8).

173.   By authorizing the filing of debt collection foreclosure proceedings and/or conducting foreclosure actions based upon bogus or insufficient papers and affidavits through its authorized substitute trustees/attorneys, Counter Defendant GMAC has asserted a claim with knowledge that the right does not exist, a violation of MD CODE ANN., COMM. LAW § 14-202(8). Specifically, GMAC and Ward were aware that such affidavits needed to be valid in order to initiate a foreclosure action against Mr. Matthews. By initiating the foreclosure proceeding without satisfying this condition precedent, GMAC and Ward attempted to enforce a right with the knowledge that the right did not yet exist.

174.   By the filing of an Order to Docket and instituting foreclosure proceedings based upon bogus or insufficient papers and affidavits through its authorized substitute trustees/attorneys, Counter Defendant Ward asserted a claim with knowledge that the right does not exist, a violation of MD CODE ANN., COMM. LAW § 14-202(8). Specifically, Ward was aware that such affidavits needed to

54

be valid in order to initiate a foreclosure action against Mr. Matthews. By initiating the foreclosure proceeding without satisfying this condition precedent, Ward attempted to enforce a right with the knowledge that the right did not yet exist.

175.   Counter Defendant GMAC also violated the MCDCA by authorizing its agents to enter Mr. Matthews' property and remove his belongings with the knowledge that it did have the right to do so.

176.   At the time that GMAC's agents entered Mr. Matthews' property, they were aware that the foreclosure sale of the property had never been ratified by the Circuit Court. Accordingly, GMAC, Ward and its agents were aware that they had neither equitable nor legal title to the property, and were therefore not entitled to possession of the property.

177.   GMAC and Ward must be held to be aware that, in Maryland, the sole method available allowing a foreclosure sale purchaser to be awarded actual possession following the sale but prior to the audit and conveyance of the property is prescribed in Maryland Rule 14-102(a). *Empire Properties, LLC v. Hardy*, 386 Md. 628, 632, 873 A.2d 1187, 1190 (Md. 2005).

178.   Specifically, Maryland Rule 14-102(a) requires a party *entitled to possession* of a property purchased at foreclosure to file a motion for judgment awarding possession of that property.

179.   At no time was Defendant GMAC or Ward legally entitled to possession of Mr. Matthews' property, nor did GMAC or Ward ever file a motion for

judgment awarding possession pursuant to Maryland Rule 14-102(a).

180.    Despite knowing that they did not have a legitimate claim to possession of
the property, Defendants GMAC and Ward authorized its agents to forcibly
enter Mr. Matthews home without his permission, change the locks on the
doors, and remove Mr. Matthews' property.  This act constituted an attempt
by GMAC to collect on the debt Mr. Matthews owed on his mortgage.

181.    GMAC and Ward's attempt to enforce a right with knowledge that it did not
exist constitutes a violation of the MDCA and has damaged Mr. Matthews.
Due to GMAC violation, Mr. Matthews was forced to find an apartment on
extremely short notice.  Additionally, he has lost the use and enjoyment of the
personal property that was confiscated by GMAC and Ward's agents.

WHEREFORE, Plaintiff respectfully requests that judgment be entered against
Defendant GMAC and Ward for:

        a.  Compensatory economic and non-economic damages in the amount of
            no less than $500,000.

        b.  Such further relief as the Court deems just and proper.

### COUNT V: VIOLATION OF THE FAIR DEBT COLLECTION PRACTICE ACT, 15 U.S.C. § 1692, et seq. (Against GMAC)

182.    Counter Plaintiff incorporates all preceding paragraphs as if set forth fully
herein.

183.    Counter Defendant GMAC acquired the ownership rights and servicing
rights to Mr. Matthews; mortgage during a period in which GMAC alleges the

loan was in default and is therefore a "Debt Collector" within the meaning of

15 U.S.C. § 1692a(6).

184.   By sending false, deceptive, and misleading communications described

above, initiating the pending foreclosure action in a manner to which it had no

right to do so based upon bogus documents and papers, and claiming Mr.

Matthews does not reside in his property, GMAC is in violation of 15 U.S.C. §

1692e.

185.   GMAC's actions described above in the last twelve months with Mr.

Matthews constitute unfair or deceptive practices in violation of 15 U.S.C. §

1692f.

186.   Counter Plaintiff has suffered actual economic and non-economic

damages, as more fully described in above, and have incurred attorney's fees

and court costs as a result of GMAC's conduct.

187.     The FDCPA provides for statutory damages in addition to actual

damages.

WHEREFORE, Plaintiff respectfully request the Court enter judgment in favor of

Counter Plaintiff and against Counter Defendant GMAC for:

a.  Actual damages in an amount not less than $100,000;

b.  Statutory damages in the amount of $1,000;

c.  Costs and attorney's fees incurred by Plaintiff; and

d.  Grant Plaintiff such other and further relief as this court finds

necessary and proper.

57

Respectfully Submitted,

Phillip R. Robinson
Scott Borison
Legg Law Firm, LLC
5500 Buckeystown Pike
Frederick, MD 21703
(301) 620-1016
*Attorney for Counter Plaintiff/Defendant*

## REQUEST FOR A JURY TRIAL

Counter Plaintiff requests a jury trial on all claims asserted herein.

Phillip Robinson

## Certificate of Service

I hereby certify that a copy of the foregoing was served by first-class, prepaid

mail to the Plaintiffs in this matter by mailing to:

Erin Brady
312 Marshall Avenue, Suite 800
Laurel, MD 20707
*Counsel for the Plaintiffs*

Phillip Robinson

## Exhibit B to Declaration

# NOTE

## NOTICE: THIS LOAN IS NOT ASSUMABLE WITHOUT THE APPROVAL OF THE DEPARTMENT OF VETERANS AFFAIRS OR ITS AUTHORIZED AGENT.

| | | |
|---|---|---|
| **February 14, 2008** | **Bel Air** | **MARYLAND** |
| [Date] | [City] | [State] |

**3216 East Northern Parkway**
**Baltimore, MD  21214-1422**
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ **150,000.00**            (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **USAA Federal Savings Bank**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of     **5.875 %**.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the **1st**    day of each month beginning on **April 01, 2008**            . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **March 01, 2038**            , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **Attn: Payment Processing, P.O. Box 205, Waterloo, IA 50704-0205**                     or at a different place if required by the Note Holder

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $ **887.31**

## 4. BORROWER'S RIGHT TO PREPAY

The Borrower shall have the right to prepay at any time, without premium or fee, the entire indebtedness or any part thereof not less than the amount of one installment, or $100.00, whichever is less. Any Prepayment in full of the indebtedness shall be credited on the date received, and no interest may be charged thereafter. Any partial Prepayment made on other than a installment due date need not be credited until the next following installment due date or 30 days after such Prepaymen whichever is earlier.

**MULTISTATE FIXED RATE NOTE**-Single Family
Amended for Veterans Affairs
**US5G** (0104)
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3                      Initials: K S m



EXHIBIT

A

tabbies

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 4.000 % of my overdue payment. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.



Initials: _KSM_

## 10. ALLONGE TO THIS NOTE

If an allonge providing for payment adjustments or for any other supplemental information is executed by the Borrower together with this Note, the covenants of the allonge shall be incorporated into and shall amend and supplement the covenants of this Note as if the allonge were a part of this Note. [Check applicable box]

☐ Graduated Payment Allonge          ☐ Other [Specify]          ☐ Other [Specify]

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Regulations (38 C.F.R. Part 36) issued under the Department of Veterans Affairs ("VA") Guaranteed Loan Authority (38 U.S.C. Chapter 37) and in effect on the date of loan closing shall govern the rights, duties and liabilities of the parties to this loan and any provisions of this Note which are inconsistent with such regulations are hereby amended and supplemented to conform thereto.

## 12. APPLICABLE LAW

Lender is a federally chartered savings bank governed, in part, by the Home Owner's Loan Act of 1933 and the rules and regulations promulgated pursuant thereto (the "Act"). To the extent permitted by the Act, this Note will be governed by applicable federal law and by the interest rate and usury provisions of the state of Texas.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Kevin S Matthews_____ (Seal)          _____ (Seal)
Kevin Jerron Matthews    -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                -Borrower

Pay to the Order of
GMAC Mortgage, LLC
Its successors and / or assigns
Without Recourse
USAA Federal Savings Bank_____ (Seal)          _____ (Seal)
                                 -Borrower                                -Borrower

By: _Gregory R Jaeger_____
Name: Gregory R. Jaeger
Title:  V.P., Fulfillment

**PAY TO THE ORDER OF**

**WITHOUT RECOURSE**

_J. Gray_____
J. GRAY
LIMITED SIGNING OFFICER
GMAC MORTGAGE, LLC f/k/a
GMAC MORTGAGE CORPORATION    *[Sign Original Only]*

## Exhibit C to Declaration

LIBER 10445 PAGE 309

Return To:

**USAA Federal Savings Bank**
**10750 McDermott Freeway**
**San Antonio, TX  78288**

Prepared By:
**Lisa A. Gallegos**
**10750 McDermott Freeway**
**San Antonio, TX  78288**

15081-08-0C040

——————————————————[Space Above This Line For Recording Data]——————————————————
PURCHASE MONEY

# DEED OF TRUST
MIN 100105600023774507

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **February 14, 2008**
together with all Riders to this document.
**(B) "Borrower"** is **Kevin Jerron Matthews, a married man**

Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is **USAA Federal Savings Bank**

Lender is a **federally chartered savings bank**
organized and existing under the laws of **the United States of America**

**MARYLAND**-Single Family- Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT WITH MERS**
**Form 3021  1/01**
Wolters Kluwer Financial Services
VMP ®-6A(MD) (0502).01
Page 1 of 15                Initials: KSM



EXHIBIT
B

LIBER 1 0 4 4 5 PAGE 3 1 0

Lender's address is **10750 McDermott Freeway, San Antonio, TX  78288**

**(D) "Trustee"** is **Michael J. Broker**

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F) "Note"** means the promissory note signed by Borrower and dated **February 14, 2008**
The Note states that Borrower owes Lender **One Hundred Fifty Thousand  And Zero/100**
                                                                                     **Dollars**

(U.S. **$150,000.00**        ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **March 01, 2038**

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☒ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items"** means those items that are described in Section 3.

