**MORRISON COHEN LLP**
909 Third Avenue
New York, New York 10022
(212) 735-8600
Joseph T. Moldovan, Esq.
Robert K. Dakis, Esq.

*Attorneys for the Independent Directors*
*of the Residential Capital, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | : | |
| | : | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | : | |
| | : | Case No. 12-12020 (MG) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

**RESPONSE TO LIMITED OBJECTION OF THE RESCAP LIQUIDATING TRUST TO THE FINAL APPLICATION OF MORRISON COHEN LLP FOR ALLOWANCE OF COMPENSATION FOR PROFESSIONAL SERVICES RENDERED AND EXPENSES INCURRED DURING THE PERIOD FROM MAY 14, 2012 THROUGH DECEMBER 16, 2013**

Morrison Cohen LLP ("MoCo"), Counsel to the Independent Directors of Residential Capital, LLC (the "Independent Directors"), hereby submits this reply to the Limited Objection of the ResCap Liquidating Trust to the Final Application of Morrison Cohen LLP for Allowance of Compensation For Professional Services Rendered and Expenses Incurred During the Period From May 14, 2012 through December 16, 2013, dated June 10, 2015 (Docket No. 7084) (the "Objection"). In response to the Objection and in further support of MoCo's Fifth Interim and Final Fee Application (Docket No. 6555) (the "Fee Application"), MoCo respectfully represents as follows:

## PRELIMINARY STATEMENT

1.    The ResCap chapter 11 cases were an unqualified success. As a result of the work of many parties including the ResCap Board of Directors, ResCap's Chief Restructuring Officer, ResCap's advisors (including MoCo), the Creditors' Committee, and the extraordinary efforts of the Honorable James M. Peck as mediator, ResCap was able to achieve a consensual plan of reorganization that will return over $4 billion to creditors. Rather than recognize the tremendous effort performed at all levels, the ResCap Liquidating Trust (the "Trust") now complains that one of the costs of achieving this result was not necessary. In particular, the Trust seeks to gut the fees of MoCo, which served as counsel to the Independent Directors. The Trust's objection, however, is devoid of merit and evidences a surprising lack of knowledge as to what actually happened in these cases. Not only does the Trust misunderstand the central role that the Independent Directors played in these cases, the Trust's "analysis" of MoCo's Fee Application disregards the actual content of the invoices submitted.

2.    The central premise of the Trust's objection is the unsupportable allegation that Independent Directors did not play a "central role" in the case, and that their role was "necessarily limited." *See* Objection at ¶ 19. Relying on this flawed premise, the Trust contends that counsel to the Independent Directors should not have (i) attended hearings, (ii) attended the auction, (iii) assisted in the preparation of their client's depositions, examiner interviews, document productions and proposed hearing testimony, (iv) performed research on legal issues necessary for the Independent Directors to properly manage and oversee these cases, or (v) held internal meetings regarding the case. The Trust, in essence, suggests that the filing of a chapter 11 case somehow divested the Independent Directors of their duty to act independently and seek independent advice, but proper corporate governance does not end simply because a chapter 11 case has been filed. As Lewis Kruger, the ResCap Chief Restructuring Officer ("CRO") explains in his Declaration of Lewis

2

Kruger in Opposition to the Objection of the ResCap Liquidating Trust to the Final Fee Application

of Morrison Cohen (the "Kruger Declaration"), "[w]ithout question the Independent Directors and

their counsel played a 'central role' in this case. The Liquidating Trust's statement to the contrary,

and the premise of its objection, is just plain wrong." Kruger Declaration at ¶ 8.

3.      The Objection wholly ignores the role that the Independent Directors actually played

in these cases. For the entirety of these cases, ResCap's board of directors (the "Board") consisted of

seven members. The Independent Directors were at all times a majority of the Board. As such, it was

the Independent Directors who (i) oversaw the filing of the cases and the successful prosecution of

the Debtors' first day motions, (ii) were declarants on numerous motions filed by the Debtors

throughout these cases, including motions relating to employee incentive and retention plans and the

retention of a CRO, (iii) were potential witnesses in the contentious litigation over proposed

settlements with the RMBS trusts, (iv) provided strategic advice in connection with the management

of an ongoing and operating business, (vi) oversaw the sale of a substantial portion of the Debtors'

assets and its loan servicing business, (vii) initiated and ran the process for selecting Lewis Kruger as

ResCap's chief restructuring officer ("CRO"), and (viii) ultimately agreed to contribute the D&O

insurance that covered the Independent Directors in order to facilitate the consensual confirmation of

the Debtors' plan of reorganization.

4.      As stated in both the Declaration of Pamela E. West In Support Of Morrison Cohen's

Final Fee Application And In Response To Limited Objection Of ResCap Liquidating Trust (the

"West Declaration") and the Declaration of John E. Mack In Support Of Morrison Cohen's Final Fee

Application And In Response To Limited Objection Of ResCap Liquidating Trust (the "Mack

Declaration"):

> Following the commencement of these Chapter 11 cases, the Board and the
> Independent Directors remained under constant scrutiny from nearly every
> constituency in the case. Given the level of interaction required by the Board, and the

nature of the prepetition relationship between the Debtors and their parent AFI Financial Inc. ("AFI"), the Independent Directors suffered frequent criticism from stakeholders and even concerns expressed by the Court. As a result, the Independent Directors were especially focused on ensuring that their consideration of critical issues arising in these Cases was guided by counsel who was truly independent and who would provide the Independent Directors with their own analysis and recommendations separate and apart from ResCap's counsel.

West Declaration at ¶ 12, Mack Declaration at ¶ 12.

5.      In order for the Independent Directors to appropriately discharge their duties, they relied on the advice of their counsel. Since its retention in 2008, MoCo has, at the Board's direction, advised the Independent Directors on every significant issue, litigation, transaction, and Board function, both pre and post petition. As such, it is consistent with both prior governance and best practices for the Independent Director's counsel to be involved in, and attend, those events that required the input of the Independent Directors. The Independent Directors' desire for independent advice from MoCo required that MoCo remain fully involved in the case, working at all times with the Debtors' general bankruptcy counsel and where appropriate with counsel to the Creditors' Committee and other constituents, in order to ensure that the Independent Directors had the information necessary to guide these cases to their successful conclusion.

