Brad Eric Scheler, Esq.
Gregg L. Weiner, Esq.
Lisa H. Bebchick, Esq.
FRIED, FRANK, HARRIS, SHRIVER
  & JACOBSON, LLP
One New York Plaza
New York, New York 10004
Telephone:  (212) 859-8000
Facsimile:  (212) 859-4000

*Attorneys for Mesirow Financial Consulting, LLC*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                             :

In re:                          :      Chapter 11
                             :

RESIDENTIAL CAPITAL, LLC, *et al.*,[1]  :      Case No. 12-12020 (MG)
                             :

                      :      Jointly Administered
          Debtors.      :
                      :
                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**REPLY OF MESIROW FINANCIAL CONSULTING, LLC TO
LIMITED OBJECTION OF THE RESCAP LIQUIDATING TRUST TO
THE "FOURTH AND FINAL" AND "FIFTH AND FINAL" FEE APPLICATIONS
OF MESIROW FINANCIAL CONSULTING, LLC FOR COMPENSATION AND
REIMBURSEMENT OF EXPENSES AS FINANCIAL ADVISOR TO THE EXAMINER**

---

**TO:   THE HONORABLE MARTIN GLENN
          UNITED STATES BANKRUPTCY JUDGE**

---

[1]       The names of the Debtors in these cases and their respective tax identification numbers are identified on
Exhibit 1 to the Declaration of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of
Chapter 11 Petitions and First Day Pleadings, filed with the Court on May 14, 2012.

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ...................................................................................................ii

REPLY .................................................................................................................................... 1

APPLICABLE LAW ............................................................................................................... 7

RESPONSES TO SPECIFIC OBJECTIONS .......................................................................... 9

    Duplicate Time Entries ....................................................................................................... 9

    Rate Increases ..................................................................................................................... 9

    Improper Time Increments and Rounding of Time Entries...................................................... 10

    Routine Billing Activities ................................................................................................... 11

    Budgeting Activities .......................................................................................................... 13

    Vague Task Descriptions .................................................................................................... 14

    Administrative Tasks .......................................................................................................... 16

    Non-Working Travel Time .................................................................................................. 18

    Typesetting Fees ................................................................................................................ 20

    Unnecessarily High Billing Rates ...................................................................................... 21

    Clawbacks ......................................................................................................................... 26

    Multiple Attendees at Meetings .......................................................................................... 27

CONCLUSION ..................................................................................................................... 29

# TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Cosgrove v. Sears, Roebuck & Co.*, 1996 WL 99390 (S.D.N.Y. Mar. 7, 1996) ......................... 15

*Dotson v. City of Syracuse*, 2011 WL 817499 (N.D.N.Y. Mar. 2, 2011) ................................... 15

*In re Ames Dep't Stores, Inc.*, 76 F.3d 66 (2d Cir. 1996) ................................................... 8

*In re Blackwood Assocs., L.P.*, 165 B.R. 108 (Bankr. E.D.N.Y. 1994) ......................................... 20

*In re CF & I Fabricators, Inc.*, 131 B.R. 474 (Bankr. D. Utah 1991) ......................................... 11

*In re Keene Corp.*, 205 B.R. 690 (Bankr. S.D.N.Y. 1997) ................................................... 8

*In re Kreidle*, 85 B.R. 573 (Bankr. D. Colo. 1988) ......................................................... 11

*In re Mesa Air Grp., Inc.*, 449 B.R. 441 (Bankr. S.D.N.Y. 2011) ......................................... 7, 8, 12

*In re NuCorp Energy Inc.*, 764 F.2d 655 (9th Cir. 1985) ................................................... 11

*In re Quigley Co., Inc.*, 500 B.R. 347 (Bankr. S.D.N.Y. 2013) ............................................. 8

*In re Residential Capital, LLC*, 504 B.R. 358 (Bankr. S.D.N.Y. 2014) ..................................... 8

*Schruefer v. Winthorpe Grant, Inc.*, 2003 WL 21511157 (S.D.N.Y. July 2, 2003) .................... 15

**Statutes**

11 U.S.C. § 330 ........................................................................................................... 7

**Other Authorities**

*United States Trustee's Guidelines for Reviewing Applications filed under 11 U.S.C. § 330 (1) in
larger chapter 11 cases by those seeking compensation who are not attorneys, (2) all chapter
11 cases below the larger case threshold, and (3) cases under other chapters of the
Bankruptcy Code* 61 Fed. Reg. 24889 ........................................................................ 16, 17

*United States Trustee's Guidelines for Reviewing Applications for Compensation and
Reimbursement of Expenses Filed under United States Code by Attorneys in Larger Chapter
11 Cases*, 78 Fed. Reg. 36248 ........................................................................................ 14

Mesirow Financial Consulting, LLC ("MFC"), financial advisor to the Court-appointed
Examiner (the "Examiner") for Residential Capital, LLC ("ResCap") and its affiliated debtors
(collectively with ResCap, the "Debtors"), by its undersigned attorneys, hereby submits this reply
to the Limited Objection (the "Objection") of the ResCap Liquidating Trust (the "Trust") to the
Fourth and Final and Fifth and Final Fee Applications of MFC for Compensation and
Reimbursement of Expenses as Financial Advisor to the Examiner (together, the "Final Fee
Applications"), and respectfully states as follows:

### REPLY

1.      As described in the Final Fee Applications, over the course of its engagement in
connection with one of the largest and most complex chapter 11 cases filed in history, MFC was
engaged by The Honorable Arthur J. Gonzalez (Ret.), the Examiner in these cases, as his financial
advisor.  In accordance with this Court's order governing the scope of the Examiner's investigation
(Dkt. No. 925, the "Scope Order"), MFC was tasked with addressing a broad array of financial,
accounting, tax, forensic, and valuation issues, and was specifically selected by the Examiner due
to the firm's ability to thoroughly address the full breadth of financial issues in these cases on an
expedited basis.[2]  MFC's assistance was critical to the Examiner's investigation, conducted over a
ten-month period, which, among other things, assessed and identified numerous causes of action,
potentially worth billions of dollars, arising from dozens of pre-petition and post-petition
transactions involving the Debtors, Ally Financial, Inc. ("AFI"), Ally Bank, Cerberus, and other
affiliated parties.  During the course of this investigation, the Examiner and his professionals
reviewed over nine million pages of documents, conducted 99 interviews, and participated in 66
third-party meetings.  At the request and direction of the Examiner, MFC performed quantitative

---

[2]      MFC's broad capabilities enabled the Examiner to hire only one financial advisor, creating numerous
efficiencies for the estates.

}}}}}

financial, accounting, tax, economic, and valuation analyses of transactions occurring over a period

of more than seven years, and performed qualitative analyses as to the Debtors' decision-making

process and governance.  MFC produced numerous analyses summarizing the financial aspects of

the transactions under review, including analytical support regarding solvency, reasonably

equivalent value, damages, and quantitative aspects of certain liability assessments, and

contributed specialized industry knowledge necessary to document and analyze practices specific

to a business that originates, services, and securitizes residential mortgage loans.  The efforts of the

Examiner and his professionals culminated in the Examiner's report filed with the Court under seal

on May 13, 2013 (the "Examiner's Report"), and unsealed by the Court on June 26, 2013, the same

date the Court approved a plan support agreement providing for a $2.1 billion settlement between

the Debtors, the Official Committee of Unsecured Creditors (the "Committee"), and AFI.

