**CHADBOURNE & PARKE LLP**
Howard Seife
David M. LeMay
30 Rockefeller Plaza
New York, New York 10112
Telephone:  (212) 408-5100
Facsimile:  (212) 541-5369

*Counsel to the Examiner*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
---------------------------------------------------------  x
In re:                                    :   Chapter 11
                                          :
RESIDENTIAL CAPITAL, LLC, et al.,         :   Case No. 12-12020 (MG)
                                          :
             Debtors.                     :   Jointly Administered
---------------------------------------------------------  x
```

**REPLY OF CHADBOURNE & PARKE LLP TO LIMITED OBJECTION**
**OF THE RESCAP LIQUIDATING TRUST TO CHADBOURNE'S FINAL**
**FEE APPLICATION AND AMENDED FINAL FEE APPLICATION**

Chadbourne & Parke LLP ("**Chadbourne**"), counsel to the Court-appointed Examiner

Arthur J. Gonzalez (the "**Examiner**") in the chapter 11 cases of the above-captioned debtors and

debtors in possession (collectively, the "**Debtors**"), hereby submits this reply (the "**Reply**") to

the Limited Objection [Docket No. 7030] (the "**Objection**") of the ResCap Liquidating Trust

(the "**Liquidating Trust**" or the "**Trust**") to the Final Fee Application and Amended Final Fee

Application of Chadbourne & Parke LLP, Counsel to the Examiner, for Allowance of

Compensation and Reimbursement of Expenses (the "**Final Fee Application**"), and respectfully

represents as follows:

**PRELIMINARY STATEMENT**

1.      The Examiner and his professionals undertook and promptly completed a full

investigation of and report on the entire course of conduct and all material intercompany dealings

involving ResCap, AFI, Ally Bank, and Cerberus over a period of almost a decade.  The

investigation covered dozens of complex affiliate transactions between those parties, including

discrete, one-time transactions, ongoing intercompany business arrangements, and various types

of capital support.  The Examiner's professionals reviewed almost nine million pages of

documents, conducted ninety-nine formal interviews of eighty-three witnesses, monitored

pending litigation between the Debtors and the ResCap creditors' committee (the "**Creditors'**

**Committee**"), attended numerous Rule 2004 depositions, met with the Creditors' Committee and

other parties (often at their request) on sixty-six occasions, and reviewed and analyzed scores of

presentations and follow-up materials from those parties.  All of this formed the basis of the

Report, which was filed under seal on May 13, 2013 and unsealed on June 26, 2013.

      2.      At the outset of his appointment, the Examiner identified the following major

work processes: (1) information gathering and verification, including obtaining and reviewing

documents; (2) completion of witness interviews; and (3) drafting the Report.  If the Examiner

had been able to set his own timetable, the work would have proceeded *sequentially* from step to

step.  But the Examiner was under intense time pressure.  To accommodate the need for speed,

those work streams instead had to proceed *concurrently*.  Although concurrent work streams

may have been less efficient than sequential work streams, the timing demands required the work

to proceed as it did.  Indeed, many of the producing parties did not complete production of

documents until April 2013, less than one month before the submission deadline for the Report.

Similarly, the last witness interviews were not completed until April 26, 2013, two weeks before

the Report was due.

      3.      The Report identified potentially viable causes of action asserting up to $5.5

billion in damages.  Notably, the Examiner found that many of the claims initially identified by

the Creditors' Committee and others were unlikely to lead to valuable causes of action for

ResCap or its creditors. But the Examiner independently discovered a number of valuable

causes of action that had not been identified by any party. In addition to providing the benefit of

fulfilling the Examiner's obligations to the Court and providing a fair, thorough, and impartial

analysis of all matters within the scope of the investigation, the Examiner's interaction with

parties in interest throughout the investigative process—which informed the parties as to how

comprehensive the Report would be—created powerful momentum towards settlement. All of

this provided real value to ResCap and its creditors.

      4.     The Examiner and his professionals did not create the Examiner's mandate.

Instead, the parties in interest in this case, including parties who now control the Liquidating

Trust, shaped the Examiner's initial mandate and then consistently sought to expand, not to limit,

the matters to be examined. The Examiner's approach to the investigation was shared with the

Court, the U.S. Trustee, and the major case parties at hearings, meetings, and numerous

chambers conferences held by the Court. Notwithstanding that transparent process, the

Liquidating Trust now objects to various tasks that the Examiner undertook and how the

Examiner and his professionals approached those tasks.

      5.     The Liquidating Trust argues that Chadbourne's fees are simply too great. No

party objected to Chadbourne's retention terms, which included details of Chadbourne's 2012

hourly billing rates. Unlike other retained counsel in this case, Chadbourne did not implement

any rate increases during the ResCap matter. That voluntary concession reduced Chadbourne's

requested fees by approximately $1.8 million from its standard rates.

      6.     In addition, no party other than the U.S. Trustee (and the Court at interim

hearings) raised any objection to Chadbourne's interim fee applications or suggested that the

settlements that Chadbourne reached to resolve the U.S. Trustee's objections were inadequate. In response to those objections to interim fee applications from the U.S. Trustee, Chadbourne reduced its fee and expense requests by approximately $545,000. That reduction was agreed to after substantial investigation and discussions between the U.S. Trustee and Chadbourne. If Chadbourne had believed that its concessions would simply be a first bite, it would never have agreed with the U.S. Trustee to the write-offs. The Trust has now raised anew many of the very same issues that were raised by the U.S. Trustee and resolved at the interim fee hearing stage. To penalize a settling party with further exposure in the absence of any new information that would render the previous settlement unreasonable, as sought by the Trust, would be a significant deterrent to any party in future cases from entering into compromises with the U.S. Trustee on interim fee applications. The ability of the U.S. Trustee, a fee examiner, or fee committee to reach a resolution on interim fees would be severely undermined if such agreement were subject to being "re-traded" without any bases.

