# EXHIBIT 19

144HB5

**Time of Request:** Monday, November 26, 2012   07:31:23 EST
**Client ID/Project Name:** reed
**Number of Lines:** 305
**Job Number:**      1828:382257847

Research Information

**Service:**   Terms and Connectors Search
**Print Request:** Current Document: 1
**Source:** NJ State Cases, Combined
**Search Terms:** name(v.a.l. floors and westminster communities)

**Send to:**  McCrink, Krisden
       MCCRINK, KEHLER & MCCRINK
       475 N ROUTE 73 STE 1
       WEST BERLIN, NJ 08091-2003



1 of 1 DOCUMENT

**V.A.L. FLOORS, INC. AND 3L COMPANY, INC., PLAINTIFFS-APPELLANTS, v. WESTMINSTER COMMUNITIES, INC., DEFENDANT-RESPONDENT.**

**DOCKET NO. A-6525-00T1**

**SUPERIOR COURT OF NEW JERSEY, APPELLATE DIVISION**

*355 N.J. Super. 416; 810 A.2d 625; 2002 N.J. Super. LEXIS 470*

**October 23, 2002, Argued**
**December 5, 2002, Decided**

**SUBSEQUENT HISTORY:** [***1] Approved for Publication December 5, 2002.

**PRIOR HISTORY:** On appeal from Superior Court of New Jersey, Law Division, Hudson County, L-4199-98.

**COUNSEL:** *Anthony J. Belkowski* argued the cause for appellants (*Hedinger & Lawless*, attorneys; *Mr. Belkowski*, on the brief).

*Stephen M. Charme* argued the cause for respondents (*Witman, Stadtmauer & Michaels*, attorneys; *Mr. Charme*, on the brief).

**JUDGES:** Before Judges KESTIN, FALL [1] and WEISSBARD. The opinion of the court was delivered by WEISSBARD, J.A.D.

> 1  Judge Fall did not participate in the argument of this case. He has been added with consent of all counsel.

**OPINION BY:** WEISSBARD

**OPINION**

[*418] [**626] The opinion of the court was delivered by

[*419] WEISSBARD, J.A.D.

In this breach of contract case, plaintiffs, V.A.L. Floors, Inc. (VAL) and 3L Company, Inc. (3L) appeal from summary judgment granted in favor of defendant Westminster Communities, Inc. We are required to determine whether a contractor's [**627] profit estimate based on its past experience is a sufficiently definite basis upon which to submit a damage claim to the jury. Because we conclude that such an estimate amounts to more than just speculation, we reverse.

Westminster is the [***2] owner of the "Villas at Harbor Island" (Villas) in West End, NJ. In July of 1997, VAL, a flooring subcontractor, learned of a project at the Villas to install and upgrade flooring materials in individual units. VAL began to prepare a base bid for the fifty-five units at the Villas. VAL employees solicited bids from subcontractors and suppliers of materials over the phone in order to obtain prices needed for the bid. According to VAL, this type of price solicitation is common among contractors in the construction business. VAL took the prices that it obtained from the phone solicitations and transferred them onto cost analysis sheets. In her certification, Linda Luppino [2] explained the process:

> Plaintiffs then obtained costs for the labor to be utilized on the Project based upon standard union rates at that time for

355 N.J. Super. 416, *419; 810 A.2d 625, **627;
2002 N.J. Super. LEXIS 470, ***2

each of the various disciplines who would be installing the different materials at the Project. These costs were translated, based on our experience, into units of work per man/hour in order to come up with the gross labor costs. In other words, we estimated not only the total labor cost for the base project, but also the per unit cost for each type of material to be [***3] installed in each type of unit. These costs were then also transferred to the cost analysis sheets.

2    Vito Luppino is the president of VAL. His daughter, Linda Luppino, worked for VAL before becoming president of 3L Company, Inc.

Based on these prices, VAL "determined what markup or profit it would seek in preparing its base bid of S 443,000," which it submitted in September 1997. Again, this method of arriving at the base bid price was that customarily followed by VAL in the past and by other subcontractors.

[*420] Up to this point in time, 3L had not been incorporated. Its incorporation, however, was in the process at the time and VAL intended that 3L would work with it on the project as a joint venture.

