**FLEISCHER, FLEISCHER & SUGLIA**
**BRIAN M. FLEISCHER, ESQUIRE**
**AHMED M. SOLIMAN, ESQUIRE**
Plaza 1000 at Main Street
Suite 208
Voorhees, NJ 08043

**Attorneys for Defendant GMAC Mortgage, LLC**

| | |
|---|---|
| Frank J. Reed, III, | NEW JERSEY SUPERIOR COURT<br>BURLINGTON COUNTY<br>LAW DIVISION |
| Plaintiff, | CIVIL ACTION |
| vs. | |
| GMAC Mortgage, LLC; Residential Funding<br>Corp.; and John Does 1-30, | DOCKET NO: BUR- L-1526-10 |
| Defendants. | **NOTICE OF MOTION TO BAR<br>EXPERT REPORT** |

**TO:**    Motions Clerk
Superior Court of New Jersey
Burlington County – Law Division
49 Rancocas Road
Mount Holly, NJ 08060

Law Offices of Jeffrey S. Walters, LLC
3000 Atrium Way Suite 2201
Mount Laurel, NJ 08054
**Attn: Jeffrey S. Walters, Esq.**

**PLEASE TAKE NOTICE** that the undersigned will apply to the above named Court, at the

Burlington County Courthouse, 49 Rancocas Road, Mount Holly, NJ 08060, on January 6, 2012, at

9:00 A.M., or soon thereafter, for the entry of an Order Barring Plaintiff's Expert Report.  Please be

advised that Defendant will rely on the attached brief. Defendant requests oral argument if

opposition is filed.

_____
Brian M. Fleischer, Esquire
Fleischer, Fleischer & Suglia
Attorneys for Defendant

Dated:

## PROOF OF MAILING

In compliance with Rule 1:6, et seq., the original of the within Notice of Motion has been filed with the Motion's Clerk of Burlington County and copies have been served upon Plaintiff's counsel via Legal Courier and Regular Mail pursuant to Rule 1:5, et seq.

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Pursuant to Rule 1:6-2(e), the undersigned:

( )    waives oral argument and consents to disposition on the papers;

(X)    does not request oral argument unless opposition is filed;

( )    requests oral argument.

A proposed form of Order is attached.

Brian M. Fleischer, Esquire
Fleischer, Fleischer & Suglia
Attorneys for Defendant

Dated:

**FLEISCHER, FLEISCHER & SUGLIA**
**BRIAN M. FLEISCHER, ESQUIRE**
**AHMED M. SOLIMAN, ESQUIRE**
**Plaza 1000 at Main Street**
**Suite 208**
**Voorhees, NJ 08043**
**Attorneys for Defendant GMAC Mortgage, LLC**

| | |
|---|---|
| Frank J. Reed, III, | NEW JERSEY SUPERIOR COURT |
| | BURLINGTON COUNTY |
| | LAW DIVISION |
| Plaintiff, | |
| vs. | CIVIL ACTION |
| GMAC Mortgage, LLC; Residential Funding Corp.; and John Does 1-30, | DOCKET NO: BUR- L-1526-10 |
| | **ORDER** |
| Defendants. | |

**THE ABOVE MATTER** being opened to the Court upon the motion of Ahmed M. Soliman, Esq., of Fleischer, Fleischer & Suglia, attorney for Defendant GMAC Mortgage, LLC, to Bar Plaintiff's Expert Reports, and the Court having considered the argument presented on the papers and any opposition presented by Plaintiff, and for good cause shown;

**IT IS** on this _____ day of _____, 2012;

**ORDERED** that Plaintiff's expert report of Mr. Evan Hendricks is hereby barred as a net opinion; and

**IT IS FURTHER ORDERED** that a copy of this Order be served upon all counsel, within _____ days from the date of the receipt of the same.

_____
                                        J.S.C.

The within Notice of Motion was:

( ) Opposed

( ) Unopposed

**FLEISCHER, FLEISCHER & SUGLIA**
**BRIAN M. FLEISCHER, ESQUIRE**
**AHMED M. SOLIMAN, ESQUIRE**
**Plaza 1000 at Main Street**
**Suite 208**
**Voorhees, NJ 08043**

**Attorneys for Defendant GMACM Mortgage, LLC**

---

| | |
|---|---|
| Frank J. Reed, III, | NEW JERSEY SUPERIOR COURT |
| | BURLINGTON COUNTY |
| | LAW DIVISION |
| Plaintiff, | |
| vs. | CIVIL ACTION |
| GMACM Mortgage, LLC; Residential Funding Corp.; and John Does 1-30, | DOCKET NO: BUR- L-1526-10 |
| Defendants. | |

---

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO BAR EXPERT REPORT

Defendant GMACM Mortgage, LLC ("GMACM") submits this brief in support of its

Motion to Bar Plaintiff's Expert Report of Mr. Evan Hendricks on the grounds that said report is

a "net opinion."

**I.    Factual Background**

1.      Frank J. Reed, III and Christina A. Reed ("Plaintiffs") executed a Note in favor of

Defendant GMACM (hereinafter "the Note") securing the sum of $1,000,000.00. See a true and

correct copy of the Note attached hereto as Exhibit "A" and incorporated herein by reference.

2.      To secure the payment of the Note, Plaintiffs executed a Mortgage in favor of

GMACM (hereinafter the "Mortgage"), which Mortgage was filed against Plaintiffs' property at

817 Matlack Drive, Moorestown, NJ (the "Property"). See a true and correct copy of the

Mortgage attached hereto as Exhibit "B" and incorporated herein by reference.

3.      As a result of Plaintiffs' failing to remit the mortgage payments when due,

1

Defendants commenced a Mortgage Foreclosure Action (the "Foreclosure Action") and filed a

Lis Pendis on the Property. See a true and correct copy of the Foreclosure Complaint attached

hereto as Exhibit "C" and incorporated herein by reference.

4.     Plaintiffs claim that GMACM failed to send them a "Notice of Intent to

Foreclose" (the "Notice"), prior to filing the Foreclosure Action and filing the Lis Pendis. See a

true and correct copy of the Complaint attached hereto as Exhibit "D" and incorporated herein by

reference.

5.     As a result of such alleged failure, Plaintiffs claim that they were injured. See

Complaint attached hereto as Exhibit "D."

6.     Specifically, Plaintiffs claim that, had the Defendants sent them the Notice, they

would have had time to refinance the Property and payoff the Defendants. See Exhibit "D,"

paragraph 15 and 16 of the First Count.

7.     Plaintiffs also claim that their credit was negatively affected by Defendants failure

to send the Notice. See Exhibit "D," paragraph 4 of the Fifth Count.

8.     Plaintiffs have been living on the Property for over three (3) years without making

a single Mortgage payment since April of 2008. See a true and correct copy of the Deposition of

Frank Reed, p. 23:6-17 attached hereto as Exhibit "E" and incorporated herein by reference.

9.     The Foreclosure Action was dismissed without prejudice. See a true and correct

copy of the Honorable Michael J. Hogan's Order dated February 9, 2009 and attached written

decision dismissing the Foreclosure Action attached hereto as Exhibit "F" and incorporated

herein by reference.

10.     Plaintiff, Christina A. Reed voluntarily withdrew as a Plaintiff in this lawsuit.

11.     Plaintiff, Frank J. Reed, III claims he has bought and sold properties for many

years. See Exhibit "E" at page 11 attached hereto.

2

12.    Discovery was exchanged in this matter, including the "expert report" of Mr.
Evan Hendricks with regard to the alleged damages to Plaintiff's credit, which Plaintiff provided
to GMACM on November 28, 2011. See a true and correct copy of Plaintiff's Expert Witness
Report of Evan Hendricks attached hereto as Exhibit "G" and incorporated herein by reference.

13.    Plaintiff's expert report is deficient in many respects and is a "net opinion."

14.    Among other things, the report of Mr. Hendricks fails to provide a comparative
analysis of Plaintiff's credit report before GMACM allegedly failed to provide proper
foreclosure notification, and Plaintiff's credit report after.

15.    In addition, the report fails to demonstrate any causal link between GMACM's
actions and Plaintiff's alleged damages. This is especially true given that Plaintiff has numerous
other delinquencies, foreclosures, unpaid judgments, tax liens and other negative credit issues.
See Exhibit "E" at page 22 – 23, 37 – 38, 49 -50 attached hereto.

16.    The report makes sweeping assumptions of facts not in evidence, including the
notion that Plaintiff has suffered from "mental anguish" and "stress" in the amount of
$350,000.00, despite the fact that Mr. Hendricks is not a psychologist, and therefore not qualified
to report the existence of such conditions on the part of Plaintiff, much less set an amount of
money with which Plaintiff could become whole again. See Exhibit "G" at pages 4-5 attached
hereto.

17.    In light of the above listed facts, Defendant now moves to bar the expert report of
Mr. Evan Hendricks on the grounds that it is a "net opinion."

3

## II.    Legal Argument

### A.    Plaintiff's expert report is inadmissible under New Jersey law because it is a "net opinion."

Plaintiff's expert report is inadmissible under New Jersey law and, as such, the "expert testimony" of Mr. Hendricks must be barred. Under New Jersey law, if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise. N.J.R.E. 702. The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. N.J.R.E. 703. The admission or exclusion of expert testimony is within the discretion of the trial court. State v. Torres, 183 N.J. 554, 567 (2005).

However, in order to be admitted, an expert's opinion testimony *must have a factual and scientific basis*. Jimenez v. GNOC Corp., 286 N.J. Super. 533, 540 (App. Div. 1996) (emphasis added). An opinion lacking a foundation is worthless. Stanley Co. of America v. Hercules Power Co., 16 N.J. 295, 305 (1954). When an expert's opinion is merely a bare conclusion unsupported by factual evidence, i.e. a "net opinion," it is inadmissible. Buckelew v. Grossbard, 87 N.J. 512, 524 (1981). The same is true of opinions based on unfounded speculation or mere possibilities. Koruba v. American Honda Motor Co., 396 N.J. Super. 517, 526 (App. Div. 2007).

In the case at hand, the expert report submitted by Mr. Evan Hendricks on behalf of Plaintiff lacks the requisite factual basis and technical analysis to qualify as an admissible and reliable expert report under New Jersey Law. See Expert Report of Mr. Evan Hendricks attached hereto as Exhibit "G." In fact, the report is little more than a general treatise on the credit reporting industry. Specifically, Mr. Hendricks has failed to cite specific credit reports of

Plaintiff that were examined, what date those reports were generated, or how GMACM's actions

may have effected said reports. Such an analysis is critical to proving Plaintiff's allegations,

especially since Plaintiff himself admits that he does not know what the status of his credit was

in 2008, immediately prior to foreclosure action filed by GMACM, and is uncertain whether or

not he was past due on any of his mortgages at that time. See Deposition of Frank Reed at pages

35 - 36 attached hereto as Exhibit "E." Plaintiff also stated that he is not sure how the foreclosure

action affected his credit -- if at all. See Deposition of Frank Reed at page 66 attached hereto as

Exhibit "E."

　　　　Moreover, the report of Mr. Hendricks also fails to provide a comparison of Plaintiff's

credit report before GMACM allegedly failed to provide proper foreclosure notification, and

Plaintiff's credit report after. Rather than provide a numerical analysis based on documentation

of Plaintiff's credit history, Mr. Hendricks merely states that "It's logical that a foreclosure is

devastating to a consumer's creditworthiness." See Exhibit "G" at page 2 attached hereto.

However, Mr. Hendricks' personal opinion as to what is logical or not is an insufficient basis

upon which to formulate an "expert opinion" under the law. It must be supported by a factual

analysis, which is missing from this report.

　　　　Mr. Hendricks follows up his unsupported conclusion about the effect of the foreclosure

action upon Plaintiff's credit with another unfounded statement that "GMACM's Foreclosure

doomed Mr. Reed's Refinance" and that the refinance "would have enabled Mr. Reed to catch up

on his debts, including the GMAC mortgage..." See Exhibit "G" at page 3 attached hereto.

However, such a statement is not only unsupported by any factual documentation, it is also

purely speculative as there is no way of knowing whether or not Plaintiff would have fulfilled his

obligation to GMAC. To the contrary, his prior failure to make timely payments on the loan

indicated that he had no intention to fulfill his admitted obligation to GMACM.

5

Furthermore, even if Plaintiff could provide documentation to demonstrate that his credit score had been lowered and/or that, as a result, he had been denied credit, Plaintiff has failed to demonstrate any type of causal link between GMACM's actions and his alleged damages related to the current status of his credit. This is especially true given that Plaintiff has numerous other delinquencies and credit issues. For example, TD Bank has initiated Foreclosure proceedings on three of Plaintiff's other properties from the property at issue in this matter. See Deposition of Frank Reed at pages 22 – 23 attached hereto as Exhibit "E." Plaintiff also has unpaid judicial judgments against him. See Exhibit "E" at pages 37 – 38. And Plaintiff has had a tax lien against him for $34,000.00. See Exhibit "E" at pages 49 – 50. All of these delinquencies would have a negative effect on Plaintiff's credit score, yet the "expert opinion" of Mr. Hendricks fails to even mention them, much less analyze their impact.

Amazingly, Mr. Hendricks also places a monetary amount for damages that he believes Plaintiff is owed for such conditions as "mental anguish" and "stress." See Exhibit "G" at pages 4 – 5 attached hereto. Specifically, Mr. Hendricks states that "Mr. Reed's non-economic damages relate to the stress, humiliation, mental anguish and frustration stemming from being blindsided by GMAC's non-compliant foreclosure…" Id. However, Mr. Hendricks is not a licensed psychologist, and is not qualified to comment on the existence of such conditions – much less opine on the amount of money required to make Plaintiff whole again. Furthermore, Plaintiff has not produced any medical records. In short, Mr. Hendrick's "expert report" is the quintessential "net opinion," and should be barred accordingly.

6

### III.    Conclusion

For the foregoing reasons, Defendant GMACM requests that the Court grant its Motion

to Bar the Expert Testimony of Mr. Evan Hendricks.


