**Exhibit  3**

**Delehey Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————
|   |   |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

———————————————————————

**DECLARATION OF LAUREN GRAHAM DELEHEY IN SUPPORT OF**
**THE RESCAP BORROWER CLAIMS TRUST'S OBJECTION TO**
**CLAIM NUMBERS 283, 1353, 1696, 4692, AND 6281**
**FILED BY PATRICK LORNE FARRELL**

I, Lauren Graham Delehey, hereby declare as follows:

1.      I serve as Chief Litigation Counsel for the ResCap Liquidating Trust (the "Liquidating Trust") established pursuant to the terms of the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 6030] in the above-captioned Chapter 11 Cases.[1]  During the Chapter 11 Cases, I served as Chief Litigation Counsel in the legal department at Residential Capital, LLC ("ResCap"), a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors in the above-captioned Chapter 11 Cases (collectively, the "Debtors").  I joined ResCap on August 1, 2011 as in-house litigation counsel.

2.      In my role as Chief Litigation Counsel at ResCap, I was responsible for the management of litigation, including, among others, residential mortgage-related litigation.  In connection with ResCap's chapter 11 filing, I also assisted the Debtors and their professional advisors in connection with the administration of the Chapter 11 Cases, including the borrower

---

[1]      Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Objection (as defined below).

1

litigation matters pending before this Court. In my current position as Chief Litigation Counsel to the Liquidating Trust, among my other duties, I continue to assist the Liquidating Trust and the Borrower Claims Trust (the "Borrower Trust") in connection with the claims reconciliation process.[2] I am authorized to submit this declaration (the "Declaration") in support of the *The ResCap Borrower Claims Trust's Objection to Claim Numbers 283, 1353, 1696, 4692, and 6281 Filed by Patrick Lorne Farrell* (the "Objection").

3.    Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations, information learned from my review of relevant documents and information I have received through my discussions with other former members of the Debtors' management or other former employees of the Debtors, the Liquidating Trust's and the Borrower Trust's professionals and consultants. If I were called upon to testify, I could and would testify competently to the facts set forth in the Objection on that basis.

4.    In my current and former capacities as Chief Litigation Counsel to the Liquidating Trust and ResCap, I am intimately familiar with the Debtors' claims reconciliation process. Except as otherwise indicated, all statements in this Declaration are based upon my familiarity with the Debtors' Books and Records (the "Books and Records"), as well as the Debtors' schedules of assets and liabilities and statements of financial affairs filed in these Chapter 11 Cases (collectively, the "Schedules"), my review and reconciliation of claims, and/or my review of relevant documents. I or other Liquidating Trust personnel have reviewed and analyzed the proof of claim forms and supporting documentation filed by Mr. Farrell (defined

---

[2]    The Liquidating Trust and the Borrower Trust are parties to an Access and Cooperation Agreement, dated December 17, 2013, which, among other things, provides the Borrower Trust with access to the books and records held by the Liquidating Trust and Liquidating Trust's personnel to assist the Borrower Trust in performing its obligations.

below).  Since the Plan went effective and the Borrower Trust was established, I, along with other members of the Liquidating Trust have consulted with the Borrower Trust to continue the claims reconciliation process, analyze claims, and determine the appropriate treatment of the same.  In connection with such review and analysis, where applicable, I or other Liquidating Trust personnel, together with their professional advisors have reviewed (i) information supplied or verified by former personnel in departments within the Debtors' various business units, (ii) the Books and Records, (iii) the Schedules, (iv) other filed proofs of claim, and/or (vi) the official claims register maintained in the Debtors' Chapter 11 Cases.

5.    In connection with the Farrell Claim (as defined below) filed by Patrick Lorne Farrell ("Mr. Farrell"), the Liquidating Trust, on behalf of the Borrower Trust, reviewed Mr. Farrell's payment history, the Debtors' internal servicing notes (the "Servicing Notes"), as well as the various pleadings filed in the litigation between the Debtors and Mr. Farrell.

6.    Mr. Farrell filed proofs of claim 283, 1353, 1696, 4692, and 6281 against GMAC Mortgage, LLC ("GMACM") (collectively, the "Farrell Claim"), copies of which are attached to the Objection as Exhibits 1-A, 1-B, 1-C, 1-D and 1-E, respectively.

7.    On June 21, 2013, pursuant to the process set forth in in the March 21, 2013 order of the United States Bankruptcy Court for the Southern District of New York, the Debtors mailed Mr. Farrell a letter requesting additional documentation in support of the Farrell Claims.  The form of this letter is attached hereto as Exhibit A.  Mr. Farrell returned two responses to the Request Letter.  On July 2, 2013, the Debtors received Mr. Farrell's first response in connection with Claim Nos. 1353, 4692, and 6281.  On July 8, 2013, the Debtors received Mr. Farrell's second response in connection with Claim Nos. 283 and 1696.

3

### A.    Litigation Underlying Mr. Farrell's Proofs of Claim

8.    Mr. Farrell is a Borrower under a loan (the "Farrell Loan") evidenced by a note in the principal amount of $283,000.00 executed on October 1, 2005, in favor of Pinnacle Financial Corporation d/b/a Tri-Star Lending Group ("Pinnacle"), which is secured by a mortgage on real property located at 2904 NW 14th Terrace, Cape Coral, Florida, 33993 (the "Property").[3]  GMACM serviced the loan beginning on or about March 9, 2006, but at no time owned the loan at issue.   GMACM continued servicing the loan until the servicing was transferred to Ocwen Loan Servicing, LLC ("Ocwen") on February 15, 2013.  The investor in the loan is Wells Fargo Bank, N.A., as Trustee under the Pooling and Servicing Agreement Relating to IMPAC Secured Assets Corporation, Mortgage Pass-Through Certificates, Series 2005-2 ("Wells Fargo as Trustee").

9.    In August 2007, Mr. Farrell defaulted under the Farrell Loan based upon his failure to timely make his payment.  Mr. Farrell's last payment on the Farrell Loan was made on June 21, 2007.  Mr. Farrell has not made any payments on the Farrell Loan since that time.

10.    From October 11, 2005 to December 1, 2006, Mr. Farrell's payment pursuant to the terms of the Farrell Loan did not increase due to lender-placed insurance. From January 1, 2007 to December 1, 2007, Mr. Farrell's payment pursuant to the terms of the Farrell Loan did not increase due to lender-placed insurance. The first lender-placed insurance policy on the Property was issued on September 8, 2010, effective July 1, 2010.

11.    On November 14, 2007, Mr. Farrell filed a complaint in the circuit court of the Twentieth Judicial Circuit in Lee County, Florida (the "Florida State Court") (Case No. 07-CA-014942, the "Farrell Initiated Action") against GMACM and Pinnacle, among other

---

[3]    A true and correct copy of Mr. Farrell's Mortgage Agreement is attached hereto as Exhibit R.

4

defendants, seeking to quiet title to the Property.  A true and correct copy of the complaint in the Farrell Initiated Action is attached hereto as Exhibit B-1.

12.    On July 15, 2008, the Florida State Court entered an order granting Mr. Farrell's motion for default judgment against Pinnacle, setting a hearing on damages at a future date. A true and correct copy of this default judgment is attached hereto as Exhibit B-2.

13.    Mr. Farrell subsequently filed multiple amended complaints in the Farrell Initiated Action. The final amended Complaint effective in the Farrell Initiated Action was the fourth amended Complaint, filed November 30, 2009. A true and correct copy of this fourth amended complaint is attached hereto as Exhibit C.[4]

14.    On December 7, 2007, Wells Fargo as Trustee filed a complaint against Patrick Farrell, among other defendants, in the Florida State Court, Case No. 07-CA-016767 (the "Florida State Foreclosure Action"), to foreclose on the Property pursuant to the terms of the Farrell Loan.  A true and correct copy of this complaint is attached hereto as Exhibit D. GMACM is not a party to the Florida State Foreclosure Action.

15.    On March 24, 2009, the Florida State Court issued an order granting summary judgment of foreclosure in favor of Wells Fargo as Trustee in the Florida State Foreclosure Action.

16.    Mr. Farrell filed an appeal from the judgment in the Florida State Foreclosure Action with Florida's Second District Court of Appeal.

---

[4]    Mr. Farrell filed a fifth amended complaint in the Consolidated State Action on November 28, 2012, entitled "Patrick Farrell's 5th Amended Complaint for Mortgage Fraud, Qui Tam, Quiet Title, Damages, and Other Statutory Relief." This complaint was never an active pleading in the Consolidated State Action, as the Florida State Court ordered it stricken on May 23, 2013.  See Order dated May 23, 2013 Striking Mr. Farrell's 5th Amended Complaint, annexed hereto as Exhibit S.

ny-1147778

17.     On November 22, 2010, and with the consent of both parties, the Florida State Court granted an order vacating the March 24, 2009 foreclosure judgment.  A true and correct copy of this order is attached hereto as Exhibit E.

18.     On March 12, 2012, the Florida State Court issued an order consolidating the Farrell Initiated Action and the Florida State Foreclosure Action (together, the "Consolidated State Action").

19.     On September 13, 2012, GMACM filed its Notice of Bankruptcy with the Florida State Court incorporating the final supplemental servicing order entered on July 13, 2012 by the United States Bankruptcy Court, Southern District of New York. A true and accurate copy of the Notice of Bankruptcy is attached hereto as Exhibit F.

20.     On March 4, 2014, Wells Fargo as Trustee (joined by IMPAC Secured Assets Corp., GMACM, and Wells Fargo Bank, N.A.) filed a joint motion for summary judgment against Mr. Farrell in the Consolidated State Action. A true and accurate copy of the joint motion for summary judgment is attached hereto as Exhibit G.

21.     On April 30, 2014, the Florida State Court issued a final judgment of foreclosure against Mr. Farrell, ending the Consolidated State Action for all parties involved. A true and accurate copy of the final judgment of foreclosure is attached hereto as Exhibit H.

22.     On May 7, 2014, Mr. Farrell filed a notice of appeal with Florida's Second District Court of Appeal, which remains pending as Case No. 2D14-2139.  This notice of appeal is attached hereto as Exhibit I-1.

23.     On May 30. 2014, Mr. Farrell filed a second notice of appeal with Florida's Second District Court of Appeal, which remains pending as Case No. 2D14-2589.  The

order entered by the Second District Court of Appeal and docket referencing this appeal is attached hereto as Exhibit I-2.

24.     In addition, while the Consolidated State Action remained ongoing, on February 27, 2013 Mr. Farrell filed a complaint against GMACM and other defendants in the United State District Court for the Middle District of Florida, Case No. 2:13-cv-00140-JES-DNF (the "Florida Federal Action").  Mr. Farrell did not file a motion requesting relief from the automatic stay prior to commencing the Florida Federal Action.

25.     On May 30, 2013, GMACM filed its Notice of Bankruptcy in the Florida Federal Action, incorporating the final supplemental servicing order entered on July 13, 2012 by the United States Bankruptcy Court, Southern District of New York.  A true and correct copy of this Notice of Bankruptcy is attached hereto as Exhibit J.

26.     On October 1, 2013, the court issued an order dismissing Mr. Farrell's complaint without prejudice in the Florida Federal Action, striking various filings by Mr. Farrell in the Florida Federal Action and granting Mr. Farrell an additional 30 days to file an amended complaint.  A true and correct copy of this order is attached hereto as Exhibit K.

27.     On October 21, 2013, Mr. Farrell filed an amended complaint (entitled "1st Amended Complaint for Mortgage Fraud, Quiet Title and Damages") in the Florida Federal Action, alleging that GMACM and other defendants engaged in mortgage loan fraud for which Mr. Farrell is entitled "a refund, treble damages and costs." A true and correct copy of this amended complaint is attached hereto as Exhibit L.

28.     During the Consolidated State Action and the Florida Federal Action, Mr. Farrell filed a number of petitions seeking Chapter 13 bankruptcy protection with the United States Bankruptcy Court for the Middle District of Florida.

7

29.     On May 19, 2009, Mr. Farrell filed a petition under Chapter 13 of the Bankruptcy Code with the United States Bankruptcy Court for the Middle District of Florida.

30.     On June 8, 2009, the court dismissed this petition for failure to file required information.  A true and correct copy of this dismissal is attached hereto as Exhibit M.

31.     On July 2, 2009, Mr. Farrell filed another petition under Chapter 13 of the Bankruptcy Code with the United States Bankruptcy Court for the Middle District of Florida.

32.     On August 11, 2009, the court dismissed this petition for failure to file required information. A true and correct copy of this dismissal is attached hereto as Exhibit N.

33.     On September 14, 2009, Mr. Farrell filed a third petition under Chapter 13 of the Bankruptcy Code with the United States Bankruptcy Court for the Middle District of Florida.

34.     On September 28, 2009, the court dismissed this petition for failure to file required information.  A true and correct copy of this dismissal is attached hereto as Exhibit O.

35.     On July 8, 2010, Mr. Farrell filed his fourth petition under Chapter 13 of the Bankruptcy Code with the United States Bankruptcy Court for the Middle District of Florida.

36.     On September 20, 2010, the court entered an order dismissing this petition. A true and correct copy of this dismissal is attached hereto as Exhibit P.

37.     On May 27, 2014, Mr. Farrell filed a fifth petition under Chapter 13 of the Bankruptcy Code with the United States Bankruptcy Court for the Middle District of Florida. A true and correct copy of this fifth petition, which remains pending, is attached hereto as Exhibit Q.

Dated:  June 30, 2014

/s/ Lauren Graham Delehey
Lauren Graham Delehey
Chief Litigation Counsel for ResCap
Liquidating Trust

**Exhibit  A**

**Request Letter Sent by the Debtors to Mr. Farrell**

    **MORRISON** | **FOERSTER**

June 21, 2013

**Claim Number:** <mark>XXX</mark>

Dear Claimant:

You are receiving this letter because you or someone on your behalf filed a Proof of Claim form in the jointly-administered chapter 11 bankruptcy cases of Residential Capital, LLC ("ResCap"), GMAC Mortgage, LLC and other affiliated debtors and debtors in possession (collectively, the "Debtors") pending before the United States Bankruptcy Court for the Southern District of New York, Case No. 12-12020 (MG) (the "ResCap bankruptcy case"), and we need additional information from you regarding the claim(s) ("claim") you are asserting against the Debtors.

**The Information we Need From You Regarding Your Proof of Claim**:
We reviewed a copy of the Proof of Claim form and documents that you filed in the ResCap bankruptcy case. A copy of your Proof of Claim form is enclosed for your reference. According to our records, you have filed a lawsuit against one or more of the Debtors. Please reply using the attached form and let us know whether the basis for and amount of the claim contained in the Proof of Claim form are the same or different in any way from the claim you have asserted in your lawsuit against the Debtors. Please ensure that you provide specific detail and support as to the basis for and amount of claim referenced in your Proof of Claim. If your lawsuit has been dismissed or withdrawn, please provide a specific explanation as to why you believe that you are still owed money or entitled to other relief from one or more of the Debtors.

**You Must Respond to this Letter by no Later Than July 22, 2013**:
In accordance with the Order of the Bankruptcy Court (Docket No. 3294, filed March 21, 2013), you **must** respond to this letter by no later than July 22, 2013 with the requested information and an explanation stating the legal and factual reasons why you believe you are owed money or are entitled to other relief from one or more of the Debtors as of May 14, 2012 (the date the Debtors filed their bankruptcy cases). You **must** also provide copies of any and all documentation that you believe supports the basis for and amount of your claim. A form is included with this letter to assist you in responding to our request for additional information.

**Consequences of Failing to Respond**:
If you do not provide the requested information regarding the basis for and amount of your claim and the supporting documentation by July 22, 2013, the Debtors may file a formal objection to your Proof of Claim on one or more bases, including that you failed to provide sufficient information and documentation to support your claim. If the Debtors file such an objection and it is successful, your claim may be disallowed and permanently expunged. If your claim is disallowed and expunged, you will not receive any payment for your claim and any other requests you may have made for non-monetary relief in your Proof of Claim will be denied. Therefore, it is very important that you respond by the date stated above with the requested information and documentation supporting the basis for and amount of your claim.

Residential Capital, LLC    P.O. Box 385220  Bloomington, Minnesota  55438

**For Those With a Mortgage Loan Originated or Serviced by One of the Debtors**:

If your claim relates to a mortgage loan that you believe was originated or serviced by one of the Debtors, please be sure to include the loan number and property address that the loan relates to in the information and any documentation that you send us, so that we can effectively search our records for information on your property and loan, and evaluate your claim.

**Questions**:

If you have any questions about this letter, or need help in providing the requested information and document(s), you should contact an attorney. You may also contact the Special Counsel to the Official Committee of Unsecured Creditors[1] with general questions (contact information provided below):

**SPECIAL COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
SILVERMANACAMPORA LLP
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
Telephone: 866-259-5217
Website: http://silvermanacampora.com
E-mail address: rescapborrower@silvermanacampora.com

**You must send the requested information and document(s) supporting your claim on or before the date provided in this letter to either;**

        **(i)**        **Claims.Management@gmacrescap.com; or**

        **(ii)**        **Residential Capital, LLC**
                  **P.O. Box 385220**
                  **Bloomington, Minnesota 55438**

**Please mark each document you send with the Claim Number referenced above.**

Sincerely,

Claims Management
Residential Capital, LLC

---

[1] Please be advised that SilvermanAcampora LLP does not represent you individually and, therefore, cannot provide you with legal advice.

**Exhibit B-1**

**Farrell Complaint Filed with Florida State Court**

1  PATRICK FARRELL
   2904 NW14TH TERRACE
2  CAPE CORAL, FL.33993
   239-558-8393
3
   **IN THE 20ᵀᴴ CIRCUIT COURT IN AND FOR LEE COUNTY FLORIDA**
·4

5  PATRICK FARRELL,                           Case No. 07-CA-14942

6              Plaintiff,    vs.             COMPLAINT FOR DAMAGES

7  G.M.A.C.,a corp.;                         JUDGE:
   ANGELO MOZILO/CEO of                      MARGERET STEINBECK
8  Countrywide Financial Home Loans;
   Pinnacle Financial Corp.;
9  Patrick Robinson/Mortgagewise;
   Joe Sealey/United Homes;
10 First American Title Ins.;
11 John La Jore/Busey Bank;
   Jody Hernandez/Premier Mortgage Funding;
12 Fl.Dept.of Business and Prof.Regulation
   Martin Worth/Lentz Appraisal Group;
13 Gary Pruitt/Appraise-It
            Defendants
14
   **COMPLAINT FOR DAMAGES**
15
   This is an action for fraud,fraud in the inducement,mortgage
16
   fraud,breach of contract,violations of Floridas Deceptive and
17
   Unfair Trade Practices Act,Civil Conspiracy,,Negligence,violations
18
   of the R.I.C.O.act,in which the alleged damages are in excess of
19
   $15,000,exclusive of interest,fees,penalties and other
20
   disbursements.Comes now the Plaintiff Patrick Farrell and files
21
   this Complaint against defendants,Jody Hernandez/Premier Mortgage
22
   Funding,Martin Worth/Lentz Appraisal Group,John LaJore/Busey
23
   Bank,First American Title Insurance,Joe Sealey/United Home
24
   Builders,Gary Pruitt/Appraise-It,PatrickRobinson/Mortgagewise,
25
   Pinnacle Financial Corporation,Countrywide Financial Home

   Loans,GMAC,Fl.Dept.of Business and Professional Regulation.

Summary of Pleading - 1

1 | **PARTIES**

2 | 1. Plaintiff,Patrick Farrell resides in Lee County.

3 | 2. Defendant G.M.A.C.[General Motors Acceptance Corporation]is a

4 |   mortgage lender/3451 Hammond Ave.Waterloo,Iowa 50704

5 | 3. Defendant Jody Hernandez was a mortgage broker with Premier

6 |   Mortgage Funding,now at SW Fl.Mortgage, 12520 World Plaza

7 |   Ln.Ste.1,Ft.Myers,Fl.33907

8 | 4. Joe Sealey/United Home Builders 231 Del Prado,Cape

9 |   Coral,Fl.33990

10 | 5. John La Jore V.P.,Busey Bank Fl.,7980 Summerlin rd.

11 |   Ft.myers,Fl.33907

12 | 6. Martin Worth/Lentz Appraisal Group 3440 Marinatown

13 |   Ln.,No.Ft.myers,Fl.33903

14 | 7. Lois Conrad/First American Title Insurance 3103 Del Prado,Cape

15 |   Coral,Fl.33904

16 | 8. Patrick Robinson/Mortgagewise 6741 Buckingham Ftmyers,Fl.33905

17 | 9. Pinnacle Financial Corp.2611 Technology dr.,Orlando,Fl.32804

18 | 10. Gary Pruitt/APPRAISE-IT,5598 8TH ST.,#4,Lehigh Acres,Fl.33971

19 | 11. Angelo Mozilo/CEO Countrywide Financial Home Loans 450 American

20 |   St.Simi Valley,Ca.93065

21 | 12. G.M.A.C.,3451 Hammond ave.Waterloo,iowa 50702

22 | 13. Fl.Dept.of Business & Prof.Regulation,400 West Robinson st.

23 |   Orlando,Fl.32801

24 | **JURISDICTION AND VENUE**

25 | The court has jurisdiction over this matter as either current
residents,have a place of business in Lee county or transact business
in lee county florida.

1 | **SUMMARY STATEMENT**

2 | Plaintiff decided to buy a home in 2004.Plaintiff was subjected to a

3 | fraud and conspiracy by defendants,who intentionally misled Plaintiff

from start to finish to take Plaintiffs money,using deception and

4 | false statements in meetings and on documents,and defendant United

5 | Homes used illegal aliens to construct Plaintiffs home.The use of

6 | illegals allowed defendant to build homes cheaper,but raised

prices while building,and to build homes quicker which resulted in a

7 | glut of excess homes on the market,which de-valued Plaintiffs home

8 | and the entire area causing Plaintiffs damages.

9 | **DOCUMENTED FACTS**

10 | In June 2004,Plaintiff,Patrick Farrell,spoke to Jennifer

11 | Sealey,daughter of defendant Joe Sealey,who owns United Homes.

Jeniffer Suggested I consider building a home with her fathers

12 | company.She told me to speak to a women who found lots to build

13 | on,and a man named Jim Reynolds who did mortgages.

14 | 6/7/04 I Met with Sheri Peterson,looked at a lot in the Cape,

15 | For $47,500.Comparable lots were from $50-$60,000.I agreed to buy the

lot,contingent on procuring financing.

16 | 6/14/04 met with United salesman Ed Trebilcock and signed agreement

17 | to build home.Gave $2,000 deposit.United document advertised that "we

18 | include all" regarding Lot Prep Cost.

19 | 6/17/04 met with Sherri Peterson and signed a contract for a lot in

Cape Coral for $47,500.

20 | I met with Jim Reynolds who examined my assets and concluded I did

21 | not qualify for a loan of the amount required,which was about

22 | $280,000.I called United back and Ed Trebilcock then referred me to

23 | Jody Hernandez,of Premier Mortgage Funding.

7/8/04 gave $295 check to LENTZ APPRAISAL GROUP to appraise property

24 | for Defendant Jody Hernandez and Premier Mortgage Funding.

25 | 7/20/04 Warranty deed for lot was filed with Lee co.clerk

7/21/04 Defendant Jody Hernandez said he could make the deal for the

lot and home with United work,as he believed that Plaintiff could

1  handle the interest payments during construction, and that Plaintiff
2  was intending to sell the home after closing anyway.

3  7/30/04 Plaintiff signed certification and authorization papers which
   stated that Plaintiff has supplied lender with income and assets
4  documents showing net worth and credit worthiness and a form 4506-T
5  for requesting a Tax Return Transcript.

6  Defendants Jody Hernandez, PREMIER MORTGAGE FUNDING, LENTZ APPRAISAL
7  GROUP, BUSEY BANK, Lois Conrad of FIRST AMERICAN TITLE INSURANCE
   COMPANY put together monetary figures on a HUD-1 settlement statement
8  that fraudulently claimed I had an additional $47,370.01 in lot
9  equity, although I just bought the lot for $47,500, raising the cost of
10 the project to $328,134.21, instead of the actual cost of $279,600.
11 After some deductions on this form, it required Plaintiff to give
   defendant First American $12,534.21, an amount based on fraud.
12 Plaintiff was charged $2,656 for the service of defendant Hernandez
13 and $2,656 to defendant Busey bank. Upon information and belief;
14 This was done to falsely inflate the appraisal on the home, get money
15 from Plaintiff, induce Plaintiff to continue to believe in investing
   with the defendants in this project, make a profit for themselves with
16 fees and interest, and make it able for Plaintiff to qualify for the
17 loan, which I would not have been able to do, with my income status and
18 savings. Defendant Jody Hernandez told Plaintiff that this is how
19 defendant Busey Bank wanted this done.

   Defendant Jody Hernandez/Premier Mortgage Funding, fraudulently told
20 Plaintiff, that the false equity would be used at closing after the
21 home was finished, as a down payment, thereby reducing the loan and
22 making it more likely that Plaintiff would Qualify for the end loan.
23 Plaintiff relied on defendants false statements to proceed on the
   contract for the building project. Based on Fraud, Busey Bank approved
24 the construction loan, where Plaintiff paid to Busey Bank a service
25 fee of $2,656 and $8,466 in interest charges, over the next year.
   Plaintiff gave First American Title $12,534.21.
   7/30/04 Plaintiff settled on the lot for $47,500.

Summary of Pleading - 4

1  8/11/04 Fidelity National Title Insurance,insured Plaintiff's lot for
2  $47,500,not any more,as there was no increased equity value.
3  11/10/04 Bob Appolloni,United Homes,Director of Construction
   Sent Plaintiff a letter confirming that concrete and construction
4  materials,including dirt,are in a shortage due to the hurricanes,
5  [Charley and others].
6  5/3/05 United Homes sent Plaintiff a letter informing him that he
7  must pay an increased cost of $6,990 for dirt.
   Defendant Joe Sealey/United Homes contracted to build the house for a
8  fixed price,but Defendant fraudulently added a cost of $6,990 for
9  more dirt.When asked for proof,Plaintiff was told there was none,and
10 I simply had to pay it at closing in Oct.2005.
11 2/28/06 Plaintiff complained about several issues in a fax to United
   Homes that threatened suit if not fixed.The main issue was the
12 fact,that there was evidence of a lack of adequate dirt all around
13 the home,Especially next to the driveway,where Plaintiff could place
14 his entire arm underneath the concrete slab.Defendant United Homes
15 agents Bob Appolloni and Lisa responded and repaired this And other
   issues and confirmed it in a letter.
16 Upon information and belief,the $6,990 was a fraudulent charge,as if
17 there was $6,990 of extra dirt used there would be no need to come
18 back right after the home was built,and use more dirt to repair a
19 serious building flaw.
   Also,in several visits Plaintiff made to the work site,I noticed
20 issues I had questions for,but all the workers did not speak
21 English,as they were illegal aliens and were unsupervised.
22 In June 2005,Plaintiff searched for defendant Jody Hernandez but
23 could not reach him.Since then Plaintiff has learned that defendant
   Hernandez is being sued by his former business partners Steve and
24 Dawn Humfleet at Premier Mortgage Funding [now with Fleet lending
25 Group]for embezzlement of funds,client files and office furniture in
   a case before Judge Corbin 06-CA-00210.
   In July 2005 Plaintiff then found defendant Patrick Robinson of
   Mortgagewise to handle the closing.
   Summary of Pleading - 5

1  8/29/05 Defendant Robinson hired an appraiser,defendant Gary Pruitt
2  of APPRAISE-IT to appraise the subject property.Defendant Pruitt,used
3  a trainee appraiser,Scott Irwin,with only a few months experience,to
   inspect the subject property.Plaintiff alleges that the defendants
4  lack of experience in a real estate market,with prices rising faster
5  than at any time in history,resulted in a grossly inaccurate,
6  incorrect,negligent,and illegal assessment of the subject property.
   Plaintiff alleges APPRAISE-IT artificially inflated the value of the
7  property to $465,000,to make it appear to defendant Patrick Robinson
8  and defendant Pinnacle Financial Corp. that the loan would be doable
9  and to induce Plaintiff to sign the contract for the end loan,
10 causing Plaintiff damage.

11 Defendant Gary Pruitt claims he used 3 comps in the area,but also
   wrote in his report that there are no known sales agreements or
12 listings for any of the comparables within one year of his
13 appraisal.Upon information and belief,Plaintiff alleges that
14 defendant Gary Pruitt used houses that were worth more as a
15 comparable instead of homes of equal value,and based his appraisal on
   unrecognized standards.
16
   Plaintiff was told by the defendant Robinson that we would use the
17 difference between the appraised value and the loan amount as a down
18 payment on the home at closing,this did not happen.

19 9/7/05 Plaintiff met with defendant Patrick Robinson to sign papers
   related to closing.Plaintiff signed certification and authorization
20 papers which stated that Plaintiff has supplied lender with income
21 and assets documents showing net worth and credit worthiness and a
22 form 4506-T for requesting a Tax Return Transcript.

23 On the Uniform Residential Loan Application,page 2, Defendant FALSELY
   AND FRAUDULENTLY stated that Plaintiff had worked as a painter for 12
24 years and had a monthly income of $7,500 per month.Plaintiff alleges
25 this was a federal crime,and was done to get the end loan approved by
   Defendant Pinnacle Financial Corporation.Plaintiff at no time,in any
   way,shape,fashion or form,claimed I made $7,500 per month.Plaintiffs
   bank and IRS tax returns were used by defendants and clearly spell

1 out Plaintiffs income and inability to handle a loan of the size of
2 the contract in this case.Based on verifiable documents Plaintiff's
3 application should have been denied. On the Uniform Residential Loan
  Application,page 3,Defendant Robinson falsely stated that Plaintiffs
4 mobile home was worth $20,000.Records in Lee Co.Tax Appraisers office
5 reveal Plaintiffs mobile home was assessed at a value of $2,360.
6 Plaintiff never claimed otherwise.Plaintiff allges defendant
  falsified information on the loan application to get it approved,
7 Defendant PINNACLE FINANCIAL CORP.,was negligent In not verifying the
8 asset information on Plaintiffs loan application,to make a profit on
9 fees and interest while having the loan,and continuing to extend
10 credit during the next few years to Plaintiff by and through credit
11 cards issued by Bank of America,increasing Plaintiffs debt and
  emotional distress.
12 9/28/05 Defendant Robinson sent Plaintiff a.complete copy of all the
13 closing papers to Plaintiff in Colorado,while Plaintiff was on
14 vacation.They were all signed and sent back to defendant Robinson.
15 About 10/1/05 Defendant Robinson told Plaintiff the lender did not
  approve Plaintiff,as Plaintiff did not have enough income and
16 assets.Defendant would have to find another lender,which caused
17 defendant United Homes to badger Plaintiff and threaten to raise the
18 cost of the home Or sell it to another person,for more money,as they
19 were due the payoff for the construction in the amount of $40,000.
20 At closing on October 11,2005,defendant Robinson told  Plaintiff that
  the equity Could not be used as a down payment,as he had affirmed it
21 would be in earlier talks,but after we close,defendant would find
22 Plaintiff a property,and Plaintiff could take out a home equity loan
23 with him and invest it in said property.This never occurred.Defendant
  also stated that Plaintiff could close on the loan,keep the home for
24 2 years,and sell it without paying taxes.All the market had to do was
25 go up 5% for the 2 years and that would offset Plaintiffs monthly
  mortgage payments.Plaintiff relied on defendants false statements to
  proceed on the contract.

1  This has not occurred as the market has dropped drastically due to
2  the actions Of the defendants in the instant case and to millions of
3  others defrauded In this type of scheme.

In December 2005,Defendant Pinnacle Financial Corporation
4  sold the loan to defendant Countrywide Financial Home Loans.
5  Defendant Countrywide kept the loan until march 1,2006,and made a
6  profit while owning it.Since then Plaintiff has learned that
7  Countrywide is being sued in a class action lawsuit For fraudulently
   inflating the appraisals of homes which served to raise their stock
8  value.Plaintiff would ask this court to take judicial notice of this
9  fact.See Scott-Scott.com

10
   ***Summary of Case:***
11
    *Scott+Scott, LLP, filed a class action against Countrywide*
12  *Financial Corp. ("Countrywide Financial" or the "Company")*
    *(NYSE:CFC) and certain officers and directors in the U.S. District*
13  *Court for the Central District of California. The action is on*
    *behalf of Countrywide Financial common stock purchasers during the*
14  *period October 27, 2005 through August 9, 2007, inclusive (the*
    *``Class Period''), for violations of the Securities Exchange Act of*
15  *1934.   The Complaint alleges that, during the Class Period,*
    *defendants made false and misleading statements regarding the*
16  *changing quality of the Company's mortgage loan portfolio.   These*
    *reassuring announcements served to conceal the alarming growth of*
17  *loan delinquencies and the increasing likelihood of impairment*
18  *charges, with resulting adverse impacts on the quality of the*
    *Company's collateralized debt obligations (CDO's), earnings and*
19  *profits.   The deadline to file for Lead Plaintiff is October 15,*
    *2007.*
20
    ***PLEASE NOTE: The class period in this securities class action has***
21  ***been expanded to include April 24, 2004 through August 9, 2007.***

22  This time period in the instant case,is included in the same time
23  period used as the basis of the class action suit.
24  Plaintiff alleges that defendant PINNACLE FINANCIAL arranged and
25  accepted the fraudulent basis of the contract of this case,in the
    same fashion as Countrywide was engaged in,then sold it to defendant
    Countrywide to avoid detection of fraudulent activity.Defendant
    Countrywide bought the fraud based contract to inflate their stock

1  value,then sold it to defendant GMAC prior to the real estate market
2  value dropping.GMAC bought the fraud based loan and incurs the
3  liability for the actions of the other defendants that preceded them.
   **DEFENDANTS FRAUDULENTLY PROCURE CONSTRUCTION FINANCING FOR PLAINTIFF**
4  The purchase agreement for the property required Plaintiff to obtain
5  interim "construction financing" for the purpose of acquiring the
6  property and constructing a home and improvements thereon,and,then,
7  upon completion of the home,to secure permanent mortgage financing,or
   an "end loan" to Pay off the interim construction financing loan.
8  Following the execution of the subject purchase agreement,defendant
9  Jody Hernendez,agent of defendant Premier Mortgage Financing,
10 arranged for Plaintiff to receive construction financing from one of
11 it's preferred lenders,defendant BUSEY BANK.The principal amount of
   the loan would be equal to the 100% of the purchase price of the
12 property,or $279,600,but the defendants artificially inflated the
13 value of the subject property to $328,134.21,by fraudulently claiming
14 $47,301.21 in lot equity,then loaned out about 80% of that to qualify
15 Plaintiff.However,at the time Plaintiff applied for such loans
   Plaintiff was an unsophisticated borrower of modest means,and had a
16 combined gross income of less than $30,000 per year,and only nominal
17 savings.Given his modest income and savings,Plaintiff should not have
18 been able to qualify for a construction loan From the lender.No
19 reasonable lender would make a loan of this size to any
   unsophisticated borrower whose income and financial wherewithal was
20 that modest.The defendants took advantage of Plaintiffs lack of
21 experience in said matters,and trust in their so called,
22 professionalism.
23 Despite the obvious inability of Plaintiff to satisfy a loan of this
   magnitude,Which was 10 times Plaintiff's annual income,defendants
24 Hernendez of Premier Mortgage,"hand picked" lender,defendant BUSEY
25 BANK,approved Plaintiff's construction loan application,and First
   American Title Insurance company aided and abetted their fraud.
   Plaintiff was solicited into pursuing the loan transaction based on
   the false promise that the "equity" would be used as a down payment,

1 | thereby reducing the liability and risk of Plaintiff, thereby
2 | garnering loan approval, which would not have been able under normal
3 | circumstances, with his modest income and means.

Plaintiff entered into an "end loan" mortgage note on 10/11/05, with

4 | defendants Patrick Robinson of Mortgagewise, representing defendant
5 | Pinnacle Financial Corporation. To date, no attempt was made by the
6 | defendants to include the alleged equity from the appraisal into the
7 | end loan as a down payment, or no home equity loan was secured for

other investing, despite the assurances from the defendants.

8 | Defendant Countrywide Home loans bought Plaintiffs mortgage to
9 | increase their stock value in a scheme inflating home appraisals.
10 | GMAC later bought the loan to service it, profit from it, and aid the

other defendants in obscuring liability.

11 | Plaintiff faces financial ruin as a result of defendants false
12 | representations and knowing participation in such a fraudulent
13 | scheme. G.M.A.C. is now intending to foreclose on Plaintiff.
14 | Plaintiffs money spent includes but is not limited to;
15 | $2,000 deposit to United Homes

$2,656 to Jody Hernandez of Premier Mortgage Funding

16 | $295 to Lentz Appraisal Group
17 | $500 deposit to Williamson and Sons for seawall
18 | $12,534.21 to First American Title for construction loan
19 | $8,466 to Busey Bank in interest on construction loan

$2,656 to Busey bank as admin.fee

20 | $1,800 to First American Title at closing in October 2005
21 | $6,000 [approx] to Pinnacle Financial Corp.mortgage payments
22 | $15,000 [approx] to Countrywide in mortgage payments
23 | $30,000 [approx] to GMAC in mortgage payments

**COUNT 1 FRAUD IN VIOLATION OF SECTION 17[a]OF THE SECURITIES ACT**

24 | Against Jody Hernandez/Premier Mortgage Funding, John LaJore/Busey
25 | Bank, First American Title, Patrick Robinson/Mortgagewise, PINNACLE

FINANCIAL CORPORATION, COUNTRYWIDE HOME LOANS, G.M.A.C.

Plaintiff re-alleges this entire complaint above as if fully set

forth herein.

1  The real estate opportunity described was an offer to sell
2  unregistered securities. The defendants knowingly,willfully,
3  or recklessly made misleading & untrue statements of material facts
   or omitted statements of material facts.The defendants have directly
4  or indirectly,by use of the means or instruments of communication in
5  interstate commerce and by use of the mails in the offer or sale of
6  unregistered securities,as described in the complaint,have;
7  1.employed a device,scheme or artifice to defraud;
   2.obtained money or property by means of untrue statements of
8  material fact and omission to state material facts necessary to make
9  statements made,in light of the circumstances under which they were
10 made,not misleading: and/or
11 3.engaged in acts,transactions,practices and course of business which
   was and is operating and will operate as a fraud or deceit upon
12 purchasers of securities.
13 The defendants,directly and directly have violated sections 17[a][1];
14 17[a][2];17[a][3] of the securities act;15 U.S.C.77q[a][1],[2],[3].
15 As a consequence of the fraud violation under section 17[a] of the
   securities act,Plaintiff has suffered damages including but not
16 limited to,the complete loss of his investment and imminent
17 foreclosure of his property and the prospect of a deficiency
18 judgement rendered against him.
19 WHEREFORE,Plaintiff demands judgement against defendants and prays;
   1.To award damages against the defendants herein for a sum of money
20 equal to the amount of damages and/or losses Plaintiff has sustained
21 or will sustain.
22 2.To award pre-judgement interest on the amount of damages Plaintiff
23 has sustained or will sustain.
   3.To award all costs of litigation incurred by Plaintiff including
24 fees,costs,disbursements and expenses pursuant to Fl.St.817.41 and
25 501.2101.
   4.To award Plaintiff punitive damages pursuant to Fl.St.817.41.

Summary of Pleading - 11

1  5. To order that the mortgage contract be rescinded, and for such
2  further relief as necessary to place Plaintiff in a position as if
3  the contract did not exist.

4  6. To enjoin any third party from any terms of the contract against
   Plaintiff.

5  7. To enjoin G.M.A.C. from foreclosing the mortgage contract on the
6  subject property with an injunction or restraining order.

7  8. To award such further relief as the court deems just and equitable.

**COUNT 2 FRAUD IN THE INDUCEMENT**

8  Against Jody Hernandez/Premier Mortgage, Martin Worth/Lentz Appraisal
9  Group, First American Title/Lois Conrad, Busey Bank, Patrick Robinson/
10 Mortgagewise, Gary Pruitt/Scott Irwin/APPRAISE-IT.

11 Plaintiff re-alleges this entire complaint above as if fully set
   forth herein.

12 The defendants made material representations and omitted to state
13 material facts necessary so as not to appear misleading, including but
14 not limited to inflating the alleged value of the property by
15 fabricating lot equity in the amount of $47,370.01 in 2004 and
   falsely appraising the entire property at $465,000 in 2005.
16
   Defendants used a fabricated equity as a means to procure initial
17 financing on Plaintiff's construction loan, used that as a means to
18 get additional profit from interest paid to defendant Busey Bank,
19 and failed to use the inflated appraisal on the end loan.

20 Plaintiff relied on defendants false statements and representations
   therefore investing and continuing to subsequently invest with
21 defendants. As a consequence of the defendants acts, Plaintiff has
22 suffered damages including but not limited to, the complete loss of
23 his investment and imminent foreclosure on his property and the
   prospect of a deficiency judgement rendered against him.
24
   WHEREFORE, Plaintiff demands judgement against defendants and prays;
25 1. To award damages against the defendants herein for a sum of money
   equal to the amount of damages and/or losses Plaintiff has sustained
   or will sustain.

1  2.To award pre-judgement interest on the amount of damages Plaintiff

2  has sustained or will sustain.

3  3.To award all costs of litigation incurred by Plaintiff including
   fees,costs,disbursements and expenses pursuant to Fl.St.817.41 and

4  501.2101.

5  4.To award Plaintiff punitive damages pursuant to Fl.St.817.41.

6  5.To order that the mortgage contract be rescinded,and for such
   further relief as necessary to place Plaintiff in a position as if

7  the contract did not exist.

8  6.To enjoin any third party from any terms of the contract against

9  Plaintiff.

10 7.To enjoin G.M.A.C. from foreclosing the mortgage contract on the

11 subject property.

   8.To award such further relief as the court deems just and equitable.

12 **COUNT 3 AIDING AND ABETTING FRAUD**

13 Against Busey Bank,First American Title,Pinnacle Financial Corp.,

14 Countrywide Home Loans,GMAC,Lentz Appraisal,Gary Pruitt/APPRAISE-IT

15 Plaintiff re-alleges this entire complaint above as if fully set
   forth herein.

16
   Defendants,knew or had reason to know of the fraud committed by Jody

17 Hernandez,Premier Mortgage Funding,Patrick Robinson,Mortgagewise,and

18 provided substantial assistance to advance the fraud's commission,

19 including but not limited to extending financing to Plaintiff when he
   did not have the income or assets to qualify for such financing.

20 By virtue of the foregoing, Busey Bank,First American Title,

21 Pinnacle Financial,Countrywide,GMAC,Lentz Appraisal,Gary Pruitt aided

22 and abetted the fraud committed by Jody Hernandez,Premier Mortgage

23 Funding,Patrick Robinson,Mortgagewise.

   As a consequence of the defendants acts,Plaintiff has suffered
24 damages including but not limited to,the complete loss of his

25 investment and imminent foreclosure on his property and the prospect
   of a deficiency judgement rendered against him.

   WHEREFORE,Plaintiff demands judgement against defendants and prays;

1  1.To award damages against the defendants herein for a sum of money
2  equal to the amount of damages and/or losses Plaintiff has sustained
3  or will sustain.
   2.To award pre-judgement interest on the amount of damages Plaintiff
4  has sustained or will sustain.
5  3.To award all costs of litigation incurred by Plaintiff including
6  fees,costs,disbursements and expenses pursuant to Fl.St.817.41 and
7  501.2101.
   4.To award Plaintiff punitive damages pursuant to Fl.St.817.41.
8  5.To order that the mortgage contract be rescinded,and for such
9  further relief as necessary to place Plaintiff in a position as if
10 the contract did not exist.
11 6.To enjoin any third party from any terms of the contract against
   Plaintiff.
12 7.To enjoin G.M.A.C. from foreclosing the mortgage contract on the
13 subject property.
14 8.To award such further relief as the court deems just and equitable.
15 COUNT 4 BREACH OF CONTRACT
   Against defendant United Homes and Joe Sealey.
16 Plaintiff re-alleges this entire complaint above as if fully set
17 forth herein.
18 Defendant offered the property for a set price including fill dirt.
19 Plaintiff accepted the offer and entered into the contract for
   purchase.Plaintiff paid consideration pursuant to the terms of the
20 contract.The defendant breached their contractual promise to provide
21 for fill dirt adequate to build the house.As a consequence of the
22 defendants acts,Plaintiff has suffered damages including but not
23 limited to,increased cost of $6,990.
   WHEREFORE,Plaintiff demands judgement against defendants and prays;
24 1.To award damages against the defendants herein for a sum of money
25 equal to the amount of damages and/or losses Plaintiff has sustained
   or will sustain.
   2.To award pre-judgement interest on the amount of damages Plaintiff
   has sustained or will sustain.

3. To award all costs of litigation incurred by Plaintiff including
fees,costs,disbursements and expenses pursuant to Fl.St.817.41 and
501.2101.

4. To award Plaintiff punitive damages pursuant to Fl.St.817.41.

5. To order that the mortgage contract be rescinded,and for such
further relief as necessary to place Plaintiff in a position as if
the contract did not exist.

6. To enjoin any third party from any terms of the contract against
Plaintiff.

7. To enjoin G.M.A.C. from foreclosing the mortgage contract on the
subject property.

8. To award such further relief as the court deems just and equitable.

**COUNT 5 DECEPTIVE AND UNFAIR TRADE PRACTICES**

(Asserted against all Defendants)

Plaintiff re-alleges this entire complaint above as if fully set
forth herein.

The foregoing conduct also constitutes a violation of the Florida
Deceptive and Unfair Practices Act (the "FDUTPA"), Florida Statues,
§ 501.201 et seq. Defendants scheme to sell real estate based upon
their false and fraudulent promises constitutes unfair or deceptive
acts or practices in the conduct of any trade or commerce. Such
practices are likely to mislead the consumer acting reasonably under
the circumstances,to the consumers detriment,more specifically,the
Plaintiff.The Defendants' above-described conduct was willful
because they knew or should have known that their conduct was unfair
or deceptive or otherwise prohibited by statute or rule.

Plaintiff has suffered damages as a result of Defendants' unlawful
and deceptive trade practices,including,but not limited to,the
complete loss of their investment and imminent foreclosure of his
property.

    WHEREFORE, the Plaintiffs demand judgment against Defendants and
pray as follows:.

1.     To award damages against the Defendants herein for a sum of
money equal to the amount of damages and/or losses Plaintiff has

Summary of Pleading - 15

1   sustained or will sustain;

2   2.   To award prejudgment interest on the amount of damages the
        Plaintiff have sustained or will sustain;
3
    3.   To award all costs of litigation incurred by the Plaintiff
4        including reasonable attorney's fees, costs, disbursements and
5        expenses pursuant to Florida statutes 817.41 and 501.2101;

6   4.   To award the Plaintiff punitive damages pursuant to Florida
        Statutes 817.41;
7
    5.   To order that the contract for the sale of the property is
8        rescinded, and for such further relief as necessary to place the
9        Plaintiff in a position as if the contracts did not exist;

10  6.   To enjoin any Third Party from attempting to enforce any term of
        the contracts against the Plaintiff;
11
    7.   To enjoin GMAC from foreclosing the construction loan and
12       mortgage on each of the properties enumerated herein;

13  8.   To award such other and further relief as the Court deems just
14       and equitable.

15  **COUNT 6 CIVIL CONSPIRACY TO COMMIT FRAUD**

        (Against all Defendants)
16
        Plaintiff re-alleges this entire complaint above as if fully set
17      forth herein.

18  All the defendants have profited in one way or another by the sale
19  of the home built by United Homes and procured through the
    fraudulent representations by defendants and/or financed by the
20  defendants and/or by receiving commissions on the sale of the
21  property or by receiving fees and/or commissions through the
22  procurement of financing for the Plaintiff through BUSEY
23  BANK,PREMIER MORTGAGE,PINNACLE FINANCIAL,COUNTRYWIDE and GMAC i.e.
    as an officer and/or agent,based on their respective parties
24  fraudulent acts.

25  Defendants by and through their association with one another and by
    and through the sale of the property from UNITED HOMES to the
    Plaintiff procured by the fraudulent representations of all other
    defendants have all profited through said association and sale.

                        Summary of Pleading - 16

As a direct and proximate result of the association between the
Defendants and the acts of the Defendants by and through said
association,the Plaintiff herein has suffered damages,including but
not limited to, the loss of their investment and imminent
foreclosure of said property.

WHEREFORE, the Plaintiffs demand judgment against Defendants and
pray as follows:

1.To award damages against the defendants herein for a sum of money
equal to the amount of damages and/or losses Plaintiff has sustained
or will sustain.

2.To award pre-judgement interest on the amount of damages Plaintiff
has sustained or will sustain.

3.To award all costs of litigation incurred by Plaintiff including
fees,costs,disbursements and expenses pursuant to Fl.St.817.41 and
501.2101.

4.To award Plaintiff punitive damages pursuant to Fl.St.817.41.

5.To order that the mortgage contract be rescinded,and for such
further relief as necessary to place Plaintiff in a position as if
the contract did not exist.

6.To enjoin any third party from any terms of the contract against
Plaintiff,

7.To enjoin G.M.A.C. from foreclosing the mortgage contract on the
subject property.

8.To award such further relief as the court deems just and equitable.

**COUNT 7 NEGLIGENCE**

Against Florida Department of Business and Professional Regulation.

Plaintiff re-alleges this entire complaint above as if fully set
forth herein.

Upon information and belief,Plaintiff alleges that this defendant was
Negligent in the performance of its duties to oversee Banking Rules
and Regulations,regarding the veracity of home appraisals,loan
applications and mortgage lending.Plaintiff further alleges That this
Negligence occurred deliberately,as the State of Florida,

1  accepted the fact that houses were being built using illegal aliens
2  all across Florida,homes were being built too quickly and cheaply,and
3  specifically in the instant case,builders were paying impact fees,the
   building of homes increased the amount of tax money coming into the
4  state,so there was no incentive to perform Its duties,which were a
5  proximate cause of Plaintiffs damages.The defendant did not insure
6  the public trust,as evidenced,by the fact,that Plaintiff,a hard
   working honest man,has lost all his savings due to the corrupt
7  actions of the other defendants,who were allowed to commit widespread
8  Fraud,take all of Plaintiffs money,by misleading Plaintiff with false
9  statements and paperwork.
10 Pursuant to F.S.768,Plaintiff moves this court for a judgement of
11 $100,000.
   **COUNT 8 RICO RACKETEERING INFLUENCED CORRUPT ORGANIZATION**
12 Against all defendants.
13    Plaintiff re-alleges this entire complaint above as if fully set
14    forth herein.
15 The hiring of illegal aliens to build homes is illegal,and a
   proximate cause,in part,of Plaintiffs damages.
16 Defendant United Home Builders used illegal aliens to build
17 Plaintiffs home in violation of state and federal law and added costs
18 to the project unjustly and without merit.
19 The other defendants engaged in fraud on loan applications,
   HUD settlement statements and in lending money to Plaintiff under
20 false pretenses,in violation of Title 18,United States code,Section
21 1001,and other laws listed earlier.
22 The listed state defendant was negligent,and ignored the laws that
23 govern their official duties,because money was coming into the county
   and state,and that is all that mattered to them,not the fact,that the
24 money Plaintiff has paid in taxes and other disbursements,was taken
25 on illegal and fraudulent means,by the other defendants.All
   defendants profitted in one way or another.This constitutes a pattern
   of criminal activity in violation of state and federal law.
       As a direct and proximate result of the association between the
                        Summary of Pleading - 18

1  Defendants and the acts of the Defendants by and through said
2  association,the Plaintiff herein has suffered damages,including but
3  not limited to, the loss of their investment and imminent
   foreclosure of said property.
4  WHEREFORE, the Plaintiffs demand judgment against Defendants and
5  pray as follows:
6  1.To award damages against the defendants herein for a sum of money
7  equal to the amount of damages and/or losses Plaintiff has sustained
   or will sustain.
8  2.To award pre-judgement interest on the amount of damages Plaintiff
9  has sustained or will sustain.
10 3.To award all costs of litigation incurred by Plaintiff including
11 fees,costs,disbursements and expenses pursuant to Fl.St.817.41 and
   501.2101.
12 4.To award Plaintiff punitive damages pursuant to Fl.St.817.41.
13 5.To order that the mortgage contract be rescinded,and for such
14 further relief as necessary to place Plaintiff in a position as if
15 the contract did not exist.
16 6.To enjoin any third party from any terms of the contract against
   Plaintiff.
17 7.To enjoin G.M.A.C. from foreclosing the mortgage contract on the
18 subject property.
19 8.To award such further relief as the court deems just and equitable.
20 **COUNT 9 INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS/PREDATORY
   LENDING**
21 Against all defendants
22   Plaintiff re-alleges this entire complaint above as if fully set
23   forth herein.
24 Defendants knowingly,willingly,with malice aforethought,subjected
   Plaintiff to an illegally constructed debt by approving his
25 construction and end loan on fraud,taking fees and other profit.
   Later defendant Pinnacle Financial continued to subject Plaintiff to
   more debt,issuing credit cards through Bank of America,and recently,
   an attempt to issue a card of their own.

1  Upon information and belief,defendant Pinnacle Financial knew

2  Plaintiff would eventually lose the fraud based equity in his

3  home,and be required to use the credit cards for living expenses,
   which he has,in an amount of $25,000,thereby subjecting Plaintiff to

4  emotional distress.Had it not been for the defendants accepting of

5  the fraudulent loan application submitted by defendant Patrick

6  Robinson,Plaintiff would not have been put into the present financial

7  position and distress.

8     As a direct and proximate result of the acts of the Defendant,the
      Plaintiff herein has suffered damages,including but not limited to,

9     the loss of his investment and imminent foreclosure of said

10    property.

11    WHEREFORE, the Plaintiffs demand judgment against Defendants and
      pray as follows:

12 1.To award damages against the defendants herein for a sum of money

13 equal to the amount of damages and/or losses Plaintiff has sustained

14 or will sustain.

15 2.To award pre-judgement interest on the amount of damages Plaintiff
   has sustained or will sustain.

16 
17 3.To award all costs of litigation incurred by Plaintiff including

18 fees,costs,disbursements and expenses pursuant to Fl.St.817.41 and
   501.2101.

19 4.To award Plaintiff punitive damages pursuant to Fl.St.817.41.

20 5.To order that the mortgage contract be rescinded,and for such
   further relief as necessary to place Plaintiff in a position as if

21 the contract did not exist.

22 6.To enjoin any third party from any terms of the contract against

23 Plaintiff.

24 7.To enjoin G.M.A.C. from foreclosing the mortgage contract on the
   subject property.

25 8.To award such further relief as the court deems just and equitable.

**COUNT 10 FRAUD**

Against Countrywide Financial Home Loans.

1  Countrywide and certain of its officers and directors violated the
2  Securities Exchange Act of 1934. Countrywide is engaged in mortgage
3  lending and other real estate businesses.Plaintiff alleges defendants
   issued materially false and misleading statements regarding the
4  Company's business and financial results during the time period that
5  defendant owned Plaintiffs mortgage. As a result of defendants' false
6  statements, Countrywide stock traded at artificially inflated prices
7  during the Period,and certain of the defendants were able to sell
   over $440 million worth of their Countrywide shares at artificially
8  inflated prices. The basis was artificially inflating the value of a
9  home,through an appraisal,made by appraisers/co-defendants Martin
10 Worth/Lentz Appraisal Group & Gary Pruitt/Appraise-it.After selling
11 the mortgage to defendant GMAC,defendants Mozilo & Sieracki publicly
   disclosed that Countrywide was recording hundreds of millions of
12 dollars of impaired losses in addition to those recorded in the first
13 quarter of 2007,causing its stock to drop.The true facts, which were
14 known to defendants but concealed from the public during the Period,
15 were: (a) the Company lacked requisite internal controls, and, as a
   result, the Company's projections and reported results issued during
16 the Class Period were based upon defective assumptions and/or
17 manipulated facts; **(b) inflated appraisals of properties on loan**
18 **applications would make Countrywide's losses much larger than current**
19 **reserve levels once real estate values cooled off, but the Company**
   **was failing to adjust its reserve levels to account for this**
20 **phenomenon;** (c) the Company's financial statements were materially
21 misstated d) given the deterioration and the increased volatility in
22 the mortgage market,the Company would be forced to tighten its credit
23 guidelines and implement additional lending restrictions, which would
   have a direct material negative impact on its loan productions going
24 forward.
25   As a direct and proximate result of the acts of the Defendant,the
       Plaintiff herein has suffered damages,including but not limited to,
       the loss of his investment and imminent foreclosure of said
       property.

Summary of Pleading - 21

1  WHEREFORE, the Plaintiffs demand judgment against Defendants and
2  pray as follows:

3  1.To award damages against the defendants herein for a sum of money
   equal to the amount of damages and/or losses Plaintiff has sustained
4  or will sustain.

5  2.To award pre-judgement interest on the amount of damages Plaintiff
6  has sustained or will sustain.

7  3.To award all costs of litigation incurred by Plaintiff including
   fees,costs,disbursements and expenses pursuant to Fl.St.817.41 and
8  501.2101.

9  4.To award Plaintiff punitive damages pursuant to Fl.St.817.41.

10 5.To order that the mortgage contract be rescinded,and for such
   further relief as necessary to place Plaintiff in a position as if
11 the contract did not exist.

12 6.To enjoin any third party from any terms of the contract against
13 Plaintiff.

14 7.To enjoin G.M.A.C. from foreclosing the mortgage contract on the
15 subject property.

   8.To award such further relief as the court deems just and equitable.
16 **COUNT 11 FRAUD**

17 Against G.M.A.C.

18  Plaintiff re-alleges this entire complaint above as if fully set
19  forth herein.

   Defendant GMAC,bought the rights to service the loan from defendant
20 Countrywide.GMAC began receiving monthly payments from Plaintiff in
21 March 2006,until Plaintiff could no longer pay in July 2007.

22 Defendant GMAC,therefore was profiting from the fraud created by the
23 other defendants and damaging Plaintiff financially.GMAC is the
   beneficiary of Fraud,while Plaintiff is being damaged.
24
    As a direct and proximate result of the acts of the Defendant,the
25  Plaintiff herein has suffered damages,including but not limited to,
    the loss of his investment and imminent foreclosure of said
    property.
    WHEREFORE, the Plaintiffs demand judgment against Defendants and

*B*

pray as follows:

1. To award damages against the defendants herein for a sum of money equal to the amount of damages and/or losses Plaintiff has sustained, or will sustain.

2. To award pre-judgement interest on the amount of damages Plaintiff has sustained or will sustain.

3. To award all costs of litigation incurred by Plaintiff including fees, costs, disbursements and expenses pursuant to Fl.St.817.41 and 501.2101.

4. To award Plaintiff punitive damages pursuant to Fl.St.817.41.

5. To order that the mortgage contract be rescinded, and for such further relief as necessary to place Plaintiff in a position as if the contract did not exist.

6. To enjoin any third party from any terms of the contract against Plaintiff.

7. To enjoin G.M.A.C. from foreclosing the mortgage contract on the subject property.

8. To award such further relief as the court deems just and equitable.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all actions so triable.

**SUMMARILY,**

Plaintiff prays for judgement against defendants In full or in part, and a minimum financial restitution of $300,000, plus interest and other related costs, to restore monetary damages incurred by Plaintiff due to the actions of defendants.

Plaintiff prays for leave to amend complaint.

Dated this 14th day of November, 2007

PATRICK FARRELL
2904 NW14TH TERRACE
CAPE CORAL, FL. 33993
239-558-8393

Summary of Pleading - 23

**Exhibit B-2**

**Order Granting Farrell Motion for Default Judgment**

## IN THE CIRCUIT COURT OF THE 20TH JUDICIAL DISTRICT IN AND FOR LEE COUNTY FLORIDA

PATRICK LORNE FARRELL©,
    Plaintiff,   vs.
G.M.A.C,et al
    Defendants

COMPLAINT FOR FRAUD,
CONSPIRACY AND DAMAGES
STATE CASE NO.07-CA-14942
JUDGE JOHN FULLER

### ORDER

THIS CAUSE having come before the court on the Plaintiff's Motion for Default Judgement against Defendant PINNACLE FINANCIAL CORPORATION,and the court having reviewed the evidence and the file,it is hereby,

ORDERED AND ADJUDGED that the Plaintiff's motion for default judgement is granted. The damages ~~assessed are in the amount of $315,000.~~ *shall be established at a future hearing.* DONE AND ORDERED in Chambers at Fort Myers,Lee Count,Florida this *15* day of July,2008.

_____
~~John Fuller~~ *Elisabeth*
Circuit Judge

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Order has been provided by

U.S.Mail to;

PATRICK FARRELL;2904 NW14TH TERRACE;CAPE CORAL,FL.33993
Michael D Onofrio;1395 Panther Ln. #300; Naples,Fl. 34109
Andrew Bolin; PO Box 1531;Tampa,Fl.33601
JEFFREY LAPIN; 244 ALHAMBRA CIRCLE #800 ;CORAL GABLES,FL. 33134
Mark Horowitz; PO Box 100767; Cape Coral,Fl.33910
Akerman Senterfitt ;50 N Laura St. #2500 ;Jacksonville,Fl.32202
Jeffrey Rice; PO Box 2366; Ft.Myers,Fl.33902

By: _____
Judicial Assistant

1

**Exhibit C**

**Fourth Amended Farrell Complaint Filed with Florida State Court**

## IN THE CIRCUIT COURT OF THE 20TH JUDICIAL DISTRICT
## IN AND FOR LEE COUNTY FLORIDA

| | |
|---|---|
| **PATRICK LORNE FARRELL©,** | **STATE CASE NO.07-CA-14942** |
| **Plaintiff,    vs.** | **JUDGE JOSEPH FULLER** |
| **G.M.A.C. et al,** | |
| **Defendants** | **NOVEMBER 30,2009** |

### 4TH AMENDED COMPLAINT
### ACTION TO QUIET TITLE,CRIMINAL COMPLAINT FOR MORTGAGE FRAUD
### SHORT PLAIN STATEMENT OF FACTS

1. Plaintiff was the victim of a predatory loan and criminal acts in violation of state and federal law resulting in mortgage Fraud. Plaintiff is entitled to relief, and demands judgment.

2.     Plaintiff contracted to get a construction loan for $280,000.Plaintiff deposited $15,000 into escrow, and the "note" became $265,000.Plaintiff went to closing and the defendants note was $286,000. Subsequently the loan servicer demanded $7,000 more without cause. Defendants illegally retained over $25,000 of Plaintiff's Money of Exchange and other costs.

3. The defendants herein similarly inflated Plaintiffs income, home appraisal and loan amount.

4. All in violation of Title 18,U.S.C. sections 1014 and 2, sec.1343 and 1344, F.S.817.545.

### CONCORDANT FACTS AND CHARGES

5. Several Criminal cases filed in Federal Court by the U.S. Atty. contain the same criminal elements, and warrants charges to be filed against the defendant mortgage broker in this case.

6. 2:09 –CR-68-29DNF U.S. V. WASH. OLIVIERA-MULTIPLE BORROWER

7. 2:09 –CR-69-29DNF U.S. V. FABRICIO MONTIERO- LOAN ORIGINATOR

8. 2:09 –CR-78-29DNF U.S. V. TIAGO OLIVIERA-MULTIPLE BORROWER

9. 2:09 –CR-79-29DNF U.S. V. DAMARYS LIORCA-MULTIPLE BORROWER

10. 2:09 –CR-83-29DNF U.S. V. CONTRERAS-MORTGAGE BROKER

11. 2:09 –CR-84-29DNF U.S. V. MARK WILLBERG-REALTOR

12. 2:09 –CR-89-29DNF U.S. V. DEBRA LANDBERG-BANK MANAGER

13. 2:09 –CR-91-29DNF U.S. V. THERESA MEULENBERG-ESCROW MANAGER

14. 2:09 –CR-92-29DNF U.S. V. OSCAR ANTELO-MORTGAGE BROKER

15. 2:09 –CR-97-29DNF U.S. V. JUAN GONZALEZ- BROKER,LOAN OFFICER

1

## PARTIES

16. Plaintiff Patrick Farrell 2904 NW14TH TERRACE,CAPE CORAL,FL.33993

17. BUSEY BANK FL. 7980 Summerlin Rd. Ft.myers,Fl.33907,created the construction loan.

18. MORTGAGEWISE 6741 Buckingham Rd. Ft.Myers,Fl.33905. Patrick Robinson/agent who converted the construction loan to an end loan with PINNACLE FINANCIAL.

19. IMPAC FUNDING CORP. 1401 DOVE ST.#200-NEWPORT BEACH,CA. 92660; bought the loan from PINNACLE and securitized the end loan into a mortgage pool.

20. WELLS FARGO 1100 Virginia Dr. Ft.Washington,PA.19034,is trustee of mortgage pool.

21. G.M.A.C. MORTGAGE LLC 1100 Virginia Dr. Ft.Washington,PA.19034, serviced loan.

22. FL.DEFAULT LAW GROUP [FDLG] P.O.BOX 25018 TAMPA,FL.33622-5018, ATTORNEY's BRIANNA FINCH and Stanley Kurek are counsel for WELLS FARGO.

23. Plaintiff is a "consumer" and "natural person" for the purpose of this complaint within the meaning of The Federal Truth in Lending Act 15 U.S.C. §1601 et seq., Regulation Z, § 226.2(11) and Act 15 U.S.C. § 1692, Fair Debt and Collection Practices Act.

24. Defendants at all material times hereto, are corporations doing business in the State of Florida including the creating and servicing of mortgage loans which in this instance, further constituted the collection of consumer debts subject to the provisions of the Federal Truth In Lending Act 15 U.S.C. §1602(f) and the Fair Debt and Collection Practices Act 15 U.S.C. §1692 and defendants are a "creditor and collector" as defined.

25. Defendants BUSEY BANK and IMPAC FUNDING CORP were doing business in the State of Florida including origination of mortgage loans either directly or indirectly through agents, thus engaged in the business of extending consumer credit and collection of debts through its agents, and subject to the provisions defined by Federal Truth In Lending Act 15 U.S.C sec. §1602(f), and a is "creditor" thereby definition.

26. Defendant MORTGAGEWISE via agent Patrick Robinson, was a mortgage broker located in Ft Myers Fl. who took mortgage applications from prospective mortgagors, qualified such applications and presented them to lending institutions in order to induce them to loan money secured by a mortgage on residential real property in Lee Co.

27. Defendants WELLS FARGO BANK and GMACM LLC, both with its principal place of business at 1100 Virginia Dr.; Ft.Washington,Pa.19034 was, a limited liability corporation,

2



doing business in the State of Florida including the servicing of mortgage loans which constituted the collection of consumer debts, and subject to provisions of and as defined by the Federal Truth In Lending Act 15 U.S.C sec. §1602(f) and is also a "creditor".

28. Defendant GMACM LLC further is subject to RESPA 2605,as a loan servicing agent and subject to statutory requirements of section 6 of RESPA 2605(e) which provides injured consumers the ability to seek redress up to 3 years after injuries from violations.

29. Defendant Fl. Default Law Group [FDLG] with its principal place of business at 9119 Corporate Lake Drive, Suite 300,Tampa, FL 33634, is and was at all times material hereto a professional corporation law firm/foreclosure mill organized under the laws of the State of Florida and was doing business in the State of Florida foreclosing mortgages.

30. Defendant FDLG is a "Collector" as defined under Fair Debt and Collection Practices Act and is engaged in regular practice and collection of consumer debts pursuant to 15 U.S.C. §1692, and thus subject further to the provisions of a "collector and creditor" as defined by the Federal Truth In Lending Act 15 U.S.C. §1602(f).

31. Defendants were also, at all times material hereto, engaged in the business of consumer transactions within the State of Florida and is thus a "seller" ,a "supplier" a "creditor" a "collector" as defined by the Federal Truth In Lending Act (15 USC sec. 1602(f)); and an "enterprise", engaged in the business of effecting or soliciting consumer transactions.

## 32. JURISDICTION AND VENUE

33. Jurisdiction of the subject matter in this Court is proper pursuant to 28U.S.C. sec. 1331, as Plaintiff has sought relief under multiple Federal Statutes.

34. Jurisdiction of the Federal claims is proper in this Court pursuant to 15 U.S.C. sec. 1601 et. seq. and 15 U.S.C. sec. 1640(e). Jurisdiction over the state-law claims is proper under the doctrine of Supplemental or Pendent Jurisdiction pursuant to 28 U.S.C. sec. 1367(a).

35. The cause of action herein arose in Lee County, Florida by virtue of a mortgage loan and related inter-temporal transactions associated therewith which concern the Plaintiffs' primary residential real estate which is located at 2904 NW 14TH TERRACE, CAPE CORAL, FL.33993 which is located in Lee Co within this Judicial District damages exceed $15,000.

36. Venue of this action is proper within this Court as at least one named Defendant is subject to suit within this Court, and thus all Defendants are properly sued in this Court.

### 37. <u>STATEMENT OF FACTS COMMON TO ALL COUNTS</u>

38. In June 2004,Plaintiff began the process of buying a home.

39. July 30,2004,Defendant BUSEY BANK created the 1ST- HUD-1 Settlement Statement for a loan of $280,000.Plaintiff paid $15,000 in deposits to BUSEY BANK,and the note and TRUTH IN LENDING STATEMENT declared the loan was $265,600.

40. Plaintiff paid $10,000 in interest charges for 15 months, until the house was built.

41.   Plaintiff used defendant MORTGAGEWISE to broker the loan process.

42.   Defendant made material misrepresentations on the relevant documents involved in the mortgage lending process including, note, mortgage, deed, surveys, inspection reports, uniform residential loan applications, appraisal reports; HUD-1 settlement statements; supporting personal documentation for loan applications such as IRS tax return, verifications of income and employment, credit reports, bank statements, and any required disclosures.

43. Defendant MORTGAGEWISE did knowingly make false statements and representations for the purpose of influencing PINNACLE FINANCIAL in connection with a loan application for property at 2904 NW14TH TERRACE CAPE CORAL, FL.33993,in the inflated amount of $286,029.41; which action falsely represented; that:

44. [a] Plaintiff earned a purported monthly income of $7,500 for 12 years;

45. [b] that Plaintiff had an asset of a mobile home worth $20,000;

46. [c] that the purchase price of the home was $286,029,41;

47. [d] that the appraisal of the subject property was $465,000;

48. **Whereas, the defendant at the time knew that;**

49. [a] the Plaintiff did not earn that amount of income, and had no evidence to support that;

50. [b] the mobile home was worth only $2,360, according to tax collector records;

51. [c] the purchase price was $265,600,as defined by BUSEY BANK'S note and mortgage;

52. [d] the appraisal was based on un comparable properties containing upgraded features.

53. All in which, in truth and fact, the defendant well knew at the time was false.

54. **All in violation of Title 18,U.S.C. sec. 1014 and 2, sec.1343 and 1344, and F.S.817.545.**

55. Oct.11,2005,Defendant BUSEY BANK created a 2nd HUD-1 and the same loan was for an inflated amount of $286,029.41,instead of $265,600,as it had been for 15 months.

56. Defendant MORTGAGEWISE used the 2nd HUD-1 to get an end loan from PINNACLE.

4

57. Defendants intentionally failed to credit the $15,000+ deposits of Plaintiff's money, and the builder added a bogus charge of $6,000 for "extra dirt" later proven to be false.

58. $280,000[original loan] - $15,000[plaintiffs deposit] = $265,000[Busey's Loan].

59. $265,000[Busey's loan] + $15,000[plaintiffs deposit added back illegally] + $6,000[builder's bogus dirt charge] = $286,000. This is the basis of dispute,nullifying the note and mortgage

60. Plaintiff paid $480 for extra dirt to the Seawall company and $2,670.41 at closing on 10/11/2005, under duress, and the end loan was for $283,000, not $265,600.

**61. Defendants did not provide disclosure documents in Para. #42 to Plaintiff at closing.**

62. November 9,2005,Defendant IMPAC FUNDING CORP bought and recorded the note.

63. Defendant IMPAC FUNDING CORP and Defendant WELLS FARGO, entered into an agreement, whereby, inter alia, Defendant IMPAC FUNDING CORP would buyback the note in the event of legal violations occurring in the origination of the note, as in this case.

64. Plaintiff has a claim in recoupment in the contract of defendant IMPAC FUNDING CORP.

65. Defendant WELLS FARGO has a "claim in recoupment" from IMPAC FUNDING CORP.

66. Dec.1,2005 Defendant WELLS FARGO became trustee of the note in a mortgage pool.

67. March 1,2006 Defendant GMACM LLC began servicing the note, mortgage, loan.

68. July 19,2006 Defendant BUSEY BANK received Satisfaction of Mortgage.

69. Defendant BUSEY BANK received $283,000 for a loan payoff that required only $265,000.

70. Defendant BUSEY BANK and MORTGAGEWISE kept Plaintiffs $18,000.

71. From Jan. to July 2007, Defendant GMACM LLC, increased escrow demand by $7,128.

72. From Jan. to July 2007,Plaintiff paid an additional $600 per month or more than required.

73. In late 2007,Plaintiff requested disclosure statements from the title company, discovered elements of Fraud from at the closing, and filed this suit, within the 3 year TILA window.

74. Dec. 5,2007 Defendant WELLS FARGO, filed foreclosure, [case 07-CA-16767].

75. April 1,2008 Defendant WELLS FARGO assigned the mortgage and note to itself, by an alleged agent of MERS named Jeffrey Stephan, an employee of Defendant GMACM LLC.

76. On May 19th,2008,the same Jeffrey Stephan, now purporting to be a "Limited Signing Officer of GMAC" swore an affidavit, in support of Defendant WELLS FARGO suit, that the amounts due and owing were based on a loan of $283,000.

5

77. October 28,2008 Defendant WELLS FARGO, received $25 BILLION in TARP funds for "recoupment" of bad loans within mortgage pools, such as in this case.

78. March 24,2009 Defendant WELLS FARGO, received a summary judgement to take Plaintiff property, despite already recouping damages via the TARP funds, and IMPAC's agreement.

79. In June 2009,GMACM LLC admitted, by letter to Plaintiff, that it had over-charged Plaintiff $7,128 in 2007,and Plaintiff would receive a refund check. That check has never been sent.

80. **SUMMARILY**, As a result of the closing and in connection therewith, Defendants placed the Plaintiff into a loan with a fraudulent amount of $18,000 more then needed, and charged an extra $7,128, intentionally misleading Plaintiff and engaging in material omissions by failing to disclose to Plaintiffs the fact that the nature of the mortgage loan application had been materially changed without Plaintiffs' knowledge.

81.     Defendants made numerous material representations to Plaintiff which Defendants knew to be false when made and which were made deliberately. Defendants made the material misrepresentations to Plaintiff with the specific intent that Plaintiff rely thereon. Plaintiffs did reasonably rely upon the affirmative representations of Defendants to his detriment. As a direct and proximate result of the misrepresentations which were made by Defendants , Plaintiff has and will continue to suffer damages.

82. Prior to the closing, Defendants failed to provide to Plaintiff the preliminary disclosures required by the Truth-In-Lending Act pursuant to 12 CFR (also known as and referred to herein as "Regulation Z) sec.226.17 and 18, and failed to provide the preliminary disclosures required by the Real Estate Settlement Procedures Act ("RESPA") pursuant to 24CFR sec. 3500.6 and 35007, otherwise known as the GFE.

83. As a direct and proximate result of these failures to disclose as required by the Truth-In–Lending Act, Defendants BUSEY BANK and MORTGAGEWISE Fraudulently induced Plaintiff to sign the closing documents with an inflated amount of $286,029.41 or lose the home by sale to another, without preliminary disclosure, which is a per se violation of 12 CFR sec. 226.4(a), 226.17 and 18(d) and (c)(1)(iii).

84. Defendants were under numerous legal obligations as fiduciaries and had responsibility for overseeing the purported loan consummation to insure that the consummation was legal,

6

proper, and that Plaintiff received all legally required disclosures pursuant to the Truth-In-Lending Act and RESPA both before and after the closing.

85. Plaintiff not being in the consumer lending, mortgage broker, or residential loan business, reasonably relied upon the Defendants to insure that the consumer credit transaction was legal, proper, and complied with all applicable laws, rules, and Regulations.

86. These transactions, designated as Loan No. 132030973, extended consumer credit which was subject to a finance charge and which was initially payable to the Defendants.

87. As part of the consumer credit transaction the subject of the closing, Defendants retained a security interest in Plaintiffs' principal residential dwelling.

88. Defendants engaged in a pattern and practice of defrauding Plaintiffs in that, during the entire life of the mortgage loan, Defendants had actual knowledge that the Plaintiffs' accounts were not accurate but Plaintiff make further payments based on Defendants' inaccurate accounts.

89. Defendants also utilized amounts known to the Defendants to be inaccurate to determine the amount allegedly due and owing for purposes of foreclosure.

90. Said violations are thus a legal basis for and legally extend Plaintiffs' right to exercise the remedy of rescission to either 3 years from the closing on Oct.11,2005.

91. The affidavit in support of the summary judgment, made by Jeffrey Stephan of GMACM LLC, is a Fraud, the Amounts Due and Owing is incorrect, and theft of Plaintiff's $18,000.

92. The filing of these false documents by attorney's working for Fl. Default Law Group, BRIANNA FINCH and STANLEY KUREK are acts of Fraud and RICO.

93. Pursuant to contract, IMPAC is required to buyback the loan, that has violations of law in the loan origination process, thereby granting WELLS FARGO recoupment.

94. On information and belief and given that the consumer credit transaction was an transaction with multiple assignments as part of an aggregation and the creation of a REMIC tranche itself a part of a predetermined CMO and/or CDS, all Defendants shared in the illegal proceeds of the transaction; conspired with each other to defraud the Plaintiff out of the proceeds of the loan; acted in concert to wrongfully deprive the Plaintiff of the residence; without providing Plaintiff reasonably equivalent value in exchange; and conducted an illegal enterprise within the meaning of the RICO statute.

95. On information and belief and given the volume of residential loan transactions solicited and processed by the Defendants, the Defendants have engaged in two or more instances of racketeering activity involving different victims but utilizing the same method, means, mode, operation, and enterprise with the same intended result.

**WHEREFORE,** Plaintiff was victimized by acts of predatory lending, with damages of $200,000.The resulting loan, note, mortgage is null, void, and rescindable, thereby Plaintiff moves the Court to grant Quiet Title to Plaintiff free and clear of all encumberances remove WELLS FARGO'S Lien in the Lee county records, and/or adjudicate the following claims.

### 96. COUNT 1: HOME OWNERSHIP EQUITY PROTECTION ACT

97. Plaintiff reaffirm and reallege paragraphs 1 through 95 hereinabove as if set forth more fully hereinbelow. All defendants.

98. In 1994, Congress enacted the Home Ownership Equity Protection Act("HOEPA") which is codified at 15 USC sec. 1639 et seq. with the intention of protecting homeowners from predatory lending practices targeted at vulnerable consumers. HOEPA requires lenders to make certain defined disclosures and prohibits certain terms from being included in home loans. In the event of noncompliance, HOEPA imposes civil liability for rescission and statutory and actual damages.

99. Plaintiff is a "consumer" and each Defendant is a "creditor" as defined by HOEPA. In the mortgage loan transaction at issue here, Plaintiff was required to pay excessive fees, expenses, and costs which exceeded the amount to be financed by $18,000,then $7,128.77.

100. Pursuant to HOEPA and specifically 15 USC sec. 1639(a)(1), each Defendant is required to make certain disclosures to the Plaintiffs which are to be made conspicuously and in writing no later than three (3) days prior to the closing.

101. Defendants violated HOEPA by numerous acts and material omissions, including but not limited to: failing to make correct disclosures on the HUD-1 in a conspicuous fashion; engaging in a pattern and practice of extending credit to Plaintiff without regard to the ability to repay in violation of 15 USC sec.1639(h).

102. By virtue of the Defendants' multiple violations of HOEPA, Plaintiff has a legal right to rescind the consumer credit transaction pursuant to 15 USC sec. 1635. This Complaint is to

8

be construed, for these purposes, as formal and public notice of Plaintiff's Notice of
Rescission of the mortgage and note, and a Criminal Complaint.

103.    As a direct consequence of and in connection with Plaintiffs' legal and lawful exercise of
their right of rescission, the true "lender" is required, [a]within twenty (20) days of Notice of
Rescission, to: desist from making any claims for finance charges in the transaction;(b) return
all monies paid by Plaintiffs in connection with the transaction to the Plaintiff;(c) satisfy all
security interests, including mortgages, which were acquired in the transaction. (d) return of
any money or property paid by the Plaintiffs including all payments made in connection with
the transactions;(e) an amount of money equal to twice the finance charge in connection with
the transactions;(f) relinquishment of the right to retain any proceeds; and (g) actual damages
in an amount to be determined at trial, including attorneys' fees' [h] The granting of quiet
title to Plaintiff by lifting the lien of WELLS FARGO in related case 07-CA-16767.

104.    Based on Defendants' HOEPA violations, each of the Defendants is liable to the Plaintiff
for the following, which Plaintiffs demand as relief: rescission of the mortgage loan
transactions; termination of the mortgage and security interest in the property the subject of
the mortgage loan documents created in the transaction, costs and related fees.

**105.   COUNT 2: REAL ESTATE SETTLEMENT PROCEDURES ACT**

106.    Plaintiff reaffirm and reallege paragraphs 1 through 95 herein as if specifically set forth
more fully hereinbelow.All defendants.

107.    As mortgage lenders, Defendants are subject to the provisions of the Real Estate
Settlement Procedures Act ("RESPA"), 12 USC sec. 2601 et seq.

108.    In violation of 12 USC sec. 2607 and in connection with the mortgage loan to Plaintiff,
Defendants accepted charges for the rendering of real estate services which were in fact
charges of $18,000 and $7,128 more than services actually contracted for.

109.    As a result of the Defendants' violations of RESPA, Defendants are liable to Plaintiff in
an amount equal to three (3) times the amount of charges paid by Plaintiffs for "settlement
services" pursuant to 12 USC sec. 2607(d)(2).

**110.   COUNT 3: VIOLATIONS OF FEDERAL TRUTH-IN-LENDING ACT**

111.    Plaintiff reaffirm and reallege paragraphs 1 through 95 hereinabove as if set forth more
fully hereinbelow. All defendants.

112.    Defendants failed to include and disclose certain charges in the finance charge shown on
the TILA statement, which charges were imposed on Plaintiff incident to the extension of
credit to the Plaintiff and were required to be disclosed pursuant to 15 USC sec. 1605 and
Regulation Z, sec. 226.4, thus resulting in an improper disclosure of finance charges in
violation of 15 USC sec. 1601 et seq., Regulation Z sec. 226.18(d). Such undisclosed charges
include a sum identified on the Settlement Statement listing the amount financed which is
different from the sum listed on the original Note, $265,600 vs. second note of $283,000.

113.    By calculating the annual percentage rate ("APR") based upon improperly calculated and
disclosed amounts, Defendants are in violation of 15 USC sec. 1601 et seq., Regulation Z
sec. 226.18(c), 18(d), and 22.

**114.    Defendants' failure to provide the required disclosures provides Plaintiff with the
right to rescind the transaction, and Plaintiff, through this public Complaint which is
intended to be construed, for purposes of this claim, as a formal Notice of Recission,
hereby elects to rescind the transaction and repay Plaintiff for all costs and damages.**

**115.    <u>COUNT 4: VIOLATION OF FAIR CREDIT REPORTING ACT</u>**

116.    Plaintiff reaffirm and reallege paragraphs 1 through 95 above as if set forth more fully
hereinbelow. GMAC LLC, WELLS FARGO, Fl. Default Law Group.

117.    At all times material, Defendants qualified as a provider of information to the Credit
Reporting Agencies, including but not limited to Experian, Equifax, and Trans Union , under
the Federal Fair Credit Reporting Act.

118.    Defendants wrongfully, improperly, and illegally reported negative information as to the
Plaintiff to one or more Credit Reporting Agencies, resulting in Plaintiff having negative
information on the credit reports and the lowering of the FICO scores.

119.    Pursuant to 15 USC sec. 1681(s)(2)(b), Plaintiff is entitled to maintain a private cause of
action against Defendants for an award of damages in an amount to be proven at the time of
trial for all violations of the Fair Credit Reporting Act which caused actual damages to
Plaintiff, including emotional distress and humiliation.

120.    Plaintiff is entitled to recover damages from Defendants for negligent non-compliance
with the Fair Credit Reporting Act pursuant to 15 USC sec. 1681(o).

121.    Plaintiff is also entitled to an award of punitive damages against Defendants for their willful noncompliance with the Fair Credit Reporting Act pursuant to 15 USC sec. 1681 (n)(a)(2) in an amount to be proven at time of trial.

**122.    COUNT 5: FL. DECEPTIVE AND UNFAIR AND TRADE PRACTICES ACT**

123.    Plaintiff reaffirm and reallege paragraphs 1 through 95 above as if set forth more fully hereinbelow. All defendants.

124.    In providing various advices, mortgage brokerage services, lending services, and otherwise through its relations and communications with Plaintiff, Defendants are subject to the provisions of the FDUTPA.

125.    In violation of the FDUTPA , Defendants have committed unfair, deceptive, and unconscionable acts and practices in connection with the consumer transaction the subject of this action, including but not limited to: [a] taking advantage of Plaintiffs' inability to protect his interests because of the inability to fully understand the terms of the transactions due to the numerous failures of the Defendants to disclose material information; altering of material terms; and misrepresentation of the terms of the transaction; (b) charging Plaintiff an excessive price for the services rendered; (c) rendering services to Plaintiffs with the knowledge that there was no reasonable probability of repayment of the obligations in full by Plaintiff; and (d) by violations of the FDUTPA incorporated into this claim by reference.

126.    Pursuant to FDUTPA Defendants are liable to Plaintiffs for each violation of the FDUTPA in the amount equal to three (3) times actual damages in addition to Plaintiffs being entitled to injunctive relief barring any further violations pursuant to FDUTPA .

**127.    COUNT 6: MORTGAGE FRAUD**

128.    Plaintiff reaffirm and reallege paragraphs 1 through 95 hereinabove as if set forth more fully hereinbelow. Defendant BUSEY BANK and MORTGAGEWISE.

129.    As set forth above, the Defendants knowingly concealed and misrepresented information which is required to be disclosed pursuant to Federal Statutes and Regulations.

130.    Defendants fraudulently induced Plaintiffs into signing a mortgage loan package which included an illegally unconscionable loan with full knowledge that same was contrary to applicable law and public policy, by concealing the theft of Plaintiff's $18,000 deposits.

11

131.   The intentional concealment and material misrepresentations of defendants were made with knowledge of falsity and, maliciously and with reckless disregard to the rights of the Plaintiff in connection with the overall intertemporal transaction being part of the Defendants' predetermined process of reselling the loan to an aggregator and ultimate creation of a CMO utilizing Plaintiffs' mortgage as part of a tranche in a REMIC security.

132.   Plaintiff not being an investment banker, securities dealer, mortgage lender, mortgage broker, or mortgage lender, reasonably relied upon the representations of the Defendants in agreeing to execute the mortgage loan documents.

133.   Defendants are thus liable to Plaintiff for an amount of damages to be determined at time of trial , as a result of the violations.

## 134.   COUNT 7: FRAUDULENT MISREPRESENTATION

135.   Plaintiffs reaffirm and reallege paragraphs 1 through 95 hereinabove as if set forth more fully hereinbelow. All defendants.

136.   Defendants knowingly and intentionally concealed material information from Plaintiff which is required by Federal Statutes and Regulations to be disclosed to the Plaintiff both before, at, and after the closing.

137.   Defendants also materially misrepresented material information to the Plaintiff with full knowledge by Defendants that their affirmative representations were false, fraudulent, and misrepresented the truth at the time said representations were made.

138.   Under the circumstances, the material omissions and material misrepresentations of the Defendants were malicious.

139.   Plaintiff not being investment banker, securities dealer, mortgage lender, mortgage broker, or mortgage lender, reasonably relied upon the representations of the Defendants in agreeing to execute the mortgage loan documents.

140.   Had Plaintiff known of the falsity of Defendants' representations, Plaintiff would not have entered into the transactions the subject of this action.

141.   As a direct and proximate cause of the Defendants' material omissions and material misrepresentations, Plaintiff has suffered damages of $100,000,plus other fees and costs.

## 142.    COUNT 8: BREACH OF FIDUCIARY DUTY

143.    Plaintiff reaffirm and reallege paragraphs 1 through 95 hereinabove as if set forth more fully hereinbelow. All defendants.

144.    Defendants, by their actions in contracting to provide mortgage loan services and a loan program to Plaintiff which was not only to be best suited to the Plaintiff given his income and expenses but by which Plaintiff would also be able to satisfy the obligations without risk of losing the home, were "fiduciaries" in which Plaintiff reposed trust and confidence.

145.    Defendants breached their fiduciary duties to the Plaintiff by fraudulently inducing Plaintiff to enter into a mortgage transaction which was contrary to the Plaintiff stated intentions; interests; preservation of the home, and contrary to the contracted amount at the inception of this entire action, by demanding $18,000 more than required.

146.    Under the totality of the circumstances, the Defendants' actions were willful, wanton, intentional, and with a callous and reckless disregard for the rights of the Plaintiff justifying an award of not only actual compensatory but also exemplary punitive damages to serve as a deterrent not only as to future conduct of the named Defendants herein, but also to other persons or entities with similar inclinations.

147.    Plaintiff thus demands restitution from the Defendants in the form of actual damages, exemplary damages, and attorneys' fees and clear title to the home.

## 148.    COUNT 9: UNJUST ENRICHMENT

149.    Plaintiff reallege and reaffirm paragraphs 1 through 95 hereinabove as if set forth more fully hereinbelow. All defendants.

150.    Defendants had an implied contract with the Plaintiff to ensure that Plaintiff understood all fees which would be paid to the Defendants to obtain credit on Plaintiffs' behalf and to not charge any fees which were not related to the settlement of the loan and without full disclosure to Plaintiff.

151.    Defendants had full knowledge that a predatory mortgage with an increase of $18,000 in the principal was not in the Plaintiffs' best interests, particularly as Plaintiff specifically requested and was told, prior to closing and in writing in more than one document provided by the Defendants, that the loan would be $265,600 not $283,000, plus increased interest.

13

152. Defendants cannot, in good conscience and equity, retain the benefits from their actions of charging a higher principal to the settlement services provided at closing.

153. Defendants have been unjustly enriched at the expense of the Plaintiffs, and maintenance of the enrichment would be contrary to the rules and principles of equity.

154. Plaintiff thus demands restitution from the Defendants in the form of actual damages, exemplary damages, and attorneys' fees, and clear title to the home.

### 155.   **COUNT 10: CIVIL RICO**

156. Plaintiff reaffirm and reallege paragraphs 1 through 95 hereinabove as set forth more fully hereinbelow. All defendants are "persons" as defined by Fl. Statute.

157. The conspiracy the subject of this action has existed from July 2004 to the present, with the injuries and damages resulting therefrom being continuing.

158. Defendants' actions and use of multiple corporate entities, multiple parties, and concerted and predetermined acts and conduct specifically designed to defraud Plaintiff constitutes an "enterprise", with the aim and objective of the enterprise being to perpetrate a fraud upon the Plaintiff through the use of intentional nondisclosure, material misrepresentation , and creation of fraudulent loan documents. Each of the Defendants is an "enterprise Defendant".

159. As a direct and proximate result of the actions of the Defendants, Plaintiff has and will continue to suffer damages of $100,000 actual plus other costs and fees.

### 160.   **COUNT 11: FRAUD**

161. Plaintiffs reaffirm and reallege paragraphs 1 through 95 hereinabove as set forth more fully hereinbelow. GMAC Mortgage LLC.

162. GMACM LLC, became the servicing agent in March 2006.

163. From January 2007 until July 2007,GMAC added a demand to Plaintiff of $7,128 more money to be placed in escrow. GMAC later stated it would refund that money to Plaintiff.

164. As a result of the violations Defendants are liable to Plaintiffs in an amount equal to three (3) times the amount of charges paid by Plaintiff, plus any and all costs for recovery. Secondly, a ruling from the court that each monthly violation by GMAC, under TILA, warrants a fine of  $2,000 X 7 months = $14,000.

14

### 165.   <u>COUNT 12 VIOLATIONS OF TILA-RESPA-15 U.S.C.</u>

166.   Plaintiff reaffirm and reallege paragraphs 1 through 95 hereinabove as set forth more fully hereinbelow. All defendants are "persons" as defined by Fl. Statute.

167.   Plaintiff is entitled to bring this action under Section 15 U.S.C. §1640(a).

168.   This Complaint is filed pursuant to the Federal Truth in Lending Act, 15 U.S.C. § 1635(b), (f) (TILA), and other statutory authority and causes of action set forth herein.

169.   This facts set forth herein arose out of the same nexus of facts and previously pled by Plaintiff, and which relate back to Complaint filed by WELLS FARGO in the Lee Co. 20th circuit, 07-CA-16767- WELLS FARGO V. PATRICK FARRELL

170.   This complaint is a TILA enforcement action with other claims against Defendants, including those prescribed under TILA and Regulation Z and Congressional authority.

171.   Material disclosure provisions of the Federal Truth in Lending Act were violated in the course of the consumer credit transaction set forth below.

172.   Defendants' TILA Material disclosure violations were "*all violations being evident upon the face of the loan documents*", **which liability is imputed to all assigns**, with Defendants committing the subject violations in the course of extending consumer credit as set forth herein which was extended pursuant to the requirements of Sec.125 (a) of TILA, 15 U.S.C. § 1635 (a)(f) and 15 U.S.C. § 1641 and Regulation Z, 12 CFR sec. § 226.15 and § 226.23.

173.   The plaintiff has a continuing right to rescind the transaction until the third business day after the receiving the forms and notices indispensable to constitute "Material Disclosures", pursuant to Section 125(a) of TILA, 15 U.S.C. §1635(a) and Regulation Z, 12 C.F.R. §§ 226.15(a)(3), § 226.23(a)(3). As Plaintiff never received such disclosures, he has a continuing right to rescind.

174.   The "material loan disclosures" failed to disclose the true loan amount being offered,was not the loan disclosed on the 1st HUD-1, Notice of Right to Cancel, Good Faith Estimate and Final Truth in Lending Act Disclosures provided the plaintiff by Defendants during the consummation of the loan as required by Section 125(a) of TILA, 15 U.S.C. §1635(a), 15 U.S.C. §1635 (b) and 15 U.S.C. §1635(f), Regulation Z § 226.15(a)(3), § 226.23(a)(3).

175.   Defendants' loan disclosures, among other disclosure violations, were at all times hereto, "materially deficient" with said *deficiencies presenting and evident at all time to be on the "Face of the Loan Documents"*, 15 U.S.C. §1641(a), and section 130, 15 U.S.C. §1640(a).

176.   Defendants and their agents and Substitute Trustees for these Defendants accepted the Plaintiffs' loan from the originating defendant, BUSEY BANK, MORTGAGEWISE and PINNACLE FINANCIAL, with full and actual knowledge of said material disclosure effects which were evident at all times material hereto on *"the face of the loan documents"*.

177.   The purpose of TILA, 15 U.S.C. §1601(a), is to promote informed consumer credit decisions about the true cost of the loan being offered and to provide substantive consumer protections and remedy provisions for violations of TILA and the imposition of strict liability upon the creditor for noncompliance.

178.   The difference between the actual cost of the loan $265,000 vs. the resulting Fraud that produced the subject note of $283,000,is the core of this case and controversy.

179.   Defendants stole and/or converted for their own purpose, Farrell's $18,000, at the outset of the loan agreement, then another $7,128 by GMACM LLC during servicing in 2007.

180.   Plaintiff timely rescinded the transaction by sending to the Defendants, by U.S.Mail, postage prepaid, certified mail, return receipt, a notice of rescission in November 2007 [this case] and again in December 2007 and January 2008,[case 07-CA-16767].

181.   The Defendants acknowledged receipt of said timely given rescission notice as Defendants, by and through counsel, replied to said rescission notice by written response of denial and refusal to perform as required, or take any appropriate action therein at said time as required under the requirements of TILA pursuant to §1635(b), §1640(a)(1) and Reg. Z, 12 C.F.R, § 226.15 and § 226.23(d)(2). Defendant WELLS FARGO is in default.

182.   Defendants failed to take necessary or appropriate action to reflect the termination of any security interest created under the transaction pursuant their strict liability under the law and Congress to do so as required by Section 125(b) of TILA 15 U.S.C. §1635(b) and Regulation Z § 226.15 and C.F.R. § 226.23(d)(2).

183.   Once the court is presented with a TILA violation such as not responding to the TILA rescission letter, no matter how technical and based on the uniform application of TILA and

16

the broad substantive consumer provisions and protections thereunder wherein TILA must be construed in favor of the consumer, it has no discretion with respect to liability.

184. The Defendants Security Interest is thus void, moving the court for an injunction.

185. *The substantive consumer provisions provided under TILA statute regulation specify that the security interest, promissory note or lien arising by operation of law on the property becomes automatically void, 15 U.S.C. §1635(b) and Regulation Z §§ 226.15(d)(1), § 226.23(d)(1). As noted by the Official Staff Commentary," the creditor's interest in the property is automatically negated regardless of its status and whether or not it was recorded or perfected."*

186. The Defendants have failed to return to the Plaintiffs' any money given by the Plaintiff to anyone, including the Defendants, as required under the strict provisions of TILA pursuant to Section 125(b) of TILA 15 U.S.C. §1635(b) and Regulation Z § 226.23(d)(2).

187. As a result of the Defendants' violations of TILA and Regulation Z, pursuant to §§ 125(a) and 130(a) of TILA 15 U.S.C. §§ 1635(a) and §1635(f), and §1640(a) and 1641, Defendants are liable to Plaintiff as set forth herein under the substantive consumer protections provided to the consumer by TILA that are to be construed in a light most favorable the consumer, that being Farrell.

188. Pursuant to 11 U.S.C. §108(a) or (b), suit is properly brought for TILA statutory violations and enforcement for said violation through the remedy of Rescission, 15 U.S.C. §1635(b), and was originally brought within the three years of the date of the known violations which occurred on October 11,2005, additionally bringing of the suit is tolled within the 3 additional years extending Farrell's timelines and right to sue for TILA, FDCPA, and RESPA Servicing Violations.

189. Equitable tolling applies to TILA's three year extended period of rescission enforcement actions and applies here in this case as stated above especially in view of extensive exercise of due diligence on behalf of Plaintiff.

190. This TILA enforcement action, and claims under RESPA Servicer section 6 of 2605(e), and all other causes stated herein or that may be discovered during the pendancy of this lawsuit, are subject to 11 U.S.C. §108(a) or (b) or, alternatively, under Fed Rule Civ.P 6(a) with all said causes relating back to the same nexus of case facts.

17

191.   Thus, any claims herein or any other causes not yet asserted, or that may be asserted after
discovery or during trial of these facts, are more than properly brought within the 3 additional
years including the foreclosure action on 03/24/2009 filed in the Lee Co. Circuit Courts by
Defendants WELLS FARGO BANK as substitute Trustees, Case No. 07-CA-16767.

192.   TILA, 15 U.S.C. §1635(a)(b)(f) is a statute of repose, and subsection §1635(f) says
nothing in terms of bringing an action but instead provides that the "extended 3 year right of
rescission may be exercised by the consumer under the "Act" when all "forms or Material
Disclosures" have not been made, as is the case

193.   The contract the subject this action was consummated on, 10/11/2005,and timely right of
rescission was exercised less than 3 years for so doing for TILA "Material Loan Disclosure
Violations" evident on *The Face of the Loan Documents*" and pursuant to all assignments,
liabilities associated therewith pursuant to 15 U.S.C. §1635(b) §1641 and §1640(a)§1640 (e).

194.   **WHEREFORE,**The right of this consumer to enforce the right of rescission and recover
statutory awards for defendants violation of TILA, and other causes of action together with
claims for costs and attorney fees as provided by law.

195.   Plaintiff moves the court for damages to be assessed at trial,or in the alternative,to grant
Plaintiff clear title for the $100,000 worth of payments made upon a fraudulent "contract"

196.   **WHEREFORE,** having set forth legally sufficient causes of actions against the
Defendants, Plaintiffs pray for the entry of Final Judgment against all Defendants jointly and
severally,for amounts to be proven at trial, costs and attorneys' fees; that the Court find that the
transactions of this action are deemed void; the foreclosure be deemed void and that further
proceedings with the foreclosure be enjoined; and for any other relief which is just and proper.

197.   Secondly, that in fact WELLS FARGO has been paid TARP funds to recoup damages, in
conjunction with a contractual obligation on the part of IMPAC FUNDING to pay damages that
WELLS FARGO has thereby re-couped damages, voiding any need to sell Plaintiff's home.

**198.   DEMAND FOR JURY TRIAL**

199.   Plaintiff demands trial by jury of all matters so triable as a matter of right.

200.   This complaint is an Affidavit of Material Facts, attested true, certain, correct.

**201.   A TRUE BILL IN COMMERCE**

18

I HEREBY CERTIFY that a true and correct copy has been sent by U.S. Mail to the defendants or their existing counsel, and the United States F.B.I. for investigation.

- Atty.Karl Landsteiner-5235 RAMSEY WAY STE. 13-FT.MYERS,FL.33911-7198

- Atty.Mark Horowitz- 1633 SE 47TH TERRACE- CAPE CORAL,FL. 33910

- Atty.Stanley Kurek/Fl. Default Law Group-9119 Corp.Lk.Dr..3RD FL. TAMPA,FL.33634.

- Atty.Alejandra Arroyave-255 Alhambra cir. #800-Coral Gables,Fl.33134.

- Marc Burridge/IMPAC 19500 Jamboree rd. Irvine,Ca.96212

- AMBAC ASSURANCE David W. Wallis-One State Street Plaza, New York, NY 10004

- Comptroller of the Currency-1302 McKinney St. #3450 Houston,Tx.77010-9050

- U.S.Treasury/I.R.S. Tim Geithner 1500 Pennsylvania Avenue, NW -Washington, D.C. 20220

- Charlie Green Lee Co. clerk of Court P.O.BOX 310 Ft.myers,Fl.33902

**Patrick Lorne Farrell**

**in Propria Persona/Attorney In Fact/ Secured Party Creditor**

**signed "without the united states" and without prejudice/UCC 1-207**

**UCC-1 Filing # 2007-356-2344-8 [12/22/07]-Wash. St. -DOL**

**2904 NW14th Terrace-Cape Coral,Fl. 33993**

**239-558-8393**

**NOVEMBER 30,2009**

RECEIVED

DEC 0 2 2009

RECEIVED

DEC 0 2 2009

**Exhibit  D**

**Wells Fargo  Complaint  in Florida  State Foreclosure  Action**

IN THE CIRCUIT COURT OF THE TWENTIETH
JUDICIAL CIRCUIT IN AND FOR LEE COUNTY, FLORIDA
CIVIL ACTION

WELLS FARGO BANK, N.A., AS TRUSTEE UNDER THE POOLING AND SERVICING AGREEMENT
RELATING TO IMPAC SECURED ASSETS CORPORATION, MORTGAGE PASS-THROUGH
CERTIFICATES, SERIES 2005-2,
        Plaintiff,

                        07 – CA – 016767
                  CASE NO.   Judge: Gerald, Lynn, Jr.
vs.                 DIVISION

PATRICK FARRELL; THE UNKNOWN SPOUSE OF PATRICK FARRELL; ANY AND ALL UNKNOWN
PARTIES CLAIMING BY, THROUGH, UNDER, AND AGAINST THE HEREIN NAMED INDIVIDUAL
DEFENDANT(S) WHO ARE NOT KNOWN TO BE DEAD OR ALIVE, WHETHER SAID UNKNOWN
PARTIES MAY CLAIM AN INTEREST AS SPOUSES, HEIRS, DEVISEES, GRANTEES, OR OTHER
CLAIMANTS; BANK OF AMERICA, N.A.; TENANT #1, TENANT #2, TENANT #3, and TENANT #4
the names being fictitious to account for parties in possession
        Defendant(s).
_____/

### MORTGAGE FORECLOSURE COMPLAINT

      Plaintiff, WELLS FARGO BANK, N.A., AS TRUSTEE UNDER THE POOLING AND SERVICING
AGREEMENT RELATING TO IMPAC SECURED ASSETS CORPORATION, MORTGAGE PASS-THROUGH
CERTIFICATES, SERIES 2005-2, sues Defendants,  PATRICK FARRELL, THE UNKNOWN SPOUSE OF
PATRICK FARRELL; ANY AND ALL UNKNOWN PARTIES CLAIMING BY, THROUGH, UNDER, AND
AGAINST THE HEREIN NAMED INDIVIDUAL DEFENDANT(S) WHO ARE NOT KNOWN TO BE DEAD
OR ALIVE, WHETHER SAID UNKNOWN PARTIES MAY CLAIM AN INTEREST AS SPOUSES, HEIRS,
DEVISEES, GRANTEES, OR OTHER CLAIMANTS; BANK OF AMERICA, N.A.; TENANT #1, TENANT #2,
TENANT #3 and TENANT #4 the names being fictitious to account for parties in possession, and alleges:

### COUNT I - MORTGAGE FORECLOSURE

     1.    This is an in rem action to foreclose a mortgage on real property located and situated in LEE County,
Florida.

     2.    This firm has complied with the notice requirement of the Fair Debt Collection Practices Act, 15
U.S.C. § 1601, as amended. The Notice(s) previously mailed by the firm is attached hereto and incorporated herein
as an Exhibit.

FILE_NUMBER: F07058981                  DOC_ID: M000100



3.    On October 11, 2005, there was executed and delivered a Promissory Note ("Mortgage Note") and a Mortgage ("Mortgage") securing the payment of the Mortgage Note. The Mortgage was recorded on November 9, 2005, in Official Instrument #2005000110952, of the Public Records of LEE County, Florida, (All subsequent recording references are to the public records of LEE County, Florida) and mortgaged the real and personal property ("Property") described therein, then owned by and in possession of the Mortgagor(s). A copy of the original Mortgage is attached hereto and incorporated herein as an Exhibit.

4.    Plaintiff is now the holder of the Mortgage Note and Mortgage.

5.    The Property is now owned of record by Defendant(s), PATRICK FARRELL.

6.    The Mortgage Note and Mortgage are in default. The required installment payment of August 1, 2007, was not paid, and no subsequent payments have been made. The Mortgage is contractually due for the August 1, 2007, payment. The last payment received was applied to the July 1, 2007, installment, and no subsequent payments have been applied to the loan.

7.    Plaintiff declares the full amount payable under the Mortgage Note and Mortgage to be now due.

8.    Plaintiff must be paid $277,105.62 in principal on the Mortgage Note and Mortgage, together with interest from July 1, 2007, late charges, and all costs of collection including title search expenses for ascertaining necessary parties to this action and reasonable attorney's fees.

9.    All conditions precedent to the acceleration of the Mortgage Note and foreclosure of the Mortgage have been performed or have occurred.

10.    Plaintiff has retained the law firm of Florida Default Law Group, P.L., in this action and is obligated to pay it a reasonable fee for its services in bringing this action as well as all costs of collection.

11.    The interests of each Defendant are subject, subordinate, and inferior to the right, title, interest, and lien of Plaintiff's Mortgage with the exception of any special assessments that are superior pursuant to Florida Statutes §159 (2006) and Florida Statutes §170.09 (2006).

12.    THE UNKNOWN SPOUSE OF PATRICK FARRELL may have or claim an interest in the Property that is the subject of this Foreclosure action by virtue of homestead rights, possession, or any right of redemption, or may otherwise claim an interest in the Property.

13.    BANK OF AMERICA, N.A. may have or claim an interest in the Property that is the subject of this Foreclosure action by virtue of a Mortgage recorded in Official Records Instrument #2007000190140, or may otherwise claim an interest in the Property.

14.     TENANT #1, TENANT #2, TENANT #3 and TENANT #4, the names being fictitious to account for parties in possession may claim some interest in the Property that is the subject of this foreclosure action by virtue of an unrecorded lease or purchase option, by virtue of possession, or may otherwise claim an interest in the Property. The names of these Defendants are unknown to the Plaintiff.

WHEREFORE, Plaintiff requests that the Court ascertain the amount due Plaintiff for principal and interest on the Mortgage Note and Mortgage and for late charges, abstracting, taxes, expenses and costs, including attorney's fees, plus interest thereon; that if the sums due Plaintiff under the Mortgage Note and Mortgage are not paid immediately, the Court foreclose the Mortgage and the Clerk of the Court sell the Property securing the indebtedness to satisfy Plaintiff's mortgage lien in accordance with the provisions of Florida Statutes §45.031 (2006); that the rights, title and interest of any Defendant, or any party claiming by, through, under or against any Defendant named herein or hereafter made a Defendant be forever barred and foreclosed; that the Court appoint a receiver of the Property and of the rents, issues, income and profits thereof, or in the alternative, order sequestration of rents, issues, income and profits pursuant to Florida Statutes §697.07 (2006); and that the Court retain jurisdiction of this action to make any and all further orders and judgments as may be necessary and proper, including the issuance of a writ of possession and the entry of a deficiency decree, when and if such deficiency decree shall appear proper, if borrower(s) has not been discharged in bankruptcy.

<u>**COUNT II – RE-ESTABLISHMENT OF NOTE**</u>

15.     This is an action to re-establish a lost Mortgage Note pursuant to Florida Statutes §673.3091 (2006).

16.     Plaintiff incorporates by reference the allegations previous pled as fully set forth herein.

17.     The Plaintiff and the Defendants named herein are the only persons known to Plaintiff to have an interest for or against the re-establishment of the Mortgage Note.

18.     Plaintiff was in possession of the Mortgage Note and entitled to enforce it when loss of possession occurred or Plaintiff has been assigned the right to enforce the Mortgage Note. (Plaintiff does not presently have a copy of the note, but is seeking to obtain a copy, and will file a copy with the Court when obtained.)

19.     The terms of the Note are as follows:

   a.     Original loan amount:  $ 283,000.00

   b.     Amount of monthly principal and interest payment:  $1742.48

   c.     Interest rate: 6.25000%

   d.     Loan beginning date:  October 11, 2005

3

20.    At some time between October 11, 2005, and the present, the Mortgage Note has either been lost or destroyed and the Plaintiff is unable to state the manner in which this occurred. After due and diligent search, Plaintiff has been unable to obtain possession of the Mortgage Note.

21.    The Mortgage Note has not been seized or transferred by Plaintiff.

WHEREFORE, Plaintiff requests that the Court re-establish the Mortgage Note which this Mortgage secures.

Florida Default Law Group, P.L.
P.O. Box 25018
Tampa, Florida 33622-5018
(813) 251-4766

By:_____

Brianna Finch
FLORIDA BAR NO. 37467
Courtney E. Nicholson
FLORIDA BAR NO. 13190

GMAC-CONV–R-abiven

## ADAM JUSTIN HARDMAN
## FLORIDA BAR
## NO. 0037533

4

## FLORIDA DEFAULT LAW GROUP, P.L.
ATTORNEYS AT LAW
9119 CORPORATE LAKE DRIVE
3RD FLOOR
TAMPA, FLORIDA 33634

Please reply to:                                                                 Telephone (813) 251-4766
Post Office Box 25018                                                        Telefax (813) 251-1541
Tampa, FL 33622-5018

December 03, 2007

PATRICK FARRELL
2904 NW 14TH TERRACE
CAPE CORAL, FL  33993-0000

Re:

| | |
|---|---|
| Loan Number: | 0359244301 |
| Mortgage Servicer | GMAC MORTGAGE, LLC |
| Creditor to whom the debt is owed: | WELLS FARGO BANK, N.A., AS TRUSTEE UNDER THE POOLING AND SERVICING AGREEMENT RELATING TO IMPAC SECURED ASSETS CORPORATION, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-2 |
| Property Address: | 2904 NW 14TH TERRACE, CAPE CORAL, FL  33993-0000 |
| Our File No.: | F07058981 |

Dear Borrower:

The law firm of Florida Default Law Group, P.L. (hereinafter referred to as "law firm") has been retained to represent WELLS FARGO BANK, N.A., AS TRUSTEE UNDER THE POOLING AND SERVICING AGREEMENT RELATING TO IMPAC SECURED ASSETS CORPORATION, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-2 with regards to its interests in the promissory Note and Mortgage executed by PATRICK FARRELL  on October 11, 2005.  Pursuant to the terms of the promissory Note and Mortgage, our client has accelerated all sums due and owing, which means that the entire principal balance and all other sums recoverable under the terms of the promissory Note and Mortgage are now due.

As of the date of this letter, the amount owed to our client is $289,466.04, which includes the unpaid principal balance, accrued interest through today, late charges, and other default-related costs recoverable under the terms of the promissory Note and Mortgage.   Additional interest will accrue after the date of this letter.

This correspondence is being sent to comply with the Fair Debt Collection Practices Act and should not be considered a payoff letter. Our client may make advances and incur fees and expenses after the date of this letter which are recoverable under the terms of the promissory Note and Mortgage.  Therefore, if you wish to receive figures to reinstate (bring your loan current) or pay off your loan through a specific date, please contact this law firm at (813) 251-4766 or client.services@defaultlawfl.com.

FILE_NUMBER: F07058981                               DOC_ID: M005104



Unless you notify this law firm within thirty (30) days after your receipt of this letter that the validity of this debt, or any portion thereof, is disputed, this law firm will assume that the debt is valid. If you do notify this law firm in writing within thirty (30) days after receipt of this letter that the debt, or any portion thereof, is disputed, this law firm will obtain verification of the debt or a copy of the judgment against you, if any, and mail it to you. Also, upon your written request within thirty (30) days after your receipt of this letter, this law firm will provide you with the name and address of the original creditor, if different from the current creditor. Florida Default Law Group, P.L. is a debt collector. This law firm is attempting to collect a debt, and any information obtained will be used for that purpose.

All written requests should be addressed to Brianna Finch, Florida Default Law Group, P.L., P.O. Box 25018, Tampa, Florida 33622-5018.

This law firm is in the process of filing a Complaint on the promissory Note and Mortgage to foreclose on real estate. The advice in this letter pertains to your dealings with this law firm as a debt collector. It does not affect your dealings with the Court, and in particular, it does not change the time at which you must answer the Complaint. The Summons is a command from the Court, not from this law firm, and you must follow its instructions even if you dispute the validity or amount of the debt. The advice in this letter also does not affect this law firm's relations with the Court. This law firm may file papers in the suit according to the Court's rules and the judge's instructions.

Finally, if you previously received a discharge in a bankruptcy involving this loan and did not sign a reaffirmation agreement, then this letter is not an attempt to collect a debt from you personally. This law firm is seeking solely to foreclose the creditor's lien on real estate and this law firm will not be seeking a personal money judgment against you.

If you have questions regarding this matter, please do not hesitate to contact this law firm.

Florida Default Law Group, P.L.
Attorneys for WELLS FARGO BANK, N.A., AS TRUSTEE
UNDER THE POOLING AND SERVICING AGREEMENT
RELATING TO IMPAC SECURED ASSETS CORPORATION,
MORTGAGE PASS-THROUGH CERTIFICATES, SERIES
2005-2

BRIANNA FINCH

## NOTICE

**Florida Default Law Group, P.L. is a debt collector. This Firm is attempting to collect a debt, and information obtained may be used for the purpose.**

INSTR # 2005000110952, Doc Type MTG, Pages 16, Recorded 11/09/2005 at 09:44 AM,
Charlie Green, Lee County Clerk of Circuit Court, Mtg Doc:  $990.50 Int. Tax
$566.00 Rec. Fee  $137.50 Deputy Clerk JCASOLA

AFTER RECORDING RETURN TO:
PINNACLE FINANCIAL
CORPORATION

2611 TECHNOLOGY DRIVE

ORLANDO, FL 32804
ATTN:    POST CLOSING

THIS DOCUMENT PREPARED BY:
MARILYN BERMINGHAM

PINNACLE FINANCIAL
CORPORATION D/B/A TRI-STAR
LENDING GROUP
2611 TECHNOLOGY DRIVE

ORLANDO, FL 32804

1024-973415

[Space Above This Line For Recording Data]

## MORTGAGE

FARRELL
LOAN #: 132030973
MIN:    100062701320309731
PIN:    05-44-23-C1-04078.0370

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3,
11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in
Section 16.

(A) "Security Instrument" means this document, which is dated OCTOBER 11, 2005     , together with
all Riders to this document. Single
(B) "Borrower" is PATRICK  FARRELL,

Borrower is the mortgagor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this
Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and
telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "Lender" is PINNACLE FINANCIAL CORPORATION D/B/A TRI STAR LENDING GROUP

Lender is a  CORPORATION                                 organized and existing under the laws of
FLORIDA                    , Lender's address is   2611 TECHNOLOGY DRIVE,
ORLANDO, FL 32804

(E) "Note" means the promissory note signed by Borrower and dated   OCTOBER 11, 2005     . The Note
states that Borrower owes Lender
TWO HUNDRED EIGHTY-THREE THOUSAND AND 00/100
Dollars (U.S. $  283,000.00   ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than  NOVEMBER 1, 2035     .
(F) "Property" means the property that is described below under the heading "Transfer of Rights in
the Property."

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010 1/01        (page 1 of 14 pages)
DOCUKFL1
DOCUKFL1.VTX  09/23/2005

INSTR # 2005000110952 Page Number: 2 of 16

132030973

**(G)** "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H)** "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider  ☐ Condominium Rider  ☐ Second Home Rider
☐ Balloon Rider  ☐ Planned Unit Development Rider  ☐ Biweekly Payment Rider
☐ 1-4 Family Rider  ☒ Other(s) [specify] PREPAYMENT RIDER

**(I)** "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)** "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** "**Escrow Items**" means those items that are described in Section 3.

**(M)** "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)** "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)** "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)** "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the

COUNTY                    of    LEE                    :
[Type of Recording Jurisdiction]        [Name of Recording Jurisdiction]

LOTS 37 AND 38, BLOCK 4078, CAPE CORAL, UNIT 57, AS RECORDED IN PLAT BOOK 19 PAGES 124 TO 137, IN THE PUBLIC RECORDS OF LEE COUNTY, FLORIDA

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3010 1/01        (page 2 of 14 pages)
DOCUKFL2
DOCUKFL2.VTX  08/25/2005

132030973

which currently has the address of **2904 N.W. 14TH TERRACE**
[Street]
**CAPE CORAL**                          , Florida      33993          ("Property Address"):
[City]                                              [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

  **1.  Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

  Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

  **2.  Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010 1/01          (page 3 of 14 pages)
DOCUKFL3
DOCUKFL3.VTX   03/25/2005

132030973

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT            Form 3010 1/01          (page 4 of 14 pages)
DOCUKFL4
DOCUKFL4 .VTX   08/25/2005

132030373

RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.   Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.   Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing,

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3010 1/01        (page 5 of 14 pages)
DOCUKFLS
DOCUKFLS .VTX   06/28/2005



132030973

any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010 1/01          *(page 6 of 14 pages)*
DOCUKFLA
DOCUKFL6.VTX   08/25/2005



132030973

Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3010 1/01        *(page 7 of 14 pages)*
DOCUKFL7
DOCUKFL7.VTR    01/25/2005

132030973

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
DOCUKFL8
DOCUKFL8.VTX  08/25/2005                          Form 3010 1/01          (page 8 of 14 pages)



INSTR # 2005000110952 Page Number: 9 of 16

132030973

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010 1/01          (page 9 of 14 pages)
DOCUKF9
DOCUKF9.VTX  01/25/2005



132030973

by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall co ntinue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
DOCUKFL10
DOCUKFLA .VTX   01/25/2005

Form 3010 1/01

(page 10 of 14 pages)

132036973

(d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010 1/01          (page 11 of 14 pages)
DOCUKFL1
DOCUKFL8.VTX   06/25/2005



INSTR # 2005000110952 Page Number: 12 of 16

132030973
NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property.  The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure.  If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release.  Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument.  Borrower shall pay any recordation costs.  Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Attorneys' Fees.  As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

25. Jury Trial Waiver.  The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
DOCUKFL:}
DOCUKFLC.VTX    08/25/2005                                     Form 3010 1/01        (page 12 of 14 pages)

INSTR # 2005000110952 Page Number: 13 of 16

132030973

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____
BORROWER - PATRICK FARRELL - DATE

Signed, sealed and delivered in the presence of:

_____        _____
Witness                                Witness

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010 1/01          (page 13 of 14 pages)
DOCUKFL13
DOCUKFL0. VTX   08/25/2005

INSTR # 2005000110952 Page Number: 14 of 16

132030973

[Space Below This Line For Acknowledgment]

STATE OF    FLORIDA
COUNTY OF  LEE

The foregoing instrument was acknowledged before me this        OCTOBER 11, 2005                            by
PATRICK   FARRELL, ~~A MARRIED MAN~~

who is personally known to me or who has produced _____ *D. L.* _____ as identification.

_____
Notary Public

FRANK DESIDERIO PAIS
Comm# DD0272923
Expires 3/7/2008
Bonded thru (800)432-4254
Florida Notary Assn., Inc

My Commission Expires:

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
DOC#0FL14
DOC#FLE.VTX   08/25/2005
                                    Form 3010 1/01          (page 14 of 14 pages)

INSTR # 2005000110952 Page Number: 15 of 16

Date: OCTOBER 11, 2005
Borrower(s): PATRICK FARRELL, ~A~MARRIED~MAN~

Property Address:    2904 N.W. 14TH TERRACE, CAPE CORAL, FL 33993

## PREPAYMENT PENALTY RIDER

FARRELL
LOAN #: 132030973
MIN:    100062701320309731

(Do not sign this rider before you read it. This security instrument rider provides for the payment of a penalty if
you wish to repay the loan prior to the date provided for repayment in the loan agreement.)

THIS PREPAYMENT PENALTY RIDER IS MADE THIS  11TH     day of  OCTOBER,  2005         ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security
Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure
Borrower's Note (the "Note") to   PINNACLE FINANCIAL CORPORATION D/B/A TRI STAR
LENDING GROUP

ADDITIONAL COVENANTS: Notwithstanding anything to the contrary set forth in the Note or Security
Instrument, Borrower and Lender further covenant and agree as follows:

I have the right to make payments of Principal at any time before they are due.  A payment of Principal
only is known as a "Prepayment".   When I make a Prepayment, I will tell the Note Holder in writing that I am
doing so.

Subject to the Prepayment Penalty specified below, I may make a full Prepayment or partial
Prepayments of my obligation.  The Note Holder will use all of my Prepayments to reduce the amount of
Principal that I owe under this Note.  If I make a partial Prepayment, there will be no changes in the due date or
in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

Prepayment Penalty Rider – Multi-State            Page 1 of 2
DOC6DU01
DOC6DU01.vtx 04/18/2005

INSTR # 2005000110952 Page Number: 16 of 16

132030973

If, within the  36    -month period beginning with the date you execute the Note (the "Penalty Period"), you make a full prepayment, or partial prepayment in any twelve (12)-month period that exceeds twenty percent (20%) of the original principal loan amount, you will pay a prepayment charge as consideration for the Note Holder's acceptance of such prepayment.  The prepayment charge will equal the amount of interest that would accrue during a six (6)-month period on the amount prepaid that exceeds 20% of the original principal balance of the Note, calculated at the rate of interest in effect under the terms of the Note at the time of prepayment, unless otherwise prohibited by applicable law or regulation.  No prepayment penalty will be assessed for any prepayment made after the Penalty Period.

Notwithstanding the foregoing, in the event of a full prepayment concurrent with a bona fide sale of the Property to an unrelated third party after the first    0    month(s) of the term of the Note, no prepayment penalty will be assessed.  In order to avoid the imposition of a prepayment penalty, I will be required to provide the Note Holder with evidence acceptable to the Note Holder of such sale.  For purposes of this exception to the imposition of a prepayment penalty, a sale of the property to a person or entity with whom I have a personal or business relationship (such as a family member, builder, developer or employer) will be presumed NOT to be a bona fide sale of the Property to an unrelated third party.

All other terms and conditions of the Security Instrument remain in full force and effect.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in the Prepayment Penalty Rider.

_BORROWER  PATRICK FARRELL - DATE -    10/11/05_

Prepayment Penalty Rider – Multi-State                         Page 2 of 2
DOCUD002
DOCUD002.VTX 04/18/2005

**Exhibit E**

**Florida State Court Order Vacating Foreclosure Judgment**

## IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT
## IN AND FOR LEE COUNTY, FLORIDA

WELLS FARGO BANK, N.A., AS
TRUSTEE UNDER THE POOLING AND
SERVICING AGREEMENT RELATING
TO IMPAC SECURED ASSETS
CORPORATION, MORTGAGE PASS-
THROUGH CERTIFICATES, SERIES
2005-2,
     Plaintiff,

Case No.: 07-CA-016767

vs.

PATRICK FARRELL, et al,
     Defendants.

### CONSENT ORDER

The parties, Wells Fargo Bank, N.A., as Trustee under the Pooling and Servicing Agreement
Relating to Impac Secured Assets Corporation, Mortgage Pass-Through Certificates, Series 2005-2
("Plaintiff"), and Patrick Farrell ("Defendant"), hereby stipulate to the entry of the following Order.

1.    On or about March 24, 2009 this Court entered a Final Summary Judgment of Mortgage
Foreclosure and a foreclosure sale was scheduled for May 26, 2009, at the Lee County Justice Center,
Florida.

2.    The Foreclosure Sale has not yet occurred.

3.    The parties have agreed to vacate the prior summary judgment entry. The underlying
foreclosure action will remain open as the parties continue to litigate and move toward resolution of
claims.

4.    The March 24, 2009 Final Summary Judgment of Mortgage Foreclosure regarding
Patrick Farrell's mortgage on the property at 2904 NW 14th Terrace, Cape Coral, FL 33993 is hereby set
aside and vacated.

**DONE and ORDERED** this ⟍⟋ day of November, 2010.

1/2106862.1

**/s/ James R. Thompson**

Honorable _____

We so consent:

Patrick Farrell
2904 NW 14th Terrace-Cape
Coral, Fl. 33993

DEFENDANT PRO SE

D. Brian O'Dell (Florida Bar No. 0659665)
Christian W. Hancock (Florida Bar No. 643521)
Bradley Arant Boult Cummings LLP
Bank of America Corporate Center
100 N. Tryon Street, Suite 2690
Charlotte, North Carolina 28202
Telephone: (704) 332-8842
Facsimile: (704) 332-8858

ATTORNEYS FOR DEFENDANT WELLS FARGO BANK,
N.A., AS TRUSTEE UNDER THE POOLING AND
SERVICING AGREEMENT RELATING TO IMPAC
SECURED ASSETS CORP., MORTGAGE PASS-
THROUGH CERTIFICATES, SERIES 2005-2

1/2106862.1

**Exhibit  F**

**Notice of Bankruptcy  dated September 13, 2012**

## IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT
## IN AND FOR LEE COUNTY, FLORIDA

| | |
|---|---|
| PATRICK FARRELL, | |
|     Plaintiff, | Case No.: 07-CA-14942 |
| v. | |
| GMAC; GMAC MORTGAGE LLC; IMPAC SECURED ASSETS CORP; WELLS FARGO BANK, N.A.; et. al., | |
|     Defendants. | |
| WELLS FARGO BANK, N.A., AS TRUSTEE UNDER THE POOLING AND SERVICING AGREEMENT RELATING TO IMPAC SECURED ASSETS CORPORATION, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-2, | Case No.: 07-CA-016767 |
|     Plaintiff, | |
| v. | |
| PATRICK FARRELL, et al, | |
|     Defendants. | |

## GMAC MORTGAGE LLC'S NOTICE OF BANKRUPTCY FILING AND SUPPLEMENTAL SERVICING ORDER

COMES NOW GMAC Mortgage LLC ("GMACM"), by and through its undersigned counsel, in accordance and consistent with section 362(a) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), respectfully submits this Notice of Bankruptcy and Suggestion of Automatic Stay, and states as follows:

1.    On May 14, 2012 (the "Petition Date"), Residential Capital, LLC and certain of its direct and indirect subsidiaries (collectively, the "Debtors"), including GMAC Mortgage, LLC, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the

"Bankruptcy Filing") in the United States Bankruptcy Court for the Southern District of New

York, One Bowling Green, New York, NY 10004-1408 (the "Bankruptcy Court"). The Debtors'

Chapter 11 cases being jointly administered, indexed at case number 12-12020 (MG).

2.    As a result of the Bankruptcy Filing, on the Petition Date, the protections of the

automatic stay codified in section 362(a) of the Bankruptcy Code arose with regard to the

Debtors.    Section 362(a), among other things, operates as an automatic stay of: (i) "the

commencement or continuation, including the issuance or employment of process, of a judicial,

administrative, or other action or proceeding" against the Chapter 11 Debtors (11 U.S.C. §

362(a)(1)); (ii) acts to "obtain possession of property" of the Debtors' Chapter 11  estates (11

U.S.C. § 362(a)(3)); and (iii) acts to "collect, assess, or recover a claim" against the Debtors

arising prior to the Petition Date (11 U.S.C. § 362(a)(6)).

3.    On July 13, 2012, the Bankruptcy Court entered a final supplemental order

granting, among other things, the Debtors' motion for limited relief from the automatic stay to

permit non-Debtor parties in foreclosure and eviction proceedings, borrower bankruptcy cases

and title disputes to continue to assert and prosecute certain defenses, claims and counter-claims

(the "Final Supplemental Order"). Paragraphs 14, 15, 16 and 17 of the Final Supplemental Order

identify the categories of defenses, claims and counter-claims for which the automatic stay has

been modified (the "Permitted Claims").    A copy of the Final Supplemental Order is attached

hereto as **Exhibit A**.

4.    As set forth in the Final Supplemental Order, Permitted Claims are those asserted

by a borrower, mortgagor, or lienholder that relate "exclusively to the property that is the subject

of the loan owned or serviced by a Debtor for the purposes of defending, unwinding, or

otherwise enjoining or precluding any foreclosure, whether in a Judicial State or a Non-Judicial

State, or eviction proceeding…" (Exh. A, ¶ 14(a)).  Claims for monetary relief of any kind or

nature and claims "for relief that if granted, would not terminate or preclude the prosecution and

completion of a foreclosure or eviction" are not Permitted Claims. (*Id.*, ¶ 14(b)).

5.      To the extent that the defenses, claims and counter-claims do not constitute

Permitted Claims, they remain subject to the automatic stay and the continued prosecution of

these claims is prohibited.

6.      With regard to this matter, Patrick Farrell's ("Farrell") Fourth Amended

Complaint[1] contains claims against GMACM for alleged violations of Home Ownership Equity

Protection Act, Real Estate Settlement Procedures Act, Truth in Lending Act, Florida Unfair

Trade Practices Act, and Fraud, Fraudulent Misrepresentation, Breach of Fiduciary Duty, Unjust

Enrichment, and Civil RICO, all seek recovery of monetary damages, and as such are not

Permitted Claims. They remain subject to the automatic stay, and the continued prosecution of

these claims is prohibited.

7.      With regard to this matter, Farrell's remaining allegations[2] (including but not

limited to alleged improper placement of lender-placed insurance, fraud, payoff, settlement, and

res judicata), to the extent these allegations seek to enjoin or preclude foreclosure by GMACM,

are Permitted Claims.

8.      Pursuant to paragraph 23 of the Final Supplemental Order, any dispute regarding

the extent, application and/or effect of the automatic stay under the Final Supplemental Order,

---

[1] The Fourth Amended Complaint appears to be the current complaint in effect in Case No. 07-CA-014942, filed by Farrell on November 30, 2009.

[2] Farrell is a pro se litigant and GMACM has endeavored to construe his filings to accurately identify all allegations in this consolidated action. In this regard, GMACM specifically references the March 30, 2012 filing entitled Patrick Farrell's Answer to Mortgage Foreclosure Complaint, Affirmative Defenses; Counter-claims; Res Judicata; Request for Judicial Notice of IMPAC Letters. However, GMACM recognizes that the Court construes Farrell's arguments liberally and there may be other allegations not detailed herein.

must be heard and determined in the United States Bankruptcy Court for the Southern District of New York, jointly administered under Case No. 12-12020, in accordance with the Case Management Order entered in the Debtors' case [Docket No. 141] and such other and further orders as may be entered by the United States Bankruptcy Court for the Southern District of New York.[3]

9.      This notice has been sent, with a cover letter, to Farrell and all parties listed in the Certificate of Service.


Dated: September 12, 2012                    BRADLEY ARANT BOULT CUMMINGS LLP


                                             By: _____
                                                 Monica L. Wilson (FBN: 89441)
                                                 100 North Tryon Street, Suite 2690
                                                 Charlotte, NC 28202
                                                 Phone: 704-338-6000
                                                 Fax: 704-332-8858
                                                 Primary email: mwilson@babc.com
                                                 Secondary email: mjpalmer@babc.com

                                                 *Attorney for GMAC Mortgage, LLC*

---

[3] A copy of the Case Management Order may be obtained at no charge at http://www.kccllc.net/rescap.

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2012, I served the foregoing via e-mail or first-class United States mail, postage prepaid, upon the following:

Patrick Farrell
2904 NW 14th Terrace
Cape Coral, Florida 33993

Sarah M. Barbaccia, Esq.
Morales Law Group
service@moraleslawgroup.com
*Counsel for Defendant Bank of America, N.A.*

J.Jeffrey Rice
PO Box 2366
Fort Myers, Florida 33902-2366

Karl Carpenter Landsteiner
PO Box 7198
Fort Myers, Florida 33911-7198

Edmund Stuart Whitson
201 North Franklin Street, Suite 2700
Tampa, Florida 33602-5816

Kevin R. Gowan
Rumberger Kirk and Caldwell
kgowen@rumberger.com

OF COUNSEL

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------

In re:

RESIDENTIAL CAPITAL, LLC, et al.,

Debtors.

--------------------------------------------------------------

)
)
)
)
)
)
)
)
)

Case No. 12-12020 (MG)

Chapter 11

Jointly Administered

**FINAL SUPPLEMENTAL ORDER UNDER BANKRUPTCY CODE SECTIONS 105(a),**
**362, 363, 502, 1107(a), AND 1108 AND BANKRUPTCY RULE 9019 (I) AUTHORIZING**
**THE DEBTORS TO CONTINUE IMPLEMENTING LOSS MITIGATION PROGRAMS;**
**(II) APPROVING PROCEDURES FOR COMPROMISE AND SETTLEMENT OF**
**CERTAIN CLAIMS, LITIGATIONS AND CAUSES OF ACTION; (III) GRANTING**
**LIMITED STAY RELIEF TO PERMIT FORECLOSURE AND EVICTION**
**PROCEEDINGS, BORROWER BANKRUPTCY CASES, AND TITLE DISPUTES TO**
**PROCEED; AND (IV) AUTHORIZING AND DIRECTING THE DEBTORS TO PAY**
**SECURITIZATION TRUSTEE FEES AND EXPENSES**

Upon the motion (the "Motion")[1] of Residential Capital, LLC, and certain of its

affiliates, as debtors and debtors in possession (collectively, the "Debtors") for entry of a

supplemental order under Bankruptcy Code sections 105(a), 362, 363, 1107(a) and 1108, and

Bankruptcy Rule 9019 (i) authorizing the Debtors to continue implementing loss mitigation

programs; (ii) approving procedures for the compromise and settlement of certain claims,

litigations and causes of action in the ordinary course of the Debtors' business; (iii) granting

limited stay relief to permit (w) borrowers or their tenants, as applicable, to prosecute direct

claims and counter-claims in foreclosure and eviction proceedings (including in states in which

non-judicial foreclosure is followed), (x) borrowers to prosecute certain actions in borrower

bankruptcy cases, (y) the Debtors to prosecute foreclosure actions in those circumstances where

---

[1]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.
      Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief
      granted herein may refer to http://www.kccllc.net/rescap for additional information.

they service senior mortgage loans and own the junior mortgage loans on the underlying

property, and (z) third party lien holders to prosecute direct claims and counter-claims in actions

involving the amount, validity or priority of liens on properties subject to foreclosure

proceedings; and (iv) authorizing and directing the Debtors to pay certain securitization trustee

fees and expenses; and the Court having considered the Whitlinger Affidavit and the Bocresion

Declaration; and the Court having entered the Interim Supplemental Order on June 15, 2012

[Docket No. 391]; and the Court having entered a final order on June 15, 2012 granting the GA

Servicing Motion on a final basis [Docket No. 401]; and the Court having entered a final order

on June 15, 2012 granting the Non-GA Servicing Motion on a final basis [Docket No. 402]; and

it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157

and 1334; and it appearing that venue of these Chapter 11 cases and the Motion in this district is

proper pursuant to 28 U.S.C §§ 1408 and 1409; and it appearing that this proceeding on the

Motion is a core proceeding pursuant to 28 U.S.C. § 157(b); and sufficient notice of the Motion

having been given and it appearing that no other or further notice need be provided; and the

National Association of Consumer Bankruptcy Attorneys, on its own behalf and in a

representative capacity, two individuals who are debtors under Chapter 13, and Edward Boltz,

counsel for those individuals, having filed jointly the Limited Omnibus Objection To The

Servicing Orders And Debtors' May 31, 2012 Motion For A Supplemental Order [Docket No.

221] (the "NACBA Objection"); and the Committee having filed the Omnibus Response And

Reservation Of Rights Of The Official Committee Of Unsecured Creditors To Certain Of The

Debtors' First Day Motions [Docket No. 240]; and the Debtors having filed the Omnibus Reply

To Objections To Entry Of Final Orders For Specific "First Day" Motions And Related Relief

[Docket. No. 254]; and upon the record of the hearing; and it appearing that the relief requested

by the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in

interest; and after due deliberation thereon; and any objections to the Motion, including the

NACBA Objection, having been withdrawn, resolved, or overruled on the merits; and sufficient

cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.     The Motion is GRANTED on a final basis, as set forth herein, and any

objections to the Motion are hereby overruled;

<u>Loss Mitigation Programs</u>

2.     The Debtors are authorized, but not directed in their sole and absolute

discretion and subject to available funding, to continue developing and implementing loss

mitigation programs and procedures in the ordinary course of their businesses *nunc pro tunc* to

the Petition Date, including, but not limited to, making incentive payments to borrowers in

connection with the closing of short sales, or vacating properties in lieu of foreclosure or eviction

proceedings, or in the form of borrower rebates for loan payoffs including honoring all

obligations related thereto that accrued in whole or in part prior to the Petition Date (collectively,

the "<u>Loss Mitigation Programs</u>"); <u>provided</u>, <u>however</u>, that the aggregate cash payments made by

the Debtors to individual borrowers under the Loss Mitigation Programs that are not reimbursed

to the Debtors shall not exceed $550,000 per month (the "<u>Monthly Cap</u>"), absent consent of the

Committee or further order of the Court; <u>provided</u>, <u>further</u>, <u>however</u>, that to the extent the

Debtors do not exceed the Monthly Cap in any month they shall be entitled to utilize the

difference between the actual amount and the Monthly Cap in any succeeding month.  The

Debtors shall provide monthly reports to the Committee and the Office of the United States

Trustee for the Southern District of New York (the "<u>U.S. Trustee</u>"), which reports shall be in a

3

form agreed to by the Debtors and the Committee and such additional information as shall be

reasonably requested by the Committee, in each case, concerning the Loss Mitigation Programs.

3.      Cash payments made by the Debtors to individual borrowers under the

Loss Mitigation Programs for which the Debtors are not reimbursed shall not exceed $4.2

million in the aggregate, absent consent of the Committee or further order of the Court.  For the

avoidance of doubt, the limitation on the amount of cash payments provided for in this paragraph

3 is in addition to the limitation on the amount of cash payments provided for in paragraph 12

hereof.

Settlement Procedures

4.      The Debtors are authorized, but not directed to compromise and settle

certain claims brought by the Debtors against any non-insider third parties in connection with

foreclosure, eviction, or borrower bankruptcy proceedings (each a "Settling Party") or by a

Settling Party against any of the Debtors (each, a "Claim") in accordance with the following two-

tiered procedures (the "Settlement Procedures"):

> Tier I:  The Debtors, in their sole discretion, may enter into,
> execute and consummate written agreements of settlement with
> respect to Claims that will be binding on the Debtors and their
> estates without further action by this Court or notice to any party
> and grant such Settling Parties cash payments or allowed
> prepetition claims in amounts not to exceed $40,000 in full
> settlement of such Claim (each, a "Tier I Settlement").

> Tier II:  The Debtors may enter into, execute and consummate
> written agreements of settlement with respect to Claims that will
> be binding on the Debtors and their estates without further action
> by this Court or notice to any party and grant such Settling Parties
> cash payments or allowed prepetition claims in amounts exceeding
> $40,000 but less than $100,000 in full settlement of such Claims
> (each, a "Tier II Settlement"); provided, that in each case:

> (a) The Debtors must provide advance written notice (by
> formal or informal means, including by e-mail correspondence) of
> the terms of any Tier II Settlement to (x) the U.S. Trustee, 33

4

Whitehall Street, 21st Floor, New York, New York 10004, Attn:
Brian S. Masumoto, (y) counsel for the Committee, Kramer Levin
Naftalis & Frankel LLP, 1177 Avenue of the Americas New York,
NY 10036, Attn: Kenneth H. Eckstein and Douglas H. Mannal;
and (z) counsel to the administrative agent for the Debtors'
providers of debtor in possession financing, Skadden, Arps, Slate,
Meagher & Flom LLP, 4 Times Square, New York, New York
10036, Attn: Kenneth S. Ziman and Jonathan H. Hofer
(collectively the "Notice Parties")

(b) Those Notice Parties wishing to object to any proposed
Tier II Settlement must serve a written objection (by formal or
informal means, including by e-mail correspondence) on the
Debtors, so that it is received by no later than 4:00 p.m. (prevailing
Eastern Time) on the day that is seven (7) calendar days from the
date the Notice Parties received written notice of such Tier II
Settlement (the "Settlement Objection Deadline").  Objections
should be addressed to the proposed attorneys for the Debtors,
Morrison & Foerster LLP, 1290 Avenue of the Americas, New
York, New York 10104, Attn: Larren M. Nashelsky
(LNashelsky@mofo.com) and Norman S. Rosenbaum
(NRosenbaum@mofo.com).

(c) If the Debtors receive a timely objection from a Notice
Party, the parties will confer and attempt to resolve any
differences.  Failing that, the Debtors may petition the Court for
approval of the Tier II Settlement in accordance with any case
management orders entered in the Chapter 11 cases.  An objection
by a Notice Party with respect to a given Tier II Settlement shall
not delay the finality or effectiveness of any other settlement to
which an objection has not timely been delivered.

(d) If the Debtors do not receive a written objection to a
Tier II Settlement from a Notice Party by the Settlement Objection
Deadline, then such Tier II Settlement shall be deemed approved
and the Debtors and Settling Parties may carry out the terms of
such Tier II Settlement without further notice or Court approval.

5.     The Debtors shall be required to seek approval from the Court in order to

enter into and consummate any proposed settlement of a Claim with a settlement amount in

excess of $100,000.

6.     The Debtors are authorized in their sole discretion, but not directed, to

settle claims where some or all of the consideration is being provided by a third party and/or

5

where the Debtors are releasing claims against creditors or third parties provided the Debtors otherwise comply with the Settlement Procedures.

7.      The Settlement Procedures are without prejudice to the right of the Debtors to seek an order of this Court approving additional or different procedures with respect to specific claims or categories of claims.  For claims relating to matters specified in paragraphs 14(a) and 15(a) of this Order that were resolved pursuant to a settlement prior to the Petition Date, but where such settlement has not been consummated, the Debtors are authorized, but not directed to, consummate said settlements in accordance with the Settlement Procedures set forth in this Order.

8.      Notwithstanding anything to the contrary contained herein, this Order shall not affect, impair, impede or otherwise alter the right of the Debtors to resolve any prepetition or postpetition controversy arising in the ordinary course of the Debtors' businesses, or resolve any controversy authorized by any other order of the Court.

9.      Nothing in this Order or the Motion shall constitute a determination or admission of liability or of the validity or priority of any claim against the Debtors, and the Debtors reserve their rights to dispute the validity or priority of any claim asserted.

10.      The authority granted in this Order shall not replace or obviate the need to comply with the Debtors' internal procedures, legal or otherwise, for authorizing the settlements contemplated in the Motion.  All settlements made pursuant to the Settlement Procedures shall, to the extent applicable, be made in accordance with the Debtors' settlement procedures in effect as of the Petition Date (the "Internal Settlement Protocol") and as may be amended from time; provided, however, that the Debtors shall provide the Committee and the U.S. Trustee with notice of any material changes to the Internal Settlement Protocol.

11.     The Debtors shall provide monthly reports to the Committee and the U.S. Trustee, which reports shall be in a form agreed to by the Debtors and the Committee, and such additional information as shall be reasonably requested by the Committee, in each case, concerning settlements of any Claims pursuant to the Settlement Procedures.

12.     Cash payments made by the Debtors under the Settlement Procedures shall not exceed $4 million in the aggregate, absent consent of the Committee or further order of the Court.

13.     Any period prescribed or allowed by the Settlement Procedures shall be computed in accordance with Bankruptcy Rule 9006.

## Limited Relief from Automatic Stay

### *Borrower Foreclosure And Eviction Proceedings*

14.     The stay imposed by section 362(a) of the Bankruptcy Code applicable to (a) pending and future foreclosure actions initiated by the Debtors or in those states providing for non-judicial foreclosures, by a borrower; and (b) pending and future eviction proceedings with respect to properties for which a foreclosure has been completed or is pending, is hereby modified pursuant to the following terms and conditions:

(a)     except as set forth herein, a borrower, mortgagor, or lienholder (each, an "Interested Party") shall be entitled to assert and prosecute direct claims and counter-claims relating exclusively to the property that is the subject of the loan owned or serviced by a Debtor for the purposes of defending, unwinding, or otherwise enjoining or precluding any foreclosure, whether in a Judicial State or a Non-Judicial State, or eviction proceeding, where a final judgment (defined as any judgment where the right to appeal or seek reconsideration has expired or has been exhausted) permitting the foreclosure or

7

eviction has not been awarded or, with respect to completed foreclosure sales in Non-Judicial States, where any applicable challenge period has not yet expired, and to prosecute appeals with respect to any such direct claims or counter-claims;

(b)     absent further order of the Court, the automatic stay shall remain in full force and effect with respect to all pending and future Interested Party direct claims and counter-claims:  (i) for monetary relief of any kind and of any nature against the Debtors, except where a monetary claim must be plead in order for an Interested Party to a assert a claim to defend against or otherwise enjoin or preclude a foreclosure (each a "Mandatory Monetary Claim"); (ii) for relief that if granted, would not terminate or preclude the prosecution and completion of a foreclosure or eviction; or (iii) asserted in the form of a class action or collective action;

(c)     absent further order of the Court, the stay shall remain in full force and effect with respect to any party seeking to intervene to assert related claims against the Debtors or any class action or collective action brought by any Interested Party on behalf of any other Interested Party or class of Interested Parties;

(d)     under no circumstances shall an Interested Party be entitled to enforce against, recoup, setoff or collect from the Debtors any judgment or award related to any direct claim or counter-claim for which the automatic stay has been lifted by the terms of this Order, including, without limitation, a Mandatory Monetary Claim;

(e)     the Debtors shall retain the right, upon appropriate motion and notice to any affected Interested Party, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by this Order and to the extent such relief is sought, the

8

Debtors will not object to the Interested Party's telephonic participation at any hearing on the motion; and

        (f)      nothing set forth herein shall preclude or limit any Interested Party from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest.

*Borrower Bankruptcy Proceedings*

        15.      The automatic stay imposed by section 362(a) of the Bankruptcy Code applicable against a borrower who currently has filed, or in the future files, for bankruptcy protection under any chapter of the Bankruptcy Code (a "<u>Bankruptcy Borrower</u>"), is hereby modified pursuant to the following terms and conditions:

        (a)      except as set forth herein, a Bankruptcy Borrower or a trustee duly appointed under the Bankruptcy Code in the Bankruptcy Borrower's bankruptcy case (a "<u>Bankruptcy Trustee</u>") shall be entitled to:  (i) assert and prosecute or continue to prosecute an objection to the Debtors' proof of claim filed in the Bankruptcy Borrower's bankruptcy case; (ii) assert and prosecute or continue to prosecute an objection to the Debtors' motion for relief from the automatic stay filed in the Bankruptcy Borrower's bankruptcy case; (iii) commence or continue to prosecute against the Debtors a motion or adversary proceeding, as applicable, to determine the validity, priority or extent of a Debtor's lien against the Bankruptcy Borrower's property; (iv) commence or continue to prosecute against the Debtors a motion or adversary proceeding, as applicable, to reduce (including to reduce to $0) or fix the amount of the Debtors' claim or lien against the Bankruptcy Borrower's property; (v) prosecute appeals with respect to items (i) through (iv) above; (vi) seek an accounting from the Debtors with respect to the Bankruptcy

9

Borrower's loan; and (vii) enter into, execute and consummate a written agreement of settlement with the Debtors where the Debtors elect to enter into such settlement in their sole discretion (but subject to the Settlement Procedures), to resolve items (i) through (vi) above;

        (b)      except as set forth herein, a Bankruptcy Borrower shall be entitled to (i) engage in court-supervised or court-authorized loss-mitigation programs regarding the Bankruptcy Borrower's loan; and (ii) engage in discussions with the Debtors and execute a modification of the Bankruptcy Borrower's loan or otherwise discuss, enter into and consummate settlements of claims and liens in accordance with the ordinary course of the Debtors' business and applicable law;

        (c)      absent further order of the Court, the automatic stay shall remain in full force and effect with respect to all Bankruptcy Trustee's and Bankruptcy Borrower's direct claims, counter-claims, motions or adversary proceedings: (i) for monetary relief of any kind and of any nature against the Debtors; (ii) for violation of any local, state or federal statute or other law in connection with the origination of the Bankruptcy Borrower's loan; (iii) for relief that if granted, would have no effect on the amount, validity or priority of the Debtors' claim or lien against a Bankruptcy Borrower or the property of the Bankruptcy Borrower securing such claim or lien of the Debtors; or (iv) asserted in the form of a class action or collective action; provided however, a Bankruptcy Trustee or Bankruptcy Borrower, solely in connection with their objections to Debtors' proof of claim permitted by paragraph 15(a)(i) or proceedings permitted by 15(a)(iii), may assert claims of the type covered by subsection (i) or (ii) of this paragraph 15(c);

(d)    absent further order of the Court, the automatic stay shall remain in full force and effect with respect to any party seeking to intervene to assert related claims against the Debtors or any class action or collective action brought by any Bankruptcy Borrower on behalf of any other class of borrowers;

(e)    with the sole exception of objections to Debtors' proofs of claim permitted by paragraph 15(a)(i) above and proceedings described in 15(a)(iii) above and solely for purposes of reducing any such claim and not for the purpose of obtaining an affirmative recovery or award, under no circumstances shall a Bankruptcy Borrower or Bankruptcy Trustee be entitled to recoup, setoff or collect from the Debtors any judgment or award related to any direct claim or counter-claim for which the automatic stay has been lifted by the terms of this Order;

(f)    the Debtors shall retain the right, upon appropriate motion and notice to any Bankruptcy Borrower or Bankruptcy Trustee, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by this Order and to the extent such relief is sought, the Debtors will not object to the Interested Party's telephonic participation at any hearing on the motion; and

(g)    nothing set forth herein shall preclude or limit any Bankruptcy Borrower or Bankruptcy Trustee from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest.

*Foreclosures By The Debtors On Senior Loans*

16.    The stay imposed by section 362(a) of the Bankruptcy Code applicable to pending and future foreclosure actions initiated by the Debtors in cases where they act as

ny-1046923

servicer for the Senior Loan and also own (or for which the applicable public land records otherwise reflect that the Debtors hold an interest) the Junior Loan with respect to the underlying property (collectively, the "Junior Foreclosure Actions") is hereby modified pursuant to the following terms and conditions:

(a)     except as otherwise set forth herein, the Debtors shall be entitled to assert and prosecute Junior Foreclosure Actions, whether in a Judicial State or a Non-Judicial State;

(b)     the Debtors shall be entitled to take such actions as are necessary to extinguish the lien with respect to a Junior Loan or to otherwise ensure clear and marketable title with respect to the property underlying a Senior Loan in connection with any sale or other disposition of such property;

(c)     the Debtors shall be entitled to seek all appropriate relief with respect to a Senior Loan in connection with the bankruptcy cases of a Bankruptcy Borrower without further order of the Court; and

(d)     the Debtors shall provide monthly reports to the Committee and the U.S. Trustee, which reports shall be in a form agreed to by the Debtors and the Committee, and such additional information as shall be reasonably requested by the Committee, in each case, concerning Junior Foreclosure Actions.

D.     *Actions Involving Amount, Validity Or Priority Of Liens*

17.     The stay imposed by section 362(a) of the Bankruptcy Code applicable to actions involving the amount, validity, and/or priority of liens commenced by third parties purporting to have a lien interest or other claim ("Third Party Claimants") with respect to

12

properties that are subject to mortgages owned or serviced by the Debtors ("Title Disputes") is

hereby modified pursuant to the following terms and conditions:

(a)     except as otherwise set forth herein, a Third Party Claimant shall be

entitled to assert and prosecute direct claims and counter-claims relating exclusively to the

property that is the subject of the loan owned or serviced by a Debtor in connection with

any Title Dispute, and to prosecute appeals with respect to any such direct claims or

counter-claims;

(b)     absent further order of the Court, the automatic stay shall remain in

full force and effect with respect to all pending and future Third Party Claimant direct

claims and counter-claims:  (i) for monetary relief of any kind and of any nature against the

Debtors; (ii) for relief that is not necessary for the resolution of the Title Dispute; or

(iii) asserted in the form of a class action or collective action;

(c)     absent further order of the Court, the stay shall remain in full force

and effect with respect to any party seeking to intervene to assert related claims against the

Debtors or any class action or collective action brought by any Third Party Claimant on

behalf of any other Third Party Claimant or class of Third Party Claimants;

(d)     under no circumstances shall a Third Party Claimant be entitled to

enforce against, recoup, setoff or collect from the Debtors any judgment or award related

to any direct claim or counter-claim for which the automatic stay has been lifted by the

terms of the Order;

(e)     the Debtors shall be entitled to take such actions as are necessary to

clear title with respect to property that is subject to a Title Dispute or to otherwise ensure

13

clear and marketable title with respect to such property in connection with any sale, foreclosure or other disposition of such property;

(f)     the Debtors shall retain the right, upon appropriate motion and notice to any affected Third Party Claimant, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by the Order; and

(g)     nothing set forth herein shall preclude or limit any Third Party Claimant from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest.

Payment of Securitization Trustee Fees and Expenses

18.     The Debtors shall continue to perform all of their respective servicing duties and servicing related duties, including, but not limited to, their duties as master servicer, under all the governing agreements (including, without limitation, pooling and servicing agreements, servicing agreements, or any other agreements concerning or relating to the Debtors' obligations to reimburse and/or indemnify for reasonable fees, costs, expenses, liabilities, and/or losses) (collectively, the "Agreements") relating to Debtor-sponsored securitization transactions and non-Debtor sponsored securitization transactions to which any of The Bank of New York Mellon Trust Company, N.A., Wells Fargo Bank, N.A., Deutsche Bank Trust Company Americas, Deutsche Bank National Trust Company, or U.S. Bank National Association, or any affiliate of such entities acts as trustee for which any Debtor performs servicing duties, in each of their respective capacities as trustee (collectively, the "Trustees") and one or more of the Debtors is a party, including but not limited to, making all principal, interest or other servicing advances (including property protection advances) and reimbursing, indemnifying, defending and holding harmless the Trustees and the securitization trusts for any liability, loss, or reasonable fees, cost

14

or expense (including fees and disbursements of counsel or agents) incurred by any of the

Trustees in the performance of their duties or their administration of the trusts or other agencies

under the Agreements to the extent required by the Agreements.  For the avoidance of doubt, the

Debtors shall pay the reasonable, actual out-of-pocket costs and expenses of the Trustees in

connection with reviewing and analyzing the request by the Debtors to approve the MBS

Settlement Agreement, and in connection with reviewing and analyzing amendments to the

Agreements as necessary or appropriate in connection with any proposed Chapter 11 plan, the

MBS Settlement Agreement or the Platform Sale.  Notwithstanding the foregoing, nothing in this

paragraph 18 shall require any Debtor (i) to repurchase any mortgage loans on the basis of

alleged breaches of representations, warranties or other requirements of the Agreements, or make

any make-whole payments with respect to any mortgage loans pursuant to the Agreements; or

(ii) to enforce, as against any other Debtor entity or any non-Debtor affiliate, any provision of the

Agreements under which such other Debtor entity or non-Debtor affiliate are required to

repurchase any mortgage loans on the basis of alleged breaches of representations, warranties or

other requirements of the Agreements, or make any make-whole payments with respect to any

mortgage loans pursuant to the Agreements; and nothing in this paragraph 18 shall be deemed to

impose liability on any Debtor with respect to such alleged breaches or make-whole payment

requirements.

19.     The Trustees shall submit invoices to (a) counsel to the Debtors,

(b) counsel to the Committee, and (c) the U.S. Trustee, and all such invoices shall include (i) an

itemization of all professional fees by task with a detailed description of the work performed in

connection with such task, (ii) a description of related expenses, and (iii) a description of any

indemnity claims.  Thereafter, within thirty (30) days of presentment of such invoices, if no

written objections to the reasonableness of the fees and expenses charged in any such invoice (or portion thereof) is made by the Debtors, the Committee, or the U.S. Trustee, the Debtors are authorized and directed to pay all reasonable fees, costs and expenses and all indemnity claims referred to in paragraph 18 (including without limitation, attorney, financial advisor, consultant and expert fees and costs) incurred postpetition by any of the Trustees relating to the performance of each of the Trustees' duties or the administration of the trusts or other agencies under the Agreements (the "Trustee Expenses") that are not subject to an objection by the Debtors, the Committee, or the U.S. Trustee without further order from the Court. Any objection to the payment of the Trustee Expenses shall be made only on the basis of "reasonableness," and shall specify in writing the amount of the contested fees and expenses and a detailed basis for such objection. To the extent an objection only contests a portion of an invoice, the undisputed portion thereof shall be promptly paid. If any such objection to payment of an invoice (or any portion thereof) is not otherwise resolved between the Debtors, the Committee, or the U.S. Trustee and the issuer of the invoice, either party may submit such dispute to the Court for a determination as to the reasonableness of the disputed amounts. This Court shall resolve any dispute as to the reasonableness of any fees and expenses.

20. To the extent either the Committee, or the RMBS Trustees determine that the Trustee Expenses were improperly or mistakenly allocated to an RMBS trust or to the Debtors' estates, the Committee and the RMBS Trustees reserve the right to seek to correct the allocation of the Trustee Expenses as between the RMBS trusts or the Debtors' estates in accordance with the applicable Agreement, and such adjustment shall be the Committee's and RMBS Trustees' sole remedy arising from a misallocation. All Trustee Expenses for which (a) no objection under paragraph 19 has been interposed, or (b) where such an objection has been

interposed and the amount of Trustee Expenses determined by the Court to be reasonable, shall

be entitled to administrative expense priority in the Debtors' Chapter 11 cases notwithstanding

the entry of an order authorizing the assumption and assignment or rejection of any Agreement.

However, the Debtors will not be responsible for any fees, costs and expenses incurred with

respect to any Agreement after the entry of an order in the Debtors' Chapter 11 cases authorizing

the rejection of such Agreement.

21.     If any or all of the provisions of this Order are hereafter reversed,

modified, limited, vacated or stayed, such reversal, stay, modification or vacatur shall not affect

the validity, priority or enforceability of any Trustee Expenses incurred prior to the actual receipt

of written notice by the Trustees of the effective date of such reversal, stay, modification or

vacatur (the "Notice Date").  Notwithstanding any such reversal, stay, modification or vacatur,

the payment of any Trustee Expenses incurred prior to the Notice Date and reimbursed prior to

or after the Notice Date by the Debtors shall be governed in all respects by the original

provisions of this Order, and the Trustees shall be entitled to all of the rights, remedies,

privileges and benefits granted in this Order with respect to payment of Trustee Expenses.

22.     Notwithstanding the Debtors' obligations set forth in paragraphs 18 and

19, nothing in this Order shall be deemed to limit, extinguish, or prejudice the Debtors' rights in

any way to assume and assign or reject any Agreement in accordance with Bankruptcy Code

section 365.

Other Relief

23.     Any disputes regarding the extent, application and/or effect of the

automatic stay under this Order shall be heard and determined in the Debtors' jointly

administered bankruptcy cases pending in the United States Bankruptcy Court for the Southern

17

District of New York, Case No. 12-12020 in accordance with the Case Management Order entered in the Debtors' cases [Docket No. 141] and such other and further orders as may be entered by the Court.

24. The Debtors are authorized and empowered to take all actions and execute such documents as may be necessary or appropriate to carry out the relief granted herein.

25. Nothing herein shall be deemed to limit the rights of the Debtors to operate their business in the ordinary course, and no subsequent order shall be required to confirm such rights.

26. Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall constitute, nor is it intended to constitute, the assumption of any contract or agreement under Bankruptcy Code section 365 or the waiver by the Debtors or their non-Debtor affiliates of any of their rights pursuant to any agreement by operation of law or otherwise.

27. Notwithstanding anything to the contrary in this Order, any action to be taken pursuant to the relief authorized in this Order is subject to the terms of any cash collateral order or debtor in possession financing order entered in these chapter 11 proceedings. All amounts authorized to be paid pursuant to this Order are subject to the limitations and restrictions imposed by the Approved DIP Budget (as defined in the DIP Credit Agreement). To the extent that there is any inconsistency between the terms of this Order and the terms of any order relating to postpetition financing or cash collateral, the terms of the orders relating to postpetition financing or cash collateral shall govern.

28. Notwithstanding anything herein to the contrary, this Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board

of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among

AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal

Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment

entered April 5, 2012 by the District Court for the District of Columbia, dated February 9, 2012,

(c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the

Federal Deposit Insurance Act, as amended, dated February 10, 2012, and (d) all related

agreements with AFI and Ally Bank and their respective subsidiaries and affiliates.

       29.     Nothing in this Order shall discharge, release, or otherwise preclude any

setoff or recoupment right of the United States of America, its agencies, departments, or agents.

       30.     The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

       31.     Notwithstanding the possible applicability of Bankruptcy Rules

2002(a)(3), 6004(h), 7062 or 9014, the terms and conditions of this Order shall be immediately

effective and enforceable upon its entry.

       32.     This Court shall retain jurisdiction with respect to all matters relating to

the interpretation or implementation of this Order.

Dated:      July 13, 2012
             New York, New York

                            **/s/Martin Glenn**
                             MARTIN GLENN
                  United States Bankruptcy Judge

19

**Exhibit  G**

**Summary  Judgment  Motion in Consolidated  State Action**

Filing # 10592353 Electronically Filed 03/04/2014 05:39:38 PM

## IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT
## IN AND FOR LEE COUNTY, FLORIDA

| | |
|---|---|
| PATRICK FARRELL,<br><br>    Plaintiff,<br><br>v.<br><br>GMAC; GMAC MORTGAGE, LLC;<br>IMPAC SECURED ASSETS CORP;<br>WELLS FARGO BANK, N.A.; et. al.,<br><br>    Defendants. | Case No.:  07-CA-14942 |
| WELLS FARGO BANK, N.A., AS TRUSTEE UNDER THE POOLING AND SERVICING AGREEMENT RELATING TO IMPAC SECURED ASSETS CORPORATION, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-2,<br><br>    Plaintiff,<br><br>v.<br><br>PATRICK FARRELL, et al,<br><br>    Defendants. | Case No.:  07-CA-016767 |

### WELLS FARGO BANK, N.A., IMPAC SECURED ASSETS CORP, GMAC[1], GMAC MORTGAGE, LLC, AND WELLS FARGO BANK, N.A. AS TRUSTEE UNDER THE POOLING AND SERVICING AGREEMENT RELATING TO IMPAC SECURED ASSETS CORPORATION, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-2'S JOINT MOTION FOR SUMMARY JUDGMENT

**COMES NOW** Wells Fargo Bank, N.A., as Trustee under the Pooling and Servicing Agreement Relating to IMPAC Secured Assets Corporation, Mortgage Pass-Through Certificates, Series 2005-2 ("Wells Fargo as Trustee"); GMAC and GMAC Mortgage, LLC (collectively, "GMACM"); Wells Fargo Bank, N.A. ("Wells Fargo"); and IMPAC Secured

---

[1] Farrell identifies both GMAC and GMAC Mortgage, LLC as parties in the suit.  The correct party is GMAC Mortgage, LLC.

1

Assets Corp ("IMPAC") (collectively, the "Moving Parties") and file this Motion for Summary
Judgment. In support of this Motion, the Moving Parties state as follows:

## I.  STATEMENT OF UNDISPUTED FACTS

This is a consolidated action of Case Nos. 07-CA-14942 and 07-CA-016767, which
revolve around Patrick Farrell's ("Farrell") execution of a promissory note and mortgage on or
about October 11, 2005.

On or about October 11, 2005, Patrick Farrell ("Farrell") executed a promissory note in
the amount of $283,000.00, secured by a mortgage (the "Mortgage") on real property located at
2904 N.W. 14th Terrace, Cape Coral, Florida 33993 (the "Property"). Compl. ¶¶ 2-3; Aff. in
Support of Summary Judgment, Exh. 1, Exh. 1-A and 1-B. The Note provided a fixed yearly
interest rate of 6.250%. *Id.* at Exhibit 1-A. Both the Note and Mortgage were executed by
Farrell. *Id.* at Exh. 1-A and 1-B.

The last payment on the loan was made on June 21, 2007. Compl. ¶ 6. Farrell went into
default under the terms of the Note and Mortgage on August 1, 2007. *Id.* On September 3, 2007,
a notice of default and acceleration was mailed to Farrell. Aff. in Support of Summary Judgment,
¶ 6 and Exh. 1-C.

On November 14, 2007, Farrell filed the Complaint in Case No. 07-CA-014942, in an
attempt to quiet title to the Property.[2] On December 7, 2007, Wells Fargo as Trustee filed a
complaint seeking foreclosure of the Property in Case No. 07-CA-16767. On November 26,
2008, the original Note (endorsed in blank) and Mortgage were filed with this Court. On March
24, 2009, an order granting final summary judgment in favor of Wells Fargo as Trustee for Case
No. 07-CA-16767 was entered. By consent order entered November 22, 2010, prior to

---

[2] The current complaint in effect in Case No. 07-CA-014942 is the Fourth Amended Complaint, filed by Farrell on
November 30, 2009.

1/2347140.2

foreclosure sale of the Property, the parties vacated the March 24, 2009 order granting final summary judgment.

On March 12, 2012, this Court granted the parties' joint motion to consolidate the two actions into the lower-numbered action, Case No. 07-CA-014942. On June 7, 2013, Farrell noticed the voluntary dismissal of Case No. 07-CA-014942.[3] Therefore, the claims remaining before this court are only those in Case No. 07-CA-16767: the complaint seeking foreclosure of the Property by Wells Fargo as Trustee, and Patrick Farrell's Answer to Mortgage Foreclosure Complaint, Affirmative Defenses; Counter-Claims; Res Judicata; Request for Judicial Notice of IMPAC Letter (the "Answer, Affirmative Defenses and Counterclaims") filed on March 30, 2012.

## II.    LEGAL ARGUMENT

### A.    SUMMARY

Farrell has raised various tangential issues during the course of this Action: among them, that the originating lender should not have approved his loan based on his income; that the appraisal of the Property was wrongfully inflated; that the value and projected value of the Property were misrepresented; that GMAC or Wells Fargo as Trustee improperly force placed insurance on the Property; that the mortgage securitization process extinguished his obligations under the Note and Mortgage; that the Troubled Assets Relief Program ("TARP") acted in satisfaction of the debt Farrell owed under the Mortgage and Note; and that various government officials and banks are united in a conspiracy to defraud consumers.

---

[3] *See* Patrick Farrell's Notice of Voluntary Dismissal of Case 07-CA-14942 Without Prejudice and Notice of Removal of Case 01-CA-16767 to Federal Court, filed June 7, 2013.

1/2347140.2

Ultimately, the only dispositive issue in this Action is whether Wells Fargo as Trustee is entitled to a judgment in foreclosure of the Property against Farrell. Farrell has raised no disputes of material fact that preclude a determination of this issue by summary judgment.

For nearly five (5) years, Farrell's unsupported assertions have delayed these proceedings with endless filings, most of which are baseless and/or frivolous. The Moving Parties recognize that Farrell is a *pro se* litigant in this action, and as such, the Court will construe his arguments liberally. *See Eichelberger v. Brueckheimer*, 613 So.2d 1372, 1373 (Fla. 2d. DCA 1993). However, it should be noted throughout, that the Moving Parties have spent a significant amount of time attempting to decipher and respond to Farrell's disorganized, rambling, unintelligible claims and unrelated filings in order to attempt to adequately respond. The undisputed facts of this action show that Farrell executed the Note and failed to make payments pursuant to its terms, and that Wells Fargo as Trustee is the real party in interest entitled to foreclose on the Mortgage. Pursuant to the terms of the Mortgage, Farrell received a notice of default and thirty (30) day opportunity to cure the default prior to the institution of this Action and the default remains unresolved. Wells Fargo as Trustee has filed the original Note and Mortgage with this Court.

Therefore, Wells Fargo as Trustee respectfully requests this Court grant summary judgment of foreclosure in its favor, and the Moving Parties respectfully request this Court dismiss the action with prejudice as to the Moving Parties, and furthermore, assess all fees and costs incurred by the Moving Parties against Farrell.

### B.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *GrayRobinson, P.A. v. Fireline*

1/2347140.2

*Restoration, Inc.*, 46 So. 3d 170, 172 (Fla. 4th DCA 2010). The movant bears the burden of proving the absence of any genuine issue of material fact, at which point the burden shifts to the nonmovant to demonstrate the existence of such a genuine issue. *Id.*

A party's unsupported assertions of fact, subjective beliefs, and personal opinions are not sufficient to withstand a motion for summary judgment. *See Morgan v. Continental Cas. Co.*, 382 So.2d 351, 353 (Fla. App. 1980).

C.    **WELLS FARGO AS TRUSTEE IS ENTITLED TO SUMMARY JUDGMENT OF FORECLOSURE AGAINST PATRICK FARRELL.**

Wells Fargo as Trustee is holder of the original Note endorsed in blank and entitled to bring this foreclosure action.  Farrell properly received all notices required pursuant to the terms of the Note and Mortgage prior to the filing of this foreclosure action. Wells Fargo as Trustee has properly established Farrell's default under the terms of the Note and Mortgage, and has properly established itself as party with a superior lien on the Property based on the Note and Mortgage. Therefore, Wells Fargo as Trustee is entitled to judgment of foreclosure as a matter of law.

**1.    As holder of the original Note endorsed in blank, Wells Fargo as Trustee has standing as the real party in interest to bring this action and foreclose.**

Wells Fargo as Trustee is the holder of the original Note, which was filed with this court on November 26, 2008. Compl. ¶ 4.  The Note is a negotiable instrument as defined by Chapter 673, Article 3, Florida Statutes (2013). Pursuant to Section 673.011, Florida Statutes (2013), a 'person entitled to enforce' an instrument includes, "[t]he Holder of the instrument."   "The holder of the note is the one who has standing to seek enforcement of the note."  *Mortg. Electronic Registration Systems, Inc. v. Azize*, 965 So.2d 151, 153 (Fla. 2nd DCA 2007).

Wells Fargo as Trustee has standing to seek enforcement of the Note because the Note contains an endorsement in blank and Wells Fargo as Trustee is in possession of the original Note.  A "holder" is "[t]he person in possession of a negotiable instrument that is payable either

5

to bearer or an unidentified person that is the person in possession . . . ." FLA. STAT. §
671.201(21)(a). As the holder of the Note, Wells Fargo as Trustee has standing to bring this
foreclosure action.

Farrell seeks to contest Wells Fargo as Trustee's standing with various arguments related
to an assignment of mortgage Answer, Affirmative Defenses and Countercl. ¶¶ 106-114.
However, these allegations are irrelevant to Wells Fargo as Trustee's standing to bring this
Action: "A mortgage is the security for the payment of the negotiable promissory note, and is a
mere incident of and ancillary to such note." *Perry v. Fairbanks Capital Corp.*, 888 So.2d 725,
727 (Fla. 5th DCA 2004). "If the note or other debt secured by a mortgage is transferred without
any formal assignment of the mortgage, or even a delivery of it, the mortgage in equity passes as
an incident to the debt, unless there be some plain and clear agreement to the contrary, if that be
the intention of the parties." *Johns v. Gillian*, 134 Fla. 575, 184 So. 140 (Fla. 1938). Wells Fargo
as Trustee is the holder of the Note and the party with standing to bring this Action.

**2.      Wells Fargo as Trustee properly provided notice of default and acceleration
of the Note and Mortgage prior to instituting this foreclosure action.**

Pursuant to paragraph three of the Note, Farrell was required to make monthly payments
of principal and interest.  Farrell defaulted under the terms of the Note and Mortgage by failing
to make the payment due August 1, 2007 and every payment due thereafter. Aff. in Support of
Summary Judgment ¶ 5. "Failure to pay goes to the heart of the agreement between the
mortgagor and mortgagee, and is not a mere technical breach." *Pezzimenti v. Cirou*, 466 So.2d
274, 276 (Fla. 2d DCA 1985).

Paragraph 22 of the Mortgage contains an acceleration clause which permits Wells
Fargo as Trustee to accelerate all amounts due if Farrell defaulted on the Note by providing
notice of such default to Farrell. Aff. in Support of Summary Judgment, Exhibit 1-B. "In Florida,

6

an acceleration clause in a mortgage confers a contract right upon the note or mortgage holder which he or she may elect to enforce upon default." *LRB Holding Corporation v. Bank of America*, 944 So.2d 1113,1114 (Fla. 3d DCA 2006).

On September 3, 2007, the loan servicer, as agent of Wells Fargo, sent a letter to Farrell advising him that he was delinquent by $5,450.26, and allowing him thirty (30) days to cure the default (the "Notice to Cure") *See* Aff. in Support of Summary Judgment, ¶ 6 and Exhibit 1-C. The Notice to Cure complies with the requirements of the Note and Mortgage, including specifically paragraph 22 of the Mortgage.

Farrell failed to cure the default. *Id.* ¶ 5. On December 3, 2007, Wells Fargo as Trustee, through its counsel, sent a second notice to Farrell, advising Farrell that Wells Fargo as Trustee had accelerated all sums due and owing under the Note and Mortgage. *Id.* ¶ 7 and Exhibit 1-D. Farrell has not cured the breach by paying all amounts due as of the date of this Motion for Summary Judgment. *Id.* ¶ 7. Farrell is indebted to Wells Fargo as Trustee in the following amounts (as of July 8, 2013): $277,105.62 principal, $104,246.87 interest, $50,606.78 other expenses, and reasonable attorneys' fees. *Id.* ¶ 11; Aff. of Indebtedness, Exh. 2, ¶ 5; Aff. As to Time, Effort and Costs ¶ 7, Exh. 3; Aff. as to Reasonable Atty. Fees Exh. 4.

**3. Wells Fargo as Trustee's lien is superior to all other interests in the Property.**

The Mortgage in favor of Wells Fargo as Trustee is a purchase money mortgage; therefore, it is superior to other parties' interest in the Property. *County of Pinellas v. Clearwater Federal Savings and Loan Assn.*, 214 So.2d 525, 526 (Fla. 2d DCA 1968). Specifically, Bank of America, N.A. may have or claim an interest in the Property pursuant to the mortgage recorded on June 14, 2007 in the Official Records of Lee County, Instrument #2007000190140. According to Section 695.01, Florida Statutes (2013), Florida is a "notice" jurisdiction; therefore,

7

"competing interests in land have priority in the order in which they are created," unless the party acquiring its rights later does not have notice of the prior interest. *See Argent Mortgage Company, LLC v. Wachovia Bank, N.A.*, 52 So.3d 796, 799 (Fla. 5th DCA 2010) (*quoting Morris v. Osteen*, 948 So.2d 821, 826 (Fla. 5th DCA 2007)).  The Mortgage was recorded on November 9, 2005, while Bank of America, N.A. did not acquire its interest until June 14, 2007.  Because the Mortgage had been recorded at the time Bank of America, N.A. acquired its interest, Bank of America, N.A. had notice of the Mortgage and the Mortgage takes priority.

>    **D.    PATRICK FARRELL'S CLAIMS AGAINST THE MOVING PARTIES FAIL AS A MATTER OF LAW AND CANNOT DEFEAT THE FORECLOSURE.**

The Answer, Affirmative Defenses and Counterclaims allege multiple grounds for relief, but fail to provide any basis for a genuine issue of material fact, and cannot preclude summary judgment in favor of the Moving Parties in this Action.

### 1.    The allegations of fraud are unsubstantiated and fail as a matter of law.

Farrell alleges causes of actions and/or affirmative defenses relating to origination fraud: that his "$18,000 was stolen at closing"; that there was a "Fraudulent Appraisal for the property"; that the Note and Mortgage are void due to "non-disclosure" of the "real lender"; that the securitization of the Note into a trust constituted fraud; that monthly payments were inflated based upon force-placed insurance premiums; and that the Moving Parties committed "mortgage fraud";  and that Farrell is a "qui tam relator-whistleblower" who "exposed the Mortgage industry as a colossal Fraud."[4] Answer, Affirmative Defenses, and Countercl. ¶¶ 11-126. The

---

[4] The Moving Parties note that Farrell's allegations of fraud in these paragraphs also contain stand-alone references to state and federal statutes without any specific allegations or facts as to how each statute was allegedly violated. *See, e.g.,* Answer, Affirmative Defenses, and Countercl. ¶ 21 ("U.C.C. Article 3"), 33 ("FS 817.545 – Mortgage Fraud; RESPA, Reg Z; TILA"), 36 ("HOEPA"), 38 ("GAAP; FAS 140; HJR-192, U.C.C."), 74 ("UCC; HJR-192; FAS 140-Private Trust"), 87 ("Uniform Commercial Code, section 3-302"), and 104 ("R.I.C.O"). Because these references to various statutes do not contain factual allegations sufficient to place the Moving Parties on notice of the allegations against the Moving Parties, they must fail as a matter of law. *See Trevisani v. Department of Health*,

Moving Parties note that Farrell has failed to produce any documents substantiating these assertions, and therefore these assertions are insufficient to withstand entry of summary judgment. Nonetheless, the Moving Parties address each allegation as without merit:

Farrell's allegations relating to the origination of the loan, besides being unsubstantiated, cannot properly be asserted against Wells Fargo as Trustee. Although unclear, these allegations may be either claims of fraudulent inducement or fraudulent misrepresentation. To state a cause of action for fraudulent inducement, Farrell must allege sufficient facts showing that: (1) Wells Fargo as Trustee made a false statement concerning a material fact; (2) Wells Fargo as Trustee knew or should have known of the statement's falsity; (3) Wells Fargo as Trustee intended that the false statement would induce Farrell's reliance; and (4) Farrell was injured by his justifiable reliance on the false statement. *Rose v. ADT Security Services, Inc.*, 989 So. 2d 1244, 1247 (Fla. 4th DCA 2008) (internal citation omitted). Similarly, to state a claim for fraudulent misrepresentation, Farrell must allege: (1) a false statement concerning a material fact was made by Wells Fargo as Trustee; (2) Wells Fargo as Trustee knew that the representation was false; (3) Wells Fargo as Trustee intended the representation induce another to act on it; and (4) Farrell was injured by relying on the representation. *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (internal citation omitted). In this case, even assuming Farrell's allegations are true, Farrell's fraud claims fail as a matter of law because they are premised entirely on the alleged misrepresentations made by the <u>original lender</u>, which undisputedly was not Wells Fargo as Trustee.[5]

---

908 So.2d 1108, 1109 (Fla. 1st DCA 2005); *see also Brandon v. County of Pinellas*, 141 So.2d 278, 279 (Fla. 2d DCA 1962) ("Mere statements of opinions or conclusions unsupported by specific facts will not suffice").

[5] Indeed, Farrell has proceeded separately against the original lender. *See* Answer, Affirmative Defenses, and Countercl. ¶ 28 ("Farrell's 'agreement' is with PINNACLE FINANCIAL, who never responded to this lawsuit. Farrell got a Default Judgment in July 2008 against PINNACLE FINANCIAL.")

1/2347140.2

Farrell alleges that "Farrell was not given notice at closing as to who the real 'lender' was and was therefore deprived of his right to recission because the defendant was merely a conduit and protective layer of the real 'lender' who was not registered or chartered to do business in the State of Florida as lender." Answer, Affirmative Defenses, and Countercl. ¶ 31. Although unclear, this defense may be based on Florida Statute § 607.1501, which states a foreign corporation may not transact business in Florida until it obtains a certificate of authority. Wells Fargo as Trustee, however, is specifically exempted from this requirement as foreign corporations may sue on notes executed and delivered in Florida without qualifying to do business in Florida. *See* FLA. STAT. § 607.1501(2)(h). Section 607.1501 goes on to state that "securing or collecting debts or enforcing mortgages and security interests in property securing the debts" does not constitute transacting business. *Id.* Accordingly, these allegations are without merit.

Similarly, allegations seeking to avoid foreclosure based on the securitization of the Note (such as Farrell's allegations in paragraphs 46-58 of the Answer, Affirmative Defenses and Counterclaims) and the trust have been repeatedly dismissed by Florida courts. Because Farrell is not a party to the trust nor is he a third-party beneficiary of the trust, Farrell lacks standing to raise issues relating to the trust. *See Castillo v. Deutsche Bank Nat. Trust Co.*, 2012 WL 2009701 (3d DCA June 6, 2012); *McMullin v. Beaver*, 905 So.2d 928 (4th DCA 2005); *Riggs v. Aurora Loan Servs., LLC,* 36 So.3d 932, 933 (Fla. 4th DCA 2010).

Farrell also raises allegations regarding the placement of forced (or lender) placed insurance on the Property. The Mortgage requires Farrell to keep insurance on the Property, providing that if Farrell "fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense." Aff. in Support of

10

Summary Judgment, Exh. 1-B ¶ 5. The costs of lender-placed insurance are added to the amounts owed by Farrell pursuant to the terms of the Mortgage. *Id.*

Farrell's allegations regarding lender-placed insurance on the Property concern two specific periods of time. First, Farrell also alleges that his monthly payments from October 2005 to December 2006 were "falsely" inflated due to lender-placed insurance premiums. Answer, Affirmative Defenses, and Countercl. ¶ 70. This allegation must fail because there was no lender-placed insurance coverage on the Property from October 2005 to December 2006. Aff. in Support of Summary Judgment ¶ 8. Therefore, Farrell's payments during this period were not inflated due to lender-placed insurance.

Second, Farrell alleges that in "Jan. 2007, GMAC falsely inflated Farrell's payments by $700 due to forced place insurance." Answer, Affirmative Defenses, and Countercl. ¶ 71. This allegation must also fail because there was no lender-placed insurance coverage on the Property in 2007, and therefore Farrell's payments were not inflated due to lender-placed insurance. Aff. in Support of Summary Judgment ¶ 9. In fact, there was no lender-placed insurance coverage on the Property until 2010. Aff. in Support of Summary Judgment ¶ 10.

Finally, Farrell's assertions relating to the "entire Mortgage industry" and his status as a "qui tam relator-whistleblower" fail as mere unsupported assertions. Farrell has not identified any recognizable cause of action or any issue of fact related to these claims, and they cannot prevent judgment as a matter of law in this Action.

### 2. The allegations that there is no loan and/or that Farrell paid the full sum owing under the Note are unsubstantiated and fail as a matter of law.

Farrell incorporates his Motion for Summary Judgment; or Motion to Consolidate; or Motion to Amend Complaint and Add Defendants with Commercial Affidavit of Violations Enjoining Qui Tam Complaint ("Farrell's Motion for Summary Judgment") filed October 17,

11

2011. Answer, Affirmative Defenses, and Countercl. ¶ 142. Farrell's Motion for Summary Judgment is a 34-page, 378-paragraph document with the central claim that "the entire mortgage industry "is" a Fraud . . . and a communist plot by the IMF JEWS, THE FEDERAL RESERVE, the UNITED STATES, IRS, STATE OF FLORIDA, REPUBLICANS and ATTORNEYS/COMMUNISTS to rob U.S. citizens of their wealth, through fraud based mortgage contracts, illegally portrayed as valid debts." Farrell's Motion for Summary Judgment ¶ 56.

In addition to Farrell's Motion for Summary Judgment,  Farrell claims that he is a "Secured Party Creditor" and that his "NAME carries the right to extend credit," therefore "THERE WAS NO LOAN, THERE IS NO DEBT, THERE IS NO PROPER PARTY BEFORE THE COURT, TO CLAIM ANY DAMAGE, OTHER THAN PATRICK FARRELL. Answer, Affirmative Defenses, and Countercl. ¶¶ 143-48.  Farrell seems to allege that his name is copyrighted and this gives him priority over any party seeking to foreclose on the Property. *Id.* ¶¶ 147-48.

Ultimately, these allegations do not constitute any cognizable action under Florida law, and are unsupported by any facts or documents other than those authored by Farrell.  Farrell's subjective beliefs and personal opinions cannot be the basis to deny judgment as a matter of law. *See Morgan v. Continental Cas. Co.*, 382 So.2d 351, 353 (Fla. App. 1980).

**3.    The allegations of *res judicata* are based on facts completely unrelated to the subject Note and Mortgage, and fail to allege any basis to prevent summary judgment.**

Farrell claims that this Action is barred by the legal doctrine of *res judicata* based on what appears to be a criminal action arising out of alleged sexual misconduct (Answer, Affirmative Defenses, and Countercl. ¶¶ 149-67).  Farrell claims that the State of Florida

12

Republicans and another party known as ISKCON conspired against him to bring charges of child abuse which later led to Farrell's acquittal. *Id.*

The doctrine of *res judicata* precludes re-litigation of the same claim between the same parties on the same cause of action. *Costello v. The Curtis Bldg. Partnership*, 864 So.2d 1241, 1244 (5th DCA 2005) (*citing Hochstadt v. Orange Broadcast*, 588 So.2d 51, 52 n. 1 (Fla. 3d DCA 1991). The application of *res judicata* requires the presence of four elements: "(1) identity of the thing sued for, (2) identity of the cause of action; (3) identity of persons and parties; and (4) identity of the quality or capacity of the persons for or against whom the claim is made." *Id.* (*citing Donahue v. Davis*, 68 So.2d 163 (Fla. 1953); *Husky Indus., Inc. v. Griffith*, 422 So.2d 996 (Fla. 5th DCA 1982).

This Action is a civil action seeking foreclosure of the Note and Mortgage. The Moving Parties have no knowledge and were not involved in any prior criminal action or proceedings with Farrell. This Action is not barred by the doctrine of *res judicata* because the alleged prior criminal action did not involve any of the required elements to invoke *res judicata*: this Action involves entirely different people, entirely different causes of action and an entirely different set of facts.

## III.    CONCLUSION

Farrell executed the Note and Mortgage on October 11, 2005, and has failed to make payments on the Note and Mortgage since June 21, 2007. Before this foreclosure action was filed, Farrell was given proper notice of default and an opportunity to cure pursuant to the terms of the Note and Mortgage. Wells Fargo as Trustee is the holder of the Note and the party with proper standing to bring this foreclosure action pursuant to the filing of the original Note, endorsed in blank, and the original Mortgage with this Court on November 26, 2008. Wells

Fargo as Trustee has presented sufficient evidence in this Action to entitle Wells Fargo as Trustee to summary judgment of foreclosure.

This foreclosure action has been pending since December 2007 and throughout Farrell has used every opportunity to stall these proceedings.  The docket for this action shows endless filings by Farrell, most of which are baseless and/or frivolous. In these filings, Farrell has failed to allege any facts or allegations as grounds for relief from the foreclosure or as grounds for separate relief against any of the Moving Parties. The Moving Parties are entitled to judgment as a matter of law in their favor.

**WHEREFORE,** the Moving Parties respectfully request this Court:

1. Enter final summary judgment of foreclosure in favor of Wells Fargo Bank, N.A., as Trustee under the Pooling and Servicing Agreement Relating to IMPAC Secured Assets Corporation, Mortgage Pass-Through Certificates, Series 2005-2;

2. Enter final summary judgment in favor of Wells Fargo Bank, N.A.; IMPAC Secured Assets Corp; GMAC; and GMAC Mortgage, LLC;

3. Grant any other and just relief this Court deems necessary and proper.

This the _____ day of

_s/Monica L. Wilson_____
Christian W. Hancock (FL Bar No. 0037228)
Nicholas J. Voelker (FL Bar No. 0088876)
Monica L. Wilson (FL Bar No. 089441)
BRADLEY ARANT BOULT CUMMINGS LLP
100 N. Tryon Street, Suite 2690
Charlotte, NC 28202
Phone:  704-338-6000
Facsimile: 704-332-8858
chancock@babc.com
nvoelker@babc.com
mwilson@babc.com

*Attorneys for the Moving Parties*

14

**Laurence S. Barsky**
**Fla Bar # 515981**

Jamie Epstein (FL Bar No. 68691)
ROBERTSON, ANSCHUTZ & SCHNEID, P.L.
6409 Congress Avenue, Suite 100
Boca Raton, FL 33487
Office: (561) 241-6901
mail@rasflaw.com
jepstein@rasflaw.com

*Attorneys for WELLS FARGO BANK, N.A., AS*
*TRUSTEE UNDER THE POOLING AND*
*SERVICING AGREEMENT RELATING TO IMPAC*
*SECURED ASSET CORPORATION, MORTGAGE*
*PASS-THROUGH CERTIFICATES, SERIES 2005-2*

15

Monica L. Wilson
BRADLEY ARANT BOULT CUMMINGS LLP
100 N. Tryon Street, Suite 2690
Charlotte, NC 28202
mwilson@babc.com

Patrick Farrell
2904 NW 14th Terrace
Cape Coral, Florida 33993

Sarah Barbaccia
Morales Law Group
14750 NW 77Court, Suite 303
Miami Lakes, FL 33016
service@moraleslawgroup.com

Andrew Bolin
Beyton McLaughlin & Bolin
One Tampa City Center
201 N. Franklin Street, Suite 2900
Tampa, FL 33602
asb@bmmbw.com

s/Monica Wilson
OF COUNSEL

1/2347140.2

# IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT
## IN AND FOR LEE COUNTY, FLORIDA

| | |
|---|---|
| PATRICK FARRELL,<br><br>    Plaintiff,<br><br>v.<br><br>GMAC; GMAC MORTGAGE, LLC;<br>IMPAC SECURED ASSETS CORP;<br>WELLS FARGO BANK, N.A.; et. al.,<br><br>    Defendants. | Case No.: 07-CA-14942 |
| WELLS FARGO BANK, N.A., AS<br>TRUSTEE UNDER THE POOLING<br>AND SERVICING AGREEMENT<br>RELATING TO IMPAC SECURED<br>ASSETS CORPORATION,<br>MORTGAGE PASS-THROUGH<br>CERTIFICATES, SERIES 2005-2,<br><br>    Plaintiff,<br><br>v.<br><br>PATRICK FARRELL, et al,<br><br>    Defendants. | Case No.: 07-CA-016767 |

## PLAINTIFF'S AFFIDAVIT IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

STATE OF [ *Texas* ]:

COUNTY OF [ *Dallas* ]:

    BEFORE ME, an officer authorized to take oaths this day personally appeared [ *Peter Knapp* ]

("Affiant") who, after being first duly sworn, deposes and says:

2

1) I am a [ *Loan Analyst* ] with Ocwen Loan Servicing, LLC, ("Ocwen"), successor in interest to GMAC Mortgage, LLC, servicer for Plaintiff Wells Fargo Bank, N.A., as Trustee under the Pooling and Service Agreement Relating to IMPAC Secured Asset Corporation, Mortgage Pass-Through Certificates, Series 2005-2 ("Wells Fargo as Trustee").

2) In the regular line and scope of my job functions, I have personal knowledge of the business records maintained by Ocwen for the purposes of servicing mortgage loans. These records (which include data compilations, electronically imaged documents, and others) are made at or near the time by, or from information provided by, persons with knowledge of the activity and transactions reflected in such records, and are kept in the course of the business activity conducted by Ocwen. Further, it is the regular practice of Ocwen's business, originating and servicing loans, to make such records. In connection with making this affidavit, I have access to the Ocwen business records, including the business records for and relating the Note and Mortgage (more specifically defined below). I have personally examined these business records, and make this affidavit based on my review of the records. I am authorized to make this affidavit and to execute this document on behalf of Ocwen and Wells Fargo as Trustee.

3) Wells Fargo as Trustee is the holder of the original Note endorsed in blank and Mortgage executed by Patrick Farrell ("Borrower"). True and correct copies of the Note and Mortgage are attached hereto as Exhibits A and B, respectively, and are incorporated herein by reference.

4) Wells Fargo as Trustee had possession of the original Note on or before November 29, 2007.

5) Borrower failed to make the payment due August 1, 2007 and has failed to make every payment due thereafter.

3

6) On or about September 3, 2007, a notice of default was sent to Borrower. The notice made clear that Borrower was delinquent by $5,450.26 at the time and gave Borrower thirty (30) days to cure the default. A true and correct copy of the September 3, 2007 notice of default is attached hereto as Exhibit C.

7) On or about December 3, 2007, Ocwen through its legal counsel, sent a letter advising Borrower that it breached the repayment terms of the Note and Mortgage and all amounts due through the term of the Note were due and payable ("Breach Letter"). A true and correct copy of the Breach Letter is attached hereto and included herein as Exhibit D. As of the date of this affidavit, Borrower has failed to make any payments pursuant to the Breach Letter.

8) From October 1, 2005 to December 1, 2006, the Borrower's payment pursuant to the terms of the Mortgage and Note did not increase due to lender-placed insurance.

9) From January 1, 2007 to December 1, 2007, the Borrower's payment pursuant to the terms of the Mortgage and Note did not increase due to lender-placed insurance.

10) The first lender-placed insurance policy on the Property was issued on September 8, 2010, effective July 1, 2010.

11) Borrower, pursuant to the terms of the Loan, owes the following amounts as of July 8, 2013:

Principal……………………………………………………………..$277,105.62

Interest……………………………………………………………$104,246.87

Late Charges………………………………………………………..$ 50,606.78

Total Due…………………………………………………………$434,269.25

12) Interest will continue to accrue at the rate of $47.45 per day for each day after the date of this affidavit.

4

13)    The street address of the subject property is 2904 NW 14th Terrace, Cape Coral, Florida 33993.

FURTHER AFFIANT SAYETH NOT.

[Name] *Peter Knapp*
[Title] *Loan Analyst*
Ocwen Loan Servicing, LLC

Sworn to an subscribed before me
This 20th day of November 2013.

_____
Notary Public

MISTY RATLIFF
Notary Public, State of Texas
My Commission Expires
January 06, 2015

# NOTE

FARRELL
LOAN #:    132030973
MIN:      100062701320309731

| OCTOBER 11, 2005 | CAPE CORAL | FLORIDA |
|---|---|---|
| [Date] | [City] | [State] |

2904 N.W. 14TH TERRACE, CAPE CORAL, FL 33993

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 283,000.00           (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **PINNACLE FINANCIAL CORPORATION D/B/A TRI STAR LENDING GROUP**

. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **6.250** %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the **1ST** day of each month beginning on **DECEMBER 1, 2005** .

I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **NOVEMBER 1, 2035** I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **2611 TECHNOLOGY DRIVE, ORLANDO, FL 32804**

or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ **1,742.48**

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.



**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

132030973

**11. DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

*[signature]* 10/11/05

— BORROWER — PATRICK FARRELL — DATE

WITHOUT RECOURSE, PAY TO THE
ORDER OF: IMPAC FUNDING CORPORATION

*[signature]*

SCOTT TAYLOR, VP
PINNACLE FINANCIAL CORPORATION
D/B/A TRI-STAR LENDING GROUP

PAY TO THE ORDER OF

WITHOUT RECOURSE
IMPAC FUNDING CORPORATION

BY: *[signature]*

AARON CALDERA, AUTHORIZED SIGNATORY

*[Sign Original Only]*

**FLORIDA FIXED RATE NOTE** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**    Form 3210 1/01
DOCUCFS3
DOCUCFS3.VTX  08/25/2005    Page 3 of 3

Date: OCTOBER 11, 2005
Borrower(s):
**PATRICK FARRELL**

Property Address:  **2904 N.W. 14TH TERRACE, CAPE CORAL, FL 33993**

## PREPAYMENT PENALTY ADDENDUM TO NOTE

FARRELL
LOAN #:    132030973
MIN:    100062701320309731

(Do not sign this addendum before you read it. This loan addendum provides for the payment of a penalty if you wish to repay the loan prior to the date provided for repayment in the loan agreement.)

THIS PREPAYMENT PENALTY ADDENDUM TO NOTE IS MADE THIS **11TH**    day of    **OCTOBER, 2005**
and is incorporated into and shall be deemed to amend and supplement the Note made by the undersigned ("Borrower") in favor of  **PINNACLE FINANCIAL CORPORATION D/B/A TRI STAR LENDING GROUP**

("Lender") and dated the same date as this Addendum (the "Note"). The Note is secured by a security instrument, as modified or amended, in favor of Lender dated the  **11TH**    day of  **OCTOBER, 2005**    (the "Security Instrument").

**ADDITIONAL COVENANTS:** In addition to the covenants and agreements made in the Note, this Addendum amends and restates the section of the Note entitled **BORROWER'S RIGHT TO PREPAY** in its entirety as follows:

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.

Subject to the Prepayment Penalty specified below, I may make a full Prepayment or partial Prepayments of my obligation. The Note Holder will use all of my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

If, within the  **36**   -month period beginning with the date you execute the Note (the "Penalty Period"), you make a full prepayment, or partial prepayment in any twelve (12)-month period that exceeds twenty percent (20%) of the original principal loan amount, you will pay a prepayment charge as consideration for the Note Holder's acceptance of such prepayment. The prepayment charge will equal the amount of interest that would accrue during a six (6)-month period on the amount prepaid that exceeds 20% of the original principal balance of the Note, calculated at the rate of interest in effect under the terms of the Note at the time of prepayment, unless otherwise prohibited by applicable law or regulation. No prepayment penalty will be assessed for any prepayment made after the Penalty Period.

Notwithstanding the foregoing, in the event of a full prepayment concurrent with a bona fide sale of the Property to an unrelated third party after the first  **0**    month(s) of the term of the Note, no prepayment penalty will be assessed. In order to avoid the imposition of a prepayment penalty, I will be required to provide the Note Holder with evidence acceptable to the Note Holder of such sale. For purposes of this exception to the imposition of a prepayment penalty, a sale of the property to a person or entity with whom I have a personal or business relationship (such as a family member, builder, developer or employer) will be presumed NOT to be a bona fide sale of the Property to an unrelated third party.

132030973

All other terms and conditions of the Note remain in full force and effect.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in the Prepayment Penalty Addendum to Note.

10/11/05

- BORROWER - PATRICK FARRELL - DATE -

AFTER RECORDING RETURN TO:
PINNACLE FINANCIAL
CORPORATION

2611 TECHNOLOGY DRIVE

ORLANDO, FL 32804
ATTN:    POST CLOSING


THIS DOCUMENT PREPARED BY:
MARILYN BERMINGHAM

PINNACLE FINANCIAL
CORPORATION D/B/A TRI-STAR
LENDING GROUP
2611 TECHNOLOGY DRIVE

ORLANDO, FL 32804

*Pur 11/23/05*
*Impac*
*1103510761*

INSTR # 2005000110952, Pages 16
Doc Type MTG, Recorded 11/09/2005 at 09:44 AM,
Charlie Green, Lee County Clerk of Circuit Court
Mtg Doc: $990.50 Int. Tax $566.00 Rec. Fee $137.50
Deputy Clerk JCASOLA
#1

*1M058C*
*1103570761*

*1024-973415*

[Space Above This Line For Recording Data]

# MORTGAGE

FARRELL
LOAN #: 132030973
MIN: 100062701320309731
PIN: 05-44-23-C1-04078.0370

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated OCTOBER 11, 2005        , together with all Riders to this document.

**(B) "Borrower"** is PATRICK   FARRELL, ~~A MARRIED~~   single

Borrower is the mortgagor under this Security Instrument.

**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(D) "Lender"** is PINNACLE FINANCIAL CORPORATION D/B/A TRI STAR LENDING GROUP

Lender is a CORPORATION                                          organized and existing under the laws of FLORIDA                         . Lender's address is   2611 TECHNOLOGY DRIVE, ORLANDO, FL 32804                                                                           .

**(E) "Note"** means the promissory note signed by Borrower and dated   OCTOBER 11, 2005    . The Note states that Borrower owes Lender
TWO HUNDRED EIGHTY-THREE THOUSAND AND 00/100
Dollars (U.S. $ 283,000.00    ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than NOVEMBER 1, 2035
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                Form 3010 1/01        *(page 1 of 14 pages)*
DOCUKFL1
DOCUKFL1.VTX  08/25/2005



AFTER RECORDING RETURN TO:
PINNACLE FINANCIAL
CORPORATION

2611 TECHNOLOGY DRIVE

ORLANDO, FL 32804

ATTN:    POST CLOSING

THIS DOCUMENT PREPARED BY:
MARILYN BERMINGHAM

PINNACLE FINANCIAL
CORPORATION D/B/A TRI-STAR
LENDING GROUP
2611 TECHNOLOGY DRIVE

ORLANDO, FL 32804

*Pur 11/23/05*
*Impac*
*1103510761*

INSTR # 2005000110952, Pages 16
Doc Type MTG, Recorded 11/09/2005 at 09:44 AM,
Charlie Green, Lee County Clerk of Circuit Court
Mtg Doc: $990.50 Int. Tax $566.00  Rec. Fee $137.50
Deputy Clerk JCASOLA
#1

*IM058C*
*1103510761*

*1024-973415*

[Space Above This Line For Recording Data]

## MORTGAGE

FARRELL
LOAN #: 132030973
MIN:   100062701320309731
PIN:   05-44-23-C1-04078.0370

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3,
11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in
Section 16.

**(A)** **"Security Instrument"** means this document, which is dated OCTOBER 11, 2005     , together with
all Riders to this document.
**(B)** **"Borrower"** is PATRICK   FARRELL, ~~A MARRIED MAN~~ *single*

Borrower is the mortgagor under this Security Instrument.
**(C)** **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this
Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and
telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(D)** **"Lender"** is PINNACLE FINANCIAL CORPORATION D/B/A TRI STAR LENDING GROUP

Lender is a CORPORATION                                           organized and existing under the laws of
FLORIDA                            . Lender's address is    2611 TECHNOLOGY DRIVE,
ORLANDO, FL 32804                      .
**(E)** **"Note"** means the promissory note signed by Borrower and dated   OCTOBER 11, 2005     . The Note
states that Borrower owes Lender
TWO HUNDRED EIGHTY-THREE THOUSAND AND 00/100
Dollars (U.S. $ 283,000.00    ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than  NOVEMBER 1, 2035        .
**(F)** **"Property"** means the property that is described below under the heading "Transfer of Rights in
the Property."

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3010 1/01       *(page 1 of 14 pages)*
DOCUKFL1
DOCUKFL1.VTX  08/25/2005

132030973

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ 1-4 Family Rider | ☒ Other(s) [specify] **PREPAYMENT RIDER** | |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the

**COUNTY**                                    of    **LEE**                                                        :

[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

**LOTS 37 AND 38, BLOCK 4078, CAPE CORAL, UNIT 57, AS RECORDED IN PLAT BOOK 19 PAGES 124 TO 137, IN THE PUBLIC RECORDS OF LEE COUNTY, FLORIDA**

132030973

which currently has the address of **2904 N.W. 14TH TERRACE**
[Street]

**CAPE CORAL**                    , Florida        **33993**        ("Property Address"):
[City]                                             [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    **1.   Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
    Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.
    **2.   Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010 1/01          *(page 3 of 14 pages)*
DOCUKFL3
DOCUKFL3.VTX   08/25/2005

132030973

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3.  Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by

132030973

RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing,

FLORIDA--Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**          Form 3010 1/01          *(page 5 of 14 pages)*
DOCUKFL5
DOCUKFL5.VTX  08/25/2005



132030973

any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

    **6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

    **7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

    Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

    **8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

    **9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security



132030973

Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

   **10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

   Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

   Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

**FLORIDA**--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3010 1/01        *(page 7 of 14 pages)*
DOCUKFL7
DOCUKFL7.VTX  08/25/2005

132030973

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.



132030973

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010 1/01          *(page 9 of 14 pages)*
DOCUKFL9
DOCUKFL9.VTX  08/25/2005

132030973

by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or

132030973

(d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



132030973

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

132030973

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ _____
BORROWER - PATRICK FARRELL - DATE -

Signed, sealed and delivered in the presence of:

_____    _____
Witness                             Witness

**FLORIDA**--Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**          Form 3010 1/01          *(page 13 of 14 pages)*
DOCUKFL13
DOCUKFLD.VTX  08/25/2005

132030973

[Space Below This Line For Acknowledgment]

STATE OF    **FLORIDA**
COUNTY OF   **LEE**

The foregoing instrument was acknowledged before me this    OCTOBER 11, 2005                    by
PATRICK   FARRELL, ~~A MARRIED MAN~~

who is personally known to me or who has produced _____ U. L _____ as identification.

_____
Notary Public

FRANK DESIDERIO PAIS
Comm# DD0272923
Expires 3/7/2008
Bonded thru (800)432-4254
Florida Notary Assn., Inc

My Commission Expires:

**FLORIDA**--Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**        Form 3010 1/01        *(page 14 of 14 pages)*
DOCUKFL14
DOCUKFLE.VTX  08/25/2005

Date:  **OCTOBER 11, 2005**
Borrower(s):  **PATRICK   FARRELL,  A MARRIED MAN**

Property Address:   **2904 N.W. 14TH TERRACE, CAPE CORAL, FL 33993**

## PREPAYMENT PENALTY RIDER

**FARRELL**
**LOAN #: 132030973**
**MIN:   100062701320309731**

(Do not sign this rider before you read it.  This security instrument rider provides for the payment of a penalty if you wish to repay the loan prior to the date provided for repayment in the loan agreement.)

THIS PREPAYMENT PENALTY RIDER IS MADE THIS **11TH**     day of **OCTOBER, 2005**              ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to    **PINNACLE FINANCIAL CORPORATION D/B/A TRI STAR LENDING GROUP**

**ADDITIONAL COVENANTS:**  Notwithstanding anything to the contrary set forth in the Note or Security Instrument, Borrower and Lender further covenant and agree as follows:

I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment".   When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.

Subject to the Prepayment Penalty specified below, I may make a full Prepayment or partial Prepayments of my obligation.  The Note Holder will use all of my Prepayments to reduce the amount of Principal that I owe under this Note.  If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

Prepayment Penalty Rider – Multi-State                    Page 1 of 2

132030973

If, within the **36** -month period beginning with the date you execute the Note (the "Penalty Period"), you make a full prepayment, or partial prepayment in any twelve (12)-month period that exceeds twenty percent (20%) of the original principal loan amount, you will pay a prepayment charge as consideration for the Note Holder's acceptance of such prepayment. The prepayment charge will equal the amount of interest that would accrue during a six (6)-month period on the amount prepaid that exceeds 20% of the original principal balance of the Note, calculated at the rate of interest in effect under the terms of the Note at the time of prepayment, unless otherwise prohibited by applicable law or regulation. No prepayment penalty will be assessed for any prepayment made after the Penalty Period.

Notwithstanding the foregoing, in the event of a full prepayment concurrent with a bona fide sale of the Property to an unrelated third party after the first **0** month(s) of the term of the Note, no prepayment penalty will be assessed. In order to avoid the imposition of a prepayment penalty, I will be required to provide the Note Holder with evidence acceptable to the Note Holder of such sale. For purposes of this exception to the imposition of a prepayment penalty, a sale of the property to a person or entity with whom I have a personal or business relationship (such as a family member, builder, developer or employer) will be presumed NOT to be a bona fide sale of the Property to an unrelated third party.

All other terms and conditions of the Security Instrument remain in full force and effect.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in the Prepayment Penalty Rider.

- BORROWER - PATRICK FARRELL - DATE -    10/14/05

{{DPLX}}

09/03/07

PATRICK FARRELL

2904 NW 14TH TER

CAPE CORAL           FL 33993-0000

RE:  Account Number    0359244301
     Property Address  2904 NW 14TH TERRACE

                       CAPE CORAL FL 33993-0000

Dear PATRICK FARRELL

Our records indicate the above-referenced mortgage loan is in
default.

Your account is due for 08/01/07, and succeeding payments. This
is a demand for payment of the total amount due and owing as of
the date of this letter, which is as follows:

    Payments ............................. $       5363.14
    Late Charges ......................... $         87.12
    Fees, Costs, and other amounts accrued
       to date ........................... $          0.00
    Suspense ............................. $          0.00
    Total Amount Due ..................... $       5450.26

You may cure the default by paying the total amount due,
indicated above, within thirty (30) days from the date of this
letter.  You are also responsible for paying any additional
payments, fees, and charges that become due during this 30-day
period.  Payments must be made in certified funds or cashier's
check.  If funds tendered are not honored for any reason, the
default will not be cured.  Our acceptance of any funds less
than the total amount due shall not constitute a waiver of our
rights and/or remedies under the loan documents or applicable
law.

                                    (continued on back)

09/03/07
Account Number  0359244301
Page Two


You are hereby notified your credit rating may be adversely
affected if you fail to fulfill the terms of your credit
obligations.  You are also notified we may visit the
above-referenced property from time to time to determine its
condition and occupancy status, the costs of which you will be
responsible for.

Unless we receive full payment of all past-due amounts, we will
accelerate the maturity of the loan, declare the obligation due
and payable without further demand, and begin foreclosure
proceedings.  This could result in the loss of your property.
You have the right to assert or defend the non-existence of a
default and you may have other rights under state law.

Once in foreclosure, you have the right to reinstate your
account up to five days prior to the foreclosure sale of the
property if: 1) you pay the total amount due plus any fees, costs
and other amounts accrued through the reinstatement date, and 2)
you take any other action reasonably required by us to assure the
security of the property, as well as your obligations under the
loan documents continue in full force and effect.

HUD-approved counseling is available on FHA guaranteed loans by
calling 800-569-4287.  If you would like to discuss any matter
contained in this notice, we encourage you to contact our loan
counselors immediately at 800-850-4622.


Collection Department
Loan Servicing

Notice - This is an attempt to collect a debt and any information
obtained will be used for that purpose.  If your debt has been
discharged in bankruptcy, our rights are being exercised against
the collateral for the above-referenced loan, not as a personal
liability.

5020

**FLORIDA DEFAULT LAW GROUP, P.L.**
ATTORNEYS AT LAW
9119 CORPORATE LAKE DRIVE
3RD FLOOR
TAMPA, FLORIDA 33634

Please reply to:
Post Office Box 25018
Tampa, FL 33622-5018

Telephone (813) 251-4766
Telefax (813) 251-1541

December 03, 2007

PATRICK FARRELL
2904 NW 14TH TERRACE
CAPE CORAL, FL 33993-0000

Re:

| | |
|---|---|
| Loan Number: | 0359244301 |
| Mortgage Servicer | GMAC MORTGAGE, LLC |
| Creditor to whom the debt is owed: | WELLS FARGO BANK, N.A., AS TRUSTEE UNDER THE POOLING AND SERVICING AGREEMENT RELATING TO IMPAC SECURED ASSETS CORPORATION, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-2 |
| Property Address: | 2904 NW 14TH TERRACE, CAPE CORAL, FL 33993-0000 |
| Our File No.: | F07058981 |

Dear Borrower:

The law firm of Florida Default Law Group, P.L. (hereinafter referred to as "law firm") has been retained to represent WELLS FARGO BANK, N.A., AS TRUSTEE UNDER THE POOLING AND SERVICING AGREEMENT RELATING TO IMPAC SECURED ASSETS CORPORATION, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-2 with regards to its interests in the promissory Note and Mortgage executed by PATRICK FARRELL on October 11, 2005. Pursuant to the terms of the promissory Note and Mortgage, our client has accelerated all sums due and owing, which means that the entire principal balance and all other sums recoverable under the terms of the promissory Note and Mortgage are now due.

As of the date of this letter, the amount owed to our client is $289,466.04, which includes the unpaid principal balance, accrued interest through today, late charges, and other default-related costs recoverable under the terms of the promissory Note and Mortgage.   Additional interest will accrue after the date of this letter.

This correspondence is being sent to comply with the Fair Debt Collection Practices Act and should not be considered a payoff letter. Our client may make advances and incur fees and expenses after the date of this letter which are recoverable under the terms of the promissory Note and Mortgage.  Therefore, if you wish to receive figures to reinstate (bring your loan current) or pay off your loan through a specific date, please contact this law firm at (813) 251-4766 or client.services@defaultlawfl.com.

FILE_NUMBER: F07058981

DOC_ID: M005104



Unless you notify this law firm within thirty (30) days after your receipt of this letter that the validity of this debt, or any portion thereof, is disputed, this law firm will assume that the debt is valid. If you do notify this law firm in writing within thirty (30) days after receipt of this letter that the debt, or any portion thereof, is disputed, this law firm will obtain verification of the debt or a copy of the judgment against you, if any, and mail it to you. Also, upon your written request within thirty (30) days after your receipt of this letter, this law firm will provide you with the name and address of the original creditor, if different from the current creditor. Florida Default Law Group, P.L. is a debt collector. This law firm is attempting to collect a debt, and any information obtained will be used for that purpose.

All written requests should be addressed to Brianna Finch, Florida Default Law Group, P.L., P.O. Box 25018, Tampa, Florida 33622-5018.

This law firm is in the process of filing a Complaint on the promissory Note and Mortgage to foreclose on real estate. The advice in this letter pertains to your dealings with this law firm as a debt collector. It does not affect your dealings with the Court, and in particular, it does not change the time at which you must answer the Complaint. The Summons is a command from the Court, not from this law firm, and you must follow its instructions even if you dispute the validity or amount of the debt. The advice in this letter also does not affect this law firm's relations with the Court. This law firm may file papers in the suit according to the Court's rules and the judge's instructions.

Finally, if you previously received a discharge in a bankruptcy involving this loan and did not sign a reaffirmation agreement, then this letter is not an attempt to collect a debt from you personally. This law firm is seeking solely to foreclose the creditor's lien on real estate and this law firm will not be seeking a personal money judgment against you.

If you have questions regarding this matter, please do not hesitate to contact this law firm.

Florida Default Law Group, P.L.
Attorneys for WELLS FARGO BANK, N.A., AS TRUSTEE
UNDER THE POOLING AND SERVICING AGREEMENT
RELATING TO IMPAC SECURED ASSETS CORPORATION,
MORTGAGE PASS-THROUGH CERTIFICATES, SERIES
2005-2

BRIANNA FINCH

## NOTICE

**Florida Default Law Group, P.L. is a debt collector. This Firm is attempting to collect a debt, and information obtained may be used for the purpose.**

| | |
|---|---|
| WELLS FARGO BANK, N.A., AS TRUSTEE UNDER THE POOLING AND SERVICING AGREEMENT RELATING TO IMPAC SECURED ASSETS CORPORATION, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-2, Plaintiff, <br><br> vs. <br><br> PATRICK FARRELL, *et al.*, Defendants. | IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT, IN AND FOR LEE COUNTY, FLORIDA CIVIL DIVISION CASE NO.: 2007-CA-016767 |

## AFFIDAVIT OF INDEBTEDNESS

STATE OF PENNSYLVANIA

COUNTY OF MONTGOMERY

BEFORE me, personally appeared _____**Lori Ann Dasch**_____ who, being of lawful age and after being first duly sworn, deposes and says:

1. I am ___**Default Specialist**___ of Ocwen Loan Servicing, LLC, ("Ocwen"), successor in interest to GMAC Mortgage, LLC, servicer for Plaintiff in this action. In this capacity I have personal knowledge of the facts and matters stated herein, and I am authorized to execute this Affidavit on behalf of Ocwen.

2. The information contained in this Affidavit is contained in the original books and records maintained by Ocwen, and the records referenced or summarized herein constitute records or data compilations ("the Records") of transactions ("the Transactions") relating to the servicing of the mortgage loan at issue in this foreclosure action. The Records were made at or near the indicated time based on information transmitted by, or from, a person with knowledge of the Transactions. The Records are kept in the course of Ocwen's regularly conducted business activity. In the course of my regular job duties I have access to and am familiar with these Records, and I reviewed and relied upon these Records in executing this Affidavit.

3. According to the Records, the Plaintiff WELLS FARGO BANK, N.A., AS TRUSTEE UNDER THE POOLING AND SERVICING AGREEMENT RELATING TO IMPAC SECURED ASSETS CORPORATION, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-2 was the designated holder of the note, or otherwise authorized to enforce, the promissory note and mortgage upon which this foreclosure action is based. True and correct copies of the note and mortgage at issue in this foreclosure action are attached to this Affidavit as Exhibit A.

4. According to these Records, the Defendant/Defendants has/have defaulted pursuant to the terms of the promissory note and mortgage sued upon by failing to tender the Plaintiff the required payments when due. The default has not been cured and the Plaintiff has elected, in accordance with the terms of the note and mortgage, to accelerate the payment of the entire principal sum, together with accrued interest.

5. According to the Records, as of _____**07/08/2013**_____, there is due and owing to the Plaintiff upon said note and mortgage the following amounts:

Transition

12-12481

| | | |
|---|---|---|
| a) | Unpaid Principal Balance on the note and mortgage | $ 277,105.62 |
| b) | Accrued interest from 07/01/07 to 07/08/13 (per diem $ 47.45) | $ 104,246.87 |

| | | |
|---|---|---|
| c) | Escrow: | $ 50,606.78 |
| | Taxes            $ 19,686.58 | |
| | Hazard Insurance $ 30,920.20 | |

| | | |
|---|---|---|
| d) | Pre-acceleration Late Charges | $ 348.48 |
| e) | Property Appraisal | $ 0.00 |
| f) | Property Inspections | $ 635.50 |
| g) | Non-Sufficient Funds | $ 0.00 |
| h) | Interest on Advances | $ 0.00 |
| i) | Brokers Price Opinion | $ 206.00 |
| j) | Bankruptcy Fees and Costs | $ 1,050.00 |
| k) | Property Preservation | $ 70.00 |

TOTAL PRINCIPAL, INTEREST AND EXPENSES          $ 434,269.25

6.  On account of Defendant's/Defendants' default under the note and mortgage sued upon herein, GMACM and now Ocwen, retained its attorney of record and authorized the filing of this action. Further, Ocwen has agreed to be bound and obligated itself to pay said attorney for his/her services such sum as the Court shall adjudge to be reasonable.

Affiant Signature: _____ 7-9-13

Print Name:  **Lori Ann Dasch**

Title: **Authorized Signer, Ocwen Loan Servicing, LLC, successor in interest to GMAC Mortgage, LLC, servicing agent for WELLS FARGO BANK, N.A., AS INDENTURE TRUSTEE UNDER THE INDENTURE RELATING TO IMH ASSETS CORP., COLLATERALIZED ASSET-BACKED BONDS, SERIES 2005-6**

Sworn to and subscribed before me,
this _9_ day of _July_, 20_13_

_Patricia Nolan Hoffman_

Notary Public, Commonwealth of **Pennsylvania**

County of _Montgomery_

Commissioned Name of Notary Public _Patricia Nolan Hoffman_

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
PATRICIA NOLAN HOFFMAN, Notary Public
City of Philadelphia, Phila. County
My Commission Expires November 15, 2015

Transition

12-12481

# Exhibit A

# NOTE

FARRELL
LOAN #: 132030973
MIN:    100062701320309731

OCTOBER 11, 2005          CAPE CORAL                    FLORIDA
[Date]                    [City]                       [State]
2904 N.W. 14TH TERRACE, CAPE CORAL, FL 33993

[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 283,000.00          (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is PINNACLE FINANCIAL CORPORATION D/B/A TRI STAR LENDING GROUP
. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.250 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3.  PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1ST day of each month beginning on DECEMBER 1, 2005. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on NOVEMBER 1, 2035 I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 2611 TECHNOLOGY DRIVE, ORLANDO, FL 32804
or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 1,742.48

## 4.  BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

---

**FLORIDA FIXED RATE NOTE** – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3210 1/01
DOCUCFS1.
DOCUCFS1.VTX  08/25/2005
Page 1 of 3

132030973

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of   15   calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   5.000   % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

DOCUCFS2
DOCUCFS2.VTX  08/25/2005

132030973

**11. DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

BORROWER — PATRICK FARRELL — DATE

WITHOUT RECOURSE, PAY TO THE
ORDER OF: IMPAC FUNDING CORPORATION

SCOTT TAYLOR, VP
PINNACLE FINANCIAL CORPORATION
D/B/A TRI-STAR LENDING GROUP

PAY TO THE ORDER OF

WITHOUT RECOURSE
IMPAC FUNDING CORPORATION

BY:
AARON CALDERA, AUTHORIZED SIGNATORY

*[Sign Original Only]*

FLORIDA FIXED RATE NOTE – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3210 1/01
DOCUCFS3
DOCUCFS3.VFX  08/25/2005                                Page 3 of 3

Date: OCTOBER 11, 2005
Borrower(s):
PATRICK FARRELL


Property Address:  2904 N.W. 14TH TERRACE, CAPE CORAL, FL 33993


## PREPAYMENT PENALTY ADDENDUM TO NOTE

FARRELL
LOAN #:   132030973
MIN:   100062701320309731

(Do not sign this addendum before you read it. This loan addendum provides for the payment of a penalty if you wish to repay the loan prior to the date provided for repayment in the loan agreement.)

THIS PREPAYMENT PENALTY ADDENDUM TO NOTE IS MADE THIS 11TH    day of  OCTOBER, 2005
and is incorporated into and shall be deemed to amend and supplement the Note made by the undersigned ("Borrower") in favor of  PINNACLE FINANCIAL CORPORATION D/B/A TRI STAR LENDING GROUP

("Lender") and dated the same date as this Addendum (the "Note"). The Note is secured by a security instrument, as modified or amended, in favor of Lender dated the  11TH    day of  OCTOBER, 2005                (the "Security Instrument").

**ADDITIONAL COVENANTS:** In addition to the covenants and agreements made in the Note, this Addendum amends and restates the section of the Note entitled **BORROWER'S RIGHT TO PREPAY** in its entirety as follows:

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.

Subject to the Prepayment Penalty specified below, I may make a full Prepayment or partial Prepayments of my obligation. The Note Holder will use all of my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

If, within the  36       -month period beginning with the date you execute the Note (the "Penalty Period"), you make a full prepayment, or partial prepayment in any twelve (12)-month period that exceeds twenty percent (20%) of the original principal loan amount, you will pay a prepayment charge as consideration for the Note Holder's acceptance of such prepayment. The prepayment charge will equal the amount of interest that would accrue during a six (6)-month period on the amount prepaid that exceeds 20% of the original principal balance of the Note, calculated at the rate of interest in effect under the terms of the Note at the time of prepayment, unless otherwise prohibited by applicable law or regulation. No prepayment penalty will be assessed for any prepayment made after the Penalty Period.

Notwithstanding the foregoing, in the event of a full prepayment concurrent with a bona fide sale of the Property to an unrelated third party after the first  0     month(s) of the term of the Note, no prepayment penalty will be assessed. In order to avoid the imposition of a prepayment penalty, I will be required to provide the Note Holder with evidence acceptable to the Note Holder of such sale. For purposes of this exception to the imposition of a prepayment penalty, a sale of the property to a person or entity with whom I have a personal or business relationship (such as a family member, builder, developer or employer) will be presumed NOT to be a bona fide sale of the Property to an unrelated third party.

132030973

All other terms and conditions of the Note remain in full force and effect.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in the Prepayment Penalty Addendum to Note.

— BORROWER — PATRICK FARRELL — DATE —

INSTR # 2005000110952, Doc Type MTG, Pages 16, Recorded 11/09/2005 at 09:44 AM, Charlie Green, Lee County Clerk of Circuit Court, Mtg Doc: $990.50 Int. Tax $566.00 Rec. Fee $137.50 Deputy Clerk JCASOLA

AFTER RECORDING RETURN TO:
PINNACLE FINANCIAL
CORPORATION

2611 TECHNOLOGY DRIVE

ORLANDO, FL 32804
ATTN:    POST CLOSING

THIS DOCUMENT PREPARED BY:
MARILYN BERMINGHAM

PINNACLE FINANCIAL
CORPORATION D/B/A TRI-STAR
LENDING GROUP
2611 TECHNOLOGY DRIVE

ORLANDO, FL 32804

1024-973415

[Space Above This Line For Recording Data]

## MORTGAGE

FARRELL
LOAN #: 132030973
MIN:    100067001320309731
PIN:    05-44-23-C1-04078.0370

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated OCTOBER 11, 2005    , together with all Riders to this document.

(B) "Borrower" is PATRICK FARRELL, Single

Borrower is the mortgagor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "Lender" is PINNACLE FINANCIAL CORPORATION D/B/A TRI STAR LENDING GROUP

Lender is a CORPORATION    organized and existing under the laws of FLORIDA    , Lender's address is    2611 TECHNOLOGY DRIVE, ORLANDO, FL 32804

(E) "Note" means the promissory note signed by Borrower and dated    OCTOBER 11, 2005    . The Note states that Borrower owes Lender

TWO HUNDRED EIGHTY-THREE THOUSAND AND 00/100
Dollars (U.S. $ 283,000.00    ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than NOVEMBER 1, 2035    .

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3010 1/01    (page 1 of 14 pages)
DOCUFL1
DOCUFL1.VTX    08/25/2005

INSTR # 2005000110952 Page Number: 2 of 16

· 132030973

(C) "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ 1-4 Family Rider | ☒ Other(s) [specify] PREPAYMENT RIDER | |

(I) "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "**Escrow Items**" means those items that are described in Section 3.

(M) "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the

COUNTY                                    of  LEE
[Type of Recording Jurisdiction]                     [Name of Recording Jurisdiction]

LOTS 37 AND 38, BLOCK 4078, CAPE CORAL, UNIT 57, AS RECORDED IN PLAT BOOK 19 PAGES 124 TO 137, IN THE PUBLIC RECORDS OF LEE COUNTY, FLORIDA

132030973

which currently has the address of  2904  N.W.  14TH  TERRACE
[Street]

CAPE CORAL                          , Florida      33993        ("Property Address");
[City]                                              [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements,
appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be
covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as
the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by
Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for
Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but
not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but
not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to
mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of
record. Borrower warrants and will defend generally the title to the Property against all claims and demands,
subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with
limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    1.  **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any
prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items
pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency.
However, if any check or other instrument received by Lender as payment under the Note or this Security
Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the
Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash;
(b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is
drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or
(d) Electronic Funds Transfer.
    Payments are deemed received by Lender when received at the location designated in the Note or at such
other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender
may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan
current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver
of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but
Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment
is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold
such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within
a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied
earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to
foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve
Borrower from making payments due under the Note and this Security Instrument or performing the covenants
and agreements secured by this Security Instrument.
    2.  **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all
payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due
under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be
applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied
first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the
principal balance of the Note.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                Form 3010 1/01        (page 3 of 14 pages)
DOCUKFL3
DOCUKFL3.VTX  03/12/2005

INSTR # 2005000110952 Page Number: 4 of 16

132030973

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT           Form 3010 1/01         (page 4 of 14 pages)
DOCUKLA
DOCUKT14.VTX   08/25/2005

132030973

RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing,

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
DOCUKFL5.VTX  08/25/2005                                Form 3010 1/01              (page 5 of 14 pages)



132030973

any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.  **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.  **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3010 1/01                    (page 6 of 14 pages)
DOCUKFA
DOCUKFA.VTX  08/25/2005

132036373

Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3010 1/01                    (page 7 of 16 pages)
DOCUFLY
DOCUKFLY.VTX  08/25/2005

132030973

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

FLORIDA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010 1/01          (page 8 of 14 pages)
DOCUFLA
DOCUFLA.VTX  08/15/2005

132030373

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3010 1/01              (page 9 of 14 pages)
DOCUFL3
DOCUFL3.VTX   10/25/2003

132030973

by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                Form 3010 1/01            (page 10 of 14 pages)
DOCUKIL10
DOCUKFLA.VTX  08/25/2005



132030973

(d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010 1/01          (page 11 of 14 pages)
DOCUKFL11
DOCUKFL.VTX   04/25/2005



132030973

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

25. **Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

INSTR # 2005000110952 Page Number: 13 of 16

132030973

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____  _____ (Seal)
-BORROWER - PATRICK FARRELL -- DATE-/-

Signed, sealed and delivered in the presence of:

_____  _____
Witness                          Witness

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3010 1/01        (page 13 of 14 pages)
DOCUKFL1I
DOCUKFLO.VTX  09/23/2005

INSTR # 2005000110952 Page Number: 14 of 16

132030973

[Space Below This Line For Acknowledgment]

STATE OF    FLORIDA
COUNTY OF   LEE

The foregoing instrument was acknowledged before me this    OCTOBER 11, 2005                              by
PATRICK   FARRELL, A MARRIED MAN

who is personally known to me or who has produced _____ as identification.

_____
Notary Public

FRANK DESIDERIO PAIS
Comm# DD0273923
Expires 3/7/2008
Bonded thru (800)432-4254
Florida Notary Assn., Inc.

My Commission Expires:

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010 1/01          (page 14 of 14 pages)
DOCUFLH
DOCUFLH.VTX   03/25/2003

INSTR # 2005000110952 Page Number: 15 of 16

Date: OCTOBER 11, 2005
Borrower(s): PATRICK FARRELL, ~A MARRIED MAN~

Property Address: 2904 N.W. 14TH TERRACE, CAPE CORAL, FL 33993

## PREPAYMENT PENALTY RIDER

FARRELL
LOAN #: 132030973
MIN: 1000627013203097 31

(Do not sign this rider before you read it. This security instrument rider provides for the payment of a penalty if you wish to repay the loan prior to the date provided for repayment in the loan agreement.)

THIS PREPAYMENT PENALTY RIDER IS MADE THIS 11TH    day of  OCTOBER, 2005     , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to  PINNACLE FINANCIAL CORPORATION D/B/A TRI STAR LENDING GROUP

ADDITIONAL COVENANTS: Notwithstanding anything to the contrary set forth in the Note or Security Instrument, Borrower and Lender further covenant and agree as follows:

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.

Subject to the Prepayment Penalty specified below, I may make a full Prepayment or partial Prepayments of my obligation. The Note Holder will use all of my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

Prepayment Penalty Rider – Multi-State                                    Page 1 of 2
DOCUPREP
DOCUPREP VTX 04/18/2003

INSTR # 2005000110952 Page Number: 16 of 16

133030973

If, within the 36    -month period beginning with the date you execute the Note (the "Penalty Period"), you make a full prepayment, or partial prepayment in any twelve (12)-month period that exceeds twenty percent (20%) of the original principal loan amount, you will pay a prepayment charge as consideration for the Note Holder's acceptance of such prepayment. The prepayment charge will equal the amount of interest that would accrue during a six (6)-month period on the amount prepaid that exceeds 20% of the original principal balance of the Note, calculated at the rate of interest in effect under the terms of the Note at the time of prepayment, unless otherwise prohibited by applicable law or regulation. No prepayment penalty will be assessed for any prepayment made after the Penalty Period.

Notwithstanding the foregoing, in the event of a full prepayment concurrent with a bona fide sale of the Property to an unrelated third party after the first    0    month(s) of the term of the Note, no prepayment penalty will be assessed. In order to avoid the imposition of a prepayment penalty, I will be required to provide the Note Holder with evidence acceptable to the Note Holder of such sale. For purposes of this exception to the imposition of a prepayment penalty, a sale of the property to a person or entity with whom I have a personal or business relationship (such as a family member, builder, developer or employer) will be presumed NOT to be a bona fide sale of the Property to an unrelated third party.

All other terms and conditions of the Security Instrument remain in full force and effect.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in the Prepayment Penalty Rider.

-- BORROWER -- PATRICK FARRELL -- DATE -- 10/11/05

Prepayment Penalty Rider -- Multi-State
DOCUDOU
0003U902.VZX 01/28/2005                    Page 2 of 2

13-17667

IN THE CIRCUIT COURT OF THE TWENTIETH
JUDICIAL CIRCUIT IN AND FOR LEE
COUNTY, FLORIDA
GENERAL JURISDICTION DIVISION
CASE NO.: 2007-CA-016767

WELLS FARGO BANK, N.A. AS
TRUSTEE UNDER THE POOLING AND
SERVICING AGREEMENT RELATING
TO IMPAC SECURED ASSETS
CORPORATION, MORTGAGE PASS-
THROUGH CERTIFICATES, SERIES
2005-2,

    Plaintiff,

vs.

PATRICK FARRELL, et al
    Defendant,

_____/

## AFFIDAVIT AS TO TIME, EFFORT AND COSTS

STATE OF FLORIDA
COUNTY OF PALM BEACH

BEFORE ME, the undersigned authority, personally appeared Laurence S. Barsky, who having been duly affirmed deposes and says:

1.    I am an attorney employed by Robertson, Anschutz, & Schneid, P.L. (the "Firm"), counsel for Plaintiff in this action.

2.    I have personal knowledge of the facts contained in this affidavit including the Firm's method of recording attorney fees and costs. The attorney fees and costs described below are kept in the Firm's billing ledger, which is a compilation of data maintained in the Firm's electronic accounting system. The entries in those records are made at the time the fees are incurred and the costs are advanced either by people with first-hand knowledge of those events or from information provided by people with such first-hand knowledge. Recording such information is a regular practice of the Firm's regularly conducted business activities.

3.    As counsel for Plaintiff in the above styled action, the following services are the typical services provided in foreclosure actions and are provided by the Firm on a flat fee basis, for which time records have not been kept:

- Review payment and transaction history and other documents from Plaintiff. Open file and prepare for the filing of the foreclosure action.

- Review of initial title search and title examiner's report to determine all of the possible interests connected with the property.

- Review all of the documents required for the filing of the Lis Pendens and Complaint.

- Compliance with mandatory mediation administrative orders and review and preparation of documents associated therewith.

- Preparation for and attendance at mandatory mediation session.

- Preparation of Lis Pendens, Complaint, Summons, Motion and Order Appointing Process Server, and Civil Cover Sheet.

- Review of supplemental title search or report from title examiner.

- Review of Returns of Service and determination as to whether service was effectuated properly.

- Review of Certificates of Military Service.

- Review Answers and Responses to the Foreclosure Complaint and prepare any necessary responses to the same.

- Preparation of Motion for Default and Notice of Dropping Parties.

- Miscellaneous client communication regarding the status of the foreclosure action.

- Review and compilation of all of the documents needed to obtain Final Judgment, i.e. Motion for Judgment and supporting affidavits including the Affidavit of Indebtedness, Affidavit as to Time, Effort and Costs, Affidavit as to the Reasonableness of Attorneys' Fees; Motion for Default and Non-military affidavit; Final Judgment and Preparation of documents required for Foreclosure Sale.

- Review trial order, prepare certificate of serving trial order, prepare witness and exhibit list, prepare questions for witnesses, prepare and mark exhibits, conference with witnesses to prepare for trial, pre-trial meeting with opposing counsel, prepare final judgment package, and prepare for and attend trial.

4.    The hourly rate charged by the Affiant's Firm for the attorneys' services rendered is $180.00 per hour.    Notwithstanding, in the above-styled action, Affiant's Firm will receive compensation from Plaintiff on the basis of a blended fee consisting of a $1,340.00 flat rate fee for standard foreclosure services, plus the hourly rate of $180.00 per hour for resolution of contested issues, trial preparation and attendance.    Based on the above and anticipating trial, Affiant's firm will have expended 4 hours of time at a rate of $180.00 per hour for resolution of contested issues, preparation for and attendance at trial, for a total amount of $720.00.    Plaintiff will pay Affiant's Firm a total of $2,060.00.

5.    Affiant certifies that there are no reasons for either reduction or enhancement of the fee pursuant to *Florida Patient's Compensation Fund v. Rowe, 472 So. 2d 1145 (Fla. 1985)*.

6.    Plaintiff has incurred the following costs in connection with this above-styled Foreclosure Action.

Diligent Search                                                                                        $100.00

13-17667

TOTAL COSTS                                                          $100.00

FURTHER AFFIANT SAYETH NAUGHT.

Laurence S. Barsky, Esq.

STATE OF FLORIDA
COUNTY OF PALM BEACH

Sworn to or affirmed and subscribed before me this ___28___ day of _February_, 2014 by Laurence S. Barsky who is personally known to me or who has produced _____ as identification.

Notary Public

KIMEISHA WILLIAMS
MY COMMISSION # EE 861904
EXPIRES: April 1, 2017
Bonded Thru Budget Notary Services

IN THE CIRCUIT COURT OF THE
TWENTIETH JUDICIAL CIRCUIT IN
AND FOR LEE COUNTY, FLORIDA
GENERAL JURISDICTION DIVISION
CASE NO.: 2007-CA-016767

WELLS FARGO BANK, N.A. AS
TRUSTEE UNDER THE POOLING AND
SERVICING AGREEMENT RELATING
TO IMPAC SECURED ASSETS
CORPORATION, MORTGAGE PASS-
THROUGH CERTIFICATES, SERIES
2005-2,

    Plaintiff,

vs.

PATRICK FARRELL, et al.
    Defendant.

_____/

## AFFIDAVIT AS TO REASONABLE ATTORNEYS FEES

STATE OF FLORIDA
COUNTY OF PALM BEACH

BEFORE ME, the undersigned authority, personally appeared NATHAN A. SCHWARTZ, Esq., who being duly sworn, deposes and says:

1.    I am an attorney licensed to practice law in the State of Florida and I have practiced law in Florida since 1985. I am personally familiar with the fees usually awarded to plaintiffs in foreclosure suits of the kind and nature in which this affidavit is filed.

2.    I have reviewed, or have had the opportunity to review, the file of counsel for Plaintiff in this action.

3.    I am familiar with the amounts charged by attorneys for services rendered in such cases and $175.00 per hour is a reasonable rate.

4.    In my opinion, based on the circumstances of this case, a flat fee of $1,340.00 and contested fees in the amount of $720.00 for a total amount of $2,060.00 to be billed by Plaintiff's Attorney's Law Firm is reasonable.

5.    In arriving at my opinion I have evaluated the factors identified below in determining my opinion of a reasonable attorney's fee as stated above, pursuant to R. Regulating Fla.Bar 4-1.5(b) and under Florida Patients Compensation Fund v. Rowe, 472 So.2nd 1145 (Fla. 1985):

a.    The time and labor required, the novelty, complexity and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

b.    The likelihood that the acceptance of the particular employment will

13-17667

13-17667

preclude other employment by the lawyer.

c.  The fee, or rate of fee, customarily charged in this locality for legal services of a comparable or a similar nature.

d.  The significance of, or amount involved in, the subject matter of the representation, the responsibility involved in the representation, and the results obtained.

e.  The time limitations imposed by the client or by the circumstances and, as between attorney and client, any additional or special time demands or requests of the attorney by the client.

f.  The nature and length of the professional relationship between said counsel and the client.

g.  The experience, reputation and ability of Plaintiff's attorney.

h.  The fact that the fee is fixed and not contingent.

6.  I have no interest in the outcome of this litigation nor am I associated with or an employee of the Plaintiff or the Defendant, or of the attorneys of either.

FURTHER AFFIANT SAYETH NAUGHT.

_____
NATHAN A. SCHWARTZ, ESQ.

SWORN TO AND SUBSCRIBED before me this ___ day of February, 2014, by NATHAN A. SCHWARTZ who is personally known to me or who did produce a Florida Drivers License/_____ as identification.

_____
Notary Public

KIMBERLY A. ELLIS
MY COMMISSION # FF 070559
EXPIRES: November 14, 2017
Bonded Thru Notary Public Underwriters

Feb/21/2014

ROBERTSON ANSCHUTZ & SCHNEID PL
Client Ledger
ALL DATES

| Date Entry # | Received From/Paid To Explanation | Chrg# Rec# | |----- General -----| Rcpts    Disbs | Bid Inv# Acc | |----- Trust Activity -----| Rcpts    Disbs      Balance |

Resp Lawyer: DJS

GMAC   GMAC Mortgage, LLC
13-17667    Farrell, Patrick -- Loan# 035924430 1
Sep 13/2013   US Default Group, LLC   Skip trace search                              100.00

|        |        | UNBILLED |   |        | BILLED |        |        | BALANCES |        |
|        | CHE    | RECOV + | FEES | = TOTAL | DISBS + | FEES + | TAX - | RECEIPTS | = A/R | TRUST |
| TOTALS |        |         |      |         |         |        |        |          |       |       |
| PERIOD | 100.00 | 0.00    | 0.00 | 100.00  | 100.00  | 0.00   | 0.00   | 0.00     | 0.00  | 0.00  |
| END DATE | 100.00 | 0.00  | 0.00 | 100.00  | 100.00  | 0.00   | 0.00   | 0.00     | 0.00  | 0.00  |

|        |        | UNBILLED |   |        | BILLED |        |        | BALANCES |        |
|        | CHE    | RECOV + | FEES | = TOTAL | DISBS + | FEES + | TAX - | RECEIPTS | = A/R | TRUST |
| FIRM TOTAL |    |         |      |         |         |        |        |          |       |       |
| PERIOD | 100.00 | 0.00    | 0.00 | 100.00  | 100.00  | 0.00   | 0.00   | 0.00     | 0.00  | 0.00  |
| END DATE | 100.00 | 0.00  | 0.00 | 100.00  | 100.00  | 0.00   | 0.00   | 0.00     | 0.00  | 0.00  |

| 1312949 |

REPORT SELECTIONS - Client Ledger

Layout Template                          Default
Advanced Search Filter                   None
Requested by                             pdougherty
Finished                                 Friday, February 21, 2014 at 12:15:05 PM
Printers                                 13.0-SP1
Masters                                  13-17667
Major Clients                            13-17667 (13.0.20131028)
Clients                                  All
Matter Intro Lawyer                      All
Matter Intro Lawyer                      All
Responsible Lawyer                       All
Assigned Lawyer                          All
Type of Law                              All
Select from                             Dec/31/2199
Entries Sort by                          Active, Inactive, Archived Matters
Select Lawyer                            Default
New Page for Each Lawyer                 No
New Page for Each Matter                 No
Firm Totals Only                         No
Totals Only                              No
Entries Shown -- Billed Only             No
Entries Shown -- Disbursements           Yes
Entries Shown -- Receipts                Yes
Entries Shown -- Time or Fees            Yes
Entries Shown -- Trust                   Yes
Cli. Matters with Retainer Bal.          No
Cli. Matters with Neg Unbld Disb         No
Working Lawyer                            All
Include Corrected Entries                No
Show Client Address                      No
Consolidate Payables                     No
Consolidate Payments                     No
Show Summary by Account                  No
Show Interest                            No
Interest Up To                           Feb/21/2014
Show Invoices that Payments were Applied to   No
Display Entries in                       Date Order

**Exhibit H**

**Final Judgment of Foreclosure in Consolidated State Action**

IN THE CIRCUIT COURT OF THE TWENTIETH
JUDICIAL CIRCUIT, IN AND FOR LEE
COUNTY, FLORIDA
GENERAL JURISDICTION DIVISION

PATRICK FARRELL,
    Plaintiff,

                              CASE NO: 2007-CA-014942

vs.

GMAC; GMAC MORTGAGE, LLC; IMPAC
SECURED ASSETS CORP; WELLS FARGO
BANK, N.A.; et al,
    Defendants.
                                  /

# FILED

### APR 30 2014

**Linda Doggett, Clerk Circuit
Court Lee County, Florida**

WELLS FARGO BANK, N.A. AS
TRUSTEE UNDER THE POOLING AND
SERVICING AGREEMENT RELATING
TO IMPAC SECURED ASSETS
CORPORATION, MORTGAGE PASS-
THROUGH CERTIFICATES, SERIES
2005-2,
    Plaintiff,                  CASE NO: 2007-CA-016767

vs.

PATRICK FARRELL; BANK OF AMERICA,
N.A.; UNKNOWN TENANTS
    Defendant(s)
                                  /

## <u>FINAL JUDGMENT OF FORECLOSURE</u>

This action was tried before the court. On the evidence presented

IT IS ADJUDGED that:

    1.    Plaintiff, WELLS FARGO BANK, N.A. AS TRUSTEE UNDER THE POOLING

AND SERVICING AGREEMENT RELATING TO IMPAC SECURED ASSETS

CORPORATION, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-2, whose

address is c/o Ocwen Loan Servicing, LLC, 1100 Virginia Drive, Suite 175, Fort Washington, PA

19034, is due:

| | |
|---|---|
| Principal | $277,105.62 |
| Interest from 07/01/07 to 07/08/13 | $104,246.87 |
| Interest from 07/09/13 to 04/30/14 | $14,045.20 |

13-17667

Taxes
**Escrow Advances**                                                      **$50,606.78**
    Taxes       $19,686.58
    Hazard Insurance $30,920.20
**Brokers Price Opinions**                                              **$206.00**
**Bankruptcy Fees and Costs**                                          **$1,050.00**
**Property Inspections**                                                **$635.50**
**Pre Acceleration Late Charges**                                       **$348.48**
**Property Preservation**                                               **$70.00**
Attorneys' Fees
    Finding as to reasonable number of hours: 4
    Finding as to reasonable hourly rate: $180.00
    Other*: $1,340.00
(*The requested attorney's fee is a flat rate fee that the firm's client has agreed
to pay in this matter. Given the amount of the fee requested and the labor
expended, the Court finds that a lodestar analysis is not necessary and that the
flat fee is reasonable.)
    Attorneys' Fee Total:                               $2,060.00
Diligent Search:                                                        $100.00

Subtotal                                                               $450,474.45
    LESS: Escrow Balance
LESS: Other:
**TOTAL**                                                              **$450,474.45**


that shall bear interest at the rate of 4.75 a year.

2.    Plaintiff holds a lien for the total sum superior to all claims or estates of

defendant(s), on the following described property in Lee County, Florida:

**LOTS 37 AND 38, BLOCK 4078, CAPE CORAL, UNIT 57, AS RECORDED IN**

**PLAT BOOK 19 PAGES 124 TO 137, IN THE PUBLIC RECORDS OF LEE COUNTY,**

**FLORIDA**

3.    If the total sum with interest at the rate described in paragraph 1 and all costs

accrued subsequent to this judgment are not paid, the Clerk of this Court shall sell the property at

public sale on the 30 day of May_____, 2014 , to the highest bidder for cash, except

as prescribed in paragraph 4, ~~at the courthouse located at 1700 Monroe Street, Civil Division, 2nd~~

~~Floor, Ft. Myers, FL 33901 in Lee County, Florida~~, in accordance with section 45.031, Florida

Statutes, using the following method:

13-17667

☒ www.lee.realforeclose.com beginning at 09:00 AM

4.    Plaintiff shall advance all subsequent costs of this action and shall be reimbursed for them by the clerk if plaintiff is not the purchaser of the property for sale, provided, however, that the purchaser of the property for sale shall be responsible for the documentary stamps payable on the certificate of title. If plaintiff is the purchaser, the clerk shall credit plaintiff's bid with the total sum with interest and costs accruing subsequent to this judgment, or such part of it as is necessary to pay the bid in full.

5.    On filing the certificate of title the clerk shall distribute the proceeds of the sale, so far as they are sufficient, by paying: first, all of plaintiff's costs; second, documentary stamps affixed to the certificate; third, plaintiff's attorneys' fees; fourth, the total sum due to plaintiff, less the items paid, plus interest at the rate prescribed in paragraph 1 from this date to the date of the sale; and by retaining any remaining amount pending the further order of this court.

6.    On filing the certificate of sale, defendant(s) and all persons claiming under or against defendant(s) since the filing of the Notice of Lis Pendens shall be foreclosed of all estate or claim in the property, except as to claims or rights under chapter 718 or chapter 720, Florida Statutes, if any. Upon the filing of the certificate of title, the person named on the certificate of title shall be let into possession of the property.

7.    Jurisdiction of this action is retained to enter further orders that are proper including, without limitation, a deficiency judgment.

**IF THIS PROPERTY IS SOLD AT PUBLIC AUCTION, THERE MAY BE ADDITIONAL MONEY FROM THE SALE AFTER PAYMENT OF PERSONS WHO ARE ENTITLED TO BE PAID FROM THE SALE PROCEEDS PURSUANT TO THE FINAL JUDGMENT.**

**IF YOU ARE A SUBORDINATE LIENHOLDER CLAIMING A RIGHT TO FUNDS REMAINING AFTER THE SALE, YOU MUST FILE A CLAIM WITH THE CLERK NO LATER THAN 60 DAYS AFTER THE SALE. IF YOU FAIL TO FILE A CLAIM, YOU WILL NOT BE ENTITLED TO ANY REMAINING FUNDS.**

**IF YOU ARE THE PROPERTY OWNER, YOU MAY CLAIM THESE FUNDS YOURSELF. YOU ARE NOT REQUIRED TO HAVE A LAWYER OR ANY OTHER REPRESENTATION AND YOU DO NOT HAVE TO ASSIGN YOUR RIGHTS TO ANYONE ELSE IN ORDER FOR YOU TO CLAIM ANY MONEY TO WHICH YOU ARE ENTITLED. PLEASE CHECK WITH THE CLERK OF THE COURT, 1700**

13-17667

MONROE STREET, CIVIL DIVISION, 2ND FLOOR, FT. MYERS, FL 33901, WITHIN
10 DAYS AFTER THE SALE TO SEE IF THERE IS ADDITIONAL MONEY FROM
THE FORECLOSURE SALE THAT THE CLERK HAS IN THE REGISTRY OF THE
COURT.  IF YOU DECIDE TO SELL YOUR HOME OR HIRE SOMEONE TO HELP
YOU CLAIM THE ADDITIONAL MONEY, YOU SHOULD READ VERY CAREFULLY
ALL PAPERS YOU ARE REQUIRED TO SIGN, ASK SOMEONE ELSE,
PREFERABLY AN ATTORNEY WHO IS NOT RELATED TO THE PERSON
OFFERING TO HELP YOU, TO MAKE SURE THAT YOU UNDERSTAND WHAT
YOU ARE SIGNING AND THAT YOU ARE NOT TRANSFERRING YOUR
PROPERTY OR THE EQUITY IN YOUR PROPERTY WITHOUT THE PROPER
INFORMATION.  IF YOU CANNOT AFFORD TO PAY AN ATTORNEY, YOU MAY
CONTACT LEE COUNTY LEGAL AID SOCIETY, INC. 2211 PECK STREET, FORT
MYERS, FL 33902 (239) 334-6118 TO SEE IF YOU QUALIFY FINANCIALLY FOR
THEIR SERVICES.  IF THEY CANNOT ASSIST YOU, THEY MAY BE ABLE TO
REFER YOU TO A LOCAL BAR REFERRAL AGENCY OR SUGGEST OTHER
OPTIONS.  IF YOU CHOOSE TO CONTACT LEE COUNTY LEGAL AID SOCIETY,
INC. 2211 PECK STREET, FORT MYERS, FL 33902 (239) 334-6118 FOR ASSISTANCE,
YOU SHOULD DO SO AS SOON AS POSSIBLE AFTER RECEIPT OF THIS NOTICE.

ORDERED at Ft. Myers, Lee County Florida, on _April 30_____,
2014.

PRESIDING JUDGE

COPIES FURNISHED TO:

ROBERTSON, ANSCHUTZ & SCHNEID, P.L.
ATTORNEYS FOR PLAINTIFF
6409 CONGRESS AVENUE, SUITE 100
BOCA RATON, FLORIDA 33487
MAIL@RASFLAW.COM

PATRICK FARRELL
2904 NW 14TH TER
CAPE CORAL, FL 33993

MORALES LAW GROUP
ATTN: MARISOL MORALES, ESQ.
ATTORNEY FOR BANK OF AMERICA, N.A.
14750 NW 77TH CT STE 303
MIAMI LAKES, FL 33016
PRIMARY EMAIL: SERVICE@MORALESLAWGROUP.COM

UNKNOWN TENANTS
2904 NW 14TH TERRACE
CAPE CORAL, FL 33993-0000

13-17667

MONICA L. WILSON, ESQ.
BRADLEY ARANR BOULT CUMMINGS, LLP
100 N. TRYON STREET, SUITE 2690
CHARLOTTE, NC 28202
MWILSON@BABC.COM

ANDREW BOLIN, ESQ.
BEYTON MCLAUGHLIN & BOLIN
ONE TAMPA CITY CENTER
201 N. FRANKLIN STREET, SUITE 2900
TAMPA, FL 33602
ASB@BMMBW.COM

LINDA DOGGETT, CLERK, CIRCUIT COURT
BY: M. PARKER D.C.

MAY − 1 2014

13-17667



### IN THE CIRCUIT COURT AND 20TH JUDICIAL DISTRICT
### IN AND FOR LEE CO. FLORIDA

PATRICK LORNE FARRELL©,          CASE NO.07-CA-14942
Plaintiff, possessor, Droit-Droit,
vs. G.M.A.C.; WELLS FARGO;
IMPAC SECURED ASSETS, et al      MAY 2, 2014
Defendants_____
WELLS FARGO, as trustee..
V.                               CASE 07-CA-16767
PATRICK FARRELL



## NOTICE OF APPEAL

NOTICE IS GIVEN that PATRICK FARRELL defendant/Appellant, appeals to the 2ND District Court

of Appeal, the order of this court rendered on April 30,2014 by judge Sherra Winesett, pursuant to

Rule 9.110[d] and rule 9.125. The nature of the order is a final order of Summary Judgment of

Foreclosure.

## NOTICE TO INVOKE DISCRETIONARY JURISDICTION
## OF THE FLORIDA SUPREME COURT

NOTICE IS GIVEN that PATRICK FARRELL Defendant/Petitioner, invokes the discretionary

jurisdiction of the supreme court to review the decision of this court rendered April 30th 2014.

The decision by the lower inferior court;

d. expressly and directly conflicts with a decision of another district court of appeal or of the supreme

court on the same question of law; **FOCHT v. WELLS FARGO BANK N.A. 2D11-4511**

e. passes on a question certified to be of great public importance. **Rule of law 1.110b,**

f. is certified to be in direct conflict with decisions of other district courts of appeal;

**FOCHT v. WELLS FARGO BANK N.A. 2D11-4511.**

**I HEREBY CERTIFY that a true and correct copy has been sent to counsel.**

WITHOUT PREJUDICE-U.C.C.-1-308

*Patrick Farrell*

**Patrick Lorne Farrell-in Propria Persona**

**Attorney In Fact-2904 NW14th Terrace-Cape Coral, Florida**

**[33993-9998]-D.M.S.R. SEC.112.32**

**MAY 2,2014**

Cc\Judge Winesett & 2DCA

1

### IN THE CIRCUIT COURT AND 20TH JUDICIAL DISTRICT
### IN AND FOR LEE CO. FLORIDA

| | |
|---|---|
| **PATRICK LORNE FARRELL©,** | **CASE NO.07-CA-14942** |
| **Plaintiff, possessor, Droit-Droit,** | |
| **vs. G.M.A.C.; WELLS FARGO;** | |
| **IMPAC SECURED ASSETS, et al** | |
| **Defendants_____** | |
| **WELLS FARGO, as trustee..** | |
| **V.** | **CASE 07-CA-16767** |
| **PATRICK FARRELL** | |

### NOTICE OF FILING APPENDIX

Patrick Farrell hereby notices his filing of needed documents.

- Copy of court order of summary judgment.
- Writ of Prohibition to be directed to the Fl. Supreme Court by the 2nd DCA.
- Copy of Farrell's initial response to this frivolous lawsuit, 3 pages.
- Article that OCWEN bought $100B mortgage lawsuits for $3B .03 per $1.00
- NOV 21,2007 Certified Mail receipt, and date used on the Assignment of Mortgage, which is the predicate used by the court to grant the "judgment."
- The Assignment [Void Late Contribution] with the same date of mail notice
- First page of my Original Complaint

**I HEREBY CERTIFY, that a true and correct copy has been sent to counsel.**

WITHOUT PREJUDICE-U.C.C.-1-308

*Patrick Farrell*

**Patrick Lorne Farrell-in Propria Persona**

**Attorney In Fact-2904 NW14th Terrace-Cape Coral, Florida**

**[33993-9998]-D.M.S.R. SEC.112.32**

**MAY 2,2014**

2

IN THE CIRCUIT COURT OF THE TWENTIETH
JUDICIAL CIRCUIT, IN AND FOR LEE
COUNTY, FLORIDA
GENERAL JURISDICTION DIVISION

PATRICK FARRELL,
      Plaintiff,

                     CASE NO: 2007-CA-014942

vs.

GMAC; GMAC MORTGAGE, LLC; IMPAC
SECURED ASSETS CORP; WELLS FARGO
BANK, N.A.; et al,
      Defendants.
_____/

**FILED**

APR 3 0 2014

Linda Doggett, Clerk Circuit
Court Lee County, Florida

WELLS FARGO BANK, N.A. AS
TRUSTEE UNDER THE POOLING AND
SERVICING AGREEMENT RELATING
TO IMPAC SECURED ASSETS
CORPORATION, MORTGAGE PASS-
THROUGH CERTIFICATES, SERIES
2005-2,
      Plaintiff,               CASE NO: 2007-CA-016767

vs.

PATRICK FARRELL; BANK OF AMERICA,
N.A.; UNKNOWN TENANTS
      Defendant(s)
_____/

*ACCEPTED FOR VALUE & HONOR-EXEMPT FROM LEVY*
*For my remedy Release of the Proceeds, Accounts, in the*
*order[s] to Me in Accordance with Public Policy HJR-192,*
*UCC 10-104 & UCC 1-104,UCC 3-419 Exemption I.D. & UCC*
*Contract Account #375585666 Deposit To U.S. Treasury &*
*Charge the same to:PATRICK LORNE FARRELL#375585666*
*VALUE: $100,000,000    DATE: 5-2-14*

*Patrick Farrell*

*UCC-1-308*

**FINAL JUDGMENT OF FORECLOSURE**

This action was tried before the court.  On the evidence presented

IT IS ADJUDGED that:

    1.    Plaintiff, WELLS FARGO BANK, N.A. AS TRUSTEE UNDER THE POOLING

AND SERVICING AGREEMENT RELATING TO IMPAC SECURED ASSETS

CORPORATION, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-2, whose

address is c/o Ocwen Loan Servicing, LLC, 1100 Virginia Drive, Suite 175, Fort Washington, PA

19034, is due:

| | |
|---|---|
| Principal | $277,105.62 |
| Interest from 07/01/07 to 07/08/13 | $104,246.87 |
| Interest from 07/09/13 to 04/30/14 | $14,045.20 |

13-17667

| | | |
|---|---|---|
| Taxes | | |
| **Escrow Advances** | | **$50,606.78** |
| Taxes | $19,686.58 | |
| Hazard Insurance | $30,920.20 | |
| **Brokers Price Opinions** | | **$206.00** |
| **Bankruptcy Fees and Costs** | | **$1,050.00** |
| **Property Inspections** | | **$635.50** |
| **Pre Acceleration Late Charges** | | **$348.48** |
| **Property Preservation** | | **$70.00** |
| Attorneys' Fees | | |
| Finding as to reasonable number of hours: 4 | | |
| Finding as to reasonable hourly rate: $180.00 | | |
| Other*: $1,340.00 | | |

(*The requested attorney's fee is a flat rate fee that the firm's client has agreed
to pay in this matter. Given the amount of the fee requested and the labor
expended, the Court finds that a lodestar analysis is not necessary and that the
flat fee is reasonable.)

| | |
|---|---|
| ~~Attorneys' Fee Total:~~ | ~~$2,060.00~~ |
| Diligent Search: | $100.00 |
| | |
| Subtotal | $450,474.45 |
| LESS: Escrow Balance | |
| LESS: Other: | |
| **TOTAL** | **$450,474.45** |

that shall bear interest at the rate of 4.75 a year.

2.    Plaintiff holds a lien for the total sum superior to all claims or estates of defendant(s), on the following described property in Lee County, Florida:

**LOTS 37 AND 38, BLOCK 4078, CAPE CORAL, UNIT 57, AS RECORDED IN PLAT BOOK 19 PAGES 124 TO 137, IN THE PUBLIC RECORDS OF LEE COUNTY, FLORIDA**

3.    If the total sum with interest at the rate described in paragraph 1 and all costs accrued subsequent to this judgment are not paid, the Clerk of this Court shall sell the property at public sale on the 30 day of May, 2014, to the highest bidder for cash, except as prescribed in paragraph 4, ~~at the courthouse located at 1700 Monroe Street, Civil Division, 2nd Floor, Ft. Myers, FL 33901 in Lee County, Florida,~~ in accordance with section 45.031, Florida Statutes, using the following method:

13-17667

☒ www.lee.realforeclose.com beginning at 09:00 AM

4.,    Plaintiff shall advance all subsequent costs of this action and shall be reimbursed for them by the clerk if plaintiff is not the purchaser of the property for sale, provided, however, that the purchaser of the property for sale shall be responsible for the documentary stamps payable on the certificate of title. If plaintiff is the purchaser, the clerk shall credit plaintiff's bid with the total sum with interest and costs accruing subsequent to this judgment, or such part of it as is necessary to pay the bid in full.

5.    On filing the certificate of title the clerk shall distribute the proceeds of the sale, so far as they are sufficient, by paying: first, all of plaintiff's costs; second, documentary stamps affixed to the certificate; third, plaintiff's attorneys' fees; fourth, the total sum due to plaintiff, less the items paid, plus interest at the rate prescribed in paragraph 1 from this date to the date of the sale; and by retaining any remaining amount pending the further order of this court.

6.    On filing the certificate of sale, defendant(s) and all persons claiming under or against defendant(s) since the filing of the Notice of Lis Pendens shall be foreclosed of all estate or claim in the property, except as to claims or rights under chapter 718 or chapter 720, Florida Statutes, if any.  Upon the filing of the certificate of title, the person named on the certificate of title shall be let into possession of the property.

7.    Jurisdiction of this action is retained to enter further orders that are proper including, without limitation, a deficiency judgment.

**IF THIS PROPERTY IS SOLD AT PUBLIC AUCTION, THERE MAY BE ADDITIONAL MONEY FROM THE SALE AFTER PAYMENT OF PERSONS WHO ARE ENTITLED TO BE PAID FROM THE SALE PROCEEDS PURSUANT TO THE FINAL JUDGMENT.**

**IF YOU ARE A SUBORDINATE LIENHOLDER CLAIMING A RIGHT TO FUNDS REMAINING AFTER THE SALE, YOU MUST FILE A CLAIM WITH THE CLERK NO LATER THAN 60 DAYS AFTER THE SALE. IF YOU FAIL TO FILE A CLAIM, YOU WILL NOT BE ENTITLED TO ANY REMAINING FUNDS.**

**IF YOU ARE THE PROPERTY OWNER, YOU MAY CLAIM THESE FUNDS YOURSELF. YOU ARE NOT REQUIRED TO HAVE A LAWYER OR ANY OTHER REPRESENTATION AND YOU DO NOT HAVE TO ASSIGN YOUR RIGHTS TO ANYONE ELSE IN ORDER FOR YOU TO CLAIM ANY MONEY TO WHICH YOU ARE ENTITLED. PLEASE CHECK WITH THE CLERK OF THE COURT, 1700**

13-17667

MONROE STREET, CIVIL DIVISION, 2ND FLOOR, FT. MYERS, FL 33901, WITHIN 10 DAYS AFTER THE SALE TO SEE IF THERE IS ADDITIONAL MONEY FROM THE FORECLOSURE SALE THAT THE CLERK HAS IN THE REGISTRY OF THE COURT. IF YOU DECIDE TO SELL YOUR HOME OR HIRE SOMEONE TO HELP YOU CLAIM THE ADDITIONAL MONEY, YOU SHOULD READ VERY CAREFULLY ALL PAPERS YOU ARE REQUIRED TO SIGN, ASK SOMEONE ELSE, PREFERABLY AN ATTORNEY WHO IS NOT RELATED TO THE PERSON OFFERING TO HELP YOU, TO MAKE SURE THAT YOU UNDERSTAND WHAT YOU ARE SIGNING AND THAT YOU ARE NOT TRANSFERRING YOUR PROPERTY OR THE EQUITY IN YOUR PROPERTY WITHOUT THE PROPER INFORMATION. IF YOU CANNOT AFFORD TO PAY AN ATTORNEY, YOU MAY CONTACT LEE COUNTY LEGAL AID SOCIETY, INC. 2211 PECK STREET, FORT MYERS, FL 33902 (239) 334-6118 TO SEE IF YOU QUALIFY FINANCIALLY FOR THEIR SERVICES. IF THEY CANNOT ASSIST YOU, THEY MAY BE ABLE TO REFER YOU TO A LOCAL BAR REFERRAL AGENCY OR SUGGEST OTHER OPTIONS. IF YOU CHOOSE TO CONTACT LEE COUNTY LEGAL AID SOCIETY, INC. 2211 PECK STREET, FORT MYERS, FL 33902 (239) 334-6118 FOR ASSISTANCE, YOU SHOULD DO SO AS SOON AS POSSIBLE AFTER RECEIPT OF THIS NOTICE.

ORDERED at Ft. Myers, Lee County Florida, on April 30 , 2014.

PRESIDING JUDGE

COPIES FURNISHED TO:

ROBERTSON, ANSCHUTZ & SCHNEID, P.L.
ATTORNEYS FOR PLAINTIFF
6409 CONGRESS AVENUE, SUITE 100
BOCA RATON, FLORIDA 33487
MAIL@RASFLAW.COM

PATRICK FARRELL
2904 NW 14TH TER
CAPE CORAL, FL 33993

MORALES LAW GROUP
ATTN: MARISOL MORALES, ESQ.
ATTORNEY FOR BANK OF AMERICA, N.A.
14750 NW 77TH CT STE 303
MIAMI LAKES, FL 33016
PRIMARY EMAIL: SERVICE@MORALESLAWGROUP.COM

UNKNOWN TENANTS
2904 NW 14TH TERRACE
CAPE CORAL, FL 33993-0000

13-17667

MONICA L. WILSON, ESQ.
BRADLEY ARANR BOULT CUMMINGS, LLP
100 N. TRYON STREET, SUITE 2690
CHARLOTTE, NC 28202
MWILSON@BABC.COM

ANDREW BOLIN, ESQ.
BEYTON MCLAUGHLIN & BOLIN
ONE TAMPA CITY CENTER
201 N. FRANKLIN STREET, SUITE 2900
TAMPA, FL 33602
ASB@BMMBW.COM

LINDA DOGGETT, CLERK, CIRCUIT COURT
BY: M. PARKER D.C.

MAY – 1 2014

13-17667

# IN THE 2ND DISTRICT COURT OF APPEALS

## IN AND FOR THE STATE OF FLORIDA

### L.T. CASE 07-CA-14942+16767

The People of Florida-Coram Ipso Rege:

& Patrick Farrell-Coram Nobis:

-vs-

Wells Fargo Bank N.A.; Judge Sherra Winesett, in the 20th Fl. Circuit

Monica Wilson of Bradley-Arant, 100 no. Tryon st. Charlotte NC

Nathan Schwartz of Robertson Anschutz & Schneid; all wrongdoers

## REQUEST FOR WRIT OF PROHIBITION PER RULE 9.125; TO STAY

## THE EXECUTION OF MAY 30TH FORECLOSURE SALE MADE ON

## APRIL 30,2014 IN CASE 07-CA-14942/ 07-CA-16767-FL 20th CIRCUIT

COMES NOW the United States "Intervenor *ex relatione* PATRICK LORNE

FARRELL© state sovereign national, of ONE OF the states united for America,

Private Attorney General, Criminal Investigator and Federal Witness, Christian,

Sovereign American and Secured Party Creditor, Ex-Patriated to demand

mandatory *judicial* Notice by this honorable Court of a list of former and existing

Complaints and documents previously filed and incorporated by reference

containing relevant adjudicative facts, and to provide formal written notice to all

interested Party(s) of same.

**Rule 9.125[e] Form [1] A statement of why the appeal requires immediate
resolution by the supreme court.**

An illegal foreclosure sale in violation of Supreme court's Rule 1.110b is
scheduled for **May 30th, 2014**, which would enjoin a great miscarriage of justice,
maintain rule of law, conserve judicial resources and prevent harm to Petitioner.

**(2) A statement of why the appeal (A) is of great public importance,**

Is the rule of Law Supreme, or is the selfish illegal acts of lawyers and judges for
profit by Ignoring the rules the Supreme court laid down regarding foreclosures.

**or (B) will have a great effect on the proper administration of justice
throughout the state,** The subordinate courts either follow the law or not.
Consistency requires submission to authority. Is the Supreme Court Supreme, or is
Greed? Without following the Rule 1.110b many Appeals will follow.

**SUMMARILY**, the wrongdoers herein, made and granted a Summary Judgment
to foreclose Farrell's home by execution of Fraudulent documents over a span of
several years, ignorance of known State Rule 1.110b and Federal Laws prohibiting
their actions, which harmed and/or injured Farrell.

IN 2010 the Fl. Supreme Court made rule 1.110b to enforce a legal foreclosure.
The attorney's ignored it, moved for summary judgment and the Judge granted it.

**WHEREFORE**, Petitioner moves this Court to VOID the Order and sale
scheduled for May 30,2014, and send this to the Fl. Supreme Court.

2

## BACKGROUND

I AM the Plaintiff is case 07-CA-14942 which was filed on NOV 14,2007,

BEFORE the foreclosure case, later the two cases were consolidated.

Farrell, voluntarily dismissed 07-CA-14942 and filed Federal case 2:13-CV-140-

FTM-29DNF- Farrell v. Florida 20TH circuit judges, Wells Fargo, GMACM et al.

On March 24,2009 the lower court granted WFBNA a summary judgment in the

infamous rocket docket in Lee co. 20th circuit. Farrell delayed said order.

FEB 2010- This court made Rule 1.110b to verify foreclosures.

SEPT.2010- The moratorium ensued due to fraudulent filings like this case.

OCT 2010- The Fl. foreclosure bench book was sent to judge Sherra Winesett

NOV 2010 WFBNA vacated their MAR 2009 summary judgment.

APR 30 2014 WFBNA [non party] was granted illegal summary judgment, without

having standing since this case began. Judge Winesett ignored FOCHT v. WELLS

FARGO and other Memorandum from the Fl. Bench Book.

The banks are collecting more then once on the same note, and Rule 1.110b could

stop that and have a great public importance for courts and parties alike.

In FOCHT v. WELLS FARGO BANK N.A. 2D11-4511 the 2DCA court ruled in

favor of FOCHT, who just like Petitioner Farrell, raised the issue of standing.

One very significant difference is that Farrell responded to the DEC 7,2007 case

filing on DEC 7,2007, and argued standing on that very same day and ever since.

Farrell cited FOCHT in his opposition to the SJ and the judge ignored it, claiming

the note and mortgage, which were both filed one year after the case was filed,

were valid instruments. Farrell says they are evidence of FS 117.05;FS 817.545.

OCT 2007, an attorney before Judge Chris Boyko, Ohio Federal Court, told the

Judge, "you don't know how things work." Boyko responded with, "The

foreclosure cases before me are in a Pass Through MBS. A pass through suffers no

injury, being administrator, without injury you cannot have standing here, as Art

III jurisdiction requires party injury." Boyko dismissed all 14 foreclosure cases

What is wrong with Florida courts? Upon information and belief the judges and the

courts are merely taking their "share" evidenced by the FACT that judge Sherra

Winesett's worth went from $3,000,000 in 2011, to $3,600,000 in 2012.

How does one make $600,000 in a year, while making $150,000 as judge?

Answer. Being a beneficiary to the scam that is foreclosures which multiply the

note by using fraudulent assignments to transfer a note or mortgage after it was

paid off or discharged in another case, like the AHM bankruptcy case 07-11047,

where the MBS "plaintiff" Wells Fargo herein was discharged and destroyed.

If I copy a $100 federal reserve note, that is counterfeiting. If I fabricate a transfer

paper from "whole cloth" in the manner that Judge Altenbernd says,

"Computerized banking" in other words, mere copying, cutting and pasting with

computers and printers and paper from Office Max, that is counterfeiting.

4

That is why it is essential to have the original documents upon filing.

The facts of the case and admissions by counsel admitted the case was filed DEC 7,2007, WITH a lost note count, WITHOUT a note, mortgage or assignment, the note was filed NOV 26,2008 and the Assignment of mortgage was filed JAN 13,2009, **3 years after trust closed**, admitting they did not have standing

**WHEREFORE**, Petitioner moves the Court to Void the lower court's Order for lack of standing, there is a plethora of disputed facts to void summery judgment reverse and remand, sanction the wrongdoers and void all liens on the property.

New York Estate Powers and Trust Law EPTL Art.7.sec 2.4 VOIDS AB INITIO any and all late contributions by "assignment of mortgage" after the trust closes. Wells Fargo Bank N.A. v. Erobobo 39 Misc.3d 1220(A), 2013 WL 1831799

## VERIFICATION

I express a belief, based on a reasoned and studied professional judgment, that this appeal requires immediate resolution by the supreme court and (a) is of great public importance, or (b) will have a great effect on the administration of justice throughout the state.

WITHOUT PREJUDICE-U.C.C.-1-308

Patrick Lorne Farrell-in Propria Persona-2904 NW14th Terrace-

Cape Coral, Florida [33993-9998] D.M.S.R. SEC.112.32--**MAY 2,2014**

```
           Cape Central Postal Store
              Cape Coral, Florida
                   339903048
              1189290422 -0098
12/11/2007    (800)275-8777      09:32:10 AM
================================================
              Sales Receipt
Product        Sale    Unit      Final
Description     Qty    Price      Price
------------------------------------------------
TAMPA FL 33622 Zone-2             $1.48
First-Class Large Env
4.70 oz.
  Return Rcpt (Green Card)        $2.15
  Certified                      $2.65
  Label #:    7007149000085746852

  Issue PVI:                     $6.28

KILGORE TX 75662 Zone-5          $1.14
First-Class Large Env
3.00 oz.

  Issue PVI:                     $1.14

Total:                           $7.42

Paid by:
Visa                             $7.42
  Account #:
  Approval #:
  Transaction #:        478
23 903570554

Order stamps at USPS.com/shop or call
1-800-Stamp24. Go to USPS.com/clicknship
to print shipping labels with postage.
For other information call 1-800-ASK-USPS.

Bill#: 1000203764997
Clerk: 04

  All sales final on stamps and postage.
  Refunds for guaranteed services only.
       Thank you for your business.
************************************
************************************
      HELP US SERVE YOU BETTER

    Go to: http://gx.gallup.com/pos

   TELL US ABOUT YOUR RECENT
        POSTAL EXPERIENCE

      YOUR OPINION COUNTS
************************************
************************************


           Customer Copy
```



U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com™

OFFICIAL USE

Postage    $
Certified Fee
Return Receipt Fee
(Endorsement Required)
Restricted Delivery Fee
(Endorsement Required)
Total Postage & Fees    $

Sent To: Brianna Finch / FL Law Group
Street, Apt. No.;
or PO Box No.
City, State, ZIP+4

PS Form 3800, August 2006          See Reverse for Instructions

7007 1490 0001 8574 6852



SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3. Also complete
  item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
  so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
  or on the front if space permits.

1. Article Addressed to:

BRIANNA FINCH
FLORIDA LAW GROUP
9119 CORPORATE LAKE DRIVE
TAMPA, FLORIDA 33634

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X                              □ Agent
                               □ Addressee
B. Received by (Printed Name)   C. Date of Delivery
                                DEC 13 2007
D. Is delivery address different from item 1?  □ Yes
   If YES, enter delivery address below:        □ No

3. Service Type
   □ Certified Mail    □ Express Mail
   □ Registered        □ Return Receipt for Merchandise
   □ Insured Mail      □ C.O.D.
4. Restricted Delivery? (Extra Fee)   □ Yes

2. Article Number
   (Transfer from service label)    7007 1490 0001 8574 6852

PS Form 3811, February 2004    Domestic Return Receipt



E

Sovereign Patrick Farrell
DOMICILE: 2904 NW14th Terrace
Cape Coral,Fl.33993
Date 12/07/07

RE: "Account number ▮▮▮▮▮▮▮▮

ESTOPPEL

I received, without predjudice, your letter of 12/03/07 where you did
not;

1. Prove that you have not CREATED, LOANED and charged me INTEREST on
'CREATED CREDIT' as per several court decisions that have found this
practice FRAUDULENT and USURIOUS; First Natl. Bank v. Monroe, 59 S.E.
1123; St. Louis Savings Bank v. Parmales, 95 U.S. 557; American Express
Co. v. Citizens State Bank, 181 Wis. 172; and,

2. Prove that you have not CREATED THIS CREDIT AS A BOOKKEEPING ENTRY
such as was done in the case of First National Bank of Montgomery v.
Jerome Daly, Credit River Minnesota 12/7/1968, "Plaintiff's act of
creating credit is not authorized by the Constitution and Laws of the
United States, is unconstitutional and void, and is not a lawful
consideration in the eyes of the Law to support any thing or upon which
any lawful rights can be built"..."The bank had given nothing therefore
nothing was all they were entitled to get back" and other such court
cases; and,

3. Prove that you did not use "Fractional Reserve Banking Procedures"
where you created "money" out of nothing on your books and records for
this account; and,

4. Prove that you have given Lawful Consideration and Substance on
this account as per the Constitution for the United States of America
Article I Sec 10:1, "...gold and silver Coin...", and as per the
Constitution of the State of Florida Article IV Sec. 34,
"...for the deposit of gold and silver, but no such association shall
make, issue, or put into circulation, any bill, check, ticket,
certificate, promissory note, or other paper, or the paper of any bank,
to circulate as money" and Article IV Sec. 35 "The legislature of this
state shall prohibit, by law, any person or persons, association,
company or corporation from exercising the privileges of banking, or
creating paper to circulate as money."; and as per the U.S. Supreme
Court decision clearly designating gold and Silver Coin to be lawful
money in Bronson v. Rhodes, 74 U.S. 229, 247, 19 L. Ed. 141; "Lawful
Money of the United States could only be gold and silver coin or that
which by law is made its equivalent so as to be exchangeable therefor at
par, and on demand, and does NOT include a currency which though
nominally exchangable for coin at its face value, is not redeemable on
demand.", and as evidenced when a Act of Congress in 1862 created
"United States notes", and in doing so stated that coin (gold and
silver) is the only lawful money as opposed to a creation by act of
legislature (Congress), and as stated in Perry v. Washburn, 20 CAL 318;
and,

5. Prove that you have complied completely with the Monetary Control
Act of 1980; and,

6. Prove that you have a proper Charter to operate within Florida; and,

7. Prove that you have been properly bonded to operate within Florida; and,

8. Prove that you are complying completely with the Laws of the land in Florida and the Constitution of the State of Florida, and not operating under laws of any foreign country or entity such as the District of Columbia or any other foreign country or entity regarding this "account"; and,

9. Prove that you did fully disclose all of the foregoing in any agreement or contract with Me; and,

Because you did not prove the foregoing to be true and correct, no debt to you or contract with you exists or ever existed; This supposed debt is void; You must now make my person whole by returning the entire amount paid to you under the heading of principal and interest, and then enter a ZERO BALANCE on this account and that you CLOSE and CANCEL this account forthwith, and correct by withdrawal of any and all information from any "credit reporting agency" that may have financial information for this "account"; and,

I hereby invoke the doctrine of estoppel, I hereby invoke the Florida Constitution and I hereby invoke the Constitution for the United States of America on you; and,

If you continue to try to extract any money from my person, I will consider it attempted Extortion and or Embezzlement and will bring lawful action on any such crime; There may also be issues of Postal Fraud; Further "collection" activity will be considered harassment and may constitute Accessory to a crime personally for any "collection agent". I reserve all Rights and any other lawful remedies necessary to make my person whole.

I will also require a list of all of your Officers and their addresses, the name and address of your Bonding Company, the Bond account number, and a certified copy of your Charter from Florida.

Make all correspondence in writing, DO NOT TELEPHONE.

Done with express reservation of all of my Rights in law, equity and all other natures of law, ALL RIGHTS RESERVED;

Signed,

Patrick Farrell
Sovereign private Citizen,
First-Class, of Florida, At Law.

[http://www.bloomberg.com/news/2013-12-11/rescap-approved-to-liquidate-end-bankruptcy-lawyer-says.html](http://www.bloomberg.com/news/2013-12-11/rescap-approved-to-liquidate-end-bankruptcy-lawyer-says.html)

**ResCap Approved to Liquidate, End Bankruptcy for .03 cents on the dollar**

**By Steven Church Dec 11, 2013 8:50 PM ET**

Residential Capital LLC, the defunct mortgage company, will end its bankruptcy within the next two weeks after winning court approval of a liquidation plan that **resolves more than $100 billion in potential lawsuits**, a company attorney said. "This was probably the most overwhelming, most difficult bankruptcy of all time," the company's lead bankruptcy attorney, Gary S. Lee, with Morrison & Foerster LLP, said in a phone interview today.

U.S. Bankruptcy Judge Martin Glenn in Manhattan approved the plan at a hearing today and filed a signed decision, saying the plan is confirmable under U.S. bankruptcy law.

Under the plan, **ResCap will distribute billions of dollars to creditors raised by liquidating assets, including a mortgage platform bought by Ocwen Loan Servicing LLC and Green Tree Servicing LLC for $3 billion**. The company also sold a portfolio of loans for $1.5 billion. Ending ResCap's bankruptcy allows its owner, Detroit-based Ally Financial Inc. (ALLY), to end "substantially all past, present and future mortgage-related claims," Ally said in a statement today. ResCap filed for bankruptcy in May 2012 with plans to end potential lawsuits by settling with investors who bought mortgage-backed bonds. Investors had claimed the bonds were loaded with faulty mortgage loans and wanted ResCap and its parent to cover losses. Ally was bailed out by the U.S. government, which became the majority owner of the auto-loan company. ResCap settled with creditors who had wanted to sue Ally to force the company to contribute more to ResCap's bankruptcy.

Once the order is signed, the company's remaining employees will be transferred to a liquidating trust that will sell ResCap's remaining portfolio of mortgages, Lee said.

The case is In re Residential Capital LLC, 12-bk-12020, U.S. Bankruptcy Court, Southern District of New York (Manhattan).

5

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete Items 1, 2, and 3. Also complete item 4 If Restricted Delivery is desired. ■ Print your name and address on the reverse so that we can return the card to you. ■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature X  ROB SMEDLEY  ☐ Agent  ☐ Addressee |
|  | B. Received by ( Printed Name )    C. Date of Delivery |
| 1. Article Addressed to:  **G.M.A.C. 3451 Hammond Ave. Waterloo, Iowa 50704 AGENT:ERIC FELDSTEIN** | D. Is delivery address different from item 1?  ☐ Yes   If YES, enter delivery address below:  ☐ No |
|  | 3. Service Type  ☐ Certified Mail   ☐ Express Mail  ☑ Registered   ☐ Return Receipt for Merchandise  ☐ Insured Mail   ☐ C.O.D. |
|  | 4. Restricted Delivery? (Extra Fee)    ☐ Yes |
| 2. Article Number (Transfer from :   **RE 302 735 590 US** | |

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

Exhibit "B"

## ASSIGNMENT OF MORTGAGE

SPACE FOR RECORDING ONLY P.S.§605.26

FOR VALUE RECEIVED, on or before November 21, 2007, the undersigned, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INCORPORATED, AS NOMINEE FOR PINNACLE FINANCIAL CORPORATION D/B/A TRI STAR LENDING GROUP, ("Assignor") assigned, transferred and conveyed to: WELLS FARGO BANK, N.A., AS TRUSTEE UNDER THE POOLING AND SERVICING AGREEMENT RELATING TO IMPAC SECURED ASSETS CORPORATION, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-2, ("Assignee") whose address is 1100 Virginia Drive, , Fort Washington, PA 19034, its successors and/or assigns, all of the right, title, and interest of Assignor in and to that certain Mortgage (the "Mortgage") dated October 11, 2005 and recorded November 09, 2005 in Official Records Book 2005000110 at Page 952 of the public records of LEE County, Florida, encumbering the following-described real property:

> LOTS 37 AND 38, BLOCK 4975, CAPE CORAL, UNIT 57, AS RECORDED IN PLAT BOOK 19, PAGES 124 TO 137, IN THE PUBLIC RECORDS OF LEE COUNTY, FLORIDA

as the same may have been amended from time to time; together with the Note and indebtedness secured thereby.

MORTGAGOR(S): PATRICK FARRELL

IN WITNESS WHEREOF, Assignor has executed and delivered this Instrument on April , 2008.

Signed, sealed and delivered
in the presence of:

_Trina Whitbank_
Witness
Typed Name _Trina Whitbank_

_Elaine L. Neuman_
Witness
Typed Name _Elaine L. Neuman_

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INCORPORATED, AS NOMINEE FOR PINNACLE FINANCIAL CORPORATION D/B/A TRI STAR LENDING GROUP
By: _____

Typed Name: **Jeffrey Stephan**
Title: **Vice President**

Attest: _____

Typed Name: John Kerr, Assistant Secretary
Title: _____

(Affix Corporate Seal)

STATE OF _PA_
COUNTY OF _Montgomery_

BEFORE ME, the undersigned, personally appeared _Jeffrey Stephan_ and _John Kerr_ as _____ and _Asst Secretary_ respectively, and known to me to be the persons that executed the foregoing instrument, and acknowledged that they executed the foregoing as its duly authorized officers and that such execution was done as the free act and deed of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INCORPORATED, AS NOMINEE FOR PINNACLE FINANCIAL CORPORATION D/B/A TRI STAR LENDING GROUP this _1_ day of _April_, 2008.

_Mary Lynch_
Notary Public:
My commission expires:

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Mary Lynch, Notary Public
Horsham Twp., Montgomery County
My Commission Expires Nov. 3, 2010
Member, Pennsylvania Association of Notaries

FILE_NUMBER: F07058981

DOC_ID: M001100

**\*F07058981\***

**\*M001100\***

**25**

Case 2:07-cv-00917-JES-SPC    Document 105 Filed 12/10/2007    Page 4 of 24 of 24 Page ID 197

DEC-7-2007  04:11P FROM:                                          TO:13214413305              P:4/7

## 11/14/2007 4:00 PM Filed Lee County Clerk of Courts

1  | PATRICK FARRELL                                                    Judge
   | 2904 NW14TH TERRACE
2  | CAPE CORAL,FL.33993
   | 239-558-8393
3

4  | IN THE 20TH CIRCUIT COURT IN AND FOR LEE COUNTY FLORIDA

                                                          07-CA-014942
5  | PATRICK FARRELL,                          Case No.   Judge: Steinbeck, Margaret

6  |          Plaintiff,      vs.              COMPLAINT FOR DAMAGES

7  | G.M.A.C.,a corp.;
   | ANGELO MOZILO/CEO &            ... of
8  | Countrywide Financial Home Loans;
   | Pinnacle Financial Corp.;
9  | Patrick Robinson/Mortgagewise;
   | Joe Sealey/United Homes;
10 | First American Title Ins.;
   | John La Jore/Busey Bank;
11 | Jody Hernandez/Premier Mortgage Funding;
   | Fl.Dept.of Business and Prof.Regulation
12 | Martin Worth/Lentz Appraisal Group;
   | Gary Pruitt/Appraise-It
13 |          Defendants

14 | COMPLAINT FOR DAMAGES

15 |     This is an action for fraud,fraud in the inducement,mortgage

16 |   fraud,breach of contract,violations of Floridas Deceptive and

17 |   Unfair Trade Practices Act,Civil Conspiracy,,Negligence,violations

18 |   of the R.I.C.O.act,in which the alleged damages are in excess of

19 |   $15,000,exclusive of interest,fees,penalties and other

20 |   disbursements.Comes now the Plaintiff Patrick Farrell and files

21 |   this Complaint against defendants,Jody Hernandez/Premier Mortgage

22 |   Funding,Martin Worth/Lentz Appraisal Group,John LaJore/Busey

23 |   Bank,First American Title Insurance,Joe Sealey/United Home

24 |   Builders,Gary Pruitt/Appraise-It,PatrickRobinson/Mortgagewise,

25 |   Pinnacle Financial Corporation,Countrywide Financial Home

   |   Loans,GMAC,Fl.Dept.of Business and Professional Regulation.

**Exhibit I-2**

**Docket and Second District Court of Appeal's Order
referencing Notice of Appeal dated May 30, 2014**

**Florida State Courts** | Courts | Opinions | New Query | Help

*Florida Second District Court of Appeal Docket*

# Case Docket

### Case Number:  **2D14-2589**

### Civil Prohibition Petition from Lee County

### PATRICK LORNE FARRELL  vs.  G. M. A. C., WELLS FARGO

### Lower Tribunal Case(s): 07-CA-14942

Printer Friendly View

| Date Docketed | Description | Date Due | Filed By | Notes |
|---|---|---|---|---|
| 05/30/2014 | Petition Filed | | Patrick Lorne Farrell | |
| 06/04/2014 | Miscellaneous Order | | | JB |
| 06/04/2014 | fee - writ; pro se | | | |

Printer Friendly View

# IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## SECOND DISTRICT, POST OFFICE BOX 327, LAKELAND, FL 33802-0327

June 4, 2014

**CASE NO.: 2D14-2589**
L.T. No. : 07-CA-14942

Patrick Lorne Farrell                    v.        G. M. A. C., Wells Fargo

Appellant / Petitioner(s),                          Appellee / Respondent(s).

## BY ORDER OF THE COURT:

Petitioner's petitions for writ of prohibition and mandamus will be considered in this one appellate proceeding.

I HEREBY CERTIFY that the foregoing is a true copy of the original court order.

Served:

Robertson Anschutz & Schneid        Patrick Lorne Farrell        Linda Doggett, Clerk

ec

James Birkhold
Clerk



**Exhibit  J**

**Notice of Bankruptcy  dated May 30, 2013**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### FORT MEYERS DIVISION

PATRICK LORNE FARRELL,

      *Plaintiffs*,

v.

**Case No.: 2:13-CV-140-FTM-29DNF**

STATE OF FLORIDA REPUBLICANS,
RICK SCOTT, PAM BONDI, JOHN
STUMPF, BRIAN MOYNIHAN, THOMAS
MARANO, COUNTRYWIDE HOME
LOANS, COUNTRYWIDE FINANCIAL,
RICHARD J JOHNSON, JOSEPH R
TOMKINSON, WILLIAM ERBEY,
OCWEN LOAN SERVICING, BANK OF
AMERICA, IMPAC SECURED ASSETS,
IMPAC FUNDING CORP., GMACM,
WELLS FARGO BANK, LEE COUNTY
SHERIFF, STATE ATTORNEY AND
CIRCUIT JUDGES OF THE 20TH CIRCUIT,

      *Defendants*.

## GMAC MORTGAGE, LLC's NOTICE OF BANKRUPTCY FILING AND SUPPLEMENTAL SERVICING ORDER

Defendant and debtor, GMAC Mortgage, LLC (the "Debtor"), by and through its undersigned counsel, in accordance and consistent with Section 362(a) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), respectfully submits this Notice of Bankruptcy Filing and Supplemental Servicing Order, and states as follows:

1.      On May 14, 2012 (the "Petition Date"), Residential Capital, LLC and certain of its direct and indirect subsidiaries (collectively, the "Debtors"), including among others GMACM, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code  in the

- 1 -

United States Bankruptcy Court for the Southern District of New York.  The Debtors' Chapter 11 cases are being jointly administered, indexed at case number 12-12020 (MG).

2.      As a result of the petition for bankruptcy, on the Petition Date the protections of the automatic stay in section 362(a) of the Bankruptcy Code began to apply to the Debtors. Section 362(a) operates as an automatic stay of, among other things: (i) "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding" against the Chapter 11 Debtors (§ 362(a)(1)); (ii) acts to "obtain possession of property" of the Debtors' Chapter 11  estates (§ 362(a)(3)); and (iii) acts to "collect, assess, or recover a claim" against the Debtors arising prior to the Petition Date (§ 362(a)(6)).

3.      On July 13, 2012, the Bankruptcy Court entered a final supplemental order granting, among other things, the Debtors' motion for limited relief from the automatic stay to permit non-Debtor parties in foreclosure and eviction proceedings, borrower bankruptcy cases and title disputes to continue to assert and prosecute certain defenses, claims and counter-claims (the "Final Supplemental Order").  Paragraphs 14, 15, 16 and 17 of the Final Supplemental Order identify the categories of defenses, claims and counter-claims for which the automatic stay has been modified and thus have been allowed to proceed (the "Permitted Claims").   A copy of the Final Supplemental Order is attached as Exhibit A.

4.      As set forth in the Final Supplemental Order, Permitted Claims are those asserted by a borrower, mortgagor, or lienholder that relate "exclusively to the property that is the subject of the loan owned or serviced by a Debtor for the purposes of defending, unwinding, or otherwise enjoining or precluding any foreclosure, whether in a Judicial State or a Non-Judicial State, or eviction proceeding...."  (Ex. A ¶ 14(a)).  Claims for monetary relief of any kind or

nature and claims "for relief that if granted, would not terminate or preclude the prosecution and completion of a foreclosure or eviction" are not Permitted Claims. (*Id.* ¶ 14(b)).

5.       To the extent that the defenses, claims and counter-claims do not constitute Permitted Claims, they remain subject to the automatic stay and the continued prosecution of these claims is prohibited.

6.       With regard to this matter, Plaintiff Patrick Farrell, sets forth 303 paragraphs of rambling allegations before incorporating each allegation into the enumerated counts.  These counts allege violations of the Homeownership Equity Protection Act, the Real Estate Settlement Procedures Act, the Truth in Lending Act, the Fair Credit reporting Act, the Florida Deceptive and Unfair Trade Practices Act, and Florida statute 817.542, a criminal statute entitled "Mortgage fraud." The convoluted nature of multiple legal theories within the enumerated counts, lack of organization of allegations, and absence of facts makes it nearly impossible to determine the nature of the Plaintiff's claims. However, as these claims seek monetary relief; and are all related to pre-petition conduct, they are not Permitted Claims and are subject to the automatic stay, and the continued prosecution of the claims is prohibited.

7.       Pursuant to paragraph 23 of the Final Supplemental Order, any dispute regarding the extent, application and/or effect of the automatic stay under the Final Supplemental Order, must be heard and determined in the United States Bankruptcy Court for the Southern District of New York, jointly administered under Case No. 12-12020, in accordance with the Case Management Order entered in the Debtors' case [Docket No. 141] and such other and further

orders as may be entered by the United States Bankruptcy Court for the Southern District of New York.[1]

This 30th day of May, 2013.

/s/Christian W. Hancock
Christian W. Hancock (FBN: 643521)
BRADLEY ARANT BOULT CUMMINGS LLP
Bank of America Corporate Center
100 N. Tryon Street, Suite 2690
Charlotte, NC 28202
Telephone: (704) 338-6000
Facsimile:  (704) 332-8858
chancock@babc.com

*Attorneys for GMAC Mortgage, LLC*

---

[1] A copy of the Case Management Order may be obtained at no charge at http://www.kccllc.net/rescap.

## CERTIFICATE OF SERVICE

I hereby certify that on the May 30, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System which will send an electronic notification of such filing to attorneys of record.  I also certify that the foregoing document is being served this day on all counsel of record, identified in the service list, in the manner specified via transmission of Notice of Electronic Filing generated CM/ECF:

Patrick Lorne Farrell
2904 N.W. 14th Terr.
Cape Coral, FL 33992

Marc. T. Parrino
Liebler, Gonzlaez & Portuondo, P.A.
Courthouse Tower – 25th Floor
44 West Flagler Street Miami, FL 33130
*Counsel for Brian Moynihan, Countrywide Home Loans, Inc, Countrywide Financial*
*Corporation, and Bank of America N.A.*

Brent A. Kramer
Houser & Allison, APC
3780 Kilroy Way, Suite 130
Long Beach, CA 90806
bkramer@houser-law.com
*Counsel for Ocwen Loan Servicing and William Erby*

/s/Christian W. Hancock
OF COUNSEL

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
|  | ) |  |
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

## FINAL SUPPLEMENTAL ORDER UNDER BANKRUPTCY CODE SECTIONS 105(a), 362, 363, 502, 1107(a), AND 1108 AND BANKRUPTCY RULE 9019 (I) AUTHORIZING THE DEBTORS TO CONTINUE IMPLEMENTING LOSS MITIGATION PROGRAMS; (II) APPROVING PROCEDURES FOR COMPROMISE AND SETTLEMENT OF CERTAIN CLAIMS, LITIGATIONS AND CAUSES OF ACTION; (III) GRANTING LIMITED STAY RELIEF TO PERMIT FORECLOSURE AND EVICTION PROCEEDINGS, BORROWER BANKRUPTCY CASES, AND TITLE DISPUTES TO PROCEED; AND (IV) AUTHORIZING AND DIRECTING THE DEBTORS TO PAY SECURITIZATION TRUSTEE FEES AND EXPENSES

Upon the motion (the "Motion")[1] of Residential Capital, LLC, and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors") for entry of a supplemental order under Bankruptcy Code sections 105(a), 362, 363, 1107(a) and 1108, and Bankruptcy Rule 9019 (i) authorizing the Debtors to continue implementing loss mitigation programs; (ii) approving procedures for the compromise and settlement of certain claims, litigations and causes of action in the ordinary course of the Debtors' business; (iii) granting limited stay relief to permit (w) borrowers or their tenants, as applicable, to prosecute direct claims and counter-claims in foreclosure and eviction proceedings (including in states in which non-judicial foreclosure is followed), (x) borrowers to prosecute certain actions in borrower bankruptcy cases, (y) the Debtors to prosecute foreclosure actions in those circumstances where

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion. Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief granted herein may refer to http://www.kccllc.net/rescap for additional information.

Exhibit A



1212020120713000000000011

they service senior mortgage loans and own the junior mortgage loans on the underlying

property, and (z) third party lien holders to prosecute direct claims and counter-claims in actions

involving the amount, validity or priority of liens on properties subject to foreclosure

proceedings; and (iv) authorizing and directing the Debtors to pay certain securitization trustee

fees and expenses; and the Court having considered the Whitlinger Affidavit and the Bocresion

Declaration; and the Court having entered the Interim Supplemental Order on June 15, 2012

[Docket No. 391]; and the Court having entered a final order on June 15, 2012 granting the GA

Servicing Motion on a final basis [Docket No. 401]; and the Court having entered a final order

on June 15, 2012 granting the Non-GA Servicing Motion on a final basis [Docket No. 402]; and

it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157

and 1334; and it appearing that venue of these Chapter 11 cases and the Motion in this district is

proper pursuant to 28 U.S.C §§ 1408 and 1409; and it appearing that this proceeding on the

Motion is a core proceeding pursuant to 28 U.S.C. § 157(b); and sufficient notice of the Motion

having been given and it appearing that no other or further notice need be provided; and the

National Association of Consumer Bankruptcy Attorneys, on its own behalf and in a

representative capacity, two individuals who are debtors under Chapter 13, and Edward Boltz,

counsel for those individuals, having filed jointly the Limited Omnibus Objection To The

Servicing Orders And Debtors' May 31, 2012 Motion For A Supplemental Order [Docket No.

221] (the "NACBA Objection"); and the Committee having filed the Omnibus Response And

Reservation Of Rights Of The Official Committee Of Unsecured Creditors To Certain Of The

Debtors' First Day Motions [Docket No. 240]; and the Debtors having filed the Omnibus Reply

To Objections To Entry Of Final Orders For Specific "First Day" Motions And Related Relief

[Docket. No. 254]; and upon the record of the hearing; and it appearing that the relief requested

ny-1046923

by the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and after due deliberation thereon; and any objections to the Motion, including the NACBA Objection, having been withdrawn, resolved, or overruled on the merits; and sufficient cause appearing therefor, it is hereby

### ORDERED, ADJUDGED, AND DECREED THAT:

1.     The Motion is GRANTED on a final basis, as set forth herein, and any objections to the Motion are hereby overruled;

<u>Loss Mitigation Programs</u>

2.     The Debtors are authorized, but not directed in their sole and absolute discretion and subject to available funding, to continue developing and implementing loss mitigation programs and procedures in the ordinary course of their businesses *nunc pro tunc* to the Petition Date, including, but not limited to, making incentive payments to borrowers in connection with the closing of short sales, or vacating properties in lieu of foreclosure or eviction proceedings, or in the form of borrower rebates for loan payoffs including honoring all obligations related thereto that accrued in whole or in part prior to the Petition Date (collectively, the "<u>Loss Mitigation Programs</u>"); <u>provided</u>, <u>however</u>, that the aggregate cash payments made by the Debtors to individual borrowers under the Loss Mitigation Programs that are not reimbursed to the Debtors shall not exceed $550,000 per month (the "<u>Monthly Cap</u>"), absent consent of the Committee or further order of the Court; <u>provided</u>, <u>further</u>, <u>however</u>, that to the extent the Debtors do not exceed the Monthly Cap in any month they shall be entitled to utilize the difference between the actual amount and the Monthly Cap in any succeeding month.  The Debtors shall provide monthly reports to the Committee and the Office of the United States Trustee for the Southern District of New York (the "<u>U.S. Trustee</u>"), which reports shall be in a

ny-1046923

form agreed to by the Debtors and the Committee and such additional information as shall be

reasonably requested by the Committee, in each case, concerning the Loss Mitigation Programs.

3.      Cash payments made by the Debtors to individual borrowers under the

Loss Mitigation Programs for which the Debtors are not reimbursed shall not exceed $4.2

million in the aggregate, absent consent of the Committee or further order of the Court.  For the

avoidance of doubt, the limitation on the amount of cash payments provided for in this paragraph

3 is in addition to the limitation on the amount of cash payments provided for in paragraph 12

hereof.

<u>Settlement Procedures</u>

4.      The Debtors are authorized, but not directed to compromise and settle

certain claims brought by the Debtors against any non-insider third parties in connection with

foreclosure, eviction, or borrower bankruptcy proceedings (each a "<u>Settling Party</u>") or by a

Settling Party against any of the Debtors (each, a "<u>Claim</u>") in accordance with the following two-

tiered procedures (the "<u>Settlement Procedures</u>"):

> <u>Tier I</u>:  The Debtors, in their sole discretion, may enter into,
> execute and consummate written agreements of settlement with
> respect to Claims that will be binding on the Debtors and their
> estates without further action by this Court or notice to any party
> and grant such Settling Parties cash payments or allowed
> prepetition claims in amounts not to exceed $40,000 in full
> settlement of such Claim (each, a "<u>Tier I Settlement</u>").

> <u>Tier II</u>:  The Debtors may enter into, execute and consummate
> written agreements of settlement with respect to Claims that will
> be binding on the Debtors and their estates without further action
> by this Court or notice to any party and grant such Settling Parties
> cash payments or allowed prepetition claims in amounts exceeding
> $40,000 but less than $100,000 in full settlement of such Claims
> (each, a "<u>Tier II Settlement</u>"); <u>provided</u>, that in each case:

> (a) The Debtors must provide advance written notice (by
> formal or informal means, including by e-mail correspondence) of
> the terms of any Tier II Settlement to (x) the U.S. Trustee, 33

4

Whitehall Street, 21st Floor, New York, New York 10004, Attn: Brian S. Masumoto, (y) counsel for the Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas New York, NY 10036, Attn: Kenneth H. Eckstein and Douglas H. Mannal; and (z) counsel to the administrative agent for the Debtors' providers of debtor in possession financing, Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036, Attn: Kenneth S. Ziman and Jonathan H. Hofer (collectively the "Notice Parties")

(b) Those Notice Parties wishing to object to any proposed Tier II Settlement must serve a written objection (by formal or informal means, including by e-mail correspondence) on the Debtors, so that it is received by no later than 4:00 p.m. (prevailing Eastern Time) on the day that is seven (7) calendar days from the date the Notice Parties received written notice of such Tier II Settlement (the "Settlement Objection Deadline"). Objections should be addressed to the proposed attorneys for the Debtors, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104, Attn: Larren M. Nashelsky (LNashelsky@mofo.com) and Norman S. Rosenbaum (NRosenbaum@mofo.com).

(c) If the Debtors receive a timely objection from a Notice Party, the parties will confer and attempt to resolve any differences. Failing that, the Debtors may petition the Court for approval of the Tier II Settlement in accordance with any case management orders entered in the Chapter 11 cases. An objection by a Notice Party with respect to a given Tier II Settlement shall not delay the finality or effectiveness of any other settlement to which an objection has not timely been delivered.

(d) If the Debtors do not receive a written objection to a Tier II Settlement from a Notice Party by the Settlement Objection Deadline, then such Tier II Settlement shall be deemed approved and the Debtors and Settling Parties may carry out the terms of such Tier II Settlement without further notice or Court approval.

5. The Debtors shall be required to seek approval from the Court in order to enter into and consummate any proposed settlement of a Claim with a settlement amount in excess of $100,000.

6. The Debtors are authorized in their sole discretion, but not directed, to settle claims where some or all of the consideration is being provided by a third party and/or

where the Debtors are releasing claims against creditors or third parties provided the Debtors otherwise comply with the Settlement Procedures.

7.      The Settlement Procedures are without prejudice to the right of the Debtors to seek an order of this Court approving additional or different procedures with respect to specific claims or categories of claims.  For claims relating to matters specified in paragraphs 14(a) and 15(a) of this Order that were resolved pursuant to a settlement prior to the Petition Date, but where such settlement has not been consummated, the Debtors are authorized, but not directed to, consummate said settlements in accordance with the Settlement Procedures set forth in this Order.

8.      Notwithstanding anything to the contrary contained herein, this Order shall not affect, impair, impede or otherwise alter the right of the Debtors to resolve any prepetition or postpetition controversy arising in the ordinary course of the Debtors' businesses, or resolve any controversy authorized by any other order of the Court.

9.      Nothing in this Order or the Motion shall constitute a determination or admission of liability or of the validity or priority of any claim against the Debtors, and the Debtors reserve their rights to dispute the validity or priority of any claim asserted.

10.      The authority granted in this Order shall not replace or obviate the need to comply with the Debtors' internal procedures, legal or otherwise, for authorizing the settlements contemplated in the Motion.  All settlements made pursuant to the Settlement Procedures shall, to the extent applicable, be made in accordance with the Debtors' settlement procedures in effect as of the Petition Date (the "Internal Settlement Protocol") and as may be amended from time; provided, however, that the Debtors shall provide the Committee and the U.S. Trustee with notice of any material changes to the Internal Settlement Protocol.

11.    The Debtors shall provide monthly reports to the Committee and the U.S.

Trustee, which reports shall be in a form agreed to by the Debtors and the Committee, and such

additional information as shall be reasonably requested by the Committee, in each case,

concerning settlements of any Claims pursuant to the Settlement Procedures.

12.    Cash payments made by the Debtors under the Settlement Procedures shall

not exceed $4 million in the aggregate, absent consent of the Committee or further order of the

Court.

13.    Any period prescribed or allowed by the Settlement Procedures shall be

computed in accordance with Bankruptcy Rule 9006.

<u>Limited Relief from Automatic Stay</u>

*Borrower Foreclosure And Eviction Proceedings*

14.    The stay imposed by section 362(a) of the Bankruptcy Code applicable to

(a) pending and future foreclosure actions initiated by the Debtors or in those states providing for

non-judicial foreclosures, by a borrower; and (b) pending and future eviction proceedings with

respect to properties for which a foreclosure has been completed or is pending, is hereby

modified pursuant to the following terms and conditions:

(a)    except as set forth herein, a borrower, mortgagor, or lienholder

(each, an "<u>Interested Party</u>") shall be entitled to assert and prosecute direct claims and

counter-claims relating exclusively to the property that is the subject of the loan owned or

serviced by a Debtor for the purposes of defending, unwinding, or otherwise enjoining or

precluding any foreclosure, whether in a Judicial State or a Non-Judicial State, or eviction

proceeding, where a final judgment (defined as any judgment where the right to appeal or

seek reconsideration has expired or has been exhausted) permitting the foreclosure or

7

eviction has not been awarded or, with respect to completed foreclosure sales in Non-Judicial States, where any applicable challenge period has not yet expired, and to prosecute appeals with respect to any such direct claims or counter-claims;

(b)     absent further order of the Court, the automatic stay shall remain in full force and effect with respect to all pending and future Interested Party direct claims and counter-claims:  (i) for monetary relief of any kind and of any nature against the Debtors, except where a monetary claim must be plead in order for an Interested Party to a assert a claim to defend against or otherwise enjoin or preclude a foreclosure (each a "Mandatory Monetary Claim"); (ii) for relief that if granted, would not terminate or preclude the prosecution and completion of a foreclosure or eviction; or (iii) asserted in the form of a class action or collective action;

(c)     absent further order of the Court, the stay shall remain in full force and effect with respect to any party seeking to intervene to assert related claims against the Debtors or any class action or collective action brought by any Interested Party on behalf of any other Interested Party or class of Interested Parties;

(d)     under no circumstances shall an Interested Party be entitled to enforce against, recoup, setoff or collect from the Debtors any judgment or award related to any direct claim or counter-claim for which the automatic stay has been lifted by the terms of this Order, including, without limitation, a Mandatory Monetary Claim;

(e)     the Debtors shall retain the right, upon appropriate motion and notice to any affected Interested Party, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by this Order and to the extent such relief is sought, the

Debtors will not object to the Interested Party's telephonic participation at any hearing on the motion; and

(f)     nothing set forth herein shall preclude or limit any Interested Party from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest.

*Borrower Bankruptcy Proceedings*

15.     The automatic stay imposed by section 362(a) of the Bankruptcy Code applicable against a borrower who currently has filed, or in the future files, for bankruptcy protection under any chapter of the Bankruptcy Code (a "<u>Bankruptcy Borrower</u>"), is hereby modified pursuant to the following terms and conditions:

(a)     except as set forth herein, a Bankruptcy Borrower or a trustee duly appointed under the Bankruptcy Code in the Bankruptcy Borrower's bankruptcy case (a "<u>Bankruptcy Trustee</u>") shall be entitled to:  (i) assert and prosecute or continue to prosecute an objection to the Debtors' proof of claim filed in the Bankruptcy Borrower's bankruptcy case; (ii) assert and prosecute or continue to prosecute an objection to the Debtors' motion for relief from the automatic stay filed in the Bankruptcy Borrower's bankruptcy case; (iii) commence or continue to prosecute against the Debtors a motion or adversary proceeding, as applicable, to determine the validity, priority or extent of a Debtor's lien against the Bankruptcy Borrower's property; (iv) commence or continue to prosecute against the Debtors a motion or adversary proceeding, as applicable, to reduce (including to reduce to $0) or fix the amount of the Debtors' claim or lien against the Bankruptcy Borrower's property; (v) prosecute appeals with respect to items (i) through (iv) above; (vi) seek an accounting from the Debtors with respect to the Bankruptcy

9

Borrower's loan; and (vii) enter into, execute and consummate a written agreement of settlement with the Debtors where the Debtors elect to enter into such settlement in their sole discretion (but subject to the Settlement Procedures), to resolve items (i) through (vi) above;

(b)        except as set forth herein, a Bankruptcy Borrower shall be entitled to (i) engage in court-supervised or court-authorized loss-mitigation programs regarding the Bankruptcy Borrower's loan; and (ii) engage in discussions with the Debtors and execute a modification of the Bankruptcy Borrower's loan or otherwise discuss, enter into and consummate settlements of claims and liens in accordance with the ordinary course of the Debtors' business and applicable law;

(c)        absent further order of the Court, the automatic stay shall remain in full force and effect with respect to all Bankruptcy Trustee's and Bankruptcy Borrower's direct claims, counter-claims, motions or adversary proceedings:  (i) for monetary relief of any kind and of any nature against the Debtors; (ii) for violation of any local, state or federal statute or other law in connection with the origination of the Bankruptcy Borrower's loan; (iii) for relief that if granted, would have no effect on the amount, validity or priority of the Debtors' claim or lien against a Bankruptcy Borrower or the property of the Bankruptcy Borrower securing such claim or lien of the Debtors; or (iv) asserted in the form of a class action or collective action; provided however, a Bankruptcy Trustee or Bankruptcy Borrower, solely in connection with their objections to Debtors' proof of claim permitted by paragraph 15(a)(i) or proceedings permitted by 15(a)(iii), may assert claims of the type covered by subsection (i) or (ii) of this paragraph 15(c);

(d)      absent further order of the Court, the automatic stay shall remain in full force and effect with respect to any party seeking to intervene to assert related claims against the Debtors or any class action or collective action brought by any Bankruptcy Borrower on behalf of any other class of borrowers;

(e)      with the sole exception of objections to Debtors' proofs of claim permitted by paragraph 15(a)(i) above and proceedings described in 15(a)(iii) above and solely for purposes of reducing any such claim and not for the purpose of obtaining an affirmative recovery or award, under no circumstances shall a Bankruptcy Borrower or Bankruptcy Trustee be entitled to recoup, setoff or collect from the Debtors any judgment or award related to any direct claim or counter-claim for which the automatic stay has been lifted by the terms of this Order;

(f)      the Debtors shall retain the right, upon appropriate motion and notice to any Bankruptcy Borrower or Bankruptcy Trustee, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by this Order and to the extent such relief is sought, the Debtors will not object to the Interested Party's telephonic participation at any hearing on the motion; and

(g)      nothing set forth herein shall preclude or limit any Bankruptcy Borrower or Bankruptcy Trustee from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest.

*Foreclosures By The Debtors On Senior Loans*

16.      The stay imposed by section 362(a) of the Bankruptcy Code applicable to pending and future foreclosure actions initiated by the Debtors in cases where they act as

servicer for the Senior Loan and also own (or for which the applicable public land records otherwise reflect that the Debtors hold an interest) the Junior Loan with respect to the underlying property (collectively, the "Junior Foreclosure Actions") is hereby modified pursuant to the following terms and conditions:

(a)        except as otherwise set forth herein, the Debtors shall be entitled to assert and prosecute Junior Foreclosure Actions, whether in a Judicial State or a Non-Judicial State;

(b)        the Debtors shall be entitled to take such actions as are necessary to extinguish the lien with respect to a Junior Loan or to otherwise ensure clear and marketable title with respect to the property underlying a Senior Loan in connection with any sale or other disposition of such property;

(c)        the Debtors shall be entitled to seek all appropriate relief with respect to a Senior Loan in connection with the bankruptcy cases of a Bankruptcy Borrower without further order of the Court; and

(d)        the Debtors shall provide monthly reports to the Committee and the U.S. Trustee, which reports shall be in a form agreed to by the Debtors and the Committee, and such additional information as shall be reasonably requested by the Committee, in each case, concerning Junior Foreclosure Actions.

D.        *Actions Involving Amount, Validity Or Priority Of Liens*

17.        The stay imposed by section 362(a) of the Bankruptcy Code applicable to actions involving the amount, validity, and/or priority of liens commenced by third parties purporting to have a lien interest or other claim ("Third Party Claimants") with respect to

12

properties that are subject to mortgages owned or serviced by the Debtors ("Title Disputes") is

hereby modified pursuant to the following terms and conditions:

        (a)       except as otherwise set forth herein, a Third Party Claimant shall be

entitled to assert and prosecute direct claims and counter-claims relating exclusively to the

property that is the subject of the loan owned or serviced by a Debtor in connection with

any Title Dispute, and to prosecute appeals with respect to any such direct claims or

counter-claims;

        (b)       absent further order of the Court, the automatic stay shall remain in

full force and effect with respect to all pending and future Third Party Claimant direct

claims and counter-claims:  (i) for monetary relief of any kind and of any nature against the

Debtors; (ii) for relief that is not necessary for the resolution of the Title Dispute; or

(iii) asserted in the form of a class action or collective action;

        (c)       absent further order of the Court, the stay shall remain in full force

and effect with respect to any party seeking to intervene to assert related claims against the

Debtors or any class action or collective action brought by any Third Party Claimant on

behalf of any other Third Party Claimant or class of Third Party Claimants;

        (d)       under no circumstances shall a Third Party Claimant be entitled to

enforce against, recoup, setoff or collect from the Debtors any judgment or award related

to any direct claim or counter-claim for which the automatic stay has been lifted by the

terms of the Order;

        (e)       the Debtors shall be entitled to take such actions as are necessary to

clear title with respect to property that is subject to a Title Dispute or to otherwise ensure

13

clear and marketable title with respect to such property in connection with any sale, foreclosure or other disposition of such property;

(f)     the Debtors shall retain the right, upon appropriate motion and notice to any affected Third Party Claimant, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by the Order; and

(g)     nothing set forth herein shall preclude or limit any Third Party Claimant from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest.

Payment of Securitization Trustee Fees and Expenses

18.     The Debtors shall continue to perform all of their respective servicing duties and servicing related duties, including, but not limited to, their duties as master servicer, under all the governing agreements (including, without limitation, pooling and servicing agreements, servicing agreements, or any other agreements concerning or relating to the Debtors' obligations to reimburse and/or indemnify for reasonable fees, costs, expenses, liabilities, and/or losses) (collectively, the "Agreements") relating to Debtor-sponsored securitization transactions and non-Debtor sponsored securitization transactions to which any of The Bank of New York Mellon Trust Company, N.A., Wells Fargo Bank, N.A., Deutsche Bank Trust Company Americas, Deutsche Bank National Trust Company, or U.S. Bank National Association, or any affiliate of such entities acts as trustee for which any Debtor performs servicing duties, in each of their respective capacities as trustee (collectively, the "Trustees") and one or more of the Debtors is a party, including but not limited to, making all principal, interest or other servicing advances (including property protection advances) and reimbursing, indemnifying, defending and holding harmless the Trustees and the securitization trusts for any liability, loss, or reasonable fees, cost

14

or expense (including fees and disbursements of counsel or agents) incurred by any of the Trustees in the performance of their duties or their administration of the trusts or other agencies under the Agreements to the extent required by the Agreements. For the avoidance of doubt, the Debtors shall pay the reasonable, actual out-of-pocket costs and expenses of the Trustees in connection with reviewing and analyzing the request by the Debtors to approve the MBS Settlement Agreement, and in connection with reviewing and analyzing amendments to the Agreements as necessary or appropriate in connection with any proposed Chapter 11 plan, the MBS Settlement Agreement or the Platform Sale. Notwithstanding the foregoing, nothing in this paragraph 18 shall require any Debtor (i) to repurchase any mortgage loans on the basis of alleged breaches of representations, warranties or other requirements of the Agreements, or make any make-whole payments with respect to any mortgage loans pursuant to the Agreements; or (ii) to enforce, as against any other Debtor entity or any non-Debtor affiliate, any provision of the Agreements under which such other Debtor entity or non-Debtor affiliate are required to repurchase any mortgage loans on the basis of alleged breaches of representations, warranties or other requirements of the Agreements, or make any make-whole payments with respect to any mortgage loans pursuant to the Agreements; and nothing in this paragraph 18 shall be deemed to impose liability on any Debtor with respect to such alleged breaches or make-whole payment requirements.

19. The Trustees shall submit invoices to (a) counsel to the Debtors, (b) counsel to the Committee, and (c) the U.S. Trustee, and all such invoices shall include (i) an itemization of all professional fees by task with a detailed description of the work performed in connection with such task, (ii) a description of related expenses, and (iii) a description of any indemnity claims. Thereafter, within thirty (30) days of presentment of such invoices, if no

written objections to the reasonableness of the fees and expenses charged in any such invoice (or portion thereof) is made by the Debtors, the Committee, or the U.S. Trustee, the Debtors are authorized and directed to pay all reasonable fees, costs and expenses and all indemnity claims referred to in paragraph 18 (including without limitation, attorney, financial advisor, consultant and expert fees and costs) incurred postpetition by any of the Trustees relating to the performance of each of the Trustees' duties or the administration of the trusts or other agencies under the Agreements (the "Trustee Expenses") that are not subject to an objection by the Debtors, the Committee, or the U.S. Trustee without further order from the Court. Any objection to the payment of the Trustee Expenses shall be made only on the basis of "reasonableness," and shall specify in writing the amount of the contested fees and expenses and a detailed basis for such objection. To the extent an objection only contests a portion of an invoice, the undisputed portion thereof shall be promptly paid. If any such objection to payment of an invoice (or any portion thereof) is not otherwise resolved between the Debtors, the Committee, or the U.S. Trustee and the issuer of the invoice, either party may submit such dispute to the Court for a determination as to the reasonableness of the disputed amounts. This Court shall resolve any dispute as to the reasonableness of any fees and expenses.

20.     To the extent either the Committee, or the RMBS Trustees determine that the Trustee Expenses were improperly or mistakenly allocated to an RMBS trust or to the Debtors' estates, the Committee and the RMBS Trustees reserve the right to seek to correct the allocation of the Trustee Expenses as between the RMBS trusts or the Debtors' estates in accordance with the applicable Agreement, and such adjustment shall be the Committee's and RMBS Trustees' sole remedy arising from a misallocation. All Trustee Expenses for which (a) no objection under paragraph 19 has been interposed, or (b) where such an objection has been

16

interposed and the amount of Trustee Expenses determined by the Court to be reasonable, shall

be entitled to administrative expense priority in the Debtors' Chapter 11 cases notwithstanding

the entry of an order authorizing the assumption and assignment or rejection of any Agreement.

However, the Debtors will not be responsible for any fees, costs and expenses incurred with

respect to any Agreement after the entry of an order in the Debtors' Chapter 11 cases authorizing

the rejection of such Agreement.

21.     If any or all of the provisions of this Order are hereafter reversed,

modified, limited, vacated or stayed, such reversal, stay, modification or vacatur shall not affect

the validity, priority or enforceability of any Trustee Expenses incurred prior to the actual receipt

of written notice by the Trustees of the effective date of such reversal, stay, modification or

vacatur (the "Notice Date"). Notwithstanding any such reversal, stay, modification or vacatur,

the payment of any Trustee Expenses incurred prior to the Notice Date and reimbursed prior to

or after the Notice Date by the Debtors shall be governed in all respects by the original

provisions of this Order, and the Trustees shall be entitled to all of the rights, remedies,

privileges and benefits granted in this Order with respect to payment of Trustee Expenses.

22.     Notwithstanding the Debtors' obligations set forth in paragraphs 18 and

19, nothing in this Order shall be deemed to limit, extinguish, or prejudice the Debtors' rights in

any way to assume and assign or reject any Agreement in accordance with Bankruptcy Code

section 365.

Other Relief

23.     Any disputes regarding the extent, application and/or effect of the

automatic stay under this Order shall be heard and determined in the Debtors' jointly

administered bankruptcy cases pending in the United States Bankruptcy Court for the Southern

17

District of New York, Case No. 12-12020 in accordance with the Case Management Order entered in the Debtors' cases [Docket No. 141] and such other and further orders as may be entered by the Court.

24.     The Debtors are authorized and empowered to take all actions and execute such documents as may be necessary or appropriate to carry out the relief granted herein.

25.     Nothing herein shall be deemed to limit the rights of the Debtors to operate their business in the ordinary course, and no subsequent order shall be required to confirm such rights.

26.     Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall constitute, nor is it intended to constitute, the assumption of any contract or agreement under Bankruptcy Code section 365 or the waiver by the Debtors or their non-Debtor affiliates of any of their rights pursuant to any agreement by operation of law or otherwise.

27.     Notwithstanding anything to the contrary in this Order, any action to be taken pursuant to the relief authorized in this Order is subject to the terms of any cash collateral order or debtor in possession financing order entered in these chapter 11 proceedings.  All amounts authorized to be paid pursuant to this Order are subject to the limitations and restrictions imposed by the Approved DIP Budget (as defined in the DIP Credit Agreement).  To the extent that there is any inconsistency between the terms of this Order and the terms of any order relating to postpetition financing or cash collateral, the terms of the orders relating to postpetition financing or cash collateral shall govern.

28.     Notwithstanding anything herein to the contrary, this Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board

of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among

AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal

Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment

entered April 5, 2012 by the District Court for the District of Columbia, dated February 9, 2012,

(c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the

Federal Deposit Insurance Act, as amended, dated February 10, 2012, and (d) all related

agreements with AFI and Ally Bank and their respective subsidiaries and affiliates.

29.     Nothing in this Order shall discharge, release, or otherwise preclude any

setoff or recoupment right of the United States of America, its agencies, departments, or agents.

30.     The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

31.     Notwithstanding the possible applicability of Bankruptcy Rules

2002(a)(3), 6004(h), 7062 or 9014, the terms and conditions of this Order shall be immediately

effective and enforceable upon its entry.

32.     This Court shall retain jurisdiction with respect to all matters relating to

the interpretation or implementation of this Order.


Dated:       July 13, 2012
             New York, New York




                              _____/s/Martin Glenn_____
                                    MARTIN GLENN
                              United States Bankruptcy Judge

**Exhibit  K**

**Order  Dismissing  Farrell  Complaint  Without  Prejudice**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

PATRICK LORNE FARRELL,

                Plaintiff,

vs.                                  Case No.  2:13-cv-140-FtM-29DNF

STATE OF FLORIDA REPUBLICANS, RICK
SCOTT, Governor, PAM BONDI, Attorney
General, JOHN STUMPF, Wells Fargo
CEO, Brian Moynihan, BOA CEO, THOMAS
MARANO, GMACM CEO, COUNTRYWIDE HOME
LOANS,        COUNTRYWIDE      FINANCIAL,
RICHARD   J.   JOHNSON,  JOSEPH   R.
TOMKINSON, WILLIAM ERBEY, OCWEN CEO,
OCWEN   LOAN   SERVICING,  BANK   OF
AMERICA,  IMPAC  SECURED  ASSETS,
IMPAC FUNDING CORP., GMACM, WELLS
FARGO  BANK,  LEE  COUNTY  SHERIFF,
STATE   ATTORNEY,   20th   Circuit,
CIRCUIT JUDGES OF THE 20TH CIRCUIT,

                Defendants.

_____

## OPINION AND ORDER

    This matter comes before the Court on review of plaintiff's
*pro se* "Complaint for Fraud, Qui Tam, Quiet Title and Subsequent
Damages" (Doc. #1) filed on February 27, 2013.   Defendants Brian
Moynihan, Countrywide Home Loans, Inc., Countrywide Financial
Corporation (Countrywide collectively), and Bank of America, N.A.
(BOA or BANA) filed a Motion to Dismiss (Doc. #27); defendants
Ocwen Loan Servicing (Ocwen), IMPAC Secured Assets, IMPAC Funding
Corp. (IMPAC collectively), GMAC Mortgage, LLC (GMAC), and Wells

Fargo Bank (Wells Fargo) filed a Joint Motion to Dismiss (Doc. #28); defendant William Erbey filed a Motion to Dismiss (Doc. #29); and defendants Pam Bondi and Rick Scott's Motion to Dismiss (Doc. #59).

Also before the Court are defendants Pam Bondi and Rick Scott's Motion to Strike Doc. 51 (Doc. #54), Motion to Strike "Affidavit" (Doc. 60) (Doc. #61), Motion to Strike Doc. 62, as Scandalous, Pursuant to Fed. R. Civ. P. 12(F) (Doc. #66) and Motion to Strike Plaintiff's Reply to Response to Plaintiff's Motion for Summary Judgment (Doc. 70) (Doc. #71). Ocwen Loan Servicing, IMPAC Secured Assets, IMPAC Funding Corp., GMAC Mortgage, LLC, and Wells Fargo Bank also filed a Motion to Strike Doc. 72 as Scandalous Pursuant to Fed.R.Civ.P. 12(f) (Doc. #75).

Plaintiff's motions for summary judgment, to the extent included in various filings, are also addressed below.

**I.**

Under Federal Rule of Civil Procedure 8(a)(2), a Complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)(citation omitted). To survive dismissal, the factual allegations must be "plausible" and "must be enough to raise a right to relief above

-2-

the speculative level." <u>Id.</u> at 555. <u>See also</u> <u>Edwards v. Prime Inc.</u>, 602 F.3d 1276, 1291 (11th Cir. 2010). This requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)(citations omitted). Due to plaintiff's *pro se* status, the Court liberally construes the allegations. <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972).

The Court finds that the Complaint fails to comply with Rule 8(a)(2) by providing a short, plain statement as to the claim showing entitlement to relief, and Rule 9(b) as to some claims that require pleading with particularity. Therefore the motions to dismiss will be granted and the Complaint dismissed with leave to amend, if plaintiff is able to do so.

**II.**

Plaintiff filed a 515 paragraph long pleading against a variety of unrelated defendants alleging various unrelated claims for relief. Plaintiff jumbles together past events, and other cases pending in state court or previously dismissed in state or federal court, along with present claims. Starting in paragraph 112, plaintiff discusses "current state cases to be enjoined", and in paragraph 139, plaintiff starts "Part 2-Complaint for Mortgage Fraud, Qui Tam, Quiet Title" but proceeds to discuss past filings and other cases in state court and bankruptcy court not before this Court, and does so for several paragraphs.

In paragraph 280, plaintiff appears to allege material and false representations causing damages due to plaintiff's reliance. It is unclear if the representations include those made in the other cases, or if the allegations are directed to the representations made in conjunction with a closing in this case. Plaintiff alleges a failure to provide disclosures prior to closing as required under the Truth in Lending Act and the Real Estate Settlement Procedures Act, and therefore the fraudulent inducement of plaintiff into signing the closing documents for an inflated amount. (Doc. #1-1, ¶¶ 281, 282.) Plaintiff seeks to rescind or cancel the residential mortgage transaction, cancel the Note and Mortgage, that plaintiff be granted title to the property free and clear, triple damages, fees and costs, and an injunction permanently enjoining any further foreclosure proceedings. (Doc. #1-2, ¶¶ 295-303.) These allegations are generally stated and appear to summarize the relief sought in some of the actual counts. The first six counts are unnumbered and unidentified, and the remaining counts are numbered. Liberally construing the pleadings based on plaintiff's *pro se* status, the Court has identified the first six counts below and summarized all counts.

In unnumbered Count One, plaintiff seeks judgment against the State of Florida for $5 million for having endured 5 years of malicious prosecution for felonies, based upon a fraudulent Affidavit. (Doc. #1-2, ¶¶ 305-07.) It is unclear what

relationship these allegations have to the mortgage and foreclosure allegations, but the Court will treat these paragraphs as a claim for malicious prosecution.

In unnumbered Count Two, plaintiff alleges trespass by GMAC, Wells Fargo, and the State of Florida because foreclosure proceedings were initiated without charges and without due process. Plaintiff demands title to the home and for all liens and encumbrances on the property to be voided.  (Id., ¶¶ 308-312.)

In unnumbered Count Three, plaintiff alleges a breach of contract by the State of Florida of Article Six of the United States Constitution by committing acts of fraud against plaintiff since 1993.  Plaintiff seeks $20 million and nullification of any liens on his property.  (Id., ¶¶ 313-318.)

In unnumbered Count Four, plaintiff alleges civil rights violations by the State of Florida, GMAC, Wells Fargo, Bank of America, and Ocwen for conduct or actions in previously filed cases in state court.  There are no clear factual allegations in support but plaintiff seeks over $1 million in damages.  (Id., ¶¶ 319-331.)

In unnumbered Count Five, plaintiff alleges copyright infringement by GMAC, Wells Fargo, and Ocwen Loan by using his "NAME-TITLE" after plaintiff filed a Common Law Copyright Agreement in 2008 with the state court.  Plaintiff seeks $10 million and the cost of litigation since 2008.  (Id., ¶¶ 332-340.)

In unnumbered Count Six, plaintiff alleges fraud against the State of Florida.  Plaintiff complained about mortgage fraud issues in 2008, as detailed in his 2007 state case, to the Attorney General.  In response, he was provided forms to show his damages, and plaintiff did so by providing receipts totaling $45,000.  The State of Florida received a judgment as part of a collective action suit against Countrywide, but plaintiff did not receive his portion of the judgment despite sending a notice and demand.  (Id., ¶¶ 341-352.)

"Count 7" is brought under the Home Ownership Equity Protection Act against GMAC, Wells Fargo, Bank of America, and IMPAC.  Plaintiff alleges violations of the Act, including failing to make correct disclosures on the HUD-1, engaging in a pattern and practice of extending credit to plaintiff without regard to his ability to repay, and imposing illegal fees.  Plaintiff seeks to rescind his mortgage loans and take title to the subject property.  (Id., ¶¶ 353-367.)

"Count 8" is brought against GMAC, Wells Fargo, BOA, and IMPAC and simply provides that defendants are subject to RESPA, and as a result of their violations are liable for 3 times the amount of charges paid for "settlement services."  (Id., ¶¶ 368-369.)

"Count 9" is brought under the federal Truth-In-Lending Act (TILA) against defendants GMAC, Wells Fargo, BOA, and IMPAC.  Plaintiff alleges that defendants failed to include and disclose

certain charges on the TILA statement and he therefore has the right to rescind the transaction.  (Id., ¶¶ 370-374.)

"Count 10" alleges a violation of the federal Fair Credit Reporting Act by GMAC, Wells Fargo, BOA, and IMPAC for their wrongful and negative reporting to credit agencies resulting in negative reports and a lower FICO score.  Plaintiff seeks actual and punitive damages.  (Id., ¶¶ 375-382.)

"Count 11" alleges that defendants GMAC, Wells Fargo, BOA, and IMPAC violated Florida's Deceptive and Unfair and Trade Practices Act by taking advantage of plaintiff's inability to understand the transactions due to defendants' failure to disclose material information and misrepresentation of the terms of the transaction, charging plaintiff an excessive price for services, and rendering services knowing there was no reasonable probability of repayment. Plaintiff seeks three times actual damages and injunctive relief. (Id., ¶¶ 383-387.)

"Count 12" alleges "mortgage fraud" by "all named defendants" because plaintiff was fraudulently induced into signing a mortgage loan that was unconscionable and defendants concealed the theft of plaintiff's $18,000 deposit.  Plaintiff alleges that defendants' intentional concealment and material misrepresentations were made with knowledge and made with reckless disregard to plaintiff's rights.

-7-

"Count 13" provides that defendants IMPAC Funding and BOA knowingly and intentionally concealed material information before, at, and after the closing, and materially misrepresented material information to plaintiff's detriment in executing mortgage loan documents. (Id., ¶¶ 393-397.)  The Court will assume this is a fraudulent misrepresentation claim.

"Count 14" alleges a breach of fiduciary duty by GMAC, Wells Fargo, BOA, and IMPAC.  Plaintiff alleges that defendants were fiduciaries because they contracted to provide mortgage loan services, and they breached their duties to plaintiff by fraudulently inducing plaintiff into a mortgage transaction. Within the count, plaintiff also alleges that GMAC demanded more for insurance and then admitted the error in May 2009. (Id., ¶¶ 398-402.)

"Count 15" provides that defendants GMAC, Wells Fargo, BOA, and IMPAC had an implied contract with plaintiff to ensure that he understood all fees that would be paid, and that defendants were unjustly enriched by charging a higher principal and increased interest rate at the time of closing. (Id., ¶¶ 403-406.)  Within the same count, plaintiff goes on to allege that the unjust enrichment is subject to enforcement by the U.S. Treasury based on the pooling of mortgages and notes, and that "the bank" has $9.1 million based on plaintiff's signature, which has a value of $1 million based on the registration of his birth certificate with the

Department of Commerce.  Plaintiff alleges that defendants have
been unjustly enriched by the $9.1 million.  Plaintiff further
alleges that a default occurred when GMAC increased plaintiff's
insurance payment.  (Id., ¶¶ 407-423.)

"Count 16" is a civil RICO claim against all defendants and
alleges a conspiracy from July 2004 to the present with each
defendant being an "enterprise Defendant" with the aim and
objective to defraud plaintiff.  (Id., ¶¶ 424-427.)

"Count 17" alleges fraud against GMACM LLC, which may be the
same entity as the previously referenced GMAC or at least a related
entity, for requiring an additional $7,128 more to be placed in
escrow for forced placed insurance.  Plaintiff alleges that
"Defendants" are liable in an amount equal to 3 times the amount of
$7,128 in extra charges paid.  (Id., ¶¶ 428-433.)

"Count 18" alleges violations of TILA and RESPA against
defendants GMAC, Wells Fargo, BOA, Impac Funding, and IMPAC Secured
and appears to combine the sparse allegations in Counts 7 and 8
into this one count.  Plaintiff alleges defendants failed to
disclose the true loan amount, and the difference between the
actual cost, and the inflated amount of the note is due to
defendants' converting the difference for their own purpose and the
inflated payments are the "core of this controversy."  Plaintiff
alleges that he timely rescinded the transaction, provided notice,

and equitable tolling applies to extend the period of rescission actions.  (Id., ¶¶ 434-468.)

"Count 19" is brought under the False Claims Act "for T.A.R.P. and Securities Fraud" against defendants GMAC, Wells Fargo, BOA, and IMPAC.  Plaintiff asserts that his filing of a *qui tam* action against defendants in 2009, and also in later years, resulted in the government obtaining millions because the Federal Reserve and the United States, separately, sued defendants and obtained an agreement or otherwise recovered $25 billion in damages, payable to plaintiff.  Plaintiff asserts that the "only issue left" is for plaintiff to recover his portion of the damages.  Plaintiff, as a "*qui tam* relator" seeks to recover all damages and civil penalties on behalf of the United States.  (Id., ¶¶ 469-495.)

### III.

### A.  All Defendants:

The only Counts that apply to all defendants and do not specifically identify a defendant are Counts 12 and 16.  Therefore, these are the only counts that could pertain to Mr. Moynihan, Mr. Erbey, Countrywide, Bondi, and Scott.  Neither Count identifies any specific actions by any specific defendant, and the only reference to defendants Moynihan, Erbey, Countrywide, Bondi, and Scott appears to be in the caption of the case itself.

Count 12 alleges mortgage fraud but is not pled with any particularity pursuant to Fed. R. Civ. P. 9(b), and impermissibly

lumps defendants together without stating what a specific defendant did in furtherance of the fraud, Magluta v. Samples, 256 F.3d 1282, 1284 (11th Cir. 2001). "Particularity means that a plaintiff must plead facts as to time, place and substance of the defendant's alleged fraud, specifically the details of the defendant['s] allegedly fraudulent acts, when they occurred, and who engaged in them." United States ex rel. Atkins v. McInteer, 470 F.3d 1350, 1357 (11th Cir. 2006)(internal quotation marks and citation omitted)(alteration in original). Therefore, Count 12 fails to state a plausible claim and will be dismissed as to all defendants.

Count 16 alleges a conspiracy under the federal Racketeer Influenced and Corrupt Organizations Act (RICO), however plaintiff fails to allege or identify any predicate acts, see 18 U.S.C. § 1961(1), that constitute the "pattern of racketeering activity", see 18 U.S.C. §§ 1961(5), 1962(d). The motions to dismiss will be granted as to Count 16, and Count 16 dismissed as to all defendants.

**B.  Ocwen, IMPAC[1], GMAC, and Wells Fargo:**

These defendants "note that Plaintiff has thus far failed to properly serve the Moving Parties pursuant to the requirements of Federal Rule of Civil Procedure 4." (Doc. #28, p. 2 n.1.) Defendants only seek dismissal because the Complaint is a shotgun

---

[1]This includes IMPAC Secured Assets and IMPAC Funding Corp. who are both named as defendants.

pleading and because the matter should be handled in state court where litigation is currently pending.  There is no argument in the motion to support a claim of failure to serve process and therefore defendants are deemed to have waived this argument.  Fed. R. Civ. P. 12(h)(1).  Plaintiff will only be required to serve further pleadings on these defendants pursuant to Fed. R. Civ. P. 5, as formal service is deemed waived.

As to the arguments presented, the Court agrees that the Complaint is a shotgun pleading that fails to comply with Fed. R. Civ. P. 8, as further detailed below as to Bank of America.[2]  As it is not clear what counts will remain at issue and whether they are precluded by state court litigation, the motion to dismiss will be denied on this basis.

## C.  Bank of America, N.A.:

This defendant is named in Counts 4, 7 through 16, 18, and 19. Counts 12 and 16 are addressed above and the motion is granted as to these counts.  The motion is also due to be granted as to the other counts for the reasons stated below.

Count 4 alleges a violation of plaintiff's civil rights without any factual support.  Although the bank is federally insured, plaintiff has not pled that Bank of America is a governmental actor subject to 42 U.S.C. § 1983.  See San Fran. Arts

---

[2]Some or all of these defendants are named in Counts 2, 4, 5, 7-19.

& Athletics, Inc. v. U.S. Olympic Comm., 483 U.S. 522, 542
(1987)(the fundamental inquiry is whether there is a "governmental
actor to whom the prohibitions of the Constitution apply.")

Count 7 alleges a claim under the Home Ownership and Equity
Protection Act of 1994 (HOEPA).   This Act was passed as an
amendment to the Truth and Lending Act (TILA).   HOEPA requires
certain disclosures, 15 U.S.C. § 1639(a), and addresses qualifying
"high-cost mortgages" 15 U.S.C. § 1602(b)(b).   There are no factual
allegations made to support a claim that HOEPA applies to
plaintiff's mortgage therefore plaintiff has failed to state a
plausible claim under HOEPA as to any of the named defendants.
Additionally, the attached Mortgage (Doc. #27-1), specifically
referenced and incorporated by the Complaint, reflects that the
claim under HOEPA, as well as the claims under TILA in Counts 9 and
18 may be barred by the applicable statutes of limitation.   15
U.S.C. §§ 1635(f), 1640(e).

Count 8 is brought under the Real Estate Settlement Procedures
Act (RESPA), 12 U.S.C. § 2601, et. seq.   The claim fails to assert
any facts in support and therefore fails to state a claim as to how
Bank of America, or any of the other defendants, violated RESPA.

Count 9 is brought under TILA and plaintiff seeks to rescind
the mortgage transaction for the failure to disclose certain
charges on the settlement statement.   As previously stated, if the
mortgage at issue is the 2005 transaction, the claim appears to be

-13-

time-barred for purposes of receiving a rescission.  Further,
plaintiff fails to state a claim against defendants because it is
unclear whether it is the same 2005 mortgage at issue for all
defendants or if separate transactions are at issue.  The motion to
dismiss will be granted as to this count.

Count 10 seeks relief under the Fair Credit Reporting Act
(FCRA) because defendants provided incorrect information to credit
reporting agencies thereby negatively impacting plaintiff's credit
rating.  The FCRA prohibits "furnishers of information" from
reporting "any information relating to a consumer to any consumer
reporting agency if the person knows or has reasonable cause to
believe that the information is inaccurate."  15 U.S.C. §
1681s-2(a)(1)(A).  The FCRA does not however "provide a private
right of action to redress such a violation".  Green v. RBS Nat'l
Bank, 288 F. App'x 641, 642 (11th Cir. 2008).  If a financial
institution furnishes negative information to a credit reporting
agency regarding a customer, notice must be provided to the
customer in writing.  15 U.S.C. § 1681s-2(a)(7)(A)(i).  If after
receiving notice of a dispute with regard to the accuracy of any
information provided to a credit reporting agency, a furnisher of
information has certain duties subject to a private cause of
action.  15 U.S.C. § 16810s-2(b).  Plaintiff does not allege that
he lodged a dispute with a credit reporting agency that was not
investigated.  Therefore, the motion to dismiss will be granted.

Count 11 is brought under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.201, *et. seq.* The FDUTPA specifically does not apply to banks regulated by federal agencies such as Bank of America. Fla. Stat. 501.212(4)(c). Further, plaintiff does not allege that Bank of America falls outside the exclusion. Therefore, the claim will be dismissed.

Count 13 is a claim of fraudulent misrepresentation. As currently stated, plaintiff fails to meet the heightened requirements under Fed. R. Civ. P. 9(b) to "state with particularity the circumstances constituting fraud or mistake." Therefore the motion to dismiss will be granted for failure to state a claim.

Count 14 asserts a breach of fiduciary duty by Bank of America by virtue of its role as the mortgage provider. If based on this relationship, the claim must fail. "Generally, the relationship between a bank and its borrower is that of creditor to debtor, in which parties engage in arms-length transactions, and the bank owes no fiduciary responsibilities." Capital Bank v. MVB, Inc., 644 So. 2d 515, 518 (Fla. 3d DCA 1994)(citations omitted). A fiduciary relationship may exist if plaintiff can show that an established relationship where the bank knows the customer "is placing his trust and confidence in the bank and is relying on the bank so to counsel and inform him." Id. at 519. Plaintiff has made no such allegations in this case. The motion to dismiss will be granted.

Count 15 claims unjust enrichment by Bank of America and other lenders, collectively, based on an "implied contract" to ensure that plaintiff understood all the fees.  To the extent that plaintiff is asserting a quasi-contract theory of recovery, there is an express contract, i.e., the Mortgage and Note, and therefore plaintiff cannot assert such a theory as a basis for recovery.  See Moynet v. Courtois, 8 So. 3d 377, 379 (Fla. 3d DCA 2009)(claims arising out of a contractual relationship will not support a claim of unjust enrichment).  Additionally, plaintiff has not alleged what the interest rate was, whether it was stated in the contract, or whether the interest rate was usurious.  The motion to dismiss will be denied.

Count 18 will be dismissed for the same reasons stated above with regard to Counts 7, 8 and 9.  The Court notes that plaintiff states additional relevant facts in this count that are an attempt to assert that equitable tolling applies to his case.  Plaintiff may be able to properly assert a claim under TILA or RESPA if provided an opportunity to amend, and if the claims are stated separately.  As currently alleged, the combined claims in Count 18 are redundant of Counts 8 and 9.

Count 19 is brought under the False Claims Act (FCA) and plaintiff asserts that he is entitled to a portion of damages from litigation initiated by the United States based on his report of the banks' misdeeds.  This action was not brought against

defendants as a *qui tam* action and plaintiff makes no specific allegations against defendants in this case.  To the extent that plaintiff seeks payment as a realtor under 31 U.S.C. § 3730(d), such a request is not appropriately made in this case against Bank of America.  The motion to dismiss will be granted.

### D.  Pam Bondi and Rick Scott:

These defendants have filed a motion to dismiss for failure to state a claim but state that by doing so, they do not "waive defenses of any jurisdictional defect, insufficiency of process or lack of service of process."  (Doc. #59, p. 1.)  As no argument is provided in support as to why process was insufficient or lacking, the Court will deem this argument to be waived.  Therefore, plaintiff will only be required to serve further pleadings on these defendants pursuant to Fed. R. Civ. P. 5 because formal service is deemed waived.

There are several counts that reference the "State of Florida", however none of the counts specifically name Pam Bondi or Rick Scott, who are only identified in the caption and are otherwise defendants in Counts 12 and 16.  To that extent, the motion to dismiss will be granted.

Defendants do not purport to represent the "State of Florida", as named in Counts 1, 2, 3, 4, and 6, and the State of Florida is not listed as a defendant in the caption of the case.  Therefore, the allegations as to the State of Florida will not be addressed.

-17-

**IV.**

Defendants Pam Bondi and Rick Scott have moved to strike various documents pursuant to Fed. R. Civ. P. 7 and 12(f). (Docs. ## 54, 61, 66, 71.) Defendants Ocwen, IMPAC, GMAC, and Wells Fargo have also moved to strike, specifically pursuant to Rule 12(f) and Local Rule 3.01(c). (Doc. #75.) Under Rule 12(f), "[t]he court may strike from a **pleading** an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f)(emphasis added). The documents defendants seek to strike do not constitute pleadings, see Fed. R. Civ. P. 7, therefore the motion will be denied under Rule 12(f). Local Rule 3.01(c) provides that "[n]o party shall file any reply or further memorandum directed to the motion or response allowed in (a) and (b) unless the Court grants leave." M.D. Fla. R. 3.01(c).

The Court finds that Local Rule 3.01(c) does apply as a basis to strike documents filed by plaintiff that are frivolous, not filed in support of any motion, immaterial to any pleading or motion currently pending, or that fail to advance any aspect of litigation in this case as more specifically explained below. The motions will be granted as to some of the documents, denied as to those documents that may be deemed responses, and the Court will strike other documents *sua sponte*. The Court declines to award any fees or costs at this stage of the proceedings.

**A.  Plaintiff's Affidavit "Notice to Principal is Notice to Agent is Notice to Principal (Doc. #51):**

The first two pages appear to be a notice demanding summary judgment in plaintiff's favor if defendants do not make a "point by point rebuttal" to the attached 65 pages of citations and disjointed paragraphs addressing tax liabilities.  The Affidavit contains no argument or relationship to the pleadings in this case. Therefore, the Motion to Strike (Doc. #54) will be **granted** and the document will be **stricken.**

**B.  Plaintiff's Notice of Defendants Continued Fraud, In Violation of Federal Reserve Board Consent Orders and D.O.J. Lawsuit (Doc. #58):**

The document moves for sanctions but it appears to be in response to Ocwen's motion to dismiss.  Therefore, the Court will not strike the document.

**C.  Plaintiff's Affidavit and Demand for Removal of Liens By Lee County (Doc. #60):**

This document seeks to eliminate liens as fraudulent and null and void.  Plaintiff discusses his contract with Busey Bank to build a home and the sale of his mortgage in a bundle by Pinnacle Financial.  Plaintiff further states that the two stole $18,000 from him.  The request for relief and the allegations have no bearing on the allegations made in the Complaint, Busey Bank and Pinnacle Financial are not defendants in this case, and the document serves no purpose in furthering litigation in this case.

The Motion to Strike (Doc. #61) will be **granted** and the document will be **stricken**.

### D.  Plaintiff's Response to State of Florida, Notice of Fraud Upon the Court, Motion for Summary Judgment (Doc. #62):

The document is a response presumably to Pam Bondi and Rick Scott's motion to dismiss.  The document calls counsel "a despicable liar" and "lying demon blathers", an "idiot", a "LIAR", and otherwise responds that Pam Bondi and Rick Scott are "human underlings" being sued as humans because the State of Florida is a voiceless corporation.  Although the document is degrading, it is a response and will remain as filed.  To the extent it was construed as a motion for summary judgment or as containing a request for summary judgment, such a request is premature and denied.  The Motion to Strike (Doc. #66) will be **denied,** however plaintiff is cautioned that the continued use of insults will result in the striking of his filings with leave to re-file an appropriate response without the language.

### E.  Plaintiff's Affidavit and Demand for Removal of Liens by Lee County (Doc. #64):

This document duplicates the same arguments set forth in Document #60, and will be **stricken** for the same reasons, *sua sponte*.

**F.  Plaintiff's Demand for Judicial Notice of Fraudulent "Standard of Summary Judgment" and U.C.C.-1 Financing Statements (Doc. #65):**

Plaintiff states that his sovereignty documentation was recorded with Lee County for payment as a first in line lien holder, and all other liens should be voided.  As the Complaint fails to state a claim in favor of plaintiff and the document fails to support an argument for summary judgment, and plaintiff is seeking a summary decision in his favor and not for the Court to take judicial notice, the document will be *sua sponte* **stricken**.

**G.  Plaintiff's Argument That Summary Judgment Should be Granted in This Case (Doc. #70):**

The document appears to be a motion for partial summary judgment in plaintiff's favor removing all liens from property based on past litigation.  As the other cases are not at issue here, the motion will be denied.  Further, the motion is not appropriate at this stage of the proceedings as plaintiff's Complaint requires amendment.  The Court will deny the Motion to Strike (Doc. #71) and not strike the document, and will deny the construed motion for summary judgment.

**H.  Plaintiff's Response to Defendants Response to Motion for Summary Judgment (Doc. #72):**

The document appears to be a reply in support of plaintiff's Response to State of Florida, Notice of Fraud Upon the Court, Motion for Summary Judgment (Doc. #62) and also contains insults against counsel.  The document was not filed with leave of Court.

The Motion to Strike (Doc. #75) will be **granted** and the document **stricken**.

## I.  Plaintiff's Demand for Judicial Notice (Doc. #73):

This document appears to be a reiteration of past filed cases and plaintiff's opinion.  As there is no request for judicial notice contained therein and no appropriate relief sought, the document will be **stricken**, *sua sponte.*

Many of the filings, including the Complaint, contain expletives and derogatory remarks that do not serve to support any allegations or further plaintiff's case.  Plaintiff is cautioned that any further filings should refrain from any unnecessary use of profanities or risk being stricken from the record.

**V.**

The Court notes that defendants "State of Florida Republicans", John Stumpf, Thomas Marano, Richard J. Johnson, Joseph R. Tomkinson, the Lee County Sheriff, State Attorney, and "Circuit Judges of the 20th Circuit" have not filed an appearance in this case.  Further, the docket does not reflect that plaintiff executed service on these defendants.  Under Federal Rule of Civil Procedure 4(m), the Court "[i]f a defendant is not served within 120 days after the complaint is filed, the court--on motion or on its own after notice to the plaintiff--must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause

-22-

for the failure, the court must extend the time for service for an appropriate period.   Fed. R. Civ. P. 4(m).   As there is no indication that service of process was executed in a timely manner under Fed. R. Civ. P. 4(m), these defendants will be dismissed without prejudice and the time to execute service of process extended to allow for service of the Amended Complaint on these defendants pursuant to Fed. R. Civ. P. 4.

Accordingly, it is now

**ORDERED**:

1.   Defendants Brian Moynihan, Countrywide Home Loans, Inc., Countrywide Financial Corporation, and Bank of America, N.A.'s Motion to Dismiss (Doc. #27) is **GRANTED** and the Complaint is dismissed without prejudice.

2.   Defendants Ocwen Loan Servicing, IMPAC Secured Assets, IMPAC Funding Corp., GMAC Mortgage, LLC, and Wells Fargo Bank's Joint Motion to Dismiss (Doc. #28) is **GRANTED** and the Complaint is dismissed without prejudice.

3.   Defendant William Erbey filed a Motion to Dismiss (Doc. #29) is **GRANTED** and the Complaint is dismissed without prejudice.

4.   Defendants Pam Bondi and Rick Scott's Motion to Dismiss (Doc. #59) is **GRANTED** and the Complaint is dismissed without prejudice.

5.   The Complaint for Fraud, Qui Tam, Quiet Title and Subsequent Damages (Doc. #1) is **dismissed without prejudice** to

filing an Amended Complaint within **THIRTY (30) DAYS** of this Opinion
and Order, subject to the guidelines outlined above.

6.   Plaintiff is **GRANTED** an additional **THIRTY (30) DAYS**
thereafter to execute service of process pursuant to Fed. R. Civ.
P. 4 on the unserved defendants who are not deemed to have waived
formal service of process.

7.   Defendants Pam Bondi and Rick Scott's Motions to Strike
(Docs. ## 54, 61, 66, 71) are **GRANTED IN PART AND DENIED IN PART.**
Document 54 and 61 are granted and documents 66 and 71 are denied.

8.   Defendants Ocwen, IMPAC, GMAC, and Wells Fargo's Motion to
Strike (Doc. #75) is **GRANTED.**

9.   The following documents are stricken and the Clerk shall
make a notation on the docket that they are stricken pursuant to
this Opinion and Order:

i.   Plaintiff's Affidavit "Notice to Principal is Notice to
Agent is Notice to Principal (Doc. #51);

ii.  Plaintiff's Affidavit and Demand for Removal of Liens By
Lee County (Doc. #60);

iii. Plaintiff's Affidavit and Demand for Removal of Liens by
Lee County (Doc. #64);

iv.  Plaintiff's Demand for Judicial Notice of Fraudulent
"Standard of Summary Judgment" and U.C.C.-1 Financing Statements
(Doc. #65);

v.   Plaintiff's Response to Defendants Response to Motion for Summary Judgment (Doc. #72); and

vi.   Plaintiff's Demand for Judicial Notice (Doc. #73).

10.   Plaintiff's Argument That Summary Judgment Should be Granted in This Case (Doc. #70), construed as a motion for summary judgment, is **DENIED**.

11.   Plaintiff's Response to State of Florida, Notice of Fraud Upon the Court, Motion for Summary Judgment (Doc. #62), to the extent construed to contain a motion for summary judgment, is **DENIED**.

**DONE AND ORDERED** at Fort Myers, Florida, this ___1st___ day of October, 2013.

_____
JOHN E. STEELE
United States District Judge

Copies:
Plaintiff
Counsel of record

**Exhibit  L**

**Amended  Farrell  Complaint  in Florida  Federal Action**

FILED

# UNITED STATES DISTRICT COURT-MIDDLE DISTRICT-FORT MYERS DIVISION

2013 OCT 21  AM 8: 40

PATRICK LORNE FARRELL©,
Plaintiff,  vs.
STATE OF FLORIDA
GMAC MORTGAGE,
WELLS FARGO BANK N.A.,
BANK OF AMERICA
OCWEN LOAN SERVICING,
Defendants

CASE NO. 2:13-CV-140-FTM-29DNF

MIDDLE DISTRICT OF FLORIDA
FORT MYERS.FLORIDA

## 1ST AMENDED COMPLAINT FOR MORTGAGE FRAUD,QUIET TITLE AND DAMAGES

1. **SHORT PLAIN STATEMENT-Plaintiff was the victim of a "table funded loan" Predatory Per Se, and mortgage "loan" fraud and damaged by defendants actions. Plaintiff built a home in 2005, stopped contributing to the Fraud in JULY 2007, after paying about $100,000 into defendant's scheme, and demands a refund, treble damages and costs.**

2. **SUMMARILY**, Plaintiff bought a lot and built a home on it, and thought he "closed on a loan" with PINNACLE when in fact, he was robbed of $21,000 at closing, his note was a pre sold investment contract, funding a fraudulent security that defendants illegally and unlawfully profited from.

3. Plaintiff has put in $100,000 plus 7 years of litigation for a $283,000 home that is now worth only $200,000 due to defendants fraud scheme, which lured Plaintiff into a predatory loan.

4. Had it not been for defendants fraud scheme Plaintiff would not have been involved or suffered.

5. STATE OF FLORIDA, by the Lee Co. Clerk of Court recorded a Fraudulent lien on behalf of defendants, and has refused to remove the lien further damaging Plaintiff, in the amount of the assessed value of the home of about $200,000.

6. PINNACLE-COUNTRYWIDE-BEAR STEARNS stole $21,000 on the subject note at closing.

7. IMPAC FUNDING assumed the subject note and filed a notice in Lee CO. Records.

8. BANK OF AMERICA assumed COUNTRYWIDES notes including Plaintiff's.

9. GMAC illegally forced placed insurance and stole $7,128.OCWEN assumed GMAC.

10. WELLS FARGO filed a false foreclosure case, and owes Plaintiff the $283,000 note amount..

11. **JURISDICTION-** Plaintiff confers, consents, accords only to Common Law jurisdiction and DEMANDS A JURY. Jurisdiction of this court is invoked under Article III, Section 2 of the United States Constitution, 28 U.S.C.1331 and Amendment VII of the Constitution of the USA.

12. This court has supplemental jurisdiction over all other claims, including state law.

13. Venue is proper in this district as the defendant's illegal acts and omissions occurred here.

1

14. **PLAINTIFF**

15. PATRICK FARRELL Plaintiff is a "consumer" and "natural person" for the purpose of this complaint within the meaning of The Federal Truth in Lending Act 15 U.S.C. §1601 *et seq.*, Regulation Z, § 226.2(11) and 15 U.S.C. § 1692, Fair Debt and Collection Practices Act.

16. **DEFENDANTS- CREATORS OF ILLEGAL MBS IMPAC SECURED ASSETS-2005-2**

17. **STATE OF FLORIDA**-400 S.MONROE ST. TALLAHASSEE, FL.32399-0001, by the 20th Circuit Court, aided and abetted bank defendants by granting a Summary Judgment in case 07-CA-16767.

18. **Defendant Bear-Stearns** was doing business in the State of Florida including origination of mortgage loans through agents, PINNACLE FINANCIAL and COUNTRYWIDE.

19. **Defendant Bank of America** 100 NO.TRYON ST. CHARLOTTE, N.C. 28202 is a successor-in-interest to **Countrywide** and has thus assumed liability for the conduct alleged herein.

20. **Defendant Impac Funding** 19500 Jamboree Road, Irvine, CA 92612 is a Ca. corporation and a wholly owned subsidiary of Impac Mortgage, Impac Funding was the Sponsor for the MBS 2005-2. **Impac Secured Assets [ISA]** was a wholly owned subsidiary of Impac Funding, organized for the sole purpose of securitizing mortgage loans and Depositor for ISA-2005-2.

21. **Defendants GMACM and OCWEN, both at** 3451 Hammond Ave, PO Box 780 Waterloo, IA 50704 is subject to RESPA 2605 as a loan servicing agent and subject to statutory requirements under section 6 of RESPA which provides injured consumers with the ability to seek redress.

22. **Defendant GMACM** was, at all material times hereto, a limited liability corporation and doing business in the State of Florida including the servicing of mortgage loans and is thus subject to the provisions of, and as defined by the Federal Truth In Lending Act 15 U.S.C sec. §1602(f]

23. **WELLS FARGO BANK** 420 Montgomery St, San Francisco CA. 94163, was alleged trustee of IMPAC SECURED ASSETS-2005-2, who filed 07-CA-16767 on false pretense.

24. **JOHN OR JANE Does 1-1000**, unknown investors, undisclosed mortgage aggregators wholesalers mortgage originators, loan seller, Trustee of Pooled Assets, Trustee for holders of certificates of Collateralized Mortgage Obligations, et al, individually, jointly and severally

25. **Defendants** at all material times hereto, committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint. Any allegations about acts of corporate defendants means that those acts were committed through their officers, directors, employees, agents, and/or representatives while those individuals were acting within the actual or implied scope of their authority.

2

26. **PREAMBLE**- This case arises out of Defendants' egregious and ongoing and far reaching fraudulent schemes for improper use of Plaintiff's equity, negligent and/or intentional misrepresentation of appraised fair market value upon which Plaintiff was contractually bound to rely and factually entitled to rely, fraud in the inducement, fraud in the execution, usury, and breaches of contractual and fiduciary obligations as Mortgagee, Trustee,Mortgage Brokers,Loan Originator,Loan Seller,Mortgage Aggregator,Trustee of Pooled Assets, Trustee or officers of Structured Investment Vehicle Investment Banker, Trustee of Special Purpose Vehicle/Issuer of Certificates of Asset-backed Certificates, Seller of Asset-Backed' Certificates, Special Servicer of certain mortgage loans pooled together in an unlawful trust fund, called IMPAC SECURED ASSETS-2005-2.

27. Defendants in this scheme have devised business plans to reap millions of dollars in profits at the expense of Plaintiff and other investors in unlawful trust funds. Plaintiff is seeking compensatory, and other damages, declaratory relief as to what party, is the alleged owner of the promissory note executed at the time of the loan closing, and whether the Deed of Trust secures any obligation of the Plaintiff, and A Mandatory Injunction requiring re conveyance of the subject property to the Plaintiff or, in the alternative a Final Judgment granting Plaintiff Quiet Title in the subject property.

28. **SUMMARILY**, Plaintiff's one "loan" Note, mortgage, was an example of millions of similar acts by defendants, all across this nation. BEAR STEARNS gave investor money to COUNTRYWIDE who used PINNACLE FINANCIAL as a strawman lender, to create a bank note on OCT 11,2005.

29. Said note was allegedly "securitized" involving IMPAC, WELLS FARGO, BOA and GMAC.

### 30. BACKGROUND OF DEFENDANTS NATIONAL FRAUD SCHEME

31. **In January 1993**, James Cayne, CEO of Bear Stearns [BS] [underwriter of IMPAC SECURED ASSETS-2005-2] directed brokers to encourage private investors to place their funds into mortgage-backed security pools, which would be lent to individuals seeking residential loans. Cayne then began implementing a plan in which Bear Stearns would identify real estate brokers "who would agree to represent to borrowers that they were purchasing traditional loans, fixed 30 year and *conceal* the fact that the loans were not conventional loans at all", they were pre sold investment contracts.

32. **In January 1995**, Bear Stearns first met with Kennedy, CEO of First American Title and R.K. Arnold, CEO of MERS.

33. **In February and March 1995** additional meetings were held, in which Bear Stearns explained how they wished to work with Kennedy, Arnold, and **Wells Fargo** "to make enormous amounts of money from residential mortgage borrowers." BS informed them that "they were going to solicit billions in

3

private dollars to fund mortgages for borrowers and needed to employ brokers willing to craft loans designed to **strip equity** from Americans, increase likelihood of loan defaults and the opportunity to collect insurance proceeds, and foreclose and resell properties to make more profit.

34. **In February 1995**, Kennedy presented Bear Stearns a proposal to the First American Board of Directors. The FA board of directors then approved the agreement with Bear Stearns that called for First American "to instruct and train its Escrow and Title Insurance staff to **falsify county records** and not report title defects to borrowers or the public."

35. **On February 15, 1995**, Arnold informed Bear Stearns that he would form MERS, which would record its name with county recorders and thus conceal Bear Stearns' identity from borrowers.

36. Bear Stearns stated that in order to **conceal their identities from public record** they would need Loan Brokers, Escrow and Title agents, to **not record Investors names with County Clerk Recorders, but falsify local County Recorder Records by naming some entity in their place who would be bound to not divulge their identities publicly."**

37. **Between January 2000 and December 2010**, Arnold instructed MERS members, [defendants] not to disclose to borrowers, that MERS was acting as a front man for Bear Stearns.

38. **In early 2000**, MERS agreed to enroll **Countrywide** as a member if Mozilo would agree to "lead Countrywide into falsifying loan documents and county records, as well as keeping secret the **fraudulent nature of [MERS], its activities and purposes."**

39. **Between January 2000 and March 2006**, [TIME FRAME OF ELEMENTS OF PLAINTIFF'S COMPLAINT] First American entered into agreements with various title companies to produce escrow and title search functions that First American could underwrite.

40. **January to March 2006**, First American also required these companies to ignore title defects.

## 41. BANK OF AMERICA AND CEO KEN LEWIS

42. **Between January and May 2000**, Bear Stearns held talks with Lewis, CEO of Bank of America, and Mozilo, CEO of Countrywide, "about lending money to mortgage borrowers which they wished to hire **Countrywide to broker for Bear Stearns."** During these discussions, Lewis informed Countrywide that Bank of America wanted to lend sub prime loans to achieve greater profits, but "they did not wish to lend predatory loans directly,and wished to use Countrywide to broker their funds with certain types of borrowers."

43. **On April 15, 2000**, Bear Stearns and Lewis explained to Mozilo and other Countrywide officers that Bear Stearns and Bank of America "would provide Countrywide with the loan contract agreements"

4

that they "needed Countrywide to get borrowers to sign, and such contracts required Mozilo to design loans in a way which would **strip borrowers savings, income property and equity before leading to default and foreclosure** after statute of limitations had run out on breach of contract, fraud and other civil limitations." A month later, Bear Stearns and Lewis told Mozilo that **Countrywide would have to conceal that it was acting as a broker for Bear Stearns or Bank of America.**

44. **HEREIN, PINNACLE FINANCIAL** was used for that purpose.

45. If Mozilo agreed to the terms Bear Stearns would lend funds to borrowers for whom Mozilo brokered loans. Bear Stearns provided Mozilo with a "Master Repurchase Agreement" which committed Countrywide [now BOA] to broker loans for Bear Stearns, who would fund such loans as long as the terms of the loans met the specifications that Bank of America and Bear Stearns required.

46. The Countrywide Board of Directors then authorized Mozilo and others to enter into agreements with Bear Stearns, Bank of America, Wells Fargo, MERS, and First American.

47. **Between March 2000 and March 2006**, Bear Stearns and Lewis, on behalf of Bank of America, entered into agreements that committed them to **providing funds** for Countrywide "to find borrowers who could be **induced** into buying sub prime and later HELOC "Combo loans."

48. **Between March and December 2000**, Mozilo, Lewis, and Wells Fargo spoke with each other monthly regarding Mozilo's "efforts to move Countrywide to broker sub prime loans for them."

49. **In June 2000**, Bear Stearns and Lewis asked Mozilo to "disregard California laws regarding his real estate broker fiduciary duties, and to manage Countrywide in a way which publicly presented Countrywide as the actual lender of the funds being loaned out." Mozilo agreed.

50. **Between July and September 2000**, Sambol, president of marketing for Countrywide, instructed JOHN AND JANE DOES of Countrywide to prepare training programs for brokers, on how to **conceal from borrowers** Countrywide's predatory lending practices.

51. **Between January 2001 and March 2006**, Sambol also worked with others to design loans "with **payments that increased** over time to take 75, 90 and more than 100% of borrowers income so they could ensure that borrower would default and be subjected to foreclosure." These loans were designed pursuant to agreements Mozilo made with Bear Stearns and Bank of America.

52. **HEREIN, GMAC** forced placed insurance upon Plaintiff for 10 TIMES the cost for another $7,128, DESPITE Plaintiff already having insurance, to force Plaintiff into default.

53. **THIS ACTION** has been deemed illegal warranting sanctions by the FEDERAL RESERVE in their Consent Orders with defendants and the US Govt. in 2012, ORDERING restitution.

54. **Between 2003 and 2007,** loans produced by Countrywide were for" Bear Stearns and BOA.

55. **Between January 2006 and December 2007** Lewis spoke with Mozilo, who told Lewis that he would sell Countrywide "at a very cheap price" to Bank of America if Lewis **"would do whatever he could to cover up Mozilo deeds if their fraud became known and they were prosecuted."**

56. **December 2007,** Lewis presented this proposal to BOA Board of Directors. The board of directors authorized Lewis "to enter into this and other details of agreement with Mozilo and his team."

57. **DEC 7,2007, WELLS FARGO filed case 07-CA-16767, despite COUNTRYWIDE owning the subject note and mortgage. Case 07-CA-16767 has failed to foreclose for lack of standing.**

58. **Between December 2007 and July 2008,** Lewis and Mozilo negotiated the terms of the sale of Countrywide to Bank of America. **Lewis assured Mozilo that he "would cover up the predatory loan practices and other frauds committed by Mozilo, Sambol and others."**

59. After an audit of Countrywide was conducted, Lewis learned that "most of the Countrywide loans which they had sold, including [the FARRELL loan] were predatory loans . . . and that Countrywide was intentionally **falsifying monthly charges to borrowers,"**

60. After Lewis lobbied the board of directors to view this as "a good opportunity" for Bank of America, the board of directors accepted Lewis' assessment and his agreement with Mozilo to **cover up Countrywide's fraud**. The board of directors also "agreed that since they were generating hundreds of millions of dollars in additional profits by falsely overcharging borrowers, that they would not stop, overcharging borrowers, unless borrowers complained."

61. **THEREFORE,** since COUNTRYWIDE owned the paper until JULY 2008, it is impossible for WELLS FARGO and GMAC to file foreclosure on DEC 7, 2007, that case was a FRAUD UPON THE COURT, and the STATE OF FLORIDA, unlawfully and illegally, by way of "Judge" John Carlin granted a summary judgment for defendants, requiring Plaintiff to respond, costing him time and money and damages, warranting restitution to be given to him.

62. **LIST OF FACTS, SIMILAR TO DEFENDANTS GENERAL ACTS**

63. July 30, 2004 a HUD-1 and construction loan for **$265,000** was made by FIRST AMERICAN, on behalf of BUSEY BANK. The house was built upon a lot owned by Plaintiff.

64. Aug. 29,2005- Fraud based inflated appraisal for the property was for **$465,000.**

65. Sept.7, 2005 the interest rate on the TILA form for the new note was for only **5.75%.**

66. Oct. 11,2005 CLOSING- note was executed with PINNACLE FINANCIAL. The HUD-1 was prepared by FIRST AMERICAN title. Plaintiff went to the closing expecting to convert the $265,000

6

BUSEY BANK construction loan to an "end Loan", instead defendant PINNACLE acting as a lender on behalf of COUNTRYWIDE, executed a cash out Re-Finance. The note amount was **$286,000**, and the % rate was **6.25%**. Both Fraudulent inflated elements violating federal laws.

67. **FRAUD-** Farrell's $21,000 was stolen at closing, creating an additional loan broker fee and inflated Note, in violation of **Regulation Z**, which precipitated 20 inflated mortgage payments.

68. **FRAUD IN THE INDUCEMENT-** Farrell was told to ignore the $21,000 theft, and APR as the Appraisal for the property was for $465,000 and he had equity to profit in the future.

69. **DURESS-** Farrell was told if he did not sign the closing documents, the loan broker would sell the home to someone else, and Farrell would lose his $21,000 deposit and $10,000 in interest payments made up until the closing. So Farrell signed the papers and paid another $3,000.

70. Plaintiff did not get disclosures that his note would become collateral for a Fraudulent MBS.

71. OCT 2005 to FEB 2006 Plaintiff paid Pinnacle and Countrywide $2,000 per month.

72. MARCH 2006 Plaintiff began paying GMAC $2,000 per month.

73. JAN to JULY 2007- GMACM illegally charged Plaintiff for Forced Placed Insurance and demanded Plaintiff pay them $2,700 per month, illegally breaching contract. Plaintiff did until JULY 2007.

74. AUG 2007- American Home Mortgage filed bankruptcy 07-11049, all defendants and the MBS IMPAC SECURED ASSETS-2005-2 were listed as UNSECURED CREDITORS.

75. The subject MBS and the subject property debt was discharged, the mortgage is void.

76. NOV 2007 Plaintiff filed case 07-CA-14942 for mortgage Fraud against GMAC and others.

77. DEC 2007, Wells Fargo and GMAC filed 07-CA-16767, a foreclosure with no note or standing.

78. Defendant WELLS FARGO and GMACM, filed Fraudulent and forged ROBO SIGNED documents.

79. **FIRST**, defendants filed a LOST NOTE AFFIDAVIT. In truth the note was destroyed

80. **SECOND**, filed an AFFIDAVIT OF AMOUNTS DUE AND OWING. The amounts are wrong.

81. **THIRD**, filed an ASSIGNMENT OF MORTGAGE. The Assignment is filed 3 years too late, and the IRS REMIC rules prohibit a defaulted or Fraudulent note from being placed into a static REMIC.

82. **FOURTH,** defendant OCWEN now falsely maintains a bogus debt of $400,000+.

83. JAN 2008- Plaintiff registered his Secured Party Creditor Status with the Court & US Govt.

84. The defendants and anyone on earth CANNOT make any valid debt claim against Plaintiff, if you do I will sue you. This explains, why Plaintiff still lives in the home, 6.5 years after filing suit.

85. BIRTH CERTIFICATE- Functions as a Promissory Note, is also called the Manufacturer's Certificate of Origin, attached to the "vessel," the body in admiralty/maritime jurisdiction.

7

86. SOCIAL SECURITY CARD- Gov't. record of bond and tracking number of all commerce.

87. AFFIDAVIT OF TRUTH- nullifies all previous adhesion contracts and power of attorney.

88. SECURITY AGREEMENT- The "mortgage" which secures all property as collateral, associated with the "NAME" on the Birth Certificate, under the U.C.C.

89. HOLD HARMLESS AGREEMENT- Indemnifies the flesh entity from commercial liability.

90. COMMON LAW COPYRIGHT AGREEMENT- punishes unauthorized use of my NAME.

91. POWER OF ATTORNEY- I am in charge of all commercial/corporate affairs, not you.

92. COLLATERAL RECORD - List of everything on earth held against U.S.Treasury account.

93. THE U.C.C.-1 FINANCING STATEMENT- The Assignment of Mortgage to the original owner and title holder [me the Secured Party Creditor] of the trade name on the Birth Certificate.

94. APR 2008- discharged the Note and debt with a BILL OF EXCHANGE to WELLS FARGO

95. JULY 2008- Defendant BANK OF AMERICA bought all of COUNTRYWIDE debt paper.

96. OCTOBER 2008- Defendant BANK OF AMERICA used the subject note to get TARP funds.

97. NOV 2008-Defendant WELLS FARGO, used the BILL OF EXCHANGE as a TARP claim.

98. NOVEMBER 26, 2008- defendants WFB and GMAC filed a Counterfeit photocopy of the note and mortgage into the case file and claimed it was "The original note and mortgage"

99. **THEREFORE,** the filed subject note must be a copy and a Fraud. Or, if it IS the original, then it was never secured into the MBS trust IMPAC 2005-2 and case 07-CA-16767 is void.

100. **MARCH 24,2009** defendant STATE OF FLORIDA, by and through Judge John Carlin, and the illegal "Rocket Docket" granted a Summary Judgment for defendants WELLS FARGO and GMAC, in case 07-CA-16767, to let them sell the home for their illegal profit, despite them having no legal standing and no actual debt existed. Plaintiff had to file Bankruptcy and Appeal to counteract this Fraudulent act by "judge" Carlin causing further damage.

101. **JULY 2009,** GMAC sent letter to Plaintiff that they overcharged him $7,128 for forced insurance.

102. **February 10, 2011,** the FEDERAL RESERVE engaged in CONSENT ORDERS with defendants and issued massive financial penalties, for the acts alleged herein.

103. **MARCH 2012-** The USA Atty. General sued defendants to support CONSENT ORDERS, and

104. ORDERED defendants pay Plaintiff for damages up to $125,000, loss of Equity fees and costs.

105. Defendant STATE OF FLORIDA by and through the Lee Co. Clerk of Court, was given just cause by Plaintiff to remove the liens on the property filed by defendants and refused, furthering Plaintiff's rights and abilities to sell the home free and clear and recoup losses.

106. **WHEREFORE**, having set forth the above-described legally sufficient causes of actions against the Defendants, Plaintiff prays for the entry of Final Judgment against all Defendants jointly and severally; canceling the Note and Mortgage and rescinding the residential mortgage transaction pursuant to TILA, RESPA, Regulation Z, an award of three times the amount of actual damages sustained, costs and attorneys' fees; for declaratory relief as set forth above; that the Court find that the transactions, the subject of this action be void and any further foreclosure proceedings be permanently enjoined; and for any and all other and further relief which is just

107. ORDER that the Note in the amount of $ 283,000.00 dated October 11,2005 shall be and the same is hereby cancelled, voided, nullified, set aside and is of no further force and effect; and

108. ORDER that the Mortgage in the amount of $ 283,0000.00 which secures said Note given by PATRICK FARRELL to Mortgage Electronic Registration Systems Inc. As Nominee For IMPAC and WELLS FARGO dated October 11,2005 and recorded with the Clerk of Lee County on November 9,2005 INSTRU # 2005000110952 page 16, as assigned to WELLS FARGO by Assignment , with the Clerk of Lee County, shall be and the same is hereby vacated, cancelled, released and discharged of record; and further;

109. ORDER that IMPAC and WELLS FARGO, its successors and assigns are hereby barred, prohibited and foreclosed from attempting, in any manner, directly or indirectly, to enforce any provision of the aforesaid Note and Mortgage or any portion thereof as against Patrick Farrell, his heirs or successors; and further;

110. ORDER that the Clerk of Lee County shall cause a copy of this Order & Judgment to be filed in the Land Records so as to effectuate of record each and every one of the provisions hereinabove set forth with respect to cancellation of the instruments and items of record; and

111. ORDER that WELLS FARGO shall pay to the Clerk within ten (10) days from the date of entry hereof, any and all fees and costs required to effect cancellation of record of the Note and Mortgage, and any other fees so levied; and further,

112. ORDER that within ten (10) days of the date of entry hereof, WELLS FARGO's counsel shall serve a copy of the Order upon the Clerk of Lee County and Plaintiff Patrick Farrell.

113. ORDER that the Certificate of Title of the subject property to be given to Plaintiff, free and clear of any and all liens and encumberances.

**114.**  **COUNT #1 FRAUD**

115.  Plaintiff reaffirms and re alleges paragraphs 1-113 above as if set forth more fully herein below.

116.  WELLS FARGO foreclosure case 07-ca-16767 is a Fraud Upon the Court.

117.  FIRST- the subject note was NEVER actually forwarded into the Trust by COUNTRYWIDE,

118.  THEREFORE, BANK OF AMERICA is the "holder-in-due-course" not WELLS FARGO.

119.  WELLS FARGO BANK N.A. AS TRUSTEE is named holder but no party is named as creditor.

120.  The attachments show a different party [PINNACLE] as the alleged lender. The complaint fails to allege injury to WELLS FARGO BANK N.A. AS TRUSTEE and a short plain statement of how WELLS FARGO BANK N.A. AS TRUSTEE was financially damaged.

121.  WELLS FARGO BANK N.A. AS TRUSTEE fails to attach cancelled check(s) or wire transfer receipt(s) or wire transfer instructions for an actual transaction — which is the essential element and foundation for use of the note and mortgage as evidence of the transaction and the terms of repayment depending upon whether WFB is attempting to enforce the terms of the NOTE, MORTGAGE, DEBT, LOAN OR ASSIGNMENT.

122.  WELLS FARGO BANK N.A. AS TRUSTEE should be required to attach a copy of the cancelled checks or wire transfer receipts to show which party is actually claiming injury and a short plain statement of why their claim is secured.

123.  WELLS FARGO BANK N.A. AS TRUSTEE has failed to allege that it or an affiliate or predecessor or successor [DEFENDANT OCWEN] has responded to the RESPA 6 (Qualified Written Request) or the Debt Validation Letter sent to the apparent servicer which alternated between defendants Countrywide, IMPAC, Bank of America, GMAC and now OCWEN.

124.  WELLS FARGO BANK N.A. AS TRUSTEE has failed to allege and attach relevant copies of documentation demonstrating proof of ANY POTENTIAL OR ACTUAL LOSS nor any authority to represent the creditor(s) and identifying the creditor who meets the standard of a party qualified to submit a credit bid at foreclosure auction, execute a satisfaction of mortgage upon payment, or a correct accounting of the loan receivable or bond receivable if the loan is in fact claimed by any of the above stakeholders to be owned by a loan pool, REMIC, Special purpose vehicle or trust.

125.  Unless WELLS FARGO BANK N.A. AS TRUSTEE can allege and attach documents showing financial injury as of the date that the complaint was filed, [DEC 7,2007] it lacks standing in that case. Since the case is essentially in rem with the requested relief being the foreclosure sale of the property

10

owned by Plaintiff, WELLS FARGO BANK N.A. AS TRUSTEE has failed to state a cause of action upon which relief could be granted.

126.    It is apparent here that WELLS FARGO BANK lacks standing and certainly has failed to plead and attach required documents demonstrating financial injury since according to its own pleadings and attachments it was neither the lender nor the purchaser of the loan according to the existing allegations

127.    Plaintiff's note was NEVER put into the "trust" IMPAC-2005-2, so WELLS FARGO, GMACM and their successor OCWEN LOAN SERVICING cannot make any debt claim against Plaintiff.

128.    **WHEREFORE**, Plaintiff prays that this Honorable Court will grant Plaintiff reasonable attorney fees and costs for defending a patently sham pleading, related case 07-CA-16767; and QUIET TITLE, and ORDER the removal of all liens in the Lee Co. Records.

129.    **COUNT #2 VIOLATIONS OF FEDERAL TRUTH-IN-LENDING ACT**

130.    Plaintiff reaffirms and re alleges paragraphs 1-113 above as if set forth more fully herein below.

131.    Defendants failed to include and disclose certain charges in the finance charge shown on the TIL statement, which charges were imposed on Plaintiff incident to the extension of credit to the Plaintiff and were required to be disclosed pursuant to 15 USC sec. 1605 and Regulation Z,sec. 226.4, thus resulting in an improper disclosure of finance charges in violation of 15 USC sec. 1601 et seq., Regulation Z sec. 226.18(d). Such undisclosed charges include a sum identified on the Settlement Statement listing the amount financed which is different from the sum listed on the original Note; $265,000 vs. $283,000 and 5.75% vs. 6.25%.

132.    By calculating the annual percentage rate ("APR") based upon improperly calculated and disclosed amounts, Defendants are in violation of 15 USC sec. 1601 et seq., Regulation Z sec. 226.18(c), 18(d), and 22. Defendants' failure to provide the required disclosures provides Plaintiff with the right to rescind the transaction, and Plaintiff, through this public Complaint which is intended to be construed, for purposes of this claim, as a formal Notice of Rescission, hereby elect to rescind the transaction.

133.    **WHEREFORE**, A refund of Plaintiff's $100,000 is due and costs for this litigation and any other relief the court deems just.

134.    **COUNT #3 FRAUDULENT MISREPRESENTATION**

135.    Plaintiff reaffirms and re alleges paragraphs 1-113 above as if set forth more fully herein below.

136.    Defendants knowingly and intentionally concealed material information from Plaintiff which is required by Federal Statutes and Regulations to be disclosed to the Plaintiff both before closing.

11

Defendants also materially misrepresented material information to the Plaintiff with full knowledge by Defendants that their affirmative representations were false, fraudulent, and misrepresented the truth at the time said representations were made.Under the circumstances, the material omissions and material misrepresentations of the Defendants were malicious. Plaintiff, not being an investment banker, securities dealer, mortgage lender, mortgage broker, or mortgage lender, reasonably relied upon the representations of the Defendants in agreeing to execute the mortgage loan documents.

137.    Had Plaintiff known of the falsity of Defendants' representations, Plaintiff would not have entered into the transactions the subject of this action. As a direct and proximate cause of the Defendants' material omissions and material misrepresentations, Plaintiff suffered damages.

138.    **WHEREFORE,** Plaintiff demands a damage award of the $100,000 spent and other costs.

**139.    COUNT #4 UNJUST ENRICHMENT**

140.    Plaintiff reaffirms and re alleges paragraphs 1-113 above as if set forth more fully herein below.

141.    Defendants had an implied contract with the Plaintiff to ensure that Plaintiff understood all

142.    fees which would be paid to the Defendants to obtain credit on Plaintiff' behalf and to not

143.    charge any fees which were not related to the settlement of the loan and without full disclosure to Plaintiff. Defendants cannot, in good conscience and equity, retain the benefits from their actions of charging a higher interest rate, fees. rebates, kickbacks, profits from default insurance, TARP fund bailout, (including but not limited to from resale of mortgages and notes using Plaintiff's identity, credit score and reputation without consent, right, justification or excuse as part of an illegal enterprise scheme) and gains and YSP fee unrelated to the settlement services provided at closing.

144.    Defendants have been unjustly enriched at the expense of the Plaintiff, and maintenance of the enrichment would be contrary to the rules and principles of equity.

145.    Defendants have also been additionally enriched through the receipt of PAYMENT from third parties including but not limited to investors, insurers, other borrowers, the United States Department of the Treasury, the United States Federal Reserve, and Bank of America, N.A.

146.    Plaintiff thus demand restitution from the Defendants in the form of actual damages, exemplary damages, and attorneys' fees.

**147.    COUNT #5 CIVIL CONSPIRACY**

148.    Plaintiff reaffirms and re alleges paragraphs 1-113 above as if set forth more fully herein below.

149.    In connection with the application for and consummation of the mortgage loan the subject of this action, Defendants agreed, between and among themselves, to engage in actions and a course

12

of conduct designed to further an illegal act or accomplish a legal act by unlawful means, and to commit one or more overt acts in furtherance of the conspiracy to defraud the Plaintiff.

150.    Defendants agreed between and among themselves to engage in the conspiracy to defraud for the common purpose of accruing economic gains for themselves at the expense of the Plaintiff.

151.    Defendant STATE OF FLORIDA by and through the 20th Circuit Court and the Lee Co. Clerk filed and/or accepted Fraudulent filings on behalf of other defendants, and refused Plaintiff's Notice and Demands to remove said filings, damaging Plaintiff. The actions of the Defendants were committed intentionally, willfully, wantonly, and with reckless disregard for the rights of the Plaintiff.

152.    As a direct and proximate result of the actions of the Defendants in combination resulting in fraud and breaches of fiduciary duties, Plaintiff have suffered damages.

153.    Plaintiff thus demand an award of actual, compensatory, and punitive damages.

## 154.    COUNT# 6 CIVIL RICO

155.    Plaintiff reaffirms and re alleges paragraphs 1-113 above as if set forth more fully herein below.

156.    Defendants are "persons" as defined by ORC sec. 2923.31(G).

157.    The conspiracy the subject of this action has existed from date of application to the present, with the injuries and damages resulting there from being continuing.

158.    Defendants' actions and use of multiple corporate entities, multiple parties, and concerted and predetermined acts and conduct specifically designed to defraud Plaintiff constitutes an"enterprise", with the aim and objective of the enterprise being to perpetrate a fraud upon the Plaintiff through the use of intentional nondisclosure, material misrepresentation, and creation of fraudulent loan documents. Each of the Defendants is an "enterprise Defendant". As a direct and proximate result of the actions of the Defendants, Plaintiff has suffered damages and demands restitution.

## 159.    COUNT #7 COMPLAINT TO QUIET TITLE TO REAL PROPERTY

160.    Plaintiff reaffirms and re alleges paragraphs 1-113 above as if set forth more fully herein below.

161.    Plaintiff has sent or has caused to be sent authorized Qualified Written Requests to the only known Defendants which the said Defendants have failed and refused to answer despite acknowledging receipt. Plaintiff has sent or has caused to be sent notice of his intent to rescind the subject loan transaction but has only sent those notices to the only entities that have been disclosed.

162.    Hence, without this action, neither the rescission nor the re conveyance which the Plaintiff is entitled to file and will file contemporaneously with this complaint, gives Plaintiff full and clear title to the property. The real party in interest on the lender side may be the owner of the asset backed

13

security issued by the SPV, the insurer through some claim of equitable interest, or the Federal government through the United States Department of the Treasury or the Federal Reserve.

163. The security is a "securitized" bond deriving its value from the underlying mortgages of which the subject mortgage is one. Thus Plaintiff is entitled to quiet title against Defendants, clearing title of the purported subject mortgage encumbrance.

164. Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained.

165. Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, each of the defendants sued herein was the agent and employee of each of the remaining defendants and was at all times acting within the purpose and scope of such agency and employment.

166. Plaintiff is informed and believes and thereupon alleges that and each of the Defendants claim or might claim an interest in the property adverse to plaintiff herein. However, the claim of said Defendants is without any right whatsoever, and said Defendant have no legal or equitable right, claim, or interest in said property.

167. Plaintiff therefore seeks a declaration that the title to the subject property is vested in Plaintiff alone and that the defendants herein, and each of them, be declared to have no estate, right, title or interest in the subject property and that said defendants and each of them, be forever enjoined from asserting any estate, right, title or interest in the subject property adverse to plaintiff herein.

168. **WHEREFORE**, in this Count, plaintiff prays this Court will enter judgment against

169. defendants and each of them, as follows: For an order compelling said Defendant, and each of them, to transfer or release legal title and alleged encumbrances thereon and possession of the subject property to Plaintiff herein; For a declaration and determination that Plaintiff is the rightful holder of title to the property and that Defendant herein, and each of them, be declared to have no estate, right, title or interest in said property; For a judgment forever enjoining said defendants, and each of them, from claiming any estate, right, title or interest in the subject property; For costs of suit herein incurred; For such other and further relief as the court may deem proper

170. **COUNT #8 USURY and FRAUD**

171. Plaintiff reaffirms and re alleges paragraphs 1-113 above as if set forth more fully herein below.

172. The subject loan, note, and mortgage was structured so as to create the appearance of a higher value of the real property than the actual fair market value.

14

173.    Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, each of the defendants sued herein was the agent and employee of each of the remaining defendants and was at all times acting within the purpose and scope of such agency and employment.

174.    Defendants disguised the transaction to create the appearance of the lender being a properly chartered and registered financial institution authorized to do business and to enter into the subject transaction when in fact the real party in interest was not disclosed to Plaintiff, as aforesaid, and neither were the various fees, rebates, refunds, kickbacks, profits and gains of the various parties who participated in this unlawful scheme.

175.    Said real party in interest, i.e., the source of funding for the loan and the person to whom the note was transmitted or eventually "assigned" was neither a financial institution nor an entity or person authorized, chartered or registered to do business in this State nor to act as banking, lending or other financial institution anywhere else.

176.    As such, this fraudulent scheme, (which was in actuality a plan to trick the Plaintiff into signing what would become a negotiable security used to sell unregulated securities under fraudulent and changed terms from the original note) was in fact a sham to use Plaintiff's interest in the real property to collect interest in excess of the legal rate.

177.    The transaction involved a loan of money pursuant to a written agreement, and as such, subject to the rate limitation set forth under state and federal law. The "formula rate" referenced in those laws was exceeded by a factor in excess of 10 contrary to the applicable law and contrary to the requirements for disclosure under TILA and HOEPA.

178.    Under Applicable law, the interest charged on this usurious mortgage prevents any collection or enforcement of principal or interest of the note, voids any security interest thereon, and entitles the Plaintiff to recovery of all money or value paid to Defendants, plus treble damages, interest, and attorney fees. Under Applicable Law Plaintiff are also entitled and demand a permanent injunction

179.    be entered against the Defendants;

   (a) preventing them from taking any action or making any report in furtherance of collection on this alleged debt which was usurious, as aforesaid,

   (b) requiring the records custodian of the county in which the alleged mortgage and other instruments are recorded to remove same from the record,

15

(c) allowing the filing of said order in the office of the clerk of the property records where the subject property, "Loan transaction" and any other documents relating to this transaction are located and

(d) dissolving any lis pendens or notice of pendency relating to the Defendants purported claim.

180. **WHEREFORE**, having set forth numerous legally sufficient causes of actions against the

181. Defendants, Plaintiff pray for the entry of Final Judgment against all Defendants jointly and

182. severally in an amount not yet quantified but to be proven at trial and such other amounts to be proven at trial, and for costs and attorneys' fees; that the Court find that the transactions the

183. subject of this action are illegal and are deemed void; that the foreclosure which was instituted be deemed and declared illegal and void and that further proceedings in connection with the foreclosure be enjoined; and for any other and further relief which is just and proper.

184. **COUNT 9-COPYRIGHT INFRINGEMENT-GMAC, WELLS FARGO, OCWEN**

185. Plaintiff reaffirms and re alleges paragraphs 1-113 above as if set forth more fully herein below.

186. On January 9,2008,Farrell filed with the court and sent defendants a copy of a filing titled:

187. NOTICE OF FILING OF SOVEREIGNTY DOCUMENTS, which contained inter alia;

188. COMMON LAW COPYRIGHT AGREEMENT, which clearly spells out that any unauthorized use of the corporate designation, PATRICK LORNE FARRELL©, with the intent of procuring money, from a proposed debt, warrants a charge of $500,000, per each unauthorized use.

189. From January 2008, to present, defendants filed claims in the U.S. Mail and 20th circuit court, containing unauthorized uses of Plaintiffs property, his NAME/TITLE to convert Plaintiffs home and equity to their possession, using ROBO-SIGNED and other fraudulent documents.

190. Proper, prior notification of a properly filed contractual relationship, that I, Patrick Farrell, as Secured Party Creditor, under the corporate name PATRICK LORNE FARRELL© have the sole proprietary rights to use as I see fit, and the right to prohibit the use of by anybody.

191. Defendants have illegally used Plaintiff's Copyrighted property, his NAME-TITLE, in an attempt to make money, that Plaintiff has the exclusive rights to.

192. Plaintiff filed his SOVEREIGNTY DOCUMENTATION that contained clear and unambiguous language and an AFFIDAVIT in support, no rebuttal was made by any defendants.

193. **WHEREFORE**, pursuant to the Federal Copyright Act of 1978,17USC 511, Plaintiff demands judgment against defendants and prays; To award damages against the defendants herein for a sum of money of $5,000,000 for each of the 10 unauthorized uses of my copyrighted property.

**VERIFICATION**

I am the Plaintiff in the above-entitled action. I have read the foregoing and know the contents thereof.
The same is true of my own knowledge, except as to those matters  which are therein alleged on
information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Patrick Lorne Farrell-in Propria Persona-Attorney In Fact

Sovereign American and Secured Party Creditor

signed "without the united states" and without prejudice/UCC 1-308

UCC-1 Filing # 2007-356-2344-8 [12/22/07]-Wash. St. –DOL-

2904 NW14th Terrace-Cape Coral, Fl. 33993

**OCTOBER 20,2013**

17

**Exhibit  M**

**Order  Dismissing  First  Farrell  Bankruptcy**

**[8odsmcs]** [ORDER DISMISSING CASE]

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## FT. MYERS DIVISION

In re:                                                    Case No. 9:09−bk−10265−ALP
                                                          Chapter 13


Patrick Lorne Farrell
2904 NW 14th Terrace
Cape Coral, FL 33993




_____    Debtor(s)         /

## ORDER DISMISSING CASE

THIS CASE came on for consideration upon the Court's own motion for the purpose of entering an appropriate order. The Court considered the record and finds the debtor filed a Voluntary Petition under Chapter 13 on May 19, 2009 . At the time of filing, the clerk noted deficiencies to the petition, schedules, and/or statements. The clerk gave notice of the deficiencies to the debtor and provided an opportunity for the debtor to cure the deficiencies. The Court further finds that the debtor has failed to cure the deficiencies in a timely manner. Failure to cure the deficiencies constitutes grounds for dismissal of this case pursuant to Section 707(a) of the Bankruptcy Code. Accordingly, it is

ORDERED:

    1. That this bankruptcy case is hereby dismissed without prejudice.

    2. All pending hearings are cancelled with the exception of any hearing on an Order to Show Cause that may be presently scheduled in this case.

    3. The Debtor(s) shall immediately pay to the Clerk of Court all fees due and owing pursuant to 28 U.S.C. 1930.

DONE AND ORDERED on June 8, 2009 .

_____
Alexander L. Paskay
United States Bankruptcy Judge

**Exhibit N**

**Order Dismissing Second Farrell Bankruptcy**

[8odsmcs] [ORDER DISMISSING CASE]

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

In re:                                          Case No. 9:09−bk−14386−ALP
                                                Chapter 13

Patrick Lorne Farrell
2904 NW14th Terrace
Cape Coral, FL 33993


_____    Debtor(s)    _____/

ORDER DISMISSING CASE


    THIS CASE came on for consideration upon the Court's own motion for the purpose of entering an appropriate
order. The Court considered the record and finds the debtor filed a Voluntary Petition under Chapter 13 on July 2,
2009 . At the time of filing, the clerk noted deficiencies to the petition, schedules, and/or statements. The clerk gave
notice of the deficiencies to the debtor and provided an opportunity for the debtor to cure the deficiencies. The Court
further finds that the debtor has failed to cure the deficiencies in a timely manner. Failure to cure the deficiencies
constitutes grounds for dismissal of this case pursuant to Section 1307(c) of the Bankruptcy Code. Accordingly, it is

    ORDERED:

        1. That this bankruptcy case is hereby dismissed without prejudice.

        2. All pending hearings are cancelled with the exception of any hearing on an Order to Show Cause
        that may be presently scheduled in this case.

        3. The Debtor(s) shall immediately pay to the Clerk of Court all fees due and owing pursuant to 28
        U.S.C. 1930.

    DONE AND ORDERED on August 11, 2009 .


_____
Alexander L. Paskay
United States Bankruptcy Judge

**Exhibit O**

**Order Dismissing Third Farrell Bankruptcy**

[8odsmcs] [ORDER DISMISSING CASE]

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## FT. MYERS DIVISION

In re:                                                      Case No. 9:09−bk−20572−ALP
                                                            Chapter 13

Patrick Lorne Farrell
2904 NW14th Terrace
Cape Coral, FL 33993

_____    Debtor(s)    _____/

## ORDER DISMISSING CASE

   THIS CASE came on for consideration upon the Court's own motion for the purpose of entering an appropriate order. The Court considered the record and finds the debtor filed a Voluntary Petition under Chapter 13 on September 14, 2009 . At the time of filing, the clerk noted deficiencies to the petition, schedules, and/or statements. The clerk gave notice of the deficiencies to the debtor and provided an opportunity for the debtor to cure the deficiencies. The Court further finds that the debtor has failed to cure the deficiencies in a timely manner. Failure to cure the deficiencies constitutes grounds for dismissal of this case pursuant to Section 1307(c) of the Bankruptcy Code. Accordingly, it is

   ORDERED:

      1. That this bankruptcy case is hereby dismissed without prejudice.

      2. All pending hearings are cancelled with the exception of any hearing on an Order to Show Cause that may be presently scheduled in this case.

      3. The Debtor(s) shall immediately pay to the Clerk of Court all fees due and owing pursuant to 28 U.S.C. 1930.

   DONE AND ORDERED on September 28, 2009 .

_____
Alexander L. Paskay
United States Bankruptcy Judge

**Exhibit  P**

**Notice of Dismissal of Fourth  Farrell  Bankruptcy**

IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

In the Matter of:

                                               CASE No. 9-10-bk-16390-ALP

PATRICK LORNE FARRELL                 Chapter 7
                            Debtor(s)/
_____

## ORDER ON MOTION TO DISMISS

      THIS CASE came on to be heard at a hearing held on September 3, 2010,  on
Motion to Dismiss filed by the Debtor herein, and the Court having been advised that the
Trustee had no objection to the entry of an order dismissing the case; it is

      ORDERED, ADJUDGED and DECREED that the above-referenced bankruptcy
case be and the same is hereby dismissed.

                                          September 20, 2010
      DONE and ORDERED at Tampa, Florida, on _____.


_____
David H. Adams
United States Bankruptcy Judge


cc:      Diane L. Jensen, Trustee, P. O. Drawer 1507, Fort Myers, FL 33902-1507
CYNTHIA P. BURNETTE, Ass't U.S. Trustee, 501 E. Polk Street, Suite 1200, Tampa, FL 33602
PATRICK LORNE FARRELL, 2904 NW14th Terrace , Cape Coral, FL 33993


F:\WPDATA\SUE\WORDDOCS\ORDERS\9-10-bk-16390-ALP Farrell Order on Motion to Dismiss.doc

**Exhibit Q**

**Petition for Fifth Farrell Bankruptcy**

**B1 (Official Form 1) (04/13)**

| United States Bankruptcy Court |
|---|
| Middle District of Florida, Tampa Division |

| Name of Debtor (if individual, enter Last, First, Middle): | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| Farrell, ~~Lance~~ Patrick *LORNE P.B.* | |
| All Other Names Used by the Debtor in the last 8 years (include married, maiden, and trade names): | All Other Names Used by the Joint Debtor in the last 8 years (include married, maiden, and trade names): |
| | |
| Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) No./Complete EIN (if more than one, state all): 5666 | Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) No./Complete EIN (if more than one, state all): |
| Street Address of Debtor (No. and Street, City, and State): 2904 NW 14th Terrace | Street Address of Joint Debtor (No. and Street, City, and State): |
| Cape Coral, FL    33993 | |
| County of Residence or of the Principal Place of Business: Lee | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address): | Mailing Address of Joint Debtor (if different from street address): |
| Location of Principal Assets of Business Debtor (if different from street address above): | |

**Type of Debtor**
(Form of Organization)
(Check one box.)

- [ ] Individual (includes Joint Debtors)
  See Exhibit D on page 2 of this form.
- [ ] Corporation (includes LLC and LLP)
- [ ] Partnership
- [x] Other (If debtor is not one of the above entities, check this box and state type of entity below.)

Secured Party Creditor

**Nature of Business**
(Check one box.)

- [ ] Health Care Business
- [ ] Single Asset Real Estate as defined in 11 U.S.C. § 101 (51B)
- [ ] Railroad
- [ ] Stockbroker
- [ ] Commodity Broker
- [ ] Clearing Bank
- [ ] Other

**Chapter of Bankruptcy Code Under Which the Petition is Filed** (Check one box)

- [ ] Chapter 7
- [ ] Chapter 9
- [ ] Chapter 11
- [ ] Chapter 12
- [x] Chapter 13
- [ ] Chapter 15 Petition for Recognition of a Foreign Main Proceeding
- [ ] Chapter 15 Petition for Recognition of a Foreign Nonmain Proceeding

**Nature of Debts**
(Check one box.)

- [x] Debts are primarily consumer debts, defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose.
- [ ] Debts are primarily business debts

**Chapter 15 Debtors**

Country of debtor's center of main interests:

Each country in which a foreign proceeding by, regarding, or against debtor is pending:

**Tax-Exempt Entity**
(Check box, if applicable.)

- [x] Debtor is a tax-exempt organization under Title 26 of the United States Code (the Internal Revenue Code).

**Filing Fee** (Check one box.)

- [x] Full Filing Fee attached
- [ ] Filing Fee to be paid in installments (Applicable to individuals only). Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form 3A.
- [ ] Filing Fee waiver requested (Applicable to chapter 7 individuals only). Must attach signed application for the court's consideration. See Official Form 3B.

**Chapter 11 Debtors**

Check one box:
- [ ] Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).
- [ ] Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).

Check if:
- [ ] Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,490,925 (amount subject to adjustment on 4/01/16 and every three years thereafter).

Check all applicable boxes:
- [ ] A plan is being filed with this petition.
- [ ] Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

**Statistical/Administrative Information**

- [x] Debtor estimates that funds will be available for distribution to unsecured creditors.
- [ ] Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors.

**THIS SPACE IS FOR COURT USE ONLY**

Estimated Number of Creditors

| [x] 1-49 | [ ] 50-99 | [ ] 100-199 | [ ] 200-999 | [ ] 1,000-5,000 | [ ] 5,001-10,000 | [ ] 10,001-25,000 | [ ] 25,001-50,000 | [ ] 50,001-100,000 | [ ] Over 100,000 |
|---|---|---|---|---|---|---|---|---|---|

Estimated Assets

| [ ] $0 to $50,000 | [ ] $50,001 to $100,000 | [x] $100,001 to $500,000 | [ ] $500,001 to $1 million | [ ] $1,000,001 to $10 million | [ ] $10,000,001 to $50 million | [ ] $50,000,001 to $100 million | [ ] $100,000,001 to $500 million | [ ] $500,000,001 to $1 billion | [ ] More than $1 billion |
|---|---|---|---|---|---|---|---|---|---|

Estimated Liabilities

| [ ] $0 to $50,000 | [ ] $50,001 to $100,000 | [x] $100,001 to $500,000 | [ ] $500,001 to $1 million | [ ] $1,000,001 to $10 million | [ ] $10,000,001 to $50 million | [ ] $50,000,001 to $100 million | [ ] $100,000,001 to $500 million | [ ] $500,000,001 to $1 billion | [ ] More than $1 billion |
|---|---|---|---|---|---|---|---|---|---|

2014 MAY 27 PM 12:22 FILED CLERK U.S. BANKRUPTCY MIDDLE DISTRICT OF FLORIDA TAMPA DIVISION

**B1 (Official Form 1) (04/13)**  Page 2

| Voluntary Petition<br>(This page must be completed and filed in every case) | Name of Debtor(s):  Farrell, Lorne Patrick | |
|---|---|---|

| Location<br>Where Filed: | Middle District of Florida<br>Tampa, Divison | Case Number:<br>09-14386-ALP | Date Filed:<br>03/2009 |
|---|---|---|---|
| Location<br>Where Filed: | | Case Number: | Date Filed: |

| Name of Debtor: | Case Number: | Date Filed: |
|---|---|---|
| District: | Relationship: | Judge: |

| **Exhibit A** | **Exhibit B** |
|---|---|
| (To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.)<br><br>☐ Exhibit A is attached and made a part of this petition. | (To be completed if debtor is an individual whose debts are primarily consumer debts.)<br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter. I further certify that I delivered to the debtor the notice required by 11 U.S.C. § 342(b).<br><br>X _____<br> Date |

**Exhibit C**

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

☐ Yes, and Exhibit C is attached and made a part of this petition.

☒ No

**Exhibit D**

(To be completed by every individual debtor. If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)

☒ Exhibit D completed and signed by the debtor is attached and made a part of this petition.

If this is a joint petition:

☐ Exhibit D also completed and signed by the joint debtor is attached and made a part of this petition.

**Information Regarding the Debtor - Venue**

(Check any applicable box.)

☒ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

☐ Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District.

**Certification by a Debtor Who Resides as a Tenant of Residential Property**

(Check all applicable boxes.)

☐ Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following.)

_____
(Name of landlord that obtained judgment)

_____
(Address of landlord)

☐ Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgement for possession was entered, and

☐ Debtor has included in this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.

☐ Debtor certifies that he/she has served the Landlord with this certification. (11 U.S.C. § 362(l)).

B1 (Official Form 1) (04/13)                                                                                    Page 3

| Voluntary Petition | Name of Debtor(s):   Farrell, Lorne Patrick |
| (This page must be completed and filed in every case) | |

---

**Signature(s) of Debtor(s) (Individual/Joint)**

I declare under penalty of perjury that the information provided in this petition
is true and correct.
[If petitioner is an individual whose debts are primarily consumer debts and has
chosen to file under Chapter 7] I am aware that I may proceed under chapter 7,
11, 12 or 13 of title 11, United States Code, understand the relief available under
each such chapter, and choose to proceed under chapter 7.
[If no attorney represents me and no bankruptcy petition preparer signs the
petition] I have obtained and read the notice required by § 342(b) of the
Bankruptcy Code.

I request relief in accordance with the chapter of title 11, United States Code,
specified in this petition.

X _____ UCC-1-308
    Signature of Debtor

X _____
    Signature of Joint Debtor
    239-558-5729
    Telephone Number (If not represented by attorney)
    5-27-14
    Date

---

**Signature of a Foreign Representative**

I declare under penalty of perjury that the information provided in this petition
is true and correct, that I am the foreign representative of a debtor in a foreign
proceeding, and that I am authorized to file this petition.

(Check only one box.)

☐ I request relief in accordance with chapter 15 of title 11, United States
  Code. Certified copies of the documents required by § 1515 of title 11 are
  attached.

☐ Pursuant to § 1511 of title 11, United States Code, I request relief in accordance
  with the chapter of title 11 specified in this petition. A certified copy of the
  order granting recognition of the foreign main proceeding is attached.

X _____
    (Signature of Foreign Representative)

_____
    (Printed Name of Foreign Representative)

_____
    Date

---

**Signature of Attorney***

X _____
    Signature of Attorney

_____
    Printed Name of Attorney for Debtor(s)

_____
    Firm Name

_____
    Address

_____

_____
    Telephone Number

_____
    Date

* In a case in which § 707(b)(4)(D) applies, this signature also constitutes a
certification that the attorney has no knowledge after an inquiry that the information
in the schedules is incorrect.

---

**Signature of Non-Attorney Bankruptcy Petition Preparer**

I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer
as defined in 11 U.S.C. 110; (2) I prepared this document for compensation
and have provided the debtor with a copy of this document and the notice and
information required under 11 U.S.C. 110(b), 110(h), and 342(b); and, (3) if
rules or guidelines have been promulgated pursuant to 11 U.S.C. 110(h) setting
a maximum fee for services chargeable by bankruptcy petition preparers, I have
given the debtor notice of the maximum amount before preparing any document
for filing for a debtor or accepting any fee from the debtor, as required in that
section. Official Form 19B is attached.

Julie M. Jefferson, Owner Freedom Rings Doc Prep Srvs, LLC

Printed Name and title, if any, of Bankruptcy Petition Preparer
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

Social Security number (If the bankruptcy petition preparer is not an individual,
state the Social Security number of the officer, principal, responsible person or
partner of the bankruptcy petition preparer.)(Required by 11 U.S.C. § 110.)

3003 S. Tamiami Tr.

Address
Sarasota, FL 34239

X _____

_____
    Date                         5/27/14

Signature of Bankruptcy Petition Preparer or officer, principal, responsible
person, or partner whose social security number is provided above.

Names and Social Security numbers of all other individuals who
prepared or assisted in preparing this document unless the bankruptcy petition
preparer is not an individual.

If more than one person prepared this document, attach additional sheets
conforming to the appropriate official form for each person.

A bankruptcy petition preparer's failure to comply with the provisions
of title 11 and the Federal Rules of Bankruptcy Procedure may result
in fines or imprisonment or both 11 U.S.C. § 110; 18 U.S.C. § 156.

---

**Signature of Debtor (Corporation/Partnership)**

I declare under penalty of perjury that the information provided in this
petition is true and correct, and that I have been authorized to file this
petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11,
United States Code, specified in this petition.

_____
    Signature of Authorized Individual

_____
    Printed Name of Authorized Individual

_____
    Title of Authorized Individual

_____
    Date

B 1D (Official Form 1, Exhibit D)(12/09)

# UNITED STATES BANKRUPTCY COURT
## Middle District of Florida, Tampa Division

In Re: _____Farrell, Lorne Patrick_____          Case No. _____
               **Debtor**                                                        (if known)

## EXHIBIT D - INDIVIDUAL DEBTOR'S STATEMENT OF COMPLIANCE WITH CREDIT COUNSELING REQUIREMENT

**Warning: You must be able to check truthfully one of the five statements regarding credit counseling listed below. If you cannot do so, you are not eligible to file a bankruptcy case, and the court can dismiss any case you do file. If that happens, you will lose whatever filing fee you paid, and your creditors will be able to resume collection activities against you. If your case is dismissed and you file another bankruptcy case later, you may be required to pay a second filing fee and you may have to take extra steps to stop creditors' collection activities.**

Every individual debtor must file this Exhibit D. If a joint petition is filed, each spouse must complete and file a separate Exhibit D. Check one of the five statements below and attach any documents as directed.

☒　1. Within the 180 days before the filing of my bankruptcy case, I received a briefing from a credit counseling agency approved by the United States trustee or bankruptcy administrator that outlined the opportunities for available credit counseling and assisted me in performing a related budget analysis, and I have a certificate from the agency describing the services provided to me. Attach a copy of the certificate and a copy of any debt repayment plan developed through the agency.

☐　2. Within the 180 days before the filing of my bankruptcy case, I received a briefing from a credit counseling agency approved by the United States trustee or bankruptcy administrator that outlined the opportunities for available credit counseling and assisted me in performing a related budget analysis, but I do not have a certificate from the agency describing the services provided to me. You must file a copy of a certificate from the agency describing the services provided to you and a copy of any debt repayment plan developed through the agency *no later than 14 days after your bankruptcy case is filed.*

☐ 3. I certify that I requested credit counseling services from an approved agency but was unable to obtain the services during the five days from the time I made my request, and the following exigent circumstances merit a temporary waiver of the credit counseling requirement so I can file my bankruptcy case now. [Summarize exigent circumstances here.]

**If your certification is satisfactory to the court, you must still obtain the credit counseling briefing within the first 30 after you file your bankruptcy petition and promptly file a certificate from the agency that provided the counseling, together with a copy of any debt management plan developed through the agency. Failure to fulfill these requirements may result in dismissal of your case. Any extension of the 30-day deadline can be granted only for cause and is limited to a maximum of 15 days. Your case may also be dismissed if the court is not satisfied with your reasons for filing your bankruptcy case without first receiving a credit counseling briefing.**

☐ 4. I am not required to receive a credit counseling briefing because of: [Check the applicable statement.][Must be accompanied by a motion for determination by the court.]

☐ Incapacity. (Defined in 11 U.S.C. § 109(h)(4) as impaired by reason of mental illness or mental deficiency so as to be incapable of realizing and making rational decisions with respect to financial responsibilities.);

☐ Disability. (Defined in 11 U.S.C. § 109(h)(4) as physically impaired to the extent of being unable, after reasonable effort, to participate in a credit counseling briefing in person, by telephone, or through the Internet.);

☐ Active military duty in a military combat zone.

☐ 5. The United States trustee or bankruptcy administrator has determined that the credit counseling requirement of 11 U.S.C. § 109(h) does not apply in this district.

**I certify under penalty of perjury that the information provided above is true and correct.**

Signature of Debtor _____

Date: _____

# UNITED STATES BANKRUPTCY COURT
### Middle District of Florida, Tampa Division

In Re: _____ Farrell, Lorne Patrick _____    Case No. _____
                          **Debtor**                                                              (if known)


## VERIFICATION OF CREDITOR MATRIX


The above named debtor(s), or debtor's attorney if applicable, do hereby certify under

penalty of perjury that the attached Master Mailing List of creditors, consisting of 1 sheet(s) is

complete, correct and consistent with the debtor's schedules pursuant to Local Bankruptcy

Rules and I/we assume all responsibility for errors and omissions.


_5-27-14_____            _____
          Date                                              **Signature of Attorney**


_____            _____
     **Signature of Debtor**                              **Signature of Joint Debtor**


_____
  **Signature of Authorized Individual**

Ocwen Loan Servicing LLC
1100 Virginia Drive Ste. #175
Fort Washington, PA 19034

Wells Fargo Bank N.A.
420 Montgomery Street
San Francisco, CA 94132

Julie M. Jefferson
3003 S. Tamiami Tr.
Sarasota, FL  34239

**Exhibit  R**

**Mr. Farrell's  Mortgage**

AFTER RECORDING RETURN TO:
PINNACLE FINANCIAL
CORPORATION

2611 TECHNOLOGY DRIVE

ORLANDO, FL 32804

ATTN:   POST CLOSING

*Pur 11/23/05*
*Impac*
*1103510761*

THIS DOCUMENT PREPARED BY:
MARILYN BERMINGHAM

PINNACLE FINANCIAL
CORPORATION D/B/A TRI-STAR
LENDING GROUP
2611 TECHNOLOGY DRIVE

ORLANDO, FL 32804

INSTR # 2005000110952, Pages 16
Doc Type MTG, Recorded 11/09/2005 at 09:44 AM,
Charlie Green, Lee County Clerk of Circuit Court
Mtg Doc: $990.50 Int. Tax $566.00  Rec. Fee $137.50
Deputy Clerk JCASOLA
#1

*1M058C*
*1103570761*

*1024-973415*

[Space Above This Line For Recording Data]

# MORTGAGE

FARRELL
LOAN #: 132030973
MIN:   100062701320309731
PIN:   05-44-23-C1-04078.0370

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** **"Security Instrument"** means this document, which is dated OCTOBER 11, 2005          , together with all Riders to this document.
**(B)** **"Borrower"** is PATRICK   FARRELL, ~~A MARRIED MAN~~  *Single*

Borrower is the mortgagor under this Security Instrument.
**(C)** **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(D)** **"Lender"** is PINNACLE FINANCIAL CORPORATION D/B/A TRI STAR LENDING GROUP

Lender is a  CORPORATION                                organized and existing under the laws of
FLORIDA                        . Lender's address is    2611 TECHNOLOGY DRIVE,
ORLANDO, FL 32804                                                                          .
**(E)** **"Note"** means the promissory note signed by Borrower and dated   OCTOBER 11, 2005          . The Note states that Borrower owes Lender
TWO HUNDRED EIGHTY-THREE THOUSAND AND 00/100
Dollars (U.S. $ 283,000.00    ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than  NOVEMBER 1, 2035          .
**(F)** **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

132030973

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ 1-4 Family Rider | ☒ Other(s) [specify] **PREPAYMENT RIDER** | |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the
**COUNTY**                                      of    **LEE**                                                     :
[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

**LOTS 37 AND 38, BLOCK 4078, CAPE CORAL, UNIT 57, AS RECORDED IN PLAT BOOK 19 PAGES 124 TO 137, IN THE PUBLIC RECORDS OF LEE COUNTY, FLORIDA**

132030973

which currently has the address of **2904 N.W. 14TH TERRACE**

[Street]

**CAPE CORAL**, Florida **33993** ("Property Address"):

[City]                                    [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

132030973

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by

132030973

RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing,



132030973

any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security



132030973

Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

**FLORIDA**--Single Family--Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**          **Form 3010 1/01**          *(page 7 of 14 pages)*
DOCUKFL7
DOCUKFL7.VTX  08/25/2005

132030973

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.



132030973

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent

132030973

by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or

132030973

(d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



132030973

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property.  The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure.  If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.**  Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument.  Borrower shall pay any recordation costs.  Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.**  As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.**  The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.



132030973

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
BORROWER - PATRICK FARRELL - DATE

Signed, sealed and delivered in the presence of:

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾    ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Witness                                    Witness

**FLORIDA**--Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**        Form 3010 1/01        *(page 13 of 14 pages)*
DOCUKFL13
DOCUKFLD.VTX  08/25/2005

132030973

[Space Below This Line For Acknowledgment]

STATE OF **FLORIDA**
COUNTY OF **LEE**

The foregoing instrument was acknowledged before me this    OCTOBER 11, 2005    by
**PATRICK  FARRELL, ~~A MARRIED MAN~~**

who is personally known to me or who has produced _____ D. L. _____ as identification.

_____
Notary Public

FRANK DESIDERIO PAIS
Comm# DD0272923
Expires 3/7/2008
Bonded thru (800)432-4254
Florida Notary Assn., Inc

My Commission Expires:

FLORIDA--Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**          Form 3010 1/01          *(page 14 of 14 pages)*
DOCUKFL14
DOCUKFLE.VTX  08/25/2005

Date:  **OCTOBER 11, 2005**
Borrower(s):  **PATRICK   FARRELL,  A MARRIED MAN**

Property Address:  **2904 N.W. 14TH TERRACE, CAPE CORAL, FL 33993**

## PREPAYMENT PENALTY RIDER
**FARRELL**
**LOAN #: 132030973**
**MIN:   100062701320309731**

(Do not sign this rider before you read it. This security instrument rider provides for the payment of a penalty if you wish to repay the loan prior to the date provided for repayment in the loan agreement.)

THIS PREPAYMENT PENALTY RIDER IS MADE THIS **11TH**     day of **OCTOBER, 2005**                 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to    **PINNACLE FINANCIAL CORPORATION D/B/A TRI STAR LENDING GROUP**

**ADDITIONAL COVENANTS:** Notwithstanding anything to the contrary set forth in the Note or Security Instrument, Borrower and Lender further covenant and agree as follows:

I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment".   When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.

Subject to the Prepayment Penalty specified below, I may make a full Prepayment or partial Prepayments of my obligation.  The Note Holder will use all of my Prepayments to reduce the amount of Principal that I owe under this Note.  If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

Prepayment Penalty Rider – Multi-State            Page 1 of 2
DOCUD9U1
DOCUD901.VTX 04/18/2005

132030973

If, within the **36**  -month period beginning with the date you execute the Note (the "Penalty Period"), you make a full prepayment, or partial prepayment in any twelve (12)-month period that exceeds twenty percent (20%) of the original principal loan amount, you will pay a prepayment charge as consideration for the Note Holder's acceptance of such prepayment.  The prepayment charge will equal the amount of interest that would accrue during a six (6)-month period on the amount prepaid that exceeds 20% of the original principal balance of the Note, calculated at the rate of interest in effect under the terms of the Note at the time of prepayment, unless otherwise prohibited by applicable law or regulation.  No prepayment penalty will be assessed for any prepayment made after the Penalty Period.

Notwithstanding the foregoing, in the event of a full prepayment concurrent with a bona fide sale of the Property to an unrelated third party after the first    **0**    month(s) of the term of the Note, no prepayment penalty will be assessed.  In order to avoid the imposition of a prepayment penalty, I will be required to provide the Note Holder with evidence acceptable to the Note Holder of such sale.  For purposes of this exception to the imposition of a prepayment penalty, a sale of the property to a person or entity with whom I have a personal or business relationship (such as a family member, builder, developer or employer) will be presumed NOT to be a bona fide sale of the Property to an unrelated third party.

All other terms and conditions of the Security Instrument remain in full force and effect.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in the Prepayment Penalty Rider.

- BORROWER – PATRICK FARRELL – DATE –

**Exhibit S**

**Order dated May 23, 2013 Striking Mr. Farrell's 5th**

**Amended Complaint**

**IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT
IN AND FOR LEE COUNTY, FLORIDA**

| | |
|---|---|
| PATRICK FARRELL,<br><br>Plaintiff,<br><br>v.<br><br>GMAC; GMAC MORTGAGE, LLC; IMPAC SECURED ASSETS CORP; WELLS FARGO BANK, N.A.; et. al.,<br><br>Defendants. | Case No.: 07-CA-14942 |
| WELLS FARGO BANK, N.A., AS TRUSTEE UNDER THE POOLING AND SERVICING AGREEMENT RELATING TO IMPAC SECURED ASSETS CORPORATION, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-2,<br><br>Plaintiff,<br><br>v.<br><br>PATRICK FARRELL, et al,<br><br>Defendants. | Case No.: 07-CA-016767 |

## ORDER

**THIS MATTER** came before the Court upon Patrick Farrell's Notice of Voluntary Dismissal and Motion To Amend Complaint; Patrick Farrell's 5th Amended Complaint for Mortgage Fraud, Qui Tam, Quiet Title, Damages, And Other Statutory Relief; and Wells Fargo Bank, N.A., IMPAC Secured Assets Corp, GMAC, GMAC Mortgage, LC, and Wells Fargo Bank, N.A., As Trustee Under The Pooling and Servicing Agreement Relating To Impac Secured Assets Corporation, Mortgage Pass-Through Certificates, Series 2005-2's Response in Opposition to Patrick Farrell's Notice of Voluntary Dismissal and Motion to Amend Complaint and 5th Amended Complaint for and Motion to Strike the Proposed 5th Amended Complaint.

**IT IS HEREBY ORDERED** that:

1.   The Motion to Strike the Proposed 5th Amended Complaint is **GRANTED**;

2.   Patrick Farrell's Motion To Amend Complaint as to additional parties John

Stumpf, CEO of Wells Fargo Bank, and IMPAC Funding Corp., is **DENIED**; and

3.   The Parties shall have an additional twenty (20) days from the date of this

ORDER to add or drop parties and to file Motions to Amend pleadings.

The original of this
document was signed

Dated May ____, 2013.                         MAY 2 3 2013

/s/ Sherra Winesett
Circuit Judge
_____
Hon. Sherra Winesett, Circuit Judge

Service list:

Monica L. Wilson, BRADLEY ARANT BOULT CUMMINGS LLP, 100 N. Tryon Street, Suite 2690, Charlotte, NC 28202

Patrick Farrell, 2904 NW 14th Terrace, Cape Coral, Florida 33993

Sarah Barbaccia, Morales Law Group, 14750 NW 77Court, Suite 303, Miami Lakes, FL 33016

Andrew Bolin, Beyton McLaughlin & Bolin, One Tampa City Center, 201 N. Franklin Street, Suite 2900, Tampa, FL 33602

Choice Legal, 1800 N.W. 49th Street, Suite 120, Fort Lauderdale, FL 33309