1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-12020-mg

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  RESIDENTIAL CAPITAL, LLC, et al.,

9

10            Debtors.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14            United States Bankruptcy Court

15            One Bowling Green

16            New York, New York

17

18            June 18, 2014

19            10:04 AM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

1

2   (CC: Doc. no. 6536) Third Interim and Final Application of

3   Ernst & Young LLP for Allowance and Payment of Compensation for

4   Professional Services and Reimbursement of Actual and Necessary

5   Expenses for Ernst & Young LLP, Other Professional.

6

7   (CC: Doc. no. 6512) Final Application of Bryan Cave LLP as

8   Ordinary Course Counsel for the Debtors for Compensation and

9   Reimbursement of Expenses Incurred for the Period May 1, 2013

10  through June 30, 2013 for Bryan Cave LLP, Other Professional.

11

12  (CC: Doc. no. 6537) Final Application of Bradley Arant Boult

13  Cummings LLP as Special Litigation and Compliance Counsel for

14  the Debtors, for Compensation and Reimbursement of Expenses

15  Incurred for the Period May 14, 2012 Through and Including

16  December 17, 2013 for Bradley Arant Boult Cummings LLP, Special

17  Counsel.

18

19  (CC: Doc. no. 6531) Final Fee Application of Deloitte & Touche

20  LLP for Compensation for Services Rendered and Reimbursement of

21  Expenses as Independent Auditor and Attest Service Provider to

22  the Debtors for the Period from May 14, 2012 through August 31,

23  2013 for Deloitte & Touche LLP, Auditor.

24

25

1

2  (CC: Doc. no. 6528) Fourth and Final Fee Application of Towers

3  Watson Delaware Inc. as Human Resources Consultant for the

4  Debtors for Compensation and Reimbursement of Expenses Incurred

5  for the Period June 25, 2012 through April 30, 2013 for Towers

6  Watson Delaware Inc., Consultant.

7

8  (CC: Doc. No. 6542) Fifth Interim and Final Fee Application of

9  KPMG LLP, as Tax Compliance Professionals and Information

10  Technology Advisors to the Debtors and Debtors in Possession,

11  for Interim Allowance of Compensation and Reimbursement of

12  Actual and Necessary Expenses Incurred from September 1, 2013

13  through December 17, 2013 and for Final Allowance of

14  Compensation for Professional Services Rendered and

15  Reimbursement of Actual and Necessary Expenses Incurred from

16  May 14, 2012 through December 17, 2013 for KPMG LLP, Other

17  Professional.

18

19  (CC: Doc. no. 6541) Final Fee Application of Prince Lobel Tye

20  LLP for an Award of Compensation and Reimbursement of Expenses

21  for Services Rendered as an Ordinary Course Professional for

22  the Debtors for the Period of May 14, 2012 through December 17,

23  2013 for Prince Lobel Tye LLP, Other Professional.

24

25

1

2   (CC: Doc. no. 6539) Fifth Interim and Final Fee Application of

3   Dorsey & Whitney LLP as Special Securitization and

4   Investigatory Counsel for the Debtors for Compensation and

5   Reimbursement of Expenses Incurred for the Period from May 14,

6   2012 through December 17, 2013 for Dorsey and Whitney LLP,

7   Special Counsel.

8

9   (CC: Doc. no. 6543) Fifth and Final Application of Carpenter

10  Lipps & Leland LLP as Special Litigation Counsel for the

11  Debtors for Compensation and Reimbursement of Expenses Incurred

12  for the Interim Period of September 1, 2013 Through December

13  17, 2013 and the Final Period of May 14, 2012 Through December

14  17, 2013 for Carpenter Lipps & Leland LLP, Special Counsel.

15

16  (CC: Doc. no. 6549) Second and Final Fee Application of

17  Kurtzman Carson Consultants, LLC as Administrative Agent for

18  the Debtors for Allowance of Compensation for Professional

19  Services Rendered and for Reimbursement of Actual and Necessary

20  Expenses Incurred from May 14, 2012 through December 17, 2013

21  for Kurtzman Carson Consultants LLC, Other Professional.

22

23

24

25

(CC: Doc. no. 6550, 6972) Fifth Interim Fee Application and
Final Fee Application of Orrick, Herrington & Sutcliffe LLP, as
Special Securitization Transactional and Litigation Counsel for
the Debtors, for Allowance of Compensation for Professional
Services Rendered and For Reimbursement of Actual and Necessary
Expenses Incurred from May 14, 2012 through December 17, 2013
for Orrick, Herrington & Sutcliffe LLP, Special Counsel.

(CC: Doc. no. 6552) Third and Final Application of Perkins Coie
LLP as Special Insurance Coverage Counsel to the Debtors for
Compensation and Reimbursement of Expenses Incurred for Perkins
Coie LLP, Special Counsel.

(CC: Doc. no. 6553) Application for Final Professional
Compensation for Locke Lord LLP, Special Counsel.

(CC: Doc. no. 6555) Final Application of Morrison Cohen LLP for
Allowance of Compensation for Professional Services Rendered
and Expenses Incurred During the Period from May 14, 2012
through December 16, 2013 for Morrison Cohen LLP, Other
Professional.

1

2  (CC: Doc. no. 6556) Final Fee Application of Tilghman & Co.,

3  P.C. as Noticing Agent to Debtor in Connection with the Kessler

4  Settlement Agreement, for Allowance of Compensation for the

5  Period May 14, 2012 through December 17, 2013 for Tilghman &

6  Co., P.C., Other Professional.

7

8  (CC: Doc. no. 6559) Fourth and Final Application of

9  SilvermanAcampora LLP, Special Counsel to Official Committee of

10  Unsecured Creditors, for Allowance of Compensation for

11  Professional Services Rendered and for Reimbursement of Actual

12  and Necessary Incurred from September 1, 2013 through December

13  16, 2013 for SilvermanAcampora LLP, Special Counsel.

14

15  (CC: Doc. no. 5844) Final Fee Application of Leonard, Street

16  and Deinard Professional Association for Allowance of

17  Compensation for Services Rendered and Reimbursement of

18  Expenses Incurred as Special Minnesota Counsel for the Examiner

19  for Leonard, Street and Deinard Professional Association, Other

20  Professional.

21

22

23

24

25

1

2   (CC: Doc. No. 5846) Final Fee Application of Wolf Haldenstein

3   Adler Freeman & Herz LLP, Conflicts Counsel to the Examiner,

4   for Allowance of Compensation and Reimbursement of Expenses for

5   the Period from October 15, 2012 Through and Including April

6   30, 2013.

7

8   (CC: Doc. no. 5819) Third Interim and Final Application of

9   Pepper Hamilton LLP as Special Foreclosure Review Counsel for

10  Bankruptcy Issues for the Debtors for Compensation and

11  Reimbursement of Expenses Incurred for the Period May 15, 2012

12  through October 31, 2013.

13

14  (CC: Doc. no. 5850) Final Application of Arthur J. Gonzalez, as

15  Chapter 11 Examiner, for Allowance of Compensation and

16  Reimbursement of Expenses.

17

18  (CC: Doc. No. 5980) Third Interim and Final Application of

19  Hudson Cook, LLP as Special Counsel to the Debtors for

20  Compensation and Reimbursement of Expenses Incurred for the

21  Period May 15, 2012 through June 30, 2013.

22

23

24

25

1

2   (CC: Doc. no. 6560) Final Application for Final Professional

3   Compensation for an Award of Compensation and Reimbursement of

4   Expenses for Services Rendered as an Ordinary Course

5   Professional for the Debtors for the Period of May 14, 2012

6   through December 17, 2013 for Troutman Sanders LLP, Other

7   Professional.

8

9   CC: Doc. no. 6561) Fifth and Final Application of Severson &

10   Werson and for Donald H. Cram, Special Counsel.

11

12   (CC: Doc. no. 6567) Fifth Interim and Final Fee Application of

13   Morrison & Foerster LLP as Bankruptcy Counsel for the Debtors

14   for Allowance of Compensation for Professional Services

15   Rendered and for Reimbursement of Actual and Necessary Expenses

16   Incurred from May 14, 2012 through December 17, 2013 for

17   Morrison & Foerster LLP, Debtor's Attorney.

18

19   (CC: Doc. no. 6573) Fifth Interim and Final Application of

20   Centerview Partners LLC as Investment Banker for the Debtors

21   for Compensation and Reimbursement of Expenses Incurred for the

22   Period May 14, 2012 through December 17, 2013 for Centerview

23   Partners LLC.

24

25

1

2  (CC: Doc. no. 6565) Fourth and Final Fee Application of

3  Pachulski Stang Ziehl & Jones LLP for Compensation for Services

4  Rendered and Reimbursement of Expenses as Co-Counsel for the

5  Official Committee of Unsecured Creditors for the (I) Fourth

6  Interim Compensation Period of September 1, 2013 Through

7  December 17, 2013 and (II) Final Compensation Period From

8  September 19, 2012 Through December 17, 2013 for Pachulski

9  Stang Ziehl & Jones LLP, Creditor Comm. Aty.

10

11  (CC: Doc. no. 6571) Fifth Interim and Final Application of

12  Mercer (US) Inc. as Compensation Consultant to the Debtors for

13  the Interim Period from September 1, 2013 through December 17,

14  2013 and for the Final Period of May 14, 2012 through December

15  17, 2013 for Mercer (US) Inc., Other Professional.

16

17  (CC: Doc# 6562) First and Final Application for Professional

18  Compensation of Weir & Partners LLP.

19

20  (CC: Doc. no. 6577) Amended Final Application of Chadbourne &

21  Parke LLP, Counsel to the Examiner, for Allowance of

22  Compensation and Reimbursement of Expenses for Chadbourne &

23  Parke LLP, Other Professional.

24

25

1

2    (CC: Doc. no. 6696, CC: 6570, 7002) Fifth and Final Fee

3    Application of Fortace LLC as Consultant for the Debtors for

4    Compensation and Reimbursement of Expenses Incurred from July

5    6, 2012 through December 17, 2013 for Fortace LLC, Consultant.

6

7    (CC: Doc. no. 6569) Application for Final Professional

8    Compensation (First and Final) for Carter Ledyard & Milburn

9    LLP, Consultant.

10

11    (CC: Doc. No. 6578) Fifth and Final Fee Application of Mesirow

12    Financial Consulting, LLC For Compensation and Reimbursement of

13    Expenses as Financial Advisor to the Examiner for the Period

14    July 24, 2012 through December 17, 2013 for Mesirow Financial

15    Consulting, LLC, Other Professional.

16

17    (CC: Doc. no. 6579) Final Application of Rubenstein Associates,

18    Inc. as Corporate Communications Consultant for the Debtors for

19    Compensation and Reimbursement of Expenses Incurred for the

20    Period May 14, 2012 through April 30, 2013 for Rubenstein

21    Associates, Inc., Consultant.

22

23

24

25

1

2  (CC: Doc# 6580) Compensation /Fifth and Final Fee Application

3  of AlixPartners, LLP, Financial Advisor to the Official

4  Committee of Unsecured Creditors, for Compensation and

5  Reimbursement of Expenses Incurred During the Fifth Interim

6  Compensation Period of September 1, 2013 Through December 17,

7  2013 and for the Total Compensation Period of May 21, 2012

8  Through December 17, 2013 for AlixPartners, LLP, Other

9  Professional, period: 5/21/2012 to 12/17/2013,

10  fee:$14718273.53, expenses: $103,325.70.

11

12  (CC: Doc# 6587) Final Application of J F. Morrow, Consultant to

13  the Official Committee of Unsecured Creditors, for Final

14  Allowance of Compensation for Professional Services Rendered

15  and for Reimbursement of Actual and Necessary Expenses Incurred

16  During the Total Compensation Period of September 5, 2012

17  Through August 31, 2013 for J F. Morrow, Consultant, period:

18  9/5/2012 to 8/31/2013, fee:$250,060.00, expenses: $1,345.61.

19

20

21

22

23

24

25

1

2   (CC: Doc# 6586) Fourth and Final Application of Coherent

3   Economics, LLC, as Consultant to the Official Committee of

4   Unsecured Creditors for Final Allowance of Compensation for

5   Professional Services Rendered and for Reimbursement of Actual

6   and Necessary Expenses Incurred During (I) the Fourth Interim

7   Compensation Period of September 1, 2013 Through December 17,

8   2013 and (II) the Total Compensation Period of August 11, 2012

9   Through December 17, 2013 for Coherent Economics LLC,

10   Consultant, period: 8/11/2012 to 12/17/2013, fee:$1135367.52,

11   expenses: $15,194.52.

12

13   (CC: Doc# 6585) First and Final Application of Quest Turnaround

14   Advisors, LLC, Consultant to the Official Committee of

15   Unsecured Creditors, for Final Allowance of Compensation for

16   Professional Services Rendered and for Reimbursement of Actual

17   and Necessary Expenses Incurred From September 16, 2013 Through

18   December 17, 2013 for Quest Turnaround Advisors, LLC,

19   Consultant, period: 9/16/2013 to 12/17/2013, fee:$345,646.12,

20   expenses: $17,614.09.

21

22

23

24

25

1

2   (CC: Doc# 6581) Final Fee Application of Analytic Focus, LLC,

3   Consultant to the Official Committee of Unsecured Creditors,

4   for Allowance of Compensation for Professional Services

5   Rendered and for Reimbursement of Actual and Necessary Expenses

6   From August 28, 2012 Through December 17, 2013 for Analytic

7   Focus, LLC, Consultant, period: 8/28/2012 to 12/17/2013,

8   fee:$592,840.25, expenses: $355.29.

9

10  (CC: Doc# 6584) Third Interim and Final Fee Application of

11  Wilmer Cutler Pickering Hale and Dorr LLP, as Special Counsel

12  for Certain Regulatory Matters to the Official Committee of

13  Unsecured Creditors of Residential Capital, LLC, et al. for

14  Interim Allowance of Compensation and for the Reimbursement of

15  Expenses for Services Rendered During the Period From December

16  12, 2012 Through December 17, 2013 for Wilmer Cutler Pickering

17  Hale and Dorr LLP, Special Counsel, period: 12/12/2012 to

18  12/17/2013, fee:$831,751.50, expenses: $3,713.58.

19

20

21

22

23

24

25

1

2 (CC: Doc# 6583) Fifth Interim and Final Application of Moelis &

3 Company LLC for Compensation for Professional Services Rendered

4 and Reimbursement of Actual and Necessary Expenses Incurred as

5 Investment Banker to the Official Committee of Unsecured

6 Creditors for the Period From May 16, 2012 Through December 17,

7 2013 for Moelis & Company LLC, Other Professional, period:

8 5/16/2012 to 12/17/2013, fee:$14616129.03, expenses:

9 $250,527.01.

10

11 (CC: Doc# 6582) Fourth Interim and Final Application of Epiq

12 Bankruptcy Solutions, LLC, as Information Agent for the

13 Official Committee of Unsecured Creditors, for Allowance and

14 Payment of Compensation for Professional Services Rendered and

15 for Reimbursement of Actual and Necessary Expenses Incurred for

16 the Interim Period From September 1, 2013 Through December 17,

17 2013 and the Final Period From May 22, 2012 Through December

18 17, 2013 for Epiq Bankruptcy Solutions, LLC (Claims and

19 Noticing Agent), Other Professional, period: 5/22/2012 to

20 12/17/2013, fee:$186,302.06, expenses: $255,878.82.

21

22

23

24

25

1

2   (CC: Doc. no. 6590) Final Fee Application of San Marino

3   Business Partners LLC As Consultant to the Official Committee

4   of Unsecured Creditors For Compensation and Reimbursement of

5   Expenses Incurred For The Period August 11,2012 Through

6   December 17,2013 for San Marino Business Partners LLC,

7   Consultant.

8

9   (CC: Doc. no. 6588, PTBS: Doc. no. 7035) Fifth Interim and

10   Final Application of Curtis, Mallet-Prevost, Colt & Mosle LLP,

11   as Conflicts Counsel to the Debtors and Debtors in Possession,

12   for Allowance and Payment of Compensation for Professional

13   Services Rendered and for Reimbursement of Actual and Necessary

14   Expenses Incurred from May 14, 2012 Through and Including

15   December 17, 2013 for Curtis, Mallet-Prevost, Colt & Mosle LLP,

16   Debtor's Attorney.

17

18   (CC: Doc. no. 6591, 6632) Fifth Interim and Final Application

19   of FTI Consulting, Inc., as Financial Advisor for the Debtors.

20

21

22

23

24

25

1

2  (CC Doc. no. 6589) Fifth and Final Application of Kramer Levin

3  Naftalis & Frankel LLP, Counsel for the Official Committee of

4  Unsecured Creditors, for Final Allowance of Compensation for

5  Professional Services Rendered and for Reimbursement of Actual

6  and Necessary Expenses Incurred During (I) The Fifth Interim

7  Compensation Period of September 1, 2013 Through December 17,

8  2013 And (II) The Total Compensation Period of May 16, 2012

9  Through December 17, 2013 for Kramer Levin Naftalis & Frankel

10  LLP, Creditor Comm. Aty.

11

12

13

14

15

16

17

18

19

20  Transcribed by:  Penina Wolicki

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4        Attorneys for Debtors

5        250 West 55th Street

6        New York, NY 10019

7

8  BY:   LORENZO MARINUZZI, ESQ.

9

10

11  KRAMER LEVIN NAFTALIS & FRANKEL LLP

12        Attorneys for Official Creditors' Committee

13        1177 Avenue of the Americas

14        New York, NY 10036

15

16  BY:   DOUGLAS MANNAL, ESQ.

17

18

19  UNITED STATES DEPARTMENT OF JUSTICE

20        Office of the United States Trustee

21        201 Varick Street

22        Suite 1006

23        New York, NY 10014

24

25  BY:   BRIAN S. MASUMOTO, ESQ.

1

2    PERKINS COIE LLP

3          Insurance Counsel to Debtors

4          700 Thirteenth Street NW

5          Suite 600

6          Washington, D.C.

7

8    BY:   SELENA J. LINDE, ESQ. (TELEPHONICALLY)

9

10

11   GODFREY & KAHN, S.C.

12          Attorneys for Liquidating Trust

13          One East Main Street,

14          Suite 500

15          Madison, WI 53701

16

17   BY:   KATHERINE STADLER, ESQ.

18

19

20   CHADBOURNE & PARKE LLP

21          Attorneys for the Examiner, Arthur Gonzalez

22          30 Rockefeller Plaza

23          New York, NY 10112

24

25   BY:   HOWARD SEIFE, ESQ.

1

2    ARTHUR J. GONZALEZ, ESQ.

3        Fee Examiner

4

5

6    CARTER LEDYARD & MILLBURN LLP

7        Consultant to the Committee of Unsecured Creditors

8        2 Wall Street

9        New York, NY 10005

10

11   BY:   JAMES GADSDEN, ESQ.

12

13

14   SILVERMANACAMPORA LLP

15       Special Borrowers' Counsel for the Committee

16       100 Jericho Quadrangle

17       Suite 300

18       Jericho, NY 11753

19

20   BY:   ROBERT D. NOSEK, ESQ.

21

22

23

24

25

1

2   WILMER CUTLER PICKERING HALE AND DORR

3         Special Counsel to the Committee

4         250 Greenwich Street

5         New York, NY 10007

6

7   BY: WILLIAM J. PERLSTEIN, ESQ.

8

9

10  FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP

11        Attorneys for Mesirow Financial Consulting

12        1 New York Plaza

13        New York, NY 10004

14

15  BY:   BRAD E. SCHELER, ESQ.

16        LISA BEBCHICK, ESQ.

17        PETER SIROKA, ESQ.

18

19

20  MORRISON COHEN LLP

21        Attorneys for Independent Directors of ResCap

22        909 Third Avenue

23        New York, New York 10022

24

25  BY:   ROBERT K. DAKIS, ESQ.

1

2    ALSO PRESENT:

3         MICHAEL AGRUSA, ESQ., Towers Watson

4         JEFFREY LIPPS, ESQ., Carpenter Lipps & Leland LLP

5         STEVEN REISMAN, ESQ., Curtis, Mallet-Prevost, Colt &

6            Mosle, LLP

7         MARYANN GALLAGHER, ESQ., Curtis, Mallet-Prevost, Colt &

8            Mosle, LLP

9         ERIC LOPEZ SCHNABEL, ESQ., Dorsey & Whitney LLP

10        ROBERT J. FEINSTEIN, ESQ., Pachulski Stang Ziehl & Jones

11        MICHAEL J. RIELA, ESQ., Vedder Price

12        GARY APFEL, Pepper Hamilton LLP

13        JAY R. BENDER, Bradley Arant Soult Cummings LLP

14        EDWARD R. BERGSTROM, San Marino Business Partners, LLC

15        MICHAEL G. BIGGERS, Bryan Cave LLP

16        JEFFREY BRODSKY, Quest Turnaround Advisors

17        DANA CLARKE, Hudson Cook, LLP

18        ADRIAN COWAN, Analytic Focus

19        DONALD H. CRAM, Severson & Werson, APC

20        MINIARD CULPEPPER, Prince Lobel Tye, LLP

21        BRYAN DLUHY, Freeborn & Peters LLP

22        DEVON J. EGGERT, Freeborn & Peters LLP

23        DEBRA FELDER, Orrick, Herrington & Sutcliffe LLP

24        DRAKE D. FOSTER, Kurtzman Carson Consultants

25        ALAN FRANKEL, Coherent Economics

1       CHRISTIAN HANCOCK, Bradley Arant Soult Cummings LLP

2       ELIZABETH HULSEBOS, Dorsey & Whitney LLP

3       ARNO I. IZUAGLE, Arno I. Izuagle (Pro per)

4       BRIAN KELLY, AlixPartners, LLC

5       MATTHEW D. LEE, Foley & Lardner, LLP

6       JASON MANNING, Troutman Sanders, LLP

7       J.F. MORROW, J.F. Morrow (Pro per)

8       CHETAN NAIR, KPMG LLP

9       FRANK SILLMAN, Fortace, LLC

10      STEVE TILGHMAN, Tilghman & Company

11      TODD WUERTZ, Epiq Bankruptcy Solutions, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   P R O C E E D I N G S

2           THE COURT:  All right, please be seated.

3           We're here in Residential Capital, number 12-12020.

4   Mr. Marinuzzi?

5           MR. MARINUZZI:  Good morning, Your Honor.  For the

6   record, Lorenzo Marinuzzi, Morrison & Foerster on behalf of the

7   reorganized debtors.

8           Your Honor, we're here today on the final fee and

9   expense requests of the estate professionals.  By my count, and

10  by the agenda, there are forty-five applications that are up

11  for final approval, all but four of which are unresolved (sic)

12  and currently unopposed.  The four that have some degree of

13  objection are the applications filed by Morrison & Cohen,

14  special counsel to the board; Carter Ledyard, committee special

15  counsel; and the financial advisor and attorneys for the

16  examiner, Mesirow and Chadbourne & Parke.

17          I'd like to, if I may, Your Honor, walk through the

18  resolution tracking chart, as we've done the prior four times

19  I've been up here.  And I have extra copies in case Your Honor

20  needs them.

21          THE COURT:  I have it.  And I have it marked.  So let

22  me just make sure I find it.

23          Okay, go ahead, Mr. Marinuzzi.

24          MR. MARINUZZI:  Your Honor, I'd like to proceed with

25  the ones that are unopposed, and leave till the end of the

1    hearing those that have some degree of objection, so people in

2    the courtroom and on the phone could go about their business.

3        THE COURT:  Yeah.  And when you go through this, there

4    are four professional applications which are among those listed

5    as unopposed, as to which I have issues that are going to have

6    to be discussed.  I think because of the large number of

7    applications and the volume of materials that were generated, I

8    think on most of them, I'm satisfied where there's no

9    objection, and I believe that the U.S. Trustee has worked out

10   resolutions on many of those, some it had no objections to at

11   all, we'll be able to go through these pretty quickly.  Okay?

12       Go ahead, Mr. Marinuzzi.

13       MR. MARINUZZI:  Very well, Your Honor.

14       Your Honor, I'm just going to read the final requested

15   fees and expenses, and not the fifth or third interim,

16   depending upon how many people are up to.

17       So the first firm if Bradley, Arant, Boult Cummings,

18   and it's docket number 6537, requesting total fees of

19   $11,959,869.89 and expenses of $613,918.47.  In order to

20   resolve the informal objection of the U.S. Trustee, Bradley

21   Arent has agreed to reduce their final fee request to

22   $11,456,954.36 and expenses to $613,321.35.

23       THE COURT:  25 or 35?

24       MR. MARINUZZI:  I have 35 on my chart.

25       THE COURT:  Yeah, I'm sorry.  I misheard you.

1          MR. MARINUZZI:  I notice that my eyes have gotten

2    worse since the last time I --

3          THE COURT:  No, I probably -- my years have gotten

4    worse, so I misheard you.

5          MR. MARINUZZI:  Oh, okay.

6          THE COURT:  Go ahead.

7          MR. MARINUZZI:  Next, Your Honor, Bryan Cave

8    requesting final fees of $279,187.50, $116.60 in expenses.  No

9    objection to this final application.

10          THE COURT:  Go ahead.

11          MR. MARINUZZI:  Your Honor, next is Carpenter Lipps &

12    Leland.

13          THE COURT:  Let me just say, as Mr. Marinuzzi is going

14    through these -- we're just going to go through them, but I

15    just -- if someone -- he's identifying these as ones without an

16    objection.  If there's someone present in court or on the phone

17    who intends to object to them, please just indicate that you

18    have an objection.  We won't get into the substance of it, but

19    I just want to know whether, indeed, these are ones without

20    objection.

21          Go ahead.

22          MR. MARINUZZI:  Your Honor, I believe I left off with

23    Carpenter Lipps & Leland, docket number 6543, requesting final

24    fees of $6,163,315 and final approval of expense reimbursement

25    in the amount of $2,609,058.89.  No objections were filed to

1  the Carpenter Lipps final fee application.

2       THE COURT:  Go ahead.

3       MR. MARINUZZI:  Next, Your Honor, is Centerview

4  Partners, docket number 6573, seeking total fees of 5.7 million

5  dollars, plus 3.8 million dollars in the form of an in-court

6  transaction fee, final expenses of $68,853.16.  There was no

7  objection to the requested fees.  And to resolve the informal

8  response of the United States Trustee's Office, Centerview has

9  reduced their final fee request to $67,336 --

10      THE COURT:  Final expense request.

11      MR. MARINUZZI:  I'm sorry?

12      THE COURT:  Final expense request.

13      MR. MARINUZZI:  Final expense request, I'm sorry, Your

14  Honor.

15      THE COURT:  I think you said "fee".

16      MR. MARINUZZI:  I apologize.  To $67,336.36.

17      THE COURT:  Okay.

18      MR. MARINUZZI:  Next, Your Honor, is Curtis, Mallet-

19  Prevost, Colt & Mosle, docket number 6588, requesting final

20  fees of $9,957,770.80 and expenses of $30,505.36.  To resolve

21  the informal response of the United States Trustee, they've

22  reduced their fee request to $9,847,770.80 and there was no

23  objection to the expense request.

24      THE COURT:  Okay.

25      MR. MARINUZZI:  Next, Your Honor, is Deloitte &

1   Touche, docket number 6531, requesting final fees in the amount

2   of $5,497,620.65.  No expenses, Your Honor, requested, and no

3   objection to the application.

4           THE COURT:  Go ahead.

5           MR. MARINUZZI:  Next, Your Honor, is the application

6   of Dorsey & Whitney, docket number 6539, requesting fees in the

7   amount of $812,063.65 and expenses of $5,480.03.  No objection

8   to the final application.

9           THE COURT:  Go ahead.

10          MR. MARINUZZI:  Next, Your Honor, Ernst & Young,

11  docket number 6536, requesting final fees of $1,886,517.75 and

12  expenses of $43,285.29.  Ernst & Young reduced their fees and

13  expenses to accommodate the U.S. Trustee's concerns and are

14  seeking final approval of $1,884,808.75 and expenses of

15  $43,230.48.  No objection other than the U.S. Trustee's.

16          THE COURT:  Yes, go ahead.

17          MR. MARINUZZI:  Your Honor, next is Fortace LLC,

18  docket number 6696 requesting final fees of $2,222,459.50 and

19  expenses of $659,745.97.  No objection.

20          Next, Your Honor, is FTI Consulting, docket number

21  6591, seeking final fees in the amount of $32,491,560.75 and

22  final expenses of $920,158.65.  In order to resolve the U.S.

