1

1

2 UNITED STATES BANKRUPTCY COURT

3 SOUTHERN DISTRICT OF NEW YORK

4 Case No. 12-12020-mg; Adv. Case No. 14-01926-mg

5 - - - - - - - - - - - - - - - - - - - -x

6 In the Matters of:

7 RESIDENTIAL CAPITAL, LLC, et al.,

8             Debtors.

9 - - - - - - - - - - - - - - - - - - - -x

10 RESIDENTIAL FUNDING COMPANY, L.L.C.

11                     Plaintiff,

12         -against-

13 UBS REAL ESTATE SECURITIES, INC.,

14                     Defendant.

15 - - - - - - - - - - - - - - - - - - - -x

16             United States Bankruptcy Court

17             One Bowling Green

18             New York, New York

19

20             June 26, 2014

21             10:03 AM

22

23 B E F O R E:

24 HON. MARTIN GLENN

25 U.S. BANKRUPTCY JUDGE

2

1

2  (Doc #7095) Motion of the ResCap Liquidating Trust for an Order

3  Authorizing Release of Adequate Assurance Deposit Filed by

4  Joseph A. Shifer on Behalf of ResCap Liquidating Trust.

5

6  (Doc #7036) Motion for Order Estimating Claims and Establishing

7  Disputed Claims Reserve.

8

9  (Doc No. 6863, CC:  Doc. No. 7054) Adjourned Motion for Relief

10  from Stay Filed by Jorge Cerron.

11

12  Adv. Proc. No. 14-01926-mg:  (CC:  Doc. Nos. 5, 6, 7, 18)

13  Motion to Remand Filed by Skadden Arps.

14

15

16

17

18

19

20  Transcribed by:  Aliza Chodoff

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

3

1

2  A P P E A R A N C E S :

3  BRADLEY ARANT BOULT CUMMINGS LLP

4          Attorneys for Debtors

5          100 North Tryon Street

6          Suite 2690

7          Charlotte, NC 28202

8

9  BY:   NICHOLAS J. VOELKER, ESQ. (TELEPHONICALLY)

10

11

12  POLSINELLI PC

13          Attorneys for ResCap Borrowers Claims Trust

14          900 Third Avenue

15          21st Floor

16          New York, NY 10022

17

18  BY:   DAN FLANIGAN, ESQ.

19

20

21

22

23

24

25

4

1

2   WALTERS BENDER STROHBEHN & VAUGHAN, P.C.

3        Attorneys for ResCap Borrowers Claims Trust

4        1100 Main Street

5        Suite 2500

6        Kansas City, MO 64105

7

8   BY:   R. FREDERICK WALTERS, ESQ.

9

10

11  KRAMER LEVIN NAFTALIS & FRANKEL LLP

12        Attorneys for ResCap Liquidating Trust

13        1177 Avenue of the Americas

14        New York, NY 10036

15

16  BY:   JOSEPH A. SHIFER, ESQ.

17

18

19  MORRISON & FOERSTER LLP

20        Attorneys for ResCap Liquidating Trust

21        250 West 55th Street

22        New York, NY 10019

23

24  BY:   JORDAN A. WISHNEW, ESQ.

25        JAMES A. NEWTON, ESQ.

5

1

2   QUINN EMANUEL URQUHART & SULLIVAN, LLP

3          Attorneys for ResCap Liquidating Trust

4          51 Madison Avenue

5          22nd Floor

6          New York, NY 10010

7

8   BY:   ISAAC NESSER, ESQ.

9          JOHN O. SULLIVAN, ESQ.

10         JAMES C. TECCE, ESQ.

11

12

13  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

14         Attorneys for UBS Real Estate Securities, Inc.

15         Four Times Square

16         New York, NY 10036

17

18  BY:   ALEXANDER C. DRYLEWSKI, ESQ.

19

20

21  ALSO PRESENT:

22         TODD SILVER, Party Pro Se

23         JORGE CERRON, Party Pro Se (TELEPHONICALLY)

24         OTIS COLLIER, JR., Party Pro Se (TELEPHONICALLY)

25         RONALD ERIKSEN, Party Pro Se (TELEPHONICALLY)

1

2          CORLA JACKSON, Party Pro Se (TELEPHONICALLY)

3     DEANNA HORST, Chief Claims Officer, ResCap Liquidating

4         Trust (TELEPHONICALLY)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      P R O C E E D I N G S

2          THE COURT:  All right.  Please be seated.

3          We're here in Residential Capital 12-12020, and we'll

4   also deal with at least one adversary proceeding.  But let's

5   proceed with the agenda.

6          MR. SHIFER:  Good morning, Your Honor.  Joseph Shifer

7   with Kramer Levin for the ResCap Liquidating Trust.

8          THE COURT:  Good morning.

9          MR. SHIFER:  The first matter going forward is on page

10  7 of the agenda.  Now, that's the motion of the ResCap

11  Liquidating Trust for a release of the adequate assurance

12  deposit.

13         Your Honor, this motion was filed at docket number

14  7095.  It seeks a release of the adequate assurance deposit

15  that was created by the ResCap -- by the debtors at the time in

16  connection with Section 366 of the Bankruptcy Code to provide

17  an adequate assurance deposit for the utility companies at the

18  time.

19         Your Honor, as we state in the motion, with the

20  effectiveness of the plan, the liquidating trust no longer

21  receives services from any of the utility companies, and we ask

22  that it be released.  The original order provided that the

23  liquidating trust may terminate some of the utility companies.

24  It wasn't clear whether or not the entire deposit can be

25  released.  So out of an abundance of caution, we filed a

1  motion.  It was served on all of the original utility

2  providers, and we did not receive a response.

3          We submitted the declaration of Deanna Horst, the

4  chief claims officer for the ResCap Liquidating Trust, and

5  she's on the phone if Your Honor has any questions.  And having

6  no opposition, formal or informal, we ask that the motion be

7  entered.

8          THE COURT:  All right.  Does anybody wish to be heard

9  with respect to the liquidating trust's motion to release funds

10 being held in a segregated account as adequate assurance for

11 utility providers?

12         All right.  The motion is ECF docket 7095.  The trust

13 motion is supported by the declaration of Deanna Horst.

14 Through the motion, the trust seeks an order permitting to

15 release 566,959 dollars held in the account.  The trust asserts

16 that when the account was established it had twenty-nine

17 utility providers, but now has only one.  Moreover, the trust

18 does not owe any sums to utility companies for post-petition

19 services, and there's only one pending utilities claim

20 regarding pre-petition services for $1,254.36 filed by Waste

21 Management.

22         The trust asserts that the lone utility provider is

23 adequately assured payment on post-confirmation obligations

24 considering the significant size of the disputed claims reserve

25 and the operation of the confirmed plan.  The utility provider

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS                    9

1   faces no real risk of nonpayment.  And the funds from the

2   utilities account could -- it can be released and distributed

3   to other credits.

4          The motion is unopposed.  The motion is granted.

5          MR. SHIFER:  Thank you, Your Honor.

6          The next item on the agenda is a contested matter.

7   It's the borrowers trust's motion for an order to establish a

8   disputed claims reserve, and I'll cede the podium to counsel

9   for the borrowers trust.

10         THE COURT:  Thank you.

11         MR. FLANIGAN:  Good morning, Your Honor.  Dan

12  Flanigan, Polsinelli law firm, for the borrower claims trust

13  with respect to this motion.

14         And Your Honor, the motion is supported by the

15  declaration of Michael J. Talarico, which is attached as

16  Exhibit B.

17         THE COURT:  Before you proceed, let me get the

18  appearances of those in the court or on the phone who are

19  objecting to the motion.

20         Does anyone in the court -- come on up, and you need

21  to identify yourself.  And then, you can have a seat up front.

22         MR. SILVER:  Good morning, Todd Silver.  I'm a

23  claimant.  I filed an objection to this motion.

24         THE COURT:  Sure.

25         All right.  Why don't you have a seat, Mr. Silver?

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          10

1          MR. SILVER:  Thank you.

2          THE COURT:  Anybody on the phone who is appearing in

3  opposition to the borrower trust motion for estimating claims

4  and establishing a disputed claim reserve?

5          MR. COLLIER:  Yeah.

6          THE COURT:  And tell me your name.

7          MR. COLLIER:  Otis Collier.

8          THE COURT:  Say that again.

9          MR. COLLIER:  My -- docket number 71 -- I'm sorry,

10  Judge, or Your Honor.

11          THE COURT:  Tell me your name.

12          MR. COLLIER:  Docket -- pardon?  Only my name?

13          THE COURT:  Yes, your name.

14          MR. COLLIER:  My name is Otis Collier.

15          THE COURT:  I'm sorry, your last name is what?

16          MR. COLLIER:  Collier, C-O-L-L-I-E-R.

17          THE COURT:  Okay.  We'll come to you.  I just want to

18  make sure I get the appearances.

19          Anyone else appearing in opposition?  Anyone else on

20  the phone?

21          MR. CERRON:  Yes.  My name is Jorge Cerron, but I'm

22  appearing for my motion to request relief from the status.

23  That different, I guess.

24          THE COURT:  Yes, yes.  All right.  Now, I'm just

25  asking for those on the phone who are appearing in opposition

1  to the motion to establish their claim reserve.

2          MR. ERIKSEN:  Yes, Your Honor.  Ronald Eriksen.

3          THE COURT:  Okay, Mr. Eriksen.

4          Anybody else?

5          All right.  Mr. Flanigan, go ahead.

6          MR. FLANIGAN:  Thank you, Your Honor.  Dan Flanigan,

7  borrower claims trust.

8          Your Honor, we hope we've been able to show what we

9  believe we've done, which is approach this in the most careful

10  and conservative possible way.  We've analyzed it in three

11  different ways, making ultraconservative but rational

12  assumptions in each case.  And by rational, I mean that we

13  don't assume the claims estimation version of an asteroid

14  hitting the earth that we're within some reasonable possibility

15  of historical claims experience and what it shows us.

16          In scenario one --

17          THE COURT:  Well, let me -- let's stop for a minute,

18  okay?  I'm looking in my notes.  Okay.  How many borrower

19  claims remain unresolved?

20          MR. FLANIGAN:  592.

21          THE COURT:  I thought it was 597, but --

22          MR. FLANIGAN:  You're right, Your Honor, 597.

23          THE COURT:  597 borrower claims remain unresolved.

24  And as I understand it, 131 of those claims meet the criteria

25  for the borrower convenience class claims.

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          12

1           MR. FLANIGAN:  Yes, Your Honor.

2           THE COURT:  And tell me, under the borrower

3    convenience class, how much is going to be paid?

4           MR. FLANIGAN:  We don't know, Your Honor, because we

5    have to first understand whether they're allowed claims or not.

6           THE COURT:  Okay.  So what's the cap on convenience

7    class claims?

8           MR. FLANIGAN:  Individually or --

9           THE COURT:  Individually.

10          MR. FLANIGAN:  -- in some kind of aggregate?  I have

11   to --

12          THE COURT:  Individually.

13          MR. FLANIGAN:  Pardon me.  I always have to look that

14   up.

15          THE COURT:  Okay.

16          MR. FLANIGAN:  I'm sorry, Your Honor.  I have to look

17   it up.

18          THE COURT:  That's okay.

19       (Pause)

20          MR. FLANIGAN:  With regard to GMACM, Your Honor, it's

21   an amount equal to less than 8,500 dollars.  And at RFC, it's

22   with an asserted amount or filed amount equal to or less than

23   28,000 dollars.

24          THE COURT:  Okay.  Can you tell me, in the aggregate,

25   if all of the 131 convenience class borrower claims were

1   allowed in the full amount, how much that would be?

2         MR. FLANIGAN:  I think we can compute that quickly if

3   we don't know the answer.

4         THE COURT:  Could you, please?

5         MR. FLANIGAN:  Yes.

6         Your Honor, the allowed amount of all of those 131

7   claims would be 400,000, and the total amount paid out would be

8   150,000 dollars in distributions.

9         THE COURT:  All right.  And am I correct -- well, let

10   me ask you this question.  Under the confirmed plan, what is

11   the maximum percent that borrowers can recover on allowed

12   claims?

13         MR. FLANIGAN:  There is not a maximum percentage, Your

14   Honor.  We have a fund, and then we'll divide the ultimate

15   allowed claims into that fund.  And the percentage could

16   be -- it's projected to be a minimum of thirty percent of the

17   case of GMAC and nine percent in the case of RFC, which were

18   the plan comparable percentages.  But we already have a

19   significant cushion there and would -- that would indicate

20   higher percentage distributions than that.  And we expect them

21   to be higher that, but we don't know exactly what they are.

22         THE COURT:  All right.  So hypothetically, it's

23   possible that, depending on the pool of allowed borrower

24   claims, borrowers could recover sixty percent on a claim,

25   hypothetically.

1          MR. FLANIGAN:  Hypothetically.

2          THE COURT:  Okay.  So based on --

3          MR. FLANIGAN:  Well, I should say it would be awfully

4    hard for the RFC people who start at nine to get that high.

5          THE COURT:  Right.

6          MR. FLANIGAN:  But GMAC --

7          THE COURT:  Okay.

8          MR. FLANIGAN:  -- starting at thirty, theoretically --

9          THE COURT:  So --

10         MR. FLANIGAN:  -- could --

11         THE COURT:  -- based on the claims that have been

12   settled or allowed to date, what is the -- can you tell me what

13   the amount of allowed borrower claims is for GMAC and RFC?

14         MR. FLANIGAN:  I don't have them separately.  I could

15   give you those, but I do have them totally.

16         THE COURT:  Okay.

17         MR. FLANIGAN:  Only seventy-eight individual, not

18   including cla -- and we're dealing with all individual claims

19   now -- only seventy-right individual claims have been allowed.

20         THE COURT:  For how much?  That includes claims that

21   have been settled, because you --

22         MR. FLANIGAN:  Yes.

23         THE COURT:  -- the trust has settled -- how

24   many -- well, tell me what's the total amount for the seventy-

25   eight that have been allowed.

1      MR. FLANIGAN:  2,150,000 dollars.  I don't know if
2  this number's helpful, Your Honor.  That represe -- 2,400
3  claims have been resolved.  So of the 2,400 claims, three
4  percent, 78 claims have been allowed.  And there's only 592
5  (sic) left.

6      THE COURT:  How many of the seventy-eight --

7      MR. FLANIGAN:  597.

8      THE COURT:  -- allowed claims have been resolved by
9  settlement?

10      MR. FLANIGAN:  We don't know that answer, Your Honor,
11  but --

12      THE COURT:  You don't know the answer?  I mean,
13  the -- it -- the trust is the one that's settling the claims.

14      MR. FLANIGAN:  All of them have been allowed by
15  settlement.

16      THE COURT:  So we start with 597 borrower claims that
17  remain unresolved.  131 of them are convenience class claims,
18  which you say the maximum amount is 400,000 dollars.  So that
19  leaves 466 borrower claims that need to be resolved.  Is my
20  math correct?

21      MR. FLANIGAN:  Your math is correct, Your Honor.
22  However, I would say that even the convenience claims have to
23  be resolved.

24      THE COURT:  I'm -- but let's -- we're talking about a
25  claim reserve, and so in the context of this case, even if they

1  were allowed in full, you're telling me that there are only

2  400,000 dollars in the convenience class.

3              MR. FLANIGAN:  Yeah, it's not material, Your Honor.

4              THE COURT:  That's not the material number.

5              MR. FLANIGAN:  Right.

6              THE COURT:  So there are 466 borrower claims, by your

7  reckoning.  There are appeals from some of the decisions I

8  rendered expunging claims.  But at least, at the bankruptcy

9  court stage, there are 466 borrower claims remaining to be

10 resolved, correct?

11             MR. FLANIGAN:  That's correct, Your Honor.

12             THE COURT:  Okay.  So Mr. Flanigan, the biggest

13 problem I have is that -- let me quote from virtually every

14 prospectus for a mutual fund or others that I've had is the

15 following language.  "Past performance is no assurance of

16 future results."  And so the question I have is the methodology

17 that FTI followed in scenarios one, two and three was based

18 solely on predicting future results from past performance and

19 not on an evaluation of the 466 borrower claims that remain to

20 be dealt with, correct?

21             MR. FLANIGAN:  That is correct.

22             THE COURT:  Okay.  Do you have any case support for

23 the methodology that FTI applied?  Because what you're doing is

24 asking me to estimate claims.  To estimate the claims, I need

25 to estimate the 466 borrower claims that are unresolved.  Do

1    you have any case authority that supports the Court applying

2    the methodology that FTI used to evaluate 466 claims based on

3    what's happened with the other borrower claims that have been

4    resolved?

5            MR. FLANIGAN:  No, Your Honor.  The methodology needs

6    to stand on its own as persuasive or not.

7            THE COURT:  Well, so let --

8            MR. FLANIGAN:  We think, regardless of the mutual fund

9    prospectus statement, that it is, in fact, dependable in this

10   situation, that it's literally overwhelming.

11           THE COURT:  You think so?

12           MR. FLANIGAN:  I absolutely believe that.  We --

13           THE COURT:  You think that --

14           MR. FLANIGAN:  -- we really wouldn't --

15           THE COURT:  You think if I were to retain a court

16   expert, that they would support the methodology that FTI has

17   applied to estimate the value of claims that you are not

18   looking at at all in asking me to estimate a claims reserve?

19   Are you serious?

20           MR. FLANIGAN:  Your Honor, I believe that when you

21   look at the overwhelming evidence that FTI has gathered here,

22   and the fact that the post-petition experience has been even

23   stronger than the pre-petition experience, that the true-up

24   analysis that they did back in connection with plan

25   confirmation has shown to be even more liberal, if you will, as

1   the cushion that we had on that has increased to fifteen

2   million dollars from eight million dollars just in those few

3   months.

4            THE COURT:  So one of the things, Mr. Flanigan -- I'm

5   pretty sure I've commented on this from the bench during

6   omnibus claims objections.  Maybe I didn't use this term.  But

7   it seems to me that the debtors, before confirmation, and the

8   trust since, have gone after the low hanging fruit.  And you

9   acknowledge in your papers that what remains are the most

10  contentious -- to accept the trust's argument -- probably

11  inflated borrower claims that remain to be -- those are the

12  ones that remain.

