# ATTACHMENT 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

RESIDENTIAL FUNDING COMPANY, LLC,                    CASE NO. _____

        Plaintiff,

     v.                                                                            **COMPLAINT**

PHH MORTGAGE CORP.,

        Defendant.

Plaintiff Residential Funding Company, LLC ("RFC" or "Plaintiff"), by and through its attorneys, alleges for its Complaint against defendant PHH Mortgage Corp. ("Defendant") as follows:

### NATURE OF ACTION

1.     Defendant sold mortgage loans to RFC pursuant to the Seller Contracts attached as Exhibit A (the "Contract").

2.     The Contract incorporates into its terms and conditions the RFC Client Guide, exemplary excerpts of which are attached as Exhibit B (the "Client Guide").   (The various applicable versions of the Client Guide are known to the parties and too voluminous to attach in their entirety.) The Contract and Client Guide collectively form the parties' Agreement.

3.     Pursuant to the Agreement, Defendant made a number of representations and warranties to RFC regarding, among other things, the quality of the mortgage loans it sold RFC; the manner in which the mortgage loans were originated and underwritten; and the compliance of the mortgage loans with applicable state and federal law.

4.     Defendant breached these representations and warranties by delivering loans that were not originated or underwritten in accordance with the requirements of the Agreement; did not meet the representations and warranties made as to those loans; and/or failed to comply with applicable state and federal law.

5.     Had RFC been aware of the defects in Defendant's loans, it would never have acquired them.

6.     As a direct result of these contractual breaches, RFC has suffered damages and losses for which it is entitled to damages pursuant to the Agreement.

7.     Pursuant to the Agreement, RFC is entitled to seek repurchase of the defective loans from Defendant or, where repurchase is not possible, contractual damages sufficient to make RFC whole and/or compensate it for its acquisition of the defective loans.

8.     As a further result of Defendant's breaches of representations and warranties, RFC has been forced to incur (and continues to incur) substantial losses in the form of damages paid to third parties, settlement payments, repurchases, lost value and lost profits stemming from non-performing or defective loans, increased servicing expenses (including foreclosure costs associated with non-performing and/or non-compliant loans), attorneys' fees, court costs, and other losses.

9.     Indeed, as discussed in further detail below, in May 2012, RFC was forced to file for bankruptcy protection pursuant to Chapter 11 of the United States Bankruptcy Code, in part because of the dozens of lawsuits and allegations relating to defective loans, including those sold to it by Defendant.

10.     Defendant agreed and is obligated to indemnify RFC, and to reimburse RFC for and against any and all losses, damages, penalties, fines, forfeitures, court costs and reasonable

attorneys' fees, judgments, and any other costs, fees and expenses resulting from Defendant's breaches and defaults.

11.    RFC therefore brings this action for breach of contract, and for indemnification for losses RFC has suffered due to Defendant's conduct.

## PARTIES

12.    Plaintiff Residential Funding Company, LLC, f/k/a Residential Funding Corporation, is a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota.  RFC is a wholly owned subsidiary of GMAC Residential Holding Company, LLC, a Delaware limited liability company.  GMAC Residential Holding Company, LLC is a wholly owned subsidiary of Residential Capital, LLC, a Delaware limited liability company.  Residential Capital, LLC is a wholly owned subsidiary of GMAC Mortgage Group LLC, a Delaware limited liability company.  GMAC Mortgage Group LLC is a wholly owned subsidiary of Ally Financial, Inc., a Delaware corporation with its principal place of business in Michigan.

13.    Defendant PHH Mortgage Corp. f/k/a Cendant Mortgage Corp. is a New Jersey corporation with its principal place of business at 1 Mortgage Way, Mount Laurel, NJ 08054.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, in that the parties are citizens of different states and the amount in controversy exceeds $75,000.

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), in that a substantial part of the events and omissions giving rise to this Complaint occurred in Minnesota, and because the parties have contractually agreed that Minnesota is an appropriate venue.

## FACTUAL BACKGROUND

### The Agreement Between RFC and Defendant

16.     RFC was an aggregator of residential mortgage loans and an issuer of mortgage-backed securities.

17.     As such, RFC acquired mortgage loans from "correspondent lenders," including Defendant.  As a correspondent lender, Defendant had the initial responsibility for collecting information from the borrower, verifying its accuracy, and underwriting the loan.  Defendant had primary responsibility for all aspects of the underwriting of the loan, and it was understood between the parties that RFC would generally *not* be re-underwriting the loan.  It was the Defendant that actually closed the loans with the borrowers.

18.     Defendant contracted with RFC to sell already-closed loans to RFC pursuant to the requirements set forth in the Agreement.

19.     As Defendant was well aware, once the loans were sold to RFC, RFC pooled groups of loans with similar characteristics, and the pool of loans would be sold into a special-purpose securitization Trust.  The pool of loans formed the collateral underlying the Trust's mortgage-backed securities, which were in turn sold to investors.

20.     RFC also sold pools of loans to whole loan investors.

21.     Defendant knew of RFC's intention to securitize and/or sell the loans.  Specifically, Defendant acknowledged, in the Client Guide, that it "recognize[d] that it is [RFC's] intent to securitize some or all of the Loans sold to [RFC]," and agreed to provide RFC with "all such information … as may be reasonably requested by [RFC] for inclusion in a prospectus or private placement memorandum published in connection with such securitization," including all information necessary to comply with the disclosures required by Regulation AB

(governing asset-backed securities) and other applicable federal securities laws.  (See Client

Guide at A202(II); 206(D).)

22.    Over the course of the parties' relationship, RFC acquired more than $37 million

worth of residential mortgage loans from Defendant pursuant to the Agreement.

23.    Pursuant to the Agreement, Defendant made a number of representations and

warranties with respect to the loans, including, but not limited to, the following:

a. Defendant's "origination and servicing of the Loans have been legal, proper, prudent and customary and have conformed to the highest standards of the residential mortgage origination and servicing business."  (Client Guide A201(K).)

b. Defendant "will comply with all provisions of this Client Guide and the Program Documents, and will promptly notify GMAC-RFC of any occurrence, act, or omission regarding [Defendant], the Loan, the Mortgaged Property or the Mortgagor of which [Defendant] has knowledge, which … may materially affect [Defendant], the Loan, the Mortgaged Property or the Mortgagor."  (Client Guide A201(M).)

c. "All information relating to each Loan delivered and sold to GMAC-RFC is true, complete and accurate and there are no omissions of material facts.  All data provided by the Client to GMAC-RFC relating to any Loan, whether in electronic format, or otherwise, is true and complete and accurately reflects the information in the related Loan file."  (Client Guide A202(A).)

d. "All Loan Documents, Funding Documents and Final Documents are genuine, have been completed, duly and properly executed, are in recordable form and delivered in the form and manner specified in this Client Guide," and "[a]ll originals and copies of such documents and all other documents, materials, and other information required to be submitted to GMAC-RFC have been so submitted, and are complete and accurate."  (Client Guide A202(D).)

e. "All Loan Documents, Funding Documents and Final Documents and all other documents describing or otherwise relating thereto are in compliance with all local and State laws, regulations and orders."  (Client Guide A202(D).)

f. "There is no default, breach, violation or event of acceleration existing under any Note or Security Instrument transferred to GMAC-RFC, and no event exists which, with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and no such default, breach, violation or event of acceleration has been waived by

[Defendant] or any other entity involved in originating or servicing the Loan."
(Client Guide A202(G).)

g.  "[E]ach Loan has been originated, closed, and transferred in compliance with
all applicable local, State and federal laws and regulations, including, but not
limited to, the Real Estate Settlement Procedures Act, the Fair Credit
Reporting Act, the Equal Credit Opportunity Act, the Truth-in-Lending Act,
the Fair Housing Act, and the National Flood Insurance Act. This warranty is
made by [Defendant] with respect to each GMAC-RFC Loan Application
taken and processed for each Loan and with respect to each Loan made by the
[Defendant] or any other entity." (Client Guide A202(I).)

h.  "No Loan is a ... loan considered a 'high-cost,' covered, 'high-risk,'
'predatory' or any other similar designation under any State or local law in
effect at the time of the closing of the loan if the law imposes greater
restrictions or additional legal liability for residential mortgage loans with
high interest rates, points and/or fees." (Client Guide A202(J)(1)(d).)

i.  "[N]o circumstances exist involving the Loan Documents, the Mortgaged
Premises or the Borrower's credit standing that could: (i) cause private
institutional investors to regard the Loan as an unacceptable investment, (ii)
cause the Loan to become delinquent, or (iii) adversely affect the Value or
marketability of the Mortgaged Premises or the Loan."  (Client Guide
A202(Q).)

j.  "The Loan is of investment quality, has been prudently originated and has
been underwritten in compliance with all requirements of this Client Guide."
(Client Guide A202(T).)

k.  "For each Loan for which an appraisal is required or obtained under this
Client Guide, the appraisal was made by an appraiser who meets the minimum
qualifications for appraisers as specified in this Client Guide." (Client Guide
A202(T).)

l.  "For each Loan, as of the Funding Date, the market Value of the Mortgaged
Premises is at least equal to the appraised value stated on the Loan appraisal,
or if an Automated Valuation Model (AVM) is permitted, the Value on the
AVM, except to the extent that the market Value of the Mortgaged Premises is
lower ... due to the effect of any toxic materials or other environmental
hazards of which neither the appraiser nor the [Defendant] has actual
knowledge or reasonable grounds to suspect." (Client Guide A202(T).)

m. "No fraud or misrepresentation by the Borrower or by the [Defendant],
broker, correspondent, appraiser or any independent contractor retained by the
[Defendant], broker, correspondent, appraiser or any employee of any of the
foregoing occurred with respect to or in connection with the origination or
underwriting of any Loan and all information and documents provided to

GMAC-RFC in connection with the Loan are complete and accurate." (Client Guide A202(KK).)

24.     RFC relied on these representations and warranties in acquiring the loans, and their presence was a material consideration in RFC's decision to acquire the mortgage loans from Defendant.

25.     Pursuant to the Client Guide, Defendant's failure to comply with its representations and warranties or any of the other requirements, terms or conditions of the Client Guide constitutes an "Event of Default," as does its failure to provide RFC with true, accurate and complete information in a timely manner. (See Client Guide A208.)

26.     Similarly, it is an "Event of Default" if a "[b]orrower or any other person or entity involved in the loan transaction or its underwriting or documentation (including any appraiser, broker, third-party originator, credit reporting agency, or other provider of underwriting information) has made any false representation and/or has failed to provide information that is true, complete and accurate in connection with" the loan transaction, regardless of whether Defendant knew of the misrepresentation or incorrect information. (See Client Guide A208.)

27.     The Client Guide further specified the remedies available to RFC in case of an Event of Default, including a breach of any loan-level representation or warranty. The available remedies included repurchase of the defective loan, substitution of another loan for the defective one, or indemnification against losses resulting from such breaches.

28.     The repurchase provision requires Defendant to compensate RFC for defective loans according to a formula specified in the Client Guide that is based on the original principal balance of the loan. Where repurchase is not feasible, Defendant is nonetheless contractually obligated to pay all losses, costs and expenses incurred by RFC and/or the loan's servicer as a result of an Event of Default. (Client Guide A210.) Moreover, Defendant expressly agreed that

RFC was permitted to exercise any remedy "allowed by law or in equity" in connection with

such Events of Default. (Client Guide A209.)

29.     Defendant also expressly agreed to broad indemnification provisions, which

provide as follows:

> [Defendant] shall indemnify GMAC-RFC from all losses, damages,
> penalties, fines, forfeitures, court costs and reasonable attorneys' fees,
> judgments, and any other costs, fees and expenses … includ[ing], without
> limitation, liabilities arising from (i) any act or failure to act, (ii) any
> breach of warranty, obligation or representation contained in the Client
> Guide, (iii) any claim, demand, defense or assertion against or involving
> GMAC-RFC based on or resulting from such breach, (iv) any breach of
> any representation, warranty or obligation made by GMAC-RFC in
> reliance upon any warranty, obligation or representation made by
> [Defendant] contained in the Client Contract and (v) any untrue statement
> of a material fact, omission to state a material fact, or false or misleading
> information provided by the [Defendant] in information required under
> Regulation AB or any successor regulation.
>
> In addition, [Defendant] shall indemnify GMAC-RFC against any and all
> losses, damages, penalties, fines, forfeitures, judgments, and any other
> costs, fees and expenses (including court costs and reasonable attorneys'
> fees) incurred by GMAC-RFC in connection with any litigation or
> governmental proceeding that alleges any violation of local, State or
> federal law by [Defendant], or any of its agents, or any originator or
> broker in connection with the origination or servicing of a Loan.

(Client Guide A212.)   The Client Guide also entitles RFC to recover all court costs,

attorneys' fees and any other costs, fees and expenses incurred by RFC in enforcing the

Agreement or Client Guide.

## The Performance of Defendant's Loans and the Consequences for RFC

30.     RFC generally was not in the business of holding loans on its books.  The loans it

acquired from Defendant and other correspondent lenders were sold, either into residential

mortgage-backed securitization ("RMBS") trusts that issued certificates to outside investors, or

in "whole loan" portfolios to other mortgage companies and banks.

31.    The loans Defendant sold RFC were eventually included in more than 15 RMBS

Trusts.   When RFC sold the loans, it passed on a more limited set of representations and

warranties to the Trusts, and, as required by SEC regulations, disclosed pertinent information

about the loans to investors in its RMBS.  In making those representations and warranties, RFC

relied on information provided to it by Defendant and other correspondent lenders.   That

information in many cases violated Defendant's representations and warranties to RFC.

32.    Over time, many of the loans sold to RFC by Defendant defaulted or became

seriously delinquent.

33.    Internal reviews conducted by RFC after the loans were acquired from Defendant

determined that many of the loans sold to RFC by Defendant violated the Client Guide and/or

other representations or warranties made by Defendant, resulting in an Event of Default under

the Agreement.  In fact, more than 45% of the loans reviewed were deemed to have some type of

defect.

34.    Upon information and belief, the types of defects varied, but included owner

occupancy fraud, appraisal fraud or inaccuracies, undisclosed debt, failure to comply with

applicable state and federal laws, and missing or inaccurate documents, among others.

35.    Indeed, as part of its own analysis of the claims later asserted against it, RFC

retained its own expert, who concluded that approximately 43.5% of the loans he reviewed were

materially defective in one or more ways, and that the likely exposure to RFC and its affiliates

from defective correspondent loans exceeded $7 billion.

36.    Beginning in 2008 and continuing until RFC filed for bankruptcy protection on

May 14, 2012, RFC faced a growing number of claims and lawsuits stemming from the defective

loans sold to it by Defendant and others.

37.     RFC had always received a certain number of repurchase demands, primarily from whole loan investors.

38.     However, in early 2008, MBIA Insurance Corp., a bond insurer that issued insurance policies guaranteeing the performance of certain mortgage-backed securities issued by RFC, began for the first time questioning the quality of large numbers of loans in the securitizations it had insured.

39.     MBIA hired a team to begin reviewing loan files, and in May 2008, based on the *less-stringent* representations and warranties RFC had made to MBIA, demanded that RFC repurchase over 2,000 allegedly defective loans.

40.     Although RFC aggressively defended the claims made by MBIA wherever possible, RFC was forced to concede that, even on the basis of representations and warranties that were less stringent than those Defendant made to RFC, RFC was obligated to repurchase at least 24% of the loans MBIA claimed were defective.  MBIA continued its review and continued to find thousands of defective loans, ultimately resulting in protracted and costly litigation, as described below.

41.     Similar repurchase demands were made by other bond insurers, including FGIC, FSA/Assured, Ambac and Syncora.

42.     In 2012, Deutsche Bank, a Trustee of numerous RMBS issued by RFC, for the first time made a repurchase demand to RFC.  Deutsche likewise alleged that the loans were defective in numerous ways.

43.     Beginning in October 2008, RFC was sued in literally dozens of lawsuits stemming from allegedly defective mortgage loans, including those sold to it by Defendant.

44.    The first of these lawsuits was filed by bond insurer MBIA in October 2008. The MBIA lawsuit covered five RFC second-lien securitizations that included thousands of mortgage loans. For the first time, RFC learned that MBIA's analysis had concluded that over 80% of the loans in the pools it insured were defective.

45.    The MBIA lawsuit was followed shortly by a class action suit filed by the New Jersey Carpenters pension funds.

46.    The New Jersey Carpenters' lawsuit purported to cover 59 mortgage-backed securities offerings issued through RFC's RALI shelf in 2006 and 2007, which consisted of first-lien Alt-A loans.

47.    The New Jersey Carpenters complaint alleged that 38% of the mortgage loans underlying the securitizations were in delinquency, default, foreclosure or repossession by the time New Jersey Carpenters filed their class action complaint, and that much of RFC's mortgage loan data "was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation, and the other facets of defective underwriting" described throughout the Complaint. (NJ Carpenters First Am. Compl. at ¶¶ 9, 110.) Of course, that data was provided to RFC—and represented and warranted to be accurate—by Defendant and other correspondent lenders.

48.    Numerous other lawsuits followed on through RFC's bankruptcy filing in 2012, including over fifteen lawsuits brought by private investors in its RMBS securities, and more than a dozen lawsuits brought by monoline insurers.

49.    All of these lawsuits alleged that the loans RFC sold into RMBS securitizations were defective in a variety of ways, including because of borrower fraud, missing or inaccurate

documentation, fraudulent or inflated appraisals, misrepresentations concerning owner-occupancy, or failure to comply with applicable state and federal law.

50.     Collectively, these lawsuits involved more than a hundred RMBS securitizations, and a combined original principal balance of more than $100 billion.

51.     Across the dozens of securitizations involved in these lawsuits, Defendant was responsible for over a hundred of the loans.

52.     In May 2012, RFC filed for Chapter 11 bankruptcy protection in the Southern District of New York.

53.     In connection with the bankruptcy proceeding, literally hundreds of proofs of claim were filed by private securities investors, monoline insurers, whole loan purchasers, indenture trustees, and an array of co-defendants in the above-described loan-related litigation. These proofs of claim sought damages in the tens of billions of dollars, all stemming from allegedly defective mortgage loans, including those sold to RFC by Defendant.

54.     In addition, over time, RFC was forced to defend against, respond to, and in many instances accept repurchase demands made by purchasers of portfolios of whole loans from RFC. These whole loan purchasers included Countrywide, Wells Fargo, Indy Mac, Goldman Sachs and others, many of which also filed proofs of claim in the bankruptcy case seeking hundreds of thousands of dollars in recovery.

55.     These claims, lawsuits, and demands alleged, among other things, that the loans were defective, improperly underwritten, and breached representations and warranties made by RFC to investors, purchasers, and other contractual parties.    Those representations and warranties were, in most cases, identical to or less stringent than those received by RFC from

Defendant, and were based on RFC's reliance on Defendant's (and other correspondent lenders') representations and warranties to RFC.

56.     After hard-fought negotiations and litigation, RFC and its affiliates ultimately settled many of these claims and lawsuits in the bankruptcy proceeding for allowed claims totaling billions of dollars.  RFC continues to litigate other claims.

57.     Even given the fact that these creditors will only recover a small percentage of their claims under the Plan of Reorganization, RFC and its affiliates will still ultimately pay out hundreds of millions of dollars stemming from the defective loans.

58.     In addition to the bankruptcy settlements, before the bankruptcy, RFC had already repurchased millions of dollars' worth of defective loans from its RMBS securitizations and from whole loan purchasers, either at the request of a bond insurer or trustee, or because RFC itself discovered a defect and affirmatively took steps to repurchase the loan.

59.     RFC continues to lose value on hundreds of loans still in its own portfolio.

60.     Finally, prior to and during the bankruptcy case, RFC paid millions of dollars in attorneys' fees to defend against, negotiate, and ultimately settle claims relating to allegedly defective loans.

61.     These losses and exposures stem in part from Defendant's breaches of the representations and warranties, and RFC is entitled to recover from Defendant for those breaches.  RFC is also entitled to indemnification from Defendant pursuant to the Defendant's express indemnification obligations.

## COUNT ONE
## (BREACH OF CONTRACT)

62.     RFC realleges each and every allegation set forth in Paragraphs 1 through 61, above, as if fully rewritten herein.

13

63.    Defendant made representations and warranties to RFC regarding the quality and characteristics of the mortgage loans, which Defendant sold to RFC.

64.    Defendant breached its representations and warranties to RFC inasmuch as the mortgage loans did not comply with the representations and warranties.

65.    Defendant's breaches constitute Events of Default under the Agreement, resulting in damages to RFC.

66.    Accordingly, RFC is entitled to damages equivalent to the contractual repurchase price specified in the Client Guide, and/or damages sufficient to make RFC whole for its purchase of defective loans, in an amount to be proven at trial, which under either calculation exceeds $75,000, together with an award of attorneys' fees and costs.

## COUNT TWO
### (INDEMNIFICATION)

67.    RFC realleges each and every allegation set forth in Paragraphs 1 through 66, above, as if fully rewritten herein.

68.    RFC has incurred substantial losses and damages arising from and relating to the mortgage loans, which Defendant sold to RFC.

69.    Defendant expressly agreed to indemnify RFC for the losses and damages, including attorneys' fees and costs, which RFC has incurred.

70.    Accordingly, RFC is entitled to indemnification in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees and costs.

WHEREFORE, RFC demands judgment in its favor and against Defendant as follows:

(A)    On Count One (Breach of Contract), contractual repurchase and/or "make whole" damages in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees and costs; and

12-12020-mg   Doc 7255-1   Filed 07/11/14   Entered 07/11/14 18:20:13   Exhibit
CASE 0:13-cv-03525-PAM-SER   Document 1   Filed 12/14/13   Page 15 of 16
Attachment 1 to Declaration of Daniel F. Markham   Pg 16 of 144

(B)     On Count Two (Indemnification), damages sufficient to reimburse RFC's losses,

costs and expenses caused by Defendant's actions in excess of $75,000 and in an amount to be

proven at trial, and an award of attorneys' fees and costs; and

(C)     All such further relief, as the Court deems necessary or proper.

Dated:  December 13, 2013

/s/ Lee A. Lastovich
Donald G. Heeman, #286023
Lee A. Lastovich, #239495
FELHABER LARSON
220 South 6th Street, Suite 2200
Minneapolis, MN  55402-4504
Telephone:  (612) 339-6321
Facsimile:  (612) 335-0535
DHeeman@felhaber.com
LLastovich@felhaber.com


*Attorneys for Plaintiff Residential Funding
Company, LLC*

*Of Counsel*
Gary S. Lee
Jamie A. Levitt
Kayvan B. Sadeghi
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
Suite 3900
New York, NY  10104
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900
GLee@mofo.com
JLevitt@mofo.com
KSadeghi@mofo.com

Jeffrey A. Lipps
Jennifer A. L. Battle
CARPENTER LIPPS & LELAND LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215
Telephone:  (614) 365-4100
Facsimile:  (614) 365-9145

12-12020-mg    Doc 7255-1    Filed 07/11/14    Entered 07/11/14 18:20:13    Exhibit
CASE 0:19-cv-03503-PAM-SER    Document 1    Filed 12/44/18    Page 16 of 16
Attachment 1 to Declaration of Daniel F. Markham    Pg 17 of 144

Lipps@CarpenterLipps.com
Battle@CarpenterLipps.com

CASE 0:13-cv-03503-PAM-SER   Document 1-1   Filed 12/14/13   Page 31 of 121

# Exhibit A

# Client Contract

This Client Contract (as may be amended, supplemented or otherwise modified from time to time, this "Contract") is made this _Thirteenth_ day of _May_ 19_98_, by and between Residential Funding Corporation, its successors and assigns ("Residential Funding"), and _Cendant Mortgage_ (the "Customer", and, together with Residential Funding, the "parties" and each, individually, a "party").

WHEREAS, the Customer desires to sell Loans to, and/or service Loans for, Residential Funding, and Residential Funding desires to purchase Loans from, and/or have the Customer service Loans for, Residential Funding, pursuant to the terms of this Contract and the Guides (as that term is defined below).

NOW, THEREFORE, in consideration of the premises, and the terms, conditions and agreements set forth below, the parties agree as follows:

## 1. Incorporation of Guides by Reference.

Residential Funding has approved the Customer to sell Loans to, and/or service Loans for, Residential Funding under the Guide(s) checked below. Each Guide that is checked below (as each may be amended, supplemented or otherwise modified from time to time, together, the "Guides"), is hereby incorporated into this Contract by reference and for all purposes made a part hereof.

The Customer has been approved by Residential Funding to sell Loans to and/or service Loans for Residential Funding, as indicated below, under the following Guide(s):

| STATUS | APPLICABLE GUIDES |
|---|---|
| ☐ Seller Only | ☒ Client Guide |
| ☐ Servicer Only | ☐ AlterNet Seller Guide |
| ☒ Seller and Servicer | ☒ Servicer Guide |

If a box next to a Guide shown above has not been checked, the Customer has not been approved by Residential Funding to sell Loans to, or, as appropriate, service Loans for, Residential Funding, under that Guide(s) at this time; but, Residential Funding may in the exercise of its sole discretion approve the Customer to sell Loans to, or, as appropriate, service Loans for, Residential Funding under that Guide(s) at some time in the future and the Customer will be authorized to do so upon the execution and delivery by both Residential Funding and the Customer of an addendum to this Contract in a form provided to the Customer by Residential Funding containing that approval and incorporating that Guide(s) into this Contract by reference.

The Customer acknowledges that it has received and read the Guides. All provisions of the Guides are incorporated by reference into and made a part of this Contract, and shall be binding upon the parties; *provided, however,* that the Customer shall be entitled to sell Loans to and/or service Loans for Residential Funding only if and for so long as it shall have been authorized to do so by Residential Funding in writing. Specific reference in this Contract to particular provisions of the Guides and not to other provisions does not mean that those provisions of the Guides not specifically cited in this Contract are not applicable. All terms used herein shall have the same meanings as such terms have in the Guides, unless the context clearly requires otherwise.

## 2. Amendments.

This Contract may not be amended or modified orally, and no provision of this Contract may be waived or amended except in writing signed by the party against whom enforcement is sought. Such a written waiver or amendment must expressly reference this Contract. However, by their terms, the Guides may be amended, modified or supplemented by Residential Funding from time to time. Any such amendment(s) to the Guides shall be binding upon the parties hereto.

## 3. Representations and Warranties.

*a. Reciprocal Representations and Warranties.*

The Customer and Residential Funding each represents and warrants to the other that as of the date of this Contract:

(1) Each party is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization, is qualified, if necessary, to do business and in good standing in each jurisdiction in which it is required to be so qualified, and has the requisite power and authority to enter into this Contract and all other

agreements which are contemplated by this Contract and to carry out its obligations hereunder and under the Guides and under such other agreements.

(2) This Contract has been duly authorized, executed and delivered by each party and constitutes a valid and legally binding agreement of each party enforceable in accordance with its terms.

(3) There is no action proceeding or investigation pending or threatened, and no basis therefor is known to either party, that could affect the validity or prospective validity of this Contract.

(4) Insofar as its capacity to carry out any obligation under this Contract is concerned, neither party is in violation of any charter, articles of incorporation, bylaws, mortgage, indenture, indebtedness, agreement, instrument, judgment, decree, order, statute, rule or regulation and none of the foregoing adversely affects its capacity to fulfill any of its obligations under this Contract. Its execution of, and performance pursuant to, this Contract will not result in a violation of any of the foregoing.

*b. Customer's Representations, Warranties and Covenants.*

In addition to the representations, warranties and covenants made by the Customer pursuant to subparagraph (a) of this paragraph 3, the Customer makes the representations, warranties and covenants set forth in the Guides and agrees to deliver to Residential Funding the certified Resolution of Board of Directors which authorizes the execution and delivery of this Contract.

## 4. Remedies of Residential Funding.

If an Event of Client Default or Event of Servicer Default shall occur, Residential Funding may, at its option, exercise one or more of the remedies set forth in the Guides.

## 5. Customer's Status as Independent Contractor.

At no time shall the Customer represent that it is acting as an agent of Residential Funding. The Customer shall, at all times, act as an independent contractor.

## 6. Prior Agreements Superseded.

This Contract restates, amends and supersedes any and all prior Client Contracts or Servicer Contracts between the parties except that any subservicing agreement executed by the Customer in connection with any loan-security exchange transaction shall not be affected.

## 7. Assignment.

This Contract may not be assigned or transferred, in whole or in part, by the Customer without the prior written consent of Residential Funding. Residential Funding may sell, assign, convey, hypothecate, pledge or in any other way transfer, in whole or in part, without restriction, its rights under this Contract and the Guides with respect to any Commitment or Loan.

## 8. Notices.

All notices, requests, demands or other communications that are to be given under this Contract shall be in writing, addressed to the appropriate parties and sent by telefacsimile, by overnight courier or by first class United States mail, postage prepaid, to the addresses and telefacsimile numbers specified below. However, another name, address and/or telefacsimile number may be substituted by the Customer pursuant to the requirements of this paragraph 8, or by Residential Funding pursuant to an amendment to the Guides.

If to Residential Funding, notices must be sent to the appropriate address or telefacsimile number specified in the Guides.

If to the Customer, notices must be sent to:

_____

_____

_____

Attention: _____

Telefacsimile Number: (_____) _____

## 9. Jurisdiction and Venue.

CASE 0:20-cv-09503-PAM-SER Document 1-1 Filed 07/11/14 Page 4 of 12
12-12020-mg Doc 7255-1 Filed 07/11/14 Entered 07/11/14 13:48:24 Exhibit
Attachment 1 to Declaration of Daniel F. Markham   Pg 21 of 144

Each of the parties irrevocably submits to the jurisdiction of any state or federal court located in Hennepin County, Minnesota, over any action, suit or proceeding to enforce or defend any right under this Contract or otherwise arising from any loan sale or servicing relationship existing in connection with this Contract, and each of the parties irrevocably agrees that all claims in respect of any such action or proceeding may be heard or determined in such state or federal court. Each of the parties irrevocably waives the defense of an inconvenient forum to the maintenance of any such action or proceeding and any other substantive or procedural rights or remedies it may have with respect to the maintenance of any such action or proceeding in any such forum. Each of the parties agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment or in any other manner provided by law. Each of the parties further agrees not to institute any legal actions or proceedings against the other party or any director, officer, employee, attorney, agent or property of the other party, arising out of or relating to this Contract in any court other than as hereinabove specified in this paragraph 9.

**10. Miscellaneous.**

This Contract, including all documents incorporated by reference herein, constitutes the entire understanding between the parties hereto and supersedes all other agreements, covenants, representations, warranties, understandings and communications between the parties, whether written or oral, with respect to the transactions contemplated by this Contract. All paragraph headings contained herein are for convenience only and shall not be construed as part of this Contract. Any provision of this Contract that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction, and, to this end, the provisions hereof are severable. This Contract shall be governed by, and construed and enforced in accordance with, applicable federal laws and the laws of the State of Minnesota.

This Contract shall be of no force and effect unless and until it has been executed by both parties.

IN WITNESS WHEREOF, the duly authorized officers of the Customer and Residential Funding have executed this Contract as of the date first above written.

[Corporate Seal]
(if none, so state)

CUSTOMER

ATTEST:

By: _____Rose Robinson_____
     (Signature)

Name: __ROSE ROBINSON__
        (Typed or Printed)

Title: __ASSISTANT SECRETARY__

_____Cendant Mortgage Corporation_____
(Name of Customer)

By: _____
     (Signature)

Name: __Brian King__
        (Typed or Printed)

Title: __Assistant Vice President__

ATTEST:

By: _____Grant Paulson_____
     (Signature)

Name: __Grant Paulson__
        (Typed or Printed)

Title: __Risk Management Associate__

RESIDENTIAL FUNDING CORPORATION

By: _____
     (Signature)

Name: __Kevin Bechler__
        (Typed or Printed)

Title: __Director Credit Risk__

02/04/05

01/11/2005 13 33 FAX  973985365A                    CENDANT LEGAL DEPT                                    ☒ 002/002

12/19/2004 15:31 FAX  8734055324          CENDANT LEGAL DEPT                              ☒ 002/002

**FILED**
**JAN 7  2005**
**STATE TREASURER**

C-182A Rev 12/93

**New Jersey Division of Revenue**

**Certificate of Amendment to the Certificate of Incorporation**
(For Use by Domestic Profit Corporations)

Pursuant to the provisions of Section 14A:9-2 (4) and Section 14A:9-4 (3), Corporations, General, of the New Jersey
Statutes, the undersigned corporation executes the following Certificate of Amendment to its Certificate of Incorporation:

1 The name of the corporation is:

   Cendant Mortgage Corporation

2. The following amendment to the Certificate of Incorporation was approved by the directors and thereafter duly adopted by
the shareholders of the corporation on the  15th  day of  December  , 2004.

   Resolved, that Article FIRST  of the Certificate of Incorporation be amended to read as follows:

   "FIRST: The name of the Corporation is PHH Mortgage Corporation."

3 The number of shares outstanding at the time of the adoption of the amendment was:  1000
The total number of shares entitled to vote thereon was:  1000

If the shares of any class or series of shares are entitled to vote thereon as a class, set forth below the designation and number
of outstanding shares entitled to vote thereon of each such class or series. (Omit if not applicable)

4  The number of shares voting for and against such amendment is as follows: (If the shares of any class or series are entitled
to vote as a class, set forth the number of shares of each such class and series voting for and against the amendment,
respectively.)

| Number of Shares Voting for Amendment | Number of Shares Voting Against Amendment |
| --- | --- |
| 1000 | 0 |

5  If the amendment provides for an exchange, reclassification or cancellation of issued shares, set forth a statement of the
manner in which the same shall be effected. (Omit if not applicable)

6  Other provisions: (Omit if not applicable)
   Effective date of this amendment to the certificate of incorporation shall
   be February 1,- 2004.

                                                           BY _____
                                                              (Signature)
                                                              Lynn R. Feldman, Vice President

Dated this  16th day of  December  , 2004

May be executed by the Chairman of the Board, or the President, or a Vice President of the Corporation.

   0100051154

: PHH Mortgage    3000 Leadenhall Road
Mt. Laurel, NJ 08054



# PHH MORTGAGE CORPORATION
## RESOLUTIONS

The undersigned, being all of the members of the Board of Directors of PHH Mortgage Corporation, a New Jersey Corporation (the "Company"), do hereby unanimously consent in writing to the adoption of, and do hereby adopt, the following resolutions as of 2/1/2005.

RESOLVED, that the Company is hereby authorized to contract with banks, dealers, hedge funds, pension funds, insurance companies, investment banks, Real Estate Investment Trusts, Freddie Mac and Fannie Mae to buy and sell forward trades of, and options on, mortgage loans, mortgage backed securities, United States treasury securities and futures contracts, interest rate swaps, Eurodollar or LIBOR based futures, forwards and options, in connection with hedging the Company's mortgage production pipeline, servicing risk management, and asset sales ("Permitted Transactions").

RESOLVED, that each of the officers of the Company named below is hereby authorized and directed to cause to be arranged such Permitted Transactions with such counter-parties, and on such terms and conditions, as he/she may in his/her discretion deem appropriate to the best interests of the Company:

| Name of Officer | Officer Title |
| --- | --- |
| Joseph E. Suter | President & Chief Executive Officer |
| Robert E. Groody | Chief Operating Officer |
| Richard J. Bradfield | Senior Vice President |
| Mark S. Friedenthal | Vice President |
| Peter A. Thomas | Vice President |

RESOLVED, that each of the employees of the Company named below is hereby authorized and directed to cause to be arranged such Permitted Transactions with such counter-parties, and on such terms and conditions, as he/she may in his/her discretion deem appropriate to the best interests of the Company:

**Authorization Level 5**

Mark Affanato

**Authorization Level 4**

Crissy Judge
David Giancoli
Donald Melroy
Jim McSweeney
Peter Newall
Daniel Collins

**Authorization Level 3**

Wallace (Bud) Ryan
Brian King
Steven Crawford
Joshua Hodgson
Jeff Casella
Josh Smith
Brendon Bareiss-Bodic
Michael Potenski
Michael Farrell

**Authorization Level 2**

Dusty Cooper
David Drass
Millo Patel
Michael Cook
Jennifer Goeller

**Authorization Level 1**

Karen Collins
Rosalie Robinson
Richard D. Williams
Tina Thompson
Adam Feldman

## Notional Authorization Trading Limits Per Trade

| Trader Officer | Asset Sales None | Security Buy/Sell None | Security Swap/Roll None | IR Swaps None | Options None |
|---|---|---|---|---|---|
| Authorization level 5 | $250MM | $250MM | $1,500MM | $250MM | $250MM |
| Authorization level 4 | $175MM | $175MM | $1,000MM | $175MM | $175MM |
| Authorization level 3 | $125MM | $125MM | $750MM | $125MM | $125MM |
| Authorization level 2 | $75MM | $75MM | $500MM | $0 | $0 |
| Authorization level 1 | $25MM | $25MM | $25MM | $0 | $0 |

Trading times are limited to 8:00AM through 5:00PM Monday through Friday for authorization levels 1 through 4. Authorization level 5 and Officers may trade at any time.

RESOLVED, that each of the officers or employees of the Company named herein, acting alone, and any person or persons designated and authorized to so act by any such officers or employees of the Company named herein, is hereby severally authorized from time to time to perform or cause to be done and performed in the name and on behalf of the Company, such acts, to pay or cause to be paid on behalf of the Company such related costs and expenses, and to execute and deliver, or cause to be executed and delivered such present or future notices, requests, demands, certificates, agreements, undertakings, amendments, restatements, supplements, or communications, under the corporate seal of the Company or otherwise, in the name and on behalf of the Company, as they or any of them may deem to be necessary or advisable in order to carry into effect the intent of the foregoing resolutions or to comply with the requirements of the instruments approved and authorized by the foregoing resolutions.

RESOLVED, that any acts of the officers or employees of the Company named herein and of any person or persons designated and authorized to act by any such officer or employee of the Company named herein, which acts would have been authorized by the foregoing resolutions, except that such acts were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as acts in the name and on behalf of the Company.

RESOLVED, that the list of officers and employees of the Company named herein and trading limits specified herein supercedes any prior list of officers or employees or trading limits adopted by the Company relating to the Permitted Transactions and all such prior grants of authority are hereby revoked.

Terrence W. Edwards, Director

Joseph E. Sutter, Director

03/04/2005 09:25 FAX 8182601810          GMAC RFC                                    ☑002

**PHH Mortgage Services**

 **PHH**

3/4/05

VIA Email

Jeb Robinson
Senior Compliance Officer
2255 N. Ontario Street
Suite 400
Burbank, CA 91504

RE: Name change for Cendant Mortgage Corporation to PHH Mortgage Corporation

Dear Jeb,

This letter is in response to your questions regarding the name change of Cendant Mortgage Corporation.

