*CLAIM #4702*

*PARAGRAPH 1.*

MIN: 1000866-0010500352-1                          Loan Number: 10500352

# ADJUSTABLE RATE NOTE

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE
AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT
THE MONTHLY PAYMENT CAN INCREASE. THE PRINCIPAL AMOUNT TO REPAY
COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT
MORE THAN THE LIMIT STATED IN THIS NOTE.**

APRIL 27, 2006                    IRVINE                    CALIFORNIA
[Date]                           [City]                      [State]

5200 SOUTHWEST 122ND AVENUE, MIAMI, FLORIDA 33175
[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 1,000,000.00    (this amount is called
"Principal"), plus interest, to the order of Lender. Lender is PLATINUM CAPITAL GROUP, A
CALIFORNIA CORPORATION
I will make all payments under this Note in the form of cash, check or money order.
I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is
entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

**(A)  Interest Rate**
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest
at a yearly rate of    1.500  %. The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in
Section 7(B) of this Note.

**(B)  Interest Rate Change Dates**
The interest rate I will pay may change on the 1ST  day of  JULY, 2006                , and on
that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change
Date." The new rate of interest will become effective on each Interest Rate Change Date.

**(C)  Interest Rate Limit**
My interest rate will never be greater than    9.950 %.

**(D)  Index**
Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The
"Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities
adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve
Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is
determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.
The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the
"Current Index."
If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable
information. The Note Holder will give me notice of this choice.

PAYMENT OPTION MULTISTATE ADJUSTABLE RATE NOTE
RFC FORM 3524 (10/05) MODIFIED INSTRUMENT
For Use in FLORIDA Only                          Page 1 of 5

DocMagic eForms 800-649-1362
www.docmagic.com

Fl3524ml.rfn.1.tem

CLAIM # 4702

PARAGRAPH 1.

HER
STAMPED



PAY TO THE ORDER OF
RESIDENTIAL FUNDING CORPORATION
WITHOUT RECOURSE
PLATINUM CAPITAL GROUP
A CALIFORNIA CORPORATION

BY
ASST. SECRETARY
Celina Pykosz II

PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Corporation

By
Judy Faber, Vice President

CLAIM #4702

## Judy Faber - improper GMAC Affidavits Leading to Charges of Document Fabrication to Change Title

PARAGRAPH 1.

Ah, what a tangled web we weave when first we practice to deceive, said the bard.

And the web emanating from the GMAC affidavit improprieties extend much further than most may realize. Although GMAC continues to maintain that having its "robot signor" officers like Jeffrey Stephan provide affidavits on matters they know nothing about is a mere technical problem that they can remedy. In fact, an affidavit is a statement of someone with personal knowledge of a matter. Stephan signed as many as 10,000 documents a month and clearly could not have personal knowledge of the underlying situations. Deliberately preparing and submitting inaccurate documents in a legal proceeding is a fraud on the court, something most judges really do not like.

Predictably, lawyers who are contesting foreclosures are jumping on the affidavit issue and using it to open up broader issues with foreclosures where GMAC was the servicer of the loan. For instance, <u>this letter to a judge in South Carolina</u>, a judicial foreclosure state, discusses not only the role of an apparent fellow robot signor of Stephan, one Jack Kerr, but more critically, another document provided in this case stamped (not signed) by one Judy Faber, also of GMAC. **The Faber document transferred title to the party foreclosing in the case, so if the document is invalid, the plaintiff, in this case a Deutsche Bank trust, will lack standing to foreclose (legalese for "no tickie, no laundry"). Here is the critical section of the letter (on page 2):**

**Upon information and believe, Judy Faber has instructed document custodians in thousands of foreclosure cases to apply her stamped endorsement bearing her name after foreclosure commenced to an allonge and after a consumer had challenged the chain of title in the case. Upon information and belief, Ms. Faber and her document custodian team at facilities described in the Washington Post article attached to this letter <u>have fabricated and changed title in thousands of foreclosure cases.</u>**

This takes a wee bit of unpacking. The pooling and servicing agreement, which governs who does what when in a mortgage securitization, requires the note to be endorsed (just like a check, signed by one party over to the next), showing the full chain of title, and the minimum conveyance chain is A (originator) => B (sponsor) => C (depositor) => D (trust). The note, which is the borrower's IOU, is the critical document in 45 states. The mortgage, which is the lien, is a mere accessory to the note and can be enforced only by the proper note holder (the legalese is "real party of interest"). The required endorsements were never done.

*PARAGRAPH 1.*



**RIKARD & MOSES, LLC**
Attorneys and Counselors at Law

ROBERT G. RIKARD
rgr@rmlawsc.com

MARION M. MOSES
mmoses@rmlawsc.com

ALLYSON M. CARBAUGH
acarbaugh@rmlawsc.com

BRIAN DEQUINCEY NEWMAN
bnewman@rmlawsc.com

1803 Hampton Street
Columbia, SC 29201

Post Office Box 5640
Columbia, SC 29250

tel: 803.978.6111
fax: 803.978.6112
web: rmlawsc.com

September 22, 2010

<u>**VIA FACSIMILE (576.1865) AND U.S MAIL**</u>
The Honorable Joseph M. Strickland
Richland County Master In Equity
Post Office Box 192
Columbia, South Carolina  29202

      **RE:**    **Deutsche Bank Trust Company Americas as Trustee for RALI
2004QA6 v. Robert M. LaFitte, Elizabeth Bowen LaFitte, USAA
Federal Savings Bank, Gregg Park Homeowners Association
Civil Action Number: 2010-CP-40-0983**

Dear Judge Strickland,

      Enclosed please find an article in the Washington Post that appeared in today's paper. I have forwarded this to as a follow-up to our Motion to Reconsider the Continuance of this matter because the details outlined in the article are almost identical to the concerns that we raised in our Motions in this case. Specifically, the documents that are being created to assist in foreclosures, such as LaFitte, are believed to be fraudulent and contrary to the laws of judicial foreclosure states.

      As you can see from the article, Ally Financial formerly known as GMAC Mortgage has suspended foreclosures in 23 judicial foreclosure states this week, including South Carolina. As stated in our Motion to Reconsider yesterday, GMAC was the servicer on the Lafitte loan prior to the filing of the foreclosure.

      As you can see from the article, Jeffrey Stephan, the head of Ally's/GMAC's foreclosure document processing team, has testified that he did not insure that judicial proceedings were legally justified and that the information contained within them was accurate.

This is applicable to our case because the Plaintiff in this matter has submitted an Affidavit by an individual named John Kerr with the title of "Limited Signing Officer" for the Plaintiff in this case. I have attached his Affidavit to this letter. You can see that the Affidavit originates from Fort Washington, Pennsylvania.

We have information to believe that John Kerr works in the same office that Mr. Jeffrey Stephan works in at Ally/GMAC as Mr. Stephan's office is in that area of Pennsylvania and through depositions and documents in other cases, we believe that Mr. Kerr is a part of a document execution team not only for the Plaintiff but for other foreclosure Plaintiffs around the country.

What we have learned through the investigation of this case and others is that these documents preparers, such as Mr. Kerr, execute documents prepared by others without any firsthand knowledge of the facts contained within his affidavit. As a result of the revelation that these are sham affidavits GMAC has ordered foreclosures halted in 23 states just this week.

That is why discovery in this case is so crucial and why Summary Judgment should not be heard until we have had the opportunity to do discovery.

As you will recall, I have asked to take the deposition of Ms. Judy Faber in this case. Ms. Faber has testified previously in a deposition that she is "vice president and director of residential funding corporation or residential funding company, LLC and GMAC Mortgage Company, LLC." As you will recall that Ms. Faber "signed" the only document in this case that purports to transfer title to the Plaintiff in this matter. Her "signature" is not a signature at all, but rather a stamp.

I have another allonge that Ms. Faber "stamped" in another case in Alabama for a completely different Plaintiff when an allonge was needed after title for foreclosure had been challenged. Upon information and belief, Judy Faber has instructed document custodian's in thousands of foreclosure cases to apply her stamped endorsement bearing her name after foreclosure was commenced to an allonge and after a consumer had challenged the chain of title in this case. Upon information and belief, Ms. Faber and her document custodian team at facilities described in the Washington Post article attached to this letter have fabricated and changed the title in thousands of foreclosure cases.

Ms. Faber previously testified in a deposition in another case that there is a stamp such as the one in this case that bears her endorsement and has been in use since 1999 in foreclosure cases and she has testified that she instructs records custodians to endorse notes and/or allonges in foreclosure cases when needed.

I want the Court to understand that we are not requesting a continuance to delay this matter, we are requesting a continuance based on the information we have gathered and now documented and reported in the Washington Post that companies such as the Plaintiff are committing serious misconduct related to the way that they

foreclose on homes in South Carolina and discovery needs to be conducted to develop the record in this case.

Further, based on the moratorium of foreclosures in judicial states including South Carolina, we believe it is inappropriate to continue the foreclosure proceedings. I have attached the GMAC memo instructing all GMAC agents to cease activity in South Carolina. This is a confidential memo that was leaked to the press and was never meant to be seen by the public.

Therefore, based on our Motion to Reconsider yesterday and the Washington Post article attached hereto and the issues raised therein, I would request an immediate telephone status conference in this case.

Sincerely,

Robert G. Rikard

RGR/bjt
Enclosure(s)
Cc:    Robert M. Lafitte (via U.S. Mail)
       Gregg Park Homeowners Association (via U.S. Mail)
       Elizabeth Polk, Esquire (via fax, 252.3346 and U.S. Mail)
       John Hearn, Esquire (via fax, 343.7013 and U.S. Mail)

PARAGRAPH (A)   CLAIM #4702

Page 1

1   STATE OF INDIANA          MARION COUNTY SUPERIOR COURT

2   COUNTY OF MARION        CAUSE NO.: 49D06-0703-MF-013045
                   consolidated with: 49D10-0609-PL-40167

3   ------------------------------------------------------------

4   U.S. Bank, NA as Trustee,

5              Plaintiff(s),

6       vs.                                      COPY

7   Mamie Robinson, Individually
    and as Personal Representative
8   of Jessie Robinson,

9              Defendant.
    ------------------------------------------------------------

10

11                 DEPOSITION TRANSCRIPT OF

12                      JUDY FABER

13                   August 14, 2009

14                    10:10 A.M.

15                       at

16

17                   GMAC RFC, LLC
                One Meridian Crossings
18           Minneapolis, Minnesota   55423

19

20

21

22

23

24

25   REPORTED BY:   Janet D. Winberg, RPR

AIK # 4702

**Page 1**

```
 1  STATE OF INDIANA        MARION COUNTY SUPERIOR COURT
 2  COUNTY OF MARION       CAUSE NO.: 49D06-8703-MF-013045
                           consolidated with: 49D10-0609-PL-40147
 3  -------------------------------------------------------
 4  U.S. Bank, NA as Trustee,
 5                  Plaintiff(s),
 6        vs.
 7  Mamie Robinson, Individually
    and as Personal Representative
 8  of Jessie Robinson,
 9                  Defendant.
    -------------------------------------------------------
10
11           DEPOSITION TRANSCRIPT OF
12                   JUDY FABER
13              August 14, 2009
14                 10:10 A.M.
15                      at
16             GMAC RFC, LLC
17          One Meridian Crossings
           Minneapolis, Minnesota 55423
18
19
20
21
22
23
24
25  REPORTED BY: Janet D. Winberg, RPR
```

CHASER COURT REPORTING
Phone (612) 986-5960 ** Fax (952) 226-1784 ** chaserreporting@aol.com

**Page 2**

```
APPEARANCES:
    On Behalf of the Plaintiff(s):
 3      Christine M. Jackson
        Chris Jackson Law, LLC
 4      8555 Cedar Place Drive
        Suite 111-A
 5      Indianapolis, IN 46240
        chris@chrisjacksonlaw.com
 6
        On Behalf of the Defendants:
 7
        James R. Boyers
 8      Wooden & McLaughlin, LLP
        211 North Pennsylvania
 9      One Indiana Square
        Suite 1800
10      Indianapolis, IN 46204
        jboyers@woodmclaw.com
11
        Also Present:
12
        Kathy Priore
13      Christine Bean
14
15
16
17
18
19
20
21
24
```
NOTE: Pursuant to Minnesota Rule of Civil Procedure
      30.06, the original transcript will be
      delivered to the noticing party.

NOTE: Exhibits 1 - 8 were marked.

CHASER COURT REPORTING
Phone (612) 986-5960 ** Fax (952) 226-1784 ** chaserreporting@aol.com

**Page 3**

```
 1
 2  By Mr. Boyers: 174 - 176, 181 - 181
 3  By Ms. Jackson: 4 - 174, 77 - 181
 4
 5                    OBJECTION INDEX
 6  Mr. Boyers: 9, 16, 18, 28, 68, 77, 88, 99, 107, 113,
    124, 125, 129, 132, 142, 150, 151, 154, 164, 166
 7  -------------------------------------------------------
 8                     EXHIBIT INDEX
 9  Exhibit No. 1
10  (Purchase Advice)
    Marked........................4
11  Exhibit No. 2
12  (Interim Certification/Exception Report)
    Marked........................4
13  Exhibit No. 3
14  (Corporation Assignment of Mortgage)
    Marked........................4
15  Exhibit No. 4
16  (Complaint on Note and to Foreclose Mortgage...)
    Marked........................4
17  Exhibit No. 5
18  (Complaint on Note and to Foreclose Mortgage...)
    Marked........................4
19  Exhibit No. 6
20  (Note)
    Marked........................4
21  Exhibit No. 7
22  (Note)
    Marked........................4
23  Exhibit No. 8
24  (Affidavit of Judy Faber)
    Marked........................4
25
```
Phone (612) 986-5960 ** Fax (952) 226-1784 ** chaserreporting@aol.com

**Page 4**

```
 1              PROCEEDINGS
 2
 3        (Exhibits 1 - 8 marked.)
 4                * * *
 5        (Witness sworn.)
 6                JUDY FABER,
 7      called as a witness, being first duly sworn,
 8      was examined and testified as follows:
 9                * * *
10              EXAMINATION
11  BY MS. JACKSON:
12      Q.   Can you please say and spell your name for the
13           record?
14      A.   Judy Faber, F as in Frank.  A.  B as in Boy.
15           E-R.
16      Q.   And what is your current job position?
17      A.   I am a Vice President and a Director of
18           Residential Funding Corporation or Residential
19           Funding Company, LLC and GMAC Mortgage Company,
20           LLC.
21      Q.   Wow.
22      A.   Pretty impressive.
23      Q.   Does it all fit on your card?
24      A.   No.  I don't have cards.  Too expensive.
25      Q.   Really.
```

Claim # 4702

## Page 5

1    And how long have you worked for Residential
2  Funding Corporation?
3  A.  A little over 13 years.
4  Q.  Okay.  And when you first started with
5  Residential Funding Corporation what was your
6  first job?
7  A.  A Records Services Manager.
8  Q.  Okay.  And then at what time period did you move
9  to your new position?
10 A.  Well, it's the same position.
11 Q.  Okay.
12 A.  I received the title probably about a year after
13 I started.
14 Q.  Okay.  Did your job duties change?
15 A.  No.
16 Q.  Okay.  That makes it much easier.
17    Okay.  And then I just want to ask just a
18 little bit...
19    First of all, have you ever been deposed
20 before?
21 A.  Yes.
22 Q.  Okay.  So just briefly, if I say anything and
23 you don't understand it, --
24 A.  Uh-huh.
25 Q.  -- like I said, tell me and let me know.

## Page 6

1    I'm struggling, trying to understand some of
2  your terminology and stuff.  At times I'm just
3  trying to figure out how the process works.
4  A.  Okay.
5  Q.  If you need a restroom break, water break, any
6  kind of break, just let us know.  If I've asked
7  you a question I would just like you to finish
8  answering the question before you go.
9  A.  Okay.
10 Q.  And yesterday I forgot to tell the witness, but
11 make sure that you try to always answer either
12 Yes or No because the court reporter can't do
13 the Uh-huhs and, --
14 A.  Okay.
15 Q.  -- you know, head bobs.
16    So can you tell me just a little bit about
17 your educational background?
18 A.  I have an undergraduate degree from the
19 University of Minnesota --
20 Q.  Uh-huh.
21 A.  -- in business.
22 Q.  Okay.
23 A.  High school?
24 Q.  Well, yeah.  And did you have any other
25 education beyond your undergraduate?

## Page 7

1  A.  I do have a 2-year certificate, legal assistant
2  certificate --
3  Q.  Good.
4  A.  -- from North Hennepin Community College.
5  Q.  Okay.  And part of the reason that you have been
6  offered to testify today is that you are
7  supposed to have knowledge of how the documents
8  are handled from the beginning of the loan
9  process when the documents first come into RFC
10 and then through the point they may be
11 transferred over to another entity; --
12 A.  Right.
13 Q.  -- is that correct?
14    MR. BOYERS:  I'd just note an
15 objection --
16    MS. JACKSON:  Uh-huh.
17    MR. BOYERS:  -- because you talked about
18 the beginning of the loan process.
19    MS. JACKSON:  Uh-huh.
20    MR. BOYERS:  The beginning of the loan
21 process before anything comes in to GMAC.
22 Just for clarity.
23    So if you're asking about the process from
24 the time it comes in to RFC, that's fine, but
25 the way you asked it suggested that the

## Page 8

1  beginning of the loan process itself started
2  with RFC and that's a fact not in evidence.
3    MS. JACKSON:  Absolutely.
4  BY MS. JACKSON:
5  Q.  You don't think I was asking you about what
6  another company did that you have no knowledge
7  of, did you?
8  A.  (Nodding.)
9  Q.  Okay.
10    So we are talking about just your duties at
11 Residential Funding Corporation.
12 A.  Okay.
13 Q.  And if I get any acronyms mixed up, please stop
14 and correct me; okay?
15 A.  (Nodding.)
16 Q.  So if you could tell me your job...
17    Have your job duties changed from 2005 from
18 what you do now?
19 A.  Um...
20    MR. BOYERS:  Asked and answered.
21    MS. JACKSON:  Well, she said she did the
22 same thing for 13 years.  I don't know...
23    MR. BOYERS:  If you can answer, --
24    THE WITNESS:  Um...
25    MR. BOYERS:  -- you can answer.

