UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Hearing Date: July 30, 2014

Hearing Time: 10:00A.M

In Re:

RESIDENTIAL CAPITAL, LLC, et al.

Debtors.

**<u>RESPONSE TO OBJECTION</u>**

**<u>TO CLAIM NOS. 3889, 4129</u>**

**<u>4134 and 4139</u>**

Chapter 11

Case No.: 12-12020 (MG)

Assigned to:

Hon. Martin Glenn

Bankruptcy Judge

**TIA SMITH'S OPPOSITION AND RESPONSE TO THE RESCAP
BORROWER CLAIMS TRUST'S SIXTY-NINTH OMNIBUS OBJECTION
TO CLAIM NUMBERS 3889, 4129, 4134 and 4139
<u>(NO LIABILITY BORROWER CLAIMS)</u>**

Dated: July 22, 2014
Los Angeles, California

Tia Smith
4011 Hubert Avenue
Los Angeles, CA 90008
Tel: 323-803-3027
Fax: 323-295 -0517
myfathersdiamond@msn.com

Claimant



RECEIVED
JUL 2 4 2014
U.S. BANKRUPTCY COURT, SDNY

i

# TABLE OF CONTENTS

I.      INTRODUCTION................................................................................1

A.  Claimant Requests the Court to Take Judicial Notice...........................2

II.     FACTUAL BACKGROUND...............................................................3

III.    STANDARD OF REVIEW..................................................................5

IV.     ARGUMENT.....................................................................................7

A.  Debtors' Account of Loan History.....................................................9

B.  The Note.......................................................................................9

C.  AMN Secured $100 Million Credit Facility from Debtors GMAC and RFC..............11

D.  Assumed Liability............................................................................12

E.  The ResCap Trust's Purported Declaration of Deanna Horst is not Admissible under the
    Federal Rules of Evidence and Should be Disregarded and Stricken ......................14

F.  Claimant's Claims are not Time-Barred...................................................17

G.  Claimant has Stated Proper Causes of Action under California and Federal Law Which
    are Subject to her Proof of Claims.......................................................20

        1.  Second Cause of Action for Fraud (Against RFC, GMACM and HF).......20

        2.  Third Cause of Action for Tortious Interference with Contract (Against RFC,
            GMACM and HF)..................................................................23

        3.  Wrongful Foreclosure (Against RFC, GMACM and HF)....................26

        4.  Fifth Cause of Action Cancellation of Instruments (Against RFC and
            GMACM)..........................................................................27

5.  Sixth Cause of Action for Breach of Contract [Deed of Trust and Promissory Note]..........................................................................29

6.  Seventh Cause of Action Breach of Contract [Workout and Forbearance Agreements]........................................................................30

7.  Eighth Cause of Action Violation of California Business and Professions Code Section 17200 et seq. ......................................................30

8.  Ninth Cause of Action Violation of California Civil Code § 1788.17 Unfair Debt Collection Practices ......................................................32

9.  Eleventh Cause of Action Unjust Enrichment ..................................32

10.  Twelfth Cause of Action Accounting............................................33

11. Thirteenth Cause of Action Constructive Trust ................................34

12. Fifteenth Cause of Action for Fraudulent Omissions..........................34

13. Sixteenth Cause of Action Quiet Title............................................35

14. Seventeenth Cause of Action Violation of TILA; 15 U.S.C. § 1601.........35

V.      CONCLUSION............................................................................35

# I.
## INTRODUCTION

1.      Tia Smith ("Claimant") filed a wrongful foreclosure action against Residential Funding
Company LLC ("RFC"), Homecomings Financial LLC ("HF"), GMAC Mortgage LLC
("GMACM"), and Residential Accredit Loans, Inc. ("RALI"), (collectively, "Debtors") in the
Los Angeles Superior Court in the State of California on July 15, 2011. Claimant's third
amended complaint (**"TAC"**) seeks to set aside a trustee's sale, declaratory and injunctive relief
against a threatened unlawful eviction and damages.

2.      On June 12, 2014, the ResCap Borrower Claims Trust ("ResCap Trust") filed its
objection to Claimant's Proof of Claims advancing multiple arguments which are not supported
by the law or facts before the Court.

3.      The Claims are based on a prepetition lawsuit filed by Appellant in California state
court. Accordingly, Claimant hereby files this Response to the ResCap Trust's Objection
pursuant to section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007. Claimant
opposes the ResCap Trust's objection on the basis that the ResCap Trust's reason for
disallowance and expungement is premature because the underlying issues set forth in the **TAC**
have not yet been adjudicated. As such, the determination by the ResCap Trust of no liability for
the amount of claim is unsupported until final disposition by the Los Angeles Superior Court in
the State of California.

4.      Essentially the ResCap Trust makes unsupported factual arguments which are not
admissible under the federal rules and cannot overcome the presumption in favor of Claimant. In
response Claimant puts forward actual admissible evidence and legal argument based on federal
and California law. For the reasons stated herein, the Trust's Objection should be overruled.

### A. *Claimant Requests the Court to Take Judicial Notice*

5.      Claimant requests that the Court take judicial notice pursuant to Fed. R. Evid. 201, of

certain facts that support her claims related to the Debtors' credibility and her Proof of Claims in

this Court.

Rule 201 ... provides that a Court shall take judicial notice of adjudicative facts...a Bankruptcy
Court, in the exercise of its discretionary power under this federal rule, could take judicial notice
of all administrative and judicial actions previously undertaken in the proceedings.

*In re Kors, Inc.*, 15 B.R. 444, 446 (Bankr. D. Vt. 1981.)

6.      Specifically, Claimant requests that this Court take judicial notice of the RALI 2007-

QO1 Trust's FORM 10K filing.  A true and correct copy is attached as **Exhibit 1** hereto.

7.      Claimant requests that the Court take judicial notice of American Mortgage Network,

Inc.'s Notice of Assignment, Sale or Transfer of Servicing Rights to Debtor Homecomings

Financial LLC.  A true and correct copy is attached as **Exhibit 2** hereto.

8.      Claimant requests that the Court take judicial notice of Debtor Homecoming Financial

LLC's letter noticing mortgage transfer from American Mortgage Network, Inc. to Debtor

Homecoming Financial LLC's.  A true and correct copy is attached as **Exhibit 3** hereto.

9.      Claimant requests that the Court take judicial notice of Aurora Loan Services LLC's

letter noticing servicing rights are being assigned, sold or transferred by Debtor Homecoming

Financial LLC.  A true and correct copy is attached as **Exhibit 4** hereto.

10.     Claimant requests that the Court take judicial notice of a copy of Claimants alleged

original Adjustable Rate Note.  A true and correct copy is attached as **Exhibit 5** hereto.

11.     Claimant requests that the Court take judicial notice of a copy of Claimants alleged

original Adjustable Rate Note.  A true and correct copy is attached as **Exhibit 6** hereto.

12.        Claimant requests that the Court take judicial notice of a copy of Claimant' alleged

Loan Application. A true and correct copy is attached as **Exhibit 7** hereto.

13.        "Judicial notice may be taken of documents filed in other cases and other courts."

***Hinton v. Bruno***, 2014 WL 645028, *1 (D. Conn. 2014) (citing ***Int'l Star Class Yacht Racing***

***Ass'n v. Tommy Hilfiger U.S.A., Inc***. 146 F.3d 66, 70 (2d Cir. 1998)). *See also **Wolson v. Reed***

***Elsevier Inc.***, 2010 WL 334919 *1 (S.D.N.Y.2010) (taking judicial notice of settlement

agreement filed in multi-district class action case in ruling on motion to dismiss).

## II.
## FACTUAL BACKGROUND

14.        December 2, 2006 Claimant executed a promissory note ("Note") in the amount of

$556,000 in favor of American Mortgage Network, Inc. ("AMN.") (*TAC*; **Exhibit A.**) The

refinance loan was allegedly secured by a DOT encumbering 4011 Hubert Avenue in Los

Angeles, ("Property.") recorded on December 8, 2006. The DOT identified Appellant as

borrower, AMN as ***Lender***, MERS as nominal beneficiary "acting solely as a nominee for

***Lender*** and ***Lender***'s successors and assigns" and First American Title Insurance Company

("First American") as trustee. (*TAC*; **Exhibit B.**)

15.        Claimant's loan was ***purportedly*** sold to a securitized trust, Residential Accredit Loans

Inc., Series 2007-QO1 Trust. ("RALI 2007-QO1 Trust.")  Deutsche Bank Trust Company

Americas serves as trustee of the RALI 2007-QO1 Trust ("DBTCA.")

16.        ***According*** to a notice dated December 30, 2006, AMN informed Claimant her

mortgage servicing rights ***were being transferred*** to Homecomings Financial ("HF.") (**Exhibit**

**2.**)

17.        ***According*** to a letter dated January 16, 2007, HF informed Claimant they were her new

servicer. (**Exhibit 3.**) Appellant began making payments to Homecomings in February 2007.

18.     *According* to the RALI 2007-QO1 Trust's **FORM 10-K ANNUAL REPORT** filed
with the Securities and Exchange Commission ("SEC"), Residential Capital, LLC ("ResCap"),
which owns indirectly all of the equity of both Defendants Homecomings and GMAC Mortgage
LLC ("GMACM") restructured the operations of Homecomings and GMACM. As a result of
such restructuring, on **September 24, 2007, Homecomings transferred its *entire* mortgage
servicing platform to GMACM and Homecomings has not serviced any of those mortgage
loans** since. **(Exhibit 1.)**

(See http://www.sec.gov/Archives/edgar/data/1384915/000138491508000009/qo110k07.txt)

19.     *According* to a letter dated March 18, 2008 **ALS informs Claimant the servicing of
her loan was being assigned, sold or transferred from Homecomings to ALS and the
transfer included the right to collect payments from Claimant. (Exhibit 4.)**

20.     *According* to a representative of ALS, on April 30, 2008, **ALS orally told Appellant
she was in default.**

21.     July 15, 2011, Appellant filed this underlying action to prevent a wrongful foreclosure.

22.     November 16, 2011, ALS purportedly purchased Appellant's home in a foreclosure sale
utilizing a credit bid.

23.     On May 14, 2012, each of the Debtors filed a voluntary petition for relief under chapter
11 of the Bankruptcy Code, **thereby staying all proceedings in Claimant's wrongful
foreclosure action towards the Debtors.**

24.     On August 29, 2012, this Court entered the Bar Date Order, which established
November 9, 2012 at 5:00 p.m. as the deadline to file proofs of claim by virtually all creditors
against the Debtors (the "General Bar Date") and prescribed the form and manner for filing
proofs of claim. (ECF Doc. # 1309 ¶¶ 2, 3.)

25.    On November 9, 2012, Claimant filed the following proof of claims:

1.  No. 3889, a General Unsecured claim in the amount of $3,000,000.00 against Debtor
    GMACM.

2.  No. 4129, a General Unsecured claim in the amount of $3,000,000.00 against Debtor HF.

3.  No. 4134, a General Unsecured claim in the amount of $3,000,000.00 against Debtor
    RFC.

4.  No. 4139, a General Unsecured claim in the amount of $3,000,000.00 against Debtor
    RALI.

26.    The Court entered an order on March 21, 2013 (the "Procedures Order," ECF Doc. #

3294), authorizing the Debtors to file omnibus objections on various grounds, including those

provided in ***Bankruptcy Rule 3007(d)*** and certain additional grounds.

27.    On June 25, 2014, the Trust filed the *ResCap Borrower Claims Trust's Sixty-Ninth*

*Omnibus Objection to Claims (No Liability Borrower Claims)* (the "Objection," ECF Doc. #

7188). The ResCap Trust attached a chart for each claim submitted by Claimant asserting their

lack of liability.  In support of the Objection, the ResCap Trust submitted the Declarations of

Deanna Horst (the "Horst Decl.," ResCap Trust's Objection, Exhibit 2) and Norman Rosenbaum

(the "Rosenbaum Decl.," ResCap Trust's Objection, Exhibit 4).

### III.
### STANDARD OF REVIEW

28.    ***Section 501(a) of the Bankruptcy Code*** provides that "[a] creditor . . . may file a proof

of claim." ***11 U.S.C. § 501(a).*** A filed proof of claim is "deemed allowed, unless a party in

interest ...objects." ***11 U.S.C. § 502(a).*** If the claim is properly filed, it is *prima facie* evidence of

the validity and amount of the claim.  *See **FED. R. BANKR. P. 3001(f).*** A party in interest may

object to a proof of claim, and once an objection is made, the court must determine whether the

objection is well founded. *See 4 COLLIER ON BANKRUPTCY* ¶ 502.02[2] (16th ed. 2013).

Although *Bankruptcy Rule 3001(f)* establishes the initial evidentiary effect of a filed claim…

[t]he burden of proof for claims brought in the bankruptcy court under *[section] 502(a)* rests on different parties at different times. Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is "*prima facie*" valid. In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. The burden of going forward then shifts to the objector to **produce evidence** sufficient to negate the *prima facie* validity of the filed claim. It is often said that the objector **must produce evidence** equal in force to the *prima facie* case. In practice, the objector **must produce evidence** which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector **produces sufficient evidence** to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence.

29.      *In re Allegheny Intern., Inc.*, 954 F.2d 167, 173–74 (3rd Cir. 1992) (internal citations

omitted). *In re MF Global Holdings Ltd.*, Nos. 11-15059, 11-02790, 2012 WL 5499847, at * 3

(Bankr. S.D.N.Y. Nov. 13, 2012) ("The party objecting to the proof of claim bears the burden of

"**providing evidence** to show that the proof of claim should not be allowed"). (emphasis and

underscore added)

30.      If the objecting party satisfies its initial burden and "the presumption of *prima facie*

validity is overcome—e.g., the objecting party establishes that the proof of claim lacks a sound

legal basis—the burden shifts to the claimant to support its proof of claim unless the claimant

would not bear that burden outside of bankruptcy." *Id.* (citing *In re Oneida Ltd.*, 500 B.R. 384,

389 (Bankr. S.D.N.Y. 2009). *Bankruptcy Code section 502(b)(1)* provides that claims may be

disallowed if "unenforceable against the debtor and property of the debtor, under any agreement

or applicable law." To determine whether a claim is allowable by law, bankruptcy courts look to

"applicable nonbankruptcy law." *In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del.

2006). "What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition is filed, is a question which, in the absence of overruling federal law, is to be determined by reference to state law." *In re Hess*, 404 B.R. 747, 749 (Bankr. S.D.N.Y. 2009) (quoting *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161 (1946)).

## IV.
## ARGUMENT

31.     Claimant contends that the Debtors have failed to come forth with any admissible evidence refuting her allegations essential to her claims. Claimant contends that her Property was wrongfully foreclosed upon by the Debtors and/or Debtors' agents without any legal, equitable or pecuniary right. As a result of the Debtors' acts and omissions, Claimant has sustained damages and losses which are subject to her Proof of Claim Nos. 3889, 4129, 4134 and 4139. The fact that Claimant has been delayed in pursuing her claims by the filing of the Debtors' bankruptcy petition does not diminish the validity of stated and verified claims which the Debtors' have not rebutted whatsoever with any admissible evidence.

32.     Additionally, Claimant asserts she has standing as either a third-party beneficiary or an incidental beneficiary to challenge the ResCap Trust's assertion that her loan is included in the RALI 2007-QO1 Trust. Claimant also asserts she has standing as either a third-party beneficiary or an incidental beneficiary to challenge the Debtors non-compliance of the RALI 2007-QO1 Trust's Governing Documents.

33.     Claimant refinanced her Property in December of 2006, executing a promissory note ("Note") and deed of trust ("DOT") in favor of American Mortgage Network, Inc. (AMN.")

34.     Shortly thereafter, AMN sent Claimant a letter notifying her that Debtor HF would

soon begin to service her mortgage loan. (**Exhibit 2**.)  Debtor HF also sent Claimant a letter

notifying her that it would begin to service her mortgage loan. (**Exhibit 3**.)

35.    The RALI 2007-QO1 Trust, *allegedly* issued by Debtor RALI filed a 10K form with the

Securities and Exchange Committee ("SEC") declaring that on September 24, 2007, Debtor HF

transferred their **entire** mortgage servicing platform to Debtor GMACM.  The RALI 2007-QO1

Trust also declared that after September 24, 2007, HF **did not** service *any* loans subject to the

RALI 2007-QO1 Trust whatsoever.

36.    Unbeknownst of the above-referenced transfer between Debtors HF and GMACM,

Claimant called HF and requested a loan modification in November of 2007.  Miriam,

*purportedly* HF's representative informed Claimant that because she was current she could not

apply for a loan modification.  Inviting Claimant's nonperformance, Miriam told Claimant she

would need to skip at least three mortgage payments in order to qualify and be considered for a

loan modification.  Miriam assured Claimant she would not be in default.  Relying and following

Miriam's advice, Claimant skipped three mortgage payments. (*Newsom v. Bank of Am., N.A.,*

2014 WL 2180278 (C.D. Cal. May 22, 2014): [borrowers were current on their mortgage when

they began the modification process and were "misled into defaulting." But for servicer's

misrepresentation, borrowers would not be in their current position. The court allowed

borrower's fraud claim to survive the MTD.])

