**Hearing Date:  August 26, 2014 at 10:00 a.m. (ET)**
**Objection Deadline:  August 14, 2014 at 4:00 p.m. (ET)**

Richard M. Cieri                             Jeffrey S. Powell
Ray C. Schrock                               Daniel T. Donovan
Justin R. Bernbrock                          Judson D. Brown
KIRKLAND & ELLIS LLP                         KIRKLAND & ELLIS LLP
601 Lexington Avenue                         655 15th Street, N.W., Ste. 1200
New York, New York 10022                     Washington, D.C. 20005
Telephone: (212) 446-4800                    Telephone: (202) 879-5000
Facsimile: (212) 446-4900                    Facsimile: (202) 879-5200

*Counsel for Ally Financial Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, <u>et</u> <u>al.</u>, | Chapter 11 |
| Debtors. | Jointly Administered |

---

## NOTICE OF ALLY FINANCIAL INC.'S MOTION FOR AN
## ORDER ENFORCING THE CHAPTER 11 PLAN INJUNCTION

**PLEASE TAKE NOTICE** that a hearing on Ally Financial Inc.'s Motion for Entry of an Order Enforcing the Chapter 11 Plan Injunction (the "***Motion***") will be held before the Honorable Martin Glenn of the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***"), in Room 501, One Bowling Green, New York, New York 10004-1408, on **August 26, 2014, at 10:00 a.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that responses or objections to the Motion and the relief requested therein, if any, must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, shall set forth the basis for the objection and the specific grounds therefore and shall be filed with the Bankruptcy Court electronically in accordance with General Order M-399, by registered users of the Bankruptcy Court's case filing system (the User's Manual for the Electronic Case Filing System can be

found at http://www.nysb.uscourts.gov, the official website for the Bankruptcy Court), with a hard copy delivered directly to Chambers and served, so as to be received no later than **August 14, 2014, at 4:00 p.m. (prevailing Eastern Time)**, upon: (a) counsel to the Debtors and Liquidating Trust, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attention: Gary S. Lee, Norman S. Rosenbaum, and Jordan A. Wishnew); (b) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014 (Attention: Tracy Hope Davis, Linda A. Riffkin, and Brian S. Masumoto); (c) the Office of the United States Attorney General, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-0001 (Attention: US Attorney General, Eric H. Holder, Jr.); (d) the Office of the New York State Attorney General, The Capitol, Albany, NY 12224-0341 (Attention: Nancy Lord, Esq. and 3 Enid N. Stuart, Esq.); (e) the Office of the U.S. Attorney for the Southern District of New York, One St. Andrews Plaza, New York, NY 10007 (Attention: Joseph N. Cordaro, Esq.); (f) counsel for Ally Financial Inc., Kirkland & Ellis LLP, 153 East 53rd Street, New York, NY 10022 (Attention: Richard M. Cieri and Ray Schrock); (g) counsel for the committee of unsecured creditors, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036 (Attention: Kenneth Eckstein and Douglas Mannal); (h) counsel for Ocwen Loan Servicing, LLC, Clifford Chance US LLP, 31 West 52nd Street, New York, NY 10019 (Attention: Jennifer C. DeMarco and Adam Lesman); (i) counsel for Berkshire Hathaway Inc., Munger, Tolles & Olson LLP, 355 South Grand Avenue, Los Angeles, CA 90071 (Attention: Thomas Walper and Seth Goldman); (j) Internal Revenue Service, P.O. Box 7346, Philadelphia, PA 19101-7346 (if by overnight mail, to 2970 Market Street, Mail Stop 5-Q30.133, Philadelphia, PA 19104-5016); (k) Securities and Exchange Commission, New York Regional Office, 3 World Financial Center, Suite 400, New York, NY 10281-1022 (Attention: George S.

Canellos, Regional Director); and (l) special counsel to the Committee, SilvermanAcampora LLP,

100 Jericho Quadrangle, Suite 300, Jericho, NY 11753 (Attention: Ronald J. Friedman).

**PLEASE TAKE FURTHER NOTICE** that if you do not timely file and serve a written

response to the relief requested in the Motion, the Bankruptcy Court may deem any opposition

waived, treat the Motion as conceded, and enter an order granting the relief requested in the Motion

without further notice or hearing.

August 4, 2014                                         */s/ Ray C. Schrock*                          
New York, New York                             Richard M. Cieri
                                                              Ray C. Schrock
                                                              Justin R. Bernbrock
                                                              KIRKLAND & ELLIS LLP
                                                              601 Lexington Avenue
                                                              New York, New York 10022
                                                              Telephone: (212) 446-4800
                                                              Facsimile: (212) 446-4900

                                                              - and -

                                                              Jeffrey S. Powell
                                                              Daniel T. Donovan
                                                              Judson D. Brown
                                                              KIRKLAND & ELLIS LLP
                                                              655 15th Street, N.W., Ste. 1200
                                                              Washington, D.C. 20005
                                                              Telephone: (202) 879-5000
                                                              Facsimile: (202) 879-5200

Richard M. Cieri

Ray C. Schrock

Justin R. Bernbrock

KIRKLAND & ELLIS LLP

601 Lexington Avenue

New York, New York 10022

Telephone: (212) 446-4800

Facsimile: (212) 446-4900

Jeffrey S. Powell

Daniel T. Donovan

Judson D. Brown

KIRKLAND & ELLIS LLP

655 15th Street, N.W., Ste. 1200

Washington, D.C. 20005

Telephone: (202) 879-5000

Facsimile: (202) 879-5200

*Counsel for Ally Financial Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------

|  |  |
|---|---|
| In re: | ) Case No. 12-12020 (MG) |
| | ) |
| RESIDENTIAL CAPITAL, LLC, et al., | ) Chapter 11 |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

------------------------------------------------------

**ALLY FINANCIAL INC.'S MOTION FOR AN**
**ORDER ENFORCING THE CHAPTER 11 PLAN INJUNCTION**

**TO THE HONORABLE JUDGE GLENN,**
**UNITED STATES BANKRUPTCY JUDGE:**

Ally Financial Inc. ("*AFI*," together with its non-debtor subsidiaries and affiliates, including Ally Bank, collectively, "*Ally*") submits this Motion for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "*Order*"),[1] enforcing the injunction in the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [ECF No. 6065-1] (the "*Plan*"),[2] which was confirmed by the Court on December 11, 2013 [ECF No. 6065].  In support hereof, Ally submits the *Declaration of Chais L. Sweat*, which is attached hereto as **Exhibit B** (the "*Sweat Declaration*"), and respectfully states as follows:

---

[1] Although it has not done so as of the date of this Motion, Ally respectfully reserves its rights to seek an expedited hearing on the Motion based upon events that may occur in the underlying lawsuit.

[2] Capitalized terms used but not defined herein have the meanings given to such terms in the Plan.

## INTRODUCTION

In direct contravention of this Court's order confirming the Plan—which permanently
enjoined the pursuit of claims "arising from or related in any way to the Debtors," (Plan Art.
IX.D)—two plaintiffs in Texas state court seek to continue their lawsuit against Ally, asserting
that their foreclosure-related claims do not fall within the scope of the Plan's Third Party Release
and Injunction provisions.

The plaintiffs' claims concern the foreclosure of a residential mortgage loan allegedly
serviced by a debtor entity.  The plaintiffs' claims fall squarely within the Plan's Third Party
Release, which applies to "any and all Causes of Action whatsoever, whether known or
unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or
hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of
federal or state securities laws, veil piercing or alter-ego theories of liability, contribution,
indemnification, joint liability, or otherwise, arising from or related in any way to the Debtors."
(Plan Art. IX.D.)

This Court has entered orders enforcing the Plan's Third Party Release and Injunction
provisions against plaintiffs raising similar claims on three previous occasions.  Just as in those
cases, the plaintiffs here are "permanently enjoined and precluded" from continuing to prosecute
their claims against Ally under the Plan's Injunction.  (*See* Plan Art. IX.I.)  This Court therefore
should enter the Order enforcing the Plan's Third Party Release and Injunction, enjoining the
plaintiffs from proceeding with their claims against Ally.

## BACKGROUND

On October 16, 2013, Jahanur Subedar and Aminah Momin (the "***Plaintiffs***"), proceeding
*pro se*, filed a complaint against Ally and several other parties in Texas state court.  (Sweat
Decl. ¶ 3.)  The complaint brings claims for violation of a Pooling and Servicing Agreement with

U.S. Bank, violations of New York's estates and trusts laws, and violation of the Real Estate

Settlement Procedures Act.  (*Id.* ¶ 4.)  The complaint contains virtually no specific allegations

against Ally.  On June 6, 2014, U.S. Bank removed the case to the United States District Court

for the Eastern District of Texas.  (*Id.* ¶ 5.)

Separately, on May 14, 2012, ResCap and many of its direct and indirect subsidiaries—

including GMAC Mortgage—filed for bankruptcy protection.  On December 11, 2013, the Court

entered the Confirmation Order confirming the Plan.  An "essential component" of the Plan is a

broad Third Party Release of "any and all Causes of Action" against Ally "arising from or related

in any way to the Debtors."  (Plan Art. IX.D.)  The Plan further includes an Injunction that

"permanently enjoined and precluded" an entity from "commencing or continuing . . . against

any Released Party . . . on account of or in connection with or with respect to any Released

Claims."  (Plan Art. IX.I.)

The Plaintiffs were served notice of the Confirmation Hearing and a copy of the proposed

Plan, but did not object to the Plan or its Third Party Release.[3]  The Plaintiffs also received

notice of the entry of the Confirmation Order.[4]

On January 31, 2014, Ally's counsel sent a letter to the Plaintiffs to inform them that this

Court entered the Confirmation Order, and further provided copies of the Plan and Confirmation

Order.  (Sweat Decl. ¶ 6.)  The letter explained that the Plaintiffs' claims against Ally fall

squarely within the Third Party Release and that, by virtue of the Plan's Injunction, the Plaintiffs

are enjoined from pursuing their claims against Ally.  (*Id.* ¶ 7.)

---

[3] *Supplemental Affidavit of Service Regarding (I) Approval of Disclosure Statement, (II) Deadline for Voting on Plan, (III) Hearing to Consider Confirmation of Plan, and (IV) Deadline for Filing Objections to Confirmation of Plan* Ex. A [ECF No. 6316].

[4] *See Affidavit of Service of Clarissa D. Cu Regarding Notice of Entry of Confirmation Order Confirming the Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors and Occurrence of Effective Date, and Notice of Deadline and Procedures for Filing Certain Administrative Claims*, Ex. C, p. 75 [ECF No. 6187].

After receiving no response from the Plaintiffs, on May 6, 2014, Ally's counsel in these chapter 11 cases sent the Plaintiffs a second letter reiterating that their claims against Ally are subject to the Plan's Third Party Release and Injunction. (*Id.* ¶ 8.) This letter was returned as undeliverable. Ally's counsel then sent Plaintiffs another letter via email on May 14, 2014, restating that the Plaintiffs' claims were enjoined and must be dismissed pursuant to the Third Party Release and Injunction. (*Id.* ¶ 9.)

Again, after receiving no response, Ally's counsel sent Plaintiffs another letter on July 17, 2014. (*Id.* ¶ 10.) That letter, which was personally delivered to Plaintiffs via process server, reiterated that Plaintiffs claims are subject to the Third Party Release and Injunction and repeated Ally's willingness to discuss the matter with Plaintiffs and offered to arrange a telephone conference with this Court to discuss the matter. The Plaintiffs have not reached out to Ally's counsel to discuss the matter, and they have not dismissed their lawsuit against Ally. (*Id.* ¶ 11.)

## JURISDICTION

This Court is intimately familiar with the Plan, the issues that were litigated leading to Plan confirmation, the objections previously raised to the Third Party Release, and the purpose of the Third Party Release—which this Court deemed "an essential component and critical to the success of the Plan." (Plan Art. IX.D.) This Court is uniquely equipped to interpret and enforce the Plan terms, relevant Bankruptcy Code provisions, and ultimately its own injunction. Indeed, this Court specifically and broadly retained exclusive jurisdiction to "hear and determine any matter, case, controversy, suit, dispute, or Causes of Action [] regarding the existence, nature, and scope of the releases, injunctions, and exculpation provided under the Plan," to "hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan," to "issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with

4

consummation or enforcement of the Plan," and to "[e]nforce all orders previously entered by the Bankruptcy Court." (Plan Art. XII (c), (k), (s), and (u).)

This Court has previously found it has jurisdiction to enforce the Third Party Release and injunction against plaintiffs with claims against Ally on three separate occasions. *See generally Order Granting Ally Financial Inc.'s Motion for an Order Enforcing the Chapter 11 Plan Objection* [ECF No. 6702] (the "**Lahrman Order**"); *Mem. Op. and Order Denying Mot. to Lift the Automatic Stay and Enforcing Release of Claims Against Ally Financial Inc.* [ECF No. 6806] (the "**Mustafanos Opinion**"); *Mem. Op. and Order Granting in Part and Denying in Part Ally Financial Inc.'s Mot. for an Order Enforcing the Chapter 11 Plan Injunction* [ECF No. 7148] (the "**Hairston Opinion**"). Pursuant to that exclusive jurisdiction, Ally now seeks this Court's enforcement of the Plan, and its Third Party Release and injunction, against the Plaintiffs. *See, e.g., In re Charter Commc'ns*, 2010 WL 502764, at *3–*4 (Bankr. S.D.N.Y. Feb. 8, 2010).

## RELIEF REQUESTED

By its Motion, Ally respectfully requests entry of the Order enforcing the Plan's Third Party Release and enjoining the Plaintiffs from proceeding against with his claims against Ally. The relief does not seek to alter or impair any defenses Plaintiffs may (or may not) have vis-à-vis any foreclosure action by any party.

## ARGUMENT

Plaintiffs' claims against Ally fall squarely within the Third Party Release and Injunction provisions in the Plan confirmed by this Court. This Court should enforce the Plan and enjoin the Plaintiffs from continuing they lawsuit against Ally.

The Plaintiffs' claims against Ally are based on the foreclosure of a residential mortgage loan. Those claims are precisely within the scope of the Plan's Third Party Release. The Plan expressly provides as follows:

> On and as of the Effective Date of the Plan, the holders of Claims
> and Equity Interests, shall be deemed to provide a full and
> complete discharge and release to the Ally Released Parties and
> their respective property from any and all Causes of Action
> whatsoever, whether known or unknown, asserted or unasserted,
> derivative or direct, foreseen or unforeseen, existing or hereinafter
> arising, in law, equity, or otherwise, whether for tort, fraud,
> contract, violations of federal or state securities laws, veil piercing
> or alter-ego theories of liability, contribution, indemnification,
> joint liability, or otherwise, arising from or related in any way to
> the Debtors, including those in any way related to RMBS issued
> and/or sold by the Debtors or their affiliates and/or the Chapter 11
> Cases or the Plan, and any obligations under the DOJ/AG
> Settlement, the Consent Order, and the Order of Assessment.

(Plan Art. IX.D.)

The Plaintiffs are holders of a "Claim," as that term is defined in the Plan and the

Bankruptcy Code.  *See Mustafanos Opinion* 12 ("Since he is asserting a right of payment,

[plaintiff] is a holder of a 'Claim' pursuant to the Plan and the Bankruptcy Code.").  To define

the term "Claim," the Plan adopts the definition of that term in Bankruptcy section 101(5).

(Plan Art. I.A.53.)  Section 101(5), in turn, defines "claim" as any "right to payment, whether or

not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured,

unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  11 U.S.C. § 101(5).

As courts have observed, "[t]he definition of 'claim' in the Bankruptcy Code is very broad."  *In

re Egleston*, 448 F.3d 803, 812 (5th Cir. 2006); *accord Johnson v. Home State Bank*, 501 U.S. 78

(1991).  A claim need not have been asserted in litigation, be ripe for litigation, or even be

known to the claimant to fall within the scope of Section 101(5).  Under the Bankruptcy Code,

"'[i]t is well-established that a claim is ... allowable ... in a bankruptcy proceeding even if it is a

cause of action that has not yet accrued.'"  *In re R.H. Macy & Co.*, 67 F. App'x 30, 31–32 (2d

Cir. 2003) (quoting *In re Cool Fuel, Inc.*, 210 F.3d 999, 1006 (9th Cir. 2000) (collecting cases)).

The Plaintiffs' claims also "arise from [and are] related in any way to the Debtors." The Plaintiffs' claims against Ally are squarely based upon the mortgage business of the Debtors. The Plaintiffs challenge the foreclosure of a residential mortgage loan allegedly serviced by the U.S. Bank. Indeed, the Plaintiffs' complaint includes no specific alleges against Ally. *See Mustafanos Opinion* 18 (dismissing a plaintiff's claims that failed to allege any independent actions taken by Ally or its non-debtor subsidiaries).

Because Plaintiffs are "holders of [a] Claim[] … arising from or related in any way to the Debtors," they are bound by the Third Party Release. (*See* Plan Art. IX.D.) The express terms of the Plan's injunction therefore "permanently enjoins and precludes" the Plaintiffs from continuing their lawsuit against Ally. (*See* Plan Art. IX.I (enjoining all entities who hold "Claims … from: (a) commencing or continuing in any manner or action of other proceeding of any kind against any Released Party whether directly, derivatively or otherwise, on account of or in connection with or with respect to any Released Claims; … [and] (e) commencing or continuing in any manner or action or other proceeding of any kind against any Released Party on account of or in connection with or with respect to any Released Claims")); *see also In re Charter Commc'ns*, 2010 WL 502764, at *5 (Bankr. S.D.N.Y. Feb. 8, 2010) (enforcing confirmed plan of reorganization to enjoin plaintiffs' lawsuit against non-debtor beneficiaries of third party release).

