Michael E. Boyd
5439 Soquel Drive
Soquel, CA 95073
Phone: (408) 891-9677
E-mail: michaelboyd@sbcglobal.net
*In Pro Per*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

## OBJECTIONS AND OPPOSITION OF MICHAEL BOYD SECURED CLAIMANT # 960 TO RESCAP BORROWER CLAIMS TRUST'S MOTION TO EXTEND THE DATE BY WHICH OBJECTIONS TO CLAIMS MUST BE FILED

### INTRODUCTION

On behalf of and as Trustee to my living trust estate, the Michael Boyd and Patricia Paramoure Living Trust, Michael Boyd, respectfully objects to the ResCap Liquidating Trust July 25, 2014 *Motion to Extend the Date by which Objections to Claims Must be Filed* (the "Motion"). Claimant objects to and opposes the Motion because "12. Pursuant to Article I.A.54 of the Plan, the term 'Claims Objection Deadline' is defined, as '(i) two hundred seventy (270) days following the Effective Date or (ii) such other later date the Bankruptcy Court may establish upon a motion by the Liquidating Trust, which motion may be approved without a hearing and without notice to any party.' As the Effective Date of the Plan occurred on December 17, 2013, the Claims Objection Deadline is currently Monday, September 15, 2014. ... 13. By this Motion, the Liquidating Trust seeks an extension of the Claims Objection Deadline of approximately nine months, through and including June 15, 2015." [Motion page 5]

### Statement of Facts

I am not an Attorney, but a Borrower, with pending litigation challenging two of GMAC's no-note Debtor claims against me. GMAC's unlawful acts caused me to file Chapter 13 Bankruptcy in December 2011, prior to ResCap [AKA GMAC LLC] filing Chapter 11 Bankruptcy. So my

claims against GMAC LLC are pre-petition for bankruptcy by GMAC LLC. My claim number is 960 and was for $186,000 at the time it was filed. [1] The amount that I alleged to be defrauded of has increased substantially over that original amount, under my Court approved Bankruptcy Plan. [See Exhibit 1, Court Document 7146.] I seek the court to return my estate to my living trust and the refund of my payments to GMAC LLC, their successor servicer Ocwen LLC, and a refund of funds paid to my bankruptcy Trustee, due to GMAC LLC's scienter [2] to defraud me of my estate and my money. I am not aware of any other claimant borrower with similar circumstances to my own [with two of GMAC's no-note Debtor claims] with additional unique circumstances as I describe in my claim.

On June 20, 2014 Claimant filed with the Court Document 7146, Objection to Motion /Objection and Opposition To Motion (related document(s)7036) filed by The Michael Boyd and Patricia Paramoure Living Trust, ("objection"). Claimant asks the Court that this Document 7146 including the pleadings and Exhibits 1 through 3 be incorporated by reference as if fully set forth herein.

On October 29, 2012 Claimant filed his appeal before the U.S. Court of Appeals for the 9th Circuit in Case# 12-17434 *Michael Boyd v. GMAC Mortgage LLC, et al.*[See attached Exhibit 4 herein.]

Claimant's appeal arose out of his October 11, 2011 "Complaint of Unconscionability Contract Adhesion and Quiet Title to Real Property (Summons Issued); jury demand; *Michael Boyd v. GMAC Mortgage LLC, et al.* in the U.S. District Court California Northern District (San Jose) Case #: 5:11-cv-05018-PSG, before Magistrate Judge Paul Singh Grewal, Cause: 15:1601, Truth in Lending [See attached Civil Docket Log for this case: Exhibit 5 herein.]

### Objections, Opposition, and Arguments

As claimant pointed out at page 8 line 24 of his June 20 objections the Petitioner is "74% owned by taxpayers" which is    relevant to the separation of powers, the political doctrine of

---

[1] See http://www.kccllc.net/rescap/creditor/search using that claim number 960 and my claim's link is as follows: http://www.kccllc.net/rescap/document/121203212082415061200 2131

[2] Scienter--Scienter is a legal term that refers to intent or knowledge of wrongdoing. This means that an offending party has knowledge of the "wrongness" of an act or event prior to committing it.

OBJECTIONS II AND OPPOSITION OF MICHAEL BOYD
SECURED CLAIMANT#960

constitutional law under which the three branches of government (executive, legislative, and judicial) are kept separate to prevent abuse of power. Also known as the system of checks and balances, each branch is given certain powers so as to check and balance the other branches.

Under this doctrine Judicial Review is the idea, fundamental to the US system of government that the actions of the executive and legislative branches of government are subject to review and possible invalidation by the judicial branch. Judicial review allows the Supreme Court to take an active role in ensuring that the other branches of government abide by the constitution. Judicial review was established in the classic case of *Marbury v. Madison*, 5 US 137 (1803).

A court's authority [including this one's] is to examine an executive or legislative act and to invalidate that act if it is contrary to constitutional principles. The power of courts of law to review the actions of the executive and legislative branches is fundamental to judicial review. Though judicial review is usually associated with the U.S. Supreme Court, which has ultimate judicial authority, it is a power possessed by most federal and state courts of law in the United States. In the United States, the supremacy of national law is established by Article VI, Clause 2, of the U.S. Constitution. Called the Supremacy Clause, it states that "This Constitution, and the laws of the United States which shall be made in pursuance thereof ... shall be the supreme law of the land."

As Claimant stated in his June 20, 2014 (objection) starting at page 2 line 26 "The opinions of market participants reflected in market prices are subjective and hearsay, but market participants' pursuit of gains and risk of loss may make their collective assessment more reliable than that of rating agencies or solvency opinion-givers pursuing fees from deal-party clients." In the Motion before the Court is presented the Declaration of Deanna Horst, the Chief Claims Officer for the ResCap Liquidating Trust who previously served as Chief Claims Officer for Residential Capital, LLC and its affiliates ("ResCap"), a limited liability company organized under the laws of the State of Delaware and the parent of the other post-effective date debtors in the above-captioned Chapter 11 Case (collectively, the "Debtors"). Deanna Horst is clearly a market participant who's so-called Declaration amounts to hearsay, on which basis Claimant Objects to the Motion's fundamental basis.

1  Irrespective to this fact the Declaration itself is false, due to the fact it presume Deanna Horst is
2  qualified to testify regarding Claimant's objection where it state [Doc 7306 Page 17] "2. Except as
3  otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge
4  of the Debtors' operations and finances, information learned from my review of relevant
5  documents and information I have received through my discussions with other members of the
6  Debtors' management or other employees of the Debtors, the Debtors' professionals and
7  consultants, and/or Kurtzman Carson Consultants LLC ("KCC"), the Debtors' notice and claims
8  agent. If I were called upon to testify, I could and would testify competently to the facts set forth
9  in the Objection on that basis." I object to the Motion and Declaration therefore.

10

11  The U.S. Supreme Court on June 9, 2014 in *Executive Benefits Insurance Agency v. Arkinsb*573
12  U. S. ____ (2014), limited somewhat the ramifications of its landmark opinion two years ago in
13  *Stern v. Marshall,* 564 U. S. ___ (2011). The Court in *Executive Benefits* could have thrown the
14  entire federal bankruptcy court system into disarray by advancing *Stern's* hard line view on the
15  limited powers of Article I bankruptcy judges. Instead, it issued a simple and pragmatic decision
16  that will have only minimal impact.

17

18  In *Stern,* the Supreme Court surprised many observers by re-opening separation of powers issues
19  that most bankruptcy practitioners thought had been long settled. Although the Court's opinion in
20  *Stern* purported to be limited, its analysis in that case made clear that the jurisdictional construct
21  of the Bankruptcy Act of 1984 was constitutionally suspect. Some observers believed that the
22  Court might use *Executive Benefits* to issue a decision similar in scope to its sweeping 1982
23  ruling in *Northern Pipeline Construction v. Marathon Pipe Line* 458 U. S. 50, 53 (1982)
24  (plurality opinion) which struck down on separation of powers grounds the original grant of
25  jurisdictional authority to bankruptcy courts. However, in *Executive Benefits,* the Court, in a
26  unanimous opinion handed down by Justice Thomas, seemed intent on keeping the effect of *Stern*
27  as narrow as possible.

28

29  The current structure of the federal bankruptcy courts dates back to the last complete overhaul of
30  federal bankruptcy law in 1978. At that time, Congress created the bankruptcy courts pursuant to
31  its authority under Article I of the Constitution to establish uniform laws on bankruptcy. But in
32

- 4 -

OBJECTIONS II AND OPPOSITION OF MICHAEL BOYD
SECURED CLAIMANT#960

1 | *Northern Pipeline Construction* the Court held that the exercise of federal judicial power could
2 | only be undertaken by judges appointed under Article III of the Constitution, noting that the
3 | exceptions to that rule were territorial courts, military tribunals, and cases involving "public"
4 | rights. As claimant pointed out at page 8 line 24 of his June 20 objections the Petitioner is "74%
5 | owned by taxpayers"; which is relevant to the separation of powers and therefore provides
6 | evidence to support the bankruptcy courts jurisdiction over this as a case involving "public"
7 | rights. Inapposite *Northern Pipeline* involved a common law breach of contract dispute
8 | commenced by a company that happened to be in bankruptcy [similar to Claimant]. However,
9 | although it struck down the ability of a non-Article III bankruptcy court judge to make a final
10 | determination in an action that clearly pertained to a "private" state common law right, the Court
11 | strongly suggested that the system of Article I bankruptcy courts was itself permissible, stating
12 | that "the restructuring of debtor-creditor relations, which is at the core of federal bankruptcy
13 | power," in likelihood constituted the type of "public" rights which could be heard and decided by
14 | an Article I judge.

16 | The question of what constitutes a "public" right has never been clear. Some earlier cases had
17 | suggested that the scope of a "public" right was fairly narrow, involving only rights between
18 | individuals and the government. Other cases suggested broader parameters. Although the Court in
19 | *Northern Pipeline* did not expressly state that "the restructuring of debtor-creditor relations"
20 | under federal bankruptcy law actually constituted a "public" right, Congress accepted the Court's
21 | evident suggestion and in 1984 granted new jurisdictional authority to the United States
22 | Bankruptcy Courts. Under Section 157[4](b) of the Bankruptcy Act of 1984, bankruptcy court

---

[3] See http://www.supremecourt.gov/opinions/13pdf/12-1200_2035.pdf
[4] U.S. Code Title 28 Part I Chapter 6 § 157, 28 U.S. Code § 157 - Procedures
(a) Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.
(b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.
(2) Core proceedings include, but are not limited to—
(A) matters concerning the administration of the estate;
(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;
(C) counterclaims by the estate against persons filing claims against the estate;
(D) orders in respect to obtaining credit;
(E) orders to turn over property of the estate;

OBJECTIONS II AND OPPOSITION OF MICHAEL BOYD
SECURED CLAIMANT#960

judges became authorized to render final decisions in "core" matters under the Bankruptcy Code. Section 157(c) directed bankruptcy court judges to hear and submit findings of fact and conclusions of law to Article III district court judges with respect to "non-core" matters.

Even though the Court never ruled on the constitutionality of the "core" and "non-core" bankruptcy jurisdictional construct, in other cases involving Article I tribunals the Court took an expansive view of the "public" rights doctrine, one that certainly appeared to be broad enough to encompass the list of "core" matters enumerated in the Bankruptcy Act of 1984. The separation of powers issues raised by *Northern Pipeline* appeared to have been laid to rest. Therefore, the Court's ruling in *Stern*, that a matter could be a "core" matter under Section 157(b) but also not

(F) proceedings to determine, avoid, or recover preferences;

(G) motions to terminate, annul, or modify the automatic stay;

(H) proceedings to determine, avoid, or recover fraudulent conveyances;

(I) determinations as to the dischargeability of particular debts;

(J) objections to discharges;

(K) determinations of the validity, extent, or priority of liens;

(L) confirmations of plans;

(M) orders approving the use or lease of property, including the use of cash collateral;

(N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate;

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims; and

(P) recognition of foreign proceedings and other matters under chapter 15 of title 11.

(3) The bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11. A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.

(4) Non-core proceedings under section 157 (b)(2)(B) of title 28, United States Code, shall not be subject to the mandatory abstention provisions of section 1334 (c)(2).

(5) The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.

(c) (1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

(2) Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title.

(d) The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

(e) If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties.

OBJECTIONS II AND OPPOSITION OF MICHAEL BOYD
SECURED CLAIMANT#960

1  be a "public" right and thus not subject to final adjudication by an Article I bankruptcy court
2  judge, was completely unexpected. *Executive Benefits* raised the possibility that the Court would
3  go further by striking down the constitutionality of the "core" and "non-core" construct, and by
4  strictly circumscribing the power of Article I bankruptcy judges.

5

6  The dispute in *Executive Benefit* involved a fraudulent transfer lawsuit. Although such an action
7  is listed as a "core" matter under the Bankruptcy Act of 1984, the Ninth Circuit determined (and
8  the Court assumed for purposes of the opinion) that it does not fit within the parameters of a
9  "public" right under *Stern* and could not be adjudicated by a non-Article III judge. However, the
10  Ninth Circuit also held that the bankruptcy court could prepare recommendations for review by
11  the district court even though Section 157(b) of the Bankruptcy Act of 1984 does not explicitly
12  authorize bankruptcy judges to submit proposed findings and conclusions in a "core" proceeding
13  (as Section 157(c) does for "non-core" proceedings). It also held that the right to have a matter
14  heard by an Article III judge was an individual right that could be waived, and that the defendant
15  had implicitly consented to bankruptcy court jurisdiction.

16

17  Justice Thomas in *Executive Benefits* noted the "gap" created by what he referred to as "Stern"
18  claims, i.e., matters listed as "core" under Section 157(b) but outside the scope of "public" rights
19  and therefore not applicable to Claimant's claims herein. He also noted that, with respect to such
20  Stern claims, the statute did not provide any direct authority for bankruptcy court judges to issue
21  findings of fact and conclusions of law for review by an Article III district court judge. He had
22  little difficulty, however, in finding that a severability provision in the statute (i.e., a provision
23  that ensures the viability of the statute even if a portion of it is invalidated) "closes the so-called
24  'gap' created by Stern claims." In other words, the Court avoided what could have been a huge
25  logistical mess by stating that bankruptcy courts should simply deal with Stern claims under
26  Section 157(c) as they would with "non-core" claims.

27

28  Moreover, because the dispute in *Executive Benefits* was subsequently reviewed by an Article III
29  district court judge, the Court ruled that there was no need to address the separate constitutional
30  question of whether the right to have a matter heard by an Article III judge was an individual
31  right that could be waived.

32

OBJECTIONS II AND OPPOSITION OF MICHAEL BOYD
SECURED CLAIMANT#960

In Claimant's Case #: 5:11-cv-05018-PSG *Michael Boyd v. GMAC Mortgage LLC, et al*he was before <u>Magistrate</u> Judge Paul Singh Grewal, Cause: 15:1601, Truth in Lending. So Claimant remains confused over who has the ball here[5] in this case, the Article I <u>Magistrate</u> Judge Paul Singh Grewal, Case #: 5:11-cv-05018-PSG *Michael Boyd v. GMAC Mortgage LLC, et al*, the Article I Judge Martin Glenn, U.S. Bankruptcy Court Southern District of New York (Manhattan), Bankruptcy Petition #: 12-12020-mg, or the Article III judges at the U.S. Court of Appeals for the 9th Circuit, Case # 12-17434, *Michael Boyd v. GMAC Mortgage LLC, et al.*

Even a narrow ruling for the petitioner in *Executive Benefits* – that bankruptcy courts lack statutory authority to issue findings of fact and conclusions of law for review by an Article III district court judge with respect to "core" matters that fall beyond the scope of "public" rights that Article I judges may permissibly determine – could have wreaked havoc on the bankruptcy courts and placed huge burdens on district court judges. Such a ruling also would have raised questions about the wide-spread use of federal <u>magistrates</u>[6] (who are also Article I judges) to hear and determine a wide array of criminal and civil matters.

The Court obviously left key questions unanswered. It did not address the scope of what constitute "public" rights, the extent to which they dovetail with the list of "core" matters set forth in Section 157(b) of the Bankruptcy Act of 1984, and whether the right to have a matter heard by an Article III judge is an individual right that can be waived. The Court's ruling in *Stern* makes it inevitable that, at some point, each of these issues will need to be directly confronted.

The "Public Rights" Distinction.—A major delineation of the distinction between Article I courts and Article III courts was attempted in *Murray's Lessee v. Hoboken Land & Improvement Cô.* In this case was challenged a summary procedure, without benefit of the courts, for the collection by the United States of moneys claimed to be due from one of its customs collectors. It was objected that the assessment and collection was a judicial act carried out by nonjudicial officers and thus invalid under Article III. Accepting that the acts complained of were judicial, the Court nonetheless sustained the act by distinguishing between any act, "which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty," which, in other words, is

---

[5] Another words, is Judicial Review under the Supremacy Clause limited to Article III judges only?

[6] Same question here as in footnote 5.

OBJECTIONS II AND OPPOSITION OF MICHAEL BOYD
SECURED CLAIMANT#960

inherently judicial, and other acts which Congress may vest in courts or in other agencies. "[T]here are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper."[8] The distinction was between those acts which historically had been determined by courts and those which historically had been resolved by executive or legislative acts and comprehended those matters that arose between the government and others. Thus, Article I courts "may be created as special tribunals to examine and determine various matters, arising between the government and others, which from their nature do not require judicial determination and yet are susceptible of it. The mode of determining matters of this class is completely within congressional control."[9]

Among the matters susceptible of judicial determination, but not requiring it, are claims against the United States,[10] the disposal of public lands and claims arising therefrom,[11] questions concerning membership in the Indian tribes,[12] and questions arising out of the administration of the customs and internal revenue laws.[13] Other courts similar to territorial courts, such as consular courts and military courts martial, may be justified on like grounds.[14]

The "public rights" distinction appears today to be a description without a significant distinction. Thus, in *Crowell v. Benson*,[15] the Court approved an administrative scheme for determination, subject to judicial review, of maritime employee compensation claims, although it acknowledged that the case involved "one of private right, that is, of the liability of one individual to another

---

[7] 18 How. (59 U.S.) 272 (1856).

[8] *Id.*, 284.

[9] *Ex parte Bakelite Corp.*, 279 U.S. 438, 451 (1929).

[10] *Gordon v. United States*, 117 U.S. 697 (1864); *McElrath v. United States*, 102 U.S. 426 (1880); *Williams v. United States*, 289 U.S. 553 (1933). On the status of the then–existing Court of Claims, see *Glidden Co. v. Zdanok*, 370 U.S. 530 (1962).

[11] *United States v. Coe*, 155 U.S. 76 (1894) (Court of Private Land Claims).

