# Exhibit A-4

# RESCAP

Sent/Received

IJUL 2 2 2013

To—————
By—————

**MORRISON | FOERSTER**

## Claim Information

| Claim Number | 3889 , 4139, 4129, 4134 |
|---|---|
| **Basis of Claim**<br><br>Explanation that states the legal and factual reasons why you believe you are owed money or are entitled to other relief from one of the Debtors as of May 14, 2012 (the date the Debtors filed their bankruptcy cases) and, you **must** provide copies of any and all documentation that you believe supports the basis for your claim. | *all claims are contingent and unliquidated*<br><br><br><br><br><br>THE CLAIM IS CURRENTLY CONTIGENT and unliquidated |

If your claim relates to a mortgage loan that you believe was originated or serviced by one of the Debtors, please be sure to include the following loan information, so that we can effectively search our records for information on your property and loan, and evaluate your claim.

| Loan Number: | ▮▮▮9130  ;   ▮▮▮5654  ;   ▮▮▮6453 |
|---|---|

Address of property related to the above loan number:
4011 Hubert Avenue

| City: Los Angeles | State: California | ZIP Code: 90008 |
|---|---|---|

Submitted in conjunction with claim nos. 4139, 4129, 4134

Additional resources may be found at - http://www.kccllc.net/rescap

Residential Capital, LLC   P.O. Box 385220  Bloomington, MN  55438

Claim Number: 3889
Tia Smith
Type: POC

RE: Account Nos.: ████9130; ████5654; ████6453

      Address:     4011 Hubert Avenue, Los Angeles, California 90008

Dear Claims Management,

You have requested that I, Tia Smith provide information regarding the basis for and amount of my claim
The third amended complaint specifically details and supports the basis for my claim, however, the amount is currently contingent and unliquidated.

Please find attached a copy of the third amended complaint without exhibits and a forensic audit of the loan documents. I have also mailed a copy of my complaint **with the exhibits**.

The Debtor Defendants engaged in fraudulent business practices, predatory lending while aiding and abetting a wrongful foreclosure. I was induced into a predatory loan, my home was valued at 695,000 at the time I refinanced. The debtor Defendant Homecomings Financial LLC interfered with my performance of the allegedly void deed of trust, thereby creating a false default. My home has allegedly been sold at an illegal foreclosure sale. I have lost equity, mortgage payments, servicers were not authorized or entitled to collect, income, litigation costs and fees, damage to my credit, derogatory reporting to credit bureaus.
The likelihood of prevailing is great. Wherefore, I am entitled to recoupment, statutory, compensatory, general, and punitive damages.

*Thank you*
*Smith*

323·394·4493        MYFATHERS DIAMOND @ MSN.COM

TIA SMITH
4011 Hubert Avenue
Los Angeles, CA 90008
Telephone: (323) 384-4493
Facsimile: (323) 295-0517

Plaintiff

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

MAY 09 2013

John A. Clarke, Executive Officer/Clerk
BY _____ Deputy
Glenda Kalstead

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

TIA SMITH
                    Plaintiff,
          vs.

AMERICAN MORTGAGE NETWORK, INC.,
RESIDENTIAL FUNDING COMPANY,
WALMAR FINANCIAL GROUP,
AURORA BANK FSB, CAL-WESTERN
RECONVEYANCE CORPORATION,
HOMECOMINGS FINANCIAL, GMAC,
RESIDENTIAL ACCREDIT LOANS, INC.,
DEUTSCHE BANK TRUST COMPANY
AMERICAS as INDENTURED TRUSTEE for
RALI 2007-QO1, FIRST AMERICAN TITLE
INSURANCE COMPANY ; MORTGAGE
ELECTRONIC REGISTRATION SYSTEMS,
INC. ; AND DOES 1-20, inclusive

                    Defendants.

Case No.: BC465542
(Assigned For All Purposes to
Hon. John L. Segal)

**REQUEST FOR JUDICIAL NOTICE
IN SUPPORT OF OPPOSITION TO
DEFENDANTS' DEMURRER**

[Filed concurrently with:]

1. Plaintiff's Opposition to Defendants' Demurrer to
   Plaintiff's Second Amended Complaint;
2. Plaintiff's Opposition to Defendants' Motion to
   Strike;
3. Plaintiff's Objection to Defendants' Request for
   Judicial Notice in Support of Demurrer;

Hearing Date:
Date:  May 22, 2013
Time:  8:30 a.m.
Dept.: 50

TO THE COURT ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

     Plaintiff requests that the Court take judicial notice of the following facts and documents

pursuant to *Evidence Code* 452(d) and 453:

     1. Exhibit 1:    A true, correct and certified copy of the Opinion of the Supreme Court

     of Nebraska case No. S-04-0786, *Mortgage Electronic Registration Systems, Inc. v.*

*Nebraska Department of Banking and Finance.* This document is a public record which the Court may take judicial notice of. See *Fontenot v. Wells Fargo, N.A.,* 129 Cal.Rptr. 3d. 467, 2011 WL 3506177 at *3-*6 (Cal.App. 1st Dist. Aug. 11, 2011).

2 . Exhibit 2:    A true and correct copy of Aurora Loan Services LLC's Memorandum of Points and Authorities in Support of Motion for Relief from Stay or Determining No Stay is in Effect; *In Re Stanley Elliott Barnett,* Jr; No. 2:12-28433-RN. See *Fontenot v. Wells Fargo, N.A.,* 129 Cal.Rptr. 3d. 467, 2011 WL 3506177 at *3-*6 (Cal.App. 1st Dist. Aug. 11, 2011).

Evidence Code section 452( d) provides that judicial notice may be taken of "[r]ecords of (1) any court of this state or (2) any court of record of the United States or of any state of the United States." Evidence Code section 453 provides that "[t]he trial court shall take judicial notice of any matter specified in Section 452 if a party requests it and: (a) [g]ives each adverse party sufficient notice of the request, through the pleadings or otherwise, to enable such adverse party to prepare to meet the request; and (b) [f]urnishes the court with sufficient information to enable it to take judicial notice of the matter." Evidence Code section 452(d), the court can take judicial notice of the records in the pending action, or in any other action pending in the U.S. If such records disclose an absolute defense to the action or deficiency in the complaint, the matter can be adjudicated at the demurrer hearing. (Bistawros v. Greenberg (1987) 189 Cal.App. 3d 189, 192.)

The attached Opinion and Memorandum of Point and Authorities are records of the Supreme Court of Nebraska and the United States District Court for the Central District of California, and are therefore judicially noticeable under Evid. Code § 452(d). The Opinion

is relevant to this action as Defendant admits that "MERS shall at all times comply with the instructions of the beneficial owner of mortgage loans". The Memorandum of Points and Authorities is relevant to this action as Defendants claim that many of Plaintiff's claims are time barred.

Respectfully submitted,

Dated: May 3, 2013

_____
Tia Smith

Plaintiff's Request for Judicial Notice in Support of Opposition to Defendants' Demurrer

# EXHIBIT 1

of the conclusion reached by the trial court. *Curry v. Lewis & Clark NRD*, 267 Neb. 857, 678 N.W.2d 95 (2004).

Qwest maintained control over the site of Washington's accident, which occurred on a utility easement. Therefore, the accepted work doctrine was not applicable to the facts of this case. It was error for the trial court to instruct the jury that the accepted work doctrine could be relied upon as a defense in this case.

[5,6] Whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular case. *Semler v. Sears, Roebuck & Co.*, 268 Neb. 857, 689 N.W.2d 327 (2004). In order to prevail in a negligence action, a plaintiff must establish the defendant's duty to protect the plaintiff from injury, a failure to discharge that duty, and damages proximately caused by the failure to discharge that duty. *Keys v. Guthmann*, 267 Neb. 649, 676 N.W.2d 354 (2004). Washington adduced evidence which, if believed by the trier of fact, would establish that Qwest had a duty to protect him from injury, that it did not discharge that duty, and that he was injured as a result. Therefore, Washington is entitled to a new trial as to Qwest's liability.

### DIRECTED VERDICT

[7] Washington claims that the trial court erred when it granted Addison's motion for directed verdict and dismissed Addison from the case. A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is to say, when an issue should be decided as a matter of law. *Gerhold Concrete Co. v. St. Paul Fire & Marine Ins.*, 269 Neb. 692, 695 N.W.2d 665 (2005). The court found the evidence showed that Addison requested telephone service, that Qwest installed the service and left a wire lying on the ground in a utility easement, and that Washington tripped over the wire and sustained injuries.

[8] The threshold issue in any negligence action is whether the defendant owes a legal duty to the plaintiff. *Fuhrman v. State*, 265 Neb. 176, 655 N.W.2d 866 (2003). If there is no legal duty, there is no actionable negligence. *Id.* Washington failed to show that Addison owed him a legal duty. Washington and Addison had no contractual relationship. Addison did not control the installation of the telephone wire. Its construction site was

across the street and some 300 to 700 feet away from the terminal box on the utility easement. Addison had no control over the premises on which Washington's injury occurred.

Because Addison had no control over the installation of the wire or the premises where Washington was injured, Addison had no duty to protect Washington from injury. See, *Muckey v. Dittoe*, 235 Neb. 250, 454 N.W.2d 682 (1990); *Green v. Duke Power Co.*, 305 N.C. 603, 290 S.E.2d 593 (1982). The trial court did not err in granting Addison's motion for directed verdict, and this assignment of error has no merit.

### CONCLUSION

For the reasons set forth above, the judgment of the district court as to Qwest is reversed and the cause is remanded for a new trial. The directed verdict in favor of Addison is affirmed.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED FOR A NEW TRIAL.

STEPHAN, J., not participating.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.,
APPELLANT, v. NEBRASKA DEPARTMENT OF
BANKING AND FINANCE, APPELLEE.

704 N.W.2d 784

Filed October 21, 2005.    No. S-04-786.

1. **Administrative Law: Judgments: Appeal and Error.** A judgment or final order rendered by a district court in a judicial review pursuant to the Administrative Procedure Act may be reversed, vacated, or modified by an appellate court for errors appearing on the record. When reviewing an order of a district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

Appeal from the District Court for Lancaster County: JOHN A. COLBORN, Judge. Reversed and remanded with directions.

James M. Pfeffer and Joseph T. Breckenridge, of Abrahams, Kaslow & Cassman, L.L.P., for appellant.

Jon Bruning, Attorney General, and Fredrick F. Neid for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## NATURE OF CASE

Mortgage Electronic Registration Systems, Inc. (MERS), appealed an order of the Department of Banking and Finance (the Department), declaring that MERS is a "mortgage banker" under Neb. Rev. Stat. § 45-702 (Reissue 2004) and therefore subject to the license and registration requirements of the Mortgage Bankers Registration and Licensing Act (the Act), Neb. Rev. Stat. § 45-701 et seq. (Reissue 2004). The district court affirmed the order, and MERS appealed. For the reasons that follow, we conclude that MERS is not a mortgage banker as defined by the Act and, therefore, reverse the judgment of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

MERS is a private corporation that administers the MERS System, a national electronic registry that tracks the transfer of ownership interests and servicing rights in mortgage loans. Through the MERS System, MERS becomes the mortgagee of record for participating members through assignment of the members' interests to MERS. MERS is listed as the grantee in the official records maintained at county register of deeds offices. The lenders retain the promissory notes, as well as the servicing rights to the mortgages. The lenders can then sell these interests to investors without having to record the transaction in the public record. MERS is compensated for its services through fees charged to participating MERS members.

MERS filed a petition with the Department, requesting a declaratory order that MERS is not a "mortgage banker" under § 45-702(6) and therefore not subject to the license and registration requirements of the Act. At the hearing before the director of the Department, the parties narrowed the issue to whether MERS directly or indirectly "acquires" mortgage loans within the meaning of the Act. The Department concluded that MERS

is a mortgage banker under the Act and is therefore required to obtain a mortgage banker's license from the Department pursuant to § 45-705.

MERS filed a petition for review under the Administrative Procedure Act. The district court affirmed the order of the Department, and MERS appealed.

## ASSIGNMENTS OF ERROR

MERS assigns, summarized and restated, that the district court erred in affirming the order of the Department, finding that MERS "acquires" mortgage loans and is, therefore, a "mortgage banker" subject to the requirements of the Act.

## STANDARD OF REVIEW

[1] A judgment or final order rendered by a district court in a judicial review pursuant to the Administrative Procedure Act may be reversed, vacated, or modified by an appellate court for errors appearing on the record. When reviewing an order of a district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Troshynski v. Nebraska State Bd. of Pub. Accountancy,* ante p. 347, 701 N.W.2d 379 (2005).

## ANALYSIS

MERS assigns that the district court erred in affirming the Department's order finding MERS to be a "mortgage banker" subject to the license and registration requirements of the Act. Pursuant to the Act, persons acting as or using the title of "mortgage banker" may not do so without first obtaining a license or registering with the Department under the Act or obtaining a license under the Nebraska Installment Loan Act. § 45-705(1). Section 45-702(6) defines "mortgage banker" as

> any person not exempt under section 45-703 who, for compensation or gain or in the expectation of compensation or gain, directly or indirectly makes, originates, services, negotiates, acquires, sells, arranges for, or offers to make, originate, service, negotiate, acquire, sell, or arrange for ten or more mortgage loans in a calendar year.

Section 45-702(8) states that "[m]ortgage loan means any loan or extension of credit secured by a lien on real property, including a refinancing of a contract of sale or an assumption or refinancing of a prior loan or extension of credit." In this case, the parties agree that the inquiry is limited to whether MERS "acquires" mortgage loans under § 45-702(6). Further, although § 45-703 contains several exemptions to the Act, the parties agree that MERS does not fall under any of the exemptions.

In its order, the district court accurately characterized MERS' services as follows:

The MERS system was created to facilitate the transfer of ownership interests and servicing rights in mortgage loans. Under the System, MERS serves as mortgagee of record for participating members through assignment of the members' interests to MERS. Mortgage lenders participate in the MERS System as members upon completion of a membership application.

The district court went on to discuss the elements of the contract between MERS and its members, referring specifically to a document entitled, "Terms and Conditions," that states, in part:

The Member, at its own expense, shall promptly, or as soon as practicable, cause MERS to appear in the appropriate public records as the mortgagee of record with respect to each mortgage loan that the Member registers on the MERS® System. MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as a nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time. MERS shall have no rights whatsoever to any payments made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged properties securing such mortgage loans. MERS agrees not to assert any rights (other than rights specified in the Governing Documents) with respect to such mortgage loans or mortgaged properties.

The document also states that "MERS shall at all times comply with the instructions of the beneficial owner of mortgage loans as shown on the MERS® System."

MERS argues that it does not acquire mortgage loans and is therefore not a mortgage banker under § 45-702(6) because it only holds legal title to members' mortgages in a nominee capacity and is contractually prohibited from exercising any rights with respect to the mortgages (i.e., foreclosure) without the authorization of the members. Further, MERS argues that it does not own the promissory notes secured by the mortgages and has no right to payments made on the notes. MERS explains that it merely "immobilizes the mortgage lien while transfers of the promissory notes and servicing rights continue to occur." Brief for appellant at 12.

The Department argues that MERS, through the assignment of lenders' interests in mortgage loans, indirectly acquires mortgage loans and therefore falls within the scope of the Act. The Department further asserts that a loan and corresponding mortgage or deed of trust are inextricably intertwined and that, accordingly, the interests acquired by MERS are interests in mortgage loans, making MERS a mortgage banker subject to the requirements of the Act.

At the hearing before the Department, documents were offered and received into evidence, and the attorneys for both parties presented arguments before the hearing officer. During the hearing, counsel for the Department described MERS' function in the mortgage industry:

Mortgage lenders hire MERS to act as their nominee for mortgages, which allows the lenders to trade the mortgage note and servicing rights on the market without recording subsequent trades with the various register of deeds throughout Nebraska.

To execute a MERS Mortgage, the borrower conveys the mortgage to MERS, who is acting as a contractual nominee. MERS becomes the recorded grantee, however, the lender retains the note and servicing right. The lender can then sell that note and servicing rights on the market and MERS records each transaction electronically on its files. When the mortgage loan is repaid, MERS, as agent grantor, conveys the property to the borrower. MERS represents that this system saves the lender and the consumer the transaction costs that would be associated with manually recording every transaction.

Subsequently, counsel for MERS explained that MERS does not take applications, underwrite loans, make decisions on whether to extend credit, collect mortgage payments, hold escrows for taxes and insurance, or provide any loan servicing functions whatsoever. MERS merely tracks the ownership of the lien and is paid for its services through membership fees charged to its members. MERS does not receive compensation from consumers. The Department does not take issue with this characterization of MERS' services.

Documents offered during the Department hearing support the limited nature of MERS' services. The hearing officer received several documents into evidence from the MERS Web site providing example forms for naming MERS as the original mortgagee of a mortgage or deed of trust or for assigning mortgages to MERS. The form naming MERS as original mortgagee of a mortgage states:

Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property . . . .

(Emphasis omitted.) Similarly, the document naming MERS as original mortgagee of a deed of trust states:

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS.

(Emphasis omitted.) Both documents go on to state:

Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

Although we agree with the district court's characterization of the services provided by MERS and its contractual relationship with its members, we conclude that such services are not equivalent to acquiring mortgage loans, as defined by the Act. In other

words, through its services to its members as characterized by the district court, MERS does not acquire "any loan or extension of credit secured by a lien on real property." MERS does not itself extend credit or acquire rights to receive payments on mortgage loans. Rather, the lenders retain the promissory notes and servicing rights to the mortgage, while MERS acquires legal title to the mortgage for recordation purposes.

MERS serves as legal titleholder in a nominee capacity, permitting lenders to sell their interests in the notes and servicing rights to investors without recording each transaction. But, simply stated, MERS has no independent right to collect on any debt because MERS itself has not extended credit, and none of the mortgage debtors owe MERS any money. Based on the foregoing, we conclude that MERS does not acquire mortgage loans, as defined in § 45-702(8), and therefore, MERS is not subject to the requirements of the Act.

## CONCLUSION

The district court erred in affirming the judgment of the Department finding MERS to be a mortgage banker under the Act. Thus, we reverse the judgment of the district court, and remand the cause to the district court with directions to reverse the determination made by the Department.

REVERSED AND REMANDED WITH DIRECTIONS.

---

TYSON FRESH MEATS, INC., SUCCESSOR TO IBP, INC.,
APPELLANT AND CROSS-APPELLEE, v. STATE OF NEBRASKA,
NEBRASKA DEPARTMENT OF REVENUE, AND MARY JANE EGR,
NEBRASKA STATE TAX COMMISSIONER, APPELLEES
AND CROSS-APPELLANTS.
704 N.W.2d 788

Filed October 21, 2005.  No. S-04-1294.

1. **Administrative Law: Judgments: Appeal and Error.** A judgment or final order rendered by a district court in a judicial review pursuant to the Administrative Procedure Act may be reversed, vacated, or modified by an appellate court for errors appearing on the record.

2. ___: ___: ___. When reviewing an order of a district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is

**SUPREME COURT**      )

                                  )     **ss.**

**STATE OF NEBRASKA**      )

.I certify that I have compared the foregoing copy of the Opinion in the following case:

No. S-04-0786, Mortgage Electronic Registration Systems, Inc. v. Dept. of Banking with the

original now on file in my office. The same is a correct copy of the original.



IN TESTIMONY WHEREOF, I have hereunto set

my hand and caused to be affixed the Seal of this

Court, in the City of Lincoln, on August 13, 2012.

<u>          Lanet S. Asmussen          </u>

                                            Clerk

By                                        Deputy Clerk

# EXHIBIT 2

1  LAURIE HOWELL (CA Bar No. 098785)
   TFLG, A Law Corporation
2  202 Cousteau Place, Suite 260
   DAVIS, CA 95618
3  TELEPHONE: (530) 750-3700
   FACSIMILE: (530) 750-3344

4

5  Attorneys for
   AURORA LOAN SERVICES, LLC

6

7

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                  LOS ANGELES DIVISION

11
   In Re:                        )    Bankruptcy No. 2:12-28433-RN
12                               )
                                 )    Chapter 7
13 STANLEY ELLIOTT BARNETT, JR,  )
                                 )    MEMORANDUM   OF   POINTS   AND
14                               )    AUTHORITIES  IN   SUPPORT   OF
                                 )    MOTION  FOR  RELIEF  FROM  STAY
15        Debtor.                )    OR DETERMINING NO STAY IS IN
                                 )    EFFECT
16                               )    DATE: 11/20/12
                                 )    TIME: 9:00 am
17                               )    CTRM: 1645
                                 )    FLOOR: 16th
18 _____)

19        Movant AURORA LOAN SERVICES, LLC submits the following:

20        As set forth in the moving papers previously filed, this is

21 the second bankruptcy case by Debtor STANLEY ELLIOTT BARNETT, JR.

22 The first case, Chapter 13 No. 11-37082-ER, was filed on 6/23/11

23 and dismissed on 9/22/11, for failure to appear at the §341

24 hearing. Debtor's current case was filed on 5/25/12.

25        According to 11 USC §362(c)(3)(A), the automatic stay in this

26 case terminated on the 30th day after the filing of the petition

27 because no order continuing the stay in effect was entered within

28
   Memorandum in Support of Motion

1    that time. The termination is absolute in that once the time

2    expires it cannot be revived by a belated motion to continue the

3    stay. See, _In re Ortola_, 2011 WL 7145793 (9th Cir BAP, 2011).

4    Therefore, the automatic stay is not in effect in this case.

5        Movant also asks the Court to note that the argument raised by

6    Debtor's landlady, Tia D Smith, that Deutsche Bank did not assign

7    the note to Movant is unmerited in that Ms. Smith fails to consider

8    that Deutsche Bank was the investor who provided the funds for the

9    loan, not the lender or beneficiary for purposes of the note and

10    deed of trust. The assignment from MERS, the nominal beneficiary to

11    which Ms. Smith agreed in the deed of trust, to Movant took place

12    after the letter Ms. Smith received from Karl Wutscher LLP in

13    response to her purported qualified written request.

14        Finally, to the extent Debtor BARNETT contends that the

15    unlawful detainer procedures were not properly followed, those

16    issues should be raised in defense of the state court action, which

17    has not yet gone to trial.

18        For the above reasons, the Court should grant an order that no

19    stay is in effect and, alternatively, grant relief from stay.

