# <u>Exhibit U</u>

NOTICE SENT TO:

Smith, Tia
4011 Hubert Avenue
Los Angeles          CA    90008

```
┌─────────────────────────┐
│     ORIGINAL FILED      │
│        FILE STAMP       │
│      JUL 1 9 2011       │
│      LOS ANGELES        │
│     SUPERIOR COURT      │
└─────────────────────────┘
```

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | CASE NUMBER |
|---|---|
| TIA SMITH                     Plaintiff(s), | BC465542 |
| VS. | |
| MORTGAGE ELECTRONIC REGISTRATION SYSTEM          Defendant(s). | **NOTICE OF CASE MANAGEMENT CONFERENCE** |

### TO THE PLAINTIFF(S)/ATTORNEY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve this notice of hearing on all parties/attorneys of record forthwith, and meet and confer with all parties/attorneys of record about the matters to be discussed no later than 30 days before the Case Management Conference.

Your Case Management Conference has been scheduled for <u>November 14, 2011</u> at <u>8:30 am</u> in <u>Dept. 50</u> at 111 North Hill Street, Los Angeles, California 90012.

**NOTICE TO DEFENDANT:**     **THE SETTING OF THE CASE MANAGEMENT CONFERENCE DOES NOT EXEMPT THE DEFENDANT FROM FILING A RESPONSIVE PLEADING AS REQUIRED BY LAW.**

Pursuant to California Rules of Court, rules 3.720-3.730, a completed Case Management Statement (Judicial Council form # CM-110) must be filed at least **15 calendar days** prior to the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record. You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference.

At the Case Management Conference, the Court may make pretrial orders including the following, but not limited to, an order establishing a discovery schedule; an order referring the case to Alternative Dispute Resolution (ADR); an order reclassifying the case; an order setting subsequent conference and the trial date; or other orders to achieve the goals of the Trial Court Delay Reduction Act (Gov. Code, section 68600 et seq.)

Notice is hereby given that if you do not file the Case Management Statement or appear and effectively participate at the Case Management Conference, the Court may impose sanctions pursuant to LASC Local Rule 7.13, Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.360 and 583.410, Government Code Section 68608 (b), and California Rules of Court 2.2 et seq.

Date: <u>July 19, 2011</u>

**JOHN SHEPARD WILEY JR.**

Judicial Officer

## CERTIFICATE OF SERVICE

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named above:

[X] by depositing in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed herein in a separate sealed envelope to each address as shown above with postage thereon fully prepaid.

[ ] by personally giving the party notice upon filing the complaint.

Date: <u>July 19, 2011</u>

John A. Clarke, Executive Officer/Clerk

by **TERESA A. RIVERS**_____, Deputy Clerk

LACIV 132 (Rev. 09/07)
LASC Approved 10-03

Cal. Rules of Court, rule 3.720-3.730
LASC Local Rules, Chapter Seven

168075

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
NOTICE OF CASE ASSIGNMENT - UNLIMITED CIVIL CASE

BC 465542

Case Number _____

## THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

Your case is assigned for all purposes to the judicial officer indicated below (Local Rule 7.3©). There is additional information on the reverse side of this form.

| ASSIGNED JUDGE | DEPT | ROOM | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|
| Hon. Carolyn B. Kuhl | 1 | 534 | Hon. Holly E. Kendig | 42 | 416 |
| Hon. J. Stephen Czuleger | 3 | 224 | Hon. Mel Red Recana | 45 | 529 |
| Hon. Luis A. Lavin | 13 | 630 | Hon. Debre Katz Weintraub | 47 | 507 |
| Hon. Terry A. Green | 14 | 300 | Hon. Elizabeth Allen White | 48 | 506 |
| Hon. Richard Fruin | 15 | 307 | Hon. Deirdre Hill | 49 | 509 |
| Hon. Rita Miller | 16 | 306 | Hon. John Shepard Wiley Jr. | 50 | 508 |
| Hon. Richard E. Rico | 17 | 309 | Hon. Abraham Khan | 51 | 511 |
| Hon. Rex Heeseman | 19 | 311 | Hon. Susan Bryant-Deason | 52 | 510 |
| Hon. Kevin C. Brazile | 20 | 310 | Hon. John P. Shook | 53 | 513 |
| Hon. Zaven V. Sinanian | 23 | 315 | Hon. Ernest M. Hiroshige | 54 | 512 |
| Hon. Robert L. Hess | 24 | 314 | Hon. Malcolm H. Mackey | 55 | 515 |
| Hon. Mary Ann Murphy | 25 | 317 | Hon. Michael Johnson | 56 | 514 |
| Hon. James R. Dunn | 26 | 316 | Hon. Ralph W. Dau | 57 | 517 |
| Hon. Yvette M. Palazuelos | 28 | 318 | Hon. Rolf M. Treu | 58 | 516 |
| Hon. Barbara Scheper | 30 | 400 | Hon. David L. Minning | 61 | 632 |
| Hon. Alan S. Rosenfield | 31 | 407 | Hon. Michael L. Stern | 62 | 600 |
| Hon. Mary H. Strobel | 32 | 406 | Hon. Kenneth R. Freeman | 64 | 601 |
| Hon. Charles F. Palmer | 33 | 409 | Hon. Mark Mooney | 68 | 617 |
| Hon. Amy D. Hogue | 34 | 408 | Hon. Ramona See | 69 | 621 |
| Hon. Daniel Buckley | 35 | 411 | Hon. Soussan G. Bruguera | 71 | 729 |
| Hon. Gregory Alarcon | 36 | 410 | Hon. Ruth Ann Kwan | 72 | 731 |
| Hon. Joanne O'Donnell | 37 | 413 | Hon. Teresa Sanchez-Gordon | 74 | 735 |
| Hon. Maureen Duffy-Lewis | 38 | 412 | Hon. William F. Fahey | 78 | 730 |
| Hon. Michael C. Solner | 39 | 415 | Hon. Emilie H. Elias* | 324 | CCW |
| Hon. Michelle R. Rosenblatt | 40 | 414 | other | | |
| Hon. Ronald M. Sohigian | 41 | 417 | | | |

## *Class Actions

All class actions are initially assigned to Judge Emilie H. Elias in Department 324 of the Central Civil West Courthouse (600 S.Commonwealth Ave., Los Angeles 90005). This assignment is for the purpose of assessing whether or not the case is complex within the meaning of California Rules of Court, rule 3.400. Depending on the Outcome of that assessment, the class action case may be reassigned to one of the judges of the Complex Litigation Program or reassigned randomly to a court in the Central District.

Given to the Plaintiff/Cross-Complainant/Attorney of Record on _____   JOHN A. CLARKE, Executive Officer/Clerk

By _____, Deputy Clerk

# INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the Chapter Seven Rules, as applicable in the Central District, are summarized for your assistance.

## APPLICATION

The Chapter Seven Rules were effective January 1, 1994. They apply to all general civil cases.

## PRIORITY OVER OTHER RULES

The Chapter Seven Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

## CHALLENGE TO ASSIGNED JUDGE

A challenge under Code of Civil Procedure section 170.6 must be made within 15 days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

## TIME STANDARDS

Cases assigned to the Individual Calendaring Court will be subject to processing under the following time standards:

**COMPLAINTS:** All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days of filing.

**CROSS-COMPLAINTS:** Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

A Status Conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

## FINAL STATUS CONFERENCE

The Court will require the parties at a status conference not more than 10 days before the trial to have timely filed and served all motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested jury instructions, and special jury instructions and special jury verdicts. These matters may be heard and resolved at this conference. At least 5 days before this conference, counsel must also have exchanged lists of exhibits and witnesses and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Eight of the Los Angeles Superior Court Rules.

## SANCTIONS

The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Seven Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Seven Rules. Such sanctions may be on a party or if appropriate on counsel for the party.

**This is not a complete delineation of the Chapter Seven Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is absolutely imperative.**

# LOS ANGELES SUPERIOR COURT ADR PROGRAMS

CIVIL:

- **Civil Action Mediation** (Governed by Code of Civil Procedure (CCP) sections 1775-1775.15, California Rules of Court, rules 3.850-3.868 and 3.870-3.878, Evidence Code sections 1115-1128, and Los Angeles Superior Court Rules, chapter 12.)
- **Retired Judge Settlement Conference**
- **Neutral Evaluation** (Governed by Los Angeles Superior Court Rules, chapter 12.)
- **Judicial Arbitration** (Governed by Code of Civil Procedure sections 1141.10-1141.31, California Rules of Court, rules 3.810-3.830, and Los Angeles Superior Court Rules, chapter 12.)
- **Eminent Domain Mediation** (Governed by Code of Civil Procedure section 1250.420.)
- **Civil Harassment Mediation**
- **Small Claims Mediation**

FAMILY LAW (non-custody):

- **Mediation**
- **Forensic Certified Public Accountant (CPA) Settlement Conference**
- **Settlement Conference**
- **Nonbinding Arbitration** (Governed by Family Code section 2554.)

PROBATE:

- **Mediation**
- **Settlement Conference**

## NEUTRAL SELECTION

Parties may select a mediator, neutral evaluator, or arbitrator from the Court Party Select Panel or may hire someone privately, at their discretion. If the parties utilize the Random Select Mediation or Arbitration Panel, the parties will be assigned on a random basis the name of one neutral who meets the case criteria entered on the court's website.

## COURT ADR PANELS

| | |
|---|---|
| **Party Select Panel** | The Party Select Panel consists of mediators, neutral evaluators, and arbitrators who have achieved a specified level of experience in court-connected cases. The parties (collectively) may be charged $150.00 per hour for the first three hours of hearing time. Thereafter, the parties may be charged for additional hearing time on an hourly basis at rates established by the neutral if the parties consent in writing. |
| **Random Select Panel** | The Random Select Panel consists of trained mediators, neutral evaluators, and arbitrators who have not yet gained the experience to qualify for the Party Select Panel, as well as experienced neutrals who make themselves available pro bono as a way of supporting the judicial system. It is the policy of the Court that all Random Select Panel volunteer mediators, neutral evaluators, and arbitrators provide three hours hearing time per case. Thereafter, the parties may be charged for additional hearing time on an hourly basis at rates established by the neutral if the parties consent in writing. |
| **Private Neutral** | The market rate for private neutrals can range from $300-$1,000 per hour. |

## ADR ASSISTANCE

For assistance regarding ADR, please contact the ADR clerk at the courthouse in which your case was filed.

| | | | | | |
|---|---|---|---|---|---|
| Antonovich | 42011 4th St. West | None | Lancaster, CA 93534 | (661)974-7275 | (661)974-7060 |
| Chatsworth | 9425 Penfield Ave. | 1200 | Chatsworth, CA 91311 | (818)576-8565 | (818)576-8687 |
| Compton | 200 W. Compton Blvd. | 1002 | Compton, CA 90220 | (310)603-3072 | (310)223-0337 |
| Glendale | 600 E. Broadway | 273 | Glendale, CA 91206 | (818)500-3160 | (818)548-5470 |
| Long Beach | 415 W. Ocean Blvd. | 316 | Long Beach, CA 90802 | (562)491-6272 | (562)437-3802 |
| Norwalk | 12720 Norwalk Blvd. | 308 | Norwalk, CA 90650 | (562)807-7243 | (562)462-9019 |
| Pasadena | 300 E. Walnut St. | 109 | Pasadena, CA 91101 | (626)356-5685 | (626)666-1774 |
| Pomona | 400 Civic Center Plaza | 106 | Pomona, CA 91766 | (909)620-3183 | (909)629-8283 |
| San Pedro | 505 S. Centre | 209 | San Pedro, CA 90731 | (310)519-5151 | (310)514-0314 |
| Santa Monica | 1725 Main St. | 203 | Santa Monica, CA 90401 | (310)260-1829 | (310)319-6130 |
| Stanley Mosk | 111 N. Hill St. | 113 | Los Angeles, CA 90012 | (213)974-5425 | (213)633-5115 |
| Torrance | 825 Maple Ave. | 100 | Torrance, CA 90503 | (310)222-1701 | (310)782-7326 |
| Van Nuys | 6230 Sylmar Ave. | 418 | Van Nuys, CA 91401 | (818)374-2337 | (818)902-2440 |

Partially Funded by the Los Angeles County Dispute Resolution Program
A complete list of the County Dispute Resolution Programs is available online and upon request in the Clerk's Office

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
# ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE
[CRC 3.221 Information about Alternative Dispute Resolution]
For additional ADR information and forms visit the Court ADR web application at **www.lasuperiorcourt.org** (click on ADR).

The plaintiff shall serve a copy of this Information Package on each defendant along with the complaint (Civil only).

**What is ADR:**
Alternative Dispute Resolution (ADR) is the term used to describe all the other options available for settling a dispute which once had to be settled in court. ADR processes, such as arbitration, mediation, neutral evaluation (NE), and settlement conferences, are less formal than a court process and provide opportunities for parties to reach an agreement using a problem-solving approach.

There are many different kinds of ADR. All of them utilize a "neutral", an impartial person, to decide the case or help the parties reach an agreement.

**Mediation:**
In mediation, a neutral person called a "mediator" helps the parties try to reach a mutually acceptable resolution of the dispute. The mediator does not decide the dispute but helps the parties communicate so they can try to settle the dispute themselves. Mediation leaves control of the outcome with the parties.

### Cases for Which Mediation May Be Appropriate
Mediation may be particularly useful when parties have a dispute between or among family members, neighbors, or business partners. Mediation is also effective when emotions are getting in the way of resolution. An effective mediator can hear the parties out and help them communicate with each other in an effective and nondestructive manner.

### Cases for Which Mediation May <u>Not</u> Be Appropriate
Mediation may not be effective if one of the parties is unwilling to cooperate or compromise. Mediation also may not be effective if one of the parties has a significant advantage in power over the other. Therefore, it may not be a good choice if the parties have a history of abuse or victimization.

**Arbitration:**
In arbitration, a neutral person called an "arbitrator" hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are often relaxed. Arbitration may be either "binding" or "nonbinding." *Binding arbitration* means that the parties waive their right to a trial and agree to accept the arbitrator's decision as final. *Nonbinding* arbitration means that the parties are free to request a trial if they do not accept the arbitrator's decision.

### Cases for Which Arbitration May Be Appropriate
Arbitration is best for cases where the parties want another person to decide the outcome of their dispute for them but would like to avoid the formality, time, and expense of a trial. It may also be appropriate for complex matters where the parties want a decision-maker who has training or experience in the subject matter of the dispute.

### Cases for Which Arbitration May <u>Not</u> Be Appropriate
If parties want to retain control over how their dispute is resolved, arbitration, particularly binding arbitration, is not appropriate. In binding arbitration, the parties generally cannot appeal the arbitrator's award, even if it is not supported by the evidence or the law. Even in nonbinding arbitration, if a party requests a trial and does not receive a more favorable result at trial than in arbitration, there may be penalties.

**Neutral Evaluation:**
In neutral evaluation, each party gets a chance to present the case to a neutral person called an "evaluator." The evaluator then gives an opinion on the strengths and weaknesses of each party's evidence and arguments and about how the dispute could be resolved. The evaluator is often an expert in the subject matter of the dispute. Although the evaluator's opinion is not binding, the parties typically use it as a basis for trying to negotiate a resolution of the dispute.

### Cases for Which Neutral Evaluation May Be Appropriate
Neutral evaluation may be most appropriate in cases in which there are technical issues that require special expertise to resolve or the only significant issue in the case is the amount of damages.

### Cases for Which Neutral Evaluation May <u>Not</u> Be Appropriate
Neutral evaluation may not be appropriate when there are significant personal or emotional barriers to resolving the dispute.

**Settlement Conferences:**
Settlement conferences may be either mandatory or voluntary. In both types of settlement conferences, the parties and their attorneys meet with a judge or a neutral person called a "settlement officer" to discuss possible settlement of their dispute. The judge or settlement officer does not make a decision in the case but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Settlement conferences are appropriate in any case where settlement is an option. Mandatory settlement conferences are often held close to the date a case is set for trial.

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:** AMERICAN MORTGAGE NETWORK, INC,
**(AVISO AL DEMANDADO):** RESIDENTIAL FUNDING COMPANY, WALMAR
FINANCIAL GROUP, AURORA BANK FSB,
CALWESTERN RECONVEYANCE CORPORATION, HOMECOMINGS
FINANCIAL, GMAC, RESIDENTIAL ACCREDIT LOANS, INC, DEUTSCHE
BANK TRUST GROUP AMERICA as INDENTURED TRUSTEE FOR RALI 2005-QI,

**YOU ARE BEING SUED BY PLAINTIFF:** FIRST AMERICAN TITLE INSURANCE
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):** COMPANY AND DOES 1-24 inclusive

TIA SMITH, PLAINTIFF

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

CONFORMED COPY
ORIGINAL FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

AUG 22 2011

John A. Clarke, Executive Officer/Clerk
BY _____, Deputy
Mary Flores

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

The name and address of the court is: STANLEY MOSK
(El nombre y dirección de la corte es):
LOS ANGELES SUPERIOR COURT
111 NORTH HILL STREET, LOS ANGELES, CALIFORNIA 90012

**CASE NUMBER:** (Número del Caso): **BC 465542**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
TIA SMITH, in pro per, 4011 HUBERT AVENUE, LOS ANGELES, CALIFORNIA 90008 (323) 384-4493

**DATE:** AUGUST 22, 2011    JOHN A. CLARKE, Clerk, by _____, Deputy
(Fecha)    (Secretario)    Mary Flores    (Adjunto)

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of (specify):

3. [ ] on behalf of (specify):

under: [ ] CCP 416.10 (corporation)    [ ] CCP 416.60 (minor)
[ ] CCP 416.20 (defunct corporation)    [ ] CCP 416.70 (conservatee)
[ ] CCP 416.40 (association or partnership)    [ ] CCP 416.90 (authorized person)
[ ] other (specify):
4. [ ] by personal delivery on (date):

[SEAL]

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

SUMMONS

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

168075

TIA SMITH
4011 Hubert Avenue
Los Angeles, CA 90008
(323) 384-4493
FAX (323) 295-0517

Plaintiff, In Pro Per



CONFORMED COPY
ORIGINAL FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

DEC 22 2011

_____ Executive Officer/Clerk
_____ Deputy
Alan Flore

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| TIA SMITH<br><br>      Plaintiff,<br><br>    vs.<br><br>AMERICAN MORTGAGE NETWORK, INC., RESIDENTIAL FUNDING COMPANY, WALMAR FINANCIAL GROUP, AURORA BANK FSB, CAL-WESTERN RECONVEYANCE CORPORATION, HOMECOMINGS FINANCIAL, GMAC, RESIDENTIAL ACCREDIT LOANS, INC., DEUTSCHE BANK TRUST COMPANY AMERICAS as INDENTURED TRUSTEE for RALI 2007-QO1, FIRST AMERICAN TITLE INSURANCE COMPANY AND DOES 1-20, inclusive<br><br>      Defendants. | Case No.: BC465542<br>Assigned to Dept: 50<br><br>**AMENDED VERIFIEDCOMPLAINT FOR DECLARATORY RELIEF AND INJUNCTIVE RELIEF FOR ENFORCEMENT OF RESCISSION AND CANCELLATION OF FORECLOSURE :**<br><br>1. VIOLATION OF TILA;<br>2. VIOLATION OF CALIFORNIA MORTGAGE LENDING ACT, CALIFORNIA FINANCIAL CODE SECTION 50000;<br>3. VIOLATION OF CALIFORNIA CIVIL CODE SECTION 1916.7 (10);<br>4. VIOLATION OF EQUAL CREDIT OPPORTUNITY ACT;<br>5. VIOLATION OF RESPA;<br>6. VIOLATION OF BUSINESS AND PROFESIONS CODE §17200;<br>7. VIOLATION OF CA CIV. CODE §1572;<br>8. INTENTIONAL MISREPRESENTATION;<br>9. FRAUDULENT CONCEALMENT;<br>10.NEGLIGENT MISREPRESENTATION;<br>11.BREACH OF CONTRACT;<br>12. BREACH OF IMPLIED COVENANT OF GOOD AND FAIR DEALING;<br>13. BREACH OF FIDUCIARY DUTY;<br>14. FRAUDULENT OMISSIONS; |

# RECEIVED

## OCT 3 2011

# By: MPLS SOP DEPT
(via Inter Office Mail from)
FTW Pitney Bowes

1



15.UNCONSCIONABILITY;
16. RESCISSION;
17.NEGLIGENCE(FIRST AMERICAN);
18. BREACH OF FIDUCIARY DUTY (FIRST AMERICAN;
19. VIOLATION OF CALIFORNIA CIVIL CODE SECTION 2923.5;
20. VIOLATION OF CALIFORNIA CIVIL CODE SECTION 2923.6;
21. DECEPTIVE BUSINESS PRACTICES;
22. NEGLIGENCE;
23. SLANDER OF TITLE;
24.TRESPASS ON CONTRACT;
25. WRONGFUL CONVERSIONOF REAL PROPERTY;
26. WRONGFUL FORECLOSURE;
27. VIOLATION OF CALIFORNIA CODE§1788.17;
28. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;
29. UNJUST ENRICHMENT;
30. INJUNCTIVE RELIEF;
31.. QUIET TITLE

COMES NOW, Plaintiff, TIA SMITH in this court of record and for causes of action against the above-named Defendants, in this matter before the Bench, it becomes placidly clear that several fatal errors and deceptive actions have occurred throughout the life of the Subject Loan process causing a cloud on Plaintiff's title resulting from ineffective non-judicial foreclosure proceedings, misconduct and malfeasance. Plaintiff hereby complains and allege as follows:

# JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction based upon federal question under 20 U.S.C. Section 1331 and 1367, 18 U.S.C. Section 1964 (c) and 15 U.S.C. Section 1640(e). This is an action asserting violations of federal statutes commonly known as TILA, RESPA with additional claims under California law. These claims all arise out of the same controversy and sequence of events

2. Venue is proper in this Court pursuant to 28 U.S.C. Section 1391(b) (2) because all, or a substantial part, of the events giving rise to the claims asserted herein occurred in this judicial district.

3. This Court has personal jurisdiction over the parties because all of the Defendants engage in business within the State of California, County of Los Angeles, and thus have sufficient contacts.

4. Jurisdiction of this Court for the pendent State claims is authorized by Federal Rule of Civil Procedure, Rule 18(a).

5. The term "TILA" means the Truth in Lending Act, 15 U.S. C. Sections 1601-1666j, as amended. TILA, which took effect on July 1, 1969, is intended to promote the informed use of consumer credit by requiring creditors to disclose credit terms and costs, requiring additional disclosures for loans secured by consumer's homes, and permitting consumers to rescind certain transactions that involve their principal dwellings.

6. The terms "amount financed," "annual percentage rate," "consumer," "consumer credit," "consummation," "credit," "creditor," "dwelling," "finance charge," "mortgage," "open-end credit," "payment schedule," "points and fees," "residential mortgage transaction," "reverse mortgage transaction," "security interest, " and "total of payment" are defined as set forth in Sections 103 and 128 of TILA, 15 U.S.C. Sections 1602 and 1638, and
Sections 226.2, 226.4, 226.18, 226.22, 226.32, and 226.33 of Regulation Z, 12 C.F.R. Sections 226.2, 226.4, 226.18, 226.22, 226.32 and 226.33.

7. The term "Regulation Z" means the regulation the FRB promulgated to implement TILA and HOEPA, 12 C.F.R. 226, as amended. The term also includes the FRB Official Staff Commentary on Regulation Z, 12 C.F.R. 226, Supp. 1, as amended.

3

8. In the course of offering and extending credit to consumers, Defendants have failed to provide material information required to be disclosed by TILA; included loan terms prohibited by TILA, and engaged in unfair or deceptive acts or practices.

## INTRODUCTION

9. On December 2, 2006, Plaintiff executed a note, a deed of trust and other related documents to borrow $556,000.00, secured by the subject property (hereinafter the "Subject Loan"). Plaintiff also executed a Second Promissory Note and a Second deed of trust (hereinafter "HELOC") as security interest on the Subject Property. At closing, Plaintiff signed a "First Deed of Trust", First Promissory Note, "Second Deed of Trust" and a Second Promissory Note naming AMERICAN MORTGAGE NETWORK, INC. ("AMN") as the lender, and that Notes were separated from the deeds of trust after the execution by Plaintiff of those documents, with the Notes being transferred to investors whose money had funded the loan taken out by the Plaintiff/Trustor. AURORA BANK FSB f/k/a AURORA LOAN SERVICES, LLC ("AURORA") furnished none of the funding for the subject loan but, have trespassed on Plaintiffs' property with illegal foreclosure action. Simultaneously with or immediately after the loan was taken out by the Plaintiff, the obligation reflected by the Note was satisfied by monies provided by the investors who then would have obtained ownership of and right to payment under the terms of the "First" Note. These investors are the only parties to whom an obligation arose after the loan was securitized, and are the only proper parties to later declare a default and to have a right to direct a sale if the Plaintiff did not make payments as required under the terms of the Note.

4

10. The Note that had been executed with the Deed of Trust by the Plaintiff was separated from the Deed of Trust in that the note became part of a pool of mortgages and lost its individual identity as a Note between a lender and borrower, but instead merged with the other Notes as a total obligation due to the investors.

11.    Mortgage Electronic Registration Systems, Inc. (hereinafter "MERS) was created in relation to the MERS system with the specific intent that MERS would be named the beneficiary and/or as the nominee of the lender on the Deed of Trust which Plaintiff was induced into signing.  However, MERS was not a nominee for the lender, because the lender was an investor who had provided the funds for the loan.  This fact was known to MERS and the purported lender and the subsequent assignee of any and all rights purported to have been assigned by MERS at the time the Note and Deed of Trust was signed by the Plaintiff and at the time of each and every such later purported assignment by MERS of any interest in the Note and Deed of Trust.

12.    The foreclosure complained of herein was initiated against Plaintiff by parties who have and had no standing to commence or maintain any foreclosure proceeding, both by the express language of the Deed of Trust which required that the beneficiary/party owed the obligation declare the default and direct the sale, and by the laws governing the commencement and advancement of foreclosure proceedings which require the trust beneficiary to declare such default and direct such sale, and the fact that the foreclosure was automatically invalidated by the collection and acceptance of forbearance payments for a loan modification amidst the foreclosure proceeding.  CAL-WESTERN is a complete stranger to the purported loan transaction and AURORA did not fund the loan with any of its own assets and are not owed any of the funds to be repaid by Plaintiff, and do not stand

1    to suffer any loss should they be enjoined from having to rescind the invalid

2    foreclosure on Plaintiffs' home.

3

4    13.    The foreclosure on Plaintiffs' home complained of herein was initiated by

5    Defendants who had and have no lawful right to initiate, advance or maintain any

6    foreclosure action against her.

7

8    14.    All Defendants knew or should have known that prior to the time that the

9    loan was taken out by Plaintiff which is at issue herein, was that the loan which

10   named MERS on the Deed of Trust was securitized or intended to be securitized

11   prior to the preparation of the Note and Deed of Trust reflecting the loan.

12   Defendants also knew or should have known that the scheme employed by their

13   predecessors involved in the origination, aggregation and securitization of

14   mortgage-backed loans originated from 2003 through 2008 and secured by real

15   property in the United States originated from 2003 through 2008 included financial

16   incentives which were designed to result in loans being written on terms which

17   were likely or certain to result in foreclosure, and that the scheme described herein

18   included financial incentives designed to motivate appraisers, mortgage brokers,

19   lenders, aggregator banks and securitizing banks to steer borrowers into loans they

20   could not afford and could not repay so that the loans would go into default and the

21   Defendants involved in servicing, aggregating and securitizing those loans could

22   make yet more profits from default, foreclosure and selling the properties after

23   foreclosure.

24

25

26   15.    The financial incentives mentioned in the previous paragraph included

27   without limitation the hiring of appraisers who had financial incentive to appraise

28   properties at a value that would justify the loan requested, the payment to mortgage

6

1  brokers of higher fees for sub-prime and sub-prime loans than for prime loans and

2  the use of novel and unprecedented underwriting criteria such as stated income and

3  100% or more financing of the purchase price and the purchase of loans from

4  lenders by aggregators and servicers of loans at more than face value if the loans

5  were sub-prime or sub-prime and in particular if such loans also included an

6  adjustable interest rate and/or a pre-payment penalty.  In the case of Plaintiff, the

7  loan was advanced based upon stated income.  Also, in this case, it appears that the

8  equity in the home was used to secure a larger loan based upon the value of the

9  home when it was exaggerated by the market manipulated by the Defendants.

10

11  16.    The Plaintiff has a Deed of Trust that states that the beneficiary and/or

12  beneficiary as the nominee of the lender is MERS, and the Plaintiff has been

13  declared in default by a party not entitled to declare the default.  A party, with no

14  part of Plaintiff's contract, caused a Trustee with no standing, capacity or authority

15  to notice the obligor of the default and intent to sell under California law.

16

17

18  17.    MERS does not have standing merely because it is the alleged beneficiary

19  under the Deed of Trust.  It is not a beneficiary and, in any event, the mere fact that

20  an entity is a named beneficiary of a Deed of Trust is insufficient to enforce the

21  obligation.  Since the Deed of Trust attempts to name MERS as both a beneficiary

22  and a nominee, MERS is not a true beneficiary with the rights to foreclose.  The

23  Deed of Trust states as follows:

24      "MERS is a separate corporation that is acting solely as a nominee for

25  Lender and Lender's successors and assigns.  MERS is the beneficiary under this

26  Security Instrument".  And later it says "The beneficiary of this Security

27  Instrument is MERS (solely as nominee for Lender and Lenders successors and

28  assigns) and the successors and assigns of MERS".

7

18. However, the terms and conditions given to the members of MERS contradicted
the beneficiary status, MERS Terms and conditions: "MERS shall serve as
mortgagee of record with respect to all such mortgage loans solely as a nominee, in
an administrative capacity, for the beneficial owner or owners thereof from time to
time. MERS shall have no rights whatsoever to any payments made on account of
such mortgage loans, to any servicing rights related to such mortgage loans, or to
any mortgaged properties securing such mortgage loans. MERS agrees not to
assert any rights (other than rights specified in the Governing Documents) with
respect to such mortgage loans or mortgaged properties. References herein to
"mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and
beneficiary under a Deed of Trust and any other form of security instrument under
applicable State law."

19. AURORA's predecessor's use of MERS created the method to defraud the
Trustor because MERS was not the holder of the Note and MERS was not a
transferee in possession who was entitled to the rights of a holder or had authority
under State law to act for the holder.

20. The entities that have given notice of foreclosure on the home of the Plaintiff
are not MERS and are not the Trustee named on the Deed of Trust and are not the
parties that funded the loan of the Plaintiff.

21.    Per the Los Angeles County Recorder of Deeds there was an assignment
executed by Theodore Schultz (alleged robo-signer), as Vice-President of MERS,
also known as Vice-President of AURORA, recorded on December 31, 2009,
assigning its beneficial rights to AURORA, but MERS was not a true beneficiary.

