QUARLES & BRADY LLP
One Renaissance Square
Two North Central Avenue
Phoenix, Arizona 85004-2391
Telephone: (602) 229-5200
Facsimile: (602) 229-5690
John M. O'Neal, Esq. (admitted *pro hac vice*)
john.oneal@ quarles.com
Walter J. Ashbrook, Esq. (admitted *pro hac vice*)
walter.ashbrook@quarles.com

*Counsel for OneWest Claimants*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, et al., | Case No. 12-12020-MG |
| Debtors. | (Jointly Administered) |

## DECLARATION OF REBECCA MARKS IN SUPPORT OF RESPONSE OF ONEWEST CLAIMANTS IN OPPOSITION TO CLAIM OBJECTION

I, REBECCA MARKS, hereby declare as follows:

1.    I am an Assistant Vice President of OneWest Bank N.A., formerly known as OneWest Bank, FSB ("**OneWest**").  I am over the age of 18 and am competent to testify as to the matters contained herein.  I am authorized to sign this declaration on behalf of OneWest.

2.    In the regular performance of my job functions, I am familiar with business records maintained by OneWest for the mortgage loans it owns and mortgage loans that OneWest services, including the mortgage loan at issue in this matter and referred to below.  These records (which include data compilations, electronically imaged documents, and others) are made at or near the time of the occurrences or transactions recorded therein by a person with knowledge, or from information provided by a person with knowledge, and are kept in the course of business activity conducted regularly by OneWest.  It is the regular practice of OneWest's mortgage-servicing business to make and/or to maintain these records.  In connection with making this declaration, I have acquired personal knowledge of the matters stated herein by personally examining these business records.  Accurate copies of some of those business records are attached hereto.

3.    On or around August 30, 2005, a refinancing transaction (the "**Refinance**") was completed in which borrower Mayra Hernandez ("**Borrower**"), residing at 8234 E. Desert Cove, Scottsdale, AZ   85260 (the "**Property**"), borrowed approximately $640,000 (the "**Refinance Loan**") from IndyMac Bank, F.S.B. ("**IndyMac**") to pay off (a) an existing first mortgage held by Citi Mortgage in the amount of approximately $543,320.63, and (b) a junior home equity line of credit ("**HELOC**") held by Debtor Homecomings Financial, LLC ("**Homecomings Financial**") in the amount of approximately $101,846.28. The Refinance Loan was to be secured by a first position deed of trust recorded against the Property.

4.    Prior to the close of escrow, Homecomings provided a payoff statement for the HELOC (the "**Payoff Letter**").  A copy of the Payoff Letter is attached hereto as **Exhibit "1"** and is incorporated herein by this reference.

-2-

5.    The HUD Settlement Statement for the closing shows that $543,320.63 was sent from escrow to CitiBank, and $101,846.28 was sent to Homecomings. A copy of the HUD Settlement Statement is attached hereto as **Exhibit "2"**. Those amounts were sufficient to pay both loans in full.

6.    A copy of the promissory note evidencing the Refinance Loan is attached hereto as **Exhibit "3"**.

7.    A Deed of Trust securing the Refinance Loan (the "**Deed of Trust**") was recorded in the Official Records of the Maricopa County Recorder's Office (the "**Official Records**") as Recorder's Number 20051308183 on September 7, 2005 and is attached hereto as **Exhibit "4"**.

8.    On July 11, 2008 IndyMac was closed by the Office of Thrift Supervision ("OTS"), and the Federal Deposit Insurance Corporation ("FDIC") was appointed receiver of IndyMac. On the same date, the OTS chartered a new institution, IndyMac Federal Bank, FSB ("IndyMac Federal"), and appointed the FDIC as conservator.

9.    OneWest acquired substantially all the assets and mortgage servicing rights of IndyMac Federal from the FDIC, as receiver for IndyMac Federal, on March 19, 2009. The following is a link to the FDIC public record detailing the acquisition: https://www.fdic.gov/bank/individual/failed/IndyMac.html.

10.    On or about April 18, 2009, MERS assigned legal title to the Refinance Loan and Deed of Trust to IndyMac Federal by a certain Assignment of Deed of Trust recorded in the Official Records on May 28, 2009 as Recorder's Number 20090482227 ("**MERS Assignment**"). A copy of the MERS Assignment is attached hereto as **Exhibit "5"**.

11.    On or about February 5, 2010, IndyMac Federal assigned beneficial interests of the Refinance Loan and the Deed of Trust to Deutsche Bank National Trust Company, as Trustee of the IndyMac INDX Mortgage Loan Trust 2005-AR23, Mortgage Pass-Through Certificates, Series 2005-AR23 under the Pooling and Servicing Agreement dated September 1, 2005 ("**Deutsche Bank**") by virtue of (among other things) an Assignment of Deed

-3-

Trust, which was recorded in the Official Records on March 3, 2010 as Recorder's Number 20100182325 (the "**Assignment to Deutsche Bank**"). A copy of the Assignment is attached hereto as **Exhibit "6"**.

