Hearing Date: TBD
Response Date: September 5, 2014 at 5:00 p.m. (Prevailing Eastern Time)

| | |
|---|---|
| **MORRISON & FOERSTER LLP** | **REED SMITH LLP** |
| 250 West 55th Street | Princeton Forrestal Village |
| New York, New York 10019 | 136 Main Street, Suite 250 |
| Telephone:    (212) 468-8000 | Princeton, New Jersey 08540 |
| Facsimile:    (212) 468-7900 | Telephone:   (609) 987-0050 |
| Norman S. Rosenbaum | Facsimile:   (609) 951-0824 |
| Jordan A. Wishnew | Diane A. Bettino |
| Meryl L. Rothchild | Barbara K. Hager, *admitted pro hac vice* |
| *Counsel for the ResCap Borrower Claims Trust* | *Co-Counsel for the ResCap Borrower Claims Trust* |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

# THE RESCAP BORROWER CLAIMS TRUST'S MOTION IN LIMINE TO EXCLUDE THE EXPERT TESTIMONY OF LOUISE CARTER

**PRELIMINARY STATEMENT**

The ResCap Borrower Claims Trust (the "Borrower Trust") submits this motion in limine to exclude the purported expert testimony of Louise Carter ("Ms. Carter") offered by the Claimants Frank J. Reed III and Christina Reed ("Claimants").

Ms. Carter is Claimants' realtor for the property at issue in this case located at 817 Matalack Drive, Moorestown, New Jersey (the "Property"). She has submitted a one-page letter as her expert report (the "Report"). A true and correct copy of the Report is attached hereto as Exhibit A. In the Report, Ms. Carter concludes that the foreclosure action devalued the Property, causing Mr. Reed to lose a value of $940,000. *See generally* Report. In arriving at this figure, Ms. Carter presents no analysis or opinion, expert or otherwise, to support her bare conclusion that the pending foreclosure devalued the Property. Rather, she simply isolates the highest and lowest figures from among multiple sale and offer prices in a series of thwarted deals (a number of which she neglects to disclose in her Report), and subtracts the lowest from the highest to arrive at her $940,000 loss number. Without offering any basis for her conclusions, Ms. Carter asserts that (1) this difference constitutes a loss in the value of the Property and (2) such loss was the result of the pending foreclosure, to the exclusion of any other factors. At best, Ms. Carter's report amounts to nothing more than a two-dimensional exercise in grammar school math, devoid of any analysis or explanation that could qualify as expert opinion. Perhaps more troubling, however, Ms. Carter fails to mention or account in her report for (1) the well-publicized economic crisis that sent shock waves through the real estate market during this timeframe, (2) at least one contemporaneous appraisal that contradicted her $2,040,000 valuation of the Property and contributed directly to the failure to conclude the sale at that price and (3) multiple price reductions and other offers exchanged during the course of her efforts to sell the

Property.  The exclusion of these significant facts and circumstances from her analysis makes Ms. Carter's Report inherently unreliable and may even call into question the neutrality of her proposed "expert" opinion.  Ms. Carter's Report does not pass muster under the rules governing expert testimony. Not only is her conclusion that the foreclosure action devalued the Property faulty and completely unsupported, there is no rational basis for the use of either figure in her calculation.  In addition, since the calculation is from 2012 and real estate prices are not static, it does not help the trier of fact today.  The Report should thus be stricken, and Ms. Carter should be precluded from testifying for the below reasons.

     First, the opinion of Ms. Carter is not expert testimony and ultimately, will not assist the trier of fact. In Ms. Carter's Report she simply provides us with some of the facts known to her about some of the history with the Property.  She reports that she sold the Property to Mr. Reed and was thereafter the listing agent for the Property though she does not say when.  Ms. Carter goes on to provide several facts which she knows to be true because she was the listing agent: (i) prior to the foreclosure action, the Property was both under agreement for, and appraised for, $2,040,000; (ii) the sale for $2,040,000 did not close; (iii) every offer after the foreclosure action was filed was "substantially under market value" because potential buyers were concerned over the Property's foreclosure status; and, (iv) the last offer was for $1,100,000.  Remarkably, she leaves out very important facts (discussed in detail below) which undermine her conclusion that "it is clear to me that this [the Property's foreclosure status] devalued Mr. Reed's home" and that "Mr. Reed lost a value of $940,000."  Even if her ultimate conclusion as to lost value was based on sound numbers – which it is not – it is a simple mathematical equation, one that the Court does not need an expert to provide.  Accordingly, the selected facts in the Report and the

ultimate conclusion address lay matters which the trier of fact is perfectly capable of understanding and deciding without Ms. Carter's help.

