# EXHIBIT D

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CASE NO. 12-12020(MG)

- - -

IN RE:                           :
                                 : (PENDING IN THE
RESIDENTIAL CAPITAL, LLC,        : SOUTHERN DISTRICT OF
et al,                           : NEW YORK)
                                 : CHAPTER 11
         Debtors                 :
                                 :
                                 :
                                 :

- - -

DEPOSITION UNDER ORAL EXAMINATION OF
FRANK REED
Mount Laurel, New Jersey
WEDNESDAY, AUGUST 13, 2014

- - -

REPORTED BY:   HEATHER A. KIRSCH, CCR

- - -

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



```
Page 94
 1   approve the Jacobs loan?
 2        A    I contacted Commerce and asked them
 3   what do you do about the fact that this is a
 4   defective appraisal?  And I was told that I, as
 5   the person who did not apply for the mortgage,
 6   could not ask for them to correct the clear
 7   errors in the appraisal.
 8   Q    So you had a long-standing relationship
 9   with Commerce, right?
10        A    Yes.
11   Q    And ultimately you refused to return the
12   Jacobs $50,000 deposit, right?
13        A    That's privileged between my wife and
14   I.  I don't know about how to say who actually
15   was the one to say who actually was the one who
16   refused to return the Jacobs money.
17   Nonetheless, the buyers as a group, Christina
18   and Frank authorized that it not be returned.
19   Q    So at one point you attempted to settle
20   with the Jacobs for half of the deposit, if you
21   understand, right?
22        A    Oh, I don't remember.  I honestly
23   don't remember that perhaps.
24   Q    You did testify to that in a different
25   deposition?
```



```
Page 95
 1      A    If I testified to that in a different
 2   deposition, closer in time to that, I would go
 3   with it.  I can't remember.
 4      Q    Does it refresh your recollection --
 5      A    No.
 6      Q    -- to know that you said that they could
 7   have 25,000 back and you, the Reed's would keep
 8   25,000 and they could walk away?
 9      A    I do not recall the specifics.  I
10   recall trying to negotiate the contract even
11   prior to that situation.
12      Q    So after you tried to settle with them over
13   the deposit, they ended up suing you and Mrs.
14   Reed, right?
15      A    Yes.  You pointed that out earlier.  I
16   thought I was the one who was doing the suing
17   and you said they were the ones, we were the
18   defendants.  They were the plaintiffs.
19      Q    So who won that case?
20      A    The Jacobs won on summary judgment.
21   It's a thing that I will take to my grave.  I am
22   aggravated that and I'm going to say my peace
23   for the record here, Barb, just because it's
24   going to go down somewhere in someone's record.
25   Is one provision in that Jacobs contract that
```



```
Page 96
 1   burns in my memory and that is they were
 2   supposed to take reasonable efforts to obtain a
 3   mortgage and --
 4   Q    And the judge found that they did?
 5   A    The judge found that they did because
 6   on our side didn't put on evidence as to what
 7   the reasonableness was.  I found my attorney
 8   committed malpractice because I asked him to
 9   address that very point.
10   Q    In that litigation you kind of mentioned
11   this earlier, you counselor sued the appraiser,
12   the realtor and Commerce, which became TD,
13   right?
14   A    Appraiser, realtor -- appraiser,
15   realtor and Commerce.
16   Q    Right.
17   A    Yes, appraiser being -- the appraiser
18   for the Jacobs.
19   Q    Robert Jones?
20   A    I guess the guy's name.
21   Q    So you think Mr. Jones made mistakes on his
22   report, right?
23   A    TD Bank told me they thought so as
24   well.
25   Q    But you thought so, right?
```



```
Page 108
 1      A    The initial offer, yes, because --
 2      Q    And even their second offer?
 3      A    Yeah, both offers were below the
 4   asking.
 5      Q    And why was their offer so much less than
 6   the asking price?
 7      A    I can't answer their motivation.  How
 8   can -- I mean, save money like anyone, I guess,
 9   that could make an offer.
10      Q    Right.  The foreclosure hadn't been filed
11   at that point, correct?
12      A    That is correct.  But we were a high
13   priced house at that time, too.
14      Q    You actually agreed to sell for less than
15   the asking price, didn't you?
16      A    I did.
17      Q    And it wasn't a distressed sale at that
18   time, correct?
19      A    That is correct.  It was marginally
20   less than the asking price, but correct.
21      Q    So Mr. McCaffrey, who we talked about a
22   moment ago, he ended up preparing two
23   appraisals, didn't he?
24      A    He came to my house one time.  I had
25   one from that guy who liked Disney stuff, the
```



```
Page 109
 1   guy from the Jacobs and then McCaffrey came
 2   through, but I can't remember when he came
 3   through.
 4   Q    Well, McCaffrey came up with two different
 5   values first he came up with 1.975, then later
 6   he came up with a second report of 2,040,000.
 7   Do you remember that?
 8        A    No, but okay.
 9   Q    Do you remember arguing that
10   Mr. McCaffrey's first report at 1.975 had
11   mistakes in it, just like the Jones' report?
12        A    I wouldn't put it beyond me to point
13   out that there are missed pieces to some value.
14   Q    So you argued about it with TD Bank and
15   McCaffrey ended up re-doing his report and
16   coming in at the exact amount of the sales
17   price, 2,040,000.  Do you remember that?
18        A    You know, I remember them -- I think I
19   do remember that there was an initial report.  I
20   don't know -- maybe so.  But I think actually,
21   to be honest with you, hold on, let me think.
22   Give me a second, I'm trying to remember this.
23   I don't want to misstate things just because I
24   feel like I remember it.  I want to see if I can
25   remember this.
```



```
Page 110
 1         Hold on.  Hold on.  I do remember.  I
 2    remember some of this now, the McCaffrey --
 3    here's what happened, I'm pretty sure McCaffrey
 4    had the first report was 1.975.  I don't
 5    remember the number.  You're telling me, 1.975.
 6    I'm not testifying that being the actual number
 7    that's okay you can show it to me.  I'm pretty
 8    sure that I did argue about.  I don't put it
 9    past myself, but I do remember because it must
10    have happened.  It must have happened because I
11    remember here's what I do remember, McCaffrey
12    telling me -- McCaffrey telling me -- I don't
13    know if it was a conference call with TD Bank
14    now or not, that he had to cap the value -- that
15    yes, that what I pointed out was correct, that
16    the house was worth more, but that he had to cap
17    the value at two million forty because there was
18    a contract that had been on the house for two
19    million forty.
20         So in other words, I had won my argument
21    about the larger value of the property with
22    Mr. McCaffrey and TD Bank had agreed with me,
23    but McCaffrey said look, I can't go beyond two
24    million forty, the market value has been set.
25    The market value has been set by a contract, a
```



