# EXHIBIT I

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CASE NO. 12-12020(MG)

— — —

IN RE:                          :

                                : (PENDING IN THE

RESIDENTIAL CAPITAL, LLC,  : SOUTHERN DISTRICT OF

et al,                          : NEW YORK)

                                : CHAPTER 11

            Debtors             :

                                :

                                :

                                :

— — —


DEPOSITION UNDER ORAL EXAMINATION OF
FRANK REED
Mount Laurel, New Jersey
THURSDAY, AUGUST 14, 2014


— — —

REPORTED BY:  HEATHER A. KIRSCH, CCR

— — —



MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



Page 62

1    clarify some of this, I don't know how relevant

2    it is -- he was supposed to close on the 29th of

3    September and I believe he missed that

4    settlement.  Then he communicated with the title

5    company, I'm reading from my own e-mail, that he

6    was going to close, I guess four days later on

7    October 3rd and he didn't do it.

8         "I think he wanted to close by noon today,"

9    my e-mail says and my e-mail is dated or timed

10   at 2:00 in the afternoon.

11        And so he missed I think two closings,

12   September 29th and the one that he asked for to

13   be moved to the 3rd.  And then we entered into

14   this agreement.

15   Q    The addendum?

16        A    The addendum.

17   Q    And on the addendum it indicates that on

18   paragraph 3, numbered paragraph 3, a good faith

19   deposit was to be wired to Infinity Title Agency

20   by October 24th, 2008.  Did that happen?

21        A    It did.

22   Q    How much?

23        A    I don't know when it did.

24   Q    What was the amount of the good faith

25   deposit?


MAGNA
LEGAL SERVICES

Page 63

```
 1      A      $50,000.

 2   Q      So was that deposited?

 3      A      I believe it eventually was received.

 4   Q      When you say eventually what do you mean by

 5   that?

 6      A      I don't know if it came on the 24th of

 7   October.

 8   Q      Okay.  But so that deposit was received by

 9   you and your wife, right?

10      A      It went to -- well, it went to

11   Infinity Title.

12   Q      But it eventually went to you and your

13   wife?

14      A      Yes.

15   Q      And you retained that?

16      A      I did.

17   Q      Never gave it back?

18      A      Correct.

19   Q      Okay.  All right.  But he still didn't

20   settle on November 21st?

21      A      No.

22   Q      Right?

23      A      No, he did not.

24   Q      So what did happen on November 21st, 2008,

25   do you remember?
```



Page 66

1   Q     And did you sign this agreement?

2         A     I did.

3   Q     Okay.  And what was the nature of this

4   agreement?

5         A     It was a lease.

6   Q     So he didn't settle on November 21st,

7   right?

8         A     Correct.

9   Q     That was supposed to have been his extended

10  closing date, right?

11        A     That is correct.

12  Q     And he did not have cash to close on that

13  day, so he didn't close, is that right?

14        A     That's correct.

15  Q     Okay.  So instead of bringing the cash to

16  closing, he presents you with this agreement and

17  basically says to you hey, I don't have the

18  money right now, I'm going to be getting it,

19  will you agree to lease the property to me while

20  I'm waiting on the money.  Is that the way it

21  happened?

22        A     That's correct.

23  Q     Okay.  So you agree to this arrangement

24  whereby Mr. Weaver is going to move into your

25  house and you guys are going to move out, right?



Page 67

1        A     I agreed to it.  My wife did not,

2    which is a matter of contention to this day.

3    Q     All right.  So he paid you $400,000 for the

4    option to purchase the property, right?

5        A     He did.

6    Q     All right.  And you actually did receive

7    that money?

8        A     I did.

9    Q     And it went into your mother's bank

10   account?

11       A     That's right.

12   Q     Okay.  But then your mother gave it to you,

13   so effectively you received it?

14       A     The reason that it went into my

15   mother's account, for the record, for whoever

16   looks at this in posterity, I did not trust

17   Mr. Cooper.  Mr. Cooper wanted to write a check

18   that night, he wanted to wire the money the

19   following week and we refused all those or I

20   refused those offers.  My wife never accepted

21   any of this.

