# EXHIBIT A

## PLAINTIFF'S EXPERT WITNESS REPORT OF
## EVAN HENDRICKS

I, Evan Hendricks, provide the following Expert Report in connection with the action entitled Frank J. Reed III v. GMAC Mortgage LLC, et al., Superior Court of New Jersey, Burlington County (Docket No. L-1526-10). **Part 1** of this report addresses issues that are specific to this case, including a context and history that robustly put Defendants on notice of the problems in this case and why Defendants should have prevented them. **Part 2** includes my qualifications, list of prior cases in which I have testified, my fee, and more general opinions, such as the nature and purpose of credit scores and credit reports, and damages. It is likely that Defendants will disclose additional evidence after I have completed this expert report.  If appropriate, and if justified by the production of additional evidence in discovery, I reserve the right to supplement this report at a future date.

### Summary of Opinions

- This case is the result of Defendant GMAC ("GMAC") abusing both the foreclosure process and the credit reporting system to block the ability of Plaintiff Frank Reed ("Plaintiff" or "Mr. Reed") to avoid foreclosure by ruining his credit.

- GMAC abused the foreclosure process by failing to adhere to the all-important notice provisions in the Fair Foreclosure Act.  It abused the credit reporting system by filing the foreclosure action, and instructing the credit reporting agencies (CRAs) to portray Mr. Reed as being in foreclosure, when the foreclosure action should never have been filed prior to providing a Notice of Intent to Mr. Reed.

- This set off a highly damaging chain reaction.  The foreclosure on Mr. Reed's credit stood out as a "scarlet letter" and scuttled his soon-to-be-completed efforts to refinance his mortgage and avoid foreclosure.  That in turn further worsened Mr. Reed's credit, making it impossible for him to obtain any meaningful credit, either to avoid foreclosure, extract equity from his home, or to continue Mr. Reed's real estate business.

- All of this caused Mr. Reed both economic and non-economic damages.  The economic damages stemmed from the ruined credit that ended Mr. Reed's ability to continue his real estate business.

- Mr. Reed's economic damages include, but likely are not limited to, the losses from being unable to refinance his home mortgage, the losses stemming from his inability to sell his Moorestown property at the peak of the market, the losses and foreseeable losses stemming from Mr. Reed's inability to continue his real estate business and the loss of time and opportunity stemming from dealing with the unfair and incomplete/inaccurate credit reporting.

- The non-economic damages related to the stress, humiliation, mental anguish and frustration stemming from being blindsided by GMAC's non-compliant foreclosure, from watching his credit being ruined and knowing the consequences for his and his family's economic plans and aspirations, and from the consequential loss of reasonable control over such crucial personal information, making him a victim of chronic credit report inaccuracy.

- Given that this occurred during a period in which wrongful foreclosures were a growing, foreseeable problem, and that the damages stemming from wrongful foreclosures were potentially devastating, GMAC's actions in regard to Mr. Reed were reckless.

- From 1996 to the present, GMAC was put on notice by a variety of events of the importance of credit report accuracy.

- It is well known in our field that victims of chronic credit report inaccuracy endure a common pattern of harms.  The damages suffered by Mr. Reed was consistent with those experienced by other victims.  As mentioned above, Mr. Reed suffered damages that were peculiar to his situation.

### Impact of 'Foreclosure' On Creditworthiness

It's logical that a foreclosure is devastating to a consumer's creditworthiness. After all, a home mortgage is often the most important credit obligation of an American consumer, and a foreclosure typically means that the consumer has defaulted on the mortgage to the point that the bank has to foreclose on the home and take possession of it.

Most lenders, like TD Bank in the case of Mr. Reed, have a policy of not approving (or even reviewing) credit applications from consumers who are in foreclosure. In addition, most lenders run automated scans of applicants' credit reports for key derogatory terms, and "foreclosure" is one of them.  This is because underwriters typically will not give final approval to a credit application for someone who is in foreclosure.

The State of New Jersey has recognized foreclosure's devastating impact on the consumer through enactment of the Fair Foreclosure Act, which seeks to ensure that proper and timely notice is given to potential targets of foreclosure so they will have adequate opportunity to make things right and avoid losing their home. ("Institution of foreclosure is traumatic to the debtor-mortgagor and creates a permanent court record which can be injurious to the debtor's credit.  The notice of intention is meant to give the debtor a chance to prevent acceleration and institution of foreclosure." See Myron C. Weinstein, "Law of Mortgages: Chapter 24: New Jersey's Fair Foreclosure Act.  B. Notice of Intention." New Jersey Practice Series TM.)

GMAC knew or should have known all of this.  GMAC's rushed and allegedly improper foreclosure action against Mr. Reed came during a period in which GMAC

allegedly was falsifying documents in order to foreclose on other properties. (See Paul Kiel, "Internal Doc Reveals GMAC Filed False Document in Bid to Foreclose," ProPublica, July 27, 2011. ([www.foreclosuredefenseblog.com/2011/08/firm-commentary-readers-should.html](www.foreclosuredefenseblog.com/2011/08/firm-commentary-readers-should.html))

Thus, GMAC's reckless and highly damaging improper foreclosure against Mr. Reed coincided with other reckless and presumably highly damaging improper foreclosures against other Americans, and appeared to be part of a pattern and practice of a declining mortgage lender desperate to salvage itself by trampling on its customers' rights.

### GMAC's Foreclosure Doomed Mr. Reed's Re-finance, His Path To Normalcy, & Doomed Him To 'Credit Jail'

Mr. Reed had a long-standing relationship with the TD Bank President, who had been involved with numerous loans over a period of many years as part of Mr. Reed's ongoing business of buying, improving and selling real estate.  In the Spring of 2008, the TD Bank President had visited one of Mr. Reed's properties and had ordered and received an appraisal.

The approval of this loan, and the consummation of this transaction, would have enabled Mr. Reed to catch up on his debts, including the GMAC mortgage, and extract equity from his home in order to conduct his business ventures.

That is when the key moment occurred. GMAC improperly moved to foreclose on Mr. Reed's home, figuratively hanging a "scarlet letter" around his creditworthiness, and scuttling the ability to consummate a loan transaction.

This in turn set off a horrific chain reaction that resulted in Mr. Reed, figuratively, being thrown into "credit jail."  Unable to complete the planned transaction and obtain the necessary funds to become current on his credit obligations (and to continue his ongoing real estate endeavors), Mr. Reed suddenly could not meet his other credit obligations and quickly fell behind.  Within months, his credit report was marred with a plethora of derogatory credit accounts which further doomed any hope he had of restoring his creditworthiness and returning to a normal economic life.[1]  This chain reaction was caused directly by GMAC's improper foreclosure, and it devastated Mr. Reed's life.

