**EXHIBIT A**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

CASE NO. 12-12020(MG)

- - -

IN RE:                          :

                                : (PENDING IN THE

RESIDENTIAL CAPITAL, LLC,       : SOUTHERN DISTRICT OF

et al,                          : NEW YORK)

                                : CHAPTER 11

          Debtors               :

                                :

                                :

                                :

- - -


DEPOSITION UNDER ORAL EXAMINATION OF

FRANK REED

Mount Laurel, New Jersey

WEDNESDAY, AUGUST 13, 2014


- - -

REPORTED BY:  HEATHER A. KIRSCH, CCR

- - -


MAGNA LEGAL SERVICES

(866) 624-6221

www.MagnaLS.com



Page 41

1   obligation.   Under equitable consideration I

2   would be relieved of the obligation.

3   Q    What do you mean the predecessor interfered

4   with the payment of the note, what happened?

5        A    That's a subject of this litigation.

6   And then there was also a violations of federal

7   law in the subsequent holder of I believe holder

8   or servicer, yet to be determined, of the note

9   that allows for setoff and recoupment, even if

10  there is a debt owed, it may be a nullity, but

11  I -- I don't think that's, from my understanding

12  at this moment, that the defenses to the

13  mortgage may be mooted by an order from the

14  bankruptcy court confining them to our action

15  here pressing.

16  Q    When is the last time that you paid on the

17  first mortgage?

18       A    2008.   I don't know what month.

19  Q    Have you ever made payments pursuant to a

20  loan modification?

21       A    I did.

22  Q    When was that?

23       A    Barbara, it was after the foreclosure

24  started in 2008, but before moving out with --

25  for Brett Cooper.   I don't remember if it was



Page 42

1    July or August or September.  I don't believe it

2    was October.  I think it was warmer weather.

3    Q    How many payments did you make?

4         A    The only one that was required at the

5    point of execution of the contract.  It was

6    never counter -- it was never countersigned and

7    returned.

8    Q    Countersigned by the bank?

9         A    Correct.  It was offered, I accepted,

10   I executed it and I returned it with payment,

11   which they cashed and kept.

12   Q    How much was the payment?

13        A    It was like $3000.

14   Q    Have you been setting aside the monthly

15   payments that you're not sending to the

16   servicer?

17        A    I could not.

18   Q    What's the amount that's needed to bring

19   the first mortgage current?

20        A    I don't know, but I can find out for

21   you.  It's hundreds of thousands of dollars, I

22   believe.

23   Q    How is it that you can find out?  Do you

24   have paperwork with you?

25        A    Not with me.  I was going -- I can



Page 43

1    contact the foreclosing law firm and they can

2    give me a statement of what's due, Zucker

3    Goldberg, or I don't know if you can do it.  If

4    you want me to do it, I can do it.  I don't know

5    if you're allowed to, if they'll give that to

6    you, but I can ask them for that if you wish?

7              MS. HAGER:  I think that's covered by

8         one of the requests in our document demands.

9         So if you could work on getting that, I

10        think that would be responsive.

11             MR. REED:  Yeah, I'll call them.  If

12        we're out of here before 5:00, I'll call

13        them that.  If not, I'll call them in the

14        morning.

15             MS. HAGER:  Can you mark that?

16   BY MS. HAGER:

17   Q    Do you presently have a second mortgage?

18        A    No.

19   Q    When was that paid off?

20        A    2008.

21   Q    Do you remember when in 2008?

22        A    Winter, don't know the month.  I'm

23   pretty sure it was winter.

24   Q    Do you remember how much was required to

25   pay that off?



Page 44

```
 1          A     No.

 2   Q     Was it several hundred thousand dollars?

 3          A     I think so, yeah.

 4   Q     Did you use the 400,000 dollars that you

 5   got from Brett Cooper to pay that off?

 6          A     I used some of that, but I had other

 7   money as well.  I don't know which one, where --

 8   which source of cash on hand that I used.

 9   Q     Who was that second mortgage with?

10          A     I don't remember, but I think we

11   can -- I think I can get that from the county

12   'cause that's a recorded thing.

13              MS. HAGER:  Do you know if they filed

14         a release of lien?

15              MR. REED:  I'm pretty sure they did.

16         You know what, I can also check -- what I

17         can do is I can check the current lawsuit --

18         the current foreclosure suit.  If there's a

19         lien still there, they would be listed, I

20         think.

21              MS. HAGER:  Can you mark that?

22              MR. REED:  Do you want me to do that

23         when you say that?

24              MS. HAGER:  Yes.  Because I think

25         that's covered by the document demands.
```



Page 57

1    and a half years?

