**EXHIBIT B**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY


IN RE:                              : Case No.:

                                    : 12-12020(MG)

RESIDENTIAL CAPITAL, LLC, et        : (Pending in

al.                                 : the Southern

                                    : District of

                                      New York)

                                      Chapter 11


-   -   -

DEPOSITION UNDER ORAL EXAMINATION OF

LOUISE CARTER

Mount Laurel, New Jersey

Thursday, August 7, 2014

-   -   -

REPORTED BY:  JENNIFER MAUTE, CCR

-   -   -


MAGNA LEGAL SERVICES

(866) 624-6221

www.MagnaLS.com



Page 53

1    extras.  Staircases, millwork, so I don't know

2    where this figure came from.

3          Q.    Okay.

4          A.    But, yeah, they added that after

5    settlement.  I know that they did the third floor

6    and the basement after.  I think the tax assessment

7    was high, also.

8          Q.    Well, hold that thought for a minute.

9                        - - -

10              (Whereupon, documents were marked as

11   Exhibit Carter-6 for identification.)

12                       - - -

13   BY MS. HAGER:

14         Q.    So showing you what was marked as

15   Carter-6.  I'll represent that this is a

16   compilation of various MLS print screens showing

17   the listing prices at various points in time for

18   Matlack Drive, combined with some status change

19   forms that appear to be signed by you.  So if we

20   just look at the first page.  Is that your

21   signature at the bottom?

22         A.    Yes.

23         Q.    Okay.  And what do you use this kind of

24   a form for, in general?

25         A.    To make changes.


MAGNA ►
LEGAL SERVICES

Page 54

1          Q.      To what?

2          A.      To the listing.

3          Q.      So if you've got a property listed and

4    you want to change the price for some reason, the

5    listing agent would fill out this kind of a form?

6          A.      Yes.

7          Q.      And what do you do with it, give it to

8    somebody?

9          A.      Put it in the file.

10         Q.      Put it in the file.

11                 How does somebody know to change it on

12   the MLS?

13         A.      The secretary does it.

14         Q.      Okay.  So would you fill this out and

15   hand it to a secretary?

16         A.      Yes.

17         Q.      Okay.  All right.  So just looking at

18   the one that's on top, it has the property address

19   at 817 Matlack Drive.  And it says, extend

20   expiration date to 9/1/09.  And then, in

21   parenthesis, EXP 3/31.  What do those dates mean?

22         A.      It expires on 3/31.

23         Q.      What expires?

24         A.      The listing.

25         Q.      Okay.  So the listing would expire on



Page 55

1   3/31.  Is this your direction to extend it to

2   September 1st?

3       A.     Yes.

4       Q.     And how long are you able to extend a

5   listing for?

6       A.     With the seller's permission, as long as

7   he wants me to.

8       Q.     Okay.  And then when you say that it

9   expired on March 31st, what derives when it

10  expires?

11      A.     The length that we put in the computer.

12  Whether we extend it for three months, or four

13  months, or five months, or six months.

14      Q.     So when you first get a listing that

15  comes in, is there a standard amount of time that

16  it remains listed?

17      A.     We usually take a listing for at least

18  six months.

19      Q.     Okay.  So if we turn to the second page.

20  Can you tell me what we are looking at here, the

21  second page of Carter-6?

22      A.     Okay.  That must be -- that must be when

23  it was pending for a lease purchase.

24      Q.     Well, what is this document that we're

25  looking at?  Let's start there.



Page 56

```
 1        A.     The Trend MLS sheet.

 2        Q.     Is that what it's called?

 3        A.     Yes.

 4        Q.     Okay.  And is this a printout from the

 5   computer?

 6        A.     Yes.

 7        Q.     Okay.  And what is MLS?

 8        A.     Multiple Listing Service.

 9        Q.     Okay.  And that's where an agent or

10   broker puts all of the information concerning a

11   particular property; is that right?

12        A.     Right.

13        Q.     And so if an agent wants to pull

14   comparable sales, they would go to the MLS; right?

15        A.     Yes.

16        Q.     Or if an agent wants to see how much a

17   different property is listed for, they would go to

18   the MLS --

19        A.     Yes.

20        Q.     -- right?

21               Wait for me to finish my question

22   before you answer.

23               So is there a date on this document

24   that shows when this property was listed for this

25   particular price?
```



Page 57

1        A.    This is pending.  Let's see, we

2    stayed -- for that price, I think, maybe, March

3    30th, that date.

