**EXHIBIT C**

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CASE NO. 12-12020(MG)

-  -  -

IN RE:                          :
                                : (PENDING IN THE
RESIDENTIAL CAPITAL, LLC,  : SOUTHERN DISTRICT OF
et al,                          : NEW YORK)
                                : CHAPTER 11
        Debtors              :
                                :
                                :
                                :

-  -  -

DEPOSITION UNDER ORAL EXAMINATION OF
FRANK REED
Mount Laurel, New Jersey
THURSDAY, AUGUST 14, 2014

-  -  -

REPORTED BY:  HEATHER A. KIRSCH, CCR

-  -  -

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



Page 7

```
 1                        *   *   *
 2              (It is agreed by and between counsel
 3         for the respective parties that the signing,
 4         sealing, certification and filing of the
 5         deposition be waived and that all
 6         objections, except as to the form of the
 7         question, be reserved until the time of
 8         trial.)
 9                        *   *   *
10              FRANK REED, residing at 817 Matlack
11         Drive, Moorestown, New Jersey 08057, after
12         having been first duly sworn, was examined
13         and testified as follows:
14                        *   *   *
15
16   BY MS. HAGER:
17   Q    Good morning, Mr. Reed.  We're here on your
18   deposition, which was continued from yesterday.
19   I still have some questions, so let's get
20   started.  You understand that you're under oath
21   again this morning?
22        A    Yes.
23   Q    And all the same ground rules that we
24   talked about yesterday will apply today as well.
25   Since the default on the mortgage have you paid
```



Page 8

1   the real estate taxes on the property?

2        A     I don't know if we have.  I know that

3   at some point we stopped, but I don't know at

4   what point that happened.

5   Q     Was your wife paying the real estate taxes?

6        A     I believe so because that's part of

7   the bills that would come in.

8   Q     Well, were taxes and insurance included in

9   your monthly mortgage payment initially?

10        A     I don't remember.

11   Q     Do you pay for your property insurance?

12        A     Yes.  Yes.

13   Q     When was the last time you made a payment

14   on the property insurance?

15        A     That's been -- that's been a while.  I

16   don't know.

17   Q     A year?

18        A     I don't know.  I can't speculate.

19   Q     Who is your property insurance with?

20        A     I thought it was Chubb.  I know there

21   was another one, I don't remember it.

22   Q     How much money have you saved in mortgage

23   payments since you stopped paying the monthly

24   mortgage payment?

25        A     I don't understand the question.



Page 9

1    Q    Sure.  Well, you haven't been paying on the

2    mortgage since 2008, right?

3        A    Yes, I think.  I think -- remember

4    yesterday, I don't know when -- when that

5    actually stopped.

6    Q    Well, you said you didn't know the exact

7    month, but we can agree that it was --

8        A    Oh, 2008, yes.

9    Q    Okay.  So you haven't paid on the mortgage

10   since 2008.  Have you saved the money that you

11   would have otherwise been paying to the

12   servicer?

13       A    No, because I did not earn the money

14   to then save it.

15   Q    What do you mean that you haven't earned

16   it?

17       A    I mean, I wasn't able to continue in

18   my flipping business or pursuit and I didn't

19   continue to earn the money that I would have,

20   then I would save it by not spending it on the

21   mortgage.  If that was -- in other words, I

22   would have to have had it to save it.  The

23   meaning of the word save means I would have had

24   it, but not spent it.

25   Q    So when you were talking yesterday a little



Page 10

1  bit about the flipping business, you mentioned

2  that part of that was that you would do the work

3  yourself to save on the labor costs, right?

4        A     Yes.

5  Q    And then you would obviously pay for the

6  materials so that would be an out of pocket

7  expense, right?

8        A     Yes.

9  Q    But you would do the work yourself and you

10 would recognize that as a savings when you sold

11 the house, right?

12       A     And earnings, maybe I don't understand

13 exactly what your meaning is.

