1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-12020-mg

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  RESIDENTIAL CAPITAL, LLC, et al.,

9

10             Debtors.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14             United States Bankruptcy Court

15             One Bowling Green

16             New York, New York

17

18             August 26, 2014

19             10:01 AM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

1

2  (CC:  Doc# 7208) Adjourned Hearing RE:  ResCap Borrower Claims

3  Trust's Objection to Claim Numbers 283, 1353, 1696, 4692 and

4  6281 Filed by Patrick Lorne Farrell

5

6  (Doc# 7258)Adjourned Hearing RE:  Ally Financial Inc.'s Renewed

7  Motion for Entry of an Order Imposing Sanctions (related

8  document 7148)

9

10  (Doc# 7306)Hearing RE: ResCap Liquidating Trust's Motion to

11  Extend the Date by Which Objections toClaims Must be Filed

12

13  (Doc# 7305)Hearing RE:  Motion for Omnibus Objection to

14  Claims/Notice of ResCap Liquidating Trust's Seventy-First

15  Omnibus Objection to Claims (No Liability Claims) filed by

16  Douglas Mannal of behalf of ResCap Liquidating Trust

17

18  (Doc# 7221)Adjourned Hearing RE:  Motion for Objection to Claim

19  Number 2024/Notice of Objection of the ResCap Borrower Claims

20  Trust to Claim Number 2024 Filed by Irene Schmidt

21

22

23

24

25

1

2 (Doc# 7188)Adjourned Hearing RE:  Motion for Omnibus Objection

3 to Claims/ResCap Borrower Claims Trust's Sixty-Ninth Omnibus

4 Objection to Claims (No Liability Borrower Claims)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20 Transcribed by:  Hana Copperman

21 eScribers, LLC

22 700 West 192nd Street, Suite #607

23 New York, NY 10040

24 (973)406-2250

25 operations@escribers.net

```
 1
 2   A P P E A R A N C E S :
 3   MORRISON & FOERSTER LLP
 4         Attorneys for Post-Effective Date Debtors,
 5         ResCap Liquidating Trust and ResCap Borrower
 6         Claims Trust
 7         250 West 55th Street
 8         New York, NY 10019
 9
10   BY:   NORMAN S. ROSENBAUM, ESQ.
11         CRAIG A. DAMAST, ESQ.
12
13
14   KRAMER LEVIN NAFTALIS & FRANKEL LLP
15         Attorneys for ResCap Liquidating Trust
16         1177 Avenue of the Americas
17         New York, NY 10036
18
19   BY:   JOSEPH A. SHIFER, ESQ.
20
21
22
23
24
25
```

1

2   KIRKLAND & ELLIS LLP

3         Attorneys for Ally Financial, Inc. and Ally Bank

4         300 North LaSalle

5         Chicago, IL 60654

6

7   BY:   JUSTIN R. BERNBROCK, ESQ.

8

9

10  POLSINELLI PC

11        Attorneys for ResCap Borrower Claims Trust

12        900 Third Avenue

13        21st Floor

14        New York, NY 10022

15

16  BY:   DAN FLANIGAN, ESQ.

17

18

19  EDWARD TOBIAS, Party Pro Se

20

21

22

23

24

25

**6**

1

2   BRADLEY ARANT BOULT CUMMINGS LLP

3       Special Litigation and Compliance Counsel for the Debtors

4       Bank of America Corporate Center

5       100 N. Tryon Street

6       Suite 2690

7       Charlotte, NC 28202

8

9   BY:   CHRISTY W. HANCOCK, ESQ.(TELEPHONICALLY)

10

11

12   BURR & FORMAN LLP

13       Attorneys for Synovus Mortgage Corporation

14       420 North 20th Street

15       Suite 3400

16       Birmingham, AL 35203

17

18   BY:   VICTOR HAYSLIP, ESQ. (TELEPHONICALLY)

19

20

21

22

23

24

25

1

2  PALMER, LOMBARDI, & DONAHUE LLP

3      Attorneys for Mortgage Investors Group, Inc.

4      515 South Flower Street #2100

5      Los Angeles, CA 90071

6

7  BY:   ROLAND P. REYNOLDS, ESQ. (TELEPHONICALLY)

8

9

10  ALSO APPEARING (TELEPHONICALLY):

11      GREG W. CHAMBERS, ESQ., American Mortgage Law Group, P.C.

12      PATRICK FARRELL, Party Pro Se

13      NANCY K. LAYNE, Party Pro Se

14      MICHAEL MCGUINTY, Party Pro Se

15      JULIO PICHARDO, Party Pro Se

16      JOHN E. SATTERWHITE, JR., Party Pro Se

17      TIA D. SMITH, Party Pro Se

18

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, ET AL.                    8

1                      P R O C E E D I N G S

2           THE COURT:  All right.  Please be seated.

3           We're here in Residential Capital, number 12-12020.

4           Mr. Rosenbaum?

5           MR. ROSENBAUM:  Good morning, Your Honor.  Norm

6    Rosenbaum, Morrison & Foerster,for the ResCap Borrower Claims

7    Trust and the ResCap Liquidating Trust.

8           Your Honor, the first matter on the agenda is at page

9    7, III.  It's the objection to the claim of Mr. Farrell.

10          THE COURT:  All right.  Go ahead.

11          Mr. Farrell, are you on the phone?

12          MR. FARRELL:  Yes, I am.

13          THE COURT:  Thank you very much.

14          MR. FARRELL:  Good morning.

15          THE COURT:  Good morning.  Go ahead, Mr. Rosenbaum.

16          MR. ROSENBAUM:  Your Honor, this is an objection to

17   several proofs of claim filed by Mr. Farrell, claims number

18   283, 1353, 1696, 4692, and 6281.  I would add that these claims

19   came in both official and unofficial forms, but they were each

20   docketed by KCC's claims.

21          The objection is supported by the declaration of

22   Lauren Delehey, a litigation counsel at the ResCap Liquidating

23   Trust.  And also with us today on the phone is Christy Hancock

24   of Bradley Arant as cocounsel.

25          For the reasons that we've set forth both in the

1   objection and our reply that was filed at docket number 7409 we

2   believe that Mr. Farrell has not satisfied his burdens and each

3   of the claims should be dismissed with prejudice.

4          Your Honor, we laid out the facts in both the

5   objection and the reply.  I'm happy to walk through them if

6   Your Honor has any specific question as to those facts.

7          THE COURT:  Let me hear from Mr. Farrell.

8          Okay.  Mr. Farrell, go ahead.

9          MR. FARRELL:  Well, Your Honor, this case is ten years

10  old, and I've got a speech here of about ten minutes.  Is that

11  okay?  But aft --

12         THE COURT:  No, I'm not going to let you go on for ten

13  minutes, but go on.  Let me hear your arguments.

14         MR. FARRELL:  Okay.  I'm seeking payment of my 400,000

15  dollar UCC-1 lien, because I was a victim of mortgage fraud and

16  suffered a needless seven-year foreclosure case by GMAC in

17  retaliation for stating the truth, the facts, and the law.  The

18  law says triple my 100,000 dollars of cost to build this home

19  and add fees, and that's 400,000.

20         In 2004 I began the process by depositing 20,000

21  dollars with Busey Bank.  In 2005 that 20,000 dollars was

22  stolen at the closing table by Countrywide.  At the closing

23  table I was told the 20,000 was for other costs that came up,

24  which is fraud, that my house was appraised for 465,000 dollars

25  for a 280,000 dollar note, which is fraud in the inducement,

RESIDENTIAL CAPITAL, LLC, ET AL.                    10

1    that if I did not sign the papers they would sell my home to

2    another, which is duress.  Fraudvitiates a contract per UCC

3    Section 3-305.

4            In 2006 the --

5            THE COURT:  Mr. Farrell?

6            MR. FARRELL:  --Leibowitz case --

7            THE COURT:  Mr. Farrell?

8            MR. FARRELL:  --that I submitted that they're talking

9    about here in Florida.

10           THE COURT:  Mr. Farrell, let me just interrupt you.

11   Mr. Farrell, let me --

12           MR. FARRELL:  Mart Leibowitz was granted money damages

13   and awarded sanctions for fraudulent signing of affidavits of

14   indebtedness by GMAC, who was told to cease and desist from

15   doing this in the future, but they ignored the court order and

16   continued, especially against me.

17           In 2007 GMAC illegally increased my payments of 2,000

18   a month to 2,700.  Then I filed a lawsuit in November, 2007

19   asking for the return of my hundred thousand dollars and GMAC

20   refused.

21           In December, 2007 GMAC filed foreclosure knowing of my

22   TILA, RESPA, and other fraud claims without any note or

23   mortgage or assignment and with a lost note affidavit.  That

24   right there voids standing, as the note was never in their

25   hands or the Trust.

RESIDENTIAL CAPITAL, LLC, ET AL.                    11

1          In April of 2008 GMAC made a false assignment of

2    mortgage, and held onto it till they got a note.

3          In November, 2008, a year after they filed their case,

4    GMAC mysteriously found the formerly lost note and filed a

5    note, the assignment into the case.

6          In January, 2009, which is thirteen months after the

7    case was filed, both documents were made by infamous rebel

8    signer Jeffrey Stephan three years after the Trust closed,

9    thereby voiding standing.  Period.  And just recently the

10   Second and Fourth District Court of Appeals here in Florida

11   repeatedly reversing and remanding summary judgments of

12   foreclosure for the reasons that I've been stating for years:

13   lack of standing due to the longstanding principle of not

14   having the necessary papers to show status as owner and holder

15   in due course, not just the holder, of both the note and the

16   mortgage.  Four concerns, and all of them ignored by GMAC.

17         Summarily, Your Honor, that says it all, voiding a

18   seven-year dispute.  Here in Florida the Courts of Appeals have

19   recently reversed for lack of standing several cases.  In

20   September of 2013 you got Deborah Focht v. Wells Fargo.  In

21   July of 2014 you got LaFrance v. U.S. Bank, noting Focht.  July

22   of 2014, Olivera v. Bank of America, noting Focht.  And August

23   of 2014, just a few days ago, Benz v. Federal Home Loan 2D13-974,

24   noting Focht again.

25         Obviously the tide has turned in favor of Florida law

RESIDENTIAL CAPITAL, LLC, ET AL.                    12

1   instead of New York Wall Street fraud.  The Courts simply are

2   saying that these cases filed without proper papers get

3   reversed, and so it means that it -- the foreclosure case is

4   completely unnecessary.

5           I mean, I could keep going, but I, you know, I've been

6   a whistleblower for years, and I've successfully stated facts.

7   In 1997 I filed a qui tam against the Hare Krishna cult that

8   cost them 25 million dollars, and I put several people in jail,

9   and I was awarded a 40,000 dollar spine surgery by a man named

10  Howard Solomon of Humana provided that I drop my federal

11  lawsuit, which I did.

12          And on the day Obama took office I filed a forty-four-

13  page racketeering lawsuit qui tam against the United States

14  Congress and the Treasury and the banks and the State of

15  Florida, and I was right about everything concerning bank fraud

16  and foreclosures.  In 2010 the United States Attorney's office

17  used that qui tam and made their own qui tam with Lynn

18  Szymoniak versus all the banks and stated summarily that 3,500

19  trusts, including the trust that I'm involved with, were empty.

20  They had -- the notes and mortgages were not put into the

21  trusts properly, and she was awarded eighteen million dollars

22  for her claims, which are the exact same as mine years after,

23  and I'm only asking for 400,000 dollars.

24          Counsel's argument uses MERS v. Azize from 2007, which

25  is mentioned on page 6 of the Florida Foreclosure Bench Book of

RESIDENTIAL CAPITAL, LLC, ET AL.                    13

1    2010, and all those cases have been overturned by the Florida
2    Supreme Court with Rule 1.110(b) and Florida statute 702.105,
3    requiring verification and current case law in the DCA.
4         The 7,128 dollars mentioned came from GMAC, not me.
5    They said that there was an overage of escrow, and they were to
6    return it to me.  That came from them, not me.  The 20,000
7    dollar difference on the two banknotes is clear.  It's simple
8    fraud.
9         Ocwen bought GMAC's paper for three cents on the
10   dollar of a 300,000 dollar note, or 9,000 dollars, which is
11   only names and account numbers, not equity, and they're trying
12   to say a debt of 450,000 dollars exists, all based on fraud in
13   a home worth 200,000 dollars.
14        THE COURT:  Mr. Farrell, let me ask you this.  As I
15   understand it, Pinnacle Financial Corporation originated your
16   mortgage in October of 2005.  Am I correct on that?
17        MR. FARRELL:  Yes, sir.
18        THE COURT:  And it was my understanding -- it is my
19   understanding that GMAC began servicing the loan in March,
20   2006.
21        MR. FARRELL:  Correct.
22        THE COURT:  So part of what you're complaining about
23   relates to the origination of your loan.  On what basis do you
24   believe you have origination claims against GMAC when the loan
25   was originated by Pinnacle Financial Corp.?

