1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-12020-mg

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  RESIDENTIAL CAPITAL, LLC, et al.,

9

10              Debtors.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              September 8, 2014

19              10:00 AM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

1

2  (CC: Doc# 7222) Adjourned RE: Motion for Omnibus Objection to

3  Claim(s) / ResCap Borrower Claims Trust's Seventieth Omnibus

4  Objection to Claims (Res Judicata Borrower Claims)

5

6  (CC: Doc# 7017) Final Pre-Trial Conference RE: ResCap Borrower

7  Claims Trust's Objection to Proofs of Claim Filed By Frank Reed

8  and Christina Reed.

9

10

11

12

13

14

15

16

17

18

19

20  Transcribed by:  Penina Wolicki

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

```
 1
 2  A P P E A R A N C E S :
 3  MORRISON & FOERSTER LLP
 4        Attorneys for ResCap Borrower Claims Trust
 5        250 West 55th Street
 6        New York, NY 10019
 7
 8  BY:   JORDAN A. WISHNEW, ESQ.
 9
10
11  REED SMITH LLP
12        Attorneys for ResCap Borrower Claims Trust
13        1717 Arch Street
14        Suite 3100
15        Philadelphia, PA 19103
16
17  BY:   BARBARA K. HAGER, ESQ.
18
19
20  FRANK REED
21  Pro Se
22
23
24  RAMON QUIROZ
25  Pro Se
```

1                    P R O C E E D I N G S

2           THE COURT:  All right, please be seated.  All right.

3    We're here in Residential Capital.  It's number 12-12020.

4           MR. WISHNEW:  Good morning, Your Honor.

5           THE COURT:  Nice to see you, Mr. Reed.

6           Mr. Wishnew?

7           MR. WISHNEW:  Thank you, Your Honor.  Your Honor,

8    there are two matters on today's agenda.  The first contested

9    matter on today's agenda is on page 2 under II, claims

10   objections, item 2 specifically, the ResCap Borrower Claims

11   Trust's seventieth omnibus objection to claims, which deal with

12   seven res judicata borrower claims.

13          Your Honor, through this seventieth omnibus objection,

14   the Borrower Trust seeks to expunge seven borrower proofs of

15   claim that do not represent valid pre-petition claims against

16   the debtors, because they are barred by the doctrine of res

17   judicata.  Each of the claims in the objection are based on

18   state or federal court litigation that has been dismissed with

19   prejudice, either as to the debtors or to nondebtors that were

20   codefendants with the debtors in each action.  I will refer to

21   the latter as the "nondebtor litigations".

22          The nondebtor litigations were not dismissed against

23   the debtors because of the automatic stay put into effect as a

24   result of ResCap's Chapter 11 filing.  However, in each

25   nondebtor litigation, at least one of the nondebtor

1  codefendants was either the original lender of the loan at

2  issue, a subsequent servicer or previous servicer to the loan

3  at issue, or was the investor of the loan at issue; and the

4  debtor-defendants were either the servicer, investor,

5  originator, or purchaser of the loan at issue.  Furthermore, in

6  each nondebtor litigation, the plaintiff-claimant's allegations

7  did not distinguish between the actions of the debtor

8  codefendants and the nondebtor codefendants.

9         In support of the objection as well as the reply filed

10  last week, the Borrower Trust submitted the declarations from

11  Lauren Delehey, chief litigation counsel to the ResCap

12  Liquidating Trust.  She is here in court today and available to

13  answer any questions the Court may have for her.

14         The objection was filed on July 2nd, 2014.  Responses

15  to the objection were due August 1st, 2014.  The Borrower Trust

16  received only one response, and that was from Mr. Ramon Quiroz.

17  I believe Mr. Quiroz is in the courtroom today.

18         THE COURT:  Mr. Quiroz, would you come on up?  Are you

19  in the courtroom.  Come on up to -- why don't you have a seat

20  at the table over there, okay?  Go ahead have a seat over

21  there?  Yeah, sure.

22         Go ahead, Mr. Wishnew.

23         MR. WISHNEW:  Thank you, Your Honor.  So briefly, Your

24  Honor, with regards to Mr. Quiroz's claim; on or about June

25  1st, 2010, Mr. Quiroz filed a complaint in the Eastern District

1   of New York against GMAC Mortgage, Homecomings, and nondebtors

2   U.S. Bank National Association, as trustee, New Century

3   Mortgage Corp., and Steven J. Baum, P.C.  The case was styled

4   as Quiroz, et al. v. U.S. Bank National Association, case

5   number 10-cv-02485.  The complaint contained various causes of

6   action, including violations of TILA and securities fraud.

7           The debtors filed a motion to dismiss pursuant to

8   Rules 12(b)(1) -- Federal Rules of Civil Procedure, 12(b)(1)

9   and 12(b)(6) on November 2nd, 2010.  The court referred the

10  complaint and a motion to dismiss to the Magistrate Judge Joan

11  M. Azrack, who issued a report and recommendation on May 16th,

12  2011, recommending the debtors' motion to dismiss be granted.

13          The district court adopted the report and

14  recommendation on August 8th, 2011, and dismissed the complaint

15  with prejudice.

16          On September 8th, 2011, Mr. Quiroz appealed the

17  district court order to the United States Court of Appeals for

18  the Second Circuit, case number 11-3663.  On May 21st, 2012, a

19  notice of bankruptcy was filed in the Second Circuit advising

20  of the debtors' Chapter 11 proceeding.

21          On November 8th, 2012, Mr. Quiroz filed his proof of

22  claim against GMAC Mortgage and Homecomings, designated as

23  claim number 4413, asserting a general unsecured claim in the

24  amount of 522,000 dollars.  The respondent does not list the

25  basis for his claim in box 2 of the proof of claim, however,

1   attached to the proof of claim are the same exhibits that were

2   attached to the complaint filed in the Eastern District of New

3   York.

4          Additionally, in response to the debtors' diligence

5   requests, the respondent references an April 25th, 2000 Second

6   Circuit opinion which construed the respondent's motion for

7   summary judgment as a motion for summary reversal of a district

8   court's order.

9          On June 10th, 2013, respondent filed a motion for

10  relief from the automatic stay to proceed with his Second

11  Circuit appeal, and this Court, on September 13th, granted the

12  respondent's motion to lift the stay in order to proceed with

13  the appeal.  And that order was docketed at docket number 5039.

14         As the order provides, the relief is limited for the

15  purpose of allowing the appeal to be adjudicated.  On April

16  14th, 2014, the Second Circuit dismissed the appeal, because it

17  "lacks an arguable basis in law or fact."  On August 15th,

18  2014, Mr. Quiroz filed a petition for writ of certiorari with

19  the United States Supreme Court.  Your Honor --

20         THE COURT:  Did my order lifting the stay prevent Mr.

21  Quiroz from filing a cert petition?  I mean, isn't that part of

22  the appellate process?  I was surprised to see that the Trust

23  objected to the filing of the petition for writ of certiorari.

