**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**FOR PUBLICATION**

In re:

RESIDENTIAL CAPITAL, LLC, *et al.*

Debtors.

Case No. 12-12020 (MG)

Jointly Administered

---

**MEMORANDUM OPINION AND ORDER DETERMINING THE AMOUNT OF**
**ALLOWED CLAIM OF FRANK AND CHRISTINA REED**

*A P P E A R A N C E S:*

FRANK REED
*Pro Se*
817 Matlack Drive
Moorestown, New Jersey 08057
By:    Frank Reed

REED SMITH LLP
*Attorneys for ResCap Borrower Claims Trust*
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, New Jersey 08540
By:    Diane A. Bettino, Esq.
       Barbara K. Hager, Esq.

MORRISON & FOERSTER LLP
*Attorneys for ResCap Borrower Claims Trust*
250 West 55th Street
New York, New York 10019
By:    Norman S. Rosenbaum, Esq.
       Jordan A. Wishnew, Esq.
       Meryl L. Rothchild, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

This is a case involving, on the one hand, seemingly undeserving borrowers—who have

not paid their mortgage, property taxes, or homeowners' insurance for over seven years but

continue to occupy their home—and, on the other, a loan servicer that was willing to cut corners

and ignore applicable law while proceeding with an improperly filed foreclosure action.  Frank

and Christina Reed (the "Reeds") defaulted on their mortgage in early 2008; their default led to

two related prepetition lawsuits filed in New Jersey state court: (1) a foreclosure action initiated

by their then loan servicer, GMAC Mortgage, LLC ("GMACM"), on May 19, 2008 (the

"Foreclosure Action") and (2) a lawsuit filed by the Reeds against GMACM and Residential

Funding Corp.[1] related to the Foreclosure Action on May 10, 2010 (the "Reed Action").  The

Reeds filed four claims (the "Claims") in these bankruptcy cases:  two claims against GMACM[2]

and two claims against Residential Capital, LLC ("ResCap"),[3] based on the prepetition lawsuits.

As described below, the Foreclosure Action was dismissed because GMACM could not

prove that it complied with New Jersey notice requirements before commencing its foreclosure

action.  Thereafter, the Reeds filed the Reed Action against GMACM for wrongful foreclosure,

negligence, breach of contract, and estoppel.  The Reeds were permitted to amend their original

complaint (the "Reed Complaint"), and filed an amended complaint (the "Amended Complaint")

on January 6, 2012, adding claims for economic and non-economic losses stemming from the

Foreclosure Action, punitive damages, and consumer fraud.  The Reeds voluntarily dismissed the

Reed Action on February 9, 2012, to participate in the Federal Reserve Board's Independent

Foreclosure Review.  On May 14, 2012 (the "Petition Date"), ResCap and various related entities

(collectively, the "Debtors") filed chapter 11 bankruptcy petitions, and the Reeds filed the

Claims, seeking relief for the following:  violation of the New Jersey Fair Foreclosure Act (the

"FFA") (Claim No. 1); negligence (Claim No. 2); breach of contract (Claim No. 3); punitive

---

[1]      Residential Funding Corp. was the predecessor of Residential Funding Company, LLC, a Debtor entity.
For the purposes of this Opinion, the Court will refer to both as "RFC."

[2]      Claim Nos. 3759 (filed by Mr. Reed on November 8, 2012) and 4736 (filed by Mrs. Reed on November 14,
2012).

[3]      Claim Nos. 3708 (filed by Mr. Reed on November 8, 2012) and 4759 (filed by Mrs. on November 14,
2012).  The Reeds assert that a "scrivener's error" led to the filing against ResCap; in fact, they intended to assert
these claims against RFC.  (Response ¶ 120.)  The Trust agreed to the Reeds' request to amend the designation of
these claims.  (Reply ¶ 4 n.5.)  Therefore, the Court will treat Claim Nos. 3708 and 4759 as asserted against RFC.

damages related to actual malice (Claim No. 4); violation of the New Jersey Consumer Fraud

Act (the "CFA") (Claim No. 5); and malicious use of process (Claim No. 6).  Additionally, the

Reeds sought to establish a constructive trust to avoid alleged unjust enrichment (Claim No. 7)

and to be "made whole" under the Consent Order (defined below) (Claim No. 8).

      The ResCap Borrower Claims Trust (the "Trust"), successor in interest to the Debtors for

the purpose of resolving borrower claims, filed an objection to the Reeds' Claims on May 29,

2014.[4]  After a hearing on the Objection on July 9, 2014, the Court sustained the Objection in

part and overruled the Objection without prejudice in part.  (*See* "Preliminary Reed Order," ECF

Doc. # 7246.)  The Court additionally set an evidentiary hearing (the "Evidentiary Hearing") for

September 15–16, 2014, for claims 2 (negligence), 3 (breach of contract), 4 (punitive damages

based upon actual malice), and 5 (the Reeds' CFA claim) (collectively, the "Surviving Claims");

the Trust's Objection to the Reeds' other claims was sustained.[5]  (*See id.*)  The purpose of the

Evidentiary Hearing was to determine whether the Trust is liable for any of the Reeds' Surviving

Claims and, if so, the amount of damages incurred by the Reeds as a result.

---

[4]     *See ResCap Borrower Claims Trust's Objection to Proofs of Claim Filed by Frank Reed and Christina Reed Pursuant to Section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007* (the "Objection," ECF Doc. # 7017).  Attached to the Objection is the Declaration of Lauren Graham Delehey (the "Delehey Decl.," Objection Ex. 3; admitted in evidence as Ex. B).  The Reeds filed a response (the "Response," ECF Doc. # 7153), attaching hundreds of pages of exhibits purporting to support their Claims filed in these chapter 11 cases, including a Declaration of Frank Reed (the "Reed Decl.," ECF Doc. # 7153-36).  The Trust filed a reply (the "Reply," ECF Doc. # 7228), attaching the Supplemental Declaration of Lauren Graham Delehey (the "Supp. Delehey Decl.," Reply Ex. 1).

[5]     In advance of the Evidentiary Hearing, the parties filed several additional briefs on September 8, 2014. The Trust filed its Pretrial Memorandum (ECF Doc. # 7494) and Proposed Findings of Fact and Conclusions of Law (ECF Doc. # 7495), and the Reeds filed a Pretrial Memorandum (ECF Doc. # 7504).  The Reeds' Pretrial Memorandum includes their proposed findings of fact and conclusions of law.  The Parties also presented the Court with pre-marked exhibits and witness lists.

At the Evidentiary Hearing,[6] the Reeds called four witnesses:  (1) Mr. Reed;[7] (2) Christy Donati, a New Jersey attorney who testified regarding foreclosure custom and practice in New Jersey; (3) Evan Hendricks, who testified regarding the effect of a *lis pendens* on refinancing a mortgage loan; and (4) Drew Murdock, a friend of the Reeds.  The Trust called one witness, Lauren Graham Delehey, Chief Litigation Counsel of the Trust and, formerly, of the Debtors (after the Petition Date) and ResCap (before the Petition Date).  In addition to the testimony from these witnesses, each of the parties submitted documentary evidence over the course of the two-day Evidentiary Hearing.

After considering all of the evidence and arguments, the Court determines pursuant to section 502(b) of the Bankruptcy Code that the Reeds are entitled to one allowed unsecured claim against GMACM in the amount of $17,469.00, on one of their claims under the New Jersey Consumer Fraud Act—the amount of attorneys' fees they incurred ($5,823) in defending against the Foreclosure Action, trebled.[8]  The Reeds have not demonstrated that any other damages are recoverable from GMACM on any of the theories asserted in their Claims.

---

[6]     Trial exhibits were pre-marked:  The Reeds' trial exhibits were marked with numbers and are referenced in this Opinion as, *e.g.*, Ex. 1, Ex. 2, etc.; the Trust's trial exhibits were marked with letters and are referenced in this Opinion as, *e.g.*, Ex. A, Ex. B., etc.  References to the trial transcript in this Opinion are shown as [date] Tr. [page]: [lines].

[7]     References in this Opinion to both Frank and Christina Reed are to the "Reeds."  References to Frank Reed alone are hereinafter to "Reed."

[8]     As explained below, the Reeds' two Claims against RFC (Claims 3708 and 4759) are disallowed and expunged.  The Reeds' two Claims against GMACM (Claims 3759 and 4736), one filed by each of the Reeds, are duplicative.  Therefore, the Court will allow Claim 3759 (filed by Mr. Reed) in the amount determined in this Opinion; Claim 4736 (filed by Mrs. Reed) is disallowed.

# I.    FACTUAL FINDINGS[9]

## A.    Chapter 11 Proceedings

On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The General Bar Date to file proofs of claim was originally set for November 9, 2012, and was extended to November 16, 2012 at 5:00 p.m. (Prevailing Eastern Time) (ECF Doc. # 2093).  All of the Claims were timely filed.

On March 21, 2013, the Court entered the Procedures Order, approving, among other things, procedures to be applied for objections to claims filed by current or former Borrowers (the "Borrower Claims Procedures") (ECF Doc. # 3294).  The Procedures Order includes specific protections for Borrowers and sets forth a process for the Debtors (and now the Trust) before objecting to certain categories of Borrower Claims.  The Borrower Claims Procedures require that before objecting to certain Borrower Claims, the Trust must send the Borrower a letter (a "Request Letter") requesting additional documentation in support of the purported claim. (*See* Procedures Order at 4.)

On December 11, 2013, the Court entered an *Order Confirming Second Amended Joint Chapter11 Plan Proposed by Residential Capital, LLC, et al. and The Official Committee of Unsecured Creditors* (the "Confirmed Plan," ECF Doc. # 6065).  The Confirmed Plan became effective on December 17, 2013 (the "Effective Date").  (ECF Doc. # 6137.)  On the Effective Date, the Trust and the ResCap Liquidating Trust were established as successors in interest to the Debtors; the Trust is the successor in interest specifically with respect to Borrower Claims.  (*Id.*) The Trust was established to, among other things, "(i) direct the processing, liquidation and

---

[9]    This Opinion contains the Court's findings of fact and conclusions of law pursuant to FED. R. BANKR. P. 52, made applicable by FED. R. CIV. P. 52.  In making its findings of fact, the Court has resolved credibility issues and the weight appropriately given to conflicting evidence.  Where contested or disputed facts or opinions were offered during trial, this Opinion reflects the Court's resolution of those disputes, whether or not the Opinion specifically refers to the contrary evidence introduced by the opposing parties.

payment of the Allowed Borrower Claims in accordance with the Plan, and the distribution procedures established under the Borrower Claims Trust Agreement, and (ii) preserve, hold, and manage the assets of the Borrower Claims Trust for use in satisfying the Allowed Borrower Claims." (Confirmed Plan, Art. IV.F.)  The Trust is empowered to object to borrower claims that it believes do not reflect liability of the Debtors.  The Trust filed its Objection to the Claims on May 29, 2014.

### B.    The Reed Loan

On May 31, 2006, the Reeds borrowed $1,000,000 (the "Loan") from Metrocities Mortgage, LLC ("Metrocities Mortgage"), evidenced by a note (the "Note") secured by a mortgage (the "Mortgage") on real property located at 817 Matlack Drive, Moorestown, New Jersey (the "Property").[10]  GMACM began servicing the Loan on June 27, 2006 but never owned the Note.  GMACM continued servicing the Loan until servicing was transferred to Ocwen Loan Servicing, LLC ("Ocwen") on February 15, 2013.  Ocwen thereafter transferred servicing to 21st Mortgage Corp. on October 1, 2013.  RFC acquired the Loan on December 30, 2009 from non-debtor GMAC Bank (which, in turn, acquired the Loan from the originator, Metrocities Mortgage); RFC transferred the Note to 21st Mortgage Corp. on February 6, 2013.  21st Mortgage Corp. currently owns and services the Reed Loan; it filed a foreclosure complaint against the Reeds on March 5, 2014.  (*See* Ex. UU.)

The Reeds made their last monthly payment on the Loan on January 4, 2008.  (*See* Ex. A (Servicing Notes), entry for 1/4/2008.)  But, according to the Servicing Notes, the Reeds had not paid property taxes on the Property since the third quarter of 2006.  On October 18, 2007, Moorestown Township informed GMACM that the Property was going to be sold in a tax sale;

---

[10]    The Reeds took out a second loan, also from Metrocities Mortgage, in the amount of $414,400, secured by a second mortgage on the Property (the "Second Mortgage").  (*See* Ex. KK (HUD Settlement Statement for Reed Closing).)  The Second Mortgage was repaid in full and is not the subject of the Reeds' Claims.

unpaid property taxes totaled $1,892.44 for 2006, and $32,683.61 for 2007 through October 18, 2007.  (*See id.*, entry for 10/18/2007; *see also* Sept. 16, 2014 Tr. 133:17–25.)  Prior to the notice of tax sale, the Reeds' monthly payments did not include an escrow for taxes and insurance. (*See* Sept. 16, 2014 Tr. 135:12–14.)  GMACM then altered the monthly payments, as it was permitted to do, establishing an escrow for property taxes and insurance premiums, with GMACM making those payments directly.  (*Id.* 135:19–24 (referencing Servicing Notes, entry for 10/18/2007).)  The altered monthly payment became effective beginning February 1, 2008, but the Reeds never made the February Mortgage payment.  The Reeds have not made *any* monthly Mortgage payments for the period February 1, 2008 through July 1, 2014.  (*See* Trust's Request for Admissions Directed to Claimants ¶¶ 9–25.)  The Reeds have not made *any* property tax payments for the period June 1, 2008 through July 1, 2014.  (*Id.* ¶¶ 28–33.)  Finally, the Reeds have not made *any* insurance premiums on the Property for the period June 1, 2008 through July 1, 2014.  (*Id.* ¶¶ 34–39.)

