Case 12-12020 (MG)          Page 1 of 5

Karen M. Rozier
7957 Dahlia Circle
Buena Park, CA 90620
(714) 512-5740
Claimant Unrepresented

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Case No. 12-12020 (MG) |
|  | Chapter 11 |
| Residential Capital, LLC, et. al. | Jointly Administered |
|  |  |
| Debtors | **DECLARATION OF KAREN MICHELE ROZIER IN SUPPORT OF OPPOSITION TO THE OBJECTION OF THE RESCAP BORROWER CLAIMS TRUST TO PROOFS OF CLAIM FILED BY KAREN MICHELE ROZIER (CLAIMS NOS. 4738 AND 5632)** |
|  | [Related to 7474-4,7457] |
|  | Hearing: October 22,2014 |
|  | Time: 10:00 A.M. EST |

1. I am <u>Karen Michele Rozier</u>, the Claimant in the subject case for Proofs of Claim 4738 and 5632, over the age of 18 and without benefit of counsel in this litigation. I have personal knowledge of the facts herein, and, if called as a witness, could testify competently thereto.I am competent to submit this declaration in support of my *"THE OBJECTION OF THE RESCAP BORROWER CLAIMS TRUST TO PROOFS OF CLAIM FILED BY KAREN MICHELE ROZIER (CLAIMS NOS. 4738 AND 5632)"* (the "Motion to Strike"[1]).

2. I submit this declaration of my own free will and without assistance of counsel.

3. I timely filed my Proofs of Claims and timely filed my Final Demand in response to Debtors' request for information.  Debtors have known of my claim since July 2013. They are not being

OCT - 3 2014

U.S. BANKRUPTCY COURT, SDNY

---

[1] Defined terms used but not defined herein shall have the meanings ascribed to such terms in the Objection.

truthful with the court when they claim the first time they learned of my claim and my intent to

hold them liable was in December 2013.

4.  My proof of crimes are reasonable including my demands for punitive damages. It is my

understanding that at the federal level, punitive damages are nine (9) times. As I was content to

resolve this in California state court (which only allows for three-times punitive damages) but

Debtors chose to remove the initial California Action to federal court, and since bankruptcy is

also federal, I believe I am entitled to the higher level of punitive damages.

5.  I have been an active participant in these proceedings. I have scoured the docket carefully,

spoken with other Claimants, and filed numerous motions in these proceedings. I believe my

most significant contribution to these proceedings was in opposing the Borrower's Trust expert

Michael Talerico. While I was not the only Claimant opposed to the Trust's efforts to reduce

claims, I *was* the only Claimant who opposed their expert. As the Court agreed with me, I take

full credit. In their Motion, Debtors completely omit my contribution in their three page

description of my prior motions before the court.

6.  I have reviewed the Debtors' Opposition Motion to my claims and all supporting declarations.

7.  Debtors are not entitled to the relief requested.

8.  Declarants, each of them, made materially false statements in their declarations. I am filing a

motion to strike the declarations of both Deanna Horst and Yaron Shaham and declarations in

support of my motions with attachments concurrently with this Opposition Motion

9.  The property under dispute is and at all times material to this dispute a 4,206 square foot

architectural masterpiece, worth at the top of the market around $1,245,000. A true and correct

copy of the most recent appraisal is attached hereto as **Exhibit 1**.

10. Debtors' portrayed my property as a 2,096 square foot property worth around $350,000 but

with me owing them $585,000. This made me appear upside down in my mortgage, a credit risk,

and worse, greedy. California judges initially believed Debtors when it claimed I took out a

jumbo loan on a $350,000 home and was trying to steal the money and the home. This has

caused me embarrassment. Moreover, it casts me in a negative light in a County the FBI deems

one of the worst places in America to be Black according to their Hate Crime statistics.

11. Even after Debtors were informed by the Orange County Tax Assessor as to the true size of my

home, they continued to portray it as a smaller, worthless shack.

12. Almost all of the equity in our home was put their by my husband. I purchased a 2,096 square

foot home in 2009 for $165,000 planning to move in with my husband and infant son, who was

on oxygen and a heart monitor at the time. We used an agent for the purchase and the seller,

upon discovering that we are African American, raised the price $10,000 at the closing table. I

think we finally ended up paying $185,000. As I was still recuperating from the birth of our son

at 24.5 weeks (744 grams) I did not personally handle the transaction.

13. The seller first refused to release the property. We tried to get the Buena Park police to help but

they had not yet evolved. They told us to "go back to Anaheim[2]."

14. While I attempted to show the police all of the paperwork which proved I was the rightful

owners and solicit their help to remove the seller from the property, my husband went inside to

survey the home. Our son remained in the vehicle, in my sight. Again, he was still on oxygen

and an apnea monitor. The seller was smirking the entire time.

15. My husband came outside and asked the police if I was the owner of the property and the police

said "yes". He then grabbed a sledge hammer from the van and demolished the entire house.

Then he told the police and seller to get off of his wife's property.

16. At first I thought he had lost him mind, but then he explained why we would never live in the

seller's "filth". Though I did not see the damage inside, I did cry when I watched the walk

---

[2] Though the two cities share a border, Anaheim is mockingly referred to as "Anacrime", whereas Buena Park has
traditionally enjoyed a low crime rate.

through[3]. The owner had defecated in almost every corner, urinated on walls, sprayed electrical

outlets with water, and completely trashed the interior. The Buena Park police refused to arrest

him, claiming that for all they knew, we bought the house in that condition.

17. This is when I first met attorney Judith Deming. While she agreed that we were the victim of

racial discrimination, she educated me to the realities of Orange County living and the near

impossibility of me prevailing at trial. I have worked with many lawyers and I found Ms. Deming

to be quite credible. Ms. Deming would later handle my rescission of the December 2005

transaction. Her office also reviewed our contracts for purchases we made in Mexico.

18. We fought with the Buena Park Planning Department for months before finally getting permits

approved. Here too we ran into racism. At one point when the Commission wouldn't budge, we

used a white friend to present the same drawings they rejected. The Commission approved the

plans thinking we had hired a white architect. Unbeknownst to them, he and David were

partners in a business at the time. We started building in January 2000. David rebuilt our home

with **no** outside labor. 100% of everything there was put here by him, from foundation to finish

including plumbing, electrical, HVAC, and all other construction. He is the uncompensated

builder of the subject property. He took out an ad bragging about his work and rather than being

allowed to present witnesses and video of his amazing feat, was persecuted by the California

Architect Board and the City of Los Angeles. At the time, David was very vocally opposed to the

almost billion dollars spent to open a new school for Mexican children over hydrogen sulfide

and methane gases. The school was originally named Belmont Learning Center. It garnered so

much opposition for the clear racism that when it opened, it opened under a name with a

positive reputation – Edward Roybal. Californians have short memories and few people would

associate a school named after Mr. Roybal with the Belmonth Learning Center.

---

[3] We intended to use the video while telling "our story" about how one man could build a house, but we were
instead forced to defends against Debtors wrongful actrs.

19. Shortly after we completed construction, we began being bombarded with offers to refinance our home. As I was very unhappy with U.S. Bank, I was more than pleased to leave them. My so-called satisfaction of debt was 'signed' by Judy Faber. A true and correct copy of that document is attached hereto as **Exhibit 2**.

20. I have never received hundreds of thousands of dollars from anyone. Debtors claim they gave me hundreds of thousands of dollars to purchase a home but the loan under dispute was a refinance, not a purchase. Given the number of other wrong ideas they have about the transaction – date, my name, size of home, name of trust, parties – I don't think they can prove any case in any court.

21. I signed a note in May 2005. A few months later, I was heavily lobbied by WMC Mortgage Corp. At the time, I was unfamiliar with the concept of churning. I was also ignorant of the fact that these companies were all the same. After I stepped back and looked at the history of loans on my property, I was shocked to realize that I too had fallen hook, line and sinker to churning.

22. I believed that I was discriminated against by WMC Mortgage. They stipulated to discriminatory lending practices but I was not a member of the class. However, after I received my loan file from U.S. Bank I finally had the evidence that I was placed in a high risk loan despite the fact that my monthly disposable income after my financial obligations was over $15,000 *per month*. In my loan package was the evidence that WMC Mortgage not only had twelve months of bank statements but also that they contacted each of my clients to verify my projects. Debtors and US Bank had access to all of this information.

23. When I received a so-called executed December 2005 Note, I was shocked to discover that Judy Faber also signed this transaction. A true and correct copy of the disputed note page executed by Judy Faber is attached hereto as **Exhibit 3**.

24. Given the volume of loans U.S. Bank handles and considering that I was led to believe with each transaction that I was getting further away from U.S. Bank, I began investigating Judy Faber.

That is when I discovered that she was a robo-signer. A true and correct copy of her admission

by declaration is attached hereto as **Exhibit 4.**

25. I have two open cases in California which involve Debtors. Case 30-2008-00217056-CU-JR-CJC

remains open in California. This is the Initial California Action filed on October 28, 2008. Debtors

removed the case to federal court and attempted to have everything dismissed in federal court,

but the California court elected to retain jurisdiction. An Order to Show Cause Hearing was held

on Wednesday October 1, 2008. At that hearing, the Court ruled that the case would remain

open for another 30-days pending resolution of the October 22, 2014 hearing in New York. A

true and correct copy of the Minute Order dated 10/1/2014 is attached hereto as **Exhibit 5.**

26. I also have a case 30-2012-00601310-CU-OR-CJC open in the same court. This case is for acts

which began around the time Bank of American RAMP2007 RPI inserted itself into my life.

