1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


            Debtors.


- - - - - - - - - - - - - - - - - - - -x

            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            October 7, 2014

            2:01 PM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

1

2   Telephone Conference, on the Record, Regarding Discovery

3   Dispute in Reference to the Mack's Claims

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Hana Copperman

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

1

2 A P P E A R A N C E S :

3 MORRISON & FOERSTER LLP

4       Attorneys for ResCap Borrower Claims Trust and

5       ResCap Liquidating Trust

6       425 Market Street

7       San Francisco, CA 94105

8

9 BY:   ADAM A. LEWIS, ESQ. (TELEPHONICALLY)

10

11

12 DAVID F. GARBER, P.A.

13       Attorney for Creditor Barry F. Mack

14       700 Eleventh Street South

15       Suite 202

16       Naples, FL 34102

17

18 BY:   DAVID F. GARBER, ESQ. (TELEPHONICALLY)

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, ET AL.                          4

1                      P R O C E E D I N G S

2           THE COURT:  All right.  We're on the record in

3    Residential Capital, number 12-12020.  This is a telephone

4    conference in connection with a discovery dispute concerning

5    the Mack claim.

6           May I have the appearances, please?

7           MR. LEWIS:  Yes, Your Honor.  Adam Lewis of Morrison &

8    Foerster for the ResCap Borrower Claims Trust.

9           THE COURT:  Good afternoon.

10          MR. GARBER:  Your Honor, David Garber on behalf of Mr.

11   Mack and Mrs. Mack's estate.

12          THE COURT:  All right.  Thank you very much.

13          Mr. Lewis, why don't you go ahead and start?

14          You had forwarded some correspondence, and I read it

15   over quickly, but why don't you tell me where things stand as

16   of now?

17          MR. LEWIS:  Yes.  I'll be happy to try to explain the

18   situation.  In the course of doing that, Your Honor, I'm going

19   to characterize Mr. Garber's position as I understand it, but I

20   may misstate it, and, of course, he'll have a chance to correct

21   anything I say.

22          The Court will recall the remaining claim in this

23   matter is the RESPA claim for the alleged failure of GMACM to

24   respond to a qualified written request and any damages arising

25   from that failure to respond.

1        When the Court ruled that that was still part of their

2    case the Court expressly stated that the claimant would have to

3    show what damages arose specifically from the failure to

4    respond, as contrasted with other things that may or may not

5    have been done, including the wrongful foreclosure.

6        The failure to respond -- the response would have been

7    due, I think, on December 26th of 2009.  The letter was sent in

8    October, but in those days it was a sixty-day response cycle.

9    So what I was -- my discovery is aimed, in part, at trying to

10   separate out in the world the Mack's conditions prior to late

11   December from those after late December, because anything

12   before late December would already have been compensated by the

13   prior judgment.  And then for after late December I would have

14   to -- in that pool of information that I would get I would then

15   have to try to extract what might be traceable to the RESPA

16   violation and what might not be.

17       Mr. Garber, in my view, will have to try to do the

18   same when he puts on his case, but I don't want to wait for him

19   to do that.

20       And so my discovery was aimed at tracking primarily

21   their medical conditions from 2000 through, pretty much,

22   through today in order to create those two pools of

23   information, the pre-late December, 2009 and the post, and then

24   try, in the post, to reduce it to what might be specifically

25   traceable to the RESPA issue.  And so I served, as the Court

1  could see in Mr. Garber's discovery responses, document

2  requests that were aimed, in part, at that issue.

3         My belief is that under the Federal Rules, which apply

4  here, a party has possession, custody, and, more specifically

5  control over his medical records.  And as I indicated in one of

6  the letters, in both New Jersey and Florida a party has a right

7  to his medical records.  He may have to wait a while.  He may

8  have to pay some money for copying costs.  But he has a right

9  to them, a statutory right.  So it's my belief that it's the

10 responsibility of the Mack claimant to produce those medical

11 records that I've asked for.

12        My impression is that Mr. Garber thinks he has to only

13 go so far, and then if it's too much trouble shift the burden

14 to me, and also shift the burden to me of telling him which

15 records I want from amongst his various providers that he sent

16 me a list of.  But I have no way of knowing which providers I

17 want material from or further information from until I see what

18 they did or didn't do.

