**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

In re:

RESIDENTIAL CAPITAL, LLC, *et al.*

Debtors.

**NOT FOR PUBLICATION**

Case No. 12-12020 (MG)

Jointly Administered

**MEMORANDUM OPINION AND ORDER SUSTAINING OBJECTION TO
CLAIM NO. 1466 OF SUZANNE KOEGLER AND EDWARD TOBIAS**

*A P P E A R A N C E S:*

MORRISON & FOERSTER LLP
*Counsel for the ResCap Borrower Claims Trust*
250 West 55th Street
New York, NY 10019
By:   Jordan A. Wishnew, Esq.

LAW OFFICES OF EDWARD N. TOBIAS, LLC
*Counsel for Edward N. Tobias and Suzanne Koegler*
226 Richwood Road
Mullica Hill, New Jersey 08062
By:   Edward N. Tobias, Esq.

**MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE**

Suzanne Koegler and Edward Tobias (together, the "Claimants") filed claim number 1466 (the "Long Beach Claim") against Debtor GMAC Mortgage, LLC ("GMACM"), asserting a general unsecured claim in the amount of $1,000,000.[1] The Long Beach Claim stems from alleged damage caused by Hurricane Sandy to real property located at 93 Wisconsin Street, Long Beach, NY 11561 (the "Long Beach Property"). Claimants assert that GMACM (1) manipulated

---

[1] Claimants amended their original $1,000,000 claim to a claim for $100,000. Initially, Claimants alleged a "token" amount of $1 million until damages could be determined. (*See* "Response," ECF Doc. # 7307 at 5.) Claimants base their damages on a purported property value of $425,000 before Hurricane Sandy, and an October 9, 2013 sale price of $210,000 plus a $100,189.55 insurance recovery from Hurricane Sandy, resulting in a loss of approximately $100,000. (*See id.* at 6 n.7.)

the national housing market, which resulted in a loss on the Long Beach Property, and (2) failed to adequately compensate Claimants for Hurricane Sandy-related damages. In the Court's *Memorandum Opinion and Order Sustaining Objection to Claim No. 1467 of Suzanne Koegler and Edward Tobias* (the "Freehold Order," ECF Doc. # 7052), the Court has already ruled on, sustained, and expunged claim number 1467 filed by Claimants with an identical stated basis, which claim related to real property located at 75 Princeton Oval, Freehold, NJ 07728 (the "Freehold Claim"). Claimants now seek damages related to an entirely different property, but the Long Beach Claim suffers from the same infirmities as the now-expunged Freehold Claim.

As explained below, Claimants fail to adequately state a claim against GMACM. For that reason, the Objection is **SUSTAINED** and the Long Beach Claim is **EXPUNGED.**

## I.    BACKGROUND

Pending before the Court is the *ResCap Borrower Claims Trust's Sixty-Ninth Omnibus Objection to Claims (No Liability Borrower Claims)* (the "Objection," ECF Doc. # 7188). The ResCap Borrower Claims Trust (the "Trust") seeks an order disallowing and expunging the Long Beach Claim. In support of the Objection, the Trust submitted the declarations of Deanna Horst (*id.* Ex. 2), P. Joseph Morrow IV (*id.* Ex. 3), and Norman S. Rosenbaum (*id.* Ex. 4). Claimants filed their Response (ECF Doc. # 7307), supported by a letter (the "Tobias Letter," ECF Doc. # 7307-1)[2] they filed in an action styled *Tobias v. United* States, Civil Action No. 3:13-cv-06471 (JAP)(TJP), pending in the United States District Court for the District of New Jersey (the "District Court Action"). The Trust submitted a reply (the "Reply," ECF Doc. # 7410),

---

[2] The Tobias Letter is dated January 7, 2014 and is addressed to the Hon. Joel A. Pisano. Claimants incorporate the Tobias Letter by reference in their reponse and seek to have the letter serve as a complaint in the current matter.

2

supported by a supplemental declaration of Deanna Horst (the "Supp. Horst Decl.," ECF Doc. # 7410-1). The Court held a hearing on August 26, 2014, and Claimants appeared telephonically.

On September 2, 2005, GMACM originated a $299,000 loan to the Claimants (the "Loan") secured by the Long Beach Property. (*See* Supp. Horst Decl. ¶ 16.) GMACM sold its interest in the Loan to Freddie Mac on October 20, 2005, but continued as servicer of the Loan until servicing was transferred to Ocwen Loan Servicing ("Ocwen") on February 16, 2013.[3] (*See* Reply ¶ 26.)

