1

1

2 UNITED STATES BANKRUPTCY COURT

3 SOUTHERN DISTRICT OF NEW YORK

4 Case No. 12-12020-mg

5 - - - - - - - - - - - - - - - - - - - -x

6 In the Matter of:

7

8 RESIDENTIAL CAPITAL, LLC, et al.,

9

10            Debtors.

11

12 - - - - - - - - - - - - - - - - - - - -x

13

14            United States Bankruptcy Court

15            One Bowling Green

16            New York, New York

17

18            October 22, 2014

19            10:26 AM

20

21 B E F O R E:

22 HON. MARTIN GLENN

23 U.S. BANKRUPTCY JUDGE

24

25

1

2    Doc# 7305 Adjourned hearing re: motion for omnibus objection to

3    claim(s)/Notice of ResCap Liquidating Trust's seventy-first

4    omnibus objection to claims (no-liability claims) filed by

5    Douglas Mannal on behalf of ResCap Liquidating Trust, as to

6    claim filed by OneWest Bank (Claim 4872).

7

8    Doc# 7474 Motion for objection to claim(s)/Objection of the

9    ResCap Borrower Claims Trust to proofs of claim filed by Karen

10   Michele Rozier (Claim Nos. 4738 and 5632)

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Penina Wolicki

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

```
 1   A P P E A R A N C E S :

 2   KRAMER LEVIN NAFTALIS & FRANKEL LLP

 3        Attorneys for the ResCap Liquidating Trust

 4        1177 Avenue of the Americas

 5        New York, NY 10036

 6

 7   BY:   JOSEPH A. SHIFER, ESQ.

 8        NATHANIEL ALLARD, ESQ.

 9

10

11   MORRISON & FOERSTER LLP

12        Attorneys for the Post-Effective Date Debtors, the ResCap

13         Liquidating Trust, and the ResCap Borrower Claims Trust

14        250 West 55th Street

15        New York, NY 10019

16

17   BY:   JORDAN A. WISHNEW, ESQ.

18

19

20   QUARLES & BRADY LLP

21        Attorneys for OneWest Bank

22        Two North Central Avenue

23        Phoenix, AZ 85004

24

25   BY:   JOHN M. O'NEAL, ESQ. (TELEPHONICALLY)
```

1

2  SEVERSON & WERSON, APC

3        Special California Litigation Counsel for Debtors

4        19100 Von Karman Avenue

5        Suite 700

6        Irvine, CA 92612

7

8  BY:   YARON SHAHAM, ESQ. (TELEPHONICALLY)

9

10

11  KAREN ROZIER, IN PROPRIA PERSONA (TELEPHONICALLY)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE COURT:  All right, please be seated.  We're here

3    in Residential Capital, number 12-12020.  Apologize for being

4    late this morning.

5              MR. SHIFER:  Good morning, Your Honor.  Joseph Shifer,

6    Kramer Levin Naftalis & Frankel, for the ResCap Liquidating

7    Trust.  Also from Kramer Levin is Nathaniel Allard.

8              THE COURT:  Actually, I would like to start with the

9    Rozier --

10             MR. SHIFER:  I was going to offer Your Honor the

11   option, so --

12             THE COURT:  I'd like to start with the Rozier matter.

13             MS. ROZIER:  Hello?

14             THE COURT:  Yes, Ms. Rozier on the phone?

15             MS. ROZIER:  Hello, Judge.  Thank you.

16             THE COURT:  All right.  We'll let the trust argue

17   first and then I'll give you an opportunity to argue, as well,

18   Ms. Rozier.

19             Ms. Rozier, you need to put your phone on mute until

20   it's your opportunity to speak, because I'm picking up a lot of

21   noise from your phone.  Okay?

22             All right.  Mr. Wishnew?

23             MR. WISHNEW:  Good morning, Your Honor.  Jordan

24   Wishnew, Morrison & Foerster, for the ResCap Borrower Claims

25   Trust.

1        We are addressing item number 2 on today's agenda,

2    page 5 of today's agenda:  the objection of the ResCap Borrower

3    Claims Trust to the proof of claim filed by Karen Michele

4    Rozier, claim numbers 4738 and 5632.  The objection was filed

5    by the Borrower Claims Trust on September 3rd at docket number

6    7474.  In support of the objection, the trust has submitted two

7    declarations:  one by Deanna Horst, chief claims officer of the

8    ResCap Liquidating Trust, which is attached as Exhibit 3.A to

9    the Borrower Trust objection; and the other declaration by

10   Yaron Shaham of Severson & Worsen, PC, attached as Exhibit 3.B

11   to the objection.  I believe Mr. Shaham is on the phone today,

12   listening -- I'm sorry -- participating live in today's

13   hearing.  Ms. Horst is in the courtroom.  Both declarants are

14   available should the Court have any questions.

15       Ms. Rozier filed an opposition to the objection, on

16   October 3rd, along with her own declaration in support of her

17   response; that was docketed at docket number 7620 and 7620-2

18   respectively.  Appended to Ms. Rozier's response, as Exhibit B,

19   was a motion to strike the declaration of Mr. Shaham, which is

20   docketed 7620-3 and is Exhibit C to her response; a motion to

21   strike the declaration of Mr. Horst, assigned docket number

22   7620-7.

23       Consistent with the case-management procedures order

24   in place in these Chapter 11 cases, at docket number 141, on

25   October 20th the Borrower Trust filed several documents in

1  further support of the objection and in response to

2  Ms. Rozier's filings.  The Borrower Trust filed its reply along

3  with a reply declaration from Ms. Horst; that was filed at

4  docket number 7655.  There was also a notice of a supplemental

5  Horst declaration to correct the record with respect to certain

6  factual statements previously made by the Borrower Trust; that

7  was filed at docket number 7653.  There's an omnibus objection

8  to Ms. Rozier's motions to strike; that was filed at docket

9  number 7654.  Late Monday evening Ms. Rozier filed a motion to

10 strike the Borrowers Trust reply as untimely.

11         Your Honor, before I get to the merits of the claim,

12 I'd like to first address the motions to strike.

13         THE COURT:  I'm going to take all this under

14 submission, so you don't need to address the motion to strike.

15 Just --

16         MR. WISHNEW:  Okay.

17         THE COURT:  -- proceed.

18         MR. WISHNEW:  Okay.  Very well, Your Honor.

19         Your Honor, Ms. Rozier filed two proofs of claim

20 against Debtors, GMAC Mortgage, and Executive Trustee Services.

21 The GMAC claim, claim number 4738, alleges liability for

22 wrongful foreclosure/IFR/Civil Case 30-2012-00601310 -- the

23 California action -- and damages in the amount of 666,000

24 dollars, plus punitive damages if permitted.  Appended to the

25 GMAC Mortgage claim is the first amended complaint Ms. Rozier

1   filed in the California action.  The ETS claim, claim number

2   5632, is substantially similar.

3          As set forth in both the Borrowers Trust objection and

4   a reply, Ms. Rozier fails to state any valid basis for

5   liability against any of the debtors, under applicable law.

6   The first amended complaint identifies nine causes of action

7   against the debtors, among other defendants, including:

8   wrongful foreclosure; temporary and permanent injunctive

9   relief; violation of California Civil Code Sections 2923.5,

10  2923.6 and 2924; slander of title; violation of California

11  Business and Professional (sic) Code 17200; negligence;

12  defamation of character; and quiet title.

13         Borrowers Trust reviewed the debtors' books and

14  records and servicing notes, along with Ms. Rozier's litigation

15  history, in connection with Ms. Rozier's loan documents, and

16  concluded that the debtors' prior conduct was both lawful and

17  consistent with their rights in connection with the note and

18  deed of trust at issue.  Through the objection, the Borrower

19  Trust addressed and rebutted each claim raised in each proof of

20  claim, and countered Ms. Rozier's prima facie case against the

21  debtors.

22         Ms. Rozier has failed to meet her burden of proof and,

23  to date, has neither demonstrated the merits of her claims by

24  preponderance of the evidence nor sufficiently substantiated

25  the damages she purportedly suffered as a result of the

1    wrongful acts of the debtors, by establishing any nexus with

2    the debtors' purported improper acts.  The Borrower Trust

3    highlighted numerous deficiencies with her claim, and

4    Ms. Rozier did not substantiate her claim through her response.

5    Contrary to her wishes noted in the response, Ms. Rozier should

6    not be given a chance to further amend her claim.

7            Before addressing the actual merit of each of the

8    components of the proof of claim, I do want to make a comment

9    about standing and Ms. Rozier's ability to prosecute her proof

10   of claim.  Ms. Rozier is presently a Chapter 7 debtor in

11   California.  Her Chapter 7 trustee, James J. Joseph, has

12   received copies of the objection and copies of all subsequent

13   pleadings.  To date, he has not responded.  Mr. Joseph is the

14   only party who has standing to prosecute Ms. Rozier's proof of

15   claim.

16           THE COURT:  I want to ask questions about standing.

17   So as I understand it, Ms. Rozier filed a Chapter 13 case on

18   August 22, 2011.

19           MR. WISHNEW:  Um-hum.

20           THE COURT:  And she converted it to Chapter 7 on

21   January 12th, 2012.  And in a Chapter 7 case, any pre-petition

22   claims are property of her Chapter 7 estate.  And I understand

23   the argument that the Chapter 7 trustee is the only one who

24   could prosecute those claims.  You haven't addressed this in

25   your briefs, but Section 554 of the Bankruptcy Code, which

RESIDENTIAL CAPITAL, LLC, et al.                    10

1  deals with abandonment of property of the estate -- and a

2  Chapter 7 pre-petition cause of action would be property of the

3  estate.

4         So my first question is, did Ms. Rozier schedule

5  claims against GMAC or ETS in -- because she amended her

6  schedules after the case was converted to Chapter 7.  Did she

7  schedule any claims against any of the debtors?

8         MR. WISHNEW:  In connection with the amendments that

9  Ms. Rozier made on December 16th, 2013, that is the first

10  instance we are aware of on when she scheduled her claims

11  against the debtors.

