## **Exhibit 7**

**Childress Decision**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**SIDNEY CHILDRESS** on behalf of himself
and all others similarly situated**,**

        Plaintiff,

vs.                                    Civ. No. 08-1137 MCA/RHS

**CITIMORTGAGE, INC.,**
        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER comes before the Court on *Defendant CitiMortgage, Inc.'s Motion To Dismiss Plaintiff's Amended Complaint*, which was filed April 3, 2009. [Doc 21] Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants in part and denies in part the motion.

## I.    <u>BACKGROUND</u>

The following facts are taken from Plaintiff's *Amended Complaint*. Plaintiff, Sidney Childress, and Defendant, CitiMortgage, Inc., are parties to a residential mortgage and promissory note. [Doc 17 at 1] In addition to being the lender, Defendant is also the servicer of Plaintiff's mortgage account. [<u>Id.</u> at 2] In the Mortgage Agreement (Agreement), Plaintiff promised to make monthly payments of principal and interest on a 30-year fixed-rate loan. [<u>Id.</u> at 1]

In April 2008, Plaintiff sent Defendant a check for $7,500 and indicated that the money was a prepayment—an additional payment apart from the monthly accrued principal

and interest.  [Id. at 3]  On May 1, 2008, Defendant sent a statement to Plaintiff, which

showed that although the total May mortgage payment was $1,361.74, Plaintiff had been

charged $1,923.66 in interest for the month of May.  [Id.]  On June 9, 2008, Plaintiff sent an

additional prepayment, together with a request for information relating to the interest charged

in May.  [Id. at 3-4]  Defendant did not acknowledge or respond to the June 9, 2008 request

for information.  [Id. at 4]  Plaintiff sent another letter on July 9, 2008.  [Id.] Defendant

acknowledged receipt of the July 9, 2008 letter, but did not substantively respond.  [Id. at 4-

5]

      On November 7, 2008, Plaintiff filed suit in state court.  On December 9, 2008,

Defendant removed the matter to this Court.  [Doc 1 at 1, Doc 1-2 at 1]  Plaintiff amended his

complaint on February 16, 2009, and on April 3, 2009, Defendant filed a motion to dismiss

the amended complaint.  [Doc 21]

## II.   ANALYSIS

      Plaintiff's *Amended Complaint* [Doc 17] incorporates five counts and a request for

class certification.  The five counts are for breach of contract; for breach of covenant for

good faith and fair dealing; for prima facie tort; for violations of the Real Estate Settlement

Procedures Act, 12 U.S.C. § 2506 (RESPA); and for injunctive relief.  *Defendant

CitiMortgage, Inc.'s Motion To Dismiss Plaintiff's Amended Complaint* [Doc 21] requests

dismissal of each count.[1]  Defendant's arguments are addressed in turn.

---

[1] Defendant has clarified that it does not, in this motion, address Plaintiff's request for
class certification.  [Doc 21 at 18, n. 9]

## A.   Standard of Review

Under Fed. R. Civ.P. 12(b)(6), a court may dismiss a complaint for "failure to state
a claim upon which relief can be granted."  The sufficiency of a complaint is a question of
law, and when considering and addressing a motion to dismiss pursuant to Rule 12(b)(6), a
court must accept as true all well-pleaded factual allegations in the complaint, view those
allegations in the light most favorable to the non-moving party, and draw all reasonable
inferences in the plaintiff's favor.  See Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir.
2006).  Further, in order to withstand a Rule 12(b)(6) motion, a complaint must contain
"enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v.
Twombly, 550 U.S. 544, 570 (2007) (Twombly).  "A claim has facial plausibility when the
plaintiff pleads factual content that allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949
(2009) (internal citation omitted) (Iqbal).  If a plaintiff cannot nudge the claims "across the
line from conceivable to plausible," the complaint must be dismissed.  Twombly, 550 U.S.
at 570.

Plaintiff, in his response to Defendant's motion, cites the longstanding rule that a
complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt
that the plaintiff can prove no set of facts in support of his claim which would entitle him to
relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  [Doc 22 at 1-2]  In handing down
Twombly, the United States Supreme Court invalidated that rule.  The Conley standard
proved problematic over the years because it suggested that "a wholly conclusory statement

of claim would survive a motion to dismiss whenever the pleadings left open the possibility
that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery."
Twombly, 550 U.S. at 561 quoting Conley, 355 U.S. at 45-46.  As a result, defendants could
be forced to bear the burden and expense of discovery before they are afforded a real
opportunity to seek the dismissal of groundless claims, while plaintiffs could use the
burdensome discovery process as leverage to induce otherwise unjustified settlement of such
groundless claims.  See Twombly, 550 U.S. at 557-59.

A complaint is now subject to dismissal under the new standard if it does not "possess
enough heft to 'sho[w] that the pleader is entitled to relief.'"  Twombly, 550 U.S. at 557
quoting Fed. R. Civ. P. 8(a)2).  In other words, "the mere metaphysical possibility that *some*
plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the
complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood
of mustering factual support for *these* claims."  Ridge at Red Hask, L.L.C. v. Schneider, 493
F.3d 1174, 1177 (10th Cir. 2007).

Two "working principles" underlie the Twombly standard.  Iqbal, 129 at 1949.

First, the tenet that a court must accept as true all of the allegations contained
in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the
elements of a cause of action, supported by mere conclusory statements, do not
suffice. . . . Second, only a complaint that states a plausible claim for relief
survives a motion to dismiss.  Determining whether a complaint states a
plausible claim for relief will . . . be a context-specific task that requires the
reviewing court to draw on its judicial experience and common sense.

