1

1

2 UNITED STATES BANKRUPTCY COURT

3 SOUTHERN DISTRICT OF NEW YORK

4 Case No. 12-12020-mg

5 - - - - - - - - - - - - - - - - - - - - -x

6 In the Matter of:

7

8 RESIDENTIAL CAPITAL, LLC, ET AL.,

9

10          Debtors.

11

12 - - - - - - - - - - - - - - - - - - - - -x

13

14          United States Bankruptcy Court

15          One Bowling Green

16          New York, New York

17

18          October 30, 2014

19          2:03 PM

20

21 B E F O R E:

22 HON. MARTIN GLENN

23 U.S. BANKRUPTCY JUDGE

24

25

1

2  (CC: Doc #6763) Status Conference Regarding Macks' Proof of

3  Claim

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20  Transcribed by:  Sharona Shapiro

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

1

2 A P P E A R A N C E S :

3 MORRISON & FOERSTER LLP

4        Attorneys for Post-Effective Date Debtors, the ResCap

5        Liquidating Trust, and the ResCap Borrower Claims Trust

6        425 Market Street

7        San Francisco, CA 94105

8

9 BY:   ADAM A. LEWIS, ESQ.

10

11

12 GARBER & HOOLEY, LLP

13        700 Eleventh Street South

14        Suite 202

15        Naples, FL 34102

16

17 BY:   DAVID F. GARBER, ESQ.

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2          THE COURT:  Okay.  All right.  We're on the record in

3    Residential Capital, number 12-12020.  This is status

4    conference with respect to the Macks' proof of claim.

5          Can I have the appearances?

6          MR. GARBER:  Your Honor, David Garber on behalf of

7    Barry Mack.

8          MR. LEWIS:  Adam Lewis of Morrison & Foerster for the

9    ResCap Borrower Claims Trust.

10         THE COURT:  I was operating under the assumption that

11   we were on the phone today.  My -- so we do have somebody on

12   the phone, right?

13         COURTCALL OPERATOR:  Yes, Your Honor.

14         THE COURT:  Yes, go ahead.  Who's on the phone?

15         COURTCALL OPERATOR:  Yes, this is the CourtCall

16   operator.  We have two attorneys on the line.  They are listen

17   only.  Would you like me to open their lines?

18         THE COURT:  If they're listen only, that's fine.  I

19   see them on the list.  Okay.

20         COURTCALL OPERATOR:  Okay.

21         THE COURT:  Thank you.

22         Mr. Lewis, where are we?

23         MR. LEWIS:  When we last talked, it was at the

24   discussion we had about discovery.

25         THE COURT:  Right.  I know you -- it was the issue

1  about getting the medical records --

2          MR. LEWIS:  Yeah.  And that --

3          THE COURT:  -- and the cost of getting the medical

4  records.  You shortened the amount of time in which you were

5  seeking records.

6          MR. LEWIS:  And in the last week or so, I've gotten a

7  substantial additional delivery of various records.  Some of

8  the records have provided me with some very important

9  information.  I think I told the Court -- because the Court had

10 inquired about settlement then, too --

11         THE COURT:  Yes.

12         MR. LEWIS:  -- and I think we were both of the view

13 that we didn't quite know enough to make a settlement or a

14 mediation discussion rational; I'm very close to being at that

15 point.  I've obtained a lot of information that I think is

16 quite useful from the medical records and from other sources,

17 for example, from the litigation.  I've dug into the litigation

18 in Florida to obtain some of the records from that.

19         I think there are two obstacles to proceeding to

20 mediation at this moment.  The first is what I've just

21 described.  I think I need some more information, but I'm close

22 on that.

23         THE COURT:  What is it you think you need?

24         MR. LEWIS:  Well, I don't yet have medical records for

25 Mrs. Mack's overdose.  And I need to see --

1           THE COURT:  Yeah, that's important.

2           MR. LEWIS:  -- compare that with what preceded it,

3    because what preceded it -- her medical condition that preceded

4    it is startling, to say the least.  And I want to see what the

5    change was, if any, really.

6           The other thing I may need to do is take a deposition

7    or two.  One of the major witnesses, I believe, for the Macks

8    is a Dr. Lichi (ph.), who was her psychiatrist, and his notes

9    are very interesting.

10          THE COURT:  How long had she been under his care?

11          MR. LEWIS:  She was under his care since -- from about

12   2005 to about 2010.  And his notes are very, very interesting.

13   But I can't read them all, so one of the things I have to do --

14   I'm the son of a doctor who had horrible handwriting, and I

15   think thought I could read anything, but he's outdone me.

16          The second thing, I think is -- I believe -- and Mr.

17   Garber can speak for himself on this point -- I believe we have

18   very different views of the scope of this case, as contrasted

19   with the merits.  I don't think we can really compare our views

20   of the merits until we have a better understanding of the scope

21   of the case.  It's my impression -- and it's just my

22   impression, but I have some reasons for it -- that Mr. Garber

23   is essentially contemplating the Deutsche Bank case and

24   throwing in a 2605(e) claim.

25          The discovery he's asked for has a lot to do with

1   stuff that -- you remember the QWR, if it is one, went out on

2   10/26 of '09.  Mr. Garber has asked for all kinds of

3   information that preceded that.  I don't see how it's relevant

4   really to what the consequences of where -- of GMACM's failure

5   to respond to that 10/26 letter.  I just don't think that's

6   relevant, and I can read the Court some excerpts from discovery

7   that was served on us that I think would illustrate the point.

8           And so my understanding of the case is, what we're

9   talking about here, the failure to respond to the QWR, which

10  wasn't due until December 26th of 2009, and its consequences as

11  contrasted with the consequences of the wrongful foreclosure

12  and other illnesses or -- that she had or that she had to some

13  degree already at the time.  and until we understand the scope

14  of the case, whether it's as narrow as I believe it is or as

15  broad as I think Mr. Garber thinks it is, it's going to be very

16  hard to have meaningful settlement discussions.

17          THE COURT:  Let me ask a couple of questions.

18          MR. LEWIS:  Yes.

19          THE COURT:  Are you providing Mr. Garber the discovery

20  for the pre-QWR period or what are -- I mean, I'm not in --

21  we're not retrying the Deutsche Bank case.  Let me make that

22  crystal clear.  We're not retrying the Deutsche Bank case.  You

23  recovered against Deutsche Bank, and res judicata applies to

24  claims that were or could have been asserted against Deutsche

25  Bank.

1     Based on my opinion, what survived was the RESPA
2  claim.  And I found that noneconomic damages are potentially
3  recoverable on a RESPA claim.  I'll deal with any issues if,
4  as, and when they arise.  But based on rulings in other ResCap
5  matters, you should have no belief that I would permit an
6  amendment to the claim to assert other new theories against the
7  Trust.  What remains is the RESPA claim.
8     With that said, Mr. Lewis, the standard for the
9  permissible scope for discovery and what is admissible at trial
10  could be very different.  So I'm not precluding Mr. Garber nor
11  did I hear you say you were preventing Mr. Garber from getting
12  discovery about the pre-QWR period.  Whether he can link it up
13  and somehow establish why it's admissible, I'm not getting to
14  now.
15     MR. LEWIS:  Well, Your Honor -- so let me tell you
16  what I have responded to and how I've responded and what I have
17  yet to respond to, because it's not due yet but will be
18  shortly.  I believe, as my objections explain, that Mr.
19  Garber's document requests -- he sent two sets.  One had to do
20  with punitive damages, and I declined to answer any of those
21  because they're not available in RESPA claims, period.  And
22  this Court has also said that they're not available in this
23  case, at least twice that I know of.
24     I also thought his document requests on substantive
25  matters were overbroad in terms of time.  Nevertheless,

1   although making the objections to preserve them and other some

2   other objections to preserve them, I produced essentially

3   everything we had, our file, just to avoid a dust-up.

