**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Hearing Date: November 13, 2014
Hearing Time: 10:00A.M

In Re:

**RESIDENTIAL CAPITAL, LLC**, et al.

Debtors.

Case No.: 1:12-BK-12020(MG)

Chapter 11

Jointly Administered

## SAM PALMER'S OPPOSITION AND RESPONSE TO THE RESCAP BORROWER CLAIMS TRUST'S SEVENTY-FIFTH OBJECTION TO CLAIM NUMBER 2761 <u>(NO LIABILITY BORROWER CLAIMS)</u>

Dated: October 12, 2014
Los Angeles, California

Sam Palmer
1682 Amarelle Street
Thousand Oaks, CA 91321
Tel: 805-480-1848
<u>kensington.taylor@verizon.net</u>
Claimant

I

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 1

    A.    Claimant Requests the Court to Take Judicial Notice.................................... 2

II.    FACTUAL BACKGROUND ......................................................................... 4

III.    STANDARD OF REVIEW ........................................................................... 6

IV.    ARGUMENT ................................................................................................ 8

    A.    The ResCap Trust's Purported Declaration of Deanna Horst is not Admissible under the

    Federal Rules of Evidence and Should be Disregarded and Stricken ......................... 8

    B.    Claimant Alleges Three Legal Theories of Liability and Recovery ...................... 12

    C.    The Debtors are Liable ................................................................................. 15

        1.    The Promissory Notes ............................................................................ 15

            (a)    First Note ...................................................................................... 16

            (b)    Second Note.................................................................................. 16

            (c)    Third Note..................................................................................... 18

        2.    Securitization Fail: The RALI 2007-QH5 Trust Never Received Claimant's Mortgage ............ 21

    D.    Claimant as Third Party Beneficiary or Incidental Beneficiary ......................... 25

    E.    Homecomings as Sub-servicer................................................................... 27

        1.    Homecomings Transfers its Computer System ......................................... 27

        2.    Homecomings Transfers its Servicing Platform........................................ 28

        3.    The RALI  2007-QH5 Trust Changes Servicer ....................................... 29

        4.    Homecomings Ceases Mortgage Servicing Operations.............................. 29

        5.    Homecomings Did Not Transfer Claimant's Servicing Rights to Aurora .................. 31

    6.   RFC Holder of Servicing Rights.................................................................................32

F.   **Aurora's Misrepresentations**...............................................................................**33**

G.   **Origination-Based Claims are Viable**....................................................................**34**

    1.   Claimant's Claims are not Time-Barred..............................................................34

H.   **Claimant has Stated Proper Causes of Action under California and Federal Law Which are**

**Subject to her Proof of Claim** .....................................................................................**38**

    1.   Fraud.......................................................................................................................38

    2.   Breach of Contract (Forbearance Agreements) .....................................................39

    4.   Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing .....................41

    5.   Violation of California Business and Professions Code 17200 ("UCL")...................................42

    5.   Tortious Interference with Contract and Interference with Prospective Economic Advantage ..43

    6.   Cancellation of Instruments...................................................................................45

    7.   Fraudulent Omissions/Concealment......................................................................47

    8.   Quiet Title and Declaratory Relief .......................................................................48

    9.   Violation of TILA; 15 U.S.C. § 1601 ....................................................................48

V.   **CONCLUSION**....................................................................................................**49**

# TABLE OF AUTHORITIES

**CASES**

*American Trust Co. v. Greuner* (1936) 13 Cal.App.2d 279, 282 ...........................24

*Brandon G. v. Gray* (2003) 111 Cal.App.4th 29, 35 ...........................38

*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1255 ...........................42

*Dudley v. Department of Transportation* (2001) 90 Cal.App.4th 255, 259 ...........................16

*Erickson v. Pardus*, 551 U.S. 89, 94 (2007.) ...........................12

*Fleming v. Kagan* (1961) 189 Cal. App. 2d 791, 796, 797, 11 Cal. Rptr. 737 ...........................50

*Glaski v Bank of America, N.A.,* (2013) 218 Cal.App.4th 1079, 1088, 1097 ...........................29

*Haines v. Kerner*, 404 U.S. 519, 520 ...........................12

*Hinton v. Bruno*, 2014 WL 645028, *1 (D. Conn. 2014) ...........................7

*Hyek v. Field Support Services, Inc.,* 702 F.Supp.2d 84, 96 (E.D.N.Y. 2010) ...........................15

*In re Allegheny Intern., Inc.*, 954 F.2d 167, 173–74 (3rd Cir. 1992) ...........................11

*In re Hess*, 404 B.R. 747, 749 (Bankr. S.D.N.Y. 2009) ...........................12

*In re Kors, Inc.,* 15 B.R. 444, 446 (Bankr. D. Vt. 1981.) ...........................6

*In re Maurice*, 69 F.3d 830 (7th Cir. 1995) at ¶ 16 ...........................12

*In re MF Global Holdings Ltd.*, Nos. 11-15059, 11-02790, 2012 WL 5499847, at * 3 (Bankr. S.D.N.Y. Nov. 13,
2012) ...........................11, 12

*In re Oneida Ltd.*, 500 B.R. 384, 389 (Bankr. S.D.N.Y. 2009) ...........................11

*In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del. 2006) ...........................12

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.* 146 F.3d 66, 70 (2d Cir. 1998) ...........................7

**Krieger v. Nick Alexander Imports, Inc.** *(1991) 234 Cal.App.3d 205, 219* ...........................38

**Newsom v. Bank of Am., N.A.,** *2014 WL 2180278 (C.D. Cal. May 22, 2014)* ...........................38

**Pashley v. Pacific Elec. Ry. Co.** *(1944) 25 Cal.2d 226, 231* ...........................39

*Riddle v. Harmon*, (1980) 102 Cal. App. 3d 524, 528 ...........................22

*Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 990 ...........................42

*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173 ...........................42

*Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161 (1946) ...........................12

IV

*Vincent v. PNC Mortg., Inc.*, 2014 WL 2766116 (E.D. Cal. June 18, 2014) ..................................................44

*Walsh v. Hunt* (1898) 120 Cal. 46, 53 ..................................................24

*Wells Fargo Bank, N.A. v. Erobobo* (Apr. 29, 2013) 39 Misc.3d 1220(A), 2013 WL 1831799, slip opn. p. 8 .........29

*Wolson v. Reed Elsevier Inc.*, 2010 WL 334919 *1 (S.D.N.Y.2010)..................................................7

## STATUTES

*Bumb v. Bennett* (1958) 51 Cal.2d 294, 303..................................................24

*California Civil Code § 1039* ..................................................22

*California Civil Code § 1511.3* ..................................................48

*California Civil Code § 1709* ..................................................42

*California Civil Code § 2920.5(a)* ..................................................43

*California Civil Code § 762.010* ..................................................52

*Code of Civil Procedure § 312*..................................................38

**Code of Civil Procedure § 338, subd. (d)** ..................................................38

*EPTL § 7-2.4*..................................................28, 30

*Fed. R. Evid. 201*..................................................6

## OTHER AUTHORITIES

*4 Miller & Starr, Cal. Real Estate* (3d ed. 2011) *Deeds of Trust*, § 10:53, p. 167 ..................................................17, 19

*Levitin & Twomey, Mortg. Servicing, supra*, 28 Yale J. on Reg. at p. 14, fn. 35..................................................29

## RULES

*[section] 502(a)* ..................................................11

*11 U.S.C. § 501(a)* ..................................................10

*11 U.S.C. § 502(a)* ..................................................10

*4 COLLIER ON BANKRUPTCY ¶ 502.02[2] (16th ed. 2013)* ..................................................10

*Bankruptcy Code section 502(b)(1)* ..................................................11

*Bankruptcy Rule 3001(f)* ..................................................10

*FED. R. BANKR. P. 3001(f)* ..................................................10

*Federal Rule of Evidence 801* .................................................................................................................................13

*Federal Rule of Evidence 802* .................................................................................................................................13

*Federal Rule of Evidence 803(6)* ............................................................................................................................14

*Section 501(a) of the Bankruptcy Code* ..................................................................................................................10

# I. INTRODUCTION

1.    Sam Palmer ("Claimant") filed a civil action against Homecomings Financial LLC ("Homecomings") and others in the Ventura County Superior Court in the State of California on March 2, 2011. Claimant's second amended complaint (**"SAC"**) sought declaratory relief to prevent a wrongful foreclosure.

2.    On September 17, 2014, the ResCap Borrower Claims Trust (the "Trust") filed its objection to Claimant's Proof of Claim advancing multiple arguments which are not supported by the law or facts before the Court.

3.    The Claims are based on a prepetition lawsuit filed by Claimant in California state court. Accordingly, Claimant hereby files this Response to the Trust's Objection pursuant to section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007. Claimant opposes the Trust's objection on the basis that the Trust's reasons for disallowance and expungement are premature because the underlying issues set forth in the SAC are pending on appeal. As such, the determination by the Trust of no liability for the amount of claim is unsupported until final disposition by the Second Appellate District Court in the State of California.

4.    Essentially the Trust makes unsupported factual arguments that are not admissible under the federal rules and cannot overcome the presumption in favor of Claimant. In response Claimant puts forward actual admissible evidence and legal argument based on federal and California law. For the reasons stated herein, the Trust's Objection should be overruled.

A. *Claimant Requests the Court to Take Judicial Notice*

5.    Claimant requests that the Court take judicial notice pursuant to *Fed. R. Evid. 201*, of

certain facts that support her claims related to the Debtors' credibility and her Proof of Claim in

this Court.

Rule 201 … provides that a Court shall take judicial notice of adjudicative facts…a Bankruptcy
Court, in the exercise of its discretionary power under this federal rule, could take judicial notice
of all administrative and judicial actions previously undertaken in the proceedings.

*In re Kors, Inc.*, 15 B.R. 444, 446 (Bankr. D. Vt. 1981.)

6.    Specifically, Claimant requests that this Court take judicial notice of the RALI 2007-QH5

Trust's **FORM 8K and FORM 10K** Securities and Exchange Commission ("SEC") filings.

True and correct copies are attached as **Exhibit 1** and **Exhibit 2** hereto.

7.    Claimant requests that the Court take judicial notice of Debtor Homecoming's Notice of

Assignment, Sale or Transfer of Servicing Rights dated March 14, 2008 to Aurora Loan Services

LLC's ("Aurora").  A true and correct copy is attached as **Exhibit 3** hereto.

8.    Claimant requests that the Court take judicial notice of Aurora Loan Services LLC's

letter dated March 18, 2008, noticing servicing rights are being assigned, sold or transferred by

Debtor Homecoming Financial LLC. A true and correct copy is attached as **Exhibit 4** hereto.

9.    Claimant requests that the Court take judicial notice of Aurora Loan Services LLC's

letter noticing servicing rights are being assigned, sold or transferred to Aurora Bank FSB dated

July 1, 2011 to be effective as of July 21, 2011. A true and correct copy is attached as **Exhibit 5**

hereto.

10.    Claimant requests that the Court take judicial notice of Aurora Bank FSB's email dated June 26, 2012, noticing servicing rights are being assigned, sold or transferred to Nationstar Mortgage LLC ("NSM") effective as of July 1, 2012.  A true and correct copy is attached as **Exhibit 6** hereto.

11.    Claimant requests that the Court take judicial notice of a copy of Claimants ***purported original*** Adjustable Rate Note ("FIRST Note") displaying an endorsement in blank and Adjustable Rate Rider.  A true and correct copy is attached as **Exhibit 7** hereto.

12.    Claimant requests that the Court take judicial notice of another copy of Claimants ***purported*** original Adjustable Rate Note ("SECOND Note") displaying two special endorsements and a ***purported*** allonge.  A true and correct copy is attached as **Exhibit 7A** hereto.

13.    Claimant requests that the Court take judicial notice of another copy of Claimants ***purported*** original Adjustable Rate Note ("THIRD Note") displaying two special endorsements and a ***purported*** allonge.  A true and correct copy is attached as **Exhibit 7B** hereto. 13.

14.    Claimant requests that the Court take judicial notice of a copy of Deutsche Bank Trust Company Americas as trustee's Motion for Relief from Stay filed in Claimant's Chapter 7 bankruptcy. True and correct copies are attached as **Exhibits 11 & 11A** hereto.

 "Judicial notice may be taken of documents filed in other cases and other courts." Hinton v. Bruno, 2014 WL 645028, *1 (D. Conn. 2014) (citing ***Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger***). See also Wolson v. Reed Elsevier Inc., 2010 WL 334919 *1 (S.D.N.Y.2010) (taking judicial notice of settlement agreement filed in multi-district class action case in ruling on motion to dismiss).

## II.  FACTUAL BACKGROUND

15.     On April 2, 2007 Claimant endorsed a promissory note in the amount of $862,500.00 in

favor of Homecomings Financial, LLC ("Homecomings.") (SAC; **Exhibit A.**)  The refinance

loan was allegedly secured by a deed of trust encumbering 1682 Amarelle Street in Thousand

Oaks ("Property.") recorded on April 11, 2007.  The deed of trust identified Appellant as

borrower, Homecomings as ***Lender***, Mortgage Electronic Registration Systems, Inc. ("MERS")

as nominal beneficiary "acting solely as a nominee for ***Lender*** and ***Lender***'s successors and

assigns" and Fidelity National Title ("FNT") as trustee. (SAC; **Exhibit 4.**)

16.     Claimant's loan was ***purportedly*** sold to a securitized trust, Residential Accredit Loans

Inc., Series 2007-QH5 Trust. ("RALI 2007-QH5 Trust.")  Deutsche Bank Trust Company

Americas serves as trustee of the RALI 2007-QH5 Trust ("DB-RALI.")

17.     ***According*** to the **RALI 2007-QH5 Trust's FORM 8-K ANNUAL REPORT** filed on

May 30, 2007 with the Securities and Exchange Commission ("SEC") attests: Residential

Capital, LLC ("ResCap"), which owns indirectly all of the equity of both Debtors Homecomings

and GMAC Mortgage LLC ("GMACM") restructured the operations of Homecomings and

GMACM. As a result of such restructuring, on September 24, 2007, Homecomings transferred

its *entire* mortgage servicing platform to GMACM and Homecomings has not serviced any

of those mortgage loans since. (**Exhibit 1.**) (See also http://www.secinfo.com/d1zj61.tEa.htm)

18.     ***According*** to the **RALI 2007-QH5 Trust's FORM 10-K ANNUAL REPORT,** filed on

March 31, 2008 with the SEC attests: ResCap which owns indirectly all of the equity of both

Debtors Homecomings and GMACM restructured the operations of Homecomings and

GMACM. As a result of such restructuring, on **September 24, 2007, Homecomings transferred**

its *entire* **mortgage servicing platform to GMACM and Homecomings has not serviced any**

**of those mortgage loans since. (Exhibit 2.)** (See http://www.secinfo.com/d1aw6m.t9.htm)

19.    *According* to a letter dated March 18, 2008 Aurora informs Claimant the servicing of her

loan was being assigned, sold or transferred from Homecomings to Aurora and the transfer

included the right to collect payments from Claimant. **(Exhibit 4.)**

20.    On July 23, 2008, Claimant spoke with Aurora's purported representative, Diane in the

Retention Department (telephone no. 866.521.3828), who verbally told Claimant that she was in

default.  Diane also, verbally suggested she either sell her home or do a short sale as those were

the best options for her and the Bank. She also indicated that she needed to be at least 3 months

late to be considered for a short sale or loan modification, and then it would take approximately

an additional 60 days to be modified. Claimant was told to send in a hardship letter with her

financial information. Instead, Claimant continued to make her payments.

21.    Claimant continued to make her monthly mortgage payments while she attempted to sell

her home, however after two months, it was determined that the value of her home had

depreciated over $300,000.00 and as a result it wasn't prudent to sell.  Exasperated, Claimant

made the unfortunate decision in September 2008 to follow the advice of Aurora's

representatives, **Diane** (Customer Service Dept.), **Roxanne** (Short Sale Depart.) and **Angela**

(Forbearance Dept.), who each at one point or another, advised Claimant to skip her mortgage

payments in order to apply and obtain a loan modification.

22.    May 2, 2011, Appellant filed a civil action to prevent a wrongful foreclosure.

23.    On May 14, 2012, each of the ResCap Debtors filed a voluntary petition for relief under

chapter 11 of the Bankruptcy Code, **thereby staying all proceedings in Claimant's pending**

**appeal against Debtor Homecomings.**

24.     On August 29, 2012, this Court entered the Bar Date Order, which established November

9, 2012 at 5:00 p.m. as the deadline to file proofs of claim by virtually all creditors against the

Debtors (the "General Bar Date") and prescribed the form and manner for filing proofs of claim.

(ECF Doc. # 1309 ¶¶ 2, 3.)

25.     On November 7, 2012, Claimant filed proof of claim No. 2761, a General Unsecured

claim in the amount of $1,012,500.00 against Debtor Homecomings.

26.     On September 17, 2014, the Trust filed the *ResCap Borrower Claims Trust's Seventy-

Fifth Omnibus Objection to Claims (No Liability Borrower Claims)* (the "Objection," ECF Doc.

# 7552). The ResCap Trust attached a chart for each claim submitted by Claimant asserting their

lack of liability.  In support of the Objection, the ResCap Trust submitted the Declarations of

Deanna Horst (the "Horst Decl.," the Trust's Objection, Exhibit 2) and Norman Rosenbaum (the

"Rosenbaum Decl.," the Trust's Objection, Exhibit 3).


### III.  STANDARD OF REVIEW


27.     Section 501(a) of the Bankruptcy Code provides that "[a] creditor . . . may file a proof of

claim." 11 U.S.C. § 501(a). A filed proof of claim is "deemed allowed, unless a party in interest

...objects." 11 U.S.C. § 502(a). If the claim is properly filed, it is prima facie evidence of the

validity and amount of the claim.  See *FED. R. BANKR. P. 3001(f)*. A party in interest may

object to a proof of claim, and once an objection is made, the court must determine whether the

objection is well founded. See *4 COLLIER ON BANKRUPTCY ¶ 502.02[2]* (16th ed. 2013).

Although *Bankruptcy Rule 3001(f)* establishes the initial evidentiary effect of a filed claim...

[t]he burden of proof for claims brought in the bankruptcy court under *[section] 502(a)* rests on different parties at different times. Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is "*prima facie*" valid. In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. **The burden of going forward then shifts to the objector to produce evidence** sufficient to negate the *prima facie* validity of the filed claim. It is often said that **the objector must produce evidence** equal in force to the *prima facie* case. In practice, **the objector must produce evidence** which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If **the objector produces sufficient evidence** to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. *In re Allegheny Intern., Inc.*, 954 F.2d 167, 173–74 (3rd Cir. 1992) (internal citations omitted). *In re MF Global Holdings Ltd.*, Nos. 11-15059, 11-02790, 2012 WL 5499847, at * 3 (Bankr. S.D.N.Y. Nov. 13, 2012) ("The party objecting to the proof of claim bears the burden of "**providing evidence** to show that the proof of claim should not be allowed"). (emphasis and underscore added)

28.     If the objecting party satisfies its initial burden and "the presumption of *prima facie* validity is overcome—e.g., the objecting party establishes that the proof of claim lacks a sound legal basis—the burden shifts to the claimant to support its proof of claim unless the claimant would not bear that burden outside of bankruptcy." *Id.* (citing *In re Oneida Ltd.*, 500 B.R. 384, 389 (Bankr. S.D.N.Y. 2009). *Bankruptcy Code section 502(b)(1)* provides that claims may be disallowed if "unenforceable against the debtor and property of the debtor, under any agreement or applicable law." To determine whether a claim is allowable by law, bankruptcy courts look to

"applicable nonbankruptcy law." *In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del. 2006). "What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition is filed, is a question which, in the absence of overruling federal law, is to be determined by reference to state law." *In re Hess*, 404 B.R. 747, 749 (Bankr. S.D.N.Y. 2009) (quoting *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161 (1946)).

29.      Claimant's pleadings must be liberally construed.  *Haines v. Kerner*, 404 U.S. 519, 520. See also *Erickson v. Pardus*, 551 U.S. 89, 94 (2007.)

30.      Further, "[l]awyers must be held to higher standards" than pro se parties.  *In re Maurice*, 69 F.3d 830 (7th Cir. 1995) at ¶ 16.

## IV.  ARGUMENT

31.      The party objecting to the proof of claim bears the burden of "**providing evidence** to show that the proof of claim should not be allowed. *In re MF Global Holdings Ltd.*, Nos. 11-15059, 11-02790, 2012 WL 5499847, at * 3 (Bankr. S.D.N.Y. Nov. 13, 2012) Claimant disputes that the declaration of Deanna Horst is sufficient to shift the burden of proof unto Claimant.

*A.      The ResCap Trust's Purported Declaration of Deanna Horst is not Admissible under the Federal Rules of Evidence and Should be Disregarded and Stricken*

32.      The declaration of Deanna Horst with which the Trust attempts to support its version of the facts explicitly incorporates inadmissible hearsay evidence and should be disregarded by the Court.  Specifically, Ms. Horst's declaration states: "... I previously served as Chief Claims Officer for Residential Capital LLC and its affiliates ("ResCap")... I have been employed by affiliates of ResCap since August of 2001....all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my

8     SAM PALMER'S OPPOSITION AND RESPONSE TO THE RESCAP BORROWER CLAIMS TRUST'S
OMNIBUS SEVENTY-FIFTH OBJECTION

review of relevant documents **and information I have received through my discussions with former members of the Debtors' management or other former employees of the Debtors, the Debtors...**" (Horst Decl.; Exhibit 2 ¶ ¶ 1-2) (emphasis added.)  "**...I or my designee at my direction have reviewed and analyzed the proof of claim forms and supporting documentation, if any, filed by the claimants...** Since the Plan became effective and the Trust was established, **I, along with other members of the Liquidating Trust's management or other employees of the Liquidating Trust have consulted with the Trust to continue the claims reconciliation process, analyze claims, and determine the appropriate treatment of the same.**  In connection with such review and analysis, where applicable, **I or other the Liquidating Trust personnel, under my supervision, and the Liquidating Trust's and the Trust's professional advisors, have reviewed...**" (Horst Decl.: Exhibit 2 ¶ 3) (emphasis added)

33.    *Federal Rule of Evidence 801* defines hearsay as "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." The Horst declaration falls squarely under this definition, as the declarant, Ms. Horst, is not making her statements to be presented to the Court at a hearing on the objection to Claimant's Proof of Claims, and the statements contained in her declaration are being offered for their truth. *Federal Rule of Evidence 802* precludes admission of hearsay unless otherwise provided by a federal statute, the Federal Rules of Evidence or other rules prescribed by the Supreme Court.

34.    In this case, no such provision is made for the testimony in Ms. Horst's declaration, which she admits is based on information provided by an unknown number of unnamed persons. To the extent the Trust relies on the exception for regularly conducted activity for the admissibility of Ms. Horst's declaration, this reliance is misplaced. *Federal Rule of Evidence*

9    SAM PALMER'S OPPOSITION AND RESPONSE TO THE RESCAP BORROWER CLAIMS TRUST'S
OMNIBUS SEVENTY-FIFTH OBJECTION

*803(6)* does provide that a record of a regularly conducted activity is admissible as an exception
to the hearsay rule. However, in order to qualify as a record of a regularly conducted activity
however, the party offering the purported record **must show**, *inter alia*, that "the record was
made at or near the time by – or from information transmitted by – someone with knowledge...
the record was kept in the course of a regularly conducted activity of a business... making the
record was a regular practice of that activity...[and]...neither the source of information nor the
method or circumstances of preparation indicate a lack of trustworthiness." Here, the Horst
Declaration was not made at or near the time of the events it recounts.

35.    The declaration was executed on September 17, 2014, but purports to describe events that
happened as far back as March 30, 2007. There is no showing by the Trust that the statements in
the declaration were transmitted by anyone with knowledge of the facts alleged. Indeed, the
Trust does not even assert such transmission. Secondly, the declaration is not a document kept in
the course of the Trust's regularly conducted business activity, and there is no showing or
assertion to the contrary. Finally, the fact that the declaration explicitly states that it is based on
**information supplied by unnamed individuals at unspecified times**, but then does not indicate
at any time what particular facts were transmitted to Ms. Horst by these persons indicates a lack
of trustworthiness that should preclude the declaration's admission into evidence. **It is the
business records that constitute the evidence**, not the testimony of the witness referring to
them. To prove the content of a writing, recording, or photograph, the ***original*** writing,
recording, or photograph is required except as otherwise provided by law.

36.    How can the parties or the Court determine which of the facts in the declaration are based
on Ms. Horst's personal knowledge, and which have been supplied by the unnamed persons to
which she refers? How can the parties or the Court even know that such unnamed persons

10   SAM PALMER'S OPPOSITION AND RESPONSE TO THE RESCAP BORROWER CLAIMS TRUST'S
OMNIBUS SEVENTY-FIFTH OBJECTION

actually exist? The vague, boilerplate references to unnamed sources of unspecified information indicates a lack of trustworthiness in the circumstances of this declaration's preparation that should preclude its admission.

37.     In a similar situation where a declarant hoped to affirm the accuracy of information transmitted by an unknown number of unnamed persons at unnamed times, the Federal District Court for the Eastern District of New York stated that "[s]ignificantly, Plaintiff never identified the source for her information regarding the interaction, or lack thereof, between [other parties], and her assertion appears to be rooted in hearsay..." *Hyek v. Field Support Services, Inc.,* 702 F.Supp.2d 84, 96 (E.D.N.Y. 2010). Such is the case here. The Trust hopes to support numerous factual assertions with Ms. Horst's declaration, which admittedly relies on information transmitted by an unspecified number of unnamed people on unspecified dates. **Such a declaration is plainly inadmissible hearsay not subject to any exception to the general ban on hearsay evidence and should be excluded, stricken, and otherwise disregarded by the Court.**

38.     Claimant contends that the Debtors have failed to come forth with any admissible evidence refuting her allegations essential to her claims.  Claimant contends that her Property is under threat of being wrongfully foreclosed upon by the Debtors, Debtors' agents and/or co-conspirators without any legal, equitable or pecuniary right.  As a result of the Debtors' acts and omissions, Claimant has sustained damages and losses which are subject to her Proof of Claim No. 2761. The fact that Claimant has been delayed in pursuing her claims by the filing of the Debtors' bankruptcy petition does not diminish the validity of stated and verified claims which the Trust have not rebutted whatsoever with any admissible evidence.

**B.**    *Claimant Alleges Three Legal Theories of Liability and Recovery*

39.    Claimant acknowledges that the trial court sustained the demurrers of Debtor

Homecomings and its agent and/or co-conspirator non-debtor, Aurora, without leave to amend

and dismissed her wrongful foreclosure action against them both.  Claimant timely appealed the

trial court's order, however the appeal is currently stayed due to the Debtors' Chapter 11

bankruptcy.  "'When a demurrer is sustained without leave to amend the [plaintiff] may advance

on appeal a new legal theory why the allegations of the [complaint] state a cause of action.'"

(***Dudley v. Department of Transportation*** (2001) 90 Cal.App.4th 255, 259.)

40.    Three theories lie at the heart of Claimant's **SAC.**  Moreover, the newly discovered

evidence corroborates two of the three theories below.

*1.  "Theory No. 1"*

41.    Claimant contends that the signature purporting to be her signature on the "FIRST" and

"SECOND" promissory notes, sent to her from Aurora, in fact are not her signatures. (see

**Exhibits 7-7A**)  Additionally, Claimant contends that the signature purporting to be her signature

on the "THIRD" promissory note admitting into in Claimant's bankruptcy by NSM and DB-

RALI, in fact is not her signature. (see **Exhibit 7B**)  **If** this theory is proven, then both the

promissory note and deed of trust would either be **void** against Debtor Homecomings or **void**

against all subsequent encumbrancers.

42.    ***According*** to Claimant's deed of trust, she has a contractual duty to defend the title to her

Property against ***all*** claims and demands subject to ***any*** encumbrances of record. If Claimant fails

to preserve, maintain and safeguard ***Lender***'s title she will be in breach. (SAC; **Exhibit 4 ¶ 9**)

(*4 Miller & Starr, Cal. Real Estate* (3d ed. 2011) *Deeds of Trust*, § 10:53, p. 167.) As such, Claimant has standing to challenge Debtors' actions pursuant to her deed of trust.

    2.   **"Theory No. 2"**

43.    Claimant's promissory note and deed of trust were **NEVER** transferred and/or deposited into the RALI 2007-QH5 Trust, as such, the RALI 2007-QH5 Trust did not obtain any right or title to her mortgage. As will be explained in further detail below.

44.    If Claimant's theory is proven, then Debtors RFC and RALI's failure to comply with the PSA voids the *purported* sale and/or transfer of Claimant's mortgage to DB-RALI.  And if that *purported* sale and/or transfer is void then it goes on to say that the *purported* sale and/or transfer to Aurora is also void. Proving then, that neither Aurora, NSM nor DB-RALI possess _any_ right or _any_ interest in Claimant's promissory note or deed of trust.  These entities have no power to service, enforce or otherwise act on the loan unless the loan is in the RALI 2007-QH5 Trust.  These entities have no right to enter into settlement agreements, modification agreements, nor to execute a "release and satisfaction of mortgage."  As a result, ALS, NSM and DB-RALI would be *legal strangers* to Claimant's mortgage contracts.

    3.   **"Theory No. 3"**

45.    *Claimant acknowledges while it is highly improbable, it is also plausible that her mortgage loan was securitized.*

46.    Claimant concedes for the sake of argument, that if her promissory note and deed of trust were transferred *and* deposited into the RALI 2007-QH5 Trust before the May 30, 2007 "closing date," then DB-RALI would be the holder of the right to title and interests in her mortgage loan.

13  SAM PALMER'S OPPOSITION AND RESPONSE TO THE RESCAP BORROWER CLAIMS TRUST'S
OMNIBUS SEVENTY-FIFTH OBJECTION

47.    *If* this theory is proven, according to the Governing Documents of the RALI 2007-QH5

Trust, Homecomings and GMACM acted as the sub-servicers for all the mortgages held by DB-

RALI.  However, on **September 24, 2007,** Homecomings transferred its entire **servicing**

**platform** and **servicing portfolio** to GMACM and subsequently, Homecomings ceased to

service any loan held by DB-RALI after **September 24, 2007**. (see **Exhibits 1-2.**)  However,

Claimant contends that Homecomings continued to perform servicing functions without

authority with regard to her mortgage.

48.    Claimant contends she assumed that Homecomings had apparent authority to act on

behalf of her [unknown to her] lender/Note-Holder/Owner.  Claimant's assumption was not true.

Homecomings, however, did not act in the best interest of DB-RALI.   Claimant alleges that after

September 24, 2007, Homecomings was a legal stranger to her contract and thereafter interfered

with her contract and has committed fraud against her and the Certificate-Holders of the RALI

2007-QH5 Trust.  Claimant admits she was deceived by misleading statements and/or conduct by

Homecomings.  In addition, Claimant was harmed financially, as Homecomings continued to

collect her mortgage payments intended for the Certificate-Holders of the RALI 2007-QH5 Trust

without any right.  Claimant suspects Homecomings was acting on behalf of and in concert with

its principals, Debtors ResCap, RFC and GMACM.

49.    In sum, Claimant alleges Debtor Homecomings and Debtors RFC, ResCap, GMACM,

and RALI and possibly more, perpetrated a fraud on her, the Investors of the RALI 2007-QH5

Trust and fraud upon the courts, and as such, should be criminally remanded.

50.    *According* to **Paragraph 9 of** Claimant's deed of trust, if she fails to protect the *Lender*'s

interest and rights, the *Lender* may take action against Claimant for breach. (SAC; **Exhibit 4 ¶**

9)  *Miller & Starr* illuminate this covenant. It explains that "[b]y the terms of the usual form of

trust deed, the trustor has a contractual duty to preserve and maintain the property security so

that the beneficiary's security is not impaired." (*4 Miller & Starr, Cal. Real Estate* (3d ed. 2011)

*Deeds of Trust*, § 10:53, p. 167.)  As such, Claimant has standing to challenge Debtors' actions

pursuant to her deed of trust.

### C.    The Debtors are Liable

*51.*    The Trust asserts that Debtor Homecomings' involvement with Claimant's loan was

limited to originator and servicer. The Trust also claims that Homecomings originated the loan

on March 30, 2007.  Claimant disputes the Trust's assertions as follows:

### 1.    The Promissory Notes

52.    Claimant endorsed a deed of trust and promissory note both in favor of Homecomings

Financial LLC on **April 2, 2007**,  not March 30, 2007 as the Trust asserts.  California law

requires that the lender record the deed of trust in the county where the property is situated.

 Claimant's deed of trust was recorded on April 11, 2007.  Although, the deed of trust was

recorded, there is no requirement in California that the lender record the promissory note. Thus,

the promissory note was not recorded.

53.    Subsequently, thereafter, Claimant never viewed the promissory note again until she sent

Aurora a qualified written request ("QWR") in a good faith attempt to secure a loan

modification.  The purpose of sending the QWR to Aurora was to discover the identity of the

Lender/Note-Holder/Owner.  Aurora responded to Claimant's QWR in the form of a letter dated

September 24, 2008 and was accompanied by a package *purporting* to be Claimant's *original*

loan documents. Although Claimant received this package in September of 2008, she did not

view the documents until September 19, 2011.

**(a)**     *First Note*

54.     A ***purported*** copy of Claimant's ***original*** promissory note was included among the loan

documents.  Again, this was the first time Claimant viewed a ***purported*** copy of the ***original***

promissory note ("FIRST Note").  A close examination of the FIRST Note shows what appears

to be Claimant's signature, which **Claimant profusely denies as hers**, and an undated ***purported***

endorsement in blank on page six (6).  This undated stamped endorsement in blank reads

**WITHOUT RECOURSE PAY TO THE ORDER OF** Dokech (appearing to be the ***purported***

signature of) Dorothy Okech, Assistant Secretary, Homecomings Financial, LLC, A Delaware

Corporation.

**55.     Claimant contends that the signature *purporting* to be hers is not and because the**

**FIRST Note has obviously been altered the endorsement is void.**

56.     Claimant sent Aurora yet another QWR as she was still seeking the identity of the

Lender/Note-Holder/Owner of her mortgage and was disputing the assignment from Aurora

Loan Services LLC to Aurora Bank FSB to service her loan. Aurora responded to Claimant's

second QWR in the form of another letter dated September 19, 2011 and was accompanied by

another package ***purporting*** to be Claimant's ***original*** loan documents.

**(b)**     *Second Note*

57.     A different version of a ***purported*** copy of Claimant's ***original*** promissory note was

included among the loan documents. ("SECOND Note").  A close examination of the SECOND

Note shows what appears to be Claimant's signature, however, **Claimant profusely denies that**

**this is her signature**. The SECOND Note also shows two undated, ***purported*** endorsements on

page 6. A ***purported*** allonge on a separate unnumbered page was also included in the package.