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to

LIBER I O 4 4 5 PAGE 3 I I

time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
**County**                    of            **Baltimore (city)**                    :
[Type of Recording Jurisdiction]                [Name of Recording Jurisdiction]
**See Exhibit "A" attached**

*5566*

Parcel ID Number: 327045555 055                                which currently has the address of
**3216 East Northern Parkway**                                                [Street]
**Baltimore**                                      [City], Maryland  **21214-1422**  [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

    

VMP ®-6A(MD) (0502).01                    Page 3 of 15        Initials: KSM        Form 3021  1/01

LIBER | 0445 PAGE 3 | 2

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's

Initials: KJm



LIBER 10445 PAGE 313

obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the



Initials:  KJm



LIBER I 0 4 4 5 PAGE 3 I 4

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Initials: 



LIBER **I 0 4 4 5** PAGE **3 I 5**

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable



Initials:  KSm



VMP ®-6A(MD) (0602).01                    Page 7 of 15                    Form 3021    1/01

LIBER I 0 4 4 5 PAGE 3 I 6

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**





Initials: KSm

LIBER 10445 PAGE 317

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.





Initials: KSm

LIBER 10445 PAGE 318

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.



LIBER 10445 PAGE 319

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA



LIBER 1 0 4 4 5 PAGE 3 2 0

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the**







Initials: KSM

VMP ®-6A(MD) (0602).01                          Page 12 of 15                          Form 3021   1/01

LIBER 10445 PAGE 321

default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale, assent to decree, and/or any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall mail or cause Trustee to mail a notice of sale to Borrower in the manner prescribed by Applicable Law. Trustee shall give notice of sale by public advertisement and by such other means as required by Applicable Law. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale and by notice to any other persons as required by Applicable Law. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, Trustee's fees of      0.000 % of the gross sale price and reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

Borrower, in accordance with Title 14, Chapter 200 of the Maryland Rules of Procedure, does hereby declare and assent to the passage of a decree to sell the Property in one or more parcels by the equity court having jurisdiction for the sale of the Property, and consents to the granting to any trustee appointed by the assent to decree of all the rights, powers and remedies granted to the Trustee in this Security Instrument together with any and all rights, powers and remedies granted by the decree. Neither the assent to decree nor the power of sale granted in this Section 22 shall be exhausted in the event the proceeding is dismissed before the payment in full of all sums secured by this Security Instrument.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender or Trustee, shall release this Security Instrument and mark the Note "paid" and return the Note to Borrower. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the city or county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Possession of the Property.** Borrower shall have possession of the Property until Lender has given Borrower notice of default pursuant to Section 22 of this Security Instrument.



LIBER **10445** PAGE **322**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ Kevin S Mathews _____ (Seal)
                                                                           **Kevin Jerron Matthews**              -Borrower


_____ (Seal)          _____ (Seal)
                                                -Borrower                                                           -Borrower


_____ (Seal)          _____ (Seal)
                                                -Borrower                                                           -Borrower


_____ (Seal)          _____ (Seal)
                                                -Borrower                                                           -Borrower


_____ (Seal)          _____ (Seal)
                                                -Borrower                                                           -Borrower


VMP ®-6A(MD) (0602).01                        Page 14 of 16                        Form 3021   1/01

LIBER 10445 PAGE 323

**STATE OF MARYLAND,**                                    *Harford* **County ss:**
    I Hereby Certify, That on this **14th**     day of **February, 2008**   , before me, the subscriber, a
Notary Public of the State of Maryland, in and for the   **county aforesaid**                                   ,
personally appeared **Kevin Jerron Matthews**

known to me or satisfactorily proven to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledge that he/she/they executed the same for the purposes therein contained.
    AS WITNESS: my hand and notarial seal.
My Commission Expires: *3/01/09*

                                    Notary Public

*(Notary seal: LINDA I. TROTSKY, NOTARY PUBLIC, HARFORD COUNTY, MD, My Comm. Exps 3/1/09)*

**STATE OF** *Maryland*        ,             *Harford* **County ss:**
    I Hereby Certify, That on this *14th*     day of *February, 2008* *Harford*  ,before me, the subscriber,
a Notary Public of the State of *Maryland* and for the *County Aforesaid*                      ,
personally appeared  *Glen Jackson*
the agent of the party secured by the foregoing Deed of Trust, and made oath in due form of law that the
consideration recited in said Deed of Trust is true and bona fide as therein set forth and that the actual sum
of money advanced at the closing transaction by the secured party was paid over and disbursed by the party
or parties secured by the Deed of Trust to the Borrower or to the person responsible for disbursement of
funds in the closing transaction or their respective agent at a time not later than the execution and delivery
by the Borrower of this Deed of Trust; and also made oath that he is the agent of the party or parties
secured and is duly authorized to make this affidavit.
    AS WITNESS: my hand and notarial seal.
My Commission Expires: *3/01/09*

                                      Notary Public

*(Notary seal: LINDA I. TROTSKY, NOTARY PUBLIC, HARFORD COUNTY, MD, My Comm. Exps 3/1/09)*

This is to certify that the within instrument was prepared  by USAA Federal Savings Bank,
    a party named in the within instrument.

                   ~~LISA A. GALLEGOS~~ Kay Wolfe, closer

VMP®-6A(MD) (0602).01                 Page 15 of 15        Initials: *KSM*               Form 3021  1/01

LIBER 10445 PAGE 327

## EXHIBIT "A" - PROPERTY DESCRIPTION

BEGINNING on the northeast side of Northern Parkway, 100 feet wide, at a point situate, north 65 degrees 05 minutes 30 seconds west 373.90 feet along said side from the corner formed by the intersection of the northeast side of Northern Parkway with the northwest side of Moyer Avenue, 50 feet wide, as shown on the Plat of Northern Heights duly recorded among the land records of Baltimore City; said place of beginning being also in line with the center of a partition wall there situate; thence leaving aid place of beginning and binding along the northeast side of Northern Parkway, north 65 degrees 05 minutes 30 seconds west 26.34 feet; thence leaving the northeast side of Northern Parkway and running for a line of division, north 24 degrees 54 minutes 30 seconds east 107.5 feet to the southwest side of a 15 foot alley there situate; thence binding along the southwest side of said alley with the use thereof in common, south 65 degrees 05 minutes 30 seconds east 26.34 feet to a point in line with the center of the above mentioned partition wall; thence leaving the southwest side of said alley and running to and through the center of said partition wall and continuing the same course in all south 24 degrees 54 minutes 30 seconds west 107.5 feet to the place of beginning. The improvements whereon are known as No. 3216 Northern Parkway, Baltimore, Maryland 21214 (For informational purposes only).

BEING THE SAME LOT OF GROUND WHICH BY DEED OF EVEN DATE HEREWITH AND RECORDED OR INTENDED TO BE RECORDED AMONG THE LAND RECORDS OF BALTIMORE CITY PRIOR HERETO WAS GRANTED AND CONVEYED BY STEPHANIE CANNIZZARO AS PERSONAL REPRESENTATIVE OF THE STEPHEN A. CANNIZZARO ESTATE UNTO THE BORROWER(s) HEREIN.

LIBER 10445 PAGE 324

## VA GUARANTEED LOAN AND ASSUMPTION POLICY RIDER

# NOTICE: THIS LOAN IS NOT ASSUMABLE WITHOUT THE APPROVAL OF THE DEPARTMENT OF VETERANS AFFAIRS OR ITS AUTHORIZED AGENT.

THIS VA GUARANTEED LOAN AND ASSUMPTION POLICY RIDER is made this **14th** day of **February, 2008**          , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Deed to Secure Debt (herein "Security Instrument") dated of even date herewith, given by the undersigned (herein "Borrower") to secure Borrower's Note to **USAA Federal Savings Bank**

(herein "Lender") and covering the Property described in the Security Instrument and located at **3216 East Northern Parkway, Baltimore, MD  21214-1422**

[Property Address]

VA GUARANTEED LOAN COVENANT: In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

If the indebtedness secured hereby be guaranteed or insured under Title 38, United States Code, such Title and Regulations issued thereunder and in effect on the date hereof shall govern the rights, duties and liabilities of Borrower and Lender. Any provisions of the Security Instrument or other instruments executed in connection with said indebtedness which are inconsistent with said Title or Regulations, including, but not limited to, the provision for payment of any sum in connection with prepayment of the secured indebtedness and the provision that the Lender may accelerate payment of the secured indebtedness pursuant to Covenant 18 of the Security Instrument, are hereby amended or negated to the extent necessary to conform such instruments to said Title or Regulations.

**MULTISTATE VA GUARANTEED LOAN AND ASSUMPTION POLICY RIDER**

Wolters Kluwer Financial Services
VMP®-538R (0405).01     10/03
Page 1 of 3      Initials: _KJM_

LIBER 1 0 4 4 5 PAGE 3 2 5

LATE CHARGE: At Lender's option, Borrower will pay a "late charge" not exceeding four per centum (4%) of the overdue payment when paid more than fifteen (15) days after the due date thereof to cover the extra expense involved in handling delinquent payments, but such "late charge" shall not be payable out of the proceeds of any sale made to satisfy the indebtedness secured hereby, unless such proceeds are sufficient to discharge the entire indebtedness and all proper costs and expenses secured hereby.

GUARANTY: Should the Department of Veterans Affairs fail or refuse to issue its guaranty in full amount within 60 days from the date that this loan would normally become eligible for such guaranty committed upon by the Department of Veterans Affairs under the provisions of Title 38 of the U.S. Code "Veterans Benefits," the Mortgagee may declare the indebtedness hereby secured at once due and payable and may foreclose immediately or may exercise any other rights hereunder or take any other proper action as by law provided.

TRANSFER OF THE PROPERTY: This loan may be declared immediately due and payable upon transfer of the property securing such loan to any transferee, unless the acceptability of the assumption of the loan is established pursuant to Section 3714 of Chapter 37, Title 38, United States Code.

An authorized transfer ("assumption") of the property shall also be subject to additional covenants and agreements as set forth below:

(a) ASSUMPTION FUNDING FEE: A fee equal to **one half of one percent** ( **.50** %) of the balance of this loan as of the date of transfer of the property shall be payable at the time of transfer to the loan holder or its authorized agent, as trustee for the Department of Veterans Affairs. If the assumer fails to pay this fee at the time of transfer, the fee shall constitute an additional debt to that already secured by this instrument, shall bear interest at the rate herein provided, and, at the option of the payee of the indebtedness hereby secured or any transferee thereof, shall be immediately due and payable. This fee is automatically waived if the assumer is exempt under the provisions of 38 U.S.C. 3729 (c).