6.      It is essential to recognize that the Board and the Independent Directors ran these cases for nine months prior to the retention of Lewis Kruger as the Debtors' CRO and that Mr. Kruger's retention did not eliminate the Independent Directors' role. Under the terms of his engagement, Mr. Kruger reported to the Board. *See* Kruger Declaration at ¶ 4. Mr. Kruger makes clear that the Independent Directors and their counsel were a "valuable component" of the team securing the impressive results in these cases. *Id.* at ¶ 8.

7.      MoCo helped achieve the successful resolution of these large and complex cases at a reasonable and appropriate cost. The total fees incurred by professionals in these cases exceed $400 million. MoCo's requested $4.2 million is 1% of the total professionals fees in these cases.

Moreover, MoCo leanly staffed the representation. Over the course of the 18 month fee period, MoCo staffed a total of 12 attorneys and 7 paraprofessionals on the case. Of those 12 attorneys, five core professionals incurred nearly 88% of the time spent. Those five professionals consisted of three seasoned bankruptcy attorneys with over 70 years of experience among them, a senior litigator, and a corporate partner who was involved in all facets of the ResCap representation, both pre and postpetition.

8.     Additionally, MoCo's hourly billing rates are nearly half that of large New York law firms. As such, the estates were able to realize the benefit of having a bankruptcy lawyer with over 30 years of experience for $685 an hour – which is nearly $100 less than that highest *associate* rate charged by the Creditors' Committee's professionals. Given (i) the total cost of MoCo's representation as against the total cost of these cases, (ii) the lean manner in which MoCo staffed this engagement, and (iii) the reasonableness of MoCo's rates, the Trust's argument that this matter was "heavily staffed" or that the estates did not receive a benefit from MoCo's services is utterly meritless.

9.     In addition to ignoring the importance of the Independent Directors and its counsel, and the reasonableness of MoCo's fees and staffing, the Objection further disregards the filed fee applications – it is as if the Trust did not even bother to read them. The Trust's pleading is replete with objections that even a cursory review of the filed fee application would have shown lack merit. Rather than do the leg work before calling into question a firm's role in the case, the Trust seems to have preferred relying on a lazy, mechanical, and rote review of materials ancillary to the filed Fee Application.

10.     The Trust's review further ignores that these applications are entirely consistent with the guidelines established by the United States Trustee's Office and the rules set forth by this Court for billing in these cases. Indeed, MoCo has throughout this case consensually resolved any concerns

raised by the United States Trustee, who has not objected to the Fee Application. MoCo respectfully

requests that the Court deny the Objection and allow MoCo's fees with certain reductions, as set

forth below.

## RELEVANT BACKGROUND

### A.    Role of the Independent Directors

11.    The Trust's central contention is that the Independent Directors were merely

interested parties – passive onlookers – in the most complex mortgage-company chapter 11 ever

filed. *See, e.g.*, Objection at ¶¶ 19 (claiming the Independent Directors were not "central" to the

case); 36 (intimating that the Independent Directors' role was "necessarily limited"), 39 (classifying

the Independent Directors' role as "minimal"). The Trust, however, plainly misunderstands

corporate governance, how ResCap operated in bankruptcy, and how the case itself was conducted.

12.    The Independent Directors joined the ResCap Board between 2008 and 2011, during

the worst financial crisis in our nation's history. During this period, mortgage businesses like

ResCap faced enormous regulatory pressures and litigation exposures, had limited access to

financing, and had few options for restructuring. Nearly every significant mortgage company closed

its doors or was acquired for pennies on the dollar between 2008 and 2011.

13.    Navigating the minefield of the mortgage crisis proved a Herculean task, and required

an enormous effort from the entire ResCap Board, especially the Independent Directors. The ResCap

Board explored every strategic alternative to preserve ResCap's business while other mortgage

businesses failed. The ResCap Board was vigilant, attentive, informed and active. The Independent

Directors reviewed voluminous materials and met hundreds of times between 2008 and the Petition

Date, formally and informally, in board meetings, in committee meetings and with their counsel and

advisors. In addition to reviewing and approving transactions and settlements, which more often than

not were affiliate transactions, the Independent Directors were required to and did assume critical

6

roles in the Debtors' governance. Independent Directors sat on and chaired the Debtors' audit committee. Independent Directors sat on and chaired the Debtors' compensation committee. Independent Directors sat on the Consent Order Compliance Committee (the committee formed to ensure and monitor compliance with the Department of Justice and state attorneys general settlement entered into by the Debtors in 2012.

14.    In May 2012, having explored and pursued various strategic alternatives, the ResCap board elected to file for bankruptcy protection. On the Petition Date, the Board consisted of seven members. The four Independent Directors constituted the majority of the Board. Given the constitution of the Board, at least one Independent Director would be required for every vote on the direction of the Company and the cases. The filing of a chapter 11 case does not, in and of itself, alter the corporate governance of a debtor. See, e.g., *In re Texaco, Inc.*, 81 B.R. 806, 813 (Bankr. S.D.N.Y. 1988) (holding the "Chapter 11 Reorganization process is not the appropriate vehicle for introducing changes in [the debtor's] existing system of corporate governance"). As such, even post-filing at least one Independent Director would be necessary for every decision to be made during the course of these cases.

15.    Owing to the prepetition efforts of the ResCap directors, officers and management team, as well as ResCap's outside advisors, ResCap smoothly transitioned into bankruptcy while remaining an operating entity.  The board approved a prepetition agreement between ResCap and its parent Ally Financial, Inc. ("AFI") – negotiated by two of the Independent Directors – that provided ResCap with the ability to continue to originate mortgages even after commencing bankruptcy. The board also approved a prepetition settlement agreement with the trustees of up to 392 securitization trusts, ultimately allowing the sale of ResCap's assets without the overhang of future litigation, as the trustees deferred and capped their cure claims.