   2.  MFC closely coordinated its activities with the Examiner and his counsel,

Chadbourne & Parke LLP ("Chadbourne"), and collectively endeavored to perform the

investigation as efficiently and expeditiously as possible.  The investigation was conducted

pursuant to the Scope Order and subject to a budget and workplan that was regularly reviewed and

updated.   The Examiner filed four supplements to his workplan and participated in several

telephonic status conferences with the Court and the principal parties in interest in the chapter 11

cases to provide regular updates regarding the progress of the Examiner's work and the actual and

anticipated level of fees incurred by the Examiner and his professionals.[3]

---

[3]  The Trust provides an incomplete and misleading description of events involving the workplans filed by the Examiner and disclosures regarding the estimated cost of work by implying that, among other things, the Examiner and his professionals did not *promptly* notify the Court of the same (Obj. ¶¶ 14-20), completely ignoring the fact that updated budgets were prepared by the Examiner's professionals and disclosed to material parties.  For example, in connection with the filing of the Third Supplemental Workplan, MFC prepared updated monthly budgets that were provided to the Court in a chambers conference that was attended by representatives of the parties, including the Debtors, AFI, the Committee, and the U.S. Trustee.  These budgets increased MFC's estimated fees from $26.5 million (which was disclosed to the Debtors' financial advisors in connection with the Second Supplemental

3.      MFC filed four fee applications, each of which was approved by the Court on an interim basis.  While MFC's fourth interim fee application was also filed as a final application, the Court adjourned the hearing on all final fee applications, and accordingly, MFC filed its Fifth and Final Fee Application (the "Final Application"), which is now before the Court for approval.  Each application was approved by MFC's client, the Examiner, prior to submission. After review by the Debtors, the Committee, and the U.S. Trustee, all of MFC's interim fee applications were approved by this Court.  At each level of review, MFC consensually addressed and resolved any and all substantive concerns raised with respect to its fees and expenses.

4.      Moreover, as disclosed in its fee applications, MFC's negotiations with the U.S. Trustee and discussions with the Examiner, in conjunction with the billing discretion exercised by MFC, resulted in reductions of MFC's fees and expenses totaling approximately $2,485,000, or 5.9% of the fees incurred,[4] including:

(a)     $1,168,000 in fees as a result of MFC's agreement with the Examiner not to implement annual structural rate increases that were implemented in other matters on January 1, 2013;

(b)     $373,000[5] in fees and $66,000 in expenses to address issues raised by the U.S. Trustee, including related to what the Trustee claimed were fees associated with such issues as "vague" time entries, "routine" billing activities, and budgeting activities, as well as expenses for travel to New York and other items;

(c)     $272,000 in fees for which MFC would typically charge, including such items as responding to the U.S. Trustee's fee objections and transitory time keepers;

(d)     $399,000 in fees as a result of reducing fees associated with travel time by 50%;

(e)     $84,000 in fees as a result of reducing fees related to the preparation of MFC's retention application by 75%;

---

Workplan) to $38.4 million.  The Examiner filed the Fourth Supplemental Workplan on April 5, 2013 that revised MFC's estimated fees downward from $38.4 million to $38.2 million.

[4]      These amounts do not include approximately $440,000 in additional fees and $35,000 in additional expenses incurred in connection with MFC's work but not billed at the discretion of MFC.

[5]      Pursuant to MFC's recent settlement with the U.S. Trustee regarding the Final Application, included in the $373,000 amount is an additional reduction of $20,000 in fees.

(f)    $53,000 in fees as a result of reducing fees related to the preparation of MFC's fee statements in the Fourth Interim Fee Period; and

(g)    $70,000 in expenses that MFC would otherwise charge to its clients, including expenses for travel to New York, lodging expenses, overtime and other meals, printing, and ground transportation.

5.    Notwithstanding the above, after the Trust became the successor to the Debtors by operation of the Plan, the Trust informed MFC that it had questions with respect to the Final Fee Applications.  MFC and its counsel had several discussions and exchanged correspondence with representatives of the Trust with respect to the Final Fee Applications, and at all times were willing to attempt to resolve any of the Trust's concerns to avoid the attendant burdens of a contested fee dispute.  Unfortunately, the Trust chose not to compromise and settle its objections to the Final Fee Applications, but rather to file the baseless and unfounded objections currently before the Court. For example:

- The Trust objects to over $2.5 million in what it calls "typesetting fees."   A cursory review of the Objection plainly shows that the Trust simply *filed a blanket objection to over 70% of MFC's time entries from April 27, 2013 (the date when the typesetting process began) through May 13, 2013 (the date the Examiner's Report was filed)*.  In fact, MFC's charges from this period are time entries for substantive work necessary to complete the Examiner's Report and had nothing to do with the decision to typeset the report.[6]

- The Trust objects to many of the *exact same time entries that were already the subject of objection and resolution with the U.S. Trustee*, including, but not limited to, in such categories as "Routine Billing Activities," "Budgeting Activities,"  and "Vague Task Descriptions."

- The Trust objects to "Rate Increases" and completely ignores MFC's agreement with the Examiner not to implement annual structural rate increases, which, as noted above, *saved the Debtors' estates $1,168,000*.

6.    The remaining objections by the Trust are equally superficial, which is not surprising given that MFC's fees have already been subject to substantial review throughout the

---

[6]    That the Trust had a similar objection to Chadbourne's fee application but only in the amount of just $349,952.50 is inexplicable and underscores the carelessness with which the Trust assembled its Objection.

course of these proceedings. Indeed, these objections are particularly troublesome given that the efforts of the Examiner and his professionals provided substantial benefit and value to the Trust's constituency. There is no basis for the Trust—through frivolous, after-the-fact objections—now to seek to extract a further recovery on the backs of the professionals who were instrumental in producing that recovery in the first place.

7.    Significantly, embracing these types of objections would put a club in the hand of parties in interest and would have the deleterious effect of chilling the essential work of independent, court-appointed examiners in future bankruptcy cases, as well as impairing the U.S. Trustee's ability to reach resolution of issues raised regarding interim fee applications.

8.    Recognizing that its "specific" objections do not withstand close scrutiny, the Trust seeks to divert attention by devoting a substantial portion of its objection to an irrelevant and inapt comparison between the work of the Examiner and MFC here and that of the examiner and his financial advisor in *Lehman Brothers*. Obj. ¶¶ 25-30. This comparison fails on numerous levels:

- *First*, notwithstanding that in absolute terms the Examiner's costs in these cases were less expensive than the examiner's work product in the *Lehman* case, the Trust attempts to argue that the Examiner was proportionally more expensive than the *Lehman* examiner when looking at the relative "size" of the cases. Obj. ¶ 30. Putting aside the fact that an examiner's investigation cannot simply be viewed in proportion to an estate's assets, as the Trust begrudgingly recognizes (*id.*), and the fact that this case was, while not the "largest" bankruptcy case ever filed, *among the largest* bankruptcy cases ever filed, the Trust completely ignores the duties with which each examiner was tasked and the circumstances surrounding their appointment. For instance, while the examiners in both cases focused on issues like preferences, fraudulent transfers, intercompany claims, breach of fiduciary duty, and other similar types of claims, the Examiner in these cases was charged with a broad duty to investigate all material transactions, agreements, and courses of dealing (both pre-petition and post-petition) between ResCap and AFI, Cerberus and Ally Bank, among others, and such investigation spanned a period of more than seven years—from and preceding ResCap's formation in 2005 through and after its bankruptcy filing in 2012. By way of contrast, the *Lehman* examiner's scope of work, while certainly expansive in nature in determining the causes and circumstances of Lehman's failure, focused primarily on the two years prior to Lehman's bankruptcy filing in September 2008.

5

- **Second**, the Objection similarly ignores the time-sensitive nature of the Examiner's report as compared to the *Lehman* report.  In the *Lehman* bankruptcy, there were no proposed terms for a plan of reorganization or pending settlement of substantially all claims at the time of the examiner's appointment.  By way of contrast, the Court is well aware of the time pressure that the Examiner was under, as he was tasked with investigating the release of pending and potential claims against AFI in connection with a pre-negotiated plan support agreement, as well as investigating the negotiations that led to that settlement.  Moreover, unlike in *Lehman*, the Examiner's task here was made more difficult by the fact that the Debtors and their professionals were managing business operations, conducting two major sales of those operations that closed in February 2013, negotiating various government settlements, and participating in numerous litigated matters, all of which hindered the Examiner's ability to gather the necessary information and added substantial time pressure and complexity to the examination.