7.      The Trust also urges an inapposite comparison to the *Lehman* examiner's work. No party until now ever suggested that the *Lehman* examiner's investigation could or should somehow serve as the yardstick for the cost of the ResCap Examiner's work. Nor is that suggestion sensible—the tasks required of the *Lehman* examiner simply do not bear any principled comparison to the extremely broad mandate assigned to the ResCap Examiner. The scope and complexity of an examiner's mandate, and not the size of the debtor's estate, is what drives the cost. The chart below highlights the lack of any correlation between the size of a bankruptcy estate and the cost of an examiner's investigation:

| Case | Assets | Approx. Cost |
|---|---|---|
| *In re Global Crossing Ltd.*, No. 02-40188 (Bankr. S.D.N.Y.) | $25.5 billion | $2 million |
| *In re Enron Corp.*, No. 01-16034 (Bankr. S.D.N.Y.) | $61 billion | $97 million |
| *In re WorldCom, Inc.*, No. 02-13533 (Bankr. S.D.N.Y.) | $107 billion | $25 million |

4

8.      It is far more meaningful to compare the blended hourly fees of Chadbourne in this case to those charged by other estate professionals in this case.  That comparison shows that the blended hourly rate of Chadbourne attorneys—approximately $594 (post-write-offs for U.S. Trustee settlements and *excluding* contract attorneys)—was significantly lower than the blended hourly rates of the Debtors' counsel—approximately $654 (post-write-offs and *including* contract attorneys)—and the Creditors' Committee's counsel—approximately $694 (post-write-offs).  *See* discussion *infra* at Section G.  The comparison to the blended hourly rate of the Creditors' Committee's counsel is particularly relevant here because, concurrent with the Examiner's efforts, the Creditors' Committee performed its own independent but similar investigation.  *See, e.g.*, Statement of the Official Committee of Unsecured Creditors [Docket No. 3202], at 2.

9.      In addition, the Trust suggests that the Examiner failed to file appropriate updates of its budget.  No one suggested until now, long after the fact, that the Court and the parties were not timely updated about the Examiner's investigation and its cost.  To the contrary, the Examiner and his professionals regularly advised the main case parties and the Court that the additional matters that they wanted investigated, along with substantial delays in discovery and substantial "clawbacks" of documents, would increase the Examiner's prior estimates on costs.  The *Lehman* case itself shows the inherent difficulty of accurately predicting the cost of an examiner investigation.  The *Lehman* examiner initially projected that he would incur approximately $23 million in legal fees and complete his report in ten months, but he ultimately incurred approximately $51 million in legal fees in a fourteen-month process.  Further, the *Lehman* examiner stated that his financial advisor was unable to provide a fee estimate at the outset because it had just been retained.  There does not appear to be any further budget

CPAM: 6583097.12

information reflected on the *Lehman* docket.  *See Order Approving the Preliminary Work Plan of Anton R. Valukas, Examiner*, No. 08-13555 (Feb. 17, 2009); Order Granting Application for Allowance of Final Compensation and Reimbursement of Expenses for the Examiner and Jenner & Block LLP, No. 08-13555 (Apr. 24, 2012).

10.     Since March 2014, Chadbourne has spent substantial resources (including hundreds of attorney hours) addressing fee inquiries from the Trust.  While the Trust is free to pursue its apparent agenda of attempting to reduce professional fees for its own financial benefit, it must do so in the way the Bankruptcy Code requires, not by invoking comparisons with the activities of other examiners in unrelated cases, but by addressing the legal question before this Court—whether Chadbourne has satisfied the requirements of section 330 of the Bankruptcy Code as they apply to this case.

11.     The Trust has asserted that Chadbourne has refused to settle, apparently implying that the parties' inability to settle should negatively influence the Court's consideration of Chadbourne's Final Fee Application.  *See* Objection*, at 2, 9.  But the ability or inability of parties to reach a negotiated resolution is entirely irrelevant to the Court's task under section 330, and should form no part of the Court's consideration of the matter.  Here, the Trust is not a disinterested fiduciary like an impartial fee examiner or like the U.S. Trustee, but is simply a litigant whose economic outcome is improved by every dollar not spent on professional fees.  The Objection should be viewed in that context.  Should the Trust wish to draw negative comparisons between Chadbourne and those professionals it has settled with, it would need to disclose the principal elements of consideration that may have influenced other professionals to agree to fee reductions, including ongoing retention by the Trust of those very same

6

professionals.  Also, it would have to establish that the review and settlement process were uniform.

12.     For these reasons and the additional reasons set forth below, and except in the limited instances noted, the Liquidating Trust's Objection should be overruled.

## ARGUMENT

13.     Each of the issues raised by the Liquidating Trust is addressed in the order raised in the Objection.

### A.     "Timekeeping and Billing Errors"

14.     The Trust has apparently reviewed and computed the individual tasks within each of the more than 21,000 individual Chadbourne fee entries and concluded that, in total, Chadbourne overcharged the estate in 49 separate entries a total of 14.9 hours or $8,699.[1] Chadbourne does not contest these calculation errors and agrees that the $8,699 should not be billed to the estate.

### B.     "Routine Billing Activities"

15.     The Objection states that "Chadbourne billed $195,683 . . . for the preparation and review of its own invoices (*not* including time spent preparing fee applications, which is compensable), and responding to inquiries from the U.S. Trustee's office about its professional fees." *See* Objection at ¶ 35.  These issues were already identified by the U.S. Trustee and resolved at substantial cost to Chadbourne and, in any case, the Trust has misstated the law on billing and thus incorrectly identified entries in this category.

---

[1] More than two-thirds of the identified entries were for alleged overcharges of 0.1 or 0.2 hours.

CPAM: 6583097.12

16.     The Trust acknowledges that fees incurred preparing fee applications are compensable.[2] The Trust also seems to suggest that any fee related to billing but not incurred in the preparation of an interim fee application is not compensable.  But that is not the law.  Compensation is generally allowable for billing-related efforts that would not be required in a non-bankruptcy context.  *See In re CF & I Fabricators, Inc.*, 131 B.R. 474, 483-89 (Bankr. D. Utah 1991); *see also In re NuCorp Energy Inc.*, 764 F.2d 655, 658-659 (9th Cir. 1985) ("[I]t is both inconsistent with the express policy of the Bankruptcy Reform Act and fundamentally inequitable to impose substantial requirements on bankruptcy counsel as a prerequisite to obtaining their compensation while simultaneously denying compensation for efforts necessary to comport with those requirements."); *In re Kreidle*, 85 B.R. 573, 575 (Bankr. D. Colo. 1988) (noting that professionals are entitled to reasonable fees for reasonable time spent on "work beyond that customarily spent in routine, necessary billing procedures for other non-bankruptcy clients").