In September of 1997, shortly after the bid was submitted, Westminster contacted VAL and informed it that Westminster was accepting VAL's bid. The parties reached a verbal agreement that VAL would perform the work set out in its bid. Luppino's certification explained what happened next:

VAL and 3L then [***4] commenced discussion with representatives of Westminster concerning various upgrade programs which would be offered to prospective unit purchasers in lieu of the base materials. The costs for these upgrade programs were obtained and prepared in the same fashion as those for the base contract work. At that time it was our opinion, based upon past experience, that there would probably be approximately S 232,000 worth of upgrades for the Project bringing the total contract amount to at

least S 675,000. As upgrade work is highly profitable in comparison to base contract work, it was our feeling that we would make at least a 33% overall profit on the job, or S 235,000.

VAL and 3L were issued numerous construction work orders for various units by Westminster in February and March of 1998. According to the Luppino certification,

[a]dditionally, plaintiffs constructed on site a showroom containing samples of [**628] base grade items and the various upgrades of flooring materials which would be available to prospective purchasers of the units. Plaintiffs expended considerable time [3] and effort in establishing the upgrade program as well as the showroom. Westminster clients would and did choose their [***5] selections from this showroom.

3    Luppino claimed to have spent more than half of her time working on this project over several months.

Plaintiffs asked Westminster for money in advance in order to purchase materials and store those materials at an off-site facility. Westminster denied the request, stating that such a payment was not their typical practice and that it normally paid a contractor after each unit was completed. In a letter dated April 21, 1998, VAL and 3L informed Westminster that it would accept Westminster's payment terms.

The next day, April 22, 1998, Joseph McGinley, a Westminster employee, wrote to plaintiffs informing them that Westminster was terminating its relationship with VAL and 3L and that [*421] Westminster had made "a decision to use another supplier." In its complaint, filed a month after the termination, plaintiffs claimed, in separate counts, both out of pocket expenses for "labor, services and materials," as well as lost profits.

As noted, plaintiffs estimated the total contract amount [***6] at S 675,000, as to which they expected to make 33% profit, or S 235,000. However, Luppino

Page 3

355 N.J. Super. 416, *421; 810 A.2d 625, **628;
2002 N.J. Super. LEXIS 470, ***6

also estimated another, alternative profit based on discovery reflecting specification sheets for upgrades on nineteen units actually completed, reflecting a profit of 36% of costs. She explained:

> Based upon the specification sheets for the number of units which were provided, and using the same methodology as used to prepare the bid estimate and upgrade program. I prepared an estimate based upon the upgrade program prices for materials and labor for each of these units. That estimate was based upon prices at the time the upgrade program was developed. A summary of my calculations is annexed to defendant's exhibits as Exhibit 12.

> It was my feeling that the units for which we had specification sheets were fairly representative of the units in the Project. In fact, two larger units which had been combined into a single unit and undoubtedly had a tremendous amount of upgrade work done, did not have specification sheets. The percentage of upgrade work in those units would undoubtedly skew my calculation upward to a higher profit percentage than that which I arrived at.

By applying that [***7] profit margin to the total sales on the project [4] plaintiffs alleged that they would have reaped a total profit of approximately $ 534,000.

> 4    Plaintiffs were replaced on the project by Commercial Flooring, which reported total sales of $ 1,482,750.

Defendant moved for summary judgment on the grounds that plaintiffs had no enforceable oral contract and because plaintiffs' claim for lost profits was speculative as a matter of law. Following oral arguments, the motion judge granted the motion on the basis that plaintiffs' damages were too speculative but rejected the argument that no enforceable oral contract existed. Defendant does not cross-appeal the denial of summary judgment on the contract issue. [5]

> 5    As noted, plaintiff's suit had advanced separate claims for lost profits and out of pocket expenses. However, the summary judgment argument only

dealt with the lost profits and plaintiffs do not assert as error the dismissal of its suit as to out of pocket expenses.

[***8] [*422] [**629] The trial judge found that the inherent problem of the price quotes upon which plaintiffs based their costs was that "even though [they] may serve the immediate business needs of the plaintiff . . ., it does not lock in the price for a particular period of time." [6]

> 6    Although it is not essential to our holding, we note that a supplier may well be bound on an oral contract to supply materials to a contractor when the supplier knows that the quoted prices will be relied upon by the contractor in submitting a bid. *E.A. Coronis Assocs. v. M. Gordon Constr. Co. 90 N.J. Super. 69, 216 A.2d 246 (App.Div.1966).*

He further summarized his findings:

> A trier of fact would be left to speculate because the market forces that would operate on the cost of these items [were] left unchecked. And in essence, the jury would be instructed to use as a measure of damages a fixed cost, when a fixed cost was not anticipated by the [plaintiffs], therefore creating a superior contract than the parties themselves [***9] arguably negotiated and anticipated. This is inherently unfair.