Respectfully Submitted,


Brian M. Fleischer, Esquire
Ahmed M. Soliman, Esquire
Attorneys for Defendant


Dated: _____


7

# EXHIBIT "A"

MIN: 100034200057200556          Loan Number: 21063043

# FIXED/ADJUSTABLE RATE NOTE

(LIBOR One - Year Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

MAY 31, 2006          SHERMAN OAKS          CALIFORNIA
[Date]                [City]                [State]

817 MATLACK DRIVE, MOORESTOWN, NEW JERSEY 08057
[Property Address]

**1.   BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U S $ 1,000,000.00          [this amount is called "Principal"], plus Interest, to the order of Lender. Lender is METROCITIES MORTGAGE, LLC, A LIMITED LIABILITY COMPANY

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay Interest at a yearly rate of    6.375 %. The Interest rate I will pay may change in accordance with Section 4 of this Note.

The Interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.   PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and Interest by making a payment every month.

I will make my monthly payments on the   1st   day of each month beginning on   JULY 1 2006   . I will make these payments every month until I have paid all of the principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to Interest before Principal. If, on   JUNE 1, 2036   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   15301 VENTURA BLVD., STE10300, SHERMAN OAKS, CALIFORNIA 91403
                                                  or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments ** See attached Interest Only Note Addendum.**

Each of my initial monthly payments will be in the amount of U.S. 16,238.70          . This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the Interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

---

MULTISTATE  FIXED/ADJUSTABLE RATE NOTE - WSJ One-Year LIBOR
Single Family - Fannie Mae MODIFIED INSTRUMENT
Form 3528  6/01                          Page 1 of 5

DocMagic ℮Farms 800-649-1362
www.docmagic.com

CERTIFIED TO BE A TRUE AND CORRECT ORIGINAL

**4.   ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

   (A) Change Dates

   The initial fixed interest rate I will pay will change to an adjustable interest rate on the    1st    day of
JUNE, 2011                  , and the adjustable interest rate I will pay may change on that day every 12th
month thereafter.  The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date
on which my adjustable interest rate could change, is called a "Change Date."

   (B) The Index

   Beginning with the first Change Date, my adjustable interest rate will be based on an Index.  The "Index" is
the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market
("LIBOR"), as published in *The Wall Street Journal*.  The most recent Index figure available as of the date 45 days
before each Change Date is called the "Current Index."

   If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable
information.  The Note Holder will give me notice of this choice.

   (C) Calculation of Changes

   Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO  AND
250/1000                              percentage points (    2.250 %) to the Current
Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point
(0.125%)  Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until
the next Change Date.

   The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the
unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate
in substantially equal payments.  The result of this calculation will be the new amount of my monthly payment.

   (D) Limits on Interest Rate Changes

   The Interest rate I am required to pay at the first Change Date will not be greater than       11.375 %
or less than      2.250  %.  Thereafter, my adjustable interest rate will never be increased or decreased on any
single Change Date by more than TWO  AND  000/1000                         percentage points
from the rate of interest I have been paying for the preceding 12 months.  My interest rate will never be greater than
     11.375 %.

   (E) Effective Date of Changes

   My new interest rate will become effective on each Change Date.  I will pay the amount of my new monthly
payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment
changes again.

   (F) Notice of Changes

   The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an
adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change.  The
notice will include the amount of my monthly payment, any information required by law to be given to me and also
the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY**

   I have the right to make payments of Principal at any time before they are due.  A payment of Principal only
is known as a "Prepayment."  When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.
I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

   I may make a full Prepayment or partial Prepayments without paying any Prepayment charge.  The Note Holder
will use my Prepayments to reduce the amount of Principal that I owe under this Note.  However, the Note Holder
may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my
Prepayment to reduce the Principal amount of this Note.  If I make a partial Prepayment, there will be no changes
in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.  My partial

---

CERTIFIED TO BE A TRUE AND ...ICINAL

Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7.   BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

MULTISTATE FIXED/ADJUSTABLE RATE NOTE - WSJ One-Year LIBOR
Single Family - Fannie Mae MODIFIED INSTRUMENT
Form 3528  6/01                                          Page 3 of 5

DocMagic DocMagic 800-649-1362
www.docmagic.com

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts that have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired

MULTISTATE FIXED/ADJUSTABLE RATE NOTE - WSJ One-Year LIBOR
Single Family - Fannie Mae MODIFIED INSTRUMENT
Form 3528  6/01                                    Page 4 of 5

DocMagic eFormns  800-649-1362
www.docmagic.com

by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)  
FRANK J. REED III                    -Borrower

_____ (Seal)  
                                     -Borrower

_____ (Seal)  
                                     -Borrower

_____ (Seal)  
                                     -Borrower

_____ (Seal)  
                                     -Borrower

_____ (Seal)  
                                     -Borrower

[Sign Original Only]

MULTISTATE FIXED/ADJUSTABLE RATE NOTE - WSJ One-Year LIBOR  
Single Family - Fannie Mae MODIFIED INSTRUMENT  
Form 3528  6/01                    Page 5 of 5

DocMagic eForms 800-649-1362  
www.docmagic.com

# EXHIBIT "B"

*GmAC*
*601613576*

SCANNED

INFINITY TITLE AGENCY, INC.
33 EAST MAIN STREET, UNIT 2
MOORESTOWN, NJ 08057
856-727-0818 - FAX 856-727-5173

2006 JUN 19  A 10 02

RECEIVED
NOV 10 2006
INFINITY TITLE
AGENCY, INC.

ARRIVED

After Recording Return To:
METROCITI MORTGAGE LLC
15301 VENTURA BLVD., STE D300
SHERMAN OAKS, CALIFORNIA 91403
Loan Number: 21063843

This Instrument Prepared By:

——————————— [Space Above This Line For Recording Data] ———————————

# MORTGAGE

MIN: 100034200057200556

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated MAY 31, 2006 , together with all Riders to this document.
(B) "Borrower" is FRANK J. REED III AND CHRISTINA A. REED, HUSBAND AND WIFE

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is METROCITIES MORTGAGE, LLC

Lender is a LIMITED LIABILITY COMPANY                                      organized
and existing under the laws of DELAWARE
Lender's address is 15301 VENTURA BLVD., STE D300, SHERMAN OAKS, CALIFORNIA 91403

(E) "Note" means the promissory note signed by Borrower and dated MAY 31, 2006
The Note states that Borrower owes Lender ONE MILLION AND 00/100
Dollars (U.S. $ 1,000,000.00 ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than JUNE 1, 2036
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

NEW JERSEY—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS        DocMagic ☎Poppins 800 649-1362
Form 3031 01/01                          Page 1 of 13                              www.docmagic.com

(H)  "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider        ☐ Planned Unit Development Rider
☐ Balloon Rider                ☐ Biweekly Payment Rider
☐ 1-4 Family Rider             ☐ Second Home Rider
☐ Condominium Rider            ☒ Other(s) [specify]
                               INTEREST ONLY ADDENDUM TO RIDER

(I)  "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J)  "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K)  "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L)  "Escrow Items" means those items that are described in Section 3.

(M)  "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N)  "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O)  "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P)  "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q)  "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For these purposes, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the
           COUNTY              of              BURLINGTON
      [Type of Recording Jurisdiction]              [Name of Recording Jurisdiction]

NEW JERSEY–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS        DocMagic 800-649-1362
Form 3031 01/01                        Page 2 of 13                              www.docmagic.com

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N.: 22-03803-00002

which currently has the address of                817 MATLACK DRIVE
                                                          [Street]

        MOORESTOWN                    , New Jersey      08057      ("Property Address"):
             [City]                                     [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1.  Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future. If Lender accepts such payments, it shall apply such payments at the time such payments are accepted. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.  Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic

Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.    Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower

HB | | 1 2 4 PG 4 | 3

shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened.

MB:P | |:2 4 PG:4 |4 :

During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   Occupancy.  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   Preservation, Maintenance and Protection of the Property; Inspections.  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   Borrower's Loan Application.  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument.  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums

MB III 24 PG 415

secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9. Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right

to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture.  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument.  The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver.  Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security

NEW JERSEY—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3031 01/01                                    Page 8 of 13                                    DocMagic eForms 800 849-1362
www.docmagic.com

HB 1 1 1 2 4 PG 4 1 7

Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

NEW JERSEY--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3031 01/01                                 Page 9 of 13                     DocMagic *eFerms* 800-649-1362
                                                                                 www.docmagic.com

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding
neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice
versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy.  Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in
the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial
interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent
of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a
natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent,
Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option
shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a
period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower
must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of
this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand
on Borrower.

19. Borrower's Right to Reinstate After Acceleration.  If Borrower meets certain conditions, Borrower shall
have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a)
five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such
other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a
judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which
then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default
of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including,
but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the
purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such
action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security
Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged.
Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms,
as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check,
provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality
or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations
secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall
not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance.  The Note or a partial interest in the Note
(together with this Security Instrument) can be sold one or more times without prior notice to Borrower.  A sale might
result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note
and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security
Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale
of the Note.  If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will
state the name and address of the new Loan Servicer, the address to which payments should be made and any other
information RESPA requires in connection with a notice of transfer of servicing.  If the Note is sold and thereafter
the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations
to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed
by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual
litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that
alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument,
until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements
of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such
notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action

NEW JERSEY—Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS          DocMagic ⨁⨍⨍⨋⨋⨋ 800-649-1362
Form 3031 01/01                                   Page 10 of 13                              www.docmagic.com

can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property; (e) the Borrower's right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure; and (f) any other disclosure required under the Fair Foreclosure Act, codified at §§ 2A:50-53 et seq. of the New Jersey Statutes, or other Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence permitted by Rules of Court.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

MB I F 1 2 4 PG 4 2 0

24. No Claim of Credit for Taxes. Borrower will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.

BY SIGNING BELOW. Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.



_____ (Seal)
FRANK J. REED III          -Borrower

_____ (Seal)
CHRISTINA A. REED          -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

Signed, sealed and delivered in the presence of:

_____

_____

NEW JERSEY–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3031 01/01                    Page 12 of 13                    DocMagic eForms 800-649-1362
                                                                    www.docmagic.com

———————————— [Space Below This Line For Acknowledgment] ————————————

State of New Jersey.
County of  CAMDEN                                                        . ss

    I CERTIFY that on  5|31|06              FRANK J. REED III.
CHRISTINA A. REED

personally came before me and stated to my satisfaction that this person (or if more than one, each person):
(a)   was the maker of the attached instrument; and
(b)   executed this instrument as his or her own act.

_____          _____
Notary's Signature                                    Date

OFFICIAL SEAL
STACIE A. JONES
NOTARY PUBLIC - NEW JERSEY
MY COMM. EXPIRES MARCH 22, 2011
_____
Notary's printed or typed name

My commission expires:

NEW JERSEY–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3031 01/01
                        Page 13 of 13                    DocMagic €Forms  800.649.1362
                                                                      www.docmagic.com

HB 1 F1 24 PG 422

# EXHIBIT "C"

# EXHIBIT "D"

| CIVIL CASE INFORMATION STATEMENT (CIS)<br><br>Use for initial Law Division - Civil Part pleadings (not motions) under Rule 4:5-1.<br>Pleading will be rejected for filing, under Rule 1:5-6(c), if information above the black bar is not completed or if attorney's signature is not affixed. | FOR USE BY CLERK'S OFFICE ONLY |  |
|---|---|---|
|  | PAYMENT TYPE: | CK  CG  CA |
|  | CHG/CK NO. |  |
|  | AMOUNT: |  |
|  | OVERPAYMENT: |  |
|  | BATCH NUMBER |  |

| 1. ATTORNEY/PRO SE NAME<br>Jeffrey S. Walters, Esq. | 2. TELEPHONE NUMBER<br>(856) 552-1045 | 3. COUNTY OF VENUE<br>Burlington |
|---|---|---|
| 4. FIRM NAME (If Applicable)<br>LAW OFFICES OF JEFFREY S. WALTERS, LLC |  | 5. DOCKET NUMBER (When Available)<br>BUR - L - 15.26 -10 |
| 6. OFFICE ADDRESS<br>3000 Atrium Way Suite 2201<br>Mount Laurel, NJ  08054 | | 7. DOCUMENT TYPE (e.g. Complaint, Answer with counterclaim)<br>Answer |
|  | | 8. JURY DEMAND  [ X ] Yes  [ ] No |
| 9. NAME AND STATUS OF PARTY (e.g., John Doe, Plaintiff)<br>Frank J. Reed III and Christina A. Reed, Plaintiffs | | 10. CAPTION<br>Frank J. Reed III and Christina A. Reed v. GMAC Mortgage LLC, Residential Funding Corp. and John Does 1-30, I/j/s/a |
| 11. CASE TYPE NUMBER (See reverse side for listing):<br>699 | | 12. IS THIS A PROFESSIONAL MALPRACTICE CASE? ___ YES  x  NO<br>IF YOU HAVE CHECKED "YES," SEE NJSA 2a:53a-27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT |
| 13. RELATED CASES PENDING? ___ YES   x  NO | | 14. IF YES, LIST DOCKET NUMBERS:  N/A |
| 15. DO YOU ANTICIPATE ADDING ANY PARTIES (arising out of same transaction or occurrence) ___ YES  x  NO | | 16. NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY, IF KNOWN<br>None  x  Unknown |

| THE INFORMATION PROVIDED BELOW CANNOT BE INTRODUCED INTO EVIDENCE | | | | |
|---|---|---|---|---|
| CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION | | | | |
| 17. DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP?<br>YES  x  NO | IF YES, IS THAT RELATIONSHIP | [ ] EMPLOYER-EMPLOYEE<br>[ ] FAMILIAL | [ ] FRIEND/NEIGHBOR<br>[ ] BUSINESS | [ ] OTHER (explain) |
| 18. DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY ___ YES  x NO | | | | |
| 19. USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION | | | | |

| 20. DO YOU OR YOUR CLIENT HAVE ANY NEEDS UNDER THE AMERICANS WITH DISABILITIES ACT?<br>[ ] YES  [X ] NO.  IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION: |
|---|
| 21. WILL AN INTERPRETER BE NEEDED? [ ] YES  [x ] NO.  IF YES, FOR WHAT LANGUAGE? |
| 22. I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b). |
| 23. ATTORNEY SIGNATURE: |

LAW OFFICES OF JEFFREY S. WALTERS, LLC
3000 Atrium Way Suite 2201
Mount Laurel, NJ 08054
Telephone: (856) 552-1045
Telecopier: (856) 974-8859
Attorneys for Plaintiffs

| | |
|---|---|
| FRANK J. REED III and CHRISTINA A. REED, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION |
| Plaintiff, | BURLINGTON COUNTY |
| v. | Docket No: BUR-L-1626-10 |
| GMAC MORTGAGE LLC, RESIDENTIAL FUNDING CORP. and JOHN DOES 1-30, Individually, Jointly, Severally and in the alternative, | CIVIL ACTION |
| | COMPLAINT AND DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiffs, whose post office address is 9717 Old Dell Trace, Richmond, VA 23238, by way of Complaint against the Defendants say:

## FIRST COUNT

1.    At all times pertinent hereto, Defendant GMAC Mortgage LLC was a Limited Liability Company duly organized and existing under and by virtue of the laws of one of the fifty states, and authorized to do business in the State of New Jersey, having an address of 1100 Virginia Drive, Fort Washington, Pennsylvania 19034.