23  Trustee's objection, the fee request has been reduced to 32

24  thousand --

25          THE COURT:  32 million.

1           MR. MARINUZZI:  I'm sorry, $32,365,687.27 and the
2   expense amount -- and there's an error in the chart, Your
3   Honor -- is $908,878.38 -- not 43 cents, 38 cents.
4           THE COURT:  Okay.
5           MR. MARINUZZI:  Next, Your Honor, is --
6           THE COURT:  Hang on, Mr. Marinuzzi.
7           MR. MARINUZZI:  I'm sorry.
8           UNIDENTIFIED SPEAKER:  Your Honor, may I have a moment
9   with Mr. Marinuzzi?
10          THE COURT:  Yes.
11          MR. MARINUZZI:  Your Honor, I have an updated number
12  from FTI.  I apologize.  The final amount of fees is
13  $32,364,884.11 and the expenses -- the chart is correct -- it's
14  $908,878.43.
15          THE COURT:  Okay.
16          MR. MARINUZZI:  I'm sorry, Your Honor.
17          That brings us to Hudson Cook, docket number 5980,
18  seeking total fees in the amount of $2,284,737.50, and expenses
19  of $30,550.67.  The objection by the U.S. Trustee was
20  withdrawn.
21          THE COURT:  Go ahead.
22          MR. MARINUZZI:  Next, Your Honor, is KPMG, LLP, docket
23  number 6542, requesting fees in the amount of $1,791,439.65 and
24  expenses in the amount of $102,515.04.  There was no objection
25  to the application.

```
 1              THE COURT:  All right.

 2              MR. MARINUZZI:  Next, Your Honor, is Kurtzman Carson

 3    Consultants, docket number 6549, requesting fees for the final

 4    period in the amount of $212,440.50.  No objection.

 5              Next, Your Honor, is Locke Lord, docket number 6553,

 6    requesting final fees in the amount of $1,222,388.78 and final

 7    approval of expenses in the amount of $22,716.90.  No

 8    objections.

 9              THE COURT:  All right.

10              MR. MARINUZZI:  Next, Your Honor, is Mercer (US) Inc.,

11    seeking final fees of $317,003.56 and expenses of $45,041.90.

12              THE COURT:  Just bear with me one second, please.

13         (Pause)

14              THE COURT:  Go ahead.

15              MR. MARINUZZI:  Your Honor, Mercer has reduced their

16    fee request to $311,434.94 and their expense request to

17    $44,731.65, in light of the informal response from the U.S.

18    Trustee.

19              THE COURT:  All right.

20              MR. MARINUZZI:  Your Honor, we'll skip over Morrison &

21    Cohen, since there's an unresolved objection.

22              THE COURT:  Right.

23              MR. MARINUZZI:  And next is Morrison & Foerster,

24    docket number 6567 requesting final fees in the amount of

25    $95,457,127.80 and expenses in the amount of $3,043,012.82.
```

1   The final fee requests reflects a three-million-dollar write-

2   down for the benefit of the liquidating trust to resolve any

3   objections that they might have had.

4           THE COURT:  Go ahead.

5           MR. MARINUZZI:  Next, Your Honor, is the final

6   application of Orrick, Herrington & Sutcliffe, docket number

7   6550, seeking final fees in the amount of $1,844,9- -- I'm

8   sorry -- $1.844,902.19 and expenses in the amount of $4,807.25.

9   Orrick has agreed to reduce its fee request to $1,833,156.19

10  and its expense request to $4,749.95.

11          THE COURT:  All right.

12          MR. MARINUZZI:  Next, Your Honor, is Pepper Hamilton,

13  docket number 5819, requesting approval of final fees in the

14  amount of $5,300,886 and expenses in the amount of $125,553.64.

15  Pepper Hamilton has agreed to reduce its fee request to

16  $5,295,708.50 and its expense request to $124,924.14.

17          Next, Your Honor, is Perkins Coie, docket number 6552,

18  requesting fees in the amount of $1,469,618 and expenses in the

19  amount of $14,725.01.  They've agreed to reduce their fee

20  request to $1,462,384.21 and their expense request to

21  $13,985.28, to accommodate the concerns of the U.S. Trustee.

22          THE COURT:  And this is one of them that I have

23  additional issues to raise.

24          MR. MARINUZZI:  Would you like to raise them now, Your

25  Honor?

1          THE COURT:  No.

2          MR. MARINUZZI:  Okay.

3          THE COURT:  Let's go on.  But we're going to have to

4  come back to Perkins Coie.

5          MR. MARINUZZI:  Okay.  Next, Your Honor, is Prince

6  Lobel Tye, seeking final approval of fees in the amount of

7  $222,328 and expenses in the amount of $29,451.34, and no

8  objection was filed with respect to this application.

9          That brings us, Your Honor, to Rubenstein &

10  Associates, docket number 6579, seeking final approval of fees

11  in the amount of $38,276 and expenses of $9,920.93.  No

12  objection was filed.

13          THE COURT:  Okay.

14          MR. MARINUZZI:  Next, Your Honor, is Severson &

15  Werson, docket number 6561, requesting approval on a final

16  basis of fees in the amount of $3,321,340.39 and expenses of

17  $297,513.49.  They've agreed to reduce their expense request to

18  $295,040.35 to accommodate the U.S. Trustee's concerns.

19          THE COURT:  All right.

20          MR. MARINUZZI:  Next, Your Honor, is docket number

21  6556, Tilghman & Co., requesting final fees in the amount of

22  $11,507.50 and expenses of $29,046.14.  No objection was filed

23  with respect to this application.

24          THE COURT:  All right.

25          MR. MARINUZZI:  Next, Your Honor, is Towers Watson,

1   docket number 6528, requesting approval of final fees in the

2   amount of $175,665.92 and expenses of $9,550.01.  There was no

3   objection.

4           THE COURT:  All right.

5           MR. MARINUZZI:  Next, Your Honor, is Troutman Sanders,

6   docket number 6560, requesting final approval of fees in the

7   amount of $1,043,948.96 and expenses in the amount of

8   $16,823.37.  No objection.

9           THE COURT:  All right.

10          MR. MARINUZZI:  Your Honor, that brings us to the

11  final uncontested debtor application, that of Weir & Partners,

12  seeking approval of final fees in the amount of $2,349 and

13  expenses of $154.68.  There was no objection.

14          THE COURT:  We're going to have to come back to Weir.

15          MR. MARINUZZI:  Okay.

16          Your Honor, that's it for the debtor professionals.  I

17  will cede the podium to Mr. Mannal to review with the Court the

18  resolved committee professional applications.

19          THE COURT:  Okay.  Just give me a second before you

20  start, Mr. Mannal.  Go ahead, you can go up there.

21          Thanks, Mr. Marinuzzi.

22          MR. MARINUZZI:  You're welcome, Your Honor.  Thank

23  you.

24      (Pause)

25          THE COURT:  All right, go ahead, Mr. Mannal.

1         MR. MANNAL:  Good morning, Your Honor.  Doug Mannal
2    from Kramer Levin on behalf of the creditors' committee.

3         Your Honor, first, Mr. Eckstein asked that I apologize
4    for his absence today.  We are currently representing another
5    debtor in front of Judge Lane, and there are depositions today
6    that required his attendance.  Many of the same characters from
7    the ResCap case are in that case, and I think as Your Honor,
8    will not be surprised, that he'd much rather be here today than
9    attending those depositions.

10        Your Honor, just briefly, looking back over the course
11   of these Chapter 11 cases, Kramer Levin and the other committee
12   professionals are very proud of what we've been able to
13   achieve.  Avoiding protracted, lengthy, expensive litigation
14   through a global settlement is truly one of our proudest
15   accomplishments.  And we appreciate the opportunity.

16        From the start, however, committee professionals, have
17   been very mindful of the significant professional fees incurred
18   in these cases.  In an effort to avoid any disputes at the
19   conclusion of these cases, many of the committee professionals
20   have agreed to make significant voluntary write-offs, both
21   during the case and as part of the final fee application.

22        Your Honor, I'm happy to walk through the chart, and
23   I'll do as good a job as Mr. Marinuzzi did, with the committee
24   professionals.  Each of the committee professionals has a
25   representative in the courtroom, should the Court have any

1   questions.

2          AlixPartners, docket 6580, requests final fees of

3   $14,718,273.53 and final expenses of $103,325.70.  There was an

4   informal objection.  It was resolved by the -- informal

5   objection filed by the United States Trustee that was resolved

6   through no changes to the application.

7          THE COURT:  Go ahead.

8          MR. MANNAL:  We ask that be approved.

9          Analytic Focus, docket number 6581, requested final

10  fees in the amount of $592,840.25 and final expenses of

11  $355.29.  There are no objections to that application.

12         Carter Ledyard, I think we're going to keep to the end

13  of the --

14         THE COURT:  Right.

15         MR. MANNAL:  -- agenda.  Coherent Economics, docket

16  6586, final fees in the amount of $1,135,367.52 and requested

17  final expenses of $15,194.52.  There were no objections to that

18  application.

19         Epiq Bankruptcy Solutions, docket number 6582, final

20  fees in the amount of $186,302.06 and final expenses requested

21  in the amount of $255,878.82.  The U.S. Trustee filed an

22  objection -- actually, I'm sorry, an informal response was made

23  by the U.S. Trustee, and they've agreed to reduce their fee

24  request to $184,593.16 and no change to the expenses.

25         THE COURT:  All right, I have some issues with Epiq.

1          MR. MANNAL:  J.F. Morrow, 6587, there were no

2     objections.  The requested final fees were $250,060 and the

3     requested expenses were $1,345.61.  There were no objections.

4          Kramer Levin, the requested fees were $65,000,300.55.

5     That reflected approximately a five-million-dollar write-down

6     through monthly and quarterly fees.  The expenses requested

7     were $2,416,309.04.  After further discussions with the

8     Liquidating Trust and the United States Trustee, Kramer Levin

9     agreed to a further reduction of its requested fees in the

10    amount of $634,284.70, making a final fee request of

11    $64,366,016.25, with no change to the requested expenses.

12         THE COURT:  Hang on just a second.  Okay.

13         MR. MANNAL:  Moelis & Co., docket number 6583.  There

14    was a requested final fees of $14,616,129 -- excuse me --

15    $14,616,129.03.  The requested expenses for that -- for the

16    final fee period is $250,527.01.  There were no objections to

17    the final fees.  However, they agreed to reduce their expenses

18    and are now requesting final expenses in the amount of

19    $249,664.42.

20         THE COURT:  Okay.

21         MR. MANNAL:  Pachulski Stang, docket number 6565,

22    requesting final fees in the amount of $4,844,469.07, final

23    expenses in the amount of $94,832.44.  Pachulski has agreed to

24    make further reductions in their fee request, making a final

25    fee request of $4,843,989.47 and agreed to reduce their

1    expenses in the amount of a final expense request of

2    $87,794.29.

3            THE COURT:  All right.

4            MR. MANNAL:  Quest Turnaround Advisors, docket number

5    6585, requested final fees in the amount of $345,646.12 and

6    requested final expenses of $17,614.09.  There were no

7    objections to that application, Your Honor.

8            THE COURT:  All right.

9            MR. MANNAL:  San Marino Business Partners, docket

10   number 6590, in the amount -- fees in the amount of $236,157.38

11   and requested expenses of $11,404.30.  There were no

12   objections.

13           SilvermanAcampora, docket number 6559, requested final

14   fees in the amount of $1,160,460.25 and requested expenses for

15   the final period of $15,099.70.  There were no objections.

16           THE COURT:  All right I have a couple -- one or two

17   issues to raise on that.

18           MR. MANNAL:  And the last unopposed committee

19   professional is Wilmer Cutler, docket number 6584, requested

20   final fees in the amount of $831,751.50 and expenses for the

21   final period of $3,713.58.  Wilmer Cutler has agreed to reduce

22   their fee request to $828,680.50 and there were no objections

23   to that revised number.

24           THE COURT:  And I have issues to raise.

25           MR. MANNAL:  Okay.

1          THE COURT:  Thank you.

2          MR. MANNAL:  Thank you, Your Honor.

3          THE COURT:  Mr. Seife?

4          MR. SEIFE:  Good morning, Your Honor.  Howard Seife,

5   Chadbourne & Parke, counsel for the examiner.  There is an

6   objection outstanding to Chadbourne & Parke, so we'll defer

7   that.

8          There is no objection to the fee request of Arthur

9   Gonzalez as examiner.  He has asked to defer consideration of

10  his application until you've heard the applications of his

11  counsel and his financial advisor, for which there are pending

12  objections.

13         THE COURT:  Okay.  But the amount being sought is

14  $568,612.50, correct?

15         MR. SEIFE:  That is correct.  With no objection.

16         THE COURT:  Right.  And no expenses?

17         MR. SEIFE:  That's correct, Your Honor.

18         THE COURT:  All right.

19         MR. SEIFE:  The next professional of the examiner is

20  Leonard, Street and Deinard.  They are seeking fees of

21  $100,000; requested expenses of $4,210.  There was no

22  objection.

23         Mesirow, as I said, there is an objection, and that'll

24  be taken up later.

25         Wolf Haldenstein Adler Freeman & Herz, requested fees

1    are $82,997 --

2            THE COURT:  Why don't you try just to repeat the --

3            MR. SEIFE:  -- 82 thousand --

4            THE COURT:  -- say it again.  Go ahead.

5            MR. SEIFE:  $82,997.85.

6            THE COURT:  Okay.

7            MR. SEIFE:  Expenses of $1,670.56.

8            THE COURT:  Okay.

9            MR. SEIFE:  And there's no objection.

10            THE COURT:  All right.  What I'd like to hear from

11   next, Mr. Marinuzzi, is from Mr. Masumoto regarding what the

12   U.S. Trustee did with respect to, I guess it's what, the fifth

13   interim application and the final fee applications.

14            And Mr. Masumoto, if you would, because I think this

15   is going to come up with respect to the Liquidation Trust's

16   objections, if you could describe generally what the U.S.

17   Trustee did with respect to the first four interim

18   applications, and not to go through on the precise dollar

19   amounts of the resolutions.  Because in the first four interim

20   professional applications, the U.S. Trustee had either filed an

21   objection or informally dealt with objections to some, not all,

22   of the professionals' fees.  And the Court likewise had

23   additional issues that the Court raised with respect to those

24   interim applications.

25            I'd just say, as I've repeated multiple times in

1   connection with the prior interim applications, and it's true

2   of this interim, the last interim, and the final, the Court, my

3   law clerks, and interns, have spent a great deal of time

4   reviewing fee applications.  Needless to say, there's a large

5   volume of materials for today, and there has been at each of

6   the interim applications.

7        And generally, when -- I've been mindful, when the

8   U.S. Trustee has reached a resolution of its objections with

9   professionals, it has generally resulted in a bottom line or

10  lump-sum figure by which applications were reduced.  And where

11  the Court felt that the proposed resolution reached by the U.S.

12  Trustee sufficiently dealt with any issues the Court might

13  have, I didn't want to -- I may have used this term -- double-

14  ding professionals by tacking on the additional reduction that

15  I felt was on an issue that I had and that the U.S. Trustee had

16  raised and had reached a resolution.

17        That becomes very much on the table today in light of

18  many, many of the Liquidating Trust's objections to

19  professional fees for the first four interim periods.  I have a

20  very strong feeling, to which you'll gather I'm reacting very

21  negatively, they're trying to retrade things that were resolved

22  before.  But I think it would be helpful, Mr. Masumoto, and

23  people could go back to the transcripts -- I've been generally

24  very complimentary of you and your colleagues.  It's an

25  enormous task on your office to review fee applications, and in

1   this case in particular.  And you've done a stellar job.

2           So but I think it would be helpful to my consideration

3   today of the final approval of the fee applications that are

4   before me and the remaining objections to fee applications that

5   I have to resolve.  Go ahead, Mr. Masumoto.

6           MR. MASUMOTO:  Yes, Your Honor.  Good morning, Your

7   Honor.  Brian Masumoto for the Office of the United States

8   Trustee.

9           Your Honor, as indicated, we reviewed the fifth

10  interim period for review at this time together with the fees

11  on a final basis, and we did focus our review primarily on the

12  fifth interim period.  We did not revisit our review of the

13  prior four interim periods specifically, except for purposes of

14  context or sort of historical information.

15          With respect to this interim, because there was

16  sufficient time prior to the filing of the objection date,

17  after reviewing the fifth interim, we did contact the parties

18  prior to filing our objections.  In the past, given the short

19  amount of time we had to prepare our review and objection, we

20  filed an objection with the matters unresolved.  In this case,

21  we did make an effort to try to address the parties.

22          But having said that, we attempted to, in our

23  pleading, list the areas that were resolved.  So if we resolved

24  a matter, say, for example, on the application preparation time

25  or transitory timekeepers, those matters that were addressed as

 1   part of the overall settlement were reflected in our pleadings.

 2   And to that extent -- and generally, there was a separation

 3   between resolutions for fees and expenses.  And that's how we

 4   treated them.

 5          Now, unfortunately, although from our purposes, in

 6   terms of settlement, we did allocate different amounts on

 7   different issues, indicating to the parties the strength we

 8   felt in particular issues.  That allocation, obviously, wasn't

 9   necessarily agreed to by all the parties.  And thus, the

10   overall settlement, leaving to the parties, their allocation

11   with respect to the expenses -- I'm sorry, with respect to the

12   objections.

13          So having said that, the pleadings that we did file,

14   although listing the areas of coverage, provide no allocation

15   as to the different topics.  And there's only an overall

16   amount.  And as indicated, we did not revisit any of the

17   earlier interim periods for purposes of filing.

18          During the final period, there were also additional

19   considerations that didn't apply to the earlier period, which

20   was that there were substantial reductions that were achieved

21   by some of the parties with the Liquidating Trust.  And that

22   played a factor in our analysis.

23          As Your Honor may or may not know, for many of the --

24   not many, but for certain of the large applicants, our office

25   had requested electronic data.  In fact -- I guess we refer to

1   it as LEDES data, which is what's also being required under the

2   new revised U.S. Trustee Guidelines.  And they were very

3   helpful for our purposes of analyzing the very large fee

4   applications, particularly by Morrison & Foerster and Kramer

5   Levin.

6        So we, in utilizing those tools, we did analyze the

7   fee applications.  But as I mentioned in the fifth interim,

8   given the very large reductions, that was taken into account in

9   terms of -- the objections that we would have to uncover would

10   have to exceed the voluntary reductions.  And therefore, in

11   this particular instance, particularly with respect to those

12   very large applications by debtor and creditor committee

13   counsel, we determined that the voluntary reductions exceeded

14   any deficiencies that we were able to determine.

15        THE COURT:  Let me just interrupt you to say that I

16   would say that, in effect, I've applied the same methodology

17   from the review by my chambers, namely that where the voluntary

18   reduction or the negotiated reduction exceeded the amounts that

19   the Court has identified as an issue, I've -- I haven't ruled

20   yet, but you'll see that I agree to the final numbers that are

21   presented for approval today without the necessity of going

22   back and revisiting line items or detailed items.  And that's

23   true in the bulk of the applications, where I've satisfied

24   myself that the resolutions that were reached by your office or

25   by the Liquidating Trust, more than sufficiently account for

1  any issues that I would otherwise raise or adjustments I would

2  otherwise make.

3        So in that sense, I'm not going to go through --

4  because of the large number of applications today, I'm not

5  going to go through each of those and say, well, there was this

6  issue or that issue, but I'm satisfied.  But in my own review

7  and analysis, I've done that.  I've gone through and satisfied

8  myself that the specific request for the fifth interim period

9  or -- and I'll come back to the issue of final fee applications

10  in a little while -- but I've tried to take into consideration,

11  do I feel that the numbers that are being sought, subject to

12  the reductions either achieved by your office or the

13  Liquidating Trust, are reasonable and appropriate in the

14  circumstances.  And I, in large measure, concluded they are.

15        Go ahead, Mr. Masumoto.

16        MR. MASUMOTO:  Thank you.  Your Honor, and I don't

17  have very much more to say, except, Your Honor, I believe that

18  we attempted to and did achieve resolutions with most of the

19  applicants.  I believe from the U.S. Trustee's standpoint, we

20  just have one applicant with one issue that remained

21  unresolved, and we thought it was a matter for the Court to

22  adjudicate.

23        THE COURT:  That's the Carter Ledyard?

24        MR. MASUMOTO:  That's correct, Your Honor.

25        And with respect to the other matters that have not

1   been resolved with the Liquidating Trust, I believe that would

2   be Chadbourne and Mesirow, we did reach our own accommodations

3   with respect to those applicants with respect to the fifth

4   interim period.  Because those two applicants, although

5   technically filed finals on the fourth, did have additional

6   time which they included as part of a supplemental filing.  So

7   we did also review those and reached accommodations with those

8   individuals.

9          THE COURT:  So to be clear, with respect to the

10  Chadbourne and Mesirow applications, for the amounts listed in

11  the chart that's before me for Chadbourne on final fees of

12  $46,860,806.66, that reflects -- that number reflects your

13  office's resolution of any amounts of fees that Chadbourne is

14  seeking.  Is that correct?

15         MR. MASUMOTO:  Yes, it does, Your Honor.  I believe

16  with respect to the fifth interim, they had agreed to a 30,000-

17  dollar reduction, with respect to that -- just this fifth

18  interim period.

19         THE COURT:  And as to the amount of the expenses that

20  Chadbourne, is seeking --

21         MR. MASUMOTO:  We had no --

22         THE COURT:  -- you had no objection to that --

23         MR. MASUMOTO:  That's correct, Your Honor.

24         THE COURT:  -- the final figure.

25         MR. MASUMOTO:  Correct.

1          THE COURT:  And --

2          MR. MASUMOTO:  And similarly, with respect to

3    Mesirow --

4          THE COURT:  So just -- but just to get the number on

5    the table.  The amount of expenses that Chadbourne is seeking,

6    as to which -- on a final basis, as to which you have no

7    objection -- it's for the final period -- $2,995,419.47.

8    Correct?

9          MR. MASUMOTO:  I believe that's correct, Your Honor.

10          THE COURT:  Okay.  All right.  And as to Mesirow?

11          MR. MASUMOTO:  As to Mesirow, they agreed, again, with

12    respect to the fifth interim period, to a reduction of 20,000

13    dollars.  And we had no objection to their expenses for that

14    fifth interim period.

15          THE COURT:  Okay.

16          MR. MASUMOTO:  So that one, I believe, with respect to

17    their fees for the final period, it's $39,492,705, and with

18    respect to expenses, it's 344,747.

19          THE COURT:  It would be useful to me, Mr. Masumoto, if

20    you could just talk a little bit about the first four interim

21    applications with respect to the process that you and your

22    office followed in reviewing and resolving -- or proposed

23    resolutions of objections to professional fees and expenses.

24          MR. MASUMOTO:  Yes, Your Honor.  If I might, I did

25    prepare a little bit of a chart reflecting some of the earlier

1    fee applications.  If I might approach?

2            THE COURT:  Yeah, please; please.

3            MR. MASUMOTO:  My apologies.  There's something on the

4    reverse side.

5            THE COURT:  That's okay.  I print on both sides too,

6    to save paper.

7            Go ahead.

8            MR. MASUMOTO:  Your Honor, the chart really sets forth

9    actually with respect to the three disputed parties, Morrison &

10   Cohen, Chadbourne, and Mesirow, the interim -- first, second,

11   third, fourth and fifth interim periods.  My apologies, the

12   fifth spilled over on the last page and it's missing the

13   header.  If you fold it up, you can get the header.  But the

14   first two columns are the interim.

15           THE COURT:  Okay.

16           MR. MASUMOTO:  The next two set would be the final

17   fees, and then third set of -- well, the three remaining

18   columns are the -- reflects the resolution.

19           The final column on the right reflects the objections

20   that were raised with respect to the various interim periods.

21   So as you can see, during the first interim period, say, for

22   example, with Morrison & Cohen, we raised transitory

23   timekeeper, multiple attendee and transportation and meal

24   objections.  And similarly, for each of the three

25   professionals, in that column, you will see the areas that gave

1    rise to objections, and ultimately resolutions for the parties.

2    So that's -- in terms of our review, we obviously looked at the

3    Court's guidelines, and your Court's rulings on various fees

4    and expenses, and applied them through our analysis.  And we

5    did that through all of the periods.

6         Once again, I believe that for each period, we treated

7    it as a discrete period without any sort of carry-over.  We did

8    raise a possible concern, because there's a lot of contention

9    with respect to the fee application preparation issue.  Many

10   firms argue fluctuation in billing, and sometimes there's

11   spillover amounts in different periods.  So however -- it's

12   been this Court's practice to teach each interim as a separate

13   period, and we've attempted to apply that for each interim

14   period on each of these discrete issues.

15        So again, with respect to all of the interim periods,

16   we've reviewed it under our typical criteria.  And where there

17   were problems or issues, we raised them as part of our

18   objection.

19        I think we -- I believe the first interim we may have

20   attempted to try to reach informal resolutions.  But generally,

21   for the succeeding interim periods, there was really

22   insufficient time between the filing of the fee applications

23   and the time to file our objections, that we didn't have time

24   to really negotiate prior to filing the objections.  We did

25   negotiate generally after the objections were filed and up

1   until the hearing.  We spent a considerable amount of time

2   resolving the disputes, and I believe that in many cases, prior

3   to the hearing, reached resolutions with most of the parties.

4           THE COURT:  The other issue I'd be interested to know

5   whether your office has a policy with respect to it.  So

6   Section 330 of the Bankruptcy Code sets forth the standard for

7   compensation of professionals.  And it really -- it doesn't

8   really distinguish between interim and final.  Section 331

9   deals with the interim fees.  And I don't think anybody

10  disputes that where a court approves fees and expenses on an

11  interim basis, there's no absolute preclusion principle that

12  would keep a court from reviewing each of the fees and expenses

13  at a final fee hearing.  There's very little case law,

14  actually, that I've found on it.

15          It's usually been in instances where a court, at a

16  final fee hearing, has revisited things that were resolved

17  earlier where a debtor is either administratively insolvent or

18  where allegations of breach of fiduciary duty or malpractice or

19  something of that nature has arisen.

20          Does your office have a policy with respect to what

21  issues regarding fees and expenses should be raised at a final

22  hearing, where fees were reviewed by the court, reviewed by

23  your office and resolved at interim hearings?

24          MR. MASUMOTO:  Your Honor, I don't think we have a

25  specific or concrete rule.  I do believe it's facts and

1    circumstances.  I think there's a tension between the

2    requirement that the fees that are -- or the services performed

3    should be looked at in terms of reasonableness at the period

4    which they were performed.

5            THE COURT:  At the time that they were performed.

6            MR. MASUMOTO:  Right.  And there may be circumstances

7    where that perspective may be distorted, and perhaps a final

8    review may result in a revisiting of that perspective.

9            But given the mandate that the fees should be examined

10   at the time performed, we do believe that the interim review

11   has -- should have a great deal of weight, and that it should

12   not be totally ignored for final review purposes.

13           There are circumstances in which perhaps sometimes you

14   are too close to the case or you don't see the overall picture

15   at the time that services are being performed, and that

16   particular perspective may create a certain consideration at

17   the final review.  But it's not the practice to re-review in

18   exhaustive detail all of the things that were examined at the

19   interim.  For example, if we had gone through a fee application

20   and noted lumping and vagueness, we wouldn't revisit that

21   review and do it all over again for the final review.

22           I believe for final purposes, sometimes there's

23   certain strategic considerations that may not have been evident

24   or considered at the time the interims were considered.  And

25   those considerations may have an impact for purposes of the

1   final review.  But I believe it is our practice that the review

2   we do at an interim should not, in fact, be ignored, and in

3   fact, should carry significant weight in determining at the

4   final, what should be reconsidered.

5        I do understand that there are some concerns, and I

6   think it was alluded to in Your Honor's question, because we

7   settle on a global basis, and the parties don't fix an

8   allocation among the different results, it may become different

9   when you're looking at the final review on a particular issue,

10   as to what adjustments were really attributable to that

11   particular problem.

12        I will concede that difficulty.  But in my mind, that

13   should be taken into consideration, and once again, not

14   entirely ignored.  But I don't have a solution, because I

15   cannot -- because there was no resolution among the parties to

16   allocate the specific reductions to specific issues.

17        THE COURT:  Nor do I think there has to be.

18        MR. MASUMOTO:  Yes.  Nor do we, Your Honor.  And that

19   is why in many cases, we're agreeable to an overall settlement.

20   But I do understand that would complicate, from the final

21   perspective, to determine what adjustments were attributable to

22   specific objections that have been raised.

23        THE COURT:  All right, thank you, Mr. Masumoto.

24        MR. MASUMOTO:  Thank you, Your Honor.

25        THE COURT:  What I'd like to do, so that many parties

1    in the court can leave if they wish to, is to go through with

2    respect to those applications that are -- as to which there are

3    no objections and as to which I don't have a separate issue I

4    want to raise, I'll rule on those now.  I don't think I need to

5    hear about -- from anybody else on those.  And then anybody who

6    wants to be excused can, and then we'll go on and deal with

7    those as to which there are issues that have to be resolved.

8              So first, with respect to Bradley Arant, final fees in

9    the amount of $11,456,954.36 and expenses of $613,321.35 are

10   approved.

11             Is there any reason why -- I don't think I have to go

12   through the fifth interim period, if I'm approving the final

13   fees.  That's -- obviously the fifth period is wrapped into

14   that.

15             UNIDENTIFIED SPEAKER:  Correct.

16             THE COURT:  Okay, so that's as to Bradley Arant.

17             As to Bryan Cave, final fees of $279,187.50 and

18   expenses of $116.60 are approved.

19             As to Carpenter Lipps, final fees of $6,163,315 and

20   expenses of $2,609,058.89, is approved.