13           I think I've commented that the claim objections have

14  gotten harder for the Court over the last few months than they

15  were in -- I've resolved -- there are a handful that are

16  awaiting decision.  But I think I've commented they've gotten

17  harder.  And I think it's a fair statement to say that the

18  debtor and the trust have gone after the low-hanging fruit, and

19  I don't fault them for doing that.

20           MR. FLANIGAN:  Your Honor, may I point out a --

21           THE COURT:  Please.

22           MR. FLANIGAN:  -- couple things on that?

23           THE COURT:  Go ahead.

24           MR. FLANIGAN:  First of all, just because they're

25  harder doesn't mean that they're more valid or more likely to

 1  be --

 2           THE COURT:  I --

 3           MR. FLANIGAN:  -- allowed.

 4           THE COURT:  -- fully agree with that.

 5           MR. FLANIGAN:  In terms of this cherry-picking or low-

 6  hanging fruit, the debtor resolved all twelve of the class

 7  claims which were very, very hard and handled hundreds or

 8  thousands of borrower claims, effectively, in doing so.

 9           Number two, nine claims in excess of seven million

10  dollars each have been resolved.  By the way, only a 45,000-

11  dollar payment in all of those claims.  Over 700 claims that

12  had asserted amounts in excess of a million dollars have been

13  expunged.  I think that provides some counterargument to

14  whether it's been low-hanging fruit or cherry-picking.

15           And Your Honor, may I point out one other thing.  In

16  terms of the low-hanging fruit left, Your Honor pointed out the

17  130-plus convenience claims, there are 300 remaining claims

18  under 100,000 dollars, including the convenience claims.

19           THE COURT:  So why don't you file objections to the

20  ones that seek a hundred million and let me deal with them,

21  and -- because you're not talking about -- see, of the 466

22  borrower claims not in the convenience classes, how many of

23  those are you saying involve relatively small amounts

24  of -- small dollars?

25           MR. FLANIGAN:  Roughly 170 more, on top of the

1  convenience claims.

2          THE COURT:  And you say --

3          MR. FLANIGAN:  That are less than 100,000.

4          THE COURT:  So we're down to 360 -- well, we're down

5  to 290 claims or something that you say are over 100,000

6  dollars.  Do you have the exact number that are over 100,000

7  that remain to be resolved?

8          MR. FLANIGAN:  297.

9      (Pause)

10          THE COURT:  So the circuit authority that I find tells

11  me -- and this is a Fifth Circuit case, Brints Cotton

12  Marketing, Inc., 737 F.2d 1338, 1341.  So when estimating

13  claims, a court must apply "the legal rules which govern the

14  ultimate value of the claim."  And ordinarily it involves state

15  law.

16          To apply the legal rules which govern the ultimate

17  value of the claims, I have to look at the claims.  I have

18  had -- not very many, but I have had estimation proceedings.

19  Usually the parties have worked it out.  But when I've had an

20  estimation trial, it's not a full-blown trial on the merits,

21  but the purpose is to estimate what the value of the claims

22  are.  Because if I set the reserve and it turns out to be

23  inadequate, those at the end of the queue are left holding the

24  bag, because they only get a percentage of what's left.

25          And it may be that the total amount that is available

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          21

1   is high, and there's no way in the world that the borrower

2   claims are going to get allowed in those amounts.  But let me

3   ask you this --

4              MR. FLANIGAN:  Your Honor, may I interrupt?

5              THE COURT:  Go ahead.

6              MR. FLANIGAN:  Mr. Wishnew has some interesting

7   information about the largest borrower claims, that if he could

8   step to the podium --

9              THE COURT:  No, not yet.

10             MR. FLANIGAN:  -- my --

11             THE COURT:  Not yet.

12             So what concerns me, Mr. Flanigan, is one home run,

13   and while perhaps unlikely to occur, could ravage your model.

14             MR. FLANIGAN:  Your Honor, I'm not sure how you define

15   a home run.  But as shown in Exhibit A to our reply, there

16   could be five -- let me put it in context.  The largest payment

17   on any individual borrower claim pre-petition was 400-and-some

18   thousand dollars.  The largest post-petition is 325,000

19   dollars.

20             We showed there, that if five borrower claims came in

21   at a million dollars each, there's still plenty of room.  And

22   you could continue extending that analysis.  So --

23             THE COURT:  Past performance is --

24             MR. FLANIGAN:  -- home runs can be hit --

25             THE COURT:  -- no -- and past performance is no

1  assurance of future results.  You haven't shown

2  anything -- because you don't look -- you're not estimating the

3  value of the remaining claims.  We've now worked it down to

4  where you say there's 297 claims over 100,000 dollars.  Some of

5  them have -- seek 100 million.  Whether those have any validity

6  or not, I'm not going to say.  Okay?

7        But how long is it going -- how long would it take you

8  to file objections to the 297 claims that week over 100,000

9  dollars?

10       MR. FLANIGAN:  As Your Honor, I think, knows, we're

11 working with the now Liquidating Trust people.  The claims

12 people have always worked with the debtors.  And they have a

13 whole schedule of how to --

14       THE COURT:  Well, if I tell you that I want you to

15 reorder your priorities, and at the earliest possible date, I

16 want whatever objections the debtor is going to file to the 297

17 claims seeking over 100,000 dollars, how long will it take you

18 to do that?  Consult with anybody you want.

19    (Pause)

20       MR. FLANIGAN:  At least until the end of the year,

21 Your Honor.

22       Your Honor, let --

23       THE COURT:  Go ahead, Mr. Flanigan.

24       MR. FLANIGAN:  I want to try something.

25       THE COURT:  You're going to have to try something

1   else, because you're not convincing me.

2          MR. FLANIGAN:  It is an unusual estimation, and it's

3   for the purpose of establishing the reserve, as opposed to this

4   particular person is stuck with this estimation.  We have this

5   cumulative feature that's going to allow someone to benefit

6   from all the claims that -- remember a three percent allowance

7   rate, turn it around, a ninety-seven percent success rate in

8   terms of expungements.  So --

9          THE COURT:  And you've got a couple of home runs

10  against you, and it's going to change these numbers.  And

11  that's what -- when you don't focus on the remaining claims,

12  when you don't focus on the 297 claims seeking over 100,000

13  dollars, you've -- you haven't estimated the claims.  You're

14  using past performance to try and estimate future results.

15  Okay?

16         Mr. Flanigan, one of two things is going to happen

17  here, okay, because I am highly doubtful about FTI's

18  methodology.  And those who've objected are for the most part

19  pro se borrowers.  And I'm not anxious to do this, but the

20  Court has the authority under Federal Rule of Evidence 706 to

21  appoint an expert.

22         And according to the Manual for Complex

23  Litigation -- the Annotated Manual for Complex Litigation,

24  Fourth Edition:  "Judges sometimes appoint an expert to render

25  assistance other than testifying at trial, such as analyzing

1    and evaluating reports prepared by the parties' experts or

2    attorneys.  In such situations, ex parte communications

3    regarding matters of substance may be necessary, but should be

4    subjected to procedural safeguards."  And it goes on to

5    describe the procedural safeguards.

6          I am not satisfied with the -- I know just enough

7    statistics to be dangerous.  Okay.  And so I'm not an expert.

8    But the methodology that FTI has applied is flawed.  It may

9    well turn out to be conservative for -- it may well turn out to

10   be too generous to the remaining claims.  And that may likely

11   be true.  But that's not the issue for me.  The issue for me is

12   do I have a reliable model for estimating remaining borrower

13   claims that is not at all based on an analysis of any of those

14   claims.  Okay?

15         And my concern is that any respectable expert is going

16   to say, Judge, you can't rely on it.

17         So I'm going to mull this over.  I'm not going to

18   grant your motion today.  I mean, I'll tell you that right now.

19   I'm not saying that every one of the 297 remaining claims

20   seeking over 100,000 dollars has to be resolved before I

21   estimate a claims reserve.  If you had come to me with even a

22   single case that supported the methodology that FTI has

23   applied, I'd be more impressed with your motion.

24         I'm reluctant to add to the expense in this case to

25   retain an expert to assist the Court, not to do its own

1    analysis, but to review the FTI report.  I just don't think

2    it's methodologically sound.

3            I don't want the borrowers who've had claims allowed

4    to have to wait indefinitely to recover.  I mean, it's -- every

5    borrower ought to understand that if they want to see the

6    dollars sooner rather than later, it's to their advantage to

7    have a claim reserve established so that the trust can start

8    paying out borrower claims.

9            So, you say there are only seventy-eight claims that

10   have been allowed so far in the amount of 2,150,000 dollars.

11   Those people are waiting.  I mean, they would -- if I granted

12   this motion, you could start paying out on those claims.  And

13   now you can't.

14           So I'm really mindful of the borrowers.  Yes, and you

15   pointed out that the largest number of borrower claims were

16   resolved through the class actions that have already been

17   approved -- settlements that have already been approved.

18           So I'm unhappy.  Okay.  Not -- this isn't so much

19   directed at you.  But I don't think you've given me what the

20   law requires for me to be able to estimate claims.  Do you want

21   me to retain an expert to review the report of FTI?

22           MR. FLANIGAN:  Probably not, Your Honor.  And, Your

23   Honor, I hope Your Honor appreciates that we're very aware that

24   this might have been a result of our motion -- your reaction to

25   it.  But we might as well not estimate.  If we have to do that,

1    we might as well just object and litigate the claims.

2    Otherwise, we're effectively doing it twice.

3          So before we spend more, before we get another expert

4    involved, we'd like to sort of caucus, regroup a little bit and

5    just make sure that makes sense.  Because an expert that just

6    came in and agreed with you --

7          THE COURT:  Well, agreed with me --

8          MR. FLANIGAN:  -- what's the point?

9          THE COURT:  What -- I need an evidentiary basis that

10   would support setting the reserve in the amount you've

11   requested.  And my concern is that the FTI methodology is

12   flawed and can't support a sustainable finding by the Court

13   that the amount of the reserve you're seeking is appropriate.

14   I would like to be able to set a disputed claims reserve.  I

15   would like to speed distributions to borrower claimants.  Okay.

16   You're trying to accomplish that; that's good.

17         Let me hear -- I want to hear from any of the

18   objectors, people who filed objections.

19         I apologize; your name, again?

20         MR. SILVER:  Todd Silver.

21         THE COURT:  Yeah, Mr. Silver, come on up.  You don't

22   have to speak, but I want to give anybody who filed an

23   objection a chance to --

24         UNIDENTIFIED SPEAKER:  I filed an objection.

25         THE COURT:  -- address -- let me -- I've got somebody

1  in the courtroom, and then I'll turn to the phone.

2          Go ahead, Mr. Silver.

3          UNIDENTIFIED SPEAKER:  I filed an objection --

4          MR. SILVER:  I think you hit everything on the head

5  that I was going to say.

6          UNIDENTIFIED SPEAKER:  I filed an objection --

7          MR. SILVER:  I just wanted to add --

8          THE COURT:  Hang on.  Hold on.  Okay.  Whoever's on

9  the phone, stop talking.  I'll give you a chance, okay?  Mr.

10  Silver, one of the borrower claimants, is in court, and I'm

11  going to hear him first.

12          Go ahead, Mr. Silver.

13          MR. SILVER:  I think you echoed most of the things

14  that I wanted to say.  Also, as far as just their wording of

15  it, it seems to me like they were picking -- cherry picking.

16  And they were using 2,400 people that were easily resolved, to

17  try to further something along and throw these 597 remaining

18  people into a category.  And I just think that it's fair that

19  everybody that took the time to file a claim -- and I

20  understand there are some wildly and absurd.  I had a lady who

21  read my objection, called me from California, and she said she

22  had a 250-million-dollar claim.  And I was, like, oh, these are

23  the people on my side, or in the same category as me; I kind of

24  thought I was in trouble right off the riff.

25          But my point is, is that every person who did the

1   diligence to file this claim deserves the same integrity to be

2   looked at.  They shouldn't be categorized.  There shouldn't be

3   a computer system to generate.  And before anything can move

4   forward with those other claimants, I think it's only fair that

5   everybody has to be on the same level.  And I guess that's

6   where I disagree.

7         THE COURT:  Let -- look, Mr. Silver, I'm not -- and

8   I'm going to let you speak some more, but so you submitted an

9   objection; it's at ECF 7143.  You filed one proof of claim in

10   the amount of 30,616 dollars against GMACM.  And you later

11   supplemented your claim to allege 231,120 dollars in liability.

12   And that's at your objection at page 2.  And the trust has not

13   yet objected to your claim.

14         I'm not urging you to back off -- the -- even

15   accepting your claim that the 230,000-dollar amount, it's

16   almost inconceivable to me that you wouldn't be protected if

17   your claim was allowed in full.  Okay.

18         MR. SILVER:  And I guess that's where I was a little

19   misreading the document.  But at the end of the day, when I was

20   reading it -- and I'm not an attorney, and I apologize --

21         THE COURT:  I under --

22         MR. SILVER:  -- in the document --

23         THE COURT:  No, don't apologize.

24         MR. SILVER:  -- if I wrote it the wrong way.

25         THE COURT:  Don't apologize.

1          MR. SILVER:  But to me, even if it does help me, it

2   doesn't help the rest of 596 people.

3          THE COURT:  Well, we're --

4          MR. SILVER:  And I just think --

5          THE COURT:  We're sort of down to the 297, because --

6          MR. SILVER:  Okay.

7          THE COURT:  -- if any claim under 100,000

8   dollars -- yours is over; 231- --

9          MR. SILVER:  Right.

10          THE COURT:  You amended it.  But if any of the claims

11   under 100,000 were allowed, there'd still be plenty of money

12   there.  Okay?

13          MR. SILVER:  The other --

14          THE COURT:  So your -- even your claim, 231,000, I

15   have no idea whether your claim ought to be allowed or not;

16   that's not before me today.  But so if your claim were allowed

17   today, you'd be sitting, maybe until the end of the year,

18   before you got a dollar.

19          MR. SILVER:  And I honestly can say that I would be

20   happy with that and fine with that as long as everybody else

21   gets their fair share.

22          THE COURT:  Okay.

23          MR. SILVER:  I've watched what this bank did to people

24   in the foreclosure court.  I was lucky enough to have my

25   foreclosure dismissed.  I watched what it did.  And if I have

1   to suffer or take a little bit less so other people get their

2   fair shot, I'm more than welcome to do that.

3           THE COURT:  My -- look, my role is to -- I've got to

4   decide these issues.  I don't favor -- whatever anybody might

5   think, I don't -- I don't believe I favor the debtor or trust,

6   versus a borrower.  Where a borrower claim should be expunged,

7   I do that, but I do it on the merits, okay?  I have no idea

8   what the merits of your claim are.  In due course, that'll

9   either -- it'll either be allowed or reduced or expunged.

10  So --

11          MR. SILVER:  I just have a pending case that was on

12  file prior --

13          THE COURT:  Lots of people did --

14          MR. SILVER:  -- back in 2012, right.

15          THE COURT:  -- okay?

16          MR. SILVER:  That's the only thing I have for --

17          THE COURT:  Okay.

18          MR. SILVER:  -- evidence right now.

19          THE COURT:  Okay.

20          MR. SILVER:  I mean, I'm being blocked from validating

21  my claims with the stay.  Meanwhile, GMAC was allowed to sell

22  the mortgage to Ocwen, who's coming after me --

23          THE COURT:  No, they didn't sell --

24          MR. SILVER:  Okay.

25          THE COURT:  I want -- this is something I want to be

 1  clear about.  Excuse me for interrupting.

 2          MR. SILVER:  Sure.

 3          THE COURT:  GMAC sold servicing rights --

 4          MR. SILVER:  Okay.

 5          THE COURT:  -- to the mortgages; it didn't sell

 6  mortgages.  And there are -- I stop you there because there are

 7  some other objections, and I've had this come up before.  I

 8  don't fault you for thinking that.  But what Ocwen purchased

 9  was the right to service your loan.  I don't know who owns your

10  loan, okay?  I have no idea --

11          MR. SILVER:  Okay.

12          THE COURT:  -- who owns your loan.

13          MR. SILVER:  EverBank, it's a new bank; I just got an

14  e-mail.

15          THE COURT:  Okay.

16          MR. SILVER:  But -- okay.

17          THE COURT:  What Ocwen acquired were the servicing

18  rights.

19          MR. SILVER:  Okay.

20          THE COURT:  Whether Ocwen's trying to foreclose, I

21  have no idea, okay?  I have no control over it.  Ocwen is the

22  loan servicer.  But I just -- it may not be all that important,

23  in the bigger scheme of things for you, but they didn't sell

24  your loan.  They didn't own your loan and they didn't sell your

25  loan.

1          MR. SILVER:  Well, the new servicer is now coming

2     after me for an absurd amount of money on a note that's being

3     contested that I can't even claim is contested because it can't

4     be validated because it's held up in a stay in my federal case.

5     I'm contesting the note in the dollar amount, and that case is

6     stayed.

7          THE COURT:  Oh, if Ocwen -- look, I'm not going to

8     give you legal advice --

9          MR. SILVER:  That was my --

10         THE COURT:  -- but if --

11         MR. SILVER:  That was my next question.

12         THE COURT:  If Ocwen -- further, even if GMAC had

13    sought to foreclose, there was an order entered in this case,

14    quite early on, the supplemental servicing order --

15         MR. SILVER:  Right.

16         THE COURT:  -- that permitted you to assert any

17    defense; if you thought there was an invalid note or mortgage,

18    you could -- and GMAC were trying to foreclose, you could have

19    asserted it.  Ocwen, you can assert anything you want.  Look,

20    I -- when I say anything you want, anything --

21         MR. SILVER:  Right.

22         THE COURT:  -- that there's --

23         MR. SILVER:  So that --

24         THE COURT:  -- some legal validity.

25         MR. SILVER:  -- that order is for the new servicer as

1    well?

2              THE COURT:  No.  Your -- I don't control what Ocwen

3    does, okay?

4              MR. SILVER:  Okay.

5              THE COURT:  What got entered early in this case,

6    because GMAC was -- I don't know if it was true in your

7    case -- they were proceeding with foreclosures, and people --

8    borrowers, well, what could we do?  Well, you could assert

9    any -- you couldn't get an affirmative dollar recovery, but you

10   could assert, as an affirmative defense, whatever defenses you

11   thought you had.  I don't want to get caught up in that.  I

12   can't give you --

13             MR. SILVER:  Right.

14             THE COURT:  -- legal advice about it.

15             MR. SILVER:  I understand what you're saying, I think.

16   I thank you for saying it.

17             THE COURT:  But I think what the trust is trying to

18   accomplish is having the ability to start paying claims that

19   are allowed soon.  Okay.  That's good, okay?  Assuring that

20   there's a big enough claim reserve is what has to happen before

21   they can start doing that, okay?