On February 1, 2005, Cendant Mortgage Corporation changed its name to PHH Mortgage Corporation. It will remain a wholly owned subsidiary of PHH Corporation.

We will continue to deliver the high quality of service you have come expect.

If you need any additional information regarding this issue, please let me know.

Sincerely,

Ruth A. Nunn

Ruth A. Nunn
Investor Accounting Compliance Analyst
Ph 856-917-8532
Email: ruth.nunn@mortgagefamily.com

— *Karen McCallson*
*856-917-0308*

*581*
*x38*
*x27*

03/04/2005 09:25 FAX 8162601810      GMAC RFC      ☐001

*FAX: 952 - 979 - 0823*     Page 1 of 1

**Robinson, Jeb**      *Darrin George, Cory Lehman*

From:    Nunn, Ruth (MBS) [Ruth.Nunn@mortgagefamily.com]
Sent:    Friday, March 04, 2005 6:13 AM
To:      Robinson, Jeb
Subject: name change letter and certification

Hi Jeb,

Here is a letter and name change certification showing the spin off from Cendant Mortgage Corporation to PHH Mortgage Corporation. Should you need anything further, please advise.

Thanks,
Ruth A. Nunn
Investor Accounting Compliance Analyst
856-917-8532

03/04/2005

03/31/99   16:07   MORTGAGE SERVICES → GMAC RFC                    NO.821   P02
03/31/99   10:18   612 979 4191
MAR 31 1999 09:39 FR RESIDENTIAL FUNDING  612 979 4191 TO 916094144190    P.02/04

## FIRST AMENDMENT TO CLIENT CONTRACT

THIS FIRST AMENDMENT TO Client CONTRACT (this "First Amendment") dated as of this 31st day of March, 1999, amending that certain Client Contract dated May 13, 1998, (as amended, supplemented or otherwise modified from time to time, the "Seller Contract") by and between Residential Funding Corporation, a Delaware corporation ("Residential Funding") and Cendant Mortgage Corporation a New Jersey Corporation("Cendant").

### RECITALS

WHEREAS, Cendant has requested that the Client Contract be amended for its benefit so as to enable Bishop's Gate Residential Mortgage Trust, a Delaware Business Trust administered by Cendant ("Bishop's Trust" and, together with Cendant, the "Client") to sell Loans to Residential Funding pursuant to the Client Contract, and Residential Funding is willing to grant such request on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises, and the terms, conditions and agreements set forth below, Residential Funding, Cendant and Bishop's Trust hereby agree as follows:

1.  Defined Terms.  All capitalized terms used herein and not otherwise defined shall have the meanings assigned to those terms in the Client Contract or, as appropriate, in the Residential Funding Client Guide incorporated therein by reference.  All references in the Client Contract to the term "Client" shall hereafter be deemed to refer to both Cendant and Bishop's Trust.

2.  Joint and Several Liability of Cendant and Bishop's Trust.  Effective immediately, both Bishop's Trust and Cendant shall be permitted to sell Loans to Residential Funding pursuant to, and on the terms and conditions set forth in, the Client Contract, as amended hereby.  Cendant agrees to be liable for all agreements, obligations, representations, warranties, indemnities and covenants of any kind undertaken by the Client pursuant to the Client Contract and the Residential Funding Client Guide incorporated therein by reference, including but not limited to, all repurchase and other obligations of any kind with respect to any Loan, regardless of whether that Loan was sold to Residential Funding by Cendant or Bishop's Trust.  Bishop's Trust agrees to be liable for all representations, warranties, indemnities and covenants undertaken by Client pursuant to the Client contract and the Residential Funding Client Guide incorporated therein by reference, that relate to the title and ownership of the loans

-1-

03/31/99    16:07    MORTG... SERVICES → GMAC RFC                            NO.821    P03
MAR 31 1999 09:55 FR RESIDENTIAL FUNDING   612 975 4191 TO 916094144198   P.03/04

sold to RFC by Bishop's Trust. Without limiting the generality of
the foregoing, Cendant acknowledges and agrees that the Client
shall be responsible for, and shall be deemed to have made, each
of the representations and warranties set forth in the Client
Contract and in the Residential Funding Client Guide incorporated
therein by reference, except that Residential Funding acknowledges
that Bishop's Trust does not currently satisfy the Client
Eligibility requirements specified in the   Residential Funding
Client Guide.  Provided further, and notwithstanding any other
provision herein to the contrary, Cendant shall not be liable for
representations   or   warranties   in   Client   Guide   relating   to
ownership or title to the Loans sold to Residential Funding by
Bishop's Trust.

3.   Address for Notices.

Notices   sent   to   Bishop's   Trust   pursuant   to   the   Client
Contract, as amended hereby, must be sent to:

> Bishop's Gate Residential Mortgage Trust
> C/O Cendant Mortgage Corporation
> 6000 Atrium Way
> Mt. Laurel, NJ  08054
> Attn:  Vice president B Secondary Market
> Mail Stop:  SM55

4.   Board Resolutions.   In conjunction with the execution
and delivery of this First Amendment, Bishop's Trust agrees to
deliver to Residential Funding a certified true copy of the Trust
Agreement between Cendant and First Union Trust Company National
Association which Trust Agreement evidences the authority of
Bishop's Trust to execute, deliver and perform this First
Amendment.

5.   Miscellaneous.   Except as amended hereby, the Client
Contract shall remain in full force and effect and any reference
in any other document to the Client Contract shall be deemed to
refer to the Client Contract as amended hereby.   This First
Amendment may be executed in any number of counterparts, but
regardless of the number of counterparts, they shall constitute
only one agreement.  All section headings contained herein are for
convenience only and shall not be construed to limit or in any
other way affect any provision of this First Amendment.

-2-

12-12020-mg   Doc 7255-1   Filed 07/11/14   Entered 07/11/14 18:20:13   Exhibit
CASE 09-134-cv-03003445AM-SER Document 1 Entered 07/11/14 13:18 Page 13 of 127
Attachment 1 to Declaration of Daniel F. Markham   Pg 30 of 144

04/08/99    16:56    MORTGAGE SERVICES → GMAC RFC                    NO.982    P02

03/31/99    16:07    MORTGAGE SERVICES → GMAC RFC                    NO.981    P04
02/21/99        19:19    612 979 4191
MAR 31 1999 09:40 FR RESIDENTIAL FUNDING  612 979 4191 TO 3180841441?     P.04/04

        IN WITNESS WHEREOF, the duly authorized officers of Cendant,
Bishop's Trust and Residential Funding have executed this First
Amendment as of the date first above written.

Attested by:                         Cendant Mortgage Corporation

_____     By  _____
                                Name _____ Eric A. Thomas

                                Title    Vice    President


Attested by:                         Bishop's Gate Residential Mortgage
                                     Trust

_____     By  Cendant Mortgage Corporation,
                                 Administrator
                                Name _____
                                Title   Vice   President


Attested by:                         Residential Funding Corporation

_____     By  _____
                                Name _____
                                Title   Director

                                    -3-

** TOTAL PAGE.04 **

P.04    612 979 4004 TO 3180841441?8                      APR 01 1999 13:12 FR RFC

12-12020-mg Doc 7255-1 Filed 07/11/14 Entered 07/11/14 18:20:13 Exhibit
CASE 2:13-cv-03560-SRC Document 1 Filed 07/11/14 Page 14 of 121
Attachment 1 to Declaration of Daniel F. Markham    Pg 31 of 144

MORTGAGE LOAN FLOW PURCHASE, SALE & SERVICING AGREEMENT

dated as of September 1, 2006

between

RESIDENTIAL FUNDING CORPORATION, Purchaser

and

PHH MORTGAGE CORPORATION and

BISHOP'S GATE RESIDENTIAL MORTGAGE TRUST
(formerly known as CENDANT RESIDENTIAL MORTGAGE TRUST)
Sellers

TABLE OF CONTENTS

**Page**

ARTICLE I:     DEFINITIONS.........................................................................................1

    Section 1.01      Defined Terms ..........................................................1

ARTICLE II:    SALE AND CONVEYANCE OF MORTGAGE LOANS;
                POSSESSION OF MORTGAGE FILES; BOOKS AND RECORDS;
                DELIVERY OF MORTGAGE LOAN DOCUMENTS ...............................16

    Section 2.01      Sale and Conveyance of Mortgage Loans ...........................................16

    Section 2.02      Possession of Mortgage Files ........................................................17

    Section 2.03      Books and Records ...........................................................17

    Section 2.04      Defective Documents; Delivery of Mortgage Loan Documents .......18

    Section 2.05      Transfer of Mortgage Loans ........................................................19

ARTICLE III:   REPRESENTATIONS, WARRANTIES AND COVENANTS OF
                THE SELLER; REPURCHASE AND SUBSTITUTION; REVIEW
                OF MORTGAGE LOANS ...........................................................................20

    Section 3.01      Representations, Warranties and Covenants of each Seller...............20

    Section 3.02      Representations, Warranties and Covenants of the Servicer .............23

    Section 3.03      Representations and Warranties as to Individual Mortgage
                Loans...........................................................................................24

    Section 3.04      Repurchase and Substitution.............................................................33

    Section 3.05      Updates to PHH Guide and References in Purchase Price and
                Terms Letters ..............................................................................35

    Section 3.06      Premium Recapture......................................................................35

    Section 3.07      Certain Covenants of each Seller and the Servicer............................36

ARTICLE IV:    REPRESENTATIONS AND WARRANTIES OF THE PURCHASER
                AND CONDITIONS PRECEDENT TO FUNDING ...................................36

    Section 4.01      Representations and Warranties...........................................................36

    Section 4.02      Conditions Precedent to Closing,.........................................................39

ARTICLE V:     ADMINISTRATION AND SERVICING OF MORTGAGE LOANS .........39

    Section 5.01      PHH Mortgage to Act as Servicer; Servicing Standards;
                Additional Documents; Consent of the Purchaser ..............................39

    Section 5.02      Collection of Mortgage Loan Payments ...........................................42

    Section 5.03      Notice of Foreclosure Sale................................................................42

    Section 5.04      Establishment of Collection Account; Deposits in Collection

|  |  | Account | 43 |
| Section 5.05 | | Permitted Withdrawals from the Collection Account | 44 |
| Section 5.06 | | Establishment of Escrow Accounts; Deposits in Escrow | 45 |
| Section 5.07 | | Permitted Withdrawals From Escrow Accounts | 45 |
| Section 5.08 | | Payment of Taxes, Insurance and Other Charges; Maintenance of Primary Insurance Policies; Collections Thereunder | 45 |
| Section 5.09 | | Transfer of Accounts | 46 |
| Section 5.10 | | Maintenance of Hazard Insurance | 47 |
| Section 5.11 | | Reserved | 48 |
| Section 5.12 | | Fidelity Bond; Errors and Omissions Insurance | 48 |
| Section 5.13 | | Realization Upon Specially Serviced Mortgage Loans and REO Properties | 49 |
| Section 5.14 | | Management of REO Properties | 51 |
| Section 5.15 | | Sale of REO Properties | 52 |
| Section 5.16 | | Investment of Funds in the Collection Account | 53 |
| Section 5.17 | | MERS | 53 |
| Section 5.18 | | Pledged Asset Mortgage Loans | 54 |
| ARTICLE VI: | REPORTS; REMITTANCES; ADVANCES | | 58 |
| Section 6.01 | | Remittances | 58 |
| Section 6.02 | | Reporting | 59 |
| Section 6.03 | | Monthly Advances by the Servicer | 60 |
| Section 6.04 | | Non Recoverable Advances | 60 |
| Section 6.05 | | Officer's Certificate | 60 |
| ARTICLE VII: | GENERAL SERVICING PROCEDURE | | 60 |
| Section 7.01 | | Enforcement of Due-on-Sale Clauses, Assumption Agreements | 60 |
| Section 7.02 | | Satisfaction of Mortgages and Release of Mortgage Files | 61 |
| Section 7.03 | | Servicing Compensation | 62 |
| Section 7.04 | | [RESERVED] | 63 |
| Section 7.05 | | [RESERVED] | 63 |
| Section 7.06 | | Purchaser's Right to Examine Servicer Records and Obtain Copies | 63 |
| ARTICLE VIII: | REPORTS TO BE PREPARED BY THE SERVICER | | 63 |
| Section 8.01 | | Financial Statements | 63 |

-ii-

ARTICLE IX:     THE SELLERS AND SERVICER ..................................................... 64
    Section 9.01     Indemnification; Third Party Claims ......................................... 64
    Section 9.02     Merger or Consolidation of the Seller ...................................... 65
    Section 9.03     Limitation on Liability of the Sellers and Others .................... 65
    Section 9.04     Servicer Not to Resign ............................................................ 65

ARTICLE X:     DEFAULT ............................................................................... 66
    Section 10.01    Events of Default .................................................................... 66

ARTICLE XI:     TERMINATION ........................................................................ 67
    Section 11.01    Term and Termination ............................................................ 67
    Section 11.02    Survival .................................................................................. 68

ARTICLE XII:     GENERAL PROVISIONS ......................................................... 68
    Section 12.01    Successor to the Servicer ....................................................... 68
    Section 12.02    Governing Law ....................................................................... 69
    Section 12.03    Notices .................................................................................... 69
    Section 12.04    Severability of Provisions ...................................................... 69
    Section 12.05    Schedules and Exhibits .......................................................... 69
    Section 12.06    General Interpretive Principles .............................................. 69
    Section 12.07    Waivers and Amendments, Noncontractual Remedies;
                     Preservation of Remedies ...................................................... 70
    Section 12.08    Captions .................................................................................. 70
    Section 12.09    Counterparts; Effectiveness .................................................. 70
    Section 12.10    Entire Agreement; Amendment ............................................. 71
    Section 12.11    Further Assurances ................................................................. 71
    Section 12.12    Intention of the Seller ............................................................ 71
    Section 12.13    No Partnership ........................................................................ 71

ARTICLE XIII:     COMPLIANCE WITH REGULATION AB
    Section 13.01    Intent of the Parties; Reasonableness ..................................... 71
    Section 13.02    Additional Representations and Warranties of PHH Mortgage ......... 72
    Section 13.03    Information to Be Provided by PHH Mortgage ..................... 73
    Section 13.04    Servicer Compliance Statement ............................................. 77
    Section 13.05    Report on Assessment of Compliance and Attestation ........... 77
    Section 13.06    Use of Subservicers and Subcontractors ............................... 78

12-12020-mg   Doc 7255-1   Filed 07/11/14   Entered 07/11/14 18:20:13   Exhibit
CASE 09:13-cv-03503-AM-SER   Document 1   Entered 07/11/14 13:18   Page 18 of 127
Attachment 1 to Declaration of Daniel F. Markham    Pg 35 of 144

Section 13.07        Indemnification; Remedies. ......................................................... 79

## Schedules

A.    Mortgage Loan Schedule
B.    Contents of Mortgage File
     B-1 Collateral File
     B-2 Credit Documents
C.    PHH Guide

## Exhibits

Exhibit 2.05    Form of Assignment, Assumption and Recognition Agreement
Exhibit 5.01(a)  Limited Power of Attorney
Exhibit 5.01(b)  Workout compensation
Exhibit 5.01(c)Schedule of Delegated Authority
Exhibit 5.03    Form of Notice of Foreclosure

Exhibit 5.04    Form of Collection Account Letter Agreement
Exhibit 5.05(4) Form of Servicer Reimbursement Schedule
Exhibit 5.06    Form of Escrow Account Letter Agreement
Exhibit 9      Form of Officer's Certificate
Exhibit 10     Form of Warranty Bill of Sale
Exhibit 11     Form of Sarbanes-Oxley Certification
Exhibit 12     Servicing Criteria to be Addressed in Assessment of Compliance

## MORTGAGE LOAN FLOW PURCHASE, SALE & SERVICING AGREEMENT

This Mortgage Loan Flow Purchase, Sale & Servicing Agreement, dated as of September 1, 2006, is entered into between Residential Funding Corporation, as the Purchaser ("Purchaser"), PHH Mortgage Corporation ("PHH Mortgage") and Bishop's Gate Residential Mortgage Trust (formerly known as Cendant Residential Mortgage Trust) (the "Trust," together with PHH Mortgage, the "Sellers" and individually, each a "Seller"), as the Sellers.

### PRELIMINARY STATEMENT

1.    PHH Mortgage is engaged in the business, inter alia, of making loans to individuals, the repayment of which is secured by a first lien mortgage on such individuals' residences (each, a **"Mortgage Loan"**).  The Trust is engaged in the business of purchasing such Mortgage Loans from PHH Mortgage and selling same to investors.

2.    Purchaser is engaged in the business, inter alia, of purchasing Mortgage Loans for its own account.

3.    PHH Mortgage has established certain terms, conditions and loan programs, as described in the PHH Investor Manual (the **"PHH Guide"**), which may be updated from time to time, and Purchaser is willing to purchase Mortgage Loans that comply with the terms of such terms, conditions and loan programs.  The applicable provisions of the current PHH Guide are attached hereto as Schedule C.

4.    Purchaser and Sellers desire to establish a flow program whereby PHH Mortgage will make Mortgage Loans that meet the applicable provisions of the PHH Guide, and Purchaser will, on a regular basis, purchase such Mortgage Loans from PHH Mortgage or the Trust, as applicable, provided the parties agree on the price, date and other conditions or considerations as set forth in this Agreement.

5.    Purchaser and Sellers wish to prescribe the terms and manner of purchase by the Purchaser and sale by the Sellers of the Mortgage Loans, and the management and servicing of the Mortgage Loans by PHH Mortgage, as the Servicer (the " Servicer"), in this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, the Purchaser and the Sellers agree as follows:

### ARTICLE I:
### DEFINITIONS

Section 1.01    Defined TermsWhenever used in this Agreement, the following words and phrases shall have the following meaning specified in this Article:

"Accounting Cut-off Date":  The first Business Day of each month during the term hereof.

"Affiliate":  When used with reference to a specified Person, any Person that (i) directly or indirectly controls or is controlled by or is under common control with the specified Person, (ii) is an officer of, partner in or trustee of, or serves in a similar capacity with respect to, the specified person or of which the specified Person is an officer, partner or trustee, or with respect

1

to which the specified Person serves in a similar capacity, or (iii) directly or indirectly is the beneficial owner of 10% or more of any class of equity securities of the specified Person or of which the specified person is directly or indirectly the owner of 10% or more of any class of equity securities.

"Agreement": This Mortgage Loan Flow Purchase, Sale & Servicing Agreement between the Purchaser and the Sellers.

"ALTA": The American Land Title Association.

"Appraised Value": With respect to any Mortgaged Property, the lesser of: (i) the value thereof as determined by an appraisal or a PHH approved AVM (as defined in the PHH Guide) made for the originator of the Mortgage Loan at the time of origination of the Mortgage Loan by an appraiser who met the minimum requirements of Fannie Mae and Freddie Mac and (ii) the purchase price paid for the related Mortgaged Property by the Mortgagor with the proceeds of the Mortgage Loan; provided that, in the case of a Refinanced Mortgage Loan, such value of the Mortgaged Property shall be based solely upon the value determined by an appraisal or a PHH approved AVM (as defined in the PHH Guide) made for the originator of such Refinanced Mortgage Loan at the time of origination of such Refinanced Mortgage Loan by an appraiser who met the minimum requirements of Fannie Mae and Freddie Mac.

"ARM Loan": An "adjustable rate" Mortgage Loan, the Note Rate of which is subject to periodic adjustment in accordance with the terms of the Mortgage Note.

"Assignment": An individual assignment of a Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect of record the sale or transfer of the Mortgage Loan to the Purchaser or, in the case of a MERS Mortgage Loan, an electronic transmission to MERS, identifying a transfer of ownership of the related Mortgage to the Purchaser or its designee.

"Assignment of Proprietary Lease": With respect to a Cooperative Loan, an assignment of the Proprietary Lease sufficient under the laws of the jurisdiction wherein the related Cooperative Unit is located to reflect the assignment of such Proprietary Lease.

"Assignment of Recognition Agreement": With respect to a Cooperative Loan, an assignment of the Recognition Agreement sufficient under the laws of the jurisdiction wherein the related Cooperative Unit is located to reflect the assignment of such Recognition Agreement.

"AVM": Automated Value Model. Electronic system to calculate the estimated property value from a provider that has been approved by the Seller.

"Bankruptcy Code": The Bankruptcy Reform Act of 1978 (11 U.S.C. §§ 101-1330), as amended, modified, or supplemented from time to time, and any successor statute, and all rules and regulations issued or promulgated in connection therewith.

"Business Day": Any day other than (i) a Saturday or Sunday, or (ii) a day on which the Federal Reserve Bank of New York is closed.

"Code": The Internal Revenue Code of 1986, as amended.

"Collection Account": The separate Eligible Account or accounts created and maintained pursuant to Section 5.04 which shall be entitled "PHH Mortgage Corporation, as servicer and custodian for Residential Funding Corporation, as the Purchaser of Mortgage Loans under the Mortgage Loan Flow Purchase, Sale & Servicing Agreement, dated as of September 1, 2006 (as amended)."

"Commission": The United States Securities and Exchange Commission.

"Condemnation Proceeds": All awards or settlements in respect of a taking of an entire Mortgaged Property or a part thereof by exercise of the power of eminent domain or condemnation.

"Consent": A document executed by the Cooperative Corporation (i) consenting to the sale of the Cooperative Unit to the Mortgagor and (ii) certifying that all maintenance charges relating to the Cooperative Unit have been paid.

"Control Agreement": With respect to each Pledged Asset Mortgage Loan, the Pledged Collateral Account Control Agreement between the guarantor or mortgagor, as applicable, and the related Pledged Asset Servicer, pursuant to which the guarantor or mortgagor, as applicable, has granted a security interest in a Securities Account.

"Cooperative Corporation": With respect to any Cooperative Loan, the cooperative apartment corporation that holds legal title to the related Cooperative Project and grants occupancy rights to units therein to stockholders through Proprietary Leases or similar arrangements.

"Cooperative Lien Search": A search for (a) federal tax liens, mechanics' liens, lis pendens, judgments of record or otherwise against (i) the Cooperative Corporation and (ii) the seller of the Cooperative Unit, (b) filings of Financing Statements and (c) the deed of the Cooperative Project into the Cooperative Corporation.

"Cooperative Loan": A Mortgage Loan that is secured by a first lien on and a perfected security interest in Cooperative Shares and the related Proprietary Lease granting exclusive rights to occupy the related Cooperative Unit in the building owned by the related Cooperative Corporation.

"Cooperative Pledge Agreement": The specific agreement creating a first lien on and pledge of the Cooperative Shares and the appurtenant Proprietary Lease securing a Cooperative Loan.

"Cooperative Project": With respect to any Cooperative Loan, all real property and improvements thereto and rights therein and thereto owned by a Cooperative Corporation including without limitation the land, separate dwelling units and all common elements.

"Cooperative Shares": With respect to any Cooperative Loan, the shares of stock issued by a Cooperative Corporation and allocated to a Cooperative Unit and represented by a stock certificates.

"Cooperative Unit": With respect to any Cooperative Loan, a specific unit in a Cooperative Project.

3

"Credit Documents": Those documents, comprising part of the Mortgage File, required of the Mortgagor, as described in Section 2 (Specific Loan Program Guidelines) of the PHH Guide. The Credit Documents are specified on Schedule B-2 hereto.

"Cut-off Date": The first day of the month in which the respective Funding Date occurs.

"Defective Mortgage Loan": As defined in Section 3.04.

"Deleted Mortgage Loan": A Mortgage Loan replaced or to be replaced with a Qualified Substitute Mortgage Loan.

"Depositor": The depositor, as such term is defined in Regulation AB, with respect to any Securitization Transaction.

"Determination Date": The 16th day of each calendar month, commencing on the 16th day of the month following the Funding Date, or, if such 16th day is not a Business Day, the Business Day immediately preceding such 16th day.

"Due Date": With respect to any Mortgage Loan, the day of the month on which each Monthly Payment is due thereon, exclusive of any days of grace.

"Due Period": With respect to each Remittance Date, the period commencing on the first day of the month immediately preceding the month of such Remittance Date and ending on the last day of the month immediately preceding the month of such Remittance Date.

"Eligible Account": One or more accounts that are maintained with (i) a depository institution, the long-term unsecured debt obligations of which are rated by Moody's Investors Service, Inc. or Standard & Poor's Ratings Services, a division of McGraw-Hill Companies, Inc. (or a comparable rating agency) in one of its three highest rating categories, (ii) the corporate trust department of a national bank, (iii) a depository which fully insures the Eligible Account with insurance provided by the FDIC, or (iv) such other institution acceptable to the Purchaser.

"Environmental Assessment": A "Phase I" environmental assessment of a Mortgaged Property prepared by an Independent Person who regularly conducts environmental assessments and who has any necessary license(s) required by applicable law and has five years experience in conducting environmental assessments.

"Environmental Conditions Precedent to Foreclosure": As defined in Section 5.13.

"Environmental Laws": All federal, state, and local statutes, laws, regulations, ordinances, rules, judgments, orders, decrees or other governmental restrictions relating to the environment or to emissions, discharges or releases of pollutants, contaminants or industrial, toxic or hazardous substances or wastes into the environment, including ambient air, surface water, ground water, or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants or industrial, toxic or hazardous substances or wastes or the cleanup or other remediation thereof.

"Escrow Account": The separate Eligible Account or accounts created and maintained pursuant to Section 5.06 which shall be entitled "PHH Mortgage Corporation, as servicer and custodian for Residential Funding Corporation, as the Purchaser under the Mortgage Loan Flow

4

Purchase, Sale & Servicing Agreement, dated as of September 1, 2006 (as amended), and various mortgagors."

"Escrow Payments":   The amounts constituting ground rents, taxes, assessments, mortgage insurance premiums, fire and hazard insurance premiums and other payments required to be escrowed by the Mortgagor with the mortgagee pursuant to any Mortgage Loan.

"Estoppel Letter":  A document executed by the Cooperative Corporation certifying, with respect to a Cooperative Unit, (i) the appurtenant Proprietary Lease will be in full force and effect as of the date of issuance thereof, (ii) the related Stock Certificate was registered in the Mortgagor's name and the Cooperative Corporation has not been notified of any lien upon, pledge of, levy of execution on or disposition of such Stock Certificate, and (iii) the Mortgagor is not in default under the appurtenant Proprietary Lease and all charges due the Cooperative Corporation have been paid.

"Exchange Act":  The Securities Exchange Act of 1934, as amended.

"Event of Default":  Any one of the conditions or circumstances enumerated in Section 10.01.

"Fannie Mae":  The Federal National Mortgage Association or any successor organization.

"Fannie Mae Guide":  The Fannie Mae Selling Guide and Single Family Servicing Guide, collectively, in effect on and after the Funding Date.

"FDIC":  The Federal Deposit Insurance Corporation or any successor organization.

"Fidelity Bond":  A fidelity bond to be maintained by the Servicer pursuant to Section 5.12.

"Financing Statement":  A financing statement in the form of a UCC-1 filed pursuant to the Uniform Commercial Code to perfect a security interest in the Cooperative Shares and Pledge Instruments.

"Financing Statement Change":  A financing statement in the form of a UCC-3 filed to continue, terminate, release, assign or amend an existing Financing Statement.

"Freddie Mac":  The Federal Home Loan Mortgage Corporation or any successor organization.

"Freddie Mac Servicing Guide":  The Freddie Mac Sellers' and Servicers' Guide in effect on and after the Funding Date.

"Funding Date":  Each date that Purchaser purchases Mortgage Loans from the Sellers hereunder.

"Gross Margin":  With respect to each ARM Loan, the fixed percentage added to the Index on each Rate Adjustment Date, as specified in each related Mortgage Note and listed in the Mortgage Loan Schedule.

"HUD": The United States Department of Housing and Urban Development, or any successor thereto and including the Federal Housing Commissioner and the Secretary of Housing and Urban Development where appropriate under the FHA Regulations.

"Independent": With respect to any specified Person, such Person who: (i) does not have any direct financial interest or any material indirect financial interest in the applicable Mortgagor, the Sellers, the Purchaser, or their Affiliates; and (b) is not connected with the applicable Mortgagor, the Sellers, the Purchaser, or their respective Affiliates as an officer, employee, promoter, underwriter, trustee, member, partner, shareholder, director, or Person performing similar functions.

"Index": With respect to each ARM Loan, on each Rate Adjustment Date, the applicable rate index set forth on the Mortgage Loan Schedule, which shall be an index described on such Mortgage Loan Schedule.

"Insolvency Proceeding": With respect to any Person: (i) any case, action, or proceeding with respect to such Person before any court or other governmental authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up, or relief of debtors; or (ii) any general assignment for the benefit of creditors, composition, marshaling of assets for creditors, or other, similar arrangement in respect of the creditors generally of such Person or any substantial portion of such Person's creditors; in any case undertaken under federal, state or foreign law, including the Bankruptcy Code.

"Insurance Proceeds": Proceeds of any Primary Insurance Policy, title policy, hazard policy or other insurance policy covering a Mortgage Loan, if any, to the extent such proceeds are not to be applied to the restoration of the related Mortgaged Property or released to the Mortgagor in accordance with the procedures that the Servicer would follow in servicing mortgage loans held for its own or its Affiliates' account or managed by it for third-party institutional investors.

"Legal Documents": Those documents, comprising part of the Mortgage File, set forth in Schedule B-1 of this Agreement.

"Lender-Paid Mortgage Insurance Rate": With respect to any Mortgage Loan, the Lender-Paid Mortgage Insurance Rate for any "lender-paid" Primary Insurance Policy shall be a per annum rate equal to the percentage indicated on the Mortgage Loan Schedule.

"Liquidation Proceeds": Amounts, other than Insurance Proceeds and Condemnation Proceeds, received by the Servicer in connection with the liquidation of a defaulted Mortgage Loan through trustee's sale, foreclosure sale or otherwise, other than amounts received following the acquisition of an REO Property in accordance with the provisions hereof.

"Loan-to-Value Ratio" or "LTV": With respect to any Mortgage Loan, the original principal balance of such Mortgage Loan divided by the Appraised Value of the related Mortgaged Property, subject to any applicable law for calculating the LTV. The Loan-to-Value Ratio of any Pledged Asset Mortgage Loan shall be calculated by reducing the principal balance of such Pledged Asset Mortgage Loan by the amount of the Original Pledged Asset Requirement with respect to such Mortgage Loan. This is referred to in the PHH Guide as the effective loan-to-value.

6

"MAI Appraiser": With respect to any real property, a member of the American Institute of Real Estate Appraisers with a minimum of 5 years of experience appraising real property of a type similar to the real property being appraised and located in the same geographical area as the real property being appraised.

"MERS": Mortgage Electronic Registration Systems, Inc., a Delaware corporation, or any successor in interest thereto.

"MERS Eligible Mortgage Loan": Any Mortgage Loan that under applicable law and investor requirements is recordable in the name of MERS in the jurisdiction in which the related Mortgaged Property is located.

"MERS Mortgage Loan": Any Mortgage Loan as to which the related Mortgage, or an Assignment, has been recorded in the name of MERS, as agent for the holder from time to time of the Mortgage Note.

"Maximum Rate": With respect to each ARM Loan, the rate per annum set forth in the related Mortgage Note as the maximum Note Rate thereunder. The Maximum Rate as to each ARM Loan is set forth on the related Mortgage Loan Schedule.

"Minimum Rate": With respect to each ARM Loan, the rate per annum set forth in the related Mortgage Note as the minimum Note Rate thereunder. The Minimum Rate as to each ARM Loan is set forth on the related Mortgage Loan Schedule. The floor in all cases will never be less than the margin.

"Monthly Advance": The aggregate amount of the advances made by the Servicer on any Remittance Date pursuant to and as more fully described in Section 6.03.

"Monthly Payment": The scheduled monthly payment of principal and interest on a Mortgage Loan which is payable by a Mortgagor under the related Mortgage Note.

"Monthly Period": Initially, the period from the Funding Date through to and including the first Record Date during the term hereof, and, thereafter, the period commencing on the day after each Record Date during the term hereof and ending on the next succeeding Record Date during the term hereof (or, if earlier, the date on which this Agreement terminates).

"Mortgage": The mortgage, deed of trust or other instrument securing a Mortgage Note, which creates a first lien on either (i) with respect to a Mortgage Loan other than a Cooperative Loan, an unsubordinated estate in fee simple in real property or (ii) with respect to a Cooperative Loan, the Proprietary Lease and related Cooperative Shares, which in either case secures the Mortgage Note.

"Mortgage File": With respect to a particular Mortgage Loan, those origination and servicing documents, escrow documents, and other documents as are specified on Schedule B-1 and B-2 to this Agreement. These documents shall be stored in a secure manner using paper or electronic storage.

"Mortgage Loan": Each individual mortgage loan or Cooperative Loan (including all documents included in the Mortgage File evidencing the same, all Monthly Payments, Principal Prepayments, Insurance Proceeds, Condemnation Proceeds, Liquidation Proceeds, and other

7

proceeds relating thereto, and any and all rights, benefits, proceeds and obligations arising therefrom or in connection therewith) which is the subject of this Agreement and the related Purchase Price and Terms Letter. The Mortgage Loans subject to this Agreement shall be identified on Mortgage Loan Schedules prepared in connection with each Funding Date.

"Mortgage Loan Schedule": The list of Mortgage Loans identified on each Funding Date that sets forth the information with respect to each Mortgage Loan that is specified on Schedule A hereto (as amended from time to time to reflect the addition of any Qualified Substitute Mortgage Loans). A Mortgage Loan Schedule will be prepared for each Funding Date.

"Mortgage Note": The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

"Mortgaged Property": With respect to a Mortgage Loan, the underlying real property securing repayment of a Mortgage Note, consisting of a fee simple estate.

"Mortgagor": The obligor on a Mortgage Note.

"Negative Amortization": That portion of interest accrued at the Note Rate in any month that exceeds the interest portion of the Monthly Payment on the related Mortgage Loan for such month and that, pursuant to the terms of the Mortgage Note, is added to the principal balance of the Mortgage Loan.

"Non-recoverable Advance": As of any date of determination, any Monthly Advance or Servicing Advance previously made or any Monthly Advance or Servicing Advance proposed to be made in respect of a Mortgage Loan that, in the good faith judgment of the Servicer and in accordance with the servicing standard set forth in Section 5.01, will not or, in the case of a proposed advance, would not be ultimately recoverable pursuant to Section 5.05 (3) or (4) hereof. The determination by the Servicer that it has made a Non-recoverable Advance or that any proposed advance would constitute a Non-recoverable Advance shall be evidenced by an Officer's Certificate satisfying the requirements of Section 6.04 hereof and delivered to the Purchaser on or before the Determination Date in any month.

"Note Rate": With respect to any Mortgage Loan at any time any determination thereof is to be made, the annual rate at which interest accrues thereon.

"Offering Materials": All documents, tapes, or other materials relating to the Mortgage Loans provided by Seller to Purchaser prior to Purchaser submitting its bid to purchase the Mortgage Loans.

"Officers' Certificate": A certificate signed by (i) the President or a Vice President and (ii) the Treasurer or the Secretary or one of the Assistant Treasurers or Assistant Secretaries of the Servicer, and delivered by the Servicer to the Purchaser as required by this Agreement.

"Original Pledged Asset Requirement": With respect to any Pledged Asset Mortgage Loan, an amount equal to the Pledged Assets required at the time of the origination of such Pledged Asset Mortgage Loan. Even though for other purposes the Original Pledged Asset Requirement may actually exceed thirty percent (30%) of the original principal balance of a Pledged Asset Mortgage Loan, solely for purposes of the Required Surety Payment, the Original

8

Pledged Asset Requirement for a Pledged Asset Mortgage Loan will be deemed not to exceed thirty percent (30%) of its original principal balance.

"Payment Adjustment Date": The date on which Monthly Payments shall be adjusted in accordance with the related Mortgage Notes. A Payment Adjustment Date shall occur on the date that is eleven months from the first payment date for any ARM Loan, unless otherwise specified in the related Mortgage Note, and on each anniversary of such first Payment Adjustment Date.

"Payoff": With respect to any Mortgage Loan, any payment or recovery received in advance of the last scheduled Due Date of such Mortgage Loan, which payment or recovery consists of principal in an amount equal to the outstanding principal balance of such Mortgage Loan, all accrued and unpaid prepayment penalties, premiums, and/or interest with respect thereto, and all other unpaid sums due with respect to such Mortgage Loan.

"Periodic Rate Cap": With respect to each ARM Loan, the maximum or minimum permissible percentage increases and decreases in the Note Rate on any Rate Adjustment Date determined in accordance with the related Mortgage Note.

"Permitted Investments": Investments that mature, unless payable on demand, not later than the Business Day preceding the related Remittance Date; provided that such investments shall only consist of the following:

> (i)  direct obligations of, or obligations fully guaranteed as to principal and interest by, the United States or any agency or instrumentality thereof, provided such obligations are backed by the full faith and credit of the United States;

> (ii)  repurchase obligations (the collateral for which is held by a third party) with respect to any security described in clause (i) above, provided that the long-term unsecured obligations of the party agreeing to repurchase such obligations are at the time rated by each Rating Agency in one of its two highest rating categories;

> (iii)  certificates of deposit, time deposits and bankers' acceptances of any bank or trust company incorporated under the laws of the United States or any state, provided that the long-term unsecured debt obligations of such bank or trust company (or, in the case of the principal depository institution of a depository institution holding company, the long-term unsecured debt obligations of the depository institution holding company) at the date of acquisition thereof have been rated by each Rating Agency in one of its two highest rating categories;

> (iv)  commercial paper (having original maturities of not more than 365 days) of any corporation incorporated under the laws of the United States or any state thereof which on the date of acquisition has been rated by each Rating Agency in its highest rating category; and

(v)    any other demand, money market or time deposit account or obligation, or interest-bearing or other security or investment, acceptable to the Purchaser (such acceptance evidenced in writing);

provided further that "Permitted Investments" shall not include any instrument described hereunder that evidences either the right to receive (a) only interest with respect to the obligations underlying such instrument or (b) both principal and interest payments derived from obligations underlying such instrument and the interest and principal payments with respect to such instrument provide a yield to maturity at par greater than 120% of the yield to maturity at par of the underlying obligations.

"Person":  Any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"PHH Guide":    As defined in paragraph 3 of the Preliminary Statement to this Agreement.

"PHH Information":  As defined in Section 13.07(a).

"Pledge Agreements": Each Control Agreement and Pledged Asset Agreement for each Pledged Asset Mortgage Loan.

"Pledged Assets": With respect to any Pledged Asset Mortgage Loan, the related Securities Account and the financial assets held therein subject to a security interest pursuant to the related Pledged Asset Agreement.