---

**Page 9**

1 THE WITNESS: They have changed. I
2 guess I would say Yes.
3 MS. JACKSON: Okay.
BY MS. JACKSON:
Q. This is the other *Pre* thing we need to tell you
6 about depositions.
7 At various points in time Jim Boyers, with
8 an S, may go ahead and object and that has to do
9 with literally if we can use the information
10 later on, when everybody is basically noting it
11 for the objection.
12 Most of the time he's going to allow you to
13 answer the question. I mean he will tell you
14 specifically, *"Do not answer that,"* if not. So
15 a lot of times there will be objections, but we
16 will just kind of continue on.
17 BY MS. JACKSON:
18 Q. So can you tell me what your job duties were in
19 2005?
20 A. Well, in 2005 I directly managed people that did
21 the work.
22 In 2007 all those people were released and
23 the functions went to a vendor who does the work
24 for us now. So I now manage the vendor as
25 opposed to directly managing people.

---

**Page 10**

1 Q. And when you say you managed people who did the
2 work, what type of work are we talking about?
3 A. Work around managing both the origination files,
4 as they were received by the organization and
5 the collateral files as they were received by
6 the organization. And then also fulfillment of
7 requests, internal requests, external requests
8 for those documents or files.
9 Q. Okay. And you just made a distinction between
10 original files and custodial files. Can you
11 explain to me...
12 A. I don't think I --
13 MR. BOYERS: Could you read back her
14 answer, please?
15 (Record read.)
16 MS. JACKSON: Thank you.
17 BY MS. JACKSON:
18 Q. The difference between the origination files and
19 the collateral files.
20 A. Uh-huh.
21 Q. Can you explain to me -- I mean you made a
22 distinction between the two, --
23 A. Okay.
24 Q. -- so can you tell me what the difference is?
25 A. An origination file, which we also call a credit

---

**Page 11**

1 file, would be the documents that are used by
2 the underwriter, by the processor, to make the
3 decision as to whether they want to fund the
4 loan or not.
5 Q. Okay.
6 A. The collateral file/legal file we refer to
7 the folder that contains the original Note and
8 copies of the mortgage and assignments, if any.
9 The legal file/collateral file is what is
10 held at the custodian.
11 The legal -- or the credit file is what's
12 held at off-site storage.
13 Q. And was -- in 2005 was the legal file held off
14 site or was it still here at this location?
15 MR. BOYERS: At what point in the --
16 MS. JACKSON: 2005.
17 MR. BOYERS: In the process, though. At
18 what point in the process are you asking about?
19 MS. JACKSON: In 2005.
20 BY MS. JACKSON:
21 Q. In 2005 were the collateral files still
22 maintained here at Residential Funding
23 Corporation by the custodian, as opposed to
24 off site?
25 MR. BOYERS: If you understand the

---

**Page 12**

1 question, you can answer.
2 My objection is not to the year you're
3 asking about, --
4 MS. JACKSON: Uh-huh.
5 MR. BOYERS: -- but to at what point in
6 the process are you talking about.
7 MS. JACKSON: At what point in the
8 process.
9 BY MS. JACKSON:
10 Q. Well, let's just start at the beginning.
11 So a file comes in from -- and how do you
12 want me to refer to -- in this particular case
13 the loan originator was Mercantile Mortgage. So
14 I want to refer to that type of entity.
15 A. Okay.
16 Q. Do you call them loan originators? Or what do
17 you --
18 A. Or clients.
19 Q. Clients. Okay.
20 Okay. So when a client file comes in...
21 A. (Gesturing.)
22 Q. No, that doesn't?
23 A. No -- yeah, it's very difficult to answer to the
24 extent that we had different processes for
25 different clients and it's hard -- I didn't

**Page 145**

1    or the signing of the endorsements and then the
2    date that they actually completed it.
3    Q.    Okay. All right. The Interim Certification
4         would also provide information about exceptions
5         to Notes?
6    A.    Um...
7    Q.    And just --
8    A.    Correct. Right.
9    Q.    And just for your ease, I'm going to --
10   A.    I think that was Exhibit 2.
11             MS. JACKSON: Exhibit 2.
12             MR. BOYERS: Yes.
13   BY MR. BOYERS:
14   Q.    Exhibit 2 is a copy of the Interim
15         Certification, which...
16             When you were talking about the Interim
17         Certification, is this an example of that?
18   A.    This is the detail behind it. There was another
19         piece of the Interim Certification that talked
20         about the stamping and endorsing piece that's
21         not included here.
22   Q.    Okay. Okay.
23   A.    But again, that was a summary, it wasn't a
24         detail.
25   Q.    Okay. Now this Exception Report, though, only

**Page 147**

1    some mortgage assignments and the use of the
2    trustee's name on mortgage assignments; do you
3    recall that?
4    A.    Yes.
5    Q.    Okay. To this day does Residential Funding
6         Company continue to endorse -- or I'm sorry --
7         prepare assignments which show the name of the
8         trustee?
9    A.    Yes.       .
10   Q.    Okay. And you testified earlier only in a few
11         limited jurisdictions is the actual security
12         identified by name?
13   A.    Correct.
14   Q.    Okay.
15   A.    And that's a very recent development.
16   Q.    Okay. Now she also asked you some questions
17         about assignments, preparing the assignments
18         and asked about the information that was put in
19         the mortgage assignment.
20             Whoever requested that an assignment be
21         prepared, was your department responsible for
22         independently verifying that the information
23         provided in that assignment was correct?
24   A.    Yes.
25   Q.    And that verification was based on the data

**Page 148**

1    identified those -- it identified those loans
2    for which something had not been completed?
3    A.    Correct.
4             MS. JACKSON: Objection. She didn't
5         prepare that document, so...
6    BY MR. BOYERS:
7    Q.    Your understanding of what this report provides
8         from Wells Fargo, as part of the standard
9         procedure, was the loans in which exceptions
10         remained to be resolved?
11   A.    Correct.
12   Q.    Okay. And then with respect to Exhibit 9, you
13         again testified that you didn't recall the
14         specific act of signing this affidavit; is that
15         your signature?
16   A.    Correct, it is.
17   Q.    And is that your handwriting --
18   A.    Yes.
19   Q.    -- with the date there?
20   A.    Yes.
21   Q.    And would you have signed this if the
22         information was not true and correct?
23   A.    No, I would not.
24   Q.    Okay. Ms. Jackson asked you some questions
25         about the use of the name of the actual trust on

**Page 148**

1    maintained on the specific loan?
2    A.    Yes.
3             MR. BOYERS: I don't have any further
4         questions.
5             MS. JACKSON: I just have a real quick
6         follow-up, since you introduced Exhibit 2. I
7         think we referred to that as an *Exception Sheet,*
8         *Exception Log.*
9             MR. BOYERS: I think it was called an
10         *Interim* --
11             MS. JACKSON: No, that was --
12             MR. BOYERS: -- *Certification Report.*
13             MS. JACKSON: But that's not -- you said
14         that was the backup -- backup information and
15         there was another document that went to it that
16         was the Interim Certification.
17             I think she said -- she said this was a
18         detail...
19             THE WITNESS: The --
20                 FURTHER EXAMINATION
21   BY MS. JACKSON:
22   Q.    I guess what is this report?
23   A.    This is a -- I would call this the *Exception,*
24         the *Interim Exception Report.*
25   Q.    Okay.

**Page 149**

1  A.  What Wells calls it, I'm not sure. That's what

2     I would call it.

3  Q.  Okay. That's how we'll call it, too.

4     This *Interim Exception Report*, when your

5     department received it, did it require that you

6     do anything with that information?

7  A.  This was not in my department.

8  Q.  Okay. Do you know what department it went to?

9  A.  It was another area within Records.

10  Q.  Do you know what they called it?

11  A.  Deal Support.

12  Q.  Deal Support?

13  A.  Well, no. Panel Certification.

14  Q.  Okay. Okay. And when you said that Wells Fargo

15     provided you Interim Certifications, were you

16     required to do anything with that information?

17  A.  Again, what they provided to me --

18  Q.  Uh-huh.

19  A.  -- was the report that showed them where they

20     were at as far as the endorsement stamping. It

21     was tied to the *Interim*. They did the stamping

22     and endorsing when they reviewed the file for

23     the Interim Certification.

24  Q.  Okay. And is that the report that you were

25     talking about where they told you if there was a

**Page 150**

1     percentage done for it?

2  A.  Correct.

3  Q.  Okay. And was there any way to determine from

4     the report whether a specific loan was stamped

5     or not?

6     MR. BOYERS: Object to the form of the

7     question. You're asking her if there's any way.

8     MS. JACKSON: Right.

9     MR. BOYERS: I think you're asking her

10    about her personal knowledge; right? And

11    you're -- therefore, if you're saying is there

12    any way, you're asking for opinion.

13     MS. JACKSON: Okay.

14     MR. BOYERS: She can answer, but I'm

15    just going to object.

16     Go ahead.

17     MS. JACKSON: On this particular

18    report --

19     MR. BOYERS: Pointing to Exhibit 2.

20  BY MS. JACKSON:

21  Q.  Exhibit 2. Is there any way to tell which one

22     has the Notes endorsed and which one does not?

23  A.  If they were not endorsed, --

24  Q.  Uh-huh.

25  A.  -- they would have shown up as an exception on

**Page 151**

1     here.

2  Q.  Okay.

3  A.  So, yes, there is a way.

4  Q.  Okay. And outside of receiving the Interim

5     Certificate and noting the progress, was there

6     anything else you had to do with that

7     information, your department, your Records

8     Department?

9  A.  No.

10  Q.  Okay.

11     MS. JACKSON: (Nodding.)

12     THE WITNESS: That's it.

13     MS. JACKSON: That's it.

14     (Discussion had off the record.)

15     MR. BOYERS: The witness will read and

16    sign her transcript.

17     (Concluded at 2:48 P.M.)

18     • • •

19

20

21

22

23

24

25

**Page 152**

1  STATE OF MINNESOTA  )

2              : ss  CERTIFICATE

    COUNTY OF WASHINGTON )

3     I, Janet D. Winberg, hereby certify

    that I reported the deposition of JUDY FABER, on

4    the 14th day of August, 2009, in Minneapolis,

    Minnesota, and that the witness was, by me,

5    first duly sworn to tell the truth;

6    That the testimony was transcribed by me and is

    a true record of the testimony of the witness;

7

    That I am not a relative, or employee, or

8    attorney, or counsel of any of the parties; or a

    relative or employee of such attorney or

9    counsel;

10    That I am not financially interested in the

    action and have no contract with the parties,

11    attorneys or persons with an interest in the

    action that affects or has a substantial

12    tendency to affect my impartiality;

13    That the right to read and sign the transcript

    by the witness was reserved.

14

15  WITNESS MY HAND AND SEAL THIS 31st day of

    August, 2009.

16

17              JANET D. WINBERG

              Registered Professional Reporter

18             Notary Public

              Washington County, Minnesota.

19

20
21
22
23
24
25

9/22/2010                         Ally Financial legal issue with foreclosur...

# The Washington Post

PARAGRAPH 10.

## Ally Financial legal issue with foreclosures may affect other mortgage companies

By Ariana Eunjung Cha
Washington Post Staff Writer
Wednesday, September 22, 2010; 5:37 AM



Some of the nation's largest mortgage companies used a single document processor who said he signed off on foreclosures without having read the paperwork - an admission that may open the door for homeowners across the country to challenge foreclosure proceedings.

The legal predicament compelled Ally Financial, the nation's fourth-largest home lender, to halt evictions of homeowners in 23 states this week. Now it appears hundreds of other companies, including mortgage giants Fannie Mae and Freddie Mac, may also be affected because they use Ally to service their loans.

As head of Ally's foreclosure document processing team, 41-year-old Jeffrey Stephan was required to review cases to make sure the proceedings were legally justified and the information was accurate. He was also required to sign the documents in the presence of a notary.

In a sworn deposition, he testified that he did neither.

The reason may be the sheer volume of the documents he had to hand-sign: 10,000 a month. Stephan had been at that job for five years.

How the nation's foreclosure system became reliant on the tedious work of a few corporate bureaucrats is still a matter that mortgage lenders are trying to answer. While the lenders may have had legitimate cause to foreclose, the mishandling of the paperwork has given homeowners ammunition in their fight against foreclosure and has drawn the attention of state law enforcement officials.

Ally spokesman James Olecki called the problem with the documents "an important but technical defect." He said the papers were "factually accurate" but conceded that "corrective action" may have to be taken in some cases and that others may "require court intervention."

Olecki said the company services loans "from hundreds of different lenders," but he declined to provide names.

Spokesmen for Fannie and Freddie confirmed Tuesday after inquiries from The Washington Post that they use Ally, formerly called GMAC, to oversee some mortgages. The companies have launched internal reviews to assess the scope of any potential issues.

Ally, Fannie and Freddie - all troubled mortgage companies that received extraordinary bailouts by the federal government during the financial crisis - declined to say how many loans might be affected. The Treasury Department, which owns a majority stake in Ally and seized Fannie and Freddie in 2008, also declined to

comment.

Fannie and Freddie, created by Congress to finance mortgages and encourage homeownership, have in recent years been repossessing houses at record numbers. Fannie alone reported recently that 450,000 of its single-family loans were seriously delinquent or in the foreclosure process as of June 30. That's nearly 5 percent of the loans it guarantees.

Lawyers defending homeowners have accused some of the nation's largest lenders of foreclosing on families without verifying all of the information in a case, but it has been hard for them to stop foreclosure proceedings.

Ally's moratorium comprises only the 23 states - none in the Washington area - that mandate a court judgment before a lender can take possession of a property. But if Stephan signed documents related to foreclosures in states without this requirement (it's unclear whether he did), it could help a much broader range of borrowers.

Iowa Assistant Attorney General Patrick Madigan, chair of a national foreclosure prevention group composed of state attorneys general and lenders, said the fallout from the Ally review could be enormous because Stephan's actions could be considered an unfair and deceptive practice.

"If servicers are submitting court documents that aren't true or that have not been verified, that is of great concern," Madigan said.

Stephan's job at Ally was arguably one of the least enviable in the mortgage business: formally signing off on foreclosure papers that his company would submit to the courts to get approval to evict delinquent homeowners and resell their homes.

From his office in suburban Philadelphia, Stephan oversaw a team of 13 employees that brought documents to him for his signature at a rapid clip. Stephan did not respond to messages left at his work and home.

His official title was team leader of the document execution unit of Ally's foreclosure department, but consumer advocates call him the company's "super robot signor" or "affidavit slave."

In sworn depositions taken in December and June for two separate court cases involving families trying to keep their homes, Stephan revealed his shortcuts when reviewing the files. He said he would glance at the borrower's names, the debt owed and a few other numbers but would not read through all the documents as legally required. He would then sign them. The files were packed up in bulk and sent off for notarization several days later.

Stephan testified he did not know how the "summary judgment" affidavits he signed were used in judicial foreclosure cases.

At the rate Stephan was reviewing files, if he worked an eight-hour day he would have had an average of only 1.5 minutes for each document.

"A ridiculous amount of time for something so critically important," said Thomas Cox, an attorney in Maine who was one of those who deposed Stephan. He added that Maine and Florida law enforcement officials are investigating the matter.

Stephan was the only employee signing papers for foreclosures that were to be submitted to courts that did not involve bankruptcies. The latter cases, which were more complex, were handled by a separate department.

# Improper GMAC Affidavits Leading to Charges of Document Fabrication to Change Title

Ah, what a tangled web we weave when first we practice to deceive, said the bard.

And the web emanating from the GMAC affidavit improprieties extend much further than most may realize. Although GMAC continues to maintain that having its "robot signor" officers like Jeffrey Stephan provide affidavits on matters they know nothing about is a mere technical problem that they can remedy. In fact, an affidavit is a statement of someone with personal knowledge of a matter. Stephan signed as many as 10,000 documents a month and clearly could not have personal knowledge of the underlying situations. Deliberately preparing and submitting inaccurate documents in a legal proceeding is a fraud on the court, something most judges really really do not like.

Predictably, lawyers who are contesting foreclosures are jumping on the affidavit issue and using it to open up broader issues with foreclosures where GMAC was the servicer of the loan. For instance, this letter to a judge in South Carolina, a judicial foreclosure state, discusses not only the role of an apparent fellow robot signor of Stephan, one Jack Kerr, but more critically, another document provided in this case stamped (not signed) by one Judy Faber, also of GMAC. The Faber document transferred title to the party foreclosing in the case, so if the document is invalid, the plaintiff, in this case a Deutsche Bank trust, will lack standing to foreclose (legalese for "no tickie, no laundry"). Here is the critical section of the letter (on page 2):

> *Upon information and believe, Judy Faber has instructed document custodians in thousands of foreclosure cases to apply her stamped endorsement bearing her name after foreclosure commenced to an allonge and after a consumer had challenged the chain of title in the case. Upon information and belief, Ms. Faber and her document custodian team at facilities described in the Washington Post article attached to this letter have fabricated and changed title in thousands of foreclosure cases.*

This takes a wee bit of unpacking. The pooling and servicing agreement, which governs who does what when in a mortgage securitization, requires the note to be endorsed (just like a check, signed by one party over to the next), showing the full chain of title, and the minimum conveyance chain is A (originator) => B (sponsor) => C (depositor) => D (trust). The note, which is the borrower's IOU, is the critical document in 45 states. The mortgage, which is the lien, is a mere accessory to the note and can be enforced only by the proper note holder (the legalese is "real party of interest").

The wee problem is that this apparently never done (I've been told one person trying to track down a particular note found it, at Countrywide. The guy who wandered down the corridor to produce it from his files claimed that Countrywide kept all the notes on its deals, and would send them out on request when someone needed them in a foreclosure. If this is true, it indicates there are pervasive and not readily remedied problems. The required endorsements were never done).

Why is this serious? The cure for the mortgage documents puts the loan out of eligibility for the trust. In order to cure, on a current basis, they have to argue that the loan goes retroactively back into the trust. This is the cure that the banks have been unwilling to do, because it is a big problem for the MBS. So instead they forge and fabricate documents.

The letter in particular mentions an allonge. An allonge is a separate sheet of paper which is attached to a note to allow for more signatures, in this case, endorsements, to be added. Allonges have had a way of magically appearing in collateral files while trails are in progress (I've seen it happen in cases I was tracking; it's gotten so common that some attorneys warn judges to be on the alert for "ta dah" moments).