37.    *According* to the ResCap Trust, HF serviced Claimant's loan until transferring it to

ALS on April 1, 2008. (*See* ResCap Objection; Exhibit 1 p. 7 ¶ 1.)  However, *according* to the

RALI 2007-QO1 Trust's **10K** filing with the SEC, **HF did not service *any* loans subject to the**

**RALI 2007-QO1 Trust after September 24, 2007.**  (**Exhibit 1**.)  The ResCap Trust completely

contradicts the RALI 2007-QO1 Trust's filing by stating that HF serviced Claimant's loan until

April of 2008. In light of this confusion, Claimant is uncertain which entity actually interfered with her compliance and performance, advising her to skip her mortgage payments. Was it HF, GMACM, ALS, or some other legal stranger?

38.        Claimant received a letter dated March 18, 2008 from Debtors RFC and HF's *alleged* successor in interest, Aurora Loan Services, LLC ("ALS"), notifying Claimant that HF had transferred the servicing rights of her debt obligation to ALS. (**Exhibit 4**.) In April of 2008, ALS informed Claimant she was in default. Claimant apprised ALS of HF's representations and ALS claimed there were no notes regarding HF's representations.

39.        Thereafter, Claimant began an unsuccessful, three year journey to ascertain a loan modification with Debtors RFC and HF's *alleged* successor in interest and agent, ALS.

### A. *Debtors' Account of Loan History*

40.        *According* to the ResCap Trust, AMN originated Claimant's loan on November 13, 2006. Debtor RFC purchased the loan from AMN. Interestingly, the ResCap Trust fails to mention the date of sale between RFC and AMN. The ResCap Trust also states that the loan was then securitized where Deutsche Bank Trust Company Americas was appointed trustee on or about January 30, 2007. However, the ResCap Trust fails to identify the specific trust Deutsche Bank Trust Company Americas as trustee represents. The ResCap Trust states that HF serviced the Loan from December 29, 2006 until servicing transferred to ALS on April 1, 2008. (*See* ResCap Objection; Ex. 1 p. 7 ¶ 1; p. 8 ¶ 1; p. 9 ¶ 1 ;p. 10 ¶ 1.)

### B. *The Note*

41.        On December 2, 2006 Claimant refinanced her Property with a loan purportedly issued by AMN. Claimant signed a Note as the sole obligor in the amount of $556,000.00 in favor of AMN. The Note named the ***Lender***, AMN as the sole obligee.

42.        An endorsement that identifies the person or entity "to whom it makes the instrument

payable" is known as a special endorsement. An instrument, when specially indorsed, becomes

payable to the identified person and may be negotiated _**only**_ by the endorsement of that person.

A special endorsement exists in opposition to a blank endorsement, which does not identify a

payee, and instead makes the instrument "payable to bearer" and negotiable "by transfer of

possession alone until specially indorsed."

43.        Both RFC and HF's _alleged_ successor in interest, ALS, sent Claimant two different

copies of her Note. Both copies purport to be true and accurate copies of the original note. In

order to evidence a complete or unbroken chain of title, the Note should show a special

endorsement from AMN to RFC. The Note then should show a special endorsement from RFC to

RALI. The Note then should show a special endorsement from RALI to RFC. And finally, the

Note should show a special endorsement from RALI to DBTCA.

44.        _**Instead,**_ the first Note at issue here was originally payable to AMN and was allegedly

transferred (negotiated) in blank by AMN with an undated blank endorsement on an unnumbered

page of the Note. The endorsement reads "Pay To the Order of" is blank 'WITHOUT

RECOURSE, American Mortgage Network, Inc., a Delaware Corporation and was signed by

Tiffany Rice, Funder" for AMN. **The copy of this Note fails to support the ResCap Trust's**

**claim that Claimant's mortgage was securitized.** (**Exhibit 5**.)

45.        The second Note at issue was originally payable to AMN and was allegedly transferred

(negotiated) by special endorsement to Residential Funding Corporation (RFC), signed by

Tiffany Rice, Funder for AMN. Next the same Note was allegedly transferred (negotiated) by

special endorsement, to Deutsche Bank Trust Company Americas as Trustee ("DBTCA"), signed

by Judy Faber, Vice President for RFC. However, Judy Faber fails to identify the specific trust

DBTCA represents. Lastly, the same Note was allegedly transferred (negotiated) by special

endorsement via an allonge to Aurora Loan Services LLC signed by Judy Deits, Authorized

Officer for RFC, Deutsche Bank Trust Company Americas as Trustee's, Attorney in Fact.

Similarly, Judy Deits also fails to identify the specific trust DBTCA represents. All

endorsements are undated. **The copy of this Note also fails to support the ResCap Trust's**

**claim that Claimant's mortgage was securitized.** (**Exhibit 6**.)

46.      Both copies of the Note supplied by RFC and HF's *alleged* successor in interest, ALS,

evidence a broken chain of title showing that Claimant's Note and DOT were not delivered into

the RALI 2007-QO1 Trust.      These *alleged* transfers are totally inconsistent with the

representations and warranties made in the PSA to the SEC and to the holders of the bonds (the

Certificate-Holders) issued by the RALI 2007-QO1 Trust. Due to the inconsistencies between

the copies of the Note and the lack of an explanation as to how ALS came to offer two different

copies of the Note into the record, Claimant contends that there is a genuine issue of material fact

as to whether Claimant's Note and DOT were deposited into the RALI-2007-QO1 Trust when

there is an unexplained gap in the chain of title.    .

### C. AMN Secured $100 Million Credit Facility from Debtors GMAC and RFC

47.      The definition of "warehouse lending" is a line of credit extended by a financial

institution (Debtors GMACM and RFC) to a loan originator (AMN) to fund a mortgage that a

borrower (Claimant) initially used to buy or refinance a property.  The loan typically lasts from

the time it is originated to when the loan is sold into the secondary market, whether directly or

through a securitization.

48.      Claimant contends that prior to closing, her loan was pre-sold to the RALI 2007-QO1

Trust Certificate-Holders. This may explain why the Debtors falsified, fabricated and forged

Claimant's Loan Application after she signed her loan documents, as Debtors needed to meet

certain requirements subject to the RALI 2007-QO1 Trust's Pooling and Servicing Agreement

("PSA"). After closing, Claimant's Loan was *purportedly* deposited into the RALI 2007-QO1

Trust. However, Claimant contends her mortgage was NEVER deposited into the RALI 2007-

QO1 Trust. If Claimant's allegations are proven, that the Debtors were involved in the

origination of her loan, the Debtors would therefore be liable for any and all loan origination

claims.

### D. Assumed Liability

49.      The ResCap Trust argues that they have no liability for Claimant's origination based

claims because no Debtor was involved in the origination of this loan. There is no stated legal

basis in the claims for assignee liability and all of the origination claims are time-barred. (*See*

ResCap Trust's Objection; Ex. 1 p. 7 ¶ 2; p. 8 ¶ 2; p. 9 ¶ 2; p. 10 ¶ 2.)

50.      The ResCap Trust claims that the Debtors were at one time or another, a purchaser

and/or servicer of Claimant's Loan. Claimant contends that because the Debtors were warehouse

lenders (the funding source), purchasers and servicers, agency principles apply in this case. As

such, the owner of a mortgage loan may be held vicariously liable for the violations of its

agent[s]. *LiMandri v. Judkins*, 52 Cal.App.4th 326, 337, 60 Cal.Rptr.2d 539 (1997) ("[A] duty

to disclose may arise from the relationship between ... parties entering into any kind of

contractual agreement."). It does not matter that the original transaction was not between

Claimant and the Debtors, because by purchasing the loan, Debtors RFC, GMACM and RALI

subjected itself to potential liability for its role in the alleged fraudulent scheme. Under *TILA*,

however, "[a]ny person who purchases or is otherwise assigned a mortgage ... shall be subject to all claims and defenses with respect to that mortgage that the consumer could assert against the creditor of the mortgage." *15 U.S.C. § 1641(d) (1)*. In turn, "the UCL borrows violations of other laws ... and makes those unlawful practices actionable under the UCL." *Leonel v. Am. Airlines, Inc.*, 400 F.3d 702, 715 (9th Cir.2005)(quoting *Lazar v. Hertz Corp.*, 69 Cal.App.4[th] 1494, 82 Cal.Rptr.2d 368 (1999)). Accordingly, since *TILA* provides that the purchase of a deceptive mortgage is itself actionable conduct, a UCL claim against an assignee whose own actions violate *TILA* cannot properly be described as imposing "vicarious" liability. *See, e.g., Srithong v. Total Inv. Co.*, 23 Cal.App.4th 721, 726, 28 Cal.Rptr.2d 672 (1994) ("Vicarious liability 'means that the act or omission of one person ... is imputed by operation of law to another[.]' " (quoting *Far West Fin. Corp.v. D & S Co.*, 46 Cal.3d 796, 819, 251 Cal.Rptr. 202, 760 P.2d 399 (1988) (Kaufman, J., concurring and dissenting))) (alteration in original).

51.    Claimant alleges her loan was *allegedly* pooled with other loans and pre-sold with a contractual commitment to the Certificate-Holders of the RALI 2007-QO1 Trust's **and** pursuant to the specific terms under the RALI 2007-QO1 Trust's **Prospectus and the PSA**, RFC and RALI agreed to assume *all* liability to which AMN was subject in connection with that loan. Such a broad assumption of liability includes tort liability arising from the conduct of AMN and/or its agents in the origination of the loan.

52.    Claimant alleges because the Debtors GMACM and RFC supplied the funding for AMN through a warehouse line of credit pursuant to the specific terms subject to the **Revolving Purchase Agreement** between AMN and the Debtors GMACM and RFC, the Debtors agreed to assume *all* liability to which AMN was subject in connection with that loan. Such a broad

assumption of liability includes tort liability arising from the conduct of AMN and/or its agents in the origination of the loan.

53.    In addition, Claimant alleges pursuant to the specific terms under the **Assignment and Assumption  Agreement,** which RFC *allegedly* purchased Claimant's Loan from AMN, RFC agreed to assume *all* liability to which AMN was subject in connection with that loan. Such a broad assumption of liability includes tort liability arising from the conduct of AMN and/or its agents in the origination of the loan.

54.    Claimant alleges pursuant to the specific terms under the **Assignment and Assumption Agreement**, which RALI *allegedly* purchased Claimant's Loan from RFC, RALI agreed to assume *all* liability to which RFC was subject in connection with that loan. Such a broad assumption of liability includes tort liability arising from the conduct of RFC and/or its agents in the origination of the loan. The tort liability of one corporation can be 'assumed voluntarily by contract' by another corporation. (See ***Henkel Corp. v. Hartford Accident & Indemnity Co***. (2003) 29 Cal.4th 934, 941.)

55.    Claimant alleges pursuant to the specific terms under the RALI 2007-QO1 Trust's **PSA**, the servicer or the master servicer will remain liable for its servicing obligations that are delegated to a subservicer as if the servicer or the master servicer alone were servicing such mortgage loans or contracts.  Such a broad assumption of liability includes tort liability arising from the conduct of AMN, HF, GMACM, ALS and/or its agents in the servicing of the loan.

E. *The ResCap Trust's Purported Declaration of Deanna Horst is not Admissible under the Federal Rules of Evidence and Should be Disregarded and Stricken*

56.    The declaration of Deanna Horst with which the Trust attempts to support its version of the facts explicitly incorporates inadmissible hearsay evidence and should be disregarded by the

Court. Specifically, Ms. Horst's declaration states:

"...all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents **and information I have received through my discussions with former members of the Debtors' management or other former employees of the Debtors...**" (ResCap Trust's Objection; Exhibit 2 ¶ 2) (emphasis added.) "...**I or my designee at my direction other have reviewed and analyzed the proof of claim forms and supporting documentation, if any, filed by the claimants listed..** Since the Plan became effective and the Trust was established, **I, along with other members of the Liquidating Trust's management or other employees of the Liquidating Trust have consulted with the Trust to continue the claims reconciliation process, analyze claims, and determine the appropriate treatment of the same.** In connection with such review and analysis, where applicable, **I or other the Liquidating Trust personnel under my supervision, and the Liquidating Trust's and the Trust's professional advisors...**" (ResCap Trust's Objection: Exhibit 2 ¶ 3) (emphasis added)

57.     *Federal Rule of Evidence 801* defines hearsay as "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." The Horst declaration falls squarely under this definition, as the declarant, Ms. Horst, is not making her statements to be presented to the Court at a hearing on the objection to Claimant's Proof of Claims, and the statements contained in her declaration are being offered for their truth. *Federal Rule of Evidence 802* precludes admission of hearsay unless otherwise provided by a federal statute, the Federal Rules of Evidence or other rules prescribed by the Supreme Court.

58.      In this case, no such provision is made for the testimony in Ms. Horst's declaration, which she admits is based on information provided by an unknown number of unnamed persons. To the extent the ResCap Trust relies on the exception for regularly conducted activity for the admissibility of Ms. Horst's declaration, this reliance is misplaced. ***Federal Rule of Evidence 803(6)*** does provide that a record of a regularly conducted activity is admissible as an exception to the hearsay rule. However, in order to qualify as a record of a regularly conducted activity however, the party offering the purported record **must show**, *inter alia*, that "the record was made at or near the time by – or from information transmitted by – someone with knowledge... the record was kept in the course of a regularly conducted activity of a business... making the record was a regular practice of that activity...[and]...neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness." Here, the Horst Declaration was not made at or near the time of the events it recounts.

59.      The declaration was executed on June 25, 2014, but purports to describe events that happened as far back as November 13, 2006. There is no showing by the ResCap Trust that the statements in the declaration were transmitted by anyone with knowledge of the facts alleged. Indeed, the ResCap Trust does not even assert such transmission. Secondly, the declaration is not a document kept in the course of the ResCap Trust's regularly conducted business activity, and there is no showing or assertion to the contrary. Finally, the fact that the declaration explicitly states that it is based on information supplied by unnamed individuals at unspecified times, but then does not indicate at any time what particular facts were transmitted to Ms. Horst by these persons indicates a lack of trustworthiness that should preclude the declaration's admission into evidence. It is the business records that constitute the evidence, not the testimony of the witness

referring to them. To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required except as otherwise provided by law.

60.    How can the parties or the Court determine which of the facts in the declaration are based on Ms. Horst's personal knowledge, and which have been supplied by the unnamed persons to which she refers? How can the parties or the Court even know that such unnamed persons actually exist? The vague, boilerplate references to unnamed sources of unspecified information indicates a lack of trustworthiness in the circumstances of this declaration's preparation that should preclude its admission.

61.    In a similar situation where a declarant hoped to affirm the accuracy of information transmitted by an unknown number of unnamed persons at unnamed times, the Federal District Court for the Eastern District of New York stated that "[s]ignificantly, Plaintiff never identified the source for her information regarding the interaction, or lack thereof, between [other parties], and her assertion appears to be rooted in hearsay..." ***Hyek v. Field Support Services, Inc.***, 702 F.Supp.2d 84, 96 (E.D.N.Y. 2010). Such is the case here. The ResCap Trust hopes to support numerous factual assertions with Ms. Horst's declaration, which admittedly relies on information transmitted by an unspecified number of unnamed people on unspecified dates. Such a declaration is plainly inadmissible hearsay not subject to any exception to the general ban on hearsay evidence and should be excluded, stricken, and otherwise disregarded by the Court.

### *F. Claimant's Claims are not Time-Barred*

62.    The statute of limitations for fraud is three years. (***Code of Civil Procedure § 338, subd. (d)***; ***Krieger v. Nick Alexander Imports, Inc.*** (1991) 234 Cal.App.3d 205, 219.) This section also codifies the delayed discovery rule, providing a cause of action for fraud "'is not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting

the fraud or mistake.'"(***Brandon G. v. Gray*** (2003) 111 Cal.App.4th 29, 35; ***Code of Civil Procedure § 338, subd. (d);*** see also ***Code of Civil Procedure § 312.***)

63.     "[T]he ground of relief is that the defendant, having by fraud or deceit concealed material facts and by misrepresentations hindered the plaintiff from bringing an action within the statutory period, is estopped from taking advantage of his own wrong."(***Pashley v. Pacific Elec. Ry. Co.*** (1944) 25 Cal.2d 226, 231.)

64.     Claimant contends she didn't and couldn't have discovered through the exercise of reasonable diligence she was injured by the Debtors' manipulation of her Loan Application. Thereby, tricking her into her loan, or much less who caused that injury, until, at the earliest on or near November 15, 2009, when Appellant received ALS' response to her qualified written request. ("QWR.") The QWR was accompanied by a compact disc, which contained a copy of her alleged Loan Application. (***TAC*** ¶¶ 16-17; 52-53.) However, Claimant didn't review the Application until sometime in June of 2011.

65.     Similarly, Claimant contends she didn't and couldn't have discovered through the exercise of reasonable diligence a 2nd promissory Note purportedly endorsed to ALS. Claimant received ALS' response to another QWR. (***TAC*** ¶ 69.) The QWR was accompanied by another compact disc, which contained a copy of her alleged Note. Although she received this evidence in late July of 2011, Claimant failed to read the Note in its entirety until August 10, 2013.