As this Court has previously stated, "If [plaintiff] had a claim, he should have timely filed it in these bankruptcy cases; he did not do so, and it is too late to do so now." *Mustafanos Opinion* 12. Plaintiffs cannot sidestep the confirmed chapter 11 Plan to pursue their claims in another forum. *Id.*

## <u>CONCLUSION</u>

For the foregoing reasons, Ally respectfully requests that the Court enter the Order, enjoining the Plaintiffs from pursuing their claims against Ally and granting such other and further relief as appropriate.

August 4, 2014                                        _/s/ Ray C. Schrock_ _____
New York, New York                            Richard M. Cieri
                                                              Ray C. Schrock
                                                              Justin R. Bernbrock
                                                              KIRKLAND & ELLIS LLP
                                                              601 Lexington Avenue
                                                              New York, New York 10022
                                                              Telephone: (212) 446-4800
                                                              Facsimile: (212) 446-4900

                                                              - and -

                                                              Jeffrey S. Powell
                                                              Daniel T. Donovan
                                                              Judson D. Brown
                                                              KIRKLAND & ELLIS LLP
                                                              655 15th Street, N.W., Ste. 1200
                                                              Washington, D.C. 20005
                                                              Telephone: (202) 879-5000
                                                              Facsimile: (202) 879-5200

                                                              *Counsel to Ally Financial Inc.*

## EXHIBIT A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Case No. 12-12020 (MG) |
| | ) |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) Chapter 11 |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

## ORDER GRANTING ALLY FINANCIAL INC.'S MOTION
## FOR AN ORDER ENFORCING THE CHAPTER 11 PLAN INJUNCTION

Upon consideration of the motion (the "***Motion***")[1] of Ally Financial Inc. ("***AFI***," together with its non-debtor subsidiaries and affiliates, including Ally Bank, collectively, "***Ally***") for entry of an order enforcing the Third Party Release and Injunction provisions of the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors*, which was confirmed by this Court on December 11, 2013; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of these chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this proceeding on the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b); and sufficient notice of the Motion having been given; and it appearing that no other or further notice need be provided; and after due deliberation and sufficient cause appearing therefor,

### IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.    The Motion is GRANTED to the extent set forth below for the reasons set forth on the record at the hearing on the Motion.

---

[1] Capitalized terms used but not defined herein have the meanings provided to such terms in the Motion.

2.      Not later than fourteen days after the entry of this Order, the Plaintiffs shall take all appropriate actions to dismiss their lawsuit against Ally with prejudice within such time frame.

3.      If the Plaintiffs fail to dismiss their lawsuit against Ally or it is not otherwise dismissed within such fourteen-day period, this Court shall issue an order holding the Plaintiffs in contempt of Court for violating the terms of this Order and the Confirmation Order by virtue of the Plaintiffs' actions to attempt to prosecute actions against Ally in violation of the Confirmation Order.

4.      Ally is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

5.      Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

6.      All objections to the Motion or the relief requested therein, if any, that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits.

7.      This Court shall retain jurisdiction with respect to all matters arising or related to the implementation of this Order.


Dated: _____, 2014
          New York, New York

                                          _____
                                          THE HONORABLE MARTIN GLENN
                                          UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT B</u>**

**Sweat Declaration**

Richard M. Cieri                              Jeffrey S. Powell
Ray C. Schrock                                Daniel T. Donovan
Justin R. Bernbrock                           Judson D. Brown
KIRKLAND & ELLIS LLP                          KIRKLAND & ELLIS LLP
601 Lexington Avenue                          655 15th Street, N.W., Ste. 1200
New York, New York 10022                      Washington, D.C. 20005
Telephone: (212) 446-4800                     Telephone: (202) 879-5000
Facsimile: (212) 446-4900                     Facsimile: (202) 879-5200

*Counsel for Ally Financial Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------
                                              )
In re:                                        )    Case No. 12-12020 (MG)
                                              )
RESIDENTIAL CAPITAL, LLC, et al.,             )    Chapter 11
                                              )
                              Debtors.        )    Jointly Administered
                                              )
---------------------------------------------------------------

**DECLARATION OF CHAIS L. SWEAT**

    I, Chais L. Sweat, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

    1.    I make this declaration on the basis of my personal knowledge of the facts stated

herein, except to the extent that I make reference to documents.  When referencing documents,

my knowledge is based upon my review of documents provided to me during the course of my

representation of Ally Financial Inc.

    2.    I am an attorney based in Dallas, Texas.

    3.    On October 16, 2013, Jahanur Subedar and Aminah Momin (the "***Plaintiffs***"),

proceeding *pro se*, filed a complaint against Ally and several other parties in Texas state court.

    4.    The complaint, which remains the operative complaint in the case, alleged claims

for violation of a Pooling and Servicing Agreement with U.S. Bank, violations of New York's

estates and trusts laws, and violation of the Real Estate Settlement Procedures Act. A copy of the complaint is attached hereto as **Exhibit 1**.

5.      On June 6, 2014, U.S. Bank removed the Action to the United States District Court for the Eastern District of Texas.

6.      On January 31, 2014, a colleague of mine sent a letter to the Plaintiffs to inform them that this Court entered the Confirmation Order, and further provided copies of the Plan and Confirmation Order. A copy of the January 31, 2014 letter is attached hereto as **Exhibit 2**.

7.      The January 31 letter explained that the Plaintiffs' claims alleged in the Complaint against Ally fell squarely within the Third Party Release and that, by virtue of the Plan's Injunction, the Plaintiffs were enjoined from pursuing their claims against Ally.

8.      I understand and believe that, on May 6, 2014, Ally's counsel in these chapter 11 cases sent the Plaintiffs a second letter reiterating that their claims against Ally were subject to the Plan's Third Party Release and Injunction. A copy of the May 6, 2014 letter is attached hereto as **Exhibit 3**.

9.      I understand and believe that the May 6 letter was returned as undeliverable. I understand and believe that Ally's bankruptcy counsel then sent Plaintiffs another letter via email on May 14, 2014, restating that the Plaintiffs' claims were enjoined and must be dismissed pursuant to the Third Party Release and Injunction. A copy of the May 14, 2014 letter is attached hereto as **Exhibit 4**.

10.     Again, after receiving no response, Ally's counsel sent Plaintiffs another letter on July 17, 2014. That letter, which was personal delivered to Plaintiffs via process server, reiterated that Plaintiffs claims are subject to the Third Party Release and Injunction and repeated Ally's willingness to discuss the matter with Plaintiffs and offered to arrange a telephone

conference with this Court to discuss the matter.  A copy of the July 17 letter is attached as

**Exhibit 5**.  A copy of the process server's affidavit of service is attached hereto as **Exhibit 6**.

11.     The Plaintiffs have not reached out to Ally's counsel to discuss the matter, and

they have not dismissed their lawsuit against Ally.

[*Remainder of Page Intentionally Left Blank*]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 4, 2014.

_____
Chais L. Sweat, Esq.

## **Exhibit 1**

**Complaint**

THE STATE OF TEXAS
CIVIL CITATION

CASE NO.417-04160-2013

Jahanur Subedar and Aminah Momin Vs. US Bank        In the 417th District Court
National Association, as Trustee, Successor in
Interest to Bank Of America, N.A. as Trustee
(Successor by Merger to Lasalle bank N.A.) as
Trustee for Morgan Stanley Mortgage Loan Trust
2007-8Xs, ("US Bank") America's Servicing
Company ("ASC") GMAC Inc.

                                                     Of Collin County, Texas
NOTICE TO DEFENDANT: "You have been sued.  You may employ an attorney.  If you or your attorney
do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next
following the expiration of twenty days after you were served this citation and petition, a default judgment
may be taken against you."

TO:  GMAC Inc
May be Served with Process by Serving its Registed Office
1100 West Virginia Drive
Fort Washington PA 19034, Defendant

GREETINGS:  You are commanded to appear by filing a written answer to **Plaintiff's Original Petition** at
or before ten o'clock A.M. on the Monday next after the expiration of twenty days after the date of service of
this citation before the Honorable 417th District Court of Collin County, Texas at the Courthouse of said
County in McKinney, Texas.

Said Plaintiff's Petition was filed in said court, by Jahanur Subedar  714 Lone Ridge Way  Murphy TX
75094 (Attorney for Plaintiff or Plaintiffs), on  October 16, 2013, in this case, numbered 417-04160-2013 on
the docket of said court.

The natures of Plaintiff's demand is fully shown by a true and correct copy of **Plaintiff's Original Petition**
accompanying this citation and made a part hereof.

Issued and given under my hand and seal of said Court at McKinney, Texas, on this the 17th day of October,
2013.

                              ATTEST: Andrea Stroh Thompson, District Clerk
                                      Collin County, Texas
                                      Collin County Courthouse
                                      2100 Bloomdale Road
                                      McKinney, Texas 75071
                    972-548-4320, Metro 972-424-1460 ext. 4320

                           By_____, Deputy
                                Ali Veal

The law prohibits the Judge and the clerks from giving legal advice, so
please do not seek legal advice.  Any questions you have should be
directed to an attorney.

CAUSE NO. 417-04160-2013

| | |
|---|---|
| JAHANUR SUBEDAR AND | ) |
| | )    IN THE 417th |
| AMINAH MOMIN | ) |
|        PLAINTIFFS, | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| US BANK NATIONAL ASSOCIATION, | ) |
| AS TRUSTEE, SUCCESSOR IN | ) |
| INTEREST TO BANK OF AMERICA, | )    PLAINTIFFS' COMPLAINT FOR |
| N.A. AS TRUSTEE (SUCCESSOR BY | ) |
| MERGER TO LASALLE BANK N.A.) | )    (1) PSA VIOLATIONS |
| AS TRUSTEE FOR MORGAN STANLEY | )    (2) VIOLATIONS OF NEW YORK |
| MORTGAGE LOAN TRUST 2007-8XS, | )        TRUST LAWS |
| ("US BANK") AMERICA'S SERVICING | )    (3) LACK OF STANDING |
| COMPANY ("ASC") GMAC INC. | )    (4) RESPA VIOLATIONS |
| | ) |
| | ) |
|        DEFENDANTS. | ) |
| | ) |
| | ) |
| | ) |

COLLIN COUNTY, TEXAS

## PLAINTIFFS' ORIGINAL PETITION

### TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Jahanur Subedar and Aminah Momin (Plaintiffs) Husband and Wife, and file this Original Petition and allege as follows:

### PARTIES

1. Plaintiffs are the owners of the property located at 714 Lone Ridge Way, Murphy, TX 74094 ("the subject property" or "property in question") legally described as Being Lot 8, in Block E, of Gables At North Hill, Phase 2A, an Addition to the

City of Murphy, Collin County Texas, according to the plat thereof recorded in Volume R, Page 77, Map Records, of Collin County, Texas., under a deed thereto recorded in the office of the Collin County Clerk.

2.  US Bank National Association, As Trustee, Successor In Interest To Bank Of America, N.A. As Trustee (Successor By Merger To LaSalle Bank N.A.) As Trustee For Morgan Staley Mortgage Loan Trust 2007-8XS (hereinafter "US BANK") is an asset- backed trust that may be served with process by serving its registered office at 180 5th St. E. Saint Paul, MN 55101-2672. Asset-backed trusts are independent entities created for the purpose of holding mortgage loans or similar assets that will be converted into mortgage-backed securities, which are saleable securities. Service of US BANK as described above can be effected by certified mail with return receipt requested.

3.  America's Servicing Company ( hereinafter "ASC") is a division of Wells Fargo Home Mortgage that services loans for other investors under the America's Servicing Company name, who may be served with process by serving its registered office at 1200 W. 7th Street, Suite L2-200, Los Angeles, CA 90017. The vast majority of America's Servicing Company mortgages were originated by other lenders, packaged into securities, and sold by those lenders into the secondary market. Service of ASC as described above can be effected by certified mail with return receipt requested.

4.  GMAC Inc. is an indirect, wholly owned subsidiary of Ally Financial Inc. (formerly known as GMAC Inc.) who may be served with process by serving its registered office at 1100 Virginia Drive, Fort Washington, PA 19034.(214-734-5000) Service of GMAC Inc., as described above can be effected by certified mail with return receipt requested.

## JURISDICTION AND VENUE

5.  Jurisdiction is conferred on this Court under 28 U.S.C. § 1652, whereas the laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply. In that this proceeding arises in and is related to the above-captioned complaint and concerns property of the Plaintiffs in that case, adherence to U.S.C. § 1652 is proper.

6.  This Court has both personal and subject matter jurisdiction to hear this case. The subject matter in controversy is within the jurisdiction limits of this Court. The federal court system has exclusive jurisdiction regarding securities and banking regulations- the body of law protecting the public by regulating the registration, offering, and trading of securities and the regulation of banking practices. Second, the amount in controversy exceeds $75,000. "In actions seeking declaratory or injunctive relief the

amount in controversy is measured by the value of the object of the litigation." *Leininger v. Leininger, 705 F.2d 727, 729 (5th Cir. 1983)*. Moreover, "'[w]hen . . . a right to property is called into question in its entirety; the value of the property controls the amount in controversy.'" *Nationstar Mortgage, LLC v. Knox, No. 08-60887, 351 F. App. 844 (5th Cir. Aug. 25, 2009) (quoting Waller v. Prof'l Ins. Corp., 296 F.2d 545, 547–48 (5th Cir.1961))*. The object of this litigation—plaintiff's property—is currently appraises for more than $270,000 according to the Collin County Appraisal District. The amount-in-controversy requirement is therefore satisfied.

7.  This Court has personal jurisdiction because the property that is the subject of this litigation is located in Texas, and Defendants are doing business within this state. The transaction and events which are the subject matter of this Complaint all occurred within the County of Collin, State of Texas. Venue in this cause is proper in Collin County, Texas pursuant to Section 17.56 of the Texas Business and Commerce Code and under Section 15.001 of the Texas Civil Practice and Remedies Code because this action involves real property and the property is located in Collin County, Texas.

8.  Furthermore, the court has jurisdiction under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1367 (Supplemental Jurisdiction) This court also has jurisdiction under all applicable federal jurisdiction involving financial institutions involved in the mortgage fraud area such as the Mortgage Fraud Act under 18 U.S.C. § 1006 (2007).

## DISCOVERY CONTROL PLAN LEVEL

9.  Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Request for Admission pursuant to Rule 36 of the Federal Civil Procedure and Motion to define Parties involved in above referenced case. Plaintiffs intend to conduct discovery in this case.

## BRIEF STATEMENT, AUTHORITIES AND ALLEGATIONS

10. Defendants (US BANK and ASC) appeared before the Justice Court Precinct 3-1 by and thru council for a Forcible Detainer against Plaintiffs property. That

court had no power to adjudicate the subject matter of this controversy because prior to foreclosure of Plaintiffs property, there was no evidence to support defendant ASC's assertion they it had the legal right, legal authority or legal standing to declare a default in the payment of the Note, accelerate the maturity of the Note, declare a default under the Deed of Trust, appoint a Substitute Trustee, or request a Substitute Trustee to enforce the Deed of Trust and conduct a Substitute Trustee's non-judicial; foreclosure sale of the property on behalf of defendant US BANK.

11. Plaintiffs allege that Defendant US BANK lacked legal standing to foreclose on Plaintiff's property because the assignment of the Deed of Trust to the Trust is void *ab initio*. Plaintiffs specifically allege that the assignment of the Plaintiff's property into the trust, if it was transferred at all, was convened well after the closing date of the trust, formed under New York trust law in 2007. Under New York trust laws, assets allegedly transferred after the closing date of the trust are void for noncompliance with the terms of the Pooling and Servicing Agreement ('PSA"), the document governing acceptance of assets into the trust. Because the interest asserted by the U.S.BANK comes from the **post-closing date** attempt to transfer the asset into the trust, it is insufficient under New York Trust laws and the assignment is void *ab initio*.

12. Plaintiffs allege violations of *Sec. 6, Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. § 2605(b) Notice by Transferor or Loan Servicing at Time of Transfer)* because they were not notified of the transfer of servicing rights from the previous lender, Willow Bend Mortgage Company, or Mortgage Electronic Registration Systems, Inc. ("MERS") as nominee for Willow Bend Mortgage Company, its Successors and Assigns, by written disclosure at least 15 days before the transfer became effective, nor was Plaintiff notified by the new servicer (GMAC) within 15 days after said assignment became effective.

*13.* Plaintiffs also allege they were never notified of the transfer of servicing rights from GMAC to America's Servicing Company ("ASC") a division of Wells Fargo Home Mortgage, by written disclosure at least 15 days before the transfer became effective as required by *Sec. 6, Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. § 2605(b) Notice by Transferor or Loan Servicing at Time of Transfer)*, thereby failing to provide to Plaintiffs required information of transfers and or assignments of property and interest, or of information as to which defendant (GMAC or ASC) was actually servicer at any given time to Plaintiff's property.