[12] *Wallace v. Adams*, 204 U.S. 415 (1907); *Stephens v. Cherokee Nation*, 174 U.S. 445 (1899) (Choctaw and Chickasaw Citizenship Court).

[13] *Old Colony Trust Co. v. CIR*, 279 U.S. 716 (1929); Ex Parte Bakelite Corp., 279 U.S. 438 (1929).

[14] See *In re Ross*, 140 U.S. 453 (1891) (consular courts in foreign countries). Military courts may, on the other hand, be a separate entity of the military having no connection to Article III. *Dynes v. Hoover*, 20 How. (61 U.S.) 65, 79 (1857).

[15] 285 U.S. 22 (1932).

- 9 -

1  under the law as defined."[16] This scheme was permissible, the Court said, because in cases

2  arising out of congressional statutes, an administrative tribunal could make findings of fact and

3  render an initial decision of legal and constitutional questions, as long as there is adequate review

4  in a constitutional court.[17] The "essential attributes" of decision must remain in an Article III

5  court, but so long as it does, Congress may utilize administrative decisionmakers in those private

6  rights cases that arise in the context of a comprehensive federal statutory scheme.[18] That the

7  "public rights" distinction marked a dividing line between those matters that could be assigned to

8  legislative courts and to administrative agencies and those matters "of private right" that could

9  not be was reasserted in *Marathon*, but there was much the Court plurality did not explain.[19]

11  The Court continued to waiver with respect to the importance to decision–making of the public

12  rights/private rights distinction. In two cases following *Marathon*, it rejected the distinction as "a

13  bright line test," and instead focused on "substance"—i.e., on the extent to which the particular

14  grant of jurisdiction to an Article I court threatened judicial integrity and separation of powers

15  principles.[20] Nonetheless, the Court indicated that the distinction may be an appropriate starting

16  point for analysis. Thus, the fact that private rights traditionally at the core of Article III

17  jurisdiction are at stake leads the Court to "searching" inquiry as to whether Congress is

18  encroaching inordinately on judicial functions, while the concern is not so great where "public"

19  rights are involved.[21]

---

[16] *Id.* 51. On the constitutional problems of assignment to an administrative agency, see *Atlas Roofing Co. v. OSHRC*, 430 U.S. 442 (1977); *NLRB v. Jones & Laughlin Steel Corp* 301 U.S. 1, 48 (1937).285 U.S. 22 (1932).
[17] *Id.*, 51–65.
[18] *Id.*, 50, 51, 58–63. Thus, Article III concerns were satisfied by a review of the agency fact finding upon the administrative record. Id., 63–65. The plurality opinion denied the validity of this approach in N*orthern Pipeline Constr. Co. v. Marathon Pipe Line Co*, 458 U.S. 50, 86 n. 39 (1982), although Justice white in dissent accepted it. *Id.*, 115. The plurality, rather, rationalized *Crowell* and subsequent cases on an analysis seeking to ascertain whether agencies or Article I tribunals were "adjuncts" of Article III courts, that is, whether Article III courts were sufficiently in charge to protect constitutional values. Id., 76–87.
[19] *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co*.458 U.S. 50, 67–70 (1982) (plurality opinion). Thus, Justice Brennan states that at a minimum a matter of public right must arise "'between the government and others'" but that the presence of the United States as a proper party to the proceeding is a necessary but not sufficient means to distinguish "private rights." Id., 69 & n. 23. *Crowell v. Benson*, however, remained an embarrassing presence.
[20] *Thomas v. Union Carbide Agric. Products Co*, 473 U.S. 568 (1985); *CFTC v. Schor*, 478 U.S. 833 (1986). The cases also abandoned the principle that the Federal Government must be a party for the case to fall into the "public rights" category. Thomas, supra, 586; and see id., 596–599 (Justice Brennan concurring).
[21] "In essence, the public rights doctrine reflects simply a pragmatic understanding that when Congress selects a quasi–judicial method of resolving matters that 'could be conclusively determined by the Executive and Legislative Branches,' the danger of encroaching on the judicial powers is reduced." *Thomas v. Union Carbide Agric. Products Co.*, 473 U.S. 568, 589 (1985) (quoting *Northern Pipeline, supra*,458 U.S., 68 (plurality opinion)).

- 10 -

However, in a subsequent case, the distinction was pronounced determinative not only of the issue whether a matter could be referred to a non–Article III tribunal but whether Congress could dispense with civil jury trials.[22] In so doing, however, the Court vitiated much of the core content of "private" rights as a concept and left resolution of the central issue to a balancing test. That is, "public" rights are, strictly speaking, those in which the cause of action inheres in or lies against the Federal Government in its sovereign capacity, the understanding since *Murray's Lessee*. However, to accommodate *Crowell v. Benson*, *Atlas Roofing* and similar cases, seemingly private causes of action between private parties will also be deemed "public" rights, when Congress, acting for a valid legislative purpose pursuant to its Article I powers, fashions a cause of action that is analogous to a common–law claim and so closely integrates it into a public regulatory scheme that it becomes a matter appropriate for agency resolution with limited involvement by the Article III judiciary.[23] Nonetheless, despite its fixing by Congress as a "core proceeding" suitable for an Article I bankruptcy court adjudication, the Court held the particular cause of action at issue was a private issue as to which the parties were entitled to a civil jury trial (and necessarily which Congress could not commit to an Article I tribunal, save perhaps through the consent of the parties).[24]

### Requests for Relief

Claimant requests the Court grant the relief requested in the objections he filed on June 20, 2014 with this Court; to make findings to use the identified Market Prices, instead of the Motion's so-called experts, to determine the *Order Estimating Claims and Establishing Disputed Claims Reserve*, benchmarking the DCR to "$12.7 billion" until completion of such analysis; with the completed analysis performed as identified in the article *Leveraged Buyout Bankruptcies, the*

---

[22] *Granfinanciera, S.A. v. Nordberg* 492 U.S. 33, 51–55 (1989). A seventh Amendment jury–trial case, the decision is critical to the Article III issue as well, because, as the Court makes clear what was implicit before, whether Congress can submit a legal issue to an Article I tribunal and whether it can dispense with a civil jury on that legal issue must be answered by the same analysis. *Id.*, 52–53.

[23] *Id.*, 52–54. The Court reiterated that the Government need not be a party as a prerequisite to a matter being of "public right." *Id.*, 54. Concurring, Justice Scalia argued that public rights historically were and should remain only those matters to which the Federal Government is a party. *Id*, 65.

[24] *Id.*, 55–64. The Court reserved the question whether, a jury trial being required, a non–Article III bankruptcy judge could oversee such a jury trial. *Id.*, 64. That question remains unresolved, both as a matter, first, of whether there is statutory authorization for bankruptcy judges to conduct jury trials, and, second, if there is, whether they may constitutionally do so. E.g., *In re Ben Cooper, Inc*, 896 F.2d 1394 (2d Cir. 1990), cert. granted, 497 U.S. 1023, vacated and remanded for consideration of a jurisdictional issue, 498 U.S. 964 (1990), reinstated, 924 F.2d 36 (2d Cir.), cert. den., 500 U.S. 928 (1991); *In re Grabill Corp.*, 967 F.2d 1152 (7th Cir. 1991), pet. for reh. en banc den., 976 F.2d 1126 (7th Cir. 1992).

1  ***Problem of Hindsight Bias, and the Credit Default Swap Solution*** by Michael Simkovic &
2  Benjamin Kaminetzky, incorporated by reference herein.

4  In the purported Declaration of Deanna Horst, it state's [Doc 7306 Page 18] "5. To date, 7,470
5  unsecured, secured, priority, and administrative proofs of claim (collectively, the "Claims") have
6  been filed in these cases, including late filed claims, with asserted liabilities in excess of $110.0
7  billion, plus unliquidated amounts." Complainant identified at page 11 line 9 of his June 20
8  objection "Commit Insurance FRAUD:  Over-insure the securities' values by 30x". Taking the
9  $110.0 billion at face value; the expected payouts to the Petitioners on their own CDS insurance
10 would have been 30x that amount, or $3.3 trillion. Therefore I respectfully request the
11 incorporation of Exhibit 6, the Bank for International Settlements, May 2014 report ***Statistical***
12 ***release OTC derivatives statistics at end-December 2013, Monetary and Economic Department***

14 According to the Bank's website "About BIS[25] The mission of the Bank for International
15 Settlements (BIS) is to serve central banks in their pursuit of monetary and financial stability, to
16 foster international cooperation in those areas and to act as a bank for central banks.

18 In broad outline, the BIS pursue its mission by:
19 promoting discussion and facilitating collaboration among central banks; supporting dialogue
20 with other authorities that are responsible for promoting financial stability; conducting research
21 on policy issues confronting central banks and financial supervisory authorities; acting as a prime
22 counterparty for central banks in their financial transactions; and serving as an agent or trustee in
23 connection with international financial operations.

25 The head office is in Basel, Switzerland and there are two representative offices: in the Hong
26 Kong Special Administrative Region of the People's Republic of China and in Mexico City.

28 Established on 17 May 1930, the BIS is the world's oldest international financial organisation.

30 As its customers are central banks and international organisations, the BIS does not accept
31 deposits from, or provide financial services to, private individuals or corporate entities."

OBJECTIONS II AND OPPOSITION OF MICHAEL BOYD
SECURED CLAIMANT#960

Exhibit 6, shows the Bank's May 2014 report, *Statistical release OTC derivatives statistics at end-December 2013, Monetary and Economic Department* which states at page 2 "OTC derivatives markets continued to expand in the second half of 2013. The notional amount of outstanding contracts totalled $710 trillion at end-2013, up from $693 trillion at end-June 2013 and $633 trillion at end-2012".

Petitioners voluntarily requested bankruptcy protection under Chapter 11 on May 14, 2012. Claimant therefore requests the Court, pursuant to its authority to do so under 28 U.S. Code § 157, determine the effects of this bankruptcy to effect the reported increase of notional amount of outstanding CDS contracts from $633 trillion at end-2012 to $710 trillion at end-2013 as reported by the Monetary and Economic Department of the Bank for International Settlements. Another words, Claimant is requesting the Court analyze and determine what portion of the increase of $77 trillion notional amount of outstanding contracts is due to Petitioner's bankruptcy filing, and which additional notational value is not?

### Conclusions

Wherefore, for the reasons presented, I respectfully request the court deny the Motion; sustain the objections; and provide the requested relief identified above, to make findings to use the identified Market Prices, instead of the Motion's so-called experts, to determine the *Order Estimating Claims and Establishing Disputed Claims Reserve* benchmarking the DCR to "$12.7 billion" until completion of such analysis; with the completed analysis performed as identified in the article *Leveraged Buyout Bankruptcies, the Problem of Hindsight Bias, and the Credit Default Swap Solution* by Michael Simkovic & Benjamin Kaminetzky, incorporated by reference herein. Also, I respectfully request the incorporation of requested additional Exhibits 4, 5 and 6 attached hereto.

/s/   Michael E. Boyd
Michael E. Boyd
5439 Soquel Drive
Soquel, CA 95073
Phone: (408) 891-9677
E-mail: michaelboyd@sbcglobal.net

DATED: July 31, 2014

---

[25] *See* http://www.bis.org/about/index.htm

- 13 -

RECEIVED
AUG 4 2014
U.S. BANKRUPTCY COURT
SO DIST OF NEW YORK

1 | **Michael E. Boyd**
**5439 Soquel Drive**
2 | **Soquel, CA 95073**
**Phone: (408) 891-9677**
3 | **E-mail: michaelboyd@sbcglobal.net**
*In Pro Per*
4 |

5 | ## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

6 |

7 | In re:                                            Case No. 12-12020 (MG)

8 | RESIDENTIAL CAPITAL, LLC, et al.,                 Chapter 11

Debtors.                                          Jointly Administered

9 |

10 |

11 | ## CERTIFICATE OF SERVICE

12 |     I hereby certify that on July 31, 2014 I electronically transmitted the attached document –

13 | *Exhibit 4* in Objections *to the ResCap Liquidating Trust July 25, 2014 Motion to Extend the Date*

14 | *by which Objections to Claims Must be Filed* separately filed – to the Clerk's Office using the

15 | CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following

16 | CM/ECF registrants:

17 |     (a) counsel to the Debtors, Morrison & Foerster LLP, 1290 Avenue of the Americas, New
18 | York, NY 10104 (Attention: Gary S. Lee, Norman S. Rosenbaum, Jordan A. Wishnew and
Samantha Martin);
19 |     (b) the Office of the United States Trustee for the Southern District of New York, U.S.
20 | Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014 (Attention:
Tracy Hope Davis, Linda A. Riffkin, and Brian S. Masumoto);
21 |     (c) the Office of the United States Attorney General, U.S. Department of Justice, 950
22 | Pennsylvania Avenue NW, Washington, DC 20530-0001 (Attention: US Attorney
General, Eric H. Holder, Jr.); (d) Office of the New York State Attorney General, The
23 | Capitol, Albany, NY 122240341 (Attention: Nancy Lord, Esq. and Enid N. Stuart, Esq.);
24 |     (e) Office of the U.S. Attorney for the Southern District of New York, One St. Andrews
Plaza, New York, NY 10007 (Attention: Joseph N. Cordaro, Esq.);
25 |     (f) counsel for Ally Financial Inc., Kirkland & Ellis LLP, 153 East 53rd Street, New York,
26 | NY 10022 (Attention: Richard M. Cieri and Ray Schrock);
    (g) counsel for the committee of unsecured creditors, Kramer Levin Naftalis & Frankel
27 | LLP, 1177 Avenue of the Americas, New York, NY 10036 (Attention: Kenneth Eckstein,
Douglas Mannal, Stephen D. Zide and Joseph A. Shifer);
28 |     (h) counsel for Ocwen Loan Servicing, LLC, Clifford Chance US LLP, 31 West 52nd
Street, New York, NY 10019 (Attention: Jennifer C. DeMarco and Adam Lesman);

EXHIBIT-4 OBJECTIONS II AND OPPOSITION OF MICHAEL BOYD

1  (i) counsel for Berkshire Hathaway Inc., Munger, Tolles & Olson LLP, 355 South Grand

2  Avenue, Los Angeles, CA 90071 (Attention: Thomas Walper and Seth Goldman);

  (j) Internal Revenue Service, P.O. Box 7346, Philadelphia, PA 19101-7346 (if by

3  overnight mail, to 2970 Market Street, Mail Stop 5-Q30.133, Philadelphia, PA 19104-

4  5016);

  (k) Securities and Exchange Commission, New York Regional Office, 3 World Financial

5  Center, Suite 400, New York, NY 10281-1022 (Attention: George S. Canellos, Regional

  Director); and

6  (l) counsel for Borrowers Claims Trust, Polsinelli, 900 Third Avenue, 21st Floor, New

7  York, NY 10022 (Attention: Daniel J. Flanigan and Jason A. Nagi).

8  I hereby certify that I served the attached document by mail on the following, who are not

9 registered participants of the CM/ECF System: NONE.

10

11          /s/   Michael E. Boyd

12          Michael E. Boyd

           5439 Soquel Drive

13          Soquel, CA 95073

14          Phone: (408) 891-9677

           E-mail: michaelboyd@sbcglobal.net

15

16          DATED: July 31, 2014

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

EXHIBIT-4 OBJECTIONS II AND OPPOSITION OF MICHAEL BOYD

## Case Query

### 12-17434 Michael Boyd v. GMAC Mortgage LLC, et al

| Associated Case | Short Title | Type | Start | End | Status |
|---|---|---|---|---|---|
| 12-16589 | Michael Boyd v. Accuray | Related | 10/31/2012 | | open |

| Originating Case | Lead Case | Filed | Execution Date | Judgment | NOA | Originating Judge | Court Reporter |
|---|---|---|---|---|---|---|---|
| 5:11-cv-05018-PSG | | 10/12/2011 | | 10/01/2012 | 10/29/2012 | | Fisher, Summer A. |

| Party | Party Type | Terminated from Case | Attorney |
|---|---|---|---|
| Boyd, Michael E. | Plaintiff-Appellant | | |
| GMAC Mortgage LLC | Defendant-Appellee | | Schindler,Maria<br>Andrews,Elizabeth Holt |
| Mortgage Electronic Registration Services, Inc. | Defendant-Appellee | | Andrews,Elizabeth Holt<br>Schindler,Maria |

| Attorney | Party Type(s) Represented | Representation End |
|---|---|---|
| Andrews, Elizabeth Holt | Defendant-Appellee | |
| Schindler, Maria | Defendant-Appellee | |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| U.S. Court of Appeals for the 9th Circuit - 07/30/2014 18:16:15 | | |
| PACER Login: | cf0738 | Client Code: | |
| Description: | Case Query | Search Criteria: | 12-17434 |
| Billable Pages: | 1 | Cost: | 0.10 |

**Michael E. Boyd**
**5439 Soquel Drive**
**Soquel, CA 95073**
Phone: (408) 891-9677
E-mail: **michaelboyd@sbcglobal.net**
*In Pro Per*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>RESIDENTIAL CAPITAL, LLC, et al.,<br><br>Debtors. | Case No. 12-12020 (MG)<br><br>Chapter 11<br><br>Jointly Administered |

### CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2014 I electronically transmitted the attached document --

*Exhibit 5* in *Objections to the ResCap Liquidating Trust July 25, 2014 Motion to Extend the Date*

*by which Objections to Claims Must be Filed* separately filed -- to the Clerk's Office using the

CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following

CM/ECF registrants:

(a) counsel to the Debtors, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attention: Gary S. Lee, Norman S. Rosenbaum, Jordan A. Wishnew and Samantha Martin);

(b) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014 (Attention: Tracy Hope Davis, Linda A. Riffkin, and Brian S. Masumoto);

(c) the Office of the United States Attorney General, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-0001 (Attention: US Attorney General, Eric H. Holder, Jr.); (d) Office of the New York State Attorney General, The Capitol, Albany, NY 122240341 (Attention: Nancy Lord, Esq. and Enid N. Stuart, Esq.);

(e) Office of the U.S. Attorney for the Southern District of New York, One St. Andrews Plaza, New York, NY 10007 (Attention: Joseph N. Cordaro, Esq.);

(f) counsel for Ally Financial Inc., Kirkland & Ellis LLP, 153 East 53rd Street, New York, NY 10022 (Attention: Richard M. Cieri and Ray Schrock);

(g) counsel for the committee of unsecured creditors, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036 (Attention: Kenneth Eckstein, Douglas Mannal, Stephen D. Zide and Joseph A. Shifer);

(h) counsel for Ocwen Loan Servicing, LLC, Clifford Chance US LLP, 31 West 52nd Street, New York, NY 10019 (Attention: Jennifer C. DeMarco and Adam Lesman);

EXHIBIT-5 OBJECTIONS II AND OPPOSITION OF MICHAEL BOYD

(i) counsel for Berkshire Hathaway Inc., Munger, Tolles & Olson LLP, 355 South Grand Avenue, Los Angeles, CA 90071 (Attention: Thomas Walper and Seth Goldman);
(j) Internal Revenue Service, P.O. Box 7346, Philadelphia, PA 19101-7346 (if by overnight mail, to 2970 Market Street, Mail Stop 5-Q30.133, Philadelphia, PA 19104-5016);
(k) Securities and Exchange Commission, New York Regional Office, 3 World Financial Center, Suite 400, New York, NY 10281-1022 (Attention: George S. Canellos, Regional Director); and
(l) counsel for Borrowers Claims Trust, Polsinelli, 900 Third Avenue, 21st Floor, New York, NY 10022 (Attention: Daniel J. Flanigan and Jason A. Nagi).