20    Dated: 10/24/12               Respectfully submitted,

21                        TFLG, A Law Corporation

22

23                        _/s/ Laurie Howell_

                          LAURIE HOWELL

24                        Attorney for Movant

                          AURORA LOAN SERVICES, LLC

25

26

27

28

Memorandum in Support of Motion        2

TIA SMITH
4011 Hubert Avenue
Los Angeles, CA 90008
Telephone: (323) 384-4493
Facsimile:  (323) 295-0517

Plaintiff

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| TIA SMITH<br>        Plaintiff,<br>    vs.<br><br>AMERICAN MORTGAGE NETWORK, INC.,<br>RESIDENTIAL FUNDING COMPANY,<br>WALMAR FINANCIAL GROUP, AURORA<br>LOAN SERVICES LLC, CAL-WESTERN<br>RECONVEYANCE CORPORATION,<br>HOMECOMINGS FINANCIAL LLC, GMAC<br>MORTGAGE LLC, RESIDENTIAL ACCREDIT<br>LOANS, INC., DEUTSCHE BANK TRUST<br>COMPANY AMERICAS as TRUSTEE for<br>CERTIFICATE-HOLDERS of the RALI 2007-<br>QO1 TRUST; MORTGAGE ELECTRONIC<br>REGISTRATION SYSTEMS, INC. ; AND<br>DOES 1-20, inclusive<br><br>        Defendants. | Case No.: BC465542<br>(Assigned For All Purposes to<br>Hon. John L. Segal)<br><br>**THIRD AMENDED COMPLAINT**<br>**[JURY TRIAL DEMANDED]**<br><br>1.  DECLARATORY RELIEF<br>2.  FRAUD<br>3.  TORTIOUS INTERFERENCE WITH<br>     CONTRACT<br>4.  WRONGFUL FORECLOSURE AND SET<br>     ASIDE TRUSTEE'S SALE<br>5.  CANCELLATION OF INSTRUMENTS<br>6.  BREACH OF CONTRACT [Deed of Trust<br>     and Promissory Note]<br>7.  BREACH OF CONTRACT[Workout and<br>     Forbearance Agreements]<br>8.  VIOLATION OF CALIFORNIA BUSINESS<br>     AND PROFESSIONS CODE SECTION 17200<br>     ET SEQ.<br>9.  VIOLATION OF *CALIFORNIA CODE §<br>     1788.17* UNFAIR DEBT COLLECTION<br>     PRACTICES<br>10. VIOLATION OF *15 U.S.C § 1641(g)*<br>11. UNJUST ENRICHMENT<br>12. ACCOUNTING<br>13. CONSTRUCTIVE TRUST<br>14. VIOLATION OF THE FAIR CREDIT |

REPORTING ACT
15. FRAUDULENT OMISSIONS
16. QUIET TITLE
17. VIOLATION OF TILA

THIRD AMENDED COMPLAINT

# TABLE OF CONTENTS

I. STATEMENT OF THE CASE..........................................................................1

II. JURISDICTION AND VENUE.......................................................................2

III. PARTIES.......................................................................................................2

IV. FACTUAL ALLEGATIONS.........................................................................5

    A. *Plaintiff's Loan Application is Fabricated and Her Signature is Forged*...................5

    B. *Plaintiff did Not Consent to the Deed of Trust and Promissory Note*.........................6

    C. *American Mortgage Network, Inc. Allegedly Sells Plaintiff's Debt Obligation*.............7

    D. *Plaintiff Attempts to Modify Her Loan with Homecomings*...................10

    E. *Plaintiff Attempts to Modify her Loan with ALS*..............................11

    F. *Condition Precedent*..............................................................18

    G. *Plaintiff Did Not Default*......................................................21

    H. *Lender Failed to Satisfy the Condition Precedent*...........................23

    I. *The Fabricated Substitution of Trustee is a Fraudulent Document that Conveyed No Legal Authority to Cal-Western to Act as the Foreclosing Trustee*...................24

    J. *Improper Substitution of Trustee Due to the Lack of an Agency Relationship*.............28

    K. *Improper Notice and Recording*................................................28

    L. *Several Different Alleged Owners of Plaintiff's Debt Obligation*.............................32

    M. *The Fabricated Assignment of the Deed of Trust is a Fraudulent Lien that Conveyed No Interest to ALS Rendering it Invalid*...........................32

V. CAUSES OF ACTION.................................................................37

FIRST CAUSE OF ACTION
DECLARATORY RELIEF
(Against DBTCA, ALS, Cal-Western and Doe Defendants) (collectively "Defendants").......37

**SECOND CAUSE OF ACTION**
**FRAUD**
(Against RFC, GMAC, MERS, ALS, Cal-Western, DBTCA and Doe Defendants).............39

**THIRD CAUSE OF ACTION**
**TORTIOUS INTERFERENCE WITH CONTRACT**
(Against RFC, GMAC, HF, ALS, DBTCA and Doe Defendants)
(collectively "Defendants")................................................46

**FOURTH CAUSE OF ACTION**
**WRONGFUL FORECLOSURE AND TO SET ASIDE TRUSTEE'S SALE**
(Against ALS, MERS, DBTCA, Cal-Western, RFC, GMAC and Doe Defendants)...........49

**FIFTH CAUSE OF ACTION**
**CANCELLATION OF INSTRUMENTS** *CALIFORNIA CIVIL CODE SECTION 3412*
(Against MERS, ALS, Cal-Western, DBTCA, RFC and Doe Defendants).......................55

**SIXTH CAUSE OF ACTION**
**BREACH OF CONTRACT (Deed of Trust and Promissory Note)**
(Against AMN, MERS, ALS, DBTCA, RFC, GMAC and Doe Defendants)
(collectively "Defendants")................................................57

**SEVENTH CAUSE OF ACTION**
**BREACH OF CONTRACT(Workout and Forbearance Agreements)**
(Against, MERS, ALS, DBTCA, RFC, GMAC and Doe Defendants)
(collectively "Defendants")................................................62

**EIGHTH CAUSE OF ACTION**
**VIOLATION OF** *BUSINESS AND PROFESSIONS CODE§ 17200*
(Against MERS, ALS, DBTCA, Cal-Western AMN, RFC, GMAC, Walmar
and Doe Defendants)................................................65

**NINTH CAUSE OF ACTION**
**VIOLATION OF** *CALIFORNIA CODE § 1788.17*
**UNFAIR DEBT COLLECTION PRACTICES**
(Against ALS, MERS, Cal-Western, Deutsche Bank, RFC and Doe Defendants)...............69

**TENTH CAUSE OF ACTION**
**VIOLATION OF 15 U.S.C § 1641(g)**
(Against ALS, DBTCA, RFC, GMAC and Doe Defendants)......................................73

**ELEVENTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
(Against HF, ALS, Aurora Bank, DBTCA, RFC, GMAC and Doe Defendants).................76

**TWELFTH CAUSE OF ACTION**
**ACCOUNTING**
(Against All Defendants)..............................................................78

**THIRTEENTH CAUSE OF ACTION**
**CONSTRUCTIVE TRUST**
(Against ALS, DBTCA, RFC, GMAC and Doe Defendants)....................79

**FOURTEENTH CAUSE OF ACTION**
**VIOLATION OF THE FAIR CREDIT REPORTING ACT**
(Against ALS, DBTCA, and Doe Defendants)..................................80

**FIFTEENTH CAUSE OF ACTION**
**FRAUDULENT OMISSIONS**
(Against RFC, GMAC, Walmar, AMN and Doe Defendants)
(collectively "Defendants").........................................................81

**SIXTEENTH CAUSE OF ACTION**
**QUIET TITLE**
(Against ALS, Deutsche Bank, RFC, GMAC and Doe Defendants)...............84

**SEVENTEENTH CAUSE OF ACTION**
**VIOLATION OF TILA**
*15 U.S.C. SECTION 1601*
(Against RFC, GMAC, Walmar, AMN DBTCA, ALS and Doe Defendants).................87

**VI. PRAYER FOR RELIEF**.........................................................91

**DEMAND FOR JURY TRIAL**.....................................................92

**VERIFICATION**......................................................................93

# COMPLAINT

COMES NOW Plaintiff Tia Smith ("Plaintiff") for her Amended Complaint against the above-named Defendants pleads as follows:

## I. STATEMENT OF THE CASE

1.    This action arises from a mortgage transaction in which Plaintiff executed a Promissory note ("Note") in favor of American Mortgage Network, Inc. ("AMN"), in the amount of $556,000.00 secured by a Deed of Trust ("DOT") for the refinance of real property located at 4011 Hubert Avenue, Los Angeles, California 90008 ("Property").   Subsequently, Defendant Aurora Loan Services LLC ("ALS") attempted but failed to assign or transfer Plaintiff's Note to itself. As such, Defendants have no authority to collect on the Note and/or enforce the DOT.

2.    Despite ALS' failure to perfect a security interest, ALS and its agents have attempted to collect on Plaintiff's Note and enforce the DOT with the knowledge that they have no legal right to do so. Under California law a party may not foreclose without the legal power to do so. Defendants knowingly concealed their lack of an enforceable interest by fabricating and recording false documents in the Los Angeles County Recorder's Office.  Defendants' conduct is not only unfair and fraudulent, but also constitutes a violation of *California Penal Code section 532 (f)(a)(4)*.[1] Through this action, Plaintiff seeks damages resulting from Defendants' unlawful conduct and a declaratory judgment establishing that Defendants failed to substantiate a perfected security interest in the Note and DOT and will not collect *another free house*. Simply, Defendants have no legal, equitable, or pecuniary interest in Plaintiff's Note and DOT.

---

[1] *Cal. Penal Code* section 532(f)(a) provides that "a person commits mortgage fraud if, with the intent to defraud, the person does any of the following…(4) files or causes to be filed with the recorder of any county in connection with a mortgage loan transaction any document the person knows to contain a deliberate misstatement, misrepresentation, or omission."

## II. JURISDICTION AND VENUE

3.    Jurisdiction for this action is properly founded in the Superior Court State of California, County of Los Angeles. The underlying property of this controversy is located in the jurisdiction of Los Angeles Superior Court California. The Los Angeles County is the location of the real property, located at 4011 Hubert Avenue, Los Angeles, California.

## III. PARTIES

4.    **TIA SMITH**

Plaintiff is and at all times herein was a resident of Los Angeles County, California. Plaintiff has an interest in the real property located at 4011 Hubert Avenue, Los Angeles, California.

5.    **AMERICAN MORTGAGE NETWORK, INC.;**

Defendant, American Mortgage Network, Inc. ("AMN") a subsidiary of Wells Fargo Bank, N.A. operated as a mortgage bank in the United States and **_had_** its principal place of business at 10421 Waterridge Circle, San Diego, CA 92121. According to the California Department of Corporations AMN is no longer licensed as a California Finance Lender as of 9/13/2007; no longer licensed as a Mortgage Banker as of 4/19/2007. [See **_Exhibit J_** true and correct copies]

6.    **RESIDENTIAL FUNDING COMPANY, LLC;**

Defendant RFC and its predecessor, Residential Funding Corporation ("RFC") is a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota.

7.    **WALMAR FINANCIAL GROUP, INC;**

Defendant Walmar Financial Group, Inc. ("Walmar") Plaintiff is informed and believes, and on this basis alleges, that Walmar no longer has a valid real estate license with the DRE. Plaintiff has no knowledge whether Walmar currently transacts any business in California.

### 8.    AURORA LOAN SERVICES, LLC

Defendant ALS is a limited liability company. ALS was assigned as the servicer of the Subject Loan by Residential Funding Company, LLC. ALS's principal office is located at 10350 Park Meadows Drive, Littleton, Colorado 80124. ALS is now known as Aurora Bank FSB.

### 9.    CAL-WESTERN RECONVEYANCE CORPORATION;

Defendant Cal-Western Reconveyance Corporation ("Cal-Western"), is and was at all times herein mentioned conducting business in California, as a National Association, and claims to be duly appointed Trustee, under the Deed of Trust executed by Plaintiff, and is conducting intrastate business in the State of California.

### 10.    HOMECOMINGS FINANCIAL, LLC;

Defendant Homecomings ("HF") is a Delaware limited liability company engaged in the business of consumer mortgage lending in this state with its principal place of business located at: 8400 Normandale Lake Boulevard, Suite 250, Minneapolis, Minnesota 55437-1059.

### 11.    GMAC MORTGAGE, LLC;

Defendant, GMAC MORTGAGE, LLC a/k/a GMAC MORTGAGE USA CORPORATION ("GMAC"), is a Delaware corporation engaged in the business of consumer mortgage lending in this state with its principal place of business located at: 100 Witmer Road, Horsham, PA 19044-0963.

### 12.    RESIDENTIAL ACCREDIT LOANS, INC.;

Defendant Residential Accredit Loans, Inc. ("RALI") is a Delaware corporation with its principal place of business 8400 Normandale Lake Boulevard, Suite 250, Minneapolis, Minnesota 55437. Plaintiff is informed and believes that RALI is the Depositor that acquired the pooled assets and in turn deposits them into the Special Purpose Vehicles.

13. **DEUTSCHE BANK TRUST COMPANY AMERICAS as TRUSTEE for CERTIFICATE-HOLDERS of RALI 2007-QO1 TRUST;**

Defendant, Deutsche Bank Trust Company Americas ("DBTCA") is a national banking association organized under the laws of the United States and is engaged in the residential mortgage business in this state with its principal executive offices located at: 60 Wall Street, New York, New York 10005. Plaintiff is informed, believes and thereon alleges, that DBTCA is the Trustee and custodian under the pooling and servicing agreement of the RALI 2007-QO1Trust ("RALI Trust") and that DBTCA is responsible for holding the notes and mortgage files on behalf of the RALI Trust which means that it is charged with the responsibility of properly funding and transferring the loan into the Trust and administering the Trust properly; DBTCA has been named in this action in its capacity as the Trustee of the RALI Trust. The Trust, being sued through its trustee, is a New York Corporate Trust formed to act as A Real Estate Mortgage Investment Conduit ("REMIC") trust pursuant to the U.S. Internal Revenue Code ("IRC").

14. **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.**

Defendant Mortgage Electronic Registration Systems, Inc., ("MERS"), is a Delaware business and has its principal place of business at 1818 Library Street, Suite 300, Reston, Virginia 20190. MERS, is owned by the company, MERSCORP, which is in turn owned by a group of Wall Street investment Banks (*e.g.*, Bank of America, CitiMortgage, Inc., GMAC

Residential Funding Corporation, and Wells Fargo Bank, N.A.), government sponsored entities (*e.g.*, Fannie Mae and Freddie Mac), mortgage insurance and title companies (*e.g.*, First American Title Insurance Corporation and PMI Mortgage Insurance Company), and the Mortgage Bankers Association.

## IV. FACTUAL ALLEGATIONS

### A. *Plaintiff's Loan Application is Fabricated and Her Signature is Forged*

15.     Plaintiff is informed and believes one or more Defendants fabricated and forged the Loan Application used to obtain the predatory Option ARM loan to refinance her property. [see *Exhibit C*] Sometime in October 2006, Broker Walter Hernandez of the Walmar Financial Group ("Walmar") requested Plaintiff to submit a loan application.  Plaintiff immediately submitted a handwritten application via fax.

16.     In June of 2011, Plaintiff discovered a fabricated and forged Loan Application dated December 5, 2006.  This application was executed three days after Plaintiff *signed* her Loan documents and three days before the Loan closed.

17.     Plaintiff alleges: (1) RFC, GMAC and/or its agent AMN, and/or its agent Walmar represented to her that she qualified for the Loan based upon her "true income," which Plaintiff provided to AMN's agent, Walter Hernandez of Walmar when she applied for the Loan; (2) the representation was false since Plaintiff's obvious qualification for the Loan was based upon a fabricated, inflated and forged statement of her income.(3) RFC, GMAC and/or its agent AMN, and/or its agent Walmar knew the representation was false; (4) AMN demonstrated its intent to defraud by failing to request documented proof of stated financial ability from Plaintiff and instead relying upon the false financial data that was inserted into Plaintiff's Application, failing to inform Plaintiff that the Application contained an inflated gross monthly income and failing to

provide Plaintiff with an opportunity to read or review the Application prior to the closing of the loan; (5) Plaintiff relied on the misrepresentation and obtained the loan believing that AMN's approval of the Loan indicated that Plaintiff qualified for the loan; and (6) Plaintiff was damaged by the misrepresentation because she would not have obtained the Loan had she known her qualification was based upon a fabricated, inflated and forged statement of her income. (7) By executing the inflated, fabricated and forged Loan Application on December 5, 2006, three days after Plaintiff signed her Loan documents, RFC, GMAC and/or its agent AMN, and/or its agent Walmar intentionally concealed the fact of the inflated, fabricated income shown on the Loan Application in order to induce Plaintiff to enter into the Option ARM loan.

18.     Because there is the potential of collusion between the broker (Walmar) and an employee of the Lender (AMN) and/or Warehouse Lender (RFC/GMAC) to produce a fraudulent loan, Plaintiff is not certain which Defendants committed this fraudulent act.

**B. *Plaintiff did Not Consent to the Deed of Trust and Promissory Note***

19.     According to ALS "...Deutsche Bank was the investor who provided the funds for the loan, not the lender or beneficiary for purposes of the note and deed of trust." [see ***Plaintiff's RJN Exhibit 2 page 2 lines 8-10***] This represents an admission of AMN not funding the Plaintiff's promissory note.

20.     Plaintiff discovered this admission when ALS filed their Memorandum of Points and Authorities in Support of Motion for Relief from Stay in the case of In re: Stanley Barnett, Jr., Case No. 2:12-28433-RN filed on October 24, 2012.

21.     Where a contract involves a loan it should include the identity of the lender and borrower, the amount of the loan, and the terms for repayment in order to be sufficiently definite. ***Peterson Development Co. v. Torrey Pines Bank***, 233 Cal.App.3d 103, 115 (1991).

22.   Plaintiff alleges that because full disclosure was not given regarding the parties involved and their respective rights Plaintiff did not and could not consent to the formation of the Deed of Trust and Promissory Note."Contract formation requires mutual consent, which cannot exist unless the parties 'agree upon the same thing in the same sense.'" *Bustamante v. Intuit, Inc.*, 141 Cal.App.4th 199, 208 (2006)(quoting *California Civil Code §§ 1580, 1550, 1565*).

### C.  American Mortgage Network, Inc. Allegedly Sells Plaintiff's Debt Obligation

23.   On or about December 2, 2006, Plaintiff executed a Note and DOT in favor of AMN secured by Plaintiff's Property. On information and belief, Plaintiff alleges that shortly before or after the origination of her Loan, AMN sold her Loan to RFC and/or GMAC.

24.   Plaintiff alleges that RFC and/or GMAC were involved in an attempt to securitize her Mortgage into the RALI 2007-QO1 Trust ("RALI Trust"). In order for Plaintiff's Mortgage to be a part of the RALI Trust, the entities involved were required to follow various agreements and established laws, including the Trust Agreement that governed the creation of the Trust. The RALI Trust, if ever formed properly, is subject to and governed by (1) the Pooling and Servicing Agreement; (2) the Mortgage and Loan Agreement; (3) the 424B5 Prospectus; (4) the common law trust rules of New York; and (5) Internal Revenue Code section 860A through 860G, better known as the Real Estate Mortgage Investment Conduit ("REMIC") rules.

25.   An essential aspect of the mortgage securitization process is that the RALI Trust must obtain and maintain good title to the mortgage loans comprising the pool for that certificate offering. This is necessary in order for the Trustee of the RALI Trust to be **legally entitled to enforce the mortgage loans in case of default**. In addition to other required documentation to complete the Collateral File of any given loan, two documents relating to each mortgage loan

**MUST** be validly transferred into the RALI Trust as part of the securitization process – the Promissory Note and the security instrument (deed of trust or mortgage). In this case, on information and belief, Plaintiff alleges neither document was validly transferred.

26.    Here, Plaintiff alleges that the "true sales" never took place due to the failure to follow the basic legal requirements for the transfer of a security and thereby, none of the named Defendants acquired any legal, equitable, and/or pecuniary interest in Plaintiff's Note and/or Deed of Trust. As a result, thereof, ALS, which purports to be Plaintiff's Creditor, actually has no secured or unsecured right, title, or interest in her Note and/or DOT, and has no right to collect Plaintiff's mortgage payments, demand mortgage payments, report derogatorily against Plaintiff's credit, foreclose or sell her property.

27.    Plaintiff further alleges that, on information and belief, the RALI Trust that purportedly owns Plaintiff's Note and DOT has been dissolved due to the disbursement and receipt of mortgage insurance payouts to DBTCA for the Certificate-Holders of the RALI Trust (including, but not limited to, CDS and other mortgage insurance products). As a result of these mortgage insurance payouts, the Certificate-Holders have been paid in full on Plaintiff's alleged debt obligation.

28.    The parties involved in the alleged Securitization and transfer of Plaintiff's Note and DOT failed to adhere to section 2.01 of the PSA, which requires that Plaintiff's Note and DOT be properly endorsed, transferred, accepted, and deposited with the RALI Trust (or its custodian) on or before the **January 30, 2007**, "closing date" indicated on the Prospectus. The "closing date" is the date by which all of the Notes and Deeds of Trust *must* be transferred into the RALI Trust. The failure to do so, results in the Note and DOT not being part of the RALI Trust, such that it is **not a loan that any Defendant can attempt to collect on.** ALS furnished none of the

funding for Plaintiff's Loan but, has trespassed on Plaintiff's Property with an unlawful foreclosure and illegal trustee's sale. Simultaneously with or immediately before the loan was taken out by the Plaintiff, the obligation reflected under the Promissory Note was satisfied by monies provided by the Investors who then would have obtained ownership of and the right to payment under the terms of the Note.

29.    Plaintiff's information and belief is based on (1) a title report and analysis of the Property's county records; (2) direct written and oral communication with Defendants; (3) her own research, experience, and extensive review of case law, correspondence, news articles, reports, and publicly available securitization documents and practices; (4) a review of the purported "Corporate Assignment of Deed of Trust" signed by an ALS employee, Theodore Schultz; and (5) RALI 2007-QO1 Trust's filings with the Securities and Exchange Commission ("SEC"), including RALI 2007-QO1 Trust's 424B5 Prospectus and Pooling and Servicing Agreement ("PSA"). This PSA dated as of January 1, 2007 is by and among RALI, as depositor RFC, as master servicer, DBTCA, as trustee.

*[See www.sec.gov/Archives/edgar/data/1384915/000138491507000009/0001384915-07-000009.txt]*

30.    Plaintiff alleges on information and belief that none of the Defendants can demonstrate or document that Plaintiff's Note was ever properly endorsed, and transferred to ALS. In fact, Plaintiff has requested numerous times that ALS verify and validate her debt. Nonetheless, ALS attempts to take advantage of the complex structured finance system to defraud yet another homeowner who has sought, for **over three years,** to come to a financial arrangement with her true Creditor and avoid the possibility of double financial jeopardy.

31.    Plaintiff does not dispute that she has an obligation under her Deed of Trust. Rather, Plaintiff disputes the amount owed, and seeks the Court's assistance in determining who the

holder in due course is of her Note and DOT, and specifically what rights, as a Servicer, if any, ALS has to claim a secured or unsecured interest in Plaintiff's Note and/or DOT.

32.   The Note that Plaintiff signed and gave to AMN didn't mention MERS of ALS whatsoever, therefore, MERS and ALS have no right to assign the Note to anyone.

33.   Prior to June 2011, Plaintiff did not know that her mortgage loan was securitized. She did not have the opportunity to accept or reject securitization funding.

34.   RFC, GMAC, MERS, DBTCA, HF and ALS, did not loan Plaintiff any money. The unlawful foreclosure complained of herein was initiated against Plaintiff by parties who have and had no standing to commence or maintain any foreclosure proceeding, both by the express language of the DOT which required that the beneficiary/party owed the obligation declare the default and direct the sale, and by the laws governing the commencement and advancement of foreclosure proceedings which require the trust beneficiary to declare such default and direct such sale. Cal-Western, the purported substituted trustee is a complete stranger to the purported loan transaction and ALS did not fund the loan with any of its own assets and are not owed any of the funds to be repaid by Plaintiff, and ***do not stand to suffer any loss*** should they be enjoined from having to rescind the invalid and unlawful sale of Plaintiffs' home.

35.   The foreclosure on Plaintiff's home complained of herein was initiated by Defendants who had and have no lawful right to initiate, advance or maintain any foreclosure or eviction action against her.

### D. *Plaintiff Attempts to Modify Her Loan with Homecomings*

36.   In mid November 2007 Plaintiff sought help from HF, whom Plaintiff thought was her Lender. Plaintiff contacted HF to request a loan modification in order to reduce her monthly payments. Upon HF's request, Plaintiff orally answered questions regarding her financial status.

HF orally informed Plaintiff that because her mortgage payments were current HF would not be able to offer her any assistance.

37.    On November 14, 2007, HF's representative "Miriam" orally advised Plaintiff that she should miss at least three payments in order to be considered for a loan modification.

38.    Plaintiff alleges that HF told her that she could not apply for or receive a modification until her loan was delinquent and in furtherance of this representation, HF failed and refused to send an application for modification or allow Plaintiff to apply for a loan modification over the telephone prior to skipping payments.

39.    Induced by HF's representative, "Miriam", Plaintiff apprehensively, followed her directions and/or advice and Plaintiff skipped her monthly mortgage payments for the next three months.

40.    It appears that the Plaintiff is a victim of the now infamous loan mod scam where the "pretender lender" tells the homeowner that they have to be three months behind in their payments in order to be considered for a loan mod, but sometime thereafter tell the homeowner that they have been referred for foreclosure.  The fact that this same *modus operandi* has been used by different "pretender lenders" and servicers in so many different states to manufacture homeowner defaults tells us that this is a well-entrenched pattern of fraudulent activity on the part of the "pretender lenders" and servicers to concoct fraudulent foreclosures.

*E. Plaintiff Attempts to Modify her Loan with ALS*

41.    Plaintiff received a letter dated April 11, 2008, stating the current Creditor to whom the Mortgage Loan debt is owed was ***RALI 2007-QO1*** and that ALS was the current servicer of her Loan.[see *Exhibit H*] ***RALI 2007-QO1*** nor ALS were a party to Plaintiff's original Loan agreement. ***RALI 2007-QO1*** nor ALS loaned Plaintiff any money.

THIRD AMENDED COMPLAINT

42.    On April 30, 2008, Plaintiff called her new servicer ALS to explain how HF had advised her to skip at least three (3) payments in order to qualify for a loan modification. ALS claimed that they had no knowledge of what HF had advised and that Plaintiff was in default. ALS claimed that there were no notes confirming what Plaintiff stated. Upon ALS's request Plaintiff orally answered questions regarding her financial information. Following the submission of Plaintiff's financial information, ALS proceeded to set-up Plaintiff into a repayment agreement consisting of (6) payments with the (1st) payment of $3100.00 and the remaining (5) payments of $3175.28. The representative advised Plaintiff that she would receive a repayment agreement via mail and once it was received to immediately sign the agreement and fax it back.[see *Exhibit O*]

43.    Relying on ALS's false representations and fearing the loss of her residence Plaintiff accepted the unaffordable payment arrangement as it was presented as her only option. The Work-out Agreement Plaintiff received states that ALS is Plaintiff's Lender which is in contradiction of the above referenced owner of Plaintiffs debt obligation (see *Exhibit O*)

44.    Under duress Plaintiff made the initial payment of $3100.00. After making the initial payment of $3100.00, Plaintiff contacted ALS in an attempt to arrange a more affordable arrangement despite the past arrangement having been stated as the only option for repayment. Plaintiff again orally submitted her financial information. On June 17, 2008, Plaintiff entered into another repayment agreement with ALS. ALS's representative verbally advised Plaintiff that this "new" repayment plan would consist of (4) consecutive payments. The (1st) payment would be $2,062.78. The (2nd and 3rd) payments would be $2088.32 but, the (4th) payment would be a balloon payment of $9,635.74. The rep advised Plaintiff after making the (3rd) payment to immediately call back in and submit a loan modification application. *The rep informed, directed*

*and/or advised* Plaintiff not to pay the (4th) payment. The rep stated that the (4th) payment was indeed a balloon payment and that *ALS did not expect Plaintiff to pay the (4th) payment.* The reasoning was if Plaintiff could make the balloon payment then Plaintiff would not need the loan modification. The representative urged Plaintiff not to pay the (4th) payment or any payment until Plaintiff heard from ALS regarding the loan modification. The representative advised Plaintiff that she would receive a repayment agreement via mail and once it was received to immediately sign the agreement and fax it back. [see *Exhibit P*]

45.  Plaintiff received a letter stating that Plaintiff was denied a loan modification based on failure to receive their request for financial documents.

46.  On August 25, 2008, Plaintiff contacted ALS and once again, orally submitted her financial information and entered into another repayment agreement with ALS. ALS's representative, "Cheryl" (ID#C3F) verbally advised Plaintiff that this repayment plan would consist of (4) consecutive payments. The (1st) payment would be $3100.00. The (2nd and 3rd) payments would be $2139.99. The representative advised Plaintiff after making the (3rd) payment to immediately call back in and submit a loan modification application. *The rep informed, directed and/or advised* Plaintiff not to pay the (4th) payment of $10,647.96. The rep stated that the (4th) payment was indeed a balloon payment and that ALS did not expect Plaintiff to pay the (4th) payment. The reasoning was if Plaintiff could make the balloon payment then Plaintiff would not need the loan modification. *The representative urged Plaintiff not to pay* the (4th) payment or any payment until Plaintiff heard from ALS regarding the loan modification. The representative advised Plaintiff that she would receive a repayment agreement via mail and once received to immediately sign the agreement and fax it back. Once again, the Work-out Agreement states that ALS is Plaintiff's Lender. [see *Exhibit Q*]

47.     Plaintiff received a letter dated October 7, 2008 congratulating her on successfully maintaining her current home retention payment arrangement. The letter also stated that ALS would like to offer Plaintiff a more permanent workout option. ALS requested updated financial information within the next (14) days. Plaintiff submitted all documents requested of ALS.