22.    Theodore Schultz has no authority to sign for MERS and MERS cannot
assign or execute any document within the chain of title.

23.    MERS is defunct, had no standing and no authority to assign interest in the
Deed of Trust.  Per the deposition of Mr. Huffman of MERS, MERS has no
employees, which means the assignment of the Deed of Trust signed by Theodore
Schultz in favor of AURORA is a fraud and a forgery and Theodore Schultz has
violated California Penal Code 115.5. (Exhibit "E").

24.    THE ALLEGED TRUSTEE, CAL-WESTERN HAD NO AUTHORITY OR
CAPACITY TO EXECUTE THE NOTICE OF DEFAULT ON September 24,
2009.

25.    Due to the LATE, DEFECTIVE, FAULTY, and FRAUDULENT
Substitution of Trustee to CAL-WESTERN, there is no validity of Substitution of
Trustee, which voids the Notice of Default.  The Deed of Trust expressly reserves
the right to the Lender to cause the Trustee to execute written notice of the
occurrence of an event of default and of Lenders' election to cause the Property to
be sold.  The Deed of Trust further provides that the Trustee shall give public
notice of sale to the persons and in the manner prescribed by applicable law.
Theses express provisions of the Deed of Trust are impossible to comply with
amidst the fraud.

26. Plaintiff acquired fee simple title by Quitclaim Deed recorded December 2,
2006 as Instrument No. 20062729009 (Exhibit #A).

27. On or about December 2, 2006, Plaintiff executed a Deed of Trust ("DOT"), a true and correct copy of which is attached hereto as Exhibit "B", which was recorded on December 8, 2006 as Instrument No. 20062729009 of the Official Records in the office of the Recorder of Los Angeles County, California, naming AMERICAN MORTGAGE NETWORK, INC., ("AMN") as the Lender, FIRST AMERICAN TITLE INSURANCE COMPANY ("FIRST AMERICAN") as the original Trustee and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), was the original beneficiary for the amount of $556,000.00.

28.    The Deed of Trust was secured by the real property located at 4011 Hubert Avenue, Los Angeles, California 90008, APN: 5033-016-023   (the "Property").

29.    On September 24, 2009, Cal-Western recorded a Notice of Default, Exhibit "C", claiming that Plaintiff was in default for her monthly obligation under the Promissory Note and Deed of Trust that provided security for the loan alleged above and on December 30, 2010 Defendants MERS and CAL-WESTERN caused to record a Notice of Trustee's Sale with the Los Angeles County Recorder's office. (Exhibit "D")

30.    What Plaintiff finds to be very particular is that the Notice of Default was recorded September 24, 2009, but neither of the Defendants had power or authority to do so.  The Substitution of Trustee was not recorded until November 9, 2009 with the County Recorder, a true and correct copy is attached hereto as Exhibit "E", naming CAL-WESTERN as the new Trustee under the Deed of Trust.  Again, what Plaintiff finds to be very suspicious is that the Notice of Default and Substitution of Trustee previously recorded are void on their faces because the Corporate Assignment of Deed of Trust was not recorded until December 31, 2009

10

with the County Recorder, a true copy is attached hereto as Exhibit E. Defendants had no authority, no capacity, no legal ability to record the Notice of Default UNTIL there was beneficial interest established in the Deed of Trust by RECORDING the Corporate Assignment of the Deed of Trust, as mandated by California Civil Code and a strict provision of the deed of trust to invoke foreclosure.

31.   Plaintiff is informed and believes and therefore alleges that the foreclosure is void and that the Trustee's Sale and Notice of Default must be rescinded accordingly. The Notice of Default was invoked by an interloper lacking authority or capacity and to allow Defendants to proceed with these criminal actions is a violation of Plaintiff's due process and civil rights as allowed by the Constitution.

32.   Plaintiff further alleges on information and belief that the alleged beneficiary on the Deed of Trust cannot prove that they are in fact the party authorized to conduct the impending foreclosure sale.

33.   Plaintiff further alleges that the foreclosure sale of the Subject Property cannot be executed in accordance with the requirements of *California Civil Code Sections 1624, 2924 et seq.*

34.   That the Trustee who is acting as the agent of the beneficiary did not have the power to act as agent for a beneficiary that did NOT have beneficial interest in the subject Note, Deed of Trust or Property. CAL-WESTERN did not have the power or authority to act as much as Plaintiff's next door neighbor had to act. They were not a party to the contract and were not substituted correctly as

11

mandated by the provisions of the Deed of Trust and underlying California Civil Code.

35.    That the notices and foreclosure failed to conform with the provisions of *California Civil Code Sections 1624, 2932.5 et seq.*, and *Commercial Code section 3302 et seq.*

36.    Plaintiff further alleges that *Cal. Civ. Code section 2924* and its subparts are being applied to Plaintiff in a manner that is unlawful, because at least in part the party acting as the Trustee proceeding with the foreclosure of Plaintiff's Subject Property notwithstanding the following facts and circumstances:

    a.    Alleged foreclosing beneficiary has no beneficial interest in the deed of trust and cannot legally conduct a foreclosure, a serious trespass on Deed of Trust paragraph 22 and *California Civil Code Sections 2932, 2932.5;*

    b.    Plaintiff has proof that the Trustee did not have power of sale to execute or record the Notice of Default per public records, the Substitution of Trustee was recorded November 9, 2009 which was SUBSEQUENT to the Notice of Default recorded September 24, 2009, and as such the current foreclosure of Plaintiff's subject property has not conformed with the strict mandates of the Deed of Trust nor *Civil Code section* and CAL-WESTERN has trespassed on Plaintiff's property and on the Deed of Trust per paragraph 24.

c.    Note, there can be no valid assignment from the original Lender

on the deed of trust, MORTGAGE ELECTRONIC REGISTRATION

SYSTEMS, INC. ("MERS") who has purported to assign the current

beneficial interest forthwith, which is fraud, extortion and trespass.

d.    Note that the assignment of record is void, due to fraud and the

toxicity of MERS as nominee and beneficiary. MERS as nominee

cannot execute a valid assignment. Note when it was assigned to the

current beneficiary, it did not convey the power of sale because it

violated the terms of *California Civil Code section 2932.5,* that the

assignment when it was made to the current alleged beneficiary that

the Note executed by Plaintiff was no longer a negotiable instrument

because the assignment could not have physically applied to the Note.

37.    California Civil Code does not apply to the strict provisions of the private

contract between the Plaintiffs and the true Lender. The alleged beneficiary has

filed false documents to purport standing and perpetration of the successor lender,

but cannot by virtue of invalid documents.

38.    That by virtue of the method and manner of Defendants carrying out the

trespass and violations of the Deed of Trust, they cannot prove that such provisions

have been complied with and the foreclosure is void on its face, causing a cloud on

Plaintiff's title.

39. This is an also action for violations of California's Unfair Competition Law
(the "UCL"), Business & Professions Code §§ 17200, *et seq.*, and common law
fraud. Plaintiff brings this action against Defendants, RFC, AMN and DOE
Defendants who originated the Option Adjustable Rate Mortgage ("Option ARM")
loan that failed to clearly, unambiguously and conspicuously disclose to Plaintiff

the following: (i) the low interest rate set forth in the Option ARM mortgage notes ("Notes") was only available for thirty days, if at all; (ii) the monthly payment amounts for the first three to five years provided to Plaintiff on a Truth-In-Lending Disclosure Statement ("TILDS") were insufficient to pay both accrued interest and principal; (iii) negative amortization was absolutely certain to occur if Plaintiff made payments according to the schedule of monthly payments provided in the TILDS; and that (iv) loss of equity and/or loss of Plaintiff's residence was certain to occur if Plaintiff made payments according to the payment schedule.

40. As alleged below, without the active participation of Defendants, AMN would not have been able to issue the Option ARM loan to Plaintiff. Despite serving as a loan originator, AMN did not use its own assets to fund the Option ARM loan. Instead, it borrowed money from warehouse lenders (which oftentimes were affiliates of Defendants) to fund the loan at closing and then sold the loan to Defendants shortly after closing. The funds paid by Defendants to purchase the loan was then paid to the warehouse lenders, with the remainder going to AMN. Because AMN's business was wholly dependent on Defendants purchasing the loan shortly after origination, AMN did not have, or utilize, any discretion in the origination of the Option ARM loan. Instead, it was required to, and did, use loan documents and underwriting guidelines designed and approved by Defendants. Thus, Defendants are liable both directly, and as aiders and abettors, for the damages caused by the deceptive loan documents at issue in this action.

## THE PARTIES

41. Plaintiff, Tia Smith is, and at all relevant times was, an individual residing at 4011 Hubert Avenue, Los Angeles, California 90008. On or about December 2, 2006, Plaintiff refinanced her existing home loan and entered into an Option ARM loan agreement with AMN. The Option ARM loan was secured by Plaintiff's residence. Attached hereto as Exhibit 1 are true and correct copies of the Note and TILDS (collectively, the "Loan Documents") for Plaintiff's loan. In or about December, 2006, AMN sold Plaintiff's Option ARM loan to Residential Funding Company, LLC ("RFC").

42. At all times mentioned herein, Defendants were engaged in the business of selling, securitizing, and/or owning, and/or are or were the assignees of, the Option ARM loan that is the subject of this Complaint, throughout the United States, including in this District.

43. Plaintiff is informed, believes and thereon alleges that each of the aforementioned Defendants are responsible in some manner, either by act or omission, strict liability, fraud, deceit, fraudulent concealment, negligence, respondeat superior, breach of contract or otherwise, for the occurrences herein alleged, and that Plaintiff's injuries, as herein alleged, were proximately caused by the conduct of Defendants.

44. Plaintiff is informed, believes and thereon alleges, that at all times material hereto and mentioned herein, each of the Defendants sued herein was the agent, servant, employer, joint venturer, partner, division, owner, subsidiary, alias, aider and abettor, assignee and/or alter-ego of each of the remaining Defendants and was at all times acting within the purpose and scope of such agency, servitude, joint venture, division, ownership, subsidiary, alias, assignment, alter-ego, partnership or employment and with the authority, consent, approval and ratification of each remaining Defendant.

45. Plaintiff is informed, believes, and thereon alleges that at all times herein mentioned, each Defendant was acting in concert or participation with each other, and/or aided and abetted the other Defendants, and/or was a joint participant and collaborator in the acts complained of, and /or was the agent or employee of the others in doing the acts complained of herein, each and all of them acting within the course and scope of said agency and/or employment by the others, each and all of them acting in concert one with the other and all together. Each Defendant was the co-conspirator, aider and abettor, agent, servant, employee, assignee and/or joint venturer of each of the other Defendants and was acting within the course and scope of said conspiracy, agency, employment, assignment and/or joint venture and with the permission and consent of each of the other Defendants.

46. Pursuant to California Civil Code § 1459 and California Code of Civil Procedure § 368, Defendants AMN, MERS, RFC, GMAC, HOMECOMINGS, AURORA, RALI TRUST, DEUTSCHE and DOES 1-20 are the subsequent purchasers and/or assignees of Plaintiff's' Option ARM loan. At all relevant times, Defendants are and/or were sophisticated and knowledgeable entities whose businesses included designing, purchasing, packaging, securitizing and selling interests in the subject Option ARM loan. Defendants purchased, packaged, directed, securitized and/or sold the subject Option ARM loan with full knowledge of the failures to disclose and material omissions as alleged herein. Defendants therefore "stand in the shoes" of the assignor, taking their rights and remedies, subject to any defenses that the obligor (Plaintiff) has against the assignor prior to notice of the assignment.

47.    At all relevant times, Plaintiff has been a resident of the County of Los

Angeles, State of California.

48.    By Law and precedent and in accordance with the Supreme Court of the

United States, pro se Pleadings MAY NOT be held to the same standard as a

lawyer's and/or attorney's; and whose motions, pleadings and all papers may

ONLY be judged by their function and never their form.  See: Haines v. Kerner;

Platsky v. CIA; Anastasoff v. United States; Litigants are to be held to less

stringent pleading standards;

See: Haines v. Kerner, 404 U.S. 519-421; In re Haines: pro se litigants are

held to less stringent pleading standards than admitted or licensed bar attorneys.

Regardless of the deficiencies in their pleadings, pro se litigants are entitled to the

opportunity to submit evidence in support of their claims.

See also: Platsky v. C.I.A., 953 f.2d. 25; In re Platsky: court errs if court

dismisses the pro se litigant without instruction of how pleadings are deficient and

how to repair pleadings.

See also: Anastasoff v. United States, 223 F.3d 898 (8th Cir. 2000); In re

Anastasoff: litigants' constitutional (guaranteed) rights are violated when courts

depart from precedent where parties are similarly situated.

49. Defendant WALMAR FINANCIAL GROUP, INC., ("WALMAR") Plaintiff is

informed and believes, and on this basis alleges, that WALMAR no longer has a

valid real estate license with the DRE.  Plaintiff has no knowledge whether

WALMAR currently transacts any business in California.

50.    Defendant MORTGAGE ELECTRONIC REGISTRATION SYSTEMS,

INC., ("MERS"), IS A Delaware business and has its principal place of business at

1818 Library Street, Suite 300, Reston, Virginia 20190.  MERS was created in or
about 1998 by conspirators from the largest banks in the United States in order to
undermine and eventually eviscerate long-standing principles of real property law,
such as the requirement that any person or entity who seeks to foreclose upon a
parcel of real property: 1) be in possession of the original note, 2) Have a publicly
recorded mortgage in the name of the party for whom the underlying debt is
actually owed and who is the holder of the original Promissory Note with legally
binding assignments, and 3) possess a written assignment giving he, she or it actual
rights to the payments due from the borrower pursuant to both the mortgage and
note. MERS, is owned by the company, MERSCORP, which is in turn owned
by a group of Wall Street investment Banks

51.  Defendant AURORA BANK FSB f/k/a AURORA LOAN SERVICES LLC
("AURORA") is a foreign corporation organized and existing under the laws of the
State of Delaware. Aurora has been assigned as the servicer of the Subject Loan.  It
is further alleged that AURORA has been assigned an interest in the loan greater
that of a typical servicer, although AURORA's full interest in the Subject Loan is
not entirely known at this time. AURORA's principal office is located at 10350
Park Meadows Drive, Littleton, Colorado 80124. AURORA's agent for service of
process is Corporation Service Company which does business in California as CSC
Lawyers Incorporating Service, (C1592199).

52 .Defendant CAL-WESTERN RECONVEYANCE CORPORATION,  is and
was at all times herein mentioned conducting business in California, as a National
Association, and claims to be duly appointed Trustee, under the Deed of Trust
executed by Plaintiff, Tia Smith, and is conducting intrastate business in the State
of California.

53. Defendant, DEUTSCHE BANK TRUST COMPANY AMERICAS (hereinafter "DEUTSCHE") is a national banking association organized under the laws of the United States and is engaged in the residential mortgage business in this state with its principal executive offices located at: 60 Wall Street, New York, New York 10005. DEUTSCHE may be served as follows: Deutsche Bank Trust Company Americas, Attn: President, 60 Wall Street, New York, New York 10005. Plaintiff is informed, believes and thereon alleges, that DEUTSCHE is the trustee and custodian under the pooling and servicing agreement of the RALI TRUST and that DEUTSCHE is responsible for holding the notes and mortgage files on behalf of the RALI TRUST which means that it is charged with the responsibility of properly funding and transferring the loan into the trust and administering the trust properly; as a "Servicer" and as the "exchange agent" when the notes are traded out on the trusts. DEUTSCHE has been named in this action in its capacity as the trustee of the RALI TRUST.

54. Defendant RESIDENTIAL FUNDING COMPANY, LLC is a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota. Prior to approximately October 2006, Residential Funding Company, LLC operated as Residential Funding Corporation, a Delaware corporation with its Residential Funding was the Sponsor for the securitization at issue in this action. As Sponsor of the securitizations at issue, Residential Funding either originated the underlying mortgage loans through its wholly owned subsidiary, Homecomings Financial, LLC, formerly Homecomings Financial Network, Inc. ("HOMECOMINGS"), or purchased them from other originators principal place of business in Minneapolis, Minnesota. Residential Funding Company, LLC and its predecessor, Residential Funding Corporation, are referred to herein as ("RFC").

55. Defendant, RESIDENTIAL ACCREDIT LOANS, INC. SERIES 2007-

Q01TRUST (hereinafter "RALI TRUST") and is a New York common law trust

engaged in the residential mortgage business in this state with its business address

at 8400 Normandale Lake Boulevard, Suite 250, Minneapolis, Minnesota 55437.

RALI TRUST may be served as follows: Residential Accredit Loans, Inc. Series

2007-QO1 Trust, c/o Deutsche Bank Trust Company Americas, 1761 East Street,

Santa Ana, California 92705-4934. Residential Accredit Loans, Inc. ("RALI") is a

Delaware corporation with its principal place of business 8400 Normandale Lake

Boulevard, Suite 250, Minneapolis, Minnesota 55437. Residential Accredited

Loans, Inc. ("RALI"), a subsidiary of Residential Capital, LLC f/k/a Residential

Capital Corporation ("RCC") Residential Capital, LLC, which owns indirectly

all of the equity of both Homecomings and GMACM, has restructured the

operations of Homecomings and GMACM.

56. Defendant, AMERICAN MORTGAGE NETWORK, INC. ("AMN") a

subsidiary of Well Fargo Bank, N.A. operates as a mortgage bank in the United

States. It underwrites and funds home loan programs, including fixed, adjustable,

stated income, interest only, jumbo, ALT-A, home equity, and first-time buyer

options, as well as sells these loans on a servicing-released basis to institutional

purchasers. The company was founded in 1997 and is headquartered in San Diego,

California with additional offices in Arizona, California, Colorado, Connecticut,

Florida, Georgia, Illinois, Minnesota, Kansas, Utah, Massachusetts, New Jersey,

New York, North Carolina, Oregon, Rhode Island, Texas, Virginia, and

Washington. American Mortgage Network, Inc. is a subsidiary of Wells Fargo

Bank, National Association.

57. Defendant, HOMECOMINGS FINANCIAL, LLC (hereinafter

"HOMECOMINGS"), is a Delaware limited liability company engaged in the

business of consumer mortgage lending in this state with its principal place of

business located at: 8400 Normandale Lake Boulevard, Suite 250, Minneapolis,

Minnesota 55437-1059. HOMECOMINGS may be served as follows: Homecomings Financial, LLC, c/o Corporation Service Company, 2730 Gateway Oaks Drive, Suite 100, Sacramento, California 95833-3503. At all relevant times alleged in this Complaint HOMECOMINGS regularly extended consumer credit payable by written agreement in more than four installments or for which a finance charge is imposed. Plaintiff is informed, believes and thereon alleges, that HOMECOMINGS is a "creditor" within the meaning of the TILA, 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17). At all relevant times alleged in this Complaint, HOMECOMINGS was engaged in the business of "mortgage lending" as defined by Cal. Finance Code § 50003(n) and was licensed by the California Department of Corporations (Lic. No. 413007). At all relevant times alleged in this Complaint, HOMECOMINGS was a "finance lender" as defined by Cal. Finance Code § 22009 and was licensed by the California Department of Corporations (Lic. No. 6035717). Plaintiff is informed, believes and thereon alleges that HOMECOMINGS FINANCIAL, LLC, is a wholly-owned subsidiary of RESIDENTIAL FUNDING COMPANY, LLC, which is a wholly-owned subsidiary of GMAC-RFC HOLDING COMPANY, LLC, which is a wholly-owned subsidiary of RESIDENTIAL CAPITAL, LLC, which is a wholly-owned subsidiary of GMAC MORTGAGE GROUP, INC., which is a wholly-owned subsidiary of GMAC, LLC.

58. Defendant, GMAC MORTGAGE USA CORPORATION, A/K/A GMAC MORTGAGE, LLC (hereinafter "GMAC"), is a Delaware corporation engaged in the business of consumer mortgage lending in this state with its principal place of business located at: 100 Witmer Road, Horsham, Pennsylvania 19044-0963. GMAC may be served as follows: GMAC Mortgage USA Corporation, c/o Corporation Service Company, 2730 Gateway Oaks Drive, Suite 100, Sacramento,

1 California 95833-3503. At all relevant times alleged in this Complaint GMAC

2 regularly extended consumer credit payable by written agreement in more than

3 four installments or for which a finance charge is imposed. Plaintiff is informed,

4 believes and thereon alleges, that GMAC is a "creditor" within the meaning of the

5 TILA, 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17). At all relevant times

6 alleged in this Complaint, GMAC was engaged in the business of "mortgage

7 lending" as defined by Cal. Finance Code § 50003(n) and was licensed by the

8 California Department of Corporations (Lic. No. 4130026). At all relevant times

9 alleged in this Complaint, GMAC was a "finance lender" as defined by Cal.

10 Finance Code § 22009 and was licensed by the California Department of

11 Corporations (Lic. No. 603A285). At all relevant times alleged in this Complaint,

12 GMAC was licensed by the California Department of Real Estate ("DRE") (Lic.

13 No. 01776965) and was a "licensee" as defined by Cal. Finance Code § 22007.

14 Plaintiff is informed, believes and thereon alleges, that GMAC

15 MORTGAGE USA CORPORATION, is a wholly-owned subsidiary of GMAC

16 MORTGAGE, LLC, which is a wholly-owned subsidiary of GMAC

17 RESIDENTIAL HOLDING COMPANY, LLC, which is a wholly-owned

18 subsidiary of RESIDENTIAL CAPITAL, LLC, which is a wholly-owned

19 subsidiary of GMAC MORTGAGE GROUP, INC., which is a wholly-owned

20 subsidiary of GMAC, LLC.

21

22 59.Defendant, , First American Title Insurance Company ("First American") is a
wholly owned sudsidiary of The First American Corporation. First American is a

23 publicly traded holding company that owns, in addition to First American Title,

24 several other companies in the field of real estate-related information services.
First American Title is a title insurance underwriter that issues title insurance

25 policies to real estate owners and lenders in 47 states and the District of Columbia.

26

27 60. The true names and capacities, whether individual, corporate, associate or

28 otherwise, of Defendants DOES 1 through 10, inclusive, and each of them, are

unknown to Plaintiff at this time, and Plaintiff therefore sues said Defendants by such fictitious names. Plaintiff is informed, believes and thereon alleges, that at all relevant times alleged in this Complaint, Defendants DOES 1 through 10, inclusive, are natural persons, limited liability companies, corporations or business entities of unknown form that have or are doing business in the state of California. Plaintiff will seek leave of the Court to replace the fictitious names of these Doe Defendants with their true names when they are discovered by Plaintiff.

61. Plaintiff is informed, believes and thereon alleges, that DOES 11 through 20, inclusive, are securitized trusts, equity funds, collateralized debt obligations (CDO), CDO underwriters, CDO trustees, hedge funds or other entities that acted as additional lenders, loan originators and/or are assignees to the predatory loans which are the subject of this action. Plaintiff will seek leave of the Court to replace the fictitious names of these entities with their true names when they are discovered by Plaintiff.

62. At all relevant times alleged in this Complaint, Defendants, and each of them, were engaged in the business of promoting, marketing, distributing and selling the predatory loans that are the subject of this Complaint, throughout the state of California, including Santa Clara County.

63. Plaintiff is informed, believes and thereon alleges, that each and all of the aforementioned Defendants are responsible in some manner, either by act or omission, strict liability, fraud, deceit, fraudulent concealment, negligence, respondeat superior, breach of contract or otherwise, for the occurrences herein alleged, and that Plaintiff's injuries, as herein alleged, were proximately caused by the conduct of Defendants.

64.  Plaintiff is informed, believes and thereon alleges, that at all relevant times alleged in this Complaint, each of the Defendants sued herein were the agent, servant, employer, joint venturer, partner, division, owner, subsidiary, alias, assignee and/or alter-ego of each of the remaining Defendants and were at all times acting within the purpose and scope of such agency, servitude, joint venture, division, ownership, subsidiary, alias, alter-ego, partnership or employment and with the authority, consent, approval and ratification of each remaining Defendant.

65.  Plaintiff is informed, believes and thereon alleges, that at all relevant times alleged in this Complaint, each Defendant was the co-conspirator, agent, servant, employee, assignee and/or joint venturer of each of the other Defendants and was acting within the course and scope of said conspiracy, agency, employment, assignment and/or joint venture and with the permission and consent of each of the other Defendants.

66.  Whenever reference is made in this Complaint to any act of any corporate or other business Defendant, that reference shall mean that the corporation or other business did the acts alleged in this Complaint through its officers, directors, employees, agents and/or representatives while they were acting within the actual or ostensible scope of their authority.

67. At all relevant times alleged in this Complaint, each Defendant has committed the acts, caused others to commit the acts, ratified the commission of the acts, or permitted others to commit the acts alleged in this Complaint and has made, caused, ratified, or permitted others to make, the untrue or misleading statements alleged in this Complaint. Whenever reference is made in this Complaint to any act of Defendants, such allegation shall mean that each Defendant acted individually

and jointly with the other Defendants. "Defendants" wherever used in this
Complaint shall mean all named Defendants.

## FACTUAL ALLEGATIONS

68. This action arises out of a loan to refinance the subject property, of which
Plaintiff is the rightful owner, and subsequent foreclosure related activity.

69. In or about October of 2006, Plaintiff sought to refinance loans secured against
the property located at 4011 Hubert Avenue, Los Angeles, CA 90008. Plaintiff
turned to broker WALMAR and lender AMN for assistance. WALMAR and AMN
represented to Plaintiff that they would provide Plaintiff with an affordable loan,
and represented to Plaintiff that she would not obtain better rates elsewhere. These
actions were intended to prevent Plaintiff from shopping for other lenders.

70. On December 2, 2006, Plaintiff executed a note, a deed of trust and other
related documents to borrow $556,000.00, secured by the subject property
(hereinafter the "Subject Loan"). The terms of the loan were memorialized in a
promissory note which was in turn secured by a deed of trust on the subject
property. The deed of trust identified AMN as the Lender. The deed of trust
identified First American as the Title Insurer/Escrow Holder/Trustee. The deed of
trust identified WALMAR as the mortgage broker. The deed of trust further
identified MERS as the nominal beneficiary.

71. Said deed of trust was recorded on December 8, 2006. Plaintiff is informed and
believes that the terms of the Subject Loan were memorialized in a promissory
note which was in turn secured by a deed of trust on the subject property.

72. In deciding to sign the Subject Loan documents and to encumber the subject
property with a deed of trust, Plaintiff relied upon promises made by Defendants,
just as Defendants had intended.

73. Despite the fact that Defendants, knew that Plaintiff did not qualify for the
loan, Defendants induced Plaintiff to obligate herself to make monthly mortgage
payments on the Subject Loan on the subject property, which was an adjustable
rate mortgage.

74. Plaintiff entered into a consumer credit transaction loan with Defendants, which extended consumer credit that was subject to a finance charge and which was initially payable to AMN.

75. Said Subject Loan is subject to the Federal Truth in Lending Act, 15 U.S.C. Section 1601 et seq. and its implementing regulations, 12 C.F.R. Part 226, "Reg. Z".

76. Defendants were required to provide Plaintiff with certain disclosures pursuant to "TILA". Under TILA and Regulation Z, Defendants were required to clearly and conspicuously disclose the amount financed and the finance charge, among other things, in connection with the Subject Loan.

77. When the Subject Loan was consummated, Plaintiff did not receive all the required documents and disclosures under TILA.

78. Plaintiff rcvd a letter dated December 30, 2006, stating that beginning February 1, 2007 HOMECOMINGS would commence servicing Plaintiff's loan.

79. Plaintiff's initial mortgage payment was due on January 1, 2007.

80. Plaintiff rcvd a welcome letter dated January 16, 2007 from HOMECOMINGS.

81. Plaintiff began experiencing a loss of income mid/late 2007, and sought help from HOMECOMINGS.

82. HOMECOMINGS advised Plaintiff that unless her mortgage payments were delinquent they would not be able to offer her any assistance.

83. On November 14, 2007, HOMECOMINGS' representative "Miriam" advised Plaintiff that she should miss at least three payments in order to be considered for a work-out option.

84. Apprehensively, Plaintiff did not make her monthly mortgage payments as advised.

85. Plaintiff rcvd a letter dated April 11, 2008, stating the current creditor to whom the Mortgage Loan debt is owed was RALI 2007-QO1 and that AURORA was the current servicer of her loan and that they were under federal law to advise her of the total amount she owed.

86. Plaintiff called her new servicer AURORA to explain how HOMECOMINGS had advised her to miss at least 3 payments in order to qualify for a work-out option.

87. AURORA claimed that they had no knowledge of what HOMECOMINGS had advised. AURORA claimed that there were no notes confirming what Plaintiff stated.

88. On April 30, 2008, AURORA proceeded to set-up Plaintiff into a repayment agreement consisting of (6) payments with the (1st) payment of $3100.00 and the remaining (5) payments of $3175.28.

89. Plaintiff made the initial payment of $3100.00. Unfortunately, Plaintiff was unable to keep up with the increased monthly payments under the repayment agreement.

90. On June 17, 2008, Plaintiff entered into another repayment agreement with AURORA. AURORA's representative verbally advised Plaintiff that this repayment plan would consist of (4) consecutive payments. The (1st) payment would be $2,062.78. The (2nd and 3rd) payments would be $2088.32 but, the (4th) payment would be a balloon payment of $9,635.74. The rep advised Plaintiff after making the (3rd) payment to immediately call back in and submit a loan modification application. The rep advised Plaintiff not to pay the (4th) payment. The rep stated that the (4th) payment was indeed a balloon payment and that AURORA did not expect Plaintiff to pay the (4th) payment. The reasoning was if Plaintiff could make the balloon payment then Plaintiff would not need the loan modification. The representative urged Plaintiff not to pay the (4th) payment or any payment until Plaintiff heard from AURORA regarding the loan modification. The representative advised Plaintiff that she would receive a repayment agreement via mail and once it was received to immediately sign the agreement and fax back.

91. On August 25, 2008, Plaintiff entered into another repayment agreement with AURORA. AURORA's representative, Cheryl (ID#C3F) verbally advised Plaintiff that this repayment plan would consist of (4) consecutive payments. The (1st) payment would be $3100.00. The (2nd and 3rd) payments would be $2139.99. The representative advised Plaintiff after making the (3rd) payment to immediately call back in and submit a loan modification application. The representative advised Plaintiff not to pay the (4th) payment of $10,647.96. The rep stated that the (4th) payment was indeed a balloon payment and that AURORA did not expect Plaintiff to pay the (4th) payment. The reasoning was if Plaintiff could make the balloon payment then Plaintiff would not need the loan modification. The representative urged Plaintiff not to pay the (4th) payment or any payment until Plaintiff heard from AURORA regarding the loan modification. The

1  representative advised Plaintiff that she would receive a repayment agreement via

2  mail and once received to immediately sign the agreement and fax back.