12.    Accordingly, Deutsche Bank and OneWest (as the servicer for the Refinance Loan) were the owner and holders of the Refinance Loan and authorized to enforce it according to its terms up to and at the time of the foreclosure sale on the HELOC on or about August 16, 2011, and Deutsche Bank still is the owner of the Refinance Loan. On or about November 1, 2013, OneWest transferred the servicing rights regarding the administrative aspects of the Refinance Loan to Ocwen Financial Corporation (including responsibility to collect payments, and send out correspondence in connection therewith); but, pursuant to a Cooperation Agreement with Ocwen, retained and maintains the authority on behalf of Deutsche Bank to pursue this claim in the above-captioned bankruptcy cases.

13.    After the Refinance, Borrower defaulted on her obligations owed under the Refinance Loan by, among other things, failing to pay timely amounts due and owing thereunder.

14.    As of August 11, 2011, the amounts due and owing under the Refinance Loan included at least the following:

| | |
|---|---|
| Principal Balance | $693,970.20 |
| Interest | $109,912.64 |
| Escrow Advance | $ 10,569.86 |
| Corporate Advance | $  5,831.66 |
| Late Charges | $  4,079.76 |
| Attorneys' Fees/Costs[1] | $ 36,226.28 |
| **Total Due as of 8/11/11** | **$806,590.40** |

I declare under the penalty of perjury that the foregoing is true and correct.


DATED this 26th day of August, 2014.

---
[1] Through November 7, 2012.

-4-

OneWest Bank N.A.

QB\29377939.2

# EXHIBIT "1"

## PAYOFF STATEMENT TO CLOSE LINE OF CREDIT

**REMIT PAYOFF FUNDS TO:**
Homecomings Financial
2711 North Haskell Ave.
Suite 1300
Dallas, TX  75204
or see below for wiring instructions

Customer Service: 1-800-206-2901

Requestor Information:
FAX: 6029262498

**Date: August 15, 2005**

**Mortgagor & Property Address:**
Mayra Hernandez
Joanna Hernandez
8234 East Desert Cove
Scottsdale, AZ 852600000

PLEASE CHECK THIS INFORMATION TO ENSURE
IT MATCHES THE LOAN YOU INTEND TO PAY OFF

Mailing Address:
Mayra Hernandez
Joanna Hernandez
8234 East Desert Cove
Scottsdale, AZ 852600000

Loan Number: 0391932118
Per Diem:  $ 25.22

**NEXT DUE DATE:** September 20, 2005
Current Escrow Balance: $      .00

CURRENT LOAN INFORMATION:

| | |
|---|---:|
| Principal | $ 100,873.16 |
| Interest Thru | $ 353.06 |
| Escrow Advance | $ .00 |
| Unpaid Late charges | $ .00 |
| Corporate Advance | $ .00 |
| Recording Fee | $ 10.00 |
| Amount to satisfy note obligation | $ 101,236.22 |
| Payoff statement fee | $ 30.00 |
| **Total as of August 15, 2005** | **$ 101,266.22** |

Funds received after Aug 15, 2005 will require additional interest of $25.22
per day.  Add a late charge of $10.00, if received after Oct 5th. If funds
are sent via wire, please add a wire fee of $20.00.  This quote is only
valid up to 30 days after issue date or up to the PENDING COSTS G/T date if
specified above.

THIS LOAN MUST BE KEPT CURRENT WHILE THE PAYOFF IS PENDING. Balances owed
will change if a payment becomes due, is late, is paid, is reversed or if a
disbursement for taxes or insurance is made on your behalf.  Please note the
next due date referenced above to determine the status of the loan. If the
loan is or becomes delinquent or subject to foreclosure or bankruptcy
proceedings, you will be responsible for additional legal costs/fees.
Please be aware that these costs will not be waived. Homecomings reserves
the right to correct/update any portion of the information contained in the
payoff statement at any time.  Issuance of this statement does not suspend
the contractual requirement to make mortgage payments when due.

Sending payoff funds to Homecomings authorizes Homecomings to CLOSE the line
of credit. Pay offs must be made by CERTIFIED FUNDS or WIRE TRANSFER. Checks
must be received at the address above by 12:00 noon on a Homecomings .
business day in order to receive same day credit. Please note that Saturday
or Sunday is not a Homecomings business day. Any funds received MUST
reference the Homecomings loan number and include the Address Information
Form on the last page of this document.  Homecomings does not accept walk-in
payments.