Second, the Report does not meet the standards for admissibility of expert testimony set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and subsequent case law and rules. Ms. Carter's main analysis is based on her personal involvement with the listing of the Property and her observations as to the reasons given by potential buyers for not buying the Property (which amounts to nothing more than hearsay, as relayed by Ms. Carter). However, the Report is devoid of support for her conclusion that Claimant's Property was devalued single-handedly by the foreclosure action. Remarkably, she does not assess – let alone even mention - the impact of other factors which may have contributed to the devaluation of the property during these years such as the real estate market crash.

Third, while Ms. Carter may be a seasoned realtor, she is not qualified to weigh in as an expert on the issues at hand. Indeed, in her Report, she draws her conclusion from only a few hand-picked facts from her personal involvement and conveniently leaves out other factors (discussed below) which change the outcome of her conclusion entirely.  As such, this Court should preclude her as an expert witness in this trial.

Based on the foregoing reasons, Ms. Carter's Report should be stricken and she should be precluded from testifying at trial.

### RELEVANT FACTS

In her Report, Ms. Carter summarily concludes that the Claimants' Property was devalued because of the foreclosure action brought against him. Ms. Carter bases her conclusion on the following select facts: (i) prior to the foreclosure action, the Property was both under

agreement for, and appraised for, $2,040,000; (ii) the sale for $2,040,000 did not close; (iii) every offer after the foreclosure action was filed was "substantially under market value" because potential buyers were concerned over the Property's foreclosure status; and, (iv) the last offer was for $1,100,000.  She leaves out very important facts (discussed in detail below) which undermine her conclusion that "it is clear to me that this [the Property's foreclosure status] devalued Mr. Reed's home" and that "Mr. Reed lost a value of $940,000." *See generally* Report.

### ARGUMENTS

**1. The Opinions Expressed By Ms. Carter Will Not Assist The Trier Of Fact**

This Court does not need "expert" testimony to understand commonly known facts. See e.g., U.S. v. Didomenico, 985 F.2d 1159, 1163 (2d Cir. 1993) (concluding "that the district court was well within the bounds of discretion in excluding [claimant's psychiatric expert's] testimony because the testimony did not meet the helpfulness criterion of Rule 702") (citations omitted); Grdinich v. Bradlees, 187 F.R.D. 77, 82 (S.D.N.Y. 1999) (excluding claimant's expert and finding that "[e]xpert testimony is not admissible when it addresses lay matters which a jury is capable of understanding and deciding without the expert's help.") (citations omitted).

Here, the opinion of Ms. Carter is not expert testimony and ultimately, will not assist the trier of fact.  Beyond that, the Report intentionally omits several key facts which were available to, if not known by, Ms. Carter at the time of the Report rendering the Report unreliable.  Each inaccurate and/or misleading statement will be discussed in turn:

First, Ms. Carter states that prior to the foreclosure action, the Property was under an agreement of sale for $2,040,000 and that the sale did not close.  *See* Report.  She attaches to the Report the Agreement of Sale between Claimants and Scott and Traci Jacobs ("Jacobs") dated

- 5 -

December 8, 2007 and an appraisal by Peter McCaffrey in the amount of $2,040,000 dated January 21, 2008.  *See* exhibits to Report, pp. 3-42.  By omission the statements about this sale are misleading.