MAGNA
LEGAL SERVICES

```
Page 111
 1   relevant recent contract or I can't remember
 2   when he did the damn report.  But that's what he
 3   said, I can't -- I can't go beyond two million
 4   forty.  That's why there was -- you know, for
 5   example, I think your tone implied that there
 6   was a coincidence to it.  He capped it at that.
 7   I remember this now.
 8   Q     But you remember that he did an appraisal
 9   that came in below 2,040,000, right?
10        A     I think -- I thought it was like two
11   million, I don't remember, but we're dibbling
12   over 70,000 or $25,000 or something like.
13   Q     You that I thought it's dibbling but
14   McCaffrey's first report came in at virtually
15   the same number as Mr. Jones report and the
16   field review of Mr. Jones report?
17        A     Right.  The field review, I don't know
18   what credence that has because the field review,
19   what I understand a field review to be, which I
20   didn't elaborate just a moment ago, but a field
21   review is merely a mathematical checking of the
22   calculations in an appraisal.  It doesn't
23   actually verify the characteristics or
24   measurements of the property themselves.
25             So the verification of those
```



```
Page 112
 1   characteristics is what was essential because
 2   that's what was in error.  If you were to put on
 3   a board two plus two equals four and say can you
 4   field review that, they would say two plus two
 5   equals four.  They wouldn't look in the box to
 6   see there were three apples in one and two in
 7   the other to say three plus two equals five.
 8   Q    Do you think it makes any difference
 9   Mr. McCaffrey's appraisal was done in connection
10   with your loan with the bank?
11        A    Mr. McCaffrey's -- hold on a second.
12   I was on a little emotional roll there.  Does it
13   make a difference -- please, Barb, say the
14   question again?
15   Q    Does it a make a difference that
16   Mr. McCaffrey's report was done in connection
17   with your loan to TD Bank as opposed to the
18   Jacobs loan?
19        A    The functional difference between
20   those two scenarios is I was willing to have the
21   review done that the Jacobs refused to have
22   done.  Do you understand?  I want to make sure
23   you understand what I'm answering there, Barb.
24   That is the difference.  The errors -- when
25   there were errors found in my report, I was the
```



MAGNA
LEGAL SERVICES