22       And Mr. Cooper -- Mr. Cooper it turns out

23   had a bank account at the same bank my mother

24   had.  And the bank was open Saturday morning, he

25   wanted to move in by Monday.  He wanted to be in



Page 68

```
 1   for Thanksgiving.  So the bank would do an
 2   internal transfer from Mr. Cooper's account to
 3   my mother's account.
 4   Q    And so to your knowledge, did he, in fact,
 5   move into the property?
 6        A    Yes.
 7   Q    Okay.  And according to this agreement,
 8   Reed-14, he had agreed to pay you $25,000 a
 9   month for rent on the first of each month.  Did
10   he make that payment for December of 2008?
11        A    He did, reluctantly.  And he -- shall
12   I tell you the source of the payment?
13   Q    Well, I just want to know if you received
14   it?
15        A    Yes.
16   Q    And it was a good check?
17        A    It was not a check.
18   Q    Okay.  It was cash?
19        A    It was wired from the $50,000 that was
20   deposited at the title company.  So the 50,000
21   that was eventually given, when was it September
22   or October -- he didn't give it upon the signing
23   of the contract, but then there was an addendum
24   that demanded it, he then put that money in with
25   the title company.
```



Page 69

1      So roll around December 1st, just days

2   after I move my family out, Mr. Cooper is due

3   the rent, according to the document he drafted

4   and proposed to me.  He doesn't pay it.  He

5   doesn't answer the calls.  He doesn't answer the

6   door.

7      So I don't remember at what point in

8   December, but he finally agrees when I tell him

9   you're not going -- I'm not going to ever

10   release the security deposit, we're going to

11   fight over that.  If you don't have the money

12   for the rent, you might as well release it from

13   the security deposit and get good use out of it,

14   which he did.

15   Q   So did he pay January 2009?

16      A   In the same methodology.

17   Q   Okay.  Out of the 50,000?

18      A   Yes.

19   Q   Leaving none of that money on deposit?

20      A   Correct.

21   Q   Then did he pay February 2009?

22      A   No.

23   Q   Did he make any payments thereafter?

24      A   No.

25   Q   Okay.  So eventually you had to evict him?



Page 70

1        A    Correct.

2    Q    But you did get from him the 400,000, which

3    you retained?

4        A    Correct.

5    Q    Okay.

6        A    Well, I didn't -- I retained it and

7    then I put it back on the house, by paying off

8    other liens.

9    Q    But you never gave it back to him?

10       A    Correct.

11   Q    You got him successfully evicted from the

12   property?

13       A    Yes.

14   Q    Okay.  Now, when you say you paid off other

15   liens, is that how you paid off the second

16   mortgage?

17       A    Part -- I believe part of that it

18   commingled at the time, but yes.

19   Q    What else did you use it for?

20       A    I thought there was another lien on

21   the property, I'm not sure.  I have to

22   investigate that.  I used the remainder plus

23   cash on hand.  I mean, we wound up living in a

24   hotel and facing more repairs on the property

25   that we were going to than I thought.



Page 76

1                                    *    *    *

2               (Whereupon, Exhibit Reed-17 was marked

3         for identification.)

4                                    *    *    *

5

6    BY MS. HAGER:

7    Q    Showing you what was just marked as

8    Reed-17, do you recognize that document?

9         A    I don't recall seeing this document.

10   Q    This document appears to be the same in

11   form as Reed-17, it's a Proposal to Purchase

12   from Frank and Gina Roccisano concerning Matlack

13   Drive.  It was prepared by Naoji Moriuchi and

14   the date is June 12th, 2010 and the offer price

15   is 1.45 million.  It's your testimony that you

16   don't remember being shown this by the broker?

17        A    Barb, that is correct.  I do not

18   remember it.  The only document to that

19   statement, the only document that I believe that

20   I ever had in my file or that I found later in

21   my file was this one for 1.3.  Did it happen,

22   can other people testify that it happened, I

23   can't remember.  I mean, if it did, maybe they

24   would remember better than I, but I cannot

25   honestly tell you yes, I remember this


MAGNA >
LEGAL SERVICES

Page 77

1    happening.

2    Q     Who is Kevin Aberant?

3         A     Kevin Aberant, Kevin Aberant.

4    Aberant, I think he was our mayor.

5    Q     Do you remember him as being a lawyer for

6    the Roccisano's?

7         A     I do.  Now I do.  Yes, I do.

8    Q     Did you ever have any discussions with him?

9         A     I think we did.

10   Q     What was the nature of those discussions?

11        A     If he was with the Roccisano's, this

12   was about proposed addendums to a contract.

13   Q     For what?

14        A     To buy the house.

15   Q     There was a proposed agreement?

16        A     I think there might have been.  Now

17   that you mentioned it, there may have been.