This caused profound economic and non-economic damages to Mr. Reed.  His other expert will opine on his economic damages.

---

[1] According to one of Mr. Reed's credit reports, a quick review indicated that eight accounts where rendered derogatory in 2008 alone.

Mr. Reed's non-economic damages relate to the stress, humiliation, mental anguish and frustration stemming from being blindsided by GMAC's non-compliant foreclosure, from watching his credit being ruined and knowing the consequences for his and his family's economic plans and aspirations, and from the consequential loss of reasonable control over such crucial personal, financial information, making him the victim of chronic credit report inaccuracy.

I have served as an expert in several cases in which consumers/plaintiffs have been victims of chronic credit report inaccuracy. In these cases, the juries recognized the profound damage to the plaintiffs. In some of the earlier cases in which I was involved, the minimum damage award was $200,000. In more recent cases, the jury awards for actual damages have been closer to $350,000.[2]

Because the chronic inaccuracy caused by GMAC cut right to the heart of Mr. Reed's ability to continue earning a living, it heightened the stress, humiliation, mental anguish and frustration he experienced from being blindsided by GMAC's non-compliant foreclosure, and from watching his credit being ruined.

---

[2] Eric Robert Drew  vs. Equifax Information Services, LLC, et al., U.S. District Court for the Northern District of California , Case No.  CV 07-00726-SI. $700,000 in punitive damages, $315,000 in emotional distress damages, and $6,326.60 in economic damages, for a total of $1,021,326.60; July 20, 2010

Suzanne Sloane vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272. $351,000 –  $106,000 in economic damages and $245,000 in mental anguish, humiliation, and emotional distress damages.  (August 2006)

Angela Williams v. Equifax Information Solutions, LLC:  Circuit Ct. or 9th Judicial Circuit, Orange County, Florida – No. 48-2003-CA-9035-O; jury verdict, Nov. 30, 2007; ($219,000 in actual damages and $2.7 million in punitive damages).

Rebecca L. Valentine v. Equifax Information Services, LLC: U.S. District Court for the District of Oregon – No. 05-cv-0801; jury verdict Oct. 12, 2007; ($200,000 in actual damages.)

Nicole M. Robinson v. Equifax Information Services, LLC: USDC-Eastern Dist. Of Virginia – No. 06-CV-1336; jury award Aug. 17, 2007; ($200,000 in actual damages.)

Sandra Cortez vs. Trans Union, LLC., U.S. District Court for the Eastern District of Pennsylvania: No. 2:05-cv-05684-JF.  (jury verdict April 26, 2007; $50,000 actual damages, $750,000 in punitive damages.)

Matthew Kirkpatrick v. Equifax, U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO; 2005 $210,000 in actual damages.

Thomas v. Trans Union, U.S. District Court for the District of Oregon.   $5million punitive, $300,000 actual damages for emotional distress.  (2001)

Soghomonian v. TransUnion, (U.S. District Court for the Northern District of California, 2004) $330,000 actual damages and $660,000 punitive damages.

Cortez v. TransUnion, LLC, U.S. District Court for the Eastern District of Pennsylvania, Case Number: 2:05-cv-5684 (April 2007); $50,000 actual damages, and $750,000.00 in punitive damages.

Therefore, in accordance with my experience as an expert in the field of chronic credit report inaccuracy, I would value his non-economic damages, at a minimum, at $350,000.[3]

## Underlying Incentive For Furnishing

Many people do not realize that creditors' furnishing of their customers' data to credit reporting agencies (CRAs) is entirely voluntary. A fundamental incentive for large creditors such as GMAC  in this case is that credit reporting is a cost-effective means of enhancing debt collection.

GMAC is keenly aware that credit reporting is a "powerful tool designed, in part, to wrench compliance with payment terms." (Rivera v. Bank One, 145 F.R.D. 64, 623 (D.P.R. 1993)). Creditors' collection letters and debt-collecting operators often advise customer-debtors that if they don't pay their debt it will result in highly derogatory data being entered on that customer's credit report which may remain for up to seven years. Creditors' collection letters often advise customer-debtors that, "Any potential employer, mortgage company, car dealership or creditor is likely to see this remark. Such a condition is far more damaging than the delinquent status you now maintain."

When a consumer applies for a mortgage, or other major form of credit, the mortgage or credit often is not granted until all outstanding unpaid debts listed on the credit report are resolved. Thus, a creditor that is owed money, or that still hopes to collect money whether or not it is actually owed by the consumer, enhances its ability to garner payment by reporting the debt to that consumer's credit report. This practice is highly problematic and damaging to the consumer when the consumer in fact does not actually owe the amount being reported to her credit report. However, it is conceivable that such practices would cause consumers, particularly those who did not know their rights, to consider paying off debts that they did not owe in order to remove serious derogatory data from their credit reports.

As I wrote in my book, "Credit Scores and Credit Reports,"

… Creditors view credit reporting as an arm of debt collection – a sort of last resort that will catch up with non-paying consumers sooner or later. This practice "crosses the line" when creditors and collectors threaten to report debts – or actually report debts – that they know or should know are not the responsibility of the consumer.  [Page 31 – Second Edition]

---

[3] I am sometimes reluctant to place a dollar value on non-economic damages for fear of "low-balling" what a future jury would decide. But I believe this initial estimate provides a reasonable basis for understanding Mr. Reed's minimum non-economic damages.

### Potential Areas of Testimony: Damages Known & Common To Victims of Chronic Credit Report Inaccuracy

It is important that the trier of fact understands that victims of chronic credit report inaccuracy often experience a series of several known and common types of negative impacts.

### Some Categories of Typical Negative Impacts of ID Theft & Chronic Inaccuracy

(1) Inaccurately described as not creditworthy and/or less creditworthy to third parties
(2) Improperly denied credit because of inaccurate data, or only able to obtain credit at less favorable rates
(3) Expended time and energy to correct errors not of one's making; in addition to loss of time and energy, loss of opportunity
(4) Wrongfully received debt collection calls
(5) Chilled from applying for credit
(6) Sleeplessness, physical symptoms
(7) Sense of helplessness, loss of control over personal data
(8) The emotional distress stemming from, and associated, with all of the above

The following factors could be used to gauge the severity of damage within each category.

### Key Factors To Consider When Assessing Severity of Negative Impact

The nature and substance of the category of damage
Time & energy to solve the immediate problem
The expectation that the problem was solved
The number of recurrences
The period of time over which the problem persist

### Mr. Reed's Damages Were Consistent with Other Victims of Chronic Credit Report Inaccuracy

Mr. Reed's damages were consistent with other victims of chronic credit report inaccuracy. His experiences touched on many of the eight categories cited above. In addition to the categories above, it is important for the trier of fact to understand that it can be very stressful not knowing everyone who may have associated you with highly derogatory credit data. Moreover, in my opinion, it can be difficult to maintain constructive personal relationships under stress.[4] It can be difficult to perform adequately at one's job.