2    Q    Right.  So between January 2008 and the

3    present have you been more than 30 days late in

4    paying any credit cards?

5         A    During that six year sweep, yes.

6    Q    Between January 2008 and the present have

7    you been more than 30 days late in paying any

8    cell phone bills?

9         A    I don't know.

10   Q    Between January 2008 and the present have

11   you been more than 30 days late in paying any

12   utility bills?

13        A    Yes.  And again, this is you're

14   saying -- God bless you -- you're saying between

15   January 2008, that entire sweep of time, yes.

16   Q    Yes.  So what's your answer to the utility

17   bills?

18        A    Yes.

19   Q    Yes, okay.  Again, since January 2008 to

20   the present have you been contacted by any debt

21   collection agencies about any of your bills?

22        A    Yes.

23   Q    Do you know your credit score?

24        A    I do not.

25   Q    Did you know your credit score in January



Page 58

1    of 2008?

2        A    I cannot say if I remember that.

3    Q    Do you know your credit score in May of

4    2008?

5        A    I do not remember those.

6    Q    Do you have a copy of a credit report from

7    January of 2008?

8        A    I don't think so, but it doesn't mean

9    I didn't have it at the time.  I don't have it.

10   I haven't seen a credit report in my current

11   files.

12   Q    Do you have a copy of a credit report from

13   May of 2008?

14       A    Now I do not have a copy of it.  I may

15   have then.  That's pure speculation.

16   Q    Do you have any copies of your credit

17   report from the last six and a half years, so

18   from January of 2008 until the present?

19       A    Barb, I don't know.  I didn't even

20   think, I wasn't looking for them.  I didn't

21   think to look for them.

22   Q    Well, those were requested --

23       A    Those were requested too?

24   Q    -- in our Request For Production.

25       A    Okay.  I don't think I have those.  I



Page 59

1   don't think I have any of that.

2   Q    So --

3        A    What is the sweep of time?

4             MS. HAGER:  January 2008 until the

5        present.  So you'll look in your files to

6        see if you have any credit reports --

7             MR. REED:  Yeah.

8             MS. HAGER:  -- for that time period?

9             MR. REED:  I'll look in whatever.

10            MS. HAGER:  Can you mark that, please?

11            MR. REED:  Until what year?

12            MS. HAGER:  The present.

13            MR. REED:  The present.

14   BY MS. HAGER:

15   Q    So I know you're not represented in this

16   case, but did you meet with an attorney to

17   prepare for this deposition today?

18        A    No.

19   Q    Did you review any documents before today

20   to prepare for today?

21        A    Yes.  I mean, not specifically for

22   today.  I mean, I've been looking at a great

23   deal of them.

24   Q    Did you discuss the deposition with your

25   wife?



Page 61

1  Q     Where were you living when you decided to

2  buy 817 Matlack?

3      A     Either Mount Laurel or Virginia, I

4  don't remember which.

5  Q     How did you find this particular property?

6      A     I think my wife found it.

7  Q     You're generally familiar with the area,

8  right?

9      A     Yes.

10  Q     Did you buy it with the intention of

11  flipping it or moving in?

12      A     Those are not mutually exclusive.  So

13  as I said earlier, any property that I would

14  buy, I would be looking to sell later at a

15  profit.

16  Q     When did you move in?

17      A     I think 2006.

18  Q     And what was the final sales price after

19  all the extras?

20      A     1.5 something, I think.

21  Q     You took out two mortgages to buy the

22  property, right?

23      A     I think so.

24  Q     So the first was with Metro Cities

25  Mortgage, right?



Page 63

1   that?

2        A    This is why like with Matlack, when

3   you buy it and you live in it for two years,

4   there's no capital gains.  It doesn't even go on

5   your tax return.  If you -- if you -- let me

6   qualify that.  If you're a married couple, and

7   this is my understanding because this is what we

8   did, if you're a married couple and you live in

9   a primary residence for two years, then any

10  capital gain up to a half a million dollars is

11  tax free.

12  Q    How much of a down payment did you put on

13  the Matlack property?

14       A    It was a couple hundred thousand, like

15  200-some thousand dollars, a quarter million.  I

16  don't remember.  I think it was less than three.

17  Q    Was the second mortgage a line of credit?

18       A    Yes.

19  Q    And was your wife on the line of credit?

20       A    Oh, I don't know.  I don't think so.

21  I don't think she's involved in that.

22  Q    Why did you take out a second mortgage at

23  the time of the closing?

24       A    To take out a second mortgage because

25  it was a -- it was a line of credit so that you



Page 66

1    real estate.

2    Q    Was your wife working at the time?

3        A    I don't know if that's when she was

4    doing that other crap.