4        Q.    Are you looking at the very bottom?

5        A.    I'm not sure.

6        Q.    Where it says, Created: 3/30/09, at 3:15

7    p.m.  Is that where you are?

8        A.    I think OMD means listing market date.

9        Q.    Well, wait.  Can we stay at the bottom

10   there?  It says, Created: 3/30/09, at 3:15 p.m.  Is

11   that the date that this document was printed?

12       A.    Where do you see that?

13       Q.    At the very bottom.

14       A.    No.  Yeah, that's when this document was

15   printed, I believe.

16       Q.    That is what I'm asking.

17       A.    Yes.

18       Q.    Okay.  So just so we're clear on the

19   record.  The date at the very bottom where it says,

20   Created:  3/30/09, at 3:15 p.m., that's the date

21   that somebody printed this document; is that right?

22       A.    I believe so.

23       Q.    Okay.  And this is the MLS listing for

24   817 Matlack Drive in Moorestown, the property we

25   have been talking about; right?



Page 58

```
 1        A.    Right.

 2        Q.    Okay.  And in the top right-hand corner,

 3   there is a dollar amount.  It's $1,895,000.

 4        A.    Yes.

 5        Q.    Is that the amount that this property

 6   was listed for at that time in March of '09?

 7        A.    That's how much it was at that time,

 8   1,895,000.

 9        Q.    Right.  So the answer to my question is,

10   yes?

11        A.    But it's pending.  It's not active.  PND

12   means pending.

13        Q.    Okay.  In order for it to be pending at

14   that amount, wouldn't it have had to have been

15   listed at that amount?

16        A.    Yes.

17        Q.    Okay.  So in March of 2009 this property

18   was listed for $1,895,000; right?

19        A.    Right.

20        Q.    Okay.  And then you're looking at where

21   it says PND.  You say that means pending?

22        A.    Yes.

23        Q.    Okay.  That means pending sale?

24        A.    Yes.

25        Q.    Okay.  So when a property is pending
```



Page 59

1    sale it remains on the MLS; is that right?

2         A.    Not active.

3         Q.    But the information as we're looking at

4    it on this sheet, which is reflect --

5         A.    It's stays pending until it settles.

6         Q.    Okay.  You have to let me finish or it's

7    going to be messy.

8               So the information as we see it on

9    this sheet remains there even while a property is

10   pending?

11        A.    Yes.

12        Q.    Okay.  And based on what you showed me

13   as Carter-2, which is the MLS for 816 Loveland

14   Road, it stays on, even after it's settled, because

15   this is marked --

16        A.    The set will stay on forever.

17        Q.    It just changes the designation because

18   at the top of Carter-2, instead of PND it shows

19   STL; right?

20        A.    Because it settled.

21        Q.    I'm just trying to clarify for the

22   record when we're looking at it later, that that's

23   what that means, STL?

24        A.    Yes.

25        Q.    Okay.  So if you can turn the page.  Now



Page 60

1    we're on Page 3 of Carter-6.  And we see another

2    status change form.  Is that your signature at the

3    bottom?

4         A.    Yes.

5         Q.    Is that your handwriting, where it has

6    the property address and the MLS number and the

7    price change to?

8         A.    No.

9         Q.    Who fills out that information?

10        A.    My secretary.

11        Q.    Okay.  And would you have given her the

12   information?

13        A.    No.  She gives it to me.

14        Q.    Well, is she telling you to change the

15   price?

16        A.    No.  She's telling me -- she fills it

17   out.  I may have told her to change the price and

18   so she filled it out and gave it to me to sign.

19        Q.    Okay.  And you wouldn't have signed it

20   if you didn't want to change the price?

21        A.    Right.

22        Q.    And so, here it's not dated, this form,

23   but it says price changed to $1,780,000; right?

24        A.    Right.

25        Q.    Okay.  So then if we turn the page.  Now



Page 61

1    we're on Page 4 of Carter-6.  Here's another MLS

2    listing and it's for 817 Matlack Drive.  And at the

3    very bottom, where it says created, the date is

4    11/14/09, at 3:15 p.m.  Would you agree that that's

5    the date that someone printed out this form?