14 Q    Right.  So I'll just rephrase that.  So

15 when you were buying and selling houses you

16 would do the work yourself as opposed to paying

17 somebody else so that you retained the money

18 that you would otherwise be paying somebody to

19 do the work?

20       A     Right.  I would have earned it from

21 the sale, but not spent it out to someone else.

22 Q    Right.  And since your injury though have

23 you been able to do construction work?

24       A     No.

25 Q    So when was the last time that you were



Page 11

1  able to work on a house and fix it up and sell

2  it on your own?

3       A    On my own it would have been

4  pre-injury.

5  Q    Right.  So is it accurate to say that since

6  April of 2008 when you were injured that that

7  injury has effectively stopped you from being

8  able to engage in that business?

9       A    No.  It, as I said yesterday, it's a

10  factor.  It's an element.  It's a percentage.  I

11  can still lay down on my, you know, as you

12  witnessed, I can still lay or sit, recline in

13  odd positions.  I can still do the drawings,

14  submit for permits.

15       I actually, my need for money to continue

16  that business would increase because I would

17  have to -- or those pursuits would increase

18  because I would now have to pay for labor, but I

19  wasn't necessarily have to hire subcontractors

20  either.

21       There's a provision in the law that when

22  you buy houses for yourself to live in, you can

23  have people work on those houses under your

24  permitting and they can do the work.  So there

25  would be an increase in cost, but it wouldn't be



Page 12

1    say equivalent to a builder who is using full

2    blown subcontractors.

3    Q    So we talked yesterday about the verbal

4    offer that came in right after you put the house

5    on the market in 2007 before the Jacobs written

6    offer.  Do you remember us having that

7    conversation yesterday?

8         A    I do.  I do.

9    Q    Okay.  And I asked you to think about it

10   last night and see whether you could recall any

11   more information.  Did you have a chance to

12   think about it?

13        A    I did not actually think about it.

14   Q    Okay.  Well, as we sit here now do you have

15   any further recollection about that verbal

16   offer?

17        A    I vaguely remember a man in our

18   kitchen at the -- at the -- at an open house

19   being enthusiastic about the house.  But I could

20   not pick up out of a lineup and I think that's

21   possibly the origin of that offer.  I cannot

22   even tell you the dollar amount.

23        As I said I think yesterday, it's something

24   that if you had put a gun to my head and asked

25   me about it, I would not have even remembered it



Page 13

1   unless prompted to think about it.  And it's

2   still as elusive in my mind as a dream upon

3   waking in the morning.

4   Q    But now that we've talked about it a little

5   do you remember though knowing that it was less

6   than the asking price?

7        A    Barb, I don't remember the specifics.

8   I may infer that it might have been because it

9   was newly listed and unless someone asked me or

10  offered the full value or full listing price, I

11  may have declined it, but I don't remember

12  anything about it other than that.  I mean, I

13  can't speak authoritatively about it.  I don't

14  want to mislead you.

15  Q    All right.  So I had asked that in

16  connection with the deposition that you bring

17  some documents with you, specifically everything

18  that we had requested in the Request For

19  Production of Documents.

20       Yesterday when we started the deposition

21  you did show me some documents that you had with

22  you, but frankly I already had all those.

23  Essentially, it was just the submission for the

24  independent foreclosure review.  The only

25  exception was one e-mail.  And when we came back



Page 20

1   documentation that you ever applied for a loan.

2   Were you aware of that before today?

3        A     As I said, it's -- it's consciously

4   aware -- no, maybe this was shown to me during

5   the time of the litigation of the State Law

6   Division case, but I don't have an answer for

7   why or what they have or how they do or do not

8   have it.

9   Q    So did you ever submit any documents to

10  Allied Mortgage?

11       A     I believe it was a verbal thing that

12  we -- they took information from us.

13  Q    And that was in March of 2008?

14       A     I can't -- it was in the beginning of

15  '08 some time.

16  Q    Well, according to the Tartamosa letter, he

17  said there were some conversations I guess in

18  March of 2008, right?  He worked on obtaining

19  financing for you, does that sound familiar?