1       MR. FARRELL:  Well, it appears that Countrywide was
2  the -- Pinnacle was a strawman lender for Countrywide, which I
3  started paying immediately for about six months.  And it's my
4  understanding that either successor to liability or the fact
5  that what --it appears thatCountrywide never forwarded the
6  loans into the Trust according to Linda DeMartini, who is a
7  whistleblower, who a few years ago said this, that the loans
8  never went into the Trusts, and the fact that these assignment
9  of mortgagor years after the Trust closed proves that, along
10 with the attorney general's lawsuit.  If the loan never went
11 into the Trust GMAC has no right to simply take names and
12 account numbers and claim that it's in the Trust and then take
13 mortgage payments.
14       THE COURT:  Mr. Farrell?
15       MR. FARRELL:  And file a foreclosure.
16       THE COURT:  Mr. Farrell, there's no relationship
17 between Countrywide and any of the debtors.  If you're saying
18 that Pinnacle originated the loan somehow for the benefit of
19 Countrywide, how do you connect any of the debtors to that?
20       MR. FARRELL:  Well, I was making -- my first payment
21 went to Pinnacle.  Then I paid Countrywide for about five or
22 six months, and then GMAC sent me a letter saying to pay them
23 from now on.
24       THE COURT:  So they became --
25       MR. FARRELL:  So I went from Countrywide to GMAC.

RESIDENTIAL CAPITAL, LLC, ET AL.                    15

1          THE COURT:  Yes, but GMAC became the loan servicer, as

2   I understand it from reading all the papers, on March 9, 2006.

3          MR. FARRELL:  Right.

4          THE COURT:  And continued servicing the loan until it

5   was -- the servicing rights were transferred to Ocwen on

6   February 15, 2013.  You referred to GMAC selling the loan to

7   Ocwen, but I've seen nothing to establish that.  What GMAC did

8   during the course of this bankruptcy case was sell its

9   servicing platform to Ocwen, and Ocwen continued servicing the

10  loans.

11         MR. FARRELL:  Right.

12         THE COURT:  You --

13         MR. FARRELL:  But --

14         THE COURT:  Go ahead.

15         MR. FARRELL:  Well, one of the problems, Your Honor,

16  is I think that's all just superficial fraud in the sense that

17  if I say GMAC sold it, and if I am incorrect and Ocwen bought

18  it, then it's just semantics, but the fact of the matter is

19  Pinnacle went out of business in January of 2008 or -- yeah,

20  2008, and the assignment of mortgage from Pinnacle to GMAC was

21  four months later.  How can they assign something they don't

22  own from a company that doesn't exist?  And then they held onto

23  that assignment of mortgage until they got a copy of the note,

24  and then filing the case a year later.  That doesn't enjoin

25  jurisdiction.  They don't have standing if they don't have the

1  proper paperwork to file a case.

2        And these arguments and this moratorium on

3  foreclosures for two years and all the attorney generals

4  arguing about this for years resulted in a twenty-five billion

5  dollar fine, which is a slap on the wrist, but the arguments

6  all have come down and out to after all these years the Second

7  and Fourth District Court of Appeals was saying sorry, these

8  foreclosure cases that were filed with the lost note affidavit

9  have no standing.  And --

10        THE COURT:  Are you saying --let me --

11        MR. FARRELL:  -- you can't create --

12        THE COURT:  May I ask you this?

13        MR. FARRELL:  -- standing retroactively.

14        THE COURT:  May I ask you this?  You --

15        MR. FARRELL:  And in my January, 2009 forty-four page

16  racketeering lawsuit I said that.  Lost note affidavits are a

17  fraud.  Everything from Countrywide's a fraud.  The foreclosure

18  cases are fraud, because they're based on fabrication and lack

19  of standing.  Your Honor, that was five and a half years ago.

20  And I got a high school education.  If I know that everybody

21  else has got to know that, and everybody, you know, when they

22  sat down and discussed it, agreed with me.

23        THE COURT:  You refer to --

24        MR. FARRELL:  Your Honor, I've been right about

25  everything, even, you know, I may not have the credentials, but

RESIDENTIAL CAPITAL, LLC, ET AL.                    17

 1  I think I do.  I'm the guy that bankrupted Hare Krishna cult,

 2  and my accusations helped bankrupt GMAC.

 3          THE COURT:  May I ask you this?  You refer to a -- is

 4  it the lost note affidavit that you say Mr. Stephan signed?

 5          MR. FARRELL:  I'm sorry?

 6          THE COURT:  You referred to Mr. Stephan having signed

 7  something.  Could you just tell me again what it is that he

 8  signed?

 9          MR. FARRELL:  Yes.  Well, in 2006 GMAC was sanctioned

10  for signing affidavits of indebtedness fraudulently, and then

11  in the State of Maine Federal Mortgage --

12          THE COURT:  Mr. --

13          MR. FARRELL:  -- Federal National Mortgage

14  Association --

15          THE COURT:  Mr. Stephan --

16          MR. FARRELL:  -- v. Nicolle Bradbury --

17          THE COURT:  Mr. Stephan --

18          MR. FARRELL:  -- and GMAC, there was a court -- four

19  court orders where the judge referred to Jeffrey Stephan

20  continuing to sign these fraudulent affidavits of indebtedness

21  outside the presence of a notary, you know, where the term

22  robo-signing came up.  And she cited the Martin Leibowitz case

23  in 2006 saying you were told years ago stop doing this.  You

24  didn't stop doing this.  And I'm going to continue to sanction

25  you.

RESIDENTIAL CAPITAL, LLC, ET AL.                    18

1          THE COURT:  Mr. Stephan?

2          MR. FARRELL:  Jeffrey Stephan here in this case signed

3   a assignment of mortgage outside the presence of a notary.  It

4   was signed on April 1, 2008.  And if you go into the attorney

5   general's Lynn Szymoniak lawsuit they mention that these robo-

6   signed documents and affidavits were signed in big blocks,

7   thousand block -- a thousandtimes blocks.

8          And they mentioned April 1, 2008 as being a block of

9   assignments that were signed by Jeffrey Stephan in Broward

10  County, Florida.  And then in May of 2008, a month later, he

11  signed an affidavit of indebtedness, and, again, he's making

12  claims he doesn't know about.  He's not stating any of my

13  claims that were made first about the mortgage fraud and the

14  amounts of money being incorrect on his affidavit.  But on his

15  assignment of mortgage in April, 2008 he says he is a MERS vice

16  president, and then a month later he says he is GMAC's limited

17  signing officer.  So he's acting on behalf of the grantor and

18  the grantee.  And this, again, is what the attorney general

19  agreed with that this is wrong.  And these are violations of

20  state and federal law, so everybody that's allowing this to

21  happen is guilty of misprision of a felony.

22         THE COURT:  Mr. --

23         MR. FARRELL:  They're allowing this stuff to happen

24  and just saying well, you know, writing fraud-based debt paper

25  is -- becomes money if you submit it to the right federal

RESIDENTIAL CAPITAL, LLC, ET AL.                    19

1  reserve.

2           THE COURT:  Mr. Farrell?

3           MR. FARRELL:  Now --

4           THE COURT:  Mr. Farrell, stop.  Stop.  You've got to

5  take a breath, because when you're speaking you obviously don't

6  hear me trying to ask you question, so you --

7           MR. FARRELL:  Sorry.

8           THE COURT:  You need to pause.  I want to make sure I

9  understand your arguments.  I've read all the papers, but I

10 want to make sure I understand all the arguments.

11          In December, 2007 Wells Fargo commenced a foreclosure

12 action in state court, not GMAC.  Is that correct?

13          MR. FARRELL:  Well, Your Honor, it appears that GMAC

14 did, because in their proof of claim, you know, it --

15 definitely filed a case.  They got a summary judgment, and they

16 filed bankruptcy.  They filed a proof of claim saying send

17 whatever money to an address which is GMAC's, and it's the same

18 address that Ocwen's using.

19          THE COURT:  Who was --

20          MR. FARRELL:  So it's not --

21          THE COURT:  Who was the plaintiff?

22          MR. FARRELL:  -- Wells Fargo.

23          THE COURT:  Who was the plaintiff in the foreclosure

24 action?

25          MR. FARRELL:  It says Wells Fargo, as trustee under

 1    the pooling and servicing agreement relating to Impac Secured

 2    Assets 2005 Mortgage Pass-Through Certificates.

 3            THE COURT:  All right.  Let me ask you this, because

 4    as I understand it Wells Fargo was granted summary judgment in

 5    March of 2009.  You appealed to the Second District Court of

 6    Appeals in -- with the consent of yourself and Wells Fargo the

 7    foreclosure judgment was vacated.  Am I correct on that?

 8            MR. FARRELL:  Yes.

 9            THE COURT:  Why was it vacated?

10            MR. FARRELL:  I don't know.  Ask them.  Actually, I

11    think part of it was because I filed a federal lawsuit against

12    the judge in Wells Fargo, and part of the request was if you

13    drop the federal lawsuit we'll vacate the summary judgment.

14    And I said okay.

15            THE COURT:  All right.  Is it correct that Wells Fargo

16    obtained a foreclosure judgment against you in April, 2014, and

17    that's on appeal currently?

18            MR. FARRELL:  I believe -- well, it's hard for me to

19    say, Your Honor.  It appears that Ocwen Loan Servicing did.

20    But here's an odd thing, Your Honor, that I want to mention.

21    All these several years the alleged plaintiff is Impac Secured

22    Assets 2005-2.  When they filed a summary judgment they filed

23    an affidavit with it, and they said "Pay to the order of Impac

24    Mortgage Holdings 2005-6.  Your Honor, that's a different trust

25    altogether.  And if you look in my documents that I submitted,

1    you go through at the beginning, there's two notes.  There's

2    two assignments of mortgage.  There's two loan numbers.

3    There's two different amounts of money.  And it seems to me

4    that they created a stream of income from the note and a stream

5    of income from the mortgage.

6            And on top of that, when I signed the closing papers I

7    signed a set of papers while I was in Colorado, and then when I

8    came back to Florida the mortgage broker said well, we got to

9    do it all over again.  So now we got two sets of mortgage

10   documents, two notes, two trusts, two loan numbers.

11           THE COURT:  All right.  Anything else you want to add,

12   Mr. Farrell?

13           MR. FARRELL:  No, Your Honor.  Just either pay a claim

14   or give me the house free and clear.  I mean --

15           THE COURT:  All right.

16           MR. FARRELL:  I paid for it.  I live here.  I bought

17   it with my own equity.  And paper shufflers don't deserve

18   anything as far as I'm concerned.

19           THE COURT:  Do I understand you're still in possession

20   of the home?

21           MR. FARRELL:  I'm sitting in it, Your Honor.

22           THE COURT:  Okay.  When is the last mortgage payment

23   you made?  When did you do that?

24           MR. FARRELL:  July of 2007.

25           THE COURT:  Okay.  All right.

1      Mr. Rosenbaum, you want to go ahead and respond?  And

2  specifically tell me what it is that Mr. Stephan did.  We've

3  had issues about Mr. Stephan arise in this courtroom before,

4  and I'm aware of the serious allegations of robo-signing by Mr.

5  Stephan.

6      MR. ROSENBAUM:  Your Honor, I believe what transpired

7  in Mr. Farrell's case was an affidavit signed by Mr. Stephan.

8      THE COURT:  While he was an employee of GMAC?

9      MR. ROSENBAUM:  Yes.  Yes.  Ms. Hancock can elaborate

10  on that.

11      And there was an agreement, which Mr. Farrell agreed

12  to, to withdraw the foreclosure that was obtained, consolidate

13  his state court action that he filed prior to the foreclosure

14  and the foreclosure in one proceeding, and it proceeded --

15      THE COURT:  Is that why the first foreclosure judgment

16  was vacated?