24  I wish somebody had told me that.

25         MR. WISHNEW:  So paragraph 1 of your order, Your

1  Honor, says:  "The automatic stay is lifted for the limited

2  purpose of allowing the appeal to be adjudicated by the Second

3  Circuit."

4          THE COURT:  Go ahead.

5          MR. WISHNEW:  Thank you, Your Honor.  Your Honor,

6  we're seeking to disallow Mr. Quiroz's claim on the basis of

7  res judicata.  The jurisdiction of the district court was based

8  on federal question jurisdiction.  The federal rule for res

9  judicata is that a final judgment on the merits of an action

10  precludes the parties or their privies from relitigating issues

11  that were or could have been raised in that action.  The movant

12  making the res judicata argument must show that the previous

13  action involved an adjudication on the merits --

14          THE COURT:  Let me interrupt you.  I know what the

15  standard for res judicata is, and I know what the standard for

16  Rooker-Feldman is.  What did the district court do with respect

17  to Mr. Quiroz's claim for negligence?

18          MR. WISHNEW:  The district courts did not exercise

19  supplemental jurisdiction over that specific count.

20          THE COURT:  And so is it fair to say that the district

21  court did not decide on the merits -- did not dismiss the

22  negligence claim on the merits, but rather for lack of

23  supplemental jurisdiction?

24          MR. WISHNEW:  That would be correct, Your Honor.

25          THE COURT:  Okay.  How do you get to res judicata over

1   the negligence claim, based on the district court's decision?

2           MR. WISHNEW:  I get to res judicata, Your Honor,

3   because the appeal -- the appellate court, the Second Circuit,

4   in its decision specifically said that --

5           THE COURT:  The appellate court affirmed the district

6   court.  The district court determined that all but two of the

7   claims were barred by Rooker-Feldman and res judicata.  The

8   district court dismissed the negligence claim and one fraud

9   claim, but that fraud claim appears to have been against Steven

10  J. Baum.  But dismissed the negligence claim for lack of

11  subject matter jurisdiction, concluding that it would not

12  exercise supplemental jurisdiction.  It did not dismiss the

13  claim on the merits.

14          MR. WISHNEW:  However, the Second Circuit also found

15  that the appeal lacked an arguable basis in law or fact, which

16  is the equivalent of saying that the --

17          THE COURT:  Hardly, hardly.

18          MR. WISHNEW:  -- appeal --

19          THE COURT:  Come on, Mr. Wishnew.  How did the Second

20  Circuit decide that a claim which -- they affirmed the district

21  court.  The district court decided not to hear the negligence

22  claim.  So let me back up for a second.  Because this is at

23  least the second time that your office has done something that

24  I chastised them about before.

25          The objection, the only thing it attached from the

1    district court, was the decision of the district court with

2    respect to whether counsel should be appointed for Mr. Quiroz.

3    It wasn't until the reply papers that you actually attached the

4    magistrate judge's report and recommendation and the district

5    court's adoption of the report and recommendation.  And it is

6    in your reply brief that you make the substantive arguments

7    about what the effect of the district court's decision is.

8            Raising those issues in the reply brief for the first

9    time, is inappropriate.  I've challenged your firm for this

10   before with respect to claim objections.  You can't sit back,

11   file -- yes you raised res judicata, but the only decision of

12   the district court you attached was with respect to appointment

13   of counsel.  Now, maybe it was an oversight, but that's what

14   you did.  Okay?

15           So, Mr. Quiroz filed his opposition and he didn't have

16   all of your arguments in front of him when he filed his

17   response.

18           Here's what the Court's going to do.  Well, first, let

19   me hear from Mr. Quiroz first.  Why don't you come on up to the

20   microphone, Mr. Quiroz.

21           MR. QUIROZ:  Yes, Your Honor.

22           THE COURT:  You have to identify yourself for the

23   record.

24           MR. QUIROZ:  My name is Ramon Quiroz.  I am living at

25   89-37 Metropolitan Avenue, Rego Park, New York, 11374.

1    I actually -- my claim is actually because my wife

2  died, Your Honor.  All right?  They've threatened us for seven

3  years, and I've been in seven courts -- this is the seventh

4  court I am.  And I've been litigating in -- you know, in every

5  other court they denied a -- they denied to me that -- they

6  were actually foreclosing home -- their right -- they have no

7  right to do so.  And I proved to the Second Circuit that, you

8  know, everything was fraud.  And that's why they gave me so

9  much on the reversal.

10    THE COURT:  The Second Circuit didn't reverse.  The

11  Second Circuit --

12    MR. QUIROZ:  The Second Circuit gave me so much on the

13  reversal, and that, they changed --

14    THE COURT:  No, no, no, no.

15    MR. QUIROZ:  -- their mind --

16    THE COURT:  Mr. Quiroz, the Second Circuit concluded

17  that you didn't state any facts or law to support your appeal,

18  and they dismissed the appeal.

19    Let me ask you this, Mr. Quiroz, in the complaint that

20  you filed in Brooklyn in the district court, in the third cause

21  of action at pages 13 and 14, you alleged that the defendants

22  have caused serious physical impairment and psychological harm

23  to Mr. Ramon Quiroz?

24    MR. QUIROZ:  It started with me, yes, Your Honor.

25    THE COURT:  Okay.

1          MR. QUIROZ:  And my wife died.

2          THE COURT:  That's the only place where you alleged

3    physical impairment or psychological harm.

4          MR. QUIROZ:  Yes.

5          THE COURT:  In the prayer in the complaint, on page

6    18, referring to the third cause of action, "for physical,

7    psychological detriment and damages caused to Helen Quiroz and

8    her husband, Mr. Ramon Quiroz" --

9          MR. QUIROZ:  Yes.

10         THE COURT:  -- "Mr. Quiroz is suffering and with

11   serious illness, impairment, and disability at this time.  He

12   is officially disabled," and it goes on, and you requested

13   fifty million dollars in damages.

14         So that's the only place where, from my reading, that

15   you alleged emotional distress damages.  Am I correct in that?

16         MR. QUIROZ:  I'm not really too sure exactly what

17   you're saying, Your Honor.

18         THE COURT:  Okay.  So, Mr. Quiroz, you heard me

19   addressing Mr. Wishnew.  And the Trust did not attach the

20   decision of the magistrate judge and of the district court

21   until the reply papers, which was not correct on their part.

22   What I need to know is whether you want more time to file an

23   additional response, limited solely to the additional papers

24   that the Trust submitted as part of its reply.  If you want

25   that time, I will give it to you.

1          MR. QUIROZ:  What I actually want, Your Honor, like

2    I'm very sick now.  I can't handle any more.

3          THE COURT:  Okay.

4          MR. QUIROZ:  And I've been doing this seven years.

5          THE COURT:  Okay.

6          MR. QUIROZ:  I want to stop.

7          THE COURT:  All right, I don't --

8          MR. QUIROZ:  I want you to help me up.

9          THE COURT:  I want to be sure -- if you want to

10   proceed on the papers -- I mean, it wasn't the first time you

11   saw those papers.  You obviously had the district -- you had

12   the decision of the magistrate judge, you had the decision of

13   the district judge, and you have the decision from the Court of

14   Appeals.  So none of this was new, other than the fact that the

15   Trust did not put it in until the reply.  But you had received

16   all of those, I take it?