       *1.   The Foreclosure Action*

       The Reeds defaulted on the Loan in March 2008, after they failed to make their payments for thirty days.  (*See* Servicing Notes, entry for 3/18/2008.)  GMACM sent at least one letter notifying the Reeds that their mortgage payments were delinquent and remained due and owing. (*See id.*; "Notice of Default Letter," Delehey Decl. Ex. A.)  GMACM contends that, in addition to this notice, it mailed a Notice of Intent to Foreclose ("NOI") to the Reeds pursuant to the FFA, but it is unable to prove this contention.  The Reeds deny that they received an NOI, and GMACM's failure to produce proof of mailing an NOI was the basis for the dismissal without prejudice of the Foreclosure Action.

GMACM filed the Foreclosure Action on May 19, 2008 in the Superior Court of New

Jersey, Chancery Division (the "Chancery Division Court"). (*See* Ex. G (Complaint of

Foreclosure – GMACM).) GMACM also recorded a *lis pendens* on the Property on May 28,

2008. (*See* Ex. 6 (Lis Pendens).) Mortgage Electronic Registration Services, Inc. ("MERS"),

identified in the Mortgage as nominee for Metrocities Mortgage and its successors and assigns,

assigned the Mortgage to GMACM on May 22, 2008.[11] (*See* Delehey Decl. Ex. D.) Jeffrey

Stephan, a now-former GMACM employee and admitted robo-signer, signed the assignment of

mortgage on behalf of MERS. (*Id.*) In its motion for summary judgment in the Foreclosure

Action, GMACM asserted that it was the holder of the Note and Mortgage. (*Id.*) However, the

Trust did not provide any evidence to this Court that it was the holder of the Note at the time it

initiated the Foreclosure Action or at any other time thereafter; instead, the Trust relied only on

the assignment of the Mortgage from MERS. (*See* Trust's Pretrial Memorandum at 12; Trust's

Proposed Findings of Fact and Conclusions of Law ¶ 30.)

GMACM maintains that it mailed an NOI to the Reeds before filing the Foreclosure

Action but, as GMACM explained to the Chancery Division Court, it was unable to locate either

the NOI or the certified mail receipt. (Delehey Decl. ¶ 15.) The Debtors maintain that,

regardless of this deficiency, GMACM had a good faith basis for filing the Foreclosure Action; it

is undisputed that the Reeds defaulted on the Mortgage. The Reeds filed an answer in the

Foreclosure Action (the "Answer," Delehey Decl. Ex. C) on June 24, 2008. GMACM filed a

motion for summary judgment (the "Summary Judgment Motion," Delehey Decl. Ex. D) in July

2008; the Reeds filed a cross-motion for summary judgment (the "Summary Judgment Cross-

---

[11]    As explained below, it is legally significant that the assignment of the Mortgage to GMACM did not occur
until *after* the Foreclosure Action was filed; the Mortgage must be assigned to the loan servicer *before* a foreclosure
action is filed.

Motion," Delehey Decl. Ex. E), arguing that the Foreclosure Action should be dismissed due to
failure to provide a proper NOI.

In the fall of 2008, the Foreclosure Action was stayed as the Reeds requested a
"stop/gap"[12] loan modification.  (*See* Ex. A (Servicing Notes), entry for 7/23/2008.)  GMACM
sent the Reeds a HOPE NOW[13] letter on July 23, 2014;[14] Reed met with a HOPE NOW
representative, Mark Folweiler, on July 26, 2008.  (*Id.*, entry for 7/26/2008.)  At that meeting,
Reed indicated to Folweiler that he had a buyer for the Property, but the buyer had breached a
contract in December of 2007.  (*Id.*)  Reed told Folweiler that the Property was on the market
and that Reed was evaluating a potential offer and, consequently, did not want to go deeper into
foreclosure.  (*Id.*)  Folweiler explained the stop/gap payment plans to Reed, who told Folweiler
that he could afford to make $7,000 payments per month for three months.  (*Id.*)  The agreement
(the "Foreclosure Repayment Agreement") Reed discussed with Folweiler would have initiated a
forbearance plan with GMACM, beginning August 1, 2008, to allow the Reeds time to sell the
Property.  (*See* Delehey Decl. ¶ 21.)  Under the terms of the Foreclosure Repayment Agreement,
the Reeds were required to make a $3,000 down payment on August 1, 2008, and $7,000
payments each month beginning on August 30, for six months, or until the Property was sold.
(Servicing Notes, entry for 7/31/2008; Ex. YY (Foreclosure Repayment Agreement); Ex. ZZ
(Foreclosure Repayment Agreement Signature Page, signed 8/8/2008).)

---

[12]     A "stop/gap" is an arrangement designed to allow a borrower time to become current on his mortgage, to
bring the loan back into compliance, and avoid foreclosure.  (Sept. 16, 2014 Tr. 139: 21–23.)  A stop/gap does not
work like a loan modification—it does not change the terms of the loan or the maturity date of the loan.  (*Id.* 140:6–
9.)  Instead, it allows the borrower only additional time to bring the loan current, according to an exact schedule.
(*Id.* 140:9–12.)  If the borrower complies with the schedule, the foreclosure is not withdrawn, but it is stayed as long
as the borrower is making timely payments.  (*Id.* 140:13–17.)

[13]     HOPE NOW is a partnership between mortgage companies, including GMACM, and non-profit housing
counselors.  Representatives from HOPE NOW would meet with borrowers in an attempt to work out loan
modifications to allow borrowers to avoid foreclosure.  (Sept. 16, 2014 Tr. 137:19–23.)

[14]     GMACM also sent the Reeds HOPE NOW letters in April, May, and June 2008; the Reeds did not respond.
(Sept. 16, 2014 Tr. 138:16–22.)

A GMACM representative contacted Reed on August 1, 2008 to review the Foreclosure

Repayment Agreement and to discuss whether Reed could afford it, but Reed refused to discuss

his financial situation with the representative.  (Servicing Notes, entry for 8/1/2009.)  Instead, he

advised the representative that he was not interested in working on arrangements with

GMACM—he only wanted to keep the Property long enough to sell it.  (*Id.*)  Reed said he was

looking for a plan that would enable him to stay the foreclosure for one month to give him time

to close a sale that was then in progress.  (*Id.* ("Justification for resolution chosen is able to

provide listing agreemnt [*sic*] that qualify for one month plan, to give time for spo [*sic*] in

progress to get finalized.").)  The GMACM representative advised Reed of the terms (including

the $3,000 down payment and $7,000 monthly payments for six months), payment options, late

fees, credit implications, potential future breach implications respecting the foreclosure process,

and Reed was told that there would be no grace period associated with the Foreclosure

Repayment Agreement.  (*Id.*)

But Reed did not fax the signed Foreclosure Repayment Agreement or deliver the $3,000

down payment on August 1, 2008 as required.  (Servicing Notes, entry for 8/1/2008; Sept. 16,

2014 Tr. 140:1–5.)  GMACM followed up with a phone call to Reed on August 13, 2008, to

discuss the late payment; GMACM agreed to extend the grace period until August 18, 2008, to

allow the Reeds to send the $3,000 payment.  (Servicing Notes, entries for 8/11/2008, 8/13/2008;

Sept. 16, 2014 Tr. 147:24–148:20.)  GMACM received the executed Foreclosure Repayment

Agreement and $3,000 initial payment from the Reeds on August 18, 2008.  (Servicing Notes,

entry for 8/18/2008; Sept. 16, 2014 Tr. 148:22–149:5.)  Reed did not make the first required

monthly payment by September 1, 2008 (*see* Servicing Notes, entry for 8/1/2008), and GMACM

was unable to reach Reed by phone to discuss the delinquency (*see id.*, entries for 9/3/2008,

9/10/2008). On September 16, 2008, GMACM cancelled the Foreclosure Repayment Agreement

after Reed did not make the required $7,000 payment.[15] GMACM then advised its counsel to

proceed with the Foreclosure Action.[16] (*Id.*, entry for 9/16/2008.)

---

[15]    GMACM held the $3,000 deposit in a suspense account, which was ultimately transferred to 21st Mortgage Corp., the successor servicer and owner of the Loan. (Supp. Delehey Decl. ¶ 7.)

[16]    The Servicing Notes reflect other purported efforts by GMACM to reach a loan modification agreement with the Reeds. Reed denied any knowledge of several of these efforts. The Court is unable to resolve the conflicting evidence, arising from Reed's trial testimony, Delehey's trial testimony, and the Servicing Notes. It is clear to the Court (and the Court finds) that with respect to the forbearance agreement that Reed acknowledges he reached with GMACM, Reed had no intention to make the required monthly payments. Rather, the Court finds that Reed was using the forbearance agreement as a stalling tactic to delay foreclosure while he tried to sell the Property.
    The Trust offered evidence that GMACM and the Reeds attempted to work out either a repayment agreement or a loan modification. The Trust points to the Servicing Notes, which indicate that GMACM received a financial package from the Reeds on May 7, 2009 (*see* Servicing Notes, entry for 5/7/2009; Sept. 16, 2014 Tr. 152:9–13) and approved a loan modification on May 10, 2009 (*see* Servicing Notes, entry for 5/10/2009; Sept. 16, 2014 Tr. 151:5–20). The Reeds never returned the executed loan modification documents to GMACM, and the loan was not modified. (*See* Sept. 16, 2014 Tr. 151:22–23, 155:13–14.) This loan modification was not a HAMP modification; the Reeds would not have been eligible for a HAMP modification at this time because, as explained below, the Property was not owner-occupied in 2009.
    Additionally, the Trust contends that another forbearance agreement was offered to the Reeds in July 2009, when GMACM approved the Reeds for a "thirty percent reduction campaign" and sent the Reeds a solicitation to participate. (Sept. 16, 2014 Tr. 155:18–156:5.) This plan was never finalized because Reed called GMACM and indicated that he could not make a payment until the end of the month. (*See* Servicing Notes, entry for 8/6/2014; Sept. 16, 2014 Tr. 156:17–157:6.) The Reeds were subsequently approved for a non-HAMP trial modification on August 13, 2009 (*see* Servicing Notes, entry for 8/13/2009; Sept. 16, 2014 Tr. 157:6–13), but the trial plan was not completed because the Reeds failed to make any payments (*see* Servicing Notes, entry for 8/31/2009 ("REPAY PLAN CANCELED AUTOMATIC"); Sept. 16, 2014 Tr. 157:14–19). In fact, on the day that GMACM was expecting payment on this trial modification, the Servicing Notes indicate that Reed contacted GMACM by fax to see if GMACM would accept a short payoff of $480,000 and release the lien in full; GMACM did not accept that offer. (*See* Servicing Notes, entry for 8/31/2009; Sept. 16, 2014 Tr. 157:19–23.)
    Reed contends that he never received any communications from GMACM and does not recall ever sending GMACM a financial package seeking a loan modification. (Sept. 16, 2014 Tr. 173:14–16.) Though the Servicing Notes indicate that, on multiple occasions, GMACM called and left messages for the Reeds, Reed asserts that he does not recall receiving phone calls. (*Id.* 173:19–20.) He apparently believes that GMACM may have sent the documents to his address in New Jersey at a time that he was living in Virginia. He does not recall if he had mail forwarded to him from New Jersey while he was living in Virginia (*id.* 174:13–16), and does not recall contacting GMACM while he was living in Virginia, from approximately Thanksgiving 2008 to Thanksgiving 2010. (*Id.* 174:17–24.)
    The Trust, in turn, claims that GMACM would send borrowers correspondence at their residence, unless instructed of a change of address by the borrower. (*Id.* 170:15–17.) If a borrower contacted GMACM to indicate a change of address or change of phone number, the changes would be reflected in the Servicing Notes. (*Id.* 170:21.) Delehey testified that she checked but did not find any entries in the Servicing Notes for mail marked "return to sender." (*Id.* 170:22–171:7.)
    What Delehey *failed* to clarify, however, is that there are many indications in the Servicing Notes that GMACM was informed that it had the wrong number, presumably after Reed vacated the Property in late 2008. (*See, e.g.*, Servicing Notes, entries for 5/11/2010.) The Servicing Notes reflect that Reed contacted GMACM multiple times after he resumed residence at the Property and *he refused* to provide his telephone number to GMACM. (*See, e.g.*, *id.*, entries for 11/5/2012, 12/13/2012.) It is clear from the Servicing Notes that the parties failed to communicate and reach resolution on numerous occasions. The Court does not need to resolve the factual

The Chancery Division Court denied the GMACM's Summary Judgment Motion and granted the Reeds' Summary Judgment Cross-Motion on February 9, 2009. (*See* Claims, Ex. A.) The Chancery Division Court determined that the Foreclosure Action should be dismissed without prejudice because GMACM could not prove that it delivered an NOI in accordance with N.J.S.A. 2A:50-56. (*Id.*) It appears that, for the purposes of deciding the cross-motions for summary judgment, the Chancery Division Court credited GMACM's assertion that it was the holder of the Note; Reed, while proceeding *pro se* in the Foreclosure Action, filed the Summary Judgment Cross-Motion, arguing only that the action should be dismissed for failure to comply with the FFA. (Delehey Decl. Ex. E.)