27. I also have an open bankruptcy. I updated my bankruptcy schedules to reflect the expected

payout from this litigation. A true and correct copy of my Amended Summary of Schedule dated

Dec 16, 2013 is attached hereto as **Exhibit 6.** I have kept the Trustee informed of this bankruptcy

and my appeal. I likewise kept the Trustee informed of my interest in the property. At a hearing

in front of the Honorable Theodor Albert (presiding over the bankruptcy for the David Bear

Irrevocable Living Trust) we all agreed that it was best for me to keep the Dahlia Circle property

as part of my estate to avoid the appearance that I had placed it in trust solely to shield the

equity from my creditors. At my oral arguments, Justices Pappas, Kirhham and Dunn also

inquired about why the property was still part of my bankruptcy despite it being held in Trust

and my clear and resounding victory in California, specifically mentioning the no tender ruling

when the Preliminary Injunction was issued with no tender required. One of the justices – the

nice one – explained that I could win my case and lose my house in bankruptcy if the Trustee

elected to sell it. I explained to the justices that this was not about my house, but about my

nation and the millions of people who could not stand up for themselves. Despite my best

efforts, the judges ruled incorrectly in U.S. Bank's favor. At the time I had not presented

*evidence* that my home was twice the size and value of U.S. Bank's claim and had not shown the

Court that U.S. Bank outright lied when it claimed I had no equity in my home if they actually did

have a secured interest in the property. I filed my oral brief in April 2014 and am anxiously

awaiting my chance to argue my case in front of the higher court. Instead of Zero Tolerance for

childhood bullying, our nation should try Zero Tolerance for perjury.

28. I am not suing anyone to Quiet Title.

29. I am suing for wrongdoing and harm done to me, as well as for the crimes committed against my

name and person. My suspicions were aroused when I returned my forbearance agreement to

Debtor GMACM and they attempted to intimidate me into signing a blank contract. A true and

correct copy of the April 2008 forbearance agreement is attached hereto as **Exhibit 7**.

30. I am not suing Mortgage Electronic Registration Systems, Inc., Mortgage Electronic Registration

System, Inc., or Ocwen Home Loan Servicing. I was forced to add U.S. Bank in my 30-2012-

00601310 California action but prevented from making any allegations against them.

31. After Bank of America failed to prove its claim, I transferred my interest into the subject

property into a Living Trust for the benefit of my minor son. I notified all parties and properly

recorded the transfer. Months later, Bank of America RAMP2007RP1 transferred its so-called

interest to U.S. Bank RAAC2007RP1.

32. Months later, Bank of America RAMP2007RP1 foreclosed on the home my husband built for us

using a void Deed of Trust bearing my name and manes similar to mine. I asked them to correct

their mistake, which they would not do. I sued, and a few days later they rescinded. They

continued to harass me.

33. I was very specific in naming individuals who caused me home including Latina Dawn, the clerk

who initially refused to speak with me while I was current on my loan and who kept trying to

convince me to go 90-days late to qualify for customer service help;, David Hagens, the former

GMACM Mortgage attorney who refused to accept my timely rescission of the alleged

modification of note; Illeana Peterson and Sally Beltran for Debtor ETS and other employees or

agents of Debtors who caused me harm. I have also filed criminal charges against many of

Debtors and their agents for their wrongful acts including filing false declarations. I also filed

formal complaints with various Consumer Protection Agencies against Debtors and their agents.

These people include: Mini Ali akMehraz Ali; Luis Rodriguez; Joseph Lyons, Stephen Maxwell;

Nikole Shelton; Tracie Schmidheiser; and Michael Batson. These complaints were filed in

Pennsylvania, California, and Texas to correspond with the agency having jurisdiction over the

appropriate party.

34. I also sued Adam Barasch in California for Violation of Business and Professions Code 17200 et

seq. I dropped those charges despite truly believing that he was guilty of extortion, but only

because his law firm was too big to fight. These two gentleman responded by 'judge shopping'

their frivolous claim of workplace violence. They shopped the case first in Santa Ana until they

realized their favorite judge was in Fullerton, at which point they moved the case to Fullerton

claiming it was the proper venue.

35. Yaron Shaham works in Irvine, CA and the proper forum for his Workplace Violence request

would have been Santa Ana. Adam Barasch works more than 225-miles from my home, so the

proper venue would have been in San Francisco. Instead, they shopped the case until it landed

in front of disgraced judge Scott Steiner. At the time, Mr. Steiner was being vilified behind closed

doors for allegedly trading sex for jobs, grades and rulings. After stipulating to the crimes where

he was caught, Mr. Steiner was censured by the California Judicial Commission on September 2,

2014. I have subsequently appealed his decision.

36. I have never threatened Yaron Shaham or Adam Barasch with violence. They presented no case

showing a credible threat yet were granted the TRO based on my ignorance of the law and the

judge, who concealed his identity from me to prevent me from being able to disqualify him as an

immoral man. I knew his name, but I did not know him by sight.

37. Mr. Shaham then used the WVTRO to prevent me from being able to prosecute my case.

Specifically, I was prevented from visiting his offices to view my entire loan file and had to trust

that he was providing me with everything. He also made it impossible for me to communicate

with him without risking incarceration.

38. I have also filed criminal complaints against Debtors lawyers Yaron Shaham and Adam Barasch in

Buena Park and Fullerton. As soon as I examined my loan file, I saw so many instances of forgery

and fraud that I asked Mr. Shaham and Mr. Barasch to present the clearly fraudulent

instruments to their clients and recommend immediate cancellation of instruments. Instead,

Mr. Shaham responded by continuing to file false and fraudulent documents.

39. He clearly has a motive to lie against me, one he failed to disclose to the court.

40. Mr. Barasch has been silent since the WVTRO. Even before the WVTRO I had little to no

interaction with Ms. Barasch. We stopped communicating once I accused him of extortion in

October 2012.

41. I have also filed charges against their agents including: Benjamin Weis,

42. I have never met Deanna Horst. Upon reading her declaration in this matter, I found so many

materially false statements that I decided to investigate her. While her claims of experience are

consistent, she is fuzzy with the details. I discuss this inconsistency as well as others in my

Motion to Strike.

43. I do not know anyone named Eric Hardemion. I first became aware of Mr. Hardemion when I

read U.S. Bank's Motion for Relief of Stay where they claimed that I was working in concert with

Mr. Hardemion. I was not.

44. I also asked my husband if he knew Mr. Hardemion. My husband David is both the

uncompensated builder of the subject property and the Trustee of the Trust which contains the

subject property. My husband claims he also doesn't know Mr. Hardemion. Based on this, we both filed a complaint with the California bankruptcy trustee requesting an investigation. We were told that because the amount of fraud was so small and their resources so limited, they would not pursue the case.

45. I don't know why Debtors keep insisting that I know Mr. Hardemion or that I informed him of Mr. Hardemion's stay. Given the number of outright untruths I revealed in the supporting declarations of Deanna Horst and Yaron Shaham, the court should immediately order them to show proof that I gave them that information and if they cannot, the Court should order them to stop falsely portraying me as the criminal in order to cover their crimes.

46. The California courts have ruled multiple times that I did not have to tender any amounts to U.S. Bank as U.S. Bank has no valid enforceable debt. Mr. Shaham tells everyone that we haven't paid "in years". As I am usually in court defending myself from these bullies – Severson and Werson + BRYANCAVE LLP + Locke Lord LLP, I am constantly surrounded by law enforcement. Several Deputies have stopped me to ask if that is true, forcing me to explain myself to them so as to not be classified as a deadbeat. Mor4epver, due to their false characterization of me in order to derail my litigation, SWAT officers are routinely sent to my home to post Notices on my door. Buena Parks is 2% African American and we are the only African Americans in our cul-de-sac.

47. We used to be respected in our community. Now we are prisoners in our home and the butt of jokes around town due to the Debtors and its agents' wrongful acts including unnecessary police escalation.

48. U.S. Bank is attempted to profit from its illegal acts. This includes them working with their co-Defendant Bank of America to ensure I was in jail during a Motion to Compel hearing, allowing them to backdoor a Summary Judgment order. That order is under appeal.

49. Debtors and U.S. Bank are also trying to hide that they originally claimed to possess a valid note which was securitized into a trust RAMP2007RP1. Now they claim it was RAAC2007RP1. I have

researched securities law and securitization schemes. I can find no law which supports their

position that an incorrectly named trust is a valid entity.

50. Debtors Motions and declarations contain many false statements and omit so many critical facts

as per my declarations in support of motions to strike, submitted concurrently with this motion

and annexed hereto as if each of the statements and exhibits are included herein.

51. All parties have been served in accordance with the Exhibit A Proof of Service.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true to the best of my

knowledge.

Executed in Buena Park, California on October 2, 2014    By

KAREN MICHELE ROZIER, MPA/MSIA/MBA/BSEE
Unrepresented Claimant

**Case 12-12020 (MG)**          Page _12_ of _55_                    **Exhibit 1**

# EXHIBIT 1

# APPRAISAL REPORT OF

a Single Family Residence at

7957 Dahlia Circle

Buena Park, CA 90620

# AS OF

04/02/14

# PREPARED FOR

David & Karen Rozier
7957 Dahlia Circle
Buena Park, CA 90620

# PREPARED BY

Molly Flaherty
Molly Flaherty
519 19th Street, Suite 4
Huntington Beach, CA 92648



04/14/2014


David & Karen Rozier
7957 Dahlia Circle
Buena Park, CA 90620

File Number: 04ROZINFNLBP-14



Dear  David Bear & Karen Rozier,


In accordance with your request, I have personally inspected and appraised the real property at:

7957 Dahlia Circle
Buena Park, CA 90620

The purpose of this appraisal is to estimate the market value of the subject property, as improved. The property rights appraised are the fee simple interest in the site and improvements.