19        I have no information, of course, on what the Macks or

20 either of them consulted them for at any point in time.  Only

21 the Macks have that information.  So I can't tell Mr. Garber,

22 on the list of providers that he sent me, which ones I want

23 documents from.  I want documents for the period from all of

24 them, so that I can decide what it is that I need to go forward

25 on.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    7

1          That's basically, I think, what this is about.  And we

2    don't have a lot of time to complete our discovery, and so I

3    felt it important to get this issue teed up sooner rather than

4    later to try to get it resolved, so that we all know what we're

5    doing going forward.

6          THE COURT:  Mr. Garber?

7          MR. GARBER:  Your Honor, this was a matter briefly in

8    which my client sent out a qualified written request on October

9    26, 2009.  And the Court has ruled that generally speaking

10   those records, medical records and damages before that date,

11   may not be compensable damages.  But after that date any

12   records and damages may be compensable.

13         Mr. Lewis has asked for all of my client's medical

14   records for the period of time from the 1st of January, 2000

15   until the 1st of November, 2009, and then also from the 1st of

16   November, 2009 to the present.  My clients, Mr. Mack and Mrs.

17   Mack, they're elderly, and they have -- Ms. Mack is dead, but

18   Mr. Mack has sent me a copy of his billing history that he has

19   kept going back to the 1st of January, 2009.  It identifies

20   about sixty different medical care providers:  doctors,

21   hospitals, radiologists, that sort of thing.  And we have

22   attempted to get those medical records.  We don't have the

23   medical records.  They all are in the hands of the medical care

24   providers.

25         We have received back responses from, perhaps, 8

RESIDENTIAL CAPITAL, LLC, ET AL.                                    8

1   medical care providers and have incurred costs of about 3,000

2   dollars.  And we have sent all the records that we have

3   received to Mr. Lewis.  We are still awaiting other records.

4   But I anticipate that some of the medical care providers,

5   specifically a hospital in Northern Florida called the Mayo

6   Clinic, will have records that are very, very extensive.  I

7   wouldn't be surprised if they were 20 to 50,000 pages long.

8   And the hospital in the State of Florida can charge a dollar a

9   page for each one of those things.

10        We have asked for all of those medical records.  And

11  everything that we get we're going to send to Mr. Lewis,

12  whether they're relevant or not relevant.  They may have

13  something to do with impeachment, even if they're not directly

14  related to the damages that my clients can claim.

15        But it seems to me that I cannot force the doctors and

16  the hospital to send me things, and if the expense is much more

17  than we paid already, 3,000 dollars, that, in fact, the rule

18  that the Court announced in a nonpublished case, which I've

19  referred to Mr. Lewis.  It's the Fisher v. Fisher case from the

20  Western District of Maryland from June 5th of 2012.  The Court

21  was faced with a similar thing where a defendant -- she was the

22  counterclaimant -- was claiming damages from an institution

23  that had published some of her records and not worked with her

24  on a debt.  And so she was asked to provide tens of thousands

25  of pages, and the Court, in that opinion, said that if they

1  were her medical records, and if she could get those medical

2  records, it was her duty to do so, even if they weren't

3  actually in her possession.  But it said, and I will read a

4  quote from the case:

5       "If the related documents are not in defendant's

6  actual possession or custody but in the physical custody of a

7  non-party financial institution, and may be obtained at no

8  greater cost by either plaintiff or defendant, defendant will

9  not be compelled to produce them."

10      That seems to me to be a fair rationale here.  We have

11  paid already, or have incurred debts of about 3,000 dollars.

12  But if we find that we're going to have 10 or 30,000 dollars,

13  or have some difficulty that the hospitals won't give them to

14  us, it seems to me that GMAC would have as equal a chance of

15  getting these documents from a subpoena as we would.

16      In any case, we will try our best to get them all and

17  provide them as they come in to Mr. Lewis.

18      THE COURT:  All right.  My silence is because I'm

19  looking for something on my computer, so just bear with me.