On October 22, 2012, Claimants timely filed two general unsecured claims, each in the amount of $1,000,000—the Long Beach Claim against GMACM and the Freehold Claim[4] against Residential Capital, LLC ("ResCap").[5] The claims relate to two different properties, but the stated basis for both claims is identical: "Damages based on Consumer Fraud or other claim/affirmative defenses to foreclosure requesting monetary relief." (Reply Ex. O.) In Box 8 of each proof of claim form—which requires the claimant to attach any documents in support of the claim—Claimants wrote: "Complaint has not yet been filed." Nothing was attached to either proof of claim. (*Id.*) This Opinion relates solely to the pending Long Beach Claim.

On November 27, 2012, Claimants requested, and on November 28, 2012 were granted, a reprieve from making loan payments between December 2012 and February 2013 (the "Forbearance Period") due to hardships that resulted in the aftermath of Hurricane Sandy (the "Forbearance Plan"). (*See* "Tobias Servicing Notes," Reply Ex. Q, entry for 11/28/2013.) Under the terms of the Forbearance Plan, GMACM agreed not to assess late charges, pursue

---

[3]  GMACM sent a letter dated February 7, 2013, advising Claimants that Ocwen would assume servicing rights on the Loan on February 16, 2013. (*See* "Notice of Service Transfer Letter," Response Ex. A.)

[4]  The Freehold Claim was previously expunged by the Court. (*See* Freehold Order, ECF Doc. # 7052.)

[5]  The General Bar Date for filing proofs of claim was November 16, 2012 at 5:00 p.m. (Prevailing Eastern Time). (ECF Doc. # 2093.)

foreclosure, or report late payments to credit bureaus during the Forbearance Period.  (*See* Reply ¶¶ 28–29.)  Ocwen extended the Forbearance Period until May 2013 upon transfer of the loan servicing rights from GMACM to Ocwen.[6]  (*See id.*)  On May 31, 2013, Claimants brought the account current.  (*See* Tobias Servicing Notes, entry for 5/31/2014.)

On March 21, 2013, the Court entered an order (the "Procedures Order," ECF Doc. # 3294) authorizing the Debtors to file omnibus objections on various grounds.  The Procedures Order included specific protections for Borrowers,[7] and established a process for the Debtors (and now the Trust) to follow before objecting to certain categories of Borrowers' claims.  Before objecting to certain Borrower claims, the Trust must send the Borrower a letter (a "Request Letter") requesting additional documentation in support of the Borrower's claim.  (*See* Procedures Order at 3–4.)

On May 24, 2013, the Debtors sent a Request Letter to Claimants requesting additional information in support of their claims.  Claimants responded by stating that they had yet to file the complaint that would form the basis of their claims.  (*See* Reply Ex. A-3.)  Claimants' response to the Request Letter also attached copies of two "representative cases" and made reference to a Consent Decree between GMACM and the Justice Department.  (*Id.*)  On July 24, 2014, Claimants filed their Response, incorporating by reference the Tobias Letter.  (*See* Response Ex. A.)

On October 28, 2013, Claimants filed a Complaint (the "Complaint," ECF Doc. # 6881-1 Ex. A) in the District Court Action, naming the Debtors, Ocwen, the United States of America,

---

[6]   Ocwen extended the Forbearance Period by letter dated March 6, 2013.  (*See* Response Ex. A.)

[7]   As used in the Procedures Order, the term "Borrower" is defined as "a person who is or was a mortgagor under a mortgage loan originated, serviced, and/or purchased or sold by one or more of the Debtors."  (*See* ECF Doc. # 3123 ¶ 21.)

4

and Barack Obama as defendants. (*See* Complaint.) The District Court Action related to three properties that are or were owned by the Claimants and that were allegedly damaged by Hurricane Sandy. The gravamen of the claims alleged in the District Court Action was that Claimants should be entitled to relief funds for Hurricane Sandy-related damages to their properties. A separate claim against GMACM, ResCap, Ocwen, and others alleges that such "defendants wrongfully engaged in illegal or other adverse actions that negatively affected the nationwide real estate market resulting in untrue and inaccurate property values at the time the plaintiffs purchased the properties." (*Id.*) The Complaint further alleges that Claimants requested assistance from these defendants following Hurricane Sandy and that the defendants failed "to adequately compensate plaintiffs for damages sustained as a result of their wrongful acts." (*Id.*) According to the Complaint, the defendants were required to provide assistance to Claimants under the terms of Claimants' mortgages and under federal law. (*Id.*) The Trust asserts that GMACM was never served with the Complaint.[8] (Reply ¶ 30.) Nevertheless, Ocwen, a co-defendant in the District Court Action, entered a notice of appearance for GMACM in late 2013 and included GMACM in its motion to dismiss, filed on December 26, 2013. The Trust asserts that Ocwen mistakenly entered an appearance for GMACM, and the Trust retained separate counsel once it learned of the mistake. (*Id.*) On May 19, 2014, GMACM filed a Notice of Bankruptcy in the District Court Action. (District Court Action, ECF Doc. # 60.)