12         THE COURT:  So the standing argument would exist for

13  any causes of action that arose -- there's a little twist here;

14  she filed as a 13 but the later date when it was converted to a

15  7 -- any pre-petition causes of action -- I'll assume January

16  12th, 2012 -- were property of the estate.  The case remains

17  open, the trustee filed no motion to abandon, and those claims

18  remain property of her Chapter 7 estate.

19         But my review, Mr. Wishnew, suggests that there are

20  causes of action that Ms. Rozier asserts that are post-

21  petition, involve alleged conduct of one or more of the debtors

22  after January 12th, 2012; and in a Chapter 7 case, those don't

23  become property of the estate.  For example, Ms. Rozier

24  contends that on October 16th, 2012, in posting a notice on her

25  door, the debtors' employees were accompanied by somewhere

1   between five and seven police officers.  And she claims -- she

2   asserts a claim for intentional affliction of emotional

3   distress; defamation; fraud; Business and Profession Code

4   171200 (sic), relating in part to acts, events, or causes of

5   action that appear to have arisen after January 12, 2012.  Do

6   you agree that Ms. Rozier has standing to pursue causes of

7   action that arose after the Chapter 7 petition?

8            MR. WISHNEW:  Yes, Your Honor.

9            THE COURT:  Okay.  And you really haven't addressed

10  for the Court, in any of the briefing, which are pre-petition

11  causes of action, which are post-petition causes of action; you

12  simply argue no standing.  But you agree now that, as to the

13  standing argument, Ms. Rozier has standing to assert claims or

14  causes of action for acts or events -- alleged wrongful acts or

15  events occurring after the Chapter 7 -- after the case was

16  converted to Chapter 7?

17           MR. WISHNEW:  Yes, Your Honor.

18           THE COURT:  Okay.  So let's just deal with -- what are

19  the claims you believe where she doesn't have standing?  What

20  are the pre-Chapter 7 petition causes of action that you

21  believe are property of her estate that only the Chapter 7

22  trustee can assert?

23           MR. WISHNEW:  Your Honor, based on the predicate

24  events, it would be the wrongful-foreclosure claim, it would be

25  the California Civil Code violations --

1          THE COURT:  Well, the California Civil Code 2923.5 --

2   Ms. Rozier challenges notices from 2008 and for 2011, which are

3   pre-petition claims.  And so your argument that with respect

4   to -- I guess it's 2923.5, Civil Code 2923.6, 2924 -- these are

5   Civil Code sections -- slander of title, from acts or events in

6   2008, 2011; cancellation of voidable instruments, from 2005,

7   2006; all of those are pre-petition claims, is that correct?

8          MR. WISHNEW:  Correct, Your Honor.

9          THE COURT:  And so your argument is that all of those

10  are barred by Ms. Rozier's lack of standing --

11         MR. WISHNEW:  Correct.

12         THE COURT:  -- before you get to any other arguments?

13         MR. WISHNEW:  Before we get to the merits of those.

14  Exactly --

15         THE COURT:  Right.

16         MR. WISHNEW:  -- Your Honor.

17         THE COURT:  Okay.  Now, with respect to her claim for

18  intentional infliction of emotional distress arising from the

19  events of October 16, 2012, you agree she had standing to

20  assert that?

21         MR. WISHNEW:  Yes, Your Honor.

22         THE COURT:  Okay.  And with respect to wrongful

23  foreclosure, Ms. Rozier raises a wrongful-foreclosure claim

24  relating to a September 24th, 2012 foreclosure.  You agree that

25  she'd have standing to prosecute that claim as well?

RESIDENTIAL CAPITAL, LLC, et al.                    13

1          MR. WISHNEW:  Yes, Your Honor.

2          THE COURT:  And she asserts a negligence claim and, to

3    the extent it arises from or relates to the December 24th, 2012

4    foreclosure, she would have standing?  It doesn't mean that

5    it's a valid claim, but she'd have standing to pursue a

6    negligence claim for that, correct?

7          MR. WISHNEW:  Correct, Your Honor.

8          THE COURT:  And for defamation, again, it focuses on

9    the October 16 -- the incident with the police on October 16th,

10   2012.  She'd have standing to pursue that defamation claim?

11         MR. WISHNEW:  Yes, Your Honor.

12         THE COURT:  And with respect to her fraud claim, she

13   asserts claims based on alleged false instruments, the deed

14   upon sale executed on September 24th, 2012 and recorded on

15   September 26, 2012.  You agree she'd have standing to pursue

16   that claim?

17         MR. WISHNEW:  I'm sorry; one more time, Your Honor?

18         THE COURT:  She asserts a claim for fraud based on

19   alleged false instruments, and two of those are the deed upon

20   sale executed on September 24th, 2012 and recorded on September

21   26, 2012, and also the notice of trustee sale executed on

22   October 12, 2012 and recorded on October 16, 2012.  You agree

23   she'd have standing to pursue those claims?

24         MR. WISHNEW:  Yes, Your Honor.

25         THE COURT:  All right, and with respect to the

 1  California Business and Professions Code 17200, again relating

 2  to October 2012 events, she'd have standing to pursue that?

 3          MR. WISHNEW:  Correct, Your Honor.

 4          THE COURT:  But not as to -- she asserts a 17200 claim

 5  for events back in 2008, and your position is that only the

 6  trustee would have standing to pursue that?

 7          MR. WISHNEW:  Yes, Your Honor.

 8          THE COURT:  All right, are there any other standing

 9  arguments you want to address?

10          MR. WISHNEW:  Not right now, Your Honor.

11          THE COURT:  All right.  So let's talk about wrongful

12  foreclosure.

13          MR. WISHNEW:  Okay.  With regards to wrongful

14  foreclosure, Your Honor, Ms. Rozier's argument appears to hinge

15  on the belief that we, GMAC Mortgage as servicer, are enforcing

16  an invalid deed of trust and an invalid note because, based on

17  her belief, those documents were rescinded.  And so to the

18  extent that we were crediting payments towards the December

19  2005 note, that was inappropriate because -- again,

20  Ms. Rozier's belief, as I understand it from the pleadings is

21  that those notes -- or that note was rescinded.  That's

22  actually not what happened.  What happened here, Your Honor,

23  was there was a December 2005 note and deed of trust; she

24  sought to rescind it in February 2006.  The lender at that

25  time, WMC, gave her an option to modify those documents.

1          THE COURT:  And she entered into a modifica -- she

2    signed the modification agreement and signed a release?

3          MR. WISHNEW:  That's correct, Your Honor.  And I

4    believe that is found at the Horst declaration; I think it's

5    Exhibit 3.A-6.  And in that, as Your Honor notes, in connection

6    with the signing of the modified deed of trust, the modified

7    note, she released all rescission claims.  There was no -- the

8    only subsequent rescission activity or rescission notice from

9    Ms. Rozier was in 2009.

10          THE COURT:  So what's the date of the modification

11   agreement?

12          MR. WISHNEW:  May 22nd, 2006.  And per the terms of

13   that note and deed of trust, the note and deed of trust

14   remained in effect, but certain economic terms of those

15   documents were modified.  Ms. Rozier clearly acknowledged that

16   by signing and dating those agreements.

17          So GMAC Mortgage has always enforced the December 2005

18   note and deed of trust as modified in May 2006.  Beginning in

19   December 2007, Ms. Rozier fell behind in payments.  To date,

20   she still remains delinquent on every single mortgage payment

21   since December 2007.

22          THE COURT:  Let me just -- so when the modification

23   agreement was entered into, was there a new note and a new deed

24   of trust, or --

25          MR. WISHNEW:  No, Your Honor.

1          THE COURT:  -- you just modified the terms of the

2     original December 2005 note?  And your position is that by

3     virtue of the modification agreement and the release, the note

4     as modified is enforceable?

5          MR. WISHNEW:  That's correct, Your Honor.  In fact, to

6     supplement your point, let me note -- let me state on the

7     record, at document 7474-4, page 58 of 126, paragraph 6 of the

8     modification of note, it says, "Modifications provided herein

9     are retroactive to the date of the original transaction and any

10    adjustments in terms, which require the refund of proceeds to

11    Borrowers, will be applied to the principal balance."  That was

12    paragraph 5.  Paragraph 6:  "In all other respects, said 'note'

13    shall remain unaffected, unchanged, and unimpaired by the

14    reason of the execution of this Modification Agreement signed

15    by Ms. Rozier and dated May 22nd, 2006."  A general release

16    that follows on the next page, third paragraph, states, "It is

17    understood and agreed that this release extends to all claims

18    of every nature concerning the right" -- I'm sorry --

19    "concerning the Right of Rescission as outlined in the Truth in

20    Lending Act and its implementing Regulation Z.  By signing

21    below, I affirm that I do not wish to rescind this loan and I

22    agree to the terms and conditions as outlined in the loan

23    documents," again, signed by Ms. Rozier, identified as the

24    releasor, May 22nd, 2006.

25         THE COURT:  All right, so let's assume I accept your

1   argument, supported by the documents that you refer to, that by

2   virtue of the modification agreement and release, the December

3   2005 note and deed of trust, as modified, are enforceable.  So

4   just sketch for me the steps that were taken to foreclose,

5   because there was foreclosure, it was rescinded, foreclosure,

6   rescinded.

7           And that is -- and I guess what you also -- because

8   there was also -- California is a deed-of-trust, nonjudicial-

9   foreclosure state.  There's a trustee on the deed of trust, and

10  on several occasions there were substitutions of the trustee.

11  And one of the things that Ms. Rozier argues about is whether

12  the substitution of trustees, when that was done -- because it

13  was done several times -- whether those were properly perfected

14  by recording and whether -- so it raises a couple issues:

15  what's required in order to substitute a trustee, is it

16  execution of the assignment agreement; when is recording

17  required.  And so let me just stop there.

18          So go ahead.  That's what I want you to focus on,

19  because -- look, there was a substitu -- one of the

20  substitution of trustees was on April 4th, 2011.

21          MR. WISHNEW:  Um-hum.

22          THE COURT:  And in reviewing the documents that the

23  trust submitted, I don't find any indication that the April

24  4th, 2011 substitution was ever recorded.  And California Civil

25  Code 2934 appears to require that a substitution agreement be

RESIDENTIAL CAPITAL, LLC, et al.                    18

1   perfected by recording, prior to recording the notice of sale.