Id. at 1949-50 (internal citations omitted).  Thus, in order to evaluate a motion to dismiss, the
Court initially identifies those allegations that appear to state legal conclusions and therefore

"not entitled to the assumption of truth" and then considers whether the factual allegations

"plausibly suggest an entitlement to relief."  Id. at 1951.

## B.    Breach of Contract

      In support of his breach of contract claim, Plaintiff alleged the following facts:

      In April 2008, Plaintiff sent Defendant a personal check in the amount of
$7500, using Defendant's account statement form to indicate the check was
intended to be a prepayment of principal.

      After Defendant received and accepted the April check, Defendant sent
Plaintiff its 5/1/08 account statement charging Plaintiff's account $1923.66 for
'interest,' even though the regularly scheduled monthly mortgage payment due
5/1/08 was only $1361.74.

      Defendant did not apply all Plaintiff's April prepayment only to principal or
accrued interest.

[Doc 17 at 3]  From these facts, Plaintiff argues that Defendant breached the Agreement by

charging "Plaintiff interest and/or charges not authorized by the contract and agreements of

the parties."  [Id. at 6]  Defendant maintains that Plaintiff has failed to state a claim for

breach of contract because Defendant's application of Plaintiff's prepayment does not violate

the Agreement.  [Doc 21 at 3]

      The terms of the Agreement provide that

      all payments accepted and applied by Lender shall be applied in the following
order of priority:  (a) Interest due under the Note; (b) principal due under the
Note; © amounts due under Section 3.  Such payments shall be applied to each
Periodic Payment in the order in which it becomes due.  Any remaining
amounts shall be applied first to late charges, second to any other amounts due
under the Security Instrument, and then to reduce the principal balance of the
Note.

[Doc 21-2 at 6]  The Note specifies that the borrower may "make payments of Principal at any time before they are due." [Doc 21-2 at 20]  Such payments are called "prepayments," and the "Note Holder will use [the] Prepayment to reduce the amount of Principal that [is owed] under the Note." [Id.]  The Note Holder may, however, "apply [the] Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying [a] Prepayment to reduce the Principal amount of the Note." [Id.]  The Agreement further states that "[a]ny application of payments . . . to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments." [Id. at 6]  A "Periodic Payment" is a regularly scheduled amount due for (I) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument." [Id. at 4]  Plaintiff's Periodic Payments are scheduled to be automatically deducted on the first of each month. [Id. at 20; Doc 22 at 3-4]

Based on these terms, Defendant explains that when it received Plaintiff's April 28, 2008 prepayment check, the proceeds were first applied to the regular mortgage payment that had already accrued and would became due on May 1, 2008.  The remainder of the prepayment was applied to principal.  On May 1, 2008, the Periodic Payment was also deducted directly from Plaintiff's bank account.  Because the prepayment check had been applied to the May 2008 payment, Defendant credited the May Periodic Payment to the June 2008 obligation.  As a result, the account statement for the month of May reflects the interest taken for the regular May mortgage payment and the regular June mortgage payment—$1923.66, which were  both credited to Plaintiff's account by May 1, 2009.

Plaintiff contends that Defendant has provided no evidence to support this
explanation.   To an extent, however, the Agreement language permits the described
application of Plaintiff's prepayment.   At the time that Plaintiff submitted the $7500 check,
April's interest and principal payment had accrued and were due.   Thus, the priority
provision of the agreement permitted Defendant to apply the prepayment first to interest due
under the Note and then to principal due under the Note.   Only after those payments were
made could the prepayment be used to reduce the principal balance of the Note.   See Doc 21-
2 at 20 (permitting the Note Holder to "apply [the] Prepayment to the accrued and unpaid
interest on the Prepayment amount, before applying my Prepayment to reduce the Principal
amount of the Note").   Importantly, no amount of the prepayment was applied toward interest
that had not yet accrued.

Despite the tender of the prepayment, which covered the May 2008 obligation,
Plaintiff was still required by the Agreement to submit the Periodic Payment on May 1, 2008.
See Doc 21-2 at 6 ("Any application of payments . . . to principal due under the Note shall
not extend or postpone the due date, or change the amount, of the Periodic Payments.").   It
is not entirely clear, however, whether the Agreement permits Defendant to simply apply the
May 2008 Periodic Payment to the June 2008 obligation.   The Agreement states that the
Lender need not immediately apply *insufficient* payments when received, but does not speak
to the Lender's obligation to immediately apply a tender that is sufficient to bring the Loan
current.   [Doc 21-2 at 5]   In addition, the Agreement explains that "[i]f each Periodic
Payment is applied as of its scheduled due date, then Lender need not pay interest on

unapplied funds." [Id.]  This suggests that if a Periodic Payment is received and not applied
as of the scheduled due date, the Lender could be required to pay interest on the unapplied
funds.  In the present case, Plaintiff submitted payment on May 1, 2008, which was not
apparently applied until June 1, 2008.  [Id. at 24]  Further, although the May 2008 account
statement states that a payment was made on May 1, 2008 and another payment was not due
until July 1, 2008, the document does not explain whether the June 1, 2008 Periodic Payment
was automatically deducted from Plaintiff's bank account.  Plaintiff contends that the June
1, 2008 Periodic Payment was paid from his bank account.  The Court concludes that
Plaintiff has alleged facts that "plausibly suggest entitlement to relief." as to this claim.  See
Iqbal, 129 S.Ct. at 1951.