4           THE COURT:  Um-hum.

5           MR. LEWIS:  But let me read you a couple of these

6   interrogatories that I have yet to respond to because a

7   response is not due yet.  "What is the name, title of the

8   employer and address of the employee of GMACM who" --

9           THE COURT:  Just a little louder and slower.

10           MR. LEWIS:  I'm sorry, Your Honor.

11           "What is the name, title, employer and address of the

12   employee of GMACM who first decided to initiate the foreclosure

13   against the Macks?"  There's more like that.

14           Then, there's another one, for example, "Since January

15   1st of 2006" -- which is even before the wrongful foreclosure

16   began in 2009 -- "has GMACM initiated foreclosure actions

17   against any borrowers for which they were the owner of the

18   notes and mortgages or servicers, which actions were without

19   basis?"  I don't see how that's relevant to this case even

20   marginally.  And there's more like that.  And there's really

21   two things at issue as a consequence.

22           One is, obviously, I don't want to go through the cost

23   of responding to these things.  And the second is I think it

24   bespeaks an expanded view of the case that Mr. Garber has that

25   will affect how he sees his merits in the mediation.  And I'm

1  afraid a mediation will be futile because we will be so far

2  apart on the merits because of our differences on the scope.

3          Now, if the Court wants us to mediate under those

4  circumstances, I will do that.  but I think if you want to have

5  this case settled, which I certainly do, it's going to cost

6  more to litigate this case than I think we will have to pay out

7  in a judgment someday.  But if the Court wants us to do that,

8  we'll do it, although I think, as a consequence of the parties'

9  differing view of the scope, if I'm correctly characterizing

10 Mr. Garber's views, it'll be a nonevent.

11         THE COURT:  All right.  Let me hear from Mr. Garber.

12         And I -- Mr. Garber, let me say -- did I tell you last

13 time that I wanted you both physically present in court?

14         MR. GARBER:  No, Your Honor.  You said we could appear

15 by telephone.

16         THE COURT:  I -- okay.  I just wanted to be sure that

17 I was not the cause for Mr. Lewis to come from San Francisco --

18         MR. LEWIS:  No.

19         THE COURT:  -- and you to come from Florida.

20         MR. LEWIS:  Mr. Garber --

21         THE COURT:  I'm happy that the two of you are

22 together.

23         MR. LEWIS:  Mr. Garber wanted to be here in person, so

24 I couldn't afford to miss the opportunity.

25         THE COURT:  That's fine.  Okay.  I just -- I -- if --

1    I really do try to go out of my way to make sure,

2    particularly -- other than an evidentiary hearing, where

3    counsel is from out of town, is to accommodate -- I'm always

4    happy to have you here, so don't misunderstand me.  But I just

5    don't people unnecessarily having to travel.  It's better when

6    I see you and hear you, but -- okay.  But let's put that aside.

7         Go ahead, Mr. Garber.

8         MR. LEWIS:  Thank you, Your Honor.

9         Your Honor, with all due respect, I disagree with Mr.

10   Lewis' characterization of our discovery request.  RESPA --

11   it's my understanding that this claim is confined to a RESPA

12   claim.  And RESPA provides for two types of damages.  It

13   provides, number one, actual damages, which are not clearly

14   defined, but we've already argued over that.  And the other

15   one, it provides for -- I would characterize them -- as

16   punitive damages.

17        THE COURT:  I wouldn't characterize them as that,

18   but --

19        MR. GARBER:  And the way that the language in RESPA

20   handles it is that says in addition to actual damages, should

21   it be found that the conduct that is now complained against is

22   repetitive or endemic, then the Court shall allow an additional

23   1,000 dollars to that.  So --

24        THE COURT:  Mr. Lewis will give you -- right now,

25   he'll agree to pay the extra 1,000 dollars, okay?  I mean, it

1  just --

2          MR. GARBER:  That's true.  It's a small amount, but

3  the plaintiff has the burden of proving that they're entitled

4  to that.

5          THE COURT:  He'll give you the extra 1,000 dollars.

6          MR. GARBER:  If he'll do that today, then I can tailor

7  my interrogatories to --

8          THE COURT:  Mr. Lewis --

9          MR. GARBER:  -- cut that.

10          THE COURT:  -- you're not really fussing about 1,000

11  dollars, no?

12          MR. LEWIS:  No, Your Honor.  But I --

13          THE COURT:  It cost more for you -- the two of you to

14  fly here than --

15          MR. LEWIS:  I have to say that that RESPA claim does

16  not appear, not only in the original proof of claim but in

17  anything else.  I consider that an attempt to amend the claim

18  when the time to amending the claim has passed.  But --

19          THE COURT:  Look, you're not fighting about --

20          MR. LEWIS:  -- that's not going to get in the way of

21  this case.

22          THE COURT:  -- you're not fighting about 1,000

23  dollars.

24          MR. LEWIS:  No.

25          THE COURT:  Just -- you know?

1        MR. GARBER:  Okay.  So the reason that we have asked

2   for some information prior to the foreclosure is to establish

3   the pattern of conduct, and that's all.  We're not going to

4   retry the Deutsche Bank case, and I'm not trying to do that.

5   And I'm sorry if he took the discovery as related to that.  I

6   didn't mean that.

7        THE COURT:  Okay.

8        MR. GARBER:  Your Honor, the other point that he

9   has --

10       THE COURT:  Mr. Garber --

11       MR. GARBER:  Yes, Your Honor.

12       THE COURT:  -- I am not going to permit discovery

13  about other instances when GMAC or Homecomings or one of the

14  other debtors that serviced loans engaged in what you may

15  consider to be wrongful foreclosure or things of that nature.

16  This case is going to be tried about the Macks and their -- the

17  handling of their loan and not how any of the debtors handled

18  anybody else's loans.  You can read some of my recent opinions

19  that have, in one case, after trial upheld -- allowed a claim

20  under the New Jersey Consumer Frauds Act with respect to the

21  Reeds -- Frank and Christina Reed over things that happened in

22  the efforts to foreclosure their house in New Jersey or, in a

23  recent opinion -- I haven't ruled on the ultimate merits, but I

24  overruled an objection to the claim of Tia Smith in California

25  arising under the Unfair Competition laws, Business and

1  Professions Codes 17200 in California.

2        I overruled an objection in part as to the Gilberts

3  claim in North Carolina.  One doesn't have to be a rocket

4  scientist to see that there were instances -- maybe many, maybe

5  not, I don't know -- where one of the debtors took

6  inappropriate action, for wont of a better term.  I mean, there

7  are reported decisions that focus on alleged robo-signing by a

8  guy, Jeffrey Stephan.  So there's no question that various of

9  the ResCap debtors were sloppy or worse in mortgage

10 foreclosure.