58.    **Generally**, all endorsements are made on the front of the signature page of a promissory note until that page is filled and there is no more room for any additional endorsements. An allonge is an <u>attachment to a legal document</u> that can be used to insert language or signatures when the original <u>document does not have sufficient space for the inserted material</u>. It may be, for example, a piece of paper attached to a negotiable instrument or promissory note, on which endorsements can be written because there isn't enough room on the instrument itself. The allonge must be firmly attached so as to become a permanent fixture of the instrument. Claimant contends that the SECOND Note shows sufficient space to include another *purported* endorsement. Thus, there was no need to draft a separate page for the allonge. A close examination of the SECOND Note shows the following *purported* endorsements:

1. an undated, *purportedly* stamped endorsement reads **WITHOUT RECOURSE PAY TO THE ORDER OF** Residential Funding Company LLC Dokech (appearing to be the *purported* signature of) Dorothy Okech, Assistant Secretary, Homecomings Financial, LLC, a Delaware Corporation;

2. an undated, *purportedly* stamped endorsement reads **PAY TO THE ORDER OF** Deutsche Bank Trust Company Americas as Trustee **WITHOUT RECOURSE BY** Residential Funding Company, LLC BY Judy Faber (appearing to be the *purported* signature of) Judy Faber, Vice President;

3. a *purported* allonge dated March 25, 2011 reads **WITHOUT RECOURSE PAY TO THE ORDER OF**: *Aurora loan Services LLC* by Nancy Walker (appearing to be the *purported* signature of) Nancy L. Walker, Assistant Vice President of Deutsche Bank Trust Company Americas as Trustee by *Aurora Loan Services LLC*, its Attorney-in-Fact.

59.    **Claimant contends that the signature *purporting* to be hers is not and because the SECOND Note has obviously been altered the endorsements are void.    Moreover, the *purported* allonge actually reflects Aurora selling and transferring the SECOND Note to itself.**

60.    In essence, Aurora acting as Deutsche Bank Trust Company Americas as Trustee's ("DB") attorney-in-fact, ***purportedly*** transferred Claimant's loan to itself on behalf of its principal, DB. [*Not to be confused with*, on behalf of another *alleged* principal DB-RALI.] Although, the principal [DB] has the right to grant its agent [Aurora] any legal abilities it possesses, some powers must be specifically accounted for in most states.  Depending on the laws of the state where the power of attorney was drafted this transaction may be unlawful. Regardless, **Claimant contends this conveyance is fraudulent and self-serving and as such, is also void.** *See Riddle v. Harmon*, (1980) 102 Cal. App. 3d 524, 528 ("Under California law, a transfer of property presupposes participation by at least two parties, namely a grantor and a grantee. Both are essential to the efficacy of a deed, **and they cannot be the same person**." (internal citations omitted; emphasis and underscore added)); see also ***California Civil Code § 1039.***

*(c)*    ***Third Note***

61.    On December 6 2013, Claimant filed a Chapter 7 bankruptcy petition Case No: 1-13-bk-17578, thereby invoking an automatic stay.   A motion to lift the automatic stay was filed by Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Pass Through Certificates 2007-QH5 ("DB-RALI.") **(Exhibits 11 and 11A:Ex. 3)** The moving party attached a ***purported*** copy of Claimant's ***original*** promissory note in support of its motion.

62.    ("THIRD Note") A close examination of the THIRD Note shows what appears to be

Claimant's signature, however, **Claimant profusely denies that this is her signature**. A close

examination of the THIRD Note shows the following *purported* endorsements:

1. an undated, *purportedly* stamped endorsement reads **WITHOUT RECOURSE PAY TO THE ORDER OF** Residential Funding Company LLC Dokech (appearing to be the *purported* signature of) Dorothy Okech, Assistant Secretary, Homecomings Financial, LLC, a Delaware Corporation;

2. an undated, *purportedly* stamped endorsement reads **PAY TO THE ORDER OF** Deutsche Bank Trust Company Americas as Trustee **WITHOUT RECOURSE BY** Residential Funding Company, LLC BY Judy Faber (appearing to be the *purported* signature of) Judy Faber, Vice President;

3. a *purported* allonge dated March 25, 2011 reads **WITHOUT RECOURSE PAY TO THE ORDER** OF: *Aurora loan Services LLC* by Nancy Walker (appearing to be the *purported* signature of) Nancy L. Walker, Assistant Vice President of Deutsche Bank Trust Company Americas as Trustee by *Aurora Loan Services LLC*, its Attorney-in-Fact;

4. an undated, *purportedly* stamped endorsement reads **PAY TO THE ORDER OF** in blank **WITHOUT RECOURSE: Aurora Loan Services LLC By** Nationstar Mortgage LLC Its Attorney-In-Fact By Shannon Sierra (appearing to be the *purported* signature of) Assistant Secretary, Shannon Sierra

**Claimant contends that the signature *purporting* to be hers is not and because the THIRD**

**Note has obviously been altered the endorsements are void.**

63.    To be enforceable, promissory notes must be validly negotiated. A valid negotiation is a two step process that requires the endorsement and the delivery of the instrument. Here, Claimant admits endorsing a promissory note in favor of Homecomings, however Claimant does not know if her *original* promissory note was delivered to Homecomings before the FIRST, SECOND and THIRD Notes were altered by an unknown party[s]. There is no California case addressing this precise issue. Nevertheless, analogous situations have arisen. For example, if a trustee, who holds bare legal title in trust for the beneficiaries, alters the deed (contract), the deed is not invalidated. It is a material alteration by a party to the contract that renders it void. (***Bumb v. Bennett*** (1958) 51 Cal.2d 294, 303.) Further, in the context of an executed contract, it has been held that a third party's alteration of that contract does not void the contract in its entirety. Rather, the contract is enforceable in accordance with its original terms. (***Walsh v. Hunt*** (1898) 120 Cal. 46, 53; ***American Trust Co. v. Greuner*** (1936) 13 Cal.App.2d 279, 282.)

64.    Applying these authorities here, it is plausible that Claimant's **executory contract** [*original* promissory note] may be void or voidable as to Homecomings. ***If*** page 6 of the promissory note was altered by Homecomings, the result would render the **executory contract** void. ***If*** it is proven, page 6 of the promissory note was altered by a third party, the result would not render the executory contract void in its entirety.

65.    Thus, a question of fact exists. Did Homecomings receive Claimant's promissory note before or after an unknown third party[s] altered the *original* promissory note?

2.    *Securitization Fail: The RALI 2007-QH5 Trust Never Received Claimant's Mortgage*

66.    The Trust asserts that Debtor Homecomings transferred its interest when the loan was securitized on or about May 1, 2007.   Claimant disputes the Trust's assertion as follows:

67.    The Trust argues that because Claimant admits to signing the loan documents in 2007, she cannot now allege that her signature is forged.  The Trust's argument misses the Claimant's point.  The issue is not whether Claimant accepted a loan from Homecomings, the issue is, Claimant's loans documents were altered *after* she signed her loan documents on April 2, 2007, as a result there now exists a question if Homecomings ever received delivery thereof.

68.    Debtors RFC and Homecomings' agent, coconspirator and *alleged* successor in interest, Aurora, subject to the RALI 2007-QH5 Trust, sent Claimant two different copies of her *purported original* promissory note.  Both copies *purport* to be true and accurate copies of the original promissory note.  In order to evidence a complete or unbroken chain of title, the promissory note should show a special endorsement from Homecomings [*as Seller*] **to** RFC [*as Sponsor.*] The promissory note then should show a special endorsement from RFC [*as Sponsor*] to RALI [*as Depositor.*]  And finally, the promissory note should show a special endorsement from RALI [*as Depositor*] to DB as trustee on behalf of the RALI 2007-QH5 Trust for the benefit of Certificate-Holders [*as Trust.*]  **See Securitization Flow Chart on next page**



69.    *Instead*, the first Note at issue here was originally payable to Homecomings and was

*purportedly* transferred (negotiated) in blank by Homecomings with an undated stamped

*purported* endorsement on an unnumbered page of the FIRST Note. The endorsement reads "Pay

To the Order of" is blank 'WITHOUT RECOURSE, Homecomings Financial , LLC, a Delaware

Corporation and was *purportedly* signed by Dorothy Okech, Assistant Secretary.   Subject to the

RALI 2007-QH5 Trust's pooling and servicing agreement, **the copy of the FIRST Note fails to**

**support the Trust's claim that Claimant's mortgage was securitized.** (Exhibit 7.)

70.    The SECOND Note at issue was originally payable to Homecomings and was

*purportedly* transferred (negotiated) by special endorsement to Residential Funding Company,

LLC, *purportedly* signed by Dorothy Okech, Assistant Secretary for Homecomings.   Next the

same promissory note was *purportedly* transferred (negotiated) by special endorsement, to

Deutsche Bank Trust Company Americas as Trustee, *purportedly* signed by Judy Faber, Vice

President for RFC. **However, Judy Faber fails to identify the specific trust DB represents.**

Lastly, the same promissory note was *purportedly* transferred (negotiated) by special

endorsement via a *purported* allonge to "Aurora Loan Services LLC *purportedly* signed by

Nancy L. Walker, Assistant Vice President dated ***March 25, 2011*** on behalf of Deutsch Bank

Trust Company Americas as Trustee by Aurora Loan Services LLC, its Attorney-in-Fact".

**Similarly, Nancy L. Walker also fails to identify the specific trust DB represents. (Exhibit**

**7A)**

71.    *The Statute of Frauds*, and long-standing California decisional authority, requires an

agent assigning an interest in property on behalf of his principal to disclose the name of his

principal or that assignment is void.  **The copy of the FIRST and SECOND Notes fail to**

**support the Trust's claim that Claimant's mortgage was securitized. (Exhibits 7 and 7A.)**

72.    The THIRD Note at issue is almost identical to the SECOND Note with one exception,

an additional undated, *purportedly* stamped endorsement reads **PAY TO THE ORDER OF** in

blank **WITHOUT RECOURSE: Aurora Loan Services LLC By** Nationstar Mortgage LLC Its

Attorney-In-Fact By Shannon Sierra (appearing to be the *purported* signature of) Assistant

Secretary, Shannon Sierra (Exhibit 7B)

73.    All three *purported* copies of the *original* promissory note evidence a broken chain of

title showing that Claimant's promissory note was not delivered into the RALI 2007-QH5 Trust.

These *purported* transfers are totally inconsistent with the representations and warranties made

in the PSA to the Certificate-Holders issued by the RALI 2007-QH5 Trust and filed with the

SEC. In addition to the *purported* forgery of Claimant's *original* promissory note, the invalid

endorsements made by the *purported* agents of the principals, the two missing transfers from

RFC to RALI and RALI to DB-RALI and the mysterious conveyance by virtue of a *purported*

allonge from DB by Aurora to Aurora and finally a *purported endorsement in blank,* which does

not identify a payee, and instead makes the instrument "payable to bearer" and negotiable "by

transfer of possession alone. Confusing, isn't it?

74.    Oddly, DB-RALI filed a Motion from Lift of Stay in Claimant's Chapter 7 bankruptcy,

attaching the THIRD Note in support of its right to foreclose on Claimant's Property. Claimant

contends the parties involved in the *alleged* securitization and transfer of her *original* promissory

note and *original* deed of trust failed to adhere to section 2.01 of the Pooling and Servicing

Agreement ("PSA"), which requires Claimant's *original* promissory note and *original* deed of

trust be *properly endorsed, transferred, accepted, and deposited* with the RALI 2007-QH5 Trust

(or its custodian) on or before the **May 30, 2007** "closing date" indicated on the Prospectus. The

"closing date" is the date by which the *original* promissory note and *original* deed of trust *must*

be transferred into the RALI 2007-QH5Trust. The failure to do so, results in the promissory note

and deed of trust  not being part of the RALI 2007-QH5Trust, such that it is **not a loan any**

**Debtor or Defendant can attempt to collect on.**

75.    Further, because the RALI 2007-QH5Trust is governed by the PSA and that agreement

establishes a "closing date" after which **the trust may no longer transfer** or accept loans, this

**statutory provision provides a legal basis** for concluding the Debtors and Defendants attempt

to either sell, transfer or accept a loan after the "closing date" would be *void* as an act in

contravention of the trust document. ("Under New York Trust Law, every sale, conveyance or

other act of the trustee in contravention of the trust is void. *EPTL § 7-2.4.* Therefore, the

acceptance of the note and mortgage by the trustee after the date the trust closed would be void."
(*Wells Fargo Bank, N.A. v. Erobobo* (Apr. 29, 2013) 39 Misc.3d 1220(A), 2013 WL 1831799,
slip opn. p. 8); see *Levitin & Twomey*, *Mortg. Servicing, supra*, 28 Yale J. on Reg. at p. 14, fn.
35 [under New York law, any transfer to the trust in contravention of the trust documents is
void].) See also *Glaski v Bank of America, N.A.*, (2013) 218 Cal.App.4th 1079, 1088, 1097: [A
borrower may challenge a securitized trust's chain of ownership of a deed of trust by alleging
that the attempts to transfer the deed of trust to the trust (which was formed under New York
law) occurred after the trust's "closing date." Transfers that violate the terms of the trust
instrument are *void* under New York trust law.]

76.     Claimant contends that there is a genuine issue of material fact as to whether Claimant's
promissory note and deed of trust were ever deposited into the RALI-2007-QH5 Trust. Claimant
thinks not. Claimant contends that prior to closing, her loan was pre-sold to the Certificate-
Holders of the RALI 2007-QH5 Trust. However, sometime before or after closing, Claimant's
loan was *purportedly* deposited into the RALI 2007-QH5 Trust. However, Claimant contends
her mortgage was NEVER deposited into the RALI 2007-QH5 Trust. If Claimant's allegations
are proven that Debtors RFC, GMACM and RALI were involved in the origination of her loan,
the Debtors would therefore be liable for any and all loan origination claims.

### D.    *Claimant as Third Party Beneficiary or Incidental Beneficiary*

77.     Because all references made to the RALI 2007-QH5 Trust's filings with the SEC are
public record, Claimant can legally reference these documents to refute the ResCap Trust's
naked allegations. A fair reading of the SAC reveals that Claimant attempts to challenge the
validity of the purported promissory notes and the various assignments of the deed of trust

which, she claims, has caused her to incur damages respecting the marketability of title to her

Property. Appellant mounts her challenge specifically to the particular transactions respecting

her mortgage for which foreclosure is claimed, asserting that the RALI 2007-QH5Trust is a

common law trust and that it falls within the narrow purview of *EPTL § 7-2.4.*

*If Appellant's allegations are proven to be factually correct, it is entirely within the realm of*

*reasonable probability that Respondents do not have any interest whatsoever in Appellant's*

*mortgage.*

78.    It logically follows that if the RALI 2007-QH5 Trust didn't take title to Claimant's

promissory note and deed of trust in accordance with the express terms and conditions of the

trust, then Debtors' agents and co-conspirators, ALS and NSM acting as *purported* servicers

and/or purported successors-in-interest thereto would be without any authority to enforce the

same, their assertions to the contrary notwithstanding. This, in turn, leads to invocation of the

ancient maxim of "**Nemo dat quod non habet**" ("You cannot give what you do not have.")

79.    Additionally, Claimant contends that Debtors RFC, GMAC, RALI, Homecomings, its

agents, ALS and NSM jointly and severally executed a *collateral contract* to her promissory

note and deed of trust. A *collateral contract* is a contract which assigns the rights and/or

obligations of an existing contract to a third party. A guaranty is an agreement made by a third

party, whether a person, trust or a business entity, to pay and/or perform the obligations of a

debtor for the satisfaction of a debt owed to a creditor upon the occurrence of an event, typically

a delinquent payment, under the original loan agreement. A guaranty, like any contract, requires

mutual assent, adequate consideration, definiteness and a meeting of the minds. In the herein

referenced argument the guaranty is the collateral contract known as RALI 2007-QH5 Trust's

Pooling and Servicing Agreement. Under most states' Statute of Frauds, a guaranty must be in

writing, signed by the guarantor(s) and delivered to the creditor. Claimant alleges that the

guarantors, RFC, GMAC, Homecomings, its agents, ALS and NSM are obligated to keep all the

promises made in Claimant's Note, including the promise to pay the full amount owed.

80.    Claimant contends that Debtors RFC, GMAC, Homecomings, its agents, ALS and NSM

jointly and severally agreed to become a guarantor, surety and/or endorser of Claimant's debt

obligation under her promissory note. Claimant alleges that Debtors RFC, GMAC,

Homecomings, its agents, ALS and NSM jointly and severally failed to disclose material

information regarding this guaranty.  Claimant further alleges anyone who guaranteed the

payment on Claimant's Note without joining, at least, Claimant to that guarantee, acts as a

Volunteer.

81.    Claimant contends that she did not default, and she further contends that Homecomings

and its agent Aurora frustrated and interfered with her payment of her promissory note by their

false representations, thereby waiving Claimant's performance.

82.    Alternatively, if it is proven, Claimant's loan was somehow deposited into the RALI

2007-QH5 Trust, Claimant asserts she has standing as either a third-party beneficiary or an

incidental beneficiary to challenge the Debtors' non-compliance of the RALI 2007-QH5 Trust's

Governing Documents. Claimant asserts she has standing as either a third-party beneficiary or an

incidental beneficiary to challenge the Trust's assertion that her loan is included in the RALI

2007-QH5 Trust.


### E.    *Homecomings as Sub-servicer*

#### 1.    *Homecomings Transfers its Computer System*

83.    According to the RALI 2007-QH5 Trust's **10K ANNUAL REPORT** for the fiscal year

84.    ended: **December 31, 2007**: Residential Capital, LLC, which owns indirectly all of the equity of both Homecomings and GMACM, has restructured the operations of Homecomings and GMACM.  As a result of the restructuring - On May 1, 2007, **the computer system** on which Homecomings maintained its servicing platform was transferred from **one system** (LSAMS) to **another system** (MortgageServ) on which its affiliate GMACM maintains its servicing platform; (**Exhibit 2**)

See also  http://www.sec.gov/Archives/edgar/data/1397977/000139797708000006/qh510k07.txt

2.    *Homecomings Transfers its Servicing Platform*

85.    According to the RALI 2007-QH5 Trust's **10K ANNUAL REPORT** for the fiscal year ended: **December 31, 2007**:  On September 24, 2007,  **Homecomings transferred its servicing platform and certain employees responsible for the servicing function to GMACM.**  As a result of such restructuring, on **September 24, 2007, Homecomings transferred its** *entire* **mortgage servicing platform to GMACM and Homecomings has not serviced any of those mortgage loans since.  (Exhibit 2.)**

See also  http://www.sec.gov/Archives/edgar/data/1397977/000139797708000006/qh510k07.txt

86.    As a result of the integration of the Homecomings and GMACM servicing platforms on a single computer system as described above, a duly authorized officer of GMACM, Homecomings and RFC, **Anthony N. Renzi**, acting as Executive Vice President for GMACM and acting as Managing Director for both Homecomings and RFC certified the following:

a.    the Report on Assessment and related Attestation Report filed as Exhibits 33.3 and 34.3 to Form 10-K address Homecomings' compliance with the applicable servicing criteria for the pre-platform integration period from January 1, 2007 through April 30, 2007; and (See **Exhibit 12-13**)

28  SAM PALMER'S OPPOSITION AND RESPONSE TO THE RESCAP BORROWER CLAIMS TRUST'S
OMNIBUS SEVENTY-FIFTH OBJECTION

b.    the Report on Assessment and related Attestation Report filed as Exhibits 33.2 and 34.2 to
Form 10-K address (1) GMACM's compliance with the applicable servicing criteria for the
pre-platform integration period from January 1, 2007 through April 30, 2007, and (2) each of
Homecomings' and GMACM's compliance with the applicable servicing criteria for the
post-platform integration period from May 1, 2007 through December 31, 2007. (See
**Exhibits 14-15)**

### 3.    The RALI 2007-QH5 Trust Changes Servicer

87.    According to the RALI 2007-QH5 Trust's **FORM 8K CURRENT REPORT** Date of

Report: **September 27, 2007**

**Residential Capital, LLC ("ResCap"), which owns indirectly all of the equity of both Homecomings
and GMACM,** has restructured the operations of Homecomings and GMACM. As a result of such
restructuring, on **September 24, 2007,** Homecomings **transferred its servicing platform** and certain
employees responsible for the servicing function to its affiliate GMACM.

**Subsequent to the transfer of the servicing platform and employees from Homecomings to
GMACM, GMACM became the subservicer for all of the mortgage loans owned by the Issuing
Entity, and Homecomings will no longer service any of the mortgage loans.** In addition, **GMACM
will be servicing all of the GMACM and Homecomings servicing portfolios**, which will consist of the
aggregate of the amounts set forth below under the headings "GMAC Mortgage LLC Primary Servicing
Portfolio" and "Homecomings Financial, LLC Servicing Portfolio." (Emphasis added)

See http://www.sec.gov/Archives/edgar/data/1397977/000106823807001177/rali_2007qh5-8k.htm

### 4.    Homecomings Ceases Mortgage Servicing Operations

88.    According to the RALI 2007-QH5 Trust's **FORM 10K ANNUAL REPORT** for the

fiscal year ended: December 31, 2007: The RALI 2007-QH5 Trust attested that after September

24, 2007, **Homecomings did not service _any_ loans subject to the RALI 2007-QH5 Trust**

**whatsoever. (Exhibit 2.)**

89.    **Not only did Homecomings cease to service the mortgage loans within the RALI**

**2007-QH5 Trust, but it also ceased to service the mortgage loans within the following**

**named trusts with mortgage pool value:**

29   SAM PALMER'S OPPOSITION AND RESPONSE TO THE RESCAP BORROWER CLAIMS TRUST'S
OMNIBUS SEVENTY-FIFTH OBJECTION

1. **RALI 2007-QA1**       **$410,069,000.00**
   http://www.sec.gov/Archives/edgar/data/1385297/000119312508069992/d10k.htm

2. **RALI 2007-QA2**       **$366,984,000.00**
   http://www.sec.gov/Archives/edgar/data/1388210/000119312508069997/d10k.htm

3. **RALI 2007-QA3**       **$882,356,800.00**
   http://www.sec.gov/Archives/edgar/data/1392496/000139249608000006/qa310k07.txt

4. **RALI 2007-QA4**       **$243,450,000.00**
   http://www.sec.gov/Archives/edgar/data/1398641/000139864108000006/qa410k07.txt

5. **RALI 2007-QA5**       **$491,200,000.00**
   http://www.sec.gov/Archives/edgar/data/1410211/000141021108000006/qa510k07.txt

6. **RALI 2007-QH1**       **$522,264,000.00**
   http://www.sec.gov/Archives/edgar/data/1385033/000138503308000009/qh110k07.txt

7. **RALI 2007-QH2**       **$348,425,000.00**
   http://www.sec.gov/Archives/edgar/data/1388211/000138821108000006/qh210k07.txt

8. **RALI 2007-QH3**       **$349,476,000.00**
   http://www.sec.gov/Archives/edgar/data/1392014/000139201408000006/qh310k07.txt

9. **RALI 2007-QH4**       **$397,963,000.00**
   http://www.sec.gov/Archives/edgar/data/1395072/000139507208000006/qh410k07.txt

10. **RALI 2007-QH5**       **$497,503,000.00**
    http://www.sec.gov/Archives/edgar/data/1397977/000139797708000006/qh510k07.txt

11. **RALI 2007-QH6**       **$595,208,000.00**
    http://www.sec.gov/Archives/edgar/data/1401414/000140141408000006/qh610k07.txt

12. **RALI 2007-QH7**       **$346,958,000.00**
    http://www.sec.gov/Archives/edgar/data/1405920/000140592008000006/qh710k07.txt

13. **RALI 2007-QH8**       **$540,449,900.00**
    http://www.sec.gov/Archives/edgar/data/1410213/000141021308000006/qh810k07.txt

14. **RALI 2007-QH9**       **$573, 585,400.00**
    http://www.sec.gov/Archives/edgar/data/1412683/000141268308000007/qh910k07.txt

15. **RALI 2007-QO1**       **$621,930,000.00**
    http://www.sec.gov/Archives/edgar/data/1384915/000106823807001159/rali_2007qo1-8k.htm

16. **RALI 2007-QO2**       **$527,132,000.00**
    http://www.sec.gov/Archives/edgar/data/1388212/000138821208000006/qo210k07.txt

17. **RALI 2007-QO3**    **$296,295,000.00**
   http://www.sec.gov/Archives/edgar/data/1393501/000139350108000006/qo310k07.txt
18. **RALI 2007-QO4**    **$502,837,000.00**
   http://www.sec.gov/Archives/edgar/data/1398693/000139869308000006/qo410k07.txt
19. **RALI 2007-QO5**    **$231,187,000.00**
   http://www.sec.gov/Archives/edgar/data/1410212/000141021208000006/qo510k07.txt

20. **RALI 2007-QS1**    **$13,259,675.0**
   http://www.sec.gov/Archives/edgar/data/1382368/000119312508070003/d10k.htm

**Homecomings also ceased servicing the mortgage loans in these trusts. Just to name a few.**

90.    Unaware of the above-referenced transfer, Claimant continued to send her mortgage

payments to Homecomings after September 24, 2007.  Claimant believes either the master

servicer of the RALI 2007-QH5 Trust, Debtor Residential Funding Company LLC ("RFC"),

GMACM or another ResCap Debtor accepted Claimant's mortgage payments after September

24, 2007.  Claimant contends the Debtors non-compliance with the servicing criterion had and

still has material impacts on her specifically, and all similarly situated borrowers and all

investors of specific RALI Trusts.

### 5.    *Homecomings Did Not Transfer Claimant's Servicing Rights to Aurora*

91.    *According* to the Trust, Homecomings serviced Claimant's loan until transferring it to

Aurora on April 1, 2008. (*See* Trust Objection: Exhibit A: p. 17 ¶ 1.)  However, *according* to the

RALI 2007-QH5 Trust's 8K and 10K filings with the SEC, **Homecomings did not service *any***

**loans subject to the RALI 2007-QH5 Trust after September 24, 2007. (Exhibits 1 and 2.)**

The Trust completely contradicts the RALI 2007-QH5 Trust's attestations and the public filings

with the SEC, by stating that Homecomings serviced Claimant's loan until April 1st of 2008.

92.    **Thus, there is more than a plausible inference that Claimant's mortgage loan was no**

**longer serviced by Homecomings after September 24, 2007.  As a result, a question of fact**

31   SAM PALMER'S OPPOSITION AND RESPONSE TO THE RESCAP BORROWER CLAIMS TRUST'S
OMNIBUS SEVENTY-FIFTH OBJECTION

exists as to who specifically serviced Claimant's mortgage loan between September 24,
2007 and April 1, 2008.

### 6.    *RFC Holder of Servicing Rights*

93.    If Claimant's loan was actually securitized and deposited into the RALI 2007-QH5 Trust,
then subject to the RALI 2007-QH5 Trust's pooling and servicing agreement ("PSA") Debtor
RFC would legally own the servicing rights to Claimant's loan and therefore, RFC would be the
only entity with the ability and authority to sell the servicing rights to Claimant's loan.

94.    Claimant contends that Homecomings was merely a sub-servicer subject to the RALI
2007-QH5 Trust. Homecomings never owned the servicing rights to any loans within the RALI
2007-QH5 Trust in any manner and therefore, Homecomings could not have sold the servicing
rights of Claimant's loan to Aurora in any manner.

95.    *According* to the RALI 2007-QH5 Trust's **FORM 8K CURRENT REPORT** dated
*March 6, 2008*, RFC as the master servicer, Debtor Residential Accredit Loans, Inc.("RALI"), as
depositor, and Deutsche Bank Trust Company Americas, as trustee (the "Trustee"), entered into
an agreement to **transfer the master servicing and subservicing of the mortgage loans** subject
to the Pooling and Servicing Agreement to Aurora Loan Services LLC. **(Exhibit 1.)**
See http://www.sec.gov/Archives/edgar/data/1397977/000106823808000453/rali2007-qh5_8k.htm

96.    Just eight days later, a letter dated *March 14, 2008* *purporting* to be from Homecomings,
was sent to Claimant, notifying her that effective April 1, 2008, the right to collect payments
from her, was being assigned, sold or transferred from Homecomings to Aurora. The letter
further states "Your present servicer is Homecomings Financial LLC." Moreover, the letter

stated Payments will be processed by Homecomings Financial LLC if received prior to

04/01/08…" (**Exhibit 4.**)

97.    Thereafter, Claimant began an unsuccessful, three year journey through a living hell to

ascertain a loan modification through Aurora.

*F.    Aurora's Misrepresentations*

98.    Claimant called Aurora and requested a loan modification on July 23, 2008.  Diane,

***purporting*** to be Aurora's representative, informed Claimant that because she was current she

could not apply for a loan modification, but she could either try and sell her house or do a short

sale and that, even if a modification was possible, she would have to be at least 3 months late

before a short sale or modification would even be possible.  Relying and following Diane's

advice, Claimant followed Diane's instruction.  Claimant contends that by telling Claimant she

would need to skip at least three mortgage payments in order to qualify and be considered for a

loan modification, Debtors' agent and co-conspirator, Aurora invited Claimant's

nonperformance and encouraged Claimant to act accordingly.

99.    Based on Debtors' agent and co-conspirator, Aurora's misrepresentations, Claimant hired

Peter Daradics of Troop Realty, to list and sell her home on August 11, 2008.  Unfortunately,

Claimant discovered that the entire real estate market was underwater and selling her home was

out of the question.

100.    To Claimant's detriment, on September 1, 2008 Claimant followed Debtors' agent and

co-conspirator, Aurora's advice and skipped her mortgage payment in order to obtain a loan

modification.

101.    Claimant skipped the three mortgage payments. (***Newsom v. Bank of Am., N.A.***, 2014

WL 2180278 (C.D. Cal. May 22, 2014): [borrowers were current on their mortgage when they

33    SAM PALMER'S OPPOSITION AND RESPONSE TO THE RESCAP BORROWER CLAIMS TRUST'S
OMNIBUS SEVENTY-FIFTH OBJECTION

began the modification process and were "misled into defaulting." But for servicer's misrepresentation, borrowers would not be in their current position. The court allowed borrower's fraud claim to survive the MTD.])

102.    In light of this hidden deception, Claimant is certain Debtors are wholly liable for any entity allegedly declaring itself to be a successor in interest to Debtor Homecomings. As a result, Claimant contends each purported successor in interest; Aurora, Aurora Bank, NSM and DB-RALI are all legal strangers to Claimant's mortgage loan.


**G.    *Origination-Based Claims are Viable***

103.    The Trust argues that the Debtor has no liability for Claimant's originated-based claims because all of those claims are time-barred. (*See* Trust's Objection; Ex. A p. 17 ¶ 2.)


**1.    *Claimant's Claims are not Time-Barred***

104.    The statute of limitations for fraud is three years. (***Code of Civil Procedure § 338, subd. (d)***; ***Krieger v. Nick Alexander Imports, Inc***. (1991) 234 Cal.App.3d 205, 219.) This section also codifies the delayed discovery rule, providing a cause of action for fraud "'is not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake.'"(***Brandon G. v. Gray*** (2003) 111 Cal.App.4th 29, 35; ***Code of Civil Procedure § 338, subd. (d);*** see also ***Code of Civil Procedure § 312***.)

105.    "[T]he ground of relief is that the defendant, having by fraud or deceit concealed material facts and by misrepresentations hindered the plaintiff from bringing an action within the statutory period, is estopped from taking advantage of his own wrong."(***Pashley v. Pacific Elec. Ry. Co***. (1944) 25 Cal.2d 226, 231.)

34    SAM PALMER'S OPPOSITION AND RESPONSE TO THE RESCAP BORROWER CLAIMS TRUST'S
OMNIBUS SEVENTY-FIFTH OBJECTION

106.    Statutes of limitations bar untimely claims. Statutes of limitations can toll, however, upon

Claimant's showing she did not discover the facts giving rise to her claims within the statutes of

limitations period. The California "**Delayed Discovery Doctrine**" allows Claimant to toll a

statutes of limitations this way if she can show her delay resulted despite "diligent investigation

of the circumstances of the injury," and that she could not have "**reasonably discovered**" the

pertinent facts within the statutes of limitations timeframe.

107.    Claimant contends she didn't and couldn't have discovered through the exercise of

reasonable diligence she was injured by Debtors RFC, GMACM, RALI, Homecomings and

Debtors' agent and co-conspirators, Aurora, DB and NSM manipulation of her promissory note,

until, at the earliest on or near September 19, 2011, when Claimant received Aurora's second

response to her QWR and discovered the forged signature on the *purported original* promissory

note. Although, Claimant received the altered instrument she did not discover the alteration until

September 19, 2011. Here, Claimant adequately pled a fraud cause of action against Debtors

RFC, GMACM, RALI, Homecomings and Debtors' agent and co-conspirator, Aurora for forging

her signature and/or altering the promissory note without her knowledge or consent. Claimant

contends that she did not discover this fraud until September 2011 when Aurora responded to her

September 5, 2011 QWR. Within that response were a series of documents which included a

single sheet of paper called an allonge. Because this document seemed suspicious, Claimant

began to *carefully* review each of the documents and noticed that her signature had been forged.

(SAC ¶ ¶ 170 – 177.)

108.    Claimant contends that the most recent alteration of the promissory note occurred

between September 2011 and March 2014. As such, the fraud apparently is still ongoing and

under the continuing tort doctrine, the statute did not run until this time, which is less than one

year. Claimant alleges a recurring fraudulent act –the alteration of her ***purported original***

promissory note by Debtors RFC, GMACM, RALI, Homecomings and Debtors' agent and co-

conspirator, Aurora, DB and NSM. The theory of continuous accrual applies to Claimant's

allegations, and as such, her claims are not time-barred. Moreover, the automatic stay imposed

by Debtors' bankruptcy coupled with the automatic stay of Claimant's pending appeal have both

tolled the statutes of limitations until such time as the bankruptcy and appeal are so resolved or

the stays are lifted.