(b) ASSUMPTION PROCESSING CHARGE: Upon application for approval to allow assumption of this loan, a processing fee may be charged by the loan holder or its authorized agent for determining the creditworthiness of the assumer and subsequently revising the holder's ownership records when an approved transfer is completed. The amount of this charge shall not exceed the maximum established by the Department of Veterans Affairs for a loan to which Section 3714 of Chapter 37, Title 38, United States Code applies.

(c) ASSUMPTION INDEMNITY LIABILITY: If this obligation is assumed, then the assumer hereby agrees to assume all of the obligations of the veteran under the terms of the instruments creating and securing the loan. The assumer further agrees to indemnify the Department of Veterans Affairs to the extent of any claim payment arising from the guaranty or insurance of the indebtedness created by this instrument.



Initials: _K J m_

VMP®-538R (0405).01                   Page 2 of 3

LIBER 10445 PAGE 326

IN WITNESS WHEREOF, Borrower(s) has executed this VA Guaranteed Loan and Assumption Policy Rider.

_____ Kevin s matters _____                          _____
Kevin Jerron Matthews          -Borrower                                    -Borrower


_____          -Borrower            _____          -Borrower


_____          -Borrower            _____          -Borrower


_____          -Borrower            _____          -Borrower


VMP®-538R (0405).01                    Page 3 of 3

**<u>Exhibit D to Declaration</u>**

IN THE CIRCUIT COURT
FOR BALTIMORE CITY, MARYLAND

JACOB GEESING *et al.*,

    *Substitute Trustees and Plaintiffs,*

        v.

KEVIN JERRON MATTHEWS,

    *Defendant.*

Case No. 24-O-10001394

## CONSENT ORDER

Having considered Plaintiffs' Motion to Dismiss Without Prejudice, the accompanying briefs submitted by the parties, the record in this action, and the argument and representations of counsels as presented at a hearing held this 14th day of January, 2011, it is this 14th day of January, 2011 hereby ordered with the consent of the parties:

(1)    Plaintiffs' Motion to Dismiss Without Prejudice is GRANTED;

(2)    This foreclosure action against Defendant Matthews is accordingly DISMISSED WITHOUT PREJUDICE;

(3)    The foreclosure sale of the real property located at 3216 East Northern Parkway, Baltimore, Maryland 21214, conducted on May 21, 2010, is hereby RESCINDED; and

(4)    All other pending Motions are DENIED AS MOOT.

**W. MICHEL PIERSON, Judge**
Judge's signature appears on original document

W. Michel Pierson
Judge

cc:  All Counsel of Record

EXHIBIT
C

**Exhibit E to Declaration**

Circuit Court of Maryland

Go Back

**Case Information**

Court System: **Circuit Court for Baltimore City - Civil System**
Case Number: **24O12000286**
Title: **Laura H G O'Sullivan vs Kevin Jerron Matthews**
Case Type: **Foreclosure**    Filing Date: **02/10/2012**
Case Status: **Open/Active**

**Plaintiff/Petitioner Information**

*(Each Plaintiff/Petitioner is displayed below)*
Party Type: **Plaintiff**    Party No.: **1**
Name: **O'Sullivan, Laura H G**
Address: **312 Marshall Avenue**
City: **Laurel**    State: **MD**    Zip Code: **20707**
**Attorney(s) for the Plaintiff/Petitioner**
Name:            **Brady, Esq, Erin M**
Appearance Date: **02/17/2012**
Practice Name:    **McCabe, Weisberg & Conway, LLC**
Address:         **312 Marshall Ave #800**
City:            **Laurel**    State: **MD**    Zip Code: **20707**

**Defendant/Respondent Information**

*(Each Defendant/Respondent is displayed below)*
Party Type: **Defendant**    Party No.: 1
Name: **Matthews (Counter-Plaintiff), Kevin Jerron**
Address: **3216 East Northern Parkway**
City:   **Baltimore**    State: **MD**    Zip Code: **21214**
Address: **C/O Phillip R Bobinson Esq.**
City:    **Frederick**    State: **MD**    Zip Code: **21703**
**Attorney(s) for the Defendant/Respondent**
Name:            **Robinson, Esq, Phillip**
Appearance Date: **03/16/2012**
Practice Name:    **Legg Law Firm LLC**
Address:         **5500 Buckeystown Pike**
City:            **Frederick**    State: **MD**    Zip Code: **21703**

Party Type: **Defendant**    Party No.: **2**
Business or Organization Name: **GMAC Mortgage LLC**
Address: **7 St. Paul Street, Suite 1660**
City:   **Baltimore**    State: **MD**    Zip Code: **21202**
**Attorney(s) for the Defendant/Respondent**
Name:            **Frechtel, Esq, Eric A**
Appearance Date: **04/25/2012**
Practice Name:    **Bradley Arant Boult Cummings LLP**
Address:         **1615 L Street,N.W.**
                 **Suite 1350**

City:                Washington    State: DC    Zip Code: 20036

---

Party Type: **Defendant**    Party No.: **3**
Name: **Ward, Carrie**
Address: **4520 East West Highway, Suite 200**
City:        **Bethesda**    State: **MD**    Zip Code: **20814**

### Attorney(s) for the Defendant/Respondent

Name:                **Schraub, Esq, J Jonathan**
Appearance Date: **07/27/2012**
Practice Name:
Address:                **1481 Chain Bridge Road**
                        **Suite 200**
City:                **McLean**    State: **VA**    Zip Code: **22101**

---

Party Type: **Defendant**    Party No.: **4**
Name: **Stephan, Jeffrey**
Address: **42 Lenape Drive**
City:        **Sellersville**    State: **PA**    Zip Code: **18960-1568**

### Attorney(s) for the Defendant/Respondent

Name:                **Simanowith, Esq, Mark A**
Appearance Date: **05/23/2012**
Practice Name:    **Saul Ewing LLP**
Address:                **500 East Pratt Street**
                        **8th Floor**
City:                **Baltimore**    State: **MD**    Zip Code: **21201**

---

### Court Scheduling Information

Event Type: **Motion Hearing (Civil)**    Notice Date: **07/20/2012**
Event Date: **07/30/2012**    Event Time: **10:30 AM**
Result:        **Cancelled/Vacated**    Result Date: **10/17/2012**

---

Event Type: **Motion Hearing (Civil)**    Notice Date: **07/30/2012**
Event Date: **08/06/2012**    Event Time: **10:30 AM**
Result:        **Cancelled/Vacated**    Result Date: **10/17/2012**

---

Event Type: **Motion Hearing (Civil)**    Notice Date: **04/09/2013**
Event Date: **04/19/2013**    Event Time: **02:00 PM**
Result:            Result Date:

---

Event Type: **Hearing**    Notice Date: **02/12/2014**
Event Date: **02/25/2014**    Event Time: **09:30 AM**
Result:            Result Date:

---

### Related Persons Information

*(Each Related person is displayed below)*
Party Type: **Trustee**    Party No.: **1**
Name: **Curran, Deborah K**

### Attorney(s) for the Related Persons

Name:                **Brady, Esq, Erin M**
Practice Name: **McCabe, Weisberg & Conway, LLC**
Address:                **312 Marshall Ave #800**
City:                **Laurel**    State: **MD**    Zip Code: **20707**

Party Type: **Trustee**  Party No.: **2**
Name: **Brady, Erin M**
*Attorney(s) for the Related Persons*
Name:                **Brady, Esq, Erin M**
Practice Name: **McCabe, Weisberg & Conway, LLC**
Address:            **312 Marshall Ave #800**
City:                **Laurel**  State: **MD**  Zip Code: **20707**

Party Type: **Trustee**  Party No.: **3**
Name: **Theologou, Diana C**
*Attorney(s) for the Related Persons*
Name:                **Brady, Esq, Erin M**
Practice Name: **McCabe, Weisberg & Conway, LLC**
Address:            **312 Marshall Ave #800**
City:                **Laurel**  State: **MD**  Zip Code: **20707**

Party Type: **Trustee**  Party No.: **4**
Name: **Latta, Laura L**
*Attorney(s) for the Related Persons*
Name:                **Brady, Esq, Erin M**
Practice Name: **McCabe, Weisberg & Conway, LLC**
Address:            **312 Marshall Ave #800**
City:                **Laurel**  State: **MD**  Zip Code: **20707**

Party Type: **Trustee**  Party No.: **5**
Name: **Elefant, Jonathan**
*Attorney(s) for the Related Persons*
Name:                **Brady, Esq, Erin M**
Practice Name: **McCabe, Weisberg & Conway, LLC**
Address:            **312 Marshall Ave #800**
City:                **Laurel**  State: **MD**  Zip Code: **20707**

Party Type: **Trustee**  Party No.: **6**
Name: **Peightel, Anne L**
*Attorney(s) for the Related Persons*
Name:                **Brady, Esq, Erin M**
Practice Name: **McCabe, Weisberg & Conway, LLC**
Address:            **312 Marshall Ave #800**
City:                **Laurel**  State: **MD**  Zip Code: **20707**

Party Type: **Trustee**  Party No.: **7**
Name: **O'Sullivan, Laura H G**
*Attorney(s) for the Related Persons*
Name:                **Brady, Esq, Erin M**
Practice Name: **McCabe, Weisberg & Conway, LLC**
Address:            **312 Marshall Ave #800**
City:                **Laurel**  State: **MD**  Zip Code: **20707**

Party Type: **Property Address**  Party No.: **1**
Business or Organization Name: **3216 E Northern Pkwy 21214 $176,680.51**

Party Type: **Interested Party**  Party No.: **1**
Business or Organization Name: **USAA Federal Savings Bank**
Address: **9800 Fredericksburg Road**

City:    **San Antonio**    State: **TX**    Zip Code: **78288**

---

**Document Tracking**

*(Each Document listed. Documents are listed in Document No./Sequence No. order)*

Doc No./Seq No.: **1/0**
File Date:    **02/10/2012**    Entered Date: **02/17/2012**    Decision:
Party Type:    **Plaintiff**    Party No.: **1**
Document Name: **Order to Docket Suit**
**DEED OF TRUST AND NOTE**