16.    These strategic prepetition agreements proved prescient, as they directly resulted in the Debtors' ability to sell their mortgage origination and servicing assets as part of a going concern – a result that had never been achieved by any significant mortgage servicer in bankruptcy. Again, this auction sale was conducted under the direction of the Independent Directors, who were the majority of the Board at that time. ResCap successfully sold the bulk of their assets to Ocwen Financial, Walter Investments and Berkshire Hathaway, generating over $4 billion in proceeds for the estates, and preserving 3,750 of 3,900 U.S.-based jobs.

17.    Just as the Independent Directors' responsibilities did not end with the filing of these chapter 11 cases, neither did their obligation to remain informed and to have the advice of their independent counsel. Indeed, as a matter of sound corporate governance, it was entirely appropriate for the Independent Directors to seek independent advice and counsel regarding nearly every significant transaction, litigation, event, and investigation conducted through these cases. As such, the Independent Directors urged MoCo to attend all board meetings (many of which concluded with a separate discussion only among the Independent Directors and their counsel) and board committee meetings, attend hearings, represent the Independent Directors as witnesses in hearings and investigations, participate in significant discovery obligations imposed on the Independent Directors during the course of these cases, and represent the interests of the Independent Directors at the mediation and plan negotiation sessions.

18.    In their declarations, Independent Directors Pam West and John Mack address a theme running throughout the Trust's Objection – that there were too many counsel involved in their representation:

> Where multiple MoCo attorneys were present at meetings, on calls, or in Court, it was at the direction of the their clients, the Independent Directors. The Independent Directors believed, and continue to believe, that MoCo's presence and participation was critical to the work of the Independent Directors.

8

Invariably calls or meetings covered multiple topics and were usually dealing with problems, emergencies, or matters in real time. Given the speed in which these cases moved, counsel to the Independent Directors were required to be present at all times. Moreover, it was necessary to have attorneys with skill in several disciplines such as bankruptcy, litigation, corporate governance, tax, and insurance, in order to ensure that the majority of the Board was adequately informed and advised by their chosen counsel.

In addition, inasmuch as the case was focused on the years of transactions that predated the filing as well as the prepetition settlements with the RMBS litigants, AFI, and various bondholders, the presence of those attorneys from MoCo who were actually involved in those prepetition transactions was essential. Their appearance in this case –even for only a few hours – was at the express direction of the Independent Directors and necessary for the Independent Directors to perform their duties.

West Declaration at ¶¶ 13-16; Mack Declaration at ¶¶ 13-16.

19.    The Independent Directors' and their counsel's, contributions directly affected the results in these cases. The Independent Directors controlled the Board during the successful auction of the Debtors' assets. Indeed, each Independent Director was in attendance at the auction in order to make real-time decisions with respect to the bidding and process, and the Board was in frequent consultation with its advisors regarding the auction process.

20.    Similarly, recognizing that creditor deadlock, and the lingering creditor concern about AFI's alleged control of the Debtors, was jeopardizing a consensual resolution of these cases, the Independent Directors took action to create an environment where a consensual resolution would be possible. To that end, the Independent Directors instructed their counsel to conduct a search and interview process for the selection of a CRO. The selection of Lewis Kruger as CRO proved to be the turning point of the case, as Mr. Kruger was able to provide the much-needed bridge across the warring factions, eliminate the concerns about AFI's influence and, with benefit of the successful mediation of the Honorable James Peck, facilitate a consensual plan of reorganization.

21.    Mr. Kruger worked regularly with the Independent Directors and their counsel, who played a significant role in all aspects of the case. Indeed, Mr. Kruger recognized and appreciated that the Independent Directors were deeply involved in the case and very cognizant and focused on

9

their duties to the estates and creditor constituencies -- which included seeking and receiving the

appropriate professional advice from MoCo in order to perform their duties in an environment that

was fraught with expressed (albeit meritless) concerns by creditors and the court about the

relationship between AFI and the debtors. As Mr. Kruger notes:

> The attorneys at Morrison Cohen representing the Independent Directors offered
> important and differing skill sets – corporate governance, litigation, bankruptcy,
> insurance and tax among them – all of which were brought to bear in order properly
> to advise the Independent Directors in fulfilling their duties.  During my tenure, I
> regularly consulted with counsel for the independent directors and found their
> strategic and legal analyses to be extremely helpful to me and ultimately to the
> benefit of ResCap estates and their creditors

Kruger Declaration at ¶ 7.

22.    Indeed, the involvement of the Independent Directors facilitated Mr. Kruger's

successful completion of his charge. The Independent Directors and their counsel provided not only

critical historical information about the transactions which formed the basis of a settlement with

AFI, but invaluable strategic and legal advice with respect to the conduct of the case, operational

matters, the Committee's 2004 investigation, the Examiner's investigation, settlements with the

RMBS litigants, claims against AFI and the creditors, analysis of the Junior Secured Noteholders'

claims and ultimate settlement, the DOJ AG Settlement, and insurance issues. Mr. Kruger was in

frequent communication with the Independent Directors and their counsel during the course of the

mediation, both to report and to seek their counsel, advice, and approvals.

23.    Moreover, in order to facilitate the Plan of Reorganization, the Independent Directors

sacrificed directors and officers liability insurance coverage (the "D&O Insurance") otherwise

available to them. As set forth in the confirmed plan of reorganization, the Directors waived their

rights to coverage under their insurance to aid AFI in facilitating a settlement with the carriers. AFI,

in turn, contributed the proceeds of that settlement to the Trust. As such, the Independent Directors

effectively contributed approximately $150 million to the results in these cases. See Disclosure

Statement For The Joint Chapter 11 Plan Proposed By Residential Capital, LLC, *et al.* And The Official Committee Of Unsecured Creditors, dated as of August 23, 2013 [Docket No. 4819-1] (the "Disclosure Statement") at 2.