- **Third**, the Objection attempts to draw a comparison between MFC's fees in 2012 and 2013 to the fees of Duff & Phelps, LLC, financial advisor to the *Lehman* examiner, in 2009.  Obj. ¶¶ 26-28.  As would be expected due to inflation and market rate increases, rates for professionals in 2009 were lower than when MFC was retained in 2012.[7]  Indeed, simple research reveals a more apt comparison:  a recent application to retain Duff & Phelps by the Debtor in *Cengage Learning, Inc.*, Case No. 13-44106 (Bankr. E.D.N.Y., Dkt. No. 1122, filed Feb. 21, 2014), reflects fees in 2014 that are more consistent with those charged by MFC here.[8]

- **Fourth**, the Trust notes that pursuant to its engagement agreement, Duff & Phelps agreed to discount its standard hourly rates by 10% for its services.  Obj. at 3 n.3.  Yet, unlike MFC, Duff & Phelps did ***not*** agree to freeze its rates for the duration of the engagement.  Indeed, less than two months after beginning work in *Lehman*, Duff & Phelps increased its standard hourly rates from $120 to $920 per hour to $125 to $955 per hour (a 3.2% to 4.2% increase).  The Trust simply fails to take into account the fact that MFC agreed to forego structural rate increases, as well as other reductions in MFC's fees that provided the Debtors with a similarly applicable "discount."  A comparison of blended rates without a comparison of the specific tasks undertaken by each firm is misleading.[9]

---

[7]     *See Application of the Examiner for Order Authorizing the Retention of Duff & Phelps, LLC as his Financial Advisor Nunc Pro Tunc as of February 6, 2009*, Case No. 08-13555, Bankr. S.D.N.Y., Dkt. No 2825, filed Feb. 23, 2009.

[8]     While comparisons between firms and titles used by such firms do not provide for an exact comparison, and while rates may vary based upon the type of engagement and the location of the professionals performing work, Duff & Phelps' fees in *Cengage* ranged from $305-$950 per hour for its non-administrative professionals, whereas MFC's fees here ranged from $315-$895 per hour.

[9]     The Objection is also misleading on its face.  MFC's blended hourly rate as disclosed in Exhibit E of the Final Application was $618, or $603 if unbilled hours were incorporated in the calculation.  The Trust instead cites MFC's average hourly rate incurred before considering any voluntary or other reductions ($632), while citing a Duff & Phelps rate of $505 that incorporates all voluntary reductions and was from a much earlier time period.

- ***Lastly***, the Trust ignores that MFC's hourly rates, which ranged from $210 to $895, are comparable to those of other similar professionals retained in these cases. FTI's hourly rates ranged from $150 to $895 per hour before consideration of a completion fee of $2.5 million. Alix Partners' hourly rates ranged from $270 to $960 per hour before consideration of e-discovery fees of $2.5 million. MFC's blended hourly rate at $618 is well within the range of these professionals as well, as compared to $610 for Alix Partners, which also was conducting its own investigation on behalf of the Committee of the matters being addressed by the Examiner, and $565 for FTI, which was advising the Debtors and had a scope typical of a role that is much more conducive to using less experienced professionals.

9.      In light of the scope of the Examiner's Report, the efforts undertaken by MFC in connection with the engagement, and the benefit to the Debtors' estates as a result thereof (of which the Court is well apprised), MFC respectfully submits that the fees and expenses requested in the Final Application provided a clear and tangible benefit to the Debtors' estates, creditors, interest holders, and other parties in interest, were reasonable and necessary and were set forth with particularity and detail so that the reasonableness of and necessity for such fees and expenses may be ascertained, and requests that the Final Application be approved by this Court.

10.      While MFC believes that the foregoing standing by itself provides ample justification and cause for the Court to approve its Final Application, MFC nevertheless addresses each of the Trust's specific objections in turn below.

## APPLICABLE LAW

11.      Pursuant to section 330 of the Bankruptcy Code, the court awards fees to professional persons comprising reasonable compensation for actual, necessary services. 11 U.S.C. § 330. Section 330(a) lists a number of factors that may be evaluated to judge reasonableness, including time spent, rates charged, necessity of the services, timeliness of the services, the professional's certification and experience in the bankruptcy field, and comparison to fees charged by similar practitioners in other cases. *See In re Mesa Air Grp., Inc.*, 449 B.R. 441, 444 (Bankr. S.D.N.Y. 2011) (Glenn, J.). The analysis is *not,* however, an application of those

factors as a strict formula. *See In re Residential Capital, LLC*, 504 B.R. 358, 366 (Bankr. S.D.N.Y. 2014) (Glenn, J.). Where the services rendered were reasonably likely to benefit the debtor's estate, they should be compensable. *See In re Ames Dep't Stores, Inc.*, 76 F.3d 66, 72 (2d Cir. 1996). Thus, it is axiomatic that when there is an actual benefit to the estate, the services are clearly necessary and compensable under section 330(a)(1)(A) of the Bankruptcy Code. *See In re Keene Corp.*, 205 B.R. 690, 695-96 (Bankr. S.D.N.Y. 1997).

12.     The term "necessary" in the context of section 330 is construed broadly. *See Mesa Air Grp.,* 449 B.R. at 444. Services are "necessary" if they are "reasonably likely to benefit the estate." *Id*. The test is objective, and considers "the services that a reasonable [advisor] would have performed in the same circumstances." *Id.* (citing *Ames Dep't. Stores*, 76 F.3d at 72). Whether services were reasonable and/or necessary is evaluated "from the perspective of the time at which the services were rendered," rather than with the benefit of hindsight. *Id.* (citing *Collier On Bankruptcy* ¶ 330.04[1][b][iii]).

13.     While the applicant bears the burden of showing the reasonableness and necessity of its services, once it has, the burden shifts to any objector to produce evidence showing the request is unreasonable. *See, e.g.*, *In re Quigley Co., Inc.*, 500 B.R. 347, 357 (Bankr. S.D.N.Y. 2013) (citations omitted). An objector to a fee application must challenge the application with specificity, producing evidence controverting the applicant's evidence. *Id.* An objection must fail unless an objector submits evidence specifying what in the application is unreasonable or, at least, what would be reasonable under the circumstances. *Id.*

14.     As discussed above, MFC through its fee applications has amply demonstrated the reasonableness and necessity of its services, which have resulted in tremendous benefit to these cases. MFC's fee applications have been examined in detail by the U.S. Trustee and the Court. As

set forth in greater detail below, the Trust has wholly failed to meet its burden of producing

evidence that the request for fees and expenses in the Final Application is unreasonable.  Indeed, as

is shown below, the Trust has merely assembled timekeeper records in a way to frame and support

its Objection, without taking care to ensure the accuracy of its submission, and proffered

supposition as opposed to evidence in support of its objections.  For these reasons, the Objection

should be overruled in its entirety.

## RESPONSES TO SPECIFIC OBJECTIONS

### I.  Duplicate Time Entries

15.     The Trust first objects to seven specific time entries as duplicate entries.  Obj. ¶ 33.

A simple examination of the full time entries, however, makes clear that these entries represent

distinct charges and are in no way duplicative.  In most cases, the professionals involved were

working on the same task at different times throughout the day, or the invoice contained

descriptions that allocated time to the wrong task (such as referring to attending a meeting instead

of preparing for the meeting) or time period (such as referring to July rather than August) but

represented actual work performed.[10]  In light of the foregoing, MFC maintains that these time

entries were reasonable, provided benefit to the estates, and should be allowed in full.

### II.  Rate Increases

16.     The Trust next objects to the so-called "maturation" increases that occurred on

April 1, 2013.  Obj. ¶¶ 34-36.  As is customary at MFC, on April 1 of each year the billing rates of

certain of MFC's professionals are adjusted to reflect promotions and increases in seniority.  The

Trust complains that these maturation rate increases resulted in an additional $229,378 in fees

without any resulting benefit to the estates.  *Id.* at ¶ 36.

---

[10]     Upon review, Mr. Mathieu's two entries are likely duplicative, and MFC agrees to a reduction of $256.50.