17.     Both the applicable legal standard and Chadbourne's specific time entries were considered when Chadbourne settled these matters with the U.S. Trustee.  The U.S. Trustee filed omnibus fee objections for each interim fee hearing in these cases.  *See Omnibus Objection of the United States Trustee Regarding Fee Applications for First Interim Period* [Docket No. 2361], at 55-56; Omnibus Objection of the United States Trustee Regarding Fee Applications for Second Interim Period [Docket No. 3310], at 49; Omnibus Objection of the United States Trustee Regarding Fee Applications for Third Interim Period [Docket No. 4869], at 52-53;

---

[2] It appears that the Liquidating Trust made an error in its exhibit by including a fee entry that was directly incurred in the preparation of Chadbourne's fee application, activity the Trust concedes is properly compensable.  *See* Objection, Exhibit B at 1, row 11 ("continue preparation of Chadbourne's first interim fee application (1.6); preparation of the Examiner's first interim fee application (1.4) and related certification (.7)").  That error overstates the amount at issue in this category by $1,095.50.

8

Omnibus Objection of the United States Trustee Regarding Fee Applications for Fourth Interim Period [Docket No. 6047], at 71; Omnibus Objection of the United States Trustee Regarding Fee Applications for Fifth Interim Period [Docket No. 7031]. The U.S. Trustee noted issues related to Chadbourne's time spent preparing billing invoices and responses to inquiries from the U.S. Trustee's office.

18.     Chadbourne spent substantial time understanding and addressing the fee issues raised by the U.S. Trustee, including with respect to billing matters. Chadbourne ultimately conceded that the time related to responding to the U.S. Trustee's issues and objections was not billable and settled with the U.S. Trustee on all other issues that the Trust identifies in the category "Routine Billing Activities." Although no specific dollar amount was allocated to the specific issues in the settlements with the U.S. Trustee, the ultimate cost to resolve all issues raised by the U.S. Trustee, which included the fee issues, was more than $420,000. *See* Hearing Transcripts dated Dec. 20, 2012 [Docket No. 2523]; Apr. 11, 2013 [Docket No. 3444]; Sept. 11, 2013 [Docket No. 5164]; Dec. 17, 2013 [Docket No. 6263]; *see also* Omnibus Objection of the United States Trustee Regarding Fee Applications for Fourth Interim Period [Docket No. 6047], at 24. The Court should not allow the Trust's second bite at the apple.

C.     **"Unadmitted Attorney, Summer Associate, or Law Clerk Time"**

19.     The Trust objects to the rates charged for law graduates not yet admitted to practice ("unadmitted attorneys") and summer associates.[3] The Trust asserts that Chadbourne should have billed graduated but unadmitted attorneys at $330 per hour, the highest rate Chadbourne charged for a paraprofessional, rather than $395 per hour, the rate charged by Chadbourne for all first year associates. The Trust further asserts that Chadbourne should not

_____

[3] The Trust appears to use the term "law clerk" interchangeably with summer associate. *See, e.g.*, Objection at ¶ 36. In this Reply, Chadbourne uses one term: "summer associate."

CPAM: 6583097.12

have billed at all for summer associates.  The Trust asserts that Chadbourne's fees for not yet

admitted attorneys should be reduced by $403,435.50 and that Chadbourne's fees for summer

associates should be reduced by $5,757.  The Trust's objection should be overruled for two

reasons: (1) the Trust's statement of the law is incorrect; and (2) the issue has already been

addressed and resolved with the U.S. Trustee for two of the three fee periods in question.

20.     ***Law on Rates for Unadmitted Attorneys.***  The Trust's statement of the applicable

law on rates for unadmitted attorneys is incorrect.  Bankruptcy fees are determined by

multiplying the number of hours reasonably expended by a reasonable hourly rate.  *See Hensley*

*v. Eckerhart*, 461 U.S. 424, 433 (1983).  A reasonable hourly rate, in turn, is the rate "prevailing

in the relevant community for similar services by lawyers of reasonably comparable skill,

experience and reputation."  *Farbotko v. Clinton Cnty.*, 433 F.3d 204, 208 (2d Cir. 2005)

(*quoting Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984)); *see also Konits v. Karahalis*, 409 F.

App'x 418, 422 (2d Cir. 2011) (*quoting Gierlinger v. Gleason*, 160 F.3d 858, 882 (2d Cir.

1998)).

21.     The Trust does not claim that the hours expended by the identified individuals are

inappropriate, but objects instead to the rates of these attorneys based only on its unsupported

claim that "[w]ork performed by attorneys not yet admitted to the bar should be billed at a rate

not to exceed the firm's highest paralegal rate."  *See* Objection, at ¶ 37.  We have not found any

reported decisions in the Southern District of New York that support the Trust's claim.  Indeed, it

is surprising that the Trust makes that claim given that its counsel argued the same position

before Judge Gerber in *In re Motors Liquidation Co*. and lost.  *See* Transcript of Hearing at 20,

*In re Motors Liquidation Co.*, No. 09-50026 (Bankr. S.D.N.Y. Apr. 29, 2010) (denying request

of fee examiner represented by Godfrey Kahn to disallow time charges for unadmitted attorneys, finding that such fees were fully compensable).

22.     Chadbourne's unadmitted associates performed substantive legal work.  The Trust has not suggested that this work could have been done by paraprofessionals.  The rates charged took into account the modest experience of the associates and the need for supervision by more senior attorneys, but that would be true whether they were admitted or not.  There is no difference between the work done by a first year associate who is admitted to the bar and one who is waiting for admission.  That is particularly true here where, during substantially all of the period at issue, each identified associate had already taken and passed the New York bar exam and was pursuing admission to the New York State Bar, a lengthy process.  (Each associate was ultimately admitted to the bar.)  New York's protracted admission process should not penalize associates and the firms that hire them.