> Without a fixed price, the jury would be free to speculate as to what would have been the market conditions, especially given the fact, the history of this project shows that even though the price quotes were given in May of 1998, the actual construction did not begin until two years thereafter. Therefore, the market forces that operated during those two years would have significantly affected the plaintiff's profit calculation.

> Furthermore, since records are only available for the first 19 units, the plaintiff further speculates that its profit would have been consistent with [this] approach with the balance of the units, correctly and noted by the defense, compounding the

355 N.J. Super. 416, *422; 810 A.2d 625, **629;
2002 N.J. Super. LEXIS 470, ***9

speculative aspect of damages to begin with.

Both parties accept the governing rule to be that "where the plaintiff is a supplier, producer, or contractor who has been prevented by the defendant from completing his contract, the plaintiff is entitled to the profit that would have been realized if performance had been completed. This is generally measured by the difference between the contract price and the cost of performance or production." [***10] *J.L. Davis & Associates v. Heidler, 263 N.J. Super. 264, 276, 622 A.2d 923 (App.Div.1993).*

[*423] The motion judge noted that under the standard of law for recovering lost profits "the party must show that profits were lost as a result of the actionable conduct complained of" and, quoting *Cromartie v. Carteret Savings & Loan, 277 N.J. Super. 88, 103, 649 A.2d 76 (App.Div.1994),* "'[l]ost profits' signif[y] the difference between gross income and the costs or expenses which had to be expended to produce the income."

Although stating the general rule, both *J.L. Davis* and *Cromartie* are quite different from the present case and do not, in our view, dictate the result reached by the motion judge. *J.L. Davis* involved a contractor hired to relocate a house. A contract price of $12,500 was agreed upon. Eventually, after performing some work, the contractor abandoned the project due to the homeowner's failure to pay the installments due under the contract. The contractor sued for the value of work performed ($9100), extra work ($1200), costs of renting certain equipment ($5400) and $3000 in lost profits. We upheld a jury verdict awarding the contractor all the [***11] amounts claimed except for the lost profits. In that regard, we found insufficient the contractor's "bare assertion that he suffered $3000 in lost profits." *Davis, supra, 263 N.J. Super. at 277, 622 A.2d 923.* [**630] We noted that "there was no evidence presented as to the costs that were or would have been incurred to complete the project *or upon which to calculate such profits." Ibid.* (emphasis supplied).

In *Cromartie,* plaintiffs' property burned down. They sued Carteret, the bank that acted as the servicing agent for the mortgagee bank. The jury found that Carteret had "breached its contractual obligation when it permitted the fire insurance on the Cromarties' property to lapse

without notifying them." *Cromartie, supra, 277 N.J. Super. at 96, 649 A.2d 76.* We remanded for a new trial on damages which had included a claim for lost rents on the property. We found the lost rent award unsustainable since "the Cromarties did not prove their expenses in operating the property and therefore did not prove their lost profits." *Id. at 103, 649 A.2d 76.* It was in that factual setting that we referred to [*424] the rule that lost profits is the "difference between gross income and the costs or expenses [***12] which had to be expended to produce the income." *Ibid.*

Unlike *Cromartie,* here plaintiffs did offer some proof that they had incurred expenses and costs, namely making the showroom models, creating various upgrade programs to be offered to unit purchasers, and foregoing other business opportunities to concentrate on the Villas project [7], although the dollar value of those costs was not established at the summary judgment stage. Nevertheless, the trial judge concluded "that the party claiming damages for breach of contract has the burden of showing the breach caused loss [or] prevented gain. The burden here cannot be satisfied without the jury being allowed to speculate as to what that measure of damages would have been." We disagree.

> 7 Luppino estimated that plaintiffs "could have easily closed $700,000 to $800,000 in other business."