2.    At all times pertinent hereto, Defendant Residential Funding Corp. was a corporation duly organized and existing under and by virtue of the laws of one of the fifty states, and authorized to do business in the State of New Jersey, having an address of 1 Meridian Crossings Suite 100, Minneapolis, Minnesota 55423.

3.    At all times pertinent hereto, Defendants John Doe 1-30 were individuals or entities
who were employees, agents or subcontractors of the non-John Doe Defendants, or employees,
agents or subcontractors of such agents or subcontractors, and who, as employees, agents or in any
other capacity, were responsible for insuring that the non-John Doe Defendants were in compliance
with their statutory duties, including but not limited to their duty to provide Plaintiffs with the
"notice of intention" required by the Fair Foreclosure Act and to refrain from failing to provide
Plaintiffs with the "notice of intention" required by the Fair Foreclosure Act.

4.    At all times pertinent hereto, Defendant GMAC Mortgage LLC was the owner of a
mortgage executed by Plaintiffs which encumbered real property owned by Plaintiffs, said property
being known as 817 Matlack Drive, Moorestown, New Jersey 08057 ("the Property").

5.    At the time the causes of action stated herein arose, Plaintiffs resided at the Property.

6.    On or about December 30, 2009, Defendant GMAC Mortgage LLC transferred
ownership of said mortgage to Defendant Residential Funding Corp.

7.    The mortgage which encumbered the Property was a "Residential Mortgage" as that
term is defined in the Fair Foreclosure Act, NJSA 2A:50-53 et seq.

8.    Under the Fair Foreclosure Act, Defendant GMAC Mortgage LLC was statutorily
prohibited from commencing any foreclosure action to take possession of the Property until
Defendant provided Plaintiffs with a "notice of intention" in form and content as provided in the Fair
Foreclosure Act, and over 30 days in advance of commencing any foreclosure action.

9.    On or about May 19, 2008, Defendant GMAC Mortgage LLC filed a Complaint for
Foreclosure in the Superior Court of New Jersey, Chancery Division, General Equity Part, Docket
No. F-19177-08, seeking to foreclose Plaintiffs' equity of redemption in the Property.

10.    On or about May 28, 2008, Defendant GMAC Mortgage LLC, through its agents, caused a Lis Pendens to be recorded with the Burlington County Clerk.

11.    Defendant GMAC Mortgage LLC failed to provide Plaintiffs with the "notice of intention" required by the Fair Foreclosure Act prior to filing its Complaint for Foreclosure on or about May 19, 2008.

12.    At all times herein, Defendant GMAC Mortgage LLC had a statutory duty to refrain from filing a Complaint for Foreclosure against the Property and Plaintiffs until such time as Defendant properly served Plaintiffs with "notice of intention" required by the Fair Foreclosure Act.

13.    At all times herein, Defendant GMAC Mortgage LLC had a duty to Plaintiffs to exercise care to refrain from violating Defendant's statutory duty as set forth above.

14.    Defendant GMAC Mortgage LLC failed to exercise the required standard of care, and negligently and/or recklessly filed a Complaint for Foreclosure and recorded a Lis Pendens against the Property and Plaintiffs without first discharging its statutory duty to provide a "notice of intention" as required by the Fair Foreclosure Act.

15.    At the time Defendant GMAC Mortgage LLC improperly and negligently filed its Complaint for Foreclosure and Lis Pendens, Plaintiffs were in the process of consummating financial transactions which, as a proximate result of Defendant's negligent and/or reckless conduct, were not consummated and which, but for Defendant's negligent and/or reckless conduct, would have been consummated.

16.    At all relevant times herein, Defendant GMAC Mortgage LLC knew or should have known that a foreclosure filing and Lis Pendens recording would severely compromise Plaintiffs' financial dealings, including but not limited to Plaintiffs' ability to obtain credit in the future.

3

17.    As a direct and proximate result of said Defendant's negligent and/or reckless conduct, Plaintiffs suffered damages and continue to suffer damages.

WHEREFORE, Plaintiffs demand judgment against Defendants for such sum of money as would reasonably and properly compensate Plaintiffs in accordance with the laws of the State of New Jersey, attorney's fees, costs, interest, and any other relief as the court may deem proper.

## SECOND COUNT

1.    The prior Count is referred to herein and made a part of this Count, but for the sake of brevity is not repeated in its entirety.

2.    The financial transaction secured by the mortgage on the Property was a contractual agreement between Defendant GMAC Mortgage LLC and Plaintiffs.

3.    The statutory obligation to provide the "notice of intention" required by the Fair Foreclosure Act was a term of the contractual agreement between Defendant GMAC Mortgage LLC and Plaintiffs.

4.    In failing to provide Plaintiffs with the "notice of intention" required by the Fair Foreclosure Act prior to filing its Complaint for Foreclosure on or about May 19, 2008, Defendant GMAC Mortgage LLC breached the aforesaid contractual agreement.

5.    As a direct and proximate result of said Defendant's breach of the contractual agreement, Plaintiffs suffered damages and continue to suffer damages.

WHEREFORE, Plaintiffs demand judgment against Defendants for such sum of money as would reasonably and properly compensate Plaintiffs in accordance with the laws of the State of New Jersey, attorney's fees, costs, interest, and any other relief as the court may deem proper.

4

## THIRD COUNT

1.      The prior Counts are referred to herein and made a part of this Count, but for the sake of brevity are not repeated in their entirety.

2.      Defendant Residential Funding Corp., as the owner of the mortgage as of December 30, 2009, undertook liability for the actions of its predecessor-in-interest Defendant GMAC Mortgage LLC as described herein, or is otherwise liable for the actions thereof as described herein.

WHEREFORE, Plaintiffs demand judgment against Defendants for such sum of money as would reasonably and properly compensate Plaintiffs in accordance with the laws of the State of New Jersey, attorney's fees, costs, interest, and any other relief as the court may deem proper.

## FOURTH COUNT

1.      The prior Counts are referred to herein and made a part of this Count, but for the sake of brevity are not repeated in their entirety.

2.      At all times pertinent hereto, Defendants John Doe 1-30 were individuals or entities who, as employees, agents or in any other capacity, were responsible for insuring that the non-John Doe Defendants were in compliance with their statutory duties, including but not limited to their duty to provide Plaintiffs with the "notice of intention" required by the Fair Foreclosure Act and to refrain from failing to provide Plaintiffs with the "notice of intention" required by the Fair Foreclosure Act.

3.      At all times pertinent hereto, Defendants John Doe 1-30 committed certain actions and/or failed to take certain actions in a careless, negligent and reckless manner and thereby caused harm and injuries to the Plaintiffs.

4.      As a direct and proximate result of the aforesaid negligence, carelessness and recklessness of Defendants John Doe 1-30, and/or their employees and/or agents, Plaintiffs suffered damages and continue to suffer damages.

**WHEREFORE,** Plaintiffs demand judgment against Defendants for such sum of money as would reasonably and properly compensate Plaintiffs in accordance with the laws of the State of New Jersey, attorney's fees, costs, interest, and any other relief as the court may deem proper.

## FIFTH COUNT

1.      The prior Counts are referred to herein and made a part of this Count, but for the sake of brevity are not repeated in their entirety.

2.      But for the negligent and reckless conduct of Defendants in prematurely filing a Complaint for Foreclosure and recording a Lis Pendens, Plaintiffs would have consummated a refinance transaction with another lender which would have paid off Defendant's mortgage.

3.      Defendants, by its/their negligent and reckless actions in prematurely filing a Complaint for Foreclosure and recording of a Lis Pendens, made it impossible for Plaintiffs to procure the funds to pay off Defendant's mortgage, and furthermore, destroyed Plaintiffs' credit and future ability to reinstate or pay off the mortgage loan as is permitted by the Fair Foreclosure Act.

4.      As a result of Defendants' actions in negligently and recklessly destroying Plaintiffs' credit and rendering Plaintiffs without the ability to take advantage of Plaintiffs' statutory rights, Defendant GMAC Mortgage LLC, its successor-in-interest Defendant Residential Funding Corp. and any other successor-in-interest should be estopped from instituting another foreclosure action against Plaintiffs and the Property.

6

**WHEREFORE,** Plaintiffs demand judgment against Defendants estopping them from

instituting another foreclosure action against Plaintiffs and the Property, and for such sum of money

as would reasonably and properly compensate Plaintiffs in accordance with the laws of the State of

New Jersey, attorney's fees, costs, interest, and any other relief as the court may deem proper.

> LAW OFFICES OF JEFFREY S. WALTERS, LLC
> Attorney for Plaintiffs
>
> BY:_____
>    JEFFREY S. WALTERS

DATED: May 7, 2010

## DESIGNATION OF TRIAL COUNSEL

Pursuant to New Jersey Court Rule 4:25-4. Jeffrey S. Walters, Esq. is designated as trial
counsel for the Plaintiffs in the above matter.

## JURY DEMAND

Plaintiffs demand trial by a jury on all of the triable issues of this complaint, pursuant to New
Jersey Court Rules 1:8-2(b) and 4:35-1(a).

> LAW OFFICES OF JEFFREY S. WALTERS, LLC
> Attorneys for Plaintiffs
>
> By:_____
>    JEFFREY S. WALTERS

Dated: May 7, 2010

## CERTIFICATION

Pursuant to New Jersey Court Rule 4:5-1, the plaintiffs hereby certify that the matter in controversy
is not the subject of any other action pending in any court and is likewise not the subject of any pending
arbitration proceeding, to the best of plaintiffs knowledge or belief. The plaintiffs further certify that
plaintiffs have no knowledge of any contemplated action or arbitration proceeding regarding the subject
matter of this action and that, other than the parties set forth in this pleading, the plaintiffs are not aware of
any other parties who should be joined in this action. In addition, plaintiffs recognize the continuing
obligation of each party to file and serve on all parties and the court an amended certification if there is a
change in the facts stated in this original certification.

> LAW OFFICES OF JEFFREY S. WALTERS, LLC
> Attorneys for Plaintiffs
>
> By:_____
>    JEFFREY S. WALTERS

Dated: May 7, 2010

7

# EXHIBIT "E"

FRANK REED                                                          April 26, 2011

9

1    Q. And where did you go to law school?
2    A. Widener.
3    Q. What year did you start law school
4  at Widener?
5    A. I think it was '07.
6    Q. How long did you attend law school?
7    A. Oh, it was just for one semester.
8    Q. How come you left?
9    A. The career counselor painted a
10 bleak picture for lawyers. It was pretty
11 scary sounding.
12   Q. Did you pay for law school?
13   A. Yes.
14   Q. Were you working while you attended
15 law school?
16   A. I don't think that semester I was.
17   Q. Are you currently working?
18   A. No.
19   Q. What was the last job that you held?
20   A. A position with Smith Barney.
21   Q. And for what time period did you
22 hold that position?
23   A. Just a couple of months in '08.
24   Q. Why did you leave that position?
25   A. I was injured; and I'm disabled.

10

1    Q. Tell me, what was the cause of the
2  disability?
3    A. I slipped and fell; embarrassing to
4  say, but it's true.
5    Q. And when was that?
6    A. April '08.
7    Q. Did you file a lawsuit with regard
8  to the slip and fall?
9    A. We recently have.
10   Q. Who is your attorney that's handling
11 the slip and fall?
12   A. McCrink. Matthew McCrink.
13   Q. When you were working at Smith
14 Barney, were you a salaried or commissioned
15 employee?
16   A. Combination.
17   Q. You indicated that while you were
18 at Smith Barney you only worked a couple
19 of months. Less than three?
20   A. Yes.
21   Q. Prior to Smith Barney, where were
22 you working?
23   A. I was self-employed; had investments
24 in real estate and a couple of LLC's, plus
25 I bought and sold houses.

11

1    Q. How long were you self-employed for?
2    A. Since 1992.
3    Q. And from 1992 to sometime when you
4  joined Smith Barney, your business was
5  buying and selling real estate?
6    A. It was a combination of -- I had
7  restaurants in theme parks, buying, reno-
8  vating and selling houses, renting houses
9  and then buying and renovating my own
10 home; would sell it every two years for the
11 nontax capital gain, you know, whenever you
12 improved the property that you lived in
13 for two years. So, it was a combination
14 of those things.
15   Q. You had mentioned that you owned a
16 couple of LLC's, is that correct?
17   A. Yes.
18   Q. What were the LLC's that you owned?
19   A. Quick Serve Concepts LLC, Theme
20 Park Foods LLC. I also had royalty payments
21 from a patent at that time, too.
22   Q. Through one of the LLC's?
23   A. No.
24   Q. Any other LLC's?
25   A. Not at that time, no.