21             And if I misspeak, Mr. Marinuzzi will call me on that.

22             MR. MARINUZZI:  I will, Your Honor.

23             THE COURT:  Centerview Partners, LLC, final fees,

24   $5,700,000 as the fees and $3,800,000 as the transaction fee,

25   expenses of $67,336.36, are approved.

1       As to Curtis Mallet, fees of $9,847,770.80 and

2   expenses of $30,505.36, are approved.

3       As to Deloitte, fees of $5,497,620.65 and no expenses,

4   are approved.

5       As to Dorsey Whitney, fees of $812,063.65 and expenses

6   of $5,480.03, are approved.

7       As to Ernst & Young, fees of $1,884,808.75 and

8   expenses of $43,230.48, are approved.

9       As to Fortace, LLC, fees in the amount of

10   $2,222,459.50 and expenses of $659,745.97, are approved.

11       As to FTI Consulting, Inc., fees of $32,364,884.11 and

12   expenses of $908,878.43, are approved.

13       As to Hudson Cook, fees of $2,284,737.50 and expenses

14   of $30,550.67, are approved.

15       As to KPMG, LLP, fees in the amount of $1,791,439.65

16   and expenses of $102,515.04, are approved.

17       As to Kurtzman Carson Consultants, LLC, final fees of

18   $212,440.50 and no expenses are approved.

19       As to Locke Lord, LLP, fees of $1,222,388.78 and

20   expenses of $22,716.90, are approved.

21       As to Mercer (US) Inc., fees of $311,434.94 and

22   expenses of $44,731.65, are approved.

23       Morrison & Cohen, we're going to pass on.

24       For Morrison & Foerster, LLP, fees of $95,457,127.80

25   and expenses of $3,043,012.82, are approved.

1          As to Orrick, Herrington & Sutcliffe, LLP, fees in the

2     amount of $1,833,156.19 and $4,749.95 are approved.

3          As to Pepper Hamilton, LLP, fees of $5,295,708.50 and

4     expenses of $124,924.14 are approved.

5          Perkins Coie we're going to pass on for now.

6          As to Prince Lobel Tye, LLP, fees in the amount of

7     $222,328 and expenses of $29,451.34, are approved.

8          As to Rubenstein Associates, Inc., fees of $38,276 and

9     expenses of $9,920.93, are approved.

10          As to Severson & Werson, P.C., fees of $3,321,340.39

11     and expenses of $295,040.35, are approved.

12          For Tilghman & Co., P.C., fees of $11,507.50 and

13     expenses of $29,046.14, are approved.

14          As to Towers Watson Delaware, Inc., fees of

15     $175,665.92 and expenses of $9,550.01, are approved.

16          As to Troutman Sanders, LLP, fees of $1,043,948.96 and

17     expenses of $16,823.37, are approved.

18          As to Weir & Partners, we're holding that for a few

19     minutes.

20          As to AlixPartners LLP, fees in the amount of

21     $14,708,273.53 (sic) and expenses of $103,325.70, are approved.

22          As to Analytic Focus, LLC, fees of $592,840.25 and

23     expenses of $355.29, are approved.

24          Carter Ledyard, we're holding.

25          As to Coherent Economics, LLC, fees in the amount of

 1  $1,135,367.52 and expenses in the amount of $15,194.52, are

 2  approved.

 3          As to Epiq Bankruptcy Solutions, we're holding on

 4  that.

 5          As to J.F. Morrow, fees in the amount of $250,060 and

 6  expenses of $1,345.61, are approved.

 7          As to Kramer Levin, fees in the amount of

 8  $64,366,016.25 and expenses of $516,511.68 --

 9          MR. MARINUZZI:  Your Honor, you're reading from the

10  column for the interim expense request.

11          THE COURT:  Okay.

12          MR. MARINUZZI:  It's the one over to the right.

13          THE COURT:  It's the 634,000?

14          MR. MARINUZZI:  No, no, it's the 2,416,000 --

15          THE COURT:  I'm sorry, okay.  All right.  Let me just

16  look at the chart again.  All right, let me do Kramer Levin

17  again.

18          Fees in the amount of $64,366,016.25 and expenses in

19  the amount of $2,416,309.04, are approved.

20          As to Moelis & Co., LLC, fees in the amount of

21  $14,616,129.03 and expenses in the amount of $249,664.42, are

22  approved.

23          As to Pachulski Stang Ziehl & Jones, LLP, fees in the

24  amount of $4,843,989.47 and expenses in the amount of

25  $87,794.29, are approved.

1        Quest Turnaround Advisors, LLC, fees in the amount of

2   $345,646.12 and expenses in the amount of $17,614.09, are

3   approved.

4        For San Marino Business Partners, LLC, fees in the

5   amount of 236 -- excuse me, let me say that again --

6   $263,157.38 and expenses of $11,404.30, are approved.

7        SilvermanAcampora and Wilmer Cutler, we have to come

8   back to.  Chadbourne, we're coming back to.

9        The fees of the examiner, Arthur Gonzalez, Mr. Seife

10  has asked to be held until I deal with the Chadbourne fees.

11  Then I will hold them.

12       For Leonard, Street and Deinard, Professional

13  Association, fees in the amount of $100,000 and expenses in the

14  amount of $4,210, are approved.

15       Mesirow, we're going to hold.

16       For Wolf Haldenstein Adler Freeman & Herz, LLP, fees

17  in the amount of $82,997.85 and expenses of $1,670.56, are

18  approved.

19       Does anybody wish to be heard with what I've just

20  ruled on so far?

21       MR. MARINUZZI:  Your Honor, I believe there needs to

22  be a discussion had between Mr. Holtz and counsel for the

23  committee.

24       Your Honor, while they're having that discussion, on

25  behalf of all of the professionals, I would like to thank Your

1    Honor and your team.  We know Your Honor and your team put a

2    tremendous amount of effort in going through these final fee

3    applications, and we really do thank you.

4         THE COURT:  Well, since some of you will be leaving

5    the courtroom after this, let me say -- and I know we still

6    have the disputed matters to deal with.  I've commented before,

7    this was an extremely complex and difficult case for the

8    lawyers and for the Court.  As the numbers I've read into the

9    record show, it was also a very expensive case.  Whenever I was

10   asked to rule on interim fees there was sticker shock to me in

11   looking at the magnitude of the fees that were being sought.  I

12   take the responsibility of reviewing fee applications very

13   seriously; that's true of the interim applications and final

14   applications.

15        I think the professionals in this case have done an

16   excellent job.  I think the case -- there were a lot of

17   contentious issues, there was a necessity of a number of

18   difficult trials that had to get resolved before the case was

19   able to move to confirmation.

20        I think it's -- had consensual resolutions of the

21   difficult issues been able to -- and there were many consensual

22   issues, and, certainly, the plan that moved forward was the

23   result of considerable efforts by the mediator, by the parties,

24   to reach a resolution.  I certainly wish it could have happened

25   earlier, the expenses of the case would have been vastly

1    reduced, but it is what it is.

2           So I certainly commend all the professionals.  I mean,

3    my compliments go to the people -- those that remain to be

4    resolved as well, they'll get resolved.

5           I mean, what are the issues that -- Mr. Mannal,

6    what's --

7           MR. MANNAL:  Your Honor, I think there's some

8    confusion on the AlixPartners final fee --

9           THE COURT:  Okay, let me turn to it.

10          MR. MANNAL:  -- number.

11          THE COURT:  Okay.  I may have messed it up.

12          MR. MANNAL:  I thought I heard it correct, but I --

13    it's -- I believe it's $14,718,273.53.

14          THE COURT:  That's what I thought I said, but if it

15    isn't that's what I intended to say.  So it should be crystal

16    clear, the court is approving --

17          MR. MANNAL:  Thank you, Your Honor.

18          THE COURT:  -- AlixPartners LLP fees in the amount of

19    $14,718,273.53, and expenses of $103,325.70.  If I misspoke

20    earlier I apologize for that.  All right.

21          MR. MARINUZZI:  Your Honor, with respect to Curtis,

22    Mallet, Your Honor and I were consistently wrong in the amount

23    of expenses requested.  The actual amount requested is

24    $53,990- --

25          THE COURT:  Let me -- wait, wait, hang on.

1          MR. MARINUZZI:   Curtis, Mallet, Your Honor.

2          THE COURT:  Yeah.

3          MR. MARINUZZI:  It is the first page of the chart.

4          THE COURT:  Tell me, what is the expense fee?

5          MARINUZZI:  The expense -- the final expense request

6     is $53,990.94.

7          THE COURT:  Let me look at my notes for a minute,

8     okay.

9      (Pause)

10         THE COURT:  So, with respect to Curtis, Mallet the

11    expenses from the final period were the $30,505.36; the

12    expenses requested in the final application is of $53,990.94.

13         MR. MARINUZZI:  Correct.

14         THE COURT:  Was that right?

15         MR. MARINUZZI:  That's right.

16         THE COURT:  All right.  So the Court -- so the record

17    is clear, the Court approves fees to Curtis, Mallet in the

18    amount of $9,847,770.80, and expenses of $53,990.94.

19         MR. MARINUZZI:  Thank you, Your Honor.

20         THE COURT:  All right.  What I'd like to deal with --

21    anybody -- well, let's take a ten-minute recess.  When we come

22    back what I'd like to deal with first is Perkins Coie, Weir &

23    Partners, Carter Ledyard, Epiq Bankruptcy Solutions,

24    SilvermanAcampora, and Wilmer Cutler.  We'll deal with those,

25    and then we'll deal with Chadbourne, Mesirow and Arthur

1   Gonzalez.  Okay.

2           MR. MARINUZZI:  Thank you, Your Honor.

3       (Recess from 11:11 a.m. until 11:28 a.m.)

4           THE COURT:  All right.  Please be seated.

5           We're back on the record in Residential Capital,

6   12-12020.

7           Just bear with me a second.

8           Let's deal with Perkins Coie first.  Somebody here

9   from Perkins Coie?

10          MS. LINDE:  Yes.  Yes, Your Honor.  Selena Linde for

11  Perkins Coie on the conference line.

12          THE COURT:  Okay.  Let me find my notes specifically

13  on this.

14          All right.  So as I understand it, Perkins Coie is

15  seeking final fees in the amount of $1,462,384.21 -- this is

16  after adjustments with the U.S. Trustee -- and expenses of

17  $13,958.28.

18          The issues are sort of anticlimactic after everything

19  we've been through.  These are relatively small items, but I

20  tried to be consistent with everybody's fee applications, large

21  or small.

22          The Perkins Coie application included expenses for

23  travel to New York City and nonworking travel time to New York

24  City.  The nonworking travel time was billed at fifty percent.

25          I believe I've been consistent throughout this case,

1   and in all other case -- well, this doesn't come up in that

2   many cases, but I know this has been an issue before in this

3   case.  Where law firms staff -- or professional services firms

4   staff matters in ResCap with lawyers or professionals in other

5   offices, I consider their expenses and travel time to be part

6   of their overhead, and not reimbursable by the estate.  It has

7   been my practice in this and other cases to compensate for

8   nonworking travel time, for example, if a lawyer is taking a

9   deposition in Chicago and travels from whatever office is their

10  principal office to Chicago for the deposition, their

11  nonworking -- obviously, they get compensated for time actually

12  spent working, but for nonworking travel time at fifty percent.

13          That guidance, which I know I've delivered before,

14  doesn't apply for traveling to New York City to staff the

15  ResCap matter.  The case is pending here; I'm happy to have

16  lawyers from other offices or other places work on the matter;

17  but as I have consistently done I have not compensated either

18  for the expenses or the travel time.  So that's one item.  It's

19  small it's $1,123.75.

20          MS. LINDE:  No issue, Your Honor, with removing that.

21          THE COURT:  Let me raise a couple of other issues, and

22  then I'll give you my --

23          MS. LINDE:  Sure.

24          THE COURT:  -- my ruling.

25          A recurring issue in this and other cases has been the

1    expenses in connection with preparation of fee applications.  I

2    have frequently referred to the guidance I've given on the

3    issue in an opinion in Mesa Airlines, repeated in one of my

4    decisions in Borders Books.  While I haven't adopted a hard

5    cap, I've said that the expenses for preparation of fee

6    applications should generally be in the range of three to five

7    percent, and the larger the fees sought, the smaller the

8    percentage should be.  So the three percent probably ought to

9    be much less than three percent.  And with some of the really

10   large -- and this is not Perkins Coie, it's some of the really

11   large fee applications here.  And, in fact, it is less than

12   that.

13          Perkins Coie in its detailed records in the fee -- in

14   the application, attributed $14,971.50 to "fee/employment

15   applications."  But there's an additional $2,122 that it

16   charged for appearing here in connection with their fee

17   applications.  I consider that part of the fee application.

18          And when combined with what they attributed to fee

19   applications it exceeded the three to five percent range, in

20   6.7 percent, the total.  Perkins Coie reached a resolution with

21   the U.S. Trustee, and they reached an agreement with U.S.

22   Trustee for a reduction in fees of $7,233.79.

23          In addition to that agreed reduction, I'm going to

24   reduce the Perkins Coie application by an additional $3,802.31

25   to account for the travel and nonworking travel time items that

1   I identified.  With that adjustment -- so I didn't do the math,

2   but you need to deduct $3,802.31 from the $1,462,384.21, to get

3   the final figure.  With that change, Perkins Coie is approved.

4           MS. LINDE:  Thank you, Your Honor.

5           THE COURT:  Okay.  Next is Weir & Partners LLP, which

6   is a miniscule amount, and I'm sorry to single them out.  Let

7   me find it.  Anybody appearing for Weir & Partners?

8           Weir only seeks fees of $2,349 and expenses of

9   $154.68.  The expenses are for the second, third and fourth

10  interim periods.  The U.S. Trustee had no objection.  But the

11  Weir application for expenses is insufficiently detailed to be

12  approved, and consists entirely of six headings and a total for

13  each heading.

14          Somebody communicate to Weir that they should resubmit

15  detailed expenses, and no further hearing will be required.

16  The Court will rule on it when I receive the detail.

17          MR. MARINUZZI:  Your Honor, if they would like they

18  could withdraw their request for reimbursement of expenses?

19          THE COURT:  They can.  So I'll approve the fees, it's

20  2,349 dollars.  The expenses in this case are miniscule.

21          But every one of these applications we go over in

22  detail, and this has happened earlier in the case when I've

23  required we get the detail on expenses.  We don't have it, so

24  it's not approved.

25          MR. MARINUZZI:  We'll get back to them, Your Honor.

1      THE COURT:  Okay.  All right.  Let's deal with Epiq

2  next.  Is someone here for Epiq?  Anybody on the phone for

3  Epiq?

4      Epiq is seeking -- after a resolution with the U.S.

5  Trustee, Epiq is seeking fees in the amount of $184,593.16 and

6  expenses for this fifth period of $42,135.64.  The total

7  expenses they're seeking are $255,878.82.

8      Epiq has not provided sufficient detail with respect

9  to the expense request for this fifth period, given the

10  magnitude of the expenses, both in absolute terms and relative

11  terms, the amount requested for the fifth period is larger --

12  of expenses, is larger than the amount of the fees for the

13  fifth period.  The lumped entries in the summary of expenses

14  that Epiq provided, that's at ECF docket number 6882, at page

15  5, are insufficient.

16      It includes items such as "call center maintenance"

17  and taxes.  Without more detail, the Court will not approve

18  Epiq's expenses for the fourth (sic) period.  I'm going to hold

19  on the fees and expenses for the fourth (sic) period since the

20  expenses exceeded the total fees.  I'll wait to get it.

21  Someone going to communicate with Epiq, Mr. Mannal?

22      MR. MANNAL:  Yes, Your Honor.  Doug Mannal from the

23  creditors' committee.

24      We'll communicate with Epiq.  And I believe Todd

25  Wuertz was on the phone, I'm not sure if he still is.

1          THE COURT:  Is anybody for Epiq still on the phone?

2          MR. MANNAL:  We'll be sure to communicate that to

3    them.

4          THE COURT:  Okay.  I'll resolve it quickly once I get

5    the additional detail.

6          MR. MANNAL:  Thank you, Your Honor.

7          THE COURT:  Let's deal with SilvermanAcampora.

8          MR. NOSEK:  Good morning, Your Honor.  Robert Nosek,

9    SilvermanAcampora.

10          THE COURT:  Thank you.  There's a single entry -- and

11   there's no objection from the U.S. Trustee.

12          There's a single entry from November 15th, 2013, for

13   Mr. Krell with no attached description.  It's at Exhibit A at

14   page 718.  It's all of 340 dollars, but it's a blank entry.

15          MR. NOSEK:  I apologize to the Court for that.

16   Obviously --

17          THE COURT:  We really do look at them.

18          MR. NOSEK:  Absolutely.

19          THE COURT:  And it's not a reflection -- because the

20   work that your firm has done has been excellent, so there

21   really is no criticism intended.  I think it's just simply --

22   the final fee request is $1,160,460.25.  I'm going to approve

23   it reduced by 340 dollars.  It's not worth waiting to -- okay.

24          MR. NOSEK:  Thank you, Your Honor.

25          THE COURT:  Just somebody when they submit the order,

1    just deduct -- and there was expenses of $15,099.70.  Okay.

2                MR. NOSEK:  Thank you, Your Honor.

3                THE COURT:  Thank you.

4                Let's come back to Carter Ledyard now.

5                MR. NOSEK:  Your Honor?

6                THE COURT:  Yes.

7                MR. NOSEK:  May I be excused?

8                THE COURT:  Oh, absolutely.

9                MR. NOSEK:  Thank you, Your Honor.

10               MR. MANNAL:  Your Honor, I believe you also said you
11   had issues with Wilmer Cutler?

12               THE COURT:  Oh, yeah, I apologize, I was actually
13   putting you off.  Let me deal with Wilmer Cutler.  Sorry about
14   that.  Let me find it in my notes, okay.

15               MR. PERLSTEIN:  Good morning, Your Honor.  William
16   Perlstein from Wilmer Cutler Pickering Hale and Dorr.

17               THE COURT:  Let me see what my issue here was.  So
18   Wilmer, after resolution with the UST, was seeking $828,680.50
19   in fees, and expenses of $3,713.58.  The resolution -- proposed
20   resolution with the U.S. Trustee included a fee reduction of
21   $3,071.  The fee application included $9,484.50 in connection
22   with the preparation of the fee application.  And that
23   represented 15.4 percent of the total fees requested,
24   significantly higher than the three to five percent Mesa range
25   that I referred to earlier.

1          I'll give you a chance, Mr. Perlstein.  What I'm

2     not -- I'm --

3          MR. PERLSTEIN:  I don't believe it was fifteen

4     percent, Your Honor.  If it was 9,000 or 128,000 it was going

5     to be --

6          THE COURT:  Well, this was from the fourth period, not

7     the total fees.  The fifth period, excuse me.

8          MR. PERLSTEIN:  Yeah.  I believe that the fee was

9     9,484 before the reduction, and the total fees for the period

10    were 125,000 dollars, or 128,000 before the reduction.  So it

11    would have been maybe seven percent, and I think it was the

12    issue that Mr. Masumoto talked about in terms of it was --

13         THE COURT:  All right.  Let me hear from Mr. Masumoto,

14    okay.  And maybe I'm satisfied, maybe my math was just wrong on

15    that.  All right.

16         MR. PERLSTEIN:  Okay, thank you, Your Honor.

17         THE COURT:  I didn't bring a calculator out with me.

18         MR. MASUMOTO:  Your Honor, I believe, as indicated --

19    I don't have the exact numbers, but as indicated in our

20    pleading, we did address the fee application preparation costs.

21    And I believe we thought the -- I don't remember the exact

22    percentage we obtained, but the three -- we thought the

23    $3,000.71 reduction brought it within -- or closer to Mesa

24    range.

25         THE COURT:  Okay.  Let me see whether -- I had some

1  other notes here.

2          All right, I'm satisfied by that explanation.  So I'm

3  approving fees for Wilmer Cutler of $828,680.50, and expenses

4  of $3,713.58.

5          MR. PERLSTEIN:  That matches my --

6          THE COURT:  Okay.  That's approved.

7          MR. PERLSTEIN:  -- my notes as well, Your Honor.

8          THE COURT:  Okay.  I'm sorry to keep you here, Mr.

9  Perlstein.

10          MR. PERLSTEIN:  That's all right.  Thank you very

11  much, Your Honor.

12          THE COURT:  Thank you.

13          All right.  Now, we're up to Carter Ledyard.  And

14  you're certainly excused, if you wish to be, Mr. Perlstein.

15          MR. GADSDEN:  Good morning, Your Honor.  James

16  Gadsden, Carter Ledyard & Milburn LLP, consultant to the

17  committee of unsecured creditors, not special counsel as we

18  were identified by debtors' counsel at the beginning of the

19  hearing.

20          My application presents basically a pure issue of law,

21  which is whether an individual or a firm that's retained as a

22  testifying expert in litigation, is required to be retained

23  pursuant to 1103 and 328, and is required to be -- to establish

24  that it is disinterested or does not have an adverse interest

25  as those --

1          THE COURT:  Let me ask you this, Mr. Gadsden.  You

2    weren't retained under 327.  You didn't have to be retained

3    under 327.  Why did you do a conflicts check?

4          MR. GADSDEN:  At the request, or really insistence of

5    creditors' committee counsel who retained me.

6          THE COURT:  You would testify as an expert witness

7    without having done a conflicts check to see whether your firm

8    has a conflict?

9          MR. GADSDEN:  No -- of course.  When I was contacted

10   by the creditors' committee counsel and asked to be retained, I

11   made a check -- ordinary check that the firm conducts any time

12   it's retained to determine whether we had a conflict.  And

13   then --

14         THE COURT:  And is it your practice or your firm's

15   practice to bill a client, or prospective client, for a

16   conflicts check, when you do?

17         MR. GADSDEN:  No, Your Honor, not -- but that's not

18   the fees that are involved here.  So after I'd done that and

19   was retained, I was given the list of 1,000 parties, including

20   all the judges in this court, all the servicers of the loans

21   administered by the debtors, all the employees in the U.S.

22   Trustee's Office, and the full list of 1,000 people and firms,

23   and told that I had to make an investigation as to whether the

24   firm had any relationship with any of those entities or their

25   affiliates.

1          THE COURT:  Do you have a written engagement letter?

2          MR. GADSDEN:  Yes, Your Honor.  It's an exhibit to my

3   retention -- my application.

4          THE COURT:  And does it provide for your recovery of

5   expenses for doing conflicts check?

6          MR. GADSDEN:  I don't believe it addresses it, Your

7   Honor.

8          THE COURT:  It didn't.

9          MR. GADSDEN:  Your Honor, as I said, I think the issue

10  presented here was whether that activity is required of the --

11         THE COURT:  Why isn't doing a conflicts check to serve

12  as an expert the cost of doing business?

13         MR. GADSDEN:  Yes, it was, Your Honor, for the initial

14  check.  Not required and not necessary for my firm to be

15  retained as a testifying expert in litigation, not as counsel

16  to a party, not to advise any party or handle the

17  administration of this case.  But I was retained as an expert

18  in a piece of litigation.

19         THE COURT:  If you were retained as an expert and gave

20  testimony that favored an existing client of your firm, that

21  wouldn't -- would that have been an appropriate subject for

22  cross-examination?

23         MR. GADSDEN:  Absolutely.  Absolutely.  And that check

24  was made.  The issue here, again, is given the seven-page list

25  of parties that are required for the full conflicts check for a

1  party to establish statutory disinterestedness for the purposes

2  of the Bankruptcy Code was imposed upon me and my firm --

3            THE COURT:  To turn down --

4            MR. GADSDEN:  -- over and above --

5            THE COURT:  -- so turn down the engagement or write an

6  engagement letter that specifically provides that you will be

7  compensated -- I'm not sure at the end of the day whether I'm

8  going to approve it, but it should have expressly included a

9  provision that you be compensated -- I mean it's a cost of

10  doing business.

11            MR. GADSDEN:  I --

12            THE COURT:  You've been practicing law a long time, as

13  I remember.

14            MR. GADSDEN:  Yes, Your Honor.

15            THE COURT:  And you would never undertake a matter

16  without doing a complete conflicts check, would you?

17            MR. GADSDEN:  But there's a --

18            THE COURT:  Have you ever charged a client for doing a

19  conflicts check?

20            MR. GADSDEN:  No, Your Honor, as I've said before.

21            THE COURT:  That's --

22            MR. GADSDEN:  But the issue here is whether or not a

23  testifying expert in litigation is required to be retained at

24  all --

25            THE COURT:  You weren't.

1        MR. GADSDEN:  -- and required to go through this

2    process.

3        THE COURT:  So why did you do a conflicts check?

4        MR. GADSDEN:  It was made a requirement for the

5    retention and engagement in this case.

6        THE COURT:  Would you ever testify as an expert

7    witness without doing a conflicts check, as long as you're a

8    partner in a law firm?  You couldn't -- you're not permitted to

9    testify adversely to one of your clients.  Are you?

10       MR. GADSDEN:  Of course, Your Honor; and I did that

11   check and I'm not seeking compensation for that.

12       THE COURT:  You know, sometimes conflicts checks

13   require reviewing a thousand different names.  I mean it's an

14   enormous -- it can be an enormous burden and you -- I've

15   never -- I've practiced for the same firm for thirty-four years

16   and never once would I have thought of charging a client for a

17   conflicts check --

18       MR. GADSDEN:  But --

19       THE COURT:  -- even as extensive as it might be.

20       MR. GADSDEN:  Here, Your Honor, it wasn't just a check

21   to find out whether I would be subject to impeachment on any

22   basis as a testifying expert.  Here it was did I meet the

23   standard of statutory disinterestedness under the Code which

24   included a check, as I said before, of our relationship with

25   any judge who sits on this court, any employee of the U.S.

1    Trustee's Office.  I don't see how that's necessary to

2    establish that the firm lacks bias -- or I lacked a bias in

3    testifying as a testifying expert in a discrete piece of

4    litigation.

5            THE COURT:  Let me hear from Mr. Masumoto.

6            MR. MASUMOTO:  Good morning, Your Honor.  Brian

7    Masumoto for the Office of the United States Trustee.

8            Your Honor, as indicated in our pleadings, we did

9    attempt to follow the same rule without distinction as to

10   whether an individual is testifying as an expert or as a

11   professional.  We do believe that whether or not as an expert

12   or a professional, as Your Honor suggested in your colloquy, if

13   in fact, the testimony may be adverse to any one of a thousand

14   people included on the conflicts check, that certainly that

15   should be disclosed, and certainly I would think any

16   individual, any expert, would want to make sure that that

17   information is available both to its client and to other

18   individuals.

19           As for the matters that were included that Mr. Gadsden

20   referred to as to conflicts checks regarding judges and the

21   U.S. Trustee's Office, I certainly don't believe that that

22   amounted to a significant portion of the 31,000 dollars

23   involved in conflicts checks.  So whether or not they did that

24   comparison and whether or not that would have had any impact on

25   their testimony, I think it would be a rather de minimis

1   portion of the cost that was charged to the estate.

2          Accordingly, we do believe that in accordance with

3   your practice with respect to professionals in this case, that

4   the conflicts undertaken by an expert witness should be the

5   same as that as a professional, and that cost should be borne

6   as overhead by the expert.

7          THE COURT:  All right.  Mr. Gadsden, I have another

8   question for you.

9          MR. GADSDEN:  Yes, Your Honor.

10          THE COURT:  Your invoice number 1135951, dated

11   December 12th, 2013, consisted entirely of entries associated

12   with revising billing records.  Why is that permissible?  I

13   have --

14          MR. GADSDEN:  I --

15          THE COURT:  Stop.

16          MR. GADSDEN:  Yes.  Sorry.

17          THE COURT:  I have -- I understand, I'm not saying you

18   were retained as a lawyer; you were retained as an expert.  Why

19   should I have --

20          MR. GADSDEN:  I accept --

21          THE COURT:  -- ruled before --

22          MR. GADSDEN:  I accept that adjustment, Your Honor.

23          THE COURT:  All right.  Go ahead, Mr. Gadsden.

24          MR. GADSDEN:  All right.  I guess I've made my

25   presentation.  I'm would just call the Court's attention to the

 1   list of parties for which the search was required which is

 2   attached as Schedule 1 to my affidavit which is part of our

 3   retention aff --

 4           THE COURT:  Did somebody give you that list

 5   electronically so you could run it through your firm's computer

 6   system which is the way that conflicts checks ordinarily get

 7   done in a big firm?

 8           MR. GADSDEN:  Yes, Your Honor.  It wasn't -- it

 9   wasn't --

10           THE COURT:  You didn't have to manually search a

11   thousand names?

12           MR. GADSDEN:  No, Your Honor.  The time that's

13   required is matching up the information that's generated for

14   each of the thousand names and their affiliates.  And, as I

15   said, the names are all listed on the schedule to my retention

16   affidavit.  And it goes, in my view, Your Honor -- our view on

17   what is required to do to establish lack of bias for the

18   purpose of my testimony.