22             I want to make clear I'm not saying all 297 claims

23   over 100,000 dollars have to get resolved before that can

24   happen.  But I need to have -- I need to be persuaded that a

25   supportable methodology has been applied in determining the

1   amount of the proposed claim reserve.  So I mean, I -- look,

2   I've read your objection.  I understand you're not a lawyer.

3               MR. SILVER:  Okay.

4               THE COURT:  I take your objection seriously.  You

5   heard my comments before --

6               MR. SILVER:  I feel part of that was --

7               THE COURT:  -- to Mr. Flanigan.

8               MR. SILVER:  -- kind of preemptive and has to be

9   waited to see if there's an objection filed to my claims before

10  I can say that part.

11              THE COURT:  I understand.  Anything else you want to

12  add?

13              MR. SILVER:  No, I've just got to stay with the fact

14  that how they wrote their motion, categorizing the 597 in the

15  one category, call them all absurd; I took offense, and that's

16  why -- you know, part of the reason of the objection.

17              THE COURT:  And they didn't call all -- well let

18  me -- in fairness, I -- yeah, I remember what they said about

19  absurd.  They applied that to some a hundred million plus

20  claims.  Whether they're absurd or not, I don't -- I'm not

21  getting into that, but --

22              MR. SILVER:  The only thing, I just -- I think

23  everybody's claims should be handled with the same diligence

24  and handled the same way --

25              THE COURT:  Okay.

1          MR. SILVER:  -- before any of those other claims can

2     move forward.  I don't think it's fair that people are

3     different levels along in this bankruptcy.

4          THE COURT:  All right.

5          MR. SILVER:  But that's all.

6          THE COURT:  Thank you very much.

7          MR. SILVER:  Thank you for your time.  Am I free to

8     go?

9          THE COURT:  Absolutely.

10         MR. SILVER:  All right.  Thank you.

11         THE COURT:  You can say or go.  You are excused if you

12    wish to be.

13         MR. SILVER:  I don't have a train until 5:30 so maybe

14    I'll stick around --

15         THE COURT:  Okay.

16         MR. SILVER:  -- and take notes.

17         THE COURT:  All right.  Thanks.

18         All right.  Are there any other borrower objections on

19    the phone?  Well, first off, anybody else in the courtroom?

20         I don't see anybody coming in the courtroom.

21         MS. LANZETTA:  I --

22         THE COURT:  You're -- yes, come on up.  There's one

23    more in the courtroom.

24         Is there anybody else in the courtroom who filed an

25    objection?  Okay.

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          36

1          Why don't you come up and identify your name, okay?

2          MS. JACKSON:  Your Honor --

3          MS. LANZETTA:  Good morning, Your Honor.

4          THE COURT:  Hold on, on the phone, hold on.  I want

5    to -- I will come to you on the phone.

6          Go ahead.

7          MS. LANZETTA:  Good morning, Your Honor.  My name is

8    Donna Lanzetta.  I'm an attorney.  I have a personal claim and

9    also represent two other claimants.  I did not file an

10   objection.  I called Mr. Flanigan and said I was ill and asked

11   for a week extension to put my objection in and I was denied

12   the courtesy of a --

13         THE COURT:  Let's just deal with --

14         MS. LANZETTA:  -- one-week extension.

15         THE COURT:  Why don't you tell me what your argument

16   is?  Tell me, who are the other two people you represent?

17         MS. LANZETTA:  It's my mother.

18         THE COURT:  Her name is?

19         MS. LANZETTA:  Jean (ph.) Lanzetta.

20         THE COURT:  Okay.

21         MS. LANZETTA:  And my deceased father, the estate of

22   Dominique Lanzetta.  It --

23         THE COURT:  And did you file proofs of claim on behalf

24   of yourself and them as well?

25         MS. LANZETTA:  Yes, claim number 4423, 4420, and 4405.

1       THE COURT:  Okay.

2       MS. LANZETTA:  Each claim, Your Honor, is in the

3   amount of 2.25 million dollars.  I feel this is very

4   reasonable.  We are within the 297 claims remaining over

5   100,000 dollars.

6       I just wanted to -- it was uplifting to hear the

7   Court's comments regarding past performance and how that is no

8   gauge of future results.  I think that it's obviously flawed,

9   the numbers that they have here.  There are some claimants

10  here -- I believe we are some of them -- that have suffered

11  some significant damages.  This fraud that the bank has done

12  has destroyed my family.

13      THE COURT:  Tell me this.

14      MS. LANZETTA:  We --

15      THE COURT:  What's the nature -- do all three of the

16  claims that you've referred to arise out of the same set of

17  facts?

18      MS. LANZETTA:  Yes, all three -- we were all three

19  named defendants in a foreclosure action, and --

20      THE COURT:  Same property?  One property?

21      MS. LANZETTA:  On one property that we jointly owned.

22      THE COURT:  Where was the property?

23      MS. LANZETTA:  The property is out in East Quogue in

24  Suffolk County.

25      THE COURT:  Okay.

1          MS. LANZETTA:  We were -- there's a lot of background

2    about the fraud that went pre-litigation, but in the process of

3    the litigation, there were fraudulent documents filed with the

4    court.

5          THE COURT:  May I ask you this?  Has the house been

6    foreclosed on?

7          MS. LANZETTA:  The house has not been --

8          THE COURT:  Okay.

9          MS. LANZETTA:  -- foreclosed on.

10         THE COURT:  Okay.

11         MS. LANZETTA:  We are -- the matter is still pending.

12         THE COURT:  May I ask you this as well?  Who owns the

13   loan?

14         MS. LANZETTA:  I have no idea.

15         THE COURT:  Do you get a monthly statement?

16         MS. LANZETTA:  I see something from Ocwen now as a

17   servicer --

18         THE COURT:  It's the loan servicer, right.

19         MS. LANZETTA:  My -- the mortgage was in the mortgage

20   electronic recording system, the biggest fraud of our lifetime,

21   according to the New York State Attorney General.

22         THE COURT:  Do you know whether it's -- whether the

23   loan is owned by a securitization trust?  You don't know?

24         MS. LANZETTA:  I don't know.

25         THE COURT:  Okay.

1        MS. LANZETTA:  I know that I myself was hospitalized

2    five times since the stress of this foreclosure.  All we wanted

3    to do was modify our mortgage.

4        THE COURT:  Okay.

5        MS. LANZETTA:  My father had a stroke and died.  There

6    are people who have claims that are valid.  And I think that

7    this cramdown is unsupported by the calculations of FTI.

8        THE COURT:  Is there a pending foreclosure action?

9        MS. LANZETTA:  Yes.

10       THE COURT:  By Ocwen?

11       MS. LANZETTA:  No, it's by RMS -- some trust.

12       THE COURT:  Okay, then a trust owns the loan; I'm

13   assuming that.  But -- and what's the status of the foreclosure

14   action?

15       MS. LANZETTA:  The status was there was a motion for

16   summary judgment, which was denied; that was over a year ago.

17       THE COURT:  Okay, anything else you want to tell me

18   now?

19       MS. LANZETTA:  No.  I thank you for taking my

20   comments.  I appreciate -- I believe that there's no legal

21   basis for the analysis and the reserve that the movants are

22   proposing.

23       THE COURT:  Okay, thank you, Ms. Lanzetta.

24       MS. LANZETTA:  Thank you.

25       THE COURT:  All right, first, is there anybody else in

 1  the courtroom who wants to be heard on their objection?

 2          All right, now let me --

 3          Wait.  One more in the courtroom.

 4          Come on up.

 5          Okay, other than the gentleman who's coming up, is

 6  there anybody else in the courtroom who wants to be heard with

 7  respect to an objection?

 8          All right, your name is?

 9          MR. QUIROZ:  Yes, Your Honor.  First of all, I would

10  like to --

11          THE COURT:  Tell me -- I'm sorry; tell me your name

12  again.

13          MR. QUIROZ:  Yeah, my name Ramon Quiroz.  I have a

14  case pending --

15          THE COURT:  Can you spell your last name?  I

16  apologize.

17          MR. QUIROZ:  I'm sorry?

18          THE COURT:  Spell your last name.

19          MR. QUIROZ:  Q-U-I-R-O, Z as in zebra.  Quiroz.

20          THE COURT:  Okay.  Go ahead, Mr. Quiroz.

21          MR. QUIROZ:  Our case in actually Second Circuit,

22  which was -- actually had summary-judgment reversal.  And the

23  court actually -- after my property was foreclosed for the

24  fourth time, they dismissed my case; they denied.  And today

25  I'm in Supreme Court because I'm filing an appeal.  But I

 1   actually want to solve this and I want to explain to you

 2   exactly what happened.

 3           THE COURT:  How much is your claim -- did you file a

 4   claim in the bankruptcy?

 5           MR. QUIROZ:  I did file a claim --

 6           THE COURT:  For --

 7           MR. QUIROZ:  -- for 522,000 dollars; yes.

 8           THE COURT:  522,000?

 9           MR. QUIROZ:  Yes.

10           THE COURT:  Okay, go ahead.

11           MR. QUIROZ:  I would like actually to speak a little

12   more, but I am not capable of speaking very good English --

13           THE COURT:  Okay.

14           MR. QUIROZ:  -- so I bring my interpreter.  Is it

15   possible that he could come --

16           THE COURT:  Sure.

17           MR. QUIROZ:  -- and talk for me?

18           THE COURT:  Yes.  What is your native language?  What

19   is your native language, first-spoken language?  Spanish.

20   Okay.

21           MR. QUIROZ:  David Gonzalez --

22           THE COURT:  Okay.

23           THE INTERPRETER:  My name's David Gonzalez.  I'm here

24   with Mr. Quiroz.

25           THE COURT:  Okay, go ahead.

1      (Statement of Mr. Quiroz translated through the

2  interpreter)

3          THE INTERPRETER:  What he's trying to say is they've

4  attempted to foreclose on four occasions; they haven't been

5  able to.  He's afraid that it's been done fraudulently.  And I

6  believe he had a case but it was -- he's trying to lift the

7  stay.

8          MR. QUIROZ:  Yeah, lift the stay, yeah.

9          THE INTERPRETER:  That's what --

10          THE COURT:  That's on the docket.

11          THE INTERPRETER:  Okay, it's on the docket, so --

12          THE COURT:  Okay.  I haven't ruled on that yet.  Go

13  ahead.  Okay.

14          Let me -- one quick -- is there currently pending a

15  foreclosure action?

16          THE INTERPRETER:  I believe so.

17          THE COURT:  Ask him.

18          MR. QUIROZ:  Yes.

19          THE COURT:  Where?

20          THE INTERPRETER:  I believe it's --

21          MR. QUIROZ:  Ocwen Loan, you know, sent someone to --

22          THE COURT:  Okay.  All right.  Thank you.

23          THE INTERPRETER:  Okay.

24          THE COURT:  Okay, let me hear -- on the phone, does

25  anybody wish to be heard?

```
1              MR. ROZIER:  Oh.  Hello?
2              THE COURT:  Yes, go ahead.
3              MS. JACKSON:  Corla Jackson.
4              MR. ROZIER:  Your Honor, this is David Rozier.  Can I
5   (sic) hear me -- can you hear me?
6              THE COURT:  Yes, I can hear you.
7              MR. ROZIER:  Yes, sir.  My name is David Rozier.  I'm
8   representing Karen Rozier.  We are in California.  We are the
9   second largest claim against GMAC in this situation.
10             THE COURT:  Mr. Rozier, are you a lawyer?
11             MR. ROZIER:  No, sir, I'm not.
12             THE COURT:  All right, ordinarily I would only hear
13  from a lawyer representing someone, but I'll let you go ahead
14  and -- well, I want to make sure, though; I'm happy to listen
15  to you, Mr. Rozier, but I'm not going to listen to Karen Rozier
16  separately.  One or the other of you, I'm happy to hear from.
17             MR. ROZIER:  Okay, sir.
18             THE COURT:  Okay?
19             MR. ROZIER:  Yeah, I'm calling for Karen Rozier, sir.
20  I'm sorry.
21             THE COURT:  Go ahead.
22             MR. ROZIER:  I'm --
23             THE COURT:  Yes.  All right, go ahead.
24             MR. ROZIER:  I'm not familiar with the procedures.
25             Ours is the second largest claim that everyone's
```

1  concerned about, for the hundred million dollars against GMAC,

2  and we are the only claim, out of all the claims, that is

3  unopposed.  The reason for that is a story.  GMAC has been so

4  foul in what they've done, committing fraud upon the Court,

5  that it's reprehensible what they have done.  In our situation

6  specifically, we were forced into foreclosure or default by

7  them.  We were paying our mortgage.  And this is why our

8  numbers are so large.  The house that they're concerned about,

9  I built it with my own two hands; it's 4,000 square feet and

10 it's worth 1.355 million dollars.  You can Zillow that and look

11 at it.  It's very -- it's common knowledge right there.

12 Everybody in the country knows this.

13        The problem is that when I was in Mexico, I was in the

14 middle of my twenty-four-million-dollar deal down there

15 developing properties, thanks to NASA, doing quite a bit of

16 work.  They forced us into foreclosure by telling us that they

17 would not -- they sent our payment back.  We were paying our

18 mortgage; they sent it back to us.  We asked what was the

19 problem, what's going on.  After they sent the mortgage back,

20 we called them.  They told us they would not talk to us for

21 three months until we were in default.  We sent the payment and

22 forced it into the system; we got it registered in the system,

23 and then they took it out and sent it back again.  This is all

24 documented.

25        After they forced us into foreclosure, we started

1  talking to them.  My wife had discovered that there was a

2  problem with LIBOR, two years before all this blew up, and that

3  the fact is that in the year '27 the whole thing fell apart.

4  It made no sense.  Now, the statistical experts and the people

5  who understand finance, as Karen does, realized that

6  their -- the whole thing was a fraud and that the numbers never

7  worked out.

8          So even if you modified your loan or changed it or

9  whatever, the numbers just don't jive.  The reason that she

10  knows is because she qualified in statistics, economics and

11  finance at Harvard University.  She's a Harvard University MPP

12  graduate from the Kennedy School.  She also has a Ph.D. (ABD)

13  at the Kennedy School.  She is one of the only people in the

14  country -- she's the first black female admitted to the school.

15          Again, they ruined my twenty-four-million-dollar deal

16  by forcing us into foreclosure, having us fight this entire

17  fight for the last six years.  We have not been able to work.

18  We have not been able to do anything.  I've lost more family

19  members than I can count anymore.  And they're continuing this

20  harassment by passing it on from originally GMAC, the whole ETS

21  nonsense, some amount of complaint against MERS.  And the whole

22  thing with MERS is, which MERS?  Because they purposely tried

23  to confuse the situation by having MERS built different ways.

24          After they tried to cloud the issue with MERS, they

25  then sold it to a series of other banks after it'd been

1   collateralized:  LaSalle (ph.) Bank, eventually Bank of

2   America, U.S. Bank.  And now Ocwen is trying to foreclose on my

3   home.  They said in court that they're not trying to foreclose,

4   and at this point the statute of limitations had run out to

5   collect any money.  However, I'm still in court twice a week,

6   every week, here in Santa Ana, fighting these people, appealing

7   to the appeals court in the Ninth Circuit, trying to get

8   resolution, because no one has done what they were supposed to

9   do legally yet.  The lawyers are all running around getting

10  paid while the claimants are all getting screwed.

11          Now, the expert that you have, this Taralico (sic) or

12  whatever, in our complaint, we've outlined exactly why he's not

13  qualified to be an expert.  This man has no experience on the

14  level that we're talking about.  And as our claim outlined, it

15  shows specifically why our claim is valid.  We've broken it

16  down, each and every bit of it, to why you owe us this money.

17          We all came to an agreement.  The agreement

18  was -- several times the claimants, we've already agreed to an

19  amount to be paid out.  They started paying.  They paid the

20  ETS-MERS portion of it.  That is basically a contract claim.

21          You're right; the reason ours is unopposed is because

22  they cannot oppose it.  What they did was so criminal to us --

23          THE COURT:  Well, Mr. Rozier --

24          MR. ROZIER:  -- that it --

25          THE COURT:  Mr. Rozier?

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS         47

1          MR. ROZIER:  -- it's obvious.

2          THE COURT:  Mr. Rozier, stop.  Okay.

3          MR. ROZIER:  Yes, sir.

4          THE COURT:  Karen Rozier has, on several occasions,

5  made the argument, which the Court has rejected, that her claim

6  is allowed.  The time for the trust to object to claims has not

7  yet run.  Okay --

8          MR. ROZIER:  Sir, I would agree --

9          THE COURT:  So I --

10         MR. ROZIER:  -- with that except for a couple --

11         THE COURT:  So don't tell me that she has an allowed

12  claim.  I've already determined she does not have an allowed

13  claim.  Let me summarize.  Karen Michele Rozier has filed

14  claims 4738 and 5632; one of the claims seeks nearly a hundred

15  million dollars.

16         MR. ROZIER:  That's correct.

17         THE COURT:  The claim object -- the objection to this

18  motion has argued that the trust expert is not qualified.  I've

19  addressed my own concerns.  It goes on.  I've read the

20  objection carefully.  I don't believe that it proposes an

21  appropriate methodology for estimating the claim reserve.  It

22  challenges the methodology that was applied by FTI; I've

23  already indicated my comments about that.

24         So now is not the time to deal with the merits of

25  Ms. Rozier's claim, other than to say I have on multiple

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          48

1    occasions rejected the argument that she has an allowed claim

2    in the amount of a hundred million dollars.  The time for the

3    trust to object to her claim has not yet run.  I'll deal with

4    her claim --

5              MR. ROZIER:  Exactly.

6              THE COURT:  -- if and when the trust files an

7    objection within the time provided.

8              All right.  Anybody else on the phone wish to be heard

9    with respect --

10             MS. JACKSON:  Corla Reed Jackson.

11             THE COURT:  Okay, tell me who you are.

12             MS. JACKSON:  Corla Reed Jackson.

13             THE COURT:  Nice to hear from you again, Ms. Jackson.

14             MS. JACKSON:  Hi, Judge.  Good morning to you.  How

15   are you doing?

16             THE COURT:  All right, go ahead, Ms. Jackson.

17             MS. JACKSON:  I like what you said about he wasn't an

18   expert who estimates these claims and damages that Residential

19   Capital and GMAC Mortgage Corporation has done and this theory.

20   I think that's the best thing you've ever said since I've been

21   coming up there and since I've been on this phone.

22             And I personally feel that GMAC Mortgage has committed

23   fraud of (sic) the court that's under you, and I can back it

24   with the evidence and will send that.  And for some reason

25   you've not been getting the proper documents to support what

1   are my claims and what I've said.