"Pledged Asset Agreement": With respect to each Pledged Asset Mortgage Loan, the Pledge Agreement for Securities Account between the related mortgagor and the related Pledged Asset Servicer pursuant to which such mortgagor granted a security interest in the related securities and other financial assets held therein.

"Pledged Asset Mortgage Loan": Each Mortgage Loan as to which Pledged Assets, in the form of a security interest in the Securities Account and the financial assets held therein and having a value, as of the date of origination of such Mortgage Loan, of at least equal to the related Original Pledged Asset Requirement, were required to be provided at the closing thereof, which is subject to the terms of this Agreement from time to time.

"Pledged Asset Servicer": The entity responsible for administering and servicing the Pledged Assets with respect to a Pledged Asset Mortgage Loan, as identified in the Purchase Price and Terms Letter.

"Pledged Asset Servicing Agreement":  With respect to each Pledged Asset Mortgage Loan, the Agreement between the related Pledged Asset Servicer and PHH Mortgage, including any exhibits thereto, pursuant to which such Pledged Asset Servicer shall service and administer the related Pledged Assets.

"Pledge Instruments": With respect to each Cooperative Loan, the Stock Power, the Assignment of the Proprietary Lease, the Assignment of the Mortgage Note and the Cooperative Pledge Agreement.

"Prepaid Monthly Payment": Any Monthly Payment received prior to its scheduled Due Date and intended to be applied to a Mortgage Loan on its scheduled Due Date.

"Prepayment Interest Shortfall Amount": With respect to any Mortgage Loan that was subject to a voluntary (not including discounted payoffs and short sales) Principal Prepayment in full or in part during any Due Period, which Principal Prepayment was applied to such Mortgage Loan prior to such Mortgage Loan's Due Date in such Due Period, the amount of interest (net of the related Servicing Fee for Principal Prepayments in full only) that would have accrued on the amount of such Principal Prepayment during the period commencing on the date as of which such Principal Prepayment was applied to such Mortgage Loan and ending on the day immediately preceding such Due Date, inclusive.

"Primary Insurance Policy": Each primary policy of mortgage insurance in effect with respect to a Mortgage Loan and as so indicated on the Mortgage Loan Schedule, or any replacement policy therefor obtained by the Servicer pursuant to Section 5.08.

"Principal Prepayment": Any payment or other recovery of principal on a Mortgage Loan (including a Payoff), other than a Monthly Payment or a Prepaid Monthly Payment that is received in advance of its scheduled Due Date, including any prepayment penalty or premium thereon, is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment and is intended to reduce the principal balance of the Mortgage Loan.

"Principal Prepayment Period": The Due Period preceding the related Remittance Date.

"Proprietary Lease": The lease on a Cooperative Unit evidencing the possessory interest of the owner of the Cooperative Shares in such Cooperative Unit.

"Purchase Price": As to each Mortgage Loan to be sold hereunder, the price set forth in the Mortgage Loan Schedule and the related Purchase Price and Terms Letter.

"Purchase Price Percentage": As to each Mortgage Loan to be sold hereunder, the price set forth in the Mortgage Loan Schedule and the related Purchase Price and Terms Letter, expressed as a percentage of the aggregate principal balance of the Mortgage Loan.

"Purchase Price and Terms Letter": With respect to each purchase of Mortgage Loans, that certain letter agreement setting forth the general terms and conditions of such transaction and identifying the Mortgage Loans to be purchased thereunder by and between the Seller and the Purchaser, which will be in a form customarily used by PHH Mortgage for similar types of purchases.

"Purchaser": Residential Funding Corporation, or its successor in interest or any successor under this Agreement appointed as herein provided.

"Purchaser's Account": The account of the Purchaser at a bank or other entity most recently designated in a written notice by the Purchaser to the Sellers as the "Purchaser's Account."

"Qualified Correspondent": Any Person from which PHH Mortgage purchased Mortgage Loans, provided that the following conditions are satisfied: (i) such Mortgage Loans

11

were originated pursuant to an agreement between PHH Mortgage and such Person that contemplated that such Person would underwrite mortgage loans from time to time, for sale to PHH Mortgage, in accordance with underwriting guidelines designated by PHH Mortgage ("Designated Guidelines") or guidelines that do not vary materially from such Designated Guidelines; (ii) such Mortgage Loans were in fact underwritten as described in clause (i) above and were acquired by PHH Mortgage within 180 days after origination; (iii) either (x) the Designated Guidelines were, at the time such Mortgage Loans were originated, used by PHH Mortgage in origination of mortgage loans of the same type as the Mortgage Loans for PHH Mortgage's own account or (y) the Designated Guidelines were, at the time such Mortgage Loans were underwritten, designated by PHH Mortgage on a consistent basis for use by lenders in originating mortgage loans to be purchased by PHH Mortgage; and (iv) PHH Mortgage employed, at the time such Mortgage Loans were acquired by PHH Mortgage, pre-purchase or post-purchase quality assurance procedures (which may involve, among other things, review of a sample of mortgage loans purchased during a particular time period or through particular channels) designed to ensure that Persons from which it purchased mortgage loans properly applied the underwriting criteria designated by PHH Mortgage.

"Qualified Mortgage Insurer": A mortgage guaranty insurance company duly qualified as such under the laws of the states in which the Mortgaged Properties are located if such qualification is necessary to issue the applicable insurance policy or bond, duly authorized and licensed in such states to transact the applicable insurance business and to write the insurance provided, and approved as an insurer by Fannie Mae or Freddie Mac (or with a different rating as may be required by a Rating Agency in connection with a Pass-Through Transfer in order to achieve the desired ratings for the securities to be issued).

"Qualified Substitute Mortgage Loan": A Mortgage Loan substituted by a Seller for a Deleted Mortgage Loan which must, on the date of such substitution, be reasonably acceptable to the Purchaser and (i) have an outstanding principal balance, after deduction of all scheduled payments due and received in the month of substitution (or in the case of a substitution of more than one Mortgage Loan for a Deleted Mortgage Loan, an aggregate principal balance), not in excess of the Unpaid Principal Balance of the Deleted Mortgage Loan and not less than ninety percent (90%) of the Unpaid Principal Balance of the Deleted Mortgage Loan (the amount of any shortfall to be distributed by the applicable Seller to the Purchaser in the month of substitution), (ii) have a remaining term to maturity not greater than (and not more than one year less than) that of the Deleted Mortgage Loan, (iii) have a Note Rate not less than (and not more than one percentage point greater than) the Note Rate of the Deleted Mortgage Loan, (iv) with respect to each ARM Loan, have a Minimum Rate not less than that of the Deleted Mortgage Loan, (v) with respect to each ARM Loan, have a Maximum Rate not less than that of the Deleted Mortgage Loan and not more than two (2) percentage points above that of the Deleted Mortgage Loan, (vi) with respect to each ARM Loan, have a Gross Margin not less than that of the Deleted Mortgage Loan, (vii) with respect to each ARM Loan, have a Periodic Rate Cap equal to that of the Deleted Mortgage Loan, (viii) have a Loan-to-Value Ratio at the time of substitution equal to or less than the Loan-to-Value Ratio of the Deleted Mortgage Loan at the time of substitution, (ix) with respect to each ARM Loan, have the same Rate Adjustment Date as that of the Deleted Mortgage Loan, (x) with respect to each ARM Loan, have the same Index as that of the Deleted Mortgage Loan, (xi) comply as of the date of substitution with each representation and warranty set forth in Sections 3.01, 3.02 and 3.03, (xii) be in the same credit grade category as the Deleted Mortgage Loan and (xiii) have the same prepayment penalty term.

12

"Rate Adjustment Date":  With respect to each ARM Loan, the date on which the Note Rate adjusts.

"Rating Agency":  Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Moody's Investors Service, Inc., and Fitch, Inc.

"Recognition Agreement":  An agreement among a Cooperative Corporation, a lender and a Mortgagor with respect to a Cooperative Loan whereby such parties (i) acknowledge that such lender may make, or intends to make, such Cooperative Loan, and (ii) make certain agreements with respect to such Cooperative Loan.

"Reconstitution":  Any Securitization Transaction or Whole Loan Transfer.

"Record Date":  The close of business of the first Business Day of the month of the related Remittance Date.

"Refinanced Mortgage Loan":  A Mortgage Loan that was made to a Mortgagor who owned the Mortgaged Property prior to the origination of such Mortgage Loan and the proceeds of which were used in whole or part to satisfy an existing mortgage.

"Regulation AB":  Subpart 229.1100 – Asset Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,531 (Jan. 7, 2005)) or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

"REMIC":  A "real estate mortgage investment conduit" within the meaning of Section 860D of the Internal Revenue Code or any similar tax vehicle providing for the pooling of assets.

"Remittance Date":  The 18th day of each calendar month, commencing on the 18th day of the month following the Funding Date or, if such 18th day is not a Business Day, then the first Business Day immediately preceding such 18th day.

"Remittance Rate":  With respect to each Mortgage Loan, the related Note Rate minus the Servicing Fee Rate.

"REO Disposition":  The final sale by the Servicer of any REO Property.

"REO Disposition Proceeds":  All amounts received with respect to any REO Disposition.

"REO Property":  A Mortgaged Property acquired by the Servicer on behalf of the Purchaser as described in Section 5.14.

"Repurchase Price":  As to (a) any Defective Mortgage Loan required to be repurchased hereunder with respect to which a breach occurred  or (b) any Mortgage Loan required to be repurchased pursuant to Section 3.04 and/or Section 7.02, an amount equal to (1) the Unpaid Principal Balance of such Mortgage Loan at the time of repurchase; plus (2) interest on such

Mortgage Loan at the applicable Note Rate from the last date through which interest has been paid and distributed to the Purchaser hereunder to the date of repurchase; plus (3) if the repurchase occurs on or before the expiration of six months from the Funding Date, an amount equal to the product of (A) the amount, if any, expressed as a decimal fraction, by which the Purchase Price Percentage exceeds 100% (1.00) multiplied by (B) the Unpaid Principal Balance of the Mortgage Loan as of the date of repurchase minus (4) any amounts received in respect of such Defective Mortgage Loan which are being held in the Collection Account for future remittance.

"Required Surety Payment": With respect to any defaulted Pledged Asset Mortgage Loan for which a claim is payable under the related Surety Bond under the procedures referred to herein, the lesser of (i) the principal portion of the realized loss with respect to such Mortgage Loan and (ii) the excess, if any, of (a) the amount of Pledged Assets required at origination with respect to such Mortgage Loan (but not more than 30% of the original principal balance of such Mortgage Loan) over (b) the net proceeds realized by the related Pledged Asset Servicer from the related Pledged Assets.

"Scheduled Principal Balance": With respect to any Mortgage Loan, (i) the outstanding principal balance as of the Funding Date after application of principal payments due on or before such date whether or not received, minus (ii) all amounts previously remitted to the Purchaser with respect to such Mortgage Loan representing (a) payments or other recoveries of principal, or (b) advances of principal made pursuant to Section 6.03.

"Securities Account": With respect to any Pledged Asset Mortgage Loans, the account, together with the financial assets held therein, that is the subject of the related Pledged Asset Agreement.

"Securities Act": The Securities Act of 1933, as amended.

"Securitization Transaction": Any transaction involving either (1) a sale or other transfer of some or all of the Mortgage Loans directly or indirectly to an issuing entity in connection with an issuance of publicly offered or privately placed, rated or unrated mortgage-backed securities or (2) an issuance of publicly offered or privately placed, rated or unrated securities, the payments on which are determined primarily by reference to one or more portfolios of residential mortgage loans consisting, in whole or in part, of some or all of the Mortgage Loans.

"Sellers": PHH Mortgage Corporation, a New Jersey corporation, and Bishop's Gate Residential Mortgage Trust (formerly known as Cendant Residential Mortgage Trust), a Delaware business trust, or their successors in interest or any successor under this Agreement appointed as herein provided.

"Servicer": PHH Mortgage Corporation, a New Jersey corporation.

"Servicing Advances": All "out of pocket" costs and expenses that are (1) customary, reasonable and necessary, (2) incurred by the Servicer in the performance of its servicing obligations hereunder and (3) permitted under the Fannie Mae Guide, including (without duplication) (i) reasonable attorneys' fees and (ii) the cost of (a) the preservation, restoration and protection of the Mortgaged Property, (b) any enforcement or judicial proceedings, including foreclosures, (c) the servicing, management and liquidation of any Specially Serviced Mortgaged

Loans and/or any REO Property, and (d) compliance with the Servicer's obligations under Section 5.08.

"Servicing Criteria": The "servicing criteria" set forth in Item 1122(d) of Regulation AB, as such may be amended from time to time.

"Servicing Event": Any of the following events with respect to any Mortgage Loan: (i) any Monthly Payment being more than 60 days delinquent; (ii) any filing of an Insolvency Proceeding by or on behalf of the related Mortgagor, any consent by or on behalf of the related Mortgagor to the filing of an Insolvency Proceeding against such Mortgagor, or any admission by or on behalf of such Mortgagor of its inability to pay such Person's debts generally as the same become due; (iii) any filing of an Insolvency Proceeding against the related Mortgagor that remains undismissed or unstayed for a period of 60 days after the filing thereof; (iv) any issuance of any attachment or execution against, or any appointment of a conservator, receiver or liquidator with respect to, all or substantially all of the assets of the related Mortgagor or with respect to any Mortgaged Property; (v) any receipt by the Servicer of notice of the foreclosure or proposed foreclosure of any other lien on the related Mortgaged Property; (vi) any proposal of a material modification (as reasonably determined by the Seller) to such Mortgage Loan due to a default or imminent default under such Mortgage Loan; or (vii) in the reasonable judgment of the Servicer, the occurrence, or likely occurrence within 60 days, of a payment default with respect to such Mortgage Loan that is likely to remain uncured by the related Mortgagor within 60 days thereafter.

"Servicing Fee": The annual fee, payable monthly to the Servicer out of the interest portion of the Monthly Payment and or Payoff actually received on each Mortgage Loan. The Servicing Fee with respect to each Mortgage Loan for any calendar month (or a portion thereof) shall be 1/12 of the product of (i) the Unpaid Principal Balance of the Mortgage Loan and (ii) the Servicing Fee Rate applicable to such Mortgage Loan.

"Servicing Fee Rate": Unless otherwise specified on the Mortgage Loan Schedule, (i) with respect to any ARM Loan, 0.375% per annum; provided that, prior to the first Rate Adjustment Date with respect to any such Mortgage Loan, such rate may be, at the Servicer's option, not less than 0.25% per annum; and (ii) with respect to any Mortgage Loan other than an ARM Loan, 0.25% per annum.

"Servicing Officer": Any officer of the Servicer involved in, or responsible for, the administration and servicing of the Mortgage Loans whose name appears on a written list of servicing officers furnished by the Servicer to the Purchaser upon request therefor by the Purchaser, as such list may from time to time be amended.

"Specially Serviced Mortgage Loan": A Mortgage Loan as to which a Servicing Event has occurred and is continuing.

"Static Pool Information": Static pool information as described in Item 1105(a)(1)-(3) and 1105(c) of Regulation AB.

"Stock Certificate": With respect to a Cooperative Loan, the certificates evidencing ownership of the Cooperative Shares issued by the Cooperative Corporation.

"Stock Power":  With respect to a Cooperative Loan, an assignment of the Stock Certificate or an assignment of the Cooperative Shares issued by the Cooperative Corporation.

"Subcontractor":  Any vendor, subcontractor or other Person that is not responsible for the overall servicing (as "servicing" is commonly understood by participants in the mortgage-backed securities market) of Mortgage Loans but performs one or more discrete functions identified in Item 1122(d) of Regulation AB with respect to Mortgage Loans under the direction or authority of the Servicer or a Subservicer.

"Subservicer":  Any Person that services Mortgage Loans on behalf of the Servicer or any Subservicer and is responsible for the performance (whether directly or through Subservicers or Subcontractors) of a substantial portion of the material servicing functions required to be performed by the Servicer under this Agreement or any Reconstitution agreement that are identified in Item 1122(d) of Regulation AB.

"Surety Bond": With respect to each Pledged Asset Mortgage Loan, the surety bond issued by the related Surety Bond Issuer covering such Pledged Asset Mortgage Loan.

"Surety Bond Issuer": With respect to each Pledged Asset Mortgage Loan, the surety bond issuer for the related Surety Bond covering such Pledged Asset Mortgage Loan, as identified in the Purchase Price and Terms Letter.

"Third-Party Originator":  Each Person, other than a Qualified Correspondent, that originated Mortgage Loans acquired by PHH Mortgage.

"Uniform Commercial Code": The Uniform Commercial Code as in effect on the date hereof in the State of New York; provided that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interest in any collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection.

"Unpaid Principal Balance": With respect to any Mortgage Loan, at any time, the actual outstanding principal balance then payable by the Mortgagor under the terms of the related Mortgage Note including any cumulative Negative Amortization.

"VA": The United States Department of Veterans Affairs.

"Warranty Bill of Sale":  A warranty bill of sale with respect to the Mortgage Loans purchased on a Funding Date in the form annexed hereto as Exhibit 10.

"Whole Loan Transfer": Any sale or transfer of some or all of the Mortgage Loans, other than a Securitization Transaction.

**ARTICLE II:**
**SALE AND CONVEYANCE OF MORTGAGE LOANS; POSSESSION OF MORTGAGE
FILES; BOOKS AND RECORDS; DELIVERY OF MORTGAGE LOAN DOCUMENTS**

Section 2.01    Sale and Conveyance of Mortgage Loans

Seller agrees to sell and Purchaser agrees to purchase, from time to time, those certain Mortgage Loans identified in a Mortgage Loan Schedule, at the price and on the terms set forth herein and in the related Purchase Price and Terms Letter. Purchaser, on any Funding Date, shall be obligated to purchase only such Mortgage Loans set forth in the applicable Mortgage Loan Schedule, subject to the terms and conditions of this Agreement and the related Purchase Price and Terms Letter.

Purchaser may purchase Mortgage Loan(s) from Seller, up to four (4) times per month, on such Funding Dates as may be agreed upon by Purchaser and Seller. The closing shall, at Purchaser's option be either: by telephone, confirmed by letter or wire as the parties shall agree; or conducted in person at such place as the parties shall agree. On the Funding Date and subject to the terms and conditions of this Agreement, each Seller will sell, transfer, assign, set over and convey to the Purchaser, without recourse except as set forth in this Agreement, and the Purchaser will purchase, all of the right, title and interest of the applicable Seller in and to the Mortgage Loans being conveyed by it hereunder, as identified on the Mortgage Loan Schedule.

Examination of the Mortgage Files may be made by Purchaser or its designee as follows. No later than 5 Business Days prior to the Funding Date, Seller will deliver to Purchaser or its custodian, Legal Documents required pursuant to Schedule B-1. Upon Purchaser's request, Seller shall make the Credit Documents available in either original paper form or electronic imaged format to Purchaser for review, at a mutually agreed upon location during mutually agreed upon hours. If Purchaser makes such examination prior to the Funding Date and identifies any Mortgage Loans that do not conform to the PHH Guide or satisfy any requirements in the applicable Purchase Price and Terms Letter, such Mortgage Loans will be deleted from the Mortgage Loan Schedule at Purchaser's discretion. Purchaser may, at its option and without notice to Seller, purchase all or part of the Mortgage Loans without conducting any partial or complete examination. The fact that Purchaser has conducted or has failed to conduct any partial or complete examination of the Mortgage Loan files shall not affect Purchaser's rights to demand repurchase, substitution or other relief as provided herein.

On the Funding Date and in accordance with the terms herein, Purchaser will pay to Seller by 2:00 p.m. Eastern Standard Time, by wire transfer of immediately available funds, the Purchase Price, together with interest, if any, accrued from the Cut-off Date through the day immediately preceding the Funding Date, according to the instructions to be provided, respectively, by PHH Mortgage and the Trust. Seller, simultaneously with the payment of the Purchase Price, shall execute and deliver to Purchaser a Warranty Bill of Sale with respect to the Mortgage Loans in the form annexed hereto as Exhibit 10.

Purchaser shall be entitled to all scheduled principal due after the Cut-off Date, all other recoveries of principal collected after the Cut-off Date and all payments of interest on the Mortgage Loans (minus that portion of any such payment that is allocable to the period prior to the Cut-off Date). Notwithstanding the foregoing, on the first Remittance Date after the Funding Date the Purchaser shall be entitled to receive the interest accrued from the Cut-off Date through

17

the day immediately preceding the Funding Date. The principal balance of each Mortgage Loan as of the Cut-off Date is determined after application of payments of principal due on or before the Cut-off Date whether or not collected. Therefore, payments of scheduled principal and interest prepaid for a due date beyond the Cut-off Date shall not be applied to the principal balance as of the Cut-off Date. Such prepaid amounts shall be the property of Purchaser. Seller shall hold any such prepaid amounts in trust for the benefit of Purchaser for subsequent remittance by Seller to Purchaser. All scheduled payments of principal due on or before the Cut-off Date and collected by Servicer after the Cut-off Date shall belong to Seller.

Section 2.02    Possession of Mortgage Files

Upon the sale of any Mortgage Loan, the ownership of such Mortgage Loan, including the Mortgage Note, the Mortgage, the contents of the related Mortgage File and all rights, benefits, payments, proceeds and obligations arising therefrom or in connection therewith, shall then be vested in the Purchaser, and the ownership of all records and documents with respect to such Mortgage Loan prepared by or which come into the possession of the Seller shall immediately vest in the Purchaser and, to the extent retained by the Seller, shall be retained and maintained, in trust, by the Seller at the will of the Purchaser in a custodial capacity only. The contents of such Mortgage File not delivered to the Purchaser are and shall be held in trust by the Seller for the benefit of the Purchaser as the owner thereof and the Sellers' possession of the contents of each Mortgage File so retained is at the will of the Purchaser for the sole purpose of servicing the related Mortgage Loan, and such retention and possession by the Seller is in a custodial capacity only. Mortgage Files shall be maintained by the Seller and the books and records of the Seller shall clearly reflect the sale of the related Mortgage Loan to the Purchaser. Each Seller shall release from its custody the contents of any Mortgage File only in accordance with written instructions from the Purchaser, except where such release is required as incidental to the Servicer's servicing of the Mortgage Loans or is in connection with a repurchase or substitution of any such Mortgage Loan pursuant to Section 3.04.

Any documents released to a Seller or the Servicer in connection with the foreclosure or servicing of any Mortgage Loan shall be held by such Person in trust for the benefit of the Purchaser in accordance with this Section 2.02. Such Person shall return to the Purchaser such documents when such Person's need therefor in connection with such foreclosure or servicing no longer exists (unless sooner requested by the Purchaser); provided that, if such Mortgage Loan is liquidated, then, upon the delivery by a Seller or the Servicer to the Purchaser of a request for the release of such documents and a certificate certifying as to such liquidation, the Purchaser shall promptly release and, to the extent necessary, deliver to such Person such documents.

Section 2.03    Books and Records

The sale of each of its Mortgage Loans shall be reflected on the applicable Seller's balance sheet and other financial statements as a sale of assets by the applicable Seller. Each Seller shall be responsible for maintaining, and shall maintain, a complete set of books and records for the Mortgage Loans it conveyed to the Purchaser which shall be clearly marked to reflect the sale of each Mortgage Loan to the Purchaser and the ownership of each Mortgage Loan by the Purchaser.

18

Section 2.04    Defective Documents; Delivery of Mortgage Loan Documents

If, subsequent to the related Funding Date, the Purchaser or either Seller finds
any document or documents constituting a part of a Mortgage File to be defective or missing in
any material respect (in this Section 2.04, a "Defect"), the party discovering such Defect shall
promptly so notify the other parties.    If the Defect pertains to the Mortgage Note or the
Mortgage, then the applicable Seller shall have a period of 60 days within which to correct or
cure any such defect after the earlier of such Seller's discovery of same or such Seller being
notified of same.   If such Defect can ultimately be cured but is not reasonably expected to be
cured within such 60 day period, such Seller shall have such additional time as is reasonably
determined by the Purchaser to cure or correct such Defect provided that such Seller has
commenced curing or correcting such Defect and is diligently pursuing same.    If the Defect
pertains to any other document constituting a part of a Mortgage File, then such Seller shall have
a period of 60 days within which to correct or cure any such Defect after the earlier of such
Seller's discovery of same or such Seller being notified of same.   If such Defect can ultimately
be cured but is not reasonably expected to be cured within the 60 day period, then such Seller
shall have such additional time as is reasonably determined by the Purchaser to cure or correct
such Defect provided such Seller has commenced curing or correcting such Defect and is
diligently pursuing same.    PHH Mortgage hereby covenants and agrees that, if any material
Defect cannot be corrected or cured, the related Mortgage Loan shall automatically constitute,
upon the expiration of the applicable cure period described above and without any further action
by any other party, a Defective Mortgage Loan, whereupon PHH Mortgage shall repurchase
such Mortgage Loan by paying to the Purchaser the Repurchase Price therefor in accordance
with Section 3.04.

The applicable Seller will, with respect to each Mortgage Loan to be purchased
by the Purchaser, deliver and release to the Purchaser the Legal Documents as set forth in
Section 2.01.   Seller shall pay any and all other fees, costs or expenses in connection with the
transfer of all Mortgage Loans to Purchaser. If the applicable Seller cannot deliver an original
Mortgage with evidence of recording thereon, original assumption, modification and substitution
agreements with evidence of recording thereon or an original intervening assignment with
evidence of recording thereon within the applicable time periods, then such Seller shall promptly
deliver to the Purchaser such original Mortgages and original intervening assignments with
evidence of recording indicated thereon upon receipt thereof from the public recording official,
except in cases where the original Mortgage or original intervening assignments are retained
permanently by the recording office, in which case, such Seller shall deliver a copy of such
Mortgage or intervening assignment, as the case may be, certified to be a true and complete copy
of the recorded original thereof.   If the applicable Seller cannot deliver the original security
instrument or if an original intervening assignment has been lost, then the applicable Seller will
deliver a copy of such security instrument or intervening assignment, certified by the local public
recording official.   If the original title policy has been lost, the applicable Seller will deliver a
duplicate original title policy.

If the original Mortgage was not delivered pursuant to the preceding paragraph,
then the applicable Seller shall use its best efforts to promptly secure the delivery of such
originals and shall cause such originals to be delivered to the Purchaser promptly upon receipt
thereof.    Notwithstanding the foregoing, if the original Mortgage, original assumption,
modification, and substitution agreements, the original of any intervening assignment or the
original policy of title insurance is not so delivered to the Purchaser within 180 days following

the Funding Date, then, upon written notice by the Purchaser to PHH Mortgage, the Purchaser may, in its sole discretion, then elect (by providing written notice to PHH Mortgage) to treat such Mortgage Loan as a Defective Mortgage Loan, whereupon PHH Mortgage shall repurchase such Mortgage Loan by paying to the Purchaser the Repurchase Price therefor in accordance with Section 3.04. It is understood that from time to time certain local recorder offices become backlogged with document volume. It is agreed that the Seller will provide an Officer's Certificate to document that the Seller has performed all necessary tasks to insure delivery of the required documentation within 180 days and the delay beyond 180 is caused by the backlog. If the delay exceeds 360 days, regardless of the backlog the Purchaser may elect to collect the documents with its own resources with the reasonable cost and expense to be borne by the Seller, or may require the Seller to repurchase the Mortgage Loan as described above. The fact that the Purchaser has conducted or failed to conduct any partial or complete examination of the Mortgage Files shall not affect its right to demand repurchase or any other remedies provided in this Agreement.

At the Purchaser's request, the Assignments shall be promptly recorded in the name of the Purchaser or in the name of a Person designated by the Purchaser in all appropriate public offices for real property records. If any such Assignment is lost or returned unrecorded because of a defect therein, then the applicable Seller shall promptly prepare a substitute Assignment to cure such defect and thereafter cause each such Assignment to be duly recorded. All recording fees related to such a one-time recordation of the Assignments to or by a Seller shall be paid by the applicable Seller.

Section 2.05    Transfer of Mortgage Loans

Subject to the provisions of this Section 2.05, the Purchaser shall have the right, without the consent of the Sellers, at any time and from time to time, to assign any of the Mortgage Loans and all or any part of its interest under this Agreement and designate any person to exercise any rights of the Purchaser hereunder, and the assignees or designees shall accede to the rights and obligations hereunder of the Purchaser with respect to such Mortgage Loans. The Sellers recognize that the Mortgage Loans may be divided into "packages" for resale ("Mortgage Loan Packages").

All of the provisions of this Agreement shall inure to the benefit of the Purchaser and any such assignees or designees. All references to the Purchaser shall be deemed to include its assignees or designees. Utilizing resources reasonably available to the Seller without incurring any cost except the Seller's overhead and employees' salaries, the applicable Seller shall cooperate in any such assignment of the Mortgage Loans and this Agreement; provided that the Purchaser shall bear all costs associated with any such assignment of the Mortgage Loans and this Agreement other than such Seller's overhead or employees' salaries.

The Servicer and Purchaser agree that in no event will the Servicer be required to remit funds or make available via Servicer's website remittance reports to more than four (4) Persons (not including the Servicer or any Affiliate or transferee thereof) at any given time with respect to any Mortgage Loans sold on a particular Funding Date.

The Servicer and the Purchaser acknowledge that the Servicer shall continue to remit payments to the Purchaser on the Remittance Date after the transfer of the Mortgage Loans, unless the Servicer was notified in writing of the new record owner of the Mortgage Loans three

20

(3) Business Days prior to the Record Date, in which case, the Servicer shall remit to the new record owner (or trustee or master servicer, as the case may be) of the Mortgage Loans.

Any prospective assignees of the Purchaser who have entered into a commitment to purchase any of the Mortgage Loans may review and underwrite the Servicer's servicing and origination operations, upon reasonable prior notice to the Servicer, and the Servicer shall cooperate with such review and underwriting to the extent such prospective assignees request information or documents that are reasonably available and can be produced without unreasonable expense or effort. The Servicer shall make the Mortgage Files related to the Mortgage Loans held by the Servicer available at the Servicer's principal operations center or such other mutually agreed upon location for review by any such prospective assignees during normal business hours upon reasonable prior notice to the Servicer (in no event less than 10 Business Days prior notice). The Servicer may, in its sole discretion, require that such prospective assignees sign a confidentiality agreement with respect to such information disclosed to the prospective assignee which is not available to the public at large and a release agreement with respect to its activities on the Servicer's premises.

The Servicer shall keep at its servicing office books and records in which, subject to such reasonable regulations as it may prescribe, the Servicer shall note transfers of Mortgage Loans. The Purchaser may, subject to the terms of this Agreement, sell and transfer, in whole or in part, any or all of the Mortgage Loans; provided that no such sale and transfer shall be binding upon the Servicer unless such transferee shall agree in writing to an Assignment, Assumption and Recognition Agreement, in substantially the form of Exhibit 2.05 attached hereto, and an executed copy of such Assignment, Assumption and Recognition Agreement shall have been delivered to the Servicer. The Servicer shall evidence its acknowledgment of any transfers of the Mortgage Loans to any assignees of the Purchaser by executing such Assignment, Assumption and Recognition Agreement. The Servicer shall mark its books and records to reflect the ownership of the Mortgage Loans by any such assignees, and the previous Purchaser shall be released from its obligations hereunder accruing after the date of transfer to the extent such obligations relate to Mortgage Loans sold by the Purchaser. This Agreement shall be binding upon and inure to the benefit of the Purchaser and the Servicer and their permitted successors, assignees and designees.

## ARTICLE III:
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE SELLER; REPURCHASE AND SUBSTITUTION; REVIEW OF MORTGAGE LOANS

### Section 3.01   Representations, Warranties and Covenants of each Seller

Each Seller, as to itself, represents, warrants and covenants to the Purchaser that as of each Funding Date or as of such date specifically provided herein:

(1)    Due Organization. The Seller is an entity duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, and has all licenses necessary to carry on its business now being conducted and is licensed, qualified and in good standing under the laws of each state where a Mortgaged Property is located or is otherwise exempt under applicable law from such qualification or is otherwise not required under applicable law to effect such qualification; no demand for such qualification has been made upon the Seller by any state having jurisdiction and in any event the Seller is or will be in compliance with the laws of any

such state to the extent necessary to enforce each Mortgage Loan and with respect to PHH Mortgage, service each Mortgage Loan in accordance with the terms of this Agreement;

(2)    Due Authority.  The Seller had the full power and authority and legal right to originate the Mortgage Loans that it originated, if any, and to acquire the Mortgage Loans that it acquired. The Seller has the full power and authority to hold each Mortgage Loan, to sell each Mortgage Loan and to execute, deliver and perform, and to enter into and consummate, all transactions contemplated by this Agreement.  The Seller has duly authorized the execution, delivery and performance of this Agreement, has duly executed and delivered this Agreement, and this Agreement, assuming due authorization, execution and delivery by the Purchaser, constitutes a legal, valid and binding obligation of the Seller, enforceable against it in accordance with its terms, subject to applicable bankruptcy, reorganization, receivership, conservatorship, insolvency, moratorium and other laws relating to or affecting creditors' rights generally or the rights of creditors of banks and to the general principles of equity (whether such enforceability is considered in a proceeding in equity or at law);

(3)    No Conflict.  The execution and delivery of this Agreement, the acquisition or origination, as applicable, of the Mortgage Loans by the Seller, the sale of the Mortgage Loans, the consummation of the transactions contemplated hereby, or the fulfillment of or compliance with the terms and conditions of this Agreement, will not conflict with or result in a breach of any of the terms, conditions or provisions of the Seller's organizational documents and bylaws or any legal restriction or any agreement or instrument to which the Seller is now a party or by which it is bound, or constitute a default or result in an acceleration under any of the foregoing, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Seller or its property is subject, or impair the ability of the Purchaser to realize on the Mortgage Loans;

(4)    Ability to Perform.  The Seller does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement;

(5)    No Material Default.  Neither the Seller nor any of its Affiliates is in material default under any agreement, contract, instrument or indenture of any nature whatsoever to which the Seller or any of its Affiliates is a party or by which it (or any of its assets) is bound, which default would have a material adverse effect on the ability of the Seller to perform under this Agreement, nor, to the best of the Seller's knowledge, has any event occurred that, with notice, lapse of time or both, would constitute a default under any such agreement, contract, instrument or indenture and have a material adverse effect on the ability of the Seller to perform its obligations under this Agreement;

(6)    Financial Statements.  PHH Mortgage has delivered to the Purchaser financial statements as to its fiscal year ended December 31, 2004.  Such financial statements fairly present the results of operations and changes in financial position for such period and the financial position at the end of such period of PHH Mortgage and its subsidiaries and such financial statements are true, correct and complete as of their respective dates and have been prepared in accordance with generally accepted accounting principles consistently applied throughout the periods involved, except as set forth in the notes thereto.  The Trust has delivered to the Purchaser financial statements dated as of December 31, 2004 (the "Trust Financials") and such Trust Financials fairly present the results of operations and changes in financial position for such period and the

financial position at the end of such period of the Trust. There has been no change in such Trust Financials since their date and the Trust is not aware of any errors or omissions therein;

(7)     No Change in Business. There has been no change in the business, operations, financial condition, properties or assets of the applicable Seller since (i) in the case of PHH Mortgage, the date of its financial statements and (ii) in the case of the Trust, the date of delivery of the Trust Financials, that would have a material adverse effect on the ability of the applicable Seller to perform its obligations under this Agreement;

(8)     No Litigation Pending. There is no action, suit, proceeding or investigation pending or, to the best of the Seller's knowledge, threatened, against the Seller that, either in any one instance or in the aggregate, if determined adversely to the Seller would adversely affect the sale of the Mortgage Loans to the Purchaser or the execution, delivery or enforceability of this Agreement or result in any material liability of the Seller, or draw into question the validity of this Agreement, or have a material adverse effect on the financial condition of the Seller;

(9)     No Consent Required. No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Seller of or compliance by the Seller with this Agreement, the delivery of the Mortgage Files to the Purchaser, the sale of the Mortgage Loans to the Purchaser or the consummation of the transactions contemplated by this Agreement or, if required, such approval has been obtained prior to the Funding Date;

(10)   Ordinary Course of Business. The consummation of the transactions contemplated by this Agreement is in the ordinary course of business of the Seller, and the transfer, assignment and conveyance of the Mortgage Notes and the Mortgages by the Seller pursuant to this Agreement are not subject to the bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction;

(11)   No Broker. The Seller has not dealt with any broker or agent or anyone else who might be entitled to a fee or commission in connection with this transaction;

(12)   No Untrue Information. Neither this Agreement nor any statement, report or other agreement, document or instrument furnished or to be furnished pursuant to this Agreement contains or will contain any materially untrue statement of fact or omits or will omit to state a fact necessary to make the statements contained therein not misleading;

(13)   Non-solicitation. In the event the Seller chooses to solicit any Mortgagors (in writing or otherwise) to refinance any of the Mortgage Loans during the term of this Agreement, such solicitations shall be directed at all of Seller's customers and will not be exclusively directed towards the Mortgagors relating to the Mortgage Loans sold hereunder; and

(14)   Privacy. The Seller agrees and acknowledges that as to all nonpublic personal information received or obtained by it with respect to any Mortgagor: (a) such information is and shall be held by Seller in accordance with all applicable law, including but not limited to the privacy provisions of the Gramm-Leach Bliley Act; (b) such information is in connection with a proposed or actual secondary market sale related to a transaction of the Mortgagor for purposes of 16 C.F.R.§313.14(a)(3); and (c) Seller is hereby prohibited from disclosing or using any such

information other than to carry out the express provisions of this Agreement, or as otherwise permitted by applicable law.

Section 3.02    Representations, Warranties and Covenants of the Servicer

The Servicer represents warrants and covenants to the Purchaser that as of the Funding Date or as of such date specifically provided herein:

(1)    Ability to Service.    The Servicer is an approved seller/servicer for Fannie Mae and Freddie Mac and is a mortgagee approved by the Secretary of Housing and Urban Development pursuant to Section 203 of the National Housing Act, with facilities, procedures and experienced personnel necessary for the servicing of mortgage loans of the same type as the Mortgage Loans. No event has occurred that would make the Servicer unable to comply with Fannie Mae or Freddie Mac eligibility requirements or that would require notification to either Fannie Mae or Freddie Mac;

(2)    No Litigation Pending.    There is no action, suit, proceeding or investigation pending or, to the best of the Servicer's knowledge, threatened, against the Servicer that, either in any one instance or in the aggregate, if determined adversely to the Servicer would adversely affect the ability of the Servicer to service the Mortgage Loans hereunder in accordance with the terms hereof or have a material adverse effect on the financial condition of the Servicer; and

(3)    Collection Practices.    The collection practices used by the Servicer with respect to each Mortgage Note and Mortgage have been in all respects legal, proper and prudent in the mortgage servicing business.