The wee problem with an allonge miraculously being discovered is that the allonges that show up are inherently in violation of UCC (Uniform Commercial Code) provisions (UCC has been adopted by all states, a few states have minor quirks, but the broad provisions are very similar).

An allonge is NOT to be used unless all the space on the original note, including the margins and the back side of pages, has been used up. This is never the case. Second, an allonge has to be so firmly attached to the original document as to be inseparable. Thus an allonge suddenly being discovered is an impossibility (well impossible if it were legit), yet it seems to happen all the time.

So as much as GMAC and its fellow servicers no doubt hope there little document mess will fade from public view, attorneys are using it as a new weapon to fight questionable foreclosures or force servicers to negotiate principal mods, which investors like Wilbur Ross (the antithesis of a charity, he's a very successful distressed investor) have found to be a win/win.

TRI-COUNTY
WILL CALL
WATSON TITLE & INSURANCE, INC.

WATSON TITLE INSURANCE, INC.
1800 N.W. 89th ST.
SUITE 120
FT. LAUDERDALE, FL 33309

RECORD AND
RETURN TO

CFN 2007R0084035
OR Bk 25305 Ps 0654i (1ps)
RECORDED 01/25/2007 08:40:02
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA
LAST PAGE

CLAIM #4702
PARAGRAPH 2.

CORPORATION ASSIGNMENT of MORTGAGE

Return To:
RESIDENTIAL FUNDING COMPANY, LLC
One Meridian Crossings
Minneapolis, MN 55423

MIN: 100086600105003521        MERS Phone: 1-888-679-6377
RFC Loan Number: 10624849
Seller Loan Number: 10500352
FOR VALUE RECEIVED, Mortgage Electronic Registration Systems, Inc. ("MERS")
AS NOMINEE FOR PLATINUM CAPITAL GROUP

the undersigned hereby grants, assigns and transfers to

Deutsche Bank Trust Company Americas as Trustee

3 Park Plaza, 16th Floor, Irvine, CA 92714-8505

all beneficial interest under that certain Mortgage dated 04/27/2006
executed by THOMAS DIAZ

TO/FOR:    THE UNDERSIGNED

and recorded in Book 24526 on Page 3829 as Instrument No. _____ on 5/15/2006 of official
Records in the County Recorder's Office of MIAMI-DADE County, Florida.

LEGAL:    AS IN MORTGAGE REFERENCED HEREIN

MORTGAGE AMOUNT: $1,000,000.00
PROPERTY ADDRESS:    5200 SOUTHWEST 122ND AVENUE MIAMI, FL 33175
TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon with interest,
and all rights accrued or to accrue under said Mortgage.

Mortgage Electronic Registration Systems, Inc. ("MERS")

STATE OF        Minnesota )        BY: _Matt Favorite_
COUNTY OF        Hennepin )        NAME: Matt Favorite
                                    TITLE: Vice President

On 10/26/2006 before me, the undersigned, a Notary Public in and for said State personally appeared Matt Favorite, Vice
President of Mortgage Electronic Registration Systems, Inc. ("MERS") personally known to me to be the person whose
name is subscribed to the within instrument and acknowledged to me that s/he executed the same in his/her authorized
capacity, and that by his/her signature on the instrument the entity upon behalf of which the person acted, executed the
instrument. WITNESS my hand and official seal.

_Karen E. Steffensen_
Notary Public in and for said State

Prepared 10/26/2006 by Matt Favorite, Residential
Funding Company, LLC, One Meridian Crossings,
Suite 100, Minneapolis, MN 55423, (952) 979-4000.

KAREN E. STEFFENSEN
NOTARY PUBLIC-MINNESOTA
MY COMMISSION EXPIRES 1-31-2010

06-C 296

IN THE C⎯⎯JIT COURT OF THE
11TH JUDICIAL CIRCUIT, IN AND FOR
DADE COUNTY, FLORIDA
CIVIL DIVISION
CASE NO.:

DEUTSCHE    BANK    TRUST    COMPANY
AMERICAS AS TRUSTEE,
                    Plaintiff,

vs.

TOMAS DIAZ;   BENEFICIAL FLORIDA, INC.;
MORTGAGE    ELECTRONIC    REGISTRATION
SYSTEMS, INCORPORATED AS NOMINEE FOR
PLATINUM CAPITAL GROUP (MIN# 1000866-
0010500365-3); UNKNOWN SPOUSE OF TOMAS
DIAZ; JOHN DOE; JANE DOE AS UNKNOWN
TENANT (S) IN POSSESSION OF THE SUBJECT
PROPERTY,
                    Defendants.
_____

**06 - 23 0 56 CA 1 1**

**PARAGRAPH 3.**



## COMPLAINT

The Plaintiff, DEUTSCHE BANK TRUST COMPANY AMERICAS AS TRUSTEE, sues the Defendants named in the caption hereof and alleges:

## COUNT I

1.    This is an action to reestablish a promissory note under Section 673.3091 Florida Statutes.

2.    On April 27, 2006 at DADE County, Florida, TOMAS DIAZ executed and delivered to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INCORPORATED AS NOMINEE FOR PLATINUM CAPITAL GROUP, a promissory note in the principal amount of $ 1,000,000.00. Attached hereto is a substantial copy of the note.

3.    Plaintiff is the owner of said note.

4.    The original promissory note was lost or destroyed subsequent to Plaintiff's acquisition thereof, the exact time and manner of said loss or destruction being unknown to Plaintiff.

5.    Plaintiff was in possession of the promissory note was entitled to enforce it when loss of possession occurred.

6.    The loss of possession was not the result of a transfer by Plaintiff or a lawful seizure.

7.    Plaintiff cannot reasonably obtain possession of the promissory note because its whereabouts cannot be determined. Said note is not in the custody or control of Plaintiff.

8.    The Defendants named in this Complaint are the only persons known to Plaintiff who are interested for or against reestablishment of the subject note.

06-09296
0441375243

9.   Plaintiff agree   ie entry of a Final Judgment of Mortgage Foi   ure requiring it indemnify and hold harmless the Defendant obligor(s) of the promissory note by reason of a claim by another person/entity attempting to enforce the lost note herein.

WHEREFORE, Plaintiff demands that this court re-establish the Lost Promissory Note.

## COUNT II

10.   This is an action to foreclose a mortgage on real property in DADE County, Florida.

11.   On April 27, 2006, TOMAS DIAZ executed and delivered a promissory note and Mortgage securing payment of the same to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INCORPORATED AS NOMINEE FOR PLATINUM CAPITAL GROUP, which mortgage was recorded in Official Records Book 24526, Page 3829, of the Public Records of DADE County, Florida and which mortgaged the property described therein, then owned by and in possession of said mortgagor. A copy of the note and mortgage are attached hereto and made a part hereof.

12.   Plaintiff owns and holds the note and mortgage.

13.   Defendant(s), TOMAS DIAZ, own(s) the property.

14.   There has been a default under the note and mortgage held by Plaintiff in that the payment due August 1, 2006 and all subsequent payments have not been made. Plaintiff declares the full amount due under the note and mortgage to be now due.

15.   All conditions precedent to the filing of this action has been performed or has occurred.

16.   There is now due, owing and unpaid to the Plaintiff as of the date of the filing of this complaint the following amounts on principal of said note and mortgage: unpaid principal balance: $997,798.80, plus interest, escrow, title search expenses for ascertaining necessary parties to this suit, title search, title exam, filing fee, and attorneys fees and costs.

17.   Plaintiff has obligated itself to pay the undersigned attorneys a reasonable fee for their services herein. Pursuant to the loan documents plaintiff is entitled to an award of attorney fees.

18.   Defendant, JOHN DOE AND JANE DOE, As Unknown Tenant(s) In Possession of the Subject Property, may claim some interest in or lien upon the subject property arising from being in actual possession of same, but interest, if any, is subject and inferior to the lien of Plaintiff's mortgage.

19.   The Defendant, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INCORPORATED AS NOMINEE FOR PLATINUM CAPITAL GROUP (MIN# 1000866-0010500365-3) may claim some interest in or lien upon the subject property by virtue of Mortgage, which is recorded at Official Records Book 24526, Page 3851 of the Public Records of DADE County. Said interest, if any, is subject and inferior to the lien of Plaintiff's mortgage.

20.   The Defendant, BENEFICIAL FLORIDA, INC. may claim some interest in or lien upon the subject property by virtue of Mortgage, which is recorded at Official Records Book 24618, Page 2490 of the Public Records of DADE County. Said interest, if any, is subject and inferior to the lien of Plaintiff's mortgage.

21.   The Defendant, U.   OWN SPOUSE OF TOMAS DIAZ may clai.   .ne interest in or lien upon the subject property by virtue of Any possible Homestead Interest.  Said interest, if any, is subject and inferior to the lien of Plaintiff's mortgage.

WHEREFORE, Plaintiff prays as follows:

(a)      That this Court will take jurisdiction of this cause, the subject matter and the parties hereto.

(b)      That this Court ascertain and determine the sums of money due and payable to the Plaintiff from the Defendant(s), including without limitation principal, interest, advances, attorney fees, and costs pursuant to the loan documents.

(c)      That the sum of money found to be due as aforesaid be decreed by this Court to be a lien upon the lands described in Plaintiff's mortgage.

(d)      That such lien be foreclosed in accordance with the rules and established practice of this Court, and upon failure of the Defendants to pay the amount of money found to be due by them to the Plaintiff, the said land be sold to satisfy said lien.

(e)      That this Court decree that the lien of the Plaintiff is superior to any and all right, title or interest of the Defendants herein or any person or parties claiming by, through or under them since the institution of this suit.

(f)      That all right, title or interest of the Defendants' or any person claiming by, through or under them be forever barred and foreclosed.

(g)      That this Court grant general relief in this cause as in its discretion might be just and proper including, but not limited to, a deficiency judgment if the proceeds of the sale are insufficient to pay Plaintiff's claim.

Law Offices of Marshall C. Watson, P.A.
1800 N.W. 49TH Street, Suite 120
Fort Lauderdale, FL 33309
Telephone: (954) 453-0365/1-800-441-2438
Facsimile: (954) 771-6052

By: _____
for:    Kathleen Angione, Esq.
        Bar Number: 175651

**NATALIE S. PAPPAS**
**FBN 26721**

IN THE CI    )T COURT OF THE
11TH JUDI  ..L CIRCUIT, IN AND FOR
DADE COUNTY, FLORIDA
CIVIL DIVISION
CASE NO.:

*PARAGRAPH 3.*
*06 - 23056CA11*

DEUTSCHE   BANK   TRUST   COMPANY
AMERICAS AS TRUSTEE,
          Plaintiff,

vs.

TOMAS DIAZ;  BENEFICIAL FLORIDA, INC.;
MORTGAGE  ELECTRONIC  REGISTRATION
SYSTEMS, INCORPORATED AS NOMINEE FOR
PLATINUM  CAPITAL  GROUP  (MIN# 1000866-
0010500365-3); UNKNOWN SPOUSE OF TOMAS
DIAZ; JOHN DOE; JANE DOE AS UNKNOWN
TENANT (S) IN POSSESSION OF THE SUBJECT
PROPERTY,
          Defendants.

_____

2006 OCT 31  PM 3:57  FILED

### CIVIL COVER SHEET

The civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form is required for the use of the Clerk of Court for the purpose of reporting judicial workload data pursuant to Florida Statute §25.075.

| Domestic Relations | Torts | Other Civil |
|---|---|---|
| Simplified dissolution | Professional Malpractice | Contracts |
| Dissolution | Products liability | Condominium |
| Support - IV-D | Auto negligence | ☒ Real property/ Mortgage foreclosure |
| Support - Non IV-D | Other negligence | Eminent domain |
| URESA - IV-D | Other | |

IS JURY TRIAL DEMANDED IN COMPLAINT?

Yes        ☒     No

Dated this ___31st___ day of ___October___, 2006.

Law Offices of Marshall C. Watson, P.A.
1800 N.W. 49TH Street, Suite 120
Fort Lauderdale, FL 33309
Telephone: (954) 453-0365/1-800-441-2438
Facsimile: (954) 771-6052

By:_____
*for:*    Kathleen Anglone, Esq.
       Bar Number: 175651

### NATALIE S. PAPPAS
### FBN 26721

06-09296
0441375243

*Claim # 4702*

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT, IN AND FOR
DADE COUNTY, FLORIDA
CIVIL DIVISION
CASE NO.: 06-23056 CA 11

*Paragraph 4.*

DEUTSCHE BANK TRUST COMPANY AMERICAS AS
TRUSTEE,
        Plaintiff,

vs.

TOMAS DIAZ, et al,
        Defendants.

---

### AFFIDAVIT OF INDEBTEDNESS

STATE OF _____MN_____ )
                    ) SS:
COUNTY OF __Dakota__ )

    BEFORE ME, the undersigned authority, personally appeared ___**Bethany Hood**___, who being duly sworn, deposes and says:

    1.    Affiant is _Default Services Junior Officer_ of the servicing agent of the Plaintiff and is personally familiar with the loan, which is owned by the Plaintiff and is the subject matter of this action. The information hereinafter given as to the indebtedness arising by virtue of the execution of the note and mortgage sued upon in this action is contained in the original books and records maintained in the office of said servicing agent. Affiant has personal knowledge of the books and records of the servicing agent and how they are maintained as they relate to the mortgage loan owned by Plaintiff. These books and records include data compilations of the payments, including escrow payments and advances made and received on the mortgage loan in question, and are kept in the course of a regularly conducted business activity by said servicing agent. The entries are made at or near the time that each payment is received by persons with knowledge of the information being recorded. It is the regular practice of said servicing agent to make these entries at the time the payments are received. Affiant has actual and personal knowledge of the facts stated herein and is authorized to make this Affidavit.

    2.    The    allegations    of    the    Complaint    filed    in    this    action    are    true    and    correct.

06-09296
0441375243

*CLAIM#4702*

3.    There is now due and owing to the Plaintiff upon said note and mortgage the following amounts:

| | | | |
|---|---|---|---|
| a. | Principal balance on note and mortgage | $ | 997,798.80 |
| b. | Accrued interest through from 8/1/06 to 12/20/06 (per diem: 222.11 ) | $ | 37,494.35 |
| c. | Restructured Interest | $ | |
| d. | Escrow: | $ | 2,639.67 |
| | Taxes | | |
| | Hazard Insurance | | |
| | Flood Insurance | 2,639.67 | |
| | Mortgage Insurance Premiums | | |
| e. | Pre-Acceleration Late Charges | $ | 517.68 |
| f. | Property Appraisal | $ | |
| g. | Property Inspections | $ | 9.00 |
| h. | Non-Sufficient Funds | $ | 15.00 |
| i. | Interest on Advances | $ | |
| j. | Brokers Price Opinion | $ | |
| k. | Bankruptcy Fees and Costs | $ | |
| l. | Property Preservation | $ | |
| m. | Escrow/Suspense Credit | -( $ | ) |

4.    On account of Defendants default under the note and mortgage sued upon herein, Plaintiff retained its attorney of record and instructed the filing of this action and agreed, bound and obligated itself to pay said attorney for his/her services on its behalf such sum as the Court shall adjudge to be reasonable.

_____
Affiant

Bethany Hood - Default Servicing
Junior officer

Sworn to and subscribed before me this
6 day of NOV , 2006.

_____
NOTARY PUBLIC, STATE OF MN
Commissioned Name of Notary Public James C. Morris
Personally known __X__ or produced identification _____
Type of Identification Produced _____

06-09296
0441375243

JAMES C. MORRIS
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES JAN. 31, 2009

## Brian Davies

| | |
|---|---|
| **From:** | Lynn Szymoniak [szymoniak@mac.com] |
| **Sent:** | Wednesday, October 20, 2010 6:16 PM |
| **To:** | Foreclosure Hamlet; Foreclosure Fraud; StopForeclosureFraud (DinSFLA); mortgagefrauds@aol.com; Deontos .is; JEFFREY BRODE; George Gingo; Adam Lamb; Lawrence J. Shapiro; adennis270@aol.com; Alina Virani; Ariane Ice; Brian Davies; Bruce Gittleman; Glenn Augenstien; Michael Olenick |
| **Subject:** | Please Circulate! |

*PARAGRAPH ⁴⁵ 5.*

Mortgage Fraud

Bethany Hood
Lender Processing Services, Inc.
MERS

Action Date: October 20, 2010
Location: South Bend, IN

On September 30, 2010, U.S. Bankruptcy Judge Harry C. Dees, Jr., Northern District of
Indiana, South Bend Division, confronted head-on the widespread practice of employees of
mortgage servicing companies signing Mortgage Assignments with false job titles, in Koontz v.
EverHome Mortgage and Mortgage Electronic Registration Systems, Inc., Case No. 09-30024,
Proc. No. 10-3005. In this contested foreclosure, EverHome and MERS moved for summary
judgment, while the plaintiff homeowners argued that there were genuine issues of material
fact that precluded summary judgment. One such issue involved a Mortgage Assignment signed by
Bethany Hood as Vice President of Mortgage Electronic Registration Systems, Inc. ("MERS").
(Regular readers of Fraud Digest will recognize that Bethany Hood is a clerical employee of
Lender Processing Services who works in the Mendota Heights, MN office and who signs
thousands of mortgage documents monthly using at least 20 different job titles.) Here is what
the Court said about this: "MERS, in its Answer to the plaintiff's Complaint, admit(ted) that
Bethany Hood is not an employee of MERS. (cite omitted). The debtor claimed that the document
[assignment signed by Bethany Hood as a MERS officer] was fabricated and MERS has offered no
other explanation, nor has it submitted properly authenticated documentation of an
assignment. It appears to this Court that a fraudulent recorded Assignment of Mortgage might
still be found today in the St. Joseph's County Recorder's Office, despite MERS' knowledge of
the false signature. Indeed, MERS has completely sidestepped the fact that this Assignment
was signed by someone representing herself to be a Vice President of MERS, and it has
declined to explain why this false document was attached to the amended Proof of Claim... In
the view of this court, the conduct of the EverHome defendants and the MERS defendant -
reflecting a lack of transparency and determination not to provide information or documents
until required - has burdened both the debtor and this Court...On this case, the Creditors
have been forced to admit that a non-employee signed the Assignment of Mortgage, representing
herself to be a Vice President of MERS and other banks or mortgage companies held the
Mortgage and or Note at issue... Having determined that genuine issues of material fact
exist, the Court denies the Motions for Summary Judgment filed by the EverHome defendants and
MERS..." How many other Mortgage Assignments signed by individuals falsely claiming to be
Vice Presidents of MERS have been filed since 2008? It is likely that the number is greater
than ten million.