66.     Additionally, Appellant didn't and couldn't have discovered through the exercise of reasonable diligence she was injured by Debtors tricking her into her loan, much less who caused that injury, until, at the earliest on or near October 25, 2012, when ALS made a judicial admission in support of its motion for relief from stay in her tenant, Stanley Barnett's bankruptcy

case, that **Deutsche Bank funded Appellant's loan**. Claimant was led to believe AMN **funded** the refinance of her mortgage. Because Debtors didn't disclose this information to Appellant before she signed her loan documents, Claimant couldn't have discovered this concealed fact. (*TAC* ¶ 248.) 'The fact…the party seeking relief has read the instrument and knows its contents does not prevent a court from finding…it was executed under a mistake.'[Citations.]" (*Western Title Guar. Co., supra,* 235 Cal.App.2d at p. 285.)

67.      Finally, Claimant contends she recently discovered Debtors' *alleged* successor in interest and agent, ALS **NEVER** acquired servicing rights of her loan. Although, Claimant has contended all along ALS didn't have *any* legal rights, she only recently discovered ALS did not acquire servicing rights from Debtor HF in *any* manner because Debtor HF transferred its *entire* mortgage servicing platform to Debtor GMACM on September 24, 2007, prior to ALS' claim of acquisition. (**Exhibit 1**.) Claimant didn't and couldn't have discovered through the exercise of reasonable diligence she was injured by ALS claiming to be her servicer, until, at the earliest July 15, 2011. Although ALS' representative revealed the "code name" of Claimant's *Lender*, it took further research to discover the "code name" referenced a REMIC trust. (*TAC* ¶ 69.) Although, Claimant obtained the RALI 2007-QO1 Trust's 10K filing in July of 2011, she did not discover HF transferred its servicing platform to Debtor GMACM until November 2013. Because neither Debtor HF nor Debtor GMACM notified Claimant regarding its transfer between the two, Claimant couldn't have discovered this concealed fact.

68.      Claimant alleges the statute of limitations had not run on any of her causes of action. Thus, because Claimant brought her action within three years of actually discovering the mistake or within three years of receiving facts putting her on inquiry or with which facts she, by

reasonable diligence, could and should have discovered the mistake, the statute of limitations doesn't bar Claimant's claims.

### G. Claimant has Stated Proper Causes of Action under California and Federal Law Which are Subject to her Proof of Claims

69.     The ResCap Trust argues that they have no liability for Claimant's origination based claims because "no Debtor was involved in the origination of this loan. There is no stated legal basis in the claims for assignee liability and all of the origination claims are time-barred." (*See* ResCap Trust's Objection Exhibit 1 p. 7 ¶ 2; p. 8 ¶ 2; p. 9 ¶ 2; p. 10 ¶ 2.)  The ResCap Trust asserts that based on the facts and reasons stated in its *No Liability Summary*, Claimant's Proof of Claims do not give rise to liability for claims for fraud, tortious interference with contract, wrongful foreclosure, cancellation of instruments, breach of contract, breach of forbearance agreements, unfair competition, unfair debt collection, *TILA*, unjust enrichment, accounting, constructive trust, fraudulent omissions, or quiet title. (ResCap Trust's Objection Exhibit 1 p. 7 ¶ 4; p. 8 ¶ 4; p. 9 ¶ 4; p. 10 ¶ 4.)  The ResCap Trust is wrong.

### 1. Second Cause of Action for Fraud (Against RFC, GMACM and HF)

70.     The elements of a cause of action for fraud are: (1) a misrepresentation; (2) knowledge of falsity; (3) intent to defraud or induce reliance; and (4) actual reliance by the plaintiff resulting in damage. (*CCC § 1709*; *Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1255; *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173.) (*Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 990.)

71.     The ResCap Trust argues that the Debtors have no liability for Claimant's origination based claims because no Debtor was involved in the origination of her loan.  Yet, Debtors RFC and HF's *alleged* successor in interest, ALS, the *alleged* servicer for DBTCA contradicts Debtors argument by claiming DBTCA **funded** Claimant's Loan.

72.     *According* to ALS "…Deutsche Bank was the investor who provided the funds for the

loan, not the lender or beneficiary…" Claimant alleges that because full disclosure was ***not*** given

regarding the parties involved, each party's respective rights, and the true intentions of the

parties, **she disputes the validity of the Note, the DOT, the parties involved and the amounts**

**owed.** Claimant alleges other agreements (i.e. the RALI 2007-QO1 Trust's PSA) were

*purportedly* made outside of her mortgage contract and these agreements altered the nature of her

mortgage. As such, **Claimant alleges she didn't consent** to the formation of the alleged

contracts and she seeks cancellation of the Note and DOT. *Harris v. Atlantic Richfield Co.*, 14

Cal. App. 4th 70, 78 (1993) ("when one party commits a fraud during the contract formation or

performance, the injured party may recover in contract and tort"). "Contract formation requires

mutual consent, which cannot exist unless the parties 'agree upon the same thing in the same

sense." *Bustamante v. Intuit, Inc.,* 141 Cal. App. 4th 199, 208 (2006) (quoting *California Civil*

*Code §§ 1580, 1550, 1565*). As a condition of obtaining cancellation of a voidable deed, the

party seeking relief is generally required to restore or offer to restore to the defendant everything

of value received in the underlying transaction. However, if the deed is *void*, as in the case of

fraud in the execution or forgery, restoration is not necessary [see *Fleming v. Kagan* (1961) 189

Cal. App. 2d 791, 796, 797, 11 Cal. Rptr. 737.]

73.     *Importantly*, Debtor RFC was the original sponsor and master servicer for the RALI

2007-QO1 Trust. RFC *allegedly* sold its master servicing rights of *all* the pooled loans within

the RALI 2007-QO1 Trust to ALS sometime in April 2008. This *purported* sale allegedly

included all RFC's books and records for the RALI 2007-QO1 Trust.

74.     ***According*** to ALS, the Debtors had actual and constructive notice of the *alleged* fraud perpetrated at origination because the Debtors had in their possession the original forged Loan Application used to induce Claimant to enter into said mortgage loan with Debtors' agent, AMN.

75.     Claimant asserts Debtors falsified her income and forged her signature on the Loan Application, ***after*** she executed her loan, but before the DOT recorded. (**Exhibit 7**) (*TAC* ¶¶ 16, 260.) Claimant contends the DOT and Note are *void* as a result of Debtors' fraudulent conduct. (*TAC* ¶¶-151-152.)

76.     Claimant relied on Debtor HF and Debtors' agents' misrepresentations and has been damaged in the following ways: (1) she has been deprived of the equity in her home; (2) the title to her home has been clouded; (3) she paid the wrong party for an undetermined amount of time and has overpaid in interest, penalties, fees and taxes that were calculated as a result of the misapplication of payments; (4) her credit and credit scores have been damaged; (5) she has expended significant funds to cover litigation costs; (6) multiple parties may seek to enforce her debt obligation against her; (7) Appellant's home has *purportedly* been sold at a trustee's sale; and (8) she had to defend an unlawful eviction. These are all sufficient allegations of injury. (*TAC* ¶ 271.)

77.     Claimant provides facts supporting her allegations that, depending on the evidence, could lead a trier of fact to reasonably conclude that ALS received the defective Loan Application and the information asserting DBTCA funded Claimant's Loan from the records and books of Debtor RFC, the originating sponsor and master servicer for the RALI 2007-QO1 Trust.

78.     ***Interestingly***, the ResCap Trust asserts that Debtor RFC sold Claimant's DOT and Note to DBTCA. (*See* ResCap Trust's Objection Exhibit 1 page 7 ¶ 1) Yet, Debtor RALI's Form S-3 Registration Statement filed with the SEC and the RALI 2007-QO1 Trust's Prospectus and PSA

also filed with the SEC claims Debtor RALI sold Claimant's DOT and Note to DBTCA. Thus, a

question of fact exists as to which Debtor actually sold Claimant's DOT and Note to DBTCA.

**[See www.sec.gov/Archives/edgar/data/1384915/000138491507000009/0001384915-07-000009.txt]**

79.      The ResCap Trust presents a blanket defense void of any admissible evidence, although,

clearly the Debtors should return to the huddle to review their playbook. Whether Claimant's

Loan was individually or corporately originated by Debtors is a question of fact and law that

must be determined by a trier of fact where evidence is presented. Thus, Claimant's 2nd cause of

action for fraud involves disputed issues of fact and law that this Court cannot resolve on the

papers alone, as such, the ResCap Trust's Objection should be **OVERRULED.**

### 2. *Third Cause of Action for Tortious Interference with Contract (Against RFC, GMACM and HF)*

80.      "The elements of a cause of action for interference with contractual relations are: (1)

the existence of a valid contract between the plaintiff and a third party; (2) the defendant's

knowledge of this contract; (3) the defendant's intentional acts designed to induce a breach or

disruption of the contractual relationship; (4) actual breach or disruption of the contractual

relationship; and (5) resulting damages. [Citation.] Proof the interfering conduct was wrongful,

independent from the interference itself, is not required to recover for interference with

contractual relations. [Citation.]" (*Sole Energy Co. v. Petrominerals Corp.* (2005) 128

Cal.App.4th 212, 237-238.)

81.      Because the Debtors failed to properly deposit Claimant's Note and DOT into the RALI

2007-QO1 Trust, Claimant contends that HF is a legal stranger to her mortgage contracts. A

question of fact exists as to HF's mortgage servicer status. Further, that fact is material.

82.    Claimant asserts that HF induced her to skip multiple mortgage payments in order to qualify and be considered for a loan modification which ultimately created a false default declared by the Debtor's successor in interest and agent, ALS.

83.    The ResCap Trust asserts Claimant's "loan was in default and due for February 1, 2008 payment when servicing transferred to Aurora…" Claimant contends she did not default and she did not fail to make a payment or cure a payment that was due under her debt obligation. Claimant alleges that Debtor HF induced her into a false default by advising her to skip numerous mortgage payments, in order to qualify and be considered for a modification. However, Claimant specifically pled the Note-Holder's right to insist on the mortgage payment is *excused* because the Defendants frustrated and/or interfered with her performance. ***California Civil Code § 1511.3.***

84.    *According* to the ResCap Trust, Debtor HF serviced Claimant's loan and that Claimant's loan was securitized on behalf of the Deutsche Bank Trust Company Americas as trustee, but fails to identify the trust.

85.    *According* to the RALI 2007-QO1 Trust's PSA, Debtors RFC and HF agreed to become a guarantor of *all* debt obligations under the RALI 2007-QO1 Trust.

86.    *According* to the RALI 2007-QO1 Trust's monthly distribution summary statements, dated June 2007 through June 2014, the Certificate-Holders have received *all* payments due under those obligations. Typically, there is a presumption that if a borrower didn't make a payment as set forth in the note, then the borrower must be delinquent and must be declared in default. **However, that is not law**. It is undisputed that there can only be a default under the note if the borrower has failed to make a payment or cure a payment that is actually due and declared

by the ***Lender***.  It is also undisputed that, if the mortgage payment has been made by a third

party, a stranger to the contract, then no such payment is due.

87.    Claimant alleges Debtor HF advised her to skip three mortgage payments and Claimant

followed HF's advice and skipped three mortgage payments.  Claimant alleges that as she

skipped these three mortgage payments, Debtors RFC and/or HF paid those three mortgage

payments to the Certificate-Holders of the RALI-2007-QO1 Trust pursuant to the RALI-2007-

QO1 Trust's Prospectus and PSA.  As a result of Debtors RFC and/or HF paying Claimant's

mortgage payments in her stead, DBTCA suffered no default.

88.    In light of these multiple considerations, it follows that the determination of whether

Claimant defaulted under her debt obligation is generally a question of fact.  Claimant provides

facts supporting her allegations that, depending on the evidence, could lead a trier of fact to

reasonably conclude that Claimant was either excused from performance or in the alternative, the

RALI 2007-QO1 Trust, ***as*** the alleged Note-Holder, received all payments and as a result, didn't

suffer any injury, resulting in no breach or default under Claimant's Note.

89.    Here, Claimant alleges (1) HF represented to Claimant ... that she had to skip her at

least three mortgage payments in order to qualify and be considered for a loan modification; (2)

HF's representation was false because homeowners did not have to skip any mortgage payments

to qualify for any government modification program and HF had no intention of allowing

Claimant to modify her existing loan; (3) the misrepresentation was material because it was the

but-for cause of Claimant skipping payments; (4) HF knew the statements that a person had to

skip at least three mortgage payments were false because they knew it was not a government

policy and they did not have an internal written policy that supported any request for the

homeowner to skip at least three payments to qualify for a loan modification; (5) HF's

statements were made with the intent to induce Claimant to skip at least three mortgage

payments and to have her allegedly fall behind in a manner in which it would be almost

impossible to catch up and/or bring her payments current and HF never intended to allow

Claimant to enter into a loan modification program; (6) Claimant had no way of knowing that

there was no HF policy that guaranteed if one skips at least three mortgage payments, they would

qualify for a loan modification ...; (7) Claimant relied on HF's statements to her detriment when

she skipped three mortgage payments; (8) Claimant had a right to rely on HF's statements

because the house was hers and in her name ...; (9) if it were not for HF's fraudulent actions and

misstatements, Claimant would never have skipped any mortgage payments and her credit rating

would not have been destroyed in an attempt to modify her loan .

90.     Claimant's 3rd cause of action for tortious interference with contract in her *TAC* is

viable against the Debtors and involves disputed issues of fact and law that this Court cannot

resolve on the papers alone, as such, the ResCap Trust's Objection should be **OVERRULED.**

### 3.  *Fourth Cause of Action Wrongful Foreclosure (Against RFC, GMACM and HF)*

91.     The ResCap Trust argues that they have no liability for Claimant's wrongful

foreclosure claims because i) loan was in default and due for February 1, 2008 payment when

servicing was transferred to ALS, and ii) foreclosure proceedings were never commenced by the

Debtors.  Debtors' records show that an "option to avoid foreclosure" letter was sent to Claimant

on February 11, 2008 as well as a breach letter on March 3, 2008.  However, Debtors have failed

to produce *any* admissible evidence in support of these allegations.

92.     An action for the tort of wrongful foreclosure will lie if the trustor or mortgagor

(borrower) can establish at the time the power of sale was exercised or the foreclosure occurred,

**no breach of condition or failure of performance existed** on the mortgagor's or trustor's part which would have authorized the foreclosure or exercise of the power of sale. *See **Munger v. Moore**,* 11 Cal.App.3d 1, 89 Cal.Rptr. 323 (Cal.App.1970).

93.     Claimant objects to the ResCap Trust's assertions her loan was purchased and securitized after origination. Moreover, Claimant contends her mortgage was **NEVER** deposited into the RALI 2007-QO1 Trust. Again, because the Debtors failed to properly deposit Claimant's Note and DOT into the RALI 2007-QO1 Trust, Claimant contends that Debtor HF is a legal stranger to her mortgage contracts. Appellant contends her duty to perform under her obligation was excused when Debtor HF and Debtors' agent, ALS induced her to skip certain mortgage payments in order to qualify and be considered for a loan modification which ultimately created a false default. ***California Civil Code § 1511.3.***

94.     Claimant's 4th cause of action for wrongful foreclosure in her ***TAC*** is viable against the Debtors and involves disputed issues of fact and law that this Court cannot resolve on the papers alone, as such, the ResCap Trust's Objection should be **OVERRULED.**

### 4.   *Fifth Cause of Action Cancellation of Instruments (Against RFC and GMACM)*

95.     The elements of a cancellation of instrument cause of action are, as follows: (1) a written instrument; (2) a reasonable apprehension it may cause serious injury to someone; and (3) as to whom it is void or voidable. ***California Civil Code § 3412.***

96.     The Debtors argue that they have no liability for Claimant's origination based claims because no Debtor was involved in the origination of this loan. Yet, ALS, the *alleged* servicer for DBTCA contradicts the ResCap Trust's argument by claiming DBTCA **funded** Claimant's Loan.

97.     *Importantly*, Debtor RFC was the original master servicer for the RALI 2007-QO1

Trust. Debtor RFC *allegedly* sold its master servicing rights of *all* the pooled loans within the

RALI 2007-QO1 Trust to ALS sometime in April 2008. This *purported* sale *allegedly* included

all Debtor RFC's books and records for the RALI 2007-QO1 Trust. *According* to ALS, the

Debtors had actual and constructive notice of the alleged fraud perpetrated at origination because

the Debtors had in their possession the original forged Loan Application.

98.     Claimant alleges that because full disclosure was *not* given regarding the parties

involved, each party's respective rights, and the true intentions of the parties, **Claimant disputes

the validity of the Note, the DOT, the parties involved and the amounts owed.** Claimant

alleges other agreements were purportedly made outside of her mortgage contract and these

agreements altered the nature of her mortgage. As such, **Claimant alleges she didn't consent** to

the formation of the alleged contracts and she seeks cancellation of the Note and DOT. (*TAC* ¶

22.) "Contract formation requires mutual consent, which cannot exist unless the parties 'agree

upon the same thing in the same sense." *Bustamante v. Intuit, Inc.,* 141 Cal. App. 4th 199, 208

(2006) (quoting *California Civil Code §§ 1580, 1550, 1565*). As a condition of obtaining

cancellation of a voidable deed, the party seeking relief is generally required to restore or offer to

restore to the defendant everything of value received in the underlying transaction. However, if

the deed is *void*, as in the case of fraud in the execution or forgery, restoration is not necessary

[see *Fleming v. Kagan* (1961) 189 Cal. App. 2d 791, 796, 797, 11 Cal. Rptr. 737.]