14. US BANK, thru a defective, unenforceable assignment from the original lender Willow Bend Mortgage Company and their nominee MERS purports to acquire "all the beneficial interest under the deed of trust, together with the note(s) and obligations therein described" (paraphrase). Plaintiffs will show with supporting facts and documents that the defendants US BANK and ASC unlawfully foreclosed on Plaintiffs property while lacking the authority and legal standing to do so. Plaintiffs seek to have the foreclosure sale rescinded.

15. We respectfully requests that the Honorable Court GRANT Plaintiffs liberty to amend further as necessary to correct any deficiencies.

## **BACKGROUND**

16. On or about January 4th, 2007, Plaintiffs executed a promissory note payable to Willow Bend Mortgage Company *see exhibit A,* secured by a deed of trust ("DOT") *see exhibit B*. Mortgage Electronic Registration Systems, Inc.("MERS") solely as nominee for Willow Bend Mortgage Company is listed as beneficiary under the DOT. On or about October 12th 2011, MERS purports to assign the DOT to US BANK ("the Trust") *see exhibit C*.

17. Since the trust's ability to transact is restricted to the actions authorized by its trust documents, this court must consider the process under which a loan can be termed as "securitized".

**The Securitized Trust.**

18. US BANK (the "Trust") is a New York common law trust created through a Pooling and Servicing Agreement (the "PSA"). A copy of the PSA was filed under oath with the Securities Exchange Commission ("S E C").

19. Under the PSA, loans were supposedly pooled into a trust and converted into mortgage-backed securities ("MBS") that could be bought and sold by investors. The loans were thus "securitized". The PSA defines the rights, duties and obligations of the parties to the Trust Agreement. The PSA provided that the "closing date" for the Trust was May 31st 2007.The PSA provided that the "cut-off date" for the Trust was May 1st 2007. The PSA also incorporates by reference a separate document called the Mortgage Loan Purchase Agreement ("MLPA").These various documents, and hence the acquisition of the mortgage assets for the Trust, are governed under the laws of the State of New York pursuant to Section 11.04 of the PSA.

20. Section 11.04 of the PSA provides, "This Agreement shall be construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties here under shall be determined in accordance with such laws. "The "Depositor" named in the PSA was Morgan Stanley Capital 1 Inc. The "Seller" named in the PSA was Morgan Stanley Mortgage Capital, Inc. The "Master Servicer" named in the PSA was Wells Fargo Bank N.A. and the "Trustee" named in the PSA was LaSalle Bank National Association. The Trust, being sued through its trustee, is a New York Corporate Trust formed to act as a "REMIC" trust (defined below) pursuant to the U.S. Internal Revenue Code ("IRC").

21. Pursuant to the terms of the Trust and the applicable Internal Revenue Service ("IRS") regulations adopted and incorporated into the terms of the Trust, Article 9 of the PSA, section 9.01(b) provides that the "closing date" of the Trust is also the "startup day" for the Trust under the REMIC provisions of the IRC. Pursuant to 26 U.S.C § 860- G-(b) (9), the "startup day" of a REMIC is the day upon which the REMIC issues all of its regular and residual interests.

The startup day is significant because the IRC ties the limitations upon which a REMIC trust may receive its assets to this date. The relevant portion of the IRC addressing the definition of a REMIC is:

(a)    General rule. For purposes of this title, the terms 'real estate mortgage investment

conduit 'and 'REMIC' mean any entity—

(1) to which an election to be treated as a REMIC applies for the taxable year and

all prior taxable years,

(2) all of the interests in which are regular interests or residual interests,

(3) which has 1 (and only 1) class of residual interests (and all distributions, if

any, with respect to such interests are pro rata),

(4) as of the close of the 3rd month beginning after the startup day and at all

times thereafter, substantially all of the assets of which consist of qualified

mortgages and permitted investments.26 U.S.C. § 860D.

The IRC also provides definitions of prohibited transactions and prohibited contributions which are relevant to this case as well. In the context of this case, the relevant statute is the definition of prohibited contributions which is as follows:

26 U.S.C. 860G (d) (1) states:

Except as provided in section 860G (d) (2), "if any amount is contributed to a REMIC

after the startup day, there is hereby imposed a tax for the taxable year of the REMIC

in which the contribution is received equal to 100 percent of the amount of such

contribution."

26 U.S.C. 860G (d) (2) states:

(2) Exceptions. Paragraph (1) shall not apply to any contribution which is made

in cash and is described in any of the following subparagraphs:

(A) Any contribution to facilitate a clean-up call (as defined in

regulations) or a qualified liquidation.

(B) Any payment in the nature of a guarantee.

(C) Any contribution during the 3-month period beginning on the startup

day.

(D) Any contribution to a qualified reserve fund by any holder of a

Residual interest in the REMIC.

(E) Any other contribution permitted in regulations.

22. The PSA (primarily in section 10.02) addresses these sections of the IRC by obliging the parties to the Trust to avoid any action which might jeopardize the tax status of any REMIC and/or impose any tax upon the Trust for prohibited contributions or prohibited transactions.

23. Section 10.02 of the PSA provides that the Trustee may not "accept any contributions to any Trust REMIC after the Closing Date" unless certain conditions are met.

24. These PSA provisions are important to the Court's analysis of the facts in this case because of the interplay between the New York trust law, the IRC's REMIC provisions, and the PSA's incorporation of the IRC REMIC provisions.

25. The terms of the PSA include a specific time, method and manner of funding the Trust with its assets. The most critical time is the Trust's closing date. According to the terms of the PSA, all of the assets of the Trust were to be transferred to the Trust on or before the closing date. This requirement is to ensure that the Trust will receive REMIC status and thus be exempt from federal income taxation.

26. The PSA provides for a window of 90 days after the Trust closing date in which the Trust may complete any missing paperwork or finalize any documents necessary to complete the transfers of assets from the depositor to the Trust. Thus, for an asset to become an asset of the Trust it must have been transferred to the Trust within the time set forth in the PSA. The additional 90 days in the timeline requirement is incorporated from the REMIC provisions of the IRC to provide a "clean-up period" for a REMIC to complete the documents associated with the transfers of assets to a REMIC after the startup day (which is also the Trust closing date).

Thus to qualify for the REMIC tax benefits, the mortgages upon which the securities are based must be acquired by the Trust within three months of its startup date.

27. A trust's ability to transact is restricted to the actions authorized by its trust documents. In this case, the Trust documents permit only one specific method of transfer to the Trust. That method is set forth in Section 2.01 of the PSA, and provides that the Depositor (Asset Backed Securities Corporation) was to convey the mortgages to the Trust.

28. Section 2.01 of the PSA required that the Depositor provide the Trustee with "the original Mortgage Note, endorsed in blank or in the following form: 'Pay to the order of LaSalle Bank National Association, as Trustee under the applicable agreement, without recourse,' with all prior and **intervening endorsements** showing a complete chain of endorsement from the originator to the Person so endorsing to the Trustee..." The PSA required the Trustee, LaSalle Bank National Association, now referred to as US BANK As Trustee, Successor In Interest To Bank Of America, N.A. As Trustee **(Successor By Merger To LaSalle Bank N.A.)** to review the documents and certify that all of the documentation required by Section 2.01 had been provided by the depositor in 2007. Thus, if Plaintiff's mortgage loan was really assigned to the Trust, then the assignment would have had to have occurred in 2007, and LaSalle Bank National Association would have reviewed the documentation in 2007 and certified that the assignment was in its possession in 2007.

## New York Estates Powers and Trusts Law

29. New York Estates Powers and Trusts Law section 7-2.1(c) authorizes a trustee to acquire property "in the name of the trust as such name is designated in the instrument creating said trust property." Thus, for transfer to an trustee to be effective, the property must be registered in the name of the trustee for the particular trust. Trust property cannot be held with incomplete endorsements and assignments that do not indicate that the property is held in trust by a trustee for a specific beneficiary trust. Under New York law an attempt to transfer to a trust which fails to specify both a trustee and a beneficiary is ineffective as a conveyance to the Trust. "The failure to name a beneficiary for the Trustee renders the assignment without merit. The PSA specifically requires the Depositor to have transferred all of the interest in the mortgage notes to the Trustee on behalf of the trust as of the closing date. PSA Article II, Section 2.05 (iii). The purported transfer to the Trust did not occur until 2011. The transfer is thus insufficient under New York trust law to assign anything to the Trust.

30. The failure to comply with the PSA is a sufficient basis for pleading the invalidity of the assignment. Plaintiffs thus have pled facts sufficient to withstand dismissal on whether the transfer to the Trust was void *ab initio*.

*Under New York Trust Law, the relevant statute provides the following: "If the trust expressed in the instrument creating the estate of the trustee, every sale, conveyance or other act of the trustee in contravention of the trust, except as authorized by this article and by other provision of law, is void."*
*N.Y. Est. Powers & Trust Law § 7-2.4.*

**Plaintiff's Standing to Challenge Validity of Assignments.**

*31.* Numerous courts within this circuit have held that a plaintiff-mortgagor does not have standing to assert claims based on an allegedly invalid assignment to which it was not a party. see Metcalf, 2012 WL2399369, at *5; DeFranceschi v. Wells Fargo Bank, N.A. 837 F. Supp. 2d 616,623 (N.D. Tex.2011). "Generally, courts have concluded that a third party lacks standing to challenge the validity of an assignment. Bank of America Nat'l Assoc. v Bassman FBT, L.L.C. et al. 981 N.E. 2d I, 7 (III. App. Ct.2012).

32. Other courts, however, have held that a plaintiff may have standing, depending on the nature of the challenges asserted. <u>*Routh v. Bank of America, N.A. No.SA-12-CV-244-XR, 2013 WL 427393, at*9 (W.D. Tex.4, 2013.); Puente v. CitiMortgage, Inc.,*</u> *No. 3:11-CV-2509, 2012 WL 4335997, at*6 (N.D. Tex. Aug.29, 2012) ("However, a careful review of Texas law persuades the Court that it is not completely accurate to say that one can never challenge assignments to which one is not a party.") (internal quotation marks omitted) (quoting* <u>*Kramer v. Fed. Nat'l Mortg. Ass'n,*</u> *No. A- 12-CA-276-SS, 2012 WL 3027990, at * 4(W.D. Tex. May 15, 2012));* <u>*Miller v. Homecoming Fin. LLC,*</u> *881 F. Supp.2d 825 (S.D. Tex. 2012).* The courts in the latter category relied on Texas law for the proposition that a plaintiff-mortgagor may have standing to challenge the validity of an assignment.

33. Thus, <u>in Roth,</u> the court noted that "Texas courts have long followed the common law rule which permits a debtor to assert against an assignee any ground that renders the assignment void or invalid" 2013 WL 42739, at *8 (quoting <u>Miller,</u> 2012 WL 3206237,at *5) The rule has been stated as follows by the Texas Court of Appeals:

"The law is settled that the obligors of a claim may defend the suit brought thereon on any ground which renders the assignment void, but may not defend on any ground which renders the assignment voidable only, because the only interest or right which an obligor of a claim has in the instrument of assignment is to insure himself that he will not have to pay the same claim twice" <u>Tri-Cities,</u> 523 S.W.2d at 430 (citing <u>Glass v. Carpenter,</u> 330 S.W. 2d 530,537 (Tex. Civ. App. 1959)

*34.* This rule accords with long-standing principles of contract law. A void contract is "invalid or unlawful from its inception" and therefore cannot be enforced. 17A C.J.S. Contracts § 169. Thus, a mortgagor who was not a party to an assignment between mortgagees may nevertheless challenge the enforcement of an assignment if the assignment is void. A voidable contract, on the other hand, "is one where one or more of the parties have the power, by the manifestation of an election to do so, to avoid the legal relations created by the contract." <u>Id.</u> Accordingly, only the parties to a voidable

contract may seek to avoid its enforcement. *Saucedo v. Deutsche Bank Nat'l Trust, et al.* No. SA-12-CV-00868-DAE (S.A.Tex. February 20th, 2013).

35. Under 28 U.S.C. § 1652, the controlling decision of the highest state court must be applied regarding Plaintiff's complaint. *Royal Bank of Canada v. Trentham Corp.*, 665 F. 2d 515,516 (5th Cir. 1981). In the recently settled case of *Glaski v. Bank of America, N.A.et al.*, 218 Cal. App. 5th 1079 No. F064556 (July 31st 2013), the 5th Cir. Appellate Court of Appeal rejected the view that a borrower's challenge to an assignment must fail once it is determined that a borrower was not a party to, or a third party beneficiary of, the assignment agreement. Cases adopting that position "paint with too broad a brush" *(Culhane V. Aurora Loan Service of Nebraska, supra, 708 F.3d at p. 290).*

The court concluded:

"[t]hat a borrower may challenge the securitized trust's claim of ownership by alleging the attempts to transfer the deed of trust to the securitized trust (which was formed under New York law) occurred after the trust's closing date. Transfers that violate the terms of the trust instrument are void under New York trust law, and borrowers have standing to challenge void assignments of their loans even though they are not a party to, or a third party beneficiary of, the assignment agreement."

36. While no New York Court of Appeals decision is applicable, the recent New York Supreme Court decision in the matter of *Wells Fargo Bank, N.A. v Erobobo, et al.,2013 WL.1831799 (N.Y. Sup. Ct. April 29th 2013)* is similar to Plaintiffs case in regards to PSA standing. In *Erobobo*, defendants argued that plaintiff (a REMIC trust) was not the owner of the note because plaintiff obtained the note and mortgage after the trust had closed in violation of the terms of the PSA governing the trust, rendering plaintiff's acquisition of the note void. The *Erobobo* court held that under § 7-2.4, any conveyance in contravention of the PSA is void, this meant that acceptance of the note and mortgage after the date the trust closed rendered the transfer void.

37. Also relying on *Erobobo*, a bankruptcy court recently concluded "that based on the *Erobobo* decision and the plain language of N.Y. Est. Powers & Trust Law § 7-2.4., under New York law, assignment of the *Salvidivars* note after the startup date is void *ab initio*. As such, none of the Saldivars claims will be dismissed for lack of standing." *Saldivar v. JP Morgan, (U.S. Bankruptcy Ct S.D. Tex., June 5th, 2013. No. 11-10689.)* Thus a borrower may raise a defense to an assignment, **if that defense renders the assignment void.**

38. An assignment from MERS to US BANK purports to "grant and convey unto the said Assignee, (US BANK) the Assignor's (MERS) beneficial interest under the Deed of Trust" (paraphrase). *see exhibit C.* The date of the "transfer" is October 12th 2011. If the deed of trust was transferred at all, the assignment was convened well after the closing date of the trust, formed under New York trust law in 2007.Under the governing document for the Trust (the PSA); no other assets could be acquired by the

trust after the closing date, which was May 31st 2007, without running afoul of the IRC and New York trust law. The assignment therefore, is void *ab initio*.

## Pooling and Servicing Agreement

39. The PSA specifically requires the Depositor to have transferred all of the interest in the mortgage notes to the Trustee on behalf of the trust as of the closing date which was September 28th 2006. *PSA Article II, Section 2.05 (iii)*. A copy of the PSA is normally filed under oath with the Securities Exchange Commission ("S E C"). To date, Plaintiff has been unable to locate on the SEC website the specific PSA associated with the Trust that foreclosed on the Plaintiff's property. This Trust could be a private placement, and thereby exempt from public disclosure of the prospectus documents, subject to Rule 144a of the Securities Act of 1933.

40. Under Section 5 of the Securities Act of 1933, all offers and sales of securities must be registered with the SEC or qualify for some exemption from the registration requirements. Rule 144a provides an exemption and permits the public resale of restricted or control securities if a number of conditions are met, including how long the securities are held, the way in which they are sold, and the amount that can be sold at any one time. But even then restricted securities cannot be sold to the public until a transfer agent removes the "restrictive" legend. The legend indicates that the securities may not be resold in the marketplace unless they are registered with the SEC or are exempt from the registration requirements. Plaintiff can only assume therefore, that the PSA to the trust is unavailable because of some registration exemption and that it would require a court order for the PSA to be produced for examination.

41. Therefore, Plaintiff request that this Court order the Defendants to produce the documents and responses referred to in the interrogatories and request for production of documents pursuant to the provisions of Rule 33 of the Federal Rules of Civil Procedure and the following request for the production and inspection of documents pursuant to Rule 34 of the Federal Rules of Civil Procedure as provided for and set forth in the foregoing rules. Answers to these Interrogatories and Request for Production of Documents must be furnished within thirty (30) days of the service of these Interrogatories, whichever is later.

## **DEFINITIONS**

A.    The term "document" or "documentation"  means all writings of any kind, including the originals and all other non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, including but not limited to correspondence, memoranda, notes, diaries, desk or other calendars,

statistics, letters, telegrams, minutes, business records, personal records, accountants' statements, account statements, contracts, reports, credit reports, studies, checks, statements, receipts, invoices, bills, return checks, summaries, pamphlets, books, inter-office and intra-office communications, notations of any sort of conversations or meetings, telephone call meetings or other communications, written agreements, bulletins, printed matter, computer printouts, teletypes, telefaxes, invoices, worksheets, all drafts, alterations, modifications, changes and amendments of any kind with respect to any of the foregoing, graphic or oral records or representations of any kind (including, without limitation, tapes, cassettes, discs, recordings, electronic mail records, computer memory records such as hard disk drives and master back-up tapes, diskettes, or other devices such as zip drive records).