I hereby certify that I served the attached document by mail on the following, who are not registered participants of the CM/ECF System: NONE.

/s/   Michael E. Boyd
Michael E. Boyd
5439 Soquel Drive
Soquel, CA 95073
Phone: (408) 891-9677
E-mail: michaelboyd@sbcglobal.net

DATED: July 31, 2014

EXHIBIT-5 OBJECTIONS II AND OPPOSITION OF MICHAEL BOYD

ADRMOP,APPEAL,CLOSED,E-Filing

# U.S. District Court
## California Northern District (San Jose)
### CIVIL DOCKET FOR CASE #: 5:11-cv-05018-PSG

Boyd v. GMAC Mortgage LLC et al
Assigned to: Magistrate Judge Paul Singh Grewal
Case in other court: US Court of Appeals for the Ninth Circuit, 12-17434
Cause: 15:1601 Truth in Lending

Date Filed: 10/12/2011
Date Terminated: 10/01/2012
Jury Demand: Plaintiff
Nature of Suit: 371 Truth in Lending
Jurisdiction: Federal Question

**Plaintiff**

**Michael E Boyd**

represented by **Maria Schindler**
One Embarcadero Center
Suite 2600
San Francisco, CA 94111
415-398-3344
Fax: 415-956-0439
Email: ms@severson.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**GMAC Mortgage LLC**

represented by **Elizabeth Holt Andrews**
Severson & Werson
A Professional Corporation
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
415-398-3344
Fax: 415-956-0439
Email: eha@severson.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maria Schindler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mortgage Electronic Registration Services, Inc.**

represented by **Elizabeth Holt Andrews**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maria Schindler**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/11/2011 | 1 | COMPLAINT of Unconscionability Contract Adhesion and Quiet Title ot Real Property (Summons Issued);jury demand; against GMAC Mortgage LLC, Mortgage Electronic Registation Services, Inc. ( Filing fee $ 350, receipt number 54611010547). Filed by Michael E Boyd. (Attachments: # 1 Civil Cover Sheet) (bw, COURT STAFF) (Filed on 10/11/2011) (Entered: 10/12/2011) |
| 10/11/2011 | 2 | Lis Pendens and (Proposed) Order by Michael E Boyd. (bw, COURT STAFF) (Filed on 10/11/2011) (Entered: 10/12/2011) |

| 10/11/2011 | 3 | Summons Issued as to GMAC Mortgage LLC, Mortgage Electronic Registation Services, Inc. (bw, COURT STAFF) (Filed on 10/11/2011) (Entered: 10/12/2011) |
| 10/11/2011 | 4 | ADR SCHEDULING ORDER: Case Management Statement due by 11/22/2011. Case Management Conference set for 11/29/2011 02:00 PM in Courtroom 5, 4th Floor, San Jose. (bw, COURT STAFF) (Filed on 10/11/2011) (Entered: 10/12/2011) |
| 10/11/2011 | | CASE DESIGNATED for Electronic Filing. (bw, COURT STAFF) (Filed on 10/11/2011) (Entered: 10/12/2011) |
| 10/21/2011 | 5 | SUMMONS Returned Executed by Michael E Boyd. GMAC Mortgage LLC served on 10/19/2011, answer due 11/9/2011. (gm, COURT STAFF) (Filed on 10/21/2011) (Entered: 10/24/2011) |
| 10/27/2011 | 6 | SUMMONS Returned Executed by Michael E Boyd. Mortgage Electronic Registation Services, Inc. served on 10/20/2011, answer due 11/10/2011. (gm, COURT STAFF) (Filed on 10/27/2011) (Entered: 10/28/2011) |
| 11/08/2011 | 11 | NOTICE of need for ADR Phone Conference (ADR L.R. 3-5 d) (bw, COURT STAFF) (Filed on 11/8/2011) (Entered: 11/09/2011) |
| 11/08/2011 | 12 | ADR Certification by Parties and Counsel (ADR L.R. 3-5 b) of discussion of ADR options (bw, COURT STAFF) (Filed on 11/8/2011) (Entered: 11/09/2011) |
| 11/08/2011 | 13 | Application for an Order to Show Cause Why a Preliminary Injunction Should not be Issued filed by Michael E Boyd. Responses due by 11/22/2011. Replies due by 11/29/2011. (bw, COURT STAFF) (Filed on 11/8/2011) (Entered: 11/09/2011) |
| 11/08/2011 | 14 | Alternative Application for an Order Shortening the Time for a Hearing on Order to Show Cause Why a Preliminary Injunction Should not be Issued or for a Temporary Restraining Order by Michael E Boyd (bw, COURT STAFF) (Filed on 11/8/2011) (Entered: 11/09/2011) |
| 11/08/2011 | 15 | MEMORANDUM to Plaintiff's Applications filed by Michael E Boyd. (bw, COURT STAFF) (Filed on 11/8/2011) (Entered: 11/09/2011) |
| 11/08/2011 | 16 | (Proposed) Order Shortening the Time for a Hearing on Order that Defendant's Show Cause Why a Preliminary Injunction Should not be Issued by Michael E Boyd. (bw, COURT STAFF) (Filed on 11/8/2011) (Entered: 11/09/2011) |
| 11/08/2011 | 17 | (Proposed) Order that Defendants Show Cause Why a Prelliminary Injunction Should not be Issued by Michael E Boyd.(bw, COURT STAFF) (Filed on 11/8/2011) (Entered: 11/09/2011) |
| 11/08/2011 | 18 | (Proposed) Order Granting Motion for a Temporary Restraining Order by Michael E Boyd. (bw, COURT STAFF) (Filed on 11/8/2011) (Entered: 11/09/2011) |
| 11/09/2011 | 7 | Disclosure Statements Pursuant to Federal Rule of Civil Procedure 7.1 and Certificate of Interested Entities or Persons Pursuant to Civil Local Rule 3-16 by GMAC Mortgage LLC, Mortgage Electronic Registation Services, Inc. identifying Corporate Parent MERSCORP, Inc. for Mortgage Electronic Registration Services, Inc.; Corporate Parent Ally Financial Inc. f/k/a GMAC Inc. for GMAC Mortgage LLC. (Attachments: # 1 Certificate/Proof of Service)(Holt, M. Elizabeth) (Filed on 11/9/2011) Modified on 11/10/2011 (bw, COURT STAFF). (Entered: 11/09/2011) |
| 11/09/2011 | 8 | CONSENT to Proceed Before a US Magistrate Judge by GMAC Mortgage LLC, Mortgage Electronic Registration Services, Inc. (Attachments: # 1 Certificate/Proof of Service)(Holt, M. Elizabeth) (Filed on 11/9/2011) Modified on 11/10/2011 (bw, COURT STAFF). (Entered: 11/09/2011) |
| 11/09/2011 | 9 | Notice of Motion and Motion to Dismiss Pursuant to Rule 12(B)(6) or in the Alternative for a More Definite Statement; Memorandum of Points and Authorities filed by GMAC Mortgage LLC, Mortgage Electronic Registation Services, Inc.. Motion Hearing set for 1/3/2012 10:00 AM in Courtroom 5, 4th Floor, San Jose before Magistrate Judge Paul Singh Grewal. Responses due by 11/23/2011. Replies due by 11/30/2011. (Attachments: # 1 (Proposed) Order, # 2 Certificate/Proof of Service) (Holt, M. Elizabeth) (Filed on 11/9/2011) Modified on 11/10/2011 (bw, COURT STAFF). (Entered: 11/09/2011) |
| 11/09/2011 | 10 | Request for Judicial Notice in Support of Motion to Dismiss Pursuant to Rule 12(B)(6) or in the Alternative for a More Definite Statement Pursuant to rule 12(E) re 9 filed by GMAC Mortgage LLC, Mortgage Electronic Registation Services, Inc . (Attachments: # 1Exhs. A to G, # 2 Exhs. H to N, # 3 Certificate/Proof of Service) (Holt, M. Elizabeth) (Filed on 11/9/2011) Modified on 11/9/2011 (feriab, COURT STAFF). (Entered: 11/09/2011) |
| 11/09/2011 | 19 | Opposition to Plaintiff's Motions for Temporary Restraining Order, Preliminary Injunction, and Order Shortening Tim re 13 filed byGMAC Mortgage LLC, Mortgage Electronic Registation Services, Inc. (Attachments: # 1 Certificate/Proof of Service)(Holt, M. Elizabeth) (Filed on 11/9/2011) Modified on 11/14/2011 (bw, COURT STAFF). (Entered: 11/09/2011) |

| 11/09/2011 | 20 | NOTICE of need for ADR Phone Conference (ADR L.R. 3-5 d) re 11 Notice of need of ADR Phone Conference (ADR L.R. 3-5 d) of defendants GMAC Mortgage LLC and Mortgage Electronic Registration Systems, Inc. (Attachments: # 1 Certificate/Proof of Service) re document 11 ) (Holt, M. Elizabeth) (Filed on 11/9/2011) Modified on 11/14/2011 (bw, COURT STAFF). (Entered: 11/09/2011) |
|---|---|---|
| 11/10/2011 | 21 | ORDER re 13 , 14 Notice (Other) filed by Michael E Boyd. Signed by Judge Paul S. Grewal on 11/10/2011. (psglc2, COURT STAFF) (Filed on 11/10/2011) (Additional attachment(s) added on 11/10/2011: # 1 CERTIFICATE OF SERVICE) (ofr, COURT STAFF). (Entered: 11/10/2011) |
| 11/14/2011 | 22 | CONSENT to Proceed Before a US Magistrate Judge by Michael E Boyd. (bw, COURT STAFF) (Filed on 11/14/2011) (Entered: 11/15/2011) |
| 11/15/2011 | 23 | Declaration of Service as to Defendant GMAC MORTGAGE, LLC Served on 11/11/2011 by Michael E Boyd (bw, COURT STAFF) (Filed on 11/15/2011) (bw, COURT STAFF). (Entered: 11/15/2011) |
| 11/15/2011 | | ADR Clerks Notice Setting ADR Phone Conference on 11/28/11 at 9:00 a.m. Pacific time. The court will provide instructions for connecting to the call in a separate notice to the parties. (sgd, COURT STAFF) (Filed on 11/15/2011) (Entered: 11/15/2011) |
| 11/16/2011 | 24 | Reply to Defendant's Response re 19 by Michael E Boyd. (bw, COURT STAFF) (Filed on 11/16/2011) (bw, COURT STAFF). (Entered: 11/16/2011) |
| 11/22/2011 | 25 | Case Management Statement filed by GMAC Mortgage LLC, Mortgage Electronic Registration Services, Inc. (Holt, M. Elizabeth) (Filed on 11/22/2011) Modified on 11/23/2011 (bw, COURT STAFF). (Entered: 11/22/2011) |
| 11/22/2011 | 26 | CERTIFICATE OF SERVICE by GMAC Mortgage LLC, Mortgage Electronic Registration Services, Inc. re 25 Case Management Statement *Certificate of Service* (Holt, M. Elizabeth) (Filed on 11/22/2011) (Entered: 11/22/2011) |
| 11/22/2011 | 27 | Certificate of Service re 22 Consent to Proceed Before a US Magistrate Judge; and 24 Reply to Defendant's Response by Michael E Boyd (bw, COURT STAFF) (Filed on 11/22/2011) (bw, COURT STAFF). Modified on 11/23/2011 (bw, COURT STAFF). (Entered: 11/22/2011) |
| 11/28/2011 | | ADR Remark: ADR Phone Conference held by RWS on 11/28/11. (sgd, COURT STAFF) (Filed on 11/28/2011) (Entered: 11/28/2011) |
| 11/28/2011 | 28 | CASE MANAGEMENT STATEMENT filed by Michael E Boyd. (bw, COURT STAFF) (Filed on 11/28/2011) (Entered: 11/29/2011) |
| 11/29/2011 | 29 | CERTIFICATE OF SERVICE re 28 Case Management Statement by Michael E Boyd (bw, COURT STAFF) (Filed on 11/29/2011) (Entered: 11/29/2011) |
| 11/29/2011 | 30 | Minute Entry: Case Management Conference held on 11/29/2011 before Magistrate Judge Paul S. Grewal (Date Filed: 11/29/2011). Further Case Management Conference set for 1/3/2012 at 10:00 AM in Courtroom 5, 4th Floor, San Jose. (Court Reporter FTR: (2:00 to 2:05.) (ofr, COURT STAFF) (Date Filed: 11/29/2011) (Entered: 11/29/2011) |
| 11/30/2011 | 31 | Reply in Support of Motion to Dismiss re 9 filed by GMAC Mortgage LLC, Mortgage Electronic Registration Services, Inc. (Attachments: # 1 Proof of Service) (Holt, M. Elizabeth) (Filed on 11/30/2011) Modified on 11/30/2011 (bw, COURT STAFF). (Entered: 11/30/2011) |
| 12/05/2011 | 32 | ORDER by Judge Paul S. Grewal granting 9 Motion to Dismiss; denying 13 Motion for Order to Show Cause (psglc2, COURT STAFF) (Filed on 12/5/2011) (Additional attachment(s) added on 12/6/2011: # 1 CERTIFICATE OF SERVICE) (ofr, COURT STAFF). (Entered: 12/05/2011) |
| 12/05/2011 | 33 | NOTICE of Pendency of Other Actions or Proceedings by Michael E Boyd (bw, COURT STAFF) (Filed on 12/5/2011) (bw, COURT STAFF). (Entered: 12/06/2011) |
| 12/05/2011 | 34 | CERTIFICATE OF SERVICE re 33 Notice of Pendency of Other Actions or Proceedings by Michael E Boyd (bw, COURT STAFF) (Filed on 12/5/2011) (bw, COURT STAFF). (Entered: 12/06/2011) |
| 12/06/2011 | 35 | NOTICE of Entry of Order (1) Granting Defendants' Motion to Dismiss; (2) Denying Plaintiff's Application for Preliminary Injunction or Temporary Restraining Order re 32 by GMAC Mortgage LLC, Mortgage Electronic Registration Services, Inc. (Attachments: # 1 Certificate/Proof of Service) (Holt, M. Elizabeth) (Filed on 12/6/2011) Modified on 12/7/2011 (bw, COURT STAFF). (Entered: 12/06/2011) |
| 12/19/2011 | 36 | Notice of Removal of Case to United States Bankruptcy Court for the Northern District of California Case #11-61311 by Michael E Boyd (bw, COURT STAFF) (Filed on 12/19/2011) (bw, COURT STAFF). (Entered: 12/20/2011) |