48.     Plaintiff received a letter dated December 23, 2008 from ALS stating that Plaintiff was denied a home retention workout because Plaintiff was financially unable to afford monthly payments. On January 8, 2009, Plaintiff contacted ALS to discuss what other options were available. Once again, Plaintiff orally submitted her financial information and entered into yet another repayment agreement with ALS.   ALS's representative, "Cheryl" (ID#C3F) verbally advised Plaintiff that this "new" repayment plan would consist of (4) consecutive payments. Each payment would be in the amount of $2100.00. "Cheryl" advised Plaintiff to apply once again for a loan modification after making the (3rd) payment. The representative advised Plaintiff that she would receive a repayment agreement via mail and once received to immediately sign the agreement and fax it back. Once again, the Work-out Agreement received states that ALS is Plaintiff's Lender. After Plaintiff made her (4th) payment, Plaintiff contacted ALS to seek further instructions. ***ALS orally advised Plaintiff not to make any additional payments*** and to wait to hear from ALS regarding loan modification. [see ***Exhibit R***]

49.     Sometime in July, Plaintiff hired an attorney to assist in achieving a loan modification. Plaintiff's attorney contacted ALS and somehow the existing loan modification application in review was denied when the attorney entered into the scenario. ALS claimed that requested documentation had not been provided. Plaintiff's attorney submits new loan modification application on Plaintiff's behalf. ALS informed Plaintiff's attorney that Plaintiff had 3 broken agreements and therefore ALS would not consider ***any*** type of work-out option.

50.   Plaintiff admitted to breaking the first agreement but no more than that.  ALS insisted that Plaintiff never made the (4th) payments on the second and third agreements, (the balloon payments).   Plaintiff argued that two of ALS's representatives advised her NOT to make the (4th) payments so how could that result in Plaintiff breaking those agreements.  ALS refused to assist.  Plaintiff spoke with three different representatives each one offered her a different work- out plan.  The first representative's supervisor authorized an offer to accept a little over an $8,000.00 deposit based on Plaintiff's history of "Broken Agreements".  Plaintiff declined offer. Plaintiff called back and another supervisor authorized an offer to accept a little over $6,000.00 deposit based on Plaintiff's history of "Broken Agreements".  Plaintiff declined offer.  Plaintiff called back and another supervisor authorized an offer to accept a little over $4,000.00 deposit based on Plaintiff's history of "Broken Agreements".  Plaintiff declined offer.  Plaintiff did not accept any of the above-mentioned offers because they were all unaffordable.

51.   On September 30, 2009, **Lenstar Vendor** #HP1, for ALS stated that "we are in need of an assignment from MERS *into* ALS".  On September 30, 2009, **Lenstar Servicer,** #HP2, a default management network, stated "Please note that we are being bombarded with requests for assignments and it is taking more time to get them completed, we are working as fast as we can".

52.   On or about September 30, 2009, Plaintiff received a Notice of Default executed by Cal-Western.  On or around October 1, 2009, Plaintiff sought assistance from Neighborhood Assistance Corporation of America ("NACA").  Plaintiff entered into an agreement with NACA to assist her in acquiring a loan modification through the Making Home Affordable Program ("HAMP"). NACA encouraged Plaintiff to send ALS a Qualified Written Request ("QWR") in order to ascertain exactly who the Lender/Owner of her Loan was.

53.    On October 6, 2009, in an effort to verify and validate her debt, Plaintiff faxed ALS a Qualified Written Request ("QWR") letter pursuant to **RESPA, 12 U.S.C. 2605(e),** in which she requested that the purported servicer (ALS) provide, among other things, a copy of her NOTE. **12 U.S.C. 2605(e),** requires that the Servicer provide this information and respond to a written request within 20 days of receipt. On November 12, 2009, Plaintiff faxed ALS her QWR dated October 6, 2009 a second time because she had yet to receive a response from ALS regarding her first QWR. A few days later Plaintiff received a response to her initial request. Karl Wutscher LLP, attorneys for ALS responded to Plaintiff's request on November 9, 2009, well past the required 20 days.  Plaintiff was informed and misled by Wurtscher that the current owner of Plaintiff's debt was Deutsche Bank Trust Company Americas as trustee.[see *Exhibit T*]

54.    However, this information was inaccurate according to Deutsche Bank "In no event should servicer-retained foreclosure professionals, including counsel, mislead third parties" [see *Exhibit I page 2, Section 2*]

55.    Attached to the response was a compact disc which included an alleged copy of Plaintiff's Promissory NOTE without any endorsements to any of the named Defendants.

56.    On or about November 28, 2009, Plaintiff received a Notice of Trustee's Sale executed by Cal-Western. However, the notice did not mention the identity of the Lender whatsoever.

57.    Plaintiff received a response to her second request. Karl Wutscher LLP, attorneys for ALS responded to Plaintiff's request on December 23, 2009, well past the required 20 days. However, this time there was no reference to the current owner. Attached to the response was a different compact disc which also included an alleged copy of Plaintiff's Note without any endorsements to any of the named Defendants.

58.   Importantly, in both their substantive responses, Wutscher allegedly provided true and correct copies of Plaintiff's Note both without any endorsements to any of the named Defendants. Because an endorsement of the original Note to ALS would be required to effectively assign ALS the Note, Plaintiff alleges that ***no such "Assignment" ever occurred***. The only endorsement of the original Note was made by AMN in blank. Also the copies of the original Note provided by Wutscher provided no indicia of ownership whatsoever.

59.   The endorsed Note in blank produced by ALS further demonstrates that it was never assigned Plaintiff's Loan. As such, the averments made in the invalid Assignment of Deed of Trust related to assignment of the Note and Deed of Trust was false and never took place.[10]

60.   A power of sale is conferred by the mortgage under ***Cal. Civ. Code § 2924***. Plaintiff's Adjustable Rate Note attached as ***Exhibit A*** states,

"Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder." The Note states in paragraph 7(C): "Notice of Default. If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount."

The Note gives the right to collect, if timely payments are not made, to the Lender and anyone who takes the Note by transfer. This does not include ALS who is not the Note Holder.

//

//

//

_____

[10] Recently, in February 2012, the Office of the Assessor-Recorder of San Francisco commissioned Aequitas Compliance Solutions, Inc. ("Aequitas") to review 382 residential mortgage loan transactions that resulted in foreclosure sales between January 2009 and October 2011 to determine the mortgage industry's compliance with applicable law. Overall, Aequitas identified one or more irregularities in 99% of the subject loans. In 84% of the loans, Aequitas identified what appeared to be one or more clear violations of law. See "*Exhibit L*" " attached hereto is a true and correct copy of the "Foreclosure in California: A Crisis of Compliance" report commissioned by the Office of the Assessor-Recorder of San Francisco. This audit supports Plaintiff's allegations related to the invalid "Assignment" of Deed of Trust, and Defendants' recording of a false document.

**17** THIRD AMENDED COMPLAINT

### F. Condition Precedent

61.   According to Plaintiff's Deed of Trust, the "Lender" is AMN and the "Trustee" is First American.  Consistent with the language of the Note, only the Lender is authorized under Section 22 of the Deed of Trust to accelerate the loan:

> "Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant of agreement in this Security Instrument…If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold.  Trustee shall cause this notice to be recorded in each county in which any part of the Property is located" (see **Exhibit B** page 13, Section 22).

62.   Plaintiff alleges that there is no obligation to tender when a substitution of trustee is not valid and the wrong trustee sells the property.  Furthermore, only the Creditor of the mortgage debt can require tender.

63.   On January 12, 2010, Plaintiff contacted ALS to check the status of her HAMP application submitted through NACA and was informed that it was denied due to insufficient income.  ALS told Plaintiff that her Lender would not agree to the needed forbearance amount. Plaintiff asked ALS who her Lender was and ALS's response was, "We cannot give you that information.  You have a private Lender."

64.   Once again, Plaintiff orally resubmitted her financial information.  On January 15, 2010, Plaintiff entered into a Forbearance Agreement with ALS. Plaintiff agreed to make six (6) consecutive payments of $1122.00.  [see **Exhibit S**] After the (2nd) payment, Plaintiff was advised to resubmit a new loan modification application.  The representative advised Plaintiff that she would receive a repayment agreement via mail and once received to immediately sign and fax it back. The Forbearance Agreement received states that ALS is Plaintiff's Lender.  After Plaintiff made all six (6) forbearance payments as agreed she contacted **ALS for further direction and was advised to not make any payments** but continue to submit updated financial

documents.  Plaintiff updated financial documents each month. Plaintiff called ALS at least once a week to check the status of her HAMP application.  Plaintiff would also call Cal-Western at least once a month to check the status of the impending trustee's sale.  On Thursday, November 25, 2010, Plaintiff called Cal-Western to check on the status of the foreclosure.  Cal-Western advised Plaintiff of a Trustee's Sale scheduled for December 2, 2010, just six (6) days away.  On Friday, November 26, 2010, Plaintiff received a letter of denial dated November 16, for failure to submit financial documentation.

65.    Plaintiff immediately called ALS and spoke with at least six different representatives.  The first two assured her, that there wasn't a trustee's sale scheduled. The next two advised her that it was too late to enter into *any* work-out agreements.  The last two advised her had she not broken the previous agreements they would have been able to offer her another work-out option.

66.    On November 28, 2010, Plaintiff filed a Chapter 7 bankruptcy petition.  After ALS learned of Plaintiff's bankruptcy filing, ALS called Plaintiff that same day and suggested that she apply again for HAMP.   On December 8, 2010, Plaintiff re-applied for HAMP. Once again, ALS informed, directed and/or advised Plaintiff not to make any payments during the loan modification process.

67.    Plaintiff called ALS at least twice a week to check the status of her HAMP application Plaintiff would also call Cal-Western at least once a month to check the status of the impending trustee's sale.  Plaintiff continued to submit updated financial documents every month.

68.    On March 30, 2011 Plaintiff's bankruptcy was discharged; sometime in May Plaintiff received an unlawful Notice of Trustee's Sale scheduled for May 26, 2011. Plaintiff

received a letter dated June 2, 2011 denying Plaintiff's HAMP application based on "excessive

forbearance."

69.    On June 28, 2011, Plaintiff telephoned ALS in another attempt to ascertain the

identity of her Lender.  An ALS representative revealed to Plaintiff that the owner's "Code

Name" was RALI 2007-QO1.  On July 13, 2011, Plaintiff faxed ALS another QWR letter in

which she requested that the purported servicer ALS provide, among other things, the name,

address, name of a contact person, telephone number of the owner of her mortgage Loan, and a

complete life of the loan transactional history ALS's attorneys, McGinnis, Tessitore, Wutscher

LLP, acknowledged their receipt of Plaintiff's QWR on or around July 14, 2011, and mailed

Plaintiff their substantive response dated July 22, 2011. Again, there was no reference to

Plaintiff's current owner.  Attached to the response was a third compact disc different from the

first and second discs received, which included a copy of Plaintiff's Note.

70.    On July 15, 2011, Plaintiff filed this instant action to prevent a wrongful

foreclosure. However, on November 16, 2011, Plaintiff attended and witnessed the unlawful

foreclosure sale of her home.  Plaintiff's home was allegedly sold to Aurora Loan Services, LLC

via an illegal credit bid. The credit bid was performed via telephone by Aurora Loan Services

LLC who did not have the authority to do so. Only the Creditor can perform this action. On

November 23, 2011, Cal-Western recorded an invalid Trustee's Deed Upon Sale in favor of

ALS. Cal-Western alleges that they received cash in the amount of $362,500.00 from ALS.

Plaintiff specifically disputes the contents and authenticity of this document.

71.    However, Aurora Bank FSB a separate entity from ALS, misrepresented itself as

Plaintiff's "Lender" by filing a fraudulent 1099-A form, Acquisition or Abandonment of Secured

Property with the IRS. [see *Exhibit N*, a true and correct copy] According to Section 5 of

Plaintiff's Promissory Note:

"..........If Borrower ***abandons*** property, Lender may file, negotiate and settle any available insurance claim and related matters. ...If Borrower does not respond within 30 days......then Lender may negotiate and settle the claim....if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or the Security Instrument and (b) ......Lender may use the insurance proceeds to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.[see *Exhibit A*]

72.    Upon information and belief, Plaintiff further alleges that ALS and/or Aurora Bank have fraudulently filed, negotiated and settled any and all available insurance claims and/or related matters associated with Plaintiff's Property that Defendants had no rights to.

73.    Plaintiff seeks to ascertain exactly who funded her Loan, or bought it, and who stands to lose money because of the alleged default by Plaintiff.

### G. Plaintiff Did Not Default

74.    Plaintiff did ***not*** default. Plaintiff contends that she did not fail to make a payment or cure a payment that was due under her Promissory Note.

//

---

[11] Case law makes clear that <u>Plaintiff is only required to allege a credible offer of tender</u>, not actual tender. *Alicia v. GE Money Bank*, No C 09-00091 SBA, 2009 WL 2136969 at *3 (N.D. Cal. July 16, 2009) ("...debtor must allege a credible tender of the amount of the secured debt..."). Moreover, tender is not required when the owner's action attacks the validity of the underlying debt because the tender would constitute an affirmation of the debt. *Saachi v. Mortgage Electronic Registration Systems, Inc.*, No. CV 11-1658 AHM, 2011 WL 2533029 (C.D. Cal. June 24, 2011), at *16 (emphasis added) (citing *Onofrio v. Rice*, 55 Cal. App. 4th 413, 424 (1997); *Stockton v. Newman*, 148 Cal. App. 2d 558, 564 (1957). *See also, Foulkrod v. Wells Fargo Financial California Inc.*, No CV 11-732-GHK (AJWx) (C.D. Cal. May 31, 2011) ("...requiring plaintiff to tender the amount due on his loan at this time would be illogical and inequitable given that he disputes that Wells Fargo has any rights under the loan.") In light of the fact that Plaintiff contests the legitimacy of the Defendants' claim to the mortgage payments, it would be **illogical and inequitable** to require Plaintiff to actually tender the amount given that Plaintiff disputes whether Defendants have any rights under the loan. *See Onofrio v. Rice*, 55 Cal. App. 4th 413, 424 (1997).

---

**21**    THIRD AMENDED COMPLAINT

75.    Plaintiff alleges that Defendants RFC, GMAC, HF and ALS jointly and severally induced Plaintiff into a false default by advising her to skip numerous monthly mortgage payments in order to qualify and be considered for a loan modification to reduce her monthly mortgage payments.  However, Plaintiff is informed and believes that the Defendants' right to insist on the occurrence of the condition precedent (mortgage payment) is **_excused_** because the defendant frustrated and/or interfered with the occurrence of the condition.  Thus, because Defendants interfered with Plaintiff's ability to perform the condition precedent, then Plaintiff is **_excused from performing_** the condition precedent.

[O]ne who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

76.    Plaintiff contends that she was not in default, and she further alleges that HF and ALS interfered with her payment of the Note by their false representations.  Plaintiff also contends that according to Section 9 of Plaintiff's Promissory Note it states:

Section 9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE

"If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note.  The Note Holder may enforce its rights under this Note against each person individually or against all of us together.  This means that any one of us may be required to pay all the amounts owed under this Note."

77.    Upon information and belief, Plaintiff alleges that Defendants RFC, GMAC, HF and ALS jointly and severally executed a **_collateral contract_** to her Promissory Note.  A **_collateral contract_** is a contract which assigns the rights and/or obligations of an existing contract (Plaintiff's Deed of Trust) to a third party. A guaranty is an agreement made by a third

party, whether a person, trust or a business entity, to pay and/or perform the obligations of a debtor for the satisfaction of a debt owed to a creditor upon the occurrence of an event, typically a default by the debtor, under the original loan agreement. A guaranty, like any contract, requires mutual assent, adequate consideration, definiteness and a meeting of the minds. In the herein referenced argument the guaranty is the collateral contract known as RALI 2007-QO1 Trust's Pooling and Servicing Agreement. Under most states' the Statute of Frauds, a guaranty must be in writing, signed by the guarantor(s) and delivered to the creditor. Plaintiff alleges that the guarantors, RFC, GMAC, HF and ALS are obligated to keep all the promises made in Plaintiffs Note, including the promise to pay the full amount owed.

78.   Plaintiff alleges that Defendants RFC, GMAC, HF and ALS jointly and severally agreed to become a guarantor, surety and/or endorser of Plaintiff's debt obligation under her promissory Note. Plaintiff alleges that Defendants RFC, GMAC, HF and ALS jointly and severally failed to disclose material information regarding this guaranty.

79.   Plaintiff further alleges anyone who guaranteed the payment on Plaintiff's Note without joining, at least, Plaintiff to that guarantee, acts as a Volunteer.

80.   Plaintiff contends that she was not in default, and she further alleges that HF and ALS interfered with her payment of the Note by their false representations.

*H. Lender Failed to Satisfy the Condition Precedent*

81.   Plaintiff's Lender committed a material breach as they failed to perform all conditions precedent prior to accelerating the mortgage and initiating foreclosure. Specifically, Plaintiff alleges that her Lender failed to furnish her with written notice of her alleged default

prior to accelerating the mortgage and initiating foreclosure as required by Section 22 of

Plaintiff's Deed of Trust. The essential purposes of a deed of trust are two-fold: to secure the

Lender's interest in the property it conveys and to protect the borrower from acceleration of the

debt and foreclosure on the securing property prior to the fulfillment of the conditions precedent

it imposes. Section 22 of the 25 sections in the Deed of Trust is the only section written to

protect the Borrower's interest.

82.    Plaintiff is entitled to a restraining order based on Defendants' wrongful foreclosure

and a Court Order declaring that any attempt to further trespass on Plaintiff's Property would be

void as the Plaintiff's Lender failed to satisfy a condition precedent to foreclosure.

**I.    The Fabricated Substitution of Trustee is a Fraudulent Document that Conveyed No Legal Authority to Cal-Western to Act as the Foreclosing Trustee**

83.    Plaintiff's Deed of Trust names First American Title Insurance Company ("First

American") as Trustee.

84.    On November 9, 2009, Cal-Western caused a document purporting to be a

Substitution of Trustee ("SOT") to be recorded with the County of Los Angeles.  The SOT

alleged that "the present Beneficiary under said Deed of Trust ...hereby substitutes Cal-

Western...as Trustee under said Deed of Trust."[see *Exhibit F*]  The SOT was purportedly

signed by an employee of Cal-Western, Jennifer Victa as "Assistant Secretary" of MERS. Victa

purportedly signed as an officer of MERS as nominee for AMN, however, at this time AMN was

no longer in existence. [see *Exhibit J*]

85.    Moreover, Plaintiff is informed and believes AMN had allegedly conveyed all

rights, title and interest to RFC and AMN could not substitute the trustee under Plaintiff's Deed

of, whatsoever.

86.   Plaintiff alleges that no such transfer ever occurred, and that Jennifer Victa is not the "Assistant Secretary" of MERS. In addition to allegedly being the "Assistant Secretary" of MERS, Jennifer Victa also claims to be the "Vice-President" of Cal-Western. However, according to a letter from ALS dated April 11, 2008, **RALI 2007-QO1** is the current Creditor to whom Plaintiff's mortgage loan debt is owed. [see *Exhibit H*] Yet, according to the numerous *invalid* Workout Agreements between ALS and Plaintiff, **ALS** identifies itself as Plaintiff's Lender. Yet still, according to the ALS's QWR Response Letter, Deutsche Bank Trust Company America as Trustee owns Plaintiff's debt obligation (i.e. Promissory Note). Moreover, according to MERS *Servicer ID* website Deutsche Bank *National* Trust Company America as Trustee owns Plaintiff's debt obligation. Deutsche Bank Trust Company America as Trustee and Deutsche Bank *National* Trust Company America as Trustee are entirely two separate entities. Therefore, based on four separate entities claiming ownership over Plaintiff's mortgage, Cal-Western had no authority to execute the purported Substitution of Trustee.

87.   Section 24 of Plaintiff's Deed of Trust governs the Substitution of Trustee. It provides in relevant part:

---

[9]   The testimony of Linda DeMartini, a 10-year litigation manager for Countrywide, in *In Re Kemp*, Case No. 08-18700-JHW, (Banker. D. N.J. November 16, 2010) (for publication) exposed the shoddy handling of mortgage notes and deeds of trust of securitized mortgages required to perfect "holder in due course" status. In that case Ms. DeMartini described how Countrywide failed to adhere to the most rudimentary of securitization procedures, such as transferring the original promissory note to the trust that had purchased the loians, as required under the pooling and servicing agreement. Ms. DeMartini testified that it was standard practice for Countrywide to warehouse the original mortgage notes, which were stored in Simi Valley, California, despite securitization contracts that required the notes to be physically transferred to sponsors, trustees or custodians of the securitized trusts. The findings in court decisions all over the country, news stories, attorney generals' complaints, and state and federal investigations reveal that business practices like Countywide's were common place and like Countrywide, most lenders failed to properly comply with protocols required to properly securitize mortage loans. Ms. DeMartini's testimony has been corroborated by Abigail Field of CNN, who reviewed foreclosures filed in two New York counties between 2006 and 2010 in which Bank of New York was foreclosing on behalf of a Countrywide Securitization trust, and found that none of the 104 loans that were examined were endorsed by Countrywide: "..If the lack of endorsement on these notes is typical—and 104 out of 104 suggests it is—the problem occurs across Countrywide securities." *See* Abigail Field, *At Bank of America, More Incomplete Mortgage Docs Raise More Questiuons*. *Fort.*, (June 3, 2011), http://finance.cnn.com/2011/06/03/at-bank-of-america-more-incomplete-mortgage-docs-and-more-questions/.

"**Lender**, at its option, may from time to time appoint a Successor trustee to any Trustee appointed hereunder by an instrument **executed and acknowledged by Lender**... This procedure for substitution of trustee shall govern to exclusion of all other provisions for Substitution." [see *Exhibit B*]

88.    In violation of Provision 24, and *Cal. Civ. Code § 2934(a)*, the lender party failed to file a valid Substitution of Trustee, substituting Cal-Western, as the new trustee. Plaintiff alleges the recorded SOT is void because AMN nor Cal-Western was not the current "Lender" at the time of the execution of the Substitution.

89.    Jennifer Victa, an employee of Cal-Western masquerading as a MERS officer and Cal-Western (in its capacity as the purported substituted trustee) recorded a Substitution of Trustee claiming that as the beneficiary, MERS desired to substitute Cal-Western in as the trustee.

90.    Plaintiff alleges that Jennifer Victa is a "robo-signer", an individual who simply signs thousands of property record documents without any legal or corporate authority whatsoever.

91.    In fact, the Substitution of Trustee was fraudulently executed without MERS's or AMN's knowledge or authorization. According to MERS, "Any action taken by MERS with respect to a consumer's mortgage loan is taken at the direct instruction of the lender or loan service provider." [see *Plaintiff's RJN Exhibit 1, page 21, lines 21-22;*] Plaintiff alleges that no such substitution occurred.

92.    Victa is not an "Assistant Secretary" for MERS and in fact, the SOT was fraudulently signed by Victa without MERS or AMN's knowledge or authorization.

93.    There is an obvious conflict of interest being that Jennifer Victa is an employee of Cal-Western and claims also to be the "Assistant Secretary" of MERS. Victa is not an employee of MERS;

**26** THIRD AMENDED COMPLAINT

and she was not employed by AMN on September 15, 2009 when she purportedly executed this invalid SOT. Victa also claims to be the "Vice-President" of Cal-Western.[see *Exhibit U*] However, Victa did not disclose that she was employed by Cal-Western anywhere on the invalid SOT.

94.    And though Victa was never, in any manner whatsoever, appointed as an "Assistant Secretary" by MERS, and thus received no corporate or legal authority from MERS, AMN or the Lender's successors and/or assigns, to execute the purported SOT. This was an integral part of intentional actions undertaken by ALS and Cal-Western, done knowingly and with the specific intent that the consequences of their actions, when brought to fruition, would be evidenced by the instant debt collection activities, illegal foreclosures and sale proceedings.

95.    Plaintiff is informed and believes Victa executed several assignments on behalf of several different assignors in her dual role as a MERS Certifying Officer and/or as Authorized Agent for Cal-Western. [see *Exhibits U*] The results are astonishing and clearly establish a pattern and practice of fraud.

96.    The Substitution of Trustee is a fraudulent document, and the execution, filing, and recordation of the document was created for the purpose of facilitating and aiding and abetting the illegal, deceptive, and unlawful collection and attempts to collect on Plaintiff's obligation and ultimately the unlawful acquisition of Plaintiff's Property.

97.    Attempting to "substitute" Cal-Western under said Deed of Trust, as Defendants did here, does not allow Cal-Western to act as the trustee under the Deed of Trust.

98.    According to *California Civil Code* **§ 2934a(D)**, Notice of the substitution is required to be sent by certified mail, postage prepaid, with return receipt requested **to each holder of an interest in the obligation secured by the deed of trust**. However, Cal-Western, the purported substituted trustee failed to notice any of the four purported owners of Plaintiff's debt (according to ALS and MERS); 1) the RALI 2007-QO1; 2)ALS; 3) Deutsche Bank Trust

Company America as Trustee; and, 4) Deutsche Bank **_National_** Trust Company America as

Trustee of their fraudulent Substitution of Trustee. [see **_Exhibit F_**]

### J.  Improper Substitution of Trustee Due to the Lack of an Agency Relationship

99.    Plaintiff alleges that the Substitution was invalid because the person executing it on

behalf of MERS and/or AMN, Victa, was a "robo-signer" who lacked the requisite agency

relationship. Section **_2934a_** requires that, in order for a trustee to be substituted, the beneficiary

or the beneficiary's agent must record the substitution. **_CCC § 2934a(a)_**.  As noted above, **_CCC §_**

**_2924_** requires that a notice of default be recorded by the mortgagee, trustee, beneficiary, or

authorized agent thereof. **_CCC § 2924(a)(1); see also CCC § 2932.5_**.  Victa lacked an agency

relationship with MERS and/or AMN when she executed the SOT, therefore, the Substitution of

Trustee was invalid, such that **Cal-Western was not one of the four parties authorized by §**

**2924 to record a NOD.**  Thus, Victa had no agency relationship with MERS and/or AMN, all

subsequent actions taken by Cal-Western as the trustee are invalid.