3

4  92.  Plaintiff received a letter dated October 7, 2008 congratulating her on

5  successfully maintaining her current home retention payment arrangement.  The

6  letter also stated that AURORA would like to offer a more permanent workout

7  option.  AURORA requested updated financial information within the next (14)

8  days.

9

10  93. Plaintiff received a letter dated December 23, 2008 from AURORA stating that

11  Plaintiff was denied a home retention workout because Plaintiff was financially

12  unable to afford monthly payments.

13

14  94. On January 8, 2009, (ID#C3F) Plaintiff entered into yet another repayment

15  agreement with AURORA.   AURORA's representative, Cheryl verbally advised

16  Plaintiff that this repayment plan would consist of (4) consecutive payments. Each

17  payment would be in the amount of $2100.00.  Rep advised Plaintiff to apply once

18  again for a loan modification after making the (3rd) payment.

19

20  95. After Plaintiff made her (4th) payment, AURORA advised Plaintiff not to

21  make any additional  payments  and to just wait to hear from AURORA regarding

22  loan modification.

23

24  96. Plaintiff received a letter dated May 21, 2009 advising her that her loan was in

25  default by $15,594.36 and she had (30) days to cure.

26

27  97. Sometime in July, Plaintiff hired an attorney to assist in achieving a loan
    modification.  Plaintiff's attorney contacted AURORA and somehow the existing
28

28

1   loan modification application in review was denied when the attorney entered into

2   the scenario AURORA claimed requested documentation had not been provided.

3   98. Attorney submits new loan modification application on Plaintiff's behalf.

4   AURORA informed Plaintiff's attorney that Plaintiff had 3 broken agreements and

5   therefore AURORA would not consider any type of work-out option.

6

7   99.  Plaintiff admitted to breaking the first agreement but no more than that.

8   AURORA insisted that Plaintiff never made the (4th) payments on the second and

9   third agreements, (the balloon payments). Plaintiff argued that two of AURORA

10  representatives, one representative Plaintiff remembers with fondness,  Cheryl

11  (ID#C3F) advised her NOT to make the (4th) payments so how could that result in

12  Plaintiff breaking the agreement.  AURORA refused to assist. Plaintiff would then

13  hang up and call back and speak to someone else until a new rep decided to offer

14  her a work-out plan.

15

16  100. Plaintiff spoke with 3 different representatives each on e offered her a

17  different work- out plan.  The first representative's supervisor authorized an offer

18  to accept a little over an $8,000.00 deposit based on Plaintiff's history of "Broken

19  Agreements".  Plaintiff called back and another supervisor authorized an offer to

20  accept a little over $6,000.00 deposit based on Plaintiff's history of "Broken

21  Agreements".  Plaintiff called back and another supervisor authorized an offer to

22  accept a little over $4,000.00 deposit based on Plaintiff's history of "Broken

23  Agreements".  Plaintiff did not accept any of the above-mentioned offers because

24  they were unaffordable.

25

26  101. Plaintiff is informed and believes that a Notice of Default in connection with

27  the subject property was filed in Los Angeles County.

28

102. In recording the above-referenced Notice of Default, CAL-WESTERN, under the deed of trust dated September 24, 2009, unlawfully initiated non-judicial foreclosure proceedings against Plaintiff by recording a Notice of Default.

103. In October 2009, Plaintiff sought assistance from Neighborhood Assistance Corporation of America ("NACA"). Plaintiff entered into an agreement with NACA to assist her in acquiring a loan modification through the Making Home Affordable Program ("HAMP").

104. Plaintiff is informed and believes that MERS assigned, granted and transferred to AURORA all beneficial interest under the aforementioned deed of trust recorded December 31, 2009 executed by Defendant by way of a Corporate Assignment of Deed of Trust.

105. Plaintiff is informed and believes and thereon allege that MERS has no standing in the arena, as it is not licensed to be and/or act as a beneficiary. MERS was developed as a document storage company, not a beneficiary. Therefore, the above-referenced deed of trust in connection with the Subject Loan must fail, as there is no standing for any of the listed parties to assert an assignment.

106. Plaintiff is informed and believes and thereon alleges that on or about November 23, 2009, CAL-WESTERN recorded a Notice of Trustee's Sale in connection with the subject property for default under the above-referenced deed of trust.

107. On January 12, 2010, Plaintiff was informed that her HAMP application was denied due to insufficient income.

108. On January 15, 2010, Plaintiff entered into a forbearance agreement with AURORA. Plaintiff agreed to make (6) consecutive payments of $1122.00. After the (2nd) payment, Plaintiff was advised to resubmit a new loan modification application.

109. Plaintiff received a letter of denial dated November 16, for failure to submit financial documentation.

110. On Thursday, November 25, 2010, Plaintiff called CAL-WESTERN to check on the status of the foreclosure.  CAL-WESTERN advised Plaintiff of a Trustee's Sale scheduled for December 2, 2011.

111.  Plaintiff immediately called AURORA and spoke with at least six different representatives, four of whom advised Plaintiff that it was too late to enter into any work-out agreements.  The last two advised Plaintiff because of all the ("Broken Agreements") they could not offer her any other work-out options.

112. November 30, 2010 Plaintiff filed an Emergency Chapter 7 Bankruptcy.

113.  On November 30, 2010 after Plaintiff filed an Emergency Chapter 7, AURORA called that same day and suggested that she apply for a loan modification.

114. December 8, 2010 Plaintiff applied for a loan modification.

115. March 30, 2011 Plaintiff's bankruptcy was discharged.

116. A letter dated June 2, 2011 denied Plaintiff's loan modification based on "excessive forbearance".

117. Plaintiff is informed and believes that Defendants, in committing the acts alleged in this complaint, are engaging in a pattern of unlawful activity. In pursuing the non-judicial foreclosure, Defendants represented that they have the right to payment under the note in connection with the Subject Loan, payment of

which was secured by a deed of trust. Whereas, in fact, the Defendants were not in
possession of the note and they were neither holders of the note or non-holders of
the note entitled to payment, as those terms are used in California Commercial
Code Section 3301 and 3309, and therefore they were proceeding to foreclose
without rights under the law.

118. Plaintiff is informed and believes and thereon alleges that Defendants are
jointly and severally responsible for the acts of the other. Each Defendant was the
agent of the other. Each Defendant knew it would commit wrongful acts against
Plaintiff as referenced in this complaint. Each Defendant gave substantial
assistance or encouragement to the other Defendant to commit wrongful acts
against Plaintiff. Each Defendant's conduct was a substantial factor in causing
harm to Plaintiff.

## SECURITIZATION

119. Securitization is a structured finance process, which involves pooling and
repackaging of cash flow producing assets into securities that are sold to investors.
Securitization, in its most basic form, is a method of selling assets. Rather than
selling those assets "whole," the assets are combined into a pool, and then that pool
is split into shares. Those shares are sold to investors who share the risk and
reward of the performance of those assets.

120. Any type of cash flow producing assets can be securitized and turned into
asset- backed securities (ABS). Mortgage-backed securities, which are backed by a
pool of mortgage loans, are formed when mortgages are purchased and placed into
an investment trust and shares of the trust are sold to investors. A prospectus, filed
with the Securities and Exchange Commission, details the composition of the loans
contained within the trust, and the payoff terms of the different levels of securities
issued by the trust, known as "tranches."

121. Different tranches within the ABS are rated differently, with senior classes of most issues receiving the highest rating, and subordinated classes receiving correspondingly lower credit ratings. However, the credit crisis of 2007-2008 has exposed the structural flaw in the securitization process, which causes the resultant ABS to be extremely high risk for investors -- loan originators retain no residual risk for the loans they make, but collect substantial fees on loan issuance and securitization, which causes unchecked degradation of underwriting standards. This has proven to be an extremely high risk factor for investors, but was, until recently, dismissed by most professional practitioners of finance, due to the financial conflict of interest they had as beneficiaries of substantial fees from the issuance and securitization of debt.

122. Because the formation of a securitized trust depends on the participation of multiple entities, each of whom gets paid for its role in the process, securitization of mortgages has resulted in widespread fraud and corruption. The diffusion of responsibility among these entities has also made it difficult for officials and consumers to hold players responsible. This diffusion was purposefully created to allow participating entities to isolate themselves from liability.

123. Participants in the formation of a securitized trust include:

a. Mortgage Broker: A licensed professional who solicits customers for loans in return for a commission from the Originator;

b. Originator: Initially owns the assets to be securitized. Performs basic loan underwriting and provides access to funding. The funding may come from a line of credit established by the originator or directly from the intended assignee of the loans;

c. Sponsor: Usually a bank that backs the formation of loan pool by providing liquidity;

d. Depositor: Assembles the underlying collateral, help structure the securities and

work with the financial markets in order to sell the securities to investors;

e. Trustee: Holds the trust assets and acts as a fiduciary to investors in the trust;

f. Guarantor: Provides guarantees or partial guarantees for the assets, the principal

and the interest payments, for a fee;

g. Special Purpose Entity (SPE): Used to create the illusion of a "true" sale;

h. Underwriter: Markets and distributes the asset-backed securities to investors;

and

i. Servicer: Collects payments and monitors the assets that are the crux of the

structured financial deal. The servicer and the originator are often the same entity.

Sometimes there are also sub-servicers who work under the servicer; frequently

this role is also taken by another entity that is already part of the structure.


124. Demand for mortgage-backed securities during the height of the credit boom

drove the creation of millions of loans, many of which, like those in the case at bar,

were the product of fraud and lax underwriting practices. The same brokers,

lenders and financial entities often worked together for years with the goal of

creating securitized trusts, which of necessity required thousands of new loan

originations. Many of these new loans came into being not to benefit borrowers or

expand home ownership, but simply to fill the pools of securitized trusts and feed

investors' insatiable appetite for mortgage-backed securities.


### FACTS COMMON TO ALL CAUSES OF ACTION
### The Deceptive Loan Documents

125. The Option ARM loan that is the subject of this Complaint was originated by

AMN, and purchased by Defendants consists of the following characteristics: (i)

the monthly payment in the Note is based upon a teaser interest rate of 1.5% ; (ii)

the payment schedule listed in the TILDS, for the first three to five years of the

loan, is based upon a fully amortizing payment at the teaser interest rate; (iii) the

34

interest rate adjusts after only one month to a rate which is the sum of an "index"
and a "margin"; and (iv) after the first three to five years of the loan, the amount of
the monthly payments increases substantially.

126. For Plaintiff's loan, the sum of the index and the margin would necessarily
result in an interest rate that always exceeded the teaser rate by several percentage
points. As a result, after only one month, the interest accruing on the Notes more
than doubled from an amount which was usually below 2% to an amount of at least
4%, and in some cases up to 8%. Because of this dramatic interest rate adjustment
after only one month, the monthly payment in the Note and TILDS, which was
calculated based on a fully amortizing payment at the low teaser rate, was no
longer sufficient to even pay the interest which accrued on the Note. Thus, the
unpaid interest would be added to the principal balance of the loan. Through this
negative amortization, Plaintiff's principal balance increased even as she made the
scheduled monthly payments in the Note and the TILDS. Thus, each month,
Plaintiff would owe more money than she did at the start of the loan, and have less
time to pay it back. To make matters worse, this "deferred interest" was added to
the principal balance and, in turn accrued more interest – in effect using compound
interest to increase the balance owed by Plaintiff.

127. Negative amortization was *certain to occur* because of the large spread
between the teaser rate and the combined index and margin. Indeed the margin
alone was consistently higher than the teaser rate. For example, for Plaintiff 's
Note lists a teaser rate of 1.500% and a margin of 3.40%. Thus, even if the index
went down to zero, the combined total of the margin and index would never be
close to the teaser rate, and thus, the Option ARM loan was unmistakably designed
to cause negative amortization. The Loan Documents did not disclose this material
information to Plaintiff. Had the Loan Documents disclosed this material
information, Plaintiff would not have purchased the subject Option ARM loan.

128. The two most important pieces of information in any mortgage loan are the
interest rate and the amount of the monthly payments. For the subject Option ARM
loan, the disclosures of both pieces of this information were misleading and
omitted material facts. The Loan Documents disclosed a teaser interest rate, but
they did not disclose that this rate would sharply increase after only one month.
The Loan Documents disclosed a low monthly payment amount for the first three
to five years of the loan, but this did not reflect the actual amount of interest being
charged or the amount Plaintiff actually owed each month. Moreover, the Loan
Documents failed to disclose that the monthly payment was based upon the teaser
rate that was only in effect for one month. Had the Loan Documents disclosed the

payment amount sufficient to cover both principal and interest based upon the index and margin that would be used to calculate the payments after the first month, the payment amounts would have been approximately double those listed in the TILDS.

129. Plaintiff was not informed of the guaranteed sharp increase in her interest rates, and the fact that her monthly payment was not enough to pay the interest accruing on her loan, until she had made multiple payments following the closing of her loan. At this time she would receive statements reflecting that her principal balances had increased with each month that had passed since the loan closed, despite the fact that she had made all monthly payments as scheduled. By the time this material information was disclosed to Plaintiff, they were locked into the loans by a draconian prepayment penalty consisting of a prepayment charge equal to the six months of interest. This provision was designed to deter or prevent borrowers from refinancing the loans during the first three years of while they were incurring negative amortization.

130. Although the Loan Documents provided that the monthly payment amount would be adjusted every year to an amount that would fully amortize the remaining principal balance of the loan at the existing interest rate, the Option ARM loan had a payment cap, which provided that the monthly payment could only increase by 7.5% each year. The payment cap insures that negative amortization will continue to occur even after borrower's payments are adjusted. For example, as discussed above, after one month, the actual interest rate being charged is typically at least double that of the teaser rate, and often much higher than that. Thus, a monthly payment in year two of the loan that is only 7.5% higher than a monthly payment based upon the teaser rate is not going to be close to sufficient to cover the monthly interest charged on the loan, let alone amortize the principal balance that has already increased due to 11 months of negative amortization.

131. The payment caps are subject to an overall cap on principal of 115% of the original loan amount. Once the principal balance reaches this 115% cap, the 7.5% limitation on payment increases no longer applies, and the payments are immediately recast to fully amortizing payments of principal and interest. To the extent that this built-in "payment shock" is more than Plaintiff can afford, she needs to refinance 115% of the amount she initially borrowed (despite having made all of the required payments) or risk losing her home to foreclosure.

132. Despite the foregoing, the only places in the Notes that even inferentially reference negative amortization suggest that negative amortization was only a mere

possibility, rather than an absolute certainty. This was ambiguous, misleading and deceptive, because it implies that negative amortization was subject to some future contingency, such as an increase in the index on which the adjustable rate was purportedly based, when, in fact, it was *guaranteed* to occur after only one month, even if the index stayed the same or went down.

133. The undisclosed fact that negative amortization is certain to occur on the subject loan and information regarding the interest rate to be charged on the loan was information that Plaintiff would have found material when deciding whether to purchase the subject Option ARM loan. Nevertheless, the Loan Documents did not disclose this material information to Plaintiff. Had the Loan Documents disclosed this material information, Plaintiff would not have purchased the subject Option ARM loans.

134. The loan characteristics described above were true of the named Plaintiff's loan and were also common characteristics of the loan forms devised, designed and/or approved by Defendants and used by AMN during the liability period. It is these Loan Documents that are the subject of this Complaint.

### RFC Was A Primary Participant in the Wrongful Conduct
### RFC's Securitization Business

135. RFC, is part of GMAC, LLC ("GMAC"), as it is a wholly-owned subsidiary of Residential Capital, LLC ("ResCap"), a holding company for GMAC's residential mortgage business. RFC is in the business of acquiring residential mortgages, home equity loans, and lines of credit originated by other mortgage banks and financial institutions. The company (also known as GMAC-RFC) then packages the loans as mortgage-backed securities, which it sells to institutional investors. RFC also provides warehouse lending facilities to mortgage loan originators and correspondent lenders to originate residential mortgage loans.

136. According to GMAC's Form 10-K for 2006, ResCap is one of the largest residential mortgage producers in the United States and produced approximately $162 billion in residential mortgage loans in 2006. ResCap sources its residential mortgage loan production either by originating loans through a direct lending network or purchasing loans in the secondary market from correspondent lenders, such as AMN. Loans purchased from correspondent lenders are originated or purchased by the correspondent lenders who then sell the loans to ResCap. ResCap must approve any correspondent lenders who participate in the correspondent lending program. In 2006, ResCap's mortgage loan productions

consisted of the purchase of 642,169 residential mortgage loans and the origination of 408,070 residential mortgage loans.

137. ResCap sold most of the loans it purchased. According to the 2006 Form 10-K, in 2006, ResCap sold $152.7 billion in mortgage loans. Of that, $106.8 billion was generated through sales to non-government sponsored investors in the form of whole loan sales and securitizations.

138. ResCap is also one of the largest providers of warehouse lending facilities to correspondent lenders and other mortgage originators in the U.S. These lines of credit enable the correspondent lenders and originators to finance residential mortgage loans until they are sold on the secondary mortgage market. According to an unnamed source quoted in an article in *Investment Dealers Digest*, warehouse lenders have detailed knowledge of the originator's operations -- "[t]hey have that day-to-day pipeline exposure to what the mortgage lender's doing."

139. At all relevant times, the subject Option ARM loan purchased by RFC which were sold to Plaintiff, and the documents provided to them in conjunction with those loans, were pre-approved by RFC as follows:

    a. RFC is, and/or was, in the business of, among other things, securitizing residential mortgage loans by purchasing loans in the secondary mortgage market, packaging those loans into trusts or other vehicles, and selling securities to investors based on the income to be derived from those loans.

    b. Pursuant to a mortgage loan purchase agreement (the "Client Contract") between RFC and AMN, RFC agreed to purchase and did purchase numerous Option ARM mortgages originated by AMN. AMN did not fund its own loan originations; rather it obtained working capital through warehouse lenders such as RFC who held liens on mortgages that were awaiting securitization or were in the process of closing (sometimes referred to as "pipeline loans"). Thus, after originating a loan, AMN immediately sold it to securitization arrangers such as RFC in order to pay back the line of credit that it used to fund the loan.

    c. AMN earned income in connection with the issuance and re-sale of Option ARM loans, rather than in connection with servicing and holding those loans. Because it needed to fund new Option ARM loans as it issued them and

because the monies available to originators for that purpose were provided by
warehouse lenders and needed to be repaid promptly, AMN needed assurance
that it would be able to promptly resell the Option ARM loans it originated to
institutions like RFC.

d. Pursuant to the Client Contract between AMN and RFC, AMN was
guaranteed a buyer for the Option ARM loans it originated provided that the
loans complied with RFC's standards, and RFC was guaranteed a pool of
mortgage loans to securitize.

e. Pursuant to this arrangement, AMN would collect fees from the homeowners
to whom it sold the Option ARM loans as well as RFC, while
RFC would collect revenues through the securitization process and in
connection with servicing rights it retained on the loans after they were
securitized.

f. On information and belief, in the RFC Client Guide, RFC established the
criteria that the Option ARM loans originated by AMN had to comply with in
order for RFC to purchase the loans, including RFC's underwriting
guidelines. The Client Guide also included instructions for how the Option
ARM loans were to be delivered to RFC, including the specific legal
documentation that had to accompany each loan.

g. AMN's compliance with the Client Contract and Client Guide was important
to AMN's operations. It was only by ensuring that the Option ARM loans it
originated complied with RFC's standards, that AMN could be assured that it
would be able to promptly resell the Option ARM loans it issued to RFC.

h. RFC's agreement to purchase the Option ARM loans sold by AMN's lenders
was critical to AMN's ability to market and sell those loans to Plaintiff and
other homeowners, since AMN did not fund the loans it originated. AMN
lacked the financial resources to issue the Option ARM loans here at issue
unless it was able to promptly sell them to investors such as RFC to repay its
warehouse lenders. Warehouse lenders required as a condition to loaning
AMN the funds, a guarantee that AMN would be able to promptly sell them
to investors such as RFC, and repayment directly from investors such as
RFC.

i. While providing a stream of financing to AMN, RFC was aware of The
Material Omissions, and it approved the specific language that was used to
create those omissions.

39

## BACKGROUND OF THE MORTGAGE LOAN TRUST

140.   The "Trusts" allegedly foreclosing are actually Mortgage Backed Securities ("MBS").  The Servicers, like ALS, are merely administrative entities which collect the mortgage payments and escrow funds.  The MBS have signed themselves up under oath with the Securities and Exchange Commission ("SEC"), and the Internal Revenue Service ("IRS"), as mortgage asset "pass through" entities wherein they can never own the mortgage loan assets in the MBS.  This allows them to qualify as a Real Estate Mortgage Investment Conduit ("REMIC") rather than an ordinary Real Estate Investment Trust ("REIT").  As long as the MBS is a qualified REMIC, no income tax will be charged to the MBS.  For purposes of this action, "Trust" and MBS are interchangeable.

141.   REMICs were newly invented in 1987 as a tax avoidance measure by Investment Banks.  To file as a REMIC, and in order to avoid one hundred percent (100%) taxation by the IRS, an MBS REMIC could not engage in any prohibited action.  The "Trustee" cannot own the assets of the REMIC.  A REMIC Trustee could never claim it owned a mortgage loan.  Hence, it can never be the owner of a mortgage loan.  Plaintiff will require the GAAP and FAS accounting in discovery to document this non-compliance and to justify this malfeasance.

142.   Additionally, and important to the issues presented with this particular action, is the fact that in order to keep its tax status and to fund the "Trust" and legally collect money from investors who bought in to the REMIC, the "Trustee" or the more properly named, Custodian of the REMIC, had to have possession of ALL the original blue ink Promissory Notes and original allonges and assignments of the Notes, showing a complete paper chain of title.

143.  Most importantly for this action, the "Trustee"/Custodian MUST have the mortgages recorded in the investors' names as the beneficiaries of a MBS in the year the MBS "closed." Every mortgage in the MBS should have been publicly recorded in the County where the property was located with a mortgage in the name similar to "RALI-2007QO1 Trust" on behalf of the beneficiaries of the "RALI-2007QO1 Trust." The mortgages in this trust would all have had to have been publicly recorded in the year 2007.

144.  As previously pointed out, the "Trusts" were never set up or registered as Trusts. The Promissory Notes were never obtained and the mortgages never obtained or recorded.

145.  The "Trust" engaged in a plethora of "prohibited activities" and sold the investors certificates and Bonds with phantom mortgage backed assets. There are now nationwide, numerous Class actions filed by the beneficiaries (the owners/investors) of the "Trusts" against the entities who sold the investments as REMICs based on a bogus prospectus.

146.  In the above scenario, even if the attorney for the servicer ("pretender lender") who is foreclosing on behalf of the Trustee (who in turn acting for the securitized trust) produces a copy of a Note, or even an alleged original, the mortgage loan was not conveyed in the trust under the requirements of the prospectus for the trust or the REMIC requirements of the IRS.

147.  As applied to the Plaintiff, the end result would be that the required MBS asset, or any part thereof (mortgage note or security interest), would not have been

legally transferred to the trust to allow the trust to ever even be considered a "holder" of a mortgage loan. Neither the "Trust" or the Servicer would ever be entitled to bring a foreclosure, let alone enforce payment. The Trust will never have authority to enforce payment. It cannot pick a side after the fact. It has purported to comply with REMIC and IRS requirements to evade taxes, and now attempts foreclosure, totally avoiding California law and trespassing upon the provisions of the Deed of Trust, and it cannot even foreclose non-judicially. Plaintiff is perplexed as to where and when the fraud may exactly end. The loans were pooled, sold and transferred to another entity. The accounting shall prove the loan was not repurchased in order to foreclose.

## BACKGROUND OF MORTGAGE ELECTRONIC REGISTRATION SYSTEMS

148.   Given the venerable and uninterrupted legacy of land title recording acts, it is interesting that first fundamental change to the American public land title recording systems in over three hundred years was not initiated by publicly elected leaders. Instead, Mortgage Electronic Recording Systems, Inc was conceived of and created by a tight-knit group of powerful mortgage industry insiders. In October of 1993, a task force of mortgage finance companies releases a "white paper" at an annual convention of mortgage bankers.

149.   The paper suggested that an electronic book entry system of tracking mortgage loans would be better for the mortgage lending industry than the legal system of county recording offices. The paper encouraged comments from the real estate finance industry, leading to the formation of a steering committee affiliated with the Mortgage Bankers Association of America (MBA).

150.    The MBA is a trade association supported through dues paid by mortgage
lending companies that conducts public relations for the industry. This committee
of mortgage bankers retained Ernst & Young, an accounting firm, to study the
feasibility of developing MERS. In addition to studying the technological and
financial hurdles, the accounting firm also did some telephone interviews with
mortgage loan originators, servicers, warehouse lenders, custodians, assignment
processors, and employees at Fannie Mae and Freddie Mac. The accountants'
primary conclusion was that the finance industry could save a lot of money by
deciding not to pay the fees that local governments require to record mortgage
assignments.

151.    The legislative history of MERS concept is not found in Congressional or
state assembly records, but in the trade magazine Mortgage Banking. In 1995 and
1996 the MBA trade association's steering committee developed a business plan
that would make MERS a reality. The principal consultant involved in creating
MERS explained that the "original investors came in 'on faith'...because the
details of how MERS would work weren't ironed out until mid-1996 at working
group meetings involving different industry players." MERS' Senior Vice
President of Operations and Information Management explained that the legal and
technological questions behind MERS were answered when "lenders and servicers
of various sizes, along with the secondary market agencies, 'got in a room
together, walked through the process and came to an agreement." Two years after
releasing the initial white paper, MERS, Inc. Incorporated in Delaware as a non-
stock corporation owned by mortgage banking companies that made initial capital
contributions ranging from 10 K to 100 K. according to a Mortgage Banking
Association Executive Vice President involved in the creation of MERS the
primary goal of the MERS initiative was to "lower costs for servicers."

152.   Today mortgage finance companies currently use the MERS' name to interact with the land title recording system in one of two ways: either by recording MERS' name as an assignee, or by recording MERS' names as the original mortgagee.

153.   Under this recording strategy the originating lender makes a traditional mortgage loan by listing itself as the payee on the Promissory Note and as the mortgagee on the security instrument. The loan is then assigned to a seller for repackaging through securitization for investors. However, instead of recording the assignment to the seller or the trust that will ultimately own the loan, the originator pays MERS a fee to record an assignment to MERS in the country records. MERS' counsel maintains that MERS becomes a "mortgagee of record" even though its ownership of the mortgage is purely fictional.

154.   Although MERS records an assignment in the real property records, the Promissory Note, which creates the legal obligation to repay the debt, is not negotiated to MERS. Everyone agrees that MERS is never entitled to receive a borrower's monthly payments, nor is MERS ever entitled to receive the proceeds of a foreclosure or a Deed of Trust sale. MERS has no actual financial interest in any mortgage loan. MERS does not even provide lien real estate of the mortgages it purports to own, instead referring title attorneys, refinancing lenders, and consumers to the loan's servicer. MERS' revenue comes, not from the loan or the disposition of collateral, but from fees that the originator and other mortgage finance companies pay to MERS. Once a loan is assigned to MERS, the public land title records no longer reveal who (or what) actually owns a lien on the property in question.

155. After a few years in business, MERS decided it could help mortgage
financiers pay even less to county governments by simply doing away with the first
assignment to MERS, and instead listing MERS as the mortgagee in the original
mortgage. Once again, although MERS does not actually advance any loan
principal to the homeowner, does not have the right to receive any payments from
the borrower, and is not the actual party in interest in any foreclosure proceeding.
Nevertheless, the actual mortgagee pays a fee to MERS to induce MERS to record
the mortgage in MERS' name. By eliminating the reference to an actual mortgagee
or the actual assignee, MERS estimated it would save the originator an average of
$22.00 per loan.

156. In addition to its record keeping and recording system liaison roles, MERS
has also become directly involved in consumer finance litigation. When MERS is
listed in county records as the owner of a mortgage, courts have generally made the
natural assumption that the appropriate plaintiff for bringing a foreclosure action is
in fact MERS. In an effort to convolute the proceedings and move foreclosures
along as quick as can be, MERS has allowed actual mortgagees and loan assignees
or their servicers to bring foreclosure actions in MERS' name, rather than in their
own name.

157. Plaintiff alleges that MERS does this in an effort to illegally privatize the
recordation process, avoiding the public recordation fees AND allowing them to
keep transfers and assignments SECRET. Once a loan is assigned to MERS, the
public land title records no longer reveal who (or what) actually owns a lien on the
property in question.

158. MERS eventually convinced financiers to simply do away with the first
assignment to MERS, and instead list them as the mortgagee in the original

mortgage. Once again: MERS does not actually advance any loan principal to the homeowner, or have the rights to receive any payments from the borrower, or even an actual party of interest.

## MERS IS TOXIC TO THE CHAIN OF TITLE

159.    The chain of title, as stated above, reveals a Deed of Trust ("DOT") in favor of MERS as nominee. No issues are readily apparent as to the execution of the Deed of Trust. However, the content of the DOT raises factual issues that require further examination and the production of additional documents and information. Since MERS is an IT platform operated for the purposes of its private owners, it is not authorized by Florida Statutes nor California Statutes to serve as the equivalent of a recording record for instruments in the public records. It is a data entry and retrieval system that is private, not public. Since MERS was named as nominee and the MERS documentation available on the internet clearly state that under no circumstances will MERS ever claim an interest in the real property, the DOT, the Note, nor will ever be the actual lender, beneficiary or mortgagee in any transaction, the effect of naming MERS raises factual issues since there are questions regarding title raised by the conflict between naming MERS and MERS disclaiming any such interest. There is no record of MERS accepting the position as nominee and if so under what circumstances. Those terms exist in agreements executed between members of MERS and one of the MERS corporations and are unavailable to the Trustors.

# MERS CANNOT ASSIGN THE DEED OF TRUST

160.   Theodore Schultz's fraudulent attempt to assign the Deed of Trust was all in vain due to the fact that MERS simply can NOT assign.

161.   MERS, by its own self definition, does not own or hold notes or mortgages, and is not a vehicle for transferring interest (which means it does not assign, sell, convey, deed, bargain or assign interests), so MERS which does not own mortgages, cannot foreclose, yet (little realized) neither can it assign.

162.   The big banks constantly present purported mortgage assignments by MERS many of them back-dated (though other business executives go to jail for back-dating financial documents), for the big banks are depending on us to believe so generally in "assignment" that we will ignore the reality that MERS cannot own – and it cannot assign – what it does not own.
MERS only, records what is going on with others, while serving as "non-owning" mortgagee.

163.   Thus, MERS, as the mortgagee in the MERS mortgage, is a crippled, invalid, impotent mortgagee, since as a non-owner, non-holder, it cannot foreclose, and as "not a vehicle for transferring interests", it cannot assign.

164.   Mortgages and notes can be assigned, if someone owns them, but MERS does not own notes or mortgages, neither is it a vehicle for transferring interests, so MERS cannot assign what it does not own.

165.  The mortgage contract makes MERS, which cannot own notes or mortgages, the mortgagee, but it is a mortgagee which cannot own notes or mortgages.