You may choose to pay off and CLOSE your line of credit via wire transfer.
By sending a wire transfer on this account, you are automatically
authorizing Homecomings to payoff and CLOSE your Line of Credit.  IF
SUFFICIENT PAY OFF FUNDS ARE RECEIVED, YOUR ACCOUNT WILL BE CLOSED AND YOU
WILL HAVE NO ACCESS TO FUTURE DRAWS.  The wire transfer fee is $20.00, which
must be included in the wire.  Wired funds must be received by our bank and
credited to our account by 1:30 p.m. Central Standard Time for same day
processing.  Funds must be wired to:

Page 1

JP MORGAN CHASE BANK, N.A.
ABA# 021000021
For credit to the account of Homecomings Financial
ACCOUNT# 639262724

We will not be able to process the payoff unless the LOAN NUMBER and the
MORTGAGOR'S NAME identify the wire transfer. A copy of the payoff statement,
amount of the wire and the completed address information on the payoff
statement must be faxed on the same day of the wire transfer to 1-214-874-
2073, Attention: Cashiering Dept.

NOTE:  Wired funds will be returned if we are unable to identify the loan
intended to be paid off or if we determine funds to be insufficient to pay
the loan in full.

It is your responsibility to ensure that you are requesting a payoff
statement on the correct loan. We are relying on you to provide us with the
correct loan number. If payoff funds are received and applied to the
incorrect loan because you have indicated the incorrect loan number when
requesting a payoff statement, these payoff funds will not be returned to
you or applied to the correct account. ONCE PAYOFF FUNDS ARE DISTRIBUTED TO
OUR INVESTORS, WE CANNOT REVERSE THE DISTRIBUTION.

Regarding a shortage of Payoff funds:
Homecomings will return funds that are insufficient to complete the payoff
along with a new quote, at our option.  Please note that interest will
continue to accrue until the full payoff is received.  We will not post
funds that are sent to the payoff address to the principal balance if the
funds are less than the total amount needed to pay off the loan.
HOMECOMINGS WILL NOT CALL YOU IF THE PAYOFF IS SHORT.

Regarding any overpayment of Payoff funds:
If additional funds are received in excess of that required to satisfy the
loan, those funds will be mailed to the borrower within 30 days after the
payoff.

Regarding the release of this lien:
Upon full payoff, the release of lien on the property will be prepared and
recorded by Homecomings according to the state's requirements. A copy may be
obtained from the county/parish after the release has been recorded.

Homeowner Information
Once you have paid off your line of credit, please destroy any remaining
checks and/or credit cards associated with this account, as they will no
longer be valid, and by doing so, you will help reduce the chances of
identity theft.

Regarding automated payment option:
In order to discontinue automated payments, you must provide notification
15 days prior to the next scheduled draft date. You may notify us of your
intent to cancel in writing, by calling Customer Service at 800-206-2901 or
online at www.homecomings.com as long as it is done 15 days prior to the
draft date.  Any funds drafted after the loan is paid in full will be mailed
to you within 30 days after the loan is paid off. Any additional costs
incurred by Homecomings as a result of the lack of timely notice for
discontinuation of drafting, will be billed to the borrower.

**Address Information Form**

Homecomings will send any remaining funds, subsequent refunds and year end information to the mailing address on file.  It is important, therefore, that you complete and return this form with your payoff funds.

**Failure to include this form may cause a delay in the payoff process.**

Any costs Homecomings incurs as a result of an improper forwarding address will be billed to the borrower.

### Address/Information Change to 0391932118

Home Phone (_____) _____    Business Phone (_____) _____

Borrower's SS# _____ Co-Borrower's SS# _____

New Mailing Address _____

_____

City _____ State _____ Zip _____

Page 3

# EXHIBIT "2"

| A. U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT | B. TYPE OF LOAN | |
|---|---|---|
| **ESTIMATED SETTLEMENT STATEMENT** Date of Printing : 09/06/05    Time of Printing: 18:48:14 | 1. [ ] FHA    2. [ ] FmHA    3. [X] Conv. Unins | OMB No. 2502-0265 |
| **Fidelity National Title Insurance Company** | 4. [ ] VA    5. [ ] Conv. Ins | |
| | 6. ESCROW NUMBER: 33020952-JF | 7. LOAN NUMBER: 121925907 |
| | 8. MORTGAGE INSURANCE NUMBER: | |

NOTE: THIS FORM IS FURNISHED TO GIVE YOU A STATEMENT OF THE ACTUAL SETTLEMENT COSTS. AMOUNTS PAID TO AND BY THE SETTLEMENT AGENT ARE SHOWN. ITEMS MARKED "(P.O.C.)" WERE PAID OUTSIDE OF THE CLOSING; THEY ARE SHOWN HERE FOR INFORMATIONAL PURPOSES AND ARE NOT INCLUDED IN THE TOTALS.