The sale of the Property to the Jacobs family did not close because the appraisal required by the Jacobs' lender indicated that as of December 24, 2007, the fair market value of the Property was less than the sales price, only $1,950,000.  *See* Deposition Transcript of Louise Carter ("Carter Trans.") at 75:11-78:22, a true and correct copy of relevant excerpts are attached hereto as Exhibit B; *see also* Letter from Edward Hovatter to Rudi Grueneburg dated January 7, 2008 terminating the Agreement of Sale on behalf of the Jacobs and attaching a denial letter from the Jacobs' lender and the Appraisal of the Property performed by Robert Jones on December 24, 2007, a true and correct copy of which are attached as Exhibit C.  Despite terminating the Agreement of Sale, Claimants refused to return the Jacobs deposit ($50,000) and commissioned the second appraisal by Peter McCaffrey.  *See* Deposition Transcript of Frank Reed ("Reed Trans") dated August 13, 2014 at 94:11-18 and 108:21-112:7, a true and correct copy of relevant excerpts are attached hereto as Exhibit D. The Jacobs did not accept the second appraisal and ultimately successfully sued Claimants for the return of their deposit.  *See* Reed Trans dated Aug. 13, 2014 at 95:12-96:9.  Conveniently Ms. Carter discusses none of these facts in her Report likely because they undermine her statement that the Property was "valued at $2,040,000" before the foreclosure.  That is simply untrue.  At best there was a dispute over the value and the buyers were not willing to pay $2,040,000.  For Ms. Carter to ignore the details of why the sale did not close and to by implication make it appear that the failure to close was somehow caused by the foreclosure is inappropriate and misleading. *See* Carter Trans. at 37:11-38:6

Second, without detail, Ms. Carter states as fact that every offer after the foreclosure action was filed was "substantially under market value". Again, this is misleading if not an outright misstatement of the actual facts clearly known to Ms. Carter. She leads the reader to believe that "market value" was at all times $2,040,000 by failing to disclose that, she reduced the listing price of the Property on multiple occasions. *See* Carter Trans. at 53:14-66:12. Specifically, between May 2008 and April 2011 she reduced the listing price from $2,025,000 to $1,895,000 to $1,780,000 to $1,690,000, to $1,595,000. *Id.*; *see also* BT Edgar change forms and MLS sheets attached hereto as Exhibit E. Thus, the listing price was not static and offers were made as the listing price changed over time.

Ms. Carter attached to her Report two such offers, one from Frank and Gina Rocciano for $1,300,000 and one from Kris and Nina Singh for $1,100,000. *See* exhibits to Report, pp. 43-44. In doing so she withholds two very important pieces of information. First, she completely failed to disclose an Agreement of Sale between Claimants and Mark Weaver (aka Brett Cooper) from August 2008 in the amount of $1,800,000 ("Weaver Agreement of Sale"). A true and correct copy of the Weaver Agreement of Sale is attached hereto as Exhibit F. And second, she conveniently ignored a second offer from Frank and Gina Rocciano for $1,450,000 (when the Property was listed for $1,595,000). A true and correct copy of the June 2010 Rocciano offer is attached hereto as Exhibit G.

Indeed, two months after the listing price for the Property was reduced from $2,025,000 to $1,895,000, buyer Mark Weaver made an offer of $1,800,000 which was accepted by Claimants. Ms. Carter did not mention this agreement nor did she opine on whether the difference of $95,000 between the agreed upon price and the asking price is significant in any way. She admitted in her deposition, however, that buyers are generally looking to get the best

deal they can and will offer less than the asking price and that the asking price is generally inflated to account for such negotiations. *See* Carter Trans. at 43:8-20, 45:19-25. Unfortunately for Claimants, the sale with Mr. Cooper did not close because Mr. Cooper could not come up with all of the funds necessary to close.[1]

No additional offers were received until March 20, 2010. At that time the listing price was $1,780,000 and the Rocciano's made an offer for $1,300,000. *See* exhibits to Report, p. 44. This offer was rejected by Claimants. *See* Carter Trans. at 96:14-97:7. Ms. Carter subsequently reduced the listing price to $1,690,000 and then to $1,595,000 before receiving another offer from the Roccianos on June 12, 2010 for $1,450,000. *See* Carter Trans. at 99:2-19 and Exhibit G. However, the Roccianos withdrew their offer before entering into an agreement of sale, indicating they had decided to relocate elsewhere due to the Roccianos' employment. *See* Reed Trans. dated August 14, 2014 at 76:7-81:17, a true and correct copy of relevant excerpts are attached hereto as Exhibit I.

The last offer referred by Ms. Carter came from Mr. and Mrs. Singh at a point when the Property was not even on the market. *See* Carter Trans. at 106:9-17. Mr. and Mrs. Singh were working with Ms. Carter to find a house and she showed them the house despite the fact that it was not on the market at the time. *Id.*.