18   Q     And what was the contract price?

19        A     I don't know.  I don't know.  I don't

20   know.

21   Q     And so you were working on addendums to

22   change some of the terms that were in the

23   agreement, right?

24        A     Yeah.  I don't know if it included the

25   price, but I remember this now.  I do remember



Page 78

1    something, there was -- yes, I believe that

2    that's correct.  But I don't know what -- I

3    can't remember the details.  Maybe I'll

4    continue, if you flush it out, show me something

5    or if someone else reminds me of it I can even

6    ask around the realtors to remind me of it.

7    Q    But you remember having a deal now with the

8    Roccisano's, right?

9        A    A deal, there was no executed

10   contract.  I don't believe there was an executed

11   contract.

12   Q    Then why were you working out addendums?

13       A    I don't know if it was an addendum or

14   terms.

15   Q    But you were working out an agreement, to

16   your recollection, with the Roccisano's for the

17   purchase of the property?

18       A    Because that's how he was involved.

19   There was an offer and we were going back and

20   forth, but I cannot tell you what stage that

21   was.

22   Q    What do you mean by stage?

23       A    That we agreed to a price, that we

24   agreed to times, that we agreed to -- I mean,

25   whatever the terms were, I can't tell you.



Page 79

1    Q    Well, after Reed-17, which is dated June

2    12th, 2010, there was an e-mail exchange June

3    30th, 2010 between you and Mr. Aberant where he

4    was trying to get in touch with you and he said,

5    "Please let me know your response to my prior

6    letter.  I'm attaching a copy in case you don't

7    have it in front of you.  Please fax or e-mail

8    it back."

9        A    Okay.

10   Q    And then that same day you said, "Okay.

11   We'll try to accomplish before the weekend."

12       A    Okay.

13   Q    The next day Kevin Aberant e-mailed

14   Mr. Roccisano and copied Naoji Moriuchi and

15   said, "FYI, I just spoke to Frank Reed.  He was

16   in a car full of kids and couldn't talk.  I

17   asked him to just take my letter and write okay

18   or no next to each change.  He said he would do

19   so, but needed to printout the contract, lock

20   himself in a room for an hour to do that.  He

21   did offer two specific comments.  He would be

22   okay with refund of deposit if due to job loss

23   or transfer, but he said he would not give a

24   credit towards the purchase price for any rent

25   paid.  Please let me know your thoughts."



Page 80

1        Does that, the context of that message

2    sound familiar to you at all?

3        A    Yes.  We -- as I said, now that you're

4    talking about Kevin, I think these people were

5    moving from another state to New Jersey or

6    contemplating staying versus moving, something

7    of that nature.  Now -- now it's amazing how

8    this helps.  They proposed, they offered, I

9    didn't realize they re-offered and I must have

10   had a copy of a contract with various provisions

11   that we were contemplating.

12        Now, you mentioned rents even and things

13   like that, possibly contemplated even renting

14   the place to them I can't tell you for a fact,

15   but I'm hearing now and it sounds familiar.

16   Q    And the response to Mr. Aberant's e-mail

17   from Mr. Roccisano, the potential buyer, is

18   essentially that he's got to discontinue

19   negotiations because he's resuming an old

20   position in Louisville.

21        A    Okay.  I'm sorry my mind was still

22   thinking in a momentum like way about some of

23   this coming back.  Could you please say what you

24   said again?

25            MS. HAGER:  Can you read that back?



Page 81

```
 1                          *   *   *

 2              (Whereupon, the court reporter read

 3        back the previous testimony.)

 4                          *   *   *

 5

 6   BY MS. HAGER:

 7   Q    Does that sound familiar?

 8        A    I remember it wasn't us that stopped

 9   that contract.

10   Q    I'm sorry?

11        A    I remember although there wasn't an

12   agreement yet met, a meeting of the minds,

13   because I still had probably not yet locked

14   myself in the room to go review all the things

15   that they wanted, whatever those were, I now

16   recollect that the Roccisano's did not move

17   forward.

18   Q    But this was -- this was more than just an

19   offer.  You were really moving towards getting

20   close to an agreement, right?

21        A    It's nothing -- I mean, it's a more

22   detailed offer, but it's an offer none the less.

23   There were a lot of moving parts.  I mean, I'm

24   just remembering that now from what you're

25   saying here.  We had just evicted someone who
```