### Defendant Knew or Should Have Known It Actions Would Have Negative Impact

The history of credit reporting cited below, which includes years of Congressional testimony and legislative actions, Federal and State enforcement actions, abundant media coverage and targeted books, such as mine, should have made it abundantly clear to GMAC

---

[4] In fact, the insurance industry says that stress, stemming from financial problems, can cause auto accidents, and therefore justifying its use of credit reports in setting insurance rates.

that failing to prevent Mr. Reed from becoming a victim of chronic inaccuracy would have a highly negative impact on him.

## Context

Context is extremely important in this type of case, in part because credit reporting, along with inaccuracies stemming from identity theft, is a long-standing and well-known problem.  An important role of experts in FCRA cases is to help the trier of fact understand the relevant context.[5]  Accordingly, I provide a brief history.  An important theme emerging from this history is that a furnisher like GMAC was  consistently provided notice in one form or another of the importance of ensuring the accuracy of information it reports and promptly restoring accuracy when the consumer disputes inaccuracies.  This history also notified GMAC  of the potential damage to consumers of both reporting erroneous information and then failing to correct it.

## History of Significant Inaccuracy Problems

It is essential that the trier of fact understand that there is a long-standing problem of significant inaccuracy rates in credit reporting data.  Since 1990, several non-industry studies have concluded that credit report inaccuracy is a problem of significant proportions that can have a major negative impact on the victims of  inaccuracy, and that can potentially be detrimental to the credit system as well.[6]  This history is covered in Chapter 10 of my book, "Credit Scores and

---

[5] Kirkpatrick v. Equifax, U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO; In rejecting Defendant Equifax's motion to exclude Mr. Hendricks' testimony, Judge Michael W. Mosman, ruling from the bench, stated: "As a general statement, what I'm allowing and the reason I'm allowing it is testimony that puts the particular actions of the defendant in particular here in context, in the context of the nationwide problem of identity theft, in the context of the congressional reaction to that and other issues in the credit-reporting industry, when he can by virtue of his study and his prior testimony, both in court and to Congress, make comparisons, then that's something that's helpful to the jury."  (January 18, 2005; Transcript available upon request.)

[6] Williams, James (CIS), "Credit File Errors, A Report," August 7, 1989 -- The first survey of 1,500 consumer reports and found serious error rate of 42% to 47%;

Consumers Union, "What Are They Saying About Me?  The Results of A review of 161 Credit Reports From The Three Major Credit Bureaus, April 29, 1991 -- 48% contained "serious errors," defined as meaning those that could, or did, cause the denial of credit, employment or insurance.

U.S. Public Interest Research Group (US PIRG), "Nightmare On Credit Street (Or How The Credit Bureau Ruined My Life): Case Studies Documenting Consumer Complaints and Recommendation For Amending the FCRA," June 12, 1990

U.S. Public Interest Research Group (US PIRG), "Don't Call; Don't Write; We Don't Care." 1991 -- Review of 156 consumer report complaints on file at the FTC revealed that the average duration of complaints against a CRA was 22.5 weeks, or almost 6 months

U.S. Public Interest Research Group (US PIRG), "Public Enemy #1 At The FTC " October 1993, Based upon a Freedom of Information Act request, the 1993 report found that between 1990-93, problems with credit bureaus was the leading cause of complaints to the FTC (30,901, 20.6%).  The 1993 PIRG

Credit Reports." As that Chapter notes, in the early 1990s, problems with inaccuracy and "mixed files," CRA non-responsiveness and inadequate reinvestigations became the cause of complaints to the FTC.

Of particular note was the 1993 study done by the U.S. Public Interest Research Group (US PIRG), "Public Enemy #1 At The FTC." Based upon a Freedom of Information Act request, the 1993 report found that between 1990-93, problems with credit bureaus was the leading cause of complaints to the FTC (30,901, 20.6%). The 1993 PIRG found that 44% of complaints concerned mixed files, and that among those, 64% involved the mixing of data with total strangers.

These and other complaints prompted the FCRA's oversight authorities – the FTC and State Attorneys General – to launch investigations and take enforcement actions. These actions resulted in a series of separate consent decrees involving Equifax, Experian and Trans Union in which each pledged to do a better job of maintaining accuracy, avoiding mixed files and the reappearance of previously deleted data, being more responsive and conducting adequate reinvestigations.

**History: Increased Attention on Role of Furnisher**

This Consent Agreements are also relevant because (1) they created widespread publicity about the problems of credit report inaccuracy, (2) they articulated (an agreed upon) higher and more specific standard of care to ensure accuracy and fairness, and (3) they formed the foundation for the 1996 Amendments to the FCRA. However, Congress knew that to ensure accuracy, it needed to go beyond the Consent Agreements by placing duties on furnishers to report information accurately.

The April 1994 House Banking Committee Report on the proposed amendments explained why, despite the consent agreements, and subsequent industry guidelines, legislation was necessary: "Moreover, because the industry guidelines are simply voluntary, they are unenforceable and may be changed or revoked at any time. Many of the provisions in the

---

found that 44% of complaints concerned mixed files, and that among those, 64% involved the mixing of data with total strangers.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: Credit Report Errors Mean Consumers Lose," March 1998

"Credit Reports: How Do Potential Lenders See You?" *ConsumerReports.org,* July 2000.

Consumer Federation of America and National Credit Reporting Association, *Credit Score Accuracy and Implications for Consumers*, December 2002.

Robert Avery, Paul Calem, Glenn Canner, and Raphael Bostic, "An Overview of Consumer Data and Credit Reporting," *Federal Reserve Bulletin*, February 2003.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: A Look at Credit Report Errors," June 2004

consent agreements expire after a short period of time, are not enforceable by consumers, and do not apply in every state. ***Additionally, these agreements do not impose any reinvestigation obligations on furnishers of information or on credit bureaus other than the three largest. Because of these limitations, federal legislation is necessary to improve accuracy-related protections for consumers. Consequently, the bill contains new reinvestigation procedures which are intended to cut down on the number of errors in consumer reports and to reduce the delay in correcting those errors.***"  [Emphasis Added]

Importantly, the Consent Agreements' language on preventing reinsertion was incorporated and expanded upon in the 1996 Amendments to the FCRA.  Under Sect. 1681 (a)(5)(B), information cannot be reinserted unless it is "certified" as complete and accurate by the furnisher.  Moreover, a CRA, five business days prior to any reinsertion, must notify the consumer, and also provide the name and address of the furnisher and inform him or her of his right to add a statement.