5            MS. HAGER:  Could we go off the record

6        for a minute?

7

8                          *   *   *

9            (Whereupon, a brief recess was taken.)

10                         *   *   *

11

12                         *   *   *

13            (Whereupon, Exhibits Reed-1 through

14        Reed-7 were marked for identification.)

15                         *   *   *

16

17   BY MS. HAGER:

18   Q    When I was asking you earlier about your

19   injury referring to your disabilities I think

20   you told me that occurred in 2008, but you

21   weren't sure of which month it was, is that

22   right?

23        A    I think it was April.

24   Q    Was it April, okay.  During the break we

25   had some documents marked.  I'll show you what



Page 67

1    was marked as Reed-1 and ask you if you

2    recognize that document?

3         A     It appears to be the Purchase

4    Agreement for my house in Moorestown.

5    Q    At 817 Matlack, right?

6         A     Yes.  Uh-huh.  I have not seen it

7    probably since that time.

8    Q    Okay.  So there is an addendum, maybe about

9    midway through that indicates that the sales

10   price would be adjusted to $1,571,619 and that

11   the date of the sale would be extended through

12   April 28, 2006.  Does all that sound about right

13   as to your recollection of the total cost and

14   timing of the closing?

15        A     I just know it was in 2006.

16   Q    And the total cost, was it about the number

17   that I said?

18        A     I thought it was about a million and a

19   half dollars.

20   Q    Okay.  Showing you what was marked as

21   Reed-2.  Reed-2 is the loan application.  Do you

22   recognize that document?

23        A     No.  I mean, I know what an

24   application is, but --

25   Q    This was shown to you during another


MAGNA
LEGAL SERVICES

Page 71

1   compare it to what I believe I have on file, but

2   what I see here before me, this document is

3   dated May 31st, 2006.  And I will confirm it

4   with what I have on file.

5   Q    And the note is in the amount of one

6   million dollars, right?

7        A    Yes.

8   Q    And the interest rate of six and

9   three-eighths, right?  That's in paragraph 2.

10       A    It appears to be.

11  Q    And your initial monthly payment was

12  $6,238.70, right?

13       A    Barb, I can't remember.

14  Q    Well, if you just look at on page 1 there,

15  in paragraph 3, it's in 3B.

16       A    3B, okay.

17  Q    What's the amount of the monthly payment

18  listed there?

19       A    The amount on this document listed as

20  a monthly payment is $6,238.70.

21  Q    Okay.  And did that payment amount ever

22  change?

23       A    I don't know.  I think this may have

24  been a variable rate mortgage.

25  Q    So did the payment ever change?


MAGNA
LEGAL SERVICES

Page 72

1       A    I don't remember.

2    Q    Okay.  Showing you what was marked as

3    Reed-5, there's actually two documents there.

4    There's two HUD-1 Settlement Statements.

5       A    Okay.

6    Q    Do you recognize either of those documents?

7       A    I don't readily recognize them.  I

8    know what a HUD-1 is.

9    Q    Is that your signature appearing on pages 2

10   and 4 of this exhibit?

11      A    They look like my signature.

12   Q    Is that also your wife's signature with

13   yours?

14      A    I cannot say for certain, but it

15   appears to be.

16   Q    So one of these settlement statements is

17   for the one million dollar loan with Metro

18   Cities and the other is for a loan for the

19   second mortgage line of credit for $414,400.  If

20   you look at line 202, do you see that principal

21   amount of new loan?

22      A    Line 202, second HUD-1, 414.  Uh-huh.

23   Q    So that was the amount of the line of

24   credit, right?

25      A    I guess.  I cannot recall, but I



Page 73

1    can -- if this is the HUD-1, if this is from

2    that transaction, if this is true, then that

3    would be the number because I surely don't

4    remember.

5    Q    Okay.  So if you turn to the third page of

6    the exhibit, which is actually the first page of

7    the HUD-1 for the one million dollar loan and it

8    says on line 101, contract sales price 1,571 --

9    excuse me, $1,571,619.  You see where I am?

10        A    Yes.

11   Q    Okay.  Do you agree that was the sales

12   price?

13        A    As I said, I believe the sales price

14   was a million, million five something but I

15   don't remember the exact number.

16   Q    If you drop down to line 201 it indicates

17   there was a deposit made of 224,816.42.  Do you

18   see that?

19        A    Yes.  That's what I think I recalled,

20   something like that earlier in our deposition.

21   Q    Okay.

22        A    I thought it was greater, but I

23   recalled that number.