6         A.    Yes.

7         Q.    Okay.  So on that date the listing price

8    was $1,780,000; right?

9         A.    Yes.

10        Q.    Okay.  And that is in line with the

11   third page of this document that we just looked at,

12   where you indicated that the price should be

13   changed to 1.78; right?

14        A.    Right.

15        Q.    And, now, if you turn the page again, I

16   think this is essentially the same screen shot but

17   I included it because the time that it was printed

18   is slightly different.  At the very bottom it says,

19   Created:  November 14th, 2009, at 3:17 p.m.  So

20   it's just two minutes after the page prior was

21   created.  But the listing amount remains the same.

22   It's still $1,780,000.  So would you agree that

23   that was the listing price at that date and time?

24        A.    Yes.  That just means someone printed it

25   out at that time.



Page 62

1          Q.     Right.   That's when someone printed it

2     out, but the information wouldn't be on there if

3     that wasn't the listing price at that time; right?

4          A.     Right.

5          Q.     All right.   So the next page is just

6     some pictures of the home.   If we go on to the next

7     page it's another status change form.   Is that your

8     signature at the bottom?

9          A.     Yes.

10          Q.     Is that your handwriting?

11          A.     Yes.

12          Q.     Is that your handwriting where it has

13     the MLS number?

14          A.     No.

15          Q.     How about the property address?

16          A.     Which?

17          Q.     The property address?

18          A.     That's not mine.

19          Q.     Okay.   How about where it says extend

20     expiration to?

21          A.     Expiration is not mine.   Extend is mine.

22          Q.     Okay.   So the date of June 30th, 2010 is

23     your handwriting?

24          A.     Yes.

25          Q.     Okay.   So this status change form



Page 63

1    indicates that the listing is set to expire on

2    February 4th, but that it should be extended to

3    June 30th, 2010; is that right?

4         A.    Right.

5         Q.    Okay.  So if we turn the page again,

6    here's another MLS printout.  And at the very

7    bottom it says the date created is May 7th, 2010,

8    at 4:56 p.m.  Do you agree with that?

9         A.    I'm looking for it.

10        Q.    Okay.

11        A.    Yes.

12        Q.    Okay.  And on that date and at that time

13   the property was listed at $1,690,000; is that

14   correct?

15        A.    Correct.

16        Q.    And at the top of this page there's some

17   handwriting.  Is that your handwriting?

18        A.    Yes.

19        Q.    What does that say?

20        A.    Please reduce 817 Matlack to 1690.

21        Q.    Okay.  And so who was that note directed

22   to?

23        A.    Becky.

24        Q.    Okay.  So why did you do it that way

25   instead of using a status change form?



Page 64

1        A.    You can do it any way.

2        Q.    I'm sorry?

3        A.    Because I guess Frank told me to reduce

4    it, so I reduced it.

5        Q.    I mean, why didn't you use the status

6    change form?

7        A.    Well, she would have given it to me to

8    fill out, so it would have to be somewhere.  She

9    wouldn't have just done it without a status change

10   form.

11       Q.    So Becky is your secretary or was your

12   secretary?

13       A.    Yes.

14       Q.    And so this MLS listing that we're

15   looking at -- well, let me strike that.

16             When you indicate to Becky or someone

17   else that a listing price or some information on

18   the MLS should be changed, does the secretary go in

19   and manually change it herself?

20       A.    Yes.

21       Q.    Okay.  And is this MLS that we're

22   looking at here a printout that Becky would have

23   made after following your instructions to change

24   the price to reduce the price to 1.69?

25       A.    Yes.



1          Q.      Okay.  So if you turn the page there's

2     another MLS printout from June 15th, 2010 at 10:20

3     a.m.  Do you see that?

4          A.      Yes.

5          Q.      Okay.  And the listing price that day

6     and time was $1,595,000; is that right?

7          A.      Right.

8          Q.      Okay.  So why was it reduced again?

9          A.      I'm not sure.  Whatever the seller told

10    me to do, I did.

11         Q.      Okay.  The next page is, again, pictures

12    of the property.  If you flip the page again, we

13    have another status change form.  Is that your

14    signature on the bottom?

15         A.      Yes.

16         Q.      And did you fill out the extend

17    expiration to blank?

18         A.      Yes.

19         Q.      So this was your direction?

20         A.      Yes.

21         Q.      To extend the listing date from June

22    30th until December 31st, 2010; right?