20       A     As I said, I believe some time early

21  in 2008, March.

22  Q    So March 2008 was after the Jacobs deal

23  fell through, right?

24       A     I don't know.  And I don't know if it

25  was March.  I don't know if it could have been



Page 30

1   Q    Did they talk to you about reinstatement?

2        A    Oh, I don't remember.  I don't

3   remember.

4   Q    Do you know what reinstatement means?

5        A    I believe I understand the term now to

6   mean when you pay your -- you pay the arrears.

7   Q    Well, at some point in 2008 you learned

8   that you could reinstate the loan, didn't you?

9        A    I don't know when I learned that.  I

10  remember meeting with someone from GMAC at a --

11  at an event even.  We addressed these issues

12  there and we decided to go forward with a loan

13  modification, but I think that's the real -- the

14  real first time.  And it was not that long

15  afterwards, maybe it was July of August or

16  something like that.  I'm pretty sure 2008,

17  summertime, late summer maybe.

18  Q    And when you're talking about late summer,

19  are you referring to that meeting that you had

20  with GMAC?

21       A    Yes.

22  Q    At that point though why didn't you just

23  bring the loan current?

24       A    We did the loan modification.

25  Q    Well, you had the money to bring it



Page 31

1   current, right?

2        A    I believe we had enough money to bring

3   it current at that time.

4   Q    Well, why didn't you?

5        A    We did the loan modification.

6   Q    What were the terms of the loan

7   modification?

8        A    It was a reduced payment.  I don't

9   know how much, perhaps it's in your client's

10  files.  Maybe I should subpoena it and see if

11  they do have it.

12  Q    Who was the person you met with?

13       A    A fellow named Mark.

14  Q    Was it a face-to-face meeting?

15       A    Yes.

16  Q    Where?

17       A    I'm pretty sure that's who I met.  It

18  was -- let me think about that.  Let me think

19  about that, where was that?  It was at a public

20  space.  I don't remember if it was a hotel, if

21  it was a college.  I can't remember, a library.

22  It was some event that was sponsored by -- by an

23  organization.  I can't remember now.

24  Q    Was it a meeting that you had set up with

25  Mark or was he just randomly there?



Page 51

1        I would -- I would find if I found

2    something in the documents that didn't seem

3    right after close inspection, I guess that's

4    when I would know.  But I don't -- I don't have

5    anything at the moment.

6    Q    Let me ask it this way, you were there for

7    Miss Carter's deposition, right?

8        A    Uh-huh.

9    Q    You were there for the whole time, right?

10        A    Yes.

11    Q    And you heard me asking her pretty detailed

12    questions about this entire exhibit, didn't you?

13        A    I hate to say it, I didn't -- I heard

14    it, but I did not listen to it or correlate it

15    or process it.

16    Q    Let me ask it this way, you're aware that

17    the listing price for Matlack changed on a

18    number of occasions?

19        A    Yes.

20    Q    And you're aware that it actually

21    decreased?

22        A    Yes.

23    Q    Every time that there was a change, it

24    decreased, right?

25        A    I think so, yes.



Page 53

1   BY MS. HAGER:

2   Q    I'm showing you what was just marked as

3   Reed-11.  Do you recognize that document?

4        A    I don't recognize the document itself,

5   but I recognize the embodiment of an agreement

6   here that was made in the summer of 2008.

7   Q    So this document that was just marked as

8   Reed-11 is a Contract For Sale for 817 Matlack

9   and it's between Mrs. Reed and Mark Weaver.

10  Would you agree with me on that?

11       A    Yes.

12  Q    And the date of the agreement is August

13  25th, 2008, would you agree?

14       A    Yes.  It's on the document.

15  Q    Okay.  Now, what was the agreed upon sales

16  price?

17       A    I think it was a million eight, wasn't

18  it?  Where was it in the document.

19  Q    Sure.  On page 2, paragraph 6.

20       A    Yes.

21  Q    A million eight?

22       A    Yes.

23  Q    Okay.  And you agreed to sell Matlack for

24  that price, right?