17      MR. ROSENBAUM:  May I defer to Ms. Hancock?

18      THE COURT:  Yes.  I'd like to know the answer.

19      MS. HANCOCK:  Good morning, Your Honor.  This is

20  Christy Hancock at Bradley Arant.

21      Yes, Mr. Rosenbaum is correct.  There was a global

22  agreement with Mr. Farrell in the fall of 2010.  He had the

23  allegations that you've run through regarding the Jeff Stephan

24  affidavit that was the basis of the original judgment in the

25  case.  He also, at that point in time, had a variety of other

RESIDENTIAL CAPITAL, LLC, ET AL.                    23

1    suits against GMAC and the investor that were in state court,

2    federal court, and, if memory serves, Your Honor, also some

3    bankruptcy cases.  And as part of an agreement to winnow down

4    all of the claims and to consolidate them into one case part of

5    our agreement was to vacate that judgment and, essentially,

6    start back at square one with the foreclosure.  And Mr. Farrell

7    consented to that and also agreed at the time to dismiss his

8    other federal cases and his bankruptcy cases so that we could

9    proceed in one consolidated case at that time in 2010.

10           THE COURT:  And tell me what happened after that?

11           MS. HANCOCK:  We then proceeded with the state court

12   case that was a consolidation of Mr. Farrell's suits.  He

13   proceeded to amend that suit several times.  We ended up with

14   the fifth amended complaint.

15           GMAC was servicing the loan.  The servicing then

16   transferred to Ocwen.  Ocwen, on behalf of the investor, who

17   was the plaintiff in the case, pursued summary judgment on all

18   of the claims.  And Mr. Farrell also, in 2013, filed another

19   federal suit that named GMAC, Ocwen, Wells Fargo, Bank of

20   America, the State of Florida, a variety, and so we also dealt

21   with the claims in the federal forum.  And they culminated in

22   the summary judgment in the state case in April of 2014, and

23   actually we have also obtained a dismissal of all of his claims

24   in the federal suit.  It just came down last week, Your Honor.

25           THE COURT:  Is there a written order on that?

1        MS. HANCOCK:  Yes, Your Honor, there is.  And we've

2    provided it to Morrison & Foerster.

3        THE COURT:  Mr. Rosenbaum, has that been put on the

4    docket?

5        MR. ROSENBAUM:  It hasn't.  It came down on the 22nd.

6    We have copies.

7        THE COURT:  Mr. Farrell, now I'm not sure about how to

8    pronounce your name.  Is it Farrell or Ferel (ph.)?

9        MR. FARRELL:  Farrell.

10       THE COURT:  Okay.  Do you have a copy of the recent

11   order from the federal court?

12       MR. FARRELL:  Yes.  It was mailed to me the other day.

13   It's pretty extensive.There's several orders, because it's

14   convoluted and long.

15       THE COURT:  Okay.  I haven't seen it.  I just wanted

16   to be sure that -- before it's given to me I want to be sure

17   you have a copy of it.

18       MR. FARRELL:  Yes, sir.

19       THE COURT:  Okay.  You want to hand a copy up, Mr.

20   Rosenbaum?

21       MR. ROSENBAUM:  Sure.

22       THE COURT:  And I'd like it filed on the docket, a

23   copy of it filed on the docket.

24       Thank you.

25       MR. FARRELL:  If I may?

1          THE COURT:  Just let me look at it a minute, Mr.

2    Farrell, okay?

3          MR. FARRELL:  Yup.

4          THE COURT:  All right.  It's going to take me some

5    time to go through it, but I'm going to take this under

6    submission in any event.

7          But, Mr. Farrell, you want to respond?  Go ahead.

8          MR. FARRELL:  Well, I'm a pro se, and these people

9    down here hate me.  I've been suing them, the judges and

10   attorneys and law firms and the state attorney, because they

11   aided and abetted the Hare Krishna religious cult.

12         Without going into great detail, the Hare Krishnas are

13   rich, and the people down here serve the rich.  Period.  As a

14   pro se they're not going to give me any slack --

15         THE COURT:  Mr. Farrell?

16         MR. FARRELL:  --whatever.

17         THE COURT:  Mr. Farrell?

18         MR. FARRELL:  And the courts down here --

19         THE COURT:  I got enough problem --

20         MR. FARRELL:  -- are not Article III injured party

21   jurisdiction.  They're Article I corporate franchise courts

22   collecting whole life insurance premiums to pay the Federal

23   Reserve interest.  So they're not interested in what most

24   people would think is justice.

25         But I would just respond that the appeals courts have

RESIDENTIAL CAPITAL, LLC, ET AL.                    26

1    repeatedly said that these foreclosure cases have no standing.

2    So regardless of my claims for damages, the other side of it is

3    that the parties, Wells Fargo and GMAC, don't have standing to

4    bring these foreclosures when I've alleged, and, I think,

5    properly, that the note was discharged in the American Home

6    Mortgage bankruptcy cases where Deutsche Bank was a major

7    creditor and Wells Fargo and GMAC were debtors.  And they had

8    to pay Deutsche Bank for representation and warranties which

9    were breached in the origination of the loans like we have in

10   this case.

11          THE COURT:  Mr. Farrell, I --

12          MR. FARRELL:  And Impac Secured Assets was an

13   unsecured creditor in that case.  If they're unsecured then

14   there's no mortgage attached.

15          THE COURT:  Mr. Farrell, did you argue in the state

16   court that Well -- look.  I think you agreed with me, from what

17   I've read, Wells Fargo succeeded in obtaining summary judgment

18   for foreclosure in, I guess, it was either April or May of

19   2014.  Did you raise the argument in that case that Wells had

20   no standing?

21          MR. FARRELL:  Absolutely.

22          THE COURT:  Okay.

23          MR. FARRELL:  But the --

24          THE COURT:  And your -- you've --

25          MR. FARRELL:  The lower courtsare --go ahead and

1    granting them because ahigh-ranking attorney down here told

2    me -- I sat down to talk with him.  He said the agenda is to

3    move the business along and foreclose regardless of the

4    situation, and then it weeds out a lot of people in the appeals

5    process.  He said as you go through the appeals process they're

6    reversing these summary judgments, Your Honor.

7              THE COURT:  Okay.  But --

8              MR. FARRELL:  So it's a way to just move the business.

9    I mean, they've been jerking around with me for seven years,

10   and I'm the kind of guy that they want to get rid of --

11             THE COURT:  But Mr. --

12             MR. FARRELL:  --because of my history here.

13             THE COURT:  Mr. Farrell, I don't --

14             MR. FARRELL:  I mean, when --

15             THE COURT:  I don't get to review state court

16   judgments.  And, I mean, you've taken an appeal, and that'll go

17   forward.

18             I'm going to take this matter under submission.  So

19   I've got all the papers.  I read everything.  I've just been

20   handed these two orders, the opinion and the separate order,

21   and Mr. Farrell's indicated he has --

22             MR. FARRELL:  Right.

23             THE COURT:  -- a copy of it.  So I'm going to take it

24   under submission.

25             Thank you very much, Mr. Farrell.

RESIDENTIAL CAPITAL, LLC, ET AL.                    28

1          MR. FARRELL:  Thank you, sir.

2          THE COURT:  Okay.

3          MR. FARRELL:  Have a good day.

4          THE COURT:  Thank you.

5          MR. ROSENBAUM:  The next matter on the agenda is at

6    IV.  We're still on page 7.  This is the motion of Ally

7    Financial for an order imposing sanctions.  And I'll cede the

8    podium to counsel for Ally.

9          THE COURT:  Okay.

10         MR. BERNBROCK:  Good morning, Your Honor.  Justin

11   Bernbrock of Kirkland & Ellis on behalf of Ally Financial, Inc.

12   and Ally Bank.

13         THE COURT:  Do I put this in the category of Ally

14   can't take yes for an answer or what?

15         MR. BERNBROCK:  I'm sorry, Your Honor.  Say that

16   again.

17         THE COURT:  Do I put this motion in the category of

18   Ally doesn't want to take yes for an answer?  You understand

19   what I'm saying?

20         MR. BERNBROCK:  We're happy to take -- if by your

21   question you mean granting the order, we're happy to --

22         THE COURT:  No, I don't mean that at all.  I think you

23   know exactly what I mean.

24         MR. BERNBROCK:  Your Honor, there are two reasons why

25   Ally wants this order entered.  The first, and if I might

1    provide Your Honor with a bit of good news.

2              THE COURT:  Well, the good news is that the California

3    case has been dismissed, right?

4              MR. BERNBROCK:  Yes, Your Honor.

5              THE COURT:  Which was what you set out to accomplish.

6              MR. BERNBROCK:  Yes, Your Honor.  The other good news

7    is that there are a host of other cases which we have not had

8    to bring before Your Honor, because plaintiffs across the

9    country are recognizing the force of this Court's orders and

10   the orders entered with respect to Mr. Lahrman, Mr. Mustafanos,

11   and in this matter.

12             THE COURT:  Well, look.  I've written several opinions

13   enforcing the third-party release for the benefit of Ally.  And

14   if people are ignoring it I will hear from you.  But this issue

15   here is whether sanctions should be awarded against the law

16   firm that waited too long in finally dismissing the case.

17   That's the issue.

18             I guess the other issue is when you originally filed

19   the motion I granted it in part and denied it in part, because

20   the sanctions request wasn't properly supported.  I certainly

21   gave your firm the opportunity to renew the motion, which was

22   done.  Today was the day scheduled for a hearing, but certainly

23   before today the relief that you were seeking, namely the

24   dismissal of the California action, was accomplished.

25             So the issue for me is whether the intervening event

1  of the dismissal of the California action should impact my

2  ruling on whether now that you have a properly supported

3  sanctions motion whether I should grant it or conclude that the

4  intervening event of the dismissal, which I had ordered the

5  parties to do, whether that should obviate the need for the

6  sanctions and support for the sanctions.  But I'll let you

7  argue briefly.

8          MR. BERNBROCK:  Your Honor, it should not.  The event

9  of dismissal should not preclude entry of the order awarding

10  sanctions.  Ally incurred those costs to pursue that motion,

11  which the Court granted, and those costs are spent at this

12  point.  The only way for Ally to recover those costs is for

13  entry of this order today.

14          THE COURT:  I think several written decisions that

15  you've obtained along the way have, I assume, been of

16  significant benefit to Ally in tamping down other similar

17  lawsuits.

18          MR. BERNBROCK:  Absolutely, Your Honor.

19          THE COURT:  All right.  Let me take the matter under

20  submission.

21          MR. BERNBROCK:  Thank you, Your Honor.  May I be

22  excused?

23          THE COURT:  You can.

24          MR. BERNBROCK:  Thank you, Your Honor.

25          THE COURT:  Thank you.  I should ask, anybody wish to

1   be heard on the other side?  My understanding is they weren't

2   going to appear.  Is anybody appearing in connection -- this is

3   in connection with the California litigation claimants.

4   Anybody appearing for the other side?

5          MR. BERNBROCK:  Your Honor, on July 21st we received

6   correspondence from counsel indicating that they would not

7   contest this matter.

8          THE COURT:  Okay.

9          MR. BERNBROCK:  Thank you, Your Honor.

10         THE COURT:  Thank you.  Just hand on a second, Mr.

11  Rosenbaum.

12         Go ahead, Mr. Rosenbaum.

13         MR. ROSENBAUM:  Your Honor, the next matter on the

14  agenda is at page 7, V, the motion of the ResCap Liquidating

15  Trustto extend the date by which objections toclaims must be

16  filed.

17         THE COURT:  Yes.

18         MR. ROSENBAUM:  And I will cede the podium to Mr.

19  Shifer from Kramer.

20         THE COURT:  Okay.  Thank you.

21         MR. SHIFER:  Good morning, Your Honor.  Joseph Shifer

22  of Kramer, Levin, Naftalis & Frankel on behalf of the ResCap

23  Liquidating Trust.

24         Your Honor, this matter is the Liquidating Trust's

25  motion to extend the claims objection deadline.  The motion was

1   filed on July 25, 2014.  It's at docket number 7306.  In

2   support of the motion the Liquidating Trust submitted the

3   declaration of Deanna Horst, the Liquidating Trust's chief

4   claims officer.  Ms. Horst is in the courtroom if Your Honor

5   has any questions for her.

6          Your Honor, although the plan provided that the claims

7   objection deadline can be extended without notice to any party,

8   out of an abundance of caution and in consultation with

9   chambers the Liquidating Trust elected to file a motion on

10  presentment and gave ten days notice of the presentment.  And

11  because service was an issue that was raised in some of the

12  objections, if I can just give you a little bit of the history

13  of the service?