17         MR. QUIROZ:  Yes.

18         THE COURT:  Okay.  All right, well, here is what I am

19   going to do.

20         Is there anything else you want to say, Mr. Quiroz?

21         MR. QUIROZ:  Yes.

22         THE COURT:  Go ahead.

23         MR. QUIROZ:  Your Honor, I actually wrote a letter to

24   you for you to read and on the basis that I have on the Supreme

25   Court now, and it's a letter, you know, whatever I didn't do in

1  the Second Circuit's here.  So I would like you to have this

2  document.

3          THE COURT:  How long is that document?  How many

4  pages?

5          MR. QUIROZ:  How long is the -- oh, it's like twenty,

6  thirty pages.

7          THE COURT:  Okay.  So I'm going to permit you to --

8  we'll take it from you and we'll get it scanned and put on the

9  docket.

10         MR. QUIROZ:  Yes.

11         THE COURT:  And Mr. Wishnew, if you want to -- there

12  is an issue I'm going to want the Trust to address in a

13  supplemental brief, Mr. Wishnew, and I'll identify that in a

14  moment.

15         MR. QUIROZ:  Your Honor, the only -- the only thing

16  that I want --

17         THE COURT:  Go ahead.

18         MR. QUIROZ:  -- is like to take consideration, my wife

19  died because she was -- they were -- we were there, the whole

20  family, seven years.  And they have no right for it.  They're

21  not the lender.  They're not the real party to the -- you know.

22         THE COURT:  Look, Mr. Quiroz, I'm not -- the

23  difficulty you're facing is that you raised all or most of

24  these issues in the state court and the stat court ruled

25  against you, and then you raised them in the district court,

1   and the district court ruled against you.

2          So federal courts, including myself, I don't sit in

3   review of what a state court does.  Okay?  So when the

4   foreclosure court -- you had two state court actions, both

5   were -- the first was the foreclosure action which judgment was

6   against you.  The second was an action you brought, and they

7   dismissed it on the technical grounds of res judicata, the

8   issues had been decided in the first action.

9          When you went to the district court, which was before

10  the bankruptcy, the court dismissed all of your claims except

11  for the negligence claim, finding that this doc -- you can't

12  relitigate the same issues in more than one court, and it found

13  that res judicata applied, that the state court had already

14  decided the issues, or they necessarily should have been raised

15  in the state court.  So that's the problem -- the major problem

16  you face.

17         Anything else you want to say?

18         MR. QUIROZ:  In the district court, actually, they

19  dismiss my case because I didn't serve proper to U.S. Bank.

20  That's why they dismissed.

21         THE COURT:  No, that's not what -- there are two very

22  clear opinions.  The report and recommendation of Magistrate

23  Judge Azrack is eighteen pages long, and it's quite detailed.

24  And you filed -- you timely filed objections to it.  And then

25  District Judge Matsumoto wrote a seventeen-page decision and

1    order adopting the report and recommendation of the magistrate

2    judge.

3         So the district court gave, I think, quite careful

4    attention to your arguments.  And for the most part it found --

5    and you acknowledged in the district court that you were

6    seeking to get the district court to reverse the decision that

7    the state court had reached.  And federal courts can't do that,

8    only the Supreme Court can do that.

9         All right.  So I'm going to direct the Trust to file a

10   supplemental memorandum of law.  And if you want to address it,

11   you can as well.  The first issue, Mr. Wishnew, is whether the

12   negligence claim is barred by res judicata from either the

13   state court or federal court decisions.  I think you basically

14   cheated in your papers by arguing that res judicata applied to

15   the negligence claim, because the district court clearly did

16   not say that.

17        But it may well be -- my reading of Mr. Quiroz's

18   complaint is that -- it's not very clear about a negligence

19   claim, it's included with the fraud claim -- the district court

20   clearly found the fraud claim is barred by Rooker-Feldman and

21   res judicata.  So is the negligence claim barred by res

22   judicata or Rooker-Feldman as a result of the state court

23   decision?  The fact that the district court didn't decide it

24   doesn't preclude me from concluding that res judicata applies

25   based on the state court decision.  You didn't argue about

1  that.

2       Second, has the claimant stated a claim for

3  negligence?  In Magistrate Judge Azrack's report and

4  recommendation, at pages 17 and footnote 13 on page 18, she

5  concluded that even reading the complaint liberally in light of

6  plaintiff's pro se status, there is no indication that a valid

7  negligence claim could be stated.  She goes on.  You can

8  address that.

9       And finally, is the negligence claim, if there was one

10  stated, barred by the applicable statute of limitations, which

11  I believe is three years, but you can address that.  Because

12  Mr. Quiroz is complaining about a loan from Homecomings that

13  was granted in 2005, and the issue seems to be as to whether it

14  was a fixed rate for five years or not.  And he alleges that in

15  2007 Homecomings increased his interest rate.  So whether the

16  cause of action would have accrued in 2005 or 2007, the proof

17  of claim was not filed until November 8th, 2012.  And it's very

18  likely that any negligence claim would be barred by the statute

19  of limitations.

20       How much time do you want to address these issues?

21       MR. WISHNEW:  Your Honor, Friday, February 19th -- I'm

22  sorry, September 19th.

23       THE COURT:  September 19th.  All right.

24       And I'll give Mr. Quiroz until Friday, October 3rd,

25  two weeks thereafter, if you want to file anything else, Mr.

RESIDENTIAL CAPITAL, LLC, ET AL.                     18

1   Quiroz.  So they're going to file --

2          MR. QUIROZ:  I will.

3          THE COURT:  -- a brief by September 19th, and I'll

4   give you until Friday, October 3rd, if you want to file

5   anything else in response.

6          MR. QUIROZ:  Okay.

7          THE COURT:  Okay?  And then I'm going to decide the

8   matter on the papers.

9          MR. QUIROZ:  Yes.

10         THE COURT:  Okay?

11         MR. QUIROZ:  Yes, Your Honor.

12         THE COURT:  Thank you very much, Mr. Quiroz.

13         MR. QUIROZ:  Thank you so much, Your Honor.

14         THE COURT:  Okay.

15         All right, the next matter on the calendar is the

16  final pre-trial conference regarding the claims of Frank and

17  Christina Reed.

18         MR. WISHNEW:  Your Honor, Jordan Wishnew of the ResCap

19  Borrower Claims Trust.  Just to fill out the record on the

20  prior matter, I just wanted to say that the -- not including

21  the district court order and the magistrate report was simply

22  an oversight on our part.  We are very mindful of Your Honor's

23  feedback that you've given us on prior objections about not

24  raising new arguments in the reply.  And in this matter, it was

25  entirely just an oversight.

1          Having said all that, I defer -- I will turn over the

2    podium to my colleague, Barbara Hager, who is the courtroom --

3          THE COURT:  Okay.

4          MR. WISHNEW:  -- from the firm of Reed Smith.  She

5    will be taking the lead on this pre-trial conference.