While the issue was not argued by the parties or addressed by the Chancery Division Court, the record before this Court establishes that GMACM did not have standing to bring the Foreclosure Action when it was filed for three reasons: First, GMACM did not obtain an assignment of the Mortgage until after the Foreclosure Action was filed; second, the assignment to GMACM that was executed on behalf of MERS by GMACM's employee, Jeffrey Stephan, falsely stated that MERS transferred the Note to GMACM, an impossibility since MERS did not own or have authority to transfer the Note; and third, GMACM did not hold the Note or demonstrate that it was given authority to bring the Foreclosure Action on behalf of the noteholder. These grounds would have been fatal to GMACM's effort to foreclose on the Property when it commenced the Foreclosure Action, apart from GMACM's failure to provide the Reeds with the NOI under New Jersey's FFA. The Court concludes that this conduct by

---

disputes regarding whether GMACM contacted the Reeds or the Reeds contacted GMACM regarding additional stop/gap repayment options or loan modification plans. The Reeds do not allege that they were wrongfully denied a loan modification or that GMACM acted improperly as servicer outside of its role in the Foreclosure Action, and these factual disputes are not relevant to the determination of the Reeds' Claims.

GMACM was wrongful, and, as explained below, supports the Reeds' CFA claim against GMACM.

Despite the dismissal without prejudice on February 9, 2009, a final judgment was not entered in the Foreclosure Action until August 9, 2013.  (*See* Delehey Decl. Ex. F, "Docket for the Foreclosure Action.")  It is unclear to the Court why the Foreclosure Action was not actually dismissed until more than four years after the dismissal order was entered.  The *lis pendens* GMACM filed on the Property on May 28, 2008 remained on record throughout this period, and before it would have expired at the end of its five-year duration (*see* N.J.S.A. 2A:15-11), Ocwen, the successor to GMACM as loan servicer, filed a *lis pendens* on the Property.  21st Mortgage Corp. currently has a *lis pendens* on the Property, associated with its own foreclosure action against the Reeds, which is pending.

The Reeds never filed a lawsuit to have GMACM's *lis pendens* discharged.  (Ex. OO (Trust's Request for Admissions Directed to Claimants)[17] ¶ 51.)  The Reeds never made a written request to GMACM, GMACM's attorneys in either the Foreclosure Action or the Reed Action, or the Clerk of Burlington County to have the *lis pendens* discharged.  (*Id.* ¶¶ 52–55.)  The Reeds never made an effort to have the *lis pendens* on the Property discharged.  (*Id.* ¶ 56.)

In connection with the Foreclosure Action, the Reeds retained several lawyers, including (1) Jeffrey S. Walters (who Reed admits was only minimally involved (*see* Sept. 16, 2014 Tr. 48:11–14)); (2) Linda Campbell; and (3) Matt McCrink.  Reed contends that Campbell's fees related to the Foreclosure Action total $1,840.00 (*see* Exs. 14, 14a) and that McCrink's fees related to the Foreclosure Action total $3,983.00 (*see* Exs. 15, 15a).  Reed was unable to attribute

---

[17]     The Reeds did not respond to the Trust's Request for Admissions and, pursuant to Federal Rule of Civil Procedure 36(a)(3), the matters are deemed admitted.  *See* FED. R. CIV. P. 36(a)(3)("*Time to Respond; Effect of Not Responding.*  A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney. . . .").

any of Walters' fees to the Foreclosure Action.  (*See* Ex. 13, 13a.)  The Court has reviewed the

exhibits and concludes that the Reeds adequately demonstrated that the fees charged by

Campbell and McCrink were incurred as a result of the Foreclosure Action, for a total of

$5,823.00.  The Court addresses below whether any of these fees are part of any compensable

damages claims by the Reeds.

> 2.  *The Reed Action*

The Reeds filed the Reed Complaint on May 10, 2010 against GMACM, RFC, and

unnamed defendants, allegedly employees or agents of GMACM and RFC.  The Reed Complaint

lists five counts:  (1) GMACM negligently and/or recklessly wrongfully filed the Foreclosure

Action and recorded a *lis pendens* against the Property without first providing an NOI;

(2) GMACM breached its contract—the "financial transaction secured by the mortgage"—with

the Reeds by failing to provide an NOI before commencing the Foreclosure Action; (3) RFC,

after it acquired ownership of the Reed Loan on December 30, 2009, inherited GMACM's

liabilities as GMACM's successor in interest, and is therefore liable for GMACM's actions; (4)

GMACM's and RFC's agents/employees were responsible for GMACM's failure to provide the

Reeds with a NOI; and (5) due to the Foreclosure Action and *lis pendens*, the Reeds were unable

to obtain the funds to pay off their mortgage and their credit was "destroyed," and GMACM,

RFC, and any other successor in interest should be estopped from instituting another foreclosure

action against the Reeds and the Property.  (*See* Reed Compl. at 4–6.)  The Reed Complaint

erroneously states that GMACM was the owner of the mortgage on the Property and that

GMACM transferred ownership of the mortgage to RFC on December 30, 2009.  (*See* Reed

Compl. at 2, ¶¶ 4, 6.)  Non-debtor GMAC Bank transferred ownership of the Note to RFC on

December 30, 2009; GMACM never owned the Note.

GMACM's motion to dismiss the Reed Complaint was denied in July 2010 (the "Order Denying the Motion to Dismiss," Delehey Decl. Ex. G). In its Order Denying the Motion to Dismiss, the New Jersey court does not explain its basis for denying GMACM's motion; instead, it appears that the judge simply wrote "DENIED" on a proposed order submitted by GMACM that would have granted the motion to dismiss submitted by the Defendants. (*See id.*)

The Reeds filed the Amended Reed Complaint on January 6, 2012, adding claims for economic and non-economic losses resulting from the Foreclosure Action,[18] punitive damages for acts taken with actual malice and/or accompanied by a wanton and willful disregard of any potential injury to the Reeds, and consumer fraud under the CFA. (*See* Am. Compl., Claims Ex. E.) The Amended Complaint incorporates the first five counts from the Reed Complaint before focusing on an additional theory of liability—GMACM, in its NOI, was required to inform the Reeds that they had the right to cure any mortgage default before the entry of a final foreclosure judgment, the NOI was not sent, and GMACM falsely led the Reeds to believe that their only option was to remit the entire principal balance and interest (at the time amounting to more than $1,000,000). The Reeds claimed that, at the time, they were approximately three months in arrears and "could have easily cured the default if Defendant had not deceived Plaintiff into believing that he did not have this right."[19] (Am. Compl. ¶ 6.) The Reeds assert that during the

---

[18]    The Reeds list injuries including: (1) their inability to consummate "income-producing transactions" they assert were in progress when the Foreclosure Action was filed; (2) Reeds' inability to resume "income-producing endeavors" that Reed conducted before the Foreclosure Action; (3) injuries stemming from the loss of "at least 3 income-producing rental properties to foreclosure due to Plaintiff's inability to service the mortgages as a result of his compromised income-producing ability"; (4) the destruction of the Reeds' credit; (5) below market offers on the Reeds' home; and (6) mental and emotional distress. (Am. Compl. ¶ 11.)

[19]    In their Brief in Opposition to Defendants' Motion to Bar Expert's Report, the Reeds assert that the three month arrearage was the result of Mrs. Reed's "oversight or prioritizing of funds for business reasons." (Opposition to Defendants' Motion to Bar Expert's Report at 2.) Based on the evidence at trial, the Court finds that the Reeds did not intend to bring the Loan current. GMACM did not deceive the Reeds regarding their right to cure any mortgage default before entry of a final foreclosure judgment.

nine months the Foreclosure Action was pending, their credit was destroyed and they were unable to obtain further financing to conduct their real estate business and earn income. (*Id.* ¶ 8.)

After filing the Amended Complaint, the Reeds sought an order either (1) staying the Reed Action to allow time for the Reeds to participate in the Independent Foreclosure Review or (2) granting leave to voluntarily dismiss the Reed Action without prejudice. On February 9, 2012, the New Jersey court entered an order granting the Reeds' motion to voluntarily dismiss the Reed Action without prejudice (the "Dismissal Order," Delehey Decl. Ex. H).

3. *The FRB Settlement*

Before the Petition Date, several of the Debtors and their affiliates were the subjects of an examination by the Board of Governors of the Federal Reserve System (the "FRB"), the Federal Deposit Insurance Corporation (the "FDIC"), the Office of the Comptroller of the Currency (the "OCC"), and the Office of Thrift Supervision (together with the FRB, the FDIC, and the OCC, the "Regulators"). The Regulators were investigating alleged foreclosure abuses by major mortgage servicing companies, including the Debtors. *Without admitting fault*, Debtors ResCap and GMACM (the "Consent Order Debtors"), as well as non-debtors Ally Financial Inc. ("AFI") and Ally Bank, entered into a consent order with the FRB and the FDIC (the "Consent Order") on April 13, 2011. Under the Consent Order, the Consent Order Debtors, AFI, and Ally Bank agreed to develop and implement certain risk management and corporate governance procedures under the guidance of the FRB. The parties were further required to undertake risk assessment of their mortgage servicing operations and make improvements to their residential mortgage loan servicing business. Of particular relevance to the Claims, GMACM agreed to pay for an independent file review regarding certain residential foreclosure actions and foreclosure sales prosecuted by the Debtors (the "FRB Foreclosure Review"), and to prepare and submit a report

16

regarding the results of that review.  (Consent Order ¶¶ 3–4; Delehey Decl. ¶ 7.)  The Debtors

were required to remediate any financial harm to borrowers resulting from errors or

misrepresentations by the Debtors that the FRB Foreclosure Review uncovered.  (Consent Order

¶ 3(c); Delehey Decl. ¶ 7.)

According to the FRB Foreclosure Review requirement, GMACM must "retain one or

more independent consultant(s) acceptable to the [Federal] Reserve Bank [of Chicago] to

conduct an independent review" of residential foreclosure actions GMACM prosecuted between

January 1, 2009, and December 31, 2010 (the "Consent Order Review Period"), as well as

foreclosure sales pending or completed during the Consent Order Review Period.  (Consent

Order ¶ 3(a); Delehey Decl. ¶ 8.)

In June 2013, a term sheet was executed among the FRB and the Consent Order Debtors,

suspending the FRB Foreclosure Review.  The Debtors escrowed $230 million as their

anticipated settlement amount.  (Delehey Decl. ¶ 9.)  After the term sheet was executed, the

Debtors' independent consultant, PricewaterhouseCoopers ("PwC"), conducted a review of the

population of borrowers who may have been eligible to receive payments from the settlement

fund.  (*Id.*)  PwC provided an initial "IFR Waterfall" to the FRB."  (*Id.*)  Under the settlement

agreement, all individual foreclosure file reviews were halted and the Debtors instead provided a

payment of some amount—*with no determination having been made of actual harm*—to each

borrower in the final population (the "Eligible Population"), i.e., all borrowers being serviced by

the Debtors who had been subject to residential mortgage foreclosure actions or proceedings,

including residential foreclosure sales, that were pending or occurred at any time during the

Consent Order Review Period.  (*Id.*)

On July 26, 2013, the previously escrowed funds were moved into a settlement fund outside the Debtors' control (the "Settlement Fund"). (Delehey Decl. ¶ 10.) After the Settlement Fund was established, the Debtors provided data from their loan servicing system to an independent consultant and the FRB; the independent consultant and the FRB verified the eligibility and placement of all the borrowers into the IFR Waterfall. (*Id.*) On November 21, 2013, the Debtors provided Rust Consulting, Inc., as paying agent for the settlement, specific borrower placement information, and the borrower placement into the IFR Waterfall was deemed final. (*Id.*) The paying agent is now in the process of distributing the funds to borrowers according to the distribution plan implemented by the FRB. (*Id.*)

The Reeds received a payment of $500 in respect of the FRB settlement—the lowest payout provided for in the IFR Waterfall.[20] (Delehey Decl. ¶ 12.) Rust Consulting, Inc. distributed the remediation settlement payment to the Reeds on January 27, 2014. (*Id.*) This payment does not indicate or represent any determination or acknowledgement by the Debtors that the Reeds Claims have merit or that they suffered any harm caused by the Debtors. (*Id.* ¶ 11.) The Reeds were included in the Eligible Population because they were subject to a foreclosure proceeding during the Consent Order Review Period. (*Id.*) Indeed, the Debtors' role in the FRB Foreclosure Review settlement was limited to providing servicing system data to the independent consultant with respect to borrowers who, given the time period in which their foreclosure actions were pending, may have been eligible to be included in one of the various "potential harm" categories in the IFR Waterfall. (*Id.* ¶ 12.) It was only after the Debtors provided the data to the independent consultant that the FRB finalized the Eligible Population

---

[20]    The Trust asserts that the Reeds' placement in this IFR Waterfall category means that there was no indication of even potential harm suffered by the Reeds that would have placed them into a higher payout category. (Delehey Decl. ¶ 12 n.3.)

and the placement of each eligible borrower in the IFR Waterfall's potential harm categories.
(*Id.*)

      As the Court stated at the Evidentiary Hearing, it is very familiar with the Consent Order

and the IFR Waterfall, as the Court approved the modified Consent Order during the bankruptcy

case. Neither AFI nor any of the Consent Order Debtors admitted any liability when they

entered into the Consent Order. Additionally, the IFR Waterfall procedures set up under the

FRB settlement have no bearing on any of the issues raised by the Reeds' Claims.