In my opinion, the estimated market value of the property as of _____ 04/02/14 _____ is:


$ ____750,000____

Seven Hundred and Fifty Thousand Dollars


The attached report contains the description, analysis and supportive data for the conclusions, final estimate of value, descriptive photographs, limiting conditions and appropriate certifications.



Respectfully submitted,


Appraiser: _____
                        Molly Flaherty




Supervisor: _____

*15 of 55*

File No.    04ROZINFNLBP-14
Case No.    N/A

# Table of Contents

| Page Title | Page # |
|---|---|
| Transmittal Letter | 1 |
| Residential Appraisal Page 1 | 2 |
| Residential Appraisal Page 2 | 3 |
| Residential Appraisal Page 3 | 4 |
| Extra Comps 4-5-6 | 5 |
| Comments | 6 |
| Comments Page 2 | 7 |
| Comments | 8 |
| Certification Page 1 | 9 |
| Certification Page 2 | 10 |
| Certification Page3 | 11 |
| Sketch | 12 |
| Location Map | 13 |
| Plat Map | 14 |
| Aerial Map | 15 |
| Photo Subject | 16 |
| Photo Subject Extra | 17 |
| Photo Subject Extra | 18 |
| Photo Subject Extra | 19 |
| Photo Subject Extra | 20 |
| Photo Subject Extra | 21 |
| Photo Comparables 1-2-3 | 22 |
| Photo Comparables 4-5-6 | 23 |

## Residential Appraisal Report

The purpose of this appraisal report is to provide the client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 7957 Dahlia Circle | City | Buena Park | | State CA | Zip Code | 90620 |

| | | | |
|---|---|---|---|
| Owner | David Bear & Karen Rozier | Intended User | David Bear & Karen Rozier | County | Orange |

Legal Description  Lot 4 of Tract No. 2630

| Assessor's Parcel # | 136-241-04 | | Tax Year | 2013 | R.E. Taxes $ | 4,532.00 |
|---|---|---|---|---|---|---|
| Neighborhood Name | N/A | Map Reference | 767-J3 | | Census Tract | 1104.01 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Occupant [X] Owner [ ] Tenant [ ] Vacant | Special Assessments $ | 0 | | [ ] PUD | HOA $ | 0 | | [ ] per year [ ] per month |

Property Rights Appraised  [X] Fee Simple  [ ] Leasehold  [ ] Other (describe)

Intended Use  Determination of Value for a Chapter 13.

| Client | David & Karen Rozier | Address | 7957 Dahlia Circle, Buena Park, CA 90620 |
|---|---|---|---|

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal?  [ ] Yes [X] No

Report data source(s) used, offering price(s), and date(s).   A combination of: Realist, Multiple Listing Service, various title companies, realtors and the Rozier's.

[ ] did [ ] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.  N/A

Contract Price $ N/A    Date of Contract N/A    Is the property seller the owner of public record? [ ] Yes [ ] No  Data Source(s) N/A

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the purchaser? [ ] Yes [ ] No

If Yes, report the total dollar amount and describe the items to be paid.  N/A

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % |
|---|---|---|---|---|---|---|---|
| Location [ ] Urban [X] Suburban [ ] Rural | Property Values [X] Increasing [ ] Stable [ ] Declining | | | PRICE $(000) | AGE (yrs) | One-Unit 89 % |
| Built-Up [X] Over 75% [ ] 25-75% [ ] Under25% | Demand/Supply [ ] Shortage [X] In Balance [ ] OverSupply | | | Low 300 | Low 1 | 2-4 Unit 1 % |
| Growth [ ] Rapid [X] Stable [ ] Slow | Marketing Time [X] Under 3 mths [ ] 3-6 mths [ ] Over 6 mths | | | High 440 | High 58 | Multi-Family 5 % |
| | | | | Pred. | Pred. 36 | Commercial 5 % |
| | | | | | | Other % |

Neighborhood Boundaries  The subject neighborhood is bounded by Rosecrans Avenue North, by Orange Avenue South, by Gilbert Street East, and by Beach Boulevard West.

Neighborhood Description  Residential properties located within the subject's market area are readily accessible and all properties appear to have adequate utilities available. The neighborhood consists of mostly single family residences with generally conforming lot utilities. The major streets in the community provide for local shopping and commerce.

Market Conditions (including support for the above conclusions)  Most Southern California cities experienced price/value depreciation until 2011. The price/value trend has stabilized as the market strengthened 2012-2013.  While it is not for certain, it appears the price/value trend in this area of Buena Park, during the past three month, is increasing.  The neighborhood's typical exposure time is presently 0-90 days.

| Dimensions | See Site Map for Area Calculation | Area | 8,276 SqFt | Shape | Cul-De-Sac/Irregular | View | Neighborhood |
|---|---|---|---|---|---|---|---|

Specific Zoning Classification  R-1    Zoning Description  (Single Family Residential)

Zoning Compliance  [X] Legal  [ ] Legal Nonconforming (Grandfathered Use)  [ ] No Zoning  [ ] Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use?  [X] Yes  [ ] No If No, describe.

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements--Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Water | [X] | | Street | Asphalt | [X] |
| Gas | [X] | None | Sanitary Sewer | [X] | In Area | Alley | None | |

FEMA Special Flood Hazard Area  [ ] Yes [X] No  FEMA Flood Zone  X    FEMA Map # 06059C-0126J   FEMA Map Date 12/03/2009

Are the utilities and off-site improvements typical for the market area?  [X] Yes  [ ] No If No, describe.

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)?  [ ] Yes [X] No If Yes, describe.

There are no apparent adverse easements, encroachments, special assessments or slide areas, illegal or legal nonconforming zoning land uses  noted other than typical utility lines. Site backs to strawberry fields and sides commercial.  This does not appear to have effect on value or marketability. The appraiser is not an expert in the field of environmental analysis and/or inspection. There was no environmental report provided to the appraiser.

| General Description | | Foundation | | Exterior Description  materials/condition | | Interior  materials/condition | |
|---|---|---|---|---|---|---|---|
| Units [X] One [ ] One with Accessory Unit | [X] Concrete Slab [ ] Crawl Space | | Foundation Walls | Concrete-Avg | Floors | Tile/Wood-Avg |
| # of Stories  Two | [ ] Full Basement [ ] Partial Basement | | Exterior Walls | Stucco/Slate-Avg | Walls | Drywall/Birch-Avg |
| Type [X] Det. [ ] Att. [ ] S-Det./End Unit | Basement Area N/A sq. ft. | | Roof Surface | Comp Shingle-Avg | Trim/Finish | Wood/Paint-Avg |
| [X] Existing [ ] Proposed [ ] Under Const. | Basement Finish N/A % | | Gutters & Downspouts | Adeq Overhang | Bath Floor | Tile-Avg |
| Design (Style)  Conventional/Avg | [ ] Outside Entry/Exit [ ] Sump Pump | | Window Type | Alum Slider/Vinyl-Avg | Bath Wainscot | Tile-Avg |
| Year Built  1957 / 2005 | Evidence of [ ] Infestation | | Storm Sash/Insulated | No/Yes | Car Storage | None |
| Effective Age (Yrs)  25 | [ ] Dampness [ ] Settlement | | Screens | Screens-Avg | [ ] Driveway  # of Cars  2 |
| Attic  None | Heating [X] FWA [ ] HWBB [ ] Radiant | | Amenities | Woodstove(s) # | Driveway Surface | Concrete |
| [ ] Drop Stair [ ] Stairs | [ ] Other  Fuel  Gas | | [ ] Fireplace(s) #  [X] Fence  Block | [X] Garage  # of Cars  2 |
| [ ] Floor [X] Scuttle | Cooling [X] Central Air Conditioning | | [X] Patio/Deck Cnc [X] Porch  Tile | [ ] Carport  # of Cars |
| [ ] Finished [ ] Heated | [ ] Individual [ ] Other | | [ ] Pool  None  [ ] Other | [ ] Att. [X] Det.  [ ] Built-in |

Appliances [P] Refrigerator [X] Range/Oven [X] Dishwasher [X] Disposal [P] Microwave [P] Washer/Dryer [ ] Other (describe)

| Finished area above grade contains: | 8 Rooms | 3 Bedrooms | 3.50 Bath(s) | 3,763 Square Feet of Gross Living Area Above Grade |
|---|---|---|---|---|

Additional features (special energy efficient items, etc.)  See the attached addendum for a full summary of the subject's property features.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.).  The subject has received periodic replacements and upgrades and is maintained adequately.  There appeared to be water stains from a prior leakage with none currently present per the homeowner.  For the purpose of this appraisal study it is assumed to have been fixed.  The Appraiser is not a roofer, and if there are concerns, an inspection performed by the appropriate contractor is recommended.  This is seen as a cosmetic repair, as reflected in subject's "Average" condition rating, with minimal effect upon marketability.  The appraisal is completed under the extraordinary assumption that the above described inadequacies are not significant and there are no structural problems with the subject property.  If my assumptions are found to be untrue, I reserve the right to change my appraisal, this property is overbuilt for the area.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property?  [ ] Yes [X] No  If Yes, describe

The appraiser is not a licensed home inspector and this report is not a home inspection.  The appraiser only performed a visual inspection of accessible areas and the appraisal cannot be relied upon to disclose conditions and/or defects in the property.  The appraiser does not have the skill or expertise needed to make such inspections.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)?  [X] Yes  [ ] No If No, describe