20      MR. GARBER:  Your Honor, if you're looking up a cite

21  on that Fisher case I don't have a cite, but I have the civil

22  case number if the Court would want that.

23      THE COURT:  No, I'm not.  I'm looking up one of my own

24  opinions.

25      MR. GARBER:  Okay.

1      (Pause)

2          THE COURT:  So I read an opinion in a case, in re

3   Lozano, L-O-Z-A-N-O.  I can't give -- it's a published opinion.

4   I can't give you the Bankruptcy Reporter cite.  It was released

5   on August 13, 2008, so it's quite some time ago.

6          It was in a Chapter 13 case.  But the issue that I

7   dealt with there was I ruled on a discovery dispute between the

8   Chapter 13 debtor and the mortgage servicers.  And the issue

9   was whether the mortgage servicers had to affirmatively obtain

10  copies of documents from the original lender.  And I

11  specifically analyzed Rule 34, and basically you're required to

12  produce anything in the possession, custody, or control.  And I

13  have a fairly lengthy discussion about what control means and

14  what cases say about it.  I didn't think about the decision

15  before I got on the call here, but it --

16          Mr. Garber, you've put Ms. Mack's medical condition at

17  issue with your claims.  And I think that that places a greater

18  burden on you to obtain documents that -- not only in your

19  possession or custody but also in control.  And I think that's

20  the issue raised with respect to the medical records.

21          Let me shift gears for a minute.  We'll come back to

22  that.  What I want to briefly discuss with you both is the

23  issue of the period for which records should be provided.

24          So when I thought about this, Mr. Lewis and Mr.

25  Garber, in some ways this strikes me as the law school -- first

1  year law school torts Palsgraf, the eggshell head case.  And so

2  whether -- I don't know whether Ms. Mack had, for want of a

3  better term, emotional issues for which she was treated before

4  this foreclosure proceeding began.

5       So whether it require -- I'm not prepared to say

6  whether it requires going all the way back to 2000, but I can

7  certainly see and appreciate, it seems to me, that Mr. Lewis is

8  entitled to medical information about Ms. Mack for a period

9  well before the events that give rise to the claim.

10      I don't know, for example, whether she'd been treated

11  for alcohol or medication abuse for earlier periods, whether

12  she'd been in counseling or seen by health care professionals

13  that specialize in mental illness or emotional issues.

14      Can you address that for me, Mr. Garber?

15      MR. GARBER:  Your Honor, I believe that she had

16  received some such care.  Now, to give a little bit more

17  background to the Court, in 2002 she had a liver transplant.

18  The liver transplant was characterized as nonalcoholic

19  cirrhosis of the liver that caused that she had an elevated

20  iron count in her blood.  I can see why all this information

21  might be relevant to Mr. Lewis and his side to attack the

22  medical damage of Ms. Mack as being pre-existing and not caused

23  by GMAC.

24      THE COURT:  Right.

25      MR. GARBER:  I can understand that.  That information

1   will not be necessary by the Macks to present to the Court,

2   because that had nothing to do with what GMAC did.

3            THE COURT:  Well, you say that --

4            MR. GARBER:  However --

5            THE COURT:  You say that, but you've put her health

6   and mental condition at issue in your claims.  And just because

7   you'd be very happy if Mr. Lewis didn't want to go through the

8   trouble of getting the earlier medical records, you're the one

9   who's -- I'm not faulting you for it -- but it's the claim and

10   the effort to seek noneconomic damages for the really

11   unfortunate events that occurred for Ms. Mack.

12            So that, in part, when you read Lozano you'll see, I

13   think, arguably, that's what distinguishes -- I didn't make the

14   existing servicer and lender go back and get the records from

15   the original lender.  I basically told the Chapter 13 debtor's

16   lawyer you got to do it.  You have their discovery means

17   available to you.  You go and do it.