On August 21, 2014, the Trust filed the Objection to the Long Beach Claim as a general no liability claim, classifying the Claim as one for wrongful foreclosure and general servicing issues. (*See* Objection Ex. 1-A at 56.) Claimants responded by arguing that they were harmed

---

[8] According to the Trust, the summons in the District Court Action was issued to GMACM c/o Morrison & Foerster, LLP ("MoFo"), but the attached proof of service is blank, and Claimants provide no other support that either GMACM or MoFo was actually served.

5

both by market manipulations caused by GMACM's subsidiary DiTech—which purportedly induced Claimants to purchase the Long Beach Property—and by a "SmartWatch report" sent to Claimants on October 2, 2007 by DiTech, which stated that the Long Beach Property appreciated from its initial value of $390,000 at the time of the purchase to $422,000 "two short years later." (Response at 4 n.4; Tobias Letter at 2.)  These "fraudulent valuations" caused Claimants to "refinance, increase the outstanding loan, or utilize the available stated equity to borrow additional money."[9]  (Tobias Letter at 2.)

Claimants further allege that they sent GMACM a "Borrower's Response Package" on February 14, 2013[10] in an effort to modify their loan and prepare the property for a short sale. (*See* Response at 3.)  GMACM sent a letter to the Claimants advising that the loan servicing rights had been transferred to Ocwen.[11]  (*See id.*)  Claimants allege that they were harmed *by Ocwen* when Ocwen terminated their loan modification and short sale request.  (*See* Tobias Letter at 4.)  According to Claimants, they never requested a termination, and Ocwen's wrongful denial of a loan modification resulted in a violation of New York State Banking Law Article 12-

---

[9]  In support of their claims, Claimants reference a certain consent decree entered into between GMACM and the Justice Department, dated March 14, 2012 (the "Consent Decree").  (*See United States v. Bank of Am. Corp.*, Case No. 1:12-cv-00361 (RMC) (D.D.C. Mar. 4, 2012) (ECF Doc. # 11); Response at 3.)  Specifically, they assert that it is clear from the Consent Decree that the Debtors were overvaluing properties when financing loans.  (*See* Response at 3.)

[10]  Claimants received a Borrower's Response Package from GMACM on January 16, 2013.  (*See* "Modification Application," Response Ex. A., ECF Doc. # 7307-1.)  The Modification Application requested a response within 15 days.  (*See id.*)

[11]  The Court is unclear whether GMACM sent a response letter dated February 16, 2013 to Claimants, as both parties allege.  GMACM notified Claimants by letter dated February 7, 2013 that Ocwen assumed servicing rights on February 16, 2013; but neither party provided a copy of a letter February 16, 2013 letter that purportedly informed Claimants that servicing rights had been transferred to Ocwen.  (*See* Response at 3, ("[claimants] received no response other than the letter, dated February 16, 2013, advising that their account had already been transferred to Ocwen on February 1, 2013.").)  Claimants submitted a letter dated February 26, 2013 seeking a loan modification and short sale, and an extension of the Forbearance Period.  (*See* "Letter Dated February 26, 2013," Response Ex. A., ECF Doc. # 7307-1.)  Further, the Tobias Servicing Notes indicate that Claimants were in contact with the Loan servicer in February regarding an extension of the Forbearance Period.  (*See* Tobias Servicing Notes, entry for 2/14/2013, ("INQ [sic] if FB [sic] can be extended,") entry for 2/15/2013, ("possible forbearance extension,") entry for 2/25/2013, ("[f]inancial information collected for HMP [sic]…loss mitigation discussed and/or financial package sent.").)

6

D, the Home Affordable Modification Program ("HAMP"), and the Home Affordable Refinance Program ("HARP"). (*See* Tobias Letter at 5.) Of course, any wrongdoing by Ocwen after the servicing rights were transferred and notice of the transfer was given to the Claimants—and no wrongdoing by Ocwen has been established by the record in this Court—would not give rise to a claim against GMACM.