2   And I didn't find evidence of the recording of the substitution

3   agreement.  I've seen the substitution agreement.

4           MR. WISHNEW:  Right, the substitution agreement is

5   Exhibit 3.A-15 --

6           THE COURT:  And --

7           MR. WISHNEW:  -- to the Horst declaration.

8           THE COURT:  -- do I have any evidence in front of me

9   that shows that the April 4th, 2011 substitution agreement was

10  ever recorded?

11          MR. WISHNEW:  May I have one minute, Your Honor?

12          THE COURT:  Yes.

13          MR. WISHNEW:  Thank you.

14          No, Your Honor.  What you do have is an executed and

15  notarized copy of the substitution of trustee, but it's not a

16  specifically recorded copy of the --

17          THE COURT:  So can you represent whether -- I know --

18  we searched; we didn't find it.  And 2934 of the Civil Code

19  requires that it be recorded prior to recording the notice of

20  sale.  And do you agree that the April 4th, 2011 substitution

21  agreement was never recorded?

22          MR. WISHNEW:  As I stand here, Your Honor, I don't

23  have evidence -- I cannot present evidence to the Court, of

24  recording.  I'm not going to represent that it doesn't exist; I

25  just don't have it at this point --

1              THE COURT:  Right.

2              MR. WISHNEW:  -- in time.

3              THE COURT:  I mean, if it's recorded, it's got to be

4     in the books and records.  Somebody can go back and look at

5     the --

6              MR. WISHNEW:  Agreed, Your Honor.

7              THE COURT:  -- books and records --

8              MR. WISHNEW:  Agreed.

9              THE COURT:  -- and seemingly find it.  We've had these

10    issues arise in so many states, and so many states' laws vary.

11    And this is frankly the first time I've had to deal with

12    California Civil Code Section 2934a.  So what are the

13    consequences, Mr. Wishnew, if the substitution agreement wasn't

14    recorded prior to recording the notice of sale?  The notice of

15    sale was recorded, right?

16             MR. WISHNEW:  The notice of sale --

17             THE COURT:  Yes, the notice of sale.

18             MR. WISHNEW:  Yeah, there was a -- just let me -- yes,

19    October 12, 2012, Executive Trustee Services re-executed a

20    notice of trustee sale, which was recorded on October 16th --

21             THE COURT:  Right.

22             MR. WISHNEW:  -- 2012.

23             THE COURT:  Okay.  And so my question is -- well, let

24    me ask you, do you agree that Civil Code Section 2934a requires

25    that the substitution agreement, in order to be perfected, must

RESIDENTIAL CAPITAL, LLC, et al.                    20

1  be recorded prior to recording the notice of sale?

2          MR. WISHNEW:  Your Honor, I would clarify one point.

3          THE COURT:  Okay, go ahead.

4          MR. WISHNEW:  My understanding of 2934 is that an

5  assignment of mortgage and any assignment of a beneficial

6  interest under a deed of trust may be recorded, not must be

7  recorded.  So I don't think that there's any sort of adverse

8  consequence that in this instance we don't have a recorded

9  copy.

10     (Pause)

11          MS. ROZIER:  Hello?  Your Honor?

12          THE COURT:  I'll give you a chance, Ms. Rozier.  I'm

13  looking through my notes.

14          MS. ROZIER:  Okay.

15          THE COURT:  After Mr. Wishnew's finished arguing, I'll

16  give you a chance to argue.

17          All right, let's assume -- let me assume, for purposes

18  of discussion, that the substitution agreement was not

19  recorded.  And I want to look back at 2934 specifically on

20  whether -- I mean, what's unclear to me is what the

21  consequences are if it must be recorded and it wasn't recorded.

22          So you also argue that California strictly enforces

23  the tender rule.

24          MR. WISHNEW:  Correct, Your Honor.

25          THE COURT:  So why don't you address that.

RESIDENTIAL CAPITAL, LLC, et al.                    21

1          MR. WISHNEW:  Your Honor, the tender rule in

2    California is, in order for the borrower to bring a wrongful-

3    foreclosure claim, the borrower needs to provide sufficient

4    evidence of its ability to tender -- essentially, tender what

5    is owing under the loan, to the creditor.  In this instance,

6    Ms. Rozier asserts that her posting of a bond in connection

7    with an injunctive order --

8          THE COURT:  Let's assume I reject that argument, that

9    posting the 5,000-dollar bond was not sufficient.

10         MR. WISHNEW:  Sure.

11         THE COURT:  What does she have to tender?  The

12   original principal amount?  How much does she have to tender to

13   satisfy the California tender rule?

14         MR. WISHNEW:  In order to -- she would have to show

15   the ability to tender the amount of the outstanding debt on the

16   mortgage loan.

17         THE COURT:  Is it the principal amount or does she

18   have to -- what about accrued and unpaid interest?

19         MR. WISHNEW:  It would basically be -- it would be

20   tendering all amounts due under her loan.

21         THE COURT:  All right, and what, if any, evidence do I

22   have that relates to whether Ms. Rozier established that she

23   was ready, willing and able and that she in fact had tendered

24   the amount due and owing on the December 2005 note?

25         MR. WISHNEW:  To my knowledge, the only evidence that

 1   Ms. Rozier has offered concerning her compliance with the
 2   tender rule would be posting of the bond in connection with the
 3   injunctive order.
 4             THE COURT:  Okay.
 5       (Pause)
 6             THE COURT:  So, address the statutory notice
 7   requirement in California Civil Code 2924, if you will.
 8             MR. WISHNEW:  So, Your Honor, 2924 talks about what is
 9   noticed in order to foreclose.  And in that regards, GMAC
10   Mortgage had reached out to Ms. Rozier on numerous occasions
11   prior to the initial notice of default, concerning her
12   delinquency and the need to cure it.  In addition, with regards
13   to GMAC or ETS's authority to foreclose, ETS was named as
14   substitute trustee in place of Westwood Associates on March
15   3rd, 2008.  On June 4, 2008, there was a recorded notice of
16   trustee sale.  And then in the next -- over the next year or
17   so, there were multiple loss-mitigation efforts undertaken
18   between the parties to try and cure the past-due amounts.  So
19   in that regards, ETS and GMAC Mortgage did everything they were
20   supposed to do under 2924 in order to properly foreclose on the
21   property.
22             THE COURT:  So what is the -- what would you point to
23   as establishing that the debtor was acting as an authorized
24   agent of the trustee when it recorded the notice of default?
25   What I have in mind is the Haffman (sic) v. Wells Fargo Bank

1  case from the Southern District of California, from March of

2  2012, where -- I read the case as saying the defendant -- if

3  the defendant was acting as an authorized agent of the trustee

4  when it recorded the notice of default, even though the

5  substitution agreement was not executed by the trustee until

6  six days after the notice of default was recorded, that's still

7  okay.

8         MR. WISHNEW:  So with regards to the authority, I

9  would point to -- I just want to step away from the mic for one

10  minute.

11        THE COURT:  Sure.  Go ahead.

12        MR. WISHNEW:  I would point to Exhibit 3-A.8 (sic) to

13  the Horst declaration, docket number 7474-4, page 64 of 126,

14  which provides for Executive Trustee Services, LLC as the

15  substitute trustee under the deed of trust; and that is dated

16  March 3rd, 2008.

17        THE COURT:  Ms. Rozier also argues that the notice of

18  default and election of sale -- the notice was not updated to

19  reflect the assignment of WMC's interest to Bank of America.

20  Was it updated?

21        MR. WISHNEW:  So the -- you're referring to the

22  March --

23        THE COURT:  Yeah.

24        MR. WISHNEW:  -- the March 3rd, 2008 --

25        THE COURT:  Ms. Rozier --

1          MR. WISHNEW:  -- notice of default?

2          THE COURT:  -- argues that ETS failed to identify --

3    well, I guess it did identify Bank of America.  So the notice

4    included MERS as beneficiary of WMC, but WMC had already

5    assigned its interest.  And when the notice was recorded in

6    April 2011, Bank of America was the beneficiary.  And the

7    notice states that WMC was the beneficiary.  So what are the

8    consequences of that?  Do you agree that that's what the

9    records show?

10         MR. WISHNEW:  Your Honor's referring to Exhibit

11   3.A-16 --

12         THE COURT:  Yeah.

13         MR. WISHNEW:  -- I believe?

14         THE COURT:  Doesn't it show -- it lists WMC as the

15   beneficiary, and it had already been assigned to Bank of

16   America.  So it appears to have misidentified the beneficiary.

17   What, if any, consequences arise from that?  Ms. Rozier argues

18   that the notice is invalid because of that.

19         MR. WISHNEW:  I'm not sure, Your Honor, that any

20   consequences come from it.

21         THE COURT:  Can --

22         MR. WISHNEW:  What we're talking about is whether the

23   entity who had the -- who was enforcing the notice of default,

24   had the ability to, and that was Executive Trustee Services.

25   So to the extent it was subseq -- I mean, given the fact that

RESIDENTIAL CAPITAL, LLC, et al.                    25

1  the loan changes hands and the assignment of the deed of trust

2  doesn't necessarily require recording, I don't know that

3  there's really any --

4           THE COURT:  Say that again --

5           MR. WISHNEW:  -- consequences.

6           THE COURT:  -- that last part again.  What doesn't

7  require recording?

8           MR. WISHNEW:  As we discussed earlier, it's under --

9  I'm sorry; that was 2934.  Let me strike that, that last point.

10          THE COURT:  I mean, the problem I'm facing,

11 Mr. Wishnew, is, in this highly technical area of what's

12 required in California in order to conduct a nonjudicial-

13 foreclosure sale -- it is highly technical, and it's unclear to

14 me that all the Is were dotted and Ts crossed.  It's also

15 unclear to me, however, what are the consequences -- assuming

16 that's the case, what are the consequences from it.  So, case

17 Pantoja v. Countrywide, 640 F.Supp.2d 1177 (N.D. Cal. 2009),

18 would seem to say that a notice of default is not deficient

19 where the notice misidentified the beneficiary, under

20 California Civil Code 2924(b)(1), unless the plaintiff

21 establishes prejudice.  And I guess there's a question in my

22 mind whether Ms. Rozier has established any prejudice -- she'd

23 been in default for many years -- what, if any prejudice.