**C.**     **Breach of Covenant for Good Faith and Fair Dealing**

"New Mexico courts have held that every contract imposes a duty of good faith and
fair dealing on the parties with respect to the performance and enforcement of the terms of
the contract." Sanders v. FedEx Ground Package Sys. Inc., 2008-NMSC-040, ¶ 7, 144 N.M.
449, 188 P.3d 1200.  In order to state such a claim, Plaintiff must show "bad faith or that one
party wrongfully and intentionally used the contract to the detriment of the other party." Id.
(internal quotation marks and citation omitted).  Defendant again contends that Plaintiff has
not alleged facts to support this count.  [Doc 21 at 6]

Turning to the complaint, Plaintiff alleged (1) that "Defendant has utilized a provision
of the mortgage giving it discretion to make, take and charge Plaintiff questionable charges"
and (2) that "Defendant's exercise of its discretion in this case was wrong, abusive, arbitrary,

capricious, unfair, and in bad faith." [Doc 17]   These allegations are "mere conclusory statements," which "do not suffice" to support a plausible claim. Iqbal, 129 S.Ct. at 1949. No facts alleged by Plaintiff permit the Court to "infer more than the mere possibility" that Defendant acted in bad faith or intentionally used the Agreement to Plaintiff's detriment. Id. at 1950.  Specifically, Plaintiff has not identified any facts that support a conclusion that Defendant intentionally "prevent[ed] the contract's performance or to with[held] its benefits from" Plaintiff.  Sanders, 2008-NMSC-040, ¶ 8 (internal quotation marks and citation omitted).  Although Plaintiff is not required to use particular words in his pleading in order to state a claim, he must allege sufficient facts to nudge his "claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570.  For a claim such as this one, Plaintiff must allege facts to support intentional conduct by Defendant.  The Court concludes that because he has failed to assert such facts to support his claim, Plaintiff "has alleged—but . . . has not shown—that [he] is entitled to relief."  Iqbal, 129 S.Ct. at 1950 (alterations omitted) (internal quotation marks and citation omitted).

Plaintiff has requested leave to amend his complaint in order to cure any deficiency with regard to this count.  [Doc 22 at 20-21]  To the extent that Plaintiff can state facts to support an allegation of intentional behavior, he is granted leave to do so.  He is not permitted, however, to simply insert a bold assertion of "intentional behavior" without additionally putting forth facts in support.

## D.    Prima Facie Tort

"The theory underlying prima facie tort is that a party that intends to cause injury to

another should be liable for that injury, if the conduct is generally culpable and not justifiable under the circumstances." Schmitz v. Smentowski, 109 N.M. 386, 394, 785 P.2d 726, 734 (1990).    According to New Mexico law, prima facie tort has four elements. See Healthsource, Inc. v. X-Ray Assocs. of N.M., 2005-NMCA-097, ¶ 34, 138 N.M. 70, 116 P.3d 861.  To state a claim for prima facie tort, "a plaintiff must allege (1) an intentional and lawful act, (2) with the intent to injure the plaintiff, (3) injury to the plaintiff as a result of an intentional act, and (4) the absence of sufficient justification for the injurious act."  Id. Further, a plaintiff must assert a "separate factual basis to support its prima facie tort claim." Id. ¶ 36.  This is because "[p]rima facie tort is not intended to be a 'catch-all' alternative for every action that cannot stand on its own legs." Guest v. Berardinelli, 2008-NMCA-144, ¶ 37, 145 N.M. 186, 195 P.3d 353.  As a result, "a claim for prima facie tort should not lie when the pleaded factual basis is within the scope of an established tort." Healthsource, Inc., 2005-NMCA-097, ¶35.

Defendant argues that Plaintiff's prima facie tort claim fails for two reasons.  First, Defendant contends that the prima facie tort claim is duplicative of the breach of contract claim.  [Doc 21 at 8-9]  Second, Defendant maintains that Plaintiff has not alleged facts to support a conclusion that Defendant intended to cause Plaintiff harm.  [Id. at 9]  Review of the complaint demonstrates that Plaintiff has again not sufficiently alleged intentional harm. Plaintiff's claim for prima facie tort relies on the allegations of intentional behavior stated in the claim for breach of good faith and fair dealing.  As has already been explained, Plaintiff failed to allege any facts to support a conclusion that Defendant acted

intentionally—rather than negligently or in good faith—to deprive Plaintiff of the benefit of

the contract.  See Iqbal, 129 S.Ct. at 1949 (discussing the insufficiency of conclusory

statements to support a claim).  The motion is granted with respect to the claim for prima

facie tort.

## E.    RESPA

Congress enacted RESPA in order "to insure that consumers throughout the Nation

are provided with greater and more timely information on the nature and costs of the

settlement process and are protected from unnecessarily high settlement charges caused by

certain abusive practices that have developed in some areas of the country."  12 U.S.C.

§2601(a) (1974).  Thus, "RESPA is a remedial act that is designed to protect consumers" and

is to be construed liberally.  Kee v. Fifth Third Bank, No. 2:06-CV-602, 2009 WL 735048,

*3, *5 (D.Utah March 18, 2009).  In relevant part, RESPA requires that

> [i]f any servicer of a federally related mortgage loan receives a qualified
> written request from the borrower (or an agent of the borrower) for
> information relating to the servicing of such loan, the servicer shall provide a
> written response acknowledging receipt of the correspondence within 20 days
> (excluding legal public holidays, Saturdays, and Sundays) unless the action
> requested is taken within such period.

12 U.S.C. § 2605(e)(1)(A).  A "qualified written request" is a written correspondence, other

than notice on a payment coupon or other payment medium supplied by the servicer," and

that

> includes, or otherwise enables the servicer to identify, the name and account
> of the borrower; and . . . includes a statement of the reasons for the belief of

Page 11 of  29

the borrower, to the extent applicable, that the account is in error or provides
sufficient detail to the servicer regarding other information sought by the
borrower.