11       I know that.  Mr. Lewis knows that.  His firm wasn't

12 representing them at the time, but that's not what -- we're not

13 going to have -- if that's what you're trying to -- if you

14 think the statute, whether your claim includes it now or not,

15 whether you think you're going to amend it or not, if the

16 statute provides if there's a pattern, you get 1,000 dollars,

17 you're not here fighting about 1,000 dollars.  So I'm not --

18 there's a fixed amount available as part of the confirmed plan

19 to satisfy borrowers' claims.

20       Every dollar -- every additional dollar spent in

21 discovery or trial or pre-trial proceedings dilutes the amount

22 that will be available to satisfy borrowers' claims.  In the

23 opinion with respect to the claim of Frank and Christina Reed,

24 one of the reasons that I declined to award punitive damages, I

25 also found they hadn't established the standard for it, but I

1  also said that punitive damages are inappropriate in a case

2  where it's not the debtor -- it's not the defendant that's

3  going to be punished.  It's going to be people with -- who

4  filed proof -- who have allowed claims -- borrowers with

5  allowed claims against the debtors who are going to suffer

6  because of dilution of the amount available for recovery.

7          So I'm not -- I don't mean to be lecturing you.  Mr.

8  Mack has a serious claim against the debtors.  I've already

9  written an opinion about it.  If we have to try it, we're going

10  to go ahead and try it.  We're not going to try how GMAC or

11  Homecomings or RFC or any of the other debtors, what they did

12  with respect to anybody else's loans.  We're going to try it

13  with respect their handling of the Macks' loans.

14          With respect to -- let me make clear, I'm not ruling

15  today on specific discovery requests.  If I have to, I will.

16  What I just said, though, Mr. Lewis, doesn't mean that Mr.

17  Garber can't inquire -- we're not retrying the Deutsche Bank

18  case, but I -- unless I'm given specifics about why, it seems

19  to me that the whole course -- just the way Mrs. Macks' medical

20  history, going back well in time, is relevant to -- may not be

21  relevant evidence at the trial, but it was certainly relevant

22  to what you want discover.  I don't see any reason why Mr.

23  Garber shouldn't be able to inquire about the entire history of

24  handling of the Macks' loans even though he can't seek to

25  recover for those things that are barred by res judicata that

1    I've already ruled on.

2            That's just kind of general, based on that rule and on

3    specific discovery requests at this point.

4            MR. LEWIS:  Your Honor, may I --

5            THE COURT:  So I had a fairly strong reaction to the

6    extent that if Mr. Garber's seeking to open discovery up to

7    what ResCap did with respect to other people's loans.  But that

8    isn't to say that I won't have the same feeling about what he's

9    trying to discover with respect to the Macks' loans here.

10           Go ahead.

11           MR. LEWIS:  Your -- a couple of things quickly.  First

12   of all, I was certainly not asking the Court to rule on a

13   discovery --

14           THE COURT:  Yeah.

15           MR. LEWIS:  -- fight that's not in front of the Court.

16   It was for a different purpose that I was quoting that

17   discovery.

18           The second thing is my understanding of this case is

19   it's about the 10/26 QWR, GMAC and its apparent failure to

20   respond to it in time and the consequences of that.

21           THE COURT:  So look, let me just stop you.  I'll let

22   you go on, but I just -- I've learned more about RESPA in this

23   case than I ever wanted to know.

24           MR. LEWIS:  Me, too.

25           THE COURT:  And I suspect there is a lot more about

RESIDENTIAL CAPITAL, LLC, ET AL.                    17

1  RESPA I don't know now, okay?  But I've learned a lot about
2  RESPA.  I don't know, Mr. Lewis.  I understand RESPA allows a
3  servicer a particular amount of time to respond.  That time has
4  been shortened, but the shortened time doesn't apply here.  I
5  don't know, for example, whether there are arguments that can
6  be made where the qualified written requests ask for
7  information that's so obvious and apparent and requires no
8  research other than a minor inquiry or they already know it
9  that liability is excused by the fact that they can sit back
10 for sixty days before responding to it.
11        I don't know, okay?  I haven't seen any cases that
12 deal with that.  What I do know is that well before the QWR,
13 Mrs. Mack, on multiple occasions, contacted GMAC trying to
14 figure out why this foreclosure action was brought.  And I'm
15 not saying the evidence -- what I've been told is or read in
16 papers is that GMAC said, oh, it's a mistake.  It'll be
17 stopped.  Okay?  If it was a mistake when they told it to her
18 on the phone, it -- when they finally, in frustration or
19 otherwise, sent a written qualified request, it suddenly didn't
20 become information that was too complicated that required sixty
21 days to respond.  Okay?
22        I don't know as a matter of law whether RESPA
23 liability can be predicated on what happens from the time the
24 request is made until the deadline for responding.  They didn't
25 respond, okay?  So I just don't know, and I'm not -- but

1  there -- you would have a hard convincing -- if -- you've never

2  disputed that GMAC told her, oh, it's a mistake, don't worry

3  about it and this crazy lawyer, Stern, in Florida, now

4  disbarred, wouldn't stop the case.

5          So I mean, there are certainly inquiries that a

6  qualified written request could make that require time to

7  respond accurately.  And maybe there were things in this

8  one -- I don't have the written request in front of me, but

9  maybe there were things in here that did.  But a request to

10 find why GMAC was continuing to prosecute a foreclosure when

11 they weren't in default is not one of those things.

12         So I -- but I don't know.  I'm not --

13         MR. LEWIS:  I understand that, Your Honor.

14         THE COURT:  It's what bothered me about this case from

15 the start.

16         MR. LEWIS:  I understand that.  And I would be content

17 to respond to targeted discovery about issues like that.

18 That's not what I'm facing here, and I think -- and again,

19 that's not before the Court today.

20         THE COURT:  Hold on a second.  I would assume that you

21 have already turned over every shred of paper to Mr. Garber

22 that deals with the servicing of the Macks' loan.

23         MR. LEWIS:  Yes, everything in the work room --

24         THE COURT:  Whether it's the --

25         MR. LEWIS:  -- that the client collected.

1        THE COURT:  -- servicing notes or whatever else there

2    was, whether the -- I don't know.  Were there requests for

3    electronic -- you know, for e-mails or things like that?  I

4    don't know what the requests have been.  I'm not sure what it

5    is that you have that he's asking for that you haven't

6    provided.

7        MR. LEWIS:  I don't think there's anything, and I'm

8    more than happy to respond to targeted discovery that reflects

9    even the possible scope of this case.  But the possible scope

10   of this case really is from October 26th on.

11       THE COURT:  Well, you say that, but -- okay.  That's

12   probably true, but I'm not ruling on that now.  But Mr. Lewis,

13   for discovery purposes, it seems to me -- and you -- but you

14   already may have done this -- is when did GMAC first have any

15   involvement with the Macks.  When did they start servicing the

16   loan?  What are the -- you've given them all the servicing

17   notes?

18       MR. LEWIS:  Yes.

19       THE COURT:  From day one and --

20       MR. LEWIS:  Yes.

21       THE COURT:  -- not October 26th?

22       MR. LEWIS:  I have.  And as a matter of fact, he has

23   them already from earlier litigation.  But I believe it's my

24   responsibility to give it to him again.  So I did.