109.    Additionally, Claimant contends she recently discovered Debtor Homecomings' *alleged*

successor in interest, agent and/or co-conspirator, Aurora **NEVER** acquired servicing rights of

her loan from Homecomings in any manner. Although, Claimant has contended for years Aurora

didn't have ***any*** legal rights to her loan, she only recently discovered Aurora did not acquire

servicing rights to her loan from Debtor Homecomings in ***any*** manner because Debtor

Homecomings NEVER owned the servicing rights to Claimant's loan. Further, Debtor

Homecomings transferred its ***entire*** mortgage servicing platform **to Debtor GMACM on**

**September 24, 2007**, prior to Aurora's claim of acquisition. (**Exhibits 1 and 2.**)

110.    Claimant didn't and couldn't have discovered through the exercise of reasonable

diligence she was injured by Debtors' agent and co-conspirator, Aurora claiming to be her

servicer, until, at the earliest sometime in January of 2014, when she gained access to and read

the RALI 2007-QH5 Trust's FORMS 8K and 10K filed with the SEC. Although, Claimant

discovered the identity of the ***purported*** investor of her loan sometime in 2011, she did not

discover the process of accessing the public records on the SEC's website until sometime in

January of 2014. Claimant did not discover that Homecomings transferred its servicing platform

and entire servicing portfolio to Debtor GMACM until sometime in January 2014. Upon further

research, Claimant discovered as a result of that transfer and restructuring **Homecomings had**

**not serviced Claimant's loan since September 24, 2007.** Because neither Homecomings nor

GMACM notified Claimant regarding their servicing transfer, Claimant could not have and did

not discover this concealed fact until sometime in January of 2014.

111.    In addition, neither Debtor RFC nor Debtor's alleged successor in interest, agent and/or

co-conspirator, Aurora, notified Claimant regarding its *purported* transfer of RFC's *purported*

interest in the servicing rights of Claimant's loan to Aurora. The following is an excerpt from the

RALI 2007-QH5 Trust's FORM 8K CURRENT REPORT dated March 6, 2008:

**Item 6.02.**      <u>**Change of Servicer or Trustee.**</u>

**Residential Funding Company, LLC ("RFC"), as the master servicer under the Standard
Terms of Pooling and Servicing Agreement, dated as of May 1, 2007**, and related Series
Supplement, dated as of May 1, 2007 (the "Pooling and Servicing Agreement"), among RFC,
Residential Accredit Loans, Inc., as depositor, and Deutsche Bank Trust Company Americas, as
trustee (the "Trustee"), **has entered into an agreement to transfer the master servicing and
subservicing of the mortgage loans subject to the Pooling and Servicing Agreement to
Aurora Loan Services LLC ("Aurora Loan Services").** The registrant expects that certain
conditions precedent to such transfer, including a determination by the Trustee that Aurora Loan
Services is reasonably satisfactory and a letter from each rating agency confirming that such
transfer of servicing will not result in a qualification, withdrawal or downgrade of the current
ratings of any of the RALI Series 2007-QH5 Mortgage Asset-Backed Pass-Through Certificates,
will be satisfied prior to **the effective date of the transfer on April 1, 2008.**

See http://www.sec.gov/Archives/edgar/data/1397977/000106823808000453/rali2007-qh5_8k.htm

As such, Claimant could not and did not discover this concealed fact until sometime in January

of 2014.

112.    Claimant alleges the statute of limitations has not run on any of her causes of action.

Thus, because Claimant brought her action within three years of actually discovering the mistake

or within three years of receiving facts putting her on inquiry or with which facts she, by

reasonable diligence, could and should have discovered the mistake, the statute of limitations

doesn't bar Claimant's claims.

**H.    Claimant has Stated Proper Causes of Action under California and Federal Law
Which are Subject to her Proof of Claim**

**1.    Fraud**

113.    Claimant realleges all prior paragraphs of the pleading as if set out here in full.

114.    Fraud allegations require: 1) a misrepresentation; 2) servicer's knowledge of its falsity; 3)

intent to induce borrower's reliance; 4) borrower's actual reliance; and 5) damages.  The

elements of a cause of action for fraud are: (1) a misrepresentation; (2) knowledge of falsity; (3)

intent to defraud or induce reliance; and (4) actual reliance by the plaintiff resulting in damage.

(*California Civil Code § 1709*; *Conroy v. Regents of University of California* (2009) 45 Cal.4th

1244, 1255; *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173.) (*Robinson Helicopter

Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 990.)   Here, Claimant contends the Debtors'

agent and co-conspirator, ALS misled her about the availability and requirements for a loan

modification and the nature of its review process.  Essentially, Debtors' agent convinced

Claimant to become delinquent, assuring her it was the only way she could qualify for a

modification. Consequently, Claimant incurred late fees, penalties and damage to her credit

associated with her missed mortgage payments. Claimant contends that the Debtors' agent's pre-

default activity and conduct directly caused Claimant's injuries and damages. (SAC ¶¶ 263-270,

278-283; 292-294) (See also SAC ¶¶ 194-255)

115.    Further, Claimant contends the alteration of her promissory note and the concealment of

the true Lender/Note-Holder and servicer of her mortgage are actionable. Thus, Claimant has

alleged viable claims for fraud.

38   SAM PALMER'S OPPOSITION AND RESPONSE TO THE RESCAP BORROWER CLAIMS TRUST'S
OMNIBUS SEVENTY-FIFTH OBJECTION

2.    *Breach of Contract (Forbearance Agreements)*

116.    To state a contract claims, borrowers must show: 1) a contract; 2) borrower's

performance, or excused nonperformance; 3) servicer's breach; and 4) damages caused by

servicer's breach.

117.    If Claimant alleges Debtors' agent and co-conspirator, ALS misrepresented itself as her

servicer and as her *Lender*, **fraudulently inducing** her into multiple Agreements. (SAC ¶ ¶ 155-

159.

118.    Claimant alleges ALS didn't have *any* authority to assess or qualify her for a loan

modification because it was neither her *Lender/*Note-Holder nor the servicer representing the

rightful Note-Holder. (*California Civil Code § 2920.5(a)*). Thus, Claimant argues she didn't

consent to the formation of the alleged Agreements and as such, these Agreements are all *void*.

119.    Claimant contends her Lender/Not-Holder/Owner committed a material breach of the

deed of trust as it failed to perform all conditions precedent prior to accelerating the mortgage

and initiating foreclosure. Specifically, Claimant alleges that her Lender failed to furnish her

with written notice of her alleged default prior to accelerating the mortgage and initiating

foreclosure as required by **Paragraph 22** of Claimant's deed of trust. The essential purposes of a

deed of trust are two-fold: to secure the Lender's interest in the property it conveys and to protect

the borrower from acceleration of the debt and foreclosure on the securing property prior to the

fulfillment of the conditions precedent it imposes. Section 22 of the 25 sections in the deed of

trust is the only section written to protect the Borrower's interest.

120.    *If* it is proven, Claimant's loan in the RALI 2007-Qh5 Trust, then Claimant has a claim

for breach of contract against the Debtors Homecomings, RFC, GMAC, RALI and Debtors'

agent and co-conspirator, ALS. This claim involves disputed issues of fact and law that this

Court cannot resolve on the papers alone, as such, the Trust's Objection should be

**OVERRULED.**

*121.*    Claimant contends she has viable breach of contract claims, as she has established the

existence of the promissory note, deed of trust and multiple workout and forbearance

agreements. Claimant contends that she was induced to skip multiple mortgage payments by the

Debtors' agent and co-conspirator Aurora, and as a result her nonperformance is excused.

Claimant contends that she has suffered and continues to suffer physically and mentally and has

suffered economic injury caused by Debtors' misconduct.

122.    To ascertain when a statute of limitations period begins to run, courts look to when the

last element required for that claim occurs.  In contract claims, then, damages determine the

statute of limitations period. California has a four-year statute of limitations for written contract

claims. So any claim must be brought within four-years of the damage that is being litigated.

Here, Debtors' agent and co-conspirator, ALS unlawfully declared a default, thereby invoking

the power of sale subject to her deed of trust and initiated foreclosure proceedings on her

Property, based on Debtors' agent and co-conspirator, ALS' creation of a false default. ***Vincent***

***v. PNC Mortg., Inc.***, 2014 WL 2766116 (E.D. Cal. June 18, 2014).

123.    The Trust argues Ms. Palmer's claims are all time-barred.  Claimant endorsed her

promissory note and deed of trust on April 2, 2007 and she commenced litigation on March 2,

2011, just one month shy of four years.  Thus, the Trust's argument fails.

### 4. *Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing*

124.    Both breach of contract and breach of the covenant of good faith and fair dealing claims depend on the existence of an enforceable contract. The covenant of good faith and fair dealing is implied into every contact. To show a breach, a borrower must demonstrate their servicer's "conscious and deliberate acts" unfairly frustrated the purposes of the contract and deprived borrower of the contract's benefits.

125.    Here, Debtors' agent and co-conspirator, Aurora promised borrower that if she became delinquent, she would qualify for a modification and no negative actions would be taken against her. As soon as borrower did become delinquent, Debtors' agent and co-conspirator, Aurora reported her to credit reporting agencies and unlawfully accelerated her loan. Claimant contends that her performance subject to her contract [promissory note and deed of trust] was excused, and that Debtors' agent and co-conspirator Aurora unfairly prevented her from seeing that contract fully performed by inducing her to miss mortgage payments. Claimant ***purportedly*** was declared in default based on these representations and Debtors' agent and co-conspirator Aurora denied her a modification and started the foreclosure process.

126.    Claimant contends that Debtors' agent and co-conspirator, Aurora consciously and deliberately frustrated her ability to perform under her contract by instructing her to miss her mortgage payments. Debtors' agent and co-conspirator, Aurora did "more than leave Claimant the impression that missing payments would entitle her to a loan modification. Moreover Debtors' agent and co-conspirator, Aurora explicitly assured her that she would suffer no negative repercussions." These same allegations are also sufficient to adequately plead promissory estoppels and violations of the Rosenthal act. (See **Exhibit 12**)

### 5. *Violation of California Business and Professions Code 17200 ("UCL")*

*127.*    Claimant contends she has viable UCL claims as she has established that she suffered

economic injury caused by defendant's misconduct. Here, Claimant's valid fraud claims serve as

a basis for her "unlawful" prong UCL cause of action. Claimant alleges she spent financial

resources improving the property, relying on servicer's promise that a better modification would

be granted in the near future.

128.    Claimant's valid fraud claims serve as a basis for her "fraudulent" prong UCL cause of

action. Claimant contends the Debtors' agent and co-conspirator, ALS misled her about the

availability and requirements for a loan modification and the nature of its review process.

Essentially, Debtors' agent convinced Claimant to become delinquent, assuring her it was the

only way she could qualify for a modification. Consequently, Claimant incurred late fees,

penalties and damage to her credit associated with her missed mortgage payments. Claimant

contends that the Debtors' agent's pre-default activity and conduct directly caused Claimant's

injuries and damages.

129.    To bring a claim under the "fraudulent" prong of the UCL, borrowers must show that

members of the public are likely to be deceived by servicer's actions. Here, servicer's assurance

that becoming delinquent would eventually lead to a modification, and then servicer's

subsequent delay in processing applications and incessant requests for repetitious documentation,

resulted in increasing late fees and penalties. Additionally, servicer incorrectly evaluated and

denied HAMP applications. (SAC ¶¶ 219 - 228) Claimant claims her request for a modification

was never supposed to be considered for a HAMP loan as her loan amount of $862,500 exceeded

that allowed by HAMP and Aurora knew this. And at the end of one year making the 1st

Forbearance payments, ALS's representative Fran ID#J09 stated Claimant "…was never eligible

for HAMP…" and then stated further "…we did it by mistake…". (SAC ¶¶s 110 through 114

These practices could be construed as deceptive to the public.

### 5.   *Tortious Interference with Contract and Interference with Prospective Economic Advantage*

*130.*   Interference with contract and interference with prospective economic advantage claims

cannot be brought against the other party to the contract or economic relationship.  Instead, a

borrower must show, inter alia, a valid contract (or economic relationship) between themselves

and a third party.  Here, the promissory note and deed of trust are contracts between Debtor

Homecomings and Claimant.

131.   Because the Debtors failed to properly deposit Claimant's Note and DOT into the RALI

2007-QH5 Trust, Claimant contends that Homecomings is a legal stranger to her mortgage

contracts. A question of fact exists as to Homecomings' mortgage servicer status.

132.   Claimant asserts that Debtors RFC and Homecomings' agent ALS induced her to skip

multiple mortgage payments in order to qualify and be considered for a loan modification which

ultimately created a false default declared by the Debtor's agent, Aurora.

133.   The ResCap Trust asserts Claimant's "loan was in default and due for October 1, 2008

payment after servicing transferred to Aurora…" Claimant contends she did not default and she

did not fail to make a payment or cure a payment that was due under her debt obligation.

Claimant alleges that RFC and Homecomings' agent ALS induced her into a false default by

advising her to skip numerous mortgage payments, in order to qualify and be considered for a

modification. However, Claimant specifically contends the Note-Holder's right to insist on the

mortgage payment is *excused* because the Debtors' agent frustrated and/or interfered with her

performance. *California Civil Code § 1511.3.* Thus, Claimant has a claim for tortious

interference with contract against Debtors RFC, RALI and Homecomings. The workout

agreements are all contracts (and evidence of an economic relationship with the probability of

future financial benefit to the borrower) between Debtors' agent, ALS and Claimant.

134.    In light of these multiple considerations, it follows that the determination of whether

Claimant defaulted under her debt obligation is generally a question of fact. Claimant provides

facts supporting her allegations that, depending on the evidence, could lead a trier of fact to

reasonably conclude that Claimant was either excused from performance or in the alternative, the

RALI 2007-QH5 Trust, *as* the alleged Note-Holder, received all payments and as a result, didn't

suffer any injury, resulting in no breach or default under Claimant's Note.

135.    Here, Claimant alleges (1) ALS, Homecomings' Agent, represented to Claimant ... that

she had to skip at least three mortgage payments in order to qualify and be considered for a loan

modification; (2) ALS, Homecomings' Agent's representation was false because homeowners

did not have to skip any mortgage payments to qualify for any government modification program

and ALS, Homecomings' Agent had no intention of allowing Claimant to modify her existing

loan; (3) the misrepresentation was material because it was the but-for cause of Claimant

skipping payments; (4) ALS, Homecomings' Agent knew the statements that a person had to

skip at least three mortgage payments were false because they knew it was not a government

policy and they did not have an internal written policy that supported any request for the

homeowner to skip at least three payments to qualify for a loan modification; (5) ALS,

Homecomings' Agent's statements were made with the intent to induce Claimant to skip at least

three mortgage payments and to have her allegedly fall behind in a manner in which it would be

44   SAM PALMER'S OPPOSITION AND RESPONSE TO THE RESCAP BORROWER CLAIMS TRUST'S
OMNIBUS SEVENTY-FIFTH OBJECTION

almost impossible to catch up and/or bring her payments current and Homecomings never

intended to allow Claimant to enter into a loan modification program; (6) Claimant had no way

of knowing that there was no ALS HF policy that guaranteed if one skips at least three mortgage

payments, they would qualify for a loan modification ...; (7) Claimant relied on ALS,

Homecomings' Agent 's statements to her detriment when she skipped three mortgage payments;

(8) Claimant had a right to rely on ALS, Homecomings' Agent's statements because the house

was hers and in her name ...; (9) if it were not for ALS, Homecomings' Agent's fraudulent

actions and misstatements, Claimant would never have skipped any mortgage payments and her

credit rating would not have been destroyed in an attempt to modify her loan .

136.    Claimant contends Debtors Homecomings, RFC and RALI are ***purported*** interested third

parties to the forbearance and workout agreements between her and Debtors' agent, ALS.

137.    Interference claims, however, must be brought within two years of the wrongful

interference. Under California's delayed discovery doctrine, a borrower may toll the statute of

limitations until she discovered the interference, if she could not have reasonably discovered it

earlier.  Here, Claimant contends she could not have discovered the Debtors' interference—or

the roll that Debtors played in the modification process—until at the earliest October 15, 2012

upon receipt of the Letter from the Ventura Court of Appeal stating "…All proceedings before

this court have been stayed pending determination of the proceedings before the bankruptcy

court…" **(See Exhibit 8)**  As a result Claimant respectfully requests the court allow Claimant to

add and/or amend her Proof of Claim to add her tortious tortuous interference claims.


6.    ***Cancellation of Instruments***

**138.**    As a condition of obtaining cancellation of a voidable deed, the party seeking relief is

generally required to restore or offer to restore to the defendant everything of value received in

the underlying transaction. However, if the deed is *void*, as in the case of fraud in the execution

or forgery, restoration is not necessary [see ***Fleming v. Kagan*** (1961) 189 Cal. App. 2d 791, 796,

797, 11 Cal. Rptr. 737.]

139.    Claimant asserts an unknown party[s] forged her signature on the promissory note ***after***

she endorsed her loan. **(Exhibits 7, 7A and 7B)** (SAC ¶¶ 16, 260.) Claimant contends the deed

of trust and promissory note are both *void* as a result of Debtors' and Debtors' agents'

fraudulent conduct. (SAC ¶¶-151-152.)

140.    Claimant relied on Debtor Homecomings and Debtors' agents' misrepresentations and

has been damaged in the following ways: (1) she has been deprived of the equity in her home;

(2) the title to her home has been clouded; (3) she paid the wrong party for an undetermined

amount of time and has overpaid in interest, penalties, fees and taxes that were calculated as a

result of the misapplication of payments; (4) her credit and credit scores have been damaged; (5)

she has expended significant funds to cover litigation costs; (6) multiple parties seek to enforce

her debt obligation against her; (7) Claimant's home is scheduled for Trustee Sale at 11:00 AM

October 24, 2014 in Ventura County California; and (8) her physical and mental health have

suffered  These are all sufficient allegations of injury. (*SAC* ¶ 271.)

141.    Claimant provides facts supporting her allegations that, depending on the evidence, could

lead a trier of fact to reasonably conclude that Debtors' agents and co-conspirators, ALS and

NSM never received any legal right to service Claimant's mortgage loan in any manner

whatsoever.

142.    Whether Claimant's Loan was individually or corporately originated by Debtors is a

question of fact and law that must be determined by a trier of fact where evidence is presented.

Thus, Claimant's cause of action for fraud involves disputed issues of fact and law that this

Court cannot resolve on the papers alone, as such, the Trust's Objection should be **OVERRULED.**

### 7.    *Fraudulent Omissions/Concealment*

143.    Under *California law*, the Loan Documents' partial representations that omitted material facts, created a duty to disclose all material facts concerning Claimant's Option ARM Loan. Thus, the partial representations in the Loan Documents created a duty to disclose to Claimant that: (i) the low interest rate in the Note was only available for thirty days if at all; (ii) the monthly payment amounts for the first three to five years provided to Claimant on the TILDS were insufficient to pay both principal and interest; (iii) negative amortization was absolutely certain to occur if Claimant made payments according to the payment schedule provided in the Loan Documents; (Claimant's Truth-In-Lending Disclosure Statement dated 03/30/07) signed on April 2, 2007 provides the payment structure given to Claimant at the time of closing. Note it states 48 Months for the low rate. (See **Exhibit 9**) There was no way that Claimant could have known that this amount would increase her loan balance; and that (iv) loss of equity and/or loss of Claimant's residence was certain to occur if Claimant made payments according to the payment schedule. (See **Exhibit 9**.)

144.    Claimant's cause of action for fraudulent omissions in her SAC is viable against Debtors Homecomings, RFC, GMAC, RALI and Debtors' agents and co-conspirators and involves disputed issues of fact and law that this Court cannot resolve on the papers alone, as such, the Trust's Objection should be **OVERRULED.**

8.    *Quiet Title and Declaratory Relief*

145.    California law requires borrowers to name "persons having adverse claims to title" as defendants in any quiet title action. ***California Civil Code § 762.010.*** Claimant doesn't seek to quiet title against her mortgagee, she seeks to quiet title to Debtors Homecomings, RFC, GMACM, RALI and Debtors' agents and/or co-conspirators, ALS, NSM and DB-RALI. Claimant alleges that Debtors and Debtors' agents and/or co-conspirators, have no authority to collect payments on her promissory note or foreclose on her Property subject to her deed of trust. (SAC ¶¶ 165-170, 288, 329-330.) Claimant contends she continues to hold rightful and equitable title by operation of law superior to any other adverse claims.

146.    California law requires borrowers bringing quiet title claims to tender the amount due on their loan. There are several exceptions to this rule, including when the borrower "attacks the validity of the underlying debt." Here, Claimant alleged Homecomings wrongfully failed to verify her income, agreeing to a loan it knew borrower could not afford. This fraud allegation is enough to excuse tender at the pleading stage. Claimant's cause of action for quiet title in her SAC is viable against the Debtors and involves disputed issues of fact and law that this Court cannot resolve on the papers alone, as such, the Trust's Objection should be **OVERRULED.**

9.    *Violation of TILA; 15 U.S.C. § 1601*

147.    The loan documents and mandatory disclosure documents provided to Claimant did not comply with the requirements of the Truth in Lending Act ("*TILA.*") (SAC ¶¶ 7, 8, 83, 84, 196) **(Exhibit 9)**

148.    Claimant's cause of action for violation of ***TILA; 15 U.S.C. § 1601*** in her SAC is viable against the Debtors and is not time-barred. This claim involves disputed issues of fact and law

that this Court cannot resolve on the papers alone, as such, the Trust's Objection should be **OVERRULED.**

## V.  CONCLUSION

As stated herein, Claimant has stated valid claims for liability against Debtors Homecomings, RFC, GMACM and RALI. The Trust presents a blanket defense void of any evidence for the Court to rebut the *prima facie* presumption in favor of Claimant. Additionally, as set forth above, Ms. Palmer's claims set forth in all her causes of action are neither time barred, nor are they speculative and if the Court has any hesitation whatsoever, Claimant requests the Court to exercise its discretion and permit her to pursue her claims in the pending action in the Second Appellate District Court in the State of California or alternatively to appoint a special master at the Debtors' and the Trust's expense to make findings of fact after a period of discovery and an evidentiary hearing/trial.  In sum, Ms. Palmer's claim should be moved to the liability borrower claims pool and retain its status as an active claim for which the Debtors are wholly liable.  For these reasons Claimant requests the Court to overrule the Trust's Objection with prejudice or grant leave to pursue the alternative relief requested herein.

WHEREFORE, the Claimant respectfully requests that the Court enter an order in which the Ms. Palmer's claim is neither disallowed nor expunged, granting the relief herein and granting such other relief as is just and proper.

Respectfully submitted,

Dated:  October 12, 2014

Sam Palmer, Claimant

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

In Re:                                          Chapter 11


RESIDENTIAL CAPITAL, LLC, et al.                Case No.: 12-12020 (MG)

        Debtors.

---

## ORDER DENYING OBJECTION OF
## THE RESCAP BORROWER TRUST
## CLAIM NUMBER 2761 FILED BY SAM PALMER

Upon consideration of the objection of the ResCap Borrowers Claims Trust (Doc. 7522),

As the successor to Residential Capital, LLC, and its affiliated debtors and debtors in possession

with respect to Borrower Claims, and the response and opposition by Sam Palmer, it is hereby

ORDERED, ADJUDGED, AND DECREED THAT:

1. The relief requested in the Objection is DENIED as set forth in the Court's Memorandum

   Opinion and/or statements on the record at a hearing held on November 13, 2014 in this

   Court;

2. The relief requested by the ResCap Borrower Trust is denied with prejudice; and

3. Kurtzman Carlson Consultants LLC, the Claims and Noticing Agent on behalf of the

   Debtors is directed to mark the claims register consistent with this Order.

Dated: _____, 2014


                                        _____
                                        The Honorable Martin Glenn
                                        United States Bankruptcy Judge



[PROPOSED] ORDER

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY that a true and correct copy was mailed on October 16, 2014 to:**

The Honorable Martin Glenn
United States Bankruptcy Court for the
Southern District of New York
Alexander Hamilton Custom House
One Bowling Green
New York, New York 10004-1408

Counsel to the ResCap Borrower Claims Trust
Morrison & Foerster LLP
250 West 55th Street
New York, New York 10019
Attention:  Norman S. Rosenbaum and Jordan A. Wishnew

The Office of the United States Trustee for the
Southern District of New York
U.S. Federal Office Building
201 Varick Street
Suite 1006
New York, New York 10014
Attention:  Linda A. Riffkin and Brian S. Masumoto

The ResCap Borrower Claims Trust
Polsinelli PC
900 Third Avenue
21st Floor
New York, New York 10022
Attention:  Daniel J. Flanigan

Dated: October 16, 2014

Sam Palmer, Claimant

# EXHIBIT A

## Palmer v HOMECOMINGS Second Amended Complaint SAC Filed11.18.11

1  Sam Palmer
   1682 Amarelle Street
2  Thousand Oaks, California 91320
3  Telephone (805) 480-1848
   kensington.taylor@verizon.net
4  *Plaintiff In Pro Per*

5

6              SUPERIOR COURT FOR THE STATE OF CALIFORNIA

7          FOR THE COUNTY OF VENTURA - VENTURA HALL OF JUSTICE

8                        UNLIMITED CIVIL CASE

9                             * * * * *

10  SAM PALMER, an individual,        CASE NO: Case 56-2011-00392361-CU-
                                                    OR-VTA
11            Plaintiff,
                                      SECOND AMENDED COMPLAINT FOR:
12  v.
13                                    1. Wrongful Initiation of Foreclosure
                                      2. Fraud In The Inducement (HC)
14  HOMECOMINGS FINANCIAL, L.L.C,     3. Fraudulent Concealment  (HC)
    [F/K/A HOMECOMINGS FINANCIAL      4. Declaratory Relief (HC)
15  NETWORK, INC.]; MORTGAGE          5. Fraud In The Inducement (Aurora)
    ELECTRONIC REGISTRATIONS          6. Fraudulent Concealment (Aurora)
16  SYSTEMS.; QUALITY LOAN            7. Fraud (Aurora)
    SERVICES CORP.; AURORA LOAN       8. Intentional Misrepresentation
17  SERVICES, L.L.C.; AURORA BANK        (Aurora)
    FSB; and  DOES 1 through 20,      9. Negligent Misrepresentation
18  inclusive,                           (Aurora)
                                      10. Intentional Infliction of Emotional
19            Defendants.                 Distress (Aurora
20                                    11. Fraud (Aurora)
                                      12. Intentional Misrepresentation
21                                        (Aurora)
                                      13. Negligent Misrepresentation
22                                        (Aurora)
23                                    14. Fraud (HC and Aurora)
                                      15. Breach of the Implied Covenant of
24                                        Good Faith and Fair Dealing
                                          (Aurora)
25                                    16. Fraud (MERS, Aurora and Quality)
26                                    17. Intentional Misrepresentation
                                         (MERS, Aurora and Quality)
27                                    18. Negligent Misrepresentation
                                         (MERS. Aurora and Quality)
28

                     SECOND AMENDED COMPLAINT
                                1

19. **Intentional Infliction of Emotional Distress (Aurora and Quality)**
20. **Intentional Infliction of Emotional Distress (Aurora and Aurora Bank)**

**DEMAND FOR JURY TRIAL**

**Complaint Filed: March 2, 2011**

Plaintiff, SAM PALMER, an individual, (sometimes referred to as "Plaintiff" or "Ms. Palmer") for her First Amended Complaint against Defendants HOMECOMINGS FINANCIAL, L.L.C. [F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.] ("Homecomings"); MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"); QUALITY LOAN SERVICE CORP. ("Quality"); AURORA LOAN SERVICES, L.L.C. ("Aurora"); and AURORA BANK FSB ("Aurora Bank") hereby alleges as follows:

## THE NATURE OF THIS ACTION

1.      This case, among other causes of action, involves the wrongful initiation of non-judicial foreclosure proceedings.  This lawsuit was filed on March 2, 2011 as a Quiet Title action.

2.      As stated in the case of Angela Sacchi et al. vs. Mortgage Electronic Registration Systems, Inc., et al. (2011) United States District Court, Central District of California, CV 11-1658 (CWx), Amended Civil Minutes-General ("Sacchi") as pertinent on page 2: **"This Court has dealt with numerous mortgage-related cases, and in the process of wading through them it has learned that seemingly straightforward**

**SECOND AMENDED COMPLAINT**
2

# EXHIBIT 1

## SEC Info - RALI Series 2007-QH5 Trust - 8-K - For 3.5.08

http://www.secinfo.com/d1zj61.tEa.htm

# EXHIBIT 1

## RALI Series 2007-QH5 Trust · 8-K · For 3/5/08

**Filed On 3/5/08, 6:40pm ET · Accession Number 1068238-8-453 · SEC File 333-140610-06**

Top of Form

| Find | | in | this entire Filing. | Show | Docs searched | and | every "hit". |
|------|--|-----|--------------------|------|---------------|-----|-------------|

Help.. *Wildcards:* **?** (any letter), **\*** (many). *Logic:* for Docs: **&** (and), **|** (or); for Text: **|** (anywhere), **"(&)"** (near).

Bottom of Form

| As Of Issuer | Filer Agent | Filing | For/On/As | Docs:Size |
|--------------|-------------|--------|-----------|-----------|
| 3/06/08 | RALI Series 2007-QH5 Trust Orrick Herringto..LLP/FA | 8-K:6,9 | 3/05/08 | 2:393K |

### Current Report — Form 8-K
### Filing Table of Contents

| Document/Exhibit | Description Size | Pages |
|------------------|------------------|-------|
| 1: 8-K | Current Report 18K | HTML |
| 2: EX-99.1 | Miscellaneous Exhibit 179K | HTML |

### 8-K — Current Report

*This is an HTML Document rendered as filed. [ Alternative Formats ]*

**UNITED STATES**

**SECURITIES AND EXCHANGE COMMISSION**

**Washington, D.C. 20549**

**FORM 8-K**

**CURRENT REPORT**

Pursuant to Section 13 or 15(d) of the

Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): March 5, 2008

Commission File Number of issuing entity:
333-140610-06

**RALI Series 2007-QH5 Trust**
(Exact name of issuing entity)

Commission File Number of depositor:
333-140610

**Residential Accredit Loans, Inc.**
(Exact name of depositor as specified in its charter)

**Residential Funding Company, LLC**
(Exact name of sponsor as specified in its charter)

| New York | None |
|---|---|
| **(State or other jurisdiction of incorporation)** | **(I.R.S. employer identification no.)** |
| One Meridian Crossings, Suite 100, Minneapolis, MN | 55423 |
| **(Address of principal executive offices)** | **(Zip code)** |

Registrant's telephone number, including area code (952) 857-7000

| 8400 Normandale Lake Boulevard, Minneapolis, MN | 55437 |
|---|---|
| **(Former name or former address, if changed since last report)** | |

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions.

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12(b) under the Exchange Act (17 CFR 240.14a-12(b))

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Item 6.02.        Change of Servicer or Trustee.

The response to Item 6.02 is set forth in part herein and in part in Exhibit 99.1.

Residential Funding Company, LLC ("*RFC*"), as the master servicer under the Standard Terms of Pooling and Servicing Agreement, dated as of May 1, 2007, and related Series Supplement, dated as of May 1, 2007 (the "*Pooling and Servicing Agreement*"), among RFC, Residential Accredit Loans, Inc., as depositor, and Deutsche Bank Trust Company Americas, as trustee (the "*Trustee*"), has entered into an agreement to transfer the master servicing and subservicing of the mortgage loans subject to the Pooling and Servicing Agreement to Aurora Loan Services LLC ("*Aurora Loan Services*"). The registrant expects that certain conditions precedent to such transfer, including a determination by the Trustee that Aurora Loan Services is reasonably satisfactory and a letter from each rating agency confirming that such transfer of servicing will not result in a qualification, withdrawal or downgrade of the current ratings of any of the RALI Series 2007-QH5 Mortgage Asset-Backed Pass-Through Certificates, will be satisfied prior to the effective date of the transfer on April 1, 2008.

Information required by Item 1108 of Regulation AB relating to Aurora Loan Services is attached to this Form 8K as Exhibit 99.1.

Item 9.01        Financial Statements and Exhibits.

                 (d)  Exhibits

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Information required by Item 1108 of Regulation AB relating to Aurora Loan Services. |

### SIGNATURES

        Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

                        **RALI SERIES 2007-QH5 TRUST**
                        (Issuing Entity)

                        By: ***Residential Funding Company, LLC***, as Master Servicer

By:  /s/ Darsi Meyer
       Name:  Darsi Meyer
       Title:  Director

Dated: March 5, 2008

---

## Dates Referenced Herein *and* Documents Incorporated By Reference

| *This 8-K Filing* | *Date* | *Other Filings* |
|---|---|---|
| | ▼ | |
| | 5/1/07 | |
| Filed On / For The Period Ended | 3/5/08 | |
| Filed As Of | 3/6/08 | |
| | 4/1/08 | |

Top                                    List All Filings

---

Filing Submission 0001068238-08-000453  –  Alternative Formats (Word / Rich Text, HTML, Plain Text, et al.)

# EXHIBIT 2

## RALI Series 2007-QH5 Trust · 10-K · For 12/31/07

### http://www.secinfo.com/d1aw6m.t9.htm

# EXHIBIT 2

## RALI Series 2007-QH5 Trust · 10-K · For 12/31/07

Link No. http://www.secinfo.com/d1aw6m.t9.htm

## RALI Series 2007-QH5 Trust · 10-K · For 12/31/07

**Filed On _3/31/08_, 8:49am ET  ·  Accession Number 1397977-8-6  ·  SEC File _333-140610-06_**

Top of Form

| Find | | in | this entire Filing. ▾ | Show | Docs searched ▾ | and | every "hit". ▾ |

**Help...**  *Wildcards: ? {any letter), * (many). Logic: for Docs: & {and), | {or); for Text: | (anywhere), "{&}" (near).*

Bottom of Form

| As Of | Filer | Filing | For/On/As | Docs:Size |
|-------|-------|--------|-----------|-----------|
| 3/31/08 | RALI Series 2007-QH5 Trust | 10-K | 12/31/07 | 15:123K |

### Annual Report — Form 10-K
### *Filing Table of Contents*

<table>
<thead>
<tr><th colspan="2">Document/Exhibit</th><th>Description</th><th>Pages</th><th>Size</th></tr>
</thead>
<tbody>
<tr><td>1:</td><td>10-K</td><td>2007 Qh5</td><td>13</td><td>52K</td></tr>
<tr><td>2:</td><td>EX-31</td><td>Ex-31.1</td><td>1</td><td>8K</td></tr>
<tr><td>3:</td><td>EX-33</td><td>Ex-33.1</td><td>6</td><td>44K</td></tr>
<tr><td>4:</td><td>EX-33</td><td>Ex-33.2</td><td>18</td><td>76K</td></tr>
<tr><td>5:</td><td>EX-33</td><td>Ex-33.3</td><td>9</td><td>51K</td></tr>
<tr><td>6:</td><td>EX-33</td><td>Ex-33.4</td><td>2</td><td>16K</td></tr>
<tr><td>7:</td><td>EX-33</td><td>Ex-33.5</td><td>2±</td><td>11K</td></tr>
<tr><td>8:</td><td>EX-34</td><td>Ex-34.1</td><td>2±</td><td>10K</td></tr>
<tr><td>9:</td><td>EX-34</td><td>Ex-34.2</td><td>2</td><td>12K</td></tr>
<tr><td>10:</td><td>EX-34</td><td>Ex-34.3</td><td>2±</td><td>11K</td></tr>
<tr><td>11:</td><td>EX-34</td><td>Ex-34.4</td><td>2</td><td>14K</td></tr>
<tr><td>12:</td><td>EX-34</td><td>Ex-34.5</td><td>2±</td><td>11K</td></tr>
<tr><td>13:</td><td>EX-35</td><td>Ex-35.1</td><td>1</td><td>7K</td></tr>
<tr><td>14:</td><td>EX-35</td><td>Ex-35.2</td><td>1</td><td>6K</td></tr>
<tr><td>15:</td><td>EX-35</td><td>Ex-35.3</td><td>1</td><td>7K</td></tr>
</tbody>
</table>

### 10-K — 2007 Qh5
### *Document Table of Contents*

| **Page** | (sequential) | | (alphabetic) | Top |
|----------|--------------|--|--------------|-----|

1  1st Page  -  Filing Submission

3  Item 1B. Unresolved Staff Comments

5  Item 9B:. Other Information

8  Item 15. Exhibits, Financial Statement Schedules

- Alternative Formats (Word, et al.)
- Exhibits, Financial Statement Schedules
- Other Information
- Unresolved Staff Comments

| 10-K | 1st Page of 13 | TOC | ↑Top | Previous | Next | ↓Bottom | Just 1st |
|------|----------------|-----|------|----------|------|---------|----------|

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-K

(Mark One)
|X| ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT
OF 1934 For the fiscal year ended: December 31, 2007
or
|_| TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES
EXCHANGE ACT OF 1934

For the transition period _____

Commission file number of issuing entity: 333-140610-06
RALI SERIES 2007-QH5 TRUST
(Exact name of issuing entity as specified in its charter)

RESIDENTIAL ACCREDIT LOANS, INC.
(Exact name of depositor as specified in its charter)

RESIDENTIAL FUNDING COMPANY, LLC
(Exact name of sponsor as specified in its charter)

New York
(State or other jurisdiction of incorporation or organization of the
issuing entity)

c/o Residential Funding Company, LLC, as Master Servicer
One Meridian Crossings, Suite 100
Minneapolis, Minnesota 55423
(Address of principal executive offices of issuing entity)

(952) 857-7000 (Telephone number, including area code)

None
(I.R.S. Employer Identification No.)