---

Doc No./Seq No.: **1/1**
File Date:    **03/19/2012**    Entered Date: **03/19/2012**    Decision:
Party Type:    **Defendant**    Party No.: **1**
Document Name: **Counter Complaint & Jury Demand**
**With Request For A Jury Trial.**

---

Doc No./Seq No.: **1/2**
File Date:    **03/16/2012**    Entered Date: **03/19/2012**    Decision:
Party Type:    **Defendant**    Party No.: **1**
Document Name: **Line-Request For Summons**

---

Doc No./Seq No.: **2/0**
File Date:    **02/10/2012**    Entered Date: **02/17/2012**    Decision:
Party Type:    **Plaintiff**    Party No.: **1**
Document Name: **Preliminary Loss Mitigation Analysis**

---

Doc No./Seq No.: **3/0**
File Date:    **02/10/2012**    Entered Date: **02/17/2012**    Decision:
Party Type:    **Plaintiff**    Party No.: **1**
Document Name: **Statement of Mortgage Debt $176,680.51**

---

Doc No./Seq No.: **4/0**
File Date:    **02/10/2012**    Entered Date: **02/17/2012**    Decision:
Party Type:    **Plaintiff**    Party No.: **1**
Document Name: **Affidavit – Non-Military**

---

Doc No./Seq No.: **5/0**
File Date:    **02/10/2012**    Entered Date: **02/17/2012**    Decision:
Party Type:    **Plaintiff**    Party No.: **1**
Document Name: **Deed of Appointment of Substitute Trustees**

---

Doc No./Seq No.: **6/0**
File Date:    **02/10/2012**    Entered Date: **02/17/2012**    Decision:
Party Type:    **Plaintiff**    Party No.: **1**
Document Name: **Affidavit of Ownership (GMAC Mortgage LLC)**

---

Doc No./Seq No.: **7/0**
File Date:    **02/10/2012**    Entered Date: **02/17/2012**    Decision:
Party Type:    **Plaintiff**    Party No.: **1**
Document Name: **Affidavit Of Mailing Of notice Of Intent To Foreclose Pursuant To Real Prop.**

**Art. 7-105.1(c)and Prop. Art. 7-105.1(d)(ii)(2)**

**Doc No./Seq No.: 8/0**
File Date: **02/10/2012**    Entered Date: **02/17/2012**    Decision:
Party Type: **Plaintiff**    Party No.: **1**
Document Name: **Assignment Of Deed Of Trust**

**Doc No./Seq No.: 9/0**
File Date: **03/01/2012**    Entered Date: **03/02/2012**    Decision:
Document Name: **Line to File Foreclosure Documents**

**Doc No./Seq No.: 10/0**
File Date: **03/02/2012**    Entered Date: **03/02/2012**    Decision:
Document Name: **Affidavit of Mailing Notice to Occupants of Forclosure Action**

Doc No./Seq No.:    **11/0**
File Date:    **03/01/2012**    Entered Date: **03/02/2012**    Decision:
Document Name:    **Affidavit of Service**

**Suitable age/suitably served on Jody Williams on 2/21/12 at 7:10 p.m. (3216 East Northern Parkway)**

**Doc No./Seq No.: 12/0**
File Date:    **03/01/2012**    Entered Date: **03/02/2012**    Decision:
Document Name: **Affidavit of Service**
**Served on Erica Evans on 2/22/12 at 12:08 p.m. (520 West Fayette Street).**

**Doc No./Seq No.: 13/0**
File Date:    **03/16/2012**    Entered Date: **03/21/2012**    Decision:
Party Type:    **Defendant**    Party No.: **1**
Document Name: **Line-Entry of Appearance**

**Doc No./Seq No.: 14/0**
File Date:    **03/23/2012**    Entered Date: **03/26/2012**    Decision:
Party Type:    **Plaintiff**    Party No.: **1**
Document Name: **Final Loss Mitigation Analysis**

**Doc No./Seq No.: 15/0**
File Date:    **04/20/2012**    Entered Date: **04/20/2012**    Decision:
Party Type:    **Defendant**    Party No.: **1**
Document Name: **Motion/Request for Foreclosure Mediation**
**Filed by Attorney: Phillip Robinson Esq LENDER: ERIN M BRADY ESQ**

**Doc No./Seq No.: 16/0**
File Date:    **04/24/2012**    Entered Date: **04/25/2012**    Decision: **Granted**
Document Name: **Consent Motion to Extend Time For the Carrie Ward to File Responsive Pleadings**

Doc No./Seq No.:    **16/1**
File Date:    **05/08/2012**    Entered Date: **05/09/2012**    Decision:
Document Name:    **ORDERED THAT COUNTER-DEFENDANT CARRIE WARD SHALL FILE HER RESPONSIVE**

**PLEADINGS TO COUNTER-PLAINTIFF KEVIN J. MATTHEWS COUNTER-COMPLAINT ON OR
BEFORE JUNE 15, 2012. (PIERSON, J)**

Doc No./Seq No.: **16/2**
File Date:          **05/08/2012**    Entered Date: **05/09/2012**    Decision:
Document Name: **Copies Mailed**

Doc No./Seq
No.:                **17/0**
File Date:          **04/24/2012**    Entered Date: **04/25/2012**    Decision:
Document          **CARRIE WARD'S MOTION TO SEVER COUNTERPLAINTIFF'S COUNTERCLAIM FROM THE
Name:             MAIN
                  ACTION**

Doc No./Seq No.: **17/1**
File Date:          **05/11/2012**    Entered Date: **05/15/2012**    Decision:
Party Type:        **Defendant**    Party No.: **1**
Document Name: **Opposition To Counter Defendant Carrie Ward's Motion To Sever Counter Plaintiff'
                  COUNTER CLAIM FROM THE MAIN ACTION & REQUEST FOR HEARING**

Doc No./Seq No.: **18/0**
File Date:          **04/26/2012**    Entered Date: **04/26/2012**    Decision:
Party Type:        **Defendant**    Party No.: **2**
Document Name: **GMAC Mortgage LLC Motion to Dismiss (Pull Date 05/16/12)
                  Filed by Attorney: Erin M Brady Esq**

Doc No./Seq No.: **18/1**
File Date:          **04/25/2012**    Entered Date: **04/26/2012**    Decision:
Party Type:        **Defendant**    Party No.: **2**
Document Name: **Request for Hearing on Selected Motion**

Doc No./Seq
No.:                **19/0**
File Date:          **05/14/2012**    Entered Date: **05/16/2012**    Decision: **Granted**
Party Type:        **Defendant**    Party No.: **1**
Document          **MOTION TO EXTEND TIME FOR COUNTER PLAINTIFF KEVIN MATTHEWS TO FILE HIS
Name:             RESPONSE
                  TO COUNTER DEFENDANT GMAC MORTGAGE LLC'S MOTION TO DISMISS.**

Doc No./Seq
No.:                **19/1**
File Date:          **05/29/2012**    Entered Date: **05/30/2012**    Decision:
Party Type:        **Defendant**    Party No.: **2**
Document          **Response/Opposition to Motion
Name:
                  GMAC'S RESPONSE TO COUNTER-PLAINTIFF'S MOTION TO EXTEND TIME TO FILE
                  ARESPONSE TO MOTION TO DISMISS AND SUGGESTION OF BANKRUPTCY.**

Doc
No./Seq           **19/2**
No.:
File Date:         **07/30/2012**    Entered Date: **07/31/2012**    Decision:
Document          **Order of Court
Name:
                  ORDERED THAT THE MOTION BE, AND HEREBY IS, GRANTED, AND DEFENDANT/COUNTER-
                  PLAINTIFF SHALL HAVE 30 DAYS FROM THE DATE OF THIS ORDER WITHING WHICH TO
                  FILE A RESPONSE. JUDGE MARTIN P WELCH**

                  **19/3**

| | |
|---|---|
| Doc No./Seq No.: | |
| File Date: | **07/31/2012**   Entered Date: **07/31/2012**   Decision: |
| Party Type: | **Defendant**   Party No.: **2** |
| Document Name: | **Copies Mailed** |
| | **Filed by Attorney: Erin M Brady Esq,Mark A Simanowith Esq,J Jonathan Schraub Esq,Eric A Frechtel Esq,Phillip Robinson Esq** |

| | |
|---|---|
| Doc No./Seq No.: | **20/0** |
| File Date: | **05/25/2012**   Entered Date: **05/25/2012**   Decision: **Granted** |
| Party Type: | **Defendant**   Party No.: **4** |
| Document Name: | **Counter Defendant Jeffrey Stephan's Motion to Dismiss (Pull Date 06/22/12)** |

| | |
|---|---|
| Doc No./Seq No.: | **20/1** |
| File Date: | **05/23/2012**   Entered Date: **05/25/2012**   Decision: |
| Party Type: | **Defendant**   Party No.: **4** |
| Document Name: | **Memorandum in Support of Motion** |
| | **Memorandum In Support Of Counter Defendant Jeffrey Stephan's Motion to Dismiss.** |

| | |
|---|---|
| Doc No./Seq No.: | **20/2** |
| File Date: | **05/23/2012**   Entered Date: **05/25/2012**   Decision: |
| Party Type: | **Defendant**   Party No.: **4** |
| Document Name: | **Request for Hearing on Selected Motion** |
| | **Counter Defendant Jeffrey Stephan's Request For Hearing.** |

| | |
|---|---|
| Doc No./Seq No.: | **20/3** |
| File Date: | **06/11/2012**   Entered Date: **06/12/2012**   Decision: |
| Party Type: | **Defendant**   Party No.: **1** |
| Document Name: | **DEFENDANT/COUNTER PLAINTIFF'S OPPOSITION TO COUNTER FDEFENDANT JEFFREY STEPHAN'S** |
| | **MOTION TO DISMISS** |
| | **Filed by Attorney: Phillip Robinson Esq** |

| | |
|---|---|
| Doc No./Seq No.: | **20/4** |
| File Date: | **07/06/2012**   Entered Date: **07/10/2012**   Decision: |
| Document Name: | **REPLY MEMORANDUM IN FURTHER SUPPORT OF COUNTER DEFENDANT JEFFREY STEPHAN'S** |
| | **MOTION TO DISMISS** |