24.    The Independent Directors were central to each and every facet of these cases. The Independent Directors' ability to remain flexible and to meet the challenges of the most successful mortgage company restructuring to date was nothing short of remarkable and was aided in large measure by work performed by their counsel MoCo.

### B.    The Independent Directors Were Authorized To Retain Counsel.

25.    In addition to being best practices, the Independent Directors were specifically authorized to retain their own counsel to advise them regarding the discharge of their duties. On July 14, 2008, ResCap adopted resolutions (the "2008 Resolutions") creating a Special Committee of Independent Directors (the "Special Committee") for the purpose of implementing a process and procedure for the approval of any material transactions entered into between ResCap and any affiliate (other than ResCap's subsidiaries) of ResCap and any of their respective affiliates (each, an "Affiliate Transaction"). The 2008 Resolutions authorized the Special Committee to engage experts and counsel in connection with the review of any Affiliate Transaction at the expense of ResCap.

26.    On December 5, 2011, ResCap updated the 2008 Resolutions (the "Updated Resolutions"), and delegated authority to certain Independent Directors acting as the Special Committee, to review and approve any Affiliate Transaction involving aggregate consideration of $10 million or more. Pursuant to the Updated Resolutions, the Independent Directors, as members of the Special Committee were authorized to retain counsel at the expense of ResCap.

27.    On December 5, 2011, ResCap also adopted resolutions (the "2011 New Resolutions") and appointed certain Independent Directors to serve together as a committee (the "Special Review Committee," and together with the Special Committee, the "Review Committees")

11

for the purpose of implementing a process and procedure for the review and assessment of (i) all Affiliate Transactions, (ii) the historic course of dealing and interrelationships between ResCap and AFI and their respective subsidiaries and affiliates and (iii) potential claims arising in relation to these transactions and interrelationships. Like the 2008 Resolutions and the Updated Resolutions, the 2011 New Resolutions authorized the Special Review Committee to engage legal counsel at the expense of ResCap.

28.     On August 29, 2012, ResCap adopted resolutions (the "2012 Resolutions"), which authorized members of the Review Committees to engage legal counsel, in respect of any Affiliate Transaction, including the review of Affiliate Transactions by the Examiner, at the expense of ResCap.

29.     As set forth in the Declaration of Tammy Hamzehpour In Support Of Debtors' Motion For The Entry Of An Order Under Section 363 Of The Bankruptcy Code Authorizing The Reimbursement Of Expenses Including Counsel Fees Incurred By The Independent Directors, dated September 5, 2012 [Docket No. 1356-4] (the "Hamzehpour Declaration"), the retention and payment of counsel to the Independent Directors was an ordinary course transaction. See Hamzehpour Declaration at ¶ 6.

**C.     The Role of Morrison Cohen In These Cases**

30.     In 2008, the Independent Directors retained MoCo to advise and represent them with respect to various corporate governance matters and in carrying out their duties as directors. MoCo was selected to represent the Independent Directors because of its extensive experience counseling corporations and their independent directors in connection with complex transactions and other matters requiring strategic planning, especially in distressed situations.

31.     In furtherance of its duties as counsel to the Independent Directors, MoCo reviewed and advised on nearly every Affiliate Transaction between the Debtors and their ultimate parent AFI.

MoCo further reviewed and advised the Independent Directors regarding potential claims and causes of action against AFI.

32.     During the course of these cases, MoCo continued the same advisory role it performed prepetition. The Independent Directors instructed the Debtors' counsel that their counsel was to be consulted regarding critical events in case. Consistent with their operation prepetition, the Independent Directors continued to consult with their Independent Counsel regarding events that directly affected their charge as Independent Directors. Given their central role in navigating the relationship between the Debtors and AFI, that proved to include nearly every key issue in the case.

33.     Indeed, MoCo was required to represent the Independent Directors in their capacities as declarants at hearings, providers of documents in response to subpoenas from the Examiner, witnesses before the Examiner, potential witnesses in the contentious RMBS settlement litigation, and at all plan negotiations and mediations.

34.     The necessity of MoCo's involvement at all levels of the case is best evidenced by the settlements reflected in the confirmed plan of reorganization. Pursuant to the Plan, the Independent Directors released their rights to indemnification from the Debtors and AFI, and released coverage available to them under their Directors and Officers insurance, which effectively resulted in an additional $150 million for distribution to unsecured creditors. See Disclosure Statement at 2. That settlement would not have been achievable without their counsel's involvement in the case.

## RESPONSE TO LIMITED OBJECTION

### A.     MoCo's Fees and Rates Are Objectively Reasonable, Actual and Necessary

35.     Section 330(a)(1)(A) of the Bankruptcy Code provides, in pertinent part, that the Court may award to a professional person, "reasonable compensation for actual, necessary services rendered." Section 330(a)(3)(A), in turn, provides that:

In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3)(A).

36.    The congressional policy expressed above provides for adequate compensation in order to continue to attract qualified and competent professionals to bankruptcy cases. *In re Busy Beaver Bldg. Ctrs., Inc.*, 19 F.3d 833, 850 (3d Cir. 1994) ("Congress rather clearly intended to provide sufficient economic incentive to lure competent bankruptcy specialists to practice in the bankruptcy courts.") (citation and internal quotation marks omitted); *In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. at 18 (Bankr. S.D.N.Y. 1991) ("Congress' objective on requiring that the market, not the Court, establish attorneys' rates was to ensure that bankruptcy cases were staffed by appropriate legal specialists").

37.    The applicant bears the initial burden of proof on its claim for compensation. *See, e.g., Houlihan Lokey Howard & Zukin Capital v. High River Ltd. P'Ship*, 369 B.R. 111, 115 (S.D.N.Y. 2007) (citing *In re Keene Corp.*, 205 B.R. 690, 695 (Bankr. S.D.N.Y. 1997)). However, "[o]bjectors have the responsibility to challenge this information and to produce evidence controverting that produced by the applicant." *In re Hunt's Health Care*, 161 B.R. 971, 981 (Bankr. N.D. Ind. 1993).