17.    As MFC disclosed in its Third Interim Fee Application and the Final Fee

Applications, these rate increases were consistent with the 2012 rate structure as agreed with the

Examiner.  This further followed MFC's agreement with the Examiner not to utilize its 2013 rate

structure and instead to continue to utilize its 2012 rate structure, even though such increases for

MFC have been routinely approved by numerous courts, including in this district in *In re AMR*

*Corporation*.  As detailed above, this agreement alone resulted in a savings to the estates of

$1,168,000.

18.    Moreover, as the Court is well aware, professional services entities typically

increase the billing rates of their professionals as they become more senior and gain further

experience and expertise.  Indeed, FTI and Alix Partners implemented both structural and

maturation increases during these cases.  That these rate increases happen to occur in the midst of

an engagement does not, in itself, provide cause for the disallowance of the marginal fees incurred

as a result of the increases.  Here, instead of carrying its burden of explaining how the maturation

rates are unreasonable, the Trust states merely that, in its view, "it is unlikely that the estates

obtained any such benefit during the short six-week period that passed between the rate increases

and the filing of the Examiner's report."  Obj. ¶ 36.  This supposition is insufficient; indeed, a more

credible exposition is the estates received the benefit of that increase in skill and experience prior

to the implementation of any maturation rate increases.  In light of the foregoing, MFC maintains

that the fees incurred as a result of the maturation increases were reasonable, provided benefit to

the estates, and should be allowed in full.

## III.  Improper Time Increments and Rounding of Time Entries

19.    The Trust's third objection is, in sum, that 40% of the time of just one of MFC's

professionals, Mr. Wei, who is a managing director in MFC's Los Angeles office who assisted

with valuation analyses and related aspects of the Examiner's Report, either ended in an even half

10

hour or even hour where, in contrast, in a statistically-perfect scenario only 20% of a professional's time would end in an even half hour or even whole hour.  Obj. ¶¶ 37-40.

20.    This argument has no merit, and the Trust's own exhibit demonstrates again its careless analysis.  Of the 34 entries highlighted by the Trust as ending in half- or whole-hour increments, six are for travel in the amount of 4.0 hours each way.  As disclosed in its Final Application, these entries were for 4.0 hours because MFC voluntarily "limited time charged per trip to 4.0 hours."  Final App. ¶ 50(b)(i).  In any event, the Trust cites no authority for the proposition that a timekeeper billing a statistically higher percentage of time at given increments gives rise to an inference of inappropriate billing practices, let alone provides a basis for disallowance.  Accordingly, this objection should be overruled in its entirety.[11]

## IV. Routine Billing Activities

21.    The Trust next objects to $268,410.50 in fees it contends are related to (i) the review and editing of time entries, and (ii) defending a fee applicant's request for fees and expenses.  Obj. ¶¶ 41-42.

22.    As an initial matter, contrary to the Trust's implication, fees and expenses incurred for billing-related efforts that are not required outside of bankruptcy are generally compensable.[12] Such is the case here.  MFC does not regularly prepare detailed time records for non-bankruptcy clients, and thus additional effort was required to complete, compile, reconcile, and review the time detail for a bankruptcy client.

---

[11]    If there were to be any reduction in fees, which there should not be, the maximum appropriate reduction would necessarily be limited to a 0.5 hour reduction (the largest potential impact of any alleged rounding) for the 80% of entries that the Objection indicates are statistically unsupported, or $9,576.

[12]    *See In re CF & I Fabricators, Inc.*, 131 B.R. 474, 483-89 (Bankr. D. Utah 1991); *see also In re NuCorp Energy Inc.*, 764 F.2d 655, 658-659 (9th Cir. 1985) ("[I]t is both inconsistent with the express policy of the Bankruptcy Reform Act and fundamentally inequitable to impose substantial requirements on bankruptcy counsel as a prerequisite to obtaining their compensation while simultaneously denying compensation for efforts necessary to comport with those requirements."); *In re Kreidle*, 85 B.R. 573, 575 (Bankr. D. Colo. 1988) (noting that professionals are entitled to reasonable fees for reasonable time spent on "work beyond that customarily spent in routine, necessary billing procedures for other non-bankruptcy clients").

23.     Moreover, as detailed in the Final Application, MFC has already reduced its fees in the amount of $284,381[13] in settlement with the U.S. Trustee to resolve objections related to the review and editing of time entries and preparation of fee statements and fee applications.  Indeed, many of the entries the Trust now seeks to disallow in its Objection under its "Routine Billing Activities" objection are the ***exact same entries*** for which MFC has not sought compensation as a result of its settlement of the U.S. Trustee's objections.  *See* Ex. C to Obj.  Further, MFC took a $52,714 voluntary reduction in the Fourth Interim Fee Period in this category and did not bill certain other time in the Fifth Interim Fee Period or any time incurred post-confirmation to prepare the Final Application.  As such, reductions from the time detail included in MFC's fee applications total $337,381, an amount in excess of those identified in the Objection.

24.     With respect to defending its fee applications, contrary to the Trust's Objection, MFC ***has not*** billed the estates for any time spent responding to the U.S. Trustee's objections, or for responding to informal inquiries about fee-related issues from members of the Committee. Together, these fees have exceeded $200,000.

25.     After consideration of voluntary reductions and agreed reductions in settlements with the U.S. Trustee, MFC billed a total of $389,166 for the preparation of fee statements and applications, comprising 1% of the total fees billed by MFC on the engagement.[14]  This amount is well below the 3% to 5% reasonableness range for these types of fees referenced in *In re Mesa Air Group, Inc*., 449 B.R. at 445, and is reasonable by any standard.  Accordingly, the Trust's objection should be overruled.

---

[13]     Pursuant to MFC's recent settlement with the U.S. Trustee regarding its Final Application, included in the $284,381 amount is an additional reduction of $20,000 in fees.

[14]     In considering the reasonableness of the time required for preparation of fee statements and fee applications, it is also important to note the massive nature of the undertaking in the ResCap matter.  MFC's fee applications contained over 41,000 time entries and over 3,000 expense entries.

## V. Budgeting Activities

26.     The Trust's fifth objection relates to time spent "preparing an engagement budget,

routinely tracking budget to actual fees and expenses, and updating the budget." Obj. ¶ 43.

27.     As an initial matter, as with the Trust's "Routine Billing Activities" objection, MFC

has already settled with the U.S. Trustee for the first and second interim periods with respect to this

category. *See, e.g.*, U.S. Trustee's Omnibus Objection to Second Interim Fee Applications, Dkt.

No. 3310, at 50. Indeed, many of the entries about which the Trust complains are the **exact same**

**entries** highlighted by the U.S. Trustee in its objections. *Compare* Ex. L to U.S. Trustee's Omnibus

Objection to Second Interim Fee Applications *with* Ex. D to Obj.

28.     Second, the Examiner was required by this Court's order to submit a workplan and

budget.[15] The preparation of a detailed workplan and budget identifying categories of work, tasks,

and professional resources necessary to complete the required work, as well as the ongoing

monitoring of actual fees in comparison with such budget, was an essential component of the

efficient completion of MFC's work in this large and highly complex matter. MFC could not

fulfill its obligation to the Examiner (and, in turn, the Examiner to fulfill his obligation to this

Court) in a timely and cost-efficient manner absent the work about which the Trust complains.

29.     Moreover, MFC did not bill for all of the time it spent in connection with the

preparation of the budget and workplan, and was judicious in determining what time to bill. Of

note, of the time to which the Trust has objected, $84,134 was incurred by the billing

paraprofessional and the senior managing director on the engagement leadership team with

responsibility for billing oversight; $56,906 was incurred by two professionals who assisted with

---

[15]     MFC notes that, while not applicable to these cases, the revised *United States Trustee's Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under United States Code by Attorneys in Larger Chapter 11 Cases*, 78 Fed. Reg. 36248, now require the use of budgets for attorneys in large chapter 11 cases.

the development and implementation of MFC's budgeting process at the start of the case; and

$7,518 was incurred by three other senior engagement leaders who reviewed and discussed the

budget and workplan at various points as part of their engagement management roles.  The work of

each of these targeted individuals was necessary to perform this Court-ordered task.[16]  For these

reasons, MFC maintains the fees incurred were appropriate and the reductions already agreed and

implemented are more than adequate to address the issued identified in the Objection.