23.     Chadbourne charged on an hourly basis in accordance with its ordinary and customary hourly rates, which in turn reflected the rates and billing practices prevailing in the relevant community (New York City) for similar services.  The ordinary and customary rate charged for the service of first year associates already reflects the limited experience of those associates.  This approach is consistent with the standard practice in this jurisdiction.

24.     ***Negotiated Settlement with the U.S. Trustee.***  The U.S. Trustee's interim omnibus fee objections also raised the issue of unadmitted attorneys.  *See* Omnibus Objection of the United States Trustee Regarding Fee Applications for Third Interim Period [Docket No. 4869], at 52; Omnibus Objection of the United States Trustee Regarding Fee Applications for Fourth Interim Period [Docket No. 6047], at 70-71.  Chadbourne and the U.S. Trustee spent substantial time discussing this issue and, while Chadbourne strongly believed that it should

11

properly be reimbursed at the rates it sought for its unadmitted attorneys, Chadbourne agreed to

settle this along with other issues for a substantial fee reduction as part of a global resolution.

*See* Hearing Transcripts dated Sept. 11, 2013 [Docket No. 5164]; Dec. 17, 2013 [Docket No.

6263].

25.     ***Summer Associate Time.***  The Trust contends, without any support, that

"[s]ummer associate time is not compensable in the Southern District of New York."  *See*

Objection, at ¶ 37.  Although there is at least one reported decision in the Southern District of

New York permitting compensation for summer associate time,[4] a Bankruptcy Judge in this

district declined to allow such compensation in a 2010 case.[5] Although judges in this district may

well disallow summer associate fees, the SDNY fee guidelines do not provide such prohibition.

After discussing this issue with the Examiner, Chadbourne will forgo such compensation and

reduce its fee request by $5,757 (the total amount billed by summer associates).

**D.     "Charges After the Examiner's Discharge"**

26.     The Trust asserts that fees incurred by Chadbourne after September 24, 2013, the

date of the Examiner's discharge,[6] are not valid estate obligations.  *See* Objection, at ¶ 40.  The

Trust asserts that $200,963 of Chadbourne's fees fall into that category, as identified in Exhibit

D to the Objection.[7]  The Discharge Order itself eliminates this Objection.

---

[4] *See In re Child World, Inc.*, 185 B.R. 14, 19 (Bankr. S.D.N.Y. 1995) (overruling objection of United States Trustee to request for summer associate fees, noting that such fees were reasonable).

[5] *See* Transcript of Hearing at 19-20, *In re Motors Liquidation Co.*, No. 09-50026 (Bankr. S.D.N.Y. Apr. 29, 2010).

[6] *See* Order Approving Examiner's Motion for Entry of Order Granting Discharge from Duties, Relief from Discovery, Approval of Disposition of Investigative Materials, and Exculpation in Connection with Duties [Docket No. 5187] (the "**Discharge Order**").

[7] The time entries start on September 25, 2013, the day after the Discharge Order was entered, and conclude on December 17, 2013, the effective date of the Debtors' chapter 11 plan.  The Debtors' confirmed plan of reorganization provides that fees incurred by the Examiner's professionals after the Effective Date will be paid by the Liquidating Trust.  *See* Second Amended Joint Chapter 11 Plan Proposed By Residential Capital, LLC, et al. and

27.     The Discharge Order generally terminates the Examiner's duties, but it also specifically provides that "the Examiner and his Professionals shall retain any and all rights, claims, defenses, and objections to oppose any . . . request for discovery pursuant to these exceptions ***and shall be entitled to reimbursement of any fees and expenses incurred (including professional fees and expenses)*** in objecting to, opposing or otherwise responding to any such discovery request."  Discharge Order, at 3 (emphasis added).  The Discharge Order further states that "the Examiner and his Professionals ***shall be entitled to reimbursement of any reasonable fees and expenses (including professional fees and expenses)*** in connection with any cooperation, assistance, responses (to discovery requests or otherwise), or other services they provide pursuant to or relating to this Order . . . ."  *Id.* at 4-5 (emphasis added).

28.     The Discharge Order by its own terms makes certain post-discharge services compensable, including responding to certain discovery requests, transferring the Document Depository to the Debtors, preserving interview materials, and filing final fee applications.  *Id.* at 2-5.  These services are, in fact, exactly what Chadbourne did, as even a cursory review of the Trust's Exhibit D will demonstrate.  Because all the activities in this category are expressly compensable under the Discharge Order itself, this portion of the Objection should be overruled.

**E.      "<u>Contract Attorneys</u>"**

29.     The Trust next objects to legal fees for contract attorneys because Chadbourne did not, as it alleges is required under Bankruptcy Code section 329(a), file "a statement of the compensation paid or agreed to be paid," and that Chadbourne allegedly did not comply with Bankruptcy Rule 2014(a) as to the identity of the contract attorneys it used.  The Trust alleges that Chadbourne should not be reimbursed by the estate for $841,842 it paid in contract attorney

---

the Official Committee of Unsecured Creditors [Docket No. 6065-1], at Article II.B.3.  The post-effective date fees incurred through May 2014 are approximately $525,000.  None of those fees have been paid.

CPAM: 6583097.12

fees.[8]  The Trust's allegations are without merit because: (1) Chadbourne followed the same

approach other estate professionals used in this case; (2) the principal case parties, the U.S.

Trustee, and the Court were aware of and did not raise an issue with that approach; and (3) in any

case, applicable law does not support the Trust's position.[9]

30.     ***Prior Practice and Contract Attorney Retention by Examiner.***  Chadbourne was

not the first law firm to use outside contract attorneys in this case.  Debtors' counsel was using

contract attorneys prior to Chadbourne's involvement and had alerted the Court, the U.S.

Trustee, and other case parties of that fact, but did not file a separate retention application for the

contract attorneys.  Although the expense was listed monthly on the Debtors' fee applications**,** no

party objected to the use of contract attorneys by the Debtors or suggested that the use of the

contract attorneys by the Debtors was improper.