In fact, we do permit considerable speculation by the trier of fact as to damages. In *Tessmar v. Grosner, 23 N.J. 193, 128 A.2d 467 (1957),* the Court [***13] stated that "[t]he rule relating to the uncertainty of damages applies to the uncertainty as to the fact of damage and not as to its amount, and where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery." *Id. at 203, 128 A.2d 467* (citations omitted). Although we require a "reasonably accurate and fair basis for the computation of alleged lost profits," *J.L. Davis & Assocs, supra,* 263 N.J. Super. at 276, 622 A.2d 923 (quoting *Borbonus v. Daoud, 34 N.J. Super. 54, 61, 111 A.2d 443 (Ch.Div.1955)),* the "fact that a plaintiff may not be able to fix its damages with precision will not preclude recovery of damages." *Inter Medical Supplies v. EBI Medical Systems, 181 F.3d 446, 463 (3rd Cir.1999)* (citing *American Sanitary Sales Co. v. State, Dep't of Treasury, 178 N.J. Super. 429, 435, 429 A.2d 403* (App. Div.), *certif. denied, 87 N.J. 420, 434 A.2d 1094 (1981)).* In *Stanley Co. of America v. Hercules*

Page 5

355 N.J. Super. 416, *424; 810 A.2d 625, **630;
2002 N.J. Super. LEXIS 470, ***13

*Powder Co., 16 N.J. 295, 314,* [*425] *108 A.2d 616 (1954).* the Court stated the rule as follows: "Loss of profits, where based on sound fact and not on mere opinion evidence [***14] without factual support, is recognized as a proper measure of damages if 'capable of being estimated with a reasonable degree of certainty'" (quoting *Rempfer v. Deerfield Packing Corp., 4 N.J. 135, 144, 72 A.2d 204 (1950)).* Profits lost by reason of breach of contract may be recovered "if there are any criteria by which probable profits can be estimated with reasonable certainty." *Feldman v.* [**631] *Jacob Branfman & Son, Inc., 111 N.J.L. 37, 42, 166 A. 126* (E & A 1933); *see also Restatement (Second) of Contracts § 352* (1981). (*Restatement*)

Past experience of an ongoing, successful business provides a reasonable basis for the computation of lost profits "with a satisfactory degree of definiteness." *Weiss v. Revenue Bldg. & Loan Ass'n, 116 N.J.L. 208, 212, 182 A. 891* (E & A 1935). [8] *See also Tull v. Gundersons, Inc., 709 P.2d 940, 945 (Colo.1985)* (noting that "past profit experience on other projects . . . is widely accepted as relevant to a determination of damages based on lost profits"): *Restatement supra, § 352 comment b* ("Evidence of past performance will form the basis for a reasonable prediction as to the [***15] future").

> 8    In *Bell Atlantic v. P.M. Video Corp., 322 N.J. Super. 74, 97-100, 730 A.2d 406* (App.Div.), *certif. denied, 162 N.J. 130, 741 A.2d 98 (1999),* we adhered to the "new business rule" of *Weiss,* despite the three judge plurality opinion in *Perini Corp. v. Greate Bay Hotel & Casino, Inc., 129 N.J. 479, 509-10, 610 A.2d 364 (1992),* which noted the recent trend to allow an award for lost profits even in the case of a new business "when they can be proved with reasonable certainty." *Bell Atlantic, supra, 322 N.J. Super. at 98, 730 A.2d 406. See generally, 22 Am.Jur.2d Damages §§ 624-27, 962-64 (1988)*: and *see Drews Co. v. Ledwith-Wolfe Associates, 296 S.C. 207, 371 S.E.2d 532, 534-35 (1988)* (abandoning the new business rule as an absolute bar to recovery of lost profits and noting a multi-jurisdictional trend in favor of treating the distinction between new and established businesses as going to the weight of evidence, rather than being an absolute bar).

[***16] Judged by these criteria, we do not believe that plaintiffs were required to prove the dollar amount of

their projected [*426] expenses. In *Alaska Children's Services, Inc. v. Smart, 677 P.2d 899, 902* (Alaska, 1984), the contractor's proof as to lost profits was his testimony as to his normal profit margin applied to the bid price. From these figures a jury could compute the costs of the project, that being the bid price less the profit percentage. In reaching that conclusion the court cited to a number of cases from other jurisdictions that "have accepted as sufficient evidence a profit estimate made by the contractor." *Ibid.* Such an opinion as to anticipated profit by one with sufficient background constitutes "*prima facie* proof of the loss." *Nelson v. Cail, 120 Ariz. 64, 583 P.2d 1384, 1387 (App.1978). See also Sir Speedy, Inc. v. L & P Graphics, Inc., 957 F.2d 1033, 1038 (2nd Cir.1992).*

As the South Carolina Supreme Court stated:

> To warrant such recovery, loss of profits must be established with reasonable certainty, for recovery cannot be had for profits that are conjectural or speculative. "But it must be borne [***17] in mind that since profits are prospective they must, to some extent, be uncertain and problematical, and so on that account or on account of the difficulties in the way of proof, a person complaining of breach of contract cannot be deprived of all remedy, and uncertainty merely as to the amount of profits that would have been made does not prevent a recovery. The law does not require absolute certainty of data upon which lost profits are to be estimated, but all that is required is such reasonable certainty that damages may not be based wholly upon speculation and conjecture, and it is sufficient if there is a certain standard or fixed method by which profits sought to be recovered may be estimated and determined with a fair degree of accuracy."

> [*South Carolina Fin. Corp. v. West Side Fin. Co., 236 S.C. 109, 113 S.E.2d 329, 336 (S.C.1960)* (quoting 15 *Am.Jur. Damages* § 150)]

355 N.J. Super. 416, *426; 810 A.2d 625, **631;
2002 N.J. Super. LEXIS 470, ***17

[**632] We agree with that approach and do not find that such a position is contrary to our prior cases which are, as we have demonstrated, quite distinguishable. We reject defendant's suggestion that plaintiffs would be required to produce each of its suppliers to testify to the prices of [***18] the materials needed for the project at the time the materials were actually supplied. Obviously, a change in prices between the time of a bid and the time of supply could work either to plaintiffs' benefit or detriment, depending on "market forces." As the motion judge noted, "[t]he market could have been for him or against him." We do not, of course, foreclose defendant from seeking to establish that plaintiffs' [*427] expenses would have been greater than originally believed at the time of the bid.

While we recognize that there is a certain amount of uncertainty in the concept of lost profits, it is only fair to lay that uncertainty "at the door of the wrongdoer who altered the proper course of events, instead of at the door of the injured party." U.S. Naval Institute v. Charter Communications, 936 F.2d 692, 697 (2nd Cir.1991) "[W]here the defendant's wrongdoing created the risk of uncertainty, the defendant cannot complain about imprecision." Jay Edwards, Inc. v. New England Toyota Distributor, Inc., 708 F.2d 814, 821 (1st Cir.), cert. denied 464 U.S. 894, 104 S. Ct. 241, 78 L. Ed. 2d 231 (1983); Restatement, supra, § 352 comment a [***19] ("Doubts [concerning calculation of damages] are generally resolved against the party in breach").

In this case, we conclude that plaintiffs did show a reasonably accurate and fair basis for the computation of lost profits. A jury could find that a contract existed between the parties and that Westminster canceled its contract with plaintiffs, thus breaching that contract. If the jury concludes that there was breach of contract, it is

certain that plaintiffs are entitled to some damages, although it is uncertain how much. That is a question that must ultimately be decided by the jury, acting, as in other cases, "upon reasonable inferences and estimates." West Haven Sound Dev. Corp. v. West Haven, 201 Conn. 305, 514 A.2d 734, 742 (1986) (quoting Burr v. Lichtenheim, 190 Conn. 351, 460 A.2d 1290, 1295 (1983)), appeal after remand, 207 Conn. 308, 541 A.2d 858 (1988). In the circumstances presented, we do not believe that the jury would be called upon to engage in "mere speculation." American Sanitary Sales, supra, 178 N.J. Super. at 436, 429 A.2d 403. As we said there,

> The ideal of a judicial system is perfect justice. However, [***20] in a case where, as here, absolute precision in fixing damages may not be attainable, we should not hesitate to seek essential justice. It would be a travesty to deny a plaintiff essential justice because the absence of means for precision precludes perfect justice.

Id. at 435, 429 A.2d 403.

[*428] VAL and 3L provided enough evidence of damages to show that a "genuine issue of material fact" did exist. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). They are permitted to have a jury assess the veracity of their claim and award such damages, if any, as are warranted. [9]

> 9 To the extent that plaintiffs' lost profits claim does not include their out of pocket expenditures, they are free to prove those actual expenses at trial.

[**633] Reversed and remanded for trial.

144HB5

********** Print Completed **********

Time of Request: Monday, November 26, 2012  07:31:23 EST

Print Number:    1828:382257847
Number of Lines: 305
Number of Pages: 6

Send To:  McCrink, Krisden
          MCCRINK, KEHLER & MCCRINK
          475 N ROUTE 73 STE 1
          WEST BERLIN, NJ 08091-2003