12

1    Q. Any other corporations?
2    A. Not at that time, no.
3    Q. When you say not at that time, what
4  do you mean not at that time? From the
5  time, during the time that you were self-
6  employed.
7    A. And there was an original -- there
8  was a "C" Corp for awhile in the '90s
9  called Specialty Concessions.
10   Q. And when you bought and sold real
11 estate during this time that you were self-
12 employed, would you do that in your
13 individual name?
14   A. Yes.
15   Q. Do you still own Quick Serve Con-
16 cepts?
17   A. It's not active.
18   Q. When did it cease to be active?
19   A. 2007.
20   Q. Why was that?
21   A. Contract dispute over legal pro-
22 visions.
23   Q. Contract dispute with whom?
24   A. Paramount/Kings Dominion.
25   Q. Kings Dominion Amusement Park in



21

1  Q. How are you currently paying the
2  taxes and carrying costs for all the five
3  properties that you mentioned?
4      A. We are not currently doing that.
5      Q. Do you have a mortgage on the
6  Stratford property?
7      A. Yes.
8      Q. Tell me, are you current on that
9  mortgage?
10     A. I am not.
11     Q. And how past due are you on that
12 Stratford mortgage?
13     A. Ten months, I think.
14     Q. How about the Sicklerville property,
15 does it have a mortgage on it?
16     A. Yes.
17     Q. Are you past due on that?
18     A. May I clarify?
19     Q. Please.
20     A. 318, 52 and 21 are on a blanket
21 mortgage. It's one mortgage.
22     Q. Just so I'm clear on the recording,
23 the three properties, 318 Columbia, 52
24 Stone Hollow and the 21 Darien Drive are
25 all under one mortgage?

22

1      A. Correct.
2      Q. Who is that mortgage with?
3      A. TD Bank.
4      Q. What was the original amount of
5  that mortgage?
6      A. 660.
7      Q. And on that mortgage, you estimate
8  that you're about ten months behind, is
9  that correct?
10     A. Could be more than a year, but I'm
11 not sure. I don't know.
12     Q. Has foreclosure started against any
13 of those properties?
14     A. Yes, it has.
15     Q. Has foreclosure started against all
16 three of those mortgages?
17     A. It's one mortgage, though. I think
18 it's -- I don't know the legal, whether
19 you foreclose on one or you foreclose on
20 all. I don't know. It's called a blanket
21 mortgage.
22     Q. Fair enough. How about the property
23 in Virginia, 9717 Old Dell Trace, does
24 that have a mortgage on it?
25     A. That's my wife's. I don't know. I

23

1  mean it has a mortgage, I believe, but,
2  yes, it has a mortgage that I'm aware of.
3      Q. That property is only in her name?
4      A. I'm on the deed, but I'm not in-
5  volved with her mortgage.
6      Q. And do you have a mortgage on the
7  817 Matlack property?
8      A. Yes.
9      Q. What is the principal amount of
10 that mortgage?
11     A. 950, I think.
12     Q. Are you current on that mortgage?
13     A. No.
14     Q. About how past due are you on that
15 mortgage?
16     A. I don't remember. I think the last
17 payment that was made is, maybe, April '08.
18     Q. How come you haven't paid since
19 April of '08?
20     A. We sold the house to someone to,
21 Bret Cooper, who was supposed to close in,
22 I think, it was February or March of '08.
23 When he didn't, it had ramifications,
24 ripple effects.
25     Q. What happened to that deal?

24

1      A. The house was under contract for
2  two million forty and there was a provision
3  in the contract if it didn't appraise or,
4  no, if they couldn't get eighty percent of
5  a mortgage on it, then they would be able
6  to terminate or modify the mortgage, I
7  mean the contract.
8      Q. Is that what happened?
9      A. And there was a dispute over the
10 appraised value --
11     Q. A dispute?
12     A. -- that caused the mortgage
13 application to not be approved.
14     Q. The buyer's appraiser didn't
15 appraise the property enough for them to
16 get the loan, is that my understanding?
17     A. Yes.
18     Q. Was there another appraisal done at
19 the time which contradicted the buyer's
20 appraiser?
21     A. Two.
22     Q. Who did those two other appraisals?
23     A. One was -- I can't remember.
24     Q. If you don't recall, that's an
25 acceptable answer. I'm not looking for you



FRANK REED                                                        April 26, 2011

33

1    A. That was Commerce Bank. I think it
2  was Commerce at the time.
3      Q. When you previously mentioned
4  Commerce in 2008, is it now your testimony
5  that it was actually in 2009?
6      A. Different transactions.
7      Q. What was the transaction or the
8  reason you were applying to Commerce in
9  2009?
10     A. 2009, you said?
11     Q. Correct.
12     A. That was for refinancing on the
13  three rental properties. They were rentals
14  at the time.
15     Q. And were you able to refinance?
16     A. Oh, yes. May I take a break?
17     Q. Yes.
18        (Recess taken, 11:02 a.m.)
19        ---
20        (Back on the record, 11:20
21  a.m.)
22  BY MR. FLEISCHER:
23     Q. Before we took a break, we were
24  talking about some past incidents where
25  you applied for credit or a loan. We had

34

1  talked about the 2009 Commerce refinancing,
2  but before, you mentioned a 2008 trans-
3  action with Commerce Bank. What was that
4  with respect to?
5      A. We were looking or started down the
6  path of a cashout re-fi on 817, a potential
7  cashout re-fi on 817.
8      Q. And what happened to that?
9      A. This other company, Allied Mortgage,
10  beat them in both readiness, I think, and
11  interest. I can't remember the interest
12  rate or something like that.
13     Q. How far along in the process did you
14  get with Commerce Bank in the 2008 re-
15  finance?
16     A. I believe they had mentioned, they
17  told me that they were going to do the
18  re-fi and they had already appraised the
19  house. They had done, I guess, whatever
20  work they do internally because they had
21  talked to me about the, that they were
22  going to be able to do it, but that was --
23  I believe that was -- they came after this
24  other company said I had different choices.
25     Q. When you say this other company,

35

1  talking about Allied?
2      A. Yes, I think that was the name of
3  it.
4      Q. Were you ever accepted or declined
5  by Commerce Bank?
6      A. I understood that I was accepted,
7  but I told them, I think, I'm going -- I
8  never formally declined, but I told them I
9  think I'm going to use this other company.
10  I had done business with Commerce for many
11  years.
12     Q. Back in 2006 when you were working
13  with Commerce and Allied Mortgage, would
14  you say that you had good credit or did you
15  have issues with your credit?
16     A. That was in 2008.
17     Q. I'm sorry, in 2008, yes. I meant
18  to discuss 2008.
19        When you were discussing with
20  them the refinance at that point in time,
21  did you consider that you had good credit
22  or you had issues with credit?
23     A. I did not know. I thought I was
24  fine because I had been told I would be able
25  to obtain the financing.

36

1      Q. At the time you were looking to
2  refinance, were you past due on any of your
3  mortgages in 2008?
4      A. No, I don't think I was. I don't
5  believe I was at all.
6      Q. When you were applying for these,
7  for the refinance with Commerce and Allied,
8  what was your source of income?
9      A. That was rental income and cash on-
10  hand and revenue from properties that we
11  were selling, we had sold in the process
12  of selling and working on.
13     Q. Did you file a tax return for 2008?
14     A. Yes, I believe we did. Yes.
15     Q. And do you recall filing a tax
16  return for 2009?
17     A. Yes.
18     Q. And did you file a tax return for
19  2010?
20     A. No.
21     Q. Are you on extension?
22     A. Yes.
23     Q. Have you ever had a judgment against
24  you?
25     A. I do now.



FRANK REED                                                              April 26, 2011

37

1    Q. Who is that with?
2    A. I cannot identify. I have probably
3    several.
4    Q. How do you know you have judgments
5    against you?
6    A. I was served actions that I didn't
7    respond to. So, I assume, they have gone
8    to default.
9    Q. And when you say you were served
10   actions, was that in 2010?
11   A. 2010. Or was it late 2009?
12   Q. Were you ever past due on any of
13   your taxes?
14   A. Yes.
15   Q. What taxes were you past due on?
16   A. Some rental property real estate
17   taxes.
18   Q. And for what time period were you
19   past due?
20   A. I cannot remember.
21   Q. Were you past due in 2009?
22   A. I don't think in 2009. In 2010, I
23   know we are.
24   Q. What happened to your application
25   with Allied Mortgage?

39

1    you living in 817?
2    A. Yes.
3    Q. Did you ever get served with a
4    Foreclosure Complaint?
5    A. Yes.
6    Q. Do you recall when that was?
7    A. Spring of '08.
8    Q. How many months past due were you
9    when you applied for the loan with Allied
10   Mortgage?
11   A. I don't know if I was at that
12   moment.
13   Q. Did you ever get letters from GMAC
14   indicating that you were past due on your
15   mortgage?
16   A. I don't remember getting any.
17   Q. After you got served with the
18   Complaint, did you contact GMAC?
19   A. I think I contacted a lawyer and, I
20   think, I called their lawyer, the one that
21   was on the Complaint and they told me to
22   contact a lawyer for myself, they can't
23   answer questions. They recommended that I
24   speak to an attorney.
25   Q. When you spoke to that lawyer, did

38

1    A. I was told that I had several or I
2    was approved for several options and I
3    needed to, you know, to look at them and
4    analyze which ones I would take.
5    Q. And did you look at the options?
6    A. I don't remember if I actually got
7    to that point because the financing was
8    withdrawn.
9    Q. And why was that?
10   A. I was told because the 817 Matlack
11   had gone into foreclosure.
12   Q. Who told you that?
13   A. It was the mortgage officer, the
14   loan officer.
15   Q. The loan officer at where?
16   A. Allied.
17   Q. Do you remember his name?
18   A. Tardamosa.
19   Q. When he told you the property was
20   in foreclosure, you did not know about it?
21   A. I think he actually told me that
22   there was -- I think there was -- I don't
23   remember. I don't believe that I knew. I
24   think they knew before I knew.
25   Q. And at that period of time, were

40

1    you tell him that you didn't think you were
2    past due?
3    A. Which lawyer?
4    Q. The lawyer, I assume, on the
5    Foreclosure Complaint.
6    A. I don't remember. I was just in a
7    state of shock. I was like what is this?
8    Why is this going on?
9    Q. Who pays the bills in your house,
10   you or your wife?
11   A. My wife had primarily been doing
12   that.
13   Q. So, she would regularly be the
14   person responsible for paying the mortgage
15   payment?
16   A. Up to when our world fell apart,
17   yes.
18   Q. And at what time did your world fall
19   apart?
20   A. That was in the spring of '08 when
21   the sale didn't go through and then the
22   refinance.
23   Q. Did your wife tell you that you were
24   past due on the mortgage?
25   A. I don't know when we discussed it.



The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:        1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

FRANK REED                                                      April 26, 2011

49

1    A. Yes. Restate that question.
2    Q. You mentioned the property at 72
3  Broad Hollow. Was that the location where
4  you lived prior to purchasing Matlack?
5    A. I had property in Virginia that we
6  stayed at for awhile, a summer property,
7  which you asked about, two properties in
8  Virginia.
9    Q. Did you ever miss a credit card
10  payment?
11    A. Yes.
12    Q. Do you recall if you missed any
13  payments on your credit cards in 2008?
14    A. After the foreclosure, probably,
15  yes.
16    Q. What about before the foreclosure?
17    A. I don't recall. I don't believe so.
18    Q. Would that be something your wife
19  might know?
20    A. She might. But, she was pretty
21  adamant about paying everything.
22    Q. At one point in time, did you have
23  a state tax lien by the State of New
24  Jersey for $34,000?
25    A. I did.

50

1    Q. What was that for?
2    A. That was for some taxes for
3  Specialty Concessions.
4    Q. Was that ever paid off?
5    A. Yes.
6    Q. And do you recall when that was paid
7  off?
8    A. Not long afterwards.
9    Q. Not long afterwards after it was
10  filed?
11    A. Yes.
12    Q. Did you ever own a property at 306
13  Magnolia Avenue in New Jersey?
14    A. I did.
15    Q. What happened to that property?
16    A. I sold it.
17    Q. Did you ever work at Trump Plaza?
18    A. Yes.
19    Q. When did you work there? Prior to
20  2000, was it?
21    A. Oh, 1991.
22    Q. What was the last time you saw your
23  credit report?
24    A. I think 1993, maybe '94. Something
25  like that.

51

1    Q. Did you bring a copy with you today?
2    A. No.
3        (Exhibit D-3, a document
4    filed May 10, 2010, indicating Mr.
5    Reed resided at the Old Dell Trace
6    address in Richmond, Virginia, marked
7    for identification.)
8  BY MR. FLEISCHER:
9    Q. I'm showing you what's been marked
10  as Defendant's Exhibit 3 and ask that you
11  take a look at that.
12    A. Okay.
13    Q. Do you recognize this?
14    A. I don't believe I physically
15  recognize this document. But, I believe,
16  I understand what it is.
17    Q. Did you review this document before
18  it was filed?
19    A. I remember reviewing something, but
20  I don't know if it's this exact document.
21    Q. This document indicates that when
22  it was filed, you resided at the Old Dell
23  Trace address in Richmond, Virginia, is
24  that correct? This was filed on May 10,
25  2010.