19           THE COURT:  All right.  Court's ruling is as follows.

20           A lawyer serving as an expert witness is not entitled

21   to be compen -- absent a engagement letter that expressly

22   covers the issue, as to which I won't rule if it is, but in the

23   absence of such a provision, conducting a conflicts check is a

24   cost of doing business not compensable from the estate.

25           I will reserve if the issue returns to me in some

1    other case where there is an engagement letter that

2    specifically covers it.

3            So the Carter Ledyard fee request should be reduced by

4    the amount -- I think it was $31,494.25 is the amount of the

5    request that pertains to the conflicts check.  Additionally,

6    the amount should be reduced by 1,190 dollars for the entry in

7    the December 12th, 2013 invoice 1135951 for revising billing

8    records.  As I've held before, that is not compensable.

9            With those two adjustments, the Carter Ledyard

10   application for fees and expenses is approved.

11           MR. GADSDEN:  Thank you, Your Honor.  May I be

12   excused?

13           THE COURT:  Yes, absolutely.

14           All right.  Let's move on to the Chadbourne

15   application.

16           The Chadbourne application seeks final fees in the

17   amount of 46,860- dollars -- excuse me; let me say that

18   again -- $46,860,806.66 and expenses of $2,995,419.47.  Those

19   amounts are after the fee reduction agreed upon with the U.S.

20   Trustee of $30,000.  Mr. Seife?

21           MR. SEIFE:  Thank you, Your Honor.  Howard Seife from

22   the law firm of Chadbourne & Parke, counsel for the examiner in

23   this case.

24           I think Your Honor is very familiar with the work of

25   the professionals for the examiner including Chadbourne.  As

1    you know, it was a very extensive undertaking mandated by the

2    request of the parties in the case as to the scope of the

3    investigation which, as we all know, was very broad and dealt

4    with extremely complicated issues that required extensive

5    factual discovery with nine million pages of documents that

6    were produced and reviewed; over ninety-nine days of witness

7    interviews, eighty-three different witnesses.  We met with all

8    of the significant parties in the case, many on multiple

9    occasions, had the benefit of their presentations and the

10    benefit of their legal theories as to potential claims in the

11    case.  All this culminated in the report which Your Honor's

12    very familiar with, in excess of 2,200 pages with the appendix.

13        The report identified substantial potential causes of

14    action, over five billion dollars.  And we'd like to think that

15    the presence of the investigation and the parties' awareness of

16    the issues we were examining which they were aware of through

17    our frequent meetings, helped in some way foster the ultimate

18    resolution in the case, obviously, with many other parties

19    involved and the assistance of the mediator.

20        Most importantly, we think we fulfilled the mandate

21    requested by the parties and Your Honor in this case.  No one

22    has questioned whether we fulfilled our mandate or that we

23    didn't do it properly and well.  The question which is being

24    raised by the objection from the Liquidating Trust relates to

25    the reasonableness of the fees.  And one needs to examine

1     reasonableness in light of the magnitude of the project, the

2     complexity of the issues, and something very important, which

3     is the timeframe within which we are operating.

4            As Your Honor is well aware, we had very extreme time

5     constraints.  We had strict deadlines that the Court asked us

6     to adhere to.  There was a lot going on in the case, and it was

7     clear no one wanted the examiner's work to delay the ultimate

8     resolution of the case.  That extreme time pressures had its

9     impact on how we approached the examination.  Whereas, if we

10    had the luxury of time to do things in a logical sequence, one

11    would commence document discovery, have the benefit of review

12    of documents, prepare for interviews, take that all into

13    account while research is going on, and then sit back and write

14    your report.  We did not have that luxury.  We were going down

15    all of those paths simultaneously.

16           So it created enormous strains on the professionals in

17    the case, including our firm, but it was a fascinating

18    assignment.  I wouldn't suggest otherwise.  Working with the

19    examiner, Mr. Gonzalez, was a wonderful opportunity.  And in

20    the end, I think we produced, on time, a work product which was

21    requested by the parties.

22           Your Honor noted our fee request which is substantial;

23    but it was a substantial undertaking.  We have settled, as you

24    noted, with the U.S. Trustee on its objections for the fifth

25    period.  Those objections related to three categories:

1    preparation of the fee application, responding to objections
2    from the U.S. Trustee's Office, and multiple parties at
3    meetings.  So that resulted in agreement to reduce the fees, as
4    you noted, by 30,000 dollars.
5           I think at this point, in light of the objection
6    that's been made, it's important to note that the U.S. Trustee,
7    as Your Honor noted at the commencement to these proceedings,
8    has been extremely active through each interim fee process
9    period in reviewing applications, and we have settled many,
10   many issues with the trustee, and either voluntarily or a
11   result of their efforts, have agreed to various reductions
12   throughout the case and those totaled some 545,000 dollars of
13   reductions in fees and expenses based on their review of each
14   of our interim applications.
15          In addition, I think it's worth noting when one
16   considers the reasonableness of the application, is that after
17   consultation with the examiner, Chadbourne agreed to forgo its
18   annual fee increases and what we call maturational fee
19   increases for associates that become partners or move up in the
20   ranks.  And that resulted in a discount from our fees of 1.8
21   million dollars.
22          I think also when considering reasonableness of fees,
23   it's worth looking at blended hourly rates.  Chadbourne's
24   blended hourly rate in this case was 594 dollars per hour.  And
25   I think when one compares that to the other leading

1   professionals, including the debtors' counsel, which was at

2   654,000 dollars -- no -- 654 dollars, and creditors' committee

3   counsel which was at 694 dollars per hour, I think in

4   comparison, I think it's worth noting for reasonableness.

5          I would also point out that our calculation of blended

6   rate does not include the use of contract attorneys which would

7   have brought that rate down significantly, whereas the debtors'

8   counsel did include that in their calculation of a blended

9   rate.  So I think the difference would have --

10          THE COURT:  Have you run the numbers with the contract

11   attorneys?

12          MR. SEIFE:  Excuse me?

13          THE COURT:  Have you run the number --

14          MR. SEIFE:  No.

15          THE COURT:  -- for the blended hourly rate if you had

16   included the contract attorneys?

17          MR. SEIFE:  We have not, Your Honor.  We could do

18   that.

19          THE COURT:  So -- and I'll give you a chance when you

20   come to the issue of the contract attorneys --

21          MR. SEIFE:  Yes.

22          THE COURT:  -- which is something that the Trust has

23   raised but go ahead with your presentation.

24          MR. SEIFE:  Yes, and we can certainly do that

25   calculation.

1        So again, many -- I'll deal with the specific

2   objections after the presentation by the Trust so we can hear

3   exactly what they're pressing in terms of their objections;

4   however, based on our review of their objection, we did

5   acknowledge in our response, much as we would with the U.S.

6   Trustee, there were certain items which we acknowledge there

7   was probably a valid issue that they've raised, and we're

8   prepared to reduce our fees accordingly.

9        And --

10       THE COURT:  Why don't you tick those off for me.

11       MR. SEIFE:  I'll tick those off.  There are three

12   items.

13       There was an objection really based on the Trust's

14   review of our 21,000 time entries; they found 49 where the

15   addition, I guess, was off by a total of 14.9 hours resulting

16   in what they view as an overcharge of 8,699 dollars.  So we're

17   amenable to reducing our fee application by that amount.

18       The second issue was the use of summer associates --

19   billing for summer associates.  There seems to be a split

20   within this court as to whether that's appropriate or not.

21   Rather than get into that debate, we'll write off the fees for

22   summer associates; 5,757 dollars.

23       The third issue where we're willing to make a

24   concession involves the category of document review.  By way of

25   background, I'm sure Your Honor is well aware of the situation

1    we faced in the winter, starting November, when the torrent of

2    documents started coming over the transom and required

3    immediate review.  And it was at shortly after that point we

4    started bringing in contract attorneys.  But as part of the

5    review, we also had Chadbourne associates review documents.

6    Part of it was to maintain quality control and to provide

7    guidance to the contract attorneys, and part of it was just to

8    deal with the volumes that had to be reviewed.

9          We -- because of the number of bodies that were

10    required for that task, we did need to use some associates who

11    are probably more senior than one ordinarily would look to.  So

12    we had identified six senior -- more senior attorneys in that

13    category and had already voluntarily marked their hourly rates

14    down to third-year associate rates.

15          The Trust apparently identified some additional

16    attorneys that we hadn't marked down.  We're agreeable to doing

17    that and charge them at the hourly rate of third-year

18    associates, the 495 rate.  That would amount to an additional

19    reduction in what we're seeking in the amount of 46,600

20    dollars.

21          So if I my math is correct, that would net out our

22    current fee request to 46,799 -- 46,799,7- --

23          THE COURT:  Give it to me again.  I'm sorry.

24          MR. SEIFE:  Yes.

25          THE COURT:  46 million --

1        MR. SEIFE:  $46,799,750.66.

2        THE COURT:  Okay.  Let me hear from the Trust counsel

3   and then I'll give you a chance to speak.

4        MR. SEIFE:  Thank you, Your Honor.

5        THE COURT:  But address the con -- the issue of

6   contract attorney -- use of contract attorneys, if you would.

7        MR. SEIFE:  In terms of the objection they raise?

8        THE COURT:  Yes.

9        MR. SEIFE:  As I understand the objection, it's based

10  on a lack of disclosure of what we were doing, that perhaps the

11  parties were not fully aware that we were using contract

12  attorneys.  I would note that we did not mark up the contract

13  attorneys.  We charged the estate at cost at the forty-eight

14  dollars an hour.  I know other law firms treat that differently

15  and do mark up for overhead and other expenses, the hourly

16  rate.  We did not do that.

17       They were working in our offices and using our

18  facilities, but we passed it straight through as charge --

19       THE COURT:  The contract attorneys were physically

20  present in the Chadbourne offices when they performed the work?

21       MR. SEIFE:  They were, Your Honor, and they were

22  supervised and overseen by Chadbourne attorneys.  There may

23  have been one or two instances where for discrete periods of

24  time one or two of the contract attorneys worked remotely, but

25  I think that was the exception.  And all of them spent

1    substantial time on the premises, if not all their time.

2           In terms of disclosure, I guess, first, we followed

3    the debtors' practice in this case.  They hired contract

4    attorneys to assist them well before we did, and we followed

5    their lead.

6           We listed the expense of contract attorneys in our

7    monthly statements that were circulated among the parties.

8           The U.S. Trustee's Office, the creditors' committee,

9    were all alerted to our use of contract attorneys.

10          I filed a supplemental declaration with this court

11   which disclosed that we were using contract attorneys and

12   confirmed that we had checked each and every one for any

13   conflicts, and we used the thousands of names that were

14   referred to in the prior fee application.

15          The U.S. Trustee was all over our use of contract

16   attorneys.  We worked closely with them.  We provided them a

17   spreadsheet with productivity data of each of the individuals.

18   Part of the process was to make sure that each of the contract

19   attorneys was maintaining a proper run rate of document review;

20   and the U.S. Trustee was involved with that.

21          And finally, I would note, we have -- our firm, based

22   on the interim fee applications, we've paid out-of-pocket for

23   those services.  So it's come out of the firm's pocket for

24   that.

25          The final thing I would note, this very issue came up

1    in the Delaware court in the Worldwide Direct case which we

2    cite in our papers, and the court there noted the very issue

3    that these contract attorneys were under close supervision of

4    the firm and that a separate retention application for each

5    individual attorney or for the service that supplies them was

6    not required.

7              So based on all that, we think we acted appropriately

8    and all the parties knew exactly what we're doing.  And, not to

9    mention, I think, in chambers with Your Honor, we certainly

10   alluded to it from time to time.

11             THE COURT:  All right.  Let me hear from the Trust's

12   counsel.

13             MS STADLER:  Thank you, Judge.

14             On behalf of the ResCap Liquidating Trust --

15             THE COURT:  You need to make your appearance.

16             MS STADLER:  Okay.  A couple of rebuttal --

17             THE COURT:  You need to make you appearance.

18             MS STADLER:  Oh, I'm sorry.

19             THE COURT:  Who you are.

20             MS STADLER:  I thought you said I did not need to.

21             THE COURT:  You do; no.

22             MS STADLER:  My name is Katherine Stadler of the law

23   firm Godfrey & Kahn.  I represent the ResCap Liquidating Trust.

24             THE COURT:  Okay.

25             MS STADLER:  We know and appreciate that the Court has

1    read all of the materials and is intimately familiar with these

2    cases and do not intend to reiterate what has been written.  We

3    do, however, want to put the applications that are subject to

4    objection here today, not just Chadbourne & Parke which I will

5    address specifically, but all of them in the context of this

6    case.

7              As you know, the total professional fees in this case

8    are approximately 400 million with about a quarter of that sum

9    allocated to only three contested applications.

10             When the consenting claimants negotiated the plan

11   support agreement in April and May of 2013, it was contemplated

12   that the Trust would review all professional fees both for fees

13   incurred before the --

14             THE COURT:  So the Trust isn't --

15             MS STADLER:  -- plan before an agreement and after.

16             THE COURT:  -- the Trust is one of two trusts created

17   by the plan --

18             MS STADLER:  Correct.

19             THE COURT:  -- and is the successor of the debtor in

20   that respect.  Correct?

21             MS STADLER:  Correct.

22             THE COURT:  And the Trust steps in the shoes of the

23   debtor.  Is that correct?

24             MS STADLER:  That's correct.  It succeeded to the

25   asset.

1          THE COURT:  And so to the extent that the Court has

2    reviewed and ruled on four interim fee applications before

3    today with objections, generally, from the U.S. Trustee and

4    from the Court, and resolved issues, how do you get to re-trade

5    issues that were raised and resolved with respect to the first

6    four interim applications?  I'll deal separately if there were

7    issues that weren't raised or addressed.  But to the extent

8    that there were issues that were -- because the thing that was

9    most irritating about your objection -- and I am irritated --

10   is the extent to which you are trying to revisit issues that I

11   considered very carefully and ruled on and that Mr. Masumoto

12   and his colleagues in the U.S. Trustee's Office considered and

13   raised objections where appropriate and sought resolutions.

14   And here you want to wipe the slate clean.  You come and you

15   step in the shoes of the debtor, but you don't seem to want to

16   be bound by anything that's happened in this case until now.

17          Do you know how much you've driven up the expenses for

18   today's hearing with -- yes, you raise a handful of issues that

19   were maybe not raised or resolved previously, but most

20   everything you raise was raised before me before and raised by

21   the U.S. Trustee and resolved.  How do you -- where do you --

22   aren't you bound by what the party who you succeed has done?

23          MS. STADLER:  I don't think so, Judge, respectfully.

24   You noted earlier the dearth of authority on the point.

25   Collier does address it, "A final application must be filed at

1   the end of each professional's engagement even if the

2   professional is not seeking additional compensation or payment.

3   Any amounts that were awarded as interim compensation are

4   subject to reconsideration at any time prior to the final award

5   for any reason."

6           THE COURT:  And when you go look at the cases where

7   those fees and expenses have been reconsidered, it's generally

8   been because the case is administratively insolvent, or they're

9   allegations of breach of fiduciary duty or other professional

10   misconduct.  But you want to just retrade issues that were

11   raised and resolved before, resulting in me spending and my

12   staff spending an enormous amount of time going over what we've

13   done before, because you feel you can come in here and just

14   retrade the same issues.

15           No, I'm not -- I said in my earlier comments, I don't

16   believe that strict preclusion principles prevent you from

17   doing it, but you're asking me to go back and revisit things

18   that I've determined before.  And you don't even -- so here's

19   my question.  What did you do before you prepared your

20   objection in going back?  Did you read all the prior fee

21   applications?

22           MS. STADLER:  Yes, I did.

23           THE COURT:  Did you read all the prior objections

24   filed by the U.S. Trustee?

25           MS. STADLER:  Yes, we did.

1          THE COURT:  Did you read all the transcripts from

2     hearings at which this Court ruled on fee applications?

3          MS. STADLER:  Yes, we did.

4          THE COURT:  And did you note any of that in your

5     papers?  Did you note in any of your objections the prior

6     hearings when the issues you seek to raise now were raised,

7     considered, and ruled on by the Court?  No, you didn't.  How

8     are you being compensated?

9          MS. STADLER:  We've been retained by the Liquidating

10    Trust.

11         THE COURT:  On what basis?

12         MS. STADLER:  On an hourly fee basis.

13         THE COURT:  And do you consider whether you're wasting

14    the trust's money by driving up the costs in this case by

15    raising objections that raise no new grounds from what were

16    considered before?  You have a handful, a smattering of issues

17    that you raise that weren't raised before, minor, but, yet, you

18    come and you file this application that's required extensive

19    responses from those parties to whom you've objected, when the

20    Court considered the precise issues before.  The U.S. Trustee

21    raised the precise issues before.  They were resolved by the

22    Court.  You make no allegations of any breach of fiduciary

23    duty, not administrative insolvency, no other -- you really

24    haven't flagged other issues that would cause the Court to want

25    to go back and rule again on issues I ruled on before.  You did

1   it in GM, too.

2           MS. STADLER:  Let me address, briefly --

3           THE COURT:  This is your little cottage industry you

4   have for -- you claim to have some proprietary -- because we

5   had at least one or two telephone conferences I don't think

6   were on the record.  I will disclose the content of those.  And

7   I believe you told me then, you weren't satisfied with the

8   format in which Chadbourne & Park was providing you with the

9   data on their fees and expenses because it didn't work with

10  your proprietary software that enables you to review all the

11  fees in a case.  That's the substance of what was raised

12  before, in a telephone conference before today, sometime before

13  today.

14          So you've got some proprietary software that you think

15  enables you, well after the fact, to go back and challenge all

16  items that you think shouldn't have been approved, but which

17  were approved, most of which, your objections now, were raised

18  and decided by the Court before.  Yet, you stand here now,

19  having consumed an enormous amount of my time, my staff's time,

20  and the applicant's time, to once again address issues that

21  were addressed before.

22          Yeah, I'm aggravated.  I'm mad.  What's the authority

23  for you stepping in the shoes of the debtor to raise issues

24  that have been raised before and resolved before?

25          MS. STADLER:  The authority, Your Honor, is in the

1    trust's obligations under the plan documents to evaluate all of
2    the claims filed.  The understanding of the parties who signed
3    off on the plan support agreement --
4            THE COURT:  Are you going to go back and ask the Court
5    to review claim determinations that I've made because I've
6    heard and I still hear slews of claim objections.  Are you
7    going to try and revisit because you think you've got an
8    obligation to go back and review everything that's occurred?
9    You're going to ask this Court to review my decisions on the
10   numerous claim objections that have come up?
11           MS. STADLER:  No, certainly not.  The administrative
12   expense claims for fees, as you know, are different from other
13   types of claims.  The adjudication of a claim objection is
14   certainly final and binding, and the time to appeal those
15   determinations long since have run.  The trust and the other
16   parties-in-interest in this case focused their energies during
17   the case on the negotiation of a plan and terms that --
18           THE COURT:  Are you telling me that I didn't take the
19   time to review the interim fee applications --
20           MS. STADLER:  No --
21           THE COURT:  -- carefully --
22           MS. STADLER:  certainly not.
23           THE COURT:  -- scrutinize them and all the detail, and
24   raise issues where I thought it was appropriate to raise
25   issues, or to the extent that the U.S. Trustee, Mr. Masumoto,

1   Mr. Driscoll is in the Court, to the extent that they raised

2   issues, you think I didn't consider those at the time?

3           MS. STADLER:  Certainly not.  My representation to the

4   Court is that on behalf of its constituency --

5           THE COURT:  So why didn't --

6           MS. STADLER:  - the trust did not.

7           THE COURT:  -- you address any of the colloquy and

8   discussions in the transcripts, which you've said you read, of

9   all of the interim fee application hearings.

10          MS. STADLER:  We did try to.  Let me address that

11  issue.  Mr. Masumoto provided this morning a chart summarizing

12  the deductions for each of the categories objected to with

13  respect to Chadbourne.

14          THE COURT:  Not each, but because --

15          MS. STADLER:  Well --

16          THE COURT:  -- as I said in my --

17          MS. STADLER:  Right.

18          THE COURT:  -- comments earlier today, the U.S.

19  Trustee or the Court may have had objections that covered five,

20  six --

21          MS. STADLER:  Right.

22          THE COURT:  -- two, some number of categories

23  included --

24          MS. STADLER:  Right.

25          THE COURT:  -- in a larger fee application --

1          MS. STADLER:  Right.

2          THE COURT:  -- and what I always wanted to be sure was

3    that the number, if there was a proposed resolution by the U.S.

4    Trustee, that it satisfied the Court as to any items that I had

5    identified and not to penalize applicants by adding on to what

6    had been proposed by the U.S. Trustee additional deductions

7    that may have covered the same items that the Court had.

8          MS. STADLER:  Right.

9          THE COURT:  So if you read the transcripts, you'd know

10   that's what I've done --

11         MS. STADLER:  We did.

12         THE COURT:  -- at each of the hearings.

13         MS. STADLER:  Correct.  And we did try, in certain

14   specific instances, to conform the objections to the rulings

15   Your Honor had made previously, for example, with respect to

16   travel to and from New York in the Mesirow application, for

17   example.  Let me address very briefly --

18         THE COURT:  So you raise the issue of transitory time

19   keepers; you know that Mr. Masumoto raised issues of transitory

20   timekeepers.  You raised issues of staffing inefficiency; you

21   know that Mr. Masumoto raised issues about staffing

22   inefficiency.  You raised issues about vagueness of -- and

23   usually the issues you've raised about vagueness clearly the

24   entries weren't vague, but you know that Mr. Masumoto and the

25   Court addressed issues of vagueness entries.  You know that the

1  Court regularly raised issues about the number of attendees at

2  hearings or meetings.  You raised that issue.

3          MS. STADLER:  Yes, and with respect to certain of

4  those categories, we did undertake to do a line-by-line

5  comparison of the trust's objections to the trustee's

6  objections.  For example, in the non-compensable billing

7  activity category that you just mentioned, the trust objection

8  on Chadbourne -- I'm sorry, on Mesirow, for example, is 268,000

9  dollars consisting of 599 entries.  We compared that to the

10  trustee's objection which included 299 entries totaling 176,000

11  dollars.

12          THE COURT:  And what you don't have in front of you

13  were my own --

14          MS. STADLER:  Right.

15          THE COURT:  -- notes because they're not public.

16          MS. STADLER:  Right.

17          THE COURT:  Because my clerks, interns, and myself

18  would go through the applications to see -- looking for exactly

19  those things.

20          MS. STADLER:  Right.  So I guess my point there was,

21  we did undertake an effort to reconcile.  We do have Mr.

22  Masumoto's totals of the deductions, and to the extent it is

23  possible, we are certainly committed to a process of

24  reconciling or trueing up so that no one, as you said earlier,

25  is double dinged for a category.  The fact remains, with

1    respect to Chadbourne, that the objections and our back-of-the-
2    envelope math, based on Mr. Masumoto's chart, the deductions
3    are arranged with the trustee total about 410,000 dollars.  Mr.
4    [Seef]'s number was different --

5             THE COURT:  Mr. [Sife].

6             MS. STADLER:  Mr. Seife's number was different, and I
7    will defer to him on that.  Nonetheless, without an ability to
8    determine which negotiated categories those deductions
9    resulted --

10            THE COURT:  You get to second guess what was done
11   before because you couldn't find a precise line-up of the items
12   that you're proprietary software identified.  So you felt you
13   could come in here and reargue all of those issues.  Is that
14   it?

15            MS. STADLER:  No, I don't think so, Judge.  I think
16   what we're trying to do is bring the universe of objectionable
17   issues to the attention of the Court for purposes of fulfilling
18   the trust's fiduciary obligation to its constituents, and, as I
19   said, committed to ensuring that the efforts of the trustee and
20   the Court, which are amply noted, are taken into consideration
21   in reconciling any of those objections, but for the benefit of
22   all of the creditors and the constituents who are expecting the
23   trust to be a steward of their assets.  They wanted to carry
24   out their obligation under the terms of the plan support
25   agreement to review all fees de novo at the end of the case.

1          Certainly, there is no suggestion that anyone; not the
2     examiner, not the Court, not the U.S. Trustee's Office fell
3     down on the job.  The trust, for its purposes and on behalf of
4     its constituents, chose to defer the comprehensive evaluation
5     of fee applications to the final fee period.  That decision, if
6     it turned out to be inopportune, was based on the trust's
7     understanding of the final fee process.

8          There's certainly no suggestion, as you said, of
9     fiduciary misconduct, administrative insolvency, but there's
10    also a line of case law that Collier cited, and I know Your
11    Honor has read, that suggests that the totality of the
12    circumstances, in that final fee phase, and comparison of the
13    results obtained and many of the other factors that Section 330
14    articulates is more appropriately in a holistic fashion at the
15    end of the case.

16         The trust undertook this effort and applied its
17    standards to everyone.  It examined anew each and every one of
18    the forty-five applications we've walked through this morning
19    and identified problems with only five.  In many instances, it
20    identified no problem.  In many instances, it identified
21    problems that were de minimis, and it determined had been
22    adequately resolved by the trustee's objections, which we did
23    evaluate to the extent possible and compare to our own.  And
24    there were a few, at the end, that did not come out of that
25    process without continued concerns on the part of the trustees

1    as fiduciaries.

2              THE COURT:  And what animates your concern about the

3    Chadbourne application?

4              MS. STADLER:  Well, the Chadbourne application as

5    we've arti --

6              THE COURT:  Have you read -- I actually have read the

7    report from cover-to-cover.  Have you?

8              MS. STADLER:  Yes.  No, I cannot claim to have done

9    that.

10             THE COURT:  How much of it have you read?

11             MS. STADLER:  I read the executive summary --

12             THE COURT:  Okay.

13             MS. STADLER:  -- and --

14             THE COURT:  Did you charge your client for doing that?

15             MS. STADLER:  No, I didn't.  No, I did not, in fact.

16   I read the executive summary, and I would say, to be honest to

17   the Court, beyond the executive summary, I probably read five

18   percent of the examiner's report.

19             THE COURT:  And --

20             MS. STADLER:  Personally, I can't speak for anyone

21   else on behalf of the trust.

22             THE COURT:  You think the examiner's report was

23   unnecessary or inappropriately thorough?

24             MS. STADLER:  Certainly not.  No one is questioning

25   that.  The examiner served his obligations under his

1    appointment order and did the job he was hired to do and did it

2    well.

3           THE COURT:  And you also see that the work plan that

4    was submitted by the examiner on behalf of the examiner was

5    revised from time-to-time?

6           MS. STADLER:  Yes.

7           THE COURT:  So Mr. Seife referred to the parties in

8    the case requesting a broader scope.  All that was reviewed

9    with the Court.  So Mr. Seife just didn't, and Chadbourne and

10   the examiner, Mr. Gonzalez, didn't just simply go off and

11   willy-nilly decide we're going to examine these additional

12   issues because a creditor or the creditors' committee or some

13   other party didn't just raise the issue.  There were revised

14   work plans, budgets that were presented to the Court, and I was

15   certainly aware, throughout, when the scope of the engagement

16   of the examiner expanded.

17          So you're not questioning the -- I take it then, so

18   you're not questioning the scope of the examiner's

19   investigation?

20          MS. STADLER:  No, we are not, nor are we questioning

21   the performance of the examiner himself.  His fees are

22   undisputed.  The term Your Honor used earlier, sticker shock,

23   is probably the best explanation for the issues that are facing

24   us today.  For an examiner's report in any case and the bulk of

25   the cost of the report, of course, resulting from the

```
 1    professional fees and not the examiner's work itself, to
 2    consume more than twenty percent of the administrative case
 3    budget is shocking.  And it caused the trust to take a closer
 4    look at those bills.  When it did so, it determined that there
 5    were items in the bills, some raised previously by the trustee
 6    in the Court and some not, that --
 7              THE COURT:  What items do you raise today that were
 8    not previously raised by the Court or the U.S. Trustee?
 9              MS. STADLER:  Well, there's --
10              THE COURT:  Just focusing specifically on Chadbourne.
11              MS. STADLER:  Specifically with respect to Chadbourne,
12    we talked about the summer associate fees.
13              THE COURT:  Well, that's out so that's --
14              MS. STADLER:  Right, there's a larger --
15              THE COURT:  That's an issue on which my colleagues may
16    differ.  I don't have to rule on it because they've been taken
17    out.
18              MS. STADLER:  Right.  There's a larger category, and
19    those are itemized in Exhibit C-2 of professionals who were not
20    yet admitted and --
21              THE COURT:  You lost on that issue before Judge
22    Gerber,  right?
23              MS. STADLER:  What Judge Gerber said was that
24    attorneys who had graduated from law school and passed the bar
25    but had not yet been admitted should be compensated as
```

```
 1   attorneys.  But that attorneys who had hadn't completed their
 2   legal education or passed a bar exam, should be paid as
 3   paralegals.  And given the data that was in the supporting
 4   material for the fee application, there was no way to know why
 5   one attorney was or was not admitted.  So that --
 6          THE COURT:  Okay.  And do you have a case that
 7   supports -- because I didn't see any case law that -- and I
 8   think the U.S. Trustee from time-to-time raises this issue.
 9   But I don't know of a specific published decision that
10   addressed the issue of what the appropriate compensation rate
11   for graduates of law school not yet admitted to the bar is.  Do
12   you have any cases?
13          MS. STADLER:  No, I don't.  Certainly not published
14   cases.  The other categories not included in the trustee's
15   universe of objections include, primarily, the typesetting and
16   proofreading issue, and the clawback issues that are
17   identified.  There's also --
18          THE COURT:  Let's take the clawback issue because --
19          MS. STADLER:  Sure.
20          THE COURT:  -- it's easy for me to deal with right off
21   the bat.  I'm really surprised by your objection, because you
22   seem to say they should have just returned the documents.
23   Whether the request for a clawback was well taken or not, just
24   give it back.  Why did you incur this cost?
25          I reviewed document -- there's no transcript from
```

1    this, I don't think, because I reviewed where, I think, that

2    the trustee -- excuse me, the examiner and his counsel

3    endeavored to resolve the issues without the necessity of court

4    intervention.  It's my standard rules, I applied here, and they

5    got many of the issues resolved.  When they couldn't get the

6    issues resolved, I reviewed boxes of documents in camera, and I

7    got letter briefs with respect to clawback claims, what the

8    arguments were, and I ruled on them.  And I'm more often -- the

9    examiner won on most, lost on a few, some were resolved with

10   redactions that I approved.