2           This is what led to an appeal.  This led to an appeal

3   because of the fraud of (sic) the court that GMAC Mortgage and

4   their affiliates have been scheming to do prior to and after

5   they filed bankruptcy.  Okay?  They robbed me after they filed

6   bankruptcy.  I was not, and I am not, a creditor of GMAC

7   Mortgage; I never have been and I never will be.  Because of

8   what transpired with me and them trying to force me to say I've

9   had a loan with them, I don't want to do no business with

10  nobody like that ever, Your Honor.

11          Now, I filed an appeal because there was no experts

12  over my cases.  I know you appointed an expert over my case,

13  but there was no expert over the cases who determined the

14  damages that GMAC Mortgage has caused me.  They have caused me

15  to lose everything I own.  They took my name off of my property

16  illegally to make it appear as if I had a loan with them, when

17  I did not.  And because the proper procedures was not done

18  or --

19          THE COURT:  Ms. --

20          MS. JACKSON:  -- someone didn't do their job right,

21  and based upon fraud of (sic) the court, it led to illegal

22  force.

23          THE COURT:  Ms. Jackson?  Ms. Jackson, the only thing

24  pending before me today is a motion to establish a claim

25  reserve.

1              MS. JACKSON:  Okay.

2              THE COURT:  Ms. Jackson filed claim number 4443

3     against GMACM, asserting a claim in the amount of a hundred

4     million dollars as a general unsecured claim.  Ms. Jackson's

5     claim was expunged by the Court on January 27th, 2014; see ECF

6     docket number 6363.  She has since appealed the Court's order

7     to the United States District Court for the Southern District

8     of New York and her appeal is pending before Judge John Koeltl

9     in the district court; it's case number 14-02427.

10             Ms. Jackson is no stranger to this Court; her most

11    recent filing, like all of her previous filings in this case,

12    repeats verbatim portions of her previous stay-relief motions

13    and responses to the debtors' objections to her proof of claim.

14             Rather than addressing the merits of the current

15    motion, Ms. Jackson again repeats her contentions that GMACM

16    does not own her mortgage or note, that GMACM is violating

17    orders issued by the bankruptcy court in Alabama, and that

18    GMACM is violating orders issued by this Court, and that Ms.

19    Jackson's ejectment action should be stayed.  She maintains

20    that any action taken by GMACM to collect the debt on her

21    property is a fraud on the Court.  All these arguments have

22    been made previously and have been addressed by me in multiple

23    denials of her request to lift the automatic stay and the

24    Court's order expunging her claim.

25             The Jackson objection that I have before me today

1  merely attached copies of sections of other cases, many from

2  outside this jurisdiction, and are pleadings -- and pleadings

3  from her own bankruptcy cases.  I've addressed those arguments

4  in the prior rulings that the Court rendered.  This is a

5  current appeal pending in the United States District Court for

6  the Southern District of New York.

7          Anyone else on the phone wish to be heard with respect

8  to objections to set the amount of the estimated claim reserve?

9          MR. ERIKSEN:  Yes, Your Honor.  Ron Eriksen.

10         THE COURT:  Go ahead, Mr. Eriksen.

11         MR. ERIKSEN:  Thank you, Your Honor.  My position is

12  that the debtor had made it impossible to (break in audio) to

13  me through the plan and that in consideration of my not

14  contesting the plan, I have made an agreement with them and

15  they have promised to pay -- New York, a promise to pay

16  constitutes an agreement.  My contention is that they are

17  looking to renegotiate the agreement that they've already made

18  with me.

19         And further, extremely respectfully, it's my position

20  that the Court does not have the jurisdiction at this time to

21  alter the plan that the Court has already ordered.  My claim is

22  about a million dollars; it is a 500,000-dollar home.  I have

23  had negotiations for settlement, and I believe those

24  negotiations were done in bad faith.  Under Illinois (sic),

25  those negotiations are allowed as part of testimony in court;

 1  and I think it would give Your Honor an insight into the

 2  thinking of the debtor if I might have thirty seconds to

 3  describe those.

 4          THE COURT:  Go ahead.

 5          MR. ERIKSEN:  Originally they -- I filed my claim as

 6  secured; they contested that and they won.  They came back and

 7  alerted me of that at the Court's direction.  I said, well, I

 8  would like to settle.  Jonathan -- I believe the last name's

 9  Platt -- said to me, I don't think I -- I know you're -- I

10  (sic) said I don't think I can get you the value of your home.

11          THE COURT:  Mr. Eriksen --

12          MR. ERIKSEN:  And I said, okay --

13          THE COURT:  Mr. Eriksen.

14          MR. ERIKSEN:  Yes.

15          THE COURT:  I'm only interrupting because I don't get

16  involved in the settlement negotiations.  So I don't want to

17  know what you demanded and what they may have offered, okay?

18          MR. ERIKSEN:  Yes, Your Honor.

19          THE COURT:  Because I may ultimately have to decide

20  disputed issues of fact and law, I don't want to know what the

21  settlement -- I don't have a problem about you telling me

22  you've had settlement discussions with them.  I encourage

23  settlement discussions.  I don't want to know the particulars

24  of what you've demanded and what they've offered, okay?

25  That's --

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          53

1           MR. ERIKSEN:  Yes, Your Honor.

2           THE COURT:  That's why I interrupted you.  Go ahead.

3           MR. ERIKSEN:  Thank you, Your Honor.  And that's why

4    I'd asked for permission.  Thank you for clarifying.

5           The short of it is I don't believe that their

6    intention is to quickly pay out the people that have already

7    become deserving of money; I believe it is to increase their

8    negotiating position with the people that they have yet to

9    object to.  This is an end run around the plan that they've

10   already agreed to, and allowing to do that will save them time

11   and money in court but will deprive myself of my day in court

12   because when they start to negotiate with me, the first thing

13   that they're going to say is, well, even if you win, all you're

14   going to be able to get is X.  I've already agreed to take

15   thirty cents on the dollar if I win, but I won't agree -- or

16   I'm contesting that they'll be -- their proposition that I

17   might take two or three cents on the dollar even if I win.

18          THE COURT:  Okay.  So, Mr. -- Ronald and Julie Eriksen

19   filed claims 5573 and 5580.  After an objection from the

20   debtor, the Court ordered that their claims be redesignated and

21   reclassified; the order is at ECF 6332.  Their claims remain

22   pending.  The redesignating is identifying the debtor against

23   which the claims properly lie.

24          Mr. Eriksen argues that they're not disputed claims

25   because the trust did not object to the merits of the claim by

1    the effective date.  But as I've held numerous times, the

2    deadline for the trust to file objections to the claims has not

3    yet run.  I think it's sometime in September.  It can be

4    extended, but it's currently a date in September.  So the

5    deadline for the trust -- and I've ruled on this numerous times

6    now -- the deadline for the trust to object to claims has not

7    yet run.

8            Mr. Eriksen, you'll get your opportunity -- assuming

9    that the -- assuming you don't resolve your claim with the

10   trust, which I encourage to keep trying to do, at some point in

11   time the claim objection -- if there's an objection to the

12   specific claim, it'll come before me, and you'll get your day

13   in court.  Nobody's denying your day in court.  I appreciate --

14           MR. ERIKSEN:  Yes, Your Honor.

15           THE COURT:  -- your concern and your -- look, you've

16   heard me already express my concern that I don't have an

17   adequate basis on which to approve the specific claim reserve

18   that's been asked for.  It is to everybody's advantage that the

19   Court set a claim reserve so that people can start getting

20   their money, but I just don't have it yet.  But I appreciate

21   hearing from you.

22           MR. ERIKSEN:  One brief clarification, please, Your

23   Honor?

24           THE COURT:  Go ahead.

25           MR. ERIKSEN:  It's not my contention that I

1  have -- that I'm automatically allowed it.  That's not what I'm

2  asserting at this point.  Your Honor's correct, obviously, that

3  they haven't filed an objection.  But my comment is, by them

4  establishing a further reserve, it's a renegotiation of the

5  plan and I would not have an opportunity to object to that the

6  same way I would have an opportunity to object to the plan.

7  And I don't think that that is their -- that that is their

8  legal prerogative to do and, respectfully, I don't think it's

9  within the Court's jurisdiction to change the plan that the

10 Court has already ordered.

11       THE COURT:  Okay.  Is there anybody else on the phone

12 who wishes to be heard with respect to objections to the

13 estimation motion?

14       MR. COLLIER:  Yes, sir.

15       THE COURT:  Go ahead.

16       MR. ERIKSEN:  I agree with the last guy, is all.

17       THE COURT:  Go ahead.  Who's that?

18       MR. COLLIER:  Yeah.  My name is Otis Collier.

19       THE COURT:  Okay.  Go ahead.

20       MR. COLLIER:  Yes, sir.  I'm in Houston, Texas.

21       THE COURT:  Okay.

22       MR. COLLIER:  And my objection to the claim is simple.

23 I applied for a modified mortgage, of which I was only

24 $6,368.36 behind.  But my wife was unemployed at the time and

25 I'm disabled, and I thought that the modification would

1    possibly save me the trouble of trying to catch up on three to

2    four mortgages that I was behind.  I was granted -- I applied

3    for the modification; I was granted the modification in March

4    of 2010.  I did -- I did six months of payment.  And

5    the -- GMAC sent me a mortgage, which they -- which I did not

6    receive for two months.  I contacted them about why they didn't

7    have -- it was returned to them undeliverable as addressed.

8          To make it short, they sent me another mortgage; I

9    refused the mortgage simply because it -- at the time it still

10   would not have helped me.  And I told them that I would go to

11   the VA or go to the -- to HUD for -- and reapply for a

12   mortgage.  Two weeks later, before I could do anything, they

13   called me and told me that they had worked out a modification

14   that I could live with.  Again, this -- by this time it

15   was -- this was early January of 2011.  Again, I sat and I

16   waited for a mortgage that never showed.

17         And I just want to read one thing into the record if

18   at all possible --

19         THE COURT:  Go ahead, Mr. Collier.

20         MR. COLLIER:  Yes, sir.

21         THE COURT:  Go ahead.

22         MR. COLLIER:  -- which is an admission, on their part,

23   of negligence.  And it reads that GMACM received an updated

24   financial-analysis package on March 22nd, 2011 subsequent to

25   the previous loan modification review, that GMAC began to

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS                    57

1  review accounts in Texas to determine that the mortgage was

2  originated as an extension of credit, as defined in Section

3  50(a)(6), Article XVI of the Texas Constitution, that this

4  mortgage loan was originated under this section.  GMAC was

5  unable to offer a loan modification.

6          In other words, sir, for 6,000 dollars, which I could

7  have gone into a loan store and borrowed, I am -- they are

8  taking my house of twenty-five years because they failed to

9  originally notify me in March of 2010 that they were not able

10  to offer me a modification.  Therefore, I'm seeking -- my

11  damages are over 100,000 dollars, and I am seeking -- and they

12  are attempting to foreclose on my home.  They are -- as soon as

13  they received this analysis, I started receiving foreclosure

14  notices again because the money is not sufficient enough to

15  cover the arrearage that I have -- that I have accumulated

16  since December of 2010.  And all of this is simply because of

17  the fact that they did not do due diligence as far as Texas law

18  is concerned.  And I don't feel that I should lose my home for

19  6,000 dollars.

20          THE COURT:  Thank you, Mr. Collier.

21          Mr. Collier filed claim 5066 against GMACM --

22          MR. COLLIER:  Yes, sir.

23          THE COURT:  -- asserting a general unsecured claim in

24  the amount of 118,115 dollars and a secured claim in the amount

25  of 243,885 dollars.  The basis of the claim appears to relate

1   to mortgage modification.  His claim remains pending.

2          Mr. Collier, in his written objection before me,

3   doesn't substantively address the motion that's before me now.

4   He attaches to his papers a delinquency notice from Ocwen

5   explaining that Mr. Collier is 1,460 days delinquent in his

6   mortgage loan and that his account has been referred to an

7   attorney to foreclosure.

8          Mr. Wishnew or Mr. Flanigan, I would appreciate it

9   if -- let me --

10          Mr. Collier, do you have a lawyer, or you're just

11  acting on your own behalf?

12          MR. COLLIER:  Sir, I have not been able to obtain a

13  lawyer --

14          THE COURT:  Okay.

15          MR. COLLIER:  -- simply because of this -- in the

16  State of Texas, they have what they call expedited foreclosure.

17          THE COURT:  Right.

18          MR. COLLIER:  And if you do not -- I had received a

19  court docket (sic) which was supposed to have given me a day in

20  court to be heard --

21          THE COURT:  Mr. Collier, the only reason I --

22          MR. COLLIER:  -- but --

23          THE COURT:  -- I ask you whether you have a lawyer is,

24  if you did, one of the lawyers, who I'm going to address my

25  remarks to, couldn't contact you directly.  But since you don't

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          59

1   have a lawyer, I would ask that a lawyer on behalf of the trust

2   contact Mr. Collier and discuss his situation with him and

3   see -- you may need to get in touch with Ocwen; you may not be

4   able to get anything accomplished, but I would -- so I'm going

5   to direct that a lawyer -- the appropriate lawyer for the trust

6   contact Mr. Collier.

7          MR. COLLIER:  May I make a -- before you make that

8   decision, thank you, sir, but I have dealt with mortgages

9   pretty much most of my life.  In December of that time, I told

10  them to simply refi instead of modifying my loan; to simply

11  refinance my loan.

12         THE COURT:  Okay, we're not going to take the time

13  now --

14         MR. COLLIER:  Then --

15         THE COURT:  Mr. Collier --

16         Mr. Wishnew or Mr. Flanigan, do you have contact

17  information for Mr. Collier?

18         MR. WISHNEW:  We will pull his proof of claim and use

19  the contact information --

20         THE COURT:  All right.

21         MR. WISHNEW:  -- on that.

22         THE COURT:  So one of the lawyers is going to be

23  directly in touch with you, Mr. Collier; whether they can help

24  you, I don't know, but we'll at least get that started.  Okay,

25  I read and reviewed your objection to the motion before me.

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          60

1          Does anybody else on the phone wish to be heard?

2          All right.  Mr. Flanigan, I'll let brief remarks.

3   Anything else you want to add?

4          MR. FLANIGAN:  Your Honor, may I suggest that -- I

5   want to make sure that our brain trust -- and I say that with

6   tongue in cheek -- doesn't have some idea that we can put

7   forward to you that would convince you to do this.  So I'm

8   going to request -- but I don't believe that we will have one,

9   but request that it be put over to the next docket.  We'll

10  withdraw the motion if we can't come up with something that we

11  think will address your remarks specifically.  We do not want

12  the expert appointed.  So --

13         THE COURT:  All right.  I will continue the matter to

14  the next omnibus hearing date.  The trust must file on ECF any

15  supplemental document, whether -- if it's just simply

16  withdrawing their objection -- their motion or if they're going

17  to proceed, at least one week before that hearing, I want to

18  have on ECF so that anybody's who's objected has an opportunity

19  to read what's there.  But we'll continue it to the next

20  omnibus hearing.

21         Mr. Silver?

22         MR. COLLIER:  Thank you, Your Honor.

23         THE COURT:  Go ahead, Mr. Silver.  Your name is

24  Silver, right?

25         MR. SILVER:  Yes, sir; yes, sir, it is.  Really quick;

1  when they file this thing, this -- the supporting document, or

2  the next information, do you require those of us who have filed

3  an objection, if we wish to withdraw that objection, a

4  withdrawal of the objection?

5           THE COURT:  No, you don't have to do anything.

6           MR. SILVER:  I wouldn't have to do anything else.

7           THE COURT:  No.  But --

8           MR. SILVER:  I could file a reply --

9           THE COURT:  Mr. Flanigan, what -- what -- the one

10  thing I would direct -- because we've got pro se parties who

11  are not on ECF -- that a copy of any supplemental filing be

12  sent by mail to those people like Mr. Silver, or those who have

13  filed written objections.  Okay?

14          MR. FLANIGAN:  Yes, Your Honor.

15          THE COURT:  Thank you very much.

16          MR. SILVER:  Okay, thank you.

17          THE COURT:  All right.  So this is adjourned for the

18  next hearing.  And just to make clear, any of the objectors

19  aren't required -- you can appear at the next hearing, if you

20  wish; you don't have to.

21          MR. SILVER:  Okay.

22          THE COURT:  I have your objections.  And --

23          MR. SILVER:  I just thought it was more diligence to

24  be here in person, since it's only the two out of three --

25          THE COURT:  That's fine.  No, I'm happy to have you

1  here.  Okay?

2          MR. SILVER:  I'm happy to be here; I've learned a lot.

3          THE COURT:  All right.

4          MS. LANZETA:  Your Honor --

5          THE COURT:  Yes, quick.

6          MR. COLLIER:  Thank you.

7          MS. LANZETA:  May I submit a written objection after

8  this?

9          THE COURT:  No; time for objections has passed.

10         MR. NEWTON:  Good morning, Your Honor; James Newton on

11 behalf of liquidating trust.  The next matters on the agenda

12 relate to numerous correspondences filed by borrower Jorge

13 Cerron.  Those include docket numbers 6860, 6863, 7065, 7034,

14 7051, 7071 and 7126.  Your Honor, with me in the courtroom I

15 have the trust declarant, Lauren Delehey, on --

16         THE COURT:  All right, Mr. Cerron?

17         MR. CERRON:  Yes, good morning, Your Honor.  Thank you

18 for having me in the court.

19         THE COURT:  Okay.  I just wanted to make sure you were

20 there.

21         Go ahead, Mr. Newton.

22         MR. NEWTON:  And on the phone, we also have Nick

23 Voelker from Bradley Arant, in case there's questions about the

24 recent developments in the underlying foreclosure.

25         Your Honor, I'm happy to take this in any way you

1    like; these are Mr. Cerron's requests, so if you don't have any

2    initial questions for me, I'm happy to turn the podium over to

3    him.

4            THE COURT:  All right, Mr. Cerron, go ahead.  So what

5    I have before me --

6            MR. CERRON:  Yes.

7            THE COURT:  Let me just spell -- and I'll give you in

8    a second.  I have Mr. Cerron's motion for relief from the

9    automatic stay; it's filed as ECF docket number 6860 -- 6860,

10   and Mr. Newton identified the -- some of the correspondence

11   from Mr. Cerron.  A duplicate of the motion was filed as a

12   different docket number, 6863, and there are also supplements

13   to the motion and affidavits:  7034, 7054, 7068, 7071, 7126.