(4)    MERS.    The Servicer is a member of MERS in good standing, and will comply in all material respects with the rules and procedures of MERS in connection with the servicing of the MERS Mortgage Loans for as long as such Mortgage Loans are registered with MERS;

(5)    Non-solicitation.    In the event the Servicer chooses to solicit any Mortgagors (in writing or otherwise) to refinance any of the Mortgage Loans during the term of this Agreement, such solicitations shall be directed at all of the Servicer's customers and will not be exclusively directed towards the Mortgagors relating to the Mortgage Loans sold hereunder; and

(6)    Privacy.    The Servicer agrees and acknowledges that as to all nonpublic personal information received or obtained by it with respect to any Mortgagor: (a) such information is and shall be held by Servicer in accordance with all applicable law, including but not limited to the privacy provisions of the Gramm-Leach Bliley Act; (b) such information is in connection with a proposed or actual secondary market sale related to a transaction of the Mortgagor for purposes of 16 C.F.R.§313.14(a)(3); and (c) Servicer is hereby prohibited from disclosing or using any such information other than to carry out the express provisions of this Agreement, or as otherwise permitted by applicable law.

Section 3.03    Representations and Warranties as to Individual Mortgage Loans.

With respect to each Mortgage Loan, the applicable Seller hereby makes the following representations and warranties to the Purchaser on which the Purchaser specifically relies in purchasing such Mortgage Loan. Such representations and warranties speak as of the Funding

Date unless otherwise indicated, but shall survive any subsequent transfer, assignment or conveyance of such Mortgage Loans:

(1)    Mortgage Loan as Described.  Such Mortgage Loan complies with the terms and conditions set forth herein, and all of the information set forth with respect thereto on the Mortgage Loan Schedule is true and correct in all material respects and does not omit any information necessary to make the information shown thereon not misleading in any material respect;

(2)    Complete Mortgage Files.  The instruments and documents specified in Section 2.02 with respect to such Mortgage Loan have been delivered to the Purchaser in compliance with the requirements of Article II.  The Seller is in possession of a Mortgage File respecting such Mortgage Loan, except for such documents as have been previously delivered to the Purchaser;

(3)    Owner of Record.  The Mortgage relating to such Mortgage Loan has been duly recorded in (or sent for recording to) the appropriate recording office, and the applicable Seller or Servicer is the owner of record of such Mortgage Loan and the indebtedness evidenced by the related Mortgage Note;

(4)    Payments Current.  All payments required to be made up to and including the Funding Date for such Mortgage Loan under the terms of the Mortgage Note have been made, such that such Mortgage Loan is not delinquent 30 days or more on the Funding Date; and, if the Mortgage Loan is a Pledged Asset Mortgage Loan, neither the Mortgage Loan nor the related Pledged Assets has been dishonored. Unless otherwise disclosed in the Offering Materials or the Mortgage Loan Schedule, there has been no delinquency, exclusive of any period of grace, in any payment by the Mortgagor thereunder during the twelve months preceding the Funding Date; and, if the Mortgage Loan is a Cooperative Loan, no foreclosure action or private or public sale under the Uniform Commercial Code has ever been threatened or commenced with respect to the Cooperative Loan;

(5)    No Outstanding Charges.  There are no delinquent taxes, insurance premiums, assessments, including assessments payable in future installments, or other outstanding charges affecting the Mortgaged Property related to such Mortgage Loan;

(6)    Original Terms Unmodified.  The terms of the Mortgage Note and the Mortgage related to such Mortgage Loan (and the Proprietary Lease and the Pledge Instruments with respect to each Cooperative Loan, and the Pledged Assets with respect to each Pledged Asset Mortgage Loan) have not been impaired, waived, altered or modified in any material respect, except as specifically set forth in the related Mortgage Loan Schedule;

(7)    No Defenses.  The Mortgage Note and the Mortgage related to such Mortgage Loan (and the Cooperative Pledge Agreement related to each Cooperative Loan, and the related Pledge Agreement with respect to each Pledged Asset Mortgage Loan) are not subject to any right of rescission, set-off or defense, including the defense of usury, nor will the operation of any of the terms of such Mortgage Note and such Mortgage (or the related Pledge Agreement with respect to each Pledged Asset Mortgage Loan), or the exercise of any right thereunder, render such Mortgage (or the related Pledge Agreement with respect to each Pledged Asset Mortgage Loan) unenforceable, in whole or in part, or subject to any right of rescission, set-off or defense,

25

including the defense of usury and no such right of rescission, set-off or defense has been asserted with respect thereto;

(8)    Hazard Insurance.  (a) All buildings upon the Mortgaged Property related to such Mortgage Loan are insured by an insurer acceptable to Fannie Mae or Freddie Mac against loss by fire, hazards of extended coverage and such other hazards as are customary in the area where such Mortgaged Property is located, pursuant to insurance policies conforming to the requirements of Section 5.10. All such insurance policies (collectively, the "hazard insurance policy") contain a standard mortgagee clause naming the originator of such Mortgage Loan, its successors and assigns, as mortgagee. Such policies are the valid and binding obligations of the insurer, and all premiums thereon due to date have been paid. The related Mortgage obligates the Mortgagor thereunder to maintain all such insurance at such Mortgagor's cost and expense, and on such Mortgagor's failure to do so, authorizes the holder of such Mortgage to maintain such insurance at such Mortgagor's cost and expense and to seek reimbursement therefor from such Mortgagor; or (b) in the case of a condominium or unit in a planned unit development ("PUD") project that is not covered by an individual policy, the condominium or PUD project is covered by a "master" or "blanket" policy and there exists and is in the Mortgage File a certificate of insurance showing that the individual unit that secures the first mortgage is covered under such policy. The insurance policy contains a standard mortgagee clause naming the originator of such Mortgage Loan (and its successors and assigns), as insured mortgagee. Such policies are the valid and binding obligations of the insurer, and all premiums thereon have been paid. The insurance policy provides for advance notice to the Seller or Servicer if the policy is canceled or not renewed, or if any other change that adversely affects the Seller's interests is made; the certificate includes the types and amounts of coverage provided, describes any endorsements that are part of the "master" policy and would be acceptable pursuant to the Fannie Mae Guide or Freddie Mac Servicing Guide;

(9)    Compliance With Applicable Laws.  All requirements of any federal, state or local law (including usury, truth in lending, real estate settlement procedures, consumer credit protection, predatory and abusive lending, equal credit opportunity or disclosure laws) applicable to the origination and servicing of such Mortgage Loan have been complied;

(10)    No Fraud.  No error or omission, misrepresentation, negligence or fraud in respect of such Mortgage Loan has taken place on the part of any Person in connection with the origination and servicing of such Mortgage Loan, and all information provided by Seller to Purchaser is true, correct and complete in all material respects.;

(11)    No Satisfaction of Mortgage.  The Mortgage related to such Mortgage Loan has not been satisfied, canceled or subordinated, in whole or in part, or rescinded, and the related Mortgaged Property has not been released from the lien of such Mortgage, in whole or in part, nor has any instrument been executed that would effect any such release, cancellation, subordination or rescission;

(12)    Valid First Lien.  The Mortgage, including any Negative Amortization, related to such Mortgage Loan is a valid, subsisting and enforceable perfected first lien on the related Mortgaged Property, including all improvements on the related Mortgaged Property, which Mortgaged Property is free and clear of any encumbrances and liens having priority over the first lien of the Mortgage subject only to (a) the lien of current real estate taxes and special assessments not yet due and payable, (b) covenants, conditions and restrictions, rights of way,

easements and other matters of the public record as of the date of recording of such Mortgage which are acceptable to mortgage lending institutions generally, are referred to in the lender's title insurance policy and do not adversely affect the market value or intended use of the related Mortgaged Property, and (c) other matters to which like properties are commonly subject which do not individually or in the aggregate materially interfere with the benefits of the security intended to be provided by such Mortgage or the use, enjoyment, or market value of the related Mortgaged Property; with respect to each Cooperative Loan, each Cooperative Pledge Agreement creates a valid, enforceable and subsisting first security interest in the collateral securing the related Mortgage Note subject only to (a) the lien of the related Cooperative Corporation for unpaid assessments representing the obligor's pro rata share of the Cooperative Corporation's payments for its blanket mortgage, current and future real property taxes, insurance premiums, maintenance fees and other assessments to which like collateral is commonly subject and (b) other matters to which like collateral is commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Cooperative Pledge Agreement; provided, however, that the appurtenant Proprietary Lease may be subordinated or otherwise subject to the lien of any mortgage on the Cooperative Project;

(13)    Validity of Documents. The Mortgage Note and the Mortgage related to such Mortgage Loan (and the Cooperative Pledge Agreement with respect to each Cooperative Loan) are genuine and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and general equitable principles (regardless whether such enforcement is considered in a proceeding in equity or at law);

(14)    Valid Execution of Documents.  All parties to the Mortgage Note and the Mortgage related to such Mortgage Loan had the legal capacity to enter into such Mortgage Loan and to execute and deliver the related Mortgage Note and the related Mortgage, and the related Mortgage Note and the related Mortgage have been duly and properly executed by such parties; with respect to each Cooperative Loan, all parties to the Mortgage Note and the Mortgage Loan had legal capacity to execute and deliver the Mortgage Note, the Cooperative Pledge Agreement, the Proprietary Lease, the Stock Power, the Recognition Agreement, the Financing Statement and the Assignment of Proprietary Lease and such documents have been duly and properly executed by such parties; each Stock Power (i) has all signatures guaranteed or (ii) if all signatures are not guaranteed, then such Cooperative Shares will be transferred by the stock transfer agent of the Cooperative Corporation if the Purchaser or Servicer undertakes to convert the ownership of the collateral securing the related Cooperative Loan;

(15)    Full Disbursement of Proceeds. Such Mortgage Loan has closed and the proceeds of such Mortgage Loan have been fully disbursed prior to the Funding Date and there is no requirement for future advances thereunder; provided that, with respect to any Mortgage Loan originated within the previous 120 days, alterations and repairs with respect to the related Mortgaged Property or any part thereof may have required an escrow of funds in an amount sufficient to pay for all outstanding work within 120 days of the origination of such Mortgage Loan, and, if so, such funds are held in escrow by the Seller, a title company or other escrow agent;

(16)    Ownership. The Mortgage Note and the Mortgage related to such Mortgage Loan have not been assigned, pledged or otherwise transferred by the applicable Seller, in whole or in part,

and the Seller has good and marketable title thereto, and the Seller is the sole owner thereof (and with respect to any Cooperative Loan, the sole owner of the related Cooperative Pledge Agreement) and has full right and authority to transfer and sell such Mortgage Loan, and is transferring such Mortgage Loan to the Purchaser free and clear of any encumbrance, equity, lien, pledge, charge, claim or security interest;

(17)   Doing Business.  All parties that have had any interest in such Mortgage Loan, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) in compliance with any and all applicable licensing requirements of the laws of the state wherein the related Mortgaged Property is located;

(18)   Title Insurance.  (a) Such Mortgage Loan is covered by an ALTA lender's title insurance policy or short form title policy acceptable to Fannie Mae and Freddie Mac (or, in jurisdictions where ALTA policies are not generally approved for use, a lender's title insurance policy acceptable to Fannie Mae and Freddie Mac), issued by a title insurer acceptable to Fannie Mae and Freddie Mac and qualified to do business in the jurisdiction where the related Mortgaged Property is located, insuring (subject to the exceptions contained in clauses (12)(a) and (b) above) the Seller or Servicer, its successors and assigns as to the first priority lien of the related Mortgage in the original principal amount of such Mortgage Loan including any Negative Amortization and in the case of ARM Loans, against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of such Mortgage providing for adjustment to the applicable Note Rate and Monthly Payment.  Additionally, either such lender's title insurance policy affirmatively insures that there is ingress and egress to and from the Mortgaged Property or the Seller warrants that there is ingress and egress to and from the Mortgaged Property and the lender's title insurance policy affirmatively insures against encroachments by or upon the related Mortgaged Property or any interest therein or any other adverse circumstance that either is disclosed or would have been disclosed by an accurate survey.  The originator of the Mortgage Loan, its successor and/or assignee is the sole insured of such lender's title insurance policy, and such lender's title insurance policy is in full force and effect and will be in full force and effect upon the consummation of the transactions contemplated by this Agreement and will inure to the benefit of the Purchaser without any further act.  No claims have been made under such lender's title insurance policy, neither the Seller nor any prior holder of the related Mortgage has done, by act or omission, anything that would impair  the coverage of such lender's insurance policy, and there is no act, omission, condition, or information that would impair the coverage of such lender's insurance policy; (b) The mortgage title insurance policy covering each unit in a condominium or PUD project related to such Mortgage Loan meets all requirements of Fannie Mae and Freddie Mac;

(19)   No Defaults.  (a) There is no default, breach, violation or event of acceleration existing under the Mortgage, the Mortgage Note (or the related Pledge Agreement with respect to each Pledged Asset Mortgage Loan), or any other agreements, documents, or instruments related to such Mortgage Loan; (b) there is no event that, with the lapse of time, the giving of notice, or both, would constitute such a default, breach, violation or event of acceleration; (c) the Mortgagor(s) with respect to such Mortgage Loan is (1) not in default under any other Mortgage Loan or (2) not the subject of an Insolvency Proceeding; (d) no event of acceleration has previously occurred, and no notice of default has been sent, with respect to such Mortgage Loan; (e) in no event has the Seller waived any of its rights or remedies in respect of any default, breach, violation or event of acceleration under the Mortgage, the Mortgage Note (or the related Pledge Agreement with respect to each Pledged Asset Mortgage Loan), or any other agreements,

28

documents, or instruments related to such Mortgage Loan; and (f) with respect to each Cooperative Loan, there is no default in complying with the terms of the Mortgage Note, the Cooperative Pledge Agreement and the Proprietary Lease and all maintenance charges and assessments (including assessments payable in the future installments, which previously became due and owing) have been paid, and the Seller has the right under the terms of the Mortgage Note, Cooperative Pledge Agreement and Recognition Agreement to pay any maintenance charges or assessments owed by the Mortgagor;

(20)   No Mechanics' Liens.  As of the date of origination of such Mortgage Loan, there were no mechanics' or similar liens, except such liens as are expressly insured against by a title insurance policy, or claims that have been filed for work, labor or material (and no rights are outstanding that under law could give rise to such lien) affecting the related Mortgaged Property that are or may be liens prior to, or equal or coordinate with, the lien of the related Mortgage;

(21)   Location of Improvements; No Encroachments.  As of the date of origination of such Mortgage Loan, to the best of the Seller's knowledge, all improvements that were considered in determining the Appraised Value of the related Mortgaged Property lay wholly within the boundaries and building restriction lines of such Mortgaged Property, and no improvements on adjoining properties encroach upon such Mortgaged Property except as permitted under the terms of the Fannie Mae Guide and the Freddie Mac Servicer Guide; to the best of the Seller's knowledge, no improvement located on or part of any Mortgaged Property is in violation of any applicable zoning law or regulation, and all inspections, licenses and certificates required to be made or issued with respect to all occupied portions of such Mortgaged Property, and with respect to the use and occupancy of the same, including certificates of occupancy, have been made or obtained from the appropriate authorities;

(22)   Origination; Payment Terms.  Principal payments on such Mortgage Loan commenced or will commence no more than 60 days after funds were disbursed in connection with such Mortgage Loan.  If the interest rate on the related Mortgage Note is adjustable, the adjustment is based on the Index set forth on the related Mortgage Loan Schedule. The related Mortgage Note is payable on the first day of each month in arrears, in accordance with the payment terms described on the related Mortgage Loan Schedule.  With respect to any Mortgage Loan subject to Negative Amortization the Monthly Payments are sufficient during the period following each Payment Adjustment Date to fully amortize the outstanding principal balance as of the first day of such period (including any Negative Amortization) over the original term thereof in accordance with the terms and conditions set forth in the Mortgage Note ;

(23)   Due On Sale.  Except as noted otherwise on the Mortgage Loan Schedule, the related Mortgage contains the usual and customary "due-on-sale" clause or other similar provision for the acceleration of the payment of the Unpaid Principal Balance of such Mortgage Loan if the related Mortgaged Property or any interest therein is sold or transferred without the prior consent of the mortgagee thereunder;

(24)   Prepayment Penalty.  Except as noted otherwise on the Mortgage Loan Schedule, such Mortgage Loan is not subject to any prepayment penalty, and no prepayment penalties (a) are payable following more than five years from the date of origination of a Mortgage Loan, and (b) exceed the lesser of six months of interest on the amount prepaid or 6% of the amount prepaid;

(25)  Mortgaged Property Undamaged; No Condemnation. As of the Funding Date, the related Mortgaged Property (and with respect to a Cooperative Loan, the related Cooperative Project and Cooperative Unit) is free of material damage and waste and there is no proceeding pending for the total or partial condemnation thereof;

(26)  Customary Provisions.   The related Mortgage contains customary and enforceable provisions that render the rights and remedies of the holder thereof adequate for the realization against the related Mortgaged Property of the benefits of the security provided thereby, including, (a) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (b) in the case of a Mortgage, otherwise by judicial foreclosure;

(27)  Conformance With Underwriting Standards. Such Mortgage Loan was underwritten in accordance with the PHH Guide;

(28)  Appraisal. The Mortgage File contains an appraisal of the related Mortgaged Property on forms and with riders approved by Fannie Mae and Freddie Mac, signed prior to the approval of such Mortgage Loan application by an appraiser, duly appointed by the originator of such Mortgage Loan, whose compensation is not affected by the approval or disapproval of such Mortgage Loan and who met the minimum qualifications of Fannie Mae and Freddie Mac for appraisers. Each appraisal of the Mortgage Loan was made in accordance with the relevant provisions of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989. In accordance with specified programs Seller may utilize an approved AVM in lieu of an appraisal;

(29)  Deeds of Trust. If the related Mortgage constitutes a deed of trust, then a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in such Mortgage, and no fees or expenses are or will become payable by the Purchaser to the trustee under such deed of trust, except in connection with a trustee's sale after default by the related Mortgagor;

(30)  LTV; Primary Mortgage Insurance Policy.   Except with respect to Pledged Asset Mortgage Loans and any loan program as defined in the PHH Guide not requiring Primary Mortgage Insurance, if such Mortgage Loan had a Loan-to-Value Ratio of more than 80% at origination, such Mortgage Loan is and will be subject to a Primary Insurance Policy issued by a Qualified Mortgage Insurer, which insures the Seller or Servicer and its successors and assigns in the amount set forth on the Mortgage Loan Schedule; provided that, a Primary Mortgage Insurance Policy will not be required for any Cooperative Loan if (i) the proceeds of such Cooperative Loan were used to purchase a Cooperative Unit at the "insider's price" when the building was converted to a Cooperative Corporation, (ii) the value of the Cooperative Unit for purposes of establishing the LTV at origination was such "insider's price", (iii) the principal amount of the Cooperative Loan at origination was not more than 100% of such "insider's price" and (iv) the LTV at origination, as calculated using the Appraised Value at origination, was less than or equal to 80%. All provisions of such Primary Insurance Policy have been and are being complied with, such policy is in full force and effect, and all premiums due thereunder have been paid. Any related Mortgage subject to any such Primary Insurance Policy (other than a "lender-paid" Primary Insurance Policy) obligates the Mortgagor thereunder to maintain such insurance for the time period required by law and to pay all premiums and charges in connection therewith. As of the date of origination, the Loan-to-Value Ratio of such Mortgage Loan is as specified in the applicable Mortgage Loan Schedule;

30

(31)    Occupancy. As of the date of origination of such Mortgage Loan, the related Mortgaged Property (or with respect to a Cooperative Loan, the related Cooperative Unit) is lawfully occupied under applicable law and all inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property (or with respect to a Cooperative Loan, the related Cooperative Unit) and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy, have been made or obtained from the appropriate authorities;

(32)    Supervision and Examination by a Federal or State Authority. Each Mortgage Loan either was (a) closed in the name of PHH Mortgage, or (b) closed in the name of another entity that is and at the time of origination was either a savings and loan association, a savings bank, a commercial bank, credit union, insurance company or an institution that is supervised and examined by a federal or state authority, or a mortgagee approved by the Secretary of Housing and Urban Development pursuant to Sections 203 and 211 of the National Housing Act (a "HUD Approved Mortgagee"), and was so at the time such Mortgage Loan was originated (PHH Mortgage or such other entity, the "Originator"). If such Mortgage Loan was originated through a loan broker, such Mortgage Loan met the Originator's underwriting criteria at the time of origination and was originated in accordance with the Originator's policies and procedures and the Originator acquired such Mortgage Loan from the loan broker contemporaneously with the origination thereof. The Mortgage Loans that the Trust is selling to Purchaser were originated by or on behalf of PHH Mortgage and subsequently assigned to the Trust. PHH Mortgage is, and at the time each Mortgage Loan closed in its name was, a HUD Approved Mortgagee;

(33)    Adjustments. All of the terms of the related Mortgage Note pertaining to interest rate adjustments, payment adjustments and adjustments of the outstanding principal balance, if any, are enforceable and such adjustments will not affect the priority of the lien of the related Mortgage; all such adjustments on such Mortgage Loan have been made properly and in accordance with the provisions of such Mortgage Loan;

(34)    Insolvency Proceedings; The Servicemembers Civil Relief Act. The related Mortgagor (1) is not the subject of any Insolvency Proceeding; and (2) has not requested any relief allowed to such Mortgagor under the Servicemembers Civil Relief Act;

(35)    Fannie Mae/Freddie Mac Documents. Such Mortgage Loan was closed on standard Fannie Mae or Freddie Mac documents or on such documents otherwise acceptable to them;

(36)    Payments. Unless otherwise disclosed in the Offering Materials or the Mortgage Loan Schedule, no Mortgage Loan contains provisions pursuant to which Monthly Payments are (a) paid or partially paid with funds deposited in any separate account established by the Seller, the Mortgagor, or anyone on behalf of the Mortgagor, (b) paid by any source other than the Mortgagor or (c) contains any other similar provisions that may constitute a "buydown" provision. The Mortgage Loan is not a graduated payment mortgage loan and the Mortgage Loan does not have a shared appreciation or other contingent interest feature;

(37)    The Assignment of Mortgage. The Assignment is in recordable form and is acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located;

(38)    No Advances. Any principal advances made to the Mortgagor prior to the Cut-off Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the

secured principal amount, as consolidated, bears a single interest rate and single repayment term. The consolidated principal amount does not exceed the original principal amount of the Mortgage Loan plus any Negative Amortization;

(39)    Balloon Loans. Unless otherwise disclosed in the Offering Materials or the Mortgage Loan Schedule, no Mortgage Loan has a balloon payment feature. With respect to any Mortgage Loan with a balloon payment feature, the Mortgage Note is payable in Monthly Payments based on a thirty year amortization schedule and has a final Monthly Payment substantially greater than the preceding Monthly Payment that is sufficient to amortize the remaining principal balance of the Mortgage Loan;

(40)    Condominium Units/PUDs. If the residential dwelling on the Mortgaged Property is a condominium unit or a unit in a planned unit development (other than a de minimis planned unit development) such condominium or planned unit development project meets the eligibility requirements of the PHH Guide;

(41)    High Cost Mortgage Loans. No Mortgage Loan is a High Cost Loan or Covered Loan, as applicable, as such terms are defined in Appendix E of the Standard & Poor's Glossary For File Format for LEVELS in effect at the time the Mortgage Loan was originated, and no Mortgage Loan meets any of the following criteria, regardless of whether the originator has grounds to claim preemption from all or part of the law:

(a)    a loan considered a "mortgage" under Section 152 of the Home Ownership and Equity Protection Act of 1994, 15 U.S.C. Section 1602 (aa) and the related regulations and commentary promulgated by the Federal Reserve Board, including Section 226.32 of Title 12 of the Code of Federal Regulations, and the official staff commentary to those regulations.

(b)    a loan considered a "high-cost", "covered", "high-risk", "predatory" or any other similar designation under any state or local law in effect at the time of the closing of the loan if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees; or

(c)    a "home loan" under the Georgia Fair Lending Act, Ga. Code Ann. Section 7-6A-1 et. Seq. that became effective on October 1, 2002 (the "Act"), if the commitment was issued on or after February 1, 2003 and the loan was closed on or before March 7, 2003.

(42)    No Rehabilitation Loan. Unless otherwise disclosed in the Offering Materials or the Mortgage Loan Schedule, no Mortgage Loan was made in connection with (a) the construction or rehabilitation of a Mortgaged Property or (b) facilitating the trade-in or exchange of a Mortgaged Property;

(43)    No Adverse Conditions. The Seller has no knowledge of any circumstances or condition with respect to the Mortgage, the Mortgage Property (or with respect to a Cooperative Loan, the Cooperative Pledge Agreement, the Cooperative Unit or the Cooperative Project), the Mortgagor or the Mortgagor's credit standing that can reasonably be expected to cause the Mortgage Loan to be an unacceptable investment, cause the Mortgage Loan to become delinquent, or adversely affect the value of the Mortgage Loan;

(44)    Scheduled Interest.  Interest on each Mortgage Loan is calculated on the basis of a 360-day year consisting of twelve 30-day months;

(45)    Environmental Laws.  To the best of Seller's knowledge, the Mortgaged Property is in material compliance with all applicable Environmental Laws pertaining to environmental hazards including, without limitation, asbestos, and the Seller has no reasonable grounds to suspect the presence of any toxic materials or other environmental hazards on, in or that could affect any Mortgaged Property, and neither the Seller nor, to the Seller's knowledge, the related Mortgagor, has received any notice of any violation or potential violation of such law;

(46)    Negative Amortization.  Unless otherwise disclosed in the Offering Materials or the Mortgage Loan Schedule, no Mortgage Loan is subject to Negative Amortization;

(47)    Cooperative Lien Search.  With respect to each Cooperative Loan, a Cooperative Lien Search has been made by a company competent to make the same which company is acceptable to Fannie Mae and Freddie Mac and qualified to do business in the jurisdiction where the Cooperative Unit is located;

(48)    Cooperative Loan- Proprietary Lease.  With respect to each Cooperative Loan, (i) the term of the related Proprietary Lease is longer than the term of the Cooperative Loan, (ii) there is no provision in any Proprietary Lease that requires the Mortgagor to offer for sale the Cooperative Shares owned by such Mortgagor first to the Cooperative Corporation, (iii) there is no prohibition in any Proprietary Lease against pledging the Cooperative Shares or assigning the Proprietary Lease and (iv) the Recognition Agreement is on a form of agreement published by the Aztech Document Systems, Inc. or includes provisions that are no less favorable to the lender than those contained in such agreement;

(49)    Cooperative Loan- UCC Financing Statement.  With respect to each Cooperative Loan, each original UCC financing statement, continuation statement or other governmental filing or recordation necessary to create or preserve the perfection and priority of the first priority lien and security interest in the Cooperative Shares and Proprietary Lease has been timely and properly made.   Any security agreement, chattel mortgage or equivalent document related to the Cooperative Loan and delivered to the Seller or its designee establishes in the Seller a valid and subsisting perfected first lien on and security interest in the property described therein, and the Seller has full right to sell and assign the same;

(50)    Cooperative Loan- Cooperative Pledge Agreement.  With respect to each Cooperative Loan, each Cooperative Pledge Agreement contains enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization of the benefits of the security provided thereby.   The Cooperative Pledge Agreement contains an enforceable provision for the acceleration of the payment of the Unpaid Principal Balance of the Mortgage Note in the event the Cooperative Unit is transferred or sold without the consent of the holder thereof;

(51)    Imaging.  Each imaged document represents a true, complete, and correct copy of the original document in all respects including, but not limited to, all signatures conforming with signatures contained in the original document, no information having been added or deleted, and no imaged document having been manipulated or altered in any manner. Each imaged document

is clear and legible, including, but not limited to, accurate reproductions of photographs. No original documents have been or will be altered in any manner; and

(52)   Qualified Mortgage. Each Mortgage Loan constitutes a "qualified mortgage" under Section 860G(a)(3)(A) of the Code and Treasury Regulation Section 1.860-2(a)(1);

(53)   Pre-paid insurance products. No Mortgagor was required to purchase any credit life, disability, accident or health insurance product as a condition of obtaining the extension of credit. No Mortgagor obtained a prepaid single premium credit life, disability, accident or health insurance policy in connection with the origination of the Mortgage Loan. No proceeds from any Mortgage Loan were used to purchase single premium credit insurance policies as part of the origination of, or a condition to closing, such Mortgage Loan;

(54)   Credit reporting. Seller or its servicer must report to all nationally recognized consumer credit reporting agencies at least monthly the favorable and unfavorable payment history information of Mortgagor on payments due to Seller on a Mortgage Loan for the period during which Seller or Servicer holds or services the Mortgage Loan. This paragraph shall not prevent Seller or its servicer from not reporting specific payment history information in the event of a resolved or unresolved dispute with Mortgagor and shall not apply to Mortgage Loans held or serviced by Seller for less than 90 days; and

(55)   Default Interest. No Mortgage Loan provides for an increase in the interest rate after default.

(56)   Freddie Reps.

(a)   If the originator offers mortgage loan products that have prepayment premiums then, the originator of the Mortgage Loan had a policy of offering the borrower, or requiring third-party brokers to offer the borrower, an array of mortgage loan products that included mortgage loan products with prepayment premiums and mortgage loan products that did not require payment of such a premium.

(b)   Neither the originator, nor any broker involved in the origination of the Mortgage Loan, engaged in a practice of encouraging or requiring mortgage applicants to select products that are higher cost products designed for less creditworthy borrowers, unless at the time of the loan's origination, such mortgage applicants did not qualify, taking into account credit history and debt-to-income ratios, for a lower-cost credit product then offered by such originator or broker.

(57)   No Foreign Mortgagor. None of the Mortgage Loans has been made to a member of a foreign diplomatic mission with diplomatic rank. The Mortgagor is either (i) a citizen of the United States, (ii) a permanent resident alien who is legally able to maintain permanent residency in the United States and holds an alien registration card ("green card") that is valid and current or (iii) a non-permanent resident alien who resides in the United States under the terms of a current visa, other than a visa classified under diplomatic immunity, temporary protected status, deferred enforced departure, asylum, refugees or humanitarian parole, and the related Mortgaged Property is either the primary residence or a second/vacation home of such non-permanent resident alien. Payments payable under the Mortgage Loan are not subject to

reduction by withholding or other taxes levied by any foreign (non-United States) sovereign government.

Section 3.04   Repurchase and Substitution.

It is understood and agreed that the representations and warranties set forth in Sections 3.01, 3.02 and 3.03 shall survive the sale of the Mortgage Loans to the Purchaser and shall inure to the benefit of the Purchaser and its assignees, notwithstanding any restrictive or qualified endorsement on any Mortgage Note or Assignment or the examination of any Mortgage File.

Upon discovery by either of the Sellers or the Purchaser of a breach of any of the representations and warranties contained in Sections 3.01, 3.02 or 3.03 that materially and adversely affects the interest of the Purchaser (or that materially and adversely affects the interests of the Purchaser in the related Mortgage Loan, in the case of a representation or warranty relating to a particular Mortgage Loan), the party discovering such breach shall give prompt written notice to the other.

Unless permitted a greater period of time to cure as set forth in Section 2.04, the applicable Seller shall have a period of 60 days from the earlier of either discovery by or receipt of written notice from the Purchaser to the Seller of any breach of any of the representations and warranties contained in Sections 3.01, 3.02 or 3.03 that materially and adversely affects the interest of the Purchaser (or that materially and adversely affects the interests of the Purchaser in the related Mortgage Loan or the value of the Mortgage Loan, in the case of a representation or warranty relating to a particular Mortgage Loan) (a "Defective Mortgage Loan"; provided that "Defective Mortgage Loan" shall also include (a) any Mortgage Loan treated or designated as such in accordance with Section 2.04 and (b) any Mortgage Loan as to which the Mortgagor fails to make the first regularly scheduled payment of principal and interest occurring after the related Funding Date within 30 days of its Due Date within which to correct or cure such breach (or as such periods of time as provided through Section 3.06(b) below and failing which this Section 3.04 will govern early payment default matters). If such breach can ultimately be cured but is not reasonably expected to be cured within the 60-day period (other than an early payment default), then the applicable Seller shall have such additional time, if any, as is reasonably determined by the Purchaser to cure such breach provided that the Mortgage Loan affected by such breach is not in default, the Seller has commenced curing or correcting such breach and is diligently pursuing same. Each Seller hereby covenants and agrees with respect to each Mortgage Loan conveyed by it that, if any breach relating thereto cannot be corrected or cured within the applicable cure period or such additional time, if any, as is reasonably determined by the Purchaser, then such Seller shall, at the direction of the Purchaser, repurchase the Defective Mortgage Loan at the applicable Repurchase Price. Notwithstanding anything to the contrary contained herein, if the first regularly scheduled payment of principal and interest due under any Mortgage Loan after the related Funding Date has been delinquent more than 30 days, the Purchaser may, by written notice to the applicable Seller, require that the Seller repurchase the related Mortgage Loan. However, if the Seller provides evidence that the delinquency was due to a servicing setup error, no repurchase shall be required. Within ten (10) Business Days following the delivery of any such written notice from the Purchaser, the applicable Seller shall repurchase the specified Mortgage Loan by paying the Repurchase Price therefor by wire transfer of immediately available funds directly to the Purchaser's Account.

Notwithstanding the previous paragraph, the applicable Seller may, at the option of the Purchaser, and assuming that such Seller has a Qualified Substitute Mortgage Loan or Loans, rather than repurchase the Mortgage Loan as provided above, remove such Mortgage Loan ("Deleted Mortgage Loan") and substitute in its place a Qualified Substitute Mortgage Loan or Loans if the effective date of such substitution is not later than two (2) years from the applicable Funding Date.  If the applicable Seller has no Qualified Substitute Mortgage Loan, it shall repurchase the Defective Mortgage Loan.

As to any Deleted Mortgage Loan for which the applicable Seller substitutes a Qualified Substitute Mortgage Loan or Loans, the applicable Seller shall effect such substitution by delivering to the Purchaser or its designee for such Qualified Substitute Mortgage Loan or Loans the Legal Documents as are required by Section 2.  Upon such substitution, such Qualified Substitute Mortgage Loan or Loans shall be subject to the terms of this Agreement in all respects, and the applicable Seller shall be deemed to have made with respect to such Qualified Substitute Mortgage Loan or Loans, as of the date of substitution, the covenants, representations and warranties set forth in Sections 3.01, 3.02 and 3.03.

For any month in which the applicable Seller substitutes one or more Qualified Substitute Mortgage Loans for one or more Deleted Mortgage Loans, the applicable Seller will determine the amount (if any) by which the aggregate principal balance of all such Qualified Substitute Mortgage Loans as of the date of substitution (after application of scheduled principal payments due in the month of substitution which have been received or as to which an advance has been made) is less than the aggregate outstanding principal balance of all such Deleted Mortgage Loans.  The amount of such shortfall shall be paid by the applicable Seller on the date of such substitution) by wire transfer of immediately available funds directly to the Purchaser's Account.

Any repurchase of a Defective Mortgage Loan required hereunder shall be accomplished by payment of the applicable Repurchase Price within three (3) Business Days of expiration of the applicable time period referred to above in paragraph 3.04 by wire transfer of immediately available funds directly to the Purchaser's Account.  It is understood and agreed that the obligations of a Seller (a) set forth in this Section 3.04 to cure any breach of such Seller's representations and warranties contained in Sections 3.01, 3.02 and 3.03 or to repurchase the Defective Mortgage Loan(s) and (b) set forth in Section 9.01 to indemnify the Purchaser in connection with any breach of a Seller's representations and warranties contained in Sections 3.01, 3.02 and 3.03 shall constitute the sole remedies of the Purchaser respecting a breach of such representations and warranties.

In the event of a repurchase or substitution, the Seller shall, simultaneously with such repurchase or substitution, give written notice (by telecopier, electronically or otherwise) to the Purchaser that such repurchase or substitution has taken place, amend the related Mortgage Loan Schedule to reflect the withdrawal of the Deleted Mortgage Loan from this Agreement, and in the case of substitution, identify the Qualified Substitute Mortgage Loan(s) and amend the related Mortgage Loan Schedule to reflect the addition of such Qualified Substitute Mortgage Loan(s) under this Agreement.

The parties further agree that, in recognition of the Trust's rights against PHH Mortgage with respect to the Mortgage Loans acquired by it from PHH Mortgage and conveyed to the Purchaser hereunder, the Purchaser shall have the right to cause PHH Mortgage to repurchase directly any Defective Mortgage Loan (other than as a result of a breach by the Trust of Section

36

3.03 (3) or 3.03(16) hereof, in which case the Purchaser shall have the right to cause the Trust to repurchase directly the Defective Mortgage Loan) acquired hereunder by the Purchaser from the Trust.

Section 3.05    Updates to PHH Guide and References in Purchase Price and Terms Letters

The Seller shall provide to the Purchaser periodic updates, if any, to the PHH Guide. Each Purchase Price and Terms Letter shall either (a) identify the version of the PHH Guide that sets forth the underwriting guidelines applicable to the Mortgage Loans described in such Purchase Price and Terms Letter, or (b) include as an attachment thereto the underwriting guidelines applicable to such Mortgage Loans.

Section 3.06    Premium Recapture and Early Payment Default

(a)    If so specified in any related Purchase Price and Terms Letter, in the event that the Servicer receives a Payoff with respect to a Mortgage Loan or a Mortgage Loan is otherwise liquidated prior to the date specified in such Purchase Price and Terms Letter, the Seller shall pay to the Purchaser an amount equal to the product of (a) the amount, if any, expressed as a decimal fraction, by which the Purchase Price Percentage exceeds 100% (1.00) multiplied by (B) the Unpaid Principal Balance of the Mortgage Loan as of the date of repayment or liquidation.

(b)    In addition to Seller's other repurchase obligations, Seller must repurchase any Mortgage Loan at the Repurchase Price if the Mortgagor has not made the number of scheduled payments after the applicable Closing Date in the case of Mortgage Loan, as specified, if any, in the applicable Purchase Price and Terms Letter and there has been no payment within fifteen (15) days of the expiration of any applicable grace period on any of the scheduled payments specified in the applicable Purchase Price and Terms Letter.

Section 3.07    Certain Covenants of each Seller and the Servicer.