*PARAGRAPH  6*

### Gregory N. Allen, 1/13/2010
Page: 1

**Page 1**

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | WESTERN DISTRICT OF WASHINGTON |
| 3 | AT SEATTLE |
| 4 | _____ |
| 5 | Kristin Bain, |
| 6 | Plaintiff, |
| 7 | vs.      Case No. 09-CV-00149-JCC |
| 8 | Metropolitan Mortgage Group, |
| 9 | Inc.; IndyMac Bank, FSB; Mortgage |
| 10 | Electronic Registration Systems; |
| 11 | Regional Trustee Service; |
| 12 | Lenders Processing Service, Inc., |
| 13 | Inclusive, |
| 14 | Defendants. |
| 15 | _____ |
| 16 | |
| 17 | DEPOSITION OF GREGORY N. ALLEN |
| 18 | Taken January 13, 2010, 2010 |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | CINDY L. SCHULTZ, RMR, CRR, CLR |
| 24 | PARADIGM REPORTING & CAPTIONING INC. |
| 25 | 612.339.0545 * 1.800.545.9668 * Fax 612.337.5575 |

**Page 2**

| | |
|---|---|
| 1 | The deposition of GREGORY N. ALLEN, taken on |
| 2 | January 13, 2010, commencing at 1:49 a.m., taken at |
| 3 | 1400 Rand Tower, 527 Marquette Avenue, South, |
| 4 | Minneapolis, Minnesota, before Cindy L. Schultz, |
| 5 | Registered Merit Reporter, Certified Realtime Reporter, |
| 6 | Certified LiveNote Reporter, and Notary Public of and |
| 7 | for the State of Minnesota. |
| 8 | A P P E A R A N C E S |
| 9 | ON BEHALF OF PLAINTIFF KRISTIN BAIN: |
| 10 | Melissa A. Huelsman, Esq. |
| 11 | LAW OFFICES OF MELISSA A. HUELSMAN, P.S. |
| 12 | Suite 1050 |
| 13 | 705 Second Avenue |
| 14 | Seattle, Washington 98104 |
| 15 | 206.447.0103 |
| 16 | |
| 17 | TELEPHONICALLY ON BEHALF OF DEUTSCHE BANK NATIONAL |
| 18 | TRUST COMPANY AND JPMORGAN CHASE BANK (Wood v. |
| 19 | Deutsche Bank National Trust Company, et al.): |
| 20 | Josh Rataezky, Esq. |
| 21 | DAVIS WRIGHT TREMAINE LLP |
| 22 | Suite 2200 |
| 23 | 1201 Third Avenue |
| 24 | Seattle, Washington 98101 |
| 25 | 206.622.3150 |

**Page 3**

| | |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | ON BEHALF OF DEFENDANT LENDER PROCESSING SERVICES: |
| 4 | Richard E. Spoonemore, Esq. |
| 5 | SIRIANNI YOUTZ MEIER & SPOONEMORE |
| 6 | 1100 Millennium Tower |
| 7 | 719 Second Avenue |
| 8 | Seattle, Washington 98104 |
| 9 | 206.223.0303 |
| 10 | rspoonemore@sylaw.com |
| 11 | and |
| 12 | Ross Gloudeman, Esq. |
| 13 | LENDER PROCESSING SERVICES |
| 14 | Suite 200 |
| 15 | 1270 Northland Drive |
| 16 | Mendota Heights, Minnesota 55120 |
| 17 | 651.234.3662 |
| 18 | ross.gloudeman@lpsdefaultsolutions.com |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | NOTE:  The original transcript will be filed |
| 24 | with Law Offices of Melissa A. Huelsman pursuant to the |
| 25 | applicable Rules of Civil Procedure. |

**Page 4**

| | |
|---|---|
| 1 | I N D E X |
| 2 | WITNESS: GREGORY N. ALLEN |
| 3 | |
| 4 | EXAMINATION BY                    PAGE |
| 5 | Ms. Huelsman. . . . . . . . . . . .5 |
| 6 | |
| 7 | INSTRUCTIONS NOT TO ANSWER |
| 8 | None |
| 9 | |
| 10 | DOCUMENT REQUESTS |
| 11 | None |
| 12 | |
| 13 | PLAINTIFF EXHIBITS MARKED/REFERRED TO |
| 14 | No. 1:  Agreement for Signing Authority. . . .14 |
| 15 | LPS-BAIN 0005 - 0013 |
| 16 | No. 2:  8/26/08 Appointment of Successor Trustee.16 |
| 17 | LPS-BAIN 0003 - 0004 |
| 18 | No. 3:  9/3/08 Assignment of Deed of Trust. . .16 |
| 19 | LPS-BAIN 0001 - 0002 |
| 20 | No. 17:  First Addendum to Default Services |
| 21 | Agreement. . . . . . . . . . . . 14 |
| 22 | LPS WOOD 0823 - 0827 |
| 23 | |
| 24 | |
| 25 | |

*Exhibit C*

**Gregory N. Allen, 1/13/2010**                                            Page: 2

Page 5

1    GREGORY N. ALLEN,
2    being first duly sworn, was examined and testified as
3    follows:
4          EXAMINATION
5    BY MS. HUELSMAN:
6       Q.  Could you state your name for the record,
7    please.
8       A.  Greg Allen.
9       Q.  Gregory or just Greg?
10      A.  I go by Greg; it is Gregory.
11      Q.  Okay.  And is it A-L-L-E-N?
12      A.  Correct.
13      Q.  All right.  Why don't you tell me your
14   business address.
15      A.  1270 Northland Drive, Suite 200,
16   Mendota Heights, Minnesota.
17      Q.  All right.  And you are an employee of LPS?
18      A.  Correct.
19      Q.  Can you tell me what your position is there?
20      A.  Assistant vice president of customer support.
21      Q.  Okay.  Can you give me -- I'm sorry.
22         You are here testifying today as an employee
23   of LPS; do you understand that?
24      A.  Yes.
25      Q.  Okay.  So when I ask you questions and I

Page 6

1    refer to "you," it's about your personal knowledge in
2    your role as an employee of LPS.  Okay?
3       A.  Okay.
4       Q.  All right.  And I got started because I was
5    trying to hurry, but I wanted to go over a few rules of
6    depositions.  Have you ever had your deposition taken
7    before?
8       A.  No.
9       Q.  Okay.  I assume Mr. Spoonemore went over the
10   rules with you, but we need to make sure that we don't
11   talk over each other, because this nice lady has to
12   take down everything we're saying.  And I talk very
13   fast, so I'm already making her life miserable.  You
14   need to make certain that you say yes or no when you
15   answer.  Don't say mm-hmm or un-unh, because that's
16   vague and ambiguous in the deposition transcript.
17         If you don't know the answer to a question,
18   it is perfectly acceptable to say "I don't know."  I
19   would rather have you say that than guess at an answer.
20   This is important, also, because you're swearing to
21   testify under oath under penalty of perjury, and if you
22   guess and it turns out later you're wrong, then I can
23   make something of the fact that you gave me a wrong
24   answer.  And so it's just best to not guess.  But I can
25   ask you for your best estimate of something or your

Page 7

1    best recollection, and then that's perfectly acceptable
2    if you're truly providing me with your best estimate or
3    your best recollection and not guessing.  Okay?
4       A.  Okay.
5       Q.  And if any of my questions are unclear, you
6    don't understand them, please let me know, because I
7    will rephrase them.  I want your best testimony.  I'm
8    not trying to trick you.  I really want you to
9    understand the question that I'm asking so you can
10   provide me with an accurate response.  Okay?
11      A.  Okay.
12      Q.  All right.
13         Why don't you give me your education after
14   high school.
15      A.  I received a BA in sociology from the
16   University of Iowa.
17      Q.  And when did you receive that?
18      A.  It was '95.
19      Q.  Okay.  And did you go to college straight out
20   of high school?
21      A.  Yes.
22      Q.  Okay.  So why don't you give me your work
23   history after you left college.
24         MS. HUELSMAN:  Josh?
25         MR. SPOONEMORE:  Josh, are you there?

Page 8

1          MR. RATAEZYK:  I'm here.  Ready.
2          MS. HUELSMAN:  Okay.  Perfect.  We're on
3    Greg Allen --
4          MR. RATAEZYK:  Okay.
5          MS. HUELSMAN:  -- who just told us a
6    little bit of background information, and that's it.
7          MR. SPOONEMORE:  Assistant vice president
8    of customer support.
9          MR. RATAEZYK:  I'm sorry, what was that?
10         MR. SPOONEMORE:  Assistant vice president
11   of customer support.
12         MR. RATAEZYK:  Okay.
13      A.  And I believe my degree was '95, but it could
14   have been '94 --
15      Q.  Okay.
16      A.  -- as far as when I got the degree --
17      Q.  Okay.
18      A.  -- to be specific.
19      Q.  I'm not going to check with the University of
20   Iowa.
21         Okay.  So why don't you give me your work
22   history, beginning after you graduated from college.
23      A.  And this will be to the best of my
24   recollection --
25      Q.  Yes.

Gregory N. Allen, 1/13/2010                                               Page: 3

Page 9

1  A. -- for some of it.
2  Q. Yes.
3  A. I worked for Northwest Mortgage as a default
4  loan counselor, then worked for Principal Residential
5  Mortgage as a supervisor in customer service on the --
6  for a call center, then I had a variety of interim
7  jobs. It's around the time the that I relocated to the
8  Twin City area. I'm trying to think.
9  Q. He can't help you.
10  A. I know.
11  When I came to the Twin Cities, I worked for
12  -- I had employment with Allied Interstate, a
13  collection agency. I worked, at one time, as a
14  Realtor; I worked, at one time, as a financial planner;
15  and worked for LPS--or at that time it was different
16  company name--as a representative, and it's during that
17  time when I segued away from the company and tried to
18  pursue a career as a Realtor, and then I rejoined the
19  company as a supervisor for an audit team. And then I
20  moved away from the company to pursue a career as a
21  financial consultant, and then it was November of '08
22  when I rejoined LPS. My role is as vice president of
23  customer support. That's the -- trail of
24  employment to the best of my recollection.
25  Q. Okay. And can you tell me what your job

Page 10

1  duties are in your current role?
2  A. I'm the department manager over the document
3  execution and referral functions -- support functions
4  that we provide and, also, I liaison the bankruptcy
5  mail processing with a third-party vendor.
6  Q. Who is that third-party vendor?
7  A. It is another division of LPS, and I believe
8  they're going by the name of Aptitude Solutions.
9  Q. That's Aptitude Solutions?
10  A. I believe so.
11  Q. Okay. And what role do they perform in
12  bankruptcy cases?
13  A. There's no role in the -- the cases. The
14  mail that can get generated at times gets processed.
15  Q. Does that mean that they process received
16  mail or they process outgoing mail?
17  A. They process received mail.
18  Q. So mail that's received by Fidelity -- or,
19  excuse me, LPS related to bankruptcy cases goes through
20  this Aptitude company, is that what you're saying?
21  A. The -- Could you repeat that?
22  Q. Is Aptitude processing mail received by LPS
23  that relates to bankruptcy cases?
24  A. The mail that is received by -- that is sent
25  to LPS is processed --

Page 11

1  Q. Okay.
2  A. -- by this -- this third party, so part of my
3  responsibilities is to liaison that relationship.
4  Q. To make sure that LPS gets the mail?
5  A. To make sure that if a client sends their
6  mail to us, that it gets processed.
7  Q. Okay. Does it manage outgoing mail for LPS?
8  A. My understanding is they manage just general
9  -- any packet -- outgoing packages that would need to
10  be sent.
11  Q. So when documents executed by LPS employees
12  need to be sent out to attorneys within the attorney
13  network -- or to servicers, is it done through this
14  Aptitude company?
15  A. Yes.
16  Q. Can you explain that process to me?
17  A. The -- the -- Well, I'll refer to it as the
18  mailroom --
19  Q. Okay.
20  A. -- has packages that go out to the various
21  firms, so the documents that get executed by LPS or
22  clients are put into those packages and then sent back
23  to the requester.
24  Q. Okay. And Aptitude tracks the -- those
25  packages?

Page 12

1  A. There is -- they retain tracking information
2  that is sent through the mail service?
3  Q. All right. So do you supervise Bethany Hood
4  and Christina Allen?
5  A. I supervise Bethany Hood. I do not supervise
6  Christina Allen.
7  Q. Okay. And what job title does Bethany Hood
8  have?
9  A. She's a manager.
10  Q. Of what department?
11  A. Within customer support.
12  Q. Okay. And what is her job function?
13  A. She manages the bankruptcy mail as well as
14  the document execution.
15  Q. And she actually signs documents herself,
16  correct?
17  A. Correct.
18  Q. Do you execute documents on a regular basis,
19  as well? And by that I mean Appointment of Successor
20  Trustee, Appointment Assignment, those kind of
21  documents.
22  A. Yes.
23  Q. So you are authorized by lenders and/or
24  servicers to sign documents on their behalf?
25  A. Yes.

Gregory N. Allen, 1/13/2010                                                    Page: 4

Page 13

1  Q.  Okay.  Do you know which companies you have
2  authorization to sign on behalf of?
3  A.  Yes.
4  Q.  Can you tell me what they are, please?
5  A.  I know a number of them.  I have a -- a list
6  at my desk that I refer to because of the number of
7  them, but I know that some of them are EverHome or
8  EverBank, EMC, JPMorgan Chase, Wilshire.  Some of them
9  could also apply; potentially a MERS authority.  Those
10 are the ones that I can recall at this particular time,
11 but there are more.
12 Q.  Okay.  And can you explain to me -- When you
13 said the MERS in some particular cases, can you explain
14 that to me, please?
15 A.  Could you rephrase that question?
16 Q.  Well, you said that in some relationships it
17 can involve MERS.  I can't remember the exact word you
18 said, but can you explain?
19 A.  It varies by client.  In some cases MERS, as
20 far as who is a potential authorized signer, because
21 the clients grant the signing authority and MERS grants
22 their signing authority.
23 Q.  Okay.  So, in other words, you don't have any
24 authority to act on behalf of MERS independent of some
25 other entity, correct?  So, in other words, there's no

Page 14

1  document that says, "we, MERS, allow Greg Allen to sign
2  documents on our behalf" without mention of any other
3  entity; is that correct?  It's in conjunction with a
4  lender or a servicer?
5  A.  Correct.
6  Q.  Okay.  I'm not trying to trick you.
7  A.  No.
8  Q.  All right.  So, in other words -- well, let's
9  use this one.  I'm going to use Exhibit 1 as well as
10 Exhibit 17 -- oops.  Sorry.  You have them.  Would you
11 pull out Exhibit 17 and Exhibit 1?
12 A.  Exhibit 17, correct?
13 Q.  Yeah, and Exhibit 1.
14 A.  Okay.
15 Q.  Take a look at these documents.
16 A.  (Reviewing documents.)
17 Q.  Okay?
18 A.  Okay.
19 Q.  All right.  So we were just talking a minute
20 ago about MERS giving signing authority.  Is this --
21 this is the kind of document we were talking about
22 where MERS gives the authority in conjunction with
23 another entity, in this case IndyMac Bank --
24 A.  Okay.
25 Q.  -- is that correct?

Page 15

1  A.  Yes, the agreement for signing authority
2  references Mortgage Electronic Registration Systems,
3  Inc., IndyMac Bank, and Fidelity National Foreclosure
4  Solutions, Inc.
5  Q.  Which is the predecessor to LPS, correct,
6  Fidelity?
7  A.  Correct.
8  Q.  So you prepared -- excuse me.  You signed
9  declarations in several of the cases that we're here
10 talking about.  One is the case brought by Kristi Bain,
11 the second is brought by Steve Bell, and the other has
12 been brought by Edmund Wood in his capacity as trustee
13 for the Batemans and for Mr. -- for Bateman and Lee.
14 Is that your understanding?
15 A.  Yes.
16 Q.  And you signed these declarations based upon
17 your personal knowledge, correct?
18 A.  Correct.
19 Q.  And in the declaration regarding Ms. Bain,
20 you asserted that signatures which were made on an
21 assignment and Appointment of Successor Trustee by
22 Ms. Hood and Christina Allen were done so under the
23 authority granted in these documents that we're looking
24 at here today; is that correct, Exhibit 1 at 17?
25 A.  Yes, this looks to be the MERS authority

Page 16

1  and -- by IndyMac Bank.
2  Q.  Okay.  If you want to turn to Exhibits 2 and
3  3, you can see the documents that I'm talking about.
4  They're in your stack.  2 and 3, they're on the bottom.
5  A.  Okay.
6  Q.  So Ms. Hood and Ms. Allen when they signed
7  these documents were doing so under their authority
8  granted in the Exhibits 1 and 17 that we were looking
9  at, correct?
10 A.  Correct.
11 Q.  I'm going to turn your attention to
12 Exhibit 2, which is the Appointment of Successor
13 Trustee, and you'll notice on the second page across
14 from Ms. Allen's signature there's a handwritten
15 notation that has an asterisk, and it says: "Effective
16 9/3/08."  Do you see that?
17 A.  Yes.
18 Q.  Do you know who inserted that handwritten
19 notation?
20 A.  No.
21 Q.  Do you know for what purpose it was inserted?
22 A.  No.
23 Q.  Do you know if it was inserted on the
24 original document?
25 A.  No.