99.     Claimant provides facts supporting her allegations that, depending on the evidence,

could lead a trier of fact to reasonably conclude that ALS received the defective Loan

Application and the information asserting DBTCA funded Claimant's Loan from the records and

books of RFC, the originating master servicer for the RALI 2007-QO1 Trust.

100.    Whether Claimant's Loan was individually or corporately originated by Debtors is a question of fact that must be determined by a trier of fact where evidence is presented.

101.    Claimant's 5th cause of action for cancellation of instruments in her **TAC** is viable against the Debtors and involves disputed issues of fact and law that this Court cannot resolve on the papers alone, as such, the ResCap Trust's Objection should be **OVERRULED.**

### 5. *Sixth Cause of Action for Breach of Contract [Deed of Trust and Promissory Note]*

102.    "To allege a cause of action for damages for breach of contract, a plaintiff must allege, '(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff.' [Citation.]" (***Bushell v. JPMorgan Chase Bank, N.A.*** (2013) 220 Cal.App.4th at p. 921.)

103.    Oral representations made by agents or employees of a servicer or lender and pertaining to the DOT (as opposed to the promissory note) may give rise to a valid breach of contract claim. ***Harris v. Wells Fargo Bank, N.A.***, 2013 WL 1820003 (N.D. Cal. Apr. 30, 2013.)

104.    The gravamen of the cause of action for breach of contract is that the Note-Holder didn't provide Claimant with notice of acceleration, nor any other notice required by the Note. "[C]ourts will generally enforce the breach of a contractual promise through contract law."(***Erlich v. Menezes*** (1999) 21 Cal.4th 543, 552, 553–554.)

105.    Clearly, under the Note and DOT, the Note-Holder or the **Lender** is the entity which is able to enforce the contracts, and is entitled to payment. No other entity is so entitled. (***TAC*** ¶60.) Therefore, *any* attempt by *legal strangers* to enforce the Note is a breach of it and or interference. Claimant contends her mortgage was not deposited into the RALI 2007-QO1 Trust

and if Debtors RALI, RFC and/or GMACM are proven to be holder[s] of Claimant's Note, their failure to comply with these provisions constituted a breach of the Note and DOT.

106.    Claimant's 6th cause of action for breach of contract [deed of trust and promissory note] in her *TAC* is viable against the Debtors and involves disputed issues of fact and law that this Court cannot resolve on the papers alone, as such, the ResCap Trust's Objection should be **OVERRULED.**

### 6.  *Seventh Cause of Action Breach of Contract [Workout and Forbearance Agreements]*

107.    Claimant alleges Debtors' *alleged* successor in interest and/or agent, ALS, misrepresented itself as her servicer and as her *Lender*, **fraudulently inducing** her into multiple Agreements. (*TAC* ¶ ¶ 274, 276.) Claimant alleges ALS didn't have *any* authority to assess or qualify her for a loan modification because it was neither her *Lender/*Note-Holder nor the servicer representing the rightful Note-Holder. (*California Civil Code § 2920.5(a)*). Thus, Claimant argues she didn't consent to the formation of the alleged Agreements and as such, these Agreements are all *void*. (*TAC* Exhibits O-S.)

108.    Claimant's 7th cause of action for breach of contract [workout and forbearance agreements] in her *TAC* is viable against the Debtors and involves disputed issues of fact and law that this Court cannot resolve on the papers alone, as such, the ResCap Trust's Objection should be **OVERRULED.**

### 7.  *Eighth Cause of Action Violation of California Business and Professions Code Section 17200 et seq.*

109.    *Section 17200* et seq. "is commonly referred to as the Unfair Competition Law (UCL). """"[T]he UCL creates "'three varieties of unfair competition—acts or practices which

are *unlawful*, or *unfair*, or *fraudulent*.'" [Citation.]' [Citation.]" (***Rossberg v. Bank of America,***

***N.A.*** (2013) 219 Cal.App.4th 1481, 1501.)

110.      Unfair or fraudulent practices provide grounds for relief under *§ 17200*. (***Yanting***

***Zhang v. Superior Court*** (2013) 57 Cal.4th 364, 370.) "'In order to state a cause of action under

the fraud prong of the UCL a plaintiff need not show that he or others were actually deceived or

confused by the conduct or business practice in question. "The 'fraud' prong of [the UCL] is

unlike common law fraud or deception. A violation can be shown even if no one was actually

deceived, relied upon the fraudulent practice, or sustained any damage. Instead, it is only

necessary to show that members of the public are likely to be deceived." [Citations.]' (***Schnall v.***

***Hertz Corp.*** (2000) 78 Cal.App.4th 1144, 1167.)"(***Buller v. Sutter Health*** (2008) 160

Cal.App.4th 981, 986.)

111.      In addition, a plaintiff can allege a defendant violates the UCL by violating some other

California or federal statute or by stating the defendant engaged in deceptive conduct. ***Cel-Tech***

***Communications, Inc. v. Los Angeles Cellular Telephone Co.,*** 27 Cal.4 th 163, 180 (1999).

112.      Claimant alleged numerous violations of California statutes-----***California Civil Code***

*§ 2924 (a)(1)*, which courts have read to bar a foreclosure by a party without the power to do so,

***Javaheri v. JP Morgan Chase Bank, N.A.,*** 2011 U.S. Dist. LEXIS 62152, at ** 5-6; *violation of*

*the Rosenthal Act* , prohibiting debt collection; *California Civil Code, §§ 1670.5 and 1671,*

prohibiting unconscionabiliy; ***Penal Code section 115(a),*** barring forgery; and ***California Civil***

***Code § 1572(3),*** prohibiting fraudulent concealment; ***California Civil Code § 1095,*** failing to

disclose principal.(CT:Vol.13:3066-3070 ¶ ¶291-304.) Claimant has demonstrated injury, as

required by ***Business & Professions Code § 17204,*** because she has alleged reliance and

damages, for the reasons stated above. The UCL bars deceptive conduct, such as fraud. ***Blank v.***

*Kirwan,* 39 Cal.3d at 329. By successfully alleging fraud, Claimant has stated a UCL claim for deceptive acts. ***Blank v. Kirwan, supra.***

113.    Claimant's 8th cause of action for ***violation of California Business and Professions Code Section 17200 et seq.*** in her ***TAC*** is viable against the Debtors and involves disputed issues of fact and law that this Court cannot resolve on the papers alone, as such, the ResCap Trust's Objection should be **OVERRULED.**

### 8. *Ninth Cause of Action Violation of California Civil Code § 1788.17 Unfair Debt Collection Practices*

114.    The Rosenthal Act forbids the use of any "false, deceptive, or misleading representation or means in connection with the collection of any debt" through its incorporation by reference of the federal Fair Debt Collection Practices Act, ***15 U.S.C. § 1692(e).*** (See ***California Civil Code § 1788.17)*** (*TAC* ¶ 312.) Claimant alleges Debtor HF and Debtors' agent ALS violated ***California Civil Code § 1788.17*** by using deceptive means to collect her debt they weren't entitled to. (***TAC*** ¶ 314(d).)

115.    Claimant's 9th cause of action for ***violation of California Civil Code § 1788.17 Unfair Debt Collection Practices*** in her ***TAC*** is viable against the Debtors and involves disputed issues of fact and law that this Court cannot resolve on the papers alone, as such, the ResCap Trust's Objection should be **OVERRULED.**

### 9. *Eleventh Cause of Action Unjust Enrichment*

116.    The elements for a claim of unjust enrichment are "receipt of a benefit and unjust retention of the benefit at the expense of another."(***Lectrodryer v. Seoul Bank*** (2000) 77 Cal.App.4th 723, 726.)

117.     Claimant asserts an unjust enrichment claim against Debtor HF and Debtor's *alleged*

successor in interest agent, ALS on the grounds Debtor HF and Debtor's agent ALS demanded

and accepted mortgage payments to which it was not entitled. Claimant argues it would be unjust

to allow Respondents to retain money procured through theft, fraud and forged documents.

(*TAC* ¶¶ 340 -349.)

118.     Claimant's 10th cause of action for unjust enrichment in her *TAC* is viable against the

Debtors and involves disputed issues of fact and law that this Court cannot resolve on the papers

alone, as such, the ResCap Trust's Objection should be **OVERRULED.**

### 10.  *Twelfth Cause of Action Accounting*

119.     The ResCap Trust argues that the proof of claims do not give rise to liability for a

claim for accounting.

120.     Claimant contends Debtor HF and Debtors' *alleged* successor in interest and agent,

ALS falsely represented to her that they were her *Lender* and servicer, thus, this claim is

connected to Appellant's causes of action for fraud and wrongful foreclosure.

121.     Claimant contends Debtors and Debtors' agent have held themselves out to be

Claimant's Creditors and/or Mortgage Servicer. If this purported relationship with Claimant is

proven lawful, then said Debtors have a fiduciary duty to Claimant to properly account for

payments made by Claimant.

122.     Claimant's 12th cause of action for accounting in her *TAC* is viable against the

Debtors and involves disputed issues of fact and law that this Court cannot resolve on the papers

alone, as such, the ResCap Trust's Objection should be **OVERRULED.**

### *11. Thirteenth Cause of Action Constructive Trust*

123.        A person who wrongfully forces a foreclosure sale and then purchases the property

should not be permitted to profit from the wrongful act. (*TAC* ¶ 362.) The ResCap Trust argues

"foreclosure proceedings were never commenced by the Debtors." However, Claimant contends

foreclosure proceedings were commenced by Debtors' *alleged* successor in interest and/or agent,

ALS.

124.        Claimant's 13th cause of action for constructive trust in her *TAC* is viable against the

Debtors and involves disputed issues of fact and law that this Court cannot resolve on the papers

alone, as such, the ResCap Trust's Objection should be **OVERRULED.**

### *12. Fifteenth Cause of Action for Fraudulent Omissions*

125.        Under *California law*, the Loan Documents' partial representations that omitted

material facts, created a duty to disclose all material facts concerning Claimant's Option ARM

loan. Thus, the partial representations in the Loan Documents created a duty to disclose to

Claimant that: (i) the low interest rate in the Note was only available for thirty days if at all; (ii)

the monthly payment amounts for the first three to five years provided to Claimant on the TILDS

were insufficient to pay both principal and interest; (iii) negative amortization was absolutely

certain to occur if Claimant made payments according to the payment schedule provided in the

Loan Documents; and that (iv) loss of equity and/or loss of Claimant's residence was certain to

occur if Claimant made payments according to the payment schedule.

126.        Claimant's 15th cause of action for fraudulent omissions in her *TAC* is viable against

the Debtors and involves disputed issues of fact and law that this Court cannot resolve on the

papers alone, as such, the ResCap Trust's Objection should be **OVERRULED.**

### 13. *Sixteenth Cause of Action Quiet Title*

127.    Claimant doesn't seek to quiet title against her mortgagee, she seeks to quiet title to

Debtors' *alleged* successor in interest and/or agent, ALS. Claimant contends that because she

didn't default…she can quiet title. Claimant alleged that Debtors and Debtors' agent had no

authority to collect payments on the Note or foreclose on the Property. (TAC ¶¶ 26, 264.)

Claimant contends she continues to hold rightful title by operation of law and because the

trustee's sale is *void*, Claimant maintains a superior title over Debtors and Debtors' *alleged*

successor in interest and/or agent, ALS. (TAC ¶ 390.)

128.    Claimant's 16th cause of action for quiet title in her *TAC* is viable against the Debtors

and involves disputed issues of fact and law that this Court cannot resolve on the papers alone, as

such, the ResCap Trust's Objection should be **OVERRULED.**

### 14. *Seventeenth Cause of Action Violation of TILA; 15 U.S.C. § 1601*

129.    The loan documents and mandatory disclosure documents provided to Claimant did

not comply with the requirements of the Truth in Lending Act ("*TILA.*") (*TAC* ¶ 405.)

130.    Claimant's 17th cause of action for violation of *TILA; 15 U.S.C. §* in her *TAC* is

viable against the Debtors and involves disputed issues of fact and law that this Court cannot

resolve on the papers alone, as such, the ResCap Trust's Objection should be **OVERRULED.**


### V.
### CONCLUSION

131.    As stated herein, Claimant has stated valid claims for liability against Debtors, RFC,

GMACM, HF and RALI. The ResCap Trust presents a blanket defense void of any admissible

evidence for the Court to rebut the *prima facie* presumption in favor of Claimant. Additionally,

as set forth above, Claimant's claims set forth in all her causes of action are neither time barred,

nor are they speculative and if the Court has any hesitation whatsoever, Claimant requests the

Court to exercise its discretion and permit her to pursue her claims in the pending action in the

Los Angeles Superior Court in the State of California or alternatively to appoint a special master

at the Debtors' and the ResCap Trust's expense to make findings of fact after a period of

discovery and an evidentiary hearing/trial. In sum, The Claimant's claims should be moved to

the liability borrower claims pool and retain their status as active claims for which the Debtors

are liable. For these reasons Claimant requests the Court to overrule ResCap Trust's Objection

with prejudice or grant leave to pursue the alternative relief requested herein.

WHEREFORE, the Claimant respectfully requests that the Court enter an order in which

the Claimant's claim is not disallowed and not expunged granting the relief herein and granting

such other relief as is just and proper.

Respectfully submitted,

Dated: July 21, 2014                                  Tia Smith, Claimant

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

_____

In Re:                                          Chapter 11

RESIDENTIAL CAPITAL, LLC, et al.                Case No.: 12-12020 (MG)

          Debtors.                     Assigned to:

                                          Hon. Martin Glenn

                                          Bankruptcy Judge

_____

### ORDER DENYING OBJECTION OF THE RESCAP BORROWER CLAIMS TRUST CLAIM NUMBERS 3889, 4129, 4134 and 4139 FILED BY TIA SMITH

Upon consideration of the objection of the ResCap Borrowers Claims Trust (Doc. 7188),

As the successor to Residential Capital, LLC, and its affiliated debtors and debtors in possession with

respect to Borrower Claims, and the response and opposition by Tia Smith, it is hereby

ORDERED, ADJUDGED, AND DECREED THAT:

1. The relief requested in the Objection is DENIED as set forth in the Court's Memorandum

   Opinion and/or statements on the record at a hearing held on July 30, 2014 in this Court;

2. The relief requested by the Borrower Trust is denied with prejudice; and

3. Kurtzman Carlson Consultants LLC, the Claims and Noticing Agent on behalf of the Debtors is

   directed to mark the claims register consistent with this Order.

Dated: _____, 2014

      Los Angeles, California

                                   _____

                                   The Honorable Martin Glenn
                                   United States Bankruptcy Judge

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY that a true and correct copy was mailed on June 23, 2014 to:**

The Honorable Martin Glenn
United States Bankruptcy Court for the
Southern District of New York
Alexander Hamilton Custom House
One Bowling Green
New York, New York 10004-1408

Counsel to the ResCap Borrower Claims Trust
Morrison & Foerster LLP
250 West 55th Street
New York, New York 10019
Attention: Norman S. Rosenbaum and Jordan A. Wishnew

The Office of the United States Trustee for the
Southern District of New York
U.S. Federal Office Building
201 Varick Street
Suite 1006
New York, New York 10014
Attention: Linda A. Riffkin and Brian S. Masumoto

The ResCap Borrower Claims Trust
Polsinelli PC
900 Third Avenue
21st Floor
New York, New York 10022
Attention: Daniel J. Flanigan

Dated: June 23, 2014

_____
Tia Smith, Claimant

# EXHIBIT 1

```
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<FILENAME>qo110k07.txt
<DESCRIPTION>2007 QO1
<TEXT>
```

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-K

(Mark One)
|X| ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT
OF 1934 For the fiscal year ended: December 31, 2007
                                   or
|_| TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES
    EXCHANGE ACT OF 1934
For the transition period _____

Commission file number of issuing entity: 333-131213-38
RALI SERIES 2007-QO1 TRUST
(Exact name of issuing entity as specified in its charter)

RESIDENTIAL ACCREDIT LOANS, INC.
(Exact name of depositor as specified in its charter)

RESIDENTIAL FUNDING COMPANY, LLC
(Exact name of sponsor as specified in its charter)

New York
(State or other jurisdiction of incorporation or organization of the
issuing entity)

c/o Residential Funding Company, LLC, as Master Servicer
One Meridian Crossings, Suite 100
Minneapolis, Minnesota 55423
(Address of principal executive offices of issuing entity)

(952) 857-7000 (Telephone number, including area code)

None
(I.R.S. Employer Identification No.)

N/A
(Former name, former address, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act: None
Securities registered pursuant to Section 12(g) of the Act: None
Indicate by check mark if the registrant is a well-known seasoned issuer, as
defined in Rule 405 of the Securities Act.
Yes |_|  No  |X|

<PAGE>

Indicate by check mark if the registrant is not required to file reports
pursuant to Section 13 or Section 15(d) of the Act.
Yes |X|  No  |_|
Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months (or for such shorter period that the registrant was
required to file such reports), and (2) has been subject to such filing
requirements for the past 90 days.
|X| Yes |_| No
Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulation S-K (ss. 229.405 of this chapter) is not contained herein, and
will not be contained, to the best of registrant's knowledge, in definitive
proxy or information statements incorporated by reference in Part III of the
Form 10-K or any amendment to this Form 10-K. |X|
[Item 405 of Regulation S-K is not applicable.]