B.    The term "act" as used herein includes acts of every kind and description.

C.    The term "identify" or "describe" when used in reference to a "document" means to state:

a. The type of document (e.g., letter, memorandum, report, electronic mail records, notes, etc.);

b. The date of the document;

c. The name of the parties or parties who originated the document, their past or present position with the defendants, their general duties and responsibilities, their current physical location with the company, and their e-mail, telephone number and telephone extension;

d. The name and address of the current custodian of the document;

e. The name and current address of each signatory thereon;

f. The reason, in detail, for the preparation of the document;

g. The subject or subjects covered by the document;

h. The names, business addresses and titles of the persons to whom the document writing was directed; and

i. The name and address and title of each person who originated, read or received the document.

D.    The term "identify" as used herein in connection with a "person" or "persons" means to state the names, titles, the present employer of such "person" or "persons," the relationship of such person or persons to any of the defendants, and such person's current business address and business telephone number.

E.    The term "identify" as used herein with respect to or in connection with an "act" means to:

a.    Furnish the date and place of the act;

b.    Identify the person acting, the person for whom the act was performed, and the person against whom the act was directed; and

c.      Describe in detail the act.

F.      The terms "describe" or "state" as used herein means:

a.      Describe or state fully by reference to underlying facts rather than by ultimate facts or conclusions of law;

b.      Particularize as to the:

     i.      Time;

     ii.     Date;

     iii.    Manner; and

     iv.     Place.

G.      The term "oral communication" as used herein means and includes any face-to-face conversation, meeting, conference, telephone conversation, cell-phone conversation, computer conversation with voice mail, or any one for more of these or related devices.

H.      The term "person" or "persons" as used herein means and includes all natural persons, public and private corporations, associates, wholly owned affiliates or subsidiary corporations or any other form of a business association, and any other type of entity and the agents, employees, officers, deputies and representatives thereof.

I.      The terms "you" or "your" as used herein shall refer to any one or all of the named defendants and any related or affiliated companies associated in any way therewith.

J.      All requests shall be deemed to include any documents made by, held by, or maintained in the files of any predecessor, successor, employee, agent or assignee of either one or all of the defendants.

K.      The term "the transaction" or "the transactions" or "account" or "accounts" when used herein without qualification means the transactions and accounts between or among the Plaintiffs and the named defendants and all related activities and agents or assigns of either party.

L.      The term "accepted servicing practices" with respect to the Plaintiffs' Mortgage Loan, when used herein means those mortgage servicing practices (including collection procedures) of prudent mortgage banking institutions which service mortgage loans of the same type as such Mortgage Loan in the jurisdiction where the related Mortgaged Property is located.

M.      The term "assignment of mortgage" when used herein means an assignment of the Mortgage or the Deed of Trust, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the sale of the Mortgage to the Purchaser.

N. The term "US BANK" when used herein means US Bank National Association, As Trustee, Successor In Interest To Bank Of America, N.A. As Trustee (Successor By

Merger To LaSalle Bank N.A.)  As Trustee For Morgan Staley Mortgage Loan Trust 2007-8XS

O.    The term "Trust 2007-8XS," when used herein means the Trust formed pursuant to a Trust Agreement between Morgan Stanley Capital 1 Inc. as Depositor, Wells Fargo Bank, N. A., as Master Servicer, UNKNOWN., as Securities Administrator, UNKNOWN, as Credit Risk Manager, and LaSalle Bank National, N.A. as Trustee dated as of May 1, 2007, designated as Morgan Staley Mortgage Loan Trust 2007-8XS

P.    The term "Document Custodian" when used herein means the entity that maintains custody of the Plaintiff's Mortgage Loan Documents on behalf of, US Bank National Association, As Trustee, Successor In Interest To Bank Of America, N.A. As Trustee (Successor By Merger To LaSalle Bank N.A.)  As Trustee For Morgan Staley Mortgage Loan Trust 2007-8XS, when used herein means "US BANK".

Q.    The term "Mortgage" when used herein means the mortgage, securing the Plaintiff's Mortgage Note, which created a first lien on the mortgage property located at 714 Lone Ridge Way, Murphy, TX 75094 entered into between the Plaintiff and Willow Bend Mortgage Company on January 4th, 2007 and filed as of record on January 10th, 2007, as Instrument No.2007010000047170 in the County of Collin, State of Texas. The term "MERS" when used herein means Mortgage Electronic Registration Systems, Inc., its successors or assigns.

S.    The term "Mortgage Loan" when used herein means the Plaintiff's Note and Mortgage as defined herein, including any endorsements of the Note, any allonges to the Note, and any assignments of the Mortgage or Deed of Trust.

T.    The term "Mortgage File" and/or "Mortgage Loan Documents" when used herein means the Plaintiffs' Mortgage Loan, including the related promissory note, any allonges thereto, any mortgage assignment, and any other documents that the terms of the Morgan Staley Mortgage Loan Trust 2007-8XS require to be deposited with the Document Custodian.

U.    The term "Mortgage Note" when used herein, means the note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage, specifically the Promissory Note executed by Plaintiff on January 4th 2007, in the amount of 235,100.00 payable to Willow Bend Mortgage Company.

V.     The term "Mortgaged Property" when used herein means the real property securing repayment of the debt evidenced by a Mortgage Note, specifically the property located at 714 Lone Ridge Way, Murphy, TX 75094.

W.     The term "Mortgagor" when used herein means the obligor on a Mortgage Note.

## INSTRUCTIONS

A.     If the space provided below each interrogatory is not sufficient for your answer, then use additional sheets, numbered consecutively after each such interrogatory, and inserted in the proper order of all copies filed and served.  For example, in the case of Interrogatory number 1, any additional sheets for your answer would be numbered as 1-A, 1-B, 1-C, etc.

B.     Each of the following requests for production of documents and interrogatories is intended to be a continuing request to produce and answer.  As a result, the Plaintiffs hereby demand that, in the event that at any later date you obtain any additional facts, or form any conclusions, opinions or contentions different from those set forth in your responses herein, then you shall amend your answers to such responses and document production promptly and sufficiently in advance of any trial date, to fully set forth such differences and to produce and documents in connection therewith.

## PRIVILEGE

If any document would be required to be produced in response to any request except for the fact that a privilege against production is claimed, set forth for each such document:

1. Its date, title, type of document (memorandum, letter, etc.), and length;

2. Its waiver, preparer, sender, addressee, recipient and copyee;

3. A general description of its subject matter (without revealing the information as to which privilege is claims);

4. The exact grounds upon which the objection to production is based;

5. The identity of all persons, in addition to those identified as required by section 2, supra, known to you who have seen or had access to the document;

6. The identity of the person now in possession of the document.

## DOCUMENTS NO LONGER IN EXISTENCE OR NO LONGER
## UNDER POSSESSION, CUSTODY OR CONTROL

If any document, requested herein was at one time in existence and under Defendant's possession, custody or control but has been lost, discarded or destroyed or has been removed from Defendant's possession, custody or control, with respect to each such document:

1. Identify and describe such document by date, title and type of document;

2. State when each such document was most recently in the possession or subject to the control of Defendant and what disposition was made of such document, including an identification of the person, if any, presently in possession or control of such document;

3. State when such document was transferred or destroyed, identify the person who transferred or destroyed such document and the persons who authorized or directed that the document be transferred or destroyed or having knowledge of its transfer or destruction and state the reason such document was transferred or destroyed; and

4. Identify all persons having knowledge of the contents thereof.

## ORGANIZATION

Pursuant to Federal Rule of Civil Procedure 34 it is requested that the documents produced be organized and labeled so as to correspond with the categories of this request.

## INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS

**REQUEST FOR PRODUCTION NO. 1:** Provide the original Note, Mortgage, Pre-Payment Riders, any Adjustable Rate Rider, any endorsements of the Note, any Allonges to the Note, and any Assignments of the Mortgage for inspection.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 2:** Please provide copies of all documents contained in the Plaintiffs' Mortgage File held by the Document Custodian for the Morgan Staley Mortgage Loan Trust 2007-8XS

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 3:**   Please provide copies of any electronic documents maintained by the Document Custodian for the Morgan Staley Mortgage Loan Trust 2007-8XS pertaining to the Plaintiffs' Mortgage Loan.

**RESPONSE:**

**INTERROGATORY NO. 1:**   Please state the name, address, and telephone number of the current Document Custodian for the Debtors' Mortgage Loan documents, and include the date that the original Mortgage Loan documents were received by the Document Custodian.

**RESPONSE:**

**INTERROGATORY NO. 2:**   Please state the actual location of any Document Custodian Facility where the Plaintiff's original Mortgage File has been maintained since the Plaintiff's Mortgage Loan was acquired by the Morgan Staley Mortgage Loan Trust 2007-8XS, including the dates when the Plaintiff's Mortgage Loan Documents were maintained at those locations.

**RESPONSE:**

**INTERROGATORY NO. 3:**   Please state the name, address, and telephone number of each and every Servicer for the Plaintiff's Mortgage Loan, identify the current Servicer for the Plaintiffs' Mortgage Loan, and include the dates that each Servicer provided servicing functions for the Morgan Staley Mortgage Loan Trust 2007-8XS or for US BANK.
**RESPONSE:**

**INTERROGATORY NO. 4:**   List each entity who now has or has ever had any interest in the underlying Mortgage NOTE, including but not limited to, any broker, table-funder, co-defendant lender, originator, lender, warehouse lender, trustee, investor, trustee under a pooling and servicing agreement, master servicer, primary servicer, sub-servicer, default servicer, specialty servicer, or any other similar party.  Identify that party's name, address and telephone number, describe that party's interest in the transaction, state the date it obtained that interest, the date it relinquished that interest, and the identity of the entity to which it relinquished that interest, and state the nature and amount of all consideration it received or disbursed in connection with obtaining or relinquishing that interest.

**RESPONSE:**

**INTERROGATORY NO. 5:**   List each entity who now has or has ever had any interest in the underlying MORTGAGE or DEED OF TRUST, including but not limited to, any broker, table-funder, co-defendant lender, originator, lender, warehouse lender, trustee, investor,

trustee under a pooling and servicing agreement, servicer, or any other similar party. Identify that party's name, address and telephone number, describe that party's interest in the transaction, state the date it obtained that interest, the date it relinquished that interest, and the identity of the entity to which it relinquished that interest, and state the nature and amount of all consideration it received or disbursed in connection with obtaining or relinquishing that interest.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 4:** Please provide a fully executed copy of all Custodial Agreements pertaining to the Plaintiffs' Mortgage Loan.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 5:** Please provide a fully executed copy of the **Pooling and Servicing Agreement** ("PSA") between Morgan Stanley Capital 1, Inc. Depositor, Wells Fargo Bank N.A.,Master Servicer, Morgan Stanley Mortgage Capital Inc.; Sponsor/Seller, Morgan Stanley Mortgage Loan Trust 2007-8XS Issuing Entity, LaSalle Bank N.A,Document Custodian, and LaSalle Bank N.A. as Trustee dated as of May1st , 2007, designated as **Morgan Stanley Mortgage Loan Trust 2007-8XS** , including a copy of any applicable Mortgage Loan Schedule pertaining to the Plaintiff's Mortgage Loan.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 6:** Please provide copies of all requests for release of any of the documents contained in the Plaintiff's Mortgage File from the Document Custodian to the entity receiving the Plaintiff's Mortgage File or any documents contained therein, and include proof of mailing (such as a Fed Ex tracking number).

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 7:** Please provide copies of all approvals to release from the Document Custodian, including copies of all transit insurance policies pertaining to the release of the Plaintiff's Mortgage File or any documents contained therein.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 8:** Please provide copies of any inventory and transactions logs maintained by the Document Custodian for the Plaintiff's Mortgage File.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 9:** Please provide copies of all Bar Codes associated with the Plaintiff's Mortgage File, a Bar Code chart with definitions, and all stored electronic data regarding the Bar Codes with all metadata.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 10:** Please provide a complete Mortgage File tracking history from the Document Custodian for the Plaintiff's Mortgage File.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 11:** Please provide copies of all initial, interim, and final certifications of receipt of the Plaintiff's Mortgage Loan Documents by the Document Custodian including any exception reports applicable thereto.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 12:** Please provide any information in your possession or control or in the possession or control of the Document Custodian pertaining to the endorsements on the Plaintiff's Mortgage Note, including, but not limited to, the date of those endorsements, the person or persons executing the endorsements, and the entity requesting the endorsements.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 13:** Please provide any information in your possession or control or in the possession or control of the Document Custodian pertaining to any alonges to the Plaintiff's Mortgage Note, including, but not limited to, the date of those endorsements, the person or persons executing the endorsements, and the entity requesting the endorsements.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 14:** Please provide a complete schedule of all principal and interest payments received by US BANK from any Servicer for the Plaintiff's Mortgage Loan.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 15:** Please provide any documentation authorizing Mortgage Electronic Registration Systems, Inc.("MERS") solely as nominee for Willow Bend Mortgage Company (The original lender) to assign the Mortgage and the Note secured by the Mortgage to US BANK on October 12th; 2011.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 16:** Please provide copies of any communications, authorizations, and/or requests for release of documents between US BANK, and America's Servicing Company ("ASC"), pertaining to the Plaintiffs' Mortgage Loan documents maintained by the Document Custodian in original form.

**RESPONSE:**

**INTERROGATORY NO. 6:** Please state the name, address, and job title of any person or persons employed by or acting under the direction of the Document Custodian for the Plaintiff's Mortgage Loan Documents having any information pertaining to the acquisition, maintenance, transfer, or release of the Plaintiffs' Mortgage Loan Documents.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 17:** Please attach copies of each and every document that you intend to use or to seek to introduce into evidence at the trial of this matter.

**RESPONSE:**

**INTERROGATORY NO. 7:** Please identify each and every witness that you intend to call at the trial of this matter and summarize the anticipated testimony of each such witness.

**RESPONSE:**

**INTERROGATORY NO. 8:** Please identify each and every expert witness that you intend to call at the trial of this matter and summarize the anticipated testimony of each such witness.

**RESPONSE:**

**INTERROGATORY NO. 9:** Please state the name, address, and job title of the person or persons providing answers or documentation for these Interrogatories and Request for Production of Documents.

**RESPONSE:**

**INTERROGATORY NO. 10:** Will you treat these Interrogatories and Requests for Production of Documents as continuing in nature and provide updated responses to these Interrogatories and Requests for Production of Documents throughout the course of this litigation?

**RESPONSE:**

# PRAYER

**WHEREFORE,** Plaintiffs pray that Defendants be cited to appear and answer herein, PLAINTIFFS' Original Petition and that upon final hearing, Plaintiffs respectfully ask that the Court grant the following relief:

    a. Declaring that Defendants lacks any interest in the subject property which would permitted them to foreclose, evict, pursuant to the Trust Deed and/or to sell the subject properties;

    b. Declaring that the Trust Deed is not a lien against the subject property, ordering the immediate release of the Trust Deed of record, and quieting title to the subject property in the Plaintiffs favor against Defendants and all claiming by, though, or under them;

    c. Declaring that the Substitute Trustee's sale of the subject property be RECINDEDED.

    d. Pre- and post-judgment interest at the maximum rate allowed by law;

1. For Compensatory Damages in an amount to be determined by proof at trial
2. For Special Damages in an amount to be determined by proof at trial
3. For General Damages in an amount to be determined by proof at trial
4. For Punitive Damages in an amount to be determined by proof at trial
5. For Restitution as allowed by law
6. For Fees and Costs of this action
7. For Declaratory Relief, including but not limited to the following Decrees of this Court That:

    a. Plaintiffs are the prevailing party
    b. The Trustees of the REMIC Trusts have no enforceable secured or unsecured claim against the 'Property"
    c. The Sponsor has no enforceable secured or unsecured claim against the "Property"
    d. The Depositor has no enforceable secured or unsecured claim against the "Property"
    e. The Mortgage Originator has no enforceable secured or unsecured claim against the "Property"

Plaintiffs' Original Complaint

f.  Attorney's fees; and

g.  For such other and further relief to which the Plaintiffs may show themselves justly entitled.


Respectfully Submitted

_____
Jahanur Subedar

714 Lone Ridge Way
Murphy, TX 75094

_____
Aminah Momin

714 Lone Ridge Way
Murphy, TX 75094

Plaintiffs' Original Complaint

Page **22** of **22**

I certify this to be a true and
correct copy of the original
instrument.                    **NOTE**

January 04, 2007        Capital Title of Texas                                              Dallas, Texas

By: _____

714 Lone Ridge Way
Murphy, TX 75094
[Property Address]

### 1.     BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $235,100.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Willow Bend Mortgage Company**. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

### 2.     INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **6.875%**.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

### 3.     PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the **First** day of each month beginning on **March 01, 2007**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **February 01, 2037**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make my monthly payments at

**Willow Bend Mortgage Company**
**5800 West Plano Pkwy., Ste. 105**
**Plano, TX 75093**

or at a different place if required by the Note Holder.