| Date | No. | Description |
|------|-----|-------------|
| 12/23/2011 | 37 | Request to Appear Telephonically for Case Management Conference Pursuant to Rule of Court 16-10(A) filed by GMAC Mortgage LLC, Mortgage Electronic Registration Services, Inc. (Holt, M. Elizabeth) (Filed on 12/23/2011) Modified on 12/27/2011 (bw, COURT STAFF). (Entered: 12/23/2011) |
| 12/23/2011 | 38 | CERTIFICATE OF SERVICE re 37 Request to Appear Telephonically for Case Management Conference Pursuant to Rule of Court 16-10(A) by GMAC Mortgage LLC, Mortgage Electronic Registration Services, Inc. (Holt, M. Elizabeth) (Filed on 12/23/2011) Modified on 12/27/2011 (bw, COURT STAFF). (Entered: 12/23/2011) |
| 12/29/2011 | 39 | ORDER by Judge Paul S. Grewal, granting 37 Motion to Appear by Telephone (ofr, COURT STAFF) (Filed on 12/29/2011) (Additional attachment(s) added on 12/29/2011: # 1 CERTIFICATE OF SERVICE) (ofr, COURT STAFF). (Entered: 12/29/2011) |
| 12/29/2011 | 40 | CLERKS NOTICE RESETTING TIME ON JANUARY 3, 2012 CASE MANAGEMENT CONFERENCE: 1/3/2012 10:00 a.m. Case Management Conference reset to 2:00 p.m. in Courtroom 5, 4th Floor, San Jose. (ofr, COURT STAFF) (Filed on 12/29/2011) (Additional attachment(s) added on 12/29/2011: # 1 CERTIFICATE OF SERVICE) (ofr, COURT STAFF). (Entered: 12/29/2011) |
| 01/03/2012 | 41 | Minute Entry: Case Management Conference held on 1/3/2012 before Magistrate Judge Paul S. Grewal. (Date Filed: 1/3/2012). Bankruptcy matter hearing set for 1/24/2012 at 02:00 PM in Courtroom 5, 4th Floor, San Jose. (Court Reporter FTR: (2:02 to 2:11.) (ofr, COURT STAFF) (Date Filed: 1/3/2012) (Entered: 01/03/2012) |
| 01/10/2012 | 42 | Opposition to Plaintiff's Petition to Transfer Case to Bankruptcy Court re 41 by GMAC Mortgage LLC, Mortgage Electronic Registration Services, Inc. (Attachments: # 1 Certificate/Proof of Service) (Holt, M. Elizabeth) (Filed on 1/10/2012) Modified on 1/11/2012 (bw, COURT STAFF). (Entered: 01/10/2012) |
| 01/17/2012 | 43 | First Joint Stipulation to Continue Hearing on Plaintiff's Notice of Removal Pursuant to Civil Local Rule 6-2 and (Proposed) Order filed by Michael E Boyd (bw, COURT STAFF) (Filed on 1/17/2012) (Entered: 01/18/2012) |
| 01/17/2012 | 44 | Proof of Service re 43 First Joint Stipulation to Continue Hearing on Plaintiff's Notice of Removal Pursuant to Civil Local Rule 6-2 and (Proposed) Order by Michael E Boyd (bw, COURT STAFF) (Filed on 1/17/2012) (Entered: 01/18/2012) |
| 01/17/2012 | 45 | Answer to Defendants' Opposition to Plaintiff's Petition to Transfer Case to Bankruptcy Court re 42 by Michael E Boyd. (bw, COURT STAFF) (Filed on 1/17/2012) (Entered: 01/18/2012) |
| 01/17/2012 | 46 | Proof of Service re 45 Answer to Defendants' Opposition to Plaintiff's Petition to Transfer Case to Bankruptcy Court by Michael E Boyd (bw, COURT STAFF) (Filed on 1/17/2012) Modified on 1/18/2012 (bw, COURT STAFF). (Entered: 01/18/2012) |
| 01/20/2012 | 47 | ORDER by Judge Paul S. Grewal granting 43 Stipulation (ofr, COURT STAFF) (Filed on 1/20/2012) (Additional attachment(s) added on 1/23/2012: # 1 CERTIFICATE OF SERVICE) (ofr, COURT STAFF). (Entered: 01/23/2012) |
| 01/20/2012 |  | Set/Reset Hearings: 1/24/2012 Bankruptcy matter hearing continued to 1/31/2012 02:00 PM in Courtroom 5, 4th Floor, San Jose. (ofr, COURT STAFF) (Filed on 1/20/2012) (Entered: 01/23/2012) |
| 01/31/2012 | 48 | Minute Entry: Hearing on Plaintiffs Petition to Transfer to Bankruptcy Court held. The Court takes matter under submission; written order after hearing to be issued.(Date Filed: 1/31/2012). (Court Reporter FTR: (2:05 to 2:18.) (ofr, COURT STAFF) (Date Filed: 1/31/2012) (Entered: 01/31/2012) |
| 03/21/2012 | 49 | Statement of Recent Decision Re: Plaintiff's Petition to Transfer Case re 36 by GMAC Mortgage LLC, Mortgage Electronic Registration Services, Inc. (Attachments: # 1 Exhibit Decision, # 2 Certificate/Proof of Service) (Schindler, Maria) (Filed on 3/21/2012) Text modified on 3/21/2012 (bw, COURT STAFF). (Entered: 03/21/2012) |
| 04/24/2012 | 50 | ORDER DENYING PLAINTIFF'S PETITION TO TRANSFER TO BANKRUPTCY COURT. Signed by Judge Paul S. Grewal on April 24, 2012. (psglc1, COURT STAFF) (Filed on 4/24/2012) (Additional attachment(s) added on 4/25/2012: # 1 CERTIFICATE OF SERVICE) (ofr, COURT STAFF). (Entered: 04/24/2012) |
| 04/26/2012 | 51 | CLERK'S NOTICE SETTING CASE MANAGEMENT CONFERENCE: Case Management Conference set for 5/29/2012 at 02:00 PM in Courtroom 5, 4th Floor, San Jose. Case Management Statement due by 5/22/2012. (ofr, COURT STAFF) (Filed on 4/26/2012) (Additional attachment(s) added on 4/26/2012: # 1 CERTIFICATE OF SERVICE) (ofr, COURT STAFF). (Entered: 04/26/2012) |
| 05/22/2012 | 52 | **First Amended** COMPLAINT of Unconscionability Contract Adhesion and Quiet Title ot Real Property against All Defendants. Filed by Michael E Boyd. (bw, COURT STAFF) (Filed on 5/22/2012) (bw, COURT STAFF). (Additional attachment(s) added on 5/23/2012: # 1 Exhibit-A) (bw, COURT STAFF). (Entered: 05/22/2012) |
| 05/22/2012 | 53 | CERTIFICATE OF SERVICE re 52 Amended Complaint by Michael E Boyd (bw, COURT STAFF) (Filed on 5/22/2012) (bw, COURT STAFF). (Entered: 05/22/2012) |

| 05/23/2012 | 54 | Joint Case Management Statement filed by Michael E Boyd, GMAC Mortgage LLC, Mortgage Electronic Registration Services, Inc. (Schindler, Maria) (Filed on 5/23/2012) Modified on 5/23/2012 (bw, COURT STAFF). (Entered: 05/23/2012) |
| 05/29/2012 | 55 | Minute Entry: Further Case Management Conference held on 5/29/2012 before Magistrate Judge Paul S. Grewal (Date Filed: 5/29/2012). (Court Reporter FTR: (2:05 to 2:07.) (ofr, COURT STAFF) (Date Filed: 5/29/2012) (Entered: 05/30/2012) |
| 06/08/2012 | 56 | First Joint Stipulation to Continue Response Date to First amended Complaint Pursuant to Civil Local Rule 6-2 re 52 filed by GMAC Mortgage LLC, Mortgage Electronic Registration Services, Inc. (Attachments: # 1 Signature Page (Declarations/Stipulations), # 2 Certificate/Proof of Service)(Schindler, Maria) (Filed on 6/8/2012) Text modified on 6/8/2012 conforming to posted document caption (bwS, COURT STAFF). (Entered: 06/08/2012) |
| 06/14/2012 | 57 | FIRST JOINT STIPULATION TO CONTINUE RESPONSE DATE TO FIRST AMENDED COMPLAINT PURSUANT TO CIVIL LOCAL RULE 6-2 AND ORDER by Judge Paul S. Grewal, granting 56 Stipulation (ofr, COURT STAFF) (Filed on 6/14/2012) (Entered: 06/14/2012) |
| 06/25/2012 | 58 | Notice of Motion and Motion to Dismiss First Amended Complaint re 52 ; Memorandum of Points and Authorities in Support filed by GMAC Mortgage LLC, Mortgage Electronic Registration Services, Inc.. Motion Hearing set for 8/7/2012 10:00 AM in Courtroom 5, 4th Floor, San Jose before Magistrate Judge Paul Singh Grewal. Responses due by 7/9/2012. Replies due by 7/16/2012. (Attachments: # 1 (Proposed) Order)(Schindler, Maria) (Filed on 6/25/2012) Text modified, linkage added on 6/25/2012 (bwS, COURT STAFF). (Entered: 06/25/2012) |
| 07/11/2012 | 59 | NOTICE of Non-Receipt of Opposition to Motion to Dismiss re 58 by GMAC Mortgage LLC, Mortgage Electronic Registration Services, Inc. (Schindler, Maria) (Filed on 7/11/2012) Modified on 7/12/2012 (bwS, COURT STAFF). (Entered: 07/11/2012) |
| 07/12/2012 | 60 | MOTION for Procedural Relief Regarding July 9, 2012 Opposition Deadline filed by Michael E Boyd. Motion Hearing set for 8/7/2012 10:00 AM in Courtroom 5, 4th Floor, San Jose before Magistrate Judge Paul Singh Grewal. Responses due by 7/26/2012. Replies due by 8/2/2012. (bwS, COURT STAFF) (Filed on 7/12/2012) (Entered: 07/12/2012) |
| 07/12/2012 | 61 | CERTIFICATE OF SERVICE re 60 MOTION for Procedural Relief Regarding July 9, 2012 Opposition Deadline by Michael E Boyd (bwS, COURT STAFF) (Filed on 7/12/2012) (Entered: 07/12/2012) |
| 07/19/2012 | 62 | RESPONSE (re 60 MOTION for Procedural Relief Regaring July 9, 2012 Opposition Deadline re 57 Order on Stipulation ) filed byGMAC Mortgage LLC, Mortgage Electronic Registration Services, Inc.. (Attachments: # 1 Exhibit)(Schindler, Maria) (Filed on 7/19/2012) (Entered: 07/19/2012) |
| 07/26/2012 | 63 | REPLY to Opposition (re 60 MOTION for Procedural Relief Regaring July 9, 2012 Opposition Deadline re 57 Order on Stipulation ) filed byMichael E Boyd. (gm, COURT STAFF) (Filed on 7/26/2012) (Entered: 07/31/2012) |
| 07/26/2012 | 64 | CERTIFICATE OF SERVICE by Michael E Boyd re 63 Reply to Opposition/Response (gm, COURT STAFF) (Filed on 7/26/2012) (Entered: 07/31/2012) |
| 08/07/2012 | 65 | Minute Entry: Motion Hearing held on 8/7/2012 before Magistrate Judge Paul S. Grewal (Date Filed: 8/7/2012) re 58 MOTION to Dismiss *First Amended Complaint filed by Mortgage Electronic Registration Services, Inc., GMAC Mortgage LLC*and 60 MOTION for Procedural Relief Regarding July 9, 2012 Opposition Deadline filed by Michael E Boyd. The Court takes matters under submission, written order after hearing to be issued. (Court Reporter: Summer Fisher.) (ofr, COURT STAFF) (Date Filed: 8/7/2012) (Entered: 08/07/2012) |
| 08/22/2012 | 66 | ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT by Judge Paul S. Grewal, granting 58 Motion to Dismiss; denying 60 Motion for Procedural Relief (ofr, COURT STAFF) (Filed on 8/22/2012) (Entered: 08/23/2012) |
| 10/01/2012 | 67 | JUDGMENT. Signed by Judge Paul S. Grewal on 10/1/2012. (ofr, COURT STAFF) (Filed on 10/1/2012) (Entered: 10/03/2012) |
| 10/29/2012 | 68 | NOTICE OF APPEAL to the 9th CCA Michael E Boyd. Appeal of Judgment 67 (Appeal fee of $455 paid receipt #54611012726.) (tsh, COURT STAFF) (Filed on 10/29/2012) (tsh, COURT STAFF). (Entered: 10/30/2012) |
| 10/30/2012 | 69 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals by Michael E Boyd re 68 Notice of Appeal (Attachments: # 1 Notice of Appeal, # 2 Judgment, # 3 Docket Sheet)(tsh, COURT STAFF) (Filed on 10/30/2012) (Entered: 10/30/2012) |
| 10/31/2012 | 70 | USCA Case Number 12-17434 US Court of Appeals for the Ninth Circuit for 68 Notice of Appeal filed by Michael E Boyd, 69 Transmission of Notice of Appeal and Docket Sheet to USCA filed by Michael E Boyd. (tsh, COURT STAFF) (Filed on 10/31/2012) (tsh, COURT STAFF). (Entered: 11/01/2012) |

| 10/31/2012 | 71 | USCA Time Scheduling Order. (tsh, COURT STAFF) (Filed on 10/31/2012) (tsh, COURT STAFF). (Entered: 11/01/2012) |
| 11/27/2012 | 72 | Transcript Designation and Ordering Form for proceedings held on 1/31/2012 and 8/7/2012 before Judge Paul S. Grewal. (gm, COURT STAFF) (Filed on 11/27/2012) (Entered: 11/29/2012) |
| 12/12/2012 | 73 | Transcript of Proceedings held on 08/07/2012, before Judge Paul S. Grewal. Court Reporter/Transcriber Summer Fisher, Telephone number 408-288-6150. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 3/12/2013. (Fisher, Summer) (Filed on 12/12/2012) (Entered: 12/12/2012) |
| 01/17/2013 | 74 | Certificate of Record forwarded to USCA re appeal 68 Notice of Appeal : (gmS, ) (Filed on 1/17/2013) (Additional attachment(s) added on 2/5/2013: # 1 Transcript Designation and Ordering Form) (gmS, ). (Entered: 01/17/2013) |

| PACER Service Center | | |
| --- | --- | --- |
| Transaction Receipt | | |
| 07/30/2014 18:22:36 | | |
| PACER Login: | cf0738 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 5:11-cv-05018-PSG |
| Billable Pages: | 7 | Cost: | 0.70 |

1 | **Michael E. Boyd**
**5439 Soquel Drive**
2 | **Soquel, CA 95073**
**Phone: (408) 891-9677**
3 | **E-mail: michaelboyd@sbcglobal.net**
*In Pro Per*
4

5

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF NEW YORK

| In re: | Case No. 12-12020 (MG) |
|---|---|
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

### CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2014 I electronically transmitted the attached document –

*Exhibit 6* in *Objections to the ResCap Liquidating Trust July 25, 2014 Motion to Extend the Date*

*by which Objections to Claims Must be Filed* separately filed – to the Clerk's Office using the

CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following

CM/ECF registrants:

(a) counsel to the Debtors, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attention: Gary S. Lee, Norman S. Rosenbaum, Jordan A. Wishnew and Samantha Martin);
(b) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014 (Attention: Tracy Hope Davis, Linda A. Riffkin, and Brian S. Masumoto);
(c) the Office of the United States Attorney General, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-0001 (Attention: US Attorney General, Eric H. Holder, Jr.); (d) Office of the New York State Attorney General, The Capitol, Albany, NY 122240341 (Attention: Nancy Lord, Esq. and Enid N. Stuart, Esq.);
(e) Office of the U.S. Attorney for the Southern District of New York, One St. Andrews Plaza, New York, NY 10007 (Attention: Joseph N. Cordaro, Esq.);
(f) counsel for Ally Financial Inc., Kirkland & Ellis LLP, 153 East 53rd Street, New York, NY 10022 (Attention: Richard M. Cieri and Ray Schrock);
(g) counsel for the committee of unsecured creditors, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036 (Attention: Kenneth Eckstein, Douglas Mannal, Stephen D. Zide and Joseph A. Shifer);
(h) counsel for Ocwen Loan Servicing, LLC, Clifford Chance US LLP, 31 West 52nd Street, New York, NY 10019 (Attention: Jennifer C. DeMarco and Adam Lesman);

EXHIBIT-6 OBJECTIONS II AND OPPOSITION OF MICHAEL BOYD

1    (i) counsel for Berkshire Hathaway Inc., Munger, Tolles & Olson LLP, 355 South Grand
2    Avenue, Los Angeles, CA 90071 (Attention: Thomas Walper and Seth Goldman);
     (j) Internal Revenue Service, P.O. Box 7346, Philadelphia, PA 19101-7346 (if by
3    overnight mail, to 2970 Market Street, Mail Stop 5-Q30.133, Philadelphia, PA 19104-
4    5016);
     (k) Securities and Exchange Commission, New York Regional Office, 3 World Financial
5    Center, Suite 400, New York, NY 10281-1022 (Attention: George S. Canellos, Regional
     Director); and
6    (l) counsel for Borrowers Claims Trust, Polsinelli, 900 Third Avenue, 21st Floor, New
7    York, NY 10022 (Attention: Daniel J. Flanigan and Jason A. Nagi).

8        I hereby certify that I served the attached document by mail on the following, who are not
9    registered participants of the CM/ECF System: NONE.
10

11                                    /s/   Michael E. Boyd
12                                    Michael E. Boyd
                                      5439 Soquel Drive
13                                    Soquel, CA 95073
                                      Phone: (408) 891-9677
14                                    E-mail: michaelboyd@sbcglobal.net
15

16                                    DATED: July 31, 2014

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32
                                      - 2 -

EXHIBIT-6 OBJECTIONS II AND OPPOSITION OF MICHAEL BOYD



BANK FOR INTERNATIONAL SETTLEMENTS



# Statistical release

## OTC derivatives statistics at end-December 2013

Monetary and Economic Department

May 2014

Queries concerning this release may be directed to statistics@bis.org.

This publication is available on the BIS website (www.bis.org).

© Bank for International Settlements 2014. All rights reserved. Brief excerpts may be reproduced or translated provided the source is stated.

## 1.    OTC derivatives statistics at end-December 2013

Highlights from the latest BIS semiannual survey of over-the-counter derivatives markets:

- OTC derivatives markets continued to expand in the second half of 2013. The notional amount of outstanding contracts totalled $710 trillion at end-2013, up from $693 trillion at end-June 2013 and $633 trillion at end-2012.

- Even as notional amounts rose, the gross market value of outstanding OTC derivatives declined to $19 trillion at end-2013, from $20 trillion at end-June 2013 and $25 trillion at end-2012. The decline was driven by interest rate derivatives and, in particular, by a narrowing between market interest rates on the reporting date and the rates prevailing at the inception of the contracts.

- In credit default swap (CDS) markets, central clearing and netting made further inroads. Contracts with central counterparties accounted for 26% of notional CDS outstanding at end-2013. Bilateral netting agreements reduced the net market value of outstanding CDS contracts, which provide a measure of exposure to counterparty credit risk, to 21% of their gross market value.

Recent developments in OTC derivatives markets are summarised in Section 2 (pp 2–7). The methodology for compiling the OTC derivatives statistics is explained in Section 3 (pp 8–14), and tables with the latest data are presented in Section 4 (pp 15–26). Additional data, including time series, are available on the BIS website (www.bis.org/statistics/derdetailed.htm).

The OTC derivatives statistics at end-June 2014 will be released on or before 15 November 2014 (www.bis.org/statistics/relcal.htm).

## 2.    Recent developments in OTC derivatives markets

The over-the-counter derivatives market continued to expand in the second half of 2013. The notional amount of outstanding OTC derivatives contracts, which determines contractual payments and is an indicator of activity in OTC derivatives markets, totalled $710 trillion at end-December 2013 (Table 1). This compares with $693 trillion at end-June 2013 and $633 trillion at end-2012 (Graph 1, left-hand panel). Adjusted for exchange rate movements, notional amounts at end-2013 were about 1% higher than at end-June 2013 and 13% higher than at end-2012.[1]

Notwithstanding the increase in notional amounts, the market value of outstanding derivatives contracts declined, based on market prices at end-December 2013. The gross market value of all contracts – that is, the cost of replacing all outstanding contracts at market prices prevailing on the reporting date – stood at $19 trillion at end-December 2013. This is down from $20 trillion at end-June 2013 and $25 trillion at end-2012 (Graph 1, centre panel).

The gross market value represents the maximum loss that market participants would incur if all counterparties failed to meet their contractual payments and the contracts could be replaced at current market prices.[2] Market participants can reduce their exposure to counterparty credit risk through netting agreements and collateral. Gross credit exposures adjust gross market values for legally

---

### Global OTC derivatives market

Outstanding positions, by data type and risk category                                                    Graph 1



¹ For definitions, see the explanatory notes in Section 3.    ² Outstanding OTC derivatives positions of dealers that do not participate in the BIS's semiannual survey. Estimated by the BIS based on the Triennial Survey of foreign exchange and derivatives activity.

Source: BIS OTC derivatives statistics.

---

[1]    The appreciation of the euro and pound sterling against the US dollar between end-June 2013 and end-December 2013 resulted in an increase in the US dollar value of outstanding contracts denominated in euros and sterling. Conversely, the depreciation of the Japanese yen against the US dollar resulted in a decline in the US dollar value of yen-denominated contracts.

[2]    The gross market value is calculated as the sum of the absolute value of gross positive market values and gross negative market values. The gross positive market value is the gain to derivatives dealers – and the gross negative market value the loss – if the dealers were to sell their outstanding contracts at market prices prevailing on the reporting date.

enforceable bilateral netting agreements but do not take account of collateral. Gross credit exposures equalled $3.0 trillion at end-December 2013, down from $3.8 trillion at end-June 2013 (Graph 1, right-hand panel). This represented 16.3% of gross market values at end-December 2013, which was a bit higher than the 2009–12 average of 15.1%.