### K.  Improper Notice and Recording

100.    Cal-Western executed and recorded an invalid Notice of Default on September 24,
2009.

101.    A notice of default is invalid if not recorded by an entity that is the trustee,

mortgagee, beneficiary, or authorized agent thereof. **_See Cal. Civ. Code § 2924(a)(1)_** (requiring

that, in order to exercise the power of sale in a deed of trust, a notice of default must be recorded

by one of the aforementioned parties); **_Cal. Civ. Code § 2932.5_** ("The power of sale may be

exercised by the assignee if the assignment is duly acknowledged _and recorded._") (emphasis

added)). The language in Plaintiff's Deed of Trust tracks this requirement. [see **_Exhibit B_**] ("If

Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written

notice of the occurrence of an event of default . . . . **_Trustee shall cause this notice to be recorded_**

. . . ." (emphasis added)). Thus, only certain parties – often the trustee – may initiate foreclosure proceedings. Trustees may be substituted at the Lender's discretion so long as the Lender or beneficiary follows certain statutory procedures; namely, the substitution must be recorded. *See CCC § 2934a* ("The trustee under a trust deed . . . may be substituted *by the recording* in the county in which the property is located of a substitution . . . ." (emphasis added)); *CCC § 2932.5.* Again, the language in Plaintiff's Deed of Trust tracks this statutory requirement. (stating that the Lender may choose to substitute a trustee "by an instrument executed and acknowledged by Lender *and recorded* [in the appropriate county recorder's office]." (emphasis added).

102.    In the present case, the Notice of Default and the Substitution of Trustee were not executed on the same day. The Notice of Default was recorded by Cal-Western acting as the trustee on September 24, 2009. This creates a problem because the Substitution of Trustee replacing First American with Cal-Western was not recorded until 55 days later, on November 9, 2009. The Notice of Default was thus potentially defective because it was recorded by an entity not yet properly substituted as the trustee. *See CCC § 2934a* (stating that a trustee is properly substituted "by the recording" of a substitution); *CCC § 2924(a)(1).* Section *2934a(b)* does, however, permit, under certain circumstances, a Substitution of Trustee to be executed, but not recorded prior to the execution of the Notice of Default: "If the substitution is executed, but not recorded, prior to or concurrently with the recording of the notice of default, the beneficiary or beneficiaries or their authorized agents *shall cause notice of the substitution to be mailed prior to or concurrently with the recording thereof* . . . . An affidavit shall be attached to the substitution that notice has been given to those persons and in the manner required by this subdivision." *CCC § 2934a(b)* (emphasis added); *see also Atienza v. Wells Fargo Bank, N.A.,* No. C 10-03457 RS, 2011 WL 11507, at *3 (N.D. Cal. Jan. 4, 2011) ("[S]ection *2934a(b)*

provides that if the substitution is executed prior to or concurrently with the recording of a

[notice of default], then notice of the substitution *must* be mailed *on or before that recordation*

*date.*

103.   Here, the Substitution of Trustee was allegedly executed prior to, but not recorded

until after the execution of the Notice of Default, so Defendants were required to comply with *§*

*2934a(b)*.  Compliance with *§ 2934a(b)* in this case required sending Plaintiff a Notice of

Substitution of Trustee on or before the date the Notice of Default was recorded – September 24,

2009– with a copy of the Substitution of Trustee attached, along with an affidavit stating that the

proper notice procedures had been followed. *See CCC § 2934a(b).*

104.   Due to the BACKDATED, LATE, DEFECTIVE, FAULTY, and FRAUDULENT

Substitution of Trustee to Cal-Western, there is no validity of Substitution of Trustee, which

voids the unlawful Notice of Default. [*See Exhibit F*]

105.   The Deed of Trust expressly reserves the right to the Lender to cause the Trustee to

execute written notice of the occurrence of an event of default and of Lenders' election to cause

the Property to be sold.  The Deed of Trust further provides that the Trustee shall give public

notice of sale to the persons and in the manner prescribed by applicable law.  Theses express

provisions of the Deed of Trust are impossible to comply with amidst the fraud.

106.   Plaintiff disputes the following contents of the Notice of Default: 1) the

authenticity of the invalid Notice of Default; 2) the authority of Cal-Western as the substituted

trustee; 3) the authority of Cal-Western acting as the agent for the trustee or beneficiary under a

deed of trust dated November 13, 2006; 4) Plaintiff's alleged breach of and default in the

obligations; 5) Plaintiff's failure to pay the monthly payment due November 1, 2008 of principal

and interest and subsequent installments due thereafter; plus late charges; together with all

subsequent sums advanced by beneficiary pursuant to the terms and conditions of said deed of trust; 6) the alleged amount of arrears; 7) the authority of MERS; 6) Cal-Western and MERS sharing an address and telephone number; 8) the Declaration of Compliance; and 9) the authenticity of Rhonda Rorie's signature.

107.   The Notice of Default states the following:

To find out the amount you must pay, or arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact: MORTGAGE ELECTRONIC REGISTRATIONS SYSTEMS INC.

108.   According to MERS, "...MERS is invisible to a consumer.  In the event a consumer has a problem with his/her mortgage loan, such consumer is not going to contact MERS, but the servicer of the loan."[see *Plaintiff's RJN Exhibit 1, page 20,line 18-20*]

109.   According to MERS, "It is the servicer that the consumer needs to contact for specific loan information not MERS."[see *Plaintiff's RJN Exhibit 1, page 19,line 21-22*]

110.   According to MERS, "MERS does not provide any servicing functions on mortgage loans, whatsoever."[see *Plaintiff's RJN Exhibit 1, page 20,line 11-12*]

111.   MERS admissions completely contradict the invalid Notice of Default.

112.   Plaintiff's Lender AMN, MERS nor ALS contacted Plaintiff, either in person or by telephone, to discuss Plaintiff's financial condition and the impending foreclosure.  Plaintiff's Lender AMN, MERS nor ALS called, wrote, or provided a toll-free HUD number to Plaintiff or her lawyer. Plaintiff's Lender AMN, MERS nor ALS offered to meet with Plaintiff or her lawyer and did not advise them that Plaintiff had a right to request a subsequent meeting within 14 days. Attached to the Notice of Default was a "Declaration of Compliance with *California Civil Code §2923.5*" allegedly signed by Rhonda Rorie for Cal-Western.  Ms. Rorie could not have had

personal knowledge of the matters described in her declaration, which stated that the mortgagee,

beneficiary or authorized agent has either contacted the borrower or tried with due diligence to

contact the borrower as required by *California Civil Code §2923.5* to explore options to avoid

foreclosure. Upon information and belief, Plaintiff alleges that Rorie did not personally sign the

Declaration of Compliance.

### L. Several Different Alleged Owners of Plaintiff's Debt Obligation

113. According to ALS's written statements and MERS *Servicer ID* website, several

separate entities claim to own Plaintiff's Deed of trust, debt obligation or be Plaintiff's Lender:

1) AMN; 2) RALI 2001-QO1; 3) Aurora Loan Services LLC; 4) Deutsche Bank Trust Company

Americas as Trustee; and 5) Deutsche Bank *National* Trust Company Americas as Trustee.

MERS and ALS's misrepresentations and concealment of the identity of the Owner of Plaintiff's

debt obligation have deprived Plaintiff of her rights, such as the ability to contact the true

Creditor, ascertain the correct amount of her obligations and the ability to negotiate with the true

Creditor of her debt obligation.

### M. The Fabricated Assignment of the Deed of Trust is a Fraudulent Lien that Conveyed No Interest to ALS Rendering it Invalid

114. Plaintiff alleges not only that the purported MERS assignment was invalid, but also

that ALS did not receive an assignment of the Deed of Trust or Plaintiff's debt obligation in any

other manner.

115. Plaintiff is informed and believes after her Loan was funded it was purportedly sold to

RFC. On information and belief, this transfer from AMN to RFC occurred before or near the origination

date of December 2, 2006. Accordingly, on October 1, 2009, AMN had no interest in Plaintiff's Mortgage

to transfer on October 1, 2009.

116.    On October 1, 2009, ALS's employee, Theodore Schultz purportedly executed a Corporate Assignment of Deed of Trust.  Schultz purportedly signed as an officer of MERS as nominee for AMN, however, at this time AMN was no longer in existence. [see *Exhibit J*]

117.    Moreover, Plaintiff is informed and believes AMN had allegedly conveyed all rights, title and interest to RFC and could not sell the Mortgage for a second time to ALS or any other Defendant.

118.    On December 31, 2009, ALS caused the invalid Assignment to be recorded with the County of Los Angeles.  The Assignment alleged that for "value received" MERS granted, assigned, and transferred to ALS all beneficial interest in the Deed of Trust. [see *Exhibit G* a true and correct copy]

119.    Plaintiff is informed and believes that ALS made no consideration nor did MERS (as nominee for AMN) receive any consideration for all beneficial interest in Plaintiff's DOT. According to MERS "MERS does not sell mortgage loans" [see *Plaintiff's RJN Exhibit 1, page 7, line 22*]

120.    Plaintiff alleges again that ALS was not entitled to exercise the power of sale because the DOT had not been assigned to it and because the NOTE had not been indorsed to it.

121.    The Assignment indicates that it also includes an Assignment of the money due and to become due thereon with interest and all rights accrued or to accrue (related indebtedness). According to MERS, "MERS has no interest at all in the promissory note evidencing the mortgage loan." [see *Plaintiff's RJN Exhibit 1, page 11, line 6*]

122.    Plaintiff contends that the Assignment was ineffective because it was a sham in that it recited that it transferred both the Deed of Trust and the underlying indebtedness to ALS when MERS ***did not have any*** interest in the underlying Note to transfer. According to MERS,

THIRD AMENDED COMPLAINT

"MERS does not acquire any interest (legal or beneficial) in the loan instrument (i.e. promissory note or other debt instrument)." [see *Plaintiff's RJN Exhibit 1, page 13, line 14-15*]

123.   Plaintiff alleges that Schultz is what has come to be known as a "robo-signer" an individual who simply signs thousands of property record documents without any legal or corporate authority whatsoever.[7]

124.   There is no evidence that the Promissory Note was actually conveyed to ALS before or after October 1, 2009.

125.   In fact, the Assignment was fraudulently executed without MERS's or AMN's knowledge or authorization. According to MERS, "Any action taken by MERS with respect to a consumer's mortgage loan is taken at the direct instruction of the lender or loan service provider." [see *Plaintiff's RJN Exhibit 1, page 21, lines 21-22*]

126.   There is an obvious conflict of interest being that Theodore Schultz is an employee of ALS and claims also to be the Vice-President of MERS.  Schultz is not an employee of MERS; and he was not employed by AMN on October 1, 2009 when he purportedly executed this invalid Assignment. Schultz also claims to be the "Assistant Vice-President" of ALS. However, Schultz did not disclose that he was employed by ALS anywhere on the invalid Assignment.

127.   Schultz was never, in any manner whatsoever, appointed as the "Vice-President" by the Board of Directors of MERS, as required by MERS's corporate by-laws and an adopted corporate resolution by the Board of Directors of MERS. For that reason, Schultz never had, nor

---

[7]   A recent "60-Minutes" television news segment reported on the epidemic of "phony" and "forged" documents used to evict homeowners, including the various different and forged signatures of "Linda Green" added to thousands of foreclosure documents filed in foreclosure proceedings all over the country, available at http://www.youtube.com/watch?v=UdeFvPC5MNI.  Ms. Green was interviewed by "60-Minutes" and admitted that her signature was forged by many DocX employees who were paid only $10 an hour and required to forge 4,000 documents a day.  These individuals are now known as "robo-signers".

has, any corporate or legal authority from MERS, AMN, or AMN's successors and assigns, to execute the purported Assignment[8].

128.    Nowhere does the Civil Code allow for assignment of a Deed of Trust by the assignee acting on its own behalf.

129.    Thus, what we have here is a fictitious, self-dealing, invalid Assignment that contains false statements, misrepresentations, and omissions of material fact in order to deceive or defraud. It was prepared and executed by ALS without AMN's knowledge, authority or consent. This Assignment was not prepared for the purpose of legally transferring Plaintiff's Deed of Trust to ALS. Rather, it is a litigation tool that was prepared under false pretenses to close the gap in the chain of title so that ALS could prosecute the instant foreclosure, which it allegedly completed on November 16, 2011. This was an intentional act undertaken by ALS, done knowingly with the specific intent that the consequences of their actions be brought to fruition, which they have as evidenced by the instant debt collection activities, illegal foreclosure and sale proceedings.

130.    Plaintiff is informed and believes Schultz executed several assignments on behalf of several different assignors in his dual role as a MERS Certifying Officer and/or as Authorized Agent for ALS. [see *Exhibits V*] The results are astonishing and clearly establish a pattern and practice of assignment fraud.

131.    The invalid Assignment is a fraudulent lien claim, and the execution, filing, and recordation of the document was created for the purpose of facilitating and aiding and abetting

---

[8]    The instant case is analogous to *Kingman Holdings, LLC v. Citimortgage, Inc. and Mortgage Electronic Registration Systems, Inc.* WL 1883829 (E.D. Tex. 2011) ("*Kingman*"), where the court denied a motion to dismiss with similar causes of action as those that are pled here on the basis that the plaintiff had adequately challenged the signatory's alleged title as "Vice-President" of MERS. The *Kingman* court held that the plaintiff had adequately pled that the assignment executed by Nate Blackstun as "Vice-President" on behalf of MERS, was void because Blackstun was not actually appointed by MERS to be its Vice-President.

the illegal, deceptive, and unlawful collection of Plaintiff's mortgage payments, various other debt collection activities, and ultimately the acquisition of Plaintiff's Property.

132.    Plaintiff further alleges that any amount allegedly owed under the Note is subject to equitable offset by the actual, consequential, special, and punitive damages owed to Plaintiff from Defendants, which amount is currently unknown, but will be determined upon conducting discovery. Plaintiff believes this amount will be in excess of the amount of her obligation.

133.    Attempting to "assign" or transfer a Deed of Trust by itself, as Defendants did here, does not allow enforcement of Plaintiff's Note and Deed of Trust. As alleged herein, Plaintiff's Note was not properly negotiated, endorsed, and transferred to ALS who sought to cause its purported authorized agent(s) to collect payments and engage in other unlawful foreclosure practices.

134.    On information and belief, Defendants were not, and are not, non-holders in possession of Plaintiff's Note who has rights of the holder.

135.    Plaintiff believes none of the Defendants were/are present holders in due course of Plaintiff's Note such that they can enforce Plaintiff's obligation, demand payments, implement and/or execute the foreclosure process. If there is a holder in due course of Plaintiff's Note at issue, pursuant the PSA, it is the entity that can establish a pecuniary, legal, and equitable interest in the property, and provide an unbroken chain of title to Plaintiff's Note and Deed of Trust.[9]

136.    Plaintiff alleges that, on information and belief, ALS and/or its agents are fraudulently enforcing an alleged debt obligation in which they have no pecuniary, equitable or legal interest. Thus, ALS's conduct is part of a fraudulent foreclosure and debt collection scheme.

137.    Plaintiff is informed and believes that the above-described Assignment of Deed of Trust is fraudulent and therefore, it is void as a matter of law. Thus, everything that flows from this "breeder document" is tainted with fraud and must be revoked.

## V. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### DECLARATORY RELIEF
### (Against DBTCA, ALS, Cal-Western and Doe Defendants)
### (collectively "Defendants")

138.    The plaintiff realleges all prior paragraphs of the pleading as if set out here in full.

139.    Pursuant to *28 U.S.C. § 2801* and *Code of Civil Procedure §1060*, Plaintiff submits that an actual controversy has arisen and now exists between Plaintiff and all Defendants regarding their respective rights and duties.

140.    Plaintiff contends that Defendants should be enjoined from conducting any post-foreclosure actions until this action is resolved. Pursuant to Code of Civil Procedure § 1060, any person interested under a written instrument or a contract who desires a declaration of his or her rights or duties with respect to another or in respect to property may, in the case of an actual controversy relating to the legal rights and duties of the parties, bring an original action in the court for a declaration of their rights or duties in the premises, including a determination of any question of construction or validity arising under the instrument or contract, with the declaration having the force and effect of a final judgment and which be had before there has been any breach of the obligation in respect to which the declaration is sought.  Plaintiff is a "person" within the meaning of *Code of Civil Procedure §1060*.

141.    *Code of Civil Procedure §1060* provides that the remedies provided by the chapter are cumulative and shall not be construed as restricting any remedy, and further that under this chapter shall not preclude any party from obtaining additional relief based on the same facts.

142.   Accordingly, Plaintiff requests that the Court make a finding and issue appropriate orders stating that none of the named Defendants or Doe Defendants, have any right or interest in Plaintiff's Note, Deed of Trust, or the Property which authorizes them, in fact or as a matter of law, to collect Plaintiff's mortgage payments or enforce the terms of the Note or Deed of Trust in any manner whatsoever.

143.   Plaintiff will suffer prejudice if the Court does not determine the rights and obligations of the parties because: (1) Plaintiff will be denied the opportunity to identify her true and current Creditor/Lender and negotiate with them; (2) she will be denied the right to conduct discovery and have Defendants' claims verified by a custodian of records who has personal knowledge of her Loan and all transactions related to it; and (3) she will be denied the opportunity to discover the true amount she still owes minus any illegal costs, fees and charges.

144.   Because Plaintiff disputes the amounts owed under her loan documents a four-year statute of limitations applies. The dispute arose sometime time in October of 2009 when Plaintiff sent ALS a qualified written request regarding her loan. Thus this claim is not time-barred.

145.   Due to the actual case and controversy regarding competing claims and allegations, it is necessary that the Court declare the actual rights and obligations of the parties and make a determination as to whether ALS's claims against Plaintiff are enforceable and whether it is secured or unsecured by any right, title, or interest in Plaintiff's Property.

146.   Furthermore, the conduct of Defendants, and the Doe Defendants, and each of them, as herein described, was so malicious and contemptible that it would be looked down upon and despised by ordinary people.  Plaintiff is therefore entitled to punitive damages in an amount appropriate to punish Defendants and to deter others from engaging in similar conduct.

WHEREFORE, Plaintiff requests that this Court take jurisdiction of this claim and issue an Order and Decree that the Substitution of Trustee, Notice of Default, Corporate Assignment of Deed of Trust, Notice of Trustee's Sales, and Trustee's Deed Upon Sale are invalid documents.

### SECOND CAUSE OF ACTION
### FRAUD
### (Against RFC, GMAC, MERS, ALS, Cal-Western, DBTCA and Doe Defendants)

147.   The plaintiff realleges all prior paragraphs of the pleading as if set out here in full.

148.   Plaintiff alleges insurance payments were made on the obligation allegedly owed to the RALI 2007-QO1 Trust. Since it is the intermediaries who initiated Plaintiff's foreclosure rather than the Certificate-Holders of the RALI 2007-QO1 Trust, the intermediaries are not Creditors and the amount they are demanding is misleading and fraudulent if there was an insurance payment or any third party payment that reduced the obligation owed to the RALI Trust.

149.   Plaintiff alleges that ALS is asserting claims for the entire obligation of the Plaintiff while the Creditor has been paid in whole or in part by these credit enhancement tools.

150.   Plaintiff did not know at the time, Defendants RFC, GMAC, AMN, Walmar, and DBTCA fabricated and falsified Plaintiff's income and forged her signature on the Loan Application utilized to secure Plaintiff's Loan. Plaintiff relied upon the false representations that she qualified for the Loan offered which was based upon Defendants fraud. Plaintiff was damaged by the misrepresentation because she would not have obtained the Loan had she known her qualification was based upon a fabricated, inflated and forged statement of her income.

151.   Defendants RFC, GMAC and/or its agent AMN, and/or its agent Walmar intentionally concealed the fact of the inflated, fabricated income shown on Plaintiff's Loan

Application in order to induce Plaintiff to enter into the Option ARM loan, knowing Plaintiff

would not have the opportunity to read the Loan Application and Plaintiff would not have

accepted the Loan if she had been aware of the true facts.

152.   Performance is excused where there is proven fraud in the execution of a contract.

Fraud in the execution is grounds for voiding a contract. One example of fraud in the execution

is when a party is tricked into signing the contract.

153.   Upon information and belief, AMN, RFC, GMAC, and DBTCA tricked Plaintiff

into signing what was understood to be a Deed of Trust and Note, in favor or AMN. Plaintiff was

not aware that AMN did not fund Plaintiff's Loan. Plaintiff discovered this information on or

about October 24, 2012. [see *Plaintiff's RJN, Exhibit 2*]

154.   In a letter dated April 11, 2008, Aurora violated *15 U.S.C. § 1692g(a)* by falsely

and intentionally misrepresented the Owner of Plaintiff's debt and the amount of Plaintiff's debt

obligation. Aurora falsely and intentionally misrepresented the status of Plaintiff's debt and

Aurora and its agents' ability to enforce Plaintiff's debt obligation, in which they had no

pecuniary, equitable, or legal interest. [see *Exhibit H*]

155.   Cal-Western violated *15 U.S.C. § 1692g(a)* falsely and intentionally

misrepresented the status of Plaintiff's debt and Defendants and its agents' ability to enforce

Plaintiff's debt obligation, in which they had no pecuniary, equitable, or legal interest when it

recorded a Notice of Default against Plaintiff's Property. [see *Exhibit E*]

156.   The conduct described above by Defendants, was malicious because Aurora and

their agents knew that they were not acting on behalf of the current pecuniary beneficiary of the

Note. However, despite such knowledge, Aurora and their agents continued to demand and

collect Plaintiff's mortgage payments.

157.    On information and belief, Aurora engaged and is engaging in a pattern and practice of defrauding Plaintiff, Aurora misrepresented the status of Plaintiff's debt, misrepresented the identity of the owner of Plaintiff's Loan, failed to properly credit payments made, incorrectly calculated interest on the account, and failed to accurately debit fees.

158.    The entire foreclosure process has been conducted utilizing a string of fraudulent documents.

159.    ALS' invalid Assignment was fraudulently executed without MERS' or AMN's knowledge or authorization. According to MERS, "Any action taken by MERS with respect to a consumer's mortgage loan is taken at the direct instruction of the lender or loan service provider." [see *Plaintiff's RJN Exhibit 1, page 21, lines 21-22*]

160.    Plaintiff contends that the Assignment was ineffective because it was a sham in that it recited that it transferred both the Deed of Trust and the underlying indebtedness to ALS when MERS ***did not have any*** interest in the underlying Note to transfer. According to MERS, "MERS does not acquire any interest (legal or beneficial) in the loan instrument (i.e. promissory note or other debt instrument)." [see *Plaintiff's RJN Exhibit 1 page 13, line 14-15*]

161.    The Assignment indicates that it also includes an Assignment of the money due and to become due thereon with interest and all rights accrued or to accrue (related indebtedness). However, according to MERS, "MERS has no interest at all in the promissory note evidencing the mortgage loan." [see *Plaintiff's RJN Exhibit 1, page 11, line 6*]

162.    On or about November 3, 2009, Defendant Cal-Western, within San Diego County, State of California, did then and there willfully aid and abet in the notarization of Cal-Western's employee Jennifer Victa's signature when said person whose signature was being notarizing/ed was not in notary, J. Archuleta's presence, another Cal-Western employee.

163.   These actions were performed in a secretive manner in order that the false documents be given full legal effect and that this criminal activity not be discovered. These actions constitute the crime of Notarization of Signature of Person Not in Presence of Notary Public, a violation of **§ 8214.2**, a gross misdemeanor. This activity was discovered in July of 2011.

164.   On or about November 9, 2009, Defendant Cal-Western, did, in the County of San Diego State of California, then and there, knowingly and feloniously, caused to be offered for filing in a public office, a false and/or forged instrument, which instrument, if genuine, might be filed, registered or recorded in a public office under the law of the State of California.

165.   On or about November 9, 2009, Cal-Western, in the County of San Diego, State of California, either directly or through an agent or employee, caused to be offered for filing, a Substitution of Trustee, Instrument No. 20091682671 of Official Records filed in the Office of the County Recorder of Los Angeles County, California dated September 15, 2009. Said document was forged in that it purported to be signed by an officer of MERS, as the agent for the beneficiary of the property listed in said instrument.

166.   On or about December 31, 2009, Defendant ALS did, in the County of Scotts Bluff State of Nebraska, then and there, knowingly and feloniously, cause to be offered for filing in a public office, a false and/or forged instrument, which instrument, if genuine, might be filed, registered or recorded in a public office under the law of the State of California.

167.   On or about December 31, 2009, Defendant ALS did, in the County of Scotts Bluff State of Nebraska, either directly or through an agent or employee, caused to be offered for filing, a Corporate Assignment of Deed of Trust, Instrument No. 20062729009 of Official Records filed in the Office of the County Recorder of Los Angeles County, California dated

October 1, 2009. Said document was forged in that it purported to be signed by an officer of

MERS, as the agent for the beneficiary of the property listed in said instrument.

168.    These actions were performed in a secretive manner in order that the false

documents be given full legal effect and that this criminal activity not be discovered. All of

which constitutes the crime of offering a false instrument for filing and/or recording, a violation

of the *California Penal Code § 115.5*, a category C felony. This activity was discovered in July

of 2011.

169.    Plaintiff alleges that HF told her that she could not apply for or receive a

modification until her loan was delinquent and in furtherance of this representation, HF failed

and refused to send an application for modification or allow Plaintiff to apply for a loan

modification over the telephone prior to skipping payments. Plaintiff contends this is an

unnecessary prerequisite.

170.    Induced by HF's Plaintiff apprehensively, followed "Miriam's" direction and/or

advice and Plaintiff skipped her monthly mortgage payments for the next three months.