166.  MERS is thus an invalid and impotent, quite powerless mortgagee – yes, a mortgagee, a mortgagee which cannot do anything except record data in its own records. MERS cannot foreclose, nor assign.  Only mortgages are assigned by those who "own" them, but MERS does not own, so it cannot assign.

167.  "A mortgagee's purported assignment of the mortgage without an assignment of the debt which is secured is a legal nullity."   Kelley V. Upshaw (1952) 39 Cal 2d 179, 246 P2d 23, 1952 Cal. LEXIS 248.

168.  "A trust deed has no assignable quality independent of the debt; it may not be assigned or transferred apart from the debt; and an attempt to assign the trust deed without a transfer of the debt is without effect." Domarad v. Fisher & Burke, Inc. (1969 Cal. App. 1st Dist) 270 Cal. App. 2d 543, 76 Cal. Rptr. 529, 1969 Cal. App. LEXIS 1556.

169. MERS is a Non-Authorized Agent and cannot legally assign the Promissory Note, making any foreclosure by other than the original lender wrongful, for the following reasons. 1) Under established and binding Ca law, a Nominee can't assign the Note. Born V. Koop 1962 200 C. A. 2d 519[200 CalApp2d Page 527, 528 2) On most Notes, the term Nominee is not included and MERS never takes ownership, making it unenforceable and unassignable by MERS. Ott v. Home Savings & Loan Association, 265 F. 2d 643 [647,648

## MERS DEPOSITION: "WE HAVE NO EMPLOYEES"

170.    Recently, the treasurer/secretary of MERS, William Hultman, was deposed
by a law firm for Superior court of New Jersey Docket No. F-10209-08 . His
answers are nothing short of stunning. He admitted to the fact that anyone could
claim to be an "assistant secretary" of MERS in documents initiating foreclosures,
even if MERS had never actually ever heard of the person.  It appears ALL of
these people amount to the thousands and there are in reality only four true
corporate officers for MERS.  None of them are the signer on the Corporate
Assignment of the Deed of Trust for Plaintiff's loan.

## CALIFORNIA U.S. BANKRUPTCY COURT ISSUES RULING
## MERS HAS NO EVIDENCE OF STANDING TO ASSIGN NOTE
## TO ANOTHER BENEFICIARY

171.    MERS does not have the capacity as only a nominee to execute the process
of foreclosure or to assign security instruments from one beneficiary to the other.
In Debtor Luis E. Gallardo, 10-04710-MM7, vs Movant US Bank National
Association, as Trustee for CSMC Mortgage-Backed Pass-Through Certificates,
Series 2006-7, a recent San Diego Bankruptcy decision handed down by the
Honorable Judge Margaret M. Mann, Judge Mann ruled "Movant has not supplied
evidence that establishes that Movant has standing to seek stay relief. Movant has
attached an "Assignment of Deed of Trust" from MERS to Movant, which assigns
the trust deed and the related note. But, there is no evidence that MERS ever
received an assignment of the note or had the ability to assign the note to Movant.
The note attached to the motion does not indicate that the note has been endorsed

to Movant or endorsed in blank such that it became bearer paper. Without evidence either that MERS could properly assign the note, or that the note was endorsed to Movant or in blank, Movant has not established standing to seek stay relief."

## CALIFORNIA U.S. BANKRUPTCY COURT ISSUES RULING
## MERS COULD NOT ASSIGN NOTE TO CITIBANK

172.    The United States Bankruptcy Court for the Eastern District of California has issued a ruling dated May 20, 2010 in the matter of *In Re: Walker*, Case No. 10-21656-E-11 which found that MERS could not, as a matter of law, have transferred the Note to Citibank from the original lender, Bayrock Mortgage Corp. The Court's opinion is headlined stating that MERS and Citibank are not the real parties in interest.

173.    The court found that MERS acted "only as a nominee" for Bayrock under the Deed of Trust and there was no evidence that the Note was transferred. The opinion also provides that "several courts have acknowledged that MERS is not the owner of the underlying Note and therefore could not transfer the Note, the beneficial interest in the Deed of Trust, or foreclose on the property secured by the deed", citing the well-known cases of *In Re Vargas* (California Bankruptcy Court), *Landmark v. Kesler* (Kansas decision as to lack of authority of MERS), *LaSalle Bank v. Lamy* (New York), and *In Re Foreclosure Cases* (the "Boyko" decision from Ohio Federal Court).

174.    The opinion states: **"Since no evidence of MERS' ownership of the underlying Note has been offered, and other courts have concluded that MERS does not own the underlying Notes, this court is convinced that MERS**

50

had no interest it could transfer to Citibank. Since MERS did not own the
underlying Note, it could not transfer the beneficial interest of the Deed of
Trust to another. Any attempt to transfer the beneficial interest of a trust
deed without ownership of the underlying Note is void under California law."

175.    Read that again: "<u>Any attempt to transfer the beneficial interest of a trust
deed without ownership of the underlying note IS VOID UNDER CALIFORNIA
LAW.</u>"

176.    This conclusion was based upon California law cited in the opinion that the
Note and the mortgage are inseparable, with the former being essential while the
latter is "an incident", and that an assignment of the note carries the mortgage with
it, "while an assignment of the latter [the mortgage] alone is a nullity."

177.    As MERS must own the Note in order to assign the incident Deed of Trust,
**MERS is legally precluded from assigning the Deed of Trust for want of
ownership of the Note, and cannot assign the Note in any event as it never
owned it.**

178.    MERS' lack of ownership interest in Promissory Note is a matter of decided
case law based on a record stipulation of MERS' own lawyers in the MERS v.
Nebraska Dept. of Finance decision.
<u>This opinion thus serves as a legal basis to challenge any foreclosure in
California based on a MERS assignment; to seek to void any MERS
assignment of the Deed of Trust or the Note to a third party for purposes of
foreclosure; and should be sufficient for a borrower to not only obtain a TRO
against a Trustee's Sale, but also a Preliminary Injunction barring any sale</u>

**pending any litigation filed by the borrower challenging a foreclosure based
on a MERS assignment.**

179.   The Court concluded by stating: "Since the claimant, Citibank, has not
established that it is the owner of the Promissory Note secured by the trust deed,
Citibank is unable to assert a claim for payment in this case." Thus, any
foreclosing party which is not the original lender which purports to claim payment
due under the Note and the right to foreclose in California on the basis of a MERS
assignment does not have the right to do so under the principles of this opinion.

180.   This ruling is more than significant not only for California borrowers, but for
borrowers nationwide, as this California court made it a point to cite non-
bankruptcy cases as to the lack of authority of MERS in its opinion.

181.   Further, this opinion is consistent with the prior rulings of the Idaho and
Nevada Bankruptcy courts on the same issue, that being the lack of authority for
MERS to transfer the Note as it never owned it (and cannot, per MERS' own
contract which provides that MERS agrees not to assert any rights to mortgage
loans or properties mortgaged thereby).

182.   Plaintiffs are perplexed as to why Theodore Schultz and ALS would go to
such great lengths to commit fraud when the act of assigning on MERS's behalf
was distinctly moot from its onset.

# FIRST CLAIM FOR RELIEF
## (ENFORCEMENT FOR RESCISSION AND RESTORATION OF TITLE AND ALLOW LOAN MODIFICATION TO PREVAIL)

183. Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

184. An actual controversy exists in which the parties must ascertain their rights, duties and right to title in the Subject Property.

185. A judicial determination is necessary that the parties may ascertain their rights, duties and right to title in the Subject Property.

186. The Plaintiff desires that the court make a judicial determination as to their rights, duties and right to title in the Subject Property.

187. An actual controversy has arisen and now exists between Plaintiff and Defendants, and each of them, concerning their respective rights, obligations and duties as it relates to the Subject Property. In particular, on one hand, Plaintiff contends: (a) that Defendants MERS, AURORA and CAL-WESTERN have conducted an unlawful foreclosure against Plaintiff and her property; (b) that failing to comply with the Deed of Trust, California Civil Code and California Commercial Code as more particularly alleged in paragraph 18 Defendants are not entitled to proceed with the foreclosure until such compliance occurs; and (c) on information and belief, that Defendants are not otherwise entitled to continue with said foreclosure because of the lack of proper statutory execution of the Deed of Trust as more fully alleged in paragraph 12 through 15.

188.   Plaintiff desires a judicial determination of Defendants rights, obligations and duties, and to enforce Defendants to cancel and rescind the illegal foreclosure on Plaintiff's Subject Property.

189.   Plaintiff alleges that Defendants, and each of them, are engaged in an illegal scheme, the purpose of which was to execute an illegal foreclosure secured by real property in order to hold an illegal Trustee's Sale and take title to Plaintiff's property by wrongful conveyance.  Plaintiff alleges that Defendants, and each of them, have represented to Plaintiff and to third parties that they were the owner of the Trust Deed and Note as either the Trustee or the Beneficiary regarding Plaintiff's real property. Based on this representation they caused a Notice of Default to be issued and recorded without disclosing their true role, and thereafter an illegal Notice of Trustee's Sale to hold a public sale which would result in a wrongful conveyance to the alleged beneficiary.  Predictably they would then record an illegal Trustee's Deed Upon Sale, permanently affecting Plaintiff's right, title and interest in the Subject Property and eventually institute illegal eviction proceedings.  Defendants have no lawful security interest in the subject property to effectuate any of these proceedings.

190.   Plaintiff alleges that based upon the foregoing representations that California Civil Code section 2924 et seq. and its subparts are being applied to Plaintiff in a manner that is unlawful. The party acting as the Trustee has proceeded with the foreclosure of Plaintiff's Subject Property notwithstanding the fact that the Trustee knew or reasonably should have known it did not have the power to initiate foreclosure on September 24, 2009 and MERS knew or reasonably should have known it did not comply with California Civil Code 2932, 2932.5, 2924 et seq. because it had no assignment or beneficial interest to conduct such foreclosure.

MERS knew or reasonably should have known it did not convey the power of sale to the alleged Trustee CAL-WESTERN because it violated the terms of California Civil Code section 2932.5 and Theodore Schultz's fraudulent assignment vested no beneficial interest to Plaintiff's Deed of Trust.

191.    Defendants have no standing to enforce a non-judicial foreclosure.

192.    Defendants are strangers to this transaction, and had no authority to go forward with the foreclosure and Trustee's Sale.

193.    Plaintiff executed a Promissory Note and a Deed of Trust to American Mortgage Network, Inc.(hereinafter "AMN")

194.    AMN is the Lender and only party entitled to enforce the Note and any security interest with it.

195.    AURORA is not listed anywhere in the Deed of Trust or Promissory Note.

196.    In California, California Civil Code § 2932.5 governs the Power of sale under an assigned mortgage, and provides that the power of sale can only vest in a person entitled to money payments: "Where a power to sell real property is given to a mortgagee, or other encumbrancer, in an instrument intended to secure the payment of money, the power is part of the security and vests in any person who by assignment becomes entitled to payment of the money secured by the instrument. The power of sale may be exercised by the assignee if the assignment is duly acknowledged and recorded."

197.  The Los Angeles County Recorder's Office does not contain any evidence of a valid assignment from a true beneficiary and has never assigned their rights under the Note.

198.  The power of sale may not be exercised by any of the Defendants since there was never an acknowledged and recorded valid assignment pursuant to California Civil Code  §2932.5.

199.  Since the Defendants did not comply with California Civil Code §2932.5, the Notice of Default provisions of California Civil Code § 2924 and Notice of Sale provisions of California Civil Code §2924(f) were likewise never complied with.

200.  MERS, AURORA and CAL-WESTERN never complied with the Notice of Default provisions of California Civil Code §2924 and Notice of Sale provisions of California Civil Code §2924(f).

201.  That by virtue of the method and manner of Defendants carrying out Civil Code section 2924 et seq., the foreclosure of the Subject Property is void ab initio as a matter of law and must rescind the Notice of Default rendering the Notice of Trustee's Sale void and rescinded from Plaintiff's property.

202.  Plaintiff alleges that Defendants, and each of them, are engaged in and continue to engage in violations of California law including but, not limited to: Civil Code section 2924 et seq. and 2932.5 et seq., and unless restrained will continue to engage in such misconduct, and that a public benefit necessitates that Defendants be restrained from such conduct in the future.  This is relief that can be

granted.  If Defendants cannot prove to being the real parties to enforce the note, they must rescind.  Being that the foreclosure is defective, they must rescind.

**FIRST CAUSE OF ACTION**
**VIOLATION OF THE TRUTH IN LENDING ACT**
**15 U.S.C. SECTION 1601**
**(AGAINST ALL DEFENDANTS)**

203. TILA, 15 U.S.C. Section 1601 et seq., requires that consumers be given meaningful disclosure of credit terms where the interest rate is not fixed so that the consumer is informed of the cost and variable rate feature of the loan.

204. Full disclosure by a broker and/or lender enables a consumer to make an appropriate loan comparison. A lender's misleading disclosure of credit terms to a consumer is tantamount to no disclosure. Smith v. Chapman, (5th Cir. 1980) 614 F. 2d 968, 977.

205.  In a residential mortgage transaction subject to the Real Estate Settlement Procedures Act 12 U.S.C. Section 2601 et seq., a broker is required to provide an itemization of the amount of money financed also known as a "good faith estimate". 12 Code of Federal Regulations 226.18, 19. A broker's failure to make a clear, conspicuous and accurate material disclosure amounting to a good faith estimate triggers an extended right of rescission. The required itemization details include: (1) annual percentage rate, (2) finance charge (3) amount financed (4) total payments and (5) payment schedule. 12 Code of Federal Regulations 226.23.

206. Further disclosures under federal law which amount to a TILA violation if not made include but are not limited to providing a consumer with: 1. a good faith estimate, 2. truth in lending documents, servicing transfer documents, adjustable rate booklet, right to copy of appraisal documents and federal equal opportunity documents.

207. California Business and Professions Code Section 10240 et seq. requires that licensed brokers provide disclosures to consumers reflecting the maximum costs and expenses of making a loan including which also amount to a TILA violation if not made. These include
1. appraisal fees 2. escrow fees 3. title charges 4. notary fees 5. recording fees and investigation fees. 6. credit

208. A lender like a broker is required to disclose an itemization of the amount of money financed also known as a "good faith estimate." 12 Code of Federal Regulations 226.18, 19.

209. Borrowers must be provided with itemized disclosures, including: (1) annual percentage rate, (2) finance charge (3) amount financed (4) total payments and (5) payment schedule. 12 Code of Federal Regulations 226.23. Similarly, the appropriate Truth in Lending, Servicing Transfer, Adjustable Rate Booklet, Copy of Appraisal and Federal Equal Opportunity documents must be provided under 24 Code of Federal Regulations 3500.6(a).

210. A failure to make clear, conspicuous and accurate material lender disclosures violates the provisions of TILA.

211. The Subject Loan is a consumer credit transaction subject to the provisions of TILA. The Subject Loan transaction between Plaintiffs and said Creditors was a consumer loan transaction wherein credit was extended to Plaintiffs, which was secured by an interest purportedly held by said Creditors in the subject property.

212. Defendants AMN and RFC, Lenders for the Subject Loan, and WALMAR, Broker for the Subject Loan, are "creditors" as defined by 15 U.S.C. Section 1602 (Lenders and Broker will be referred to as "Creditors" for the purposes of this First Cause of Action).

213. As a consumer credit transaction, Creditors were required to provide Plaintiffs with mandatory Truth-in Lending disclosure statements and notice of the borrower's right to rescind, among many other disclosures. There is no evidence that Plaintiff received Broker's early consumer loan mortgage document disclosure within three (3) days from the day of Plaintiff's original loan application in violation of the Truth in Lending Act 15 U.S.C. Section 1601.

214. There is no evidence that Plaintiff received Lenders' required early disclosures, in violation of the Truth in Lending Act 15 U.S.C. Section 1601 given that Plaintiff's loan is a residential mortgage transaction subject to the Real Estate Settlement Procedures Act 12 U.S.C. Section 2602 et seq.

215. In the course of soliciting and executing the Subject Loan and/or extending other consumer credit, said Creditors in numerous instances have violated the

58

requirements of TILA and Regulation Z. Said violations include but are not limited to the following:

a. failing to make TILA disclosures in writing before consummation of a consumer credit transaction, in violation of Sections 121(a) and 128(b) (1) of TILA, 15 U.S.C. Sections 1601-1631 (a) and 1638 (b) (1), and Sections 226.17(a) and (b) and 226.18 of Regulation Z., 12 C.F.R. Section 226.17(a) and (b), 226.18, and 226.23 (a) (3), California Business and Professions Code Section 10240, 10248.3, 10241;

b. failing to make and deliver good faith estimates of the disclosures required by 15 U.S.C. Section 1601, 12 C.F.R. Section 226.19 (a), Section 226.18;

c. failing to disclose, or accurately disclose the following information:

i. the identity of the creditor making the disclosures, in violation of Section 128(a) (1) of TILA, 15 U.S.C. Section 1638(a) (1), and Section 226.18(a) of Regulation Z, 12 C.F.R. Section 226.18;

ii. the amount financed, in violation of Section 128(a) (2) of TILA, 15 U.S.C. Section 1638(a) (2), and Section 226.18(b) of Regulation Z, 12 C.F.R. Section 226.18(b) (c);

iii. the finance charge, in violation of Sections 106 and 128(a) (3) of TILA, 15 U.S.C. Section 1605 and 1638(a) (3), and Sections 226.4 and 226.18(d) of Regulation Z, 12 C.F.R. Section 226.4 and 226.18(d);

iv. the annual percentage rate, in violation of Sections 107 and 128 (a) (4) of TILA, 15 U.S.C. Section 1605-6 and 1638 (a) (3) (4), and Sections 226.18(e) and 226.22 of Regulation Z, 12 C.F.R. Section 226.18(e) and 226.22;

v. the payment schedule, in violation of Section 128(a) (6) of TILA, 15 U.S.C. Section 1638(a) (6), and Section 226.18(g) of Regulation Z, 12 C.F.R. Section 226.18(g);

vi. the total of payments, in violation of Section 128(a) (5) of TILA, 15 U.S.C. Section 1638(a) (5), and Section 226.18(h) of Regulation Z, 12 C.F.R. Section 226.18(h) l;

vii. whether or not a penalty may be imposed if the obligation is prepaid in full, in violation of Section 128(a) (11) of TILA, 15 U.S.C. Section 1638(a) (11), and Section 226.18(k) (1) of Regulation Z, 12 C.F.R. Section 226.18(k) (1);

viii. any dollar or percentage charge that may be imposed before maturity due to a late payment, other than a deferral or extension charge, in violation of Section 128(a) (10) of TILA, 15 U.S.C. Section 1638(a) (10), and Section 226.18 (1) of Regulation Z, 12 C.F.R. Section 226.18(1);

ix. the fact that the creditor has or will acquire a security interest in the consumer's principal dwelling, in violation of Section 128(a) (9) of TILA, 15 U.S.C. Section 1638(a) (9), and Section 226.18(m) of Regulation Z, 12 C.F.R. Section 226.18(m);

x. the failure of Creditors to provide initial disclosures to Plaintiff;

xi. making consumer credit disclosures that do not reflect the terms of the legal obligation between the parties, in violation of Section 226.17(c)(1) of Regulation Z, 12 C.F.R. Section 226.17(c)(1); and

216. By failing to disclose, or accurately disclose, material credit information, as described above, Creditors have engaged, and continue to engage, in deceptive acts or practices.

217. Records in connection with the Subject Loan indicate that Creditors extended credit to Plaintiff without regard for her ability to pay and falsified relevant income and appraisal documents to ensure approval of the Subject Loan.

218. The statute of limitations for a TILA claim is subject to equitable tolling upon the pleading of fraud. The doctrine of equitable tolling suspends the limitations period until the borrower discovers or had reasonable opportunity to discover the fraud or nondisclosures that form the basis of the TILA actions. Plaintiffs plead Defendants' fraud throughout this Complaint. Due to Defendants' fraudulent actions, the Statute of Limitations period has not yet expired.

219. As a result of these TILA violations, among others, Creditors are liable to Plaintiff in the amount of twice the finance charge, actual damages to be established at trial, and costs in accordance with 15 U.S.C. Section 1640. Plaintiff are also entitled to an order requiring Creditors to take all actions necessary to

terminate any security interest in the subject residence created under the Subject Loan and a declaration by this Court that the security interest is void; expungement of any foreclosure instruments, including without limitation, the Notice of Default and Notice of Trustee's Sale, relating to the Subject Loan from any public record; removal of any derogatory information reported to any credit reporting agency or credit reporting bureau relating to the Subject Loan; the return to Plaintiff of any money given by Plaintiff to anyone, including said Creditors in connection with the Subject Loan; statutory damages; costs and reasonable attorney's fees and such other relief as this Court deems just and proper.

220. Moreover, said Creditors' conduct was willful, malicious and outrageous and therefore punitive damages are warranted and demanded.

221. As a result of said Creditors' misconduct, Plaintiff is entitled to declaratory and injunctive relief preventing said Creditors from taking any action to collect on the Subject Loan and/or to foreclose upon the subject property, and/or to transfer the subject property.

1.  In violation of the federal Truth in Lending Act, AMN extended credit to Plaintiff without regard to the consumer's repayment ability as of the time of the loan consummation.

2.  Defendants, acted in concert with AMN to extend this credit.

3.  AMN acted without regard to repayment ability of Plaintiff.

4.  AMN and WALMAR overstated the assets, income, collateral, or other financial information and committed forgery in order to qualify Plaintiff for the adjustable rate mortgage in the amount of $556,000.00 for the first lien and $69,500.00 for the junior lien.

5.  Defendants was aware of this overstatement .

6.  Defendants concealed this overstatement from Plaintiff.

7. AMN failed to disclose certain finance charges on the HUD-1 statement that were to be imposed as a part of the extension of credit in the form of the mortgage and/or failed to explain how those charges were to be determined.

8. Neither RFC nor AMN disclosed the payments made to and received by AMN for its pre-selling and holding the mortgage for RFC.

9. This fee arrangement was paid in the form of an unlawful yield spread premium, undisclosed to the borrower, but paid for by her in the form of higher payments or interest over the life of the loan.

10. Defendants RFC and AMN concealed these facts from Plaintiff

11. This concealment prevented Plaintiff from readily discovering the undisclosed acts.

12. Plaintiff was duly diligent in ascertaining these violations.

**SECOND CAUSE OF ACTION**
**VIOLATION OF CALIFORNIA RESIDENTIAL MORTGAGE LENDING ACT CALIFORNIA FINANCIAL CODE SECTION 50000 ET AL (AGAINST ALL DEFENDANTS)**

222. Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

223. At all times herein mentioned, Plaintiff is informed and believes that the

AMN and WALMAR failed to execute and provide copies of a Written Loan Brokerage Agreement to Plaintiff in violation of California Financial Code Section 50000 et seq.

224. The statute of limitations for this Second Cause of Action is subject to equitable tolling upon the pleading of fraud. Due to Defendants' fraudulent actions, the Statute of Limitations period has not yet expired.

225. As a result of the said Defendants' acts, Plaintiff has suffered damages in an amount to be proven at trial.

1. Defendant AMN and WALMAR failed to provide a Good Faith Estimate in the time and manner as required by the Real Estate and Settlement Procedures Act.

2. Defendant AMN's conduct as holding the pre-sold loan for RFC amounts to acting as a straw man for which the borrower received no value.

3. Defendants' misconduct was concealed from Plaintiff, which prevented her from readily discovering the misconduct, which she was duly diligent in attempting to ascertain.

**THIRD CAUSE OF ACTION
VIOLATION OF CALIFORNIA CIVIL CODE SECTION 1916.7(10)
(AGAINST ALL DEFENDANTS)**

226. Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

227. California Civil Code Section 1916.7 provides that a lender must provide a consumer with appropriate disclosures regarding the consumer's adjustable rate loan. These disclosures include but are not limited to:

a. term of the loan;
b. payment adjustments;
c. monthly installments;
d. interest rate changes;
e. prepayment of the loan; and
f. written disclosure which includes the appropriate index within which the loan interest will be measured by.

228. At all times herein mentioned, Plaintiff is informed and believes and thereon allege that WALMAR and AMN violated California Civil Code Section 1916.7 (10) (c) by failing to provide Plaintiff with a disclosure regarding adjustable rate mortgages.

229. Due to WALMAR and AMN's violation of California Code Section 1916.7 and TILA, Plaintiff was precluded from shopping around for a more competitively priced loan, was deprived of an opportunity to make an informed decision as to which loan product if any was suitable for her, and was not able to reasonably decipher terms in her loan contract.

230. Pursuant to California Civil Code Section 1916.7, the interest rate of an adjustable-payment, adjustable-rate mortgage loan must correspond directly to the movement of an index which is selected but not controlled by the lender.

231. At all times herein mentioned, Plaintiff is informed and believes and thereon allege that WALMAR and AMN intentionally restricted the downward adjustment of Plaintiff's adjustable-rate mortgage loan regardless of the downward movement of the index.

232. WALMAR and AMN's restriction of the downward adjustment regardless of the downward movement of the index violates California Civil Code Section 1916.7 10 (c) II.

233. Pursuant to California Civil Code Section 1916.7, a lender is precluded from charging a consumer a prepayment penalty if the borrowers prepay their loan in whole or in part.

234. At all times herein mentioned. Plaintiff is informed and believes and thereon alleges that WALMAR and AMN included a prepayment penalty in Plaintiff's Adjustable Rate Loan in violation of California Civil Code Section 1916.7 (a) (8).

235. As a result of the WALMAR and AMN's acts, (1) Plaintiff has suffered damages in an amount to be proven at trial and (2) Plaintiff is entitled to attorney's fees, costs and statutory damages consisting of double the correctly calculated finance charge.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF EQUAL CREDIT OPPORTUNITY ACT**
**15 U.S.C. SECTION 1691**
**(AGAINST ALL DEFENDANTS)**

236. Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

237. At all times herein mentioned, Plaintiff is informed and believes and thereon alleges that the WALMAR and AMN violated the Equal Credit Opportunity Act by failing to make Plaintiff's credit scores available to her to ensure that they are offered the same terms of credit issuance that other borrowers of equal characteristics are entitled to.

238. Plaintiffs upon information and belief assert that as a result of WALMAR and AMN's failure to disclose, Plaintiff was assessed higher credit charges than similarly situated borrowers each time Plaintiff made a loan payment. Plaintiff thus suffered continuing discriminatory practices.

239. As a result of the Defendant's acts, Plaintiff has suffered damages in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**VIOLATION OF THE REAL ESTATE SETTLEMENT PRACTICES ACT**
**12 U.S.C. SECTION 2601**
**(AGAINST ALL DEFENDANTS )**

240. Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

241. The Subject Loan is a mortgage loan subject to the provisions of the Real Estate Settlement Procedures Act set forth at 12 U.S.C. Section 2605 et seq. ("RESPA").

242. RESPA provides that in a residential mortgage a creditor shall make good faith estimates of loan disclosures before consummation of a loan or shall deliver or place them in the mail not later than three business days after the creditor receives the consumer's written application whichever is earlier. The purpose of RESPA is to ensure that borrowers are provided with a Standard Good Faith Estimate that clearly discloses key loan terms and closing costs.

243. A violation of RESPA is also made unlawful under California state law by Financial Code Section 50505, which states, "Any person who violates any provision of RESPA or any regulation promulgated thereunder, violates this division [California Residential Mortgage Lending Act]."

244. WALMAR and AMN violated RESPA at the time of closing the Subject Loan by failing to properly and accurately comply with disclosure requirements.

245. WALMAR and AMN failed to disclose all affiliated business arrangements to Plaintiff.

246. The statute of limitations for this Fourth Cause of Action is subject to equitable tolling upon the pleading of fraud. Due to Defendants' fraudulent actions, the Statute of Limitations period has not yet expired.

247. As a direct and proximate result of WALMAR and AMN's failure to comply with RESPA, Plaintiff has suffered and continues to suffer damages and costs of suit. Plaintiff is entitled to recover statutory damages, actual damages in an amount to be determined at trial, costs and reasonable attorney's fees incurred herein.

## SIXTH CAUSE OF ACTION
## VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200, et seq.
## (AGAINST ALL DEFENDANTS)

248. Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

249. The instant claim is predicated on the generally applicable duty of any contracting party to not omit material facts, and on the duty to refrain from unlawful, unfair and deceptive business practices. Plaintiff hereby seeks to enforce a general proscription on unfair business practices and the requirement to refrain from deceptive conduct. The instant claim is predicated on duties that govern anyone engaged in any business and anyone contracting with anyone else.

250. Plaintiff is a consumer who applied for a mortgage loan through AMN. The Loan Documents were pre-approved by RFC and, in each case, the Loan Documents failed to disclose and omitted material information that was known only to RFC and other participants in the scheme, and that could not reasonably have been discovered by Plaintiff set forth in the preceding causes of action.

251. Based on the Material Omissions and the other partially true statements and failures to disclose in the Loan Documents as alleged herein, Plaintiff agreed to finance her home through the subject Option ARM loan, and has actually been harmed.

252. RFC pre-approved the Loan Documents and would only purchase Option ARM loans from AMN that complied with the policies and procedures set forth in the RFC Client Guide. The Loan Documents were designed to mislead Plaintiff into believing that if she made payments based on the payment schedules provided to her before she entered into the subject loan, the principal balance would be reduced with each payment when it actually increased with each payment.

253. RFC pre-approved the Note, which set forth a teaser rate that was only in effect for 30 days and the TILDS which set forth payments based upon those teaser rates for the first three to five years of the loan. RFC knew, but the Loan Documents did not clearly disclose that these listed low payments in the TILDS were predicated on an interest rate which would not, in fact, exist after the first thirty days. RFC further knew, but the Loan Documents did not disclose, that negative amortization was *guaranteed* if Plaintiff made these listed low payments. RFC further knew, but the Loan Documents did not disclose, that the listed

payments set forth in the TILDS were calculated such that, if the payments were made, borrowers actually would be paying off 115% of the original principal balance. This information was material to any reasonable borrower, and the omission of such material information would cause a reasonable borrower to believe that the fully amortizing payments shown on the TILDS were in fact those payments necessary to pay off the balance of the original amount financed (*i.e.*, the original principal balance less principal payments made on account of that balance), rather than 115% of the amount financed.

254. RFC provided a stream of funding to AMN that enabled AMN to originate the subject Option ARM loans. As AMN did not fund the loans it originated, it relied on warehouse lenders such as RFC to provide warehouse lines of credit that it used to originate Option ARM loans. RFC also provided day-to-day financing to AMN under the Client Contract between RFC and AMN. Pursuant to that agreement, RFC agreed to purchase Option ARM loans from AMN provided that AMN complied with RFC's policies and procedures as set forth in the RFC Client Guide.

255. By engaging in the above-described acts and practices, Defendants has committed one or more acts of unfair competition within the meaning of UCL.