| D. NAME OF BORROWER: Mayra Hernandez 8234 E Desert Cove Scottsdale, AZ 85260 | E. NAME OF SELLER: | F. NAME OF LENDER: IndyMac Bank FSB 1707 Market Place Blvd Irving, TX 75063 |
|---|---|---|
| G. PROPERTY LOCATION: 8234 E Desert Cove Scottsdale, AZ 85260 | H. SETTLEMENT AGENT: Fidelity National Title Insurance Company PLACE OF SETTLEMENT: 1255 W. Baseline Rd., #190 Mesa, AZ 85202 | I. SETTLEMENT DATE: 09/06/2005 |

| J. SUMMARY OF BORROWER'S TRANSACTIONS | | K. SUMMARY OF SELLER'S TRANSACTIONS | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER** | | **400. GROSS AMOUNT DUE TO SELLER** | |
| 101. Contract Sales Price | | 401. Contract Sales Price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 4,406.88 | 403. | |
| 104. Payoff To HomeComings Financial | 101,846.28 | 404. | |
| 105. Payoff to Citi Mortgage | 543,320.63 | 405. | |
| *Adjustments: Items Paid by Seller in Advance* | | *Adjustments: Items Paid by Seller in Advance* | |
| 106. City/Town Taxes | | 406. City/Town Taxes | |
| 107. County Taxes | | 407. County Taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| 116. | | 416. | |
| 117. | | 417. | |
| 118. | | 418. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 649,573.79 | **420. GROSS AMOUNT DUE TO SELLER** | 0.00 |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see inst.) | |
| 202. Principal Amount of New Loan(s) | 640,000.00 | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. | |
| 205. | | 505. | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| *Adjustments: Items Unpaid by Seller* | | *Adjustments: Items Unpaid by Seller* | |
| 210. City/Town taxes | | 510. City/Town Taxes | |
| 211. County Taxes | | 511. County Taxes | |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 640,000.00 | **520. TOTAL REDUCTIONS IN AMOUNT DUE SELLER** | 0.00 |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER** | | **600. CASH AT SETTLEMENT FROM/TO SELLER** | |
| 301. Gross amount due from borrower (line 120) | 649,573.79 | 601. Gross amount due to seller (line 420) | 0.00 |
| 302. Less amounts paid by/for borrower (line 220) | 640,000.00 | 602. Less reduction in amount due seller (in 520) | 0.00 |
| **303. CASH (XX FROM) [  TO) BORROWER** | 9,573.79 | **603. CASH (  FROM) [  TO) SELLER** | 0.00 |

**L. SETTLEMENT STATEMENT**

Escrow: 33020952-JF

| | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|
| **700. TOTAL SALES/BROKER'S COMMISSION** based on price $ | | |
| Division of Commission (line 700) as follows: | | |
| 701. | | |
| 702. | | |
| 703. | | |
| 704. | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | |
| 801. Loan Origination Fee | | |
| 802. Loan Discount | | |
| 803. Appraisal Fee to Borst Appraisals | 200.00 | |
| 804. Credit Report | | |
| 805. Lender's Inspection Fee | | |
| 806. Mortgage Insurance Application Fee | | |
| 807. Tax Service Fee IndyMac Bank FSB | 75.00 | |
| 808. Loan Processing Fee Maricopa Mortgage | 495.00 | |
| 809. Broker Application Fee Maricopa Mortgage | 100.00 | |
| 810. Funding Fee IndyMac Bank FSB | 650.00 | |
| 811. Yield Spread Premium Poc $7200 to Maricopa Mortgage by IndyMac | | |
| 812. Flood Certification Fee to First American Flood Data Services | 12.00 | |
| 813. | | |
| 814. | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | |
| 901. Int at $113.33 per day fr 09/06/05 to 09/01/05 to IndyMac Bank FSB | (566.65) | |
| 902. Mortgage Insurance Premium | | |
| 903. Hazard Insurance Premium to | | |
| 904. Flood Insurance Premium to | | |
| 905. | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | |
| 1001. Insurance Impounds for 8 months @ $128.17 per month to IndyMac Bank FSB | 1,025.36 | |
| 1002. Mortgage Insurance   months @ $   per month | | |
| 1003. City Property Taxes   months @ $   per month | | |
| 1004. Tax Impounds for 2 months @ $162.66 per month to IndyMac Bank FSB | 325.32 | |
| 1005. Annual Assessments   months @ $   per month | | |
| 1006. | | |
| 1007. | | |
| 1008. Aggregate Adjustment to IndyMac Bank FSB | (290.86) | |
| **1100. ESCROW AND TITLE CHARGES** | | |
| 1101. Settlement or Closing Fee | | |
| 1102. Abstract or Title Search | | |
| 1103. Title Examination | | |
| 1104. Title Insurance Binder | | |
| 1105. Document Preparation | | |
| 1106. Notary Fees | | |
| 1107. Attorney Fees | | |
| 1108. Title Insurance                    Fidelity National Title Insurance Company | 1,255.78 | |
| | | |
| 1109. Lender's coverage - ALTA Loan Policy (10-17-92) Extended Coverage $840,000.00 @ $1,255.78 | | |
| 1110. Owner's coverage $0.00  @ $0.00 | | |
| 1111. Sub Escrow Fee | | |
| 1112. | | |
| 1113. | | |
| 1114. | | |
| 1115. | | |
| 1116. | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | |
| 1201. Recording Fees: Deed $ 0.00   Mortgage $50.00   Reconveyance(s) $0.00 | 50.00 | |
| 1202. City/County Tax/Stamps: Deed $   Mortgage $ | | |
| 1203. State Tax/stamps:   Deed $ 0.00   Mortgage $ | | |
| 1204. | | |
| 1205. | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | |
| 1301. Survey | | |
| 1302. Pest Inspection to | | |
| 1303. Maricopa County Treasurer for taxes 1st 1/2 2005 Taxes | 1,075.95 | |
| 1304. | | |
| 1305. | | |
| 1306. | | |
| 1307. | | |
| 1308. | | |
| 1309. | | |
| 1310. | | |
| 1311. | | |
| **1400. TOTAL SETTLEMENT CHARGES (enter on lines 103, Section J and 502, Section K)** | 4,406.88 | 0.00 |