---

[1] Closing was postponed several times but when Mr. Weaver, who also went by the name of Brett Cooper, advised that as of November 21, 2008 he still did not have enough funds to close what was supposed to be a cash deal, Mr. Reed refused to further extend the closing date. *See* Carter Trans. at 88:16-9. The parties then entered into a lease purchase agreement whereby Mr. Weaver could take immediate possession in exchange for an up-front payment to Mr. Reed of $400,000 and an agreement to pay $25,000 per month in rent. A true and correct copy of the Lease Agreement with Option to Purchase between Frank Reed and Brett Cooper dated November 21, 2008 ("Lease Agreement") is attached hereto as Exhibit H. Mr. Weaver paid the $400,000 via wire transfer and Mr. Reed admits that he received the funds. *See* Reed Trans. dated Aug. 14, 2014 at 66:23-67:8. Mr. Weaver moved into the Property but subsequently defaulted under the Lease Agreement after making $50,000 in monthly rent payments. *Id.* at 68:7-24. Claimants kept the $450,000 paid by Mr. Weaver and evicted him from the Property. *Id.* at 62:24-63:18, 69:25-70:10.

Lastly, Ms. Carter states that potential buyers were concerned over the Property's foreclosure status, thus precipitating offers below market value. *See* Report. In support of this statement, she submitted an email from Mr. and Mrs. Singh which does not say that they offered $1,100,000 because of the foreclosure. *See* exhibits to Report, p. 44. Rather, the emails states that "we would like a full description of what the legal dealings are with the bank and seller, as this may affect the closing." *Id.* Ms. Carter even admitted in her deposition that Mr. and Mrs. Singh did not actually say the offer was low because of the foreclosure. *See* Carter Trans. at 108:8-109:4. In addition, Ms. Carter referred in her deposition to a letter written by her colleague Naoji Moriuchi dated June 25, 2012 to support her position that buyers were making below market offers. *Id.* at 96:14-99:20. She said that Naoji's buyers, the Roccianos, made a low offer because of the foreclosure. However, Mr. Moriuchi's letter does not say that. Rather, in the letter he states that his client submitted an offer below fair market value for several reasons including consideration of the values of "comparable properties". *See* Naoji Moriuchi letter dated June 25, 2012, a copy of which is attached hereto as Exhibit J (originally attached as Exhibit 11 to Claimants' Response to Debtors' Objection). Attached to his letter, remarkably, is the Roccianos' *first* offer. Mr. Moriuchi does not even acknowledge his clients' second offer. Again, whether purposeful or inadvertent, the failure to disclose all of the facts surrounding each offer makes the Report unreliable. Each of these facts will be fully developed during trial and the trier of fact will ultimately be able to make his own determinations without expert assistance from Ms. Carter, who is otherwise merely a fact witness.

Nothing in this Report from 2012 constitutes expert opinion. Ms. Carter does not discuss the state of the economy. She offers no opinion, expert or otherwise, as to how the economy may have affected the real estate market generally or the price of the Property in particular, nor

- 9 -

does she present any theory whatsoever as to how or why a pending foreclosure might influence the value of a property. Most glaringly, she withheld, whether intentionally or unintentionally, crucial facts of which she would almost certainly have had knowledge, in her role as the listing agent for the Property. Overall, the Report simply addresses lay matters which the trier of fact is perfectly capable of understanding and deciding without Ms. Carter's help. Accordingly, Ms. Carter's purported expert testimony is inadmissible and she should be excluded from offering expert testimony at trial.

2. **Ms. Carter Does Not Use Any Relevant Or Reliable Methods, And Therefore Her Opinions Do Not Satisfy Daubert**

An expert opinion must be "relevant" so as to assist the trier of fact, and also must have "a reliable basis in the knowledge and experience of [the expert's] discipline." Daubert, 509 U.S. at 591-92. See also Fed. R. Evid. 702 (permitting expert testimony only if, among other things, "(c) the testimony is the product of reliable principles and methods and the expert has reliably applied the principles and methods to the facts of the case"). Although there is no definitive test for determining the reliability of expert testimony, the Supreme Court has identified a number of factors bearing on reliability, including "(1) whether a theory or technique 'can be (and has been) tested,' (2) whether the theory or technique has been subjected to peer review and publication, (3) a technique's 'known or potential rate of error,' and 'the existence and maintenance of standards controlling the technique's operation,' and (4) whether a particular technique or theory has gained 'general acceptance' in the relevant scientific community." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002) (quoting Daubert, 509 U.S. at 593-94) (internal citations omitted). The Supreme Court has expressly extended Daubert and its reliability requirements beyond scientific testimony to encompass all expert testimony. *See also*, Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999); Davis v. Carroll, 937 F. Supp.