Despite these Consent Decrees, the problems of mixed files, inadequate reinvestigations and reappearance did not go away.  Throughout the early 1990s, Congress held a series of hearings in which numerous consumers and consumer advocates described problems with inaccuracy, mixed files, CRA non-responsiveness, and inadequate reinvestigations.  This resulted in the 1996 legislative amendments to the FCRA.

I cite this brief history because it makes clear that for many years, a furnisher like GMAC has been on notice from Congress, the FTC, State AGs, the media and the public that it is important to ensure accuracy, and to reasonably investigate consumer disputes, and that it can be highly damaging when inaccurate information is not removed.


## Part 2

### Potential Areas of Testimony: General Issues, Context

A.    **The Nature and Purpose of Credit Scores**
B.    **The Nature and Purpose of Credit Reports**


### Nature & Purpose of Credit Scores

It is possible that the trier of fact is not intimately familiar with either the credit reporting or credit scoring systems.  If this is the case, I can provide expert testimony on the nature of both systems, how to read and understand credit reports and how to dispute errors, the parameters of credit scoring, the general impact that derogatory data have on a credit score, the interplay between identify theft, credit scoring and credit reporting, and other related matters.

A credit score is a number that reflects a consumer's creditworthiness at a given point in time.  The FICO model credit score, which is used by 75 percent of lenders, is based entirely on information in a consumer's credit report. The model was developed by Fair, Isaac & Co., which

licenses it to Equifax, Experian and Trans Union and others. The scoring range for the FICO "classic" model is 300-850. The various types of "Beacon" scores sold by Equifax, and "Classic FICOs" sold by Trans Union,[7] are based upon the FICO model. The higher the credit score, the less risky the consumer is viewed by creditors. Consequently, consumers with higher-end credit scores (720 and above) often can obtain the most favorable rates for mortgages, refinancing, personal and auto loans and auto and homeowners insurance, and also often receive solicitations for the best quality credit cards. Conversely, the lower the score, the less favorable the rate. A credit score of 620 and below is widely regarded as "sub-prime."

Maintaining a good credit score is important because of a fundamental rule: the lower one's score, the more one pays for credit, including higher interest on mortgages, auto loans, installment loans and credit cards.

For example, the Web site of Fair Isaac Corp., www.myfico.com,[8] gives this example of the difference that credit scores make in terms of interest and monthly payments, on a $300,000 30-year, fixed-rate mortgage:

| Your FICO® Score | Your Interest Rate | Your Monthly Payment |
|---|---|---|
| 760 - 850 | 6.148% | $1,827 |
| 700 - 759 | 6.370% | $1,871 |
| 680 - 699 | 6.654% | $1,927 |
| 660 - 679 | 7.464% | $2,090 |
| 640 - 659 | 8.816% | $2,374 |
| 620 - 639 | 9.782% | $2,584 |

A similar chart exists for auto loans. Moreover, about half of the major credit card companies practice "Universal Default," meaning that these companies will raise their cardholders' interest rates if those cardholders' credit scores drop below certain levels – even if the cardholder never had a late payment with the company.[9]

1.    The precise workings of the FICO score are highly proprietary and therefore closely guarded. However, the general parameters are publicly available:[10]

**35% -- Payment history.** Late payments, particularly major or serious derogatories, like 90-days late or worse, and particularly on important accounts like mortgages, are very damaging to one's credit score.

---

[7] In previous years, the Trans Union FICO Score was called "Empirica"
[8] Visited September 21, 2005
[9] Universal default is described in detail in Chapter 22 of the 2nd Edition of "Credit Scores and Credit Reports," op. cit.
[10] These parameters are published in Chpr 1 of both Editions of "Credit Scores and Credit Reports," op. cit.

**30% -- Credit Utilization.** The ratio between available "revolving" credit and how much is actually used (credit card balances vs. credit card limits).

**15% -- Length of Credit History.** The longer you maintain a positive credit history, the better it is for your credit score.

**10% -- How Much New Credit?.** This relates to "inquiries" that creditors make when you apply for credit.

**5% -- Healthy Mix of Credit?** The scoring model prefers to see a "healthy mix" of mortgage, credit cards and perhaps other kinds of credit.

2.      It is important to understand that consumers are most severely penalized when they have a serious derogatory within the past eleven months.  The "importance of being recent" is illustrated by the following Fair Isaac chart, which shows, in a proportional sense, that a major delinquency in the past year has a 93% negative impact, while a major delinquency between 1-2 years-old has about a 60% negative impact; a major delinquency between 2-3 years-old has a 44% negative impact; a 3-4 year old delinquency has a 33% impact; any delinquency older than 4 years has only a 22% negative impact.

**Previous credit performance** 



Copyright © 2003 Fair Isaac Corporation. All rights reserved.                    1

There is growing public awareness about credit scoring, but it is by no means complete. A September 2004 survey by Opinion Research Corporation Intl. sponsored by the Consumer Federation of America (CFA) and Providian Financial, a major credit card issuer, found that:

Few consumers know what constitutes a good score. Only 12% correctly identified the low 600s as the level below which they would be denied credit or have to pay a higher, sub-prime rate. (One-third thought this level was the low

11

500s, and 30% said they didn't know.) And, only 13% correctly understand that scores above the low 700s usually qualify them for the lowest rates.
http://www.consumerfed.org/092104creditscores.PDF

A March 2005 General Accounting Office study found that about one-third of respondents had obtained their credit scores.  While 70 percent of respondents correctly identified the definition of a credit score and understood many of the factors that could impact credit scores, only 28 percent could provide a number within a range of possible credit scores. In addition, consumers were more familiar with some of the factors that affected credit scores than with others. For example, while most consumers knew that skipping loan payments or making late credit card payments had a negative effect on credit scores, about half did not know that using all the credit available to them, such as reaching the maximum limit on a credit card or home equity loan, had a negative effect. Also, when asked about information that had no effect on credit scores (such as a low checking account balance), about half of consumers answered the questions incorrectly or said that they did not know, the GAO found.[11]

### Nature & Purpose Of Credit Reports

Similar to credit scoring, there is growing public awareness about the credit reporting system, but it is not universal.

According to a July 2003 survey by the Consumer Federation of America, "Only 25 percent of Americans – and less than 20 percent of those with incomes below $35,000 – said they knew what their credit score was. But only three percent of Americans could, unprompted, name the three main credit bureaus-Experian, Equifax, and Trans Union-that provide both lenders and consumers with information from credit reports.  Forty-three percent of Americans (35 percent of those with incomes below $35,000) said they had obtained a copy of their credit report from the three credit bureaus in the past two years."