24   Q    And then at the very bottom in line 302 it

25   says cash to borrower, $30,849.62.  Do you agree



MAGNA
LEGAL SERVICES

Page 74

1   with that?

2          A      Cash to borrower, okay.   303.   303,

3   right, cash to borrower, 30,849.

4   Q     And do you remember receiving that amount?

5          A      I do not.   I do not.

6   Q     Okay.   Why did you get cash back from

7   closing, do you remember?

8          A      I don't, because I don't remember -- I

9   don't even remember getting it back.

10   Q     Wouldn't that indicate that the amount of

11   the deposit plus the amount of the mortgages was

12   more than was needed to purchase the property?

13          A      Say that again?

14   Q     Wouldn't the fact that you were getting

15   money back at closing mean that the amount that

16   you put down as a deposit plus the amounts of

17   the mortgages exceeded the amount that was

18   needed to buy the house?

19          A      Yes, that could be the scenario.   I

20   would have to look at the numbers, but I would

21   imagine so because they wouldn't retain more

22   money because it's the purpose of the settlement

23   is the purchase of the house.

24   Q     Right.   So essentially you ended up getting

25   some money back, which in effect reduced the



Page 77

1   actual end result of my efforts are that that's

2   the intention is okay that's it, let's do it.

3   Q    So you had used Louise Carter -- strike

4   that.

5        Louise Carter was the listing agent for the

6   builder when you purchased the house, right?

7        A    Yes.

8   Q    So when you decided to list the property

9   did you call her?

10       A    We interviewed several agents, I

11  believe or I did.

12  Q    And you decided to go with Louise?

13       A    She sold, I mean so much of those

14  homes, not just in our neighborhood, but in the

15  next subdivision over.  Sorry about that.  I

16  mean, that price range in Moorestown, she seemed

17  to be the leading agent for that price range.

18  And we didn't know her prior to the purchase

19  transaction, for example.  And we didn't know

20  her personally post to the purchase transaction,

21  but we saw her sell other houses on the street.

22  Q    So if you closed May 31st, 2006 --

23       A    Uh-huh.

24  Q    -- under your two year scenario, you could

25  have sold Matlack after 5-31-2008 and not had



Page 78

1    tax consequences?

2        A    Yeah.  But the tax consequence for an

3    early sale if the price was good enough, it

4    washes away the tax consequences.

5    Q    So you would have sold it under two years?

6        A    Absolutely.  The Jacobs contract

7    contemplated such a sale.  It was under it

8    because why not sell it under it.

9    Q    So what was the initial listing price?

10        A    It was over -- it was in excess of two

11    million dollars.  I don't know if it was 2.1,

12    2.2, 2.3, I can't recall.  The MLS, I think you

13    had it in Louise's depositions, I would think

14    you had that.  If not, if you need me to get it,

15    I can try to get that from them.

16    Q    So whatever the number was, something over

17    two million, how did you arrive at that figure

18    or was that something that Louise proposed to

19    you?

20        A    It was a dialogue because of the

21    comparables of the features of the house.  When

22    I bought the house, I think you're aware, but

23    I'll clarify for the record here, when I buy a

24    house, again I look to buying a home that I can

25    physically -- no longer physically, but then


MAGNA
LEGAL SERVICES

Page 80

1        A       So looking at the house, when this was

2    all done and looking at that moment in time, it

3    was 600 -- I think 6700 or 6800 square feet of

4    living space above grade, which is above the

5    basement, seven bedrooms and ten bathrooms with

6    three fireplaces, plus I think it's 1000 square

7    feet of finished space in the basement, which we

8    did and finished the bathroom.

9        When we looked at and I remember looking at

10   houses in the marketplace, we decided that we

11   saw houses listed, I can't remember if I saw

12   solds, but we saw houses listed in the price

13   range that we were listing that house at.

14   Q    So you got a written offer from the Jacobs

15   family in October of 2006, right?

16       A       Yeah, I think what was it.  Maybe what

17   was it, weeks after we put on it the market.  I

18   don't know, we will have to look.  I remember my

19   emotional impression it was very rapid that we

20   got the offer.

21   Q    And before that offer you had a verbal

22   offer from another buyer, right?

23       A       Holy crap, I don't remember.  Do I?

24   If you have it, I'd like to see it.  I don't

25   remember.