23         A.      Right.

24         Q.      Okay.  And then if you turn the page,

25    we're at another MLS listing.  Similar to the last



Page 66

1    one we looked at, the listing price is $1,595,000

2    and this form was created on June 28th, 2010, at

3    11:00 a.m.  Would you agree?

4        A.    Yes.

5        Q.    So that the price, the listing price on

6    June 28th, 2010 was 1.595; right?

7        A.    Right.

8        Q.    Okay.  So what we have just looked at as

9    Carter-6, essentially, shows, doesn't it, that the

10   price -- the listing price was continuously reduced

11   throughout 2009 and 2010, would you agree?

12       A.    Yes.

13       Q.    Okay.

14       A.    There was someone in there during 2009

15   and we had to go to court to get them out.

16       Q.    How much would your commission have been

17   if this had closed in -- if the Jacobs deal had

18   closed?

19       A.    If Jacobs had closed?  I don't even

20   remember what it was.

21       Q.    Their agreement was for 2,040,000?

22       A.    If Jacobs had closed, it might have been

23   -- our office commission may have been

24   two-and-a-half percent.

25             MS. HAGER:  If we can have that marked



12-12020-mg   Doc 7495-2   Filed 09/08/14   Entered 09/08/14 09:38:18   Exhibit B -
Louise Carter Deposition Transcript   Pg 17 of 27

Page 68

1            How about at the very top, it's an

2    e-mail with the subject line, foyer picture.  It's

3    dated May 7th, 2008.  And it's from, it appears to

4    be Mr. Reed, FrankReedNJ to LMcarts.  Is LMcarts

5    your e-mail address?

6        A.    Yes.

7        Q.    So was this an -- originally, was this

8    an e-mail from Mr. Reed to you?

9        A.    From who?

10       Q.    Mr. Reed to you?

11       A.    I'm sure it was.  I have a photographer

12   that takes pictures, but he probably took the

13   picture of the foyer and wanted that in so that's

14   probably what happened.

15       Q.    He wanted that in the MLS?

16       A.    He wanted it in the MLS, yes.

17                    -  -  -

18            (Whereupon, a document was marked as

19   Exhibit Carter-8 for identification.)

20                    -  -  -

21   BY MS. HAGER:

22       Q.    The court reporter just marked another

23   document as Carter-8.  I'm showing you that

24   document.  Do you recognize that document?

25       A.    It's what's in the computer as public



Page 69

1   records for the listing.

2        Q.    So is this also considered an MLS?

3        A.    No.

4        Q.    Okay.  How is this different?

5        A.    This is public records.  This is public

6   records and it gives you all the information.  We

7   can access it through MLS.

8        Q.    So if you look -- well, for

9   clarification on the record, the document concerns

10  817 Matlack Drive; right?

11       A.    Right.

12       Q.    Okay.  If we look towards the bottom,

13  kind of on the right-hand side, it has MLS history

14  information.  And it says, status date 6/26/06.

15  Price, $1,571,619.  Was that the sales price of the

16  property when Mr. Reed purchased the home?

17       A.    That was the settled price without the

18  deed price.  That was the deed price.

19       Q.    The deed price, okay.

20             And then the information that's listed

21  right below that, May 9th, 2008, it shows a price

22  of 2,040,000.  Where would that number have come

23  from?

24       A.    That was from -- it was withdrawn.  That

25  probably was after the contract for 2 million, 40,



Page 70

1    when we withdrew the listing.

2         Q.    How do you know that that was withdrawn?

3         A.    Because WR.

4         Q.    Means withdraw; is that right?

5         A.    Yes.

6         Q.    Okay.  And so then below that, the

7    status date of September 25th, 2008, the price is

8    $1,895,000.  Where would that number have come

9    from?

10        A.    An active listing.  It would have come

11   from an MLS sheet.

12        Q.    So the PND next to that, does that mean

13   pending?

14        A.    Yes.

15        Q.    So was the 1.895 a pending sale?

16        A.    No.  That's the list sale.

17        Q.    What do you mean?

18        A.    When you have pending, it never tells

19   you what it's sold for.  That is just the list

20   price.

21        Q.    Okay.  And if we go to the very end of

22   the second page it shows that the form was

23   generated on August 4th, 2009, at 12:40 p.m.  Would

24   you agree?