25       A    I did.



Page 62

1   clarify some of this, I don't know how relevant

2   it is -- he was supposed to close on the 29th of

3   September and I believe he missed that

4   settlement.   Then he communicated with the title

5   company, I'm reading from my own e-mail, that he

6   was going to close, I guess four days later on

7   October 3rd and he didn't do it.

8        "I think he wanted to close by noon today,"

9   my e-mail says and my e-mail is dated or timed

10   at 2:00 in the afternoon.

11        And so he missed I think two closings,

12   September 29th and the one that he asked for to

13   be moved to the 3rd.   And then we entered into

14   this agreement.

15   Q    The addendum?

16        A    The addendum.

17   Q    And on the addendum it indicates that on

18   paragraph 3, numbered paragraph 3, a good faith

19   deposit was to be wired to Infinity Title Agency

20   by October 24th, 2008.   Did that happen?

21        A    It did.

22   Q    How much?

23        A    I don't know when it did.

24   Q    What was the amount of the good faith

25   deposit?



Page 63

1          A      $50,000.

2    Q    So was that deposited?

3          A      I believe it eventually was received.

4    Q    When you say eventually what do you mean by

5    that?

6          A      I don't know if it came on the 24th of

7    October.

8    Q    Okay.  But so that deposit was received by

9    you and your wife, right?

10         A      It went to -- well, it went to

11    Infinity Title.

12    Q    But it eventually went to you and your

13    wife?

14         A      Yes.

15    Q    And you retained that?

16         A      I did.

17    Q    Never gave it back?

18         A      Correct.

19    Q    Okay.  All right.  But he still didn't

20    settle on November 21st?

21         A      No.

22    Q    Right?

23         A      No, he did not.

24    Q    So what did happen on November 21st, 2008,

25    do you remember?



Page 64

1       A     The day that Mr. Cooper was supposed

2   to settle, on a Friday, I believe.

3   Q    What did happen on that day with respect to

4   Mr. Cooper?

5       A     He did not settle.

6   Q    Did you enter into a Lease Agreement With

7   Option to Purchase?

8       A     I believe the next morning we did.

9          MS. HAGER:  Okay.  Can we have this

10       document marked?

11          MR. REED:  A Lease Agreement With a

12       Purchase Option, I think that's what it was

13       titled.

14          MS. HAGER:  Can we have this marked as

15       14?

16

17                      *   *   *

18          (Whereupon, Exhibit Reed-14 was marked

19       for identification.)

20                      *   *   *

21

22          MR. REED:  Can I take one moment or is

23       there a question pending?

24          MS. HAGER:  Sure.  No.

25



Page 65

1                                 *   *   *

2              (Whereupon, a brief recess was taken.)

3                                 *   *   *

4

5    BY MS. HAGER:

6    Q    So when you and your wife entered into the

7    agreement with Mr. Weaver in August of 2008, did

8    he make a deposit at that time?

9         A    2008, November?

10   Q    No, the August agreement.  I'm looking at

11   Reed-11, that agreement says --

12        A    No.

13   Q    -- that he was to make a $50,000 deposit

14   upon the signing of the agreement?

15        A    He did not.

16   Q    Besides the $50,000 deposit that we talked

17   about before we went off the record, did he make

18   any other deposit prior to that?

19        A    No.

20   Q    Okay.  So showing you what was just marked

21   as Reed-14, you take a look at that and let me

22   know if you recognize that document?

23        A    It appears to be the Release Agreement

24   With an Option to Purchase.  It was drafted and

25   presented by Mr. Cooper to me.



Page 66

1   Q    And did you sign this agreement?

2        A    I did.

3   Q    Okay.  And what was the nature of this

4   agreement?

5        A    It was a lease.

6   Q    So he didn't settle on November 21st,

7   right?

8        A    Correct.

9   Q    That was supposed to have been his extended

10  closing date, right?

11       A    That is correct.

12  Q    And he did not have cash to close on that

13  day, so he didn't close, is that right?