14         THE COURT:  Please address that, yes.  Go ahead.

15         MR. SHIFER:  Pardon me?

16         THE COURT:  Yes, please.  Go ahead.

17         MR. SHIFER:  Your Honor, the motion was served on the

18  special and general service lists as well as the holders of all

19  disputed claims.  KCC, the Liquidating Trust noticing agent,

20  filed an affidavit of service indicating that all of these

21  parties were served via first class mail on July 25th.  That

22  was filed at docket number 7341.

23         On August 4th, because an objection to the motion was

24  filed, we filed on the docket a notice of the hearing.  That's

25  at docket number 7346.  KCC served that notice on all the

1   parties that received notice of the motion, and that affidavit

2   of service, Your Honor, is at docket number 7362.

3           In addition, Your Honor, there are two supplemental

4   affidavits of service that were filed by KCC at docket numbers

5   7391 and 7420.  Those are for addresses for which the post

6   office alerted KCC that there's a forwarding address associated

7   with that address.  And these affidavits of service state that

8   the notice and the motion were served on those addresses.

9           Your Honor, pursuant to the plan, the current claims

10  objection deadline is September 15, 2014.  By the motion we

11  seek an extension of that to June 15, 2015, which is

12  approximately nine months.

13          And if I can give the Court some background on the

14  claims?  I think the claims pool here is on a scale rarely seen

15  in Chapter 11.  And if I can give you some figures on that.

16  And I just want to note that these figures may differ slightly

17  from those in the motion, because the numbers in the motion

18  didn't reflect the reconciliation and resolution of certain

19  claims, and also that these are on an unconsolidated basis, so

20  they represent -- if an identical claim was filed against

21  multiple debtors they're being counted here.

22          Your Honor, 7,470 claims were filed against the

23  debtors.  These claims totaled more than 110 billion dollars,

24  including more than 1,800 unliquidated claims.  To date 3,357

25  claims have been expunged.  2,500 --

RESIDENTIAL CAPITAL, LLC, ET AL.                    34

1          THE COURT:  Give me that figure again.

2          MR. SHIFER:  Pardon me, Your Honor?

3          THE COURT:  Give me that figure again.  I missed.

4          MR. SHIFER:  That's 3,357.

5          THE COURT:  Okay.

6          MR. SHIFER:  Two thousand, five hundred and sixty-six

7    claims have either been withdrawn by the claimant or otherwise

8    allowed.  And since the filing of the motion an additional

9    twenty-eight claims have been resolved, including fifteen

10   Borrower claims and thirteen non-Borrower claims.

11         So as of today, Your Honor, there's 1,519 claims that

12   remain unresolved and disputed.  This is approximately twenty

13   percent.

14         THE COURT:  The declaration referred to 1,620

15   remaining claims.  You're saying that it's updated since then.

16         MR. SHIFER:  It's been updated since, right.

17         THE COURT:  Fifteen hundred and nineteen.

18         MR. SHIFER:  Right.  There were some that were

19   resolved since the motion was filed.

20         THE COURT:  Okay.

21         MR. SHIFER:  And also because there were some --

22         THE COURT:  All right.

23         MR. SHIFER:  -- other allowances or other resolutions

24   that weren't counted originally.

25         THE COURT:  All right.

1          MR. SHIFER:  Of these 1,519 claims there are
2    approximately 886 non-Borrower claims and 633 Borrower claims.
3    And of the 866 non-Borrower claims they total 300 --
4          THE COURT:  8-66?
5          MR. SHIFER:  8-8-6.
6          THE COURT: 8-8-6.  That's what I thought.
7          MR. SHIFER:  I'm sorry, Your Honor.  I misspoke.
8          They total 366.4 million dollars.  It's 1.8 million
9    dollar of administrative expense priority, 3.3 of priority
10   claims, 74.4 million of secured claims, and 286.9 million of
11   general unsecured claims.  And of that 886, 288 are
12   unliquidated.
13         Of the 633 Borrower claims they total 862.4 million
14   dollars.  And it's 4.8 million in administrative expense
15   status, 455.3 million of priority, 90.8 million of secured, and
16   311.5 million of general unsecured claims.  And of the 633
17   claims 57 are unliquidated.
18         So, Your Honor, I think these numbers show that
19   there's been significant progress in resolving claims, but
20   there's still quite a bit of work to be done.  And as Your
21   Honor has noted in previous hearings, at this point a lot of
22   the low-hanging fruit, so to speak, has been resolved, but what
23   remains is going to take some time to work through.  And for
24   that reason the Liquidating Trust, with the support of the
25   Borrower Trust, filed the motion to extend the claims objection

RESIDENTIAL CAPITAL, LLC, ET AL.                    36

1   deadline.

2           In terms of objections, Your Honor, there were no
3   objections received by non-Borrowers.  There were eight
4   objections received from Borrowers.

5           THE COURT:  I guess there were two more that were --

6           MR. SHIFER:  Which -- right, Your Honor.

7           THE COURT:  -- late filed.

8           MR. SHIFER:  Yes.  This morning, as we were sitting
9   here, I think there were two more that were filed.  I don't
10  believe that they were -- I believe that they're Borrowers.

11          THE COURT:  Yes.

12          MR. SHIFER:  And because the Borrower Claims Trust is
13  more familiar with the claimants who filed the objections, and
14  perhaps in a better position to resolve the objections, the
15  Borrower's Trust took the lead in responding to and trying to
16  resolve those objections.  And they filed a reply at docket
17  number 7406, and the Liquidating Trust filed a joinder to that
18  reply at docket number 7411.

19          And to address the specifics of the objections I'm
20  going to turn the podium back, if that's okay with Your Honor,
21  to Mr. Rosenbaum.

22          THE COURT:  Well, I think what I'd like to hear is --
23  I know that it's -- I don't know whether there are any
24  objectors -- anybody who objected to the motion is present in
25  the courtroom.  I know there were going to be some on the

1  telephone.  I'd like to hear from the individuals who objected

2  to the motion to extend the deadline for filing objections to

3  proofs of claim.  Okay?

4          Is anybody in the courtroom?

5          MR. SHIFER:  Thank you, Your Honor.

6          THE COURT:  All right.  On the telephone.  Anyone on

7  the telephone who has objected to the motion to extend the

8  deadline for the two Trusts to file objections to proofs of

9  claim?

10         MR. SATTERWHITE:  Yes, sir.

11         THE COURT:  Go ahead.  Identify yourself, please.

12         MR. SATTERWHITE:  Yes, sir, Your Honor.  My name is

13  John E. Satterwhite, Jr.

14         THE COURT:  Yes.  Go ahead.

15         MR. SATTERWHITE:  And I'm calling in concern of this

16  motion, because I did not receive any paperwork from them until

17  August 4th at 5:30 p.m.  And when I opened up the paperwork it

18  said that if I objected to this motion that it had to be on

19  your desk by August 4th at 4 p.m.

20         THE COURT:  All right.  I'm look -- Mr. --

21         MR. SATTERWHITE:  And the only way I found out about

22  it, sir, was another claimant had gotten in contact with me and

23  said that they were trying to push this motion through without

24  letting the claimants know anything about it, which was Ms.

25  Karen Michele Rozier, R-O-Z-I-E-R.

RESIDENTIAL CAPITAL, LLC, ET AL.                    38

1          THE COURT:  Yes.  But Mr. --

2          MR. SATTERWHITE:  And --

3          THE COURT:  Mr. Satterwhite?

4          MR. SATTERWHITE:  -- she contacted me.

5          THE COURT:  Mr. Satterwhite?  You filed a written

6  objection.  It's at ECF docket number 7332.

7          MR. SATTERWHITE:  Yes, sir.

8          THE COURT:  And which I've reviewed.  And I will also

9  listen to whatever argument.  So let's deal with your

10  objection.  What is your objection to the extension of this

11  deadline?

12          MR. SATTERWHITE:  Okay.  I -- well, I didn't feel that

13  they should have the objection (sic) if they had put in in the

14  bankruptcy that they would be finished by September 15th of

15  2014.  And I've been waiting for six years.  I filed a lawsuit

16  against GMAC and New York Bank of Mellon (sic) here in the city

17  of Richmond, Virginia, where the judge said that I had proven

18  fraud and had told my attorney that he needed to go fill out my

19  damages.  And once we presented the damages on the fraud case

20  then they filed bankruptcy, and then the judge said that I had

21  to wait until the bankruptcy case finished.

22          THE COURT:  All right.

23          MR. SATTERWHITE:  And I'm, you know, I feel that I

24  should get the paperwork in time.  That wasn't enough time.  If

25  the lady hadn't never gotten in contact with me, sir, I

RESIDENTIAL CAPITAL, LLC, ET AL.                    39

1  wouldn't have been able to file the objection to the motion,

2  because I didn't get the paperwork until August 4th at 5:30

3  p.m., and it said that if you objected to this motion then it

4  should have -- I should have gotten it in ample time so that I

5  could get it back to you --

6         THE COURT:  Mr. Satterwhite?

7         MR. SATTERWHITE:  -- because I'm blind, Your Honor, in

8  one eye, and little vision in the other, and I have to get

9  someone --

10        THE COURT:  Mr. Sat --

11        MR. SATTERWHITE:  -- to help me with this paperwork,

12 because I can't afford an attorney to represent me in New York.

13        THE COURT:  Mr. Satterwhite, the only issue for today

14 is whether I extend their time to file objections.  Could you

15 explain to me why -- what is the basis for your objection to

16 the extension of time?

17        MR. SATTERWHITE:  Well, I thought that when they set

18 up the rules in the bankruptcy court that they had a certain

19 amount of time that it was for them to pay us for our claims if

20 our claims were not objected or denied or expunged.

21        THE COURT:  Yes, but the plan also provided that that

22 time could be extended, so they're not seeking relief that

23 wasn't contemplated in the plan itself.

24        MR. SATTERWHITE:  Okay, Your Honor.

25        THE COURT:  All right.  Who's the next person who

1    objects on the phone?  Anybody else wish to be heard on the

2    telephone?

3          MR. MCGUINTY:  Good morning, Your Honor.  My name is

4    Michael McGuinty.

5          THE COURT:  Thank you, Mr. McGuinty.  Go ahead.

6          MR. MCGUINTY:  Your Honor, I also don't have an

7    attorney, and Gloria and I worked -- we had a thirty-day time

8    frame to work on.  We worked on it night and day and tried to

9    comply with all the Court's requests.  And I was in Northern

10   Michigan at the time when I finally got the paper, and I filed

11   my response to you.  And I left Michigan, and I have returned

12   to Florida.

13         THE COURT:  Yes.  Mr. McGuinty, I reviewed the written

14   response from you and Ms. McGuinty.  It's at ECF docket 7418.

15   I'm happy to hear from -- why don't you tell me the reasons

16   that you believe the two Trust's time to file objections to

17   claims should not be extended?

18         MR. MCGUINTY:  Well, I've been working on this since I

19   was sixty-nine years old, and I'm now seventy-six.  And I'm

20   afraid I'm going to die before I ever get anything or any of my

21   relations will.  And, I mean, it's just been -- every time I

22   called GMAC -- first of all, they never notified me.  Then I

23   went on the Internet, and I found out where they should have,

24   and I contacted them, and they told me I had no case, and went

25   back and forth.  They told me that I wasn't -- I didn't -- they

1   didn't take my home in 2011 or 2010.  And then they came back

2   and they said well, they were looking at the wrong mortgage

3   claim number.  And didn't -- I had a lawyer write the Federal

4   Reserve, and they went back to GMAC, and GMAC said yes, okay.

5   He does -- he did suffer damage, and he does have a case.  And

6   at that point I was -- I've done everything that I thought that

7   the Court offered or told me to do, and I did it within thirty

8   days, and for me to -- for Gloria and me to work like that and

9   get our job done, and for somebody else not to get their job

10  done, it's hard for me to understand.

11          THE COURT:  Okay.  Thank you very much, Mr. McGuinty.

12          Among the written objections let me ask whether people

13  who are on the phone.  Mr. Pichardo, are you on the telephone?

14          All right.  I have Mr. Pichardo's -- Julio Pichardo's

15  written objection at ECF 7355.  Anyone on the phone on behalf

16  of Kevin A. Matthews (sic)?  The objection is at 7360.

17          MR. PICHARDO:  I'm on the phone, Judge.  I wish to

18  answer.