6          THE COURT:  Okay, let me just say, with respect to the

7    Trust's seventieth omnibus objection --

8          MR. WISHNEW:  Yes, Your Honor.

9          THE COURT:  -- the objections are sustained as to all

10   of the claims other than the Quiroz claim.

11         MR. WISHNEW:  Excellent, Your Honor.  We will submit a

12   revised form of order to chambers, electronically, after the

13   hearing .

14         THE COURT:  Okay, thank you.

15         MS. HAGER:  Good morning, Your Honor.  Barbara Hager

16   with Reed Smith, co-counsel for the ResCap Borrower Claims

17   Trust.

18         THE COURT:  All right, Mr. Reed, do you want to make

19   your appearance?  You can do it from sitting; you don't have to

20   get up.  Just speak into the microphone.  You can pull it

21   closer to you, if you want.

22         MR. REED:  Frank Reed, creditor pro se.

23         THE COURT:  Okay, thanks, Mr. Reed.

24         Go ahead, Ms. Hager.

25         MS. HAGER:  Good morning, Your Honor.  So we're here

1  for the final pre-trial conference.  Specifically, what we have

2  remaining for the trial which is set for next week, are four

3  claims.  One is a claim for negligence, which is Count II of

4  the proof of claim.  There is a breach of contract claim

5  remaining against GMAC only, which is Count III.  There's a

6  punitive damages claim for actual malice, which is Count IV,

7  and a Consumer Fraud Act claim which is Count V, which only

8  remained as to one point, which was an allegation in the

9  original foreclosure complaint.

10          Your Honor, that being the case, we have submitted our

11  pre-trial papers which set forth our position.  I'm happy to go

12  through that to the extent Your Honor would like me to do so.

13  Or would you prefer more of a status on where we stand?

14          THE COURT:  No.  Before we get to that, I'd like to

15  have a brief discussion about the motions in limine.

16          MS. HAGER:  Sure.

17          THE COURT:  So I read the three motions in limine.

18  Mr. Reed e-mailed his responses this morning.  They were not

19  timely, but the Trust consented, and the Court agreed that he

20  could submit them by 9 o'clock.  I see you were copied on the

21  e-mail.

22          I have a question with respect to one aspect.

23  Ordinarily, I should say, I don't hear argument on motions in

24  limine.  I just -- I'm just telling you what my practice is.  I

25  don't -- I usually just decide them.  But I have a question on

RESIDENTIAL CAPITAL, LLC, ET AL.                    21

1   one aspect of one of them.

2         I believe I read in one of your motions with respect

3   to credit reports, that the Trust had requested production of

4   credit reports and that none were produced.  Am I correct in

5   that?

6         MS. HAGER:  Yes, Your Honor, that's correct.  The only

7   credit report that I have seen is a credit report that was

8   requested in connection with the Law Division case that another

9   firm handled, and we got a copy of their file.  There is a

10  singular credit report from Trans Union from 2008, which does

11  not even reflect GMAC reporting anything about the account.

12        THE COURT:  Okay, Mr. Reed, can you address -- so when

13  I read the papers, it was my understanding that you had not

14  pro -- well, Ms. Hager, did you request copies of credit

15  reports?

16        MS. HAGER:  Yes, Your Honor, we did.  We served Mr.

17  and Mrs. Reed with a request for production of documents,

18  requests for interrogatories and requests for admissions, none

19  of which were responded to in any way.

20        THE COURT:  Okay.  Mr. Reed, do you want to address

21  this issue of whether you provided credit reports?  Because one

22  of the things you contend is that the wrongful foreclosure

23  adversely affected credit reporting with respect to you, but

24  you haven't provided the credit reports?

25        MR. REED:  I think that's a mischaracterization.  The

1   effect that I've alleged is not on the credit report itself,

2   it's on the liquidity of the property as to public reporting in

3   regard to a lis pendens.

4           THE COURT:  I don't think that's what I read.  All

5   right.  I'm going to enter -- I'm going to rule now on the

6   motions in limine and a written order will be entered.  I'm

7   just going to basically read what I have in the written order.

8   I had this one point that I did want clarified.

9           I'll skip the preliminaries, but I refer to the prior

10  orders that the Court has entered, limiting issues, et cetera.

11          But then I say, many of the issues raised by the Trust

12  cannot be resolved by motions in limine.  The Court will need

13  to hear the proposed testimony to rule.  This order will,

14  however, provide rulings on some issues and parameters for the

15  testimony at trial.  Any issue raised by the motions and not

16  addressed in this order are reserved for trial.

17          1) The three motions in limine seek to exclude the

18  expert testimony of the three identified experts:  Carter,

19  Donati, and Hendricks.  Expert reports have been provided by

20  the three proposed experts, and the motions attach copies of

21  the reports.

22          The Court's review of the reports make clear that the

23  reports would not be admissible at trial over the objection of

24  the Trust.  They are filled with impermissible hearsay.  They

25  stray into areas beyond the witnesses' apparent expertise, and

1   the Hendricks report addresses alleged damages the Court has

2   already foreclosed, namely damages relating to any other

3   properties or lost business opportunities that the Reeds assert

4   they lost because of the foreclosure action.  And they contain

5   faulty analysis and unsupported conclusions.

6          But the issue here is whether the testimony of the

7   three witnesses is admissible on any of the matters covered in

8   the reports.  On that score, the Court concludes that all three

9   witnesses may testify on at least some of the matters covered

10  by their reports.

11         2) The trust challenges the experts' qualifications.

12  The Court concludes that with the exception of one specific

13  area identified below in what I'll -- in paragraph 5, the

14  Trust's objection goes to the weight to be accorded to the

15  experts' testimony on the issues on which the witnesses are

16  permitted to testify.  The Court cannot exclude their testimony

17  in its entirety, as a matter of law, because of the

18  qualifications of the individuals.

19         3) Because the Reeds have failed to produce any credit

20  reports reflecting an adverse impact on the Reed's credit from

21  the alleged wrongful foreclosure, despite the Trust's timely

22  request that such items be produced, neither Mr. Reed nor any

23  of the experts may testify about the effect of credit reporting

24  with respect to the Reeds.

25         4) Expert testimony about any alleged damages

1  resulting from the Reeds' failed efforts to refinance the

2  mortgage on the property will only be permitted if competent

3  evidence is offered and admitted in evidence related to the

4  failed efforts.  Assuming a proper foundation, further

5  limitations on such testimony may be appropriate, but must

6  await hearing testimony and specific questions at trial.

7          5) None of the experts will be permitted to testify

8  about noneconomic damages to the Reeds from the stress,

9  humiliation, mental anguish and frustration as a result of

10 GMAC-M's efforts to foreclose on the property.  The three

11 experts are not qualified to testify on such issues.

12          Mr. Reed is permitted to testify on these issues

13 concerning him, but not relating to his wife, who will not be

14 permitted to testify.

15          6) Ms. Donati will be permitted to testify about New

16 Jersey foreclosure custom, practice, and procedures, with

17 reference to applicable statutes and rules.  But she will not

18 be permitted to offer opinion testimony whether any of the

19 debtors violated applicable statutes and rules.