      **C.**      **The Reeds' Attempts to Sell the Property**

      Before, during, and after the Foreclosure Action was initiated, the Reeds engaged Louise

Carter, a real estate agent for BT Edgar & Sons Realtors ("BT Edgar"), to list the Property for

sale. The Reeds first engaged Ms. Carter at the end of 2007 (Sept. 15, 2014 Tr. 43:18–19); the

initial listing price was slightly more than $2 million. Throughout the relevant period, the Reeds

entertained several offers (several came close to closing) and lowered the asking price for the

Property on multiple occasions. Between 2008 and 2010, the listing price was reduced, from just

over $2 million to $1,895,000, to $1,780,000, to $1,690,000, and ultimately to $1,595,000. (*See*

Ex. O (BT Edgar Status Change Forms).) Reed contends that in early 2008, before the

Foreclosure Action was filed, his contract with the Jacobs (discussed below) is an accurate

indication of the market value of the Property: $2,040,000. From fall 2008 through 2011, Reed

contends that the value of the Property was between $1.75 and $1.9 million. However, when the

Reeds filed their Claims in November 2012, they alleged that the Property was worth

$1,650,000.

1.  *Scott and Traci Jacobs*

Before the Reeds defaulted on the Loan, Scott and Traci Jacobs (the "Jacobs") made an

offer to purchase the Property for $1.9 million on October 30, 2007.  (*See* Ex. R (Proposal of

Purchase Reed to Jacobs, $1.9M).)  Following price negotiations, on December 8, 2007, the

Reeds entered into an Agreement of Sale (the "Jacobs Sale Contract") with the Jacobs to sell the

Property for $2.04 million (which was less than the original asking price).  (*See* Ex. 1 (Jacobs

Sale Contract).)  The Jacobs Sale Contract contained a mortgage contingency clause (*see* Ex. R ¶

9), and settlement (closing) was to occur on February 7, 2008 (*see id.* ¶ 14).

The sale of the Property to the Jacobs did not close.  The Jacobs informed the Reeds,

before the Foreclosure Action was filed, that they were exercising their rights to terminate the

Jacobs Sale Contract because their application for financing had been denied by Commerce

Bank, N.A.[21] ("Commerce Bank").  (*See* Sept. 16, 2014 Tr. 84:9–18; Ex. V (Jacobs' Motion for

Summary Judgment with Certification and Exhibits — *Jacobs v. Reed*); Ex. W (Opinion

Granting Summary Judgment in *Jacobs v. Reed*).)  The appraisal required by Commerce Bank

indicated that the value of the Property was only $1,950,000—less than the sale price.  (*See* Sept.

16 Tr. 85:24–86:2.)  An appraiser hired by Commerce Bank, Robert Jones, completed the

appraisal.  (*See id.*; Ex. W at 3.)  Reed complained to Commerce Bank about the appraised value,

and the Reeds refused to return the Jacobs' $50,000 deposit.  Instead, the Reeds commissioned a

second appraisal for Commerce Bank, which engaged a second appraiser, Peter McCaffrey.  (*See*

Ex. 2 (January 21, 2008 Commerce Bank Appraisal).[22])  The second appraiser arrived at a value

---

[21]     Commerce Bank is the predecessor to TD Bank.  (*See* Sept. 15, 2014 Tr. 49:23–24.)

[22]     Exhibit 2, an appraisal by Peter R. McCaffrey on January 21, 2008, was admitted in evidence for the
limited purpose of Reed's notice and knowledge of the report, but not for the truth of the matter as to the value of
the Property.  (*See* Sept. 15, 2014 Tr. 55:15–18.)

of $2.04 million.  (*See* Sept. 15, 2014 Tr. 50:18–19.)  The Jacobs, however, did not accept the

revised appraisal and sued the Reeds for the return of their deposit.  (*See* Exs. V, W.)  The Reeds

countersued the Jacobs, Commerce Bank, Robert Jones, and BT Edgar.  (*See* Ex W.)  Ultimately,

the Jacobs were granted summary judgment in their favor in their action against the Reeds.  (*See*

*id.*)

        2.  *Mark Weaver aka Brett Cooper*

       After the sale to the Jacobs failed to close, the Reeds relisted the Property sometime after

the Foreclosure Action was commenced.  (Sept. 15, 2014 Tr. 59:5–6.)  According to Reed, when

the Reeds and their real estate agency, BT Edgar, relisted the Property, they lowered the asking

price to $1,895,00 because of the added pressure of the Foreclosure Action.  (*Id.* 59:24–60:2;

61:12; Ex. O.)

       Sometime in June or July, a second potential buyer, Mark Weaver (aka Brett Cooper[23])

("Weaver") made a verbal and written offer of $1,800,000, which the Reeds accepted.  (Sept. 15,

2014 Tr. 61:14–17; 61:20–22; 62:5.)  The Reeds and Weaver entered into an Agreement of Sale

on August 25, 2008 for an agreed price of $1,800,000 (the "Weaver Agreement of Sale," Ex. X

(Contract for Sale Reed to Weaver for $1.8M)).  Under the Weaver Agreement of Sale and an

addendum attached thereto, Weaver paid the Reeds a $50,000 deposit, which was held in escrow

by BT Edgar.  (*See* Exs. X, Y (Addendum to Contract of Sale between Reed and Weaver).)

Closing was postponed several times until Weaver finally told the Reeds that, as of November

21, 2008, he still did not have enough funds to close the cash sale.  At that point, the parties

instead entered into a lease/purchase agreement, whereby Weaver would take immediate

possession of the Property in exchange for an up-front payment to Reed of $400,000 and

---

[23]     By all indications, Mr. Weaver/Cooper was not an honest individual.  Beyond using a false name, he sent
several bad checks to the Reeds before his eviction.

monthly rental payments of $25,000.  (*See* Ex. Z (Lease Agreement with Option to Purchase

with Mr. Weaver.)  Weaver paid the initial $400,000 via wire transfer.  Reed claims that, in the

lobby of the Bank of America building when Weaver wired the funds, Weaver required Reed to

pay off the Second Mortgage with a portion of the $400,000 payment he received.  (Sept. 15,

2014 Tr. 83:10–15 ("But Mr. Cooper required that . . . I had to take the money [the $400,000

initial payment] and I had to use it to pay off the second mortgage or any other lien besides the

first mortgage on the property, which I did."); Sept. 16, 2014 Tr. 77:7–9 ("That actually

happened orally . . . in a Bank of America lobby, at the time of the money transfer.").)  The

Second Mortgage company (according to Reed, Debtor Homecomings Financial (*see* Sept. 15,

2014 Tr. 84:1–2)) agreed to accept a reduced payoff.  (Sept. 16, 2014 Tr. 60:10–14.)  Reed and

his family then relocated to another of the Reeds' properties in Virginia.  (*See* Sept. 15, 2014 Tr.

84:17–20.)

        Weaver then moved into the Property, but subsequently defaulted under the lease

agreement, failing to make required monthly payments.  After Weaver did not make the first

monthly payment in December 2008, Reed called Weaver, who told Reed that his money was

still "tied up."  (Sept. 15, 2014 Tr. 87:13–22.)  Reed and Weaver then arranged for Weaver to

release $25,000 of his initial $50,000 deposit to cover the December rent.  (*Id.* 88:1–7.)  After

Weaver failed to make his second monthly payment in January 2009, Reed went to New Jersey

to see the realtor.  (*Id.* 88:15–16.)  While he was in New Jersey, Reed gave a default notice to a

person he believed to be Weaver's wife at the Property.  (*Id.* 88:17–18.)  Weaver eventually paid

the January rent with the remaining $25,000 in the escrow account, bringing the escrow balance

to zero.  (*Id.* 88:25–89:5.)  At this point, Weaver contacted Reed to extend his lease with option

to purchase for an additional six months at $25,000 per month; Reed agreed and extended the

22

term of Weaver's lease.  (*Id.* 89:8–10; 89:16–17.)  From that point on, Reed received only bad

checks from Weaver (*id.* 89:20–21), and Reed did not collect any additional rent (*id.* 89:22–25).

      The Reeds brought an eviction action against Weaver, who was finally evicted from the

Property in fall of 2009.  (*Id.* 90:11.)  Weaver still had the six month option to purchase the

Property at the time he defaulted on his rental agreement (*id.* 90:11–12), and the Reeds began

showing the house again on or about the time Weaver was evicted.  (*Id.* 97:18–25 ("So the next

time the house is on the market is immediately—around the time that Mr. Cooper is evicted.  I

believe that as part of the agreement to—it was a consent decree in the eviction.  And Mr.

Cooper agreed to start letting people walk through.  I don't remember if that was a month or

forty days or sixty days or—and I can't tell you if it was September or October.  But we

immediately listed the house.").)

      3.  *Frank and Gina Roccisano*

      The next offer the Reeds received on the Property was from Frank and Gina Roccisano

(the "Roccisanos"), who offered $1,300,000 on March 20, 2010; the Reeds rejected this offer.

(*Id.* 102:20; Ex. 3 (Roccisano Proposal to Purchase).)[24]  Reed believes that he tried negotiating a

different price with the Roccisanos, but they never agreed to terms.  (Sept. 15, 2014 Tr. 103:1–

6.)  According to Reed, by this point, the $1,300,000 offer would not have been enough to allow

the Reeds to pay off the Loan, which had accumulated additional interest (and likely penalties).

(*See id.* 167:18–168:1 ("I believe that the million-three wasn't sufficient to be able to close the

loan, or not the loan, the sale of the house, even if it was cash, because the . . . interest and

everything that had run on the mortgage had now accumulated to the point where the house was

underwater with that offer.  It wouldn't . . . convey clear title.  It would not clean up the debt.").)

---

[24]     Exhibit 3 was admitted in evidence, with the exception of the first two pages, which were excluded.  The
portion of Exhibit 3 containing the Roccisano Proposal to Purchase was admitted.

The Roccisanos made a second offer, on June 12, 2010, for $1,450,000 (Ex. DD), which the Reeds considered.  (*See* Sept. 15, 2014 Tr. 169:12–13.)  The Roccisanos withdrew their second offer before entering into an agreement of sale with the Reeds.  Reed testified that he believes the Reeds were unable to reach an agreement with the Roccisanos because the Roccisanos were unable to wait for the Reeds to sort out the Reed Action.  (*See id.* 173:2–6 ("They didn't want to wait for us to—to sort out our, you know, how much we would owe on the house, and the mortgage, and the—you know, there was liti—at that point there was litigation.  I think they found out we had filed litigation, it's like they didn't want to bother anymore.").)  The Trust submitted an email from Frank Roccisano to Kevin Aberant, the Roccisanos' attorney, in which Mr. Roccisano indicated that he would have to "discontinue any negotiations" with the Reeds because he was "moving back home to Louisville and resuming [his] old job."  (Ex. EE.)  According to Reed, the Roccisanos' move to Louisville was determined based on a variety of factors, one of which was their ability to purchase the Property.  (*See* Sept. 15, 2014 Tr. 175:14–22 ("I think what I remember is Mr. Roccisano . . . was entertaining two positions with the same company, or something like that.  He can—whatever was favorable to him in his personal life, he would've taken.  I understood our—our house played a role in that; if he could get it for a certain price, then he would have taken the position in New Jersey, instead of moving back to [Louisville].").)