## Residential Appraisal Report

| There are | - | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ | - | to $ | - | . |
|---|---|---|---|---|---|---|
| There are | - | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ | - | to $ | - | . |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 7957 Dahlia Circle | 8524 Elm Circle | | 9532 Monterra Way | | 59 Centerstone Circle | |
| | Buena Park, CA 90620 | Buena Park, CA 90620 | | Buena Park, CA 90620 | | Buena Park, CA 90620 | |
| Proximity to Subject | | 0.83 miles S | | 2.18 miles SW | | 0.39 miles E | |
| Sale Price | $ N/A | $ 655,000 | | $ 680,000 | | $ 640,500 | |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 263.26 sq. ft. | | $ 239.44 sq. ft. | | $ 256.20 sq. ft. | |
| Data Source(s) | | CRMLS #OC13210043 | | CRMLS #PW13207738 | | CRMLS #PW13054210 | |
| Verification Source(s) | | Realist-Doc #18599 | | Realist-Doc #47880 | | Realist-Doc #317510 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing | | ArmLth | | ArmLth | | ArmLth | |
| Concessions | | FHA;0 | | Conv;0 | | Conv;0 | |
| Date of Sale/Time | | 01/15/2014 | | 02/05/2014 | | 05/24/2013 | +17,000 |
| Location | Average | Average | | Average | | Average | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 8,276 SqFt | 5,663 SqFt +/- | +8,000 | 5,519 SqFt +/- | +8,500 | 4,635 SqFt +/- | +11,000 |
| View | Neighborhood | Neighborhood | | Neighborhood | | Neighborhood | |
| Design (Style) | Conventional/Avg | Conventional/Avg | | Conventional/Avg | | Conventional/Avg | |
| Quality of Construction | Average | Average | | Average | | Average | |
| Actual Age | 57 | 31 | | 24 | | 13 | |
| Condition | Average | Average | | Average | | Average | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 8 3 3.50 | 8 4 3.00 | +3,000 | 8 4 3.50 | | 9 5 3.00 | +3,000 |
| Gross Living Area | 3,763 sq. ft. | 2,488 sq. ft. | +89,500 | 2,840 sq. ft. | +64,500 | 2,500 sq. ft. | +88,500 |
| Basement & Finished | 0sf | 0sf | | 0sf | | 0sf | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | FWA/Central AC | FWA/Central AC | | FWA/Central AC | | FWA/Central AC | |
| Energy Efficient Items | None Noted | None Noted | | None Noted | | None Noted | |
| Garage/Carport | 2 Car Garage | 2 Car Garage | | 3 Car Garage | -10,000 | 3 Car Garage | -10,000 |
| Porch/Patio/Deck | Prch/Ptio/2 Blcny | Patio/Porch | | Patio/Porch/Blcny | | Patio/Porch | |
| Fireplace(s) | No Fireplace | 1 Fireplace | | 1 Fireplace | | 2 Fireplaces | |
| Pool/Spa/Bltn BBQ/Fire Pit | None | None | | None | | None | |
| Net Adjustment (Total) | | X + - | $ 100,500 | X + - | $ 63,000 | X + - | $ 109,500 |
| Adjusted Sale Price | | Net Adj: 15% | | Net Adj: 9% | | Net Adj: 17% | |
| of Comparables | | Gross Adj: 15% | $ 755,500 | Gross Adj: 12% | $ 743,000 | Gross Adj: 20% | $ 750,000 |

I [X] did [ ] did not research the sale or transfer history of the subject property and comparable sales. If not, explain   High net/gross adjustments on comparable
3 were made due to the discrepancies between the subject and the comparables available.

My research [ ] did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data source(s) Realist, Multiple Listing Service.
My research [X] did [ ] did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data source(s) Realist, Multiple Listing Service.
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 1 | COMPARABLE SALE # 2 | COMPARABLE SALE # 3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 07/16/1999 | 06/28/2013 | 09/03/2013 | |
| Price of Prior Sale/Transfer | 185,000 | 435,000 | $0 | $0 |
| Data Source(s) | Realist. | Realist. | Realist. | Realist. |
| Effective Date of Data Source(s) | 04/03/2014 | 04/03/2014 | 04/03/2014 | 04/03/2014 |

Analysis of prior sale or transfer history of the subject property and comparable sales  The subject has not sold or transferred title in the last three years per the MLS
and Realist.  Comparable 2 had an interspousal deed on 09/03/2013 and a sale on 08/30/2013 for the amount of $615,000.  All comparables have not
had a prior sale within the past year except for the above noted transactions.

Summary of Sales Comparison Approach   See Addendum for comments on all market adjustments.

Indicated Value by Sales Comparison Approach $   750,000

Indicated Value by: Sales Comparison Approach $   750,000   Cost Approach (if developed) $   N/D   Income Approach (if developed) $   N/D

This appraisal is made [X] "as is," [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been
completed, [ ] subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or [ ] subject to the
following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:  This is a complete report.

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting
conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is
$   750,000 , as of   04/02/14 .

NL - Residential 5/2007

SALES COMPARISON ANALYSIS

RECONCILIATION

## Residential Appraisal Report

Signing appraiser's "License Status" or "Certification of Good Standing" within the State of California can be verified at:
www.orea.ca.gov.

Please see the attached sketch for the subject's floor plan and square footage. The calculated square footage of gross living area is considered to an approximation, with minor variations in actual square footage to be insignificant as to the subject property. The sketch is used to assist reader only and is not an exact rendering. The cost approach was not carried out due to its inability to be accurate for residential properties in this area at this time.

**ADDITIONAL COMMENTS**

### COST APPROACH TO VALUE (if applicable)

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)  The appraiser does not support the Cost Approach as being a good determination of value and the below figures should not and are not accurate for insurance purposes. Marshall & Swift figures are for large tract developments, not individual reconstruction and also do not include demolition or clean up costs. (See Reconciliation in comment addendum)

| ESTIMATED | REPRODUCTION OR | X REPLACEMENT COST NEW | OPINION OF SITE VALUE | | | =$ | 465,000 |
|---|---|---|---|---|---|---|---|
| Source of cost data Local Builders/Developers/Brokers | | | Dwelling | 3,763 | Sq. Ft. @ $ 95.00 | =$ | 357,485 |
| Quality rating from cost service Avg  Effective date of cost data 04/14 | | | Bsmt. | | Sq. Ft. @ $ | =$ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | | Built-Ins | | | | 20,000 |
| The appraiser estimated the physical depreciation of the subject by using | | | Garage/Carport | 500 | Sq. Ft. @ $ 25.00 | =$ | 12,500 |
| the Age Life Method, which is calculated by dividing the effective age by | | | Total Estimate of Cost-new | | | =$ | 389,985 |
| the total economic life. See addendum for additional depreciation | | | Less  Physical 33 | Functional 2 | External | | |
| information. Below indicates the subject's estimated site value. **NOTE: | | | Depreciation 128,695 | 5,226 | 0 | =$ ( | 133,921 |
| The land to building ratio exceeding 30% is typical for Orange County | | | Depreciated Cost of Improvements | | | =$ | 256,064 |
| properties.** | | | "As-is" Value of Site Improvements | | | =$ | 30,000 |
| Estimated Remaining Economic Life (HUD and VA only) | 50 | Years | Indicated Value By Cost Approach | | | =$ | 751,064 |

### INCOME APPROACH TO VALUE (if applicable)

| Estimated Monthly Market Rent $ | N/A | X Gross Multiplier | N/A | =$ | N/A | Indicated Value by Income Approach | |

Summary of Income Approach (including support for market rent and GRM)  N/A

### PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowner's Association (HOA)? [ ] Yes [ ] No  Unit type(s) [ ] Detached [ ] Attached
Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.
Legal Name of Project
Total number of phases   Total number of units   Total number of units sold
Total number of units rented   Total number of units for sale   Data source(s)
Was the project created by the conversion of existing building(s) into a PUD? [ ] Yes [ ] No  If Yes, date of conversion.
Does the project contain any multi-dwelling units? [ ] Yes [ ] No  Data source. Inspection.
Are the units, common elements, and recreation facilities complete? [ ] Yes [ ] No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowner's Association? [ ] Yes [ ] No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

NL - Residential 5/2007   This form may be reproduced unmodified without written permission, however, Bradford Technologies, Inc. must be acknowledged and credited.
Produced by ClickFORMS Software 800-622-8727   Page 4 of 23

**EXTRA COMPARABLES 4-5-6**

File No.   04ROZINFNLBP-14
Case No.   N/A

Borrower   N/A
Property Address   7957 Dahlia Circle

| City | Buena Park | County | Orange | State | CA | Zip Code | 90620 |
|------|-----------|--------|--------|-------|-----|----------|-------|
| Lender/Client | | David & Karen Rozier | | Address | 7957 Dahlia Circle, Buena Park, CA 90620 | | |