18            One of the things you'll see when you read the

19   opinion -- I focus on two opinions by then District Judge

20   Gerard Lynch, who's now a judge on the Second Circuit, in the

21   Winnick cases.  And Judge Lynch, in his district court opinions

22   in Winnick, deals with the issue of who has to provide the

23   discovery, even if it means the plaintiff going to third

24   parties to gather the information.  And you'll see when you

25   read it, in Winnick Judge Lynch put the burden on the

1  plaintiff, or actually put the burden on the defendant to go

2  and get it, even though the third party didn't want to give him

3  the information.  There was an issue of what the consequences

4  of that would be.  It depended, in part, on who put the matter

5  at issue.

6          So I think that under Rule 34, which does specifically

7  apply to possession, custody, or control and, I think, goes a

8  long way to saying with medical records, I mean, do you satisfy

9  the giving control by just giving a release to the medical

10  records.  Tell Mr. Lewis go.  Go get what you want.

11          With that said, Mr. Lewis, I am also quite sensitive,

12  and I am not sure that even telling -- if the result is that I

13  tell Mr. Garber you got to go get it, that doesn't necessarily

14  mean that I have to tell him and you pay for it, because I

15  think that the Court has discretion to shift the costs of it.

16  So the result, Mr. Lewis, could be that I tell Mr. Garber you

17  go get it, but Mr. Lewis's client's got to pay for it if he

18  wants it.  So it isn't --

19          MR. LEWIS:  Your Honor, again --

20          THE COURT:  Go ahead, Mr. Lewis.

21          MR. LEWIS:  I'm sorry.

22          THE COURT:  No, go ahead.

23          MR. LEWIS:  A couple of things.  First of all, I think

24  it's important to remember that we're not just talking about

25  post-December conditions.  We're talking about post-December

1    conditions that are attributable to the RESPA violation and not

2    simply continuations of or worsening of pre-December

3    conditions.  And so it's a much narrower band of injury that is

4    at issue here than simply whatever happened post-December.

5          THE COURT:  Well, I'm not prepared to say --

6          MR. LEWIS:  That's one of the reasons --

7          THE COURT:  Let me -- just let met just stop you

8    there.

9          MR. LEWIS:  Yes.

10          THE COURT:  I'm certainly not prepared to rule

11   whether -- what the effect of, for want of a better term, pre-

12   existing conditions -- let's assume they were exacerbated by

13   events caused by ResCap.  Okay?  I'm certainly not prepared to

14   say today what the result of that would be in terms of recovery

15   or no recovery.

16          MR. LEWIS:  I understand that, Your Honor.  If the

17   RESPA violation led to a worsening of a pre-December 26th

18   condition, that's, arguably, recoverable damages.

19          THE COURT:  Right.

20          MR. LEWIS:  And I understand that.  But in order to be

21   able to tease that out I have to know what pre-existed, and

22   then try to look at what happened post-December and try to

23   figure out which of what happened post-December is attributable

24   to the RESPA violation.

25          THE COURT:  Look, Mr. Lewis, I agree that you're

1  entitled to the information.  Okay?  Who gets it and who pays

2  for it are two different issues.

3          MR. LEWIS:  And then the second thing I was going to

4  say, Your Honor, is I'm prepared to narrow the time period at

5  issue based upon what I've seen that Mr. Garber sent me that

6  arrived yesterday on some CDs.  Specifically, there is some

7  hospitalization information about Ms. Mack from 2004, in which

8  she's checked in for some dizziness that appears to be related,

9  maybe, to a heart condition or something.

10          But in that there is a history that is given,

11  presumably after some physician interviewing her, in which such

12  things as renal insufficiency and aortic insufficiency and

13  depression and alcoholism that had led her to lead to Alcohol

14  Anonymous to join, those are all mentioned there as things that

15  she --

16          THE COURT:  Sure.

17          MR. LEWIS:  -- had in her history.  And so now I know

18  I have a, kind of, a baseline.  And perhaps some of these other

19  documents from that period of time on will help me to further

20  elaborate that baseline.

21          So I'm prepared to cut it off at the moment at 2004

22  instead of going all the way back to 2000, now that I have some

23  of this stuff in my hands, to try to lighten the burden.  I am

24  not doing this to bury Mr. Garber or Mr. Mack.  I'm doing it

25  because I need to defend my case.