Claimants seek to distinguish this claim from the Freehold Claim on the grounds that the Loan, unlike the Freehold Loan, was labeled distressed by GMACM. (*See id.*) Therefore, according to Claimants, the Loan was sold to Ocwen fraudulently and to the detriment of Claimants.[12] Claimants allege that they were harmed either as "borrower homeowners, or as shareholders of GM in bankruptcy, which had an ownership interest in [GMACM]." (Tobias Letter at 4.) Additionally, GMACM's "unreasonable delay in responding to [Claimants'] request for short sale" and Ocwen's "wrongful[] withholding [of the] application of the insurance proceeds to principal repayment" resulted in "sale of the property in its damaged 'as is' condition . . . [which was] only fortuitously mitigated by a market rebound lasting an agonizing nine months."[13] (*Id.* at 5–6.)

The Trust responds by asserting that the Court has already considered and rejected the basis of Claimants' market manipulation arguments under the Freehold Claim. (*See* Reply ¶ 48.) Further, the Trust asserts that Claimants do not allege that GMACM acted improperly following Claimants' loan modification request. (*See id* at ¶ 49.) The Trust explained that a review of the

---

[12]   Claimants support their claim by alleging that there was fraudulent intent when GMACM transferred servicing rights of both loans "at an unfair discount resulting in an improper windfall" to Ocwen. (Tobias Letter at 4.) Claimants have offered no evidence to support their assertion that GMACM transferred the Loan to Ocwen; because GMACM did not own the Loan when the servicing rights were transferred, it could not have sold the Loan to Ocwen.

[13]   Claimants' argument appears to be that the transfer of the servicing rights and any delay in applying insurance proceeds to the principal amount of the Loan while Claimants were under the Forbearance Plan resulted in Claimants selling the Long Beach Property at a loss.

7

Debtors' records showed that GMACM could not address Claimants' request because servicing rights had been transferred to Ocwen. (*See id.*) Upon transfer, Ocwen eventually extended the Forbearance Plan, and Claimants later brought the account current. (*See id.*) Accordingly, the Trust asserts that Claimants have not alleged any facts that would distinguish this claim from their Freehold Claim or support the basis for any valid claim. (*See id.*)

The Trust argues that Claimants fail to provide any objective evidence to substantiate their allegation that GMACM fraudulently transferred servicing rights to Ocwen.[14] (*See id.* at ¶ 51.) Further, because this allegation refers to an agreement between Ocwen and GMACM, to which Claimants are neither a party nor a beneficiary, it is unclear how Claimants were damaged. (*See id.*) Claimants never disputed the terms of the Loan with GMACM before filing the Long Beach Claim, nor was the Loan ever subject to a dispute or referred to foreclosure. (*See* Tobias Servicing Notes.) The Trust also points out that Ocwen acquired "servicing rights only, not rights to the mortgage loan." (Reply ¶ 51.)

The Trust further asserts that Claimants' reference to the Consent Decree is inapposite, because it neither relates to nor involves any specific facts that relate to the Long Beach Claim. (*See id.* at ¶ 52.) The Consent Decree was not a general admission of wrongdoing by GMACM, nor is it evidence of wrongdoing regarding the servicing of Claimants' Loan. (*See id.*) Accordingly, the Trust asserts that Claimants are seeking to rely on the Consent Decree to skirt their burden of proof. (*See id.*)

Finally, the Trust asserts that the District Court Action and the Tobias Letter both violated the automatic stay and amounted to an attempt by Claimants to amend their proof of

---

[14]  The sale of GMACM's loan servicing rights portfolio to Ocwen was made as the result of a competitive auction in the bankruptcy court, approved by the Court. The Claimants' allegation that the sale was a fraud is frivolous.

8

claim. (*See id.* at ¶ 53.) Claimants, fully aware of the bankruptcy proceedings, never sought leave to file the District Court Action or to amend their claim when they incorporated the Tobias Letter by reference. (*See id.*) Accordingly, the Trust seeks to exclude the Tobias Letter, arguing that the allegations set forth in the Tobias Letter have no bearing on the liability of GMACM to the Claimants. (*See id.*) The Trust also seeks to disallow and expunge the Long Beach Claim on the basis that Claimants failed to adequately substantiate any prepetition liability. (*See id.*)