24          I'm faced with two sets of issues, broadly speaking,

25 with respect to the foreclosure:  one, in this highly technical

1   area, at least in the documents that have been provided to the

2   Court, there seem to be some seeming gaps:  recording of the

3   substitution of trustee before the notice of sale is filed;

4   arguably misidentifying the beneficiary.  And the statutes

5   require one thing but case law seems to say messing up on these

6   technical details doesn't necessarily mean that the plaintiff

7   prevails.  And that's what I'm struggling with, Mr. Wishnew.

8           MR. WISHNEW:  Understood, Your Honor.

9           THE COURT:  You have anything else you want to say on

10  the wrongful-foreclosure subject?

11          MR. WISHNEW:  Your Honor, I think at this point,

12  between the arguments made in the objection, the arguments made

13  in the reply, and the substance and exhibits attached to

14  Ms. Horst's declaration as well as Mr. Shaham's declaration,

15  all our arguments are pretty well set forth.

16          THE COURT:  All right.  Let's move on.  She has a

17  quiet-title claim; you have a couple of answers on that one:

18  you don't service the loan, don't have any interest in the

19  loan, a claim for quiet title doesn't lie against any of the

20  debtors.  There's an issue whether -- arising from the Rozier

21  declaration, paragraphs 28 and 29, whether she's any longer

22  seeking to quiet title.  I don't want to spend any more time

23  than that.

24          MR. WISHNEW:  Okay.

25          THE COURT:  But I do want to talk about her claim for

1   intentional infliction of emotional distress.

2           MR. WISHNEW:  Your Honor, with regards to -- I'm

3   sorry; did Your Honor --

4           THE COURT:  No, go ahead.  This is about the October

5   16th --

6           MR. WISHNEW:  Sure.

7           THE COURT:  -- episode with the police.

8           MR. WISHNEW:  I mean, with regards to the intentional

9   infliction of emotional distress, in order to maintain that

10  cause of action, there has to be an underlying showing of fraud

11  and malice.  And frankly, what ETS or GMAC Mortgage was doing

12  was simply enforcing a pre-existing valid note and deed of

13  trust.  So to the extent that there is purported fraud in

14  enforcing those note and deed of trust, I would suggest that

15  that's not the case.  In fact, they're pursuing and doing

16  exactly what they're supposed to be doing.

17          With regards to bringing --

18          THE COURT:  Why were the police there?

19          MR. WISHNEW:  The police were there given prior

20  difficulties in effectuating service.  And if Your Honor --

21          THE COURT:  Yeah, I want to hear -- I'm looking to be

22  specific about this.  The trust has alleged the debtors

23  requested a police escort because of threats made by

24  Ms. Rozier, but you haven't cited any evidence.  There's no

25  declaration or anything.  You make the assertion in your

1   papers, but do I have any evidence regarding the reasons that

2   the police accompanied the process server?

3          MR. WISHNEW:  I just want to turn back to Ms. Horst's

4   supplemental declaration.

5          THE COURT:  Sure.  Go ahead.

6          MR. WISHNEW:  I think we address it there.

7          THE COURT:  Yeah.

8          MR. WISHNEW:  One more minute, Your Honor.

9          THE COURT:  While you're looking -- I mean, this goes

10  to both the claim for intentional infliction of emotional

11  distress, and also Ms. Rozier raises it again with respect to

12  the California Business and Professions Code 17200.

13         MR. WISHNEW:  Yes, Your Honor.

14         THE COURT:  Did you find that, then?

15         MR. WISHNEW:  I did.  Exhibit 3 to the reply

16  declaration of the Borrower Trust, docket number 7655-3, is a

17  docket in terms of the actions in Rozier v. U.S. Bank National

18  Association, in case number G050520.

19         Okay.  Your Honor, let me correct that.  Rather, the

20  certificate of posting is attached to docket number 7654-1;

21  it's Exhibit 1 to our omnibus objection to the motions to

22  strike.  And attached there is a certificate of posting, which

23  is that on October 16, 2012 --

24         THE COURT:  And it states, "Five Buena Park police

25  officers escorted me to the property.  One officer walked me to

1    the front door to post the notice of trustee sale."

2              MR. WISHNEW:  "Of trustee sale".  Correct, Your Honor.

3    And then what follows on pages 3 of 4, and 4 of 4, is pictures

4    of the notice of sale, pictures of --

5              THE COURT:  Who took the photos?  Who took the photos?

6              MR. WISHNEW:  I can only assume, Your Honor -- I

7    assuming that it's Hilda Delgado, who is the agent certifying

8    "the foregoing is true and correct".

9              THE COURT:  Okay.  So there seems to be disagreement

10   as to whether the police drew their guns.

11             MR. WISHNEW:  Standing here, Your Honor, I can't say

12   whether or not they in fact drew their guns, at this point in

13   time.

14             THE COURT:  And if they did, I don't know why it would

15   be claimed against the debtors.  It may be --

16             MR. WISHNEW:  I would agree with Your Honor.

17             THE COURT:  -- claimed against the police, but --

18             All right, is there anything else you want to add?

19             MR. WISHNEW:  One other point, Your Honor.  Going back

20   to the recording of the April 4th, 2011 substitution of

21   trustee --

22             THE COURT:  Yes.

23             MR. WISHNEW:  -- while it's not before the Court, as

24   attached as an exhibit to the Borrower Trust papers, we were

25   able to locate publicly on the Internet a filed copy.

1              THE COURT:  So what I would like is -- because I'm

2     taking this matter under submission --

3              MR. WISHNEW:  Of course, Your Honor.

4              THE COURT:  -- I want you to -- you found evidence of

5     a recording of it?

6              MR. WISHNEW:  I did, Your Honor, yes.

7              THE COURT:  And what date?

8              MR. WISHNEW:  April 11th, 2011.

9              THE COURT:  Okay.  So I would like you to file a

10    supplemental declaration attaching the recorded copy.  I want

11    the evidence that it was recorded --

12             MR. WISHNEW:  Understood, Your Honor.

13             THE COURT:  Okay?  How much time do you want to do

14    that?

15             MR. WISHNEW:  Today's Wednesday.  I can do it by

16    Friday, Your Honor.

17             THE COURT:  Okay.  And I'm going to let Ms. Rozier

18    argue now.  If you post it by -- if you file it by Friday, make

19    sure you serve Ms. Rozier.  I'll give her a chance to respond

20    to it, as well, but --

21             MR. WISHNEW:  Absolutely, Your Honor.

22             THE COURT:  Okay, anything else you want to raise now?

23             MR. WISHNEW:  That's it, Your Honor.

24             THE COURT:  Okay, Ms. Rozier, do you want to argue,

25    please?

1          MS. ROZIER:  Yes, sir.  And thank you very much for

2     giving me this opportunity.

3          Now, the first thing I want to, you know, go on the

4     record, I'd like to state that they got their reply to me very

5     late, and I think it's prejudicial, because I didn't get a

6     chance to understand everything and prepare for it.

7          THE COURT:  Ms. Rozier, I'm going to give you --

8     because I'm taking it under submission, and I've asked the

9     Trust to file this copy of the recorded substitution of

10    trustee, I will give you a week to do any -- and you did file

11    something, but I'll give you a week to file any further reply.

12    So I'm going to give you --

13         MS. ROZIER:  Thank you.

14         THE COURT:  -- I'm going to give you a chance to --

15    but I'm going to put a ten-pages limit on what you file.  All

16    right?

17         MS. ROZIER:  Okay, excellent.

18         THE COURT:  Okay, go ahead, Ms. Rozier.

19         MS. ROZIER:  The main concern I had with it is where

20    they talk about me not having standing and the issue with the

21    trustee.  Now, this is something that we've gone through here

22    in California in bankruptcy court and through the bankruptcy

23    appeal, when U.S. Bank argued that I didn't have standing to go

24    through the appeal.

25         Now, I was allowed to go forward and argue the appeal

1    both with the BAP and as well as the Calif -- the bankruptcy

2    appeals court, on the grounds that the -- first of all, I

3    applied for a Chapter 13.  And the only reason it was converted

4    to a Chapter 7 was because the debtors, ResCap, and U.S. Bank,

5    claimed that my 4,200-square-foot house was only 2,000 square

6    feet, and they claimed that my house was worth less than half

7    of what it was.  And the trustee relied on that and gave them

8    relief.

9            And now that I've introduced the evidence that U.S.

10   Bank always knew that my house was twice as big and worth twice

11   as much, the appeals court is looking at that.  So --

12           THE COURT:  But the issue --

13           MS. ROZIER:  -- I think --

14           THE COURT:  -- Ms. Rozier, Ms. Rozier?

15           MS. ROZIER:  Yes.

16           THE COURT:  You agree your Chapter 7 case is still

17   open; it hasn't been closed?

18           MS. ROZIER:  It is still open, and I'm working close

19   with the trustee --

20           THE COURT:  That's fine.

21           MS. ROZIER:  -- when I say that, because I think if

22   I'd have a chance to go over this with the trustee, explain to

23   him what was going on, then the trustee would be more inclined

24   to agree with me.  Their whole representation that the trustee

25   has abandoned it, that he hasn't applied --

1          THE COURT:  No, he hasn't -- Ms. --

2          MS. ROZIER:  -- I don't think we gave him enough time.

3          THE COURT:  Ms. Rozier, he hasn't abandoned it, that's

4  the whole point.  The Bankruptcy Code, Section 554 is very

5  clear about how abandonment occurs.  While the case is open,

6  the trustee would have to file a motion on notice seeking to

7  abandon the property.

8          MS. ROZIER:  Except --

9          THE COURT:  We've looked -- stop.

10          MS. ROZIER:  But he's had a lot --

11          THE COURT:  Stop.  Stop.  We've looked at the docket

12  from your bankruptcy case in California, and no such motion was

13  filed, no order was entered by the court abandoning any

14  property.  The case remains open.  Your amended schedules, when

15  you converted from Chapter 13 to Chapter 7, did list a claim

16  relating -- against the debtors.