12 U.S.C. § 2605(e)(1)(B).  Upon receipt of a qualified written request, within 60 days the
servicer must either make appropriate corrections to the borrower's account or conduct an
investigation and provide an explanation to the borrower.  12 U.S.C. § 2605(e)(2).  If a
servicer fails to comply with these requirements, individual borrowers are entitled to recover
actual damages and "any additional damages, as the court may allow, in the case of a pattern
or practice of noncompliance with the requirements of this section, in an amount not to
exceed $1,000."  12 U.S.C. § 2605(f)(1).  Recovery by means of class action suit is also
contemplated, for appropriate cases.  See 12 U.S.C. § 2605(f)(2).

Plaintiff's complaint alleges that Defendant violated RESPA by failing to provide the
requisite response to a "qualified written request".  [Doc 17 at 8]  In its motion to dismiss,
Defendant argue (1) that the Plaintiff's first letter, dated June 9, 2008 (June Letter), did not
constitute a qualified written response; (2) that Defendant properly responded to Plaintiff's
second letter, dated July 9, 2008 (July Letter); and (3) that regardless, Plaintiff has failed to
allege actual damages or a pattern or practice of noncompliance.  [Doc 21 at 11-12]

**1.**   **Qualified Written Response**

**a.**   **The June Letter**

The June Letter accompanied an additional prepayment and contained, in relevant
part, the following statement:

In addition, I write to ask for some explanation from you of the Account
Activity noted on the enclosed recent statement you sent me.  Last April, I sent
$7500 to pay down my mortgage and you apparently charged me $1923.66 in
interest.  My monthly mortgage payment is only $1361, so it appears you
charged me excessive interest.  I need some explanation.

[Doc 21-2 at 30]  Defendant argues that this letter is not a qualified written request because
it was sent to the incorrect address and because it was included with a payment.  [Doc 21 at
11]

The regulations that accompany RESPA permit a loan servicer to designate a specific
address at which to receive qualified written requests:  "By notice either included in the
Notice of Transfer or separately delivered by first-class mail, postage prepaid, a servicer may
establish a separate and exclusive office and address for the receipt and handling of qualified
written requests."  24 C.F.R. § 3500.21(e)(1) (1998).  In the present case, Defendant included
the following information on the back of each monthly mortgage statement:

For Residential Customers Only:  PURSUANT TO § 6 of RESPA, A
'QUALIFIED WRITTEN REQUEST' REGARDING THE SERVICING OF
YOUR LOAN MUST BE SENT TO THIS ADDRESS: CITIMORTGAGE,
INC. ATTN: CUSTOMER RESEARCH TEAM, . . . GAITHERSBURG, MD
. . . .  A 'qualified written request' is written correspondence, other than notice
on a payment coupon or statement, which includes your name, account number
and the reason(s) for the request.

[Doc 21-2 at 28]  This information was set inside a box labeled "Customer Service."  [Id.]
Plaintiff did not address the June Letter to the Customer Research Team at the Maryland
address but instead sent it to "CITIMORTGAGE, Inc" at an address in Des Moines, Iowa .
[Id. at 30]

There is some disagreement among the courts regarding whether a borrower's request
for information can trigger the servicer's obligations under RESPA if it is sent to an address
other than that which is properly designated by the servicer.  In Payne v. Mortgage Elec.
Registration Sys., Inc., 387 B.R. 614 (Bankr. Kan. 2008), the borrowers sent letters and
requests for discovery to counsel for the servicer.  Id. at 634.  The court did not reach the
issue of "whether a RESPA qualified written request may be sent to lender's counsel rather
than to the lender's designated address," but instead considered the issue to be one of equity:

> RESPA does not designate lender's counsel as an authorized recipient of a
> qualified written request.  Before an attorney is to be held accountable as an
> agent by virtue of a statute which does not itself pre-authorize an attorney as
> the lender's agent in this context, the attorney should be placed on notice that
> he or she is being approached in that capacity. In this case, letters sent to [the
> d]efendants' counsel before the lawsuit did not identify the letters as RESPA
> requests.  [The d]efendants' counsel rejected a February 20, 2004, request for
> a detailed accounting of [the d]ebtors' loan, referring [the d]ebtors' counsel
> directly to her client.  Had [the d]ebtors' counsel sent qualified written
> requests to lender's counsel identifying them as such, and lender's counsel did
> not object, the issue of whether this procedure is proper under RESPA would
> be worth considering.

Id. at 635.  The issue not addressed by the Payne court is the very issue before this Court:
whether the RESPA obligations are triggered when a borrower sends a request for
information to the wrong address and receives no response.  The Payne court continued its
reasoning, as follows:

> RESPA and its implementing regulations provide the procedure to trigger
> RESPA obligations, and in turn, RESPA sanctions for noncompliance.  A
> servicer subject to RESPA may establish a specific address to receive qualified
> written requests.  [The servicer] designated such an address. Counsel may

**Page 14 of  29**

overcome the perceived ethical problem of contacting an entity known to be
represented by counsel by sending the qualified written request to both the
servicer and its counsel, just as a lender serves a stay relief motion on both the
debtor and his counsel.  Delivery to counsel without notice of invoking
RESPA is insufficient where RESPA and the federal regulations provide a
specific procedure.  The proper procedure must be followed before a court
may award sanctions.

Id.  Thus, the court emphasized that the statute and the regulations outline a procedure that

must be followed in order to invoke the servicer's statutory obligations, and in turn, the

statutory sanctions against the servicer should it fail to comply with the statute.