25       THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, ET AL.                    20

 1          MR. LEWIS:  In fact, what Mr. Garber --

 2          THE COURT:  What is it that you -- Mr. Garber, what is

 3   it that you're asking for that -- for discovery purposes, I'm

 4   not saying any of it -- I'm not saying what, if any of it, is

 5   going to be admissible at trial.  But what is that you want?

 6          MR. GARBER:  Your Honor, we have received

 7   approximately 140 pages of documents that have been Bates

 8   stamped from ResCap or GMAC.  They're all documents I already

 9   had before.  One of them was even one that I filed with this

10   complaint.  It's the notes -- the purged loans notes about

11   this.

12          Now, it can't possibly be true that GMAC has given me

13   all that they have on this case.  And --

14          THE COURT:  I don't know.

15          MR. GARBER:  -- I will --

16          THE COURT:  Go ahead, tell me.

17          MR. GARBER:  -- show you why I believe it.

18          THE COURT:  Okay.

19          MR. GARBER:  So Your Honor, you don't have a copy of

20   the purged loan notes in front of you, but I will try to go

21   over them in a manner in which it may be clear to the Court.

22          These loan notes go back to the beginning of the loan,

23   and they, of course, went through the time of the foreclosure.

24   And I've highlighted certain portions to the Court in my

25   defense of this claim.  But they went on after that.  The Macks

1  had a contract to sell their property, which they did when they

2  felt they were going to be foreclosed against.  They sent

3  certain documents in support of that to -- or at least it

4  indicates in on the purged loan notes to GMAC.  I don't have

5  those.  They were not supplied to me.

6          Later on, in January and February of 2010, the Macks

7  were trying to close the sale of their house and pay off the

8  loan.  And there were several back and forths, according to the

9  purged loan notes, between the Macks, their attorney -- not me.

10 They had an attorney --

11         THE COURT:  Um-hum.

12         MR. GARBER:  -- for the closing -- and GMAC.  And if I

13 can refer to them specifically --

14         MR. LEWIS:  Your Honor, I have an extra copy.

15         MR. GARBER:  -- on the -- I only have this one.  But

16 if you turn to 1/14/2010 -- it's difficult to read these things

17 because they're kind of disjointed, but I will read what I have

18 here.  This is a purged loan note, and it was written on behalf

19 of Agent 12883 for GMAC.

20         And it says, "Mailed letter advising there is a

21 balance of liquidation/preservation fees on your account in the

22 amount of 3,712 dollars."  That was the money that GMAC paid

23 for this foreclosure.  That was their service, their fees to

24 their attorney and so forth, and they were demanding that they

25 be paid that money before they would release their mortgage so

1  that it could be sent.  And they say down here they sent a

2  letter saying that.  I don't have that letter.  I never got it.

3       There's another reference on the 15th where my clients

4  sent the listing agreement on the sale of their property, which

5  GMAC insisted they have in order to release the mortgage.  And

6  I don't have a copy of that.  They didn't give me a copy of

7  that.

8       Later on -- I won't go over single letter, but it

9  suggests there are probably are three or four letters back and

10  forth that were never given to me.  Later on that year,

11  primarily in September and October, the Macks came to the

12  conclusion that they -- I won't get into that now because we're

13  not here to try the case.  But they came to the conclusion that

14  they could not stay in Naples.  They had to move back to South

15  Jersey, and they bought the house of Mrs. Mack's sister.  And

16  they applied for a loan, but they ran into a problem because

17  their credit was shot because they had a foreclosure.

18       So Mrs. Mack started writing in October of 2014

19  demanding that their credit be repaired.

20       THE COURT:  Not 2014.

21       MR. GARBER:  I'm sorry, you're correct, 2010,

22  demanding that their credit be repaired.  And there are

23  numerous entries here of telephone calls and letters and so

24  forth.  We have never had -- I've been given a copy of any of

25  those letters explaining why their credit cannot be repaired,

1  why it has to be damaged.  And I want that.

2           That is in addition to -- and I've asked separately --

3  that we be given copies of all documents that GMAC would

4  have -- although the Macks did not borrow money from GMAC on

5  this New Jersey house, GMAC bought the loan.  And they wound up

6  owning the loan on the --

7           THE COURT:  On the New Jersey house?

8           MR. GARBER:  On the New Jersey house.  And so I've

9  asked for a copy of the entire file from the New Jersey house,

10  too.  And that has been objected to.  GMAC refuses to give it

11  to me.  They say that has nothing to do with a mortgage down in

12  Florida, but I think it does because they're still fighting

13  this battle over credit scores.

14           They -- I don't know if they paid more money on their

15  loan, probably did, higher interest rate because they could not

16  get this resolved with GMAC.  So is it relevant to our claim?

17  I don't know, but I think I should be able to look into it and

18  consider if that could be brought.  We do want that.

19           We have filed a request for a production of materials

20  that would support a punitive damage request, and I understand

21  very clearly the Court's ruling now that that would not be

22  relevant and not be permitted by the Court.  And so I'm not

23  here to present --

24           THE COURT:  You're -- let me just -- I don't want to

25  be too hasty in -- do you think the statute permits you to

1    recover more than the 1,000 -- that additional 1,000 dollars?

2            MR. GARBER:  Your Honor, I have not found a single

3    case that would suggest that.

4            THE COURT:  Okay.

5            MR. GARBER:  As a matter of fact, to the contrary, I

6    have found numerous cases that suggest to the contrary.  Are

7    those courts are all right?  Could it be possible?  I don't

8    know, but it would be a very difficult argument.

9            THE COURT:  Okay.  Because, look, I have shown no

10   hesitancy even with a debtor in a Trust to give what statutes

11   provide.  So for the Reeds, it was New Jersey Consumer Fraud

12   Act, treble damage statute.  I found the damage; I trebled it.

13   Okay?  The California Unfair Competition Law, treble damage

14   statute, that's what the statute provides.  We'll see whether

15   the claimant recovers under it.  So far, the objection was

16   overruled to it.  But -- so if RESPA -- if the statute says if

17   you show X, Y and Z, you get an extra 1,000 dollars, if you

18   show X, Y and Z -- if Mr. Lewis put you to the test of --

19   the -- I can't imagine the Trust spending an hour of a lawyer's

20   time trying to establish you're not entitled to 1,000 dollars,

21   okay?  That's what -- you're not here fighting about 1,000

22   dollars, okay?

23           Go ahead, Mr. Garber.

24           MR. GARBER:  Okay.  So we feel that we have other

25   documents -- now, I don't think Mr. Lewis has this.  This is

1   not Mr. Lewis' fault.

2          THE COURT:  Look, if Mr. Lewis had the documents I

3   have absolutely no doubt he would just give you the documents.

4          MR. GARBER:  I think he would, too.  I think that GMAC

5   either has the documents or they have destroyed the documents.

6          THE COURT:  Well, there are other alternatives --

7   there are other things that may have happened along the way,

8   too.  They may never have kept them in the ordinary course.

9          If you read the flow of decisions which you probably

10  don't want to waste your time doing but it seems like every

11  week I have another written decision in another borrower claim

12  or another -- so even something during the case, they have to

13  send to object to -- before they can object to a claim, they

14  have to send a request letter.  Well, on some of them they have

15  the forms of the letters but not the letters themselves they

16  sent to specific people.