**N/A**
(Former name, former address, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act: None
Securities registered pursuant to Section 12(g) of the Act: None
Indicate by check mark if the registrant is a well-known seasoned issuer, as
defined in Rule 405 of the Securities Act.
Yes |_| No |X|

| 10-K | 2nd Page of 13 | TOC | 1st | Previous | Next | ↓Bottom | Just 2nd |
|------|----------------|-----|-----|----------|------|---------|----------|

Indicate by check mark if the registrant is not required to file reports
pursuant to Section 13 or Section 15(d) of the Act.
Yes |X| No |_|
Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months (or for such shorter period that the registrant was
required to file such reports), and (2) has been subject to such filing
requirements for the past 90 days.
|X| Yes |_| No
Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulation S-K (ss. 229.405 of this chapter) is not contained herein, and
will not be contained, to the best of registrant's knowledge, in definitive
proxy or information statements incorporated by reference in Part III of the
Form 10-K or any amendment to this Form 10-K. |X|
[Item 405 of Regulation S-K is not applicable.]

Indicate by check mark whether the registrant is a large accelerated filer, an
accelerated filer, a non-accelerated filer, or a smaller reporting company. See
the definitions of *"large accelerated filer,"* *"accelerated filer"* and *"smaller
reporting company"* in Rule 12b-2 of the Exchange Act. (Check one):
Large accelerated filer |_|                              Accelerated filer |_|
    Non-accelerated filer    |X| (Do not check if a smaller reporting company)
                             Smaller reporting company |_|

Indicate by check mark whether the registrant is a shell company (as defined in
Rule 12b-2 of the Act).
Yes |_| No |X|
Registrant has no voting or non-voting common equity outstanding held by
non-affiliates.

| 10-K | 3rd Page of 13 | TOC | 1st | Previous | Next | ↓Bottom | Just 3rd |
|------|----------------|-----|-----|----------|------|---------|----------|

**PART I**

**THE FOLLOWING ITEMS HAVE BEEN OMITTED IN ACCORDANCE WITH GENERAL INSTRUCTION J
TO FORM 10-K:**

Item 1:  Business.
Item 1A: Risk Factors.
Item 2:  Properties.
Item 3:  Legal Proceedings.
Item 4:  Submission of Matters to a Vote of Security Holders.

**ITEM 1B. UNRESOLVED STAFF COMMENTS.**

Not Applicable.

**SUBSTITUTE INFORMATION PROVIDED IN ACCORDANCE WITH GENERAL INSTRUCTION J TO FORM 10-K:**

**ITEM 1112(B) OF REGULATION AB. SIGNIFICANT OBLIGORS OF POOL ASSETS (FINANCIAL INFORMATION).**

None.

**ITEM 1114(B)(2) OF REGULATION AB: CREDIT ENHANCEMENT AND OTHER SUPPORT, EXCEPT FOR CERTAIN DERIVATIVES INSTRUMENTS (FINANCIAL INFORMATION).**

None.

**ITEM 1115(B) OF REGULATION AB: CERTAIN DERIVATIVES INSTRUMENTS (FINANCIAL INFORMATION).**

Based on the standards set forth in Item 1115(b) of Regulation AB, no information is required in response to this Item.

**ITEM 1117 OF REGULATION AB: LEGAL PROCEEDINGS.**

There are no material pending legal or other proceedings involving the mortgage loans or Residential Funding Company, LLC (*"Residential Funding"*), as sponsor and master servicer, Residential Accredit Loans, Inc., as depositor, RALI Series 2007-QH5 Trust, as the issuing entity, GMAC Mortgage, LLC (*"GMACM"*), as subservicer, or other parties described in Item 1117 of Regulation AB that, individually or in the aggregate, would have a material adverse impact on investors in the securities (the *"Securities"*) to which this report relates.

| 10-K | *4th Page of 13* | TOC | 1st | Previous | Next | ↓Bottom | Just 4th |
|------|------------------|-----|-----|----------|------|---------|----------|

Residential Funding and GMACM are currently parties to various legal proceedings arising from time to time in the ordinary course of their businesses, some of which purport to be class actions. Based on information currently available, it is the opinion of Residential Funding and GMACM that the eventual outcome of any currently pending legal proceeding, individually or in the aggregate, will not have a material adverse effect on their ability to perform their obligations in relation to the mortgage loans. No assurance, however, can be given that the final outcome of these legal proceedings, if unfavorable, either individually or in the aggregate, would not have a material adverse impact on Residential Funding or GMACM. Any such unfavorable outcome could adversely affect the ability of Residential Funding or GMACM to perform its servicing duties with respect to the mortgage loans and potentially lead to the replacement of Residential Funding or GMACM with a successor servicer.

Among the legal proceedings to which Residential Funding is a party is a putative class action lawsuit that was filed against a lender (Mortgage Capital Resources Corporation), Residential Funding and other parties in state court in Kansas City, Missouri. Plaintiffs asserted violations of the Missouri Second Mortgage Loan Act ("SMLA"), Mo.R.S. Section 408.233, based on the lender's charging or contracting for payment of allegedly unlawful closing costs and fees. The relief sought included a refund of all allegedly illegal fees, the refund of interest paid, and the discounted present value of interest to be paid in the future on active mortgage loans. The plaintiffs also sought prejudgment interest and punitive damages.

Residential Funding is an assignee of some of the mortgage loans in question. The plaintiffs contended that Residential Funding is strictly liable for the lender's alleged SMLA violations pursuant to the assignee provisions of the Home Ownership and Equity Protection Act of 1994, 15 U.S.C. Section 1641(d)(1). Residential Funding terminated its relationship with the lender in early May 2000.

In connection with that proceeding, on January 4, 2008, a verdict was returned that Residential Funding pay $4.33 million in actual damages and $92 million in punitive damages. Residential Funding intends to appeal and vigorously contest the punitive damage award. However, even if the punitive damage award is not reduced upon appeal, Residential Funding's management believes that any liability with respect to this proceeding would not have a material adverse effect on investors in the Securities.

| 10-K | 5th Page of 13 | TOC | 1st | Previous | Next | ↓Bottom | Just 5th |
|---|---|---|---|---|---|---|---|

## PART II

### THE FOLLOWING ITEMS HAVE BEEN OMITTED IN ACCORDANCE WITH GENERAL INSTRUCTION J TO FORM 10-K:

Item 5:  Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.
Item 6:  Selected Financial Data.
Item 7:  Management's Discussion and Analysis of Financial Condition and Results of Operations.
Item 7A: Quantitative and Qualitative Disclosures About Market Risk.
Item 8:  Financial Statements and Supplementary Data.
Item 9:  Changes in and Disagreements With Accountants on Accounting and Financial Disclosure.
Item 9A: Controls and Procedures.

### ITEM 9B: OTHER INFORMATION.

None.

## PART III

### THE FOLLOWING ITEMS HAVE BEEN OMITTED IN ACCORDANCE WITH GENERAL INSTRUCTION J TO FORM 10-K:

Item 10: Directors and Executive Officers of the Registrant.
Item 11: Executive Compensation.
Item 12: Security Ownership of Certain Beneficial Owners and Management
and Related Stockholder Matters.
Item 13: Certain Relationships and Related Transactions.
Item 14: Principal Accountant Fees and Services.

**SUBSTITUTE INFORMATION PROVIDED IN ACCORDANCE WITH GENERAL INSTRUCTION J TO FORM
10-K:**

**ITEM 1119 OF REGULATION AB:  AFFILIATIONS AND CERTAIN RELATIONSHIPS AND
RELATED TRANSACTIONS.**

Information contemplated by Item 1119 of Regulation AB has been omitted from
this report in reliance on the Instruction to Item 1119.

**ITEM 1122 OF REGULATION AB: COMPLIANCE WITH APPLICABLE SERVICING
CRITERIA.**

Each of Residential Funding, GMACM, Homecomings Financial, LLC ("*Homecomings*"),
Deutsche Bank Trust Company Americas and Wells Fargo Bank, National Association
(each, a "*Servicing Participant*") has been identified by the registrant as a
party participating in the servicing function with respect to the pool assets
held by the Issuing Entity. Reports assessing compliance with the servicing
criteria applicable to each Servicing Participant (each, a "*Report on
Assessment*") are attached as exhibits to this Form 10-K. In addition, an
attestation report (each, an "*Attestation Report*") regarding each Report on
Assessment has been prepared by the related Servicing Participant's registered
independent public accounting firm and is attached as an exhibit to this Form
10-K.

| 10-K | **6th Page of 13** | TOC | 1st | Previous | Next | ↓Bottom | Just 6th |
|------|--------------------|-----|-----|----------|------|---------|----------|

Residential Capital, LLC, which owns indirectly all of the equity of both
Homecomings and GMACM, has restructured the operations of Homecomings and GMACM.
As a result of the restructuring –

(i) on May 1, 2007, the computer system on which Homecomings maintained its
servicing platform was transferred from one system (LSAMS) to another
system (MortgageServ) on which its affiliate GMACM maintains its servicing
platform; and

(ii) on September 24, 2007, Homecomings transferred its servicing platform
and certain employees responsible for the servicing function to GMACM.

Since September 24, 2007, GMACM has serviced the mortgage loans owned by the
trust that were previously serviced by Homecomings, and Homecomings has not
serviced any of those mortgage loans.



As a result of the integration of the Homecomings and GMACM servicing platforms
on a single computer system as described in clause (i) above –

(x) the Report on Assessment and related Attestation Report filed as Exhibits
33.3 and 34.3 to this Form 10-K address Homecomings' compliance with the

applicable servicing criteria for the pre-platform integration period from January 1, 2007 through April 30, 2007; and

(y) the Report on Assessment and related Attestation Report filed as Exhibits 33.2 and 34.2 to this Form 10-K address (1) GMACM's compliance with the applicable servicing criteria for the pre-platform integration period from January 1, 2007 through April 30, 2007, and (2) each of Homecomings' and GMACM's compliance with the applicable servicing criteria for the post-platform integration period from May 1, 2007 through December 31, 2007.

## Vendors

A Servicing Participant may engage one or more vendors to perform specific and limited, or scripted activities that address all or a portion of one or more servicing criteria applicable to such Servicing Participant. In general in these cases, the Servicing Participant has instituted policies and procedures to monitor whether such vendors' activities comply in all material respects with such servicing criteria, and may elect to take responsibility for assessing compliance with the servicing criteria applicable to such vendors' activities in such Servicing Participant's Report on Assessment. Where the Servicing Participant has not instituted such policies and procedures, or where the Servicing Participant does not otherwise elect to take responsibility for assessing its vendors' activities, the vendor is itself treated as a Servicing Participant and is required to provide its own Report on Assessment and related Attestation Report.

| 10-K | 7th Page of 13 | TOC | 1st | Previous | Next | ↓Bottom | Just 7th |
|------|----------------|-----|-----|----------|------|---------|----------|

## Exceptions

Except as disclosed below, no Report on Assessment or related Attestation Report has identified (i) any material instance of noncompliance with the servicing criteria identified in such Report on Assessment as applicable to the related Servicing Participant or (ii) any material deficiency in such Servicing Participant's policies and procedures to monitor vendor compliance.

GMAC Mortgage, LLC: The Report on Assessment prepared by GMACM and the related Attestation Report have identified material noncompliance with two elements of one servicing criterion applicable to it. Specifically, with regard to servicing criterion 1122(d)(2)(vii), which contemplates that reconciliations are prepared on a monthly basis for all asset-backed securities related bank accounts –

o   certain custodial account reconciliations were not reviewed within the timelines outlined in GMACM's policies and procedures, as contemplated by criterion 1122(d)(2)(vii)(C); and

o   certain custodial accounts had reconciling items which were not resolved within 90 calendar days of original identification, as contemplated by criterion 1122(d)(2)(vii)(D).

The registrant does not believe these instances of noncompliance had material impacts or effects on investors, and appropriate measures have been taken to resolve the bank reconciliation items noted in the Report on Assessment, and to

prevent such instances of noncompliance in the future or to detect them in such a manner as to permit prompt correction.

Homecomings Financial, LLC: The Report on Assessment prepared by Homecomings and the related Attestation Report have identified material noncompliance with one servicing criterion applicable to it. Specifically, with regard to servicing criterion 1122(d)(4)(x)(C), certain refunds resulting from payoff transactions were not returned to the obligor within 30 calendar days of full repayment of the related pool asset, as contemplated by such criterion. The registrant does not believe these instances of noncompliance had material impacts or effects on investors, and appropriate measures have been taken to prevent such instances of noncompliance in the future or to detect them in such a manner as to permit prompt correction.

## Platform-Level Reports

Regulations of the Securities and Exchange Commission (the "SEC") require that each Servicing Participant complete a Report on Assessment at a "platform" level, meaning that the transactions covered by the Report on Assessment should include all asset-backed securities transactions involving such Servicing Participant that are backed by the same asset type. Further guidance from the SEC staff identifies additional parameters which a Servicing Participant may apply to define and further limit its platform. For example, a Servicing Participant may define its platform to include only transactions that were completed on or after January 1, 2006 and that were registered with the SEC pursuant to the Securities Act of 1933. Each Servicing Participant is responsible for defining its own platform, and each platform will naturally differ based on various factors, including the Servicing Participant's business model, the transactions in which it is involved and the range of activities performed in those transactions.

Based on our understanding of their platforms and the guidance that is available at this time, we believe that the parameters by which the Servicing Participants have defined their platforms should be permissible. However, because the SEC's regulations are new and the guidance that is available at this time is subject to clarification or change, we cannot assure you that the SEC and its staff will necessarily agree.

| 10-K | 8th Page of 13 | TOC | 1st | Previous | Next | ↓Bottom | Just 8th |

## ITEM 1123 OF REGULATION AB: SERVICER COMPLIANCE STATEMENT.

Each of Residential Funding, GMACM and Homecomings (each, a "Servicer") has been identified by the registrant as a servicer with respect to the pool assets held by the Issuing Entity. Each Servicer has provided a statement of compliance with its obligations under the servicing agreement applicable to such Servicer (a "Compliance Statement") for the portion of the period covered by this Form 10-K during which such Servicer was servicing the pool assets, in each case signed by an authorized officer of such Servicer. Each Compliance Statement is attached as an exhibit to this Form 10-K. None of the Compliance Statements has identified any instance where the related Servicer has failed to fulfill its obligations under the applicable servicing agreement in any material respects.

## PART IV

**ITEM 15.    EXHIBITS, FINANCIAL STATEMENT SCHEDULES.**

(a)(1)  Not Applicable.

(a)(2)  Not Applicable.

(a)(3)  Not Applicable.

(b)    Exhibits.

### EXHIBIT

| NUMBER | DESCRIPTION |
|---|---|
| 3.1 | Certificate of Incorporation of Residential Accredit Loans, Inc. (incorporated by reference to Exhibit 3.1 included in the Annual Report on Form 10-K for the period ended December 31, 2006, filed by RALI Series 2006-QA1 Trust with the Securities and Exchange Commission on March 28, 2007). |

| 10-K | *9th Page of 13* | TOC | 1st | Previous | Next | ↓Bottom | Just 9th |

| | |
|---|---|
| 3.2 | Bylaws of Residential Accredit Loans, Inc. (incorporated by reference to Exhibit 3.2 included in the Annual Report on Form 10-K for the period ended December 31, 2006, filed by RALI Series 2006-QA1 Trust with the Securities and Exchange Commission on March 28, 2007). |
| 10.1 | Series Supplement, dated as of May 1, 2007, and the Standard Terms of Pooling and Servicing Agreement, dated as of May 1, 2007, among Residential Accredit Loans, Inc., as company, Residential Funding Company, LLC, as master servicer, and Deutsche Bank Trust Company Americas, as trustee (incorporated by reference to Exhibit 10.1 included in the Report on Form 8-K filed by the Issuing Entity with the Securities and Exchange Commission on June 14, 2007). |
| 10.2 | Assignment and Assumption Agreement, dated as of May 30, 2007, between Residential Funding Company, LLC and Residential Accredit Loans, Inc. (incorporated by reference to Exhibit 10.2 included in the Report on Form 8-K filed by the Issuing Entity with the Securities and Exchange Commission on June 14, 2007). |
| 10.3 | Swap Agreement, dated as of May 30, 2007, between Deutsche Bank Trust Company Americas, not individually but solely as the Supplemental Interest Trust Trustee on behalf of the RALI Series 2007-QH5 Supplemental Interest Trust, and ABN Amro Bank N.V., which is comprised of a Confirmation and a Credit Support Annex (incorporated by reference to Exhibit 10.3 included in the Report on Form 8-K filed by the Issuing Entity with the Securities and Exchange Commission on June 14, 2007). |
| 10.4 | SB-AM Swap Confirmation, dated as of May 30, 2007, between Deutsche Bank Trust Company Americas, as Supplemental Interest Trust Trustee for the benefit of RALI Series 2007-QH5 Supplemental Interest Trust, acting on behalf of the Class SB Certificateholders, and Deutsche Bank Trust Company Americas, as Supplemental Interest Trust Trustee for the benefit of RALI Series 2007-QH5 Supplemental Interest Trust, acting on behalf of the Class A Certificateholders |

and Class M Certificateholders (incorporated by reference to Exhibit 10.4 included in the Report on Form 8-K filed by the Issuing Entity with the Securities and Exchange Commission on June 14, 2007).

31.1    Certification of Residential Funding Company, LLC pursuant to Rule 13a-14(d)/15d-14(d) under the Securities Exchange Act of 1934.

33.1    Report on Assessment of Compliance with Servicing Criteria of Residential Funding Company, LLC as of and for the period ended December 31, 2007.

33.2    Report on Assessment of Compliance with Servicing Criteria of (i) GMAC Mortgage, LLC for the pre-platform integration period from January 1, 2007 through April 30, 2007, and (ii) each of Homecomings Financial, LLC and GMAC Mortgage, LLC for the post-platform integration period from May 1, 2007 through December 31, 2007.

33.3    Report on Assessment of Compliance with Servicing Criteria of Homecomings Financial, LLC for the pre-platform integration period from January 1, 2007 through April 30, 2007.

33.4    Report on Assessment of Compliance with Servicing Criteria of Deutsche Bank Trust Company Americas as of and for the period ended December 31, 2007.

33.5    Report on Assessment of Compliance with Servicing Criteria of Wells Fargo Bank, National Association as of and for the period ended December 31, 2007.

| 10-K | 10th Page of 13 | TOC | 1st | Previous | Next | ↓Bottom | Just 10th |

34.1    Attestation Report of PricewaterhouseCoopers LLP on Assessment of Compliance with Servicing Criteria relating to Residential Funding Company, LLC.

34.2    Attestation Report of PricewaterhouseCoopers LLP on Assessment of Compliance with Servicing Criteria relating to GMAC Mortgage, LLC and Homecomings Financial, LLC (filed as Exhibit 33.2 hereto).

34.3    Attestation Report of PricewaterhouseCoopers LLP on Assessment of Compliance with Servicing Criteria relating to Homecomings Financial, LLC (filed as Exhibit 33.3 hereto).

34.4    Attestation Report of KPMG LLP on Assessment of Compliance with Servicing Criteria relating to Deutsche Bank Trust Company Americas.

34.5    Attestation Report of KPMG LLP on Assessment of Compliance with Servicing Criteria relating to Wells Fargo Bank, National Association.

35.1    Servicer Compliance Statement of Residential Funding Company, LLC.

35.2    Servicer Compliance Statement of GMAC Mortgage, LLC.

35.3    Servicer Compliance Statement of Homecomings Financial, LLC.

(c) Not Applicable.

| 10-K | 11th Page of 13 | TOC | 1st | Previous | Next | ↓Bottom | Just 11th |

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date:   March 24, 2008

**RALI SERIES 2007-QH5 TRUST**

By:   ***Residential Funding***
      Company, LLC,
      as Master Servicer

By: /s/ **Anthony N. Renzi**
    Name: Anthony N. Renzi
    Title:  Managing Director
    (senior officer in charge of
    the servicing function)

| 10-K | *12th Page of 13* | TOC | 1st | Previous | Next | ↓Bottom | Just 12th |
|------|-------------------|-----|-----|----------|------|---------|-----------|

## INDEX TO EXHIBITS

### EXHIBIT

| NUMBER | DESCRIPTION |
|--------|-------------|
| 3.1 | Certificate of Incorporation of Residential Accredit Loans, Inc. (incorporated by reference to Exhibit 3.1 included in the Annual Report on Form 10-K for the period ended December 31, 2006, filed by RALI Series 2006-QA1 Trust with the Securities and Exchange Commission on March 28, 2007). |
| 3.2 | Bylaws of Residential Accredit Loans, Inc. (incorporated by reference to Exhibit 3.2 included in the Annual Report on Form 10-K for the period ended December 31, 2006, filed by RALI Series 2006-QA1 Trust with the Securities and Exchange Commission on March 28, 2007). |
| 10.1 | Series Supplement, dated as of May 1, 2007, and the Standard Terms of Pooling and Servicing Agreement, dated as of May 1, 2007, among Residential Accredit Loans, Inc., as company, Residential Funding Company, LLC, as master servicer, and Deutsche Bank Trust Company Americas, as trustee (incorporated by reference to Exhibit 10.1 included in the Report on Form 8-K filed by the Issuing Entity with the Securities and Exchange Commission on June 14, 2007). |
| 10.2 | Assignment and Assumption Agreement, dated as of May 30, 2007, between Residential Funding Company, LLC and Residential Accredit Loans, Inc. (incorporated by reference to Exhibit 10.2 included in the Report on Form 8-K filed by the Issuing Entity with the Securities and Exchange Commission on June 14, 2007). |
| 10.3 | Swap Agreement, dated as of May 30, 2007, between Deutsche Bank Trust Company Americas, not individually but solely as the Supplemental Interest Trust Trustee on behalf of the RALI Series 2007-QH5 Supplemental Interest Trust, and ABN Amro Bank N.V., which is comprised of a Confirmation and a Credit Support Annex (incorporated by reference to Exhibit 10.3 included in the Report |

|       |       |
|-------|-------|
|       | on Form 8-K filed by the Issuing Entity with the Securities and Exchange Commission on June 14, 2007). |
| 10.4  | SB-AM Swap Confirmation, dated as of May 30, 2007, between Deutsche Bank Trust Company Americas, as Supplemental Interest Trust Trustee for the benefit of RALI Series 2007-QH5 Supplemental Interest Trust, acting on behalf of the Class SB Certificateholders, and Deutsche Bank Trust Company Americas, as Supplemental Interest Trust Trustee for the benefit of RALI Series 2007-QH5 Supplemental Interest Trust, acting on behalf of the Class A Certificateholders and Class M Certificateholders (incorporated by reference to Exhibit 10.4 included in the Report on Form 8-K filed by the Issuing Entity with the Securities and Exchange Commission on June 14, 2007). |
| 31.1  | Certification of Residential Funding Company, LLC pursuant to Rule 13a-14(d)/15d-14(d) under the Securities Exchange Act of 1934. |
| 33.1  | Report on Assessment of Compliance with Servicing Criteria of Residential Funding Company, LLC as of and for the period ended December 31, 2007. |

| **10-K** | *Last Page of 13* | TOC | 1st | Previous | Next | ↓Bottom | Just 13th |
|----------|-------------------|-----|-----|----------|------|---------|-----------|

| 33.2 | Report on Assessment of Compliance with Servicing Criteria of (i) GMAC Mortgage, LLC for the pre-platform integration period from January 1, 2007 through April 30, 2007, and (ii) each of Homecomings Financial, LLC and GMAC Mortgage, LLC for the post-platform integration period from May 1, 2007 through December 31, 2007. |
| 33.3 | Report on Assessment of Compliance with Servicing Criteria of Homecomings Financial, LLC for the pre-platform integration period from January 1, 2007 through April 30, 2007. |
| 33.4 | Report on Assessment of Compliance with Servicing Criteria of Deutsche Bank Trust Company Americas as of and for the period ended December 31, 2007. |
| 33.5 | Report on Assessment of Compliance with Servicing Criteria of Wells Fargo Bank, National Association as of and for the period ended December 31, 2007. |
| 34.1 | Attestation Report of PricewaterhouseCoopers LLP on Assessment of Compliance with Servicing Criteria relating to Residential Funding Company, LLC. |
| 34.2 | Attestation Report of PricewaterhouseCoopers LLP on Assessment of Compliance with Servicing Criteria relating to GMAC Mortgage, LLC and Homecomings Financial, LLC (filed as Exhibit 33.2 hereto). |
| 34.3 | Attestation Report of PricewaterhouseCoopers LLP on Assessment of Compliance with Servicing Criteria relating to Homecomings Financial, LLC (filed as Exhibit 33.3 hereto). |
| 34.4 | Attestation Report of KPMG LLP on Assessment of Compliance with Servicing Criteria relating to Deutsche Bank Trust Company Americas. |
| 34.5 | Attestation Report of KPMG LLP on Assessment of Compliance with Servicing Criteria relating to Wells Fargo Bank, National Association. |
| 35.1 | Servicer Compliance Statement of Residential Funding Company, **LLC.** |
| 35.2 | Servicer Compliance Statement of GMAC Mortgage, LLC. |

35.3          Servicer Compliance Statement of Homecomings Financial, LLC.

## *Dates Referenced Herein* and *Documents Incorporated By Reference*

| This 10-K Filing | Date | First | Last | Other Filings |
|---|---|---|---|---|
| | | \_Referenced-\_ | | |
| | | \_On Page\_ | | |
| | ▼ | | | |
| | 1/1/06 | 7 | | |
| | 12/31/06 | 8 | 12 | |
| | 1/1/07 | 6 | 13 | |
| | 3/28/07 | 8 | 12 | |
| | 4/30/07 | 6 | 13 | |
| | 5/1/07 | 6 | 13 | |
| | 5/30/07 | 9 | 12 | 424B5, 8-K |
| | 6/14/07 | 9 | 12 | 8-K |
| | 9/24/07 | 6 | | |
| For The Period Ended | 12/31/07 | 1 | 13 | |
| | 1/4/08 | 4 | | |
| | 3/24/08 | 11 | | |
| Filed On / Filed As Of | 3/31/08 | | | |

Top                                                                List All Filings

Filing Submission 0001397977-08-000006   –   Alternative Formats (Word / Rich Text, HTML,
Plain Text, et al.)

# EXHIBIT 3

## 3.14.8 HOMECOMINGS Letter To AURORA Transferring Servicing To Be Effective 4.1.08

**Homecomings Financial**

*A GMAC Company*
PO Box 205
Waterloo, IA 50704-0205

03/14/08

SAM PALMER

1682 AMARELLE STREET

THOUSAND OAKS CA 91320

Homecomings Financial, LLC          Acct Number: 7473373223
AURORA LOAN SERVICES                Acct Number: 0021922075

Property Address:  1682 AMARELLE STREET

                   THOUSAND OAKS CA 91320

Dear SAM PALMER

Effective 04/01/08, the servicing of the above referenced
account, that is, the right to collect payments from you, is
being assigned, sold, or transferred from
Homecomings Financial, LLC          to
AURORA LOAN SERVICES                . The assignment, sale, or
transfer of servicing does not affect the terms or conditions of
your mortgage documents/security instruments, other than the
terms directly related to the servicing of your account.

Your present servicer is Homecomings Financial, LLC          .
Prior to 04/01/08, any questions regarding your account should be
directed to our Customer Care Department at 800-206-2901.

Your new servicer will be AURORA LOAN SERVICES                .
Beginning 04/01/08, any questions you have regarding your account
should be directed to AURORA LOAN SERVICES                . You
can contact their Customer Service Department at 800-550-0508.
Also beginning 04/01/08, written inquiries regarding your account
should be directed to AURORA LOAN SERVICES                's
Customer Service Department at the address below.

Payment Information - Effective 04/01/08, please direct payments
to AURORA LOAN SERVICES                's Payment Processing

03/14/08
Account Number 7473373223
Page Two

Department at the address below. Payments will be processed by Homecomings Financial, LLC          if received prior to 04/01/08, and will be forwarded to AURORA LOAN SERVICES          if received on or after 04/01/08.

          AURORA LOAN SERVICES
          PO BOX 5180--CASHERING DEPARTMENT
          DENVER          CO 80217-5180

As of 03/14/08, your Current Principal Balance is $    885491.25. your current escrow balance is $        0.00, your current interest rate is   7.87500%, your total monthly payment is $       3407.92, and your next due date is 04/01/08.

Automatic Payment Deduction - If you currently have your payments automatically withdrawn from your financial institution, this service will be transferred to AURORA LOAN SERVICES          . If this service is not transferable, you will receive a letter under separate cover providing further direction.

Government Allotment/Bill Pay Service - If you currently make your payment through a third party entity (e.g. government allotment, biweekly, or bill-pay service), please advise them of your new account number and change the payee to AURORA LOAN SERVICES          . In the event of a payment change, it is your responsibility to notify the third party of the new payment amount. If you have been using the bill-pay service on Homecomings Financial, LLC          's website, this service will be deactivated after 04/01/08.

Optional Insurance - If you have taken advantage of any of our optional insurance plans or optional products, this service will be transferred to AURORA LOAN SERVICES          . If any of these plans or products are not transferable, you will receive a letter under separate cover providing further direction.

Year-End Statement - You will receive a year-end statement from Homecomings Financial, LLC          reflecting account activity this year. AURORA LOAN SERVICES          should provide their own statement for the period of time they serviced your account this year. You will need to combine these two statements for income tax purposes.

Escrow Account - If you have an escrow account, Homecomings Financial, LLC          will send you, within 45 days, an escrow history statement reflecting escrow deposits, disbursements and balances for the period of time we serviced your account since your last escrow analysis. The transferring escrow balance will be reflected on this statement.

03/14/08
Account Number 7473373223
Page Three

Except in limited circumstances, the law requires that your
present servicer send you this notice at least 15 days before the
effective date of the transfer. Your new servicer must also send
you this notice no later than 15 days after the effective date of
transfer.

If you have filed for bankruptcy or have been discharged of your
personal liability for repayment of this debt, be advised this is
for informational purposes only. Furthermore, this is not an
attempt to collect on the debt and should not be misconstrued to
be so.

You should be aware of the following information, which is set
out in more detail in Section 6 of the Real Estate Settlement
Procedures Act (RESPA) (12 USC 2605):

> During the 60 day period following the effective date of the
> transfer of the account servicing, a payment received by
> your old servicer, before its due date, may not be treated
> by the new servicer as late, and a late fee may not be
> imposed on you.

> Section 6 of RESPA (12 USC §2605) gives you certain consumer
> rights. If you sent a "qualified written request" to your
> servicer concerning the servicing of your account, your
> servicer must provide you with a written acknowledgment
> within 20 business days of receipt of your request. A
> "qualified written request" is written correspondence, other
> than notice on a payment coupon or other payment medium
> supplied by the serivcer, which includes your name, account
> number, and reason for the request.

> No later than 60 business days after receiving your
> request, your servicer must make appropriate corrections to
> your account, and must provide you with a written
> clarification regarding any dispute. During this 60 business
> day period, your servicer may not provide information to a
> consumer reporting agency concerning any overdue payment
> related to such period or qualified written request.
> However, this does not prevent the servicer from initiating
> foreclosure if proper grounds exist under the mortgage
> documents/security instruments.

> A "business day" is a day on which the offices of the
> business entity are open to the public for carrying on
> substantially all of its business functions.

03/14/08
Account Number 7473373223
Page Four

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section. You should seek legal advice if you believe your rights have been violated.

Homecomings Financial, LLC          appreciated the opportunity to service your account. We wish you a successful relationship with AURORA LOAN SERVICES

Sincerely,


Homecomings Financial, LLC
6020

**Homecomings Financial**

*A GMAC Company*

PO Box 205
Waterloo, IA 50704-0205

DROP SHIPMENT
AUTHORIZATION 44
MAILED AT CEDAR RAPIDS IA
PRESORTED FIRST CLASS




AXYCS31 91320

# EXHIBIT 4

## 3.18.8 AURORA Letter to Sam Palmer of Notice Of Assignment, Sale Or Transferring Of Servicing Rights From HOMECOMINGS

# AURORA LOAN SERVICES

**www.myAuroraLoan.com**

## NOTICE OF ASSIGNMENT, SALE, OR TRANSFER OF SERVICING RIGHTS

March 18, 2008

3640021922075534WEL031808
73126 0041394 009
SAM PALMER
1682 AMARELLE ST
THOUSAND OAKS CA 91320-5971

Re:  Homecomings Financial, LLC
Loan #: 7473373223
Aurora Loan Services
Loan#: 0021922075

Dear Customer(s).

Welcome to Aurora Loan Services. This letter is to notify you that the servicing of your mortgage loan is being assigned, sold or transferred from Homecomings Financial, LLC to Aurora Loan Services ("Aurora"), effective April 1, 2008. The transfer of your mortgage loan to Aurora includes the right to collect payments from you.