| | |
|---|---|
| Doc No./Seq No.: | **20/5** |
| File Date: | **07/31/2012**   Entered Date: **08/01/2012**   Decision: |
| Document Name: | **Order of Court** |
| | **UPON CONSIDERATION OF DEFENDANT/COUNTER-PLAINTIFF'S ORAL MOTION TO EXTEND TIME TO RESPN TO COUNTER-DEFENDANT STEPHAN'S MOTION TO DISMISS (PAPER NO. 20000))** **ORDERED THAT THE MOTION BE, AND HEREBY IS, GRANTED, AND DEFENDANT/COUNTER-PLAINTIFF SHALL HAVE 30 DAYS FROM THE DATE OF THIS ORDER WITHIN WHICH TO FILE A RESPONSE FOR THE ISSUES NOT ADDRESSED IN THE PREVIOUSLY SUBMITTED REPLY (THOSE ISSUES NOT PERTAINING TO COURT'S PERSONAL JURISDICTION OVER COUNTER-DEFENDANT STEPHAN) JUDGE MARTIN P WELCH** |

| | |
|---|---|
| Doc No./Seq No.: | **20/6** |
| File Date: | **08/01/2012**   Entered Date: **08/01/2012**   Decision: |
| Party Type: | **Defendant**   Party No.: **4** |

| Document Name: | **Copies Mailed** |
|---|---|
| | **Filed by DEF004-Stephan, DEF003-Ward, DEF001-Matthews (Counter-Plaintiff)**<br>**Filed by Attorney: Erin M Brady Esq,Mark A Simanowith Esq,J Jonathan Schraub Esq,Eric A Frechtel Esq,Phillip Robinson Esq** |

| Doc No./Seq No.: | **21/0** |
|---|---|
| File Date: | **06/14/2012**  Entered Date: **06/15/2012**  Decision: **Granted** |
| Document Name: | **CARRIE WARD'S MOTION TO DISMISS**<br>        **PULL DATE 7/5/12** |

| Doc No./Seq No.: | **21/1** |
|---|---|
| File Date: | **06/14/2012**  Entered Date: **06/15/2012**  Decision: |
| Document Name: | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CARRIE WARDS MOTION TO**<br><br>        **DISMISS** |

| Doc No./Seq No.: | **21/2** |
|---|---|
| File Date: | **07/30/2012**  Entered Date: **08/01/2012**  Decision: |
| Document Name: | **Order of Court**<br><br>        **UPON CONSIDERATION OF DEFENDANT/COUNTER-PLEAINTIFF'S ORAL MOTION TO EXTEND TIME TO RESPON TO COUNTER-DEFENDANT WARD'S MOTION TO DISMISS (PAPER NO. 21000)**<br>        **ORDERED THAT THE MOTION BE, AND HEREBY IS, GRANTED, AND DEFENDANT/COUNTER-PLAINTIFF SHALL HAVE 30 DAYS FROM THE DATE OF THIS ORDER WITHIN WHICH TO FILE A RESPONSE. JUDGE MARTIN P WELCH** |

| Doc No./Seq No.: | **21/3** |
|---|---|
| File Date: | **08/01/2012**  Entered Date: **08/01/2012**  Decision: |
| Party Type: | **Defendant**  Party No.: **4** |
| Document Name: | **Copies Mailed**<br><br>        **Filed by DEF004-Stephan, DEF003-Ward, DEF002-GMAC Mortgage LLC, DEF001-Matthews (Counter-Plaintiff)**<br>        **Filed by Attorney: Erin M Brady Esq,Mark A Simanowith Esq,J Jonathan Schraub Esq,Eric A Frechtel Esq,Phillip Robinson Esq** |

| Doc No./Seq No.: | **22/0** |
|---|---|
| File Date: | **06/26/2012**  Entered Date: **06/27/2012**  Decision: **Granted** |
| Party Type: | **Defendant**  Party No.: **1** |
| Document Name: | **MOTION FOR DIRECTION CONCERNING THE AUTOMATIC STAY AS TO COUNTER DEFENDANTS**<br>        **CARRIE WARD AND JEFFREY STEPHAN AND POTENTIAL OTHER PARTIES BY AMENDMNET & REQUEST FOR A HEARING AS TO THOSE COUNTER DEFENDANTS ONLY (PULL DATE 7/17/12**<br>        **Filed by Attorney: Phillip Robinson Esq** |

| Doc No./Seq No.: | **22/1** |
|---|---|
| File Date: | **07/13/2012**  Entered Date: **07/16/2012**  Decision: |
| Party Type: | **Defendant**  Party No.: **4** |
| Document Name: | **COUNTER DEFENDANT JEFFREY STEPHAN'S RESPONSE TO COUNTER PLAINTIFF'S MOTION FOR**<br>        **DIRECTION CONCERNING THE AUTOMATIC STAY AS TO COUNTER DEFENDANTS CARRIE WARD AND JEFFREY STEPHAN AND POTENTIAL OTHER PARTIES BY AMENDMENT**<br>        **Filed by Attorney: Mark A Simanowith Esq** |

|  | **22/2** |
|---|---|

| | |
|---|---|
| Doc No./Seq No.: | |
| File Date: | **07/30/2012**    Entered Date: **07/31/2012**    Decision: |
| Document Name: | **Order of Court** |
| | **ORDERED THAT THE COUNTER-DEFENDANTS HAVE A RIGHT TO PROCEED WITH THEIR MOTIONS TO DISMISS AND MOTION TO SEVER. JUDGE MARTIN P WELCH** |

| | |
|---|---|
| Doc No./Seq No.: | **22/3** |
| File Date: | **07/31/2012**    Entered Date: **07/31/2012**    Decision: |
| Party Type: | **Defendant**    Party No.: **4** |
| Document Name: | **Copies Mailed** |
| | **Filed by Attorney: Erin M Brady Esq,Mark A Simanowith Esq,J Jonathan Schraub Esq,Eric A Frechtel Esq,Phillip Robinson Esq** |

| | |
|---|---|
| Doc No./Seq No.: **23/0** | |
| File Date: | **06/27/2012**    Entered Date: **06/27/2012**    Decision: |
| Document Name: | **Motion For Extension For Counter Plaintiff To Respond to Defendants GMAC's &** |

| | |
|---|---|
| Doc No./Seq No.: **24/0** | |
| File Date: | **07/20/2012**    Entered Date: **07/20/2012**    Decision: |
| Document Name: | **Notice Motion Hearing Sent** |
| | **Event: MOTN Block Date: 07/30/12 Facility: 228**<br>**PARTIES :**<br>**Robinson, Phillip 5500 Buckeystown Pike , Frederick, MD, 21703**<br>**Frechtel, Eric 1615 L Street,N.W. Suite 1350, Washington, DC, 20036**<br>**Ward, Carrie 4520 East West Highway, Suite 200 , Bethesda, MD, 20814**<br>**Simanowith, Mark 500 East Pratt Street 8th Floor, Baltimore, MD, 21201**<br>**Brady, Erin 312 Marshall Avenue Suite 800, Laurel, MD, 20707** |

| | |
|---|---|
| Doc No./Seq No.: **25/0** | |
| File Date: | **07/19/2012**    Entered Date: **07/23/2012**    Decision: |
| Document Name: | **Foreclosure Mediation Extended (Beyond 30 days to 10/9/12)** |

| | |
|---|---|
| Doc No./Seq No.: **26/0** | |
| File Date: | **07/25/2012**    Entered Date: **07/26/2012**    Decision: |
| Party Type: | **Plaintiff**    Party No.: **1** |
| Document Name: | **Notice of Filing Bankruptcy** |

| | |
|---|---|
| Doc No./Seq No.: | **27/0** |
| File Date: | **07/27/2012**    Entered Date: **07/27/2012**    Decision: |
| Document Name: | **Foreclosure Mediation Extended** |
| | **THE MEDIATOR FILES THE FOLLOWING REPORT OF THE MEDIATION PROCEEDING: BY AGREEMENT OF THE PARTIES, THE TIME FOR MEDIATION WAS EXTENDED BEYOND 30 DAYS TO 10/9/12** |
| | **FORECLOSURE MEDIATION DATE: 7/19/12** |
| | **MEDIATOR: MARY R CRAIG** |

| | |
|---|---|
| Doc No./Seq No.: **28/0** | |
| File Date: | **07/30/2012**    Entered Date: **07/30/2012**    Decision: |
| Document Name: | **Notice Motion Hearing Sent** |

**Event: MOTN Block Date: 08/06/12 Facility: 228**
**PARTIES :**
**Robinson, Phillip 5500 Buckeystown Pike , Frederick, MD, 21703**
**Frechtel, Eric 1615 L Street,N.W. Suite 1350, Washington, DC, 20036**
**Ward, Carrie 4520 East West Highway, Suite 200 , Bethesda, MD, 20814**
**Simanowith, Mark 500 East Pratt Street 8th Floor, Baltimore, MD, 21201**
**Brady, Erin 312 Marshall Avenue Suite 800, Laurel, MD, 20707**

---

Doc No./Seq No.: **29/0**
File Date:     **07/27/2012**   Entered Date: **07/30/2012**   Decision:
Document Name: **Attorney Appearance Filed**

---

Doc No./Seq No.:     **30/0**
File Date:     **08/01/2012**   Entered Date: **08/02/2012**   Decision:
Party Type:     **Defendant**   Party No.: **1**
Document Name:     **Defendant/Counter Plaintiff Kevin J Matthews' Supplemental Memorandum Of Law In**

**OPPOSITION TO COUNTER DEFENDANT JEFFERY STEPHAN'S MOTION TO DISMISS (DOC. 20)**

---

Doc No./Seq No.:     **30/1**
File Date:     **08/02/2012**   Entered Date: **08/03/2012**   Decision:
Party Type:     **Defendant**   Party No.: **4**
Document Name:     **Counder Defendant Jeffrey Stephan's Reply Memorandum To Defendant/Counter**

**PLAINTIFF KEVIN J MATTHEW'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO COUNTER DEFENDANT JEFFREY STEPHAN'S MOTION TO DISMISS**

---

Doc No./Seq No.:     **30/2**
File Date:     **08/29/2012**   Entered Date: **09/07/2012**   Decision:
Document Name:     **DEFENDANT/COUNTER PLAINTIFF KEVIN J MATTHEWS COMBINDED OPPOSITION TO COUNTER**