14

38.     Whether an attorney's fees are reasonable is not judged through hindsight. *See, e.g.,*
*In re Brous*, 370 B.R. 563, 570 (Bankr. S.D.N.Y. 2007). The test is an objective one examining
"what services a reasonable lawyer or legal firm would have performed in the same circumstances."
*In re Ames Dep't Stores, Inc.*, 76 F.3d 66, 72 (2d Cir.1996) (citing *In re Taxman Clothing Co.*, 49
F.3d 310, 315 (7th Cir.1995).

39.     Here, there is no question that MoCo's fees are objectively reasonable. Morrison
Cohen is seeking fees of $4,163,466.92 for the services it provided to the Independent Directors
through the course of these cases. MoCo's rates are nearly half that of other New York firms, and
MoCo's lean staffing of these cases was demonstrably reasonable. Given that MoCo's clients were
ultimately asked to give up all protections from suit, and to forgo their right to insurance, valued at
$150 million, for the benefit of the Trust's constituency, the cost of MoCo's services were eminently
reasonable.

40.     It also bears noting that MoCo's fee structure and staffing policies were in part what
caused the Independent Directors to retain MoCo. As Mack and West state:

> The Independent Directors understood and accepted MoCo's staffing and fee
> structure that dispenses with younger less valuable associates for senior attorneys
> who bill at rates well below the rates of associates at other firms but provide
> seasoned experienced counsel, which is what the directors believed the engagement
> required.

*See* West Declaration at ¶ 17; Mack Declaration at 17.

**B.     Response To The Trust's Specific Objections**

41.     The Objection sets forth thirteen categories of fees that the Trust contends should not
be compensated. The Trust's objection, however, is entirely unsupportable.

**1.    The Unsupported Fees Are Set Forth In The Filed Fee Application**

42.    The Trust contends that MoCo's request for compensation should be reduced by

$37,531.50 on account of fees that MoCo purportedly failed to support. This contention is frivolous.

As the Trust concedes in the exhibit to its Objection, all amounts MoCo seeks appear in the Fee

Application. Moreover, each and every entry is included on the electronic version of the Fee

Application submitted to the US Trustee's office consistent with the Compensation Order.[1]

43.    Given that, as the Trust recognizes, each entry about which is now complains is

included on MoCo's filed and certified fee application, it is entirely disingenuous for the Trust to

even suggest that the time is not supported. As such, the Trust's objection to this purportedly

unsupported time must be denied.

**2.    The Filed Fee Applications Only Contain Two Limited Instances Of Duplicate
Time Entries**

44.    The Trust next contends that MoCo's time entries contain $11,853.07 of "duplicate

time entries." With two very minor exceptions, the entries complained of by the Trust *do not* appear

on MoCo's filed fee applications. Had the Trust taken the time to actually verify that these entries

exist in the Fee Application, they could have saved themselves considerable time crafting an entirely

unsupported objection.

45.    In the course of its review of the actual filed fee application, MoCo identified two

potentially duplicate entries – each on November 11, 2013 – totaling 0.9 hours from Michael

---

[1] 1. Notwithstanding MoCo's compliance with the requirements for filing fee applications in this case, the Trust requested that MoCo provide it with its bills in spreadsheet form. The Trust provided MoCo with the form to which it requested MoCo's time be converted. MoCo's billing software, however, is not able to perform the conversion demanded by the Trust, so MoCo had to manually convert each and every invoice into the spreadsheet format requested by the Trust. The Trust's objection likely results from manual error in this conversion process. This explanation was provided to the Trust, which precipitously filed an objection anyway.

Connolly. MoCo will agree to voluntarily remove the duplicate entries and will reduce its fee request by $513.00 accordingly.

46.     Except for this errant $513 charge, MoCo's fees are entirely supported by their filed fee applications, and this objection too lacks any merit.

### 3.    **Duplicate Docket Entries**

47.     The Trust next complains of $2,707.50 of time incurred by a professional double checking the docket review performed by a paralegal. It is beyond question that a professional has an ethical obligation to supervise the work performed by paraprofessionals under his charge. That obligation extends to the review of documents that the paraprofessional has indicated are important to a proceeding. As such, these charges are entirely reasonable and consistent with MoCo's obligations in these cases.

### 4.    **Unsupported Rate Increases**

48.     The Trust has identified $17,190 relating to rate increases. At the Debtors' request, MoCo froze its rates at its 2011 level.  However, as a result of a coding error, the rates of certain paraprofessionals were inadvertently increased. Because these rate increases were made in error and MoCo will voluntarily agree to this reduction of $17,190.

### 5.    **Non-Compensable Billing Activities**

49.     The Trust has identified $2,279 of activities performed by a paralegal in reviewing MoCo's bills for privilege issues before they were distributed to the US Trustee and Committee according to the Fee Order. While MoCo believes these charges are entirely supportable, MoCo will agree to voluntarily write these charges off.  As such, MoCo will agree to an additional voluntary reduction of $2,279.

6.   **Vague Time Descriptions**

50.   The Trust next identifies $100,569 of purportedly vague time entries. Again, this objection is entirely disingenuous. A fee application is required to contain information sufficient to permit the Court to determine whether the amounts sought are reasonable and necessary.

51.   Many of the entries that the Trust claims is "vague" are entirely clear on their face. Even a cursory review of the allegedly vague time reveals that all information necessary for the reviewer to determine the necessity for the services provided are contained therein. For example, the Trust suggests that entries such as "respond to HSR request," is not chargeable because it is vague. However, it is entirely clear that the attorney was responding to a Hart Scott Rodino request, and the service provided is self evident. The mere fact that the attorney used an acronym that was unfamiliar to the Trust does not render an entry vague.

52.   Similarly, there are a number of entries that are clear on their face, but have drawn an objection because the subject of a privileged communication was not included. The fact that the entry describes what was done, but leaves out the subject of a clearly privileged conversation does not render a time entry so vague as to prevent a reviewer from determining what service was provided.