## VI. Vague Task Descriptions

30.    In its sixth specific objection, the Trust asks this Court to disallow $289,249 in fees

"that were *so vaguely described* that the Trust could not determine the benefit to the estate derived

from that work."  Obj. ¶ 45 (emphasis added).  A cursory review of the challenged entries shows

the Trust's contentions are baseless.  By way of illustration, the Trust seeks disallowance of the

following time entries as "vague" in just the first page of its 30-page exhibit:

- "Attend call with counsel regarding E. Feldstein Interview."  Entry of James Atkinson of December 13, 2012, Ex. E to Obj.;

- "Coordinate providing representatives from all workstreams with Relativity credentials."  Entry of Oneika Duncan of March 15, 2013 and March 26, 2013, Ex. E to Obj.; and

- "Consider technology to assist with review process with Chadbourne."  Entry of Kevin Faulkner of October 10, 2012, Ex. E to Obj.

These time entries are appropriately descriptive, and the Trust's inclusion of these entries in this

objection is not an instance of mere oversight.  Indeed, the Trust's exhibit is littered with similarly

detailed descriptions.  Not only does the Trust's objection show disregard for what constitutes

---

[16]    Further, the entries to which the Trust objected included $41,862 in fees included in the fee/retention applications category.  As noted previously, MFC's reductions already taken for billing activities exceed those identified in the Objection by approximately $69,000.

"vagueness,"[17] but it also appears that its counsel randomly selected time entries to challenge on vagueness grounds without engaging in a careful, contextual review of such entries. Viewed by a party knowledgeable about the context of the overall case and the issues being investigated by the Examiner, and in conjunction with the detailed narratives provided in each of the five fee applications filed by MFC, the time entries provide sufficient detail regarding the work being performed and the benefit to the estate resulting therefrom.

31.    Moreover, MFC already settled with the U.S. Trustee with respect to certain time entries that are ***exactly the same*** as entries that the Objection lists on its exhibit.[18]  Needless to say, MFC should not have fees for these entries disallowed twice.

32.    Finally, it is important to note the vast majority of the entries identified as "vague" are for small time increments that could permissibly be lumped and for which even a broader time description provides detail in excess of that required by the U.S. Trustee's Guidelines and the Court's guidelines.[19]  Of the 779 entries identified, 501 entries (64%) were for 0.4 hours or less. As such, the detailed time increments recorded by MFC's timekeepers merit consideration in addition to the general content of the descriptions viewed independently.

33.    Based on the foregoing, MFC submits that no additional reductions are merited for allegedly "vague" entries identified in the Objection.

---

[17]    *See, e.g.*, *Cosgrove v. Sears, Roebuck & Co.*, 1996 WL 99390, at *3 (S.D.N.Y. Mar. 7, 1996) ("[M]any of the descriptions of the work performed are vague, including entries such as 'review of file,' 'review of documents' and 'review of [adversary's] letter.'"); *Dotson v. City of Syracuse*, 2011 WL 817499, at *24 (N.D.N.Y. Mar. 2, 2011) ("Descriptions of work such as 'review of file,' 'review of documents' and 'review of letters' are vague . . . ."); *Schruefer v. Winthorpe Grant, Inc.*, 2003 WL 21511157, at *3 (S.D.N.Y. July 2, 2003) (finding time entries including "various phone conferences," "review file," "legal research," and "case administration" were vague).

[18]    *Compare* Ex. I to U.S. Trustee's Omnibus Objection to First Interim Fee Applications, Dkt. No. 2361, *and* Ex. L to U.S. Trustee's Omnibus Objection to Second Interim Fee Applications, Dkt. No. 2361, *with* Ex. E to Obj.

[19]    *See United States Trustee's Guidelines for Reviewing Applications filed under 11 U.S.C. § 330 (1) in larger chapter 11 cases by those seeking compensation who are not attorneys, (2) all chapter 11 cases below the larger case threshold, and (3) cases under other chapters of the Bankruptcy Code,* 61 Fed. Reg. 24889, 24891 at (b)(4)(v) (May 17, 1996) ("[T]asks performed in a project which total a <u>de minimis</u> amount of time can be combined or lumped together if they do not exceed .5 hours on a daily aggregate.") (the "<u>UST Guidelines</u>").

## VII.  Administrative Tasks

34.      The Trust's seventh objection is that certain of MFC's professionals "recorded significant time performing clerical and administrative tasks such as scheduling meetings, preparing, and distributing materials," which was "most appropriate for secretarial staff and should be considered part of a professional firm's overhead expense."  Obj.  ¶¶ 46-47.

35.      A substantial portion of the time about which the Trust complains ($21,216) relates to paraprofessional and analyst time uploading documents to Synthesis.  *See, e.g.*, Ex. F to Obj., Time Entries of Colleen Cummings.  Synthesis is an MFC proprietary web-based analytical tool designed to identify and analyze relationships, synthesize and analyze data and information, and manage engagement workflows and workplans.  MFC customized this tool for use on the engagement to enable the sharing of information regarding the investigation between MFC and Chadbourne professionals.

36.      The UST Guidelines include as overhead "all continuous administrative or general costs incident to the operation of the applicant's office and not particularly attributable to an individual client or case." UST Guidelines at (b)(5)(vii).  Specifically, the UST Guidelines set forth several categories of overhead expenses that are not compensable, such as "word processing, proofreading, secretarial and other clerical services, rent, utilities, office equipment and furnishings, insurance, taxes, local telephones and monthly car phone charges, lighting, heating and cooling, and library and publication charges."  *Id.*.  The uploading of documents to Synthesis was particularly attributable to the engagement and not incident to MFC's day-to-day operations. Moreover, these tasks were delegated to timekeepers with the lowest billing rates, and MFC

16

incurred over $80,000 in fees in connection with this aspect of the engagement that were not billed to the estates.[20]

37.    In addition, another significant block of the time the Trust seeks to disallow ($10,091) relates to "coordinating" internal meetings and third-party interviews. *See, e.g.*, Ex. F to Obj., Time Entries of Melissa Knoll.  These tasks were not administrative in nature simply because they involved "coordination."  Instead, they related to high level meetings and interviews undertaken by MFC's most senior professionals staffed on the engagement.  Given the nature of the meetings and interviews conducted, it was both necessary and appropriate for these more senior professionals to coordinate these matters, including determining the topics to be discussed, the materials to be prepared, and the participants to attend.  The Trust's belief that a secretary or paraprofessional would be able to do so is nothing more than its own supposition based on a hindsight review of billing records.  Such tasks were appropriately assigned to MFC professionals based on the knowledge, skills, and experience required.[21]

38.    Finally, the Trust's objection to "administrative tasks" includes $11,614 in fees from the fee/retention applications category.  These fees primarily related to time spent by MFC's billing paraprofessionals analyzing, reconciling, and documenting the expenses incurred.  MFC submits that these amounts should be compensated in accordance with the UST Guidelines and the Court's guidelines.  Regardless, as noted above, MFC's reductions previously taken for billing activities already exceed those identified in the Objection by approximately $69,000.

---

[20]    In its "Unnecessarily High Billing Rates" objection (discussed below) the Trust argues, among other tasks, "adding users to the Synthesis system . . . . should have been performed by associates."  Obj. ¶ 57.  The Trust makes no effort to explain why, in one portion of its Objection it contends activities relating to Synthesis should have been treated as overhead, while in another portion it argues such tasks should have been performed by associates.  This inconsistency is symptomatic of the haste with which the Objection was assembled.