31.     The Examiner propounded document requests soon after he was appointed.

Documents trickled in through October 2012, with fewer than 1,000,000 pages produced.  In

November, the pace of production changed dramatically, with approximately 1,400,000 pages

produced in a matter of weeks.  At that time, it became clear to the Examiner and Chadbourne

that, in order to allow Chadbourne associates to focus on the complex legal and factual analyses

that were the subject of the investigation, it would be necessary to engage outside contract

attorneys to expeditiously perform first-tier document review.  The Court, the U.S. Trustee, the

Creditors' Committee, and other principal case parties (including, directly and indirectly, parties

who are now governing the Trust) were alerted in advance by the Examiner and Chadbourne of

---

[8] Chadbourne billed all contact attorneys ***at cost***—$48 per hour.  There was no markup on the billing rates of the
contract attorneys.

[9] In addition, even if the Court determines that a retention application should have been filed for the contract
attorneys, the circumstances here would justify the filing of an application on a *nunc pro tunc* basis.

14

their intent to engage contract attorneys.  No party objected.  Chadbourne then undertook the

process of finding and hiring contract attorneys.  Chadbourne disclosed the use of contract

attorneys in several ways, including: (1) orally, at chambers conferences; (2) by the distribution

of monthly Chadbourne invoices to the main case parties; (3) by the filing of a Supplemental

Declaration of Howard Seife in Connection with Retention and Employment of Chadbourne &

Parke LLP as Counsel to the Examiner [Docket No. 2653] (detailing the agreement with Update

Legal to provide contract attorneys to provide document review and confirming that the same

conflict screening process was used by each of the attorneys); (4) by inclusion of expense totals

in quarterly fee applications (including a redacted spreadsheet with a listing of all contract

attorneys in Exhibit F of Chadbourne's Second Quarterly Fee Application); and (5) by

communications between the U.S. Trustee and Chadbourne.  With respect to the last item, a

spreadsheet with contract attorney productivity data was provided to the U.S. Trustee in

February 2013 and at the end of the Third Interim Fee Application period.  Chadbourne also

exchanged e-mails and held conferences with the U.S. Trustee's office on several occasions in

January and February 2013 to confirm that the work of the contract attorneys had been fully

reviewed and vetted by Chadbourne for quality and quantity purposes.[10] Neither the Creditors'

Committee nor any other party objected to Chadbourne's engagement of the contract attorneys

after these disclosures.  Based on all of the above disclosures and approvals, Chadbourne paid

for the services of the contract attorneys.  The reimbursement of that expense was approved as

part of the interim fee applications.

---

[10] As discussed with the U.S. Trustee at the outset of the contract attorney retention process, full names of contract
attorneys were not filed or publically disclosed.  Instead, Chadbourne provided each contract attorneys' first name
and the first initial of each last name.  This was important because Chadbourne provided specific productivity data
by individual—including the number of documents reviewed each day by each contract attorney—and believes that
data should not be available on a named contract attorney basis.

15

32.     With the exception of the data requested by the U.S. Trustee, Chadbourne was
never asked for contract attorney time sheets or any other supporting data regarding contract
attorneys.  Although the Trust requested certain information from Chadbourne on contract
attorneys' rates and the contract attorney retention processes in April 2014 (and complete
answers were provided by Chadbourne), the Trust never requested any additional documentation.

33.     ***Applicable Law.***  The cases cited by the Trust are inapposite and stand for the
unremarkable general proposition that attorneys who are required to file retention applications
must file those applications to be paid.  *See, e.g.*, *In re Midland Capital Corp.*, 82 B.R. 233, 241
(Bankr. S.D.N.Y. 1988) (applicants seeking administrative expense claim could not have their
attorney paid by estate unless a retention application is filed); *In re Cenargo Int'l, PLC,* 294 B.R.
571, 606 (Bankr. S.D.N.Y. 2003) (barristers could not be paid because not retained under section
327 and "also because the Joint Administrators have assured the Court that the barristers may
apply in England to be compensated").  Of course, the issue is not whether Chadbourne was
required to file a retention application for itself, but whether Chadbourne (or the contract
attorney placement firm or each individual contract attorney) was required to file a retention
application on behalf of each contract attorney.  One case appears to have addressed that issue.

34.     In *In re Worldwide Direct, Inc.*, 316 B.R. 637, 645-52 (Bankr. D. Del. 2004), a
liquidating trustee objected to the reimbursement of fees for contract attorneys who were used by
a debtor's counsel but never separately retained.  There, just as here, it appears to have been
undisputed that the retention of the contract attorneys was disclosed to both the court and the
creditors' committee on a number of occasions and that the contract attorneys worked in the law
firm's office under the direct supervision of more senior attorneys, performing tasks similar to
those performed by the firm's attorneys.

16

35.     Judge Walrath reviewed a number of issues concerning the requested fees and
concluded that contract "attorneys who are under the close supervision of a law firm are not
outside attorneys who must be disclosed to the client under the Model Code of Professional
Responsibility (1980) or the Model Rules of Professional Conduct." *Id.* at 650.  Judge Walrath
concluded that the retention application of the debtor's counsel covered the retention of the
contract attorneys and that a separate retention application was not necessary. *See id.* at 651.

### F.     **"Typesetting Fees and Expenses"**

36.     The Trust objects to $342,952.50 in fees that the Trust believes were "additional
proofreading and quality control charges necessitated solely by the decision to typeset the
Examiner's report." *See* Objection, at ¶ 45.  The Trust also seeks to disallow reimbursement to
Chadbourne of $371,405.20 it paid a vendor for typesetting, managing, and publishing the
Report, and providing the technological platform for those services. *See id*. at ¶ 48.[11]  The
Trust's argument is essentially that the Examiner's decision to use an outside vendor to provide
the technological platform for publication of the Report was unreasonable because the *Lehman*
examiner did not do so.  That is not the applicable standard.  The question is whether the services
provided were "reasonably likely to benefit the estate." *See In re Mesa Air Grp., Inc.*, 449 B.R.
441, 444 (Bankr. S.D.N.Y. 2011).  Here, the Examiner carefully considered the options for
overcoming the daunting logistical hurdles presented by the completion of the Report, and made
a reasonable decision to use an outside vendor.  Moreover, as discussed below, even if the Court
were to disagree with the reasonableness of the Examiner's decision to use an outside vendor, the
specific time entries identified by the Trust are not attributable to "typesetting," but rather reflect

---

[11] Chadbourne obtained a very favorable rate structure from the vendor for its work.  Moreover, upon receipt of the
final invoice, Chadbourne negotiated an additional reduction of approximately $150,000 from the vendor.