52

1    A. Yes.
2    Q. And when did you move out of that
3  property?
4    A. It was this past fall. I think it
5  was November.
6    Q. When you moved out of the Dell Trace
7  property, where did you move to?
8    A. 817 Matlack.
9    Q. Were your kids enrolled in school
10  in Moorestown?
11    A. They are.
12    Q. What school are they enrolled in?
13    A. Is that an appropriate question?
14        William Allen Middle School;
15  Upper Elementary School and Baker School.
16  Sorry, just seems odd for you to ask that.
17    Q. The Complaint indicates that when
18  the foreclosure action was filed, that you
19  were in the process of consummating a
20  financial transaction. Which financial
21  transaction was that?
22    A. That was the pending re-fi.
23    Q. With Allied Mortgage?
24    A. I had one from Commerce that they
25  said that I was, had been approved for,


setdepo™
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:       1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

FRANK REED                                                April 26, 2011

65

1    A. I believe I made a half dozen calls
2  to hard money lenders.
3    Q. Do you have any documents regarding
4  those calls?
5    A. I think Jeff asked me to look for
6  stuff like that, and I didn't...
7    Q. What did you expect the proceeds
8  from the refinance with Allied to be?
9    A. I thought it was, like, 550 or 600
10  or something like that.
11    Q. Do you have any documents that would
12  show what you might have gotten out of the
13  refinancing?
14    A. No. I think we might be able to
15  reconstruct based on the appraisals and
16  how that was a percentage of what the
17  value was.
18    Q. What I'm really looking for is
19  documents from Allied or Commerce indicating
20  what they were willing to lend you and the
21  amount of the proceeds that you would have
22  been able to walk away with from that
23  closing?
24    A. I understood it to be 90 per cent.
25  I don't have, I did not discover any

66

1  documents in writing, looking for them at
2  this time.
3    Q. We were just discussing that you
4  believe you suffered damages as a result
5  of not being able to fix up the Virginia
6  property. Are you claiming any other
7  damages as a result of GMAC's foreclosure
8  action or the lis pendens that you suffered?
9    A. Well, I would say, and I'm not sure
10  how to quantify a number for you as of
11  yet, but if I had done the re-fi, we would
12  have had cash in hand; we would have had
13  cash in hand to live. Our bills would not
14  have eventually gone into arrears. I assume
15  my credit report, from all the commercials
16  on TV and what I understand, has been
17  harmed greatly by this.
18        I know that, for example,
19  when I worked in the casino's and when I
20  worked for Smith Barney, my credit scores
21  and my credit history had to be of a
22  certain caliber, I cannot say what they
23  are at the moment, but they had to be a
24  certain caliber or I would not be licensed
25  or hired for those positions.

67

1        It's my general understanding
2  that currently I cannot go back to those
3  careers at all and others because of this
4  situation. I don't know if this is
5  something -- I can't pass judgment on the
6  legal veracity of something, but we entered
7  into an arrangement, contract with Mr.
8  Cooper/Mark Weaver, at a reduced price to
9  what we were then, the appraised value of
10  a quarter million dollars because we felt
11  that we were under duress. Houses in our
12  neighborhood sold for over two million
13  dollars during the time we were entangled
14  with Mr. Cooper. In back of my house, one
15  sold, the very house behind us, sold for
16  that. The realtor believed ours could not
17  because ours was not available.
18        Another issue that we
19  encountered not long ago, the lis pendens,
20  I understand, is still on record. I don't
21  know how those things work, but a realtor
22  from Edgar & Son had a customer shopping
23  in Moorestown for houses in the million
24  eight, million nine price range, where our
25  house was last year assessed at a million

68

1  nine, and we had reduced it now. We had a
2  tax appeal and gotten it down to a million
3  seven. The buyer instructed the realtor,
4  based on the buyer's knowledge, I don't
5  know how he gets this knowledge, of a lis
6  pendens regarding our property, to offer
7  us a substantially reduced offer of a
8  million four fifty for the property. It
9  was originally a million four or a million
10  three-eighty. He then settled on a million
11  four-fifty. He said he wanted to buy the
12  property or he wanted to be in before
13  school, which was in August of '10 or July
14  of '10. We said okay.
15        The contract comes and the
16  guy wants to rent it for eighteen months
17  with a closing on or before eighteen months.
18  Why? According to what I heard from the
19  realtor, it's because he's expecting us to
20  get foreclosed on. That's why he offered
21  a lower price; and he then, at the last
22  minute, converted it to a rent, then
23  purchase later, hoping that we were going
24  to be foreclosed on before we can fulfill
25  our delivery of the property based on the



sd≡ setdepo™
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax: 1.888.451.3376
www.setdepo.com

# EXHIBIT "F"

# EXHIBIT "G"

# PLAINTIFF'S EXPERT WITNESS REPORT OF
# EVAN HENDRICKS

I, Evan Hendricks, provide the following Expert Report in connection with the action entitled Frank J. Reed III v. GMAC Mortgage LLC, et al., Superior Court of New Jersey, Burlington County (Docket No. L-1526-10). **Part 1** of this report addresses issues that are specific to this case, including a context and history that robustly put Defendants on notice of the problems in this case and why Defendants should have prevented them. **Part 2** includes my qualifications, list of prior cases in which I have testified, my fee, and more general opinions, such as the nature and purpose of credit scores and credit reports, and damages. It is likely that Defendants will disclose additional evidence after I have completed this expert report. If appropriate, and if justified by the production of additional evidence in discovery, I reserve the right to supplement this report at a future date.

## Summary of Opinions

- This case is the result of Defendant GMAC ("GMAC") abusing both the foreclosure process and the credit reporting system to block the ability of Plaintiff Frank Reed ("Plaintiff" or "Mr. Reed") to avoid foreclosure by ruining his credit.

- GMAC abused the foreclosure process by failing to adhere to the all-important notice provisions in the Fair Foreclosure Act. It abused the credit reporting system by filing the foreclosure action, and instructing the credit reporting agencies (CRAs) to portray Mr. Reed as being in foreclosure, when the foreclosure action should never have been filed prior to providing a Notice of Intent to Mr. Reed.

- This set off a highly damaging chain reaction. The foreclosure on Mr. Reed's credit stood out as a "scarlet letter" and scuttled his soon-to-be-completed efforts to refinance his mortgage and avoid foreclosure. That in turn further worsened Mr. Reed's credit, making it impossible for him to obtain any meaningful credit, either to avoid foreclosure, extract equity from his home, or to continue Mr. Reed's real estate business.

- All of this caused Mr. Reed both economic and non-economic damages. The economic damages stemmed from the ruined credit that ended Mr. Reed's ability to continue his real estate business.

- Mr. Reed's economic damages include, but likely are not limited to, the losses from being unable to refinance his home mortgage, the losses stemming from his inability to sell his Moorestown property at the peak of the market, the losses and foreseeable losses stemming from Mr. Reed's inability to continue his real estate business and the loss of time and opportunity stemming from dealing with the unfair and incomplete/inaccurate credit reporting.

- The non-economic damages related to the stress, humiliation, mental anguish and frustration stemming from being blindsided by GMAC's non-compliant foreclosure, from watching his credit being ruined and knowing the consequences for his and his family's economic plans and aspirations, and from the consequential loss of reasonable control over such crucial personal information, making him a victim of chronic credit report inaccuracy.

- Given that this occurred during a period in which wrongful foreclosures were a growing, foreseeable problem, and that the damages stemming from wrongful foreclosures were potentially devastating, GMAC's actions in regard to Mr. Reed were reckless.

- From 1996 to the present, GMAC was put on notice by a variety of events of the importance of credit report accuracy.

- It is well known in our field that victims of chronic credit report inaccuracy endure a common pattern of harms. The damages suffered by Mr. Reed was consistent with those experienced by other victims. As mentioned above, Mr. Reed suffered damages that were peculiar to his situation.

**Impact of 'Foreclosure' On Creditworthiness**

It's logical that a foreclosure is devastating to a consumer's creditworthiness. After all, a home mortgage is often the most important credit obligation of an American consumer, and a foreclosure typically means that the consumer has defaulted on the mortgage to the point that the bank has to foreclose on the home and take possession of it.

Most lenders, like TD Bank in the case of Mr. Reed, have a policy of not approving (or even reviewing) credit applications from consumers who are in foreclosure. In addition, most lenders run automated scans of applicants' credit reports for key derogatory terms, and "foreclosure" is one of them. This is because underwriters typically will not give final approval to a credit application for someone who is in foreclosure.

The State of New Jersey has recognized foreclosure's devastating impact on the consumer through enactment of the Fair Foreclosure Act, which seeks to ensure that proper and timely notice is given to potential targets of foreclosure so they will have adequate opportunity to make things right and avoid losing their home. ("Institution of foreclosure is traumatic to the debtor-mortgagor and creates a permanent court record which can be injurious to the debtor's credit. The notice of intention is meant to give the debtor a chance to prevent acceleration and institution of foreclosure." See Myron C. Weinstein, "Law of Mortgages: Chapter 24: New Jersey's Fair Foreclosure Act. B. Notice of Intention." New Jersey Practice Series TM.)

GMAC knew or should have known all of this. GMAC's rushed and allegedly improper foreclosure action against Mr. Reed came during a period in which GMAC

allegedly was falsifying documents in order to foreclose on other properties. (See Paul
Kiel, "Internal Doc Reveals GMAC Filed False Document in Bid to Foreclose,"
ProPublica, July 27, 2011. (www.foreclosuredefenseblog.com/2011/08/firm-
commentary-readers-should.html)

Thus, GMAC's reckless and highly damaging improper foreclosure against
Mr. Reed coincided with other reckless and presumably highly damaging improper
foreclosures against other Americans, and appeared to be part of a pattern and practice
of a declining mortgage lender desperate to salvage itself by trampling on its customers'
rights.

### GMAC's Foreclosure Doomed Mr. Reed's Re-finance, His Path To Normalcy, & Doomed Him To 'Credit Jail'

Mr. Reed had a long-standing relationship with the TD Bank President, who had
been involved with numerous loans over a period of many years as part of Mr. Reed's
ongoing business of buying, improving and selling real estate. In the Spring of 2008, the
TD Bank President had visited one of Mr. Reed's properties and had ordered and
received an appraisal.

The approval of this loan, and the consummation of this transaction, would have
enabled Mr. Reed to catch up on his debts, including the GMAC mortgage, and extract
equity from his home in order to conduct his business ventures.

That is when the key moment occurred. GMAC improperly moved to foreclose on
Mr. Reed's home, figuratively hanging a "scarlet letter" around his creditworthiness, and
scuttling the ability to consummate a loan transaction.

This in turn set off a horrific chain reaction that resulted in Mr. Reed, figuratively,
being thrown into "credit jail." Unable to complete the planned transaction and obtain
the necessary funds to become current on his credit obligations (and to continue his
ongoing real estate endeavors), Mr. Reed suddenly could not meet his other credit
obligations and quickly fell behind. Within months, his credit report was marred with a
plethora of derogatory credit accounts which further doomed any hope he had of
restoring his creditworthiness and returning to a normal economic life.[1]   This chain
reaction was caused directly by GMAC's improper foreclosure, and it devastated Mr.
Reed's life.

This caused profound economic and non-economic damages to Mr. Reed. His
other expert will opine on his economic damages.

---

[1] According to one of Mr. Reed's credit reports, a quick review indicated that eight accounts where
rendered derogatory in 2008 alone.

Mr. Reed's non-economic damages relate to the stress, humiliation, mental anguish and frustration stemming from being blindsided by GMAC's non-compliant foreclosure, from watching his credit being ruined and knowing the consequences for his and his family's economic plans and aspirations, and from the consequential loss of reasonable control over such crucial personal, financial information, making him the victim of chronic credit report inaccuracy.

I have served as an expert in several cases in which consumers/plaintiffs have been victims of chronic credit report inaccuracy. In these cases, the juries recognized the profound damage to the plaintiffs. In some of the earlier cases in which I was involved, the minimum damage award was $200,000. In more recent cases, the jury awards for actual damages have been closer to $350,000.[2]

Because the chronic inaccuracy caused by GMAC cut right to the heart of Mr. Reed's ability to continue earning a living, it heightened the stress, humiliation, mental anguish and frustration he experienced from being blindsided by GMAC's non-compliant foreclosure, and from watching his credit being ruined.

---

[2] Eric Robert Drew  vs. Equifax Information Services, LLC, et al., U.S. District Court for the Northern District of California , Case No. CV 07-00726-SI. $700,000 in punitive damages, $315,000 in emotional distress damages, and $6,326.60 in economic damages, for a total of $1,021,326.60; July 20, 2010

Suzanne Sloane vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272. $351,000 –   $106,000 in economic damages and $245,000 in mental anguish, humiliation, and emotional distress damages. (August 2006)

Angela Williams v. Equifax Information Solutions, LLC: Circuit Ct. or 9th Judicial Circuit, Orange County, Florida – No. 48-2003-CA-9035-O; jury verdict, Nov. 30, 2007; ($219,000 in actual damages and $2.7 million in punitive damages).

Rebecca L. Valentine v. Equifax Information Services, LLC: U.S. District Court for the District of Oregon – No. 05-cv-0801; jury verdict Oct. 12, 2007; ($200,000 in actual damages.)

Nicole M. Robinson v. Equifax Information Services, LLC: USDC-Eastern Dist. Of Virginia – No. 06-CV-1336; jury award Aug. 17, 2007; ($200,000 in actual damages.)

Sandra Cortez vs. Trans Union, LLC., U.S. District Court for the Eastern District of Pennsylvania: No. 2:05-cv-05684-JF. (jury verdict April 26, 2007; $50,000 actual damages, $750,000 in punitive damages.)

Matthew Kirkpatrick v. Equifax, U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO; 2005 $210,000 in actual damages.

Thomas v. Trans Union, U.S. District Court for the District of Oregon.   $5million punitive, $300,000 actual damages for emotional distress. (2001)

Soghomonian v. TransUnion, (U.S. District Court for the Northern District of California, 2004) $330,000 actual damages and $660,000 punitive damages.

Cortez v. TransUnion, LLC, U.S. District Court for the Eastern District of Pennsylvania, Case Number: 2:05-cv-5684 (April 2007); $50,000 actual damages, and $750,000.00 in punitive damages.

4

Therefore, in accordance with my experience as an expert in the field of chronic credit report inaccuracy, I would value his non-economic damages, at a minimum, at $350,000.[3]

**Underlying Incentive For Furnishing**

Many people do not realize that creditors' furnishing of their customers' data to credit reporting agencies (CRAs) is entirely voluntary. A fundamental incentive for large creditors such as GMAC in this case is that credit reporting is a cost-effective means of enhancing debt collection.

GMAC is keenly aware that credit reporting is a "powerful tool designed, in part, to wrench compliance with payment terms." (Rivera v. Bank One, 145 F.R.D. 64, 623 (D.P.R. 1993)). Creditors' collection letters and debt-collecting operators often advise customer-debtors that if they don't pay their debt it will result in highly derogatory data being entered on that customer's credit report which may remain for up to seven years. Creditors' collection letters often advise customer-debtors that, "Any potential employer, mortgage company, car dealership or creditor is likely to see this remark. Such a condition is far more damaging than the delinquent status you now maintain."