11          The bottom line is, most of the clawback requests were

12   not well taken.  The Court overruled them, and your brief

13   suggests just give the documents back despite, and I remember

14   as the clock was ticking and I'm responsible for that, okay,

15   the time pressure was directly the result of deadlines I

16   imposed.  This was a big case.  If I hadn't imposed deadlines,

17   we still wouldn't have a confirmed plan.  The quarterly

18   professional fees would have continued to skyrocket.  So this

19   case was moving forward.  I set what I thought were reasonable

20   but tight timelines.

21          The examiner's report was a very important -- the case

22   is perhaps a little unusual because it was the overhang of the

23   completed examiner's report that finally led almost all the

24   parties to a consensual resolution.  I say, almost, because the

25   JSNs did not, and we had to have some trials about it but --

1    and the parties, most of the parties-in-interest were very

2    aware of what issues the examiner was looking at.  And I have

3    no doubt that the overhang of that report was a motivating

4    factor in coming to a consensual resolution.

5            But one of the arguments I heard on the clawback

6    request is because of the deadlines, Judge, that you've

7    imposed, we're working on sections of this report that refer to

8    documents, refer to interviews as to which now there's a

9    clawback request, and we have to go back, and as Mr. Seife says

10   in his response to your objection, they have to go back and

11   look at all the different work streams, all the different

12   sections that are being drafted.  And if a document's clawback,

13   remove references to the document or interview testimony based

14   on the document.  And so it was real problem, and it all got

15   resolved.  It got resolved because if they couldn't resolve the

16   clawback requests on their own, I heard it in camera.  I looked

17   at the documents, and I entered -- I know there's a written

18   order where there was a long list of specific documents where

19   I'd overruled or I said with the following redacted, et cetera,

20   but your paper is just, give it back.  Isn't that the position

21   you've taken?

22           MS. STADLER:  The position that we've taken is that

23   the trust's understanding of the process, the expedited process

24   for document production --

25           THE COURT:  Just tell me this.  Answer my question,

1   and then I'll let you give an answer.  You've taken the

2   position that rather than fighting clawbacks, the examiner and

3   his professionals should have just returned the documents?

4           MS. STADLER:  I don't think that --

5           THE COURT:  Yes or no?

6           MS. STADLER:  I don't think that fairly characterizes

7   our brief.  I think what we've stated is that we think that the

8   amount of time spent on clawback activities, in both

9   professionals, warrants a closer look.  And that we've raised

10  that for the Court's attention.  And obviously your judgment,

11  as an experienced participant in the process, certainly carries

12  the day.

13          The only other issue that does not overlap in any

14  respect with the trustee's objection is the typesetting.  You

15  had asked me to itemize those.

16          THE COURT:  Yes.

17          MS. STADLER:  And that's a 371,000 dollar expense.

18  And I do want to, just briefly, address the different

19  methodology we applied for Chadbourne and Mesirow because I

20  know that was an issue raised in the responses.  When we looked

21  at this, on behalf of the trust afresh in the final fee-review

22  process, we looked at all the documents Your Honor has itemized

23  and discussed, and asked ourselves what role Chadbourne and

24  what role Mesirow played and how the two of the them worked

25  together to create this significant work product.

1          The premise underlying the objection and the different

2     treatment of the professionals is that Chadbourne & Park, as

3     the legal counsel and the primary drafter of the document, was

4     responsible for the final packaging of the product and putting

5     it to press and putting it out to the public.  The financial

6     advisor role, in the Liquidating Trust's view, is a supporting

7     function to provide very high level detailed financial

8     analysis, which Mesirow certainly did.  But to have Mesirow

9     professionals, in addition to Chadbourne professionals,

10    spending millions of dollars and time in editing and

11    proofreading once that text had been consolidated with a single

12    document production system, in this case a typesetter, that the

13    process could and should have been streamlined with Chadbourne

14    taking the lead on editing, creating more uniformity, making

15    sure that things flow and fit and together, and that the role

16    of the financial advisor, at that point, would be limited to

17    financial checking and making sure the financial

18    representations and the charts and tables were adequate.

19         THE COURT:  Have you ever undertaken an investigation

20    of the scope and magnitude of this one?

21         MS. STADLER:  I don't think many people have, Judge.

22         THE COURT:  And what is it that -- why is that you

23    think your judgment should be substituted for that of the

24    professionals who undertook this engagement?

25         MS. STADLER:  The trust believes that its judgment

1   ought to be given weight in the analysis, not necessarily to

2   override the professionals, when the context of the case is

3   viewed as a whole, when the cost of the process, the role of

4   all the other players, as you've mentioned, including the

5   parties, Judge Peck as mediator, all of those things in the

6   trust's view contributed to the success of the case.  And while

7   the examiner and his report played an important role, I think

8   the trust takes issue with the characterization of the

9   examiner's report as the catalyst for resolution because

10  certainly the trust constituents --

11         THE COURT:  Nobody could have predicted, at least I

12  didn't predict -- let me leave it at that -- that the impending

13  release of the examiner's report -- yes, I knew that,

14  obviously, I entered an order for mediation.  And I knew that

15  Judge Peck was very actively engaged in mediation.  And I set a

16  deadline for the completion of the examiner's report.  I know

17  those were going on at the same time.  And it was the wild card

18  what impact would the examiner's report have on the parties'

19  settlement positions.

20         And I certainly wasn't predicting a request; the

21  examiner's report was done.  It was about to be filed, and the

22  parties to the mediation requested that the examiner's report

23  be placed under seal, over the objection of the U.S. Trustee,

24  for the short-time to allow -- I guess the parties had reached

25  an agreement in principle.  It was a question of when it was

1    going to come on for a court hearing, at least until that time,

2    and I carefully balanced the arguments.  I'd rejected -- I

3    think Mr. Masumoto was the one who presented the U.S. Trustee's

4    position about it.  It was a difficult question for the Court,

5    but I did; I left it sealed because it was only for a short

6    period of time.  Okay.  And there probably are not many

7    situations where the sequence of events will happen exactly the

8    same way.  But you think that because the report got sealed,

9    until the parties had cut their deal, that means that the

10    examiner and his professionals, that their compensation should

11    be cut?

12            MS. STADLER:  No, certainly not.  What the trust is

13    asserting is that in the context of this final review process

14    where the outcome of the case is determinative, in part, by the

15    reasonableness of the fees, the factors, the contributors --

16            THE COURT:  You don't think this case has a good

17    out -- I wish that it had been resolved much earlier.  It

18    certainly wasn't because of the examiner that it wasn't

19    resolved earlier.  You think this didn't have a good outcome?

20            MS. STADLER:  Well, I think the trust feels that the

21    recovery that the unsecured creditors are receiving is

22    adequate.  I think they think better control of the

23    administrative expenses of the case could have made the

24    recovery better.  I think that's probably true --

25            THE COURT:  Probably true.

1      MS. STADLER:  -- of unsecured creditors in most cases.

2      THE COURT:  Yeah, that's probably true in most

3  cases --

4      MS. STADLER:  Yeah.

5      THE COURT:  -- too.

6      MS. STADLER:  Yeah.

7      THE COURT:  Yeah, I agree.

8      MS. STADLER:  So I mean, in the end, Judge, I want to

9  make clear that the trust, again, is appearing today and

10  presenting these issues to the Court in its role as fiduciary.

11      THE COURT:  Let me ask you this.  Do you agree,

12  because I've made some comments about this from the bench

13  before, that the examiner and his professionals -- I'm not

14  saying a different standard of review, that I apply a different

15  standard of review in reviewing the applications of the

16  examiner and his professionals, but I've also commented it

17  seems to me the examiner and his professionals stand in a

18  somewhat different position in the case than the debtor's

19  counsel, the Creditors' Committee counsel, et cetera.  They're

20  fulfilling a different role.  They're not representing a

21  constituency.  They had an assignment.  Yes, it expanded,

22  appropriately, in my view.  And they fulfilled that role.  So

23  you successfully negotiated reductions in fees by Morrison &

24  Foerster and Kramer, Levin.  I raise no issue about it.  They

25  consented to those reductions.  But don't you agree, that an

1    examiner, in a case, and the examiner's professionals stand in

2    a different relationship to the case than do other court

3    approved professionals in a case?

4            MS. STADLER:  I agree that the examiner is in a

5    different role than the other case participants, exactly, for

6    the reason you've stated.  They are not a pre-existing

7    participant as the debtor's counsel are, and they are not

8    representing a constituency as the Creditors' Committee is.  I

9    disagree with the premise that that somehow changes the

10   treatment that those professionals, representing the examiner,

11   should get under Section 330.  The trust's position is that

12   Section 330 of the Bankruptcy Code, all of the case law

13   interpreting it, ought to be applied to every case

14   professionals in the same way.

15           THE COURT:  And I have.  But let me ask you this.

16   When I ask you to identify areas with respect to Chadbourne

17   that you think were not previously raised, you raise the issue

18   about summer associates; that's off the table.  You've raised

19   the issue about attorneys not yet admitted to the bar.  I'm not

20   sure whether Mr. Masumoto had ever raised that issue with

21   Chadbourne or not, usually, the U.S. Trustee is not shy about

22   raising that issue.  You raised the issue about typesetting.  I

23   have Mr. Seife's response that deals with the reasons,

24   particularly given the time pressure and just the length of the

25   document, as to why.  Are there other categories in your

1  objection that you think were not previously raised in the

2  case?

3          MS. STADLER:  I think the issues that were previously

4  raised were not raised to the full extent that they were, but

5  there was some overlap in the remaining issues as I'm looking

6  down the list.

7          THE COURT:  So the summer associates, off the table.

8  The not-yet-admitted attorneys, the typesetting you think those

9  are the only issues that weren't raised at all?  I'm not so

10 sure about the not-admitted attorneys, but I don't --

11         MS. STADLER:  Yeah, I would agree that there's

12 different definitions used in the different fee processes on

13 that one.  But was it raised as a generic proposition, yes.

14 Was --

15         THE COURT:  So you agree that the not-yet-admitted

16 attorneys was raised in the case?

17         MS. STADLER:  By the U.S. Trustee, correct.

18         THE COURT:  Okay, all right.

19         MS. STADLER:  Yeah, and I think that --

20         THE COURT:  So what I want to know is whether there

21 are areas in your objection that were not raised before.

22         MS. STADLER:  I think we've covered those.

23         THE COURT:  Okay.  Is there anything else you want to

24 add with respect to Chadbourne?

25         MS. STADLER:  No, Judge.

1          THE COURT:  Okay.

2          Mr. Seife, do you want to respond?

3          Mr. Masumoto, do you want to get into this mix?

4          MR. MASUMOTO:  Just briefly, Your Honor.

5          THE COURT:  Go ahead.

6          MR. MASUMOTO:  With respect to the issue -- Brian

7    Masumoto for the Office of the U.S. Trustee -- with respect to

8    the issue of unadmitted attorneys, I believe our pleads may

9    have referred them to an issue involving law school graduates

10   not yet admitted to the bar or that.  But we, in fact, did

11   raise it and, in fact, although not to discuss settlement

12   issues, we took into account the different rulings by this

13   Court and reached, at least in our mind, an appropriate

14   resolution.  And so they were included in the overall

15   reductions on a number of occasions.  It may have been on one

16   interim period that we did not raise it.  I don't know that the

17   amount was not significant.  But as indicated in the chart that

18   I supplied, certainly the issue of unadmitted attorneys were

19   addressed specifically and were included in our pleadings.

20         THE COURT:  Thank you, Mr. Masumoto.

21         All right, Mr. Seife, do you want to respond?

22         MR. SEIFE:  Thank you, Your Honor, Howard Seife,

23   Chadbourne & Park.  I think Your Honor covered in great detail

24   many of the things we would have raised in response to the

25   objections, so I'm not going to go over the objections that it

1  sounds like you've dealt with.

2          On the issue of unadmitted attorney fees, it clearly

3  was raised by the U.S. Trustee and that was part of our

4  resolution on the interim fees.  I would just note each of the

5  unadmitted attorneys did pass the bar and, thankfully, have

6  been admitted.

7          THE COURT:  Happily for them.

8          MR. SEIFE:  So just the principle of the objection,

9  which I won't get into on the merits because it has been

10  resolved in prior fee applications, I would take exception to.

11          I think Your Honor noted our response on the use of an

12  outside vendor to perform, what people refer to typesetting,

13  but in this day and age nobody is setting type anymore.  It's

14  really electronic document production.  And it involves the

15  systems of word processing, changes of footnotes in sequential

16  numbers.  It's a very sophisticated process.  And as we noted,

17  fairly early in the process, we had so many different work

18  streams going with so many different parties producing their

19  sections of what would be a very long report.  And the

20  difficulty of tying all those together, knitting them together,

21  forced us to discuss with the examiner going to an outside

22  service.  We interviewed four different outside vendors.  We

23  picked the one we thought would be most appropriate.  The

24  examiner agreed, and that was disclosed in one of our interim

25  applications.  It was approved and Chadbourne wrote a check to

1  the vendor.  So --

2       THE COURT:  I'm going to give you a confession --

3       MR. SEIFE:  Yes.

4       THE COURT:  -- Mr. Seife, and that is, I read every

5  page of the report on my iPad.

6       MR. SEIFE:  Did you find any typos?

7       THE COURT:  I don't remember because I downloaded the

8  PDFs onto my iPad, and it was easier carrying the report.  That

9  isn't to say -- I'm not suggesting it was not appropriate to

10  have the printed copies, but I read it on my iPad.

11       MR. SEIFE:  And I must say when the report was

12  released from the -- released by the Court, we had long lines

13  of parties in the case at our office seeking hardcopies, so I

14  think a lot of people found the hardcopy much easier to read

15  than the electronic version.

16       Are there any other of the objections that you'd like

17  me to address, Your Honor?  I --

18       THE COURT:  No.  All right.

19       MR. SEIFE:  -- think they've been dropped or --

20       THE COURT:  Okay.  So let me --

21       MR. SEIFE:  -- dealt with.

22       THE COURT:   With respect to the Chadbourne

23  application -- well, first, is there anybody else who wishes to

24  be heard with respect to the Chadbourne application?

25       Mr. Gonzalez, you want to be heard?

1          MR. GONZALEZ:  Yes, thank you.

2          THE COURT:  Sorry for not having recognized you

3     before.

4          MR. GONZALEZ:  I'm Arthur Gonzalez, the examiner, in

5     the ResCap case.  Much of what I was going to say, Your Honor,

6     I think you've dealt with, but I was struck by a few comments

7     being made by counsel for the trust.  One of the points I

8     wanted to make, that is extremely frustrating to me in looking

9     at the objections that were filed, was that there's amnesia as

10    to what happened in this case by the trust.  And who is the

11    trust?  The trust is made up of members of the committee, at

12    least one holder of a significant piece of an indenture in

13    which the indentured trustee sat on a committee, and with that

14    knowledge this objection is filed.

15         They also have -- you noted that the trust is

16    successor-in-interest of the debtor.  They have debtor's

17    counsel working for the trust.  They have committee counsel

18    working for the trust.  Either one of those two counsels could

19    put in context much of this for counsel for the trust here

20    today.  And I just note that in a limited objection to

21    committee filed to the December fees when it saw this -- an

22    adjournment of examiner's fees, and the Court granted it.  It

23    says very clearly on page 6 paragraph 7 that the committee made

24    a general review of each of the examiner's professionals'

25    monthly fee statements and interim fee applications.  Further,

on page 6 paragraph 8, the committee stated that it believes

that the Liquidating Trust Board should have the opportunity to

perform such review post-effective date and is confident that

the Liquidating Trust Board, representing the interest of all

the creditors whose funds will be used to pay the fees of the

professionals, will be able to perform such review promptly.

So we know who was on the board.  We know that the

committee intended that board to look at the fees.  We know

that the committee members or the committee itself all looked

at the examiner's fees and, yet, when it came time to the work

plan object -- it's not really an objection with respect to the

examiner's work plan.  It appeared to me in paragraphs 16

through 20 of the Chadbourne fee application, that there's an

assertion that I did not fulfill my self-imposed obligation to

promptly advise the Court and the parties as to any significant

variance in the estimate provided in the amended work plan.

Well, first of all, many examiners may not do budgets;

we did a budget.  Many examiners who do budget may not

represent that they intend to promptly advise the Court and the

parties if there are any changes.  So this trust, basically,

doesn't file a dollar-amount objection, but intimates that that

obligation wasn't satisfied, in spite of the fact, that we're

the only ones in the case, that I know of, that did a budget,

certainly submitted a budget.

We sat down in chambers conference with counsel for

1  the committee present, debtor's counsel present, the U.S.

2  Trustee present, obviously with the Court, explained every step

3  along the way in which fees were escalating.  Initially, they

4  were escalating linearly -- and that may not be a word, but I

5  think -- they were escalating based on the amount of time we

6  were spending.  Then it became -- when discovery exploded

7  around January 2013, it advanced to a much greater amount

8  proportionately, and we turned around and filed more and more

9  supplements.  And ultimately, the last one had the numbers in

10  it.

11       But we have a board on the trust who sat on a

12  committee, who saw the monthly fee statements, knew what was

13  going on, and now represents -- and I just heard it from

14  counsel -- that better control of administrative expenses.

15  Well, where were they?  They knew exactly what was going on

16  with us.  They had more information about us than they probably

17  had about any other professional.  As for the Court, because

18  the monthly fee statements themselves were not filed with the

19  Court under the monthly fee order, we provided the Court with

20  more information, more current information, than the Court

21  otherwise had on any other professional because the Court was

22  left with the interim fee applications, which naturally lag in

23  time in terms of information.

24       So with all of this information, the trust forgets it

25  and tries to cast a very negative image of the examiner's

professionals or the examiner really, here.  But what do they
do with that?  They don't object to the examiner's
professionals about that.  They don't object to the examiner's
fees, which they well should have, because if I failed to live
up to that obligation this is where the adjustment should be
made, on my fees not theirs.  I told Chadbourne what to do.
Mesirow had nothing to do with it.  So in their view if they
weren't promptly informed, as I said I would, this is where
they should have come.  But instead, they put it in an
objection to Mesirow and to Chadbourne just to try to get some
negative inference about the conduct of their performance of
their professional obligations.  It made no sense to me.  So
the better control they wanted in this case, then they should
have exercised better control.

In terms of percentage of recovery, I've heard this
before.  It's kind of an interesting argument.  I can
understand it from a creditor's standpoint.  But as a very
practical matter, you cannot have an examiner do an independent
investigation if the examiner's professionals believe if the
case is not successful, we may not get paid.  It just can't
happen.  It needs to be dealt with in the scope of the
examination, not an afterthought and say, wait a minute, the
amount of your examination was a greater percentage of recovery
than we expected; therefore, you need to share the burden and
take a hit.  That's exactly what's going on here.  It would

1   undermine the independence of any examiner if that were --

2   first of all, that's not a standard anyway.  It's not a

3   standard under 330.  You don't look back and see what people

4   are going to recover and turn around and say what was

5   reasonable at the time you expended it, at least not if you're

6   retained on an hourly basis.

7           So I won't go through a lot of what I said because, as

8   I said, I think it was addressed. And just with -- we haven't

9   gotten to Mesirow's, but as a general statement, certainly with

10  respect to Chadbourne and Mesirow, their fees, I think, are

11  reasonable under the circumstances based upon the quality of

12  the report that was produced and the time frame it was

13  produced.  And there's nothing, I believe, in this record that

14  would alter that with the exception of whatever modifications

15  were already made by the parties before the Court; nothing in

16  the case law, nothing in the statute that would really change

17  the outcome, whether or not the examiner's report had an impact

18  on the mediation, whether the examiner's report had no impact

19  on the case at all.  It's really irrelevant to what the exam --

20  whether the fees were reasonable for the work that we did.

21          And it may not be a good thing for creditors to hear.

22  They may not be pleased about, but that's the reality of what

23  the standard is under 330.  And with that, I will sit down.

24          THE COURT:  Thank you.

25          MR. GONZALEZ:  Thank you.

1         THE COURT:  Anybody else who hasn't been heard that

2   wants to be heard?

3         Okay, with respect to the Chadbourne fees, first

4   section 330 of the Bankruptcy Code provides that and this is

5   a(1), "After notice to the parties in interest and the United

6   States Trustee and a hearing" and it goes on, the court may

7   award fees and expenses.  So notice and a hearing is required,

8   and that's what we're having today.  There was some issue, and

9   I don't think this was on the record.  It was in one or more

10   telephone calls.  There was an issue as to whether there would

11   be any evidentiary hearing with respect to today's hearing.

12   The law of the Second Circuit and elsewhere -- there's a

13   published Third Circuit decision, there's an unpublished Second

14   Circuit decision -- that the bankruptcy court has broad

15   discretion in deciding what procedure to follow.  What the Code

16   required is notice and a hearing and an opportunity for parties

17   to be heard, and that's what's happened today.

18         Extensive briefing has been filed by the parties not

19   only with respect to Chadbourne but the other contested fees,

20   as well.  And I've concluded it's unnecessary for the Court to

21   have an evidentiary hearing.  That the record before me, the

22   extensive fee applications which the Court has reviewed, and

23   there have been some declarations that have been put in, the

24   trust put in an authorized reply that I received, I think,

25   yesterday, received an additional short brief and a

1  declaration.  I've reviewed them, but no evidentiary hearing is

2  required.

3          The Court has made a thorough review.  As I indicated

4  earlier, with respect to each of the interim applications, I

5  did make a thorough review.  But with respect to the final

6  application, I have done that as well.  I've made a final

7  review.  And while all issues of fees at a final hearing, I

8  suppose, are fair game for objection and requests, so the

9  preclusion doesn't apply to what the Court decided on an

10 interim basis, the Court believes that absent unusual

11 circumstances, the Court should not -- and unusual

12 circumstances would be new issues that have been raised, new

13 facts that are raised that weren't raised at the time of the

14 interim applications -- that the Court is not required to go

15 back and revisit every decision that was made previously, every

16 resolution by the U.S. Trustee, which as I said before has done

17 a very good job throughout this case in reviewing fee

18 applications.

19         When I asked Ms. Stadler to identify what are the new

20 issues, I think there's one that we didn't talk about that I do

21 want to raise, and that's the -- after the examiner was

22 released from the case, there were fees that were incurred.

23 And that was an issue that was raised in the trust brief.  We

24 haven't previously spoken about it; that was not previously

25 raised.  I think that the Chadbourne response dealt with that

1    quite effectively.  There were discovery requests that were --

2    requests may be the wrong term -- subpoena from the U.S.

3    Attorney in the Central District of California, for one, and

4    perhaps some others, where the trust -- the examiner and his

5    professionals had to respond to a subpoena from the United

6    States, and the fees were incurred and the expenses that were

7    incurred after.

8            And I think the response that Chadbourne filed, showed

9    that the order that discharged the examiner's professionals

10   specifically covered fees incurred.  So I think that that

11   answer is really provided in the reply that Mr. Seife had

12   filed.  I agree with it completely.  And I was privy -- there

13   were conferences with, I believe, the U.S. Trustee was present

14   but also the U.S. Attorney from Los Angeles was -- the

15   Assistant U.S. Attorney in Los Angeles was on the phone for

16   those.  We had discussions about how the subpoena was going to

17   be dealt with, and it's clearly appropriate, in my view, that

18   those fees are reimbursed, and that's included in this final

19   interim fee application, I believe.

20           So that wasn't covered before, Ms. Stadler, but that

21   was an issue that you raised that I think probably had not

22   previously been raised.

23           So the Court's review of all of the pleadings in this

24   matter and a review of the fee applications, for the

25   overwhelming majority of what the objections covered by the

1    trust, those were raised, considered by the Court, ruled on by

2    the Court, usually with a resolution by the U.S. Trustee, and

3    no facts have been brought to the Court's attention that would

4    suggest that they should be revisited.  I'm not saying what the

5    precise legal standard, but I tried to be flexible in looking

6    at was there really anything in the trust objection that wasn't

7    really considered by the Court, or new facts or circumstances

8    brought to the Court's attention which should lead to reopening

9    the issue.  I didn't believe there was.

10          So with respect to these new issues that have come up,

11   the issue about summer associates is resolved because

12   Chadbourne has withdrawn that from the application.  With

13   respect to attorneys not yet admitted, that was raised by the

14   U.S. Trustee, resolved as part of the interim applications, the

15   Court is satisfied with the resolution that was made.  There

16   isn't complete uniformity among the judges.  I asked Ms.

17   Stadler -- and my research is the same as hers -- I have not

18   found any cases that deal specifically with the issue.  I'll

19   save it for another day when I have to rule on it.  Here, I

20   believe, I'm satisfied with the resolutions that the U.S.

21   Trustee reached throughout.

22          With respect to the typesetting, it's a large expense.

23   I believe that the Chadbourne reply has adequately dealt with

24   it, the time pressures under which they were operating; the

25   length of the report -- it wasn't just pure -- typesetting

1    really is a misnomer for what the process was going on -- the

2    review of the final report by Mesirow -- we'll get to the

3    Mesirow application separately -- in the Court's view, was all

4    appropriate.

5           The report -- it's an excellent work product.  I don't

6    know, Mr. Seife, did you find some typos?  I didn't look for

7    it, but --

8           MR. SEIFE:  No.  I was just concerned that in your

9    review, you may have found something.

10          THE COURT:  Okay.  It's an excellent report.  It may

11   have been not foreseen as it was getting to its end that just

12   the impending report would have the effect it had on the case.

13   But I agree with Mr. Gonzalez that examiner's fees, examiner-

14   as-professional's fees can't be dependent on whether there's a

15   consensual resolution of the case or not.  I would say there

16   have been cases, and I've written on this, when I have

17   declined -- I've over -- I've denied a motion for appointment

18   of an examiner.  I did it in Dewey & LeBoeuf.  And the argument

19   was that the statutory criteria for an examiner were satisfied.

20   I wrote an opinion, I won't revisit it now, but what was

21   crystal clear in Dewey & LeBoeuf was there would be nothing for

22   anybody if there were a complete exam, because of the cost of

23   the examination if it was to be meaningful.

24          So here, substantial creditors requested it.  The

25   statute, I think, makes it mandatory in that circumstance.

1    This was clearly -- in light of the issues that had been raised

2    early in the case, the number of related-party transactions

3    with the nondebtor parent, it was clearly necessary and

4    appropriate.  The scope was reviewed with the Court.  It was

5    modified with the approval of the Court.  There was a budget

6    that increased; it was reviewed with the Court.  The Court and

7    the major parties-in-interest were all privy to what the

8    examiner was doing and what the expense, the growing expense,

9    the time, and so it's inappropriate now to be second-guessing

10   the judgments and the decisions of the examiner and his

11   professionals.  And I believe the examiner did appropriately

12   supervise his professionals in a very substantial undertaking.

13           So for all of those reasons, I'm approving the

14   Chadbourne application for fees and expenses with the three

15   reductions that Mr. Seife specifically identified:  8,699

16   dollars for math errors, 5,757 dollars for the summer

17   associates, 46,600 dollars for document review had to do with

18   the level of the associates that were undertaking that work.

19   So those amounts will be deducted.  I believe, if I'm correct,

20   Mr. Seife, the final figure is $46,799,750.66?

21           MR. SEIFE:  Yes.  That's the right figure for fees,

22   Your Honor.

23           THE COURT:  Okay.  And the expense number -- total

24   expense is $2,995,419.47.

25           MR. SEIFE:  Yes, that's correct.

1          THE COURT:  All right.  With the three -- that's

2    not -- that doesn't include the three reductions that we've

3    talked about, does it, Mr. Seife?  The three that I just --

4    that I cataloged?