14           Go ahead, Mr. Cerron.

15           MR. CERRON:  Thank you, Your Honor.  My number is

16   Jorge Cerron, and I'm calling from Sarasota, Florida, where the

17   actual foreclosure case, initiated by GMAC versus myself, is

18   starting 2009.  Since that starting of the foreclosure, I have

19   been a pro se defendant, and just to give you a brief history

20   of the case, in 2009, GMAC filed, in its complaint of

21   foreclosure, on September 14, 2009.  And I have include in my

22   papers sent to your attention the pertinent copies in reference

23   to my claims.

24           We have a claim that GMAC has no standing at a time of

25   filing this foreclosure because GMAC didn't have the underlying

1   note, the solvent note, for my mortgage.  Consequently, just to

2   make a brief history -- because I already sent you all the

3   details, and you probably have it --

4          THE COURT:  Yes, but I just want to make clear, Mr.

5   Cerron, I've read everything that you've provided the Court.

6          MR. CERRON:  Thank you very much, Your Honor.  So just

7   to make a brief -- very shortly, the foreclosure was granted to

8   GMAC.  They pretty much foreclosed on my property in 2011, they

9   conduct the sale of my property, and to be able to do that

10  sale, they obtained a certificate of title, and that also is my

11  exhibit that has been submitted to the Court.  And that

12  certificate of title, just to have everybody in the same page,

13  is marked as Exhibit D -- D as in dog.

14         Now, the certificate of title clearly shows that they

15  don't take a clear title in August 31, 2011, and therefore, all

16  the encumbrances on the title, mortgage note were extinguished.

17         Consequently, I filed my appeal, and I was able to

18  prevail on my appeal.  In 2012, the Second District Court of

19  Appeals reversed the case, ordering, in his opinion and his

20  mandate -- which is marked with Exhibit A -- order for the

21  reversal of the summary judgment.  And that order also was to

22  reverse the previous certificate of title and foreclosure sale,

23  and all those documents which were pertaining to the previous

24  final judgment is reversed by the Second District Court of

25  Appeals.

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS                65

1          At that point, I discovered that GMAC filed for

2    bankruptcy, so they filed their bankruptcy status.  And that

3    case continued in the court until 2013 -- I believe, probably

4    to December 2013; the plaintiff came to the Court alleging that

5    they have transfer my loan and mortgage in bundle of loans that

6    were --

7          THE COURT:  Mr. Cerron, let me -- I want to interrupt

8    you, because if I understand all of the papers correctly, after

9    Ocwen was substituted as the plaintiff in the foreclosure

10   action in Florida, you and Ocwen reached a consensual

11   resolution of the Florida foreclosure proceeding, and it

12   resulted in a judgment issued in favor of Ocwen on June 23,

13   2014, and that judgment schedules a foreclosure sale for

14   October 20th, 2014.  So as far as this Court is concerned, the

15   issue of title and whether foreclosure is proper has been

16   resolved by you and Ocwen with the entry of a judgment in

17   Florida recently -- very recently; June 23rd, 2014 -- and

18   the foreclosure doesn't get -- doesn't occur until October

19   20th, 2014.  Am I correct in all that?

20         MR. CERRON:  Yes, Your Honor, but -- you are correct

21   in part.  If you allow me to explain that there are issues

22   there.  I'm just going to be very fast in this.

23         You are correct that we get an agreement with Ocwen;

24   however, I had my file hearing set for the 23rd.  But prior to

25   that, on June 19, we have a hearing before Judge Donnellan,

1  Nancy Donnellan, and I emphatically request for the

2  postponement of the hearing, because I have stated I have a

3  hearing at your court on the 26th, three days after that.  They

4  denied my motion to postpone the hearing, and at that point, I

5  was really indirectly forced to come to an agreement with

6  Ocwen.

7          THE COURT:  Mr. Cerron?  Mr. Cerron?  If you want to

8  challenge the settlement and the judgment that's been entered

9  in Florida between you and Ocwen, it's not me who does that,

10 okay?  You have filed a proof of claim for damages -- well, you

11 didn't file a proof of claim; that's, I think, the major point.

12 There was a bar date.  You didn't file a proof of claim seeking

13 damages from any of the debtors.  One of the issues that's

14 before me is whether to permit you to file a late proof of

15 claim --

16         MR. CERRON:  Yes.

17         THE COURT:  -- well after the deadline for doing so.

18 Let me ask Mr. Newton.

19         Did Mr. Cerron receive notice of the bar date?

20         MR. NEWTON:  He did, Your Honor.  And attached as

21 Exhibit 2 -- I apologize; Exhibit 3 to our response is an

22 excerpt from the affidavit of service regarding the notice of

23 bar date containing Mr. Cerron's information.

24         THE COURT:  Okay.

25         MR. CERRON:  I will have to contest that, Your Honor.

1    I was not properly served with that.

2            THE COURT:  All right.  I'm going to take this matter

3    under submission.

4            THE COURT:  All right.  I'm going to take this matter

5    under submission.  I have reviewed the papers carefully.  With

6    respect to the foreclosure issues, they're clearly resolved.  I

7    mean, it was between Ocwen and Mr. Cerron.  A judgment's been

8    entered.  He's still in possession.  This is just last week

9    that the judgment was entered.  Foreclosure isn't going to

10   occur until October, but that's an agreed judgment.  If Mr.

11   Cerron has a problem with that judgment, he's going to have to

12   go to the Florida court to deal with that.

13           The issue really before me is whether to lift the stay

14   to allow him to proceed with the damages action when he didn't

15   file a proof of claim in this case.  I'm going to take that

16   matter under submission.

17           THE COURT:  Thank you, Mr. Newton.

18           Thank you, Mr. Cerron.

19           MR. NEWTON:  Thank you, Your Honor.

20           MR. CERRON:  Mr. Markingly (ph.) -- Your Honor, I just

21   have a last question, if I may?

22           THE COURT:  Go ahead.

23           MR. CERRON:  Yes, I'm looking forward to have my claim

24   approved, so I can submit my claim.  I don't know if I can

25   submit my claim right now orally against GMAC for the losses

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          68

1  that I have suffered.

2          THE COURT:  No, you can't.  The issue that's pending

3  before me is to allow you -- whether you would be permitted to

4  file a late proof of claim in this case.  I have not permit --

5          MR. CERRON:  So I will have --

6          THE COURT:  I have not permitted damage actions

7  against GMAC and to proceed in state court anywhere.  The

8  claims have to be brought here.  There is no timely proof of

9  claim.  I will have to consider whether to permit an untimely

10  proof of claim.  All right.

11          Mr. Newton's, what is the next --

12          MR. CERRON:  And I would like you to please take

13  into --

14          THE COURT:  Mr. Cerron, thank you very much.  I'm

15  moving onto the next matter on the calendar.

16          MR. NEWTON:  Your Honor, the next matter is --

17          MR. CERRON:  Thank you, Your Honor.  Appreciate it.

18          THE COURT:  Okay, Mr. Cerron.

19          MR. NEWTON:  The next matter is the adversary

20  proceeding matter that's on for today.

21          THE COURT:  All right.  While counsel -- this is the

22  UBS -- okay.  Let's take a ten-minute recess and we'll come

23  back in and hear argument.  This is on the motion to remand the

24  case to state court.

25          (Recess from 11:33 a.m. until 11:45 a.m.)

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          69

1              THE COURT:  All right.  Please be seated.

2              We're here in Residential Funding Company, LLC v. UBS

3    Real Estate Securities, Inc.  It's adversary proceeding number

4    14-01926.

5              Counsel, make your appearances.

6              MR. FUMERTON:  Good morning, Your Honor.  Robert

7    Fumerton, Alex Drylewski, and Brett Edkins from Skadden, Arps

8    for defendant UBS Real Estate Securities, Inc.  Mr. Drylewski

9    will be conducting the argument.

10             THE COURT:  Okay.

11             MR. NESSER:  Isaac Nesser of Quinn Emanuel.  I'm here

12   with James Tecce of my firm and John Sullivan.  We represent

13   the ResCap Liquidating Trust.

14             THE COURT:  Thank you very much.

15             All right.  For the moving party?

16             MR. DRYLEWSKI:  Good morning, Your Honor.  Alex

17   Drylewski on behalf of UBS.

18             We're here today on UBS's motion to remand this action

19   back to state court.  And as I informed Your Honor on Tuesday,

20   we've also filed a motion to withdraw the reference and that --

21             THE COURT:  It's before Judge Daniels?

22             MR. DRYLEWSKI:  Judge Daniels, correct, Your Honor.

23   We have a pre-trial conference scheduled in front of Judge

24   Daniels for July 10th.

25             THE COURT:  Okay.

1      MR. DRYLEWSKI:  This action, Your Honor, was commenced

2  in New York State Court in December of last year.  It asserts

3  exclusively state common law causes of action arising out of

4  pre-petition contracts entered into between UBS and RFC

5  relating to the sale of mortgage loans.

6      Now, despite choosing New York as its forum, plaintiff

7  them removed its own action three months later, asserting for

8  the very first time that this Court has exclusive jurisdiction.

9  Once the case was removed, it was referred to Your Honor under

10  the district's amended standing order of reference.

11      Now, UBS has moved to remand on three principal

12  grounds: (1) that the Court lacks subject matter jurisdiction,

13  (2) that mandatory abstention applies and (3) that equitable

14  abstention should apply.

15      With the Court's permission, I would like to address

16  at the onset, the mandatory abstention doctrine because we

17  believe that all six factors have been met here.

18      THE COURT:  No.  Actually what I'd like you to address

19  first is whether the Court has subject matter jurisdiction.

20      MR. DRYLEWSKI:  Sure, Your Honor.

21      THE COURT:  Because if I don't have subject matter

22  jurisdiction, end of discussion.

23      MR. DRYLEWSKI:  Absolutely, Your Honor.  And mandatory

24  abstention obviously applies even this Court were to find that

25  it had related-to jurisdiction.  We submit here there's no

1   related-to jurisdiction.

2           First and foremost, this case doesn't arise under

3   Title 11 or in a case under Title 11.  The cases that we cited,

4   pages 9 and 10 of our opening brief, make clear that a case

5   arises under Title 11 where the causes of action or the

6   substantive right to be enforced is created by the Bankruptcy

7   Code.  That's not the case here.

8           Cases also arise under a Title 11 proceeding where

9   they would have no independent existence outside of the

10  bankruptcy.  Again, that's not the case here.  What plaintiff

11  claims is that this is a core proceeding because it constitutes

12  a "mirror image counterclaim" of the proof of claim that UBS

13  submitted in 2012 in the ResCap bankruptcy.  Your Honor, we

14  think that there's several problems with that theory.

15          First of all, the proof of claim is not a mirror image

16  of this action at all.  That proof of claim arises out of

17  entirely different contracts, entirely different loans, and

18  entirely different third-party claims.

19          THE COURT:  Let me ask you this question.  And you

20  told me the other day that the contract by which UBS purchased

21  loans from RFC was -- the exact name was the master seller's --

22          MR. DRYLEWSKI:  Purchaser's warranties agreement.

23          THE COURT:  Right, warranties agreement.

24          MR. DRYLEWSKI:  Yeah, it's a tongue-twister.

25          THE COURT:  Okay.  And what was the contract by which

1    UBS purchased loans from RFC?

2             MR. DRYLEWSKI:  It was a distinct contract, Your

3    Honor.

4             THE COURT:  Well, was that also a UBS-prepared master

5    purchaser's agreement?

6             MR. DRYLEWSKI:  I can't speak to the specifics of that

7    contract.  I can tell you only when I say they're different

8    contracts, it wasn't one contract governing a reciprocal sale

9    of loans.

10            THE COURT:  I understand that.  It was a separate

11   contract, but was it a UBS contract by which UBS, as opposed to

12   an RFC form of contract by which UBS acquired loans from RFC?

13            MR. DRYLEWSKI:  Yeah, I can't tell you with one

14   hundred percent certainty that it was an RFC contract.  I can

15   say that typically in this space, the loan seller is the one

16   who drafts the contract governing the terms of the sale.

17            THE COURT:  Except in the case of RFC and it usually

18   has -- yes, that's true, but that wasn't true with respect to

19   loans you bought from RFC.  It wasn't the seller's form.  It

20   was a UBS form.

21            MR. DRYLEWSKI:  That's true, Your Honor.

22            THE COURT:  And so I don't know.

23            Mr. Nesser, are you able to tell me whether the

24   contract by which UBS bought loans from RFC was a RFC form or a

25   UBS form?

1          MR. NESSER:  Standing here right now, Your Honor, I'm

2    not able to answer that.  We can --

3          THE COURT:  So I'm going to want to know from the

4    part -- I want to see the contracts, okay?  I really -- so I

5    want to -- and there may be some other supplemental filings I

6    want, but I want to see -- because, look, one of the arguments

7    that the trust makes is that, whether or not an Article I judge

8    can enter a final order or judgment, what's involved here is a

9    counterclaim to the proof of claim.  And UBS filed a proof of

10   claim before RFC filed its lawsuit.  You agree with that?

11         MR. DRYLEWSKI:  Yes, Your Honor.

12         THE COURT:  Okay.  Mr. Nesser.

13         MR. NESSER:  Your Honor, my colleague has handed to me

14   a contract --

15         THE COURT:  Okay.

16         MR. NESSER:  -- pursuant to which UBS purchased loans

17   from RFC.  That contract was e-filed in the case 14-cv --

18         THE COURT:  Speak up a little louder.

19         MR. NESSER:  -- 14-cv-02170, Document 1.  It was filed

20   on March 27, 2014, at page 70 of that filing, and it's a UBS

21   contract.

22         THE COURT:  Okay.  So I want to see the two contracts,

23   the two contracts I'm talking -- and I understand -- if I'm

24   understanding you correctly, Mr. Drylewski, when -- well, let

25   me ask this.  Was it a master contract by which UBS purchased

 1   loans from RFC over time or were there separate contracts every

 2   time there was a purchase?

 3          Mr. Nesser, are you able to tell me that?

 4          MR. NESSER:  The contract on its face is named a

 5   master contract.

 6          THE COURT:  Okay.  So assuming that there was one

 7   master contract, are the terms of the contract -- and I want

 8   the parties to address this -- are the terms of the contract by

 9   which RFC purchased loans from UBS the same or different from

10   the terms by which it sold loans to UBS?

11          So on the issue of whether a court or courts in

12   resolving the competing claims -- I'll just use the term claims

13   for now -- are the courts going to have to interpret the same

14   contract language so -- there may be lots of things that are

15   different, but the lawsuit that the trust has filed against

16   RFC -- or initially it was RFC that filed it in state court,

17   there are two basic claims that are being asserted: breach of

18   the representations and warranties, and then indemnification.

19          And so what I want the parties to focus on and provide

20   me (a) with the contracts and memoranda -- we'll talk about

21   page limits after -- whether the reps and warranty provisions

22   in the two contracts or sets of contracts are the same or

23   different and whether the indemnification clauses are the same

24   or different, such that courts in adjudicating the rights of

25   the parties on claims and counterclaims has to do it on the

 1   basis of interpretation of the same contract language.  There

 2   may be lots of other provisions that are different, but that's

 3   not what this dispute is about.  This dispute primarily is

 4   about the reps and warranty claims and the indemnification

 5   claims.

 6          So in what I looked at, I obviously couldn't answer

 7   the question.  That's why I am asking it.

 8          MR. DRYLEWSKI:  Absolutely, Your Honor.  We're happy

 9   to do that, and I'd just like to give a couple of responses --

10          THE COURT:  Go ahead.

11          MR. DRYLEWSKI:  -- to what Your Honor just said.

12          First of all, our position is that irrespective of the

13   overlap in the terms of the two contracts, the sales constitute

14   completely separate transactions or occurrences.

15          THE COURT:  Oh, I understand your position.

16          MR. DRYLEWSKI:  Yes.

17          THE COURT:  Don't -- they're separate transactions,

18   and it may be that a court will determine that it -- and maybe

19   this court will determine or withdraw the reference a court

20   will determine or if it gets remanded to state court, I won't

21   have to determine, but whether -- look, the statute -- the

22   remaining statute defines counterclaims by the estate as

23   statutory core.  Stern and Arkison raise questions about how

24   that applies but nevertheless, it's defined as statutory core.

25   It may be that an Article I judge can't enter a final order or

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          76

1  a judgment with respect to RFC or the trust's claims against

2  UBS.  You file a proof of claim in my court, you've submitted

3  to bankruptcy court jurisdiction to a determination of the

4  proof of claim if what's involved is interpretation of the same

5  contract language, query whether different courts ought to be

6  doing that at different --

7           MR. DRYLEWSKI:  And Your Honor raises a point that I

8  was going to make next.

9           THE COURT:  Okay.

10          MR. DRYLEWSKI:  And it's an important point.  And

11 that's that the proof of claim and the counterclaim implicate

12 different legal issues as well.  I mentioned this on Tuesday

13 and I'll reiterate it.  UBS intends to move to dismiss this

14 claim on several threshold dispositive issues including statute

15 of limitations, failure to comply with the conditions precedent

16 under the contract, the notice condition precedents.

17          Now, RFC does not have those defenses available to the

18 proof of claim.  RFC hasn't asserted those defenses to the

19 proof of claim.  Their objection was solely on insufficient

20 documentation.

21          So, Your Honor, it's uncontested by plaintiff here

22 that adjudication of the proof of claim will not necessarily

23 resolve this action.

24          THE COURT:  I don't think it's conceded but --

25          MR. DRYLEWSKI:  It's not contested, Your Honor.

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          77

1       THE COURT:  Well, have they filed an objection to your

2    proof of claim yet?

3       MR. DRYLEWSKI:  They did file an objection, and it's

4    based solely on insufficient documentation.

5       THE COURT:  And did they waive any other objections to

6    your claim?

7       MR. DRYLEWSKI:  It's not clear, Your Honor.  I can

8    represent --

9       THE COURT:  That might --

10      MR. DRYLEWSKI:  -- UBS has given notice in connection

11   with that proof of claim.  So --

12      THE COURT:  Has given notice of what?

13      MR. DRYLEWSKI:  Notice of the indemnification claim,

14   so that they don't have that sort of defense available to them.

15   They also don't have the statute of limitations defense

16   available to them.  And as Your Honor mentioned already and as

17   the Court well knows, under the new Arkison decision, which

18   just came out a couple of weeks ago, it came out actually the

19   day before our reply brief was due, where you have a situation

20   such as a so-called Stern claim where adjudication of the proof

21   of claim won't necessarily resolve the purported counterclaim,

22   the Court must treat those claims as noncore in nature,

23   notwithstanding the fact that it may technically be labeled

24   core under 157(b)(2)(C).