Without incurring undue effort or any cost except the Seller's overhead or employees' salaries, each Seller shall take reasonable steps to assist the Purchaser, if the Purchaser so requests by 30 days' advance written notice to the related Seller or Sellers (it is agreed that electronic mail shall not be considered valid notification if not followed by verbal communication by the Purchaser to the related Seller or Sellers), in re-selling the Mortgage Loans in a whole loan sale or in securitizing the Mortgage Loans and selling undivided interests in such Mortgage Loans in a public offering or private placement or selling participating interests in such Mortgage Loans, which steps may include, (a) providing any information relating to the Mortgage Loans reasonably necessary to assist in the preparation of any disclosure documents, (b) providing information relating to delinquencies and defaults with respect to the Servicer's servicing portfolio (or such portion thereof as is similar to the Mortgage Loans), (c) entering into any other servicing, custodial or other similar agreements, that are consistent with the provisions of this Agreement, and which contain such provisions as are customary in securitizations rated "AAA" (including a securitization involving a REMIC) (a "Securitization, (d) to restate the representations and warranties contained in Article III hereof as of the closing date of such Securitization or whole loan sale; provided, however, Servicer may qualify and/or modify any such representations or warranties to reflect any facts or circumstances arising subsequent to the related Funding Date, (e) provide such opinions of

37

counsel as are customary in such transactions, provided, however, that any opinion of outside counsel shall be provided at Purchaser's expense and (f) provide the Sarbanes-Oxley certification in the form of Exhibit 11.

In connection with such a Securitization, the Purchaser may be required to engage a master servicer or trustee to determine the allocation of payments to and make remittances to the certificateholders, at the Purchaser's sole cost and expense. In the event that a master servicer or trustee is requested by the Purchaser   to determine the allocation of payments and to make remittances to the certificateholders, the Servicer agrees to service the Mortgage Loans in accordance with the reasonable and customary requirements of such Securitization, which may include the Servicer's acting as a subservicer in a master servicing arrangement. With respect to the then owners of the Mortgage Loans, the Servicer shall thereafter deal solely with such master servicer or trustee, as the case may be with respect to such Mortgage Loans which are subject to the Securitization and shall not be required to deal with any other party with respect to such Mortgage Loans. The cost of such securitization shall be borne by the Purchaser, other than the Seller's overhead or employees' salaries.

## ARTICLE IV:
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER AND CONDITIONS PRECEDENT TO FUNDING

Section 4.01    Representations and Warranties

The Purchaser represents, warrants and covenants to the Seller that as of each Funding Date or as of such date specifically provided herein:

(1)    Due Organization. The Purchaser is an entity duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, and has all licenses necessary to carry on its business now being conducted and is licensed, qualified and in good standing under the laws of each state where a Mortgaged Property is located or is otherwise exempt under applicable law from such qualification or is otherwise not required under applicable law to effect such qualification; no demand for such qualification has been made upon the Purchaser by any state having jurisdiction and in any event the Purchaser is or will be in compliance with the laws of any such state to the extent necessary to enforce each Mortgage Loan.

(2)    Due Authority. The Purchaser had the full power and authority and legal right to acquire the Mortgage Loans that it acquired. The Purchaser has the full power and authority to hold each Mortgage Loan, to sell each Mortgage Loan and to execute, deliver and perform, and to enter into and consummate, all transactions contemplated by this Agreement. The Purchaser has duly authorized the execution, delivery and performance of this Agreement, has duly executed and delivered this Agreement, and this Agreement, assuming due authorization, execution and delivery by the Seller, constitutes a legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms, subject to applicable bankruptcy, reorganization, receivership, conservatorship, insolvency, moratorium and other laws relating to or affecting creditors' rights generally or the rights of creditors of banks and to the general principles of equity (whether such enforceability is considered in a proceeding in equity or at law);

38

(3)     No Conflict.  None of the execution and delivery of this Agreement, the acquisition of the Mortgage Loans by the Purchaser, the consummation of the transactions contemplated hereby, or the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of the Purchaser's organizational documents and bylaws or any legal restriction or any agreement or instrument to which the Purchaser is now a party or by which it is bound, or constitute a default or result in an acceleration under any of the foregoing, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Purchaser or its property is subject, or impair the ability of the Purchaser to realize on the Mortgage Loans, or impair the value of the Mortgage Loans;

(4)     Ability to Perform.  The Purchaser does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement;

(5)     No Material Default.  The Purchaser is not in material default under any agreement, contract, instrument or indenture of any nature whatsoever to which the Purchaser is a party or by which it (or any of its assets) is bound, which default would have a material adverse effect on the ability of the Purchaser to perform under this Agreement, nor, to the best of the Purchaser's knowledge, has any event occurred which, with notice, lapse of time or both, would constitute a default under any such agreement, contract, instrument or indenture and have a material adverse effect on the ability of the Purchaser to perform its obligations under this Agreement;

(6)     No Change in Business.  There has been no change in the business, operations, financial condition, properties or assets of the Purchaser since the date of the Purchaser's financial statements that would have a material adverse effect on the ability of the Purchaser to perform its obligations under this Agreement;

(7)     Litigation Pending.  There is no action, suit, proceeding or investigation pending or, to the best of the Purchaser's knowledge, threatened, against the Purchaser which either in any one instance or in the aggregate, if determined adversely to the Purchaser would adversely affect the Purchasers ability to purchase of the Mortgage Loans or the execution, delivery or enforceability of this Agreement or result in any material liability of the Purchaser, or draw into question the validity of this Agreement, or the Mortgage Loans or have a material adverse effect on the financial condition of the Purchaser;

(8)     Broker.  The Purchaser has not dealt with any broker or agent or anyone else who might be entitled to a fee or commission in connection with this transaction;

(9)     No Consent Required.  No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Purchaser of or compliance by the Purchaser with this Agreement, the purchase of the Mortgage Loans from the Seller or the consummation of the transactions contemplated by this Agreement or, if required, such approval has been obtained prior to the Funding Date;

(10)     Ordinary Course of Business.  The consummation of the transactions contemplated by this Agreement is in the ordinary course of business of the Purchaser;

(11)     Non-Petition Agreement. The Purchaser covenants and agrees that it shall not, prior to the date which is one year and one day (or if longer, the applicable preference period then in effect) after the payment in full of all rated obligations of Bishop's Gate Residential Mortgage

39

Trust, acquiesce, petition or otherwise, directly or indirectly, invoke or cause Bishop's Gate Residential Mortgage Trust to invoke the process of any governmental authority for the purpose of commencing or sustaining a case against Bishop's Gate Residential Mortgage Trust under any federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator, or other similar official of Bishop's Gate Residential Mortgage Trust. This covenant and agreement shall be binding upon the Purchaser and any assignee or transferee of the Purchaser;

(12)  <u>No Untrue Information</u>. Neither this Agreement nor any statement, report or other agreement, document or instrument furnished or to be furnished pursuant to this Agreement contains or will contain any materially untrue statement of fact or omits or will omit to state a fact necessary to make the statements contained therein not misleading;

(13)  <u>Non-solicitation</u>. In the event the Purchaser chooses to solicit any Mortgagors (in writing or otherwise) to refinance any of the Mortgage Loans during the term of this Agreement, such solicitations shall be directed at all of Purchaser's customers and will not be exclusively directed towards the Mortgagors relating to the Mortgage Loans sold hereunder;

(14)  <u>Privacy</u>. Purchaser agrees and acknowledges that as to all nonpublic personal information received or obtained by it with respect to any Mortgagor: (a) such information is and shall be held by Purchaser in accordance with all applicable law, including but not limited to the privacy provisions of the Gramm-Leach Bliley Act; (b) such information is in connection with a proposed or actual secondary market sale related to a transaction of the Mortgagor for purposes of 16 C.F.R.§313.14(a)(3); and (c) Purchaser is hereby prohibited from disclosing or using any such information other than to carry out the express provisions of this Agreement, or as otherwise permitted by applicable law; and

(15)  <u>MERS</u>. The Purchaser is a member of MERS in good standing, and will comply in all material respects with the rules and procedures of MERS in connection with the Purchaser's performance of its obligations under this Agreement with respect to the Mortgage Loans, for as long as such Mortgage Loans are registered with MERS.

Section 4.02   <u>Conditions Precedent to Closing</u>

Each purchase of Mortgage Loans hereunder shall be subject to each of the following conditions:

(a)  All of the representations and warranties of Seller under the PHH Guide, and of Seller, Servicer and Purchaser under this Agreement shall be true and correct as of the Funding Date, and no event shall have occurred that, with notice or the passage of time, would constitute an Event of Default under this Agreement or under the PHH Guide;

(b)  Purchaser shall have received, or Purchaser's attorneys shall have received in escrow, all closing documents as specified herein, in such forms as are agreed upon and acceptable to Purchaser, duly executed by all signatories other than Purchaser as required pursuant to the respective terms thereof;

(c)    All other terms and conditions of this Agreement shall have been complied with.

Subject to the foregoing conditions, Purchaser shall pay to Seller on each Funding Date the applicable Purchase Price as provided herein.

### ARTICLE V:
### ADMINISTRATION AND SERVICING OF MORTGAGE LOANS

Section 5.01    PHH Mortgage to Act as Servicer; Servicing Standards; Additional Documents; Consent of the Purchaser

(1)    The Servicer, as independent contract servicer, shall service and administer the Mortgage Loans and REO Property from and after each Funding Date in accordance with the terms and provisions of the Mortgage Loans, applicable law and the terms and provisions of this Agreement and the Fannie Mae Guide and the Fannie Mae Servicing Modification Schedule 5.01(1) (to the extent matters noted on such Fannie Mae Servicing Modification Schedule are not already expressly set forth herein), for and on behalf of, and in the best interests of, the Purchaser (without taking into account any relationship the Servicer may have with any Mortgagor or other Person, the participation, if any, of the Servicer in any financing provided in connection with the sale of any Mortgaged Property, or the Servicer's obligation to advance any expenses or incur any costs in the performance of its duties hereunder) in accordance with a standard that is not less than the higher of (a) the same care, skill, prudence and diligence with which it services similar assets held for its own or its Affiliates' account and (b) the same care, skill, prudence and diligence with which it services similar assets for third party institutional investors, in each case giving due consideration to customary and usual standards of practice of prudent institutional mortgage loan servicers utilized with respect to mortgage loans comparable to the Mortgage Loans. Subject to the foregoing standards, in connection with such servicing and administration, the Servicer shall seek to maximize the timely recovery of principal and interest on the Mortgage Notes; provided that nothing contained herein shall be construed as an express or implied guarantee by the Servicer of the collectibility of payments on the Mortgage Loans or shall be construed as impairing or adversely affecting any rights or benefits specifically provided by this Agreement to the Seller, including with respect to Servicing Fees. Servicer will in all cases and circumstances service the Mortgage Loans as required above and in accordance with and subject to the Schedule of Delegated Authority attached hereto as Exhibit 5.01(c) and notwithstanding to the contrary any term, condition or provision of this Agreement.

In the event that any of the Mortgage Loans included on the Mortgage Loan Schedule for a particular Funding Date are Pledged Asset Mortgage Loans, such Pledged Asset Mortgage Loans will be serviced in accordance with Section 5.18 hereof.

(2)    To the extent consistent with Section 5.01(1) and further subject to any express limitations set forth in this Agreement, the Servicer (acting alone or, solely in the circumstances permitted hereunder, acting through a subservicer) shall have full power and authority to do or cause to be done any and all things that it may deem necessary or desirable in connection with such servicing and administration, including the power and authority (a) to execute and deliver, on behalf of the Purchaser, customary consents or waivers and other instruments and documents (including estoppel certificates), (b) to consent to transfers of any Mortgaged Property and assumptions of the Mortgage Notes and related Mortgages, (c) to submit claims to collect any

41

Insurance Proceeds and Liquidation Proceeds, (d) to consent to the application of any Insurance Proceeds or Condemnation Proceeds to the restoration of the applicable Mortgaged Property or otherwise, (e) to bring an action in a court of law, including an unlawful detainer action, to enforce rights of the Purchaser with respect to any Mortgaged Property, (f) to execute and deliver, on behalf of the Purchaser, documents relating to the management, operation, maintenance, repair, leasing, marketing and sale of any Mortgaged Property or any REO Property, and (g) to effectuate foreclosure or other conversion of the ownership of the Mortgaged Property securing any Mortgage Loan; provided that the Servicer shall not take any action not provided for in this Agreement that is materially inconsistent with or materially prejudices the interest of the Purchaser in any Mortgage Loan or under this Agreement. The Purchaser shall furnish the Servicer with a power of attorney in the form of Exhibit 5.01(a) and other documents reasonably necessary or appropriate to enable the Servicer to service and administer the Mortgage Loans and the REO Properties, including documents relating to the foreclosure, receivership, management, operation, maintenance, repair, leasing, marketing and sale (in foreclosure or otherwise) of any Mortgaged Property or any REO Property. Except as provided in Section 3.01(13), nothing contained in this Agreement shall limit the ability of the Servicer to lend money to (whether on a secured or unsecured basis), and otherwise generally engage in any kind of business or dealings with, any Mortgagor, as though the Servicer were not a party to this Agreement or to the transactions contemplated hereby.

(3)    Notwithstanding anything to the contrary contained herein:

        (a)    the Servicer acknowledges that the Purchaser or its nominee will retain title to, and ownership of, the Mortgage Loans and the REO Properties and that the Servicer does not hereby acquire any title to, security interest in, or other rights of any kind in or to any Mortgage Loan or REO Property or any portion thereof;

        (b)    the Servicer shall not file any lien or any other encumbrance on, exercise any right of setoff against, or attach or assert any claim in or on any Mortgage Loan or REO Property, unless authorized pursuant to a judicial or administrative proceeding or a court order;

        (c)    the Servicer shall, in servicing the Mortgage Loans, follow and comply with the servicing guidelines established by Fannie Mae, provided that the Servicer shall specifically notify the Purchaser in writing and obtain the Purchaser's written consent prior to the Servicer taking any of the following actions if such action is outside the scope of the Schedule of Delegated Authority attached hereto as Exhibit 5.01(c):   (1) modifying, amending or waiving any of the financial terms of, or making any other material modifications to, a Mortgage Loan, except that the Servicer may, upon a   Mortgagor's request and Purchaser's written approval, accept a principal prepayment and re-amortize the then remaining principal balance over the then remaining term of the loan (resulting in a lower scheduled monthly payment but no change in the maturity date); (2) selling any Specially Serviced Mortgage Loan; (3) making, with respect to any Specially Serviced Mortgage Loan or REO Property, Servicing Advances; provided that the Servicer shall not be required to so advise the Purchaser to the extent that each related Servicing Advance as to the related

Mortgaged Property or REO Property is in the best interests of the Purchaser or other owner of the Mortgage Loan and that are deemed to be recoverable by the Servicer and the aggregate amount of all such Servicing Advances with respect to a Mortgage Loan is less than ten thousand dollars ($10,000); (4) forgiving principal or interest on, or permitting to be satisfied at a discount, any Mortgage Loan except in the event of a Specially Serviced Mortgage Loan; or (5) accepting substitute or additional collateral, or releasing any collateral, for a Mortgage Loan. If the Purchaser has not approved or rejected in writing any proposed action(s) recommended by the Servicer to be taken hereunder within 10 Business Days of the date such recommendation is made, then the Purchaser shall be deemed to have accepted such recommended action(s) and the Servicer shall take any such action(s);

(d)     the Servicer shall notify the Purchaser of any modification, waiver or amendment of any term of any Mortgage Loan and the date thereof and shall deliver to the Purchaser, for deposit in the related Mortgage File, an original counterpart of the agreement relating to such modification, waiver or amendment promptly following the execution thereof;

(e)     in accordance with the Fannie Mae Guide, the Servicer shall be entitled to workout compensation as it relates to repayment plans, loan modifications, short-sales, deed-in lieu of foreclosure, and hardship assumptions as evidenced in Exhibit 5.01(b);

(f)     the Servicer shall remain primarily liable for the full performance of its obligations hereunder notwithstanding any appointment by the Servicer of a subservicer or subservicers hereunder; and

(g)     the Purchaser may at any time and from time to time, in its sole discretion, upon 30 Business Days written notice to the Servicer, terminate the Servicer's servicing obligations hereunder with respect to (1) any REO Property, (2) any Mortgage Loan that, in accordance with the Purchaser's internal credit classification criteria, has been classified as "doubtful" or a "loss" or (3) any Mortgage Loan as to which any portion of a Monthly Payment is ninety (90) or more days past due. Prior to the effectiveness of such termination the Purchaser shall, or shall cause its nominee to, reimburse the Servicer for all outstanding Servicing Advances and Monthly Advances made with respect to any such Mortgage Loan. The Purchaser may notify the Servicer of its intention to terminate the servicing of any Mortgage Loan pursuant to the preceding clause (3) when such Mortgage Loan is at least sixty (60) days past due, and such termination will be effective not less than thirty (30) days after such notice is given. Upon the effectiveness of any such termination of the Servicer's servicing obligations with respect to any such REO Property or Mortgage Loan, the Servicer shall deliver all agreements, documents, and instruments related thereto to the Purchaser or its nominee, in accordance with applicable law. Termination of servicing under this Section 5.013(g)

is with out compensation of any kind or nature other than reimbursement of Servicing Advances and Monthly Advances.

Section 5.02    Collection of Mortgage Loan Payments

Continuously from the date hereof until the principal and interest on all Mortgage Loans are paid in full, the Servicer will proceed diligently to collect all payments due under each Mortgage Loan when the same shall become due and payable and shall, to the extent such procedures shall be consistent with this Agreement and the terms and provisions of any related Primary Insurance Policy, follow such collection procedures as it follows with respect to mortgage loans comparable to the Mortgage Loans, which procedures shall in any event comply with the servicing standards set forth in Section 5.01. Furthermore, the Servicer shall ascertain and estimate annual ground rents, taxes, assessments, fire and hazard insurance premiums, mortgage insurance premiums, and all other charges that, as provided in the Mortgages, will become due and payable to the end that the installments payable by the Mortgagors will be sufficient to pay such charges as and when they become due and payable.

Section 5.03    Notice of Foreclosure Sale

Prior to foreclosing on a Mortgage Loan, the Servicer shall notify the Purchaser of its intent to foreclose. Upon receipt of such a notice, the Purchaser shall, within three (3) Business Days, notify the Servicer of the name in which to foreclose any such Mortgage Loan and whether the Mortgage Loan is subject to any special investor handling requirements. The Servicer shall comply with any special investor handling requirements specified by the Purchaser. The Servicer shall, within one (1) Business Day following the occurrence of any foreclosure sale with respect to any Mortgaged Property, deliver to the Purchaser a notice of foreclosure sale substantially in the form of Exhibit 5.03.

Section 5.04    Establishment of Collection Account; Deposits in Collection Account

The Servicer shall segregate and hold all funds collected and received pursuant to each Mortgage Loan separate and apart from any of its own funds and general assets and shall establish and maintain one or more Collection Accounts which shall be an Eligible Account. The creation of any Collection Account shall be evidenced by a letter agreement in the form of Exhibit 5.04 attached hereto. A copy of such letter agreement shall be furnished to the Purchaser.

The Servicer shall deposit in the Collection Account, within two (2) Business Days after receipt (or as otherwise required pursuant to this Agreement in the case of clauses (8), (9) and (10) of this Section 5.04) and retain therein the following payments and collections received or made by it subsequent to each Funding Date, or received by it prior to the Funding Date but allocable to a period subsequent thereto, other than in respect of principal and interest on the Mortgage Loans due on or before the Funding Date:

(1)    all payments on account of principal, including Principal Prepayments, on the Mortgage Loans;

(2)    all payments on account of interest, less the Servicing Fee on the Mortgage Loans;

(3)    all Liquidation Proceeds;

44

(4)    all REO Disposition Proceeds;

(5)    all Insurance Proceeds, including amounts required to be deposited pursuant to Section 5.10, other than proceeds to be held in the Escrow Account and applied to the restoration or repair of the Mortgaged Properties or released to the applicable Mortgagors in accordance with the Servicer's normal servicing procedures, the related Mortgages or applicable law;

(6)    all Condemnation Proceeds affecting any Mortgaged Property that are not released to a Mortgagor in accordance with the Servicer's normal servicing procedures, the related Mortgage or applicable law;

(7)    any Monthly Advances in accordance with Section 6.03;

(8)    [reserved];

(9)    any amounts required to be deposited by the Servicer pursuant to Section 5.16 in connection with any losses on Permitted Investments; and

(10)    any amounts required to be deposited in the Collection Account pursuant to Sections 7.01 or 7.02 or otherwise pursuant to the terms hereof.

The foregoing requirements for deposit in the Collection Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments in the nature of late payment charges and assumption fees, to the extent permitted by Section 7.01, and any prepayment penalties on the Mortgage Loans need not be deposited by the Servicer in the Collection Account and shall be retained by the Servicer as additional compensation.

    Section 5.05    Permitted Withdrawals from the Collection Account

The Servicer may, from time to time in accordance with the provisions hereof, withdraw amounts from the Collection Account for the following purposes (without duplication) :

(1)    to reimburse itself for unreimbursed Monthly Advances and Servicing Advances that the Servicer has determined to be Non-Recoverable Advances as provided in Section 6.04;

(2)    to make payments to the Purchaser in the amounts, at the times and in the manner provided for in Section 6.01;

(3)    to reimburse itself for Monthly Advances, subject to on-going obligations of the Servicer under this Agreement;

(4)    to reimburse itself for unreimbursed Servicing Advances and for unreimbursed Monthly Advances, the Servicer's right to reimburse itself pursuant to this Subsection (4) with respect to any Mortgage Loan being limited to related Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds and such other amounts as may be collected by the Servicer from the Mortgagor or otherwise relating to the Mortgage Loan, it being understood that, in the case of such reimbursement, the Servicer's right thereto shall be prior to the rights of the Purchaser, except that, where a Seller or the Servicer is required to repurchase (or substitute a Qualified Substitute Mortgage Loan for) a Mortgage Loan pursuant to Sections 2.04, 3.04 and/or 7.02, the Servicer's right to such reimbursement shall be subsequent and subordinate to the payment to the

45

Purchaser of the applicable Repurchase Price (or delivery of a Qualified Substitute Mortgage Loan) and all other amounts required to be paid to the Purchaser with respect to such Mortgage Loan; provided that in connection with any reimbursement pursuant to this Subsection (4), Servicer shall provide Purchaser with a schedule in the form of Exhibit 5.05(4) hereto itemizing any such amounts requiring reimbursement;

(5)     to pay to itself as additional servicing compensation any interest earned on funds in the Collection Account (all such interest to be withdrawn monthly not later than each Remittance Date),;

(6)     to pay to itself with respect to each Mortgage Loan that has been repurchased pursuant to Sections 2.04, 3.04 and/or 7.02 all amounts received thereon and not distributed as of the date on which the related Repurchase Price is determined (except to the extent that such amounts constitute part of the Repurchase Price to be remitted to the Purchaser);

(7)     to remove any amounts deposited into the Collection Account in error; and

(8)     to clear and terminate the Collection Account in the event a new Collection Account has been established, or upon the termination of this Agreement, with any funds contained therein to be distributed in accordance with the terms of this Agreement.

The Servicer shall keep and maintain a separate, detailed accounting, on a Mortgage Loan-by-Mortgage Loan basis, for the purpose of justifying any withdrawal from the Collection Account pursuant to this Section.

Section 5.06    Establishment of Escrow Accounts; Deposits in Escrow

The Servicer shall segregate and hold all funds collected and received pursuant to each Mortgage Loan that constitute Escrow Payments separate and apart from any of its own funds and general assets and shall establish and maintain one or more Escrow Accounts which shall be an Eligible Account. The creation of any Escrow Account shall be evidenced by a letter agreement in the form shown on Exhibit 5.06 attached hereto. A copy of such letter agreement shall be furnished to the Purchaser.

The Servicer shall deposit in each Escrow Account within two (2) Business Days after receipt, and retain therein, (i) all Escrow Payments collected on account of the related Mortgage Loans for the purpose of effecting timely payment of any such items as required under the terms of this Agreement, and (ii) all Insurance Proceeds that are to be applied to the restoration or repair of any Mortgaged Property. The Servicer shall make withdrawals therefrom only to effect such payments as are required under Sections 5.07 and/or 5.08. The Servicer shall be entitled to retain any interest paid on funds deposited in the Escrow Account by the depository institution other than interest on escrowed funds required by law to be paid to the Mortgagor and, to the extent required by law, the Servicer shall pay interest on escrowed funds to the Mortgagor notwithstanding that the Escrow Account is non-interest bearing or that interest paid thereon is insufficient for such purposes, without any right of reimbursement therefor.

Section 5.07    Permitted Withdrawals From Escrow Accounts

Withdrawals from any Escrow Account may be made by the Servicer only (i) to effect timely payments of ground rents, taxes, assessments, hazard insurance premiums, Primary

46

Insurance Policy premiums, if applicable, and comparable items constituting Escrow Payments for the related Mortgage, (ii) to reimburse the Servicer for any Servicing Advance made by the Servicer with respect to a related Mortgage Loan but only from amounts received on the related Mortgage Loan that represent late payments or collections of Escrow Payments thereunder, (iii) to refund to the Mortgagor any funds as may be determined to be overages, (iv) if permitted by applicable law, for transfer to the Collection Account in accordance with the terms of this Agreement, (v) for application to the restoration or repair of the Mortgaged Property in accordance with the terms of the related Mortgage Loan, (vi) to pay to the Servicer, or to the Mortgagor to the extent required by law, any interest paid on the funds deposited in the Escrow Account, (vii) to reimburse a Mortgagor in connection with the making of the Payoff of the related Mortgage Loan or the termination of all or part of the escrow requirement in connection with the Mortgage Loan, (viii) to remove any amounts deposited into the Escrow Account in error; or (ix) to clear and terminate the Escrow Account in the event a new Escrow Account has been established or upon the termination of this Agreement.

Section 5.08    Payment of Taxes, Insurance and Other Charges; Maintenance of Primary Insurance Policies; Collections Thereunder

With respect to each Mortgage Loan, the Servicer shall maintain accurate records reflecting the status of ground rents, taxes, assessments, and other charges that are or may become a lien upon the Mortgaged Property and the status of Primary Insurance Policy premiums and fire and hazard insurance coverage and shall obtain, from time to time, all bills for the payment of such charges, including renewal premiums, and shall effect payment thereof prior to the applicable penalty or termination date and at a time appropriate for securing maximum discounts allowable, employing for such purpose deposits of the Mortgagor in the Escrow Account which shall have been estimated and accumulated by the Servicer in amounts sufficient for such purposes, as allowed under the terms of the Mortgage and applicable law. If a Mortgage does not provide for Escrow Payments, then the Servicer shall require that any such payments be made by the Mortgagor at the time they first become due. The Servicer assumes full responsibility for the timely payment of all such bills and shall effect timely payments of all such bills irrespective of the Mortgagor's faithful performance in the payment of same or the making of the Escrow Payments and shall make advances from its own funds to effect such payments but shall be entitled to reimbursement thereof in accordance with the terms of this Agreement.

The Servicer shall maintain in full force and effect a Primary Insurance Policy, conforming in all respects to the description set forth in Section 3.03(30), issued by an insurer described in that Section, with respect to each Mortgage Loan for which such coverage is required. Such coverage will be maintained until the Loan-to-Value Ratio of the related Mortgage Loan is reduced to 75% or less in the case of a Mortgage Loan having a Loan-to-Value Ratio at origination in excess of 80% or until such time, if any, as such insurance is required to be released in accordance with the provisions of applicable law including, but not limited to, the Homeowners Protection Act of 1998. The Servicer shall assure that all premiums due under any Primary Insurance Policy are paid in a timely manner, but shall be entitled to reimbursement pursuant to the terms of this Agreement for premiums paid by the Servicer on behalf of any Mortgagor who is obligated to pay such premiums but fails to do so. The Servicer shall not cancel or refuse to renew any Primary Insurance Policy in effect on the Funding Date that is required to be kept in force under this Agreement unless a replacement Primary Insurance Policy for such canceled or nonrenewed policy is obtained from and maintained with an insurer

47

that satisfies the standards set forth in Section 3.03(30). The Servicer shall not take any action that would result in noncoverage under any applicable Primary Insurance Policy of any loss that, but for the actions of the Servicer, would have been covered thereunder. In connection with any assumption or substitution agreement entered into or to be entered into pursuant to Section 7.01, the Servicer shall promptly notify the insurer under the related Primary Insurance Policy, if any, of such assumption or substitution of liability in accordance with the terms of such policy and shall take all actions that may be required by such insurer as a condition to the continuation of coverage under the Primary Insurance Policy. If such Primary Insurance Policy is terminated as a result of such assumption or substitution of liability, then the Servicer shall obtain and, except as otherwise provided above, maintain, a replacement Primary Insurance Policy as provided above.

In connection with its activities as servicer, the Servicer agrees to prepare and present, on behalf of itself and the Purchaser, claims to the insurer under any Primary Insurance Policy in a timely fashion in accordance with the terms of such policies and, in this regard, to take such action as shall be necessary to permit recovery under any Primary Insurance Policy respecting a defaulted Mortgage Loan. Pursuant to Section 5.04, any amounts collected by the Servicer under any Primary Insurance Policy shall be deposited in the Collection Account, subject to withdrawal in accordance with Section 5.05.

Section 5.09    Transfer of Accounts

The Servicer may transfer the Collection Account or any Escrow Account to a different depository institution from time to time; provided that (i) no such transfer shall be made unless all certifications or letter agreements required under Section 5.04 have been executed and delivered by the parties thereto; and (ii) concurrently upon any such transfer, the Servicer shall give written notice thereof to the Purchaser. Notwithstanding anything to the contrary contained herein, the Collection Account and each Escrow Account shall at all times constitute Eligible Accounts.

Section 5.10    Maintenance of Hazard Insurance

The Servicer shall cause to be maintained for each Mortgage Loan fire and hazard insurance with extended coverage as is customary in the area where the Mortgaged Property is located in an amount that is at least equal to the lesser of (a) the maximum insurable value of the improvements securing such Mortgage Loan and (b) the greater of (1) the Unpaid Principal Balance of such Mortgage Loan or (2) an amount such that the proceeds thereof shall be sufficient to prevent the Mortgagor and/or the loss payee from becoming a co-insurer.

If any Mortgaged Property is in an area identified by the Federal Emergency Management Agency as having special flood hazards and such flood insurance has been made available, then the Servicer will cause to be maintained a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration with a generally acceptable insurance carrier, in an amount representing coverage not less than the lesser of (a) the minimum amount required, under the terms of coverage, to compensate for any damage or loss on a replacement cost basis (or the outstanding principal balance of the related Mortgage Loan if replacement cost coverage is not available for the type of building insured) or (b) the maximum amount of insurance which is available under the Flood Disaster Protection Act of

48

1973, as amended (assuming that the area in which such Mortgaged Property is located is participating in such program).

The Servicer shall also maintain on each REO Property fire, hazard and liability insurance, and to the extent required and available under the Flood Disaster Protection Act of 1973, as amended, flood insurance with extended coverage in an amount which is at least equal to the lesser of (a) the maximum insurable value of the improvements that are a part of such property and (b) the outstanding principal balance of the related Mortgage Loan at the time it became an REO Property plus accrued interest at the Note Rate and related Servicing Advances.

All such policies shall be endorsed with standard mortgagee clauses with loss payable to the Servicer, or upon request to the Purchaser, and shall provide for at least 30 days prior written notice of any cancellation, reduction in the amount of, or material change in, coverage to the Servicer. The Servicer shall not interfere with the Mortgagor's freedom of choice in selecting either his insurance carrier or agent, provided that the Servicer shall not accept any such insurance policies from insurance companies unless such companies (a) currently reflect (1) a general policyholder's rating of B+ or better and a financial size category of III or better in Best's Key Rating Guide, or (2) a general policyholder's rating of "A" or better in Best's Key Rating Guide, and (b) are licensed to do business in the state wherein the related Mortgaged Property is located. Notwithstanding the foregoing, the Servicer may accept a policy underwritten by Lloyd's of London or, if it is the only coverage available, coverage under a state's Fair Access to Insurance Requirement (FAIR) Plan. If a hazard policy becomes in danger of being terminated, or the insurer ceases to have the ratings noted above, the Servicer shall notify the related Mortgagor, and shall use its best efforts, as permitted by applicable law, to obtain from another qualified insurer a replacement hazard insurance policy substantially and materially similar in all respects to the original policy. In no event, however, shall a Mortgage Loan be without a hazard insurance policy at any time.

Pursuant to Section 5.04, any amounts collected by the Servicer under any such policies other than amounts to be deposited in the Escrow Account and applied to the restoration or repair of the Mortgaged Property or REO Property, or released to the Mortgagor in accordance with the Servicer's normal servicing procedures, shall be deposited in the Collection Account within two (2) Business Days after receipt, subject to withdrawal in accordance with Section 5.05. Any cost incurred by the Servicer in maintaining any such insurance shall not, for the purpose of calculating remittances to the Purchaser, be added to the Unpaid Principal Balance of the related Mortgage Loan, notwithstanding that the terms of such Mortgage Loan so permit.

It is understood and agreed that no earthquake or other additional insurance need be required by the Servicer of the Mortgagor or maintained on property acquired in respect of the Mortgage Loan, other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance.

Section 5.11    Reserved

Section 5.12    Fidelity Bond; Errors and Omissions Insurance

The Servicer shall maintain, at its own expense, a blanket fidelity bond and an errors and omissions insurance policy, with broad coverage with responsible companies that would meet the requirements of Fannie Mae or Freddie Mac on all officers, employees or other Persons

acting in any capacity with regard to the Mortgage Loans to handle funds, money, documents and papers relating to the Mortgage Loans. The Fidelity Bond and errors and omissions insurance shall be in the form of the "Mortgage Banker's Blanket Bond" and shall protect and insure the Servicer against losses, including losses arising by virtue of any Mortgage Loan not being satisfied in accordance with the procedures set forth in Section 7.02 and/or losses resulting from or arising in connection with forgery, theft, embezzlement, fraud, errors and omissions and negligent acts of or by such Persons. Such Fidelity Bond shall also protect and insure the Servicer against losses in connection with the failure to maintain any insurance policies required pursuant to this Agreement and the release or satisfaction of a Mortgage Loan without having obtained payment in full of the indebtedness secured thereby. No provision of this Section 5.12 requiring the Fidelity Bond and errors and omissions insurance shall diminish or relieve the Servicer from its duties and obligations as set forth in this Agreement. The minimum coverage under any such bond and insurance policy shall be at least equal to the corresponding amounts required by Fannie Mae in the Fannie Mae Guide or by Freddie Mac in the Freddie Mac Servicing Guide. The Servicer shall cause to be delivered to the Purchaser upon request: (i) a certified true copy of the Fidelity Bond and insurance policy; (ii) a written statement from the surety and the insurer that such Fidelity Bond or insurance policy shall in no event be terminated or materially modified without 30 days' prior written notice to the Purchaser; and (iii) written evidence reasonably satisfactory to the Purchaser that such Fidelity Bond or insurance policy provides that the Purchaser is a beneficiary or loss payee thereunder.

Section 5.13    Realization Upon Specially Serviced Mortgage Loans and REO Properties

The Servicer shall foreclose upon or otherwise comparably convert the ownership of properties securing such of the Specially Serviced Mortgage Loans as come into and continue in default and as to which (a) in the reasonable judgment of the Servicer, no satisfactory arrangements can, in accordance with prudent lending practices, be made for collection of delinquent payments pursuant to Section 5.01 and (b) such foreclosure or other conversion is otherwise in accordance with Section 5.01. The Servicer shall not be required to expend its own funds in connection with any foreclosure or towards the restoration, repair, protection or maintenance of any property unless it shall determine that such expenses will be recoverable to it as Servicing Advances either through Liquidation Proceeds or through Insurance Proceeds (in accordance with Section 5.05) or from any other source relating to the Specially Serviced Mortgage Loan. The Servicer shall be required to advance funds for all other costs and expenses incurred by it in any such foreclosure proceedings; provided that it shall be entitled to reimbursement thereof from the proceeds of liquidation of the related Mortgaged Property, as contemplated by Section 5.05.

Upon any Mortgaged Property becoming an REO Property, the Servicer shall within one (1) Business Day notify the Purchaser thereof, specifying the date on which such Mortgaged Property became an REO Property. Pursuant to its efforts to sell such REO Property, the Servicer shall, either itself or through an agent selected by it, protect and conserve such REO Property in accordance with the servicing standards set forth in Section 5.01 and may, subject to Section 5.01(3)(c) and incident to its conservation and protection of the interests of the Purchaser, rent the same, or any part thereof, for the period to the sale of such REO Property.

Notwithstanding anything to the contrary contained herein, the Purchaser shall not, and the Servicer shall not on the Purchaser's behalf, acquire any real property (or personal property incident to such real property) except in connection with a default or a default that is imminent

50

on a Mortgage Loan. If the Purchaser acquires any real property (or personal property incident to such real property) in connection with such a default, then such property shall be disposed of by the Servicer in accordance with this Section and <u>Section</u> 5.15 as soon as possible but in no event later than 3 years after its acquisition by the Servicer on behalf of the Purchaser, unless the Servicer obtains, at the expense of the Purchaser, in a timely fashion an extension from the Internal Revenue Service for an additional specified period.

Any recommendation of the Servicer to foreclose on a defaulted Mortgage Loan shall be subject to a determination by the Servicer that the proceeds of such foreclosure would exceed the costs and expenses of bringing such a proceeding. The income earned from the management of any REO Property, net of reimbursement to the Servicer for Servicing Advances and fees for work-out compensation in accordance with the Freddie Mac Servicing Guide, incurred with respect to such REO Property under Section 5.14, shall be applied to the payment of the costs and expenses set forth in Section 5.14(4), with any remaining amounts to be promptly deposited in the Collection Account in accordance with Section 5.14.

If, in the exercise of its servicing obligations with respect to any Mortgaged Property hereunder, the Servicer deems it is necessary or advisable to obtain an Environmental Assessment, then the Servicer shall so obtain an Environmental Assessment, it being understood that all reasonable costs and expenses incurred by the Servicer in connection with any such Environmental Assessment (including the cost thereof) shall be deemed to be Servicing Advances recoverable by the Servicer pursuant to <u>Section</u> 5.14(4). Such Environmental Assessment shall (a) assess whether (1) such Mortgaged Property is in material violation of applicable Environmental Laws or (2) after consultation with an environmental expert, taking the actions necessary to comply with applicable Environmental Laws is reasonably likely to produce a greater recovery on a net present value basis than not taking such actions, and (b) identify whether (1) any circumstances are present at such Mortgaged Property relating to the use, management or disposal of any hazardous materials for which investigation, testing, monitoring, containment, clean-up or re mediation could be required under any federal, state or local law or regulation, or (2) if such circumstances exist, after consultation with an environmental expert, taking such actions is reasonably likely to produce a greater recovery on a present value basis than not taking such actions. (The conditions described in the immediately preceding clauses (a) and (b) shall be referred to herein as "<u>Environmental Conditions Precedent to Foreclosure</u>.") If any such Environmental Assessment so warrants, the Servicer is hereby authorized to and shall perform such additional environmental testing as it deems necessary and prudent to establish the satisfaction of the foregoing Environmental Conditions Precedent to Foreclosure or to proceed as set forth below (such additional testing thereafter being included in the term "<u>Environmental Assessment</u>").