Gregory N. Allen, 1/13/2010                                              Page: 5

### Page 17

1    Q. Would there be any way to find out who out
2  added that to the document or why or when?
3    A. I don't know.
4    Q. You don't know if there's a way to find why
5  it was inserted or who did it? I want to make sure you
6  understood my question.
7    A. You're asking -- Your question is if there's
8  a way to find out why the "Effective 9/3/08" was put on
9  there?
10   Q. Yes.
11   A. I can -- I can speculate --
12   Q. Okay.
13   A. -- what I -- I mean, the only thing, posing a
14 question to the firm that prepared the document. But I
15 -- I don't know why the "Effective 9/3/08" date was put
16 on there.
17   Q. And there's no way to know when it was put on
18 there, right?
19   A. Not that I'm aware of.
20   Q. Okay. So if an LPS employee alters a
21 document -- actually, do you know what, let me back up
22 a bit. I already have this testimony from Mr. Hymer
23 this morning, but I want to make sure that you have the
24 same understanding as I. It's my understanding that
25 these documents, when they're blank, as in unsigned,

### Page 18

1  are uploaded onto the system by the attorneys from the
2  attorney network; is that correct?
3    A. Correct.
4    Q. The assignment and appointment documents,
5  correct?
6    A. Correct.
7    Q. And then that essentially triggers -- or
8  sends a message to LPS that somebody needs to sign the
9  document, correct?
10   A. Correct. There's -- there's something that
11 becomes known to LPS that the document has been
12 submitted.
13   Q. Right. His -- his -- his explanation to me,
14 in general, was that it gets posted up to the system,
15 and that is what is seen on the screen, and that
16 without there being any accompanying message, indicates
17 that it needs to be signed; is that correct?
18       MR. SPOONEMORE: I'm going to object. I'm
19 not actually sure that properly characterizes his
20 testimony, but. . .
21       MS. HUELSMAN: I'm not attempting to
22 mischaracterize it, so. . .
23   Q. What happens? Why don't you tell me what
24 happens?
25   A. Sure. When a document is submitted by an

### Page 19

1  attorney, they do that within Process Management, and
2  when they submit it, it prints --
3    Q. Oh, okay.
4    A. -- in our office, the physical document.
5    Q. Okay.
6    A. And then there is a process that gets
7  launched in the -- within Process Management.
8    Q. Can you explain that to me, please.
9    A. The way the functionality is set up, the
10 firms can go into the individual file in the Desktop
11 and submit their document that needs to be executed,
12 and then there's a process with that -- that's used as
13 workflow that has events, and when those events become
14 due, that's how it's understood that a document has
15 been submitted.
16   Q. Okay.
17   A. So they're basically tracking steps for the
18 process along the way from submission to getting it
19 sent back to the requester.
20   Q. Okay. And then so how does the person, you
21 know, the employee, whether it's Ms. Hood or Ms. Allen,
22 actually sitting at LPS's offices, how does she see
23 that and know what to do?
24   A. When the documents come off the printer,
25 there is staff that gets them to a team that does

### Page 20

1  perform a high-level review of the document to make
2  sure that it is, in fact, a document that's in the
3  Desktop, that it -- to verify the document type; if
4  they submitted an SOT, is it an SOT; and is it a
5  document based on our signing authority that gives us
6  the ability to execute it and to check for any type of
7  verbiage related to attesting to facts.
8       And if it passes that review, then it gets
9  directed to the authorized signer, who then executes
10 the document. It goes through an notarization process
11 and gets sent back to the attorney.
12   Q. So Ms. Hood or Ms. Allen would not be the
13 person who was actually scrutinizing the document
14 beforehand; is that right?
15   A. I can't speak to what they may have or have
16 not done --
17   Q. Okay.
18   A. -- but I can share that there is a team that
19 does put the documents that come through through that
20 review process.
21   Q. Are they members of that team?
22   A. They are members of a customer support team.
23   Q. Okay. So it's a customer support team that
24 reviews the documents?
25   A. Correct, for -- for documents that LPS may be

Page 21

1 able to execute.
2    Q. Right. Okay.
3       Does LPS undertake any steps at that review
4 process to verify that the information contained on the
5 document is accurate?
6    A. The -- There's a review done of the -- to
7 make sure that it's for the right file of the document
8 type. But I'm not sure -- Could you elaborate on that
9 question?
10   Q. Sure. So, for example, the Appointment of
11 Successor Trustee says that MERS, as nominee for
12 successors or assigns of an undescribed entity, says
13 that it wants to -- I'm sorry, then it says that it
14 wants to appoint Regional Trustee as the trustee. So
15 when it's in this review process, does anyone at MERS
16 undertake to ascertain whether, in fact, IndyMac or
17 MERS, or whoever, actually wants to appoint Regional
18 Trustee as the trustee?
19       MR. SPOONEMORE: Other than the fact that
20 it's coming from the attorney.
21   A. The need for the document is decided by the
22 firm that's working the file. So that would be
23 something that they would determine --
24   Q. Okay.
25   A. -- and if they needed to, they would draft it

Page 22

1 and submit it for execution.
2    Q. So, in other words, in this case Regional
3 Trustee is submitting the document to LPS for
4 signature, telling -- that says, "We should be
5 appointed as the trustee," but the fact that MERS and
6 -- and/or IndyMac has -- has designated Regional
7 Trustee as the intended trustee is indicated on LPS's
8 system, correct?
9    A. Could you rephrase the second part?
10   Q. The document is coming from Regional Trustee
11 to LPS, correct?
12   A. Correct.
13   Q. Okay. And I was asking if anybody at LPS
14 undertakes verification to make certain that, in fact,
15 MERS and/or IndyMac has actually made a decision to
16 appoint Regional Trustee as the trustee?
17   A. It seems that that need would fall in line
18 with the signing authority that grants the list of --
19 the list of approved signers' approval to sign
20 documents related to the foreclosure process --
21   Q. Okay.
22   A. -- that are created by the attorneys.
23   Q. Okay.
24      Turning to the Assignment of Deed of Trust
25 document, again, this document would have been received

Page 23

1 from Regional Trustee, correct?
2    A. Correct.
3    Q. Okay. And it says that MERS wants to assign
4 its interest in the Deed of Trust to IndyMac Federal
5 Bank, correct?
6    A. Correct.
7    Q. Does LPS employees -- or do LPS employees
8 undertake any review or investigation to determine
9 whether, in fact, that is what MERS wants to
10 accomplish?
11   A. There's not that type of review. The review
12 is related to the signing authority that is granted
13 from MERS to execute documents, if needed -- if that
14 need was deemed by the attorney working the file as
15 part of the foreclosure process.
16   Q. Okay. So --
17   A. So the review is, is this a document type
18 that we can execute based off of our assignment
19 authority we've been granted.
20   Q. Okay. So the LPS employees are essentially
21 relying upon the attorneys to have provided them with
22 documents that contain accurate information?
23   A. Yes.
24   Q. Okay. So you testified a little bit ago that
25 you said the LPS employees, the team makes a high-level

Page 24

1 review. Do you recall using that phrase?
2    A. Yes.
3    Q. Can you explain to me what you mean by a
4 high-level review before it goes on to the document
5 execution person?
6    A. What I mean by the high-level review is -- is
7 the record -- is the loan that the document is for one
8 in the Desktop, is it the document type that's been
9 submitted, is there any glaring verbiage reflected
10 within the document about attesting to facts or
11 something that requires attention by the client
12 themselves for handling, and has it been prepared in a
13 way that allows LPS to execute it based off of our
14 signing authority.
15   Q. Okay. So you -- you just said that the team
16 is looking for facts that need -- might need to be
17 looked into. You said attesting to the verbiage,
18 correct?
19      MS. HUELSMAN: Go ahead and read back his
20 answer.
21      (The record was read as requested.)
22   A. Correct.
23   Q. I was using that phrase, okay?
24   A. Yes. Correct.
25   Q. Okay. So what kind of verbiage would give

Gregory N. Allen, 1/13/2010                                         Page: 7

| Page 25 |
|---|
| 1  rise to a need to talk to the servicer? |
| 2  A. If the attorney noted it -- specifically |
| 3  noted it within the request. Within the document, if |
| 4  it reflected the verbiage that there was attesting to a |
| 5  fact within the -- it would depend on any variation of |
| 6  that. That's the -- the phrase, so to speak, that |
| 7  would be looked for. |
| 8  Q. But, for example, looking at this assignment, |
| 9  document, isn't the signer, Bethany Hood, attesting to |
| 10  the fact that MERS wants to assign the Deed of Trust to |
| 11  IndyMac Federal Bank? |
| 12  MR. SPOONEMORE: That's a |
| 13  mischaracterization, I object. Bethany Hood isn't |
| 14  representing; MERS is representing. That's a gross |
| 15  misinterpretation of the document. |
| 16  MS. HUELSMAN: No. Ms. Hood is signing on |
| 17  behalf of MERS; therefore, she is making an affirmation |
| 18  on behalf of MERS. |
| 19  MR. SPOONEMORE: MERS is making the |
| 20  affirmation. |
| 21  MS. HUELSMAN: She's making it on their |
| 22  behalf. |
| 23  MR. SPOONEMORE: Yeah, as MERS is the one |
| 24  making the affirmation. |
| 25  Q. So could you please answer the question, |

| Page 26 |
|---|
| 1  Mr. Allen? |
| 2  A. MERS is making the reaffirmation. |
| 3  Q. Mr. Allen, you're not allowed to parrot your |
| 4  attorney's response. Please -- |
| 5  MR. SPOONEMORE: He's -- |
| 6  MS. HUELSMAN: -- answer -- |
| 7  MR. SPOONEMORE: -- answered your -- |
| 8  MS. HUELSMAN: -- the question. |
| 9  Are you coaching him, Mr. Spoonemore? |
| 10  MR. SPOONEMORE: No. I'm saying the |
| 11  premise of your question -- |
| 12  MS. HUELSMAN: Well -- |
| 13  MR. SPOONEMORE: -- is -- |
| 14  MS. HUELSMAN: -- a speaking -- |
| 15  MR. SPOONEMORE: -- misleading. |
| 16  MS. HUELSMAN: -- objection is providing |
| 17  your client with an answer -- your client with an |
| 18  answer to a question, and that's improper. |
| 19  MR. SPOONEMORE: Well, and a misleading |
| 20  legal premise to your question is clearly |
| 21  objectionable, because this client is not an attorney. |
| 22  When you represent Mr. Hood is representing, that is a |
| 23  gross legal mischaracterization of this document. I'm |
| 24  allowed to correct that. |
| 25  MS. HUELSMAN: Well, I disagree. When |

| Page 27 |
|---|
| 1  people sign documents in their capacity as alleged |
| 2  officers of the company, they are, in fact, making a |
| 3  representation. |
| 4  If MERS can figure out how, as a corporation, |
| 5  which doesn't exist except on paper, it can sign |
| 6  documents itself, then, in fact, it can say that it's |
| 7  doing so without the assistance of a person. |
| 8  MR. SPOONEMORE: Legally it is MERS making |
| 9  the representation. People are authorized to sign on |
| 10  behalf of MERS. That doesn't make them making the |
| 11  representation; it makes MERS making the |
| 12  representation. |
| 13  Q. Okay. So when did MERS tell Ms. Hood that |
| 14  this is what it wanted to do? |
| 15  A. I would think within the -- when granting the |
| 16  signing authority. |
| 17  Q. No. When did MERS specifically say to |
| 18  Bethany Hood, We want to assign our interest in the |
| 19  Deed of Trust referenced herein to IndyMac Federal |
| 20  Bank? When did that occur? |
| 21  MR. SPOONEMORE: Counsel knows very well |
| 22  that MERS can operate through counsel, which is their |
| 23  agent. Again, you're asking misleading questions of |
| 24  this witness, and you know it. You know that MERS's |
| 25  counsel made this request, and that's an agent of MERS. |

| Page 28 |
|---|
| 1  MS. HUELSMAN: Well, then, you can explain |
| 2  to Regional Trustee why they violated their duty to -- |
| 3  to the Deed of Trust doc by acting on behalf and as an |
| 4  agent for somebody when they're supposed to be acting |
| 5  as a neutral in conjunction with a foreclosure sale. |
| 6  Is that your representation, Counsel? |
| 7  MR. SPOONEMORE: That's not us. You can |
| 8  go after whoever you want, but as far as what we're |
| 9  doing, you're way off base here. |
| 10  Q. When did MERS give instruction to Bethany |
| 11  Hood to assign this Deed of Trust? Whether it came |
| 12  through Regional Trustee or Santa Claus, I don't care. |
| 13  When did MERS give this instruction to Ms. Hood? |
| 14  MR. SPOONEMORE: Objection; form. |
| 15  Objection; badgering and argumentative. |
| 16  A. When submitting assignments, the firms are |
| 17  responsible for the entities within that. |
| 18  Q. So your understanding is that Regional |
| 19  Trustee communicated with MERS and received |
| 20  instruction? |
| 21  A. I don't know what Regional Trustee did or did |
| 22  not do. |
| 23  Q. So it's irrelevant what happened behind the |
| 24  scenes? LPS has a document that came up through its |
| 25  system, you have an assigning document, and so LPS's |

**Gregory N. Allen, 1/13/2010**        Page: 8

Page 29

1  employees signed; is that correct?
2  A. If a document is submitted and it is a
3  document that we can execute based off a signing
4  authority that's been granted, yes, LPS would execute
5  it.
6  Q. Can you explain to me how LPS's services help
7  lenders and mortgagees lower their costs and reduce
8  processing time associated with non-judicial
9  foreclosures?
10  A. LPS's services can help provide workflow of
11  what needs to be done within the process that can then
12  help the efficiency that it's done, within which, then,
13  in turn, could benefit to a servicer or a client.
14  Q. And can you explain to me how that occurs?
15  How does it help them lower their costs and reduce
16  processing time?
17  A. It could help -- if the process is done more
18  efficiently, it could help to reduce attorney costs.
19  Q. How?
20  A. By it not taking as long. There isn't as
21  much -- if there is additional work that may need to be
22  done.
23  Q. Because, for example, Regional Trustee can
24  send these documents for signature to LPS rather than
25  being required to send them to IndyMac or to the

Page 30

1  servicer, correct?
2  A. Document execution is an example of a support
3  service that can help to streamline that function.
4  Q. Okay. In your deposition you've asserted
5  that MERS acts as a nominee in county land records --
6  excuse me, I said "deposition," and I meant
7  declaration. I'm sorry. MERS acts as a nominee in
8  county land records for lenders and servicers. How do
9  you know that?
10  A. I reviewed the information from the Web site
11  that was included within -- My understanding of MERS is
12  they act as the mortgagee nominee, and in the event
13  foreclosure proceedings are needed, then it's possible
14  that it would need to be assigned out of MERS, into the
15  name of the servicer in question.
16  Q. So your understanding is that assignments are
17  transferring the Deeds of Trust to servicers, correct?
18  A. Yes.
19  Q. Does LPS ever undertake to find out -- in the
20  context of foreclosure or bankruptcy proceedings, does
21  it ever endeavor to find out who actually has the note?
22  A. No.
23  Q. Does it have access to the information
24  regarding who has the note?
25  A. Not that I'm aware of.

Page 31

1  Q. Okay. And you testified in your declaration
2  that once, for example, in this case the assignment and
3  the Appointment of Successor Trustee documents are
4  signed, that they were sent to Regional Trustee to be
5  recorded. Do you recall that?
6  A. I recall the declaration reflecting that.
7  Q. And that's your understanding of what
8  actually did happen here as regards the appointment and
9  the assignment document that we're looking at?
10  A. Correct.
11  Q. And then once they're sent out to Regional
12  Trustee for recording, does LPS obtain copies of those
13  recorded documents?
14  A. No.
15  Q. It doesn't? So Regional Trustee is not
16  required to send back copies to indicate they've been
17  recorded?
18  A. Not to LPS.
19  Q. Okay. Does it make a notation on the
20  platform?
21  A. It could depend on the client. If that was
22  something that they wanted to track, then it's
23  possible.
24  Q. Okay. But it's not necessarily standard
25  operating procedure?

Page 32

1  A. Correct.
2  Q. Okay.
3  And if they are, for some reason, sent back
4  to LPS, or copies, I would say, are they sent through
5  the electronic imaging system or are they mailed or
6  both?
7  A. If it -- if a client's request was to have it
8  provided in the Desktop, then a firm could be asked to
9  image a recorded copy. In the event LPS received one,
10  we would automatically forward it on to the client.
11  Q. And you talked a minute ago about the -- MERS
12  Web site that you looked at before you signed the
13  declaration. Do you remember that?
14  A. Yes, I remember stating that I referred to
15  the information within the declaration --
16  Q. Okay.
17  A. -- that reflected that.
18  Q. And when you looked at that information on
19  MERS's Web site before signing the declaration, was
20  that the first time you had looked at MERS's Web site?
21  A. Can I see the -- the --
22  Q. I don't have it, but I actually have it up
23  electronically if you wanted to see that.
24  A. No.
25  Q. I didn't think you'd need it.

Page 33

1   A.   What I meant was -- What I'm saying is, I
2   referred to, in the declaration --
3       Q.   Oh.
4       A.   -- there was an exhibit --
5       Q.   That's -- that's it.
6       A.   -- that reflected that.  That's what I
7   referred to.
8       Q.   Okay.  That's it.  And, I'm sorry, I didn't
9   print it because I didn't think we'd need it for
10  deposition, but this (indicating) is it.
11      A.   Okay.
12      Q.   So this is what you were talking about, the
13  attachment to your exhibit?
14      A.   Do we -- Can I review a copy of it just to
15  confirm?  But, yes, that's --
16      Q.   Will I have to print it?
17          MR. SPOONEMORE:  Do you happen to have one
18  handy?  I just didn't think we'd need it as an exhibit.
19          Thank you.
20      A.   Correct.  That looks to be the same.
21      Q.   So was that the first time that you'd looked
22  at MERS's Web site?
23      A.   Yes.
24      Q.   Okay.  And did you look at any other part of
25  MERS's Web site before signing that declaration?