Indicate by check mark whether the registrant is a large accelerated filer, an
accelerated filer, a non-accelerated filer, or a smaller reporting company. See
the definitions of "large accelerated filer," "accelerated filer" and "smaller
reporting company" in Rule 12b-2 of the Exchange Act. (Check one):
Large accelerated filer  |_|                          Accelerated filer  |_|
Non-accelerated filer    |X| (Do not check if a smaller reporting company)
                                        Smaller reporting company  |_|

Indicate by check mark whether the registrant is a shell company (as defined in
Rule 12b-2 of the Act).
Yes |_|  No  |X|
Registrant has no voting or non-voting common equity outstanding held by
non-affiliates.


<PAGE>


                                    PART I

THE FOLLOWING ITEMS HAVE BEEN OMITTED IN ACCORDANCE WITH GENERAL INSTRUCTION J
TO FORM 10-K:

Item 1:  Business.
Item 1A: Risk Factors.
Item 2:  Properties.
Item 3:  Legal Proceedings.
Item 4:  Submission of Matters to a Vote of Security Holders.

ITEM 1B. UNRESOLVED STAFF COMMENTS.

Not Applicable.

SUBSTITUTE INFORMATION PROVIDED IN ACCORDANCE WITH GENERAL INSTRUCTION J TO FORM
10-K:

ITEM 1112(B) OF REGULATION AB. SIGNIFICANT OBLIGORS OF POOL ASSETS
(FINANCIAL INFORMATION).

None.

ITEM 1114(B)(2) OF REGULATION AB: CREDIT ENHANCEMENT AND OTHER SUPPORT,
EXCEPT FOR CERTAIN DERIVATIVES INSTRUMENTS (FINANCIAL INFORMATION).

None.

ITEM 1115(B) OF REGULATION AB: CERTAIN DERIVATIVES INSTRUMENTS
(FINANCIAL INFORMATION).

Based on the standards set forth in Item 1115(b) of Regulation AB, no
information is required in response to this Item.

ITEM 1117 OF REGULATION AB: LEGAL PROCEEDINGS.

There are no material pending legal or other proceedings involving the mortgage
loans or Residential Funding Company, LLC ("Residential Funding"), as sponsor
and master servicer, Residential Accredit Loans, Inc., as depositor, RALI Series
2007-QO1 Trust, as the issuing entity, GMAC Mortgage, LLC ("GMACM"), as
subservicer, or other parties described in Item 1117 of Regulation AB that,
individually or in the aggregate, would have a material adverse impact on
investors in the securities (the "Securities") to which this report relates.


<PAGE>


Residential Funding and GMACM are currently parties to various legal proceedings
arising from time to time in the ordinary course of their businesses, some of
which purport to be class actions. Based on information currently available, it
is the opinion of Residential Funding and GMACM that the eventual outcome of any
currently pending legal proceeding, individually or in the aggregate, will not
have a material adverse effect on their ability to perform their obligations in
relation to the mortgage loans. No assurance, however, can be given that the
final outcome of these legal proceedings, if unfavorable, either individually or
in the aggregate, would not have a material adverse impact on Residential
Funding or GMACM. Any such unfavorable outcome could adversely affect the
ability of Residential Funding or GMACM to perform its servicing duties with
respect to the mortgage loans and potentially lead to the replacement of
Residential Funding or GMACM with a successor servicer.

Among the legal proceedings to which Residential Funding is a party is a
putative class action lawsuit that was filed against a lender (Mortgage Capital
Resources Corporation), Residential Funding and other parties in state court in
Kansas City, Missouri. Plaintiffs asserted violations of the Missouri Second
Mortgage Loan Act ("SMLA"), Mo.R.S. Section 408.233, based on the lender's
charging or contracting for payment of allegedly unlawful closing costs and
fees. The relief sought included a refund of all allegedly illegal fees, the
refund of interest paid, and the discounted present value of interest to be paid
in the future on active mortgage loans. The plaintiffs also sought prejudgment
interest and punitive damages.

Residential Funding is an assignee of some of the mortgage loans in question.
The plaintiffs contended that Residential Funding is strictly liable for the
lender's alleged SMLA violations pursuant to the assignee provisions of the Home
Ownership and Equity Protection Act of 1994, 15 U.S.C. Section 1641(d)(1).
Residential Funding terminated its relationship with the lender in early May
2000.

In connection with that proceeding, on January 4, 2008, a verdict was returned
that Residential Funding pay $4.33 million in actual damages and $92 million in
punitive damages. Residential Funding intends to appeal and vigorously contest

the punitive damage award. However, even if the punitive damage award is not reduced upon appeal, Residential Funding's management believes that any liability with respect to this proceeding would not have a material adverse effect on investors in the Securities.

<PAGE>

## PART II

THE FOLLOWING ITEMS HAVE BEEN OMITTED IN ACCORDANCE WITH GENERAL INSTRUCTION J TO FORM 10-K:

Item 5:   Market for Registrant's Common Equity, Related Stockholder
          Matters and Issuer Purchases of Equity Securities.
Item 6:   Selected Financial Data.
Item 7:   Management's Discussion and Analysis of Financial Condition and
          Results of Operations.
Item 7A:  Quantitative and Qualitative Disclosures About Market Risk.
Item 8:   Financial Statements and Supplementary Data.
Item 9:   Changes in and Disagreements With Accountants on Accounting
          and Financial Disclosure.
Item 9A:  Controls and Procedures.

ITEM 9B: OTHER INFORMATION.

None.

## PART III

THE FOLLOWING ITEMS HAVE BEEN OMITTED IN ACCORDANCE WITH GENERAL INSTRUCTION J TO FORM 10-K:

Item 10: Directors and Executive Officers of the Registrant.
Item 11: Executive Compensation.
Item 12: Security Ownership of Certain Beneficial Owners and Management
          and Related Stockholder Matters.
Item 13: Certain Relationships and Related Transactions.
Item 14: Principal Accountant Fees and Services.

SUBSTITUTE INFORMATION PROVIDED IN ACCORDANCE WITH GENERAL INSTRUCTION J TO FORM 10-K:

ITEM 1119 OF REGULATION AB:  AFFILIATIONS AND CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS.

Information contemplated by Item 1119 of Regulation AB has been omitted from this report in reliance on the Instruction to Item 1119.

ITEM 1122 OF REGULATION AB: COMPLIANCE WITH APPLICABLE SERVICING CRITERIA.

Each of Residential Funding, GMACM, Homecomings Financial, LLC ("Homecomings"), Deutsche Bank Trust Company Americas and Wells Fargo Bank, National Association (each, a "Servicing Participant") has been identified by the registrant as a party participating in the servicing function with respect to the pool assets held by the Issuing Entity. Reports assessing compliance with the servicing criteria applicable to each Servicing Participant (each, a "Report on Assessment") are attached as exhibits to this Form 10-K. In addition, an

attestation report (each, an "Attestation Report") regarding each Report on
Assessment has been prepared by the related Servicing Participant's registered
independent public accounting firm and is attached as an exhibit to this Form
10-K.

<PAGE>

Residential Capital, LLC, which owns indirectly all of the equity of both
Homecomings and GMACM, has restructured the operations of Homecomings and GMACM.
As a result of the restructuring -

  (i) on May 1, 2007, the computer system on which Homecomings maintained its
      servicing platform was transferred from one system (LSAMS) to another
      system (MortgageServ) on which its affiliate GMACM maintains its servicing
      platform; and

  (ii) on September 24, 2007, Homecomings transferred its servicing platform
       and certain employees responsible for the servicing function to GMACM.

Since September 24, 2007, GMACM has serviced the mortgage loans owned by the
trust that were previously serviced by Homecomings, and Homecomings has not
serviced any of those mortgage loans.

As a result of the integration of the Homecomings and GMACM servicing platforms
on a single computer system as described in clause (i) above -

  (x) the Report on Assessment and related Attestation Report filed as Exhibits
      33.3 and 34.3 to this Form 10-K address Homecomings' compliance with the
      applicable servicing criteria for the pre-platform integration period from
      January 1, 2007 through April 30, 2007; and

  (y) the Report on Assessment and related Attestation Report filed as Exhibits
      33.2 and 34.2 to this Form 10-K address (1) GMACM's compliance with the
      applicable servicing criteria for the pre-platform integration period from
      January 1, 2007 through April 30, 2007, and (2) each of Homecomings' and
      GMACM's compliance with the applicable servicing criteria for the
      post-platform integration period from May 1, 2007 through December 31,
      2007.

Vendors

A Servicing Participant may engage one or more vendors to perform specific and
limited, or scripted activities that address all or a portion of one or more
servicing criteria applicable to such Servicing Participant. In general in these
cases, the Servicing Participant has instituted policies and procedures to
monitor whether such vendors' activities comply in all material respects with
such servicing criteria, and may elect to take responsibility for assessing
compliance with the servicing criteria applicable to such vendors' activities in
such Servicing Participant's Report on Assessment. Where the Servicing
Participant has not instituted such policies and procedures, or where the
Servicing Participant does not otherwise elect to take responsibility for
assessing its vendors' activities, the vendor is itself treated as a Servicing
Participant and is required to provide its own Report on Assessment and related
Attestation Report.

<PAGE>

Exceptions

Except as disclosed below, no Report on Assessment or related Attestation Report has identified (i) any material instance of noncompliance with the servicing criteria identified in such Report on Assessment as applicable to the related Servicing Participant or (ii) any material deficiency in such Servicing Participant's policies and procedures to monitor vendor compliance.

GMAC Mortgage, LLC: The Report on Assessment prepared by GMACM and the related Attestation Report have identified material noncompliance with two elements of one servicing criterion applicable to it. Specifically, with regard to servicing criterion 1122(d)(2)(vii), which contemplates that reconciliations are prepared on a monthly basis for all asset-backed securities related bank accounts –

o  certain custodial account reconciliations were not reviewed within the timelines outlined in GMACM's policies and procedures, as contemplated by criterion 1122(d)(2)(vii)(C); and

o  certain custodial accounts had reconciling items which were not resolved within 90 calendar days of original identification, as contemplated by criterion 1122(d)(2)(vii)(D).

The registrant does not believe these instances of noncompliance had material impacts or effects on investors, and appropriate measures have been taken to resolve the bank reconciliation items noted in the Report on Assessment, and to prevent such instances of noncompliance in the future or to detect them in such a manner as to permit prompt correction.

Homecomings Financial, LLC: The Report on Assessment prepared by Homecomings and the related Attestation Report have identified material noncompliance with one servicing criterion applicable to it. Specifically, with regard to servicing criterion 1122(d)(4)(x)(C), certain refunds resulting from payoff transactions were not returned to the obligor within 30 calendar days of full repayment of the related pool asset, as contemplated by such criterion. The registrant does not believe these instances of noncompliance had material impacts or effects on investors, and appropriate measures have been taken to prevent such instances of noncompliance in the future or to detect them in such a manner as to permit prompt correction.

Platform-Level Reports

Regulations of the Securities and Exchange Commission (the "SEC") require that each Servicing Participant complete a Report on Assessment at a "platform" level, meaning that the transactions covered by the Report on Assessment should include all asset-backed securities transactions involving such Servicing Participant that are backed by the same asset type. Further guidance from the SEC staff identifies additional parameters which a Servicing Participant may apply to define and further limit its platform. For example, a Servicing Participant may define its platform to include only transactions that were completed on or after January 1, 2006 and that were registered with the SEC pursuant to the Securities Act of 1933. Each Servicing Participant is responsible for defining its own platform, and each platform will naturally differ based on various factors, including the Servicing Participant's business model, the transactions in which it is involved and the range of activities performed in those transactions.

<PAGE>

Based on our understanding of their platforms and the guidance that is available at this time, we believe that the parameters by which the Servicing Participants have defined their platforms should be permissible. However, because the SEC's regulations are new and the guidance that is available at this time is subject to clarification or change, we cannot assure you that the SEC and its staff will necessarily agree.

ITEM 1123 OF REGULATION AB: SERVICER COMPLIANCE STATEMENT.

Each of Residential Funding, GMACM and Homecomings (each, a "Servicer") has been identified by the registrant as a servicer with respect to the pool assets held by the Issuing Entity. Each Servicer has provided a statement of compliance with its obligations under the servicing agreement applicable to such Servicer (a "Compliance Statement") for the portion of the period covered by this Form 10-K during which such Servicer was servicing the pool assets, in each case signed by an authorized officer of such Servicer. Each Compliance Statement is attached as an exhibit to this Form 10-K.  None of the Compliance Statements has identified any instance where the related Servicer has failed to fulfill its obligations under the applicable servicing agreement in any material respects.

PART IV

ITEM 15.   EXHIBITS, FINANCIAL STATEMENT SCHEDULES.

  (a)(1)  Not Applicable.

  (a)(2)  Not Applicable.

  (a)(3)  Not Applicable.

  (b)     Exhibits.

| EXHIBIT NUMBER | DESCRIPTION |
| --- | --- |
| 3.1 | Certificate of Incorporation of Residential Accredit Loans, Inc. (incorporated by reference to Exhibit 3.1 included in the Annual Report on Form 10-K for the period ended December 31, 2006, filed by RALI Series 2006-QA1 Trust with the Securities and Exchange Commission on March 28, 2007). |

<PAGE>

| | |
| --- | --- |
| 3.2 | Bylaws of Residential Accredit Loans, Inc. (incorporated by reference to Exhibit 3.2 included in the Annual Report on Form 10-K for the period ended December 31, 2006, filed by RALI Series 2006-QA1 Trust with the Securities and Exchange Commission on March 28, 2007). |
| 10.1 | Series Supplement, dated as of January 1, 2007, and the Standard Terms of Pooling and Servicing Agreement, dated as of December 1, 2006, among Residential Accredit Loans, Inc., as company, Residential Funding Company, LLC, as master servicer, and Deutsche Bank Trust Company Americas, as trustee (incorporated by reference to Exhibit 10.1 included in the Report on Form 8-K filed by the Issuing Entity with the Securities and Exchange Commission on February 14, 2007). |
| 10.2 | Assignment and Assumption Agreement, dated as of January 30, 2007, |

between Residential Funding Company, LLC and Residential Accredit Loans, Inc. (incorporated by reference to Exhibit 10.2 included in the Report on Form 8-K filed by the Issuing Entity with the Securities and Exchange Commission on February 14, 2007).

31.1    Certification of Residential Funding Company, LLC pursuant to Rule 13a-14(d)/15d-14(d) under the Securities Exchange Act of 1934.

33.1    Report on Assessment of Compliance with Servicing Criteria of Residential Funding Company, LLC as of and for the period ended December 31, 2007.

33.2    Report on Assessment of Compliance with Servicing Criteria of (i) GMAC Mortgage, LLC for the pre-platform integration period from January 1, 2007 through April 30, 2007, and (ii) each of Homecomings Financial, LLC and GMAC Mortgage, LLC for the post-platform integration period from May 1, 2007 through December 31, 2007.

33.3    Report on Assessment of Compliance with Servicing Criteria of Homecomings Financial, LLC for the pre-platform integration period from January 1, 2007 through April 30, 2007.

33.4    Report on Assessment of Compliance with Servicing Criteria of Deutsche Bank Trust Company Americas as of and for the period ended December 31, 2007.

33.5    Report on Assessment of Compliance with Servicing Criteria of Wells Fargo Bank, National Association as of and for the period ended December 31, 2007.

34.1    Attestation Report of PricewaterhouseCoopers LLP on Assessment of Compliance with Servicing Criteria relating to Residential Funding Company, LLC.

34.2    Attestation Report of PricewaterhouseCoopers LLP on Assessment of Compliance with Servicing Criteria relating to GMAC Mortgage, LLC and Homecomings Financial, LLC (filed as Exhibit 33.2 hereto).

34.3    Attestation Report of PricewaterhouseCoopers LLP on Assessment of Compliance with Servicing Criteria relating to Homecomings Financial, LLC (filed as Exhibit 33.3 hereto).

34.4    Attestation Report of KPMG LLP on Assessment of Compliance with Servicing Criteria relating to Deutsche Bank Trust Company Americas.

34.5    Attestation Report of KPMG LLP on Assessment of Compliance with Servicing Criteria relating to Wells Fargo Bank, National Association.

<PAGE>


35.1    Servicer Compliance Statement of Residential Funding Company, LLC.

35.2    Servicer Compliance Statement of GMAC Mortgage, LLC.

35.3    Servicer Compliance Statement of Homecomings Financial, LLC.

(c) Not Applicable.