**(B)     Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. **$1,544.44**.

### 4.     BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

### 5.     LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 6.     BORROWER'S FAILURE TO PAY AS REQUIRED

**(A)     Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **Fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

MULTISTATE FIXED RATE NOTE–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3200  1/01(Page 1 of 3 Pages)
Loan No. 2117202  (R&A) RA0156870 – nt3200.mls - Rev  10/03/2006



EXHIBIT "A"

**(B)    Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)    Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)    No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)    Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.    WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10.    UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Loan No.: 2117202

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____     (Seal)
Jahanur R. Subedar                                   -Borrower
Social Security Number 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

                                                     [Sign Original Only]

PAY TO THE ORDER OF

_____     WITHOUT RECOURSE

Willow Bend Mortgage Company

By: _____
Tracy L. Keil, Sr. Vice President



MULTISTATE FIXED RATE NOTE–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3200  1/01(Page 3 of 3 Pages)
Loan No. 2117202  (R&A) RA0156870 - nt3200.mis - Rev. 10/03/2006

010-028196-WB/610

After Recording Mail To:
**Willow Bend Mortgage Company**
**5800 West Plano Pkwy., Ste. 105**
**Plano, TX 75093**

Prepared By:
**Robertson & Anschutz**
**10333 Richmond Avenue, Suite 550**
**Houston, TX 77042**

I certify this to be a true and correct copy of the orignal instrument.
Capital Title of Texas
By: _KW_

## DEED OF TRUST

### NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

Loan No. 2117202
MIN No. 1002785-7807010200-7

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)**    **"Security Instrument"** means this document, which is dated **January 04, 2007**, together with all Riders to this document.
**(B)**    **"Borrower"** is **Jahanur R. Subedar and Aminah N. Momin, husband and wife.** Borrower is the grantor under this Security Instrument.
**(C)**    **"Lender"** is **Willow Bend Mortgage Company.** Lender is a **Corporation** organized and existing under the laws of the **State of Texas.** Lender's address is **5800 West Plano Pkwy., Ste. 105, Plano, TX 75093.** Lender includes any holder of the Note who is entitled to receive payments under the Note.
**(D)**    **"Trustee"** is **Thomas F. Vetters.** Trustee's address is **10333 Richmond Avenue, Suite 550, Houston, TX 77042.**
**(E)**    **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. **(888)** 679-MERS.
**(F)**    **"Note"** means the promissory note signed by Borrower and dated **January 04, 2007.** The Note states that Borrower owes Lender **Two Hundred Thirty-Five Thousand One Hundred** Dollars (U.S. **$235,100.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **February 01, 2037.**
**(G)**    **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(H)**    **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(I)**    **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[X] Planned Unit Development Rider



EXHIBIT "B"

(J)    "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K)    "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L)    "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M)    "**Escrow Items**" means those items that are described in Section 3.

(N)    "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O)    "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P)    "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q)    "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R)    "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (a) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (b) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of Collin:

> Being Lot 8 in Block E of The Gables at North Hill, Phase 2A, an Addition to the City of Murphy, Collin County, Texas, according to the Plat thereof recorded in Volume R, Page 77, Map records, Collin County, Texas

which currently has the address of 714 Lone Ridge Way, Murphy, TX 75094 ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

TEXAS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3044 1/01
(R&A) RA0156870 - sicmers.tx - Rev. 09/14/2006            (Page 2 of 13 pages)

**BORROWER COVENANTS** that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

**THIS SECURITY INSTRUMENT** combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees, and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all

TEXAS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3044 1/01
(R&A) RA0156870 - siemers.tx - Rev. 09/14/2006          (Page 3 of 13 pages)

notices of amounts to be paid under this Section.  Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.  Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.  Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9.  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount.  Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA.  Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank.  Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA.  Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds.  Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds.  Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA.  If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments.  If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than twelve monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender

TEXAS–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT  Form 3044  1/01
(R&A) RA0156870 - siemers.tx - Rev. 09/14/2006          (Page 4 of 13 pages)

requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

TEXAS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3044 1/01
(R&A) RA0156870 - siemers.tx - Rev. 09/14/2006        (Page 5 of 13 pages)



**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not

If Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated

payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender

otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

TEXAS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT  Form 3044  1/01
(R&A) RA0156870 · sicmers.tx · Rev. 09/14/2006          (Page 8 of 13 pages)

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective

TEXAS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3044 1/01
(R&A) RA0156870 - sicmers.tx - Rev. 09/14/2006        (Page 9 of 13 pages)

as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects  Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing.  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.  If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.**  As used in this Section 21:  (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials;  (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contributes to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge,  (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS.  Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice shall specify:  (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the**

date specified in the notice will result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence. For the purposes of this Section 22, the term "Lender" includes any holder of the Note who is entitled to receive payments under the Note.

If Lender invokes the power of sale, Lender or Trustee shall give notice of the time, place and terms of sale by posting and filing the notice at least 21 days prior to sale as provided by Applicable Law. Lender shall mail a copy of the notice to Borrower in the manner prescribed by Applicable Law. Sale shall be made at public vendue. The sale must begin at the time stated in the notice of sale or not later than three hours after that time and between the hours of 10 a.m. and 4 p.m. on the first Tuesday of the month. Borrower authorizes Trustee to sell the Property to the highest bidder for cash in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying indefeasible title to the Property with covenants of general warranty from Borrower. Borrower covenants and agrees to defend generally the purchaser's title to the Property against all claims and demands. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

If the Property is sold pursuant to this Section 22, Borrower or any person holding possession of the Property through Borrower shall immediately surrender possession of the Property to the purchaser at that sale. If possession is not surrendered, Borrower or such person shall be a tenant at sufferance and may be removed by writ of possession or other court proceeding.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall provide a release of this Security Instrument to Borrower or Borrower's designated agent in accordance with Applicable Law. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee; Trustee Liability.** All rights, remedies and duties of Trustee under this Security Instrument may be exercised or performed by one or more trustees acting alone or together. Lender, at its option and with or without cause, may from time to time, by power of attorney or otherwise, remove or substitute any trustee, add one or more trustees, or appoint a successor trustee to any Trustee without the necessity of any formality other than a designation by Lender in writing. Without any further act or conveyance of the Property the substitute, additional or successor trustee shall become vested with the title, rights, remedies, powers and duties conferred upon Trustee herein and by Applicable Law.

Trustee shall not be liable if acting upon any notice, request, consent, demand, statement or other document believed by Trustee to be correct. Trustee shall not be liable for any act or omission unless such act or omission is willful.

25. **Subrogation.** Any of the proceeds of the Note used to take up outstanding liens against all or any part of the Property have been advanced by Lender at Borrower's request and upon Borrower's representation that such amounts are due and are secured by valid liens against the Property. Lender shall be subrogated to any and all rights, superior titles, liens and equities owned or claimed by any owner or holder of any outstanding liens and debts, regardless of whether said liens or debts are acquired by Lender by assignment or are released by the holder thereof upon payment.

26. **Partial Invalidity.** In the event any portion of the sums intended to be secured by this Security Instrument cannot be lawfully secured hereby, payments in reduction of such sums shall be applied first to those portions not secured hereby.

27. **Purchase Money; Owelty of Partition; Renewal and Extension of Liens Against Homestead Property; Acknowledgment of Cash Advanced Against Non-Homestead Property.** Check box as applicable:
[ X ]   Purchase Money.

TEXAS–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT  Form 3044  1/01
(R&A) RA0156870 - slcmers.tx - Rev. 09/14/2006         (Page 11 of 13 pages)

The funds advanced to Borrower under the Note were used to pay all or part of the purchase price of the Property. The Note also is primarily secured by the vendor's lien retained in the deed of even date with this Security Instrument conveying the Property to Borrower, which vendor's lien has been assigned to Lender, this Security Instrument being additional security for such vendor's lien.

[ ]    Owelty of Partition.
The Note represents funds advanced by Lender at the special instance and request of Borrower for the purpose of acquiring the entire fee simple title to the Property and the existence of an owelty of partition imposed against the entirety of the Property by a court order or by a written agreement of the parties to the partition to secure the payment of the Note is expressly acknowledged, confessed and granted.

[ ]    Renewal and Extension of Liens Against Homestead Property.
The Note is in renewal and extension, but not in extinguishment, of the indebtedness described on the attached Renewal and Extension Exhibit which is incorporated by reference. Lender is expressly subrogated to all rights, liens and remedies securing the original holder of a note evidencing Borrower's indebtedness and the original liens securing the indebtedness are renewed and extended to the date of maturity of the Note in renewal and extension of the indebtedness.

[ ]    Acknowledgement of Cash Advanced Against Non-Homestead Property.
The Note represents funds advanced to Borrower on this day at Borrower's request and Borrower acknowledges receipt of such funds. Borrower states that funds secured by this Security Instrument as a business or residential homestead. Borrower disclaims all homestead rights, interests and exemptions related to the Property.

**28. Loan Not a Home Equity Loan. The Loan evidenced by the Note is not an extension of credit as defined by Section 50(a)(6) or Section 50(a)(7), Article XVI, of the Texas Constitution. If the Property is used as Borrower's residence, then Borrower agrees that Borrower will receive no cash from the Loan evidenced by the Note and that any advances not necessary to purchase the Property, extinguish an owelty lien, complete construction, or renew and extend a prior lien against the Property, will be used to reduce the balance evidenced by the Note or such Loan will be modified to evidence the correct Loan balance, at Lender's option. Borrower agrees to execute any documentation necessary to comply with this Section 28.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
                                        -Borrower
Jahanur R. Sabedar

_____ (Seal)
Aminah N. Momin

TEXAS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3044 1/01
(R&A) RA0156870 - sicmers.tx - Rev. 09/14/2006        (Page 12 of 13 pages)

STATE OF TEXAS, _____Collin_____ County

This instrument was acknowledged before me on _Jan 4 2007_ by Jahanur R. Subedar and Aminah N. Momin.



_____
Notary Public

_____
Printed Name
My Commission Expires:

CAROL A. NICHOLAS
Notary Public, State of Texas
My Commission Expires
May 16, 2010

TEXAS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT  Form 3044  1/01
(R&A) RA0156870 - sicmers.tx - Rev. 09/14/2006        (Page 13 of 13 pages)

2011111500123491B    11/15/2011 10:03:06 AM AS    1/3

Recording Requested By:
WELLS FARGO BANK, N.A.

When Recorded Return To:

DEFAULT ASSIGNMENT
WELLS FARGO BANK, N.A.
MAC: X9999-018
PO BOX 1629
MINNEAPOLIS, MN  55440-9790

---

## CORPORATE ASSIGNMENT OF DEED OF TRUST

Collin, Texas
SELLER'S SERVICING #:1127139683 "SUBEDAR"

MERS #: 1002785-7807010200-7  SIS #: 1-888-679-6377

Date of Assignment: October 12th, 2011
Assignor: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR WILLOW BEND MORTGAGE COMPANY, ITS SUCCESSORS AND ASSIGNS at BOX 2026 FLINT MI 48501, 1901 E VOORHEES ST STE C, DANVILLE, IL 61834
Assignee: US BANK NATIONAL ASSOCIATION, AS TRUSTEE, SUCCESSOR IN INTEREST TO BANK OF AMERICA, NATIONAL ASSOCIATION, AS TRUSTEE (SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL ASSOCIATION) AS TRUSTEE FOR MORGAN STANLEY MORTGAGE LOAN TRUST 2007-8XS at 4801 FREDERICA STREET, OWENSBORO, KY 42301

Executed By: JAHANUR R. SUBEDAR AND AMINAH N. MOMIN, HUSBAND AND WIFE  To: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR WILLOW BEND MORTGAGE COMPANY, ITS SUCCESSORS AND ASSIGNS
Date of Deed of Trust: 01/04/2007 Recorded: 01/10/2007  as Instrument No. 2007011000004170  In the County of Collin, State of Texas.

Property Address: 714 LONE RIDGE WAY, MURPHY, TX 75094

Legal:  See Exhibit "A" Attached Hereto And By This Reference Made A Part Hereof

KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Deed of

*CMO*CMOWFEM*10/12/2011 03:06.19 PM* WFEM01WFEMA00000000000000000214594* TXCOLLM*1127139683 TXCOLLI_TRUST_ASSIGN_ASSN **CMOWFEM*

UNOFFICIAL

EXHIBIT "C"

CORPORATE ASSIGNMENT OF DEED OF TRUST Page 2 of 2

Trust having an original principal sum of $235,100.00 with interest, secured thereby, with all moneys now owing or that may hereafter become due or owing in respect thereof, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's beneficial interest under the Deed of Trust.

TO HAVE AND TO HOLD the said Deed of Trust, and the said property unto the said Assignee forever, subject to the terms contained in said Deed of Trust.  IN WITNESS WHEREOF, the assignor has executed these presents the day and year first above written:

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR WILLOW BEND MORTGAGE COMPANY, ITS SUCCESSORS AND ASSIGNS
On _10/13/2011_

By: _____
    Stephanie Tautges , Assistant
    Secretary


STATE OF MINNESOTA
COUNTY OF Dakota

On _10/13/2011_ , before me, ____Matthew F. Ryan____ , a Notary Public in and for Dakota in the State of Minnesota, personally appeared ____Stephanie Tautges____, Assistant Secretary, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

_____

Notary Expires: _____

(This area for notarial seal)

MATTHEW F. RYAN
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2012


*CMO*CMOWFEM*10/12/2011 03:08:19 PM* WFEM01WFEMA0000000000000002145H* TXCOLL1_1127139685 TXCOLL_TRUST_ASSIGN_ASSN **CMOWFEM*


EXHIBIT "C"

Exhibit "A"

Being Lot 8 in Block E of The Gables at North Hill, Phase 2A, an Addition to the City of
Murphy, Collin County, Texas, according to the Plat thereof recorded in Volume R, Page
77, Map records, Collin County, Texas



Filed and Recorded
Official Public Records
Stacey Kemp, County Clerk
Collin County, TEXAS
11/15/2011 10:03:06 AM
$24.00 CLUNA
20111115001234910



EXHIBIT "C"

**<u>Exhibit 2</u>**

**January 31, 2014 Letter**



Dykema Gossett PLLC
400 Renaissance Center
Detroit, MI 48243
WWW.DYKEMA.COM
Tel:  (313) 568-6800
Fax:  (313) 568-6658
**Robert Hugh Ellis**

Direct Dial: (313) 568-5448
Direct Fax: (855) 255-1528
Email: REllis@dykema.com

**Via Federal Express**

January 31, 2014

Jahanur Subedar & Aminah Momin
714 Lone Ridge Way
Murphy, TX 75094

> Re:    *Subedar, et al v. U.S Bank, N.A., et al*
> 417-04160-2013, 417[th] District Court, Collin County Texas

Dear Mr. Subedar & Ms. Momin:

We are writing regarding the above-captioned complaint in which you bring numerous claims against Ally Financial Inc. (formerly known as "GMAC, Inc.") concerning mortgage servicing and securitization. Ally Financial Inc. is not a proper defendant in this matter. Your complaint confuses Ally Financial Inc. with GMAC Mortgage, LLC. Ally Financial Inc. is not and has never been known as GMAC Mortgage, LLC. The complaint improperly conflates multiple legal entities and seeks to hold Ally Financial Inc. liable for the alleged actions and inactions of indirect subsidiaries.

As you may be aware, on December 11, 2013, the United States Bankruptcy Court for the Southern District of New York entered an order confirming the Second Amended Joint Chapter 11 Plan Proposed By Residential Capital, LLC, et al. and the Official Committee Of Unsecured Creditors. On December 17, 2013, the Effective Date of the Plan occurred, and the Plan was substantially consummated. Copies of the Plan and the Confirmation Order are attached.

Article IX,D of the Plan, entitled "Third Party Release," provides a release of all claims against the Ally Released Parties (which include Ally Financial Inc. and each of its non-debtor affiliates), including claims for tort, fraud, contract or alter ego theories of liability, "arising from or related in any way to the Debtors."[1] To the extent the Complaint in this action attempts to

---

[1] "Debtors" include Residential Capital, LLC and its direct and indirect subsidiaries, including GMAC Mortgage, LLC.

DYKEMA

Jahanur Subedar & Aminah Momin
January 31, 2014
Page 2

assert claims against Ally Financial Inc. those claims arise from and are related to the alleged actions of the Debtors. (See, e.g., Cmplt. ¶¶ 13)

Article IX,I of the Plan further provides that "all Entities," which the Bankruptcy Code defines to include individuals, "are permanently enjoined and precluded" from "commencing or continuing" any action against any Released Party based on any Released Claims. Accordingly, we request that you voluntarily dismiss, with prejudice, the claims asserted against Ally Financial Inc. in the above-referenced action. If you do not do so, Ally Financial Inc. will commence proceedings in the Bankruptcy Court in New York to enforce these provisions of the Plan.

Please contact us at the phone number above to discuss this matter.

Sincerely,

DYKEMA GOSSETT PLLC

Robert Hugh Ellis

Enclosures

California | Illinois | Michigan | Minnesota | North Carolina | Texas | Washington, D.C.

**<u>Exhibit 3</u>**

**May 6, 2014 Letter**

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C.  20005

Judson D. Brown
To Call Writer Directly:
(202) 879-5082
judson.brown@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

May 6, 2014

<u>Via Federal Express</u>

Jahanur Subedar & Aminah Momin
714 Lone Ridge Way
Murphy, TX 75094

Re:  ***Subedar, et al. v. U.S. Bank, N.A., et al***
         **417-04160-2013, 417th District Court, Collin County Texas**

Dear Mr. Subedar & Ms. Momin:

I am counsel to Ally Financial Inc. in the Residential Capital, LLC, et al. ("ResCap") Chapter 11 bankruptcy proceedings pending in the United States Bankruptcy Court for the Southern District of New York.