Interest rate derivatives

The interest rate segment accounts for the majority of OTC derivatives activity. For single currency interest rate derivatives at end-December 2013, the notional amount of outstanding contracts totalled $584 trillion, which represented 82% of the global OTC derivatives market (Table 3). At $461 trillion, swaps account for by far the largest share of outstanding interest rate derivatives.

The recent trend in the global market of increasing notional amounts but declining market values was driven by developments in the interest rate segment. Even as notional amounts rose, the gross market value of interest rate derivatives declined to $14 trillion at end-2013, from $15 trillion at end-June 2013 and its most recent peak of $20 trillion at end-2011. Such declines were reported for interest rate derivatives denominated in most of the major currencies (Graph 2, left panel). Long-term bond yields and swap rates in these currencies rose in mid-2013 after announcements in May that the US Federal Reserve envisaged phasing out quantitative easing.[3] The decline in the gross market value of interest rate derivatives over this period suggests that the bond market sell-off narrowed the gap between market interest rates on the reporting date and the rates prevailing at contract inception.[4]

Increases in the notional amount of interest rate derivatives were concentrated in the medium- and long-term segments. The notional amount of contracts with a remaining maturity of one to five years rose to $234 trillion at end-2013 from $180 trillion one year earlier, or to 40% of all



**OTC interest rate derivatives**                                                                    Graph 2

Gross market values, by currency — Percentage of notional amount

Notional amounts, by maturity — Per cent

Notional amounts, by counterparty — Per cent / USD trn

US dollar — Yen — Euro — All currencies

One year or less / Over 1 year and up to 5 years / Over 5 years

Lhs: Share of other financial institutions
Rhs: Reporting dealers / Other financial institutions / Non-financial institutions

Source: BIS OTC derivatives statistics.

<hr/>

[3]   See BIS, "Markets precipitate tightening", *BIS Quarterly Review*, September 2013, pp 1–11, www.bis.org/publ/qtrpdf/r_qt1309a.htm.

[4]   At the inception of an interest rate swap contract, the market value is zero, ie the expected value of fixed interest rate cash flows over the life of the swap is equal to the expected value of floating interest rate cash flows.

maturities outstanding from 37% (Graph 2, centre panel). The notional amount of contracts with a remaining maturity greater than five years rose to $152 trillion from $119 trillion over the same period, or to 26% of all maturities from 24%. The increased activity in the medium- and long-term segments may have reflected investors' changing expectations about the persistence of low policy rates and large-scale asset purchases by central banks over the medium term.[5]

The distribution of interest rate derivatives by counterparties points to a continued shift in activity towards financial institutions other than dealers, including central counterparties (CCPs). The notional amount of interest rate contracts between derivatives dealers has been falling steadily since 2011, to $96 trillion at end-2013 compared with the (post-2008) peak of $159 trillion at end-June 2011 (Graph 2, right-hand panel). Contracts between dealers and other financial institutions stood at $470 trillion at end-2013, or 80% of all contracts, up from $355 trillion, or 64%, at end-June 2011. The shift towards central clearing exaggerates the growth in notional amounts for other financial institutions because, when contracts are cleared through CCPs, one trade becomes two outstanding contracts.[6]

The latest data show a sharp drop in the notional amount reported for interest rate contracts with non-financial customers. This drop is explained by a dealer's reclassification of contracts with central counterparties, which it had previously incorrectly reported against non-financial customers but, starting in December 2013, reported against other financial institutions.

Turning to the concentration of derivatives activity among dealers, as of end-December 2013 concentration in many segments had fallen to levels close to or below those reported prior to 2008. Herfindahl indices calculated based on notional amounts provide a measure of how concentrated the market shares of individual dealers are. In most segments of interest rate derivatives markets, concentration rose in 2008–09 and then declined in 2010–11 (Table 9a). As of end-2013, Herfindahl indices for the US dollar and euro interest rate swap (IRS) markets had fallen back almost to 2007 levels, and for yen and Canadian dollar markets to below 2007 levels. However, in the sterling, Swiss franc and Swedish krona IRS markets, concentration remained well above 2007 levels.

Foreign exchange derivatives

Foreign exchange derivatives make up the second largest segment of the global OTC derivatives market. At end-December 2013, the notional amount of outstanding foreign exchange contracts totalled $71 trillion, which represented 10% of OTC derivatives activity (Table 2).

The latest data show little change in the instrument composition of foreign exchange derivatives. Forwards and foreign exchange swaps accounted for close to half of the notional amount outstanding (Table 1). However, currency swaps – which typically have a longer maturity than other foreign exchange derivatives and thus are more sensitive to changes in market prices – accounted for the largest proportion of the gross market value.

In contrast to the interest rate derivatives market, in the foreign exchange derivatives market inter-dealer contracts continued to account for nearly as much activity as contracts with other financial institutions. The notional amount of outstanding foreign exchange contracts between reporting dealers totalled $31 trillion at end-December 2013, and contracts with financial counterparties other than dealers about the same amount. The inter-dealer share has averaged around 43% since 2011, up from less than 40% prior to 2011. Inter-dealer activity is especially significant in the yen and US dollar

---

[5]    See BIS, "Low rates spur credit markets as banks lose ground", *BIS Quarterly Review*, December 2013, pp 1–12, www.bis.org/publ/qtrpdf/r_qt1312a.htm.

[6]    See N Vause, "Central clearing and OTC derivatives statistics", *BIS Quarterly Review*, June 2011, p 26, www.bis.org/publ/qtrpdf/r_qt1106x.htm.

markets, where it accounted for 52% and 47%, respectively, of notional amounts at end-December 2013. Among instruments, inter-dealer activity accounts for a greater share of more complex contracts, such as currency swaps (54% of notional amounts) and options (49%).

While the importance of inter-dealer activity differs in the BIS's two surveys of derivatives activity – the semiannual survey of outstanding positions, on which this release is based, and the Triennial Survey of turnover – this mainly reflected differences in the structure of the surveys. The 2013 Triennial Survey pointed to other financial institutions, including smaller banks, institutional investors and hedge funds, as the main drivers of rising trading volumes in foreign exchange markets.[7] This development appears to reflect trading in simpler instruments with shorter maturities, such as spot and forward transactions. The OTC derivatives statistics on outstanding contracts suggest that the major dealers continue to dominate activity in more complex, longer-term instruments, such as currency swaps. Indeed, in the foreign exchange derivatives market, inter-dealer activity accounted for 58% of notional amounts for contracts with a remaining maturity of more than five years, compared with only 40% of contracts with a maturity of one year or less. In addition, whereas outstanding positions (in the OTC derivatives statistics) are reported by dealers on a globally consolidated basis, turnover data (in the Triennial Survey) are reported by sales desks and include transactions between affiliates of the same reporting institution.

## Credit default swaps

In 2007, credit derivatives had come close to surpassing foreign exchange derivatives as the second largest segment in the global OTC derivatives market, but notional amounts have since declined steadily. Notional amounts of CDS fell to $21 trillion at end-2013 from $29 trillion at end-2011 and a peak of $58 trillion at end-2007 (Graph 3, left-hand panel). The gross market value of CDS fell to $0.7 trillion at end-2013, from $1.6 trillion at end-2011 (Graph 3, centre panel). The net market value fell to $139 billion from $417 billion over the same period. This net measure takes account of bilateral netting agreements covering CDS contracts but, unlike gross credit exposures, is not adjusted for cross-product netting.

The decline in overall CDS activity was driven mainly by a contraction in inter-dealer activity. The notional amount for contracts between reporting dealers fell to $11 trillion at end-December 2013 from $14 trillion at end-2012 (Table 4). Notional amounts with banks and securities firms also fell, to less than $2 trillion from $3 trillion over the same period. Trade compression continued to eliminate redundant contracts, although the volume of compressions has slowed from the peaks of 2008–09.[8]

Central clearing made further inroads in the CDS market in 2013. Central clearing is a key element in global regulators' agenda for reforming OTC derivatives markets to reduce systemic risks. The shift towards central clearing had made significant progress in 2010–11, when the share of outstanding contracts cleared through CCPs had risen from less than 10% to 19% (Graph 3, right-hand panel). However, in 2012 progress stalled, with the share stagnating at 19%. Then in 2013 contracts with CCPs rose to account for 26% of all CDS contracts at year-end. The share of CCPs is highest for multi-name products, at 37%, and much lower for single-name products, at 17% (Table 4). Contracts on CDS indices in the multi-name segment tend to be more standardised than those in the single-name segment, which thus makes the former more amenable to central clearing.

---

[7]  See D Rime and A Schrimpf, "The anatomy of the global FX market through the lens of the 2013 Triennial Survey", *BIS Quarterly Review*, December 2013, pp 27–43, www.bis.org/publ/qtrpdf/r_qt1312e.htm.

[8]  Compression is a process for tearing up trades, which enables economically redundant derivative trades to be terminated early without changing the net position of each participant. For statistics on multilateral compressions of CDS contracts, see TriOptima, www.trioptima.com/resource-center/statistics/triReduce.html.



**Credit default swaps** — Graph 3

Lhs: — Gross market value / notional
Rhs: Single-name notional
     Multi-name notional

Lhs: — Net / gross market values
Rhs: Grosa market values
     Net market values

Lhs: — CCPs / total
Rhs: Single-name notional
     Multi-name notional

Source: BIS OTC derivatives statistics.

Owing in part to the shift towards central clearing, the CDS market has seen an increase in netting. Netting enables market participants to reduce their counterparty exposure by offsetting contracts with negative market values against contracts with positive market values. A comparison of net market values with gross market values indicates the prevalence of legally enforceable bilateral netting agreements. As a result of the increased use of such agreements, net market values as a percentage of gross market values fell to 21% at end-2013 from 24% at end-2012 and 26% at end-2011 (Graph 3, centre panel). The prevalence of netting is greatest for CDS contracts with CCPs and other dealers, where it reduced the ratio of net to gross market values to 9% and 15%, respectively, at end-2013 (Table 4). It is lowest for those with insurance companies (83%) and special purpose vehicles (57%).

The distribution of underlying reference entities indicates that contracts referencing non-financial firms have declined at a somewhat more rapid pace than those referencing other sectors. Outstanding CDS contracts referencing non-financial firms stood at $7 trillion at end-December 2013, representing 34% of all CDS (Table 7). This is down from 37% at end-2012 and 40% at end-2011 (when this breakdown was first reported). Contracts referencing financial firms stood at $6 trillion at end-2013, followed by securitised products and multiple sectors at $5 trillion, and sovereigns at less than $3 trillion. By rating, contracts referencing investment grade entities equalled $13 trillion and those referencing lower-rated or unrated entities $8 trillion (Table 5).

The distribution of outstanding CDS by location of the counterparty showed little change in 2013. The CDS market is very international; CDS with counterparties from the same country in which the dealer is headquartered accounted for only 19% of outstanding contracts at end-2013, or $4 trillion (Table 8). Most of the foreign counterparties were from Europe, followed by the United States.

## Equity-linked and commodity derivatives

The notional amount of OTC derivatives linked to equities or commodities totalled $9 trillion at end-December 2013, and the gross market value $1 trillion (Table 1). Activity in equity-linked contracts declined precipitously in 2008–09 but has since fluctuated around levels similar to the notional amount reported at end-December 2013, $6.6 trillion.

By contrast, activity in commodity contracts continues to decline. Dealers expanded their commodity derivatives business rapidly between 2004 and 2008 but subsequently scaled back their outstanding positions. The notional amount of outstanding OTC commodity derivatives contracts declined to $2.2 trillion at end-2013 from $2.9 trillion at end-2009 and a peak of $8.5 trillion at end-2007.

## 3.    Explanatory notes

### Participating authorities

Central banks and other authorities in the following 13 jurisdictions participate in the BIS's semiannual survey of OTC derivatives markets:

| | | | |
|---|---|---|---|
| **Australia** | Reserve Bank of Australia | **Netherlands** | Netherlands Bank |
| **Belgium** | National Bank of Belgium | **Spain** | Bank of Spain |
| **Canada** | Bank of Canada | **Sweden** | Sveriges Riksbank |
| **France** | Bank of France | | Statistics Sweden |
| **Germany** | Deutsche Bundesbank | **Switzerland** | Swiss National Bank |
| **Italy** | Bank of Italy | **United Kingdom** | Bank of England |
| **Japan** | Bank of Japan | **United States** | Board of Governors of the Federal Reserve System |

Every three years, central banks and other authorities from an additional 34 jurisdictions participate in the Triennial Central Bank Survey. The latest Triennial Survey took place at end-December 2013; the results are available on the BIS website (www.bis.org/publ/rpfx13.htm).

The market share of dealers that participate in the semiannual survey varies across risk categories. It is highest in the credit, equity and interest rate segments (almost 100%, 98% and 97%, respectively, at end-June 2013) and lowest in the commodity and foreign exchange segments (both 90%). Overall, the results of the Triennial Survey indicate that the semiannual survey captures about 96% of global OTC derivatives activity.

### Reporting basis

Data are reported on a consolidated basis. Data from all branches and (majority-owned) subsidiaries worldwide of a given institution are aggregated and reported by the parent institution to the official authority in the country where the parent institution has its head office. Deals between affiliates (ie branches and subsidiaries) of the same institution are excluded from the reporting.

All data are reported to the BIS in US dollars, with positions in other currencies being converted into US dollars at the exchange rate prevailing at the end of each reporting period.

### Types of data collected

**Notional amounts outstanding**: Nominal or notional amounts outstanding are defined as the gross nominal or notional value of all deals concluded and not yet settled on the reporting date. For contracts with variable nominal or notional principal amounts, the basis for reporting is the nominal or notional principal amounts at the time of reporting.

Nominal or notional amounts outstanding provide a measure of market size and a reference from which contractual payments are determined in derivatives markets. However, such amounts are generally not those truly at risk. The amounts at risk in derivatives contracts are a function of the price level and/or volatility of the financial reference index used in the determination of contract payments, the duration and liquidity of contracts, and the creditworthiness of counterparties. They are also a function of whether an exchange of notional principal takes place between counterparties.

**Gross market values**: Gross market values are calculated as the sum of the absolute values of all open contracts with either positive or negative replacement values evaluated at market prices prevailing on the reporting date. Thus, the gross positive market value of a dealer's outstanding contracts is the sum of the replacement values of all contracts that are in a current gain position to the reporter at current market prices (and therefore, if they were settled immediately, would represent claims on counterparties). The gross negative market value is the sum of the values of all contracts that have a negative value on the reporting date (ie those that are in a current loss position and therefore, if they were settled immediately, would represent liabilities of the dealer to its counterparties).

The term "gross" indicates that contracts with positive and negative replacement values with the same counterparty are not netted. Nor are the sums of positive and negative contract values within a market risk category such as foreign exchange contracts, interest rate contracts, equities and commodities set off against one another.

Gross market values supply information about the potential scale of market risk in derivatives transactions and of the associated financial risk transfer taking place. Furthermore, gross market value at current market prices provides a measure of economic significance that is readily comparable across markets and products.

**Gross credit exposures**: Gross credit exposures are calculated as gross market values minus amounts netted with the same counterparty across all risk categories under legally enforceable bilateral netting agreements. In other words, the market value of dealers' claims and liabilities are netted when they are claims on and liabilities to the same counterparty and the reporting dealer and the counterparty have a valid, legally enforceable netting agreement. The absolute value of amounts across counterparties is then summed.

Gross credit exposures provide a measure of exposure to counterparty credit risk. However, they do not take collateral into account. Collateral would offset losses should the counterparty default.

**Net market values**: Net market values are calculated in the same way as gross credit exposures, except that netting is restricted to one type of derivative product instead of across all products. In the OTC derivatives statistics, net market values are reported for credit default swaps only.

**Herfindahl index**: The Herfindahl index represents a measure of market concentration and is defined as the sum of the squares of the market shares of each individual institution. It ranges from 0 to 10,000. The more concentrated the market, the higher the measure becomes. If the market is fully concentrated (only one institution), the measure will have the (maximum) value of 10,000.

Instrument types

**Forward contracts**: Forward contracts represent agreements for the delayed delivery of financial instruments or commodities in which the buyer agrees to purchase and the seller agrees to deliver, at a specified future date, a specified instrument or commodity at a specified price or yield. Forward contracts are generally not traded on organised exchanges and their contractual terms are not standardised. The reporting exercise also includes transactions where only the difference between the contracted forward outright rate and the prevailing spot rate is settled at maturity, such as non-deliverable forwards (ie forwards which do not require physical delivery of a non-convertible currency) and other contracts for differences.

**Swaps**: Swaps are transactions in which two parties agree to exchange payment streams based on a specified notional amount for a specified period. Forward-starting swap contracts are reported as swaps.

**Options**: Option contracts confer either the right or the obligation, depending upon whether the reporting institution is the purchaser or the writer, respectively, to buy or sell a financial instrument or commodity at a specified price up to a specified future date.

**Single-name CDS**: A credit derivative where the reference entity is a single name.

**Multi-name CDS**: A contract where the reference entity is more than one name, as in portfolio or basket CDS or CDS indices. A basket CDS is a CDS where the credit event is the default of some combination of the credits in a specified basket of credits.

**Index products**: Multi-name CDS contracts with constituent reference credits and a fixed coupon that are determined by an administrator such as Markit (which administers the CDX indices and the iTraxx indices). Index products include tranches of CDS indices.