171.    Plaintiff was misinformed by ALS that she was in default.

172.    On June 17, 2008, ALS *advised* Plaintiff not to make certain payments. The

Agreement states falsely that ALS is Plaintiff's Lender.[see *Exhibit P*]

173.    On August 25, 2008, ALS *advised* Plaintiff not to make certain payments. The

Agreement states falsely that ALS is Plaintiff's Lender. [see *Exhibit Q*]

174.    On January 8, 2009, ALS' *advised Plaintiff not to make any additional payments

until further notice*. The Agreement states falsely that ALS is Plaintiff's Lender. [see *Exhibit R*]

175.    The final Agreement Plaintiff received states that ALS is Plaintiff's Lender. After

Plaintiff made all six forbearance payments as agreed she contacted *ALS for further direction*

*and was advised not to make any payments until further notice.* The Agreement states falsely

that ALS is Plaintiff's Lender. [see *Exhibit S*]

176.    ALS deceived Plaintiff by misrepresenting its status as Lender; ALS misled

Plaintiff to believe that it wanted to help Plaintiff maintain ownership of her home.

177.    ALS misrepresented that at the expiration of the Workout and Forbearance

Agreements("Agreements"), Plaintiff would have an opportunity to cure her loan default

through: (1) reinstatement; (2) payoff; (3) loan modification; or (4) some other workout.

178.    At the time that ALS made these false representations, ALS knew that they were

not true.  ALS had no intention to provide an opportunity to cure at the end of the Agreements

or prior to foreclosing on Plaintiff's home. ALS designed its scheme so that it could foreclose.

179.    ALS also misrepresented to Plaintiff that her foreclosure would continue to be on

hold after the expiration of the Agreements.  At the time that ALS made these representations

ALS knew that they were not true. ALS made these false representations with the purpose of

persuading Plaintiff to enter into the Agreements and to continue to make payments of thousands

of dollars.

180.    Plaintiff reasonably relied on ALS' representations. Plaintiff would not have

entered into the Agreements had she known that these representations were not true.  That is, had

she known that she would not have a genuine opportunity to cure her alleged arrears and that

ALS could and would foreclose on her Property without any notice that the modification was

denied and after she had paid thousands of dollars to ALS, Plaintiff would not have entered into

the Agreements to begin with and would not have made the payments during the terms of the

Agreements.

181.    ALS knew, or should have known, they **cannot modify that which they do not own**, nor possess;

182.    On December 8, 2010, Plaintiff re-applied for HAMP. Once again, ALS informed, directed and/or advised Plaintiff not to make any payments during the loan modification process.

183.    Plaintiff alleges that ALS has misrepresented that RALI 2007-QO1 was the owner of her debt obligation. .[see *Exhibit H*] ALS' attorney, Kahrl Wurtscher LLP also misrepresented that Deutsche Bank Trust Company Americas as Trustee was the owner of Plaintiff's debt obligation. [see *Exhibit T*]

184.    Plaintiff alleges that MERS' via their Servicer ID website also misrepresented that Deutsche Bank *National* Trust Company Americas as Trustee was the owner of her debt obligation.[see *Exhibit M* a true and correct copy]

185.    Plaintiff alleges that Cal-Western confirmed that MERS' Servicer ID website also misrepresented that Deutsche Bank *National* Trust Company Americas as Trustee was the owner of her debt obligation.[see *Exhibit W, page 2, lines 7-8* a true and correct copy]

186.    Plaintiff alleges that Aurora Bank has also misrepresented to her and the IRS that they are Plaintiff's Lender. [see *Exhibit N*].

187.    The actions and conduct of Defendants falsifying and forging her Loan Application, failing to disclose the proper parties to Plaintiff's Deed of Trust and Promissory Note, misrepresentations, applying illegal, unauthorized charges, creating and/or inducing Plaintiff into a false default, fabricating documents, forgeries, concealing the identity of Plaintiff's true Creditor are extremely deceptive business practices.

**45** THIRD AMENDED COMPLAINT

188.    Acts of fraud are renewed each and every time the act of fraud is committed or repeated, and further, time limits for acting on fraud perpetrated upon Plaintiff began when Plaintiff became aware of the fraud, not necessarily at the time the initial fraud was committed.

189.    Defendants threaten to, and unless restrained, will evict Plaintiff.  Injunctive relief is necessary to enjoin Defendants from consummating the unlawful and illegal trustee's sale with a wrongful eviction since they are not the Real-Parties-in-Interest and lack standing and any enforceable rights under Plaintiff's Promissory Note and Deed of Trust.

WHEREFORE, Plaintiff prays this Court award Plaintiff return of the original Promissory NOTE, order Defendants to return all the mortgage payments collected, and because Defendants' conduct was outrageous, willful, oppressive and fraudulent, an award of compensatory, punitive and treble damages and reasonable litigation fees and costs is justified in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### TORTIOUS INTERFERENCE WITH CONTRACT
### (Against RFC, GMAC, HF, ALS, DBTCA and Doe Defendants)
### (collectively "Defendants")

190.    The plaintiff realleges all prior paragraphs of the pleading as if set out here in full.

191.    Defendants knew of Plaintiff's contractual relationship with her mortgage Lender and/or Investors related to the funding of Plaintiff's Loans. By making false statements and false representations, Defendants intentionally interfered with Plaintiffs contractual relationship with her mortgage Lender and/or Investors.

192.    Defendants' false statements and false representations caused actual interference with Plaintiff's contractual relationship with her mortgage Lenders and/or Investors.

193.    Plaintiff alleges also that Defendant HF orally represented to Plaintiff that she needed to skip at least three (3) mortgage payments in order to apply and be considered for a loan modification.

194.    Plaintiff alleges that HF knew that these representations were false because HF knew they were not complying with all of the third party agreements and governing laws and regulations.

195.    Plaintiff alleges that HF made these misrepresentations with the intent to induce her into default in order to obtain late fees, collect on Credit Default Swaps and ultimately lead her into foreclosure.

196.    Plaintiff alleges also that Defendant ALS orally represented to Plaintiff upon entering into invalid Workout and Forbearance Agreements ("Agreements") that she skip certain payments during the loan modification process.

197.    Plaintiff alleges that ALS knew that these representations were false because ALS knew they were not complying with all of the third party agreements and governing laws and regulations.

198.    Plaintiff alleges that ALS made these misrepresentations with the intent to induce her to maintain an alleged default in order to obtain late fees, collect on Credit Default Swaps and ultimately lead her into foreclosure.

199.    Plaintiff believed HF and ALS' misrepresentations to be true and reasonably relied on HF and ALS' misrepresentations and non-disclosures because HF and ALS were believed to be Plaintiff's Lenders at different times during the life of her Loan.

200.    HF and ALS' statements were intended to and did create a false impression of their position on whether to consider Plaintiff for a loan modification, and as a result, such

misrepresentations constituted actionable fraud. The misrepresentations of HF and ALS'

willfully or intentionally interfered with the business relations of Plaintiff without just cause or

excuse, which resulted in HF and ALS' liability for damages for tortuous interference with the

performance of Plaintiff's contract.

201.    Upon information and belief Defendants filed an insurance claim and DBTCA

collected on insurance once Plaintiff's alleged default was duly declared, customarily default is

declared after ninety (90) days has passed without receiving an alleged payment due from

Borrower;

202.    Plaintiff alleges insurance payments were made on her debt obligation allegedly

owed to the RALI 2007-QO1 Trust.

203.    Upon information and belief DBTCA was unlawfully empowered to liquidate the

debt; as it is now worth zero (0).

204.    Since it is the intermediaries who are initiated Plaintiff's foreclosure rather than the

Certificate-Holders of the RALI 2007-QO1 Trust, these intermediaries are not Creditors and the

amount they are demanding is misleading and fraudulent if there was an insurance payment or

any third party payment that reduced Plaintiff's obligation allegedly owed to the Certificate-

Holders of the RALI 2007-QO1 Trust.

205.    Plaintiff alleges she suffered damages by relying on HF and ALS's

misrepresentations and failures to disclose. Had Plaintiff known the truth she would have altered

the manner in which she did business and would have avoided skipping her mortgage payments

and entering into the invalid Agreements.

206.    As a result of Defendants' acts, Plaintiff has suffered damages in an amount to be

proven at trial. Defendants' conduct was outrageous, willful, oppressive and fraudulent and an

award of punitive and treble damages and reasonable litigation fees and costs is justified in an amount to be determined at trial.

207.    The statute of limitations for this Cause of Action is subject to equitable tolling upon the pleading of fraud.  Due to Defendants' fraudulent actions, the Statute of Limitations period has not yet expired.

## FOURTH CAUSE OF ACTION
### WRONGFUL FORECLOSURE AND TO SET ASIDE TRUSTEE'S SALE
### (Against ALS, MERS, DBTCA, Cal-Western, RFC, GMAC and Doe Defendants)

208.    The plaintiff realleges all prior paragraphs of the pleading as if set out here in full.

209.    Plaintiff is ready, willing and able to tender her debt obligation.  However, only the true Creditor can demand tender. Plaintiff is not required to tender the full amount of the indebtedness to an entity that is not the beneficiary to her Deed of Trust.

210.    Upon information and belief, ALS was the purported foreclosing beneficiary upon the property. ALS, MERS and Cal-Western were the entities which exercised the power of sale within the Deed of Trust.

211.    Upon information and belief, Defendants and each of them, did knowingly and willfully conspire and agree among themselves to engage in a conspiracy to promote, encourage, facilitate and actively engage in and benefit from wrongful foreclosure perpetrated on Plaintiff as alleged herein.

212.    Although MERS is the Mortgagee of record, it has never been the "owner" or "holder" of Plaintiff's Note. Because the original Lender and its successors and assigns were not signatories to Plaintiff's Deed of Trust, Plaintiff disputes that MERS' designation in her Deed of Trust as *"nominee for Lender and Lender's successors and assigns"* established an agency relationship between MERS and AMN, the original Lender or any successor and assigns to

AMN. As a result, there is a serious question over which entity actually owns Plaintiff's Loan and has the corresponding right to collect payments and exercise the power of sale under Plaintiff's Deed of Trust.

213.   At no point in time did the original beneficiary of the Plaintiff's Deed of Trust assign his, her, or its interest in the Property to any purported holder in due course of Plaintiff's Note or Deed of Trust.

214.   As set forth above, since **ALS**'s purported status as beneficiary is void *ab initio*, ALS did not have authority to exercise the power of sale within the Deed, and Cal-Western could not initiate foreclosure based upon alleged defaults created and induced by ALS. Therefore, the entire foreclosure is void *ab initio*.

215.   Currently, Plaintiff is at risk of eviction and having to relocate from the Property and lose her rights in that Property due to the unlawful actions of Defendants.

216.   Foreclosure was initiated by ALS, MERS, DBTCA, RFC, GMAC and/or Cal-Western, without privilege and with malice, as the Defendants knew that a "default" had never occurred. As stated, ALS was not owed any money, Cal-Western was not the trustee, and ALS had no pecuniary interest in the loan, and was not a beneficiary of the Note and/or Deed of Trust. Therefore, despite the fact that said Defendants knew no "default" had occurred, they proceeded with the foreclosure sale.

217.   Upon information and belief, Plaintiff alleges the Note and Deed of Trust as the same described above, was improperly pledged or sold to another party, and such sale was not done in accordance with *Article 3* or *Article 9* of the *California Commercial Code* and was therefore improper and failed to confer any legally cognizable rights in any party claiming to be a beneficiary of the Note and Deed of Trust.

218.    Plaintiff alleges that "between November 15 and December 8, 2006, AMN transferred Plaintiff's Note to RFC. Plaintiff claims that the Note was then allegedly sold to an investment trust, the RALI 2007-QO1 Trust.  An essential aspect of the mortgage securitization process is that the Trust must obtain and maintain good title to the mortgage loans comprising the pool for that certificate offering. This is necessary in order for the Trustee of the purportedly Securitized Trust to be **legally entitled to enforce** the mortgage loans in case of an alleged default. In addition to other required documentation to complete the Collateral File of any given loan, two documents relating to each mortgage loan must be validly transferred to the Trust as part of the securitization process – the NOTE and the security instrument (DOT or Mortgage). In this case, on information and belief, neither document was validly transferred.

219.    Plaintiff alleges that the "true sale" never took place due to the failure to follow the basic legal requirements for the lawful transfer of a security into the RALI 2007-QO1Trust.

220.    Plaintiff alleges the only recorded Assignment was executed *after* the January 30, 2007 closing date of the Trust. The dubious Assignment raises numerous red flags and further demonstrates that Plaintiff's NOTE and DOT were not deposited into the Trust by the closing date, and that the Assignment was fabricated in attempt to "paper over" the fatal securitization defects.

221.    The failure to deposit Plaintiff's Note into the RALI Trust before the January 30, 2007 closing date is a violation of the Pooling and Servicing Agreement and of New York trust law. Consequently, the RALI 2007-QO1 Trust cannot claim any legal or equitable right, title, or interest in Plaintiff's Note and Deed of Trust since DBTCA and ALS cannot take any action which is not authorized by the Securitization agreements that created and govern the RALI 2007-QO1Trust.

222.    ALS allegedly assigned *itself* Plaintiff's mortgage on October 1, 2009, approximately 4 years after the RALI 2007-QO1 Trust had closed.

223.    Defendants falsely represented to Plaintiff that if she did not pay Defendants, Plaintiff's home would be sold at a public auction.  Such actions are malicious and fraudulent.  In fact, the sale that took place is *void*, for the reasons stated herein.

224.    The Notice of Trustee's Sale pertaining to Plaintiff's Property ***fails*** to identify the current identity of the holder of the beneficial interest or owner of the Note and Deed of Trust.  Plaintiff is informed and believes, and thereon alleges, that Defendants are not in possession of the Promissory Note in connection with her Property.

225.    Plaintiff alleges said Notice of Sale was false, void, and without privilege, for the reasons stated and discussed herein.

226.    In addition, the foreclosure sale is *void* because Cal-Western engaged in fraud to fabricate a purported Substitution of Trustee to "substitute" themselves into the Deed of Trust.  As a result of the *void* substitution the sale was conducted by an entity that was not the duly appointed trustee.

227.    In addition, employee of Cal-Western and robo-signer, Jennifer Victa had no agency relationship with MERS and/or AMN, this is an obvious conflict of interest.  Therefore, all subsequent actions taken by Cal-Western as the trustee are invalid.

228.    Jennifer Victa was not employed or deputized by MERS or AMN at the time of the alleged substitution.  Such a misrepresentation invalidates the document in question and constitutes fraud by the entity executing the document.

229.   Furthermore, ALS, MERS, DBTCA, RFC, GMAC nor Cal-Western had the right to foreclose, for the following reasons: (1) Plaintiff did not breach her obligation.   A power of sale is conferred upon the mortgagee, trustee, or any other person, to be exercised after a breach of the obligation for which that mortgage or transfer is a security.   Plaintiff did not breach her Deed of Trust; (2) Plaintiff's Lender failed to satisfy a condition precedent pursuant to Section 22 of Plaintiff's Deed of Trust; (3) Clear violations of *§2934a(b)*; (4) Defendants unlawfully, illegally and fraudulently recorded the Notice of Default, a pre-condition to a foreclosure sale, required by *California Civil Code* § 2924(a).

a.   A Notice of Default is invalid if not recorded by an entity that is the trustee, mortgagee, beneficiary, or authorized agent thereof. *See CCC* § 2924(a)(1)

b.   Under information and belief, the allegations in the Notice of Default contain hearsay, **Rhonda Rorie's attached declaration to the Notice of Default is without foundation and contains hearsay, as well as her signature being forged;**

c.   Under California law, only the beneficiary (or its authorized agent) to the Deed of Trust can execute the foreclosure documents. *CCC § 2924* et seq. does not create authority for a third entity to execute the foreclosure documents.

d.   As Defendants obtained their alleged interest in Plaintiff's Property illegally and fraudulently, as set forth herein, they had no right to convey such interest to any other trustees, nominees, or beneficiaries. ALS, MERS, and Cal-Western therefore hold no beneficial interest in Plaintiff's Property and should not have foreclosed.

230.    Defendants have held an unlawful, illegal and fraudulent trustee's sale without lawful security interest in the Property. Defendants did not possess the right to enforce the security interest at any time, regardless of whether Defendants possessed a copy of the Instrument.

231.    Defendants conducted an unlawful sale without the Real-Party-of-Interest involved.

232.    The *submission of a credit bid at auction in lieu of cash by a stranger to the transaction* is a fraudulent act. Acceptance of the credit bid is an *ultra vires act.*

233.    This is in no way a procedural deficiency. This is **THEFT BY DECEPTION!**

234.    Plaintiff therefore is informed and believes, and thereon alleges that said Defendants are not "person[s] entitled to enforce" the alleged security interest on herProperty, as that term is defined in *CCC* § 3301.

235.    Defendants did not have any legal right to foreclose upon Plaintiff's Property. Furthermore, the procedures implemented by said Defendants in attempting to enforce the alleged security interest in her Property violated statutory requirements governing non-judicial foreclosure proceedings.

236.    "It is the general rule that courts have power to vacate a foreclosure sale where there has been fraud in the procurement of the foreclosure decree or where the sale has been improperly, unfairly or unlawfully conducted, or is tainted by fraud, or where there has been such a mistake that to allow it to stand would be inequitable to purchaser and parties." (Emphasis added). *6 Angels, Inc. v. Stuart-Wright Mortgage, Inc.* (2001) 85 Cal.App.4th 1279 at 1286

237.    The estate of interest claimed in Plaintiff's Property by Defendants, and each of them, under the trustee's deed is a cloud on Plaintiff's title to her Property in that it restricts

Plaintiff's right to the use and enjoyment of her Property, hinders Plaintiff's right to unrestricted alienation of her Property. If the trustee's deed is not delivered and canceled, serious injury will result to Plaintiff.

238.    As a direct and proximate result of said Defendants' negligent or reckless conduct, Plaintiff has suffered damages, including without limitation, Plaintiff's credit has been impaired and she is threatened with the eminent the loss of her Property.

239.    In committing the wrongful acts alleged herein, Defendants acted with malice, oppression and fraud. Defendants' willful conduct warrants an award of exemplary damages in an amount sufficient to punish the wrongful conduct alleged herein and deter such misconduct in the future.

240.    Accordingly, Plaintiff hereby requests this Court for an order holding the unlawful trustee's sale is set-aside in that it was legally void and conducted without any right or privilege by ALS, MERS, DBTCA, RFC, GMAC, Cal-Western and/or one or more of the Doe Defendants, and any of the Defendants in this matter. Plaintiff also seeks an injunction preventing any further sale, transfer of the Property or eviction during the pendency of this litigation.

241.    Plaintiff further alleges that any amount allegedly owing under the Deed is offset by the damages owed to her from HF, ALS, MERS, DBTCA, Cal-Western, RFC, GMAC and/or one or more of the Doe Defendants, and any of the Defendants in this matter.

### FIFTH CAUSE OF ACTION
### CANCELLATION OF INSTRUMENTS *CALIFORNIA CIVIL CODE SECTION 3412*
### (Against MERS, ALS, Cal-Western, DBTCA, RFC and Doe Defendants)

242.    In California, an action may be brought to cancel a written instrument that is void or voidable when there is a reasonable apprehension that if it is left outstanding it may cause a

serious injury. (see *California Civil Code 3412* "[a] written instrument, in respect to which there is a reasonable apprehension that if left outstanding it may cause serious injury to a person against whom it is void or voidable, may, upon his application be so adjudged, and ordered to be delivered up or cancelled.")

243.    The action can be brought against the person who received the instrument or any successor of the instrument or of the title transferred by the instrument with notice of the Plaintiff's right to cancel. (*Duley v. Westinghouse Elect. Corp.* (1979) 97 Cal.App.3d 430, 432.)

244.    Each of the written instruments described below in this cause of action were recorded in Los Angeles County, California.  The Property to which all of the written instruments sought to be cancelled relates is situated in Los Angeles County.

245.    Plaintiff is informed and believes thereon alleges that the Deed of Trust, Promissory Note, Corporate Assignment of Deed of Trust , Notice of Default, Substitution of Trustee, Notice of Trustee's Sale and Trustee's Deed Upon Sale are void for the reasons stated herein.

246.    The written instruments sought to be cancelled in this cause of action should be cancelled and Plaintiff is entitled to litigation costs and fees.

247.    An action to cancel an instrument is subject to the applicable statute of limitations, Actions under *section 3412* are generally subject to a four-year statute of limitations period under *California Code of Civil Procedure section 343*. See *Moss v. Moss*, 20 Cal. 2d 640, 644 (1942). When fraud or mistake is involved, the claim is subject to a three-year statute of limitations under *California Code of Civil Procedure section 338(d). Zakaessian v. Zakaessian*, 70 Cal. App. 2d 721, 725 (1st Dist. 1945). Several courts, however, have also applied a five- year statute of limitations for actions that impact title or possession of real property based on

*California Code of Civil Procedure sections 318, 319, and 328*. See, e.g., *Robertson*, 90 Cal.

App. 4th at 1328-29.

248.    Plaintiff contends that the three-year statute of limitations is applicable in this

case in regards to the cancellation of her Deed of Trust and Promissory Note because her claim is

grounded in fraud and that the discovery rule applies in this case. In an action alleging fraud, the

cause of action "is not deemed to have accrued until the discovery, by the aggrieved party, of the

facts constituting the fraud or mistake." *Cal. Code Civ. Proc. § 338(d)*. Plaintiff alleges that she

is entitled to plead the delayed discovery rule because she was not aware that DBTCA funded

her Loan until in or about October 2012, when ALS revealed this concealed fact in their Motion

for Relief from Stay seeking to continue eviction proceedings against Plaintiff's border/tenant

residing in her Property.

**SIXTH CAUSE OF ACTION**
**BREACH OF CONTRACT (Deed of Trust and Promissory Note)**
**(Against AMN, MERS, ALS, DBTCA, RFC, GMAC and Doe Defendants)**
**(collectively "Defendants")**

249.    The Plaintiff realleges all prior paragraphs of the pleading as if set out here in full.

250.    In the alternative, because ALS claims it was purportedly assigned MERS' interest

in Plaintiff's Deed of Trust and Note, if the Court finds that ALS is indeed a successor in interest

to Plaintiff's Deed of Trust and Note, then pursuant to the terms of the Deed of Trust and Note,

Plaintiff alleges that ALS breached the Deed of Trust and Note.

251.    In the alternative, because ALS claims DBTCA funded Plaintiff's loan, if the Court

finds that DBTCA is indeed Plaintiff's original Lender of Plaintiff's Deed of Trust and Note,

then pursuant to the terms of the Deed of Trust and Note, Plaintiff alleges that DBTCA breached

the Deed of Trust and Note.

252.    On or around December 2, 2006, Plaintiff obtained the Option ARM Loan from AMN and executed a Promissory Note and a Deed of Trust. The Deed of Trust identified AMN as the Lender, First American as the Trustee and MERS as the nominal beneficiary.

253.    According to the position of ALS, DBTCA was the funding source of Plaintiff's Loan at origination. [see *Plaintiff's RJN Exhibit 2*].

254.    Plaintiff alleges that Defendants Walmar, AMN, RFC, GMAC, MERS, DBTCA and Doe Defendants are in breach of her Promissory Note and Deed of Trust. Considering that the funding of Plaintiff's Loan came from parties who were not disclosed to Plaintiff before or at closing, therefore, Plaintiff's Note and Deed of Trust are void *ab initio*. Where a contract involves a loan it should include the identity of the lender and borrower, the amount of the loan, and the terms for repayment in order to be sufficiently definite. *Peterson Development Co. v. Torrey Pines Bank*, 233 Cal.App.3d 103, 115 (1991).

255.    Plaintiff alleges that she did not consent to the formation of the Deed of Trust and Promissory Note because there was not full disclosure regarding the parties involved and their respective rights. "Contract formation requires mutual consent, which cannot exist unless the parties 'agree upon the same thing in the same sense.'" *Bustamante v. Intuit, Inc.*, 141 Cal.App.4th 199, 208 (2006)(quoting *Cal. Civ.Code, §§ 1580, 1550, 1565*).

256.    Plaintiff alleges that Defendants breached her Deed of Trust and Promissory Note.

257.    Plaintiff has certain obligations and rights under the Note and Deed of Trust and law applicable to these contracts and the purported current owner of the Note and beneficiary under the Deed of Trust has certain rights and obligations in connection with exercising those rights and ALS has improperly asserted that it acquired title to Plaintiff's property.

258.    Plaintiff's Lender committed a material breach as they failed to perform all conditions precedent prior to accelerating the mortgage and initiating foreclosure. Specifically, Plaintiff alleges that her Lender failed to furnish her with written notice of her alleged default prior to accelerating the mortgage and initiating foreclosure as required by Section 22 of Plaintiff's Deed of Trust.

259.    Plaintiff also alleges that the Loan Application used to qualify her for the Option ARM loan she received was fabricated, falsified and forged **_after_** Plaintiff signed her loan documents thereby affecting a serious breach by Defendants.

260.    In mid November 2009, Karl Wutscher LLP, attorneys for ALS responded to Plaintiff's qualified written request, a compact disc was attached to the response which contained copies of her Loan documents. However, Plaintiff did not review these documents until June of 2011. Plaintiff then discovered a fabricated and forged Loan Application dated December 5, 2006. This Application was executed three days after Plaintiff **_signed_** her loan documents and three days before her Loan closed.

261.    Plaintiff alleges that Defendants breached her Deed of Trust and Promissory Note.

262.    The Deed of Trust sets forth the dates that the monthly principal and interest payments were due and when late fees and other charges could be assessed. Section 2 of the Deed of Trust states that: "Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due."

263.    Plaintiff substantially performed all of her conditions in the Deed of Trust, including timely paying her mortgage to HF. In or around mid-November 2007, while Plaintiff

was current on her monthly mortgage obligation, the business Plaintiff owns was experiencing a "massive" diminution in earnings so Plaintiff contacted HF seeking a loan modification. Subsequently, HF interfered with Plaintiff's performance, instead intended for and/or induced Plaintiff's nonperformance.