256. Defendants misconduct, as alleged herein, gave it an unfair competitive advantage over their competitors.

257. Unlawful: The unlawful acts and practices of Defendants alleged above constitute unlawful business acts and/or practices within the meaning of UCL. Defendants unlawful business acts and/or practices as alleged herein violated the Federal Trade Commission Act, 15 U.S.C. § 45, *et seq.*, because at all times relevant, Defendants misconduct and omissions alleged herein caused: i) substantial injury to Plaintiff and the public, ii) had no countervailing benefit to consumers or to competition that could possibly outweigh this substantial injury; and iii) caused injury that could not have been avoided or even discovered by ordinary consumers, because it resulted from Defendants failure to disclose and/or omission of material information that only Defendants knew or could have known.

258. Plaintiff has incurred substantial financial injury because she has lost substantial equity in her home due to the Option ARM loan scheme. There is no countervailing benefit to consumers or competition that outweighs this substantial injury. Plaintiff could not have avoided the substantial injury because RFC had exclusive knowledge of the material facts but actively concealed these material

facts from Plaintiff through The Material Omissions. Thus, Defendants acts and/or practices as alleged herein were unlawful within the meaning of Bus. & Prof. Code 17200, *et seq*.

259. Unfair: Defendants misconduct as alleged herein was unfair because it offends established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

260. Defendants misconduct as alleged herein was unfair because it is contrary to the public policy expressed in the UCL to protect consumers from ongoing wrongful business conduct in whatever context such activity may occur.

261. Defendants' misconduct as alleged herein was unfair because (i) it caused Plaintiff substantial injury by, among other things, causing her to lose equity in her home, (ii) there were absolutely no countervailing benefits to consumers or to competition that could possibly outweigh this substantial injury, and (iii) this injury could not have been avoided or even discovered by the consumers, because it resulted from Defendants' failure to disclose and/or omission of material information in the Loan Documents that only Defendants and other participants in the scheme knew or should have known.

262. Plaintiff has been substantially injured because she has lost substantial equity in her home due to the Option ARM loan scheme. Defendants' misconduct as alleged herein is contrary to the public policy expressed in the UCL because the Loan Documents approved by Defendants failed to disclose important material facts concerning Plaintiff's Option ARM loan, including that negative amortization was absolutely guaranteed to occur if Plaintiff made payments according to the payment schedule provided in the Note and TILDS. There is no countervailing benefit to consumers or competition that outweighs the substantial injury Plaintiff has suffered. Plaintiff could not have avoided the substantial injury because Defendants had exclusive knowledge of the material facts but actively concealed these material facts from Plaintiff through The Material Omissions. Thus, Defendants' acts and/or practices as alleged herein were unfair within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq*.

263. Fraudulent: Through its omissions and/or acts, practices and non-disclosures as alleged herein, RFC pre-approved the Loan Documents that AMN used to originate the subject Option ARM loans in order to deceive the public through The Material Omissions leading to consumer confusion, including, but not limited to the fact that, for the first three to five years, the loans were negatively amortizing

loans. Said omissions, acts, practices and non-disclosures as alleged herein therefore constitute fraudulent business acts and/or practices within the meaning of UCL.

264. Defendants' conduct, as fully described above, was designed to and was therefore likely to deceive members of the consuming public, and at all times, Defendants' participation in the scheme alleged herein that allowed those documents to be delivered to Plaintiffs, have been and continue to be unfair, fraudulent, untrue and/or deceptive.

265. As a direct and proximate result of the aforementioned omissions, acts and practices, Defendants received monies and continue to hold the monies expended by Plaintiff similarly situated who purchased the Option ARM loan as described herein.

266. The unfair, deceptive and/or fraudulent business practices of Defendants, as fully described herein, present a continuing threat to members of the public to be misled and/or deceived by the Loan Documents at issue, as described herein. Plaintiff and the general public have no other remedy of law that will prevent Defendants misconduct as alleged herein from occurring and/or reoccurring in the future.

267. Plaintiff is informed and believes, and thereon alleges, that WALMAR, RFC and AMN, committed unlawful, unfair and/or fraudulent business practices, as defined by California Business and Professions Code Section 17200, by engaging in unlawful, unfair, and fraudulent business practices as alleged throughout this complaint. This includes but is not limited to predatory lending practices such as:

a. Failure to exercise due diligence regarding underwriting standards and Plaintiff's ability to repay the adjustable rate mortgage.

b. Offering Plaintiff an adjustable rate mortgage despite Plaintiff not being able to afford the loan under a debt ratio analysis.

c. Offering Plaintiff an adjustable rate mortgage despite Plaintiff not being able to afford the loan under a stated income analysis.

d. Failure to use a realistic means test to determine whether Plaintiff could afford the adjustable rate mortgage at the qualified initial rate and fully indexed and amortized rate.

e. Failure to verify Plaintiff's income with income verification documents.

f. Overstating Plaintiff's income, assets and debts on the loan documents.

g. Failure to demand Plaintiff's proof of employment.

h. Failure to perform a Debt and Real Income analysis to determine if Plaintiff could afford her adjustable rate mortgage loan payments.

i. Stating the Plaintiff's income and assets in the loan application preventing a final determination as to whether Plaintiff qualified for the adjustable rate mortgage.

j. Placing Plaintiff in a loan whereby it was likely that she would default or incur bankruptcy as a result of the loan and it was reasonably foreseeable that such would occur.

k. Placing Plaintiff in a loan that they could not afford to pay.

l. Placing Plaintiff in a loan with no tangible benefit to her.

m. Failure to provide Plaintiff with a lender broker agreement.

n. Engaging in aggressive marketing of credit to prospective borrowers like Plaintiff who cannot afford credit on the terms being offered.

o. Extending credit to Plaintiff based on the liquidation value of the collateral rather that Plaintiff's ability to pay.

p. Requiring Plaintiff to pay interest rates, fees and/or other charges not justified by marketplace economics in place at the time that the adjustable rate mortgage was created.

q. Approving Plaintiff's loan with a high debt ratio without determining Plaintiff's ability to repay the loan.

r. Approving Plaintiff for an adjustable rate mortgage where she has little or no equity in her home precluding her from refinancing when the rate adjusts because of Plaintiff's lack of equity.

s. Approving Plaintiff for an adjustable rate mortgage loan where she qualified at the initial teaser fixed rate only.

t. Marketing the adjustable rate mortgage to Plaintiff and other borrowers to avoid disclosure of all material terms.

u. Utilizing a stated-income loan application for Plaintiff when she had the ability to obtain income verification documents.

v. Failure to use due diligence in underwriting the loan.

w. Offering borrowers such as Plaintiff a loan program materially more expensive in terms of fees, charges, and/or interest rates than alternative financing for which the borrower qualifies.

x. Incorporating pre-dispute, mandatory, binding arbitration clauses which limit the rights of borrowers such as Plaintiff to seek relief through the judicial process for any and all claims and defenses the borrower may have against the mortgage lender, mortgage broker or other party involved in the loan transaction.

y. Badgering homeowners such as Plaintiff with advertisements and solicitations that tout the benefits of consolidating bills into a mortgage loan increasing the risk of foreclosures and length of time to pay off the debt.

z. Engaging in equity stripping by removing the equity from Plaintiff's home through repeated refinances.

aa. Violation of RESPA at the time of closing the Subject Loan by failing to properly and accurately comply with disclosure requirements.

bb. Failure to disclose the relationship between the mortgage broker and lender.

cc. Committing forgery and falsifying income on Plaintiff's Loan application.

268. Broker and Lenders' practices violate TILA Section 226.34 by failing to carefully consider consumers repayment ability and by failing to make the appropriate disclosures under TILA and the Real Estate Settlement Practices Act.

269. As a result of Defendants' actions, Plaintiff is entitled to TILA and RESPA damages. Also, Plaintiffs are entitled to actual damages pursuant to California Business and Professions Code Section 17200.

270. As a direct result of Defendants' acts, Plaintiff has incurred actual damages consisting of mental and emotional distress, nervousness, grief, embarrassment, loss of sleep, anxiety, worry, mortification, shock, humiliation, indignity, pain and suffering, and other injuries.

271. Plaintiff has incurred out of pocket monetary damages.

272. Plaintiff continues to incur monetary damages.

273. Plaintiff will incur the loss of her personal residence if a non-judicial foreclosure is allowed to proceed.

274. Each of Defendants' harassing acts were so willful, vexatious, outrageous, oppressive, and maliciously calculated enough, so as to warrant statutory penalties and punitive damages. Plaintiffs request rescission of the foreclosure.

275. As a direct and proximate result of Defendants' unfair and/or fraudulent conduct alleged herein, Plaintiff and others have lost hundreds of thousands if not millions of dollars of equity in their homes. Plaintiff is a direct victim of Defendants' unlawful conduct, and has suffered injury in fact, and has lost money as a result of Defendants' unfair competition.

276. WHEREFORE, Plaintiff is entitled to equitable relief, including restitution, restitutionary disgorgement of all profits accruing to Defendants because of its unfair, fraudulent, and deceptive acts and/or practices, attorney's fees and costs,

declaratory relief, and a permanent injunction enjoining Defendants from its unfair, fraudulent and deceitful activity.

**SEVENTH CAUSE OF ACTION**
**Violation Of Civil Code §1572**
**(AGAINST ALL DEFENDANTS)**

277.   Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

278.   The misrepresentations by Defendants' and/or Defendants' predecessors, failures to disclose, and failure to investigate as described above were made with the intent to induce Plaintiff to obligate herself on the Loan in reliance on the integrity of Defendants and/or Defendants' predecessors.

279.   Plaintiff is an unsophisticated customer whose reliance upon Defendants and/or Defendants' predecessors was reasonable and consistent with the Congressional intent and purpose of *California Civil Code § 1572* enacted in 1872 and designed to assist and protect consumers similarly situated as Plaintiff in this action.

280.  As an unsophisticated customer, Plaintiff could not have discovered the true

nature of the material facts on her own.

281.  The  accuracy  by  Defendants  and/or  Defendants'  predecessors  of

representation is important in enabling consumers such as Plaintiff to compare

market lenders in order to make informed decisions regarding lending transactions

such as a loan.

282.  Plaintiff was ignorant of the facts which Defendants and/or Defendants'

predecessors misrepresented and failed to disclose.

283.  Plaintiff's reliance on Defendants and/or Defendants' predecessors was a

substantial factor in causing her harm.

284.  Had the terms of the Loan been accurately represented and disclosed by

Defendants and/or Defendants' predecessors, Plaintiff would not have accepted the

Loan nor been harmed.

285. Had Defendants and/or Defendants' predecessors investigated Plaintiff's financial capabilities, they would have been forced to deny Plaintiff on this particular loan.

286. Defendants and/or Defendants' predecessors conspired and agreed to commit the above- mentioned fraud.

287. As a proximate result of Defendants and or Defendants' predecessors fraud, Plaintiff has suffered damage in an amount to be determined at trial.

288. The conduct of Defendants and/or Defendants' predecessors as mentioned above was fraudulent within the meaning of *California Civil Code § 3294(c)(3)*, and by virtue thereof Plaintiff is entitled to an award of punitive damages in an amount sufficient to punish and make an example of the Defendants.

**EIGHTH CAUSE OF ACTION**
**INTENTIONAL MISREPRESENTATION**
**(AGAINST ALL DEFENDANTS)**

289. Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

290. As alleged herein, Broker and Lender have made several representations to Plaintiff regarding material facts concerning the Subject Loan and the subject property. Broker and Lender furthermore fraudulently and with intent concealed

76

and omitted key terms of the Subject Loan agreement, including but not limited to the nature of the adjustable interest rate.

291. Broker and Lender representations concerning the Subject Loan and the subject property were material to Plaintiff's decision to finance the subject property and make monthly payments in connection with the Subject Loan, and these representations were false.

292. Broker and Lender made the representations to Plaintiff with knowledge of their falsity or with reckless disregard for their truth or falsity.

1. During the time of the loan application, Defendants misrepresented to Plaintiff (a) her ability to repay the loan and (b) her qualifications for the loan in the amount of $556,000.00.

2. During the time of the closing, Defendants misrepresented to Plaintiff (a) her ability to repay the loan; (b) her qualifications for the loan in the amount of $556,000.00; (c) the identity of the recipients of fees to be paid on the HUD-1; (d) the fees that AMN was paid by RFC; (e) that her loan was pre-sold to RFC and (f) that the price of her loan was based on an inflated appraisal report.

3. Defendants made these misrepresentations knowing they were false, with the purpose of inducing Plaintiff to obtain credit from AMN.

4. Defendants had an obligation to disclose the truth.

5. Plaintiff relied on these misrepresentations and had the right to do so.

6. These misrepresentations denied Plaintiff the opportunity to find cheaper credit and/or a non-predatory loan. As a result, she has been

injured in that she paid more for the credit she was defrauded into

obtaining and that her predatory loan was the proximate cause of her

pending foreclosure.

## NINTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT
## (AGAINST ALL DEFENDANTS)

293. Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

294. Defendant Broker and Lender owed a legal duty to disclose certain documents and facts related to the Subject Loan.

295. Broker and Lender fraudulently and with intent concealed and omitted key terms of the Subject Loan agreement, including but not limited to the nature of the adjustable interest rate. Considering Broker and Lender's bargaining position and knowledge of the nature of the adjustable rate mortgage, Plaintiff could not reasonably obtain the concealed information from third party sources.

296. Defendants' intentional omissions concerning the Subject Loan and the subject property were material to Plaintiff's decision to finance the subject property and make monthly payments in connection with the Subject Loan.

297. Broker and Lender concealed information regarding the Subject Loan with knowledge and the intent to deceive Plaintiff and to induce them into consummating the Subject Loan.

298. Plaintiff was induced to her detriment to proceed to closing on the Subject Loan.

299. But for Broker and Lender's omissions, Plaintiff would not have consummated the Subject Loan.

300. As a result of Broker and Lender's fraudulent concealment and omissions, Plaintiff has been injured in an amount in excess of this Court's jurisdictional minimum, which amount will be proven at trial.

301. Broker and Lender's conduct was willful, oppressive and fraudulent, and an award of punitive damages is justified in an amount to be determined at trial.

302. As a result of the above-alleged misconduct, Plaintiff has been required to commence and prosecute this action, and may incur attorney's fees and costs in an amount to be proven at trial. Pursuant to the controlling contractual document(s) and/or applicable law, Plaintiff is entitled to recover their costs and reasonable attorneys' fees.

1. During the time of the loan application, Defendants misrepresented to Plaintiff (a) her ability to repay the loan and (b) her qualifications for the loan in the amount of $556,000.00.

2. During the time of the closing, Defendants misrepresented to Plaintiff (a) her ability to repay the loan; (b) her qualifications for the loan in the amount of $556,000.00; (c) the identity of the recipients of fees to be paid on the HUD-1; (d) the fees that AMN was paid by RFC; (e) that her loan was pre-sold to RFC and (f) that the price of her loan was based on an inflated appraisal report.

3. Defendants made these misrepresentations knowing they were false, with the purpose of inducing Plaintiff to obtain credit from AMN.

4. Defendants had an obligation to disclose the truth.

5. Plaintiff relied on these misrepresentations and had the right to do so.

6.  These misrepresentations denied Plaintiff the opportunity to find cheaper credit and/or a non-predatory loan.  As a result, she has been injured in that she paid more for the credit she was defrauded into obtaining and that her predatory loan was the proximate cause of her pending foreclosure.

**TENTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**
**(AGAINST ALL DEFENDANTS)**

303. Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

304. As alleged herein, Broker and Lender have made several representations to Plaintiff regarding material facts concerning the Subject Loan and the subject property.
Broker and Lender furthermore fraudulently and with intent concealed and omitted key terms of the Subject Loan agreement, including but not limited to the nature of the adjustable interest rate.

305. Broker and Lender's representations concerning the Subject Loan and the subject property were material to Plaintiff's decision to refinance the subject property and make monthly payments in connection with the Subject Loan, and these representations were false.

306. Broker and Lender made the representations to Plaintiff with knowledge of their falsity, with reckless disregard for their truth or falsity, or without a reasonable basis to believe that they were true and with the knowledge or expectation that Plaintiff would rely on the representations.

307. Broker and Lender made the representations to Plaintiff with the knowledge and intent that Plaintiff would rely on the representations and with the intent to deceive Plaintiff and to induce them into consummating the Subject Loan.

308. In reasonable and justifiable reliance on Broker and Lender's representations, and without knowledge of their falsity, Plaintiff was induced to her detriment to proceed to closing on the Subject Loan.

309. But for said Defendants' representations, Plaintiff would not have consummated the Subject Loan.

310. As a result of said Defendants' intentional and fraudulent misrepresentations and Plaintiffs' reasonable and justifiable reliance thereon, Plaintiffs have been injured in an amount in excess of this Court's jurisdictional minimum, which amount will be proven at trial.

311. Defendants' conduct was willful, oppressive and fraudulent, and an award of punitive damages is justified in an amount to be determined at trial.

312. As a result of the above-alleged misconduct, Plaintiff has been required to commence and prosecute this action, and may incur attorney's fees and costs in an amount to be proven at trial. Pursuant to the controlling contractual document(s) and/or applicable law, Plaintiff is entitled to recover their costs and reasonable attorneys' fees.

    1. During the time of the loan application, Defendants misrepresented to Plaintiff (a) her ability to repay the loan and (b) her qualifications for the loan in the amount of $556,000.00.

    2. During the time of the closing, Defendants misrepresented to Plaintiff (a) her ability to repay the loan; (b) her qualifications for the loan in the amount of $556,000.00; (c) the identity of the recipients of fees to be paid on the HUD-1; (d) the fees that AMN was paid by RFC; (e) that her loan was pre-sold to RFC and (f) that the price of her loan was based on an inflated appraisal report.

3.  Defendants made these misrepresentations knowing they were false, with the purpose of inducing Plaintiff to obtain credit from AMN.

4.  Defendants had an obligation to disclose the truth.

5.  Plaintiff relied on these misrepresentations and had the right to do so.

6.  These misrepresentations denied Plaintiff the opportunity to find cheaper credit and/or a non-predatory loan.  As a result, she has been injured in that she paid more for the credit she was defrauded into obtaining and that her predatory loan was the proximate cause of her pending foreclosure.

**ELEVENTH CAUSE OF ACTION**
**Breach of Contract**
**(AGAINST ALL DEFENDANTS)**

313. Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

314. On December 2, 2006, Plaintiffs executed a note, a deed of trust and other related documents to borrow $556,000.00, secured by the subject property (hereinafter the "Subject Loan"). The terms of the loan were memorialized in a promissory note which was in turn secured by a deed of trust on the subject property. The deed of trust identified AMN as the lender. The deed of trust identified First American as the Title Insurer/Escrow Holder/Trustee. The deed of trust identified WALMAR as the mortgage broker. The deed of trust further identified MERS as the nominal beneficiary.

315. Plaintiffs fully and faithfully performed all of the covenants, terms, conditions, and obligations required under the loan agreement for the Subject Loan on her part to be performed.

316. Broker and Lenders breached their agreement by, among other things, failing to provide Plaintiffs with required disclosures.

317. As a result of said Broker and Lenders' breach of the Subject Loan agreement in connection with the Subject Loan, Plaintiffs' home has been foreclosed upon.

318. As a direct and proximate result of Broker and Lenders' breaches of the Subject Loan agreement, Plaintiffs have suffered damages in an amount in excess of this Court's jurisdictional minimum, which amount will be proven at trial.

319. Plaintiffs further seeks, as a result of said defendants' breaches of the Subject Loan agreement, restitution, disgorgement of sums wrongfully obtained, costs of suit, reasonable attorney's fees, and such other and further relief as the Court may deem just and proper.

320. The Plaintiff's loan agreement set forth conditions under which the deed of trust could be assigned or transferred.

321. Defendants violated those conditions in successive, illegal attempts to assign the Trust Deed to third parties.

322. As a proximate result of the Defendants' breaches, the Plaintiff has suffered compensatory damages in an amount to be proven at trial.

**TWELFTH CAUSE OF ACTION**
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(AGAINST ALL DEFENDANTS)**

323. Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

324. California law inserts an implied covenant of good faith and fair dealing into every contract. The documents in connection with the Subject Loan including, without limitation, the Subject Loan agreement, promissory note and deed of trust, all therefore include an implied covenant of good faith and fair dealing.

325. A party to a contract breaches the implied covenant of good faith and fair dealing by interfering with or failing to cooperate with the plaintiff in the performance of the contract.

326. At all times relevant herein, Broker and Lenders agreed to act in good faith and deal fairly with Plaintiffs upon entering into the Subject Loan and accepted payments from Plaintiffs.

327. Broker and Lenders breached the implied covenant of good faith and fair dealing by:
a. Failing to disclose key terms, including but not limited to the nature of the adjustable interest rate.
b. Failing to reasonably evaluate Plaintiffs' ability to pay or perform.
c. Providing Plaintiffs the Subject Loan with knowledge of Plaintiffs' inability to pay or perform.

328. Plaintiff is informed and believes that Defendants have profited from the Subject Loan transaction with Plaintiff and will profit from non-performance of the Subject Loan.

329. Plaintiff, on information and belief, alleges that Broker and Lenders executed the Subject Loan with disregard for Plaintiff's ability to perform. Defendants, beyond failing to cooperate with Plaintiff's performance, instead intended for or anticipated Plaintiff's nonperformance. Broker and Lenders, in bad faith, entered the Subject Loan in anticipation of non-performance and foreclosure.

330. Plaintiff is informed and believes, and thereon alleges, that Defendants have a pattern and practice of similar bad faith conduct toward other borrowers in similar situations.

331. The statute of limitations for this Twelfth Cause of Action is subject to equitable tolling upon the pleading of fraud. Due to Defendants' fraudulent actions, the Statute of Limitations period has not yet expired.

332. As a proximate result of Defendants' breaches of the covenant of good faith and fair dealing alleged herein, Plaintiffs have suffered damages, incurred attorneys' fees and costs, emotional distress and other economic losses and damages in an amount in excess of this Court' jurisdictional minimum, which amount will be proven at trial.

333. Defendants pursued said course of conduct intentionally and maliciously and in conscious disregard of the rights of Plaintiffs and their economic interests. Further Defendants' actions were made with the intent to intimidate, vex and harass Plaintiffs, so as to discourage them from pursuing their rights under the Subject Loan. In order to deter such conduct or said defendants in the future and to prevent repetition thereof as a practice, by way of punishment and as example. Plaintiffs pray that exemplary damages be awarded according to proof at trial pursuant to California Civil Code Section 3294.

85

334. Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement. This implied covenant of good faith and fair dealing requires that no party will do anything that will have the effect of impairing, destroying, or injuring the rights of the other party to receive the benefits of their agreement. The covenant implies that in all contracts each party will do all things reasonably contemplated by the terms of the contract to accomplish its purpose. This covenant protects the benefits of the contract that the parties reasonably contemplated when they entered into the agreement.

335. Alternatively, if the note and deed of trust was validly and properly assigned to the Defendants, the Defendants did not act in good faith and did not deal fairly with the Plaintiff in connection with the note and deed of trust when they: (1) Illegally attempted to transfer the deed of Trust by assignments; (2) back dated documents; (3) failed to notarize the Notice of Default and Election to sell; (4) failed to notarize both Notice of Trustee's Sale documents;

336. The Defendants enjoyed substantial discretionary power affecting the rights of the Plaintiff during the events alleged in this Complaint. They were required to exercise such power in good faith.

337. The Defendants engaged in such conduct to drive the Plaintiff into foreclosure so that they could acquire the Subject Property. These actions were a bad faith breach of the contract between the Plaintiff and the Defendants which show that they had no intention of performing the contract, consisting of the original note and deed of trust, in good faith.

338. As a result of the Defendants' breaches of this covenant, the Plaintiff has suffered general and special damages in an amount to be determined at trial.


**THIRTEENTH CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(AGAINST ALL DEFENDANTS)**

339. Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

340. Broker and Lender offered their services as agents for the purpose of providing Plaintiffs with the Subject Loan. As such, these Defendants were the agents of Plaintiff.

341. Pursuant to the agreement to refinance the subject property and obtain the Subject Loan, Plaintiff agreed to pay a commission from the proceeds of the loan.

342. Broker and Lender by and through their agents, owed a fiduciary duty to Plaintiff to act primarily for their benefit, to act with proper skill and diligence, and not to make a personal profit from the agency at the expense of its principal.

343. As Plaintiff's agents, Broker and Lender owed a duty of loyalty and duty to deal fairly with Plaintiff at all times.

344. Broker and Lender willfully and intentionally breached their fiduciary obligations and their duty of loyalty to Plaintiff by obtaining the Subject Loan with unfavorable terms and for a self-serving purpose, knowing Plaintiff did not have the financial means to ultimately make monthly payments in connection with the Subject Loan. Further, Defendants breached their fiduciary duty and duty of loyalty by not disclosing to Plaintiff, as required by federal law and state law, all adverse consequences of the Subject Loan, by securing an undisclosed profit for the sale and servicing of the Subject Loan in violation of TILA and RESPA, among other statutes, and by engaging in unfair business practices.

345. As a direct and proximate result of Broker and Lender's breaches as alleged herein, Plaintiff has been damaged and is entitled to actual damages.

346. Broker and Lender's willful, oppressive, intentional and malicious breaches of fiduciary duty authorize the imposition of exemplary damages pursuant to California Civil Code Section 3294.

**FOURTEENTH CAUSE OF ACTION**
**Fraudulent Omissions**
**(AGAINST ALL DEFENDANTS)**

347. Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

348. Under California law, the Loan Documents' partial representations that omitted material facts, created a duty to disclose all material facts concerning Plaintiff's Option ARM loan. Thus, the partial representations in the Loan Documents created a duty to disclose to Plaintiff that: (i) the low interest rate in the Note was only available for thirty days if at all; (ii) the monthly payment amounts for the first three to five years provided to Plaintiff on the TILDS were insufficient to pay both principal and interest; (iii) negative amortization was absolutely certain to occur if Plaintiff made payments according to the payment schedule provided in the Loan Documents; and that (iv) loss of equity and/or loss of Plaintiff's residence was certain to occur if Plaintiff made payments according to the payment schedule.

349. The Note at issue states: "I will make a payment every month" [and] "I will make these payments every month until I have paid all the *Principal and Interest* and any other charges described below that I may owe under this Note." (emphasis added). The Note then states, while referencing the Payment Cap provision, that "[t]his Payment Cap applies only to the *Principal and Interest* payment ..." (emphasis added). And, under the heading "BORROWERS FAILURE TO PAY AS REQUIRED," the Note state "[t]he amount of the charge will be 5.000% of my overdue payment of *Principal and Interest*." (emphasis added). These partial representations failed to disclose that the payment amounts prescribed in the Loan Documents were certain to result in negative amortization. Had the Loan Documents disclosed this information, Plaintiff would not have purchased the loan.

350. The Note further states: "For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal, and interest will accrue on the amount of this difference at the interest required by Section 2." However, the Loan Documents failed to disclose the material fact that the payment schedules in the TILDS could not possibly cover the amount of interest due under any conceivable index rate plus the margin after the first thirty days. To be accurate and complete, the Notes should have disclosed that if the borrower followed the payment schedules, the monthly payments would not cover the amount of interest due and negative amortization would occur. Had the Loan Documents disclosed this information, Plaintiff would not have purchased the loans.

351. The Note further states, "my Minimum Payment could be less than or greater than the amount of the amount of the interest portion of the monthly payment..." (emphasis added). And, under "Payment Options" the Notes state: "Lender may

provide me with up to three (3) additional payment options that are greater than the Minimum Payment...." However, the so called "Payment Options" that the lender "may provide" were not disclosed to Plaintiff before they entered into the subject Option ARM loan. It was only after Plaintiff entered into the loan that she was provided crucial material information about the true cost of her loan, and by then, it was too late as the borrower was already locked into the loan, which contained heavy prepayment penalties. Had the Loan Documents disclosed this information, Plaintiff would not have purchased the loans.

352. The Note further states, under "Amount of My Initial Monthly Payments" "Each of my initial monthly payments until the first Payment Change Date will be ...." and then, under "Payment Change Dates" it states "My monthly payment *may* change..." (emphasis added). However, under the terms of the subject Option ARM loan, Plaintiff's loan "payment" was *absolutely guaranteed to go up the very next month*. In particular, the Loan Documents failed to disclose and omitted the material fact that while the initial monthly payment amount would remain constant, the actual amount owed each month for the loan was absolutely guaranteed to go up. Had the Loan Documents disclosed this information, Plaintiff would not have purchased the loans.

353. RFC pre-approved the Note, which set forth a teaser rate that was only in effect for 30 days and the TILDS which set forth payments based upon those teaser rates for the first three to five years of the loan. RFC knew, but the Loan Documents did not disclose, that these listed low payments in the TILDS were predicated on an interest rate which would not exist after the first thirty days. RFC knew, but the Loan Documents did not disclose, that negative amortization was *guaranteed* if borrowers made these listed low payments. RFC further knew, but the Loan Documents did not disclose, that the listed payments set forth in the TILDS were calculated such that, if the payments were made, borrower would actually be would be paying off 115% of the original principal balance. While providing a stream of financing to AMN, RFC was aware of The Material Omissions, and it approved the specific language that was used to create those omissions. This information was material to any reasonable borrower, and the omission of such material information would cause a reasonable borrower to believe that the fully amortizing payments shown on the TILDS were in fact those payments necessary to pay off the balance of the original amount financed (*i.e.*, the original principal balance less principal payments made on account of that balance), rather than 115% of the amount financed. Had the Loan Documents disclosed this information, Plaintiff would not have purchased the loans.

354. Defendants are liable under this Cause of Action because they were aware of The Material Omissions and provided a stream of funding to AMN that enabled AMN to originate the subject Option ARM loan. This stream of funding provided AMN with day-to-day financing in two ways:

a. First, AMN did not fund its own loan originations; rather it obtained the funds to originate loans from warehouse lines of credit provided by RFC. After originating a loan, AMN immediately sold it to RFC to be securitized in order to pay back the line of credit that it used to fund the loan.

b. Second, AMN received day-to-day financing from RFC pursuant to the Client Contract between AMN and RFC. Pursuant to that contract, RFC agreed to purchase Option ARM loans originated by AMN provided that the loans complied with the standards set forth in RFC's Client Guide. Thus, the Client Contract guaranteed that AMN would have an immediate buyer for the Option ARM loans it originated.

355. At all times relevant, RFC and other participants in the scheme had exclusive knowledge of these materials facts, but actively concealed the material facts from Plaintiff. In those cases where the Loan Documents did make some disclosures about the "subjects" at issue, the Loan Documents made only partial representations while suppressing materials facts, as alleged herein. The Loan Documents' concealment, omissions and partial representations occurred prior to the consummation of the loan transactions with Plaintiff. Plaintiffs not presently aware of the identities of all the specific executives and employees responsible for the fraudulent scheme at issue; however, Defendants know such facts, which can be determined in discovery.