Tuesday, September 6, 2005, 19:46

Escrow: 33020952-JF

### ATTACHMENT TO RESPA

|  | BUYER | SELLER |
|---|---|---|
| **PAYOFF CHARGES FOR HomeComings Financial** | | |
| Principal Balance | 101,266.22 | |
| Interest Fr. 08/15/05 To 09/07/05 | 580.06 | |
| **PAYOFF CHARGES FOR Citi Mortgage** | | |
| Principal Balance | 542,645.63 | |
| Interest Fr. 09/01/05 To 09/09/06 | 675.00 | |

**CHARGES FROM 800 SECTION**
The Lender is paying a Yield Spread Premium in the amount of $7,200.00 to Maricopa Mortgage, through this escrow.

**CHARGES FROM 800 SECTION**
The Lender is paying a Yield Spread Premium in the amount of $7,200.00 to Maricopa Mortgage, through this escrow.

### ADDENDUM TO HUD

GF #: 33020952-JF

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

I hereby authorize the Settlement agent to make expenditures and disbursements as shown above and approve same for payment.

BORROWER'S:

_____

Mayra Hernandez

SELLER'S:

I have caused or will cause the funds to be disbursed in accordance with the HUD-1 Statement which I have prepared.

_____    _____
Settlement Agent                                     Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any similar form. Penalties upon conviction can include a fine or imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

# EXHIBIT "3"

*HERNANDEZ*

# FIXED/ADJUSTABLE RATE NOTE
## INTEREST ONLY FIXED PERIOD
**(6 Month LIBOR Index (As Published In *The Wall Street Journal*)-Rate Caps)**

Loan # 121925907

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

August 30, 2005
[Date]                                    [City]                                    [State]

8234 E DESERT COVE AVE, SCOTTSDALE, AZ 85260
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 640,000.00        (this amount is called "Principal"), plus interest, to the order of Lender. Lender is        IndyMac Bank, F.S.B., a federally chartered savings bank

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   6.375   %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will make a payment on the first day of every month, beginning on   October, 2005   . Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.

I will make monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal, interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal If, on   September 1, 2035   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   IndyMac Bank, F.S.B., P.O. Box 78826, Phoenix, AZ 85062-8826
or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

My monthly payment will be in the amount of U.S. $ 3,400.00        before the First Principal and Interest Payment Due Date, and thereafter will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of change in monthly payment.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

---

**MULTISTATE FIXED/ADJUSTABLE RATE NOTE - 6 MONTH LIBORINDEX - Single Family**
Page 1 of 5
8480388 (0301)                VMP MORTGAGE FORMS - (800)521-7291

MIN: 100055401219259076
Form 5000
1/2003



Loan No:  121925907

## 4.   ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHARGES

### (A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of **September,   2015** , and the adjustable interest rate I will pay may change on that day every **6th** month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **two and 750/1000ths** percentage points (     **2.750** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than     **11.375** % or less than     **2.750** %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than **1.000** percentage points from the rate of interest I have been paying for the preceding **6** months. My interest rate will never be greater than     **12.375** %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

### (G)  Date of First Principal and Interest Payment

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment date after the first Change Date.