2d 390, 417 (S.D.N.Y. 2013) ("Neither Daubert nor Kumho Tire tolerates expert testimony that departs from scientific or professional standards and cannot be independently justified as a reliable analytical tool.")

In the present case, even if this Court held Ms. Carter's opinions to be expert testimony, the Report meets none of the foregoing indicia of reliability and utterly fails to satisfy the requirements of F.R.E 702. As an initial matter, Ms. Carter does not specify the theory she uses to come to her conclusions. Moreover, Ms. Carter's main analysis is based on her personal observations. She does not take into consideration and address other factors which may have contributed to the devaluation of the property during the relevant years including the economy and the overall decline in the real estate market. As such, Ms. Carter's Report does not use any relevant and reliable methods, and therefore her opinions do not satisfy Daubert. Accordingly, her Report should be stricken and her testimony should be excluded.

**3.   Ms. Carter's Report Should Be Excluded Because She Is Not Qualified To Provide An Expert Opinion On Any Of The Issues At Hand**

An expert witness may not offer opinions falling outside of the areas in which she is qualified as an expert by knowledge, skill, experience, training, or education. See Fed. R. Evid. 702; United States v. Chang, 207 F.3d 1169, 1172-73 (9th Cir. 2000) (affirming exclusion of defense expert because he lacked the "specific" expertise necessary to offer helpful testimony). See also, Garnac Grain Co., Inc. v. Blackley, 932 F.2d 1563, 1566 (8th Cir. 1991) (finding witnesses' practical knowledge, including employment in claimant-company's accounting department for twenty-two years and role in implementing company's internal controls, did not provide them with requisite expertise in auditing or accounting to opine as to auditing issues or compliance with GAAS, and affirming exclusion of their testimony); Gray v. Briggs, 45 F. Supp.

2d 316, 323-24 (S.D.N.Y. 1999) (finding expert, whose expertise resided primarily in the securities industry, lacked sufficient knowledge of and experience with ERISA to offer opinions involving ERISA, and thereby excluding opinions).

Ms. Carter asserts that she is qualified to opine on the value of the Property because she has been a Realtor in Moorestown since 1986. While Ms. Carter may be an experienced realtor, as the court noted in Garnac Grain Co., working in an accounting department does not necessarily provide someone with the requisite expertise in auditing. Garnac Grain Co., Inc. v. Blackley, 932 F.2d at 1566. Ms. Carter is not a real estate appraiser and is not qualified to testify as to the value of a residential home such as the Property. Ms. Carter is not trained as an appraiser, is not licensed as an appraiser and has never provided testimony as an appraiser. Further Ms. Carter does not purport to possess any expertise in economics or in foreclosure issues that would qualify her to opine on whether or how the economic crisis or the foreclosure pending on the Property may have impacted the value of the Property. Further, Ms. Carter's Report is undeniably sparse and one-sided. She draws her conclusion from unreliable and incomplete facts. She may be a relevant fact witness due to her personal involvement in listing the Property, but she does not qualify as an expert witness under the case law.

## CONCLUSION

For these reasons, the Borrower Trust respectfully requests that Louise Carter be precluded from testifying at trial and that her Report be stricken.

| | |
|---|---|
| Dated: August 29, 2014<br>New York, New York | /s/ Norman S. Rosenbaum<br>Norman S. Rosenbaum<br>Jordan A. Wishnew<br>Meryl L. Rothchild<br>MORRISON & FOERSTER LLP<br>250 West 55th Street<br>New York, New York 10019<br>Telephone: (212) 468-8000<br>Facsimile: (212) 468-7900<br><br>*Counsel for The ResCap Borrower Claims Trust*<br><br>-and-<br><br>Diane A. Bettino<br>Barbara K. Hager, *pro hac vice pending*<br>REED SMITH LLP<br>Princeton Forrestal Village<br>136 Main Street, Suite 250<br>Princeton, New Jersey 08540<br>Telephone: (609) 987-0050<br>Facsimile: (609) 951-0824<br><br>*Co-Counsel for The ResCap Borrower Claims Trust* |