A March 2005 General Accounting office report concluded that the public's understanding of credit reports and credit scores was improving, but that a federal education campaign was needed to better inform those segments of the population that remain unfamiliar with the systems.  The report found that 60 percent of respondents had seen their credit reports, most often because they were making a large purchase or refinancing a loan. Most of these consumers said that they understood their reports.  However, about half (53 percent) did not know that information could stay on their report for 7 or 10 years.[12]

It is important that the trier of fact have an accurate understanding of the nature and purpose of credit reports.  Accordingly, a brief description of the consumer report is fundamental to my opinions in this case.

---

[11] General Accounting Office, "Credit Reporting Literacy: Consumers Understood the Basics but Could Benefit from Targeted Educational Efforts" (GAO-05-223). www.gao.gov/new.items/d05223.pdf
[12] *Ibid.*

A consumer report, sometimes referred to as a credit report, consists of highly sensitive and personal information, containing a compilation of a consumer's current credit relationships, their credit history, their employment history, estimated income and identifying information, such as name, address, phone number and Social Security Number (SSN). There are three major repositories known as credit bureaus or consumer reporting agencies (CRAs) -- Equifax, Trans Union and Experian. The CRAs regularly receive updates on a consumer's credit relationships from credit grantors -- banks, mortgage companies, credit card issuers, department stores and others. The consumer report typically contains highly sensitive details about a consumer's finances, including account numbers, loan amounts, credit limits and payment history. It also can contain information on the consumer's interaction with the judicial system, including paid or unpaid civil judgments or bankruptcies.

The Credit Report consists of three (or four) basic sections:

(1)    A section with the consumer's *identifying information*-name, address, Social Security number, date of birth, previous address, employer, and sometimes phone number.

(2)    A section with the consumer's *payment history*, including mortgage, auto and installment loans, credit cards and department store cards, collections, and public records like bankruptcy and court judgments.

(3)    <u>If applicable</u>, a section showing *public record* information, like bankruptcies, court judgments and tax liens.

(4)    A section showing *inquiries*, in other words, those companies which accessed the report and for what purposes.

In addition, attached to the credit report is

(1) A form for disputing errors, and
(2) A statement of your rights under the FCRA

Each of the Big Three CRAs uses a slightly different format. A fundamental purpose of the credit report is to describe a consumer's creditworthiness. For example, the Equifax report lists the codes showing how consumers are classified when they don't pay their bills on time. Along with these numeric codes, a credit report can have a letter showing the type of credit, i.e., "R" for revolving (credit card) and "I" for installment (personal loan). The code for someone who always paid her credit card on time would be "R1." Here are the numeric codes:

- 2 : 30-59 Days Past Due
- 3 : 60-89 Days Past Due
- 4 : 90-119 Days Past Due
- 5 : Over 120 Days Past Due
- 7 : Included in Wage Earner Plan
- 8 : Repossession
- 9 : Charge Off
- Blank : No Data available for that month
- 0 : Too new to rate, or unrated
- 1 : On Time

The Trans Union and Experian credit reports describe similar categories with a text narrative, rather than with an alpha-numeric code.

It is important to note that public record information like bankruptcy, judgments and tax liens, and charge-offs (R-9) and collections, are considered some of the most negative entries.  It is also important to note that when a creditor reports a negative tradeline as disputed, that tradeline typically is not scored and therefore does not negatively impact the credit score.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit, whether it is a loan or a credit card.  Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness.  This is known as an "Account Review."  Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers.  Some employers use consumer reports to evaluate job applicants.  Insurers use credit reports for underwriting purposes, and also use credit scores, but presumably only where not prohibited by State law.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit.  Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness.  This is known as an "Account Review."  Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers.  Some employers use consumer reports to evaluate job applicants.  Insurers also can use credit reports for underwriting purposes.  Landlords also use credit reports for tenant screening.

**Background & Qualifications (Curriculum Vitae Attached)**

My expertise in credit reporting stems from several of my professional activities, including:

(1) Editor/Publisher of a specialty news reporting service that covers credit reporting, Fair Information practices and related matters;

(2) Author of the book <u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do</u>, 3rd Edition, (Privacy Times 2005), and co-author of a book with a chapter on credit reporting;

(3) An expert witness qualified by Federal and State courts in Fair Credit Reporting Act (FCRA) litigation:

(4) an expert on credit reporting who has testified before Congress on numerous occasions, including four hearings in 2003, and who has testified twice before the California legislature in regards to legislation on the use of financial data, and who regularly presents at Continuing Legal Education and other professional events; and

(5) an expert consultant to government agencies and private corporations, a member of the Consumer Advisory Council of Experian (one of the three national Credit Reporting Agencies (CRAs), and as one who has earned FCRA Certification from the National Credit Reporting Association (NCRA).

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

I am author of the book, <u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do</u> (3rd Edition, Privacy Times 2007. The book has 23 Chapters, 399 pages and 415 footnotes. As the title indicates, it describes how the credit scoring and credit reporting systems work and what consumers can do to obtain their reports, read and understand them, correct errors in them and enforce their rights. I also am co-author of <u>Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society</u> (2nd Edition, Southern Illinois University Press, 1990), which has a chapter on credit reporting.

Since the early 1990s, I have served as an expert witness in numerous FCRA cases and have been qualified by the federal courts. As an expert witness, I have had the opportunity to read thousands of pages of deposition testimony by consumer reporting agency officials and by credit grantor personnel responsible for reporting data to CRAs. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and

practices for handling personal data.  In fact, CRAs typically consider such procedures and practices to be proprietary and/or trade secrets.  To my knowledge, the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation.  Due to my access to this information, I have augmented my specialized body of knowledge on practices and procedures related to credit scoring and credit reporting.

I have testified numerous times before Congress – always by invitation – on issues related to the collection, maintenance, security, use and disclosure of sensitive personal data, including credit reports and other financial information.  (Consult CV for list of hearings and Web links to testimony.)

In 2003, the year in which Congress was dedicated to a major upgrade of the FCRA, I testified twice before the Senate and twice before the House, and presented once before the FTC. The hearings covered a wide range of credit reporting issues, accuracy, fairness, privacy, CRA procedures and security:

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003[13]

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003[14]

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003[15]

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003[16]

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

Some of my recommendations were reflected in the final FCRA Amendments approved by Congress and signed by President Bush in December 2003.

On December 3, 2002, I testified before the California State Senate Insurance Committee. On January 29, 2003, I testified before the California State Assembly Insurance Committee. Both Committees were considering financial privacy legislation (SB 1), which ultimately was enacted by the legislature and signed into law in September 2003.