Page 85

1    Q    If you accepted the one nine from them, you
2    would have gotten around 200,000 from them, give
3    or take?
4         A    I guess the profit, right.  The profit
5    from it, right.
6    Q    What do you mean?
7         A    That's the profit from the sale.  I
8    would have also gotten my money back because the
9    mortgage wasn't that high, right?  We're talking
10   about the profit?
11   Q    Right.
12        A    Right.  The basis plus the actual --
13   the basis being the cash in, but that's not -- I
14   don't know how you devalue the labor.
15   Q    Right.
16        A    I don't know, I don't know the
17   relevant law to that or what, but that's
18   factually and practically how I would make a
19   good amount of money more than as a builder who
20   contracts out the labor.
21   Q    Right.  So but you didn't accept this
22   offer, did you?
23        A    No, I guess not.  We asked them could
24   they come up.
25   Q    Right.  And they did ultimately to



Page 86

1    2,040,000?

2         A    Yes.

3    Q    So I'll show you what we marked as Reed-7,

4    which is the Contract for Sale with the Jacobs?

5         A    Is that the Jacobs.

6    Q    So this is dated December 10th, 2007, so

7    about almost a month and a half after they made

8    you the offer that we just looked at, and this

9    is the document that was signed by you and your

10   wife and the Jacobs?

11        A    Okay.

12   Q    Can you confirm that for me?

13        A    It looks, as I said with some of the

14   other documents, Barb, it looks like it.  I

15   don't know if I have even a copy of the Jacobs.

16   I might have a copy of the Jacobs contract in my

17   file, but it's also I think that contract has

18   been filed with the court.  So if it is this

19   contract, then it is.  But that's the price, two

20   million forty was the price of the contract.

21   Q    Right.  Okay.

22        A    And the parties to the contract are

23   the Jacobs.  I can't say to what all the dates

24   are or the provisions in the contract or

25   anything like that, but the price was two



Page 87

 1    million forty.  The Jacobs were the buyers, we

 2    were the sellers.

 3    Q    And were you supposed to close in January

 4    of 2007?

 5        A    That -- it was supposed to be early in

 6    the year.  I don't know if it was January or

 7    February, I can't remember.

 8    Q    Now, your wife handled the checking

 9    account, is that right?

10        A    Pretty -- most of the time, yes.

11    Q    And you didn't look at the monthly

12    statements that were coming in from GMAC, right?

13        A    Typically I didn't look at any

14    statements like credit cards.

15    Q    She paid all that, right?

16        A    Pretty much.  I mean, you know, I

17    don't remember getting like a warning notice on

18    anything.  So I mean, since we were kids pretty

19    much she would do that.

20    Q    So you didn't look at any of the GMAC

21    monthly statements, right?

22        A    Typically no, I would not.

23    Q    Do you remember having a hard time making

24    the mortgage payment in 2006?

25        A    No.  Uh-uh.



Page 92

1   that month, knowing that the mortgages would be

2   paid off by the closing?

3        A    No.  I don't remember that at all

4   because it was not -- there wasn't a real reason

5   for that.  Everything was fine.

6   Q    So the Jacobs ultimately told you in early

7   January that they weren't going to close, right?

8        A    I don't recall when.  I don't recall

9   when.

10  Q    The Jacobs did tell you that they weren't

11  going to close, right?

12       A    Yes.

13  Q    Okay.  And at that time when you learned

14  that they weren't going to close was there any

15  reason why you or your wife didn't bring the

16  GMAC account current at that point?

17       A    I can't speak to that because at that

18  moment I don't believe that I was aware that it

19  was in arrears.

20  Q    And with respect to the Jacobs, when they

21  informed you that they weren't going to close,

22  you tried to get them to close, right, working

23  out an issue with the appraisal?

24       A    Yes.  Yes.  And I didn't approach the

25  Jacobs first.  We -- there was an irony to this,



Page 93

1   which I'm sure you're probably aware, but I will

2   flesh it out for you.  The Jacobs applied for a

3   mortgage with TD Bank and I had a cash out re-fi

4   that was set up through TD Bank in case a buyer

5   didn't bu, it's just my normal -- I've done that

6   before with TD Bank on other properties and

7   other transactions.

8        And there were two appraisals on the

9   property.  The Jacobs got an appraisal through

10  TD Bank that was defective that missed -- that

11  factually was defective.  It missed square

12  footage, features, other things in it.

13       The Jacobs failed or refused to tender a

14  formal request to TD Bank, even though TD was

15  willing to have the appraisal revised to reflect

16  the correct information.  The Jacobs took that

17  opportunity and refused so that they wouldn't --

18  they wouldn't be able to leverage it into an

19  opportunity to get out of the contract.

20       And I was told firsthand by the Jacobs that

21  it was because they could -- they overestimated

22  the sales price of their house, which was not a

23  contingent, the selling of their house was not

24  contingent to them buying.

25  Q    So were you trying to convince Commerce to



Page 94

1    approve the Jacobs loan?