25        A.    Yes.



Page 75

1    page, at the bottom left-hand corner, does it

2    indicate what the fair market value of the property

3    is?

4          A.    Really fast, I don't see.

5          Q.    Page 2, the very bottom.  I'm sorry, I

6    guess it's Page 3 of our document.  Third page.

7          A.    Next one?

8          Q.    Yeah.  And then the very bottom corner,

9    left-hand side.

10         A.    1,950.

11         Q.    Okay.  So Mr. Jones appraised the

12   property at $1,950,000 as of December 24th, 2007;

13   right?

14         A.    I think he missed some square footage.

15   I think that was an issue.

16         Q.    Well, I'm just asking about this

17   document.

18         A.    That's what he said.

19         Q.    That's what he says.

20               And as a result of him appraising it

21   at 1,950,000, did the Jacobs indicate that they

22   would not close on the sale?

23         A.    That must have been it, because I see

24   that there was a rider, additional contract

25   provisions that said it had to appraise.  That's on



12-12020-mg    Doc 7495-2    Filed 09/08/14    Entered 09/08/14 09:38:18    Exhibit B -
Louise Carter Deposition Transcript    Pg 21 of 27

Page 76

1    the last page of the agreement.

2        Q.    So going back to your letter, which was

3    Carter-3.  This was your July 2nd, 2012 letter,

4    where you said that prior to GMAC's foreclosure

5    action, Mr. Reed had a contract for sale on his

6    home for the amount of $2,040,000.  However, this

7    sale did not close.  Do you remember writing that?

8        A.    Yes.

9        Q.    Okay.  Do you think it would have been

10   relevant to put in that letter the reason that the

11   sale didn't close?

12       A.    You know, until you gave this to me, I

13   didn't even remember.  But, also, I think it's

14   relevant to say that the appraisal missed a lot of

15   square footage.

16       Q.    Well, in that regard, I asked you

17   previously if you were aware of some litigation

18   between Mr. Jacobs --

19       A.    I didn't remember.

20       Q.    Between Mr. and Mrs. Jacobs and Mr. and

21   Mrs. Reed.  Do you now recall that litigation?

22       A.    I really don't.  I'm sorry.

23       Q.    Okay.  If I told you that Mr. and Mrs.

24   Reed refused to give the Jacobs back their deposit,

25   would that ring any bells?



12-12020-mg   Doc 7495-2   Filed 09/08/14   Entered 09/08/14 09:38:18   Exhibit B -
Louise Carter Deposition Transcript   Pg 22 of 27

Page 77

 1          A.    I don't -- I don't remember.  I'm sorry.

 2     I really don't remember.

 3          Q.    In your letter, July 2nd letter, does

 4     your failure to explain the reason that the

 5     $2,040,000 deal didn't close, perhaps, give a false

 6     impression as to why it didn't close?

 7          A.    I don't think so because it wasn't

 8     mentioned at all.

 9          Q.    Well, the contract with the Jacobs

10     didn't close because the house didn't appraise.

11     Not because of the foreclosure actions; isn't that

12     right?

13          A.    At that time, yes.

14          Q.    What do you mean "at that time"?

15          A.    I mean, yes.  It wasn't a foreclosure

16     action, I don't think, at that time.  I don't know.

17          Q.    So to the extent that, perhaps, there

18     could be any confusion from that particular

19     sentence in your letter, would you agree that

20     GMAC's foreclosure did not have anything to do with

21     the failure of the $2,040,000 deal to close?

22          A.    I don't know.  I don't know.

23          Q.    Why don't you know?

24          A.    It was prior to that he had a contract

25     for the 2,040,000.  And then after that, it was



Page 78

1   difficult to sell it because of their foreclosure.

2       Q.     Right.   That's further in time --

3       A.     Right.

4       Q.     -- that we're not talking about.   All

5   I'm concerned about right at this moment is the

6   Jacobs' deal.   Because to me, it looks like the

7   Jacobs deal didn't close because it didn't appraise

8   and people argued over the appraisal --

9       A.     By $50,000 I --

10      Q.     90,000.

11      A.     90 was it?   I don't --

12      Q.     So they argued over the appraisal and

13  whether the deposit should be returned, but the

14  reality is the Jacobs didn't close because they

15  didn't like the appraisal and not because Mr. Reed

16  was in foreclosure; right?