14       A    That's correct.

15  Q    Okay.  So instead of bringing the cash to

16  closing, he presents you with this agreement and

17  basically says to you hey, I don't have the

18  money right now, I'm going to be getting it,

19  will you agree to lease the property to me while

20  I'm waiting on the money.  Is that the way it

21  happened?

22       A    That's correct.

23  Q    Okay.  So you agree to this arrangement

24  whereby Mr. Weaver is going to move into your

25  house and you guys are going to move out, right?



Page 67

1          A     I agreed to it.  My wife did not,

2     which is a matter of contention to this day.

3     Q    All right.  So he paid you $400,000 for the

4     option to purchase the property, right?

5          A     He did.

6     Q    All right.  And you actually did receive

7     that money?

8          A     I did.

9     Q    And it went into your mother's bank

10    account?

11         A     That's right.

12    Q    Okay.  But then your mother gave it to you,

13    so effectively you received it?

14         A     The reason that it went into my

15    mother's account, for the record, for whoever

16    looks at this in posterity, I did not trust

17    Mr. Cooper.  Mr. Cooper wanted to write a check

18    that night, he wanted to wire the money the

19    following week and we refused all those or I

20    refused those offers.  My wife never accepted

21    any of this.

22         And Mr. Cooper -- Mr. Cooper it turns out

23    had a bank account at the same bank my mother

24    had.  And the bank was open Saturday morning, he

25    wanted to move in by Monday.  He wanted to be in



Page 68

1   for Thanksgiving.  So the bank would do an

2   internal transfer from Mr. Cooper's account to

3   my mother's account.

4   Q    And so to your knowledge, did he, in fact,

5   move into the property?

6        A    Yes.

7   Q    Okay.  And according to this agreement,

8   Reed-14, he had agreed to pay you $25,000 a

9   month for rent on the first of each month.  Did

10  he make that payment for December of 2008?

11       A    He did, reluctantly.  And he -- shall

12  I tell you the source of the payment?

13  Q    Well, I just want to know if you received

14  it?

15       A    Yes.

16  Q    And it was a good check?

17       A    It was not a check.

18  Q    Okay.  It was cash?

19       A    It was wired from the $50,000 that was

20  deposited at the title company.  So the 50,000

21  that was eventually given, when was it September

22  or October -- he didn't give it upon the signing

23  of the contract, but then there was an addendum

24  that demanded it, he then put that money in with

25  the title company.



Page 69

1        So roll around December 1st, just days

2    after I move my family out, Mr. Cooper is due

3    the rent, according to the document he drafted

4    and proposed to me.  He doesn't pay it.  He

5    doesn't answer the calls.  He doesn't answer the

6    door.

7        So I don't remember at what point in

8    December, but he finally agrees when I tell him

9    you're not going -- I'm not going to ever

10    release the security deposit, we're going to

11    fight over that.  If you don't have the money

12    for the rent, you might as well release it from

13    the security deposit and get good use out of it,

14    which he did.

15    Q    So did he pay January 2009?

16        A    In the same methodology.

17    Q    Okay.  Out of the 50,000?

18        A    Yes.

19    Q    Leaving none of that money on deposit?

20        A    Correct.

21    Q    Then did he pay February 2009?

22        A    No.

23    Q    Did he make any payments thereafter?

24        A    No.

25    Q    Okay.  So eventually you had to evict him?



Page 70

1       A     Correct.

2   Q    But you did get from him the 400,000, which

3   you retained?

4       A     Correct.

5   Q   Okay.

6       A     Well, I didn't -- I retained it and

7   then I put it back on the house, by paying off

8   other liens.

9   Q    But you never gave it back to him?

10      A     Correct.

11  Q    You got him successfully evicted from the

12  property?

13      A     Yes.

14  Q    Okay.  Now, when you say you paid off other

15  liens, is that how you paid off the second

16  mortgage?

17      A     Part -- I believe part of that it

18  commingled at the time, but yes.