19          THE COURT:  Go ahead.  Is this Mr. Matthews himself?

20          MR. PICHARDO:  This is Mr. Pichardo.

21          THE COURT:  Mr. Pichardo?  Oh, okay.

22          MR. PICHARDO:  Yes.

23          THE COURT:  Go ahead, Mr. Pichardo.  Let me hear --

24          MR. PICHARDO:  Judge, I have a request here previously

25  submitted to the debtors for review.  And on their docket

1   number 3521, which they represented to you two years ago, they

2   have made a full review of this file according to them.  And I

3   sent a request for denial, because I've been waiting on this to

4   be resolved, and I have several certified mails sent to them

5   requesting for review status.  So on docket 3521 they

6   represented to Your Honor then that they had made a full review

7   of this loan -- of this issue that was presented then.

8        So this has been already reviewed, and I've been

9   waiting and requesting for them to review.  As a matter of

10  fact, Judge, when I request a relief from you I -- it was on

11  the basis that my home was being transferred, and it was

12  transferred to lienholders on a contract that they caused.  So

13  they did represent to Your Honor then, on docket number 3521,

14  that they had -- on line 18 -- that they had made a full review

15  of this loan.

16       So I've been requesting several times, and I have here

17  sent to Morrison & Foerster several requests for a status,

18  which was never answered.  The only answers that I've gotten,

19  Judge, is when it's come before you.  And they get this -- from

20  2009 they've been, according to them, trying to resolve this,

21  which never has been.

22       Now all I request, Judge, is that they answer to the

23  full review they represented before you on docket 3521 that

24  they -- on that hearing they said to you a full review has been

25  done on Mr. Pichardo's file.On 9/18, when that request was made

1  for relief, Judge, now I have lienholders transfer this

2  property to their name because they, according to them, said

3  there was no kind of action on this home.

4          But there has been, Judge.  And this home, and

5  everything we've had has gone down the drain, and all I

6  requested was from them -- within the last two years I've sent

7  several requests for review status.  No answer, Judge, because

8  they believe that they need not to answer to anyone.

9          So if that is the status why should I allow them

10  another extension, sir, that I don't need, when they have

11  destroyed my wife, my two kids, my life, and they put all

12  finances through a chaos.

13          THE COURT:  All right.  Thank you very much, Mr.

14  Pichardo.  Is Mr. Matthews, Kevin A. Matthews, or any lawyer on

15  his behalf on the telephone?

16          MR. PICHARDO:  Were you able to look at that docket,

17  Judge?

18          THE COURT:  No.  I've heard your arguments, Mr.

19  Pichardo.

20          MR. PICHARDO:  Okay.

21          THE COURT:  And I read your papers.  I want to go

22  through each of the individuals who's filed a written

23  objection, so the next --

24          MR. PICHARDO:  Okay.

25          THE COURT:  Anybody appearing on behalf of Kevin A.

RESIDENTIAL CAPITAL, LLC, ET AL.                    44

1   Matthews?

2          Next is Karen Michele Rozier.  Ms. Rozier, are you on

3   the phone?  Anyone appearing on behalf of Karen Michele Rozier?

4   Her objection was filed as ECF dockets 7363, 7381, and 7382.

5          All right.  Next is William Futrell, ECF docket 7374.

6   Mr. Futrell, are you on the telephone?

7          Next isMichael Boyd, ECF docket 7375.  Mr. Boyd, are

8   you on the telephone?

9          Next isEsteban and Maria Losoya.  It's ECF docket

10  7404.  Mr. or Mrs. Losoya, are you on the telephone?

11         Then there were two late-filed objections.  I don't

12  have ECF docket numbers yet.  One is from Rhonda Deese,

13  D-E-E-S-E.  Ms. Deese, are you on the telephone?

14         All right.  And lastly is the objection of Kathleen D.

15  Cline, C-L-I-N-E.

16         Ms. Cline, are you on the telephone?

17         All right.  And I've reviewed each of the objections,

18  and whether they're on the telephone or not, I'm taking each of

19  the objections into consideration.

20         Let me hear -- I'd like to hear from someone from the

21  borrower's trust.  Okay?

22         MR. ROSENBAUM:  Your Honor, Norm Rosenbaum, Morrison &

23  Foerster for the borrower's trust.

24         Your Honor, I really echo what Mr. Shifer had to say.

25  We've done -- over the past several months, I think we've done

1    a Herculean effort to resolve these claims through the claims

2    reconciliation process.  It is a very difficult, time-intensive

3    task.  We used both the resources of the borrower's trust and

4    the liquidating trust pursuant to the cooperation agreement.

5           I think Your Honor's well aware of our efforts.  We're

6    doing our level best to resolve these claims, but clearly, we

7    need more time to do it.

8           As we said in our response, these are very fact-

9    intensive.  Many of these borrowers raise numerous issues of

10   law that we're trying to deal with in our analysis.  We are

11   open to settlement where parties are reasonable in settling

12   with us, and we've settled many matters on that basis.

13          We found -- we always are willing to engage in

14   settlement to move this process along, and we will continue to

15   do so.  Many instances we found the gaps were just too wide,

16   and we had to continue the process before the Court.

17          We've taken Your Honor's positions and advice to us as

18   to how to move things more swiftly through the court, through

19   deeming things contested matters, and we're also looking at

20   those issues as we continue our review of the approximately 600

21   claims.

22          We have addressed, through the reconciliation process,

23   most of the claims filed by these objectors.  I prefer not to

24   debate the merits of the claims.

25          THE COURT:  So the trust --

RESIDENTIAL CAPITAL, LLC, ET AL.                    46

1           MR. PICHARDO:  Question --

2           THE COURT:  The borrower's trust had made a motion for

3    establishing the claims reserve so that allowed claims could

4    start to be paid.  I denied that motion; I'm not revisiting

5    that now.

6           The result is, correct me if I'm wrong, that those

7    whose claims have not yet been resolved aren't disadvantaged.

8    At this point, everybody is basically suffering because we're

9    still going through this claims objection reconciliation

10   process.

11          MR. ROSENBAUM:  Everyone -- every claimant's in the

12   same boat, Your Honor.

13          I would say that you have to look at the other side of

14   it:  we're trying to reconcile claims so that what's left are

15   valid claims.  And that's going to inure to every borrower who

16   holds a --

17          THE COURT:  Look, I've said --

18          MR. ROSENBAUM:  -- valid claims benefit.

19          THE COURT:  I've said on numerous occasions from the

20   bench that it's my desire to facilitate distributions to all

21   creditors, whether the borrower's trust or the liquidating

22   trust, as soon as possible.  For those who filed objections, I

23   certainly understand frustration.  For many of them they have

24   either been in litigation with the debtors before the

25   bankruptcy filing, and this lengthy process since the filing.

RESIDENTIAL CAPITAL, LLC, ET AL.                    47

1    And it remains my goal to try and facilitate distributions to

2    allowed claims as soon as that's reasonably possible.

3            Many of the remaining claims are asserted as very

4    large.  Some may be well taken, others not.  There's some

5    evidentiary hearings that have now been scheduled on some of

6    the remaining unresolved claims, and I think we've added some

7    omnibus hearing days to try and move this process along.

8            I think the only thing I want to try and get across to

9    those who are on the telephone, I understand your frustration.

10   You shouldn't feel that because your claims remain unresolved,

11   that you've been disadvantaged versus other borrowers whose

12   claims have either been allowed or expunged.  For better or

13   worse, you're kind of all in the same boat.  So the fact that

14   we can only do so much at any one time doesn't mean that you've

15   been disadvantaged.

16           So I have all the arguments with respect to this

17   motion, and I anticipate entering an order today or tomorrow.

18   So it's under submission.

19           MR. ROSENBAUM:  Thank you, Your Honor.

20           THE COURT:  Thank you very much, Mr. Rosenbaum.

21           All right.  Anybody who's appeared on the telephone in

22   connection with this motion, you're welcome to stay on the

23   phone, but you're also excused if that's what you wish to do.

24           Go ahead, Mr. Rosenbaum.

25           MR. PICHARDO:  I have a question, Your Honor.

RESIDENTIAL CAPITAL, LLC, ET AL.                    48

1           THE COURT:  Who's speaking?

2           MR. PICHARDO:  Julio Pichardo.

3           THE COURT:  Go ahead, Mr. Pichardo.

4           MR. PICHARDO:  Is there a reason why when they were

5   presented before you that they had made a complete review of

6   this claim then, they never answered to us debtors.  And not

7   only that, but even upon me contacting them fax, telephone,

8   certified mail, there was no answer.  And instead of sending

9   this, which I just received a couple of days back, not even

10  thirty days in advance, why wouldn't they simply send me an

11  answer saying what is your request?  Because I was willing to

12  simply come to a settlement with them, but they never answered

13  anything.

14          THE COURT:  All right, let me ask --

15          MR. PICHARDO:  So if they have only five claims here

16  now, on the phone objecting, they could have taken care of

17  that, sir, by answering -- instead of answering with all this

18  paperwork they sent several days ago.

19          THE COURT:  All right.  Mr. Rosenbaum, has your firm

20  received inquiries from Mr. Pichardo?

21          MR. ROSENBAUM:  Mr. Pichardo's been an active

22  participant in the case --

23          THE COURT:  And -- and --

24          MR. ROSENBAUM:  -- for a long time.

25          THE COURT:  I know he has, I'm very aware of that.

RESIDENTIAL CAPITAL, LLC, ET AL.                    49

1  Have you responded to requests from him?

2          MR. ROSENBAUM:  My understanding is that we have

3  responded to his correspondence, his faxes --

4          MR. PICHARDO:  No response.

5          THE COURT:  All right.  I'm not going to get into this

6  now.  I'm going to take the matter under submission, we need to

7  move on in the calendar.

8          Thank you very much, Mr. Pichardo.

9          Mr. Rosenbaum, go ahead.

10          MR. ROSENBAUM:  Thank you, Your Honor.

11          Your Honor, the next matter on the agenda is at page

12  9, VI, is the additional claims objections.

13          And the first matter is the liquidate -- the ResCap

14  Liquidating Trust's seventy-first omnibus objection.  And I

15  will cede the podium to Mr. Shifer.

16          THE COURT:  Okay.

17          MR. SHIFER:  Good morning, again, Your Honor.  Joseph

18  Shifer of Kramer Levin Naftalis & Frankel for the ResCap

19  Liquidating Trust.

20          THE COURT:  So as I understand it, Mr. Shifer, there's

21  been no responses filed to the seventy-first --

22          MR. SHIFER:  Yeah, with two notes, Your Honor.

23          The first is that we've adjourned the hearing with

24  respect to OneWest Bank's -- the objection to OneWest Bank's

25  claim.

RESIDENTIAL CAPITAL, LLC, ET AL.                        50

1             THE COURT:  Okay.

2             MR. SHIFER:  That will be on for the -- currently for

3      the September 30th hearing.

4             THE COURT:  Okay.

5             MR. SHIFER:  Their objection deadline is actually

6      extended to today.

7             THE COURT:  All right.

8             MR. SHIFER:  The other note would be that we received

9      an informal response from WFBNA, that's Wells Fargo as

10     successor to Wachovia.  We've resolved their informal response

11     with the markup to the proposed order, which I can hand up to

12     Your Honor.

13            THE COURT:  You can do it after --

14            MR. SHIFER:  It's not very significant.

15            THE COURT:  -- after the hearing.

16            MR. SHIFER:  Okay.

17            THE COURT:  As to the remaining --

18            MR. SHIFER:  As to the remaining claimants, we did not

19     receive any response.

20            THE COURT:  Okay.  The Court has reviewed the seventy-

21     first omnibus objection to claims; it's at ECF 7305.  The

22     objections are sustained, other than the two which are being

23     deferred.

24            MR. SHIFER:  The objection will go forward to Wells

25     Fargo as successor with the changes to the proposed order.

1          THE COURT:  Okay.  All right.  So seventy-first is

2     resolved.

3          MR. SHIFER:  Thank you, Your Honor.

4          THE COURT:  Thank you very much.

5          MR. SHIFER:  Thank you.

6          THE COURT:  Mr. Rosenbaum.

7          MR. ROSENBAUM:  Your Honor, the next matter is at

8     number 2 on page 9.  It's the objection to ResCap Borrower's

9     Claims Trust to claim number 2024, filed by Irene Schmidt.

10    I'll cede the podium to my colleague, Craig Damast.

11         THE COURT:  Thank you.

12         MR. DAMAST:  Good morning, Your Honor.  As Mr.

13    Rosenbaum --

14         THE COURT:  You have to identify yourself on the

15    record.