20          7) Expert testimony will be permitted, assuming a

21 proper foundation for the alleged economic damages suffered by

22 the Reeds as a result of the alleged diminution in the value of

23 the property, as a result of wrongful foreclosure.

24          Okay.  So that's the substance.  It will be filed

25 shortly after the hearing.  I always want to make sure that

RESIDENTIAL CAPITAL, LLC, ET AL.                          25

1  everybody knows in advance what can and can't be done during

2  the trial.  So that's with respect to the rulings on the

3  motions in limine.

4         Ms. Hager, have you provided Mr. Reed with copies of

5  whatever exhibits you intend to offer into evidence at the

6  trial?

7         MS. HAGER:  Your Honor, the exhibits were overnighted

8  to both the Court and Mr. Reed on Friday.

9         THE COURT:  Okay.

10        MS. HAGER:  So they should be at his house this

11  morning.

12        THE COURT:  All right.  Okay.  And how many witnesses

13  are you calling?

14        MS. HAGER:  Your Honor, we have two witnesses.  One is

15  a corporate witness, Lauren Delehey, and the other is an expert

16  witness on credit, Oscar Marquis.

17        THE COURT:  Well is he going to be able to testify in

18  light of what the Court's ruling is with respect to -- in light

19  of the failure to produce credit reports?

20        MS. HAGER:  Right.  Based on what Your Honor just read

21  into the record, I'd like to consider whether we still need to

22  call Mr. Marquis.  But for the moment, I'd like to keep him on.

23        THE COURT:  Okay.  Just bear with me a second, okay?

24        MS. HAGER:  Sure.

25      (Pause)

RESIDENTIAL CAPITAL, LLC, ET AL.                    26

1          THE COURT:  Are there any deposition ex -- I guess the

2     deadline was 5 o'clock today for the final witness lists and

3     exhibit lists, pre-marked exhibits, deposition excerpts.  Are

4     there any depositions that you're relying on?

5          MS. HAGER:  No, Your Honor.

6          THE COURT:  Okay.

7          MS. HAGER:  Except to the extent, obviously, that they

8     might be needed for impeachment purposes.  But --

9          THE COURT:  Have there been depositions taken in this?

10         MS. HAGER:  There have.  We deposed Mr. Reed, Ms.

11    Carter, and another witness by the name of Drew Murdock.

12         THE COURT:  Okay.  All right, Mr. Reed, have you

13    provided Ms. Hager with copies of the exhibits that you intend

14    to offer?

15         MR. REED:  Not as of yet, but I believe they will be

16    there before 5 o'clock.

17         THE COURT:  5 o'clock.  Okay.  And all of those

18    documents have previously been produced in the litigation?

19         MR. REED:  Yes.

20         THE COURT:  Okay.  And what witnesses do you intend to

21    call?

22         MR. REED:  I actually -- we had almost decided against

23    Mr. Hendricks.  I don't think we're going to be calling him,

24    especially in light of what -- your ruling.

25         THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, ET AL.                                27

1          MR. REED:  But I'm not sure yet.  And -- but so it

2     leaves Louise Carter, myself, Ms. Donati, Mr. Murdock, and a

3     yet-still-waiting-to-be-identified authentication expert, a

4     corporate rep from TD Bank which is on our list.

5          THE COURT:  What is it that you need to authenticate?

6          MR. REED:  A written correspondence regarding a denial

7     of financing from TD Bank.  And I asked Ms. Hager if she would

8     voluntarily admit those documents, because if I'm not mistaken,

9     Your Honor had said only if there was a basis to believe

10    they're not authentic --

11         THE COURT:  I didn't say authentic.  I said with

12    respect -- because one of your experts is testifying about --

13    proposes to testify about the effect of your being unable to

14    refinance.  And if you establish that you were denied an

15    opportunity to refinance and put in the foundation for that,

16    I'm going to permit the expert to testify about it.

17         I'll have to see when specific questions are asked and

18    answered -- I'm not saying every question that you might ask

19    the expert, but I thought you were entitled to do that.

20         So, Ms. Hager, is there an issue about the

21    authenticity of the documents from TD Bank?

22         MS. HAGER:  There is, Your Honor.  Mr. Reed is

23    specifically referring to two letters from TD Bank, the

24    authenticity of which is suspect.

25         THE COURT:  And you've told him which documents?

1          MS. HAGER:  I have.

2          THE COURT:  Are there other documents from TD Bank?

3          MS. HAGER:  No, Your Honor.  Those are the only two.

4          THE COURT:  Two?  Okay.  All right.

5          And who's -- so you're trying to get a witness from TD

6    Bank?

7          MR. REED:  Well, it's -- Your Honor, the letters come

8    from the regional president responsible for the State of New

9    Jersey.  They're authentic letters.  I have the e-mail trails.

10   I just don't know who at the bank -- and I've made it clear in

11   our papers -- is it the actual writer, the president who wrote

12   it, or his secretary who drafted it and e-mailed it and FedExed

13   to us -- to authenticate the actual letter.  It was provided as

14   required by federal law and the Equal Credit Opportunity Act

15   that they must tell us the material reasons why the loan was

16   denied.  They did it in the due course of their business

17   transactions.

18         And Ms. Hager has allowed a much less stringent

19   correspondence -- or I don't know how you say it -- from

20   another broker that I had dealt with.  It was a faxed

21   paragraph, and Ms. Hager's willing to admit that one, because

22   it's a little more amorphous as to what opportunity I lost,

23   whereas the TD Bank letter is very, very clear and verified in

24   a subsequent letter as to why they provided it, because of

25   the -- they were required under law to provide it.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    29

1          THE COURT:  And what is your -- tell me more

2    specifically, Ms. Hager, the basis for your objection on

3    grounds of authenticity?

4          MS. HAGER:  Sure, Your Honor.  As Mr. Reed mentioned,

5    the first of the two letters purports to be a denial letter

6    providing the reason that Mr. Reed was denied for financing

7    pursuant to the Equal Credit Opportunity Act.  And that letter

8    is from 2012.  But Mr. Reed was allegedly in process for a

9    refinance in 2008.  The Equal Credit Opportunity Act requires

10   such notice of denial to be provided within thirty days.

11   Typically, it's on a standard form.  It's not something that's

12   typically on a letter.

13         It's my understanding that the letter from 2012 was

14   specifically provided to Mr. Reed pursuant to his request when

15   he was going through the independent foreclosure review

16   process.

17         The second letter, which is from the same author, Mr.

18   Curley at TD Bank, was provided to me at the end of the day on

19   the last day of discovery in this matter, August 22nd, which

20   essentially clarifies that the first letter was provided

21   pursuant to the Equal Credit Opportunity Act.  That particular

22   letter does not appear to be on TD Bank letterhead.  Its

23   formatting is suspect.  The font is not the same everywhere.

24   It gives me cause for concern.  So unless he can bring in Mr.

25   Curley, I'm going to --

RESIDENTIAL CAPITAL, LLC, ET AL.                                30

1          THE COURT:  I don't know that he has to bring Mr.

2   Curley in, but he's got to bring somebody from TD Bank.

3          MS. HAGER:  Somebody.

4          MR. REED:  Your Honor?

5          THE COURT:  Just a second, Mr. Reed.

6          So you're agreeing that one of the two letters can

7   come in?