In any event, after negotiations with the Roccisanos did not result in sale of the Property, the Reeds lowered the listing price again.  (*Id.* 173:8–11.)  Eventually, sometime around Thanksgiving of 2010, the Reeds moved back into the Property and, at that time or shortly thereafter, unlisted the Property.  (*See id.* 173:17–18; 174:5–6.)

24

4.  *Kris and Nina Singh*

The final offer Ms. Carter received on the Property was from Kris and Nina Singh for

$1,100,000, at a point when the Property was not listed on the market.  (*See id.* 174:14–15.)  The

Reeds rejected this offer because it was not sufficient to convey clear title to the Property.  (*See*

*id.* 174:22–175:1.)  Reed contends that the Singhs offered a low price because of the Foreclosure

Action (*see* Sept. 16, 2014 Tr. 97:24), but the only evidence of the offer from the Singhs is an

email that states "we would like a full description of what the legal dealings are with the bank

and seller, as this may affect the closing."  (Ex. FF.)

After the Reeds rejected the Singh offer, they ceased marketing the Property.  The Reeds

believed that the ongoing litigation with GMACM and the *lis pendens* on the Property resulted in

fewer and lower offers than they could accept that would offer clear title to the Property.  (*See*

Sept. 15, 2014 Tr. 176:12–177:9.)  Consequently, since the Reeds moved back in to the Property

around Thanksgiving of 2010, they have not tried to sell the Property.  (*See id.* 180:21–24.)

### D.    The Reeds' Attempts to Refinance the Property

Reed admits that he did not complete a written application to refinance the Property.

Though he did not complete an application with Commerce Bank (Sept. 15, 2014 Tr. 47:23–

48:1), Reed claims that because of his "relationship" with Commerce Bank, he never needed to

complete an application to receive refinancing.  (*Id.* 48:4–9 ("As I've said . . . that was our

relationship, because I—they never needed one, Your Honor; that's just the way we—we had a

business relationship.  I think the last application, to be clear, that I filled out for TD Bank

[Commerce Bank's successor] may have been 1992 or something, '93, involving one of my

original properties.").)  Reed testified that while the contract with the Jacobs "was not in dispute"

(*id.* 48:14–15), he asked Commerce Bank to complete a cash-out refinance of the Property in the

event that the sale to the Jacobs did not close.  (*Id.* 46:12–13.)  The appraisal Reed commissioned

for Commerce Bank was a necessary part of the refinance process.  (*Id.* 48:20–21.)  According to

Reed's recollection, Commerce Bank was going to provide a refinancing of the Property that

would have satisfied the Mortgage; it is unclear if it would have also satisfied the Second

Mortgage.  (*See id.* 46:12–16 ("I asked them to do a cash-out refi, could they take out the first.

And I believe I had a balance on the second, which was a line of credit, and provided me free

cash beyond that.  My recollection was that number would have been about 4-, 500,000 dollars

beyond the liens that were there.").)  Due to the Foreclosure Action, Reed claims that Commerce

Bank denied his requested refinance.

      The Court finds that Reed's testimony regarding his attempts to refinance the Property

with Commerce Bank was not credible.  Reed relies solely on his own testimony to establish that

(1) he applied to refinance the Loan on the Property with Commerce Bank for a cash-out

refinance before the Foreclosure Action was filed; (2) he was going to be approved for a

refinance; and (3) the refinance was denied because of the Foreclosure Action.  However, Reed

told a very different story in connection with the Jacobs' lawsuit against him in 2009.  Then, at a

deposition in which Reed was represented by counsel, he testified under oath that (1) he applied

for a refinance of the *Second Mortgage* with Commerce Bank for $250,000; (2) the loan was not

approved by Commerce; (3) the process died down due to his belief that he was going to sell the

Property, making a refinance unnecessary.  (*See* Sept. 16, 2014 Tr. 106:1–107:20, 109:3–110:3.)

Reed's "explanation" of these discrepancies in his sworn testimony was not credible.[25]  In light

---

[25]      At the Evidentiary Hearing, Reed unsuccessfully sought to admit into evidence several writings from the TD Bank loan officer, Robert E. Curley, dated long after the events involved.  These writings did not satisfy the business records exception to the hearsay rule.  Even though Curley was not listed on Reed's witness list, the Court agreed to permit Curley to testify at trial about the reasons Reed's effort to refinance the Property was refused. Reed, however, failed to produce Curley as a witness.

of this conflicting testimony and lack of corroboration, the Court does not credit Reed's claim

that he was denied a cash-out refinance from Commerce Bank because of the Foreclosure

Action.

According to Reed, he also asked Allied Mortgage for a cash-out refinance of the

Property in March 2008 and was informed that they had multiple options available for the

Property, but Reed did not ask for interest rates or closing costs when he was negotiating the

refinancing loan.  (*See* Sept. 16, 2014 Tr. 99:15–24.)  Reed submitted a letter from Thomas J.

Tartamosa, a Loan Officer for Allied Mortgage in March 2008, indicating that, at the time Reed

contacted him, the Property was under contract for sale and Reed qualified for various loan

programs.  (*See* Ex. 19 (Tartamosa Letter).)  Tartamosa's letter states that the "options [he]

presented to Mr. Reed [became] null and void when his property at 817 Matlack Dr. Moorestown

NJ 08057 was placed into foreclosure."  (*Id.*)  However, GMACM introduced evidence that

Allied Mortgage confirmed that it has no record of an application by Reed.  (*See* Ex. LL.)

Though Stuart Shilling, a Vice President at Allied Mortgage, confirms that Mr. Tartamosa was

employed by Allied Mortgage in March 2008 (*id.* ¶ 5), Allied Mortgage "has no documentation

or information supporting Mr. Tartamosa's claim that Plaintiffs sought financing from Allied

Mortgage Group at any time, including March 2008."  (*Id.* ¶ 8.)

The Court finds that Reed has not established that he was denied a cash-out refinance on

the Property due to the Foreclosure Action.

E.      **The Claims**

The Reeds' Claims assert as their bases "Negligence – Unjust Enrichment – Constructive

Trust."  Each claim is listed in the amount of $2,953,000, of which $1,650,000 is purportedly

secured as the value attributed to the Property, and $1,303,000 is unsecured and should be

afforded priority status under section 507(a)(3) of the Bankruptcy Code. The Claims attach a

number of documents, some of which were admitted into evidence at the Evidentiary Hearing.

The Claims are all based on the Foreclosure Action and the Reed Action.

### F.    The Trust's Objection to the Claims

The Trust filed the Objection on May 29, 2014, arguing that the Claims fail as a matter of

law. The Court held a hearing on the Trust's Objection and the Reeds' Response on July 9,

2014. The Court entered a written Order, sustaining in part and overruling in part the Trust's

Objection, and indicating that an evidentiary hearing would be necessary. At the July 9, 2014

hearing, Reed showed that GMACM's initial foreclosure complaint alleged that GMACM owned

the Note and Mortgage; in the Objection, however, GMACM affirmatively asserted that it *never*

owned the Note. The Trust's counsel asserted that the allegation in the foreclosure complaint

was an error. The discrepancy raised a disputed issue of fact about the ownership of the Note.

The Court therefore overruled the Trust's Objection to the Reeds' (1) breach of contract claim

and (2) CFA claim, to the extent the Reeds' claims could be premised on GMACM's lack of

standing in the Foreclosure Action. The Court additionally overruled the Trust's Objection to

the Reeds' negligence and punitive damages/actual malice claims, determining that any ruling on

those claims involved disputed issues of fact. The Court sustained the Trust's Objection to the

Reeds' claims arising under the FFA, claims for unjust enrichment/constructive trust, malicious

use of process, and his claim to be "made whole" under the Consent Order and Foreclosure

Review. (*See* Preliminary Reed Order.)

Between the July 9, 2014 hearing and the Evidentiary Hearing, the Court held a number

of telephonic conferences regarding various discovery disputes; the Court resolved these disputes

by entering a series of orders: (1) an order limiting the scope of witness testimony (and the

28

Reeds' damages contentions) to the single Property subject to the Foreclosure Action (ECF Doc.

# 7314); (2) an order precluding the Reeds from introducing the testimony of Mrs. Reed at the

Evidentiary Hearing, because Mrs. Reed was not made available for deposition prior to the close

of discovery[26] (ECF Doc. # 7387); (3) an order granting in part and denying in part the Trust's

motions in limine to exclude certain expert evidence that, among other things, excluded the

expert reports filed by the Reeds, thereby (i) precluding any of the witnesses from testifying

about the effect of credit reporting with respect to the Reeds since Reed failed to produce any

credit reports, (ii) limiting expert testimony about alleged damages resulting from the Reeds'

failed refinance efforts, (iii) precluding experts from testifying about any non-economic damages

suffered by the Reeds, (iv) allowing expert testimony (assuming proper foundation) for

economic damages suffered by the Reeds from diminution of the value of the Property as a result

of the Foreclosure Action, and (v) allowing a New Jersey attorney, Donati, to testify about New

Jersey foreclosure custom, practice, and procedures (but not to offer opinion testimony as to

whether the Debtors violated these rules) (ECF Doc. # 7499); and (4) an order precluding the

expert testimony of Dr. Jay I. Sussman, who was not timely identified to the Trust as a witness

(ECF Doc. # 7516).

## II.    DISCUSSION

### A.    Negligence Claim

The Reeds claim that GMACM negligently brought the Foreclosure Action without first

complying with the FFA's notice requirements, resulting in damages to the Reeds, apparently in

the form of damage to their credit and a subsequent inability to obtain financing for Reed's

home-flipping business.  The Court ruled in its July 29, 2014 order limiting the scope of witness

---

[26]    The Court eventually extended the Reeds' opportunity to make Mrs. Reed available for deposition until
August 29, 2014, but Mrs. Reed never appeared for her deposition and she was excluded from testifying at trial.

testimony that "the Reeds may not recover damages relating to any other properties [other than

the Property] or lost business opportunities that the Reeds assert they lost because of the

Foreclosure Action.  The Court concludes as a matter of law that such other damages, if any, are

speculative and not foreseeable, and are not recoverable on the Reeds' surviving claims."  (ECF

Doc. # 7314 at 1–2.)  To the extent the Reeds seek to recover on their negligence claim for

damages *not* related to the Property, they cannot.  Additionally, in the Court's September 8, 2014

order regarding the Trust's motions in limine, the Court concluded that "[b]ecause the Reeds

have failed to provide any credit reports reflecting an adverse impact on the Reeds' credit from

the alleged wrongful foreclosure, despite the Trust's timely request that such items be produced,

neither Mr. Reed nor any of the experts may testify about the effect of credit reporting with

respect to the Reeds."  (ECF Doc. # 7499 ¶ 3.)  Consequently, to the extent the Reeds seek to

recover damages for their negligence claim relating to adverse impact on credit reports they

failed to submit, they are precluded from doing so.

 The Reeds argue that the Debtors' statutory duty to provide notice under the FFA is

sufficient to support their negligence claim.  (*See* Response ¶¶ 44–45.)  At the Evidentiary

Hearing, the Reeds asserted that, in addition to the FFA deficiency, GMACM failed to establish

that it had standing to foreclose before it filed the Foreclosure Action.  The Reeds assert that this

supports their negligence claims.

 First, the Trust argues that the Reeds cannot rely on the statutory NOI requirement as

definitive proof that the Trust owed a duty to the Reeds that they breached and, therefore, the

Reeds' negligence claim fails.  Second, the Trust argues that GMACM acted reasonably under

the circumstances.  Finally, the Trust argues that the Reeds have not provided any credible

evidence that they can establish damages, because they still have the right to cure the default at

any point prior to the entry of a final judgment of foreclosure.  The Reeds respond that fairness,
public policy, and foreseeability support their negligence claim.  (*Id.* ¶¶ 44–45.)

Under New Jersey law, negligence has four elements:  "(1) duty of care, (2) breach of
duty, (3) proximate cause, and (4) actual damages." *Wartsila NSD N. Am., Inc. v. Hill Int'l, Inc.*,
342 F. Supp. 2d 267, 278 (D.N.J. 2004) (citation omitted).  "[T]he standard of care is the conduct
of the reasonable person of ordinary prudence under the circumstances." *Rappaport v. Nichols*,
156 A.2d 1, 8 (N.J. 1959).  "The most common test of negligence . . . is whether the
consequences of the alleged wrongful act were reasonably to be foreseen as injurious to others
coming in the range of such acts." *DiCosala v. Kay*, 450 A.2d 508 (N.J. 1982) (citations
omitted).

"There can be no actionable negligence if defendant or the act violated no duty to the
injured plaintiff.  The question of the existence of duty is one of law and not one of fact." *Ryans
v. Lowell*, 484 A.2d 1253, 1258 (N.J. Super. Ct. App. Div. 1984) (citations omitted).  "The
question is not simply whether a[n] . . . event is foreseeable, but whether a [d]uty exists to take
measures to guard against it.  Whether a [d]uty exists is ultimately a question of fairness.  The
inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the
public interest in the proposed solution." *Goldberg v. Hous. Auth. of Newark*, 186 A.2d 291, 293
(N.J. 1962).