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---------|---------|---------------------|--|---------------------|--|---------------------|--|
| Address | 7957 Dahlia Circle | 8571 Monticello Avenue | | 8602 Los Coyotes Drive | | 8550 Buena Tierra Circle | |
| | Buena Park, CA 90620 | Buena Park, CA 90621 | | Buena Park, CA 90620 | | Buena Park, CA 90621 | |
| Proximity to Subject | | 2.18 miles N | | 2.97 miles N | | 3.03 miles N | |
| Sale Price | $ N/A | $ | 850,000 | $ | 850,000 | $ | 998,000 |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 199.25 sq. ft. | | $ 260.58 sq. ft. | | $ 262.63 sq. ft. | |
| Data Source(s) | | CRMLS #S724272 | | CRMLS #PW13219222 | | CRMLS #PW14009612 | |
| Verification Source(s) | | Realist-Doc #298215 | | Realist-Doc #6129 | | Real Estate Broker | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing | | ArmLth | | ArmLth | | Listing | |
| Concessions | | Cash;0 | | Conv;0 | | Conv;0 | |
| Date of Sale/Time | | 05/17/2013 | +22,500 | 01/07/2014 | | Active | -37,500 |
| Location | Average | Superior | -35,000 | Superior | -35,000 | Superior | -35,000 |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 8,276 SqFt | 16,988 SqFt +/- | -26,000 | 13,939 SqFt +/- | -17,000 | 11,761 SqFt +/- | -10,500 |
| View | Neighborhood | Neighborhood | | Golf Course | -30,000 | Neighborhood | |
| Design (Style) | Conventional/Avg | Conventional/Avg | | Conventional/Avg | | Conventional/Avg | |
| Quality of Construction | Average | Average | | Superior | -10,000 | Superior | -10,000 |
| Actual Age | 57 | 42 | | 37 | | 36 | |
| Condition | Average | Average | | Superior | -10,000 | Superior | -10,000 |
| Above Grade | Total Bdrms Baths | Total Bdrms Baths | 0 | Total Bdrms Baths | | Total Bdrms Baths | |
| Room Count | 8  3  3.50 | 11  5  4.00 | -3,000 | 8  3  3.00 | +3,000 | 8  4  2.50 | +5,000 |
| Gross Living Area | 3,763 sq. ft. | 4,266 sq. ft. | -35,000 | 3,262 sq. ft. | +35,000 | 3,800 sq. ft. | 0 |
| Basement & Finished | 0sf | 0sf | | 0sf | | 0sf | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | FWA/Central AC | FWA/Central AC | | FWA/Central AC | | FWA/Central AC | |
| Energy Efficient Items | None Noted | None Noted | | None Noted | | None Noted | |
| Garage/Carport | 2 Car Garage | 3 Car Garage | -10,000 | 3 Car Garage | -10,000 | 3 Car Garage | -10,000 |
| Porch/Patio/Deck | Prch/Ptio/2 Blcny | Patio/Porch/Blcny | | Patio/Porch | | Patio/Porch | |
| Fireplace(s) | No Fireplace | 1 Fireplace | | 1 Fireplace | | 2 Fireplaces | |
| Pool/Spa/Bltn BBQ/Fire Plt | None | Built-In BBQ | -2,000 | IG Pool/IG Spa | -25,000 | Bltn BBQ/Fire Plt | -4,000 |
| Net Adjustment (Total) | | [ ] + [X] - | $ -88,500 | [ ] + [X] - | $ -99,000 | [ ] + [X] - | $ -112,000 |
| Adjusted Sale Price | | Net Adj: -10% | | Net Adj: -12% | | Net Adj: -11% | |
| of Comparables | | Gross Adj: 16% | $ 761,500 | Gross Adj: 21% | $ 751,000 | Gross Adj: 12% | $ 886,000 |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE # 6 |
|------|---------|---------------------|---------------------|---------------------|
| Date of Prior Sale/Transfer | 07/16/1999 | | | |
| Price of Prior Sale/Transfer | 185,000 | $0 | $0 | $0 |
| Data Source(s) | Realist. | Realist. | Realist. | Realist. |
| Effective Date of Data Source(s) | 04/03/2014 | 04/03/2014 | 04/03/2014 | 04/03/2014 |

Analysis of prior sale or transfer history of the subject property and comparable sales  Comparable 6 is an active listing with T.N.G. Real Estate Consultant (562) 315-9330 David Clescerl. This comparable was utilized as it is a good gauge of market trend, and is supportive of the final opinion of value. A 3.75% market adjustment was applied to account for the typical and probable difference between asking and contract sale price (rounded to the nearest $500). Comparable 6 was used mainly for its similar livable area and for bracketing purposes. Little, if any weight given to this comparable, due to it being in a different area. Listings are provided to demonstrate current market conditions (the subject's market conditions), and should not be construed as any indicator of current market value. Oftentimes properties sell below, as well as above, the listing price. Concessions, seller incentives, and discounts for listings are an ongoing unknown within a competitive market until the property actually sells. The appraiser cannot predict the motivations of parties involved in a transaction that has not occurred yet. In this report, little weight is given to the above listing and it is adjusted for the benefit of the lender. Reconciling the estimate of the subject market value against unknown events (the eventual sale of a listing) would be forecasting and misleading. The listing provided is adjusted only in order to further provide additional information.

Summary of Sales Comparison Approach  See addendum.

COMMENT ADDENDUM

File No.   04ROZINFNLBP-14
Case No.   N/A

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 7957 Dahlia Circle | | | | | | |
| City | Buena Park | County | Orange | State | CA | Zip Code | 90620 |
| Lender/Client | David & Karen Rozier | | Address 7957 Dahlia Circle, Buena Park, CA 90620 | | | | |

### DESCRIPTION OF IMPROVEMENTS FOR THE SUBJECT RESIDENCE

The subject's additional features include, but are not limited to:
The subject was a tract home built in 1957. It was torn down, leaving one wall, and was custom rebuilt in 2005. The subject has floor and wall finishing of Travertine, porcelain and Italian tile. There is granite in the entry, kitchen, living room and bathroom floors. The kitchen has newer stainless steel appliances and fixtures. The bathrooms have been remodeled. There are French doors, sky lights and recessed lighting throughout. There are two balconies, a patio and porch. One bathroom has a spa tub and there is a limestone lined spa in the bonus room.

### ESTIMATED REMAINING ECONOMIC LIFE

The building cost estimates were supported by Marshall-Swift Valuation service and market reaction. The subject's physical depreciation of 34% is computed by dividing the effective age (25 years) by the total remaining economic life (25 + 50 = 75 years). The effective age is based on the appraiser's physical inspection, market analysis and matched pair study, which indicates that the subject's remaining economic life is average to good.

### MARKET APPROACH

The best comparable data is usually taken from the subject's immediate market area. However, because the subject is larger than average, it was necessary to exceed typical guidelines and expand the search over the one mile radius and use mostly smaller sales, due to the complexity of the appraisal assignment. It is the appraiser's opinion that the comparable sales are from similar competing market areas and that a buyer for the subject might look in these areas for a similar home. Reader must be aware of the uniqueness of the subject and the difficulties associated with estimating market value with limited recent closed sales with the subject's size. All value affecting dissimilarities were adjusted according to market reaction. The appraiser did not adjust for every line item amenity, but all factors were considered in the appraisal process. Foreclosures/short sales in the neighborhood were somewhat common at the time of inspection leading to a range of sale prices. There was no conclusive evidence that there's been time/value depreciation of comparables. Most weight given to comparables 1, 2 and 3 due to being closest in proximity and in similar locations. Comparables 2 and 3 are in a gated community. Secondary weight given to comparable 4 and 5. Least, if any, weight given to comparable 5. Upgrades adjusted as recognized by the market.

The comparables are adjusted as follows:

NOTE:
The subject's value comes in above the predominant value for the neighborhood due primarily to the subject's improvement size and lot being larger than the neighborhood average and the lack of similar sales. Also, due to being a newer construction property.

ADDITION:
It was indicated through the appraiser's physical inspection and interview with the owner that gross living area was added to the subject property in 2005. According to the owner all additions were permitted by the city of Buena Park. All improvements have been completed in a workmanlike manner and conform to the subject property in both quality and condition. (05/05/2005 - #2605). There is an office loft addition added above the garage.

TIME OF SALE ADJUSTMENTS:
Market statistics and analysis were derived from the appraiser's current knowledge of the subject market area and use of statistics personally compiled within what would be considered an area with properties in direct comparison to the subject. A .875% per month (3 months) adjustment was added to comparables 3 and 4 for being dated sales. These comparables are dated more than 3 months, but it's only been in the past three months that the area has been increasing.

LOCATION:
Comparables 4, 5 and 6 are given negative adjustments due to their superior location. It was indicated to the appraiser through market analysis and matched pair study, as well as with interviews with local real estate brokers that properties located in close proximity to Los Coyotes Country Club and/or in the hills command higher prices on the open market. This appears to be due to being close to the Los Coyotes Country Club and/or in the hills and/or having a view and/or having larger lots. Based on this information the appraiser made the appropriate adjustments. (Adjustments rounded to the nearest $500.00).

LOT SIZE:
It was indicated to the appraiser through a market analysis, matched pair study as well as interviews with local real estate brokers that properties having larger lot areas demand higher prices on the open market. Based on this information the appraiser made the appropriate adjustments at $3.00 per square foot of additional lot area. No lot adjustment for comparable 5 due to having an upslope in the rear yard minimizing lot utility. Comparable 5 has a 11,561 square foot site (judged approximately 75% near-level/useable). (Adjustments rounded to the nearest $500.00).

QUALITY OF CONSTRUCTION:
Comparables 5 and 6 are given negative adjustments due to their superior quality of construction and/or upgrades. It was indicated to the appraiser through market analysis, matched pair study, a review of available MLS information (including interior photos provided by MLS) and the external viewing of the comparables that properties having a higher improvement price per square foot are superior in quality of construction compared to properties having a lower improvement price per square foot (everything else being equal). Based on this information the appraiser made the appropriate adjustments.

# COMMENT ADDENDUM

File No.  04ROZINFNLBP-14
Case No.  N/A

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 7957 Dahlia Circle | | | | | | |
| City Buena Park | | County | Orange | State | CA | Zip Code | 90620 |
| Lender/Client | David & Karen Rozier | | Address 7957 Dahlia Circle, Buena Park, CA 90620 | | | | |

**AGE/YEAR BUILT:**
Based on market analysis, matched pair study, available MLS information, and the external viewing of the comparables the appraiser did not deem any adjustments appropriate or necessary for differences in age/year built.

**CONDITION:**
Comparables 5 and 6 are given negative adjustments due to their superior condition and/or upgrades. It was indicated to the appraiser through market analysis, matched pair study, a review of available MLS information (including interior photos provided by MLS), interviews with local real estate brokers and the external viewing of each comparable that properties having a lower improvement price per square foot are inferior in condition and/or upgrades compared to properties having a higher improvement price per square foot (everything else being equal). Adjustments based on research conducted.