1    THE COURT:  I don't doubt that at all.  I think, based

2  on what I know about the background and what you described to

3  me now -- and I'm not ruling yet, Mr. Garber, so I'll hear you

4  further -- it clearly is appropriate for Mr. Lewis to look back

5  at Ms. Mack's medical history, medical condition, well before

6  the events that give rise to the claim.  Exactly where that

7  cutoff should be, I mean, 2004, cutting -- if she has quite an

8  extensive medical history cutting four years out probably

9  accomplishes a fair amount.

10    Just let me come back again.  Mr. Lewis, you're

11  entitled to the discovery.  So from my standpoint the two

12  questions are who has to get it and who has to pay for it.  And

13  one doesn't necessarily follow from the other.  Because it may

14  be easier for Mr. Garber, even with releases and all that, it

15  may be easier for Mr. Garber, on behalf of Mr. Mack, to get the

16  records.  And it may not break down this way on each -- I

17  looked at this list of care providers.  It's a long list.

18    What I would hope is that the two of you would

19  cooperate, because you may be able to hash out -- look.

20  Because where the provider is in Naples, because that's where

21  you are, Mr. Garber, am I right in that?

22    MR. GARBER:  Yes, Your Honor.

23    THE COURT:  So it may be much easier for you to chase

24  down and get the records of professionals, medical

25  professionals who are in Naples, where you're located.  And, I

1  mean, most of them are -- there's some Miami and stuff like

2  that, at least it's the same state as you.

3          But what I would urge is that the two of you take a

4  crack at seeing if you can divide this list.  First of all, if

5  you can work out the dates for which the requests apply.  And

6  on that score I would tend to err with Mr. Lewis, because I

7  think that the Trust is entitled -- Mr. Mack has put Mrs.

8  Mack's medical condition at issue.  It's clear that she had

9  pre-existing conditions.  And so it's important for Mr. Lewis

10  to be able to gather his facts and be able to fully present it.

11          If 2004 instead of 2000, if he's satisfied with that,

12  I'm satisfied with that.  And if he comes back later and says

13  but as to this specific -- I got these records, and I need to

14  go back further as to this provider or that specialist, I'm

15  certainly open to it.

16          Mr. Lewis, look, I'm sensitive about the cost to the

17  Trust, because every dollar the Trust spends is a dollar less

18  for borrowers for distribution.  But I'm equally sensitive to

19  the costs for Mr. Mack.  I do think that I have the discretion

20  to shift the costs so that if your -- proper though it may be,

21  your discovery requests would require 50,000 dollars, because

22  Florida Hospitals have a policy of a dollar a page and there's

23  50,000 pages, I think I have the discretion to shift that cost

24  to the Trust if you want the documents.

25          I mean, what I consider -- I mean, go read Lozano.

1   Read the Winnick decisions that Judge Lynch -- he was dealing

2   with all big banks.  I don't think he was particularly

3   concerned about who paid.

4        In Lozano -- well, it was a plague on all of their

5   houses.  But Lozano, I mean, I had a Chapter 13 debtor who

6   really didn't have money, but the result was I concluded that

7   the Lozanos' lawyer had to go and take discovery.  He couldn't

8   just simply tell the defense you go get it for me.  And so

9   that, again, comes to who's put the matter at issue.

10        Remind me what's the fact discovery cutoff date?

11        MR. LEWIS:  It was four months from late August.

12   August 25, I think, is when you entered the order.

13        THE COURT:  You know, look I --

14        MR. LEWIS:  And my document requests went out on the

15   29th of August.

16        THE COURT:  Yes.

17        MR. LEWIS:  And the thing may -- the picture may shift

18   once again.  I also served interrogatories at that time.  And

19   they were due a couple of days ago, but Mr. Garber asked for an

20   extension of about two weeks, and I granted it to him.

21        THE COURT:  Sure.

22        MR. LEWIS:  When I see those interrogatory responses,

23   they may make my job easier and clearer, or not.  But they

24   could have a major impact on what further information I need.