## II.    DISCUSSION

### A.    Claims Objections

Claims objections have a shifting burden of proof. Correctly filed proofs of claim "constitute prima facie evidence of the validity and amount of the claim . . . . To overcome this prima facie evidence, an objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim." *Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (2d Cir. B.A.P. 2000). By producing "evidence equal in force to the prima facie case," an objector can negate a claim's presumptive legal validity, thereby shifting the burden back to the claimant to "prove by a preponderance of the evidence that under applicable law the claim should be allowed." *Creamer v. Motors Liquidation Co. GUC Trust (In re Motors Liquidation Co.)*, No. 12 Civ. 6074 (RJS), 2013 U.S. Dist. LEXIS 143957, at *12–13 (S.D.N.Y. Sept. 26, 2013) (internal quotation marks omitted). If the objector does not "introduce[] evidence as to the invalidity of the claim or the excessiveness of its amount, the claimant need offer no further proof of the merits of the claim." 4 COLLIER ON BANKRUPTCY ¶ 502.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014).

"Federal pleading standards apply when assessing the validity of a proof of claim." *See, e.g.*, *In re Residential Capital, LLC*, 513 B.R. 856, 864 (Bankr. S.D.N.Y. 2014) (citing *In re DJK*

9

*Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009) ("In determining whether a party has met their burden in connection with a proof of claim, bankruptcy courts have looked to the pleading requirements set forth in the Federal Rules of Civil Procedure." (citations omitted)). For their claim to survive, Federal Rule of Civil Procedure 8(a) provides that Claimants must allege "enough facts to state a claim for relief that is plausible on its face." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (citing *Iqbal*, 556 U.S. 662, 678). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). Plausibility "is not akin to a probability requirement," but rather requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation and internal quotation marks omitted). The court must accept all factual allegations as true, discounting legal conclusions clothed in factual garb. *See, e.g.*, *id.* at 677–78; *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (stating that a court must "assum[e] all well-pleaded, nonconclusory factual allegations in the complaint to be true") (citing *Iqbal*, 556 U.S. at 678). The court must then determine if these well-pleaded factual allegations state a "plausible claim for relief." *Iqbal*, 556 U.S. at 679 (citation omitted).

Courts do not make plausibility determinations in a vacuum; it is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (citation omitted). A claim is plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). A claim that pleads only facts that are "merely consistent with a defendant's liability" does not meet the plausibility requirement. *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "A pleading that offers labels and conclusions or a formulaic recitation of

10

the elements of a cause of action will not do." *Id.* (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted). "The pleadings must create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted).

To support their fraud claim, the Claimants "must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). "In order to meet the particularity requirement of Rule 9(b), a plaintiff [must] allege the time, place, and content of the misrepresentations on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Ind. State Dist. Council of Laborers & HOD Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 719 F.3d 498, 503 (6th Cir. 2013) (alteration in original) (internal quotation marks omitted).

In short, the Claimants' Long Beach Claim does not come close to meeting the pleading standards described above. Tobias, although appearing pro se in this proceeding, is a practicing lawyer in New Jersey—quite simply, he should know better! The Long Beach Claim is long on hyperbole, speculation and exaggeration, but woefully short on substance. Tobias was given a chance during the hearing to explain why the Long Beach Claim is "plausible." He provided no understandable reasons.[15]

### B. Amendment of Claims

Bankruptcy Rule 3003(c)(3) directs bankruptcy courts "to establish a bar date beyond which proofs of claim are disallowed in a chapter 11 case." *In re Enron Creditors Recovery*

---

[15] For purposes of this Opinion, it is unnecessary for the Court to address Claimants' failure to file the Complaint until more than a year after they filed the Freehold Claim, or that the District Court Action—commenced more than seventeen months after the Petition Date—was filed against the Debtors in clear violation of the automatic stay.

11

*Corp.*, 370 B.R. 90, 94 (Bankr. S.D.N.Y. 2007). The bar date "is critically important to the administration of a successful chapter 11 case for it is intended to be a mechanism providing the debtor and its creditors with finality." *Id.* (citation omitted) (internal quotation marks omitted). Where the bar date has passed and a creditor seeks to file an amended proof of claim, "the decision to allow the amendment of the claim is committed to the discretion of the bankruptcy judge." *In re Asia Global Crossing, Ltd.*, 324 B.R. 503, 507 (Bankr. S.D.N.Y. 2005) (internal citations omitted). In the Second Circuit, amendment to a claim is

> freely allowed where the purpose is to cure a defect in the claim as originally filed, to describe the claim with greater particularity, or to plead a new theory of recovery on the facts set forth in the original claim. However, the court must subject post bar date amendments to careful scrutiny to assure that there was no attempt to file a new claim under the guise of amendment.