17          So the issue from the Court's standpoint is -- and

18  here -- whether the BAP let you argue -- found you had standing

19  to argue an appeal or not really has nothing to do with what

20  the issue is before me.  The question is whether --

21          MS. ROZIER:  Okay.

22          THE COURT:  -- your claims or causes of action against

23  the debtors that arose before you converted your case to a

24  Chapter 7 case in California are property of the estate, and

25  therefore only the trustee can pursue those.  Go ahead.

1      MS. ROZIER:  Well, which is where -- I mean, my

2  concern about being prejudiced by this late reply is that the

3  trustee has allowed me to pursue the claims that happened pre-

4  petition, because the trustees in Orange County just have so

5  much work to do that they -- that he has allowed me to pursue

6  this action.  And I've also been including them in all of it,

7  and he has not objected to me doing this.  So --

8      THE COURT:  All right.  Let's --

9      MS. ROZIER:  -- that argument is --

10     THE COURT:  -- let's move on from the standing.  I

11 understand the standing argument.

12     MS. ROZIER:  Okay.

13     THE COURT:  If you would, let's go on and address your

14 wrongful-foreclosure claim.

15     MS. ROZIER:  Okay.  Now, a couple of things that they

16 brought out.  The one thing where they say the note is modified

17 is enforceable.  And this goes back to the original

18 modification.  I've showed the Court that there was a May 22nd

19 modification, but that we went back and signed a new note on

20 June 1st.

21     There were several modifications between February 28th

22 and the May note.  There was one -- there were two in March,

23 and it was not as simple of I asked WMC to rescind my note.  It

24 was a matter of WMC, the original lender, contacted me and said

25 that there were problems with my note, and I ran through all of

1   the math and went through it with them, and I told them to

2   rescind my note.  I did not want to -- I wanted to go back to

3   my original position.  And they wouldn't put me in position.

4   And we ended up modifying a note, and then that was wrong.  And

5   then we went through several series of modifying notes before I

6   finally hired a lawyer.

7            And the lawyer, you know, they went through all of the

8   paperwork.  And then in May we signed a modification of note,

9   and then they came back like a week later and said, hey, the

10  modification of note was still not right, because the deed of

11  trust was not changed to -- it still called out the old note

12  and the language wasn't right.

13           So June 1st, we went through and we signed all new

14  loan papers.  And I've given that evidence to the Court.  And I

15  was under the impression that my new note was June 1st.

16           So in December 2008 -- and that's another issue is

17  about the default.  They keep claiming that I went into default

18  in December 2007, and the record shows -- and I've given you

19  their own records that show that that wasn't the case.

20           THE COURT:  Ms. Rozier, is it correct you haven't paid

21  any mortgage payments for six years?

22           MS. ROZIER:  Not since we started the litigation, no.

23  I've offered several times to pay if they would agree to

24  certain things.  Even in the forbearance agreement, I agreed to

25  bring it up completely up to date, and I signed it, predicated

1   on GMAC admitting that they were at fault.  And they originally

2   signed the forbearance agreement saying that they were at

3   fault, and then they came back and said, no, they would only

4   accept the money if I agreed that I was at fault.  So that's

5   that March -- April 28th -- April 30th, 2008 forbearance

6   agreement.

7           And I had the money there to bring everything up then.

8   And I even agreed, provided that GMAC admitted that it was at

9   fault.  Now, you know, Ms. Horst claims that we had a

10  forbearance agreement, but the only one that is shown is the

11  one where I wrote on there, hey, you guys admit default, you

12  guys admit that you guys are bad people, you guys admit that I

13  did everything right, and I'll send you the money; and they

14  wrote me back and said no, you have to sign one with no

15  comments on it, and that's the only way we will accept your

16  money.

17          So that's when the litigation began.  This was not a

18  matter of me not trying to pay a mortgage.  It was a matter of

19  me trying to pay a mortgage and them putting me in default when

20  I was still paying in March of 2008, them sending me back my

21  money, and then trying to get me to admit that I was wrong,

22  when I was not.

23          And again, the whole thing with the old note, the

24  record is clear that I did sign a note on June 1st, 2006.  And

25  that note closed on June 6th, 2006.  And so I was well within

1  my rights to keep telling them, hey guys, you have the wrong

2  note.  At one time they had the wrong house.  I mean, they have

3  a note dated December 23rd, 2005; they're saying my 4,000-

4  square-foot house is 2,000 square feet, and they were signing

5  my name in correctly -- spelled my name incorrectly.

6       So even a reasonable person would say, hey, there's a

7  problem here, and that's what I did, and they continued to

8  instead of trying to solve the problem, continue to tell me

9  that I was wrong, that I was in default.

10      Now, the -- again, the claim when I first put it in,

11 they were for pre-petition acts as well -- and the post-

12 petition acts came after they got the relief from stay.  Now,

13 when Ms. Horst, the original declaration, they had the March

14 2013 substitution of trustee -- assignment of deed of trust.

15 But you can see it now, but that U.S. Bank came into the

16 picture in January 2012, and then BofA was allowed to foreclose

17 in September 2013 -- I mean, 2012, nine months later.

18      And again, rather than -- and this was in violation of

19 a written agreement that I had with U.S. Bank and ResCap's

20 lawyer.  So instead of them saying hey, we made a mistake,

21 let's get this right, they called me deadbeat things, sent

22 people to my house at midnight to try to kick me out of my

23 house.  They did the construction -- eviction, and at no point

24 did I threaten them with anything, at no point did I chase

25 anyone across my yard with any gun or shotgun, as they alleged.

1   But instead, on October 16th --

2              THE COURT:  I don't have any -- I don't see any

3   allegations of anybody chasing you across your yard with a

4   shotgun.

5              MS. ROZIER:  That's what led up to the October 16th

6   police coming to my door.  Now, on September 24th, they --

7   someone knocked on my door and said hey, we just -- we bought

8   your house, and you have -- I think it was a Tuesday.  So it

9   was September 25th.  Somebody knocked on my door and says hey,

10  we just bought your house, you have three days to get out.  And

11  that was before they even perfected -- they recorded the sale.

12             The next day, people came to my house -- and I did not

13  chase anyone.  I just told them hey, I don't know who you are

14  or what you're talking about.  But I immediately got on the

15  phone with U.S. Bank to see what was going on, because we had

16  an agreement in place, and it was from the appeal.  I was in

17  the process of getting a stay.

18             Now, they told the Buena Park police that I chased

19  them with a shotgun, and that's why the police accompanied them

20  on the 16th.  So the only reason the police accompanied them on

21  the 16th is because they called the Buena Park police up and

22  said that when they came on the 25th, that I posted them with a

23  shotgun, and that simply is not true.

24             Now, the tender rule.  When we went to the foreclosure

25  action -- and mind you, the foreclosure has already been

1  rescinded in California.  Now, when I went to sue them simply

2  for the wrongful foreclosure and the acts which were done on my

3  name, U.S. Bank and ResCap both asked the judge for a 280,000-

4  dollar bond, and they said tender was required.  And we

5  definitely argued whether or not tender was required.  And one

6  of the issues that we brought up was the whole statute of

7  limitations argument as well as the fact that U.S. Bank had not

8  proven that I owed them anything; and that has been argued

9  three different times in front of three different judges in

10  California.  And each time, U.S. Bank has asked for 280,000

11  dollars or more to tender it, claiming that I owe them money,

12  and each time the judges have denied their request.

13        So I don't understand why they keep saying that in

14  California, in order for me to prosecute something, I would

15  have to tender an amount, when they haven't proved that the

16  amount is due.

17        Now, the substitution of trustee.  There was one that

18  was recorded in March of 2006, and that was where Executive

19  Trustee was substituted in with MERS.  So at that point,

20  Westwood Associates has not existed in California for years.

21  It's not a legal entity and it is -- did not exist as a legal

22  entity when the trust was created.  So how does Westwood

23  Associates all of a sudden, in 2011, begin to exist to

24  substitute Bank of America in as trustee?  Especially since in

25  2008, Executive Trustee Services was substituted in through

RESIDENTIAL CAPITAL, LLC, et al.                    40

1   MERS.  So there's all of this paperwork washing -- going back

2   and forth and it happens every time I challenge the legality of

3   what they've already put forward.

4          Now, again, when they talk about the delinquency, the

5   need to cure it, the thing about the unclean hands -- the

6   record is clear that I have definitely tried to work with -- I

7   tried to work with them in the beginning, in December when it

8   was not thirty days late, in 2007, when I called them to make a

9   payment, and then to be told by their employee, Latina Dawn

10  (ph.) that since I'm not thirty days late they won't even talk

11  to me or take my payment over the phone, and you know, just the

12  headache that I had to go through from December '07 through --

13  2007 until I eventually sued them.

14         And I've even shown the evidence that I made the

15  payment in March, trying to work -- I mean, February -- trying

16  to work with them.  They put me in default, sent the payment

17  back and then, you know, started with the nonsense paperwork.

18         The other part of that is about the false

19  declarations.  Now, again, I asked to strike the declarations,

20  and I've given more than enough evidence that the declarations

21  that they put in contain a lot of false and misleading

22  information:  information about the forbearance agreement,

23  about the trustees, about what happened when.

24         In the latest declaration, they claim that, hey, it's

25  a moot point in California, when it's not a moot point.

RESIDENTIAL CAPITAL, LLC, et al.                    41

1    That -- the appeal is still open, and they're doing these

2    back -- behind the doors, telling one thing to California, one

3    thing to New York, and one thing to the appeals court, claiming

4    it's closed when it's not.  It's still in place.

5           And I think -- and again, the claims against the

6    debtors that -- the pleadings -- the claims against the debtor

7    is because of the debtors and their agents' bad actions that I

8    made those claims.

9           And I think that's the -- I mentioned the invalid note

10   and deed of trust, because of the June 1st new note, which is

11   the one that was always willing to work with.  And even in U.S.