In Carter v. Countrywide Home Loans, Inc., No. 3:07CV651, 2009 WL 2742560

(E.D.Va. August 25, 2009), the borrower again mailed the request for information to counsel

for the servicer.  Id. at *7.  The court concluded that "RESPA duties were not implicated as

the letter was not received by Countrywide, nor was it received by an agent authorized to

receive its qualified written requests."  Id.  The court noted that although it is not clear

whether the statute permits a servicer to assign an agent to receive qualified written requests,

if such assignment is permitted, "the agent would have to be specifically designated for such

a purpose in order for the servicer's duties to be implicated under the statute."  Id. *8.  This

is necessarily so because

the statute places strict time limits on when a servicer must respond to a
borrower's inquiry, and if the servicer were to designate 'receipt' of qualified
written requests by an agent, the servicer would necessarily have to implement
certain policies or procedures to ensure that the agent properly responded to
the request or informed the servicer of the 'receipt' in a timely fashion.

Id.  Although agency and assignment are not at issue in the present case, the Carter court's

analysis is pertinent because it highlights the specificity of the statutory requirements and the
need for the servicer to have particular policies in place—such as an exclusive address for
qualified written requests—in order to comply with such time- and subject matter-sensitive
requirements.

The court in McLean v. GMAC Mortgage Corp., Inc., No. 06-22795-CIV, 2008 WL
5246149 (S.D.Fla. December 16, 2008), focused on whether the borrower received adequate
notice of the designated address.  Id. at *4-5.  The McLean plaintiffs sent their request for
information to an address in Pennsylvania, even though the servicer contended it had
designated an address in Iowa in the mortgage account statements.  Id. at *4.  The court was
not convinced that the mortgage account statement sufficiently communicated that "the
Waterloo, IA address listed under 'General Inquiries' was the 'separate and exclusive office
and address for the receipt and handling of qualified written requests.'"  Id. quoting 24
C.F.R. § 3500.21(e)(1).  Thus, the court found that an address listed under "the category
'General Inquires' on a Mortgage Account Statement sent approximately 4 years prior to the
plaintiffs' [request for information] was insufficient to provide the plaintiffs with notice of
an exclusive address for qualified written requests."  Id.

Catalan v. RBG Mortgage Co., No. 05 C 6920, 2008 WL 2741159 (N.D.Ill. July 8,
2008), also considered whether the borrower received adequate notice of a designated
address.  Id. at *7-8.  That case focused on the "separate and exclusive" language that is
found in §3500.21(e)(1).  Id.  The servicer sent the borrower a notice, which stated that the
borrower had failed to meet the terms of the mortgage, that a certain sum was due by a

Page 16 of  29

certain date, and advised the borrowers of the consequences of failing to pay.  Id. at *7.  The

notice instructed that any "[c]ommunication" about the notice should be sent to a particular

person who was associated with the "Mortgage Collections" department.  Id. (alteration in

original).  Two return addresses were included in the notices, one for "Mortgage Loan

Services," and one for "Payments."    Id.    The Catalan court concluded that this

communication was neither a "Notice of Transfer" nor a "separately delivered" notice of an

exclusive qualified written request address.  Id. at *7, 8.  The court determined that the

regulation was intended to "ensure that borrowers would not be blindsided by notices of

separate and exclusive addresses buried in the fine print of complex documents or conveyed

subtly in communications from mortgage servicers."  Id. at *7.  As a result, the court read

the regulation "as mandating that a proper notice include only information concerning the

designated 'separate and exclusive address' and its purpose."  Id.  At a minimum, the Catalan

court required that "the notice must be 'separate' and must advise customers of a 'separate

and exclusive address' that they must use for the mailing of inquiries regarding the servicing

of their mortgage loans."  Id. at *8.

The Catalan court cited Bally v. Homeside Lending, Inc., No. 02C5799, 2005 WL

2250856 (N.D.Ill. Sept. 8, 2005).  See Catalan, 2008 WL 2741159, *7-8.  In Bally, the

borrower's loan was transferred to the defendant servicer.  2005 WL 2250856 at *1.  The

borrower received a "notice of transfer," which included the following statement:  "If you

want to send a 'qualified written request' regarding the servicing of your loan, it must be sent

to [the servicer] at the address shown on the reverse side of this page."  Id.  The address on

Case 1:13-cv-01737-MCA-RHS   Document 52   Filed 02/19/15   Page 18 of 29

the reverse side of the page was located in Texas.  Id.  The borrowers sent two requests for
information to the servicer's attorney and not to the address in Texas.  Id.  The Bally court
was satisfied that the request for information did not trigger the servicer's obligations under
RESPA because "only a request sent to the San Antonio, Texas, address specified in the
Notice to Transfer may constitute a qualified written request to defendant."  Id. at *2.

These cases demonstrate that the policies and procedures set forth in RESPA and its
implementing regulations are not only mandatory, but also necessary.  The requirements for
the servicer and the sanctions for noncompliance are specific and immediate.  Thus,
designation of an address for qualified written requests is permitted so that a servicer may
implement procedures for quickly identifying qualified written requests and handling them
appropriately.  While this streamlined process is permitted by RESPA and its regulations, the
cases also demonstrate that the servicer must adequately notify the borrower of the address
so that the borrower is able to operate within the servicer's established procedure and so that
RESPA's remedial purpose can be achieved.

In the present case, there is no question that Defendant established an exclusive
address for qualified written requests and that Plaintiff failed to send the June Letter to that
address.  Plaintiff instead included the request for information in an envelope together with
additional prepayments and sent the communication to the Iowa address, which the monthly
statement designates is to be used for payments.  [Doc 17 at 3-4; Doc 21-2 at 24]  A payment
center presumably has its own processes for dealing with payments and is ill equipped for
properly responding to qualified written requests.  It is for this very reason that servicers are

permitted to establish exclusive addresses for qualified written requests—and such a designation is ultimately for the borrower's benefit.  See Carter, 2009 WL 2742560 at * 8.  Thus, Plaintiff's failure to send the June Letter to the designated Maryland address is fatal to his argument unless he received inadequate notice of the "separate and exclusive" address.  See Catalan, 2008 WL 2741159 at *7.