17         Mr. Lewis, I am sure, understands that the Trust must

18  produce documents in -- when I say "its", it includes from the

19  debtors, right -- their possession, custody or control.  They

20  can't produce what they can't find, what they don't have.  If

21  and when the time comes and you have arguments about what the

22  consequences should be of failure to produce the documents,

23  well, I'll listen to it.  I can't --

24         At one point in this case, Mr. Lewis -- and that's

25  focused on the borrower -- not, Mr. Lewis, I'm sorry, Mr.

RESIDENTIAL CAPITAL, LLC, ET AL.                    26

1  Garber -- for both of you, I think Mr. Lewis probably knows

2  this, in connection with the examiner report, nine million

3  pages of documents were produced.  There have been other

4  countless productions of documents in this case.  There are

5  electronic copies of a lot -- a lot of stuff was scanned.

6          So, Mr. Lewis, Mr. Garber has pointed to servicing

7  notes, he refers to as the purged loan notes that reference --

8          MR. LEWIS:  Yeah, let me explain first the term

9  "purged".

10          THE COURT:  Go ahead.

11          MR. LEWIS:  It's nothing ominous.

12          THE COURT:  I'm not -- I don't think it --

13          MR. LEWIS:  Just so you know --

14          THE COURT:  Okay.

15          MR. LEWIS:  -- what happens is when the loan notes get

16  to a certain age, they are retired to another computer

17  system --

18          THE COURT:  Okay.

19          MR. LEWIS:  -- and purged from the main computer.

20  That's why it's called purged loan notes.  I was struck by the

21  number of documents that the client gave me access to on this

22  online workroom and so I questioned them about it.  And I was

23  told in part what you have just said.  A lot of the documents,

24  they don't actually keep the originals.  They generate them

25  from a database, but they don't keep a copy of what's

1    generated.  It's gone.  And the only way to produce it would be

2    to go back and regenerate it from the database with the same

3    parameters.  That's why there aren't as many documents as you

4    might expect.  That's what I understand.

5              On the New Jersey house, this is very strange, I have

6    to say, when I got this document request about the New Jersey

7    mortgage, I asked Mr. Garber in an e-mail, I think it was, or

8    maybe a letter, what's this about?  It's not Florida.  And I

9    got a letter back from him saying, "Oh, yeah, it's a

10   different -- it's not relevant.  Don't worry about it."  I

11   didn't bring that letter with me because there was no reason

12   for me to.  I'm stunned, frankly.

13             THE COURT:  I don't know, his explanation of why he

14   wants it sounds plausible.  I'm not ruling on the request

15   but -- and I'm sure -- I don't know whether the two of you have

16   had a discussion focusing on that letter, so if -- GMAC

17   commenced an improper foreclosure action against the Macks

18   because the Macks were current when the foreclosure action was

19   filed.  Mr. Stern wouldn't dismiss the case.  He defaulted on

20   the cross-complaint against Deutsche Bank.  He's disbarred.

21             The Macks, I gather from the litigation against

22   Deutsche Bank, sold the house, lost money in the sale,

23   recovered as part of their damages against Deutsche Bank, the

24   diminution in value to the property by reason of the wrongful

25   foreclosure.  I don't know if that's exactly what -- that's the

1    gist of what I took away from part of their recovery.  Okay?

2          If what Mr. Garber is saying is that to try and get

3    back on their feet, the Macks bought from one of their

4    relatives, a house in New Jersey, moved out of the house in

5    Florida, moved to New Jersey because of the wrongful

6    foreclosure, their credit was impaired, if his argument is if

7    GMAC had timely responded to the QWR, and acknowledged

8    wrongful -- essentially that the foreclosure action was

9    commenced in error, that the Macks were current on their loan,

10   credit reporting agencies might well have treated the Macks

11   differently.  Their credit may have been -- their credit scores

12   may have been different.  The reluctance of other banks to lend

13   may have been different.

14         So I don't -- I'm not saying it is part of recoverable

15   damages on the RESPA claim.  I'm not saying it's not.  At

16   least -- from the way at least Mr. Garber described it today,

17   at least -- unless and until I get a precise discovery dispute

18   over it, it seemed plausible to me that he was requesting that

19   information.  It may not be how he described it to you before.

20   It may not be the way it should be described today.  But at

21   least as the way he described it to me a few minutes ago, I

22   can't say -- I don't react to that the same way I did to his

23   trying to find out about any other loans that GMACM -- to

24   totally unrelated borrowers.  It's linked to the Macks, okay?

25         And I could see plausibly how he could argue it's

RESIDENTIAL CAPITAL, LLC, ET AL.                          29

1    linked to their failure to respond to the QWR because it

2    resulted in continued adverse effects to their credit rating.

3    It cost them money in terms of higher interest rate on a loan

4    or ability to get a loan.  How did GMAC wind up owning the loan

5    on their new house?  Do you know?

6             MR. LEWIS:  No.  But, Your Honor, here's the thing

7    about that.

8             THE COURT:  Do they still own that loan?

9             MR. LEWIS:  I believe they do.

10            THE COURT:  They didn't sell -- this didn't go to

11   Berkshire Hathaway?

12            MR. LEWIS:  I don't know.  Oh, did GMAC sell the loan?

13   Oh, I imagine they did.

14            THE COURT:  Okay.

15            MR. LEWIS:  I don't know.

16            THE COURT:  All right.  Do you think they still own

17   the loan, Mr. Garber?

18            MR. GARBER:  Your Honor, I haven't been told to the

19   contrary, so I don't believe they do.

20            THE COURT:  You know, they -- I wouldn't expect you to

21   know in the bankruptcy case.  I mean, they still do own some

22   loans, not a whole lot.  They sold most of their loan portfolio

23   to Berkshire Hathaway during an auction in the bankruptcy.  I

24   have no idea whether this was one of them or not.  And they

25   have sold it separately to somebody else before or after.  I

1  have no idea.  This is the first I'm hearing that.

2          MR. LEWIS:  Well, I was kind of stunned by it.  We did

3  actually --

4          THE COURT:  GMACM's relationship with the Macks

5  extended beyond the house in Florida.

6          MR. LEWIS:  We actually did find the note and the

7  trust deed.  I was stunned.  I contacted the client.  They were

8  kind of puzzled.

9          THE COURT:  Could you find out if they still own it?

10          MR. LEWIS:  I didn't ask that question.

11          THE COURT:  No, could you find out?

12          MR. LEWIS:  Oh, sure.  So let me --

13          THE COURT:  It wouldn't be unheard -- does he still

14  live in that house in New Jersey?

15          MR. GARBER:  Yes, Your Honor.  Mr. Mack still lives

16  there.

17          MR. LEWIS:  So, Your Honor --

18          THE COURT:  It wouldn't be the first time that

19  something like that figured into settlement discussions, Mr.

20  Lewis.

21          MR. LEWIS:  The thing about the credit score, when the

22  Macks got a judgment in May of 2011 at the prove-up hearing on

23  the default judgment, that judgment included damages not only

24  for the loss value of the house but for emotional distress and

25  for credit damage.  That's after they moved to New Jersey.

1    They've already recovered for it.

2              THE COURT:  We'll see.  Okay.  You may absolutely be

3    right but if we're -- you ought to meet and confer with Mr.

4    Garber, and if he what he wants are documents that relate to

5    the New Jersey property that they bought while they were

6    selling as part of the continuation of this -- they had to move

7    somewhere.  They moved from Florida.  They moved to New Jersey.