The assignment, sale or transfer of the servicing of the mortgage loan does not affect any term or condition of the mortgage instruments, other than terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present servicer send you this notice at least 15 days before the effective date of transfer, or at closing. Your new servicer must also send you this notice no later than 15 days after this effective date or at closing.

Your present servicer is Homecomings Financial, LLC. If you have any questions relating to the transfer of servicing from your present servicer call Homecomings Financial, LLC Customer Care at 800-206-2901 between 6:00 A.M. To 10:00 P.M. Cdt on the following days Monday Through Friday. This is a toll-free number.

Beginning April 1, 2008, your new servicer will be Aurora Loan Services. The business address and toll-free telephone numbers for your new servicer are:

| Aurora Loan Services | Aurora Loan Services | Aurora Loan Services |
|---|---|---|
| Customer Service Department | Tax Department | Insurance Center |
| P.O. Box 1706 | P.O. Box 961233 | P.O. Box 2963 |
| Scottsbluff, NE 69363-1706 | Fort Worth, TX 76161-0233 | Phoenix, AZ 85062-2963 |
| 1 (800) 550-0508 | 1 (800) 550-0508 | 1 (800) 732-6578 |
| 8:00 A.M. to 11:00 P.M. ET | 8:00 A.M. to 5:00 P.M., MT | 6:00 A.M. to 6:00 P.M., MT |
| Monday through Thursday | Monday through Friday | Monday through Friday |
| 8:00 A.M. to 9:00 P.M., ET | | |
| Friday | | |
| 8:00 A.M. to 4:00 P.M., ET | | |
| Saturday | | |

If you have any questions relating to the transfer of servicing to your new servicer call the toll-free numbers listed during the business hours specified above.

The date that Homecomings Financial, LLC will stop accepting payments from you is March 31, 2008. The date that Aurora will begin accepting payments from you is April 1, 2008. Send all payments due on or after that date to Aurora Loan Services.

If you have been paying premiums for life, disability, accidental death insurance or other optional products, these policies will not transfer to Aurora. If you desire to continue your optional coverage, you can contact your optional insurance provider and discuss the possibility of directly remitting your premium to them and continuing the policy.

You should also be aware of the following information, which is set out in more detail in Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. 2605).

During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA (12 U.S.C. 2605) gives you certain consumer rights. If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgement within 20 Business Days of receipt of your request. A business day is a day on which the offices of the business entity are open to the public for carrying on substantially all of its business functions. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request. If you want to send a "qualified written request" regarding the servicing of your loan, it must be sent to this address:

Aurora Loan Services
Attention: Customer Service Research
P.O. Box 1706
Scottsbluff, NE 69363-1706

Not later than 60 business days after receiving your request, your servicer must make any appropriate corrections to your account and must provide you with a written clarification regarding any dispute. During this 60-business-day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the servicer from initiating foreclosure if proper grounds exist under the mortgage documents.

Section 6 of RESPA also provides the damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that section. You should seek legal advice if you believe your rights have been violated.

Please retain this information with your loan documentation for future reference. Aurora appreciates the opportunity to provide service on your loan and for allowing us to be of service to

Sincerely,

Cassie Leet
Customer Service Manager

704-2028-1207F

***CONTINUED ON REVERSE SIDE**

DETACH AND RETURN BOTTOM PORTION

**EXHIBIT 5**

**7.1.11 AURORA BANK FSB Letter Transferring Services
from AURORA LOAN SERVICES, LLC Effective as of
7.21.11**

 Aurora • Loan Services           Aurora Bank FSB

July 1, 2011

3-T-04-59003-0072111-015-01-000-000-000-000



SAM PALMER
1682 AMARELLE ST
THOUSAND OAKS CA 91320-5971

Aurora Loan Services LLC Mortgage Loan Account Number: 0021922075
Aurora Bank FSB Mortgage Loan Account Number: 0021922075

Dear Customer(s):

**Aurora Loan Services LLC (Aurora Loan Services) and Aurora Bank FSB (Aurora Bank),** want to take this opportunity to say "Thank You" and "Welcome."   Effective July 21, 2011, your mortgage loan servicing will be transferred from Aurora Loan Services to our parent company, Aurora Bank. This transfer **does not affect** the terms or conditions of your loan documents other than the terms directly related to the servicing of your loan.  You will keep the same mortgage loan account number, the same access to the web site, www.myAuroraLoan.com, and the same service that you experienced previously with Aurora Loan Services.  Also, additional information regarding this change can be found on www.myAuroraLoan.com in the FAQ section.

In an effort to make this transfer as smooth as possible for you, below please find a brief list of important updates. Please take a moment to review this information, as it may answer many of your questions.

### Regarding Your Mortgage Statements, Payments, and Optional Products

1. Aurora Bank will start accepting payments on July 21, 2011. Starting on that date, all future or past due payments should be sent to Aurora Bank at the same address to which you previously sent payments (noted below).  Please always include your Aurora Bank mortgage loan account number on your check and make it payable to: Aurora Bank FSB. Every month you will receive a detailed statement from Aurora Bank reflecting all your activity and key financial data. Your first monthly Mortgage Account Statement will arrive in August.

2. If you made payment(s) to Aurora Loan Services and any payment(s) are received on or after July 21, 2011, it will be processed by Aurora Bank. Because your mortgage loan account number and address to which you are sending your mortgage loan account payments are not changing, we don't anticipate any delay in processing your payment due to this transfer of servicing.

3. If Aurora Loan Services is currently automatically drafting your monthly payment from your bank account, Aurora Bank will continue this service for you.  If you would like to discontinue your automatic drafting arrangement, please contact Aurora Bank at the phone number or address listed below.

4. If your payment is issued by a third party, or if you make your payment through a bill pay or online service, or if your mortgage payment is drafted biweekly through a third party provider, please take the appropriate action to change the name of your mortgage loan servicer from Aurora Loan Services to Aurora Bank.  Because your payment address and account number are not changing, only the name needs to be changed with your bill pay/payment drafting service.

5. In January 2012, in addition to your monthly statement, you will receive an Annual Statement from Aurora Bank listing all payments on your account during 2011, including payments made to Aurora Loan Services. This Annual Statement will report the amount of interest and real estate taxes you paid during 2011.

6. If your monthly payment includes the collection of optional insurance premiums and/or membership fees, Aurora Bank will continue to collect your monthly premiums and/or membership fees and remit them to the appropriate provider(s).

7. If you previously provided information or documentation to Aurora Loan Services in support of your request for a possible loan modification under the federal government's Home Affordable Modification Program ("HAMP") or you have been established on a HAMP Trial Period Plan, Aurora Loan Services will be transferring all your documentation to Aurora Bank. Prior to July 21, 2011, you should continue to make your monthly Trial Period Plan payments to Aurora Loan Services.  On or after July 21, 2011, you should make all Trial Period Plan payments to Aurora Bank, until such time that you are provided additional direction. Prior to July 21, 2011, approval decisions regarding your request for a possible HAMP loan modification will be made by Aurora Loan Services. On or after July 21, 2011, approval decisions regarding your HAMP loan modification request will be made by Aurora Bank.

8. If you previously provided information and documentation in support of your request for approval of other possible loss mitigation options (including a loan modification, repayment agreement, forbearance agreement, short sale, or deed-in-lieu of foreclosure) Aurora Loan Services will be transferring all of your documentation to Aurora Bank.  Prior to July 21, 2011, approval decisions regarding your request for other possible loss mitigation options will be made by Aurora Loan Services.  On or after July 21, 2011, approval decisions regarding your loss mitigation option request will be made by Aurora Bank.

### How to Contact Us

Should you have questions, here are the applicable mailing addresses, toll-free numbers and hours of operation.
CONTACT YOUR PRESENT SERVICER, Aurora Loan Services LLC, PRIOR TO July 21, 2011:
CUSTOMER SERVICE:
1-800-550-0508
8:00 a.m. to 11:00 p.m. (ET) Monday through Thursday, 8:00 a.m. to 9:00 p.m. (ET) Friday, 8:00 a.m. to 4:00 p.m. (ET) Saturday

CONTACT YOUR NEW SERVICER, Aurora Bank FSB, ON OR AFTER July 21, 2011:
CUSTOMER SERVICE:
1-800-550-0508
8:00 a.m. to 11:00 p.m. (ET) Monday through Thursday, 8:00 a.m. to 9:00 p.m. (ET) Friday, 8:00 a.m. to 4:00 p.m. (ET) Saturday
www.myAuroraLoan.com

SEND PAYMENTS TO:
Aurora Bank FSB

When you provide a check, you authorize us to use information from your check to make a one-time electronic fund transfer from your account. If we use your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive your payment, and you will not receive your check back from your financial institution.

**The following Notice is required by Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. Section 2605)**
NOTICE OF ASSIGNMENT, SALE, OR TRANSFER OF SERVICING RIGHTS

You are hereby notified that the servicing of your mortgage loan, that is, the right to collect payments from you, is being assigned, sold or transferred from Aurora Loan Services LLC to Aurora Bank FSB, effective July 21, 2011.

The assignment, sale or transfer of the servicing of your mortgage loan does not affect any terms or conditions of the mortgage instruments, other than terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present servicer send you this notice at least 15 days before the effective date of transfer, or at closing. Your new servicer must also send you this notice no later than 15 days after this effective date or at closing. In this case, all necessary information is combined in this one notice.

Your present servicer is Aurora Loan Services LLC. If you have any questions relating to the transfer of servicing from your present servicer, please call Aurora Loan Services Customer Service Department toll free at 1-800-550-0508 8:00 a.m. to 11:00 p.m. (ET) Monday through Thursday 8:00 a.m. to 9:00 p.m. (ET) Friday 8:00 a.m. to 4:00 p.m. (ET) Saturday

Your new servicer will be Aurora Bank FSB.  The business address for your new servicer is the same address you previously used for Aurora Loan Services and is:

> **Aurora Bank FSB**
> **ATTN: Customer Service**
> **P.O. Box 1706**
> **Scottsbluff, NE  69361-1706**

The toll-free telephone number of your new servicer is the same toll free number as you previously used for Aurora Loan Services and is 1-800-550-0508.   If you have any questions relating to the transfer of servicing to your new servicer call Customer Service at 1-800-550-0508.

The date that your present servicer will stop accepting payments from you is July 20, 2011. The date that your new servicer will start accepting payments from you is July 21, 2011. Send all payments due on or after that date to your new servicer.

The transfer of servicing rights may affect the terms of, or the continued availability of any optional insurance coverage or other membership products. If your monthly payment includes the collection of optional insurance premiums and/or membership fees Aurora Bank will continue to collect your monthly premiums and/or membership fees and remit them to the appropriate provider(s).

You should also be aware of the following information, which is set out in more detail in Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. 2605):

During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA (12 U.S.C. 2605) gives you certain consumer rights. If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgment within 20 Business Days of receipt of your request.  A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request. If you want to send a "qualified written request" regarding the servicing of your loan, it must be sent to:

> **PRIOR TO July 21, 2011:**           **ON OR AFTER July 21, 2011:**
>
> **Aurora Loan Services LLC**          **Aurora Bank FSB**
> **ATTN: CUSTOMER RESEARCH**       **ATTN: CUSTOMER RESEARCH**
> **P.O. Box 1706**                    **P.O. Box 1706**
> **Scottsbluff, NE  69361-1706**      **Scottsbluff, NE  69361-1706**

Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account and must provide you with a written clarification regarding any dispute. During this 60 Business Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the servicer from initiating foreclosure if proper grounds exist under the mortgage documents. A Business Day is a day on which the offices of the business entity are open to the public for carrying on substantially all of its business functions.

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section. You should seek legal advice if you believe your rights have been violated.

# EXHIBIT 6

## 6.26.12 Email Mortgage Transfer Of Servicing From AURORA BANK FSB to NATIONSTAR MORTGAGE LLC Effective as of 7.1.12

| | |
|---|---|
| **From:** | "Aurora Bank FSB" <AuroraBankFSB@venture-mail.com> |
| **To:** | <kensington.taylor@verizon.net> |
| **Sent:** | Tuesday, June 26, 2012 9:03 AM |
| **Subject:** | Your Mortgage Transfer – Aurora Bank to Nationstar Mortgage |

To view this email as a web page, go here.

# AuroraBank FSB | myAuroraLoan

## The Transfer of Your Mortgage to Nationstar Mortgage

By now you should have received a letter advising the servicing of your loan number account ending in 2075 is moving from Aurora Bank FSB to Nationstar Mortgage LLC effective 07/01/2012. It has been Aurora Bank's pleasure to service your mortgage needs. We want to make the transfer of your loan to Nationstar Mortgage as smooth as possible. To this end, the following is what you can expect over the next 30 days.

- **Loan Terms:** Your original loan terms will not change as a result of this transfer

- **Loan Modification or Short Sale:** Nationstar will pick up where we left off and will have all of your documentation

- **Escrowed Loans:** If your loan is escrowed and you have property taxes or homeowners insurance due during this transfer, rest assured it will be paid on time

- **Already sent your payment to us?** We will ensure that it is provided to Nationstar and they will apply it as of the day we received it

- **Monthly Auto Draft: This will transfer to Nationstar.** You may notice a slight delay, up to 2 weeks, in the processing of your first auto draft with Nationstar. Please be assured you will not be penalized for this delay and it will not reflect negatively on your account

- **Welcome Call:** You will receive a welcome package in the mail and a welcome call the week of 07/10/2012 from Nationstar to help answer your questions

The Nationstar website is available 24/7. Visit NationstarMTG.com and use the "New to Nationstar?" link for answers to your mortgage transfer questions.

Your loan information will be accessible online as of 07/10/2012. Visit the Customer Sign In page to set up your profile. Additionally, as of 07/11/2012 you can call Nationstar with any questions; the Nationstar Customer Service team will have your account information by this date as will the automated phone system

Please see the servicing transfer notice you received in the mail for more information about the transfer, including your right to submit a qualified written request.

Due to the number of loans transferring and the level of personal service Nationstar provides each customer, they expect longer than normal telephone wait time. Your patience is appreciated and you may wish to call during lower call volume times - early mornings or late afternoons Tuesday - Thursday.

Thank you again for your business.

 Equal Housing Lender : © 2012 myAuroraLoan, Aurora Bank FSB

Aurora Bank FSB is a debt collector. Aurora Bank FSB is attempting to collect a debt and any information obtained will be used for that purpose. However, if you are in bankruptcy or received a bankruptcy discharge of this debt, this communication is not an attempt to collect the debt against

you personally, but is notice of a possible e ~~~~ement of the lien against the collateral prope~~

This an automated message, please do not reply to this email. If you have any questions regarding this email or its contents, please <u>click here</u> to contact us, through email or contact our Customer Service Department at 1-800-550-0508, Monday through Thursday 8:00 AM to 11:00 PM ET, Friday 8:00 AM to 9:00 PM ET, and Saturday 8:00 AM to 4:00 PM ET.

We respect your privacy. Please <u>click here</u> to view our current privacy policy.

This message is intended only for the personal and confidential use of the designated recipient(s) name. If you are not the intended recipient of this message, you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial products, an official confirmation of any transaction, or as an official statement of Aurora Bank FSB. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject to change without notice.

This email was sent to: **kensington.taylor@verizon.net**

This email was sent by:        Aurora Bank FSB
                               2617 College Park
                               Scottsbluff, NE 69361
                               United States

<u>Manage Subscriptions</u> | <u>Update Profile</u>

10/1/2014

# EXHIBIT 7

# HOMECOMINGS Adjustable Rate Note – Adjustable Rate Rider With Blank Endorsement

# ADJUSTABLE RATE NOTE
## 5 Year Fixed Rate Payment Option

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.**

MARCH 30TH, 2007                    SIMI VALLEY                    CALIFORNIA
[Date]                                [City]                        [State]

1682 AMARELLE STREET, THOUSAND OAKS, CA 91320
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $   862,500.00                    (this amount, including any increase to this amount under the terms of this Note, is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided in this Note, but can never exceed the maximum amount specified in Section 3(F) of this Note. Lender is  HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)
I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

### (A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will initially pay interest at a yearly rate of   7.8750        %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### (B) Interest Rate Change Dates

The interest rate I will pay may change on the first day of    MAY, 2012                 , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. Although the interest rate may change monthly, my monthly payment will be recalculated in accordance with Section 3.

### (C) Interest Rate Limit

My interest rate will never be greater than    9.9500        %.

5 YEAR FIXED RATE PAYMENT OPTION MULTISTATE ADJUSTABLE RATE NOTE 05/06
MFCD6289 (10/2006) / 047-337322-3
7754168 (0005)
Page 1 of 6
VMP Mortgage Solutions, Inc.
Initials: 

(D) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(E) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding
TWO AND ONE FOURTH                                                                percentage point(s)
(    2.2500          %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date.

3. PAYMENTS

(A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the first day of each month beginning on   JUNE 1ST, 2007              .
Each of these dates is called a "Payment Due Date." I will make these payments every month until I have paid all the Principal and interest and any other charges that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  MAY 1ST, 2037              , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  4350 VON KARMAN AVENUE, #100, NEWPORT BEACH, CA 92660                              or at a different place if required by the Note Holder.

(B) Minimum Payment; Amount of My Initial Monthly Payments

My "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment, which the Note Holder will determine in accordance with this Section 3(B), or Section 3(D), 3(F) or 3(G), below, as applicable.

Each of my initial Minimum Payments will be in the amount of U.S. $   3,407.92              ,
until a new Minimum Payment is required as provided below. If my Minimum Payment is not sufficient to cover the interest due under this Note, the difference will be added to my Principal amount as provided in Section 3(E) below. My initial Minimum Payment may not be sufficient to cover the interest due.

(C) Payment Change Dates

My Minimum Payment may change as required by Section 3(D) below beginning on the first day of JUNE, 2012              , and on that day every 12th month thereafter through my 109th Payment Due Date. Beginning with my 121st Payment Due Date, my Minimum Payment may change monthly thereafter. Each of these dates is called a "Payment Change Date." My Minimum Payment also will change at any time Section 3(F) below requires me to pay a different amount.

I will pay at least the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

#### (D) Calculation of Monthly Payment Changes

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." For the Payment Change Dates occurring on the 61st, 73rd, 85th, 97th, and 109th Payment Due Dates, the Note Holder also will multiply the amount of my last Minimum Payment due before the Payment Change Date by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) below requires me to pay a different amount, the amount of my new Minimum Payment that will be effective on each of the 61st, 73rd, 85th, 97th, and 109th Payment Change Dates will be the lesser of the Full Payment or the Limited Payment. The amount of my new Minimum Payment that will be effective on each of the Payment Change Dates beginning with the 121st Payment Due Date and continuing monthly thereafter will be the Full Payment, as provided in Section 3(G) below.

The Minimum Payment applies only to the Principal and interest payment and does not apply to any escrow payments the Note Holder may require under the Security Instrument (as defined in Section 11 of this Note, below).

#### (E) Additions to My Unpaid Principal

My monthly payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above. For each month that my monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

#### (F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed a maximum amount equal to 115% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid Principal under Section 3(E) above could cause my unpaid Principal to exceed that maximum amount. In that event and unless Section 3(G) requires me to pay a different amount, on the Payment Due Date that my paying my monthly payment would cause me to exceed that limit and continuing each monthly Payment Due Date thereafter through the 120th Payment Due Date, I will instead pay a new monthly payment in an amount not less than the amount that would pay the interest portion of the monthly payment at the interest rate effective during the month preceding the applicable Payment Due Date. This amount will be my new Minimum Payment. This means that my Minimum Payment may change monthly. This method of calculating my new Minimum Payment amount will remain in effect until the 121st Payment Due Date.

#### (G) Required Full Payment

Beginning on the Payment Change Date that occurs on the 121st Payment Due Date and continuing monthly thereafter, I will pay the Full Payment as my Minimum Payment until my payment changes again.

#### (H) Payment Options

Each month the Note Holder may provide me with up to three additional payment options (in addition to the Minimum Payment) that are equal to or greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

     (i)     **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option. This payment option will not be available beginning with the 121st Payment Due Date.

(ii)   **Fully Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month. This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change in accordance with Section 2(B) above.

(iii)   **15 Year Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) within a fifteen (15) year period from the first payment due date in substantially equal installments at the interest rate effective during the preceding month. This Payment Option is calculated on the assumption that the current rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change in accordance with Section 2(B) above.

Payment Options will only be available if they are equal to or greater than the Minimum Payment.

(I) **Failure to Make Adjustments**

If for any reason the Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree the Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold the Note Holder responsible for any damages to me that may result from the Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies that I may have paid to partial Prepayment of unpaid Principal.

## 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received at least the full amount of any Minimum Payment by the end of    15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.0000        % of my overdue Minimum Payment. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay at least the full amount of each Minimum Payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions read as follows:

> Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.



To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
                          -Borrower

SAM PALMER

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

Without Recourse
Pay to the Order of

Dorothy Okech
Assistant Secretary
Homecomings Financial, LLC
A Delaware Corporation

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

[Sign Original Only]

7754168 (0005)
MFCD8289 (10/2006) / 047-337322-3

Page 6 of 6

# ADJUSTABLE RATE RIDER
### 5 Year Fixed Rate Payment Option

THIS ADJUSTABLE RATE RIDER is made this 30TH day of MARCH, 2007 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)

("Lender") of the same date and covering the property described in the Security Instrument
and located at:
        1682 AMARELLE STREET
        THOUSAND OAKS, CA 91320
                [Property Address]

THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST
RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE
AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE.
THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE
AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT
STATED IN THE NOTE.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

Lender or anyone who takes the Note by transfer and who is entitled to receive payments
under the Note is called the "Note Holder."

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

### 2. INTEREST
(A) Interest Rate
Interest will be charged on unpaid Principal until the full amount of Principal has been
paid. I will initially pay interest at a yearly rate of      7.8750      %. The interest rate I
will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any
default described in Section 7(B) of the Note.
(B) Interest Rate Change Dates
The interest rate I will pay may change on the first day of MAY, 2012 ,
and on that day every month thereafter. Each date on which my interest rate could change is

---

**5 YEAR PAYMENT OPTION MULTISTATE ADJUSTABLE RATE RIDER 05/06**

Page 1 of 6                                         Initials: _____

7754167 (0402).01        VMP Mortgage Solutions, Inc.
MFCD6290 (10/2006) / 047-337322-3

called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. Although the interest rate may change monthly, my monthly payment will be recalculated in accordance with Section 3.

**(C) Interest Rate Limit**

My interest rate will never be greater than    9.9500           %.

**(D) Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(E) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding  TWO AND ONE FOURTH
percentage point(s) (    2.2500                    %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the first day of each month beginning on JUNE 1ST, 2007         . Each of these dates is called a "Payment Due Date." I will make these payments every month until I have paid all the Principal and interest and any other charges that I may owe under the Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on MAY 1ST, 2037
, I still owe amounts under the Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  4350 VON KARMAN AVENUE, #100, NEWPORT BEACH, CA 92660
or at a different place if required by the Note Holder.

**(B) Minimum Payment; Amount of My Initial Monthly Payments**

My "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment, which the Note Holder will determine in accordance with this Section 3(B), or Section 3(D), 3(F) or 3(G), below, as applicable.

Each of my initial Minimum Payments will be in the amount of U.S. $  3,407.92        , until a new Minimum Payment is required as provided below. If my Minimum Payment is not sufficient to cover the interest due under the Note, the difference will be added to my Principal amount as provided in Section 3(E) below. My initial Minimum Payment may not be sufficient to cover the interest due.

Initials: _____

7754167 (0402).01                     Page 2 of 6
MFCD6290 (10/2006) / 047-337322-3

**(C) Payment Change Dates**

My Minimum Payment may change as required by Section 3(D) below beginning on the first day of JUNE, 2012        , and on that day every 12th month thereafter through my 109th Payment Due Date. Beginning with my 121st Payment Due Date, my Minimum Payment may change monthly thereafter. Each of these dates is called a "Payment Change Date." My Minimum Payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay at least the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." For the Payment Change Dates occurring on the 61st, 73rd, 85th, 97th, and 109th Payment Due Dates, the Note Holder also will multiply the amount of my last Minimum Payment due before the Payment Change Date by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) below requires me to pay a different amount, the amount of my new Minimum Payment that will be effective on each of the 61st, 73rd, 85th, 97th, and 109th Payment Change Dates will be the lesser of the Full Payment or the Limited Payment. The amount of my new Minimum Payment that will be effective on each of the Payment Change Dates beginning with the 121st Payment Due Date and continuing monthly thereafter will be the Full Payment, as provided in Section 3(G) below.

The Minimum Payment applies only to the Principal and interest payment and does not apply to any escrow payments the Note Holder may require under the Security Instrument.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above. For each month that my monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

Initials: _____

**7754167 (0402).01**
MFCD8290 (10/2008) / 047-337322-3

Page 3 of 6

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal may never exceed a maximum amount equal to 115% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid Principal under Section 3(E) above could cause my unpaid Principal to exceed that maximum amount. In that event and unless Section 3(G) requires me to pay a different amount, on the Payment Due Date that my paying my monthly payment would cause me to exceed that limit and continuing each monthly Payment Due Date thereafter through the 120th Payment Due Date, I will instead pay a new monthly payment in an amount not less than the amount that would pay the interest portion of the monthly payment at the interest rate effective during the month preceding the applicable Payment Due Date. This amount will be my new Minimum Payment. This means that my Minimum Payment may change monthly. This method of calculating my new Minimum Payment amount will remain in effect until the 121st Payment Due Date.

**(G) Required Full Payment**

Beginning on the Payment Change Date that occurs on the 121st Payment Due Date and continuing monthly thereafter, I will pay the Full Payment as my Minimum Payment until my monthly payment changes again.

**(H) Payment Options**

Each month the Note Holder may provide me with up to three additional payment options (in addition to the Minimum Payment) that are equal to or greater than the applicable Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)   **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option. This payment option will not be available beginning with the 121st Payment Due Date.

(ii)  **Fully Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month. This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change in accordance with Section 2(B) above.

(iii) **15 Year Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) within a fifteen (15) year period from the first payment due date in substantially equal installments at the interest rate effective during the preceding month. This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change in accordance with Section 2(B) above.

Payment Options will only be available if they are equal to or greater than the Minimum Payment.

**(I) Failure to Make Adjustments**

If for any reason the Note Holder fails to make an adjustment to the interest rate or payment amount as described herein, regardless of any notice requirement, I agree the Note

Initials: _____

7754167 (0402).01
MFCD8290 (10/2008) / 047-337322-3

Page 4 of 6

Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold the Note Holder responsible for any damages to me that may result from the Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies that I may have paid to partial Prepayment of unpaid Principal.

## 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Initials: _____

**7754167 (0402).01**
MFCD6290 (10/2006) / 047-337322-3

Page 5 of 6

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)                    _____ (Seal)
                        -Borrower                                          -Borrower
SAM PALMER

_____ (Seal)                    _____ (Seal)
                        -Borrower                                          -Borrower

_____ (Seal)                    _____ (Seal)
                        -Borrower                                          -Borrower

_____ (Seal)                    _____ (Seal)
                        -Borrower                                          -Borrower

7754167 (0402).01                    Page 6 of 6
MFCD6290 (10/2008) / 047-337322-3

**Name Affidavit**

SAM PALMER
Borrower

MARCH 30, 2007
Date

1682 AMARELLE STREET

THOUSAND OAKS, CA 91320
Property Address

047-337322-3
Loan Number

BEFORE ME, the undersigned authority, a Notary Public, in and for said jurisdiction, on this day personally appeared SAM PALMER
who after being by me first duly sworn, upon his/her oath does depose and say that:

| | |
|---|---|
| ALIAS 1 | ALIAS 2 |
| ALIAS 3 | ALIAS 4 |
| ALIAS 5 | ALIAS 6 |
| ALIAS 7 | ALIAS 8 |
| ALIAS 9 | ALIAS 10 |
| ALIAS 11 | ALIAS 12 |

as the name(s) signed in connection with the purchase of property known as:
1682 AMARELLE STREET, THOUSAND OAKS, CA 91320
is/are one and the same person as SAM PALMER

SAM PALMER                                          hereby certifies that the signature below is
his/her true and correct signature.

Borrower SAM PALMER

Subscribed and sworn to before me this _2_ day of _APRIL_
_2007_, in the County of _VENTURA_, State of _CALIFORNIA_

Notary Public

My Commission expires 11-9-2007

N. DUFRENE
Commission # 1450182
Notary Public - California
Ventura County
My Comm. Expires Nov 9, 2007

MFCD8319-01/2000                                               047-337322-3

DATE:  04/02/2007
BORROWER:  SAM PALMER
LOAN #:  047-337322-3
PROPERTY ADDRESS:  1682 AMARELLE STREET, THOUSAND OAKS, CA 91320

**IMPORTANT LOAN INFORMATION**
**ADJUSTABLE RATE MORTGAGE LOAN PROGRAM DISCLOSURE**
**5 YEAR FIXED RATE PAYMENT OPTION**

**Please Read Carefully**

This disclosure describes the features of the Adjustable Rate Mortgage (ARM) program you are considering.  Information about our other ARM programs is available upon request.

**General Description of the ARM Program**

- After the initial five year interest rate period, your interest rate can change monthly and will be based on an Index plus a Margin.
- Your minimum monthly payment amount will remain the same for the first five years of your loan, then can change yearly during the next five years of your loan, then can change monthly thereafter, and can increase or decrease substantially based on changes in the interest rate.  Make sure you read the section on "How Your Payment Can Change," below.
- If you pay only the minimum monthly payment, and that amount is not sufficient to cover the interest due, the difference will be added to your principal amount.  This is called "negative amortization."  If the principal amount of your loan reaches the negative amortization cap discussed below, your payments amount may change regardless of scheduled payment changes.  Make sure you read the section on "Important Information about Negative Amortization," below.
- The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields").  The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.
- The "Margin" is the amount added to the Index to calculate your interest rate.  The Margin remains constant for the life of the loan.  Ask us for the amount of our current interest rate and Margin.

**How Your Initial Interest Rate and Initial Payment Amount Will Be Determined**

- Initial Interest Rate.  Your initial interest rate will be in effect for five years.  Your initial interest rate has a discount or premium feature and is not based on the Index used to make later adjustments.  The amount by which the initial interest rate is less than the rate that would be determined by adding the Margin to the Index is called the "discount."  The amount by which the initial interest rate is more than the rate that would be determined by adding the Margin to the Index is called the "premium."  Ask us for the amount of our current initial interest rate discount or premium.
- Initial Minimum Payment Amount.  Your ARM program has a minimum payment feature.  Your "Minimum Payment" is the minimum amount we will accept for your monthly payment.  Your initial Minimum Payment is not based on the initial interest rate.  The initial Minimum Payment is less than the amount required to repay the loan (principal and interest) in substantially equal monthly payments over the loan term at the initial interest rate.  Your initial Minimum Payment amount may be in effect for up to five years.  Your initial Minimum Payment may not be sufficient to cover the interest due.  Your initial Minimum Payment amount may not stay the same for the full five years if a change is required due to the limits on negative amortization.  Make sure you read the section on "How Your Payment Can Change," below.

**How Your Interest Rate Can Change**

- Your interest rate can change after the first five year period and monthly  thereafter.  The day the rate change is effective is an "Interest Rate Change Date."
- On each Interest Rate Change Date, the interest rate will be calculated by adding the Margin to the most recent Index figure available 15 days before the Interest Rate Change Date.  The result will be rounded to the nearest one-eighth of one percentage point (.125%).  This  rounded amount will be your new interest rate unless one of these limits applies:
    - (a)    Your interest rate will never be greater than 9.95%.
    - (b)    Beginning with  the first Interest Rate Change Date, your interest rate will never be lower than the Margin.

**How Your Payment Can Change**

- When Your Minimum Monthly Payment Can Change.  Your monthly Minimum Payment can change on your 61st payment due date and every 12 months thereafter through your 109th payment due date, then monthly thereafter beginning with your 121st payment due date (these dates are called "Scheduled Payment Change Dates"), or more frequently if necessary to prevent the unpaid principal balance of your loan from exceeding a negative amortization cap, described more fully below.
- Calculating Your Minimum Payment.  To calculate your monthly Minimum Payment for a Scheduled Payment Change Date, we will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance in full on the maturity date in substantially equal payments at the interest rate in effect during the month preceding the Scheduled Payment Change Date.  The result of this calculation is called the "Full Payment."  For the Scheduled Payment Change Dates occurring on your 61st, 73rd, 85th, 97th, and 109th payment due dates, we also multiply your last Minimum Payment due before the Scheduled Payment Change Date by 1.075.  The result of this calculation is called the "Limited Payment."  For the Scheduled Change Dates occurring on the 61st, 73rd, 85th, 97th, and 109th payment due dates, your new Minimum Payment will be the lesser of the Full Payment or the Limited Payment.  For the Scheduled Change Dates occurring on the 121st payment due date and monthly thereafter, your Minimum Payment will be the Full Payment.  However, your new monthly payment is subject to the following additional restrictions:
- Limit on My Unpaid Principal.  If you pay only the monthly Minimum Payment, the amount may not be sufficient to cover the interest due on your loan.  For each month that your monthly Minimum Payment is less than the interest due on your loan, we will subtract the amount of your monthly payment from the amount of interest due on your loan and will add the difference to your unpaid principal.  This means that the principal balance of your loan could increase.  This is known as negative amortization.  The unpaid principal balance of your loan can never exceed 115% (110% in New York) of the original amount borrowed.  If your outstanding principal balance reaches that limit, we will immediately increase your monthly Minimum Payment to an amount sufficient to pay the interest portion of the monthly payment at the interest rate effective during month preceding the applicable payment due date.  This means that your Minimum Payment may change monthly.  We will make this change whether or not your Minimum Payment is otherwise scheduled to change and without regard to any limit to the increase in the payment amount.  This method of calculating your new monthly Minimum Payment amount will be in effect until the 121st payment due date.
- Payment Options.  We may provide you with up to three (3) additional payment options that are equal to or greater than your Minimum Payment, which are called "Payment Options."  You may be given the following Payment Options:
    Interest Only Payment: the amount that would pay the interest portion of the monthly payment at the current interest rate.  The principal balance will not be decreased by this Payment Option.  This Payment Option will not be available beginning with the 121st payment due date.
    Fully Amortized Payment: the amount necessary to pay the loan off (principal and interest) at the maturity date in substantially equal payments at the interest rate effective during the preceding month.  This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full; however, the current interest rate may in fact change as described in the "How Your Interest Rate Can Change" section above.
    15 Year Amortized Payment: the amount necessary to pay the loan off (principal and interest) within a fifteen (15) year term from the first payment due date in substantially equal payments at the interest rate effective during the preceding month.  This Payment Option is

*Page 1 of 2 Pages*

calculated on the assumption .... the current rate will remain in effect until the loan is paid in full; however, the current interest rate may in fact change as described in the "How Your Interest Rate Can Change" section above.