**DEFENDANTS GMAC MORTGAGE LLC, CARRIE WARDSS AND JEFFDREY STEPHAN'S MOTIONS TO DISMISS THE COUNTER PLAINTIFFS COUUNTER COMPLAINT (DOCS 15,20,21)**

---

Doc No./Seq No.: **31/0**
File Date:     **07/31/2012**   Entered Date: **08/02/2012**   Decision:
Party Type:     **Plaintiff**   Party No.: **1**
Document Name: **Amended Order to Docket Suit**

---

Doc No./Seq No.:     **32/0**
File Date:     **08/07/2012**   Entered Date: **08/09/2012**   Decision:
Document Name:     **ORDERED THAT THIRD-PARTY DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL**

**JURISDICTION IS HEREBY DENIED WITH PREJUDICE. THE OTHER ISSUES RAISED BY THIRD-PARTY DEFENDANT STEPHAN ARE TO BE ADDRESSED, ALONG WITH THOSE OF THE OTHER THIRD-PARTY AND COUNTER DEFENDANTS. (WELCH, J)**

---

Doc No./Seq No.: **33/0**
File Date:     **08/10/2012**   Entered Date: **08/14/2012**   Decision: **Denied**
Party Type:     **Defendant**   Party No.: **1**
Document Name: **Defendant/Counter Plaintiff's Motion to Dismiss And Strike Plaintiffs' Amended**
**ORDER TO DOCKET AND ORIGINAL ORDER TO DOCKET**

---

**33/1**

Doc No./Seq No.:

File Date: **08/24/2012**   Entered Date: **08/27/2012**   Decision:

Party Type: **Plaintiff**   Party No.: **1**

Document Name: **SUBSTITUTE TRUSTEES RESPONSE TO DEFENDANT'S MOTION TO DISMISS AND STRIKE**

**PLAINTIFFS AMENDED ORDER TO DOCKET AND ORIGINAL ORDER TO DOCKET Filed by Attorney: Erin M Brady Esq**

---

Doc No./Seq No.: **33/2**

File Date: **09/07/2012**   Entered Date: **09/11/2012**   Decision:

Party Type: **Defendant**   Party No.: **3**

Document Name: **REPLY MEMORANDUM IN SUPPORT OF CARRIE WARDS MOTION TO DISMISS**

**Filed by Attorney: J Jonathan Schraub Esq**
**Filed by Attorney: J Jonathan Schraub Esq**

---

Doc No./Seq No.: **33/3**

File Date: **09/18/2012**   Entered Date: **09/20/2012**   Decision:

Party Type: **Defendant**   Party No.: **2**

Document Name: **Reply Memorandum In Support Of GMAC Mortgage, LLC'S Motion To Dismiss**

---

Doc No./Seq No.: **33/4**

File Date: **09/20/2012**   Entered Date: **09/21/2012**   Decision:

Party Type: **Plaintiff**   Party No.: **1**

Document Name: **Counter Defendant Jeffrey Stephan's Reply Memorandum in Further Support of Motion to Dismiss.**

---

Doc No./Seq No.: **33/5**

File Date: **03/04/2013**   Entered Date: **03/05/2013**   Decision:

Document Name: **Ordered the motion is not under oath or supported by an affidavit Md Rule 14-211**

**(a)(3)(A). The motion fails to provide a factural and legal basis of a defense that the movant has to the validity of the lien or lien instrument or the right of the plaintiff to foreclose. Md Rule 14-211 (a)(3)(B) and 14-211(b)(1)(C). Movant arguses that an order to docket may not be amended because it is not a pleading. However, in accordance with Maryland Rule 14-207, an order to docket is a pleading. (Pierson, J)**

---

Doc No./Seq No.: **33/6**

File Date: **03/04/2013**   Entered Date: **03/05/2013**   Decision:

Document Name: **Copies Mailed**

---

Doc No./Seq No.: **34/0**

File Date: **09/04/2012**   Entered Date: **09/05/2012**   Decision:

Document Name: **NOTICE OF DISMISSAL WITOUT PREJUDICE OF COUNT 1 ONLY OF COUNTER PLAINTIFF'S**

**COUNTER COMPLAINT & NOTICE THAT COUNTER PLAINTIFF HAS ASKED THE U.S. BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK TO LIFT THE AUTOMATIC STAY RELATED TO THIS ACTION**

---

Doc No./Seq No.: **35/0**

File Date: **10/10/2012**   Entered Date: **10/10/2012**   Decision:

Document Name: **Foreclosure Mediation Concluded Agreement Not Reached (Failed)**

**THE MEDIATOR FILES THE FOLLOWING REPORT OF THE MEDIATION PROCEEDING: THE PARTIES PARTICIPATED IN THE MEDIATION BUT NO AGREEMENT WAS REACHED.**

**FORECLOSURE MEDIATION DATE: 7/19/12 & 10/9/12**

**MEDIATOR: ALJ MARY R CRAIG**

---

Doc No./Seq No.: **36/0**
File Date:     **10/24/2012**   Entered Date: **10/25/2012**   Decision:
Party Type:    **Defendant**   Party No.: **1**
Document Name: **Line Request For Writ of Summons**

---

Doc No./Seq No.: **37/0**
File Date:     **10/24/2012**   Entered Date: **10/25/2012**   Decision:
Document Name: **Order Lifting Bankruptcy Stay (11-12020(MG)**

---

Doc No./Seq No.:     **38/0**

File Date:     **10/24/2012**   Entered Date: **10/25/2012**   Decision:
Document Name:     **NOTICE OF DISMISSAL WITHOUT PREJUDICE AS TO COUNTER DEFENDANT GMAC MORTGAGE LLC ONLY**

---

Doc No./Seq No.:     **39/0**
File Date:     **10/26/2012**   Entered Date: **10/26/2012**   Decision: **Denied**
Document Name:     **Defendant' Rule 14-211 Renewed Motion to Dismiss, Or In The Alternative Motion**

**TO STAY FORECLOSURE PROCEEDINGS PENDING RESOLUTION OF LEGAL QUESTIONS & REQUEST FOR JURY TRIAL SET FORTH IN HIS COUNTER COMPLAINT PENDING BEFORE THIS COURT & REQUEST FOR HEARING**

---

Doc No./Seq No.:     **39/1**
File Date:     **03/04/2013**   Entered Date: **03/05/2013**   Decision:
Document Name:     **Ordered that the defendant argues that a Notice of Intent to Foreclose should**

**identify all secured parties and that, although the failure to identify all parties is not a basis for dismissing a foreclosure action in all cases sucha dismisal is required here pursuant to Shephered v Burson 427 Md 541 (2012). See Original Order etc.....(Pierson, J)**

---

Doc No./Seq No.: **39/2**
File Date:     **03/04/2013**   Entered Date: **03/05/2013**   Decision:
Document Name: **Copies Mailed**

---

Doc No./Seq No.: **40/0**
File Date:     **10/24/2012**   Entered Date: **10/26/2012**   Decision:
Party Type:    **Defendant**   Party No.: **1**
Document Name: **Amended Counter Complaint & Jury Demand**

---

Doc No./Seq No.: **41/0**
File Date:     **11/13/2012**   Entered Date: **11/14/2012**   Decision:
Party Type:    **Plaintiff**   Party No.: **1**
Document Name: **Joint Stipulation to Extend Time for Counter Defendant Jeffrey Stephan To Respond To counter plaintiff Kevin J. Matthews' Amended Counterclaim.**

---

Doc No./Seq No.: **42/0**

File Date:       **11/13/2012**  Entered Date: **11/14/2012**  Decision: **Granted**
Party Type:      **Defendant**  Party No.: **3**
Document Name: **Motion to Dismiss the amended counter complaint**

---

Doc No./Seq No.:   **42/1**
File Date:       **11/19/2012**  Entered Date: **12/12/2012**  Decision:
Document Name:   **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR STAY**
                 **FORECLOSURE**

---

Doc No./Seq No.:   **42/2**
File Date:       **10/23/2013**  Entered Date: **10/30/2013**  Decision:
Document Name:   **Order of Court**
                 **UPON CONSIDERATION OF THE COUNTER-DEFENDANT CARRIE WARD'S MOTION TO
                 DISMISS DEFENDANT KEVIN MATTHEWS' AMENDED COUNTER-COMPLAINT AND THE
                 OPPOSITION THERETO AND THE COUFNTER-DEFENDANT JFEFFREY STEPHAN'S MOTION TO
                 DISMISS DEFENDANT KEVIN MATTHEWS' AMENDED COUNTER-COMPLAINT AND THE
                 OPPOSITION THERETO AND A CONSDERATION OF THE ARGUMENTS OF COUNSEL MADE ON
                 THE RECCORD ON APRIL 19, 2013
                 FOUND THAT THE AMENDED COUNTER-COMPLAINT RAISES CLAIMS AGAINST THREE
                 COUNTER DEFENDANTS WHO ARE NOT PARTIES TO THE ORIGINAL ACTION BETWEEN THE
                 PLAINTIFF AND THE DEFENDANT, AND IT IS FURTHER
                 FOUND THAT NONE OF THE CLAIMS RAISED IN THE AMENDED COUNTER-COMPLAINT
                 NEGATE OR DEFEAT THE CLAIMS RAISED BY THE PLAINTIFF AGAINST THE DEFENDANT IN
                 THE ORIGINAL ACTION, SEE, BILLMAN V STATE OF MARYLAND DEPOSIT INSURANCE FUND
                 CORPORATION, 88 MD. APP, 79, 95 (1989) AND IT IS FURTHER
                 ORDERED THAT COUNTER-DEFENDANT CARRIE WARD'S MOTION TO DISMISS IS GRANTED,
                 AND IT IS FURTHER
                 ORDERED THAT OUNTER-DEFENDANT JEFFREY STEPHAN'S MOTION TO DISMISS IS
                 GRANTED, AND IT IS FURTHER
                 ORDERED THAT COUNTER-DEFENDANT JEFFRY STEPHYAN'S MOTION TO DISMISS IS
                 GRANTED. JUDGE YOLAND A TANNER**

---

Doc No./Seq No.: **42/3**
File Date:       **10/30/2013**  Entered Date: **10/30/2013**  Decision:
Document Name: **Copies Mailed**