53.   The Trust additionally contends that entries such as review "recent filings" as vague because the attorney did not specifically list each and every fling reviewed on that day. Again, the Trust seeks to create a burden that is simply not imposed by law. The reasonableness of a review of recent filings in a case like this is self-evident.

54.   The Trust also manufactures a false claims of "vagueness" by taking one small snippet of a time entry out of a larger entry. For example, the Trust argues that two entries on May 23, 2012 were vague: "EMAIL CORRESPONDENCE J. ILANY" and "TELEPHONE CALL J. ILANY." While the redaction of the substance of the privileged conversation does not render the

18

objection vague, the subject was in fact not redacted. The timekeeper's entire entry for that day was "DRAFT SLIDES TO PRESENTATION TO CREDITORS' COMMITTEE COUNSEL REGARDING ALLY SETTLEMENT (3.5); EMAIL CORRESPONDENCE J. ILANY (.3); TELEPHONE CALL J ILANY (1)." Given that Jonathan Ilany negotiated the form of the AFI settlement in existence at that time, and that MoCo had no other professional relationship with Mr. Ilany, a party with even a bare familiarity with these cases could have determined the subject of their conversations.

55.     Similarly, the Trust argues that an entry on June 1, 2012 stating "TELEPHONE CALL WITH PAM WEST" is vague. Again, even a cursory review of the entire entry revealed that the subject of the call was readily apparent: "TELEPHONE CALL WITH JAMIE LEVITT CONCERNING DISCOVERY TO COMMITTEE (.3); TELEPHONE CALL WITH BOB SALERNO FROM MOFO REGARDING DISCOVERY (.8); TELEPHONE CALL WITH PAM WEST (1.0); EMAIL CORRESPONDENCE WITH INDEPENDENT DIRECTORS CONCERNING DISCOVERY (.8)." It is clear from the context of the entire entry that the timekeeper was discussing discovery with Ms. West, one of the Independent Directors.

56.     Attached hereto as Exhibit A is a chart providing illumination, where necessary, to the allegedly vague time. Given the explanations, where necessary, MoCo does not believe any of these entries are vague and as such the Trust's objection must be denied.

### 7.     **Unnecessary Research**

57.     The Trust next complains that MoCo failed to "justify" its need to perform legal research regarding equitable subordination. Because the Trust was formed after the completion of the case, it is understandable that the Trust would not understand that one of the key issues faced by the Independent Directors was what leverage, if any, the estates had against the various creditor constituencies in these cases. Given that the central issue of the case turned on the relationship

19

between the Debtors' senior secured creditor, AFI, and the Debtors, questions regarding the allowance and priority of AFI's claim were central to the estates' positions at, *inter alia*, the mediation and in plan settlements. In addition, much of the research done with respect to this and similar issues was directly in response to materials, documents, and arguments provided to counsel for the Independent Directors by both the Committee and by AFI, as each constituency sought to present their cases to the Independent Directors for evaluation in connection with settlement.

58.    MoCo, at the request of the Board and with the consent and support of Debtors' counsel, reviewed subordination issues. At the time this research was being conducted, there was no clarity as to the direction of a potential confirmation of the Plan. While parties pursued a mediated solution to the disputes regarding the settlement of AFI's potential obligations with ResCap, they also continued to prepare for the imminent litigation of the proposed RMBS settlement. During that period, parties also begun planning for a potential contested confirmation fight. This research was performed in the event that the mediation pending was ultimately unsuccessful and that challenges would need to be made to AFI's claims. As is plain from the filed Fee Application, the research on subordination ended the moment that there was a deal in place with AFI. Thus, the fact that the estates never needed to file a pleading using that research does not mean that it lacked value. To the contrary, the research and counsel's analysis informed the positions taken by the Board and facilitated their ability to understand and approve the proposed settlement with AFI. As such, there is no credible argument that this time is not compensable.

**8.    Administrative Tasks**

59.    The Trust next contends that MoCo professionals incurred $16,857 in administrative tasks. While certain of these tasks might be considered administrative, the bulk of the charges relate to establishing and maintaining an electronic repository of documents produced by the Independent Directors in response to the various document requests made to or from them from the Committee

and the Examiner. Establishing a litigation database and the fees incurred by specialized professionals in manipulating that database cannot be considered administrative.

60.    Recognizing, however, that certain of the tasks identified by the Trust might be considered administrative, MoCo is voluntarily reducing its fee application by $6,742 on account of those entries that may be deemed administrative.

### 9.    **Transient Timekeepers**

61.    The Trust next contends that time incurred by three of MoCo's timekeepers should be denied as the timekeepers were "transient." MoCo was counsel to the Independent Directors dating back to 2008. During that period, MoCo, as counsel to the Independent Directors, reviewed virtually every transaction between the Debtors and AFI. MoCo necessarily amassed a wealth of institutional information that was relevant to, *inter alia*, all the transactions reviewed by the Examiner. Throughout the course of the case, issues arose that called into question certain transactions MoCo previously reviewed. Rather than have the lawyers regularly staffed on the case review voluminous board minutes and transaction documents, MoCo simply discussed the transaction with the lawyer who originally worked on it. While the lawyer was arguably "transitional" in that he did not bill considerable time to the case, the time spent actually saved the estates considerable time and money.

62.    MoCo, however, did staff one attorney on a discrete document review project and that lawyer amassed less than 10 hours on the case. MoCo is willing to voluntarily write down $2,695 in respect of time charged by that attorney.

### 10.    **Multiple Attendees**

63.    The Trust next launches a blunderbuss objection claiming that nearly every instance where two MoCo attorneys were in the same place at the same time was unnecessary and not compensable. MoCo followed the guidelines established by this Court in these cases, and in the few

cases where MoCo did not follow the guidelines MoCo previously agreed to a voluntary reduction in time. Accordingly, this objection is without merit.