[21]    Similarly, other tasks complained of by the Trust, such as preparing and formatting exhibits and charts, *see* Obj. ¶ 56 & Ex. I-2, involved the analysis and manipulation of spreadsheets and graphics that required professional skills and, depending on the task, subject matter knowledge, rather than being administrative in nature.  The identification, distribution, and compilation of relevant documents to be addressed in specific interviews, including drafting explanations as to their significance, required subject matter knowledge that administrative personnel lack.

39.     For the reasons provided above, the time incurred was reasonable and necessary and, thus, the Objection should be overruled.

## VIII.  Non-Working Travel Time

40.     In its eighth specific objection, the Trust seeks disallowance of $282,700.75 for non-working travel time billed for travel to New York by out-of-town professionals.  Obj. ¶ 48. Specifically, the Trust argues that, because the Court directed that travel expenses for non-New York professionals to New York should be considered overhead, MFC's non-working travel fees for MFC's non-New York professionals traveling to New York should be disallowed.  *Id.*

41.     As a preliminary matter, MFC limited time charged per trip to no more than 4.0 hours and took a 50% reduction of all time billed.  Moreover, during the hearing on first interim fee applications on December 20, 2012, the Court stated the general guidelines that "[f]or out-of-town travel the case law and the guidelines generally are fifty percent for nonworking. You can bill for working time, but fifty percent for nonworking time."[22]  In addition, during the hearing on second interim fee applications on April 11, 2013, approximately one month before the Examiner's Report was due, the Court provided "future guidance" that "airfare and hotel expenses" associated with travel to New York be treated as overhead but reiterated the Court's past general guidance that "reimbursement for fifty percent of non-work travel time outside of New York" was appropriate.[23]  While MFC is cognizant that the Court ruled on December 17, 2013, in connection with its review of FTI's fourth interim fee application that it would not award compensation in that period for the preponderance of non-working travel time (even at a 50% rate) to and from New

---

[22]     Transcript of Hearing, Dec. 20, 2012, [Docket No. 2523] at 123:24-124:2.
[23]     Transcript of Hearing, Apr. 11, 2013, [Docket No. 3444] at 53:4-5.  MFC notes that the Objection implicitly refers to the April 11, 2013 hearing on second interim fee applications during which the Court ruled that travel expenses were overhead.  Obj. ¶ 48.  To the extent the Court intended to apply the same future guidance to post-April 11, 2013 fees, after taking into account the 50% reduction, MFC incurred $22,173 in fees for non-working travel time after April 11, 2013.

18

York for professionals based outside of New York, the nature of MFC's work on this matter

warrants a different result,[24] namely, the typical allowance of non-working travel time with a 50%

reduction.[25]

42.    Good cause for allowing MFC's non-working travel fees at 50% exists here for a

number of reasons.  **First,** while MFC endeavored to staff the matter with New York-based

employees where appropriate and use conference calls where possible, given the scope and

complexity of the engagement and the abbreviated time frame in which the Examiner's Report was

produced, MFC was required to staff the matter with professionals from other offices who had the

technical expertise and capabilities necessary to perform the analyses required in this  matter.  The

majority of the travel to New York was to attend meetings with the Examiner, Chadbourne, and

other parties in interest and to attend interviews in New York, as well as certain hearings.  **Second**,

as the Examiner and his professionals were reaching conclusions and documenting those

determinations in the Examiner's Report, frequent in-person meetings and coordination between

team members (internal and external to MFC) were required, given the size, scope, and complexity

of the issues being addressed and the relevant time constraints (*i.e.,* the Examiner's original report

deadline was early February, then was extended until early May 2013).  The efficient conduct of

the investigation, including the preparation of complex financial analytics, and the expeditious

development of the Examiner's Report required that members of the various transaction,

functional, and engagement leadership teams interact on a regular and proximate basis.  **Lastly,**

almost all of the professionals travelling to New York based out of other offices were senior

professionals (Senior Vice President or higher), whose participation was critical in performing the

---

[24]    In its guidance with respect to travel expenses to New York at the April 11, 2013 hearing on the second interim fee applications, the Court noted that it was outlining "presumptive rules [that] can be overcome by a showing of good cause."  Transcript of Hearing, Apr. 11, 2013, [Docket No. 3444] at 48:9-10.
[25]    *See* Transcript of Hearing, Dec. 17, 2013 [Dkt. No. 6263] at 111:4-10, 114:22-115:17.

above-described tasks.  Accordingly, there was a compelling reason for MFC's decision to staff

certain professionals from outside of New York and for their travel to New York.  Such staffing

and travel was necessary and in the best interests of the Debtors' estates, justified in view of the

scope of MFC's work, and the skills and expertise of MFC's professionals assigned to this matter,

and, therefore, should be allowed.

## IX.  Typesetting Fees

43.    The Trust's ninth specific objection relates to $2,548,340.50 in fees alleged to have

been incurred in typesetting the Examiner's Report.  Obj. ¶ 49.  The Trust argues that the

typesetting was "unnecessary" and that the Examiner should have used "commercially-available

word processing software . . . ."  Obj. ¶ 50.  This objection shows both a lack of understanding of

the scope of the Examiner's Report and a failure to appreciate the nature of the engagement.

- ***First***, the $2.5 million figure for which the Trust seeks disallowance is fiction.  A cursory
  review of the Trust's exhibit in support of this objection reveals that the Trust did little
  more diligence with respect to this objection than compile the vast majority of time records
  from April 27, 2013 (when the typesetting process began) until the Examiner filed his
  report with the Court on May 13, 2013.  Indeed, the fees identified by the Trust represent
  over 70% of MFC's fees during this approximately two-week period.

- ***Second***, while the Trust appropriately acknowledges that substantial additional work on
  both the narrative of and exhibits to the Examiner's Report was required concurrently with
  the typesetting being undertaken (Obj. ¶ 51), it is important to note what the Objection does
  not say.  Nowhere does the Trust contend that MFC did not efficiently and competently
  complete the task requested of it by the Examiner.  The Trust "carr[ies] the burden of
  explaining what . . . is unreasonable or, at least, what would be reasonable under the
  circumstances."  *In re Blackwood Assocs., L.P.*, 165 B.R. 108, 112 (Bankr. E.D.N.Y.
  1994).  This is especially true here, where Chadbourne bore the responsibility for
  compiling the report.  Whether the report was typeset or whether "commercially-available
  word processing software" (Obj. ¶ 50) was used, MFC would have proceeded the same
  way, by sending to either Chadbourne or the typesetter its analyses or edits to be included
  in the report.  Moreover, in any event, the process of reviewing, editing, and finalizing the
  draft Examiner's Report would have been largely the same whether it was typeset or
  prepared in Microsoft Word; the decision to typeset did not dictate the quantity of work
  performed, merely the medium in which it was performed.

- **Third**, it is important to note the report was typeset *at the direction of the Examiner*.  In his business judgment, and in consideration of both the size and scope of the Examiner's Report, the Examiner determined that typesetting the Examiner's Report was both necessary and appropriate under the circumstances.  As the Examiner's retained financial advisor, MFC followed the direction of its client in this regard, which was inherently reasonable under the circumstances.[26]

44.    For the foregoing reasons, the Trust failed to meet its burden here and, accordingly, this objection should be overruled in its entirety.

## X.  Unnecessarily High Billing Rates

45.    In its tenth objection, the Trust complains MFC staffed certain tasks with professionals who were more senior than required and asks the Court to disallow $330,761 in fees as a result of these alleged staffing inefficiencies.  Obj. ¶¶ 53-57.  Specifically, the Trust argues that MFC (i) staffed senior professionals on initial research items that should have been staffed by associates; (ii) staffed mid-level professionals on document requests and source citation items that should have been performed by paraprofessionals; and (iii) staffed mid-level professionals on document review, citation research, and dataroom management matters that should have been staffed by associates.  Obj. ¶¶ 54-57.