17

substantive work on the Report that would have been incurred in any case and should be allowed.

37.    ***Reasonableness of Using the Outside Vendor***.  Although the Trust correctly identifies the standard as an objective reasonableness test, "[t]he determination of reasonableness should not be made in hindsight ***but as of the time when the services were rendered***."  *See Mesa Air*, 449 B.R. at 444  (emphasis added); *see also In re Value City Holdings, Inc.*, 436 B.R. 300, 306 (Bankr. S.D.N.Y. 2010) ("Even if the Professionals turned out to be wrong . . . a 'court does not determine 'reasonableness' through hindsight.'").

38.    In this case, the press of time and the size of the Report made its timely completion as a Word document problematic, if not impossible.  Early in the drafting process, certain Report sections had to be further divided into separate Word documents because each of the documents contained hundreds of footnotes and dozens of complex exhibits, and would "crash" during revisions.  After multiple discussions on this issue with, among others, Chadbourne's document management and reproduction specialists, the Examiner determined that outside assistance was needed to complete the Report on time and in a useful form.

39.    The Examiner's team interviewed four vendors who specialized in printing and/or data management.  After review of the vendors' proposals, Chadbourne found (unsurprisingly) that each had its benefits and drawbacks.  Ultimately, it was determined that using an outside vendor would be the best way to publish the Report while meeting the Bankruptcy Court-imposed deadline.  Doing so eliminated the logistical problems that occurred with early efforts to produce the Report in-house and also allowed for better quality control over the final version of the Report.  That decision was reasonable and should not be second-guessed in hindsight.

CPAM: 6583097.12

40.    ***The Identified Time Entries Relate to Substantive Work***.  The fees disputed by

the Trust in this category were not incurred because an outside vendor was used, but rather

involved substantive drafting, revising, editing, and reviewing of drafts of the Examiner's Report

(which at that stage was in the outside vendor's electronic publication format: "typeset").  A

review of the itemized fee entries identified by the Trust in its Exhibit E reveals that the Trust

has taken issue with fee narratives that include the word "typeset," without any regard for the

actual work performed.

41.    The time entries specifically identified by the Trust in its Exhibit E reflect time

spent by attorneys reviewing, revising, and finalizing the Report.  As we have repeatedly

explained to the Trust's representatives, that review and revision process was not simply a matter

of performing "additional proofreading and quality control."  Obj. ¶ 45.  Rather, professionals

working on the drafts of the Report were reviewing and revising for substance.  Most, if not all,

of the sections needed significant substantive editing at that stage to clarify certain points or add

analysis that was triggered by new information (the last witness interviews were not completed

until April 26, 2013, two weeks before the Report was due) or by the final substantive page-by-

page review performed by the Examiner himself and the most senior members of the team.

42.    The Report ended up being 2,245 pages  in length (including the Appendix), with

nearly 9,000 footnotes and over 180 graphs, charts, and tables.  It consists of many different

sections and topics, each of which was prepared by separate teams.  Knitting the various sections

into one cohesive Report required a significant amount of effort, and that effort would have been

necessary regardless of the format in which the Report was being compiled.  Even with extensive

coordination efforts throughout the course of the Investigation, given the sheer magnitude of the

investigation and the deadlines imposed on the Examiner, there were necessarily some overlaps

19

as well as some gaps within the initial end-to-end draft of the Report, which were all addressed

when the Report sections were joined together into a single document and edited into a coherent

whole.  The process of creating one cohesive Report was not less efficient as a result of the

Report being compiled by the outside vendor.  In many ways, the use of the outside vendor made

the process ***more*** efficient.  For example, it obviated the need for attorneys to deal with the many

logistical problems that invariably arise when multiple Word documents are combined.  (Those

problems would have been compounded many times over in this case, where literally dozens of

Word documents had been created.)

43.     The process of compiling the Report began several weeks before the submission

deadline.  At the time, Chadbourne was still receiving and analyzing documents and information

from late-producing parties, and Chadbourne needed until the very end of the time allotted for

completion of the Report to synthesize this information and put it in proper context within the

Report.  In addition, as discussed below, Chadbourne was also dealing with many "clawback"

requests by various parties until almost the very end of the Investigation.  The clawbacks

required revisions to the Report, almost until the date of filing, to add and remove references to

certain documents and information.  Had parties provided information and initiated their

clawback requests earlier, there would have been less editing of the draft.  That was not a luxury

that Chadbourne was afforded.

44.     The final week before submission of the Report involved a significant amount of

work, as reflected by the time recorded by Chadbourne attorneys.  For purposes of efficiency,

some Chadbourne attorneys worked on site at the vendor's office.  At that stage, every single

cross-reference in the Report had to be reviewed and, if necessary, corrected.  Each team initially

drafted its own section, and this cross-referencing could not be completed until the Report was

CPAM: 6583097.12

integrated into a single document and placed in close to final form.  Looking up cross-references in a Report over two thousand pages long is a long and tedious process, but it is also one that was critical to bring the Report together and make it a document that could be used effectively by the Court and the parties who would be relying on it.  Finally, the legal and factual citations were reviewed carefully at this last stage, and every one of the sections was checked for consistency with other sections of the Report and accuracy in light of information still being received, or clawed back, late in the Investigation process.  The attorneys at the vendor's office worked in different teams, with some focused on the citations, others on cross-references, and others on the final substantive review.  No one was tasked with a simple typo or spelling review of the Report; that work was undertaken as part of the Report drafting while the sections were still in Word.

## G.      "Unnecessarily High Billing Rates"

45.      The Trust asserts that Chadbourne chose to "staff even routine aspects of this engagement using senior attorneys at very high rates."  The result, according to the Trust, is the "unnecessarily high" overall blended rate of $572.  The Trust provides no factual support for this assertion.