When a consumer applies for a mortgage, or other major form of credit, the mortgage or credit often is not granted until all outstanding unpaid debts listed on the credit report are resolved. Thus, a creditor that is owed money, or that still hopes to collect money whether or not it is actually owed by the consumer, enhances its ability to garner payment by reporting the debt to that consumer's credit report. This practice is highly problematic and damaging to the consumer when the consumer in fact does not actually owe the amount being reported to her credit report. However, it is conceivable that such practices would cause consumers, particularly those who did not know their rights, to consider paying off debts that they did not owe in order to remove serious derogatory data from their credit reports.

As I wrote in my book, "Credit Scores and Credit Reports,"

... Creditors view credit reporting as an arm of debt collection – a sort of last resort that will catch up with non-paying consumers sooner or later. This practice "crosses the line" when creditors and collectors threaten to report debts – or actually report debts – that they know or should know are not the responsibility of the consumer. [Page 31 – Second Edition]

---

[3] I am sometimes reluctant to place a dollar value on non-economic damages for fear of "low-balling" what a future jury would decide. But I believe this initial estimate provides a reasonable basis for understanding Mr. Reed's minimum non-economic damages.

**Potential Areas of Testimony: Damages Known & Common To Victims of
Chronic Credit Report Inaccuracy**

It is important that the trier of fact understands that victims of chronic credit report inaccuracy often experience a series of several known and common types of negative impacts.

**Some Categories of Typical Negative Impacts of ID Theft & Chronic Inaccuracy**

(1) Inaccurately described as not creditworthy and/or less creditworthy to third parties
(2) Improperly denied credit because of inaccurate data, or only able to obtain credit at less favorable rates
(3) Expended time and energy to correct errors not of one's making; in addition to loss of time and energy, loss of opportunity
(4) Wrongfully received debt collection calls
(5) Chilled from applying for credit
(6) Sleeplessness, physical symptoms
(7) Sense of helplessness, loss of control over personal data
(8) The emotional distress stemming from, and associated, with all of the above

The following factors could be used to gauge the severity of damage within each category.

**Key Factors To Consider When Assessing Severity of Negative Impact**

The nature and substance of the category of damage
Time & energy to solve the immediate problem
The expectation that the problem was solved
The number of recurrences
The period of time over which the problem persist

**Mr. Reed's Damages Were Consistent with Other Victims
of Chronic Credit Report Inaccuracy**

Mr. Reed's damages were consistent with other victims of chronic credit report inaccuracy. His experiences touched on many of the eight categories cited above. In addition to the categories above, it is important for the trier of fact to understand that it can be very stressful not knowing everyone who may have associated you with highly derogatory credit data. Moreover, in my opinion, it can be difficult to maintain constructive personal relationships under stress.[4] It can be difficult to perform adequately at one's job.

**Defendant Knew or Should Have Known It Actions Would Have Negative Impact**

The history of credit reporting cited below, which includes years of Congressional testimony and legislative actions, Federal and State enforcement actions, abundant media coverage and targeted books, such as mine, should have made it abundantly clear to GMAC

---

[4] In fact, the insurance industry says that stress, stemming from financial problems, can cause auto accidents, and therefore justifying its use of credit reports in setting insurance rates.

that failing to prevent Mr. Reed from becoming a victim of chronic inaccuracy would have a
highly negative impact on him.

## Context

Context is extremely important in this type of case, in part because credit reporting, along
with inaccuracies stemming from identity theft, is a long-standing and well-known problem. An
important role of experts in FCRA cases is to help the trier of fact understand the relevant
context.[5] Accordingly, I provide a brief history. An important theme emerging from this history
is that a furnisher like GMAC was consistently provided notice in one form or another of the
importance of ensuring the accuracy of information it reports and promptly restoring accuracy
when the consumer disputes inaccuracies. This history also notified GMAC of the potential
damage to consumers of both reporting erroneous information and then failing to correct it.

## History of Significant Inaccuracy Problems

It is essential that the trier of fact understand that there is a long-standing problem of
significant inaccuracy rates in credit reporting data. Since 1990, several non-industry studies
have concluded that credit report inaccuracy is a problem of significant proportions that can have
a major negative impact on the victims of inaccuracy, and that can potentially be detrimental to
the credit system as well.[6] This history is covered in Chapter 10 of my book, "Credit Scores and

---

[5] Kirkpatrick v. Equifax, U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO; In
rejecting Defendant Equifax's motion to exclude Mr. Hendricks' testimony, Judge Michael W. Mosman,
ruling from the bench, stated: "As a general statement, what I'm allowing and the reason I'm allowing it is
testimony that puts the particular actions of the defendant in particular here in context, in the context of the
nationwide problem of identity theft, in the context of the congressional reaction to that and other issues in
the credit-reporting industry, when he can by virtue of his study and his prior testimony, both in court and
to Congress, make comparisons, then that's something that's helpful to the jury." (January 18, 2005;
Transcript available upon request.)

[6] Williams, James (CIS), "Credit File Errors, A Report," August 7, 1989 -- The first survey of 1,500
consumer reports and found serious error rate of 42% to 47%;

Consumers Union, "What Are They Saying About Me? The Results of A review of 161 Credit Reports
From The Three Major Credit Bureaus, April 29, 1991 -- 48% contained "serious errors," defined as
meaning those that could, or did, cause the denial of credit, employment or insurance.

U.S. Public Interest Research Group (US PIRG), "Nightmare On Credit Street (Or How The Credit Bureau
Ruined My Life): Case Studies Documenting Consumer Complaints and Recommendation For Amending
the FCRA," June 12, 1990

U.S. Public Interest Research Group (US PIRG), "Don't Call; Don't Write; We Don't Care." 1991 -- Review
of 156 consumer report complaints on file at the FTC revealed that the average duration of complaints
against a CRA was 22.5 weeks, or almost 6 months

U.S. Public Interest Research Group (US PIRG), "Public Enemy #1 At The FTC " October 1993,
Based upon a Freedom of Information Act request, the 1993 report found that between 1990-93, problems
with credit bureaus was the leading cause of complaints to the FTC (30,901, 20.6%). The 1993 PIRG

Credit Reports." As that Chapter notes, in the early 1990s, problems with inaccuracy and
"mixed files," CRA non-responsiveness and inadequate reinvestigations became the cause of
complaints to the FTC.

Of particular note was the 1993 study done by the U.S. Public Interest Research Group
(US PIRG), "Public Enemy #1 At The FTC." Based upon a Freedom of Information Act
request, the 1993 report found that between 1990-93, problems with credit bureaus was the
leading cause of complaints to the FTC (30,901, 20.6%). The 1993 PIRG found that 44% of
complaints concerned mixed files, and that among those, 64% involved the mixing of data with
total strangers.

These and other complaints prompted the FCRA's oversight authorities – the FTC and
State Attorneys General – to launch investigations and take enforcement actions. These actions
resulted in a series of separate consent decrees involving Equifax, Experian and Trans Union in
which each pledged to do a better job of maintaining accuracy, avoiding mixed files and the
reappearance of previously deleted data, being more responsive and conducting adequate
reinvestigations.

### History: Increased Attention on Role of Furnisher

This Consent Agreements are also relevant because (1) they created widespread publicity
about the problems of credit report inaccuracy, (2) they articulated (an agreed upon) higher and
more specific standard of care to ensure accuracy and fairness, and (3) they formed the
foundation for the 1996 Amendments to the FCRA. However, Congress knew that to ensure
accuracy, it needed to go beyond the Consent Agreements by placing duties on furnishers to
report information accurately.

The April 1994 House Banking Committee Report on the proposed amendments
explained why, despite the consent agreements, and subsequent industry guidelines, legislation
was necessary: "Moreover, because the industry guidelines are simply voluntary, they are
unenforceable and may be changed or revoked at any time. Many of the provisions in the

---

found that 44% of complaints concerned mixed files, and that among those, 64% involved the mixing of
data with total strangers.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: Credit Report Errors Mean
Consumers Lose," March 1998

"Credit Reports: How Do Potential Lenders See You?" *ConsumerReports.org,* July 2000.

Consumer Federation of America and National Credit Reporting Association, *Credit Score
Accuracy and Implications for Consumers,* December 2002.

Robert Avery, Paul Calem, Glenn Canner, and Raphael Bostic, "An Overview of Consumer
Data and Credit Reporting," *Federal Reserve Bulletin,* February 2003.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: A Look at Credit Report Errors,"
June 2004

consent agreements expire after a short period of time, are not enforceable by consumers, and do
not apply in every state. *Additionally, these agreements do not impose any reinvestigation
obligations on furnishers of information or on credit bureaus other than the three largest.
Because of these limitations, federal legislation is necessary to improve accuracy-related
protections for consumers. Consequently, the bill contains new reinvestigation procedures
which are intended to cut down on the number of errors in consumer reports and to reduce the
delay in correcting those errors.* " [Emphasis Added]

Importantly, the Consent Agreements' language on preventing reinsertion was
incorporated and expanded upon in the 1996 Amendments to the FCRA. Under Sect. 1681
(a)(5)(B), information cannot be reinserted unless it is "certified" as complete and accurate by
the furnisher. Moreover, a CRA, five business days prior to any reinsertion, must notify the
consumer, and also provide the name and address of the furnisher and inform him or her of his
right to add a statement.

Despite these Consent Decrees, the problems of mixed files, inadequate reinvestigations
and reappearance did not go away. Throughout the early 1990s, Congress held a series of
hearings in which numerous consumers and consumer advocates described problems with
inaccuracy, mixed files, CRA non-responsiveness, and inadequate reinvestigations. This resulted
in the 1996 legislative amendments to the FCRA.

I cite this brief history because it makes clear that for many years, a furnisher like
GMAC has been on notice from Congress, the FTC, State AGs, the media and the public
that it is important to ensure accuracy, and to reasonably investigate consumer disputes,
and that it can be highly damaging when inaccurate information is not removed.


### Part 2

### Potential Areas of Testimony: General Issues, Context

A.    **The Nature and Purpose of Credit Scores**
B.    **The Nature and Purpose of Credit Reports**


### Nature & Purpose of Credit Scores

It is possible that the trier of fact is not intimately familiar with either the credit reporting
or credit scoring systems. If this is the case, I can provide expert testimony on the nature of both
systems, how to read and understand credit reports and how to dispute errors, the parameters of
credit scoring, the general impact that derogatory data have on a credit score, the interplay
between identify theft, credit scoring and credit reporting, and other related matters.

A credit score is a number that reflects a consumer's creditworthiness at a given point in
time. The FICO model credit score, which is used by 75 percent of lenders, is based entirely on
information in a consumer's credit report. The model was developed by Fair, Isaac & Co., which

licenses it to Equifax, Experian and Trans Union and others. The scoring range for the FICO
"classic" model is 300-850. The various types of "Beacon" scores sold by Equifax, and "Classic
FICOs" sold by Trans Union,[7] are based upon the FICO model. The higher the credit score, the
less risky the consumer is viewed by creditors. Consequently, consumers with higher-end credit
scores (720 and above) often can obtain the most favorable rates for mortgages, refinancing,
personal and auto loans and auto and homeowners insurance, and also often receive solicitations
for the best quality credit cards. Conversely, the lower the score, the less favorable the rate. A
credit score of 620 and below is widely regarded as "sub-prime."

Maintaining a good credit score is important because of a fundamental rule: the lower
one's score, the more one pays for credit, including higher interest on mortgages, auto loans,
installment loans and credit cards.

For example, the Web site of Fair Isaac Corp., www.myfico.com,[8] gives this example of
the difference that credit scores make in terms of interest and monthly payments, on a $300,000
30-year, fixed-rate mortgage:

| Your FICO® Score | Your Interest Rate | Your Monthly Payment |
| --- | --- | --- |
| 760 - 850 | 6.148% | $1,827 |
| 700 - 759 | 6.370% | $1,871 |
| 680 - 699 | 6.654% | $1,927 |
| 660 - 679 | 7.464% | $2,090 |
| 640 - 659 | 8.816% | $2,374 |
| 620 - 639 | 9.782% | $2,584 |

A similar chart exists for auto loans. Moreover, about half of the major credit card
companies practice "Universal Default," meaning that these companies will raise their
cardholders' interest rates if those cardholders' credit scores drop below certain levels – even if
the cardholder never had a late payment with the company.[9]

1.    The precise workings of the FICO score are highly proprietary and therefore closely
guarded. However, the general parameters are publicly available:[10]

**35% -- Payment history.**   Late payments, particularly major or serious
derogatories, like 90-days late or worse, and particularly on important accounts like
mortgages, are very damaging to one's credit score.

---

[7] In previous years, the Trans Union FICO Score was called "Empirica"
[8] Visited September 21, 2005
[9] Universal default is described in detail in Chapter 22 of the 2nd Edition of "Credit Scores and Credit Reports,"
op. cit.
[10] These parameters are published in Chpr 1 of both Editions of "Credit Scores and Credit Reports," op. cit.

**30% -- Credit Utilization.** The ratio between available "revolving" credit and how much is actually used (credit card balances vs. credit card limits).

**15% -- Length of Credit History.** The longer you maintain a positive credit history, the better it is for your credit score.

**10% -- How Much New Credit?.** This relates to "inquiries" that creditors make when you apply for credit.

**5% -- Healthy Mix of Credit?** The scoring model prefers to see a "healthy mix" of mortgage, credit cards and perhaps other kinds of credit.

2.    It is important to understand that consumers are most severely penalized when they have a serious derogatory within the past eleven months. The "importance of being recent" is illustrated by the following Fair Isaac chart, which shows, in a proportional sense, that a major delinquency in the past year has a 93% negative impact, while a major delinquency between 1-2 years-old has about a 60% negative impact; a major delinquency between 2-3 years-old has a 44% negative impact; a 3-4 year old delinquency has a 33% impact; any delinquency older than 4 years has only a 22% negative impact.