5          Well, to get to the 46,799,750.66, that does.

6          MR. SEIFE:  Yes.  So that's the reduced.

7          THE COURT:  And that's approved.

8          MR. SEIFE:  Thank you.

9          THE COURT:  The Trust's objections are overruled.

10         Let's go on.  I want to try and get this all done.

11   Let's deal with Mesirow.

12         MR. SEIFE:  Thank you.

13         THE COURT:  Mr. Scheler.

14         MR. SCHELER:  Good afternoon, Your Honor.  For the

15   record, Brad Scheler, Fried, Frank, Harris, Shriver & Jacobson,

16   on behalf of Mesirow Financial Consulting, LLC.

17         Your Honor, I'm here today with my colleagues Lisa

18   Bebchick and Peter Siroka.  Also in the court today are

19   representatives of our clients, Mr. Tuliano and Ms. Knoll.  As

20   always, Your Honor, it's an honor and a privilege to be in your

21   courtroom.

22         I'm here to echo the sentiments that Your Honor has

23   already heard from the examiner, the Honorable Arthur Gonzalez,

24   as well as from fellow practitioner and friend, Howie Seife

25   from Chadbourne.  Without being overly repetitious, Mesirow,

1    like Chadbourne, has had all of its charges subject to review

2    and scrutiny by the office of the United States Trustee, by all

3    parties-in-interest and, of course, by this Court.

4             Mesirow understands and appreciates the important

5    distinction between interim and final review.  However, between

6    interim and final review, nothing has altered or changed the

7    results, efforts and efficiency of Mesirow in these cases,

8    including, with respect to Mesirow, complying fully with the

9    direction of its client the examiner.

10             There's nothing new.  There's nothing improvident.

11             The work done by the examiner was first-rate, which

12    was not surprising, and the work done by the examiner's

13    professionals was also first-rate; also not surprising.

14    Indeed, as the Court has stated, the work of the examiner's

15    professionals should be commended and appreciated.  The irony

16    here, as Your Honor has heard, is that the parties-in-interest

17    that have already directly benefited from the work that -- the

18    irony is that the parties who have benefited from the work are

19    now the parties that are in control of and are the

20    beneficiaries of the very Trust that is before the Court

21    objecting.  That they are pursuing objections against the

22    examiner's professionals is both ironic and painful.  And we

23    understand that while the Trust professionals are duty bound to

24    adhere to the wishes and direction of their client, sometimes,

25    Your Honor, as officers of the court, it's also our duty to

1  push back.  This may be one of those instances, Your Honor.

2          They're simply not right under these circumstances to

3  pursue these objections against the examiner's professionals,

4  especially given the positive results that these cases have had

5  for the Trust and for all the parties-in-interest.  First, the

6  examiner did extraordinary work here, as I said.  Secondly,

7  these are all, as Your Honor has observed, after-the-fact

8  objections, and the Trust's attempts to take a second or a

9  third bite at the apple is not appropriate.  It will also

10  potentially have the effect of impairing the ability of the

11  United States Trustee to reach resolution of issues raised with

12  respect to interim fee applications.  Parties want to know that

13  when they come to a landing with the approval of the Office of

14  the United States Trustee and the approval of this Court, they

15  are done.  And that incentivizes reductions, Your Honor.

16          Third, Your Honor, I worry a bit that if there's any

17  embrace of the Trust's objections here, it would put a club in

18  the hand of parties-in-interest in future Chapter 11 cases and

19  may have a chilling effect on the work of examiner's

20  professionals in those cases.  But most importantly, Your

21  Honor, we know and understand that this Court always has the

22  right to and must hold all professionals to the highest of

23  standards which we in Mesirow completely embrace.  It is wrong

24  for the Trust to come in here, under these circumstances and in

25  their own self-interest, to endeavor to work a baseless

1    forfeiture of the professionals and to challenge the work that

2    was done by the Office of the United States Trustee and by this

3    Court.

4            I understand, Your Honor, that the Court has reviewed

5    the pleadings.  I know well that you take to heart all that is

6    submitted to you.  Given the overlap between us and Chadbourne,

7    I will not delve further into the arguments unless the Court

8    desires us to do so, or until Ms. Stadler has presented --

9            THE COURT:  Could you -- Mr. Scheler, there were

10   certain reductions that Mesirow has agreed to make.  Am I

11   correct?

12           MR. SCHELER:  Yes, Your Honor.

13           THE COURT:  Could you itemize those?

14           MR. SCHELER:  Well, Your Honor, overall, in the

15   entirety of the case, we reduced in its --

16           THE COURT:  No, I don't want -- that's not what I'm

17   asking you about.  I know that there have been reductions at

18   various points in the case.  But when I read the response,

19   there were certain additional adjustments that Mesirow has

20   agreed to make.

21           MR. SCHELER:  Your Honor, it's only a de minimis, I

22   think, 256 dollars with --

23           THE COURT:  All right.

24           MR. SCHELER:  And Your Honor, I want to clarify one

25   other thing.  Our final request, the actual amount is

1    39,472,705.  It was originally 34,492.  In the colloquy between

2    you and Mr. Masumoto, and in your numbers, the 20,000 dollars

3    was not reduced; that was the subject of the final interim,

4    which was in the amount of 57,179, which we reduced by the

5    20,000.  So the number that should be --

6            THE COURT:  Give me -- what's the number on the table?

7            MR. SCHELER:  What it should be now is 39,472,705.

8            THE COURT:  Okay.  And that's reflected in the chart I

9    was given this morning.

10           MR. SCHELER:  Yes.  And the expenses are the 344,747.

11           THE COURT:  Okay.

12           MR. SCHELER:  Your Honor, both myself and Ms. Bebchick

13   can go through any of the details.  But I think at this point,

14   perhaps, it is wise and prudent for me to defer to the Trust

15   counsel.

16           THE COURT:  Yeah, let me hear from Ms. Stadler.

17           MR. SCHELER:  Thank you.

18           MS. STADLER:  Thank you, Judge.  Adopting the

19   methodology from the earlier report, I'll focus only on those

20   items that were not previously addressed by the United States

21   Trustee.

22           THE COURT:  Thank you.

23           MS. STADLER:  The Trust has identified some duplicate

24   time entries.  It's unclear whether they're the same ones that

25   were identified by the United States Trustee or not.  The Trust

```
 1  did identify 229,000 dollars in rate increases.  I do not
 2  because that that issue was raised by the United States
 3  Trustee.
 4          The Exhibit B that we've prepared showing the time
 5  increment practices of a particular timekeeper and the request
 6  of reduction for that, I do not believe was raised by the
 7  United States Trustee.
 8          THE COURT:  Just cover that.  So you're talking about
 9  the seniority increases during the course of the case?  Is that
10  what you're referring to?  So when people move up a year, their
11  billing rate --
12          MS. STADLER:  Right.
13          THE COURT:  -- goes up.  That's what you're referring
14  to?
15          MS. STADLER:  The rate increases -- the issue is the
16  statement in the retention materials that rate increases will
17  be -- would be disclosed by affidavit, and Exhibit A-2 to our
18  objection itemizes people whose rates changed throughout the
19  engagement --
20          THE COURT:  But my question is --
21          MS. STADLER:  -- for which there was no disclosure.
22          THE COURT:  In other words, rate increases, one would
23  ordinarily think first year in a law firm, first-year
24  associates are billed at X dollars.  If the firm increases its
25  rates so that first-year associates are now billed X-plus-
```

1   fifty, that's a rate increase.

2          Is it your view that a maturity increase -- so when

3   someone goes from a first-year associate to a second-year

4   associate, their rate goes up.  I didn't understand the

5   disclosure of any rate increases to cover seniority increases.

6          MS. STADLER:  That may just be a nomenclature issue,

7   Judge, but from the perspective of the clients, when rates go

8   up, rates go up, and they affect the bottom line.  And a case

9   of this length --

10         THE COURT:  So when someone's a third-year associate,

11  they've got a lot more experience than a first- or second-year

12  associate.  And that's ordinarily reflected in a higher billing

13  rate.  That's true in your firm, isn't it?

14         MS. STADLER:  Ordinarily.  But I --

15         THE COURT:  Is that true in your firm?  Are there

16  seniority increases in your firm?

17         MS. STADLER:  There are.  But they're not imposed in

18  the middle of an engagement without --

19         THE COURT:  Is that right?

20         MS. STADLER:  -- consulting the client.

21         THE COURT:  So when an associate who was a first-year

22  associate when they started working on the matter and they

23  become a second-year associate or the matter continues on, they

24  become a third-year associate, you don't make any increase in

25  their rates to reflect their seniority?

1          MS. STADLER:  Not without disclosing it --

2          THE COURT:  Really?

3          MS. STADLER:  -- to the client.

4          THE COURT:  Okay.  And so when the statement for

5    professional services comes in and it shows the hourly -- shows

6    the professional, the number of hours, and the hourly rate, is

7    that a disclosure to the client?

8          MS. STADLER:  No.  I mean, I don't know that my firm's

9    practices are before the Court, but I will tell you that --

10         THE COURT:  I'm just asking a question.

11         MS. STADLER:  Yeah.  The way that we do our engagement

12   letter says, we typically raise rates consistent with the

13   market and consistent with the expanding experience of our

14   associates.

15         THE COURT:  Um-hum.

16         MS. STADLER:  But my engagement letters that I sign

17   have a sentence in them that says we will not do so without

18   consulting with you first.

19         THE COURT:  Okay, all right.

20         MS. STADLER:  And that was in the retention agreement

21   here.

22         THE COURT:  Okay.  So what other issues?

23         MS. STADLER:  The time increments issue --

24         THE COURT:  You raised the issue that people

25   miraculously had half-hour or full-hour time increments.

1        MS. STADLER:  Right.  And I --

2        THE COURT:  You don't think that was considered by the

3   Court when I reviewed stacks of time records?

4        MS. STADLER:  I don't have any way of knowing that.

5        THE COURT:  Or by the -- so you don't think the --

6   we'll find out from Mr. Masumoto whether --

7        MS. STADLER:  I did not see that issue itemized on Mr.

8   Masumoto's chart.  I did just get it this morning so I may have

9   missed it.  But no, I didn't -- I don't think that was on

10  there.

11       THE COURT:  Okay.

12       MS. STADLER:  The travel issue we've talked about in

13  the context of another professional; that's merely applying one

14  of the Court's earlier rulings.

15       THE COURT:  So I'm looking at Mr. Masumoto's chart

16  that he handed up to the Court.

17       MS. STADLER:  Right.

18       THE COURT:  I'm sure he gave you a copy this morning.

19       Okay, we're going to have to take a recess because my

20  ECRO operator has to leave at 1:30.  We're going to get a -- I

21  was trying to avoid having to come back, taking a lunch break,

22  and -- what's your pleasure?  I would just as soon push through

23  as soon as we get another ECRO operator.  Mr. Seife?

24       MR. SEIFE:  That would be our preference, Your Honor.

25       THE COURT:  Okay.  So let's take a fifteen-minute

1   recess and we'll pick up -- I apologize, Ms. Stadler, for

2   having to interrupt you.

3           Okay?  Thank you.

4       (Recess from 1:27 p.m. until 1:48 p.m.)

5           THE COURT:  Okay.  Please be seated.  Mr. Scheler, I

6   think you were -- are you done?

7           MR. SCHELER:  Oh, no, I --

8           THE COURT:  Oh, okay.  I'm sorry.

9           Go ahead, Ms. Stadler.

10          MS. STADLER:  Thank you, Judge.  I think we were

11  just -- we left off on the issue of travel.  But I do want to

12  loop back quickly.  During the break I took a look at

13  something.  We talked about the rate increases and the

14  seniority adjustments.  And I do just want to note that the

15  seniority adjustments identified in Exhibit A-2 on the Mesirow

16  objection, which is 229,000 dollars, we applied the same

17  methodology to all of the professionals.  So we did make that

18  finding in Chadbourne.  So Chadbourne alleged, or apparently

19  did not adjust for seniority the way that Mesirow did, to the

20  extent that's pertinent to the inquiry.

21          With respect to the travel --

22          THE COURT:  Yes.  I do have a question.  I didn't ask

23  Mr. Scheler about it, but I do have a question about travel.

24  Go ahead.

25          MS. STADLER:  I guess my only point was that I think

1    there is a universe of time in there that was not objected to

2    by the United States Trustee.  I believe the United States

3    Trustee objected to travel expenses.

4          We've talked about --

5          THE COURT:  So if you look at what Mr. Masumoto handed

6    out, the fourth interim period, it shows that the Trustee

7    objection included travel time and expenses.

8          MS. STADLER:  I stand corrected.  It does say travel

9    time there.

10         THE COURT:  But it doesn't say it -- it doesn't say

11   travel time for the other interim periods.

12         MS. STADLER:  Correct.

13         THE COURT:  And, actually, that I do have --

14         MS. STADLER:  Or for the final, I guess.

15         THE COURT:  Yes.  Well, correct.  And I do have a

16   question, because I've tried to be consistent throughout the

17   case, that where professional staff ResCap with people from

18   other offices outside of New York, that their expenses in New

19   York, their non-working travel time is not compensable.  And

20   it's not clear to me what Mesirow did in that regard.

21         MS. STADLER:  It isn't clear to me either, although I

22   will note that most of the timekeepers we identify in the

23   exhibit do have offices in Chicago, not New York.  So I believe

24   that those entries on that exhibit do fall into the category

25   that you previously ruled on.

1          THE COURT:  So, I mean, look, if they were traveling

2    to Los Angeles --

3          MS. STADLER:  Right.

4          THE COURT:  -- to do interviews my fifty percent rule

5    for non-working travel time applies.  If they're coming to New

6    York to work it's not reimbursable.

7          MS. STADLER:  Right.  Exhibit G is a nine-page

8    exhibit.  Just eyeballing it looks to be mostly -- well, all

9    travel to and from New York.  From different places.  Mostly

10   Chicago, but some Boston, Miami, and Atlanta.

11         So obviously the time entries are what they are.  It

12   doesn't say for a deposition or for a hearing or for a meeting.

13   But I think the identification of the items on Exhibit G

14   reasonably fall within that ruling.

15         THE COURT:  Yes.  And I must say that it was this area

16   of the travel expenses that you raise in your objection.  I'm

17   going to want to hear from Mr. Masumoto, because for the fourth

18   interim period he does identify travel time and expenses as

19   having been covered.  If it was part of the resolution in that

20   period I'm not going to double ding them by doing it again.

21         MS. STADLER:  Right.

22         THE COURT:  But that was the one area in your

23   objection on Mesirow -- I'm not saying the only one -- but that

24   was one area where I have questions.  I didn't ask Mr. Scheler

25   before, but after you speak I'll get him a chance to address

1    it.

2           MS. STADLER:  Continuing down the list, we talked

3    about the typesetting fees.  I appreciate the clarification

4    that the presentation provided regarding what typesetting

5    actually means; apparently not the kind of typesetting we do

6    when we file those little briefs with the Supreme Court.

7           THE COURT:  Let me just say.  With respect to the non-

8    working travel time, you identify $565,401.50, so it's a big

9    ticket item.

10          MS. STADLER:  It is.  And what I think we did, and let

11   me double check the exhibit, is it was reduced by fifty

12   percent.  So the objection amount, which is 282,000 dollars --

13          THE COURT:  Right.

14          MS. STADLER:  -- is the other 50 percent.

15          THE COURT:  Yes.  And -- okay.  I'll hear what Mr.

16   Scheler has to say about it.  I apply the fifty percent for

17   non-working travel time; if somebody in New York is going to

18   Chicago to do an interview or a deposition or something, yes,

19   that rule applies.  But what I've tried to be consistent in the

20   case is staff outside of New York, that's fine, but don't

21   charge the estate for either non-working travel time, the

22   expenses while you're in New York, et cetera.

23          MS. STADLER:  Right.  The next group of categories,

24   and these are all in Exhibit I to our objection, these, I

25   think, do fall into the general heading that, using the

1   Trustee's nomenclature, is "staffing issues", I think, is the

2   way they refer to it.

3         You know we've broken that down a little bit more,

4   identified research that was performed at a high hourly rate

5   that we believe could have been done at a lower rate.

6         Professional are analyst tasks that were --

7         THE COURT:  So I'll make another confession.

8         MS. STADLER:  -- done at high rates.

9         THE COURT:  I used to do a lot of my own research when

10   I was in practice, because I thought I could do it better than

11   those people.

12         MS. STADLER:  Probably could.

13         THE COURT:  My hourly rate was higher, but in the end

14   I thought it cost people a lot less money.

15         MS. STADLER:  And probably faster.

16         THE COURT:  I knew where I was starting from.  So I

17   don't -- the fact that more expensive timekeepers do research

18   is not enough.  I mean, it doesn't necessarily fall, flow down,

19   only first-year associates should do legal research.

20         MS. STADLER:  No.

21         THE COURT:  That's nonsense.

22         MS. STADLER:  Certainly not.  I would agree with that.

23   I would just --

24         THE COURT:  I bet you do some of your own legal

25   research too, don't you?

1          MS. STADLER:  Usually, because it's -- I'm faster,

2     yes.

3          THE COURT:  Okay.

4          MS. STADLER:  But I would say, looking at Exhibit I-1,

5     some of the descriptions on there, "Banking Industry

6     Delinquency", some of the descriptions don't really suggest any

7     particular level of sophistication is required.  So the

8     position is not senior people should never do research.  It's

9     that basic research should be performed at a lower level.  And

10    some of what's on Exhibit I certainly appeared to be more basic

11    market conditions research than anything else.

12         The next category, specific category of tasks, is

13    "Paraprofessional Staffing".  That's Exhibit I-2, amounting to

14    about 98,000 dollars.  These are people charging upwards of 600

15    dollars an hour to create this or -- and input materials into

16    this synthesis document system.

17         And I understand from the application materials that

18    Mesirow, as a representative of Chadbourne, in this instance

19    was keeping a document repository and was charged with keeping

20    it updated with the documents.  It's unclear to the Trust why

21    maintenance of that database needs to be done at rates of 695,

22    755, and 800 dollars an hour.  And that is Exhibit I-2.

23         Exhibit I-3 is similar.  These are tasks performed by

24    analysts that could have been performed by associates.  Many of

25    them are the same involving the synthesis document:  uploading,

1 identifying documents, flagging documents, et cetera.

2   And so those are the three categories of staffing

3 issues that the Trust has identified.  And, again, unclear to

4 me whether the United States Trustee's generic staffing

5 objection would have encompassed those areas or not.

6   Finally the clawback issue.  We have discussed and,

7 again, I think adequately understand the Court's ruling in that

8 regard.  And then the multiple attendees certainly was an issue

9 that the Trustee did raise.  But, again, no indication of what

10 the actual allocation on that deduction would have been.

11   THE COURT:  Okay.  So, by my reckoning you've raised

12 five issues.  Billing increments of half-hour or one hour, and

13 I think you said something like twenty percent of the entries

14 were in half-hour increments.  Rate increase, seniority

15 adjustments, travel, staffing issues, high billing rates for

16 people doing research and multiple attendees.  Those are the

17 five issues that you're raising now.

18   MS. STADLER:  Yes.  And let me just get a quick

19 clarification for you on the time increments.  We flagged this

20 particular timekeeper not because it was more than twenty

21 percent of the time it was half and whole hours.  It was more

22 than forty percent of the time.

23   THE COURT:  Okay.  All right.  All right.

24   Mr. Masumoto, tell me what you've -- of these five

25 issues that Ms. Stadler is raising now, can you tell me which

RESIDENTIAL CAPITAL, LLC, ET AL.                    139

1    ones were part of the discussions for the first four interim

2    periods?

3            MR. MASUMOTO:  Yes, Your Honor.  With respect to the

4    billing increments, we don't have a hard and fast rule in terms

5    of percentages.  I have, certainly, and my colleagues have

6    certainly noted where we thought someone was billing in half

7    and whole hour increments inappropriately.  The most obvious

8    case, if everything is billed in whole and half hour

9    increments, but we don't have a set percentage that triggers an

10   objection as being an improper percentage.  So I can say that

11   in this case, certainly, as we reviewed the fee application it

12   didn't trigger an objection on our part on that issue.

13           THE COURT:  Okay.

14           MR. MASUMOTO:  With respect to rate increases, usually

15   the language we require in the retention order requests that

16   rate increases be disclosed.  We don't distinguish between

17   regular market rate increases and seniority, although as a

18   general rule we believe that at the current time, prior to the

19   guidelines, that both increases should be disclosed.

20           As far as the --

21           THE COURT:  Well, what does that mean when you say

22   disclosed?  And the reason I focus on it, you get the billing

23   records.  I got the billing records.  And it shows for each

24   timekeeper what the hourly rate is.  So if there's been an

25   increase, there's not a separate document I look at to see

1  well, this timekeeper's rate was increased from x to y.  I'd

2  have to look and figure it out, compare an earlier period with

3  the later period.  What is it that you require?

4          MR. MASUMOTO:  Generally a notice that's filed on the

5  record.  Essentially, a form of the supplemental disclosure

6  that's required when the rate increase occurs.

7          THE COURT:  Even for seniority increases?  I was

8  certainly aware that that was your -- that your office's policy

9  with respect to -- I'll call it across the board "rate

10 increases".  So the first-year associates, rather than being

11 400 now become 450 or -- I'm just picking random numbers.

12         MR. MASUMOTO:  Your Honor, the language in the

13 retention order doesn't specify, and we had not really made

14 that specific determination, but, as a general rule we, as I

15 said, since it was intended to be general, we didn't

16 distinguish between market --

17         THE COURT:  Okay.  Did you raise this issue with

18 Mesirow?

19         MR. MASUMOTO:  Not the disclosure issue.

20         THE COURT:  Okay.

21         MR. MASUMOTO:  No, Your Honor.

22         THE COURT:  All right.  What about traveling?

23         MR. MASUMOTO:  With respect to travel, as indicated on

24 our chart, I guess we did raise it during one interim.  It does

25 not appear to have been raised in all of the interim periods,

1  but we did address the travel issue at least on one interim

2  period.

3        The staffing issue, again, as mentioned, ours is

4  somewhat general.  I don't believe that our staffing

5  inefficiency category necessarily focuses on any one specific

6  area.  It may usually be if a senior person is doing a routine

7  matter.  It may address some research issues, although, again,

8  I'm not sure if in this particular case those issues were

9  specifically raised.

10        THE COURT:  It was the depths of the recession that --

11  usually in smaller cases rather than the bigger cases -- I was

12  reviewing fee applications, and I would see partners billing

13  time for things that probably should have been done by

14  paralegals.  And I regularly flagged those items and disallowed

15  them.  But in the bigger cases that hasn't seemed to have been

16  as big a problem.

17        MR. MASUMOTO:  Yes, Your Honor.  And I think our

18  office experiences similar things.  Typically it would be

19  purely administrative things.  If those were being done by high

20  billing partners we would certainly object.

21        As to the issue regarding research, it is, sort of,

22  discretionary, depending on the nature of the research and

23  who's doing it.

24        I do believe that with respect to multiple attendees

25  we did raise that, at least on some of the applications.  I'm

RESIDENTIAL CAPITAL, LLC, ET AL.                    142

1    not sure if in every single interim period.  But the multiple

2    attendee issue is one that we fairly frequently and routinely

3    raised.

4              THE COURT:  Okay.

5              MR. MASUMOTO:  Thank you, Your Honor.

6              THE COURT:  Thank you very much.

7              All right.  Mr. Scheler, was it miraculous that one

8    timekeeper, in particular, a very, very large number of his

9    entries were in half-hour increments?

10             MR. SCHELER:  No, Your Honor.  I have to raise that

11   with respect to travel --

12             THE COURT:  I was going to go through my list in

13   order.

14             MR. SCHELER:  No, but it is important.  I'm going to

15   come back to travel with you.

16             THE COURT:  I know.  On travel you put a four-hour

17   cap.

18             MR. SCHELER:  A cap.  So what you're seeing is the

19   consequence of the cap.

20             THE COURT:  Am I really?  I mean, I --

21             MR. SCHELER:  Yes.

22             THE COURT:  I thought there were entries that are a

23   lot less than the four hours

24             MR. SCHELER:  There were some half-hour entries as

25   well.  But, Your Honor, in the main what we can say is that out

RESIDENTIAL CAPITAL, LLC, ET AL.                    143

1   of the multitude of parties -- and there were -- I think, six

2   of the twenty entries or so were with respect to travel.

3             THE COURT:  Okay.

4             MR. SCHELER:  Others were just -- I just -- Your

5   Honor, there's no chicanery going on here --

6             THE COURT:  Okay.

7             MR. SCHELER:  -- in any way, shape, or form.

8             THE COURT:  Well, that's what you're saying now.

9             MR. SCHELER:  Yes.

10            THE COURT:  Okay.  What about rate increases?

11            MR. SCHELER:  Rate increases, Your Honor we had in

12  place that we would not do any market increases.  So we capped

13  throughout the engagement.  We did not undertake with the

14  examiner to cap maturation increases.  And I would note that

15  the maturation increases occurred in April, so we're talking

16  about a six-week period of maturation increases.

17            Your Honor, that was fully understood and discussed

18  with the examiner, and, again, from the point of view of

19  Mesirow our understanding was that we were capping on market.

20            THE COURT:  Okay.  So -- go ahead.

21            MR. SCHELER:  Yes.  I think other of the professionals

22  in the case also had such rate increases.

23            THE COURT:  I'm not so sure about that.  I think some

24  of them agreed not to do that.

25            MR. SCHELER:  I think FTI did.  I think FTI and Alix,

RESIDENTIAL CAPITAL, LLC, ET AL.                    144

1  as well.

2          THE COURT:  Okay.  All right.  So travel was a big --

3  that was one that I meant to ask you about before.  I was going

4  to -- I had a note to ask you about.  It did seem to me -- was

5  Mesirow permitting its timekeepers to bill fifty percent for

6  non-working travel from wherever they were to New York?

7          MR. SCHELER:  I think, Your Honor, once Mesirow became

8  aware that your ruling was that that kind of travel was not

9  reimbursable at the fifty percent rate they eliminated that.

10 But there was a period in the case where there was some travel,

11 and what has happened here is the Trust identified the

12 aggregate of those, but what the Trust hasn't accounted for is

13 that there was other travel elsewhere where we imposed the

14 four-hour cap.  So it's not --

15         THE COURT:  Well, I don't -- it's not a tradeoff as

16 far as I'm concerned, Mr. Scheler.

17         MR. SCHELER:  But in the aggregate dollar amount there

18 is a differential, Your Honor.

19         THE COURT:  Well, what I am going to need to be

20 advised about is whether the total fees which Mesirow is

21 seeking approval for includes amounts for non-working travel to

22 New York by people from other offices.  If it's in there it has

23 to come out of there.

24         I tried to be consistent throughout the case.  Look,

25 there are not that many cases that are so overwhelming that --

1  where the professionals needed to staff up with people from

2  other offices.  Whether they're -- and I respect their

3  arguments that they brought people, they assigned people with

4  the appropriate expertise.  Fine.  I'm all in favor of staffing

5  from other offices.  The only thing that I imposed for this

6  case, and there could be cases where the circumstances are

7  completely different that I might relent.

8          I think in this case there was an expert witness who

9  was testifying who came from another place, but his role was as

10  an expert witness.  And I permitted the billing for the

11  expenses to New York.  And I don't think there was any non-

12  working travel time.

13          But in this case I did, early on, announce that I

14  would not reimburse for non-working travel or expenses for

15  professionals from other offices coming to New York.  If they

16  went somewhere else to do an interview or something or document

17  review, that's a different story.

18          MR. SCHELER:  Your Honor, may I suggest the following?

19  Could we have an authorization and approval of the final

20  compensation net of 250,000 dollars in effect as a holdback,

21  subject to our --

22          THE COURT:  Let's see where we come out --

23          MR. SCHELER:  Okay.

24          THE COURT:  -- on the other issues, okay?  I think Ms.

25  Stadler had indicated there was what -- 280,000 dollars that

1  she identified of --

2          MR. SCHELER:  But that doesn't take into account the

3  fourth interim.

4          THE COURT:  Okay.  Well, let's -- we'll -- I

5  understand your request.  Let's try and finish up.

6          What about on the staffing issues of higher billing

7  rate people doing administrative or research tasks?

8          MR. SCHELER:  Your Honor, as you know well, people

9  were under the gun.  There was no intention to do anything

10  other than work efficiently.  This was very senior intensive

11  work, most especially in the latter periods, and the work that

12  was being done, both with respect to what Ms. Stadler

13  identified and otherwise, was achieving greater efficiencies in

14  terms of doing the work.

15          So with respect to anywhere in the ordinary course on

16  the interim basis, we certainly discuss any concerns that the

17  U.S. Trustee had.  And I think that we performed fairly and

18  reasonably.

19          THE COURT:  All right.  What about the multiple

20  attendees?

21          MR. SCHELER:  Your Honor, on multiple attendees I

22  don't think we did anything unusual.  We went through all of

23  that with the Office of the United States Trustee for certain.

24          And the other thing I would add, Your Honor, with

25  respect to multiple attendees, we were working on a multitude

 1    of issues in terms of putting together the report and the

 2    examiner's work.  So what you had is, in an interesting way,

 3    Your Honor, you had a comprehensive team working across a broad

 4    range of issues.

 5           At one point it was suggested, by way of example, that

 6    Mesirow didn't have anything to do with the writing of the

 7    report.  Mesirow wrote whole sections of that report, and it

 8    had various teams assigned to that.