25      THE COURT:  Well, I have to treat it as -- assuming

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          78

1   that Arkison applies in the particular circumstances, a

2   determination I'm not making now, I would treat an otherwise

3   statutory core claim as noncore for purposes of whether the

4   Court can enter final order of judgment or has to do purposed

5   findings of fact and conclusions of law.  That isn't to say

6   that it means that it's no longer treated as core, for example,

7   for purposes of mandatory versus permissive abstention,

8   different issue, not decided in Arkison.

9        MR. DRYLEWSKI:  Your Honor, if you look at pages 9 and

10  10 of the slip opinion in Arkison, what the Court does there is

11  it says, all right, you have a so-called Stern claim, we're

12  going to treat that as noncore.

13       THE COURT:  Treat it as noncore; doesn't say treat it

14  as noncore for purposes of mandatory or permissive abstention.

15       MR. DRYLEWSKI:  Well, that's true, Your Honor, but

16  then it drops a hint as to what it meant there.  It says that

17  "At the next analysis, you must go onto Section 157(c) to see

18  whether the Court has related-to jurisdiction to determine

19  whether the Court can even issue findings of fact and

20  conclusions of law subject to de novo review."

21       So I think when you read Arkison as a whole, it's

22  clear that what the Court is saying there it's determining

23  whether the Court has a core jurisdiction for all purposes

24  based on the resolvability that the Stern -- so-called Stern

25  analysis.

1          THE COURT:  So let's -- I want you to focus on subject

2     matter jurisdiction of the trust or RFC's complaint against

3     UBS.

4          MR. DRYLEWSKI:  Yes, Your Honor.  So as I said, we

5     submit that Arkison forecloses the argument about the proof of

6     claim.

7          THE COURT:  Could you move onto what I've asked you to

8     address?

9          MR. DRYLEWSKI:  Yes.  So their next basis for core

10    jurisdiction is that this action represents claims against

11    third parties, the recoveries of which will inure to the

12    benefit of former creditors of RFC.  Your Honor, that theory of

13    core jurisdiction has been roundly rejected by the Second

14    Circuit and by numerous judges in this district.  We cite for

15    that the In re Orion case, that's 4 F.3d at page 1102.  We cite

16    Judge Koeltl's decision in Little Rest Twelve.  We cite Judge

17    Bernstein's decision in the In re General Media case.  All of

18    these decisions stand for the proposition that simply because a

19    state contract action may potentially augment the estate or the

20    coffers of a trust for the benefit of general distributions to

21    creditors, that fact alone is insufficient to render a

22    proceeding core.

23         THE COURT:  Okay.  Does the trust's claim against UBS

24    for indemnification -- let's put aside the separate rep and

25    warranty claim, but does the trust's claim against UBS for

 1  indemnification require a court to interpret and apply a

 2  confirmed Chapter 11 plan in this case?

 3          MR. DRYLEWSKI:  We don't believe so, Your Honor.

 4          THE COURT:  Okay.  So can you walk me through the

 5  provisions -- so what was briefly said at the case management

 6  conference a few days ago, and the trust argues it in their

 7  briefs here, that an issue for a court on indemnification --

 8  let's assume just for purposes of discussion that UBS breached

 9  reps and warranties with respect to ten million dollars of

10  loans that were purchased -- let me reverse that.

11          Let's assume that you purchased loans from -- UBS

12  purchased loans from RFC and RFC breached reps and warranties

13  on ten million dollars of loans, RFC settled the RMBS claims as

14  part of the confirmed plan and I approved that settlement as

15  fair, reasonable and in the best interest.  Confirmation

16  judgment is final, wasn't appealed.  The plan has provisions

17  dealing with how recoveries from the plan are allocated.  Duff

18  & Phelps developed a model that ultimately was approved.  On

19  page 66 of 265 of ECF docket number 6065-1, it's Appendix 1 to

20  the plan, there's a provision romanette (ii)(1) about

21  recognized original R+W claims.  On page 62, subsection (d) --

22  that's page 68 of 265 -- allocation of units in the RFC pool to

23  RMBS trusts with recognized claims against RFC.

24          So the basis, as I understand it, of the RFC

25  indemnification claim is we got claims asserted against us for

1  breach of representations and warranties.  We settled with the

2  trust as part of the plan confirmed.  And a portion of the

3  settlement amount is attributable to defective loans we

4  purchased from UBS.  And therefore, we're entitled to

5  indemnification from UBS.

6          To determine how much, if any, the trust is entitled

7  to recover from UBS on its indemnification claim, doesn't that

8  require interpretation and application of the confirmed plan

9  and a fairly complex set of provisions that deal with -- just

10  dealing with -- it's broken down GMAC, M-claims, RFC claims.

11  In Appendix 1, at page 190 of 265 in the same 6065-1 unit,

12  there's a chart that shows, with various securitization trusts,

13  what the loss due to breach was, how much the recognized claim

14  is, et cetera.

15          So one of the things that is troubling me and it's not

16  really well identified in the briefing I have -- I mean, they

17  argue -- the other side argues, yes, you have to apply the

18  plan, but it does seem to me that there is a very complex

19  issue, assuming that there were defective mortgages that UBS

20  sold to RFC that went into securitization trusts for which RFC

21  settled, approved as part of the global plan -- as part of the

22  plan, how it would be determined what the amount of

23  indemnification they're entitled to.  Can you address that?

24          MR. DRYLEWSKI:  Yes, Your Honor, and I think I'm

25  perceiving two separate questions in Your Honor's comments, and

1   I'd like to keep them separate.

2           THE COURT:  Okay.

3           MR. DRYLEWSKI:  The first is whether that

4   interpretation of the plan renders this action core, and the

5   second is whether that interpretation of the plan and the terms

6   gives this Court related-to jurisdiction.

7           Now, as to the first, we think that the answer is no

8   under well-established law.  Orion is clear that in any state

9   action that is looking to increase recoveries for creditors,

10  former creditors, that alone is not enough to render an action

11  core.

12          THE COURT:  This is the other side of the coin.  This

13  is how much they're entitled to -- it isn't just increasing

14  recoveries -- well, go ahead.  Go on with your argument.

15          MR. DRYLEWSKI:  Sure, Your Honor.  And what plaintiff

16  will be entitled to recover in this action, it really will rise

17  and fall on this action.  It will rise and fall on whether or

18  not UBS' specific loans breached reps and warranties in the

19  specific contracts that UBS entered into with RFC.  Now, those

20  are purely state common law causes of action that do not rely

21  on the Bankruptcy Code or an interpretation of the bankruptcy

22  plan.

23          THE COURT:  So whether the issues that have to be

24  resolved are state or federal doesn't resolve whether the

25  claims are core or not.  I mean, the code says that

1   specifically, and the case law clearly supports that, too.

2        MR. DRYLEWSKI:  That's absolutely true, Your Honor,

3   but there has to be a hook either under -- a statutory hook

4   under 157 or it has to either arise under Title 11 or in a case

5   under Title 11.

6        THE COURT:  And now I'm raising the question with you

7   whether the statutory hook is, in order to resolve these

8   claims, it requires an interpretation and application of the

9   plan with respect to determining the amounts of indemnification

10  that RFC, here the trust, would be entitled to recover.

11       Look, I talked the other day about Judge Rakoff's Flag

12  Star decision.  It's complicated, but nevertheless the amount

13  recoverable wasn't capped by the claims against Flag Starr.  It

14  was -- he determined ultimately how much was recoverable

15  because of breaches of reps and warranties in connection with

16  the loans that were sold.

17       MR. DRYLEWSKI:  Sure.  And this Court did determine

18  the reasonableness of the settlement of rep and warranty claims

19  against the estate when it approved that 8.7 billion dollar cap

20  on allowed claims.  But again, we think that, assuming this

21  case moves past the motion to dismiss stage, this is really

22  going to turn on the indemnification right in the contract.

23  UBS is entitled or obligated to indemnify RFC for breaches of

24  reps and warranties, for losses and liabilities arising out of

25  breaches of reps and warranties, and that's going to rise and

1   fall, in this action, separate and apart from what happened in

2   the bankruptcy proceeding.

3           THE COURT:  But to determine the amount that RFC could

4   recover from losses, you'd have to figure out how much it had

5   to pay as a result of those breaches of reps and warranties.

6   That requires you -- seemingly requires you to go to the plan.

7           So one of the things I want both sides to do in the

8   supplemental -- same supplemental filing is address

9   specifically for the Court whether determining the amount of

10  any recovery by the trust from UBS for breaches of reps and

11  warranties -- for indemnification as a result of breaches of

12  reps and warranties, requires a court to interpret and apply

13  the confirmed Chapter 11 plan, okay?  It's just -- your brief's

14  good.  Their brief's good.

15          MR. DRYLEWSKI:  Yes.

16          THE COURT:  The law in this area seems to me to be

17  quite complicated.

18          MR. DRYLEWSKI:  We're happy to address that, Your

19  Honor.  I would just note that if that were the case, then

20  every post-confirmation indemnification claim brought by a

21  trustee would be swept within the core jurisdiction of the

22  bankruptcy court.

23          THE COURT:  Not if all of them had been -- perhaps

24  if -- if all of them had been settled and the amount of the

25  settlement or the methodology of payments under that settlement

1    by the estate was required to be interpreted and applied, this

2    may well fit within post-appropriate, post-confirmation

3    jurisdiction.

4            Look, there's no question here -- you can quibble all

5    you want about it and I know you argue on the one hand that the

6    plan here said filed in any court with competent jurisdiction

7    and they say there's a provision that says the bankruptcy court

8    retains exclusive jurisdiction.

9            MR. DRYLEWSKI:  Right.

10           THE COURT:  In my view, there's no question that the

11   plan has a provision that would retain jurisdiction of the

12   bankruptcy court if the jurisdiction existed.  The law is clear

13   that plan language can't create jurisdiction.  It can retain

14   jurisdiction.  It can't create it.  So you go to that step of

15   is there jurisdiction, okay?

16           And it does seem to me that, in part, this hinges on

17   whether I have to interpret -- or whether any court has to

18   interpret and apply the language of the confirmed plan.  The

19   notion of having twelve judges having to do the same thing, ten

20   judges in Minnesota, me here, and perhaps a state court judge

21   in Manhattan, whatever happened to the notion of efficiency and

22   consistency of results?  That's why I'm asking these questions.

23           It may be that you will persuade me that the

24   resolution of the indemnity claim, assuming -- and for purposes

25   of the discussion, you assume there is a breach of reps and

1    warranties, okay?  Then what follows with respect to the

2    indemnification claim.

3             MR. DRYLEWSKI:  Sure, Your Honor.

4             THE COURT:  Okay.

5             MR. DRYLEWSKI:  And there is a nuance I want to just

6    introduce --

7             THE COURT:  Go ahead.

8             MR. DRYLEWSKI:  -- in that analysis and it's whether

9    or not -- assuming just for the sake of argument that the Court

10   is obligated to interpret the terms of the plan in order to

11   resolve the indemnification claim, does that give rise to core

12   bankruptcy jurisdiction or related-to jurisdiction?  We would

13   submit that at most, it would be related-to jurisdiction.  And

14   the reason why that distinction is important here is because we

15   believe mandatory abstention applies and that applies even if

16   there's related-to jurisdiction.

17            So if you would like, Your Honor --

18            THE COURT:  Well, mandatory jurisdiction -- a

19   mandatory abstention is not absolute.  Do you agree with that?

20            MR. DRYLEWSKI:  Well, if all six factors are met then,

21   Your Honor, the law is clear that mandatory abstention is

22   mandatory.

23            THE COURT:  Okay.  But some of those factors require a

24   balancing, require an analysis of whether the state court can

25   timely adjudicate the claims.  So it's not -- they're not

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          87

1  bright line -- each of the six factors is not a bright line

2  factor.  Would you agree with me on that?

3          MR. DRYLEWSKI:  I would.  And the one that we're

4  specifically here to discuss is that timely adjudication prong,

5  and with the Court's permission, I'd be happy to address that

6  now.

7          THE COURT:  Go ahead.

8          MR. DRYLEWSKI:  So what plaintiff argues here is that

9  UBS has not demonstrated that this action could be timely

10  adjudicated by the commercial division.  We'll put aside for

11  the moment the irony that the forum they chose to litigate in

12  originally is incapable of doing so now.  They're also wrong on

13  the law here.  The burden is on the plaintiff to show --

14          THE COURT:  Well, I think the law is unclear upon

15  which party the burden rests.  The Second Circuit in Parmalat

16  has a footnote that addresses this issue of burden but doesn't

17  decide it.

18          MR. DRYLEWSKI:  That's true, Your Honor.

19          THE COURT:  There's a split in authority among courts

20  as to who has the burden.  I understand that.  I'm not saying

21  which is the right answer, but there's a -- so you can't say

22  with complete authority that the law is clear, Your Honor, that

23  the party that brought the action has the burden of

24  establishing --

25          MR. DRYLEWSKI:  Your Honor, and we cite to that

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          88

 1   Parmalat decision where the Second Circuit said -- and it

 2   wasn't a holding, you're correct, but they said in suggestive

 3   language that principals of comity --

 4          THE COURT:  Look, I'm familiar with the issue.  And

 5   even if the burden is on the trust, then I'll have to evaluate

 6   whether they've carried the burden.  And they've attempted to

 7   do that.  I mean, they argue that you have the burden, but

 8   they've attempted to carry -- whoever has the burden, that

 9   might be the dispositive issue here.

10          MR. DRYLEWSKI:  Sure, Your Honor.  And we do cite

11   numerous post-Parmalat decisions placing the burden on the

12   plaintiff in the timely adjudication factor.  Those are the In

13   re Tronox case by Judge Gropper, the Judge Sands decision in

14   Allstate v. Ace.  So the Courts have taken the Second Circuit's

15   heeding.

16          THE COURT:  I understand your argument.  I know where

17   the cases have gone on the issue.  It's still not a bright line

18   that it definitively -- there still has to be an analysis of

19   facts.

20          MR. DRYLEWSKI:  So let's move onto that analysis then.

21   What UBS demonstrated on the record in this case is, one, we

22   cite to Your Honor the administrative order by the commercial

23   division.

24          THE COURT:  So would you agree with me that none of

25   those cases involve claims and counterclaims between the

1  parties?

2         MR. DRYLEWSKI:  I'm sorry, Your Honor, the cases

3  discussing the timely adjudication?

4         THE COURT:  The cases on mandatory abstention.  None

5  of those cases arise in circumstances where there are claims

6  and counterclaims between the parties.

7         MR. DRYLEWSKI:  I'm not aware one way or the other.  I

8  know that we cite a number of decisions that hold that even

9  where there's a counterclaim, a purported counterclaim, the

10  Court found that there was not core bankruptcy jurisdiction.

11  We cite, you know, Judge Stanton's decision in In re Durso.

12  That's 170 B.R. at page 213 to 214.  There Judge Stanton

13  rejected the same argument plaintiff makes here on the ground

14  again that the proof of claim and the counterclaim are

15  unrelated.  So there are those cases out there.

16         THE COURT:  That's one of the reasons I want to see

17  whether there's the same contract language that has to be

18  interpreted and applied for both the claims and counterclaims.

19         MR. DRYLEWSKI:  Sure.  And then you get to the issue

20  of the different legal issues and that resolution of one won't

21  necessarily resolve the other.

22         THE COURT:  Right.

23         MR. DRYLEWSKI:  But if we could go back to the timely

24  adjudication prong for a moment, what we cited to Your Honor at

25  Fumerton declaration, Exhibit K, is an administrative order by

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS                    90

1  the commercial division.

2          THE COURT:  Yes, I understand.  You pointed out to me

3  that Justice Marcy Friedman has all of the RMBS cases.

4          MR. DRYLEWSKI:  So what we have -- the record shows we

5  have essentially an expert court in the commercial division

6  handling these types of claims and defenses.

7          THE COURT:  Can you tell me how many cases she has in

8  front of her, RMBS cases?

9          MR. DRYLEWSKI:  I don't have the exact number.  We

10  cite to a number of them, I think at least six in footnote 14.

11          THE COURT:  Can you get the -- does somebody have --

12  Mr. Nesser, do you have the statistics on how many cases she

13  has before her?

14          MR. NESSER:  Your Honor, we actually prepared a

15  hand-up on that issue about the accepted --

16          THE COURT:  Okay.  I'll wait until you -- you can hand

17  it up when you make your argument.  Okay.

18          MR. DRYLEWSKI:  And I'd reserve the right to address

19  that because I haven't seen it.

20          THE COURT:  Look, there's going to be -- I'm asking

21  for more briefs, so you'll have another chance.

22          MR. DRYLEWSKI:  Sure.

23          THE COURT:  Okay.

24          MR. DRYLEWSKI:  We cite to a number of cases.  That's

25  footnote 14 of our opening brief.  There's also a case I

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          91

1  mentioned on Tuesday in front of Judge Friedman right now

2  involving this same UBS affiliate as a defendant, and in that

3  case, the plaintiff trust has brought claims for breach in rep

4  and warranty.  UBS has asserted, in its pre-motion answer to

5  dismiss, defenses of statute of limitations and failure to

6  comply with conditions precedent.  That index number, just for

7  the Court's record, is 651282-2012.  That's currently pending

8  before Justice Friedman.

9          THE COURT:  What's the status of it?

10         MR. DRYLEWSKI:  It's -- the motion to dismiss is fully

11 briefed.  It hasn't been argued yet before Justice Friedman,

12 but it's pending.

13         THE COURT:  Has she set an argument date?

14         MR. DRYLEWSKI:  Not yet.  Justice Friedman has heard

15 argument though in other similar RMBS cases, including the ones

16 that we cite in our brief, and there's a decision on these

17 motions to dismiss pending right now.

18         And as we argue in the briefs and as Your Honor knows

19 already, those cases also involve similar defenses of statute

20 of limitations, failure to comply with condition precedent.

21         So the same types of legal issues are being handled by

22 a single judge.  And we cited to Your Honor an article; it was

23 declaration -- Fumerton declaration, Exhibit B, which explained

24 the motivation behind the administrative order, and it was

25 borne out of divergent rulings by judges on this very statute

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS                    92

1   of limitations issue.  And so the administrative order was

2   meant to promote the uniformity of application of law in this

3   area.

4         Now, plaintiff makes the claim that New York law is

5   going to apply whether we're in New York court or in federal

6   court.  But, Your Honor, I know that you're well aware of the

7   legal landscape here relating to these types of claims.  Ace,

8   the decision by the First Department which held that the

9   statute of limitations for these types of claims runs from the

10  date of the contract, has not been uniformly followed by

11  federal judges.  We cite on page 9 of our reply brief, a

12  decision by Judge Hellerstein recently in the WMC case where he

13  refused to follow Ace on the statute of limitations issue and

14  he held that the law is "in flux."