If an Environmental Assessment deemed necessary or advisable by the Servicer in accordance with this Section 5.13 establishes that any of the Environmental Conditions Precedent to Foreclosure is not satisfied with respect to any Mortgaged Property, but the Servicer in good faith reasonably believes that it is in the best economic interest of the Purchaser to proceed against such Mortgaged Property and, if title thereto is acquired, to take such remedial, corrective or other action with respect to the unsatisfied condition or conditions as may be prescribed by applicable law to satisfy such condition or conditions, then the Servicer shall so notify the Purchaser. If, pursuant to <u>Section</u> 5.01(3)(c), the Purchaser is deemed to have accepted Servicer's recommendation to proceed against such Mortgaged Property, then the Servicer shall so proceed. The cost of any remedial, corrective or other action contemplated by

51

the preceding sentence in respect of any of the Environmental Conditions Precedent to Foreclosure that is not satisfied shall not be an expense of the Servicer and the Servicer shall not be required to expend or risk its own funds or otherwise incur any financial liability in connection with any such action.

If an Environmental Assessment deemed necessary or advisable by the Servicer in accordance with this Section 5.13 establishes that any of the Environmental Conditions Precedent to Foreclosure is not satisfied with respect to any Mortgaged Property and, in accordance with Section 5.01(3)(c), the Purchaser elects or is deemed to have elected not to proceed against such Mortgaged Property, then the Servicer shall, subject to Section 5.01(3)(c), take such action as it deems to be in the best economic interest of the Purchaser (other than proceeding against the Mortgaged Property or directly or indirectly becoming the owner or operator thereof) as determined in accordance with the servicing standard set forth in Section 5.01 and is hereby authorized at such time as it deems appropriate to release such Mortgaged Property from the lien of the related Mortgage.

Prior to the Servicer taking any action with respect to the use, management or disposal of any hazardous materials for which investigation, testing, monitoring, containment, clean-up or re mediation could be required under any federal, state or local law or regulation on any Mortgaged Property, the Servicer shall request the approval of the Purchaser in accordance with Section 5.01(3)(c) and, if such action is deemed approved by the Purchaser, (a) keep the Purchaser apprised of the progress of such action; and (b) take such action in compliance with all applicable Environmental Laws.

Section 5.14    Management of REO Properties

If title to any Mortgaged Property is acquired in foreclosure or by deed in lieu of foreclosure (each, an "REO Property"), the deed or certificate of sale shall be taken in the name of the Purchaser or the Person designated by the Purchaser.  The Servicer (acting alone or through a subservicer or managing agent specializing in the disposition of REO Properties), on behalf of the Purchaser, shall, subject to Section 5.01(3)(c), dispose of any REO Property pursuant to Section 5.15. Promptly following any acquisition by the Purchaser (through the Servicer) of an REO Property, the Servicer shall obtain a narrative appraisal thereof (at the expense of the Purchaser) in order to determine the fair market value of such REO Property. The Servicer shall promptly notify the Purchaser of the results of such appraisal. The Servicer shall also cause each REO Property to be inspected promptly upon the acquisition of title thereto and shall cause each REO Property to be inspected at least annually thereafter, and Servicer shall be entitled to be reimbursed for expenses in connection therewith in accordance with this Agreement.  The Servicer shall make or cause to be made a written report of each such inspection.  Such reports shall be retained in the Mortgage File and copies thereof shall be forwarded by the Servicer to the Purchaser. Notwithstanding anything to the contrary contained herein, if a REMIC election has been or is to be made with respect to the arrangement under which the Mortgage Loans and the REO Properties are held, then the Servicer shall manage, conserve, protect and operate each REO Property in a manner that does not cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code or result in the receipt by such REMIC of any "income from non-permitted assets" within the meaning of Section 860F(a)(2)(B) or any "net income from foreclosure property" within the meaning of Section 860G(c)(2) of the Code (or comparable provisions of any successor or similar legislation).

52

The Servicer shall deposit and hold all revenues and funds collected and received in connection with the operation of each REO Property in the Collection Account, and the Servicer shall account separately for revenues and funds received or expended with respect to each REO Property.

The Servicer shall have full power and authority, subject only to the specific requirements and prohibitions of this Agreement (and, in particular, Section 5.01(3)(c)), to do any and all things in connection with any REO Property as are consistent with the servicing standards set forth in Section 5.01. In connection therewith, the Servicer shall deposit or cause to be deposited within two (2) Business Day of receipt in the Collection Account all revenues and collections received or collected by it with respect to each REO Property, including all proceeds of any REO Disposition. Subject to Section 5.13, the Servicer shall withdraw (without duplication) from the Collection Account and or Escrow Account, but solely from the revenues and collections received or collected by it with respect to a specific REO Property, such funds necessary for the proper operation, management and maintenance of such REO Property, including the following:

(1)     all insurance premiums due and payable in respect of such REO Property;

(2)     all real estate taxes and assessments in respect of such REO Property that may result in the imposition of a lien thereon;

(3)     all customary and reasonable costs and expenses necessary to maintain, repair, appraise, evaluate, manage or operate such REO Property (including the customary and reasonable costs incurred or assessed by any "managing agent" retained by the Servicer in connection with the maintenance, management or operation of such REO Property);

(4)     all reasonable costs and expenses of restoration improvements, deferred maintenance and tenant improvements; and

(5)     all other reasonable costs and expenses, including reasonable attorneys' fees, that the Servicer may suffer or incur in connection with its performance of its obligations under this Section (other than costs and expenses that the Servicer is expressly obligated to bear pursuant to this Agreement).

To the extent that amounts on deposit in the Collection Account are insufficient for the purposes set forth in clauses (1) through (5) above, the Servicer shall, subject to Section 6.04, advance the amount of funds required to cover the shortfall with respect thereto. The Servicer shall promptly notify the Purchaser in writing of any failure by the Servicer to make a Servicing Advance of the type specified in clauses (1) or (2) above (irrespective of whether such Servicing Advance is claimed to be non-recoverable by the Servicer pursuant to Section 6.04).

Following the consummation of an REO Disposition, the Servicer shall remit to the Purchaser, in accordance with Section 6.01, any proceeds from such REO Disposition in the Collection Account following the payment of all expenses and Servicing Advances relating to the subject REO Property.

Section 5.15    Sale of REO Properties

The Servicer shall offer to sell any REO Property in the manner that is in the best interests of the Purchaser or other owner of the REO, but no later than the time determined by the Servicer to be sufficient to result in the sale of such REO Property on or prior to the time specified in Section 5.13. In accordance with the servicing standards set forth in Section 5.01, the Servicer or designated agent of the Servicer shall solicit bids and offers from Persons for the purchase of any REO Property and, upon receipt thereof, promptly (but in any event within three (3) Business Days) present such bids and offers to the Purchaser. The Servicer shall not accept any bid or offer for any REO Property except in compliance with Section 5.01(3)(c). The Purchaser may reject any bid or offer if the Purchaser determines the rejection of such bid or offer would be in the best interests of the Purchaser. The Purchaser shall notify the Servicer of such determination within three (3) Business Days of notice of any such bids from the Servicer.

The Servicer shall act on behalf of the Purchaser in negotiating and taking any other action necessary or appropriate in connection with the sale of any REO Property, including the collection of all amounts payable in connection therewith. The terms of sale of any Specially Serviced Mortgage Loan or REO Property shall be in the sole discretion of the Purchaser. Any REO Disposition shall be without recourse to, or representation or warranty by, the Purchaser or the Servicer, and, if consummated in accordance with the terms of this Agreement, then the Servicer shall have no liability to the Purchaser with respect to the purchase price therefor accepted by the Purchaser. The proceeds of any sale after deduction of the expenses of such sale incurred in connection therewith shall be promptly deposited in (a) if such sale is an REO Disposition, in the Collection Account in accordance with Section 5.13 and (b) in any other circumstance, the Collection Account in accordance with Section 5.04.

The Servicer shall not sell any Specially Serviced Mortgage Loan without the prior written consent of the Purchaser.

Section 5.16    Investment of Funds in the Collection Account

The Servicer may direct any depository institution that holds the Collection Account to invest the funds in the Collection Account in one or more Permitted Investments bearing interest. All such Permitted Investments shall be held to maturity, unless payable on demand. In the event amounts on deposit in the Collection Account are at any time invested in a Permitted Investment payable on demand, the Servicer shall:

(a)    consistent with any notice required to be given thereunder, demand that payment thereon be made on the last day such Permitted Investment may otherwise mature hereunder in an amount equal to the lesser of (1) all amounts then payable thereunder and (2) the amount required to be withdrawn on such date; and

(b)    demand payment of all amounts due thereunder promptly upon determination by the Servicer or notice from the Purchaser that such Permitted Investment would not constitute a Permitted Investment in respect of funds thereafter on deposit in the Collection Account.

All income and gain realized from investment of funds deposited in the Collection Account shall be for the benefit of the Servicer and shall be subject to its withdrawal in accordance with Section 5.05. The Servicer shall deposit in the Collection Account the amount of any loss incurred in respect of any Permitted Investment immediately upon realization of such loss.

Except as otherwise expressly provided in this Agreement, if any default occurs in the making of a payment due under any Permitted Investment, or if a default occurs in any other performance required under any Permitted Investment, the Purchaser may elect to take such action, or instruct the Servicer to take such action, as may be appropriate to enforce such payment or performance, including the institution and prosecution of appropriate proceedings, at the expense of the Servicer.

Section 5.17    MERS

In the case of each MERS Mortgage Loan, the Servicer shall, as soon as practicable after the Purchaser's request (but in no event later than the end of the month in which the Funding Date occurs, but not less than ten (10) days after the Funding Date with respect to each Mortgage Loan that was a MERS Mortgage Loan as of the Funding Date, or 90 days thereafter with respect to each Mortgage Loan that was a MERS Eligible Mortgage Loan as of the Funding Date and subsequent to the Funding Date becomes a MERS Mortgage Loan), take such actions as are necessary to cause the Purchaser to be clearly identified as the owner of each MERS Mortgage Loan on the records of MERS for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by MERS. Each of the Purchaser and the Servicer shall maintain in good standing its membership in MERS. In addition, each of the Purchaser and the Servicer shall comply with all rules, policies and procedures of MERS, including the Rules of Membership, as amended, and the MERS Procedures Manual, as amended. With respect to all MERS Mortgage Loans serviced hereunder, the Servicer shall promptly notify MERS as to any transfer of beneficial ownership or release of any security interest in such Mortgage Loans. The Servicer shall cooperate with the Purchaser and any successor owner or successor servicer to the extent necessary to ensure that any transfer of ownership or servicing is appropriately reflected on the MERS system. Upon request of the Purchaser, the Servicer will take such actions as are reasonably necessary to assign any or all MERS Mortgage Loans to the Purchaser or its designee at Purchaser's expense.

Section 5.18    Pledged Asset Mortgage Loans

(a)    Representations of Servicer

(1)    Servicer hereby represents and warrants to Purchaser that prior to its assignment to Purchaser of the security interest in and to any Pledged Assets set forth in Section 5.18(b) hereof, Servicer had a first priority perfected security interest in each Securities Account, and/or, if necessary to perfect a first priority security interest in each asset contained in such Securities Account, a first priority perfected security interest in each such asset contained in such Securities Account and following Servicer's assignment of the Pledged Asset Agreements and such security interest in and to any Pledged Assets, Purchaser has a first priority perfected security

55

interest in each Securities Account, and/or, if necessary to perfect a
first priority security interest in each asset contained in such
Securities Account, a perfected first priority security interest in
each such asset contained in such Securities Account. Servicer
hereby represents and warrants to Purchaser that prior to the
related Pledged Asset Servicer's assignment to the Servicer of the
security interest in and to any Pledged Assets, the related Pledged
Asset Servicer had a first priority perfected security interest in
each Securities Account, and/or, if necessary to perfect a first
priority security interest in each asset contained in such Securities
Account, a first priority perfected security interest in each such
asset contained in such Securities Account and following such
Pledged Asset Servicer's assignment of the Pledged Asset
Agreements and such security interest in and to any Pledged
Assets, the Servicer had a first priority perfected security interest
in each Securities Account, and/or, if necessary to perfect a first
priority security interest in each asset contained in such Securities
Account, a perfected first priority security interest in each such
asset contained in such Securities Account.

(2)     Servicer represents and warrants to Purchaser that each Pledged
        Asset Mortgage Loan is insured under the terms and provisions of
        a Surety Bond subject to the limitations set forth therein. Servicer
        covenants that within 2 Business Days after the Funding Date for
        any purchase of Pledged Asset Mortgage Loans, Servicer will
        deliver to each Surety Bond Issuer any instrument required to be
        delivered under the related Surety Bond, executed by the necessary
        parties, and that all other requirements for transferring coverage
        under the related Surety Bonds in respect of such Pledged Asset
        Mortgage Loans to the Purchaser shall be complied with. Servicer
        shall indemnify Purchaser and hold it harmless against any and all
        claims, losses, damages, penalties, fines, forfeitures, reasonable
        and necessary legal fees and related costs, judgments, and any
        other costs, fees and expenses that are related to or arise from the
        non-payment of Required Surety Payments with respect to the
        Pledged Asset Mortgage Loans purchased by Purchaser from
        applicable Seller under this Agreement. The indemnification
        obligation provided in this subparagraph 2 with respect to each
        Pledged Asset Mortgage Loan shall expire upon receipt by the
        related Surety Bond Issuer of the necessary documentation referred
        to in this paragraph, signed by the appropriate parties thereto.

(3)     Servicer represents and warrants that the assignment of rights to
        Purchaser under each Surety Bond, as described herein, will not
        result in Purchaser assuming any obligations or liabilities of
        Servicer with respect thereto.

(4)     Servicer represents and warrants that each Pledged Asset Servicing
        Agreement and the Pledge Agreements are in full force and effect

56

as of the Funding Date and their provisions have not been waived, amended or modified in any respect, nor has any notice of termination been given thereunder. Servicer represents to Purchaser that as of the Funding Date, neither Servicer nor any Pledged Asset Servicer is in default under the related Pledged Asset Servicing Agreement.

(b)      Assignment of Security Interest

       (1)      With respect to each Pledged Asset Mortgage Loan sold to Purchaser under this Agreement, the Servicer hereby assigns to the Purchaser its security interest in and to any related Pledged Assets, all of its rights in each related Pledge Agreement, its right to receive amounts due or to become due in respect of any related Pledged Assets and its rights as beneficiary under the related Surety Bond in respect of any Pledged Asset Mortgage Loans.

(c)      Servicing of Pledged Assets

       (1)      The parties acknowledge that pursuant to each Pledged Asset Servicing Agreement between Servicer and the related Pledged Asset Servicer, the Securities Accounts and other Pledged Assets in which Purchaser shall (pursuant to the terms of this Agreement) have a security interest, shall continue to be maintained and serviced by such Pledged Asset Servicer. Servicer represents and warrants that the terms of each Pledged Asset Servicing Agreement are not inconsistent with any of the provisions of this Agreement. Subject to subsection (c)(2) below, the Servicer shall service and administer the Securities Accounts and other Pledged Assets, in accordance with (i) prudent business practices and procedures employed in the industry to administer securities accounts and additional collateral similar to that securing the Pledged Asset Mortgage Loans; (ii) the terms of the related Pledge Agreements; and (iii) the terms of this Agreement. Servicer's obligations under this Section 5.18(c) will be subject to the provisions of Section 9.04 hereof.

       (2)      Notwithstanding any other provision of this Agreement to the contrary, except as provided below in this subsection (c)(2), the Servicer shall have no duty or obligation to service and administer the Pledged Assets, and the Servicer shall not be deemed to be the Pledged Asset Servicer with respect to any Pledged Asset Mortgage Loan, unless and until the related Pledged Asset Servicer's obligations to administer the Pledged Asset as provided in the related Pledged Asset Servicing Agreement have been terminated with respect to such Pledged Asset Mortgage Loans sold hereunder, in which case the Servicer shall be bound to service and administer the related Pledged Assets and the related Surety Bond in accordance with the provisions of this Agreement

57

and the related Pledge Agreements, from the date of such termination.  The Servicer shall enforce the obligations of each Pledged Asset Servicer to service and administer the Pledged Assets as provided in the related Pledged Asset Servicing Agreement, and shall take appropriate action thereunder if any Pledged Asset Servicer fails to substantially comply with its obligations to administer the Pledged Assets.  Such enforcement, including without limitation, the legal prosecution of claims, termination of the related Pledged Asset Servicing Agreement with respect to the related Pledged Asset Mortgage Loans, and the pursuit of other appropriate remedies, shall be carried out as the Servicer, in its good faith business judgment, would require were it the owner of the related Securities Accounts and other Pledged Assets.  Without in any way limiting any other remedies set forth herein, Servicer shall indemnify Purchaser and  hold it harmless against any and all claims, losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and any other costs, fees and expenses (collectively, "Losses") that arise with respect to Pledged Asset Mortgage Loans purchased by Purchaser from Servicer hereunder, provided that (i) such Losses are caused by the related Pledged Asset Servicer's failure to administer the Pledged Assets as provided in the related Pledged Asset Servicing Agreement and in a manner consistent with the standard set forth in subsection (c)(1) above, (ii) the indemnification contained in this subsection (c)(2) will in no event exceed the Original Pledged Asset Requirement for the related Pledged Asset Mortgage Loan, and (iii) such indemnification liability shall be offset to the extent that the Losses are covered by a Required Surety Payment.

(3)     The related Pledged Asset Servicer shall use its best reasonable efforts to realize upon any related Pledged Assets for such of the Pledged Asset Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments; provided that the related Pledged Asset Servicer shall not obtain title to any such Pledged Assets as a result of or in lieu of the disposition thereof or otherwise; and provided further that (i) the related Pledged Asset Servicer shall not proceed with respect to such Pledged Assets in any manner that would impair the ability to recover against the related Mortgaged Property, and (ii) the Servicer shall proceed with any acquisition of REO Property in a manner that preserves the ability to apply the proceeds of such Pledged Assets against amounts owed under the defaulted Mortgage Loan. Any proceeds realized from such Pledged Assets (other than amounts to be released to the Mortgagor or the related guarantor in accordance with procedures that the Servicer would follow in servicing loans held for its own account, subject to the terms and conditions of the

58

related Mortgage and Mortgage Note and to the terms and
conditions of any security agreement, guarantee agreement,
mortgage or other agreement governing the disposition of the
proceeds of such Pledged Assets) shall be deposited in the
Collection Account, subject to withdrawal pursuant to Section 5.05
hereof; provided, that such proceeds shall not be so deposited if the
Required Surety Payment in respect of such Pledged Asset
Mortgage Loan has been deposited in the Collection Account or
otherwise paid to the Purchaser (except to the extent of any such
proceeds taken into account in calculating the amount of the
Required Surety Payment).

(4)     Servicer's obligations to administer the Securities Accounts shall
terminate upon termination of the related Pledged Asset
Agreement. Purchaser acknowledges coverage under the terms and
provisions of the related Surety Bond as to any particular Pledged
Asset Mortgage Loan shall terminate upon termination of the
related Pledged Asset Agreement; provided, however, that such
termination shall not affect claims arising under this Agreement or
the related Surety Bond prior to the date of termination of the
related Pledged Asset Agreement.

(5)     The Pledged Asset Servicer with respect to each Pledged Asset
Mortgage Loan may, without the consent of the Purchaser, amend
or modify a Pledged Asset Agreement in any non-material respect
to reflect administrative or account changes, provided that the
same are consistent with the PHH Guide.

(d)     Surety Bonds

(1)     If a Required Surety Payment is payable pursuant to the related
Surety Bond with respect to any Pledged Asset Mortgage Loan, as
determined by the Servicer, the related Pledged Asset Servicer
shall so notify the related Surety Bond Issuer promptly. The
Servicer shall cause the prompt completion of any necessary
documentation relating to the related Surety Bond and shall cause
the prompt submission of such documentation to the related Surety
Bond Issuer as a claim for a required surety. The Purchaser shall
execute such documentation if requested by the related Pledged
Asset Servicer.

(2)     In the event that the Servicer receives a Required Surety Payment
from a Surety Bond Issuer on behalf of the Purchaser, the Servicer
shall deposit such Required Surety Payment in the Collection
Account and shall distribute such Required Surety Payment, or the
proceeds thereof, in accordance with the provisions hereof
applicable to Insurance Proceeds.

59

(3)    Purchaser will cooperate with Servicer to transfer to Purchaser the coverage of each Surety Bond in respect of the related Pledged Asset Mortgage Loans.

## ARTICLE VI:
## REPORTS; REMITTANCES; ADVANCES

Section 6.01   Remittances

(1)    On each Remittance Date, the Servicer shall remit to the Purchaser (a) all amounts credited to the Collection Account as of the close of business on the last day of the related Due Period (including (1) the amount of any Principal Prepayment, together with interest thereon at the related Remittance Rate to the end of the month in which prepayment of the related Mortgage Loan occurs except when such Principal Prepayment is received on the last day of the related Due Period in which case interest calculated at the related Remittance Rate to the end of the month in which prepayment of the related Mortgage Loan occurs shall not be remitted and (2) all proceeds of any REO Disposition net of amounts payable to the Servicer pursuant to Section 5.14), net of charges against or withdrawals from the Collection Account in accordance with Section 5.05, which charges against or withdrawals from the Collection Account the Servicer shall make solely on such Remittance Date, plus (b) all Monthly Advances, if any, that the Servicer is obligated to remit pursuant to Section 6.03; provided that the Servicer shall not be required to remit, until the next following Remittance Date, any amounts attributable to Monthly Payments collected but due on a Due Date or Dates subsequent to the related Due Period.

(2)    All remittances made to the Purchaser on each Remittance Date will be made to the Purchaser by wire transfer of immediately available funds according to the instructions that will be provided by Purchaser to the Servicer.

(3)    With respect to any remittance received by the Purchaser after the Business Day on which such payment was due, the Servicer shall pay to the Purchaser interest on any such late payment at an annual rate equal to One-month LIBOR (as published in the Wall Street Journal) plus 200 basis points, but in no event greater than the maximum amount permitted by applicable law. Such interest shall be paid by the Servicer to the Purchaser on the date such late payment is made and shall cover the period commencing with the Business Day on which such payment was due and ending with the Business Day on which such payment is made, both inclusive. Such interest shall be remitted along with such late payment. Neither the payment by the Servicer nor the acceptance by the Purchaser of any such interest shall be deemed an extension of time for payment or a waiver by the Purchaser of any Event of Default.

Section 6.02   Reporting

On or before the 3rd Business Day following the Accounting Cut-off Date of each month during the term hereof, the Servicer shall deliver to the Purchaser fully reconciled monthly accounting reports pursuant to Schedule 5.01(1) with respect to the most recently ended Due Period. Such monthly accounting reports shall include information as to the aggregate Unpaid Principal Balance of all Mortgage Loans, the scheduled amortization of all Mortgage Loans, the amount of any Principal Prepayments as of the most recent Accounting Cut-off Date, the amount of any Liquidation Proceeds as of the most recent Accounting Cut-off, and loss mitigation and

60

default reporting with respect to the Mortgage Loans, all such reports in form and content reasonably acceptable to Purchaser and Servicer.

Utilizing resources reasonably available to the Servicer and to the extent the requested data is contained within the Servicer's electronic systems without incurring any cost except the Servicer's overhead and employees' salaries, the Servicer shall furnish to the Purchaser during the term of this Agreement such periodic, special or other reports, information or documentation, whether or not provided for herein, as shall be reasonably requested by the Purchaser with respect to Mortgage Loans or REO Properties (provided the Purchaser shall have given the Servicer reasonable notice and opportunity to prepare such reports, information or documentation), including any reports, information or documentation reasonably required to comply with any regulations of any governmental agency or body having jurisdiction over the Purchaser, all such reports or information to be as provided by and in accordance with such applicable instructions and directions as the Purchaser may reasonably request. If any of such reports, periodic, special or other reports, information or documentation are not customarily prepared by the Servicer or require that the Servicer program data processing systems to create the reports, information or documentation, then the Purchaser shall pay to the Servicer a fee mutually agreed to by the Purchaser and the Servicer taking into account the Servicer's actual time and cost in preparing such reports, information or documentation. The Servicer agrees to execute and deliver all such instruments and take all such action as the Purchaser, from time to time, may reasonably request in order to effectuate the purposes and to carry out the terms of this Agreement.

Section 6.03    Monthly Advances by the Servicer

(1)    Not later than the close of business on the Business Day immediately preceding each Remittance Date, the Servicer shall either (a) deposit in the Collection Account from its own funds an amount equal to the aggregate amount of all Monthly Payments (with interest adjusted to the Remittance Rate) that were due on the Mortgage Loans during the applicable Due Period and were delinquent at the close of business on the immediately preceding Determination Date (each such advance, a "Monthly Advance"), (b) cause to be made an appropriate entry in the records of the Collection Account that amounts held for future distribution have been, as permitted by this Section 6.03, used by the Servicer in discharge of any such Monthly Advance or (c) make Monthly Advances in the The Servicer's obligations to make Monthly Advances as to any Mortgage Loan will continue through the last Monthly Payment due prior to the payment in full of the Mortgage Loan, form of any combination of (a) or through the Remittance Date prior to the Remittance Date for the remittance of all Liquidation Proceeds and other payments or recoveries (including Insurance Proceeds or Condemnation Proceeds) with respect to the Mortgage Loan; provided that such obligation shall cease if the Servicer furnishes to the Purchaser an Officers' Certificate evidencing the determination by the Servicer in accordance with Section 6.04 that an advance with respect to such Mortgage Loan would constitute a Non-recoverable Advance.(b) aggregating the total amount of advances to be made. Any amounts held for future distribution and so used shall be replaced by the Servicer by deposit in the Collection Account on or before any future Remittance Date if funds in the Collection Account on such Remittance Date shall be less than payments to the Purchaser required to be made on such Remittance Date. The Servicer's obligation to make Monthly Advances as to any Mortgage Loan will continue through the last Monthly Payment due prior to the payment in full of a Mortgage Loan, up to and including the first day of the month following the month in which

61

the foreclosure sale occurs when the Mortgaged Property securing the Mortgage Loan becomes an REO Property.

(2)    On the Business Day prior to the Remittance Date, the Servicer shall deposit into the Collection Account payments on account of the Prepayment Interest Shortfall Amount in an aggregate amount equal to the lesser of (a) the aggregate amount of Prepayment Interest Shortfall Amount for the related Remittance Date resulting solely from Principal Prepayments during the related Due Period, and (b) the total amount of the servicing compensation that would be payable to the Servicer if no Principal Prepayment was made during the Due Period related to such Remittance Date.  Such payments shall be deposited into the Collection Account.

Section 6.04    Non-recoverable Advances

The determination by the Servicer that it has made a Non-recoverable Advance or that any Monthly Advance or Servicing Advance, if made, would constitute a Non-recoverable Advance shall be evidenced by an Officers' Certificate delivered to the Purchaser detailing the reasons for such determination.

Section 6.05    Officer's Certificate.

The Seller shall deliver to the Purchaser an Officer's Certificate in the form attached hereto as Exhibit 9 on the Initial Funding Date and upon Purchaser's reasonable request thereafter.

## ARTICLE VII:
## GENERAL SERVICING PROCEDURE

Section 7.01    Enforcement of Due-on-Sale Clauses, Assumption Agreements

(1)    The Servicer will, to the extent it has knowledge of any conveyance or prospective conveyance by any Mortgagor of the Mortgaged Property (whether by absolute conveyance or by contract of sale, and whether or not the Mortgagor remains or is to remain liable under the Mortgage Note and/or the Mortgage), exercise its rights to accelerate the maturity of such Mortgage Loan under any " due-on-sale" clause applicable thereto; provided that the Servicer shall not exercise any such rights if prohibited by law from doing so or if the exercise of such rights would impair or threaten to impair any recovery under the related Primary Insurance Policy, if any.

(2)    If the Servicer is prohibited from enforcing such "due-on-sale" clause, then the Servicer will attempt to enter into an assumption agreement with the Person to whom the Mortgaged Property has been conveyed or is proposed to be conveyed, pursuant to which such Person becomes liable under the Mortgage Note and, to the extent permitted by applicable state law, the Mortgagor remains liable thereon.  (For purposes of this Section 7.01, the term "assumption" is deemed to also include a sale of the Mortgaged Property subject to the Mortgage that is not accompanied by an assumption or substitution of liability agreement.)

(3)    If the Servicer receives a request for any Mortgage Loan to be assumed, then the Servicer shall inquire into the creditworthiness of the proposed transferee and shall use the same underwriting criteria for approving the credit of the proposed transferee that are used with respect to underwriting mortgage loans of the same type as the Mortgage Loans.  Where an

assumption is allowed, the Servicer, with the prior written consent of the primary mortgage insurer, if any, and subject to the conditions of Section 7.01(3), shall, and is hereby authorized to, enter into a substitution of liability agreement with the Person to whom the Mortgaged Property is proposed to be conveyed pursuant to which the original mortgagor is released from liability and such Person is substituted as mortgagor and becomes liable under the related Mortgage Note. Any such substitution of liability agreement shall be in lieu of an assumption agreement. In no event shall the Note Rate, the amount of the Monthly Payment or the final maturity date be changed. The Servicer shall notify the Purchaser that any such substitution of liability or assumption agreement has been completed by forwarding to the Purchaser the original of any such substitution of liability or assumption agreement, which document shall be added to the related Purchaser's Mortgage File and shall, for all purposes, be considered a part of such Purchaser's Mortgage File to the same extent as all other documents and instruments constituting a part thereof. Any fee collected by the Servicer for entering into an assumption or substitution of liability agreement shall be retained by the Servicer as additional compensation for servicing the Mortgage Loans.

(4)    If the credit of the proposed transferee does not meet such underwriting criteria, then the Servicer shall, to the extent permitted by the Mortgage or the Mortgage Note and by applicable law, accelerate the maturity of the Mortgage Loan.

Section 7.02    Satisfaction of Mortgages and Release of Mortgage Files

Upon the payment in full of any Mortgage Loan, the Servicer will immediately notify the Purchaser by a certification of a Servicing Officer, which certification shall include a statement to the effect that all amounts received or to be received in connection with such payment that are required to be deposited in the Collection Account pursuant to Section 5.04 have been or will be so deposited and shall request delivery to it of the Purchaser's Mortgage File held by the Purchaser. Upon receipt of such certification and request, the Purchaser shall promptly release the related mortgage documents to the Servicer and the Servicer shall promptly prepare and process any satisfaction or release. No expense incurred in connection with any instrument of satisfaction or deed of reconveyance shall be chargeable to the Collection Account.

With the exception of short sales approved by the Purchaser, if the Servicer satisfies or releases a Mortgage without having obtained payment in full of the indebtedness secured by the Mortgage, or should it otherwise take such action which results in a reduction of the coverage under the Primary Insurance Policy, if any, then the Servicer shall promptly give written notice thereof to the Purchaser, and, within 10 Business Days following written demand therefor from the Purchaser to the Servicer, the Servicer shall repurchase the related Mortgage Loan by paying to the Purchaser the Repurchase Price therefor by wire transfer of immediately available funds directly to the Purchaser's Account.

From time to time and as appropriate for the servicing or foreclosure of the Mortgage Loan, including for this purpose collection under any Primary Insurance Policy, the Purchaser shall, upon request of the Servicer and delivery to the Purchaser of a servicing receipt signed by a Servicing Officer, release the Purchaser's Mortgage File held by the Purchaser to the Servicer. Such servicing receipt shall obligate the Servicer to return the related mortgage documents to the Purchaser when the need therefor by the Servicer no longer exists, unless the Mortgage Loan has been liquidated and the Liquidation Proceeds relating to the Mortgage Loan have been deposited in the Collection Account or the Purchaser's Mortgage File or such document has been delivered

63

to an attorney, or to a public trustee or other public official as required by law, for purposes of initiating or pursuing legal action or other proceedings for the foreclosure of the Mortgaged Property either judicially or nonjudicially, and the Servicer has delivered to the Purchaser a certificate of a Servicing Officer certifying as to the name and address of the Person to which such Purchaser's Mortgage File or such document was delivered and the purpose or purposes of such delivery. Upon receipt of a certificate of a Servicing Officer stating that such Mortgage Loan was liquidated and the Liquidation Proceeds were deposited in the Collection Account, the servicing receipt shall be released by the Purchaser to the Servicer.

Section 7.03    Servicing Compensation

As compensation for its services hereunder, the Servicer shall be entitled to retain from interest payments on the Mortgage Loans the amounts provided for as the Servicing Fee. The Servicing Fee in respect of a Mortgage Loan for a particular month shall become payable only upon the receipt by the Servicer from the Mortgagor of the full Monthly Payment in respect of such Mortgage Loan. Additional servicing compensation in the form of assumption fees, as provided in Section 7.01, late payment charges, and other servicer compensation for modifications and short sales as provided in Section 5.01(e) shall be retained by the Servicer to the extent not required to be deposited in the Collection Account. In the event that Liquidation Proceeds, Insurance Proceeds and proceeds from any REO Disposition exceeds the Unpaid Principal Balance of such Mortgage Loan plus unpaid interest accrued thereon at a per annum rate equal to the related Remittance Rate, the Servicer shall be entitled to retain therefrom and pay to itself any Servicing Fee considered to be accrued but unpaid. The Servicer shall be required to pay all expenses incurred by it in connection with its servicing activities hereunder and shall not be entitled to reimbursement therefor except as specifically provided for herein.

Section 7.04    [RESERVED]

Section 7.05    [RESERVED]

Section 7.06    Purchaser's Right to Examine Servicer Records and Obtain Copies

The Purchaser shall have the right to examine and audit, during business hours or at such other times as are reasonable under applicable circumstances, upon ten (10) Business Days advance notice any and all of (i) the credit and other loan files relating to the Mortgage Loans or the Mortgagors, (ii) any and all books, records, documentation or other information of the Servicer (whether held by the Servicer or by another) relating to the servicing of the Mortgage Loans and (iii) any and all books, records, documentation or other information of the Servicer (whether held by the Servicer or by another) that are relevant to the performance or observance by the Servicer of the terms, covenants or conditions of this Agreement. The Servicer shall be obligated to make the foregoing information available to the Purchaser at the site where such information is stored; provided that the Purchaser shall be required to pay all reasonable costs and expenses incurred by the Servicer in making such information available.

In addition, the Servicer shall provide to the Purchaser, within ten (10) Business Days of a request, either originals, copies, or electronic images, as requested by Purchaser, of any Mortgage Files relating to the Mortgage Loans for examination by its auditors or investors.

64

## ARTICLE VIII:
## REPORTS TO BE PREPARED BY THE SERVICER

Section 8.01   Financial Statements

The Servicer understands that, in connection with marketing the Mortgage Loans, the Purchaser may make available to any prospective purchaser of the Mortgage Loans the Servicer's current audited financial statements and its audited financial statements for the preceding two fiscal years, to the extent such statements are available, together with any additional statements provided pursuant to the next sentence.   During the term hereof, the Servicer will deliver to the Purchaser audited financial statements for each of its fiscal years following the Funding Date and all other financial statements prepared following the Funding Date to the extent any such statements are available upon request to the public at large.

The Servicer also agrees to make available upon reasonable notice and during normal business hours to any prospective purchasers of the Mortgage Loans a knowledgeable financial or accounting officer for the purpose of answering questions respecting recent developments affecting the Servicer or the financial statements of the Servicer which may affect, in any material respect, the Servicer's ability to comply with its obligations under this Agreement, and to permit any prospective purchasers upon reasonable notice and during normal business hours to inspect the Servicer's servicing facilities for the purpose of satisfying such prospective purchasers that the Servicer has the ability to service the Mortgage Loans in accordance with this Agreement.

## ARTICLE IX:
## THE SELLERS AND SERVICER

Section 9.01   Indemnification; Third Party Claims

Each Seller and Servicer shall indemnify and hold harmless the Purchaser, its directors, officers, agents, employees, and assignees (each, an "Indemnified Party") from and against any costs, damages, expenses (including reasonable attorneys' fees and costs, irrespective of whether or not incurred in connection with the defense of any actual or threatened action, proceeding, or claim), fines, forfeitures, injuries, liabilities or losses ("Losses") suffered or sustained in any way by any such Person, no matter how or when arising (including Losses incurred or sustained in connection with any judgment, award, or settlement), in connection with or relating to (i) a breach by either Seller of any of its representations and warranties contained in Article III or (ii) a breach by either Seller or the Servicer of any of its covenants and other obligations contained herein including any failure to service the Mortgage Loans in compliance with the terms hereof and in accordance with the standard of care in Section 5.01 and Section 9.03, provided however, in the case of both of the preceding clauses (i) and (ii), PHH Mortgage shall have no obligation to indemnify an Indemnified Party for a breach by the Trust of the Trust's representations contained in Sections 3.01, 3.03(3) or 3.03(16) hereof.   In the event of a breach by the Trust of the Trust's representations in Section 3.01, 3.03(3) or 3.03(16), the Indemnified Party's sole right to indemnification shall be from the Trust.   The applicable Seller shall immediately (i) notify the Purchaser if a claim is made by a third party with respect to this Agreement, any Mortgage Loan and/or any REO Property (ii) assume (with the prior written consent of the Purchaser) the defense of any such claim and pay all expenses in connection therewith, including attorneys' fees, and (iii) promptly pay, discharge and satisfy any judgment, award, or decree that

65

may be entered against it or the Purchaser in respect of such claim; provided, however, that no claim against the Purchaser shall be settled without its prior written consent, which shall not be unreasonably withheld. Nothing contained herein shall prohibit the Purchaser, at its expense, from retaining its own counsel to assist in any such proceedings or to observe such proceedings; provided that neither Seller shall be obligated to pay or comply with any settlement to which it has not consented. The Servicer shall be reimbursed from amounts on deposit in the Collection Account for all amounts advanced by it pursuant to the second preceding sentence except when the claim in any way relates to the Servicer's indemnification pursuant to this Section 9.01.

Section 9.02    Merger or Consolidation of the Seller

Each Seller will keep in full effect its existence, rights and franchises as a corporation or a Delaware business trust, as applicable, under the laws of the state of its organization and will obtain and preserve its qualification to do business as a foreign entity in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement or any of the Mortgage Loans and to perform its duties under this Agreement.