Page 34

1       A.   No.
2       Q.   And do you ever have any -- In the context of
3   doing your business at LPS, do you ever have any
4   contact or communications directly with MERS?
5       A.   No.
6       Q.   Do you know if MERS has a client relationship
7   with LPS?
8       A.   My understanding is that MERS, if they chose
9   to, could grant signing authority, and that's the
10  extent of my knowledge on it related to document
11  execution.
12      Q.   Okay.  Because my understanding is that
13  attorneys in the attorney network have agreements that
14  are called--I'm looking for them--Network Agreements,
15  and they also have Technology Agreements, correct?
16      A.   Correct.
17      Q.   And then servicers, lenders, or banks have
18  Default Servicing Agreements; is that correct?
19      A.   Correct.
20      Q.   Okay.  Just one minute.  I want to review my
21  notes.
22          No further questions.
23          MR. SPOONEMORE:  I have no questions.  We
24  will read and sign.  Thank you.
25      (The deposition was terminated at 2:34 p.m.)

```
 1   STATE OF MINNESOTA   )
                          :           ss CERTIFICATE
 2   COUNTY OF HENNEPIN   )

 3
     I, Cindy L. Schultz, RMR, CRR, CLR, a notary public in
 4   and for the County of Hennepin, certify that I reported
     the deposition of GREGORY N. ALLEN, who was first duly
 5   sworn by me, having been taken on January 13, 2010, at
     1400 Rand Tower, 527 Marquette Avenue, South,
 6   Minneapolis, Minnesota;

 7   I further certify that I am not a relative or employee
     or attorney or counsel of any of the parties or a
 8   relative or employee of such attorney or counsel;

 9   That I am not financially interested in the action and
     have no contract with the parties, attorneys, or
10   persons with an interest in the action that affects or
     has a substantial tendency to affect my impartiality;
11   that all parties who ordered copies have been charged
     at the same rate for such copies;
12
     That the right to read and sign the deposition by the
13   Witness was not waived.

14   IN WITNESS WHEREOF, I have hereunto set my hand and
     affixed my seal of office at Minneapolis, Minnesota,
15   this 20th day of January 2010.

16

17                              _____
                                Cindy L. Schultz, RMR, CRR, CLR
18                              My commission expires 1/31/2010

19

20

21

22

23

24

25
```

*PARAGRAPH 7.*

## IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT
## IN AND FOR MIAMI-DADE COUNTY, FLORIDA

DEUTSCHE BANK TRUST COMPANY
AMERICAS AS TRUSTEE,                              GENERAL JURISDICTION DIVISION

          Plaintiff,                          CASE NUMBER: 06-23056 (CA-11)

v.

TOMAS DIAZ, et al.

          Defendants.
_____/

### DEFENDANT'S ANSWER TO COMPLAINT

Defendant, TOMAS DIAZ, answers the allegations of the Complaint.

1.    Defendant admits the allegations set forth in paragraphs 1, 10 and 13 of the Complaint.

2.    Defendant denies the allegations set forth in the remaining paragraphs of the Complaint.

*CERTIFICATE OF SERVICE*

I certify that we served a copy of this document by fax and mail this 29st day of November, 2006 upon Ms. Kathleen Angione, Esq., Law Offices of Marshall C. Watson, P.A., 1800 Northwest 49th Street, Suite 120, Fort Lauderdale, Florida 33309.

RANDALL NORDLUND, Esq.
Fla. Bar No. 855804
Weissman, Dervishi, Borgo & Nordlund, P.A.
SunTrust International Center, Suite 1980
One Southeast Third Avenue
Miami, Florida 33131
(305)  347-4070
       347-4077 (Fax)
nordlund@wdbn.net

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT, IN AND FOR
DADE COUNTY, FLORIDA
CIVIL DIVISION
CASE NO.: 06-23056 CA 11

DEUTSCHE    BANK    TRUST    COMPANY
AMERICAS AS TRUSTEE,
                    Plaintiff,

*PARAGRAPH 8*

vs.

TOMAS DIAZ; BENEFICIAL FLORIDA, INC.;
MORTGAGE    ELECTRONIC    REGISTRATION
SYSTEMS, INCORPORATED AS NOMINEE FOR
PLATINUM CAPITAL GROUP (MIN# 1000866-
0010500365-3); UNKNOWN SPOUSE OF TOMAS
DIAZ; JOHN DOE; JANE DOE AS UNKNOWN
TENANT (S) IN POSSESSION OF THE SUBJECT
PROPERTY,
                    Defendants.

## MOTION FOR SUMMARY FINAL JUDGMENT OF FORECLOSURE

Plaintiff, DEUTSCHE BANK TRUST COMPANY AMERICAS AS TRUSTEE, moves the Court for entry

of a Summary Final Judgment of Foreclosure including an award of attorney's fees to Plaintiff on the grounds that

Plaintiff is entitled to such a Final Judgment as a matter of law. The substantial matter of law to be argued is the

priority of the lien of Plaintiff's mortgage over the interest of all other Defendants in the real property encumbered

by said mortgage and Plaintiff's entitlement to an award of attorney's fees.

In support of this motion, Plaintiff shows the Court:

1.    Plaintiff filed its Complaint to Foreclose a Mortgage on real property located in Dade County, Florida, the

legal description of which is set forth in the Complaint.

2.    The provisions of the note and mortgage being sued upon in this action confer upon Plaintiff the right to

accelerate all sums due thereunder upon the default thereof, and the right to foreclose all interests in the encumbered

property which are inferior to the lien of said mortgage. *Hubbard v. Highland Realty & Inv. Co.*, 156 So. 322 (Fla.

1934); *Campbell v. Werner*, 232 So. 2d 252 (Fla.3d D.C.A. 1970). The provisions of said note and mortgage also

provide for an award of attorneys fees to Plaintiff in the event of the filing of an action for foreclosure.

3.    The pleadings and exhibits filed herein, as well as Plaintiff's affidavit in support hereof, establish that

Plaintiff's mortgage is a purchase money mortgage or was recorded prior to the recording of the instruments creating

the liens in favor of those Defendants who claim an interest in the real property encumbered by the mortgage.

Therefore, any such interest which may be vested in the aforesaid Defendants is subordinate and inferior to the lien of

06-09296

Plaintiff's mortgage. <u>Sarmiento v. Stockton, Whatley, Davin & Co., Inc.</u>, 399 So. 2d 1057 (Fla. 3d DCA 1981), <u>United States v. First Federal Savings and Loan Association of St. Petersburg</u>, 155 So. 2d 192 (Fla. 2d DCA 1963).

WHEREFORE, Plaintiff respectfully requests this Court grant its Motion for Summary Final Judgment of Mortgage Foreclosure including an award of attorney's fees and for such further relief as the Court deems just and proper.

**I HEREBY CERTIFY** that a true copy of the foregoing Motion for Summary Judgment, and the following supporting affidavits: Time & Effort, Attorney's Fees, Indebtedness, Cost  were delivered to the parties on the attached mailing list by mail this_____18th_____day of December, 2006.

Law Offices of  Marshall C. Watson, P.A.
1800 N.W. 49TH Street, Suite 120
Fort Lauderdale, FL 33309
Telephone: (954) 453-0365/1-800-441-2438
Facsimile: (954) 771-6052

By:_____

for:    Kathleen Angibne, Esq.
          Bar Number: 175651

NATALIE S. PAPPAS
FBN 26721

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT, IN AND FOR
DADE COUNTY, FLORIDA
CIVIL DIVISION
CASE NO.: 06-23056 CA 11

*PARAGRAPH    9.*

BANK    TRUST    COMPANY
AMERICAS AS TRUSTEE
Plaintiff,

*3 - 22*

vs.

TOMAS DIAZ; BENEFICIAL FLORIDA, INC.;
MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INCORPORATED AS NOMINEE FOR
PLATINUM CAPITAL GROUP (MIN# 1000866-
0010500365-3); UNKNOWN SPOUSE OF TOMAS
DIAZ; JOHN DOE; JANE DOE AS UNKNOWN
TENANT (S) IN POSSESSION OF THE SUBJECT
PROPERTY,
                    Defendants.

### FINAL JUDGMENT OF FORECLOSURE
(Pursuant to Administrative Order No. 06-02)

THIS ACTION was heard before the Court of Plaintiff's Motion for Summary Final Judgment on
_January 16_, 20 _07_. On the evidence presented IT IS ADJUDGED that:

1. The Plaintiff's Motion for Summary Judgment is GRANTED. Service of process been duly and regularly
obtained over TOMAS DIAZ; BENEFICIAL FLORIDA, INC.; MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INCORPORATED AS NOMINEE FOR PLATINUM CAPITAL GROUP
(MIN# 1000866-0010500365-3); JANE DOE; JOHN DOE; UNKNOWN SPOUSE OF TOMAS DIAZ;
JOHN DOE; JANE DOE defendants.

2.

3. There is due and owing to the Plaintiff the following:

| | | |
|---|---|---|
| Principal due on the note secured by the mortgage foreclosed: | $ | 997,798.80 |
| Interest on the note and mortgage from | | |
| **August 1, 2006 to December 20, 2006** | $ | 37,494.35 |
| Restructured Interest to January 16, 2007 | $ | 4,442.20 |
| Title search expenses | $ | 325.00 |
| Court Cost: | | |
| Filing fee | $ | 268.50 |
| Service of Process at $45.00 per defendant | $ | 646.20 |
| SUBTOTAL | $ | **1,040,975.07** |

06-09296

Additional Costs:

| | | |
|---|---|---|
| Skip Search for Locating Defendants | $ | 20.00 |
| Inspections | $ | 9.00 |
| Flood Insurance | $ | 2,639.67 |
| Non-Sufficient Funds | $ | 15.00 |
| | | |
| **SUBTOTAL** . | **$** | **1,043,658.72** |
| | | |
| Attorney fees based upon 8 hours at $150 per hour | $ | 1,200.00 |
| Less: Undisbursed escrow funds | $ | 0 |
| Less: Unearned insurance premiums | $ | 0 |
| | | |
| **GRAND TOTAL** | **$** | **1,044,858.72** |

4.  The grand total amount referenced in Paragraph 2 shall bear interest from this date forward at the prevailing legal rate of interest.

5.  Plaintiff, whose address is 2711 N Haskell Ave, Suite 900 Dallas, TX 75204, holds a lien for the grand total sum specified in Paragraph 2 herein. The lien of the plaintiff is superior in dignity to any right, title, interest or claim of the defendants and all persons, corporations, or other entities claiming by, through, or under the defendants or any of them and the property will be sold free and clear of all claims of the defendants, with the exception of any assessments that are superior pursuant to Florida Statutes, Section 718.19. The plaintiff's lien encumbers the subject property located in Miami-Dade County, Florida and described as:

**SOUTH ONE-HALF OF TRACT 226, OF BIRD ROAD FARMSITES, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 46, PAGE 3, OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA.**

Property Address:  **5200 Southwest 122nd Avenue, Miami, FL 33175**

6.  If the grand total amount with interest at the rate described in Paragraph 3 and all costs accrued subsequent to this judgment are not paid, the Clerk of the Court shall sell the subject property at public sale on ___ day of _____ 2007, at 11:00 A.M to the highest bidder for cash, except as prescribed in Paragraph 6, at Room 908, 140 West Flagler Street, Miami, Florida after having first given notice as required by Section 45.031, Florida Statutes. The Clerk shall not conduct the sale in the absence of the plaintiff or its representative.

06-09296

all subsequent costs of this action and shall be reimbursed for them by the Clerk if the purchaser of the property for sale. If plaintiff is the purchaser, the Clerk shall credit plaintiff's bid with the total sum with interest and costs accruing subsequent to this judgment, or such part of it, as is necessary to pay the bid in full.

8. On the filing the Certificate of Title, the Clerk shall distribute the proceeds of the sale, so far as they are sufficient, by paying: first, all of the plaintiff's costs; second, documentary stamps affixed to the Certificate; third, plaintiff's attorneys' fees; fourth, the total sum due to the plaintiff, less the items paid, plus interest at the rate prescribed in Paragraph 2 from this date to the date of the sale; and by retaining any remaining amount pending further Order of this Court.

9. On the filing of the Certificate of Sale, defendant's right of redemption as proscribed by Florida Statutes, Section 45.0315 shall be terminated.

10. On the filing of the Certificate of Title, defendant and all persons claiming under or against defendant since the filing of the Notice of Lis Pendens shall be foreclosed of all estate or claim in the property and the purchaser at sale shall be let into possession of the property.

11. The Court finds, based upon the affidavits presented and upon inquiry of counsel for the plaintiff, that 8 hours were reasonably expended by plaintiff's counsel and that an hourly rate of $150.00 is appropriate. PLAINTIFF'S COUNSEL REPRESENTS THAT THE ATTORNEY FEE AWARDED DOES NOT EXCEED ITS CONTRACT FEE WITH THE PLAINTIFF. The Court finds that there are no reduction or enhancement factors for consideration by the Court pursuant to Florida Patient's Compensation Fund v. Rowe, 472 So.2d 1145 (Fla. 1985).

The Court retains jurisdiction of this action to enter further orders that are proper, including, without limitation, writs of possession and deficiency judgments.

IF THIS PROPERTY IS SOLD AT PUBLIC AUCTION, THERE MAY BE ADDITIONAL MONEY FROM THE SALE AFTER PAYMENT OF PERSONS WHO ARE ENTITLED TO BE PAID FROM THE SALE PROCEEDS PURSUANT TO THIS FINAL JUDGMENT.

IF YOU ARE A SUBORDINATE LIENHOLDER CLAIMING A RIGHT TO FUNDS REMAINING AFTER THE SALYOU MUST FILE A CLAIM WITH THE CLERK NO LATER THAN 60 DAYS AFTER THE SALE. IF YOU FAIL TO FILE A CLAIM, YOU WILL NOT BE ENTITLED TO ANY REMAINING FUNDS.

IF YOU ARE THE PROPERTY OWNER, YOU MAY CLAIM THESE FUNDS YOURSELF. YOU ARE NOT REQUIRED TO HAVE A LAWYER OR ANY OTHER REPRESENTATION AND YOU DO NOT HAVE TO ASSIGN YOUR RIGHTS TO ANYONE ELSE IN ORDER FOR YOU TO CLAIM ANY MONEY TO WHICH YOU ARE ENTITLED. PLEASE CHECK WITH THE CLERK OF THE COURT, **HARVEY RUVIN (305) 275-1155** WITHIN TEN (10) DAYS AFTER THE SALE TO SEE IF THERE IS ADDITIONAL MONEY FROM THE FORECLOSURE SALE THAT THE CLERK HAS IN THE REGISTRY OF THE COURT.

OUR HOME OR HIRE SOMEONE TO HELP YOU CLAIM THE
YOU SHOULD READ VERY CAREFULLY ALL PAPERS YOU ARE
ASK SOMEONE ELSE, PREFERABLY AN ATTORNEY WHO IS NOT RELATED
OFFERING TO HELP YOU, TO MAKE SURE THAT YOU UNDERSTAND WHAT
ARE SIGNING AND THAT YOU ARE NOT TRANSFERRING YOUR PROPERTY OR THE
EQUITY IN YOUR PROPERTY WITHOUT THE PROPER INFORMATION. IF YOU CANNOT AFFORD
TO PAY AN ATTORNEY, YOU MAY CONTACT **LEGAL AID SOCIETY OF THE DADE COUNTY
BAR ASSOCIATION 123 NW FIRST AVENUE, 3RD FLOOR MIAMI, FL 33128 PHONE: (305) 579-
5733** TO SEE IF YOU QUALIFY FINANCIALLY FOR THEIR SERVICES. IF THEY CANNOT ASSIST
YOU, THEY MAY BE ABLE TO REFER YOU TO A LOCAL BAR REFERRAL AGENCY OR SUGGEST
OTHER OPTIONS.  IF YOU CHOOSE TO CONTACT **LEGAL AID SOCIETY OF THE DADE
COUNTY BAR ASSOCIATION** FOR ASSISTANCE, YOU SHOULD DO SO AS SOON AS POSSIBLE
AFTER RECEIPT OF THIS NOTICE.


ORDERED at Miami, Florida, on _____, 20_____.



_____
Circuit Judge

**Copies furnished to:**

Law Office of Marshall C. Watson
1800 NW 49th Street, Suite 120
Fort Lauderdale, Florida 33309
Telephone:  (954) 453-0365
Facsimile:  (954) 771-6052
Toll Free: 1-800-441-2438

RANDALL NORDLUND, ESQ., ATTORNEY FOR
TOMAS DIAZ
C/O WEISSMAN, DERVISHI, BORGO & NORDLUND, P.A.
SUNTRUST INTERNATIONAL CENTER, SUITE 1980
ONE SOUTHEAST THIRD AVENUE
MIAMI, FL 33131

BENEFICIAL FLORIDA, INC.
C/O DONNA MOCH, SUPERVISOR OF PROCESS
1200 S PINE ISLAND ROAD
PLANTATION, FL 33324

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INCORPORATED AS NOMINEE FOR PLATINUM CAPITAL GROUP (MIN#
1000866-0010500365-3)
C/O DONNA MOCH, SUPERVISOR OF PROCESS
1200 S PINE ISLAND
PLANTATION, FL 33324

UNKNOWN TENANT(S)
5200 SOUTHWEST 122ND AVENUE
MIAMI, FL 33175

UNKNOWN SPOUSE OF TOMAS DIAZ
10420 SW 58TH STREET
MIAMI, FL 33173

06-09296

3-2Y

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION                    CIVIL ACTION NO. 06-23056

DEUTSCHE BANK TRUST COMPANY AMERICAS AS TRUSTEE,
Plaintiff (s) / Petitioner (s)                   **CERTIFICATE OF MAILING**

          vs.

TOMAS DIAZ, et al.,
Defendant (s) / Respondent (s)

          THE UNDERSIGNED CLERK of the Court certifies that a copy of the Final Summary Judgment/Final Judgment/Default Final Judgment was mailed on JANUARY 16, 2007.

MARSHALL C. WATSON
1800 NW 49TH ST. SUITE 120
FT LAUDERDALE, FL 33309

RANDALL NORDLUND, ESQ.
ATTY. FOR TOMAS DIAZ
ONE SE 3RD AVE., SUITE 1980
MIAMI, FL 33131

BENEFICIAL FLORIDA, INC.
C/O DONNA MOCH
1200 S PINE ISLAND RD.
PLANTATION, FL 33324

MTGE. ELECTRONIC REG. SYSTEMS, INC.
C/O DONNA MOCH
1200 S PINE ISLAND RD.
PLANTATION, FL 33324

          WITNESS my hand and the Seal of this Court on <u>January 16, 2007.</u>

                    Harvey Ruvin, Clerk of Court

          By: _____
                    Deputy Clerk



# LOST NOTE AFFIDAVIT

**AFFIDAVIT OF LOST NOTE**

*PARAGRAPH 9.*

### (Photocopy of Note Attached)

**Loan Number  10624849**

STATE OF MINNESOTA

COUNTY OF HENNEPIN

**On this 30 day of May 2007 before me appeared S. Seidel, Assistant Secretary who being first duly sworn, does depose and say that**

**Residential Funding Company, LLC**

Was the holder of a certain NOTE dated April 27, 2006 in the amount of One Million   Dollars and 0/100 ($1,000,000.00) made by THOMAS  DIAZ to Platinum Capital Group. and does further depose and say that said NOTE, a copy of which is attached as a true and correct photocopy of the front and back and any and all endorsements, has either been lost, misplaced, or destroyed and can not be produced.