<PAGE>


SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date:  March 24, 2008

RALI SERIES 2007-QO1 TRUST

By:  Residential Funding
Company, LLC,
as Master Servicer

By: /s/ Anthony N. Renzi
Name:  Anthony N. Renzi
Title: Managing Director
(senior officer in charge of
the servicing function)

<PAGE>


INDEX TO EXHIBITS

| EXHIBIT NUMBER | DESCRIPTION |
| --- | --- |
| 3.1 | Certificate of Incorporation of Residential Accredit Loans, Inc. (incorporated by reference to Exhibit 3.1 included in the Annual Report on Form 10-K for the period ended December 31, 2006, filed by RALI Series 2006-QA1 Trust with the Securities and Exchange Commission on March 28, 2007). |
| 3.2 | Bylaws of Residential Accredit Loans, Inc. (incorporated by reference to Exhibit 3.2 included in the Annual Report on Form 10-K for the period ended December 31, 2006, filed by RALI Series 2006-QA1 Trust with the Securities and Exchange Commission on March 28, 2007). |
| 10.1 | Series Supplement, dated as of January 1, 2007, and the Standard Terms of Pooling and Servicing Agreement, dated as of December 1, 2006, among Residential Accredit Loans, Inc., as company, Residential Funding Company, LLC, as master servicer, and Deutsche Bank Trust Company Americas, as trustee (incorporated by reference to Exhibit 10.1 included in the Report on Form 8-K filed by the Issuing Entity with the Securities and Exchange Commission on February 14, 2007). |
| 10.2 | Assignment and Assumption Agreement, dated as of January 30, 2007, between Residential Funding Company, LLC and Residential Accredit Loans, Inc. (incorporated by reference to Exhibit 10.2 included in the Report on Form 8-K filed by the Issuing Entity with the Securities and Exchange Commission on February 14, 2007). |
| 31.1 | Certification of Residential Funding Company, LLC pursuant to Rule 13a-14(d)/15d-14(d) under the Securities Exchange Act of 1934. |
| 33.1 | Report on Assessment of Compliance with Servicing Criteria of Residential Funding Company, LLC as of and for the period ended December 31, 2007. |
| 33.2 | Report on Assessment of Compliance with Servicing Criteria of (i) GMAC Mortgage, LLC for the pre-platform integration period from January 1, 2007 through April 30, 2007, and (ii) each of Homecomings Financial, LLC and GMAC Mortgage, LLC for the post-platform integration period from May 1, 2007 through December 31, 2007. |
| 33.3 | Report on Assessment of Compliance with Servicing Criteria of Homecomings Financial, LLC for the pre-platform integration period from January 1, 2007 through April 30, 2007. |

33.4    Report on Assessment of Compliance with Servicing Criteria of Deutsche Bank Trust Company Americas as of and for the period ended December 31, 2007.

33.5    Report on Assessment of Compliance with Servicing Criteria of Wells Fargo Bank, National Association as of and for the period ended December 31, 2007.

34.1    Attestation Report of PricewaterhouseCoopers LLP on Assessment of Compliance with Servicing Criteria relating to Residential Funding Company, LLC.

<PAGE>

34.2    Attestation Report of PricewaterhouseCoopers LLP on Assessment of Compliance with Servicing Criteria relating to GMAC Mortgage, LLC and Homecomings Financial, LLC (filed as Exhibit 33.2 hereto).

34.3    Attestation Report of PricewaterhouseCoopers LLP on Assessment of Compliance with Servicing Criteria relating to Homecomings Financial, LLC (filed as Exhibit 33.3 hereto).

34.4    Attestation Report of KPMG LLP on Assessment of Compliance with Servicing Criteria relating to Deutsche Bank Trust Company Americas.

34.5    Attestation Report of KPMG LLP on Assessment of Compliance with Servicing Criteria relating to Wells Fargo Bank, National Association.

35.1    Servicer Compliance Statement of Residential Funding Company, LLC.

35.2    Servicer Compliance Statement of GMAC Mortgage, LLC.

35.3    Servicer Compliance Statement of Homecomings Financial, LLC.

<PAGE>

</TEXT>
</DOCUMENT>

# EXHIBIT 2

 **American Mortgage Network**

DECEMBER 30, 2006


TIA DANIELLE SMITH

4011 HUBERT AVENUE
LOS ANGELES, CA 90008


RE:  Loan Number: 206-989130

Property Address:
4011 HUBERT AVENUE
LOS ANGELES, CA 90008

### NOTICE OF ASSIGNMENT, SALE, OR TRANSFER OF SERVICING RIGHTS

Dear TIA DANIELLE SMITH :

In accordance with Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. 2605), you are hereby notified that the servicing of your mortgage loan, that is the right to collect payments from you is being assigned, sold, or transferred from American Mortgage Network, Inc. to HOMECOMINGS FINANCIAL effective FEBRUARY 1, 2007.

The assignment, sale, or transfer of the servicing of your mortgage loan does not affect any term or condition of your security instruments, other than the terms directly related to the servicing of your loan.

The effective date of transfer is defined as the date of the first payment directed to the new servicer. Except in limited circumstances, the law requires that your present servicer send you this notice at least 15 days before the effective date of the transfer. Your new servicer must also send you this notice no later than 15 days after the effective date.

Inquiries relating to the transfer of the servicing rights of your mortgage loan may be directed to American Mortgage Network, Inc. - Servicing Department toll free at 1-(888)-373-3974, between the hours of 8:00 AM - 5:00 PM Pacific Standard Time, Monday through Friday excluding holidays.

On FEBRUARY 1, 2007, Your new servicer is HOMECOMINGS FINANCIAL. If you have any questions on or after this date relating to the transfer of servicing, please call the servicer's Customer Service Department TOLL FREE AT 1-800-206-2901 BETWEEN 8:00 AM - 5:00 PM CENTRAL STANDARD TIME, MONDAY THROUGH FRIDAY EXCLUDING HOLIDAYS. Please reference your NEW LOAN NUMBER 11208073 when directing any inquiries or correspondence to HOMECOMINGS FINANCIAL.

American Mortgage Network, Inc. will stop accepting payments from you after JANUARY 31, 2007. PLEASE NOTE THAT YOUR PAYMENT DUE JANUARY 1, 2007 IN THE AMOUNT OF $1,918.87 IS STILL DUE TO AMERICAN MORTGAGE NETWORK, INC. AND SHOULD BE REMITTED TO US AT:

American Mortgage Network, Inc.
ATTENTION: Servicing Department
10421 Wateridge Circle, Suite 250
San Diego, CA 92121

HOMECOMINGS FINANCIAL will begin accepting payments from you on FEBRUARY 1, 2007. Please send all payments due on or after that date to HOMECOMINGS FINANCIAL at the following address:

HOMECOMINGS FINANCIAL
P. O. BOX 650515
DALLAS, TX 75265-0515

PAGE TWO

American Mortgage Network, Inc. will provide HOMECOMINGS FINANCIAL with a complete set of your loan records. If American Mortgage Network, Inc. currently holds an escrow for payment of your property tax, or homeowners insurance, the taxing authority(s) and insurance agent(s) will be notified of the transfer to ensure proper and timely payments of these items. If you receive any insurance or tax bills after JANUARY 31, 2007, please forward them to HOMECOMINGS FINANCIAL.

The transfer of servicing rights may affect the terms of, or the continued availability of accidental death, life, disablity or any other type of optional insurance products. You will need to contact HOMECOMINGS FINANCIAL to determine the availability of optional insurance.

American Mortgage Network, Inc. will provide you with a year-to-date tax statement (IRS FORM 1098) for any interest remitted to us or tax payments made on your behalf in the current tax year. HOMECOMINGS FINANCIAL will provide you with a tax statement for any payments that you may remit to them in the current tax year.

It has been a pleasure to service your mortgage loan and we wish you a successful relationship with HOMECOMINGS FINANCIAL.

Sincerely,

Customer Service Department
Mortgage Loan Servicing

## IMPORTANT INFORMATION ABOUT YOUR CONSUMER RIGHTS

YOU SHOULD ALSO BE AWARE OF THE FOLLOWING INFORMATION WHICH IS SET OUT IN MORE DETAIL IN SECTION 6 OF RESPA (12 U.S.C. SECTION 2605):

DURING THE 60-DAY PERIOD FOLLOWING THE EFFECTIVE DATE OF THE TRANSFER OF THE LOAN SERVICING, A LOAN PAYMENT RECEIVED BY YOUR OLD SERVICER BEFORE ITS DUE DATE MAY NOT BE TREATED BY THE NEW LOAN SERVICER AS LATE, AND A LATE FEE MAY NOT BE IMPOSED UPON YOU.

THIS SECTION GIVES YOU CERTAIN CONSUMER RIGHTS. IF YOU SEND A "QUALIFIED WRITTEN REQUEST" TO YOUR LOAN SERVICER CONCERNING THE SERVICING OF YOUR LOAN, THEY MUST PROVIDE YOU WITH A WRITTEN ACKNOWLEDEGMENT WITHIN 20 BUSINESS DAYS OF RECEIPT OF YOUR REQUEST. A "QUALIFIED WRITTEN REQUEST" IS WRITTEN CORRESPONDENCE, OTHER THAN NOTICE ON A PAYMENT COUPON OR OTHER PAYMENT MEDIUM SUPPLIED BY THE SERVICER, WHICH INCLUDES YOUR NAME AND ACOUNT NUMBER, AND YOUR REASON FOR THE REQUEST.

NO LATER THAN 60 BUSINESS DAYS AFTER RECEIVING YOUR REQUEST, YOUR SERVICER MUST MAKE ANY APPROPRIATE CORRECTIONS TO YOUR ACCOUNT AND MUST PROVIDE YOU WITH A WRITTEN CLARIFICATION REGARDING ANY DISPUTE. DURING THIS 60 BUSINESS DAY PERIOD, YOUR SERVICER MAY NOT PROVIDE INFORMATION TO A CONSUMER REPORTING AGENCY CONCERNING ANY OVERDUE PAYMENT RELATED TO SUCH PERIOD OR QUALIFIED WRITTEN REQUEST. HOWEVER, THIS DOES NOT PREVENT THE SERVICER FROM INITIATING FORECLOSURE IF PROPER GROUNDS EXIST UNDER THE MORTGAGE DOCUMENTS. A BUSINESS DAY IS A DAY ON WHICH THE OFFICES OF THE SERVICER ARE OPEN TO THE PUBLIC FOR CARRYING ON SUBSTANTIALLY ALL OF ITS BUSINESS FUNCTIONS.

SECTION 6 OF RESPA ALSO PROVIDES FOR DAMAGES AND COSTS FOR INDIVIDUALS OR CLASSES OF INDIVIDUALS IN CIRCUMSTANCES WHERE SERVICES ARE SHOWN TO HAVE VIOLATED THE REQUIREMENTS OF THE SECTION. YOU SHOULD SEEK LEGAL ADVICE IF YOU BELIEVE YOUR RIGHTS HAVE BEEN VIOLATED.

EXHIBIT 3

**Homecomings Financial**

*A GMAC Company*

www.homecomings.com

January 16, 2007

Homecomings Financial
P.O. Box 890036
Dallas TX 75389

#BWNFNYZ
#ZSSQRXTVTS1#
+ 0131476 000000728 09ATR2  0933845  P258
Tia D Smith
4011 Hubert Ave
Los Angeles CA 90008-2621

Re: **Homecomings Financial Loan Number:    0442385654**
Property Address:      4011 Hubert Avenue
Los Angeles, CA 90008

Dear Tia D Smith:

Welcome to Homecomings Financial[SM], your new mortgage servicer! Effective 02/01/07, your mortgage transfers to Homecomings Financial from American Mortgage Network, Inc. For consumer information that may be required by your state, please see the following Required Disclosures.

**Your new Homecomings Financial loan number is 0442385654.** It is important that you write your loan number on all payments and correspondence, so that we can identify your account and post your payments quickly and accurately. Please know that the transfer of your mortgage does not in any way affect the terms and conditions of your loan.

**Payments** - Payments will be accepted by your current mortgage holder until 02/01/07. Please mail any payments due on or after 02/01/07 to:

Homecomings Financial
P.O. Box 650515
Dallas, TX 75265-0515

If you have already sent a payment for the current month, simply use the coupon attached for your next payment due. By sending your check to us, you authorize Homecomings Financial to convert the check into an electronic funds transfer. Your bank account may be debited the same day we receive your payment. You will soon begin receiving monthly billing statements from us. Please keep this letter and extra coupons in case you need to make a payment before you receive your first monthly billing statement. After receiving your first statement, you can discard any remaining coupons attached and use the coupon and return envelope provided in the monthly statement.

Your Adjustable Rate Mortgage has the possibility for negative amortization because your interest rate changes more often than your payment amount.

We invite you to enroll in our automated payment program, in which your monthly payments are automatically withdrawn from your bank account on the day you specify. Just visit us on the Internet at www.homecomings.com or call our Customer Service Department at the number below and sign up today!

**CONTACTING US—You can access your up-to-date loan information via the Internet. Just go to www.homecomings.com and select the "Access My Account Info" button.** In addition, you are welcome to contact us at 1.800.206.2901. Our automated phone system, which provides specific loan information and can answer many of your questions, is available 24 hours a day, 7 days a week, and our helpful Account Managers are available from 8:00 a.m. to 9:00 p.m., Monday through Thursday, and 8:00 a.m. to 6:00 p.m. on Friday's, Central Time. We also provide the special address below for your qualified, written requests. Please be sure to note your loan number on your correspondence.

Correspondence Address:

Homecomings Financial
P.O. Box 890036
Dallas, TX 75389

Again, welcome to Homecomings Financial! We look forward to having you as a customer and serving all of your financing needs.

Sincerely,

Homecomings Financial




## NOTICE OF ASSIGNMENT, SALE OR TRANSFER
## OF SERVICING RIGHTS.

This correspondence is an attempt to collect the debt, and any information obtained will be used for that purpose. If you haved filed for bankruptcy, or have been discharged in a Chapter 7 Bankruptcy proceeding, no attempt is being made to collect this debt or hold you personally responsible for repayment of the debt.

You are hereby notified that the servicing of your mortgage loan, that is, the right to collect payments from you, is being assigned or transferred from your present loan servicer to the new loan servicer shown on the reverse side of this notice.

Except in limited circumstances, the law requires that your present servicer send you notice of this transfer at least 15 days before the effective date of transfer or at closing. Your new servicer must also send you this notice no later than 15 days after the effective date or at closing.

You should also be aware of the following information which is set out in more detail in Section 6 of the Real Estate Settlement Procedures Act (**RESPA**) (12 U.S.C.2605):

During the 60 day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer, before its due date, may not be treated by your new servicer as late, and a late fee may not be imposed.

Section 6 of **RESPA** (12 U.S.C.2605) gives you certain consumer rights. If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgment within 20 business days of receipt of your request. A "qualified written request" is written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name, loan number, and your reasons for the request. If you want to send a "qualified written request" regarding the servicing of your loan, it must be sent to this address: Homecomings Financial, P.O. Box 890036, Dallas, TX 75389

Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account, and must provide you with written clarification regarding any dispute. During this 60 Business Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the servicer from initiating foreclosure if proper grounds exist under the mortgage documents.

A Business day is a day on which the offices of the servicer are open to the public for carrying on substantially all of its business functions.

Section 6 of **RESPA** also provides for the damages and costs for the individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section. You should seek legal advice if you believe your rights have been violated.