As you know, in December 2013, the Bankruptcy Court overseeing the ResCap bankruptcy confirmed ResCap's Chapter 11 Plan of Reorganization—and I understand you have received a copy of that Plan and the Court's Confirmation Order.  ResCap's Plan includes a Third Party Release that releases all claims against Ally "arising from or related in any way to the Debtors," including ResCap, GMAC Mortgage, LLC and Residential Funding Company, LLC. (*See* Plan Art. IX.D.)  ResCap's Plan also includes an Injunction which "permanently enjoined and precluded" the continuation of any claims against Ally that were released pursuant to the Third Party Release, and the Injunction further states that "[a]ny person injured by any willful violation of this injunction shall be entitled to recover actual damages, including costs and attorneys' fees." (*See* Plan Art. IX.I.)

I understand that you have brought the above-captioned lawsuit asserting claims against Ally and other defendants in Texas state court concerning a foreclosure-related matter.  The claims against Ally arise from and relate to the business of ResCap and its subsidiaries—namely, the alleged servicing of a mortgage.  Those claims therefore are subject to the Third Party Release and the Injunction in ResCap's Plan of Reorganization.  As a result, we request that you voluntarily dismiss, with prejudice, the claims asserted against Ally in the above-referenced action.

The Bankruptcy Court has twice enforced the Third Party Release and Injunction against other plaintiffs who—like you—had refused to dismiss their claims against Ally with prejudice.

Beijing    Chicago    Hong Kong    Houston    London    Los Angeles    Munich    New York    Palo Alto    San Francisco    Shanghai

KIRKLAND & ELLIS LLP

Jahanur Subedar & Aminah Momin
May 6, 2014
Page 2

In both cases, brought by pro se plaintiffs like you, the Bankruptcy Court issued orders directing the plaintiffs to dismiss their claims against Ally with prejudice within 14 days—and failure to do so would result in the plaintiffs being in contempt of Court and would entitle Ally to fees and costs from those pro se plaintiffs. *See* Mar. 26, 2014 Order [Dkt. 6702], attached as Ex. A; Apr. 21, 2014 Order [Dkt 6806], attached as Ex. B.

We are happy to discuss these issues if that would be helpful. And we would be willing to arrange a telephone conference with the Bankruptcy Court, yourself, and Ally's counsel to discuss these issues; let me know if you want us to do that. However, if we do not hear from you and you have not dismissed the claims against Ally with prejudice by **Tuesday, May 13**, Ally will be forced to seek relief—including seeking to enforce the terms of the Injunction—in the Bankruptcy Court.

Sincerely,

Judson D. Brown

Enclosures

## **Exhibit 4**

**May 14, 2014 Letter**

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Judson D. Brown
To Call Writer Directly:                        (202) 879-5000                        Facsimile:
(202) 879-5082                                                                        (202) 879-5200
judson.brown@kirkland.com                      www.kirkland.com

May 14, 2014

<u>Via Email</u>

Jahanur Subedar & Aminah Momin (jahanur@yahoo.com)
714 Lone Ridge Way
Murphy, TX 75094

Re:  ***Subedar, et al. v. U.S. Bank, N.A., et al***
     **417-04160-2013, 417th District Court, Collin County Texas**

Dear Mr. Subedar & Ms. Momin:

I am counsel to Ally Financial Inc. in the Residential Capital, LLC, et al. ("ResCap") Chapter 11 bankruptcy proceedings pending in the United States Bankruptcy Court for the Southern District of New York.

As you know, in December 2013, the Bankruptcy Court overseeing the ResCap bankruptcy confirmed ResCap's Chapter 11 Plan of Reorganization—and I understand you have received a copy of that Plan and the Court's Confirmation Order. ResCap's Plan includes a Third Party Release that releases all claims against Ally "arising from or related in any way to the Debtors," including ResCap, GMAC Mortgage, LLC and Residential Funding Company, LLC. (*See* Plan Art. IX.D.)  ResCap's Plan also includes an Injunction which "permanently enjoined and precluded" the continuation of any claims against Ally that were released pursuant to the Third Party Release, and the Injunction further states that "[a]ny person injured by any willful violation of this injunction shall be entitled to recover actual damages, including costs and attorneys' fees." (*See* Plan Art. IX.I.)

I understand that you have brought the above-captioned lawsuit asserting claims against Ally and other defendants in Texas state court concerning a foreclosure-related matter.  The claims against Ally arise from and relate to the business of ResCap and its subsidiaries—namely, the alleged servicing of a mortgage.  Those claims therefore are subject to the Third Party Release and the Injunction in ResCap's Plan of Reorganization.  As a result, we request that you voluntarily dismiss, with prejudice, the claims asserted against Ally in the above-referenced action.

The Bankruptcy Court has twice enforced the Third Party Release and Injunction against other plaintiffs who—like you—had refused to dismiss their claims against Ally with prejudice.

Beijing    Chicago    Hong Kong    Houston    London    Los Angeles    Munich    New York    Palo Alto    San Francisco    Shanghai

# KIRKLAND & ELLIS LLP

Jahanur Subedar & Aminah Momin
May 14, 2014
Page 2

In both cases, brought by pro se plaintiffs like you, the Bankruptcy Court issued orders directing the plaintiffs to dismiss their claims against Ally with prejudice within 14 days—and failure to do so would result in the plaintiffs being in contempt of Court and would entitle Ally to fees and costs from those pro se plaintiffs. *See* Mar. 26, 2014 Order [Dkt. 6702], attached as Ex. A; Apr. 21, 2014 Order [Dkt 6806], attached as Ex. B.

We are happy to discuss these issues if that would be helpful. And we would be willing to arrange a telephone conference with the Bankruptcy Court, yourself, and Ally's counsel to discuss these issues; let me know if you want us to do that. However, if we do not hear from you and you have not dismissed the claims against Ally with prejudice by **Wednesday, May 21**, Ally will be forced to seek relief—including seeking to enforce the terms of the Injunction—in the Bankruptcy Court.

Sincerely,

Judson D. Brown

Enclosures

**Exhibit 5**

**July 17, 2014 Letter**

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Judson D. Brown
To Call Writer Directly:
(202) 879-5082
judson.brown@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

July 17, 2014

Via Process Server

Jahanur Subedar & Aminah Momin (jahanur@yahoo.com)
714 Lone Ridge Way
Murphy, TX 75094

Re: *Subedar, et al. v. U.S. Bank, N.A., et al*
**417-04160-2013, 417th District Court, Collin County Texas**

Dear Mr. Subedar & Ms. Momin:

I am counsel to Ally Financial Inc. in the Residential Capital, LLC, et al. ("ResCap") Chapter 11 bankruptcy proceedings pending in the United States Bankruptcy Court for the Southern District of New York. I have attempted to contact you on two previous occasions: the first letter, sent to the mailing address above on May 6, 2014, was returned as undeliverable; the second letter was sent to the email address on May 14, 2014, but I never heard back from you.

As you know, in December 2013, the Bankruptcy Court overseeing the ResCap bankruptcy confirmed ResCap's Chapter 11 Plan of Reorganization—and I understand you have received a copy of that Plan and the Court's Confirmation Order. ResCap's Plan includes a Third Party Release that releases all claims against Ally "arising from or related in any way to the Debtors," including ResCap, GMAC Mortgage, LLC and Residential Funding Company, LLC. (*See* Plan Art. IX.D.) ResCap's Plan also includes an Injunction which "permanently enjoined and precluded" the continuation of any claims against Ally that were released pursuant to the Third Party Release, and the Injunction further states that "[a]ny person injured by any willful violation of this injunction shall be entitled to recover actual damages, including costs and attorneys' fees." (*See* Plan Art. IX.I.)

I understand that you have brought the above-captioned lawsuit asserting claims against Ally and other defendants in Texas state court concerning a foreclosure-related matter. The claims against Ally arise from and relate to the business of ResCap and its subsidiaries—namely, the alleged servicing of a mortgage. Those claims therefore are subject to the Third Party Release and the Injunction in ResCap's Plan of Reorganization. As a result, we request that you voluntarily dismiss, with prejudice, the claims asserted against Ally in the above-referenced action.

Beijing    Chicago    Hong Kong    Houston    London    Los Angeles    Munich    New York    Palo Alto    San Francisco    Shanghai

## KIRKLAND & ELLIS LLP

Jahanur Subedar & Aminah Momin
July 17, 2014
Page 2


The Bankruptcy Court has twice enforced the Third Party Release and Injunction against other plaintiffs who—like you—had refused to dismiss their claims against Ally with prejudice. In both cases, brought by pro se plaintiffs like you, the Bankruptcy Court issued orders directing the plaintiffs to dismiss their claims against Ally with prejudice within 14 days—and failure to do so would result in the plaintiffs being in contempt of Court and would entitle Ally to fees and costs from those pro se plaintiffs. *See* Mar. 26, 2014 Order [Dkt. 6702], attached as Ex. A; Apr. 21, 2014 Order [Dkt 6806], attached as Ex. B.

We are happy to discuss these issues if that would be helpful. And we would be willing to arrange a telephone conference with the Bankruptcy Court, yourself, and Ally's counsel to discuss these issues; let me know if you want us to do that. However, if we do not hear from you and you have not dismissed the claims against Ally with prejudice by **Thursday, July 31**, Ally will be forced to seek relief—including seeking to enforce the terms of the Injunction—in the Bankruptcy Court.

Sincerely,

Judson D. Brown


Enclosures

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
|  | ) |  |
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

### ORDER GRANTING ALLY FINANCIAL INC.'S MOTION
### FOR AN ORDER ENFORCING THE CHAPTER 11 PLAN INJUNCTION

Upon consideration of the motion (the "***Motion***")[1] of Ally Financial Inc. ("***Ally***") for entry of an order enforcing the Third Party Release and Injunction provisions of the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors*, which was confirmed by this Court on December 11, 2013; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of these chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this proceeding on the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b); and sufficient notice of the Motion having been given; and it appearing that no other or further notice need be provided; and the Court having found that the relief requested in the Joint Motion is in the best interests of the Debtors' estates and their creditors; and after due deliberation and sufficient cause appearing therefor and for the reasons set forth on the record at the hearing on the Motion,

### IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.    The Motion is GRANTED to the extent set forth below for the reasons set forth on the record at the hearing on the Motion.

---

[1]        Capitalized terms used but not defined herein have the meanings provided to such terms in the Motion.

EXHIBIT A

2.      Not later than fourteen days after entry of this Order, Lahrman shall take all appropriate actions to dismiss the Action against Ally with prejudice within such time frame.

3.      If Lahrman fails to dismiss the Action against Ally or the Action is not otherwise dismissed against Ally within such fourteen-day period, this Court shall issue an order holding Lahrman in contempt of Court for violating the terms of this Order and the Confirmation Order by virtue of Lahrman's actions to attempt to prosecute an action against Ally in violation of the Confirmation Order.

4.      Further, in connection with any contempt proceeding against Lahrman, Ally shall be permitted to seek sanctions against Lahrman in this Court for reasonable fees and costs incurred by Ally after the date of this Order in connection with this matter.

5.      Ally shall cause service of this Order to be made upon Lahrman in accordance with Bankruptcy Rules 9014 and 7004.

6.      Ally is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

7.      Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

8.      All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits.

EXHIBIT A

12-12020-mg    Doc 6762    Filed 03/26/14    Entered 03/26/14 16:40:49    Main Document
Pg 3 of 3

9.      This Court shall retain jurisdiction with respect to all matters arising under or

related to the implementation of this Order.

**IT IS SO ORDERED.**

Dated: March 26, 2014
       New York, New York

                                    _____/s/Martin Glenn_____
                                        MARTIN GLENN
                                    United States Bankruptcy Judge

3

EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

FOR PUBLICATION

In re:

RESIDENTIAL CAPITAL, LLC, *et al.*

Case No. 12-12020 (MG)

Debtors.

Jointly Administered

## MEMORANDUM OPINION AND ORDER DENYING MOTION TO LIFT THE AUTOMATIC STAY AND ENFORCING RELEASE OF CLAIMS AGAINST ALLY FINANCIAL INC.

*A P P E A R A N C E S :*

YOSEF LE ROI MUSTAFANOS
*Pro Se*
5400 Railroad Street
Silver Springs, Nevada 89429
By:    Yosef Le Roi Mustafanos

MORRISON & FOERSTER LLP
*Counsel for the Liquidating Trust*
1290 Avenue of the Americas
New York, New York 10104
By:    Daniel J. Harris, Esq.

KIRKLAND & ELLIS LLP
*Counsel for Ally Financial Inc.*
655 15th Street, N.W., Ste. 1200
Washington, D.C. 20005
By:    Judson D. Brown, Esq.

WILLIAMS KASTNER
*Counsel for Ally Financial Inc.*
888 SW Fifth Avenue, Ste. 600
Portland, Oregon 97204
By:    Rachel A. Robinson, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Yosef Le Roi Mustafanos ("Mustafanos"), on behalf of the estate of his deceased father,

James Jackson Marshall ("Marshall"), wants to prosecute claims in an Oregon state court against

EXHIBIT B

Debtors GMAC Mortgage LLC ("GMACM") and Residential Capital LLC ("ResCap"), and

against non-debtor Ally Financial Inc. ("AFI"). All claims against the Debtors (defined below),

except for claims that are allowed in Debtors' chapter 11 cases, were discharged as part of the

Debtors' confirmed chapter 11 Plan (defined below), which became effective on December 17,

2013. Mustafanos did not file any proof of claim in the bankruptcy case, and he is barred from

doing so now. The effect of the Plan is to bar Mustafanos from proceeding with claims against

GMACM and ResCap.

Furthermore, the confirmed Plan includes release and injunction provisions that bar

assertion of any covered claims against AFI. The third-party release and injunction provisions in

favor of AFI are enforceable against Mustafanos, and he will be enjoined from proceeding with

his claims against AFI.

## I.    BACKGROUND

### A.    The Pending Requests for Relief

Pending before the Court is the *Ex Parte Motion of the Movant Yosef Le Roi Mustafanos*

*for an Order Shortening the Notice Period for Certain Emergency Relief from the Automatic*

*Stay* (the "Motion," ECF Doc. # 6535), which Mustafanos filed on behalf of Marshall, his

deceased father.[1] Mustafanos seeks relief from the automatic stay to pursue foreclosure-related

claims against non-debtor AFI and Debtors GMACM and ResCap in a foreclosure action

commenced by non-debtor EverBank, Inc. ("EverBank") in the District Court in Multnomah

County, Oregon (the "State Court").

The ResCap Liquidating Trust (the "Liquidating Trust") submitted a *Statement of the*

*Liquidating Trust in Connection with Motion of Movant Yosef Le Roi Mustafanos for an Order*

---

[1]    Mustafanos also sought to have his Motion heard on shortened notice. The Court denied his request and
the Motion was scheduled for April 10, 2014—the next ResCap omnibus date that would allow Mustafanos time to
serve notice on the Debtors and AFI.

2

EXHIBIT B

*Shortening Notice Period for Certain Emergency Relief from the Automatic Stay* (the

"Statement," ECF Doc. # 6747).  In support of the Statement, the Liquidating Trust submitted

the Declaration of Lauren Graham Delehey (the "Delehey Decl.," Statement Ex. 1).  The

Liquidating Trust contends that there is no basis to grant Mustafanos relief from the automatic

stay because (1) GMACM acted only as servicer of Marshall's loan and transferred the servicing

rights to Everhome Mortgage Company ("Everhome") in 2008 and (2) neither GMACM nor

ResCap received notice of the state court proceeding.

AFI submitted *Ally Financial Inc.'s Objection to Ex Parte Motion of the Movant Yosef Le*

*Roi Mustafanos for an Order Shortening the Notice Period for Certain Emergency Relief from*

*the Automatic Stay* (the "Objection," ECF Doc. # 6748, and together with the Statement, the

"Responses").  In support of the Objection, AFI submitted the Declaration of Rachel A.

Robinson (the "Robinson Decl.," Objection Ex. A).  Also attached to the Objection are:  (1) the

original counterclaim in the underlying state court action (the "Original Counterclaim,"

Objection Ex. 1); (2) the February 10, 2014 letter from AFI's local counsel informing

Mustafanos of the Third Party Release and Plan Injunctions (defined below) (Objection Ex. 2);

(3) Mustafanos' amended counterclaim in the state court action (the "Amended Counterclaim,"

Objection Ex. 3); (4) the February 14, 2014 letter from AFI's local counsel to Mustafanos

regarding the Amended Counterclaim (Objection Ex. 4); and (5) the February 24, 2014 letter

from AFI's counsel in these chapter 11 cases, Kirkland & Ellis LLP ("Kirkland"), again

informing Mustafanos of the Third Party Release and Plan Injunctions (Objection Ex. 5).  While

styled as an objection to the Motion, the Court permitted AFI to request affirmative relief as part

of its Objection—specifically, enforcement of the Third Party Release and Plan Injunction (as

defined below).  AFI contends that Mustafanos' state court action against AFI is barred by the

EXHIBIT B

Court's order confirming the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* (the "Plan," ECF Doc. # 6065-1).  The Plan released and enjoined the pursuit of claims against AFI "arising from or related in any way to the Debtors."  (Plan Art. IX.D.)  AFI timely served the Objection on Mustafanos, and the Court considers the Objection as a cross-motion for relief seeking enforcement of the Third Party Release and Injunction provisions of the Plan.