## Definitions for foreign exchange transactions

| | |
|---|---|
| Outright forward: | Transaction involving the exchange of two currencies at a rate agreed on the date of the contract for value or delivery (cash settlement) at some time in the future (more than two business days later). This category also includes forward foreign exchange agreement (FXA) transactions, non-deliverable forwards and other forward contracts for differences. |
| Foreign exchange swap: | Transaction involving the actual exchange of two currencies (principal amount only) on a specific date at a rate agreed at the time of the conclusion of the contract (the short leg), and a reverse exchange of the same two currencies at a date further in the future at a rate (generally different from the rate applied to the short leg) agreed at the time of the contract (the long leg). Both spot/forward and forward/forward swaps should be included. Short-term swaps carried out as "tomorrow/next day" transactions should also be included in this category. |
| Currency swap: | Contract which commits two counterparties to exchange streams of interest payments in different currencies for an agreed period of time and to exchange principal amounts in different currencies at a pre-agreed exchange rate at maturity. |
| Currency option: | Option contract that gives the right to buy or sell a currency with another currency at a specified exchange rate during a specified period. This category also includes exotic foreign exchange options such as average rate options and barrier options. |

## Definitions for single-currency interest rate derivatives

| | |
|---|---|
| Forward rate agreement (FRA): | Interest rate forward contract in which the rate to be paid or received on a specific obligation for a set period of time, beginning at some time in the future, is determined at contract initiation. |
| Interest rate swap: | Agreement to exchange periodic payments related to interest rates on a single currency; can be fixed for floating, or floating for floating based on different indices. This group includes those swaps whose notional principal is amortised according to a fixed schedule independent of interest rates. |
| Interest rate option: | Option contract that gives the right to pay or receive a specific interest rate on a predetermined principal for a set period of time. |

## Definitions for equity and stock index derivatives

| | |
|---|---|
| Equity forward: | Contract to exchange an equity or equity basket at a set price at a future date. |

OTC derivatives statistics at end-December 2013

| Equity swap: | Contract in which one or both payments are linked to the performance of equities or an equity index (eg S&P 500). It involves the exchange of one equity or equity index return for another and the exchange of an equity or equity index return for a floating or fixed interest rate. |
| Equity option: | Option contract that gives the right to deliver or receive a specific equity or equity basket at an agreed price at an agreed time in the future. |

## Definitions for commodity derivatives

| Commodity forward: | Forward contract to exchange a commodity or commodity index at a set price at a future date. |
| Commodity swap: | Contract with one or both payments linked to the performance of a commodity price or a commodity index. It involves the exchange of the return on one commodity or commodity index for another and the exchange of a commodity or commodity index for a floating or fixed interest rate. |
| Commodity option: | Option contract that gives the right to deliver or receive a specific commodity or commodity index at an agreed price at a set date in the future. |

Non-plain vanilla products are in principle separated into their plain vanilla components. If this is not feasible, then OTC options take precedence in the instrument classification, so that any product with an embedded option is reported as an OTC option. All other OTC products are reported in the forwards and swaps category.

## Counterparties and elimination of double-counting

Reporting institutions are requested to provide for each instrument in the foreign exchange, interest rate, equity and credit derivatives risk categories a breakdown of contracts by counterparty as follows: reporting dealers, other financial institutions and non-financial customers.

**Reporting dealers**: Institutions whose head office is located in one of the 13 reporting countries (Australia, Belgium, Canada, France, Germany, Italy, Japan, the Netherlands, Spain, Sweden, Switzerland, the United Kingdom and the United States) and which participate in the semiannual OTC derivatives market statistics; in addition, reporting dealers include all branches and subsidiaries of these entities worldwide; "reporting dealers" will mainly be commercial and investment banks and securities houses, including their branches and subsidiaries and other entities that are active dealers.

**Other financial institutions**: Financial institutions not classified as reporting dealers, including central counterparties (CCPs), banks, funds and non-bank financial institutions which may be considered as financial end users (eg mutual funds, pension funds, hedge funds, currency funds, money market funds, building societies, leasing companies, insurance companies and central banks).

In the specific case of credit default swaps, the counterparty item "other financial institutions" is broken further down into the following subcategories:

- Banks and securities firms: smaller commercial banks, investment banks and securities houses that do not participate in the survey.

- CCPs: Entities that interpose themselves between counterparties to contracts traded in one or more financial markets, becoming the buyer to every seller and the seller to every buyer.[9]

- Insurance firms (including pension funds[10]), reinsurance and financial guaranty firms.

- Special purpose vehicles (SPVs), special purpose corporations (SPCs) and special purpose entities (SPEs): Legal entities that are established for the sole purpose of carrying out single transactions, such as in the context of asset securitisation through the issuance of asset-backed and mortgage-backed securities.

- Hedge funds: Mainly unregulated investment funds that typically hold long or short positions in commodity and financial instruments in many different markets according to a predetermined investment strategy and that may be highly leveraged.

- Other financial customers: All remaining financial institutions that are not listed above. In practice, they are mainly mutual funds.

**Non-financial customers**: Any counterparty other than those described above, in practice mainly corporate firms and governments.

### Elimination of double-counting

Double-counting arises because transactions between two reporting entities are recorded by each of them, ie twice. In order to derive meaningful measures of overall market size, it is therefore necessary to halve the data on transactions between reporting dealers. To allow for this, reporters are asked to identify and report separately deals contracted with other reporters. The following methods of adjustment are applied for the three different types of data collected in the survey:

- Notional amounts outstanding: Double-counting is eliminated by deducting half of the amount reported under the counterparty category "reporting dealers".

- Gross market values: The gross negative market value of contracts with other reporting dealers is subtracted from the total gross market value data in order to obtain the adjusted aggregates.

- Gross credit exposures: Similarly to the adjustment performed for gross market values, the gross negative credit exposures, ie liabilities, vis-à-vis other reporting dealers are subtracted from the total gross credit exposures in order to correct the reported aggregates for inter-dealer double-counting.

### Maturities

A breakdown by remaining contract maturity is provided for foreign exchange contracts (including gold), interest rate contracts, equity-linked contracts and CDS notional amounts outstanding, according to the following bands:

- one year or less

---

[9]    The CCPs that currently serve or plan to serve the CDS market are: Eurex Credit Clear, ICE Clear Europe and LCH.Clearnet SA in Europe; CME CMDX and ICE Trust US in North America; and Japan Securities Clearing Corporation and Tokyo Financial Exchange in Japan.

[10]   As a general rule, pension funds are included under insurance firms. However, if they do not offer saving schemes involving an element of risk-sharing linked to life expectancy, they are more akin to mutual funds and are therefore included under "other financial customers".

- over one year and up to five years

- over five years

In the case of transactions where the first leg has not come due, the remaining maturity of each leg should be determined as the difference between the reporting date and the settlement or due date, respectively, of the near- and far-end legs of the transaction.

For CDS, the remaining contract maturity is to be determined by the difference between the reporting date and the expiry date for the contract and not by the date of execution of the deal.

## Breakdowns collected for credit default swaps

### Ratings

A breakdown by rating is available for CDS. The current rating for any contract is used and not the rating at inception. The categories used are those provided by the major rating companies. If no public ratings are available, reporters have been requested to use their internal ratings.

Data are available for the following rating categories:

- investment grade (AAA–BBB)

- below investment grade (BB and below)

- non-rated.

If a CDS contract refers to a specific underlying reference asset for which several public ratings are available, the lower of the two highest is used. However, if the CDS contract specifies merely a corporate name (or country) as the underlying credit rather than a specific reference obligation, reporters are allowed to report the internal credit rating that meets their business requirements.

For single-name instruments, the rating of the underlying reference obligation(s) is used.

For rated multi-name instruments, the rating of the contract (entire basket, portfolio or index) is used. If the portfolio or basket underlying a multi-name instrument is unrated or not available, then it is recommended that the contract be allocated to (1) "investment grade" if all underlying contracts are investment grade, and to (2) "below investment grade" if the underlying reference entities are sub-investment grade.

An instrument is classified as "non-rated" only if (1) it does not have any rating and (2) it is not possible or very burdensome to classify the contract based on the ratings of the underlying reference entities.

### Sector of the reference entity

A breakdown is provided for CDS by economic sector of the obligor of the underlying reference obligation (reference entity) as follows:

**Sovereigns**: Restricted to a country's central, state or local government, excluding publicly owned financial or non-financial firms.

**Non-sovereign**, of which:

- Financial firms: All categories of financial institution, including commercial and investment banks, securities houses, mutual funds, hedge funds and money market funds, building societies, leasing companies, insurance companies and pension funds.

- Non-financial firms: All categories of institution other than financial firms and sovereigns (as defined above).

- Securitised products, ie portfolio or structured products: CDS contracts written on a securitised product or a combination of securitised products, ie asset-backed securities (ABS) or mortgage-backed securities (MBS). The reference entity of these types of contract is not the securitised product itself, ie the ABS or the MBS, but the individual securities or loans that were used to construct it. From this perspective, these contracts are classified as multi-name rather than single-name instruments. Hence, by default, all CDS contracts written on securitised products are classified as multi-name instruments. They can be decomposed in the following two components.

  – CDS on asset-backed and mortgage-backed securities

  – CDS on other securitised products (including collateralised debt obligations)

- Multisectors: CDS on other than securitised products where the reference entities belong to different sectors (such as in the case of basket credit default swaps).

### Location of the counterparty

A breakdown by nationality of the counterparty (ie on an ultimate risk basis) is provided for CDS notional amounts outstanding.

**Home country**: Trades with counterparties with head office incorporated in reporter's home country (reporting dealers and non-reporting counterparties in home country).

**Abroad**: Trades with counterparties abroad (reporting dealers and non-reporting counterparties abroad).

## 4.     Tables

Table 1  Global OTC derivatives market.................................................................................................16

Table 2  Global OTC foreign exchange derivatives market ................................................................17

Table 3  Global OTC interest rate derivatives market.........................................................................18

Table 4  Credit default swaps .................................................................................................................19

Table 5  Credit default swap, by rating category..................................................................................20

Table 6  Credit default swaps, by remaining maturity..........................................................................21

Table 7  Credit default swaps, by sector ...............................................................................................22

Table 8  Credit default swaps, by location of counterparty.................................................................23

Table 9  Herfindahl indices

    9a       OTC interest rate derivatives contracts........................................................................24

    9b       OTC foreign exchange derivatives contracts ..............................................................25

    9c       OTC equity-linked derivatives contracts........................................................................26

Additional     data,     including     time     series,     are     available     on     the     BIS     website
(www.bis.org/statistics/derdetailed.htm).

#### Table 1

#### Global OTC derivatives market[1]
Amounts outstanding, in billions of US dollars

| | Notional amounts outstanding | | | | Gross market value | | | |
|---|---|---|---|---|---|---|---|---|
| | H1 2012 | H2 2012 | H1 2013 | H2 2013 | H1 2012 | H2 2012 | H1 2013 | H2 2013 |
| **GRAND TOTAL** | **639,395** | **632,582** | **692,924** | **710,182** | **25,408** | **24,733** | **20,082** | **18,658** |
| **A. Foreign exchange contracts** | **66,672** | **67,358** | **73,121** | **70,553** | **2,249** | **2,313** | **2,427** | **2,284** |
| Outright forwards and forex swaps | 31,395 | 31,718 | 34,421 | 33,218 | 773 | 806 | 957 | 824 |
| Currency swaps | 24,156 | 25,420 | 24,654 | 25,448 | 1,190 | 1,259 | 1,131 | 1,186 |
| Options | 11,122 | 10,220 | 14,046 | 11,886 | 286 | 249 | 339 | 273 |
| Memo: Exchange-traded contracts[2] | 328 | 336 | 344 | 384 | ... | ... | ... | ... |
| **B. Interest rate contracts[3]** | **494,427** | **489,706** | **561,314** | **584,364** | **19,113** | **18,833** | **15,081** | **14,039** |
| FRAs | 64,711 | 71,353 | 86,334 | 73,819 | 51 | 47 | 168 | 108 |
| Swaps | 379,401 | 370,002 | 425,584 | 461,281 | 17,214 | 17,080 | 13,588 | 12,758 |
| Options | 50,314 | 48,351 | 49,396 | 49,264 | 1,848 | 1,706 | 1,325 | 1,174 |
| Memo: Exchange-traded contracts[2] | 55,581 | 48,546 | 62,178 | 57,007 | ... | ... | ... | ... |
| **C. Equity-linked contracts** | **6,313** | **6,251** | **6,821** | **6,560** | **639** | **600** | **692** | **700** |
| Forwards and swaps | 1,880 | 2,045 | 2,321 | 2,277 | 147 | 157 | 206 | 202 |
| Options | 4,434 | 4,207 | 4,501 | 4,283 | 492 | 443 | 486 | 498 |
| Memo: Exchange-traded contracts[2] | 5,601 | 5,240 | 6,602 | 7,237 | ... | ... | ... | ... |
| **D. Commodity contracts[4]** | **2,994** | **2,587** | **2,458** | **2,206** | **379** | **347** | **384** | **264** |
| Gold | 523 | 486 | 461 | 341 | 51 | 42 | 80 | 47 |
| Other | 2,471 | 2,101 | 1,997 | 1,865 | 328 | 304 | 304 | 217 |
| Forwards and swaps | 1,659 | 1,363 | 1,327 | 1,261 | ... | ... | ... | ... |
| Options | 812 | 739 | 670 | 603 | ... | ... | ... | ... |
| **E. Credit default swaps[5]** | **26,930** | **25,068** | **24,349** | **21,020** | **1,187** | **848** | **725** | **653** |
| Single-name instruments | 15,566 | 14,309 | 13,135 | 11,324 | 715 | 527 | 430 | 369 |
| Multi-name instruments | 11,364 | 10,760 | 11,214 | 9,696 | 472 | 321 | 295 | 284 |
| Index products | ... | 9,656 | 10,163 | 8,746 | ... | ... | ... | ... |
| **F. Unallocated[6]** | **42,059** | **41,611** | **24,861** | **25,480** | **1,841** | **1,792** | **772** | **718** |
| **GROSS CREDIT EXPOSURE[7]** | **...** | **...** | **...** | **...** | **3,691** | **3,609** | **3,784** | **3,033** |
| Memo: Exchange-traded contracts[2,8] | 61,511 | 54,122 | 69,124 | 64,628 | ... | ... | ... | ... |

[1] Based on the data reported by 11 countries up to H1 2011. Includes data reported by Australia and Spain from H2 2011 onwards. Data on total notional amounts outstanding, gross market value and gross credit exposure are shown on a net basis, ie transactions between reporting dealers are counted only once. The definitions of notional amounts outstanding, gross market value and gross credit exposure are available under Section 2 of the statistical notes. [2] Sources: FOW TRADEdata; Futures Industry Association; various futures and options exchanges. [3] Single currency contracts only. [4] Adjustments for double-counting partly estimated. [5] See Tables 4 to 8. [6] Includes foreign exchange, interest rate, equity, commodity and credit derivatives of non-reporting institutions, based on the latest Triennial Central Bank Survey of Foreign Exchange and Derivatives Market Activity, in 2013. [7] Before 2011, excludes CDS contracts for all countries except the United States. [8] Excludes commodity contracts.

## Table 2

### Global OTC foreign exchange derivatives market[1,2]

Amounts outstanding, in billions of US dollars

| | Notional amounts outstanding | | | | Gross market values | | | |
|---|---|---|---|---|---|---|---|---|
| | H1 2012 | H2 2012 | H1 2013 | H2 2013 | H1 2012 | H2 2012 | H1 2013 | H2 2013 |
| **Total contracts** | **66,672** | **67,358** | **73,121** | **70,553** | **2,249** | **2,313** | **2,427** | **2,284** |
| With reporting dealers | 29,484 | 28,834 | 30,690 | 31,206 | 881 | 946 | 992 | 1,011 |
| With other financial institutions | 27,538 | 28,831 | 31,757 | 30,552 | 885 | 911 | 999 | 887 |
| With non-financial customers | 9,651 | 9,693 | 10,674 | 8,794 | 483 | 456 | 437 | 386 |
| Up to 1 year[3] | 48,469 | 48,135 | 53,677 | 51,198 | ... | ... | ... | ... |
| Between 1 and 5 years[3] | 12,854 | 13,728 | 13,802 | 13,658 | ... | ... | ... | ... |
| Over 5 years[3] | 5,350 | 5,495 | 5,642 | 5,696 | ... | ... | ... | ... |
| US dollar | 57,375 | 57,599 | 64,483 | 61,019 | 1,827 | 1,870 | 2,059 | 1,917 |
| Euro | 24,293 | 23,796 | 24,366 | 25,177 | 882 | 764 | 622 | 707 |
| Yen | 13,667 | 14,113 | 15,181 | 14,122 | 529 | 827 | 684 | 721 |
| Sterling | 7,591 | 7,825 | 8,435 | 8,789 | 213 | 208 | 207 | 256 |
| Swiss franc | 4,055 | 3,832 | 4,179 | 4,070 | 170 | 155 | 125 | 133 |
| Canadian dollar | 3,002 | 3,099 | 3,280 | 3,263 | 89 | 80 | 103 | 74 |
| Swedish krona | 1,498 | 1,453 | 1,389 | 1,407 | 39 | 41 | 35 | 28 |
| Other | 21,863 | 22,999 | 24,928 | 23,258 | 748 | 681 | 1,020 | 731 |
| *Memo: Exchange-traded contracts*[4] | *328* | *336* | *344* | *384* | ... | ... | ... | ... |

[1] See footnote 1 to Table 1.   [2] Counting both currency sides of every foreign exchange transaction means that the currency breakdown sums to 200% of the aggregate.   [3] Residual maturity.   [4] See footnote 2 to Table 1.

### Table 3

#### Global OTC interest rate derivatives market[1]

#### Amounts outstanding, in billions of US dollars

| | Notional amounts outstanding | | | | Gross market values | | | |
|---|---|---|---|---|---|---|---|---|
| | H1 2012 | H2 2012 | H1 2013 | H2 2013 | H1 2012 | H2 2012 | H1 2013 | H2 2013 |
| **Total contracts** | 494,427 | 489,706 | 561,314 | 584,364 | 19,113 | 18,833 | 15,081 | 14,039 |
| With reporting dealers | 139,146 | 116,892 | 104,210 | 96,197 | 6,568 | 6,024 | 4,486 | 3,742 |
| With other financial institutions | 316,905 | 338,083 | 421,266 | 469,611 | 11,483 | 11,669 | 9,732 | 9,503 |
| With non-financial customers | 38,376 | 34,731 | 35,838 | 18,556 | 1,062 | 1,141 | 863 | 794 |
| Up to 1 year[2] | 207,236 | 190,672 | 219,237 | 198,302 | ... | ... | ... | ... |
| Between 1 and 5 years[2] | 170,252 | 180,262 | 206,887 | 234,284 | ... | ... | ... | ... |
| Over 5 years[2] | 116,938 | 118,772 | 135,190 | 151,778 | ... | ... | ... | ... |
| US dollar | 164,024 | 148,676 | 169,029 | 173,792 | 7,386 | 5,936 | 4,734 | 4,312 |
| Euro | 179,076 | 187,363 | 227,356 | 241,067 | 7,941 | 9,067 | 7,258 | 6,838 |
| Yen | 60,092 | 54,816 | 55,086 | 52,873 | 1,055 | 911 | 715 | 696 |
| Sterling | 39,913 | 42,244 | 46,334 | 52,214 | 1,462 | 1,616 | 1,103 | 1,293 |
| Swiss franc | 5,494 | 5,357 | 5,583 | 5,777 | 161 | 149 | 113 | 121 |
| Canadian dollar | 7,380 | 7,507 | 9,333 | 10,372 | 195 | 166 | 146 | 139 |
| Swedish krona | 6,994 | 6,193 | 5,906 | 6,406 | 94 | 116 | 73 | 77 |
| Other | 31,452 | 37,551 | 42,687 | 41,862 | 819 | 872 | 938 | 563 |
| *Memo: Exchange-traded contracts*[3] | 55,581 | 48,546 | 62,178 | 57,007 | ... | ... | ... | ... |

[1] See footnote 1 to Table 1.   [2] Residual maturity.   [3] See footnote 2 to Table 1.