264.    Most recently, Plaintiff was excused from further performance under the Deed of Trust because the "Assignment" to ALS was invalid such that Aurora did not have the power to demand or collect mortgage payments.  As such, ALS is not servicing Plaintiff's mortgage on behalf of the true Creditor.  Moreover, Plaintiff's inquiry into the MERS Servicer Identification System has confirmed that the owner is Deutsche Bank *National* Trust Company Americas as Trustee.(*another legal stranger*)

265.    Because ALS represented to Plaintiff her mortgage was past due, on information and belief, Plaintiff believes ALS knew that Plaintiff was current, it is clear that ALS breached the Deed of Trust by failing to apply the payments made by Plaintiff in the order of priority set forth in Section 2.  As a result, improper fees, penalties, interest and taxes have been added to the balance of the Loan as well as, an unlawful foreclosure.

266.    Plaintiff was unaware that ALS were failing to apply the payments in the way set forth in the Deed of Trust because ALS fraudulently concealed this practice of applying Plaintiff's mortgage payments to Plaintiff's account.  Plaintiff could not have reasonably discovered the impropriety of ALS's behavior because these facts were hidden from her and were not disclosed throughout the servicing of her Loan.

267.    Plaintiff could not have reasonably known of the existence of this breach of the Deed of Trust because ALS fraudulently concealed the improperly applied mortgage payments,

the incorrect calculation of interest, and the improper fees added to Plaintiff's account that did not comply with Section 2 of Plaintiff's Deed of Trust.

268.    The actions and conduct of Defendants falsifying and forging her Loan Application, failing to disclose the proper parties to Plaintiff's Deed of Trust and Promissory Note, Plaintiff's Lender failing to perform all conditions precedent according to Section 22 of the Deed of Trust applying illegal, unauthorized charges, creating a false default, fabricated documents and conducting an unlawful foreclosure and trustee's sale on the Property of the Plaintiff is a breach of the Deed of Trust and Promissory Note.

269.    Plaintiff fully and faithfully performed all of the covenants, terms, conditions, and obligations required under the Loan agreement for the Subject Loan on her part to be performed.

270.    A contract to perform services gives rise to a duty of care which requires that such services be performed in a competent and reasonable manner,"

271.    The contract required Defendants to provide services which were breached when Defendants failed to provide those services.  Plaintiff justifiably relied to her detriment on Defendants' misrepresentations of proper performance and has been damaged in the following ways: (1) she has been deprived of the equity in her home; (2) the title to her home has been clouded; (3) she has overpaid in interest, penalties, fees and taxes that were calculated as a result of the misapplication of payments; (4) she is unable to determine whether she sent her monthly mortgage payments to the right party; (5) her credit and credit scores have been damaged; (6) she has expended significant funds to cover litigation costs; and (7) Plaintiff's home has been sold at a trustee's sale.  Defendants violated an independent duty not to defraud Plaintiff.

272.    As a result thereof, the Defendants are liable for all natural, proximate and consequential damages of their breach of contract.

THIRD AMENDED COMPLAINT

## SEVENTH CAUSE OF ACTION
### BREACH OF CONTRACT(Workout and Forbearance Agreements)
### (Against, MERS, ALS, DBTCA, RFC, GMAC and Doe Defendants)
### (collectively "Defendants")

273.    The Plaintiff realleges all prior paragraphs of the pleading as if set out here in full.

274.    Aurora offers Workout Agreements to financially distressed borrowers. The Workout Agreements are supposed to provide borrowers the opportunity to cure the alleged arrearage in their loan payments while they are being considered for a loan modification.  Thus, borrowers are required to make several planned monthly installment payments ("Plan Payments") for the purpose of bringing their loan payments current.  The lure of this program is that it implies that successful completion would result in either loan modification or otherwise allow the borrowers to cure the alleged arrearage in their loan.

275.    Plaintiff asserts Defendant violated her right to cure the alleged arrears, and failed to exercise its discretion in good faith by telling her to stop making payments; informing her that her Lender wanted to offer her a permanent workout solution and then denying the modification; providing her conflicting, inconsistent, and inaccurate information about her account;

276.    Plaintiff entered into Workout Agreements or Forbearance Agreements ("Agreements") with ALS.  Under the terms of its Agreements, ALS expressly agrees to allow borrowers to cure the arrearage on their loan. The Agreements expressly states that "Customer has requested and **Lender** [ALS] has agreed to allow Customer to repay the Arrearage pursuant to a loan work-out arrangement on the terms set forth below." Similarly, the terms of the Agreement provide borrowers with the right to cure the arrearage through, among other things, reinstatement or payment in full.

277.    Plaintiff has done all, or substantially all, of the significant things that the contract required her to do by making all Plan Payments, or alternatively, she was excused from doing those things. All conditions required by the contract for Plaintiff's performance have occurred.

278.    Plaintiff received a letter dated October 7, 2008 congratulating her on successfully maintaining her current home retention payment arrangement. The letter also stated that ALS would like to offer Plaintiff a more permanent workout option. ALS requested updated financial information within the next (14) days. Plaintiff submitted all documents requested of ALS. Subsequently, Plaintiff was denied a home retention workout because Plaintiff was financially unable to afford monthly payments.

279.    A contract to perform services gives rise to a duty of care which requires that such services be performed in a competent and reasonable manner."

280.    Plaintiff alleges that ALS breached its contract with Plaintiff by failing to allow Plaintiff to repay her alleged remaining arrearage, and by initiating foreclosure without notice and without an opportunity to cure despite its promise of providing access to a cure method.

281.    The Agreements required ALS to provide services which were breached when and ALS failed to provide those services, Plaintiff justifiably relied, to her detriment, on and ALS misrepresentations of proper performance and ALS violated an independent duty not to defraud people.

282.    Plaintiff was harmed by ALS's breach of contract by virtue of making payments under the Agreements without getting the benefits thereof, and by virtue of losing her Property without notice and without an opportunity of curing any alleged default.

283.    Because ALS claims that Plaintiff was denied HAMP, she has the ability to demand proof (a) that they considered it (b) that it was communicated to the Investor (with

copies) and (c) that there was a reasonable basis for rejection — meaning that the *servicer must*

*SHOW the analysis that was used to determine whether to accept or reject the HAMP proposal.*

284.    Plaintiff fully and faithfully performed all of the covenants, terms, conditions, and

obligations required under the Loan agreement for the Subject Loan on her part to be performed.

285.    A contract to perform services gives rise to a duty of care which requires that such

services be performed in a competent and reasonable manner,"

286.    The conduct of Defendants, in pertinent part, as set forth above, constituted a

breach of the oral and express agreements between Plaintiff and Defendants, and upon which

Plaintiff had detrimentally relied.   Plaintiff has performed all obligations to Defendants, except

those obligations Plaintiff was prevented or excused from performing.

287.    The contract required Defendants to provide services which were breached when

Defendants failed to provide those services.  Plaintiff justifiably relied to her detriment on

Defendants' misrepresentations of proper performance and has been damaged in the following

ways: (1) she has been deprived of the equity in her home; (2) the title to her home has been

clouded; (3) she has overpaid in interest, penalties, fees and taxes that were calculated as a result

of the misapplication of payments; (4) she is unable to determine whether she sent her monthly

mortgage payments to the right party; (5) her credit and credit scores have been damaged; (6) she

has expended significant funds to cover litigation costs; and (7)   Plaintiff's home has been sold

at a trustee's sale.  Defendants violated an independent duty not to defraud Plaintiff.

288.    As a direct and proximate result of Defendants' breaches of the above-mentioned

agreements, Plaintiff has suffered compensatory damages in an amount to be proven at trial.

Pursuant to *California Code of Civil Procedure § 1021.5*, Plaintiff is entitled to recover

reasonable litigation fees, costs, and expenses incurred in bringing this action.

**64** THIRD AMENDED COMPLAINT

289.   Plaintiff further seeks, as a result of said Defendants' breaches of the above-mentioned agreements, restitution, disgorgement of sums wrongfully obtained, and such other and further relief as the Court may deem just and proper.

## EIGHTH CAUSE OF ACTION
### VIOLATION OF *BUSINESS AND PROFESSIONS CODE§ 17200*
### (Against MERS, ALS, DBTCA, Cal-Western
### AMN, RFC, GMAC, Walmar and Doe Defendants)

290.   The plaintiff realleges all prior paragraphs of the pleading as if set out here in full.

291.   *Cal. Bus. And Prof. Code § 17200*, et seq. prohibits acts of unfair competition, which means and includes any unlawful, unfair or fraudulent business act and conduct which is likely to deceive and is fraudulent in nature.

292.   The "unlawful" prong of *Cal. Bus. & Prof. Code, § 17200* makes a business practice that violates *any* law independently actionable. Furthermore, the statute of limitations of the other law is irrelevant, and any claim on any Section 17200 claim is subject to the four-year statute of limitations created by that section.

293.   ALS engaged in "unlawful" business practices under the UCL based on (1) its debt collection practices in violation of the *Rosenthal Act*; (2) its violations of the Security First Rule, *Cal. Code Civ. Proc. § 726*; (3) its insertion of unconscionable provisions in its standard form Workout Agreements in violation of *Civil Code, §§ 1670.5 and 1671*; and

294.   MERS, ALS, and Cal-Western's conduct, for the reasons stated herein, is in direct violation of *California Civil Code §§ 2924*, **et seq.**

295.   MERS, ALS, and Cal-Western's conduct, for the reasons stated herein, is in direct violation of *California Civil Code §§ 2924f(c)(2) and 2932.5*.

296.   California's Unfair Competition Law ("UCL") defines unfair competition to include any "unlawful, unfair, or fraudulent" business act or practice. *Cal. Bus. & Prof. Code, §*

*17200, et seq.*, prohibits the above mentioned conduct. Defendants' acts and practices are

unlawful, fraudulent and likely to deceive. This conduct is ongoing and continues to this date.

297.   RFC, GMAC AMN, HF, MERS DBTCA and ALS's acts and practices alleged

herein constitute ***unfair*** and ***fraudulent*** business practices with respect to mortgage loan

servicing, including, without limitation, the following practices:

(a)   Misrepresenting to Plaintiff that they were the "Lender";

(b)   Misrepresenting to Plaintiff that other entities were the owner of her debt obligation;

(c)   Misrepresenting to Plaintiff that they had the authority to negotiate, and approve a loan

modification;

(d)   Making oral and written misrepresentations and omissions of material facts that induced

Plaintiff to enter "Workout and Forbearance Agreements" in order to obtain a permanent loan

modification;

(e)   Making oral and written misrepresentations and omissions of material fact regarding the

status of Plaintiff's loan modification applications and loan payments;

(f)   Making oral and written misrepresentations and omissions likely to deceive the reasonable

consumer, and did in fact deceive Plaintiff;

(g)   Making oral and written misrepresentations objectively material to the reasonable consumer,

and therefore reliance upon such representations may be presumed as a matter of law, and

Plaintiff did in fact believe the misrepresentations were reasonable and did in fact rely upon

them.

(h)   Failing to perform loan servicing functions consistent with its responsibilities to Plaintiff

and its responsibilities under HAMP;

(i)   Failing to properly supervise its agents and employees, including without limitation, its loss

mitigation and collection personnel, foreclosure personnel, and personnel implementing its

modification programs;

(j)  Failing to permanently modify loans and/or provide alternatives to foreclosure, and using

unfair means to keep Plaintiff in temporary modification contracts, including, without

limitations, routinely demanding information it already had and failing to communicate

accurately or consistently with Plaintiff about the status of her loan modification applications;

(k)  Making inaccurate calculations and determinations of Plaintiff's eligibility for permanent

modifications; and

(l)  Engaging in acts and practices that prolong the HAMP process;

(m)  Refusing to offer a "resolution" of the alleged default after leading Plaintiff to believe that

the "Work-out" Agreement would lead to another agreement that would cure the alleged

arrearages (which they never disclosed in amount) by creating a plan of decreased monthly

payments;

(n)  Falsely representing that Plaintiff did not qualify for a HAMP modification when, in fact

Plaintiff did qualify for a HAMP modification in breach of industry standards set by *15 U.S.C*

*1639;*

(o)  Allegedly auctioning off the property for less than the amount owed, yet refusing to reduce

the principal which would have resulted in a positive NPV in breach of industry standards set by

*15 U.S.C 1639a;*

298.    RFC, GMAC, MERS, ALS and Cal-Western engaged in unlawful [1], fraudulent and

deceptive business practices with respect to mortgage loan servicing, assignment of Note and

Deed of Trust, and related matters by, among other things:

(a)    Executing and recording false and misleading documents;

(b)    Executing and recording documents without the legal authority to do so;

(c)    Failing to disclose the principal for which documents were being executed and recorded in violation of *California. Civil Code § 1095*;

(d)    Failing to record Powers of Attorney in connection with other recorded documents in violation of *California Civil Code § 2933*;

(e)    Violating the Security First Rule;

(f)    Demanding and accepting payments for debts that were non-existent;

(g)    Reporting payments as late to credit bureaus without the legal right or authority to do so;

(h)    Acting as a beneficiary without the legal authority to do so, and;

(i)    Other deceptive business practices as described herein.

299.    Plaintiff alleges that by engaging in the above described acts and/or practices as alleged herein, Defendants have violated several California laws, including *§ 131(g) 15 U.S.C. § 1641*, **Cal. Penal Code section 115(a)**[2] **and 532(f)(a)(4)**[3], and regulations and said predicate acts are therefore per se violations of *Cal. Bus. & Prof. Code, § 17200*, et seq.

300.    As a direct and proximate result of Defendants' unfair and/or fraudulent conduct alleged herein, Plaintiff and others have lost hundreds of thousands if not millions of dollars of

---

[1]    "Unlawful" acts or practices are those forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, or court-made. *Saunders v. Superior Court*, 27 Cal.4th 832(1994); *Hewlett v. Squaw Valley*, 54 Cal.4th 499 (1997).

[2]    *Cal. Penal Code section 115 (a)* Every person who knowingly procures or offers any false or forged instrument to be filed, registered, or recorded in any public office within this state, which instrument, if genuine, might be filed, registered, or recorded under any law of this state or of the United States, is guilty of a felony.

[3]    Defendants' recording of the fabricated Substitution of Trustee, Notice of Default, Corporate Assignment of Deed of Trust, Notice of Trustee's Sale and Trustee's Deed Upon Sale violates *Cal. Penal Code section 532(f)(a)(4)* which prohibits any person from filing a document related to a mortgage loan transaction with the county recorder's office which that person knows to contain a deliberate misstatement, misrepresentation, or omission. The facts demonstrate that Defendants have committed mortgage fraud by filing the Substitution of Trustee, Notice of Default, Corporate Assignment of Deed of Trust, Notice of Trustee's Sale and Trustee's Deed Upon Sale with the county recorder's office with the knowledge that the documents contained deliberate misstatements, misrepresentations, or omissions of fact.

equity in their homes.   Plaintiff is a direct victim of Defendants' unlawful conduct, and has

suffered injury in fact, and has lost property and money as a result of Defendants' unfair

competition.

301.   By reason of the foregoing, Defendants have been unjustly enriched and should be

required to disgorge their illicit profit and/or make restitution to Plaintiff and other California

consumers who have been harmed, and/or be enjoined from continuing in such practices

pursuant to *Cal. Bus. & Prof. Code §§ 17203 and 17204* and *Code of Civil Procedure § 1021.5*.

Additionally, Plaintiff is entitled to injunctive relief enjoining Defendants from any post-

foreclosure actions, litigation costs and fees as available under *Cal. Bus. & Prof. Code § 17200.*

302.   As a direct and proximate result of the actions of Defendants, and each of them,

stated above, Plaintiff has been injured in that a cloud has been placed upon title to Plaintiff's

Property and Defendants, have failed to remove this cloud from Plaintiff's title.

303.   The statute of limitations on UCL claims is four years from the date of accrual.

*(Bus. & Prof. Code, § 17208)*

304.   Plaintiff is entitled to an order compelling ALS, RFC, DBTCA and any other

Defendants claiming an interest in and to Plaintiff's Property to take any and all actions

necessary to remove the cloud they have placed upon her title and an order enjoining such

Defendants from taking such actions in the future.

### NINTH CAUSE OF ACTION
### VIOLATION OF *CALIFORNIA CODE § 1788.17*
### UNFAIR DEBT COLLECTION PRACTICES
### (Against ALS, MERS, Cal-Western, Deutsche Bank, RFC and Doe Defendants)

305.   The plaintiff realleges all prior paragraphs of the pleading as if set out here in full.

THIRD AMENDED COMPLAINT

306.   ALS and Cal-Western are in the business where the principal purpose is to collect debts on behalf of Investors, but upon information and belief. Plaintiff also believes ALS collects on behalf of itself.

307.   ALS is a "debt collector" engaging in "debt collection" practices under the *Rosenthal Fair Debt Collection Practices Act* (the *"Rosenthal Act"*). See *Cal. Civ. Code §* *1788.2(c).*

308.   In April of 2008, ALS began servicing Plaintiffs' Loan after it was allegedly in default.

309.   ALS attempted to collect Plaintiff's debt obligation on its own behalf. "The term 'debt collector' means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." *15 U.S.C. §1692a(6).*

310.   Cal-Western attempted to collect Plaintiff's debt obligation on behalf of MERS and thus is also a debt collector pursuant to *15 U.S.C. §1692a(6).*

311.   Plaintiff alleges that in the course and conduct of ALS's loan servicing and collection, ALS and its agent Cal-Western, in numerous instances have represented, expressly or by implication, that Plaintiff owes the amounts specified in their oral and written communications. Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed, in violation of Section 807(8) of the FDCPA, *15 U.S.C. § 1692e(8);*

312.    ALS violated the Rosenthal Act by using false, deceptive, and misleading statements and deceptive omissions in connection with its collection of Plaintiff's mortgage debt, as alleged herein. *See Cal. Civ. Code* § 1788.17, incorporating *15 U.S.C.* § 1692(e).   For example (and without limitation), Plaintiff was consistently led to believe that modification review was pending under the Workout and Forbearance Agreements ("Agreements") and that the requests for additional documents and receipt thereof would continue the review process and Agreements. But ALS unilaterally ceased the review process and foreclosed on Plaintiff's property.

313.    Plaintiff has suffered damages and harm as a result of ALS's unfair debt collection practices, including irreparable harm to her credit and the amounts paid under the Agreements.

314.    *California Civil Code § 1788.17* requires Defendants to comply with the provisions of *15 U.S.C. § 1692*, through their acts including but not limited to, the following:

(a)    The Defendants violated *California Civil Code* § 1788.17 by engaging in conduct, the natural consequence of which is to oppress, and abuse persons in connection with the collection of the alleged debt, a violations of *15 U.S.C. §* 1692(d);

(b)    The Defendants violated *California Civil Code* § 1788.17 by misrepresenting the status of the alleged debt, a violations of *15 U.S.C.* § 1692(e)(s)(A);

(c)    The Defendants violated *California Civil Code* § 1788.17 by using unfair or unconscionable means to collect or attempt to collect a debt, a violation *15 U.S.C.* § 1692(f); and

(d)    The Defendants violated *California Civil Code* § 1788.17 by using deceptive means to collect or attempt to collect a debt from the Plaintiffs, a violation of *15 U.S.C.* § 1692e(10).

315.    The foregoing violations of *15 U.S.C. § 1692* by Defendants result in separate violations of *California Civil Code § 1788.17*.

316. The forgoing acts by Defendants were willful and knowing violations of *Title 1.6C of the California Civil Code* (FRDCPA), are sole and separate violations under *California Civil Code § 1788.30(b)*, and trigger **multiple $1,000.00 penalties.**

317. *CCC § 1788.17* provides that Defendants are subject to the remedies of *15 U.S.C. § 1692(k)*, for failing to comply with the provisions of *15 U.S.C. § 1692(b)(6) and § 1692(c)c*.

318. The foregoing acts by Defendants were intentional persistent, frequent, and devious violations of *15 U.S.C. § 1692*, which trigger **additional damages of $1,000.00 under 15 U.S.C. § 1692(k)(a)(2)(A)**.

319. Plaintiff relied on Defendants and their agents' misrepresentations and have been damaged in the following ways: (1) multiple parties may seek to enforce her debt obligation against her; (2) the title to her home has been clouded and its salability has been rendered unmarketable, as any buyer of Plaintiff's Property will find themselves in legal limbo, unable to know whether they can safely buy Plaintiff's Property or get title insurance; (3) she has been paying the wrong party for an undetermined amount of time and overpaid in interest, penalties, § fees and taxes that were overcalculated; (4) she is unable to determine whether she sent her monthly mortgage payments to the right party; (5) her credit and credit scores have been damaged; (6) she has expended significant funds to cover litigation costs; and (7)Plaintiff's home has been sold at a trustee's sale. Defendants violated an independent duty not to defraud Plaintiff.

320. The statute of limitations on a Rosenthal Act claim is one year. (*Civil Code § 1788.30, subd. (f).)* Defendants debt collection efforts commenced in or about April 2008 and these collection efforts continued up until December 2010; under the continuing tort doctrine, the statute did not run until this time, which is less than a year before the filing of Plaintiff's

initial complaint in July 2011. However, Plaintiff could not have reasonably known of the existence of a claim for violation of *15 U.S.C. § 1692(e)* because Defendants fraudulently concealed the fact that they were not entitled to enforce Plaintiff's debt obligation and that they were falsely representing to Plaintiff that the character and amount of money Plaintiff still owed on her debt.[1]

## TENTH CAUSE OF ACTION
## VIOLATION OF 15 U.S.C § 1641(g)
## (Against ALS, DBTCA, RFC, GMAC and Doe Defendants)

321.    The plaintiff realleges all prior paragraphs of the pleading as if set out here in full.

322.    Plaintiff resides in the Subject Property and it is her principal residence.

323.    The new subsection (g) added to **§ 131 of TILA by § 404 of The Helping Families Save Their Homes Act of 2009** states:

(g) NOTICE OF NEW CREDITOR-
(1)    IN GENERAL – In addition to other disclosures required by this title, not later than 30 days after the date on which a mortgage loan is sold or otherwise transferred or assigned to a third party, the creditor that is the new owner or assignee of the debt shall notify the borrower in writing of such transfer, including-

(A) The identity, address, telephone number of the new creditor;
(B) The date of transfer;
(C) How to reach an agent or party having authority to act on behalf of the new creditor;
(D) The location of the place where transfer of ownership of the debt is recorded; and
(E) Any other relevant information regarding the new creditor."

Failure to comply with the requirements of this new subsection 131(g) of **TILA** may result in civil liability for actual damages, legal fees and statutory damages under **§ 130(a) of TILA.**

---

[1]    "If a reasonable plaintiff would not have known of the existence of a possible claim within the limitations period, then equitable tolling will serve to extend the statute of limitations for filing suit until the plaintiff can gather what information he needs." Garcia v. Wachovia Mortg. Corp., 676F.Supp.2d....

324. Irrespective of who effected the recordation of the "Assignment" recorded on December 31, 2009, the purported transfer of ownership of Plaintiff's NOTE occurred after May 2009.

325. Plaintiff alleges that § 130(a) of *TILA* applies to ALS's purported and alleged assignee of Plaintiff's loan. Plaintiff is unable to determine which Defendant is the purported beneficiary of Plaintiff's NOTE and DOT.

326. Plaintiff alleges that § 130(a) of *TILA* applies to ALS as it was purportedly assigned Plaintiff's loan on or about December 31, 2009

327. Section **130(a)** of *TILA* requires ALS to perform and comply with the requirements of the statute, otherwise face statutory and civil penalties and damages.

328. ALS purports to be a **creditor** under the alleged "Assignment" of DOT and is alleged to have violated *15 U.S.C § 1641(g)*.

329. ALS alleges that it is the purported owner of Plaintiff's debt. Plaintiff disputes the validity of ALS's claim, for the reasons stated herein.

330. ALS did not provide Plaintiff with written notice within 30 days after the date on which it was allegedly assigned the mortgage.

331. Plaintiff did not receive notice indicating the exact date of the purported "Assignment" of the interest in her NOTE, as required by *§ 131(g)(1)(B)*.

332. Ms. Smith did not receive notice indicating how to reach an agent or party having authority to act on ALS's behalf, as required by *§ 131(g)(1)(C)*.

333. Plaintiff did not receive notice indicating the location of the place where transfer of ownership of the debt is recorded, as required by *§ 131(g)(1)(D)*.

334.    Ms. Smith did not receive notice indicating any other relevant information regarding the new creditor, purportedly ALS, as required by *§ 131(g)(1)(E).*

335.    As a result of ALS's violations, Plaintiff's home was foreclosed and she has had extensive litigations costs to defend against an eviction and fraudulent foreclosure, in amounts to be proven at trial.

336.    Plaintiff did not discover that her Note and DOT had allegedly been "assigned" to ALS until she went to research documents recorded at the Los Angeles County Recorder's Office on or about June 2011. Plaintiff could not have with reasonable diligence discovered such facts because she did not receive a copy of the "Assignment" as required by law. Plaintiff did not discover that ALS had violated *15 U.S.C § 1641* et seq. until on or about May 2012, when she discovered the meaning of *15 U.S.C § 1641* et seq. Therefore, the statute of limitations on her claims against ALS and other Doe Defendants was equitably tolled and did not begin to run until on or around May 2012.

337.    Thus, ALS violated *§ 131(g), 15 U.S.C § 1641* and its subject to statutory damages, civil liability, penalties, litigation fees and costs, and actual damages. *See § 131(g), 15 U.S.C § 1640.* The actual pecuniary damages include, but are not limited to, the over calculation and overpayment of interest on Plaintiff's loan, the costs of repairing Plaintiff's credit, the reduction and/or elimination of Plaintiff's credit limits, costs associated with removing the cloud on her Property title, and litigation fees and costs, in an amount to be proven at trial, but in excess of $75,000.00.

338.    As a result of ALS's violations, Plaintiff's home was purportedly sold at an illegal trustee's sale and she has suffered actual damages in that she has been foreclosed upon.