356. The omitted information, as alleged herein, was objectively material to both the interest rate and the amount of payments, which are the two most important features of any mortgage loan. Had the Loan Documents disclosed this information, Plaintiff would not have purchased the loans.

357. As a direct and proximate result of the Loan Documents' failures to disclose and omission of material facts, as alleged herein, Plaintiff have suffered damages, including but not limited to, the loss of equity in their homes.

358. The wrongful conduct of RFC and Doe Defendants, as alleged herein, including RFC and Doe Defendants placing their corporate and/or individual profits over the rights of others, was willful, oppressive, immoral, unethical, unscrupulous, substantially injurious, malicious and in conscious disregard for the well being of Plaintiff, and particularly vile, base, contemptible, and wretched.

Such acts and/or omissions were performed on the part of officers, directors, and/or managing agents of each corporate defendant and/or taken with the advance knowledge of the officers, directors, and/or managing agents who authorized and/or ratified said acts and/or omissions. RFC and Doe Defendants thereby acted with malice and complete indifference to and/or conscious disregard for the rights and safety of others, including Plaintiff and the general public. Accordingly, Plaintiff are entitled to an award of punitive damages against RFC in an amount to deter them from similar conduct in the future.

### A. Plaintiffs' Fraudulent Omissions Claims Against Defendants are Timely

359. Cal. Code Civ. Proc. § 338 codifies the delayed discovery rule in connection with fraud actions, such that a cause of action for fraud "is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud . . ."

360. Plaintiff discovered fraudulent omissions and violations against Defendants after October 1, 2009 Thus, Plaintiff's claims are timely under the applicable three-year statute of limitations.

### FIFTHTEENTH CAUSE OF ACTION
### UNCONSCIONABILITY
### CIVIL CODE SECTIONS 1670.5(a), 1770(s)
### (AGAINST ALL DEFENDANTS )

361. Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

362. Civil Code Sections 1670.5(a) and 1770(s) provide that if a court finds a contract or any clause to be unconscionable, it may refuse to enforce the contract.

363. While "unconscionability" is not defined by statute, the basic test is whether, in light of the general background and the needs of the particular case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the contract is made. The principle is one of prevention of oppression and unfair surprise, and not of disturbance of the allocation of risks because of superior bargaining power.

364. Due to Broker and Lender's obvious forgery of The Uniform Residential Application falsifying Plaintiff's income. By failing to disclose, or accurately disclose, material credit information, as described above, Creditors have engaged, and continue to engage, in deceptive acts or practices. Due to Broker and Lender's violation of California Code Section 1916.7 and TILA, Plaintiff was precluded from shopping around for a more competitively priced loan, was deprived of an opportunity to make an informed decision as to which loan product if any was suitable for her, and was not able to reasonably decipher terms in her loan contract. Broker and Lender's failure to disclose key terms of the Subject Loan combined with Broker and Lender's superior bargaining power at the time the Subject Loan agreements were made render the Subject Loan agreements unconscionable.

365. The adjustable rate mortgage agreement between Plaintiff and Broker and Lender is unconscionable and should not be enforced by the Court because Plaintiff is informed and believes that Broker and Lender have engaged in predatory lending practices against Plaintiff amounting to unlawful, unfair and fraudulent business practices as described in this Complaint.

366. As a result of Broker and Lender's conduct, Plaintiff is entitled to damages and extended rescission rights.

**SIXTEENTH CAUSE OF ACTION**
**RESCISSION**
**CALIFORNIA CIVIL CODE SECTION 1689 (b)**
**(AGAINST ALL DEFENDANTS)**

367. Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

368. The California Civil Code Section 1689(b) provides in pertinent part a party is authorized to rescind a contract induced by fraud, duress, menace or undue influence.

369. Defendants AMN and WALMAR's numerous failures to disclose critical loan terms amount to predatory lending practices against Plaintiff. Such practices, as pleaded throughout this SAC, amount to unlawful, unfair and fraudulent business practices. As pleaded throughout this Complaint, Defendants have induced Plaintiff's consent to enter into the Subject Loan agreements by fraud.

370. As a result of Defendants' misconduct, Plaintiff has suffered damages to be proven at trial.

371. Plaintiff seeks injunctive relief enjoining Defendants from engaging in unfair business practices described herein.

372. Plaintiffs further seek restitution, disgorgement of sums wrongfully obtained, costs of suit, reasonable attorney's fees, and such other and further relief as the Court may deem just and proper including extended rescission rights.

**SEVENTEENTH CAUSE OF ACTION**
**NEGLIGENCE**
**(AGAINST FIRST AMERICAN)**

373. Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

374. On December 2, 2006, Plaintiff executed a note, a deed of trust and other related documents to borrow $556,000.00, secured by the subject property (hereinafter the "Subject Loan"). The deed of trust identified FIRST AMERICAN as the Title Insurer/Escrow Holder/Trustee.

375. FIRST AMERICAN, as title insurer, escrow holder, and trustee owed Plaintiff a fiduciary duty to (1) faithfully follow escrow instructions; and (2) act with reasonable care.

376. FIRST AMERICAN breached its duty by releasing funds from escrow without all disclosures and documents required by law.

377. The missing documentation would have provided Plaintiff notice of her inability to repay the loan and provided Plaintiff notice of the true terms of the Subject Loan.

378. As a result of said FIRST AMERICAN's breach, Plaintiff's HELOC was funded even though the loan documents expired on November 30, 2006. Plaintiff's adjustable rate mortgage was also funded even though the loan documents expired

on November 20, 2006. These loans would not have been funded or closed had the
Plaintiff been aware of the true terms of the Subject Loan.

379. As a direct and proximate result of FIRST AMERICAN's breach, Plaintiff
has suffered damages in an amount in excess of this Court's jurisdictional
minimum, which amount will be proven at trial.

**EIGHTEENTH CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(AGAINST FIRST AMERICAN)**

380. Plaintiff realleges and incorporates the preceding paragraphs of this
Complaint as if they were fully set forth herein.

381. On December 2, 2006, Plaintiff executed a note, a deed of trust and other
related documents to borrow $556,000.00, secured by the subject property
(hereinafter the "Subject Loan"). The deed of trust identified FIRST AMERICAN
as the Title Insurer/Escrow Holder/Trustee.

382. FIRST AMERICAN, as title insurer, escrow holder, and trustee by and
through their agents, owed a fiduciary duty to Plaintiff to act primarily for their
benefit, to act with proper skill and diligence.

383. As Plaintiff's agents, FIRST AMERICAN owed a duty of loyalty and duty to
deal fairly with Plaintiff at all times.

384. FIRST AMERICAN breached its duty by releasing funds from escrow
without all disclosures and documents required by law.

385. The missing documentation would have provided Plaintiff's notice of their
inability to repay the loan and provided Plaintiff's notice of the true terms of the
Subject Loan.

386. As a result of said FIRST AMERICAN's breach, Plaintiff's HELOC was
funded even though the loan documents expired on November 30, 2006. Plaintiff's
adjustable rate mortgage was also funded  even though the loan documents expired

on November 20, 2006. These loans would not have been funded or closed had the Plaintiff been aware of the true terms of the Subject Loan.

387. As a direct and proximate result of FIRST AMERICAN's breach, Plaintiff has suffered damages in an amount in excess of this Court's jurisdictional minimum, which amount will be proven at trial.

**NINETEENTH CAUSE OF ACTION**
**VIOLATION OF CALIFORNIA CIVIL CODE SECTION 2923.5**
**(AGAINST ALL DEFENDANTS)**

388. Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

389. Pursuant to California Civil Code Section 2923.5, a mortgagee, trustee beneficiary or authorized agent may not file a notice of default until 30 days after contacting a borrower in person or by telephone to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure.

390. Nevertheless, Defendants failed to contact and assess Plaintiff's financial situation and explore options for Plaintiff to avoid foreclosure on the subject residence.

391. California Civil Code Section 2923.5 subsection (b) further requires said defendants to include a declaration outlining their due diligence to contact Plaintiff prior to serving a Notice of Default. On information and belief, Plaintiff thereon alleges that the Notice of Default filed in connection with the Subject Loan did not include the required declaration.

392. Plaintiff was injured by reason of these violations of Civil Code Section 2923.5, in that, as a direct and proximate result of Defendants' conduct, Plaintiff has suffered, and continues to suffer, damages including, without limitation, monetary damages and emotional distress, all in an amount in excess of this Court's jurisdictional minimum, which amount will be proven at trial.

393. As a result of the above-alleged misconduct, Plaintiff has been required to commence and prosecute this action, and may incur attorney's fees and costs in an amount to be proven at trial. Pursuant to the controlling contractual document(s) and/or applicable law, Plaintiff is entitled to recover their costs and reasonable attorneys' fees.

## TWENTIETH CAUSE OF ACTION
## VIOLATION OF CALIFORNIA CIVIL CODE 2923.6
## (AGAINST ALL DEFENDANTS)

394. Plaintiff realleges and incorporate by reference the above paragraphs as though set forth fully herein.

395. Defendants' Pooling and Servicing Agreement (hereinafter "PSA") contains a duty to maximize net present value to its investors and related parties.

396. California Civil Code 2923.6 broadens and extends this PSA duty by requiring servicers to accept loan modifications with borrowers.

397. Pursuant to California Civil Code 2923.6(a), a servicer acts in the best interest of all parties if it agrees to or implements a loan modification where the (1) loan is in payment default, and (2) anticipated recovery under the loan modification or workout plan exceeds the anticipated recovery through foreclosure on a net present value basis.

398. California Civil Code 2923.6(b) now provides that the mortgagee, beneficiary, or authorized agent offer the borrower a loan modification or workout plan if such a modification or plan is consistent with its contractual or other authority.

399. Plaintiff's loan is presently in an uncertain state.

400. Plaintiff is willing, able, and ready to execute a modification of her loan on the following terms:

    (a)   New Loan Amount:   360,000.00
    (b)   New Interest Rate:   2%
    (c)   New Loan Length:   30 years
    (d)   New Payment:   $1330.63

401. The present fair market value of the property is $360,000.00.

402. The Joint Economic Committee of Congress estimated in June, 2007, that the average foreclosure results in $77,935.00 in costs to the homeowner, lender, local government, and neighbors.

403.   Of the $77,935.00 in foreclosure costs, the Joint Economic Committee of Congress estimates that the lender will suffer $50,000.00 in costs in conducting a non-judicial foreclosure on the property, maintaining, rehabilitating, insuring, and reselling the property to a third party.  Freddie Mac places this loss higher at $58,759.00.

404. The 320,000 through foreclosure on a net present value basis is $40,000 more than the defendants will recover through foreclosure.

405.   The recovery under the proposed loan modification at $360,000 in addition to accrued interest exceeds the net present value recovery through foreclosure of $320,000 by over $160,000.00.

406.   Pursuant to California Civil Code §2823.6, Defendants are now contractually bound to accept the loan modification as provided above.

**TWENTY-FIRST CAUSE OF ACTION**
**DECEPTIVE BUSINESS PRACTICES**
**(AGAINST ALL DEFENDANTS)**

407.   Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

408.   The entire foreclosure process has been conducted utilizing a string of
fraudulent documents.  If the invalid assignment purporting to the alleged
beneficial interest is fraudulent, then there is no basis in which to foreclose.   Void
Assignment of the Deed of Trust, and a void Substitution of Trustee, which wasn't
even valid at its onset, has resulted in an entirely void foreclosure on its face.  The
signatories had no authority on which to act, did not have a recorded power of
attorney, and were employees with conflicting interests to legally execute
documents. The Corporate Assignment of Deed of Trust (Exhibit E) was executed
by Theodore Schultz as Vice-President of MERS. This assignment when recorded
purportedly assigns the security instruments to AURORA.  It has been discovered
that Theodore Schultz is actually an employee of AURORA (Exhibit H) which is a
subsidiary of Lehman Brothers. Therefore, Exhibit E was not executed by MERS
but rather by an employee of AURORA. This is now a case whereby a bank has
bestowed upon itself the powers of a beneficiary without authority to do so. If this
act is judicially acceptable, what's to stop anyone from simply assigning the
security instruments to themselves by asserting to be the Vice-President of MERS,
and then commence foreclosure on a consumer's principle residence?  Before a
Trustee can commence a foreclosure, they must be **empowered by the beneficiary
either by a Deed of Trust** or a **valid Substitution Of Trustee recorded** in the
County in which the trust property is situated.  I have noted that the original
Trustee on the Deed of Trust was FIRST AMERICAN.  A Substitution of Trustee
(Exhibit F) was executed on 10/01/2009 by Jennifer Victa as Assistant Secretary
for MERS.  This document was acknowledged by the notary J. Archuleta 55 days
later who asserted that Jennifer Victa was who she alleged to be. It has been
discovered that Jennifer Victa is indeed an employee of CAL-WESTERN (Exhibit
G) who happens to be the Substituted Trustee named in the Substitution of Trustee
(Exhibit F). Therefore, CAL-WESTERN appointed oneself as Trustee and in doing
so, initiated foreclosure on a consumer's principle residence by executing and

recording a Notice of Default. This is also a case whereby an instrument was executed and recorded which appoints an attorney-in-fact by the attorney-in-fact so appointed. Given this discovery, all instruments originated, executed and recorded by CAL-WESTERN should be voidable.

409.    Cal. False Claims Act, Cal. Gov't. Code 12650 et. seq. : Cause for using false and misleading claims through filing recordable documents *presumed to be true by virtue of statutory compliance with filing requirements, yet carry no validity due to parties' lack of standing to issue and by notarized documents bearing false information.*

"Fraud destroys the validity of everything into which it enters," *Nudd v. Burrows*, 91 U.S. 426. "Fraud vitiates everything," *Boyce v. Grundy*, 3 Pet. 210. "Fraud vitiates the most solemn contracts, documents and even judgments," *U.S. v. Throckmorton*, 98 U.S. 61. Therefore (whatever action) …..should be dismissed for fraud.

410.    Plaintiff alleges that Defendants, and each of them, knew at the time they made these representations to Plaintiff that they were untrue, and defendants knew at the time that they were attempting to foreclose on Plaintiff's Trust Deed and note that they had no right to do so.

411.    Plaintiff alleges that Defendants cannot affirmatively prove that they have complied with each of the statutory requirements for foreclosure.

412.    Each of them, intentionally and fraudulently have attempted to convert Plaintiff's right, title and interest to their property, and any equity therein.

413.  Additionally, Plaintiff has been made to suffer deep and severe emotional distress, mortification, anxiety and humiliation all to their damage and injury in an amount the totality of which has not yet been fully ascertained, but in no event less than the jurisdiction limitations of this court.

414.  Defendants' conduct as set forth above was intentional, oppressive fraudulent and malicious so as to justify an award of punitive damages in an amount sufficient that such conduct will not be repeated.

415.  Defendants do not have standing or enforceable right to enforce the note and any incidental right to collateral so as to have foreclosed on Plaintiff's Home, including without limitation, planning to conduct the invalid foreclosure sale on the property.

416.  Defendants threaten to, and unless restrained, will evict Plaintiff.

417.  Any such action will cause irreparable harm to Plaintiff, and will cause pecuniary compensation which will not afford adequate relief because Plaintiffs' home is unique.

418.  Injunctive relief is necessary to enjoin Defendants from consummating the illegal foreclosure sale with a wrongful eviction since they lacked standing and any enforceable rights under the Promissory Note and Deed of Trust.

**TWENTY-SECOND CAUSE OF ACTION**

**Negligence**

**(AGAINST ALL DEFENDANTS)**

419.  Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

420. All Defendants, inclusive, owe Plaintiffs a duty to conform of reasonable care and the avoidance of unreasonable risk of harm to Plaintiffs.

421. Defendants willfully and intentionally breached this duty of care by subjecting the Plaintiffs to an unreasonable risk of harm. Defendants, namely Broker and Lenders, knowing Plaintiffs did not have the financial means to ultimately make monthly payments in connection with the Subject Loan, nevertheless offered the loan to Plaintiffs. Defendants, namely Broker and Lenders, further breached this duty by failing to disclose to Plaintiffs, as required by federal law and state law, all adverse consequences of the Subject Loan, by securing an undisclosed profit for the sale and servicing of the Subject Loan in violation of TILA and RESPA, among other statutes, and by engaging in unfair business practices.

422. As a direct and proximate result of Defendants' breaches as alleged herein, Plaintiffs has been damaged and is entitled to actual damages.

423. Defendants' willful, oppressive, intentional and malicious breaches of fiduciary duty authorize the imposition of exemplary damages pursuant to California Civil Code Section 3294.

424. The Plaintiff incorporates herein by reference the allegations made in paragraphs above that at all times the Defendants, acting as Plaintiff's lender and loan servicers had a duty to exercise reasonable care and skill to maintain proper and accurate loan records and perform procedures according to law and the processes set forth in said laws. This would include transfer of deeds, notices, truthful reporting and include, but not limited to, the proper loan numbers associated with alleged promissory notes.

425. In taking the actions alleged above, and in failing to take the actions as alleged above, the Defendants breached their fiduciary duty of due care and skill to the Plaintiff in the servicing of the Plaintiff's loan by, among other things, failing to properly and accurately recording loan numbers, preparing and filing false documents, and foreclosing on the Subject Property, without having the legal authority and/or proper documentation to do so.

426. As a direct and proximate result of the negligence and carelessness of the Defendants as forth above, the Plaintiff suffered general and special damages and irreparable harm in an amount to be determined at trial.

**TWENTY-THIRD CAUSE OF ACTION**
**SLANDER OF TITLE**
**(AGAINST ALL DEFENDANTS )**

427.   Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

428.   Plaintiff contends that her property has been slandered with invalid and fraudulent foreclosure documents recorded in the Los Angeles County Recorder's Office.

429.    The recordation of an instrument facially valid but without underlying merit will, of course, give rise to an action for slander of title (*Forte v. Nolfi* (1972) 25 Cal.App.3d.656, 685-686 [102 Cal.Rptr. 455]).

430.    Given weight to the invalidity of the foreclosure proceeding, trespass on the deed of trust and inability to prove holder in due course status, Defendants acted without privilege to disparage Plaintiff's title and said actions constitute a Slander of Title by Disparagement under Cal. Civil Code 40.81.

431.    Defendants are intimidating Plaintiff with wrongful foreclosure threats.  A definition of the tort for slander, perhaps more pertinent to the facts of this case, is to be found in Fearon v. Fodera (1915) 169 Cal. 370, at pages 379 and 380 [148 P. 200], as follows: "Slander of title," as recognized by the law, may be defined to be defamation of title to property, real or personal, by one who falsely and maliciously disparages the title thereof, and thereby causes the owner thereof some special pecuniary loss or damage. "Admittedly under this definition slander of title may be committed by maliciously clouding the title to real property and causing damage to the owner thereof by the execution, willful acceptance, and malicious recordation of a deed, which falsely declares the title of the property involved to be in a person other than the true owner."

432.    Plaintiff is aware that title has not been fraudulently conveyed to Defendant AURORA yet, but the Trustee's Sale scheduled tentatively August 24, 2011, is an attempted theft of property should the sale take place.

433.    California has adopted the definition of the tort of slander of title set forth in section 624 of the Restatement of Torts, which provides: "One who, without a

privilege to do so, publishes matter which is untrue and disparaging to another's

property in land .... under such circumstances as would lead a reasonable man to

foresee that the conduct of a third person as purchaser or lessee thereof might be

determined thereby is liable for pecuniary loss resulting to the other rom the

impairment of vendibility thus caused." (*Howard v. Schaniel* (1980) 113 Cal.App.

3d 256, 263-264 [169 Cal.Rptr. 678]; see *Gudger v. Manton* (1943) 21 Cal.2d 537,

541 [134 P.2d 2170.

434.    Under 392 of the Code of Civil Procedure, said, in *Coley v. Hecker,* 206 Cal.

22, 272 P. 1045, 1047, ...'the owner of the slandered title is given the right to bring

and maintain the action in the county where the real property is situated, upon the

theory that the action is one in which the determination of the owner's right or

interest therein is properly adjudicated, and for the additional reason that slander of

title is an injury to real property.

435.    The Court then went on to say 'The phrase 'slander of title' is a figure of

speech in which the title is personified. In the instant case, the phrase seems to be

an anomaly as applied to a situation which, strictly speaking, is a libel upon the

title, inasmuch as the damage was accomplished by the recordation of a written

document, and no spoken words were uttered. However, the term 'slander of title'

includes both spoken and written means by which the right of property may be

invaded and a right of action exists, irrespective of the means by which the title is

traduced. This is so because a property right has been invaded-- an injury to real

property has been sustained.

436.    This language of the highest court of the state is entitled to great weight, and

this view of 'slander of title' as an injury to property is repeated in *Smith v.*

*Stuteman*, 79 Cal.App.2d 708, 181 P.2d 123, 124. In the Smith case the question was whether an action for slander of title survived the death of the defendant, 574, Probate Code. The question there was whether a **trespass on real property** which survives the death of a defendant includes an action for slander of title. In holding that it did, the Court pointed out that trespass has a broadened meaning today and now includes consequential injuries to realty such as an action for slander of title, as well as direct physical injuries.

437.    We quote from *Smith v. Stuteman*, 79 Cal.App.2d 708, 181 P.2d 123, 124: 'Slander of title is a tort action for redress of an invasion of a **particular property right,** that of immediate salability of the property involved. *Coley v. Hecker,* 206 Cal. 22, 27, 272 P. 1045; Restatement, Torts, sec. 624. As a cause of action arising out of a violation of a property right it survives the death of its owner. Civil Code, sec. 954; *Wikstrom v. Yolo Fliers Club,* 206 Cal. 461, 464, 274 P. 959. It has been held that it necessarily follows that such a cause of action also survives the death of the defendant. Vragnizan v. Savings Union, etc., Co., 31 Cal.App. 709, 713, 161 P. 507.

**TWENTY-FOURTH CAUSE OF ACTION
TRESPASS ON THE CONTRACT
(AGAINST ALL DEFENDANTS)**

438.    Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

439.    The Deed of Trust is the contract which allows a non-judicial foreclosure to proceed and gives Power of Sale to the duly appointed Trustee.  Per the Deed of Trust, only the Lender can invoke the foreclosure (paragraph #22).

440.   Per Deed of Trust paragraph #24, the Lender may appoint a Trustee. (Exhibit F) Under "Substitute Trustee", the language clearly states that the **Lender** may appoint successor trustees **via an instrument** acknowledged by the **Lender** and **recorded** in the County in which the property is located. This paragraph also states **"This procedure for substitution shall govern to the exclusion of all other provisions for substitution"** This implies that **only the Lender** can substitute a trustee. The Lender as defined on page 1 of the Deed of Trust is AMN. **This paragraph does not state that successors, assigns, or nominees may appoint a Successor Trustee.** Therefore, The Substitution of Trustee **is invalid** as it was executed by Jennifer Victa, an officer of MERS, who also happens to be an employee of CAL-WESTERN. The Substitution of Trustee is void, due to fraud, and was not executed in compliance with California Civil Code 2934(a). The Substitution of Trustee is invalid also because it was not executed by the Lender, per requirement of the Deed of Trust.

441.   The duly appointed Trustee under the Deed of Trust as of the recording of the Notice of Default on September 24, 2009 was First Title Insurance Company. Cal-Western under false pretenses, was not substituted in as Trustee effectively until November 9, 2009.

442.   The Notice of Default was recorded PRIOR to the Substitution of Trustee, which if it were the true holder-in-due-course, it would be mandatory to obtain beneficial interest in the Deed of Trust, prior to invoking foreclosure.

443.   In the Case of a Mortgage with a power of sale, an assignee can only enforce the power of sale if the assignment is recorded, since the assignee's authority to

conduct the sale must appear in the public records, *New York Life Insurance Co. V. Doane* (1936) 13 CA 2d. 233, 235-237, 56 P2d. 984, 56 ALR 22.

444.   The fraudulent Substitution of Trustee was recorded AFTER the Notice of Default, which proves the Notice of Default was void at its inception and recording on November 9, 2009.

445.   A non-judicial foreclosure sale under the power-of-sale in a deed of trust or mortgage, on the other hand, must be conducted in strict compliance with its provisions and applicable statutory law.

446.   A Trustee's powers and rights are limited to those set forth in the deed of trust and laws applicable thereto. (See, e.g., *Fleisher v. Continental Auxiliary Co.*, (1963) 215 Cal.App.2d 136, 139, 30 Cal.Rptr. 137; *Woodworth v. Redwood Empire Sav. & Loan Assn.*, (1971) 22 Cal.App.3d 347, 366, 99 Cal.Rptr. 373.)

447.   The Trustee is charged with the duty to perform and condition precedent prior to bringing the instant action and failed to do so. Paragraph (20) of the Deed of Trust provides in pertinent part:

Neither borrower or lender may commence, join, or be joined to any judicial action (as either an individual litigant, or the member of a class, that arises from the other party's actions pursuant to this security instrument or alleges that the other party has breached any provision of, or any duty by reason of, this Security Instrument, until such borrower  or lender has notified the other party (with such notice given in compliance with the requirements of section 15) of such alleged breach and afforded the other party hereto a reasonable period after giving of such notice to take corrective action. If applicable law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable

for the purposes of this paragraph. The notice of acceleration and notice to cure given to borrower pursuant to Section 22 and the notice of  acceleration given to borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20. (Emphasis added.)

448.   When there is an agreement between the Beneficiary and Trustor, such as the Condition Precedent expressed in Paragraph 20 of the Deed of Trust, a Foreclosure cannot take place before the condition is satisfied.

449. If the Beneficiary fails to carry out its obligation a subsequent foreclosure is invalid. Haywood Lumber & Investment Co. V. Corbett (1934) 138 CA 644, 650, 33 P2d 41.

450. MERS, AURORA and CAL-WESTERN as agent have not complied with any expressed provisions of the Deed of Trust, have speciously trespassed upon the Deed of Trust and Plaintiff's property, and the foreclosure must be rendered void and rescinded and the trustee's sale cancelled immediately.

451. *California Civil Code 3513.*  Any one may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement.

452. *California Civil Code 3514.*  One must so use his own rights as not to infringe upon the rights of another.

453. Trustors are systematically deprived of their rights to due process with no way to substantially enforce the law with regards to §2924 of the Civil Code which, as

enforced in California, is akin to a freight train at full speed; the fuel for which is found in subsection (c) of that code that states: " A recital in the deed executed pursuant to the power of sale of compliance with all requirements of law regarding the mailing of copies of notices or the publication of a copy of the notice of sale or the personal delivery of the copy of the notice of default or the posting of copies of the notice of sale or the publication of a copy thereof shall constitute prima facie evidence of compliance with these requirements and conclusive evidence thereof in favor of bona fide purchasers and encumbrancers for value and without notice."

454.   Alone this provision irrationally denies equal rights to sue and gives evidence to mortgagees, whose properties were the victims of fraudulent foreclosures (foreclosures instituted or prosecuted by any party, principal, witness, or attorney willing, either knowingly or negligently, to present false recitations regarding compliance with statutory provisions regarding service and delivery of notices).

455.   MERS, AURORA and CAL-WESTERN have violated Title 42 USC 1983, by depriving Plaintiff of the following clearly established and well-settled constitutional rights protected by the Fourth and Fourteenth Amendments to the U.S. Constitution and the invoked due process rights of Article(s) IV, and VI in Amendment to the Federal Constitution, contrary to Article I §10 (clause 1) of the Federal Constitution to wit:

   The right not to have her contracts impaired, Article I, §10, clause 1;

   The right of one not to be deprived of constitutionally protected interests in
      one's property; California Constitution § 1 Art. 1.

456. "Where administrative action may result in loss of both property and

life, or of all that makes life worth living, any doubt as to the extent of power delegated to administrative officials is to be resolved in citizen's favor, and court must be especially sensitive to the citizen's rights where proceeding is non-judicial." *United States v. Minker,* 350 U.S.179(1956).

457.   The Defendants have trespassed on Plaintiff's property and the deed of trust in concert as a scheme to defraud Plaintiff out of her property.   Plaintiff desires rescission of the invalid foreclosure.

## TWENTY-FIFTH CAUSE OF ACTION

## Wrongful Conversion of Real Property

## (AGAINST ALL DEFENDANTS)

458.   Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

459.   Defendants MERS, AURORA and CAL-WESTERN's invalid foreclosure proceeding is a result of wrongful conversion of Plaintiff's property.

460.   The Defendants wrongfully converted the trespass on Plaintiff's contract to an alleged interest in her property.

461.   **Converting Real Property by Defendants or any other entity from its true owner without true owner's knowledge and consent is an act of "conversion through fraudulent means" and "Direct conversion."**

462.   Defendant cannot obtain legal and equitable title to property by fraud.   The trustee's sale purportedly scheduled for August 24, 2011 is a fraud upon the public,

1  wrongful conversion of real property and attempted theft of real property.  The
2  sale, if held, would be illegally held subsequent to an invalid Notice of Default.

4  463.  *Lo v. Jensen* (2001) 88 Cal.App 4th 1093, 1095, A trustee's sale tainted by
5  fraud may be set aside.

7  464.  *Angell v. Superior Court* (73 Cal.App. 4th 691).

9  **TWENTY-SIXTH CAUSE OF ACTION**
   **Wrongful Foreclosure**
10 **CALIFORNIA CIVIL CODE SECTION 2924, CALIFORNIA**
11 **COMMERCIAL CODE SECTIONS 3-301, 3-305, 33-801, 33-807, 2932.5**
   **(AGAINST ALL DEFENDANTS)**

13 465. Plaintiff realleges and incorporates the preceding paragraphs of this
   Complaint as if they were fully set forth herein.

15 466. California Commercial Code Section 3301 specifically identifies the persons
16 who are entitled to enforce a security interest, such as instituting a foreclosure sale
   under a deed of trust. The statute is exclusive, rather than inclusive in nature, and
17 those who are not identified do not have the right to enforce such an interest. The
18 statute sets forth that only the holder of the instrument, or a non-holder in
   possession of the instrument with rights of the holder, or person not possessing the
19 instrument but entitled to enforce the instrument pursuant to California
20 Commercial Code § 3309 may enforce the instrument.

22 467. While possession of an instrument such as a promissory note is not by itself a
   requirement for non-judicial foreclosure, California Commercial Code § 3309
23 provides that a person without a promissory note may foreclose **only in limited**
   **circumstances**. California Commercial Code § 3309 states that a person not in
24 possession of an instrument may **only** enforce the instrument if:

26 a.The person was in possession of the instrument and entitled to enforce it when
   loss of possession occurred;

112

b. The loss of possession was not the result of a transfer by the person or a lawful seizure; and

c. The person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process.

468. The Notice of Trustee's Sale pertaining to the subject property fails to identify who is the holder of the beneficial interest. Plaintiff is informed and believes, and thereon alleges, that Defendants are not in possession of the note ("Instrument") in connection with the subject property.

489. Plaintiff is informed and believes, and thereon alleges that a) Defendants **did not** lose possession of the Instrument via the means set forth in Commercial Code § 3309, and b) therefore cannot enforce the security interest in the subject property pursuant to Commercial Code §§ 3301 and 3309.