## 5.   BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such

Loan No: 121925907

loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7.   BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of   15   calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   5.000   % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10.   WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11.   UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A)   Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Loan No: 121925907

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B)  When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
MAYRA  HERNANDEZ            -Borrower                                          -Borrower


_____ (Seal)          _____ (Seal)
                           -Borrower                                          -Borrower


_____ (Seal)          _____ (Seal)
                           -Borrower                                          -Borrower


_____ (Seal)          _____ (Seal)
                           -Borrower                                          -Borrower


*[Sign Original Only]*

Pay To The Order Of

Without Recourse
IndyMac Bank, F.S.B.
By:

Richard B. Whitman
Vice President

Loan No:  121925907

8480388   (0301)                    Page 5 of 5                    Form 5000
                                                                   1/2003

# EXHIBIT "4"

**FIDELITY NATIONAL TITLE**

After recording please return to:
IndyMac Bank, F.S.B. c/o Document Management
*[Company Name]*

*[Name of Natural Person]*

3465 E. Foothill Blvd.
*[Street Address]*
Pasadena, CA 91107
*[City, State Zip Code]*

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
20051308183   09/07/2005   03:44
ELECTRONIC RECORDING

33020952-16-2-2--
Galej

33020952          *[Space Above This Line For Recording Data]*

# DEED OF TRUST

MIN:  100055401219259076

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)**    "Security Instrument" means this document, which is dated    August 30, 2005    , together with all Riders to this document.

**(B)**    "Borrower" is MAYRA HERNANDEZ, a single woman

. Borrower is the trustor under this Security Instrument. Borrower's mailing address is    8234 E DESERT COVE, SCOTTSDALE, AZ 85260

**(C)**    "Lender" is   IndyMac Bank, F.S.B., a federally chartered savings bank
. Lender is a
Federal Savings Bank       organized   and   existing   under   the   laws   of
United States of America    . Lender's mailing address is    155 North Lake Avenue, Pasadena, CA 91101

**(D)**    "Trustee" is  Fidelity National Title Insurance Company
. Trustee's mailing address
is  1255 W BASELINE RD 190, Mesa, AZ 85210

**(E)**    "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, Michigan 48501-2026, tel. (888) 679-MERS.

**(F)**    "Note" means the promissory note signed by Borrower and dated    August 30, 2005    . The Note states that Borrower owes Lender   six hundred forty thousand and NO/100ths
Dollars (U.S. $ 640,000.00      )
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than    September 1, 2035    .

Loan No: 121925907

Arizona Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
---THE COMPLIANCE SOURCE, INC.---                               Page 1 of 12
www.compliancesource.com

MERS Modified Form 3003 01/01 (rev. 06/02)
14301AZ 08/00 (Rev. 06/02)
©2002, The Compliance Source, Inc.

Public Record

**(G)** · **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H)** **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I)** **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☒ Other(s) [specify] |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | |

Fixed/Adjustable Rate Interest Only LIBOR Rider

**(J)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M)** **"Escrow Items"** means those items that are described in Section 3.

**(N)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

Loan No: 121925907

Arizona Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3003 01/01 (rev. 06/02)
—THE COMPLIANCE SOURCE, INC.—                                          Page 2 of 12                            14301AZ 08/00 (Rev. 06/02)
www.compliancesource.com                                                                          © 2002, The Compliance Source, Inc.

Public Record

20051308183

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as a nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County** of **Maricopa** :
[Type of Recording Jurisdiction]           [Name of Recording Jurisdiction]

LOT 50, SUNDOWN RANCHOS, ACCORDING TO BOOK 71 OF MAPS, PAGE 10, RECORDS OF MARICOPA COUNTY, ARIZONIA

which currently has the address of                8234 E DESERT COVE AVE
                                                                [Street]

SCOTTSDALE                              , Arizona        85260            ("Property Address"):
[City]                                                      [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    1.    **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
    Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay

Loan No: 121925907

Arizona Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3003 01/01 (rev. 06/02)
—THE COMPLIANCE SOURCE, INC.—                              Page 3 of 12                              1430IAZ 08/00 (Rev. 06/02)
www.compliancesource.com                                                                          © 2002, The Compliance Source, Inc.

Public Record

20051308183

interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.  **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the

Loan No: 121925907

Arizona Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3003 01/01 (rev. 06/02)
—THE COMPLIANCE SOURCE, INC.—                    Page 4 of 12                      1436AZ 08/00 (Rev. 06/02)
www.compliancesource.com                                                          © 2002, The Compliance Source, Inc.