---

[13] http://banking.senate.gov/03_07hrg/071003/index.htm
[14] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=229
[15] http://judiciary.senate.gov/testimony.cfm?id=983&wit_id=2790
[16] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=202

I regularly present at Continuing Legal Education or professional seminars related to the FCRA. (Consult CV.)

Two of the three major CRAs have acknowledged that I am an expert on credit reporting as it relates to "Fair Information Practices."  First developed in the United States in the late 1960s, Fair Information Practices (FIPs) standards are at the core of the FCRA and most other U.S. and European privacy and data protection laws, and serve as an internationally accepted standard for gauging privacy policy and practices.

In 1990, Equifax published "The Equifax Report on Consumers In the Information Age," a nationwide opinion survey and analysis by Louis Harris and Associates and Prof. Alan F. Westin.  The report listed me as a privacy expert to whom the authors expressed appreciation for my advice on survey coverage.

In April 2002, I accepted Experian's invitation to serve on the Experian Consumer Advisory Council of Experian (formerly TRW), a national CRA and vendor of other information services.  Before being disbanded in 2004, the Council met twice a year to offer non-binding advice and to discuss a host of credit reporting, marketing and other privacy-related topics.

In 2004, I passed an industry examination, thereby earning "FCRA Certification" from the National Credit Reporting Association.

Since August 1998, I have served under contract as a member of the Social Security Administration's Panel Of Privacy Experts advising the agency on a host of issues.

(Please consult the attached CV for additional information.)

## Testimony & Expert Reports

Within recent years, I have testified at trial, or been deposed as an expert, in the following cases:

Andrews v. Trans Union Corp. et al., Case No. 96-7369, (USDC-C.D. Calif.), concerning theft-of-identity and consumer report inaccuracies. Expert report, deposition, trial testimony. Judge Lourdes Baird presiding. The U.S. Court of Appeals for the Ninth Circuit specifically found that my opinion on the prevalence of identity theft was relevant to the reasonableness of CRA procedures. (see 225 F.3d 1063 (2000)).

Angela P. Williams vs. Equifax Information Services, LLC, et al., Circuit Court for the Ninth Judicial Circuit, Orange County Florida. Credit Reporting. Expert disclosure and report. Deposition. Trial Testimony. Judge George A. Sprinkel IV presiding.

Eric Robert Drew  vs. Equifax Information Services, LLC, et al., U.S. District Court for the Northern District of California, Case No.  CV 07-00726-SI. Expert report, deposition. Trial testimony. Judge Susan Illston presiding.

Direct Data Solutions, Inc., v. Bailey & Associates Advertising, Inc.: Circuit Court of the Eleventh Judicial Circuit, Miami-Dade County, Florida; Case No.:  07-9322 CA 09.  Judge Jerald Bagley presiding.

Brenda F. Campbell v. Experian: U.S. District Court for the Western District of Missouri (No. 07-2514).  FCRA.  Expert report, deposition. Trial Testimony.  Judge Nanette K. Laughrey presiding.

Harold & Beryllin Gamby v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Michigan [Southern Div.] (CV-06-11020-MO).  FCRA, identity theft. Expert report. Deposition. Trial Testimony.  Judge Marianne O. Battani presiding.

Deborah Adams v. National Engineering Service Corp./Verifications Inc.,: U.S. District Court for the District of Connecticut.  3:07-cv-01035-JCH.  FCRA.  Expert report, deposition. Trial Testimony.  Judge Warren W. Eginton presiding.

Patricia Holmes vs. TeleCheck Intl., Inc., U.S. District Court for the Middle District of Tennessee (Nashville Div.).  FCRA. Expert report. Deposition. Trial Testimony.  Chief District Judge Todd J. Campbell presiding.

Rebecca L. Valentine. v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. CV 05-801-JO. FCRA, identity theft. Expert report. Deposition. Trial Testimony.  Judge Robert E. Jones presiding.

Nicole Robinson vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272.  Expert reports. Deposition. Trial Testimony   Judge Walter H. Rice presiding.

Suzanne Sloane vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272.  Expert reports.  Deposition. Trial Testimony   Judge Leonie M. Brinkema presiding.

Matthew Kirkpatrick v. Equifax, LLC,  U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO.   FCRA   Expert report. Trial Testimony. Judge Michael W. Mosman presiding.

Sandra Cortez vs. Trans Union, LLC., U.S. District Court for the Eastern District of Pennsylvania: No. 2:05 –cv—05684-JF.   FCRA.   Expert Report. Daubert Hearing. Trial Testimony.  Senior Judge John P. Fullam qualified me to testify at trial.

Federal Trade Commission vs. Accusearch, Inc., et al., U.S. District Court for the District of Wyoming, Case No. 06CV0105-D.  FTC Section 5.  Expert Report.  U.S. Magistrate Judge William C. Beaman rejected Defendant's motion to exclude my testimony.

Eddie Silva, et al. v. Haynes Furniture Co., Inc.: U.S. District Court for the Eastern District of Virginia:  No. 4:04CV82. FCRA.  Fairness hearing testimony. Judge Walter D. Kelley, Jr. presiding.

Joi Helmes v. Wachovia Bank N.A.:  U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 01-81277-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony.  Judge Robert G. Mayer presiding.

Alex Campos and Michael York v. ChoicePoint Services, Inc.: U.S. District Court for the District of Georgia (Atlanta), Civ. Action No. 1-03-CV-3577-WSD.  FCRA. Expert Declaration. Fairness hearing testimony. Judge William S. Duffey, Jr. presiding.

Denis W. Stasulis v. Suntrust:  U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 04-12542-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony.  Judge Robert G. Mayer presiding.

Dwaine Perry, et al. v. FleetBoston Financial Corp.: U.S. District Court for the Eastern District of Pennsylvania: No. 04-507. FCRA. Expert Report.  Fairness hearing testimony.  Judge Berle M. Schiller presiding.

Tammy Cochran v. C&M Motors, LLC, dba I-10 Toyota, et al: U.S. District Court for the Central District of California, No. CV-03-3568FMC. FCRA. Expert Report. Trial Testimony Judge Florence-Marie Cooper presiding.

Myra Coleman v. Trans Union LLC, CA4: 98-CV-169B-B (USDC-Mississippi) FCRA. Expert report, deposition, trial testimony.  Judge Neal B. Biggers presiding.

Arthur Spengler v. Sears Roebuck & Co., Case No. C-03-0557. (Circuit Court, Wicomico County, Maryland). Tort, Interference with Business Relationships. Trial Testimony. Judge D. Davis qualified me as expert on credit scoring, credit reporting and FCRA-related issues.