2         A    I contacted Commerce and asked them

3    what do you do about the fact that this is a

4    defective appraisal?  And I was told that I, as

5    the person who did not apply for the mortgage,

6    could not ask for them to correct the clear

7    errors in the appraisal.

8    Q    So you had a long-standing relationship

9    with Commerce, right?

10        A    Yes.

11   Q    And ultimately you refused to return the

12   Jacobs $50,000 deposit, right?

13        A    That's privileged between my wife and

14   I.  I don't know about how to say who actually

15   was the one to say who actually was the one who

16   refused to return the Jacobs money.

17   Nonetheless, the buyers as a group, Christina

18   and Frank authorized that it not be returned.

19   Q    So at one point you attempted to settle

20   with the Jacobs for half of the deposit, if you

21   understand, right?

22        A    Oh, I don't remember.  I honestly

23   don't remember that perhaps.

24   Q    You did testify to that in a different

25   deposition?



Page 95

1        A     If I testified to that in a different

2    deposition, closer in time to that, I would go

3    with it.  I can't remember.

4    Q    Does it refresh your recollection --

5        A    No.

6    Q    -- to know that you said that they could

7    have 25,000 back and you, the Reed's would keep

8    25,000 and they could walk away?

9        A    I do not recall the specifics.  I

10   recall trying to negotiate the contract even

11   prior to that situation.

12   Q    So after you tried to settle with them over

13   the deposit, they ended up suing you and Mrs.

14   Reed, right?

15       A    Yes.  You pointed that out earlier.  I

16   thought I was the one who was doing the suing

17   and you said they were the ones, we were the

18   defendants.  They were the plaintiffs.

19   Q    So who won that case?

20       A    The Jacobs won on summary judgment.

21   It's a thing that I will take to my grave.  I am

22   aggravated that and I'm going to say my peace

23   for the record here, Barb, just because it's

24   going to go down somewhere in someone's record.

25   Is one provision in that Jacobs contract that



Page 96

1   burns in my memory and that is they were

2   supposed to take reasonable efforts to obtain a

3   mortgage and --

4   Q    And the judge found that they did?

5        A    The judge found that they did because

6   on our side didn't put on evidence as to what

7   the reasonableness was.  I found my attorney

8   committed malpractice because I asked him to

9   address that very point.

10  Q    In that litigation you kind of mentioned

11  this earlier, you counselor sued the appraiser,

12  the realtor and Commerce, which became TD,

13  right?

14       A    Appraiser, realtor -- appraiser,

15  realtor and Commerce.

16  Q    Right.

17       A    Yes, appraiser being -- the appraiser

18  for the Jacobs.

19  Q    Robert Jones?

20       A    I guess the guy's name.

21  Q    So you think Mr. Jones made mistakes on his

22  report, right?

23       A    TD Bank told me they thought so as

24  well.

25  Q    But you thought so, right?



Page 98

1    Q    Okay.

2         A    But then again, I didn't remember

3    getting an offer the day before my birthday

4    either.

5    Q    Okay.  So Mr. Jones' report indicated that

6    the value was 1.95 million, is that right?

7         A    Yes.

8    Q    Okay.  Which was less than the Jacobs had

9    agreed to pay for the house, right?

10        A    Yes.

11   Q    Okay.  And so essentially, you sued

12   Mr. Jones to recover the difference between the

13   lost Jacobs sale and the then pending sale with

14   Weaver, right?

15        A    Then pending sale, you're going to

16   have to say that again.

17   Q    You sued Mr. Jones to recover the

18   difference between the lost sale with the Jacobs

19   and what at the time was the pending sale with

20   Weaver because you blamed Jones for the failure

21   of the Jacobs loan to go through?

22        A    I don't know what the dollar amount

23   was.  I just know we felt that he was negligent

24   in his -- his performance of his job.  I don't

25   know what -- I don't remember the basis of that



Page 101

  1   that to be corrected.

  2   Q    So there was a second appraisal done --

  3   A    Uh-huh.

  4   Q    -- in that same timeframe and it was

  5   prepared by Peter McCaffrey?

  6   A    Yes.

  7   Q    And on whose behalf was that prepared?

  8   A    TD Bank.

  9   Q    Why would they do that if they did the

 10   field review?

 11   A    That was my cash out re-fi.

 12   Q    Right.  And you're saying cash out re-fi,

 13   what was the amount that you had applied for?

 14   A    It was like 90 percent of the property

 15   value.

 16   Q    So that application you're saying was to

 17   refinance the entire --

 18   A    Yes.  That's what a cash out re-fi is.

 19   You re-fi the notes that are on the property and

 20   cash out.

 21   Q    And when did you put that application in

 22   with TD Bank?