17      A.     Not because he was in foreclosure at

18  that time.   I think they had other reasons, but

19  that's the reason they used.

20      Q.     They did not use as one of their reasons

21  that the house was in foreclosure; right?

22      A.     I don't think so.

23      Q.     Okay.   All right.   Do you remember Mark

24  Weaver?

25      A.     Mark Weaver.   Wait a minute, Mark


MAGNA
LEGAL SERVICES

Page 96

 1        Q.    Did you think it would sell faster at

 2   the lower price?

 3        A.    I did.

 4                      -  -  -

 5              (Whereupon, a Proposal to Purchase was

 6   marked as Exhibit Carter-18 for identification.)

 7                      -  -  -

 8   BY MS. HAGER:

 9        Q.    I'm showing you what has been marked as

10   Carter-18.  Have you seen that document before

11   today?

12        A.    Yes.

13        Q.    What is that document?

14        A.    An offer to purchase from Naoji.

15        Q.    Well, Naoji is the listing agent -- or,

16   excuse me, the buyers' agent; right?

17        A.    Yes.

18        Q.    And who are the buyers?

19        A.    Frank and Gina Roccisano.

20        Q.    We kind of talked about them a little

21   earlier on I think.  This offer is dated what date?

22        A.    March 20th, 2010.

23        Q.    And what did they offer?

24        A.    A million, three.

25        Q.    Did this turn into an Agreement of Sale?



Page 97

1          A.      No.

2          Q.      Why not?

3          A.      It was -- it was too low.  It was not

4    accepted.

5          Q.      Not accepted by the sellers?

6          A.      By the seller.

7          Q.      Okay.

8          A.      And they would not come up.

9                  MS. HAGER:  Let's mark this Carter-19.

10                           -  -  -

11                 (Whereupon, Proposal to Purchase was

12   marked as Exhibit Carter-19 for identification.)

13                           -  -  -

14   BY MS. HAGER:

15         Q.      I'm showing you what has been marked as

16   Carter-19.  Do you recognize that document?

17         A.      I guess he did come up.

18         Q.      Do you recognize that document?

19         A.      I don't, but I do -- you know, I guess I

20   received it.

21         Q.      What is this document?

22         A.      It is an offer to purchase.

23         Q.      Who is this from?

24         A.      Naoji.

25         Q.      Who are the buyers?



Page 99

```
 1        A.     Right.

 2        Q.     So am I right that when the Roccisanos'

 3   proposal from March 20th, 2010 came in, the listing

 4   price was $1,780,000 and they offered 1 million,

 5   three?

 6        A.     Right.

 7        Q.     Okay.  Then you dropped the price on May

 8   7th, 2010 to 1,690,000 and then a month or so later

 9   the Roccisanos came back and offered $1,450,000 on

10   June 12th, 2010; is that right?

11        A.     Right.

12        Q.     Okay.  So they came up in their offer,

13   didn't they?

14        A.     Yes.

15        Q.     And the listing came down in the

16   interim, didn't it?

17        A.     Yes.

18        Q.     So at the time the Roccisanos offered

19   1.45 million the property was listed at 1,690,000?

20        A.     Yes.

21        Q.     Given the price range that we're talking

22   about, do you think a $240,000 difference is

23   insurmountable?

24        A.     I think it's significant, considering

25   the reductions.
```



Page 106

1   them.

2        Q.   It was -- that was a year prior?

3        A.   Um-hum.

4        Q.   Is it possible there could have been

5   some decreases since then?

6        A.   I may have.  I might have told them what

7   it was on for at that time and, you know, like,

8   before and they wanted to get in it to see it.

9        Q.   And if there were further decreases,

10  would that be in the office file?

11       A.   Not if it was not officially on the

12  market.  Didn't she say something about a pocket

13  listing?

14       Q.   She did.  What does that mean?

15       A.   That means it's really not listed.  It's

16  not on the market, but I could get them into the

17  house.

18       Q.   Do you know when the property was taken

19  off the market?

20       A.   I think there would be a record of it.

21       Q.   Do you have a record of it?

22       A.   We'll have to look and see.  Where is

23  the document -- it makes it easier, with all the

24  list prices?

25            MS. HAGER:  Let's go off the record for