19  Q    What else did you use it for?

20      A     I thought there was another lien on

21  the property, I'm not sure.  I have to

22  investigate that.  I used the remainder plus

23  cash on hand.  I mean, we wound up living in a

24  hotel and facing more repairs on the property

25  that we were going to than I thought.



Page 71

1    Q    You mentioned that he wouldn't come to the

2    door.  Were you still in New Jersey?

3        A    I think Louise went to go look for him

4    or Dave Louis again.  I was at that point in

5    December he was -- we were in Virginia.

6    Q    All right.  Why didn't you use any of the

7    400,000 to pay down the arrearage to GMAC?

8        A    Because we no longer -- it was still

9    in the air.  They never sent me back the

10   agreement to finish -- to say what my new

11   payments were going to be.

12   Q    Did you ever call GMAC and say hey, I now

13   have the money to bring this current, what's the

14   status?

15       A    I believe that I did because I -- I'm

16   pretty sure I did because that's why I paid off

17   the second loan.

18   Q    So the agreement, the lease agreement with

19   Mr. Weaver was at one point extended until

20   August 1st, 2009, right?

21       A    Yes.

22   Q    Okay.  And you were okay with that, as long

23   as he was making his monthly rental payments?

24       A    Who wouldn't be?

25   Q    So when was it that you evicted Mr. Weaver?



Page 74

1    besides Louis Carter.

2    Q    But the offer is actually from Mr. and Mrs.

3    Roccisiano?

4        A    Yes.

5    Q    Who were using another agent at B.T. Edgar?

6        A    Yes.

7    Q    Naoji Moriuchi?

8        A    Yes.

9    Q    Their offer was for 1,300,000, right?

10       A    Yes.  I'm saying yes to the document.

11   I was just looking at the time the dates, yes.

12   I believe so, yes.

13   Q    And what is the date of this offer?

14       A    March 20th, 2010.

15   Q    Okay.  Did you accept this offer?

16       A    No, I don't think we did.

17   Q    Okay.  What was the listing price at this

18   time, do you remember?

19       A    I don't know if I'm reading this

20   right.  Again the only date on these things on

21   the MLS sheets that you showed Miss Carter in

22   her deposition reflecting price changes are on

23   the bottom and they say created date and

24   created:  A date and time, it appears 1,780,000.

25   Q    And notwithstanding what it shows on that



Page 80

1        Does that, the context of that message

2   sound familiar to you at all?

3        A    Yes.  We -- as I said, now that you're

4   talking about Kevin, I think these people were

5   moving from another state to New Jersey or

6   contemplating staying versus moving, something

7   of that nature.  Now -- now it's amazing how

8   this helps.  They proposed, they offered, I

9   didn't realize they re-offered and I must have

10  had a copy of a contract with various provisions

11  that we were contemplating.

12       Now, you mentioned rents even and things

13  like that, possibly contemplated even renting

14  the place to them I can't tell you for a fact,

15  but I'm hearing now and it sounds familiar.

16  Q    And the response to Mr. Aberant's e-mail

17  from Mr. Roccisano, the potential buyer, is

18  essentially that he's got to discontinue

19  negotiations because he's resuming an old

20  position in Louisville.

21       A    Okay.  I'm sorry my mind was still

22  thinking in a momentum like way about some of

23  this coming back.  Could you please say what you

24  said again?

25            MS. HAGER:  Can you read that back?



Page 81

```
 1                          *   *   *

 2              (Whereupon, the court reporter read

 3        back the previous testimony.)

 4                          *   *   *

 5

 6   BY MS. HAGER:

 7   Q    Does that sound familiar?

 8        A    I remember it wasn't us that stopped

 9   that contract.

10   Q    I'm sorry?

11        A    I remember although there wasn't an

12   agreement yet met, a meeting of the minds,

13   because I still had probably not yet locked

14   myself in the room to go review all the things

15   that they wanted, whatever those were, I now

16   recollect that the Roccisano's did not move

17   forward.

18   Q    But this was -- this was more than just an

19   offer.  You were really moving towards getting

20   close to an agreement, right?

21        A    It's nothing -- I mean, it's a more

22   detailed offer, but it's an offer none the less.

23   There were a lot of moving parts.  I mean, I'm

24   just remembering that now from what you're

25   saying here.  We had just evicted someone who
```



Page 87

1          MS. HAGER:  So I want to have marked

2     as Exhibit 19 an e-mail from Nina Singh to

3     Louise Carter.

4

5                         *   *   *

6          (Whereupon, Exhibit Reed-19 was marked

7     for identification.)