16         MR. DAMAST:  Craig Damast --

17         THE COURT:  Yes.

18         MR. DAMAST:  -- from Morrison & Foerster on behalf of

19    the ResCap Borrower Claims Trust.

20         As Mr. Rosenbaum indicated, this is the objection of

21    the ResCap Borrower Claims Trust to disallow and expunge claim

22    number 2024 filed by Irene Schmidt.  That can be found at

23    docket number 7221.

24         The objection attaches the declaration of Deanna

25    Horst, who is the chief claims officer for the ResCap

RESIDENTIAL CAPITAL, LLC, ET AL.                    52

1    Liquidating Trust, as Exhibit 2.  And Ms. Horst is in the

2    courtroom if Your Honor has any questions.

3            THE COURT:  Let me ask, is Irene Schmidt or any lawyer

4    on her behalf either in the courtroom or on the telephone?

5            Go ahead.

6            MR. DAMAST:  Responses were due by July 23rd; we

7    received none.  So unless Your Honor has any questions, we

8    would request that the objection is granted.

9            THE COURT:  The trust had previously objected to the

10   Schmidt claim.  She filed a response, and then the objection

11   was withdrawn without prejudice.  A new objection's now been

12   filed; she did not file a response to it.  I'm just concerned

13   that having once been proactive in objecting -- in responding

14   to your objection that -- I mean, I've heard nothing from her.

15   I'm not sure -- has anything changed since then?

16           MR. DAMAST:  There were conversations with Ms.

17   Schmidt.  She was well aware of the fact that we were

18   withdrawing the forty-ninth omnibus claims objection as to her

19   claim.  There was a time where we thought we might be able to

20   resolve this matter, but that, obviously, didn't happen.

21           We told her that we were going to be refiling a

22   standalone objection and that she would be provided notice with

23   that, and --

24           THE COURT:  Let me -- do I understand correctly

25   that -- she's divorced, correct?

1          MR. DAMAST:  Correct.

2          THE COURT:  And the obligor on the note was her

3    husband, not her.

4          MR. DAMAST:  Correct, sole obligor.

5          THE COURT:  Solely her husband.

6          MR. DAMAST:  Correct.

7          THE COURT:  What about who was listed on the mortgage?

8          MR. DAMAST:  They both were listed on the mortgage.

9          THE COURT:  Is there any explanation for how he,

10   alone, was the -- the former husband was the obligor and -- but

11   both were listed on the mortgage?

12         MR. DAMAST:  What I can think of is a title to the

13   property was actually in both of their names, so that's

14   probably why the mortgage had to be in both of their names.

15         THE COURT:  And as I understand the circumstances, Mr.

16   Schmidt was granted a loan modification.

17         MR. DAMAST:  Correct.

18         THE COURT:  He alone signed.  They had been divorced,

19   and in the divorce settlement which the trust -- nothing of

20   record regarding the trust settlement, she was given the house;

21   he remained an obligor on the note.  He entered into a loan

22   modification which stretched out the payments, but actually

23   reduced the total amount of the payments that would be made.

24         MR. DAMAST:  Correct.

25         THE COURT:  And as I understand the objection, since

1   he was the obligor, the trust's view is he had the authority to

2   enter into the modified -- the loan modification?

3         MR. DAMAST:  That's what the mortgage -- the mortgage

4   explicitly provides that.

5         THE COURT:  Okay.  What about the -- he was also

6   the -- the home was damaged by Hurricane Katrina, and there

7   were insurance proceeds regarding the damage that was done.

8   And as I understand it, those proceeds were paid to her ex-

9   husband.

10         MR. DAMAST:  They were either remitted to her ex-

11   husband, or they are currently being held in escrow by Ocwen,

12   as successor servicer.

13         THE COURT:  Okay.  Do you know how much is still being

14   held?  I gather -- she says the home has never been repaired

15   because she doesn't have the money to do it.

16         MR. DAMAST:  Yeah, I don't know the answer to that.

17         THE COURT:  All right.  Pending before the Court is

18   the objection to the ResCap Borrower's Claim Trust to claim

19   number 2024 filed by Irene Schmidt; it's at ECF -- the

20   objection's at ECF 7221.  The objection is supported by the

21   declaration of Deanna Horst; it's attached to the objection as

22   Exhibit 2.  Through the objection, the borrower claims trust

23   seeks an order disallowing and expunging claim 2024 filed by

24   Irene Schmidt, because the debtors' books and records do not

25   reflect any liability owed to Schmidt -- Ms. Schmidt.

RESIDENTIAL CAPITAL, LLC, ET AL.                    55

1          Ms. Schmidt did not file an opposition to this current

2    objection.  As I referenced earlier, she had filed an earlier

3    response to an earlier objection which was then withdrawn.

4          I won't go through all the facts since no response to

5    the objection was filed.  Her claim against the debtor's for

6    $245,241.48.  She didn't specify the relevant debtor on the

7    proof of claim form; it was construed as being against

8    Residential Capital LLC.  She attached to her proof of claim a

9    petition for damages that she filed in Louisiana State Court

10   against GMAC Mortgage, LLC on June 27th, 2012, after the

11   petition date; the automatic stay was in place.

12         Mrs. Schmidt alleged liability for alleged "fraudulent

13   refinancing" and for damages related to Hurricanes Katrina and

14   Isaac, that the supposed fraudulent refinancing is because of

15   the undisputed facts that her husband, who was the obligor on

16   the note, entered into a loan modification that reduced the

17   total payments over time, but stretched them out.  And with

18   respect to the damage to the property, there was insurance;

19   some of it was paid to her ex-husband, and some of it remains

20   held in escrow by Ocwen.

21         The debtor asserts -- the trust asserts that the

22   debtors bear no liability for Ms. Schmidt's allegations because

23   her husband was the only obligor under the original note

24   secured by her mortgage, so he was the only party who could

25   seek the modification to the loan.  The Court agrees.

1              And with respect to the release of insurance proceeds,

2    GMACM followed standard industry practice in releasing proceeds

3    to the noteholder, that was Mr. Schmidt, and not a party who

4    was not listed on the note.  That was the reason that he was

5    paid a portion of the proceeds.

6              The objection's well taken; it's sustained.

7              MR. DAMAST:  Thank you, Your Honor.  May we submit an

8    order?

9              THE COURT:  Yes, you can.

10             MR. DAMAST:  Thank you.

11             MR. ROSENBAUM:  Your Honor, Norm Rosenbaum, Morrison &

12   Foerster for the ResCap Borrower's Claims Trust.

13             Your Honor, the final matter on the agenda is number 3

14   at page 9.  It's the ResCap Borrower Claims Trust's sixty-ninth

15   omnibus objection to claims, a no liability borrower claims.

16             If Your Honor'd just give me one second.

17             THE COURT:  That objection is at ECF docket 7188.

18             MR. ROSENBAUM:  Thank you, Your Honor.  Your Honor,

19   I'm sorry, it's a little noisy in the --

20             THE COURT:  Yeah, let's see if we can -- I suspect

21   it's the next group of ResCap matters.

22             MR. ROSENBAUM:  We'll try to be quick.

23             Thank you, Your Honor.

24             Your Honor, this is objection -- an omnibus objection,

25   no liability claims.  We objected to thirty-six claims in this

1    objection.  We received approximately nine responses.

2          THE COURT:  I think there were ten responses, but --

3    by our reckoning, but --

4          MR. ROSENBAUM:  Thank you, Your Honor.

5          THE COURT:  -- maybe I miscounted.

6          MR. ROSENBAUM:  Today we scheduled hearings on the

7    objections filed by Linton and Nancy Layne, Ronald and Elaine

8    Nakamoto, Edward Tobias, and Tia Smith.  And then in September

9    we'll have the balance of the objections.

10          We also received an objection from Mr. Harris, which

11   we dealt with summarily in our response.

12          THE COURT:  All right.  So Harris is dealt with.

13          MR. ROSENBAUM:  We did address it in our response.

14   The response was he didn't provide anything additional --

15          THE COURT:  Right.

16          MR. ROSENBAUM:  -- in his reply.

17          THE COURT:  Is that going forward today?

18          MR. ROSENBAUM:  Yes.

19          THE COURT:  Okay.  Tia Smith has four claims.  Ms.

20   Smith, are you on the telephone?

21          MS. SMITH:  Good morning, Your Honor.

22          THE COURT:  Thank you.  Claims 3889, 4129, 4134, and

23   4139.  Let's proceed with respect to Smith.

24          Go ahead, Mr. Rosenbaum.

25          MR. ROSENBAUM:  Well, Your Honor, Ms. Smith filed four

1    claims in the amount of three million against GMACM,

2    Homecomings, Residential Financial Corporation, and Residential

3    Accredit.  We've laid out the facts in our objection and our

4    reply, Your Honor.

5         THE COURT:  Let me see if I can focus this on what's

6    of concern to me.  I certainly have reviewed all the papers;

7    they're lengthy.  And there are multiple claims -- multiple

8    causes of action that are alleged in the claims.  Let me find

9    it in my notes.

10        (Pause)

11        THE COURT:  So among Ms. Smith's claims, there's a

12   claim under California Business and Professions Code, Section

13   17200.  And the issue I have there is on many other claims

14   you've asserted a statute of limitations defense.  For example,

15   the fraud claim has a three-year statute of limitations for

16   fraud under California Civil Code Section 338 (d).  But the

17   Business and Professions Code claim has a four-year statute of

18   limitations under Section 17208, and the four years had not run

19   when Ms. Smith filed her proof of claim.  And the issue in my

20   mind is whether she has stated a plausible claim under Business

21   and Professions Code Section 17200.

22        Mr. Rosenbaum, my issue there is that it appears to me

23   that there are disputed issues of fact whether Ms. Smith has

24   stated a claim.  And I think what this revolves around is that

25   Ms. Smith alleges that GMACM -- when she approached GMACM about

1   a loan modification, they told her you're not in default; we

2   can't consider a modification unless you are in default.  She

3   then defaulted, and GMACM then commenced foreclosure.

4           I understand from your response, that you say the

5   servicing notes reflect no such communication with Ms. Smith

6   advising her to default on the loan if she wanted a loan

7   modification.  She says they did; you say they didn't.  It may

8   be that you'll ultimately prevail, but maybe not.  That seems

9   to me to be a disputed issue of fact.

10          Can you tell me this, whether there is any authority

11  in California sustaining a claim, either for fraud, negligence,

12  Business and Professions Code 17200 where relating to a loan

13  servicer's advice to a borrower that you're not in default, if

14  you want a modification you need to default, they default, and

15  then foreclosure.  In those -- roughly in those circumstances,

16  are there any cases that deal with -- because that seems to me

17  to be the essence.  She has lots of other allegations, but that

18  seems to me to be the essence of her claims that aren't -- that

19  are at least they're not barred by the statute of limitations.

20          MR. ROSENBAUM:  I'm not aware of any, Your Honor.

21          THE COURT:  Okay.  So this has been a problem -- I'm

22  not saying it's a problem with the ResCap debtors, but I can't

23  tell you how many times, when I had the Chapter 13 calendar, in

24  particular, I was faced with arguments that I applied for a

25  loan modification, they said you're current, the borrower says

RESIDENTIAL CAPITAL, LLC, ET AL.                    60

1    I can't afford it, that's why I'm in a bankruptcy proceeding,
2    but you're current so we won't even consider a loan
3    modification.  So if you want us to consider it you need to
4    default.  So the borrower defaults, and then lo and behold, a
5    foreclosure's started.
6          So this came up quite often, not in the context of a
7    specific cause of action that was asserted, but when I read the
8    allegations, they didn't surprise me.  It was something I was
9    quite used to seeing.  And whether it would state a claim in
10   this case under the California Business Professions Code --
11   California's been pretty active in enforcing -- 17200, I
12   remember from years ago when I practiced in California was a
13   cottage industry on plaintiff's claims.  So --
14         MR. ROSENBAUM:  Your Honor --
15         THE COURT:  -- you have any authority you can point me
16   to?
17         MR. ROSENBAUM:  Well, we have authority that we've
18   cited in our brief, but there has to be an underlying violation
19   of the statute.  We don't use the California --
20         THE COURT:  The statute prohibits unlawful, unfair, or
21   fraudulent practices.  And so is advising a borrower, if that's
22   what happened -- I understand it's disputed -- advising a
23   borrower to default so they can be considered for a loan
24   modification, is that an unfair, deceptive, or fraudulent
25   practice?  That's my question.

RESIDENTIAL CAPITAL, LLC, ET AL.                    61

1       MR. ROSENBAUM:  Your Honor, I would consider that an

2   unfair and deceptive practice.