8          MS. HAGER:  I don't -- because I have suspicions as to

9   the second letter that's giving me concern as to the nature of

10  the first letter as well.  But my more specific comments are

11  directed to the second letter.

12         THE COURT:  Okay.

13         MS. HAGER:  That's right.

14         THE COURT:  All right.  But that doesn't answer my

15  question.  Are you going to object to the admissibility of the

16  first letter?

17         MS. HAGER:  I will object to the admissibility of the

18  first letter.

19         THE COURT:  On grounds of lack of authentication --

20  authenticity?

21         MS. HAGER:  Right, lack of authenticity.

22         THE COURT:  Okay.  Go ahead, Mr. Reed.  You don't have

23  to have Mr. Curley.  You're going to need somebody from TD Bank

24  to authenticate it.  But --

25         MR. REED:  Well, I -- are we -- I guess I'm ignorant

1  of -- I may subpoenas them.  Is that correct?  Is that --

2           THE COURT:  You better get going if you're going to.

3  Yeah.  Well, where are they located?

4           MR. REED:  Cherry Hill, New Jersey.

5           THE COURT:  I don't know whether they're within

6  subpoena range.

7           MS. HAGER:  I'm not sure if that's within a hundred

8  miles or not.

9           MR. REED:  And I would like to make a point, Your

10 Honor, as to the thirty-day rule, or whatever the days.  TD --

11 a bank does not have to provide it.  They can tell you orally.

12 And then if you ask at any time after for clarification in

13 writing you can obtain it.

14          At the time, as I've said all along in our filings and

15 papers that were filed even with the independent foreclosure

16 review, we were told orally why and then it was later, when I

17 actually had a reason to have to verify it, that I requested it

18 from TD Bank.  Then TD Bank provided it and they told me why

19 they would provide it.  They would -- they didn't want to --

20 believe me, they didn't want to get involved with my issues.

21 They provided it because they had to.

22          THE COURT:  Do you have any explanation as to why it's

23 not on TD letterhead?  I'm assuming --

24          MR. REED:  It is.  No, it is on TD letterhead.  It's

25 just the -- one is in black and white and the other one is in a

RESIDENTIAL CAPITAL, LLC, ET AL.                                   32

1   green -- there's a green logo on it.  I can't tell you why the

2   secretary used the different paper.  I mean, it's -- you know,

3   they sent me a hard copy and then they e-mailed it to me.  I

4   have an incoming e-mail from them with the attachment, even.

5          THE COURT:  Everybody sit still.  I just want to get

6   something off my bookshelf.  You don't have to get up.

7      (Pause)

8          THE COURT:  I just needed a --

9          MR. REED:  It's your courtroom, Your Honor.

10     (Pause)

11         THE COURT:  Ms. Hager, have you tried to contact TD

12  Bank?

13         MS. HAGER:  I'm sorry, Your Honor?

14         THE COURT:  Have you contacted TD Bank to see whether

15  you can verify that this document is authentic?

16         MS. HAGER:  No, I have not, Your Honor.

17         THE COURT:  All right, here's what I'm going to order

18  with respect to the document.  Mr. Reed, if you intend to

19  offer -- it's a letter, is that --

20         MR. REED:  There are two of them, Your Honor, yes.

21         THE COURT:  If you intend to offer the letters in

22  evidence, since Ms. Hager indicates she intends to object to

23  the authenticity of both of them, I'm going to require that you

24  get a declaration or affidavit from an officer or employee of

25  TD Bank testifying that the letters were prepared by TD Bank

1    and sent to you in the ordinary course of their business.

2    Copies of the two letters need to be attached to the

3    declaration as exhibits.

4            If Ms. Hager wishes to contest -- if she wishes to

5    contest the authenticity of the documents, Ms. Hager, take the

6    deposition of the declarant.

7            MS. HAGER:  Yes, Your Honor.

8            THE COURT:  Contact TD Bank today, Mr. Reed -- unless

9    you're able -- if you can resolve this issue -- I have a

10   feeling that it may be possible that if you and Ms. Hager have

11   a telephone conversation with an appropriate person at TD Bank,

12   they can satisfy Ms. Hager over the telephone that these two

13   documents which you wish to offer are authentic.  If not, you

14   need to get a declaration or affidavit.

15           If TD Bank is unwilling to do it, your problems are --

16   you're going to have to take a deposition.  You can't compel

17   them to come testify -- I don't know whether it's -- I think

18   probably more than a hundred miles from here.  I'm not sure you

19   can compel them to come testify here.  It's a waste of time to

20   have them come testify here.  So if you'll, after this hearing

21   today, talk to Ms. Hager and Mr. Wishnew and see whether you

22   can work out jointly calling TD Bank and see whether they can

23   satisfy Ms. Hager as to the authenticity of the two documents.

24   If not, I'm going to give you a chance to see if you can get a

25   declaration or an affidavit.  And if she wants to take their

1   deposition, because she has questions about authenticity, she

2   can go ahead and do that.

3           Okay.  Who's Mr. Murdock?

4           MR. REED:  He's a long-term friend, Your Honor.

5           THE COURT:  What is he going to testify about?

6           MR. REED:  It's really a very simple thing.  What was

7   intended to be done with the proceeds from the sale of the

8   property at 817 Matlack Drive.  And the only one testify --

9           THE COURT:  What's that relevant to?  I've already

10  said -- I already ordered that you can't offer any evidence of

11  damages relating to any other investment opportunities,

12  anything like that.  So what is Mr. -- is it Murdock or

13  Matlock?  What is his name?

14          MR. REED:  Murdock.

15          THE COURT:  Murdock -- what --

16          MS. HAGER:  Matlack is the street that I live on.

17          THE COURT:  I'm sorry.  Yeah.  What is Mr.

18  Murdock's -- what issue is Mr. Murdock's testimony -- I mean,

19  you can bring him here, but I'm just telling you now, I'm

20  sticking by my earlier ruling.

21          MR. REED:  Absolutely.  All right.

22          THE COURT:  Okay.  So that's why -- I'm pressing you

23  hard about it.  I'm not saying don't call him.

24          MR. REED:  No, no.

25          THE COURT:  But I'm trying to understand, what are you

 1  calling him about?

 2          MR. REED:  Your Honor, there is -- there is a question

 3  that has to be decided by this trial, one of the questions is

 4  was the foreclosure, if improper, and the lis pendens

 5  associated with the foreclosure, if improper, either filed or

 6  remaining -- had an effect at the value of the property in

 7  question, which is what we're asking -- we're asking about.

 8          Did it -- did it diminish the value of the property --

 9  the market value of the property or the marketability of the

10  property?  Did it affect the liquidity of the property in a

11  financing context?

12          But inherent in one of those questions, especially the

13  sale question, is a consideration of what my damages are if the

14  house doesn't sell versus if the house does sell.  So if the

15  house sells, it's -- we're going to do a quick but-for

16  analysis -- if the house sells then I have X amount of dollars

17  that's -- it's my allegation that we would have X amount of

18  dollars, because the value of the property would be here at a

19  certain point, the debt owed on the property was substantially

20  lower, and there would be a certain amount of cash in my hand.