In New Jersey, a "violation of a statutory duty of care is not conclusive on the issue of
negligence in a civil action but it is a circumstance which the trier of fact should consider in
assessing liability." *Braitman v. Overlook Terrace Corp.*, 346 A.2d 76, 85 (N.J. 1975).
"[S]tatutes rarely define a standard of conduct in the language of common-law negligence."
*Eaton v. Eaton*, 575 A.2d 858, 866 (N.J. 1990).  The statute at issue in this case—the FFA—does

31

not incorporate the negligence standard of "reasonableness," and so, the Trust argues, a violation

of the statute alone does not establish the existence of a duty of care or a breach of such duty.

But even where a statute does not create a separate cause of action for its violation and does not

incorporate a standard of reasonableness, the trier of fact may still consider violation of the

statute as evidence possibly supporting a determination of negligence.  *See Braitman*, 346 A.2d

at 385.  In *Braitman*, the Supreme Court of New Jersey gave two examples of instances where it

*had* considered statutory duties in the context of civil negligence actions:  traffic violations and

landlord-tenant law.  In both instances, the court noted that while the statutes at issue did not

create separate causes of action for their violation, they did create standards of conduct that juries

should consider in assessing the ultimate determination of negligence.  *Id.*  Thus, under New

Jersey law, plaintiffs can rely on statutory duties—even those without private rights of action—

as *evidence* of a defendant's negligence that a trier of fact can consider when assessing a

negligence claim, regardless of whether or not the statute incorporates "reasonableness"

standards into the provisions at issue, even if a violation of a statute is not negligence per se,

when the violation is causally connected to the damages incurred.  *See Horbal v. McNeil*, 66 N.J.

99, 103 (1974) (citations omitted).

Even considering GMACM's violation of the FFA and apparent lack of standing to

pursue the Foreclosure Action, however, New Jersey courts generally do not impose any

heightened duty on loan servicers for negligently initiating foreclosure actions.  For example,

when addressing negligence claims against loan servicers, New Jersey courts typically state the

proposition that a bank does not owe a duty of care to a borrower, even if the borrower is a

consumer.  *See Shinn v. Champion Mortg. Co.*, Civil Action No. 09-CV-00013(WJM), 2010 WL

500410, at *4 (D.N.J. Feb. 5, 2010) (citing *United Jersey Bank v. Kensey*, 704 A.2d 38, 45 (N.J.

Super. Ct. App. Div. 1997) (discussing whether banks have fiduciary obligations to disclose

certain information to borrowers, noting that "the relationship between lenders and borrowers is

conducted at arms-length, and the parties are each acting in their own interest" (citations and

quotation marks omitted))); *see also Park v. M&T Bank Corp.*, Civil Action No. 09-CV-02921

(DMC), 2010 WL 1032649, at *7 (D.N.J. Mar. 16, 2010) (citing *Kensey*, 704 A.2d. at 45); *Stolba

v. Wells Farbo & Co.*, Civil Action No. 10-cv-6014 (WJM)(MF), 2011 WL 3444078, at *5 (Aug.

8, 2011) (dismissing plaintiff's negligence claim against loan servicer based on alleged negligent

processing of HAMP modification, and noting that "[e]ven if a preexisting commercial

relationship between a bank and its customer might be said to give rise to a duty of care," the

plaintiff was not a "bank customer" because the defendant merely serviced the loan on behalf of

its customer, the noteholder (citing *Shinn*, 2010 WL 500410, at *4)).  In *Shinn*, the complaint

alleged that the defendant loan servicer "owed [the p]laintiffs a duty of care with respect to

servicing their mortgage loans, that [the defendant] was negligent, and that [the p]laintiffs

suffered damages as a direct result."  *Shinn*, 2010 WL 500410, at *4.  The court dismissed this

theory, finding that the loan servicer's relationship with the borrower did not establish a duty

outside of a contractual relationship sufficient to support a negligence claim.

Rather than focusing on remedies in tort, New Jersey courts appear to remedy violations

of standing requirements and FFA notice requirements in foreclosure proceedings through

dismissal of the proceedings, generally without prejudice.  *See, e.g.*, *Deutsche Bank Nat'l Trust

Co. v. Mitchell*, 27 A.3d 1229, 1236 (N.J. Super. Ct. App. Div. 2011) (reversing trial court's

grant of summary judgment in favor of plaintiff and dismissing, without prejudice, foreclosure

action, because plaintiff did not have standing to foreclose; it only acquired assignment of the

mortgage the day after the foreclosure action was filed, which was inadequate to confer

standing); *see also US Bank Nat'l Ass'n v. Guillaume*, 38 A.3d 570, 587 (N.J. 2012) (reversing

earlier precedent to hold that dismissal without prejudice is not the only remedy a trial court may

impose for the residential mortgage lender's failure to comply with the NOI requirements of the

FFA; instead, when "determining an appropriate remedy for a violation of [the FFA], trial courts

should consider the express purpose of the provision:  to provide notice that makes the debtor

aware of the situation, and to enable the homeowner to attempt to cure the default" (citations and

quotation marks omitted)).  When the New Jersey courts have granted such dismissals—for

failure to comply with notice requirements under the FFA or for failure to obtain necessary

documents to confer standing prior to filing foreclosure actions—they have not granted

economic relief to borrowers.  Instead, New Jersey courts have taken the position that dismissal

of the underlying action itself is the appropriate remedy.  The Court cannot impose a duty on

loan servicers under New Jersey negligence law that the New Jersey courts have not articulated.

Moreover, the only relationship between the Reeds and GMACM was of a contractual

nature:  On May 22, 2008, MERS assigned its interest in the Mortgage to GMACM.  This

assignment of the Mortgage to GMACM *after* the Foreclosure Action was filed was not

sufficient to grant GMACM standing in the Foreclosure Action—the assignment must occur

*before* the foreclosure action is commenced—but it did establish a contractual relationship with

the Reeds *after* the assignment.  To the extent that the Reeds assert claims arising from

GMACM's failure to comply with the terms of the Mortgage, their negligence claims are barred

by the New Jersey economic loss doctrine.  "Under New Jersey law, a tort remedy does not arise

from a contractual relationship unless the breaching party owes an independent duty imposed by

law."  *Saltiel v. GSI Consultants, Inc.*, 788 A.2d 268, 280 (N.J. 2002) (citations omitted).  Only if

a defendant "owe[s] a duty of care separate and apart from the contract between the parties" will

New Jersey courts allow a tort claim such as negligence. *Id.* at 277.  As explained above,

violation of the statutory requirements identified by the Reeds do not impose any additional

duties under New Jersey law.

Additionally, it is worth noting that arguments that the New Jersey economic loss

doctrine is rendered inapplicable based on alleged emotional injuries or damage to credit

resulting from such violations have been repeatedly rejected by the New Jersey courts.  *See, e.g.*,

*Skypala v. Mortg. Elec. Registration Sys., Inc.*, No. 08-CV-5867, WL 2762247, at *6 (D.N.J.

Sept. 1, 2009) (rejecting argument because the court found it incredible that the defendant's

alleged overcharging of fees in connection with the curing of the plaintiff's default could have a

negative effect on the plaintiff's creditworthiness and because "it is axiomatic that a plaintiff

cannot collect contract damages for emotional distress" (citations omitted)); RESTATEMENT

(SECOND) OF CONTRACTS § 353 and *cmt. a* ("Recovery for emotional disturbance will be

excluded unless the breach also caused bodily harm or the contract or the breach is of such a kind

that serious emotional disturbance was a particularly likely result . . . .  Damages for emotional

disturbance are not ordinarily allowed."); *see also Shinn*, 2010 WL 500410, at *4 (rejecting

plaintiffs' claim that their case "'is about more than the loan' and that the 'impact to [the

plaintiffs] concerns their credit worthiness, the emotional upset from [d]efendants' egregious

actions and possible loss of their home in addition to any contractual damages'").  Thus, to the

extent that the Reeds' negligence claim arises from the Mortgage, it is barred by the economic

loss doctrine.

The Trust's Objection to the Reeds' negligence claim is **SUSTAINED**.

35

### B.    Breach of Contract Claim

To state a claim for breach of contract under New Jersey law, the Reeds must establish: (1) the existence of a contract; (2) a breach of that contract; (3) damages flowing from that breach; and (4) that they performed their own contractual duties.  *See Video Pipeline Inc. v. Buena Vista Home Entm't, Inc.*, 2010 F. Supp. 2d 552, 561 (D.N.J. 2002) (citation omitted); *see also In re Cendant Corp. Sec. Litig.*, 139 F. Supp. 2d 585, 604 n.10 (D.N.J. 2001) (stating that New Jersey law requires pleading performance of the movant's own contractual duties).

The Reeds assert that GMACM is liable for breaching the Mortgage and Note by filing the Foreclosure Action without first sending an NOI, as allegedly was required by the terms of the Mortgage.  Additionally, the Reeds argue that RFC, who purchased the Mortgage "from GMACM" in December 2009, is liable as a successor-in-interest for GMACM's breach of contract.  The Trust asserts that the Reeds cannot sustain a breach of contract claim against any of the Debtors due to the Reeds' own breach of the Note and Mortgage.

To the extent the Reeds assert a breach of contract claim against RFC, this claim fails. The Reeds identify the contractual breach as the filing of the Foreclosure Action without having first issued an NOI.  The Foreclosure Action was filed on May 19, 2008, but RFC did not acquire ownership of the Loan until December 30, 2009.  The Reeds' contention that RFC acquired ownership from GMACM is incorrect.  Therefore, the Trust's Objection to the Reeds' breach of contract claim (Claim No. 3) against RFC is **SUSTAINED**.

MERS assigned the Mortgage to GMACM on May 22, 2008.  GMACM filed its foreclosure complaint on May 19, 2008 asserting that it owned the Note and Mortgage.  This was an error.  On June 3, 2008, after GMACM was party to the Mortgage via MERS' assignment, GMACM amended its foreclosure complaint to reflect that GMACM did not own the Note and

36

Mortgage; instead, the Mortgage was assigned to GMACM by MERS, as nominee for

Metrocities Mortgage.  Though GMACM never owned the Note, it became a party to the

Mortgage by assignment.

The Mortgage provides that, before proceeding with a foreclosure action, GMACM was

required to comply with the FFA's notice requirements.  GMACM failed to do so.  The Trust

contends that GMACM's performance under the Mortgage was excused by virtue of the Reeds'

admitted default.  The Trust's interpretation of New Jersey law, however, as excusing a loan

servicer or owner's obligation to comply with noticing requirements under instruments such as

the Note or Mortgage, would render these provisions meaningless.  The Trust has not provided

the Court any authority that suggests this result.  It is precisely when a borrower defaults on

mortgage payments that notice must be given to the borrower before filing a foreclosure action.

The Court rejects the Trust's argument.

The question that arises is what damages the Reeds are entitled to collect as a result of

this breach.  The Reeds argue that their damages consist of (1) lost refinance opportunities, (2) an

inability to sell the Property due to the Foreclosure Action, (3) diminution in the value of the

Property proximately caused by wrongful foreclosure and (4) attorneys' fees for defending the

Foreclosure Action.

1.  *Lost Refinance Opportunities*

The Reeds contend that they were denied cash-out refinances of the Property after the

Foreclosure Action was filed.  The Reeds failed to carry their burden of proof to establish that

they were denied refinancing of the Loan on the Property because of the Foreclosure Action.

The Reeds failed to produce any credit reports establishing that their credit was harmed because

of the Foreclosure Action; therefore, the Court excluded testimony from their expert, Mr.

Hendricks, on the matter.  Because the Reeds did not submit any credit reports, there is no

evidence concerning how creditors, including GMACM, were reporting on the Reeds at the time

Reed says he applied for cash-out refinancing.  Additionally, Reed failed to provide any loan

applications indicating that he applied for refinancing.  Reed testified that he never submitted

applications because his "relationship" with Commerce Bank allowed him to request refinancing

in a more informal manner.  The Court finds this testimony unconvincing.  The affidavit from

Stuart Shilling at Allied Mortgage further provides that Allied Mortgage has no record of ever

receiving a loan application from the Reeds.  Finally, Reed's prior inconsistent testimony on the

subject renders the Court unable to credit his trial testimony on this subject.  Consequently, the

Reeds have failed to establish a claim for damages based on lost refinance opportunities.

> 2.  *Inability to Sell the Property*

Next, the Reeds assert that they were unable to sell the Property as a result of the

Foreclosure Action and concomitant *lis pendens* on the Property.  The Court finds and concludes

that the Reeds failed to carry their burden of proof of establishing damages based on this theory.