**ROOM #:**
The appraiser has taken variances in room count into consideration in the Size section of this report. The appraiser has done so as to not make duplicate adjustments when determining additional size value. There is no adjustment for bedrooms. (Bathroom = $5,000, 1/2 Bathroom = $3,000).

**SIZE:**
Adjustments based on $70.00 per additional square foot of gross living area, (so as not to have a duplicate adjustment when determining additional room value), determined by market analysis and matched pair study. (Adjustments rounded to the nearest $500.00).

**POOL/SPA/FIRE PIT/BUILT-IN BARBECUE:**
The appraiser was unable to find a similar comparable with an in-ground spa inside the home. It should be noted that sometimes it is not possible to compare the subject ideally or bracket a specific attribute particularly in this limited segment of the market because of the lack of data available. No adjustment was made, but the spa was considered in the overall quality of the subject and the final opinion of value. (Pool = $20,000, Spa = $5,000, Fire Pit = $2,000, Built-In BBQ = $2,000).

**OTHER ADJUSTMENTS:**
All other Improvement Adjustments were based on market reaction and supported by Marshall and Swift's Cost Book. All sales verified through public records and/or Multiple Listing Service. The appraisal was completed as per requirements to the best of my abilities.

**COMPARABLE PROPERTY PHOTOS:**
Unless not possible (such as inaccessible due to a gated community, a long private driveway or road work), the appraiser personally drove by each of the comparable properties profiled in this report. Occasionally a comparable photo is downloaded from the MLS sources for the appraisal report due to the appraiser not being able to take a representative photo for any number of reasons, the most common reason being a person situated in front of the comparable property at the time of inspection.

**LEAD BASED PAINT:**
The presence of lead based paint and contamination cannot be ruled out based on properties constructed prior to 1978. If the client has any questions regarding these items, it is the client's responsibility to order the appropriate inspections with the final opinion of market of value being subject to a licensed professional's findings.

Additional Information and Conditions of the Appraisal:

**COMPETENCY PROVISION:**
The appraiser has the appropriate knowledge and experience to complete this assignment competently. Appraiser qualifications are maintained in Association files and can be provided upon request.

**PURPOSE AND INTENDED USERS:**
The purpose of this report is to estimate the market value of the subject property as of October 31, 2012 for Daniel Cruz. There are no other intended uses. If a third party receives a copy of this appraisal, this does not mean that the third party is an Intended User as that term is defined in the URAR form.

**SELF CONTAINMENT:**
This appraisal report is intended to be a complete summary report containing the information necessary to enable the reader to understand the appraiser opinion. Any third party studies referred to, such as pest, hazardous materials or structural reports have been verified by the appraiser to the extent of the assumptions and conclusions used.

**PERSONAL PROPERTY:**
Any personal property involved in the transaction has been excluded from the valuation of the real property. Should a transaction, which includes personal property of sufficient value to affect the market value of the real property, be evident, a separate assessment of the personal property fixtures or intangible items will be identified and included with the report as a separate valuation.

**DIGITAL SIGNATURE:**
This appraisal is digitally signed. This digital signature requires a security password known only by me, Molly Flaherty. No changes can be made to any portion of the appraisal once it has been digitally signed. The digital signature used on this appraisal is an accurate representation of my signature.

**COMMENT ADDENDUM**

File No.    04ROZINFNLBP-14
Case No.    N/A

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 7957 Dahlia Circle | | | | | | |
| City | Buena Park | County | Orange | State | CA | Zip Code | 90620 |
| Lender/Client | David & Karen Rozier | | Address 7957 Dahlia Circle, Buena Park, CA 90620 | | | | |

### EXPOSURE TIME

Exposure Time, at the estimated value, is considered to be at 1 to 3 months. This is typical for the subject's neighborhood and market area. Exposure Time is directly associated with the appraised value and is considered to be prior to the effective date of the appraisal. Marketing Time is also estimated at 1 to 3 months, but is considered after the appraisal date. These estimates are based upon the comparables' performance as well as typical marketing times evidenced by interviews of market participants and analysis of listing to closing dates indicated in MLS for the area. Exposure Time relates to the probable time the subject would likely have been exposed to the market to sell at its estimated Market Value. Marketing Time relates to the probable time that the subject will need to be exposed to the market in order to sell at the estimated Market Value.

### LIMITING CONDITIONS

I am not a licensed building contractor or professional building inspector. I am not qualified to survey or analyze physical items that are not readily visible. If any of the parties in this transaction have questions or concerns regarding any mechanical or structural physical problems, conditions, infestation, contamination or other issues regarding the subject property, an expert in that field or specialty should be consulted.

### RECONCILIATION

The Direct Sales comparison Approach is generally considered to be the best indicator of value for this type of property. The Cost Approach is usually considered to be a value indicator of secondary importance which provides supplementary support for the Direct Sales Comparison Approach. The Income Approach is usually not considered a reliable indicator of value for this type of property. Homes in this neighborhood similar to the subject are generally not purchased for th income stream they might produce. The majority of the properties in the neighborhood are owner occupied, and the Income Approach does not apply. The appraiser has given the greatest consideration in the final estimate of value to the Market Approach.

### EXTRAORDINARY ASSUMPTION

It is assumed that all structures given value in this report are legally permitted as stated. The land is assumed to have no unknown geological or environmental adverse issues. The physical characteristics of the comparables were either verified through county records, MLS, inspection from the street by the appraiser and/or homeowner verification and are assumed to be as stated. The comparables are assumed to have no sales concessions unless otherwise noted. Due to being market driven, the cost approach (if used) figures are assumed to be as stated in this report. The CC&Rs (if any) were not reviewed; therefore, all project information is assumed to be as stated. The current zoning and flood map information is assumed to be as stated in this report. The legal age of the home is assumed to be as stated. The type and condition of utilities is assumed to be as stated. The estimated cost to cure is assumed to be as stated. The type of foundation is assumed to be as stated. All rental information was obtained through MLS, homeowner, area brokers, homeowner, or tenant, and is assumed to be as stated. The local airport is assumed not to impose any adverse condition to the subject property. If any of these items are found not be true and correct, I reserve the right to change my appraisal.

*I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.*

This appraisal report is subject to the scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. The Appraiser may  expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**DEFINITION OF MARKET VALUE:** As per Fannie Mae the definition of market value is the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event.

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21. I am aware that any disclosure or distribution of this appraisal report by me or the client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

22. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature _____ | Signature _____ |
| Name   Molly Flaherty | Name _____ |
| Company Name _____ | Company Name _____ |
| Company Address 519 19th Street, Suite 4 | Company Address _____ |
| Huntington Beach, CA 92648 | |
| Telephone Number (714) 536-4223 | Telephone Number _____ |
| Email Address molly.flaherty@verizon.net | Email Address _____ |
| Date of Signature and Report 04/14/2014 | Date of Signature _____ |
| Effective Date of Appraisal 04/02/14 | State Certification # _____ |
| State Certification # _____ | or State License # _____ |
| or State License #   AL026488 - Appraising for 15 Years | State _____ |
| or Other (describe) _____ State #   CA | Expiration Date of Certification or License _____ |
| State   CA | |
| Expiration Date of Certification or License 01/19/2013 | |

ADDRESS OF PROPERTY APPRAISED

7957 Dahlia Circle

Buena Park, CA 90620

APPRAISED VALUE OF SUBJECT PROPERTY $   750,000

CLIENT

Name  David & Karen Rozier

Company Name David & Karen Rozier

Company Address 7957 Dahlia Circle

Buena Park, CA 90620

Email Address rozier.karan@yahoo.com

SUBJECT PROPERTY

☐ Did not inspect subject property

☐ Did inspect exterior of subject property from street

Date of Inspection _____

☐ Did inspect interior and exterior of subject property

Date of Inspection _____

COMPARABLE SALES

☐ Did not inspect exterior of comparable sales from street

☐ Did inspect exterior of comparable sales from street

Date of Inspection _____

NL - General Certification 5/2007          This form may be reproduced unmodified without written permission, however, Bradford Technologies, Inc. must be acknowledged and credited.

Produced by ClickFORMS Software 800-622-8727          Page   11  of   23

**SKETCH ADDENDUM**

File No.    04ROZINFNLBP-14
Case No.    N/A

| Borrower | N/A | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Property Address | 7957 Dahlia Circle | | | | | | | |
| City  Buena Park | | County | Orange | State | CA | | Zip Code | 90620 |
| Lender/Client | David & Karen Rozier | | Address | 7957 Dahlia Circle, Buena Park, CA 90620 | | | | |



Sketch by Apex Sketch v5 Standard™
Comments:

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Net Size | Net Totals |
| GLA1 | First Floor | 2123.50 | 2123.50 |
| GLA2 | Second Floor | 1639.25 | 1639.25 |
| GAR | Garage | 500.00 | 500.00 |

| LIVING AREA BREAKDOWN | | | |
|---|---|---|---|
| Breakdown | | | Subtotals |
| First Floor | | | |
| 0.5 x | 20.0 x | 0.0 | 0.00 |
| | 31.0 x | 1.0 | 31.00 |
| | 11.0 x | 29.0 | 319.00 |
| 0.5 x | 5.0 x | 6.0 | 15.00 |
| | 4.5 x | 18.0 | 81.00 |
| | 16.0 x | 47.0 | 752.00 |
| | 21.0 x | 23.0 | 483.00 |
| | 13.0 x | 6.0 | 78.00 |
| 0.5 x | 0.0 x | 18.0 | 0.00 |
| | 13.5 x | 27.0 | 364.50 |
| Second Floor | | | |
| | 19.0 x | 3.0 | 57.00 |
| | 45.9 x | 25.0 | 1148.21 |
| | 21.0 x | 13.0 | 273.00 |
| 0.5 x | 0.0 x | 10.0 | 0.14 |
| | 10.0 x | 9.0 | 90.00 |
| 0.5 x | 0.1 x | 25.0 | 0.89 |
| | 7.0 x | 10.0 | 70.00 |

| Net LIVABLE Area | (rounded) | 3763 |
|---|---|---|

| 17 Items | (rounded) | 3763 |
|---|---|---|

| Borrower | N/A | | | | | | |
|----------|-----|---|---|---|---|---|---|
| Property Address | 7957 Dahlia Circle | | | | | | |
| City | Buena Park | County | Orange | State | CA | Zip Code | 90620 |
| Lender/Client | David & Karen Rozier | | Address | 7957 Dahlia Circle, Buena Park, CA 90620 | | | |