25        THE COURT:  Right.

1      MR. LEWIS:  I would add, too, that I don't -- I don't

2  know how Mr. Garber intends to put on his case, and I certainly

3  am not going to tell him how to put on his case.  But it seems

4  to me he needs the same medical information to put on his case

5  that I need to defend my case; that is what was the situation

6  before and how does that contrast with the situation

7  afterwards, and what of the situation afterwards is

8  specifically traceable to the RESPA violation?  So, it seems --

9      THE COURT:  Yes, I mean, look.  When I --

10     MR. LEWIS:  -- get the --

11     THE COURT:  -- wrote the opinion, I mean, the

12  challenge that -- one of the challenges you have, Mr. Garber,

13  is that the worst of the facts -- the whole story is

14  horrible -- the worst of the facts occurred before the

15  qualified written request went out.

16     Did Stern ever go to jail?

17     MR. LEWIS:  I don't know --

18     MR. GARBER:  I think --

19     MR. LEWIS:  -- I don't know what his situation is,

20  Your Honor.  He's not a popular man, though.

21     THE COURT:  No, I know he was disbarred, but I don't

22  know whether he ever went to jail.

23     MR. GARBER:  Oh, Stern.  I don't think he went to

24  jail, but I have heard he was disbarred.

25     THE COURT:  No, I knew he was disbarred.

1        MR. LEWIS:  I'm just reading a deposition from the

2    state court case in which the Stern attorney in charge of that

3    specific file is the witness, and it's fascinating.

4        THE COURT:  I mean, look, what I --

5        MR. GARBER:  I'm not hearing anything.

6        THE COURT:  Mr. Garber, what -- let me ask you this.

7    You gave Mr. Lewis the list of medical professionals --

8        MR. LEWIS:  Yes, Your Honor.

9        THE COURT:  -- what hospitals -- what, if any, contact

10   have you had with the names on that list to try and get

11   records?  I mean, I -- look, I think you've put Mrs. Mack's

12   medical condition at issue.  You can't carve the line by

13   saying, well, it only is her condition from such-and-such date.

14   I think once you put it at issue, given her pre-existing

15   conditions, Mr. Lewis is entitled to go back in time.  I do

16   think that it's easier -- it should be easier for you to get

17   the records than for Mr. Lewis to get the records.

18       MR. GARBER:  Yes, Your Honor.

19       THE COURT:  And I think that there's sufficient legal

20   authority to say that because of this issue of control, that

21   the records are within your control.  But in saying that, I

22   reiterate that who gets them and who pays for them are two

23   different questions.

24       And what I -- I've never had to recover thousands of

25   pages of my own medical records, but there were times where I

1  had to get some of them, and most of the doctors just gave me

2  copies and didn't raise -- it wasn't worth their time.

3  Hospitals may be a different story, I don't know.

4          I think the way I'd like to leave things today is I

5  want the two of you to talk again.  I think for those providers

6  who are in Naples, I am going to direct Mr. Garber to seek to

7  get -- the two of you ought to talk about the time period

8  again.  I'm going to leave it to see if you can work that out.

9  And then I want Mr. Garber to go to -- to move forward to get

10 the records from the providers in Naples.  You ought to see if

11 you can work out -- because it's such a long list, Mr. Lewis,

12 see whether, with Mr. Garber's cooperation, your office can try

13 and get the records from some of the other providers outside of

14 Naples.

15         You ought to find out -- both of you ought to -- I'd

16 like to know -- and this I'm not deciding who pays, because I'd

17 like to know how much.  I'll just -- it's what I've already

18 said, Mr. Lewis.  I think that what may be the appropriate

19 resolution here is at least a partial cost-shifting, not an

20 entire cost-shifting.  But I'm not going to rule on that in the

21 abstract.  I want to know if such-and-such hospital is saying

22 50,000 dollars or we won't give you the records, if the two of

23 you can't agree how to deal with it, you'll get me on the phone

24 and I'll decide it.

25         MR. GARBER:  Your Honor, you asked what we had done.

RESIDENTIAL CAPITAL, LLC, ET AL.                    22

1   We have contacted every medical care provider that we've been

2   able to identify since the 1st of January 2000.  We have asked

3   for the medical records.  We have already received about 5,000

4   pages of medical records, all of which have been given to Mr.