*Integrated Res., Inc. v. Ameritrust Co., N.A. (In re Integrated Res., Inc.)*, 157 B.R. 66, 70 (S.D.N.Y. 1993) (citations omitted).

Courts apply a two-step inquiry when considering whether to allow post-bar date amendments to proofs of claim. *See Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.)*, 419 F.3d 115, 133 (2d Cir. 2005); *In re Barquet Grp. Inc.*, 477 B.R. 454, 464 (Bankr. S.D.N.Y. 2012) (noting that courts in the Second Circuit "apply a two-prong test to assess whether to permit amendment of a proof of claim"), *aff'd*, 486 B.R. 68 (S.D.N.Y. 2012). First, the court must determine "whether there was a timely assertion of a similar claim or demand evidencing an intention to hold the estate liable." *Enron*, 419 F.3d at 133 (quotation omitted). A claim satisfies this first prong if it: "1) corrects a defect of form in the original claim; 2) describes the original claim with greater particularity; or 3) pleads a new theory of recovery on the facts set forth in the original claim." *Id.* (quoting *In re McLean Indus., Inc.*, 121

12

B.R. 704, 708 (Bankr. S.D.N.Y. 1990)). In other words, the amendment must relate back to the original proof of claim.

If this "relation back" inquiry is satisfied, courts then examine whether it would be equitable to allow the amendment. *See id.*; *Integrated Res.*, 157 B.R. at 70. Courts consider the following five equitable factors in determining whether to allow an amendment:

> (1) undue prejudice to opposing party; (2) bad faith or dilatory behavior on the part of the claimant; (3) whether other creditors would receive a windfall were the amendment not allowed; (4) whether other claimants might be harmed or prejudiced; and (5) the justification for the inability to file the amended claim at the time the original claim was filed.

*Integrated Res.*, 157 B.R. at 70 (citation omitted). "The critical consideration is whether the opposing party will be unduly prejudiced by the amendment." *Id.* (citation omitted).

Because November 16, 2012 was the General Bar Date, no new claims could be filed by Claimants unless such claims relate back to their timely filed claim. (ECF Doc. # 1309.) Claimants initially claimed, in their timely filed proof of claims, consumer fraud or other foreclosure claims. In the Tobias Letter, Claimants elaborated on the Long Beach Claim by alleging instances of fraudulent behavior and other statutory violations applicable to a mortgage servicer. Claimants' Response raises allegations that adequately relate back to Claimants' original Long Beach Claim; therefore, the Court will address these claims in turn.

### C.  Claimants Fail to State a Claim Against GMACM

The vague, conclusory allegations contained in the Response are insufficient to state a claim against GMACM that is plausible on its face. The Response therefore fails to satisfy even the relaxed pleading standards of Rule 8(a)(2). *See Twombly*, 550 U.S. at 570. For example, the Response alleges that Claimants were "damaged by [GMACM]'s market manipulations resulting in inflated market values at the time of the purchase." (Tobias Letter at 3.) As with the

13

expunged Freehold Claim, which alleged nearly identical market manipulation claims, Claimants fail to specify how and when GMACM inflated the market price of the Long Beach Property. The Response alleges that Claimants contacted "defendants" and requested a loan modification and assistance after Hurricane Sandy to prepare for a short sale to no avail. (*See id.* at 4.) But the Complaint does not specify *which defendants* Claimants contacted and fails to identify the basis for any obligation on the part of GMACM to provide assistance to Claimants. The Trust asserts that the Debtors' books and records indicate that GMACM promptly notified Claimants that it no longer serviced their Loan and referred Claimants to Ocwen, who subsequently extended the Forbearance Plan. (Reply ¶¶ 48–49.) Additionally, the Trust states that GMACM did not hold an interest in the Loan at the time of the alleged misconduct underlying Claimants' allegations against the Debtors. (Reply ¶ 49.) The Trust shifted the burden back to Claimants, who then failed to provide any support for their far-fetched assertions. Any dispute Claimants have regarding the servicing of their loan is not appropriately directed at GMACM.

       To pursue a claim against GMACM, Tobias (who is a lawyer) was required to state a plausible claim for relief *in this Court*, not in the District Court Action filed against GMACM in violation of the automatic stay. The vague, conclusory allegations contained in the Response—on which Claimants now rely to support their claim—do not permit the Court to draw a reasonable inference that GMACM is liable for the alleged misconduct. Indeed, many of the allegations in the Complaint can temporally pertain only to Ocwen and are inapplicable as to GMACM.