12   Bank's records, it shows that I signed that new note June 1st.

13   And if they had just, you know, admitted that as opposed to all

14   of this -- you know the note was securitized and all that

15   nonsense, just I signed the note June 1st.  I was willing to

16   pay the note, and they wouldn't allow me, and as a result, you

17   know, I've lost everything.  I've lost -- you know, yes, I

18   still have my house, but I have no life; I have no profession.

19   I spend all of my time in court in fighting this, and I've lost

20   my faith in the system from having to listen to them and see

21   the false declarations.  And it has been very emotional.

22          THE COURT:  All right.  Anything else you want to add,

23   Ms. Rozier?

24          MS. ROZIER:  That's all I have.

25          THE COURT:  Mr. Wishnew, address the issue of whether

RESIDENTIAL CAPITAL, LLC, et al.                    42

1   there was a June 1st, 2006 note that replaced the December 2005

2   note.

3           MR. WISHNEW:  I am not aware of any specific note,

4   Your Honor.  I've not seen any note.  I've not seen any note

5   attached to any declaration or documents that Ms. Rozier has

6   provided.

7           THE COURT:  So the modification agreement is dated May

8   22.

9           MR. WISHNEW:  Correct, Your Honor.

10          THE COURT:  Ms. Rozier, do I have a copy of a June

11  2006 note that you say was substituted?

12          MS. ROZIER:  In one of mine, I sent the copy of all of

13  the -- when we went through the discovery phase, U.S. Bank sent

14  me a file and it had all of the loan closing documents from the

15  June 1st loan, but it didn't actually have the loan.  So it had

16  all of the -- itemization of amount financed in the three-day

17  closing, which is all dated June 1st, 2006.

18          THE COURT:  And --

19          MR. WISHNEW:  And you do have that.  And I can send

20  you that with the supplemental, if you don't.

21          THE COURT:  Did you file that with your papers?

22          All right, one of my law clerks has handed me a

23  document.  It is part of -- it's page 93 of 269.  It's a Truth

24  in -- it's a TILA disclosure statement which Ms. Rozier signed

25  on June 1st, 2006.

1          Mr. Wishnew, what is that?

2          MR. WISHNEW:  So this relates back, Your Honor, to the

3    May 22nd note.  As Your Honor will see, there was a -- the

4    number -- under the heading "Payment Schedule", the initial

5    payment is 33.12, which I believe reflects the same monthly

6    payment reflected in the new note.

7          THE COURT:  When you say -- what new note?

8          MR. WISHNEW:  The note -- I'm sorry, the modified

9    note.  Excuse me -- let me strike the term "new note".

10   Modified note from May 22nd.

11         So this all relates back to the May 22nd modification.

12         THE COURT:  The modification agreement?

13         MR. WISHNEW:  Yes, Your Honor.

14         THE COURT:  So this is what -- a new TILA disclosure

15   statement --

16         MR. WISHNEW:  Yes, Your Honor.

17         THE COURT:  -- that relates to the modification -- the

18   modified note -- or the modification of the note on May 22nd,

19   2006.

20         MR. WISHNEW:  Your Honor -- correct, Your Honor.  I'd

21   also note for the record, it has the same loan number as the

22   modification as well.

23         THE COURT:  Okay.  And there was -- that same day of

24   June 1st, 2006, there was a separate notice of right to cancel?

25         MR. WISHNEW:  That's correct, Your Honor.

1          THE COURT:  Okay.  All right.  What I'm going to do

2     is, Mr. Wishnew, I'll give you until Friday to file and serve

3     Ms. Rozier with the recorded copy of the notice of assignment

4     of trustee.

5          MR. WISHNEW:  Yep.

6          THE COURT:  And Ms. Rozier, I'll give you -- let's

7     see -- I'm going to give you until 5 o'clock on October 31st --

8     a week from Friday -- to file a supplemental pleading not to

9     exceed ten pages in length.

10         I did receive and review the surreply that you filed,

11    but I know you said you didn't feel you had sufficient time to

12    respond, and I want to make sure you do.  So I'll give you

13    until 5 o'clock on Friday, October 31st to file any

14    supplemental filing.  And if you want, you can address the

15    issue about the additional recorded notice of assignment that

16    the Trust will file and serve on you by Friday.

17         MS. ROZIER:  Thank you.

18         THE COURT:  And once I receive your additional

19    supplemental papers, the matter will be taken under submission,

20    and I won't hear any further argument.  Okay?  Thank you very

21    much for participating by phone.

22         MS. ROZIER:  Thank you very much.  Thank you everyone.

23         THE COURT:  Okay.

24         MR. WISHNEW:  Your Honor, I'm sorry.

25         THE COURT:  All right.

1            MR. WISHNEW:  One last question.

2            THE COURT:  Hold on -- hold on.  Go ahead --

3            MS. ROZIER:  Yes.

4            THE COURT:  -- Mr. Wishnew.

5            MR. WISHNEW:  Does Your Honor have any questions about

6    our argument about improper amendment of Ms. Rozier's proof of

7    claim?

8            THE COURT:  I don't.

9            MR. WISHNEW:  Okay.

10            THE COURT:  Well, look, I mean, part of it, you're

11    complaining that she's increased the amount of the claim.  It

12    seems to me I've got to decide whether she has a claim.  If she

13    does, it's not going to fix the amount.  There may have to be

14    additional proceedings.  I mean, she's seeking punitive damages

15    with respect to the intentional infliction of emotional

16    distress claim.

17            In one of the ResCap -- I think in the Reed -- in my

18    opinion in Reed, Mr. Reed was also seeking punitive damages,

19    and one of the things I pointed out in the opinion, because the

20    amount available in the Borrowers Trust is fixed, any award of

21    punitive damages would hurt the creditors.  It would not punish

22    ResCap.  And I cited some cases in support of that, so --

23            MR. WISHNEW:  Yeah.

24            THE COURT:  -- I have the argument.  I mean --

25            MR. WISHNEW:  Okay.

1        THE COURT:  -- the issue on amendment of claim, I

2   think, really focuses on whether she's attempting to assert a

3   new claim that wasn't previously asserted --

4        MR. WISHNEW:  Right.

5        THE COURT:  -- not whether the amount that she's

6   seeking to recover on the claim --

7        MR. WISHNEW:  Understood, Your Honor.

8        THE COURT:  So -- all right, it'll be deemed submitted

9   once I get those additional papers, okay?

10        MR. WISHNEW:  Thank you, Your Honor, for your time.

11        THE COURT:  All right, thank you very much, Ms.

12   Rozier.

13        MS. ROZIER:  Thank you, Your Honor.  Thank you,

14   everyone.

15        THE COURT:  Okay.

16        MR. WISHNEW:  Your Honor, may I be excused?

17        THE COURT:  You may.  Let me -- is Mr. Carlebach still

18   in here?  Why don't you see if you can get him.  This is going

19   to be quick.  Okay?

20        I'm going to call -- we have one more matter in ResCap

21   we need to deal with, but I think if we can find Mr. Carlebach,

22   we'll take CCH Restaurant Management Inc., because it's going

23   to be brief.  It's a case-management conference.  Okay?

24     (Recess from 11:37 a.m. to 11:41 a.m.)

25        THE COURT:  Okay, now we go back to ResCap, 12-12020.

RESIDENTIAL CAPITAL, LLC, et al.                    47

1          MR. SHIFER:  Good morning, Your Honor.  Joseph Shifer

2     of Kramer Levin Naftalis & Frankel, for the ResCap Liquidating

3     Trust.  Also present is Nathaniel Allard, of Kramer Levin.

4          THE COURT:  Okay.

5          MR. SHIFER:  Your Honor, this matter is on page 4 of

6     the agenda.

7          THE COURT:  Right.

8          MR. SHIFER:  It's the ResCap Liquidating Trust's

9     seventy-first omnibus claims objection.

10         THE COURT:  Is anybody appearing for Bank One?

11         MR. SHIFER:  I think they're on the telephone, Your

12     Honor.

13         THE COURT:  Is anyone from Bank One on the phone?

14         MR. O'NEAL:  Judge, do you mean OneWest Bank?

15         THE COURT:  Yes, I'm sorry.  OneWest Bank.  I

16     apologize.

17         MR. O'NEAL:  No worries, Judge.  They all blend in

18     together.  Yes, John O'Neal appearing on behalf of OneWest

19     Bank.

20         THE COURT:  Okay.

21         MR. O'NEAL:  And also Deutsche Bank as trustee for the

22     trust.

23         THE COURT:  Okay.  Thanks.

24         Go ahead, Mr. Shifer.

25         MR. SHIFER:  Your Honor, that objection was filed at

RESIDENTIAL CAPITAL, LLC, et al.                    48

1    docket number 7306.  Your Honor granted the objection on August

2    26th, except with respect to the OneWest claim, which is claim

3    number 4872.  And that's the claim by OneWest Bank in its

4    capacity as successor to IndyMac.  The claim is for

5    approximately 806,000 dollars against Homecomings Financial,

6    LLC.

7         In support of the objection, the Liquidating Trust

8    submitted the declaration of Deanna Horst, who is the

9    Liquidating Trust's chief claims officer.  Ms. Horst is present

10   in the courtroom.

11        On August 26th, 2014, OneWest filed its response and

12   several supporting declarations.  The response is at docket

13   number 7436.  The declaration of Rebecca Marks, an assistant

14   vice president at OneWest, is at docket number 7437.  And the

15   declaration of counsel is at docket number 7438.  On October

16   15th the Liquidating Trust filed its reply.

17        Your Honor, just to give you a little bit of

18   background, the facts as we understand them presently.  This

19   relates to a HELOC which was opened by a borrower from

20   Homecomings in March 2005.  In Septem -- that was at the second

21   lien position.  There was a first lien loan by Citi of

22   approximately 540,000.

23        In September 2005, the borrower entered into a

24   transaction with IndyMac to completely refinance the loans.

25   They were going to borrow approximately 640,000; they were

1   going to use part of it to pay off the first lien, part of it

2   to close the HELOC.

3          Homecomings or any of the debtors were not a party to

4   the refinancing, other than they would have received some

5   payoff amount, presumably.  And for that reason, because

6   refinance lenders aren't in privity with previous banks, they

7   hire an escrow agent that's responsible for doing the closing

8   and offers title insurance to make sure that everything goes

9   smoothly.  And if there's any issues with title, either the

10  escrow agent will take care of it, or the refinanced lender

11  will have recourse under their title insurance.