For example, Bally, the most straightforward of the cases dealing with this issue, does not address the notice deficiency claimed in the present case.  In Bally, the separate and exclusive address was sent to the borrower by means of a "notice of transfer," which is specifically permitted by § 3500.21(e)(1).  See id. (permitting the servicer to provide the exclusive address to the borrower "[b]y notice . . . included in the Notice of Transfer); Bally, 2005 WL 2250856 at *1.  There is no dispute in the present case that the address was not provided by means of a notice of transfer.

Catalan is similarly distinguishable.  In Catalan, the address was purportedly provided in a demand for payment, and the communication sent by the servicer was not clear about which of two addresses the borrower should use.  It was these facts that led that court to conclude that "the notice must be 'separate' and must advise customers of a 'separate and exclusive address' that they must use for the mailing of inquiries regarding the servicing of their mortgage loans."  2008 WL 2741159 at *8.  In the present case, however, Plaintiff received notice of the address every month on his account statements, and the Maryland address was clearly identified on the statements as the exclusive address for qualified written requests.

The ambiguities marring the <u>Catalan</u> notice, and the notice in <u>McLean</u> (as identified

earlier), are not present in this case.  Further, unlike the court in <u>Catalan,</u>  I am not persuaded

that the notice regulation applicable to the facts of this case  requires "that a proper notice

include only information concerning the designated 'separate and exclusive address' and its

purpose."  <u>Catalan,</u> 2008 WL 2741159 at *8.  If this were so, I question whether Congress

would have also permitted a servicer to notify a borrower of the separate and exclusive

address by way of a notice of transfer—which presumably includes other information

relating to the transfer of loan servicers.  In my view, the requirement that notice of the

separate and exclusive address for qualified written requests be "separately delivered" simply

means that the address must be clearly labeled and set apart from other information and must

not buried or hidden amidst confusing, technical jargon, or demands for payment.  Thus,

Defendant's use of the mortgage statement to provide Plaintiff with the exclusive address is

sufficient to satisfy the notice requirement of § 3500.21(e)(1) because the address

information was set apart from other information on the statement, and it was clearly labeled

as the qualified written request address.

Based on review of the RESPA cases, the Court concludes that the June Letter did not

trigger Defendant's RESPA obligations because Plaintiff received adequate notice of the

designated and exclusive address for qualified written requests, but yet failed to send the

letter to that address.

**b.**    **The July Letter**

After receiving no response from Defendant regarding the June Letter, Plaintiff sent

the July Letter.  In the July Letter, Plaintiff made the following statements:

> This letter is intended to constitute a Qualified Written Request, pursuant to RESPA, regarding the servicing of my loan.  Attached hereto is a copy of my letter to Citimortgage dated 6/9/08, with attachments.  I have received no response to this letter.

> You received all my payments I sent to pay down the principal balance of my mortgage.  I know this because I have also received the enclosed PAYOFF STATEMENT date 6/23/08.

> Instead of applying my payments to the principal, it appears you have charged me excessive interest, or interest my Note does not allow or authorize.  See the enclosed Statement of 5/1/08 indicating you charged me $1923.66 in interest in one month.  I need some explanation of how and why this happened.

> I also request that my account be corrected and that I receive an account detail for the period March 2008 through September 2008, showing the principal balance and interest paid, all to be correct in accordance with my Promissory Note.

[Id.]  The July Letter was addressed to the "Customer Research Team" and was mailed to the Maryland address, which, as discussed, is the exclusive address for qualified written requests.

[Doc 21-2 at 34]  Defendant does not deny that the July Letter is a proper qualified written request.  Instead, it argues that it responded as required by RESPA.

RESPA requires two actions from a servicer when it receives a qualified written request.  The servicer must first "acknowledge receipt of the correspondence within 20 days . . . unless the action requested is taken within such period."  12 U.S.C. § 2605(e)(1)(A).  After the initial acknowledgment, the servicer must also, within 60 days, either (1) make the appropriate corrections  to the borrower's account or (2) conduct an investigation and provide an explanation to the borrower.  12 U.S.C. § 2605(e)(2).  Plaintiff admits that

Case 1:13-cv-01737-MCA-RHS   Document 52   Filed 02/19/15   Page 22 of 29

Defendant provided him with a "prompt written acknowledgment . . . in the form of a non-substantive form letter that referred Plaintiff to Defendant's 'collection department.'" [Doc 17 at 4] Nevertheless, Plaintiff further alleges that he has received no other written response to the July Letter. [Id. at 5]. Defendant simply states that because it submitted the initial response, "there is no dispute that [it] promptly responded to [P]laintiff's letter." [Doc 21 at 10, n.6] After making this statement, Defendant's brief is entirely devoted to the validity of the June Letter and to Plaintiff's failure to establish that he suffered damages.

The statute clearly requires the servicer to conduct an investigation and provide the borrower with an explanation or clarification. See Harris v. Am. Gen. Fin., Inc., 259 Fed.Appx. 107, 109 (10th Cir. 2007) ("RESPA requires that upon the receipt of a qualified written request, the servicer of a federally related mortgage loan must acknowledge receipt of the correspondence within twenty days, excluding weekends and holidays, and within sixty working days, must make appropriate corrections or investigate and provide the borrower with a written notification explaining why the servicer believes the account is correct."). The relevant sections state the following in their entirety:

> (B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—
>
> > (I) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and
> >
> > (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or

© after conducting an investigation, provide the borrower with a written explanation or clarification that includes—

> (I) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and

> (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

12 U.S.C. § 2605(e)(2)(B), (C).   Defendant does not contend that it conducted an investigation or that it provided Plaintiff with the required written explanation.   Accordingly, the Court concludes that Plaintiff has stated a claim that Defendant violated RESPA provisions with regard to the July Letter.   Nevertheless, as will be noted below, in order to survive a motion to dismiss, Plaintiff must also sufficiently allege facts to establish damages.