8    I think you ought to meet and -- I'm not ruling on it now.

9              MR. LEWIS:  Your Honor?

10             THE COURT:  It may be that there's something that I

11    don't understand, so I am not --

12             MR. LEWIS:  I'm not one to stand on a lot of

13    technicalities, particularly when there's not a lot of burden

14    involved.  If Mr. Garber has now changed his mind from what he

15    told me in his letter that he now wants it, I'll give it to

16    him.

17             THE COURT:  You'll two talk about it, okay?

18             MR. LEWIS:  I'll give it to him.

19             THE COURT:  Okay.

20             MR. LEWIS:  It's as simple as that.

21             THE COURT:  Let me ask a couple of questions.  When we

22    had the last telephone hearing, much of the discussion was

23    about medical records and the cost of obtaining medical

24    records.  During the telephone hearing, you quite reasonably

25    narrowed the time frame for which you were seeking records.

1  But that left it with the two of you sort of going back and
2  sort of dealing with some of the providers.  Do you now have
3  the medical records you need other than -- I know you may want
4  to take a doctor's deposition.  You said you read some notes
5  that are hard to read.  Tell me what the situation is with the
6  medical records.

7          MR. LEWIS:  The only medical records that I now need,
8  whatever may be left, are the medical records of Mrs. Mack's
9  emergency treatment and follow-up for her overdose.  I don't
10 have those yet.

11         THE COURT:  That's a Florida hospital?

12         MR. LEWIS:  Yes, and I need them.

13         THE COURT:  Okay.  And what was the status of -- and I
14 think when we had the hearing on the telephone, I suggested
15 that things that were -- records that were sort of
16 geographically in Mr. Garber's area, he ought to take the lead
17 in trying to obtain them.  If they were elsewhere, it may make
18 more sense for you to go ahead.  What's the status of those
19 records with respect to her treatment for the overdose?

20         MR. GARBER:  Your Honor, with respect to her treatment
21 for the overdose, there are two types of records; number one,
22 there's the hospital records.

23         THE COURT:  Right.

24         MR. GARBER:  And we have those hospital records and
25 we've give (sic) them to him --

1          THE COURT:  Okay.

2          MR. GARBER:  -- given them to Mr. Lewis.

3          THE COURT:  Uh-hum.

4          MR. GARBER:  And they will be the bulk of it.  They'll

5   be ninety percent of it.  But in addition to that, there were

6   treating physicians that may have come to see her and they may

7   have some office notes.

8          THE COURT:  Okay.

9          MR. GARBER:  We have been able to identify two

10  physicians that might have such notes.  Number one is her

11  psychiatrist, a guy named Dr. Lichi.  He moved.  He's now in

12  northern Florida.

13         THE COURT:  That's who we've heard -- I've heard about

14  him.

15         MR. GARBER:  Yes.

16         THE COURT:  Where did he move to?

17         MR. GARBER:  Northern Florida, near Tallahassee.

18         THE COURT:  Okay.

19         MR. GARBER:  And he's been giving us trouble but he

20  did give us five pages of medical records.  The other one is

21  her primary care doctor, a Dr. Foley in Naples.  We don't even

22  know where she is.  We have an old address on her.  The mail is

23  coming back.  We want not only her medical records that would

24  show some of the history but also the stay in the hospital --

25         THE COURT:  Um-hum.

RESIDENTIAL CAPITAL, LLC, ET AL.                    34

1          MR. GARBER:  -- and after that.  We want not only

2    those records; we want to take a deposition.

3          THE COURT:  The Florida Medical Board, has somebody

4    checked with them to see whether they have a current address?

5    Is she still licensed in Florida?

6          MR. GARBER:  She's still licensed in Florida and they

7    have an old address on her and the mail's coming back from

8    that.  So I think we're going to be able to find it but we've

9    run up against a stone wall.

10          The other source of records, the big source of records

11    that I think we have here is in northern Florida at the Mayo

12    Clinic --

13          THE COURT:  Yes, we had a discussion about the Mayo

14    Clinic last time.

15          MR. GARBER:  -- we have had trouble with them.  They

16    lost our request.  We sent them another request.  We've been on

17    their back, and they now say that they don't have to send us

18    all of the paperwork which would be many, many, many thousands

19    of pages, that they can put them on CDs.  And they've given us

20    an estimate, I think, of 1,500 dollars.  So I told my associate

21    to please go ahead and order those things.

22          THE COURT:  Okay.

23          MR. GARBER:  Get them in and you left open who should

24    pay for that --

25          THE COURT:  Right.

RESIDENTIAL CAPITAL, LLC, ET AL.                    35

1          MR. GARBER:  -- but we need them in.

2          THE COURT:  Okay.

3          MR. GARBER:  And we have one final thing that I think

4    is needed for our case, even whether they think they need it

5    for theirs.  There was a treating doctor in New Jersey, a Dr.

6    Dorfner, who was the primary care doctor during various

7    hospitalizations, various injuries.

8          THE COURT:  Did she pass away in New Jersey?

9          MR. GARBER:  She passed away in New Jersey in the fall

10   of 2013.  So Dr. Dorfner, as far as we can tell, is going to

11   have the most information about her care in New Jersey while

12   she was out there for a year-and-a-half or two years.  And we

13   need to take his deposition.  So --

14         THE COURT:  Did you get his records yet?

15         MR. GARBER:  No, we don't have his records.  Well, I

16   take that back.  We have some records from him because they

17   were supplied through the hospital.

18         THE COURT:  Okay.

19         MR. GARBER:  But we don't have his records from his

20   office.  But we have them from the New Jersey Hospital and we

21   supplied those.

22         THE COURT:  Has someone communicated with him through

23   this -- have you served a subpoena -- anybody served a subpoena

24   on him for his office records?

25         MR. GARBER:  No, we have not served any subpoenas.

RESIDENTIAL CAPITAL, LLC, ET AL.                                36

1   We've narrowed it down to these three individuals and it looks

2   like at least on Dr. Lichi, we'll have to serve the subpoena.

3   He is not going to cooperate with us.  So --

4            MR. LEWIS:  Which is disturbing.

5            THE COURT:  Well, just pull the microphone a little

6   closer, Mr. Lewis.

7            MR. LEWIS:  Yeah.  Because under both New Jersey law

8   and Florida law -- I researched this -- they are required to

9   provide those records if requested.  They charge a reasonable

10  fee for it, but it's not optional with them.  And I am not

11  suggesting that --

12           THE COURT:  Tell me this, Mr. --

13           MR. LEWIS:  -- Mr. Garber isn't doing his part on

14  that.

15           THE COURT:  Tell me this, is this the first person

16  you've ever served a subpoena on who has given you a hard time?

17           MR. LEWIS:  Well, I haven't even served a subpoena on

18  him.