Payment Options are only applicable if they are equal to or greater than the monthly Minimum Payment amount.

**Notice of Interest Rate and Payment Change**
We will notify you once each year during which interest rate adjustments, but not payment adjustments, have been made to your loan. This notice will contain information about your interest rate, index, payment amount and loan balance. We will notify you of a payment change in writing at least 25 days, but no more than 120 days, before the due date of the payment at a new level. This notice will contain information about your interest rate, index, payment amount and loan balance.

**Example of Maximum Interest Rate and Maximum Payment Which Could Be Required**

*New York Residents (Discounted Rate)*
On a $10,000 thirty year loan originated at an initial interest rate of 6.750%* in effect in October, 2006, the maximum amount that the interest rate can rise under this program is to 9.95% (the lifetime interest rate cap). The monthly minimum payment can rise from an initial payment for the first five years of the loan of $36.96** to a maximum of $105.79 in the eleventh year.
*The initial interest rate is equal to the index of 4.827%, plus a 2.25 % margin, minus a .327 % discount, rounded to the nearest 1/8%.
**The initial payment amount for the first five years of the loan is the minimum amount we will accept for your initial monthly payment. This payment is not based on the initial interest rate. This payment is less than the amount required to repay the loan (principal and interest) in substantially equal monthly payments over the loan term at the initial interest rate. That payment would be $64.86 .
To see what your payments would be, divide your mortgage amount by $10,000; then multiply the monthly payment by that amount. (For example, the monthly payment for a mortgage amount of $100,000 would be: $100,000 ÷ $10,000 = 10; 10 x $36.96 = $369.60 per month).

*Residents of all other States (Discounted Rate)*
On a $10,000 thirty year loan originated at an initial interest rate of 6.750%* in effect in October, 2006, the maximum amount that the interest rate can rise under this program is to 9.95% (the lifetime interest rate cap). The monthly minimum payment can rise from an initial payment for the first five years of the loan of $36.96** to a maximum of $110.60 in the eleventh year.
*The initial interest rate is equal to the index of 4.827%, plus a 2.25 % margin, minus a .327 % discount, rounded to the nearest 1/8%.
**The initial payment amount for the first five years of the loan is the minimum amount we will accept for your initial monthly payment. This payment is not based on the initial interest rate. This payment is less than the amount required to repay the loan (principal and interest) in substantially equal monthly payments over the loan term at the initial interest rate. That payment would be $64.86 .
To see what your payments would be, divide your mortgage amount by $10,000; then multiply the monthly payment by that amount. (For example, the monthly payment for a mortgage amount of $100,000 would be: $100,000 ÷ $10,000 = 10; 10 x $36.96 = $369.60 per month).

*New York Residents (Premium Rate)*
On a $10,000 thirty year loan originated at an initial interest rate of 7.375%* in effect in October, 2006, the maximum amount that the interest rate can rise under this program is to 9.95% (the lifetime interest rate cap). The monthly minimum payment can rise from an initial payment for the first five years of the loan of $36.96** to a maximum of $105.79 in the eleventh year.
*The initial interest rate is equal to the index of 4.827%, plus a 2.25 % margin, plus a .298 % premium, rounded to the nearest 1/8%.
**The initial payment amount for the first five years of the loan is the minimum amount we will accept for your initial monthly payment. This payment is not based on the initial interest rate. This payment is less than the amount required to repay the loan (principal and interest) in substantially equal monthly payments over the loan term at the initial interest rate. That payment would be $69.07 .
To see what your payments would be, divide your mortgage amount by $10,000; then multiply the monthly payment by that amount. (For example, the monthly payment for a mortgage amount of $100,000 would be: $100,000 ÷ $10,000 = 10; 10 x $36.96 = $369.60 per month).

*Residents of all other States (Premium Rate)*
On a $10,000 thirty year loan originated at an initial interest rate of 7.375%* in effect in October, 2006, the maximum amount that the interest rate can rise under this program is to 9.95% (the lifetime interest rate cap). The monthly minimum payment can rise from an initial payment for the first five years of the loan of $36.96** to a maximum of $110.60 in the eleventh year.
*The initial interest rate is equal to the index of 4.827%, plus a 2.25 % margin, plus a .298 % premium, rounded to the nearest 1/8%.
**The initial payment amount for the first five years of the loan is the minimum amount we will accept for your initial monthly payment. This payment is not based on the initial interest rate. This payment is less than the amount required to repay the loan (principal and interest) in substantially equal monthly payments over the loan term at the initial interest rate. That payment would be $69.07 .
To see what your payments would be, divide your mortgage amount by $10,000; then multiply the monthly payment by that amount. (For example, the monthly payment for a mortgage amount of $100,000 would be: $100,000 ÷ $10,000 = 10; 10 x $36.96 = $369.60 per month).

**Important Information about Negative Amortization**
- Negative amortization means the mortgage balance is increasing. This occurs whenever your monthly mortgage payments are not large enough to pay all of the interest due on your mortgage.
- Because payment caps limit only the amount of payment increases, and not interest rate increases, your monthly payments sometimes may not cover all of the interest due on your loan. This means that the interest shortage in your payment is automatically added to your unpaid principal balance, and interest may be charged on that amount. However, the unpaid principal balance of your loan can never exceed 115% (110% in New York) of the original amount borrowed. You may owe more later in the loan term than you did at the start.
- If you have any questions, be sure to ask us about negative amortization to understand how it may apply to your loan.

**This Program Disclosure is for Your Reference**
- This disclosure is intended for reference purposes only. Important information relating specifically to your loan will be contained in the loan documents, which alone establish your rights and obligations under the loan plan. This disclosure does not address any other payments that may be required under the terms of your loan, for example, monthly escrow payments.

_____    ____4.2.7____
Borrower - SAM PALMER                Date

_____    _____
Borrower -                           Date

_____    _____
Borrower -                           Date

_____    _____
Borrower -                           Date

_____    _____
Borrower -                           Date

_____    _____
Borrower -                           Date

MPCD6293 (11/2006) / 047-337322-3                              *Page 2 of 2 Pages*

# EXHIBIT 7A

**Adjustable Rate Note 2 With Special Endorsements Signed By Dorothy Okech Assistant Secretary On Behalf of Homecomings Financial, LLC With Deutsche Bank Trust Company Americas As Trustee – Residential Funding Company – Signed By Judy Faber, Vice President**

**AND**

**Allonge To Aurora Loan Services LLC Signed By Nancy L. Walker, Assistant Vice President Dated _March 25, 2011_ On Behalf Of Deutsch Bank Trust Company Americas As Trustee By Aurora Loan Services LLC, It's Attorney-in-Fact**

# ADJUSTABLE RATE NOTE
## 5 Year Fixed Rate Payment Option

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.**

MARCH 30TH, 2007                          SIMI VALLEY                    CALIFORNIA
[Date]                                    [City]                         [State]

1682 AMARELLE STREET, THOUSAND OAKS, CA 91320
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 862,500.00 (this amount, including any increase to this amount under the terms of this Note, is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided in this Note, but can never exceed the maximum amount specified in Section 3(F) of this Note. Lender is HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

### (A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will initially pay interest at a yearly rate of 7.8750 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### (B) Interest Rate Change Dates

The interest rate I will pay may change on the first day of MAY, 2012 , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. Although the interest rate may change monthly, my monthly payment will be recalculated in accordance with Section 3.

### (C) Interest Rate Limit

My interest rate will never be greater than 9.9500 %.

**(D) Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(E) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding
TWO AND ONE FOURTH                                                                    percentage point(s)
(   2.2500        %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the first day of each month beginning on   JUNE 1ST, 2007                 .
Each of these dates is called a "Payment Due Date." I will make these payments every month until I have paid all the Principal and interest and any other charges that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   MAY 1ST, 2037              , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   4350 VON KARMAN AVENUE, #100, NEWPORT BEACH, CA
92660                                               or at a different place if required by the Note Holder.

**(B) Minimum Payment; Amount of My Initial Monthly Payments**

My "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment, which the Note Holder will determine in accordance with this Section 3(B), or Section 3(D), 3(F) or 3(G), below, as applicable.

Each of my initial Minimum Payments will be in the amount of U.S. $   3,407.92                 ,
until a new Minimum Payment is required as provided below. If my Minimum Payment is not sufficient to cover the interest due under this Note, the difference will be added to my Principal amount as provided in Section 3(E) below. My initial Minimum Payment may not be sufficient to cover the interest due.

**(C) Payment Change Dates**

My Minimum Payment may change as required by Section 3(D) below beginning on the first day of
JUNE, 2012            , and on that day every 12th month thereafter through my 109th Payment Due Date. Beginning with my 121st Payment Due Date, my Minimum Payment may change monthly thereafter. Each of these dates is called a "Payment Change Date." My Minimum Payment also will change at any time Section 3(F) below requires me to pay a different amount.

I will pay at least the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

### (D) Calculation of Monthly Payment Changes

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." For the Payment Change Dates occurring on the 61st, 73rd, 85th, 97th, and 109th Payment Due Dates, the Note Holder also will multiply the amount of my last Minimum Payment due before the Payment Change Date by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) below requires me to pay a different amount, the amount of my new Minimum Payment that will be effective on each of the 61st, 73rd, 85th, 97th, and 109th Payment Change Dates will be the lesser of the Full Payment or the Limited Payment. The amount of my new Minimum Payment that will be effective on each of the Payment Change Dates beginning with the 121st Payment Due Date and continuing monthly thereafter will be the Full Payment, as provided in Section 3(G) below.

The Minimum Payment applies only to the Principal and interest payment and does not apply to any escrow payments the Note Holder may require under the Security Instrument (as defined in Section 11 of this Note, below).

### (E) Additions to My Unpaid Principal

My monthly payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above. For each month that my monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

### (F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed a maximum amount equal to 115% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid Principal under Section 3(E) above could cause my unpaid Principal to exceed that maximum amount. In that event and unless Section 3(G) requires me to pay a different amount, on the Payment Due Date that my paying my monthly payment would cause me to exceed that limit and continuing each monthly Payment Due Date thereafter through the 120th Payment Due Date, I will instead pay a new monthly payment in an amount not less than the amount that would pay the interest portion of the monthly payment at the interest rate effective during the month preceding the applicable Payment Due Date. This amount will be my new Minimum Payment. This means that my Minimum Payment may change monthly. This method of calculating my new Minimum Payment amount will remain in effect until the 121st Payment Due Date.

### (G) Required Full Payment

Beginning on the Payment Change Date that occurs on the 121st Payment Due Date and continuing monthly thereafter, I will pay the Full Payment as my Minimum Payment until my payment changes again.

### (H) Payment Options

Each month the Note Holder may provide me with up to three additional payment options (in addition to the Minimum Payment) that are equal to or greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

   (i)   **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option. This payment option will not be available beginning with the 121st Payment Due Date.

(ii)  **Fully Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month. This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change in accordance with Section 2(B) above.

(iii)  **15 Year Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) within a fifteen (15) year period from the first payment due date in substantially equal installments at the interest rate effective during the preceding month. This Payment Option is calculated on the assumption that the current rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change in accordance with Section 2(B) above.

Payment Options will only be available if they are equal to or greater than the Minimum Payment.

### (I) Failure to Make Adjustments

If for any reason the Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree the Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold the Note Holder responsible for any damages to me that may result from the Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies that I may have paid to partial Prepayment of unpaid Principal.

### 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

### 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

### 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 7. BORROWER'S FAILURE TO PAY AS REQUIRED

#### (A) Late Charges for Overdue Payments

If the Note Holder has not received at least the full amount of any Minimum Payment by the end of   15.
calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be
      **5.0000**          % of my overdue Minimum Payment. I will pay this late charge promptly but only once on each late payment.

#### (B) Default

If I do not pay at least the full amount of each Minimum Payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

**If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.**

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____(Seal)          _____(Seal)
                                -Borrower                                         -Borrower
SAM PALMER

_____(Seal)          _____(Seal)
                                -Borrower                                         -Borrower

_____(Seal)          _____(Seal)
                                -Borrower                                         -Borrower

Without Recourse
Pay to the Order of
RESIDENTIAL FUNDING COMPANY, LLC

Dorothy Okech
Assistant Secretary
Homecomings Financial, LLC _____(Seal)          _____(Seal)
A Delaware Corporation                        -Borrower                                         -Borrower

PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee                   *[Sign Original Only]*
            without recourse
Residential Funding Company, LLC
BY _____
   Judy Faber, Vice President

7754168 (0008)
MFCD8289 (10/2008) / 047-337322-3                    Page 6 of 6

NOTE ALLONGE
======================================

For purposes of further endorsement of the following described
Note, this Allonge is affixed and becomes a permanent part of
said Note:

Loan #: 0021922075

Executing Mortgagor: SAM PALMER

Original Mortgage Amount: $862,500.00

Original Lender: HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS
FINANCIAL NETWORK, INC.)

Loan Date: MARCH 30TH, 2007

Property Address: 1682 AMARELLE STREET, THOUSAND OAKS, CA 91320

Without recourse pay to the order of: Aurora Loan Services LLC

By: _____
Name: Nancy L. Walker
Title: Assistant Vice President
Date: March 25, 2011
Company: Deutsche Bank Trust Company Americas as Trustee by
Aurora Loan Services LLC, it's Attorney-in-Fact

# EXHIBIT 7B

## Adjustable Rate Note 3 With Special Endorsement Filed 3.10.14 By Deutsche Bank Trust Company Americas' Motion For Lift of Stay As Exhibit 2 in Palmer's Bankruptcy Filed 12.6.13

# EXHIBIT 2

# ADJUSTABLE RATE NOTE
### 5 Year Fixed Rate Payment Option

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.**

MARCH 30TH, 2007                    SIMI VALLEY                    CALIFORNIA
[Date]                               [City]                         [State]

1682 AMARELLE STREET, THOUSAND OAKS, CA 91320
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $   862,500.00   (this amount, including any increase to this amount under the terms of this Note, is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided in this Note, but can never exceed the maximum amount specified in Section 3(F) of this Note. Lender is  HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

### (A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will initially pay interest at a yearly rate of   7.8750   %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### (B) Interest Rate Change Dates

The interest rate I will pay may change on the first day of   MAY, 2012   , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. Although the interest rate may change monthly, my monthly payment will be recalculated in accordance with Section 3.

### (C) Interest Rate Limit

My interest rate will never be greater than   9.9500   %.

Initials: 

(D) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(E) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding TWO AND ONE FOURTH percentage point(s) ( 2.2500 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date.

## 3. PAYMENTS

(A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the first day of each month beginning on    JUNE 1ST, 2007          . Each of these dates is called a "Payment Due Date." I will make these payments every month until I have paid all the Principal and interest and any other charges that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   MAY 1ST, 2037          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  4350 VON KARMAN AVENUE, #100, NEWPORT BEACH, CA 92660                  or at a different place if required by the Note Holder.

(B) Minimum Payment; Amount of My Initial Monthly Payments

My "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment, which the Note Holder will determine in accordance with this Section 3(B), or Section 3(D), 3(F) or 3(G), below, as applicable.

Each of my initial Minimum Payments will be in the amount of U.S. $   3,407.92                  , until a new Minimum Payment is required as provided below. If my Minimum Payment is not sufficient to cover the interest due under this Note, the difference will be added to my Principal amount as provided in Section 3(E) below. My initial Minimum Payment may not be sufficient to cover the interest due.

(C) Payment Change Dates

My Minimum Payment may change as required by Section 3(D) below beginning on the first day of JUNE, 2012                , and on that day every 12th month thereafter through my 109th Payment Due Date. Beginning with my 121st Payment Due Date, my Minimum Payment may change monthly thereafter. Each of these dates is called a "Payment Change Date." My Minimum Payment also will change at any time Section 3(F) below requires me to pay a different amount.

I will pay at least the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

(D) Calculation of Monthly Payment Changes

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." For the Payment Change Dates occurring on the 61st, 73rd, 85th, 97th, and 109th Payment Due Dates, the Note Holder also will multiply the amount of my last Minimum Payment due before the Payment Change Date by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) below requires me to pay a different amount, the amount of my new Minimum Payment that will be effective on each of the 61st, 73rd, 85th, 97th, and 109th Payment Change Dates will be the lesser of the Full Payment or the Limited Payment. The amount of my new Minimum Payment that will be effective on each of the Payment Change Dates beginning with the 121st Payment Due Date and continuing monthly thereafter will be the Full Payment, as provided in Section 3(G) below.

The Minimum Payment applies only to the Principal and interest payment and does not apply to any escrow payments the Note Holder may require under the Security Instrument (as defined in Section 11 of this Note, below).

(E) Additions to My Unpaid Principal

My monthly payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above. For each month that my monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

(F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed a maximum amount equal to 115% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid Principal under Section 3(E) above could cause my unpaid Principal to exceed that maximum amount. In that event and unless Section 3(G) requires me to pay a different amount, on the Payment Due Date that my paying my monthly payment would cause me to exceed that limit and continuing each monthly Payment Due Date thereafter through the 120th Payment Due Date, I will instead pay a new monthly payment in an amount not less than the amount that would pay the interest portion of the monthly payment at the interest rate effective during the month preceding the applicable Payment Due Date. This amount will be my new Minimum Payment. This means that my Minimum Payment may change monthly. This method of calculating my new Minimum Payment amount will remain in effect until the 121st Payment Due Date.

(G) Required Full Payment

Beginning on the Payment Change Date that occurs on the 121st Payment Due Date and continuing monthly thereafter, I will pay the Full Payment as my Minimum Payment until my payment changes again.

(H) Payment Options

Each month the Note Holder may provide me with up to three additional payment options (in addition to the Minimum Payment) that are equal to or greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)    Interest Only Payment: the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option. This payment option will not be available beginning with the 121st Payment Due Date.

(ii) **Fully Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month. This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change in accordance with Section 2(B) above.

(iii) **15 Year Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) within a fifteen (15) year period from the first payment due date in substantially equal installments at the interest rate effective during the preceding month. This Payment Option is calculated on the assumption that the current rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change in accordance with Section 2(B) above.

<u>Payment Options will only be available if they are equal to or greater than the Minimum Payment.</u>

**(I) Failure to Make Adjustments**

If for any reason the Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree the Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold the Note Holder responsible for any damages to me that may result from the Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies that I may have paid to partial Prepayment of unpaid Principal.

## 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received at least the full amount of any Minimum Payment by the end of    15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.0000    % of my overdue Minimum Payment. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay at least the full amount of each Minimum Payment on the date it is due, I will be in default.



### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)            _____ (Seal)
                              -Borrower                                          -Borrower
SAM PALMER

_____ (Seal)            _____ (Seal)
                              -Borrower                                          -Borrower

_____ (Seal)            _____ (Seal)
                              -Borrower                                          -Borrower

Without Recourse
Pay to the Order of

RESIDENTIAL FUNDING COMPANY, LLC

Dorothy Okech
Assistant Secretary
Homecomings Financial, LLC
A Delaware Corporation
_____ (Seal)            _____ (Seal)
                              -Borrower                                          -Borrower

PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Company, LLC

BY _____
Judy Faber, Vice President

[Sign Original Only]

Pay to the Order of

Without Recourse:
Aurora Loan Services LLC By Nationstar
Mortgage LLC Its Attorney-In-Fact

By: _____
Assistant Secretary
Shannon Sierra

NOTE ALLONGE
==================================

For purposes of further endorsement of the following described
Note, this Allonge is affixed and becomes a permanent part of
said Note:

Loan #: ████████

Executing Mortgagor: SAM PALMER

Original Mortgage Amount: $862,500.00

Original Lender: HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS
FINANCIAL NETWORK, INC.)

Loan Date: MARCH 30TH, 2007

Property Address: 1682 AMARELLE STREET, THOUSAND OAKS, CA 91320

Without recourse pay to the order of: Aurora Loan Services LLC

By: _____
Name: Nancy L. Walker
Title: Assistant Vice President
Date: March 25, 2011
Company: Deutsche Bank Trust Company Americas as Trustee by
Aurora Loan Services LLC, it's Attorney-in-Fact

# EXHIBIT 8

# 10.15.12-APPEAL-Letter From Ventura Court of Appeal Staying Process

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT

JOSEPH A. LANE, CLERK

DIVISION 6          October 15, 2012

Sam Palmer
1682 Amarelle St.
Thousand Oaks, CA 91320

> Palmer v. Homecomings Financial
> B240307
> Ventura County No. 56-2011-00392361-CU-OR-VTA

Dear Counsel:

All proceedings before this court have been stayed pending determination of the proceedings before the bankruptcy court.  Though you may not be directly involved with the bankruptcy proceedings, it is still your responsibility to keep this court advised of the status of the proceedings.  All update letters must be served on opposing counsel and filed with this Court.

Appellant is directed to file status letters with this court beginning on April 15, 2013 and every 90 days thereafter.  Failure to timely file these letters WILL be viewed as an abandonment of the appeal.

Very truly yours,

Joseph A. Lane, Clerk

by:_____
          Deputy Clerk

cc:    All Counsel
       Superior Court, Civil Appeal Section
       File

Second Appellate District, Div. Six
200 East Santa Clara
Ventura, CA  93001
(805) 641-4700
www.courts.ca.gov/2dca

# EXHIBIT 9

## 03/30/07-TRUTH-IN-LENDING DISCLOSURE STATEMENT SHOWING PAYMENT STRUCTURE WHEN SIGNING THE LOAN

FEDE    TRUTH-IN-LENDING DISCLOSURE STAT   IT

| Borrower: | Creditor: |
|---|---|
| SAM PALMER<br>1682 AMARELLE STREET<br>THOUSAND OAKS, CA 91320 | HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS<br>FINANCIAL NETWORK, INC.)<br>4350 VON KARMAN AVENUE, #100<br>NEWPORT BEACH, CA  92660 |

Loan Number: 047-337322-3          Date:  03/30/2007

| ANNUAL PERCENTAGE RATE<br><br>The cost of your credit as a yearly rate | FINANCE CHARGE<br><br>The dollar amount the credit will cost you. | Amount Financed<br><br>The amount of credit provided to you or on your behalf. | Total of payments<br><br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.5850% | $1,623,646.07 | $852,572.82 | $2,476,218.89 |

Your payment schedule will be:

| No. of Pmts | Amt. of Pmts | Monthly Pmts Begin | No. of Pmts | Amt. of Pmts | Monthly Pmts Begin | No. of Pmts | Amt. of Pmts | Monthly Pmts Begin |
|---|---|---|---|---|---|---|---|---|
| 48 | 3407.92 | 06/01/2007 | | | | | | |
| 12 | 6490.89 | 06/01/2011 | | | | | | |
| 60 | 5975.74 | 06/01/2012 | | | | | | |
| 239 | 7817.52 | 06/01/2017 | | | | | | |
| 1 | 7816.37 | 05/01/2037 | | | | | | |

**VARIABLE RATE:**  Your loan contains a variable-rate feature.  Disclosures about the variable-rate feature have been provided to you earlier.

**INSURANCE:** The following insurance is required to obtain credit:   * Property You may obtain the insurance from anyone that is acceptable to creditor.

**SECURITY:**  You are giving a security interest in real property you already own. Property Address: 1682 AMARELLE STREET, THOUSAND OAKS, CA  91320

**LATE CHARGE:**  If a payment is more than 15 days late, you will be charged 5 % of the overdue payment of principal and interest.

**PREPAYMENT:**  If you pay off your loan early,   * You will not have to pay a penalty. * You will not be entitled to a refund of part of the finance charge.

**ASSUMPTION:**  Someone buying your property may assume the remainder of your loan on the original terms.

**See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.**

_____          4.2.7
SAM PALMER                       DATE

# EXHIBIT 11

## 3.10.14 Deutsche Bank Trust Company Americas As Trustee's Motion For Lift of Stay Part 1 pgs1-12

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Keefe E. Roberts, Esq. SBN 212643<br>Angie Marth, Esq. SBN 264567<br>Roberts & Shapiro, LLP<br>6 Venture, Suite 305<br>Irvine, CA 92618<br>Telephone: (888) 659-2899<br>Fax: (855) 491-5809<br><br>☐ *Movant appearing without an attorney*<br>☒ *Attorney for Movant* | |

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO VALLEY DIVISION**

</div>

| In re:<br><br>Sam Palmer<br><br><br><br><br><br><br><br>Debtor(s). | CASE NO.: 1:13-bk-17578-MT<br>CHAPTER: 7<br><br>**NOTICE OF MOTION AND MOTION  FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (WITH SUPPORTING DECLARATIONS) REGARDING REAL PROPERTY**<br><br>DATE: 04/02/2014<br>TIME: 9:30 am<br>COURTROOM: 302 |
|---|---|

Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc Pass Through Certificates

**Movant:** _2007-QH5_

**Movant is the (*check one*):**

☐ Holder of deed of trust
☒ Assignee of holder of deed of trust
☐ Servicing agent for holder of deed of trust or assignee of holder of deed of trust

1. NOTICE IS HEREBY GIVEN to the Debtor and trustee (*if any*)(Responding Parties), their attorneys (*if any*), and other interested parties that on the above date and time and in the stated courtroom, Movant in the above-captioned matter will move this court for an order granting relief from the automatic stay as to Debtor and Debtor's bankruptcy estate on the grounds set forth in the attached Motion.

2. **Hearing Location**:

   ☐ 255 East Temple Street, Los Angeles, CA 90012          ☐ 411 West Fourth Street, Santa Ana, CA 92701
   ☒ 21041 Burbank Boulevard, Woodland Hills, CA 91367     ☐ 1415 State Street, Santa Barbara, CA 93101
   ☐ 3420 Twelfth Street, Riverside, CA 92501

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*December 2012*                            Page 1                            **F 4001-1.RFS.RP.MOTION**

3.   a.   ☒   This motion is being heard on REGULAR NOTICE pursuant to LBR 9013-1.  If you wish to oppose this motion, you must file a written response to this motion with the court and serve a copy of it upon the Movant's attorney (or upon Movant, if the motion was filed by an unrepresented individual) at the address set forth above no less than 14 days before the above hearing and appear at the hearing of this motion.

     b.   ☐   This motion is being heard on SHORTENED NOTICE.  If you wish to oppose this motion, you must appear at the hearing.  Any written response or evidence may be filed and served:

              ☐ at the hearing.   ☐ at least _____ days before the hearing.

         (1)  ☐   A Motion for Order Shortening Time was not required according to the calendaring procedures of the assigned judge.

         (2)  ☐   A Motion for Order Shortening Time was filed pursuant to LBR 9075-1(b) and was granted by the court, and such motion and order have been or are being served upon the Debtor and trustee, if any.

         (3)  ☐   A Motion for Order Shortening Time has been filed and is pending.  Once the court has ruled on that motion, you will be served with another notice or an order that will specify the date, time and place of the hearing on the attached motion and the deadline for filing and serving a written opposition to the motion, if any.

4.   You may contact the clerk's office to obtain a copy of an approved court form for use in preparing your response (optional LBR form F 4001-1.RESPONSE), or you may prepare your response using the format required by LBR 9004-1 and the Court Manual.

5.   If you fail to file a written response to the motion, if required, or fail to appear at the hearing, the court may treat such failure as a waiver of your right to oppose the motion and may grant the requested relief.

Date:  03/10/2014

                                                 Roberts & Shapiro, LLP
                                                 Printed name of law firm (if applicable)

                                                 Angie M. Marth
                                                 Printed name of individual Movant or attorney for Movant

                                                 /s/  Angie M. Marth
                                                 Signature of individual Movant or attorney for Movant

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

December 2012                    Page 2                    F 4001-1.RFS.RP.MOTION

# MOTION FOR RELIEF FROM THE AUTOMATIC STAY

1. **The Property at Issue:** Movant moves for relief from the automatic stay with respect to following real property (Property):

   > Street address: 1682 AMARELLE STREET
   > Unit/suite no.:
   > City, state, zip code: THOUSAND OAKS, CA 91320

   Legal description or document recording number (including county of recording):

   [X] See attached continuation page.

2. **Case History:**

   a. [X] A voluntary petition ☐ An involuntary petition under chapter [X] 7 ☐ 11 ☐ 12 ☐ 13 was filed on (specify date): _____

   b. ☐ An Order of Conversion to chapter ☐ 7 ☐ 11 ☐ 12 ☐ 13 was entered on (specify date): _____

   c. ☐ Plan, if any, was confirmed on (specify date): _____

   d. ☐ Other bankruptcy cases affecting this Property were pending within the past two years. See attached declaration.

3. **Grounds for Relief from Stay:**

   a. [X] Pursuant to 11 U.S.C. § 362(d)(1), cause exists to grant Movant the requested relief from stay as follows:

      (1) [X] Movant's interest in the Property is not adequately protected.

         (a) [X] Movant's interest in the collateral is not protected by an adequate equity cushion.

         (b) ☐ The fair market value of the Property is declining and payments are not being made to Movant sufficient to protect Movant's interest against that decline.

         (c) ☐ No proof of insurance re Movant's collateral has been provided to Movant, despite borrower's obligation to insure the collateral under the terms of Movant's contract with Debtor.

         (d) ☐ Payments have not been made as required by an Adequate Protection Order previously granted to Movant.

      (2) ☐ The bankruptcy case was filed in bad faith to delay, hinder, and defraud Movant.

         (a) ☐ Movant is the only creditor or one of very few creditors listed on the Debtor's master mailing matrix.

         (b) ☐ Non-individual entity was created just prior to bankruptcy filing for the sole purpose of filing bankruptcy.

         (c) ☐ The Debtor filed what is commonly referred to as a "face sheet" filing of only a few pages consisting of the petition and a few other documents. No other Schedules or Statement of Financial Affairs (or chapter 13 Plan, if appropriate) have been filed.

         (d) ☐ Other (see attached continuation page).

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

December 2012                                    Page 3                        **F 4001-1.RFS.RP.MOTION**

     (3) ☐ (Chapter 12 or 13 cases only)

         (a) ☐ Postconfirmation plan payments have not been made to the standing trustee.

         (b) ☐ Postpetition payments due on the note secured by a deed of trust on the Property have not been made to Movant.

     (4) ☐ For other cause for relief from stay, see attached continuation page.

  b. ☒ Pursuant to 11 U.S.C. § 362(d)(2)(A), Debtor has no equity in the Property, and pursuant to § 362(d)(2)(B), the Property is not necessary to an effective reorganization.

  c. ☐ Pursuant to 11 U.S.C. § 362(d)(3), Debtor has failed within the later of 90 days after the order for relief or 30 days after the court determined that the Property qualifies as "single asset real estate" as defined in 11 U.S.C. § 101(51B) to file a reasonable plan of reorganization or to commence monthly payments.

  d. ☐ Pursuant to 11 U.S.C. § 362(d)(4), Debtor's filing of the petition was part of a scheme to delay, hinder, and defraud creditors that involved:

     (1) ☐ The transfer of all or part ownership of, or other interest in, the Property without the consent of Movant or court approval; or

     (2) ☐ Multiple bankruptcy filings affecting the Property.

4. ☐ Movant also seeks annulment of the stay so that the filing of the bankruptcy petition does not affect postpetition acts, as specified in the attached declaration(s).

5. **Evidence in Support of Motion: (Important Note: Declaration(s) in support of the Motion MUST be attached hereto.)**

  a. ☒ Movant submits the attached declaration(s) on the court's approved forms (if applicable) to provide evidence in support of this motion pursuant to the LBR.

  b. ☐ Other declaration(s) are also attached in support of this motion.

  c. ☒ Movant requests that the court consider as admissions the statements made by Debtor under penalty of perjury concerning Movant's claims and the Property set forth in Debtor's schedules. Authenticated copies of the relevant portions of the schedules are attached as Exhibit  4  .

  d. ☐ Other evidence (specify): _____

6. ☐ **An optional Memorandum of Points and Authorities is attached to this motion.**

**WHEREFORE, Movant prays that the court issue an Order terminating or modifying the stay and granting the following (specify forms of relief requested):**

1. Relief from the stay allowing Movant (and any successors or assigns) to proceed under applicable nonbankruptcy law to enforce its remedies to foreclose upon and obtain possession of the Property.

2. **Movant, or its agents, may, at its option, offer, provide and enter into a potential forebearance agreement, loan modification, refinance agreement or other loan workout or loss mitigation agreement. Movant, through its servicing agent, may contact the Debtor via telephone or written correspondence to offer such an agreement. Any such agreement shall be nonrecourse unless stated in a reaffirmation agreement.**

3. ☐ Annulment of the stay so that the filing of the bankruptcy petition does not affect postpetition acts, as specified in the attached declaration(s).

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

December 2012                                        Page 4                                        F 4001-1.RFS.RP.MOTION

4.  ☒ Additional provisions requested:
    a.  ☒ That the 14-day stay described by FRBP 4001(a)(3) is waived.

    b.  ☐ That Extraordinary Relief be granted as set forth in the Attachment (*attach optional LBR Form F 4001-1.EXT.RELIEF.ATTACH*).

    c.  ☐ For other relief requested, see attached continuation page.

5.  If relief from stay is not granted, Movant respectfully requests the court to order adequate protection.


Date:  03/10/2014                          Respectfully submitted,

                                           Deutsche Bank Trust Company Americas as Trustee for Residential
                                           Accredit Loans, Inc Pass Through Certificates 2007-QH5
                                           Printed name of Movant


                                           ROBERTS & SHAPIRO, LLP
                                           Printed name of attorney for Movant (if applicable)



                                            /s/ Angie M. Marth
                                           Signature


                                            Angie M. Marth
                                           Printed name of individual Movant or attorney for Movant

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*December 2012*                          Page 5                          **F 4001-1.RFS.RP.MOTION**

# REAL PROPERTY DECLARATION

I, _NIK SREEKANTH_____, declare as follows
_____
(*Print Name of Declarant*)

1.  I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would
    competently testify thereto. I am over 18 years of age. I have knowledge regarding Movant's interest in the real
    property that is the subject of this Motion (Property) because (*specify*):

    ☐ I am the Movant and owner of the Property.

    ☐ I manage the Property as the authorized agent for the Movant.

    ☐ I am employed by Movant as (*state title and capacity*): _____

    ☒ Other (*specify*):  _SEE ATTACHED CONTINUATION PAGE_____

2.  I am one of the custodians of the books, records and files of Movant that pertain to loans and extensions of credit
    given to Debtor concerning the Property. I have personally worked on books, records and files, and as to the
    following facts, I know them to be true of my own knowledge or I have gained knowledge of them from the business
    records of Movant on behalf of Movant, which were made at or about the time of the events recorded, and which are
    maintained in the ordinary course of Movant's business at or near the time of the acts, conditions or events to which
    they relate. Any such document was prepared in the ordinary course of business of Movant by a person who had
    personal knowledge of the event being recorded and had or has a business duty to record accurately such event.
    The business records are available for inspection and copies can be submitted to the court if required.