---

Doc No./Seq No.: **42/4**
File Date:       **12/10/2013**  Entered Date: **12/17/2013**  Decision:
Party Type:      **Defendant**  Party No.: **4**
Document Name: **ERROR**

---

Doc No./Seq No.: **43/0**
File Date:       **11/15/2012**  Entered Date: **11/16/2012**  Decision:
Party Type:      **Plaintiff**  Party No.: **1**
Document Name: **Joint Stipulation to Extend Time For Plaintiffs' Response**

---

Doc No./Seq No.:   **43/1**
File Date:       **12/04/2012**  Entered Date: **12/04/2012**  Decision:
Document Name:   **DEFENDANT/COUNTER PLAINTIFF KEVIN J MATTHEWS OPPOSITION TO COUNTER
                 DEFENDANT**
                 **CARRIE WARD'S MOTION TO DISMISS THE AMENDED COUNTER COMPLAINT &
                 DEFENDANT/COUNTER PLAINTIFF KEVIN J MATTHEWS CROSS MOTION FOR PARTIAL**

**SUMMARY JUDGMENT AGAINST CARRIE WARD'S MOTION TO DISMISS REQUEST FOR HEARING**

Doc No./Seq No.: **43/2**

File Date: **10/23/2013**  Entered Date: **10/30/2013**  Decision: **Denied**

Document Name: **Order of Court**

**UPON CONSIDERATION OF THE COUNTER-PLAINTIFF'S MOTION FOR PATIAL SUMMARY JUDGEMENT WITH RESPECT TO CLAIMS AGAINST COUNTER-DEFENDANT CARRIE WARD, AND THE COUNTER-PLAINTIFF'S MOTION FOR PATIAL SUMMARY JUDGMENT WITH RESPECT TO CLAIMS AGAINST COUNTER-DEFENDANT JEFFREY STEPHAN, THE ARGUMENTS MADE ON THE RECORD ON APRIL 19TH, 2013, AND THE ENTIRE RECORD
ORDERED THAT THE MOTION FOR PATRIAL SUMMARY JUDGMENT IS DENIED AS MOOT IN LIGHT OF THE COURT'S DISMISSAL OF THE COUNTER-COMPLAINT AS TO DEFENDANT CARRIE WARD, AND IT IS FURTHER
ORDERED THAT THE MOTION FOR PARTIAL SUMMARY JUDGEMENT IS DENIED AS MOOT IN LIGHT OF THE COURT'S DISMISSAL OF THE COUNTER-COMPAINT AS TO DEFENDANT JEFFREY STEPHAN. JUDGE YOLANDA TANNER**

Doc No./Seq No.: **43/3**

File Date: **10/30/2013**  Entered Date: **10/30/2013**  Decision:

Document Name: **Copies Mailed**

Doc No./Seq No.: **44/0**

File Date: **11/19/2012**  Entered Date: **11/20/2012**  Decision:

Party Type: **Plaintiff**  Party No.: **1**

Document Name: **Motion to Dismiss or stay foreclosure**

Doc No./Seq No.: **45/0**

File Date: **11/27/2012**  Entered Date: **11/27/2012**  Decision:

Party Type: **Defendant**  Party No.: **4**

Document Name: **Motion to Dismiss amended counter complaint with request for hearing**

Doc No./Seq No.: **46/0**

File Date: **12/05/2012**  Entered Date: **12/07/2012**  Decision:

Document Name: **ERROR**

Doc No./Seq No.: **47/0**

File Date: **12/06/2012**  Entered Date: **12/11/2012**  Decision:

Document Name: **DEFENDANT/COUNTER PLAINTIFF KEVIN J MATTHEWS MOTION TO CORRECT MISNOMER &
RELATED DOCKET ENTERY**

Doc No./Seq No.: **48/0**

File Date: **11/26/2012**  Entered Date: **12/12/2012**  Decision:

Document Name: **COUNTER DEFENDANT JEFFREY STEPHAN'S MOTION TO DISMISS AMENDED COUNTER COMPLAINT
WITH REQUEST FOR HEARING**

Doc No./Seq No.: **48/1**

File Date: **12/14/2012**  Entered Date: **12/17/2012**  Decision:

Document Name: **DEFENDANT/COUNTER PLAINTIFF KEVIN J MATTHEWS OPPOSITION TO COUNTER DEFENDANT**

JEFFREY D STEPHAN'S MOTION TO DISMISS THE AMENDED COUNTER COMPLAINT (DOC 43) & DEFENDANT/COUNTER PLAINTIFF KEVIN J MATTHEWS CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST JEFFREY STEPHAN & REQUEST FOR HEARING

| Doc No./Seq No.: | 48/2 |
|---|---|
| File Date: | 12/14/2012  Entered Date: 12/17/2012  Decision: |
| Document Name: | MEMORANDUM OF POINTS AND AUTHORITIES OF THIRD PARTY DEFENDANT CARRIE WARD |
| | IN OPPOSITION TO MATTHEWS MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN FURTHER SUPPORT OF WARD'S MOTION TO DISMISS |

| Doc No./Seq No.: | 48/3 |
|---|---|
| File Date: | 01/09/2013  Entered Date: 01/11/2013  Decision: |
| Document Name: | OPPOSITION TO DEFENDANT/COUNTER PLAINTIFF KEVIN J MATTHEWS MOTION FOR PARTIAL |
| | SUMMARY JUDGMENT AND MEMORANDUM IN FURTHER SUPPORT OF COUNTER DEFENDANT JEFFREY STEPHAN'S MOTION TO DISMISS AMENDED COUNTER COMPLAINT |

| Doc No./Seq No.: | 48/4 |
|---|---|
| File Date: | 04/10/2013  Entered Date: 04/15/2013  Decision: |
| Party Type: | Interested Party  Party No.: 1 |
| Document Name: | ANSWER TO AMENDED COUNTER COMPLAINT |

| Doc No./Seq No.: | 49/0 |
|---|---|
| File Date: | 01/11/2013  Entered Date: 01/14/2013  Decision: Denied |
| Party Type: | Defendant  Party No.: 1 |
| Document Name: | Motion for Sanctions Against the Trustees for Violation of Confidential |
| | Mediation Communications (pull date 2/1/13) |
| | Filed by Attorney: Phillip Robinson Esq |
| | Filed by Attorney: Phillip Robinson Esq |

| Doc No./Seq No.: | 49/1 |
|---|---|
| File Date: | 02/06/2013  Entered Date: 02/07/2013  Decision: |
| Document Name: | Plaintiffs Response to Defendant's Motion for Sanctions Against the Trustees |
| | For Violation of Confidential Mediation Communications |

| Doc No./Seq No.: | 49/2 |
|---|---|
| File Date: | 10/23/2013  Entered Date: 10/30/2013  Decision: |
| Document Name: | Order of Court |
| | UPON CONSIDRATION OF THE DEFENDANT KEVIN JERRON MATTHEWS' MOTION FOR SANCTIONS FOR VIOLATIONS AND THE ARGUMENTS MADE ON THE RECORD AT THE HEARING ON APRIL 19TH, 2013 |
| | FOUND THAT THE DEFENDANT SEEKS TO HAVE THE COMPLAINT DISMISSED AS A SANCTION FOR A ALLEGED VIOLATION OF CONFIDENTIALITY IN COMMUNICATIONS IN MEDIATION, AND IT IS FURTHER |
| | FOUND THAT THERE IS NO SHOWING OF HARM TO THE DEFENDANT AS A RESULT OF THE ALLEGED VIOLATION, AND IT IS FURTHER |
| | ORDERED THAT THE MOTION FOR SANCTIONS IS DENIED. JUDGE YOLANDA TANNER |

| Doc No./Seq No.: | 49/3 |
|---|---|
| File Date: | 10/30/2013  Entered Date: 10/30/2013  Decision: |
| Document Name: | Copies Mailed |

| Doc No./Seq No.: | 50/0 |
|---|---|
| File Date: | 01/16/2013  Entered Date: 02/11/2013  Decision: |
| Party Type: | Plaintiff  Party No.: 1 |

**Document Name:** **Affidavit of Service of Process Upon Counter Defendant USSA**

---

**Doc No./Seq No.:** **51/0**
**File Date:** **01/16/2013**  Entered Date: **02/11/2013**  Decision:
**Party Type:** **Plaintiff**  Party No.: **1**
**Document Name:** **Affidavit of Reservice of Process Upon Counter Defendant USSA**

---

**Doc No./Seq No.:** **52/0**
**File Date:** **02/07/2013**  Entered Date: **02/12/2013**  Decision:
**Party Type:** **Defendant**  Party No.: **1**
**Document Name:** **Counter Plaintiffs Rule 2-613 Request for Immediate Entry of Default Against
Counter Defendant USAA Federal Savings Bank("USAA").**

---

**Doc No./Seq No.:** **53/0**
**File Date:** **03/19/2013**  Entered Date: **03/19/2013**  Decision:
**Document Name:** **Notice Motion Hearing Sent**

   **Event: MOTN Block Date: 04/19/13 Facility: 404B**
   **PARTIES :**
   **Robinson, Phillip 5500 Buckeystown Pike , Frederick, MD, 21703**
   **Schraub, J 1481 Chain Bridge Road Suite 200, McLean, VA, 22101**
   **Simanowith, Mark 500 East Pratt Street 8th Floor, Baltimore, MD, 21201**
   **USAA Federal Savings Bank, 9800 Fredericksburg Road , San Antonio, TX, 78288**
   **Brady, Erin 312 Marshall Ave #800 , Laurel, MD, 20707**

---

**Doc No./Seq No.:** **54/0**
**File Date:** **03/19/2013**  Entered Date: **03/19/2013**  Decision:
**Document Name:** **Notice Motion Hearing Sent**

   **Event: MOTN Block Date: 04/19/13 Facility: 404B**
   **PARTIES :**
   **Robinson, Phillip 5500 Buckeystown Pike , Frederick, MD, 21703**
   **Schraub, J 1481 Chain Bridge Road Suite 200, McLean, VA, 22101**
   **Simanowith, Mark 500 East Pratt Street 8th Floor, Baltimore, MD, 21201**
   **USAA Federal Savings Bank, 9800 Fredericksburg Road , San Antonio, TX, 78288**
   **Brady, Erin 312 Marshall Ave #800 , Laurel, MD, 20707**