64.    <u>Multiple Attorneys In Attendance At Hearings</u>:    The Trust first complains of instances where more than one MoCo attorney attended a hearing. MoCo only staffed multiple lawyers at a hearing where it was necessary to MoCo's representation of the Board.  At times that was because one or more of the Independent Directors has submitted a declaration in support of the relief being sought and was potentially a witness. At other times Board meetings were scheduled immediately following a hearing, and the Independent Directors needed information from their counsel in real time in order to take action arising from the hearing. In each instance where more than one counsel was present, the West and Mack declaration make clear that it was at the direction of the Independent Directors. *See* West Declaration at ¶ 13; Mack Declaration at ¶13.

65.    MoCo leanly staffed these cases – indeed, a core group of five timekeepers incurred almost 88% of the total fees charged by MoCo. In certain instances, it became necessary for MoCo lawyers from different disciplines to appear at a hearing. As such, even where more than one MoCo lawyer was present, there was no duplication of skill sets. Attached hereto as Exhibit B is a chart detailing every instance of multiple attorneys appearing at a hearing and explaining the need for each attorney.

66.    <u>Multiple Attorneys In Attendance At Board Meetings</u>:  The ResCap board was an active board meeting approximately weekly and often more frequently throughout this case. Indeed, the board was involved in nearly every aspect of these cases. In furtherance of its fiduciary duties, the Board met frequently. Depending on the status of the case, the Board could meet multiple times in a week. As such, there were at least 77 full board meetings and 22 Board committee meetings held throughout the course of these cases. Understandably, the Independent Directors requested their counsel be in attendance at those meetings.

67.    The Trust contends that MoCo's staffing multiple attorneys to attend board meetings was unnecessary. The suggestion that those MoCo attorneys responsible for advising the Independent Directors should not be present during the board meetings where such advice was to be dispensed is ridiculous. MoCo was counsel to the Independent Directors. The Independent Directors were in attendance at board meetings. MoCo had a professional responsibility to attend those meetings. Anything less would have been against the express direction of the Independent Directors and could have been borderline malpractice.

68.    Included within the category of "Board Meetings" are other key events in the case. Indeed, the Trust contends that MoCo "overstaffed" by sending more than on attorney to interview potential CRO candidates. These were not short "meet and greet" interviews. The importance of retaining a CRO was deeply appreciated by the Independent Directors. During the course of the interviews there was extensive discussion about the case and extensive grilling of prospective candidates about how they might analyze matters and their understanding the numerous legal issues involved. This required more than a single attorney. Given that the selection of a CRO, a process initiated and conducted by the Independent Directors and their counsel, was the turning point in these cases, the Trust is hard pressed to credibly suggest that the staffing during that period is now imprudent.

69.    Consistent with MoCo's staffing for court hearings, MoCo did not have overlapping attorneys in attendance at board meetings. Included within Exhibit B is an explanation as to why each and every MoCo attorney was necessary to each meeting.

70.    <u>MoCo Attendance At Auction</u>: The Trust next contends that no MoCo attorneys should have attended the auction of the substantial majority of ResCap's assets. The auction was conducted before the appointment of a CRO, and therefore the supervision of the auction was the Board's responsibility. Understanding the significance of the auction to the recoveries of these cases,

each and every Board member, including the Independent Directors were in attendance at the auction. The Independent Directors were necessarily required to make a decision in real time regarding the highest and best offer for ResCap's assets. In making that determination, the Independent Directors relied upon the advice of their Independent Counsel. As such, it was plainly necessary for MoCo to be in attendance at the Auction.[2]

71.    Examiner Meetings And Interviews: The Trust next contends that MoCo improperly sent multiple attorneys to meetings with the Examiner and his counsel. Again, the Trust simply refuses to understand the case before it. The Examiner's broad scope included an excruciatingly thorough review and analysis of every transaction between AFI and ResCap. Each of the transactions reviewed by the Examiner had been approved prepetition by the Independent Directors who were advised by their counsel – MoCo. As such, documents and information in the hands of the Independent Directors was central to the Examiner's investigation. Rather than send one MoCo attorney – assuming it would even have been possible to try to educate a single attorney on four years of complicated mortgage, finance, tax, sale, and other transactions – and then have internal meetings to discuss the follow up from the Examiner meeting, which would have undoubtedly drawn an objection from this Trust, MoCo sent the attorneys that were primarily responsible for reviewing documents and preparing responses to the Examiner's requests. Again, this staffing was not duplicative, and indeed saved the estates from redundant and unnecessary meetings.

72.    The Trust similarly contends that multiple attorneys at the Examiner's interviews with the Independent Directors were unnecessary. Again, the Trust oversimplifies the analysis. Each

---

[2]    Additionally, AFI was a stalking horse bidder for the Debtors' servicing platform. As such, it was incumbent upon the Independent Directors to have access to their independent counsel.

of the attorneys in attendance at the investigation had a discrete skill set making them necessary. Further explanation is provided in Exhibit B.

73.    It is self evident from the fact that a significant portion of the Examiner's more than 2,000 page report concerns the transactions involving the Independent Directors and their counsel that sending a single attorney to meet with the Examiner or represent Independent Directors being examined about those transactions, would have been unconscionable.

74.    Initial Meeting With Mediator: The Trust next complains that MoCo's sending three attorneys to the initial meeting with the Mediator was not necessary. First, MoCo was invited to the meeting by the Mediator, who requested to speak with those attorneys that were most familiar with the representation. As such, MoCo's lead bankruptcy lawyer, lead litigator, and lead corporate attorney attended the meeting in order for the initial conversation with the Mediator to be useful to the Mediator. Subsequently, MoCo sent only one attorney to meetings with the Mediator.

75.    Committee Meetings: The Trust further contends that MoCo unnecessarily sent multiple attorneys to "committee meetings." First, this objection mixes apples and oranges. The objection includes time spent at ResCap Board audit committee meetings and ResCap Board compensation committee meetings. Independent Directors sat on and chaired both the audit committee and compensation committee, and therefore their counsel was necessary to advise them on governance issues arising from those meetings.