46.    As a general matter, a staffing structure more heavily weighted towards senior professionals has become typical in the industry.  Technology has reduced the time required for junior staff to review documents or prepare basic analyses, while clients' expectations require significant involvement of senior professionals who have the experience to analyze and address increasingly complex financial issues in a timely fashion.  As a result, it is customary to have multiple senior managing directors lead a large engagement, each with specific areas of responsibility.  Such was the case here, especially in light of the complexity of the required

---

[26]    While Chadbourne initially endeavored to compile the Examiner's Report through a desktop word processing program, MFC understands that due to technical difficulties, the Examiner, in consultation with Chadbourne, opted to have the report typeset.

analyses and the severely compressed time frame for the engagement.  In this context, it was

essential that MFC implement a staffing structure that facilitated the simultaneous pursuit of

parallel paths of inquiry and analysis.  The senior managing directors then collaborated across

work streams to ensure consistent and seamless work product.

47.    Moreover, unlike some other engagements, MFC's work in these cases did not

require extensive basic analysis that would be analogous to the initial legal research capable of

being performed by a junior associate at a law firm, or the performance of numerous and wide-

ranging routine tasks that would be more appropriate for para-professionals.  Rather, given the

nature of the engagement, including the fact that the engagement was time sensitive, MFC needed

to rely heavily on its most experienced professionals.  Accordingly, MFC's staffing on the

engagement was appropriate and efficient, and the Trust's objection should be overruled.

Nevertheless, MFC addresses each of the specific categories in turn below.

a.    **Research Fees ($211,400)**[27]

48.    With respect to its Research Fees objection (Obj. ¶ 55 & Ex. I-1) similar to its tactic

with respect to its "typesetting" objection, the Trust appears merely to have identified any time

description containing the word "research" for inclusion in the objection without considering the

context of the use of the term or the task being performed and without examination of the nature of

the analysis being undertaken.  The Trust broadly assumes that the lowest level senior associate

billing at $495 per hour (a professional with an average of three years of post-undergraduate

experience) could perform all of these tasks because they involved "research" in some way.  Obj. ¶

55.

---

[27]    The Trust identified $500,232.50 in charges under this category that it claims should have all been billed at
the senior associate rate of $495 per hour, resulting in the Trust seeking a disallowance of $211,400.

49.     Importantly, from a nomenclature perspective, the term "research," as used by MFC professionals, often more broadly included overall review and analysis of relevant documents, financial data, and other information, rather than the type of initial research performed in a legal context by a junior associate.  To the extent that true research of general public data sources (rather than those requiring specific functional or industry knowledge) was required, MFC has infrastructure personnel who performed that research at no cost to the estates.  In addition, other research and analytical tasks requiring additional experience were delegated to more junior professionals.  There were times, however, when a particular senior team member's unique expertise allowed that person to conduct research (and in reality, perform analysis) most efficiently.  For example:

- The process of drafting or editing heavily factual sections of the report, such as the macroeconomic, industry, and capital markets developments in general and relative to ResCap for which Kevin McColgan (Managing Director) was responsible, was necessarily interactive and required ongoing verification and identification of the data included therein.

- Certain specialized research and analysis related to the securitization process for residential mortgage backed securities and related mortgage servicing industry issues was most effectively performed by more senior professionals, such as Donna Troia (Managing Director), who have extensive experience in this regard.

- The Examiner's Report addressed a number of highly complex theoretical and practical valuation issues, the resolution of which required MFC's senior technical valuation professionals, such as David King (Managing Director) and Matthew Steele (Managing Director), to undertake the necessary research and analysis.

50.     Thus, MFC assessed the skills and experience needed for a given task and assigned it to the individual who could complete it most efficiently and expeditiously within the time constraints of the engagement.  In that regard, MFC believes that all hours and fees identified by the Trust were reasonable and necessary and should be compensated at full rates, rather than the significantly reduced rates proposed in the Objection.

23

b.     **Paraprofessional/Analyst Tasks ($98,143)**[28]

51.    Similar to their purported analysis of "research" charges, with respect to

"Paraprofessional/Analyst Tasks," the Trust again appears to select entries based on certain key

words and makes broad generalizations about the level of professional required to perform the

tasks, assuming all could be performed by a paraprofessional or analyst at $210 per hour.  Obj.

¶ 56 & Ex. I-2.  This assumption fails on several levels:

- *First*, based on MFC's review, the Objection identifies $22,635[29] in case administration and general bankruptcy management fees that are almost entirely related to the Synthesis case management tool described above.  Ex. I-2 to Obj.  MFC's ongoing management of Synthesis was overseen by Kevin Faulkner, a senior vice president in MFC's Technology Advisory Services group who advises clients on structured data discovery, electronic discovery, electronic risk, and digital forensics.  Both Mr. Faulkner and Daniel Ruegg, a senior associate in that group who addressed more straightforward issues, have specialized expertise required to perform these tasks.

- *Second*, with respect to the category of document review and analysis, based on MFC's review, the Objection identifies entries totaling $26,580, many of which include the preparation of a chart, timeline, matrix, list, or other summary or compilation.  Ex. I-2 to Obj.  While the purposes of these tasks were varied, MFC's professionals were developing these documents as part of their analytical processes, not merely retyping information easily derived or resident elsewhere.

- *Third*, with respect to the category of report drafting, based on MFC's review, the Objection identifies entries totaling $51,674 of fees, most of which relate to the preparation or confirmation of citations for the Examiner's Report.  Ex. I-2 to Obj.  While MFC's analysts did perform some work in connection with citations, the entries identified by the Trust generally relate to the assessment of whether the correct document was being cited (not the form of the citations), and thus required the subject matter knowledge of more experienced professionals.  A more limited number of the time entries in this category address preparation of exhibits and related files, which was fully within the purview of the mid-level professionals who performed these tasks.

- *Finally*, in the category of witness interviews and discovery, based on MFC's review, the Objection identifies entries totaling $43,329, most of which relate to the identification, review, and compilation of relevant documents and topics for interviews, as well as preparation of certain interview tracking summaries.  Ex. I-2 to Obj.  The

---

[28]    The Trust identified $144,217 in charges under this category that it claims should have all been billed at the paraprofessional/analyst rate of $210 per hour, resulting in the Trust seeking a disallowance of $98,143.

[29]    The amounts listed in this section are the actual amounts contained in the exhibits to the Objection and billed by MFC in connection with each category of services.

interview preparation process was analytical, rather than administrative, and required the interpretation, prioritization, and synthesis of extensive documents and data from various sources. These tasks required more experienced personnel who understood the issues to be addressed.

52.    Across the board, the Objection considerably understates the level of skill and experience needed to execute the tasks described above. MFC believes that all hours and fees identified by the Trust were reasonable and necessary and should be compensated at full rates, rather than the significantly reduced rates proposed in the Objection.

**c.    <u>Associate Tasks</u> ($21,218)**[30]

53.    With respect to its Associate Tasks objection, the Objection purports to identify certain tasks that are similar to those classified as paraprofessional/analyst tasks above and broadly assumes that the lowest level senior associate billing at $495 per hour could have performed all of these tasks. Obj. ¶ 56 & Ex. I-3. For instance:

- *First*, in the case administration and document review and analysis matter categories, which total $32,092,[31] a number of the entries broadly relate once again to Synthesis system customization or user identification of documents for upload, topics which have been addressed previously. Ex. I-3 to Obj. Other entries relate to professionals reading, reviewing, and analyzing documents concerning such issues as board of directors' governance, strategy, asset sales, and debtor-in-possession financing, which are clearly appropriate for more experienced professionals with responsibility for specific issues or work streams. Certain entries of MFC's Technology Advisory Services professionals performing structured data analysis and other technology reviews of data produced were also included. In each of these cases, the task dictated the experience and skills of the professional assigned.

- *Second*, in the report drafting matter category, which totals $31,780, the entries relate once again to the research and preparation of citations for the Examiner's Report, and are almost exclusively the entries of a single MFC senior vice president, Mary Korycki. Ex. I-3 to Obj. Similar to the above, these entries generally related to the determination of the correct source document for the citation, rather than the form of the citation, and thus required the assistance of a more experienced professional.

---

[30]    The Trust identified $65,817.50 in charges under this category that it claims should have all been billed at the senior associate rate of $495 per hour, resulting in the Trust seeking a disallowance of $21,218.