46.      Even though the task at hand here required more senior level input than might be required in a routine or run-of-the-mill case, Chadbourne's blended rate is powerful proof that this engagement was staffed thoughtfully and efficiently.  Chadbourne's blended hourly rate for all attorneys—*excluding* lower cost contract attorneys—was $594 (post-write-offs for U.S. Trustee settlements).  *See* Final Fee Application, Exhibit F, at 6.  In comparison, the Debtors' counsel's blended hourly for all attorneys—*including* outside contract attorneys—was approximately $654 (post-write-offs), *see* Fifth Interim and Final Fee Application of Morrison & Foerster LLP [Docket No. 6567], and the Creditors' Committee's counsel's blended hourly rate

for all attorneys was approximately $694 (post-write-offs). *See* Fifth and Final Application of

Kramer Levin Naftalis & Frankel LLP [Docket No. 6589]. The comparative blended rate data

belies the Trust's suggestion that Chadbourne did not work as efficiently as other major

participants in this case.

**H.     "Document Review"**

47.     The Trust next objects to Chadbourne's use of certain "first tier" document

reviewers. The Trust argues that contract attorneys should have conducted all "first tier"

document review and that Chadbourne incorrectly represented in its Second Interim Fee

Application that all such work would be performed solely by contract attorneys. The Trust

asserts that some of this work was instead done by "more senior associates or partners" at an

overall blended rate of $520, resulting in $836,614 of time charges for first-tier document

review. *See* Objection, at ¶ 52. The Trust alleges that Chadbourne therefore overbilled the estate

the difference between a $50 per hour contract attorney rate and the $520 blended rate for this

work, for an aggregate of $756,254. *Id*.

48.     As noted above, the volume of documents produced to the Examiner increased

significantly in November 2012, when approximately 1,400,000 pages were produced, including

a substantial number of the complicated transactional documents that the Examiner had sought.

That was followed by approximately 1,000,000 pages produced in December, over 1,500,000

pages in January, and approximately 3,300,000 pages in February.

49.     Given the complexity of the transactions which the Examiner had to analyze,

Chadbourne could not simply hire contract attorneys and ask them to find a "smoking gun" in an

enormous mass of documents. In fact, there was no specific e-mail or other document that could

provide the answers to any single contested issue. Instead, painstaking preliminary analysis was

CPAM: 6583097.12

required to understand the transactions and what type of documents might be important. That preliminary analysis took place during the initial phase of the review before contract attorneys were involved. During that initial period, certain more experienced attorneys reviewed the documents, including the complex transactional documents. This allowed Chadbourne to satisfy the twin goals of obtaining sufficient information on the types of documents at issue to inform less experienced attorneys and to begin the long and difficult task of reviewing the documents.

50. By the time the substantial November productions began arriving, Chadbourne had sufficiently mastered the learning curve and understood what types of documents were being produced and what needed to be examined more carefully. Given that fact and the substantial production of documents during the month, Chadbourne notified the Court and the main case parties of its intention to use contract attorneys. No party disputed that need and, in mid-November, Chadbourne began to use contract attorneys. The initial group of contract attorneys started work by the end of November and a second group started on December 10, 2012.

51. The work complained about by the Trust in this category relates to the efforts of the Chadbourne document review team. That team was mostly comprised of junior and mid-level associates. Chadbourne voluntarily reduced the billing rates of six of the more senior attorneys on the document review team to the 2012 rate charged for third-year associates, $495 per hour. The Trust identified 586.5 hours of additional document review time billed by mid-level and senior attorneys (not partners) at a blended hourly rate of approximately $574.45, for a total charge of $336,917.50. While Chadbourne asserts that the use of all of these attorneys was necessary and appropriate from the outset, after discussing this issue with the Examiner, Chadbourne will voluntarily reduce the billing rate in this category for all mid-level and senior attorneys to the 2012 rate charged for third-year associates, $495 per hour. The adjustment of

23

the billing rate for those 586.5 hours to $495 per hour results in a total charge of $290,317.50, a reduction of $46,600.

52.     Staffing this matter with experienced attorneys at the outset allowed those attorneys to become fully conversant in the nature of the produced documents.  Those attorneys could then train and supervise contract attorneys when that became necessary and/or perform additional substantive work during the investigation.  Chadbourne was able to determine which documents were likely of interest to the investigation and pass on that know-how to the contract attorneys, who then conducted the first-tier review of the vast majority of the almost 9,000,000 pages that were produced.

I.     **"Clawbacks"**

53.     The clawback procedure in the Examiner discovery process was established pursuant to a Court order that had been approved or reviewed by all of the main case parties, including the Creditors' Committee.  As described below, a party wishing to claw back a document had to show that the document was: (1) inadvertently or mistakenly produced; and (2) protected or prohibited from disclosure.  The Trust—ignoring the second criteria—now argues that it was inappropriate for Chadbourne professionals "to review clawed-back documents for privilege, challenge clawback requests, and research alternative sources of privileged information."  *See* Objection, at ¶ 55.  Instead, according to the Trust, the Examiner should have complied with clawback requests "promptly" and without question, and that doing so would have somehow "streamline[d] the document discovery process."  *See id*. at ¶ 56-57.

54.     The Trust's argument is fundamentally flawed for two reasons.  First, the Trust ignores the significant effort that was necessary just to comply with the clawback requests.  It was not a matter of simply identifying and returning the documents.  Rather, as shown below, the

24

clawback requests related to thousands of documents that had already become deeply embedded in the work streams of the Examiner's professionals, including in witness interviews and in draft sections of the Report. The removal and deletion of one particular clawed-back document often had a "butterfly effect" on other sections of the Report.

55.     Second, in arguing that Chadbourne's response to the clawback requests was unreasonable, the Trust ignores the state of the case at the time the clawback requests were made. On the one hand, the Examiner was being threatened with litigation from the producing parties if any "confidential" clawed-back document was mentioned in the Report. On the other hand, the Creditors' Committee and certain of its members, among other creditors, insisted on a complete and thorough investigation and analysis that dealt with all non-privileged documents. If the Examiner had simply acceded to all of the clawback requests without any challenge, there is little doubt that the Creditors' Committee (and perhaps other parties) would have challenged the quality and completeness of the report. The Creditors' Committee—the predecessor of the Liquidating Trust—was especially adamant on those issues.

56.     A brief review of case history shows that the response by the Examiner (and Chadbourne) to the clawback requests was completely reasonable and indeed was almost identical to the response of the Creditors' Committee and its professionals.