There is growing public awareness about credit scoring, but it is by no means complete. A September 2004 survey by Opinion Research Corporation Intl. sponsored by the Consumer Federation of America (CFA) and Providian Financial, a major credit card issuer, found that:

Few consumers know what constitutes a good score. Only 12% correctly identified the low 600s as the level below which they would be denied credit or have to pay a higher, sub-prime rate. (One-third thought this level was the low

500s, and 30% said they didn't know.) And, only 13% correctly understand that
scores above the low 700s usually qualify them for the lowest rates.
http://www.consumerfed.org/092104creditscores.PDF

A March 2005 General Accounting Office study found that about one-third of
respondents had obtained their credit scores. While 70 percent of respondents correctly
identified the definition of a credit score and understood many of the factors that could impact
credit scores, only 28 percent could provide a number within a range of possible credit scores. In
addition, consumers were more familiar with some of the factors that affected credit scores than
with others. For example, while most consumers knew that skipping loan payments or making
late credit card payments had a negative effect on credit scores, about half did not know that
using all the credit available to them, such as reaching the maximum limit on a credit card or
home equity loan, had a negative effect. Also, when asked about information that had no effect
on credit scores (such as a low checking account balance), about half of consumers answered the
questions incorrectly or said that they did not know, the GAO found.[11]

### Nature & Purpose Of Credit Reports

Similar to credit scoring, there is growing public awareness about the credit reporting
system, but it is not universal.

According to a July 2003 survey by the Consumer Federation of America, "Only 25
percent of Americans – and less than 20 percent of those with incomes below $35,000 – said
they knew what their credit score was. But only three percent of Americans could, unprompted,
name the three main credit bureaus-Experian, Equifax, and Trans Union-that provide both
lenders and consumers with information from credit reports. Forty-three percent of Americans
(35 percent of those with incomes below $35,000) said they had obtained a copy of their credit
report from the three credit bureaus in the past two years."

A March 2005 General Accounting office report concluded that the public's
understanding of credit reports and credit scores was improving, but that a federal education
campaign was needed to better inform those segments of the population that remain unfamiliar
with the systems. The report found that 60 percent of respondents had seen their credit reports,
most often because they were making a large purchase or refinancing a loan. Most of these
consumers said that they understood their reports. However, about half (53 percent) did not
know that information could stay on their report for 7 or 10 years.[12]

It is important that the trier of fact have an accurate understanding of the nature and
purpose of credit reports. Accordingly, a brief description of the consumer report is fundamental
to my opinions in this case.

---

[11] General Accounting Office, "Credit Reporting Literacy: Consumers Understood the Basics but Could
Benefit from Targeted Educational Efforts" (GAO-05-223). www.gao.gov/new.items/d05223.pdf
[12] *Ibid.*

12

A consumer report, sometimes referred to as a credit report, consists of highly sensitive and personal information, containing a compilation of a consumer's current credit relationships, their credit history, their employment history, estimated income and identifying information, such as name, address, phone number and Social Security Number (SSN). There are three major repositories known as credit bureaus or consumer reporting agencies (CRAs) -- Equifax, Trans Union and Experian. The CRAs regularly receive updates on a consumer's credit relationships from credit grantors -- banks, mortgage companies, credit card issuers, department stores and others. The consumer report typically contains highly sensitive details about a consumer's finances, including account numbers, loan amounts, credit limits and payment history. It also can contain information on the consumer's interaction with the judicial system, including paid or unpaid civil judgments or bankruptcies.

The Credit Report consists of three (or four) basic sections:

(1)    A section with the consumer's *identifying information*-name, address, Social Security number, date of birth, previous address, employer, and sometimes phone number.
(2)    A section with the consumer's *payment history*, including mortgage, auto and installment loans, credit cards and department store cards, collections, and public records like bankruptcy and court judgments.
(3)    If applicable, a section showing *public record* information, like bankruptcies, court judgments and tax liens.
(4)    A section showing *inquiries*, in other words, those companies which accessed the report and for what purposes.

In addition, attached to the credit report is

(1) A form for disputing errors, and
(2) A statement of your rights under the FCRA

Each of the Big Three CRAs uses a slightly different format. A fundamental purpose of the credit report is to describe a consumer's creditworthiness. For example, the Equifax report lists the codes showing how consumers are classified when they don't pay their bills on time. Along with these numeric codes, a credit report can have a letter showing the type of credit, i.e., "R" for revolving (credit card) and "I" for installment (personal loan). The code for someone who always paid her credit card on time would be "R1." Here are the numeric codes:

- 2 : 30-59 Days Past Due
- 3 : 60-89 Days Past Due
- 4 : 90-119 Days Past Due
- 5 : Over 120 Days Past Due
- 7 : Included in Wage Earner Plan
- 8 : Repossession
- 9 : Charge Off
- Blank : No Data available for that month
- 0 : Too new to rate, or unrated
- 1 : On Time

The Trans Union and Experian credit reports describe similar categories with a text narrative, rather than with an alpha-numeric code.

It is important to note that public record information like bankruptcy, judgments and tax liens, and charge-offs (R-9) and collections, are considered some of the most negative entries. It is also important to note that when a creditor reports a negative tradeline as disputed, that tradeline typically is not scored and therefore does not negatively impact the credit score.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit, whether it is a loan or a credit card. Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness. This is known as an "Account Review." Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers. Some employers use consumer reports to evaluate job applicants. Insurers use credit reports for underwriting purposes, and also use credit scores, but presumably only where not prohibited by State law.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit. Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness. This is known as an "Account Review." Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers. Some employers use consumer reports to evaluate job applicants. Insurers also can use credit reports for underwriting purposes. Landlords also use credit reports for tenant screening.

**Background & Qualifications (Curriculum Vitae Attached)**

My expertise in credit reporting stems from several of my professional activities, including:

(1) Editor/Publisher of a specialty news reporting service that covers credit reporting, Fair Information practices and related matters;

(2) Author of the book Credit Scores and Credit Reports: How The System Really Works, What You Can Do, 3rd Edition, (Privacy Times 2005), and co-author of a book with a chapter on credit reporting;

(3) An expert witness qualified by Federal and State courts in Fair Credit Reporting Act (FCRA) litigation:

(4) an expert on credit reporting who has testified before Congress on numerous occasions, including four hearings in 2003, and who has testified twice before the California legislature in regards to legislation on the use of financial data, and who regularly presents at Continuing Legal Education and other professional events; and

(5) an expert consultant to government agencies and private corporations, a member of the Consumer Advisory Council of Experian (one of the three national Credit Reporting Agencies (CRAs), and as one who has earned FCRA Certification from the National Credit Reporting Association (NCRA).

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

I am author of the book, Credit Scores and Credit Reports: How The System Really Works, What You Can Do (3rd Edition, Privacy Times 2007. The book has 23 Chapters, 399 pages and 415 footnotes. As the title indicates, it describes how the credit scoring and credit reporting systems work and what consumers can do to obtain their reports, read and understand them, correct errors in them and enforce their rights. I also am co-author of Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society (2nd Edition, Southern Illinois University Press, 1990), which has a chapter on credit reporting.

Since the early 1990s, I have served as an expert witness in numerous FCRA cases and have been qualified by the federal courts. As an expert witness, I have had the opportunity to read thousands of pages of deposition testimony by consumer reporting agency officials and by credit grantor personnel responsible for reporting data to CRAs. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and

15

practices for handling personal data. In fact, CRAs typically consider such procedures and practices to be proprietary and/or trade secrets. To my knowledge, the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation. Due to my access to this information, I have augmented my specialized body of knowledge on practices and procedures related to credit scoring and credit reporting.

I have testified numerous times before Congress – always by invitation – on issues related to the collection, maintenance, security, use and disclosure of sensitive personal data, including credit reports and other financial information. (Consult CV for list of hearings and Web links to testimony.)

In 2003, the year in which Congress was dedicated to a major upgrade of the FCRA, I testified twice before the Senate and twice before the House, and presented once before the FTC. The hearings covered a wide range of credit reporting issues, accuracy, fairness, privacy, CRA procedures and security:

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003[13]

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003[14]

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003[15]

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003[16]

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

Some of my recommendations were reflected in the final FCRA Amendments approved by Congress and signed by President Bush in December 2003.

On December 3, 2002, I testified before the California State Senate Insurance Committee. On January 29, 2003, I testified before the California State Assembly Insurance Committee. Both Committees were considering financial privacy legislation (SB 1), which ultimately was enacted by the legislature and signed into law in September 2003.

---

[13] http://banking.senate.gov/03_07hrg/071003/index.htm
[14] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=229
[15] http://judiciary.senate.gov/testimony.cfm?id=983&wit_id=2790
[16] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=202

I regularly present at Continuing Legal Education or professional seminars related to the FCRA. (Consult CV.)

Two of the three major CRAs have acknowledged that I am an expert on credit reporting as it relates to "Fair Information Practices." First developed in the United States in the late 1960s, Fair Information Practices (FIPs) standards are at the core of the FCRA and most other U.S. and European privacy and data protection laws, and serve as an internationally accepted standard for gauging privacy policy and practices.

In 1990, Equifax published "The Equifax Report on Consumers In the Information Age," a nationwide opinion survey and analysis by Louis Harris and Associates and Prof. Alan F. Westin. The report listed me as a privacy expert to whom the authors expressed appreciation for my advice on survey coverage.

In April 2002, I accepted Experian's invitation to serve on the Experian Consumer Advisory Council of Experian (formerly TRW), a national CRA and vendor of other information services. Before being disbanded in 2004, the Council met twice a year to offer non-binding advice and to discuss a host of credit reporting, marketing and other privacy-related topics.

In 2004, I passed an industry examination, thereby earning "FCRA Certification" from the National Credit Reporting Association.

Since August 1998, I have served under contract as a member of the Social Security Administration's Panel Of Privacy Experts advising the agency on a host of issues.

(Please consult the attached CV for additional information.)

## Testimony & Expert Reports

Within recent years, I have testified at trial, or been deposed as an expert, in the following cases:

Andrews v. Trans Union Corp. et al., Case No. 96-7369, (USDC-C.D. Calif.), concerning theft-of-identity and consumer report inaccuracies. Expert report, deposition, trial testimony. Judge Lourdes Baird presiding. The U.S. Court of Appeals for the Ninth Circuit specifically found that my opinion on the prevalence of identity theft was relevant to the reasonableness of CRA procedures. (see 225 F.3d 1063 (2000)).

Angela P. Williams vs. Equifax Information Services, LLC, et al., Circuit Court for the Ninth Judicial Circuit, Orange County Florida. Credit Reporting. Expert disclosure and report. Deposition. Trial Testimony. Judge George A. Sprinkel IV presiding.

Eric Robert Drew vs. Equifax Information Services, LLC, et al., U.S. District Court for the Northern District of California, Case No. CV 07-00726-SI. Expert report, deposition. Trial testimony. Judge Susan Illston presiding.

Direct Data Solutions, Inc., v. Bailey & Associates Advertising, Inc.: Circuit Court of the Eleventh Judicial Circuit, Miami-Dade County, Florida; Case No.: 07-9322 CA 09. Judge Jerald Bagley presiding.

Brenda F. Campbell v. Experian: U.S. District Court for the Western District of Missouri (No. 07-2514). FCRA. Expert report, deposition. Trial Testimony. Judge Nanette K. Laughrey presiding.

Harold & Beryllin Gamby v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Michigan [Southern Div.] (CV-06-11020-MO). FCRA, identity theft. Expert report. Deposition. Trial Testimony. Judge Marianne O. Battani presiding.

Deborah Adams v. National Engineering Service Corp./Verifications Inc.,: U.S. District Court for the District of Connecticut. 3:07-cv-01035-JCH. FCRA. Expert report, deposition. Trial Testimony. Judge Warren W. Eginton presiding.

Patricia Holmes vs. TeleCheck Intl., Inc., U.S. District Court for the Middle District of Tennessee (Nashville Div.). FCRA. Expert report. Deposition. Trial Testimony. Chief District Judge Todd J. Campbell presiding.

Rebecca L. Valentine. v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. CV 05-801-JO. FCRA, identity theft. Expert report. Deposition. Trial Testimony. Judge Robert E. Jones presiding.

Nicole Robinson vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272. Expert reports. Deposition. Trial Testimony   Judge Walter H. Rice presiding.

Suzanne Sloane vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272. Expert reports. Deposition. Trial Testimony   Judge Leonie M. Brinkema presiding.

Matthew Kirkpatrick v. Equifax, LLC, U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO. FCRA  Expert report. Trial Testimony. Judge Michael W. Mosman presiding.

Sandra Cortez vs. Trans Union, LLC., U.S. District Court for the Eastern District of Pennsylvania: No. 2:05 –cv—05684-JF. FCRA. Expert Report. Daubert Hearing. Trial Testimony. Senior Judge John P. Fullam qualified me to testify at trial.

Federal Trade Commission vs. Accusearch, Inc., et al., U.S. District Court for the District of Wyoming, Case No. 06CV0105-D. FTC Section 5. Expert Report. U.S. Magistrate Judge William C. Beaman rejected Defendant's motion to exclude my testimony.

Eddie Silva, et al. v. Haynes Furniture Co., Inc.: U.S. District Court for the Eastern District of Virginia: No. 4:04CV82. FCRA. Fairness hearing testimony. Judge Walter D. Kelley, Jr. presiding.

Joi Helmes v. Wachovia Bank N.A.: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 01-81277-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony.  Judge Robert G. Mayer presiding.

Alex Campos and Michael York v. ChoicePoint Services, Inc.: U.S. District Court for the District of Georgia (Atlanta), Civ. Action No. 1-03-CV-3577-WSD. FCRA. Expert Declaration. Fairness hearing testimony. Judge William S. Duffey, Jr. presiding.

Denis W. Stasulis v. Suntrust: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 04-12542-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony.  Judge Robert G. Mayer presiding.

Dwaine Perry, et al. v. FleetBoston Financial Corp.: U.S. District Court for the Eastern District of Pennsylvania: No. 04-507. FCRA. Expert Report. Fairness hearing testimony. Judge Berle M. Schiller presiding.