 9           THE COURT:  I'm not questioning that, Mr. Scheler.  Or

10    I'm not questioning the appropriateness of Mesirow working on

11    editing, reviewing this very lengthy comprehensive report.

12           MR. SCHELER:  But even writing portions of it, Your

13    Honor, in various sections.

14           THE COURT:  I'm not questioning --

15           MR. SCHELER:  So that's why you would have multiple

16    members of a team working on that, because the parts were

17    integrated.

18           THE COURT:  Anything else you want to add?

19           MR. SCHELER:  I guess the only thing that I would note

20    is that there is the best practices memo that the Lehman

21    examiner sent to the Office of the United States Trustee, which

22    by its very terms, which has become, sort of, a yard marker,

23    contemplates this kind of staffing.  So I would just say

24    that --

25           THE COURT:  What kind of staffing?

1        MR. SCHELER:  Where you would have multiple

2   individuals present at meetings.  That's a norm for this kind

3   of work.

4        THE COURT:  Okay.  Ms. Stadler, is there anything you

5   want to add?

6        MS. STADLER:  Just to --

7        THE COURT:  Yes.  I'll give -- Mr. Gonzalez wants to

8   be heard too.  Let me hear from Mr. Gonzalez, and then I'll

9   give you a chance to respond.

10        Go ahead, Mr. Gonzalez.

11        MR. GONZALEZ:  Thank you.  Arthur Gonzalez, the

12   examiner.  I just want to mention something about rates.  It

13   seems to me, and this is the way I've looked at it, when a firm

14   publishes their rates they don't publish them by individual.

15   They publish them by category.  Rates are categorized:  first

16   year, second year, fifth year, partner, et cetera.  So when

17   someone moves from one category to another it's hard to imagine

18   that should be looked at as a rate increase.  Because the rate

19   didn't increase.

20        THE COURT:  I mean, I have to say that this is the --

21        MR. GONZALEZ:  My response is really more focused on

22   what Mr. Masumoto had to say about a general category that

23   maturation in his mind, or the Office's mind, is part of the

24   rate increase structure.  It doesn't make sense to me from the

25   standpoint when professionals file their applications and say

RESIDENTIAL CAPITAL, LLC, ET AL.                    149

1  our rates range from 200 dollars an hour to 1,000 dollars an

2  hour, they're talking about categories and not which individual

3  gets paid that rate.

4          THE COURT:  Yes.  I was going to say in the last seven

5  and a half years no one, including Mr. Masumoto or anybody in

6  his office, has raised the issue with me about any increases,

7  maturation increases being inappropriate.

8          Yes, I've seen the requirement that there be notice in

9  advance of any rate increases, but I've interpreted that to be

10 the general rate increase where you increase each -- or, if not

11 every increase, when first-year associates go from x to x plus

12 something.

13         Okay?  That is what I've usually considered as the

14 rate increase, not the -- I guess it's echoing what you've

15 said, Mr. Gonzalez, that --

16         MR. GONZALEZ:  Yes.  See, I think the argument would

17 be when someone becomes a fifth-year associate the question

18 really is why is the fifth-year associate doing this work, not

19 necessarily should they get paid at a fourth-year rate.

20         THE COURT:  All right.

21         MR. GONZALEZ:  Thank you.

22         THE COURT:  Thank you, Mr. Gonzalez.

23         Ms. Stadler?

24         MS. STADLER:  Just wanted to touch on two points that

25 Mr. Scheler made.  On the time increments issue I just glanced

RESIDENTIAL CAPITAL, LLC, ET AL.                    150

1   at Exhibit B, and I found, not scientifically, about five time

2   entries that are 4.0 hours.

3           THE COURT:  You know, sometimes people really do spend

4   four hours --

5           MS. STADLER:  Yes.

6           THE COURT:  Oh.

7           MS. STADLER:  But those are --

8           THE COURT:  You're saying that's the travel --

9           MS. STADLER:  Those are travel.

10          THE COURT:  Okay.

11          MS. STADLER:  I think those are the ones --

12          THE COURT:  All right.

13          MS. STADLER:  -- that are attributable to the travel

14  issue.

15          THE COURT:  All right.

16          MS. STADLER:  So four out of however many, seventy-

17  nine, on there.

18          The other point that I wanted --

19          THE COURT:  You're suggesting that somebody is being

20  dishonest when they're writing down their time in half-hour

21  time increments.

22          MS. STADLER:  I think dishonest may be too hard a

23  word.  I think rounding up, possibly, is a better way to say

24  it.

25          THE COURT:  Sometimes rounding down.

1        MS. STADLER:  Yes.  Maybe.  On the multiple attendees

2   issue, I just wanted to point out that Exhibit K, which is the

3   calculation of the objection amount, which is 662,000 dollars,

4   lists the attendees at the various meetings and objects only to

5   the fourth and fifth participants.  So, in essence, it applies

6   the rule that Your Honor has -- or the guideline Your Honor has

7   suggested for in-court participation to internal meetings.

8   And --

9        THE COURT:  But, you see, there I didn't announce a

10  guideline for internal meetings.  The issue arose in ResCap.

11  It arose, I think, in MF Global, perhaps in Borders where I'd

12  see a flock of attorneys from a debtor or creditors, debtor's

13  firm or creditors' committee firm in court, most of them not

14  saying a word at any point in the hearing.  And that's what led

15  me to -- and they weren't -- occasionally they'd pass a note,

16  but for the most point they were sitting there absorbing.  And

17  I'm more than happy to have them here.  Just don't charge the

18  estate for it.

19        I'm not sure that I would get to the same position

20  with respect to three or more people attending an internal

21  meeting, because they all may well have a role to play and

22  receive directions as to what they do carrying forward.

23        So I never did adopt -- and you were fair about it in

24  your papers.  You acknowledged that you were seeking to apply

25  what I said for in-court presence to internal meetings.  I

1  didn't adopt that for internal meetings.  I could look at time

2  entries and see -- if I looked at a bill and saw that there

3  were nine people at a four-hour meeting I'd have real questions

4  about it, and Mr. Masumoto would have had a real question about

5  it too.  It could be a lot less than nine, but I would be -- I

6  am reluctant to say that the guidance -- and I think even in

7  court I said look.  If there are three more people here in

8  anything that they are actually working on, fine.  Charge for

9  it.  Okay?  I didn't just say automatically you're not going to

10  charge.

11       So I can remember having some fairly large team

12  meetings in big cases where we had a lot of people there, and

13  it was important that they be there.  So I can't categorically

14  say that there was anything wrong or inappropriate in having

15  more people at a meeting.

16       That I'm not faulting you for raising, okay?  It

17  raises questions.

18       MS. STADLER:  Right.  And, I mean, the only point of

19  my response is that the individual meetings are all identified

20  in Exhibit K, as are the attendees and the lengths of time the

21  meetings took.  So that information is there.

22       THE COURT:  So what I used to look for to see if six

23  people attended the same meeting and everybody had a different

24  amount of time down for it.

25       MS. STADLER:  That would have showed up on the billing

1    error, I think.  But, yes, I mean, there --

2              THE COURT:  May I ask you this?

3              MS. STADLER:  I don't see any nine-hour meetings.

4              THE COURT:  With respect to the half-hour increments.

5              MS. STADLER:  Yes.

6              THE COURT:  Was this focused on one particular

7    timekeeper?

8              MS. STADLER:  The time is all one timekeeper, yes.

9              THE COURT:  Who's the timekeeper?

10             MS. STADLER:  Ben.  Ben Wei.

11             THE COURT:  Spell the last name.

12             MS. STADLER:  W-E-I.  And that, I just would note, is

13   not because we chose to single that individual out.  We

14   filtered for, like we said, disproportionate use of the time

15   increments, and that's the individual who used it more than

16   forty percent of the time.

17             THE COURT:  Okay.  What was his billing rate?

18             MS. STADLER:  Eight hundred and fifty-five dollars an

19   hour.  Title is managing director.

20             THE COURT:  And what was the total of the -- do you

21   have a figure for the total fees charged in these increments,

22   in the half-hour increments?

23             MS. STADLER:  The total was $152,617.50.

24             THE COURT:  Is that the total for just those billing

25   entries that were in the half-hour increments?

RESIDENTIAL CAPITAL, LLC, ET AL.                    154

1           MS. STADLER:  No.  That's that timekeeper's entire --

2           THE COURT:  Okay.  Did your system filter how much he

3     charged on entries that were in half-hour increments?

4           MS. STADLER:  It can filter, but we didn't do that for

5     preparing this exhibit.

6           THE COURT:  Okay.  All right.  Let me come back to the

7     non-working travel time to New York.

8           What did you identify as the total -- I don't know

9     whether you -- I mean, I found the figure --

10          MS. STADLER:  $282,700.75 was --

11          THE COURT:  Give me -- I'm sorry.  Give me the figure

12    again.  282 --

13          MS. STADLER:  Well, your question is what was the

14    total travel, and I'm giving you a number that is half that

15    amount.

16          THE COURT:  The fifty percent.  I know.

17          MS. STADLER:  Yes.

18          THE COURT:  I know.

19          MS. STADLER:  2 --

20          THE COURT:  Because that's what they charged.

21          MS. STADLER:  Right.  $282,700.75.

22          THE COURT:  Okay.  And that reflects travel to New

23    York.

24          MS. STADLER:  To or from.

25          THE COURT:  Well, the problem with the from is yes, if

RESIDENTIAL CAPITAL, LLC, ET AL.                    155

1    people are going from New York somewhere else to do work --

2              MS. STADLER:  Right.

3              THE COURT:  -- the fifty percent for non-working

4    travel applies.

5              MS. STADLER:  I think in order to answer --

6              THE COURT:  Unless you're saying that it's a Chicago

7    based timekeeper, and the from "New York" is New York to

8    Chicago.  He's going home.  He or she are going home.

9              MS. STADLER:  Right.  I will say this.  Looking at

10   Exhibit G, a number of these timekeepers I know to be housed in

11   Chicago, and they are listing travel to and from New York.

12             THE COURT:  Okay.

13             MS. STADLER:  There are some that are listing travel

14   from Dallas to New York, from Boston to New York, from

15   Minneapolis to New York, from Atlanta to New York, from

16   Washington, DC to New York.  And I cannot tell you, as I stand

17   here, whether those people are housed in offices there.

18             THE COURT:  Okay.

19             MS. STADLER:  I think it's mostly the Chicago travel

20   that is the kind that you're looking to identify, but it's

21   unclear to me, without doing some further analysis, which of

22   these trips was getting to New York to work on the case and

23   which was a trip for a purpose like a deposition or a meeting.

24             THE COURT:  Okay.

25             MS. STADLER:  We can certainly supplement the record

RESIDENTIAL CAPITAL, LLC, ET AL.                    156

 1  with that information.

 2            THE COURT:  No.  Hang on.

 3            Okay.  Anything else you want to?

 4            MS. STADLER:  No, Judge.

 5            THE COURT:  Okay.

 6            Mr. Scheler?  How much is the holdback for Mesirow?

 7            MR. SCHELER:  About two million dollars.

 8            THE COURT:  Okay.  So what I have before me is Mesirow

 9  seeking a fee award, final fee award of 39,472,705 dollars.

10            MR. SCHELER:  Correct.

11            THE COURT:  And expenses of 344,747 dollars.

12            MR. SCHELER:  Yes, sir.

13            THE COURT:  Ms. Stadler, let me ask you another

14  question.  With respect to the travel time, did you find any

15  entries suggesting that the Chicago-based professionals, that

16  there are expenses for travel to New York for professionals

17  based in offices outside of New York, either hotel, airfare, et

18  cetera?

19            MS. STADLER:  Yes.  I believe that the entries in

20  Exhibit G are also accompanied by travel expenses.

21            THE COURT:  Okay.  Here is what I'm going to do.  I'm

22  going to sustain in part and overrule in part the objection of

23  the Trust to the final fee and expense application of Mesirow.

24  I'm going to approve the fee request of 39,472,705 dollars

25  subject to a continued holdback of 500,000 dollars.  And I

RESIDENTIAL CAPITAL, LLC, ET AL.                    157

1   don't know.  I think that's overkill, but that's what I'm going

2   to do.

3          And I expect that -- and the expenses, I think, if I

4   didn't say, out of 344,747 dollars -- 344,747 dollars, the

5   500,000-dollar holdback is to cover fees and expenses for the

6   following items, and I expect that Mesirow -- either through

7   you, Mr. Scheler, or otherwise -- will communicate with Mr.

8   Masumoto and Ms. Stadler, and see if you can come to an

9   agreement -- provide the data and come to an agreement with

10  respect to the amount of nonworking travel time for

11  professionals based outside of New York, traveling to or from

12  New York.

13         And likewise, a reduction in expenses for non-New

14  York-based professionals coming to New York, because I've said,

15  in this case at least, I'm happy to have people from other

16  offices come here, but their expenses while here is part of

17  overhead, so that the expense number of 344,747 needs to be

18  reduced by any amount of expenses for professionals from other

19  offices for while they were in New York or their airfare.  And

20  the fees need to be reduced by any of the nonworking travel

21  time to or from New York for those professionals.

22         My award of fees and expenses will not be final until

23  that adjustment is made, but the only holdback will be this

24  500,000-dollar figure, which I think should more than

25  adequately --

1          MR. SCHELER:  It's very cushioned.

2          THE COURT:  -- cover the items we're talking about.

3          And that's not an invitation, Ms. Stadler, to insist

4  that it be a 500,000-dollar adjustment, okay?

5          MS. STADLER:  Understood.

6          THE COURT:  It just I want to be comfortable that --

7  because I don't have the hard figures --

8          MR. SCHELER:  Your Honor, what I will undertake that

9  Mesirow will do, is that we will go back through every one of

10 our charges to determine, with respect to travel to and from

11 New York by our professionals, the aggregate amounts that were

12 included in our fee number, and we will include the aggregate

13 amounts of hotel and related expenses for when those

14 professionals were in New York.  And we will submit those

15 schedules as the earliest possible date.

16         THE COURT:  Well, see if you could confer with Mr.

17 Masumoto and Ms. Stadler and see if you can reach a resolution

18 of that, and then --

19         MR. SCHELER:  What about -- but I --

20         THE COURT:  -- and if you can't, you'll inform --

21         MR. SCHELER:  Yes, but what I'm saying to --

22         THE COURT:  I want to give you a chance to see if you

23 can work this out before you come back to me, okay?

24         MR. SCHELER:  But what I'm saying to Your Honor is

25 that whatever we're going to present is going to be absolutely

1  factual.

2           THE COURT:  Right.

3           MR. SCHELER:  So the only question will be is somehow

4  if they look at the materials we provided, we've missed

5  somebody.  But it's going to be factual, and it's going to be

6  consistent with what you've just ruled.

7           THE COURT:  Okay, so let me just address -- so that's

8  the travel related.

9           On multiple attendees, I'm going to overrule the

10  Trust's objection.  On the staffing issues, higher billing

11  rate, people doing work that arguably could be done by

12  lower-rate people, I'm going to overrule the objection.  I'm

13  sensitive to this issue of efficiency.  I'm also sensitive to

14  the time constraints that everybody was operating under, and

15  the fact that I think I can do legal research better than my

16  law clerks, even as good as they are, and I don't have a

17  billing rate anymore, but when I did -- so I don't think that

18  the Trust carried its burden on that issue.

19           On the rate increases, I'm unpersuaded by the -- I'm

20  going to overrule the objection.  We're talking about the

21  seniority adjustments, and I take -- Mr. Scheler said, well,

22  we're talking about a six-week period, so I don't think the

23  number would be a very big number and I'm not -- whenever I

24  have seen in a fee -- in a retention application, I've seen

25  what associates at different levels or professionals at

 1   different levels are billed at; with maturity they move up to a

 2   different level.  And I think if the U.S. Trustee wants to

 3   preclude that from happening, they can require it in the

 4   retention order.

 5            Okay, with respect to Mr. Wei.

 6            Ms. Stadler, you had how many time entries that were

 7   in half-hour increments?  I think you told me that number.

 8            MS. STADLER:  There were sought seventy-nine time

 9   entries total recorded by this timekeeper.

10            THE COURT:  And were six of those that were the four-

11   hour --

12            MS. STADLER:  Well, yeah, I don't -- don't hold me to

13   that.  Those are eyeballing.  Six or eight.

14            MR. SCHELER:  There are six entries, which are located

15   in rows 322, 23, 39, 61 and 79.  So six of thirty-four entries

16   were travel, so that brings down the --

17            THE COURT:  I thought it was seventy-nine entries.

18            MR. SCHELER:  The total of seventy-nine.

19            THE COURT:  Okay.

20            MS. STADLER:  All his --

21            MR. SCHELER:  Okay, his -- all of his entries were

22   seventy-nine.

23            THE COURT:  Okay.

24            MR. SCHELER:  Not all of them were in the --

25            THE COURT:  Not all increment -- even half-hours.

1           MR. SCHELER:  So there's only thirty-four that were in

2   the half-hour range, and of the thirty-four, six.  So you get

3   down to the twenty-eight of those entries.

4           THE COURT:  All right.  The objection's overruled.

5           MR. SCHELER:  Thank you, Your Honor.

6           THE COURT:  I'm not faulting you for flagging the

7   issue, Ms. Stadler.

8           All right, I think that disposes of the Mesirow

9   application.  With respect to the adjustments, I'm not sure --

10  I don't think we need to have an in-court hearing.  You're in

11  Wisconsin.  If you can come to an agreement, put it in the form

12  of a stipulation.  If you can't, we'll do a telephone hearing,

13  so you don't have to travel to New York for it.  Okay?

14          MR. SCHELER:  That'll be fine, Your Honor, thank you.

15          THE COURT:  All right, thanks, Mr. Scheler.

16          MR. SCHELER:  Thank you.

17          THE COURT:  We still have Morrison Cohen.

18          MR. SEIFE:  Your Honor, yes, and we still have the

19  examiner's final application.

20          THE COURT:  Oh, there were no objections.  It's

21  approved.

22          MR. SEIFE:  Would you like me to put the amount on the

23  record, Your Honor?

24          THE COURT:  Sure, why don't you do that?

25          MR. SEIFE:  Howard Seife, Chadbourne & Parke.  The

1   examiner, Arthur J. Gonzalez, final fee request is $568,612.50,

2   and no expenses.

3            THE COURT:  Right.  And that is approved.

4            MR. SEIFE:  Thank you, Your Honor.

5            THE COURT:  Okay.  All right.  Morrison Cohen.

6            MR. DAKIS:  Last, but certainly not least, Your Honor,

7   Morrison Cohen is here seeking final fees --

8            THE COURT:  Tell me -- you have to make your

9   appearance.

10           MR. DAKIS:  Oh, sorry, apologies, Your Honor.  Robert

11  Dakis from Morrison Cohen.

12           THE COURT:  Tell -- your last name again?

13           MR. DAKIS:  Dakis, D-A-K-I-S.

14           THE COURT:  Thanks, go ahead.

15           MR. DAKIS:  Your Honor, Morrison Cohen filed a final

16  fee application seeking $4,212,750.50.  Morrison Cohen has

17  agreed to a reduction with the U.S. Trustee of $17,524.08.  And

18  in response to concerns raised by the Trust in the Trust's

19  objection, we've agreed to an additional reduction of

20  $33,709.50, bringing our total fee request to $4,163,466.92.  I

21  think that's slightly lower than what's on the chart before

22  Your Honor.  I think the chart doesn't reflect the additional

23  30,000 dollars we took in our response to the Trust's

24  objection.

25           Much of what I was prepared to say here today has been

1   covered both by the Court and by other professionals who have

2   stood up and spoke, and so I'll limit my remarks, but there is

3   a word that came up that Judge Gonzalez raised, and I think a

4   good lawyer listens to the judge, and listens to former judges

5   when they speak.  And the word is "amnesia".  And I think

6   that's an appropriate word to describe the Trust's objection to

7   Morrison Cohen's fee applications.

8           The Trust's objection is predicated on a central focus

9   that the independent directors in the case weren't very

10  important, and therefore weren't entitled to the level of

11  representation they were receiving.  And I believe that that

12  central premise is, simply put, faulty, flawed and just wrong.

13  Your Honor, as the Court recognized and as the parties

14  recognized, the independent directors ran the company as -- the

15  time the case filed.  The independent directors were a majority

16  of the board; the independent directors negotiated the initial

17  settlement with Ally Bank.

18          That initial settlement, while raised through the

19  mediation process that the independent directors participated

20  in, also led to certain noncash compensation, including a DIP,

21  the use of cash collateral, the shared servicing agreement, and

22  all of the various agreements between Ally and the debtors that

23  permitted the debtors to continue to operate through their

24  Chapter 11, to continue to originate mortgages until the time

25  of the sale.  And the sale itself was overseen by the

1    independent directors.

2         The climate of this case at the outset was one of

3    acrimony.  The creditors' committee and other constituents in

4    the case challenged, at every point, the actions of the debtors

5    and the debtors' management.  Central to that challenge was the

6    relationship between the debtors' board and Ally Bank.  And as

7    such, in the middle of all of this disputes, was a group of

8    independent directors who had no ties to Ally, who were trying

9    to make decisions in the best interest of the estate, and for

10   the most part, apparently succeeded.

11        And it's those decisions that led to ultimately the --

12   the results of this case, led to the appointment of Lew Kruger

13   as CRO.  It led to the plan mediation process.  And ultimately,

14   it led to the independent directors agreeing to give up 150

15   million dollars of their own insurance in order for Ally to up

16   their contribution, which became the final piece of the

17   settlement puzzle.

18        Throughout that process, the independent directors

19   looked to their independent counsel for advice, and it was a

20   necessity that their independent counsel be involved in every

21   feature of this case in order for them to ultimately make a

22   decision and assist their clients in deciding to give up their

23   rights to indemnification from Ally and their right to

24   insurance.  It would have been malpractice for a firm to sit

25   back and say, yes, give up insurance, give up indemnification,

RESIDENTIAL CAPITAL, LLC, ET AL.                    165

1  without being fully versed in where the case was and where the

2  case was going.

3         In addition, the creditors' committee had raised --

4  brought a 2004 application that sought document discovery.

5  That document discovery necessarily looked to documents in the

6  hands of the independent directors.  In addition, the

7  independent directors were called as witnesses in the RMBS

8  trial, and so the independent directors would have been part of

9  the RMBS trial, had that gone forward, had the case ultimately

10 not settled.

11        So ultimately, the independent directors looked to

12 their counsel to take a more active role in this case than

13 perhaps the Trust would have liked, but it is not a role that

14 was unnecessary given the acrimony, given the tenor of this

15 case, and given, ultimately, how the case was resolved.

16        Now, in response to the Trust's objections, Morrison

17 Cohen has agreed to take certain reductions.  In particular,

18 Your Honor, Morrison Cohen has agreed to take a 513-dollar

19 reduction for duplicate time entries.  Through our review of

20 the actual bills that were filed, we did locate two duplicate

21 time entries, and we have decided to write them off.  In

22 addition, Morrison Cohen inadvertently raised rates of certain

23 para --

24        THE COURT:  .9 hours by Michael Connolly on November

25 11th, 2013.

1          MR. DAKIS:  Yes, Your Honor.

2          In addition, Your Honor, we located 17,000 dollar --

3   17,190 dollars of rate increases in paraprofessional time.

4   That was inadvertent.  It was done through a coding error, and

5   we are agreeing to write those charges off.

6          The Trust has identified 2,279 dollars of billing

7   activities that were done by a paralegal in the early stages of

8   the case.  We have agreed to write that time off.

9          Transient time, which the Court and the U.S. Trustee

10  has looked at with respect to Morrison Cohen, is an interesting

11  thing.  We had certain lawyers who were involved in the very

12  pre-petition transactions that the examiners were looking at

13  that were the subject of the inquiry by the creditors'

14  committee and by other parties in the case.  And so Morrison

15  Cohen had the unique benefit of at times being able to walk

16  down to the lawyer who wrote the board resolution at issue or

17  walk down to the lawyer's office who wrote the document at

18  issue, and ask them, hey, what was this about?

19         And so there were two lawyers that were involved in

20  pre-petition representation of the board, David Lerner and

21  Eitan Tabak, both of whom didn't spend a considerable amount of

22  time on the case, but the time they spent was valuable, because

23  it allowed us to get to historical information about the

24  debtors quickly.  One lawyer we staffed, a junior associate, on

25  a document review project; that was 2,695 dollars of time.

RESIDENTIAL CAPITAL, LLC, ET AL.                    167

1    We've agreed to write that off.

2         THE COURT:  Sometimes when you -- the people who are

3    working on the case need to get some information about

4    historical information, they pick up the phone; they call the

5    lawyer who worked on it.  He tells them, oh, I wrote that back

6    then, and it doesn't get billed, because it wasn't work in

7    connection with the case.  It's just an explanation of what was

8    done that the lawyers currently working on the case needed to

9    know.

10        So not every -- I question whether that's an

11   appropriate charge.  It's not a whole lot of money.  But I just

12   have a question whether it's an appropriate charge to the case

13   to have a lawyer who's not working on it charge time because he

14   answered a question to somebody who is working on it about

15   something he did -- he or she did -- historically; not because

16   this person is the world's leading tax expert on some

17   subsection of a subsection of a code and the best way to get an

18   answer is call the -- because you have that issue, call the tax

19   lawyer who deals with the issue.  That's not the same -- and

20   ask for legal input; not, there's this resolution I think you

21   worked on.  Tell me what it means or why was it done?

22        MR. DAKIS:  I certainly can understand the Court's

23   concern with that.  And that was minimized by the ability to

24   staff the people who actually worked on the case -- for the

25   most part on the case.  And so Michael Connolly, who had the

RESIDENTIAL CAPITAL, LLC, ET AL.                    168

1    most historic knowledge of the debtors, actually worked on the

2    case, so we didn't run into these types of issues.

3           But with one lawyer in particular, David Lerner, who

4    spent the most -- who is the bulk of the challenged transitory

5    time, David Lerner was intimately involved with the debtors'

6    pre-petition activities.  And he also provided guidance

7    post-petition on corporate governance issues.  And so it was

8    good to be able to speak to somebody who was providing how the

9    debtors did a pre-petition, but also being able to turn to us

10   and say, and maybe now this is where we should be trying to

11   steer things.  It was essential, especially given that, again,

12   the ultimate resolution here was that the board was going to

13   give up their ability to look to D&O insurance, and to look to

14   indemnification from Ally and the debtors.

15          And so while I certainly appreciate that if we were

16   just picking up the phone and calling somebody and saying, hey,

17   what did we do here and what does that resolution mean?  The

18   advice here given by the allegedly transitory timekeeper went

19   to history, and is the history is why we called, but the estate

20   got more than just history from that.  We got guidance.  And so

21   it was important that we were able to look to Mr. Lerner.

22          The Trust has also identified 6,742 dollars of what

23   the Trust believes are administrative time.  In -- the Trust's

24   administrative time category is both time that we will say is

25   administrative for the purposes of trying to reach a

1  resolution.  I'm not sure we would concede that it's

2  administrative.  But also in that time are entries by our

3  specialists dealing with litigation databases for coding and

4  putting documents into that database.

5       THE COURT:  Well, as I understand it, you've agreed to

6  a 6,742-dollar reduction for items that might be considered

7  administrative?

8       MR. DAKIS:  Yes, Your Honor.  And in that category is

9  also items that are just clearly not administrative.

10  They're -- within that category of administrative costs --

11      THE COURT:  Let me see if I can -- what I want to

12  focus on -- what's still in dispute as opposed to what you've

13  agreed -- whether you had to or not, you've agreed to reduce

14  that 6,742 dollars.  But what I want to focus on, particularly

15  given that it's a quarter to 3, is what's still in dispute?

16      MR. DAKIS:  Certainly, Your Honor.  I believe it's

17  three large categories, and the Trust can speak to anything

18  that I miss here.  But it's multiple attendees at meetings and

19  court hearings, and internal meetings, I believe, are the two

20  largest.

21      THE COURT:  The U.S. Trustee called you on every, I

22  think -- maybe there was one interim period where it didn't

23  arise.  The second interim period is the only time that Mr.

24  Masumoto has not reflected the objection about multiple

25  attendees.

1          MR. DAKIS:  That's correct, Your Honor.

2          THE COURT:  Maybe your firm didn't get the message,

3    because I kept saying at hearings, I'm not going to compensate

4    for multiple attendees, but you just kept sending people.

5          MR. DAKIS:  Well, it was -- these were internal

6    meetings, but -- and so the message was somewhat mixed as to

7    whether or not, and how many lawyers could be staffed at

8    internal meetings, but we got the message ultimately, Your

9    Honor.  And we went back through our time and the final fee

10   application reflects a reduction even for those periods where

11   the U.S. Trustee didn't ask for it.  So we went back to the

12   second period --

13         THE COURT:  The U.S. Trustee's even objected in the

14   fifth interim period for multiple attendees.