15        Now, as Parmalat, as Your Honor knows in the Second

16  Circuit, held where the state law claims at issue involve

17  unsettled issues of state law, mandatory abstention is

18  particularly appropriate.

19        And just to address Your Honor's concern about the

20  familiarity with the settlement here, in Parmalat --

21        THE COURT:  It's not just familiarity.  It's not just

22  a question of familiarity with the settlement.  I approved it,

23  but it's extremely complex.  And so if we assume a

24  securitization trust that have mortgages that were originated

25  by several different originators, how an allocation would be

1  made, if it should be made, the question I'm raising really is

2  does that require an interpretation and application of the

3  confirmed plan and the annexes to it, and is it important that

4  there be consistency in applying it.  And as with any order

5  that a court enters, the law generally is the Court that

6  entered the order is in the best position to interpret and

7  apply its own order.

8          MR. DRYLEWSKI:  And we understand that concern of Your

9  Honor.  We're happy to brief that further.

10          I will point out the Parmalat case which plaintiffs

11  rely on in their briefs.  Parmalat was up and down a number of

12  times.  There was just a decision out of the Seventh Circuit

13  yesterday finally putting to rest this timely adjudication

14  issue.  But in one of the Second Circuit's decisions, it held

15  that mandatory abstention applied, and it ordered remand to the

16  Illinois state courts based on the novelty and the difficulty

17  of the state law issues and out of deference for state courts,

18  notwithstanding the fact that the district court and Judge

19  Kaplan there had already presided over the actions for a

20  significant period of time and, in fact, it even entered a

21  summary judgment order in favor of the defendants.  The court

22  held, of course, it would be more timely adjudicated in the

23  federal court, but because we're dealing here in mandatory

24  abstention with the timely adjudication factor of the state

25  courts, it ordered remand.  We think that issue applies -- that

1  holding applies a fortiori here.

2          We'd also just like to point out that irrespective of

3  what burden -- who has the burden here, plaintiffs have not

4  demonstrated that the commercial division can't timely

5  adjudicate that matter.  We point to numerous decisions, Your

6  Honor, holding that the commercial division in Manhattan is

7  presumptively an effective forum.  You yourself, Your Honor,

8  recognized that in the In re ResCap case at 488 B.R. at page --

9          THE COURT:  There's two.  Sealink and Deutsch

10 Landesbank.

11         MR. DRYLEWSKI:  Yes.

12         THE COURT:  Obviously very familiar with it.

13         MR. DRYLEWSKI:  Yes.  At page 576, as Your Honor

14 knows, you held that the RMBS claim at issue, a state common

15 law fraud claim, should and can be adjudicated in the

16 commercial division.

17         THE COURT:  And both of those cases involved claims

18 entirely between nondebtors.  Go ahead.

19         MR. DRYLEWSKI:  Both parties in that case, as Your

20 Honor knows, also submitted proofs of claim in the bankruptcy.

21 And Your Honor equitably abstained and ordered remand.  You

22 didn't reach the mandatory abstention issue, and that's because

23 there was a dispute between the parties as to whether there was

24 diversity jurisdiction.  But here, plaintiff doesn't contest

25 that Section 1334 is the sole basis for jurisdiction.  So if

1    we're just looking at the timely adjudication factor, it weighs

2    in favor of mandatory abstention.

3        Your Honor, I'd also like to briefly address, even if

4    mandatory abstention doesn't apply, we think that equitable

5    abstention is appropriate here.  Courts --

6        THE COURT:  You're referring to permissive abstention

7    on --

8        MR. DRYLEWSKI:  Yes.  It's referred to a number of

9    different ways.  It's Section 1334(c)(1).  The factors that

10   courts take into account there are the extent to which state

11   law issues predominate, the novelty or difficulty of those

12   state law claims, comity -- principles of comity to the state

13   court, the prejudice to involuntarily dismiss defendants, and

14   the relation or relatedness to the bankruptcy administration.

15       Here, Your Honor, federal courts --

16       THE COURT:  The issue on the relatedness to the

17   bankruptcy administration is one of the reasons I asked the

18   question whether the plan must be interpreted and applied in

19   resolving the claims that the trust is asserting.

20       MR. DRYLEWSKI:  Understood, Your Honor.  And if we

21   just assume for the moment though, for the sake of argument,

22   that these claims are noncore, that this court has related-to

23   jurisdiction but not core jurisdiction.

24       THE COURT:  So will you assume that the court that

25   resolves it has to interpret and apply the confirmed Chapter 11

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          96

1  plan?

2          MR. DRYLEWSKI:  I'm not ready to assume that, Your

3  Honor.

4          THE COURT:  So what happens if you do assume it?  What

5  happens then to your analysis.

6          MR. DRYLEWSKI:  Well --

7          THE COURT:  It seems to fall apart.

8          MR. DRYLEWSKI:  It depends on what you mean by

9  "interpret and apply" the plan.  If the idea is we need to

10  figure out --

11          THE COURT:  So go to this plan.  Do you have it with

12  you?

13          MR. DRYLEWSKI:  I don't have it in front of me, Your

14  Honor.

15          THE COURT:  Have you made the analysis, under this

16  plan, how an indemnification claim would work, how the amount

17  that would be recoverable by the trust for indemnification

18  would be determined under the plan?

19          MR. DRYLEWSKI:  No, I haven't, Your Honor.  And we

20  assume that that kind of analysis is something that plaintiffs

21  would obviously try to provide --

22          THE COURT:  Well, that's what I'm asking both sides to

23  do in a supplemental brief.  The degree of relatedness to the

24  bankruptcy case and its administration may or may not -- I'm

25  not saying it does, but in reviewing your motion in the

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          97

1  opposition, it's an issue that I've tried to sort through.  I

2  want to give the parties a chance to address it.  Whether you

3  agree or not, it seems to me that I have to make this analysis

4  in order to reach a decision on the pending motion.

5        MR. DRYLEWSKI:  Yes, Your Honor.  And just to

6  reiterate our point for the sake of clarity here, at most,

7  assuming that we're required to interpret or analyze the plan

8  in connection with the indemnification claims here, that would

9  at most give rise to related-to jurisdiction, not to core

10  jurisdiction, because core proceedings either statutorily arise

11  under Section 157, as Your Honor knows, or they arise under or

12  in a Title 11 proceeding.  None of those are met here.

13        Unless Your Honor has further questions, I'd like to

14  reserve time for rebuttal.

15        THE COURT:  Let me just see if I have any other

16  questions, okay?  I think I asked my questions.  I'll give you

17  a chance to reply, okay?

18        MR. DRYLEWSKI:  Thank you, Your Honor.

19        THE COURT:  Thank you very much.

20        MR. NESSER:  Good afternoon, Your Honor.  The trust

21  is --

22        THE COURT:  You need to make your appearance, every

23  one of you.

24        MR. NESSER:  Isaac Nesser at Quinn Emanuel, counsel

25  for the ResCap Liquidating Trust which, by this action, is

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          98

1   seeking to liquidate assets of the bankruptcy estate for the

2   benefit of bankruptcy creditors by recovering for bankruptcy

3   settlement that this bankruptcy court reviewed and approved,

4   pursuant to a bankruptcy plan that preserved the specific

5   claims at issue here, that named UBS as a target of those

6   claims.

7          THE COURT:  Okay.  Look --

8          MR. NESSER:  And that will require interpretation of

9   the plan.

10         THE COURT:  Well, that's the -- the plan reserves

11  jurisdiction.  Jurisdiction has to exist.  You've heard my

12  questions --

13         MR. NESSER:  Yeah.

14         THE COURT:  -- regarding whether this plan has to be

15  interpreted and applied in order to adjudicate the claims

16  against UBS.  Could you address that?

17         MR. NESSER:  Absolutely, Your Honor.  As I think

18  you've indicated, it is the case that resolution of this

19  adversary proceeding would require interpretation of the plan.

20         THE COURT:  I know.  I've raised questions.

21         MR. NESSER:  That's our --

22         THE COURT:  Don't take my questions as the answer.

23  Don't assume that.

24         MR. NESSER:  I apologize, Your Honor.

25         THE COURT:  I've raised questions because I have

1    questions.  It may be that it doesn't, okay.  So let me

2    just -- and I'll stop you there, because it -- when I work

3    through the analysis, faulty or otherwise, it didn't seem to me

4    that Count I of your complaints, I know we're only dealing with

5    one today, but the breach of the representations and warranties

6    is not going to require an interpretation of the plan.  It's

7    Count II, the indemnification claim that does.  So does Count I

8    of -- and I didn't open this complaint, in fact, this morning,

9    but in most of your complaints, it's Count I and Count II.

10    Count I is breach of reps and warranties; Count II is the

11    indemnification.

12         MR. NESSER:  Your Honor, that is how the complaint is

13    set up.  And I think our position is that the indemnification

14    claim clearly would require interpretation of the plan.

15         THE COURT:  What about Count I though?

16         MR. NESSER:  The breach of contract claim would also

17    require interpretation of the plan.

18         THE COURT:  Why?

19         MR. NESSER:  Because the damages that we are seeking

20    through that claim, in part, include the liabilities and losses

21    that we incurred pursuant to the settlement agreement that was

22    part of the plan.  And so call of these questions concerning

23    what was settled, how it was settled, for what price it was

24    settled, how that settlement should be allocated among the

25    various correspondent lenders that we've sued, all of that

1   directly is going to require interpretation of the plan and the

2   settlement that underlies the plan.

3           THE COURT:  Have you gone through the plan and can you

4   track for me now how, in your view, the answer is going to be

5   derived as to -- so if you assume that UBS sold defective loans

6   to RFC, how damages on a breach of representation warranty

7   claim or loss or damage on an indemnification claim is to be

8   determined?

9           MR. NESSER:  Your Honor, I'm not prepared to do

10  that --

11          THE COURT:  All right.  That's fine.

12          MR. NESSER:  -- now.  And we're happy to present that

13  in a separate brief.

14          THE COURT:  Fine.

15          MR. NESSER:  If I can just, by way of updates, before

16  getting to the substance --

17          THE COURT:  Sure.

18          MR. NESSER:  -- of their argument, just a few things.

19  First, we heard counsel this morning discussing the ACE case in

20  the New York State court system.  Literally two hours ago, the

21  New York Court of Appeals granted leave to appeal in that case.

22  So issues concerning coordination and making sure that we have

23  the same results in federal and state courts following

24  resolution of that appeal in the court of appeals won't be an

25  issue any longer.

1          THE COURT:  Well, it may still be an issue, but

2     anyway.

3          MR. NESSER:  Well, to the extent that the --

4          THE COURT:  Fine.  The Court of Appeals will speak to

5     it.

6          MR. NESSER:  To the extent it is an issue of New York

7     State contract law, under Erie, presumably this case will be

8     bound by that, and that really would be the issue, of course, I

9     suppose, depending on how the New York Court of Appeals

10    resolves it.

11         Second thing we wanted to note is, in response to Your

12    Honor's questions, we were able at least to take a preliminary

13    look at the contract that underlies UBS's proofs of claim.  And

14    Section 3.02 of that contract presents the same types of reps

15    and warranties as to the loans that were being sold that are

16    substantively the same reps and warranties that we are

17    proceeding on here with respect to, for example, issues such as

18    borrower fraud.  And that's not surprising.  Nobody buys a loan

19    without having some representation and warranty that the

20    borrower hasn't committed fraud in the course of disclosing his

21    income, in the course of disclosing whether the appraisal is

22    accurate or not, and in the course of disclosing whether he

23    intends to occupy the property.

24         And so it's not surprising and it, in fact, is the

25    case that the existence of representations and warranties is in

1    both cases; the extent to which those reps and warranties were

2    breached is going to be a common issue in the proof of claim.

3    And in our case, the methodologies by which this court is going

4    to have to determine whether the breaches -- the alleged

5    breaches and the proof of claim are the same methodologies that

6    are going to be discussed in our claim.  It's issues such as

7    sampling presumably are going to be presented by their case,

8    right?  Are they going to argue for sampling of the loans that

9    we sold them that they allege are defective?  Are we going to

10   argue that sampling is an appropriate method of proof as to the

11   loans that we bought from them.  And so it's going to be the

12   same issues, issues such as -- legal issues as well, such as

13   how do you prove causation in these cases.  How do you allocate

14   damages in these cases?

15          THE COURT:  Anyway, I just -- offhand, do you know how

16   many loans RFC bought from UBS, how many loans RFC sold to UBS?

17          MR. NESSER:  I know that -- I believe that RFC

18   purchased -- the complaint alleges that RFC purchased at least

19   1,900 loans from UBS.  I think the actual number is somewhat

20   higher than that.

21          THE COURT:  Okay.

22          MR. NESSER:  And we're prepared to provide more detail

23   pursuant to discussion yesterday.  But certainly, there are

24   thousands of loans at issue in our case.  It's not clear to me

25   how many loans are at issue in their proof of claim.

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          103

1          THE COURT:  Okay.

2          Is UBS's counsel able to tell me how many loans you

3   sold RFC?

4          MR. DRYLEWSKI:  Yes, Your Honor.  According to Exhibit

5   F of the Fumerton declaration or opening brief, the proof of

6   claim submitted by UBS against RFC seeks indemnification for

7   about forty-five million dollars and change in loans.

8          THE COURT:  Does it say how many loans were -- okay.

9          MR. DRYLEWSKI:  I don't see a number of loans.

10          THE COURT:  Because where I'm going with this is the

11   issue of setoff and recoupment --

12          MR. NESSER:  Yeah, Your Honor --

13          THE COURT:  -- whether that is going to be -- whether

14   arguments about setoff and recoupment support one court

15   adjudicating the claims and counterclaims.

16          I pride myself on timely adjudicating anything that

17   comes before me.  Is it going to be a situation where UBS could

18   obtain a ruling from me in six months on its claims against the

19   estate, but it's going to take five years to get an

20   adjudication of the estate's -- the trust's claim against UBS?

21   And what happens in between, even though they arise from

22   different contracts which may have exactly the same terms that

23   are at issue.  Shouldn't claims and counterclaims be resolved

24   at once so that setoff or recoupment can be determined?

25          MR. NESSER:  Yes, Your Honor.  And that's why

1   Congress, in enacting 157(b)(2), includes counterclaims as one

2   of the statutorily defined core proceedings, because the

3   purpose of proceeding and the benefit of proceeding on a

4   counterclaim basis, is precisely because of issues such as

5   setoff and recoupment, precisely because there are issues of

6   efficiencies as between the two actions.  And it's not just

7   setoff and recoupment, Your Honor, but also, as I indicated and

8   as we discussed on Tuesday in the initial pre-trial

9   conferences, there are going to be common legal questions

10  across our case and the proof of claim.  There are going to be

11  common legal issues on damages, on the legal elements of

12  indemnity, perhaps on defenses to indemnity, as to allocation,

13  as to all of these things.  And it's going to be the same

14  questions.  And there's simply no reason to have two courts,

15  one in federal court and one in state court, adjudicating those

16  issues duplicatively.  Number 2, it would defeat the purpose of

17  having the cases in one -- it would also --

18          THE COURT:  Can I ask --

19          MR. NESSER:  -- lead to inconsistent adjudications

20  and -- yeah.

21          THE COURT:  May I ask you this?  Whether any of the

22  judges in Minnesota who denied a motion to transfer addressed

23  the issue of whether resolution of the indemnity claims, for

24  example, requires an interpretation of the confirmed Chapter 11

25  plan.

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          105

1          MR. NESSER:  They did not discuss that precise issue.

2          THE COURT:  Was it raised with them?

3          MR. NESSER:  No.

4          THE COURT:  I don't know.  Your firm --

5          MR. NESSER:  Yes.

6          THE COURT:  Did you file the cases originally?

7          MR. NESSER:  We did not file the cases originally.  We

8    did file the transfer motions.

9          THE COURT:  Okay.

10         MR. NESSER:  And what we argued in the transfer

11   motions was that this Court's familiarity with and

12   understanding of the terms of the settlement and the bankruptcy

13   plan, as well as this Court's retention of jurisdiction, were

14   factors, among others, that suggested the cases should be tried

15   here.

16         THE COURT:  All right.

17         MR. NESSER:  But the precise issue of interpretation

18   of the plan was not presented.

19         THE COURT:  Okay.

20         MR. NESSER:  Your Honor, also by way of update, asked

21   counsel about where things stand in the New York State Court.

22   And what we did -- because this was first raised, frankly, in

23   counsel's reply brief, we took, over the last couple --

24         THE COURT:  You may well have the burden.  I mean, the

25   footnote --

1             MR. NESSER:  We don't believe --

2             THE COURT:  -- in Parmalat suggests you have the

3    burden.

4             MR. NESSER:  We don't believe we have the burden, but

5    we, of course, understand that that's an open issue in the

6    Second Circuit.  And so we took a look, over the last couple of

7    days preliminarily at some statistics on the RMBS cases that

8    are pending in Part 60.  And again, it's preliminary.  I

9    can -- we can include this in our brief or I can --

10            THE COURT:  Why don't you give -- do you have a chart?

11   Give it to --

12            MR. NESSER:  Sure.

13            THE COURT:  -- your opposing counsel.

14            MR. NESSER:  And Your Honor, we want to be clear in

15   presenting this -- and I'm happy to walk through it briefly,

16   but we want to be clear in presenting this that what happened

17   in the New York State Court system was in May of 2013 there was

18   an administrative order entered that had the effect of dumping

19   into Part 60 literally dozens and dozens and dozens of RMBS

20   actions.  So all of a sudden, the justice woke up and was faced

21   with this fountain of RMBS cases.  We presented some statistics

22   in the hand-up, and I can walk through what we have here just

23   in terms of what the posture of those cases are and how they've

24   been proceeding.

25            The first two pages of the hand-up just present the

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS            107

1    time to adjudicate -- the time from the filing of the cases

2    which, in most instances, those cases were filed with other

3    judges, not Part 60.

4            THE COURT:  Right.

5            MR. NESSER:  The time from the commencement of those

6    cases until the disposition of the current motion to dismiss,

7    if there has been a disposition.  And then the second two

8    pages, for the same set of cases, presents the amount of time

9    that the most recent motion to dismiss --

10           THE COURT:  Has Justice Friedman permitted discovery

11   or directed that discovery go forward while motions to dismiss

12   are pending?

13           MR. NESSER:  As I understand it, and we've not had the

14   ability to determine this, but to a certain -- but as I

15   understand it, there are some cases in which the prior justice

16   had entered a stay of discovery and Justice Friedman has

17   permitted that stay to remain in place.  There are other cases

18   in which, I believe, discovery is proceeding.