Any Person into which a Seller may be merged or consolidated, or any corporation resulting from any merger, conversion or consolidation (including by means of the sale of all or substantially all of such Seller's assets to such Person) to which the Seller shall be a party, or any Person succeeding to the business of the Seller, shall be the successor of the Seller hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding; provided that, unless otherwise consented to by the Purchaser, the successor or surviving Person, in the case of a merger or consolidation, etc. of the Servicer, shall be an institution qualified to service mortgage loans on behalf of Fannie Mae or Freddie Mac in accordance with the requirements of Section 3.02(1) and shall not cause a rating on any security backed by a Mortgage Loan to be downgraded.

Section 9.03    Limitation on Liability of the Sellers and Others

Neither the Sellers nor any of the officers, employees or agents of the Sellers shall be under any liability to the Purchaser for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement or pursuant to the express written instructions of the Purchaser, or for errors in judgment made in good faith; provided that this provision shall not protect the Sellers or any such Person against any breach of warranties or representations made herein, or failure to perform its obligations in compliance with any standard of care set forth in this Agreement, or any liability which would otherwise be imposed by reasons of willful misfeasance, bad faith, negligence or any breach in the performance of the obligations and duties hereunder. The Sellers and any officer, employee or agent of the Sellers may rely in good faith on any document of any kind reasonably believed by the Sellers or such Person to be genuine and *prima facie* properly executed and submitted by any Person respecting any matters arising hereunder.

The Sellers shall not be under any obligation to appear in, prosecute or defend any legal action that is not incidental to their duties hereunder and which in their opinion may involve them in any expense or liability; provided that the Sellers may in their discretion undertake any such action that it may deem necessary or desirable in respect of this Agreement and the rights and duties of the parties hereto. In such event, the legal expenses and costs of such action and any liability resulting therefrom shall be expenses, costs and liabilities for which the Sellers shall

66

be entitled to be reimbursed therefor out of the Collection Account. This indemnity shall survive the termination of this Agreement.

### Section 9.04    Servicer Not to Resign

With respect to the retention by PHH Mortgage of the servicing of the Mortgage Loans and the REO Properties hereunder, PHH Mortgage acknowledges that the Purchaser has acted in reliance upon PHH Mortgage's independent status, the adequacy of its servicing facilities, plan, personnel, records and procedures, its integrity, reputation and financial standing and the continuance thereof. Consequently, PHH Mortgage shall not assign the servicing rights retained by it hereunder to any third party nor resign from the obligations and duties hereby imposed on it except upon any determination that its duties hereunder are no longer permissible under applicable law and such incapacity cannot be cured by PHH Mortgage. Any determination permitting the transfer of the servicing rights or the resignation of PHH Mortgage hereunder shall not occur without RFC's written approval and RFC's written approval shall not be unreasonably withheld and shall be evidenced by an opinion of counsel to such effect delivered to the Purchaser, which opinion of counsel shall be in form and substance reasonably acceptable to the Purchaser.

## ARTICLE X:
## DEFAULT

### Section 10.01  Events of Default

In case one or more of the following events shall occur and be continuing:

(1)     any failure by the Servicer to remit to the Purchaser any payment required to be made under the terms of this Agreement which continues unremedied for a period of 3  Business Days unless such failure to remit is due to a cause beyond the Servicer's control, including an act of God, act of civil, military or governmental authority, fire, epidemic, flood, blizzard, earthquake, riot, war, or sabotage, provided that the Servicer gives the Purchaser notice of such cause promptly and uses its reasonable efforts to correct such failure to remit and does so remit within 2 Business Days following the end of the duration of the cause of such failure to remit;

(2)     any failure on the part of a Seller/Servicer duly to observe or perform in any material respect any of the covenants or agreements on the part of such Seller/Servicer set forth in this Agreement which continues unremedied for a period of 30 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the applicable Seller/Servicer by the Purchaser; provided that such 30-day period shall not begin with respect to any failure to cure, repurchase or substitute in accordance with Sections 2.04 and/or 3.04 until the expiration of the cure periods provided for in Sections 2.04 and/or 3.04, as applicable, and such thirty day period shall not apply to any obligations or duties of the Seller/Servicer in Article 13 of this Agreement;

(3)     any filing of an Insolvency Proceeding by or on behalf of a Seller/Servicer, any consent by or on behalf of a Seller/Servicer to the filing of an Insolvency Proceeding against a Seller/Servicer, or any admission by or on behalf of a Seller/Servicer of its inability to pay its debts generally as the same become due;

(4)     any filing of an Insolvency Proceeding against a Seller/Servicer that remains undismissed or unstayed for a period of 60 days after the filing thereof;

(5)     any issuance of any attachment or execution against, or any appointment of a conservator, receiver or liquidator with respect to, all or substantially all of the assets of a Seller/Servicer;

(6)     any failure or inability of PHH Mortgage to be eligible to service Mortgage Loans for Fannie Mae or Freddie Mac;

(7)     any sale, transfer, assignment, or other disposition by a Seller/Servicer of all or substantially all of its property or assets to a Person who does not meet the qualifications enumerated or incorporated by reference into Section 9.02, any assignment by a Seller/Servicer of this Agreement or any of a Seller's/Servicer's rights or obligations hereunder except in accordance with Section 9.04, or any action taken or omitted to be taken by a Seller/Servicer in contemplation or in furtherance of any of the foregoing, without the consent of the Purchaser; or

(8)     any failure by the Seller to be in compliance with applicable "doing business" or licensing laws of any jurisdiction where Mortgaged Property is located;

then, and in each and every such case, so long as an Event of Default shall not have been remedied, the Purchaser, by notice in writing to the Sellers may, in addition to whatever rights the Purchaser may have at law or in equity to damages, including injunctive relief and specific performance, terminate all the rights and obligations of the Sellers and the Servicer under this Agreement and in and to the Mortgage Loans and the proceeds thereof subject to Section 12.01, without the Purchaser's incurring any penalty or fee of any kind whatsoever in connection therewith; provided that, upon the occurrence of an Event of Default under Subsection (3), (4) or (5) of this Section 10.01, this Agreement and all authority and power of the Sellers and the Servicer hereunder (whether with respect to the Mortgage Loans, the REO Properties or otherwise) shall automatically cease. On or after the receipt by the Sellers of such written notice, all authority and power of the Sellers and the Servicer under this Agreement (whether with respect to the Mortgage Loans or otherwise) shall cease. Notwithstanding the occurrence of an Event of Default, the Sellers or the Servicer, as applicable, shall be entitled to all amounts due to such party and remaining unpaid on such date of termination.

### ARTICLE XI:
### TERMINATION

Section 11.01   Term and Termination

(1)     The servicing obligations of the Servicer under this Agreement may be terminated as provided in Section 10.01 hereof.

(2)     In any case other than as provided under Subsection (1) hereof, the respective obligations and responsibilities of the Sellers hereunder shall terminate upon: (a) the later of the final payment or other liquidation (or any advance with respect thereto) of the last Mortgage Loan or the disposition of all REO Property and the remittance of all funds due hereunder; or (b) the mutual written consent of the Sellers and the Purchaser.

(3)    Upon any termination of this Agreement or the servicing obligations of the Servicer hereunder, then the Servicer shall prepare, execute and deliver all agreements, documents and instruments, including all Servicer Mortgage Files, and do or accomplish all other acts or things necessary or appropriate to effect such termination, all at the Servicer's sole expense.  In any such event, the Servicer agrees to cooperate with the Purchaser in effecting the termination of the Servicer's servicing responsibilities hereunder, including the transfer to the Purchaser or its designee for administration by it of all cash amounts which shall at the time be contained in, or credited by the Servicer to, the Collection Account and/or the Escrow Account or thereafter received with respect to any Mortgage Loan or REO Property.

Section 11.02  Survival

Notwithstanding anything to the contrary contained herein, the representations and warranties of the parties contained herein and in any certificate or other instrument delivered pursuant hereto, as well as the other covenants hereof (including those set forth in Section 9.01) that, by their terms, require performance after the termination by this Agreement, shall survive the delivery and payment for the Mortgage Loans on each Funding Date as well as the termination of this Agreement and shall inure to the benefit of the parties, their successors and assigns. Sellers further agree that the representations, warranties and covenants made by Sellers herein and in any certificate or other instrument delivered pursuant hereto shall be deemed to be relied upon by Purchaser notwithstanding any investigation heretofore made by Purchaser or on Purchaser's behalf.

## ARTICLE XII:
## GENERAL PROVISIONS

Section 12.01  Successor to the Servicer

Upon the termination of the Servicer's servicing responsibilities and duties under this Agreement pursuant to Section 10.01, or 11.01, the Purchaser shall (i) succeed to and assume all of the Servicer's responsibilities, rights, duties and obligations under this Agreement or (ii) appoint a successor servicer which shall succeed to all rights and assume all of the responsibilities, duties and liabilities of the Servicer under this Agreement prior to the termination of the Servicer's responsibilities, duties and liabilities under this Agreement.  If the Servicer's duties, responsibilities and liabilities under this Agreement should be terminated pursuant to the aforementioned sections, then the Servicer shall continue to discharge such duties and responsibilities during the period from the date it acquires knowledge of such termination until the effective date thereof (if applicable) all on the terms and conditions contained herein and shall take no action whatsoever that might impair or prejudice the rights or financial condition of its successor.  The termination of the Servicer's servicing responsibilities pursuant to any of the aforementioned Sections shall not, among other things, relieve the Servicer of its obligations pursuant to Section 2.04 and/or 7.02, the representations and warranties or other obligations set forth in Sections 2.04, 3.01, 3.02 and 3.03 and the remedies available to the Purchaser under the various provisions of this Agreement.  In addition, such termination shall not affect any claims that the Purchaser may have against the Servicer arising prior to any such termination.

The Servicer shall promptly deliver to the successor the funds in the Collection Account and the Escrow Account and the Mortgage Files and related documents and statements held by it

69

hereunder and the Servicer shall account for all funds. The Servicer shall execute and deliver such instruments and do such other things all as may reasonably be required to more fully and definitely vest and confirm in the successor all such rights, powers, duties, responsibilities, obligations and liability of the Servicer. The successor shall make such arrangements as it may deem appropriate to reimburse the Servicer for unrecovered Servicing Advances which the successor retains hereunder and which could otherwise have been recovered by the Servicer pursuant to this Agreement but for the appointment of the successor Servicer.

### Section 12.02  Governing Law

This Agreement is to be governed by, and construed in accordance with the internal laws of the State of New York without giving effect to principals of conflicts of laws. The obligations, rights, and remedies of the parties hereunder shall be determined in accordance with such laws.

### Section 12.03  Notices

Any notices or other communications permitted or required hereunder shall be in writing and shall be deemed conclusively to have been given if personally delivered, sent by courier with delivery against signature therefor, mailed by registered mail, postage prepaid, and return receipt requested or transmitted by telex, telegraph or telecopier and confirmed by a similar writing mailed or sent by courier as provided above, to (i) in the case of the Purchaser, Residential Funding Corporation, Master Servicing Division, 2255 North Ontario Street, Suite 400, Burbank, California 91504, Attn: Senior Compliance Officer, Facsimile: 818-260-1810, (ii) in the case of PHH Mortgage, PHH Mortgage Corporation, 3000 Leadenhall Road, Mt. Laurel, NJ 08054, Attention: Vice President, Servicing, and (iii) in the case of the Trust, c/o PHH Mortgage Corporation, as Administrator, 3000 Leadenhall Road, Mt. Laurel, NJ 08054, Attention: Peter A. Thomas, Vice President, Secondary Marketing ,or such other address as may hereafter be furnished to the Purchaser in writing by the applicable Seller.

### Section 12.04  Severability of Provisions

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, the invalidity of any such covenant, agreement, provision or term of this Agreement shall in no way affect the validity or enforceability of the other provisions of this Agreement.

### Section 12.05  Schedules and Exhibits

The schedules and exhibits that are attached to this Agreement are hereby incorporated herein and made a part hereof by this reference.

### Section 12.06  General Interpretive Principles

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(1)    the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(2)    any reference in this Agreement to this Agreement or any other agreement, document, or instrument shall be a reference to this Agreement or any other such agreement, document, or instrument as the same has been amended, modified, or supplemented in accordance with the terms hereof and thereof (as applicable);

(3)    accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

(4)    references herein to "Articles," "Sections," "Subsections," "Paragraphs, " and other subdivisions without reference to a document are to designated articles, sections, subsections, paragraphs and other subdivisions of this Agreement, unless the context shall otherwise require;

(5)    a reference to a subsection without further reference to a section is a reference to such subsection as contained in the same section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(6)    a reference to a "day" shall be a reference to a calendar day;

(7)    the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(8)    the terms "include" and "including" shall mean without limitation by reason of enumeration .

    Section 12.07 Waivers and Amendments, Noncontractual Remedies; Preservation of Remedies

    This Agreement may be amended, superseded, canceled, renewed or extended and the terms hereof may be waived, only by a written instrument signed by authorized representatives of the parties or, in the case of a waiver, by an authorized representative of the party waiving compliance.  No such written instrument shall be effective unless it expressly recites that it is intended to amend, supersede, cancel, renew or extend this Agreement or to waive compliance with one or more of the terms hereof, as the case may be.  No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party of any such right, power or privilege, or any single or partial exercise of any such right, power or privilege, preclude any further exercise thereof or the exercise of any other such right, power or privilege.  The rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies that any party may otherwise have at law or in equity.

    Section 12.08 Captions

    All section titles or captions contained in this Agreement or in any schedule or exhibit annexed hereto or referred to herein, and the table of contents to this Agreement, are for convenience only, shall not be deemed a part of this Agreement and shall not affect the meaning or interpretation of this Agreement.

Section 12.09  Counterparts; Effectiveness

This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument. This Agreement shall become effective as of the date first set forth herein upon the due execution and delivery of this Agreement by each of the parties hereto. The parties intend that faxed signatures and electronically imaged signatures such as .pdf files shall constitute original signatures and are binding on the parties. The original document shall be promptly delivered.

Section 12.10  Entire Agreement; Amendment

This Agreement (including the schedules and exhibits annexed hereto or referred to herein), together with the PHH Guide, and each Purchase Price and Terms Letter, contain the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes all prior agreements, written or oral, with respect thereto. No amendment, modification or alteration of the terms or provisions of this Agreement shall be binding unless the same shall be in writing and duly executed by the authorized representatives of the parties hereto. In the event of a conflict between this Agreement and any Purchase Price and Terms Letter, the terms of the Purchase Price and Terms Letter shall supersede those in this Agreement with respect to the Mortgage Loans described in such Purchase Price and Terms Letter, but not with respect to any other Mortgage Loans.

Section 12.11  Further Assurances

Each party hereto shall take such additional action as may be reasonably necessary to effectuate this Agreement and the transactions contemplated hereby. The Sellers will promptly and duly execute and deliver to the Purchaser such documents and assurances and take such further action as the Purchaser may from time to time reasonably request in order to carry out more effectively the intent and purpose of this Agreement and to establish and protect the rights and remedies created or intended to be created in favor of the Purchaser.

Section 12.12  Intention of the Seller

Each Seller intends that the conveyance of such Seller's right, title and interest in and to the Mortgage Loans to the Purchaser shall constitute a sale and not a pledge of security for a loan. If such conveyance is deemed to be a pledge of security for a loan, however, the applicable Seller intends that the rights and obligations of the parties to such loan shall be established pursuant to the terms of this Agreement. Each Seller also intends and agrees that, in such event, (i) the applicable Seller shall be deemed to have granted to the Purchaser and its assigns a first priority security interest in such Seller's entire right, title and interest in and to the Mortgage Loans, all principal and interest received or receivable with respect to the Mortgage Loans, all amounts held from time to time in the accounts mentioned pursuant to this Agreement and all reinvestment earnings on such amounts, together with all of the applicable Seller's right, title and interest in and to the proceeds of any title, hazard or other insurance policies related to such Mortgage Loans and (ii) this Agreement shall constitute a security agreement under applicable law. All rights and remedies of the Purchaser under this Agreement are distinct from, and cumulative with, any other rights or remedies under this Agreement or afforded by law or equity and all such rights and remedies may be exercised concurrently, independently or successively.

72

Section 12.13  <u>No Partnership</u>

Nothing herein contained shall be deemed or construed to create a partnership or joint venture between the parties hereto and the services of Servicer shall be rendered as an independent contractor and not as agent for Purchaser.

### ARTICLE XIII:
### COMPLIANCE WITH REGULATION AB

Section 13.01  <u>Intent of the Parties; Reasonableness</u>

The Purchaser, each Seller and the Servicer acknowledge and agree that the purpose of Article XIII of this Agreement is to facilitate compliance by the Purchaser and any Depositor with the provisions of Regulation AB and related rules and regulations of the Commission. Although Regulation AB is applicable by its terms only to offerings of asset-backed securities that are registered under the Securities Act, each Seller acknowledges that investors in privately offered securities may require that the Purchaser or any Depositor provide comparable disclosure in unregistered offerings. References in this Agreement to compliance with Regulation AB include provision of comparable disclosure in private offerings.

Neither the Purchaser nor any Depositor shall exercise its right to request delivery of information or other performance under these provisions other than in good faith, or for purposes other than compliance with the Securities Act, the Exchange Act and the rules and regulations of the Commission thereunder (or the provision in a private offering of disclosure comparable to that required under the Securities Act). Each Seller and the Servicer acknowledges that interpretations of the requirements of Regulation AB may change over time, whether due to interpretive guidance provided by the Commission or its staff, consensus among participants in the asset-backed securities markets, advice of counsel, or otherwise, and agrees to comply with requests made by the Purchaser or any Depositor in good faith for delivery of information under these provisions on the basis of evolving interpretations of Regulation AB. In connection with any Securitization Transaction, each Seller and the Servicer shall cooperate fully with the Purchaser to deliver to the Purchaser (including any of its assignees or designees) and any Depositor, any and all statements, reports, certifications, records and any other information necessary in the good faith determination of the Purchaser or any Depositor to permit the Purchaser or such Depositor to comply with the provisions of Regulation AB, together with such disclosures relating to the Sellers, the Servicer, any Subservicer, any Third-Party Originator and the Mortgage Loans, or the servicing of the Mortgage Loans, reasonably believed by the Purchaser or any Depositor to be necessary in order to effect such compliance.

The Purchaser (including any of its assignees or designees) shall cooperate with the Sellers and the Servicer by providing timely notice of requests for information under these provisions and by reasonably limiting such requests to information required, in the Purchaser's reasonable judgment, to comply with Regulation AB.

Section 13.02  <u>Additional Representations and Warranties.</u>

(a)    The Sellers and Servicer shall be deemed to represent to the Purchaser and to any Depositor, as of the date on which information is first provided to the Purchaser or any Depositor under Section 13.03 that, except as disclosed in writing to the Purchaser or such Depositor prior

to such date: (i) the Servicer is not aware and has not received notice that any default, early amortization or other performance triggering event has occurred as to any other securitization due to any act or failure to act of the Servicer; (ii) the Servicer has not been terminated as servicer in a residential mortgage loan securitization, either due to a servicing default or to application of a servicing performance test or trigger; (iii) no material noncompliance with the applicable servicing criteria with respect to other securitizations of residential mortgage loans involving the Servicer as servicer has been disclosed or reported by the Servicer; (iv) no material changes to the Servicer's policies or procedures with respect to the servicing function it will perform under this Agreement and any Reconstitution agreement for mortgage loans of a type similar to the Mortgage Loans have occurred during the three-year period immediately preceding the related Securitization Transaction; (v) there are no aspects of the Servicer's financial condition that could have a material adverse effect on the performance by the Servicer of its servicing obligations under this Agreement or any Reconstitution agreement; (vi) there are no material legal proceedings pending or governmental proceedings pending (or known to be contemplated) against PHH Mortgage, the Servicer, any Subservicer or any Third-Party Originator; and (vii) there are no affiliations, relationships or transactions relating to PHH Mortgage, the Servicer, any Subservicer or any Third-Party Originator with respect to any Securitization Transaction and any party thereto identified by the related Depositor of a type described in Item 1119 of Regulation AB.

(b)    If so requested by the Purchaser or any Depositor on any date following the date on which information is first provided to the Purchaser or any Depositor under Section 13.03, the Sellers and Servicer shall, within five Business Days following such request, confirm in writing the accuracy of the representations and warranties set forth in paragraph (a) of this Section or, if any such representation and warranty is not accurate as of the date of such request, provide reasonably adequate disclosure of the pertinent facts, in writing, to the requesting party.

Section 13.03 Information to Be Provided by PHH Mortgage.

In connection with any Securitization Transaction PHH Mortgage shall (i) within five Business Days following request by the Purchaser or any Depositor, provide to the Purchaser and such Depositor (or, as applicable, cause each Third-Party Originator and each Subservicer to provide), in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor, the information and materials specified in paragraphs (a), (b), (c) and (f) of this Section, and (ii) as promptly as practicable following notice to or discovery by PHH Mortgage, provide to the Purchaser and any Depositor (in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor) the information specified in paragraph (d) of this Section.

(a)    If so requested by the Purchaser or any Depositor, PHH Mortgage shall provide such information regarding (i) PHH Mortgage, as originator of the Mortgage Loans (including as an acquirer of Mortgage Loans from a Qualified Correspondent), or (ii) each Third-Party Originator, and (iii) as applicable, each Subservicer, as is requested for the purpose of compliance with Items 1103(a)(1), 1105, 1110, 1117 and 1119 of Regulation AB.  Such information shall include, at a minimum:

(A)    the originator's form of organization;

74

(B)     a description of the originator's origination program and how long the originator has been engaged in originating residential mortgage loans, which description shall include a discussion of the originator's experience in originating mortgage loans of a similar type as the Mortgage Loans; information regarding the size and composition of the originator's origination portfolio; and information that may be material, in the good faith judgment of the Purchaser or any Depositor, to an analysis of the performance of the Mortgage Loans, including the originators' credit-granting or underwriting criteria for mortgage loans of similar type(s) as the Mortgage Loans and such other information as the Purchaser or any Depositor may reasonably request for the purpose of compliance with Item 1110(b)(2) of Regulation AB;

(C)     a description of any material legal proceedings pending or governmental proceedings pending (or known to be contemplated) against PHH Mortgage, the Servicer, each Third-Party Originator and each Subservicer; and

(D)     a description of any affiliation or relationship between PHH Mortgage, the Servicer, each Third-Party Originator, each Subservicer and any of the following parties to a Securitization Transaction, as such parties are identified to PHH Mortgage by the Purchaser or any Depositor in writing in advance of such Securitization Transaction:

        (1)     the sponsor;

        (2)     the depositor;

        (3)     the issuing entity;

        (4)     any servicer;

        (5)     any trustee;

        (6)     any originator;

        (7)     any significant obligor;

        (8)     any enhancement or support provider; and

        (9)     any other material transaction party.

(b)     If so requested by the Purchaser or any Depositor, PHH Mortgage shall provide (or, as applicable, cause each Third-Party Originator to provide) Static Pool Information with respect to the mortgage loans (of a similar type as the Mortgage Loans, as reasonably identified by the Purchaser as provided below) originated by (i) PHH Mortgage, if PHH Mortgage is an originator of Mortgage Loans (including as an acquirer of Mortgage Loans from a Qualified Correspondent), and/or (ii) each Third-Party Originator. Such Static Pool Information shall be prepared by PHH Mortgage (or Third-Party Originator) on the basis of its reasonable, good faith interpretation of the requirements of Item 1105(a)(1)-(3) of Regulation AB. To the extent that there is reasonably available to PHH Mortgage (or Third-Party Originator) Static Pool Information with respect to more than one mortgage loan type, the Purchaser or any Depositor shall be entitled to specify whether some or all of such information shall be provided pursuant to this paragraph. The content of such Static Pool Information may be in the form customarily provided by PHH Mortgage, and need not be customized for the Purchaser or any Depositor.

75

Such Static Pool Information for each vintage origination year or prior securitized pool, as applicable, shall be presented in increments no less frequently than quarterly over the life of the mortgage loans included in the vintage origination year or prior securitized pool. The most recent periodic increment must be as of a date no later than 135 days prior to the date of the prospectus or other offering document in which the Static Pool Information is to be included or incorporated by reference. The Static Pool Information shall be provided in an electronic format that provides a permanent record of the information provided, such as a portable document format (pdf) file, or other such electronic format reasonably required by the Purchaser or the Depositor, as applicable.

Promptly following notice or discovery of a material error in Static Pool Information provided pursuant to the immediately preceding paragraph (including an omission to include therein information required to be provided pursuant to such paragraph), PHH Mortgage shall provide corrected Static Pool Information to the Purchaser or any Depositor, as applicable, in the same format in which Static Pool Information was previously provided to such party by PHH Mortgage.

If so requested by the Purchaser or any Depositor, PHH Mortgage shall provide (or, as applicable, cause each Third-Party Originator to provide), at the expense of the requesting party (to the extent of any additional incremental expense associated with delivery pursuant to this Agreement), such agreed-upon procedures letters of certified public accountants reasonably acceptable to the Purchaser or Depositor, as applicable, pertaining to Static Pool Information relating to prior securitized pools for securitizations closed on or after January 1, 2006 or, in the case of Static Pool Information with respect to PHH Mortgage's or Third-Party Originator's originations or purchases, to calendar months commencing January 1, 2006, as the Purchaser or such Depositor shall reasonably request. Such letters shall be addressed to and be for the benefit of such parties as the Purchaser or such Depositor shall designate, which may include, by way of example, any sponsor, any Depositor and any broker dealer acting as underwriter, placement agent or initial purchaser with respect to a Securitization Transaction. Any such statement or letter may take the form of a standard, generally applicable document accompanied by a reliance letter authorizing reliance by the addressees designated by the Purchaser or such Depositor.

(c)    If so requested by the Purchaser or any Depositor, the Servicer shall provide such information regarding PHH Mortgage, as servicer of the Mortgage Loans, and each Subservicer (each of the Servicer and each Subservicer, for purposes of this paragraph, a "Transaction Servicer"), as is requested for the purpose of compliance with Item 1108 of Regulation AB. Such information shall include, at a minimum:

(A)    the Transaction Servicer's form of organization;

(B)    a description of how long the Transaction Servicer has been servicing residential mortgage loans; a general discussion of the Transaction Servicer's experience in servicing assets of any type as well as a more detailed discussion of the Transaction Servicer's experience in, and procedures for, the servicing function it will perform under this Agreement and any Reconstitution agreements; information regarding the size, composition and growth of the Transaction Servicer's portfolio of residential mortgage loans of a type similar to the Mortgage Loans and information on factors related to the Transaction Servicer that may be material, in the good faith judgment of the Purchaser or any Depositor, to any analysis of the servicing of the

76

Mortgage Loans or the related asset-backed securities, as applicable, including, without limitation:

(1)    whether any prior securitizations of mortgage loans of a type similar to the Mortgage Loans involving the Transaction Servicer have defaulted or experienced an early amortization or other performance triggering event because of servicing during the three-year period immediately preceding the related Securitization Transaction;

(2)    the extent of outsourcing the Transaction Servicer utilizes;

(3)    whether there has been previous disclosure of material noncompliance with the applicable servicing criteria with respect to other securitizations of residential mortgage loans involving the Transaction Servicer as a servicer during the three-year period immediately preceding the related Securitization Transaction;

(4)    whether the Transaction Servicer has been terminated as servicer in a residential mortgage loan securitization, either due to a servicing default or to application of a servicing performance test or trigger; and

(5)    such other information as the Purchaser or any Depositor may reasonably request for the purpose of compliance with Item 1108(b)(2) of Regulation AB;

(C)    a description of any material changes during the three-year period immediately preceding the related Securitization Transaction to the Transaction Servicer's policies or procedures with respect to the servicing function it will perform under this Agreement and any Reconstitution Agreements for mortgage loans of a type similar to the Mortgage Loans;

(D)    information regarding the Transaction Servicer's financial condition, to the extent that there is a material risk that an adverse financial event or circumstance involving the Transaction Servicer could have a material adverse effect on the performance by the Servicer of its servicing obligations under this Agreement or any Reconstitution agreement;

(E)    information regarding advances made by the Transaction Servicer on the Mortgage Loans and the Transaction Servicer's overall servicing portfolio of residential mortgage loans for the three-year period immediately preceding the related Securitization Transaction, which may be limited to a statement by an authorized officer of the Transaction Servicer to the effect that the Transaction Servicer has made all advances required to be made on residential mortgage loans serviced by it during such period, or, if such statement would not be accurate, information regarding the percentage and type of advances not made as required, and the reasons for such failure to advance;

(F)    a description of the Transaction Servicer's processes and procedures designed to address any special or unique factors involved in servicing loans of a similar type as the Mortgage Loans;

(G)    a description of the Transaction Servicer's processes for handling delinquencies, losses, bankruptcies and recoveries, such as through liquidation of mortgaged properties, sale of defaulted mortgage loans or workouts; and

(H)    information as to how the Transaction Servicer defines or determines delinquencies and charge-offs, including the effect of any grace period, re-aging, restructuring, partial payments considered current or other practices with respect to delinquency and loss experience.

(d)    If so requested by the Purchaser or any Depositor for the purpose of satisfying its reporting obligation under the Exchange Act with respect to any class of asset-backed securities, the Servicer shall (or shall cause each Subservicer and Third-Party Originator to) (i) notify the Purchaser and any Depositor in writing of (A) any material litigation or governmental proceedings pending against the Servicer, any Subservicer or any Third-Party Originator and (B) any affiliations or relationships that develop following the closing date of a Securitization Transaction between the Servicer, any Subservicer or any Third-Party Originator and any of the parties specified in clause (D) of paragraph (a) of this Section (and any other parties identified in writing by the requesting party) with respect to such Securitization Transaction, and (ii) provide to the Purchaser and any Depositor a description of such proceedings, affiliations or relationships.

(e)    As a condition to the succession to the Servicer or any Subservicer as servicer or subservicer under this Agreement or any Reconstitution agreement by any Person (i) into which the Servicer or such Subservicer may be merged or consolidated, or (ii) which may be appointed as a successor to the Servicer or any Subservicer, the Servicer shall provide to the Purchaser and any Depositor, at least 15 calendar days prior to the effective date of such succession or appointment, (x) written notice to the Purchaser and any Depositor of such succession or appointment and (y) in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor, all information reasonably requested by the Purchaser or any Depositor in order to comply with its reporting obligation under Item 6.02 of Form 8-K with respect to any class of asset-backed securities.

(f)    In addition to such information as PHH Mortgage, as servicer, is obligated to provide pursuant to other provisions of this Agreement, if so requested by the Purchaser or any Depositor, the Company shall provide such information regarding the performance or servicing of the Mortgage Loans as is reasonably required to facilitate preparation of distribution reports in accordance with Item 1121 of Regulation AB. Such information shall be provided concurrently with the monthly reports otherwise required to be delivered by the Servicer under this Agreement, commencing with the first such report due not less than ten Business Days following such request.

Section 13.04 Servicer Compliance Statement.

On or before March 1 of each calendar year, commencing in 2007, the Servicer shall deliver to the Purchaser and any Depositor a statement of compliance addressed to the Purchaser and such Depositor and signed by an authorized officer of the Servicer, to the effect that (i) a review of the Servicer's activities during the immediately preceding calendar year (or applicable portion thereof) and of its performance under this Agreement and any applicable Reconstitution agreement during such period has been made under such officer's supervision, and (ii) to the best of such officers' knowledge, based on such review, the Servicer has fulfilled all of its obligations under this Agreement and any applicable Reconstitution agreement in all material respects throughout such calendar year (or applicable portion thereof) or, if there has been a failure to

78

fulfill any such obligation in any material respect, specifically identifying each such failure known to such officer and the nature and the status thereof.

Section 13.05  Report on Assessment of Compliance and Attestation.

(a)  On or before March 1 of each calendar year, commencing in 2007, the Company shall:

(i)  deliver to the Purchaser and any Depositor a report (in form and substance reasonably satisfactory to the Purchaser and such Depositor) regarding the Servicer's assessment of compliance with the Servicing Criteria during the immediately preceding calendar year, as required under Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122 of Regulation AB. Such report shall be addressed to the Purchaser and such Depositor and signed by an authorized officer of the Servicer, and shall address each of the Servicing Criteria indicated on Exhibit 12 hereto as applicable to the Servicer;

(ii)  deliver to the Purchaser and any Depositor a report of a registered public accounting firm reasonably acceptable to the Purchaser and such Depositor that attests to, and reports on, the assessment of compliance made by the Servicer and delivered pursuant to the preceding paragraph.  Such attestation shall be in accordance with Rules 1-02(a)(3) and 2-02(g) of Regulation S-X under the Securities Act and the Exchange Act;

(iii)  cause each Subservicer, and each Subcontractor determined by the Servicer pursuant to Section 13.06(b) to be "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, to deliver to the Purchaser and any Depositor an assessment of compliance and accountants' attestation as and when provided in paragraphs (a) and (b) of this Section; and

(iv)  if requested by the Purchaser or any Depositor not later than March 1 of the calendar year in which such certification is to be delivered, deliver to the Purchaser, any Depositor and any other Person that will be responsible for signing the certification (a "Sarbanes Certification") required by Rules 13a-14(d) and 15d-14(d) under the Exchange Act (pursuant to Section 302 of the Sarbanes-Oxley Act of 2002) on behalf of an asset-backed issuer with respect to a Securitization Transaction a certification in the form attached hereto as Exhibit 11.

The Servicer acknowledges that the parties identified in clause (a)(iv) above may rely on the certification provided by the Servicer pursuant to such clause in signing a Sarbanes Certification and filing such with the Commission.  Neither the Purchaser nor any Depositor will request delivery of a certification under clause (a)(iv) above unless a Depositor is required under the Exchange Act to file an annual report on Form 10-K with respect to an issuing entity whose asset pool includes Mortgage Loans.

(b)  Each assessment of compliance provided by a Subservicer pursuant to Section 13.05(a)(i) shall address each of the Servicing Criteria on Exhibit 12 that are applicable to such Subservicer.  An assessment of compliance provided by a Subcontractor pursuant to Section 13.05(a)(iii) need not address any elements of the Servicing Criteria other than those specified by the Servicer pursuant to Section 13.06.

Section 13.06  Use of Subservicers and Subcontractors.

The Servicer shall not hire or otherwise utilize the services of any Subservicer to fulfill any of the obligations of the Servicer as servicer under this Agreement or any Reconstitution agreement unless the Servicer complies with the provisions of paragraph (a) of this Section. The Servicer shall not hire or otherwise utilize the services of any Subcontractor, and shall not permit any Subservicer to hire or otherwise utilize the services of any Subcontractor, to fulfill any of the obligations of the Servicer as servicer under this Agreement or any Reconstitution agreement unless the Servicer complies with the provisions of paragraph (b) of this Section.

(a)    It shall not be necessary for the Servicer to seek the consent of the Purchaser or any Depositor to the utilization of any Subservicer. The Servicer shall cause any Subservicer used by the Servicer (or by any Subservicer) for the benefit of the Purchaser and any Depositor to comply with the provisions of this Section and with Sections 13.02, 13.03(c) and (e), 13.04, 13.05 and 13.07 of this Agreement to the same extent as if such Subservicer were the Servicer, and to provide the information required with respect to such Subservicer under Section 13.03(d) of this Agreement. The Servicer shall be responsible for obtaining from each Subservicer and delivering to the Purchaser and any Depositor any servicer compliance statement required to be delivered by such Subservicer under Section 13.04, any assessment of compliance and attestation required to be delivered by such Subservicer under Section 13.05 and any certification required to be delivered to the Person that will be responsible for signing the Sarbanes Certification under Section 13.05 as and when required to be delivered.

(b)    It shall not be necessary for the Servicer to seek the consent of the Purchaser or any Depositor to the utilization of any Subcontractor. The Servicer shall promptly upon request provide to the Purchaser and any Depositor (or any designee of the Depositor, such as a master servicer or administrator) a written description (in form and substance satisfactory to the Purchaser and such Depositor) of the role and function of each Subcontractor utilized by the Servicer or any Subservicer, specifying (i) the identity of each such Subcontractor, (ii) which (if any) of such Subcontractors are "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, and (iii) which elements of the Servicing Criteria will be addressed in assessments of compliance provided by each Subcontractor identified pursuant to clause (ii) of this paragraph.

As a condition to the utilization of any Subcontractor determined to be "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, the Servicer shall cause any such Subcontractor used by the Servicer (or by any Subservicer) for the benefit of the Purchaser and any Depositor to comply with the provisions of Sections 13.05 and 13.07 of this Agreement to the same extent as if such Subcontractor were the Servicer. The Servicer shall be responsible for obtaining from each Subcontractor and delivering to the Purchaser and any Depositor any assessment of compliance and attestation required to be delivered by such Subcontractor under Section 13.05, in each case as and when required to be delivered.

Section 13.07  Indemnification; Remedies.

(a)    PHH Mortgage shall indemnify the Purchaser, each affiliate of the Purchaser, and each of the following parties participating in a Securitization Transaction: each sponsor and issuing entity; each Person responsible for the preparation, execution or filing of any report required to be filed with the Commission with respect to such Securitization Transaction, or for execution of a certification pursuant to Rule 13a-14(d) or Rule 15d-14(d) under the Exchange Act with respect to such Securitization Transaction; each broker dealer acting as underwriter,

80

placement agent or initial purchaser that is an affiliate of the Purchaser, each Person who controls any of such parties or the Depositor (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act); and the respective present and former directors, officers, employees and agents of each of the foregoing and of the Depositor, and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon:

(i)    (A)    any untrue statement of a material fact contained or alleged to be contained in any information, report, certification, accountants' letter or other material provided in written or electronic form under this Article XIII by or on behalf of PHH Mortgage, or provided under this Article XIII by or on behalf of any Subservicer, Subcontractor or Third-Party Originator (collectively, the "PHH Information"), or (B) the omission or alleged omission to state in the PHH Information a material fact required to be stated in the PHH Information or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, by way of clarification, that clause (B) of this paragraph shall be construed solely by reference to the PHH Information and not to any other information communicated in connection with a sale or purchase of securities, without regard to whether the PHH Information or any portion thereof is presented together with or separately from such other information;

(ii)    any failure by PHH Mortgage, any Subservicer, any Subcontractor or any Third-Party Originator to deliver any information, report, certification, accountants' letter or other material when and as required under this Article XIII, including any failure by PHH Mortgage to identify pursuant to Section 13.06(b) any Subcontractor "participating in the servicing function" within the meaning of Item 1122 of Regulation AB; or

(iii)    any breach by PHH Mortgage of a representation or warranty set forth in Section 13.02(a) or in a writing furnished pursuant to Section 13.02(b) and made as of a date prior to the closing date of the related Securitization Transaction, to the extent that such breach is not cured by such closing date, or any breach by PHH Mortgage of a representation or warranty in a writing furnished pursuant to Section 13.02(b) to the extent made as of a date subsequent to such closing date.