**IN THE EVENT THE ORIGINAL NOTE IS HEREAFTER LOCATED, RESIDENTIAL FUNDING COMPANY, LLC SHALL DELIVER IT TO THE APPROPRIATE CUSTODIAN**

Residential Funding Company, LLC

By: *S. Seidel*

**S. Seidel**
**Assistant Secretary**

On **5-30-07** before me, **B.Nolan**, personally appeared S. Seidel ☒ personally known to me - ☐ or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacity, and that by their signatures on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.

Witness my hand and official seal.



B. NOLAN
NOTARY PUBLIC- MINNESOTA
MY COMMISSION EXPIRES 1-31-2010

CFN 2007R0570608
OR Bk 25680 Pgs 4696 - 4697; (2pgs)
RECORDED 06/07/2007 09:30:32
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

PARAGRAPH 10.

This space is for recording purposes only

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL
CIRCUIT, IN AND FOR MIAMI-DADE COUNTY,
FLORIDA

GENERAL JURISDICTION DIVISION
CASE NO:

**07-16754 CA 10**

DEUTSCHE BANK TRUST COMPANY
AMERICAS, AS TRUSTEE
      PLAINTIFF
VS.

TOMAS DIAZ; UNKNOWN SPOUSE OF
TOMAS DIAZ, IF ANY; ANY AND ALL
UNKNOWN PARTIES CLAIMING BY,
THROUGH, UNDER, AND AGAINST THE
HEREIN NAMED INDIVIDUAL
DEFENDANT(S) WHO ARE NOT KNOWN
TO BE DEAD OR ALIVE , WHETHER SAID
UNKNOWN PARTIES MAY CLAIM AN
INTEREST AS SPOUSES, HEIRS, DEVISEES,
GRANTEES OR OTHER CLAIMANTS;
MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.; BENEFICIAL FLORIDA,
INC.; NELSON QUEVEDO; ANA QUEVEDO;
JOHN DOE AND JANE DOE AS UNKNOWN
TENANTS IN POSSESSION;
      DEFENDANT(S)

NOTICE OF LIS PENDENS

1. TO: The above named Defendants, AND ALL OTHERS WHOM IT MAY CONCERN:

F:\GROUPS\FCDOCS\COMPLAIN\0707-88388.CMP



OR BK 25680 PG 4697
LAST PAGE

2. YOU ARE NOTIFIED of the institution of this action by the Plaintiff against you seeking to foreclose the Note and Mortgage encumbering the described property and the decreeing of a sale of the property under the direction of the court in default of the payment of the amount found to be due the Plaintiff under the Note and Mortgage, and for other, further and general relief set forth in the Complaint.

3. The property involved is that certain parcel, lot or unit situate, lying and being in MIAMI-DADE County, Florida, as set forth in the mortgage recorded in Official Records Book 24526, at Page 3829, more particularly described as follows:

ALL THAT LAND SITUATE IN MIAMI-DADE COUNTY, FLORIDA, TO-WIT:

SOUTH ONE-HALF OF TRACT 226, OF BIRD ROAD FARMSITES, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 46, AT PAGE 3, OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA.

Dated at Plantation, Broward County, Florida, this ____ day of _____, 2007.

LANCE E. FORMAN
Law Offices of David J. Stern, P.A.
Attorney for Plaintiff
801 S. University Drive Suite 500
Plantation, FL 33324
(954) 233-8000
Bar #: 0493864

07-88388(HCNW)

F:\GROUPS\FCDOCS\COMPLAIN\0707-88388.CMP

_____ COURT   THE 11TH JUDICIAL
CIRCUIT, IN AND FOR MIAMI-DADE COUNTY,
FLORIDA
GENERAL JURISDICTION DIVISION
CASE NO:    07-16754 CA 10

PARAGRAPH 11.

DEUTSCHE BANK TRUST COMPANY
AMERICAS, AS TRUSTEE

        PLAINTIFF

VS.

TOMAS DIAZ; UNKNOWN SPOUSE OF
TOMAS DIAZ, IF ANY; ANY AND ALL
UNKNOWN PARTIES CLAIMING BY,
THROUGH, UNDER, AND AGAINST THE
HEREIN NAMED INDIVIDUAL
DEFENDANT(S) WHO ARE NOT KNOWN TO
BE DEAD OR ALIVE , WHETHER SAID
UNKNOWN PARTIES MAY CLAIM AN
INTEREST AS SPOUSES, HEIRS, DEVISEES,
GRANTEES OR OTHER CLAIMANTS;
MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.; BENEFICIAL FLORIDA,
INC.; NELSON QUEVEDO; ANA QUEVEDO;
JOHN DOE AND JANE DOE AS UNKNOWN
TENANTS IN POSSESSION;

        DEFENDANT(S)

```
F I L E D

JUN 0 1 2007

HARVEY RUVIN
CLERK, CIRCUIT & COUNTY COURTS
```

258
6 - ups
h y.
R# 4009

COMPLAINT TO FORECLOSE MORTGAGE
AND TO ENFORCE LOST LOAN DOCUMENTS

Plaintiff, sues the Defendant(s) and alleges:

COUNT I

1.    THIS IS AN ACTION to foreclose a Mortgage on real property in MIAMI-DADE County, Florida.

2.    This Court has jurisdiction over the subject matter herein.

3.    On APRIL 27, 2006 TOMAS DIAZ, A SINGLE MAN executed and delivered a Promissory Note and a
      Mortgage securing payment of the Note to the Payee named thereon.

4.    The Mortgage was recorded on MAY 15,2006 in Official Records Book 24526 at page 3829, of the Public
      Records of MIAMI-DADE County, Florida, and mortgaged the property described in it, then owned by and
      possessed by the Mortgagors, a copy of the Mortgage IS attached hereto as "Exhibit "A". Said mortgage
      was subsequently assigned to BANK TRUST COMPANY AMERICAS, AS TRUSTEE by virtue of an
      assignment recorded on JANUARY 25, 2007 at Official Records Book 25305, Page 654 of the MIAMI-
      DADE County Records, a copy of which is attached hereto as Exhibit "B".

5.    The Plaintiff owns and holds the Note and Mortgage.

6.    The property is now owned by the Defendant(s), TOMAS DIAZ, if living and if dead, the unknown
      spouses, heirs and beneficiaries of TOMAS DIAZ who hold(s) possession.

7.    There is a default under the terms of the note and mortgage for the APRIL 27, 2007 payment and all
      payments due thereafter.

8.    All conditions precedent to the acceleration of this Mortgage Note and to foreclosure of the Mortgage have
      been fulfilled or have occurred.

9.    The Plaintiff declares the full amount payable under the Note and Mortgage to be due.

together with interest from MARCH 27, 2009, late charges, and all costs of collection including title search expenses for ascertaining necessary parties to this action and reasonable attorney's fees.

11.  Plaintiff is obligated to pay its attorney a reasonable fee for his services rendered.

12.  Defendants, John Doe and Jane Doe, may claim an interest in the property described in the Mortgage as tenants pursuant to a lease agreement, either written or oral.  Said interest is subject, subordinate, and inferior to the lien of the Mortgage held by Plaintiff.

13.  In addition to all other named defendants, the unknown spouses, heirs, devisees, grantees, assignees, creditors, trustees, successors in interest or other parties claiming an interest in the subject property by, through under or against any of said defendants, whether natural or corporate, who are not known to be alive or dead, dissolved or existing, are joined as defendants herein.  The claims of any of said parties are subject, subordinate, and inferior to the interest of Plaintiff.

14.  The Defendant, UNKNOWN SPOUSE OF TOMAS DIAZ is joined because SHE may claim some interest in or lien upon the subject property by virtue of a possible homestead interest.  Said interest is subject, subordinate and inferior to the interest of the Plaintiff's mortgage.

15.  The Defendant(s) MORTGAGE ELECTRONIC REGUSTRATION SYSTEMS, INC. IS joined because THEY may claim some interest in or lien upon the subject property by virtue of a MORTGAGE recorded in Official Records Book 24526 at Page 385in MIAMI-DADE COUNTY which is inferior to Plaintiff's Mortgage described herein.

16.  The Defendant(s) BENEFICIAL FLORIDA, INC. IS  joined because THEY may claim some interest in or lien upon the subject property by virtue of a MORTGAGE recorded in Official Records Book 24618 at Page 2490 in MIAMI-DADE COUNTY which is inferior to Plaintiff's Mortgage described herein.

17.  The Defendant(s) NELSON QUEVEDO AND ANA VICKY QUEVEDO ARE joined because THEY may claim some interest in or lien upon the subject property by virtue of a JUDGEMENT recorded in Official Records Book 25448 at Page 1473 in MIAMI-DADE COUNTY which is inferior to Plaintiff's Mortgage described herein.

WHEREFORE, Plaintiff prays:  That an accounting may be had and taken under the direction of this Court of what is due the Plaintiff for principal and interest on said Mortgage and Mortgage Note, and for the costs, charges and expenses, including attorney's fees and title search costs, and advancements which Plaintiff may be put to or incur in and about this suit, and that the Defendants found responsible for same be ordered to pay the Plaintiff herein the amounts so found to be due it; that in default of such payments, all right, title, interest, claim, demand, or equity of redemption of the Defendants and all other persons claiming by, through, under or against said Defendants since the filing of the Lis Pendens herein be absolutely barred and foreclosed and that said mortgage property be sold under the direction of this Court; that out of the proceeds of said sale, the amounts due the Plaintiff may be paid so far as same will suffice; and that a deficiency judgment be entered if applicable and only in the event no Order of Discharge of Personal Liability in Bankruptcy has been entered as to any of the Defendants who signed the subject Note and Mortgage and a Writ of Possession be issued.

18.   This is an action to enforce a lost, destroyed or stolen promissory note and Mortgage under
      Fla.Stat.§673.3091.

19.   On APRIL 27, 2006, TOMAS DIAZ, A SINGLE MAN, executed and delivered a Promissory Note and a
      Mortgage securing payment of the Note to the payee named thereon.

20.   The Mortgage was recorded on MAY 15,2006 in Official Records Book 24526 at page 3829, of the Public
      Records of MIAMI-DADE County, Florida, a substantial copy of the Mortgage being attached hereto as
      composite Exhibit "A" to the Plaintiff's original Complaint herein.

21.   The Plaintiff is not presently in possession of original Note and Mortgage. However,

      a)    the Plaintiff was in possession of the Note and Mortgage and was entitled to enforce THEM when
            the loss of possession occurred;

      b)    the loss of possession was not the result of a transfer by Plaintiff or lawful seizure; and

      c)    the Plaintiff cannot reasonably obtain possession of the Note and Mortgage because THEIR
            whereabouts cannot be determined.

22.   The terms of the Note are shown on the attached ledger of loan marked as Exhibit "_____ ".

23.   The Plaintiff will agree to entry of a Final Judgment of Foreclosure wherein it will be required to indemnify
      and hold harmless Defendant(s), TOMAS DIAZ, A SINGLE MAN, from any loss they may incur by reason
      of a claim by another person to enforce the lost Note and Mortgage.


      WHEREFORE, Plaintiff requests entry of judgment confirming its right to enforce the lost Note and
Mortgage under Fla. Stat.§673.3091.


**TO ALL DEFENDANTS: PLEASE NOTE EFFECTIVE OCTOBER 13, 2006, 15 U.S.C. §1692G OF THE
FAIR DEBT COLLECTION PRACTICES ACT HAS BEEN AMENDED AS FOLLOWS:**

      **(a) LEGAL PLEADINGS -- Section 809 of the Fair Debt Collection Practices Act (15 U.S.C. 1692g) is
      amended by adding at the end the following new subsection:**

      **"(d) Legal Pleadings -- A communication in the form of a formal pleading in a civil action shall not
      be treated as an initial communication for purposes of subsection (a)."**


                                                    _____
                                                    LANCE E. FORMAN
                                                    Law Offices of David J. Stern, P.A.
                                                    Attorney for Plaintiff
                                                    801 S. University Drive Suite 500
                                                    Plantation, FL 33324
                                                    (954) 233-8000
07-88388(HCNW)                                      Bar #: 0493864

*PARAGRAPH 12.*



| | |
|---|---|
| DEUTSCHE BANK TRUST COMPANY AMERICAS AS TRUSTEE, Plaintiff, vs. TOMAS DIAZ, et al, Defendants. | IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, IN AND FOR DADE COUNTY, FLORIDA CIVIL DIVISION CASE NO.: 06-23056 CA 11 |

## EX PARTE MOTION TO DISSOLVE LIS PENDENS, DISMISS COMPLAINT, VACATE FINAL JUDGMENT, AND RELEASE ORIGINAL DOCUMENTS

**COMES NOW,** Plaintiff DEUTSCHE BANK TRUST COMPANY AMERICAS AS TRUSTEE, by and through its undersigned counsel, and moves this Court to Dissolve Lis Pendens, Dismiss Complaint, Vacate Final Judgment, And Release Original Documents and as grounds thereof would state as follows:

1. Defendant tendered sufficient funds to Reinstate the loan which was the subject of this proceeding.

**WHEREFORE,** Plaintiff, DEUTSCHE BANK TRUST COMPANY AMERICAS AS TRUSTEE, respectfully requests that this Court enter an Order to Dissolve Lis Pendens, Dismiss Complaint, Vacate Final Judgment, And Release Original Documents .

**I HEREBY CERTIFY** that a true and correct copy of the foregoing Motion was mailed this _____ _____ day of _____ JAN 2 3 2008 ` to defendants on the attached service list:

Law Offices of Marshall C.Watson, P.A.
1800 N.W. 49TH Street, Suite 120
Fort Lauderdale, FL 33309
Telephone: (954) 453-0365/(800) 441-2438
Facsimile: (954) 771-6052

By: _____
Sean Moloney, Esq.
Bar Number: 0638358

**Andrew Scolaro**
FBN 44927

06-09296

PARAGRAPH 13.

| | |
|---|---|
| DEUTSCHE BANK TRUST COMPANY AMERICAS AS TRUSTEE,<br>Plaintiff,<br>vs.<br>TOMAS DIAZ, et al,<br>Defendants. | IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, IN AND FOR DADE COUNTY, FLORIDA<br>CIVIL DIVISION<br>CASE NO.: 06-23056 CA 11 |

### ORDER ON PLAINTIFF'S EX PARTE MOTION TO DISSOLVE LIS PENDENS, DISMISS COMPLAINT, VACATE FINAL JUDGMENT, AND RELEASE ORIGINAL DOCUMENTS

**THIS CAUSE,** having come before the Court on Plaintiff's Ex Parte Motion to Dissolve Lis Pendens, Dismiss Complaint, Vacate Final Judgment, And Release Original Documents, and the Court being fully advised in the premises, it is hereby:

**ORDERED AND ADJUDGED** that:

1. The Plaintiff's Ex parte Motion to Dissolve Lis Pendens, Dismiss Complaint, Vacate Final Judgment is hereby **GRANTED.**

2. The Clerk of the Court shall release all the original documents forthwith to Plaintiff's counsel.

**DONE AND ORDERED** in Chambers at Miami, Dade County, Florida, this ___ day of _____, _____, 2007.

_____
Circuit Judge

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, IN
AND FOR MIAMI-DADE COUNTY, FLORIDA
GENERAL JURISDICTION DIVISION
CASE NO: 2007-16754-CA

*PARA GRAPH 13 A.*

DEUTSCHE BANK TRUST COMPANY AMERICAS,
AS TRUSTEE
         PLAINTIFF
VS.
TOMAS DIAZ, ET AL
         DEFENDANT(S)

### EX PARTE MOTION TO RESET FORECLOSURE SALE

Plaintiff, by and through its undersigned counsel, hereby files this Ex Parte Motion to Reset Foreclosure Sale and in support thereof states:

1.    The Plaintiff filed its Complaint on JUNE 1, 2007.

2.    The Summary Final Judgment was entered on JANUARY 8, 2008 and the Foreclosure Sale was scheduled for MARCH 12, 2008.

3.    On or about MARCH 12, 2008, the Plaintiff voluntarily canceled the foreclosure sale. DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE sold the loan to AURORA LOAN SERVICING, LLC.

4.    No settlement has been achieved and the Plaintiff now elects to proceed with the foreclosure sale.

5.    Plaintiff request to take title in the name of **AURORA LOAN SERVICING, LLC.**

WHEREFORE, Plaintiff requests that this Court enter an Order to Reset the Foreclosure Sale in this Cause.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Ex Parte Motion to Reset Sale was mailed this _9_ day of _May_, 2008 to:

RANDALL NORDLUND, ESQUIRE
ATTORNEY FOR TOMAS DIAZ
ONE SE 3RD AVENUE
SUNTRUST INTERNATIONAL CENTER
SUITE 1980
MIAMI, FL 33131

UNKNOWN SPOUSE OF TOMAS DIAZ
10420 SW 58TH ST
MIAMI, FL 2835

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
1595 SPRING HILL ROAD, SUITE 310
VIENNA, VA 22182

BENEFICIAL FLORIDA, INC.
C/O CT CORPORATION SYSTEM, REGISTERED AGENT
1200 S. PINE ISLAND ROAD
PLANTATION, FL 33324

NELSON QUEVEDO
ANA VICKY QUEVEDO
1415 GARCIA AVENUE
CORAL GABLES, FL 33134

                                                    *for 30017*
MATTHEW L. KAHL
Law Offices of David J. Stern, P.A.
Attorney for Plaintiff
900 South Pine Island Road Suite 400
Plantation, FL 33324-3920
(954) 233-8000
Florida Bar #: 766801

Case #: 07-88388(HCNW)

*PARAGRAPH 14.*

## STATE OF FLORIDA
## OFFICE OF THE ATTORNEY GENERAL,
## OF LEGAL AFFAIRS

IN THE MATTER OF:                                        AG Case # L10-3-1147

**INVESTIGATION OF**
**Law Offices of Marshall C. Watson, P.A.**
**and Marshall C. Watson, Individually.**
_____/

### ASSURANCE OF VOLUNTARY COMPLIANCE

PURSUANT to the provisions of the Florida Deceptive and Unfair Trade Practices Act,

Part II of the Consumer Protection Statute, Chapter 501, the OFFICE OF THE ATTORNEY

GENERAL, DEPARTMENT OF LEGAL AFFAIRS, hereinafter referred to as the

"DEPARTMENT," caused an investigation to be made into the business practices of the LAW

OFFICES OF MARSHALL C. WATSON, P.A. and MARSHALL C. WATSON, Individually

(collectively, "Respondents") to determine whether Respondents have engaged in deceptive or

unfair trade practices.