# EXHIBIT 4

REPRESENTATION OF PRINTED DOCUMENT

# AURORA LOAN SERVICES
**www.myAuroraLoan.com**

NOTICE OF ASSIGNMENT, SALE, OR TRANSFER OF SERVICING RIGHTS

March 18, 2008

3640021796453534WEL031808                         Re.    Homecomings Financial, LLC
73126 0031217 007                                        Loan # 7442385554
TIA DANIELLE SMITH                                       Aurora Loan Services
4011 HUBERT AVE                                          Loan#: 0021796453
LOS ANGELES CA 90008-2621

Dear Customer(s)'

Welcome to Aurora Loan Services. This letter is to notify you that the servicing of your mortgage loan is being assigned, sold or transferred from Homecomings Financial, LLC to Aurora Loan Services ("Aurora"), effective April 1, 2008  The transfer of your mortgage loan to Aurora includes the right to collect payments from you

The assignment, sale or transfer of the servicing of the mortgage loan does not affect any term or condition of the mortgage instruments, other than terms directly related to the servicing of your loan

Except in limited circumstances, the law requires that your present servicer send you this notice at least 15 days before the effective date of transfer, or at closing. Your new servicer must also send you this notice no later than 15 days after this effective date or at closing

Your present servicer is Homecomings Financial, LLC. If you have any questions relating to the transfer of servicing from your present servicer call Homecomings Financial, LLC's Customer Care at 800-206-2901 between 6:00 A.M. To 10:00 P.M. Cdt on the following days Monday Through Friday. This is a toll-free number

Beginning April 1, 2008, your new servicer will be Aurora Loan Services. The business address and toll-free telephone numbers for your new servicer are'

| Aurora Loan Services | Aurora Loan Services | Aurora Loan Services |
|---|---|---|
| Customer Service Department | Tax Department | Insurance Center |
| P.O. Box 1706 | P O Box 961233 | P.O. Box 2963 |
| Scottsbluff, NE 69363-1706 | Fort Worth, TX 76161-0233 | Phoenix, AZ 85062-2963 |
| 1 (800) 550-0508 | 1 (800) 550-0506 | 1 (800) 732-6578 |
| 8:00 A.M. to 11:00 P.M , ET | 8:00 A.M. to 5:00 P M., MT | 6:00 A.M. to 6:00 P.M , MT |
| Monday through Thursday | Monday through Friday | Monday through Friday |
| 8:00 A.M. to 9:00 P.M , ET | | |
| Friday | | |
| 8:00 A.M. to 4:00 P.M , ET | | |
| Saturday | | |

If you have any questions relating to the transfer of servicing to your new servicer call the toll-free numbers listed during the business hours specified above

The date that Homecomings Financial, LLC will stop accepting payments from you is March 31, 2008  The date that Aurora will begin accepting payments from you is April 1, 2008  Send all payments due on or after that date to Aurora Loan Services

If you have been paying premiums for life, disability, accidental death insurance or other optional products, these policies will not transfer to Aurora. If you desire to continue your optional coverage, you can contact your optional insurance provider and discuss the possibility of directly remitting your premium to them and continuing the policy

You should also be aware of the following information, which is set out in more detail in Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. 2605)

During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA (12 U.S.C. 2605) gives you certain consumer rights  If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgement within 20 Business Days of receipt of your request. A business day is a day on which the offices of the business entity are open to the public for carrying on substantially all of its business functions. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request. If you want to send a "qualified written request" regarding the servicing of your loan, it must be sent to this address'

Aurora Loan Services
Attention Customer Service Research
P O Box 1706
Scottsbluff, NE 69363-1706

Not later than 60 business days after receiving your request, your servicer must make any appropriate corrections to your account and must provide you with a written clarification regarding any dispute. During this 60-business-day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request  However, this does not prevent the servicer from initiating foreclosure if proper grounds exist under the mortgage documents

Section 6 of RESPA also provides the damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that section. You should seek legal advice if you believe your rights have been violated

Please retain this information with your loan documentation for future reference. Aurora appreciates the opportunity to provide service on your loan and for allowing us to be of service to you

Sincerely,

***CONTINUED ON REVERSE SIDE***

Cassie Leet
Customer Service Manager

DETACH AND RETURN BOTTOM PORTION:

| ACCOUNT NUMBER | OPTION 1 MINIMUM AMOUNT | OPTION 2 INTEREST ONLY | OPTION 3 PRIN & INT | OPTION 4 PRIN & INT-15 YR |
|---|---|---|---|---|
| 0021796453 | 2,062.78 | 3,966.19 | 4,334.06 | 5,596.74 |

TIA DANIELLE SMITH

☐ Please check here if address, phone # or e-mail change is indicated on reverse side

## CHOOSING YOUR PAYMENT OPTIONS

**Option 1: Minimum Amount Due** - This amount will not be sufficient to pay all accrued interest for the month or to pay loan in full over remaining term in equal monthly installments. Therefore, negative amortization will result and any deferred interest will be added to the balance of the loan.
**Option 2: Interest Only** – No reduction in your principal balance will occur with this payment.

**Option 3: Fully Amortized Payment** - Traditional payment of interest and principal. Pays all the interest due and reduces your principal in an amount sufficient to pay off your loan on schedule.
**Option 4: Accelerated Payment Option** - Payment is calculated to amortize the loan based on a 15 year term or the remaining term, whichever is less, resulting in substantial interest savings.

All funds will be applied in the following order:
(1) Interest due, (2) Principal due, (3) Escrow, (4) Fees, (5) To reduce principal balance
Include your loan number on your check.

**AURORA LOAN SERVICES**
**ATTN: CASHIERING**
**P.O. BOX 78112**
**PHOENIX, AZ 85062-8112**

Amount Enclosed    $ ☐☐☐☐☐☐☐

EXHIBIT 5

 

LOAN NO.   206-989130
MIN: 1001310-2060989130-2

### ADJUSTABLE RATE NOTE
(MTA-Twelve Month Average Index - Payment Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.**

NOVEMBER 13, 2006          LOS ANGELES          CALIFORNIA
[Date]                          [City]                        [State]

4011 HUBERT AVENUE
LOS ANGELES, CALIFORNIA 90008-2621
[Property Address]

**1.   BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $   556,000.00   (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed ( ONE HUNDRED FIFTEEN PERCENT              ) of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is   AMERICAN MORTGAGE NETWORK, INC., A DELAWARE CORPORATION

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**

**(A)   Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   1.500   %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B)   Interest Rate Change Dates**

The interest rate I will pay may change on the   1ST   day of   JANUARY, 2007   , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

**(C)   Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D)   Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 400/1000   percentage point(s)   3.400   % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than   9.950   %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

**3.   PAYMENTS**

**(A)   Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the   1ST   day of each month beginning on JANUARY 01, 2007 . I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on DECEMBER 01, 2036   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   P. O. BOX 85302
ATTN:  CASHIER'S DEPT., SAN DIEGO, CA 92186
or at a different place if required by the Note Holder.

 

LOAN NO. 206-989130

**(B) Amount of My Initial Monthly Payments**
Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S.
$ 1,918.87 unless adjusted under Section 3 (F).

**(C) Payment Change Dates**
My monthly payment may change as required by Section 3(D) below beginning on the 1ST day of JANUARY, 2008 , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment which is determined at the last Payment Change Date as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.
I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3 (F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**
At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment."Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E) Additions to My Unpaid Principal**
Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3 (A).

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**
My unpaid Principal can never exceed the Maximum Limit equal to 115 percent of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G) Required Full Payment**
On the TENTH Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H) Payment Options**
After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:
(i) Interest Only Payment: the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.
(ii) Fully Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.
(iii) 15 Year Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.
These Payment Options are only applicable if they are greater than the Minimum Payment.

LOAN NO.   206-989130

### 4.   NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

### 5.   BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

### 6.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 7.   BORROWER'S FAILURE TO PAY AS REQUIRED

#### (A)   Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.00  % of my overdue payment of Principal and Interest. I will pay this late charge promptly but only once on each late payment.

#### (B)   Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

#### (C)   Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

#### (D)   No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

#### (E)   Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

### 8.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

### 9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.



LOAN NO.   206-989130

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

RIDER TO THE NOTE AND SECURITY INSTRUMENT ATTACHED AND MADE A PART HEREOF.

_____ (Seal)
TIA DANIELLE SMITH                                    -Borrower

_____ (Seal)
                                                                  -Borrower

_____ (Seal)
                                                                  -Borrower

_____ (Seal)
                                                                  -Borrower

Pay to the Order of:

Without recourse,
American Mortgage Network, Inc.,
a Delaware Corporation,
By: _____
Name: Tiffany Rice
Title: _Funder_____

# RIDER TO NOTE AND SECURITY INSTRUMENT

LOAN NO.    206-989130

THIS RIDER is made this 13TH day of      NOVEMBER,    2006      ,      and is incorporated into and shall be deemed to amend and supplement both the Note and Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to    AMERICAN MORTGAGE NETWORK, INC., A DELAWARE CORPORATION                                    (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

4011 HUBERT AVENUE, LOS ANGELES, CALIFORNIA 90008-2621

[Property Address]

### PREPAYMENT PENALTY - FIRST    12      MONTHS OF NOTE

You have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When you make a Prepayment, you must tell the Note Holder in writing that you are doing so.

Subject to the Prepayment Penalty specified below, you may make a full Prepayment or partial Prepayment of your obligation. The Note Holder will use all of your Prepayments to reduce the amount of principal that you owe under this Note. If you make a partial Prepayment, there will be no changes in the due date(s) or in the amount of your monthly payment unless the Note Holder agrees in writing to those changes.

**If within the 12 month period beginning with the date of the Note, (the "Penalty Period"), you make a full or partial Prepayment, you will pay a prepayment charge as consideration for the Note Holder's acceptance of such payment. No prepayment charge will be assessed for any prepayment made after the Penalty Period.**

**You may prepay an amount not exceeding twenty percent (20%) of the original principal amount in any twelve month period commencing from the date of the Note or anniversary dates thereof without penalty. However, during the Penalty Period, if the aggregate amount of the principal prepaid in any twelve month period exceeds twenty percent (20%) of the original principal amount of this loan, then as consideration of the acceptance of such Prepayment and in addition to any other sum payable hereunder, you agree to pay the Note Holder hereof a sum equal to six (6) months interest on the amount prepaid in excess of twenty percent (20%) of the original principal amount at the rate specified in the Note.**

**Such additional sums shall be paid whether prepayment is voluntary or involuntary including any prepayment affected by the exercise of any acceleration provisions contained in the Note to which this Rider is attached, or in the Security Instrument securing the Note to which this Rider is attached.**

All other terms and conditions of the Note remain in full force and effect.

By signing below, Borrower accepts and agrees to the terms and provisions contained in this Rider to Note and Security Instrument.

**NOTICE TO BORROWER**

<u>**Do not sign this loan agreement before you read it. This loan agreement provides for the payment of a penalty if you wish to repay the loan prior to the date provided for repayments in the loan agreement.**</u>

_____    12/2/06
TIA DANIELLE SMITH                                    Date

_____
                                                                  Date

_____
                                                                  Date

_____
                                                                  Date

# EXHIBIT 6

# ORIGINAL

# NOTE

LOAN NO.    206-989130

**ADJUSTABLE RATE NOTE**    MIN:    1001310-2060989130-2

(MTA-Twelve Month Average Index - Payment Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.**

NOVEMBER 13, 2006            LOS ANGELES                    CALIFORNIA
     [Date]                     [City]                        [State]

                        4011 HUBERT AVENUE
                        LOS ANGELES, CALIFORNIA 90008-2621
                        [Property Address]

**1.   BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $    556,000.00    (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed ( ONE HUNDRED FIFTEEN PERCENT            ) of the Principal amount I originally borrowed. This is called the "Maximum Limit". Lender is    AMERICAN MORTGAGE NETWORK, INC., A DELAWARE CORPORATION
I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**

**(A)  Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    1.500   %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B)  Interest Rate Change Dates**

The interest rate I will pay may change on the            1ST            day of    JANUARY, 2007    , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

**(C)  Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D)  Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 400/1000            percentage point(s)    3.400   % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than    9.950   %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

**3.   PAYMENTS**

**(A)  Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the    1ST            day of each month beginning on JANUARY 01, 2007 . I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on DECEMBER 01, 2036    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at    P. O. BOX 85302
                                    ATTN:   CASHIER'S DEPT., SAN DIEGO, CA 92186
or at a different place if required by the Note Holder.

LOAN NO.   206-989130

**(B) Amount of My Initial Monthly Payments**
Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S.
$   1,918.87    unless adjusted under Section 3 (F).

**(C) Payment Change Dates**
My monthly payment may change as required by Section 3(D) below beginning on the   1ST
day of   JANUARY, 2008   , and on that day every 12th month thereafter. Each
of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F)
or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount
the Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as
provided in Section 3(F) or 3(G) below.  If the Minimum Payment is not sufficient to cover the amount of the
interest due then negative amortization will occur.
    I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or
as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**
At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the
monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment
Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the
month preceding the Payment Change Date. The result of this calculation is called the "Full Payment."Unless
Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will
not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap."
This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments
Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the
amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the
number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below
requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and
the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E) Additions to My Unpaid Principal**
Since my monthly payment amount changes less frequently than the interest rate, and since the monthly
payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less
than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay
the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal
payments. For each month that my monthly payment is less than the interest portion, the Note Holder will
subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to
my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by
Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will
apply the payment as provided in Section 3 (A).

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**
My unpaid Principal can never exceed the Maximum Limit equal to   115   percent of the Principal
amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments
and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to
exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change
more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new
Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the
Maturity Date in substantially equal payments at the current interest rate.

**(G) Required Full Payment**
On the   TENTH   Payment Change Date and on each succeeding fifth Payment Change Date
thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes
again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H) Payment Options**
After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment
options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the
following Payment Options:
      (i)    **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment
at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is
only available if the interest portion exceeds the Minimum Payment.
      (ii)    **Fully Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) at
the Maturity Date in substantially equal payments.
      (iii)    **15 Year Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest)
within a fifteen (15) year term from the first payment due date in substantially equal payments. This
monthly payment amount is calculated on the assumption that the current rate will remain in effect for
the remaining term.
These Payment Options are only applicable if they are greater than the Minimum Payment.



LOAN NO.    206-989130

### 4.  NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

### 5.  BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

### 6.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 7.  BORROWER'S FAILURE TO PAY AS REQUIRED

**(A)  Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.00    % of my overdue payment of Principal and Interest. I will pay this late charge promptly but only once on each late payment.

**(B)  Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)  Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)  No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)  Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

### 8.  GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

### 9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.



LOAN NO.   206-989130

### 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

### 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full. Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

RIDER TO THE NOTE AND SECURITY INSTRUMENT ATTACHED AND MADE A PART HEREOF.

_____ (Seal)
TIA DANIELLE SMITH                                         -Borrower

_____ (Seal)
                                                                         -Borrower

_____ (Seal)
                                                                         -Borrower

_____ (Seal)
                                                                         -Borrower

Pay to the Order of:

RESIDENTIAL FUNDING COMPANY, LLC
Without recourse,
American Mortgage Network, Inc.,
a Delaware Corporation

By: _____

Name: Tiffany Rice

Title: Funder


PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Company, LLC

BY _____

Judy Faber, Vice President

## NOTE ALLONGE

================================

For purposes of further endorsement of the following described
Note, this Allonge is affixed and becomes a permanent part of
said Note:

Loan #: 0021796453

Executing Mortgagor:  TIA DANIELLE SMITH

Original Mortgage Amount: $556,000.00

Original Lender: AMERICAN MORTGAGE NETWORK, INC., A DELAWARE
CORPORATION.

Loan Date:  NOVEMBER 13, 2006

Property Address: 4011 HUBERT AVENUE, LOS ANGELES, CA 90008-2621

Pay to the order of: AURORA LOAN SERVICES LLC

Without Recourse

By: _____
Name: _____
Title: _____
Company: Deutsche Bank Trust Company Americas as Trustee FKA
Bankers Trust Company, as Trustee by Residential Funding
Company, LLC FKA Residential Funding Corporation, it's Attorney
in Fact

# RIDER TO NOTE AND SECURITY INSTRUMENT

LOAN NO.    206-989130

THIS RIDER is made this 13TH day of    NOVEMBER,    2006    ,    and is incorporated into and shall be deemed to amend and supplement both the Note and Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to    AMERICAN MORTGAGE NETWORK, INC., A DELAWARE CORPORATION    (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

4011 HUBERT AVENUE, LOS ANGELES, CALIFORNIA 90008-2621

[Property Address]

## PREPAYMENT PENALTY - FIRST    12    MONTHS OF NOTE

You have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When you make a Prepayment, you must tell the Note Holder in writing that you are doing so.

Subject to the Prepayment Penalty specified below, you may make a full Prepayment or partial Prepayment of your obligation. The Note Holder will use all of your Prepayments to reduce the amount of principal that you owe under this Note. If you make a partial Prepayment, there will be no changes in the due date(s) or in the amount of your monthly payment unless the Note Holder agrees in writing to those changes.

**If within the 12 month period beginning with the date of the Note, (the "Penalty Period"), you make a full or partial Prepayment, you will pay a prepayment charge as consideration for the Note Holder's acceptance of such payment. No prepayment charge will be assessed for any prepayment made after the Penalty Period.**

**You may prepay an amount not exceeding twenty percent (20%) of the original principal amount in any twelve month period commencing from the date of the Note or anniversary dates thereof without penalty. However, during the Penalty Period, if the aggregate amount of the principal prepaid in any twelve month period exceeds twenty percent (20%) of the original principal amount of this loan, then as consideration of the acceptance of such Prepayment and in addition to any other sum payable hereunder, you agree to pay the Note Holder hereof a sum equal to six (6) months interest on the amount prepaid in excess of twenty percent (20%) of the original principal amount at the rate specified in the Note.**

**Such additional sums shall be paid whether prepayment is voluntary or involuntary including any prepayment affected by the exercise of any acceleration provisions contained in the Note to which this Rider is attached, or in the Security Instrument securing the Note to which this Rider is attached.**

All other terms and conditions of the Note remain in full force and effect.

By signing below, Borrower accepts and agrees to the terms and provisions contained in this Rider to Note and Security Instrument.