As explained below, Mustafanos's Motion for relief from stay is **DENIED** and Mustafanos is **ENJOINED** from proceeding against GMACM and ResCap.  Furthermore, AFI's request for relief is **GRANTED** and Mustafanos is **ENJOINED** from prosecuting his claims against AFI and he is **ORDERED** to dismiss with prejudice his claims against AFI in the State Court no later than fourteen (14) days from the date of this Order.  Should Mustafanos fail to dismiss his claims, AFI may seek further relief from this Court with a motion to hold Mustafanos in contempt under Bankruptcy Rule 9020.  Nothing in the Court's ruling affects the defenses to foreclosure or counterclaims that Mustafanos may assert against parties other than GMACM, ResCap and Ally; those issues are controlled by state law.

### B.   Marshall's Mortgage Loan

On March 3, 2004, Marshall entered into a mortgage loan (the "Mortgage Loan") with Mortgage Investors Corporation.  (Delehey Decl. ¶ 4.)  GMACM serviced the Mortgage Loan from March 3, 2004 until it transferred its servicing responsibilities to Everhome in November 2008. [2]  (*Id.*)

---

[2]      At the hearing on the Motion, the Liquidating Trust indicated that GMAC Corp., predecessor in interest to GMACM, originally serviced the Mortgage Loan.  (*See* Apr. 10, 2014 Tr. at 7:5–6.)

4

EXHIBIT B

On March 3, 2007, Mortgage Investors Corporation "funded a refinance" of the

mortgage. (Original Counterclaim ¶ 6; *see also* Robinson Decl. ¶ 5 (indicating that the mortgage

was refinanced in 2007).) Mortgage Investors Corporation is unrelated to the Debtors or Ally.

Mustafanos alleges that on March 3, 2004, GMACM "went to Mr. Marshall's house[,] picked

him up[,] and [t]ransported him to the GMAC Mortgage office and had him sign the mortgage

deed of Trust without aid and attendance from his children." (Motion ¶ 4.) At its office,

Mustafanos alleges, GMACM had Marshall replace a "first position loan" financed by Sierra

Pacific Mortgage at a five percent interest rate with an adjustable interest rate loan that "became

toxic, considering that Mr. Marshall was on a fixed income." (*Id.* at 9.) Additionally,

Mustafanos argues that the loan note and adjustable rate rider agreement may not have been

signed on the same date "due to the absence of a notary Certification." (*Id.* ¶ 4.) He appears to

allege that Marshall's signature may have been copied and pasted into the relevant documents.

(*Id.*) Additionally, Mustafanos argues that GMACM "should have clearly noticed that Mr.

Marshall would hallucinate, was unable to hold his attention and would drift off into sleep." (*Id.*

¶ 5.) Mustafanos further alleges that he "discovered senior abuse and fraud in the transactions

involving GMAC Mortgage and began a counterclaim against EverBank." (*Id.* ¶ 13.) According

to the Debtors, however, GMACM did not act as broker for the Mortgage Loan, and after it

transferred its servicing duties in 2008, GMACM no longer had any involvement with Marshall

or the Mortgage Loan. (Delehey Decl. ¶ 4.) Mustafanos disputes this alleged fact, asserting that

GMACM "brokered" the refinance transaction. Because of the Court's disposition of the

pending matters, this factual dispute is not material.

Mustafanos additionally claims to have made various discoveries in February 2014

related to AFI that he believes impact his counterclaims. First, he purportedly discovered that

EXHIBIT B

AFI "settled and consented to the charges of fraud and unfair lending against the United States

consumers by its subsidiaries and daughter companies as well as GMAC Mortgage, Inc. and

settled for $25 billion dollars with the United States Attorneys General on April 4, 2012." (*Id.*

¶ 17.)  Second, he claims to have "discovered that Ally Financial, Inc. consented to permit

lawsuits and claims being brought against them by individuals, class action and associations for

injurious conduct inflicted by GMAC Mortgage, Residential Capital, Inc."[3]  (*Id.* ¶ 18.)  Third, he

learned that GMACM and ResCap filed for bankruptcy on May 14, 2012.  (*Id.* ¶ 19.)  Finally, he

received a phone call from counsel for AFI "threatening to contact the bankruptcy court and have

Judge Glenn to hold him in contempt" if he failed to dismiss his claims against AFI with

prejudice.  (*Id.* ¶ 20.)

Marshall died on March 20, 2010.  (Motion ¶ 10.)  After Marshall's death, Mustafanos,

Marshall's son and the representative of Marshall's estate, was listed as the Successor of the

Estate.  (*See* Original Counterclaim, Letter from Everhome Mortgage.)  Mustafanos contacted

Everhome to request payment assistance in December 2010 and was approved for a permanent

loan modification.  (*Id.*)  But Mustafanos did not return the signed modification agreement to

Everhome, so Everhome closed his file on February 17, 2011.  (*Id.*)

## C.     State Court Foreclosure Proceedings and Mustafanos' Counterclaims

On May 10, 2012, EverBank filed a complaint for judicial foreclosure against Mustafanos

and others[4] in the State Court.  (Robinson Decl. ¶ 3.)  The State Court entered a default order as

---

[3]      As the Court noted at the April 10, 2014 hearing, some of Mr. Mustafanos's "discoveries" are based on his erroneous interpretation of the Consent Order settling the Federal Reserve Board investigation and the state attorneys general action.  *See* Apr. 10, 2014 Tr. 27:8–21.

[4]      Though it is not entirely clear, the "others" presumably include those listed as defendants (in addition to Mustafanos) in Mustafanos' Original Counterclaim—Tonny D. Marshall, James M. Marshall, Don E. Marshall, Cherry Bush Lane Homeowners' Association, Inc., NW Professional Judgment Recovery, and occupants of the premises.  (*See* Original Counterclaim at 1.)

EXHIBIT B

to all named defendants except Mustafanos on August 28, 2012.  (*Id.*)  Mustafanos filed the

Original Counterclaim in March 2013.  (*Id.* ¶ 4.)  In the Original Counterclaim, Mustafanos

alleges that GMACM "is the mortgage broker who prepared all documents and shopped and

secured the Lender (Mortgage Investors Corporation)" for Marshall.  (Original Counterclaim

¶ 6.)  The majority of Mustafanos's claims in the Original Counterclaim are related to the

origination of the Mortgage Loan.  Mustafanos claims that his father was "incompetent" for

various reasons, including that he "suffered from:  Type 2 Diabetes, High blood pressure,

obesity, cataracts, dementia, paranoid schitzophrenia [*sic*], obsessive compulsion [*sic*] disorder,

disorientation, fainting spells, kidney and liver dialysis dependency."  (*Id.* ¶ 14.)

On August 22, 2013, Mustafanos filed his first amended counterclaim,[5] naming AFI as a

counterclaim defendant.[6]  (Robinson Decl. ¶ 6.)  AFI moved to dismiss the first amended

counterclaim on December 5, 2013, on the grounds that the first amended counterclaim did not

include specific allegations against AFI.  (*Id.* ¶ 7.)  The State Court granted AFI's motion to

dismiss on January 28, 2014, but granted Mustafanos leave to amend his counterclaim to

describe the relationship between AFI and GMACM.  (*Id.*)

AFI's local counsel in Oregon sent Mustafanos a letter on February 10, 2014, informing

Mustafanos that this Court had confirmed the Plan, and providing Mustafanos with copies of the

Confirmation Order and the Plan.  (*Id.*; *see also* Objection Ex. 2.)  Mustafanos filed the

Amended Counterclaim on February 14, 2014, alleging that AFI "does business as" GMACM

---

[5]     It appears that GMACM was never served with the first (or second) amended counterclaim(s).  At the
hearing on April 10, 2014, Mustafanos indicated that he believed GMACM was "adequately served" because he had
served AFI's agent, and believed AFI and GMACM share the same agent, "CT Corporation."  (*See* Apr. 10, 2014
Tr. 26:12–14.)  The Court need not resolve this dispute.  In any event, the Court was not provided a copy of the first
amended counterclaim.

[6]     Although Mustafanos did not initially list AFI as a counterclaim defendant in the version of the first
amended counterclaim that he filed with the State Court, he did add AFI to the caption in the version that he served
on AFI in October 2013.  (Robinson Decl. ¶ 6 n.1.)

7

EXHIBIT B

and EverBank.  (Amended Counterclaim at 1, ¶ 6.)  Also on February 14, 2014, AFI's local

counsel sent Mustafanos a second letter, highlighting the Plan's Third Party Release and

Injunction provisions.  (Robinson Decl. ¶ 10; Objection Ex. 4.)  Finally, after no response from

Mustafanos, Kirkland sent Mustafanos a third letter on February 24, 2014, explaining that the

Third Party Release bars Mustafanos's claims against AFI and warning Mustafanos that if he did

not dismiss his claims against AFI with prejudice by March 3, 2014, AFI would seek relief in

this Court.  (Objection Ex. 5 at 2.)  Mustafanos has not dismissed his claims against AFI; instead,

after he received the letter from Kirkland, Mustafanos filed the instant Motion seeking to lift the

automatic stay.

### D.      ResCap Bankruptcy Plan Confirmation

ResCap and various related entities (the "Debtors") filed chapter 11 bankruptcy petitions

on May 14, 2012 (the "Petition Date").  On August 29, 2012, the Court entered an order setting

the bar date of November 9, 2012 for filing non-governmental proofs of claim in the chapter 11

cases.  (ECF Doc. # 1309.)  The Court thereafter entered an Order Extending the Bar Date for

Filing Proofs of Claim to November 16, 2012 (the "Bar Date").  (ECF Doc. # 2093.)  Mustafanos

did not file a proof of claim.

On December 11, 2013, the Court confirmed the Plan.  (ECF Doc. # 6065.)  Pursuant to

the Plan,

> Except as otherwise agreed by the Debtors, the Liquidating Trust, or the
> Borrower Claims Trust, as applicable, or ordered by the Bankruptcy
> Court, any and all proofs of claim filed after the applicable Bar Date shall
> be deemed disallowed, discharged, released, and expunged as of the
> Effective Date without any further notice to or action, order, or approval
> of the Bankruptcy Court, and holders of such Claims may not receive any
> distributions on account of such Claims, unless such late proof of claim is
> deemed timely filed by a final order of the Bankruptcy Court.

(Plan Art. VIII.B (formatting altered from original).)

EXHIBIT B

To define the term "Claim," the Plan adopts the definition contained in Bankruptcy Code section 101(5). (Plan Art. I.A.53.) Section 101(5), in turn, defines a "claim" as the "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5).

The Plan also includes the release of the Debtors' parent company AFI (the "Third Party Release") in exchange for a contribution from AFI of $2.1 billion to the Debtors' estate (the "AFI Contribution"). (*See* Plan Art. IV.A.) The Third Party Release extends to

> **any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to the Debtors.**

(Plan Art. IX.D.)[7] The Third Party Release further provides:

> **On and as of the Effective Date of the Plan . . ., the holders of Claims and Equity Interests shall be deemed to provide a full and complete discharge and release to the Ally Released Parties and their respective property from any and all Causes of Action . . . arising from or related in any way to the Debtors, including those in any way related to RMBS issued and/or sold by the Debtors or their affiliates and/or the Chapter 11 Cases or the Plan, the Consent Order, and the Order of Assessment.**

(*Id.*) A "Cause of Action" under the Plan is defined as:

> any and all Claims, actions, causes of action, choses in action, rights, demands, suits, claims, liabilities, encumbrances, lawsuits, adverse consequences, debts, damages, dues, sums of money, accounts, reckonings, deficiencies, bonds, bills, disbursements, expenses, losses, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims,

---

[7]    Capitalized terms used but not defined herein have the meanings given to such terms in the Plan.

9

EXHIBIT B

indemnity claims, counterclaims, and cross-claims (including those of the
Debtors, and/or the bankruptcy estate of any Debtor created pursuant to
sections 301 and 541 of the Bankruptcy Code upon the commencement of
the Chapter 11 Cases), including, without limitation, any claims, causes of
action, objections, rights, remedies arising under Chapter 5 of the
Bankruptcy Code pursuant to, among others, sections 502, 510, 542
through 545 and 547 through 553 or 558 thereof, whether known or
unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or
unliquidated, fixed or contingent, matured or unmatured, disputed or
undisputed, whether held in a personal or representative capacity, that are
or may be pending as of the date hereof or instituted hereafter against any
entity, based in law or equity, including under the Bankruptcy Code,
whether direct, indirect, derivative, or otherwise and whether asserted or
unasserted as of the date hereof.

(*Id.* Art. I.A.50.)  Thus, Claims or Causes of Action asserted against AFI "arising from or related

in any way related to the Debtors" are "Released Claims" under the Plan.  (*See id.* Art. I.A.242;

*see also id.* IX.D.)

The Plan "**permanently enjoin[s] and preclude[s]**" all parties

**who have held, hold or may hold Claims, . . . [or] Causes of Action . . .
that constitute Released Claims . . . from and after the effective date of
the Plan, from:  (a) commencing or continuing in any manner or
action or other proceeding of any kind against any Released Party
whether directly, derivatively or otherwise, on account of or in
connection with or with respect to any Released Claims; . . . [and] (e)
commencing or continuing in any manner or action or other
proceeding of any kind against any Released Party on account of or in
connection with or respect to any Released Claims . . .**

(*Id.* Art. IX.I.)

The Plan became effective on December 17, 2013 (the "Effective Date").  (*See* ECF Doc.

# 6137.)

10

EXHIBIT B

## II.    DISCUSSION

### A.    The Debtors' Discharge Under the Plan

Section 1141 of the Bankruptcy Code, titled "Effect of Confirmation," generally provides

that a plan of reorganization is binding upon a broad list of entities once it is confirmed.  *See* 8

COLLIER ON BANKRUPTCY ¶ 1141.02 (16th ed. rev. 2013).

> Under [section 1141], subject to compliance with the requirements of due
> process under the Fifth Amendment, a confirmed plan of reorganization is
> binding upon every entity that holds a claim against or interest in the
> debtor even though a holder of a claim or interest is not scheduled, has not
> filed a claim, does not receive a distribution under the plan or is not
> entitled to retain an interest under such plan.  *In other words, a confirmed
> plan precludes parties from raising claims or issues that could have or
> should have been raised before confirmation but were not*.

*Id.* (emphasis added) (footnotes omitted).

Section 1141(d)(1)(A) provides:

> (1) Except as otherwise provided in this subsection, in the plan, or
> in the order confirming the plan, the confirmation of a plan—
>> (A) *discharges the debtor* from any debt that arose before
>> the date of such confirmation, and any debt of a kind
>> specified in section 502(g), 502(h), or 502(i) of this title,
>> *whether or not*—
>>> (i) a *proof of the claim based on such debt is filed* or
>>> deemed filed under section 501 of this title;
>>> (ii) such claim is allowed under section 502 of this
>>> title; or
>>> (iii) the holder of such claim has accepted the plan.

11 U.S.C. § 1141(d)(1)(A) (emphasis added).

Confirmation of a plan operates as a final judgment for *res judicata* purposes.  *See First

Union Commercial Corp. v. Nelson, Mullins, Riley & Scarborough (In re Varat Enters., Inc.)*, 81

F.3d 1310, 1315 (4th Cir. 1996).  "Under the doctrine [of *res judicata*], questions concerning the

treatment of any creditor under the plan, discharge of liabilities, or disposition of property, may

no longer be raised after plan confirmation.  These issues must be raised in the context of

11

EXHIBIT B

objections to confirmation of the plan." 8 COLLIER ON BANKRUPTCY ¶ 1141.02[4] (footnotes

omitted).

Since he is asserting a right of payment, Mustafanos is a holder of a "Claim" pursuant to

the Plan and the Bankruptcy Code. *See* 11 U.S.C. § 101(5); 8 COLLIER ON BANKRUPTCY

¶ 1141.02 n.2. Mustafanos did not file a proof of claim in these chapter 11 cases, and did not

object to confirmation.

The Plan clearly provides that

Any and all proofs of claim filed after the applicable Bar Date shall be
deemed disallowed, discharged, released, and expunged as of the Effective
Date without any further notice to or action, order, or approval of the
Bankruptcy Court, and holders of such Claims may not receive any
distributions on account of such Claims, unless such late proof of claim is
deemed timely filed by a final order of the Bankruptcy Court.

(Plan Art. VIII.B (formatting altered from original).)

Despite the fact that Mustafanos did not file a claim before the Bar Date, he later sought

to bring a claim against the Debtors and AFI in the form of counterclaims to the foreclosure

action—initiated by EverBank, a non-debtor that is unrelated to any of the Debtors or AFI—

raising allegations of misconduct related to the origination, securitization, servicing, and

foreclosure of the Mortgage Loan, and seeking to recover monetary damages for the alleged

misconduct. A review of the Amended Counterclaim makes clear that Mustafanos seeks to

sidestep the confirmed chapter 11 Plan to pursue his claim in another forum. If Mustafanos had

a claim, he should have timely filed it in these bankruptcy cases; he did not do so, and it is too

late to do so now. Any unasserted claims Mustafanos had against the Debtors' estate were

discharged pursuant to the Plan. Consequently, for the reasons explained in the next section, his

Motion for relief from the automatic stay is **DENIED**; the relief he seeks from GMACM and

ResCap in the State Court is precluded under the Plan.

EXHIBIT B

## B.    Mustafanos Has Not Established Cause to Lift the Automatic Stay

Mustafanos has not established cause to lift the stay.  Section 362(a)(1) of the Bankruptcy

Code provides that the filing of a bankruptcy petition automatically stays

> the commencement or continuation, including the issuance of employment
> of process, of a judicial, administrative, or other action or proceeding
> against the debtor that was or could have been commenced before the
> commencement of the case under this title, or to recover a claim against
> the debtor that arose before the commencement of the case under this title.