### Table 4

### Credit default swaps[1]

Amounts outstanding, in billions of US dollars

| | Notional amounts outstanding | | | | | | Gross market values | | Net market values |
|---|---|---|---|---|---|---|---|---|---|
| | H1 2013 | | | H2 2013 | | | H1 2013 | H2 2013 | H2 2013 |
| | Bought | Sold | Total | Bought | Sold | Total | | | |
| **Total contracts** | 19,257 | 18,820 | 24,349 | 16,223 | 15,850 | 21,020 | 725 | 653 | 139 |
| With reporting dealers | 13,711 | 13,746 | 13,728 | 11,024 | 11,081 | 11,053 | 455 | 389 | 56 |
| With other financial institutions | 5,424 | 5,004 | 10,428 | 5,083 | 4,697 | 9,779 | 260 | 276 | 76 |
| Central counterparties[2] | 2,776 | 2,772 | 5,548 | 2,773 | 2,745 | 5,518 | 87 | 123 | 11 |
| Banks and security firms | 1,220 | 996 | 2,216 | 956 | 768 | 1,724 | 66 | 53 | 15 |
| Insurance firms | 165 | 66 | 230 | 152 | 57 | 209 | 9 | 7 | 6 |
| SPVs, SPCs and SPEs | 292 | 80 | 372 | 271 | 92 | 363 | 21 | 16 | 9 |
| Hedge funds | 443 | 633 | 1,076 | 423 | 611 | 1,034 | 42 | 44 | 16 |
| Other financial customers | 529 | 457 | 986 | 507 | 425 | 931 | 35 | 33 | 20 |
| With non-financial customers | 122 | 70 | 193 | 116 | 72 | 188 | 10 | 9 | 6 |
| **Single-name credit default swaps** | 10,886 | 10,808 | 13,135 | 9,292 | 9,248 | 11,324 | 430 | 369 | ... |
| With reporting dealers | 8,564 | 8,553 | 8,559 | 7,197 | 7,234 | 7,215 | 292 | 249 | ... |
| With other financial institutions | 2,279 | 2,219 | 4,498 | 2,031 | 1,979 | 4,010 | 134 | 116 | ... |
| Central counterparties[2] | 1,024 | 1,023 | 2,047 | 986 | 978 | 1,964 | 38 | 35 | ... |
| Banks and security firms | 745 | 618 | 1,363 | 573 | 462 | 1,035 | 42 | 33 | ... |
| Insurance firms | 54 | 31 | 84 | 49 | 28 | 78 | 5 | 4 | ... |
| SPVs, SPCs and SPEs | 67 | 31 | 98 | 57 | 27 | 84 | 10 | 7 | ... |
| Hedge funds | 141 | 302 | 443 | 150 | 297 | 448 | 19 | 21 | ... |
| Other financial customers | 249 | 214 | 463 | 215 | 187 | 402 | 19 | 16 | ... |
| With non-financial customers | 43 | 36 | 78 | 64 | 34 | 99 | 4 | 4 | ... |
| **Multi-name credit default swaps** | 8,371 | 8,013 | 11,214 | 6,931 | 6,602 | 9,696 | 295 | 284 | ... |
| With reporting dealers | 5,146 | 5,193 | 5,170 | 3,828 | 3,847 | 3,837 | 164 | 120 | ... |
| With other financial institutions | 3,145 | 2,785 | 5,930 | 3,052 | 2,718 | 5,769 | 126 | 160 | ... |
| Central counterparties[2] | 1,752 | 1,749 | 3,501 | 1,787 | 1,767 | 3,554 | 49 | 88 | ... |
| Banks and security firms | 474 | 378 | 853 | 384 | 306 | 689 | 24 | 21 | ... |
| Insurance firms | 111 | 35 | 146 | 102 | 29 | 132 | 4 | 3 | ... |
| SPVs, SPCs and SPEs | 225 | 49 | 274 | 214 | 65 | 279 | 11 | 9 | ... |
| Hedge funds | 302 | 331 | 633 | 273 | 313 | 586 | 23 | 23 | ... |
| Other financial customers | 280 | 243 | 523 | 291 | 238 | 529 | 16 | 17 | ... |
| With non-financial customers | 80 | 35 | 114 | 52 | 37 | 89 | 5 | 4 | ... |
| **of which: index products** | 7,540 | 7,424 | 10,163 | 6,188 | 6,073 | 8,746 | ... | ... | ... |
| With reporting dealers | 4,794 | 4,806 | 4,800 | 3,521 | 3,509 | 3,515 | ... | ... | ... |
| With other financial institutions | 2,699 | 2,596 | 5,295 | 2,647 | 2,544 | 5,191 | ... | ... | ... |
| Central counterparties[2] | 1,749 | 1,747 | 3,495 | 1,781 | 1,754 | 3,535 | ... | ... | ... |
| Banks and security firms | 369 | 325 | 694 | 300 | 261 | 561 | ... | ... | ... |
| Insurance firms | 51 | 27 | 78 | 46 | 24 | 70 | ... | ... | ... |
| SPVs, SPCs and SPEs | 69 | 33 | 102 | 77 | 59 | 136 | ... | ... | ... |
| Hedge funds | 292 | 325 | 617 | 263 | 307 | 570 | ... | ... | ... |
| Other financial customers | 168 | 139 | 308 | 179 | 138 | 318 | ... | ... | ... |
| With non-financial customers | 47 | 22 | 68 | 21 | 20 | 41 | ... | ... | ... |

[1] See footnote 1 to Table 1. Data on notional amounts outstanding bought and sold are recorded on a gross basis, ie not adjusted for inter-dealer double-counting.   [2] Both contracts post-novation are captured.

**Table 5**

**Credit default swaps, by rating category[1]**

Notional amounts outstanding, in billions of US dollars

| | Total | | | Investment grade (AAA-BBB) | | | Non-investment grade (BB and below) | | | Non-rated[2] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | H2 2012 | H1 2013 | H2 2013 | H2 2012 | H1 2013 | H2 2013 | H2 2012 | H1 2013 | H2 2013 | H2 2012 | H1 2013 | H2 2013 |
| **Total contracts** | 25,068 | 24,349 | 21,020 | 15,102 | 15,229 | 13,205 | 5,147 | 4,387 | 4,867 | 4,819 | 4,734 | 2,948 |
| With reporting dealers | 14,149 | 13,728 | 11,053 | 8,303 | 8,270 | 7,007 | 3,018 | 2,723 | 2,486 | 2,828 | 2,735 | 1,559 |
| With other financial institutions | 10,719 | 10,428 | 9,779 | 6,693 | 6,831 | 6,111 | 2,098 | 1,625 | 2,312 | 1,929 | 1,972 | 1,356 |
| Central counterparties[3] | 4,891 | 5,548 | 5,518 | 3,464 | 4,013 | 3,610 | 848 | 715 | 1,364 | 578 | 821 | 544 |
| Banks and security firms | 2,963 | 2,216 | 1,724 | 1,746 | 1,364 | 1,087 | 758 | 450 | 452 | 459 | 402 | 185 |
| Insurance firms | 258 | 230 | 209 | 113 | 117 | 102 | 61 | 37 | 44 | 84 | 76 | 63 |
| SPVs, SPCs and SPEs | 587 | 372 | 363 | 289 | 174 | 191 | 52 | 44 | 42 | 246 | 155 | 129 |
| Hedge funds | 957 | 1,076 | 1,034 | 553 | 685 | 699 | 199 | 222 | 209 | 204 | 169 | 125 |
| Other financial customers | 1,063 | 986 | 931 | 527 | 479 | 421 | 179 | 157 | 201 | 357 | 350 | 309 |
| With non-financial customers | 200 | 193 | 188 | 106 | 127 | 87 | 32 | 38 | 69 | 63 | 27 | 32 |
| **Single-name credit default swaps** | 14,309 | 13,135 | 11,324 | 9,712 | 9,150 | 8,369 | 2,830 | 2,490 | 2,350 | 1,767 | 1,495 | 605 |
| With reporting dealers | 9,031 | 8,559 | 7,215 | 5,846 | 5,669 | 5,071 | 2,087 | 1,899 | 1,750 | 1,098 | 990 | 394 |
| With other financial institutions | 5,170 | 4,498 | 4,010 | 3,806 | 3,421 | 3,231 | 732 | 580 | 578 | 632 | 498 | 201 |
| Central counterparties[3] | 2,078 | 2,047 | 1,964 | 1,728 | 1,735 | 1,745 | 155 | 141 | 173 | 195 | 172 | 47 |
| Banks and security firms | 1,778 | 1,363 | 1,035 | 1,223 | 999 | 796 | 357 | 223 | 188 | 218 | 181 | 50 |
| Insurance firms | 114 | 84 | 78 | 63 | 55 | 52 | 23 | 14 | 17 | 28 | 16 | 8 |
| SPVs, SPCs and SPEs | 225 | 98 | 84 | 158 | 60 | 57 | 36 | 21 | 21 | 31 | 17 | 10 |
| Hedge funds | 464 | 443 | 448 | 282 | 294 | 297 | 104 | 104 | 113 | 78 | 45 | 38 |
| Other financial customers | 511 | 463 | 402 | 352 | 319 | 284 | 77 | 78 | 70 | 82 | 66 | 48 |
| With non-financial customers | 108 | 78 | 99 | 59 | 60 | 66 | 11 | 11 | 22 | 37 | 7 | 10 |
| **Multi-name credit default swaps** | 10,760 | 11,214 | 9,696 | 5,390 | 6,078 | 4,837 | 2,317 | 1,897 | 2,516 | 3,052 | 3,239 | 2,343 |
| With reporting dealers | 5,118 | 5,170 | 3,837 | 2,457 | 2,601 | 1,936 | 931 | 825 | 736 | 1,730 | 1,744 | 1,165 |
| With other financial institutions | 5,549 | 5,930 | 5,769 | 2,886 | 3,410 | 2,880 | 1,366 | 1,045 | 1,734 | 1,297 | 1,475 | 1,155 |
| Central counterparties[3] | 2,813 | 3,501 | 3,554 | 1,736 | 2,278 | 1,866 | 693 | 574 | 1,191 | 383 | 646 | 497 |
| Banks and security firms | 1,185 | 853 | 689 | 523 | 404 | 291 | 421 | 228 | 264 | 241 | 221 | 135 |
| Insurance firms | 144 | 146 | 132 | 50 | 63 | 50 | 38 | 23 | 27 | 56 | 60 | 55 |
| SPVs, SPCs and SPEs | 362 | 274 | 279 | 131 | 114 | 135 | 16 | 23 | 25 | 215 | 138 | 120 |
| Hedge funds | 493 | 633 | 586 | 271 | 391 | 402 | 95 | 118 | 97 | 126 | 123 | 88 |
| Other financial customers | 552 | 523 | 529 | 176 | 160 | 137 | 102 | 80 | 131 | 275 | 283 | 261 |
| With non-financial customers | 93 | 114 | 89 | 46 | 67 | 21 | 21 | 27 | 46 | 25 | 20 | 22 |

[1] See footnote 2 to Table 1.   [2] Without rating or rating not known.   [3] Both contracts post-novation are captured.

Table 6

Credit default swaps, by remaining maturity[1]

Notional amounts outstanding, in billions of US dollars

| | Total | | | One year or less | | | Over one year up to five years | | | Over five years | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | H2 2012 | H1 2013 | H2 2013 | H2 2012 | H1 2013 | H2 2013 | H2 2012 | H1 2013 | H2 2013 | H2 2012 | H1 2013 | H2 2013 |
| **Total contracts** | 25,068 | 24,349 | 21,020 | 5,078 | 4,316 | 3,655 | 18,055 | 18,360 | 16,162 | 1,935 | 1,674 | 1,203 |
| With reporting dealers | 14,149 | 13,728 | 11,053 | 3,173 | 2,718 | 2,202 | 9,963 | 10,106 | 8,297 | 1,013 | 905 | 554 |
| With other financial institutions | 10,719 | 10,428 | 9,779 | 1,879 | 1,558 | 1,438 | 7,952 | 8,138 | 7,728 | 888 | 722 | 614 |
| Central counterparties[2] | 4,891 | 5,548 | 5,518 | 761 | 744 | 777 | 3,827 | 4,588 | 4,517 | 302 | 215 | 224 |
| Banks and security firms | 2,953 | 2,216 | 1,724 | 692 | 497 | 366 | 2,060 | 1,604 | 1,264 | 210 | 115 | 94 |
| Insurance firms | 258 | 230 | 209 | 33 | 27 | 27 | 171 | 162 | 147 | 54 | 41 | 35 |
| SPVs, SPCs and SPEs | 587 | 372 | 363 | 88 | 50 | 41 | 429 | 289 | 292 | 70 | 33 | 29 |
| Hedge funds | 957 | 1,076 | 1,034 | 155 | 155 | 120 | 686 | 800 | 798 | 116 | 121 | 116 |
| Other financial customers | 1,063 | 986 | 931 | 150 | 95 | 106 | 778 | 695 | 709 | 136 | 196 | 116 |
| With non-financial customers | 200 | 193 | 188 | 25 | 30 | 15 | 141 | 116 | 138 | 34 | 47 | 35 |
| **Single-name credit default swaps** | 14,309 | 13,135 | 11,324 | 3,519 | 3,158 | 2,565 | 9,725 | 8,817 | 8,059 | 1,065 | 1,160 | 700 |
| With reporting dealers | 9,031 | 8,559 | 7,215 | 2,312 | 2,114 | 1,692 | 6,106 | 5,749 | 5,161 | 613 | 695 | 362 |
| With other financial institutions | 5,170 | 4,498 | 4,010 | 1,188 | 1,036 | 862 | 3,546 | 3,022 | 2,827 | 437 | 440 | 321 |
| Central counterparties[2] | 2,078 | 2,047 | 1,964 | 470 | 496 | 437 | 1,469 | 1,438 | 1,429 | 139 | 113 | 98 |
| Banks and security firms | 1,778 | 1,363 | 1,035 | 487 | 393 | 279 | 1,177 | 890 | 688 | 114 | 80 | 67 |
| Insurance firms | 114 | 84 | 78 | 18 | 14 | 12 | 73 | 51 | 48 | 23 | 19 | 17 |
| SPVs, SPCs and SPEs | 225 | 98 | 84 | 43 | 17 | 10 | 149 | 64 | 60 | 33 | 17 | 14 |
| Hedge funds | 464 | 443 | 448 | 81 | 49 | 46 | 327 | 325 | 340 | 56 | 69 | 62 |
| Other financial customers | 511 | 463 | 402 | 88 | 67 | 78 | 351 | 253 | 261 | 71 | 148 | 63 |
| With non-financial customers | 108 | 78 | 99 | 19 | 8 | 10 | 73 | 46 | 71 | 16 | 25 | 17 |
| **Multi-name credit default swaps** | 10,760 | 11,214 | 9,696 | 1,559 | 1,157 | 1,090 | 8,330 | 9,543 | 8,104 | 870 | 513 | 502 |
| With reporting dealers | 5,118 | 5,170 | 3,837 | 861 | 604 | 509 | 3,856 | 4,357 | 3,136 | 401 | 209 | 192 |
| With other financial institutions | 5,549 | 5,930 | 5,769 | 692 | 532 | 576 | 4,406 | 5,116 | 4,901 | 451 | 282 | 292 |
| Central counterparties[2] | 2,813 | 3,501 | 3,554 | 291 | 248 | 340 | 2,358 | 3,150 | 3,089 | 163 | 103 | 125 |
| Banks and security firms | 1,185 | 853 | 689 | 205 | 104 | 87 | 884 | 713 | 576 | 96 | 36 | 27 |
| Insurance firms | 144 | 146 | 132 | 15 | 14 | 15 | 98 | 110 | 99 | 31 | 22 | 18 |
| SPVs, SPCs and SPEs | 362 | 274 | 279 | 44 | 33 | 32 | 281 | 225 | 232 | 37 | 16 | 15 |
| Hedge funds | 493 | 633 | 586 | 74 | 106 | 74 | 359 | 475 | 459 | 60 | 52 | 54 |
| Other financial customers | 552 | 523 | 529 | 62 | 28 | 28 | 427 | 442 | 448 | 64 | 53 | 53 |
| With non-financial customers | 93 | 114 | 89 | 6 | 22 | 5 | 68 | 70 | 67 | 18 | 22 | 18 |

[1] See footnote 1 to Table 1.  [2] Both contracts post-novation are captured.