339.    Plaintiff is entitled to a private right of action to enforce *§ 131(g), 15 U.S.C §*
*1641et seq.*

## ELEVENTH CAUSE OF ACTION
## UNJUST ENRICHMENT
### (Against HF, ALS, Aurora Bank, DBTCA, RFC, GMAC and Doe Defendants)

340.    The plaintiff realleges all prior paragraphs of the pleading as if set out here in full.

341.    ALS attempted but failed to become a party to the Note and Deed of Trust when it was purportedly assigned AMN's interest in Plaintiff's Note and Deed of Trust.  HF and ALS demanded monthly mortgage payments from Plaintiff starting in February 1, 2007 and continued to collect payments from Plaintiff for nearly 4 years. Plaintiff reasonably relied upon HF and ALS assertion that they were entitled to the benefit of Plaintiff's mortgage payments.

342.    In the Workout Agreements, ALS misrepresented their status as Lender;

343.    As a result of the Workout Agreement scheme, Defendant ALS extracted millions of dollars in payments from Plaintiff and others similarly situated, that they would not have been entitled to collect had they not engaged in the scheme as described herein.

344.    Because (1) ALS fraudulently misrepresented itself; (2) Plaintiff's consent to the Workout Agreement was fraudulently induced; and/or (3) ALS's consideration for the Workout Agreements failed in whole or in part, the agreements are void. As such, the payments made by Plaintiff to ALS are not and were not the subject of express binding contracts governing the parties' rights. There is no valid agreement governing the transaction between Plaintiff and ALS.

345.    In the alternative, because ALS breached its Agreements with Plaintiff, Plaintiff derived no benefit from the Agreements and ALS was not entitled to retain such payments.

346.    By their wrongful acts and omissions, the Defendants have been unjustly enriched at the expense of the Plaintiff, and thus the Plaintiff has been unjustly deprived.

347.    HF and ALS knowingly accepted payments and retained them for their own use knowing that HF and ALS did not acquire an interest in Plaintiff's Note, such that they could accept or keep Plaintiff's payments. It would be inequitable for HF and ALS to retain the payments it received from Plaintiff which they did not have legal authority to collect. The equitable remedy of restitution when unjust enrichment has occurred is an obligation created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to his or her former position by return of the thing or its equivalent in money.

348.    Section 23 of the Deed of Trust states that:

"Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it."
Plaintiff is informed and believes the obligations to AMN under the Deed of Trust were fulfilled when AMN received the balance on the Note as proceeds of the sale of Plaintiff's Note and Mortgage to RFC. HF and ALS have been unjustly enriched by collecting monthly payments from Plaintiff when they have no interest in her Note or Deed of Trust.

349.    By reason of the foregoing, Plaintiff seeks restitution from the Defendants that were not paid to her Lender or beneficiary, if any. As a result of Defendant's unjust enrichment, Plaintiff has sustained damages in an amount to be determined at trial (which include legal and other fees in excess of the principle and interest due on her loan) and seeks full disgorgement and restitution of Defendant's enrichment, benefits, and ill-gotten gains acquired as a result of the wrongful conduct alleged above.

//

//

//

THIRD AMENDED COMPLAINT

## TWELFTH CAUSE OF ACTION
## ACCOUNTING
### (Against All Defendants)

350.    The plaintiff realleges all prior paragraphs of the pleading as if set out here in full.

351.    RFC, AMN, HF, ALS, RALI Trust, Aurora Bank, and DB have held themselves out to be Plaintiff's Creditor and/or Mortgage Servicer.  As a result of this purported relationship with Plaintiff, said Defendants have a fiduciary duty to Plaintiff to properly account for payments made by Plaintiff.  Plaintiff seeks to ascertain exactly who funded her Loan, or bought it, and who stands to lose money because of the alleged default by Plaintiff.

352.    The true Creditor/The Real Party of Interest has to pay taxes on their earnings from Plaintiff's mortgage payments.  In other words, whoever owns Plaintiff's NOTE *must* pay tax on the mortgage payments earned from that Note.

353.    If the RALI Trust owns Plaintiff's Note, then the Trust has a tax liability.  To avoid the problem of double taxation, the securitizing banks put these loans into SPVs (Special Purpose Vehicles) so they don't get taxed on them. This is covered under Internal Revenue Code ("IRS") 365.  This way, only the RALI Trust Certificate-Holders are taxed. This means, only the Certificate-Holders are the Real Parties of Interest.

354.    Plaintiff paid HF and ALS her mortgage payments for a period of approximately four years.  However, for the reasons stated herein, none of this money was actually owed to HF and/or ALS.  For that reason, these monies are due to be returned to Plaintiff in full.

355.    Paragraph 10 of the Workout Agreement under "Application of Payments" states that ALS, in ALS's sole discretion, can elect to hold Plaintiff's Workout payments in "suspense".

356.   Plaintiff alleges that ALS, by accepting Plaintiff's payments and keeping these payments in "suspense", violated Uniform Covenant 2 of Plaintiff's Deed of Trust and TILA, both of which require Lenders to apply payment on the day it is received.

357.   Uniform Covenant 2 of Plaintiff's Deed of Trust states that payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3 [escrow items].

358.   On information and belief, Plaintiff believes that ALS pocketed the Workout Agreement payments and **_never_** applied the payments according to the priority set forth in Plaintiff's Deed of Trust and applicable laws.

359.   Plaintiff has a right to the proof that her payments flow to whoever has the ultimate legal right and duty to extinguish a debt on satisfaction and not to impostors.

360.   The amount of the money due from Defendants to Plaintiff is unknown and cannot be ascertained without an accounting of the receipts and disbursements of the aforementioned transactions.  Plaintiff is informed and believes and thereon alleges that the amount due to them exceeds $75,000.00.

## THIRTEENTH CAUSE OF ACTION
## CONSTRUCTIVE TRUST
### (Against ALS, DBTCA, RFC, GMAC and Doe Defendants)

361.   The plaintiff realleges all prior paragraphs of the pleading as if set out here in full.

362.   A person who wrongfully forces a foreclosure sale and then purchases the property should not be permitted to profit from the wrongful act.

363.   As a proximate cause of the Defendants' fraudulent misrepresentations and otherwise wrongful conduct as alleged herein, Plaintiff's home has been foreclosed upon. Plaintiff also stands to lose all of the monies paid to parties that were not entitled to them.

364.    By reason of the fraudulent and otherwise wrongful manner in which the

Defendants obtained their alleged right, title and interest in and to Plaintiff's Property,

Defendants, and each of them, have no legal, equitable, or pecuniary right, claim or interest

therein, but instead, Defendants and each of them are involuntary trustees, ex maleficio, holding

said sums, Property and profits in constructive trust for Plaintiff, with the duty to convey the

same to Plaintiff forthwith. *See California Civil Code* § 2224.

365.    Plaintiff is unable to ascertain the exact amount of said sums, property and profits,

held by the Defendants as constructive trustees, ex maleficio, without a full and complete

accounting from Defendants and each of them, and an equitable tracing with regard to

Defendants and each of them.

**WHEREFORE**, Plaintiff prays judgment against Defendants and each of them, as

follows: For a declaration that Defendants hold the sums, Property and profits as constructive

trustees, ex maleficio, for the benefit of the Plaintiff; For costs of suit incurred herein; and For

such other and further relief as the court may deem proper.

### FOURTEENTH CAUSE OF ACTION
### VIOLATION OF THE FAIR CREDIT REPORTING ACT
### (Against ALS, DBTCA, and Doe Defendants)

366.    The plaintiff realleges all prior paragraphs of the pleading as if set out here in full.

367.    Defendant ALS has reported, and continues to report un-verified information to

the three major reporting agencies, Equifax, Experian and Trans Union;

368.    Plaintiff over the past three years has requested, more than once for ALS to

validate the debt it alleges to service;

369.    Defendant ALS is either unable or unwilling to do so; as much,

370.   Plaintiff informed ALS and Cal-Western on numerous occasions that she disputed the completeness or accuracy of the reported debt information;

371.   However, the Defendants failed to report the dispute to the Consumer Reporting Agencies as required by the FCRA.

372.   Plaintiff maintains Defendant ALS has and is knowingly reporting un-verified financial information to the three separate reporting agencies monthly;

373.   Each monthly report is a separate and distinct violation times three (3).

**WHEREFORE, PREMISES CONSIDERED**; Plaintiff directs this Court for entry of judgment against ALS for Violation of The Fair Credit Reporting Act, a strict liability statute; award Plaintiff One-Thousand ($1,000.00) for each un-verified monthly report, filed with each one of the three reporting agencies, costs and fees in an amount to be determined according to proof at trial.

### FIFTEENTH CAUSE OF ACTION
### FRAUDULENT OMISSIONS
### (Against RFC, GMAC, Walmar, AMN and Doe Defendants)
### (collectively "Defendants")

374.   The plaintiff realleges all prior paragraphs of the pleading as if set out here in full.

375.   Under California law, the Loan Documents' partial representations that omitted material facts, created a duty to disclose all material facts concerning Plaintiff's Option ARM loan.

376.   Thus, the partial representations in the Loan Documents created a duty to disclose to Plaintiff that: (i) the low interest rate in the Note was only available for thirty days if at all; (ii) the monthly payment amounts for the first three to five years provided to Plaintiff on the TILDS were insufficient to pay both principal and interest; (iii) negative amortization was absolutely certain to occur if Plaintiff made payments according to the payment schedule provided in the

Loan Documents; and that (iv) loss of equity and/or loss of Plaintiff's residence was certain to occur if Plaintiff made payments according to the payment schedule.

377.    The Promissory NOTE at issue states: "I will make a payment every month" [and] "I will make these payments every month until I have paid all the *Principal and Interest* and any other charges described below that I may owe **under this Note**." (emphasis added). The Note then states, while referencing the Payment Cap provision, that "[t]his Payment Cap applies only to the *Principal and Interest* payment ..." (emphasis added). And, under the heading "BORROWERS FAILURE TO PAY AS REQUIRED," the Note state "[t]he amount of the charge will be 5.000% of my overdue payment of *Principal and Interest*." (emphasis added). [see *Exhibit A*]

378.    These partial representations failed to disclose that the payment amounts prescribed in the Loan Documents were certain to result in negative amortization. Had the Loan Documents disclosed this information, Plaintiff would not have purchased the Loan.

379.    The Note further states: "For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal, and interest will accrue on the amount of this difference at the interest required by Section 2." However, the Loan Documents failed to disclose the material fact that the payment schedules in the TILDS could not possibly cover the amount of interest due under any conceivable index rate plus the margin after the first thirty days. [see *Exhibit D* a true and correct copy]  To be accurate and complete, the Notes should have disclosed that if the borrower followed the payment schedules, the monthly payments would not cover the amount of interest due and negative amortization

would occur. Had the Loan Documents disclosed this information, Plaintiff would not have purchased the loans.

380.   The Note further states, "my Minimum Payment could be less than or greater than the amount of the amount of the interest portion of the monthly payment..." (emphasis added). And, under "Payment Options" the Notes state: "Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment..." However, the so called "Payment Options" that the lender "may provide" were not disclosed to Plaintiff before they entered into the subject Option ARM loan. It was only after Plaintiff entered into the loan that she was provided crucial material information about the true cost of her loan, and by then, it was too late as the borrower was already locked into the loan, which contained heavy prepayment penalties. Had the Loan Documents disclosed this information, Plaintiff would not have purchased the loans.

381.   The Promissory Note further states, under "Amount of My Initial Monthly Payments" "Each of my initial monthly payments until the first Payment Change Date will be ...." and then, under "Payment Change Dates" it states "My monthly payment _**may**_ change..."(emphasis added).

382.   However, under the terms of the subject Option ARM loan, Plaintiff's loan "payment" was _**absolutely guaranteed to go up the very next month**_. In particular, the Loan Documents failed to disclose and omitted the material fact that while the initial monthly payment amount would remain constant, the actual amount owed each month for the loan was absolutely guaranteed to go up. Had the Loan Documents disclosed this information, Plaintiff would not have purchased the loans.

**83** | THIRD AMENDED COMPLAINT

383.    Defendants pre-approved Plaintiff's Note, which set forth a teaser rate that was only in effect for 30 days and the TILDS which set forth payments based upon those teaser rates for the first three to five years of the loan. Defendants knew, but the Loan Documents did not disclose, that these listed low payments in the TILDS were predicated on an interest rate which would not exist after the first thirty days. Defendants knew, but the Loan Documents did not disclose, that negative amortization was **_guaranteed_** if borrowers made these listed low payments. Defendants further knew, but the Loan Documents did not disclose, that the listed payments set forth in the TILDS were calculated such that, if the payments were made, borrower would actually be paying off 115% of the original principal balance. Defendants were aware of The Material Omissions, as it approved the specific language that was used to create those omissions.

384.    Plaintiff is not presently aware of the identities of all the specific executives and employees responsible for the fraudulent scheme at issue; however, Defendants know such facts, which can be determined in discovery.

385.    As a direct and proximate result of the Loan Documents' failures to disclose and omission of material facts, as alleged herein, Plaintiff has suffered damages, including but not limited to, the loss of equity in her home and the eminent loss of her Property.

386.    **_Cal. Code Civ. Proc._** § 338 codifies the delayed discovery rule in connection with fraud actions, such that a cause of action for fraud "is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud . . ."

### SIXTEENTH CAUSE OF ACTION
### QUIET TITLE
### (Against ALS, Deutsche Bank, RFC, GMAC and Doe Defendants)

387.    The plaintiff realleges all prior paragraphs of the pleading as if set out here in full.

388.    Plaintiff is ready, willing and able to tender her debt obligation. However, only the true Creditor can demand tender. Plaintiff is not required to tender the full amount of the indebtedness to an entity that is not the beneficiary to her Deed of Trust.

389.    Plaintiff alleges ALS nor any other Defendant currently have a valid interest in her Property.

390.    Plaintiff asserts a superior title to the Property over the trustee's deed through which ALS asserts its invalid interest in the property. Plaintiff also asserts that ALS cannot show that it complied with the minimal requirements for properly conducting a non-judicial foreclosure sale.

391.    The Plaintiff is the equitable owner of the Subject Property which has the following legal description:

> Lot 23 of Tract 11193 in the City of Los Angeles, County of Los Angeles, as per map recorded in book 202, pages 18 and 19 of maps, records in the office of the County Recorder of said Los Angeles 208. Plaintiff is entitled to possession, control, and ownership of the real property located at this address, together with any improvements made thereon.

392.    Defendants, ALS, MERS, and Cal-Western have at relevant times claimed interests adverse to Plaintiff's interest in the Subject Property, in the form of the Deed of Trust recorded pursuant to the Subject Loan.

393.    Plaintiff alleges that due to the fraud of Defendants the title to her Property has been rendered unmarketable in that Defendants and their assigns, have caused to be recorded as against Plaintiff's Property documents which have clouded Plaintiff's title thereto.

394.    Defendant obtained the initial Deed of Trust by unlawfully entering into a Promissory Note with Plaintiff. Defendants fraudulently induced Plaintiff to enter into a Loan with lenders. Defendants obtained their interest in Plaintiff's Property illegally and fraudulently

and therefore had no right to convey such interest to any other trustees, nominees, or beneficiaries.

395.    Defendants obtained unlawful interests in the property located at 4011 Hubert Avenue, Los Angeles, California as trustees, nominees or beneficiaries of Lender. As MERS independently had no right to convey such interest to any other trustees, nominees, or beneficiaries, Defendants could not have lawfully obtained beneficial interests in Plaintiff's Property. For the reasons set forth herein, Defendants hold no beneficial interest in Plaintiff's Property.

396.    Plaintiff is therefore seeking to quiet title against the claims of said Defendants under the said Deed of Trust, effective as of the date on which Plaintiff's Loan was commenced.

397.    Defendants securitized Plaintiff's single-family residential mortgage loan through RFC. Plaintiff is informed and believes that the lawful beneficiary has been paid in full. The Deed of Trust states in Section 23:

> Reconveyance.  Upon payment of all sums secured by this Security Instrument, lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it...

398.    The Deed of Trust does not state that Plaintiff must pay all sums, only that all secured sums must be paid. Plaintiff alleges that the obligations owed to AMN under the Deed of Trust were fulfilled and the loan was fully paid when AMN received funds in excess of the balance on the Note as proceeds of sale through securitization(s) of the loan and insurance proceeds from Credit Default Swaps.

399.    Defendants' claims are adverse to Plaintiff because Plaintiff is informed and believes that none of the Defendants are a holder of Plaintiff's Note, none of them can prove any

interest in the Note, and none of them can prove that the Note is secured by the Deed of Trust, as well as for the reasons set forth in the preceding causes of action. As such, Defendants have no right, title, lien, or interest in the "Property".

400.    The Plaintiff seeks to quiet title against the claims of the Defendants; ALL PERSONS UNKNOWN, CLAIMING ANY LEGAL OR EQUITABLE RIGHT, TITLE, ESTATE, LIEN, OR INTEREST IN THE PROPERTY DESCRIBED IN THE COMPLAINT ADVERSE TO PLAINTIFF'S TITLE, OR ANY CLOUD ON Plaintiff's TITLE THERETO; In fact, the Defendants had no right to title or interest in Plaintiff's Property and no right to entertain any rights of ownership including the right to foreclosure, offering Plaintiff's Property for sale at a Trustee's sale, demanding possession or filing cases for unlawful detainer.

401.    The Plaintiff seeks to quiet title on her Property. Plaintiff seeks a judicial declaration that the title to Plaintiff's Property is vested in the Plaintiff alone and that the Defendants and each of them be declared to have no interest estate, right, title or interest in the Property and that the Defendants, their agents and assigns, be forever enjoined from asserting any estate, right title or interest in Plaintiff's Property subject to the Plaintiff's rights.

402.    When a man has the possession as well as the right of property, he is said to have *jus duplicatum* - a double right, forming a complete title. Possessor has right against all men but him who has the very right.

**SEVENTEENTH CAUSE OF ACTION**
**VIOLATION OF TILA**
*15 U.S.C. SECTION 1601*
**(Against RFC, GMAC, Walmar, AMN DBTCA, ALS and Doe Defendants)**

403.    The plaintiff realleges all prior paragraphs of the pleading as if set out here in full.

404.    During October 2006, Plaintiff was persuaded to refinance her existing home loan through Defendant AMN. Specifically, she was sold an Option Adjustable Rate Mortgage ("Option ARM") allegedly issued by AMN.

405.    The loan documents and mandatory disclosure documents provided to Plaintiff did not comply with the requirements of the Truth in Lending Act ("*TILA*").  Among other things, Defendants

(1)    failed to disclose the interest rate actually applicable to Plaintiff's loan in a clear and easily understandable manner (12C.F.R.§226.17); [see *Exhibit A*]

(2)    failed to disclose that payment cap associated with the Option ARM loan sold to Plaintiff would **certainly** cause negative amortization to occur (12C.F.R.§226.19); and

(3)    Failed to disclose that the initial 1.5% interest rate was actually a discounted rate not based upon the formula or index used to determine the interest rate actually applicable to Plaintiff's loan and, therefore, was **certain** to increase immediately after the loan began (12C.F.R.§226.19). Indeed, rather than comply with these mandatory disclosure requirements, the loan and disclosure documents that Defendants provided to Plaintiff falsely stated that the initial 1.5% interest rate **could** increase, when , in fact it was certain to increase just **one month into the loan**. Likewise, Defendants told Plaintiff that negative amortization might occur, when, in fact, the loan was structured in a way that **absolutely guaranteed** negative amortization. Likewise, Defendants structured the loan in a way that concealed both of these facts and provided Plaintiff with a payment schedule that

was consistent with the 1.5% interest rate applying throughout the first year of the

loan.

(4)  failing to make *TILA* disclosures in writing before consummation of a consumer

credit transaction, in violation of **§ 121(a) and § 128(b) (1) of *TILA*, 15 U.S.C.**

**§1601-1631 (a) and § 1638 (b) (1), and § 226.17(a) and (b) and §226.18 of**

***Regulation Z., 12 C.F.R. § 226.17(a) and (b), § 226.18, and § 226.23 (a) (3),***

***California Business and Professions Code* §§ 10240, 10248.3, 10241;**

(5)  failing to make and deliver good faith estimates of the disclosures required by *15*

***U.S.C. § 1601, 12 C.F.R. § 226.19 (a), § 226.18;***

(6)  failing to disclose, or accurately disclose the following information:

a.    the identity of the creditor making the disclosures, in violation of **§128(a)**

**(1) of *TILA*, 15 U.S.C. § 1638(a) (1), and §226.18(a) of *Regulation Z, 12 C.F.R.***

**§ 226.18;**

b.    the amount financed, in violation of **§ 128(a) (2) of *TILA*, 15 U.S.C. §**

**1638(a) (2), and § 226.18(b) of *Regulation Z, 12 C.F.R. § 226.18(b) (c);***

c.    the finance charge, in violation of **§106 and §128(a) (3) of *TILA*, 15 U.S.C.**

**§1605 and 1638(a) (3), and § 226.4 and 226.18(d) of *Regulation Z, 12 C.F.R. §***

**226.4 and § 226.18(d);**[see *Exhibit D* a true and correct copy]

d.    the annual percentage rate, in violation of **§107 and §128 (a) (4) of *TILA*,**

***15 U.S.C. §1605-6 and 1638 (a) (3) (4), and Sections 226.18(e) and 226.22 of***

***Regulation Z, 12 C.F.R. § 226.18(e) and § 226.22;***

e.    the payment schedule, in violation of **§128(a) (6) of *TILA*, 15 U.S.C. §**

**1638(a) (6), and § 226.18(g) of *Regulation Z, 12 C.F.R. §226.18(g);***

THIRD AMENDED COMPLAINT

f.     the total of payments, in violation of **§128(a) (5) of *TILA*, 15 U.S.C. §
1638(a) (5), and §226.18(h) of *Regulation Z, 12 C.F.R.* §226.18(h) l;**

g.     whether or not a penalty may be imposed if the obligation is prepaid in full,
in violation of **§128(a) (11) of *TILA*, 15 U.S.C. §1638(a) (11), and § 226.18(k)
(1) of *Regulation Z, 12 C.F.R.*§ 226.18(k) (1);**

h.     any dollar or percentage charge that may be imposed before maturity due to
a late payment, other than a deferral or extension charge, in violation of **§128(a)
(10) of *TILA*, 15 U.S.C. §1638(a) (10), and §226.18 (1) of *Regulation Z, 12
C.F.R.* § 226.18(1);**

i.     the fact that the creditor has or will acquire a security interest in the
consumer's principal dwelling, in violation of **§ 128(a) (9) of *TILA*, 15 U.S.C. §
1638(a) (9), and § 226.18(m) of *Regulation Z, 12 C.F.R.* § 226.18(m);**

j.     the failure of Creditors to provide initial disclosures to Plaintiff;

k.     incomplete copies of the Right to Cancel form, in violation of ***TILA* and
*Regulation Z*, 12 C.F.R. § 226.23 (b)(1)**

l.     making consumer credit disclosures that do not reflect the terms of the legal
obligation between the true parties, in violation of **§ 226.17(c)(1) of *Regulation
Z, 12 C.F.R.* §226.17(c)(1); and**

Thus, Defendants' representations and disclosures to Plaintiff was not only incomplete, false and
misleading, they violated the detailed disclosure requirements of the Truth in Lending Act.

406.    Although Defendants were required by law to disclose key aspects of the loan's
term to Plaintiff in a clear, conspicuous and easily understandable manner, the information
supplied to Plaintiff was anything but. As a result of Defendants' failures to comply with the

law, Plaintiff is entitled, among other things, to rescind her loan. *12 C.F.R. §226.23(a)(3)*.

However, ALS rushed to conduct an unlawful foreclosure sale and allegedly sold Plaintiff's

Property to itself.

407.   The statute of limitations for a *TILA* damages claim is one year from the

occurrence of a violation. *15 U.S.C. § 1640(e)*. Defendants overstated Plaintiff's income and

committed forgery in order to qualify Plaintiff for the Option ARM mortgage in the amount of

$556,000.00. Defendants concealed these overstatements from Plaintiff. This concealment

prevented Plaintiff from readily discovering the undisclosed acts until in or around July 2011.

Plaintiff also exercised reasonable diligence by reading the Deed of Trust and Promissory Note

before she signed them. However, Defendants' failures to comply with the law to disclose the

Loan's terms in a clear, conspicuous and easily understandable manner prevented Plaintiff from

discovering Defendants' violations until in or around October 2010 via a complimentary

forensic audit through CMAC Audit.[see *Exhibit X*] Thus, the doctrine of equitable tolling is

appropriate to toll the limitations period until Plaintiff had a reasonable opportunity to discover

the facts giving rise to a *TILA* claim.

## VI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against the Defendants as follows:

1.   Assume jurisdiction in this proceeding;

2.   For a preliminary and permanent injunction on behalf of Plaintiff preventing Defendants,

from collecting on the Subject Loan and from causing the subject Property to be sold, assigned

or transferred to a third party, and post foreclosure proceedings;

3.   For an order compelling Defendants to remove any instrument which does or could be

construed as constituting a cloud upon Plaintiff's title to the Property;

## VERIFICATION

I, Tia Smith, am the Plaintiff in the above-entitled action. I have read the foregoing

Complaint and know the contents thereof. The same is true of my own knowledge, except as to

those matters which are therein alleged on information and belief, and as to those matters, I

believe it to be true. I declare under penalty of perjury that the foregoing is true and correct and

that this declaration was executed this 12th day of June, 2013, in Los Angeles, California.

DATED: June 12, 2013

TIA SMITH

# EXHIBIT A

 

### ADJUSTABLE RATE NOTE

LOAN NO.            9130
MIN:            9130-2

**(MTA-Twelve Month Average Index - Payment Caps)**

THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.