490. Furthermore, neither AURORA, MERS, nor CAL-WESTERN possess valid security interests in the property sought to be foreclosed, for the following reasons:

    a. Defendants failed to properly record and give notice of the Notice of Default, a pre-condition to a foreclosure sale, required by California Civil Code Section 2923.5(b).

    b. As Broker and Lender obtained their interest in the subject property illegally and fraudulently, as set forth herein this Complaint, they had no right to convey such interest to any other trustees, nominees, or beneficiaries. Defendants AURORA, MERS, and CAL-WESTERN therefore hold no beneficial interest in the subject property and may not foreclose.

491. Defendants seek to proceed with an unlawful trustee's sale without lawful security interest in the subject property. Defendants did not possess the right to enforce the security interest at any time, regardless of whether Defendants possessed the Instrument.

492. Plaintiff therefore is informed and believes, and thereon alleges that said Defendants are not "person[s] entitled to enforce" the security interest on the subject property, as that term is defined in Commercial Code Section 3301.

493. Defendants do not have any legal right to foreclose upon the subject property. Furthermore, the procedures implemented by said defendants in attempting to enforce the alleged security interest in the subject property violated statutory requirements governing non-judicial foreclosure proceedings.

494. As a direct and proximate result of said Defendants' misconduct. Plaintiff has suffered damages, including without limitation, direct monetary loss, consequential damages and emotional distress.

495. In committing the wrongful acts alleged herein, Defendants acted with malice, oppression and fraud. Defendants' willful conduct warrants and award of exemplary damages in an amount sufficient to punish the wrongful conduct alleged herein and deter such misconduct in the future.

**TWENTY-SEVENTH CAUSE OF ACTION:**
**Violation Of § 1788.17 Of The RFDCPA**
**(AGAINST ALL DEFENDANTS)**

496.   Plaintiff realleges and incorporates by reference the above paragraphs as though set forth fully herein.

497. *California Civil Code §1788.17* requires that Defendants comply with the provisions of *15 U.S.C. § 1692*, through their acts including but not limited to, the following:

(a)    The Defendants violated *California Civil Code § 1788.17* by engaging in conduct, the natural consequence of which is to harass, oppress, and abuse persons in connection with the collection of the alleged debt, a violations of *15 U.S.C. § 1692(d);*

(b)    The Defendants violated *California Civil Code § 1788.17* by misrepresenting the status of the debt, a violations of *15 U.S.C. § 1692(e)(s)(A)*;

(c)    The Defendants violated California *Civil Code § 1788.17* by using unfair or unconscionable means to collect or attempt to collect a debt, a violation *15 U.S.C. § 1692(f)*; and

(d)    The Defendants violated *California Civil Code § 1788.17* by using deceptive means to collect or attempt to collect a debt from the Plaintiffs, a violation of *15 U.S.C. § 1692e(10)*.

498. The foregoing violations of *15 U.S.C. § 1692* by Defendants result in separate violations of *California Civil Code § 1788.17*.

499. The forgoing acts by Defendants were willful and knowing violations of *Title 1.6C of the California Civil Code* (FRDCPA), are sole and separate violations under *California Civil Code § 1788.30(b)*, and trigger **multiple $1,000.00 penalties.**

500. *California Civil Code § 1788.17* provides that Defendants are subject to the remedies of *15 U.S.C. § 1692(k)*, for failing to comply with the provisions of *15 U.S.C. § 1692(b)(6) and § 1692(c)c.*

501. The foregoing acts by Defendants were intentional persistent, frequent, and

devious violations of *15 U.S.C. § 1692*, which trigger **additional damages of**

**$1,000.00 under** *15 U.S.C. § 1692(k)(a)(2)(A)*.

**TWENTY-EIGHTH CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress**
**(AGAINST ALL DEFENDANTS)**

502 Plaintiff realleges and incorporates the preceding paragraphs of this Complaint
as if they were fully set forth herein.

503. Defendants' attempt to foreclose on Plaintiff's property knowing that the
adjustable rate mortgage agreement between Plaintiff and the Defendants was
illegal and void because the loan was predatory was intended to be and was a
reckless act resulting in Plaintiff sustaining extreme emotional distress.

504. Defendants' recklessly failed to evaluate Plaintiff's ability to repay the
Subject Loan with an intention to profit from Plaintiff's default. Such conduct is
extreme and outrageous.

505. Recovery of damages for mental suffering is permitted in regard to contracts,
like the Subject Loan agreement, which so affect the vital concerns of the
individual that severe mental distress is a foreseeable result of breach. The Subject
Loan agreement relates to Plaintiff's residence. The residence of the Plaintiff is
clearly a matter which directly concerns the comfort, happiness, or personal
welfare of the Plaintiff. Loss of one's home is bound to directly affect a person's
affection, self-esteem, or tender feelings. Consequently, damages for intentional
inflection of emotional distress are recoverable for Defendants' actions in relation
to the Subject Loan and the foreclosure of the subject property.

506. Recovery of damages for mental suffering is also permitted with regard to
fraud claims sounding in tort, such as fraudulent misrepresentation, as pleaded
herein this Complaint.

507. As a result of Defendants' acts, Plaintiff has suffered damages in an amount
to be proven at trial.

508. Defendants' conduct was willful, oppressive and fraudulent and an award of punitive damages is justified in an amount to be determined at trial.

**TWENTY-NINTH CAUSE OF ACTION**
**Unjust Enrichment**
**(AGAINST ALL DEFENDANTS)**

509. Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

510. By their wrongful acts and omissions, the Defendants have been unjustly enriched at the expense of the Plaintiff, and thus the Plaintiff has been unjustly deprived.

511. The DOT states in Paragraph 23: "Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee." The obligations to AMN under the DOT were fulfilled when AMN received the balance on the Note as proceeds of sale through securitization to private investors. AURORA has been unjustly enriched by collecting monthly payments from Plaintiff.

512. Plaintiff seeks restitution for any payments he made to AURORA that were not paid to the lender or beneficiary, if any.

513. By reason of the foregoing, the Plaintiff seeks restitution from the Defendants, and an order of this Court disgorging all profits, benefits, and other compensation obtained by the Defendants from their wrongful conduct.

**THIRTIETH CAUSE OF ACTION**
**Injunctive Relief**
**(AGAINST ALL DEFENDANTS)**

514.  Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

515.  The Plaintiff seeks injunctive relief to preserve the status quo as the balance of equities so heavily favors the Plaintiff that justice requires the court to intervene to secure the positions until the merits of the actions are ultimately determined. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

516.  The Plaintiff has (1) a combination of probable success and the certainty of irreparable harm, and/or (2) serious questions are raised and the balance of hardship tips in her favor. *Arcamuzi v. Continental Air Lines, Inc.*, 819 F. 2d 935, 937 (9th Cir. 1987). The Plaintiff has demonstrated a significant threat of irreparable injury and shows a chance of success on the merits. At a bare minimum, the Plaintiff has demonstrated a fair chance of success on the merits, and/or questions serious enough to require litigation. *Arcamuzi*, 819 F.2d at 937.

517.  Injunctive relief to halt post-foreclosure proceedings serves a legitimate purpose. Furthermore, equitable remedies are available in view of an irreparable injury, as a real or immediate threat that the Plaintiff will be wronged again – a likelihood of substantial and immediate irreparable injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 1670 (1983) (quoting *O'Shea*, 414 U.S. at 502, 94 S.Ct. at 679).

518.  The Plaintiff provides credible, substantiated evidence of identifiable, potentially repeatable wrongs and supports his injunctive relief request with adequate legal and factual grounds.

**THIRTY-FIRST CAUSE OF ACTION**
**QUIET TITLE**
**(AGAINST ALL DEFENDANTS)**

519.  Plaintiff realleges and incorporates the preceding paragraphs of this Complaint as if they were fully set forth herein.

520.  The Plaintiff is the equitable owner of the Subject Property which has the following legal description:

Lot 23 of Tract 11193 in the City of Los Angeles, County of Los Angeles, as per map recorded in book 202, pages 18 and 19 of maps, records in the office of the County Recorder of said Los Angeles 208. Plaintiff is entitled to possession, control, and ownership of the real property located at this address, together with any improvements made thereon.

521. Defendants, AURORA, MERS, and CAL-WESTERN have at relevant times claimed interests adverse to Plaintiff's interest in the subject property, in the form of the deed of trust recorded pursuant to the Subject Loan. The relevant deeds of trust are attached hereto as Exhibit B.

522. On December 2, 2006 Plaintiff executed a note, a deed of trust and other related documents to borrow $556,000.00, secured by the subject property (hereinafter the "Subject Loan"). The terms of the loan were memorialized in a promissory note which was in turn secured by a deed of trust on the subject property. The deed of trust identified AMN as the lender. The deed of trust identified WALMAR as the mortgage broker. The deed of trust further identified MERS as the nominal beneficiary.

523. These representatives, agents and/or employees of Defendants, and each of them, made false representations to Plaintiff in order to fund a loan, in which the Plaintiff's personal residence was to be security therefore. Plaintiff alleges that Defendants, and each of them, made certain representations regarding their honesty, that they were experts in obtaining loans which borrower's could afford and that they would only offer Plaintiff a loan which was in her best interest given her credit history and financial needs and limitations and that Plaintiff could trust

the representations of Defendants, and each of them. Plaintiff alleges that based

upon the representations made by Defendants, and each of them, Plaintiff

reasonably reposed their trust in Defendants' representations and disclosed her

private financial information to Defendants, in order that Defendants could in

keeping with their representations, find a loan which was in the best interests of

Plaintiff given her financial needs and limitations. More particularly, Defendants,

and each of them, represented that they would not make a loan to Plaintiff unless

she could afford the loan, and that they would not make the loan unless and until

she had passed the underwriting guidelines of the lender, which further assured that

the loan being offered to Plaintiff was in fact in the Plaintiff's best interest, and

that the loan was within Plaintiff's financial needs and limitations.

524. The loan which contained excessive financing was approved to allow closing

costs to be financed. That Defendants failed to utilize adequate due diligence

regarding Plaintiff's ability to repay the loan, Defendants' as part of their

continuing scheme intentionally placed Plaintiff in a sub-prime loan to the benefit

of the Defendants with excessively high interest rates, Defendants failed to provide

Plaintiff mandated disclosures and Defendants repeatedly employed coercive

tactics in order to force Plaintiff to sign the loan documents.

525. Plaintiff alleges that due to the fraud of Defendants the title to the subject property has been rendered unmarketable in that Defendants and their assigns, have caused to be recorded as against the subject property documents which have clouded Plaintiff's title thereto.

526. Plaintiff seeks an Order of the court quieting title to the subject property, effective as of the date on which the Subject Loan was commenced.

527. Defendant obtained the initial deed of trust by unlawfully entering into a promissory note with Plaintiff. Defendants fraudulently induced Plaintiff to enter into a loan with lenders. Defendants obtained their interest in the subject property illegally and fraudulently and therefore had no right to convey such interest to any other trustees, nominees, or beneficiaries.

528. Defendants obtained interests in the property located at 4011 Hubert Avenue, Los Angeles, California 90008 as trustees, nominees or beneficiaries of lenders. As lenders had no right to convey such interest to any other trustees, nominees, or beneficiaries, Defendants could not have lawfully obtained beneficial interests in the subject property. For the reasons set forth herein, Defendants hold no beneficial interest in the subject property.

529. Plaintiff is therefore seeking to quiet title against the claims of said Defendants under the said deeds of trust, effective as of the date on which the Subject Loan was commenced.

530. Plaintiff's desire and is entitled to a judicial declaration quieting title in Plaintiff's name as of the date on which the Subject Loan was consummated.

531. Defendants securitized Plaintiff's single-family residential mortgage loan through RFC. Plaintiff is informed and believes that the lawful beneficiary has been paid in full. The DOT states in paragraph 23:

Reconveyance.  Upon payment of all sums secured by this Security Instrument, lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it…

532. The DOT does not state that Plaintiff must pay all sums, only that all secured sums must be paid. Plaintiff alleges that the obligations owed to AMN under the DOT were fulfilled and the loan was fully paid when AMN received funds in excess of the balance on the Note as proceeds of sale through securitization(s) of the loan and insurance proceeds from Credit Default Swaps.

533. Defendants' claims are adverse to Plaintiff because Plaintiff is informed and believes that none of the Defendants is a holder of the Note, none of them can prove any interest in the Note, and none of them can prove that the Note is secured by the DOT, as well as for the reasons set forth in the preceding causes of action. As such, Defendants have no right, title, lien, or interest in the "Property".

534. Plaintiff therefore seeks a judicial declaration that the title to the

"Property" is vested solely in Plaintiff and that Defendants have no right, title,
estate, lien, or interest in the Property and that Defendants and each of them be
forever enjoined from asserting any right, title, lien or interest in the Property
adverse to Plaintiff.

535. The Plaintiff seeks to quiet title against the claims of the Defendants; ALL
PERSONS UNKNOWN, CLAIMING ANY LEGAL OR EQUITABLE RIGHT,
TITLE, ESTATE, LIEN, OR INTEREST IN THE PROPERTY DESCRIBED IN
THE COMPLAINT ADVERSE TO PLAINTIFF'S TITLE, OR ANY CLOUD ON
Plaintiff's TITLE THERETO; and DOES 1 through 20 (collectively referred to
herein as the "Title Defendants"). In fact, the Title Defendants had no right to title
or interest in the Subject Property and no right to entertain any rights of ownership
including the right to foreclosure, offering the Subject Property for sale at a
Trustee's sale, demanding possession or filing cases for unlawful detainer.

536. The Plaintiff seeks to quiet title on the Subject Property. Plaintiff seeks a
judicial declaration that the title to the Subject Property is vested in the Plaintiff
alone and that the Title Defendants and each of them be declared to have no
interest estate, right, title or interest in the Subject Property and that the Title
Defendants, their agents and assigns, be forever enjoined from asserting any estate,
right title or interest in the Subject Property subject to the Plaintiff's rights.

## CONCLUSION

In the interest of justice and prudence, this Court should study the effects of the
criminal conspiracy to defraud America known as MERS and ill-fated criminal
acts of "pretender lenders" which are servicers like AURORA purporting to be a
holder in due course, and their partners in crime – the trustee, CAL-WESTERN,
who at their beckon call is on standby to conduct each and every fraudulent
foreclosure at its disposal. In order to prevent the destruction of this country by the
criminal conspiracy, an Injunctive Relief in favor of Plaintiff to prevent the loss of
her home and irreparable harm from Defendants is necessary, and is also in the
interest of the public.

# DEMAND FOR JURY TRIAL

Plaintiff hereby request a trial by jury of no less than twelve (12) persons on all issues so triable pursuant to California Civil Procedure 192 and 220.

# PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against the Defendants as follows:

1.    For award of damages against Defendants and each of them on Plaintiff's claims as applicable as alleged above in an amount to be shown at trial if Defendants steal Plaintiff's home as a result of this illegal foreclosure;

2.    For a loan modification at market value, with terms acceptable to Plaintiff, should Defendants be prohibited from conducting the illegal foreclosure sale;

3.    For an order of rescission on behalf of named Plaintiff;

4.    For a temporary restraining order and preliminary and permanent injunction on behalf of Plaintiff against AURORA, DEUTSCHE and CAL-WESTERN, in addition to each and every one of their respective officers, agents, employees, servants, and attorneys, and those persons in active concert or participation with any of them or each of them, as specifically alleged above from transferring any interest in the subject property, from proceeding with any eviction action as to the Plaintiff and their residence and/or proceeding with any collection action against the Plaintiff;

5.    For a declaratory judgment holding that Plaintiff's rights were violated as alleged above;

124

6.   For a judgment for the Plaintiff for all money damages available in a sum to be determined if Defendants steal her home, in an amount to be shown at trial;

7.   For an award of attorney fees to the Plaintiff for her reasonable attorney's fees, court costs and necessary disbursements incurred in connection with this lawsuit; and,

Plaintiff demands a jury trial.

WHEREFORE, Plaintiffs pray for judgment and an order against Defendants, inclusive, as follows:

1. That judgment be entered in Plaintiff's favor and against Defendants, and each of them;

2. For an order requiring Defendants to show cause, if any, why they should not be enjoined as set forth below, during the pendency of the action;

3. For a temporary restraining order, preliminary and permanent injunction preventing Defendants or anyone acting in concert with them, from collecting on the Subject Loan and from causing the subject property to be sold, assigned or transferred to a third party;

4. For an order stating that Defendants engaged in unfair business practices;

5. For damages, disgorgement, and injunctive relief under California's common and statutory law of unfair business practices;

6. For compensatory and statutory damages, attorneys' fees and costs according to proof at trial;

7. For treble damages;

8. For exemplary damages in an amount sufficient to punish and deter Defendants' misconduct;

9. For rescission of the promissory note;

10. An accounting of any amounts owed between Plaintiffs and Defendants;

11. For such other relief as the Court may deem just and proper.

8.    For such other and further relief as the Court deems just and equitable.

Respectfully submitted:

Dated this 22nd day of August, 2011.

TIA SMITH, Pro Per

# VERIFICATION

I, Tia Smith, am the Plaintiff in the above-entitled action.  I have read the foregoing Complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.  I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed this 1st day of August, 2011, in Los Angeles, California.


_____

TIA SMITH, Plaintiff

# MEMORANDUM OF LAW

## THE NOTE AND MORTGAGE (DEED OF TRUST) ARE INSEPARABLE

Kirby v. Williams 230 F2d 330 (US Court of Appeals, 5th cir.) Feb 10, 1956, Rehearing denied Apr. 24, 1956 states: **"the note and mortgage are inseparable, the former as essential, the latter as an incident. An assignment carries the mortgage with it, while an assignment of the latter is a _nullity._"**

Instant matter: presenting a copy of a note with the excuse of "customary procedure" is inadmissible. **See:** In United States of America v. Hibernia Nat'l. Bank, 841 F2d 592 96 A.L.R. Fed. 895, 5 UCC Rep. Serv. 2d 1392, U.S. Court of Appeals, 5th cir. Apr. 5, 1988. Rehearing and Rehearing En Banc Denied May 9, 1988, the Court stated: **"Hibernia's reliance on commercial custom is misplaced, _commercial custom does not apply where the UCC provides otherwise."_** Plaintiff has no evidence that U.S. BANK is a true holder in due course and that they have anything other than just a "copy" of the alleged note in question and the fraudulent assignment, the groundwork of a fraudulent foreclosure. This is inexcusable and shows the intent of U.S. BANK to deceive and misrepresent their true status.

**Carpenter v. Longan, 83 US 271, 274 21 L.Ed. 313 (1872):** The Note and Deed are inseparable. In this case, the Note and Deed have been separated from the beginning. This act alone determines that the acts of One West Bank have been without authority. **See; Restatement Property, 3rd.**

**In Re Leisure Time Sports, Inc. 194 B.R. 859, 861 (9th cir. 1996) stating that: _"[a] security interest cannot exist, much less be transferred, independent from the obligation which it secures and that, if the debt is not transferred, neither is the security interest."_** U.S. BANK has not, and cannot ever, evidence to this court that the Note and Deed were kept together or that any valid assignments were ever given in this matter. Since the original beneficial holder made no assignment to U.S. BANK, U.S. BANK takes the assignment as it was given to them, with no power of sale. Further, _the assignment evidenced by U.S. BANK as their proof of claim is void for illegal and improper filing with the County Recorders' Office._

*Kelly v. Upshaw*, 39 Cal. 2d 179, 192, 246 P2d 23 (1952): *"assigning only the deed without a transfer of the note is completely ineffective;* see also: Restatement of Property (3d) (Mortgages) § 5.4 stating: *"A mortgage may be enforced only by, or in behalf of, a person who is entitled to enforce the OBLIGATION that the mortgage secures."* (emphasis mine). Again, U.S. BANK fails to evidence their substantive right to invoke this courts' jurisdiction, making them subject to a lack of standing to even plead before this court.

## INJUNCTIVE RELIEF IS PROPER AND JUST

A private party may seek declaratory and injunctive relief against state actions on the basis of Federal preemption where a federal right exists [*Bernhardt v. Los Angeles County (9th cir. 2003) 339 F3d 920, 929]*. Plaintiffs are entitled to due process and have been denied that right by virtue of U.S. BANK availing themselves of the Courts' jurisdiction through the statutory scheme of non-judicial foreclosure.

**Injunctive Relief:** likelihood of irreparable injury: party must demonstrate irreparable injury is likely in the absence of injunction [**Winter v. Natural Resources Defense Council, Inc. (2008) See: Freedom Holdings, Inc. v. Spitzer (2nd cir. 2005) 408 F3d 112, 114-irreparable injury is the "single most important prerequisite for the issuance of a preliminary injunction."** In this instant matter, Plaintiff would be irreparably harmed by the illegal unlawful detainer proceeding as a direct result of the illegal foreclosure sale proceeding without proper authority in that they would lose possession of their property through the Defendants' abuse of the California statutory scheme of non-judicial foreclosure.

**"Sufficient serious questions make them a fair ground for litigation *plus the balance of hardships tipped sharply in plaintiffs favor."* [ Dept. of Parks and

Rec. for state of Calif. V. Bazaar Del Mundo, Inc. (9th cir. 2006) 448 F3d
1118,1123; Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Group, Inc. (2nd
cir. 1989) 886 F2d 490, 497; See also: J. Ginsburg Dissent Opn. In Winter v.
Natural Resources Defense Council, Inc., supra    US at    , 129 S.ct. at 392-
*court may evaluate claims for equitable relief on a "sliding scale", awarding
relief based upon a lower likelihood of harm when the likelihood of success is
very high..*

**Evidentiary considerations:** A preliminary injunction is customarily granted on
the basis of procedures less formal and evidence less complete than at trial.
Therefore, plaintiff need not prove his case at a preliminary injunction
hearing…plaintiffs' evidence *need not meet summary judgment standards.*
*(FRCP)*

*"Because the note in question was not payable 'to order or to the bearer', the
plaintiff payee did not 'hold in due course'.* [Pascal v. Tardera (1986) 123 A.D.
2d 752, 507 N.Y.S. 2d 225]; *"where an instrument is neither payable to order or
to bearer, no one can qualify as a holder in due course,"* [Key Bank of S.E New
York v. Strober Bros., Inc. (1988) 136 A.D. 2d 604, 523 N.Y.S. 2d 855].
Plaintiff Deutsche has exhibited no evidence of having the holder in due course
status needed to pursue this matter and cannot ever bring said evidence before this
court, nor can they ever evidence being or representing the true creditor. This
necessary element precludes Deutsche from exercising any power or authority over
the subject property.

"Where administrative action may result in loss of both property and life, or of all that makes life worth living, any doubt as to the extent of power delegated to administrative

officials is to be resolved in citizen's favor, and court must be especially sensitive to the citizen's rights where proceeding is non-judicial." **United States v. Minker,** 350 U.S.179(1956).

**ANY MERS ASSIGNMENT TO ANY NON-MERS MEMBER IS A NULLITY AND IS VOID FOR LACK OF AUTHORITY TO ASSIGN ANY INTEREST AS THERE IS NONE!** MERS, Inc. could never have given any rights to One West Bank it did not possess at the time of the recorded assignment, which is still void for violations of state and federal laws. MERS, Inc. argued in the above case that: *"it is not authorized to engage in the practices that would make it a party to __enforcement__ or __transfer of mortgages.__"* Non-judicial foreclosure is an obvious enforcement action and attempt to collect a debt by extortionate means within the state of California and, therefore, MERS, Inc. or any of its fatally assigned "beneficiaries" lacks the authority to invoke the statutes or laws within this state.

**Mtg. Electronic Reg. Sys., Inc. v. Nebraska Dep't. of Banking and Finance, 704 N.W. 2d 784, 786-787 (Neb. 2005) : MERS, Inc. represented that it "***only holds legal title to members' mortgages in a __nominee__ capacity and is contractually prohibited from exercising any rights with respect to the mortgages (i.e., foreclosures) without the authorization of its members."*

MERS, Inc Assignment does not confer standing or authority: See: In re Sheridan, 2009 WL 631355, *4(Bankr. D. Idaho 2009); in re Mitchell, 2009 WL 1044368, *3-4(Bankr. D. Nev. 2009); in re Jacobson, 402 B.R. 359, 367 (Bankr. W.D. Wash. 2009). As noted in the *Sheridan Court*, MERS, Inc. "collects no money from the debtors under the note(s), nor will it realize the value of the property through the foreclosure of the deed of trust in the event the note is not paid." 2009 W.L. 631355 at *4. MERS, Inc. and U.S. BANK have never had any pecuniary or financial interest in the subject property and lack standing to invoke the non-judicial foreclosure statutory scheme within the state of California.

Saxon Mortgage Services, Inc. v. Ruthie B. Hillery No. C-08-4357 EMC (Docket no. 7) US Dist. Court For Northern Dist. Of Calif.: *"Because MERS has no financial interest in the note, it will suffer no injury if the note is not paid and will realize no benefit if the D.O.T. is foreclosed. Accordingly, MERS, Inc. cannot satisfy the requirements of constitutional standing. GMAC, as MERS' assignee of the D.O.T., "stands in the shoes" of the assignor, taking only those rights and remedies the assignor would have had.* [Hunnicut Constr. Inc. v. Stewart Title & Trust of Tucson, Trust No. 3496, 187 Az. 301, 304 (Ct. App. 1996) *citing* Van Waters & Rogers v. Interchange Res., Inc., 114 Az. App. 414, 417 (1971); In re Boyajian, 367 B.R. 138, 145 (9th cir. BAP 2007). It is well settled law and is therefore a functional impossibility for MERS, Inc. to have assigned any rights to power of sale, substitution of trustee, non-judicial foreclosure, and ultimately, Unlawful Detainer, to Defendant U.S. Bank, or any other person/entity.

Bellistri v. Ocwen, 284 SW 3d, 619 (Missouri Appeal, cert. denied); In re

Vargas (Cal. B.K.) 396, Bankr. 517; Supreme Court State of Kansas,

Landmark Nat'l Bank v. Kesler, Mortgage Electronic Registration Systems,

Inc. (MERS) No. 98, 48: In these and all cases listed above, the courts

demonstrated that MERS, Inc's capacity is limited and that MERS, Inc. never had

the authority to execute the assignments. The courts all held the assignments to be

invalid. Even in the light most favorable to Deutsche Bank in this case, the

assignments allegedly made and filed by Deutsche are void and invalid on their

face for false information in the instrument as filed by Deutsche Bank.


## ALS CANNOT BENEFIT FROM RECORDING FALSE DOCUMENTS

Generes v. Justice Court, 106 Cal. App. 3d 678, 165 Cal. Rptr. 222 (3rd Dist.

1980); People v. Baender, 68 Cal. App. 49, 228 P. 536 (1st Dist. 1924): *"*

*knowingly recording spurious documents for the record with intent to defraud."*

Every person who files a false or forged document with the County Recorder that

affects title to, or places an encumbrance on, or places an interest secured by a

mortgage or deed of trust on, real property….with knowledge that the document is

false or forged is punishable by statute (Cal. Penal Code § 115.5 (a)(b)(c)(d)). The

word "knowingly" in the statute does not import intent, but merely refers to

knowledge of the essential facts. In the case of a deed, the crime is complete when

the deed has been prepared so that upon its' face it will have the effect of

defrauding one who acts upon it as genuine. Defendants have knowingly filed

documents within Los Angeles County Recorder's Office that are unquestionably

false and patently misleading to those relying on them as being true and correct,

thus damaging Plaintiff by the invalid trustee's deed upon sale that was directed by

U.S. Bank and clouding Plaintiffs' title.  The entire foreclosure proceeding is a

baseless, invalid monstrosity and is the foundation for Plaintiffs' case.

*California Civil Code §3517* No one can take advantage of his own wrong.

## WHEN THE NOTE IS SPLIT FROM THE DEED THE LOAN IS UNSECURED

When the note is split from the deed of trust, "the note becomes, as a practical matter, unsecured." RESTATEMENT (THIRD) OF PROPERTY (MORTGAGES) § 5.4 cmt. a (1997).

A person holding only a note lacks the power to foreclose because it lacks the security, and a person holding only a deed of trust suffers no default because only the holder of the note is entitled to payment on it. See RESTATEMENT (THIRD) OF PROPERTY (MORTGAGES) § 5.4 cmt. e (1997).

"Where the mortgagee has 'transferred' only the mortgage, the transaction is a **nullity** and his 'assignee,' having received no interest in the underlying debt or obligation, has a worthless piece of paper." 4 RICHARD R. POWELL, POWELL ON REAL PROPERTY, § 37.27[2] (2000).



TIA SMITH, PRO PER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit A

# Quitclaim Deeds



**RECORDING REQUESTED BY:**
North American Title Company

**AND WHEN RECORDED MAIL TO:**

Tia Danielle Smith
4011 Hubert Avenue
Los Angeles CA 90008

12/8/06

**20062729008**

THIS SPACE FOR RECORDER'S USE ONLY:

Title Order No.: 157-4019-63

Escrow No.: 100405-DS

## QUITCLAIM DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S)
           DOCUMENTARY TRANSFER TAX Is $NONE    CITY TRANSFER TAX $NONE
[X] computed on full value of property conveyed, or "This Conveyance transfers the grantors interest out of his or her revocable living trust, R & T 11930."
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[ ] Unincorporated area    [X] City of Los Angeles AND

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**Tia Smith Trustee of the Tia Smith Trust Dated December 4, 2003**

do(es) hereby remise, release and forever quitclaim to:

**Tia Danielle Smith, An Unmarried Woman**

the real property in the City of Los Angeles, County of Los Angeles, State of California, described as:

Lot 23 of Tract No. 11193, in the City of Los Angeles, County of Los Angeles, State of California, as per Map recorded in Book 202, Pages 18 and 19 of Maps, in the Office of the County Recorder of said County.
Also Known As:  4011 Hubert Avenue, Los Angeles, CA  90008
A.P. # 5033-016-023

DATED October 12, 2006
STATE OF CALIFORNIA
COUNTY OF Los Angeles
On ___ 12-2-06
Before me, Rosalind G. Acevedo notary
A Notary Public in and for said State, personally appeared Tia Smith -TR        Trustee
Tia Danielle Smith
~~personally known to me~~ (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that ~~he/she/they~~ executed the same in ~~his/her/their~~ authorized capacity(~~ies~~), and that by ~~his/her/their~~ signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.

ROSALIND G. ACEVEDO
Commission # 1644234
Notary Public - California
Los Angeles County
My Comm. Expires May 12, 2010

Signature_____                    (This area for official notarial seal)
MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS DIRECTED ABOVE:

RECORDING REQUESTED BY:
North American Title Company

AND WHEN RECORDED MAIL TO:

Tia Danielle Smith
4011 Hubert Avenue
Los Angeles CA 90008



12/11/06

20062737261

THIS SPACE FOR RECORDER'S USE ONLY:

Title Order No.: 157-4019-63    Escrow No.: 180405-DS

## QUITCLAIM DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S)

**DOCUMENTARY TRANSFER TAX is $NONE   CITY TRANSFER TAX $NONE**

[X] computed on full value of property conveyed, or"This Conveyance transfers the grantors interest into his or her revocable living trust, R & T 11930."