Public Record

20051308183

shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.    Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower:  (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.    Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan.  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.  Lender may require Borrower to pay, in connection with this Loan, either:  (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee.  Lender shall have the right to hold the policies and renewal certificates.  If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices.  If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender.  Lender may make proof of loss if not made promptly by Borrower.  Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened.  During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress

Loan No:  121925907

Arizona Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    MERS Modified Form 3003 01/01 (rev. 06/02)
—THE COMPLIANCE SOURCE, INC.—                                    Page 5 of 12                              1430IAZ 08/00 (Rev. 06/02)
www.compliancesource.com                                                                          ©2002, The Compliance Source, Inc.

Public Record

payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.  **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.  **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Public Record

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous

<u>Loan No: 121925907</u>

Arizona Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3003 01/01 (rev. 06/02)
—The Compliance Source, Inc.—                          Page 7 of 12                    14301AZ 01/00 (Rev. 06/02)
www.compliancesource.com                                                              © 2002, The Compliance Source, Inc.



Public Record

Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12.  Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13.  Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

Loan No: 121925907

Arizona Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3003 01/01 (rev. 06/02)
—THE COMPLIANCE SOURCE, INC.—                                      Page 8 of 12                      1430AZ 08/00 (Rev. 06/02)
www.compliancesource.com                                                                            ©2002, The Compliance Source, Inc.

20051308183

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this

Loan No: 121925907

Arizona Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3003 01/01 (rev. 06/02)
—THE COMPLIANCE SOURCE, INC.—                         Page 9 of 12                    14301AZ 08/00 (Rev. 06/02)
www.compliancesource.com                                                              © 2002, The Compliance Source, Inc.



Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period, which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Loan No: 121925907

Arizona Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3003 01/01 (rev. 06/02)
—THE COMPLIANCE SOURCE, INC.—                                    Page 10 of 12                                    1436IAZ 08/00 (Rev. 06/02)
www.compliancesource.com                                                                                          © 2002, The Compliance Source, Inc.



Public Record

20051308183

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall record a notice of sale in each county in which any part of the Property is located and shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale. Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county treasurer of the county in which the sale took place.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender may, for any reason or cause, from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Time of Essence.** Time is of the essence in each covenant of this Security Instrument.

——————————————— *[Signatures on Following Page]* ———————————————

Loan No: 121925907

Arizona Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                MERS Modified Form 3003 01/01 (rev. 06/02)
—THE COMPLIANCE SOURCE, INC.—                                      Page 11 of 12                                      14301AZ 08/00 (Rev. 06/02)
www.compliancesource.com                                                                                      © 2002, The Compliance Source, Inc.

Public Record

20051308183

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_Mayra Hernandez_ _____     _____ (Seal)
MAYRA HERNANDEZ                                                                    -Borrower

_____     _____ (Seal)
                                                                                                    -Borrower

_____ [Space Below for Acknowledgment] _____

State of Arizona                            §
                                                       §
County of    Maricopa    _____   §

Before me the undersigned authority, on this day personally appeared    MAYRA HERNANDEZ

known to me (or proved to me through an identity card or other document)
to be the person(s) whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal on this    30th    day of    Aug    , 2005.

(Seal)                                                                        _____
                                                                                      Notary Public

                                                                My Commission Expires:    2-28-09

JENNIFER A. FIELDS
Notary Public - Arizona
Maricopa County
Expires 02/28/09

Loan No: 121925907

Arizona Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    MERS Modified Form 3003 01/01 (rev. 06/02)
—THE COMPLIANCE SOURCE, INC.—                                                                                  14301AZ 08/00 (Rev. 06/02)
www.compliancesource.com                                       Page 12 of 12                             ©2002, The Compliance Source, Inc.



20051308183

# FIXED/ADJUSTABLE RATE RIDER
# INTEREST ONLY FIXED PERIOD
### (LIBOR 6 Month Index (As Published In *The Wall Street Journal*)- Rate Caps)

Loan # 121925907                                    MIN:    100055401219259076

THIS FIXED/ADJUSTABLE RATE RIDER is made this  30th day of   **August, 2005**  ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to
secure Borrower's Fixed/Adjustable Rate Note (the "Note") to    **IndyMac Bank, F.S.B., a
federally chartered savings bank**

("Lender") of the same date and covering the property described in the Security Instrument and located at:

**8234 E DESERT COVE AVE, SCOTTSDALE, AZ 85260**
[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST
RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE
AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT
ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial fixed interest rate of    **6.375**         %. The Note also
provides for a change in the initial fixed rate to an adjustable interest rate, as follows:
**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
    **(A) Change Dates**
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of
**September   2015**                , and the adjustable interest rate I will pay may change on that
day every **6th**   month thereafter. The date on which my initial fixed interest rate changes to an
adjustable interest rate, and each date on which my adjustable interest rate could change, is called a
"Change Date."