Judy C. Thomas v. Trans Union LLC, U.S. District Court for the District of Oregon; Case No. 00-1150-JE.  FCRA. Expert report, deposition, trial testimony.  Magistrate Judge John Jelderks presiding.

Scott E. Campbell v. G.E. Capital Auto Lease, Circuit Court For St. Mary's County, Maryland, Case No. 99-522. FCRA, invasion of privacy. Expert report, deposition.  Judge Karen Abrams qualified me to testify, but the case settled one week before trial.

Franklin F. Grizzard, Jr.  v. Trans Union, L.L.C., & Equifax Information Services L.L.C., et al.: U.S. District Court for the District of Virginia (Richmond Div.); Nos. 04-CV-625 & 04-CV-626, respectively. Expert report. Affidavit. Deposition.  On the eve of trial, Judge Richard Williams rejected Defendant's motion to disqualify me.  The case settled shortly thereafter.

Catherine Smith, et al. v. Progressive Corporation, et al.: U.S. District Court for the Middle District of Florida (Gainesville), Case No.1:00-CV-210-MMP. Expert Report, Declaration of Value, Fairness Hearing testimony.  Judge Maurice M. Paul presiding.

Franklin E. Clark, et al. v. Experian, et al.: U.S. District Court for the District of South Carolina, Case Nos. 8:00-1217-22, 8:00-1218-22, 8:00-1219-22.  Affidavit, Supplemental Affidavit (both affidavits were admitted into evidence without objection). Judge Cameron McGowan Currie presiding.

Alana Valerie Sheldon v. Trans Union, LLC., LVNV Funding, LLC, & Resurgent Capital Services L.P.: U.S. District Court for the District of Maryland; 8:08-cv-00057-PJM.  Expert report, deposition.

In Re: Cellphone Termination Fee Cases, Superior Court of the State of California, Alameda County, JCCP No. 4332.  Deposition.

Karl Benedikt v. ChoicePoint, Inc..: U.S. District Court for the District of New Jersey [Newark Vicinage]; 07-2569. Expert report, deposition.

Abdirizak Gayre v. CSC Credit Services, Inc., Equifax Information Services, LLC, and Afni, Inc.: U.S. District Court for the District of Minnesota (C.A. No. 07-CV-0622 [JRT/FLN]). FCRA.  Expert report, deposition.

Erin Ayles v. Experian Information Solutions, Inc.: U.S. District Court for the Eastern District of Virginia (Alexandria Division); 1:07cv 662.  Expert report, deposition.

Maria D. v. Comcast Corp., Sacramento Superior Court, Case No. 03AS05745. Deposition.

In Re: Farmers Insurance Co., Inc., FCRA Litigation, U.S. District Court for the Western District of Oklahoma, Case No. CIV 03-158-F.  FCRA. Expert report, deposition.

Steven E. Beck v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Virginia: No. 1-05cv347. FCRA.  Expert report, deposition.

Ford Motor Credit Co. v. Sudesh Agrawal, Court of Common Pleas, Cuyahoga Country, Ohio; Case No. CV04536588.  Credit reporting and credit scoring. Deposition.

Larry Alabran v. Capital One Services, Inc..: U.S. District Court for the Eastern District of Virginia (Richmond Division); Case No. 3:04-CV-935. Expert report, deposition.

Gail Cope v. MBNA American Bank NA: U.S. District Court for the District of Oregon; No. 04-CV-493-JE.  Expert report, deposition.

Robert Gordon Peoples v. Experian Services Corp., et al.: U.S. District Court for the Central District of California: No. CV-04-1378 CAS (Ex). Expert report. Deposition.

Lottie Robertson v. Experian Information Services, Inc. & Capital One Bank: U.S. District Court for the Eastern District of Michigan (Southern Div.) No. 04-72308. Expert report. Deposition.

Barbara A. Harris v. Experian Information Solutions, Inc., and Equifax Credit Information Services, Inc: U.S. District Court for the District of Oregon, Civil No. 01-1728-JE. FCRA. Expert reports. Deposition

Bruce Danielson v. Experian Information Solutions:  U.S. District Court for the Northern District of Texas, Case No: 3-04CV-1722N. FCRA. Expert report. Deposition.

Stacy Lawton Guin, et al. v. Brazos Higher Education Service Corporation, Inc.: USDC-Minnesota – No. CV 05-668 RHK/JSM. Negligence. Security Breach. Affidavit. Deposition.

Anthony Chin v. State Dept. Federal Credit Union: Circ. Ct. Prince George's County (Maryland); Civ. Act. No. CAL04-12778; Tort. Deposition.  Trial testimony.

James M. McKeown v. Sears Roebuck & Co., et al: U.S. District Court for the Western District of Wisconsin, Civil No. Case No. 03-CV-0528 C.  Expert Report, deposition.

Paulette Field v. Trans Union LLC, et al., Case No. 01 C 6390 (USDC-N.D. Illinois - Eastern Div.  FCRA. Expert report.  Deposition.

Earle E. Ausherman, et al. v. Bank of America Corporation et al.: U.S. District Court for the District of Maryland, Civil Action No. MJG-01-438.  FCRA. Expert report.  Deposition.

Jesse Klco v. Elmhurst Dodge, U.S. District Court for the Northern District of Illinois (Eastern Division) Civil Action No. 01 C 0433.  FCRA.  Expert report, deposition.

(David & Ruthie Keefner v. Webb Ford, Inc. & Deon L. Willis.: U.S. District Court for the Northern District of Illinois (Eastern Division), Civil Action No. 02C-4643. FCRA. Expert report. Deposition.

Anthony & Alethea Preston v. MGIC, U.S. District Court for the Middle District of Florida (Ocala), Case No. 5:03-cv-111-Oc-10GRJ. FCRA. Expert report, deposition.

Bruce Butcher and Pam Butcher v. Chase Manhattan Bank, U.S.A., Inc., U.S. District Court for District of South Carolina, Case No. 8:03-3184-26. FCRA. Expert report, deposition.

**FEE**

My fee is $300 per hour for consulting and for the expert report; $300 per hour, or a minimum of $1,200 per day, for deposition or trial testimony, plus reasonable travel time, plus travel costs and expenses.

# *Evan D. Hendricks*

### *CURRICULUM VITAE*

## Professional Activities

1981- Present         **Editor/Publisher** of ***Privacy Times***

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA).  The newsletter ranges from 8-12 pages, 23 issues per year.  Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

## 1992 – Present         Expert Witness

Qualified by the federal courts in FCRA and identity theft cases.  (Complete list attached). I have read extensive deposition testimony by credit bureau and credit grantor personnel. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data, and the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation.