 23   A    There is no application.  TD Bank and

 24   I had a relationship where I would just call

 25   them.



Page 105

1    was -- we were going to sell the house or cash

2    out re-fi the property and then sell the house,

3    whether it be five months, three months, six

4    months.  The summer was coming, it would happen.

5    Q    But you're saying you weren't aiming to

6    just pay off the second?

7         A    No.

8    Q    Okay.  And the cash out you're talking

9    about, you're saying 400,000, that's how much

10   cash out you were trying to get?

11        A    I don't remember the number.  As I

12   said, I think it was -- I want to say that the

13   amount was a million eight or a million eight

14   something was the cash out re-fi dollar amount.

15   You would have to subtract whatever I owed on

16   the line of credit and the mortgage itself to

17   find out what that number is.  I don't remember.

18   I wasn't even at -- I mean, I don't know.  I

19   don't know.  I don't know.  I'd have to go

20   through that and see.

21   Q    Do you have any documents for your

22   application to TD Bank?

23        A    There was no -- this was a verbal

24   thing.  This is how we did business.

25   Q    And there was no denial letter?



Page 107

```
 1        A     No, there's two -- no, there was -- to
 2   TD Bank?
 3   Q     Yes.
 4        A     No.  There were two -- there were two
 5   loans, two things that were contemplated with TD
 6   Bank.  There was the rental properties, which
 7   they went through with, and then the house, that
 8   they didn't go through with.
 9   Q     When you took the offer from the Jacobs,
10   what was the asking price at the time?
11        A     The asking price, again we'd have to
12   turn to the MLS.  I don't know.  I thought it
13   was over two million.  My recollection off the
14   hand, off the cuff, 2.1 something maybe.
15   Q     So their initial offer of 1.9 was less than
16   asking price, right?
17        A     Yes.
18   Q     And the number that you all agreed to in
19   the Agreement of Sale was also less than the
20   asking price, right?
21        A     Wait, say that again?
22   Q     The contract price of 2,040,000 was less
23   than the asking price, right?
24        A     Yes.
25   Q     So their offer was below asking, right?
```



Page 108

1          A     The initial offer, yes, because --

2    Q     And even their second offer?

3          A     Yeah, both offers were below the

4    asking.

5    Q     And why was their offer so much less than

6    the asking price?

7          A     I can't answer their motivation.  How

8    can -- I mean, save money like anyone, I guess,

9    that could make an offer.

10   Q     Right.  The foreclosure hadn't been filed

11   at that point, correct?

12         A     That is correct.  But we were a high

13   priced house at that time, too.

14   Q     You actually agreed to sell for less than

15   the asking price, didn't you?

16         A     I did.

17   Q     And it wasn't a distressed sale at that

18   time, correct?

19         A     That is correct.  It was marginally

20   less than the asking price, but correct.

21   Q     So Mr. McCaffrey, who we talked about a

22   moment ago, he ended up preparing two

23   appraisals, didn't he?

24         A     He came to my house one time.  I had

25   one from that guy who liked Disney stuff, the





Page 109

1   guy from the Jacobs and then McCaffrey came

2   through, but I can't remember when he came

3   through.

4   Q    Well, McCaffrey came up with two different

5   values first he came up with 1.975, then later

6   he came up with a second report of 2,040,000.

7   Do you remember that?

8        A    No, but okay.

9   Q    Do you remember arguing that

10  Mr. McCaffrey's first report at 1.975 had

11  mistakes in it, just like the Jones' report?

12       A    I wouldn't put it beyond me to point

13  out that there are missed pieces to some value.

14  Q    So you argued about it with TD Bank and

15  McCaffrey ended up re-doing his report and

16  coming in at the exact amount of the sales

17  price, 2,040,000.  Do you remember that?

18       A    You know, I remember them -- I think I

19  do remember that there was an initial report.  I

20  don't know -- maybe so.  But I think actually,

21  to be honest with you, hold on, let me think.

22  Give me a second, I'm trying to remember this.

23  I don't want to misstate things just because I

24  feel like I remember it.  I want to see if I can

25  remember this.



Page 110

1        Hold on.  Hold on.  I do remember.  I

2    remember some of this now, the McCaffrey --

3    here's what happened, I'm pretty sure McCaffrey

4    had the first report was 1.975.  I don't

5    remember the number.  You're telling me, 1.975.

6    I'm not testifying that being the actual number

7    that's okay you can show it to me.  I'm pretty

8    sure that I did argue about.  I don't put it

9    past myself, but I do remember because it must

10   have happened.  It must have happened because I

11   remember here's what I do remember, McCaffrey

12   telling me -- McCaffrey telling me -- I don't

13   know if it was a conference call with TD Bank

14   now or not, that he had to cap the value -- that

15   yes, that what I pointed out was correct, that

16   the house was worth more, but that he had to cap

17   the value at two million forty because there was

18   a contract that had been on the house for two

19   million forty.