8                         *   *   *

9

10   BY MS. HAGER:

11   Q    So showing you what's been marked as

12   Reed-19, have you seen that before?

13        A    Yes.

14   Q    All right.  So that's an e-mail from Nina

15   Singh to Louise Carter that Louise Carter

16   forwarded to you on May 9th, 2011, right?

17        A    Yes.

18   Q    And this is an offer, a pocket -- excuse

19   me, it's an offer on a pocket listing.  Do you

20   know what that means?

21        A    I believe it means that Louise for

22   some reason it was not listed on the MLS at that

23   moment in time.

24   Q    What do you mean for some reason?

25        A    Well, maybe it had expired and we had



Page 88

1   not yet re-signed it.  I don't know why it

2   wasn't at that moment.

3   Q    So you got an offer when the house was not

4   on the market for 1.1 million, right?

5        A    Uh-huh.

6   Q    Is that a yes?

7        A    Yes.

8   Q    And what did you do in response to the

9   offer?

10       A    I believe -- I believe we -- when was

11  this?  May -- I think I talked to my attorney

12  about this offer.

13  Q    Did you accept it?

14       A    I could not.

15  Q    Why could you not?

16       A    Because the -- the matter was pending

17  in the Law Division with GMAC.  What was due or

18  not due was undetermined under the note and the

19  modification that was supposed to go through,

20  but didn't.  And that's why this woman said she

21  wanted to know about the dealings with the bank.

22  And if I'm not mistaken, the 1.1, you know,

23  wasn't enough to cover the note and commissions

24  and what they call the tax, millionaire's tax or

25  whatever the heck it is.  So it was financially,



Page 89

1   mathematically, I think a problem.  And also, it

2   was unresolved with GMAC as it had outstanding

3   litigation at that time.

4   Q    And she doesn't say anywhere in this e-mail

5   that the offer is what it is because of the

6   foreclosure, does she?

7        A    That's what Louise told me.

8   Q    Okay.

9        A    And she was her agent, just like

10  Mr. Moriuchi, Naoji Moriuchi.

11           MS. HAGER:  Can I have this marked as

12       20?

13

14                      *   *   *

15           (Whereupon, Exhibit Reed-20 was marked

16       for identification.)

17                      *   *   *

18

19  BY MS. HAGER:

20  Q    I'm showing you what was marked as Reed-20.

21  This is a credit report, the first page is a

22  cover letter from Brian Fleischer to your former

23  lawyer, Jeffrey Walters, enclosing the credit

24  report.  The cover letter is dated January 13th,

25  2012, but the credit report is dated November



Page 92

1   What was that TD Bank account for?

2           A       Probably one of my rental properties.

3   Q    Would you agree that you were past due with

4   that mortgage at some point?

5           A       I cannot -- I cannot agree.  I don't

6   know if this is accurate or not.  I don't know

7   what it is for sure, where it came from.  It

8   says Transunion, I don't know of the accuracy of

9   it.  Credit reports are known to be wrong.

10  Q    Okay.

11          MR. REED:  May I use the bathroom

12          again?  You mind?

13          MS. HAGER:  Sure.

14          MR. REED:  And here is -- do we need

15          the listing?

16          MS. HAGER:  You can just put them all

17          in a pile.  You can go off the record.

18

19                          *   *   *

20          (Whereupon, a brief recess was taken.)