3       THE COURT:  Okay.

4       MR. ROSENBAUM:  But we do cite -- I would refer Your

5   Honor to the authorities that we've cited in our brief that

6   under California law there has to be an underlying violation.

7   And she claims in her -- one of her other counts that she

8   raises, tortious interference with contract, which we have

9   briefed, is time-barred.

10      THE COURT:  I'm not -- I'm -- in part because of the

11  lateness of the hour, I'm trying to focus on what is my focus.

12  And I think you have good statute of limitations arguments.

13  With respect to anything that had a two- or three-year statute

14  of limitations, you have a very good statute of limitations

15  argument.

16      The problem is that the California Business

17  Professions Code, you got a four-year statute of limitations.

18  And the cases say even though a fraud claim may be barred, it

19  doesn't bar the Business and Professions Code claim.  Do you

20  agree with that?

21      MR. ROSENBAUM:  Your Honor, I'd have to -- I

22  understand what Your Honor's saying.

23      THE COURT:   That's what I read the cases as saying.

24  Do you disagree with it?  I mean tell me.

25      MR. ROSENBAUM:  Your Honor, I'd need to take a closer

RESIDENTIAL CAPITAL, LLC, ET AL.                    62

1   look, but I'm not disputing it, Your Honor.

2        THE COURT:  All right.  Look, you may have even made

3   the more persuasive argument that such an alleged statement was

4   never made, but it's disputed.

5        Ms. Smith, I understand that you're prepared to

6   testify that someone from GMACM told you that you needed to

7   default on your loan if you wanted to be considered for a loan

8   modification, am I correct in that?

9        MS. SMITH:  Your Honor, I allege that Homecomings

10  Financial --

11       THE COURT:  That's one of the debtors.  I'm sorry, I

12  said GMACM but it was Homecomings.  I'm sorry, go ahead.

13       MS. SMITH:  Correct.  I allege Homecomings Financial

14  advised me of this information.  And I also, in my opposition,

15  submitted Exhibit -- I believe it's Exhibit 1, where

16  Homecomings, the RALI -- the Residential Accredit Loans, Inc.

17  2007-Q01 Trust, submitted a 10-K form and also an 8-K form to

18  the Securities and Exchange Commission, basically stating that

19  Homecomings transferred all of their servicing rights, their

20  servicing platforms, to GMAC Mortgage on September 24th, 2007.

21  And they also declared that Homecomings Financial did not

22  service, in any manner, any loans after September 24th, 2007.

23       THE COURT:  Ms. Smith, I'm aware of your arguments

24  about that.  I want to focus on the one -- right now, I want to

25  focus on one thing in particular.  Are you prepared to testify

1　at an evidentiary hearing that you were told by either

2　Homecomings or GMACM that you needed to default on your loan if

3　you wished to be considered for a loan modification?

4　　　　　　MS. SMITH:  Yes, I am, Your Honor.

5　　　　　　THE COURT:  Okay.  And I recognize, Ms. Smith, that

6　you had many other claims that you've asserted.  And I'm going

7　to -- I'm going to take it under submission, I'm going to issue

8　a written order, or opinion, resolving the issues -- well --

9　　　　　　MS. SMITH:  May I make one more point, Your Honor --

10　　　　　　THE COURT:  Just a second.

11　　　　　　MS. SMITH:  -- regarding Exhibit --

12　　　　　　THE COURT:  Ms. Smith, stop.

13　　　　　　MS. SMITH:  -- X, that the --

14　　　　　　THE COURT:  Stop, stop.  I will let you speak --

15　　　　　　MS. SMITH:  -- ResCap Trust submitted regarding --

16　　　　　　THE COURT:  Ms. Smith, stop, I'm going to have you cut

17　off.

18　　　　　　MS. SMITH:  -- the Smith servicing note?  Oh.

19　　　　　　THE COURT:  Ms. Smith, I will let you speak again

20　after I'm finished; don't interrupt me.

21　　　　　　MS. SMITH:  My apologies.

22　　　　　　THE COURT:  I will enter an order dealing with the

23　Smith claims.  I recognize that there are multiple claims that

24　she's asserted.  The trust has asserted statute of limitations

25　defenses.  I'll deal with them in the opinion or order.

1            With respect to the California Business Professions

2    Code Section 17200, the statute of limitations, which is a

3    four-year statute of limitations, clearly is not a bar.  The

4    issue from the Court's standpoint is which of Mrs. -- of Ms.

5    Smith's claims can be asserted -- can go forward under the

6    17200, to the extent that it's a contested matter with disputed

7    issues of fact.

8            I'll enter an order about it, and set forth the

9    schedule if they're going to go forward.

10           Ms. Smith, briefly, what else did you want to say?

11           MS. SMITH:  I wanted to say that the ResCap trust

12   failed to identify the actual servicer on Exhibit X.  It

13   doesn't even give the name of who the servicer is.

14           THE COURT:  Okay.  All right.  The matter's taken

15   under submission.  Go ahead, Mr. Rosenbaum.

16           MR. ROSENBAUM:  Your Honor, could we take the next

17   matter, the Layne objection, Your Honor?

18           THE COURT:  Sure, let's take Layne, we got to move

19   through this with some --

20           MR. ROSENBAUM:  I believe Ms. or Mr. Layne -- I

21   apologize if I got that wrong, is on the phone.

22           THE COURT:  Mr. Layne, are you on the phone?

23           MS. LAYNE:  It's Mrs. Layne.

24           THE COURT:  Mrs. Layne, thank you very much.  Go

25   ahead, Mr. Rosenbaum.

1          MS. LAYNE:  Thank you.

2          THE COURT:  And I'll give you a chance to respond,

3    Mrs. Layne, okay.

4          MS. LAYNE:  Thank you.

5          THE COURT:  Go ahead, Mr. Rosenbaum.

6          MR. ROSENBAUM:  Your Honor, we've laid out the facts

7    in our response and in the objection.  GMAC serviced this loan

8    from August 4th, 2006 until the servicing was transferred to

9    Ocwen.  Mr. and Mrs. Layne filed a Chapter 7 bankruptcy and

10   received a discharge.  The claim -- all the facts that gave

11   rise to the claim that they filed in the bankruptcy court

12   existed at the time of their bankruptcy.  They did not schedule

13   it.  It included the schedules showing the absence of the

14   affirmative claim in the declaration.

15         The basis of this claim seems to be that there's no

16   assignment of the mortgage in Oregon.  We don't believe that to

17   be required, as we argue in our brief, and we don't see how

18   that gives rise to damages against GMAC.  And in addition, as

19   we've said, we don't believe that they have standing to bring

20   this claim, and they're estopped.

21         THE COURT:  Let me ask you a question, Mr. Rosenbaum,

22   with respect to the objections of the Layne claim.  And Nancy

23   and Linton Layne filed a response to the objection; it's at ECF

24   7301.

25         The Layne matter was before the Court once before.

1    And the Court denied -- the Laynes had made a motion to strip

2    the second lien and grant relief from the stay; that was at ECF

3    docket 4655.  And the Court denied the motion in an opinion

4    entered on February 10th, 2014; it's at ECF 6454.

5           In support of the opposition to that motion the

6    debtors have filed a declaration of Lauren Graham Delehey that

7    stated that U.S. Bank is the owner of the Laynes' loan; that's

8    at 6168-1, paragraph 4.

9           Here, though, the Horst supplemental declaration

10   states that Citibank was securitization trustee to whom RFC

11   transferred the loan in 2006.  That's in the Horst supplemental

12   declaration at paragraph 8.

13          The note that the trustee attached does not reflect

14   any endorsements after RFC.  So there seems to be an

15   inconsistency between the positions you've taken in the two

16   Layne motions.  And I -- the Court relied on the sworn Delehey

17   declaration in issuing its February 10th opinion; see ECF 6454

18   at pages 8 and 11.

19          MR. ROSENBAUM:  One second, Your Honor.

20          THE COURT:  Yes.  Here's what we're going to do.  I'm

21   going to take this matter under advisement.  I'm going to give

22   you a week to file a supplemental decl -- it may be a simple

23   explanation; it wasn't simple when we looked at it.  It

24   appeared to be an inconsistency.  Whether it makes a difference

25   at the end of the day, I'm not sure, but I don't want to go

RESIDENTIAL CAPITAL, LLC, ET AL.                    67

1   ahead and rule when it appears that I don't know what the facts

2   are.

3          MR. ROSENBAUM:  Thank you, Your Honor.

4          THE COURT:  Okay.  Ms. Layne, I'm -- Mr. Rosenbaum,

5   I'll give you a week to file further papers.  And Ms. Layne,

6   I'll give you a week after that if you want to file any further

7   response.  Okay?

8          MS. LAYNE:  Okay.  I just would like to make one

9   statement.

10         THE COURT:  Go ahead.

11         MS. LAYNE:  Which is -- or a correction in their

12  declaration which is they claim that both of us, husband and

13  wife, declared bankruptcy, and that is not the case.  Only Mr.

14  Layne declared bankruptcy in 2010.

15         THE COURT:  Okay, all right.

16         MS. LAYNE:  So I have never claimed a bankruptcy

17  against GMAC.

18         THE COURT:  All right.  So Mr. Layne filed a Chapter 7

19  bankruptcy petition on December 14th, 2010, is that correct?

20         MS. LAYNE:  Correct.

21         THE COURT:  Okay.  All right.

22         So just so we're clear, I'm giving the trust a week to

23  file some further papers explaining to me what appears to be

24  inconsistent positions, and I'm going to give you -- you don't

25  have to file anything further, Ms. Layne, but --

RESIDENTIAL CAPITAL, LLC, ET AL.                        68

 1          MS. LAYNE:  Okay.

 2          THE COURT:  -- if you wish to, you have a week to do

 3    that.  Okay.  And then I'm --

 4          MS. LAYNE:  Great.

 5          THE COURT:  Once those papers, additional papers, are

 6    in front of me, I'll take the matter under submission and

 7    render a ruling.  Okay?

 8          MS. LAYNE:  Okay, thank you.

 9          THE COURT:  Thank you very much, Mrs. Layne.  Go

10    ahead, Mr. Rosenbaum.

11          MR. ROSENBAUM:  Your Honor, the next objection was to

12    the Nakamoto claim.  I don't believe I heard anyone on the

13    phone for --

14          THE COURT:  All right.  Mr. Nakamoto, are you on the

15    telephone?  Let me find my notes.

16          Ronald Nakamoto, he filed an opposition to the

17    objection; it's at ECF 7345.  There were five attachments to

18    Mr. Nakamoto's filings.

19          Mr. Nakamoto, it's -- I guess both you and your wife,

20    Elaine, filed claim 1279 against GMACM on October 15th, 2012.

21    Are you on the phone, Mr. Nakamoto, or Ms. Nakamoto?  All

22    right, I'm going to take it under submission.

23          MR. ROSENBAUM:  Thank you, Your Honor.

24          Your Honor, the final objection or response that we

25    received was to the objection to Mr. Tobias' claim.  I believe

RESIDENTIAL CAPITAL, LLC, ET AL.                              69

1   Mr. Tobias is in the courtroom.

2          THE COURT:  Come on up, Mr. Tobias.

3          MR. TOBIAS:  Thank you.  Good morning.

4          THE COURT:  You have to come up to the microphone,

5   okay?  Let me find my notes.

6       (Pause)

7          THE COURT:  Okay.  So here we're dealing with the

8   proof of claim 1466 filed by Suzanne Koegler and Edward Tobias,

9   is that --

10         MR. TOBIAS:  Yes.

11         THE COURT:  Okay.  And let me see what else.

12         Go ahead, Mr. Rosenbaum.

13         You can have a seat, Mr. Tobias.

14         MR. TOBIAS:  Thank you.

15         MR. ROSENBAUM:  Your Honor, as we set forth in our

16  response and in declarations in support, we don't see any basis

17  for this claim.

18         Mr. Tobias and Ms. Tobias were given a deferred

19  payment because of Hurricane Sandy.  The loan servicing was

20  transferred to Ocwen.  They sent GMAC requests on modifications

21  that were referred to Ocwen after the servicing was

22  transferred.  We still don't see any basis for this claim.

23  We're aware of the lawsuit that Mr. Tobias filed post-petition.

24  Your Honor had addressed that.  Summarily, you didn't rule on

25  the merits of that in the prior order Your Honor entered on the

RESIDENTIAL CAPITAL, LLC, ET AL.                              70

1   claim, I think it was 1477, and that we just see no liability

2   on this claim.