21          The other part to -- so I would be missing that cash.

22  That's an element of damage.  I should have had that cash, but

23  for interference in the sale, the effect of the interference by

24  the bad foreclosure and the lis pendens.

25          The other side of that is, another damage that I have.

RESIDENTIAL CAPITAL, LLC, ET AL.                    36

1  I have a bill on a house that has continued to grow that I
2  otherwise would not have, if it had sold.  It is a logical,
3  completely connected situation.  If I was a mailman and I was
4  run over in the street, and I had to sit in a rehab center for
5  four years, and I ran a bill because I was in the rehab center,
6  living in the rehab center instead of at home, I would have to
7  pay that bill and the person who perpetrated the wrongful act
8  would have to pay it, not me.
9           In this case, we couldn't -- we couldn't liquidate the
10 property.
11          THE COURT:  Why not?
12          MR. REED:  That's the question for trial, we're going
13 to --
14          THE COURT:  Well, tell me why not?  I mean, you said
15 this before.  You still are in possession of the property.  And
16 look, if you had sold the property at a loss --
17          MR. REED:  I can't answer that.
18          THE COURT:  Stop.  If you had sold the property -- if
19 you had sold the property and your argument was that you
20 suffered economic damage as a result of diminution in the value
21 of the property because of wrongful foreclosure, okay.  If
22 you'd sold the house for 500,000 and say it was worth 700,000,
23 but because of the foreclosure -- okay, but you still own the
24 property.  You've not -- there's -- they've not stopped you --
25          MR. REED:  So --

RESIDENTIAL CAPITAL, LLC, ET AL.                    37

1          THE COURT:  -- from selling the property.

2          MR. REED:  Two things, Your Honor, I have to address.

3    One, when the market offers that come in are less than the

4    outstanding balance on the property, it's impossible to go to

5    settlement.

6          THE COURT:  It's not.  Did you -- did you seek

7    approval for a short sale?  Because it's given all the time.

8    Did you?

9          MR. REED:  Your Honor, I did not.

10         THE COURT:  Okay.  This is not --

11         MR. REED:  We were in --

12         THE COURT:  -- an evidentiary hearing.

13         MR. REED:  -- we were in active litigation with GMAC

14   to discuss trying to resolve it.  I mean, I think that my

15   saying no we did not, is probably not a correct

16   characterization.  We were open to discussion --

17         THE COURT:  All right, we're not going to --

18         MR. REED:  -- as to how we could resolve it --

19         THE COURT:  -- through it.  All I'm --

20         MR. REED:  -- and we did make discussions --

21         THE COURT:  -- what I want to make clear -- I'll have

22   to hear what issues you're going to have Mr. Murdock testify

23   about.  But in my July 29th order I said the following:

24   "Witness testimony will only be permitted regarding the one

25   specific property owned by the Reeds that was the subject of

1    the New Jersey foreclosure action and any damages the Reeds

2    suffered directly related to the alleged wrongful foreclosure.

3    The Reeds may not recover damages relating to any other

4    properties or lost business opportunities that the Reeds assert

5    they lost because of the foreclosure action. The Court

6    concludes as a matter of law that such other damages, if any,

7    are speculative and not foreseeable, and are not recoverable on

8    the Reeds' surviving claims."

9            I'm going to stop there.  Call Mr. Murdock.  You're

10   going to offer him -- if there are objections -- if somehow you

11   think he's offering competent evidence -- he has to have

12   personal knowledge of it -- competent evidence of damages or

13   losses you suffered specifically with respect to this property,

14   I'll hear it.  If Ms. Hager has objections, I'm going to listen

15   to the objections and I'll rule on the objections at the time.

16           I'm not precluding you from calling him.  I want to

17   make clear, I'm raising questions because it isn't obvious to

18   me.  Okay?  But --

19           MR. REED:  Your Honor, I guess I am absolutely -- I

20   believe I understand that fully, and that's fine.  I appreciate

21   you allowing me the opportunity to do it.  And if doesn't

22   conform and if Ms. Hager objects, then fine.

23           And the last -- I just would like to reaffirm in

24   the -- on the record that the statement that I call the

25   mortgage company and ask for a short sale, our counsel, during

1   the several-year-and-a-half plus, we -- I mean, we had

2   mediation meetings and tried to actively discuss resolution,

3   short sale, contribution, non-con -- I mean, I don't -- you

4   know, I answered on simply my own -- did I make that call.  Do

5   you understand what I answered?

6              THE COURT:  Okay.  We'll deal with it next week.

7              MR. REED:  Okay.

8              THE COURT:  Fine.  So if I understand you correctly,

9   you're withdrawing the designation of Evan Hendricks as an

10  expert witness.

11             MR. REED:  I would like to -- I would like to wait --

12  I'm going to go through the -- hopefully tonight -- the report.

13  And if it's -- if his -- based on your order, excludes -- two

14  orders, the order you just dictated and the order that you just

15  recited --

16             THE COURT:  Fair enough.

17             MR. REED:  -- excludes a lot of his testimony.

18             THE COURT:  The only thing I ask you to do -- you're

19  clearly entitled to that opportunity.  By Wednesday at 5

20  o'clock, please advise Ms. Hager whether you're intending to

21  call Mr. Hendricks as a witness.  Okay?  Either way, okay?

22             MR. REED:  Fine.

23             THE COURT:  So let her know by e-mail or whatever; no

24  I'm not going to call him; yes, I am going to call him.  Okay?

25  Because I just want each side to know who the witnesses are.

1    Okay?

2              MS. HAGER:  Yes, thank you, Your Honor.  And I think

3    that Mr. Reed's determination as to Mr. Hendricks will factor

4    into our decision on Mr. Marquis as well.

5              THE COURT:  Well, I've already ruled with respect to

6    the credit report issue.  But the Hendricks expert report was

7    broader than just that.  But I'm not -- the one piece of it

8    that I expressly ruled on is with respect to credit reports.

9    Okay.

10             Both sides -- so I know we got your briefs this

11   morning, your pre-trial memorandum.  And I think you brought

12   yours with you.  Is that --

13             MR. REED:  Yeah, I filed -- I was directed to file --

14             THE COURT:  That's fine.  We'll get it.  And have you

15   given Ms. Hager a copy?

16             MR. REED:  I --

17             THE COURT:  Did you e-mail it to them, or?

18             MR. REED:  Okay, I will.

19             THE COURT:  Okay.

20             MR. REED:  I didn't know I -- I didn't know -- I think

21   that the way I read it, I didn't know if I should -- that was a

22   question for today:  do I just hand it in?  I didn't even know

23   if I should file it --

24             THE COURT:  Well --

25             MR. REED:  -- or do I give it to --

1          THE COURT:  -- you don't have an ECF password; they

2     do.  They --

3          MR. REED:  Plus, I didn't know if I got their briefs.

4     I hadn't -- I hadn't received them electronically, so I didn't

5     know, do I get their briefs?  Do I get a copy of their --

6          THE COURT:  Of course you do.

7          MR. REED:  Yeah.

8          THE COURT:  After the hearing's over, talk to each

9     other, okay?  Yes, you get the briefs.  I want everybody

10    understanding exactly what each side's arguing.  Okay.