The Reeds have not provided any evidence other than Reed's own personal conjecture that their

inability to sell the Property had anything to do with the Foreclosure Action.  While it is true

that, at various points in 2008, the Reeds had two different fully-executed agreements to sell the

Property, those agreements did not close through no fault of GMACM.  *First*, the Jacobs' offer

was withdrawn before the Foreclosure Action was filed, because the appraisal conducted on the

Property was for less than the agreed purchase price.  GMACM's improper filing of the

Foreclosure Action had no effect on the Jacobs' offer.  *Second*, the Weaver offer failed to close

because Weaver could not come up with the funds necessary to close the sale.  Despite several

attempts by the Reeds to work out an acceptable payment schedule, Weaver did not comply.

Weaver's option to purchase the Property also prevented the Reeds from selling the Property to anyone else until they succeeded in evicting Weaver from the Property. Again, GMACM's Foreclosure Action had nothing to do with Weaver's failure to come up with enough money to close.

After these two agreements failed to close, the next offer made on the Property came from the Roccisanos in 2010. At this point the Foreclosure Action had been dismissed, but the Reeds were still in default under the terms of the Note and Mortgage. The Roccisanos made two offers that Reed contends were below the market value of the Property. However, the Roccisanos never entered into a contract with the Reeds; instead, they relocated to Louisville, Kentucky, due to Mr. Roccisano's employment. Reed's tortured explanation that the Roccisanos may have made a different decision had they been able to close on the Property more quickly is pure conjecture. In any event, per Reed's testimony, it was the Reeds who delayed action on any attempt by the Roccisanos to close on the Property. Reed asserts that he was still in the process of determining whether the Roccisanos' second offer would convey clear title to the Property when they informed him that they were no longer considering purchasing the Property.

The final "offer" the Reeds received on the Property came in 2011 from the Singhs, when the Property was no longer listed with a broker. The Singhs informed the realtor, Ms. Carter, by email that they "would like a full description of what the legal dealings are with the bank and seller, as this may affect the closing." (Ex. FF.) This, however, does not establish that the Singhs gave the Reeds a low offer because of the Foreclosure Action.

In any event, the Foreclosure Action was dismissed in early 2009. Reed asserts that this does not matter, because the Foreclosure Action still impacted sale efforts due to the *lis pendens*, which remained in effect after the dismissal of the Foreclosure Action. At any point after that

39

time, however, Reed—who was at various points represented by counsel—could have had the *lis pendens* discharged, either by presenting the county clerk with the dismissal order (*see* N.J.S.A. 2A:15-14) or by petitioning the court to remove the *lis pendens* for failure to prosecute (*see* N.J.S.A. 2A:15-10). The Reeds did not do either. Moreover, GMACM's original notice of *lis pendens* is part of a judicial proceeding, and absolute privilege applies under New Jersey law. *See, e.g.*, *Wendy's of South Jersey, Inc. v. Blanchard Mgmt. Corp. of N.J.*, 406 A.2d 1337, 1340 (N.J. Sup. Ct. Ch. Div. 1979) (refusing to permit action for slander of title because the filing of a notice of *lis pendens* is an absolutely privileged act from which no liability in an action for slander of title can arise).

In sum, the Reeds failed to establish that GMACM was responsible for their inability to sell the Property. In fact, many factors appear to have contributed to Reed's failure to sell the Property, including his growing obligation on the Loan as he continued to ignore his monthly payments. As the Reeds' arrearages and interest accumulated, they were unable to accept offers that would not convey clear title to the Property. Additionally, Reed's flippant contention that "Moorestown operates like the top of a [mountain] when a flood comes and may, in my opinion, avoid much of the collateral damage of a flood, if not entirely," referring to the effect of the housing market collapse on Moorestown, is utterly without basis. In fact, there was a real impact on the real estate market in 2008 that was completely unrelated to GMACM's improperly filed Foreclosure Action.

Reed also wants to ignore the obvious. While GMACM improperly cut corners in commencing the Foreclosure Action, and must bear the consequences of that action, the Reeds unquestionably have been in default on the Loan since February 2008; they have failed to pay any property taxes since before that date; and GMACM was required to obtain forced place

40

insurance to protect the mortgagee's interest in the Property.  The Reeds cannot blame GMACM

if the Property cannot be sold for more than the outstanding Loan and other liens that have

accumulated while the Reeds have continued to live in the Property without paying a dollar.

### 3.  *Diminution in the Value of the Property Due to Wrongful Foreclosure*

The Court permitted Reed, as a home owner, to give opinion testimony about the value of

the Property.  While the value unquestionably declined over time, Reed failed to prove by a

preponderance of the evidence that any diminution in value of the Property was the proximate

result of a wrongful foreclosure action filed by GMACM.

### 4.  *Attorneys' Fees*

What remains, then, is consideration of whether the Reeds may recover as damages the

attorneys' fees associated with defending the Foreclosure Action.  According to the Reeds, they

incurred these fees due to the improperly filed action.  As the Court noted above, Mr. Reed

presented additional affidavit support for Exhibits 14 and 15, detailing that the fees listed on

these exhibits were performed by attorneys in connection with defending the *GMACM v. Reed*

matter.  In light of these sworn affidavits, the Court concludes that the Reeds have established

that they incurred fees amounting to $5,823 defending the Foreclosure Action.

New Jersey generally follows the American Rule regarding attorneys' fees awards, with

several exceptions.  In New Jersey,

> A party who prevails in a civil action, either as plaintiff or defendant,
> against any other party may be awarded all reasonable litigation costs and
> reasonable attorney fees, if the judge finds at any time during the
> proceedings or upon judgment that a complaint, counterclaim, cross-claim
> or defense of the nonprevailing person was frivolous.

N.J.S.A. 2A:15-59.1(a)(1).  A complaint is "frivolous" if it "was commenced, used or continued

in bad faith, solely for the purpose of harassment, delay or malicious injury; or" the

"nonprevailing party knew, or should have known, that the complaint . . . was without any

reasonable basis in law or equity and could not be supported by a good faith argument for an

extension, modification or reversal of existing law."  N.J.S.A. 2A:15-59.1(b).

However, an application for sanctions under N.J.S.A. 2A:15-59.1 requires an affidavit

specifying

> the nature of the services rendered, the responsibility assumed, the results
> obtained, the amount of time spent by the attorney, any particular novelty
> or difficulty, the time spent and services rendered by the secretaries and
> staff, other factors pertinent in the evaluation of the services rendered, the
> amount of the allowance applied for, an itemization of the disbursements
> for which reimbursement is sought, and any other factors relevant in
> evaluating fees and costs; and [h]ow much has been paid to the attorney
> and what provision, if any, has been made for the payment of these fees in
> the future.

N.J.S.A. 2A:15-59.1(c).  Additionally, the party seeking the award must "make application to the

court which heard the matter."  *Id.*  The Reeds did not file any such application in the Chancery

Division Court, which granted the Reeds' cross-motion for summary judgment.  "The

requirements of the provisions imposing sanctions must be strictly construed."  *Marenbach v.*

*Cty. of Margate*, 942 F. Supp. 2d 488, 496 (D.N.J. 2013) (citing *DeBrango v. Summit Bancorp*,

745 A.2d 561 (N.J. Super. Ct. App. Div. 2000)).  Consequently, the Court cannot grant the

Reeds' motion for attorneys' fees under N.J.S.A. 2A:15-59.1.  The Reeds failed to prove that

they are entitled to recover any of their legal fees based on the breach of contract claim.[27]

The Court concludes that the Reeds failed to establish that they are entitled to recover any

damages on the breach of contract claim.

---

[27]    The Court separately addresses below whether the Reeds' attorneys' fees in defending the Foreclosure
Action are recoverable as compensable damages on the CFA claim.

### C.      Punitive Damages Claim Based Upon Actual Malice

The Reeds assert claims for punitive damages premised upon claims for actual malice under New Jersey law.  The Reeds justify their demand based on allegations that GMACM's noncompliance with the FFA was motivated by actual malice or accompanied by a wanton and willful disregard of the injuries that the Reeds may have suffered.

Under New Jersey law, actual malice "is nothing more or less than intentional wrongdoing, an evil minded act or an act accompanied by a wanton and willful disregard of the rights of another."  *Chli Tital Ins. Co. v. Goldberg (In re Goldberg)*, 12 B.R. 180, 185 (Bankr. D.N.J. 1981) (citing *Sandler v. Lawn-a-Mat Chem. & Equip. Corp.*, 358 A.2d 805 (N.J. Super. Ct. App. Div. 1976)).  To recover punitive damages under New Jersey law, the Reeds must show by clear and convincing evidence that the harm suffered was the result of GMACM's acts or omissions, and "that such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions."  N.J.S.A. 2A:15-5:12(a).  They must also first receive a compensatory damages award before they are eligible for punitive damages.  *In re Estate of Stockdale*, 953 A.2d 454 (N.J. 2008).  Additionally, in the absence of exceptional circumstances, punitive damages are generally not permitted in litigation involving breach of a commercial contract.  *See Sandler v. Lawn-A-Mat Chem. & Equip. Corp.*, 358 A.2d 805, 811 (N.J. Super. Ct. App. Div. 1976) (citations omitted).

While the Court concludes below that the Reeds are entitled to an allowed claim for compensatory damages on their CFA claim, for which treble damages are applicable, they have not established entitlement to compensatory damages on any other claims, making the award of punitive damages inappropriate.  Furthermore, while GMACM's conduct gives rise to CFA

liability, the Reeds failed to prove by clear and convincing evidence that GMACM's conduct

satisfies the high standards required to award punitive damages.  An award of punitive damages

in this case would not punish GMACM in any event; rather, it would reduce recoveries by other

Borrowers with allowed claims.  *See Novak v. Callahan (In re GAC Corp.)*, 681 F.2d 1295, 1301

(11th Cir. 1982) (affirming the bankruptcy court's decision to strike a claim for punitive

damages against the trustees of a chapter X debtor under the Bankruptcy Act, finding that "the

effect of allowing a punitive damages claim would be to force innocent creditors to pay for the

bankrupt's wrongdoing").  The confirmed Plan of Liquidation sets a fixed amount for recovery

of Borrower Claims.  Awarding punitive damages to the Reeds would hurt other Borrower

Claimants by further diluting the amount available to satisfy Borrower Claims.

> **D.     Consumer Fraud Act Claim**

A claim under the New Jersey CFA requires three elements:  "(1) an unlawful practice,

(2) an 'ascertainable loss,' and (3) a 'causal relationship between the unlawful conduct and the

ascertainable loss . . . .'"  *Gonzalez v. Wilshire Credit Corp.*, 25 A.3d 1103, 1115 (N.J. 2011)

(quoting *Lee v. Carter-Reed Co.*, 4 A.3d 561, 576 (N.J. 2010)); *Frederico v. Home Depot*, 507

F.3d 188, 202 (3d Cir. 2007) (requiring that a plaintiff "allege that the defendant engaged in an

unlawful practice that caused an ascertainable loss to the plaintiff") (citing *Cox v. Sears Roebuck

& Co.*, 647 A.2d 454, 462–65 (N.J. 1994)).  Claims brought under the CFA "are subject to the

particularity requirements of Federal Rule of Civil Procedure 9(b)."  *Parker v. Howmedica

Osteonics Corp.*, No. 07-2400, 2008 WL 141628, at *2 (D.N.J. Jan. 14, 2008) (unpublished

opinion).  The CFA provides for recovery of treble damages.  *See* N.J.S.A. 56:8–19 ("In any

action under this section the court shall, in addition to any other appropriate legal or equitable

relief, award *threefold* the damages sustained by any person in interest.") (emphasis added).

The CFA defines an "unlawful practice" as

> [t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived, or damaged thereby . . . .

N.J.S.A. 56:8–2.  In other words, "[u]nlawful practices fall into three general categories: affirmative acts, knowing omissions, and regulation violations." *Frederico*, 507 F.3d at 202 (citation and quotation marks omitted).  Notably, "misrepresentations" are affirmative acts that "do not require a showing of intent," i.e., "[o]ne who makes an affirmative misrepresentation is liable even in the absence of knowledge of the falsity of the misrepresentation, negligence, or the intent to deceive." *Glass v. BMA of N. Am., LLC*, No. 10-5259, 2011 WL 6887721, at \*5 (D.N.J. Dec. 29, 2011) (citations and quotation marks omitted).  "[C]ollecting or enforcing a loan, whether by the lender or its assignee, constitutes the 'subsequent performance' of a loan, an activity falling within the coverage of the CFA." *Gonzalez v. Wilshire Credit Corp.*, 25 A.3d 1103, 1116 (N.J. 2011) (citations omitted).

To state an "ascertainable loss," a plaintiff must allege "a cognizable and calculable . . . loss." *Parker*, 2008 WL 141628, at \*3 (citations and quotation marks omitted).  The ascertainable loss must be stated with "reasonable certainty." *Id.*  Factual allegations of a "future loss do not meet the ascertainable loss requirement as they are too speculative." *Id.* (citations and quotation marks omitted).  Finally, a plaintiff must state a "causal nexus" between the first two elements, namely that the loss suffered is a result of the defendant's misrepresentation. *Id.* (citations omitted).