**PLAT MAP**

File No.  04ROZINFNLBP-14
Case No.  N/A

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 7957 Dahlia Circle | | | | | | |
| City | Buena Park | County | Orange | State | CA | Zip Code | 90620 |
| Lender/Client | David & Karen Rozier | | | Address | 7957 Dahlia Circle, Buena Park, CA 90620 | | |



**Aerial Map**

File No.    04ROZINFNLBP-14
Case No.    N/A

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 7957 Dahlia Circle | | | | | | |
| City  Buena Park | | County | Orange | State | CA | Zip Code | 90620 |
| Lender/Client  David & Karen Rozier | | | Address  7957 Dahlia Circle, Buena Park, CA 90620 | | | | |



**SUBJECT PHOTO ADDENDUM**

File No.  04ROZINFNLBP-14
Case No.  N/A

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 7957 Dahlia Circle | | | | | | |
| City | Buena Park | County | Orange | State | CA | Zip Code | 90620 |
| Lender/Client | David & Karen Rozier | | Address | 7957 Dahlia Circle, Buena Park, CA 90620 | | | |



**FRONT OF
SUBJECT PROPERTY**
7957 Dahlia Circle
Buena Park, CA 90620



**REAR OF
SUBJECT PROPERTY**



**STREET SCENE**

## SUBJECT PHOTO ADDENDUM

File No.    04ROZINFNLBP-14
Case No.    N/A

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 7957 Dahlia Circle | | | | | | |
| City | Buena Park | County | Orange | State | CA | Zip Code | 90620 |
| Lender/Client | David & Karen Rozier | | Address | 7957 Dahlia Circle, Buena Park, CA 90620 | | | |



1/2 Bathroom



Living Room



Bonus Room

**SUBJECT PHOTO ADDENDUM**

File No.    04ROZINFNLBP-14
Case No.  N/A

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 7957 Dahlia Circle | | | | | | |
| City  Buena Park | | County | | Orange | State | CA | Zip Code   90620 |
| Lender/Client    David & Karen Rozier | | | Address | 7957 Dahlia Circle, Buena Park, CA 90620 | | | |



Dining



Kitchen



Family Room

**SUBJECT PHOTO ADDENDUM**

File No.    04ROZINFNLBP-14
Case No.    N/A

| Borrower | N/A | | | | | | |
|----------|-----|---|---|---|---|---|---|
| Property Address | 7957 Dahlia Circle | | | | | | |
| City   Buena Park | | County | Orange | State | CA | Zip Code | 90620 |
| Lender/Client | David & Karen Rozier | | Address | 7957 Dahlia Circle, Buena Park, CA 90620 | | | |



Primary Bedroom



Primary Bathroom



Bedroom

**SUBJECT PHOTO ADDENDUM**

File No.  04ROZINFNLBP-14
Case No.  N/A

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 7957 Dahlia Circle | | | | | | |
| City  Buena Park | | County | Orange | State | CA | Zip Code | 90620 |
| Lender/Client | David & Karen Rozier | | Address | 7957 Dahlia Circle, Buena Park, CA 90620 | | | |



Steps



Bedroom



Bathroom

# [This page intentionally left blank]

Missing page 21 of 23

COMPARABLES 1-2-3

File No.   04ROZINFNLBP-14
Case No.   N/A

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Borrower | N/A | | | | | | |
| Property Address | 7957 Dahlia Circle | | | | | | |
| City | Buena Park | County | Orange | State | CA | Zip Code | 90620 |
| Lender/Client | David & Karen Rozier | | Address | 7957 Dahlia Circle, Buena Park, CA 90620 | | | |



**COMPARABLE SALE #   1**
8524 Elm Circle
Buena Park, CA 90620



**COMPARABLE SALE #   2**
9532 Monterra Way
Buena Park, CA 90620



**COMPARABLE SALE #   3**
59 Centerstone Circle
Buena Park, CA 90620

COMPARABLES 4-5-6

File No.   04ROZINFNLBP-14
Case No.   N/A

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 7957 Dahlia Circle | | | | | | |
| City   Buena Park | | County | Orange | State | CA | Zip Code | 90620 |
| Lender/Client   David & Karen Rozier | | | Address   7957 Dahlia Circle, Buena Park, CA 90620 | | | | |



**COMPARABLE SALE #    4**
8571 Monticello Avenue
Buena Park, CA 90621



**COMPARABLE SALE #    5**
8602 Los Coyotes Drive
Buena Park, CA 90620



**COMPARABLE SALE #    6**
8550 Buena Tierra Circle
Buena Park, CA 90621

Produced by ClickFORMS Software 800-622-8727

Page   23   of   23

**Case 12-12020 (MG)**          Page 38 of 55          **Exhibit 2**

# EXHIBIT 2

# Note Endorsements

Borrower(s): Karen M. Rozier
Property Address: 7957 Dahlia Circle, Buena Park, CA  90620

Without Recourse, Pay to the Order of:  RESIDENTIAL FUNDING CORPORATION

PAY TO THE ORDER OF
U.S. Bank National Association as Trustee
WITHOUT RECOURSE
Residential Funding Corporation

EquiFirst Corporation

By

Margaret Kronmueller
Assistant Vice President

By
Judy Faber, Vice President

741029
EF5nendr (7/03)

Page 1 of 1

**Case 12-12020 (MG)**          Page 40 of 55                          **Exhibit 3**

# EXHIBIT 3

Identifi    REDACTED    Doc Type: NOTEN    41055

with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Karen M Rozier_    12/23/05
- Borrower - KAREN M ROZIER - Date -

Pay to the order of
RESIDENTIAL FUNDING COMPANY, LLC
without ...
... Secl.
Monica ... 
WMC Mortgage Corp.

PAY TO THE ORDER OF
LaSalle Bank, N.A. as Trustee
WITHOUT RECOURSE
Residential Funding Company, LLC

By: _Judy Faber_
Judy Faber, Vice President

*[Sign Original Only]*

**Exhibit A**

**Case 12-12020 (MG)**         Page 42 of 55                    **Exhibit 4**

# EXHIBIT 4

## STATE OF NEW HAMPSHIRE

BELKNAP, SS.                                         SUPERIOR COURT

### 211-2010-CV-000196

Miroslav Zecevic
Petitioner

v.

US Bank National Association, as Trustee
Harmon Law Offices, P.C.
Mortgage Lenders Network U.S.A. Inc. d/b/a Lenders Network
Wells Fargo Bank, N.A. d/b/a America's Servicing Co.
GMAC Mortgage
Respondents

### AFFIDAVIT OF JUDY FABER IN SUPPORT OF DEFENDANTS, US BANK NATIONAL ASSOCIATION, AS TRUSTEE, AND WELLS FARGO BANK, N.A. D/B/A AMERICA'S SERVICING CO.'S, RENEWED MOTION FOR SUMMARY JUDGMENT

I, Judy Faber, on my oath do depose and state that:

1.      In addition to the facts set forth in my affidavit dated March 17, 2011,

submitted in support of US Bank National Association's and Wells Fargo Bank, N.A's

Opposition to the Plaintiff's Motion to Nullify Mortgage and Cross Motion for Partial

Summary Judgment, I offer the following additional facts.

2.      As an employee of Residential Funding Corporation (the Master Servicer),

I acted on behalf of Residential Asset Securities Corporation (the Depositor) to endorse

the Notes that were part of the Pooling and Servicing Agreement, including the subject

Note for loan number ending in 1878. I did so by delegating the task of the actual

stamping of the Notes to Wells Fargo Bank, N.A (the Custodian), in accordance with

the Pooling and Servicing Agreement, which is attached as Exhibit C to my affidavit

dated March 17, 2011.

3.     I provided, or caused to be provided, to Wells Fargo Bank, N.A., prior to

the closing date of the Pooling and Servicing Agreement, a stamp with a facsimile of my

signature, which I intended for Wells Fargo Bank, N.A. to use when affixing an

endorsement onto the subject Note.

Judy Faber

STATE OF _Minnesota_
_County of Hennepin_         , ss

On this _1st_ day of _May_, _2012_, before me, the undersigned
officer, personally appeared the above-named _Judy Faber_ known to me to be the
person whose name is subscribed to within the instrument and acknowledged that she
executed the same for the purposes contained therein.