5   Lewis.

6            THE COURT:  Okay.

7            MR. GARBER:  So far, they sent me bills for about

8   3,000 dollars for those records.  And we are still waiting for

9   a response from the Mayo Clinic, which will have tens of

10  thousands of pages, I'm sure.

11           I do believe -- and I have agreed with Mr. Lewis --

12  all of this information he can use in his defense.  So I've

13  never disputed that.  It's just a matter of we have not been

14  able to get it, at least as of the date of this telephone call.

15           THE COURT:  Okay.  Let me ask, was she hospitalized at

16  Mayo Clinic in Minnesota?

17           MR. GARBER:  I believe that she was.  I think she had

18  the liver transplant in 2002 in the Mayo Clinic in northern

19  Florida.

20           MR. LEWIS:  Yeah, I think Florida --

21           MR. GARBER:  And then she went back periodically.

22           MR. LEWIS:  Not Minnesota.

23           THE COURT:  Not Minnesota?

24           MR. GARBER:  Yes, there was a Mayo Clinic in northern

25  Florida.

1          THE COURT:  Okay.

2          MR. LEWIS:  And as I said, Your Honor, once I see the

3    interrogatory responses, we may be able to whittle things down.

4    And then I told Mr. Garber on the record today, he can skip

5    everything before 2004, now.

6          THE COURT:  Okay.

7          MR. LEWIS:  Because I've got a baseline with that

8    information.  And even those from whom he's requested records,

9    he can narrow those requests now, to anything after January 1st

10   of 2004, and I may be able to narrow it further, as I see

11   further materials.

12         THE COURT:  Okay.  Look, I --

13         MR. LEWIS:  And I don't necessarily have to get each

14   and every page from each and every provider.

15         THE COURT:  Okay.

16         MR. LEWIS:  As information accretes, I may be able to

17   say to myself, I can create a record that I can rely on to

18   accomplish what I need to accomplish without having every piece

19   of paper that was ever generated.

20         THE COURT:  Okay.  Let me just talk about just how I

21   deal with discovery cutoff dates.  And I probably have --

22   you'll forgive me if I've told you this before.  But I always

23   set discovery cutoff dates.  I'm usually pretty aggressive win

24   managing my calendar and keeping people on track.

25         My general approach about extending time is -- and I

1   say this all the time to lawyers -- if you come and tell me you

2   need an extension of time, you're going to have to explain to

3   me what you've done to date.  The thing I care about the most

4   is that people have been diligent in their effort to conduct

5   discovery.  You can be diligent and because you've got all

6   these medical providers scattered around and you're a little

7   bit at their mercy in getting materials, if the circumstance is

8   the discovery cutoff's approaching, we promptly requested the

9   medical records, we've gotten X, Y, and Z, but not A, B, and C;

10  we're still waiting on those; I'm likely to agree to extend the

11  time.  I'm not going to do that now.

12          What you need -- look, it's to everybody's advantage

13  to get this done, because the more time you have, the work

14  expands to fill the available time and it costs everybody time

15  and money to do that.

16          I've said in ResCap, Mr. Garber, generally, it's my

17  goal to get as many claims as possible resolved.  There hasn't

18  been a distribution yet.  I turned down one motion to approve

19  reserves because I wasn't satisfied with the showing that had

20  been made.  Whether your client's claim turns out to be one of

21  these or not, I don't know.  It could be one of the larger

22  claims that is unliquidated at this stage, and it's going to

23  have to get resolved.

24          So I'm trying to move all of the remaining ResCap

25  matters along as fast as I possibly can.  But the facts and

1  circumstances and the issues raised by your claim are not the

2  garden variety type; let me put it that way.

3          So what I -- I don't know whether, Mr. Lewis, this is

4  answering your questions that you've raised in your letter and

5  the reason you requested the conference.  I do think that Mr.

6  Garber, on most all of these provide -- and he's already said

7  that he's taken steps to get the information from all of them.