       The Claimants' assertion of market manipulation by GMACM, contained in the Response and the Tobias Letter, includes only nebulous allegations that are insufficient to support a claim

14

against GMACM that is plausible on its face.  Claimants' reference to a television commercial "extolling the merits of purchasing property" falls woefully short of this standard.

Claimants also attempt to use the Consent Decree to bolster their fraud claims.  The Consent Decree was not an admission of general wrongdoing by GMACM and does not provide a basis for the fraud asserted by Claimants.  (*See* Reply ¶ 52.)  Claimants' allegation is based on an erroneous interpretation of the Consent Decree.  The SmartWatch report referenced by Claimants specifically states that it is merely an *estimate* of the value of Claimants' Property, and, in any event, was prepared *after* GMACM originated Claimants' Loan.  (*See* Response at 4 n.4.)  Moreover, as the Trust asserts, Claimants never disputed the terms of the Loan with GMACM.  (*See* Reply ¶ 27.)  The Court has already rejected these identical "market manipulation" claims when it expunged the Freehold Claim.  (*See* Freehold Order.)  Therefore, neither the Consent Decree nor the SmartWatch report can act to support the market manipulation allegations in connection with the Loan origination-based claims.

Claimants assert that GMACM mischaracterized their Loan as distressed to allow Ocwen to purchase it at a discounted price.  Ocwen purchased the Loan servicing rights from GMACM in an auction sale in this Court.  Ocwen did *not* purchase the Loan from GMACM.  Claimants do not provide any evidence to support their assertions; their naked allegations are not sufficient to state a plausible claim for relief.  In any event, even if the Claimants' allegations were true, GMACM would have been harmed, *not* Claimants as borrowers.[16]  The Claimants provided no evidence supporting their assertion that they had an ownership interest in GMACM as shareholders of GM in bankruptcy.  This claim makes no sense! GM had spun off Ally Financial

---

[16]  The Claimants were not a party to the asset purchase agreement, which merely transferred *servicing* rights and not an *interest* in the Loan to Ocwen.  It is unclear from Claimants' arguments exactly how a loan servicer that purchases distressed accounts at a "discount" could affect the rights of a borrower such as Claimants.

15

Inc. ("AFI") well before the GM bankruptcy; AFI was the indirect, non-debtor parent of GMACM when these chapter 11 cases were filed. In any event, GMACM would have no incentive to sell loans to Ocwen at a reduced price.

Claimants attempt to distinguish the Long Beach Claim from the previously-expunged Freehold Claim, asserting that they never contacted GMACM for a loan modification or loss mitigation in connection with the Freehold Property, but did send a Borrower's Response Package to GMACM on February 14, 2013 in connection with the Long Beach Property. (*See* Reply ¶ 49.) Claimants refer to the letter they sent to GMACM requesting a loan modification (*see* Notice of Service Transfer Letter), but they do not explain how they were harmed by GMACM's response that the loan servicing rights had already been transferred to Ocwen.[17] Additionally, Claimants do not respond to the Trust's argument that GMACM did not have the ability to grant a modification at the time of the request since the loan servicing rights had already been transferred. Accordingly, Claimants have not met their burden of adequately alleging any cognizable claims relating to their attempts to modify their Loan.

Claimants contend that the Debtors' lending practices somehow drove up the national market prices of real estate, causing Claimants to "overpay" for the Property. (Response at 4 n.4.) After Hurricane Sandy, market prices declined, thereby "causing" Claimants to lose money. (*Id.*) This argument appears to suggest that GMACM is responsible for any depreciation in the value of the Long Beach Property and should be made to pay for any loss resulting in that property's sale. The Claimants' naked allegations, unsupported by any facts, do

---

[17] As noted above, Claimants point to a letter dated February 16, 2013 that purportedly notified them, for a second time, that servicing rights had been transferred to Ocwen. (*See* Response at 4 n.4.) However, Claimants failed to provide that letter in their filings. Regardless, GMACM sent a letter dated February 7, 2013 (*see* Notice of Service Transfer Letter), notifying Claimants of the transfer of servicing rights to Ocwen. It is unclear how Claimants were harmed by GMACM after waiting until the eve of transfer to send the Borrower's Response Package to GMACM, especially since Ocwen subsequently granted Claimants their forbearance extension. Again, any dispute that Claimants have regarding their loan modification is with Ocwen, not the Debtors.