12         Your Honor, if you look at a copy of the HUD-1, which

13  was filed as part of the Marks declaration at docket number

14  7437 -- I have an extra copy if Your Honor would --

15         THE COURT:  No, that's okay.

16         MR. SHIFER:  Okay.  It does show that the escrow agent

17  was Fidelity National Title Insurance and that they

18  purchased -- IndyMac purchased title insurance from Fidelity

19  National Title.

20         Also, we know that at some point either the borrower

21  or the escrow agent received a payoff letter from Homecomings.

22  And that was attached to the Marks declaration as Exhibit 1.  I

23  have an extra copy if Your Honor --

24         THE COURT:  No, I've been through the papers.

25         MR. SHIFER:  Okay.  The payoff letter basically gives

RESIDENTIAL CAPITAL, LLC, et al.                    50

1   the current balance of the loan and what additional payments

2   would need to be made to close it, as well as a per diem

3   amount, so that the borrower can calculate how much would be

4   needed at the date of the refinancing closing or whenever the

5   borrower chooses to pay off the loan.

6          Your Honor, just to highlight something that's in the

7   payoff letter.  The payoff letter is very clear that it's not

8   just a matter of submitting funds.  There's a form that appears

9   at the end of the payoff letter, and it's a form that has to be

10  filled out by the borrower and submitted along with payment, to

11  make sure that if there's any excess funds, they can be

12  remitted to the borrower after closing the loan.

13         THE COURT:  Yes.  And you letter says we will not

14  process the payoff unless the loan number --

15         MR. SHIFER:  Correct.

16         THE COURT:  -- mortgager's name --

17         MR. SHIFER:  Also I want to highlight one other thing.

18  In paragraph 2, the letter clearly states that the payoff

19  letter itself could be modified at any time by Homecomings.

20         THE COURT:  And dealt with what would happen with

21  overpayment of funds --

22         MR. SHIFER:  Right, Your Honor.

23         We don't have -- it's not in the record -- and by the

24  way, Your Honor, just another little piece of background.

25  There was some discovery taken on this claim in the very early

1   stages of this case; it was August 2012; where the debtors

2   produced the loan file to OneWest.  There was no evidence in

3   the loan file or anything submitted by OneWest that that step

4   was ever taken -- that that form was completed.  In fact,

5   there's no copy of -- we don't really -- we're not really sure

6   how they calculated the amount that was actually paid.

7            THE COURT:  So the escrow agent received the payoff,

8   but didn't provide a lien release because it didn't have --

9   your position is, because all the forms weren't filled out?

10           MR. SHIFER:  Correct, Your Honor.  And it's my

11  understanding -- and this isn't exactly in the record -- and if

12  it comes to it this is perhaps something we could pursue in

13  discovery -- but it's my understanding that the ordinary

14  business practice for escrow agents is that they don't just

15  send in a check, they have a letter -- some other indication to

16  the initial bank requesting that they close the loan when it's

17  refinanced.  There's no evidence of that, either.

18           THE COURT:  Okay.  So the HELOC didn't get closed.

19           MR. SHIFER:  The HELOC did not get closed.  And

20  submitted in the counsel declaration by OneWest there's some

21  servicing notes that indicate that several months after the

22  transaction the borrower called up and said why is this open,

23  and they were advised by Homecomings that the loan was never

24  closed.

25           And subsequent to that, the borrower ran up the

RESIDENTIAL CAPITAL, LLC, et al.                    52

1  loan -- the HELOC and --

2            THE COURT:  And he started borrowing again.

3            MR. SHIFER:  Correct.

4            THE COURT:  To the tune of about 100,000 dollars.

5            MR. SHIFER:  Correct, which was the credit line --

6            THE COURT:  Right.

7            MR. SHIFER:  -- whatever was available under the

8  HELOC.

9            And then fast forward to August 2011, the HELOC was

10 sold to a third party.

11           During this time, as far as I'm aware, Your Honor, as

12 far as the debtors are aware, as far as the Trust is aware,

13 there was no contact by IndyMac, by OneWest, at any point, to

14 pursue a claim against Homecomings or any of the other debtors.

15           And, Your Honor, in our reply, we identify two

16 problems with the claim.  First is the statute of limitations

17 argument.  This transaction took place in 2005.  The longest

18 possible statute of limitations that's applicable here -- well,

19 I would say it's not applicable, but conceivably applicable,

20 that's argued by OneWest, is the statute of limitations for a

21 breach of a written contract, which is six years.  And this was

22 roughly -- almost seven years, certainly more than six.

23           Of course, it's our position that there was no written

24 contract.

25           THE COURT:  Right.

1        MR. SHIFER:  But that gets into the merits.

2        And one thing to highlight, other than the statute of

3   limitations argument, there's simply no evidence -- all the

4   claims asserted by OneWest, all bases that they assert, don't

5   take into account that there's simply no evidence that the

6   borrower did or the escrow agent did what they had to do to pay

7   off the loan.  There's no evidence that they filled out that

8   form or otherwise contacted Homecomings to let them know that

9   the payment that you're receiving is for a payoff not a pay-

10  down of the HELOC.

11        And if Your Honor wishes, I can go through each of the

12  claims and --

13        THE COURT:  No.

14        MR. SHIFER:  Okay.  In that case, Your Honor, unless

15  you have questions for --

16        THE COURT:  Well --

17        MR. SHIFER:  -- me, I'll --

18        THE COURT:  -- is there any indication that OneWest is

19  a third-party beneficiary of any agreement between Homecomings

20  and whatever his name was?

21        MR. SHIFER:  Certainly not.  The payoff letter is

22  addressed to the borrower.

23        THE COURT:  So what does Arizona law require -- this

24  is Arizona, right?

25        MR. SHIFER:  And this is cited in our reply, Your

1  Honor.  Arizona law requires that third-party beneficiaries be

2  identified in the contract.  And here, even assuming the payoff

3  letter is a contract, which we don't think it is, first of all,

4  there's no evidence that it was ever accepted by the borrower,

5  if it was some sort of offer.

6          THE COURT:  So your position with respect to the

7  negligence claim is it's barred by a two-year statute of

8  limitations.

9          MR. SHIFER:  In addition, there's -- the negligence

10  claim, Your Honor, they cite the Restatement of Property.

11          THE COURT:  Yes.

12          MR. SHIFER:  And the Restatement of Property section

13  that they cite --

14          THE COURT: 1.6, subsection --

15          MR. SHIFER:  1.6(c) Restatement Third of Property --

16          THE COURT:  Right.

17          MR. SHIFER:  -- Mortgages, identifies seven items that

18  are required to be disclosed by a mortgagee.  There's no

19  connection between those seven items.  And it's the amount of

20  the loan, it's the interest rate, it's fees that are owed on

21  the loan, whether the loan is in default or in acceleration,

22  whether there are any future advances or if the mortgagee can

23  modify the mortgage, escrow amounts, and the identity of other

24  parties with an interest in the mortgage.  What does that have

25  to do with the payoff and whether or not the HELOC was actually

1    paid off?  There's simply no nexus between those items and

2    whatever erroneous information OneWest Bank may think is in the

3    payoff letter.

4         THE COURT:  Okay.  The breach of contract claim, you

5    say no breach of contract claim because it's not a party -- not

6    a third-party beneficiary --

7         MR. SHIFER:  Because there's no contract, and at best,

8    it would be a third-party beneficiary.

9         THE COURT:  And what about promissory estoppel?

10        MR. SHIFER:  Promissory estoppel, again, the payoff

11   letter would have to be a promise.

12        THE COURT:  There's a three-year statute of

13   limitations.

14        MR. SHIFER:  We don't think it is.  And it's barred by

15   the statute of limitations.  And it's sort of a quasi-

16   equitable-type of relief.

17        And just one thing to underline.  Had OneWest pursued

18   its title insurance, I don't think we'd be sitting here.  As

19   far as we know, they never made a claim against Fidelity.  And

20   it would have been Fidelity's responsibility to make sure that

21   title was cleared after the transaction took place.  That's why

22   they exist.

23        And unjust enrichment, we would say that there's

24   nothing unjust about the debtors' conduct.  They acted in the

25   ordinary course --

RESIDENTIAL CAPITAL, LLC, et al.                    56

1          THE COURT:  Well, the debtor got its payoff.

2          MR. SHIFER:  -- of business.

3          THE COURT:  Although whatever happened to the 100,000-

4    dollar balance when the borrower -- he filed a Chapter 7

5    bankruptcy?

6          MR. SHIFER:  I'm not aware of that, Your Honor.

7          THE COURT:  Okay, maybe I'm wrong in that.  I may be

8    confusing it with another.

9          MR. SHIFER:  I just don't have any information on

10   that.

11         THE COURT:  Okay.  Did Homecomings ever collect on --

12   what did it do?  Did it foreclose on the property?

13         MR. SHIFER:  Homecomings did not foreclose on the

14   property.  Homecomings --

15         THE COURT:  Did you ever get paid?  He ran up another

16   100,000 dollars.

17         MR. SHIFER:  Ran up a hundred -- there's no indication

18   from what I've seen -- and I stand to be corrected -- but

19   there's no indication that there was a problem with the loan.

20   As far as I know, the Hernandezes -- I believe are the

21   borrowers -- enjoyed a wonderful commercial relationship with

22   Homecomings until it was sold to a third party.

23         THE COURT:  Okay.

24         MR. SHIFER:  I stand to be corrected, Your Honor.  It

25   just wasn't --

1            THE COURT:  Well --

2            MR. SHIFER:  -- something that was put in issue,

3    and --

4            THE COURT:  All right.  There's also a conversion --

5            MR. SHIFER:  -- I'd have to do further research.

6            THE COURT:  -- claim?

7            MR. SHIFER:  Pardon me?

8            THE COURT:  A conversion claim?

9            MR. SHIFER:  On the conversion claim, there's an

10   element of intent that's required.  There's nothing that

11   indicates that the debtors were ever aware of OneWest's

12   existence and its interest in this property.