## 2.   <u>Damages</u>

According to RESPA, a noncomplying servicer is liable to the borrower for (1) "any actual damages to the borrower as a result of the failure;" and (2) "any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $1,000." 12 U.S.C. § 2605(f)(1)(A), (B).   In order to survive a motion to dismiss, Plaintiff must sufficiently allege facts to support damages resulting from the RESPA violation.   <u>See</u> <u>Hutchinson v. Del. Sav. Bank FSB</u>, 410 F.Supp.2d 374, 383 (D. N.J. 2006) ("[A]lleging a breach of RESPA duties alone does not state a claim under RESPA [because] Plaintiffs must, at a minimum, also allege that the breach resulted in actual damages."); <u>Byrd v. Homecomings Fin. Network</u>, 407 F.Supp.2d 937, 945-46 (N.D. Ill. 2005) (concluding that the plaintiff failed to state a claim because "

RESPA, 12 U.S.C.A. § 2605(f), however, requires a party to show actual damage from a violation of § 2605(e)(2)"); Ricotta v. Ocwen Loan Servicing Ctr., No. 06-cv-1502, 2008 WL 516674, * 5 (D. Colo. February 22, 2008) (finding that "a RESPA plaintiff must plead and prove, as an element of the claim, that he or she suffered some actual damage as a result of the alleged RESPA violation"); Caddel v. CitiMortgage, Inc., No. Civ.A. 04-2403, 2006 WL 625970, *6, n. 9 (D. Kan. February 14, 2006) (concluding that a RESPA claim lacked substantive merit because the plaintiff did not allege or show "actual damages which is a required element under RESPA Section 2605"). Defendant maintains that Plaintiff failed to properly plead either actual or statutory damages. [Doc 21 at 12, 15]

## a.    **Actual Damages**

The parties dispute whether the term "actual damages" includes damages for emotional distress. [Id. at 14; Doc 22 at 16] Our Tenth Circuit has not yet spoken to the issue of the scope of actual damages under RESPA. However, according to one court in our circuit, "[a]ctual damages may include recovery for emotional distress." Payne, 387 B.R. at 639. Regardless of the scope of recovery that is available, it is clear that any actual damages must have been caused by the failure of the servicer to respond to the borrower's qualified written request. See 12 U.S.C. § 2605(F)(1) (applying the damages provision to "any actual damages to the borrower as a result of the failure"). Plaintiff alleged that the Defendant's failure to respond to his qualified written request caused him to incur the cost of the current litigation, loss of time, aggravation, frustration, aguish, distress, investigation, postage, copy costs, travel to the post office, and reproduction and preparation of exhibits. [Doc 17 at 8-9]

With regard to the first allegation, Plaintiff's argument is that had Defendant
responded to the letters within 60 days with the required substantive explanation, he would
not have been required to initiate the current lawsuit and would not have incurred the loss of
time and money associated with legal action.  [Doc 22 at 18]  These damages are not, as
Defendant suggests, the same as damages for breach of the Agreement.  Plaintiff's point is
that if Defendant had simply provided an explanation, he would not have been required to
bring the cause of action for breach of contract.  Courts have been wary about allowing
plaintiffs to proceed based on speculative theories of damages.  For example, in Payne, the
borrower attempted to recover damages because the servicer's failure to respond "kept her
from refinancing her mortgage and forced her to abandon plans for a new home."  387 B.R.
at 640.  The court concluded that these assertions would require "too many assumptions to
arrive at an actual damage amount to award."  Id.; see also McLean v. GMAC Mortg. Corp.,
595 F.Supp.2d 1360, 1372-73 (S.D.Fla. 2009) (concluding that claims for lost wages and
employment, as well as damaged credit, were too speculative to permit recovery).  Plaintiff's
suggestion that he would not have brought this lawsuit had Defendant properly responded
to the letters requires this Court to assume that Defendant would have responded in a manner
that would have satisfied Plaintiff such that he would not have sued for breach of contract.
Even at this point, the parties do not agree about the terms of the Agreement and whether the
Agreement permitted Defendant to apply the prepayment funds as it did.  Thus, Plaintiff
cannot recover for the costs of the pending litigation *in this manner*.[2]

---

[2]  The Court makes no ruling at this time on the question of attorney fees or costs.

Page 25 of  29

    In addition, the complaint does not allege facts to support a conclusion that the loss
of time, aggravation, postage, investigation, etc., were caused by Defendant's failure to
respond to the letters.  See Iqbal, 129 S.Ct. at 1949 ("Threadbare recitals of the elements of
a cause of action, supported by mere conclusory statements, do not suffice.").  Again, it is
speculative for this Court to assume that had Defendant responded, Plaintiff would have
ceased to pursue the matter of the application of his prepayments or ceased to feel
aggravation, frustration, anguish, and distress.  Further, any cost or inconvenience associated
with the mailing of the letters are not recoverable because at the time that Plaintiff mailed the
July letter, Defendant had not yet had an opportunity to respond and thus had not yet violated
RESPA at that point.  Only those costs incurred by the failure to respond are permissible
damages.  Payne, 387 B.R. at 649 ("The plaintiff must prove his actual damages and prove
they were proximately caused by the defendant's RESPA violation.").  Plaintiff has not
alleged that he again wrote to Defendant or incurred additional costs in effort to force
Defendant to comply with RESPA.  Accordingly, Plaintiff has not sufficiently pleaded that
any damages resulted from Defendant's failure to respond to the July Letter.