19           THE COURT:  Okay.

20           MR. LEWIS:  Yeah.

21           THE COURT:  Is it -- I --

22           MR. LEWIS:  No.  But I grew up in a medical family and

23  I find it disturbing.

24           THE COURT:  Okay.

25           MR. GARBER:  Your Honor, I deal with this all the

1    time.  It's not surprising to me.  And he has given us the

2    records, but I can't read those records and I do think it's

3    necessary to talk to him --

4              THE COURT:  Okay.

5              MR. GARBER:  -- and find out what he knows.

6              There is one other item that I have that I wanted to

7    bring up with the Court.  I think this is just form over

8    procedure but I want to make sure that I've touched on it.  The

9    Court knows that Cheryl Mack died in the fall of 2013.  Barry

10   Mack, her husband, is her executor and he's also the

11   beneficiary of her estate.  Does the Court need that we add the

12   Estate of Cheryl Mack as a party or can we go forward on this?

13             THE COURT:  What's your position, Mr. Lewis?

14             MR. LEWIS:  I don't care, Your Honor.  I told Mr.

15   Garber that this morning.

16             THE COURT:  Here's what I -- you're getting outside of

17   my area of expertise, okay?  I think I had this come up once

18   maybe but I think what might be the most expeditious way to

19   work on something -- to solve an issue that neither of you seem

20   to making an issue is to enter into a written stipulation that

21   just makes it clear that he can proceed without substituting

22   the estate.  See if you can work it out, okay?

23             MR. GARBER:  Yes, Your Honor.

24             MR. LEWIS:  I'm sure we can.

25             THE COURT:  It's fine with me.  If you can't agree --

1        MR. LEWIS:  We won't have any trouble agreeing, Your

2   Honor.

3        THE COURT:  Okay.  I think I had one other case where

4   somebody did have to substitute the estate but the parties

5   couldn't agree on anything.  I think this should be the least

6   of the problems, okay?

7        MR. GARBER:  Okay.  Your Honor, I had four items.  All

8   the four items have been covered.

9        THE COURT:  Okay.

10        MR. GARBER:  And I think I understand --

11        THE COURT:  So give me some -- what I want to know

12   about is timing.

13        MR. LEWIS:  Your Honor, I think we will finish

14   discovery in the four months, assuming things continue to

15   percolate along as they are now.

16        THE COURT:  Just a little closer to the microphone.

17        MR. LEWIS:  Sure.  I'm sorry, Your Honor.  I should

18   have gotten the message the first time.

19        THE COURT:  No, it's okay.

20        MR. LEWIS:  I think I will finish fact discovery in

21   the four months originally set aside if things continue to

22   percolate along as they have been.  I don't see taking a lot of

23   depositions.  I see a few and they are going to be in different

24   places and probably towards the end of the process.

25        I think Mr. Garber's nearly done producing documents

1   to me and there's going to come a point where I am going to

2   tell him don't bother with anymore anyhow because I don't need

3   to know everything.  I just need to have enough information

4   that's collaborated (sic) in some way that -- corroborated in

5   some way that I can be comfortable with what I have, and I'm

6   very close to that.  And the last batch of stuff that Mr.

7   Garber has talked about this morning that he hopes to have to

8   me, ought to cap that off.  So that's where I see it and that

9   would put us in the expert discovery period which the Court set

10   aside two months for.

11        There may be other issues that come up along the way.

12   I'm expecting, frankly, that we will have some disagreements

13   over discovery but we will deal with those if and when they

14   happen and we can't get them resolved amongst ourselves.

15        THE COURT:  Okay.  Let me raise a couple of other

16   general subjects without -- I'm just -- look, I'm still hoping

17   that you can come to an agreement to settle the matter; you

18   will or you won't.  It strikes me if you can't settle the

19   matter by agreeing on a number for an allowed claim, it raises

20   some issues about how you want to proceed in this court to try

21   the issues.  It does strike me that the trial could be time

22   consuming and, therefore -- with a lot of witnesses and

23   expensive for both of you.

24        So I have encouraged parties on occasion to try and

25   agree on a streamlined, expedited means for trying a case.

1   Section 502(c) of the Bankruptcy Code provides for estimation

2   of claims, and in one hotly contested matter, the parties had

3   been litigating for six years in state court before the

4   bankruptcy started.  And if a full-blown trial had been

5   necessary, yeah, I said, fine, I'll do it but I suggested, why

6   don't you see if you can agree to a more summary trial.

7           So I don't know whether you practice bankruptcy law or

8   not, Mr. Garber; the 502(c) estimating claims -- you can go

9   read Collier, the Bankruptcy treatise -- a bankruptcy judge has

10  very broad discretion in establishing the procedures for an

11  estimation hearing -- estimation trial.

12          And so what I got the parties to do was they

13  consensually agreed.  They tried the case.  Each side would

14  call no more than two witnesses.  I agreed in advance and they

15  agreed that the hearsay rules would not apply and that I would

16  give such weight to hearsay evidence as I deemed appropriate so

17  that, like, if people were talking about meetings, they were

18  talking about what other people said and I listened to it all.

19  It turned out there weren't any real great disputes, but if

20  someone had been a stickler about hearsay rules, it would have

21  taken around another two days of trial to get the same evidence

22  in.

23          They didn't need any experts.  But I tried the case,

24  I'm trying to think whether it was a day or two and I wrote an

25  opinion and solved it and I've got to tell the lawyers told me

1   afterwards they said, we could have litigated this for another

2   three years and we would have gotten to the same place that we

3   did at the end.

4           When I was a lawyer, in one particularly contentious

5   matter, a complicated, contentious matter, the parties agreed

6   to a summary trial before a magistrate judge in New Jersey.  We

7   did it.  We agreed on the ground rules for it.  Each side put

8   on a few witnesses.  We had lengthy argument.  We basically --

9   we did away with the hearsay rule and it got the matter -- I

10  honestly don't remember there how we wound up concluding

11  whether it was going to be binding what the magistrate judge

12  did or not, but he listened to a couple of days of evidence and

13  argument and he basically told us what he thought and we agreed

14  and we settled it on that basis.

15          So all I'm suggesting is look, if you can't do that,

16  fine.  I'll try whatever is necessary.  I'll apply the rules of

17  evidence.  If you try to introduce stuff that I don't think

18  should come in, I'll rule on it, keep it out and the same goes

19  the other way.  But I don't know that you're going to achieve a

20  result substantially different from if you do a full-blown

21  trial, if you try and agree on something more summary.  I'm

22  just throwing some things out.

23          If you don't want to do it before me, agree on ADR

24  where you do it before somebody else that you agree on.  I

25  don't know.  I just -- I'm always concerned about how much time

1  it takes me to hear a trial of a matter.  When I do trials, I
2  do them day-to-day.  I mean and some -- you know, a lot of
3  bankruptcy judges windup not doing that because we have bench
4  trials and I never liked as a lawyer in an arbitration when it
5  got extended out over two months with a day here and there, I
6  hated it.  And so every trial I've done as a judge, I do them
7  day-to-day.  I work with my calendar and move it around.  I may
8  hear some emergency matters in an afternoon but I try things
9  day-to-day and we get it done and everybody -- I want it fresh
10 in my mind and I want the lawyers to be able to concentrate and
11 focus, put their evidence on and arguments.  But I'm still
12 hoping that once each of you have all the information you need
13 to evaluate settlement, with or without a mediator -- you're
14 both experienced lawyers.  You don't always need a mediator to
15 help you in that circumstance.  You'll find a way to solve this
16 problem.
17        Anything else either of you want to raise today?
18        MR. GARBER:  Your Honor, to briefly give the Court an
19 idea of where we're coming from, there's a Roman saying that's
20 something to, "Si Vo (sic) Vis Pacem, Para Bellum," which means
21 "If you want peace, prepare for war."  And so I have been
22 focused on, if we do go to a trial, what would it be because
23 that's the best means to see that this thing can settle in my
24 opinion.
25        And if we go to trial, the plaintiff would probably

1   have four live witnesses that I could pare down to two, and we

2   would have five depositions.  And I have seen courts, they

3   don't need to have it read to them in court, they go --

4           THE COURT:  I don't have depositions -- so that you're

5   both aware right now, I read the depositions in chambers.  We

6   don't take trial time.  I have sat through responsive reading

7   of depositions; it's awful.  So I read the depositions.  I

8   require -- nobody dumps whole depositions in.  You do

9   designations, counterdesignations, objections I rule on in

10  advance.  Once it's settled what's going to be in evidence, I

11  don't read it from the bench, I read it beforehand.