3.  The Movant is:

    ☐ Original holder of the beneficial interest in the Property. A true and correct copy of a recorded proof of this
       interest is attached hereto as Exhibit _____ (*e.g., deed of trust*).

    ☒ Assignee of the original holder of the beneficial interest in the Property. A true and correct copy of recorded proof
       of this interest is attached hereto as Exhibit _3____ (*e.g., allonge, assignment, et.al.*).

    ☐ Servicing or subservicing agent pursuant to a servicing agreement or other documented authorization to act as
       Movant for the owner of the beneficial interest. Attached hereto as Exhibit _____ is a true and correct copy of the
       relevant part of the document which reflects authority to act as Movant for the owner of the beneficial interest.

4.  a.  The address of the Property that is the subject of this Motion is:

        Street address: _1682 AMARELLE STREET_____
        Unit/suite no.: _____
        City, state, zip code: _THOUSAND OAKS, CA 91320_____

    b.  The legal description or document recording number (including county of recording) set forth in Movant's deed of
        trust is attached as Exhibit _1___.

    ☒ See attached page.

5.  Type of property (*check all applicable boxes*):

    a. ☒ Debtor's principal residence        b. ☐ Other single family residence
    c. ☐ Multi-unit residential              d. ☐ Commercial
    e. ☐ Industrial                          f. ☐ Vacant land
    g. ☐ Other (*specify*): _____

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

6.   Nature of Debtor's interest in the Property:

a.  ☒  Sole owner

b.  ☐  Co-owner(s) (*specify*):

c.  ☐  Lien holder (*specify*):

d.  ☐  Other (*specify*):

e.  ☒  Debtor   ☒ did   ☐ did not   list the Property in the schedules filed in this case.

f.  ☐  Debtor acquired the interest in the Property by   ☐ grant deed   ☐ quitclaim deed   ☐ trust deed

    The deed was recorded on: _____

7.   Amount of Movant's claim with respect to the Property:

| | PREPETITION | POSTPETITION | TOTAL |
|---|---|---|---|
| a.  Principal: | $ | $ | $ 944,942.32 |
| b.  Accrued interest: | $ | $ | $ 207,935.77 |
| c.  Late charges | $ | $ | $ 0.00 |
| d.  Costs (attorney's fees, other costs): | $ | $ | $ 6,625.00 |
| e.  Advances (property taxes, insurance): | $ | $ | $ 35,202.22 |
| f.  Less suspense account or partial balance paid: | $[          ] | $[          ] | $[2,104.71          ] |
| g.  TOTAL CLAIM as of: 02/21/2014 | $ | $ | $ 1,192,600.60 |

h.  ☐ Loan is all due and payable because it matured on (*specify date*): _____

8.   Movant holds a   ☒ deed of trust   ☐ judgment lien   ☐ other (*specify*) _____
     that encumbers the Property.

a.  A true and correct copy of the document as recorded is attached as Exhibit _1___.

b.  A true and correct copy of the promissory note or other document that evidences the Movant's claim is attached
    as Exhibit _2___.

c.  ☒ A true and correct copy of the assignment(s) transferring the beneficial interest under the note and deed of
       trust to Movant is attached as Exhibit _3___.

9.   Status of Movant's foreclosure actions relating to the Property (*fill the date or check the box confirming no such action
     has occurred*):

a.  Notice of default recorded on the following date: _12/18/2008__ or none recorded ☐

b.  Foreclosure sale originally scheduled for the following date: _04/14/2009__ or none scheduled ☐

c.  Foreclosure sale currently scheduled for the following date: _____ or none scheduled ☒

d.  Foreclosure sale already held on the following date: _____ or none held ☒

e.  Trustee's deed on sale already recorded on the following date: _____ or none recorded ☒

10. Attached (*optional*) hereto as Exhibit _____ is a true and correct copy of a POSTPETITION statement of account that
    accurately reflects the dates and amounts of all charges assessed to and payments made by the Debtor since the
    petition date.

11. ☒ (chapter 7 and 11 cases only):

    Status of Movant's loan:

a.  Amount of current monthly payment: $ _2,791.89_____ for the month of _February_____ 20_14_.

b.  Number of payments that have come due and were not made: _48__. Total amount: $_245,782.52_____

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

December 2012                          Page 7                          **F 4001-1.RFS.RP.MOTION**

c. Future payments due by time of anticipated hearing date (*if applicable*):

An additional payment of $ 2,791.89 _____ will come due on 03/01/2014 _____, and on the 1st__ day of each month thereafter. If the payment is not received within _____ days of said due date, a late charge of $_____ will be charged to the loan.

d. The fair market value of the entire Property is $811,899.00 _____ , established by:

&#9744; Appraiser's declaration with appraisal is attached herewith as Exhibit _____.

&#9744; A real estate broker or other expert's declaration regarding value is attached as Exhibit _____.

&#9746; A true and correct copy of relevant portion(s) of Debtor's schedules is attached as Exhibit 4 ____.

&#9744; Other (*specify*): _____

e. **Calculation of equity in Property:**

Based upon &#9744; preliminary title report    &#9746; Debtor's admissions in the schedules filed in this case, the Property is subject to the following deed(s) of trust or lien(s) in the amounts specified securing the debt against the Property:

|  | **Name of Holder** | **Amount as Scheduled by Debtor (*if any*)** | **Amount known to Declarant and Source** |
|---|---|---|---|
| 1st deed of trust: | MOVANT |  | $1,192,600.60 |
| 2nd deed of trust: |  |  |  |
| 3rd deed of trust: |  |  |  |
| Judgment liens: |  |  |  |
| Taxes: |  |  |  |
| Other: |  |  |  |

**TOTAL DEBT: $** 1,192,600.60

f. Evidence establishing the existence of the above deed(s) of trust and lien(s) is attached as Exhibit 4 ____ and consists of:

&#9744; Preliminary title report

&#9746; Relevant portions of Debtor's schedules as filed in this case

&#9744; Other (*specify*): _____

g. Subtracting the deed(s) of trust and other lien(s) set forth above from the value of the Property as set forth in Paragraph 11d above, the Debtor's equity in the Property is $ -380,701.60 _____ (§ 362(d)(2)(A)).

h. The value of the "equity cushion" in the Property exceeding Movant's debt and any lien(s) senior to Movant is $ -380,701.60 _____ (§ 362(d)(1)).

i. Estimated costs of sale: $ 64,951.92 _____ (estimate based upon 8 _____ % of estimated gross sales price)

j. The fair market value of the Property is declining based on or due to:

_____

_____

12. &#9744; (Chapter 12 and 13 cases only)

Chapter 12 or 13 case status information:

a. A 341(a) meeting is currently scheduled for (*or concluded on*) the following date: _____
Confirmation hearing currently scheduled for (or concluded on) the following date:_____
Plan was confirmed on the following date (*if applicable*): _____

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

December 2012                    Page 8                    F 4001-1.RFS.RP.MOTION

b.  Postpetition payments due BUT REMAINING UNPAID since the filing of the case:

(Number of) _____ payment(s) due at  $ _____    Each =  $ _____
(Number of) _____ payment(s) due at  $ _____    Each =  $ _____
(Number of) _____ payment(s) due at  $ _____    Each =  $ _____
(Number of) _____ payment(s) due at  $ _____    Each =  $ _____
(Number of) _____ late charges at  $ _____    Each =  $ _____
(Number of) _____ late charges at  $ _____    Each =  $ _____
(Number of) _____ late charges at  $ _____    Each =  $ _____
(Number of) _____ late charges at  $ _____    Each =  $ _____
(See attachment for additional breakdown or information attached as Exhibit _____.)

c.  Postpetition advances or other charges due but unpaid:                    $ _____
(See attachment for details of type and amount attached as Exhibit _____.)

d.  Attorneys' fees and costs                                              $ _____
(See attachment for details of type and amount attached as Exhibit _____.)

e.  Less suspense account or partial paid balance                        $[              ]

                    TOTAL POSTPETITION DELINQUENCY:                      $ _____

f.  Future payments due by time of anticipated hearing date (if applicable): _____
An additional payment of $_____ will come due on _____, and on
the _____ day of each month thereafter. If the payment is not received by the _____ day of the month, a late
charge of $_____ will be charged to the loan.

g.  Amount and date of the last 3 postpetition payments received in good funds, regardless of how applied, from the
Debtor, if applicable:

$ _____ received on _____
$ _____ received on _____
$ _____ received on _____

h.  ☐  The claim is provided for in the chapter 12 or 13 Plan. Plan payment history is attached as Exhibit _____.

i.  ☐  See attached declaration(s) of chapter 12 or 13 Trustee regarding receipt of payments under the plan (attach
LBR form F 4001-1.DEC.AGENT.TRUSTEE).

13. ☐  Movant has not been provided with evidence that the Property is currently insured, as required under the terms of
the loan.

14. ☐  The court determined on _____ that the Property qualifies as "single asset real estate" as defined in
11 U.S.C. § 101(51B).  More than 90 days have passed since the filing of the petition, more than 30 days have
passed since the court determined that the Property qualifies as single asset real estate; the Debtor has not filed
a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or the
Debtor has not commenced monthly payments to Movant as required by 11 U.S.C. § 362(d)(3).

15. ☐  See attached continuation page for facts establishing that the bankruptcy case was filed in bad faith to delay,
hinder, and or defraud Movant.

16. ☐  The filing of the petition was part of a scheme to delay, hinder, and defraud creditors that involved:

a.  ☐  The transfer of all or part ownership of, or other interest in, the Property without the consent of Movant or
court approval. See attached continuation page for facts establishing the scheme.

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

December 2012                           Page 9                    F 4001-1.RFS.RP.MOTION

b. ☐ Multiple bankruptcy filings affecting the Property. The multiple bankruptcy filings include the following cases:

1. Case name:                    Chapter:
   Case number:                  Date dismissed:              Date discharged:
   Date filed:
   Relief from stay re this Property ☐ was  ☐ was not granted.

2. Case name:                    Chapter:
   Case number:                  Date dismissed:              Date discharged:
   Date filed:
   Relief from stay re this Property ☐ was  ☐ was not granted.

3. Case name:                    Chapter:
   Case number:                  Date dismissed:              Date discharged:
   Date filed:
   Relief from stay re this Property ☐ was  ☐ was not granted.

☐ See attached continuation page for more information about other bankruptcy cases affecting the Property.

☐ See attached continuation page for facts establishing that the multiple bankruptcy cases were part of a scheme to delay, hinder, and defraud creditors.

17. ☐ Movant seeks annulment of the automatic stay so that the filing of the bankruptcy petition does not affect any and all of the enforcement actions set forth in paragraph 8 above that were taken after the filing of the bankruptcy petition in this case.

a. ☐ These actions were taken by Movant without knowledge of the bankruptcy filing, and Movant would have been entitled to relief from stay to proceed with these actions.

b. ☐ Although Movant knew about the bankruptcy filing, Movant had previously obtained relief from stay to proceed with these enforcement actions in prior bankruptcy cases affecting this Property as set forth in Exhibit _____ attached hereto.

c. ☐ For other facts justifying annulment, see attached continuation page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

3/7/14                    Nik Sreekanth                         [signature] 3/7/14
Date                      Printed name                          Signature

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

December 2012                    Page 10                    F 4001-1.RFS.RP.MOTION

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

Roberts & Shapiro, LLP | 6 Venture, Suite 305 | Irvine, CA 92618

A true and correct copy of the foregoing document entitled: **NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (WITH SUPPORTING DECLARATIONS) REGARDING REAL PROPERTY** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (date) 03/10/2014 , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

  Debtors Counsel: Lauren Rode, auren.rode@gmail.com
  David Seror (TR)    kpscion@ebg-law.com, C133@ecfcbis.com
  United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (date) 03/10/2014 , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

  DEBTOR: SAM PALMER, 1682 Amarelle St. Newbury Park, CA 91320
  HONORABLE JUDGE: MAUREEN TIGHE, 21041 Burbank Boulevard, Suite 324, Woodland Hills, CA 91367

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served):**  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (date) _____ , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 03/10/2014 | SYED ALI | /s/ Syed Ali |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

1        **CONTINUATION PAGE (Paragraph 1)**

2        I am employed as a _Assistant Secretary_ by Nationstar Mortgage LLC,

3

4        servicing agent for Deutsche Bank Trust Company Americas as Trustee for Residential Accredit

5        Loans, Inc Pass Through Certificates 2007-QH5 ("Movant").

6            Attached are redacted copies of any documents that support the claim, such as

7        promissory notes, purchase order, invoices, itemized statements of running accounts, contracts,

8        judgments, mortgages, and security agreements in support of right to seek a lift of the automatic

9        stay and foreclose if necessary.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 11A

## 3.10.14 Deutsche Bank Trust Company Americas As Trustee's Motion For Lift of Stay Part 2 pgs1-44

## EXHIBIT "ONE"

PARCEL NO. 1

Lot 334 of Tract No.4366-8, in the City of Thousand Oaks, County of Ventura, State of California, as shown on a Subdivision Map thereof, recorded in Book 126, Pages 45 through inclusive, of Maps, in the Office of the Ventura County Recorder ("Property").

Excepting therefrom, an non-exclusive easements for access, ingress, egress, encroachment, maintenance, repair, drainage, support, and for other purposes, all as described in the Master Declaration and Supplemental Declaration defined below.

Also excepting therefrom, all minerals, oil, gas. petroleum, other hydrocarbon substances, and all underground water in or under or which may be produced from said land which underlies a plane parallel to and 550 feet below the present surface of said land for the purpose of prospecting for, the exploration, development, production. extraction, and taking of said minerals, oil, gas, petroleum, other hydrocarbon substances, and water from said land by means of mines, wells, derricks, or other equipment from surface locations on adjoining or neighboring land or lying outside of the above-described land, it being understood that the owner of such minerals, oil, gas, petroleum, other hydrocarbon substances. and water, as set forth above, shall have no right to enter upon the surface of the above-described land nor to use any of the said land or any portion thereof above said plane parallel to and 550 feet below the present surface of the said land for any purpose whatsoever.

PARCEL NO. 2

Non-exclusive easements for access, ingress, egress, maintenance, repair, drainage. encroachment, support, and for other purposes, all as described in the Master Declaration of Covenants, Conditions and Restrictions and Reservation of Easements for Rancho Conejo Village ("Declaration"), recorded on June 6. 1991, as Instrument No. 91-07183, re-recorded on July 8, 1992, as Instrument No. 92-119811, and amended by the First Amendment thereto recorded on August 10, 1992, as Instrument No. 92-139404; and the Supplemental Declaration of Covenants, Conditions, Restrictions and Reservation of Easements ("Supplemental Declaration ") for Phase 20 of Rancho Conejo Village, recorded on September 05, 1995, as Instrument No. 95-105044, all of which are recorded in Official Records of Ventura County, California.

Assessor's Parcel No: 667-0-253-335

# EXHIBIT 1

# FIDELITY-VAN NUYS

Recording Requested By: Homecomings Financial

Return To:    Homecomings Financial
One Meridian Crossing, Ste. 100
Minneapolis   MN   55423
Loan Number: 047-337322-3

20070411-00074780-0   1/25
Ventura County Clerk and Recorder
Philip J. Schmit
04/11/2007 00:00:00 AM
73580 $81.00 PR

Prepared By:   Homecomings Financial
4350 Von Karman Avenue, Suite 100
Newport Beach, CA 92660

———————————[Space Above This Line For Recording Data]———————————

## DEED OF TRUST

MIN

**DEFINITIONS**
Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   MARCH 30TH, 2007
together with all Riders to this document.
(B) "Borrower" is

SAM PALMER, AN UNMARRIED WOMAN

Borrower's address is   1682 AMARELLE STREET, THOUSAND OAKS, CA 91320
. Borrower is the trustor under this Security Instrument.
(C) "Lender" is HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL
NETWORK, INC.)
Lender is a  LIMITED LIABILITY COMPANY
organized and existing under the laws of  DELAWARE

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3005 1/01
MFCA7770 (09/2005) / 047-337322-3
-6A(CA) (0207).01
Page 1 of 16        Initials:
VMP Mortgage Forms, Inc.

Lender's address is 4350 VON KARMAN AVENUE, #100
NEWPORT BEACH, CA 92660
(D) "Trustee" is FIDELITY NATIONAL TITLE

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated MARCH 30TH, 2007
The Note states that Borrower owes Lender EIGHT HUNDRED SIXTY TWO THOUSAND FIVE HUNDRED AND NO/100                                                                                      Dollars
(U.S. $ 862,500.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than        MAY 1ST, 2037
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☒ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

VMP-6A(CA) (0207).01                          Page 2 of 15        Initials: ___        Form 3005  1/01
MFCA7770 (09/2006) / 047-337322-3

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor In Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY                                                of    VENTURA                                                 :
        [Type of Recording Jurisdiction]                                    [Name of Recording Jurisdiction]
Legal description attached hereto and made a part hereof

Parcel ID Number:    667-0-253-335                            which currently has the address of
1682 AMARELLE STREET                                                                            [Street]
THOUSAND OAKS                                        [City], California  91320            [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

-6A(CA) (0207).01                                        Page 3 of 15            Initials: [signature]            Form 3005  1/01
MFCA7770 (09/2006) / 047-337322-3

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

-6A(CA) (0207).01
MFCA7770 (09/2006) / 047-337322-3

Page 4 of 16

Initials: _____

Form 3005   1/01

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

-6A(CA) (0207).01
MFCA7770 (09/2006) / 047-337322-3

Page 8 of 15

Initials:

Form 3005    1/01

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Initials: _____

-6A(CA) (0207).01
MFCA7770 (09/2006) / 047-337322-3

Page 6 of 15

Form 3005    1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

Initials: _____

Description: Ventura,CA Document-Year.DocID 2007.74780 Page: 8 of 25
Order: ventura Comment:

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

-6A(CA) (0207).01
MFCA7770 (09/2006) / 047-337322-3
Page 6 of 16        Initials: ____        Form 3005  1/01

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify a mortization of the sums secured by this Security Instrument by reason of any demand made by the original borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

-6A(CA) (0207).01
MPCA7770 (09/2006) / 047-337322-3

Page 10 of 18

Initials: 

Form 3006   1/01

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

-6A(CA) (0207).01
MFCA7770 (09/2006) / 047-337322-3

Page 12 of 15

Initials:

Form 3005    1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

Initials: _____

-6A(CA) (0207).01    Page 13 of 15    Form 3005  1/01
MFCA7770 (09/2006) / 047-337322-3

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____                    _____ (Seal)
                                                                                    -Borrower

                                                  SAM  PALMER


_____                    _____ (Seal)
                                                                                    -Borrower


_____ (Seal)                  _____ (Seal)
                        -Borrower                                                   -Borrower


_____ (Seal)                  _____ (Seal)
                        -Borrower                                                   -Borrower


_____ (Seal)                  _____ (Seal)
                        -Borrower                                                   -Borrower


-6A(CA) (0207).01                        Page 14 of 15                    Form 3005  1/01
MFCA7770 (09/2006)  /  047-337322-3

Description: Ventura,CA Document-Year.DocID 2007.74780 Page: 15 of 25
Order: ventura Comment:

State of California
County of VENTURA                                      } ss.

On   2 APRIL 2007   before me, N. DUFRENE, NOTARY PUBLIC
                                                    personally appeared

      SAM   PALMER


                                                    , personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

                                          _____(Seal)

```
+--------------------------------------+
|        N. DUFRENE                    |
|    Commission # 1450182              |
|   Notary Public - California         |
|       Ventura County                 |
|  My Comm. Expires Nov 9, 2007        |
+--------------------------------------+
```

                                          Initials: _____

-8A(CA) (02071.01                Page 16 of 16              Form 3005  1/01
MPCA7770 (09/2006) / 047-337322-3

# ADJUSTABLE RATE RIDER
### 5 Year Fixed Rate Payment Option

THIS ADJUSTABLE RATE RIDER is made this   30TH  day of   MARCH, 2007
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)

("Lender") of the same date and covering the property described in the Security Instrument
and located at:

> 1682 AMARELLE STREET
> THOUSAND OAKS, CA 91320
> [Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST
RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE
AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE.
THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE
AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT
STATED IN THE NOTE.**

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

Lender or anyone who takes the Note by transfer and who is entitled to receive payments
under the Note is called the "Note Holder."

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

**2. INTEREST**
   **(A) Interest Rate**
   Interest will be charged on unpaid Principal until the full amount of Principal has been
paid. I will initially pay interest at a yearly rate of    7.8750       %. The interest rate I
will pay may change.
   The interest rate required by this Section 2 is the rate I will pay both before and after any
default described in Section 7(B) of the Note.
   **(B) Interest Rate Change Dates**
   The interest rate I will pay may change on the first day of  MAY, 2012
and on that day every month thereafter. Each date on which my interest rate could change is

**5 YEAR PAYMENT OPTION MULTISTATE ADJUSTABLE RATE RIDER 05/06**
Page 1 of 6
Initials: _____

7754167 (0402).01              VMP Mortgage Solutions, Inc.
MFOD8290 (10/2006) / 047-337322-3

called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. Although the interest rate may change monthly, my monthly payment will be recalculated in accordance with Section 3.

(C) Interest Rate Limit

My interest rate will never be greater than       9.9500       %.

(D) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(E) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding   TWO AND ONE FOURTH
percentage point(s) (    2.2500        %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date.

## 3. PAYMENTS

(A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the first day of each month beginning on JUNE 1ST, 2007        . Each of these dates is called a "Payment Due Date." I will make these payments every month until I have paid all the Principal and interest and any other charges that I may owe under the Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on MAY 1ST, 2037
, I still owe amounts under the Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  4350 VON KARMAN AVENUE, #100, NEWPORT BEACH, CA 92660
or at a different place if required by the Note Holder.

(B) Minimum Payment; Amount of My Initial Monthly Payments

My "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment, which the Note Holder will determine in accordance with this Section 3(B), or Section 3(D), 3(F) or 3(G), below, as applicable.

Each of my initial Minimum Payments will be in the amount of U.S. $   3,407.92        , until a new Minimum Payment is required as provided below. If my Minimum Payment is not sufficient to cover the interest due under the Note, the difference will be added to my Principal amount as provided in Section 3(E) below. My initial Minimum Payment may not be sufficient to cover the interest due.

Initials: _____

7754167 (0402).01                              Page 2 of 6
MFC06290 (10/2006) / 047-337322-3

**(C) Payment Change Dates**

My Minimum Payment may change as required by Section 3(D) below beginning on the first day of JUNE, 2012       , and on that day every 12th month thereafter through my 109th Payment Due Date. Beginning with my 121st Payment Due Date, my Minimum Payment may change monthly thereafter. Each of these dates is called a "Payment Change Date." My Minimum Payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay at least the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." For the Payment Change Dates occurring on the 61st, 73rd, 85th, 97th, and 109th Payment Due Dates, the Note Holder also will multiply the amount of my last Minimum Payment due before the Payment Change Date by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) below requires me to pay a different amount, the amount of my new Minimum Payment that will be effective on each of the 61st, 73rd, 85th, 97th, and 109th Payment Change Dates will be the lesser of the Full Payment or the Limited Payment. The amount of my new Minimum Payment that will be effective on each of the Payment Change Dates beginning with the 121st Payment Due Date and continuing monthly thereafter will be the Full Payment, as provided in Section 3(G) below.

The Minimum Payment applies only to the Principal and interest payment and does not apply to any escrow payments the Note Holder may require under the Security Instrument.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above. For each month that my monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

Initials: ____

**7764167 (0402).01**
MFCD6290 (10/2006) / 047-337322-3

Page 3 of 6

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal may never exceed a maximum amount equal to 115% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid Principal under Section 3(E) above could cause my unpaid Principal to exceed that maximum amount. In that event and unless Section 3(G) requires me to pay a different amount, on the Payment Due Date that my paying my monthly payment would cause me to exceed that limit and continuing each monthly Payment Due Date thereafter through the 120th Payment Due Date, I will instead pay a new monthly payment in an amount not less than the amount that would pay the interest portion of the monthly payment at the interest rate effective during the month preceding the applicable Payment Due Date. This amount will be my new Minimum Payment. This means that my Minimum Payment may change monthly. This method of calculating my new Minimum Payment amount will remain in effect until the 121st Payment Due Date.

**(G) Required Full Payment**

Beginning on the Payment Change Date that occurs on the 121st Payment Due Date and continuing monthly thereafter, I will pay the Full Payment as my Minimum Payment until my monthly payment changes again.

**(H) Payment Options**

Each month the Note Holder may provide me with up to three additional payment options (in addition to the Minimum Payment) that are equal to or greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

   (i)   Interest Only Payment: the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option. This payment option will not be available beginning with the 121st Payment Due Date.

   (ii)  Fully Amortized Payment: the amount necessary to pay the loan off (including all Principal and interest) on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month. This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change in accordance with Section 2(B) above.

   (iii) 15 Year Amortized Payment: the amount necessary to pay the loan off (including all Principal and interest) within a fifteen (15) year period from the first payment due date in substantially equal installments at the interest rate effective during the preceding month. This Payment Option is calculated on the assumption that the current rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change in accordance with Section 2(B) above.

Payment Options will only be available if they are equal to or greater than the Minimum Payment.

**(I) Failure to Make Adjustments**

If for any reason the Note Holder fails to make an adjustment to the interest rate or payment amount as described herein, regardless of any notice requirement, I agree the Note

Initials: _____

**7754167 (0402).01**
MFCD8290 (10/2008) / 047-337322-3

Page 4 of 6

Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold the Note Holder responsible for any damages to me that may result from the Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies that I may have paid to partial Prepayment of unpaid Principal.

## 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Initials: _____

7754167 (0402).01
MFCD8280 (10/2006) / 047-337322-3

Page 5 of 6

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
                    -Borrower                            -Borrower
SAM PALMER

_____ (Seal)          _____ (Seal)
                    -Borrower                            -Borrower

_____ (Seal)          _____ (Seal)
                    -Borrower                            -Borrower

_____ (Seal)          _____ (Seal)
                    -Borrower                            -Borrower

7764167 (0402).01                   Page 6 of 6
MFCD6280 (10/2006) / 047-337322-3

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 30TH                day of
MARCH,                                  2007, and is incorporated into and shall be
deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the
"Security Instrument") of the same date, given by the undersigned (the "Borrower") to
secure Borrower's Note to
HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)

(the "Lender") of the same date and covering the Property described in the Security
Instrument and located at:
1682 AMARELLE STREET
THOUSAND OAKS, CA 91320

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling,
together with other such parcels and certain common areas and facilities, as described in
COVENANTS, CONDITIONS, AND RESTRICTIONS

(the "Declaration"). The Property is a part of a planned unit development known as
RANCHO CONEJO

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or
equivalent entity owning or managing the common areas and facilities of the PUD (the
"Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's
Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of
incorporation, trust instrument or any equivalent document which creates the Owners
Association; and (iii) any by-laws or other rules or regulations of the Owners Association.
Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the
Constituent Documents.

MULTISTATE PUD RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01    MFCD6065 [08/2006] / 047-337322-3
Wolters Kluwer Financial Services         Page 1 of 3              Initials: _____
VMP®-7R (0411).01

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Initials: _____

VMP®-7R (0411).01
MFCD8058 (08/2006) / 047-337322-3

Page 2 of 3

Form 3150 1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)          _____ (Seal)
                         -Borrower                                 -Borrower
SAM PALMER


_____ (Seal)          _____ (Seal)
                         -Borrower                                 -Borrower


_____ (Seal)          _____ (Seal)
                         -Borrower                                 -Borrower


_____ (Seal)          _____ (Seal)
                         -Borrower                                 -Borrower


**VMP®-7R (0411).01**
MFCD8065 (06/2006) / 047-337322-3

Page 3 of 3

Form 3150 1/01

# EXHIBIT  2

# ADJUSTABLE RATE NOTE
## 5 Year Fixed Rate Payment Option

THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.

| MARCH 30TH, 2007 | SIMI VALLEY | CALIFORNIA |
|---|---|---|
| [Date] | [City] | [State] |

1682 AMARELLE STREET, THOUSAND OAKS, CA 91320
[Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $  862,500.00                          (this amount, including any increase to this amount under the terms of this Note, is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided in this Note, but can never exceed the maximum amount specified in Section 3(F) of this Note. Lender is HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.)

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

#### (A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will initially pay interest at a yearly rate of   7.8750          %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

#### (B) Interest Rate Change Dates

The interest rate I will pay may change on the first day of   MAY, 2012            , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. Although the interest rate may change monthly, my monthly payment will be recalculated in accordance with Section 3.

#### (C) Interest Rate Limit

My interest rate will never be greater than      9.9500       %.

Initials: 

### (D) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (E) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding
TWO AND ONE FOURTH                                                                                    percentage point(s)
(    2.2500         %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the first day of each month beginning on   JUNE 1ST, 2007                          .
Each of these dates is called a "Payment Due Date." I will make these payments every month until I have paid all the Principal and interest and any other charges that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  MAY 1ST, 2037                  , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  4350 VON KARMAN AVENUE, #100, NEWPORT BEACH, CA
92660                                        or at a different place if required by the Note Holder.

### (B) Minimum Payment; Amount of My Initial Monthly Payments

My "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment, which the Note Holder will determine in accordance with this Section 3(B), or Section 3(D), 3(F) or 3(G), below, as applicable.

Each of my initial Minimum Payments will be in the amount of U.S. $   3,407.92                              ,
until a new Minimum Payment is required as provided below. If my Minimum Payment is not sufficient to cover the interest due under this Note, the difference will be added to my Principal amount as provided in Section 3(E) below. My initial Minimum Payment may not be sufficient to cover the interest due.

### (C) Payment Change Dates

My Minimum Payment may change as required by Section 3(D) below beginning on the first day of
JUNE, 2012              , and on that day every 12th month thereafter through my 109th Payment Due Date. Beginning with my 121st Payment Due Date, my Minimum Payment may change monthly thereafter. Each of these dates is called a "Payment Change Date." My Minimum Payment also will change at any time Section 3(F) below requires me to pay a different amount.

I will pay at least the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

### (D) Calculation of Monthly Payment Changes

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." For the Payment Change Dates occurring on the 61st, 73rd, 85th, 97th, and 109th Payment Due Dates, the Note Holder also will multiply the amount of my last Minimum Payment due before the Payment Change Date by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) below requires me to pay a different amount, the amount of my new Minimum Payment that will be effective on each of the 61st, 73rd, 85th, 97th, and 109th Payment Change Dates will be the lesser of the Full Payment or the Limited Payment. The amount of my new Minimum Payment that will be effective on each of the Payment Change Dates beginning with the 121st Payment Due Date and continuing monthly thereafter will be the Full Payment, as provided in Section 3(G) below.

The Minimum Payment applies only to the Principal and interest payment and does not apply to any escrow payments the Note Holder may require under the Security Instrument (as defined in Section 11 of this Note, below).

### (E) Additions to My Unpaid Principal

My monthly payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above. For each month that my monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

### (F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed a maximum amount equal to 115% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid Principal under Section 3(E) above could cause my unpaid Principal to exceed that maximum amount. In that event and unless Section 3(G) requires me to pay a different amount, on the Payment Due Date that my paying my monthly payment would cause me to exceed that limit and continuing each monthly Payment Due Date thereafter through the 120th Payment Due Date, I will instead pay a new monthly payment in an amount not less than the amount that would pay the interest portion of the monthly payment at the interest rate effective during the month preceding the applicable Payment Due Date. This amount will be my new Minimum Payment. This means that my Minimum Payment may change monthly. This method of calculating my new Minimum Payment amount will remain in effect until the 121st Payment Due Date.

### (G) Required Full Payment

Beginning on the Payment Change Date that occurs on the 121st Payment Due Date and continuing monthly thereafter, I will pay the Full Payment as my Minimum Payment until my payment changes again.

### (H) Payment Options

Each month the Note Holder may provide me with up to three additional payment options (in addition to the Minimum Payment) that are equal to or greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)    Interest Only Payment: the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option. This payment option will not be available beginning with the 121st Payment Due Date.

(ii) **Fully Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month. This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change in accordance with Section 2(B) above.

(iii) **15 Year Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) within a fifteen (15) year period from the first payment due date in substantially equal installments at the interest rate effective during the preceding month. This Payment Option is calculated on the assumption that the current rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change in accordance with Section 2(B) above.

<u>Payment Options will only be available if they are equal to or greater than the Minimum Payment.</u>

**(I) Failure to Make Adjustments**

If for any reason the Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree the Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold the Note Holder responsible for any damages to me that may result from the Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies that I may have paid to partial Prepayment of unpaid Principal.

**4. NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received at least the full amount of any Minimum Payment by the end of    15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.0000    % of my overdue Minimum Payment. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay at least the full amount of each Minimum Payment on the date it is due, I will be in default.

#### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

#### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

#### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

### 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

### 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

### 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

### 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)             _____ (Seal)
                        -Borrower                                   -Borrower
SAM PALMER

_____ (Seal)             _____ (Seal)
                        -Borrower                                   -Borrower

_____ (Seal)             _____ (Seal)
                        -Borrower                                   -Borrower

Without Recourse
Pay to the Order of
RESIDENTIAL FUNDING COMPANY, LLC

Dorothy Okech
Assistant Secretary          _____ (Seal)    _____ (Seal)
Homecomings Financial, LLC              -Borrower                           -Borrower
A Delaware Corporation

PAY TO THE ORDER OF                                     [Sign Original Only]
Deutsche Bank Trust Company Americas as Trustee
        WITHOUT RECOURSE                                Pay to the Order of
Residential Funding Company, LLC
                                                        Without Recourse:
BY Judy Faber                                           Aurora Loan Services LLC By Nationstar
   Judy Faber, Vice President                           Mortgage LLC Its Attorney-In-Fact

                                                        By: _____
                                                            Assistant Secretary
                                                            Shannon Sierra

## NOTE ALLONGE

For purposes of further endorsement of the following described
Note, this Allonge is affixed and becomes a permanent part of
said Note:

Loan #: ▮▮▮▮▮▮▮▮

Executing Mortgagor: SAM PALMER

Original Mortgage Amount: $862,500.00

Original Lender: HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS
FINANCIAL NETWORK, INC.)