---

**Doc No./Seq No.:** **55/0**
**File Date:** **03/21/2013**  Entered Date: **03/21/2013**  Decision:
**Document Name:** **Notice Motion Hearing Sent**

   **Event: MOTN Block Date: 04/19/13 Facility: 451**
   **PARTIES :**
   **Robinson, Phillip 5500 Buckeystown Pike , Frederick, MD, 21703**
   **Schraub, J 1481 Chain Bridge Road Suite 200, McLean, VA, 22101**
   **Simanowith, Mark 500 East Pratt Street 8th Floor, Baltimore, MD, 21201**
   **USAA Federal Savings Bank, 9800 Fredericksburg Road , San Antonio, TX, 78288**
   **Brady, Erin 312 Marshall Ave #800 , Laurel, MD, 20707**

---

**Doc No./Seq No.:** **56/0**
**File Date:** **04/09/2013**  Entered Date: **04/09/2013**  Decision:
**Document Name:** **Notice Motion Hearing Sent**

   **Event: MOTN Block Date: 04/19/13 Facility: 451**
   **PARTIES :**
   **Robinson, Phillip 5500 Buckeystown Pike , Frederick, MD, 21703**
   **Schraub, J 1481 Chain Bridge Road Suite 200, McLean, VA, 22101**
   **Simanowith, Mark 500 East Pratt Street 8th Floor, Baltimore, MD, 21201**
   **USAA Federal Savings Bank, 9800 Fredericksburg Road , San Antonio, TX, 78288**
   **Brady, Erin 312 Marshall Ave #800 , Laurel, MD, 20707**

---

**Doc No./Seq No.:** **57/0**
**File Date:** **04/19/2013**  Entered Date: **04/22/2013**  Decision:
**Party Type:** **Defendant**  Party No.: **1**
**Document Name:** **Notice Of Dismissal without Prejudice As To Counter Carrie Ward (only)**

| Doc No./Seq No.: | **58/0** | | |
|---|---|---|---|
| File Date: | **11/22/2013** | Entered Date: **11/27/2013** | Decision: **Denied** |
| Party Type: | **Defendant** | Party No.: **1** | |
| Document Name: | **Counter Plt's Motion to Alter or Amend or Revise the Judgment of the Court of** | | |
| | **October 23, 2013 Dismissing Certain Parties from the Counter Plt's Counter Complaint & Request for Hearing (pull 12/16/13)** | | |

| Doc No./Seq No.: | **58/1** | | |
|---|---|---|---|
| File Date: | **12/10/2013** | Entered Date: **01/16/2014** | Decision: |
| Party Type: | **Defendant** | Party No.: **4** | |
| Document Name: | **Jeffrey Stephan's Opposition to Def/Counter Plt Kevin J Matthews's Motion to** | | |
| | **Alter or Amend or Revise the Judgment of the Court of October 23, 2013 Dismissing Certain Parties from the Counter Plt's Counter Complaint** | | |

| Doc No./Seq No.: | **58/2** | | |
|---|---|---|---|
| File Date: | **03/18/2014** | Entered Date: **03/18/2014** | Decision: |
| Document Name: | **Ordered that the Court's ruling of October 23, 2013 as to Counter-Defendant** | | |
| | **Carrie Ward's Motion to Dismiss (paper #42) is VACATED in light of the Counter-Plaintiff's Notice of Dismissal as to Counter Defendant Carrie Ward (paper#57), and it is further Ordered that Motion to Alter or Amend the Court's ruling of October 23, 2013 as it relates to all other matters is DENIED. (Tanner, J)** | | |

| Doc No./Seq No.: | **58/3** | | |
|---|---|---|---|
| File Date: | **03/07/2014** | Entered Date: **03/18/2014** | Decision: |
| Document Name: | **Copies Mailed** | | |

| Doc No./Seq No.: | **59/0** | | |
|---|---|---|---|
| File Date: | **01/24/2014** | Entered Date: **01/24/2014** | Decision: |
| Document Name: | **Hearing/Trial Notice Sent** | | |
| | **Event: HEAR Block Date: 02/25/14 Facility: 438** | | |
| | **PARTIES :** | | |
| | **Robinson, Phillip 5500 Buckeystown Pike , Frederick, MD, 21703** | | |
| | **Schraub, J 1481 Chain Bridge Road Suite 200, McLean, VA, 22101** | | |
| | **Simanowith, Mark 500 East Pratt Street 8th Floor, Baltimore, MD, 21201** | | |
| | **USAA Federal Savings Bank, 9800 Fredericksburg Road , San Antonio, TX, 78288** | | |
| | **Brady, Erin 312 Marshall Ave #800 , Laurel, MD, 20707** | | |

| Doc No./Seq No.: | **60/0** | | |
|---|---|---|---|
| File Date: | **02/12/2014** | Entered Date: **02/12/2014** | Decision: |
| Document Name: | **Batch Hearing Notice Sent** | | |
| | **Event: HEAR Block Date: 02/25/14 Facility: 438** | | |
| | **PARTIES :** | | |
| | **Robinson, Phillip 5500 Buckeystown Pike , Frederick, MD, 21703** | | |
| | **Schraub, J 1481 Chain Bridge Road Suite 200, McLean, VA, 22101** | | |
| | **Simanowith, Mark 500 East Pratt Street 8th Floor, Baltimore, MD, 21201** | | |
| | **USAA Federal Savings Bank, 9800 Fredericksburg Road , San Antonio, TX, 78288** | | |
| | **Brady, Erin 312 Marshall Ave #800 , Laurel, MD, 20707** | | |

| Doc No./Seq No.: | **61/0** | | |
|---|---|---|---|
| File Date: | **02/25/2014** | Entered Date: **02/27/2014** | Decision: **Denied** |
| Party Type: | **Defendant** | Party No.: **1** | |
| Document Name: | **Motion to Stay of the Foreclosure Proceedings Pending Final Settlement & Claims** | | |

Case Information                                                                    Page 18 of 18
  12-12020-mg    Doc 7094-2    Filed 06/12/14    Entered 06/12/14 13:10:44    Exhibit 2 -
                         Delehey Declaration    Pg 117 of 119

**Administration in the Matter Known as In Re Residential Capital, LLC & Request for
Hearing**

---

**Doc No./Seq No.:** **61/1**

**File Date:** **03/18/2014** **Entered Date:** **03/20/2014** **Decision:**

**Party Type:** **Plaintiff** **Party No.:** **1**

**Document Name:** **Plaintiffs Response in Opposition to Matthews Motion for Stay of the Foreclosure**

---

**Doc No./Seq No.:** **61/2**

**File Date:** **03/28/2014** **Entered Date:** **03/31/2014** **Decision:**

**Party Type:** **Defendant** **Party No.:** **1**

**Document Name:** **Reply In Support of Defendant Kevin Matthews Motion for Stay of The Foreclosure**

**Proceedings Pending Final Settlement & Claims Administration in the Matter Know as in
Re Residential Capital LLC with Exhibits 1-6.**

---

**Doc No./Seq No.:** **61/3**

**File Date:** **04/01/2014** **Entered Date:** **04/01/2014** **Decision:**

**Document Name:** **Order Denying Motion to Stay (Heard, J) 04/01/14**

**ORDERED that the motion is untimely filed not under oath or supported by affidavit and the
motion does not on its face state a valid defense to the validity of the lien or the lien
instrument or to the right of the plt to foreclose in the pending action. MD Rule 14-211(b)
(1). (Heard, J)**

---

**Doc No./Seq No.:** **61/4**

**File Date:** **04/01/2014** **Entered Date:** **04/01/2014** **Decision:**

**Document Name:** **Copies Mailed**

---

*This is an electronic case record. Full case information cannot be made available either because of legal restrictions
on access to case records found in Maryland rules 16-1001 through 16-1011, or because of the practical difficulties
inherent in reducing a case record into an electronic format.*

**<u>Exhibit F to Declaration</u>**

12-02030-mg    Doc 6094-2    Filed 06/13/14    Entered 06/13/14 16:30:10    Exhibit 2g
07/30/2012    02:15         4105451   Delehey Declaration    Pg 119 of 119

PAGE  02/03

| | | |
|---|---|---|
| | * | **IN THE** |
| **LAURA H.G. O'SULLIVAN**, *et al.* | * | |
| *Plaintiffs,* | * | **CIRCUIT COURT** |
| | * | |
| **v.** | * | **FOR** |
| | * | |
| **KEVIN J. MATTHEWS,** | * | **BALTIMORE CITY** |
| *Defendant.* | * | |
| | * | **CASE NO.: 24-O-12-000286** |
| * * * * * * | * | * * * * * * |

## ORDER

The above-captioned matter came before the Circuit Court for Baltimore City, Part 18, for a hearing on Defendant/Counter-Plaintiff's Motion for Direction Concerning the Automatic Stay as to Counter-Defendants Carrie Ward and Jeffrey Stephan and Potential Other Parties by Amendment (Paper No. 22000). A hearing was held on July 30, 2012, before the Honorable Martin P. Welch. Phillip Robinson, Esq., appeared on behalf of Kevin J. Matthews, Defendant/Counter-Plaintiff; Eric A. Frechtel, Esq., appeared on behalf of GMAC Mortgage, LLC, Counter-Defendant; J. Jonathan Schraub, Esq., appeared on behalf of Carrie Ward, Counter-Defendant; and Mark A. Simanowith, Esq., appeared on behalf of Jeffrey Stephan, Counter-Defendant.

After reviewing the Final Supplemental Order rendered by the United States Bankruptcy Court, Southern District of New York, In re: Residential Capital, LLC, *et al.*, Case Number 12-12020 (MG), paragraph 14(b), the Court finds that paragraph 14(b) does not preclude the pursuance and consideration of any dispositive Motions to Dismiss filed prior to this order.

The Court further finds that the parties' pursuance of such motions and the Court's consideration of such motions does not violate the automatic stay  It is, therefore, this ___30th___ day of July, 2012,

**ORDERED** that the Counter-Defendants **HAVE A RIGHT TO PROCEED** with their Motions to Dismiss and Motion to Sever.

> Honorable Martin P. Welch
> _____
> The Judge's Signature Appears On The
> Original Document

TRUE COPY
TEST

FRANK M. CONAWAY, CLERK



**EXHIBIT**

**F**