76.    This section also includes one meeting with the Creditors' Committee where the Committee presented its theory of claims against AFI. In attendance at that meeting were all the Independent Directors. Each of the attorneys present at that meeting were directly involved in the analysis of the AFI claims, had contributed to the advice provided to the Independent Directors, and were necessary to ensure that the Independent Directors' questions regarding the Committee presentation were fully answered. In the absence of having multiple attorneys present at this

25

meeting, MoCo would have had to conduct an additional internal conference to bring the responsible attorneys up to speed.

77.    Discovery:  The Trust next contends that multiple MoCo attorneys at a deposition of one of the Independent Directors' depositions was unnecessary. The Trust first complains that two attorneys attending the depositions of the CEO and chairman of the Board of Directors and the General Counsel in the RMBS settlement litigation was unreasonable. Given the litigation, and the fact that two Independent Directors were potential witnesses in the ultimate trial, it was patently reasonable and efficient to have these lawyers present at the deposition.

78.    The Trust next complains of two MoCo attorneys attending a meet and confer conference with the Committee regarding the production of documents by the Independent Directors in the RMBS litigation. Again, there is no credible question that the attendance of MoCo attorneys at a meet and confer regarding documents their clients were directed to produce was reasonable.

79.    Claims Meetings:  The Trust also contends that MoCo's attendance at presentations from the Creditors' Committee and AFI regarding the settlement of AFI claims was not reasonable. Every one of the questioned presentations occurred before the installation of the CRO, and therefore the Independent Directors were the *only* Debtor-fiduciary with the ability to review and consider these challenges. As such, it is inherently reasonable that their counsel would attend with them.

80.    Moreover, the presentations could have included reference to documents produced by the Independent Directors in response to the various document requests served by the Examiner and the Committee. It was, therefore, appropriate to have those lawyers that performed the review of the Independent Directors' production, and were therefore most familiar with the documents, in attendance for these presentations.

81.    Mack Trial Preparation:  The Trust finally objects to multiple MoCo attorneys assisting with the preparation of Independent Director John Mack for his testimony at the RMBS

26

trial – if necessary. Again, it is inherently reasonable for the attorneys with complementary skill sets who would actually be defending Mr. Mack at trial to attend his trial preparation.

## 11.    **Intrafirm Communication**

82.    The Trust next lobs an objection to each and every instance of MoCo attorneys meeting to discuss the status or new developments in the case. These meetings were critical to MoCo's effective representation of the Independent Directors. Indeed, a cursory review of the subject matter of the internal meetings reveals that the Trust believes that meetings regarding (i) production of documents from the Independent Directors and related discovery issues, (ii) the settlement with AFI, (iii) response to 2004 requests, (iv) the Examiner's investigation of the transactions reviewed by the Independent Directors and their counsel, (v) emails of dockets, (vi) the appointment of the CRO, (vii) the appointment of additional independent directors, (viii) updates on mediation, and (ix) updates on the status of the various litigations pending during the case, are unreasonable.

83.    The Trust's objection proves far too much. The Trust implies that a core group of lawyers should not communicate regarding critical issues in a case or the tasks for which they are directly charged. In the absence of either meetings or emails regarding case events, there is absolutely no way for the Independent Directors' counsel to confer with one another. Indeed, the Trust would apparently have professionals develop ESP or learn through osmosis in order to fully and properly represent the Independent Directors. This objection is unmerited and must be denied.

## 12.    **Associate Tasks**

84.    The Trust next contends that MoCo overcharged the estates by $20,431.50 by having "senior" staff perform associate level tasks. This objection places form over substance. MoCo's rates are nearly half those of its competitor firms. As such, MoCo partners charge less than associates at other leading New York firms. Indeed, each of the entries listed as "associate" tasks were performed

by partners with rates of $575, $585, and $685. These are associate rates at most of the other firms retained in these cases.

85.    Additionally, by having partners at reduced rates perform the "associate" tasks the estates recognized additional savings. First, these partners are skilled professionals who performed the tasks in far less time than an associate would have taken. Moreover, these partners were intimately familiar with the facts and documents underlying the research or review being undertaken. Rather than take additional time and explain documents or theories to associates who lacked familiarity with these cases or the underlying facts, it was simply more efficient for the partners to do the work. As such, the estates saved by having a skilled professional at a reduced rate performing these tasks.

86.    The Trustee's arbitrary reduction of MoCo's rate to $450, which is $25 more than the rate charged by the Creditors' Committee's counsel for unadmitted and first year lawyers, is both unwarranted and unsupported.

### 13.    **Paraprofessional Tasks**

87.    Finally, the Trust identifies allegedly paraprofessional tasks performed by attorneys in these cases. While MoCo disagrees with that characterization, MoCo will accept the Trust's suggestion and voluntarily reduce its fees for these charges to the paralegal rate, which is an additional reduction of $4,082.00.

88.    MoCo takes very seriously its obligations to fairly charge these estates for only the work actual and necessary to its representation of the Independent Directors, who during the case comprised virtually the full Board of Directors of ResCap. MoCo leanly staffed these cases. Moreover, MoCo's rates are far less than those of other New York professionals. As such, MoCo respectfully requests that the Court overrule the Objection as it relates to MoCo's Fees, and award the fees set forth in the Fee Application as reduced herein.

## CONCLUSION

WHEREFORE, MoCo respectfully requests the Court to enter an order, (a) overruling the Objection as to MoCo's fees, (b) allowing MoCo (i) final compensation for professional services rendered in these cases  in the amount of $4,163,466.92, which reflects voluntary reductions of $119,440.58 –which amount is inclusive of $33,709.50 – agreed to in this response, and (ii) reimbursement of expenses incurred in connection with rendering such services in the aggregate amount of $105,425.95, for a total award of $4,268,892.87; and (c) granting such further relief as is just and necessary.

Dated: New York, New York
      June 13, 2014

                                   MORRISON COHEN LLP

                                 By:   */s/ Joseph T. Moldovan*     
                                           Joseph T. Moldovan
                                           Robert K. Dakis
                                           909 Third Avenue
                                           New York, New York 10022
                                           Telephone:  (212) 735-8600
                                           Fax:  (212) 735-8708
                                           jmoldovan@morrisoncohen.com
                                           www.morrisoncohen.com