[31]    The amounts listed in this section are the actual amounts contained in the exhibits to the Objection and billed by MFC in connection with each category of services.

54.    The Objection once again considerably understates the level of skill and experience

needed to execute the tasks described above.  MFC believes that all hours and fees identified by the

Trust were reasonable and necessary and should be compensated at full rates, rather than the

significantly reduced rates proposed in the Objection.

## XI.  Clawbacks

55.    The Trust next contends that the Court should disallow $388,844 in fees incurred

by MFC in responding to so-called clawback requests.  Obj. ¶¶ 58-63.  To expedite the production

of documents, certain parties produced documents prior to completing a full review and later

"clawed back" those to which they asserted privilege or otherwise asserted protections.  In the

context of this reasonable and cost-saving mechanic, the Trust objects to fees incurred with respect

to three specific tasks:  (i) time spent identifying documents requested for clawback; (ii) time spent

searching for alternative documents to cite in lieu of clawed-back documents; and (iii) time spent

reviewing clawed-back documents for content, privilege, or to challenge clawback requests.

56.    The objection is patently absurd, and the Trust fails to offer any argument as to why

these fees should be disallowed.  The Trust's own objection recognizes the Examiner was able to

create certain efficiencies by permitting broad document production subject to clawback.  Obj. ¶

61.  The corollary of that efficiency is that a certain amount of time must be spent on the back end

to return documents erroneously produced.

57.    MFC assisted Chadbourne in responding to "clawback" requests involving

approximately 17,500 documents from January 2013 through the issuance of the Examiner's

Report.  MFC also assisted Chadbourne in (i) identifying information from clawed-back

documents that had been incorporated into the Examiner's Report draft and underlying analyses

and (ii) in identifying alternate data sources (such as redacted versions), facilitating usage of

relevant information in the Examiner's Report in accordance with the protective orders entered in

this matter, and removing references to the protected information.  In most cases, issues needed to be resolved on a document-by-document basis under significant time pressure given the report deadline and the receipt of several clawback requests in the weeks preceding the report's issuance. MFC did not review the clawed-back documents for privilege, as the Objection alleges.  Obj.  ¶¶ 60, 62.[32]

58.    Even with this work on the back end, it is likely the Examiner saved the estates significant funds by negotiating broad productions with clawback rights instead of engaging in significant litigation over discovery matters.  Indeed, though difficult to quantify, a further 30, 60, or 90 days of delay in the issuance of the Examiner's Report would likely have led to additional costs to the estates and to a delay in reaching the global settlement between the parties and confirming the plan of reorganization.

59.    For the reasons above, MFC should be fully compensated for the assistance provided in implementing this transparent process in a highly responsive manner.

**XII.  Multiple Attendees at Meetings**

60.    In its final objection, the Trust asks that the Court disallow $662,978.50 in charges for more than three timekeepers' attendance at meetings.  Obj. ¶¶ 64-67.  Relying on the Court's oral direction to Debtors' counsel at an April 11, 2013 hearing with respect to the number of the Debtor's attorneys who would be permitted to bill for time spent *attending hearings*, the Trust contends that the three-attorney limit imposed by the Court likewise applies to *internal meetings* at MFC.  The proffered basis for this objection is not only inapposite, but reflects a complete lack of understanding of how things get accomplished on a complex matter being worked on by many professionals and should be overruled.

---

[32]    By way of comparison, the Trust objected to $1,119,952 in "Clawback Fees" incurred by Chadbourne.

61.    In the first instance, the Trust's reliance on the Court's oral directions at the April 11, 2013 hearing is completely misplaced.  As the transcript from the hearing reveals, the Court was concerned at the hearing about the large number of the Debtors' lawyers (the Court noted perhaps 15 at a single hearing) attending hearing days with extensive calendars, arguing for 10 minutes, and billing time for attendance at the entire hearing.  *See April 11, 2013 Hearing Transcript* [Docket No. 3444] at 50-52.  That is simply not the case here.

62.    An examiner is not a typical bankruptcy estate professional, as the Court has recognized, and the challenges and rigors of an examiner's task necessitate a staffing and organizational structure that is unique.  Indeed, despite what the Trust suggests, circumstances such as these demonstrate why there is not a blanket rule with respect to the number of internal attendees at meetings.  During the course of the engagement, MFC enlisted the support of over 65 of its professionals.  At the onset of the engagement, MFC committed to the Examiner and Chadbourne that its CEO, Ralph Tuliano, and four senior managing directors would lead MFC's work (the "Leadership Group").[33]  The Leadership Group held frequent meetings to coordinate efforts among MFC's various substantive teams.  This was not an instance of attorneys sitting at a hearing and billing for waiting time.  Rather, it was imperative for the Leadership Group to collaborate and communicate frequently as to avoid siloed work streams and disjointed work product.  These calls and meetings were a necessary and efficient way to supervise the myriad activities MFC was tasked with completing over the course of the engagement, and the efficiencies from these meetings resulted in time and cost savings.

63.    In addition to the Leadership Group, MFC also formed approximately eleven different substantive teams to address specific subject matters under investigation, or work streams,

---

[33]    Ralph Tuliano was tasked with oversight of the entire engagement.  The other four members of the Leadership Group were charged with oversight of specific work streams, each of which included dedicated teams of professionals.

28

such as asset sales, allocation of government settlements, taxes, or derivatives, swaps and hedges, as well as certain functional teams to address tasks such as document management, exhibit preparation, or report drafting.  Given the nature and extent of the investigation, the teams met routinely to discuss the status of their analyses and to share relevant findings from the investigation.  Whether internal or with counsel, various meetings and calls had multiple participants to ensure that individuals with different subject matter knowledge, functional areas of expertise, or roles within the transaction and engagement teams were involved and provided appropriate information and guidance.  In light of the breadth and complexity of the subject matter and the limited time allotted for the Examiner's investigation, frequent communication within MFC's leadership and project teams, as well as between MFC, Chadbourne, and the Examiner, was critical to ensuring that the investigation progressed effectively, work was coordinated to avoid duplication of effort, information was disseminated in a timely and efficient manner to appropriate individuals working on a variety of distinct yet interrelated efforts, and that the resultant Examiner's Report could be completed expeditiously, effectively, and accurately.

64.     Based on the foregoing, MFC submits that the time expended on those occasions requiring more than three professionals in attendance at calls or meetings was thoroughly and clearly accounted for in MFC's time detail, was appropriate and merited under the circumstances. Moreover, even if the Court's April 11, 2013 direction were somehow applicable, it would not provide for a blanket disallowance of all time spent by timekeepers in excess of three. Accordingly, for these reasons, the Court should likewise overrule the Trust's final objection.

## CONCLUSION

65.     For the foregoing reasons, MFC respectfully requests that the Objection be overruled and that the Court enter an order (i) authorizing final compensation in the amount of $39,472,705 for professional services rendered (including $37,179 as reduced pursuant to MFC's

settlement of the U.S. Trustee's concerns with respect to the Final Application during the Fifth

Interim Fee Period) and final reimbursement for actual and necessary expenses incurred in

connection therewith in the amount of $344,747 during the Final Application Period, for total fees

and expenses of $39,817,452; (ii) authorizing and directing the Trust to remit payment to MFC as

set forth in the Final Application, less all amounts previously paid on account of such fees and

expenses; and (iii) granting such further relief as this Court deems just and proper.


Dated: New York, New York          FRIED, FRANK, HARRIS, SHRIVER &
       June 16, 2014                JACOBSON LLP

                /s/ Lisa H. Bebchick_____
                Brad Eric Scheler, Esq.
                Gregg L. Weiner, Esq.
                Lisa H. Bebchick, Esq.
                One New York Plaza
                New York, NY 10004
                Telephone:  (212) 859-8000
                Facsimile:   (212) 859-4000
                brad.scheler@friedfrank.com
                gregg.weiner@friedfrank.com
                lisa.bebchick@friedfrank.com

                *Attorneys for Mesirow Financial Consulting, LLC*