57.     Production of documents to the Examiner began on a rolling basis in late July 2012 and continued into April 2013. Witness interviews began in September 2012 and continued throughout the course of the Examiner Investigation. The Uniform Protective Order

CPAM: 6583097.12

for Examiner Discovery (the "**Protective Order**")[12] contained a "clawback" provision that stated in pertinent part:

> If a Disclosing Party inadvertently or mistakenly produces information that is protected or prohibited from disclosure, upon written request [("Clawback Request")] by the Disclosing Party after the discovery of such inadvertent or mistaken production, the Receiving Party shall use all commercially reasonable efforts to return or destroy the information for which a claim of inadvertent production is made and all copies of it, including any work product containing, identifying, or referencing such information . . . .

Protective Order, at ¶ 26.

58.    After millions of pages of documents had already been produced to the Examiner, and after dozens of interviews had already been conducted (at which witnesses were shown documents that had been produced), certain of the producing parties began making Clawback Requests.  Many of the Clawback Requests were based on the so-called "Bank Regulation privilege," whereas others were based on the attorney-client privilege and/or the work product doctrine.[13]

59.    The Examiner received numerous and substantial Clawback Requests, covering approximately 17,000 documents and over 100,000 pages.  The volume of Clawback Requests— of a magnitude entirely unexpected by the Examiner—became so significant that, on March 4, 2013, the Examiner sought the Court's intervention to impose time deadlines on the issuance of further Clawback Requests, noting that further Clawback Requests would complicate and

---

[12] The Protective Order was approved by the Court on August 20, 2012 as part of the Court's entry of the Order (I) Granting Examiner Authority to Issue Subpoenas for the Production of Documents and Authorizing the Examination of Persons and Entities, (II) Establishing Procedures for Responding to Those Subpoenas, (III) Approving Establishment of a Document Depository and Procedures to Govern Use, and (IV) Approving Protective Order [Docket No. 1223].

[13] No court has considered or adjudicated the claims of privilege that underlie the Clawback Requests.

CPAM: 6583097.12

possibly disrupt the orderly completion of the Examiner Report.[14]  The Creditors' Committee

filed a statement [Docket No. 3202] (the "**Committee Statement**") requesting that the

Examiner's request for the imposition of clawback deadlines apply with equal force to any

clawback requests directed to the Creditors' Committee.  On March 15, 2013, the Court imposed

the requested clawback deadlines.[15]

60.     The Examiner and his professionals expended substantial efforts to comply with

the Clawback Requests.  Upon receipt of each Clawback Request, as required by the Protective

Order, the Examiner and his professionals used all commercially reasonable efforts to: (1) return

or destroy the information that was the subject of the Clawback Request, including all electronic

and paper copies of relevant documents; and (2) destroy any work product containing,

identifying, or referencing information that was the subject of the Clawback Request.

61.     As part of that process, the Examiner and his professionals surveyed all the

various teams involved in the Investigation to determine if they were using such information in

their work product.  The Examiner and his professionals then took all necessary steps to modify

or adjust their work product in light of the Clawback Requests, including by discontinuing the

use of any documents implicated by Clawback Requests in further witness interviews.  With

respect to interviews that had already occurred, the Examiner's professionals flagged the

portions of the interviews that referenced a document that had subsequently become subject to a

Clawback Request and ensured that none of those passages were used or cited in the Report.

62.     In certain limited instances, where a clawed-back document was integral to the

Report's findings, no suitable replacement source could be located, and the claim of privilege

---

[14] *See* Motion of the Examiner for Entry of an Order Modifying the Uniform Protective Order for Examiner
Discovery [Docket No. 3092].

[15] *See* Order Modifying Uniform Protective Order for Examiner Discovery [Docket No. 3215].

CPAM: 6583097.12

was suspect, the Examiner directed his professionals to challenge the Clawback Request.  In

almost all circumstances, the challenges were resolved consensually.  In the one instance in

which the Court was asked to rule on a clawback dispute, the Court ruled in the Examiner's favor

and denied the clawback request.[16]

63.      Chadbourne's response to the Clawback Requests was reasonable and benefited

the estate.  The reasonableness of Chadbourne's response can be confirmed by the fact that the

Creditors' Committee responded in a nearly identical manner under the same circumstances.  In

the Committee Statement, the Creditors' Committee outlined its significant efforts in response to

the Clawback Requests, and highlighted the importance of the clawed-back material in light of

the impending deadline for submission of the Examiner's Report:

> AFI's, Cerberus' and the Debtors' belated clawbacks have placed
> significant burdens on the Committee . . . .  Upon receipt of each of
> these requests, the Committee had to undertake to remove many
> thousands of pages from its databases; find and destroy references
> in its work product—including, most significantly, its draft
> submissions—to any clawed back material; and scour the parties'
> productions for suitable alternate sources of important information.
> In several instances, the Committee was unable to find such
> alternatives, and had to incur additional time and resources making
> formal requests to bank regulators for their discretionary disclosure
> of certain purportedly privileged materials. Having to reach out to
> such regulators on a piecemeal basis . . . reduces the likelihood that
> the Committee will obtain any waiver in time to share its views of
> such material with the Examiner before he issues his report.

Committee Statement, at 3-4.

### CONCLUSION

For the reasons set forth above, Chadbourne asserts that the fees and reimbursement of

expenses it seeks in the Final Fee Application are reasonable and necessary and should be

---

[16] *See* Order Denying Oral Application By Ally Financial Inc. To Clawback Documents Produced By Cerberus To
The Examiner [Docket No. 3516].

CPAM: 6583097.12

allowed, and that the specific objections raised by the Liquidating Trust should be overruled,

subject to the adjustments identified herein.


Dated:  June 16, 2014
       New York, New York


                              **CHADBOURNE & PARKE LLP**

                              By:   __/s/ Howard Seife_____
                                    Howard Seife
                                    David M. LeMay
                                    30 Rockefeller Plaza
                                    New York, New York 10112
                                    Telephone:  (212) 408-5100
                                    Facsimile:  (212) 541-5369

                                    *Counsel to the Examiner*

CPAM: 6583097.12