Tammy Cochran v. C&M Motors, LLC, dba I-10 Toyota, et al: U.S. District Court for the Central District of California, No. CV-03-3568FMC. FCRA. Expert Report. Trial Testimony Judge Florence-Marie Cooper presiding.

Myra Coleman v. Trans Union LLC, CA4: 98-CV-169B-B (USDC-Mississippi) FCRA. Expert report, deposition, trial testimony.  Judge Neal B. Biggers presiding.

Arthur Spengler v. Sears Roebuck & Co., Case No. C-03-0557. (Circuit Court, Wicomico County, Maryland). Tort, Interference with Business Relationships. Trial Testimony. Judge D. Davis qualified me as expert on credit scoring, credit reporting and FCRA-related issues.

Judy C. Thomas v. Trans Union LLC, U.S. District Court for the District of Oregon; Case No. 00-1150-JE.  FCRA. Expert report, deposition, trial testimony.  Magistrate Judge John Jelderks presiding.

Scott E. Campbell v. G.E. Capital Auto Lease, Circuit Court For St. Mary's County, Maryland, Case No. 99-522. FCRA, invasion of privacy. Expert report, deposition. Judge Karen Abrams qualified me to testify, but the case settled one week before trial.

Franklin F. Grizzard, Jr. v. Trans Union, L.L.C., & Equifax Information Services L.L.C., et al.: U.S. District Court for the District of Virginia (Richmond Div.); Nos. 04-CV-625 & 04-CV-626, respectively. Expert report. Affidavit. Deposition.  On the eve of trial, Judge Richard Williams rejected Defendant's motion to disqualify me.  The case settled shortly thereafter.

Catherine Smith, et al. v. Progressive Corporation, et al.: U.S. District Court for the Middle District of Florida (Gainesville), Case No.1:00-CV-210-MMP. Expert Report, Declaration of Value, Fairness Hearing testimony. Judge Maurice M. Paul presiding.

Franklin E. Clark, et al. v. Experian, et al.: U.S. District Court for the District of South Carolina, Case Nos. 8:00-1217-22, 8:00-1218-22, 8:00-1219-22. Affidavit, Supplemental Affidavit (both affidavits were admitted into evidence without objection). Judge Cameron McGowan Currie presiding.

Alana Valerie Sheldon v. Trans Union, LLC., LVNV Funding, LLC, & Resurgent Capital Services L.P.: U.S. District Court for the District of Maryland; 8:08-cv-00057-PJM.  Expert report, deposition.

In Re: Cellphone Termination Fee Cases, Superior Court of the State of California, Alameda County, JCCP No. 4332.  Deposition.

Karl Benedikt v. ChoicePoint, Inc.,: U.S. District Court for the District of New Jersey [Newark Vicinage]; 07-2569. Expert report, deposition.

Abdirizak Gayre v. CSC Credit Services, Inc., Equifax Information Services, LLC, and Afni, Inc.: U.S. District Court for the District of Minnesota (C.A. No. 07-CV-0622 [JRT/FLN]). FCRA.  Expert report, deposition.

Erin Ayles v. Experian Information Solutions, Inc.: U.S. District Court for the Eastern District of Virginia (Alexandria Division); 1:07cv 662. Expert report, deposition.

Maria D. v. Comcast Corp., Sacramento Superior Court, Case No. 03AS05745. Deposition.

In Re: Farmers Insurance Co., Inc., FCRA Litigation, U.S. District Court for the Western District of Oklahoma, Case No. CIV 03-158-F.  FCRA. Expert report, deposition.

Steven E. Beck v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Virginia: No. 1-05cv347. FCRA.  Expert report, deposition.

Ford Motor Credit Co. v. Sudesh Agrawal, Court of Common Pleas, Cuyahoga Country, Ohio; Case No. CV04536588.  Credit reporting and credit scoring. Deposition.

Larry Alabran v. Capital One Services, Inc.,: U.S. District Court for the Eastern District of Virginia (Richmond Division); Case No. 3:04-CV-935. Expert report, deposition.

Gail Cope v. MBNA American Bank NA: U.S. District Court for the District of Oregon; No. 04-CV-493-JE.  Expert report, deposition.

Robert Gordon Peoples v. Experian Services Corp., et al.: U.S. District Court for the Central District of California: No. CV-04-1378 CAS (Ex). Expert report. Deposition.

Lottie Robertson v. Experian Information Services, Inc. & Capital One Bank: U.S. District Court for the Eastern District of Michigan (Southern Div.) No. 04-72308. Expert report. Deposition.

Barbara A. Harris v. Experian Information Solutions, Inc., and Equifax Credit Information Services, Inc: U.S. District Court for the District of Oregon, Civil No. 01-1728-JE. FCRA. Expert reports. Deposition

Bruce Danielson v. Experian Information Solutions:  U.S. District Court for the Northern District of Texas, Case No: 3-04CV-1722N. FCRA. Expert report. Deposition.

Stacy Lawton Guin, et al. v. Brazos Higher Education Service Corporation, Inc.: USDC-Minnesota -- No. CV 05-668 RHK/JSM. Negligence. Security Breach. Affidavit. Deposition.

Anthony Chin v. State Dept. Federal Credit Union: Circ. Ct. Prince George's County (Maryland); Civ. Act. No. CAL04-12778; Tort. Deposition.  Trial testimony.

James M. McKeown v. Sears Roebuck & Co., et al: U.S. District Court for the Western District of Wisconsin, Civil No. Case No. 03-CV-0528 C.  Expert Report, deposition.

Paulette Field v. Trans Union LLC, et al., Case No. 01 C 6390 (USDC-N.D. Illinois - Eastern Div. FCRA. Expert report. Deposition.

Earle E. Ausherman, et al. v. Bank of America Corporation et al.: U.S. District Court for the District of Maryland, Civil Action No. MJG-01-438. FCRA. Expert report.  Deposition.

Jesse Klco v. Elmhurst Dodge, U.S. District Court for the Northern District of Illinois (Eastern Division) Civil Action No. 01 C 0433. FCRA.  Expert report, deposition.

(David & Ruthie Keefner v. Webb Ford, Inc. & Deon L. Willis.: U.S. District Court for the Northern District of Illinois (Eastern Division), Civil Action No. 02C-4643. FCRA. Expert report. Deposition.

Anthony & Alethea Preston v. MGIC, U.S. District Court for the Middle District of Florida (Ocala), Case No. 5:03-cv-111-Oc-10GRJ. FCRA. Expert report, deposition.

Bruce Butcher and Pam Butcher v. Chase Manhattan Bank, U.S.A., Inc., U.S. District Court for District of South Carolina, Case No. 8:03-3184-26. FCRA. Expert report, deposition.

**FEE**
My fee is $300 per hour for consulting and for the expert report; $300 per hour, or a minimum of $1,200 per day, for deposition or trial testimony, plus reasonable travel time, plus travel costs and expenses.

# *Evan D. Hendricks*

## *CURRICULUM VITAE*

**Professional Activities**

1981- Present    **Editor/Publisher** of *Privacy Times*

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

**1992 – Present    Expert Witness**

Qualified by the federal courts in FCRA and identity theft cases. (Complete list attached). I have read extensive deposition testimony by credit bureau and credit grantor personnel. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data, and the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation.

**1998 – Present    Privacy Expert Consultant, U.S. Social Security Administration**

Regularly review policies and practices in relation to the collection, use and disclosure of personal data and Social Security numbers and provide feedback and recommendations.

**2002 – 2004    Member, Experian Consumer Advisory Council**

Along with other Council members, I provide an outsider's view on credit reporting, marketing and other privacy issues.

**July – October 2002    Consultant to U.S. Postal Service**

Working with the USPS's Chief Privacy Officer, I assisted in reviewing and editing the re-write of the USPS's Privacy Act notices, with an emphasis on "Plain English."

---

**Evan Hendricks    P.O. Box 302    Cabin John, MD 20818**
**(301) 229 7002  (301) 229 8011 [fax]  evan@privacytimes.com**

---

**Recent Testimony Before Congress & The FTC**

"Credit Reports: Consumers' Ability to Dispute and Change Information," House Financial
Services Committee, June 19, 2007.[17]

"Privacy in the Commercial World II," House Energy & Commerce Subcommittee On
Commerce, Trade, and Consumer Protection, June 20, 2006[18]

"Financial Data Protection Act of 2005," House Financial Services Subcommittee on Financial
Institutions and Consumer Credit, November 9, 2005[19]

"Credit Card Data Processing: How Secure Is It?" House Financial Services Subcommittee on
Oversight and Investigations, July 21, 2005[20]

"Identity Theft: Recent Developments Involving the Security of Sensitive Consumer
Information,"[21] Senate Banking Committee, March 15, 2005
"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking
Committee, July 10, 2003[22]
"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on
Financial Institutions & Consumer Credit, June 12, 2003[23]
"Database Security: Finding Out When Your Information Has Been Compromised," Senate
Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003[24]
"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on
Financial Institutions & Consumer Credit, and Oversight, April 3, 2003[25]
"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and
Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

**Books**

Credit Scores and Credit Reports: How The System Really Works, What You Can Do
[3rd Edition] (Privacy Times, 2007)

Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society (2nd Edition,
Southern Illinois University Press, 1990), (Includes a chapter on credit reporting)

Former Secrets: Government Records Made Public Through The Freedom of Information Act
(Campaign For Political Rights, 1982)

---

[17] www.house.gov/apps/list/hearing/financialsvcs_dem/ht061907.shtml
[18] http://energycommerce.house.gov/108/Hearings/06202006hearing1938/Hendricks.pdf
[19] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=425
[20] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=407
[21] http://banking.senate.gov/index.cfm?Fuseaction=Hearings.Detail&HearingID=144
[22] http://banking.senate.gov/03_07hrg/071003/index.htm
[23] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=229
[24] http://judiciary.senate.gov/testimony.cfm?id=983&wit_id=2790
[25] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=202

**International Lectures**
24th International Conference of Data Protection & Privacy Commissioners (Cardiff, Wales –
Presentation published in conference proceedings, 2002)
The 23rd International Conference of Data Protection Commissioners (Paris, La Sorbonne –
Presentation published in conference proceedings, 2001)
The 22nd Annual Conference on Data Protection (Venice, Italy -- 2000)
The 16th Annual Conference on Data Protection (The Hague, The Netherlands -- 1994).
In the 1980s, served as an expert consultant to both the Privacy Commissioner of Canada and
Privacy Commissioner of Australia.

**Presentations/Instruction At Recent CLE & Professional Seminars**
"Second Law and Information Society Symposium: Enforcement, Compliance and Remedies in
the Information Society," Presenter, "Credit Report Cases – Effective Remedies?" Center on
Law and Information Policy (CLIP), Fordham Law School, New York, May 29-30, 2008.)[26]
"The 1st Annual Privacy Law Scholars Conference," Presenter, "Assessing Privacy Harm: How
can victims of privacy violations prove that they have been harmed?  The George Washington
University Law School, Washington, DC, June 12-13, 2008.[27]
"11th Annual Consumer Financial Services Litigation," Practicing Law Institute, March 20-21,
2006 (New York City)
"Bankruptcy Roundtable," and, "Fair Credit Reporting Act Roundtable," National Consumer
Law Center, October 27, 2005
"Advanced Consumer Litigation," Texas Bar CLE, Feb. 10-11, 2005
"Financial Privacy Litigation," (Impact of FACT Act), Practicing Law Institute,
February 28- March 1, 2005 (New York City)
"The New FACT Act: Challenge & Oppty.," Privacy & American Business, Feb. 9-10, 2004
"Understanding the FACT Act And The Impact of Multi-Agency Rulewriting Process,"
Glasser LegalWorks, Sept. 28-29. 2004
"12th Annual National Conference," National Credit Reporting Association, Nov. 10-12, 2004
**Professional Societies**
Past President & Board Member, American Society of Access Professionals www.accesspro.org
**Industry Certification**
FCRA Certification, National Credit Reporting Association (www.ncrainc.org).
**Media**
In addition to being a paid consultant and special guest on CNN's IMPACT news in 1996,
I am quoted regularly by major and small newspapers (including The Washington Post, New
York Times, Wall Street Journal, Chicago Tribune, Los Angeles Times, Newsweek and Money
Magazine), regarding issues of privacy generally and the privacy implications of consumer
reporting specifically. I have appeared on National Public Radio, PBS NewsHour with Jim
Lehrer, ABC Nightline and World News Tonight, NBC Nightly News, CBS Evening News,
CNN News Watch, CNBC, MSNBC, Fox News, various local affiliates, and the Oprah Winfrey
Show and Geraldo, regarding these issues as well.
**Education**
Bachelor of Arts, Columbia College, Columbia University, New York, N.Y. (1979)

---

[26] http://law.fordham.edu/ihtml/eventitemPP.ihtml?id=37&idc=8943&template=clip
[27] http://privacyscholars.com

## MATERIALS CONSIDERED

In specific preparation for this case, I have reviewed the following:

Plaintiffs' Complaint & Attached Exhibits
Plaintiffs' credit reports
Plaintiff's deposition
Documents cited in this report

I also generally rely upon:

The Fair Credit Reporting Act & Consumer Credit Reporting Reform Act of 1996
Fair Credit Reporting Act (w/ Companion Disk & 2000 Cumulative Supplement,
National Consumer Law Center, 1998 (Boston)
Credit Scores and Credit Reports: How The System Really Works, What You Can
Do (3rd Edition, Privacy Times 2007),

My opinions in this case are also based on my 31-year profession of following
privacy developments including those relating to the consumer reporting and information
broker industry and the criminal justice system as a journalist, editor, publisher and
privacy expert. My experience includes listening to and participating in dozens of hours
of Congressional testimony, hearings before the Federal Trade Commission, media
coverage, studies by independent groups, my own personal observations and numerous
contacts, and my previous work preparing to be an expert witness in other FCRA cases.

**Executed This The 9th Day of November 2011 in Bethesda, Maryland**

**/s/ Evan D. Hendricks**
**Evan D. Hendricks**
PO Box 302
Cabin John, MD 20818
(301) 229 7002

26