15         MR. DAKIS:  It was -- at that time, Your Honor, it was

16   a paralegal who came down to court for a day, and we missed it,

17   and just didn't write off the time, and once the U.S. Trustee

18   brought it to our attention, we wrote the time off.  But that

19   wasn't the same level of staffing that had raised the

20   objections beforehand.  We had wrote down all the time for

21   anybody above -- I believe it's three timekeepers -- at every

22   internal meeting going back to the outset of the case, so that

23   we insured that the U.S. Trustee and this Court's guidance was

24   covered.

25         THE COURT:  Okay.

1              MR. DAKIS:  Similarly, with respect to hearings.

2              THE COURT:  That included internal meetings, not just

3    court hearings?

4              MR. DAKIS:  Absolutely.

5              THE COURT:  Okay.

6              MR. DAKIS:  Court hearings, what we -- we tried to

7    mainly staff court hearings as best as we could, and brought

8    only those lawyers that were necessary.  Morrison Cohen uses an

9    interdisciplinary approach, as I'm sure every law firm tells

10   you they do, but Morrison Cohen --

11             THE COURT:  Considering you didn't have any speaking

12   role in court; you just had a lot of observers sitting around.

13             MR. DAKIS:  Mr. Moldovan had to speak, I think, a

14   couple of times.

15             THE COURT:  There are transcripts that you can --

16   somebody can get, but I'm always happy to have people in the

17   courtroom.

18             MR. DAKIS:  Thank you, Your Honor.  It -- at times,

19   given the speed in which the case was moving and the number of

20   board meetings, and the information that was being flowed to

21   the board, waiting for a transcript to come out and reading a

22   transcript was -- would have been less efficient then simply

23   having somebody listen to the hearing.  And given that some of

24   the hearings dealt with discovery issues that directly impacted

25   the independent directors, it was prudent to send attorneys

1    down to court.

2              THE COURT:  What other categories do you still have

3    issues with?

4              MR. DAKIS:  It's internal meetings and multiple

5    attendees.  Oh, and there's one other one, Your Honor,

6    regarding research.  Morrison Cohen, at the request of the

7    independent directors, performed research on a particular

8    topic.  The topic was equitable subordination.

9              The research was performed at a time before the

10   settlement was done, and the purpose of the research was the

11   independent directors were looking to where their levers were

12   ultimately going to be, to the extent that the then pending

13   mediation wasn't successful.  The independent directors were

14   still looking to try to get this ultimately to a plan, and

15   ultimately to hopefully a confirmation hearing.

16             And as part of that, the independent directors felt

17   that they were the parties that were the most -- that were in

18   the best position, given the overlay between Ally and --

19             THE COURT:  Who --

20             MR. DAKIS:  -- the debtors themselves.

21             THE COURT:  Who were trying to equitably subordinate?

22             MR. SEIFE:  We were looking at the Ally claims, Your

23   Honor.  And so the question was whether or not we had any

24   leverage against the parent, and it was the pre-petition

25   special committee of independent directors who was tasked

RESIDENTIAL CAPITAL, LLC, ET AL.                    173

1  directly with examining the Ally claims that ultimately led to

2  the pre-petition settlement.

3          So in furtherance of that responsibility, they asked

4  their counsel to look at equitable subordination of the Ally

5  claims to determine, in the event that there wasn't going to be

6  a settlement, whether or not there was a lever there that they

7  could use, and ultimately the case settled.  And once the

8  settlement was announced and was finalized in May, we stopped

9  the research immediately.

10          THE COURT:  All right.  Any other issues that you're

11  still disagreeing about?

12          MR. DAKIS:  None that come to mind, but I'm sure the

13  Trust will remind us of anything.

14          THE COURT:  Okay, let me hear from Ms. Stadler.  Thank

15  you very much.

16          MR. DAKIS:  Thank you.

17          MS. STADLER:  Thank you, Judge.  Morrison Cohen is not

18  an examiner's professional.  And whatever may be said about the

19  unique circumstances of an examiner under Chapter 11, the same

20  cannot typically be said for independent directors of a debtor.

21  The debtor and its board of directors, including the

22  independent directors, were represented in these cases by a

23  long list of professionals that have been granted final fee

24  applications today.

25          THE COURT:  Look, there was -- from day one of this

RESIDENTIAL CAPITAL, LLC, ET AL.                    174

1   case, the major issues arose from intercompany transactions

2   with the nondebtor ultimate parent, Ally Financial.  From day

3   one of this case, when there was a proposed pre-petition plan

4   support agreement, opposed from day one by -- well, it wasn't

5   day one; there wasn't a creditors' committee on day one -- but

6   from the appointment of the creditors' committee on, that

7   agreement was opposed.  And it does seem to me that Mr. Dakis

8   is right; that the independent directors of Residential Capital

9   had very direct and strong interests in what are the

10  responsibilities of directors of a debtor.  This is long before

11  Mr. Kruger was appointed as the CRO, and he didn't totally

12  supplant the directors, but he had an important role.

13          You're not getting much traction from me on the

14  research issue.  I mean, you put in the declaration of --

15  what's his name?

16          MS. STADLER:  John Dubel?

17          THE COURT:  Yes, John Dubel, who testified in my

18  courtroom.  He was a very impressive witness.  And -- but he

19  was a member of the creditors' committee.  He wasn't part of

20  the debtors' management.  He wasn't a director of the debtor.

21  He had a very different stake.  He was the head of FGIC at the

22  time, and negotiated the settlement with the debtors and the

23  dispute with FGIC.  And impressive guy, experienced, but with a

24  very different interest in the case than the independent

25  directors of ResCap.

1           And so I have a hard time having you or Mr. Dubel

2    substitute your judgment for the judgment of Morrison Cohen and

3    the independent directors about what the appropriate -- what

4    should have been -- what should the lawyers for those

5    independent directors do in connection with the case.

6           Equitable subordination, for a time, looked like it

7    was going to be a big issue in this case.  And Mr. Dakis'

8    explanation of why they were looking at it, from the standpoint

9    of -- because Ally had a big claim -- it makes sense to me.

10   Tell me why that doesn't make sense?

11          MS. STADLER:  Well, I will push back a little bit on

12   this one, just because, Judge, you shared with us your anger on

13   some of the issues that these applications raised, and this

14   application is one that really raises anger on the part of the

15   Trust, because of the -- there is absolutely no dispute that

16   the independent directors themselves played an important role

17   in this case.  And their involvement in the negotiation of the

18   pre-petition plan support agreement and all of the issues that

19   arose out of that, including the examiner's investigation, was

20   a narrow issue where their interests diverged from that of the

21   company.

22          But in most other respects -- and this is the point of

23   the Dubel declaration -- as a participant in this case and

24   other restructurings, in most respects, the independent

25   directors' interests are adequately protected by the debtors'

1  counsel, and I think the Ally subordination research is a

2  perfect example of that.  Why did Morrison Cohen need to spend

3  90,000 dollars researching equitable subordination, which was a

4  huge issue in the case for the debtor and everyone else?  We

5  didn't review -- I personally did not look at Morrison &

6  Foerster's application, but I suspect if we did, you would see

7  there was research going on on behalf of the debtor on that

8  issue.

9              And the issue that the Trust takes with the Morrison

10 Cohen participation has nothing to do with the independent

11 directors themselves and their role.  It has to do with their

12 need to be separately represented, separate and apart from the

13 company and the board of directors and the CRO --

14             THE COURT:  Well, there wasn't --

15             MS. STADLER:  -- on issues --

16             THE COURT:  There wasn't a CRO at the start of the

17 case.

18             MS. STADLER:  Right, but later the CRO.  Separate and

19 apart from him on matters of routine Chapter 11 practice.  And

20 that is why the exhibits that are key to this discussion are

21 really I and J.  Mr. Dakis is incorrect.  We don't have

22 meetings and court appearances lumped together.  Exhibit I is

23 broken down into many categories, including court attendance.

24 This is things like first-day motions, first-day hearings.

25             THE COURT:  It wasn't until a little later in the case

1   that I set out my guideline about how many lawyers in the

2   courtroom were getting --

3         MS. STADLER:  Right.

4         THE COURT:  -- there would be compensation for.  So --

5         MS. STADLER:  Attending the JSN trial, confirmation

6   hearing, all of these things; and then we have board meetings.

7   We have two and three Morrison Cohen lawyers sitting in on the

8   call every time the board met.  The board, which except for in

9   these narrow issues where the independent directors' interests

10  diverged, was adequately represented by very experienced

11  Chapter 11 counsel.  Attendance at the auction -- obviously the

12  examiner meeting and interviews were the area where special

13  attention and separate representation was required.  That's

14  29,000 dollars of this entire category.

15        THE COURT:  How much was charged for attendance of the

16  JSN trial?  Two trials.

17        MS. STADLER:  Yeah.  I do apologize --

18        THE COURT:  That's all right.

19        MS. STADLER:  -- this is about a thirty-page exhibit

20  so without a search function, it's going to be a little bit

21  hard.  There were three people at various portions of the

22  October 23rd, 2013 JSN trial.

23        THE COURT:  That was the Phase I trial?

24        MS. STADLER:  There were one, two, three, four, five

25  people at the November 19th trial, which is described by at

1    least one of the timekeepers as the Phase II trial.

2              THE COURT:  It was the combined Phase II and

3    confirmation trial.

4              MS. STADLER:  And confirmation, right.  So there were

5    five people at that one.

6              And the important -- I want to continue briefly --

7    board meetings was the other category in Exhibit I which

8    really, most directors on routine board meetings don't need

9    counsel present, much less --

10             THE COURT:  Hard to say any board meeting in here --

11             MS. STADLER:  -- separate counsel.

12             THE COURT:  -- was routine.

13             MS. STADLER:  The auction we talked about, and then

14   the discovery.  And then committee meetings and claims

15   meetings, that's the category of objections that's a multiple

16   attendees at outside events, and it amounts to more than

17   300,000 dollars; $337,991.50 to be exact.

18             I want to make a point, because here's one area where

19   we can clearly say this is not the same objection that the

20   trustee made.  The trustee objected to three and up.  On most

21   of these categories except the auction, we had -- we allowed

22   one and deducted the second or third participant, and that's

23   where the 337 number comes from.  So that is granting them the

24   need to have someone at each and every one of those things, but

25   one person rather than two or three.

1          Now, the next exhibit is Exhibit J.  This is the

2    internal meetings, and this, I understand, is a different

3    category.  And I agree with you, workflow meetings and making

4    sure that everybody's getting the same information at the same

5    time makes perfect sense in some of these types of engagements.

6    This is another 315,000 dollars in internal conferencing and

7    meeting among these people who were already sitting two, three

8    and four at a time in every proceeding.  So it appears a lot

9    less important given the role of the independent directors and

10   their counsel, as independent counsel as opposed to debtors'

11   counsel, that they would need to have such a high level of

12   internal conferencing.

13         So those are the two big nuts, so to speak, on this

14   list.  The ones that Mr. Dakis addressed already or that the

15   Trustee has addressed, I think, the vague -- clearly our

16   universe of vague task descriptions is much larger than what

17   the Trustee would have raised or objected to.  But again, no

18   way to really determine which deductions were allocated to

19   which vague task.  The research we have talked about -- the

20   transient timekeepers, I will just note, because I was

21   following along --

22         THE COURT:  Transitory timekeepers.

23         MS. STADLER:  Transitory timekeepers.  I will just

24   note that one of the things David Lerner billed for -- because

25   we were just talking about this, it struck my eye -- was two

RESIDENTIAL CAPITAL, LLC, ET AL.                    180

1   hours on one day and an hour -- 1.8 hours on another day to

2   review the examiner's report.  I'm not sure how that would

3   relate to his prior experience in corporate governance with the

4   debtor.  But with that, I will sit down, as I know everyone's

5   patience is running thin for this process.

6          Thank you.

7          THE COURT:  So the examiner's report in a number of

8   places -- I don't have it in front of me -- raised questions

9   about pre-petition transactions, related-party transactions

10  that this debtor engaged in.  And I think -- I'm -- without the

11  report in front of me, never fully resolved what the basis for

12  doing those transactions -- why wasn't counsel for the

13  independent directors who were involved in passing on those

14  transactions, why wasn't it appropriate for -- and some of

15  the -- and they covered -- some of this stuff is in the

16  examiner's report.  Why isn't it appropriate for counsel to the

17  independent directors to look and see what the examiner said

18  about pre-petition transactions, related-party transactions as

19  to which independent directors voted?

20         MS. STADLER:  These professionals had billed

21  substantially to prepare the witnesses for the examiner

22  interviews and to attend those interviews and in some cases --

23         THE COURT:  Let's --

24         MS. STADLER:  -- attend trial.

25         THE COURT:  Until the plan was confirmed, there was no

RESIDENTIAL CAPITAL, LLC, ET AL.                    181

1   assurance that the compromises reflected in the second plan

2   support agreement would be confirmed in a plan.  And so if

3   everything had blown up the way the JSNs wanted it to, wouldn't

4   the independent directors have faced the risk of breach of

5   fiduciary duty claims in connection with pre-petition

6   transactions they had approved?

7          I mean, the fact that -- I mean, I think it was more

8   than prurient interest that would lead counsel for the

9   independent directors to look at what the examiner included in

10  the report.  There's stuff in that report that specifically

11  dealt with related-party transactions pre-petition that were

12  approved by the board, the independent directors.  So why isn't

13  it appropriate?  I mean, you're complaining about Mr. Lerner

14  spending -- it took me a lot longer than a couple of hours to

15  read all 2,245 pages, but I read it all.

16         MS. STADLER:  Fair.  That's fair.

17         THE COURT:  It's well indexed and you could -- and

18  also if you open it electronically, it is easily searchable.

19  But --

20         MS. STADLER:  Right.  I think this goes back in

21  general to the basic issue of was counsel limiting its

22  involvement to issues where the board of directors as a whole

23  was not -- had interests that were somehow divergent from these

24  independent directors with their separate counsel.  And again,

25  I raise that issue not for any other purpose than to just give

1    a flavor of the types of activities that show up on Exhibit H,

2    because with all of the paper flying around, it's easy to lose

3    sight of these things.

4         I do want to make one more point as a whole in the

5    context of this application.  The notion of the fee application

6    processes; certainly, you evaluate the fees for reasonableness

7    and necessity at the time that they were rendered.  But the 330

8    analysis is really designed to get at the inquiry of whether

9    professional services provided delivered value to the case,

10   delivered --

11        THE COURT:  As of the time --

12        MS. STADLER:  -- value to the estate.

13        THE COURT:  As of the time the services were

14   performed.

15        MS. STADLER:  Correct.

16        THE COURT:  So it may be easy for you or for me to say

17   now that that shouldn't have been a real concern of the

18   independent directors or counsel to the independent directors.

19   You know, hindsight makes it much easier.  But viewed as of the

20   time that the services were performed, it's not so clear.

21        Well, other issues you want to raise?

22        MS. STADLER:  No.  I think we've been through them

23   all.  Thank you.

24        THE COURT:  Okay.

25        Mr. Dakis, you want to respond?  When you get to

1  respond, I've got to tell you that there are -- I'm troubled by

2  the size of the Morrison Cohen fees and the -- you didn't

3  represent an active stakeholder in the bankruptcy proceeding,

4  creditors' committee, debtor.  Important representation, I

5  don't dispute that, but your firm is seeking, with the

6  adjustments agreed to with the U.S. Trustee, $4,195,226.42 in

7  fees for representing the independent directors.

8         It's a big number for not representing one of the

9  active stakeholders in the case.  And when you drill down into

10  how that number was built up, it's not clear to me why two,

11  three or four people should be compensated for something that

12  one person could have done.

13         I mean, I'm not -- I disagree with Ms. Stadler's -- to

14  some of her arguments; the equitable subordination research, I

15  disagree with her about that.  I mean, I viewed -- viewing the

16  case in its entirety, the issues that rose and fell as the case

17  went on; very contentious case early on -- contentious about

18  issues that could potentially impact the independent directors.

19  There was a need -- it was appropriate for them to have

20  independent legal counsel.  I don't dispute that.  But to me,

21  that doesn't justify three, four or five people at a board

22  meeting or three, four or five people in court or three -- or

23  sitting through the JSN trial.  Why did people sit through the

24  JSN trial?

25         MR. DAKIS:  Your Honor, the JSN trial became important

1    to the independent directors because, as Your Honor noted, at

2    that time, there was a settlement in place.  But if the JSNs

3    were able to blow the settlement up and blow the plan up, it

4    was the board that was going to be sued.  I mean, ultimately

5    this entire case --

6            THE COURT:  How many people sat through the JSN or

7    appeared -- were present during the JSN trial?

8            MR. DAKIS:  During the JSN trial?

9            THE COURT:  Yes.

10           MR. DAKIS:  It would have been either David Piedra or

11   myself, for most.  Mr. Moldovan might have appeared for some of

12   it.  There was never more than two until the confirmation

13   hearing.

14           At the confirmation hearing -- on the first day of the

15   confirmation hearing, I believe we had five attorneys.  We

16   wrote that down to three.  On the second day of the

17   confirmation hearing, we might have had four; we would have

18   wrote that down to three.

19           THE COURT:  You weren't -- you didn't represent a

20   party in the JSN trial.  There was transcript -- there was

21   daily transcript from the JSN trial.

22           MR. DAKIS:  There were also daily board meetings about

23   the JSN trial at the end, Your Honor.  We were in constant

24   communication with the independent directors who wanted to

25   know, ultimately, where are we going; are we going to get sued.

1  And to sit back at the end of a trial, at the end of the day,

2  and not be able to turn to the client and say okay, here's what

3  happened, here's where you are, here's where the case is, would

4  have put us at a disadvantage with the client and would have

5  put the very people who were trying to guide the process

6  through -- and ultimately would have been the parties who were

7  in front of Your Honor at whatever breach of fiduciary duty

8  litigation would have been started at the time of the process

9  stopped, had it not been successful -- would have put them at a

10 disadvantage as to exactly where they stood.

11         I concede, Your Honor, that in a normal case, and what

12 is a normal case in Chapter 11 -- I think we've all yet to see

13 every case's nuance.  But in other cases, it certainly might

14 not be as appropriate to have independent counsel to the

15 independent directors of the board be as involved as Morrison

16 Cohen was.  But from day one of this case, it was the judgment

17 of these board -- of these directors, of the independent

18 directors that was called into question.  It was the

19 independent directors who negotiated the deals with Ally.

20 Their judgment was assailed from the second that a creditors'

21 committee came in.

22         It was the independent directors who approved the

23 various pre-petition transactions that were the very subject of

24 the examiner's report that was called into question.

25         THE COURT:  Many of which the examiner concluded had a

 1  high probability of success.

 2          MR. DAKIS:  Yes.  And -- well, I'm not so sure that

 3  the examiner concluded that many of them had a high probability

 4  of success, but --

 5          THE COURT:  It didn't take that many, you know.  They

 6  were big-dollar items.

 7          MR. DAKIS:  But the point stands, Your Honor, that

 8  these are the parties that, while they were not a direct

 9  economic stakeholder, they were a stakeholder in this case more

10  so than independent directors might have been in other cases.

11  In this case, it was --

12          THE COURT:  Okay, stop.

13          MR. DAKIS:  -- about the independent directors.

14          THE COURT:  I'm going to take this one under

15  submission.  I'm going to enter an order with respect to the

16  amount of the fees that are going to be -- fees and expenses

17  that are going to be approved for Morrison Cohen.  I want to go

18  back and look at some of the underlying billing records in the

19  exhibits attached to Ms. Stadler's objection.  I'm not writing

20  an opinion on it; I'm going to enter an order.

21          With respect to all of the professionals whose fees I

22  approved today -- I didn't necessarily say it at the time when

23  I was resolving the objections that the trust raised.  Ms.

24  Stadler had used this term earlier about using the holistic

25  approach, and I've tried to do that.  I've looked at the

RESIDENTIAL CAPITAL, LLC, ET AL.                    187

1    entire -- I've lived through this case.  I've lived through

2    what the issues were at various times.  I've lived through each

3    of the -- more than live through; I've reviewed the fee

4    applications.  I looked to the U.S. Trustee for its view on it.

5             The amount of fees being sought by Morrison Cohen for

6    representation of the independent directors is a very large

7    number for the role it had in this case.  I don't doubt the

8    importance of the work that was being done, and I'm not saying

9    I won't approve it in the amounts requested.  But I want to go

10   back -- I am going to go back and look at it again.  I'm

11   sufficiently concerned about this one.  I want to be sure I get

12   it right.

13            So I'm going to take it under submission.

14            MR. DAKIS:  Understood, Your Honor.  I would just note

15   for the record that in our response to the fee committee's --

16   to the Trust's objection, we provided a counter exhibit that

17   goes through the multiple attendees at hearings and at meetings

18   that explains why each individual timekeeper was at each

19   individual meeting.  So to the extent that's useful --

20            THE COURT:  All right.  Just give me a second.  I want

21   to look at one other -- here, I have here --

22       (Pause)

23            THE COURT:  All right, thank you.

24            MR. DAKIS:  Thank you, Your Honor.

25            MR. MARINUZZI:  Your Honor, that's the end of the

1  agenda.  Just housekeeping; we have to reach out to Weir &

2  Partners about the 154-dollar expense, and I believe Kramer

3  Levin will reach out to Epiq.  Assuming we can get quick

4  responses, we'll include those numbers in the form of order

5  that covers all of the professionals except, I guess, for

6  Morrison Cohen.  If we're unable to get a quick response, then

7  I would suggest, Your Honor, if it's okay with chambers, we'd

8  submit an order that covers all of the professionals but Weir,

9  Epiq, and Morrison Cohen, and then we'll try to close the loop

10  on those.

11          THE COURT:  What I'm fussing about is such a small

12  number, but it just --

13          MR. MARINUZZI:  Understood.  Thank you, Your Honor.

14          THE COURT:  Okay.  Thank you.

15          MR. MARINUZZI:  Thank you.

16          THE COURT:  We're adjourned.

17          MR. AGRUSA:  Hello?

18          THE COURT:  Yes.

19          MR. AGRUSA:  Yes, I'm sorry, Your Honor.  My name is

20  Mike Agrusa  and I represent Towers Watson.  We were on the

21  agenda.  I did not hear anything regarding our --

22          THE COURT:  I approved it.

23          MR. AGRUSA:  -- fee or our expenses that were

24  requested.

25          THE COURT:  I approved it.

1          MR. AGRUSA:  I'm sorry.  I must not have heard that.

2    Thank you very much.

3          THE COURT:  Don't charge anybody for sticking around

4    until now.  That got approved fairly early.

5          MR. AGRUSA:  Thank you.

6          THE COURT:  We're adjourned.

7       (Whereupon these proceedings were concluded at 3:14 PM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          **I N D E X**

3

4                             RULINGS

5                                            Page      Line

6   Bradley Arant, final fees in the amount of   51        8

7   $11,456,954.36 and expenses of $613,321.35

8   are approved.

9   Bryan Cave, final fees of $279,187.50 and   51       17

10  expense of $116.60 are approved

11  Carpenter Lipps, final fees of $6,163,315   51       19

12  and expenses of $2,609,058.89, is approved

13  Centerview Partners, LLC, final fees,       51       23

14  $5,700,000 as the fees and $3,800,000 as the

15  transaction fee, expenses of $67,336.36, are

16  approved.

17  Curtis Mallet, fees of $9,847,770.80 and    52        1

18  expenses of $53,990.94 (as amended later),

19  are approved.

20  Deloitte, fees of $5,497,620.65  are        52        3

21  approved.

22  Dorsey Whitney, fees of $812,063.65 and     52        5

23  expenses of $5,480.03, are approved.

24  Ernst & Young, fees of $1,884,808.75 and    52        7

25  expenses of $43,230.48, are approved

```
 1
 2                              RULINGS
 3                                        Page      Line
 4   Fortace, LLC, fees in the amount of      52        9
 5   $2,222,459.50 and expenses of $659,745.97,
 6   are approved.
 7   FTI Consulting, Inc., fees of $32,364,884.11 52     11
 8   and expenses of $908,878.43, are approved.
 9   Hudson Cook, fees of $2,284,737.50 and     52       13
10   expenses of $30,550.67, are approved.
11   KPMG, LLP, fees in the amount of          52       15
12   $1,791,439.65 and expenses of $102,515.04,
13   are approved.
14   Kurtzman Carson Consultants, LLC, final fees 52    17
15   of $212,440.50 are approved.
16   Locke Lord, LLP, fees of $1,222,388.78 and  52      19
17   expenses of $22,716.90, are approved.
18   Mercer (US) Inc., fees of $311,434.94 and   52      21
19   expenses of $44,731.65, are approved.
20   Morrison & Foerster, LLP, fees of          52       24
21   $95,457,127.80 and expenses of
22   $3,043,012.82, are approved.
23   Orrick, Herrington & Sutcliffe, LLP, fees   53       1
24   In the amount of $1,833,156.19 and expenses
25   of $4,749.95 are approved.
```

```
 1
 2                          RULINGS
 3                                    Page      Line
 4  Pepper Hamilton, LLP, fees of $5,295,708.50  53        3
 5  and expenses of $124,924.14 are approved.
 6  Prince Lobel Tye, LLP, fees in the amount    53        6
 7  of $222,328 and expenses of $29,451.34, are
 8  approved.
 9  Rubenstein Associates, Inc., fees of $38,276 53        8
10  and expenses of $9,920.93, are approved.
11  Severson & Werson, P.C., fees of            53        10
12  $3,321,340.39 and expenses of $295,040.35,
13  are approved.
14  Tilghman & Co., P.C., fees of $11,507.50 and 53        12
15  expenses of $29,046.14, are approved.
16  Towers Watson Delaware, Inc., fees of        53        14
17  $175,665.92 and expenses of $9,550.01, are
18  approved.
19  Troutman Sanders, LLP, fees of $1,043,948.96 53        16
20  and expenses of $16,823.37, are approved.
21  AlixPartners LLP, fees in the amount of      53        20
22  $14,718,273.53 and expenses of $103,325.70,
23  are approved.
24  Analytic Focus, LLC, fees of $592,840.25     53        22
25  and expenses of $355.29, are approved.
```

1

2                              RULINGS

3                                           Page      Line

4   Coherent Economics, LLC, fees in the amount   53        25

5   of $1,135,367.52 and expenses in the amount

6   of $15,194.52, are approved.

7   J.F. Morrow, fees in the amount of $250,060   54         5

8   and expenses of $1,345.61, are approved

9   Kramer Levin fees in the amount of           54         7

10  $64,366,016.25 and expenses in the amount of

11  $2,416,309.04, are approved.

12  Moelis & Co., LLC, fees in the amount of     54        20

13  $14,616,129.03 and expenses in the amount of

14  $249,664.42, are approved.

15  Pachulski Stang Ziehl & Jones, LLP, fees in  54        23

16  the amount of $4,843,989.47 and expenses in

17  the amount of $87,794.29, are approved.

18  Quest Turnaround Advisors, LLC, fees in the  55         1

19  amount of $345,646.12 and expenses in the

20  amount of $17,614.09, are approved.

21  San Marino Business Partners, LLC, fees in   55         4

22  the amount of $263,157.38 and expenses of

23  $11,404.30, are approved.

24

25

1

2                              RULINGS

3                                         Page      Line

4  Leonard, Street and Deinard, Professional    55        12

5  Association, fees in the amount of $100,000

6  and expenses in the amount of $4,210, are

7  approved.

8  Wolf Haldenstein Adler Freeman & Herz, LLP,  55        16

9  fees in the amount of $82,997.85 and

10  expenses of $1,670.56, are approved.

11  Curtis, Mallet fee application approved in   58        17

12  the amount of $9,847,770.80, and expenses

13  of $53,990.94.

14  Perkins Coie fee application approved with   62         3

15  Reduction of $3,802.31 from the

16  $1,462,384.21 requested.

17  Weir & Partners fees approved in amount      62        20

18  of 2,349 dollars.  Expense request should

19  be resubmitted with more detail.

20  SilvermanAcampora fee application approved   64        22

21  with a reduction of 340 dollars.

22  Wilmer Cutler fee application approved in    67         3

23  amount of $828,680.50 fees, expenses of

24  $3,713.58.

25

| | | RULINGS | | |
|---|---|---|---|---|
| | | | Page | Line |
| | Fee application for Carter Ledyard & | | 75 | 10 |
| | Milburn LLP approved as reduced on | | | |
| | the record. | | | |
| | Trust's objections to Chadbourne fee | | 120 | 9 |
| | application overruled. | | | |
| | Chadbourne application for fees and | | 122 | 13 |
| | expenses granted with reductions: | | | |
| | $46,799,750.66 for fees and $2,995,419.47 | | | |
| | for expenses Mesirow's final fee application | | | |
| | is granted in part and denied in part | | | |
| | Mesirow's fee request of 39,472,705 | | 156 | 21 |
| | dollars approved subject to a continued | | | |
| | holdback of 500,000 dollars | | | |
| | Examiner's final application is approved. | | 161 | 20 |

1

2                               C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9    _____

10   PENINA WOLICKI

11   AAERT Certified Electronic Transcriber CET**D-569

12

13   eScribers

14   700 West 192nd Street, Suite #607

15   New York, NY 10040

16

17   Date:  June 19, 2014

18

19

20

21

22

23

24

25