19           And again, much of what's presented on this chart,

20   Your Honor -- I just want to be emphatic about this, I hope for

21   reasons that are clear.  Much of what's presented in this chart

22   has to do with things that happened prior to the administrative

23   order.  But the facts are the facts and the statistics are the

24   statistics.  And what they show --

25           THE COURT:  So what's the total number of cases she

1  hasn't filed?

2          MR. NESSER:  -- is that there's a very significant

3  backlog.

4          Your Honor what we did on this chart, in answer to

5  your question, is we looked at all the cases that the New York

6  State docketing system shows as having been -- as pending with

7  Justice Friedman --

8          THE COURT:  Right.

9          MR. NESSER:  -- to the extent they were filed on or

10  after June 24, 2011.  I believe there's something in the range

11  of seventy of them -- between sixty and seventy of them just on

12  this chart.  There may well be others that we're not capturing

13  on this list.  And these are all RMBS cases as best we've been

14  able to determine.

15          THE COURT:  Okay.

16          MR. NESSER:  I would point out, Your Honor, that by

17  comparison to some of the numbers on this chart, it doesn't

18  need a huge amount of emphasis that this Court was able to

19  resolve the entire bankruptcy in just over two years.  And this

20  Court, on Tuesday, indicated an intention to resolve these

21  fifteen adversary proceedings on a very quick timetable.  And

22  so the timely adjudication issue, to the extent we're talking

23  about backlog, we think we've demonstrated that there's a

24  pretty significant backlog in the New York State Court.  And to

25  the extent we're talking about a comparison of what this Court

1    might be able to do in light of its head start and

2    understanding of the issues, in light of its ability to

3    coordinate versus what might be available in the state court is

4    clear.

5            THE COURT:  So what I'm going to -- since I'm going to

6    have an additional filing from both sides, in fairness to UBS,

7    since -- if I assume for purposes of discussion that the trust

8    has the burden, you've made arguments on timely adjudication,

9    but this is the first real focus on what the backlog in the

10   commercial division is.  I'm going to permit both sides to

11   address it in the same supplemental filing.  So I want to be

12   sure that UBS has -- and if they have additional information

13   they want to submit, that's fine.  Okay?

14          MR. NESSER:  And Your Honor, we appreciate that

15   opportunity.

16          THE COURT:  Okay.

17          MR. NESSER:  On the issue of core jurisdiction, which

18   was discussed with counsel, we think there's core jurisdiction

19   here for at least three different reasons.  First, under

20   157(b)(2)(C), this adversary proceeding is a counterclaim to

21   UBS's proof of claim.  There's no dispute there's a proof of

22   claim.  There's no dispute that the parties are the same and --

23         THE COURT:  So why did they file in state court?

24         MR. NESSER:  Your Honor, unfortunately, it's the same

25   answer I gave you yesterday, which is that I don't know.  These

1    cases were filed by prior counsel representing a prior entity.

2          THE COURT:  One of the cases yesterday that was

3    discussed was a case that was filed in Minnesota and then

4    voluntarily dismissed when the case was filed here.  Why

5    haven't you just simply filed a new case here and just continue

6    your action in the state court?  I remember when I was in

7    practice, people used to file a protective action.  You'd file

8    an action in state court, then you'd file an action in federal

9    court.  Assuming you had jurisdiction in federal court, that

10   was the one you were going to proceed with.

11         MR. NESSER:  Your Honor, we've had various defendants

12   in these cases make statute of limitations arguments, and they

13   may well have been part of what was under discussion.

14         THE COURT:  Have you focused on this case?  Is

15   there -- well, I know UBS is raising a statute of limitations

16   issue.

17         MR. NESSER:  I'm sorry, Your Honor?

18         THE COURT:  Somebody unnecessarily complicated the

19   issues before me by filing an action in state court.  That's

20   fine.  I'll decide the issue.  But it's an issue I probably

21   didn't have to get to, although I suppose you could still raise

22   a mandatory permissive abstention.  There are some decisions

23   that don't require that an action be pending in state court.

24   Some decisions require that there be an action pending in state

25   court.  So I suppose if you had filed a protective action, I'd

1    still maybe have the same issue.  But I just -- it's

2    complicated the circumstances.  I understand your firm didn't

3    do it.

4            MR. NESSER:  It is complicated.  And what we've tried

5    to do --

6            THE COURT:  So now you're living with twenty-seven

7    cases in district court in Minneapolis between -- before ten

8    different judges, fifteen cases before me, one that's been

9    sitting in the district court to see whether it's going to get

10   transferred here, this motion to remand.  There probably will

11   be some more.

12           MR. NESSER:  You're preaching to the choir, Your

13   Honor.

14           What we've tried to do, Your Honor -- all I can say is

15   that what we've tried to do, in as aggressive a method as we've

16   been able to, is to get all the cases in one place, and that's

17   why we moved to remove this -- that's why we removed this

18   action -- that's why in the same time period we removed the

19   action; we moved to transfer the cases from Minnesota.

20           While I'm talking about that, I guess I should mention

21   counsel has this argument that we were forum shopping to try to

22   get out from under ACE.  That was not at all what was going on.

23   We were trying to -- we transferred fifty-seven -- we

24   transferred fifty-eight cases -- we tried to transfer fifty-

25   eight cases to this Court at the same time that we were trying

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          112

1    to remove that case, so it was --

2          THE COURT:  So I'm wrong at twenty-seven.  It's fifty-

3    eight cases?

4          MR. NESSER:  I think -- I may have misspoken.  It may

5    be -- anyway, the numbers -- I think the precise numbers aren't

6    the point.  The point is that this was part of a single attempt

7    to get everything in one place in which we filed a massive

8    amount of paper in this state and also in Minnesota.  The

9    notion that that massive campaign was somehow motivated by an

10   attempt to get out from under ACE is simply not true.  And in

11   any event, ACE would only be relevant to the contract claims,

12   not to the indemnity claims.  And as I've indicated, ACE is --

13         THE COURT:  We'll deal with that later.

14         MR. NESSER:  -- is now being reconsidered in the court

15   of appeals.

16         THE COURT:  Okay.  Any --

17         MR. NESSER:  But turning back to the counterclaim

18   issue, because this is a really simple way out, Your Honor, and

19   we think this is really the easiest, although some of the

20   issues you've raised may be even easier.  But the language of

21   157(b)(2)(C) could not be clearer in stating

22   that -- unambiguously, that a counterclaim is a core

23   proceeding.

24         THE COURT:  Yes, but Arkison -- if you dissect the

25   language of Arkison, it's ambiguous, in my view -- it's unclear

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          113

1   to me -- I won't say ambiguous -- it's unclear to me.  At two

2   points, Justice Thomas talks about treating the claims as if

3   they are related-to, noncore, and another point, there's

4   language -- because where it refers to -- in the cases where an

5   Article I judge can't enter -- a Stern-type claim that you

6   can't enter a final order or judgment, this subsection of 157

7   is unconstitutional.  Then you look to see whether you can do

8   it under 157(c)(1).

9            MR. NESSER:  If I can address that argument, Your

10  Honor --

11           THE COURT:  Go ahead.

12           MR. NESSER:  Stern clearly held that the counterclaim

13  at issue there, even though it was a "Stern counterclaim",

14  Stern clearly held that that counterclaim was a core

15  proceeding.  That was a holding in Stern.

16           THE COURT:  I know.

17           MR. NESSER:  And so there may well --

18           THE COURT:  Now we get to Arkison.

19           MR. NESSER:  Even if there -- and that's why I'm

20  stressing that was a holding in Stern.  And so any suggestive

21  language that Your Honor may perceive in Justice Thomas's

22  opinion in Arkison is at most dicta and could not possibly have

23  overruled the holding in Stern.  I won't belabor it beyond

24  that.  I think Your Honor clearly understands those issues

25  likely better than I do.

1    But turning back again, if I can, to the counterclaim,

2    and I'll move off it very quickly, Federal Civil Procedure

3    13(B) is unambiguous that a counterclaim does not need to have

4    a relationship to the occurrences or transactions underlying

5    the primary claim, and so there's simply no relate -- there's

6    no need for there to be --

7        THE COURT:  This is a commentary on Stern they have

8    not updated yet for Arkison, whether there's a difference

9    between permissive and compulsory counterclaims.  We're not

10   going to go there now.

11       MR. NESSER:  I won't go there, Your Honor.

12       And then, even if there were some obligation of an

13   overlap between the primary claim and the underlying claim, we

14   have that here for all the reasons that we've discussed.  The

15   counterclaim and the -- the proof of claim and the adversary

16   proceeding involve the same legal issues and defenses and so

17   on.  We concede, of course, that the loans are different, and

18   we concede, of course, that the title of the contract is

19   different.

20       THE COURT:  I want to see whether the applicable

21   provisions of the contracts that are in dispute are the same or

22   different.

23       MR. NESSER:  Your Honor, I said that there are three

24   reasons why we thought there's core jurisdiction here.  Also,

25   under 157(b)(2)(O) and (b)(2)(A), this is a proceeding that

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          115

1  directly affects the administration of the estate and the

2  liquidation of the estate.

3           THE COURT:  On that, I don't think you do so well

4  because the cases, as I read them, say if the only thing you're

5  talking about is adding money to the estate, that's not enough.

6           MR. NESSER:  Well, Your Honor, but it's not -- that's

7  not all we're talking about here because what we're talking

8  about, as Your Honor asked, is also issues concerning the

9  interpretation and implementation of the plan and recoveries

10 of --

11          THE COURT:  Well --

12          MR. NESSER:  -- payments that --

13          THE COURT:  -- I've raised that issue.  I haven't

14 decided that issue.

15          MR. NESSER:  And I didn't mean to suggest that you had

16 decided it.  I --

17          THE COURT:  So because what you really -- we haven't

18 talked about this, and I don't have much -- I have a 2 o'clock

19 trial today.  This is addressed in the Skadden brief.  The

20 narrowing of post-confirmation jurisdiction, because I start

21 with the issue, do I have subject matter jurisdiction --

22          MR. NESSER:  Um-hum.

23          THE COURT:  -- is the issue of whether, in a

24 liquidation case, you have to satisfy the close nexus test, and

25 if you do, have you satisfied it.

1      MR. NESSER:  Your Honor, I'm happy to address that.

2 To begin with, the close nexus test does not apply, in our

3 view.  We think that was necessarily the holding of Parmalat,

4 the 2011 decision, which held that a claim by a liquidating

5 trustee was a -- it was related-to jurisdiction there solely

6 for the reason that the liquidating trustee was trying to

7 obtain money for the benefit of creditors.

8      THE COURT:  I have to go back and look at that in

9 Parmalat because I don't remember that.

10      MR. NESSER:  I have that down as 639 F.3d 572 at 579.

11 As well -- that wasn't an explicit holding, but that was the

12 necessary conclusion of that decision.

13      THE COURT:  There's this whole body of law about --

14      MR. NESSER:  Absolutely.

15      THE COURT:  -- narrowing a post-confirmation

16 jurisdiction, and I'd be reluctant to read a Second Circuit

17 case that sort of in passing doesn't really address the issue.

18      MR. NESSER:  Well -- and Your Honor, the cases that we

19 cite in the brief made clear that the cases on narrowing of

20 jurisdiction post-confirmation, those cases relate to

21 reorganizations; they don't relate to liquidations.

22      THE COURT:  Well, that's my question.  Is there a

23 difference between liquidation cases and reorganization cases.

24      MR. NESSER:  Yes, there is, Your Honor.  And if you

25 look, for example, at the First Circuit's decision In re Boston

 1  Regional Medical Center --

 2          THE COURT:  Which I've applied.

 3          MR. NESSER:  -- it was cited in Your Honor's decision

 4  and was cited also in the Second Circuit decision, that court

 5  goes on at length and explains why it is that there is such a

 6  difference.  As well, in In re DPH, the court observed that a

 7  bankruptcy court's post-confirmation jurisdiction is actually

 8  broader than it was pre-confirmation because the only thing

 9  that the liquidating trustee is doing is liquidating the estate

10  of the assets.  And so the notion that the close nexus applies

11  here -- the close nexus applies here we don't agree is the

12  case.  Even if the close nexus test applied, arguendo, it's

13  satisfied here.

14          THE COURT:  It's satisfied why?

15          MR. NESSER:  It's satisfied because there are two

16  elements of that test, and we satisfied both of them.  The

17  first element of that test is "whether the matter affects the

18  interpretation, implementation, consummation, execution or

19  administration of the confirmed plan", and we satisfied that

20  test for the reason that we discussed already.

21          The second element of the plan is -- of the close

22  nexus test is whether the plan provides for the retention of

23  jurisdiction over the dispute.  And as we've discussed --

24          THE COURT:  Okay.  I'm satisfied --

25          MR. NESSER:  -- the plan does that as --

1          THE COURT:  Whether they agree or not, I'm satisfied

2     that the plan has a provision that would retain jurisdiction.

3     The focus for me is, is there jurisdiction.  You can't create

4     jurisdiction.

5          MR. NESSER:  Certainly, Your Honor.  As well, on the

6     issue of the close nexus test, although we think the factors

7     we've already identified are sufficient to satisfy the test,

8     there's more here.  There's more here because we have the UBS

9     proof of claim.  We have the fact that the actual adversary

10    proceeding is going to require litigation of what happened in

11    the bankruptcy.  Separate and apart from interpretation of the

12    plan, at the core of our indemnity claim, is the claim

13    regarding things that happened in the bankruptcy, the claims

14    that were settled, the terms on which they were settled, how

15    they were settled; all of that is going to require document

16    productions from the bankruptcy, litigation concerning things

17    that happened in the bankruptcy.  And so that's a close nexus

18    as well on the facts.

19         THE COURT:  All right.  I'm going to have to cut you

20    off.

21         MR. NESSER:  And if I can just make my one last point,

22    and it's a small one, but I do want to just slightly make note

23    of it.  In addition to the proof of claim filed by UBS, there

24    are proofs of claim filed by seven or eight other banks in the

25    bankruptcy in which they assert claims for indemnification in

1  respect of some of the very same loans that we are suing UBS

2  for.  And clearly, Your Honor, it's not a huge number of loans.

3  It's something like 268 loans, I think.

4            THE COURT:  Does UBS's claim arise out of -- was UBS a

5  defendant in the FHFA cases before Judge Cote?

6            MR. DRYLEWSKI:  Yes, it was, Your Honor.

7            THE COURT:  And does the indemnification claim that

8  was filed here arise out of the FHFA cases before Judge Cote?

9            MR. NESSER:  Yes, Your Honor.

10            THE COURT:  All right.

11            MR. DRYLEWSKI:  Your Honor, we don't know at this

12  time --

13            THE COURT:  All right.  That's fine.

14            MR. DRYLEWSKI:  -- whether we had RFC loans at issue.

15  We can get back to you on that.

16            MR. NESSER:  Actually, I should say I believe the

17  answer is yes.

18            THE COURT:  Okay.  All right.  Let's agree on a

19  briefing schedule.  I want one brief from each side.  How much

20  time do you want?

21            MR. NESSER:  Two weeks, Your Honor.

22            THE COURT:  You really want to do that over the 4th of

23  July?

24            MR. NESSER:  I don't.

25            THE COURT:  Come on.

RESIDENTIAL CAPITAL, LLC, ET AL.; RFC v. UBS          120

1      MR. NESSER:  Thirty days.  Your Honor, these are going

2   to be simultaneous briefs?

3      THE COURT:  Yeah, simultaneous briefs.

4      MR. NESSER:  I think thirty days is fine with us.

5      THE COURT:  All right.

6      MR. DRYLEWSKI:  We'd prefer to do it quicker than

7   thirty days.

8      THE COURT:  Well, I'm going to set the thirty days.  I

9   want the briefs within thirty days.  I've raised a number of

10  issues that I want addressed.

11     MR. NESSER:  Page limits?

12     THE COURT:  Twenty-five pages.  That doesn't count

13  attachments.  I asked, for example, the contract language and

14  stuff like that.

15     MR. DRYLEWSKI:  And this is limited solely, Your

16  Honor, to the issue of whether the indemnification claim here

17  in this action requires interpretation of the plan's terms?

18     THE COURT:  No.  I raised several questions.  I raised

19  question -- order a transcript.  I mean, I raised questions and

20  said I wanted to know whether, in the two forms of master

21  agreements that UBS supplied, one as a purchaser, one as a

22  seller, whether the provisions on reps and warranties and

23  indemnification are the same in those flip-side agreements --

24  flip-side meaning one purchaser, one seller -- such that the

25  same contract language is going to have to be interpreted and

 1  applied in adjudicating the claims and counterclaims.  That was

 2  one set of questions.  Get a transcript.

 3          I mean, I think I tried to -- I don't want to go

 4  by -- off the top of my head.  I asked a series of questions.

 5  I just want to do one filing -- simultaneous filing by each

 6  side.  Some of it, you'll have to put in a declaration just to

 7  authenticate this is the master agreement on the buy side, this

 8  is the master agreement on the sell side; not elaborate.  And

 9  then I asked for an analysis of whether the plan provisions

10  regarding the settlement of the RMBS claims require an

11  interpretation, an application of the plan in determining --

12  I'll say it -- this may not be the exact way I said it

13  before -- the amount of damages or recovery on either the

14  breach of rep and warranty claim or the indemnity claim.  So I

15  hope that's clear enough.

16          MR. DRYLEWSKI:  Yes, Your Honor.  Thank you.

17          THE COURT:  So order the transcript, and you can make

18  sure that you're being responsive.

19          So bear with me a second, okay?

20          I want those simultaneous briefs by 5 p.m. Friday,

21  July 25th.  After receiving the briefs, I will review them and

22  decide whether I want to hear further argument, okay.  And you

23  can indicate in your brief whether you're requesting argument.

24  I may or may not do it, but I'm more likely to have you come

25  back.  And if you do, it will be not too long after the briefs

1    are filed.  I try not to let things linger, okay?  All right.

2              We're adjourned.  Thank you very much.

3              IN UNISON:  Thank you, Your Honor.

4          (Whereupon these proceedings were concluded at 1:02 PM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                    I N D E X

3

4                                    RULINGS

5                                              PAGE      LINE

6   ResCap Liquidating Trust motion for order    9        4

7   Authorizing the release of adequate

8   Assurance deposit Granted

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          C E R T I F I C A T I O N

3

4    I, Aliza Chodoff, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10   _____

11   ALIZA CHODOFF

12   AAERT Certified Electronic Transcriber CET**D-634

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:  June 27, 2014

19

20

21

22

23

24

25