In the case of any failure of performance described in clause (a)(ii) of this Section, PHH Mortgage shall promptly reimburse the Purchaser, any Depositor, as applicable, and each Person responsible for the preparation, execution or filing of any report required to be filed with the Commission with respect to such Securitization Transaction, or for execution of a certification pursuant to Rule 13a-14(d) or Rule 15d-14(d) under the Exchange Act with respect to such Securitization Transaction, for all costs reasonably incurred by each such party in order to obtain the information, report, certification, accountants' letter or other material not delivered as required by PHH Mortgage, any Subservicer, any Subcontractor or any Third-Party Originator.

(b)    (i)    Any failure by PHH Mortgage, any Subservicer, any Subcontractor or any Third-Party Originator to deliver any information, report, certification, accountants' letter or other material when and as required under this Article XIII, or any breach by PHH Mortgage of a representation or warranty set forth in Section 13.02(a) or in a writing furnished pursuant to Section 13.02(b) and made as of a date prior to the closing date of the related Securitization Transaction, to the extent that such breach is not cured by such closing date, or any breach by

81

PHH Mortgage of a representation or warranty in a writing furnished pursuant to Section 13.02(b) to the extent made as of a date subsequent to such closing date, shall, except as provided in clause (ii) of this paragraph, immediately and automatically, without notice or grace period, constitute and is deemed an Event of Default with respect to PHH Mortgage under this Agreement and any applicable Reconstitution agreement, and shall entitle the Purchaser or Depositor, as applicable, in its sole discretion to terminate the rights and obligations of PHH Mortgage as servicer under this Agreement and/or any applicable Reconstitution agreement without payment (notwithstanding anything in this Agreement or any applicable Reconstitution agreement to the contrary) of any compensation to PHH Mortgage; provided that to the extent that any provision of this Agreement and/or any applicable Reconstitution agreement expressly provides for the survival of certain rights or obligations following termination of PHH Mortgage as servicer, such provision shall be given effect.

(ii)    Any failure by PHH Mortgage, any Subservicer or any Subcontractor to deliver any information, report, certification or accountants' letter when and as required under Section 13.04 or 13.05, including (except as provided below) any failure by PHH Mortgage to identify pursuant to Section 13.06(b) any Subcontractor "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, which continues unremedied for ten calendar days after the date on which such information, report, certification or accountants' letter was required to be delivered shall constitute and is deemed an Event of Default with respect to PHH Mortgage under this Agreement and any applicable Reconstitution agreement, and shall entitle the Purchaser or Depositor, as applicable, in its sole discretion to terminate the rights and obligations of PHH Mortgage as servicer under this Agreement and/or any applicable Reconstitution agreement without payment (notwithstanding anything in this Agreement to the contrary) of any compensation to PHH Mortgage; provided that to the extent that any provision of this Agreement and/or any applicable Reconstitution agreement expressly provides for the survival of certain rights or obligations following termination of PHH Mortgage as servicer, such provision shall be given effect.

Neither the Purchaser nor any Depositor shall be entitled to terminate the rights and obligations of PHH Mortgage pursuant to this subparagraph (b)(ii) if a failure of PHH Mortgage to identify a Subcontractor "participating in the servicing function" within the meaning of Item 1122 of Regulation AB was attributable solely to the role or functions of such Subcontractor with respect to mortgage loans other than the Mortgage Loans.

(iii)    PHH Mortgage shall promptly reimburse the Purchaser (or any designee of the Purchaser, such as a master servicer) and any Depositor, as applicable, for all reasonable expenses incurred by the Purchaser (or such designee) or such Depositor, as such are incurred, in connection with the termination of PHH Mortgage as servicer and the transfer of servicing of the Mortgage Loans to a successor servicer.  The provisions of this paragraph shall not limit whatever rights the Purchaser or any Depositor may have under other provisions of this Agreement and/or any applicable Reconstitution agreement or otherwise, whether in equity or at law, such as an action for damages, specific performance or injunctive relief.

12-12020-mg Doc 7255-1 Filed 07/11/14 Entered 07/11/14 18:20:13 Exhibit
Attachment 1 to Declaration of Daniel F. Markham    Pg 119 of 144
CASE 09-cv-08903-PKM-SEH Document 1 Entered 12/11/13 Page 302 of 121

IN WITNESS WHEREOF, the Sellers and the Purchaser have caused their names to be signed hereto by their respective officers as of the date first written above.

**RESIDENTIAL FUNDING CORPORATION**

By: _____

Name: Daniel F. Hellams
Title: Senior Vice President

**PHH MORTGAGE CORPORATION**

By: _____

Name:
Title:

**BISHOP'S GATE RESIDENTIAL
MORTGAGE TRUST (formerly known as
CENDANT RESIDENTIAL MORTGAGE TRUST)**

By:    **PHH Mortgage Corporation, as Administrator**

By: _____

Name:
Title:

IN WITNESS WHEREOF, the Sellers and the Purchaser have caused their names to be signed hereto by their respective officers as of the date first written above.

**RESIDENTIAL FUNDING CORPORATION**

By:_____

Name:
Title:

**PHH MORTGAGE CORPORATION**

By:_____

Name: Crissy Judge
Title: Assistant Vice President

**BISHOP'S GATE RESIDENTIAL
MORTGAGE TRUST (formerly known as
CENDANT RESIDENTIAL MORTGAGE TRUST)**

By: PHH Mortgage Corporation, as Administrator

By:_____

Name: Crissy Judge
Title: Assistant Vice President

## EXHIBIT 2.05

## FORM OF ASSIGNMENT, ASSUMPTION AND RECOGNITION AGREEMENT

THIS ASSIGNMENT, ASSUMPTION AND RECOGNITION AGREEMENT (this "Assignment"), dated of _____ __, 2005, is entered into among [_____], a _____ (the "Assignee"), [_____] (the "Assignor"), [PHH Mortgage Corporation] [Bishop's Gate Residential Mortgage Trust] (the "Seller ") , with PHH Mortgage Corporation, as the servicer (the "Servicer").

## RECITALS

WHEREAS the Assignor, the Seller and the Servicer have entered into a certain Mortgage Loan Flow Purchase, Sale and Servicing Agreement, dated as of _____, 2005 (as amended or modified to the date hereof, the "Agreement"), pursuant to which the Assignor has acquired certain Mortgage Loans pursuant to the terms of the Agreement and Servicer has agreed to service such Mortgage Loans; and

WHEREAS the Assignee has agreed, on the terms and conditions contained herein, to purchase from the Assignor [certain] [all] of the Mortgage Loans (the "Specified Mortgage Loans") which are subject to the provisions of the Agreement and are listed on the mortgage loan schedule attached as <u>Exhibit I</u> hereto (the "Specified Mortgage Loan Schedule");

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the parties agree as follows:

1.     <u>Assignment and Assumption</u>

(a)     On and of the date hereof, the Assignor hereby sells, assigns and transfers to the Assignee all of its right, title and interest in the Specified Mortgage Loans and all rights related thereto as provided under the Agreement to the extent relating to the Specified Mortgage Loans, the Assignee hereby accepts such assignment from the Assignor, and the Seller hereby acknowledges such assignment and assumption.

(b)     On and as of the date hereof, the Assignor represents and warrants to the Assignee that the Assignor has not taken any action that would serve to impair or encumber the Assignee's ownership interests in the Specified Mortgage Loans since the date of the Assignor's acquisition of the Specified Mortgage Loans.

2.     <u>Recognition of Purchaser</u>

From and after the date hereof, both the Assignee and the Seller shall note the transfer of the Specified Mortgage Loans to the Assignee in their respective books and records and shall recognize the Assignee as the owner of the Specified Mortgage Loans, and Servicer shall service the Specified Mortgage Loans for the benefit of the Assignee pursuant to the Agreement, the terms of which are incorporated herein by reference. It is the intention of the Seller, the Servicer, the Assignee and the Assignor that the Assignment shall be binding upon and inure to the benefit of the Assignee and the Assignor and their successors and assigns.

3.    Representations and Warranties

(a)    The Assignee represents and warrants that it is a sophisticated investor able to evaluate the risks and merits of the transactions contemplated hereby, and that it has not relied in connection therewith upon any statements or representations of the Seller or the Assignor other than those contained in the Agreement or this Assignment.

(b)    Each of the parties hereto represents and warrants that it is duly and legally authorized to enter into this Assignment.

(c)    Each of the parties hereto represents and warrants that this Assignment has been duly authorized, executed and delivered by it and (assuming due authorization, execution and delivery thereof by each of the other parties hereto) constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (regardless of whether such enforcement is considered in a proceeding in equity or at law).

4.    Continuing Effect

Except as contemplated hereby, the Agreement shall remain in full force and effect in accordance with its terms.

5.    Governing Law

This Assignment and the rights and obligations hereunder shall be governed by and construed in accordance with the internal laws of the State of New York.

6.    Notices

Any notices or other communications permitted or required under the Agreement to be made to the Assignee shall be made in accordance with the terms of the Agreement and shall be sent to the Assignee as follows: [_____], or to such other address as may hereafter be furnished by the Assignee to the parties in accordance with the provisions of the Agreement.

7.    Counterparts

This Agreement may be executed in counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same instrument.

8.    Definitions

Any capitalized term used but not defined in this Agreement has the same meaning as in the Agreement.

[Assignment continues with signature page]

IN WITNESS WHEREOF, the parties hereto have executed this Assignment the day and year first above written.

ASSIGNOR:

[_____]

By: _____
Name: _____
Title: _____


SELLER:

[PHH MORTGAGE CORPORATION]
[BISHOP'S GATE RESIDENTIAL
MORTGAGE TRUST]

By: _____
Name: _____
Title: _____


ASSIGNEE:

By: _____
Name: _____
Title: _____


SERVICER:

PHH MORTGAGE CORPORATION

By: _____
Name: _____
Title: _____

## EXHIBIT 5.05(4)

## FORM OF SERVICER REIMBURSEMENT SCHEDULE

### Calculation of Realized Loss

_____

Prepared by:                                                          Date:


Servicer Loan#                          Servicer:    PHH Mortgage f.k.a. Cendant Mortgage
                                        Address:     REO Marketing SV-23
                                                     4001 Leadenhall Rd
                                                     Mt. Laurel, NJ 08054

RMSC Loan#
Borrower's Name:
Property:


**Liquidation & Acquisition Expenses**

| | |
|---|---|
| Actual Unpaid Principal Balance | _____ |
| Interest Accrued @ Net Rate | _____ |
| Attorney's Fees | _____ |
| Taxes | _____ |
| Property Maintenance | _____ |
| MI Insurance Premiums | _____ |
| Hazard Insurance Premiums | _____ |
| Accrued Servicing Fees | _____ |
| Other (Itemize)   Statutory Disbursements | _____ |
| First American Asset Services | _____ |
| Other Disbursements | _____ |

**Total Expenses**                                          _____

**Credits:**

| | |
|---|---|
| Escrow Balance | _____ |
| MIP Refund | _____ |
| Rental Receipts | _____ |
| Hazard Loss Proceeds | _____ |
| Primary Mortgage Insurance Proceeds   (Pool proceeds) | _____ |
| Proceeds from Sale of Acquired Property | _____ |
| Other (itemize) | |

**Total Credits**                                              _____

**Total Realized Loss (or amount of Gain)**                    _____

12-12020-mg   Doc 7255-1   Filed 07/11/14   Entered 07/11/14 18:20:13   Exhibit
CASE 09-cv-03903 PAM-SER   Document 1-1   Filed 12/11/13   Page 310 of 127
Attachment 1 to Declaration of Daniel F. Markham    Pg 127 of 144

# Expense Information

**Borrower:** _____   **Loan#** _____

## Attorney Fees

| Date | Type | Amount |
|------|------|--------|
|  |  |  |
|  |  |  |
|  |  |  |
|  | **TOTAL** |  |

## Property Taxes

| Date | Type | Amount |
|------|------|--------|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  | **TOTAL** |  |

## Property Preservation Costs

| Date | Type | Amount |
|------|------|--------|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  | **TOTAL** |  |

CASE 2:13-cv-03003-PAM-SER Document 1-1 Filed 12/11/13 Page 311 of 127
12-12020-mg Doc 7255-1 Filed 07/11/14 Entered 07/11/14 18:20:13 Exhibit
Attachment 1 to Declaration of Daniel F. Markham Pg 128 of 144

## Hazard Insurance

| Date | Type | Amount |
|------|------|--------|
|      |      |        |
|      |      |        |
|      |      |        |
|      |      |        |
|      | **TOTAL** |   |

## Statutory Disbursements

| Date | Type | Amount |
|------|------|--------|
|      |      |        |
|      |      |        |
|      |      |        |
|      |      |        |
|      |      |        |
|      |      |        |
|      |      |        |
|      |      |        |
|      |      |        |
|      |      |        |
|      |      |        |
|      |      |        |
|      | **TOTAL** |   |

## Other Disbursements

| Date | Type | Amount |
|------|------|--------|
|      |      |        |
|      |      |        |
|      | **TOTAL** |   |

12-12020-mg   Doc 7255-1   Filed 07/11/14   Entered 07/11/14 18:20:13   Exhibit
CASE 0:13-cv-03903-PAM-SER   Document 1-1   Filed 12/11/13   Page 312 of 127
Attachment 1 to Declaration of Daniel F. Markham    Pg 129 of 144

# CLAIM ATTACHMENT

**Expenses for period from** _____ **to** _____

**Borrower:** ___0___  **Loan#** ___0___

| | |
|---|---|
| Utilities | _____ |
| Lawn Maintenance | _____ |
| Winterization | _____ |
| Appraisal | _____ |
| Eviction | _____ |
| Rekey & Secure | _____ |
| HOA/Condo | _____ |
| Pool Maintenance | _____ |
| Termite | _____ |
| Cleaning/Detrash | _____ |
| Inspections | _____ |
| **TOTAL** | $ - |

**Repairs**

| | |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| **TOTAL** | $ - |

**Other**

| | |
|---|---|
| _____ | $ |
| _____ | $ |
| _____ | $ |
| _____ | $ |
| _____ | $ |
| **TOTAL** | $ - |

| | |
|---|---|
| Management Fee | _____ |
| Mailing | _____ |
| **TOTAL** | $ |

-  _____

**TOTAL**                                                                  -  _____

## EXHIBIT 10

## FORM OF WARRANTY BILL OF SALE

On this _____ day of _____, 200__, [PHH Mortgage Corporation] [Bishop's Gate Residential Mortgage Trust] ("Seller") as the Seller under that certain Mortgage Loan Flow Purchase, Sale & Servicing Agreement, dated as of _____, 2005 (the "Agreement") does hereby sell, transfer, assign, set over and convey to [_____] as Purchaser under the Agreement, without recourse, but subject to the terms of the Agreement, all rights, title and interest of the Seller in and to the Mortgage Loans listed on the Mortgage Loan Schedule attached hereto, together with the related Mortgage Files and all rights and obligations arising under the documents contained therein. Pursuant to Section 2.01 of the Agreement, the Seller has delivered to the Purchaser or its custodian the Legal Documents for each Mortgage Loan to be purchased as set forth in the Agreement. The contents of each related Mortgage File required to be retained by PHH Mortgage Corporation ("PHH") to service the Mortgage Loans pursuant to the Agreement and thus not delivered to the Purchaser are and shall be held in trust by PHH for the benefit of the Purchaser as the owner thereof. PHH's possession of any portion of each such Mortgage File is at the will of the Purchaser for the sole purpose of facilitating servicing of the related Mortgage Loan pursuant to the Agreement, and such retention and possession by PHH shall be in a custodial capacity only. The ownership of each Mortgage Note, Mortgage, and the contents of the Mortgage File and Mortgage File is vested in the Purchaser and the ownership of all records and documents with respect to the related Mortgage Loan prepared by or which come into the possession of PHH shall immediately vest in the Purchaser and shall be retained and maintained, in trust, by PHH at the will of the Purchaser in such custodial capacity only.

The Seller confirms to the Purchaser that the representations and warranties set forth in Sections 3.01, 3.02 and 3.03 of the Agreement are true and correct as of the date hereof, and that all statements made in the Sellers' Officer's Certificate and all attachments thereto remain complete, true and correct in all respects as of the date hereof.

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Agreement.

> [PHH MORTGAGE CORPORATION]
> [BISHOP'S GATE RESIDENTIAL MORTGAGE TRUST]
>
> (Seller)
>
> By:
>
> Name:
>
> Title:

EXHIBIT 11

FORM OF SARBANES-OXLEY CERTIFICATION

I, Martin Foster, certify to [Purchaser Name], [Master Servicer Name], [Depositor Name] and [Trustee Name], and their officers, with the knowledge and intent that they will rely on this certification, in connection with [Insert name and date of applicable contract and/or name of securitization deal] (the "Agreement"), that I am a duly elected Senior Vice President of PHH Mortgage Corporation, a corporation organized under the laws of the State of New Jersey (the "Servicer"), and further as follows:

(i)  I have reviewed the servicer compliance statement of the Servicer provided in accordance with Item 1123 of Regulation AB (the "Compliance Statement"), the report on assessment of the Servicer's compliance with the servicing criteria set forth in Item 1122(d) of Regulation AB (the "Servicing Criteria"), provided in accordance with Rules 13a-18 and 15d-18 under Securities Exchange Act of 1934, as amended (the "Exchange Act") and Item 1122 of Regulation AB (the "Servicing Assessment"), the registered public accounting firm's attestation report provided in accordance with Rules 13a-18 and 15d-18 under the Exchange Act and Section 1122(b) of Regulation AB (the "Attestation Report"), and all servicing reports, officer's certificates and other information relating to the servicing of the Mortgage Loans by the Servicer during 200[ ] that were delivered by the Servicer to the [Depositor] [Master Servicer] [Trustee] pursuant to the Agreement (collectively, the "Servicer Servicing Information");

(ii)  Based on my knowledge, the Servicer Servicing Information, taken as a whole, does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading,  with respect to the period of time covered by the Servicer Servicing Information;

(iii)  Based on my knowledge, all of the Servicer Servicing Information required to be provided by the Servicer under the Agreement has been provided to the [Depositor] [Master Servicer] [Trustee];

(iv)  I am responsible for reviewing the activities performed by the Servicer as servicer under the Agreement, and based on my knowledge and the compliance review conducted in preparing the Compliance Statement and except as disclosed in the Compliance Statement, the Servicing Assessment or the Attestation Report, the Servicer has fulfilled its obligations under the Agreement in all material respects; and

(v)  The Compliance Statement required to be delivered by the Servicer pursuant to the Agreement, and the Servicing Assessment and Attestation Report required to be provided by the Servicer and by any Subservicer or Subcontractor pursuant to the Agreement, have

been provided to the [Depositor] [Master Servicer].  Any material instances of noncompliance described in such reports have been disclosed to the [Depositor] [Master Servicer].  Any material instance of noncompliance with the Servicing Criteria has been disclosed in such reports.

Capitalized terms used herein and not defined shall have the meanings ascribed to them in the Agreement.

PHH Mortgage Corporation

By: _____

Martin Foster
Senior Vice President
Date:

## EXHIBIT 12

## SERVICING CRITERIA TO BE ADDRESSED IN ASSESSMENT OF COMPLIANCE

The assessment of compliance to be delivered by the Servicer shall address, at a minimum, the criteria identified as below as "Applicable Servicing Criteria":

| SERVICING CRITERIA | | APPLICABLE SERVICING CRITERIA |
|---|---|---|
| Reference | Criteria | |
| | **General Servicing Considerations** | |
| 1122(d)(1)(i) | Policies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements. | X |
| 1122(d)(1)(ii) | If any material servicing activities are outsourced to third parties, policies and procedures are instituted to monitor the third party's performance and compliance with such servicing activities. | X |
| 1122(d)(1)(iii) | Any requirements in the transaction agreements to maintain a back-up servicer for the mortgage loans are maintained. | X |
| 1122(d)(1)(iv) | A fidelity bond and errors and omissions policy is in effect on the party participating in the servicing function throughout the reporting period in the amount of coverage required by and otherwise in accordance with the terms of the transaction agreements. | X |
| | **Cash Collection and Administration** | |
| 1122(d)(2)(i) | Payments on mortgage loans are deposited into the appropriate custodial bank accounts and related bank clearing accounts no more than two business days following receipt, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(2)(ii) | Disbursements made via wire transfer on behalf of an obligor or to an investor are made only by authorized personnel. | X |
| 1122(d)(2)(iii) | Advances of funds or guarantees regarding collections, cash flows or distributions, and any interest or other fees charged for such advances, are made, reviewed and approved as specified in the transaction agreements. | X |
| 1122(d)(2)(iv) | The related accounts for the transaction, such as cash reserve accounts or accounts established as a form of overcollateralization, are separately maintained (e.g., with respect to commingling of cash) as set forth in the transaction agreements. | |
| 1122(d)(2)(v) | Each custodial account is maintained at a federally insured depository institution as set forth in the transaction agreements. For purposes of this criterion, "federally insured depository institution" with respect to a foreign financial institution means a foreign financial institution that meets the requirements of Rule 13k-1(b)(1) of the Securities Exchange Act. | X |
| 1122(d)(2)(vi) | Unissued checks are safeguarded so as to prevent unauthorized access. | X |
| 1122(d)(2)(vii) | Reconciliations are prepared on a monthly basis for all asset-backed securities related bank accounts, including custodial accounts and related bank clearing accounts. These reconciliations are (A) mathematically accurate; (B) prepared within 30 calendar days after the bank statement cutoff date, or such other number of days specified in the transaction agreements; (C) reviewed and approved by someone other than the person who prepared the reconciliation; and (D) contain explanations for reconciling items. These reconciling items are resolved within 90 calendar days of their original identification, or such other number of days specified in the transaction agreements. | X |

| | SERVICING CRITERIA | APPLICABLE SERVICING CRITERIA |
|---|---|---|
| **Reference** | **Criteria** | |
| | *Investor Remittances and Reporting* | |
| 1122(d)(3)(i) | Reports to investors, including those to be filed with the Commission, are maintained in accordance with the transaction agreements and applicable Commission requirements. Specifically, such reports (A) are prepared in accordance with timeframes and other terms set forth in the transaction agreements; (B) provide information calculated in accordance with the terms specified in the transaction agreements; (C) are filed with the Commission as required by its rules and regulations; and (D) agree with investors' or the trustee's records as to the total unpaid principal balance and number of mortgage loans serviced by the Servicer. | X |
| 1122(d)(3)(ii) | Amounts due to investors are allocated and remitted in accordance with timeframes, distribution priority and other terms set forth in the transaction agreements. | X |
| 1122(d)(3)(iii) | Disbursements made to an investor are posted within two business days to the Servicer's investor records, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(3)(iv) | Amounts remitted to investors per the investor reports agree with cancelled checks, or other form of payment, or custodial bank statements. | X |
| | *Pool Asset Administration* | |
| 1122(d)(4)(i) | Collateral or security on mortgage loans is maintained as required by the transaction agreements or related mortgage loan documents. | X |
| 1122(d)(4)(ii) | Mortgage loan and related documents are safeguarded as required by the transaction agreements | X |
| 1122(d)(4)(iii) | Any additions, removals or substitutions to the asset pool are made, reviewed and approved in accordance with any conditions or requirements in the transaction agreements. | X |
| 1122(d)(4)(iv) | Payments on mortgage loans, including any payoffs, made in accordance with the related mortgage loan documents are posted to the Servicer's obligor records maintained no more than two business days after receipt, or such other number of days specified in the transaction agreements, and allocated to principal, interest or other items (e.g., escrow) in accordance with the related mortgage loan documents. | X |
| 1122(d)(4)(v) | The Servicer's records regarding the mortgage loans agree with the Servicer's records with respect to an obligor's unpaid principal balance. | X |
| 1122(d)(4)(vi) | Changes with respect to the terms or status of an obligor's mortgage loans (e.g., loan modifications or re-agings) are made, reviewed and approved by authorized personnel in accordance with the transaction agreements and related pool asset documents. | X |
| 1122(d)(4)(vii) | Loss mitigation or recovery actions (e.g., forbearance plans, modifications and deeds in lieu of foreclosure, foreclosures and repossessions, as applicable) are initiated, conducted and concluded in accordance with the timeframes or other requirements established by the transaction agreements. | X |
| 1122(d)(4)(viii) | Records documenting collection efforts are maintained during the period a mortgage loan is delinquent in accordance with the transaction agreements. Such records are maintained on at least a monthly basis, or such other period specified in the transaction agreements, and describe the entity's activities in monitoring delinquent mortgage loans including, for example, phone calls, letters and payment rescheduling plans in cases where delinquency is deemed temporary (e.g., illness or unemployment). | X |
| 1122(d)(4)(ix) | Adjustments to interest rates or rates of return for mortgage loans with variable rates are computed based on the related mortgage loan documents. | X |

| | SERVICING CRITERIA | APPLICABLE SERVICING CRITERIA |
|---|---|---|
| **Reference** | **Criteria** | |
| 1122(d)(4)(x) | Regarding any funds held in trust for an obligor (such as escrow accounts): (A) such funds are analyzed, in accordance with the obligor's mortgage loan documents, on at least an annual basis, or such other period specified in the transaction agreements; (B) interest on such funds is paid, or credited, to obligors in accordance with applicable mortgage loan documents and state laws; and (C) such funds are returned to the obligor within 30 calendar days of full repayment of the related mortgage loans, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(4)(xi) | Payments made on behalf of an obligor (such as tax or insurance payments) are made on or before the related penalty or expiration dates, as indicated on the appropriate bills or notices for such payments, provided that such support has been received by the servicer at least 30 calendar days prior to these dates, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(4)(xii) | Any late payment penalties in connection with any payment to be made on behalf of an obligor are paid from the servicer's funds and not charged to the obligor, unless the late payment was due to the obligor's error or omission. | X |
| 1122(d)(4)(xiii) | Disbursements made on behalf of an obligor are posted within two business days to the obligor's records maintained by the servicer, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(4)(xiv) | Delinquencies, charge-offs and uncollectible accounts are recognized and recorded in accordance with the transaction agreements. | X |
| 1122(d)(4)(xv) | Any external enhancement or other support, identified in Item 1114(a)(1) through (3) or Item 1115 of Regulation AB, is maintained as set forth in the transaction agreements. | |
| | | |

Schedule B-1

## CONTENTS OF PURCHASER'S MORTGAGE FILE

With respect to each Mortgage Loan, the Purchaser's Mortgage File shall include each of the following items, which shall be available for inspection by the Purchaser, and which shall be retained by the applicable Seller or delivered to the Purchaser pursuant to the provisions of the Sellers' Warranties and Servicing Agreement.

### To be Delivered 5 days prior to Closing Date:

1       The original Mortgage Note bearing all intervening endorsements, endorsed, at the direction of the Purchaser either (1) "Pay to the order of "------", without recourse," or (2) in blank and signed in the name of the applicable Seller by an authorized officer. To the extent that there is no space on the face of the Mortgage Notes for endorsements, the endorsement may be contained on an allonge, if state law so allows and the Purchaser is so advised by the Seller that state law so allows

.

2.      If the Mortgage Loan is not a MERS Mortgage Loan, the original Assignment of Mortgage for each Mortgage Loan, in form and substance acceptable for recording. The Mortgage shall be assigned, at the direction of the Purchaser either (1) to "--------" or (2) with assignee's name left blank. The Assignment of Mortgage must be duly recorded only on the direction of the Purchaser. If the Mortgage Loan was acquired by the applicable Seller in a merger, the Assignment of Mortgage must be made by "PHH Mortgage Corporation, successor by merger to [name of predecessor]." If the Mortgage Loan was acquired or originated by the Company while doing business under another name or under an assumed name, the Assignment must be by "PHH Mortgage Corporation formerly known as [previous name] or [PHH Mortgage Corporation dba _____, ] respectively.

3.      With respect to each Pledged Asset Mortgage Loan, a copy of the related Control Agreement and Pledged Asset Agreement.

4.      With respect to each Pledged Asset Mortgage Loan, a copy of the UCC-1, to the extent the Pledged Asset Servicer was required to deliver such UCC-1 to Servicer, and an original form UCC-3, if applicable, to the extent the Pledged Asset Servicer was required to deliver such UCC-3 to Servicer, together with any instrument required to be delivered under the

related Surety Bond for transferring coverage under such Surety Bond.

5.  With respect to each Cooperative Loan, the original Stock Certificate and related Stock Power, in blank, executed by the Mortgagor with such signature guaranteed and original Stock Power, in blank executed by the Seller provided, that if the Seller delivers a certified copy, the Seller shall deliver the original Stock Certificate and Stock Powers to the Custodian on or prior to the date which is 180 days after the related Closing Date.

## To be delivered within 120 days after the related Closing Date:

1.  the original Mortgage with evidence of recording thereon. If in connection with any Mortgage Loan, the applicable Seller cannot deliver or cause to be delivered the original Mortgage with evidence of recording thereon on or prior to the Closing Date because of a delay caused by the public recording office where such Mortgage has been delivered for recordation or because such Mortgage has been lost or because such public recording office retains the original recorded Mortgage, the applicable Seller shall deliver or cause to be delivered to the Custodian, a photocopy of such Mortgage, together with (i) in the case of a delay caused by the public recording office, an Officer's Certificate of the applicable Seller (or certified by the title company, escrow agent, or closing attorney) stating that such Mortgage has been dispatched to the appropriate public recording office for recordation and that the original recorded Mortgage or a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage will be promptly delivered to the Custodian upon receipt thereof by the applicable Seller; or (ii) in the case of a Mortgage where a public recording office retains the original recorded Mortgage or in the case where a Mortgage is lost after recordation in a public recording office, a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage;

2.  To the extent applicable, the original of each power of attorney, surety agreement or guaranty agreement with respect to such Mortgage Loan;

3.  Originals of any executed intervening assignments of the Mortgage, with evidence of recording thereon or, if the original intervening assignment has not yet been returned from the recording office, a copy of such assignment certified by the applicable Seller to be a true copy of the original of the assignment which has been sent for recording in the appropriate jurisdiction in which the Mortgaged Property is located.

4.  Originals of all assumption, modification and substitution agreements, if any, or, if the originals of any such assumption, modification and substitution agreements have not yet been returned from the recording

office, a copy of such instruments certified by the applicable Seller to be a true copy of the original of such instruments which have been sent for recording in the appropriate jurisdictions in which the Mortgaged Properties are located.

5. The original mortgagee policy of title insurance or, in the event such original title policy is unavailable, a certified true copy of the related policy binder or commitment for title certified to be true and complete by the title insurance company, in each case, including an Environmental Protection Agency Endorsement and an adjustable-rate endorsement.

6. With respect to each Cooperative Loan, the original Recognition Agreement and the original Assignment of Recognition Agreement;

7. With respect to each Cooperative Loan, an Estoppel Letter and/or Consent;

8. With respect to each Cooperative Loan, the Cooperative Lien Search;

9. With respect to each Cooperative Loan, the guaranty of the Mortgage Note and Cooperative Loan, if any; and

10. With respect to each Cooperative Loan, the original Cooperative Pledge Agreement.

11. With respect to each Cooperative Loan, the original Proprietary Lease and the Assignment of Proprietary Lease executed by the Mortgagor in blank or if the Proprietary Lease has been assigned by the Mortgagor to the Seller, then the Seller must execute an assignment of the Assignment of Proprietary Lease in blank;

12. With respect to each Cooperative Loan, the recorded state and county Financing Statements and Financing Statement Changes;

From time to time, the Sellers shall forward to the Custodian additional original documents pursuant to the Agreement or additional documents evidencing an assumption, modification, consolidation or extension of a Mortgage Loan approved by the Sellers, in accordance with the Agreement. All such mortgage documents held by the Custodian as to each Mortgage Loan shall constitute the "Custodial File".

# PHH Mortgage Corporation
## Mortgage File Cover Sheet: Credit Documents
## (Schedule B-2)

**Prepared by:** _____          **Phone:** _____

**Location:**   **PHH Mortgage Corporation**         **Fax:** _____

   **Borrower Name:**      _____

   **Loan Number:**   _____

_____

**General:**

|   |   |   |
|---|---|---|
| _____ | 1. | Mortgage File Cover Sheet Checklist - Inside File |
| _____ | 2. | Borrower's Authorization to Obtain Information (Original) |
| _____ | 3. | Fannie Mae1008(original) or Underwriter's Worksheet (CUW2) |

**Applications:**

|   |   |   |
|---|---|---|
| _____ | 4. | Final Signed Typed Loan Application (Form 1003 or personal profile) |
| _____ | 5. | Initial Signed Loan Application (personal profile, handwritten or typed) |

**Credit Documentation:**

|   |   |   |
|---|---|---|
| _____ | 6 | Credit Report(s), Merged In-file or RMCR) (original or photocopy) |
| _____ | 7. | Borrower's explanations (credit, employment, etc., if applicable) |
| _____ | 8. | VOM(s) or other form of verification(s) on all mortgages (not required on Aus scored loans) |
| _____ | 9. | Separation agreement, divorce decree (if applicable) |
| _____ | 10. | Miscellaneous Credit Documents (if applicable) |

**Employment/Income Documentation:**

|   |   |   |
|---|---|---|
| _____ | 11. | Copy or Original initial VOE(s); OR |
| _____ | 12. | Paystubs dated with 30 days of closing; OR |
| _____ | 13. | IRS Form W-2's Original or Copy (for wage earner); OR |
| _____ | 14. | IRS Form 1040's, 1120's, 1065's, etc.,(2 years)for self-employed; |
| _____ | 15. | Leases (if applicable) |
| _____ | 16. | All documentation required to support Borrower's cash flow for loans Originated. |

**Asset Documentation:**

|   |   |   |
|---|---|---|
| _____ | 17. | Copy or Original VOD(s) or source of funds to close (if applicable) |
| _____ | 18. | Gift Letter (if applicable) (original) |
| _____ | 19. | Verification of original purchase price, real estate sales contract, or HUD-1 on first mortgage (if applicable) |

**Property Documentation:**

|   |   |   |
|---|---|---|
| _____ | 20. | Appraisal, including original photos of subject and comps. (original) |
| _____ | 21. | Review Appraisal or second full Appraisal (if required) (original) |
| _____ | 22. | 442 Final Inspection |
| _____ | 23. | Copy or Original Contract of Sale |
| _____ | 24. | Miscellaneous |

**Legal Documentation:**

12-12020-mg    Doc 7255-1    Filed 07/11/14    Entered 07/11/14 18:20:13    Exhibit
CASE 09-13-cv-03903 PAM-SER Document 1-1 Filed 12/11/13 Page 324 of 24
Attachment 1 to Declaration of Daniel F. Markham    Pg 141 of 144

_____25.    Copy of Note
_____26.    Copy of Mortgage
_____27.    Copy of Title
_____28.    Copy of HUD1
_____29.    Copy of Final

## EXHIBIT 5.01(C) SCHEDULE OF DELEGATED AUTHORITY

### Modifications

- No permanent interest rate reductions
- No rate reduction lower than 1/2 the current rate in effect prior to the modification maximum with the number of steps not to exceed three  (final step rate must return the fixed note rate to its original rate and may not exceed three years)
- Maximum term of 360 months
- No multiple modifications (without Purchaser approval).
- Minimum seasoning of 12 payments before eligible for modification
- Modified LTV's not to exceed 110% of original loan terms LTV
- Maximum capitalization of total of: 9 P&I Payments, 1 Year Tax and/or Insurance Arrearage and $7,000.00 in hard costs, no late charges
- Must establish trial repayment plans (of a minimum of 4 payments) as a condition of modification for products/loans defined as higher-risk (e.g., EA/TPR, A-, Alt-A, Home Solutions, Manufactured Housing)

### Preforeclosure Sales (3PS or SPO)

- Net proceeds to value greater than or equal to 85% or no loss to Purchaser

### Deed-in-Lieu of Foreclosure Sale

- No restriction, must be the prudent decision and property must be vacant

Fannie Mae Servicing Modification Schedule 5.01(1)

Servicer has agreed to service and administer all Mortgage Loans in accordance with the Fannie Mae Single Family Servicing Guide http:/// [insert link] as amended, supplemented or otherwise modified from time to time ("Fannie Mae Servicing Guide"), subject to the modifications and exceptions to the Fannie Mae Servicing Guide described below.  The Fannie Mae Servicing Guide together with the modifications and exceptions described below constitute the Servicing Procedures:

(1) Purchaser is substituted for Fannie Mae wherever Fannie Mae's name appears in the Fannie Mae Servicing Guide.

(2) The following address of Purchaser is substituted for Fannie Mae's address wherever it appears in the Fannie Mae Servicing Guide:

> Residential Funding Corporation
> Master Servicing Division
> 2255 North Ontario Street, Suite 400
> Burbank, California 91504
> Attn:   Sr. Compliance Officer
> Fax:   818-260-1810

(3) Servicer will remit principal and interest owing on the Mortgage Loans to Purchaser on a scheduled/scheduled basis, regardless of whether or not Mortgagor has made corresponding payments of principal and interest to Servicer. Such remittances must be made by the Servicer up to and including the first of the month following the date of the foreclosure sale when the Mortgaged Property securing the Mortgage Loan becomes an REO Property. An "REO Property" means a Mortgaged Property for which Purchaser, or its designee, has acquired marketable title as the result of a completed foreclosure, deed-in-lieu of foreclosure, or other action.

(4) Servicer must report all monthly Mortgage Loan data electronically using the TransAction℠ Reporting method, Alltel file format or via electronic spreadsheet GMAC-RFC Form 2306.  Specific fields required will be provided by Purchaser.

(5) Servicer must not re-apply previously-paid principal curtailments to cure or waive a principal, interest, or other payment default or to waive any subsequent, scheduled payment.

(6) Servicer has sole responsibility for filing all claims with mortgage insurance companies, and must file the claims within the allotted time limits.

(7) Purchaser will reimburse Servicer for its outstanding Servicing Advances in accordance with the Fannie Mae Servicer Guide after submission of a pre-claim at the time of the acquisition and a final claim upon liquidation.  As used herein, Servicing Advances means all customary, reasonable and necessary out-of-pocket costs and expenses incurred in the performance by the Servcier of its servicing obligations, subject to guidelines as described within the Fannie Mae Servicing Guide, including, but not limited to, the cost

of (a) the preservation, restoration and protection of the Mortgaged Property, (b) any enforcement or judicial proceedings, including forecloses, (c) the management and liquidation of the Mortgaged Property if the Mortgaged Property is acquired in satisfaction of the Mortgage.

(8) All Prepayment Charges belong to the Purchaser.

(9) Purchaser may unilaterally modify the terms of this Servicing Addendum to the extent Purchaser's investors require such modifications as a condition to such investors purchaser of the applicable Mortgage Loans. Such modifications are effective upon written notice from Purchaser to Seller.