Respondent, LAW OFFICES OF MARSHALL C. WATSON, P.A., is a Florida

corporation filed June 19, 1997 which presently conducts business in the State of Florida, with

its principal place of business being 1800 NW 49th Street, #120, Fort Lauderdale, FL 33309.

Respondent, MARSHALL C. WATSON, is an attorney licensed to practice in the State

of Florida.

This Assurance of Voluntary Compliance (hereinafter referred to as the "Assurance") is

solely intended to resolve the investigation as to whether Respondents engaged in any deceptive

or unfair trade practices. It is AGREED that this Assurance does not constitute an admission of

1                    Initial        Initial

**ORIGINAL**

any kind. This Assurance does not constitute a finding by any court or agency, including the DEPARTMENT, that Respondents have engaged in any act or practice declared unlawful by any laws, rules or regulations of the State of Florida. Respondents enter into this Assurance solely for the purpose of resolving this matter and without any admission that they have violated the law.

The DEPARTMENT, by and through the undersigned representatives of the Attorney General's Office, accept this Assurance in termination of this investigation, pursuant to Section 501.207(6), Florida Statutes, and by virtue of the authority in the Attorney General by said statute. The DEPARTMENT acknowledges Respondents' good faith and full cooperation during the course of its investigation, and Respondents' role in working with the DEPARTMENT to establish best practices in foreclosure actions.

## I.   BACKGROUND

1.1.    During the time frame beginning at least four years prior to the effective date of this Assurance, Respondents participated in the filing of foreclosure actions on consumers alleged to have defaulted on their home mortgages. During this time period, Respondents have represented mortgagees in filing foreclosure actions in circuit courts throughout the State of Florida, obtained foreclosure judgments and handled the subsequent purchase of the foreclosed properties at the foreclosure sale on behalf of the Plaintiff, as well as the subsequent sale of the properties. The Department has received and reviewed consumer complaints and other information alleging the following:

a.    foreclosure actions have been filed before the legal standing of the Plaintiff has been determined;

2                    Initial        Initial

b.      process servers have provided false returns of service in foreclosure actions;

c.      unnecessary Defendants, such as John and Jane Doe, unknown tenants and unknown spouses, have been named in foreclosure actions and served with complaints at increased costs to foreclosure Defendants;

d.      forged documents have been filed with the Courts in foreclosure actions;

e.      affidavits have been filed which were executed by persons without knowledge of the allegations contained in the affidavits;

f.      documents have been filed which were notarized outside the presence of the party whose signature was being notarized;

g.      Summary Judgments of foreclosure have been obtained without proper notice to the Defendants.

1.2.    As a result of these complaints, the DEPARTMENT opened an investigation into the business practices of the Respondents and other law firms.

1.3.    This Assurance is being entered by Respondents for the sole purpose of compromising disputed claims without the necessity for protracted and expensive litigation, and this Assurance does not in any regard or respect constitute an admission by Respondents of violations of any law or regulation.

1.4.    This Assurance is being entered by the DEPARTMENT to protect consumers by ensuring that best practices are utilized in foreclosure actions insuring significant and immediate changes in the process and procedures of litigation of foreclosure actions by Respondents.

3

Initial      Initial

## II.    TERMS

2.1.    Effective with the date of this Assurance, Respondents have agreed to implement the following policies and procedures and to ensure such best practices:

a.    As a condition precedent to initiating a foreclosure case in a circuit court in Florida, each foreclosure case file of Respondent, LAW OFFICES OF MARSHALL C. WATSON, P.A. will contain the following: (1) the original note, or a lost note affidavit; (2) the original mortgage or a copy of the recorded mortgage; and (3) documentation establishing the loan and mortgage are in default; if (1) through (3) do not reflect the Plaintiff to be named in the foreclosure complaint as the party entitled to foreclose the note and mortgage, there must also be contained in the law firm's file documentation reflecting that the Plaintiff is a holder of the note or a nonholder in possession of the note who has the rights of a holder pursuant to Section 673.3011 of the Florida Statutes.

b.    All foreclosure complaints filed subsequent to the effective date of this Assurance will name only one John or Jane Doe, or one unknown tenant per living unit unless Respondents have specific information in their file from a source in which MARSHALL A. WATSON has no ownership interest that there are persons other than the mortgagors residing in the home. Respondents will only add an "unknown spouse" as a party Defendant if there is information and documentation contained in Respondent's file that the property has been declared as Homestead Property. In the event of service by publication, Respondents' file will contain evidence of all efforts to make contact with

4

Initial    Initial

the Defendants listed in the foreclosure complaint to be served by publication prior to seeking service by publication.

c.     For cases that have already been filed and active, but in which no final judgment has yet been issued by the court on the effective date of this Assurance, the Respondents will ensure that prior to seeking entry of a final judgment the foreclosure court file contains the following: (i) the original note or a lost note affidavit; (ii) the original mortgage or a copy of the recorded mortgage; (iii) documentation establishing that the loan and mortgage are in default; and (iv) documentation reflecting that the named Plaintiff is entitled to enforce the mortgage. A verified complaint will only be required to be filed for complaints and amended complaints that were filed after June 3, 2010.

d.     For cases currently in litigation on the effective date of this Assurance, without a final judgment having been issued by the court, the Respondents shall review said filings for compliance with Section 2.1(c) of this agreement and will file either amended affidavits, replacement affidavits or notices of withdrawal of any affidavits executed by persons who Respondents learn did not have actual knowledge of the allegations contained in the affidavits. Respondents shall not proceed with the litigation until there is compliance with the terms and conditions of this provision.

2.2.     Respondents and their representatives, agents, employees, successors, assigns or any other person who acts under, by, through, or on behalf of Respondents, directly or indirectly, or through any corporate or other device, shall continue to comply with the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Florida Statutes.

5

Initial        Initial

2.3.    It is further agreed by the parties that Respondents shall be responsible for making the substantive terms and conditions of this agreement known to the officers, employees, agents, representatives, or any other persons that are substantially affected by this Assurance and are involved in Respondents' businesses, projects and activities. The obligation imposed by this paragraph is continuing in nature and shall apply to new officers, employees, agents, representatives or any other persons who become engaged in Respondents' business activities, including any future business activities in which MARSHALL C. WATSON engages.

2.4.    It is further agreed by the parties that Respondents shall not affect any change in the form of doing business, or the organizational identity of any of the existing business entities, or create any new business entities, as a method of avoiding the terms and conditions set forth in this Assurance.

2.5.    Nothing in this Assurance shall affect the private rights of any person or release any private causes of action.

### III.    STIPULATED PAYMENT

3.1.    The parties agree that Respondent shall contribute a total of one million dollars ($1,000,000.00) to the State of Florida, Office of the Attorney General, of Legal Affairs, pursuant to Section 501.207(6), Florida Statutes, in payment of all legal fees, costs and investigative fees regarding this investigation and in payment for costs of future investigations, if any. All payments shall be made by cashier's check or other certified funds, made payable to Department of Legal Affairs Revolving Trust Fund. The lump sum payment(s) shall be delivered to Assistant Attorney General June M. Clarkson and/or Assistant Attorney General Theresa B.

6

Initial    Initial

Edwards with the original executed Assurance and delivered to the Office of the Attorney General at 110 S.E. 6th Street, Tenth Floor, Ft. Lauderdale, Florida 33301.

3.2     Respondents shall make, at the time of the signing of the present agreement, a one million dollar ($1,000,000.00) donation to the Florida Bar Foundation, a Florida non-for-profit corporation (hereinafter "FBF"), Post Office Box 1553, Orlando, FL 32802-1553, to continue the Florida Attorney General Mortgage Foreclosure Grant Program, said funding to be utilized to provide legal assistance and representation to single family occupant homeowners in Florida who are in foreclosure proceedings or are in danger of facing foreclosure.

3.3     No statutory penalties or fines shall be applied.

3.4     The original Assurance, bearing the signature of Respondents' counsel and the notarized signatures of MARSHALL C. WATSON, individually and as President and Director of LAW OFFICES OF MARSHALL C. WATSON, P.A. and the above-described payments will be delivered to the attention of: June M. Clarkson and Theresa B. Edwards, Assistants Attorneys General, Office of Attorney General, Economic Crimes Division, 110 SE 6th Street, 10th Floor, Fort Lauderdale, FL 33301.

### IV.     BUSINESS RECORDS

4.1.     Respondents agree to retain documents and other information reasonably sufficient to establish compliance with the provisions herein, and shall provide reasonable access to such documents and information to the DEPARTMENT within ten days of request.

Respondents will provide to the DEPARTMENT the name of a person who will act as liaison for the firm, available to representatives of the DEPARTMENT to answer questions and provide information establishing compliance with the terms of this Assurance.

7

Initial          Initial

## V.    FUTURE VIOLATIONS

5.1.    It is hereby agreed by the parties that any willful failure by either Respondent to comply with the terms and conditions of this Assurance will be prima facie evidence of a violation of Chapter 501, Part II, Florida Statutes, and will subject the Respondent in violation to any and all civil penalties and sanctions authorized by law, including attorneys' fees and costs.

## VI.    CLOSURE OF INVESTIGATION

6.1.    The DEPARTMENT agrees to close its civil investigation into the activities of Respondents upon the execution of this Assurance by all parties. The parties agree that this Assurance has been entered into based on the truthfulness of the information provided by Respondents, in their individual and corporate capacities.

## VII.    EFFECTIVE DATE OF ASSURANCE OF VOLUNTARY COMPLIANCE

7.1    It is further agreed by the parties that the effective date of this Assurance shall be the date of its execution and delivery by all the parties, including each of the parties reflected by the signature lines below. Acceptance by the Office of the Attorney General can be established only by the signature of the Deputy Attorney General. It is further agreed that facsimile copies of signatures and notary seals may be accepted as original for the purposes of establishing the existence of this agreement.

## VIII.    NOTICE TO PARTIES

8.1.    It is further agreed that future notice to any of the parties to this Assurance may be made by notice sent certified mail to the addresses set forth below unless either party notifies the other by certified mail of another address to which notices should be provided.

8

Initial        Initial

## IX.    CONSTRUCTION OF AGREEMENT

9.1.    It is further agreed that the parties jointly participated in the negotiation of the terms of this Assurance. No provision of this Assurance shall be construed for, or against, any party, on the grounds that one party had more control over establishing the terms of this Assurance, than another.

GREENBERG TRAURIG
1221 Brickell Avenue
Miami, FL 33131

By: Holly R. Skolnick, Esq.
(305) 579-0860
skolnickh@gtlaw.com

Marshall C. Watson, individually
1800 NW 49ᵗʰ Street, #120
Fort Lauderdale, FL 33309

Marshall C. Watson as President and Director of
The Law Offices of MARSHALL C. WATSON, P.A.
1800 NW 49ᵗʰ Street, #120
Fort Lauderdale, FL 33309

STATE OF FLORIDA                    )

COUNTY OF BROWARD              )

BEFORE ME, an officer duly authorized to take acknowledgments in the State of Florida, personally appeared, Marshall C. Watson individually, and as President and Director of

9

Initial          Initial

## Service Mailing List

ResCap Claims Processing Center
c/o Kurtzman Carson Cosultants LLC
2335 Alaska Avenue
El Segundo, CA 90245

Judge Martin Glenn
The United States Bankruptcy Court
For the Southern District of New Cork
One Bowling Green, Room 501
New York, NY 10004

Kramer Levin Naftallis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10005

Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104

AlixPartners LLP
200 Town Center, Suite 2400
Southfiled , MI 48075

Moelis & Company LLC
399 Park Avenue
5th Floor
Ney York, NY 10022

Curtis, Mallet- Prevost , Colt & Mosle LLP
101 Park Avenue
New York, NY 10178-0061

FTI Consulting Inc.
3 Times Square, 9th Floor
New York , NY 10036

Centerview Parters LLC
31 West 52nd Street, 22nd Floor
New York, NY 10019

Arthur J. Gonzalez Esq.
New York University School of Law
40 Washington Square South , 314A
New York, NY 10012

United States Trustee
33 Whitehall Street
21st Floor
New York, NY 10004

### Office of the United States Trustee for the Southern District of New York

Office of the United States Trustee
33 Whitehall Street
21st Floor
New York, NY 10004
Attn:   Tracy Hope Davis, Esq.
        Brian Masumoto, Esq.
        Linda Riffkin, Esq.
Phone: (212) 510-0500
Facsimile: (212) 668-2255
Email: Tracy.Davis2@usdoj.gov
        Brian.Masumoto@usdoj.gov
        Linda.Riffkin@usdoj.gov

### Office of the United States Attorney General

U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001
Attn:   US Attorney General, Eric H. Holder, Jr.
Phone: (202) 514-2063
Facsimile: (202)307-6777
Email: AskDOJ@usdoj.com

### Office of the New York Attorney General

Office of the New York State Attorney General
The Capitol
Albany, NY 12224-0341
Attn:   Nancy Lord, Esq.
        Neal Mann, Esq.
Phone: (518) 474-5481
Email: Nancy.Lord@OAG.State.NY.US
        Neal.Mann@OAG.State.NY.US

### Office of the U.S. Attorney for SDNY

Office of U.S. Attorney for the Southern District of New York
One St. Andrews Plaza
New York, NY 10007
Attn:   Joseph N. Cordaro, Esq.,
Phone: (212) 637-2200
Facsimile: (212) 637-2745

**Debtors**

Residential Capital, LLC
1177 Avenue of the Americas
New York, NY 10036
Attn: Tammy Hamzehpour
Email: Tammy.Hamzehpour@gmacrescap.com


**Counsel to the Debtors**

Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104
Attn:   Larren Nashelskly, Esq.
        Gary S. Lee, Esq.
        Lorenzo Marinuzzi, Esq.
Phone: (212) 468-8000
Facsimile: (212) 468-7900
Email: LNashelskly@mofo.com
        Glee@mofo.com
        LMarinuzzi@mofo.com


**Counsel to the Creditors' Committee** of seno

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Attn:   Ken Eckstein
        Doug Mannal
Phone: (212) 715-9100
Facsimile: (212) 715-8000
Email: keckstein@kramerlevin.com
        dmannal@kramerlevin.com

**Prepetition Lenders**

Citibank N.A.
390 Greenwich Street, 6th Floor
New York, NY 10013
Attn: Bobbie Theivakurnaran
Phone: (212) 723-6753
Facsimile: (646) 291-3799
Email: bobbie.theivakurnaran@citi.com

Fannie Mae


15

3900 Wisconsin Avenue NW
Mail Stop 8H-504
Washington DC 20016
Attn: Vice President, Credit Management, John S. Forlines
Facsimile: (202) 752-2208
Email: john_s_forlines@fanniemae.com

### Counsel to Ally Financial Inc.

Kirkland & Ellis
601 Lexington Avenue
New York, NY 10022
Attn:   Ray C. Schrock
        Richard M. Cieri
Phone: (212) 446-4800
Facsimile: 212) 446-4900
Email: richard.cieri@kirkland.com
        stephen.hessler@kirkland.com
        projectrodeo@kirkland.com
        william.b.solomon@ally.com
        timothy.devine@ally.com

### Indenture Trustees

Deutsche Bank Trust Company Americas
25 DeForest Avenue
Summit, NJ 07901
Attn: Kevin Vargas
Phone: (201) 593-2456
Email: kevin.vargas@db.com

The Bank of New York Mellon
Asset Backed Securities Group
101 Barclay Street 4W
New York, NY 10286

U.S. Bank National Association
50 South 16th Street, Suite 2000
Philadelphia, PA 19102
Attn: George Rayzis
Phone: (215) 761-9317
Email: george.rayzis@usbank.com

U.S. Bank National Association

60 Livingston Avenue
EP-MN-WS1D
St. Paul, MN 55107
Attn: Irina Palchuk
Phone: (651) 495-3404
Facsimile: (651) 495-8100
Email: irinia.palchuk@usbank.com

**Counsel to U.S. Bank National Association**

Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178
Attn:   James S. Carr
        Eric R. Wilson
Phone: (212) 808-7800
Facsimile: (212) 808-7987
Email: kdwbankruptcydepartment@kelleydrye.com

Wells Fargo Bank, N.A.
P.O. Box 98
Columbia, MD 21046
Attn: Corporate Trust Services, GMACM Home Equity Notes 2004 Viable Funding Trust

**Counsel to Administrative Agent for the Debtors' Providers of Debtor in Possession Financing**

Skadden Arps Slate Meagher & Flom LLP
Four Times Square
New York, NY 10036
Attn:   Jonathan H. Hofer
        Ken Ziman
Phone: (212) 735-3849
Facsimile: (917) 777-3849
Email: jhofer@skadden.com
       kziman@skadden.com

**Nationstar Mortgage LLC**

Nationstar Mortgage LLC
350 Highland Drive
Lewisville, TX 75067
Attn: General Counsel
Phone: (469) 549-2000
Facsimile: (972) 315-8637

17

**Counsel to Nationstar Mortgage LLC**

Sidley Austin LLP
One Dearborn
Chicago, IL 60603
Attn:   Larry J. Nyhan
        Jessica CK Boelter
Phone:  (312) 853-7710
Facsimile:  (312) 853-7036
Email:  lnyhan@sidley.com
       jboelter@sidley.com
       bmyrick@sidley.com

**Internal Revenue Service**

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346
Facsimile:  (267) 941-1015

Overnight mail should be directed to:
Internal Revenue Service
2970 Market Street
Mail Stop 5-Q30.133
Philadelphia, PA 19104-5016

**U.S. Securities and Exchange Commission** send ok

Securities and Exchange Commission, New York Regional Office
3 World Financial Center, Suite 400
New York, NY 10281-1022
Attn:  George S. Canellos, Regional Director
Phone:  (212) 336-1100
Email:  newyork@sec.gov

18