## NOTICE TO BORROWER

**Do not sign this loan agreement before you read it. This loan agreement provides for the payment of a penalty if you wish to repay the loan prior to the date provided for repayments in the loan agreement.**

_____  12/2/06
TIA DANIELLE SMITH                            Date

_____
                                                    Date

_____
                                                    Date

_____
                                                    Date

# EXHIBIT 7

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower", as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☑ the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse or other person who has community property rights pursuant to state law will not be used as a basis for loan qualification, but his or her liabilities must be considered because the spouse or other person has community property rights pursuant to applicable law and Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

If this is an application for joint credit, Borrower and Co-Borrower each agree that we intend to apply for joint credit (sign below):

_____                    _____
Borrower                                    Co-Borrower

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA    ☑ Conventional    ☐ Other (explain): | | Agency Case Number | Lender Case Number |
|---|---|---|---|---|
| | ☐ FHA    ☐ USDA/Rural Housing Service | | | |

| Amount | Interest Rate | No. of Months | Amortization Type: | ☑ Fixed Rate    ☐ Other (explain): |
|---|---|---|---|---|
| $         556,000 | 1.500 % | 360/360 | | ☐ GPM    ☐ ARM (type): |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state, & ZIP) | No. of Units |
|---|---|
| 4011 HUBERT AVENUE, Los Angeles, CA 90008    County: Los Angeles | 1 |

| Legal Description of Subject Property (attach description if necessary) | Year Built |
|---|---|
| PER PRELIM | 1939 |

| Purpose of Loan | ☐ Purchase    ☐ Construction    ☐ Other (explain): | Property will be: |
|---|---|---|
| | ☑ Refinance    ☐ Construction-Permanent | ☑ Primary Residence ☐ Secondary Residence ☐ Investment |

*Complete this line if construction or construction-permanent loan.*

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a+b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

*Complete this line if this is a refinance loan.*

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements | ☐ made    ☐ to be made |
|---|---|---|---|---|---|
| 2033 | $      305,000 | $      616,000 | | Cost: $ | |

| Title will be held in what Name(s) | Manner in which Title will be held | Estate will be held in: |
|---|---|---|
| TIA DANIELLE SMITH | Single woman | ☑ Fee Simple ☐ Leasehold (show expiration date) |

| Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain) |
|---|
| Equity from Subject Property |

## III. BORROWER INFORMATION

| Borrower | Co-Borrower |
|---|---|

| Borrower's Name (include Jr. or Sr. if applicable) | Co-Borrower's Name (include Jr. or Sr. if applicable) |
|---|---|
| TIA DANIELLE SMITH | |

| Social Security Number | Home Phone (incl. area code) | DOB (mm/dd/yyyy) | Yrs. School | Social Security Number | Home Phone (incl. area code) | DOB (mm/dd/yyyy) | Yrs. School |
|---|---|---|---|---|---|---|---|
| ▬▬-2841 | 323-295-0517 | 12/04/1966 | 14 | | | | |

| ☐ Married    ☑ Unmarried (include single, divorced, widowed) ☐ Separated | Dependents (not listed by Co-Borrower) no.    ages | ☐ Married    ☐ Unmarried (include single, divorced, widowed) ☐ Separated | Dependents (not listed by Borrower) no.    ages |
|---|---|---|---|

| Present Address (street, city, state, ZIP) ☑ Own ☐ Rent _5_ No. Yrs. | Present Address (street, city, state, ZIP) ☐ Own ☐ Rent ____ No. Yrs. |
|---|---|
| 4011 HUBERT AVENUE Los Angeles, CA 90008 | |

| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |
|---|---|
| | |

*If residing at present address for less than two years, complete the following:*

| Former Address (street, city, state, ZIP) ☐ Own ☐ Rent ____ No. Yrs. | Former Address (street, city, state, ZIP) ☐ Own ☐ Rent ____ No. Yrs. |
|---|---|
| | |

| Former Address (street, city, state, ZIP) ☐ Own ☐ Rent ____ No. Yrs. | Former Address (street, city, state, ZIP) ☐ Own ☐ Rent ____ No. Yrs. |
|---|---|
| | |

| Borrower | IV. EMPLOYMENT INFORMATION | | Co-Borrower |
|---|---|---|---|

| Name & Address of Employer [✓] Self Employed | Yrs. on this job |
|---|---|
| **REVIVE A HAIR AND BODY SPA** | 15 yr(s) |
| **217 N. EUCALYPTUS** | Yrs. employed in this line of work/profession |
| **Inglewood, CA 90301** | 15 |

| Name & Address of Employer [ ] Self Employed | Yrs. on this job |
|---|---|
| | Yrs. employed in this line of work/profession |

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|
| **OWNER** | **310-677-3733** | | |

*If employed in current position for less than two years or if currently employed in more than one position, complete the following:*

| Name & Address of Employer [ ] Self Employed | Dates (from-to) | Name & Address of Employer [ ] Self Employed | Dates (from-to) |
|---|---|---|---|
| | Monthly Income $ | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

| Name & Address of Employer [ ] Self Employed | Dates (from-to) | Name & Address of Employer [ ] Self Employed | Dates (from-to) |
|---|---|---|---|
| | Monthly Income $ | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

| Name & Address of Employer [ ] Self Employed | Dates (from-to) | Name & Address of Employer [ ] Self Employed | Dates (from-to) |
|---|---|---|---|
| | Monthly Income $ | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

| Name & Address of Employer [ ] Self Employed | Dates (from-to) | Name & Address of Employer [ ] Self Employed | Dates (from-to) |
|---|---|---|---|
| | Monthly Income $ | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 17,500.00 | $ | $ 17,500.00 | Rent | $ | |
| Overtime | | | | First Mortgage (P&I) | 2,830.00 | $ 1,918.87 |
| Bonuses | | | | Other Financing (P&I) | 1,119.00 | 593.64 |
| Commissions | | | | Hazard Insurance | 80.00 | 80.00 |
| Dividends/Interest | | | | Real Estate Taxes | 322.00 | 322.00 |
| Net Rental Income | | | | Mortgage Insurance | | |
| Other (before completing, see the notice in "describe other income," below) | | | | Homeowner Assn. Dues | | |
| | | | | Other: | | |
| Total | $ 17,500.00 | $ | $ 17,500.00 | Total | $ 4,351.00 | $ 2,914.51 |

\* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

**Describe Other Income**   **Notice:**  Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan.

| B/C | | Monthly Amount |
|---|---|---|
| | | $ |
| | | |
| | | |

Fannie Mae Form 1003   07/05
CALYX Form Loanapp2.frm 09/05

Page 2 of 5      Borrower _I.D.S_      Freddie Mac Form 65   07/05
                 Co-Borrower _____

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise, separate Statements and Schedules are required. If the Co-Borrower section was completed about a non-applicant spouse or other person, this Statement and supporting schedules must be completed by that spouse or other person also.

Completed [✓] Jointly [ ] Not Jointly

| ASSETS Description | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | |
|---|---|---|---|---|
| Cash deposit toward purchase held by: | $ | | | |
| | | **LIABILITIES** | Monthly Payment & Months Left to Pay | Unpaid Balance |
| *List checking and savings accounts below* | | Name and address of Company **CHASE MANHATTAN MTGE** | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union **MORGAN STANLEY** | | | | |
| | | Acct. no. 1230202576 | * (2,830) | 480,354 |
| Acct. no. 238040402165 | $ 8,805 | Name and address of Company **COUNTRYWIDE HOME LOANS** 16210,16214 SANDY PLACE | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union **MORGAN STANLEY** | | | | |
| | | Acct. no. 115360023 | (998) | 165,200 |
| Acct. no. 238040401165 | $ 7,151 | Name and address of Company **AMERICAN HOME MTG SRV** 5108 JEREMIAH RENTAL | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union **UBS FINANCIAL** | | | | |
| | | Acct. no. 1001241152 | (909) | 125,520 |
| Acct. no. TP74523PC | $ 1,607 | Name and address of Company **EMC MORTGAGE** 12 PINE WAY RENTAL | $ Payment/Months | $ |
| Stocks & Bonds (Company name/number description) | $ | | | |
| **MARTH STEWART (50 Shares)** **PRUDENTIAL FINCL** | 950 6,337 | Acct. no. 5890012987061 | (656) | 96,000 |
| | | Name and address of Company **AURORA LOAN SERVICES** 17 PINE WAY RENTAL | $ Payment/Months | $ |
| Life Insurance net cash value | $ | | | |
| Face amount: $ 352,000 | 6,500 | Acct. no. 3640036661684 | (893) | 84,000 |
| Subtotal Liquid Assets | $ 32,929 | Name and address of Company **COUNTRYWIDE HOME LOANS** 16210,16214 SANDY PASS RENTAL | $ Payment/Months | $ |
| Real estate owned (enter market value from schedule of real estate owned) | $ 1,400,000 | | | |
| Vested interest in retirement fund | $ | Acct. no. 115360055 | (613) | 58,992 |
| Net worth of business(es) owned (attach financial statement) | $ | | | |
| Automobiles owned (make and year) **2004 RANGE ROVER HSE** | $ 56,000 | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| Other Assets (itemize) **HOUSEHOLD ITEMS** | $ | Job-Related Expense (child care, union dues, etc.) | $ | |
| | | **Total Monthly Payments** | $ 2,199 | |
| **Total Assets a.** | $ 1,488,929 | Net Worth (a minus b) => $ 179,594 | **Total Liabilities b.** | $ 1,309,335 |

**Schedule of Real Estate Owned** (if additional properties are owned, use continuation sheet)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|---|
| **4011 HUBERT AVENUE** Los Angeles, CA 90008 | | SFR | O/O $ 690,000 | $ 616,000 | $ | $ 4,147 | $ INC | $ |
| **12 PINE WAY** CONROY, TX | R | SFR | 145,000 | 120,000 | 1,200 | 884 | INC | 16 |
| **5108 JEREMIAH** MISSOURI | R | SFR | 175,000 | 149,055 | 1,350 | 1,160 | INC | -148 |
| * See page 5 for the additional properties | | Totals | $ 1,400,000 | $ 1,223,441 | $ 6,300 | $ 8,986 | $ 245 | $ -360 |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |

Fannie Mae Form 1003   07/05
CALYX Form Loanapp3.frm 09/05

Borrower _____

Co-Borrower _____

Page 3 of 5

Freddie Mac Form 65   07/05

## Continuation Sheet/Residential Loan Application

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower:<br>**TIA DANIELLE SMITH** | Agency Case Number: |
|---|---|---|
| | Co-Borrower: | Lender Case Number: |

### VI. ASSETS AND LIABILITIES

| ASSETS | Cash or Market Value | LIABILITIES | Monthly Payment & Months Left to Pay | Unpaid Balance |
|---|---|---|---|---|
| Name and address of Bank, S&L, or Credit Union<br>**OPTIONS XPRESS** | $ | Name and address of Company<br>**US BANK** | $ Payt./Mos. | $ |
| Acct. no. 5A15-261/0220-9641 | $ 1,579 | Acct. No. 2694049028 | 1,018 | 41,769 |
| Name and address of Bank, S&L, or Credit Union | $ | Name and address of Company<br>**GMAC MORTGAGE CORP**<br>**17 PINE WAY RENTAL** | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. 307659323 | (291) | 30,205 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company<br>**EMC MORTGAGE**<br>**12 PINE WAY RENTAL** | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. 5890012987087 | (228) | 24,000 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company<br>**AMERICAN HOME MTG SRV**<br>**5108 JEREMIAH RENTAL** | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. 1001241182 | 251/(R) | 23,522 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company<br>**BOA MBNA** | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. 0325 | 200/(R) | 19,535 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company<br>**BANK OF AMERICA** | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. 470620000020 | 272/(R) | 14,661 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company<br>**HSBC NV** | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. 410008160944 | 380/(R) | 7,616 |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature:<br>X | Date<br>12/5/2006 | Co-Borrower's Signature:<br>X | Date |
|---|---|---|---|

Fannie Mae Form 1003   07/05
CALYX Form 1003 Lnapp5ast.frm 9/05

Freddie Mac Form 65   07/05

## Continuation Sheet/Residential Loan Application

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower:<br>**TIA DANIELLE SMITH**<br>Co-Borrower: | Agency Case Number:<br><br>Lender Case Number: |
| --- | --- | --- |

### VI.    ASSETS    AND    LIABILITIES

| ASSETS | Cash or Market Value | LIABILITIES | Monthly Payment & Months Left to Pay | Unpaid Balance |
| --- | --- | --- | --- | --- |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company<br>**UNLV/CITI** | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No.  549113034252 | 19/(R) | 19 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company<br>**BLMDSNB** | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No.  3143413702 | 34/(R) | 1,333 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company<br>**HSBC/SAKS** | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No.  106604-1019049269 | 25/(R) | 609 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company<br>**COUNTRYWIDE HOME LOANS** | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No.  139573171 | *     (900) | 136,000 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature:<br>X | Date<br>12/5/2006 | Co-Borrower's Signature:<br>X | Date |
| --- | --- | --- | --- |

Fannie Mae Form 1003   07/05
CALYX Form 1003 Lnap5ast.frm 9/05

Freddie Mac Form 65   07/05



## Continuation Sheet/Residential Loan Application

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower: TIA DANIELLE SMITH | Agency Case Number: |
|---|---|---|
| | Co-Borrower: | Lender Case Number: |

### VI. ASSETS AND LIABILITIES

**Schedule of Real Estate Owned**

| Property Address (enter S if sold, PS if pending sale or R if rental being held for Income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 16210,16214 SANDY PASS LANE HOUSTON, TX | R 2-4PLX | 245,000 | 224,192 | 2,400 | 1,611 | 245 | -56 |
| 17 PINE WAY CONROY, TX | R SFR | 145,000 | 114,194 | 1,350 | 1,184 | inc | -172 |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: | Date 12/5/2006 | Co-Borrower's Signature: X | Date |
|---|---|---|---|

## VII. DETAILS OF TRANSACTION

| | | |
|---|---|---|
| a. Purchase price | $ | |
| b. Alterations, improvements, repairs | | |
| c. Land (if acquired separately) | | |
| d. Refinance (incl. debts to be paid off) | 616,354.00 | |
| e. Estimated prepaid items | 2,412.00 | |
| f. Estimated closing costs | 8,589.00 | |
| g. PMI, MIP, Funding Fee | | |
| h. Discount (if Borrower will pay) | | |
| i. Total costs (add items a through h) | 627,355.00 | |
| j. Subordinate financing | 69,500.00 | |
| k. Borrower's closing costs paid by Seller | | |
| l. Other Credits (explain) | | |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 556,000.00 | |
| n. PMI, MIP, Funding Fee financed | | |
| o. Loan amount (add m & n) | 556,000.00 | |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | 1,855.00 | |

## VIII. DECLARATIONS

| If you answer "Yes" to any questions a through i, please use continuation sheet for explanation. | Borrower Yes | Borrower No | Co-Borrower Yes | Co-Borrower No |
|---|---|---|---|---|
| a. Are there any outstanding judgments against you? | ☐ | ☑ | ☐ | ☐ |
| b. Have you been declared bankrupt within the past 7 years? | ☐ | ☑ | ☐ | ☐ |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | ☐ | ☑ | ☐ | ☐ |
| d. Are you a party to a lawsuit? | ☐ | ☑ | ☐ | ☐ |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? | ☐ | ☑ | ☐ | ☐ |
| (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes", provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | | | |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes", give details as described in the preceding question. | ☐ | ☑ | ☐ | ☐ |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | ☐ | ☑ | ☐ | ☐ |
| h. Is any part of the down payment borrowed? | ☐ | ☑ | ☐ | ☐ |
| i. Are you a co-maker or endorser on a note? | ☐ | ☑ | ☐ | ☐ |
| j. Are you a U. S. citizen? | ☑ | ☐ | ☐ | ☐ |
| k. Are you a permanent resident alien? | ☐ | ☑ | ☐ | ☐ |
| l. Do you intend to occupy the property as your primary residence? If "Yes", complete question m below. | ☑ | ☐ | ☐ | ☐ |
| m. Have you had an ownership interest in a property in the last three years? | ☑ | ☐ | ☐ | ☐ |
| (1) What type of property did you own—principal residence (PR), second home (SH), or investment property (IP)? | PR | | | |
| (2) How did you hold title to the home-solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | S | | | |

## IX. ACKNOWLEDGEMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described in this application; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated in this application; (6) the Lender, its servicers, successors or assigns may retain the original and/or an electronic record of this application, whether or not the Loan is approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the Lender, its servicers, successors or assigns may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

Acknowledgement. Each of the undersigned hereby acknowledges that any owner of the Loan, its servicers, successors or assigns, may verify or reverify any information contained in this application or obtain any information or data relating to the Loan, for any legitimate business purpose through any source, including a source named in this application or a consumer reporting agency.

| Borrower's Signature | Date 12/5/2006 | Co-Borrower's Signature X | Date |
|---|---|---|---|

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a Lender may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation and surname if you have made this application in person. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER ☑ I do not wish to furnish this information | | | CO-BORROWER ☐ I do not wish to furnish this information | | |
|---|---|---|---|---|---|
| Ethnicity: ☐ Hispanic or Latino | ☐ Not Hispanic or Latino | | Ethnicity: ☐ Hispanic or Latino | ☐ Not Hispanic or Latino | |
| Race: ☐ American Indian or Alaska Native | ☐ Asian | ☐ Black or African American | Race: ☐ American Indian or Alaska Native | ☐ Asian | ☐ Black or African American |
| ☐ Native Hawaiian or Other Pacific Islander | ☐ White | | ☐ Native Hawaiian or Other Pacific Islander | ☐ White | |
| Sex: ☑ Female | ☐ Male | | Sex: ☐ Female | ☐ Male | |

| To be Completed by Interviewer This application was taken by: ☐ Face-to-face interview ☐ Mail ☑ Telephone ☐ Internet | Interviewer's Name (print or type) WALTER W. HERNANDEZ Interviewer's Signature [signature] Date 12/8/2006 Interviewer's Phone Number (incl. area code) 818-280-3838 | Name and Address of Interviewer's Employer WALMAR FINANCIAL GROUP 8300 TAMPA AVE STE K Northridge, CA 91324 (P) 818-280-3838 (F) 818-280-3828 |
|---|---|---|