11 U.S.C. § 362(a)(1).

The automatic stay affords "one of the fundamental debtor protections provided by the

bankruptcy laws." *Midlantic Nat'l Bank v. New Jersey Dep't of Evntl. Prot.*, 474 U.S. 494, 503

(1986).  The stay maintains the status quo and protects the debtor's ability to formulate a plan for

the sale or other disposition of property of the estate.  3 COLLIER ON BANKRUPTCY ¶ 362.03.

Section 362(d)(1) of the Bankruptcy Code provides that "[o]n request of a party in

interest and after notice and a hearing, the court shall grant relief from the stay . . . (1) for cause,

including the lack of adequate protection of an interest in property of such party in interest . . . ."

11 U.S.C. § 362(d)(1).  The Bankruptcy Code does not, however, define the phrase "for cause."

In determining whether "cause" exists to lift the stay for prepetition litigation, courts consider the

so-called "*Sonnax* Factors."  *See Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re*

*Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286 (2d Cir. 1990); *In re Residential Capital, LLC*, 501

B.R. 624, 643 (Bankr. S.D.N.Y. 2013); *In re New York Medical Grp., PC*, 265 B.R. 408, 413

(Bankr. S.D.N.Y. 2001).

Not all of the *Sonnax* Factors are relevant in every case, and "cause" is a broad and

flexible concept that must be determined on a case-by-case basis.  *Spencer v. Bogdanovich (In re*

*Bogdanovich)*, 292 F.3d 104, 110 (2d Cir. 2002) (citing *Mazzeo v. Lenhart (In re Mazzeo)*, 167

13

EXHIBIT B

F.3d 139, 143 (2d Cir. 1999)).  The moving party bears the initial burden to demonstrate that

"cause" exists to lift the stay.  *See Sonnax*, 907 F.2d at 1285; *Capital Comm. Fed. Credit Union*

*v. Boodrow* (*In re Boodrow*), 126 F.3d 43, 48 (2d Cir. 1997) ("We have emphasized that a

bankruptcy court should deny relief from the stay if the movant fails to make an initial showing

of cause.") (internal quotation marks omitted).  "If the movant is an unsecured creditor, the

policies of the automatic stay weigh against granting the relief requested.  [T]he general rule is

that claims that are not viewed as secured in the context of § 362(d)(1) should not be granted

relief from the stay unless extraordinary circumstances are established to justify such relief."

*Residential Capital*, 501 B.R. at 643–44 (alteration in original) (internal quotation marks

omitted).  Under section 362(d)(1), Mustafanos bears the initial burden of showing "cause" to lift

the stay.  *See id.* at 1285 ("If the movant fails to make an initial showing of cause, however, the

court should deny relief without requiring any showing from the debtor that it is entitled to

continued protection.").

Since the claims Mustafanos seeks to assert against GMACM and ResCap are barred and

discharged by the Plan, Mustafanos cannot establish cause to lift the stay—litigating those claims

in *any* forum would be futile.  Therefore, Mustafanos's Motion to lift the stay is **DENIED**.  This

ruling does not prevent Mustafanos from asserting any equitable or legal defenses or

counterclaims he may have in the foreclosure action against EverBank, or against any of the

other non-debtor defendants, except for AFI.  What he cannot do is drag GMACM or ResCap

into the foreclosure action in support of his defenses to foreclosure.  And as explained below, he

also cannot assert any counterclaims against AFI.

14

EXHIBIT B

## C.      Enforcement of Third Party Release and Plan Injunction

The Court considers AFI's Objection as a cross-motion for relief under the Third Party

Release and Injunction provisions of the Plan.  Mustafanos received fair notice of AFI's

requested relief and it is properly before the Court even though Mustafanos initiated the current

Motion.

### 1.      *The Third Party Release and Plan Injunction are Appropriate in these Cases*

In the Second Circuit, non-debtor releases are permissible under certain circumstances.

"[A] bankruptcy court only has jurisdiction to enjoin third party non-debtor claims that directly

affect the res of the bankruptcy estate."  *In re Johns-Manville Corp.*, 600 F.3d 135, 152 (2d Cir.

2010) (citation omitted).  Because AFI filed proofs of claim for indemnification against the

Debtors, and because AFI and the Debtors shared insurance policies, third-party claims such as

the ones asserted by Mustafanos would affect the *res* of the estate, satisfying the jurisdictional

underpinnings for the third-party release approved by the Court.

In *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992), the

Second Circuit noted that "[i]n bankruptcy cases, a court may enjoin a creditor from suing a third

party, provided the injunction plays an important part in the debtor's reorganization plan."  In its

decision in *In re Metromedia Fiber Network Inc.*, 416 F.3d 136 (2d Cir. 2005), the Second

Circuit further clarified the standard under which it is appropriate to grant non-debtor releases.

The court identified two factors that are necessary for court approval of a non-debtor release:

(1) the release must itself be important to the plan; and (2) the scope of the release must be

necessary to the plan.  *Id.* at 143.  Thus, a non-debtor release is not justifiable simply on the

ground that it was offered in exchange for a monetary contribution.  *Id.*

EXHIBIT B

During the Plan confirmation hearing, the Court considered all of the factors under
*Metromedia* and *Johns-Manville* and their progeny and determined that the Court had the
jurisdiction to enter the third party non-debtor release in favor of AFI.  (*See* ECF Doc. # 6065,
*Order Confirming Second Amended Joint Chapter 11 Plan Proposed by Residential Capital,*
*LLC, et al. and the Official Committee of Unsecured Creditors* (the "Confirmation Order"),
¶ UU.)  The Court found that the *Metromedia* factors, which establish a high burden before a
court will grant non-debtor releases, were satisfied in this case.  The AFI Contribution was the
"lynchpin of the Plan, without which the cases would devolve into endless litigation, the Plan
would not be confirmable or feasible, and the recoveries currently contemplated by the Plan
would not exist."  (*Id.* ¶ RR.)  As stated in the Plan, the Third Party Release was "an essential
component and critical to the success of the Plan."  (Plan Art. IX.D.)  The Court found that
"[t]hese facts are unprecedented and justify the approval of the Third Party Releases."
(Confirmation Order ¶ RR.)

> 2.    *The Court Has Authority to Enforce the Third Party Release and Plan*
> *Injunction Against Mustafanos*

"All courts retain the jurisdiction to interpret and enforce their own orders."  *In re*
*Charter Commc'ns*, No. 09-11435, 2010 WL 502764, at *4 (Bankr. S.D.N.Y. Feb. 8, 2010); *see*
*also Travelers Indem. Co. v. Bailey,* 557 U.S. 137, 151 (2009) ("[A]s the Second Circuit
recognized . . . the Bankruptcy Court plainly had jurisdiction to interpret and enforce its own
prior orders.").  While a bankruptcy court's jurisdiction diminishes in importance following plan
confirmation, *In re Gen. Media, Inc.*, 335 B.R. 66 (S.D.N.Y. 2005), the action in this case is
"sufficiently close in time to confirmation of the Plan and sufficiently critical to the integrity of
the Plan's structure that it is proper for this Court to take firm control and decide" the Motion.
*Charter Commc'ns*, 2010 WL 502764, at *4.

16

EXHIBIT B

As the court explained in *Charter Communications*, where a motion seeks to "prevent the prosecution of causes of action expressly prohibited by the confirmation order," it would be "difficult to identify judicial acts that are any more critical to the orderly functioning of the bankruptcy process or more closely tethered to core bankruptcy jurisdiction." *Id.* (citing *In re Petrie Retail, Inc.*, 304 F.3d 223, 230 (2d Cir. 2002) (finding that bankruptcy court retained core jurisdiction post-confirmation "to interpret and enforce its own orders, particularly when disputes arise over a bankruptcy plan of reorganization")).[8]

The $2.1 billion AFI Contribution to the successful Plan in this case was a significant factor to achieving Plan confirmation and a global resolution of the Debtors' bankruptcies. A key component of Ally's willingness to provide the Contribution was the Plan Injunction and Third Party Release. The Court carefully considered the record and weighed the relevant factors. Initially, the U.S. Trustee, which rigorously enforces the law with respect to third party non-debtor releases, had objected to the Third Party Release. That objection was withdrawn. By the time of confirmation, there were no objections to the non-debtor release included in the Plan. After considering the applicable case law and the U.S. Trustee's withdrawal of its objection, the Court approved the Plan, which included the Third Party Release and Injunction.

Mustafanos did not name AFI as a counter-defendant in his foreclosure proceeding until August 22, 2013; he did not serve AFI with the Amended Counterclaim until October 2013. He did not object to the Third Party Release or Injunction contained in the Plan.

---

[8]    While both this Court and the Oregon state court are competent to rule on the Plan Injunction and Third Party Release, the "bankruptcy court is more closely connected to the current dispute and is the proper forum to rule with respect to" enforcement of third party releases pursuant to the Plan. *Charter Commc'ns*, 2010 WL 502764, at *3 (explaining that the bankruptcy court was the appropriate court to interpret the plan releases in that case, for reasons that apply equally here:  (1) the bankruptcy court had natural familiarity with the full record of the confirmation hearing and process; and (2) if the bankruptcy court interprets the plan confirmation order, there is a much smaller risk of erosion of its provisions and the injunction due to inconsistent interpretations across courts).

17

EXHIBIT B

Mustafanos's claims against AFI in the Amended Counterclaim relate to the origination of the Mortgage Loan, the assignment of the recorded mortgage, the securitization of the Mortgage Loan, the servicing of the Loan, and attempts to foreclose upon the Loan and the secured real property.  Mustafanos names AFI as a counter-defendant in the case, describing AFI as "*doing Business as* GMAC Mortgage Corporation"; he uses "Ally" and "GMAC Mortgage" interchangeably in his pleadings.  (Amended Counterclaim ¶ 6 (emphasis added).)  The asserted bases for AFI's purported liability are derivative of the alleged misconduct of GMACM and ResCap.  Mustafanos does not allege any independent actions taken by AFI or its non-debtor subsidiaries.[9]  Such claims fall squarely within the Plan's Third Party Release, which releases AFI from claims "arising from or related in any way to the Debtors."  (Plan Art. IX.D.)

Consequently, Mustafanos is bound by the Third Party Release and is therefore "permanently enjoin[ed] and preclude[ed]" from continuing his lawsuit against AFI.  (*See* Plan Art. IX.I (enjoining all entities who hold "Claims . . . from:  (a) commencing or continuing in any manner or action or other proceeding of any kind against any Released Party whether directly, derivatively or otherwise, on account of or in connection with or with respect to any Released Claims; . . . [and] (e) commencing or continuing in any manner or action or other proceeding of any kind against any Released Party on account of or in connection with or with respect to any Released Claims").)

After Mustafanos filed the Amended Counterclaim, AFI's counsel served him with copies of the Plan and Confirmation Order, as well as letters explaining the Plan's Third Party

---

[9]    At the hearing on April 10, 2014, Mustafanos alleged that AFI had "confessed" to acting in collusion with its subsidiaries, apparently including GMACM, as well as to fraud and racketeering, in July 2012.  As the Court explained on the record, to the extent Mustafanos is basing his action against AFI on these allegations, he is mistaken in his interpretation of the agreement AFI signed at the conclusion of the Attorney General's investigation.  *See* Apr. 10, 2014 Tr. 27:8–21.  However, it is not necessary for the Court to consider the merits of these allegations to resolve the Motion or AFI's request for relief.

18

EXHIBIT B

Release and Injunction.  Mustafanos has failed to dismiss his counterclaims against AFI.
Instead, he filed the current Motion.  Mustafanos is bound by the Third Party Release since he is
a "holder[] of [a] Claim[] . . . arising from or related in any way to the Debtors."

The Court hereby **ORDERS** Mustafanos to dismiss his claims against AFI with prejudice
no later than fourteen (14) days from the date of this Order.  If Mustafanos fails to do so, AFI
may file a motion seeking to hold Mustafanos in contempt.

### III.    CONCLUSION

For the foregoing reasons, the Court **DENIES** the Motion to lift the stay, and **ENJOINS**
Mustafanos from pursuing claims in the State Court against GMACM and ResCap.
Additionally, Mustafanos is **ENJOINED** from prosecuting his claims against AFI.  The Court
also **ORDERS** that Mustafanos shall dismiss his claims in the State Court against AFI with
prejudice no later than fourteen (14) days from the date of this Order.  As noted above, the
Court's ruling does not affect the defenses to foreclosure or claims against other parties that
Mustafanos may be permitted to assert; such issues are controlled by state law.

**IT IS SO ORDERED.**

Dated:  April 21, 2014
       New York, New York

                              *Martin Glenn*
                              MARTIN GLENN
                       United States Bankruptcy Judge

19

EXHIBIT B

## __Exhibit 6__

**Process Server's Affidavit of Service**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

## AFFIDAVIT OF SERVICE

Came to my hand on **Thursday, July 17, 2014 at 7:25 PM**,
Executed at: **5000 K AVENUE, APT.# 3938, PLANO, TX 75074**
within the county of **COLLIN** at **9:15 PM**, on **Thursday, July 17, 2014**,
by delivering to the within named:

**AMINAH MOMIN**

**By delivering to JAHANUR SUBEDAR,**

a true copy of this

**COVER LETTER and ORDER GRANTING ALLY FINANCIAL INC'S MOTION FOR AN ORDER ENFORCING THE CHAPTER 11 PLAN INJUNCTION and MEMORANDUM OPINION AND ORDER DENYING MOTION TO LIFT THE AUTOMATIC STAY AND ENFORCING RELEASE OF CLAIMS AGAINST ALLY FINANCIAL INC.**

having first endorsed thereon the date of the delivery.

**BEFORE ME,** the undersigned authority, on this day personally appeared **Ernesto M. Herrera** who after being duly sworn on oath states: "My name is **Ernesto M. Herrera**. I am a person over eighteen (18) years of age and I am competent to make this affidavit. I am a resident of the State of Texas. I have personal knowledge of the facts and statements contained in this affidavit and aver that each is true and correct. I am not a party to this suit nor related or affiliated with any herein, and have no interest in the outcome of the suit. I have never been convicted of a felony or of a misdemeanor involving moral turpitude. I am familiar with the Texas Rules of Civil Procedure, and the Texas Practice and Remedies Codes as they apply to service of process. I am approved by the Supreme Court of Texas, Misc. Docket No. 05-9122 under Rule 103 and 501.2 of the TRCP to deliver citations and other notices from any District, County and Justice Courts in and for the State of Texas."

                                          **Ernesto M. Herrera**

Of:   **Dallas County**

By:

Authorized Person - SCH4418 - Exp 11/30/14

Subscribed and Sworn to by Ernesto M. Herrera, Before Me, the undersigned authority, on this
_21_ day of July, 2014.



GREG BENEFIELD
Notary Public
STATE OF TEXAS
My Comm. Exp. 12/27/2017

**Notary Public in and for the State of Texas**

UNITED STATES BANKRUPTCY COURT
__SOUTHERN DISTRICT OF NEW YORK__

|  |  |
|---|---|
| | ) |
| | ) |
| In re: | )   Case No. 12-12020 (MG) |
| | ) |
| RESIDENTIAL CAPITAL, LLC, et al., | )   Chapter 11 |
| | ) |
| Debtors. | )   Jointly Administered |

## AFFIDAVIT OF SERVICE

Came to my hand on **Thursday, July 17, 2014 at 7:25 PM,**
Executed at: **5000 K AVENUE, APT.# 3938, PLANO, TX 75074**
within the county of **COLLIN** at **9:15 PM, on Thursday, July 17, 2014,**
by individually and personally delivering to the within named:

### JAHANUR SUBEDAR

a true copy of this

**COVER LETTER and ORDER GRANTING ALLY FINANCIAL INC'S MOTION FOR AN
ORDER ENFORCING THE CHAPTER 11 PLAN INJUNCTION and MEMORANDUM
OPINION AND ORDER DENYING MOTION TO LIFT THE AUTOMATIC STAY AND
ENFORCING RELEASE OF CLAIMS AGAINST ALLY FINANCIAL INC.**

having first endorsed thereon the date of the delivery.

**BEFORE ME,** the undersigned authority, on this day personally appeared **Ernesto M. Herrera** who after being duly sworn on oath states: "My name is **Ernesto M. Herrera**. I am a person over eighteen (18) years of age and I am competent to make this affidavit. I am a resident of the State of Texas. I have personal knowledge of the facts and statements contained in this affidavit and aver that each is true and correct. I am not a party to this suit nor related or affiliated with any herein, and have no interest in the outcome of the suit. I have never been convicted of a felony or of a misdemeanor involving moral turpitude. I am familiar with the Texas Rules of Civil Procedure, and the Texas Practice and Remedies Codes as they apply to service of process. I am approved by the Supreme Court of Texas, Misc. Docket No. 05-9122 under Rule 103 and 501.2 of the TRCP to deliver citations and other notices from any District, County and Justice Courts in and for the State of Texas."

**Ernesto M. Herrera**

Of:   **Dallas County**

By:   _Ernesto M. Herrera_

Authorized Person - SCH4418 - Exp 11/30/14

**Subscribed and Sworn to by Ernesto M. Herrera, Before Me, the undersigned authority, on this
_21_ day of July, 2014.**



Notary Public in and for the State of Texas

GREG BENEFIELD
Notary Public
STATE OF TEXAS
My Comm. Exp. 12/27/2017