Table 7

## Credit default swaps, by sector[1]

Notional amounts outstanding, in billions of US dollars

| | Total[2] | | Sovereigns | | Financial firms | | Non-financial firms | | Securitised products | | Multiple sectors | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | H1 2013 | H2 2013 | H1 2013 | H2 2013 | H1 2013 | H2 2013 | H1 2013 | H2 2013 | H1 2013 | H2 2013 | H1 2013 | H2 2013 |
| **Total contracts** | 24,349 | 21,020 | 3,243 | 2,633 | 6,404 | 5,709 | 8,360 | 7,230 | 732 | 566 | 5,606 | 4,879 |
| With reporting dealers | 13,728 | 11,053 | 2,430 | 1,929 | 3,340 | 2,794 | 4,916 | 4,067 | 509 | 372 | 2,532 | 1,950 |
| With other financial institutions | 10,428 | 8,779 | 791 | 683 | 3,041 | 2,894 | 3,401 | 3,118 | 210 | 181 | 2,983 | 2,861 |
| Central counterparties[3] | 5,548 | 5,518 | 133 | 147 | 1,629 | 1,705 | 2,002 | 1,969 | 7 | 8 | 1,777 | 1,689 |
| Banks and security firms | 2,216 | 1,724 | 393 | 276 | 555 | 477 | 756 | 546 | 90 | 76 | 431 | 350 |
| Insurance firms | 230 | 209 | 16 | 15 | 47 | 41 | 57 | 46 | 31 | 22 | 79 | 85 |
| SPVs, SPCs and SPEs | 372 | 363 | 22 | 27 | 80 | 71 | 79 | 56 | 15 | 11 | 176 | 198 |
| Hedge funds | 1,076 | 1,034 | 118 | 111 | 462 | 427 | 304 | 309 | 36 | 34 | 157 | 154 |
| Other financial customers | 986 | 931 | 110 | 107 | 258 | 214 | 222 | 192 | 30 | 30 | 363 | 386 |
| With non-financial customers | 193 | 188 | 22 | 22 | 24 | 41 | 43 | 45 | 13 | 12 | 91 | 68 |
| **Single-name credit default swaps** | 13,135 | 11,324 | 3,098 | 2,514 | 3,202 | 2,859 | 6,836 | 5,950 | 0 | 0 | 0 | 0 |
| With reporting dealers | 8,559 | 7,215 | 2,325 | 1,850 | 2,174 | 1,916 | 4,060 | 3,450 | 0 | 0 | 0 | 0 |
| With other financial institutions | 4,498 | 4,010 | 752 | 644 | 1,006 | 903 | 2,740 | 2,463 | 0 | 0 | 0 | 0 |
| Central counterparties[3] | 2,047 | 1,964 | 128 | 145 | 316 | 305 | 1,603 | 1,514 | 0 | 0 | 0 | 0 |
| Banks and security firms | 1,363 | 1,035 | 374 | 259 | 350 | 290 | 639 | 486 | 0 | 0 | 0 | 0 |
| Insurance firms | 84 | 78 | 15 | 14 | 29 | 31 | 40 | 33 | 0 | 0 | 0 | 0 |
| SPVs, SPCs and SPEs | 98 | 84 | 10 | 10 | 31 | 27 | 58 | 47 | 0 | 0 | 0 | 0 |
| Hedge funds | 443 | 448 | 116 | 110 | 98 | 105 | 229 | 233 | 0 | 0 | 0 | 0 |
| Other financial customers | 463 | 402 | 109 | 106 | 182 | 145 | 172 | 151 | 0 | 0 | 0 | 0 |
| With non-financial customers | 78 | 99 | 21 | 21 | 21 | 40 | 36 | 37 | 0 | 0 | 0 | 0 |
| **Multi-name credit default swaps** | 11,214 | 9,696 | 145 | 119 | 3,203 | 2,850 | 1,524 | 1,279 | 732 | 566 | 5,606 | 4,879 |
| With reporting dealers | 5,170 | 3,837 | 105 | 79 | 1,165 | 818 | 856 | 617 | 509 | 372 | 2,532 | 1,950 |
| With other financial institutions | 5,930 | 5,769 | 39 | 39 | 2,035 | 2,031 | 661 | 655 | 210 | 181 | 2,983 | 2,861 |
| Central counterparties[3] | 3,501 | 3,554 | 4 | 2 | 1,312 | 1,399 | 400 | 456 | 7 | 8 | 1,777 | 1,689 |
| Banks and security firms | 853 | 689 | 19 | 17 | 215 | 187 | 97 | 60 | 90 | 76 | 431 | 350 |
| Insurance firms | 146 | 132 | 1 | 1 | 18 | 11 | 17 | 13 | 31 | 22 | 79 | 85 |
| SPVs, SPCs and SPEs | 274 | 279 | 12 | 17 | 49 | 44 | 22 | 9 | 15 | 11 | 176 | 198 |
| Hedge funds | 633 | 586 | 1 | 1 | 364 | 322 | 75 | 76 | 36 | 34 | 157 | 154 |
| Other financial customers | 523 | 529 | 2 | 2 | 76 | 68 | 50 | 41 | 30 | 30 | 363 | 386 |
| With non-financial customers | 114 | 89 | 1 | 1 | 3 | 1 | 7 | 7 | 13 | 12 | 91 | 68 |

[1] See footnote 1 to Table 1.   [2] Due to an incomplete breakdown reported by one country, the sum of components is less than the total.   [3] Both contracts post-novation are captured.

Table 8

Credit default swaps, by location of counterparty[1]

Notional amounts outstanding, in billions of US dollars

| | Total | | | With reporting dealers | | | With non-reporters | | |
|---|---|---|---|---|---|---|---|---|---|
| | H2 2012 | H1 2013 | H2 2013 | H2 2012 | H1 2013 | H2 2013 | H2 2012 | H1 2013 | H2 2013 |
| All locations | 25,068 | 24,349 | 21,020 | 14,149 | 13,728 | 11,053 | 10,920 | 10,621 | 9,967 |
| Home country[2] | 6,106 | 4,744 | 4,091 | 1,625 | 2,549 | 1,932 | 4,481 | 2,195 | 2,159 |
| Abroad | 18,963 | 19,606 | 16,929 | 12,524 | 11,180 | 9,121 | 6,438 | 8,426 | 7,808 |
| US | ... | 5,132 | 4,486 | ... | 2,484 | 2,147 | ... | 2,648 | 2,339 |
| Japan | ... | 196 | 162 | ... | 139 | 110 | ... | 57 | 51 |
| European developed countries | ... | 13,011 | 10,871 | ... | 8,480 | 6,800 | ... | 4,531 | 4,071 |
| Latin America | ... | 600 | 780 | ... | 7 | 3 | ... | 594 | 777 |
| Other Asian countries | ... | 187 | 170 | ... | 9 | 7 | ... | 178 | 162 |
| All other countries | ... | 479 | 461 | ... | 61 | 53 | ... | 419 | 408 |

[1] See footnote 1 to Table 1. The notional amounts outstanding are allocated to one of the locations listed in the table on an ultimate risk basis, ie according to the nationality of the counterparty. [2] Home country means country of incorporation of the reporter's head office.

Table 9a

Herfindahl indices for all OTC interest rate derivatives contracts

| | Canadian dollar | | | Swiss franc | | | Euro | | | Sterling | | | Japanese yen | | | Swedish krona | | | US dollar | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FRAs[1] | IRS[2] | Opts[3] | FRAs[1] | IRS[2] | Opts[3] | FRAs[1] | IRS[2] | Opts[3] | FRAs[1] | IRS[2] | Opts[3] | FRAs[1] | IRS[2] | Opts[3] | FRAs[1] | IRS[2] | Opts[3] | FRAs[1] | IRS[2] | Opts[3] |
| Jun 2001 | 1,347 | 1,621 | 874 | 1,264 | 678 | 1,239 | 936 | 486 | 559 | 693 | 438 | 648 | 1,937 | 613 | 708 | 1,125 | 592 | 989 | 888 | 529 | 764 |
| Dec 2001 | 1,812 | 1,702 | 1,044 | 1,252 | 788 | 1,228 | 740 | 524 | 584 | 638 | 476 | 727 | 1,758 | 706 | 1,217 | 1,002 | 608 | 1,081 | 1,145 | 730 | 1,143 |
| Jun 2002 | 1,556 | 1,682 | 1,044 | 1,234 | 824 | 1,461 | 556 | 478 | 561 | 605 | 489 | 648 | 1,763 | 779 | 1,202 | 944 | 532 | 1,149 | 907 | 666 | 1,044 |
| Dec 2002 | 1,818 | 2,112 | 1,047 | 1,218 | 846 | 1,693 | 571 | 492 | 546 | 610 | 515 | 635 | 1,942 | 790 | 1,624 | 886 | 569 | 1,224 | 1,042 | 682 | 1,038 |
| Jun 2003 | 1,530 | 2,161 | 1,041 | 1,264 | 896 | 1,694 | 539 | 481 | 608 | 607 | 544 | 643 | 1,972 | 806 | 1,223 | 839 | 561 | 1,174 | 901 | 701 | 961 |
| Dec 2003 | 1,522 | 2,226 | 1,039 | 1,269 | 852 | 1,616 | 639 | 478 | 591 | 1,095 | 565 | 666 | 1,647 | 744 | 1,065 | 947 | 570 | 1,230 | 786 | 672 | 877 |
| Jun 2004 | 1,965 | 2,313 | 1,048 | 1,169 | 797 | 1,796 | 670 | 473 | 675 | 930 | 594 | 747 | 1,308 | 728 | 978 | 965 | 583 | 1,137 | 725 | 626 | 847 |
| Dec 2004 | 1,855 | 2,830 | 1,051 | 1,278 | 851 | 1,583 | 611 | 472 | 668 | 933 | 574 | 1,480 | 1,898 | 699 | 776 | 892 | 587 | 1,084 | 641 | 667 | 760 |
| Jun 2005 | 1,639 | 2,955 | 1,000 | 1,158 | 936 | 1,508 | 631 | 479 | 597 | 855 | 614 | 1,288 | 2,555 | 664 | 781 | 811 | 564 | 1,077 | 652 | 650 | 755 |
| Dec 2005 | 1,649 | 3,052 | 1,017 | 1,630 | 1,015 | 1,584 | 667 | 484 | 539 | 1,210 | 661 | 905 | 3,025 | 635 | 793 | 767 | 571 | 1,259 | 690 | 691 | 762 |
| Jun 2006 | 1,670 | 2,703 | 1,018 | 1,698 | 1,080 | 1,398 | 690 | 503 | 534 | 1,083 | 707 | 958 | 3,280 | 613 | 824 | 847 | 586 | 1,431 | 788 | 678 | 816 |
| Dec 2006 | 1,499 | 2,952 | 1,020 | 1,919 | 1,149 | 1,205 | 783 | 561 | 569 | 1,024 | 692 | 916 | 3,468 | 620 | 768 | 1,068 | 594 | 1,638 | 917 | 679 | 830 |
| Jun 2007 | 1,164 | 2,978 | 987 | 2,043 | 1,150 | 1,045 | 812 | 623 | 604 | 1,120 | 736 | 806 | 2,569 | 675 | 799 | 1,096 | 628 | 1,945 | 850 | 686 | 865 |
| Dec 2007 | 1,122 | 2,962 | 985 | 2,032 | 1,162 | 948 | 709 | 596 | 596 | 1,066 | 765 | 777 | 2,302 | 673 | 745 | 1,242 | 660 | 2,337 | 967 | 698 | 982 |
| Jun 2008 | 1,405 | 3,314 | 976 | 1,712 | 1,336 | 899 | 648 | 562 | 594 | 1,055 | 830 | 824 | 1,981 | 660 | 938 | 1,152 | 677 | 1,904 | 881 | 729 | 1,020 |
| Dec 2008 | 1,160 | 2,939 | 1,069 | 1,839 | 1,336 | 947 | 568 | 621 | 639 | 1,218 | 919 | 867 | 2,793 | 738 | 851 | 1,124 | 730 | 1,301 | 891 | 790 | 1,034 |
| Jun 2009 | 1,240 | 2,544 | 1,245 | 1,672 | 1,351 | 852 | 581 | 657 | 607 | 1,194 | 921 | 950 | 2,164 | 777 | 865 | 1,055 | 751 | 1,540 | 996 | 949 | 936 |
| Dec 2009 | 1,149 | 2,739 | 1,145 | 1,889 | 1,401 | 816 | 622 | 641 | 638 | 1,138 | 929 | 929 | 1,810 | 709 | 857 | 939 | 773 | 2,452 | 1,075 | 936 | 512 |
| Jun 2010 | 1,323 | 2,097 | 1,038 | 1,925 | 1,465 | 926 | 621 | 620 | 624 | 1,088 | 973 | 1,256 | 1,409 | 639 | 873 | 924 | 809 | 2,623 | 975 | 916 | 866 |
| Dec 2010 | 1,276 | 2,934 | 993 | 2,159 | 1,497 | 913 | 765 | 626 | 626 | 1,033 | 894 | 1,074 | 1,214 | 585 | 881 | 823 | 797 | 2,694 | 993 | 920 | 801 |
| Jun 2011 | 1,250 | 1,716 | 795 | 1,773 | 1,773 | 1,302 | 613 | 635 | 635 | 907 | 928 | 1,037 | 1,880 | 579 | 1,077 | 797 | 846 | 2,006 | 981 | 849 | 831 |
| Dec 2011 | 1,502 | 1,828 | 793 | 1,603 | 1,429 | 1,102 | 558 | 538 | 605 | 903 | 889 | 992 | 2,127 | 575 | 994 | 820 | 900 | 1,934 | 956 | 831 | 823 |
| Jun 2012 | 1,273 | 2,033 | 785 | 1,729 | 1,508 | 990 | 608 | 549 | 607 | 931 | 867 | 979 | 2,202 | 559 | 895 | 996 | 904 | 2,129 | 1,022 | 804 | 804 |
| Dec 2012 | 1,142 | 2,388 | 756 | 1,606 | 1,606 | 1,013 | 656 | 554 | 632 | 923 | 908 | 908 | 1,204 | 554 | 816 | 873 | 872 | 1,832 | 1,069 | 754 | 782 |
| Jun 2013 | 1,023 | 2,040 | 777 | 1,795 | 1,527 | 1,005 | 661 | 545 | 646 | 979 | 880 | 917 | 1,116 | 550 | 770 | 848 | 885 | 3,042 | 924 | 767 | 767 |
| Dec 2013 | 1,029 | 2,660 | 811 | 1,856 | 1,511 | 1,042 | 720 | 545 | 664 | 1,206 | 856 | 940 | 1,490 | 566 | 762 | 931 | 1,003 | 1,978 | 897 | 668 | 773 |

[1] Forward rate agreements.   [2] Interest rate swaps.   [3] Interest rate options.

## Table 9b

### Herfindahl indices for all OTC foreign exchange derivatives contracts

|  | Forwards, forex swaps and currency swaps | Options |
|---|---|---|
| Jun 2000 | 423 | 507 |
| Dec 2000 | 423 | 528 |
| Jun 2001 | 416 | 546 |
| Dec 2001 | 471 | 564 |
| Jun 2002 | 427 | 518 |
| Dec 2002 | 434 | 503 |
| Jun 2003 | 438 | 498 |
| Dec 2003 | 429 | 605 |
| Jun 2004 | 442 | 560 |
| Dec 2004 | 448 | 611 |
| Jun 2005 | 440 | 591 |
| Dec 2005 | 464 | 624 |
| Jun 2006 | 475 | 606 |
| Dec 2006 | 481 | 567 |
| Jun 2007 | 486 | 558 |
| Dec 2007 | 497 | 570 |
| Jun 2008 | 496 | 636 |
| Dec 2008 | 515 | 641 |
| Jun 2009 | 556 | 640 |
| Dec 2009 | 570 | 628 |
| Jun 2010 | 565 | 654 |
| Dec 2010 | 570 | 635 |
| Jun 2011 | 551 | 648 |
| Dec 2011 | 485 | 651 |
| Jun 2012 | 487 | 689 |
| Dec 2012 | 527 | 872 |
| Jun 2013 | 496 | 902 |
| Dec 2013 | 472 | 728 |

### Table 9c

#### Herfindahl indices for all OTC equity-linked derivatives contracts

| | Europe | | Japan | | Latin America | | Other Asia | | United States | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Forwards and swaps | Options | Forwards and swaps | Options | Forwards and swaps | Options | Forwards and swaps | Options | Forwards and swaps | Options |
| Jun 2000 | 618 | 657 | 2,501 | 1,018 | 6,881 | 6,776 | 5,119 | 1,586 | 1,088 | 749 |
| Dec 2000 | 750 | 779 | 2,043 | 1,386 | 5,015 | 6,703 | 1,663 | 1,600 | 1,132 | 759 |
| Jun 2001 | 693 | 891 | 1,461 | 860 | 5,163 | 4,353 | 1,631 | 1,188 | 1,048 | 663 |
| Dec 2001 | 733 | 880 | 2,005 | 841 | 6,063 | 8,084 | 5,294 | 1,447 | 1,070 | 751 |
| Jun 2002 | 770 | 952 | 1,822 | 1,072 | 7,546 | 7,585 | 6,086 | 1,550 | 1,174 | 890 |
| Dec 2002 | 762 | 791 | 1,946 | 1,132 | 7,281 | 4,807 | 1,677 | 1,675 | 1,037 | 665 |
| Jun 2003 | 768 | 985 | 1,854 | 2,322 | 8,839 | 9,332 | 3,197 | 1,894 | 964 | 793 |
| Dec 2003 | 698 | 1,013 | 3,106 | 1,718 | 3,808 | 6,432 | 2,233 | 5,464 | 1,040 | 1,031 |
| Jun 2004 | 611 | 1,195 | 1,984 | 2,553 | 3,732 | 6,304 | 2,010 | 5,435 | 855 | 836 |
| Dec 2004 | 635 | 710 | 1,779 | 1,185 | 5,694 | 4,485 | 1,339 | 1,739 | 843 | 943 |
| Jun 2005 | 597 | 661 | 2,064 | 898 | 6,953 | 4,427 | 1,355 | 1,177 | 722 | 725 |
| Dec 2005 | 650 | 614 | 2,347 | 3,973 | 7,039 | 5,790 | 1,334 | 5,566 | 947 | 787 |
| Jun 2006 | 613 | 690 | 1,408 | 3,409 | 6,704 | 3,918 | 1,294 | 5,537 | 946 | 1,385 |
| Dec 2006 | 687 | 775 | 1,278 | 3,158 | 7,199 | 3,902 | 1,066 | 5,615 | 1,487 | 751 |
| Jun 2007 | 782 | 716 | 1,168 | 2,333 | 7,876 | 3,735 | 1,343 | 1,098 | 1,057 | 802 |
| Dec 2007 | 732 | 668 | 1,423 | 1,310 | 7,420 | 4,414 | 1,350 | 2,881 | 803 | 755 |
| Jun 2008 | 707 | 706 | 1,044 | 989 | 5,979 | 6,290 | 1,180 | 1,249 | 847 | 741 |
| Dec 2008 | 729 | 860 | 1,100 | 1,191 | 4,566 | 4,934 | 989 | 871 | 743 | 909 |
| Jun 2009 | 921 | 981 | 981 | 1,512 | 4,687 | 6,181 | 949 | 1,105 | 773 | 1,145 |
| Dec 2009 | 808 | 931 | 802 | 1,098 | 3,319 | 4,043 | 1,077 | 1,026 | 763 | 1,490 |
| Jun 2010 | 850 | 1,124 | 693 | 1,013 | 3,900 | 6,467 | 1,219 | 1,192 | 877 | 1,416 |
| Dec 2010 | 824 | 1,013 | 701 | 990 | 5,529 | 3,893 | 1,781 | 1,134 | 793 | 1,152 |
| Jun 2011 | 709 | 923 | 832 | 1,067 | 2,078 | 2,369 | 1,200 | 1,176 | 814 | 1,239 |
| Dec 2011 | 717 | 929 | 797 | 1,040 | 3,031 | 3,502 | 1,098 | 956 | 727 | 931 |
| Jun 2012 | 781 | 933 | 757 | 1,191 | 2,511 | 3,112 | 1,187 | 1,053 | 736 | 966 |
| Dec 2012 | 714 | 1,083 | 787 | 1,211 | 4,387 | 3,769 | 1,129 | 1,038 | 784 | 953 |
| Jun 2013 | 785 | 938 | 915 | 1,404 | 4,606 | 3,495 | 1,162 | 1,078 | 734 | 940 |
| Dec 2013 | 720 | 1,047 | 1,230 | 1,514 | 4,595 | 4,478 | 1,012 | 1,170 | 808 | 928 |