NOVEMBER 13, 2006                    LOS ANGELES                    CALIFORNIA
       [Date]                            [City]                       [State]

4011 HUBERT AVENUE
LOS ANGELES, CALIFORNIA 90008-2621
[Property Address]

**1.    BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $    $56,000.00    (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed (ONE HUNDRED FIFTEEN PERCENT            ) of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is    AMERICAN MORTGAGE NETWORK, INC., A DELAWARE CORPORATION
I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.    INTEREST**

**(A)  Interest Rate**
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    1.500    %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B)  Interest Rate Change Dates**
The interest rate I will pay may change on the            1ST            day of    JANUARY, 2007    , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

**(C)  Index**
Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D)  Calculation of Interest Rate Changes**
Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 400/1000    percentage point(s)    3.400    % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than    9.950    %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

**3.    PAYMENTS**

**(A)  Time and Place of Payments**
I will make a payment every month.

I will make my monthly payments on the    1ST            day of each month beginning on JANUARY 01, 2007 . I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on DECEMBER 01, 2036    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at    P. O. BOX 85302
                          ATTN:    CASHIER'S DEPT., SAN DIEGO, CA 92186
or at a different place if required by the Note Holder.

LOAN NO.    █████ 9130

**(B)  Amount of My Initial Monthly Payments**

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S.
$    1,918.87    unless adjusted under Section 3 (F).

**(C)  Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the    1ST
day of    JANUARY,  2008   , and on that day every 12th month thereafter. Each
of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F)
or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount
the Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as
provided in Section 3(F) or 3(G) below.  If the Minimum Payment is not sufficient to cover the amount of the
interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or
as provided in Section 3(F) or 3(G) below.

**(D)  Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the
monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment
Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the
month preceding the Payment Change Date. The result of this calculation is called the "Full Payment."Unless
Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will
not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap."
This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments
Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the
amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the
number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below
requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and
the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E)  Additions to My Unpaid Principal**

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly
payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less
than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay
the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal
payments. For each month that my monthly payment is less than the interest portion, the Note Holder will
subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to
my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by
Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will
apply the payment as provided in Section 3 (A).

**(F)  Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed the Maximum Limit equal to    115    percent of the Principal
amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments
and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to
exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change
more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new
Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the
Maturity Date in substantially equal payments at the current interest rate.

**(G)  Required Full Payment**

On the    TENTH    Payment Change Date and on each succeeding fifth Payment Change Date
thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes
again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H)  Payment Options**

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment
options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the
following Payment Options:

(i)    Interest Only Payment:  the amount that would pay the interest portion of the monthly payment
at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is
only available if the interest portion exceeds the Minimum Payment.

(ii)    Fully Amortized Payment:  the amount necessary to pay the loan off (Principal and Interest) at
the Maturity Date in substantially equal payments.

(iii)   15 Year Amortized Payment:  the amount necessary to pay the loan off (Principal and Interest)
within a fifteen (15) year term from the first payment due date in substantially equal payments. This
monthly payment amount is calculated on the assumption that the current rate will remain in effect for
the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

 

LOAN NO. ███████130

**4.   NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)  Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.00 % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B)  Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)  Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)  No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)  Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.




LOAN NO. ████0130

## 10.  WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11.  SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b). Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

RIDER TO THE NOTE AND SECURITY INSTRUMENT ATTACHED AND MADE A PART HEREOF.

_____ (Seal)
TIA DANIELLE SMITH                                                    -Borrower

_____ (Seal)
                                                                                      -Borrower

_____ (Seal)
                                                                                      -Borrower

_____ (Seal)
                                                                                      -Borrower

Pay to the Order of:

Without recourse,
American Mortgage Network, Inc.,
a Delaware Corporation
By: _____
Name: Tiffany Rice
Title: Funder

# RIDER TO NOTE AND SECURITY INSTRUMENT

LOAN NO.    ████ 9130

THIS RIDER is made this 13TH day of    NOVEMBER,    2006    ,    and is incorporated into and shall be deemed to amend and supplement both the Note and Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to    AMERICAN MORTGAGE NETWORK, INC., A DELAWARE CORPORATION    (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

4011 HUBERT AVENUE, LOS ANGELES, CALIFORNIA 90008-2621

[Property Address]

## PREPAYMENT PENALTY - FIRST    12    MONTHS OF NOTE

You have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When you make a Prepayment, you must tell the Note Holder in writing that you are doing so.

Subject to the Prepayment Penalty specified below, you may make a full Prepayment or partial Prepayment of your obligation. The Note Holder will use all of your Prepayments to reduce the amount of principal that you owe under this Note. If you make a partial Prepayment, there will be no changes in the due date(s) or in the amount of your monthly payment unless the Note Holder agrees in writing to those changes.

If within the 12 month period beginning with the date of the Note, (the "Penalty Period"), you make a full or partial Prepayment, you will pay a prepayment charge as consideration for the Note Holder's acceptance of such payment. No prepayment charge will be assessed for any prepayment made after the Penalty Period.

You may prepay an amount not exceeding twenty percent (20%) of the original principal amount in any twelve month period commencing from the date of the Note or anniversary dates thereof without penalty. However, during the Penalty Period, if the aggregate amount of the principal prepaid in any twelve month period exceeds twenty percent (20%) of the original principal amount of this loan, then as consideration of the acceptance of such Prepayment and in addition to any other sum payable hereunder, you agree to pay the Note Holder hereof a sum equal to six (6) months interest on the amount prepaid in excess of twenty percent (20%) of the original principal amount at the rate specified in the Note.

Such additional sums shall be paid whether prepayment is voluntary or involuntary including any prepayment affected by the exercise of any acceleration provisions contained in the Note to which this Rider is attached, or in the Security Instrument securing the Note to which this Rider is attached.

All other terms and conditions of the Note remain in full force and effect.

By signing below, Borrower accepts and agrees to the terms and provisions contained in this Rider to Note and Security Instrument.

### NOTICE TO BORROWER

**Do not sign this loan agreement before you read it. This loan agreement provides for the payment of a penalty if you wish to repay the loan prior to the date provided for repayments in the loan agreement.**

TIA DANIELLE SMITH _____ 12/2/06 Date

_____ Date

_____ Date

_____ Date

1/18/05                              Page 2 of 2                              ACST1552




Doc ID#: ████9130

## ADJUSTABLE RATE RIDER

### (MTA-Twelve Month Average Index - Payment Caps)

THIS ADJUSTABLE RATE RIDER is made this    13TH    day of    NOVEMBER,
2006                   , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by
the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
AMERICAN MORTGAGE NETWORK, INC., A DELAWARE CORPORATION
("Lender") of the same date and covering the property described in the Security Instrument and
located at:
4011 HUBERT AVENUE, LOS ANGELES, CALIFORNIA 90008-2621
[Property Address]

THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE
AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT
THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL
AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY
BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THE NOTE.

ADDITIONAL COVENANTS: In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agrees as follows:

### A. INTEREST RATE AND MONTHLY PAYMENT CHANGES ·
The Note provides for changes in the interest rate and the monthly payments, as follows:

2.    INTEREST
(A)  Interest Rate
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I
will pay interest at a yearly rate of    1.500    %. The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any
default described in Section 7(B) of the Note.

(B)  Interest Rate Change Dates
The interest rate I will pay may change on the    1ST    day of    JANUARY,
2007      , and on that day every month thereafter. Each date on which my interest
rate could change is called an "Interest Rate Change Date." The new rate of interest will become
effective on each Interest Rate Change Date. The interest rate may change monthly, but the
monthly payment is recalculated in accordance with Section 3.

PayOption MTA ARM Rider
FE-5315 (0511)                    Page 1 of 5

385ST

Certified to be a
true & correct copy
of the original
X _Oscar A. Smith_




LOAN NO. ███ 9130

(C) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(D) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding   THREE AND 400/1000   percentage point(s)   3.400   % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than   9.950   %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

3.   PAYMENTS

(A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the   1ST   day of each month beginning on JANUARY   01, 2007.  I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   DECEMBER 01, 2036   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   P. O. BOX 85302
ATTN:   CASHIER'S DEPT., SAN DIEGO, CA 92186
or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $   1,918.87   unless adjusted under Section 3 (F).

(C) Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the   1ST   day of   JANUARY, 2008   , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below.  If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

PayOption MTA ARM Rider
FE-5315 (0511)                    Page 2 of 5

Certified to be a
true & correct copy
of the original

X ___Op.O A.Bryant___




LOAN NO. ████9130

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D)  Calculation of Monthly Payment Changes**
At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply; the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075.  The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E)  Additions to My Unpaid Principal**
Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3 (A).

**(F)  Limit on My Unpaid Principal; Increased Monthly Payment**
My unpaid Principal can never exceed the Maximum Limit equal to   ONE HUNDRED FIFTEEN                                        percent (    115   %)of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G)  Required Full Payment**
On the    TENTH     Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.
PayOption MTA ARM Rider
FE-5315 (0511)                                    Page 3 of 5

Certified to be a
true & correct copy
of the original

X _Opal S. Smith_

 

LOAN NO. ████9130

**(H)  Payment Options**
After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

   (i)   Interest Only Payment:  the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.
   (ii)   Fully Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.
   (iii)   15 Year Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

   Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

   If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

   To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

PayOption MTA ARM Rider
FE-5315 (0511)                    Page 4 of 5

Certified to be a
true & correct copy
of the original
X _Opra b. Smith_

 

LOAN NO. ███████9130

·If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____     -Borrower
TIA DANIELLE SMITH

_____     -Borrower

_____     -Borrower

_____     -Borrower

PayOption MTA ARM Rider
FE-5315 (0511)                    Page 5 of 5

Certified to be a
true & correct copy
of the original

X _____

 

# SIGNATURE/NAME AFFIDAVIT

**DATE:**   NOVEMBER 13, 2006

**LOAN #:**   ████9130

**BORROWER:**   TIA DANIELLE SMITH

THIS IS TO CERTIFY THAT MY LEGAL SIGNATURE IS AS WRITTEN AND TYPED BELOW.
(This signature must <u>exactly</u> match signatures on the Note and Mortgage or Deed of Trust.)

TIA DANIELLE SMITH
_____
(Print or Type Name)

_____
Signature

(If applicable, complete the following.)

I AM ALSO KNOWN AS:

_____
(Print or Type Name)

_____
Signature

_____
(Print or Type Name)

_____
Signature

_____
(Print or Type Name)

_____
Signature

_____
(Print or Type Name)

_____
Signature

and that                                                                            are one

and the same person.

State/Commonwealth of   C. A
County/Parish of   Los Angeles

Subscribed and sworn (affirmed) before me   Rosalind G. Asevedo, notary public
this   2   day of   December . 2006

ROSALIND G. ASEVEDO
Commission # 1666236
Notary Public - California
Los Angeles County
My Comm. Expires May 12, 2010

Notary Public
State/Commonwealth of
Acting in the County/Parish of

My Commission Expires:   5-12-2010

VMP-304 (0405)                    VMP Mortgage Solutions, Inc. (800)521-7291                    5/04

# EXHIBIT B




**This page is part of your document - DO NOT DISCARD**

## 06 2729009

**RECORDED/FILED IN OFFICIAL RECORDS**
**RECORDER'S OFFICE**
**LOS ANGELES COUNTY**
**CALIFORNIA**
**12/08/06 AT 08:00am**

# TITLE(S) :





L E A D   S H E E T

**FEE**

D.T.T.



FEE $ 17 00
DAF $ 2
C-20

**CODE**
**20**

**CODE**
**19**

**CODE**
**9**___

**Assessor's Identification Number (AIN)**
**To be completed by Examiner OR Title Company in black ink.**

**Number of AIN's Shown**

### THIS FORM IS NOT TO BE DUPLICATED

Public Record

# NORTH AMERICAN TITLE COMPANY

Recording Requested By.
NORTH AMERICAN TITLE

Return To

AMERICAN MORTGAGE NETWORK, INC
P O. BOX 85463
SAN DIEGO, CALIFORNIA 92186


12/8/06
20062729009

Prepared By.
TIFFANY RICE

K574019763 ___[Space Above This Line For Recording Data]___

# DEED OF TRUST

MIN ████████9130-2
LOAN NO. ████

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21  Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated  NOVEMBER 13, 2006
together with all Riders to this document
(B) "Borrower" is

    TIA DANIELLE SMITH, AN UNMARRIED WOMAN

Borrower's address is  4011 HUBERT AVENUE, LOS ANGELES, CALIFORNIA 90008-2621
            Borrower is the trustor under this Security Instrument
(C) "Lender" is  AMERICAN MORTGAGE NETWORK, INC., A DELAWARE CORPORATION

Lender is a   CORPORATION
organized and existing under the laws of  THE STATE OF DELAWARE

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3005  1/01

-6A(CA) (0207) 01
Page 1 of 15
        VMP Mortgage Forms  Inc

199CA

Public Record

Lender's address is    P. O. BOX 85463, SAN DIEGO, CA 92186

(D) "Trustee" is    FIRST AMERICAN TITLE INSURANCE COMPANY

(E) "MERS" is Mortgage Electronic Registration Systems, Inc  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument  MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P O  Box 2026, Flint, MI 48501-2026, tel (888) 679-MERS

(F) "Note" means the promissory note signed by Borrower and dated    NOVEMBER 13, 2006
The Note states that Borrower owes Lender    FIVE HUNDRED FIFTY SIX THOUSAND AND
00/100                                                                                    Dollars
(U S $    556,000.00    ) plus interest  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than    DECEMBER 01, 2036

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower  The following Riders are to be executed by Borrower [check box as applicable]

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |

PREPAYMENT PENALTY RIDER

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property, (ii) condemnation or other taking of all or any part of the Property, (iii) conveyance in lieu of condemnation, or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

-6A(CA) (0207) 01                    Page 2 of 15                    Form 3005  1/01

Public Record

4

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C Section 2601 et seq ) and its implementing regulation, Regulation X (24 C F R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA

(R) "Successor In Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS This Security Instrument secures to Lender (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note, and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY                of               LOS ANGELES

[Type of Recording Jurisdiction]                [Name of Recording Jurisdiction]

LOT 23 OF TRACT 11193, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 202, PAGES 18 AND 19 OF MAPS, RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID LOS ANGELES COUNTY.

Parcel ID Number    5033-016-023                which currently has the address of
                    4011 HUBERT AVENUE                                    [Street]
                    LOS ANGELES          [City], California  90008    [Zip Code]
("Property Address").

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property All replacements and additions shall also be covered by this Security Instrument All of the foregoing is referred to in this Security Instrument as the "Property " Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property, and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

-6A(CA) (0207) 01              Page 3 of 15                      Form 3005  1/01

5

of record  Borrower warrants and will defend generally the title to the Property against all claims and
demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform
covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real
property.

UNIFORM COVENANTS  Borrower and Lender covenant and agree as follows.

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any
prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items
pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.
currency. However, if any check or other instrument received by Lender as payment under the Note or this
Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments
due under the Note and this Security Instrument be made in one or more of the following forms, as
selected by Lender  (a) cash, (b) money order, (c) certified check, bank check, treasurer's check or
cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a
federal agency, instrumentality, or entity, or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at
such other location as may be designated by Lender in accordance with the notice provisions in Section 15
Lender may return any payment or partial payment if the payment or partial payments are insufficient to
bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan
current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial
payments in the future, but Lender is not obligated to apply such payments at the time such payments are
accepted  If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay
interest on unapplied funds  Lender may hold such unapplied funds until Borrower makes payment to bring
the Loan current  If Borrower does not do so within a reasonable period of time, Lender shall either apply
such funds or return them to Borrower  If not applied earlier, such funds will be applied to the outstanding
principal balance under the Note immediately prior to foreclosure  No offset or claim which Borrower
might have now or in the future against Lender shall relieve Borrower from making payments due under
the Note and this Security Instrument or performing the covenants and agreements secured by this Security
Instrument

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all
payments accepted and applied by Lender shall be applied in the following order of priority. (a) interest
due under the Note; (b) principal due under the Note, (c) amounts due under Section 3. Such payments
shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts
shall be applied first to late charges, second to any other amounts due under this Security Instrument, and
then to reduce the principal balance of the Note

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a
sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and
the late charge  If more than one Periodic Payment is outstanding, Lender may apply any payment received
from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be
paid in full  To the extent that any excess exists after the payment is applied to the full payment of one or
more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall
be applied first to any prepayment charges and then as described in the Note

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under
the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due
under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due
for  (a) taxes and assessments and other items which can attain priority over this Security Instrument as a
lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any, (c)
premiums for any and all insurance required by Lender under Section 5, and (d) Mortgage Insurance
premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage
Insurance premiums in accordance with the provisions of Section 10  These items are called "Escrow
Items "  At origination or at any time during the term of the Loan, Lender may require that Community
Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and
assessments shall be an Escrow Item  Borrower shall promptly furnish to Lender all notices of amounts to
be paid under this Section  Borrower shall pay Lender the Funds for Escrow Items unless Lender waives
Borrower's obligation to pay the Funds for any or all Escrow Items  Lender may waive Borrower's
obligation to pay to Lender Funds for any or all Escrow Items at any time  Any such waiver may only be

-6A(CA) (0207) 01                    Page 4 of 15                    Form 3005  1/01

Public Record

in writing  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount  Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA  Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank  Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA  Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge  Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds  Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds  Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA  If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender

4.  Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower, (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement, (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded, or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

-6A(CA) (0207) 01                    Page 5 of 15                              Form 3005  1/01

Public Record

7

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires What Lender requires pursuant to the preceding sentences can change during the term of the Loan  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either  (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense  Lender is under no obligation to purchase any particular type or amount of coverage  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance  Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices  If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender  Lender may make proof of loss if not made promptly by Borrower  Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened  During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds  Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

-6A(CA) (0207) 01                    Page 6 of 15                    Form 3005  1/01

Public Record

06 2772 9009

8

the excess, if any, paid to Borrower Such insurance proceeds shall be applied in the order provided for in Section 2

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property If it has reasonable cause, Lender may inspect the interior of the improvements on the Property Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property Lender's actions can include, but are not limited to (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court, and (c) paying reasonable

-6A(CA) (0207) 01                    Page 7 of 15                                    Form 3005  1/01

Public Record

9

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

-6A(CA) (0207).01                    Page 8 of 15                    Form 3005  1/01

06 2729009

10

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction· (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

-6A(CA) (0207) 01                    Page 8 of 15                    Form 3005   1/01

Public Record

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy

   **13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"). (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument, (b) is not personally obligated to pay the sums secured by this Security Instrument, and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent

   Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender

   **14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law

   If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note) Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge

   **15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure There may be only one designated notice address under this Security Instrument at any one time Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument

-6A(CA) (0207) 01                    Page 10 of 15                              Form 3005  1/01

Public Record

12

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender, (b) words in the singular shall mean and include the plural and vice versa, and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of  (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument, (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate, or (c) entry of a judgment enforcing this Security Instrument  Those conditions are that Borrower. (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred, (b) cures any default of any other covenants or agreements, (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall  continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order, (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity, or (d) Electronic Funds Transfer  Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower  A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

-6A(CA) (0207) 01                    Page 11 of 15                    Form 3005  1/01

06  27 29009

---

13

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials, (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

-6A(CA) (0207) 01                    Page 12 of 15                    Form 3005  1/01

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

-6A(CA) (0207) 01                    Page 13 of 15                    Form 3005    1/01

15

**BY SIGNING BELOW**, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it

Witnesses:

_____          _____ (Seal)
                                            TIA DANIELLE SMITH          -Borrower

_____          _____ (Seal)
                                                                        -Borrower

_____ (Seal)   _____ (Seal)
                          -Borrower                                     -Borrower

_____ (Seal)   _____ (Seal)
                          -Borrower                                     -Borrower

_____ (Seal)   _____ (Seal)
                          -Borrower                                     -Borrower

-6A(CA) (0207).01                Page 14 of 15                Form 3005  1/01

Public Record

State of California
County of *Los Angeles*                    } ss.

On *12-2-06*            before me, *Rosalind G. Asevedo, notary public*

personally appeared

*Tia Danielle Smith*                    , personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal

_____ (Seal)

ROSALIND G. ASEVEDO
Commission # 1666236
Notary Public - California
Los Angeles County
My Comm. Expires May 12, 2010

-6A(CA) (0207) 01            Page 15 of 15            Form 3005    1/01

Public Record

17

EXHIBIT "A"
(LEGAL DESCRIPTION)

LOT 23 OF TRACT 11193, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF
CALIFORNIA, AS PER MAP RECORDED IN BOOK 202, PAGES 18 AND 19 OF MAPS, RECORDS IN THE
OFFICE OF THE COUNTY RECORDER OF SAID LOS ANGELES COUNTY.

*18*

Doc ID#. ▮▮▮▮▮▮

## ADJUSTABLE RATE RIDER

### (MTA-Twelve Month Average Index - Payment Caps)

THIS ADJUSTABLE RATE RIDER is made this    13TH    day of    NOVEMBER,
2006    , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by
the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
AMERICAN MORTGAGE NETWORK, INC., A DELAWARE CORPORATION
("Lender") of the same date and covering the property described in the Security Instrument and
located at.

4011 HUBERT AVENUE. LOS ANGELES, CALIFORNIA 90008-2621
[Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE
AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT
THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL
AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY
BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THE NOTE.**

ADDITIONAL COVENANTS: In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agrees as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for changes in the interest rate and the monthly payments, as follows.

**2. INTEREST**
(A) Interest Rate
Interest will be charged on unpaid Principal until the full amount of Principal has been paid I
will pay interest at a yearly rate of    1.500    %. The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any
default described in Section 7(B) of the Note

(B) Interest Rate Change Dates
The interest rate I will pay may change on the    1ST    day of    JANUARY,
2007    , and on that day every month thereafter. Each date on which my interest
rate could change is called an "Interest Rate Change Date." The new rate of interest will become
effective on each Interest Rate Change Date. The interest rate may change monthly, but the
monthly payment is recalculated in accordance with Section 3.

PayOption MTA ARM Rider
FE-5315 (0511)                    Page 1 of 5

385ST

Public Record

19

LOAN NO. [redacted]

**(C) Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index  The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12  The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice

**(D) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding   THREE AND 400/1000   percentage point(s)   3.400   % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than   9.950   %  Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin

**3.  PAYMENTS**

**(A)  Time and Place of Payments**

I will make a payment every month

I will make my monthly payments on the   1ST   day of each month beginning on JANUARY   01, 2007  I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note  Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal  If, on   DECEMBER 01, 2036   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date "

I will make my monthly payments at   P. O. BOX 85302
                                     ATTN:  CASHIER'S DEPT., SAN DIEGO, CA 92186
or at a different place if required by the Note Holder

**(B)  Amount of My Initial Monthly Payments**

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $   1,918.87   unless adjusted under Section 3 (F).

**(C)  Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the   1ST   day of   JANUARY, 2008   , and on that day every 12th month thereafter  Each of these dates is called a "Payment Change Date "  My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment  The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below.  If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

PayOption MTA ARM Rider
FE-5315 (0511)                          Page 2 of 5

Public Record

LOAN NO. 

*20*

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7 5% of my prior monthly payment. This 7 5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E) Additions to My Unpaid Principal**

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3 (A)

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed the Maximum Limit equal to    ONE HUNDRED FIFTEEN    percent (    115    %)of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7 5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate

**(G) Required Full Payment**

On the    TENTH    Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

PayOption MTA ARM Rider

FE-5315 (0511)                    Page 3 of 5

Public Record

LOAN NO. ▒▒▒▒▒

*U*

**(H)  Payment Options**

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)  **Interest Only Payment:**  the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)  **Fully Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments

(iii)  **15 Year Amortized Payment:**  the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term

These Payment Options are only applicable if they are greater than the Minimum Payment

**B.  TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument   Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing

PayOption MTA ARM Rider
FE-5315 (0511)                    Page 4 of 5

LOAN NO. █████████

$\mathcal{W}$

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____    -Borrower
TIA DANIELLE SMITH

_____    -Borrower

_____    -Borrower

_____    -Borrower

PayOption MTA ARM Rider
FE-5315 (0511)                      Page 5 of 5

90
2729009

Public Record

23

# RIDER TO NOTE AND SECURITY INSTRUMENT

LOAN NO. 

THIS RIDER is made this 13TH day of         NOVEMBER, 2006         and is
incorporated into and shall be deemed to amend and supplement both the Note and Mortgage, Deed of
Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the
"Borrower") to secure Borrower's Note (the "Note") to    AMERICAN MORTGAGE NETWORK, INC., A
DELAWARE CORPORATION                                      (the "Lender")
of the same date and covering the property described in the Security Instrument and located at:

4011 HUBERT AVENUE, LOS ANGELES, CALIFORNIA 90008-2621

[Property Address]

## PREPAYMENT PENALTY - FIRST    12    MONTHS OF NOTE

You have the right to make payments of Principal at any time before they are due. A payment of
Principal only is known as a "Prepayment". When you make a Prepayment, you must tell the Note
Holder in writing that you are doing so.

Subject to the Prepayment Penalty specified below, you may make a full Prepayment or partial
Prepayment of your obligation. The Note Holder will use all of your Prepayments to reduce the amount
of principal that you owe under this Note. If you make a partial Prepayment, there will be no changes in
the due date(s) or in the amount of your monthly payment unless the Note Holder agrees in writing to
those changes

If within the 12 month period beginning with the date of the Note, (the "Penalty Period"), you
make a full or partial Prepayment, you will pay a prepayment charge as consideration for the Note
Holder's acceptance of such payment. No prepayment charge will be assessed for any prepayment
made after the Penalty Period.

You may prepay an amount not exceeding twenty percent (20%) of the original principal amount in
any twelve month period commencing from the date of the Note or anniversary dates thereof
without penalty. However, during the Penalty Period, if the aggregate amount of the principal
prepaid in any twelve month period exceeds twenty percent (20%) of the original principal amount
of this loan, then as consideration of the acceptance of such Prepayment and in addition to any
other sum payable hereunder, you agree to pay the Note Holder hereof a sum equal to six (6)
months interest on the amount prepaid in excess of twenty percent (20%) of the original principal
amount at the rate specified in the Note.

Such additional sums shall be paid whether prepayment is voluntary or involuntary including any
prepayment affected by the exercise of any acceleration provisions contained in the Note to which
this Rider is attached, or in the Security Instrument securing the Note to which this Rider is
attached.

| 1/18/05 | Page 1 of 2 | ACST1551 |
| | 155ST | B1CA |