{ } computed on full value less value of liens or encumbrances remaining at time of sale.

{ } Unincorporated area   [X] City of Los Angeles AND

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**Tia Danielle Smith, An Unmarried Woman**

do(es) hereby remise, release and forever quitclaim to:

*"This conveyance transfers an interest into or out of a Living Trust, R & T 11930"*

**Tia Smith Trustee of the Tia Smith Trust Dated December 4, 2003**

the real property in the City of Los Angeles, County of Los Angeles, State of California, described as:

Lot 23 of Tract No. 11193, in the City of Los Angeles, County of Los Angeles, State of California, as per Map recorded in Book 202, Pages 18 and 19 of Maps, in the Office of the County Recorder of said County.
Also Known as: 4011 Hubert Avenue, Los Angeles, CA 90008
A.P. # 5033-016-023

DATED October 12, 2006
STATE OF CALIFORNIA
COUNTY OF Los Angeles
On 12-2-06
Before me, Rosalind G. Acevedo, notary,
A Notary Public in and for said State, personally appeared Tia Danielle Smith
Tia Danielle Smith

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument
WITNESS my hand and official seal.

ROSALIND G. ACEVEDO
Commission # 1666238
Notary Public - California
Los Angeles County
My Comm. Expires May 12, 2010

Signature _____                    (This area for official notarial seal)
MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS DIRECTED ABOVE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit B

# Deed of Trust

State of California
County of *Los Angeles*
On *12-2-06* , before me *RosaLind G Asevedo, notary Public* , personally appeared

*Tia Danielle Smith* , personally known to me (or proved to me on the basis
of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that
by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the
person(s) acted, executed the instrument
        WITNESS my hand and official seal



ROSALIND G. ASEVEDO
Commission # 1666636
Notary Public - California
Los Angeles County
My Comm. Expires May 12, 2010

FE-4331(CA) (0204)                    Page 10 of 10

(1)  No Hazardous Substance has been located, used, manufactured, generated, treated, handled, stored, spilled, disposed of, discharged or released by any person on, under or about the Property

(2)  Trustor has no knowledge of or reason to believe that there is any pending or threatened investigation, assessment, claim, demand, action or proceeding of any kind relating to (i) any alleged or actual Hazardous Substance located under or about the Property or (ii) alleged or actual violation or noncompliance by Trustor or any tenant of Trustor with regard to any Environmental Law involving the Property

(3)  Neither Trustor nor any tenant of Trustor is required by any Environmental Law to obtain or maintain any permit, license, financial responsibility certificate or other approval as a condition to its business operations or in connection with its use, development or maintenance of the Property

c.   Trustor represents and warrants that Trustor and every tenant of Trustor have been, are and will remain in full compliance with any Environmental Law applicable to its business operations and its use, development or maintenance of the Property

d.   Trustor agrees to permit, or cause any tenant of Trustor to permit, Beneficiary to enter and inspect the Property at any reasonable time for purposes of determining, as Beneficiary deems necessary or desirable, (i) the existence, location and nature of any Hazardous Substance on, under or about the Property, (ii) the existence, location, nature, magnitude and spread of any Hazardous Substance that has been spilled, disposed of, discharged or released on, under or about the Property or (iii) whether or not Trustor and any tenant of Trustor are in compliance with applicable Environmental Law. If Trustor or its tenant fails to comply fully with the terms hereof, Beneficiary may obtain affirmative injunctive relief therefor

e.   Trustor agrees to indemnify and hold Beneficiary and its successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including, without limitation, all costs of litigation and attorneys' fees, which Beneficiary and its successors and assigns may directly or indirectly sustain or suffer as a consequence of any inaccuracy or breach of any representation, warranty or promise made in this deed of trust in connection with any Hazardous Substance or Environmental Law Notwithstanding any of the language in the deed of trust to the contrary, this indemnity covers claims asserted after all the indebtedness secured by this deed of trust has been paid and discharged, whether or not the deed of trust has also been reconveyed to Trustor  The only exclusions hereto may relate to claims arising out of the affirmative acts of Beneficiary or of a third party after Trustor's interest in the Property has terminated.

f.   The provisions of this Paragraph 4 shall not be affected by the acquisition by Beneficiary or its successors or assigns of any ownership or other interest in the Property beyond Beneficiary's security interest in the Property created under this deed of trust, whether or not such acquisition is pursuant to the foreclosure of this deed of trust or a merger of the interest of the Beneficiary or its successors and assigns in the Property

FE-4331(CA) (0204)                    Page 8 of 10

affected by any prior declaration or notice of default. The exercise by Beneficiary of the right of rescission shall not constitute a waiver of any default then existing or subsequently occurring, nor impair the right of the Beneficiary to execute other declarations of default and demand for sale, or notices of default and of election to cause the Property to be sold, nor otherwise affect the note or deed of trust, or any of the rights, obligations or remedies of the Beneficiary or Trustee hereunder

h   At least three months or any lesser period required by law having elapsed between the recordation of the notice of default and the date of sale, Trustee, having first given notice of sale as then required by law, shall sell the Property at the time and place of sale fixed by it in the notice of sale, either as a whole or in separate parcels, and in such order as the Trustee may determine, at public auction to the highest bidder for cash, in lawful money of the United State of America, payable at the time of sale except as otherwise permitted by law  Trustee may postpone sale of all or any portion of the Property by public announcement at the time of sale, and from time to time thereafter may postpone the sale by public announcement, all as permitted by law. Trustee shall deliver to the purchaser its deed conveying the Property so sold, but without any covenant or warranty, expressed or implied  The recital in any such deed of any matters or facts, stated either specifically or in general terms, or as conclusions of law or fact, shall be conclusive proof of the truthfulness thereof  Any person, including Trustor, Trustee or Beneficiary, may purchase at the sale. After deducting all costs, fees and expenses of Trustee and of this trust, including costs of evidence of title in connection with the sale, the Trustee shall apply the proceeds of this sale to the payment of all sums then secured hereby, in such order and manner as may be required by the Beneficiary, the remainder, if any, to be paid to the person or persons legally entitled thereto  If Beneficiary shall elect to bring suit to foreclose this deed of trust in the manner and subject to the provisions, rights and remedies relating to the foreclosure of a mortgage, Beneficiary shall be entitled to reasonable attorney's fees and litigation costs

i   Beneficiary, or any successor in ownership of any indebtedness secured hereby, may from time to time, by instrument in writing, substitute a successor or successors to any Trustee named herein or acting hereunder, which instrument, executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where said property is situated, shall be conclusive proof of proper substitution of such successor Trustee or Trustees, who shall, without conveyance from the Trustee predecessor, succeed to all its title, estate, rights, powers and duties  Said instrument must contain the name of the original Trustor, Trustee and Beneficiary hereunder, the book and page where this deed of trust is recorded and the name and address of the new Trustee

j   This deed of trust applies to, inures to the benefit of, and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors and assigns. The term Beneficiary shall mean the owner and holder, including, without limitation, pledgees, of the note, guarantee, Agreement, or other evidence of indebtedness secured hereby, whether or not named as Beneficiary herein. In this deed of trust, whenever the context so requires, the singular number includes the plural

k   Trustee accepts this Trust when this deed of trust, duly executed and acknowledged, is made a public record as provided by law  Trustee is not obligated to notify any party hereto of pending sale under any other deed of trust or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a party unless brought by Trustee

FE4331(CA) (0204)                         Page 8 of 10



06  2706010

5

f    To pay immediately and without demand all sums so expended by Beneficiary or Trustee,
with interest from date of expenditure at the maximum rate allowed by law in effect at the date
hereof or at the option of Beneficiary, such sums may be added to the principal balance of any
indebtedness secured hereby and shall bear the highest rate of interest as any such indebtedness.

g.    To pay for any statement provided for by the law in effect on the date hereof regarding the
obligation secured hereby in the amount demanded by the Beneficiary but not to exceed the
maximum allowed by law at the time the statement is demanded.

3.    IT IS FURTHER AGREED THAT

a    Any award of damages in connection with any condemnation for public use of or injury to
the Property or any part thereof is hereby assigned and shall be paid to Beneficiary who may apply
or release such monies received by him in the same manner and with the same effect as above
provided for disposition of fire or other insurance

b.    By accepting payment of any sum secured hereby after its due date, or after the filing of
notice of default and of election to sell, Beneficiary shall not waive its right to require prompt
payment when due of all other sums so secured, or to declare default for failure so to pay, or to
proceed with the sale under any such notice of default and of election to sell, for any unpaid
balance of said indebtedness. If Beneficiary holds any additional security for any obligation
secured hereby, it may enforce the sale thereof at its option, either before, contemporaneously
with, or after the sale is made hereunder, and on any default of Trustor, Beneficiary may, at its
option, offset against any indebtedness owing by it to Trustor, the whole or any part of the
indebtedness secured hereby

c    Without affecting the liability of any person, including, without limitation, Trustor, for the
payment of any indebtedness secured hereby, or the lien of this deed of trust on the remainder of
the Property for the full amount of any indebtedness unpaid, Beneficiary and Trustee are
respectively empowered as follows

(1)    Beneficiary may from time to time and without notice (a) release any person liable
for the payment of any of the indebtedness, (b) extend the time or otherwise alter the
terms of payment of any of the indebtedness, (c) accept additional security therefor of
any kind, including deeds of trust or mortgages, (d) alter, substitute or release any of the
Property securing the indebtedness

(2)    Trustee may, at any time, and from time to time, upon the written request of
Beneficiary (a) consent to the making of any map or plat of the Property, (b) join in
granting any easement or creating any restriction thereon, (c) join in any subordination or
other agreement affecting this deed of trust or the lien or charge thereof or, (d) reconvey,
without any warranty, all or any part of the Property

d.    Upon (a) written request of Beneficiary or (b) performance of all obligations of the Trustor
hereunder and under each and every note, guarantee, Agreement or other writing evidencing the
indebtedness secured hereby, and upon surrender of this deed of trust to Trustee for cancellation
and retention and upon payment of its fees, Trustee shall reconvey, without warranty, the
Property then held hereunder. The recital in such reconveyance of any matters of facts shall be
conclusive proof of the truthfulness thereof  The grantee in such reconveyance may be described

FE-4331(CA) (0204)                              Page 4 of 10


06 2729010

Parcel ID Number    5033-016-023                together with all improvements
now or hereafter erected on the property, and all easements, rights, appurtenances, rents (subject however
to the rights and authorities given herein to Beneficiary to collect and apply such rents), royalties, mineral,
oil and gas rights and profits, water, water rights, and water stock, and all fixtures now or hereafter
attached to the property, all of which, including replacements and additions thereto, shall be deemed to be
and remain a part of the property covered by this deed of trust, and all of the foregoing, together with said
property (or the leasehold estate if this deed of trust is on a leasehold) are herein referred to as the
"Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by
Borrower in this Deed of Trust; but, if necessary to comply with law or custom, MERS, (as nominee for
Lender and Lender's successors and assigns), has the right to exercise any or all of those interests,
including, but not limited to, the right to foreclose and sell the Property, and to take any action required of
Lender including, but not limited to, releasing or canceling this Deed of Trust.

**1.    THIS DEED OF TRUST SECURES**

    a    All of the obligations of Trustor in favor of Beneficiary or order under the terms of a
revolving credit agreement dated    NOVEMBER 13, 2006 , herein called Agreement  The
Agreement provides, among other things, for the payment of all sums advanced by Beneficiary
from time to time pursuant to the Agreement and for the payment of interest  The maximum
principal obligation under the Agreement to be secured by this deed of trust at any one time is
SIXTY NINE THOUSAND FIVE HUNDRED AND 00/100
Dollars ($    69,500.00    ) unless Beneficiary, with Trustor's written consent, hereafter
increases this amount. Advances made by Beneficiary to protect the security of this deed of trust
or to preserve the Property shall not be subject to the limitation of the preceding sentence

    The security of this deed of trust shall not be affected by the extension, renewal or modification
from time to time of the obligations, instruments or agreements described above

    b    Payment of any and all obligations and liabilities, whatsoever, whether primary, secondary,
direct, indirect, fixed or contingent, whether now or hereafter due from Trustor (or any successor
in interest to Trustor) whether created directly or acquired by assignment if the document
evidencing such obligation or liability or any other writing signed by Trustor (or any successor in
interest to Trustor) specifically provides that said obligation or liability is secured by this deed of
trust

    c    Performance of each agreement of Trustor herein contained or contained in any other
agreement, instrument or other writing to which Trustor is a party if the same is written in
connection with any of the foregoing

FE-4331(CA) (0204)                Page 2 of 10

23

# RIDER TO NOTE AND SECURITY INSTRUMENT

LOAN NO.       ███8130

THIS RIDER is made this 13TH day of       NOVEMBER,    2006       and is
incorporated into and shall be deemed to amend and supplement both the Note and Mortgage, Deed of
Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the
"Borrower") to secure Borrower's Note (the "Note") to    AMERICAN MORTGAGE NETWORK, INC., A
DELAWARE CORPORATION                                                                (the "Lender")
of the same date and covering the property described in the Security Instrument and located at:

4011 HUBERT AVENUE, LOS ANGELES, CALIFORNIA 90008-2621

                         [Property Address]

## PREPAYMENT PENALTY - FIRST    12       MONTHS OF NOTE

You have the right to make payments of Principal at any time before they are due. A payment of
Principal only is known as a "Prepayment". When you make a Prepayment, you must tell the Note
Holder in writing that you are doing so.

Subject to the Prepayment Penalty specified below, you may make a full Prepayment or partial
Prepayment of your obligation. The Note Holder will use all of your Prepayments to reduce the amount
of principal that you owe under this Note. If you make a partial Prepayment, there will be no changes in
the due date(s) or in the amount of your monthly payment unless the Note Holder agrees in writing to
those changes.

If within the 12 month period beginning with the date of the Note, (the "Penalty Period"), you
make a full or partial Prepayment, you will pay a prepayment charge as consideration for the Note
Holder's acceptance of such payment. No prepayment charge will be assessed for any prepayment
made after the Penalty Period.

You may prepay an amount not exceeding twenty percent (20%) of the original principal amount in
any twelve month period commencing from the date of the Note or anniversary dates thereof
without penalty. However, during the Penalty Period, if the aggregate amount of the principal
prepaid in any twelve month period exceeds twenty percent (20%) of the original principal amount
of this loan, then as consideration of the acceptance of such Prepayment and in addition to any
other sum payable hereunder, you agree to pay the Note Holder hereof a sum equal to six (6)
months interest on the amount prepaid in excess of twenty percent (20%) of the original principal
amount at the rate specified in the Note.

Such additional sums shall be paid whether prepayment is voluntary or involuntary including any
prepayment affected by the exercise of any acceleration provisions contained in the Note to which
this Rider is attached, or in the Security Instrument securing the Note to which this Rider is
attached.

1/18/05                          Page 1 of 2                          ACST1551

                                 1559T                               B1CA

06  2726009

*U*

LOAN NO. ████████130

**(H)  Payment Options**

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)   Interest Only Payment:  the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)  Fully Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments

(iii) 15 Year Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term

These Payment Options are only applicable if they are greater than the Minimum Payment

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing

PayOption MTA ARM Rider
FE-5315 (0511)                    Page 4 of 5

06 27 29009

19

LOAN NO. ████████130

### (C) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (D) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding   THREE AND 400/1000   percentage point(s)   3.400   % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be greater than   9.950   %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

## 3.  PAYMENTS

### (A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the   1ST   day of each month beginning on   JANUARY   01, 2007   I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   DECEMBER 01, 2036   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   P. O. BOX 85302
                    ATTN:  CASHIER'S DEPT., SAN DIEGO, CA 92186
or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $   1,918.87   unless adjusted under Section 3 (F).

### (C) Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the   1ST   day of   JANUARY, 2008   , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

**PayOption MTA ARM Rider**
FE-5315 (0511)                    Page 2 of 5

06 2729009

17

EXHIBIT "A"
(LEGAL DESCRIPTION)

LOT 23 OF TRACT 11193, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF
CALIFORNIA, AS PER MAP RECORDED IN BOOK 202, PAGES 18 AND 19 OF MAPS, RECORDS IN THE
OFFICE OF THE COUNTY RECORDER OF SAID LOS ANGELES COUNTY.

17

**EXHIBIT "A"**
**(LEGAL DESCRIPTION)**

LOT 23 OF TRACT 11193, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF
CALIFORNIA, AS PER MAP RECORDED IN BOOK 202, PAGES 18 AND 19 OF MAPS, RECORDS IN THE
OFFICE OF THE COUNTY RECORDER OF SAID LOS ANGELES COUNTY.

06  2729006

13

requires in connection with a notice of transfer of servicing  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph  The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20

21.  **Hazardous Substances.**  As used in this Section 21  (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials, (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection, (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property  Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products)

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law  Nothing herein shall create any obligation on Lender for an Environmental Cleanup

-6A(CA) (0207)01                          Page 12 of 16                          Form 3005  1/01

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

-6A(CA) (0207)01                                    Page 8 of 15                                    Form 3005    1/01

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires What Lender requires pursuant to the preceding sentences can change during the term of the Loan The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense Lender is under no obligation to purchase any particular type or amount of coverage Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender Lender may make proof of loss if not made promptly by Borrower Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

-6A(CA) (0207) 01                              Page 6 of 15                          Form 3005   1/01

5

of record  Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS  Borrower and Lender covenant and agree as follows.

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15 Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted  If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds  Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current  If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower  If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure  No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge  If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any, (c) premiums for any and all insurance required by Lender under Section 5, and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10  These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item  Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section  Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items  Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time  Any such waiver may only be

-6A(CA) (0207)01                    Page 4 of 15                    Form 3005  1/01

06  2720009

Lender's address is   P. O. BOX 85463, SAN DIEGO, CA 92186

**(D) "Trustee"** is   FIRST AMERICAN TITLE INSURANCE COMPANY

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary
under this Security Instrument MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P O Box 2026, Flint, MI 48501-2026, tel (888) 679-MERS

**(F) "Note"** means the promissory note signed by Borrower and dated   NOVEMBER 13, 2006
The Note states that Borrower owes Lender   FIVE HUNDRED FIFTY SIX THOUSAND AND
   00/100                                                                                                Dollars
(U S $    556,000.00    ) plus interest  Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than     DECEMBER 01, 2036

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower  The following
Riders are to be executed by Borrower [check box as applicable]

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |
| | | PREPAYMENT PENALTY RIDER |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization

**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.

**(M) "Escrow Items"** means those items that are described in Section 3

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for, (i)
damage to, or destruction of, the Property, (ii) condemnation or other taking of all or any part of the
Property, (iii) conveyance in lieu of condemnation, or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument,



-6A(CA) (0207)01                                    Page 2 of 15                                    Form 3005   1/01

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit C

# Notice of Default

733396

THIS IS TO CERTIFY THAT THIS IS A FULL,
TRUE AND CORRECT COPY OF THE ORIGINAL
RECORDED IN THE OFFICE OF THE COUNTY

**Recording Requested By**
**When Recorded Mail To**

RECORDING FEE:    **$15.00**

RECORDED ON:    **September 24, 2009**

Cal-Western Reconveyance Corp.
P.O. Box 22004
525 East Main Street
El Cajon CA 92022-9004

AS DOCUMENT NO:    **09-1452803**

BY:    **s/ Luis Henriquez**

LSI TITLE COMPANY (CA)

*1241071-14*  *NDXXR*
Trustee Sale No. 1241071-14
09066 3370

Space Above This Line For Recorder's Use

Loan No. XXXXXX6453 Ref: SMITH, TIA DANIELLE

# NOTICE OF DEFAULT

## IMPORTANT NOTICE

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN
YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION, and you may
have legal right to bring your account in good standing by paying all of your past due payments plus
permitted costs and expenses within the time permitted by law for reinstatement of your account, which
is normally five business days prior to the date set for the sale of your property. No sale date may be set
until three months from the date this notice of default may be recorded (which date of recordation
appears on this notice). This amount is $25,509.83 as of September 23, 2009, and will increase until your
account becomes current. While your property is in foreclosure, you still must pay other obligations
(such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make
future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other
obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist
that you do so in order to reinstate your account in good standing. In addition, the beneficiary or
mortgagee may require as a condition to reinstatement that you provide reliable written evidence that
you paid all senior liens, property taxes, and hazard insurance premiums.**

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the
entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even
though full payment was demanded, but you must pay all amounts in default at the time payment is
made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time
the notice of sale is posted (which may not be earlier than the end of the three-month period stated above)
to, among other things, (1) provide additional time in which to cure the default by transfer of the
property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1)
and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the
obligation being foreclosed upon or a separate written agreement between you and your creditor permits
a longer period, you have only the legal right to stop the sale of your property by paying the entire
amount demanded by your creditor.

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your
property is in foreclosure for any other reason, contact:

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC

C/O CAL-WESTERN RECONVEYANCE CORPORATION
525 EAST MAIN STREET
P.O. BOX 22004
EL CAJON        9004  CA 92022-9004
(619)590-9200

If you have any questions, you should contact a lawyer or the governmental agency which may have
insured your loan.

Page 1 of 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit D

# Notice of Trustee's Sale

RECORDING REQUESTED BY
And When Recorded Mail To:

CAL-WESTERN RECONVEYANCE CORPORATION
525 EAST MAIN STREET
P.O. BOX 22004
EL CAJON CA 92022-9004

*1241071-14*  *nosxr*

Trustee Sale No. 1241071-14

Space Above This Line For Recorder's Use

 6570     **NOTICE OF TRUSTEE'S SALE**

LOAN NO: XXXXXX6453
REF. SMITH, TIA DANIELLE

APN: 5033-016-023  TRA 000067
UNINS

### IMPORTANT NOTICE TO PROPERTY OWNER:

YOU ARE IN DEFAULT UNDER A DEED OF TRUST, DATED November 13, 2006.  UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE.  IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER

On **January 19, 2010**, at **10:00am**, CAL-WESTERN RECONVEYANCE CORPORATION, as duly appointed trustee under and pursuant to Deed of Trust recorded December 08, 2006, as Inst. No. 20062729009, in book XX, page XX, of Official Records in the office of the County Recorder of LOS ANGELES County, State of CALIFORNIA executed by:

### TIA DANIELLE SMITH, AN UNMARRIED WOMAN

WILL SELL AT PUBLIC AUCTION TO HIGHEST BIDDER FOR CASH, CASHIER'S CHECK DRAWN ON A STATE OR NATIONAL BANK, A CHECK DRAWN BY A STATE OR FEDERAL CREDIT UNION, OR A CHECK DRAWN BY A STATE OR FEDERAL SAVINGS AND LOAN ASSOCIATION, SAVINGS ASSOCIATION, OR SAVINGS BANK SPECIFIED IN SECTION 5102 OF THE FINANCIAL CODE AND AUTHORIZED TO DO BUSINESS IN THIS STATE:

**AT THE WEST SIDE OF THE LOS ANGELES COUNTY COURTHOUSE, SOUTHEAST DISTRICT, 12720 NORWALK BLVD., NORWALK CALIFORNIA**

all right, title and interest conveyed to and now held by it under said Deed of Trust in the property situated in said County and State described as:

### COMPLETELY DESCRIBED IN SAID DEED OF TRUST

NOS DOC                    Rev 07/06/09                    Page 1 of 2

3

## NOTICE OF TRUSTEE'S SALE

Trustee Sales No. 1241071-14

The street address and other common designation, if any, of the real property described above is
purported to be:
**4011 HUBERT AVENUE**
**LOS ANGELES  CA  90008**

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other
common designation, if any, shown herein.

Said sale will be held, but without covenant or warranty, express or implied, regarding title, possession,
condition, or encumbrances, including fees, charges and expenses of the Trustee and of the trusts created
by said Deed of Trust, to pay the remaining principal sums of the note(s) secured by said Deed of Trust.
The total amount of the unpaid balance of the obligation secured by the property to be sold and reasonable
estimated costs, expenses and advances at the time of the initial publication of the Notice of Sale is:
$630,063.73.

**If the Trustee is unable to convey title for any reason, the successful bidder's sole and exclusive
remedy shall be the return of monies paid to the Trustee, and the successful bidder shall have no
further recourse.**

The beneficiary under said Deed of Trust heretofore executed and delivered to the undersigned a written
Declaration of Default and Demand for Sale, and a written Notice of Default and Election to Sell. The
undersigned caused said Notice of Default and Election to Sell to be recorded in the county where the real
property is located.

**Regarding the property that is the subject of this notice of sale, the "mortgage loan servicer" as
defined in Civil Code § 2923.53(k)(3), declares that it has obtained from the Commissioner a final
or temporary order of exemption pursuant to Civil Code section 2923.53 and that the exemption is
current and valid on the date this notice of sale is recorded.  The time frame for giving a notice of
sale specified in Civil Code Section 2923.52 subdivision (a) does not apply to this notice of sale
pursuant to Civil Code Sections 2923.52.**

FOR SALES INFORMATION: Mon – Fri 9.00am to 4:00pm (619)590-1221
**CAL-WESTERN RECONVEYANCE CORPORATION**
**525 EAST MAIN STREET**
**P.O. BOX 22004**
**EL CAJON  CA  92022-9004**

Dated: December 29, 2009                    CAL-WESTERN RECONVEYANCE CORPORATION

                                            By: *Pete Vella*
                                            Authorized Signature

                                            *Pete Vella /kv.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit E

# Corporate Assignment Of Deed

# Of Trust

Recording Requested By.
AURORA LOAN SERVICES

When Recorded Return To.

ASSIGNMENT PREP
AURORA LOAN SERVICES
P.O. Box 1706
Scottsbluff, NE 69363-1706

*12/31/2009*

*20091994646*

*1241071-14*
*fc 090665570*

## CORPORATE ASSIGNMENT OF DEED OF TRUST

Los Angeles, California
SELLER'S SERVICING #:▮▮▮▮5453 "SMITH"

MERS #: 100131020609991302 VRU #: 1-888-679-6377

Prepared By.   Kathleen Olson,  AURORA LOAN SERVICES 2617 COLLEGE PARK, PO BOX 1706, SCOTTSBLUFF, NE
69363-1706 308-635-3500

For Value Received, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC , AS NOMINEE FOR AMERICAN
MORTGAGE NETWORK, INC., A DELAWARE CORPORATION IT'S SUCCESSORS OR ASSIGNS hereby grants,
assigns and tranfers to AURORA LOAN SERVICES LLC at 2617 COLLEGE PARK, SCOTTSBLUFF, NE 69361 all
beneficial interest under that certain Deed of Trust dated 11/13/2006 , in the amount of $556,000 00, executed by
TIA DANIELLE SMITH, AN UNMARRIED WOMAN to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS,
INC., AS NOMINEE FOR AMERICAN MORTGAGE NETWORK, INC., A DELAWARE CORPORATION and
Recorded: 12/08/2006  as Instrument No.· 20062729009 in Los Angeles,  California

Together with the note or notes therein described or referred to, in said Deed of Trust, the money due and to
become due thereon with interest, and all rights accrued or to accrue under said Deed of Trust.

In witness whereof this instrument is executed

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC , AS NOMINEE FOR AMERICAN MORTGAGE
NETWORK, INC., A DELAWARE CORPORATION IT'S SUCCESSORS OR ASSIGNS
On October 1st. 2009

THEODORE SCHULTZ, Vice-President

SLAI
1994

*KFO*KFOALSI*10/01/2009 12 05 43 PM* ALSI01ALSIA000000000000000000800832* CALOS A* 0021796453 CASTATE_TRUST_ASSIGN_ASSN *KFOALSI*

18

CORPORATE ASSIGNMENT OF DEED OF TRUST Page 2 of 2

STATE OF Nebraska
COUNTY OF Scotts Bluff

On October 1st, 2009 before me, ROBERTA A. RUMMEL, Notary Public, personally appeared THEODORE
SCHULTZ, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Nebraska that the foregoing paragraph is true
and correct.

WITNESS my hand and official seal,

ROBERTA A. RUMMEL
Notary Expires: 09/18/2010

GENERAL NOTARY-State of Nebraska
ROBERTA A. RUMMEL
My Comm. Exp. Sept. 18, 2010

(This area for notarial seal)

*KFO*KFOALSI*10/01/2008 12:05:43 PM* ALSI01ALSIA0000000000000000000632* CALOS A* 0021798453 CASTATE_TRUST_ASSIGN_ASSN **KFOALSI*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit F

# SUBSTITUTION OF

# TRUSTEE

·RECORDING REQUESTED BY:

AND WHEN RECORDED MAIL TO:



11/09/2009

*20091682871*

CAL-WESTERN RECONVEYANCE CORPORATION
525 EAST MAIN STREET
P.O. BOX 22004
EL CAJON CA 92022-9004

 

SPACE ABOVE THIS LINE FOR RECORDER'S USE

LOAN NO.: XXXXXX6453 T.S. NO.:  1241071-14
MERS PHONE: 1-888-679-6377    MIN NO: 1001310 2060989130 2

090aa05570

# SUBSTITUTION OF TRUSTEE
### This Form Provided By Cal-Western Reconveyance Corporation

WHEREAS, TIA DANIELLE SMITH, AN UNMARRIED WOMAN  was the original Trustor,

FIRST AMERICAN TITLE INSURANCE COMPANY
was the original Trustee,

and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR
AMERICAN MORTGAGE NETWORK, INC., A DELAWARE CORPORATION  was the original
Beneficiary

under that certain Deed of Trust dated November 13, 2006 and recorded on December 08, 2006 as
Instrument No. 20062729009, in book XX, page XX of Official Records of LOS ANGELES County,
California, and

WHEREAS, the undersigned is the present Beneficiary under said Deed of Trust, and WHEREAS,
the undersigned desires to substitute a new Trustee under said Deed of Trust in the place and stead of
present Trustee thereunder, in the manner in said Deed of Trust provided.

NOW, THEREFORE, the undersigned hereby substitutes

CAL-WESTERN RECONVEYANCE CORPORATION
525 EAST MAIN STREET, P.O. BOX 22004
EL CAJON CA  92022-9004

as Trustee under said Deed of Trust.

# SUBSTITUTION OF TRUSTEE

3

**LOAN NO:** *6453*

**TS NO:** *124/071-14*

Whenever the context hereof so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

**Dated:** SEP 1 5 2009

Mortgage Electronic Registration Systems, Inc. (MERS)

Jennifer Victa
**Assistant Secretary of MERS**

**STATE OF:** California
**COUNTY OF:** San Diego

On 11/3/09 before me, J Archuleta , a Notary Public, personally appeared Jennifer Victa, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature J. Archuleta                                      (Seal)

J ARCHULETA
Commission # 1695691
Notary Public - California
San Diego County
My Comm. Expires Oct 22, 2010