**MULTISTATE FIXED/ADJUSTABLE RATE RIDER - LIBORIO - Single Family**
                              Page 1 of 4                              **Form 5008**
8480396  (0208)          VMP MORTGAGE FORMS - (800)521-7291                    8/2002



Public Record

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal.* The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and 750/1000ths                                             percentage points
(            2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than
      11.375 % or less than   2.750               %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than   1.00    percentage points from the rate of interest I have been paying for the preceding     6    months. My interest rate will never be greater than    12.375          %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment due after the first Change Date.

Loan No: 121925907
8480396  (0208)                          Page 2 of 4                          Form 5008
                                                                              8/2002



20051308183

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

1.  Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2.  When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

**Form 5008**
8480396  (0208)       8/2002
Loan No:  121925907       Page 3 of 4



Public Record

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.



_____ (Seal)          _____ (Seal)
MAYRA HERNANDEZ              -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                            -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                            -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                            -Borrower                                        -Borrower

Loan No: 121925907
8480396  (0208)                          Page 4 of 4                Form 5008
                                                                    8/2002

# EXHIBIT "5"

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
20090482227   05/28/2009   04:45
ELECTRONIC RECORDING

Recording requested by:

When recorded mail to:

090283853a5-2-1-1-1
Wadel

Indymac Bank FSB
6900 Beatrice Drive
Kalamazoo, MI 49009

Space above this line for recorders use

TS # AZ-09-274592-TC
MERS MIN No.:
100055401219259076

Order # 090283853-AZ-MSI

Loan # 1006271988
Investor No. 0121925907

## Assignment of Deed of Trust

For value received, the undersigned corporation hereby grants, assigns, and transfers to

**IndyMac Federal Bank FSB**

all beneficial interest under that certain Deed of Trust dated **8/30/2005** executed by **MAYRA HERNANDEZ , A SINGLE WOMAN**, as Trustor(s) to **FIDELITY NATIONAL TITLE INSURANCE COMPANY**, as Trustee and recorded as instrument No. **20051308183**, on **9/7/2005**, in Book xxx, Page xxx of Official Records, in the office of the County Recorder of **MARICOPA** County, AZ together with the Promissory Note secured by said Deed of Trust and also all rights accrued or to accrue under said Deed of Trust.

Page 1 of 2

Effective Date: 4/18/2009 12:02 PM

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC., AS NOMINEE FOR INDYMAC BANK, F.S.B., A FEDERALLY CHARTERED SAVINGS BANK, A FEDERAL SAVINGS BANK**

By: _____
Roger Stotts    *Vice President*

State of   **Texas**
County of   **Williamson**

On 5/19/09 before me, _Lorna Morell_____ a notary public, personally appeared_____**Roger Stotts**_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of ____**Texas**_____ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____    (Seal)

LORNA M. MORELL
Notary Public, State of Texas
My Commission Expires
December 23, 2012

Page 2 of 2

# EXHIBIT "6"

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
20100182325   03/03/2010   04:43
ELECTRONIC RECORDING

Recording requested by:

When recorded mail to:
OneWest Bank, FSB
888 East Walnut Street
Pasadena, CA 91101

090310800ASG315-2-1—
Hoye

---

TS # AZ-09-274592-TC
MERS MIN No.:
100055401219259076

Order # 090283853-AZ-MSI

Space above this line for recorders use

Loan # 1006271983
Investor No. 0121925907

## Assignment of Deed of Trust

For value received, the undersigned corporation hereby grants, assigns, and transfers to

Deutsche Bank National Trust Company, as Trustee of the IndyMac INDX Mortgage Loan Trust 2005-AR23, Mortgage Pass-Through Certificates, Series 2005-AR23 under the Pooling and Servicing Agreement dated September 1, 2005

all beneficial interest under that certain Deed of Trust dated 8/30/2005 executed by MAYRA HERNANDEZ , A SINGLE WOMAN, as Trustor(s) to FIDELITY NATIONAL TITLE INSURANCE COMPANY, as Trustee and recorded as Instrument No. 20051306183, on 9/7/2005, in Book xxx, Page xxx of Official Records, in the office of the County Recorder of MARICOPA County, AZ together with the Promissory Note secured by said Deed of Trust and also all rights accrued or to accrue under said Deed of Trust.

Page 1 of 2

TS# AZ-09-274592-TC
Page 2

Effective Date: 2/5/10

IndyMac Federal Bank FSB

By _____ T. A. Johnson-S-    Attorney In Fact

State of    Texas
County of    Travis

On 2/5/10    before me,    Alex McBride
personally appeared    T. A. Johnson-S.    who proved to me on the basis of
satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that
by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the
person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the
State of ____Texas____    that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature    _____    (Seal)



ALEX MCBRIDE
Notary Public, State of Texas
My Commission Expires
November 10, 2010

Page 2 of 2