## 1998 – Present         Privacy Expert Consultant, U.S. Social Security Administration

Regularly review policies and practices in relation to the collection, use and disclosure of personal data and Social Security numbers and provide feedback and recommendations.

## 2002 – 2004    Member, Experian Consumer Advisory Council

Along with other Council members, I provide an outsider's view on credit reporting, marketing and other privacy issues.

## July – October 2002        Consultant to U.S. Postal Service

Working with the USPS's Chief Privacy Officer, I assisted in reviewing and editing the re-write of the USPS's Privacy Act notices, with an emphasis on "Plain English."

---

**Evan Hendricks        P.O. Box 302        Cabin John, MD 20818**
**(301) 229 7002  (301) 229 8011 [fax]    evan@privacytimes.com**

---

**Recent Testimony Before Congress & The FTC**

"Credit Reports: Consumers' Ability to Dispute and Change Information," House Financial Services Committee, June 19, 2007.[17]

"Privacy in the Commercial World II," House Energy & Commerce Subcommittee On Commerce, Trade, and Consumer Protection, June 20, 2006[18]

"Financial Data Protection Act of 2005," House Financial Services Subcommittee on Financial Institutions and Consumer Credit, November 9, 2005[19]

"Credit Card Data Processing: How Secure Is It?" House Financial Services Subcommittee on Oversight and Investigations, July 21, 2005[20]

"Identity Theft: Recent Developments Involving the Security of Sensitive Consumer Information,"[21] Senate Banking Committee, March 15, 2005

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003[22]

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003[23]

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003[24]

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003[25]

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

**Books**

Credit Scores and Credit Reports: How The System Really Works, What You Can Do [3rd Edition] (Privacy Times, 2007)

Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society (2nd Edition, Southern Illinois University Press, 1990), (Includes a chapter on credit reporting)

Former Secrets: Government Records Made Public Through The Freedom of Information Act (Campaign For Political Rights, 1982)

---

[17] www.house.gov/apps/list/hearing/financialsvcs_dem/ht061907.shtml
[18] http://energycommerce.house.gov/108/Hearings/06202006hearing1938/Hendricks.pdf
[19] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=425
[20] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=407
[21] http://banking.senate.gov/index.cfm?Fuseaction=Hearings.Detail&HearingID=144
[22] http://banking.senate.gov/03_07hrg/071003/index.htm
[23] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=229
[24] http://judiciary.senate.gov/testimony.cfm?id=983&wit_id=2790
[25] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=202

**International Lectures**

24th International Conference of Data Protection & Privacy Commissioners (Cardiff, Wales – Presentation published in conference proceedings, 2002)

The 23rd International Conference of Data Protection Commissioners (Paris, La Sorbonne – Presentation published in conference proceedings, 2001)

The 22nd Annual Conference on Data Protection (Venice, Italy -- 2000)

The 16th Annual Conference on Data Protection (The Hague, The Netherlands -- 1994).

In the 1980s, served as an expert consultant to both the Privacy Commissioner of Canada and Privacy Commissioner of Australia.


**Presentations/Instruction At Recent CLE & Professional Seminars**

"Second Law and Information Society Symposium: Enforcement, Compliance and Remedies in the Information Society," Presenter, "Credit Report Cases – Effective Remedies?" Center on Law and Information Policy (CLIP), Fordham Law School, New York, May 29-30, 2008.)[26]

"The 1st Annual Privacy Law Scholars Conference," Presenter, "Assessing Privacy Harm: How can victims of privacy violations prove that they have been harmed? The George Washington University Law School, Washington, DC, June 12-13, 2008.[27]

"11th Annual Consumer Financial Services Litigation," Practicing Law Institute, March 20-21, 2006 (New York City)

"Bankruptcy Roundtable," and, "Fair Credit Reporting Act Roundtable," National Consumer Law Center, October 27, 2005

"Advanced Consumer Litigation," Texas Bar CLE, Feb. 10-11, 2005

"Financial Privacy Litigation," (Impact of FACT Act), Practicing Law Institute, February 28- March 1, 2005 (New York City)

"The New FACT Act: Challenge & Oppty.," Privacy & American Business, Feb. 9-10, 2004

"Understanding the FACT Act And The Impact of Multi-Agency Rulewriting Process," Glasser LegalWorks, Sept. 28-29. 2004

"12th Annual National Conference," National Credit Reporting Association, Nov. 10-12, 2004

**Professional Societies**

Past President & Board Member, American Society of Access Professionals www.accesspro.org

**Industry Certification**

FCRA Certification, National Credit Reporting Association (www.ncrainc.org).

**Media**

In addition to being a paid consultant and special guest on CNN's IMPACT news in 1996, I am quoted regularly by major and small newspapers (including The Washington Post, New York Times, Wall Street Journal, Chicago Tribune, Los Angeles Times, Newsweek and Money Magazine), regarding issues of privacy generally and the privacy implications of consumer reporting specifically. I have appeared on National Public Radio, PBS NewsHour with Jim Lehrer, ABC Nightline and World News Tonight, NBC Nightly News, CBS Evening News, CNN News Watch, CNBC, MSNBC, Fox News, various local affiliates, and the Oprah Winfrey Show and Geraldo, regarding these issues as well.

**Education**

Bachelor of Arts, Columbia College, Columbia University, New York, N.Y. (1979)

---

[26] http://law.fordham.edu/ihtml/eventitemPP.ihtml?id=37&idc=8943&template=clip
[27] http://privacyscholars.com

**MATERIALS CONSIDERED**

In specific preparation for this case, I have reviewed the following:

Plaintiffs' Complaint & Attached Exhibits
Plaintiffs' credit reports
Plaintiff's deposition
Documents cited in this report

I also generally rely upon:

The Fair Credit Reporting Act & Consumer Credit Reporting Reform Act of 1996
Fair Credit Reporting Act (w/ Companion Disk & 2000 Cumulative Supplement,
National Consumer Law Center, 1998 (Boston)
Credit Scores and Credit Reports: How The System Really Works, What You Can
Do (3rd Edition, Privacy Times 2007),

My opinions in this case are also based on my 31-year profession of following privacy developments including those relating to the consumer reporting and information broker industry and the criminal justice system as a journalist, editor, publisher and privacy expert. My experience includes listening to and participating in dozens of hours of Congressional testimony, hearings before the Federal Trade Commission, media coverage, studies by independent groups, my own personal observations and numerous contacts, and my previous work preparing to be an expert witness in other FCRA cases.

**Executed This The 9th Day of November 2011 in Bethesda, Maryland**

**/s/  Evan D. Hendricks**
**Evan D. Hendricks**
PO Box 302
Cabin John, MD 20818
(301) 229 7002