20       So in other words, I had won my argument

21   about the larger value of the property with

22   Mr. McCaffrey and TD Bank had agreed with me,

23   but McCaffrey said look, I can't go beyond two

24   million forty, the market value has been set.

25   The market value has been set by a contract, a



Page 111

1  relevant recent contract or I can't remember

2  when he did the damn report.  But that's what he

3  said, I can't -- I can't go beyond two million

4  forty.  That's why there was -- you know, for

5  example, I think your tone implied that there

6  was a coincidence to it.  He capped it at that.

7  I remember this now.

8  Q    But you remember that he did an appraisal

9  that came in below 2,040,000, right?

10      A    I think -- I thought it was like two

11 million, I don't remember, but we're dibbling

12 over 70,000 or $25,000 or something like.

13 Q    You that I thought it's dibbling but

14 McCaffrey's first report came in at virtually

15 the same number as Mr. Jones report and the

16 field review of Mr. Jones report?

17      A    Right.  The field review, I don't know

18 what credence that has because the field review,

19 what I understand a field review to be, which I

20 didn't elaborate just a moment ago, but a field

21 review is merely a mathematical checking of the

22 calculations in an appraisal.  It doesn't

23 actually verify the characteristics or

24 measurements of the property themselves.

25      So the verification of those



Page 112

1    characteristics is what was essential because

2    that's what was in error.  If you were to put on

3    a board two plus two equals four and say can you

4    field review that, they would say two plus two

5    equals four.  They wouldn't look in the box to

6    see there were three apples in one and two in

7    the other to say three plus two equals five.

8    Q    Do you think it makes any difference

9    Mr. McCaffrey's appraisal was done in connection

10   with your loan with the bank?

11       A     Mr. McCaffrey's -- hold on a second.

12   I was on a little emotional roll there.  Does it

13   make a difference -- please, Barb, say the

14   question again?

15   Q    Does it a make a difference that

16   Mr. McCaffrey's report was done in connection

17   with your loan to TD Bank as opposed to the

18   Jacobs loan?

19       A     The functional difference between

20   those two scenarios is I was willing to have the

21   review done that the Jacobs refused to have

22   done.  Do you understand?  I want to make sure

23   you understand what I'm answering there, Barb.

24   That is the difference.  The errors -- when

25   there were errors found in my report, I was the



Page 114

1          A      Right.

2     Q     You still had litigation pending --

3          A      Right.

4     Q     -- against the other party?

5          A      Right.

6     Q     What happened with that litigation?

7          A      I think -- I think B.T. Edgar, they

8     were released.  I personally did not want to sue

9     them.  In my judgment, at that time I didn't

10    think and I'm still not sure, but at that time I

11    didn't think they did anything wrong.  The

12    realtor we did settle with them.  And TD Bank --

13    not the realtor, the appraiser.  And TD Bank, TD

14    Bank settled, but I think TD Bank settled first.

15    Q     You settled with TD Bank for 22,500, right?

16         A      I don't remember.

17    Q     What if I told you you testified to that in

18    your other deposition?

19         A      Then that's what I settled for.

20    Q     Does that refresh your recollection?

21         A      It wasn't a lot of money.

22    Q     22,500 isn't a lot of money considering

23    what went on, you don't think so?

24         A      A lot of mistakes were going on.

25    Q     What did the bank do wrong?



Page 115

 1        A    I still am not convinced that they had

 2    an obligation to not review the Jacobs

 3    appraisal.  Again, I had counsel, I don't think

 4    they did an appropriate job on that.  I don't

 5    know what legal theory they would have

 6    liability, but that was my feeling at the time

 7    and my feeling is still, I haven't gone back to

 8    re-examine and apply some standard now to say

 9    oh, wow, we got a good deal from them.  In

10    retrospect, I never examined it again in my life

11    since that point in the settlement.

12    Q    What did you settle with the appraiser for?

13        A    I don't recall.

14    Q    You received the money from TD Bank?

15        A    I believe so.

16    Q    Did you pay any of the money to GMAC

17    towards the mortgage?

18        A    No, I don't believe so.

19        MR. REED:  Do you mind if I take a

20        moment?

21        MS. HAGER:  Sure.

22        MR. REED:  Look, Barb, if you see

23        these things, if there's something I'm not

24        remembering correctly, point it out.  If

25        that's my depo, show me or talk to me about