21                          *   *   *

22

23  BY MS. HAGER:

24  Q    I think you had told me yesterday that your

25  mother's name is Georgiana, is that right?



Page 93

1        A    Yes.

2    Q    Is it Georgiana Leona Gardner?

3        A    Yes.

4    Q    Was there a time in 2008 that she wired

5    some money to Homecomings Financial on your

6    behalf?

7        A    I think that's the second mortgage

8    company.  I think that's the lien.  I think.

9    Q    The second mortgage on Matlack?

10        A    Yes.

11    Q    Okay.  Does it sound familiar to you that

12    the amount she wired was 167,000?

13        A    I don't remember.  I thought it was a

14    couple hundred thousand dollars.

15    Q    Okay.  So you testified about TD Bank and

16    Allied not making a loan on Matlack.  Were you

17    able to get other financing though on other

18    properties?

19        A    I think I said I think in 2008 I may

20    have re-fi'd some of my rental properties, but I

21    don't remember when.

22    Q    June 5th, 2008 sound familiar as to when --

23        A    Yeah.

24    Q    -- you had taken out a loan with TD Bank?

25        A    Could be, yeah.



Page 94

1    Q     For $665,000?

2          A     Sounds familiar, yes.

3    Q     Okay.  So it wasn't that TD wouldn't lend

4    to you at all, right?

5          A     That's correct.

6    Q     Now, this loan for $665,000 with TD in June

7    of 2008, when did you start the application

8    process for that loan?

9          A     I don't remember.

10   Q     You stated in your Interrogatory responses

11   in the Law Division case that you had satisfied

12   all of the lender requirements for the cash out

13   refinance referring presumably to TD and/or

14   Allied.  What were the lender requirements that

15   you had satisfied?

16         A     I don't remember answering that

17   question.  I don't remember answering in that

18   way.  Counsel may have prepared those with me.

19   I don't remember it at all.

20   Q     Well, what requirements did TD have?

21         A     I never knew whatever their

22   requirements would be.

23   Q     Did you think it's accurate to say as you

24   did in response to Interrogatory Number 15 that,

25   "You would have been able to sell Matlack Drive



Page 114

1    that?

2        A    It seems to be close to two million

3    dollars.

4    Q    And is that taking into account the

5    mortgage payments that you have not been making?

6        A    The mortgage payments that I have not

7    been making would not have been -- would not

8    have been my obligation.  As -- as is reality, I

9    would have taken the cash from the sale and

10   lived in a property mortgage free.  Your client

11   cannot claim credit for mortgage payments that

12   they caused the debt to run up against me when I

13   would have otherwise lived mortgage free.  They

14   caused the fact that this debt still rings month

15   to month to month on me.  It's an obligation.

16   Q    And could you not have mitigated your

17   damages at various points throughout the

18   process?  You could have brought the mortgage

19   current and you didn't, right?

20       A    Bringing the mortgage current does not

21   mitigate my damage.  It just transfers it from a

22   liability that accrues to a cash payment that I

23   would seek a refund for.

24   Q    In June of 2008 you had the ability to

25   bring the mortgage current, didn't you?



Page 115

```
 1        A     Yes.

 2   Q    And certainly in November of 2008 when

 3   Mr. Cooper made his payment, you definitely had

 4   the ability to bring the mortgage current at

 5   that point, right?

 6        A     That's correct.

 7   Q    Your wife didn't want to do that, did she?

 8        A     Say that again?

 9   Q    Your wife did not want to bring the

10   mortgage current, did she?

11        A     Because that did not solve the

12   impediment to selling the property.

13   Q    Can you answer the question?

14        A     I guess she didn't.  I can't remember

15   for sure.  I think you asked me that earlier and

16   I can't say if she did or did not.

17   Q    Well, did you want to bring it current?

18        A     Not without solving the impediment of

19   the foreclosure and the lis pendens relating to

20   it.

21             MS. HAGER:  Let's go off the record.

22

23                        *   *   *

24             (Whereupon, a brief recess was taken.)

25                        *   *   *
```