3           Mr. Tobias is free to deal with Ocwen on his own.

4           THE COURT:  All right, go ahead.  Come on up to the

5   podium.

6           MR. TOBIAS:  Thank you very much.

7           THE COURT:  You need to identify yourself on the

8   record when you speak, sir.

9           MR. TOBIAS:  Yes.

10          THE COURT:  Are you a lawyer?

11          MR. TOBIAS:  Yes, I am.

12          THE COURT:  Okay.

13          MR. TOBIAS:  I'm admitted, actually, in New Jersey,

14  New York and federal court.

15          THE COURT:  Okay.

16          MR. TOBIAS:  I don't know if I had to be admitted pro

17  hac vice here to represent my wife.

18          THE COURT:  You don't because it's your -- it's

19  yourself.

20          MR. TOBIAS:  And my wife.

21          THE COURT:  And your wife.  But you got to identify

22  yourself on the record.

23          MR. TOBIAS:  Yes, yes, yes, Your Honor.

24          This is Edward N. Tobias --

25          THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, ET AL.                    71

1          MR. TOBIAS:  -- representing myself, pro se, and my

2   wife Suzanne Koegler.

3          THE COURT:  Okay, go ahead.

4          MR. TOBIAS:  Actually, Your Honor, this does have a

5   companion case that was set for hearing -- I don't have the

6   exact date.  Your Honor did rule on that; that was claim 1467,

7   I believe.  And there were a number of differences between the

8   two properties.

9          THE COURT:  So you had two properties, Freehold and --

10         MR. TOBIAS:  Two properties, yes.  And if you have

11  questions I can address those first, and then go into some

12  points basically.

13         THE COURT:  Long Beach and Freehold.

14         MR. TOBIAS:  Long Beach and Freehold, yes, sir.

15         THE COURT:  Go ahead.

16         MR. TOBIAS:  Okay.  Essentially, there were two

17  differences.  And coincidentally, I just sold the Freehold

18  property yesterday.  One of the points in your opinion was that

19  I didn't -- I failed to state a claim because I had no damages,

20  which was completely accurate, because I had not sold that

21  property.  So there are substantial differences.  I purchased

22  that property before the Long Beach property; I sold that

23  property after the Long Beach property.  But I'm not going to

24  get into it.

25         THE COURT:  Do I understand correctly, both of these

1    properties were investment properties, not your primary

2    residence?

3          MR. TOBIAS:  Both of these properties were investment

4    properties.  One -- the Freehold property was my principal

5    residence for purposes; however, at that time, 2003, I -- my

6    wife and I had more assets.  And one of the decisions that I

7    made that, in hindsight, was fairly disastrous, but on the

8    Freehold property not too shabby, we did take out the mortgage.

9    We did have funds to purchase the house outright.

10         THE COURT:  Look, fundamentally --

11         MR. TOBIAS:  Yes.

12         THE COURT:  -- the argument that you make that I

13   rejected before, and have great problems with --

14         MR. TOBIAS:  Yes.

15         THE COURT:  -- is that you argue that you overpaid for

16   these properties because the defendants manipulated the market

17   for real estate in New Jersey and maybe the world, I don't

18   know.  That's not an argument that any court has accepted.

19         MR. TOBIAS:  Well, that is an argument that they did

20   enter into a consent agreement with Attorney General Holder

21   that does state those exact points.

22         Essentially, one of my problems as an attorney, I seem

23   to be -- have gotten -- I filed a pre-Iqbal complaint in a

24   post-Iqbal world.  Right now, in this particular forum and on

25   the claims that I have in federal court, basically it's failure

1    to state a claim.  Personally, I thought I said enough in my

2    complaint, and now I'm entitled to discovery, and now we can go

3    on, and I can do that.  But, unfortunately, the post-Iqbal --

4    Ashcroft v. Iqbal world, and the Sixth Circuit has addressed

5    this, that even if all the information is within the possession

6    of the defendant, I can't get into the courthouse steps --

7            THE COURT:  Look, I --

8            MR. TOBIAS:  -- to get the information that I need to

9    prove, basically, what all their -- the consent agreement --

10           THE COURT:  Mr. Tobias --

11           MR. TOBIAS:  Yes, sir.

12           THE COURT:  -- you simply do not state a plausible

13   claim --

14           MR. TOBIAS:  Well --

15           THE COURT:  -- that you overpaid for your two beach

16   properties, which were damaged by Hurricane Sandy --

17           MR. TOBIAS:  Well --

18           THE COURT:  -- because you allege that GMACM, the

19   debtors, generally, manipulated the market, which resulted in

20   you overpaying for the property; because they were too generous

21   in the mortgages they were prepared to give you, you overpaid

22   for the properties.  That's the thrust of your argument.

23           MR. TOBIAS:  Well, respectfully, that's not how I see

24   it, of course.  I see a different hypothetical.

25           Basically, these people are in the business of selling

1  loans.  And what they did was they appraised my property so

2  that they can induce me to take out a loan that did not reflect

3  the property.  And one of the reasons I say that I overpaid,

4  and it is in hindsight, at the time no one knew these things,

5  okay.  And the claims can be separated from the Freehold claim

6  and the Long Beach claim.

7         The Long Beach claim was actually significantly

8  damaged by Hurricane Sandy.  I did have the standard 250,000-

9  dollar flood insurance policy, okay.  The --

10        THE COURT:  You were better off than a lot of people.

11        MR. TOBIAS:  I was better off than practically

12 everyone; I wholeheartedly agree with that.  And I did received

13 100,000 dollars in funds in payment on that particular policy.

14 The problem is, okay, that that entire 100,000 dollars was paid

15 to GMAC who then subsequently transferred the loan to Ocwen.  I

16 did pay off that entire --

17        THE COURT:  They transferred the servicer on this.

18        MR. TOBIAS:  I'm sorry, they transferred the servicing

19 to Ocwen.  I did pay off that loan in total upon the sale of

20 the house.

21        Now, one of the things in my second submission, was

22 basically I sold the house for around 320,000 dollars, given

23 the price that was paid for its damaged condition, given the

24 amount of the flood proceeds.

25        Now, the problem is, okay, that the dispute is whether

1  the house should be repaired or whether it should be replaced.

2  And the problem is, in a replaced conditions, okay, the actual

3  cash value of that house, according to the federal government

4  is 108,000 dollars, which is why it seems like I'm greedy,

5  getting 100,000 dollars, when my whole house is worth 108.  So

6  I have the federal government saying, gee, that house has

7  always been worth around 108,000 dollars, so they're not going

8  to pay me the rest of my 150,000-dollar claim.

9          THE COURT:  Tell me this, did you shop for properties

10 when you bought these two?  I mean, did you --

11         MR. TOBIAS:  Well, that --

12         THE COURT:  -- look what the market was, and --

13         MR. TOBIAS:  I understand.  And I understand the

14 analogy.

15         THE COURT:  Just answer my question.  Did you?  I

16 mean, you had your heart set on these two properties, or -- I

17 mean, when you -- you said one was originally your primary

18 residence, and then became an investment property; the other

19 was always an investment property.

20         MR. TOBIAS:  Right.  Well, I'll tell you, the answer

21 to that question is I did shop for properties.  And the market

22 at the time, that was the market, and the price is fairly non-

23 negotiated between a buyer and seller.  However, okay -- and

24 really just for hypo --

25         THE COURT:  When you negotiated the price between a

RESIDENTIAL CAPITAL, LLC, ET AL.                    76

1   buyer and seller, you didn't have a mortgage yet.  Somebody was

2   offering a house for sale, you negotiated aprice, you filed a

3   mortgage application and you got a mortgage.

4         MR. TOBIAS:  And I got a mortgage based on an

5   appraisal.

6         THE COURT:  And so --

7         MR. TOBIAS:  So GMAC did appraise that property.

8         THE COURT:  -- sue the seller because theseller

9   charged you too much for the house; that's your basic position.

10        MR. TOBIAS:  Well, but with the approval of GMAC.  I

11  mean, they did appraise it.

12        THE COURT:  All right.  I un --

13        MR. TOBIAS:  In addition -- I understand --

14        THE COURT:  Mr. Tobias, I understand your argument.

15        MR. TOBIAS:  I understand.  Let me make a couple of

16  points just to have on the record --

17        THE COURT:  Go ahead.

18        MR. TOBIAS:  -- to address one thing.  A couple of

19  things, hold on.  Where did it go?  I lost it now.

20        I mean, basically, for hypothetical purposes, it's

21  less a matter that it was a good-faith, arm's-length

22  transaction between a buyer and a seller.

23        Basically, GMAC rented money.  Using this hypothetical

24  situation is only -- say I rent a Cadillac, okay, and they give

25  me a car with the logo Cadillac on it, okay.  And then I drive

RESIDENTIAL CAPITAL, LLC, ET AL.                    77

1  around, the label falls off, and I find out that it's a Dodge,

2  okay.  And I try to return it and they say oh, I'm sorry, we

3  gave you a Cadillac, and I will explain the analogy and how it

4  has to do with appraisals.

5          THE COURT:  Mr. Tobias --

6          MR. TOBIAS:  Yes.

7          THE COURT:  -- spare me.  GMAC didn't sell you were a

8  Cadillac, a Dodge, or anything else.  They didn't sell you a

9  house.  A seller sold you a house.  You negotiated at arm's

10 length to buy the house.  You negotiated a price, you applied

11 for a mortgage --

12         MR. TOBIAS:  Yes.

13         THE COURT:  -- you got the mortgage on two different

14 properties.

15         MR. TOBIAS:  I did.

16         THE COURT:  Yousay you overpaid for the properties.  I

17 understand your argument.  The matter is taken under

18 submission.

19         MR. TOBIAS:  Okay.  I would also like to say one thing

20 just for purposes of failure to state a claim purposes.  There

21 was a matter under Ashcroft v. Iqbal.  Basically, the remedy

22 for failure to state a claim is to be able to submit an amended

23 complaint.

24         THE COURT:  If I thought you had a plausible claim,

25 Mr. Tobias, I would let you amend.  You do not state a

 1  plausible claim.

 2          MR. TOBIAS:  Um-hum.

 3          THE COURT:  Your basic theory, which was rejected in

 4  connection with the initial property that came before me, is

 5  that you were duped into overpaying for a house because GMAC

 6  was prepared to give you a bigger mortgage than they should

 7  have.

 8          MR. TOBIAS:  Yeah.

 9          THE COURT:  And that's not plausible; that's as simple

10  as that.

11          MR. TOBIAS:  Well, I --

12          THE COURT:  Okay, the matter -- no, stop.  Stop.

13          MR. TOBIAS:  Yes, Your Honor.

14          THE COURT:  The matter is under submission.

15          MR. TOBIAS:  Yes, Your Honor.

16          THE COURT:  Mr. Rosenbaum, is there anything else on

17  the docket?

18          MR. ROSENBAUM:  That concludes our cases, Your Honor.

19          THE COURT:  We're going to take a ten-minute recess.

20  I know we're running late.  We're going to take a ten-minute

21  recess.  We got a RFC in ResCap Liquidation Trust adversary

22  proceedings on for calendar -- on the calendar.  My courtroom

23  deputy needs to call into CourtCall to make more appearances on

24  the phone.

25          MR. ROSENBAUM:  I'm sorry, Your Honor.

1      THE COURT:  Mr. Rosenbaum?

2      MR. ROSENBAUM:  We would request that Your Honor grant

3  the balance on these sixty-nine forparties that didn't file.

4      THE COURT:  It is; it is granted.

5      MR. ROSENBAUM:  Thank you.

6      THE COURT:  The balance of it is granted.  All right.

7  We're taking a ten-minute recess.

8    (Recess at 11:42 a.m.)

9    (End of requested proceedings)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1

2                                    I N D E X

3

4                                    RULINGS

5                                                    Page      Line

6   Objections sustained to seventy-first omnibus   50        22

7   objection, other than two which will go

8   forward to proposed order and one adjourned

9   Objection to claim of Irene Schmidt sustained   56         6

10  Balance of sixty-ninth omnibus objection        79         4

11  granted

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

C E R T I F I C A T I O N

I, Hana Copperman, certify that the foregoing transcript is a

true and accurate record of the proceedings.

_____

HANA COPPERMAN

AAERT Certified Electronic Transcriber CET**D 487

eScribers

700 West 192nd Street, Suite #607

New York, NY 10040

Date:  August 27, 2014