11         Timed trial, six hours to each side.  Use it

12    judiciously so you don't run out of time.  Okay.

13         I'm permitting you to testify as a witness in what's

14    referred to as the narrative form.

15         MR. REED:  I was looking that up.

16         THE COURT:  You don't need to ask yourself questions

17    and answer the questions.  Ms. Hager can certainly object to

18    portions of your testimony.  You don't get carte blanche

19    because you're pro se.

20         But some issues, Ms. Hager, we'll -- that you might

21    object to, I will decide on the appropriate weight.  I think I

22    can sort out what's admissible -- I'm not trying to tell you

23    don't object.  Okay?

24         I don't allow speaking objections.  What that means

25    is, if you -- obviously you have to speak, Mr. Reed.  But that

1   means if you have an objection to a question that Ms. Hager

2   asks of one of her witnesses, all you need to say is

3   "objection", okay, you don't have to give me the grounds.  If I

4   need any more from you, I will -- I don't want to hear speeches

5   from either side about -- okay?

6          So all you -- if there's something that's

7   objectionable, there's no jury here.  Okay?  I think I can sort

8   through stuff.  Okay?  But if you have an objection to a

9   question she asked, you need to state "objection" before the

10  witness answers.  Okay?  You just say "objection", and I'll --

11  if I need more from you, I'll ask.  And Ms. Hager, same goes to

12  you.  Okay?

13         MS. HAGER:  Yes, Your Honor.

14         THE COURT:  All right.  Any other questions about the

15  evidentiary hearing?  So we're going to start promptly at 9

16  o'clock.

17         MR. REED:  Yes, I'm sleeping over the night before,

18  Your Honor.

19         THE COURT:  All right.  That solves that.

20         MR. REED:  I've done that before.

21         THE COURT:  Okay, Ms. Hager, anything else for today?

22         MS. HAGER:  Your Honor, Mr. Reed and myself were

23  trying to stipulate to the admissibility of certain facts --

24         THE COURT:  Okay.

25         MS. HAGER:  -- and documents.  We tried last week to

1  have a meeting --

2          THE COURT:  Well, you're both here, so when I get off

3  the bench, you can meet.

4          MS. HAGER:  Right.  Well, I did just want to state

5  that we've provided him last week with our proposed

6  stipulations of fact and also our witness list.

7          THE COURT:  Okay.

8          MS. HAGER:  And so definitely wanted to -- because I

9  think we can narrow some issues and make things easier for next

10 week.  So I --

11         THE COURT:  I would appreciate it if you both could do

12 that.  Okay?  Because there are going to be a lot of things

13 that aren't contested.  All right?

14         Mr. Reed, let me ask you another question.  Because

15 this has been an issue that was discussed at prior hearings.

16 Do you have any evidence of -- do you intend to offer any

17 evidence of the amount of attorneys' fees, if any, that you

18 incurred in defending the foreclosure action which was

19 ultimately dismissed?

20         MR. REED:  I -- we supplied them during discovery, and

21 I supplied them --

22         THE COURT:  Okay.

23         MR. REED:  -- they'll go in as exhibits.

24         THE COURT:  Okay.

25         MR. REED:  We were finally able to obtain them from

 1    their accountant.

 2              THE COURT:  Okay.  Anything else you want to raise

 3    today, Mr. Reed?

 4              MR. REED:  Who's picking up the baby from daycare

 5    today.  And my wife graduated -- or finished nursing school.

 6              THE COURT:  Congratulations to her.

 7              All right, Ms. Hager?

 8              MS. HAGER:  Your Honor, maybe just to round things

 9    out, we had some settlement discussions a few weeks back.  The

10    Borrower Trust made an offer which Mr. Reed didn't accept.  I

11    don't think that settlement is a possibility at this time, but

12    I just wanted to inform Your Honor that it was something that

13    we had explored.

14              THE COURT:  Settlement's always a possibility.  You

15    know, Mr. Reed, you have to think about -- look, I don't get in

16    the midst of settlement discussions, because I've got to be the

17    trier of fact.  Okay?  But the parameters of this trial have

18    been set by my rulings.  I wanted both of you to go into this

19    trial knowing what issues are open for evidence and argument

20    and what issues are not.  And I think I've done that.  You may

21    disagree, but that's -- it is what it is.

22              And so settlements are often reached -- you both

23    have -- you're both on a level playing field now, because you

24    know what it is the Court has said he will listen to and what

25    he said he won't listen to.  Okay?  And it ought to give you a

RESIDENTIAL CAPITAL, LLC, ET AL.                    45

1   sense of what do I have a reasonable chance of recovering and

2   what not; and am I better off trying to reach a settlement?

3   But you either will or you won't, you know?

4           The time -- I've set aside the time for the trial.

5   Okay?  I encourage you to both continue to talk.  You're both

6   here, so when I leave the bench, I encourage you to see if you

7   can work out the issue of stipulations.  If you want to talk

8   about settlement, that's fine.

9           MS. HAGER:  Sure.

10          THE COURT:  Okay, anything else you want to raise

11  today?

12          MS. HAGER:  No, Your Honor.  Thank you.

13          THE COURT:  Mr. Reed, anything else?

14          MR. REED:  That's it, Your Honor.

15          THE COURT:  Okay.  See you next week.

16          MS. HAGER:  Thank you, Your Honor.

17          MR. WISHNEW:  Thank you for your time, Your Honor.

18      (Whereupon these proceedings were concluded at 11:04 AM)

19

20

21

22

23

24

25

1

2                                  I N D E X

3

4                                  RULINGS

5                                           Page      Line

6   Trust's seventieth omnibus objection to    19        10

7   claims is sustained as to all claims but the

8   Quiroz claim.

9   Trust's motion in limine to exclude expert   23        9

10  testimony is denied.

11  The Court will not exclude the experts'    23        17

12  testimony in its entirety.

13  Mr. Reed and his experts may not testify    23        20

14  about the effect of credit reporting.

15  Expert testimony about any alleged damages   23        25

16  resulting from the Reeds' failed efforts to

17  refinance the mortgage on the property will

18  only be permitted if competent evidence is

19  offered and admitted.

20  None of the experts will be permitted to     24        8

21  testify about noneconomic damages, as they

22  are not qualified to do so.

23  Ms. Donati may testify about NJ foreclosure  24        16

24  custom, practice and procedures, but not

25  whether the debtors violated such rules.

```
 1                              RULINGS

 2                                               Page      Line

 3    Expert testimony will be permitted for the    24        21

 4    alleged economic damages suffered by the

 5    Reeds.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                        C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10

11    _____

12    PENINA WOLICKI

13    AAERT Certified Electronic Transcriber CET**D-569

14

15    eScribers

16    700 West 192nd Street, Suite #607

17    New York, NY 10040

18

19    Date:   September 9, 2014

20

21

22

23

24

25