45

The CFA is intended to "be applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud." *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 696 A.2d 546, 551 (N.J. 1997). Consequently, the CFA is to be liberally construed in favor of the consumer. *See Cox*, 647 A.2d at 454. "The history of the [CFA] [has been] one of constant expansion of consumer protection." *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 364 (N.J. 1997).

The Reeds' original fraud claims were not pled with particularity, as required by both federal and New Jersey pleading standards. *See* FED R. CIV. P. 9(b); N.J. Ct. R. 4:5-8(a); *Levinson v. D'Alfonso & Stein*, 727 A.2d 87, 88 (N.J. Super. Ct. App. Div. 1999). New Jersey courts have recognized that a claim under the CFA is essentially a claim for fraud and must be pled with particularity. *Hoffman v. Hampshire Labs, Inc.*, 963 A.2d 849, 853 (N.J. Super. Ct. App. Div. 2009). Conclusory statements are insufficient to satisfy the particularity requirement. *Rego Indus. v. Am. Modern Metals Corp.*, 221 A.2d 35, 40 (N.J. Super. Ct. App. Div. 1966). To state a claim under the CFA, the Reeds must satisfy a heightened pleading standard, and must state the particulars of the wrong, including dates and items if necessary. They failed to do so. Their original CFA claim merely parrots the language of the CFA itself, and is insufficient to state a claim for relief. The Reeds' Response provides no further details, only asserting that "[i]t can reasonably be inferred that the Debtors intended to defraud the Reeds into believing that their ONLY choice was to pay the note in full." (Response ¶ 87.) The Reeds do not provide any evidence of this fact. Consequently, the Reeds failed to carry their burden to prove that CFA claim by a preponderance of the evidence.

At the July 9, 2014 hearing, however, the Court allowed the Reeds to proceed with their CFA claim as to a limited claim, upon consideration of GMACM's misrepresentation during the

Foreclosure Action that it owned the Reeds' Note (and therefore had standing) when it initiated

the Foreclosure Action.  (*See* Preliminary Reed Order at 8.)  The Court permitted the Reeds to

proceed with the CFA claim based only on this single misrepresentation.  The Trust asserts that

the June 3, 2008 amended complaint cured this defect; however, as explained above, GMACM

did not have standing to foreclose when it initiated the Foreclosure Action as it cannot

demonstrate that it was a holder of the Note as of May 19, 2008 and, in any case, it was not

assigned an interest in the Mortgage until May 22, 2008.  Indeed, the Trust's "explanation" of

this discrepancy only highlighted the multiple flaws that should have prevented GMACM from

filing the Foreclosure Action when it did.  Based on the evidence presented, the Court concludes

that GMACM did not have standing to foreclose when it filed the Foreclosure Action—it did not

yet have an assignment of the Mortgage, and it never owned or held the Note.  The assignment

bearing the signature of GMACM's employee, Jeffrey Stephan, on behalf of MERS, was false—

MERS could assign the Mortgage, but it could not assign the Note since it never owned the Note

and had no authority to assign it on behalf of Metrocities.  *See In re Lippold*, 457 B.R. 293, 296–

99 (Bankr. S.D.N.Y. 2011) ("The language of the Assignment in this case purports to transfer

both the Mortgage and the Note . . . .  But MERS, as the purported assignor, could not legally

assign the Note; it *only* had legal rights with respect to the Mortgage.") (applying New York

law).  The question is whether GMACM's misrepresentations, first that it *owned* the Note and

Mortgage (in the original foreclosure complaint), and, second, that it was *assigned* both the Note

and Mortgage by MERS after it initiated the Foreclosure Action, are actionable under the CFA,

and, if so, what damages are recoverable.[28]

---

[28]         Any contention by the Reeds that GMACM's failure to comply with the FFA is actionable under the CFA
is incorrect.  *See Wilson v. Deutsche Bank Nat'l Trust Co.*, No. L-6495-11, 2014 WL 1716093, at *4 (N.J. Super. Ct.
App. Div. May 2, 2014) ("As to the FFA violation count, the [plaintiffs] do not address the trial judge's correct
holding that there is no private right of action under the FFA, which we are convinced prevents [the CFA] claim

The Court concludes that GMACM committed an "unlawful act" that violated the CFA when it submitted the assignment signed under oath by Stephan to try to establish GMACM's standing to bring the Foreclosure Action.  This was an affirmative act/misrepresentation by GMACM; therefore, no showing of intent is required.  *See Glass*, 2011 WL 6887721, at *5; *Gonzalez*, 25 A.3d at 1116.  Additionally, this false filing of a document signed under oath by Stephan was hardly an isolated instance of similar misconduct by GMACM.  *See In re Residential Capital, LLC*, 501 B.R. 531, 547–48 (Bankr. S.D.N.Y. 2013) (overruling objection to claim under North Carolina Unfair & Deceptive Practices Act because of false affidavit signed by Stephan and filed in court, and discussing other cases in which courts discussed false affidavits signed by Stephan).

Having concluded that GMACM committed an unlawful act, ascertainable loss and causal connection needs to be established to recover damages.  The only possible "ascertainable loss" the Reeds have established resulting from the improperly filed foreclosure action is the attorneys' fees the Reeds incurred in defending the Foreclosure Action; and the incurrence of those fees were clearly caused by the wrongful filing of the Foreclosure Action.  The fees that the Reeds have incurred in prosecuting their affirmative action against GMACM, which was then dismissed without prejudice at Reed's request, cannot satisfy the requirements (explained below) to recover attorneys' fees—the Foreclosure Action had already been dismissed, the Reed Action was not necessary to protect their interests, and the Reeds did not prosecute the Reed Action to a conclusion.  The Reeds have appeared *pro se* throughout the bankruptcy case and in filing the Claims, and therefore no attorneys' fees are recoverable in connection with this case.  As the

---

from proceeding. . . .  Additionally, the [plaintiffs] contend that by providing a defective NOI, the bank committed fraud under the CFA. . . .  Even if it was defective, such defect would not generally rise to the level of fraud or illegality required by the CFA.  Nor would a defect in the NOI cause ascertainable harm since [the defendant] would have an opportunity to cure such a defect." (citations omitted)) (unpublished decision).

48

Court stated earlier in this Opinion, any other bases for damages other than attorneys' fees have already been rejected above. The Court has already concluded above that the Reeds' attorneys' fees are not recoverable on their breach of contract claim.

As a general rule in New Jersey, each party must bear its own litigation expenses, including attorneys' fees. *Right to Choose v. Byrne*, 450 A.2d 925, 940 (N.J. 1982). However, a prevailing party can recover those fees and costs if they are expressly provided by statute, court rule, or contract. *Dep't of Envt'l. Prot. v. Ventron Corp.*, 468 A.2d 150, 166 (N.J. 1983). Under New Jersey law, many statutes expressly authorize these awards. *See, e.g.*, The Conscientious Employee Protection Act, N.J.S.A. § 34:19-5e, 34:19-6; The CFA, NJSA § 56:8-19; The Law Against Discrimination, NJSA § 10:5-27.1. Additionally, N.J. Court Rule 4:42-9 provides for an award of attorneys' fees in certain situations, none of which are applicable here. *See* N.J. Ct. R. 4:42-9. The Reeds did not avail themselves of the procedures for recovery of fees under N.J.S.A. 2A:15-59.1. Courts need to be chary about awarding fees on some other legal basis, particularly under a treble damages statute such as the CFA. But the CFA imposes a different standard of liability than the statute permitting fee shifting based on frivolous filings such as N.J.S.A. 2A:15-59.1.

New Jersey courts also permit recovery of legal fees in circumstances that fall within the exception to the American rule reflected in section 914 of the Restatement (Second) of Torts. That section provides in part as follows: "One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action." RESTATEMENT (SECOND) OF TORTS § 914(2). *See, e.g.*, *Estate of Lash*, 776 A.2d 765, 769–70 (N.J. 2001) ("Thus, if a plaintiff has been forced

because of the wrongful conduct of a tortfeasor to institute litigation against a third party, the

plaintiff can recover the fees incurred in that litigation from the tortfeasor.  Those fees are merely

a portion of the damages the plaintiff suffered at the hands of the tortfeasor."); *DiMisa v.*

*Acquaviva*, 947 A.2d 168, 172 (N.J. Super. Ct. App. Div. 2008) (stating that "one whose tortious

conduct requires another to bring or defend a suit against a third party to protect his interests may

be assessed the attorneys' fees incurred in the third-party action as an element of damages arising

from the tort" (citations omitted)).

Here, GMACM brought the Foreclosure Action and it is against GMACM that the Reeds

filed their Claims.  At first blush these circumstances would not seem to fit the requirements of

Restatement section 914(2) that, in order to recover attorneys' fees as damages, it is the "tort of

another" that required the Reeds to incur attorneys' fees in defending the Foreclosure Action.

But GMACM, which never owned the Note, brought the Foreclosure Action in its capacity as

loan servicer; foreclosure would have benefitted the holder of the Note.  The Reeds' FCA claim

is against GMACM for its own misconduct.  While neither party has cited any cases addressing

the circumstances of a party against whom attorneys' fees are sought acting in two different

capacities—the Court has not found any cases in its own research—the Court concludes that

such circumstances  can satisfy the "tort of another" requirement; and the Reeds' attorneys' fees

in defending the Foreclosure Action satisfy the "ascertainable loss" and "causal relationship

between the unlawful conduct and the ascertainable loss" requirements for recovery under the

CFA.  The Court has found earlier in this Opinion that the Reeds incurred fees in the amount of

$5,823 defending the Foreclosure Action.  The Court concludes that this amount—trebled

($17,469.00)—reflects the Reeds' damages.

50

The Reeds also seek to recover the attorneys' fees they incurred in prosecuting the Reed

Action, but that case was not filed until after the Foreclosure Action was dismissed without

prejudice and GMACM never refiled a foreclosure case.  The Reeds did not need to file the Reed

Action to protect their interests and the Reeds also voluntarily dismissed the Reed Action

without prejudice.  The Court concludes under these circumstances that the attorneys' fees

incurred by the Reeds in prosecuting the Reed Action are not recoverable under Restatement

section 914(2) or on any other basis.  While the CFA also allows recovery of attorneys' fees

incurred successfully prosecuting a CFA cause of action, the Reeds have not incurred attorneys'

fees in this Court prosecuting the CFA claim because they have been acting *pro se*.  Furthermore,

the evidence the Reeds submitted concerning the attorneys' fees incurred in prosecuting the Reed

Action does not break down fees among the many causes of action asserted in the Reed Action,

so the Court is unable in any event to attribute any portion of those fees to prosecuting the CFA

cause of action.

The damages amount determined above is an unsecured claim against GMACM.[29]

Therefore, the Reeds will be granted an allowed unsecured claim in the amount of $17,469.00.

## III.    CONCLUSION

For the reasons explained above, the only claim on which the Reeds may recover

damages is the CFA claim.  With respect to that claim, the only recoverable damages proven by

the Reeds by a preponderance of the evidence are the attorneys' fees the Reeds incurred in

defending the Foreclosure Action.  Trebled under the CFA, the Reeds have established a claim in

---

[29]    Section 726(a)(4) of the Bankruptcy Code effectively subordinates treble damages claims to unsecured claims in a chapter 7 case.  *See* 11 U.S.C. § 726(a)(4).  However, section 726(a)(4) does not apply in a chapter 11 case.  *See* 6 COLLIER ON BANKRUPTCY ¶ 726.01 (16th ed. 2014) ("Section 726 applies directly only in liquidation cases under chapter 7.").

the amount of $17,469.00, which is determined to be the allowed amount of their unsecured claim.

GMACM was all too willing to cut corners and submit false evidence in support of the Foreclosure Action against the Reeds.  Such conduct by a loan servicer is unacceptable.  The Reeds are hardly deserving claimants; they have resided in the Property for the majority of the time that has passed since early 2008 without paying their mortgage, late charges, property taxes or insurance premiums.  They face a new foreclosure action filed by the current holder of the Note and Mortgage.  Certainly, nothing in this Opinion provides the Reeds with a defense to that new foreclosure action, which the New Jersey courts will have to adjudicate on the merits.

But unless there are consequences for a loan servicer that ignores the law, as GMACM did here, such wrongful conduct will not be deterred.  In most instances, as the New Jersey courts have held, dismissal of a foreclosure action without prejudice will suffice as the appropriate remedy.  Where, as here, the loan servicer engages in unlawful acts that violate the CFA, an affirmative recovery by a borrower that can establish ascertainable loss and a causal connection is appropriate.  Here, the Reeds' only ascertainable loss with a causal connection to the wrongful conduct is the attorneys' fees incurred in defending the Foreclosure Action.

**IT IS SO ORDERED.**

Dated:  October 6, 2014
        New York, New York

_____*Martin Glenn*_____
MARTIN GLENN
United States Bankruptcy Judge

52