PATRICK W RAUM
Notary Public
Minnesota
My Commission Expires January 31, 2013

Notary Public
My Commission Expires:   1·31·2013

2

**Case 12-12020 (MG)**          Page 45 of 55          **Exhibit 5**

# EXHIBIT 5

## SUPERIOR COURT OF CALIFORNIA,
## COUNTY OF ORANGE
## CENTRAL JUSTICE CENTER

### MINUTE ORDER

DATE: 10/18/2011                TIME: 09:00:00 AM          DEPT: C03

COMMISSIONER: Jane D. Myers
CLERK:  Lira Marie C Labrador, Virginia Harting
REPORTER/ERM: Kathy Hettick-12505 CSR# 12505
BAILIFF/COURT ATTENDANT:  J. McMillion

CASE NO: **30-2008-00217056-CU-JR-CJC**  CASE INIT.DATE: 10/28/2008
CASE TITLE: **Rozier vs. GMAC Mortgage, LLC**
CASE CATEGORY: Civil - Unlimited     CASE TYPE: Judicial Review - Other

EVENT ID/DOCUMENT ID: 71287226,80362121

**EVENT TYPE:** Order to Show Cause re: Dismissal
MOVING PARTY: Karen M. Rozier
CAUSAL DOCUMENT/DATE FILED: Amended Complaint First, 07/23/2009

**APPEARANCES**
Karen M. Rozier, counsel, present for Petitioner(s).

Plaintiff represents to the Court that case in Federal Court is pending.

The Order to Show Cause re: Dismissal is taken off calendar.

The Court states monitoring will be suspended and plaintiff is ordered to notify the Court upon conclusion of the federal matter.

**Case 12-12020 (MG)**          Page 47 of 55          **Exhibit 6**

# EXHIBIT 6

48765

AMENDED

FILED
DEC 1 6 2013
CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:                        Deputy Clerk

B 6 Summary (Official Form 6 – Summary) (12/13)

4806

# UNITED STATES BANKRUPTCY COURT

In re  Karen Michele Rozier
　　　　　　Debtor

Case No. 8:11-bk-21737-CB

Chapter _____

## SUMMARY OF SCHEDULES

Indicate as to each schedule whether that schedule is attached and state the number of pages in each. Report the totals from Schedules A, B, D, E, F, I, and J in the boxes provided. Add the amounts from Schedules A and B to determine the total amount of the debtor's assets. Add the amounts of all claims from Schedules D, E, and F to determine the total amount of the debtor's liabilities. Individual debtors also must complete the "Statistical Summary of Certain Liabilities and Related Data" if they file a case under chapter 7, 11, or 13.

| NAME OF SCHEDULE | ATTACHED (YES/NO) | NO. OF SHEETS | ASSETS | LIABILITIES | OTHER |
|---|---|---|---|---|---|
| A - Real Property | YES | 1 | $ 695,000 | | |
| B - Personal Property | YES | 3 | $ 29,694,125 | | |
| C - Property Claimed as Exempt | YES | 1 | | | |
| D - Creditors Holding Secured Claims | NO | 0 | $ | | |
| E - Creditors Holding Unsecured Priority Claims (Total of Claims on Schedule E) | NO | 0 | $ | | |
| F - Creditors Holding Unsecured Nonpriority Claims | YES | 4 | | $ 1,102,950 | |
| G - Executory Contracts and Unexpired Leases | NO | | | | |
| H - Codebtors | NO | | | | |
| I - Current Income of Individual Debtor(s) | NO | | | | $ |
| J - Current Expenditures of Individual Debtors(s) | NO | | | | $ |
| TOTAL | | 9 | $ 30,389,125 | $ 1,102,950 | |

**Case 12-12020 (MG)**          Page 49 of 55                    **Exhibit 7**

# EXHIBIT 7

Identifier:081002L144    Doc Type:LRPIT

Page 50 of 55

## GMAC Mortgage

3451 Hammond Ave
P.O. Box 780
Waterloo, IA 50704-0780

04/29/08

**FORECLOSURE REPAYMENT AGREEMENT**

**KAREN ROZIER**

7597 DARLA CIR
BUENA PARK    CA 90620-0000

RE:  Account Number    081002L144
     Property Address   7597 DARLA CIR
                        BUENA PARK    CA 90620-0000

KAREN ROZIER ("Customer") and GMAC Mortgage, LLC ("Lender"), in consideration for the mutual covenants set forth in this Foreclosure Repayment Agreement (the "Agreement"), hereby agree as follows:

1. There is an outstanding debt to the Lender pursuant to a note and mortgage or deed of trust or equivalent security instrument (the "Mortgage") executed on 12/23/05, in the original principal amount of $579000.00.

2. The account is presently in default for nonpayment to Lender of the 12/01/07 installment and all subsequent monthly payments due on the Mortgage for principal, interest, *[handwritten: GM accepts responsibility for ignoring my phone calls, letters and rejecting my payments.]* escrows and charges.

3. The amount necessary to cure the default is $9949.09 plus such additional amounts that are presently due under the terms of the loan documents as of 04/29/08, and will increase until the default in the account is brought current. *[handwritten: I do not expect to see the ported in bad faith while they prematurely foreclosed on how so...]*

4. Lender has instituted foreclosure proceedings against the property securing the Mortgage indebtedness, which proceedings will continue until the default(s) described herein is/are brought current under the terms of the Mortgage, or otherwise cured as provided for in this Agreement.

5. Notwithstanding the foregoing, Lender agrees to suspend but not terminate foreclosure activity on the default account, provided we receive the executed Agreement and we receive the initial installment in the amount of $6603.26 no later than the MONTHLY. This executed Agreement can be mailed or faxed to us at:

Identifier:0810021144

Doc Type:GRNT

04/28/08
Account Number 0810021144
Page Two

GMAC Mortgage, LLC
Attention: Default Payment Processor
3451 Hammond Avenue
Waterloo, IA 50702
Fax: 866-240-5043

6.  Pursuant to your request you agree to pay the remainder of the default, if, as indicated in the Payment Schedule enclosed and make a part hereof by reference. Customer understands that payments due under the Payment Schedule may include amounts due, fees and costs associated hereunder, and the Payment Schedule amounts may, in such event, have to be increased, at the sole option of the Lender, if the items for such escrow purposes should increase during the duration of the Agreement.

7.  All payments under this Agreement, including the regular monthly payments, shall be made in certified funds or cashier's check, shall include the account number on the Customer's check or on a written attachment to the check, and shall be sent to the following address:

GMAC Mortgage, LLC
Attention: Default Payment Processor
3451 Hammond Avenue
Waterloo, IA 50702

Additional methods of remitting payments under this agreement are:
· Money Gram using a Receive Code of 04/25/08
· Western Union using a Code City and State of

If payment is tendered in any other form, Lender may return this payment and invoke any remedies available under the loan documents and this Agreement.

8.  In the event we do not receive timely payment called for under this Agreement, Lender may, without further notice to Customer, undertake or continue collection or foreclosure activities. In such event, any payments tendered under this Agreement shall be applied to the account in the manner specified in the Mortgage, and there will be no right to a refund of the tendered funds. In the event Lender chooses to accept any payment not in the full amount called for under this Agreement, such acceptance shall not be deemed a waiver of Lender's right to declare a default under this Agreement. Upon any default in meeting the terms of this Agreement, any such payments received under the terms of this Agreement shall be applied first against the default in the account, with the excess, if any, then applied according to the terms of the Mortgage. The parties expressly understand and agree time shall be of the essence as to the obligation under this Agreement.

04/29/08
Account Number 0810021144
Page Three

9. Customer understands and agrees that all other provisions, covenants and agreements set forth in the Mortgage shall remain in force and effect during the duration of this Agreement and thereafter, and this Agreement shall not constitute a modification or extension of the Mortgage.

10. If a notice of a new or subsequent bankruptcy is received during the duration of this Agreement, the Agreement will automatically be voided.

11. Acceptance of any payment hereunder shall not constitute a cure nor be deemed a waiver of the existing default, and in no manner shall such acceptance prejudice any rights of Lender to proceed with the Trustee Sale Action noticed in the Notice of Default, and shall not constitute a violation of California Code of Civil Procedure Section 726.580(a), 580(d) (the One Form of Action Rule), and shall not invalidate the Notice of Default. ~~Customer expressly relinquishes and waives any rights, claims and defenses Customer may have under any of the Code of Civil Procedure Sections or under the Loan with regard to any whole or partial payments, whether current, past or future.~~ *No, I don't.*

12. If any additional amounts are added to the loan to be collected that have not been addressed in this agreement, those amounts will need to be paid at the conclusion of this agreement, *provided customer accepts these amounts are legitimate. I will not give GM a pass for hiring Latina Dawn as a bad employee.*

Notice: This is an attempt to collect a debt, and any information obtained will be used for that purpose. If your debt has been discharged in bankruptcy, our rights are being exercised against the collateral for the above-referenced account, not as a personal liability.

If you have any additional questions, please contact us at 800-850-4622, extension .

Loss Mitigation Department
Loan Servicing

Enclosure

04/29/08
Account Number 0810021144
Page Four

**◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆CERTIFIED FUNDS ONLY◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆**

NOTE:  There is no grace period during this Agreement.  Pursuant to your request and in order
to cure the default on this account, all payments must be received on or before the due date.

RECEIVED AND AGREED:

*[handwritten: which should not be 4/15 since this was not sent until 4/29!]*

_____ (Seal)
KAREN ROZIER
Customer

*[handwritten: 4/29/2008]*
Date

_____          _____
Customer                          Date

*[handwritten: 4 pages, returned w/ comments. GM acknowledges they also sent this late.]*

Upon receipt of the signed agreement, we as the Servicer will also execute to indicate our
concurrence with this agreement.

*[handwritten signature: Shira Hirshman 4/30/08]*
Servicer

S:13

( **SIGN AND RETURN THIS PAGE ONLY** )

**◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆FAX TO 866-340-5843 ◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆**

*[handwritten: I do not accept your terms NO 4 pages which relieves GM of all culpability in this matter! You screwed me first while my Son lay dying ignored my phone calls unilateral terms letters and messages and now want to deny it happened! N.O. SENT]*

US000047

**Case 12-12020 (MG)**                **Page 54 of 55**                **Exhibit A**

# EXHIBIT A