8  You cut back on the date a little bit, and I think that's

9  helpful.  The fact that he might have -- his client has control

10  for purposes of Rule 34 of the Federal Rules of Civil

11  Procedure, doesn't answer the ultimate question about the cost

12  sharing.  He's indicated he's had about 30,000 dollars in bills

13  so far.  If a provider comes along and says it's going to be

14  50,000 dollars, because Mayo Clinic has got however-many pages,

15  and he's going to balk at it, and you can't agree on it, you'll

16  get me involved, because I do believe that I have the authority

17  to shift costs, even if he has to be the one to try and get the

18  records.

19          MR. LEWIS:  Your Honor, the diligence issue -- your

20  admonition about that, that's the reason I wanted to set this

21  conference up instead of waiting for October 30th.  I think the

22  conference has been very helpful, actually.  I really

23  appreciate the Court's finding the time on such short notice to

24  deal with us.

25          THE COURT:  So let me just -- I'll go ahead and

1  litigate this if I have to.  Have you given up on your

2  settlement efforts?  I hope not.

3          MR. LEWIS:  We're --

4          MR. GARBER:  Your Honor, I don't think so.  But in

5  fairness to Mr. Lewis, he does need medical records to decide

6  what he's willing to settle for.

7          THE COURT:  Yes, I always say that parties have to be

8  on a level playing field to be able to know -- to make the risk

9  assessment to know what to settle for.

10          MR. LEWIS:  We did have -- as the Court required, and

11  as I think was reflected in the first letter, we did have our

12  mandatory settlement conference, and I thought it was useful,

13  even if it didn't result in a settlement, in terms of

14  identifying issues and who thinks what, because that will help

15  us to focus our efforts.  And depending on how some of those

16  issues pan out in discovery, that will help us to decide where,

17  if we can, we can settle.

18          THE COURT:  You know, Mr. Lewis, it does strike me --

19  and I'm not going to tell you what order to do your discovery

20  in.  You're an experienced lawyer and you'll proceed the way

21  you will.  But to the extent that if you both feel that

22  settlement talks could be more profitably undertaken when

23  you've -- well, it may be that Mr. Lewis is the one who needs

24  to get the information -- it may be that one of two of these

25  medical providers you will conclude, based on the records

RESIDENTIAL CAPITAL, LLC, ET AL.                    27

1  you're seeing, are likely to be the most crucial to your

2  arguments, and deposing those one or two sooner rather than

3  later, not waiting to get all the medical records before you do

4  that, might facilitate the two of you having a discussion -- a

5  further discussion about settlement.  But I'm not going to --

6  I'm not ordering you to do that.  I'm just throwing out that

7  suggestion.

8          MR. LEWIS:  I understand, Your Honor.  Actually, I

9  think that provided, among other things, that Mr. Garber's

10 willing to stipulate that some of these medical records are

11 business records that can be admitted, I think I may not have

12 to take time to do that, because some of these things, I think,

13 should be fairly --

14         THE COURT:  Well, I sure hope --

15         MR. LEWIS:  Oddly.

16         THE COURT:  -- I sure hope that the two of you will be

17 able to stipulate as to the admissibility.  I don't know what

18 weight any of it's going to apply to, but that you're not going

19 to fight about authenticity or admissibility of the medical

20 records.  But we'll see.

21         I think you both have bigger fish to fry -- bigger

22 issues to fight about than that, but we'll see.

23         Is there anything else either of you want to raise

24 today?

25         MR. LEWIS:  No, Your Honor.  Thank you, again, so

RESIDENTIAL CAPITAL, LLC, ET AL.                                    28

1    much, for taking us on, on such short notice.  I think it's

2    really helped.

3           THE COURT:  Mr. Garber, is there anything you want to

4    raise?

5           MR. GARBER:  Thank you very much, Your Honor.

6           THE COURT:  Okay, all right.  Thank you both very

7    much.  All right, we're adjourned.

8           MR. GARBER:  Okay.  Bye-bye.

9        (Whereupon these proceedings were concluded at 2:45 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

29

1

2                        C E R T I F I C A T I O N

3

4    I, Hana Copperman, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10

11    _____

      HANA COPPERMAN

12    AAERT Certified Electronic Transcriber CET**D 487

13

14    eScribers

15    700 West 192nd Street, Suite #607

16    New York, NY 10040

17

18    Date:  October 8, 2014

19

20

21

22

23

24

25