16

*not* raise a plausible claim for relief. Therefore, Claimants' market manipulation allegations do not support a valid claim.

Claimants also assert that GMACM is liable for breach of contract by failing to apply insurance proceeds resulting from Hurricane Sandy to reduce the outstanding principal on the Loan. (*See* Tobias Letter at 5.) Claimants misdirect their complaint, if one exists at all, as GMACM did not hold an interest in the Loan at the time of this alleged misconduct.[18] (*See* Tobias Servicing Notes, entry for 2/14/2013 ("SD [sic] RCVD [sic] check from insurance.").) Nor have Claimants established that any Loan provision governs the manner in which the holder of the Loan must apply insurance proceeds to the principal of the Loan. Accordingly, Claimants have not met their burden of alleging a breach of contract claim.

Claimants also assert a tortious interference of contract claim against GMACM in connection with the Long Beach Property insurance proceeds. Claimants appear to allege that if GMACM had applied insurance proceeds to the principal amount of the Loan, they could have sold the Long Beach Property at a higher price. (*See* Tobias Letter at 5.) However, Claimants fail to establish GMACM's liability; Ocwen, not GMACM held servicing rights at the time of the alleged misconduct. (*See id.* ("[T]hese documents state the basis of [Claimants] contractual dispute with . . . *Ocwen* . . . .") (emphasis added).) Even when it held servicing rights to the Loan, Claimants have not adequately established that GMACM took any improper actions with respect to insurance proceeds. (*See* Tobias Servicing Notes.) Finally, Claimants offer no

---

[18] The Tobias Servicing Notes indicate that Claimants sent an improperly endorsed check after servicing rights were transferred to Ocwen. (*See* Tobias Servicing Notes, entry for 3/1/2013.)

17

evidence that their delayed application of insurance proceeds to the principal amount of the Loan resulted in the sale of the Long Beach Property in its damaged state.[19]

Claimants also refer to N.Y. BANKING LAW § 590-B, which states that a mortgage broker shall "act in good faith and with fair dealing." (Tobias Letter at 5.) Claimants allege that by not responding to Claimants' loan modification request, GMACM did not act in good faith. However, the Tobias Servicing Notes indicate that GMACM responded to Claimants' modification request and informed Claimants that Ocwen acquired servicing rights to the Loan. (*See* Notice of Service Transfer Letter.) Moreover, Claimants' allegations do not amount to a lack of good faith and fair dealing. Claimants have therefore not alleged any claim for violation of N.Y. BANKING LAW § 590-B.

Finally, Claimants' last ditch effort to allege violations of HAMP or HARP fails because no private right of action arises under either act. *See Wheeler v. Citigroup*, 938 F. Supp. 2d 466, 471 (S.D.N.Y. 2013) ("HAMP does not create a private right of action for borrowers against loan servicers."); *see also Kelsey v. Citigroup Inc.*, No. 2:12-CV-0754, 2013 WL 1249732 (D. Nev. Mar. 26, 2013) (holding that while authority has not yet developed regarding a private right of action under HARP, the reasoning of the vast majority of courts that HAMP does not provide such a right would apply equally to HARP). In any case, HAMP and HARP are not applicable to Claimants' Long Beach Property since it was not their primary residence. *See Edwards v. Aurora Loan Servs., LLC*, 791 F. Supp. 2d 144, 149 n.2 (D.D.C. 2011) (explaining that the loan must be on the borrower's principal residence). Nor do Claimants state how and when GMACM violated the terms of HAMP or HARP. Accordingly, Claimants HAMP and HARP claims fail.

---

[19] Additionally, Claimants do not offer any evidence that would substantiate their allegations that they received a bona fide offer for the Long Beach Property before Hurricane Sandy. Instead, Claimants base their allegations on the SmartWatch report sent to them on October 2, 2007, which estimated that the value of the Long Beach Property was $422,000. (*See* Response at 4 n.4.)

### III. CONCLUSION

For all of the foregoing reasons, the Trust's Objection is **SUSTAINED**. Claim No. 1466 is hereby **DISALLOWED** and **EXPUNGED**. Tobias, a practicing lawyer, has put the Trust to what was undoubtedly considerable expense, objecting to the Long Beach Claim and then replying to the Claimants' largely frivolous Response. Any further meritless pleadings or arguments by Tobias may result in the imposition of sanctions.

**IT IS SO ORDERED.**

Dated:  October 20, 2014
         New York, New York

                                    ___*Martin Glenn*_____
                                    MARTIN GLENN
                                    United States Bankruptcy Judge