13            And of course the statute of limitations.

14            THE COURT:  So part of the unjust enrichment claim,

15   which arguably wouldn't be barred by the statute of

16   limitations, is that OneWest bases it on Homecoming's sale of

17   the HELOC in 2011.  Why wouldn't they have an unjust enrichment

18   claim with respect to that?  Because I'd forgotten about this

19   piece.  You successfully -- your client, the predecessor,

20   successfully sold the HELOC loan in 2011.  I don't know for how

21   much, but they sold the loan.

22            MR. SHIFER:  And again, Your Honor, I don't know

23   whether it was distressed or if there was some sort of default

24   or --

25            THE COURT:  Excuse me.  And why is it they don't have

1  an unjust enrichment claim based on the sale of the loan in

2  2011?

3           MR. SHIFER:  Well, an unjust enrichment claim would

4  require some sort of unjust conduct by Homecomings.  There's

5  just no indication of any sort of unjust conduct.  And also,

6  it's -- there has to be some sort of nexus between the

7  enrichment and the impoverishment.  Here, the only

8  impoverishment was OneWest's failure to pursue its title

9  insurance with Fidelity.

10          THE COURT:  All right, let me hear from Mr. O'Neal.

11          MR. O'NEAL:  Thank you, Judge.  Addressing the points

12 that counsel has raised in no particular order, I'll start with

13 the statute of limitations argument, which I will note, Judge,

14 is under Arizona law, and at least as the papers that the Trust

15 has put together, the only silver bullet argument that could

16 somehow be used to dispose of the claims as a matter of law.

17 What the Trust fails to address is that for purposes of the

18 accrual of the statute of limitations, two elements need to be

19 had.  One is the offending event, and then the other is the

20 damage which results from the offending event.

21          And the damage, in this instance, Judge, did not

22 accrue until 2012, which is the date that the party completed

23 its foreclosure on the original Homecomings line of credit deed

24 of trust.  That's when the damage accrued.  And that was within

25 all of the statute of limitations which the Trust has cited --

1              THE COURT:  Yes, but your --

2              MR. O'NEAL:  -- in its papers.

3              THE COURT:  -- your argument about a breach of

4      contract is that when the refinance took place and Homecomings

5      failed to release its lien, you're alleging that that was the

6      wrongful act.  Whether the damages were realized years later or

7      not, what you're complaining about is the failure to release

8      the lien at the time of the refinancing.  Am I correct?

9              MR. O'NEAL:  With respect to the breach of contract

10     claim, the answer is yes.  And Your Honor is correct that that

11     event did occur back in 2005.  But, Judge, if we're going to

12     apply that length to the analysis, it would constitute a

13     continuing breach, because the promise that was made in the

14     payoff letter was after funds were received --

15             THE COURT:  Do you have any -- wait, wait, wait; stop.

16     Do you have any authority that supports that statement?

17             MR. O'NEAL:  That the --

18             THE COURT:  That it's a continuing breach and the

19     statute hasn't run?  I mean, the act -- the breach that you're

20     claiming is the failure to release the lien at the time of the

21     refinancing.  First off, you're not a party to the contract,

22     you're not an express third-party beneficiary in the contract

23     when it occurs more than six years ago.  And I don't understand

24     how you have an argument about a continuing breach.

25             MR. O'NEAL:  To address your first question, Judge, I

RESIDENTIAL CAPITAL, LLC, et al.                    60

1    do not have a specific authority or case that would track this

2    type of fact.  What I am aware of, Judge, and if you desire to

3    see it, the general case law in Arizona, which constitutes if a

4    party has a continuing duty under whatever obligation, whether

5    it be contract or something which exists at law, say, for

6    example --

7              THE COURT:  You mean your noncontract?

8              MR. O'NEAL:  Correct, for a duty of care, that the

9    continuing breach can, in essence, toll or extend the time

10   period within which to file a claim.

11             THE COURT:  All right, I have your argument.

12             MR. O'NEAL:  With respect to the other parts, Judge,

13   and following up on that issue, negligence and the promissory

14   estoppel, unjust enrichment, conversion, the analysis of when

15   the breach occurred doesn't apply, because again, those do have

16   the element of incurring damage.  And the damage didn't happen

17   until the foreclosure occurred in 2012.

18             THE COURT:  Yes, but the wrongful conduct --

19             MR. O'NEAL:  And can I --

20             THE COURT:  -- is still the alleged failure to release

21   the lien.  When the damages are -- materialize is not the whole

22   story.  I mean, if there were no damages, you couldn't recover.

23   But the alleged wrongful conduct, on whatever your theory is,

24   was the failure to release the lien.

25             MR. O'NEAL:  Your Honor, is correct --

1          THE COURT:  Why didn't you file -- why didn't your
2   client file a claim on the title insurance?

3          MR. O'NEAL:  The client did raise a claim for title
4   insurance, Judge, but the title company denied the claim
5   asserting that the claim came too late and thus prejudiced the
6   title company's ability to preserve its rights.

7          THE COURT:  It came too late there and it came too
8   late here.

9          MR. O'NEAL:  I would respectfully disagree with
10  respect to the second comment, Your Honor, but certainly it was
11  the title company's position that the title claim was made too
12  late.

13         Your Honor, any further questions on the --

14         THE COURT:  Yes, I do.

15         MR. O'NEAL:  -- statute of limitations issue?

16         THE COURT:  What about the Trust's argument that
17  Homecomings had no obligation to release the lien because the
18  Hernandezes didn't complete the paperwork that was expressly
19  required in order to close the HELOC and release the lien?

20         MR. O'NEAL:  My belief is that the Trust is referring
21  to the form which is found on page 3 of the payoff letter.  And
22  if Your Honor looks, that language only applies to the issue of
23  remitting any excess funds that may have been received by
24  Homecomings from the escrow company.  But it does not apply to
25  the language which is found on the first page of the payoff

1   letter, which says in capital and bold, "If sufficient payoff

2   funds are received, your account will be closed and you will

3   have no access to future draws."

4         So the notion, Judge, that the address form is

5   required in order for the other statements made in the payoff

6   letter to become effective is inaccurate.  The address form is

7   required and tied to the issue of you need to send us your

8   address if you send us too many dollars.

9         And so since our claim doesn't focus on issues with

10  respect to the remission of excess proceeds, we believe that

11  portion of the payoff letter is irrelevant.

12        THE COURT:  Mr. O'Neal, I believe it's also on the

13  first page.  It says, "We will not be able to process the

14  payoff unless the loan number and the mortgagor's name identify

15  the wire transfer.  A copy of the payoff statement, amount of

16  the wire, and the completed address information on the payoff

17  statement must be faxed on the same day of the wire to

18  transfer," and it gives a phone number, "attention Cashier

19  Department."

20        Doesn't that say in very clear terms that we will not

21  process the payoff unless you provide the information that's

22  specified?

23        MR. O'NEAL:  Two different things, Judge.  One, I

24  don't know whether the escrow company paid this off via wire or

25  whether or not it was done via check.  I've seen escrow

1  companies do both.  But in either event, the Trust hasn't

2  asserted that Homecomings did not get the loan number, et

3  cetera, that is tied to that specific language with respect to

4  the payoff.

5          Candidly, I don't think either side knows whether that

6  information was provided by the escrow company or not.  My

7  guess is, Judge, that it was, because certainly the records

8  that were produced by Homecomings reflect that the money that

9  was received from the escrow was applied to Mr. Hernandez's

10  account properly, and in fact, reduced it all the way down to

11  not just a zero balance, but in fact, there were few hundred

12  dollars that were deemed to be an excess payment.

13          That information, Judge, does not tie, and is

14  different than the form which is referenced on the third page

15  of the payoff letter.

16          THE COURT:  Okay, anything else you want to say?

17          MR. O'NEAL:  One other point, Judge, with respect to

18  the third-party beneficiary/contract issue.  I agree with

19  counsel in the traditional notion that you have two parties

20  sitting across the table and sign an agreement, that's where

21  you have privity.  But the piece which wasn't addressed in the

22  Trust's papers, in which debtors passed the concept of that

23  versus a third-party beneficiary, the escrow agent, under

24  Arizona law, absolutely is acting as the agent of the

25  principal, i.e., my client.  And in that regard, Judge, there

1    is privity.  And we certainly are deemed to be a third-party

2    beneficiary known to the other side, including Homecomings,

3    because they realized that our money is being used to pay off

4    their loan.  And in that regard, Judge, they should have, at

5    least with respect to the industry, known that the payoff was

6    looking for a position which had a superior collateral priority

7    to Homecomings.

8             THE COURT:  All right.  Anything else?

9             MR. O'NEAL:  No, Judge, unless you have any specific

10   questions you'd like me to address.

11            THE COURT:  No.

12            Mr. Shifer, can you address Mr. O'Neal's point

13   about -- that OneWest is a party to the escrow and --

14            MR. SHIFER:  Your Honor, OneWest and Fidelity may be

15   in privity with each other in terms of the escrow, but there's

16   nothing that shows that there's any privity between the escrow

17   agent and Homecomings.  They're not -- the payoff letter may

18   have been requested, perhaps, by the escrow agent.  But it's

19   clearly addressed to the --

20            THE COURT:  To Hernandez.

21            MR. SHIFER:  -- to the borrower.  And there's -- I

22   dispute that there's anything in the record that shows that

23   there's any indication that Homecomings would have had that the

24   money's coming from IndyMac or OneWest Bank.

25            THE COURT:  All right.  I'm going to take the matter

1    under submission.  Thank you very much.

2              MR. SHIFER:  Thank you, Your Honor.

3              MR. O'NEAL:  Thank you, Judge.

4              THE COURT:  Thank you.  We're in recess until 2

5    o'clock.

6         (Whereupon these proceedings were concluded at 12:04 PM)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T I O N

2

3   I, Penina Wolicki, certify that the foregoing transcript is a

4   true and accurate record of the proceedings.

5

6

7

8

9

10   _____

11   PENINA WOLICKI

12   AAERT Certified Electronic Transcriber CET**D 569

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:  October 23, 2014

19

20

21

22

23

24

25