    Plaintiff has requested an opportunity to amend his complaint to properly allege actual
damages.  [Doc 22 at 19]  To the extent that Plaintiff intends to allege facts to support his
assertion of damages related solely to Defendant's failure to answer the July Letter—and not
to the June Letter, the breach of contract, or speculation regarding the instigation of the
suit—he is permitted to do so.  See Kee, 2009 WL 735048, *11(instructing that evidence
relating to communications that did not constitute violations of RESPA could not be used to

establish damages under RESPA).

**b.**     **Statutory Damages**

To recover damages under 12 U.S.C. § 2605(f)(1)(B), "the plaintiff must show a pattern or practice of noncompliance."  McLean, 595 F.Supp. at 1365 (internal quotation marks and citation omitted).  "The courts have interpreted the term 'pattern or practice' in accordance with the usual meaning of the words," and the "term suggests a standard or routine way of operating."  Id. at 1366 (internal quotation marks and citation omitted). Plaintiff has alleged that Defendant's conduct "constitutes a pattern of practice towards Plaintiff individually."  [Doc 17 at 8]  From this allegation, I understand Plaintiff's contention to be that Defendant had a pattern or practice of failing to address Plaintiff's letters.  As with actual damages, the Court considers only Defendant's failure to respond to the July Letter because the June Letter did not trigger the RESPA obligations.  See Kee, 2009 WL 735048, *11.

It has become well established that the failure to answer one or two qualified written responses does not constitute a pattern or practice.  See id. at 1365 (finding that the failure to respond to two letters "is insufficient to support a pattern or practice of noncompliance as required by section 2605(f)"); Garcia v. Wachovia Mortgage, Corp., No. 2:09-cv-03925, __ F.Supp.2d __, 2009 WL 3837621, *10 (C.D.Cal. Oct. 14, 2009) ("[A]lmost as a matter of definition, a single failure to respond to a Qualified Written Request does not state a claim for a 'pattern or practice' of doing so."); In re Holland, No. 06-1418, 2008 WL 4809493, *11 (Bankr.D.Mass. Oct. 30, 2008) ("[O]ne violation, without more, is insufficient to establish

a 'pattern or practice' entitling the [d]ebtor to statutory damages. . . ."); <u>McCutcheon v Am.'s</u>

<u>Serv. Co.</u>, No. CIV A 06-03121-JF, 2007 WL 2287675, *2 (E.D.Pa. July 31, 2007) ("[T]he

failure to respond to a single letter does not establish a pattern or practice of noncompliance.

. . .); <u>Barnett v. T.D. Escrow Servs., Inc.</u>, 2005 WL 1838623, *3 (W.D.Wash. August 1,

2005) (finding that the "failure to respond to one qualified written request falls short of

demonstrating a 'pattern or practice of noncompliance' warranting additional damages").

Accordingly, Defendant's failure to respond to the July Letter cannot, as a matter of law, be

considered a pattern or practice of RESPA, and Plaintiff has failed to properly plead statutory

damages.

## F.  **Injunctive Relief**

In his amended complaint, Plaintiff also asserted a one sentence claim for injunctive relief.

[Doc 17 at 9]  Specifically, Plaintiff stated simply that "Defendant should be Ordered by this Court

to design, adopt and implement procedures, patterns and practices that comply with RESPA's

qualified written request provisions."  [<u>Id.</u>]  Defendant argues that this count should be dismissed

because Plaintiff has not alleged any facts to support the elements of a permanent injunction.  [Doc

21 at 18]  The complaint as it stands is devoid of any facts to support a permanent injunction.  <u>See</u>

<u>United States v. Sommerstedt</u>, 610 F.Supp.2d 1311, 1318 (D.N.M. 2009) ("A party requesting a

permanent injunction bears the burden of showing: (1) actual success on the merits; (2) irreparable

harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction

may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public

interest.").  Plaintiff has failed to respond to Defendant's argument.  Additionally, Plaintiff's request

for injunctive relief is related only to his RESPA claims.  This Court has already determined that

the June Letter did not trigger RESPA obligations and that Plaintiff has failed to sufficiently allege

damages resulting from Defendant's failure to respond to the July Letter.  This disposition of the

RESPA claims makes moot any entitlement to injunctive relief related to RESPA, which is the only

basis articulated for the injunctive relief sought.  Defendant's motion as to this claim is granted, and

Plaintiff's claim for this relief is denied.

## III.    CONCLUSION

*Defendant CitiMortgage, Inc.'s Motion To Dismiss Plaintiff's Amended Complaint* is

**GRANTED** in part and **DENIED** in part.

**IT IS THEREFORE ORDERED** that as to the claim for breach of contract, Defendant's

motion is **DENIED**.

**IT IS FURTHER ORDERED** that for the reasons stated in this opinion, Defendant's

motion is **GRANTED** as to the claims (1) for breach of good faith and fair dealing, (2) for prima

facie tort, (3) for RESPA violations and (4) for injunctive relief.

**IT IS FURTHER ORDERED** that Plaintiff is allowed 10 calendar days to amend his

complaint in limited part in the following manner:  (1) Plaintiff is permitted to amend his complaint

for breach of good faith and fair dealing so as to state factual support for his allegation of intentional

conduct and (2) Plaintiff is permitted to amend his complaint in order to allege factual support for

actual, if any, damages resulting from Defendant's alleged failure to provide a substantive response

to the July Letter and resulting alleged RESPA violation.

**SO ORDERED** this 19th day of February, 2010 in Albuquerque, New Mexico.


**M. CHRISTINA ARMIJO**
**United States District Judge**