12          MR. GARBER:  Okay.  So our two witnesses, my guess is,

13  they would be no more than three hours with cross-examination.

14  We would have approximately one hundred pieces of paper which I

15  think we'd go through fairly rapidly.  Now it may be and I

16  often find the defense wants to have thousands of pieces of

17  paper because that's just the way defenses go.  I don't

18  anticipate the defense would have many witnesses.

19          So from that point of view, I don't think we'd have a

20  trial more than two days and I've certainly seen issues like

21  this go in one day before a judge.

22          THE COURT:  Okay.  Maybe my fears were unfounded.

23          Mr. Lewis, do you want --

24          MR. LEWIS:  Well, Your Honor, I think Mr. Garber's

25  assessment of this case is probably pretty accurate.

1          THE COURT:  Okay.

2          MR. LEWIS:  I might not have any of my own GMAC

3    witnesses.  I might have -- want to talk to Mr. Garber's

4    witnesses.  I might want to call a witness from his camp, so-

5    to-speak, when I know more, but it's not go to be a

6    major -- it's mostly documentary and I think Mr. Garber and I

7    are going to be able to work out -- for example, the medical

8    records, they're just business records that speak for

9    themselves.  They say what they say.

10          THE COURT:  If somebody can read them.

11          MR. LEWIS:  Yeah, well, those are -- I'm talking about

12    the typed ones.  I can read some of Dr. Lichi's handwriting but

13    some of it, I can't.  And so I also don't envision a major

14    proceeding over this subject.

15          THE COURT:  Mr. Garber, and I don't know whether

16    you've thought about it at all, the Trust has the misfortune of

17    not having anybody around who knows anything about anything

18    contemporaneous to the events and so there can be issues about

19    authenticating business records.

20          In the hearings I've had, the trial I had, we didn't

21    have any issues about it.  They just -- the stuff came in but I

22    think you need to -- when the two of you, if you're headed to

23    trial, you need to get serious about figuring out what exhibits

24    are going to come in by stipulation and that sort of thing.

25          MR. LEWIS:  Yes.  And I don't think many of our

1   business records are going to be of consequence.  I mean the

2   basic things are the 10/26 letter and the lack of any entry in

3   our purged notes of the response.  It doesn't mean one wasn't

4   sent but I can't prove to you that one was.  That's a piece of

5   Mr. --

6          THE COURT:  Did the receipt of the letter get logged

7   in in the servicing notes?

8          MR. LEWIS:  I'm sorry?

9          THE COURT:  Did the receipt of the QWR get logged in?

10         MR. LEWIS:   No, there's no record of it and there's

11  no record of a response and that's in the purged loan notes and

12  that's the only record basically that I have.  And we also have

13  other documents that have been collected but none of them is

14  that letter or a response to it.  And the only other documents

15  would be, for example, the dismissals and some of that might be

16  important but those documents, I don't think anybody's going to

17  contest or the timing of them.

18         So it should be, in that sense, a fairly simple case

19  especially, you know what, Mr. Garber's an experienced lawyer,

20  I'm an experienced lawyer.  Neither of us, I think, spends a

21  lot of time going around in circles and I'm sure we'll be able

22  to get a lot of stuff arranged.

23         THE COURT:  Has anybody been deposed so far?

24         MR. LEWIS:  Not yet.  It's sort of been pending

25  receipt of the fundamental documents.

RESIDENTIAL CAPITAL, LLC, ET AL.                    46

1        THE COURT:  Are you going to do the depositions as

2   video depositions?  Have you talked about that?

3        MR. LEWIS:  I haven't really.  I don't, I mean the

4   depositions I envision, I don't know that I need to have them

5   as video depositions, but I haven't made a decision yet.  Do

6   you prefer video depositions?

7        THE COURT:  I'm not pressing one way or the other.

8        MR. LEWIS:  Okay.  Well, if you did, I would be happy

9   to do it if that's easier for you.

10        THE COURT:  It's not easier.

11        MR. LEWIS:  It's the Trust's money after all.

12        THE COURT:  I know.  It's not easier.

13        MR. LEWIS:  Okay.

14        MR. GARBER:  Your Honor, the three doctors that we've

15   identified to the Court, Dorfner, Foley and Lichi, we would

16   anticipate by videotape.  We do have the videotaped deposition

17   of Cheryl Mack while she was alive and we have the videotaped

18   deposition of Barry Mack but I wouldn't present that deposition

19   if he's available.

20        THE COURT:  Is there going to be any issue, Mr. Lewis,

21   whether Mrs. Mack's deposition is admissible?  She's obviously

22   unavailable, that's for sure.

23        MR. LEWIS:  No, I don't think there's going to be

24   any -- I've read the transcript.  I know what's in it.

25        THE COURT:  Okay.  So you think you're going to

1    complete fact discovery when?  I can go back and look.  What

2    are the deadlines?

3            MR. LEWIS:  Four months from August 27th when the

4    Court issued the scheduling order is fact discovery.  Two

5    months longer is expert discovery, if anybody's going to have

6    an expert.  I'm not sure I am, and I am not sure whether Mr.

7    Garber is going to have an expert.  I mean, there's a lot of

8    doctors but they're not necessarily going to appearing as

9    experts.  They're going to be appearing --

10           THE COURT:  So what's the date for cutoff of fact

11   discovery in December?

12           MR. LEWIS:  It would be December 26th or thereabouts.

13           THE COURT:  Get a date from Deanna for a telephone

14   status conference, not that I don't want to see you, I'm happy

15   to see you, for early January.

16           MR. LEWIS:  Okay.  I'll do that, Your Honor.

17           THE COURT:  And let's see where we are --

18           MR. LEWIS:  Okay.

19           THE COURT:  -- at that point.  Okay?

20           MR. LEWIS:  Thank you very much for your time today.

21           THE COURT:  The two of you are welcome to sit here and

22   talk and maybe even settle the case but --

23           MR. LEWIS:  I would be happy to talk with him.  I

24   think we need to get a little bit further before we could

25   settle but we'll find out.

1          THE COURT:  Okay.  All right.  Thanks very much.

2          MR. LEWIS:  Thank you, Your Honor.

3          THE COURT:  Nice to see you both.

4          MR. GARBER:  Thank you, Your Honor.

5          THE COURT:  It's a nice day in New York.

6      (Whereupon these proceedings were concluded at 3:12 PM)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                         C E R T I F I C A T I O N

3

4    I, Sharona Shapiro, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9    _____

10   SHARONA SHAPIRO

11   AAERT Certified Electronic Transcriber CET**D 492

12

13   eScribers

14   700 West 192nd Street, Suite #607

15   New York, NY 10040

16

17   Date:  October 31, 2014

18

19

20

21

22

23

24

25