Loan Date: MARCH 30TH, 2007

Property Address: 1682 AMARELLE STREET, THOUSAND OAKS, CA 91320

Without recourse pay to the order of: Aurora Loan Services LLC

By: *Nancy L. Walker*
Name: Nancy L. Walker
Title: Assistant Vice President
Date: March 25, 2011
Company: Deutsche Bank Trust Company Americas as Trustee by
Aurora Loan Services LLC, it's Attorney-in-Fact

# EXHIBIT  3

RECORDING REQUESTED BY
FIRST AMERICAN TITLE INSURANCE COMPANY

Recording Requested By:
AURORA LOAN SERVICES

When Recorded Return To:

Deborah Backus
AURORA LOAN SERVICES
P.O. Box 1706
Scottsbluff, NE 69363-1706

CA. 08 - 324178 - CL

FC  3945765  CORPORATE ASSIGNMENT OF DEED OF TRUST

Ventura, California
SELLER'S SERVICING #: 
OLD SERVICING #: 

MERS #:                   VRU #: 1-888-679-6377

CERTIFIED BY FIRST AMERICAN TITLE
INSURANCE COMPANY TO BE A COPY
OF THE DOCUMENT RECORDED ON 09/07/2010
AS INSTRUMENT NO. 20100907-00133564-0
IN BOOK          PAGE
OFFICIAL RECORDS OF VENTURA

Prepared By:  Deborah Backus,  AURORA LOAN SERVICES 2617 COLLEGE PARK, PO BOX 1706, SCOTTSBLUFF, NE
69363-1706 308-635-3500

For Value Received, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. hereby grants, assigns and
tranfers to AURORA LOAN SERVICES at 2617 COLLEGE PARK, PO BOX 1706, SCOTTSBLUFF, NE 69361
all beneficial interest under that certain Deed of Trust dated 03/30/2007 , in the amount of $862,500.00, executed by
SAM PALMER, AN UNMARRIED WOMAN to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS
NOMINEE FOR HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.) and
Recorded: 04/11/2007  as Instrument No.: 20070411-00074780-0 in Ventura,  California

Together with the note or notes therein described or referred to, in said Deed of Trust, the money due and to
become due thereon with interest, and all rights accrued or to accrue under said Deed of Trust.

In witness whereof this instrument is executed.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
On December 19th, 2008

JANETTE CHAPPEL, Vice-President

"DB"DBALSI"12/19/2008 02:52:08 PM" AL            26" CAVENTU" 0021922075 CASTATE_TRUST_ASSIGN_ASSN "?DBALSI"

CORPORATE ASSIGNMENT OF DEED OF TRUST Page 2 of 2

STATE OF Nebraska
COUNTY OF Scotts Bluff

On December 19th, 2008 before me,  MICHELE KLEIN, Notary Public, personally appeared JANETTE CHAPPEL ,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which
the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Nebraska that the foregoing paragraph is true
and correct.

WITNESS my hand and official seal,

MICHELE KLEIN
Notary Expires: 02/14/2009

> GENERAL NOTARY - State of Nebraska
> MICHELE KLEIN
> My Comm. Exp. Feb. 14, 2009

(This area for notarial seal)

*DB*DBALSI*12/19/2008 02:52:08 PM* ALSI0     CAVENTU* 0021922075 CASTATE_TRUST_ASSIGN_ASSN **DBALSI*

CERTIFIED BY FIRST AMERICAN TITLE
INSURANCE COMPANY TO BE A COPY
OF THE DOCUMENT RECORDED ON 09/04/2012
AS INSTRUMENT NO. 20120904-00155613-0
IN BOOK            PAGE
OFFICIAL RECORDS OF VENTURA

After Recordation Return To:

Doc Administration
350 Highland Drive
Lewisville, TX 75067

TYPE OF DOCUMENT:    Assignment of Deed of Trust

| | |
|---|---|
| T.S. No.: | CA-08-224178-CL |
| Order No.: | 3945765 |
| Borrower(s) | SAM PALMER |
| Beneficiary: | NATIONSTAR MORTGAGE, LLC |

Recording Requested By:

When Recorded Return To:

---

## CORPORATE ASSIGNMENT OF DEED OF TRUST

Ventura, California
REF #:0021922075 "PALMER"
INVESTOR'S LOAN #: 0015466035

Prepared By: Shee Brost, AURORA BANK FSB 2617 COLLEGE PARK, PO BOX 1706, SCOTTSBLUFF, NE 69363-1706
720-945-4308

For Value Received, AURORA LOAN SERVICES LLC hereby, assigns and transfers to NATIONSTAR MORTGAGE,
LLC at 350 HIGHLAND DRIVE, LEWISVILLE, TX 95067 all beneficial interest under that certain Deed of Trust
dated 03/30/2007 , executed by SAM PALMER to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS
NOMINEE FOR HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.) and
Recorded: 04/11/2007 as Instrument No.: 20070411-074780 in the County of Ventura, State of California.

In witness whereof this instrument is executed.

AURORA LOAN SERVICES LLC
On June 29th. 2012          Effective Date: 07/01/2012

CASSANDRA LEET, Vice-President

STATE OF Nebraska
COUNTY OF Scotts Bluff

On June 29th, 2012, before me, ROBERTA A. RUMMEL, a Notary Public in and for Scotts Bluff in the State of
Nebraska, personally appeared CASSANDRA LEET, Vice-President, personally known to me (or proved to me on
the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by
his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal,

ROBERTA A. RUMMEL
Notary Expires: 09/18/2014

> GENERAL NOTARY - State of Nebraska
> ROBERTA A. RUMMEL
> My Comm. Exp. Sept. 18, 2014

(This area for notarial seal)

*BKH*BKHALSI*06/29/2012 08:35:00 AM* ALSI01ALSIA000000000000000938706* CAVENTU* 0021922075 CASTATE_ALSI_TRUST_ASSIGN_ASSN **SBALSI*

CERTIFIED BY FIRST AMERICAN TITLE
INSURANCE COMPANY TO BE A COPY
OF THE DOCUMENT RECORDED ON 02/04/2014
AS INSTRUMENT NO. 20140204-00013471-0
IN BOOK                    PAGE
OFFICIAL RECORDS OF VENTURA

Recording Requested By:
Nationstar Mortgage

When Recorded Return To:

DOCUMENT ADMINISTRATION
Nationstar Mortgage
2617 COLLEGE PARK
SCOTTSBLUFF, NE 69361

## CORPORATE ASSIGNMENT OF DEED OF TRUST

Ventura, California
SELLER'S SERVICING #:            "PALMER"

Prepared By: Linda Parks, Nationstar Mortgage 2617 COLLEGE PARK, SCOTTSBLUFF, NE 69361 1-888-480-2432

For Value Received, NATIONSTAR MORTGAGE LLC hereby grants, assigns and transfers to DEUTSCHE BANK TRUST COMPANY AMERICAS AS TRUSTEE FOR RESIDENTIAL ACCREDIT LOANS, INC PASS THROUGH CERTIFICATES 2007-QH5 at 1761 E ST ANDREW PLACE, SANTA ANA, CA 92705-4934 all its interest under that certain Deed of Trust dated 03/30/2007 , in the amount of $662,500.00, executed by SAM PALMER, AN UNMARRIED WOMAN to MORTGAGE ELECTRONIC REGISTRATION SYTEMS, INC. AS NOMINEE FOR HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.) and Recorded: 04/11/2007 as Instrument No.: 20070411-00074780-0 in the County of Ventura, State of California.

In witness whereof this instrument is executed.

NATIONSTAR MORTGAGE LLC
On   1-27-2014

_Susan Lindhorst_
Susan Lindhorst          , Assistant

Secretary

STATE OF Nebraska
COUNTY OF Scotts Bluff

On 1-27-2014 , before me, LINDA D. PARKS, a Notary Public in and for Scotts Bluff in the State of Nebraska, personally appeared_____ Susan Lindhorst _____, Assistant Secretary, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

_Linda D. Parks_
LINDA D. PARKS
Notary Expires: 11/14/2015

> GENERAL NOTARY - State of Nebraska
> LINDA D PARKS
> My Comm. Exp. Nov. 14, 2015

(This area for notarial seal)

*JKA*JKANATN*01/27/2014 07:52:42 AM* NATT01#          CAVENTU* 0599443769 CASTATE_TRUST_ASSIGN_ASSN **LPNATN*

# EXHIBIT  4

B6A (Official Form 6A) (12/07)

In re   **Sam Palmer**                                                      Case No. _____
                                            _____,
                                                    Debtor

## SCHEDULE A - REAL PROPERTY

Except as directed below, list all real property in which the debtor has any legal, equitable, or future interest, including all property owned as a cotenant, community property, or in which the debtor has a life estate. Include any property in which the debtor holds rights and powers exercisable for the debtor's own benefit. If the debtor is married, state whether husband, wife, both, or the marital community own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor holds no interest in real property, write "None" under "Description and Location of Property."

Do not include interests in executory contracts and unexpired leases on this schedule. List them in Schedule G - Executory Contracts and Unexpired Leases.

If an entity claims to have a lien or hold a secured interest in any property, state the amount of the secured claim. See Schedule D. If no entity claims to hold a secured interest in the property, write "None" in the column labeled "Amount of Secured Claim." If the debtor is an individual or if a joint petition is filed, state the amount of any exemption claimed in the property only in Schedule C - Property Claimed as Exempt.

| Description and Location of Property | Nature of Debtor's Interest in Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption | Amount of Secured Claim |
|---|---|:---:|---:|---:|
| Rental Property: 2415 C St., Sacramento, CA 95816 | Fee Simple | - | 340,000.00 | 328,328.00 |
| FMV determined by Zillow.com | | | | |
| Primary Residence: 1682 Amarelle St., Newbury Park, CA 91320 | Fee Simple | - | 811,899.00 | 944,942.00 |
| FMV determined by Zillow.com | | | | |

|  |  |  |
|---|---|---|
| Sub-Total > | 1,151,899.00 | (Total of this page) |
| Total > | 1,151,899.00 | |

  **0**   continuation sheets attached to the Schedule of Real Property

(Report also on Summary of Schedules)

B6D (Official Form 6D) (12/07)

In re   **Sam Palmer** _____    Case No. _____

<div align="center">Debtor(s)</div>

<h2 align="center">SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS</h2>

State the name, mailing address, including zip code, and last four digits of any account number of all entities holding claims secured by property of the debtor as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and other security interests.

List creditors in alphabetical order to the extent practicable. If a minor child is the creditor, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed R. Bankr. P. 1007(m). If all secured creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns).

Total the columns labeled "Amount of Claim Without Deducting Value of Collateral" and "Unsecured Portion, if Any" in the boxes labeled "Total(s)" on the last sheet of the completed schedule. Report the total from the column labeled "Amount of Claim Without Deducting Value of Collateral" also on the Summary of Schedules and, if the debtor is an individual with primarily consumer debts, report the total from the column labeled "Unsecured Portion, if Any" on the Statistical Summary of Certain Liabilities and Related Data.

☐ Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE AND AN ACCOUNT NUMBER (See Instructions Above) | C O D E B T O R | Husband, Wife, Joint or Community | | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|---|
| | | H | W J C | | | | | | |
| ACCOUNT NO        257<br><br>**Bank Of America**<br>**P.O. Box 982236**<br>**El Paso, TX 79998** | | N A | | **Opened 10/01/08  Last Active 8/16/13**<br><br>**Automobile**<br><br>VALUE                $0.00 | | | | **$4,693.00** | **Unknown** |
| ACCOUNT N        610<br><br>**Chase**<br>**Po Box 24696**<br>**Columbus, OH 43224** | | N A | | **Opened 10/01/04  Last Active 8/08/13**<br><br>**First Mortgage**<br><br>**Rental Property:  2415 C St., Sacramento, CA 95816**<br><br>**FMV determined by Zillow.com**<br><br>VALUE           $340,000.00 | | | | **$328,328.00** | **$0.00** |

Sheet 1 of 2 total sheets in Schedule of Creditors Holding Secured Claims

Software Copyright (c) 1996-2013 Best Case, LLC - www.bestcase.com

Best Case Bankruptcy

B6D (Official Form 6D) (12/07) - Cont.
In re  **Sam Palmer**

Debtor(s)

Case No. _____

## SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS
(Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE AND AN ACCOUNT NUMBER (See Instructions Above) | CODEBTOR | HWJC | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|
| ACCOUNT NO. 3769<br><br>Nationstar Mortgage LLC<br>Attn: Bankruptcy<br>350 Highland Dr<br>Lewisville, TX 75067 | | N A | Opened 3/01/07  Last Active 2/10/11<br><br>**First Mortgage**<br><br>**Primary Residence: 1682 Amarelle St., Newbury Park, CA 91320**<br><br>FMV determined by Zillow.com<br><br>*Debtor believes this to be unsecured given the current pending lawsuit over whether a valid secured claim is held by the lender. | | | | $944,942.00 | $133,043.00 |
| | | | VALUE    $811,899.00 | | | | | |
| | | | Total(s)<br>(Use only on last page) | | | | $1,277,963.00 | $133,043.00 |

(Report also on Summary of Schedules)    If applicable, report also on Statistical Summary of Certain Liabilities and Related Data)

Sheet 2 of 2 total sheets in Schedule of Creditors Holding Secured Claims

**EXHIBIT 12**

**10.15.14 EMAIL NOTICE OF PROPOSED CLASS
ACTION SETTLEMENT FOR AURORA LOAN
SERVICES LLC VICTIMS**

**sam palmer**

| | |
|---|---|
| **From:** | "Gilardi & Co. LLC" <donotreply@auroraworkoutagreementsettlement.com> |
| **To:** | <kensington.taylor@verizon.net> |
| **Sent:** | Wednesday, October 15, 2014 6:50 PM |
| **Subject:** | Notice of Class Action Settlement - Chao v. Aurora Loan Services, LLC |

AUCH1-100105106

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| MAUDER and ALICE CHAO; DEOGENESO and GLORINA PALUGOD, and MARITZA PINEL, individually and on behalf of all others similarly situated,<br><br><div align="center">Plaintiffs,</div><br>v.<br><br>AURORA LOAN SERVICES, LLC,<br><div align="center">Defendant.</div> | No. 10-cv-03118-SBA<br>**NOTICE OF CLASS ACTION SETTLEMENT** |

<div align="center">

**THIS IS A NOTICE OF A PROPOSED CLASS ACTION SETTLEMENT.**
**PLEASE READ THIS NOTICE CAREFULLY. YOUR RIGHTS MAY BE AFFECTED.**
<u>**YOU MAY BE ENTITLED TO MONEY FROM THIS SETTLEMENT**</u>

</div>

This is an important notice from the United States District Court for the Northern District of California regarding a proposed class action settlement and upcoming hearing in the above-referenced class action lawsuit that may affect your rights. This notice is being sent to you because you have been identified as a potential class member in this lawsuit.

## I.    BACKGROUND AND SUMMARY OF LITIGATION

This class action lawsuit alleges that Defendant Aurora Loan Services LLC ("Aurora") violated the legal rights of its customers in the following ways: (a) by sending defaulted California customers a Special Forbearance Agreement, also called a Workout Agreement or Foreclosure Avoidance Agreement ("SFA"), that was deceptive under the Rosenthal Unfair Debt Collection Practices Act; (b) by collecting the required payments under SFAs, but not offering customers a bona fide opportunity to cure the arrearages on their loans; and (c) by collecting additional payments after the completion of the term of the SFA, but not offering customers a bona fide opportunity to cure the arrearages on their loans. Aurora denies that it has done anything unlawful, but has agreed to enter into a settlement agreement to resolve these allegations.

The Court has certified the following classes for settlement purposes:

**The Rosenthal Act Settlement Class**

All California residential mortgage customers, to whom Aurora sent the "Workout Agreement," later called the "Foreclosure Alternative Agreement," or substantially identical correspondence on or after June 8, 2009.
**The Restitution Settlement Class**

All California residential mortgage customers to whom Aurora sent the "Workout Agreement," later called the "Foreclosure Alternative Agreement," or substantively identical correspondence on or after June 8, 2006, who made the trial payments required by their final Workout Agreement, did not thereafter enter into a repayment plan or HAMP trial payment plan, were not thereafter offered a loan modification by Aurora, and were thereafter foreclosed upon.

The Restitution Settlement Class contains the "**Excess Payment Subclass**" who made additional payments to Aurora after the term of their SFA expired.

## II.    SUMMARY OF THE PROPOSED SETTLEMENT TERMS

The Court certified the Settlement Class and preliminarily approved the settlement on September 5, 2014. The Settlement Agreement provides for the following relief:

### Monetary Relief to Settlement Class Members and Distribution Formula

Pursuant to the Settlement Agreement, Aurora has agreed to establish a non-reversionary Gross Settlement Fund of Five Million, Two Hundred Fifty Thousand Dollars ($5,250,000.00). This Fund will be used to provide monetary relief to all Settlement Class Members who do not timely opt out of the Settlement ("Eligible Class Members"). The following amounts will be deducted from the Gross

Settlement Fund: any amounts app    ed by the Court    192 of 196 wards for the    med Plaintiffs for their efforts in bringing and prosecuting this case (not to exceed $7,500 each); (b) attorneys' fees and costs to Class Counsel (not to exceed thirty percent of the Gross Settlement Fund and Class Counsel's actual expenses); and (c) the costs of the Claims Administrator. The Court has not yet decided whether to award some or all of these amounts, but to the extent that any amounts are awarded, they will be deducted from the Gross Settlement Fund and the remainder will constitute the Net Settlement Fund.

The Net Settlement Fund shall be distributed by check to Eligible Class Members in proportion to each Eligible Class Member's "Settlement Damages" as calculated by Class Counsel based upon the Class Data produced by Aurora and supplemented, if needed, by Eligible Class Members pursuant to this Notice. The Settlement Damages for Settlement Class Members is the sum of: (a) their Rosenthal Act Settlement Damages; and (b) their Restitution Settlement Damages.

The Net Settlement Fund shall be distributed to Eligible Class Members as follows:

a. The Net Settlement Fund shall be divided into the "Rosenthal Act Net Settlement Fund" and the "Restitution Net Settlement Fund."

b. Rosenthal Act class-wide damages are capped by California law at $500,000. As a result, the Rosenthal Act Net Settlement Fund shall be $500,000 multiplied by the ratio of the Net Settlement Fund to the Gross Settlement Fund. By way of example only, if the Net Settlement Fund is $3,600,000, then the Rosenthal Act Net Settlement Fund would be $500,000 * ($3,600,000/$5,250,000) = $342,857.

c. The Restitution Net Settlement Fund shall be the Net Settlement Fund less the Rosenthal Act Net Settlement Fund. By way of example only, and carrying forward the assumptions immediately above, if the Net Settlement Fund is $3,600,000 and the Rosenthal Act Net Settlement fund is $342,857, then the Restitution Net Settlement Fund would be $3,600,000-$342,857 = $3,257,143.

d. "Rosenthal Act Settlement Damages" for Eligible Rosenthal Act Settlement Class Members shall be an equal share of the Rosenthal Act Net Settlement Fund. By way of example only, if the Rosenthal Act Net Settlement Fund is $342,857 and there are 12,000 Eligible Rosenthal Act Settlement Class Members, then Rosenthal Act Settlement Damages shall be $342,857 / 12,000 = $28.57.

e. "Restitution Settlement Damages" for Eligible Restitution Settlement Class Members shall be based *pro rata* upon each Eligible Restitution Settlement Class Members' payments to Aurora under their Workout Agreement, and (for Excess Payment Subclass Members) following the term of their Workout Agreement. By way of example only, if the Restitution Net Settlement Fund is $3,257,143, and an Eligible Restitution Settlement Class member paid $8,000 to Aurora under their Workout Agreement, and paid $8,000 to Aurora following their Workout Agreement, and the total of all payments to Aurora by Eligible Restitution Settlement Class Members was $28,000,000, then that Eligible Restitution Settlement Class Member would have Restitution Settlement Damages of: (($8,000+$8,000)/$28,000,000)*$3,257,143 = $1,861.22.

f. Settlement Damages for each Settlement Class Member shall be the sum of their Rosenthal Act Settlement Damages and their Restitution Settlement Damages.

## III.   Release of Claims

In exchange for the monetary relief provided by the Settlement Agreement, all Settlement Class Members who do not timely exclude themselves by opting out of the settlement will release Aurora Loan Services LLC and each of its past, present and future parents, subsidiaries, members, divisions, affiliates, affiliated companies and corporations, joint venturers, directors, officers, managers, employees, general partners, limited partners, principals, agents, insurers, reinsurers, shareholders, attorneys, advisors, legal representatives, consultants, representatives, predecessors, successors, independent contractors, or related entities, and each and all of their executors, predecessors, successors and assigns, from all claims actually made or that could have been made on behalf of Settlement Class Members based on the facts asserted in the Second Consolidated Amended Complaint through September 5, 2014 ("Released Claims"). Releasing Parties who are only members of the Rosenthal Act Settlement Class (*i.e.*, are not members of the Restitution Settlement Class) shall only release, resolve, relinquish and forever discharge their right and ability to bring claims under or based on the California Rosenthal Act against the Released Parties.

Specifically, the Settlement Agreement sets forth the Class Release as follows:

## RELEASES

The "Released Parties" are: Aurora Loan Services LLC and each of its past, present and future parents, subsidiaries, members, divisions, affiliates, affiliated companies and corporations, joint venturers, directors, officers, managers, employees, general partners, limited partners, principals, agents, insurers, reinsurers, shareholders, attorneys, advisors, legal representatives, consultants, representatives, predecessors, successors, independent contractors, or related entities, and each and all of their executors, predecessors, successors and assigns. The Released Parties include, by way of example but not limitation: Aurora Loan Services, LLC, Aurora

The "Releasing Parties" are:  the Named Plaintiffs and each Settlement Class Member (except those who timely opt out of the Settlement) and his or her assigns, heirs, successors and personal representatives.

The "Released Claims" are:  any and all liabilities, rights, claims, actions, causes of action, demands, damages, costs, attorneys' fees, losses, and remedies, whether known or unknown, existing or potential, suspected or unsuspected, liquidated or unliquidated, legal, statutory, or equitable, that result from, arise out of, are based upon, or relate to the conduct, omissions, duties or matters from the beginning of time up through and including Preliminary Approval Date that were or could have been asserted or alleged in the Action, including, without limitation, any claims, actions, causes of action, demands, damages, losses, or remedies relating to, based upon, resulting from, arising out of or in any way related to Aurora's use of, or policies and practices in connection with, Aurora's Workout Agreements or Special Forbearance Agreements.

The Released Claims include, by way of example but not limitation, any and all claims concerning: (a) whether Aurora provided or had any obligation to provide Settlement Class Members an opportunity to cure in connection with the Workout Agreement; (b) whether Aurora rendered or had any obligation to render a modification decision during the term of the Workout Agreement; (c) whether Aurora provided or had any obligation to provide cure information, including reinstatement or pay off figures, to Settlement Class Members in connection with the Workout Agreement; (d) whether Aurora notified or had any obligation to notify Settlement Class Members at least five days before the foreclosure sale that their request for a loan modification or other workout plan was denied; (e) whether Aurora provided or had any obligation to provide Settlement Class Members a loan modification or other workout option at the conclusion of a Workout Agreement; (f) whether Aurora told or had any obligation not to tell Settlement Class Members to continue making payments after the end of the Workout Agreements; (g) fees charged by Aurora in connection with Workout Agreements; (h) whether Aurora complied with California's deficiency judgment statute (e.g., Cal. Code Civ. Proc. § 580b) in connection with Workout Agreements; (i) whether Aurora complied with California law concerning postponing and scheduling foreclosure sales (e.g., Cal. Civ. Code § 2994g), in connection with Workout Agreements; (j) whether Aurora complied with the California Rosenthal Fair Debt Collection Practices ("Rosenthal Act"), Cal. Civil Code §§ 1788, et seq. in connection with Workout Agreements; (k) whether Aurora complied with the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq. in connection with Workout Agreements; (l) whether Aurora "dual tracked" Settlement Class Members in connection with Workout Agreements; and (m) whether Workout Agreements are fraudulent, unconscionable, or violate any California law, whether statutory, common law, or any other.

Class Release. Upon the Effective Date, the Releasing Parties shall automatically be deemed to have fully and irrevocably released, resolved, relinquished, and forever discharged the Released Parties of and from the Released Claims, provided, however, that Releasing Parties who are only members of the Rosenthal Act Settlement Class (*i.e.*, are not members of the Restitution Settlement Class) shall only release, resolve, relinquish and forever discharge their right and ability to bring claims under or based on the California Rosenthal Act against the Released Parties.

The Releasing Parties may hereafter discover facts other than or different from those that he/she knows or believes to be true with respect to the subject matter of the claims released pursuant to the terms of this Agreement, or the law applicable to such claims may change. Nonetheless, each of those individuals expressly agrees that, as of the Effective Date, he/she shall have automatically and irrevocably waived and fully, finally, and forever settled and released any known or unknown, suspected or unsuspected, asserted or unasserted, liquidated or unliquidated, contingent or non-contingent claims with respect to the Released Claims. Further, each of those individuals agrees and acknowledges that he/she shall be bound by this Agreement, including by the releases contained in this Agreement, and that all of their claims in the Action shall be dismissed with prejudice and released, whether or not such claims are concealed or hidden; without regard to subsequent discovery of different or additional facts and subsequent changes in the law; and even if he/she does not receive actual notice of the Settlement or does not receive a distribution of funds from the Settlement.

Waiver of California Civil Code Section 1542. Without limiting the foregoing, the Released Claims specifically extend to claims that Settlement Class Members do not know or suspect to exist in their favor at the time that the Settlement, and the releases contained therein, becomes effective. This paragraph constitutes a waiver of, without limitation to any other applicable law, all rights under California Civil Code Section 1542 with respect to the Released Claims. Section 1542 provides:

A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

As such, the Participating Class Members understand and agree that they are providing the Released parties with a full and complete release with respect to the Released Claims.

If the proposed settlement is approved, a judgment will be entered by the Court following the Final Fairness Hearing that will dismiss with prejudice the Released Claims as set forth above.

## IV.    **Your Legal Rights and Options**

You are receiving this notice because Aurora's records indicate you were sent a Workout Agreement on or after June 8. 2006. But this does not necessarily mean you are in any Settlement Class. You are in the Rosenthal Act Settlement Class only if you were

sent a Workout Agreement on or after June 8, 2009. You are a member of the Restitution Settlement Class only if you made the trial payments required by your final Workout Agreement, did not thereafter enter into a repayment plan or HAMP trial payment plan, were not thereafter offered a loan modification by Aurora, and were thereafter foreclosed. <u>The enclosed "Payment Documentation Form" states whether, according to Aurora's records, you are in the Rosenthal Act Settlement Class and/or the Restitution Settlement Class.</u>

If you are not in either the Rosenthal Act Settlement Class or the Restitution Settlement Class, then you will not receive any benefits under this settlement and you will not release any claims you may have against Aurora. If you are not in one or both of the Settlement Classes, but you believe you should be because you meet the criteria, you may complete and return the "Payment Documentation Form," along with the required documentation, and you will be considered for addition to one or both Settlement Classes.

If you are in either the Rosenthal Act Settlement Class or the Restitution Settlement Class and you wish to participate in this settlement, you do not need to sign or return any documents in order to be considered part of the class or classes and to receive your portion of the Settlement Fund.

Further, if you are in either the Rosenthal Act Settlement Class or the Restitution Settlement Class, but the payment information from Aurora's records set forth on the "Payment Documentation Form" is incorrect, you may complete and sign the "Payment Documentation Form" and provide documentation of payments that you made to Aurora under your SFA and after the term of your SFA expired. Note that under the terms of the settlement you must have made at least all of the payments required under your SFA to be a member of the Restitution Settlement Class. For example, if your SFA required three payments and you only made two or fewer payments, or if your SFA required six payments and you only made five or fewer payments, then you are not a member of the Restitution Settlement Class even though you may have made substantial payments to Aurora under your SFA. In addition, if after you completed an SFA, you were placed into a HAMP trial modification or an Aurora repayment plan that would have brought your loan current, or you were offered a loan modification, then you are not a member of the Restitution Settlement Class even though you may have made substantial payments to Aurora under your SFA. If you are not a member of the Restitution Settlement Class then you will not release claims you may have against Aurora related to your SFA, except you will release claims under the California Rosenthal Act if you are in the Rosenthal Act Settlement Class and you do not opt-out of the settlement.

The Settlement Administrator will accept documentation of payments to Aurora if your Payment Documentation Form has been completed and signed and you have provided one of the following for each claimed payment that matches the amount of payment required under your SFA: (1) cancelled check; (2) credit card or debit card receipt or charge slip; (3) money order or cashiers' check receipt; (4) bank account statement showing a payment to Aurora; (5) credit card statement showing a payment to Aurora; or (6) a receipt or acknowledgment of payment from Aurora.

If you are in either the Rosenthal Act Settlement Class or the Restitution Settlement Class and you do not wish to participate in this settlement, in which case, you will not receive any portion of the Settlement Funds and you will not be bound by the release set forth above, then you must submit a written statement requesting exclusion from the settlement ("opt-out") postmarked no later than December 15, 2014. Your written request for exclusion must contain your name, address, telephone number and email address, and be personally signed by you. No opt-out request may be made on behalf of a group of Settlement Class Members. The opt-out request must be sent by mail to the Claims Administrator at Aurora Workout Agreement Settlement Claims Administrator, c/o Gilardi & Co. LLC, P.O. Box 8060, San Rafael, CA 94912-8060 and must be timely postmarked as set forth above. Any Settlement Class Member who requests exclusion from (opts out of) the settlement will not receive any money from the settlement and will not be bound by the Settlement Agreement or have any right to object, appeal or comment thereon.

If you wish to object to the settlement, you must mail a written statement of your objection to the Claims Administrator at Aurora Workout Agreement Settlement Claims Administrator, c/o Gilardi & Co. LLC, P.O. Box 8060, San Rafael, CA 94912-8060 postmarked no later than December 15, 2014. You must include the basis for your objection, as well as your name, address, telephone number, and email address, and the objection must be personally signed by you. In addition, you must identify any previously filed objections by you or your counsel in any state or federal court. This listing must contain (a) the name of the case; (b) the case number; and (c) the court in which the objection was filed. The postmark date of the mailing envelope is the exclusive means that will be used to determine whether an objection is timely submitted. Settlement Class Members who fail to make objections in the manner specified above shall be deemed to have waived any objections and shall be foreclosed from making any objection (whether by appeal or otherwise) to the Settlement Agreement.

## V.    The Final Fairness Hearing

On January 13, 2015, at 1 pm before the Honorable Saundra B. Armstrong at the United States District Court, located at 1301 Clay Street, 2nd floor, Oakland, CA 94612, the Court will hold a Final Fairness Hearing to determine whether to grant final approval to the proposed settlement and determine the appropriate amount of compensation to be awarded to Class Counsel and the Class Representatives out of the Gross Settlement Fund. You may, but are not required to attend this hearing. You may also enter an appearance in the case through your own attorney, if you so desire.

You may review a copy of the Settlement Agreement and other documents that are pertinent to this case, including Class Counsel's Motion for Attorneys' Fees and Costs (when it is filed), at the settlement website, www.auroraworkoutagreementsettlement.com. You may also review a copy of the Settlement Agreement at the Clerk's Office at the

  

Page 5 of 6

12-12020-mg    Doc 7744    Filed 10/16/14    Entered 11/12/14 11:10:29    Main Document
Court (1301 Clay Street, Oakland,      94612).    Pg 195 of 196

## VI.    How to Obtain Additional Information

    This Notice of Class Action Settlement provides a summary of the proposed Settlement Agreement. If you have any questions concerning this settlement, you should visit the settlement website, www.auroraworkoutagreementsettlement.com. If you have further questions after visiting the settlement website, you may call the Claims Administrator at 1-888-283-7346, or mail or email your inquiry to the Claims Administrator at the address below:

<div align="center">

Aurora Workout Agreement Settlement Claims Administrator
c/o Gilardi & Co. LLC
P.O. Box 8060
San Rafael CA 94912-8060
Email: info@auroraworkoutagreementsettlement.com

</div>

    You may also contact Class Counsel, as follows:

| | |
|---|---|
| Ali Abtahi (224688)<br>ABTAHI LAW FIRM<br>1012 Torney Ave.<br>San Francisco, CA 94129<br>Tel: (415) 639-9800<br>Fax: (415) 639-9801<br>aabtahi@abtahilaw.com | Andrew Oldham (144287)<br>LAW OFFICE OF ANDREW OLDHAM<br>901 Campisi Way, Suite 248<br>Campbell, CA 95008<br>Telephone: (888) 842-4930 |
| Thomas E. Loeser<br>HAGENS BERMAN SOBOL SHAPIRO LLP<br>1918 Eighth Avenue, Suite 3300<br>Seattle, WA 98101<br>Telephone: (206) 623-7292<br>Facsimile: (206) 623-0594<br>toml@hbsslaw.com | T. Christopher Tuck<br>RICHARDSON, PATRICK, WESTBROOK<br>& BRICKMAN, LLC<br>1037 Chuck Dawley Blvd., Bldg. A<br>PO Box 1007<br>Mt. Pleasant, SC 29464<br>(843) 727-6515<br>ctuck@rpwb.com |

<div align="center">

### PLEASE DO NOT CONTACT THE COURT

</div>

---

<div align="center">

### PAYMENT DOCUMENTATION FORM

</div>

**FOR PROPERTY ADDRESS: 1682 AMARELLE ST**
                       **THOUSAND OAKS, CA 91320**

**LOAN NUMBER: 0021922075**

### ROSENTHAL ACT SETTLEMENT CLASS

  Aurora's records reflect that you are in the Rosenthal Act Settlement Class for the loan identified above. You **do not** need to sign or return this form or any documents in order to receive your portion of the Rosenthal Act Settlement Fund.

### RESTITUTION SETTLEMENT CLASS

  Aurora's records reflect that you are not in the Restitution Settlement Class for the loan identified above. If this is incorrect and you believe you made each payment required under your final Workout Agreement, you did not thereafter enter into an Aurora repayment plan (that would have brought your loan current) or HAMP trial payment plan, you were not thereafter offered a loan modification by Aurora, and you were thereafter foreclosed upon, complete this portion of this Payment Documentation Form, sign it below and provide copies of Approved Documentation as defined below.

<div align="right">10/15/2014</div>

| Date | Payment | Date | Payment | Date | Payment |
|------|---------|------|---------|------|---------|
| _____ | $_____ | _____ | $_____ | _____ | $_____ |
| _____ | $_____ | _____ | $_____ | _____ | $_____ |
| _____ | $_____ | _____ | $_____ | _____ | $_____ |
| _____ | $_____ | _____ | $_____ | _____ | $_____ |

I swear or affirm that this statement and the attached documents are true and correct.

Signature: _____    Date: _____

<u>Approved Documentation</u> consists of copies of the following showing paid amounts matching the required payment under your Workout Agreement: (1) cancelled check; (2) credit card or debit card receipt or charge slip; (3) money order or cashiers' check receipt; (4) bank account statement showing a payment to Aurora; (5) credit card statement showing a payment to Aurora; or (6) a receipt or acknowledgment of payment from Aurora.

This message was intended for: kensington.taylor@verizon.net
You were added to the system October 15, 2014.
For more information click here. Update your preferences
Unsubscribe | Unsubscribe via email

