# In Re:

*RESIDENTIAL CAPITAL, LLC, et al.*

*Case No. 12-12020-mg*

*September 15, 2014*

*eScribers, LLC*

*(973) 406-2250*

*operations@escribers.net*

*www.escribers.net*

*To purchase copies of this transcript, please contact us by phone or email*



**Min-U-Script® with Word Index**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


            Debtors.


- - - - - - - - - - - - - - - - - - - -x

            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            September 15, 2014

            9:03 AM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

2

1

2   (CC: Doc#7017) Trial re: ResCap Borrower Claims Trust's

3   Objection to Proofs of Claim Filed by Frank Reed and Christina

4   Reed.

5

6   Case Management/Scheduling Conference Regarding ResCap Borrower

7   Claims Trust's objection to the Matthews Claim.

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Hana Copperman

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

1

2   A P P E A R A N C E S :

3   REED SMITH LLP

4         Attorneys for ResCap Borrower Claims Trust

5         1717 Arch Street

6         Suite 3100

7         Philadelphia, PA 19103

8

9   BY:   BARBARA K. HAGER, ESQ.

10

11

12   MORRISON & FOERSTER LLP

13         Attorneys for ResCap Borrower Claims Trust

14         250 West 55th Street

15         New York, NY 10019

16

17   BY:   JORDAN A. WISHNEW, ESQ.

18         NORMAN S. ROSENBAUM, ESQ. (TELEPHONICALLY)

19

20

21

22

23

24

25

4

1

2    LEGG LAW FIRM

3          Attorneys for Kevin J. Matthews

4          5500 Buckeystown Pike

5          Frederick, MD 21703

6

7    BY:    PHILLIP R. ROBINSON, ESQ. (TELEPHONICALLY)

8

9

10    FRANK REED, Pro Se

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, et al.                              5

1                        P R O C E E D I N G S

2              THE COURT:  Please be seated.  All right, I have the

3    list of appearances of counsel and Mr. Reed, pro se.

4              Mr. Reed, do you wish to make an opening statement?

5    You don't have to, but you have the opportunity to make an

6    opening statement.  The only thing you have to do is decide.

7              MR. REED:  Yeah, yeah.  I would like to, Your Honor.

8              THE COURT:  Okay.  And I know you have difficulty

9    standing and then sitting, so if you wish to, you can do so

10   from your seat.

11             MR. REED:  Thank you, Your Honor.  First I would like

12   to say I presented the Court with a motion and I would like the

13   Court to know that I'm willing to cede whatever time's

14   necessary --

15             THE COURT:  You don't have to cede time.  I haven't

16   read it before I took the bench, but I will read it and I

17   won't -- it's -- the deadline for filing things has already

18   come and gone, but I will read it and I won't take your time.

19   So go ahead.

20             MR. REED:  As you know, we're here to discuss the

21   fruits of the claims that we have remaining, that I filed and

22   my wife had filed.  The crux of those claims are the liability

23   would be stemming from the wrongful foreclosure -- what we

24   believe to be a wrongful foreclosure, "wrongful" meaning that

25   it should have not happened at that time, for a variety of

RESIDENTIAL CAPITAL, LLC, et al.                                    6

1   reasons, from standing to breaches of contract, common law, and

2   the reduction or interference with the ability to realize a

3   market value of the property 817 Matlack Drive in Moorestown,

4   New Jersey.

5         And to that end, I guess we're here to examine the

6   facts as I see them and I understand them, and for you to -- if

7   you find that there's been a wrongful act, then damage to be

8   estimated by you, from what I understand, the Rules and your

9   role in bankruptcy.

10         And I think that's what I have for an opening

11   statement.

12         THE COURT:  Okay.  Thank you, Mr. Reed.

13         Ms. Hager or -- who's going to -- are you going to be

14   speaking?

15         MS. HAGER:  I am, Your Honor --

16         THE COURT:  Okay.

17         MS. HAGER:  -- yes.  Barbara Hager with Reed Smith,

18   for the Borrower Claims Trust.

19         Your Honor, before I get started with my prepared

20   opening, it came to my attention, just prior to the start of

21   the hearing, that several of Mr. Reed's witnesses will not be

22   available today, specifically, Christy Donati, Evan Hendricks,

23   and Louise Carter.  It's my understanding that Mr. Reed intends

24   to call them tomorrow, from what he said.  My prior

25   understanding was that witnesses were to be made available for

1   the duration of the trial.  Obviously, Your Honor ordered that

2   this would be a two-day trial, with each side having six hours.

3   But if his witnesses are going tomorrow, I'm not sure that

4   leaves us enough time.

5           Specifically in the order from July 22nd, Your Honor

6   ordered that each party would be responsible for having

7   witnesses present and ready to testify, without any gaps --

8   without any delays or gaps -- excuse me -- in testimony.

9           THE COURT:  Mr. Reed?

10          MR. REED:  Your Honor, I -- this is when I can get

11  them to come.  I mean, Ms. --

12          THE COURT:  Court doesn't work that way, Mr. Reed.

13  The Court doesn't work that way.  I mean, it's not -- trials,

14  whether there're pro se parties or parties represented by

15  counsel -- the trial's supposed to be today; if necessary,

16  tomorrow.  Ms. Hager has accurately quoted from the order I

17  enter in every case before trial, to make clear witnesses have

18  to be here and the parties are responsible for having them

19  here.  Let's see where we get to today.

20          I will often accommodate parties usually when I know

21  in advance, and I ask opposing counsel to take witnesses out of

22  order.  But once a trial starts, Mr. Reed, you put your

23  witnesses -- and you're the plaintiff, essentially; you're the

24  claimant.  You put your witnesses on and, when you've run out

25  of witnesses, I ask whether you rest.  And then the other side

1  puts their witnesses on and I ask whether they rest.  That's

2  how trials are conducted.

3          Anything else, Ms. Hager?

4          MS. HAGER:  Excuse me, Your Honor?

5          THE COURT:  Is there anything else you want to raise

6  now?  You want to give an opening statement?

7          MS. HAGER:  I do want to give an opening statement.

8          THE COURT:  Okay, go ahead.

9          MS. HAGER:  No other preliminary issues, though, Your

10 Honor.

11          Your Honor, the claimant, Mr. Reed, along with his

12 wife, have argued entitlement to damages stemming from their

13 inability to sell or refinance their property at 817 Matlack

14 Drive.  Not only can't they prove damages; the evidence will

15 show that the opposite is true, that throughout the process of

16 attempting to market the property, the claimants were paid at

17 least 472,500 dollars, and they recognized a savings in their

18 living expenses, of nearly 900,000 dollars; that was for

19 failing to pay on the mortgage since early 2008.

20          Now, the claimants have to prove three of their claims

21 by a preponderance of the evidence:  negligence, breach of

22 contract, and the violation of the CFA.  And the fourth, which

23 is for punitive damages, needs to be proven by clear and

24 convincing evidence.  Based on the evidence that will be put on

25 at the trial, they won't be able to meet either of those

1  burdens.

2         Specifically, the claimants claim as damages several

3  categories; one is the interest which they presently owe to

4  their new servicer on the same mortgage, which is presently in

5  foreclosure.  And according to the pre-trial submissions,

6  Mr. Reed would have the Court order that the Borrower Trust pay

7  that interest that is due on their loan, because, according to

8  them, but for the issues with the 2008 foreclosure, Mr. and

9  Mrs. Reed would have paid off that loan.  And since the loan

10  wasn't paid off, they think that the Borrower Trust should be

11  responsible for paying their interesting and ensuring their

12  free living for the last six and a half years.

13         In addition, they claim very nonspecific lost profits

14  from the sale or refinance, at an unknown point in time

15  essentially -- there's no real evidence, and I'll talk about

16  that in a little bit -- and the attorney's fees in connection

17  with the foreclosure, which the claimants argue they're

18  entitled to.

19         With respect to what I think are these speculative and

20  nonspecific damages resulting from their alleged

21  loan-application process, there will be no evidence put on that

22  the claimants ever applied for a loan, that they were ever

23  approved for a loan.  There'll be no evidence of what the

24  theoretical terms of the loan would have been; no evidence of

25  what the actual cash proceeds would have been.  The one

1  argument that you'll hear from Mr. Reed is that he would have

2  refinanced and taken the proceeds to do various things.

3  There's no evidence of what that dollar amount would have even

4  been; and specific to that, there's no evidence of the amount

5  of the liens that were on the property at the time, which would

6  have been instrumental in actually calculating the amount of

7  cash proceeds.  And frankly, there's no real evidence as to

8  timing.  There's nothing that shows when the actual application

9  was made, if it was in fact made.  Whether they were approved

10  or denied, when and for what, is completely speculative.

11        In addition, you'll hear testimony about attempts of

12  the claimants to sell their property.  However, there's no

13  actual evidence that they ever could have sold the property or

14  for what amount or when or, again, what the amount of the liens

15  were at the time, making it impossible to calculate -- even if

16  they're entitled to damages, making it impossible to calculate

17  what those might have been.

18        You'll hear testimony that, over time, the house was

19  on the market and the listing price was reduced five or six

20  times throughout that period of time, to reflect what was going

21  on in the market at the time.  The reality is that it was a

22  declining market.  Another reality is that there were two

23  agreements of sale:  one with the Jacobs family, and another

24  with a man by the name of Mark Weaver, who also used another

25  name, Brett Cooper.  Both of those agreements of sale were

1   entered into and agreed to by the Reeds; both of them fell

2   through for reasons that had nothing to do with the

3   foreclosure.

4           The amounts that the claimants argue -- or will argue

5   that should be paid by the Borrower Trust to their new servicer

6   have no legal basis.  There's no reason -- and none has really

7   been put forth in any of the pleadings -- for holding the

8   Borrower Trust liable to pay the mortgage that the claimants

9   are obligated on, which, again, is no longer serviced by GMAC

10  but has a new servicer by the name of 21st Mortgage

11  Corporation.  Mr. Reed signed the mortgage and the note, he

12  still lives in the house, he's been living for there free, yet

13  he wants the Borrower Trust to pay the interest over that

14  period of time.

15          And as to the attorney's fees, the invoices that were

16  supplied during discovery and will presumably be discussed

17  during the trial are not specific as to the work that was

18  performed.  There's no evidence as to what work, if any, was

19  incurred in the foreclosure.  And to the extent that any of the

20  amounts claimed by the attorneys has to do with Mr. Reed's

21  affirmative case, Reed v. GMAC, those should not be borne by

22  the Borrower Trust.

23          THE COURT:  Why's that?

24          MS. HAGER:  Well, his affirmative claim is separate

25  and apart from the foreclosure.  And he had every opportunity

1  to bring the mortgage current, he had the ability to bring the

2  mortgage current; he chose not to.  He chose instead to sue

3  GMAC.  He litigated that case for years and then he withdrew

4  it.  It didn't even come to a decision.  There's no reason to

5  hold the Borrower Trust liable for any fees that he incurred in

6  a case that he didn't even bring to conclusion.

7           As far as the legal basis for the claims, I just spoke

8  a bit about damages because that seems to me to be such a huge

9  component of the case.  But obviously, with respect to the

10  claims, each of those claims requires that the claimants be

11  able to prove damages.  But in addition to that, with respect

12  to the breach-of-contract claim, that claim requires

13  performance by the party alleging breach.  And here we have

14  some facts that are not contested.  Mr. Reed does not contest

15  the fact that he didn't pay on the mortgage.  He is perhaps not

16  specific as to the month but has admitted that early 2008 he

17  was not paying on the mortgage.

18           THE COURT:  May I ask you this, Ms. Hager:  did the

19  mortgage require that Mr. Reed be given a minimum of thirty

20  days' notice before the commencement of a foreclosure action?

21           MS. HAGER:  Yes.  The terms of the mortgage do provide

22  that.

23           THE COURT:  How can it be that if Mr. Reed was in

24  breach of his obligation to pay, that the noteholder or the

25  loan servicer would be excused from complying with the

1   requirement that it give advance notice of filing a foreclosure

2   action?  It seems to me that that can't be right, I mean,

3   because if that were true, the provision in the mortgage

4   requiring thirty days' advance notice before bringing a

5   foreclosure action would be utterly meaningless, because the

6   only circumstance in which you could bring a foreclosure action

7   is if the borrower was in default.

8         MS. HAGER:  Well, I don't disagree with that, Your

9   Honor, and I don't believe that --

10         THE COURT:  So how can you argue that Mr. Reed's

11   breach excused -- assuming the existence of a contract as to

12   which one of the debtors was a party or chargeable as a party,

13   how is it that you can argue that Mr. Reed's breach would

14   excuse GMACM from complying with the specific requirement in

15   the mortgage about advance notice before bringing the mortgage

16   foreclosure action?

17         MS. HAGER:  Well, Your Honor, I don't believe that we

18   are arguing that here today.  I believe that -- it's not our

19   position that that performance was excused.  That issue was

20   litigated in the foreclosure case below and it was determined

21   that GMAC was not properly positioned to bring the foreclosure

22   action, and that case was dismissed.  So I don't think I could

23   stand here today and argue that it was okay.

24         THE COURT:  So what is your argument, then, about --

25   what is it that you believe your client was excused from doing

RESIDENTIAL CAPITAL, LLC, et al.                    14

1   by virtue of Mr. Reed's breach by nonpayment?

2          MS. HAGER:  Well, I think, Your Honor, the argument is

3   simply that it couldn't have been a breach-of-contract claim by

4   virtue -- or you can't have a breach-of-contract claim by

5   virtue of the fact that he breached first.  And that's

6   inherently --

7          THE COURT:  How can that be?  That's exactly the

8   point.  There's a mortgage document; it has a requirement that

9   you give thirty days' advance notice.  If you didn't do that,

10  you seem to be arguing that your breach is -- when I say

11  "your", obviously your client, and your client is the Trust,

12  which is the successor, so excuse the shorthand.

13          How can it be that GMACM would be excused from

14  complying with the contractual requirement if Mr. Reed was in

15  breach of his obligation to pay?  I mean, it just -- it utterly

16  is nonsensical.  It can't be that nonpayment of the mortgage

17  excuses the mortgagee or its loan servicer from complying with

18  a contractual obligation of notice.  You have any authority for

19  that?

20          MS. HAGER:  Your Honor, I don't believe that we're

21  arguing that my client's performance, specifically their

22  obligation to send a notice, was excused.

23          THE COURT:  What are you arguing is excused?

24          MS. HAGER:  Well, the argument is that the claimants

25  cannot fulfill their prima facie breach-of-contract case --

1  claim, because one of the elements is missing, and that is the

2  element that the party asserting the breach needed to have

3  performed in the first instance.

4          THE COURT:  We're talking in circles.

5          No, Mr. Reed, you had your chance to make an opening

6  statement.

7          Okay.  We're talking in circles.  But go on with your

8  argument.

9          MS. HAGER:  Okay.  Thank you, Your Honor.

10         With respect to the counts for negligence and

11 violation of the Consumer Fraud Act, the claimants focus on the

12 foreclosure and the corresponding lis pendens.  But the

13 evidence is clear that GMAC was not entitled to proceed with

14 the foreclosure; that's not in dispute that the case was

15 dismissed without prejudice.

16         THE COURT:  Did GMACM have standing -- put aside the

17 FFA.  Did GMACM have standing to commence a foreclosure action

18 against the Reeds at the time that it did commence it?

19         MS. HAGER:  Well, the complaint in the foreclosure was

20 amended, specifically -- I'll take a step back.  I think the

21 issue at the hearing on this matter previously was that there

22 was a provision in paragraph 4 of the complaint, which stated

23 that GMAC -- GMACM was the owner of the note and mortgage, and

24 that presented an issue because it conflicted with a provision

25 in Ms. Delehey's declaration to the contrary.

1          Now, there is, and there was, an amended complaint,
2     which was not discussed at that hearing, in which the amendment
3     to the complaint changed paragraph 4 of the complaint to state
4     that GMACM was the assignee of the mortgage.  So --
5          THE COURT:  Go ahead.
6          MS. HAGER:  So by virtue of that correction of what
7     was otherwise a misstatement, GMAC remedied that issue and
8     should have been entitled to proceed with respect to the issue
9     of standing.  But again, that case was dismissed without
10    prejudice, so --
11         THE COURT:  Well, let me ask you, because actually
12    when I saw the amendment, and particularly the reliance on an
13    assignment signed by Mr. Stephan, my antenna went up and it
14    appeared to me that perhaps GMACM committed a fraud on the
15    Court, beyond its failure to serve notice under the FFA.  So
16    let me ask my question again:  at the time that GMACM filed its
17    complaint, assuming that it gave notice under the FFA, did it
18    have standing to proceed with the foreclosure action against
19    the Reeds?
20         MS. HAGER:  Well, there are two ways that GMAC
21    Mortgage could have had standing:  one is if it was the
22    assignee of the mortgage, and the other is if it was the holder
23    of the note.
24         THE COURT:  Well, I don't think so.  I don't think so.
25    New Jersey, I believe, follows the rule that most states do,

1   that the mortgage follows the note.  You agree with that?

2            MS. HAGER:  I do.

3            THE COURT:  First I would note that the assignment

4   signed by Mr. Stephan occurred after the -- it was sometime

5   after the case was filed, not before.  That assignment purports

6   to assign the note and the mortgage from MERS, but I've seen

7   nothing to indicate that MERS ever had an interest in the note.

8   Don't believe it did.  Even if Mr. Stephan -- you agree

9   Mr. Stephan was an employee of GMAC?

10           MS. HAGER:  Yes, Your Honor.

11           THE COURT:  He signed the assignment on behalf of

12   MERS, correct?

13           MS. HAGER:  He did, Your Honor.  He had signing

14   authority for MERS.

15           THE COURT:  Okay.  You agree he would only have the

16   authority to assign for MERS what MERS owned, correct?

17           MS. HAGER:  He would have authority to sign for that

18   which MERS was the nominee.

19           THE COURT:  The only thing MERS -- I looked at the

20   documents carefully; the only thing MERS was the beneficiary of

21   was the mortgage, not the note.

22           MS. HAGER:  Agreed.

23           THE COURT:  And therefore, MERS couldn't assign the

24   note; do you agree with that?

25           MS. HAGER:  Yes, Your Honor.

 1          THE COURT:  And New Jersey law would require that the

 2  moving party -- that the party that filed the foreclosure

 3  action have a right to proceed on behalf of the noteholder, if

 4  it didn't actually own the note itself; do you agree with that?

 5          MS. HAGER:  I'm sorry, would you repeat that?

 6          THE COURT:  GMACM could not file a foreclosure action

 7  against Mr. Reed unless it demonstrated that it either was the

 8  noteholder if it held, for example, the original of a note

 9  endorsed in blank, or if it had an assignment of the note from

10  the noteholder.  You agree with that?

11          MS. HAGER:  Yes, Your Honor.

12          THE COURT:  And did GMACM have either of those things?

13          MS. HAGER:  Your Honor, as I stand here today, it's a

14  difficult question to ask (sic), because the note is not static

15  in time.  And the copies of the note that we have have been

16  subsequently endorsed, and the original note today has been

17  subsequently endorsed.  A lot of time has gone by since 2008.

18          THE COURT:  At some point, Metrocities assigned the

19  note to GMAC Bank, which is not any of the debtors in this

20  case, correct?

21          MS. HAGER:  Yes, Your Honor.

22          THE COURT:  And do you know when that occurred?

23          MS. HAGER:  I do not.

24          THE COURT:  And GMAC Bank at some point assigned the

25  note to RFC, correct?

1            MS. HAGER:  Yes, Your Honor.

2            THE COURT:  And is there -- I mean, I haven't heard

3    the proof yet, but when I looked at the documents, the exhibits

4    that were submitted, particularly when I looked at the amended

5    complaint that was filed, standing has to be as of the time you

6    filed the case, not after.  And so you would agree that GMAC

7    did not have standing to file the foreclosure action on the

8    date it was filed, correct?

9            MS. HAGER:  Well, I can't agree to that.  I do agree

10   with Your Honor's observation as to the date on the assignment

11   of mortgage.  However, it's our position that the second way in

12   which GMAC Mortgage could have had standing is if it was the

13   holder of the original note --

14           THE COURT:  Okay, you're going to put on a witness to

15   testify they were the holder of the original note?

16           MS. HAGER:  Well, I can't, again, because of the issue

17   of timing and how much time has gone by and the fact that the

18   original note has been subsequently endorsed.  But it's our

19   position that, because the foreclosure case was dismissed

20   without prejudice, that we don't need to get into the issue of

21   standing.  There's no dispute that there was a problem with

22   asserting the foreclosure.  That's not disputed.  They couldn't

23   go forward with the foreclosure and it was dismissed.

24           THE COURT:  Well, but Mr. Reed is asserting several

25   claims, the negligence claim, for example, and you dispute

1  whether there was a duty.  Are you telling me that a loan

2  servicer does not owe a duty to a borrower that when it files a

3  foreclosure action, it actually has standing and authority to

4  file the action?  It can just -- doesn't matter -- if Mr. Reed

5  was in default, it wouldn't matter whether GMAC had standing or

6  not; they could just go ahead and file the foreclosure action?

7  That's your position?

8          MS. HAGER:  No.  No.  Of course that's not our

9  position.  Obviously, the servicer should be able to meet all

10  of the components required by law.  So it's certainly not our

11  position that they could just --

12          THE COURT:  And you agree that you can't --

13          MS. HAGER:  -- go ahead --

14          THE COURT:  -- you can't demonstrate that they could

15  satisfy all the requirements of law at the time they filed the

16  foreclosure action?

17          MS. HAGER:  No.  And the lower court said that too,

18  that --

19          THE COURT:  Well, they focused -- the lower court

20  focused solely on the FFA, that GMACM was unable to demonstrate

21  that it gave Mr. Reed the notice that a state statute required.

22  The state court had no reason at that time -- I don't know

23  whether the argument was made, but it certainly jumped out at

24  me when I looked at the documents, and particularly when I saw

25  the amended complaint, which you provided, that attached the

 1  post-dated assignment from Mr. Stephan, a notorious

 2  robo-signer.  It wasn't you, but one of the other counsel for

 3  the Trust has acknowledged that something like 400 foreclosures

 4  based on documents signed by Mr. Stephan were vacated even

 5  after a foreclosure occurred.  It's very troubling.

 6          Go ahead with your opening statement.

 7          MS. HAGER:  Sure.  Thank you, Your Honor.

 8          THE COURT:  I say that all -- and I've said this

 9  before, but to put it on the record:  you're representing the

10  Trust, which is a successor to GMAC.  You were not involved --

11  you weren't involved in the original foreclosure action,

12  correct?

13          MS. HAGER:  That's correct, Your Honor.

14          THE COURT:  And Morrison Foerster was not involved in

15  the original foreclosure action.  You take your clients as you

16  find them, but the facts are as they are and perhaps difficult

17  to assemble.  So I don't mean, by my questioning, to suggest

18  that you've done anything improper.  It's just it's what you're

19  stuck with.

20          MS. HAGER:  Sure.  Absolutely, Your Honor.

21          Bear with me for a moment.

22          THE COURT:  Go ahead.

23          MS. HAGER:  Given our conversation --

24          THE COURT:  Sure.

25          MS. HAGER:  -- I want to make sure I don't --

RESIDENTIAL CAPITAL, LLC, et al.                    22

1              THE COURT:  Yeah.

2              MS. HAGER:  -- duplicate --

3              THE COURT:  That's fine.

4              MS. HAGER:  Your Honor, no one disputes that the

5    claimants were in default at the time the complaint was filed,

6    and no one disputes that the prerequisites for filing the

7    complaint hadn't been met.  And the question for the Court to

8    decide in light of the foreclosure court's order is whether the

9    filing is negligent or violated the Consumer Fraud Act.  And

10   it's our position that the simple answer to that is no, the

11   filing was not negligent, because there was no duty and no

12   damages.

13             THE COURT:  What do you base the no-duty on?  Because

14   it seems to me that the FFA -- there's no private right of

15   action; I understand that.  But the existence of duty under New

16   Jersey law, certainly the violation -- this is from a case,

17   Braitman v. Overlook Terrace:  "A violation of statutory duty

18   of care is not conclusive on the issue of negligence in a civil

19   action but it is a circumstance which the trier of fact should

20   consider in assessing a liability."  Do you agree with that

21   statement?

22             MS. HAGER:  I do agree with the quote, yes.

23             THE COURT:  And --

24        (Pause)

25             THE COURT:  There's a New Jersey Supreme Court case

1  from 1982, Di Cosala v. Kay, which said, "The most common test

2  of negligence is whether the consequences of the alleged

3  wrongful act were reasonably to be foreseen as injurious to

4  others coming in the range of such acts."  And so on the issue

5  of duty, if the only thing -- and it might be enough, but if

6  the only thing were the FFA issue, the Court might come to one

7  conclusion.  But after seeing a post-dated -- when I say "post-

8  dated", post-dated after the commencement of the foreclosure

9  action -- assignment signed by Mr. Stephan signing on behalf of

10 MERS, but you acknowledge -- and I've heard before in other

11 cases that Mr. Stephan was an employee of GMACM -- and you're

12 being -- you've acknowledged you're unable to put in any proof

13 that GMACM either held the original note or was an assignee of

14 the original note or was given written authority on behalf of

15 the noteholder to commence the action.

16        What seems to me clear is, at the time that the

17 foreclosure action was filed, not only because of the lack of

18 compliance with the FFA but because of the lack of standing,

19 GMACM couldn't bring that action.  They commenced a foreclosure

20 against the Reeds, who were in default.  No question about it;

21 they were in default.  But a mortgage servicer doesn't get

22 absolved from responsibility or liability solely because a

23 borrower is in default.  It has to comply with the law before

24 it commences a foreclosure action.  And GMACM didn't do that.

25 And when they sought to serve the subsequent notice after this

1    issue of the FFA came up, the court still dismissed the action.

2          So it was arguably a wrongful-foreclosure action, not

3    just because of the violation of the FFA notice requirement,

4    but because of standing, because of a document signed by

5    Mr. Stephan which appears on its face -- unless you can show

6    that MERS owned an interest in the note, it couldn't assign the

7    note, and that's what Mr. Stephan purported to do.  He couldn't

8    do that.  And that was presented to the New Jersey court with

9    the amended complaint, in an effort to salvage a foreclosure

10   case.

11         Go ahead.

12      (Pause)

13         MS. HAGER:  What the Borrowers' Trust will prove is

14   the claimants' receipt of a substantial amount of funds that

15   flowed through the attempts to sell the property.

16   Specifically, there was a 400,000-dollar cash payment that was

17   paid to the Reeds by Mr. Cooper so that he could move into the

18   property and have an option to purchase the property.

19   Mr. Cooper subsequently paid another 50,000 dollars over the

20   period of two months, to remain in the property.  The idea

21   behind that was he was trying to buy the property and didn't

22   have the money to buy it outright.  Nevertheless, Mr. Cooper

23   ended up defaulting on the agreement, subsequently was evicted,

24   but the claimants kept that 450,000 dollars.

25         With respect to the first agreement of sale on the

1  property with the Jacobses, there was a dispute that stemmed

2  from the assertion of the Jacobses of their right to cancel the

3  contract because the house didn't appraise and they weren't

4  able to get financing.  The Reeds did not accept the attempt to

5  cancel the contract and would not return the Jacobses' funds;

6  they had 50,000 dollars on deposit.  So the Jacobses ended up

7  suing the claimants.  In connection with that case, the

8  claimants countersued a number of counterparties, including the

9  appraiser TD Bank, and the realtor B.T. Edgar.

10          The court ended up finding that the Jacobses were

11  entitled to cancel the contract, because in fact the house did

12  not appraise for the amount that they agreed to in the

13  agreement of sale.  But after that judgment was entered,

14  Mr. Reed was left with his counterclaims and he settled with

15  those counterclaimants.  I don't know the amounts of all the

16  settlements, but one with TD Bank was for 22,500 dollars.

17          And the reason that that's relevant goes to -- all

18  goes to timing, because the 400,000 dollars and the 50,000

19  dollars are were paid at the end of 2008, at a time after the

20  foreclosure complaint had been filed but at a time when

21  Mr. Reed admitted that he had plenty of money to bring the

22  account current; he didn't do so; he chose to use that money

23  differently.  The 22,500 was paid the following year but,

24  still, the same idea there that there was a failure to mitigate

25  damages.

1              The foreclosure court dismissed the foreclosure, and
2    we all know that there was an issue with GMACM proving its
3    entitlement to foreclose.  But the reality is that that doesn't
4    give claimants carte blanche to file an action and just wait
5    around for some sort of resolution and then withdraw the action
6    and just the whole time taking the position that GMACM or its
7    successor --
8              THE COURT:  Well, he --
9              MS. HAGER:  -- were not entitled to get paid.
10             THE COURT:  Ms. Hager, as I understand it, and we'll
11   hear evidence about it, but -- and maybe you dispute this, that
12   he withdrew his affirmative action against GMACM to participate
13   in the Federal Reserve Bank's independent foreclosure review.
14   Do you agree or disagree with that?
15             MS. HAGER:  That is what he has testified to.
16             THE COURT:  Okay.  All right.  Go ahead.
17             MS. HAGER:  So it's simply our position that as a
18   direct result of the attempts to sell the property, that the
19   Reeds netted nearly a half a million dollars and didn't use
20   that to bring the mortgage current, in addition to the fact
21   that they haven't paid on the mortgage for a number of years
22   and still own the house, which I mentioned previously.
23             So in sum --
24             THE COURT:  None of that money was due to GMACM.  It
25   would have been the mortgagee who suffered the loss, not GMACM,

 1  correct?

 2          MS. HAGER:  That's right as we stand here today.

 3  Sure.  The new --

 4          THE COURT:  Which never was GMACM?

 5          MS. HAGER:  I'm sorry?

 6          THE COURT:  GMACM never owned the note?

 7          MS. HAGER:  I'm not taking that position, and

 8  certainly, as the servicer --

 9          THE COURT:  You're not taking the posi -- wait, wait,

10  let -- is it your position that GMACM ever owned this note?

11  Are you going to offer --

12          MS. HAGER:  I cannot --

13          THE COURT:  Let me say -- are you going to offer any

14  evidence -- the notes -- the copies of the notes that I've

15  seen -- there's no note that I've seen that shows an

16  endorsement or a transfer to GMACM; correct?

17          MS. HAGER:  That's correct, Your Honor.

18          THE COURT:  All right.  You're not -- are you

19  intending to offer any evidence that GMACM owned the note at

20  any point in time?

21          MS. HAGER:  No, Your Honor.

22          THE COURT:  Okay.  Go ahead.

23          MS. HAGER:  And it is true that as of today that

24  there's a different servicer.

25          THE COURT:  Right.

1      MS. HAGER:  But to Your Honor's point, at all times

2  prior to recent history, GMACM was at least the servicer and,

3  therefore, the entity collecting the payments.

4      THE COURT:  Right.

5      MS. HAGER:  So, notwithstanding the fact that there's

6  a different servicer today, at all relevant times prior, the

7  payments were due to GMAC Mortgage.

8      In sum, the claimants will be unable to successfully

9  prove entitlement, to prevail on the proofs of claim, and the

10  objection should be sustained and the claims disallowed.

11      THE COURT:  Thank you very much, Ms. Hager.

12      MS. HAGER:  Thank you, Your Honor.

13      THE COURT:  Mr. Reed, call your first witness.

14      MR. REED:  Your Honor, Mr. Murdock.

15      THE COURT:  Mr. Murdock, if you'd come up to the

16  witness stand and be sworn.  Okay?

17      MR. REED:  And, Your Honor, I --

18      THE COURT:  Just -- let's just stop for a minute.

19  Okay, move the microphone closer to you, because we have to

20  make sure that we're picking up your questions.

21      Okay, if you'd raise your right hand, Mr. Murdock.

22    (Witness sworn)

23      THE COURT:  All right, please have a seat,

24  Mr. Murdock.

25      All right, Mr. Reed, what'd you want to say?

1          MR. REED:  I've been informed that Ms. Donati and

2   Mr. Evans (sic) should be here shortly after lunch.

3          THE COURT:  All right, let's proceed with Mr. Murdock.

4          MR. REED:  I have two --

5          THE COURT:  Before you begin --

6          Why don't you tell us your full name, Mr. Murdock.

7          THE WITNESS:  My name is Drew David Murdock.

8          THE COURT:  And why don't give me either your business

9   or home address, whichever you prefer.

10         THE WITNESS:  My home address is 6166 Robin Drive,

11  Mays Landing, New Jersey 08330.

12         THE COURT:  Thank you very much.

13         All right, go ahead, Mr. Reed.

14         MR. REED:  Your Honor, I --

15         THE COURT:  Hold on, hold on, hold on.  You got to

16  pull the microphone -- either get yourself closer to the

17  microphone -- the microphone's --

18         MR. REED:  Is that better?

19         THE COURT:  -- fixed in place.  That's okay.  I want

20  to make sure we get a clear record; that's why, Mr. Reed, you

21  need to speak into the microphone.

22         And, Mr. Murdock, you need to speak into the

23  microphone.  Okay?

24         MR. REED:  Okay.

25         THE COURT:  Go ahead.

RESIDENTIAL CAPITAL, LLC, et al.                          30

1   DIRECT EXAMINATION

2   BY MR. REED:

3   Q.   I have two questions.

4         THE COURT:  Ask them one at a time.

5   Q.   First question -- actually, maybe three.

6        Mr. Murdock, was there a time in early summer 2008,

7   shortly after our house was in foreclosure, that you were in

8   our kitchen and you heard conversations between my wife and I?

9   A.   Yes.

10        MS. HAGER:  Objection.

11        THE COURT:  He can answer that yes or no.  He answered

12  yes.

13  Q.   Mr. Murdock, did you -- do you recall if I made any

14  promises to my wife during that time that you may have visited

15  us in our -- in early summer 2008?

16        THE COURT:  Hold on --

17        MS. HAGER:  Objection.

18        THE COURT:  -- Mr. Murdock.

19        MS. HAGER:  Calls for hearsay.

20        THE COURT:  Sustained.

21        "Sustained" means you can't answer the question.

22  Okay?

23        THE WITNESS:  Okay.

24        THE COURT:  See, anything -- I'm not going to give

25  you -- I'm not instructing you about the law, Mr. Reed; I

1    recognize you're a pro se party without counsel.  But you can't

2    inquire about an out-of-court statement made by yourself or by

3    Mr. Murdock in Mr. Murdock's presence; that's hearsay and I've

4    sustained the objection to it.

5            Go ahead with your next question

6            MR. REED:  Your Honor, I understood there to be an

7    exception to hearsay in terms of motive or intent.

8            THE COURT:  Mr. Reed, ask your next question.  I've

9    sustained the objection.

10           MR. REED:  I have no further questions for the

11   witness.

12           THE COURT:  All right.  Any cross-examination?

13           MS. HAGER:  No, Your Honor.

14           THE COURT:  All right, you're excused, Mr. Murdock.

15           Call your next witness.

16           MR. REED:  Your Honor, I'm not sure how to handle -- I

17   am the witness.

18           THE COURT:  So what you need to do -- you had

19   certainly indicated, before, your intention to testify and you

20   have the absolute right to do that.  You need to do it from the

21   witness stand.  Bring with you any documents that you wish to

22   use.  You've pre-marked exhibits, and what you'll have to do --

23   I've indicated previously I'm going to permit you to testify in

24   what's referred to as the narrative form, rather than --

25   there's no lawyer to ask you questions.  I'm not going to

1  require you to frame questions to yourself.  I'm going to

2  permit you to testify about the facts relevant to the claims.

3  It may be that at various points Ms. Hager is going to have

4  objections to something you've said.  Because she can't object

5  before the question where you're testifying in narrative form,

6  I'm going to permit her to object after you make a statement.

7  It may result in me striking -- indicating that I'm going to

8  strike a portion of your testimony.  The transcript will show

9  what you've said and what her objection is and what my ruling

10 is, but you do need to testify from the witness stand.

11        So if you want to get yourself regrouped up there.

12 Bring with you whatever documents you intend to use.  If you

13 have notes that you want to use, you're certainly permitted to

14 do that.  If you use notes as part of your testimony, you're

15 going to have to show them to Ms. Hager if she wants to see

16 them.  You'll do that before the cross-examination, not while

17 you're in the midst of testifying.

18        So I'm just alerting you that, yes, you can bring

19 notes that you want to look at while you're testifying but, if

20 you refer to the notes, then Ms. Hager's going to have an

21 opportunity to look at them after you finish testifying.

22        So you need to -- if you're going to testify, you need

23 to come up to the witness stand; you'll be sworn.  Bring your

24 exhibits.  You can -- as you're explaining to me whatever it is

25 you want to testify to, if you're going to refer to exhibits,

1  refer to them by the exhibit number or letter.  You're using

2  numbers.  You'll refer to them by the exhibit number.  And

3  exhibits need to be offered in evidence for them to be

4  admissible -- to be admitted in evidence.  And Ms. Hager'll

5  have an opportunity -- she has your exhibits and she will

6  undoubtedly have an objection to some.  If you offer Exhibit 3

7  and she has an objection, she'll tell me her objection and I'll

8  rule on it.

9          So not everything you pre-marked is -- none of it is

10 in evidence until you actually offer it in evidence.  That's

11 how the trial proceeds.  So if you want to take a few minutes

12 to get yourself up to the witness stand, you need to do that,

13 you need to be sworn, bring your exhibits with you, and I'll

14 permit you to testify as to the basis of your claims.  Okay?

15         MR. REED:  Your Honor, will I be able to bring some

16 and then come back for more?

17         THE COURT:  Take them all, okay, because it'll speed

18 things up.  I'll let you -- we'll take -- I'll tell you what:

19 we'll take a break until -- a short recess until 10 o'clock.

20 Get your documents situated up there at the witness stand.

21 Bring anything -- anything you're going to want to refer to in

22 your testimony, bring it with you.  And I'm explaining, if

23 you're going to offer anything -- if you're going to use an

24 exhibit, if you're going to offer it into evidence, you have to

25 actually tell me that you're offering whatever the exhibit

1  number is.  Ms. Hager'll have an opportunity to object to it if

2  she wishes, and I'll rule on the objections.  If I sustain the

3  objection, it's not in evidence.  If I overrule the objection,

4  it'll come into evidence.  Okay, that's how we'll proceed.

5         So we'll just take, like, about a six-minute recess,

6  okay?  Get yourself resettled up there, okay?

7         MR. REED:  Thank you, Your Honor.

8         THE COURT:  And you don't need to put your jacket on,

9  or anything.  You can take water with you.  Okay?

10         MR. REED:  Thank you, sir.

11     (Recess from 9:52 a.m. until 10:03 a.m.)

12         THE COURT:  All right, please be seated.

13         Mr. Reed, go ahead up to the witness stand.  Before

14  you sit down up there, you'll have to raise your right hand to

15  be sworn.

16     (Witness sworn)

17         THE COURT:  All right, please have a seat, Mr. Reed.

18  Okay, just make sure you pull the microphone as close to you as

19  you -- you're pretty close to it; that should be -- no, pull it

20  near you.  That's it.

21         All right, Mr. Reed, why don't you begin.  And if

22  Ms. Hager rises to raise an objection, just stop and let her

23  raise your objection.  Okay?  All right, this is your

24  opportunity to provide your direct testimony, Mr. Reed.

25         MR. REED:  Your Honor, I have a housekeeping about a

1   piece of evidence that's been sent to the Court, by TD Bank,

2   instead of provided to me.

3          THE COURT:  Nothing was filed this morning, Mr. Reed.

4   Do you have a copy of what it is that --

5          Ms. Hager, do you have anything from TD Bank?

6          MS. HAGER:  No, Your Honor.  And obviously we would

7   object to the admissibility of anything that's being shown here

8   today that I didn't previously see.

9          MR. REED:  Your Honor, it is a -- it is the

10  authentication of those letters from TD's legal department, the

11  correspondence that you said if it was provided at trial and

12  they were authenticated.  It took TD Bank this entire time.

13  And I received the correspondence this morning, a text message,

14  that their legal department overnighted them Friday to the

15  Clerk's Office.  And I've alerted the clerk this morning first

16  thing to look for them.  That's why I have someone here to keep

17  going to check when it would come in.

18         THE COURT:  Well, my courtroom deputy can hear what's

19  going on in the courtroom; I'd like her to check with the

20  Clerk's Office again and see whether anything was received

21  today in the Clerk's Office from TD Bank.  As of the time I

22  took the bench, there was nothing, Mr. Reed.

23         So go ahead with your testimony and we'll see what

24  happens.  Even -- go ahead with your testimony.

25         MR. REED:  First count I think I would like to

 1   discuss, Your Honor, is the breach-of-contract count.  And I

 2   believe the relevant contract -- contracts, plural, to this

 3   case are in the declaration -- or exhibits of the declaration

 4   of Lauren Graham Delehey in support of a ResCap Borrowers'

 5   Claims objection to my proofs of claim.  I believe that they

 6   contain the mortgage contract and the note contract, and I just

 7   want to take a moment and try and find which one; it's either

 8   Exhibit 9 or 10.  So it might take me a few moments to find

 9   them.

10            THE COURT:  I have your exhibit binder in front of me

11   and I see what you've listed as 9 and 10 are two of the Delehey

12   declarations --

13            MR. REED:  Um-hum.

14            THE COURT:  -- the first, the May 29th, 2014

15   declaration, and the supplemental Delehey declaration of July

16   3, 2014.

17       (Pause)

18            MS. HAGER:  Your Honor, it's a couple.  The note and

19   mortgage were attached to the supplemental declaration, which

20   is Mr. Reed's Exhibit 10.

21       (Pause)

22            MR. REED:  Your Honor, I'd first like to point out to

23   the Court that a note is a contract in and of itself; it's a

24   separate contract requiring separate execution.  As a matter of

25   fact, I'm the party to the note.  My wife is not a party to the

1   note.  It's just evidence that they're indeed separate, besides

2   being physically separate, signed separately by separate

3   parties.  The fundamental reason for that is a note is a

4   negotiable instrument that doesn't contain an obligation from

5   the lender to a borrower.

6         THE COURT:  Okay, Mr. Reed, after all the evidence is

7   completed, you'll have a chance to make whatever legal

8   arguments.  Now --

9         MR. REED:  Okay.

10         THE COURT:  Now is the time during the trial when each

11   side is entitled to provide the evidence, not the arguments

12   about the evidence.  So the evidence are the facts that you

13   want to tell us about, not whatever legal conclusion you think

14   derives from that.

15         MR. REED:  Not what they mean.

16         THE COURT:  Not what they mean, but to tell me -- this

17   is your chance to explain the facts as you lived them.  I'm

18   trying to give you a little leeway.  I understand you're not a

19   lawyer.  But what the meaning of the documents is, if it's

20   relevant, your understanding of the meaning.  But at this point

21   I'm not sure that's the relevant issue.  If you're looking

22   at -- and Ms. Hager pointed out that attached to the

23   supplemental declaration of Ms. Delehey is a copy of the

24   mortgage and of the note.  And while you indicated that only

25   you signed the note, in fact there's an interest-only addendum

RESIDENTIAL CAPITAL, LLC, et al.                    38

1   to adjustable-rate note, and that is signed by your wife as

2   well as by yourself.

3          MR. REED:  Hmm.

4          THE COURT:  But now is the time to talk about the

5   facts, okay?  Are these the two documents you were looking for,

6   the mortgage and --

7          MR. REED:  They are.

8          THE COURT:  Okay.

9          MR. REED:  So there are two separate contracts, I

10  believe is the fact.  And although -- I'm trying to think of

11  how I can do this.

12         THE COURT:  Well, first off, do you want to offer

13  these two documents?  It's actually three documents because the

14  adjustable-rate riders is in there.  The documents which are in

15  your binder, marked as Exhibit 10, are you offering them in

16  evidence?

17         MR. REED:  Yes.

18         THE COURT:  Okay, any objection?

19         MS. HAGER:  No, Your Honor.

20         THE COURT:  All right.  Exhibit 10 is in evidence.

21  (Mortgage for Reed residence, fixed/adjustable-rate rider, and

22  interest-only addendum were hereby received into evidence as

23  Reed's Exhibit 10, as of this date.)

24         THE COURT:  Okay.  And, I mean, I'm not trying to tell

25  you how to proceed, Mr. Reed.  View it as your time to tell the

RESIDENTIAL CAPITAL, LLC, et al.                    39

1    story from your perspective.  It has to be competent evidence

2    that you're offering.  You'll have a chance, at the conclusion

3    of all the evidence, to make your arguments about it.

4              So what I now have in front of me in evidence is the

5    mortgage, which appears to be signed by both you and your wife.

6    And then attached to the mortgage is the fixed/adjustable-rate

7    rider; that appears to be signed by both you and your wife.

8    And then there's an interest-only addendum, which again is

9    signed by you and your wife.  And there're sort of multiple

10   copies of some of these documents.

11             So why don't you just try and tell us -- look, you

12   asserted claims, you had originally asserted defenses to the

13   mortgage foreclosure action, then you filed your own

14   independent action.  That's what your proofs of claim relate

15   to.  And now is the time for you to tell us what are the facts

16   that you believe support your claim, okay?  I'm going to give

17   you some leeway, but this is not the time for legal argument

18   about what you think the documents mean, okay?

19             MR. REED:  In 2008 we were served with a foreclosure

20   complaint, and I have gotten no notice for that complaint that

21   it was coming -- imminently coming.  Our contract that was just

22   entered into evidence --

23             THE COURT:  You're talking about the note?

24             MR. REED:  The mortgage contra --

25             THE COURT:  The mortgage, okay.

1        MR. REED:  The mortgage --

2        THE COURT:  Uh-huh.

3        MR. REED:  -- contract, not the note.  The mortgage

4   contract, in paragraph 15 --

5      (Pause)

6        MR. REED:  Your Honor, I didn't know if you need to

7   read paragraph 15.

8        THE COURT:  I've read it.

9        MR. REED:  Okay.  It requires that I be served with

10  notice.  And turn -- oh, I'm -- paragraph 22 of the mortgage

11  contract --

12       THE COURT:  Go ahead.  I'm paying attention.

13       MR. REED:  Oh --

14       THE COURT:  Just go ahead with your explaining.

15       MR. REED:  -- seems to mention a requirement to have

16  notice sent, including incorporating the requirements of the

17  state Fair Foreclosure Act.  Paragraph 20 of the mortgage

18  contract --

19       THE COURT:  Yes.

20       MR. REED:  -- the section -- the second paragraph of

21  that section says that "Neither Borrower or Lender may

22  commence, join or be joined to any judicial action".  Do you

23  see that, that --

24       THE COURT:  Yes, I do.

25       MR. REED:  So I was surprised to receive a foreclosure

RESIDENTIAL CAPITAL, LLC, et al.                    41

1  action when I hadn't received any notice pursuant to the

2  contract or law.

3          THE COURT:  What did you do after you got served with

4  the complaint?  I understand your testimony that it came as a

5  surprise to you that you were served with the foreclosure.

6  But -- I want to be careful.  I don't want to -- I'm not trying

7  to take over -- this is your case.  I don't think there's a

8  dispute about this.  You hadn't made your mortgage -- some

9  mortgage payments when they filed the foreclosure action,

10 right?

11         MR. REED:  Still a matter between my wife and I, Your

12 Honor.  I can't determine, like -- I don't have personal

13 knowledge whether or not those payments --

14         THE COURT:  Okay.

15         MR. REED:  -- were made --

16         THE COURT:  All right.

17         MR. REED:  -- or not.

18         THE COURT:  So what did you do after you were served

19 with the complaint?

20         MR. REED:  Your Honor, I can't remember the order, if

21 I called our -- an -- our attorney or if I called the mortgage

22 company.  I know that we were nervous, scared about this.  We

23 had a contract on the house recently for -- to sell, as

24 Ms. Hager had said in her opening remarks, to a buyer, for the

25 sales price of two million forty.  That transaction was

1  repudiated, or cancelled, by the buyer before the foreclosure

2  was filed.  There was legal interactions between my lawyer and

3  their lawyers.

4            THE COURT:  "Their lawyers" meaning --

5            MR. REED:  The Jacobses'.  The buyers'.

6            THE COURT:  The Jacobses'.  Okay.

7            MR. REED:  The buyers', yeah.

8            THE COURT:  Can I just ask, was this your principal

9  residence?

10           MR. REED:  It was.

11           THE COURT:  And when did you start to try to sell it?

12           MR. REED:  Several months earlier in 2007 --

13           THE COURT:  Before the foreclosure action?

14           MR. REED:  Oh, yes.  We -- Your Honor, we -- "we"

15 meaning my wife and I, since 1990, on average, would buy and

16 improve a property, maybe on average every eighteen months.

17           Do you mind if I --

18           THE COURT:  I don't, no.

19           MR. REED:  Those properties included -- just to give

20 you some background -- rental properties, single-family homes.

21 There was one duplex.  They included homes that we would live

22 in, and properties that would be rented and then sold for

23 profit.  Investment properties that I wouldn't live in would --

24 we would --

25           THE COURT:  Go ahead.  Ms. Hager, if you want to make

RESIDENTIAL CAPITAL, LLC, et al.                    43

1  your objection, go ahead.  I don't mean to keep you from making

2  your objections on the record.

3          MS. HAGER:  Well, objection to the extent that

4  evidence is coming in relating to prior business activities.

5          THE COURT:  I'm going to overrule the objection.  This

6  is just part of background.  I don't consider it as relevant to

7  the specific claim for this property.  But I'm going to listen

8  to Mr. Reed's ex -- but please make your record.  And when I

9  raise my hand like that, it was just to have you hold until he

10  finished his sentence.  But I'm not trying to keep you from

11  preserving the record on behalf of your client.

12          I'm going to overrule that.

13          I'm going to give you some leeway, Mr. Reed.  Give me

14  the background of -- but this was your principal residence at

15  the time?

16          MR. REED:  It was, Your Honor.

17          THE COURT:  Okay.

18          MR. REED:  And we put it on the market and -- in 2007;

19  had multiple showings and interest.  I don't tell you exactly

20  when; maybe it was September or something like that that it was

21  put on the market; October.  And within weeks -- I don't

22  believe it was even six weeks or five weeks.  There might even

23  be a document in Ms. Hager's file that shows that -- she's got

24  it listed for trial evidence, how long it took.

25          We had an offer for --

RESIDENTIAL CAPITAL, LLC, et al.                    44

1           THE COURT:  This is the Jacobs offer?

2           MR. REED:  The Jacobs offer.  -- for two -- which

3     resulted in a contract for two million forty.  I can't remember

4     the interplay exactly.

5           THE COURT:  May I ask you this?  At the time you

6     listed the house for sale, were you current on your mortgage?

7           MR. REED:  Yes.

8           THE COURT:  Okay.  Go ahead.

9           MR. REED:  This was significantly higher than our

10    purchase price, which was what we -- I would normally see,

11    because I -- we would improve the properties and expand living

12    space.  It was very systematic the way we would do things like

13    that, knowing what things added financial and marketing value

14    to properties, for a decade and a half.

15          And so we had a buyer in the Jacobses, who we didn't

16    know, the realtor brought to us, although they -- turns out

17    they lived in town, so they knew the market as well.  And

18    the -- and so as -- because -- and I understand this doesn't go

19    to damages; they've been excluded.  Other damages on other

20    projects have been excluded.  So I want you to understand if I

21    go to say something that's not for that.

22          At the time that I had the house under contract to

23    sell, and it wouldn't be the first time, I would secure

24    financing options to cash out money from one of my improved

25    properties, just to ensure cash -- smoothness in my cash flow.

1  So if a property had any delay in selling, which I never

2  actually experienced, but if they -- if it had, then I would

3  have a plan B in place to pull more cash out to allow more time

4  for the market, to sell a property, to realize the cash free

5  and clear.  And that's because I had other projects going

6  forward in motion:  a house that we would be moving into, or

7  another one under development or renovation.

8          So that's how the TD Bank financing that we'll talk

9  about comes into play.  I had asked TD Bank, a funding partner

10 of mine for a number of years, to be prepared -- or I asked

11 them to be ready to close on a cash-out refi of the property if

12 necessary.

13         THE COURT:  Which property?

14         MR. REED:  The 817 Matlack --

15         THE COURT:  Okay.

16         MR. REED:  -- the -- my house.

17         THE COURT:  And I should say before we go on, my

18 courtroom deputy retrieved from the Clerk of the Court a letter

19 dated September 12, 2014 from Barbara J. Morgan, TD Bank, N.A.,

20 custodian of records, attaching a subpoena and a TD Bank

21 records certification.

22         MR. REED:  Could I -- would I be able to see that,

23 Your Honor?

24         THE COURT:  Yes, you will.  What I'm going to ask

25 is -- let's go on with your --

RESIDENTIAL CAPITAL, LLC, et al.                    46

1              MR. REED:  I can stop talking for that.

2              THE COURT:  No, no, no.  We'll -- tell me what it is

3    that you asked TD Bank with respect to this specific property.

4    We're talking about this specific property -- this is the

5    Matlack --

6              MR. REED:  Yes.

7              THE COURT:  -- property; this is the one as to which

8    the foreclosure was commenced, so we can just refer to it as

9    "the property".

10             MR. REED:  Um-hum.

11             THE COURT:  Okay, go ahead.

12             MR. REED:  I asked them to do a cash-out refi, could

13   they take out the first.  And I believe I had a balance on the

14   second, which was a line of credit, and provided me free cash

15   beyond that.  My recollection was that number would have been

16   about 4-, 500,000 dollars beyond the liens that were there.

17             THE COURT:  Mr. Reed, let me ask you this:  Ms. Hager

18   indicated in her opening statement -- I think the gist of this

19   point was that you've not -- you didn't pre-mark any refinance

20   loan applications.  Do you have any refinanced-loan

21   applications that you --

22             MR. REED:  My -- Your Honor, the relationship with TD

23   Bank did not require that.  And I don't -- I didn't have

24   them --

25             THE COURT:  Okay.

1          MR. REED:  -- or they didn't exist.

2          THE COURT:  So there was no --

3          MR. REED:  I didn't have --

4          THE COURT:  Let me just -- on this point, you did not

5   complete an application with TD Bank to refinance the existing

6   mortgages on the property?

7          MR. REED:  They did not require so.

8          THE COURT:  You just -- whether you say they required

9   it or not, I just want -- look, you didn't pre-mark any.  Do

10  you agree that you never completed an application with TD Bank

11  to refinance the mortgages on this property?

12         MR. REED:  That and many other properties --

13         THE COURT:  Okay, I only want to know about --

14         MR. REED:  Yes.

15         THE COURT:  -- this property --

16         MR. REED:  Yes, Your Honor.

17         THE COURT:  -- okay?  We'll simplify -- I'm not trying

18  to interrupt your narrative explanation, but you raised this

19  point; it's a point that Ms. Hager raised in her opening.  In

20  your exhibits that you pre-marked, there was no loan

21  application with TD Bank or anyone else.  And I'm only trying

22  to make sure we have a clear record.  So if you can answer my

23  question yes or no, I would appreciate it.  Is it correct that

24  you did not complete a mortgage application with TD Bank to

25  refinance the existing mortgages on this property?

1          MR. REED:  That is correct, Your Honor.

2          THE COURT:  Okay, all right.  Go ahead with your

3    narrative.

4          MR. REED:  As I've said, my primary residences before,

5    and other properties, that was our relationship, because I --

6    they never needed one, Your Honor; that's just the way we -- we

7    had a business relationship.  I think the last application, to

8    be clear, that I filled out for TD Bank may have been 1992 or

9    something, '93, involving one of my original properties.

10         THE COURT:  Did you speak with TD Bank about the

11   possibility of refinancing the mortgages on this property?

12         When did you do that?  Was it before the foreclosure

13   action was filed?

14         MR. REED:  Yes.  Yes.  It was while the contract was

15   not in dispute with the Jacobses.

16         THE COURT:  Okay.

17         MR. REED:  As I said, it's -- it was a -- an MO of

18   mine to make sure that I conservatively would have no

19   interruption in cash flow.  I was actually criticized by my

20   wife about spending 850 dollars to TD Bank for the appraisal

21   that needed to be done for that refinance.

22         THE COURT:  Okay, my law clerk, Ms. Dabbert, has

23   handed to Ms. Hager and to Mr. Reed the letter and attachments

24   that the Clerk of the Court received this morning from TD Bank.

25   Rather than get diverted on that for now, we can talk about

1   that during a recess.  Why don't you proceed with your

2   narrative, Mr. Reed.

3           Okay, so you had gotten to -- you've explained to us

4   you had a contract with the Jacobses for 2,040,000.  You, in

5   your mind, had a backup plan to refinance the existing

6   mortgages.  Did the Jacobses back out of the purchase before or

7   after the foreclosure action was filed?

8           MR. REED:  They backed out -- they gave notice of

9   wanting to back out of the contract before the foreclosure

10  action.

11          THE COURT:  Go ahead.

12          MR. REED:  But there was the -- there was a lingering

13  conversation between our attorney and their attorney regarding

14  if the Jacobses were still interesting in buying the house.

15  The reason that the Jacobses had decided formally through

16  written correspondence to terminate the contract for two

17  million forty was the -- they couldn't obtain financing for --

18  I think it was eighty percent of the appraised value of the

19  property, and it would be equal to a certain dollar amount.

20  The reason that didn't happen for them, ironically, is they

21  applied for a mortgage through TD Bank, just like I sought a

22  refi.

23          THE COURT:  I thought I saw in the papers that they

24  had applied to Commerce Bank.

25          MR. REED:  Commerce is the predecessor.  So, TD now.

1           THE COURT:  Well, now.  But wasn't Commerce Bank

2    separate then?

3           MR. REED:  No.  Oh.  Oh, oh.  I'm sorry.  Let's be

4    clear about that.  My dealings with -- at the time, 2007, 2008,

5    prior to that, was with Commerce Bank.

6           THE COURT:  Okay.  All right, go ahead with your

7    explanation.

8           MR. REED:  So the Jacobses applied for a purchase

9    mortgage from the same bank that I had my cash-out refinance in

10   place, supposedly, as my historical understanding and relations

11   with them, Commerce Bank.

12          The troubling thing that resulted in litigation, even,

13   with the Jacobses was TD Bank produced conflicting appraisals

14   on the same property.  I believe the Jacobses' appraisal,

15   ordered through TD Bank, performed by a contractor of TD Bank,

16   just like the one -- mine was ordered by TD Bank and produced

17   by a different contractor used by TD Bank -- came up with

18   different numbers.  Mine was two million forty, and the

19   Jacobses' Commerce Bank appraisal was for -- I think it was

20   1.97, and that might be, again, in Ms. Hager's records, in her

21   evidence -- proposed evidence.

22          So we had a discussion with the Jacobses, and it was

23   my understanding that there was a desire to reduce the price

24   because of this conflict in the appraisals.  So -- and we

25   were -- I was willing -- it turned out, after first making the

1  case to them that it would -- we would have liked not to; we

2  had pointed out errors in the -- what we thought were -- I

3  guess you would use the term "material errors", in the

4  appraisal that would -- their appraisal, that would have caused

5  the value to be lower:  square footage, features, things of

6  that nature.  I think there was a bathroom missing, fireplace

7  missing.

8          But nonetheless, from a business standpoint it was not

9  very consequential to change the contracts 70,000 dollars or

10  50,000.  It didn't matter.  We would do it.  It's just the

11  nature of business to just make a sale.  Whatever needs to be

12  done, if that's what's at hand, you do it.

13         So that conversation continued for months -- or

14  several months, I believe.  And it seemed like we were going to

15  perhaps get somewhere.  The Jacobses had their house up for

16  sale; it was not contingent on the contract that they had to

17  sell their house.  But I think they were nervous about whether

18  or not they could sell their house, and --

19         MS. HAGER:  Objection, Your Honor, to the extent that

20  Mr. Reed's testifying as to the thoughts of the Jacobses.

21         THE COURT:  Sustained.

22         You can't talk about what's on somebody else's mind,

23  okay?

24         MR. REED:  Your Honor, I'll do my best.

25         THE COURT:  Go ahead.

 1              MR. REED:  And I'm --

 2              THE COURT:  Go ahead, Mr. Reed.

 3              MR. REED:  -- I'm thankful that you can discern that

 4      and Ms. Hager can --

 5              THE COURT:  Go ahead.

 6              MR. REED:  -- stop it.

 7              THE COURT:  Go ahead.

 8              Did you ever reach a new agreement with the Jacobses?

 9              MR. REED:  At a point when we thought we were going

10      to, that's a point when I believe, in my memory, we wound up in

11      the foreclosure action.

12              THE COURT:  Let me ask my question again.  Did you

13      ever reach an agreement with the Jacobses to modify the

14      purchase contract with them?

15              MR. REED:  No.

16              THE COURT:  All right, go ahead.  What happened then?

17              MR. REED:  Trying to make sure I get -- I want to make

18      sure I get these things -- I always want to make sure we get

19      them accurate for you.

20              The -- during this time, Edgar Real Estate (sic) had

21      the house --

22              THE COURT:  Let me -- before you do that, Mr. Reed,

23      you put the Court in an uncomfortable position because I don't

24      want to -- it's not my role to help either counsel.  And you're

25      not a counsel; you're pro se.  But you've talked about -- the

1  only thing that ever is in evidence are things that are offered
2  in evidence and are admitted in evidence, okay?  You attach as
3  Exhibit 1 -- or you include as Exhibit 1 in your binder, I
4  believe -- is that the contract with the Jacobses?
5          MR. REED:  Yes, Your Honor.
6          THE COURT:  Are you offering it in evidence?
7          MR. REED:  Yes, Your Honor.
8          THE COURT:  Any objection, Ms. Hager?
9          MS. HAGER:  No, Your Honor.
10         THE COURT:  Okay.
11 (Contract between the Reeds and the Jacobses was hereby
12 received into evidence as Reed's Exhibit 1, as of this date.)
13         MR. REED:  But, Your Honor, I -- can I get a -- my
14 sticky tabs that I'll know that that was one that was put in --
15         THE COURT:  Just write a note on it.
16         MR. REED:  Oh.  I didn't know if I --
17         THE COURT:  I have the official records up here, okay?
18 Those are your copies.
19         You know, it's sometimes a trap for unwary lawyers,
20 which you're not a lawyer, when they refer to exhibits during a
21 trial and then fail to offer them in evidence and get a ruling
22 from the Court.  And one of the things I always try and do -- I
23 don't want cases decided because of a trap for the unwary, so
24 when the evidence is closed, I usually go back over with
25 counsel what's in evidence, what's not in evidence.  You're pro

RESIDENTIAL CAPITAL, LLC, et al.                54

1    se.  I'm doing it now.  I'm not in a position -- I'm not

2    looking to help you, Mr. Reed.  I think a lot of this is not

3    going to be controversial, but I'm just raising it now because

4    you talked about the Jacobs contract; I know it's in your

5    binder; it's now evidence.  So go ahead.

6             When you're telling your story, if you've got an

7    exhibit you want to offer, you can offer it and Ms. Hager may

8    have an objection; I'll rule on the objection at the time.  But

9    you need -- if you want me to consider anything in reaching my

10   decision, it has to be in evidence.  Okay?

11            MR. REED:  Then --

12            THE COURT:  So this is in evidence now.  Go ahead.

13            MR. REED:  Before it slips my mind, perhaps I should

14   offer in evidence number 2.

15            THE COURT:  That you got a problem about.  Well, let

16   me see; what is Exhibit 2?

17            MR. REED:  That is the Commerce Bank appraisal that

18   was given to me by Commerce Bank for my records, through my

19   regular business relations with them; regards the refinance

20   with them.  And I kept it -- received it at that time and kept

21   it.  It's part of my normal business relations with them.

22            THE COURT:  Ms. Hager?

23            MS. HAGER:  Well, Your Honor, there's no foundation

24   for the document, and Mr. Reed's testimony is not sufficient to

25   get the document in, because this was a document prepared by

1  Mr. McCaffrey (ph.) for Commerce Bank.  Doesn't indicate at all

2  that it was a document prepared for or by Mr. Reed.

3       (Pause)

4           MR. REED:  Your Honor, may I point to something on the

5  face of the document?

6       (Pause)

7           THE COURT:  All right, this is a document you received

8  from Commerce Bank?

9           MR. REED:  It is, Your Honor.  If you look at two

10 things on the face of the document -- and I need a minute to go

11 through the document well.

12          THE COURT:  Well, just tell me, is this a document you

13 received from Commerce Bank?

14          MR. REED:  Yes.

15          THE COURT:  All right.  I'm going to admit Exhibit 2

16 for the limited purpose of notice or knowledge by Mr. Reed.  It

17 is not admitted in evidence for the truth of the matter

18 asserted within the appraisal report.

19 (Commerce Bank appraisal re: Reed refinance was hereby received

20 into evidence for the limited purpose of notice or knowledge,

21 and not for the truth of the matter as to value, as Reed's

22 Exhibit 2, as of this date.)

23          THE COURT:  So let me underst -- I want to explain; I

24 ordinarily wouldn't, Mr. Reed, but -- okay.  The document is

25 not admitted -- when I say it's not admitted for the truth of

RESIDENTIAL CAPITAL, LLC, et al.                    56

1  the matter, on page 2 of 6, the appraisal indicates an -- it

2  gives an "indicated value", by sales comparison approach, of

3  2,040,000 dollars.  The document is not admitted in evidence

4  for the purposes of the truth of that conclusion.  The

5  document's hearsay, okay?  The appraiser is not here testifying

6  and is not on the witness list to call them as a witness.  So

7  it can't -- I can't admit it, and I'm not admitting it, in

8  evidence for the truth of the matter, namely, the appraised

9  value.  I'm admitting it solely as part of the background

10  of --you indicated you had these discussions with TD Bank; you

11  indicated that you paid 850 dollars to them to get an

12  appraisal.  I see on the first page of the document, in the

13  right-hand corner, there's a handwritten 850 dollars; I can't

14  read the rest of it.

15        But I'm admitting it solely for the purpose of notice

16  or knowledge.  You testified that you were in communication

17  with TD Bank and that they obtained an appraisal, but I can't

18  admit it for the truth --

19        MR. REED:  For the value?

20        THE COURT:  For the value.

21        MR. REED:  That's fine.

22        THE COURT:  Okay?  So that's my ruling.  But go ahead.

23        MR. REED:  What I wanted to draw your attention to

24  actually, Your Honor, on the face of the document there's a

25  stamp from TD Bank -- or Commerce Bank.  The top.  You had

1  asked about an application, or proof of an application,

2  which --

3         THE COURT:  You can't prove the existence of a loan

4  application by a stamp that says, "This appraisal has been

5  performed for Commerce Bank in connection with a loan request

6  made by you.  Commerce Bank makes no representation regarding

7  the accuracy of the information contained in the appraisal, and

8  assumes no liability in connection with this appraisal."

9  That's the stamp you're talking about, right?

10         MR. REED:  I don't know --

11         THE COURT:  Okay.

12         MR. REED:  -- the legal import of it, but --

13         THE COURT:  I understand, Mr. Reed.  Go ahead with

14  your narrative.  You've offered it.  I can't -- I'm not going

15  to admit it for the truth of the matter asserted, namely, the

16  value, because that's hearsay.  I'm admitting it for the

17  limited purpose of notice or knowledge.  You indicated your

18  communication with TD Bank; you've testified about that.  You

19  indicated that you paid them a fee to get an appraisal done.

20  Okay.  But go ahead, all right?

21         What happened -- so you didn't -- you told me that you

22  didn't reach a new agreement with the Jacobses, they backed

23  out.  You wound up in litigation with them, didn't you?

24         MR. REED:  I did.

25         THE COURT:  Yeah.  Okay.  I'm not sure that that's

1  really relevant to -- Ms. Hager wants to -- if you want to tell
2  me about it, you can, but it's not really relevant to the
3  issues here.  But go ahead.  Pick up your narrative where you
4  wanted to pick it up.  You wound up paying back their deposit.
5          MR. REED:  Yes.  We litigated the -- the issue in the
6  litigation was that we, especially in light of the conflicting
7  appraisals from the same institution, and the -- what we felt
8  were material defects in their -- the Jacobses' appraisal from
9  the same institution, that a contract provision requiring best
10 efforts to obtain financing -- there needed to be a
11 determination what "best efforts" meant.  And a New Jersey
12 court found it -- they felt that the Jacobses had satisfied
13 that requirement.
14          THE COURT:  All right, what happened?  Just pick up
15 the story.
16          MR. REED:  Yeah.  So we -- so they got their deposit
17 back.
18          So the -- we were still bound by a listing agreement
19 with B.T. Edgar.
20          THE COURT:  Is that Ms. Carter?
21          MR. REED:  Ms. Carter.  And for the record, has defied
22 a federal subpoena, Your Honor, to appear today as a witness in
23 this case.  I don't know what to do about that.
24          There ensued a conflict with B.T. Edgar regarding the
25 Jacobs contract.  B.T. had a position that they didn't want to

1  relist the house until they were -- as active for sale, until

2  they were satisfied that the Jacobs transaction was not going

3  to be amended or come to a purchase conclusion.

4      (Pause)

5          MR. REED:  I believe it was after the -- I'm pretty

6  sure it was after the foreclosure commenced that -- yeah,

7  because I went to see B.T. about that; we wanted to make sure

8  we got it on the -- back on the market.  And I was satisfied, I

9  think, that from a business perspective, the Jacobses were

10 going to come to an agreement that, whether or not we relisted

11 or not -- left it pending on the MLS was not really relevant to

12 actually coming to an agreement with them.  It was necessary,

13 from a business perspective -- and I had maintained it prior to

14 the foreclosure action -- to relist the property.  They had

15 resistance and they had contractual language in the listing

16 agreement, about -- that they had pointed to and -- that

17 stalemated between us the fact that it was still listed as

18 pending.  When the foreclosure happened, they seemed to back

19 off that position and relist the property.

20         Your Honor, I'm not sure of, like, the times, the

21 dates.  I reference things in my mind as pre and post the

22 foreclosure action commencing.  Trying to get an idea where in

23 that time line they are.

24         When we relisted it, if I'm not mistaken, we brought

25 the price down and for the simple reason there's now added

1  pressure; I have a foreclosure action, I want to sell the

2  property.  We had a contract just for two million forty.  As

3  you said, you didn't admit it as evidence, but I had

4  understanding that the property was worth that or near that.

5  From a market perspective, the contract itself is evidence of

6  what the market was interested in paying for that property.  We

7  were in an arm's-length transaction.  I didn't know the

8  Jacobses; they were two separate individuals that came together

9  for that price.  But for the fact that they had a third party

10  involved for financing, if it was a cash transaction, they

11  would have bought the property; it was -- there was an

12  agreement.

13          So --

14          THE COURT:  The world changed in 2008, Mr. Reed.  The

15  world changed in 2008 with respect to the real-estate market.

16          MR. REED:  Not yet, though.  And I don't know if it

17  was 2008, and I think there'll be evidence to show --

18          THE COURT:  Well, let's get on with the evidence,

19  okay?  All right, so after the Jacobses cancelled, did B.T.

20  Edgar relist the property?

21          MR. REED:  Yes, it --

22          THE COURT:  When?  Do you know?

23          MR. REED:  I believe right -- I mean shortly after

24  the --

25          THE COURT:  What happened next?

1          MR. REED:  Well, it was a relatively good price at

2    that moment in time, and --

3          THE COURT:  All right, but that deal didn't happen, so

4    what happened then?

5          MR. REED:  No, I'm saying, when they relisted it --

6          THE COURT:  Yes.

7          MR. REED:  -- the new price was a lower --

8          THE COURT:  Listing price, yes.

9          MR. REED:  Yes, new listing price.

10         THE COURT:  Do you remember what you listed it at --

11   reduced it to?

12         MR. REED:  1.8-something, I think.

13         THE COURT:  Okay.

14         MR. REED:  And we got an offer from -- and this is

15   maybe -- I can't remember how early -- it was very close --

16   June, July; I don't know.  We had a verbal offer for 1.8 that

17   then came in writing from a fella called Mark Weaver.

18         THE COURT:  Weaver?

19         MR. REED:  Weaver.

20         THE COURT:  He ever make a written offer?  Mr. Weaver

21   make a written offer?

22         MR. REED:  Through Ms. Carter, yes.

23         THE COURT:  Because when I went through your exhibits,

24   I didn't see a written offer from the Weavers.  Was there a

25   written offer?

1        MR. REED:  Yeah; I think Ms. Hager has them in her

2  exhibits.

3        THE COURT:  All right, go ahead.  And what happened

4  then?  Did you enter into a contract with the Weavers?

5        MR. REED:  We did.

6        THE COURT:  Do you remember what the purchase price

7  was?

8        MR. REED:  It was the 1.8, which --

9        THE COURT:  And what happened?

10        MR. REED:  Mr. Weaver proceeded as normal; had, I

11  think, some home inspections done on the property.  And at that

12  same time -- that same time frame, I -- pretty sure I had some

13  communication with the mortgage company, maybe on -- and there

14  was a -- there was a meeting -- a large meeting being sponsored

15  by, I think, Senator Menendez -- U.S. Senator Menendez's

16  office, for mortgage companies and buyers and sellers and

17  people, to work on their mortgages.  If I'm not mistaken, it

18  was at the local county college.  And I -- in talking with the

19  mortgage company about our situation --

20        THE COURT:  Which mortgage company?

21        MR. REED:  We had a mortgage comp -- the servicer, I

22  guess, GMAC Mortgage.

23        They -- I believe they were first reluctant -- my

24  memory serves me, they were first reluctant to talk to me,

25  because we were in foreclosure.  They wanted to direct me to

 1   speak to their foreclosure counsel in New Jersey.  And as a

 2   matter of fact, I don't -- I think I -- I think I became aware

 3   of the -- this event -- it may have been something in the

 4   little -- it was like a little -- it's a news -- like, a little

 5   town newspaper, and there was something in the newspaper, a,

 6   like, flyer about the event.

 7              So nonetheless, I -- the -- when I had spoken to the

 8   law firm, their position was we're in default, we have the --

 9   you have to pay the mortgage.  I didn't speak to any lawyer.  I

10   left messages for the lawyer.  I spoke to some -- I believe,

11   some lady.  I cannot tell you who I spoke to.

12              But when I -- I remember, when I went to this meeting

13   at Brook (ph.) College, they had an actual representative.

14              THE COURT:  Who did?

15              MR. REED:  GMAC Mortgage.  There were many -- reminded

16   me of college registration in the old days before computers,

17   where you would have to go in the school and -- at all the

18   tables set up, and everything like that.

19              So I went there.  I was able to find -- they called

20   themselves ResCap; GMAC.  I think that might have been the

21   first time I heard the name ResCap.  But I realized that that's

22   who we would be -- know -- have any information about my

23   mortgage situation.

24              So I brought my information to them.  They gave me --

25   we spent maybe an hour or so.  They had multiple

1  representatives.  And we came to a written agreement, or there

2  were notes.  I didn't walk out of there that day with a written

3  agreement, but there was -- there were notes on the -- you

4  know, that we would have -- there was an understanding and

5  agreement that there would be, you know, a modification to our

6  mortgage.  But I believe, Your Honor, it was -- it may have

7  been in two steps, and that they were going to -- the gentleman

8  said look, don't worry about the foreclosure action.  This

9  is -- meaning I'm not telling you not to fight it or do

10  something to do it, but this is the point of our meeting here

11  is to resolve your -- you know, any default in your note.

12          MS. HAGER:  Objection, Your Honor, to the extent that

13  he's testifying about what the representative actually said,

14  which is hearsay.

15          THE COURT:  Well, if the representative said it, it

16  may or may not be admissible as an admission.  I'll take it

17  under advisement.

18          MS. HAGER:  Okay.

19          THE COURT:  I'm not ruling on the objection at the

20  present time.

21          Go ahead.

22          Did they give you any paperwork to complete in

23  applying for a modification of the mortgage?

24          MR. REED:  Yeah, they did.  They gave me -- they gave

25  me some kind of a package, Your Honor.  I'm pretty sure they

 1  did.

 2          Your Honor, I need to stand up for a moment.

 3          THE COURT:  Go ahead.  If you stand within voice range

 4  of the microphone, I'll let you stand and we can try and do it

 5  that way.  If you want to take short break --

 6          MR. REED:  That's --

 7          THE COURT:  -- we can do that.

 8          MR. REED:  The issue is, Your Honor, from a physically

 9  comment, not to bore you, sitting I only last so long, standing

10  I only last so long, or lounging, as you can see.  I mean no

11  disrespect to the Court --

12          THE COURT:  You know, you've been in my courtroom

13  enough, Mr. Reed, that I understand that you have back issues.

14          MR. REED:  I'm sorry.

15          THE COURT:  And I don't suffer from it to the extent

16  you do, but there are times when I wind up standing at the

17  bench because my back is sore.  So I have no problem if you

18  sit, if you stand, okay?  That is no -- I don't take it as any

19  disrespect.  I understand you're uncomfortable.

20          While you're looking through, I just want to come back

21  to your testimony about the Weavers.  Was the Weaver offer an

22  all-cash offer or subject to financing contingency?

23          MR. REED:  All cash.  Especially in light of what I --

24          THE COURT:  You know --

25          MR. REED:  -- just went through --

 1              THE COURT:  Okay, Mr. Reed, here's my suggestion.

 2     Move the chair over to the side, and so you can get closer to

 3     the microphone standing.  Okay?

 4              MR. REED:  Let me try this.

 5              THE COURT:  Rather than leaning over, if you'd just

 6     slide the chair over further.

 7              MR. REED:  I'm doing this --

 8              THE COURT:  Okay, I'm not going to tell you what you

 9     need or --

10              MR. REED:  No.

11              THE COURT:  Okay.  I just want to make sure the

12     microphone is picking up your testimony.

13              Okay, so the Weaver offer was an all-cash offer, not

14     subject to a financing contingency?

15              MR. REED:  Yeah, and that was in -- that, of course,

16     would be very appealing to us, Your Honor --

17              THE COURT:  Sure.

18              MR. REED:  -- in light of what just transpired.

19              THE COURT:  But the deal never closed?

20              MR. REED:  Correct.

21              THE COURT:  And why didn't it close?  I just want --

22     because you started telling me about Weaver, and then you went

23     on to talk about this meeting with a GMAC representative.

24              MR. REED:  Oh, yes, I was talking about that meeting

25     because it was something else --

RESIDENTIAL CAPITAL, LLC, et al.                    67

1        THE COURT:  And we'll come back to the meeting.  But I
2   want to make sure that I, at least, have heard the testimony
3   about Weaver.  From looking at documents, my understanding is
4   that deal didn't close?
5        MR. REED:  That is correct, Your Honor.
6        THE COURT:  And why didn't it close?
7        MR. REED:  Mr. Weaver failed to -- well, first of all,
8   if I'd like to -- I don't know if it's legally relevant in any
9   way, but factually, the contract was amended to reflect --
10  Mr. Weaver did not come to a settlement, I think, that was set
11  to occur, and Mr. -- it turns out his name was not Mr. Weaver,
12  apparently, it was Mr. Cooper.  I know, believe me.
13       THE COURT:  Okay, all right.  Well, I'm sure Ms. Hager
14  is going to have some questions about the Weaver/Cooper --
15       MR. REED:  And --
16       THE COURT:  Let's go back to GMAC.
17       MR. REED:  Okay.
18       THE COURT:  They gave you a package of materials in
19  connection with a possible modification of your mortgage?
20       MR. REED:  Yes.
21       THE COURT:  Right.  And did you complete the
22  documents?
23       MR. REED:  I did.
24       THE COURT:  And did you send them in?
25       MR. REED:  I did.  And I sent the three -- there were

RESIDENTIAL CAPITAL, LLC, et al.                    68

1  two -- there were two steps, I believe -- if I remember
2  correctly, Your Honor, there was a completion of some documents
3  about our assets and things of that nature.  I'm pretty sure
4  about that.  And then I remember receiving -- I originally
5  thought I got it at the meeting, but I don't -- I don't think
6  so.  I think it came later in the mail.  I think I got
7  documents from them, filled them out, sent them.  I think they
8  gave them back to me.  And there was -- there was a
9  modification.
10             And as I said, I think it was a -- it was a two-step
11  process.  It was supposed to last so long.  I don't remember if
12  it was five months, six months.
13             THE COURT:  So what --
14             MR. REED:  And I accepted the terms of the
15  modification and sent -- they required a 3,000-dollar payment
16  to -- in consideration, I guess, for the -- for the
17  modification.  The -- I don't have the document.  I couldn't
18  find it.  As a matter of fact, I didn't even -- I'd forgotten
19  about it.
20             But I sent it back, and the -- you know, with the
21  payment, and the mortgage company kept the payment.
22             THE COURT:  The payment was the 3,000 payment?
23             MR. REED:  Yes, um-hum.  And I didn't hear -- they
24  were sup -- according to the documents, they were supposed
25  to -- you know, it said on it, this is not complete until you

RESIDENTIAL CAPITAL, LLC, et al.                    69

1  receive a signed copy back, you know, for your -- for your

2  records.  I mean, there was two places on the bottom of the

3  document for signatures:  one for me and one for the mortgage

4  company.  And we never got it back.

5          And in the -- in that time, you know, I wasn't

6  thinking about it so much.  It wasn't at the top of my

7  attention, because now we had a contract for sale, a cash

8  contract for sale, for -- from, you know, Mr. Weaver or Cooper,

9  or whatever, for a million-eight.

10          So my point in this narrative brings me to Exhibit 16.

11  I think Ms. Hager has a copy of it in her exhibits as well.

12          THE COURT:  And what is Exhibit 16?

13          MR. REED:  That's an e-mail exchange between the

14  representative that I had met from GMAC ResCap.

15          THE COURT:  So the representative you met was this

16  Mark Folweiler, F-O-L-W-E-I-L-E-R?

17          MR. REED:  Yes.

18          THE COURT:  And do I understand that Exhibit 16 is an

19  exchange of e-mails, the first from you on Monday September

20  22nd, 2008 at 10:09 a.m., and a response from Mr. Folweiler on

21  September 2 (sic), 2008 at 11:29 a.m.?

22          MR. REED:  Yes.

23          THE COURT:  Are you offering Exhibit 16?

24          MR. REED:  Yes.

25          THE COURT:  Ms. Hager?

1          MS. HAGER:  Your Honor, the Borrower Trust objects to

2     the extent that the page that's being offered is actually an

3     incomplete document.  It does not represent the entire e-mail

4     chain.  I don't have an issue with that particular page itself.

5     However, our Exhibit MM actually reflects the entirety of that

6     e-mail exchange.

7          So just to the extent that Mr. Reed is offering a

8     portion of what is otherwise the complete document, we have an

9     issue with that.  It's not the best evidence of that e-mail

10    exchange.

11         THE COURT:  Let me look at your Exhibit MM.

12         MR. REED:  And that's on --

13         THE COURT:  Just let's stop.

14      (Pause)

15         THE COURT:  So, Mr. Reed, Ms. Hager has pointed me to

16    the Trust's Exhibit MM.  And it includes -- it's three pages in

17    length, and it appears to relate to the same e-mail chain, but

18    include additional -- you agree as to what it is?

19         MR. REED:  Yes, Your Honor.

20         THE COURT:  All right.  We have a doctrine of

21    completeness, so that if you offer part of an exchange, the

22    Trust would be entitled to have the whole exchange in evidence.

23    Do you want to offer Exhibit MM even though it's their exhibit?

24         MR. REED:  Yes.

25         THE COURT:  Okay, Ms. Hager?

1          MS. HAGER:  No objection to that, Your Honor.

2          THE COURT:  All right.  So Exhibit MM, which is three

3    pages in length, and relates to the e-mail exchange between

4    Mr. Reed and Mr. Folweiler, is in evidence.

5    (E-mail exchange was hereby received into evidence as Trust's

6    Exhibit MM, as of this date.)

7          THE COURT:  Okay, so that's in evidence now, Mr. Reed.

8    What is it that you want to pick up in the narrative?

9        (Pause)

10         MR. REED:  Just what -- at this point, I'd point to

11   the Court that as it didn't mean -- with my attention focused

12   from trying to do a work-out --

13         THE COURT:  You weren't concerned about the mortgage

14   modification if you were going to close a sale to Mr. Weaver?

15         MR. REED:  Right.  And I did -- I did everything that

16   I was supposed to do, at that point, for them.  You know, I

17   sent -- I filled the paperwork out and we got an agreement.  I

18   sent it back.  I sent a payment.  And it wasn't at the top of

19   my mind and I -- I was just telling Mr. Folweiler here that,

20   you know, I guess it's a moot issue, but just for the record

21   I'd like to point out that, you know, thinking about it now,

22   you know, I never got my documents; I never got the new payment

23   schedule; I never got the new payment coupons.  You know, this

24   stuff never arrived.

25         THE COURT:  Okay.

1          MR. REED:  And Mr. Fol -- now, looking back, I find it

2     interesting to note, whether it has any relevancy legally or

3     not, Mr. Folweiler says in the e-mail, they never send them

4     back.  The executed agreement that -- and the stuff that

5     they're supposed to send me, they didn't even send me.

6          THE COURT:  Let me ask you this, Mr. Reed:  did the

7     documents that you signed -- you made the 3,000-dollar payment;

8     did it require that you make monthly payments as well?

9          MR. REED:  There was supposed to be a coupon book that

10    came -- several coupons --

11         THE COURT:  All right.  We'll look at the

12    statements --

13         MR. REED:  -- and the amount was supposed to be --

14         THE COURT:  Okay.

15         MR. REED:  -- they were going to set the date of when

16    it was going to be.  You know, it was going to be a different

17    date.  You know, there were -- I don't remember the amount of

18    what it was supposed to be.  It was a variable rate where they

19    adjust -- they adjust the rates.  You know, the import -- the

20    import of this was, I needed to commit to them doing this, and

21    they were going to -- you know, they wanted the 3,000 dollars

22    and my commitment, and then they were going to respond to that.

23         THE COURT:  Okay, go ahead with your -- pick up your

24    narrative.

25         So, but let me ask you this:  this discussion with

1   Mr. Folweiler, this was after the mortgage foreclosure action

2   was commenced, right?

3          MR. REED:  Yes.

4          THE COURT:  Did you retain a lawyer to defend you in

5   the mortgage foreclosure action?

6          MR. REED:  As it -- after this.

7          THE COURT:  Not yet?

8          MR. REED:  No.

9          THE COURT:  Okay.  All right.  Go ahead with your --

10          MR. REED:  I mean, I called; we talked.

11          THE COURT:  Who's the -- talked to who?

12          MR. REED:  McCrink -- attorney Matt McCrink, at

13   this -- at this stage of the game.

14          THE COURT:  All right, go ahead.

15          MR. REED:  And I think we had a meeting.  I told him

16   that we were -- I think we had a contract; we had the -- you

17   know, the modification with the mortgage company had gone well.

18   Everything, you know, seemed like it was in place.

19          I believe I had filed an answer, at that point.  I

20   can't remember how long I had to file the answer, but I think

21   at that point, I had already filed an answer.

22          THE COURT:  On your own behalf?

23          MR. REED:  To the foreclosure complaint, just to make

24   sure that it, you know, it wasn't defaulted.  So you know, it

25   was -- everything seemed to be -- all the bricks that could be

RESIDENTIAL CAPITAL, LLC, et al.                    74

1  put into place, seemed to be in place, you know, to make every

2  party involved satisfied for what -- you know, what interest

3  they had, at that moment in time.

4         I mean, I wasn't happy that I'd lowered the price at

5  that point in time.  You know, the world hadn't suffered any

6  financial issues as of yet.  So -- but I was happy to have the

7  buyer so quickly, the rework with the mortgage company.

8         THE COURT:  When were you supposed to close on the

9  sale to Mr. Weaver?

10        MR. REED:  Your Honor, I thought it was September, and

11 I looked down at the evidence and it is -- the e-mail says

12 September, the end of September.

13        THE COURT:  Of 2008?

14        MR. REED:  Yes.

15        THE COURT:  All right, go ahead.

16        MR. REED:  Now, again, I think that's the original

17 contract with Mark Weaver.  And I have moving trucks come to

18 our house.  They're loading, the settlement is coming.  It's a

19 cash transaction; thousands of dollars expended to do this.

20 And --

21        THE COURT:  Was Mr. McCrink your real-estate lawyer in

22 connection with the sale to Weaver?

23        MR. REED:  No.  There -- I did not have one.

24        THE COURT:  All right, go ahead.

25        MR. REED:  Because of the years of dealing with the --

1    and in Southern New Jersey, there's a practice that you don't

2    have attorneys -- a common custom.  Title companies handle the

3    transactions.

4              So I think, if I'm not mistaken, I got a call that

5    afternoon that they were going to -- the buyer was going to

6    need a little more time.  I can't tell you if it was a week

7    they wanted or a month that they --

8              THE COURT:  So when you say "I got a call that

9    afternoon", I don't know what afternoon?

10             MR. REED:  From the realtor.  I believe Ms. Carter --

11             THE COURT:  All right.

12             MR. REED:  -- called me.

13             THE COURT:  And when was that?

14             MR. REED:  I think it was the 29th itself.

15             THE COURT:  Of September?

16             MR. REED:  Yeah.

17             THE COURT:  2008.

18             MR. REED:  Yeah, when we were loading the trucks.

19             THE COURT:  Okay.

20             MR. REED:  And so --

21             THE COURT:  Did she tell you why more time was needed?

22             MR. REED:  I think -- Mr. Weaver -- she told me

23    that --

24             THE COURT:  I'm only asking this for notice, not the

25    truth of the matter asserted, what she told you.

1          MR. REED:  That Mr. Weaver had money offshore and he

2     needed to wire it in.

3          THE COURT:  That's what Ms. Carter told you?

4          MR. REED:  Yes.

5          THE COURT:  Okay.  Go ahead.

6          MR. REED:  And then they gave me some document I

7     didn't understand --

8          THE COURT:  Who's the "they"?

9          MR. REED:  Ms. Carter, purportedly from Mr. Weaver to

10    me, showing five million dollars in some kind of an account,

11    and that it would be free soon.

12          Such is my life.

13          THE COURT:  The check was in the mail?

14          MR. REED:  That's right.  That'll -- we'll address

15    that kind of thought in a little bit about Mr. Weaver and a

16    check in the mail.

17          So you know, selling real estate in the fall, heading

18    into Christmas is not the best time, necessarily to sell real

19    estate, not for value, so to speak, but it's typically a longer

20    days on market, a longer settlement, from my experience -- time

21    to settlement, when it comes to family homes, homes that have,

22    you know, multiple bedrooms and baths for people with children,

23    unlike vacation homes or condos or smaller homes.

24          So I was very aggravated with the situation.  But

25    still, it -- you know, from a business perspective, you know, I

1   was presented with evidence of funds.  I was told.  And Ms.

2   Carter even had said to us, look, I know the family.

3   They're -- you know, they've been in here in town for years.

4   Ms. Carter was a realtor for years in town.  And --

5           THE COURT:  Well, stop for a second.

6           Go ahead.

7           MS. HAGER:  Objection to the extent that he's

8   testifying about hearsay from Ms. Carter.

9           THE COURT:  I'm going to admit it only for notice or

10  knowledge, not for the truth of matter asserted.  I don't think

11  he's blaming GMAC for Mr. Weaver-cum-whatever his name was.

12          Go ahead.  Anyway, Ms. Carter said she knew him?

13          MR. REED:  It actually turns out she knew the

14  grandmother of the wife of Mr. Weaver.

15          THE COURT:  Okay.  How long was the closing delayed,

16  in your understanding, at that time?

17          MR. REED:  Your Honor, let me take a moment to think

18  about the timeline.  I believe that there -- in 2008, there was

19  a scheduled closing in September originally.  Then I bel -- now

20  I'm thinking about it, I remember some kind of a settlement

21  that was scheduled in October.  Maybe --

22          THE COURT:  When you're talking about settlement -- a

23  closing?

24          MR. REED:  Closing -- a closing.  A closing in

25  October.  And I'm wondering if that's -- and again, I don't

1    know the significance, but I'm -- the facts pop into my head.

2    That may have been when the trucks were in --

3                THE COURT:  Did you ever move out?

4                MR. REED:  I did.  I did.  I did, Your Honor.  In an

5    attempt -- I wanted to make sure this would go through.  I

6    mean, I did whatever I could to -- you know, to make it happen.

7                THE COURT:  Did you subsequently move back in?

8                MR. REED:  Yeah, yes, Your Honor.

9                THE COURT:  How long were you out of the house before

10   you moved back in?

11               It's okay, Mr. Reed.  Take your time.

12        (Pause)

13               MR. REED:  A week before Thanksgiving, it was a

14   Friday, 2008, we were supposed to have another closing.  I know

15   this is dry material for you.  I just want -- it's hard to live

16   it.

17               The Friday before Thanksgiving 2008, we were supposed

18   to have another settlement -- closing.  The contract, I think

19   had been changed to reflect Mr. Cooper, not Mr. Weaver.  Mr.

20   Cooper assured us directly and through Ms. Carter that the

21   funds would be there for settling.  We once again ordered

22   trucks from ABS Trucking.  We had workers filling it.

23               Your Honor, you must have a proper perspective of the

24   undertaking.  There was five children and my wife, my mother,

25   not knowing, you know, what to do, where to go.  In our

1  circumstance, it's not just like it's me.  You know, I could

2  live in my car if I had to.

3          So and for the record, prior to that, Mr. -- for me to

4  go forward, I think Mr. Cooper had to -- we wanted to make sure

5  he put some good-faith money down, so he'd given 50,000 dollars

6  to hold in escrow.  In my mind, I recollect that Infinity Title

7  Company held that money in escrow, because the closing was

8  supposed to occur there.

9          So I come ready for settlement, Mr. Cooper -- I showed

10  up at the title company at 3, because the vice president -- I

11  think she may have been a partner in the title company -- had

12  told me that wire cutoffs for their transactions were 3

13  o'clock.  And with the trucks there again, filling them, and

14  everyone upset.  We wanted to go see if it was going to close.

15          So when Mr. Cooper walked in, he didn't address me.

16  He nodded to me.  I spoke to him, and he nodded to me, turned

17  to his phone.  Ms. Carter and I believe the owner of the agency

18  or the brokerage, as well as the person that -- the executive

19  from the title company whisked Mr. Cooper to another room.

20          And they -- Ms. Carter said to me -- I said what's

21  going on?  The title company just told me the wire cutoff has

22  passed, the money is not here.  I'm once again in a situation,

23  now a week before Thanksgiving -- not even -- we're -- what's

24  going on?

25          So they just said go get a cup of coffee, go home for

RESIDENTIAL CAPITAL, LLC, et al.                    80

1   a little bit, do whatever, just we're going to talk to Mr.

2   Cooper.  He says he wants to speak to us about the situation.

3   Which that plus the wire not being there, was not a good word

4   to hear.  I didn't drink much coffee and relaxing with that

5   word on your mind.

6          So about an hour goes by and they want -- they pull me

7   into a conference room.  They ask me to come back and I come

8   back.  The meantime my wife is hysterical about this stuff.

9   And you know, we've already pulled the kids out of school, you

10  know, all their documents were taken.

11         So Mr. Cooper presents -- they said that Mr. Cooper

12  would like to present you with a different agreement.  And I

13  said what is it?  What -- you know, understand my state of

14  mind, Your Honor.  I'm -- you know, I thought back in September

15  this was not a problem to foreclosure.  I believe our matter

16  was adjourned or was scheduled to be heard, you know, in the

17  near future.  So my back's again to that, at this moment in

18  time, something that I didn't discuss in my narrative, but back

19  in the time line, I contacted TD Bank with my plan B that had

20  supposedly been sitting there waiting to be used at my

21  discretion as had always, you know, been, and they wouldn't go

22  forward with it.

23         That's to the -- the sole evidence I have to that is

24  the documents you've received from this morning in the court

25  from their legal department.

1    So now I have only so much liquidity.  I see what's

2    happening.  And so I entertain Mr. Cooper's --

3        THE COURT:  Can I ask?  Had you met a gentleman named

4    Weaver at the time that you had the initial all-cash purchase?

5        MR. REED:  I met a man who walked through our house --

6        THE COURT:  And identified himself as Weaver?  You

7    have to answer audibly.

8        MR. REED:  Oh.  I believe so.  I mean, I believe -- I

9    don't know if I actually spoke to him.  I mean, I opened the

10   door and let Ms. Carter and Mr. Weaver in the house -- who I

11   thought was Mr. Weaver.  And there was an offer from that

12   gentleman who walked through the house, and the offer said

13   "from Mr. Weaver".

14       THE COURT:  And when did you -- and when's the first

15   time you heard that it's not Weaver, it's Cooper?

16       MR. REED:  Maybe Oct -- maybe the October settlement.

17   Maybe it was -- I can't remember, Your Honor.  It was --

18       THE COURT:  Was it your understanding that they were

19   one and the same person, as opposed to your original deal with

20   a Mr. Weaver, and he assigned the contract to Mr. -- to

21   somebody named Cooper?  I'm just trying to understand what your

22   understanding was?

23       Most people don't change their names from Weaver to

24   Cooper --

25       MR. REED:  Your Honor, I questioned -- I questioned

1    what that -- because --

2              THE COURT:  Did you question him?  Did you --

3              MR. REED:  No, no.  The title company, I believe, and

4    the realtor, in the -- Ms. Carter had said to me, oh, it's --

5    it's okay, he's doing it as an a/k/a, a fictitious name that's

6    registered with the government, blah, blah, blah.

7              THE COURT:  All right.  So it doesn't close before

8    Thanksgiving, and his new offer is what?  This is the lease

9    option?

10             MR. REED:  Yes, yes.  This is a document Mr. Cooper

11   drafted.

12             THE COURT:  And do you have a copy of that?  Is that

13   in your exhibits?

14             MR. REED:  It's not.  I --

15             THE COURT:  Okay, all right.  Go ahead.

16             So from reading, he paid you 400,000 dollars -- he'd

17   already paid you 50,000; he paid you another 400,000.  There

18   was a lease with an option to purchase?

19             MR. REED:  The 50,000 wasn't paid to me.  It was in --

20   in --

21             THE COURT:  In escrow.

22             MR. REED:  -- escrow.

23             THE COURT:  And the 400,000 was paid to you?

24             MR. REED:  At the end --

25             THE COURT:  So when was it paid to you?

1       MR. REED:  The closing was supposed to be Friday, and

2  it now was -- if I accepted it, it would be, I think, Monday.

3  Not a closing, I'm sorry.  Not a closing.  It would be

4  possession -- occupancy would change Monday or Tuesday.  And

5  Mr. Cooper wanted to write a check or a cashier's check.  But

6  it was late in the evening on Friday.  So with all the trucks

7  still there -- so Mr. Cooper was willing to give me 400,000

8  dollars, and I said I'm not going to -- I want it before I let

9  you move in.

10       But Mr. Cooper required that it -- that the money --

11  there was a specific use for that money, and that I had to use

12  that money for a specific thing, that I had -- I had to take

13  the money and I had to use it to pay off the second mortgage or

14  any other lien besides the first mortgage on the property,

15  which I did.

16       THE COURT:  Is there a written agreement with Mr.

17  Cooper that required that the 400,000 dollars be used to pay

18  the second mortgage?

19       MR. REED:  No.  I had to -- I mean, I had to

20  provide -- they required evidence -- I mean, I had to give a

21  receipt to the title company.  I had to give it to the realtor.

22  They wanted it done very quickly.  It's not like I got the

23  400,000 dollars and I could just go to Las Vegas with it or you

24  know, buy a yacht or something like that.

25       THE COURT:  Who held the second mortgage?

1          MR. REED:  ResCap, Homecomings Financial.  The money

2    went to them.

3          THE COURT:  Okay, why don't you pick up with your

4    narrative.

5          MR. REED:  So -- Your Honor, to be clear, not all of

6    the -- it turned out the balance wasn't a full 400-.  I don't

7    remember the exact amount.  But it was a -- to pay off all the

8    liens and things on the house, it was over 200-and-some-

9    thousand dollars to do that.

10         THE COURT:  Okay, go ahead.

11         MR. REED:  So the remainder of the money gave us -- it

12   was for the fact that we had to vacate.  It turns out there was

13   damage done to the other property that we had that we were

14   going to.  There was a roof leak that caused a great deal of

15   damage that I was not aware of, because it was in another

16   state.

17         THE COURT:  This was income property that you owned?

18         MR. REED:  It was a property -- it was not an income

19   property.  It was my next property that we were going to

20   occupy.

21         THE COURT:  All right.

22         MR. REED:  I was doing like I normally do, Your Honor,

23   where I renovate it and we were expanding it, increasing the

24   value.  That's in those volumes of documents that you didn't

25   want to see, that you excluded.  But that was just the next

1  thing where we were going with that money, one of the two

2  things --

3          THE COURT:  You moved from Moorestown to a property

4  that you had already purchased?

5          MR. REED:  Yes.

6          THE COURT:  All right, go ahead.

7          MR. REED:  But we couldn't move into it because I

8  discovered that it was damaged.  So that's why there was some

9  excess money from Mr. Cooper, and we spent, I don't know,

10  30,000 dollars, living in a -- wound up living in a Hampton Inn

11  or a Homewood Suites -- Homewood Suites in Virginia, two

12  bedrooms and a little living room.  I don't know if you've ever

13  been in there -- the little places.  But five kids, me and my

14  wife.

15          THE COURT:  Where was the property you were moving to?

16  In Virginia?

17          MR. REED:  Yes, nearby.

18          THE COURT:  All right.  So let's go back to the story

19  of the Moorestown property.  What's the next thing that

20  happened?

21          MR. REED:  So --

22          THE COURT:  Mr. Weaver or Gordon (sic) was supposed to

23  paying you rent payments as well as the --

24          MR. REED:  Right.  So this is not -- this money was

25  not supposed to -- the 400 was not a payment towards the

RESIDENTIAL CAPITAL, LLC, et al.                    86

1   purchase of the property, it was an option -- he called it an

2   option to buy.  If he -- you know, that's what would secure the

3   option.

4              THE COURT:  When did he default with you?

5              MR. REED:  Well, he -- he had sixty -- this agreement

6   was for sixty days:  December and January.  In December -- by

7   the middle of December, Mr. Cooper did not pay the rent.

8              THE COURT:  How much was the rent?

9              MR. REED:  You're going to love this one, Your Honor.

10  25,000 dollars a month.  I guess he knew that that would be a

11  number that I would bite, because it was a significant number.

12  Normal rents in that house probably would be 6,000, 7,000,

13  something like that.  I mean we have a -- I don't know if

14  you've seen any of it, but it's a seven-bedroom, ten-bath

15  house.  I mean, there's a lot of room in it.

16             THE COURT:  Okay, so by mid-December, he hasn't paid

17  you the rent?

18             MR. REED:  Right.

19             THE COURT:  What happens next?

20             MR. REED:  So now I'm in -- I'm in a hotel for a

21  couple weeks now.  My -- seven tractor-trailers full of my

22  whole life.  All of us jammed into a little hotel, having a

23  heart attack, trying to figure out how to fix the house in

24  Virginia.  Not enough money to make sure everything happens,

25  because I just gave it all to pay a mortgage company to pay off

RESIDENTIAL CAPITAL, LLC, et al.                    87

 1   the other notes.

 2          So -- so I got his phone number, because I was really

 3   angry.  I said, look, I'm coming up there.  I mean, I was

 4   really pissed.  You have no idea, Your Honor.  I mean, I was --

 5   sorry, but I mean, I was, you know -- I'm a very calm man,

 6   especially with all these kids, I have to be.  But I tell you,

 7   if ever I was moved to almost the point of violence, that would

 8   have been it.

 9          And so --

10          THE COURT:  Did you go up to Moorestown?

11          MR. REED:  Not on that occasion, I didn't.  So I mean,

12   imagine this, ten days before Christmas, the guy's check is not

13   there yet.  So I got his number and I called him and I said

14   look, I don't care -- you know, we'll sort this out after the

15   holidays, but look, you put 50,000 dollars in escrow, I'll be

16   damned if you're going to get that money.  So why don't you --

17   you know, it's not going to happen.  I don't care if this goes

18   nowhere and you wind up walking away, you will not get -- I

19   will fight you to the end over that money.

20          So why don't you just -- if you don't have money, if

21   you -- because he told me, oh, my money's still tied up; I gave

22   you whatever I had.  I said, well, not all your money's tied

23   up.  I'd like to point out to the fact that there's 50,000

24   dollars at the title company, which happens to coincide with

25   two months' rent payment which you contracted with me to pay.

1          Why don't I do this?  I'll agree to allow you to

2    reduce your security held against the house for the purchase by

3    25,000 dollars for the month's rent that you owe for 25,000

4    dollars.  Tell the title company that you agree to release the

5    money.

6          Three or four, five days go by.  We're almost at

7    Christmas, he finally does it.

8          THE COURT:  He released the whole fifty?

9          MR. REED:  No, the twenty-five.  So then that was

10   somewhat of a relief, at least, for the moment, you know,

11   because it's -- the money and everything -- you know, there's

12   not enough going --

13          THE COURT:  All right.  So it comes to January, he

14   doesn't pay that rent either?

15          MR. REED:  He doesn't pay again.  No.  So this time I

16   go up to New Jersey to see the realtor.  And I'm pretty sure --

17   I'm pretty sure that I gave a notice, like a default notice to

18   his wife in my house.  Because they've just enjoyed the

19   holidays in my house when I enjoyed them in the hotel.

20          So she was surprised.  I think -- you know, I find out

21   later, apparently, she -- Mr. Cooper told them that they bought

22   the house, but -- that's why she was surprised to see me.

23          So then --

24          THE COURT:  Did you have to bring an action to evict?

25          MR. REED:  I could not yet, because he then paid the

RESIDENTIAL CAPITAL, LLC, et al.                                89

 1  25,000 dollars.

 2          THE COURT:  For January?

 3          MR. REED:  For January.  Out of the escrow amount.

 4          THE COURT:  Okay, so now the escrow is zero?

 5          MR. REED:  Yes.

 6          THE COURT:  All right.  So what happens next?

 7      (Pause)

 8          MR. REED:  So Cooper tells me, either -- I think

 9  through Carter, that he wants to extend for six more months at

10  25,000 dollars a month, because his money is tied up now.  I

11  mean, it's still illiquid.  Him and his partners, something,

12  it's not -- it's not liquid, but it will be --

13          MS. HAGER:  Objection, Your Honor, to the extent that

14  it's hearsay within hearsay.

15          THE COURT:  Sustained.

16          MR. REED:  So I extended.  The net result is I

17  extended it.

18          THE COURT:  Did you ever collect any more rent from

19  him?

20          MR. REED:  I collected bad checks from Mr. Cooper from

21  that point.

22          THE COURT:  But did you -- other than December and

23  January, which you collected out of the escrow, did you ever

24  collect any more rent from him?

25          MR. REED:  No.

RESIDENTIAL CAPITAL, LLC, et al.                    90

1          THE COURT:  All right.  When did you get him evicted?

2     Did you have to bring an action, or did he just move out?

3          MR. REED:  No, I had to -- I had to bring an action.

4          THE COURT:  When did you get possession of the

5     property back?

6          MR. REED:  Actually, Your Honor, we had to serve him

7     while he was sitting in county jail for passing bad checks to

8     other people.

9          THE COURT:  Okay.  When did you actually get him out

10    of the house?

11         MR. REED:  Fall -- fall of -- what is this, 2009.  He

12    had the six month option.  He tendered payments in the form of

13    checks that bounced and then continued to promise and tendered

14    other --

15         THE COURT:  Let me see if I can try and bring this

16    back to why we're here, okay?  So Weaver's in the house.  I've

17    seen -- what, if any, communication did you have with GMACM

18    during the period in which you thought you were selling the

19    house to Weaver/Cooper?  Was the foreclosure action on hold

20    during this period?

21         MR. REED:  No, it was adjourned -- it was just

22    adjourned.

23         THE COURT:  It was adjourned.  It wasn't -- you

24    didn't -- go ahead.  Tell me, what was -- let me ask this

25    again.  What, if any, communication did you have with anyone

1  from GMACM during the period that you're going through this

2  ordeal with Mr. Cooper?

3           MR. REED:  I don't re -- Your Honor, I don't remember

4  any.  I hired an attorney, now, to handle that.

5           THE COURT:  Okay.  Who was the attorney you hired?

6           MR. REED:  There were two.  McCrink worked on it for a

7  while, and then -- I don't know if there was some issue with

8  the judge and McCrink, and then I had to have someone else

9  appear at the --

10          THE COURT:  Who did you retain?

11          MR. REED:  -- Linda Campbell.  So Matt McCrink and

12  Linda Campbell.  We also worked with Jeffery Walters.  But Mr.

13  Walters to a limited extent.  Again, some kind of a conflict

14  there.  His firm -- the firm he worked for at the time was

15  working with Homecomings or a division of ResCap.

16          And -- I'm sorry.

17          THE COURT:  Go ahead.

18      (Pause)

19          MR. REED:  Your Honor, on the subject of the lawyers

20  who worked on the foreclosure action, as an aside, the Court

21  had asked me for copies of the bills.  I told the lawyers I

22  needed copies for the Court for this purpose.  After our

23  meeting or status conference and the discussion about

24  certifying documents or something like that, I got concerned a

25  bit about -- because I had e-mailed Ms. Hager the -- you know,

1    the -- like I got an e-mail from Matt McCrink's office from the

2    bookkeeper.  I got a copy.  I went to Ms. Campbell's office and

3    finally got a copy of what I had paid -- because I had paid for

4    them at that time.  They were cash receipts.

5           I don't know what to do with the fact -- I have

6    affidavits, now, signed from them, attesting to the

7    authenticity of those bills.

8           THE COURT:  Well, during the lunch recess, show them

9    to Ms. Hager, as an initial matter.

10          MR. REED:  I mean, I don't even know if it's required,

11   but I went and did it.

12          THE COURT:  Let me -- I think part of the -- so in

13   reading the Trust's memorandum -- pre-trial memorandum, one of

14   the issues they focused on -- I saw what you marked from your

15   lawyers, but it doesn't indicate what work it was for.  So you

16   had lawyers who defended the mortgage foreclosure action, and

17   then at some point you filed your own case --

18          MR. REED:  Yes.

19          THE COURT:  -- against GMACM.  And what I haven't seen

20   is anything that shows how much your lawyers charged for

21   defending the mortgage foreclosure action versus what did they

22   charge you for the action that you brought against GMACM.

23          MR. REED:  It's a very --

24          THE COURT:  Just stop for a second.  Because what I

25   understand the Trust's objection, in part, to be that they may

RESIDENTIAL CAPITAL, LLC, et al.                    93

1    dispute it, but whether you're entitled to recover the costs of

2    defending the foreclosure action, their position is you're not

3    entitled to recover any lawyers' fees for the action that you

4    filed.

5            MR. REED:  To make that simpler for you, Your Honor.

6    There were -- the lawyer, singular, who worked on the pursuit

7    of the Law Division damages --

8            THE COURT:  Yes.

9            MR. REED:  -- case, is Mr. Jeffery Walters.  He had

10   limited -- he had a limited role in the foreclosure defense and

11   was conflicted out.  His bill -- I don't know -- it could have

12   been 500 or 1,000 dollars for that purpose.  The lion's share

13   of the tens of thousands of dollars of his bill was for the --

14   but McCrink was not involved with the -- with the Law Division

15   case.  Ms. Campbell was not involved with the Law Division case

16   in any way.

17           THE COURT:  Okay.  Let me -- it's 12:15.  Let me tell

18   you what we're going to do.

19           We're going to continue on until 12:30 and then we're

20   going to take a lunch recess.  Okay.

21           You need to think about, during lunch, how you can

22   speed up your testimony, all right?

23           MR. REED:  I didn't even realize it's --

24           THE COURT:  And the reason I say -- I've limited each

25   side to six hours.  You've got some other people who supposedly

 1    are going to show up this afternoon.  We'll see whether they

 2    come or not.  Okay?  I'm not trying to cut you short.  And I'm

 3    prompting you with more questions than I like to do with a

 4    witness, because it shouldn't be me who's examining you.  Okay?

 5              You just need to get your story out and tell me the

 6    story.  But here's the point.  I mean, I think you're -- the

 7    Weaver/Cooper saga -- and I don't mean that in a disparaging

 8    way.  It's horrible.  Okay?  But it's not the fault of GMACM.

 9    I mean, the failure of the Jacobses to close, it's not on --

10    there's nothing that GMACM did to cause the Jacobses to walk

11    away.

12              The more you talk about Mr. Weaver or Cooper or

13    whatever his name may be, you had the terrible misfortune at a

14    very bad time in your life, to be dealing with someone who was

15    totally unreliable -- okay?  Again, that's not on their

16    doorstep.

17              What you need to do -- and when we continue on, I do

18    want you to explain what happened.  I want you to satisfy

19    yourself that you've told your story as it relates to this

20    claim against GMACM.  But what you need to try and do -- we'll

21    continue on till 12:30 -- but you need to be mindful, you've

22    got other witnesses --

23              MR. REED:  Yeah.

24              THE COURT:  -- who you say are going show up, and I

25    want to hear from them.  To the extent that their testimony is

1   admissible, I want to hear from them.  Okay?  I want you to

2   have an opportunity to put your case in.

3            I understand you're not a lawyer.  I think that Ms.

4   Hager has actually been appropriately solicitous of your

5   narrative without asserting every objection that could be

6   asserted.  Okay?  I think she's acting entirely appropriate in

7   letting you get your story out.  Okay?  But you're going to

8   have to pick it up.

9            If during lunch you want to make some notes about the

10  key points that you want to cover so when you come back after

11  lunch, just get it in and -- okay?

12            MR. REED:  Okay.

13            THE COURT:  All right.  So let's come back -- we've

14  jumped around a little bit.  I understand -- see if you can

15  tell me this.  When do you finally get Cooper out of the house?

16  It took you a while.

17            MR. REED:  2009.

18            THE COURT:  Not until --

19            MR. REED:  All 2009 was -- the beginning was -- I

20  think September.

21            THE COURT:  Did you move back in, then?

22            MR. REED:  No, not right away.  I mean we --

23            THE COURT:  When did you move back in?  You're in

24  there now?

25            MR. REED:  Yes.

1          THE COURT:  Okay.  When did you move back in?

2          MR. REED:  I believe around Thanksgiving 2010.

3          THE COURT:  Okay.

4          MR. REED:  And, Your Honor, the other communication I

5    had with the mortgage company -- again, it became -- it became

6    through lawyers, at that point -- was the -- the dismissal of

7    the foreclosure, which was in March or February of 2009.

8          THE COURT:  So Mr. McCrink was primarily handling the

9    defense of the foreclosure action?

10         MR. REED:  At that point.

11         THE COURT:  At that point.

12         MR. REED:  But Ms. Campbell -- like I said, I don't

13   remember if it was some kind of conflict in my mind is what I

14   remember, and Mr. McCrink couldn't go argue before that judge

15   or something like that.

16         THE COURT:  Okay.  Did -- once you're represented by a

17   lawyer, GMACM has to deal through your lawyer, can't speak to

18   you directly unless your lawyer provides his consent.  But just

19   so I'm clear about it, did you personally have communication

20   with anyone from GMACM after you were defended in the mortgage

21   foreclosure action by a lawyer?

22         MR. REED:  I don't remember that, Your Honor.  I don't

23   think so.

24         THE COURT:  It wouldn't surprise me.  I mean, because

25   once you're represented by a lawyer, they can't talk to you

RESIDENTIAL CAPITAL, LLC, et al.                    97

1   directly.  So but -- so when I asked the question, it's not

2   intended as a trick question --

3            MR. REED:  No, no.

4            THE COURT:  -- not intended to suggest --

5            MR. REED:  And I'm not trying to -- I'm not trying

6   to -- I want to be clear in my memory.

7            THE COURT:  Okay.

8            MR. REED:  There's so much going on in my head that I

9   want to --

10            THE COURT:  All right.

11            MR. REED:  -- try to make sure I get the right dates

12   and times and things like that in my head.

13            THE COURT:  Tell me where you want to pick up your

14   story.  And by "story", I'm not suggesting a pejorative in

15   using that.  I want you to pick up with your narrative at the

16   point where you want to pick up.  But remember, the focus is on

17   your proofs of claim against GMACM.

18            MR. REED:  Okay.  So the next time the house is on the

19   market is immediately -- around the time that Mr. Cooper is

20   evicted.  I believe that as part of the agreement to -- it was

21   a consent decree on the eviction.  And Mr. Cooper agreed to

22   start letting people walk through.  I don't remember if that

23   was a month or forty days or sixty days or -- and I can't tell

24   you if it was September or October.

25            But we immediately listed the house.  Again, I could

1  not list it because he had an option to buy it.

2           THE COURT:  Right.

3           MR. REED:  It was impossible --

4           THE COURT:  Did you list with the same broker?

5           MR. REED:  I did.

6           THE COURT:  Okay.

7           MR. REED:  I did, because they had -- the Edgar Real

8  Estate sold the majority of -- I mean, a good portion of those

9  houses, they represented the builder for the whole subdivision

10 and I believe initially sold every single property in there,

11 and had constantly handled the resales.

12          THE COURT:  All right.  So you listed it again.  What

13 did you list -- what price did you list it at after --

14          MR. REED:  Your Honor, I can't remember.

15          THE COURT:  -- Cooper had moved out?

16          MR. REED:  I mean, we reduced it again.  I mean, I

17 reduced it many times to -- to try and sell it.  But what was

18 odd about it -- about this time was, you know, the -- our

19 property and the properties that I had worked on, always had

20 tremendous response.  And I don't necessarily mean -- I mean,

21 in several factors.

22          One, it's not atypical that I would get an offer on a

23 house above an appraised value or a market, you know, because

24 the buyers liked the product that I would create.

25          MS. HAGER:  Your Honor, objection to relevancy.

1           THE COURT:  Overruled.

2           MR. REED:  So -- and you would see the kind of product

3    that was created in the listing, the photographs, and things --

4    the features.  So we would have, you know, not only that kind

5    of response -- like the Jacobs contract shows that kind of

6    example, but we had a lot of people coming to see the house.

7           And I measure that in relation to how many people go

8    and see other houses on the market, similar, not the same, but

9    similar to our house.

10          So like Louise Carter, she's not the -- my house is

11   not the only house that she would have on the market.  B.T.

12   Edgar was not there just simply to list and market my house.

13   They had multiple properties, and I would inquire, just like I

14   would in other transactions, what is the -- you know, what's

15   the traffic.  What are you showing --

16          THE COURT:  When is the next offer you received?

17          MR. REED:  I don't -- I don't -- it's from, I think,

18   the people -- their name was Roccisano.

19          THE COURT:  Yeah, I'm looking here at your Exhibit 3.

20          MR. REED:  You know what -- wait a second here.  It's

21   in -- I think it's attached to an exhibit.

22          THE COURT:  Well, there is attached to Exhibit 3 a

23   proposal to purchase from Roccisano.

24          MR. REED:  Yes.  And this exhibit, I would like to

25   offer into evidence, and Ms. Hager had agreed pre-trial to

 1  allow it.

 2          THE COURT:  Let me ask Ms. Hager what her --

 3          MS. HAGER:  Well, I did agree pre-trial to Exhibit 3,

 4  which is the entirety, which includes a letter from Naoji

 5  Moriuchi of B.T. Edgar, because I was under the impression that

 6  Ms. Carter would be here to otherwise lay a foundation and

 7  authenticate the letter.  If she's not coming, and it's my

 8  understand that she's not, then I do have an objection to the

 9  letter as hearsay.  I do not have an objection, though, to page

10  3 of that exhibit, which is the proposal to purchase.

11          MR. REED:  I'd like to respond to the objection, Your

12  Honor.

13          THE COURT:  Give me just a second.

14          So Exhibit 3 -- first off, the letter isn't signed by

15  Ms. Carter anyway -- has a number of pages.  It has a letter

16  from June 2012.  It has a page that's totally illegible to me,

17  I guess about Mr. Moriuchi.  It has the proposal to purchase

18  from Roccisano.  And it has notice of the lis pendens.  I take

19  it, Ms. Hager, you don't dispute the authenticity of the lis

20  pendens?

21          MS. HAGER:  No, I don't.

22          THE COURT:  Okay.  Mr. Reed, with or without Ms.

23  Carter here, the first two pages wouldn't be admissible in --

24          MR. REED:  Your Honor, may I ask you --

25          THE COURT:  Just a second.

1          MR. REED:  -- or propose something?

2          THE COURT:  So I'm going to -- go ahead, what is it

3    you want to tell me?

4          MR. REED:  Thank you.  In trying to learn as much as I

5    can about what -- you know, how to handle this situation, I'm

6    going to ask you to deny her objection, because I researched

7    this -- and I could be totally wrong, and you're going to tell

8    me if I am or not, so thank you for listening to me.

9          I proffer to you that Mr. Naoji is -- spoke to me as

10   the agent of the Roccisanos, and this letter stands for the

11   principle of the motive or intent of the Roccisanos.

12         THE COURT:  He couldn't testify about the motive or

13   intent of the Roccisanos in any event.  Even if he was sitting

14   in the witness chair where you are now, I wouldn't let him

15   testify about the motive or intent of the Roccisanos.

16         MR. REED:  Even if he's -- isn't the agent --

17         THE COURT:  No, let's stop.

18         MR. REED:  Okay.

19         THE COURT:  Let's --

20         MR. REED:  I want -- I wanted to say --

21         THE COURT:  Just stop.

22         With respect to Exhibit 3, the first two pages, the

23   first of which is a letter dated June 25, 2012 from Naoji

24   Moriuchi, realtor associated with B.T. Edgar and Sons (sic)

25   Realtors, and the second page, which is illegible in my copy,

1  but it seems to be some sort of biography of Mr. Moriuchi, the

2  objection is sustained as to those two pages.

3          The remainder of the exhibit, consisting of the

4  proposal to purchase from the Roccisanos and the lis pendens

5  dated May 27 -- it's got a stamp of May 27, 2008, that is

6  admitted.  So those three pages are admitted into evidence.

7  (Proposal to purchase and lis pendens was hereby received into

8  evidence as Reed's Exhibit 3, as of this date.)

9          THE COURT:  All right, so you got the proposal to

10  purchase from the Roccisanos.  Did you ever enter into a

11  contract with them?

12          MR. REED:  We worked on that.

13          THE COURT:  Did you ever enter into a contract with

14  them?

15          MR. REED:  No, we did not execute a contract or enter

16  into one.

17          THE COURT:  Was there a dispute about the price?

18  Because this is a proposal for a million -- 1,040,000.  No, a

19  million -- I can't even tell.  What is it?

20          MR. REED:  It was a million-three, Your Honor.

21          THE COURT:  A million-three.  Okay.  The confusion

22  comes about because the contract -- looking at the first page,

23  it has the sum of a million-three -- all right.  I see.  Okay.

24          Did you negotiate a different price with them?  That's

25  the offer they made.

 1          MR. REED:  Yeah, Your Honor.  I believe we did.  I had

 2   forgotten about it.  But we did.  But it never came to

 3   fruition.

 4          THE COURT:  Because they -- you had a contract for

 5   sale, there was a closing date, and it didn't close?

 6          MR. REED:  No, we just -- we couldn't come to terms.

 7          THE COURT:  All right.  Okay.

 8          What happened -- well, what happened next is a recess.

 9          It's 12:30 by the clock in the court.  We're going to

10   be in recess until 2 o'clock, because at 1:30 I have a

11   different ResCap hearing -- brief.

12          MR. REED:  Do I need --

13          THE COURT:  You can leave everything right where it

14   is.  You can take that which you want to take with you or you

15   can leave it there.

16          But what you need to do, Mr. Reed, is you need to

17   focus -- make some notes to yourself, if that'll help you,

18   about -- with respect specifically to the claims you've

19   asserted against GMACM, what it is that you believe you can

20   tell me that's evidence, that focuses on the claim.  Okay?

21          And you -- who's coming this afternoon to testify?

22          MR. REED:  Ms. Donati about foreclosure practice.

23          THE COURT:  Okay.

24          MR. REED:  And Mr. Henricks.  I think you limited his

25   testimony.

 1              THE COURT:  I did.

 2              MR. REED:  We're not going to be discussing credit

 3    reports and reporting.

 4              THE COURT:  All right.

 5              Let me -- what time are they going to be here?

 6              MR. REED:  I don't -- I don't know.  I mean, it's

 7    supposed to be early afternoon, 2 o'clock or something like

 8    that.

 9              THE COURT:  All right.  Ms. Hager, what I would like

10    to do is when Mr. Reed's other witnesses come, even if he

11    hasn't completed his testimony and you haven't had your cross-

12    examination yet, is to take the other witnesses out of order.

13    Is that acceptable to you?

14              MS. HAGER:  Yes, Your Honor.

15              THE COURT:  And obviously you can do your cross

16    examination of them then.  But if we need to -- and then pick

17    up with Mr. Reed's testimony.

18              MS. HAGER:  Sure, of course.  That's fine.

19              THE COURT:  Okay.  So when your witnesses show up,

20    assure them that we're going to get them on the witness stand

21    and hopefully off the witness stand, and then we can resume

22    with your testimony when they're done.  Okay?

23              But you need to really focus about what it is that

24    specifically relates to the claims you've asserted, okay?  All

25    right.

1        So we're in recess until 2 o'clock for the Reed

2   matter, 1:30 for the Matthews matter.

3        All right, we're in recess.

4      (Recess from 12:30 p.m. until 1:30 p.m.)

5        THE COURT:  All right.  This is Judge Glenn.  We're on

6   the record in Residential Capital, 12-12020.  This is a

7   telephone hearing with respect to claim number 392 filed by

8   Kevin J. Matthews.  May I have the appearances, please?

9        MR. ROSENBAUM:  Good afternoon, Your Honor.  Norman

10  Rosenbaum, Morrison & Foerster, for the ResCap Borrower Claims

11  Trust.

12       THE COURT:  Okay.  And for the --

13       MR. ROBINSON:  Good afternoon, Your Honor.  Phillip

14  Robinson on behalf of Kevin Matthews.

15       THE COURT:  Thank you very much.

16       All right.  Mr. Rosenbaum, can you update me on where

17  things stand?

18       MR. ROSENBAUM:  I'm happy to, Your Honor.  Over the

19  past couple of weeks Mr. Robinson and I have been engaged in

20  settlement discussions.  I would characterize this as having a

21  very useful conversation last week.  There are a couple of

22  points that the Borrower Trust needs to follow up on to get

23  back to some of the proposals that Mr. Robinson put forward.  I

24  would hope that in terms of either closing the loop and

25  completing a settlement or not we'd be able to get back to him

 1  within this week, if not by the end of next week.  There's just
 2  people that we need to talk to that we don't necessarily
 3  control their schedule.
 4       So in terms of settlement that's where we are, without
 5  disclosing any of the details.
 6       THE COURT:  Okay.  Mr. Robinson?
 7       MR. ROBINSON:  That's an accurate description, sort
 8  of, where we're at, Your Honor.  There's a little bit of a
 9  delay, Your Honor, just to be candid to the Court, because I
10  was on vacation a little bit in August and wasn't able to get
11  back to Mr. Rosenbaum as quickly.
12       THE COURT:  Shocking, Mr. Robinson.  You're able to
13  take vacation?
14       MR. ROBINSON:  Thank you, Your Honor.
15       THE COURT:  All right.  Obviously, as always, I'm
16  hopeful that the parties' counsel are going to be able to reach
17  a settlement, that the parties are going to be able to reach
18  the settlement.  And I'm certainly prepared to give you another
19  two weeks to try and do that, but we really do need to move
20  this along.  So what -- hold on a minute.  I just want to get
21  my calendar open on the computer.  Just bear with me.
22       (Pause)
23       THE COURT:  What I'd like to do is schedule a
24  telephone status conference for two weeks from today.  So
25  that's Monday, September 29th.  I have a lot of matters on the

1    calendar, so I'd like to do it for 4 o'clock.  Are you both

2    able to do that?

3            MR. ROBINSON:  That's fine with me, Your Honor.  This

4    is Phillip Robinson.

5            MR. ROSENBAUM:  Your Honor, that's fine for me as

6    well.  4 o'clock on the 29th.

7            THE COURT:  Okay.  And what I would ask is if you're

8    able, even at the point where you've reached an agreement in

9    principle subject to any further documentation, if you could

10   advise me of that.  If that occurs I may just cancel the

11   September 29th telephone conference.  So as soon as you're able

12   to get the matter to the point where your clients have agreed

13   in principle to settle the matter please advise me.

14           Because what I'm going to do, I mean, I'll tell you.

15   I have a draft of a written order sustaining in part and

16   overruling in part the Trust's objections.  I essentially

17   advised you both of that at the hearing, when I heard argument

18   on the hearing.  And I haven't finalized the writing, but it's

19   pretty close to it.  I'm putting it aside at this point in the

20   hope that I don't have to finalize it.  If I do, certainly by

21   the time of that hearing -- I won't enter it before the

22   hearing, but probably immediately after if you haven't reached

23   an agreement.

24           And, I mean, if your talks break down what you need to

25   agree upon is what discovery each side wishes to take and how

1  long you believe it will take to do that.  At the telephone
2  hearing on September 29th it's my plan, if you have not
3  resolved the matter, to set a pretty tight discovery schedule
4  for any remaining discovery that either side wishes to take and
5  a schedule for filing of pre-trial papers and to give you both
6  a trial date at that time.

7         So I'm going to give you two weeks to try and get this
8  wrapped up, but it's certainly my hope that you'll be able to
9  do that.

10        But, again, let me know in advance at the stage where
11  you're able to reach an agreement in principle so that I can
12  not have to put in more time on the written order with my
13  ruling.
          Okay?

14        MR. ROBINSON:  We'll --

15        MR. ROSENBAUM:  Yes, Your Honor.

16        THE COURT:  And, Mr. Rosenbaum, if you would arrange
17  the call in for the September 29th telephone hearing I would
18  appreciate it.  It'll be on the record, as this one is.  Okay?

19        MR. ROSENBAUM:  That's fine, Your Honor.

20        THE COURT:  All right.  I appreciate the efforts of
21  both of you, and I hope you're able to bring this to a
22  successful conclusion.

23        All right.  We're adjourned.  Thank you.

24        MR. ROBINSON:  Thank you.

25        MR. ROSENBAUM:  Thank you, Your Honor.

1           Unless -- is there anything either of you want to add?

2           MR. ROSENBAUM:  I'm sorry, Your Honor?

3           THE COURT:  Is there anything you want to add before

4    we adjourn?

5           MR. ROBINSON:  No.  There's nothing on behalf of

6    Mr. Matthews.

7           THE COURT:  Okay.  Mr. Rosenbaum, anything you want to

8    add?

9           MR. ROSENBAUM:  Nothing further, Your Honor.  Thank

10   you.

11          THE COURT:  All right.  Thank you very much.  We're

12   adjourned.

13          MR. ROSENBAUM:  All right.

14      (Recess from 1:36 p.m. until 2:02 p.m.)

15          THE COURT:  All right.  Please be seated.  We're back

16   on the record in Residential Capital, 12-12020 with respect to

17   the Reed's claims.

18          Mr. Reed, do you have one of your witnesses here?

19          MR. REED:  I do, Your Honor.  And I'm also, as to the

20   TD Bank documents --

21          THE COURT:  Yes.

22          MR. REED:  Ms. Hager has expressed a concern and may

23   want to lodge an objection to them.  So I don't know how to

24   proceed from here on those.

25          THE COURT:  Well, let's proceed with your witness, and

1  when that's done we'll deal with the documents.

2          So you have one person here to testify?

3          MR. REED:  And I believe the other one will be here

4  shortly as well.

5          THE COURT:  All right.  So let's proceed.  Which

6  witness are you calling?

7          MR. REED:  Christy Donati.

8          THE COURT:  Okay.  Ms. Donati, would you come on up?

9          If you would come up to the witness stand and raise

10  your right hand and be sworn.

11      (Witness sworn)

12          THE COURT:  All right.  Please have a seat.

13          THE CLERK:  State and spell your name for the record,

14  please.

15          THE WITNESS:  Christy Zoltun Donati, C-H-R-I-S-T-Y,

16  Z-O-L-T-U-N, D-O-N-A-T-I.

17          THE COURT:  Thank you very much, Ms. Donati.

18          THE WITNESS:  You're welcome.

19          THE COURT:  All right.  Mr. Reed, do you want to ask

20  your questions of Ms. Donati?

21          MR. REED:  I do.

22  DIRECT EXAMINATION

23  BY MR. REED:

24  Q.   Ms. Donati, can you relay to the Court any and all

25  experience you have professionally relating to real estate or

 1 | foreclosures?

 2 |         THE COURT:  We'll skip the all, because we'll be here

 3 | all day, so tell me what your experience --

 4 |         THE WITNESS:  Twenty-five years.

 5 |         THE COURT:  You're a lawyer.  Am I correct?

 6 |         THE WITNESS:  I'm a law -- I'm currently a lawyer,

 7 | yes.

 8 |         THE COURT:  You practice where?

 9 |         THE WITNESS:  I practice commercial real estate at

10 | DuPont in-house.  I've been doing that since March of this

11 | year.  Prior to that I practiced at Phelan Hallinan & Diamond

12 | in New Jersey, which is a firm that -- a boutique firm that

13 | represents lenders in residential foreclosures.  And I was

14 | there from January of 2010 until March of 2014.

15 |         THE COURT:  Okay.  So I think Mr. Reed's question was

16 | about your ex --

17 |         Why don't you ask your question again, Mr. Reed?

18 | Q.   I wanted to, I guess, have you, Ms. Donati, relay to the

19 | Court the relevant experience, I think, regarding residential

20 | foreclosure, preparation of foreclosure complaints, filing of

21 | those complaints, filing of lis pendens and maintenance or

22 | removal of those, and --

23 |         THE COURT:  Let's take it a piece at a time, if we

24 | could.

25 | A.   All right.  In the just over four years I worked at Phelan

1  Hallinan I practiced almost exclusively in un -- in the filing

2  of residential foreclosures.  In that process I was responsible

3  for reviewing the evidence or the documents necessary in order

4  to file foreclosure, reviewing the ownership and the note or

5  the -- reviewing the note, reviewing the mortgage, reviewing

6  assignments, reviewing title to make sure we include all the

7  proper defendants, reviewing the complaint and making sure we

8  were able to move forward, assigning the complaint and having

9  it filed.  I followed through the cases through default and

10  judgment and sale.

11       In that time I would say conservatively I was involved in

12  thousands of foreclosure actions.

13            THE COURT:  Okay.  Go ahead, Mr. Reed.

14            THE WITNESS:  Should I --

15  Q.   In connection to -- would you say that you -- did you say

16  that you would confirm standing, proper standing of your

17  clients to bring foreclosure actions?

18            MS. HAGER:  Objection.  Leading.  And mischaracterizes

19  her testimony.

20            THE COURT:  Well, I don't know that it

21  mischaracterized anything, but --

22  A.   In reviewing --

23            THE COURT:  Stop.

24            THE WITNESS:  Okay.

25            THE COURT:  Stop.  Stop.  I'm going to overrule the

 1  objection.  Go ahead.

 2  A.   In order to proceed with the complaint we reviewed the

 3  mortgage and the note and assignments to make sure that the

 4  plaintiff in the action had the standing to proceed with the

 5  action, had a note endorsed to them or in blank, had an

 6  assignment if they were not the originating lender.  You know,

 7  that --

 8            THE COURT:  So --

 9  A.   That was --

10            THE COURT:  Before you go on and Mr. Reed goes on, I

11  don't know whether Mr. Reed shared with you my ruling on the

12  motions in limine.  Ms. Hager, the Trust had moved to exclude

13  your testimony.  And I overruled the objection to this extent,

14  that you would be permitted to testify about custom usage and

15  practice in mortgage foreclosure matters in New Jersey but not

16  to give opinion testimony with respect to whether the GMACM in

17  this case had done anything improper.

18            Okay?  Just that's -- I don't have the writing in

19  front of me, but it was basically not to permit you to give

20  legal opinion about what happened here but to testify about

21  custom practice and usage in residential mortgage foreclosure

22  in New Jersey.  Did you understand that?

23            THE WITNESS:  Yes.

24            THE COURT:  Okay.  All right.

25            So go ahead, Mr. Reed.

RESIDENTIAL CAPITAL, LLC, et al.                    114

1  Q.   So it's the custom of the law firm representing the

2  mortgage company to make sure that whatever documents or

3  evidence is necessary to proceed in foreclosure has been

4  accumulated and verified for such action.

5            MS. HAGER:  Objection.  Leading.

6            THE COURT:  Overruled.

7  A.   The lender would refer a defaulted foreclosure to our

8  office.  At that time we would obtain -- we would pull the

9  necessary documents to proceed with the foreclosure.

10       We would look at the note to make sure that it was the

11 same lender as who the plaintiff would be, or, if not, that it

12 had been endorsed to that plaintiff or in blank.  We would look

13 at the mortgage, and if it was a different lender originating

14 it we would look for an assignment into the plaintiff.

15       If we did not have those we would not proceed.  We would

16 have to wait till we got them.

17       We would also review title, as I said, to look for any

18 other defendants that would be included in a New Jersey

19 foreclosure.

20 Q.   Ms. Donati, as part of the foreclosure firm's practice,

21 was it routine for them, on or just after the time of filing a

22 foreclosure action, to file the legal document called a lis

23 pendens in the county where the foreclosure action would take

24 place?

25            MS. HAGER:  Objection.  Leading.

 1          THE COURT:  Overruled.

 2  A.    Yes.  And if you want me to just give you a step-by-step

 3  of the foreclosure process I could do that if that would --

 4          THE COURT:  Okay.  Please give me a step-by-step.

 5          THE WITNESS:  Okay.  But I'm not -- I wasn't sure if

 6  that would be considered overstepping.

 7          THE COURT:  Well, give me what you understand the

 8  step-by-step of the foreclosure process in New Jersey to be.

 9          THE WITNESS:  Once we -- our office confirmed that the

10  referral was valid and we could proceed with the foreclosure

11  then we would prepare the foreclosure complaint and file it

12  with the Office of Foreclosure in Trenton.

13          Once that complaint was filed and we received a file

14  number we would file -- record a lis pendens in the county

15  where the property was located, which is a vehicle to notice

16  anyone who may be interested in the property that there is a

17  lawsuit pending that involves that property.  Then we would

18  proceed with service, often simultaneously with filing the lis

19  pendens.

20          After service, if there was no response from the

21  defendant, we would file for default, and after a default was

22  granted, if it was not contested and the default was granted,

23  then we would move for a final judgment.  And at that time you

24  present all your proofs to the Court.

25          The initial complaint does not include copies of the

RESIDENTIAL CAPITAL, LLC, et al.                    116

 1   proof -- it doesn't include a copy of the note or the mortgage

 2   or the certificate amount due.  That's not a judgment.  And

 3   then you cannot proceed to judgment without all the proofs,

 4   which are numerous.  And then file judgment.

 5           Now, it -- that stays in the foreclosure unit.  It

 6   goes back to the county court if it's -- if a defendant files

 7   an answer.  So if it's a contested foreclosure then it would go

 8   back to the --

 9           THE COURT:  So assume Mr. Reed did file an answer.

10   What happens where a --

11           THE WITNESS:  Then it would go back.

12           THE COURT:  -- foreclosure defendant files an answer?

13           THE WITNESS:  Then it's moved from the foreclosure

14   unit to the county chancery court, and that judge hears the

15   case.  And it's either dismissed as a result of that court

16   action or the judge decides it can move forward, and then it

17   goes back to the foreclosure unit.

18           THE COURT:  And what happens then?

19           THE WITNESS:  And then we move for judgment, and when

20   judgment's granted then they schedule a sheriff's sale in the

21   county where the property is located.

22           THE COURT:  What, if anything, happens to the lis

23   pendens if the action is dismissed without prejudice?

24           THE WITNESS:  If that action is dismissed without

25   prejudice then the lis pendens should be also discharged,

1  because it is specific to that action.  It carries a caption

2  that has the file number unique to the original filing.

3         It's not unusual for a complaint to be dismissed for

4  one reason or another and then immediately refiled, but you

5  still have to discharge the lis pendens and then file a new

6  one.

7         THE COURT:  In New Jersey how is a dismissal effected?

8         THE WITNESS:  Of the foreclosure complaint?

9         THE COURT:  Yes.

10        THE WITNESS:  It can be by court order of the judge in

11 the chancery court.  It could be by a voluntar -- voluntarily

12 withdrawing it.

13        THE COURT:  So I'm not familiar with New Jersey State

14 Court procedure.  So if a judge --

15        THE WITNESS:  Okay.  And foreclosure is not normal New

16 Jersey State Court procedure --

17        THE COURT:  Okay.

18        THE WITNESS:  -- because it has that whole separate

19 foreclosure unit.

20        THE COURT:  Just to give you an example.  I may enter

21 an order that would provide for a complaint to be dismissed

22 without prejudice, but until somebody actually presents the

23 judgment it doesn't get dismissed.  What documents are required

24 to actually effect the dismissal of a complaint in New Jersey

25 in connection with mortgage foreclosure?

RESIDENTIAL CAPITAL, LLC, et al.                    118

1           THE WITNESS:  The actual order from the judge in the

2    chancery court can act as a dismissal of the foreclosure

3    complaint.  If it's an uncontested foreclosure, and it doesn't

4    go into chancery court, it stays in the foreclosure unit, then

5    a separate motion or -- to dismiss would need to be filed and

6    granted by the foreclosure unit.

7           THE COURT:  What would be reflected on the docket in

8    the case when it's actually dismissed?

9           THE WITNESS:  The order from a judge.

10          THE COURT:  And what does one have to do to discharge

11   a lis pendens?

12          THE WITNESS:  Execute a dischargeable lis pendens that

13   references the original filing information from the lis pendens

14   with the caption that matches the case, and it's recorded with

15   the land records of the county in which the property is

16   located.

17          THE COURT:  Go ahead with your questioning, Mr. Reed.

18   BY MR. REED:

19   Q.   So, Ms. Donati, the process you describe, an order is

20   issued to the firm that you worked for to dismiss the

21   foreclosure complaint.  You received the order.  You then, as a

22   matter of course and custom, followed -- dismissed that lis

23   pendens afterwards.

24          MS. HAGER:  Objection.  Leading.

25          THE COURT:  Sustained.  You have to ask a different

RESIDENTIAL CAPITAL, LLC, et al.                    119

 1  question, Mr. Reed.

 2       (Pause)

 3  Q.   Ms. Donati, what would your firm do with regard to a lis

 4  pendens when received in order to dismiss from the chancery

 5  court?

 6            MS. HAGER:  Objection.  Calls for speculation.

 7            THE COURT:  Overruled.

 8  A.   When a case was dismissed, either with an order from the

 9  chancery court or voluntarily, for one reason or another, by

10  the plaintiff, it would get in the queue for the preparation

11  and filing of a discharge of lis pendens, and that would be

12  sent to the county for reporting.  Depending on the county, you

13  know, we would get it back in a few days, sometimes a few

14  weeks.

15            THE COURT:  So I want to try to be sure that I

16  understand your testimony on this point.  In the practice in

17  New Jersey, do I understand your testimony that a lis pendens

18  should be discharged when the action in which it has been

19  entered has been actually dismissed by the Court?

20            THE WITNESS:  Yes.  Dismissed by the chancery court or

21  dismissed through the foreclosure unit.

22            THE COURT:  Bear with me a second, okay?

23       (Pause)

24            THE COURT:  In order to determine the date the action

25  was dismissed, did you look at the Court docket?

1          THE WITNESS:  Yes, it would be in the order, whatever

2    the date of the order was, if the order dismissed it or the

3    filing of the notice of dismissal.

4          THE COURT:  All right.  Ask your next question,

5    Mr. Reed.

6    Q.   Ms. Donati, would the receipt of the physical order with

7    the date of the dismissal trigger the action you described

8    customarily, the release of the lis pendens?

9    A.   Yes, if the order said that foreclosure was dismissed,

10   then we would treat it as if it was a voluntary dismissal or

11   any other kind of dismissal of the case and we filed the

12   discharge of lis pendens and wind up the case.

13         THE COURT:  Go ahead, Mr. Reed.

14         MR. REED:  Your Honor, believe it or not, I don't

15   think I have anything more.

16         THE COURT:  Okay.  Cross-examination?

17   CROSS-EXAMINATION

18   BY MS. HAGER:

19   Q.   Good afternoon, Ms. Donati.

20   A.   Hi.

21   Q.   You mentioned that you're presently employed by DuPont, is

22   that right?

23   A.   I work for Kelly Legal Services.

24   Q.   So you --

25   A.   And I am in place at DuPont Corporation.

1   Q.   You're a contract attorney, is that right?

2   A.   Yes.

3   Q.   And how long have you been a contract attorney?

4   A.   Since March of 2014.

5   Q.   Can you describe your duties at DuPont?

6   A.   Yes, I prepare easements, ground leases, building leases,

7  review title, work with the title company for preparing

8  commitments for larger acquisitions, manage outside counsel.

9   Q.   But nothing foreclosure related, right?

10  A.   No.

11  Q.   And are you presently licensed to practice in New Jersey?

12  A.   Yes.

13  Q.   Why did you leave Phelan, Hallinan & Schmieg?

14  A.   Because the opportunity at DuPont was more in line with

15  the career projectory I see for myself.

16  Q.   When you were at Phelan, Hallinan & Schmieg, you

17  represented mortgage lenders, services and banks, is that

18  right?

19  A.   Yes.

20  Q.   And you managed foreclosure proceedings for your clients,

21  is that right?

22  A.   Yes.

23  Q.   Did you ever represent GMAC Mortgage?

24  A.   Yes.

25  Q.   Did you ever represent Residential Funding Company?

1   A.   Yes.

2            MS. HAGER:  Your Honor, I would like to move to

3   disqualify the witness based on her prior representation of

4   GMAC Mortgage and RFC.  Her testimony on behalf of claimants

5   creates a conflict of interest and violates the rules of

6   professional conduct.  Specifically, RPC 1.9, Duties To Former

7   Clients:  "(B) A lawyer shall not knowingly represent a person

8   in the same or substantially related matter in which a firm

9   with which the lawyer formerly was associated had previously

10  represented a client whose interests are materially adverse to

11  that person."  And also, "(C) A lawyer who has formerly

12  represented a client in a matter or whose present or former

13  firm had formerly represented a client in a matter, shall not

14  thereafter (1) use information relating to the representation

15  to the disadvantage of the former client, except as these rules

16  would permit or require with respect to a client or when the

17  information has become generally known or (2) reveal

18  information relating to the representation except as these

19  rules would otherwise permit."

20           THE COURT:  Did you represent GMAC or Residential

21  Funding in connection with any mortgage foreclosure action

22  against Mr. Reed?

23           THE WITNESS:  No.

24           THE COURT:  I didn't read in your motion in limine to

25  exclude Ms. Donati's testimony because of prior work that she

1  did for GMACM or RFC.  Did I miss that?

2           MS. HAGER:  It wasn't raised at that time because I

3  didn't know the answer to those questions.

4           THE COURT:  All right.

5           MS. HAGER:  I didn't know if she had represented those

6  companies or not.

7           THE COURT:  I'll permit you to file a post-trial

8  memorandum of law addressing the issue.  It does not appear to

9  me -- I'm not ruling at this point but Ms. Donati's testimony

10 talked about custom, practice, and usage in residential

11 mortgage foreclosure in New Jersey.  She's not addressed in any

12 respect GMAC's mortgage foreclosure action with respect to the

13 Reeds.

14          I'm not ruling on it but I am going to give you --

15 you've raised this for the first time now.  I'll give you an

16 opportunity.  We can talk when the evidence is over about how

17 much time you want to file the memorandum.  I'll take under

18 advisement whether or not to consider Ms. Donati's testimony.

19          MS. HAGER:  Okay.  Thank you, Your Honor.

20          THE COURT:  Do you wish to cross-examine?

21          MR. REED:  Your Honor?

22          THE COURT:  No, Mr. Reed.

23          Go ahead.  Do you wish to cross-examine?

24          MS. HAGER:  Well, I had some more preliminary

25 questions.

1        THE COURT:  Do your cross-examination now.  Do you

2   have cross-examination --

3        MS. HAGER:  I do.

4        THE COURT:  -- you want to do?

5        MS. HAGER:  Of course.

6        THE COURT:  Go ahead, let's go.

7        MS. HAGER:  Sure.

8   BY MS. HAGER:

9   Q.   Where did you attend law school?

10  A.   Widener University.

11  Q.   And what year did you start and when did you graduate?

12  A.   I began in the -- Septem -- August of 2006 and I graduated

13  in May of 2009.

14       THE COURT:  Just get yourself a little closer to the

15  microphone.

16       THE WITNESS:  Oh, I'm sorry.

17       THE COURT:  I want to be sure that -- okay.  Thank

18  you.  You don't have to repeat anything.

19       THE WITNESS:  Okay.

20       THE COURT:  But go ahead.

21  Q.   Your employment at Phelan, Hallinan & Schmieg is your only

22  experience with foreclosures, right?

23  A.   Yes.

24  Q.   And are you a member of any professional or industry

25  organizations?

RESIDENTIAL CAPITAL, LLC, et al.                    125

1   A.   The New Jersey Bar Association and the Pennsylvania Bar

2   Association.

3   Q.   Have you ever written or spoken professionally?

4   A.   No.

5   Q.   When were you retained to provide an expert report in this

6   case?

7   A.   Exactly?  July -- I'm not sure exactly the date.

8   Q.   July of 2014?

9   A.   Yes.

10   Q.   And by whom were you retained?

11   A.   Frank Reed.

12   Q.   Have you ever spoken with Christina Reed?

13   A.   No.

14   Q.   Did Frank provide you -- did Mr. Reed provide you with any

15   facts or data about the case?

16   A.   Yes.

17   Q.   What were they?

18   A.   I was provided copies of the foreclosure complaint, the

19   note, the mortgage, the assignment, the lis pendens, and the

20   order from the judge in the foreclosure from 2008.

21   Q.   Have you ever testified as an expert before?

22   A.   No.

23   Q.   Have you ever provided deposition testimony?

24   A.   No.

25   Q.   Would you agree with me that the right to foreclose

1  accrues upon default and the performance of conditions

2  precedent such as notice?

3  A.   Yes.

4  Q.   Are you aware of whether the Reeds were in default prior

5  to the foreclosure complaint being filed?

6  A.   I did not see anything that indicated that.

7  Q.   The lower court didn't hold that GMAC Mortgage failed to

8  prove standing, did it?

9  A.   No.

10 Q.   Which -- excuse me.  Who is supposed to discharge a lis

11 pendens?

12 A.   The party that recorded it.

13 Q.   And when should that occur?

14 A.   When the foreclosure case is dismissed.

15 Q.   And on what authority do you base those responses?

16 A.   On the practice of law for four-and-a-half years in --

17 four years in that -- and I can't tell you off the top of my

18 head what statutes or rules involved, but that is the practice.

19 Q.   So as an expert on foreclosures in New Jersey, you must be

20 familiar with N.J.S.A. 2A:15-14 and 15-11 concerning lis

21 pendens, right?

22 A.   I have seen them.

23 Q.   What are those?

24      THE COURT:  I'd like to see them though --

25 A.   But I --

1           THE COURT:  -- if you're going to ask questions about

2    it.

3    A.    -- don't have them committed to memory.

4           THE COURT:  Stop.  Stop.  If you wish to ask questions

5    about a specific statutory section, put it in front of the

6    witness and put a copy in front of me.  Otherwise, I will not

7    permit you to question about it.

8           MS. HAGER:  Sure.  I do have an extra copy, if you

9    just bear with me a moment.

10          THE COURT:  Yes.

11          MR. REED:  Your Honor, do I get a copy?

12          THE COURT:  You should.

13          MS. HAGER:  I actually don't have enough copies for

14   everybody.  Can I ask the question a different way?

15          THE COURT:  You can ask.

16          MS. HAGER:  Sure.

17          THE COURT:  I'll see whether I let her answer it.

18   Q.    Is it not the case that lis pendens are supposed to be

19   discharged when a judgment is made in favor of the defendant?

20   A.    That -- if a judgment is made in favor of a defendant,

21   then a lis pendens should be discharged.

22   Q.    So you agree with me then?

23   A.    Yes.

24   Q.    Okay.  And is it not the county clerk who is actually

25   supposed to discharge the lis pendens upon receipt of a

RESIDENTIAL CAPITAL, LLC, et al.                    128

1  certified copy of the judgment?

2  A.    That is one way it can be handled.

3  Q.    Isn't that the only way it's described in the rule?

4  A.    I don't know.  I don't have the rule in front of me, but I

5  do know that at the conclusion of a foreclosure, a discharge of

6  lis pendens is filed -- is recorded on the land records.

7  Q.    Because that's the way your former firm handled it, right?

8  A.    Yes.

9  Q.    At what point in a foreclosure proceeding would the county

10 clerk receive a certified copy of the judgment in favor of the

11 defendant?

12 A.    At what point, if there was a judgment in favor of the

13 defendant would the county court (sic) recorder --

14 Q.    Let me ask --

15 A.    -- the county court or --

16 Q.    I'll ask it again if that's okay.

17 A.    Okay.

18 Q.    At what point in a foreclosure proceeding would the county

19 clerk receive a certified copy of the judgment?

20 A.    After we received -- after the law firm received it from

21 the court.

22 Q.    After the law firm received what from the court?

23 A.    The certified copy of the judgment.

24 Q.    Are you aware of when the Reeds' foreclosure action was

25 dismissed by the court?

1    A.    I do not know the date.

2    Q.    Are you aware of whether or not it says in the rule

3    regarding lis pendens that the plaintiff is obligated to

4    discharge the lis pendens?

5    A.    Do I know where that is?

6    Q.    Sorry.  I'll just rephrase it for you.  Does it say

7    anywhere in the rule regarding lis pendens that the plaintiff

8    is obligated to discharge the lis pendens?

9    A.    I do not know off the top of my head.

10   Q.    Are you aware of how long a lis pendens remains effective

11   in New Jersey?

12   A.    Five years.

13          MS. HAGER:  Thank you.  I don't have anything further.

14          THE COURT:  So Ms. Donati, did you see Judge

15   Hogan's -- a copy -- with respect to this matter, did you see

16   Judge Hogan's decision?

17          THE WITNESS:  I did see it.

18          THE COURT:  Okay.  And that decision is dated February

19   6, 2009.  I think the issue arises here that the clerk's office

20   didn't enter a dismissal of the complaint -- of the case, of

21   the foreclosure case until August 9th, 2013.  Why, I have no

22   idea.  But the --

23          THE WITNESS:  That's a long time.

24          THE COURT:  -- dismissal wasn't entered until August

25   9th, 2013.  That's at least why I asked some questions earlier

1  about when the lis pendens should be discharged.  Judge Hogan

2  wrote a decision but the judgment -- a dismissal wasn't entered

3  until years later.  Why, I don't know.  But I take it your

4  understanding is it's when the judgment of dismissal is

5  entered, that's when the lis pendens should be discharged.

6          THE WITNESS:  Yes.

7          THE COURT:  Okay.

8          Mr. Reed, do you have any additional questions?

9  REDIRECT EXAMINATION

10  BY MR. REED:

11  Q.   I'm trying to understand the terminology.  I think Ms.

12  Donati, you had said when you received an order from the judge

13  dismissing the case is when you would proceed with dismissing

14  the lis pendens.

15  A.   That is what we did, yes.  I --

16          MR. REED:  Your Honor, I would like to ask the witness

17  about preparation of filing foreclosure complaints, moving away

18  from the lis pendens.

19  Q.   Would your firm routinely -- can you explain any process,

20  if at all, relating to obligations under New Jersey Fair

21  Foreclosure Act and filing a foreclosure action?

22          MS. HAGER:  Objection.  It exceeds the scope of cross-

23  exam.

24          THE COURT:  I'm going to overrule the objection.  Go

25  ahead.

 1              THE WITNESS:  I'm sorry, I didn't hear.

 2              THE COURT:  I overruled the objection.

 3              THE WITNESS:  Okay.  The Fair Foreclosure Act calls

 4      for a notice of intent to foreclose which is a letter sent to

 5      the borrower letting them know that they're in default, who the

 6      lender is, how much would be required to cure the default and

 7      other information.  And it gives them thirty days to cure the

 8      default before a foreclosure can be initiated.

 9              We -- part of the pre-filing procedure for a

10      foreclosure action would be to make sure that the notice of

11      intent to foreclose was sent and that the thirty days had run.

12      So we would not file prior to the thirty days expiring.

13      Usually we would give them thirty-five days.

14              THE COURT:  Anything else, Mr. Reed?

15              MR. REED:  I can't -- I can't -- my understanding is I

16      can't discuss the actual -- my foreclosure.

17              THE COURT:  That's correct.

18              MR. REED:  And any questions about the --

19              THE COURT:  I'm not going to allow you to elicit any

20      opinion testimony from Ms. Donati.

21              Look, Mr. Reed, the Trust doesn't -- is not

22      contesting, for the purposes of this matter, that the FFA

23      notice was not given and that's the reason that Judge Hogan

24      entered his decision to dismiss the matter without prejudice.

25      Am I correct in that, Ms. Hager?

1           MS. HAGER:  That's correct, Your Honor.

2           THE COURT:  Okay.  So this doesn't serve any purpose.

3           MR. REED:  Okay.

4           THE COURT:  Okay?  Do you have anything else you want

5    to ask her about?

6           MR. REED:  I think -- I was going to just ask

7    questions about the assignment of the mortgage certificate in

8    relation to the filing of the foreclosure, the date but I --

9    like I said, I'm trying to understand that I can't talk about

10   my specific foreclosure action.

11          THE COURT:  I think she's already testified about what

12   her custom and practice was with respect to when a lender would

13   ask that a foreclosure action be commenced, what the custom and

14   practice was with reviewing the note, the mortgage, any

15   assignment.  Is there something beyond that you want to --

16   she's already testified about that.

17          MR. REED:  I don't -- I don't think so.

18          THE COURT:  Okay.  Because ordinarily, you call a

19   witness, you ask -- and I'm giving you some leeway on this, you

20   ask your questions, then the other side cross-examines as

21   Ms. Hager did.  Then ordinarily any redirect is limited to the

22   scope of the cross-examination.  You can't go back over a new

23   area and things like that.

24          MR. REED:  So cover every new --

25          THE COURT:  I've given you some -- I've tried to give

 1   you some leeway.  I've overruled the objections about beyond

 2   the scope of the cross, but Ms. Donati already did testify --

 3             MR. REED:  Okay.

 4             THE COURT:  -- about the procedures with respect to

 5   looking as to whether there was an assignment or an endorsement

 6   of the note or whether it was endorsed in blank.  I have that

 7   clearly in mind.

 8              Is there something else you wanted to ask about?

 9             MR. REED:  No.

10             THE COURT:  Okay.  Ms. Hager, is there anything else

11   you want to ask?

12             MS. HAGER:  No, Your Honor.

13             THE COURT:  All right.

14             MS. HAGER:  Thank you.

15             THE COURT:  You're excused.  Thank you very much for

16   your testimony.

17              All right.  And you have another witness here?

18   Somebody else came in while we were --

19             MR. REED:  He did.  He did, Your Honor.

20             THE COURT:  And who is that?

21             MR. REED:  This is Evan Hendricks.

22             THE COURT:  Okay.  Mr. Hendricks, do you want --

23   you're going to call him as a witness, I take it then.

24             MR. REED:  Yes.

25             THE COURT:  All right.  Mr. Hendricks, would you come

RESIDENTIAL CAPITAL, LLC, et al.                    134

1   on up and be sworn.  If you would go up there and stand there

2   and raise your right hand.  Just want to make sure the

3   microphone is picking up your response.  Okay.  All right.

4        (Witness sworn)

5             THE COURT:  All right.  Please have a seat.

6             THE WITNESS:  Thank you.

7             THE COURT:  If you would state and spell your full

8   name.

9             THE WITNESS:  My name is Evan Hendricks, E-V-A-N,

10  H-E-N-D-R-I-C-K-S.

11            THE COURT:  Thank you very much, Mr. Hendricks.  And

12  just so you understand, Mr. Reed hadn't completed his direct

13  testimony, but when we broke for lunch, I indicated that I

14  would take witnesses out of order, so they wouldn't have to

15  wait while Mr. Reed completed.  So you were here, I think, when

16  Ms. Donati was testifying.  So now I'll permit Mr. Reed to ask

17  his questions of you.

18            Go ahead, Mr. Reed.

19            THE WITNESS:  Thank you, Your Honor.

20            MR. REED:  Your Honor, I have to get my computer

21  because the -- I just realized the reference material is on the

22  actual computer.

23            THE COURT:  I'll tell you what, you stay there.  I'll

24  ask one of my law clerks if you don't mind them bringing it

25  back to you, so you don't have to get it.  It's the red-covered

RESIDENTIAL CAPITAL, LLC, et al.                    135

```
 1  computer on the ledge there, right?
 2          MR. REED:  Yes.
 3          THE COURT:  Okay.  They'll bring it back to you.
 4      (Pause)
 5          THE WITNESS:  I'm a bit out of order; is there any
 6  water available in the courtroom?
 7          THE COURT:  We'll have to get you some.
 8          THE WITNESS:  Thanks.  Sorry.  I just got off the
 9  train, so I haven't had a chance to --
10  DIRECT EXAMINATION
11  BY MR. REED:
12  Q.   Mr. Hendricks, can you state your name for the Court?
13          THE COURT:  He did already.
14          MR. REED:  He did.
15  Q.   Your residence?
16          THE COURT:  No, we --
17          MR. REED:  Oh, you don't --
18          THE COURT:  Yes, go ahead.  Tell him --
19          THE WITNESS:  I --
20          THE COURT:  Give me your office or your home,
21  whichever you prefer.
22          THE WITNESS:  I live in Bethesda, Maryland.
23          THE COURT:  Okay.
24          THE WITNESS:  Street address.
25          THE COURT:  All right.
```

1   Q.   Would you care to share with the Court your experience as

2   an expert witness in matters of banking and public records?

3   A.   Sure.  I --

4          THE COURT:  Let me ask you this --

5          THE WITNESS:  Sure.

6          THE COURT:  -- before you do that:  tell me what you

7   understand you're here to testify as an expert about.  What is

8   the subject of your --

9          THE WITNESS:  The effect of the public record filing,

10  specifically to lis pendens on his -- the -- in the foreclosure

11  of his property and the -- what -- you know, what GMAC's

12  practice and pattern was in relation to that information and

13  that kind of activity.  And the impact it had on his ability to

14  sell his house and on the foreseeability of the damage that

15  would cause him on behalf of GMAC.

16         THE COURT:  All right.  We'll take it one step at a

17  time.

18         THE WITNESS:  Okay.

19         THE COURT:  Go ahead, Mr. Reed.  What is your question

20  of Mr. Hendricks?

21         MR. REED:  I understand that Mr. Hendricks said we

22  would like to have him talk about his experience.

23  Q.   First off, have you ever testified in a court in regard to

24  these issues that you just described to the Judge?

25  A.   Yes, sir.  I have been qualified more than twenty times,

1    testified in federal and state court.  They involve the

2    personal information that affects people's financial standing,

3    their creditworthiness.  Many of the cases involve public

4    records because foreclosures and tax liens are very -- have a

5    negative impact on someone's ability to close a transaction.

6         And so I have a lot of specialized knowledge in that field

7    and I -- one of the ways I've built that up was I was editor

8    and publisher of a newsletter, specialized newsletter, for

9    thirty-three years dealing with information, law and policy,

10   including the use of public records in consumer transactions,

11   the public access to that information, what kind of personal

12   information and public records is available like foreclosure

13   information, property records.  So I have a lot of specialized

14   knowledge in that area and that's why I serve as a specialized

15   knowledge expert in cases involving personal information, a lot

16   of times in credit reporting.

17        THE COURT:  I don't know whether you -- have you seen

18   my order on the motion in limine?

19        THE WITNESS:  Yes, sir.  I know we're not talking

20   about credit reporting today and so I am here to talk

21   specifically about the public record and its impact on that

22   transaction and that house.  And I know there's other limits in

23   your order.

24        THE COURT:  All right.

25        Mr. Reed, go ahead with your questioning.

1  Q.   Mr. Hendricks, could you describe, in particular, the

2  effects of the public record of a lis pendens on the

3  alienability of the property either through selling or

4  financing?

5  A.   Thank you, and this is what I am here to testify about is

6  that a lis pendens and a foreclosure brings a transaction to a

7  halt because no mortgage lender or a banker can approve a

8  credit application or any sort of transaction when there's that

9  sort of public record existing and they find out about it

10  because they use services that notify them of it, as soon as

11  it's feasibly possible.

12       So it's figuratively like a -- it's hanging a scarlet

13  letter around a consumer who has one of these foreclosures or

14  other figurative phrase, it throws them in credit jail and

15  there's no get out of jail card.

16  Q.   Mr. Hendricks, you spoke of the consumer but does it have

17  an effect on the property itself, as well?

18  A.   Yes, it locks up the property.  It basically puts it in

19  the deep freeze, so no transaction can take place for that

20  property because it's -- I'm not a lawyer but it's encumbered.

21  I don't know if that's the right term but it's simply not free

22  to be used in a transaction.

23          THE COURT:  Well, a mortgage encumbers a property as

24  well, right?

25          THE WITNESS:  Yes.

1          THE COURT:  Go ahead, Mr. Reed.

2          THE WITNESS:  But this is a special sort of -- again,

3     a scarlet letter on -- which ties up that property.

4          THE COURT:  Go ahead with your question, Mr. Reed.

5          THE WITNESS:  Sorry.

6     Q.   Is it fair to say that a lis pendens signifies that a

7     dispute is happening over the title of the property?  That's

8     the role of the lis pendens?

9          MS. HAGER:  Objection.  Leading.

10         THE COURT:  Overruled.

11    A.   It certainly indicates that a dispute is likely.  It

12    doesn't a hundred percent confirm there's a dispute but it

13    definitely confirms that a dispute is likely, yes.

14    Q.   You -- Mr. Hendricks, you live in Maryland and you have

15    traveled the country, so the rules may be different from state

16    to state on lis pendens, is that correct?

17    A.   Right.  But there are also -- most of the rules

18    supplement.  If there's a state rule and there's federal rule,

19    it's usually -- one doesn't trump or pre-empt the other.  It's

20    usually -- they build on each other, so the rights are

21    cumulative.

22    Q.   Since it's a public -- a lis pendens is a public record,

23    would -- regular individuals would be able to learn of that

24    information as well, would they not?

25    A.   If it's a -- as a public record, yes, if they knew where

RESIDENTIAL CAPITAL, LLC, et al.                    140

1    to look and how to get it.  Yes, they would be able to access

2    that sort of public record.

3    Q.   To your knowledge, are there services that report those

4    public records to anyone who may be interested in knowing that

5    information?

6    A.   Yes, it's a standard industry practice for major creditors

7    to subscribe to services that will notify them of foreclosures

8    and bankruptcies are two of the leading categories that

9    creditors want to know about, especially for existing

10   customers.  So that's something that's now -- it used to be if

11   it was just in a court record somewhere, they might not know

12   about it but now there's services that bring it -- push that

13   information to them almost -- very promptly, if not

14   immediately.

15   Q.   Are you aware if there are any such services accessible to

16   the general public?  I'll let you answer that question.

17   A.   I am more familiar with the industry using them.  I'm not

18   sure to the extent that there's one that's mainly designed for

19   the general public.  But it is publicly available information,

20   so it's conceivable.

21   Q.   Are you -- would it surprise you if there was services

22   like this employed or used by realtors to determine properties

23   subject to public records recorded against them?

24   A.   No, that -- that wouldn't surprise me because they're

25   central to the industry and they're industry participants, just

RESIDENTIAL CAPITAL, LLC, et al.                    141

1    like a lender like GMAC would use this sort of thing because

2    they would not want to and would not approve any sort of loan

3    or transaction to someone who has a lis pendens pending.

4    Q.   The recordation of a lis pendens, is it fair to say that

5    that would send or can it send any kind of a message to the

6    public, as it's a public record, that the owner of that

7    property is in distress -- financial distress?

8            MS. HAGER:  Objection.  Leading and calls for

9    speculation.

10           THE COURT:  Sustained.  Do you have another question,

11   Mr. Reed?

12           MR. REED:  I'm trying to think of how I can rephrase

13   that, Your Honor, if I understand the objection.

14   Q.   Mr. Hendricks, you mentioned that filing of a lis pendens

15   and foreclosure actions foreseeably can cause harm.  Could you

16   elaborate?

17           THE COURT:  He didn't say that.

18   A.   I can elaborate.

19           THE COURT:  Ask another question, Mr. Reed.

20   Q.   Filing of a foreclosure and a lis pendens does have harm

21   or -- to the property and owner of that property, is that

22   correct?

23   A.   Yes.

24           MS. HAGER:  Objection.

25   A.   Becau -- I'm sorry.  Yes, it does because it ties up the

 1  house -- a person's home is usually the most important asset

 2  and when you have a lis pendens is completely ties up that

 3  asset and makes it so you can't sell it, you can't borrow

 4  against it and it --

 5          THE COURT:  Well, to sell it, he has to satisfy the

 6  mortgage, correct?

 7          THE WITNESS:  Yes, sir.

 8          THE COURT:  And if there's a valid mortgage, you would

 9  agree that that's an obligation that the mortgagor would have

10  to pay at the time they sell their house, correct?

11          THE WITNESS:  Right.  And I understand that was Mr.

12  Reed's plan provided this transaction was going to go through

13  that he was working on at the time.

14          THE COURT:  Well --

15          THE WITNESS:  That's my understanding, Your Honor; I'm

16  sorry.

17          THE COURT:  That's what you're basing your opinion on?

18          THE WITNESS:  That's certainly part of the basis for

19  my opinion, yes.

20          THE COURT:  Go ahead, Mr. Reed.  Ask your next

21  question.

22  Q.   Is it your understanding that -- from your experience,

23  does litigation over title and property, is that something

24  that's quickly or easily typically resolved?

25  A.   No, not --

1              MS. HAGER:  Objection.  Leading and calls for

2    speculation.

3              THE COURT:  Sustained.

4    Q.   During 2008 and 2009, could you describe for the Court

5    your understanding of the foreclosure industry?  I'll back that

6    up.

7         In your experience, Mr. Hendricks, why would a lender not

8    want to underwrite property because of a lis pendens or pending

9    litigation?

10             MS. HAGER:  Objection.  Leading.  It calls for --

11             THE COURT:  Sustained.

12        (Pause)

13             THE COURT:  Do you have any additional questions, Mr.

14   Reed?

15             MR. REED:  I do, Your Honor.  It's just trying --

16   difficulty of my trying to phrase them in a way -- trying to

17   understand the -- I don't want to elicit objections because I

18   am not phrasing them correctly.  I don't want to do something

19   inappropriate.

20             THE COURT:  Tell me what it is you're trying to

21   inquire about, Mr. Reed.  This is not a question to him.

22   You're telling me.  Okay?

23             MR. REED:  Um-hum.

24             THE COURT:  What's the point you want to make?

25             MR. REED:  Would a lender know, reasonably know, if

RESIDENTIAL CAPITAL, LLC, et al.                    144

1  filing a foreclosure action is going to have a harmful effect

2  on the person who owned the property or the property value it's

3  of -- by way of -- you know, just by -- by putting it into the

4  public awareness that there is a debt collection activity on

5  the property and against the property owner.  And what -- what

6  result of that -- in other words, is it -- would they happen to

7  know with -- of course, this is going to have some negative

8  impact on them -- on that person but it just doesn't happen in

9  a vacuum.

10          THE COURT:  Do you have an opinion, Mr. Hendricks,

11  whether the filing of a lis pendens has an impact on the market

12  value of residential real estate?  Just answer that yes or no.

13          THE WITNESS:  Yes, I do have an opinion on that.

14          THE COURT:  Okay.  Don't tell me your opinion yet but

15  tell me what's the basis for your opinion?

16          THE WITNESS:  The basis for my opinion is the

17  specialized knowledge I've accumulated following cases

18  involving mortgages, property sale and the impact that public

19  records with personal information has on those properties.

20          THE COURT:  And does the filing of the lis pendens

21  have some different effect than simply if you had knowledge

22  that the borrower had defaulted on his mortgage?

23          THE WITNESS:  Well, I mean that's a compound question.

24  Can I take it --

25          THE COURT:  Well, I get to ask what I want to.

1          THE WITNESS:  Yeah, I know.  Can I take it one at a

2   time then?  The lis pendens is particularly damaging when, as

3   you just had another witness talk about and your question went

4   to this, and it's -- I think this is stipulated, when it's

5   not -- adequate notice is not given.  So much of the -- the

6   regimes that I deal with are based on notice.

7          THE COURT:  Look, the complaint was on file.  It was

8   public.  The issue about whether Mr. Reed received the notice,

9   that the New Jersey statute required thirty days in advance was

10  an issue in this case, but it's undisputed that Mr. Reed was in

11  default payment of his mortgage beginning in February of 2008.

12  I think that's also undisputed.

13         So my question is, does the filing of the lis pendens

14  have an effect that's different from the fact that the Reeds

15  had defaulted on their mortgage?  The lis pendens was filed May

16  27th, 2008, months later.

17         THE WITNESS:  My answer is yes.

18         THE COURT:  All right.  Let me hear your opinion.

19         THE WITNESS:  Because it goes into this whole public

20  records regime which is then transferred into interested

21  stakeholders in the private sector, including lenders.

22         THE COURT:  Well, no lender is going to lend to Mr.

23  Reed if he's been in default of his mortgage for five months

24  when he applies for refinance, are they?

25         THE WITNESS:  Well, I mean, I think if -- in most

1   traditional circles probably not but I believe is Mr. Reed was

2   working with a lender he had a long track record with and that

3   that -- my understanding is that that lender told him that once

4   they --

5             THE COURT:  Well, don't tell me what the lender told

6   him --

7             THE WITNESS:  Okay, I'm sorry.

8             THE COURT:  -- because he hasn't been able to put that

9   into evidence.

10            THE WITNESS:  Okay.  All right.

11            THE COURT:  All right.

12            THE WITNESS:  But that public record regime kicked in

13   and that's how that played a role in bringing a halt in this

14   transaction preventing him from --

15            THE COURT:  That's contrary to the testimony this

16   morning.

17            THE WITNESS:  Okay.

18            THE COURT:  The testimony this morning about the

19   transactions which Mr. Reed had entered into, the first buyer

20   failed to close and was able to recover his deposit.  The

21   second buyer defaulted and Mr. Reed had to -- I heard a lot of

22   testimony about it and there was no testimony that the second

23   borrower didn't go forward and close the purchase because of

24   anything related to a mortgage foreclosure action.  So you're

25   assuming that Mr. Reed lost a sale because of mortgage

1    foreclosure?

2              THE WITNESS:  No, I think it was a refinance or some

3    sort of a financial arrangement that he was going to have with

4    the lender he had been working with at TD Bank.

5              THE COURT:  And do you think -- well, never mind.

6              THE WITNESS:  And I apologize because I thought I was

7    testifying tomorrow, so I didn't have time to prepare that I

8    normally would, sir.

9              THE COURT:  Well, it's -- go ahead with your

10   questions, Mr. Reed.

11             THE WITNESS:  Obviously my opinions have to square

12   with the facts of the case.

13             THE COURT:  Okay.

14             THE WITNESS:  And that -- but you asked about two

15   things and I'm thinking of something that I think happened

16   after those two --

17             THE COURT:  And what's -- go ahead and tell me.

18             THE WITNESS:  Well, my understanding is that -- and I

19   wish I was here to hear the testimony as well, that TD Bank was

20   looking to do a -- some sort of finance or loan processing with

21   Mr. Reed when TD Bank discovered, through the public records

22   regime, the lis pendens.  And then that brought it to a halt.

23             THE COURT:  And do you think that TD Bank would have

24   asked whether he's current in his mortgage payments before they

25   agreed to do a refinance?

 1              THE WITNESS:  I think they would have, yes.

 2              THE COURT:  Yes.  And so Mr. Reed's testimony this

 3   morning as about discussions with TD Bank before any

 4   foreclosure action was filed.

 5              Ask your next question, Mr. Reed.  Let's get on with

 6   this.

 7        (Pause)

 8              THE COURT:  Do you have a question, Mr. Reed?

 9              MR. REED:  Yes, I am trying to formulate it, Your

10   Honor.

11   BY MR. REED:

12   Q.   In your experience with the -- the existence of a

13   foreclosure action and its associated lis pendens on a

14   property --

15              MR. REED:  I don't know if this is an allowable

16   question, Your Honor.

17              THE COURT:  Well go ahead and ask it and we'll see.

18   Q.   -- signify to a buyer or a buyer's realtor that there may

19   be a more involved process in the sale of a property than a

20   property that didn't have such a recordation?

21              MS. HAGER:  Objection.  Calls for speculation.

22              THE COURT:  Overruled.  Go ahead.

23   A.   Yes, it does, just like you do title searches to see if

24   properties have liens on them.  This is a same, parallel

25   situation.  Yes, it would show that this is -- the transaction

RESIDENTIAL CAPITAL, LLC, et al.                     149

1  is not going to go through quickly.

2  Q.   Would the filer of that foreclosure and associated lis

3  pendens likely be aware of that effect?

4  A.   Yes, it's foreseeable that it's going to be a financial

5  servicing mortgage company that's going to file that sort of

6  thing and they -- if they're on the other end looking at a

7  consumer or a property that had that, they know that they would

8  not do -- they would not do that transaction either.  So it

9  would be no mystery to an entity like GMAC, and GMAC, there was

10  a lot of -- GMAC was recklessly foreclosing on lots of people

11  at this time and was being investigated by the government for

12  it and was the subject of an audit by the Treasury Department.

13  So this was part of a pattern and practice of GMAC's actions

14  where -- during that period of time where they were recklessly

15  foreclosing on people.

16         MS. HAGER:  Objection to the witness' testimony as far

17  as the --

18         THE COURT:  Objection is sustained and the testimony

19  is stricken.  There's no foundation.  It's beyond his

20  permissible scope of expertise.

21         MR. REED:  What -- Your Honor, he strayed there.

22         THE COURT:  Ask your next question, Mr. Reed.

23         MR. REED:  Your Honor, I'm unsure what was stricken.

24         THE COURT:  His whole answer was stricken, Mr. Reed.

25  Ask your next question.

1        (Pause)

2              MR. REED:  Your Honor, I would like you to turn

3   Exhibit 5 and enter it into evidence.  Ms. Hager agreed to

4   allow this.  I don't know if she has any objection now, but she

5   agreed to allow it.

6              MS. HAGER:  No objection, Your Honor.

7              THE COURT:  All right.  Exhibit 5, which is the

8   Interagency Review Of Foreclosure Policies And Practices,

9   Federal Reserve System, Office of the Comptroller of The

10  Currency, Office of Thrift Supervision and the cover has a date

11  of April 2011, is admitted into evidence.

12  (Intragency Review of Foreclosure Policies and Practices was

13  hereby received into evidence as Reed's Exhibit 5, as of this

14  date.)

15             MR. REED:  Your Honor, may I approach the witness to

16  allow him to review the document?

17             THE COURT:  Sure.

18             MR. REED:  This was provided to the witness in

19  preparation towards --

20             THE COURT:  Okay.  Go ahead.  If you want to -- we've

21  got to make sure we get you on --

22             MR. REED:  Yes.

23             THE COURT:  -- the sound system, so -- all right.

24             Mr. Reed has placed Exhibit 5 in evidence before the

25  witness.

RESIDENTIAL CAPITAL, LLC, et al.                         151

1              Go ahead with your questioning, Mr. Reed.

2    BY MR. REED:

3    Q.   Mr. Hendricks, is this the report that you were referring

4    to when you said that GMAC was one of many firms under

5    investigation by an agency of the government?

6    A.   This is one of the reports that I reviewed which covered

7    this period, but in my expert report, I also cited a report

8    that specifically cited an audit of GMAC by an agent of the

9    Treasury Department which found all sorts of irregularities

10   with GMAC's foreclosure which is in -- basically supplements

11   or, you know, complements this report on the problems with

12   foreclosure across the industry.

13             MS. HAGER:  Objection to any testimony stemming from a

14   report which is inadmissible.

15             THE COURT:  I'm going to overrule that objection.  The

16   report to which he refers is not in evidence, other than this

17   report itself.  You know, what he said specifically about GMAC

18   being discussed in another report, that part is inadmissible,

19   but I'm going to let the answer stand and give appropriate

20   weight to the portion of it that remains.

21             Go ahead, Mr. Reed.  Let's go.

22        (Audio resumes mid-sentence)

23   Q.   -- of these -- of this particular report -- put on any

24   heightened notice that their actions could cause harm?

25             MS. HAGER:  Objection.

1          THE COURT:  Sustained.

2          Mr. Reed, you just put in evidence a report from April

3   2011.  The lis pendens about which you complain was entered in

4   May 2008.  How a report from 2011 would impact what GMACM did

5   in 2008 is not something -- you've drawn no logical connection

6   and I am going to exclude that -- that's why I am sustaining

7   the objection to the question, okay?

8          MR. REED:  Your Honor, the basis of the report --

9          THE COURT:  I don't want to hear any argument.  Ask

10  your next question.

11      (Pause)

12          MR. REED:  Your Honor, I think -- I don't think I have

13  anything more.

14          THE COURT:  Cross-examination?

15  CROSS-EXAMINATION

16  BY MS. HAGER:

17  Q.    Good afternoon.  How are you aware of Mr. Reed's

18  relationship with TD Bank?

19  A.    Through my discussions with Mr. Reed and through documents

20  that he provided.

21  Q.    The majority of your prior testimony in other matters

22  related to credit reports, isn't that right?

23  A.    A lot of were credit reporting cases involving credit

24  reports and some of them involved the use of public records,

25  yes.

1   Q.   How often have you been involved with matters involving

2   lis pendens in New Jersey?

3   A.   In terms of a specific case involving a lis pendens in New

4   Jersey, this is the first one that I remember of all the cases

5   I've been involved in.

6   Q.   And have you ever prepared a study of the effect of the

7   lis pendens on market value of property?

8   A.   No.

9   Q.   Isn't a lis pendens simply a notice to third parties?

10   A.   It's -- yes, it's a notice, it's a public notice, yes.

11   Q.   And it puts parties on notice of litigation between

12   parties, isn't that right?

13   A.   Yes, that's part of it.  Yes.

14   Q.   And couldn't a potential creditor simply ask the potential

15   borrower about the lis pendens?

16   A.   Yes.

17   Q.   It's not necessarily something that precludes a potential

18   borrower from getting a loan, is it?

19   A.   The lis pendens, is that your question?

20   Q.   Right, the question is does a lis pendens necessarily

21   preclude a lender from lending to a potential borrower?

22   A.   Effectively, yes, it does, because no underwriter would

23   approve a loan if there's a lis pendens on a property.

24   Q.   But didn't you just testify that a potential creditor

25   could have a discussion with the potential borrower about the

1  facts surrounding the lis pendens?

2  A.   Oh, sure, of course they could; but that's not -- that

3  wasn't your last question.

4  Q.   You testified that you can't sell a house when there's a

5  lis pendens.  Why is that?

6  A.   For the reason that you can't get the transaction

7  approved.  The underwriter won't approve the transaction, the

8  application for credit.

9  Q.   What if the potential buyer had cash?

10  A.   Right, if it's all cash between two parties and I suppose

11  that's, you know, in the category of anything's possible, yes.

12  Q.   Well, it's not actually an impediment to closing, right?

13  A.   Well, I mean in the real world it is, yes.

14  Q.   It is simply a notice, isn't it?

15  A.   Well, it's a notice of a very major problem.

16  Q.   A lis pendens is not the same thing as a lien, is that

17  right?

18  A.   I don't believe so, no.

19  Q.   So let me just make sure I understood your answer.  A lis

20  pendens is not the same thing as a lien, correct?

21  A.   A lien is a lien and a lis pendens and a lis pendens.

22  Q.   They're different?

23  A.   Yes.

24  Q.   Right.  Okay.  Thank you.  I don't have anything further.

25  A.   Thank you.

 1              THE COURT:  Mr. Reed, any further examination?  It has

 2    to relate to the subject of Ms. Hager's questions.

 3              MR. REED:  Yes.

 4    REDIRECT EXAMINATION

 5    BY MR. REED:

 6    Q.    A lis pendens indicates a potential lien, is that correct?

 7    A.    I think that's a fair interpretation, yes.

 8    Q.    It has to be resolved by the litigation that it's

 9    associated with?

10    A.    That's my understanding, yes.

11    Q.    What you testified earlier is typically understood to be a

12    complicated -- signifies a complicated matter is pending

13    regards to the property?

14    A.    Yes.

15    Q.    So the reverse of that, it's not a simple scenario

16    regarding the title of --

17    A.    Right.

18    Q.    -- the property.

19    A.    Right.  It's not a typical residential mortgage or

20    residential property transaction, yes.

21              MR. REED:  Your Honor, I have nothing further.

22              THE COURT:  Isn't any proposed sale transaction where

23    there's a mortgage on the property, the buyer is going to

24    insist on having a payoff demand from the existing mortgagee,

25    so that the mortgage is satisfied and released when the

1   transaction is closed, correct?

2              THE WITNESS:  If I understand your question, I think I

3   agree.  No buyer is going to want to just take on an unpaid

4   mortgage as part of buying a property.

5              THE COURT:  Whether there was a lis pendens or not,

6   whenever a buyer is buying a property that's subject to a

7   mortgage, whether it's through an escrow agent or lawyers who

8   were closing the transaction, you get a payoff demand with

9   respect to the outstanding mortgages or liens on the property,

10  correct?

11             THE WITNESS:  I believe that's correct.  I --

12             THE COURT:  And the buyer wants to be sure that the

13  existing liens are satisfied unless he's taking -- unless he

14  expressly agrees to take subject to, the buyer wants to be sure

15  that existing liens are satisfied when the transaction closes,

16  correct?

17             THE WITNESS:  I believe that's a fair description,

18  yes.

19             THE COURT:  All right.  And so when a mortgagee has

20  filed a lis pendens and a foreclosure action, a buyer can still

21  close on the property and get a payoff demand to find out what

22  is required to satisfy the existing liens and mortgages on the

23  property, correct?

24             THE WITNESS:  I think, theoretically, that's happened

25  but in the real world and my understanding -- the reason I'm

1  here is that my understanding is that lis pendens basically

2  convinced TD Bank that it cannot go ahead what it was

3  borrowing --

4           THE COURT:  Well, you've said that, but I don't have

5  any evidence of that.

6           THE WITNESS:  Okay.  I'm sorry.  That's why I have

7  to -- that's what -- my understanding is why I am here --

8           THE COURT:  Okay.

9           THE WITNESS:  -- that that public record regime --

10          THE COURT:  Right.

11          THE WITNESS:  -- kicked in and prevented that

12  transaction, interfered with the contract.

13          THE COURT:  All right.  Any other questions?

14          MS. HAGER:  No, Your Honor.

15          THE COURT:  Mr. Reed?

16          MR. REED:  No.

17          THE COURT:  All right.  You're excused.

18          THE WITNESS:  Can I clarify one further thing?

19          THE COURT:  Go ahead.

20          THE WITNESS:  Okay.  Thank you.  I appreciate the

21  indulgence.  GMAC was cited in this report.  The one I cited in

22  my expert report is more specific to GMAC, so they are in both

23  of them.

24          THE COURT:  Okay.  All right.  Thank you.

25          THE WITNESS:  Thank you.

1          THE COURT:  All right.

2          THE WITNESS:  Thanks for the water.

3          THE COURT:  Okay.  You're welcome.

4          All right.  Mr. Reed, other than your testimony, do

5    you have any other witnesses you're going to call?

6          MR. REED:  I was hoping that I can convince Ms. Carter

7    to appear.  I have someone working on that.  I don't know the

8    effort because I don't have the phone.  I can't have access to

9    my phone and I would love to check that.

10         THE COURT:  All right.  Here's what we're going to do.

11   We're going to take a recess until 4 o'clock, Mr. Reed.  You'll

12   resume the witness stand.  And we need to move forward

13   expeditiously with the rest of your direct testimony and then

14   Ms. Hager can cross-examine and we'll see where we go to at the

15   end of the day, okay?  All right.

16         So we're in recess until 4 o'clock.

17      (Recess from 3:42 p.m. until 3:59 p.m.)

18         THE COURT:  All right.  Please be seated.

19         Mr. Reed, you're going to resume the witness stand.

20         MR. REED:  Your Honor, I'm troubled by the TD Bank

21   evidence.

22         THE COURT:  Mr. Reed, are you going to resume the

23   witness stand?

24         MR. REED:  Okay.  I didn't know how we addressed that.

25         THE COURT:  All right.  While you're standing there,

1    Ms. Hager you've seen the affidavit from TD Bank.  Do you

2    object to the admission of the August 20, 2012 letter from

3    Mr. Reed to Mr. Curley, and Mr. Curley's August 20th, 2012

4    letter to Mr. Reed, and the July 8th, 2014 letter from

5    Mr. Curley, To Whom It May Concern?

6              MS. HAGER:  Well, Your Honor, I don't have an

7    objection to the letter from Mr. Reed to TD Bank.  As I told

8    Mr. Reed the other day, that's a letter from him and he's here

9    to testify about it.

10             I still have the same objections to the two TD Bank

11   letters that I had when we were here last Monday when Your

12   Honor clearly --

13             THE COURT:  No, the only thing we talked about on

14   Monday was authenticity.  We didn't talk about any other

15   objections that you might have.  So what are your -- tell me

16   specifically to -- the basis for your objection to the August

17   20, 2012 letter from Mr. Curley to Mr. Reed.

18             MS. HAGER:  Sure, the particular letter that's

19   attached to what was handed to me today is actually a bad copy

20   and I don't know if this is what came from TD Bank's records or

21   not.  This is what appears to have been attached to the

22   business records affidavit which was transmitted pursuant to

23   the subpoena which, by the way, was not served on me pursuant

24   to Federal Rules of Civil Procedure 45(a)(4).

25             I didn't have an opportunity to see this previously.

RESIDENTIAL CAPITAL, LLC, et al.                    160

1   I didn't have an opportunity to depose Ms. Morgan.  I don't

2   know if this was a copy of the letter that came from her file.

3   I do question why it's a bad copy because there are actually

4   better copies that I've seen.

5           THE COURT:  Well, look --

6           MS. HAGER:  With respect to the content of the

7   document itself, this is a letter that purports to be an

8   explanation as to why Mr. Reed was denied refinancing and it's

9   dated four years after -- more than four years after he

10  testified he applied for the loan, which is atypical and runs

11  afoul of the Equal Credit Opportunity Act.

12          So I do have doubts as to the authenticity of the

13  letter and I have the same issue with the July 8th, 2014 letter

14  which basically addresses the concern or tries to address the

15  concern I have with the 2012 letter.  It says well, no, that

16  August 20th, 2012 letter's just fine.

17          And so, you know, the specific comment I think I made

18  on Monday with respect to the July 8th letter has also to do

19  with the formatting of the letter and the font.  You'll notice

20  that the font on the date is different than the font on the

21  body of the letter.  This was something that was, though dated

22  July 8th, was provided to me on the last day of discovery and I

23  suspect that was to preclude a chance for me to depose

24  Mr. Curley about it, but nevertheless, I have my concerns as to

25  the authenticities of both letters, notwithstanding the fact

1   that there's a business records affidavit attached to them now.

2              THE COURT:  Well --

3              MS. HAGER:  I don't --

4              THE COURT:  Your objection is that to -- all right.

5   Let me take this in pieces.  With respect to the objection as

6   to the authenticity of the three letters attached to Ms.

7   Morgan's declaration, the objection to authenticity is

8   overruled on the basis of Federal Rule of Evidence 902(8),

9   "Acknowledged documents:  A document accompanied by a

10  certificate of acknowledgement that is lawfully executed by a

11  notary public or another officer who is authorized to take

12  acknowledgements."

13             I will accept Ms. Morgan's declaration which is under

14  penalty of perjury.  It satisfies the authentication

15  requirement.

16             However, the three documents -- Mr. Reed's letter of

17  August 20th, 2012, Mr. Curley's letter of August 20th, 2012 and

18  Mr. Curley's letter of July 8th, 2014 -- are all hearsay, and

19  despite Ms. Morgan's declaration, it's clear from the face of

20  the documents that they do not satisfy Federal Rule of Evidence

21  803(6), Records of a regularly conducted activity, which reads,

22  "A record of an act, event, condition, opinion or diagnosis if

23  (a) the record was made at or near the time by or from

24  information transmitted by someone with knowledge, (b) the

25  record was kept in the ordinary course of a regularly conducted

1  activity of a business organization, occupation or calling,

2  whether or not for profit, (c) making the record was a regular

3  practice of that activity".  It goes on with additional

4  subsections.

5          The key letters in this chain are the two letters from

6  Mr. Curley dated August 20th, 2012 and July 8th, 2014, both

7  relating to facts that transpired in early 2008.  Therefore,

8  neither of these letters is a record that was made at or near

9  the time by someone with knowledge.  Neither letter satisfies

10  the business records exception to the hearsay rule.

11          No other basis -- authenticity only gets you over the

12  first leg of this school, Mr. Reed.  When this matter was

13  presented to me and what I understood Ms. Hager was -- the sole

14  basis for objection was authenticity, I told you to go get the

15  affidavit from TD Bank, and you did.  And if what this was, if

16  what had been attached was a document from 2008 at TD Bank that

17  had recorded the reason for their declining to refinance the

18  loan, having overruled the authenticity objection, I probably

19  would have found that the business records exception was

20  satisfied.  The documents are clearly hearsay.

21          So with respect to authenticity, I overrule the

22  objection, but the documents are clearly hearsay.  They don't

23  fall within any recognized exception to the rules on admitting

24  of hearsay evidence.  Consequently, those exhibits are excluded

25  from evidence.

1          MS. HAGER:  Thank you, Your Honor.

2          THE COURT:  Mr. Reed, resume the witness stand.

3          MR. REED:  Your Honor, Mr. Curley has actually --

4    he'll be able to come to court tomorrow, Your Honor, if

5    necessary, and was listed as a witness regarding the letters.

6          THE COURT:  Ms. Hager, is Mr. Curley listed on the

7    witness list?

8          MS. HAGER:  No, Your Honor.  Mr. Curley is not listed

9    on the witness list.  The most recent witness list in a generic

10   way does list a TD Bank representative for document

11   authentication but we've just addressed authentication.

12         THE COURT:  Mr. Reed, when we finished with your

13   testimony before the lunch recess, you had provided the Court

14   with testimony regarding the Jacobses' proposed transaction,

15   and the Weaver/Cooper transaction.  You had also covered a few

16   other subjects in your testimony.

17         I'm not intending to review what you did or didn't

18   discuss.  But I want you to pick up with your narrative

19   testimony, mindful of what I also said before the break, the

20   focus needs to be on your claims against GMAC.  So go ahead,

21   Mr. Reed.

22      (Pause)

23         MR. REED:  I'm trying to go back now, Your Honor, to

24   that time period.

25      (Pause)

1          MR. REED:  So Mr. Weaver, Mr. Cooper -- I'm sorry,

2     Your Honor.  It's taking me a moment to compose --

3          THE COURT:  Well, that's okay.  I think what you

4     just -- you had also introduced Exhibit 3.

5          MR. REED:  Exhibit 3.

6          THE COURT:  The portion of it that came into evidence,

7     which was the Roccisano offer, and you told me that you had not

8     come to an agreement with the Roccisanos.  And that offer is

9     dated March 20th, 2010.  So I think you had -- I mean, if

10    there's something you want to fill in, that's okay, but I think

11    you had brought that chronology up to that point.

12         (Pause)

13         MR. REED:  Ms. Hager, you have an -- you have an

14    example.  You talk about completeness.

15         Your Honor, there is a -- an additional proposed

16    contract regarding this offer that I think the Trust has, that

17    I don't have.  It might help me refresh my memory in that, and

18    I don't know if I can, you know, look at that.  And then, I

19    have a copy, and then -- I don't know if it's better to put

20    that into evidence.  I don't know if I have to yet, but I'm --

21    I would like to look at that for a minute.  That's --

22    there's -- there's -- I think the discussion with the

23    Roccisanos took place over an extended period of time.

24         MS. HAGER:  Your Honor, that -- I believe that

25    Mr. Reed's referring to our Exhibit DD.

1          THE COURT:  DD?  Let me look at it.  Thank you, Ms.

2    Hager.

3       (Pause)

4          THE COURT:  Carol, will you bring it to Mr. Reed?

5          MR. REED:  I'm sorry?

6          THE COURT:  Is that what you were referring to?

7          MR. REED:  Yeah, yes.  Yes, Your Honor.

8          THE COURT:  Okay, so Exhibit DD is a proposal to

9    purchase from the Roccisanos.  And at the bottom, it's dated

10   June 12th, 2010.  Is that an offer that you received from the

11   Roccisanos?

12         MR. REED:  I -- I think so, Your Honor.  I do not have

13   a clear recollection of that, but I believe the Trust has some

14   information on it from the realtor.  The realtor's office

15   retained those documents, so I believe so.  If we look at it,

16   there was a -- the original offer was in March 2010, and then

17   there was an additional offer in -- that's June.

18         THE COURT:  That's what this is.

19         MR. REED:  Yeah, three months later.

20         THE COURT:  You want to offer Exhibit DD?

21         MR. REED:  I believe it's true, so yes.

22         THE COURT:  Well, it's up to you.  I mean, you're

23   telling me this story, and you said there was a substantive

24   offer, and you couldn't remember it.  And Ms. Hager's helped

25   you out there.

 1           MR. REED:  Uh-huh.

 2           THE COURT:  Do you want to offer it or not?

 3           MR. REED:  Sure.  Number 3 from mine was entered,

 4  right?

 5           THE COURT:  Yes, it was.

 6           MR. REED:  And then -- okay, so also DD.

 7           THE COURT:  Any objection?

 8           MS. HAGER:  No, Your Honor.

 9           THE COURT:  All right.  Just let me go back and look.

10  Bear with me a second.

11           All right, Exhibit DD, which is the June 12th, 2010

12  proposal to purchase from the Roccisanos is admitted in

13  evidence.

14  (Roccisanos' June 12, 2010 proposal to purchase was hereby

15  received into evidence as Trust's Exhibit DD, as of this date.)

16           THE COURT:  Did you ever agree to it -- the "it" is

17  the offer they made in Exhibit DD?

18           MR. REED:  No, Your Honor.  Make sure to get all my

19  times squared away in my head that refer to another -- what I'm

20  trying to -- what I'm trying to find, Your Honor, is when we --

21  when we filed the state court action --

22           THE COURT:  Your action against GMAC?

23           MR. REED:  -- GMAC, yeah, that's what I'm -- and --

24  and it took place from what point to what point.  So I'm clear

25  on -- on, you know, time lines.

 1        (Pause)

 2        MR. REED:  Yes, I -- I think it's -- I think it's

 3  important that I -- that I see that and enter that, Your Honor.

 4  So --

 5        (Pause)

 6        MR. REED:  And I think it's contained within the

 7  Delehey declaration and exhibits.  So now I have to find that.

 8        (Pause)

 9        THE COURT:  You filed your complaint, Mr. Reed, May

10  10th, 2010.

11        MR. REED:  May 10th, 2010, okay.

12        THE COURT:  And it's Exhibit D to your proof of claim.

13        MR. REED:  Okay.  Okay, and the -- okay, so this --

14  all right, that's -- that's -- that's helping me.  Okay, so the

15  Roccisanos made us an offer, the first offer, which was Exhibit

16  3, for a million-three, I believe.

17        THE COURT:  Then they upped it to a million-450.

18        MR. REED:  Yeah, yeah.  I believe that the million-

19  three wasn't sufficient to be able to close the loan, or not

20  the loan, the sale of the house, even if it was cash, because

21  the -- trying to remember this, now -- the interest and

22  everything that had run on the mortgage had now accumulated to

23  the point where the house was underwater with that offer.  It

24  wouldn't -- the one-three wouldn't cover -- give -- the one-

25  three would not convey clear title.  It would not clean up the

1  debt.

2          And if I'm not mistaken, this is where we turned to

3  Mr. Walters.  That's why I'm trying to get my times correct.

4  We -- we evicted -- we evicted Mr. Cooper in the fall.  We put

5  it back on the market in 2009.  Does that occur in 2009?

6          In 2009, our next-door neighbor behind us -- very

7  similar house in -- in square footage, in bedrooms, bathrooms,

8  sold for over two million dollars.  So we wanted to put -- we

9  wanted to put it -- you know, we wanted to get Mr. Cooper out.

10          While Mr. Cooper was in the house, the neighbor in the

11  backyard in our subdivision -- it's a neighborhood, the same

12  builders and lots and such -- some deviation, but you know,

13  similar, very similar -- that house sold in a very short order

14  for over two million.

15          We wanted Mr. Cooper out, obviously, because he --

16  he -- he then didn't -- you know, he tendered these -- these

17  bad checks during the course of 2009.  And we evicted him, and

18  then relisted it in the fall of '09, seeing that the houses in,

19  you know, our neighborhood, or this particular house --

20  house -- I don't remember now to think about if there's any

21  other -- if there were any other sales in our neighborhood.

22  But I remember being pleased that the neighbor sold for that

23  dollar amount, and -- and being pleased that we would -- had

24  gotten Mr. Cooper out.

25          So when we got the offer for one-three -- one-three-

1    five, whatever that offer was, it was drastically different,

2    drastically different than what we were expecting at that time.

3    But nonetheless, we entertained it.  I mean, you know, I'm --

4    I'm in a situation, I'm under duress, as I explained earlier.

5    And from what I recall, we could not convey the clear title,

6    because it wasn't the right, you know, the right amount, or

7    enough.

8            I'm pretty sure that's what we told Ms. Carter, told

9    Mr. Nayogi (ph.).  And some time went by, and we got a slightly

10   higher offer from the Roccisanos, which is the one --

11           THE COURT:  A million-450.

12           MR. REED:  Million-450.  So I -- I wanted to entertain

13   the offer because, you know, I'm seeking resolution now.  I

14   don't have -- you have to understand, Your Honor, I don't --

15   also, we were not re-served with foreclosure at this time; a

16   new foreclosure had not come.  You know, I -- I expected that

17   there would be one, because now there weren't being payments

18   being made.

19           THE COURT:  Am I correct, Mr. Reed, that you had not

20   made any payments on the mortgage since February 2008?

21           MR. REED:  I don't -- Your Honor, I can say this:  I

22   took the advice of counsel --

23           THE COURT:  I don't want to know about what advice --

24   if you want to tell me, I'll let you, but you waive privilege

25   when you tell me what the advice of counsel is, okay?

1              MR. REED:  Okay.

2              THE COURT:  My question to you is limited to

3    whether -- if you want to go ahead and do it, I'll let you do

4    it, but I just -- my question, specifically, is whether you

5    stopped making your mortgage payments through GMACM, the

6    mortgage servicer, in February 2008.  That's what they've

7    represented, and I gather what they're going to offer proof of.

8              MR. REED:  Your Honor, I -- as I said earlier today, I

9    cannot testify if the payments from our family that would've

10   been made, more routinely from my wife, were actually made.  I

11   know that when I met with the GMAC rep and I reworked the deal,

12   and I tendered my money then, the agreement was that the loan

13   would've been current at that moment in time.  The arrearage

14   that supposedly wasn't paid at that -- from February -- I'm not

15   admitting to it, because I don't know --

16             THE COURT:  Okay.

17             MR. REED:  -- was put into -- into the loan, and from

18   that point forward, pending the receipt of those documents,

19   there would be new payments to be made.  But that -- the ones

20   from February to the point I met with them, and we made this

21   agreement, and I tendered my 3,000 dollars, that all went away.

22             THE COURT:  Wait, here's what I don't -- I want to be

23   sure I understand.  You testified that the 400,000 dollars that

24   you received from Cooper, or whatever his name was --

25             MR. REED:  Yes.

1           THE COURT:  -- you were required to satisfy a second

2    mortgage and other liens.  And had you paid off all liens other

3    than the first mortgage, after you received the 400,000-dollar

4    payment from Mr. Cooper?

5           MR. REED:  Had I paid off all the liens?

6           THE COURT:  Other than the first mortgage.

7           MR. REED:  I believe so.

8           THE COURT:  Okay, so subject to receiving the evidence

9    on this, we'll see, the Trust contends that not only did you

10   not pay the mortgage, first mortgage, you didn't pay any

11   property taxes or insurance since February 2008.  Did you pay

12   any property taxes or insurance?

13          MR. REED:   I can't say from February, Your Honor.  I

14   could say from --

15          THE COURT:  I'm not trying to put you to a mental

16   test --

17          MR. REED:  No, no, I'm just --

18          THE COURT:  -- on this, okay?

19          MR. REED:  -- I'm just -- I don't -- I don't know for

20   sure, like I said, about -- and why.  I've told you the basis

21   for why.

22          THE COURT:  When you received the 400,000-dollar

23   payment from Mr. Cooper, did you use any of it to pay any

24   unpaid property taxes?

25          MR. REED:  I don't know.  I don't know.

RESIDENTIAL CAPITAL, LLC, et al.                               172

1          THE COURT:  All right, do you know -- you say that the

2     1,300,000-dollar offer from the Roccisanos was not sufficient

3     to enable you to pay off all of your -- all of the existing

4     liens on the property?  Is that what I understand?

5          MR. REED:  I believe that the first mortgage had --

6     had accumulated -- the interest and penalties and maybe there

7     was some taxes in that, that -- that brought it beyond that.

8     Plus, you had to pay -- there's a -- there's a transf --

9     there's several taxes, transfer taxes and things like that.

10         THE COURT:  All right, so what about the million-450

11    offer?  Was that enough to enable you to satisfy all existing

12    liens on the property, to the best of your knowledge?

13         MR. REED:  I think that was being investigated at the

14    time, and I don't recall if we have a -- an answer on that.

15    The Roccisanos -- if we couldn't come to terms on the

16    contract -- I think we were -- I don't -- I don't believe that

17    that was resolved.  I mean, it -- I don't believe I had an

18    answer yet.

19         THE COURT:  Why is it that you didn't -- why do you

20    believe you didn't reach an agreement with the Roccisanos?

21         MR. REED:  I -- my recollection is they -- there were

22    two things that were told to me.  They're hearsay, I'm sorry.

23    You know, I don't -- I don't -- you asked me directly, and that

24    is --

25         THE COURT:  Well, I'm asking you why you believe you

1    did not reach an agreement with the Roccisanos.

2         MR. REED:  They didn't want to wait for us to -- to

3    sort out our, you know, how much we would owe on the house, and

4    the mortgage, and the -- you know, there was liti -- at that

5    point there was litigation.  I think when they found out we had

6    filed litigation, it's like they didn't want to bother anymore.

7    They just, you know, didn't --

8         THE COURT:  Okay, what happened after the Roccisanos

9    went away?

10

11        MR. REED:  We lowered -- I mean, I -- I'm pretty sure

     we lowered the price, again.  I don't remember what the listing

12

     price was at the moment.  Again, Ms. Hager had some listing

13

     information that she got from a subpoena from the -- the

14

     realtor's office.  It -- I cannot confirm, but it shows --

15

     seems to show a list -- you know, when we -- when we reduced

16

     the prices to the property.

17

18        And there came a point that we -- that the house was

     no longer listed, and that was -- I don't know if it coincided

19

     with our reoccupancy of the property, or shortly thereafter,

20

     which fast forwards to '08 -- to 2010.  So the Roccisanos,

21

     when -- when was this offered?  What, 6/10?

22

          THE COURT:  So Cooper moved out in the fall of 2009,

23

     correct?

24

          MR. REED:  Yes.

25

1        THE COURT:  And when is it that you moved back in, in
2    2009 or 2010?

3        MR. REED:  '10, I waited a year.  We tried to market
4    the house for a year.

5        THE COURT:  Thanksgiving 2010, I think is what you
6    told me earlier.

7        MR. REED:  Yeah.

8        THE COURT:  I was unclear about that.

9        MR. REED:  So fourteen months we -- we tried to market
10   the property.

11       THE COURT:  All right.

12       MR. REED:  And I guess it's during that time that
13   the -- we had the offer from the Roccisanos, and there was --
14   Ms. Carter brought us another offer from an interested party.
15   It was a million -- a million-one and change.

16       I -- I don't -- I think it was actually part of --
17   attached to Ms. Carter's letter, and I'm not sure if it's an
18   exhibit in the Trust's documents.  I believe that I had put it
19   in my proof of claim filing.

20       THE COURT:  Who was the offer from?

21       MR. REED:  Mr. and Ms. Singh.

22       THE COURT:  And what happened with that?

23       MR. REED:  Nothing, I mean, Your Honor, again it
24   wasn't sufficient --

25       THE COURT:  Okay.

 1            MR. REED:  -- to give clear title, and they, you know,

 2   they -- they wanted, you know, any of the litigation or issues

 3   revolving (sic) the mortgage company resolved before entering

 4   into the agreement.  So --

 5            THE COURT:  What happened after -- see, you didn't

 6   successfully negotiate a transaction with the Singhs, correct?

 7            MR. REED:  Right.

 8            THE COURT:  What happened then; what happened after

 9   that?

10            Let me ask you, before you do that:  you understood

11   the Roccisanos had decided to move out of the New Jersey area?

12            MR. REED:  Yes.

13            THE COURT:  They were moving to Louisville, Kentucky?

14            MR. REED:  It was an option.  Mr. -- Mr. Rocci -- I

15   think what I remember is Mr. Roccisano -- you know, was

16   entertaining two positions with the same company, or something

17   like that.  He can -- whatever was favorable to him in his

18   personal life, he would've taken.

19            I understood our -- our house played a role in that;

20   if he could get it for a certain price, then he would have

21   taken the position in New Jersey, instead of moving back to

22   the -- I don't remember what state you said.  But --

23            THE COURT:  I think Louisville, Kentucky, but I can't

24   testify.

25            MR. REED:  Yeah, to Louisville --

1              THE COURT:  If that refreshes your recollection, fine.

2              MR. REED:  -- yeah, to Louisville -- Louisville,

3    Kentucky.

4              THE COURT:  So what happened after the --

5              MR. REED:  But he couldn't -- we couldn't come to an

6    agreement, so he -- from what I understand, it played in

7    impacting them, and then they wound up -- they wound up going

8    back.

9              THE COURT:  After the Singh offer, which you didn't

10   reach an agreement with them, did you have any further efforts

11   to sell the property?

12             MR. REED:  At that point, we were -- we were now into

13   litigation with GMAC Mortgage, and I became aware of the

14   existence of the lis pendens, and in talking to, you know, to

15   the realtors, trying to investigate -- sorry -- trying to

16   investigate why, you know, we weren't -- we weren't seeing

17   similar kind of traffic that we used to, or -- or values, I

18   understood that the nation as a whole was entering into

19   financial difficulty and -- and real-estate issues, but there

20   were still houses in our town, and our particular neighborhood,

21   and there is -- our particular neighborhood was extremely

22   desirable.

23             I think -- and I can talk about those elements, but

24   the problem was we -- we now started to realize, with the aid

25   of counsel, that -- and our realtors, and discussing it with

1    them, they -- you know, there was -- there was a problem, that

2    we couldn't sell the property as simply as we could before.

3           And the biggest problem that we encountered was not --

4    not our willingness to sell the property, you know, period, or

5    come down with a price, even in the face of other houses in the

6    neighborhood still selling at a -- a higher price.  It was, you

7    know, there was concern at how long it would take to -- to

8    figure -- you know, to resolve our what appeared to be

9    conflicts.

10          So we -- during the litigation, we had two mediation

11   sessions with GMAC.  I can't -- I can't tell you when they

12   were.  I'm pretty sure it was after we moved back.  And --

13          THE COURT:  I don't want to know what went on in

14   mediation, because ordinarily that's confidential.

15          MR. REED:  But I think -- I don't know.

16          THE COURT:  But here's my question to you.  You said

17   this morning that once you filed the lawsuit against GMACM, you

18   didn't personally have conversations with any representatives

19   of GMAC.  We talked about once you're represented by counsel,

20   they can't talk to you.

21          Did you -- other than the one period where you had

22   applied for a modification that we talked about -- that you

23   talked about this morning, was there any other time when you

24   applied to GMACM for a loan modification?

25          (Pause)

1          MR. REED:  Something is -- there is, I believe some --

2    there is something, Your Honor, and I'm trying to place it now,

3    that this -- there was -- there was an effort under HOPE NOW,

4    or something like that, that -- that --

5          THE COURT:  Separate and apart because it was -- your

6    communication with GMACM that you introduced into evidence, the

7    e-mail chain identified it as HOPE NOW.  And I'm just trying to

8    understand whether there was some -- another effort --

9          MR. REED:  I think -- Your Honor, I think there was.

10   I had something about that too, as a matter of fact.

11         THE COURT:  Let's -- I want to try and keep this

12   moving along, if I can.  If you think about it, you'll tell me,

13   but when did you take the property off the market?

14         MR. REED:  Sometime after we moved into it, Your

15   Honor.  I don't know the --

16         THE COURT:  All right, so you say you moved in around

17   Thanksgiving of 2010.  And since approximately then, have you

18   tried to sell the house?

19         MR. REED:   No, Your Honor, it -- based on the

20   mediation results that we had.

21         THE COURT:  It's just a question that -- I don't want

22   to know about the mediation, okay?  Because I -- unless,

23   Ms. Hager, do you have an objection to him telling me about the

24   mediation?  Ordinarily you can't do that.  That's -- when a

25   mediation takes place in one of my cases, the parties are

1    absolutely precluded from talking about what went on in the
2    mediation.
3            MS. HAGER:  Just for clarification, which mediation is
4    being referred to?  Is this in connection with --
5            THE COURT:  He's referring to the mediation during his
6    lawsuit against GMACM.  I think that's what he's talking about.
7            MS. HAGER:  Well, I don't have knowledge of that, so I
8    will object.
9            MR. REED:  I -- we had two mediations; face-to-face
10   they flew someone in.
11           THE COURT:  During the lawsuit?
12           MR. REED:  Yes.
13           THE COURT:  Yeah.  Was it court supervised?
14           MR. REED:  Yes.
15           MS. HAGER:  I'm not saying it didn't happen.
16           THE COURT:  I know.  I'm not -- I know you're not, but
17   Mr. Reed, the reason mediation can work -- it doesn't always
18   work -- but the reason that mediation can work is it's entirely
19   confidential; that each side can speak freely about whatever is
20   on its mind in an effort to settle the case, without any
21   concern that one party or the other is going to come back and
22   tell a judge, this is what they said in mediation; this is what
23   I said in mediation.  Okay, that's what the whole purpose --
24   mediation is intended to be a confidential process, okay.
25           I'm not -- whether you understand that or not, that

1  is -- and it's not just mediation in my court -- that's what --

2  mediation can work because it's confidential and that you can

3  say what's on your mind, and they can say what's on their mind

4  without fear that you're going to come into my court and

5  testify about who said what to whom --

6           MR. REED:  Sure.

7           THE COURT:  -- during the mediation.

8           MR. REED:  Okay, I think I understand it.  I -- the

9  only thing I guess I can say is, to how I went to the

10  mediation.  I wanted to resolve it.  I wanted to resolve the

11  situation.  I wanted to sell the house.  I wanted to either

12  rework the mortgage or sell it.  I didn't want the limbo.

13  That's why we brought the lawsuit in the first place.  There

14  was limbo.  There was no further foreclosure.

15           THE COURT:  All right.  You got their foreclosure

16  action dismissed, and they didn't file a new one.

17           MR. REED:  Right.  And yet there was no -- what --

18  where do we go from here, like what -- how do we resolve this?

19           THE COURT:  Let me come back to the question I asked

20  you.  It's really not intended as a trick question.  I just

21  want to know.  From the time, approximately, when you moved

22  back in the house, did you ever put it on the market for sale?

23  It's a yes or a no.

24           MR. REED:  No.  I mean, it's a matter of public

25  record, I mean.

1          THE COURT:  Well, it's not of public record
2    necessarily.  It's just that I'm asking you a question
3    because --
4          MR. REED:  Yeah, I -- the realtors all knew that if
5    anyone was interested in the house, if we -- you know, that the
6    matter was not still resolved with the mortgage company, and it
7    seemed to have an effect from our understanding on how --
8    people not being interested in it, because they didn't want to
9    wait for --
10         THE COURT:  Let me ask you a different question.
11         MR. REED:  -- the complications to be sorted out.
12         THE COURT:  Let me ask you a different question.  In
13   2008, you testified that you paid 850 dollars to get an
14   appraisal done.  Have you obtained an appraisal of the value of
15   the property since 2008?  Not what a broker may have told you.
16   Did you -- you got an appraisal in 2008.  You testified you
17   paid for it.  And my question is, at anytime since then, have
18   you gotten an appraisal of the value of the property?
19         MR. REED:  We had an appraisal?
20         THE COURT:  You know what an appraisal is, come on.
21         MR. REED:  I understand, but I don't -- I'm trying to
22   think if there was any done involved with the offer with
23   Mr. Cooper, if there was something done there, or if there was
24   one during -- with Roccisano.
25         THE COURT:  As you sit here today, you don't recall

 1  getting --

 2          MR. REED:  No.

 3          THE COURT:  -- an appraisal after the one --

 4          MR. REED:  No, Your Honor --

 5          THE COURT:  -- that you obtained in 2008, is that a

 6  fair statement?

 7          MR. REED:  Yes.

 8          THE COURT:  After the unsuccessful offer from Mr.

 9  Singh, were there any other offers that you received after

10  that?

11          MR. REED:  I don't know if it was before or after Mr.

12  Singh, there was another person who was interested in it.  They

13  wound up buying a house in our neighborhood, 5 Coles Court.

14          THE COURT:  Did you ever receive a written offer from

15  them?

16          MR. REED:  No, I don't think so, Your Honor.  I

17  explained to them the situation that we had, and I don't -- I

18  don't think so.

19          THE COURT:  All right.  I want you to look at your

20  Exhibit 13; it's the statement from the Law Offices of Jeffrey

21  S. Walters.  Do you have that?

22          MR. REED:  Yes.

23          THE COURT:  When did you receive that from Mr.

24  Walters?

25          MR. REED:  That was this year.  I think I needed it

 1  for the case, Your Honor.

 2          THE COURT:  Okay.  So let me ask this.  You testified

 3  to some extent about this, this morning, but I want to be clear

 4  about it.  What services did Mr. Walters provide for you for

 5  which he billed you in Exhibit 13?

 6          MR. REED:  A small percentage, Your Honor, of the

 7  bill -- I couldn't tell you exactly, I don't think; I might be

 8  able to check with him -- was the original communications with

 9  Zucker Goldberg, I think it was, the foreclosure firm, in late

10  '08.  And when it -- there were trading, I think, of letters

11  and things of that nature, and but when it became apparent that

12  it had to go to be argued, Mr. Walters said he couldn't do it,

13  because he was conflicted, because his firm had done work with

14  or for GMAC or Homecomings or one of their affiliates, which

15  was surprising to me at the time, because I don't know why he

16  started doing the work -- you know, he knew who he was dealing

17  with.  But that's what happened.  Then he took the case against

18  GMAC with the -- you know, with the intent of, you know,

19  seeking monetary damages and a resolution, so that we could

20  liquidate the property.

21          THE COURT:  But, just to be clear, because maybe I

22  misunderstood.  Most of Mr. Walters work was -- and the fees

23  that he charged were in connection with Reed v. GMAC?

24          MR. REED:  Yes, Your Honor.  I know that does not bode

25  well for me, given your --

1          THE COURT:  It's a question, Mr. Reed.

2          MR. REED:  Yes, yes, Your Honor.

3          THE COURT:  Okay.  Who defended you in GMAC v. Reed?

4          MR. REED:  I started to.

5          THE COURT:  Yourself, I know.  You filed an answer

6    yourself, and then a lawyer filed an answer for you and moved

7    to dismiss or move for summary judgment.  Which lawyer?

8          MR. REED:  The next lawyer that engage -- the lawyer

9    that engaged in the foreclosure action is McCrink.

10         THE COURT:  And you don't have a bill from McCrink?

11         MR. REED:  I do.

12         THE COURT:  Which is McCrink?

13         MR. REED:  It's in -- this is their e-mail from them.

14   As I said to you, Your Honor, I'm --

15         THE COURT:  Which exhibit?

16         MR. REED:  Exhibit 15.

17         THE COURT:  Barbara Clark is from McCrink?

18         MR. REED:  Yes.  And I -- and I wound up giving in an

19   affidavit with, I think, more detailed bills from McCrink

20   signed by Krisden McCrink, a partner at the firm.

21         THE COURT:  So McCrink charged you less than 4,000

22   dollars for representing you in the mortgage foreclosure

23   action?  Okay.  I just want to understand --

24         MR. REED:  Yes, I -- for not a great amount of time.

25   I mean, it was not -- it wasn't -- I don't mean calendar time.

 1    I mean hours.

 2            THE COURT:  Just this -- approximately 4,000 dollars?

 3            MR. REED:  Yes.

 4            THE COURT:  That was for the defense of the mortgage

 5    foreclosure action?

 6            MR. REED:  Yeah, let me make sure what they gave me in

 7    their affidavit.  Their affidavit is 3,983.

 8            THE COURT:  Okay, so that's the 4,000 dollar number.

 9    It's the exact amount when you add the charges in -- that are

10    reflected in the CEO.

11            And what did Linda Campbell do for you?

12            MR. REED:  She made the appearance.

13            THE COURT:  In what?

14            MR. REED:  To orally argue the dismissal.

15            THE COURT:  Of the mortgage foreclosure action?

16            MR. REED:  Yes.  So I had three of them and each one

17    wound up not -- like I said, Mr. Walters said he couldn't

18    continue because he had done business with or his firm had done

19    business with ResCap.  Mr. McCrink said there was some issue

20    with the judge, because I believe he's involved in -- knows him

21    out -- external to the court.  And there was a conflict of

22    interest --

23            THE COURT:  Well, somebody did okay by you, because

24    you got it dismissed.  Right?  The mortgage -- the foreclosure

25    action got dismissed.

1          MR. REED:  Well, it did.

2          THE COURT:  Yes.  All right.  We're going to go until

3   5:30.  Is that -- Karen is that all right?

4          All right.  Go ahead Mr. Reed.  I wanted to -- do you

5   want to offer Exhibits 13, 14, and 15?

6          MR. REED:  Yes, I don't know if you need the

7   affidavits for them, Your Honor?

8          THE COURT:  Well, I don't -- they're not pre-marked.

9   Do you want to offer 13, 14, and 15?

10          MR. REED:  Yes, Your Honor.

11          MS. HAGER:  Your Honor, the Borrower Trust objects to

12   Exhibit 15.  It's hearsay and it's not a contemporaneous

13   record.  There's no applicable hearsay exception.

14          THE COURT:  So you don't object to --

15          MS. HAGER:  Well, it --

16          THE COURT:  -- 13 or 14?

17          MS. HAGER:  With respect to 13 and 14, I guess -- and

18   also 15 -- all of them, they're not the best evidence.  They

19   don't contain detailed billing records and aren't complete

20   documents.

21          THE COURT:  So who do you have affidavits from, Mr.

22   Reed?

23          MR. REED:  Mr. -- Mr. Walters --

24          THE COURT:  I'm sorry, say it again; I coughed.

25          MR. REED:  Mr. Walters --

1           THE COURT:  Yes.

2           MR. REED:  -- Esq. and Linda Campbell, Esq. and

3    Krisden McCrink, Esq.

4           THE COURT:  All right.  So when we finish tonight,

5    show -- I'm going to withhold a ruling on the offer of exhibits

6    13, 14, and 15 until the morning -- show those affidavits to

7    Ms. Hager.  You don't have to do that now.  All right.

8         (Pause)

9           THE COURT:  Something you're looking for, Mr. Reed?

10          MR. REED:  Yeah.  I can't find --

11          THE COURT:  All right, so among the damages that

12   you're seeking are legal fees that you expended -- well, that

13   you incurred.  And those amounts are reflected in these three

14   e-mails, which -- or one invoice -- two invoices, one e-mail.

15   What other damages are you seeking to recover?

16          MR. REED:  Could you repeat the question, Your Honor?

17          THE COURT:  Other than the legal fees that you

18   incurred, what other damages are you seeking to recover?

19          MR. REED:  Your Honor, I am -- as I think I said

20   before, I'm seeking the amount of money that would not be owed

21   by me if we had been able to sell the property without

22   interference.  And I guess that's a subject of question as to

23   what that amount -- or put aside the amount.  If you were to

24   assume that the house would have sold, then there would be no

25   ongoing -- there would not be an accumulated bill.

1        The money that I would have had, the equity from the

2   house if it had sold -- and I would like to talk about -- or

3   there's proofs about that, the value of the house then, the --

4   I think the TD Bank appraisal, not for the value of the

5   appraisal but for the -- there's some language about what

6   appraisals are, what they do.  I have a presentation, or a

7   discussion, about that.  And so there's the money that would

8   not be owed but for the interference, because the sale would

9   have been -- would have happened and the equity that could have

10  been realized had a sale occurred without interference.  And --

11  and --

12        THE COURT:  Do you agree that neither the Jacobses'

13  proposed sale nor the Weaver/Cooper proposed sales were

14  interfered with, to use your term, by GMAC?

15        MR. REED:  The Weaver/Cooper one I -- Mr. Cooper

16  expressly told me -- and I didn't know how to address this,

17  because it's -- I guess it's hearsay -- that he was waiting it

18  out, that he decided to do that.  And I don't know what to do

19  with that.  But --

20        THE COURT:  He also told you he was going to close

21  multiple times and --

22        MR. REED:  I understand, Your Honor; I don't --

23        THE COURT:  Okay.

24        MR. REED:  And -- go ahead.

25        THE COURT:  No; go ahead.

1          MR. REED:  I believe that -- I heard Your Honor when

2     you said in our status conference about the house still being

3     in my possession.  And I thought about that.  It dawned on me

4     for the first time that I don't want the house too, that you

5     don't understand that I would have -- I'd hereby abandon claim

6     to the house if we get an award for the equity that we would

7     have gotten at the time.  I mean -- and the payment for the

8     bill that would have accrued.  I don't -- I don't want a double

9     payment; I don't want to retain the asset and the payment that

10    I would have received had it -- had it sold.

11          So in my mind, when I think about a remedy for the

12    problem, for the damages, there is a -- if the mortgage could

13    become current, to get rid of the lis pendens, which I believe

14    had an impact on selling the property, then we can market and

15    liquidate the property fairly now.  And whatever equity I could

16    realize from it, even though it's a worse market, I believe,

17    now than it was --

18          THE COURT:  You think it's a worse market now than it

19    was in 2009 and 2010?

20          MR. REED:  In --

21          THE COURT:  I'm expressing -- I don't mean to -- I

22    didn't mean to suggest -- I don't know the market in --

23          MR. REED:  Or, Your Honor --

24          THE COURT:  -- Moorestown.

25          MR. REED:  -- let's take -- let's take the inference

RESIDENTIAL CAPITAL, LLC, et al.                    190

1  from your --

2              THE COURT:  Hold on.

3              MR. REED:  -- from your --

4              THE COURT:  I deal with real-estate --

5              MR. REED:  It's okay.

6              THE COURT:  I deal with real-estate bankruptcy issues

7  a lot.  And the market in 2009 was horrible; the market in 2010

8  was horrible.  And it isn't great, but it's a lot better now

9  than it --

10             MR. REED:  Okay --

11             THE COURT:  -- was then.

12             MR. REED:  -- so let's -- let's --

13             THE COURT:  I mean, do you agree with that?

14             MR. REED:  -- okay, let's take -- let's take that as

15  part of -- as part of the discussion.

16             THE COURT:  I mean, if you don't agree with it, tell

17  me.

18             MR. REED:  No.  Listen, I'm not -- I'm not --

19             THE COURT:  I don't know the market in Moorestown, New

20  Jersey.

21             MR. REED:  Right.  Well, there's two -- there's two --

22  like I said, there's two remedies, or courses of action.  I

23  mean, first off, as to 2009, again, there was a house -- my

24  neighbor's house sold for two million dollars, which was the

25  type of sale that you would have saw (sic) in 2008 or 2007,

1   prior to the collapse.  So did the collapse have that kind of

2   effect on us?  You know, that's a matter for, I guess,

3   discussion and analysis.

4          So the two remedies:  one, the bill that would not

5   have accumulated; and an estimation, if we can give you, of

6   what that -- of:  a) would it -- would it or could it have sold

7   during 2008, 2009, 2010 -- could it have sold?  For how much?

8   Is there some basis for you -- I understand you have the

9   equitable power to --

10          THE COURT:  That's the reason I asked you whether

11  you've had any appraisals of the property done since 2008?  I

12  mean, I haven't seen any evidence of market value of this

13  specific property.  I don't even have it as of 2008, because it

14  didn't come in for the truth of the matter asserted.  But even

15  if it had --

16          MR. REED:  Yeah, the market value I would -- I propose

17  to you, just as an aside, is -- the contract gives some

18  indication of the market value, because it -- we had a buyer

19  and a seller come to some terms, whether you believe it's the

20  full value or the testimony that it wasn't the full -- that it

21  didn't get the right amount, or the appraisal was less than

22  that for their -- you know, the -- you understand what I'm

23  saying; I'm getting tongue tied --- the litigation regarding

24  they didn't get the appraisal, the mortgage, things like that,

25  was still in excess of a million-nine-something.

1          So I believe Ms. Hager has things in her file that may

2     indicate some kind of value --

3          THE COURT:  I can only go by what's in evidence before

4     me.

5          MR. REED:  Um-hum.  So I say that it's not -- we're

6     not done yet discussing it.  I didn't expect to do it today.  I

7     have notes back in my hotel room.  I was going to offer my lay

8     opinion, at several points, to the value of the property, as

9     the owner of the property.  I have basis for it.  I don't have

10    it with me today, Your Honor; these are numbers I --

11         THE COURT:  You're going to be back on the witness

12    stand first thing in the morning, Mr. Reed.

13         MR. REED:  I mean I have -- I mean I understand by the

14    rules that I'm allowed to, and that's the only thing I have for

15    you.

16         THE COURT:  Okay.

17         MR. REED:  And I was going to discuss, I thought, the

18    value at this point.  I believe there was a value at this

19    point.  This is why I believe the value at this point.

20         THE COURT:  All right.  Are there other types of

21    damages that you're seeking to recover?

22         MR. REED:  Your Honor, I -- punitive damages,

23    emotional distress.  I'm sorry I lost it today; I clearly feel

24    it.  This has been a very difficult situation for me.

25         There -- I have to review my notes about the

RESIDENTIAL CAPITAL, LLC, et al.                    193

 1  modification of that loan.  There's a question, now, if we -- I

 2  did my part on that workout.  And I believe, now that you

 3  mention it, I think there's -- we have something on a possible

 4  additional subsequent workout, prior to the litigation, that I

 5  believe that we did what we were supposed to do --

 6          THE COURT:  Well, I am going to want to hear from Ms.

 7  Delehey whether GMACM ever returned a countersigned copy of the

 8  loan modification.  The testimony -- we haven't heard the

 9  cross-examination yet, but the testimony from Mr. Reed is that

10  he signed it, returned it with a 3,000-dollar check, and never

11  received back the countersigned loan modification agreement.

12          He introduced in evidence, as an Exhibit MM, the

13  e-mail chain with Mr. Folweiler.

14      (Pause)

15          THE COURT:  Because in the last -- in the e-mail

16  chain -- and I haven't heard the Trust's evidence -- on July

17  31, 2008, Mr. Folweiler e-mailed Mr. Reed, stating that:  "I

18  had been waiting on the docs that you just sent to me so that

19  we could get the stopgap plan in place.  The action is only

20  placed on hold once the agreement is in place and funds are

21  received."

22          On September 22nd, Mr. Reed e-mailed Mr. Folweiler,

23  saying in the third paragraph:  "Even though it is moot at this

24  point now, I also want to tell you that your HQ never sent back

25  the executed written agreement as their package said it would."

1  And it was a longer e-mail than that, but -- and then Mr.

2  Folweiler responds, about an hour later on September 22nd,

3  saying:  "That is great news.  And as far as the docs are

4  concerned, they never send them back!"

5         So I need -- I do expect to hear testimony from the

6  Trust about what happened with the loan modification.  In the

7  brief that I read, it certainly indicates that Mr. Reed

8  never -- that the loan modification was canceled when Mr. Reed

9  didn't send the required 7,000-dollar payment.  But at least

10 Mr. Reed testified and offered e-mails to support that he never

11 got the signed copy back.  And he has Mr. Folweiler saying they

12 never send them back.  So I need to hear more about that.

13        MR. REED:  Your Honor, I'm getting very tired.

14        THE COURT:  We're going to stop in a few minutes, Mr.

15 Reed, within six minutes.  Are there other areas of damages

16 that you're seeking to recover?

17        MR. REED:  In my pre-trial brief, I think I have --

18 let me make sure I don't forget something.

19    (Pause)

20        MR. REED:  So I think -- just make sure I say this --

21 I want to make sure -- try to make sure I do this right.  I

22 don't want to -- I can't remember what I said.

23        So the damages -- the economic damages relating to the

24 house, 817 Matlack, are an accumulation of a bill that

25 otherwise would not be there but for either interference in the

1    sale or should be less because of there was a modification, or

2    work-out that wasn't completed, through no fault of my own.  So

3    if, say for example, I owe the new mortgage company a million

4    dollars, but if the work-out had shown that the note would have

5    proceeded in a dollar amount that would have left me owing

6    400,000 dollars, but for their bad behavior -- you know, their

7    not finishing the deal with me, then I would want the 600,000

8    dollars.  I mean, you don't have to give it to me; give it to

9    the mortgage company to pay them to reduce the dollar amount,

10   because it's a debt that I owe because of that.

11          The equity that would have been realized in different

12   points if the sale could have happened but for interference.  I

13   proposed another possible remedy, that we bring it to date, the

14   lis pendens is cleared, and we have free ability to market it

15   now.

16          THE COURT:  There's a new lis pendens that 21st

17   Century has put on it.  It's got --

18          MR. REED:  Right; I understand.  So the emotional

19   distress, the punitive damages, the legal fees.

20          I think I covered the lessening of the mortgage

21   amount.

22          THE COURT:  All right, we're going to stop for the

23   day.  I have one ruling before we end for the day.  Mr. Reed

24   had previously marked for identification the correspondence

25   with Mr. Curley as to the reasons that TD Bank declined to

RESIDENTIAL CAPITAL, LLC, et al.                    196

1   refinance.  I sustained the objections earlier this afternoon,

2   not on authentication grounds, which I believe a declaration

3   can be document custodian satisfied, but on the hearsay grounds

4   that they don't satisfy the requirement to be a business record

5   because they're not contemporaneous record of events.  Mr. Reed

6   indicated he could have Mr. Curley here tomorrow morning to

7   testify.  Ms. Hager stated an objection to Mr. Curley

8   testifying because he was not identified as a witness.

9           The Court is going to overrule that objection and

10  permit Mr. Curley to testify if he appears here tomorrow

11  morning at 9 o'clock.  Mr. Reed certainly put the Trust on

12  notice of his intention to offer evidence from Mr. Curley as to

13  the reasons that the refinance failed.  In fairness to

14  Mr. Reed, a non-lawyer, he could not have anticipated the

15  Court's ruling in refusing to admit into evidence the letters.

16          So one of two things can occur.  And I want you to

17  just talk briefly with Ms. Hager about it when we end.  If Ms.

18  Hager withdraws the objection to the two letters -- that's a

19  August 20th, 2012 letter, July 8th, 2014 letter, and I guess

20  it's also your August 20th, 2012 letter to Mr. Curley --if she

21  withdraws the objections, I will permit those exhibits into

22  evidence and not permit you to call Mr. Curley, who was not

23  identified.  If she does not agree to withdraw the objection,

24  then I'll permit you to bring Mr. Curley here tomorrow.

25          In your second witness list, which differed from the

 1   first, you indicated calling a TD Bank representative to

 2   authenticate the letters.  Well, the authentication is

 3   resolved; the issue is the hearsay statement as to the reasons

 4   that the refinance was declined.

 5          In the August 20th, 2012 letter, the two relevant

 6   paragraphs on this point:  "It is my recollection that the

 7   reason for this loan declination was that our primary" -- oh,

 8   that's Mr. Reed's letter; I'm sorry.  Mr. Curley's August 20th,

 9   2012 letter:  "As stated in your letter, dated August 20, 2012,

10   you were declined by TD Bank for a loan secured by the above

11   property back in early 2008.  The reason you were declined was

12   due to a pending foreclosure of your first mortgage on this

13   property that was uncovered during our underwriting process."

14          So confer with Ms. Hager.  She's perfectly entitled to

15   stand on her objection.  If she does, I will permit you to call

16   Mr. Curley, provided he's here first thing in the morning.

17          MR. REED:  I'm sure he can come.

18          THE COURT:  You said he would come.

19          MR. REED:  There are many e-mails from the legal

20   department asking me what time he's supposed to be here.

21          THE COURT:  Okay, I just -- I will permit him to come

22   testify.  We'll put him on out of order at 9 o'clock.  He can

23   come and testify and be out of here quickly.  If Ms. Hager

24   withdraws -- and I'm not trying to force her to do anything --

25   if she withdraws the objection, the letters will come in.  And

1  as far as I'm concerned, that's the end of the matter, because

2  you didn't identify Curley as a witness.

3          And the only reason I'm -- would permit you to do

4  that -- to call him -- is that I don't think you could have --

5  you did identify the letters as exhibits, but you could not

6  have anticipated the basis of the Court's ruling.  And so

7  that's going to be my ruling for the close of the business

8  today.

9          Mr. Reed, you need to get your testimony over and done

10 with, because you've used your time.  I'm going to listen to

11 the end of your testimony.  You say that you plan to offer

12 evidence on the value of the property.  The Trust may have an

13 objection to it.  Because I have ruled on similar objections

14 before, the law, as I understand it -- and if you're going to

15 object to Mr. Reed's testimony about the value of his property

16 at various points in time, you need to provide me with a brief,

17 by 9 a.m. tomorrow morning.  I've ruled on this issue before,

18 and the law, as I understand it, and consistent with my prior

19 rulings, is that an owner of property is permitted to give

20 expert testimony about the value of the property.  The Court

21 will consider what weight to apply to it.  But it's an

22 exception to the ordinary rule about expert testimony.  It

23 permits the owner of a property to testify to value.  But I'll

24 permit you to provide me with a brief, by 9 a.m. tomorrow

25 morning, if you're going to object to Mr. Reed's testimony

RESIDENTIAL CAPITAL, LLC, et al.                    199

 1   about value.

 2          But I think the first order of business is for you to

 3   talk to Mr. Reed about the Curley letters, to see whether that,

 4   at least, can get resolved.

 5          MR. REED:  Your Honor, would I have a copy of that

 6   brief when -- upon simultaneous transmission?

 7          THE COURT:  Absolutely; of course.

 8          Okay, so -- but if I'm correct, your only witness is

 9   Ms. Delehey, right?

10          MS. HAGER:  That's right, Your Honor.

11          THE COURT:  Okay.  All right, I'll see you all ready

12   to start, sharply at 9 o'clock.

13          MS. HAGER:  Excuse me, if it's okay, can we get from

14   Kate the time that we've used up?

15          THE COURT:  You can.

16      (Whereupon these proceedings were concluded at 5:35 PM)

17

18

19

20

21

22

23

24

25

1

2                          I N D E X

3

4    WITNESS                 EXAMINATION BY          PAGE

5    Drew David Murdock   Mr. Reed                    30

6    Frank Reed           (Self, in narrative)   35, 164

7    Christy Donati       Mr. Reed                110

8    Christy Donati       Ms. Hager               120

9    Christy Donati       Mr. Reed                130

10   Evan Hendricks       Mr. Reed                135

11   Evan Hendricks       Ms. Hager               152

12   Evan Hendricks       Mr. Reed                155

13

14

15                       E X H I B I T S

16   REED'S    DESCRIPTION                    PAGE

17   1         Contract between the Reeds     53

18             and the Jacobses

19   2         Commerce Bank appraisal        55

20             re: Reed refinance

21   3         Proposal to purchase, and     102

22             Lis pendens

23   5         Intragency review of          150

24             foreclosure policies and

25             practices

```
 1
 2                    E X H I B I T S (cont'd.)
 3   REED'S     DESCRIPTION                    PAGE
 4   10         Mortgage for Reed residence,    38
 5              fixed/adjustable-rate rider,
 6              and interest-only addendum
 7
 8   TRUST'S    DESCRIPTION                    PAGE
 9   DD         Roccisanos' June 12, 2010      166
10              proposal to purchase
11   MM         E-mail exchange                71
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2                        C E R T I F I C A T I O N

3

4    I, Hana Copperman, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9                 *Hana Copperman*

10

11   _____

12   HANA COPPERMAN

13   AAERT Certified Electronic Transcriber CET**D 487

14

15   eScribers

16   700 West 192nd Street, Suite #607

17   New York, NY 10040

18

19   Date:  September 17, 2014

20

21

22

23

24

25

**194:24**

# #

**#607 (1)**
2:22

# A

**a/k/a (1)**
82:5
**abandon (1)**
189:5
**ability (5)**
6:2;12:1;136:13;
137:5;195:14
**able (27)**
8:25;12:11;20:9;
25:4;33:15;45:22;
63:19;105:25;
106:10,12,16,17;
107:2,8,11;108:8,11,
21;112:8;139:23;
140:1;146:8,20;
163:4;167:19;183:8;
187:21
**above (2)**
98:23;197:10
**ABS (1)**
78:22
**absolute (1)**
31:20
**Absolutely (3)**
21:20;179:1;199:7
**absolved (1)**
23:22
**accept (2)**
25:4;161:13
**acceptable (1)**
104:13
**accepted (2)**
68:14;83:2
**access (3)**
137:11;140:1;
158:8
**accessible (1)**
140:15
**accommodate (1)**
7:20
**accompanied (1)**
161:9
**according (3)**
9:5,7;68:24
**account (2)**
25:22;76:10
**accrued (1)**
189:8
**accrues (1)**
126:1
**accumulated (6)**
114:4;144:17;
167:22;172:6;
187:25;191:5
**accumulation (1)**

**accuracy (1)**
57:7
**accurate (2)**
52:19;106:7
**accurately (1)**
7:16
**acknowledge (1)**
23:10
**acknowledged (3)**
21:3;23:12;161:9
**acknowledgement (1)**
161:10
**acknowledgements (1)**
161:12
**acquisitions (1)**
121:8
**across (1)**
151:12
**act (10)**
6:7;15:11;22:9;
23:3;40:17;118:2;
130:21;131:3;
160:11;161:22
**acting (1)**
95:6
**action (91)**
12:20;13:2,5,6,16,
22;15:17;16:18;
18:3,6;19:7;20:3,4,6,
16;21:11,15;22:15,
19;23:9,15,17,19,24;
24:1,2;26:4,5,12;
39:13,14;40:22;41:1,
9;42:13;48:13;49:7,
10;52:11;59:14,22;
60:1;64:8;73:1,5;
88:24;90:2,3,19;
91:20;92:16,21,22;
93:2,3;96:9,21;
113:4,5;114:4,22,23;
116:16,23,24;117:1;
119:18,24;120:7;
122:21;123:12;
128:24;130:21;
131:10;132:10,13;
144:1;146:24;148:4,
13;156:20;166:21,
22;180:16;184:9,23;
185:5,15,25;190:22;
193:19
**actions (5)**
112:12,17;141:15;
149:13;151:24
**active (1)**
59:1
**activities (1)**
43:4
**activity (5)**
136:13;144:4;
161:21;162:1,3
**acts (1)**
23:4

**actual (7)**
9:25;10:8,13;
63:13;118:1;131:16;
134:22
**actually (32)**
10:6;16:11;18:4;
20:3;30:5;33:10,25;
38:13;45:2;48:19;
56:24;59:12;64:13;
70:2,5;77:13;81:9;
90:6,9;95:4;117:22,
24;118:8;119:19;
127:13,24;154:12;
159:19;160:3;163:3;
170:10;174:16
**add (4)**
109:1,3,8;185:9
**added (2)**
44:13;59:25
**addendum (3)**
37:25;38:22;39:8
**addition (4)**
9:13;10:11;12:11;
26:20
**additional (7)**
70:18;130:8;
143:13;162:3;
164:15;165:17;
193:4
**address (7)**
29:9;10;76:14;
79:15;135:24;
160:14;188:16
**addressed (3)**
123:11;158:24;
163:11
**addresses (1)**
160:14
**addressing (1)**
123:8
**adequate (1)**
145:5
**adjourn (1)**
109:4
**adjourned (6)**
80:16;90:21,22,
23;108:23;109:12
**adjust (2)**
72:19,19
**adjustable-rate (2)**
38:1,14
**admissibility (1)**
35:7
**admissible (4)**
33:4;64:16;95:1;
100:23
**admission (2)**
64:16;159:2
**admit (7)**
55:15;56:7,18;
57:15;60:3;77:9;
196:15
**admitted (12)**

**12:16;25:21;33:4;**
**53:2;55:17,25,25;**
**56:3;102:6,6;**
**150:11;166:12**
**admitting (6)**
56:7,9,15;57:16;
162:23;170:15
**advance (7)**
7:21;13:1,4,15;
14:9;108:10;145:9
**adverse (1)**
122:10
**advice (3)**
169:22,23,25
**advise (2)**
107:10,13
**advised (1)**
107:17
**advisement (2)**
64:17;123:18
**affects (1)**
137:2
**affidavit (7)**
159:1,22;161:1;
162:15;184:19;
185:7,7
**affidavits (4)**
92:6;186:7,21;
187:6
**affiliates (1)**
183:14
**affirmative (3)**
11:21,24;26:12
**afoul (1)**
160:11
**afternoon (11)**
75:5,9,9;94:1;
103:21;104:7;105:9,
13;120:19;152:17;
196:1
**afterwards (1)**
118:23
**again (30)**
10:14;11:9;16:9,
16;19:16;35:20;
39:8;50:20;52:12;
74:16;77:25;78:21;
79:13,22;80:17;
88:15;90:25;91:13;
94:15;96:5;97:25;
98:12,16;108:10;
111:17;128:16;
139:2;174:23;
186:24;190:23
**against (20)**
15:18;16:18;18:7;
23:20;26:12;88:2;
92:19,22;94:20;
97:17;103:19;
122:22;140:23;
142:4;144:5;163:20;
166:22;177:17;
179:6;183:17

**12:16;25:21;33:4;**
**53:2;55:17,25,25;**
**56:3;102:6,6;**
**150:11;166:12**
**agency (2)**
79:17;151:5
**agent (4)**
101:10,16;151:8;
156:7
**aggravated (1)**
76:24
**agree (28)**
17:1,8,15,24;18:4,
10;19:6,9,9;20:12;
22:20,22;26:14;
47:10;70:18;88:1,4;
100:3;107:25;
125:25;127:22;
142:9;156:3;166:16;
188:12;190:13,16;
196:23
**agreed (9)**
11:1;17:22;25:12;
97:21;99:25;107:12;
147:25;150:3,5
**agreement (33)**
24:23,25;25:13;
52:8,13;57:22;
58:18;59:10,12,16;
60:12;64:1,3,5;
71:17;72:4;80:12;
83:16;86:5;97:20;
107:8,23;108:11;
164:8;170:12,21;
172:20;175:4;176:6,
10;193:11,20,25
**agreements (2)**
10:23,25
**agrees (1)**
156:14
**ahead (83)**
5:19;8:8;16:5;
20:6,13;21:6,22;
24:11;26:16;27:22;
29:13,25;31:5;
34:13;35:23,24;
40:12,14;42:25;
43:1;44:8;46:11;
48:2;49:11;50:6;
51:25;52:2,5,7,16;
54:5,12;56:22;57:13,
20;58:3;62:3;64:21;
65:3;72:23;73:9,14;
74:15,24;76:5;77:6,
12;82:15;84:10;
85:6;90:24;91:17;
101:2;112:13;113:1,
25;118:17;120:13;
123:23;124:6,20;
130:25;134:18;
135:18;136:19;
137:25;139:1,4;
142:20;147:9,17;
148:17,22;150:20;
151:1,21;157:2,19;
163:20;170:3;186:4;
188:24,25

aid (1)
176:24
alerted (1)
35:15
alerting (1)
32:18
alienability (1)
138:3
all-cash (3)
65:22;66:13;81:4
alleged (2)
9:20;23:2
alleging (1)
12:13
allow (7)
45:3;88:1;100:1;
131:19;150:4,5,16
allowable (1)
148:15
allowed (1)
192:14
almost (4)
87:7;88:6;112:1;
140:13
along (3)
8:11;106:20;
178:12
although (2)
38:10;44:16
always (6)
52:18;53:22;
80:21;98:19;106:15;
179:17
amended (7)
15:20;16:1;19:4;
20:25;24:9;59:3;
67:9
amendment (2)
16:2,12
among (1)
187:11
amount (24)
10:3,4,6,14,14;
24:14;25:12;49:19;
72:13,17;84:7;89:3;
116:2;168:23;169:6;
184:24;185:9;
187:20,23,23;
191:21;195:5,9,21
amounts (4)
11:4,20;25:15;
187:13
analysis (1)
191:3
angry (1)
87:3
answered (1)
30:11
antenna (1)
16:13
anticipated (2)
196:14;198:6
anything's (1)

154:11
apart (2)
11:25;178:5
apologize (1)
147:6
apparent (1)
183:11
apparently (1)
67:12;88:21
appealing (1)
66:16
appear (4)
58:22;91:9;123:8;
158:7
appearance (1)
185:12
appearances (2)
5:3;105:8
appeared (2)
16:14;177:8
appears (6)
24:5;39:5,7;70:17;
159:21;196:10
applicable (1)
186:13
application (11)
10:8;47:5,10,21,
24;48:7;57:1,1,4;
138:8;154:8
applications (2)
46:20,21
applied (7)
9:22;49:21,24;
50:8;160:10;177:22,
24
applies (1)
145:24
apply (1)
198:21
applying (1)
64:23
appraisal (27)
48:20;50:14,19;
51:4,4;54:17;55:18,
19;56:1,12,17;57:4,
7,8,19;58:8;181:14,
14,16,18,19,20;
182:3;188:4,5;
191:21,24
appraisals (5)
50:13,24;58:7;
188:6;191:11
appraise (2)
25:3,12
appraised (3)
49:18;56:8;98:23
appraiser (2)
25:9;56:5
appreciate (4)
47:23;108:18,20;
157:20
approach (2)
56:2;150:15

appropriate (2)
95:6;151:19
appropriately (1)
95:4
approve (4)
138:7;141:2;
153:23;154:7
approved (3)
9:23;10:9;154:7
approximately (3)
178:17;180:21;
185:2
April (2)
150:11;152:2
area (3)
132:23;137:14;
175:11
areas (1)
194:15
arguably (1)
24:2
argue (8)
9:17;11:4,4;13:10,
13,23;96:14;185:14
argued (2)
8:12;183:12
arguing (4)
13:18;14:10,21,23
argument (9)
10:1;13:24;14:2,
24;15:8;20:23;
39:17;107:17;152:9
arguments (3)
37:8,11;39:3
arises (1)
129:19
arm's-length (1)
60:7
around (6)
26:5;95:14;96:2;
97:19;138:13;
178:16
arrange (1)
108:16
arrangement (1)
147:3
arrearage (1)
170:13
arrived (1)
71:24
aside (5)
15:16;91:20;
107:19;187:23;
191:17
assemble (1)
21:17
asserted (10)
39:12,12;55:18;
57:15;75:25;77:10;
95:6;103:19;104:24;
191:14
asserting (4)
15:2;19:22,24;

95:5
assertion (1)
25:2
assessing (1)
22:20
asset (3)
142:1,3;189:9
assets (1)
68:3
assign (2)
17:6,16,23;24:6
assigned (3)
18:18,24;81:20
assignee (3)
16:4,22;23:13
assigning (1)
112:8
assignment (14)
16:13;17:3,5,11;
18:9;19:10;21:1;
23:9;113:6;114:14;
125:19;132:7,15;
133:5
assignments (2)
112:6;113:3
associated (5)
101:24;122:9;
148:13;149:2;155:9
Association (2)
125:1,2
assume (2)
116:9;187:24
assumes (1)
57:8
assuming (3)
13:11;16:17;
146:25
assure (1)
104:20
assured (1)
78:20
attach (1)
53:2
attached (12)
20:25;36:19;
37:22;39:6;99:21,
22;159:19,21;161:1,
6;162:16;174:17
attaching (1)
45:20
attachments (1)
48:23
attack (1)
86:23
attempt (2)
25:4;78:5
attempting (1)
8:16
attempts (3)
10:11;24:15;26:18
attend (1)
124:9
attention (5)

95:5
assertion (1)
25:2

6:20;40:12;56:23;
69:7;71:11
attesting (1)
92:6
attorney (8)
41:21;49:13,13;
73:12;91:4,5;121:1,3
Attorneys (3)
4:3;11:20;75:2
attorney's (2)
9:16;11:15
atypical (2)
98:22;160:10
audibly (1)
81:7
Audio (1)
151:22
audit (2)
149:12;151:8
August (16)
106:10;124:12;
129:21,24;159:2,3,
16;160:16;161:17,
17;162:6;196:19,20;
197:5,8,9
authenticate (2)
100:7;197:2
authenticated (1)
35:12
authentication (6)
35:10;161:14;
163:11,11;196:2;
197:2
authenticities (1)
160:25
authenticity (10)
92:7;100:19;
159:14;160:12;
161:6,7;162:11,14,
18,21
authority (7)
14:18;17:14,16,
17;20:3;23:14;
126:15
authorized (1)
161:11
available (5)
6:22,25;135:6;
137:12;140:19
average (2)
42:15,16
award (1)
189:6
aware (10)
63:2;84:15;126:4;
128:24;129:2,10;
140:15;149:3;
152:17;176:13
awareness (1)
144:4
away (3)
87:18;94:11;
95:22;130:17;

166:19;170:21

**B**

**back (65)**
15:20;33:16;49:6,
9;53:24;58:4,17;
59:8,18;65:13,17,20;
67:1,16;68:8,20;
69:1,4;71:18;72:1,4;
78:7,10;80:7,8,14,
18;85:18;90:5,16;
95:10,13,21,23;96:1;
105:23,25;106:11;
109:15;116:6,8,11,
17;119:13;132:22;
134:25;135:3;143:5;
163:23;166:9;168:5;
174:1;175:21;176:8;
177:12;179:21;
180:19,22;192:7,11;
193:11,24;194:11,
12;197:11
**back! (1)**
194:4
**backed (2)**
49:8;57:22
**background (4)**
42:20;43:6,14;
56:9
**back's (1)**
80:17
**backup (1)**
49:5
**backyard (1)**
168:11
**bad (7)**
89:20;90:7;94:14;
159:19;160:3;
168:17;195:6
**balance (2)**
46:13;84:6
**Bank (67)**
18:19,24;25:9,16;
35:1,5,12,21;45:8,9,
19,20;46:3,23;47:5,
10,21,24;48:8,10,20,
24;49:21,24;50:1,5,
9,11,13,15,15,16,17,
19;54:17,18;55:1,8,
13,19;56:10,17,25,
25;57:5,6,18;80:19;
109:20;147:4,19,21,
23;148:3;152:18;
157:2;158:20;159:1,
7,10;162:15,16,
163:10;188:4;
195:25;197:1,10
**banker (1)**
138:7
**banking (1)**
136:2
**bankruptcies (1)**

140:8
**bankruptcy (2)**
6:9;190:6
**banks (1)**
121:17
**Bank's (2)**
26:13;159:20
**Bar (2)**
125:1,1
**Barbara (3)**
6:17;45:19;184:17
**base (2)**
22:13;126:15
**Based (5)**
8:24;21:4;122:3;
145:6;178:19
**basically (5)**
113:19;138:18;
151:10;157:1;
160:14
**basing (1)**
142:17
**basis (15)**
11:6;12:7;33:14;
142:18;144:15,16;
152:8;159:16;161:8;
162:11,14;171:20;
191:8;192:9;198:6
**bathroom (1)**
51:6
**bathrooms (1)**
168:7
**baths (1)**
76:22
**Bear (5)**
21:21;106:21;
119:22;127:9;
166:10
**became (5)**
63:2;96:5,5;
176:13;183:11
**Becau (1)**
141:25
**become (2)**
122:17;189:13
**bedrooms (3)**
76:22;85:12;168:7
**began (1)**
124:12
**begin (2)**
29:5;34:21
**beginning (2)**
95:19;145:11
**behalf (10)**
17:11;18:3;23:9,
14;43:11;73:22;
105:14;109:5;122:4;
136:15
**behavior (1)**
195:6
**behind (2)**
24:21;168:6
**bel (1)**

77:19
**below (1)**
13:20
**bench (3)**
5:16;35:22;65:17
**beneficiary (1)**
17:20
**besides (2)**
37:1;83:14
**best (7)**
51:24;58:9,11;
70:9;76:18;172:12;
186:18
**Bethesda (1)**
135:22
**better (4)**
29:18;160:4;
164:19;190:8
**beyond (7)**
16:15;46:15,16;
132:15;133:1;
149:19;172:7
**biggest (1)**
177:3
**bill (8)**
93:11,13;183:7;
184:10;187:25;
189:8;191:4;194:24
**billed (1)**
183:5
**billing (1)**
186:19
**bills (3)**
91:21;92:7;184:19
**binder (4)**
36:10;38:15;53:3;
54:5
**biography (1)**
102:1
**bit (9)**
9:16;12:8;76:15;
80:1;91:25;95:14;
106:8,10;135:5
**bite (1)**
86:11
**blah (3)**
82:6,6,6
**blaming (1)**
77:11
**blanche (1)**
26:4
**blank (4)**
18:9;113:5;
114:12;133:6
**bode (1)**
183:24
**body (1)**
160:21
**book (1)**
72:9
**bookkeeper (1)**
92:2
**bore (1)**

65:9
**borne (1)**
11:21
**borrow (1)**
142:3
**Borrower (26)**
2:2,6;6:18;9:6,10;
11:5,8,13,22;12:5;
13:7;20:2;23:23;
37:5;40:21;70:1;
105:10,22;131:5;
144:22;146:23;
153:15,18,21,25;
186:11
**Borrowers' (2)**
24:13;36:4
**borrowing (1)**
157:3
**Both (11)**
10:25;11:1;39:5,7;
107:1,17;108:5,21;
157:22;160:25;
162:6
**bottom (2)**
69:2;165:9
**bought (2)**
60:11;88:21
**bounced (1)**
90:13
**bound (1)**
58:18
**boutique (1)**
111:12
**Braitman (1)**
22:17
**breach (9)**
8:21;12:13,24;
13:11,13;14:1,10,15;
15:2
**breached (1)**
14:5
**breaches (1)**
6:1
**breach-of-contract (5)**
12:12;14:3,4,25;
36:1
**break (4)**
33:19;65:5;
107:24;163:19
**Brett (1)**
10:25
**bricks (1)**
73:25
**brief (6)**
103:11;194:7,17;
198:16,24;199:6
**briefly (1)**
196:17
**bring (27)**
12:1,1,6;13:6,21;
23:19;25:21;26:20;
31:21;32:12,18,23;
33:13,15,21,22;

88:24;90:2,3,15;
108:21;112:17;
135:3;140:12;165:4;
195:13;196:24
**bringing (4)**
13:4,15;134:24;
146:13
**brings (2)**
69:10;138:6
**broke (1)**
134:13
**broker (2)**
98:4;181:15
**brokerage (1)**
79:18
**Brook (1)**
63:13
**brought (5)**
44:16;59:24;
63:24;92:22;147:22;
164:11;172:7;
174:14;180:13
**BT (9)**
25:9;58:19,24,25;
59:7;60:19;99:11;
100:5;101:24
**Buckeystown (1)**
4:4
**build (1)**
139:20
**builder (1)**
98:9
**builders (1)**
168:12
**building (1)**
121:6
**built (1)**
137:7
**burdens (1)**
9:1
**business (20)**
29:8;43:4;48:7;
51:8,11;54:19,21;
59:9,13;76:25;
159:22;161:1;162:1,
10,19;185:18,19;
196:4;198:7;199:2
**buy (6)**
24:21,22;42:15;
83:24;86:2;98:1
**buyer (16)**
41:24;42:1;44:15;
74:7;75:5;146:19,
21;148:18;154:9;
155:23;156:3,6,12,
14,20;191:18
**buyers (2)**
62:16;98:24
**buyers' (2)**
42:5,7
**buyer's (1)**
148:18
**buying (4)**

49:14;156:4,6;
182:13

## C

**calculate (2)**
10:15,16
**calculating (1)**
10:6
**calendar (3)**
106:21;107:1;
184:25
**call (13)**
6:24;28:13;31:15;
56:6;75:4,8;108:17;
132:18;133:23;
158:5;196:22;
197:15;198:4
**called (9)**
41:21,21;61:17;
63:19;73:10;75:12;
86:1;87:13;114:22
**calling (3)**
110:6;162:1;197:1
**Calls (7)**
30:19;119:6;
131:3;141:8;143:1,
10;148:21
**calm (1)**
87:5
**came (14)**
6:20;24:1;41:4;
50:17;60:8;61:17;
64:1;68:6;72:10;
103:2;133:18;
159:20;160:2;164:6
**Campbell (6)**
91:11,12;93:15;
96:12;185:11;187:2
**Campbell's (1)**
92:2
**can (88)**
5:9;7:10;12:23;
13:10,13;14:7,13;
20:4;24:5;30:11;
32:18,24;34:9;
35:18;38:11;42:8;
46:1,8;47:22;48:25;
52:3,4;53:13;54:7;
58:2;65:4,7,10;66:2;
81:3;90:15;93:21;
95:14;101:5;103:13,
14,15,19;104:15,21;
105:16;108:11;
110:24;116:16;
117:10;118:2;121:5;
123:16;127:14,15;
128:2;130:19;131:8;
135:12;138:7,19;
141:5,12,15,18;
144:24;145:1;
156:20;157:18;
158:6,14;164:18;

169:21;175:17;
176:23;178:12;
179:17,18,19;180:2,
2,3,9;189:14;191:5;
192:3;196:3,16;
197:17,22;199:4,13,
15
**cancel (4)**
25:2,5,11;107:10
**canceled (1)**
194:8
**cancelled (2)**
42:1;60:19
**candid (1)**
106:9
**Capital (2)**
105:6;109:16
**caption (2)**
117:1;118:14
**car (1)**
79:2
**card (1)**
138:15
**care (4)**
22:18;87:14,17;
136:1
**career (1)**
121:15
**careful (1)**
41:6
**carefully (1)**
17:20
**Carol (1)**
165:4
**carries (1)**
117:1
**carte (1)**
26:4
**Carter (24)**
6:23;58:20,21;
61:22;75:10;76:3,9;
77:2,4,8,12;78:20;
79:17,20;81:10;
82:4;89:9;99:10;
100:6,15,23;158:6;
169:8;174:14
**Carter's (1)**
174:17
**Case (48)**
2:6;7:17;11:21;
12:3,6,9;13:20,22;
14:25;15:14;16:9;
17:5;18:20;19:6,19;
22:16,25;24:10;
25:7;36:3;41:7;51:1;
58:23;92:17;93:9,15,
15;95:2;113:17;
116:15;118:8,14;
119:8;120:11,12;
125:6,15;126:14;
127:18;129:20,21;
130:13;145:10;
147:12;153:3;

179:20;183:1,17
**cases (9)**
23:11;53:23;
112:9;137:3,15;
144:17;152:23;
153:4;178:25
**cash (18)**
9:25;10:7;24:16;
44:24,25,25;45:3,4;
46:14;48:19;60:10;
65:23;69:7;74:19;
92:4;154:9,10;
167:20
**cashier's (1)**
83:5
**cash-out (3)**
45:11;46:12;50:9
**categories (2)**
9:3;140:8
**category (1)**
154:11
**cause (4)**
94:10;136:15;
141:15;151:24
**caused (2)**
51:4;84:14
**CC (1)**
2:2
**cede (2)**
5:13,15
**central (1)**
140:25
**Century (1)**
195:17
**CEO (1)**
185:10
**certain (2)**
49:19;175:20
**certainly (13)**
20:10,23;22:16;
27:8;31:19;32:13;
106:18;107:20;
108:8;139:11;
142:18;194:7;
196:11
**certificate (3)**
116:2;132:7;
161:10
**certification (1)**
45:21
**certified (4)**
128:1,10,19,23
**certifying (1)**
91:24
**CFA (1)**
8:22
**chain (6)**
70:4,17;162:5;
178:7;193:13,16
**chair (3)**
66:2,6;101:14
**chance (6)**
15:5;37:7,17;39:2;

135:9;160:23
**chancery (7)**
116:14;117:11;
118:2,4;119:4,9,20
**change (4)**
51:9;81:23;83:4;
174:15
**changed (4)**
16:3;60:14,15;
78:19
**characterize (1)**
105:20
**charge (1)**
92:22
**chargeable (1)**
13:12
**charged (3)**
92:20;183:23;
184:21
**charges (1)**
185:9
**check (10)**
35:17,19;76:13,
16;83:5,5;87:12;
158:9;183:8;193:10
**checks (4)**
89:20;90:7,13;
168:17
**children (2)**
76:22;78:24
**chose (3)**
12:2,2;25:22
**Christina (2)**
2:3;125:12
**Christmas (3)**
76:18;87:12;88:7
**Christy (3)**
6:22;110:7,15
**C-H-R-I-S-T-Y (1)**
110:15
**chronology (1)**
164:11
**circles (3)**
15:4,7;146:1
**circumstance (3)**
13:6;22:19;79:1
**cited (4)**
151:7,8;157:21,21
**civil (2)**
22:18;159:24
**Claim (23)**
2:3,7;9:2,13;
11:24;12:12,12;14:3,
4;15:1;19:25;28:9;
36:5;39:14,16;43:7;
94:20;97:17;103:20;
105:7;167:12;
174:19;189:5
**claimant (2)**
7:24;8:11
**claimants (18)**
8:16,20;9:2,17,22;
10:12;11:4,8;12:10;

14:24;15:11;22:5;
24:24;25:7,8;26:4;
28:8;122:4
**claimants' (1)**
24:14
**claimed (1)**
11:20
**Claims (20)**
2:2,7;5:21,22;
6:18;8:20;12:7,10,
10;19:25;28:10;
32:2;33:14;36:5;
39:12;103:18;
104:24;105:10;
109:17;163:20
**clarification (1)**
179:3
**clarify (1)**
157:18
**Clark (1)**
184:17
**clean (1)**
167:25
**clear (20)**
7:17;8:23;15:13;
23:16;29:20;45:5;
47:22;48:8;50:4;
84:5;96:19;97:6;
161:19;165:13;
166:24;167:25;
169:5;175:1;183:3,
21
**cleared (1)**
195:14
**clearly (5)**
133:7;159:12;
162:20,22;192:23
**clerk (8)**
35:15;45:18;
48:22,24;110:13;
127:24;128:10,19
**clerks (1)**
134:24
**Clerk's (4)**
35:15,20,21;
129:19
**client (9)**
13:25;14:11,11;
43:11;122:10,12,13,
15,16
**clients (5)**
21:15;107:12;
112:17;121:20;
122:7
**client's (1)**
14:21
**clock (1)**
103:9
**close (21)**
34:18,19;45:11;
61:15;66:21;67:4,6;
71:14;74:8;79:14;
82:7;94:9;103:5;

107:19;137:5;
146:20,23;156:21;
167:19;188:20;
198:7
**closed (3)**
53:24;66:19;156:1
**closer (4)**
28:19;29:16;66:2;
124:14
**closes (1)**
156:15
**closing (16)**
77:15,19,23,24,24,
24;78:14,18;79:7;
83:1,3,3;103:5;
105:24;154:12;
156:8
**coffee (2)**
79:25;80:4
**coincide (1)**
87:24
**Coles (1)**
182:13
**collapse (2)**
191:1,1
**collect (2)**
89:18,24
**collected (2)**
89:20,23
**collecting (1)**
28:3
**collection (1)**
144:4
**college (3)**
62:18;63:13,16
**coming (10)**
23:4;39:21,21;
43:4;59:12;74:18;
87:3;99:6;100:7;
103:21
**commence (4)**
15:17,18;23:15;
40:22
**commenced (5)**
23:19;46:8;59:6;
73:2;132:13
**commencement (2)**
12:20;23:8
**commences (1)**
23:24
**commencing (1)**
59:22
**comment (2)**
65:9;160:17
**Commerce (15)**
49:24,25;50:1,5,
11,19;54:17,18;55:1,
8,13,19;56:25;57:5,6
**commercial (1)**
111:9
**commit (1)**
72:20
**commitment (1)**

72:22
**commitments (1)**
121:8
**committed (2)**
16:14;127:3
**common (3)**
6:1;23:1;75:2
**communication (8)**
56:16;57:18;
62:13;90:17,25;96:4,
19;178:6
**communications (1)**
183:8
**comp (1)**
62:21
**companies (3)**
62:16;75:2;123:6
**company (28)**
41:22;62:13,19,
20;68:21;69:4;
73:17;74:7;79:7,10,
11,19,21;82:3;83:21;
86:25;87:24;88:4;
96:5;114:2;121:7,
25;149:5;175:3,16;
181:6;195:3,9
**comparison (1)**
56:2
**competent (1)**
39:1
**complain (1)**
152:3
**complaint (34)**
15:19,22;16:1,3,3,
17;19:5;20:25;22:5,
7;24:9;25:20;39:20,
20;41:4,19;73:23;
112:7,8;113:2;
115:11,13,25;117:3,
8,21,24;118:3,21;
125:18;126:5;
129:20;145:7;167:9
**complaints (3)**
111:20,21;130:17
**complements (1)**
151:11
**complete (7)**
47:5,24;64:22;
67:21;68:25;70:8;
186:19
**completed (6)**
37:7;47:10;
104:11;134:12,15;
195:2
**completely (2)**
10:10;142:2
**completeness (2)**
70:21;164:14
**completing (1)**
105:25
**completion (1)**
68:2
**compliance (1)**

23:18
**complicated (2)**
155:12,12
**complications (1)**
181:11
**comply (1)**
23:23
**complying (4)**
12:25;13:14;
14:14,17
**component (1)**
12:9
**components (1)**
20:10
**compose (1)**
164:2
**compound (1)**
144:23
**Comptroller (1)**
150:9
**computer (4)**
106:21;134:20,22;
135:1
**computers (1)**
63:16
**conceivable (1)**
140:20
**concern (6)**
109:22;159:5;
160:14,15;177:7;
179:21
**concerned (4)**
71:13;91:24;
194:4;198:1
**concerning (1)**
126:20
**concerns (1)**
160:24
**concluded (1)**
199:16
**conclusion (8)**
12:6;23:7;37:13;
39:2;56:4;59:3;
108:22;128:5
**conclusive (1)**
22:18
**condition (1)**
161:22
**conditions (1)**
126:1
**condos (1)**
76:23
**conduct (1)**
122:6
**conducted (3)**
8:2;161:21,25
**confer (1)**
197:14
**Conference (6)**
2:6;80:7;91:23;
106:24;107:11;
189:2
**confidential (4)**

177:14;179:19,24;
180:2
**confirm (2)**
112:16;139:12
**confirmed (1)**
115:9
**confirms (1)**
139:13
**conflict (6)**
50:24;58:24;
91:13;96:13;122:5;
185:21
**conflicted (3)**
15:24;93:11;
183:13
**conflicting (2)**
50:13;58:6
**conflicts (1)**
177:9
**confusion (1)**
102:21
**connection (12)**
9:16;25:7;57:5,8;
67:19;74:22;112:15;
117:25;122:21;
152:5;179:4;183:23
**consent (1)**
96:18;97:21
**consequences (1)**
23:2
**consequential (1)**
51:9
**Consequently (1)**
162:24
**conservatively (2)**
48:18;112:11
**consider (5)**
22:20;43:6;54:9;
123:18;198:21
**consideration (1)**
68:16
**considered (1)**
115:6
**consistent (1)**
198:18
**consisting (1)**
102:3
**constantly (1)**
98:11
**Consumer (6)**
15:11;22:9;
137:10;138:13,16;
149:7
**contacted (1)**
80:19
**contain (3)**
36:6;37:4;186:19
**contained (2)**
57:7;167:6
**contemporaneous (2)**
186:12;196:5
**contends (1)**
171:9

**content (1)**
160:6
**contest (1)**
12:14
**contested (3)**
12:14;115:22;
116:7
**contesting (1)**
131:22
**contingency (2)**
65:22;66:14
**contingent (1)**
51:16
**continue (4)**
93:19;94:17,21;
185:18
**continued (2)**
51:13;90:13
**contra (1)**
39:24
**contract (53)**
6:1;8:22;13:11;
25:3,5,11;36:2,6,6,
23,24;39:21;40:3,4,
11,18;41:2,23;44:3,
22;48:14;49:4,9,16;
51:16;52:14;53:4,
11;54:4;58:9,25;
60:2,5;62:4;67:9;
69:7,8;73:16;74:17;
78:18;81:20;99:5;
102:11,13,15,22;
103:4;121:1,3;
157:12;164:16;
172:16;191:17
**contracted (1)**
87:25
**contractor (2)**
50:15,17
**contracts (3)**
36:2;38:9;51:9
**contractual (3)**
14:14,18;59:15
**contrary (2)**
15:25;146:15
**control (1)**
106:3
**controversial (1)**
54:3
**conversation (4)**
21:23;49:13;
51:13;105:21
**conversations (2)**
30:8;177:18
**convey (2)**
167:25;169:5
**convince (1)**
158:6
**convinced (1)**
157:2
**convincing (1)**
8:24
**Cooper (45)**

10:25;24:17,19,
22;67:12;69:8;
78:19,20;79:4,9,15,
19;80:2,11,11;81:15,
21,24;82:10;83:5,7,
10,17;85:9;86:7;
88:21;89:8,20;91:2;
94:12;95:15;97:19,
21;98:15;164:1;
168:4,9,10,15,24;
170:24;171:4,23;
181:23;188:15
**Cooper's (1)**
81:2
**copies (10)**
18:15;27:14;
39:10;53:18;91:21,
22;115:25;125:18;
127:13;160:4
**Copperman (1)**
2:20
**copy (24)**
35:4;37:23;69:1,
11;82:12;92:2,3;
101:25;116:1;127:6,
8,11;128:1,10,19,23;
129:15;159:19;
160:2,3;164:19;
193:7;194:11;199:5
**corner (1)**
56:13
**Corporation (2)**
11:11;120:25
**correction (1)**
16:6
**correctly (2)**
68:2;143:18
**correspondence (4)**
35:11,13;49:16;
195:24
**corresponding (1)**
15:12
**Cosala (1)**
23:1
**costs (1)**
93:1
**coughed (1)**
186:24
**counsel (15)**
5:3;7:15,21;21:2;
31:1;52:24,25;
53:25;63:1;106:16;
121:8;169:22,25;
176:25;177:19
**count (2)**
35:25;36:1
**counterclaimants (1)**
25:15
**counterclaims (1)**
25:14
**counterparties (1)**
25:8
**countersigned (2)**

193:7,11
**countersued (1)**
25:8
**country (1)**
139:15
**counts (2)**
15:10
**county (15)**
62:18;90:7;
114:23;115:14;
116:6,14,21;118:15;
119:12,12;127:24;
128:9,13,15,18
**couple (4)**
36:18;86:21;
105:19,21
**coupon (1)**
72:9
**coupons (2)**
71:23;72:10
**course (10)**
20:8;66:15;
104:18;118:22;
124:5;144:7;154:2;
161:25;168:17;
199:7
**courses (1)**
190:22
**COURT (745)**
5:2,8,12,13,15;
6:12,16;7:9,12,12,
13;8:5,8;9:6;11:23;
12:18,23;13:10,24;
14:7,23;15:4,16;
16:5,11,15,24;17:3,
11,15,19,23;18:1,6,
12,18,22,24;19:2,14,
24;20:12,14,17,19,
19,22;21:8,14,22,24;
22:1,3,7,13,23,25,25;
23:6;24:1,8;25:10;
26:1,8,10,16,24;
27:4,6,9,13,18,22,25;
28:4,11,13,15,18,23;
29:3,5,8,12,15,19,25;
30:4,11,16,18,20,24;
31:8,12,14,18;33:17;
34:8,12,17;35:1,3,
18;36:10,14,23;37:6,
10,16;38:4,8,12,18,
20,24;39:23,25;40:2,
8,12,14,19,24;41:3,
14,16,18;42:4,6,8,11,
13,18,25;43:5,17;
44:1,5,8;45:13,15,
17,18,24;46:2,7,11,
17,25;47:2,4,8,13,15,
17;48:2,10,16,22,24;
49:11,23;50:1,6;
51:21,25;52:2,5,7,
12,16,22,23;53:6,8,
10,15,17,22;54:12,
15,22;55:7,12,15,23;

56:20,22;57:3,11,13,
25;58:12,14,20;
60:14,18,22,25;61:3,
6,8,10,13,18,20,23;
62:3,6,9,20;63:14;
64:15,19;65:3,7,11,
12,15,24;66:1,5,8,11,
17,19,21;67:1,6,13,
16,18,21,24;68:13,
22;69:12,15,18,23,
25;70:11,13,15,20,
25;71:2,7,11,13,25;
72:6,11,14,22;73:4,
7,9,11,14,22;74:8,13,
15,21,24;75:8,11,13,
15,17,19,21,24;76:3,
5,8,13;77:5,9,15,22;
78:3,7,9;80:24;81:3,
6,14,18;82:2,7,12,15,
21,23,25;83:16,25;
84:3,10,17,21;85:3,
6,15,18,22;86:4,8,16,
19;87:10;88:8,13,24;
89:2,4,6,15,18,22;
90:1,4,9,15,23;91:5,
10,17,20,22;92:8,12,
19,24;93:8,17,24;
94:24;95:13,18,21,
23;96:1,3,8,11,16,
24;97:4,7,10,13;
98:2,4,6,12,15;99:1,
16,19,22;100:2,13,
22,25;101:2,12,17,
19,21;102:9,13,17,
21;103:4,7,9,13,23;
104:1,4,9,15,19;
105:5,12,15;106:6,9,
12,15,23;107:7;
108:16,20;109:3,7,
11,15,21,25;110:5,8,
12,17,19,24;111:2,5,
8,15,19,23;112:13,
20,23,25;113:8,10,
24;114:6;115:1,4,7,
24;116:6,9,12,14,15,
18,22;117:7,9,10,11,
13,14,16,17,20;
118:2,4,7,10,17,25;
119:5,7,9,15,19,20,
22,24,25;120:4,13,
16;122:20,24;123:4,
7,20,22;124:1,4,6,14,
17,20;126:7,24;
127:1,4,10,12,15,17;
128:13,15,21,22,25;
129:14,18,24;130:7,
24;131:2,14,17,19;
132:2,4,11,18,25;
133:4,10,13,15,20,
22,25;134:5,7,11,23;
135:3,7,12,13,16,18,
20,23,25;136:1,4,6,
16,19,23;137:1,17,

24;138:23;139:1,4,
10;140:11;141:10,
17,19;142:5,8,14,17,
20;143:3,4,11,13,20,
24;144:10,14,20,25;
145:7,18,22;146:5,8,
11,15,18;147:5,9,13,
17,23;148:2,8,17,22;
149:18,22,24;150:7,
17,20,23;151:15;
152:1,9,14;155:1,22;
156:5,12,19;157:4,8,
10,13,15,17,19,24;
158:1,3,10,18,22,25;
159:13;160:5;161:2,
4;163:2,4,6,12,13;
164:3,6;165:1,4,6,8,
18,20,22;166:2,5,7,9,
16,21,22;167:9,12,
17;169:11,19,23;
170:2,16,22;171:1,6,
8,15,18,22;172:1,10,
19,25;174:1,5,8,11,
20,22,25;175:5,8,13,
23;176:1,4,9;177:13,
16;178:5,11,16,21;
179:5,11,13,13,16;
180:1,4,7,15,19;
181:1,10,12,20,25;
182:3,5,8,13,14,19,
23;183:2,21;184:1,3,
5,10,12,15,17,21;
185:2,4,8,13,15,21,
23;186:2,8,14,16,21,
24;187:1,4,9,11,17;
188:12,20,23,25;
189:18,21,24;190:2,
4,6,11,13,16,19;
191:10;192:3,11,16,
20;193:6,15;194:14;
195:16,22;196:9;
197:18,21;198:20;
199:7,11,15
**courtroom (5)**
35:18,19;45:18;
65:12;135:6
**court's (3)**
22:8;196:15;198:6
**cover (4)**
95:10;132:24;
160:10;167:24
**covered (3)**
151:6;163:15;
195:20
**create (1)**
98:24
**created (1)**
99:3
**creates (1)**
122:5
**credit (11)**
46:14;104:2;
137:16,20;138:8,14;

152:22,23,23;154:8;
160:11
**creditor (2)**
153:14,24
**creditors (2)**
140:6,9
**creditworthiness (1)**
137:3
**criticized (1)**
48:19
**cross (2)**
104:15;133:2
**cross- (2)**
104:11;130:22
**cross-examination (10)**
31:12;32:16;
120:16,17;124:1,2;
132:22;152:14,15;
193:9
**cross-examine (3)**
123:20,23;158:14
**cross-examines (1)**
132:20
**crux (1)**
5:22
**cumulative (1)**
139:21
**cup (1)**
79:25
**cure (2)**
131:6,7
**Curley (19)**
159:3,5,17;
160:24;162:6;163:3,
6,8;195:25;196:6,7,
10,12,20,22,24;
197:16;198:2;199:3
**Curley's (4)**
159:3;161:17,18;
197:8
**Currency (1)**
150:10
**current (8)**
12:1,2;25:22;
26:20;44:6;147:24;
170:13;189:13
**currently (1)**
111:6
**custodian (2)**
45:20;196:3
**custom (8)**
75:2;113:14,21;
114:1;118:22;
123:10;132:12,13
**customarily (1)**
120:8
**customers (1)**
140:10
**cut (1)**
94:2
**cutoff (1)**
79:21
**cutoffs (1)**

79:12

# D

**Dabbert (1)**
48:22
**damage (4)**
6:7;84:13,15;
136:14
**damaged (1)**
85:8
**damages (24)**
8:12,14,23;9:2,20;
10:16;12:8,11;
22:12;25:25;44:19,
19;93:7;183:19;
187:11,15,18;
189:12;192:21,22;
194:15,23,23;195:19
**damaging (1)**
145:2
**damned (1)**
87:16
**data (1)**
125:15
**date (22)**
19:8,10;38:23;
53:12;55:22;71:6;
72:15,17;102:8;
103:5;108:6;119:24;
120:2,7;125:7;
129:1;132:8;150:10,
14;160:20;166:15;
195:13
**dated (11)**
23:8;45:19;
101:23;102:5;
129:18;160:9,21;
162:6;164:9;165:9;
197:9
**dates (2)**
59:21;97:11
**David (1)**
29:7
**dawned (1)**
189:3
**day (7)**
64:2;111:3;
158:15;159:8;
160:22;195:23,23
**days (13)**
63:16;76:20;86:6;
87:12;88:6;97:23,
23;119:13;131:7,11,
12,13;145:9
**days' (3)**
12:20;13:4;14:9
**DD (8)**
164:25;165:1,8,
20;166:6,11,15,17
**deadline (1)**
5:17
**deal (12)**

61:3;66:19;67:4;
81:19;84:14;96:17;
110:1;145:6;170:11;
190:4,6;195:7
**dealing (4)**
74:25;94:14;
137:9;183:16
**dealings (1)**
50:4
**debt (3)**
144:4;168:1;
195:10
**debtors (2)**
13:12;18:19
**decade (1)**
44:14
**December (4)**
86:6,6,7;89:22
**decide (2)**
5:6;22:8
**decided (4)**
49:15;53:23;
175:11;188:18
**decides (1)**
116:16
**decision (6)**
12:4;54:10;
129:16,18;130:2;
131:24
**declaration (12)**
15:25;36:3,3,15,
15,19;37:23;161:7,
13,19;167:7;196:2
**declarations (1)**
36:12
**declination (1)**
197:7
**declined (4)**
195:25;197:4,10,
11
**declining (2)**
10:22;162:17
**decree (1)**
97:21
**deep (1)**
138:19
**default (21)**
13:7;20:5;22:5;
23:20,21,23;63:8;
64:11;86:4;88:17;
112:9;115:21,21,22;
126:1,4;131:5,6,8;
145:11,23
**defaulted (5)**
73:24;114:7;
144:22;145:15;
146:21
**defaulting (1)**
24:23
**defects (1)**
58:8
**defend (1)**
73:4

**defendant (7)**
115:21;116:6,12;
127:19,20;128:11,13
**defendants (2)**
112:7;114:18
**defended (3)**
92:16;96:20;184:3
**defending (2)**
92:21;93:2
**defense (3)**
93:10;96:9;185:4
**defenses (1)**
39:12
**defied (1)**
58:21
**definitely (1)**
139:13
**delay (2)**
45:1;106:9
**delayed (1)**
77:15
**delays (1)**
7:8
**Delehey (7)**
36:4,11,15;37:23;
167:7;193:7;199:9
**Delehey's (1)**
15:25
**demand (3)**
155:24;156:8,21
**demonstrate (2)**
20:14,20
**demonstrated (1)**
18:7
**denied (2)**
10:10;160:8
**deny (1)**
101:6
**department (6)**
35:10,14;80:25;
149:12;151:9;
197:20
**Depending (1)**
119:12
**depose (2)**
160:1,23
**deposit (4)**
25:6;58:4,16;
146:20
**deposition (1)**
125:23
**deputy (2)**
35:18;45:18
**derives (1)**
37:14
**describe (4)**
118:19;121:5;
138:1;143:4
**described (3)**
120:7;128:3;
136:24
**description (2)**
106:7;156:17

**designed (1)**
140:18
**desirable (1)**
176:22
**desire (1)**
50:23
**despite (1)**
161:19
**detailed (2)**
184:19;186:19
**details (1)**
106:5
**determination (1)**
58:11
**determine (3)**
41:12;119:24;
140:22
**determined (1)**
13:20
**development (1)**
45:7
**deviation (1)**
168:12
**Di (1)**
23:1
**diagnosis (1)**
161:22
**Diamond (1)**
111:11
**differed (1)**
196:25
**different (21)**
27:24;28:6;50:17,
18;72:16;80:12;
102:24;103:11;
114:13;118:25;
127:14;139:15;
144:21;145:14;
154:22;160:20;
169:1,2;181:10,12;
195:11
**differently (1)**
25:23
**difficult (3)**
18:14;21:16;
192:24
**difficulty (3)**
5:8;143:16;176:19
**direct (8)**
26:18;30:1;34:24;
62:25;110:22;
134:12;135:10;
158:13
**directly (4)**
78:20;96:18;97:1;
172:23
**disadvantage (1)**
122:15
**disagree (2)**
13:8;26:14
**disallowed (1)**
28:10
**discern (1)**

52:3
**discharge (9)**
117:5;118:10;
119:11;120:12;
126:10;127:25;
128:5;129:4,8
**dischargeable (1)**
118:12
**discharged (6)**
116:25;119:18;
127:19,21;130:1,5
**disclosing (1)**
106:5
**discovered (2)**
85:8;147:21
**discovery (5)**
11:16;107:25;
108:3,4;160:22
**discretion (1)**
80:21
**discuss (6)**
5:20;36:1;80:18;
131:16;163:18;
192:17
**discussed (3)**
11:16;16:2;151:18
**discussing (3)**
104:2;176:25;
192:6
**discussion (8)**
50:22;72:25;
91:23;153:25;
164:22;188:7;
190:15;191:3
**discussions (4)**
56:10;105:20;
148:3;152:19
**dismiss (5)**
118:5;20;119:4;
131:24;184:7
**dismissal (13)**
96:6;117:7,24;
118:2;120:3,7,10,11;
129:20,24;130:2,4;
185:14
**dismissed (27)**
13:22;15:15;16:9;
19:19,23;24:1;26:1;
116:15,23,24;117:3,
21,23;118:8,22;
119:8,19,20,21,25;
120:2,9;126:14;
128:25;180:16;
185:24,25
**dismissing (2)**
130:13,13
**disparaging (1)**
94:7
**dispute (14)**
15:14;19:21,25;
25:1;26:11;41:8;
48:15;93:1;100:19;
102:17;139:7,11,12,

13
**disputed (1)**
    19:22
**disputes (2)**
    22:4,6
**disqualify (1)**
    122:3
**disrespect (2)**
    65:11,19
**distress (4)**
    141:7,7;192:23;
    195:19
**diverted (1)**
    48:25
**division (4)**
    91:15;93:7,14,15
**Doc#7017 (1)**
    2:2
**docket (2)**
    118:7;119:25
**docs (2)**
    193:18;194:3
**doctrine (1)**
    70:20
**document (29)**
    14:8;24:4;43:23;
    54:24,25,25;55:2,5,
    7,10,11,12,24;56:3,
    12,24;68:17;69:3;
    70:3,8;76:6;82:10;
    114:22;150:16;
    160:7;161:9;162:16;
    163:10;196:3
**documentation (1)**
    107:9
**documents (41)**
    17:20;19:3;20:24;
    21:4;31:21;32:12;
    33:20;37:19;38:5,13,
    13,14;39:10,18;67:3,
    22;68:2,7,24;71:22;
    72:7;80:10,24;
    84:24;91:24;109:20;
    110:1;112:3;114:2,
    9;117:23;152:19;
    161:9,16,20;162:20,
    22;165:15;170:18;
    174:18;186:20
**document's (1)**
    56:5
**dollar (6)**
    10:3;49:19;
    168:23;185:8;195:5,
    9
**dollars (44)**
    8:17,18;24:19,24;
    25:6,16,18,19;26:19;
    46:16;48:20;51:9;
    56:3,11,13;72:21;
    74:19;76:10;79:5;
    82:16;83:8,17,23;
    84:9;85:10;86:10;
    87:15,24;88:3,4;

89:1,10;93:12,13;
168:8;170:21,23;
181:13;184:22;
185:2;190:24;195:4,
6,8
**Donati (20)**
    6:22;29:1;103:22;
    110:7,8,15,17,20,24;
    111:18;114:20;
    118:19;119:3;120:6,
    19;129:14;130:12;
    131:20;133:2;
    134:16
**D-O-N-A-T-I (1)**
    110:16
**Donati's (3)**
    122:25;123:9,18
**done (19)**
    21:18;48:21;
    51:12;57:19;62:11;
    83:22;84:13;104:22;
    110:1;113:17;
    181:14,22,23;
    183:13;185:18,18;
    191:11;192:6;198:9
**door (1)**
    81:10
**doorstep (1)**
    94:16
**double (1)**
    189:8
**doubts (1)**
    160:12
**down (6)**
    34:14;59:25;
    74:11;79:5;107:24;
    177:5
**draft (1)**
    107:15
**drafted (1)**
    82:11
**drastically (2)**
    169:1,2
**draw (1)**
    56:23
**drawn (1)**
    152:5
**Drew (1)**
    29:7
**drink (1)**
    80:4
**Drive (3)**
    6:3;8:14;29:10
**dry (1)**
    78:15
**due (5)**
    9:7;26:24;28:7;
    116:2;197:12
**duplex (1)**
    42:21
**duplicate (1)**
    22:2
**DuPont (5)**

111:10;120:21,25;
121:5,14
**duration (1)**
    7:1
**duress (1)**
    169:4
**during (24)**
    11:16,17;30:14;
    37:10;49:1;52:20;
    53:20;90:18,20;
    91:1;92:8;93:21;
    95:9;143:4;149:14;
    168:17;174:12;
    177:10;179:5,11;
    180:7;181:24;191:7;
    197:13
**duties (2)**
    121:5;122:6
**duty (6)**
    20:1,2;22:11,15,
    17;23:5

**E**

**earlier (7)**
    42:12;129:25;
    155:11;169:4;170:8;
    174:6;196:1
**early (8)**
    8:19;12:16;30:6,
    15;61:15;104:7;
    162:7;197:11
**easements (1)**
    121:6
**easily (1)**
    142:24
**economic (1)**
    194:23
**Edgar (9)**
    25:9;52:20;58:19,
    24;60:20;98:7;
    99:12;100:5;101:24
**editor (1)**
    137:7
**effect (10)**
    117:24;136:9;
    138:17;144:1,21;
    145:14;149:3;153:6;
    181:7;191:2
**effected (1)**
    117:7
**effective (1)**
    129:10
**Effectively (1)**
    153:22
**effects (1)**
    138:2
**effort (5)**
    24:9;158:8;178:3,
    8;179:20
**efforts (4)**
    58:10,11;108:20;
    176:10

**eighteen (1)**
    42:16
**eighty (1)**
    49:18
**either (19)**
    8:25;18:7,12;
    23:13;29:8,16;36:7;
    52:24;88:14;89:8;
    105:24;108:4;109:1;
    116:15;119:8;138:3;
    149:8;180:11;
    194:25
**elaborate (2)**
    141:16,18
**element (1)**
    15:2
**elements (2)**
    15:1;176:23
**elicit (2)**
    131:19;143:17
**else (10)**
    8:3,5;47:21;66:25;
    91:8;131:14;132:4;
    133:8,10,18
**else's (1)**
    51:22
**e-mail (16)**
    69:13;70:3,6,9,17;
    71:3,5;72:3;74:11;
    92:1;178:7;184:13;
    187:14;193:13,15;
    194:1
**e-mailed (3)**
    91:25;193:17,22
**e-mails (4)**
    69:19;187:14;
    194:10;197:19
**emotional (2)**
    192:23;195:18
**employed (2)**
    120:21;140:22
**employee (2)**
    17:9;23:11
**employment (1)**
    124:21
**enable (2)**
    172:3,11
**encountered (1)**
    177:3
**encumbered (1)**
    138:20
**encumbers (1)**
    138:23
**end (12)**
    6:5;25:19;74:12;
    82:24;87:19;106:1;
    149:6;158:15;
    195:23;196:17;
    198:1,11
**ended (3)**
    24:23;25:6,10
**endorsed (7)**
    18:9,16,17;19:18;

113:5;114:12;133:6
**endorsement (2)**
    27:16;133:5
**engage (1)**
    184:8
**engaged (2)**
    105:19;184:9
**enjoyed (2)**
    88:18,19
**enough (8)**
    7:4;23:5;65:13;
    86:24;88:12;127:13;
    169:7;172:11
**ensued (1)**
    58:24
**ensure (1)**
    44:25
**ensuring (1)**
    9:11
**enter (10)**
    7:17;62:4;102:10,
    13,15;107:21;
    117:20;129:20;
    150:3;167:3
**entered (11)**
    11:1;25:13;39:22;
    119:19;129:24;
    130:2,5;131:24;
    146:19;152:3;166:3
**entering (2)**
    175:3;176:18
**entertain (2)**
    81:2;169:12
**entertained (1)**
    169:3
**entertaining (1)**
    175:16
**entire (2)**
    35:12;70:3
**entirely (2)**
    95:6;179:18
**entirety (2)**
    70:5;100:4
**entitled (11)**
    9:18;10:16;15:13;
    16:8;25:11;26:9;
    37:11;70:22;93:1,3;
    197:14
**entitlement (3)**
    8:12;26:3;28:9
**entity (2)**
    28:3;149:9
**equal (2)**
    49:19;160:11
**equitable (1)**
    191:9
**equity (5)**
    188:1,9;189:6,15;
    195:11
**errors (2)**
    51:2,3
**eScribers (1)**
    2:21

**escrow (9)**
79:6,7;82:21,22;
87:15;89:3,4,23;
156:7
**especially (4)**
58:6;65:23;87:6;
140:9
**ESQ (4)**
4:7;187:2,2,3
**essentially (3)**
7:23;9:15;107:16
**Estate (7)**
52:20;76:17,19;
98:8;110:25;111:9;
144:12
**estimated (1)**
6:8
**estimation (1)**
191:5
**Evan (3)**
6:22;133:21;134:9
**E-V-A-N (1)**
134:9
**Evans (1)**
29:2
**even (28)**
10:3,15;12:4,6;
17:8;21:4;35:24;
43:22,22;50:12;
68:18;70:23;72:5;
77:2;79:23;92:10;
93:23;101:13,16;
102:19;104:10;
107:8;167:20;177:5;
189:16;191:13,14;
193:23
**evening (1)**
83:6
**event (4)**
63:3,6;101:13;
161:22
**events (1)**
196:5
**everybody (1)**
127:14
**everyone (1)**
79:14
**evict (1)**
88:24
**evicted (6)**
24:23;90:1;97:20;
168:4,4,17
**eviction (1)**
97:21
**evidence (106)**
8:14,21,24,24;
9:15,21,23,24;10:3,
4,7,13;11:18;15:13;
26:11;27:14,19;33:3,
4,10,10,24;34:3,4;
35:1;37:1,6,11,12,
12;38:16,20,22;39:1,
3,4,22;43:4,24;

50:21,21;53:1,2,2,6,
12,21,24,25,25;54:5,
10,12,14;55:17,20;
56:3,8;60:3,5,17,18;
70:9,22;71:4,5,7;
74:11;77:1;80:23;
83:20;99:25;102:6,
8;103:20;112:3;
114:3;123:16;146:9;
150:3,11,13,24;
151:16;152:2;157:5;
158:21;161:8,20;
162:24,25;164:6,20;
166:13,15;171:8;
178:6;186:18;
191:12;192:3;
193:12,16;196:12,
15,22;198:12
**ex (2)**
43:8;111:16
**exact (2)**
84:7;185:9
**exactly (6)**
14:7;43:19;44:4;
125:7,7;183:7
**exam (1)**
130:23
**EXAMINATION (8)**
30:1;104:12,16;
110:22;130:9;
135:10;155:1,4
**examine (1)**
6:5
**examining (1)**
94:4
**example (6)**
18:8;19:25;99:6;
117:20;164:14;
195:3
**exceeds (1)**
130:22
**except (2)**
122:15,18
**exception (6)**
31:7;162:10,19,
23;186:13;198:22
**excess (2)**
85:9;191:25
**exchange (8)**
69:13,19;70:6,10,
21,22;71:3,5
**exclude (3)**
113:12;122:25;
152:6
**excluded (4)**
44:19,20;84:25;
162:24
**exclusively (1)**
112:1
**excuse (6)**
7:8;8:4;13:14;
14:12;126:10;
199:13

**excused (10)**
12:25;13:11,19,
25;14:13,22,23;
31:14;133:15;
157:17
**excuses (1)**
14:17
**execute (2)**
102:15;118:12
**executed (3)**
72:4;161:10;
193:25
**execution (1)**
36:24
**executive (1)**
79:18
**exhibit (60)**
33:1,2,6,24,25;
36:8,10,20;38:15,20,
23;53:3,3,12;54:7,
16;55:15,22;69:10,
12,18,23;70:5,11,16,
23,23;71:2,6;99:19,
21,22,24;100:3,10,
14;101:22;102:3,8;
150:3,7,13,24;164:4,
5,25;165:8,20;
166:11,15,17;
167:12,15;174:18;
182:20;183:5;
184:15,16;186:12;
193:12
**exhibits (20)**
19:3;31:22;32:24,
25;33:3,5,13;36:3;
47:20;53:20;61:23;
62:2;69:11;82:13;
162:24;167:7;186:5;
187:5;196:21;198:5
**exist (1)**
47:1
**existence (5)**
13:11;22:15;57:3;
148:12;176:14
**existing (11)**
47:5,25;49:5;
138:9;140:9;155:24;
156:13,15,22;172:3,
11
**expand (1)**
44:11
**expanding (1)**
84:23
**expect (2)**
192:6;194:5
**expected (1)**
169:16
**expecting (1)**
169:2
**expeditiously (1)**
158:13
**expended (2)**
74:19;187:12

**expenses (1)**
8:18
**experience (10)**
76:20;110:25;
111:3,19;124:22;
136:1,22;142:22;
143:7;148:12
**experienced (1)**
45:2
**expert (10)**
125:5,21;126:19;
136:2,7;137:15;
151:7;157:22;
198:20,22
**expertise (1)**
149:20
**expiring (1)**
131:12
**explain (4)**
37:17;55:23;
94:18;130:19
**explained (3)**
49:3;169:4;182:17
**explaining (3)**
32:24;33:22;40:14
**explanation (3)**
47:18;50:7;160:8
**expressed (1)**
109:22
**expressing (1)**
189:21
**expressly (2)**
156:14;188:16
**extend (1)**
89:9
**extended (3)**
89:16,17;164:23
**extent (14)**
11:19;43:3;51:19;
64:12;65:15;70:2,7;
77:7;89:13;91:13;
94:25;113:13;
140:18;183:3
**external (1)**
185:21
**extra (1)**
127:8
**extremely (1)**
176:21

**F**

**face (6)**
24:5;55:5,10;
56:24;161:19;177:5
**face-to-face (1)**
179:9
**facie (1)**
14:25
**fact (21)**
10:9;12:15;14:5;
19:17;22:19;25:11;
26:20;28:5;36:25;

37:25;38:10;59:17;
60:9;63:2;68:18;
84:12;87:23;92:5;
145:14;160:25;
178:10
**factors (1)**
98:21
**facts (13)**
6:6;12:14;21:16;
32:2;37:12,17;38:5;
39:15;78:1;125:15;
147:12;154:1;162:7
**factually (1)**
67:9
**fail (1)**
53:21
**failed (4)**
67:7;126:7;
146:20;196:13
**failing (1)**
8:19
**failure (3)**
16:15;25:24;94:9
**Fair (8)**
40:17;130:20;
131:3;139:6;141:4;
155:7;156:17;182:6
**fairly (1)**
189:15
**fairness (1)**
196:13
**fall (6)**
76:17;90:11,11;
162:23;168:4,18
**familiar (3)**
117:13;126:20;
140:17
**family (4)**
10:23;76:21;77:2;
170:9
**far (4)**
12:7;149:16;
194:3;198:1
**fault (2)**
94:8;195:2
**favor (4)**
127:19,20;128:10,
12
**favorable (1)**
175:17
**fear (1)**
180:4
**feasibly (1)**
138:11
**features (2)**
51:5;99:4
**February (9)**
96:7;129:18;
145:11;169:20;
170:6,14,20;171:11,
13
**Federal (8)**
26:13;58:22;

137:1;139:18;150:9;
159:24;161:8,20
**fee (1)**
57:19
**feel (1)**
192:23
**fees (8)**
9:16;11:15;12:5;
93:3;183:22;187:12,
17;195:19
**fell (1)**
11:1
**fella (1)**
61:17
**felt (2)**
58:7,12
**few (6)**
33:11;36:8;
119:13,13;163:15;
194:14
**FFA (10)**
15:17;16:15,17;
20:20;22:14;23:6,
18;24:1,3;131:22
**fictitious (1)**
82:5
**field (1)**
137:6
**fifty (1)**
88:8
**fight (2)**
64:9;87:19
**figurative (1)**
138:14
**figuratively (1)**
138:12
**figure (2)**
86:23;177:8
**file (25)**
18:6;19:7;20:4,6;
26:4;43:23;73:20;
112:4;114:22;
115:11,13,14,21;
116:4,9;117:2,5;
123:7,17;131:12;
145:7;149:5;160:2;
180:16;192:1
**Filed (38)**
2:3;5:21,22;16:16;
17:5;18:2;19:5,6,8;
20:15;22:5;23:17;
25:20;35:3;39:13;
41:9;42:2;48:13;
49:7;73:19,21;
92:17;93:4;105:7;
112:9;115:13;118:5;
120:11;126:5;128:6;
145:15;148:4;
156:20;166:21;
167:9;177:17;184:5,
6
**filer (1)**
149:2

**files (3)**
20:2;116:6,12
**filing (26)**
5:17;13:1;22:6,9,
11;108:5;111:20,21;
112:1;114:21;
115:18;117:2;
118:13;119:11;
120:3;130:17,21;
132:8;136:9;141:14,
20;144:1,11,20;
145:13;174:19
**fill (1)**
164:10
**filled (3)**
48:8;68:7;71:17
**filling (2)**
78:22;79:13
**final (1)**
115:23
**finalize (1)**
107:20
**finalized (1)**
107:18
**finally (3)**
88:7;92:3;95:15
**finance (1)**
147:20
**financial (8)**
44:13;74:6;84:1;
137:2;141:7;147:3;
149:4;176:19
**financing (9)**
25:4;44:24;45:8;
49:17;58:10;60:10;
65:22;66:14;138:4
**find (13)**
6:7;21:16;36:7,8;
63:19;68:18;72:1;
88:20;138:9;156:21;
166:20;167:7;
187:10
**finding (1)**
25:10
**fine (8)**
22:3;56:21;
104:18;107:3,5;
108:19;160:16;
176:1
**finish (2)**
32:21;187:4
**finished (2)**
43:10;163:12
**finishing (1)**
195:7
**fireplace (1)**
51:6
**FIRM (19)**
4:2;63:8;91:14,14;
111:12,12;114:1;
118:20;119:3;122:8,
13;128:7,20,22;
130:19;183:9,13;

184:20;185:18
**firms (1)**
151:4
**firm's (1)**
114:20
**First (46)**
5:11;14:5;15:3;
17:3;24:25;28:13;
30:5;35:15,25;36:14,
22;38:12;44:23;
46:13;50:25;56:12;
62:23,24;63:21;
67:7;69:19;81:14;
83:14;100:14,23;
101:22,23;102:22;
123:15;136:23;
146:19;153:4;
162:12;167:15;
171:3,6,10;172:5;
180:13;189:4;
190:23;192:12;
197:1,12,16;199:2
**five (10)**
10:19;43:22;
68:12;76:10;78:24;
85:13;88:6;129:12;
145:23;169:1
**fix (1)**
86:23
**fixed (1)**
29:19
**fixed/adjustable-rate (2)**
38:21;39:6
**flew (1)**
179:10
**flow (2)**
44:25;48:19
**flowed (1)**
24:15
**flyer (1)**
63:6
**focus (5)**
15:11;97:16;
103:17;104:23;
163:20
**focused (4)**
20:19,20;71:11;
92:14
**focuses (1)**
103:20
**Foerster (2)**
21:14;105:10
**Fol (1)**
72:1
**follow (1)**
105:22
**followed (2)**
112:9;118:22
**following (2)**
25:23;144:17
**follows (2)**
16:25;17:1
**Folweiler (11)**

69:16,20;71:4,19;
72:3;73:1;193:13,17,
22;194:2,11
**F-O-L-W-E-I-L-E-R (1)**
69:16
**font (3)**
160:19,20,20
**footage (2)**
51:5;168:7
**force (1)**
197:24
**foreclose (4)**
26:3;125:25;
131:4,11
**foreclosing (2)**
149:10,15
**foreclosure (165)**
5:23,24;9:5,8,17;
11:3,19,25;12:20;
13:1,5,6,16,20,21;
15:12,14,17,19;
16:18;18:2,6;19:7,
19,22,23;20:3,6,16;
21:5,11,15;22:8;
23:8,17,19,24;24:9;
25:20;26:1,1,13;
30:7;39:13,19;40:17,
25;41:5,9;42:1,13;
46:8;48:12;49:7,9;
52:11;59:6,14,18,22;
60:1;62:25;63:1;
64:8;73:1,5,23;
80:15;90:19;91:20;
92:16,21;93:2,10;
96:7,9,21;103:22;
111:20,20;112:4,12,
17;113:15,21;114:3,
7,9,19,20,22,23;
115:3,8,10,11,12;
116:5,7,12,13,17;
117:8,15,19,25;
118:2,3,4,6,21;
119:21;120:9;121:9,
20;122:21;123:11,
12;125:18,20;126:5,
14;128:5,9,18,24;
129:21;130:17,21,
21;131:3,8,10,16;
132:8,10,13;136:10;
137:12;138:6;
141:15,20;143:5;
144:1;146:24;147:1;
148:4,13;149:2;
150:8,12;151:10,12;
156:20;169:15,16;
180:14,15;183:9;
184:9,22;185:5,15,
24;197:12
**foreclosures (9)**
21:3;111:1,13;
112:2;124:22;
126:19;137:4;
138:13;140:7

**foreseeability (1)**
136:14
**foreseeable (1)**
149:4
**foreseeably (1)**
141:15
**foreseen (1)**
23:3
**forget (1)**
194:18
**forgotten (2)**
68:18;103:2
**form (3)**
31:24;32:5;90:12
**formally (1)**
49:15
**formatting (1)**
160:19
**Former (4)**
122:6,12,15;128:7
**formerly (3)**
122:9,11,13
**formulate (1)**
148:9
**forth (1)**
11:7
**forty (6)**
41:25;44:3;49:17;
50:18;60:2;97:23
**forward (10)**
19:23;45:6;79:4;
80:22;105:23;112:8;
116:16;146:23;
158:12;170:18
**found (3)**
58:12;151:9;
162:19
**foundation (3)**
54:23;100:6;
149:19
**four (5)**
88:6;111:25;
126:17;160:9,9
**four-and-a-half (1)**
126:16
**fourteen (1)**
174:9
**fourth (1)**
8:22
**frame (2)**
32:1;62:12
**Frank (4)**
2:3;4:10;125:11,
14
**frankly (1)**
10:7
**Fraud (3)**
15:11;16:14;22:9
**Frederick (1)**
4:5
**free (7)**
9:12;11:12;45:4;
46:14;76:11;138:21;

195:14

**freely (1)**
179:19

**freeze (1)**
138:19

**Friday (5)**
35:14;78:14,17;
83:1,6

**front (6)**
36:10;39:4;
113:19;127:5,6;
128:4

**fruition (1)**
103:3

**fruits (1)**
5:21

**fulfill (1)**
14:25

**full (6)**
29:6;84:6;86:21;
134:7;191:20,20

**fundamental (1)**
37:3

**funding (3)**
45:9;121:25;
122:21

**funds (5)**
24:14;25:5;77:1;
78:21;193:20

**further (11)**
31:10;66:6;107:9;
109:9;129:13;
154:24;155:1,21;
157:18;176:10;
180:14

**future (1)**
80:17

## G

**game (1)**
73:13

**gaps (2)**
7:7,8

**gather (1)**
170:7

**gave (14)**
16:17;20:21;49:8;
63:24;64:24,24;
67:18;68:8;76:6;
84:11;86:25;87:21;
88:17;185:6

**general (2)**
140:16,19

**generally (1)**
122:17

**generic (1)**
163:9

**gentleman (3)**
64:7;81:3,12

**gets (1)**
162:11

**gist (1)**

46:18

**given (9)**
12:19;21:23;
23:14;54:18;79:5;
131:23;132:25;
145:5;183:25

**gives (3)**
56:2;131:7;191:17

**giving (2)**
132:19;184:18

**Glenn (1)**
105:5

**GMAC (49)**
11:9,21;12:3;
13:21;15:13,23;16:7,
20;17:9;18:19,24;
19:6,12;20:5;21:10;
28:7;62:22;63:15,
20;66:23;67:16;
69:14;77:11;121:23;
122:4,20;126:7;
136:15;141:1;149:9,
9,10;151:4,8,17;
157:21,22;163:20;
166:22,23;170:11;
176:13;177:11,19;
183:14,18,23;184:3;
188:14

**GMACM (46)**
13:14;14:13;
15:16,17,23;16:4,14,
16;18:6,12;20:20;
23:11,13,19,24;26:2,
6,12,24,25;27:4,6,10,
16,19;28:2;90:17;
91:1;92:19,22;94:8,
10,20;96:17,20;
97:17;103:19;
113:16;123:1;152:4;
170:5;177:17,24;
178:6;179:6;193:7

**GMAC's (4)**
123:12;136:11;
149:13;151:10

**goes (9)**
25:17,18;80:6;
87:17;113:10;116:6,
17;145:19;162:3

**Goldberg (1)**
183:9

**good (7)**
61:1;80:3;98:8;
105:9,13;120:19;
152:17

**good-faith (1)**
79:5

**Gordon (1)**
85:22

**government (3)**
82:6;149:11;151:5

**graduate (1)**
124:11

**graduated (1)**

124:12

**Graham (1)**
36:4

**grandmother (1)**
77:14

**granted (4)**
115:22,22;116:20;
118:6

**great (4)**
84:14;184:24;
190:8;194:3

**ground (1)**
121:6

**grounds (2)**
196:2,3

**guess (15)**
6:5;51:3;62:22;
68:16;71:20;86:10;
100:17;111:18;
174:12;180:9;
186:17;187:22;
188:17;191:2;
196:19

**guy's (1)**
87:12

## H

**Hager (183)**
6:13,15,17,17;
7:16;8:3,4,7,9;11:24;
12:18,21;13:8,17;
14:2,20,24;15:9,19;
16:6,20;17:2,10,13,
17,22,25;18:5,11,13,
21,23;19:1,9,16;
20:8,13,17;21:7,13,
20,23,25;22:2,4,22;
24:13;26:9,10,15,17;
27:2,5,7,12,17,21,23;
28:1,5,11,12;30:10,
17,19;31:13;32:3,15;
34:22;35:5,6;36:18;
37:22;38:19;41:24;
42:25;43:3;46:17;
47:19;48:23;51:19;
52:4;53:8,9;54:7,22,
23;58:1;62:1;64:12,
18;67:13;69:11,25;
70:1,15,25;71:1;
77:7;89:13;91:25;
92:9;95:4;98:25;
99:25;100:2,3,19,21;
104:9,14,18;109:22;
112:18;113:12;
114:5,25;118:24;
119:6;120:18;122:2;
123:2,5,19,24;124:3,
5,7,8,12;127:8,13,16;
129:13;130:22;
131:25;132:1,21;
133:10,12,14;139:9;
141:8,24;143:1,10;

148:21;149:16;
150:3,6;151:13,25;
152:16;157:14;
158:14;159:1,6,18;
160:6;161:3;162:13;
163:1,6,8;164:13,24;
165:2;166:8;178:23;
179:3,7,15;186:11,
15,17;187:7;192:1;
196:7,17,18;197:14,
23;199:10,13

**Hager'll (2)**
33:4;34:1

**Hager's (5)**
32:20;43:23;
50:20;155:2;165:24

**half (3)**
9:12;26:19;44:14

**Hallinan (5)**
111:11;112:1;
121:13,16;124:21

**halt (3)**
138:7;146:13;
147:22

**Hampton (1)**
85:10

**Hana (1)**
2:20

**hand (6)**
28:21;34:14;43:9;
51:12;110:10;134:2

**handed (2)**
48:23;159:19

**handle (4)**
31:16;75:2;91:4;
101:5

**handled (3)**
98:11;128:2,7

**handling (1)**
96:8

**handwritten (1)**
56:13

**hanging (1)**
138:12

**happen (7)**
49:20;61:3;78:6;
87:17;144:6,8;
179:15

**happened (25)**
5:25;52:16;57:21;
58:14;59:18;60:25;
61:4;62:3,9;85:20;
94:18;103:8,8;
113:20;147:15;
156:24;174:22;
175:5,8,8;176:4;
183:17;188:9;194:6;
195:12

**happening (2)**
81:2;139:7

**happens (8)**
35:24;86:19,24;
87:24;89:6;116:10,

18,22

**happy (3)**
74:4,6;105:18

**hard (1)**
78:15

**harm (3)**
141:15,20;151:24

**harmful (1)**
144:1

**head (6)**
78:1;97:8,12;
126:18;129:9;
166:19

**heading (1)**
76:17

**hear (16)**
10:1,11,18;26:11;
35:18;68:23;80:4;
94:25;95:1;131:1;
145:18;147:19;
152:9;193:6;194:5,
12

**heard (12)**
19:2;23:10;30:8;
63:21;67:2;80:16;
81:15;107:17;
146:21;189:1;193:8,
16

**hearing (11)**
6:21;15:21;16:2;
103:11;105:7;
107:17,18,21,22;
108:2,17

**hears (1)**
116:14

**hearsay (21)**
30:19;31:3,7;56:5;
57:16;64:14;77:8;
89:14,14;100:9;
161:18;162:10,20,
22,24;172:22;
186:12,13;188:17;
196:3;197:3

**heart (1)**
86:23

**heightened (1)**
151:24

**held (5)**
18:8;23:13;79:7;
83:25;88:2

**help (4)**
52:24;54:2;
103:17;164:17

**helped (1)**
165:24

**helping (1)**
167:14

**Hendricks (16)**
6:22;133:21,22,
25;134:9,11;135:12;
136:20,21;138:1,16;
139:14;141:14;
143:7;144:10;151:3

**H-E-N-D-R-I-C-K-S (1)**
134:10

**Henricks (1)**
103:24

**hereby (8)**
38:22;53:11;
55:19;71:5;102:7;
150:13;166:14;
189:5

**here's (5)**
66:1;94:6;158:10;
170:22;177:16

**Hi (1)**
120:20

**higher (3)**
44:9;169:10;177:6

**himself (1)**
81:6

**hired (2)**
91:4,5

**historical (1)**
50:10

**history (1)**
28:2

**Hmm (1)**
38:3

**Hogan (2)**
130:1;131:23

**Hogan's (2)**
129:15,16

**hold (12)**
12:5;29:15,15,15;
30:16;43:9;79:6;
90:19;106:20;126:7;
190:2;193:20

**holder (3)**
16:22;19:13,15

**holding (1)**
11:7

**holidays (2)**
87:15;88:19

**home (6)**
29:9,10;62:11;
79:25;135:20;142:1

**Homecomings (3)**
84:1;91:15;183:14

**homes (6)**
42:20,21;76:21,21,
23,23

**Homewood (2)**
85:11,11

**Honor (188)**
5:7,11;6:15,19;
7:1,5,10;8:4,10,11;
13:9,17;14:2,20;
15:9;17:10,13,25;
18:11,13,21;19:1;
21:7,13,20;22:4;
27:17,21;28:12,14,
17;29:14;31:6,13,16;
33:15;34:7,25;35:6,
9;36:1,18,22;38:19;
40:6;41:12,20;

42:14;43:16;45:23;
46:22;47:16;48:1,6;
51:19,24;53:5,7,9,
13;54:23;55:4,9;
56:24;58:22;59:20;
64:6,12,25;65:2,8;
66:16;67:5;68:2;
70:1;19;71:1;74:10;
77:17;78:4,8,23;
80:14;81:17,25;84:5,
22;86:9;87:4;89:13;
90:6;91:3,19;93:5;
96:4,22;98:14,25;
100:12,24;102:20;
103:1;104:14;105:9,
13,18;106:8,9,14;
107:3,5;108:15,19,
25;109:2,9,19;
120:14;122:2;
123:19,21;127:11;
130:16;132:1;
133:12,19;134:19,
20;141:13;142:15;
143:15;148:10,16;
149:21,23;150:2,6,
15;152:8,12;155:21;
157:14;158:20;
159:6,12;163:1,3,4,
8,23;164:2,15,24;
165:7,12;166:8,18,
20;167:3;169:14,21;
170:8;171:13;
174:23;178:2,9,15,
19;182:4,16;183:1,6,
24;184:2,14;186:7,
10,11;187:16,19;
188:22;189:1,23;
192:10,22;194:13;
199:5,10

**Honor's (2)**
19:10;28:1

**hope (6)**
105:24;107:20;
108:8,21;178:3,7

**hopeful (1)**
106:16

**hopefully (1)**
104:21

**hoping (1)**
158:6

**horrible (3)**
94:8;190:7,8

**hotel (4)**
86:20,22;88:19;
192:7

**hour (3)**
63:25;80:6;194:2

**hours (3)**
7:2;93:25;185:1

**house (70)**
10:18;11:12;25:3,
11;26:22;30:7;
41:23;44:6,22;45:6,

16;49:14;51:15,17,
18;52:21;59:1;
74:18;78:9;81:5,10,
12;84:8;86:12,15,23;
88:2,18,19,22;90:10,
16,19;95:15;97:18,
25;98:23;99:6,9,10,
11,12;136:14;
137:22;142:1,10;
154:4;167:20,23;
168:7,10,13,19,20;
174:4;175:19;
178:18;180:11,22;
181:5;182:13;
187:24;188:2,3;
189:2,4,6;190:23,24;
194:24

**housekeeping (1)**
34:25

**houses (5)**
98:9;99:8;168:18;
176:20;177:5

**HQ (1)**
193:24

**huge (1)**
12:8

**hundred (1)**
139:12

**hysterical (1)**
80:8

# I

**idea (5)**
24:20;25:24;
59:22;87:4;129:22

**identification (1)**
195:24

**identified (4)**
81:6;178:7;196:8,
23

**identify (2)**
198:2,5

**illegible (2)**
100:16;101:25

**illiquid (1)**
89:11

**imagine (1)**
87:12

**immediately (5)**
97:19,25;107:22;
117:4;140:14

**imminently (1)**
39:21

**impact (8)**
136:13;137:5,21;
144:8,11,18;152:4;
189:14

**impacting (1)**
176:7

**impediment (1)**
154:12

**import (3)**

16;49:14;51:15,17,
(continued)

**57:**12;72:19,20

**important (2)**
142:1;167:3

**impossible (3)**
10:15,16;98:3

**impression (1)**
100:5

**improper (2)**
21:18;113:17

**improve (2)**
42:16;44:11

**improved (1)**
44:24

**inability (1)**
8:13

**inadmissible (2)**
151:14,18

**inappropriate (1)**
143:19

**include (5)**
53:3;70:18;112:6;
115:25;116:1

**included (3)**
42:19,21;114:18

**includes (2)**
70:16;100:4

**including (4)**
25:8;40:16;
137:10;145:21

**income (2)**
84:17,18

**incomplete (1)**
70:3

**incorporating (1)**
40:16

**increasing (1)**
84:23

**incurred (4)**
11:19;12:5;
187:13,18

**indeed (1)**
37:1

**independent (2)**
26:13;39:14

**indicate (4)**
17:7;55:1;92:15;
192:2

**indicated (13)**
31:19,23;37:24;
46:18;56:2,10,11;
57:17,19;126:6;
134:13;196:6;197:1

**indicates (4)**
56:1;139:11;
155:6;194:7

**indicating (1)**
32:7

**indication (1)**
191:18

**individuals (2)**
60:8;139:23

**indulgence (1)**
157:21

**industry (7)**
124:24;140:6,17,
25,25;143:5;151:12

**inference (1)**
189:25

**Infinity (1)**
79:6

**information (22)**
57:7;63:22,24;
118:13;122:14,17,
18;131:7;136:12;
137:2,9,11,12,13,15;
139:24;140:5,13,19;
144:19;161:24;
165:14

**informed (1)**
29:1

**inherently (1)**
14:6

**in-house (1)**
111:10

**initial (3)**
81:4;92:9;115:25

**initially (1)**
98:10

**initiated (1)**
131:8

**injurious (1)**
23:3

**Inn (1)**
85:10

**inquire (3)**
31:2;99:13;143:21

**insist (1)**
155:24

**inspections (1)**
62:11

**instance (1)**
15:3

**instead (3)**
12:2;35:2;175:21

**institution (2)**
58:7,9

**instructing (1)**
30:25

**instrument (1)**
37:4

**instrumental (1)**
10:6

**insurance (2)**
171:11,12

**intend (1)**
32:12

**intended (4)**
97:2,4;179:24;
180:20

**intending (2)**
27:19;163:17

**intends (1)**
6:23

**intent (7)**
31:7;101:11,13,
15;131:4,11;183:18

**intention (2)**
31:19;196:12
**interactions (1)**
42:2
**Interagency (1)**
150:8
**interest (11)**
9:3,7;11:13;17:7;
24:6;43:19;74:2;
122:5;167:21;172:6;
185:22
**interested (8)**
60:6;115:16;
140:4;145:20;
174:14;181:5,8;
182:12
**interesting (3)**
9:11;49:14;72:2
**interest-only (3)**
37:25;38:22;39:8
**interests (1)**
122:10
**interfered (2)**
157:12;188:14
**interference (6)**
6:2;187:22;188:8,
10;194:25;195:12
**interplay (1)**
44:4
**interpretation (1)**
155:7
**interrupt (1)**
47:18
**interruption (1)**
48:19
**into (50)**
11:1;19:20;24:17;
29:21,22;33:24;
34:4;38:22;39:22;
45:6,9;53:12;55:20;
62:4;71:5;74:1;
76:18;78:1;80:7;
85:7;86:22;99:25;
102:6,7,10,13,16;
114:14;118:4;144:3;
145:19,20;146:9,19;
150:3,11,13;164:6,
20;166:15;170:17,
17;175:4;176:12,18;
178:6,14;180:4;
196:15,21
**Intragency (1)**
150:12
**introduced (3)**
164:4;178:6;
193:12
**investigate (2)**
176:15,16
**investigated (2)**
149:11;172:13
**investigation (1)**
151:5
**Investment (1)**

42:23
**invoice (1)**
187:14
**invoices (2)**
11:15;187:14
**involve (2)**
137:1,3
**involved (15)**
21:10,11,14;
60:10;74:2;93:14,
15;112:11;126:18;
148:19;152:24;
153:1,5;181:22;
185:20
**involves (1)**
115:17
**involving (6)**
48:9;137:15;
144:18;152:23;
153:1,3
**ironically (1)**
49:20
**irregularities (1)**
151:9
**issue (27)**
13:19;15:21,24;
16:7,8;19:16,20;
22:18;23:4,6;24:1;
26:2;37:21;58:5;
65:8;70:4,9;71:20;
91:7;123:8;129:19;
145:8,10;160:13;
185:19;197:3;
198:17
**issued (1)**
118:20
**issues (10)**
8:9;9:8;58:3;
65:13;74:6;92:14;
136:24;175:2;
176:19;190:6

---

## J

**jacket (1)**
34:8
**Jacobs (7)**
10:23;44:1,2;54:4;
58:25;59:2;99:5
**Jacobses (26)**
25:1,2,6,10;44:15;
48:15;49:4,6,14,15;
50:8,13,22;51:15,20;
52:8,13;53:4,11;
57:22;58:12;59:9;
60:8,19;94:9,10
**Jacobses' (8)**
25:5;42:5,6;50:14,
19;58:8;163:14;
188:12
**jail (3)**
90:7;138:14,15
**jammed (1)**

86:22
**January (6)**
86:6;88:13;89:2,3,
23;111:14
**Jeffery (2)**
91:12;93:9
**Jeffrey (1)**
182:20
**Jersey (33)**
6:4;16:25;18:1;
22:16,25;24:8;
29:11;58:11;63:1;
75:1;88:16;111:12;
113:15,22;114:18;
115:8;117:7,13,16,
24;119:17;121:11;
123:11;125:1;
126:19;129:11;
130:20;145:9;153:2,
4;175:11,21;190:20
**join (1)**
40:22
**joined (1)**
40:22
**judge (18)**
91:8;96:14;105:5;
116:14,16;117:10,
14;118:1,9;125:20;
129:14,16;130:1,12;
131:23;136:24;
179:22;185:20
**judgment (18)**
25:13;112:10;
115:23;116:2,3,4,19;
117:23;127:19,20;
128:1,10,12,19,23;
130:2,4;184:7
**judgment's (1)**
116:20
**judicial (1)**
40:22
**July (13)**
7:5;36:15;61:16;
125:7,8;159:4;
160:13,18,22;
161:18;162:6;
193:16;196:19
**jumped (2)**
20:23;95:14
**June (7)**
61:16;100:16;
101:23;165:10,17;
166:11,14

---

## K

**Karen (1)**
186:3
**Kate (1)**
199:14
**Kay (3)**
23:1
**keep (4)**

35:16;43:1,10;
178:11
**Kelly (1)**
120:23
**Kentucky (3)**
175:13,23;176:3
**kept (5)**
24:24;54:20,20;
68:21;161:25
**Kevin (3)**
4:3;105:8,14
**key (2)**
95:10;162:5
**kicked (2)**
146:12;157:11
**kids (3)**
80:9;85:13;87:6
**kind (16)**
64:25;76:10,15;
77:20;91:13;96:13;
99:2,4,5;120:11;
136:13;137:11;
141:5;176:17;191:1;
192:2
**kitchen (1)**
30:8
**knew (7)**
44:17;77:12,13;
86:10;139:25;181:4;
183:16
**knowing (3)**
44:13;78:25;140:4
**knowingly (1)**
122:7
**knowledge (16)**
41:13;55:16,20;
56:16;57:17;77:10;
137:6,14,15;140:3;
144:17,21;161:24;
162:9;172:12;179:7
**known (1)**
122:17
**knows (1)**
185:20
**Krisden (2)**
184:20;187:3

---

## L

**lack (2)**
23:17,18
**lady (1)**
63:11
**land (2)**
118:15;128:6
**Landing (1)**
29:11
**language (2)**
59:15;188:5
**large (1)**
62:14
**larger (1)**
121:8

**Las (1)**
83:23
**last (10)**
9:12;48:7;65:9,10;
68:11;105:21;154:3;
159:11;160:22;
193:15
**late (2)**
83:6;183:9
**later (6)**
68:6;88:21;130:3;
145:16;165:19;
194:2
**Lauren (1)**
36:4
**LAW (26)**
4:2;6:1;18:1;
20:10,15;22:16;
23:23;30:25;41:2;
48:22;63:8;93:7,14,
15;111:6;114:1;
123:8;124:9;126:16;
128:20,22;134:24;
137:9;182:20;
198:14,18
**lawfully (1)**
161:10
**lawsuit (5)**
115:17;177:17;
179:6,11;180:13
**lawyer (25)**
31:25;37:19;42:2;
53:20;63:9,10;73:4;
74:21;93:6;95:3;
96:17,17,18,21,25;
111:5,6;122:7,9,11;
138:20;184:6,7,8,8
**lawyers (10)**
42:3,4;53:19;
91:19,21;92:15,16,
20;96:6;156:7
**lawyers' (1)**
93:3
**lay (2)**
100:6;192:7
**Leading (9)**
112:18;114:5,25;
118:24;139:9;140:8;
141:8;143:1,10
**leak (1)**
84:14
**leaning (1)**
66:5
**learn (2)**
101:4;139:23
**lease (2)**
82:8,18
**leases (2)**
121:6,6
**least (7)**
8:17;28:2;67:2;
88:10;129:25;194:9;
199:4

12-12020-mg    Doc 7766-25    Filed 11/17/14    Entered 11/17/14 19:14:16    Sept. 15
RESIDENTIAL CAPITAL, LLC et al.
Case No. 12-12020-mg

2014 Hearing Transcript    Pg 217 of 232

September 15, 2014

**leave (3)**
103:13,15;121:13
**leaves (1)**
7:4
**ledge (1)**
135:1
**leeway (5)**
37:18;39:17;
43:13;132:19;133:1
**left (4)**
25:14;59:11;
63:10;195:5
**leg (1)**
162:12
**legal (17)**
11:6;12:7;35:10,
14;37:7,13;39:17;
42:2;57:12;80:25;
113:20;114:22;
120:23;187:12,17;
195:19;197:19
**legally (2)**
67:8;72:2
**LEGG (1)**
4:2
**lend (1)**
145:22
**lender (18)**
37:5;40:21;113:6;
114:7,11,13;131:6;
132:12;138:7;141:1;
143:7,25;145:22;
146:2,3,5;147:4;
153:21
**lenders (3)**
111:13;121:17;
145:21
**lending (1)**
153:21
**length (2)**
70:17;71:3
**less (3)**
184:21;191:21;
195:1
**lessening (1)**
195:20
**letter (40)**
33:1;45:18;48:23;
100:4,7,9,14,15;
101:10,23;131:4;
138:13;139:3;159:2,
4,4,7,8,17,18;160:2,
7,13,13,15,18,19,21;
161:16,17,18;162:9;
174:17;196:19,19,
20;197:5,8,9,9
**letters (15)**
35:10;159:11;
160:25;161:6;162:5,
5,8;163:5;183:10;
196:15,18;197:2,25;
198:5;199:3
**letter's (1)**

**160:16**
**letting (3)**
95:7;97:22;131:5
**liability (4)**
5:22;22:20;23:22;
57:8
**liable (2)**
11:8;12:5
**licensed (1)**
121:11
**lien (6)**
83:14;154:16,20,
21,21;155:6
**liens (15)**
10:5,14;46:16;
84:8;137:4;148:24;
156:9,13,15,22;
171:2,2,5;172:4,12
**life (4)**
76:12;86:22;
94:14;175:18
**light (4)**
22:8;58:6;65:23;
66:18
**liked (2)**
51:1;98:24
**likely (3)**
139:11,13;149:3
**limbo (2)**
180:12,14
**limine (3)**
113:12;122:24;
137:18
**limited (10)**
55:16,20;57:17;
91:13;93:10,10,24;
103:24;132:21;
170:2
**limits (1)**
137:22
**Linda (4)**
91:11,12;185:11;
187:2
**line (4)**
46:14;59:23;
80:19;121:14
**lines (1)**
166:25
**lingering (1)**
49:12
**lion's (1)**
93:12
**liquid (1)**
89:12
**liquidate (2)**
183:20;189:15
**liquidity (1)**
81:1
**lis (81)**
15:12;100:18,19;
102:4,7;111:21;
114:22;115:14,18;
116:22,25;117:5;

**118:11,12,13,22;**
119:3,11,17;120:8,
12;125:19;126:10,
20;127:18,21,25;
128:6;129:3,4,7,8,
10;130:1,5,14,18;
136:10;138:2,6;
139:6,8,16,22;141:3,
4,14,20;142:2;143:8;
144:11,20;145:2,13,
15;147:22;148:13;
149:2;152:3;153:2,3,
7,9,15,19,20,23;
154:1,5,16,19,21,21;
155:6;156:5,20;
157:1;176:14;
189:13;195:14,16
**list (12)**
5:3;56:6;98:1,4,
13,13;99:12;163:7,9,
9,10;196:25
**listed (10)**
36:11;43:24;44:6;
59:17;61:10;97:25;
98:12;163:5,6,8
**listen (3)**
43:7;190:18;
198:10
**listening (1)**
101:8
**listing (6)**
10:19;58:18;
59:15;61:8,9;99:3
**litigated (3)**
12:3;13:20;58:5
**litigation (12)**
50:12;57:23;58:6;
142:23;143:9;
153:11;155:8;175:2;
176:13;177:10;
191:23;193:4
**little (15)**
9:16;37:18;63:4,4,
4;75:6;76:15;80:1;
85:12,13;86:22;
95:14;106:8,10;
124:14
**live (6)**
42:21,23;78:15;
79:2;135:22;139:14
**lived (2)**
37:17;44:17
**lives (1)**
11:12
**living (7)**
8:18;9:12;11:12;
44:11;85:10,10,12
**LLC (1)**
2:21
**loading (2)**
74:18;75:18
**loan (31)**
9:7,9,9,22,23,24;

**12:25;14:17;20:1;**
46:20;47:20;57:3,5;
141:2;147:20;
153:18,23;160:10;
162:18;167:19,20;
170:12,17;177:24;
193:1,8,11;194:6,8;
197:7,10
**loan-application (1)**
9:21
**local (1)**
62:18
**located (3)**
115:15;116:21;
118:16
**locks (1)**
138:18
**lodge (1)**
109:23
**logical (1)**
152:5
**long (13)**
43:24;65:9,10;
68:11;73:20;77:15;
78:9;108:1;121:3;
129:10,23;146:2;
177:7
**longer (4)**
11:9;76:19,20;
194:1
**look (28)**
32:19,21;35:16;
39:11;47:9;55:9;
64:8;70:11;72:11;
77:2;87:3,14,15;
114:10,12,14,17;
119:25;131:21;
140:1;145:7;160:5;
164:18,21;165:1,15;
166:9;182:19
**looked (5)**
17:19;19:3,4;
20:24;74:11
**looking (12)**
37:21;38:5;54:2;
65:20;67:3;72:1;
99:19;102:22;133:5;
147:20;149:6;187:9
**loop (1)**
105:24
**loss (1)**
26:25
**lost (3)**
9:13;146:25;
192:23
**lot (13)**
18:17;54:2;86:15;
99:6;106:25;137:6,
13,15;146:21;
149:10;152:23;
190:7,8
**lots (2)**
149:10;168:12

**12:25;14:17;20:1;**
**Louise (2)**
6:23;99:10
**Louisville (5)**
175:13,23,25;
176:2,2
**lounging (1)**
65:10
**love (2)**
86:9;158:9
**lower (5)**
20:17,19;51:5;
61:7;126:7
**lowered (1)**
74:4
**lunch (8)**
29:2;92:8;93:20,
21;95:9,11;134:13;
163:13

**M**

**mail (3)**
68:6;76:13,16
**mainly (1)**
140:18
**maintained (1)**
59:13
**maintenance (1)**
111:21
**major (2)**
140:6;154:15
**majority (2)**
98:8;152:21
**makes (2)**
57:6;142:3
**making (7)**
10:15,16;43:1;
50:25;112:7;162:2;
170:5
**man (3)**
10:24;81:5;87:5
**manage (1)**
121:8
**managed (1)**
121:20
**Management/Scheduling (1)**
2:6
**many (7)**
47:12;63:15;
98:17;99:7;137:3;
151:4;197:19
**March (6)**
96:7;111:10,14;
121:4;164:9;165:16
**Mark (4)**
10:24;61:17;
69:16;74:17
**marked (3)**
38:15;92:14;
195:24
**market (37)**
6:3;8:16;10:19,21,
22;43:18,21;44:17;

45:4;59:8;60:5,6,15;
76:20;97:19;98:23;
99:8,11,12;144:11;
153:7;168:5;174:3,
9;178:13;180:22;
189:14,16,18,22;
190:7,7,19;191:12,
16,18;195:14
**marketing (1)**
44:13
**Maryland (2)**
135:22;139:14
**matches (1)**
118:14
**material (4)**
51:3;58:8;78:15;
134:21
**materially (1)**
122:10
**materials (1)**
67:18
**Matlack (5)**
6:3;8:13;45:14;
46:5;194:24
**Matt (3)**
73:12;91:11;92:1
**matter (37)**
15:21;20:4,5;
36:24;41:11;51:10;
55:17,21;56:1,8;
57:15;63:2;68:18;
75:25;77:10;80:15;
92:9;105:2,2;107:12,
13;108:3;118:22;
122:8,12,13;129:15;
131:22,24;155:12;
162:12;178:10;
180:24;181:6;191:2,
14;198:1
**matters (5)**
106:25;113:15;
136:2;152:21;153:1
**Matthews (6)**
2:7;4:3;105:2,8,
14;109:6
**May (39)**
12:18;30:14;32:3,
7;36:14;40:21;44:5;
48:8;54:7;55:4;63:3;
64:6,16,16;78:2;
79:11;92:25;94:13;
100:24;102:5,5;
105:8;107:10;
109:22;115:16;
117:20;124:13;
139:15;140:4;
145:15;148:18;
150:15;152:4;159:5;
167:9,11;181:15;
192:1;198:12
**maybe (13)**
26:11;30:5;42:16;
43:20;61:15;62:13;

63:25;77:21;81:16,
16,17;172:6;183:21
**Mays (1)**
29:11
**McCaffrey (1)**
55:1
**McCrink (18)**
73:12,12;74:21;
91:6,8,11;93:14;
96:8,14;184:9,10,12,
17,19,20,21;185:19;
187:3
**McCrink's (1)**
92:1
**MD (1)**
4:5
**mean (66)**
7:11,13;13:2;
14:15;19:2;21:17;
37:15,16;38:24;
39:18;43:1;60:23;
65:10;69:2;71:11;
73:10;74:4;78:6;
81:8,9;83:19,20;
86:13,15;87:3,4,5,
11;89:11;92:10;
94:6,7,9;95:22;
96:24;98:8,16,16,20,
20;104:6;107:14,24;
144:23;145:25;
154:13;164:9;
165:22;169:3;
172:17;174:23;
180:24,25;184:25,
25;185:1;189:7,21,
22;190:13,16,23;
191:12;192:13,13;
195:8
**meaning (6)**
5:24;37:19,20;
42:4,15;64:9
**meaningless (1)**
13:5
**means (1)**
30:21
**meant (1)**
58:11
**meantime (1)**
80:8
**measure (1)**
99:7
**mediation (18)**
177:10,14;178:20,
22,24,25;179:2,3,5,
17,18,22,23,24;
180:1,2,7,10
**mediations (1)**
179:9
**meet (2)**
8:25;20:9
**meeting (10)**
62:14,14;63:12;
64:10;66:23,24;

67:1;68:5;73:15;
91:23
**member (1)**
124:24
**memorandum (4)**
92:13,13;123:8,17
**memory (5)**
52:10;62:24;97:6;
127:3;164:17
**Menendez (1)**
62:15
**Menendez's (1)**
62:15
**mental (1)**
171:15
**mention (2)**
40:15;193:3
**mentioned (3)**
26:22;120:21;
141:14
**MERS (12)**
17:6,7,12,14,16,
16,18,19,20,23;
23:10;24:6
**message (2)**
35:13;141:5
**messages (1)**
63:10
**met (7)**
22:7;69:14,15;
81:3,5;170:11,20
**Metrocities (1)**
18:18
**microphone (11)**
28:19;29:16,17,21,
23;34:18;65:4;66:3,
12;124:15;134:3
**microphone's (1)**
29:17
**mid-December (1)**
86:16
**middle (1)**
86:7
**mid-sentence (1)**
151:22
**midst (1)**
32:17
**might (11)**
10:17;23:5,6;36:8;
43:22;50:20;63:20;
140:11;159:15;
164:17;183:7
**million (14)**
26:19;41:25;44:3;
49:17;50:18;60:2;
76:10;102:18,19;
168:8,14;174:15;
190:24;195:3
**million- (1)**
167:18
**million-450 (4)**
167:17;169:11,12;
172:10

**million-eight (1)**
69:9
**million-nine-something (1)**
191:25
**million-one (1)**
174:15
**million-three (4)**
102:20,21,23;
167:16
**mind (17)**
42:17;49:5;51:22;
54:13;59:21;71:19;
79:6;80:5,14;96:13;
133:7;134:24;147:5;
179:20;180:3,3;
189:11
**mindful (2)**
94:21;163:19
**mine (5)**
45:10;48:18;
50:16,18;166:3
**minimum (1)**
12:19
**minute (4)**
28:18;55:10;
106:20;164:21
**minutes (3)**
33:11;194:14,15
**mischaracterized (1)**
112:21
**mischaracterizes (1)**
112:18
**misfortune (1)**
94:13
**miss (1)**
123:1
**missing (3)**
15:1;51:6,7
**misstatement (1)**
16:7
**mistaken (4)**
59:24;62:17;75:4;
168:2
**misunderstood (1)**
183:22
**mitigate (1)**
25:24
**MLS (1)**
59:11
**MM (7)**
70:5,11,16,23;
71:2,6;193:12
**MO (1)**
48:17
**modification (16)**
64:5,23;67:19;
68:9,15,17;71:14;
73:17;177:22,24;
193:1,8,11;194:6,8;
195:1
**modify (1)**
52:13
**moment (11)**

21:21;36:7;61:2;
65:2;74:3;77:17;
80:17;88:10;127:9;
164:2;170:13
**moments (1)**
36:8
**Monday (7)**
69:19;83:2,4;
106:25;159:11,14;
160:18
**monetary (1)**
183:19
**money (29)**
24:22;25:21,22;
26:24;44:24;76:1;
79:5,7,22;83:10,11,
12,13;84:1,11;85:1,
9,24;86:24;87:16,19,
20;88:5,11;89:10;
170:12;187:20;
188:1,7
**money's (2)**
87:21,22
**month (6)**
12:16;75:7;86:10;
89:10;90:12;97:23
**monthly (1)**
72:8
**months (12)**
24:20;42:12,16;
51:13,14;68:12,12;
89:9;145:16,23;
165:19;174:9
**months' (1)**
87:25
**month's (1)**
88:3
**Moorestown (6)**
6:3;85:3,19;87:10;
189:24;190:19
**moot (2)**
71:20;193:23
**more (23)**
33:16;45:3,3;75:6,
21;89:9,18,24;94:3,
12;108:12;120:15;
121:14;123:24;
136:25;140:17;
148:19;152:13;
157:22;160:9;
170:10;184:19;
194:12
**Morgan (2)**
45:19;160:1
**Morgan's (3)**
161:7,13,19
**Moriuchi (4)**
100:5,17;101:24;
102:1
**morning (18)**
35:3,13,15;48:24;
80:24;146:16,18;
148:3;177:17,23;

183:3;187:6;192:12;
196:6,11;197:16;
198:17,25
**Morrison (2)**
21:14;105:10
**mortgage (137)**
8:19;9:4;11:8,10,
11;12:1,2,15,17,19,
21;13:3,15,15;14:8,
16;15:23;16:4,21,22;
17:1,6,21;19:11,12;
23:21;26:20,21;
28:7;36:6,19;37:24;
38:6,21;39:5,6,13,
24,25;40:1,3,10,17;
41:8,9,21;44:6;
47:24;49:21;50:9;
62:13,16,19,20,21,
22;63:9,15,23;64:6,
23;67:19;68:21;
69:3;71:13;73:1,5,
17;74:7;83:13,14,18,
25;86:25;92:16,21;
96:5,20;112:5;113:3,
15,21;114:2,13;
116:1;117:25;
121:17,23;122:4,21;
123:11,12;125:19;
126:7;132:7,14;
138:7,23;142:6,8;
144:22;145:11,15,
23;146:24,25;
147:24;149:5;
155:19,23,25;156:4,
7;167:22;169:20;
170:5,6;171:2,3,6,
10,10;172:5;175:3;
176:13;180:12;
181:6;184:22;185:4,
15,24;189:12;
191:24;195:3,9,20;
197:12
**mortgagee (4)**
14:17;26:25;
155:24;156:19
**mortgages (9)**
47:6,11,25;48:11;
49:6;62:17;144:18;
156:9,22
**mortgagor (1)**
142:9
**most (8)**
16:25;23:1;81:23;
139:17;142:1;
145:25;163:9;
183:22
**mother (1)**
78:24
**motion (5)**
5:12;45:6;118:5;
122:24;137:18
**motions (1)**
113:12

**motive (4)**
31:7;101:11,12,15
**move (20)**
24:17;28:19;66:2;
78:3,7;83:9;85:7;
90:2;95:21,23;96:1;
106:19;112:8;
115:23;116:16,19;
122:2;158:12;
175:11;184:7
**moved (12)**
78:10;85:3;87:7;
98:15;113:12;
116:13;174:1;
177:12;178:14,16;
180:21;184:6
**moving (8)**
18:2;45:6;74:17;
85:15;130:17;
175:13,21;178:12
**Mrs (1)**
9:9
**much (19)**
19:17;28:11;
29:12;69:6;80:4;
81:1;86:8;92:20;
97:8;101:4;105:15;
109:11;110:17;
123:17;131:6;
133:15;134:11;
145:5;191:7
**multiple (6)**
39:9;43:19;63:25;
76:22;99:13;188:21
**Murdock (13)**
28:14,15,21,24;
29:3,6,7,22;30:6,13,
18;31:3,14
**Murdock's (1)**
31:3
**must (2)**
78:23;126:19
**myself (1)**
121:15
**mystery (1)**
149:9

**N**

**NA (1)**
45:19
**name (16)**
10:24,25;11:10;
29:6,7;63:21;67:11;
77:11;82:5;94:13;
99:18;110:13;134:8,
9;135:12;170:24
**named (2)**
81:3,21
**namely (2)**
56:8;57:15
**names (1)**
81:23

**Naoji (3)**
100:4;101:9,23
**narrative (15)**
31:24;32:5;47:18;
48:3;49:2;57:14;
58:3;69:10;71:8;
72:24;80:18;84:4;
95:5;97:15;163:18
**nation (1)**
176:18
**nature (4)**
51:6,11;68:3;
183:11
**Nayogi (1)**
169:9
**near (5)**
34:20;60:4;80:17;
161:23;162:8
**nearby (1)**
85:17
**nearly (2)**
8:18;26:19
**necessarily (6)**
76:18;98:20;
106:2;153:17,20;
181:2
**necessary (8)**
5:14;7:15;45:12;
59:12;112:3;114:3,
9;163:5
**need (38)**
19:20;29:21,22;
31:18,20;32:10,22,
22;33:3,12,13;34:8;
40:6;54:9;55:10;
65:2;66:9;75:6;
93:21;94:5,17,20,21;
103:12,16,16;
104:16,23;106:2,19;
107:24;118:5;
158:12;186:6;194:5,
12;198:9,16
**needed (9)**
15:2;48:6,21;
58:10;72:20;75:21;
76:2;91:22;182:25
**needs (4)**
8:23;51:11;
105:22;163:20
**negative (2)**
137:5;144:7
**negligence (5)**
8:21;15:10;19:25;
22:18;23:2
**negligent (2)**
22:9,11
**negotiable (1)**
37:4
**negotiate (2)**
102:24;175:6
**neighbor (3)**
168:6,10,22
**neighborhood (7)**

168:11,19,21;
176:20,21;177:6;
182:13
**neighbor's (1)**
190:24
**Neither (4)**
40:21;162:8,9;
188:12
**nervous (2)**
41:22;51:17
**net (1)**
89:16
**netted (1)**
26:19
**Nevertheless (2)**
24:22;160:24
**New (53)**
2:23;6:4;9:4;11:5,
10;16:25;18:1;
22:15,25;24:8;27:3;
29:11;52:8;57:22;
58:11;61:7,9;63:1;
71:22,23;75:1;82:8;
88:16;111:12;
113:15,22;114:18;
115:8;117:5,7,13,15,
24;119:17;121:11;
123:11;125:1;
126:19;129:11;
130:20;132:22,24;
145:9;153:2,3;
169:16;170:19;
175:11,21;180:16;
190:19;195:3,16
**news (2)**
63:4;194:3
**newsletter (2)**
137:8,8
**newspaper (2)**
63:5,5
**next (20)**
31:5,8,15;60:25;
84:19,25;85:19;
86:19;89:6;97:18;
99:16;103:8;106:1;
120:4;142:20;148:5;
149:22,25;152:10;
184:8
**next-door (1)**
168:6
**NJSA (1)**
126:20
**nodded (2)**
79:16,16
**no-duty (1)**
22:13
**nominee (1)**
17:18
**none (3)**
11:6;26:24;33:9
**nonetheless (3)**
51:8;63:7;169:3
**non-lawyer (1)**

196:14
**nonpayment (2)**
14:1,16
**nonsensical (1)**
14:16
**nonspecific (2)**
9:13,20
**nor (1)**
188:13
**normal (4)**
54:21;62:10;
86:12;117:15
**normally (3)**
44:10;84:22;147:8
**Norman (1)**
105:9
**notary (1)**
161:11
**note (52)**
11:11;15:23;
16:23;17:1,3,6,7,21,
24;18:4,8,9,14,15,16,
19,25;19:13,15,18;
23:13,14;24:6,7;
27:6,10,15,19;36:6,
18,23,25;37:1,3,24,
25;38:1;39:23;40:3;
53:15;64:11;72:2;
112:4,5;113:3,5;
114:10;116:1;
125:19;132:14;
133:6;195:4
**noteholder (5)**
12:24;18:3,8,10;
23:15
**notes (12)**
27:14,14;32:13,14,
19,20;64:2,3;87:1;
95:9;103:17;192:7,
25
**notice (44)**
12:20;13:1,4,15;
14:9,18,22;16:15,17;
20:21;23:25;24:3;
39:20;40:10,16;
41:1;49:8;55:16,20;
56:15;57:17;75:24;
77:9;88:17,17;
100:18;115:15;
120:3;126:2;131:4,
10,23;145:5,6,8;
151:24;153:9,10,10,
11;154:14,15;
160:19;196:12
**notify (2)**
138:10;140:7
**notorious (1)**
21:1
**notwithstanding (2)**
28:5;160:25
**nowhere (1)**
87:18
**number (18)**

25:8;26:21;33:1,2;
34:1;45:10;46:15;
54:14;86:11,11;87:2,
13;100:15;105:7;
115:14;117:2;166:3;
185:8

**numbers (3)**
33:2;50:18;192:10

**numerous (1)**
116:4

**NY (1)**
2:23

## O

**object (9)**
32:4,6;34:1;35:7;
159:2;179:8;186:14;
198:15,25

**Objection (80)**
2:3,7;28:10;30:10,
17;31:4,9;32:9;33:6,
7,7;34:3,3,22,23;
36:5;38:18;43:1,3,5;
51:19;53:8;54:8,8;
64:12,19;71:1;77:7;
89:13;92:25;95:5;
98:25;100:8,9,11;
101:6;102:2;109:23;
112:18;113:1,13;
114:5,25;118:24;
119:6;130:22,24;
131:2;139:9;141:8,
13,24;143:1,10;
148:21;149:16,18;
150:4,6;151:13,15,
25;152:7;159:7,16;
161:4,5,7;162:14,18,
22;166:7;178:23;
196:7,9,18,23;
197:15,25;198:13

**objections (11)**
32:4;34:2;43:2;
107:16;133:1;
143:17;159:10,15;
196:1,21;198:13

**objects (2)**
70:1;186:11

**obligated (3)**
11:9;129:3,8

**obligation (6)**
12:24;14:15,18,
22;37:4;142:9

**obligations (1)**
130:20

**observation (1)**
19:10

**obtain (3)**
49:17;58:10;114:8

**obtained (3)**
56:17;181:14;
182:5

**Obviously (9)**

7:1;12:9;14:11;
20:9;35:6;104:15;
106:15;147:11;
168:15

**occasion (1)**
87:11

**occupancy (1)**
83:4

**occupation (1)**
162:1

**occupy (1)**
84:20

**occur (5)**
67:11;79:8;
126:13;168:5;
196:16

**occurred (4)**
17:4;18:22;21:5;
188:10

**occurs (1)**
107:10

**o'clock (12)**
33:19;79:13;
103:10;104:7;105:1;
107:1,6;158:11,16;
196:11;197:22;
199:12

**Oct (1)**
81:16

**October (5)**
43:21;77:21,25;
81:16;97:24

**odd (1)**
98:18

**off (18)**
9:9,10;38:12;
59:19;83:13;84:7;
86:25;100:14;
104:21;126:17;
129:9;135:8;136:23;
171:2,5;172:3;
178:13;190:23

**offer (67)**
27:11,13,19;33:6,
10,23,24;38:12;
43:25;44:1,2;53:21;
54:7,7,14;61:14,16,
20,21,24,25;65:21,
22;66:13,13;70:21,
23;81:11,12;82:8;
98:22;99:16,25;
102:25;164:7,8,16;
165:10,16,17,20,24;
166:2,17;167:15,15,
23;168:25;169:1,10,
13;170:7;172:2,11;
174:13,14,20;176:9;
181:22;182:8,14;
186:5,9;187:5;
192:7;196:12;
198:11

**offered (5)**
33:3;53:1;57:14;

70:2;194:10

**offering (6)**
33:25;38:15;39:2;
53:6;69:23;70:7

**offers (1)**
182:9

**Office (14)**
35:15,20,21;
62:16;92:1,2;114:8;
115:9,12;129:19;
135:20;150:9,10;
165:14

**officer (1)**
161:11

**Offices (1)**
182:20

**official (1)**
53:17

**offshore (1)**
76:1

**often (3)**
7:20;115:18;153:1

**old (1)**
63:16

**once (11)**
7:22;78:21;79:22;
96:16,25;115:9,13;
146:3;177:17,19;
193:20

**one (68)**
9:3,25;10:23;
13:12;15:1;16:21;
21:2;22:4,6,23:6;
25:16;30:4;36:7;
42:21;44:24;45:7;
46:7;48:6,9;50:16;
53:14,22;69:3,3;
74:23;81:19;85:1;
86:9;92:13;98:22;
102:16;108:18;
109:18;110:2,3;
117:4,6;118:10;
119:9;128:2;134:24;
136:16;137:7;
138:13;139:19;
140:18;145:1;151:4,
6;153:4;157:18,21;
169:10,17;177:21;
178:25;179:21;
180:16;181:24;
182:3;183:14;
185:16;187:14,14;
188:15;191:4;
195:23;196:16

**one- (1)**
167:24

**ones (1)**
170:19

**one-three (2)**
167:24;168:25

**one-three- (1)**
168:25

**ongoing (1)**

187:25

**only (31)**
5:6;8:14;13:6;
17:15,19,20;23:5,6,
17;37:24;47:13,21;
53:1;65:9,10;75:24;
77:9;81:1;99:4,11;
124:21;128:3;
159:13;162:11;
171:9;180:9;192:3,
14;193:19;198:3;
199:8

**open (1)**
106:21

**opened (1)**
81:9

**opening (11)**
5:4,6;6:10,20;8:6,
7;15:5;21:6;41:24;
46:18;47:19

operations@escribersnet (1)
2:25

**opinion (13)**
113:16,20;131:20;
142:17,19;144:10,
13,14,15,16;145:18;
161:22;192:8

**opinions (1)**
147:11

**opportunity (12)**
5:5;11:25;32:21;
33:5;34:1,24;95:2;
121:14;123:16;
159:25;160:1,11

**opposed (1)**
81:19

**opposing (1)**
7:21

**opposite (1)**
8:15

**option (9)**
24:18;82:9,18;
86:1,2,3;90:12;98:1;
175:14

**options (1)**
44:24

**orally (1)**
185:14

**ordeal (1)**
91:2

**order (34)**
7:5,16,22;9:6;
22:8;41:20;104:12;
107:15;108:12;
112:3;113:2;117:10,
21;118:1,9,19,21;
119:4,8,24;120:1,2,
2,6,9;125:20;130:12;
134:14;135:5;
137:18,23;168:13;
197:22;199:2

**ordered (5)**
7:1,6;50:15,16;

78:21

**ordinarily (5)**
55:24;132:18,21;
177:14;178:24

**ordinary (2)**
161:25;198:22

**organization (1)**
162:1

**organizations (1)**
124:25

**original (16)**
18:8,16;19:13,15,
18;21:11,15;23:13,
14;48:9;74:16;
81:19;117:2;118:13;
165:16;183:8

**originally (3)**
39:12;68:4;77:19

**originating (2)**
113:6;114:13

**others (1)**
23:4

**otherwise (6)**
16:7;70:8;100:6;
122:19;127:6;
194:25

**out (56)**
7:21,24;20:23;
36:22;37:22;44:16,
24;45:3;46:13;48:8;
49:6,8,9;50:25;51:2;
57:23;64:2;67:11;
68:7;71:17,21;
77:13;78:3,9;80:9;
84:6,12;86:23;87:14,
23;88:20;89:3,23;
90:2,9;93:11;94:5;
95:7,15;98:15;
104:12;134:14;
135:5;138:9,15;
156:21;165:25;
168:9,15,24;175:11;
181:11;185:21;
188:18;197:22,23

**out-of-court (1)**
31:2

**outright (1)**
24:22

**outside (1)**
121:8

**outstanding (1)**
156:9

**over (21)**
10:18;11:13;
24:19;41:7;53:24;
66:2,5,6;84:8;87:19;
105:18;111:25;
123:16;132:22;
139:7;142:23;
162:11;164:23;
168:8,14;198:9

**Overlook (1)**
22:17

**overnighted (1)**
35:14
**overrule (8)**
34:3;43:5,12;
112:25;130:24;
151:15;162:21;
196:9
**Overruled (11)**
99:1;113:13;
114:6;115:1;119:7;
131:2;133:1;139:10;
148:22;161:8;
162:18
**overruling (1)**
107:16
**overstepping (1)**
115:6
**owe (5)**
9:3;20:2;88:3;
195:3,10
**owed (2)**
187:20;188:8
**owing (1)**
195:5
**own (6)**
18:4;26:22;39:13;
73:22;92:17;195:2
**owned (7)**
17:16;24:6;27:6,
10,19;84:17;144:2
**owner (8)**
15:23;79:17;
141:6,21;144:5;
192:9;198:19,23
**ownership (1)**
112:4

**P**

**package (3)**
64:25;67:18;
193:25
**page (8)**
56:1,12;70:2,4;
100:9,16;101:25;
102:22
**pages (7)**
70:16;71:3;
100:15,23;101:22;
102:2,6
**paid (27)**
8:16;9:9,10;11:5;
24:17,19;25:19,23;
26:9,21;56:11;
57:19;82:16,17,17,
19,23,25;86:16;
88:25;92:3,3;
170:14;171:2,5;
181:13,17
**papers (2)**
49:23;108:5
**paperwork (2)**
64:22;71:17

**paragraph (8)**
15:22;16:3;40:4,7,
10,17,20;193:23
**paragraphs (1)**
197:6
**parallel (1)**
148:24
**part (21)**
32:14;43:6;54:21;
56:9;70:21;92:12,
25;97:20;107:15,16;
114:20;131:9;
142:18;149:13;
151:18;153:13;
156:4;174:16;
190:15,15;193:2
**participants (1)**
140:25
**participate (1)**
26:12
**particular (7)**
70:4;138:1;
151:23;159:18;
168:19;176:20,21
**particularly (4)**
16:12;19:4;20:24;
145:2
**parties (11)**
7:14,14,18,20;
37:3;106:17;153:9,
11,12;154:10;178:25
**parties' (1)**
106:16
**partner (3)**
45:9;79:11;184:20
**partners (1)**
89:11
**party (15)**
7:6;12:13;13:12,
12;15:2;18:2,2;31:1;
36:25,25;60:9;74:2;
126:12;174:14;
179:21
**passed (1)**
79:22
**passing (1)**
90:7
**past (1)**
105:19
**pattern (2)**
136:12;149:13
**Pause (32)**
22:24;24:12;
36:17,21;40:5;55:3,
6;59:4;70:14;71:9;
78:12;89:7;91:18;
106:22;119:2,23;
135:4;143:12;148:7;
150:1;152:11;
163:22,25;164:12;
165:3;167:1,5,8;
177:25;187:8;
193:14;194:19

**pay (25)**
8:19;9:6;11:8,13;
12:15,24;14:15;
63:9;83:13,17;84:7;
86:7,25,25;87:25;
88:14,15;142:10;
171:10,10,11,23;
172:3,8;195:9
**paying (6)**
9:11;12:17;40:12;
58:4;60:6;85:23
**payment (19)**
24:16;68:15,21,21,
22,22;71:18,22,23;
72:7;85:25;87:25;
145:11;171:4,23;
189:7,9,9;194:9
**payments (13)**
28:3,7;41:9,13;
72:8;85:23;90:12;
147:24;169:17,20;
170:5,9,19
**payoff (3)**
155:24;156:8,21
**pejorative (1)**
97:14
**penalties (1)**
172:6
**penalty (1)**
161:14
**pendens (81)**
15:12;100:18,20;
102:4,7;111:21;
114:23;115:14,19;
116:23,25;117:5;
118:11,12,13,23;
119:4,11,17;120:8,
12;125:19;126:11,
21;127:18,21,25;
128:6;129:3,4,7,8,
10;130:1,5,14,18;
136:10;138:2,6;
139:6,8,16,22;141:3,
4,14,20;142:2;143:8;
144:11,20;145:2,13,
15;147:22;148:13;
149:3;152:3;153:2,3,
7,9,15,19,20,23;
154:1,5,16,20,21,21;
155:6;156:5,20;
157:1;176:14;
189:13;195:14,16
**pending (8)**
59:11,18;115:17;
141:3;143:8;155:12;
170:18;197:12
**Pennsylvania (1)**
125:1
**people (13)**
62:17;76:22;
81:23;90:8;93:25;
97:22;99:6,7,18;
106:2;149:10,15;

181:8
**people's (1)**
137:2
**percent (2)**
49:18;139:12
**percentage (1)**
183:6
**perfectly (1)**
197:14
**performance (4)**
12:13;13:19;
14:21;126:1
**performed (4)**
11:18;15:3;50:15;
57:5
**perhaps (5)**
12:15;16:14;
21:16;51:15;54:13
**period (12)**
10:20;11:14;
24:20;90:18,20;
91:1;149:14;151:7;
163:24;164:23;
177:4,21
**perjury (1)**
161:14
**permissible (1)**
149:20
**permit (18)**
31:23;32:2,6;
33:14;113:19;
122:16,19;123:7;
127:7;134:16;
196:10,21,22,24;
197:15,21;198:3,24
**permits (1)**
198:23
**permitted (3)**
32:13;113:14;
198:19
**person (8)**
79:18;81:19;
110:2;122:7,11;
144:2,8;182:12
**personal (6)**
41:12;137:2,11,
15;144:19;175:18
**personally (2)**
96:19;177:18
**person's (1)**
142:1
**perspective (6)**
39:1;59:9,13;60:5;
76:25;78:23
**ph (3)**
55:1;63:13;169:9
**Phelan (5)**
111:11,25;121:13,
16;124:21
**PHILLIP (3)**
4:7;105:13;107:4
**phone (4)**
79:17;87:2;158:8,

9
**photographs (1)**
99:3
**phrase (2)**
138:14;143:16
**phrasing (1)**
143:18
**physical (1)**
120:6
**physically (2)**
37:2;65:8
**Pick (12)**
58:3,4,14;71:8;
72:23;84:3;95:8;
97:13,15,16;104:16;
163:18
**picking (3)**
28:20;66:12;134:3
**piece (2)**
35:1;111:23
**pieces (1)**
161:5
**Pike (1)**
4:4
**pissed (1)**
87:4
**place (16)**
29:19;45:3;50:10;
73:18;74:1,1;
114:24;120:25;
138:19;164:23;
166:24;178:2,25;
180:13;193:19,20
**placed (2)**
150:24;193:20
**places (2)**
69:2;85:13
**plaintiff (8)**
7:23;113:4;
114:11,12,14;
119:10;129:3,7
**plan (7)**
45:3;49:5;80:19;
108:2;142:12;
193:19;198:11
**play (1)**
45:9
**played (3)**
146:13;175:19;
176:6
**pleadings (1)**
11:7
**Please (13)**
5:2;28:23;34:12,
17;43:8;105:8;
107:13;109:15;
110:12,14;115:4;
134:5;158:18
**pleased (2)**
168:22,23
**plenty (1)**
25:21
**plural (1)**

36:2
**plus (2)**
80:3;172:8
**pm (7)**
105:4,4;109:14,
14;158:17,17;199:16
**point (54)**
9:14;14:8;18:18,
24;27:20;28:1;
36:22;37:20;46:19;
47:4,19,19;52:9,10;
55:4;64:10;69:10;
71:10,10,16,21;
73:19,21;74:5;87:7,
23;89:21;92:17;
94:6;96:6,10,11;
97:16;107:8,12,19;
119:16;123:9;128:9,
12,18;143:24;
164:11;166:24,24;
167:23;170:18,20;
176:12;192:18,19,
19;193:24;197:6
**pointed (4)**
37:22;51:2;59:16;
70:15
**points (6)**
32:3;95:10;
105:22;192:8;
195:12;198:16
**Policies (2)**
150:8,12
**policy (1)**
137:9
**pop (1)**
78:1
**portion (5)**
32:8;70:8;98:8;
151:20;164:6
**posi (1)**
27:9
**position (18)**
13:19;19:11,19;
20:7,9,11;22:10;
26:6,17;27:7,10;
52:23;54:1;58:25;
59:19;63:8;93:2;
175:21
**positioned (1)**
13:21
**positions (1)**
175:16
**possession (3)**
83:4;90:4;189:3
**possibility (1)**
48:11
**possible (5)**
67:19;138:11;
154:11;193:3;
195:13
**post (1)**
59:21
**post- (1)**

23:7
**post-dated (3)**
21:1;23:7,8
**post-trial (1)**
123:7
**potential (8)**
153:14,14,17,21,
24,25;154:9;155:6
**power (1)**
191:9
**practice (18)**
75:1;103:22;
111:8,9;113:15,21;
114:20;119:16;
121:11;123:10;
126:16,18;132:12,
14;136:12;140:6;
149:13;162:3
**practiced (2)**
111:11;112:1
**Practices (2)**
150:8,12
**pre (1)**
59:21
**precedent (1)**
126:2
**preclude (2)**
153:21;160:23
**precluded (1)**
179:1
**precludes (1)**
153:17
**predecessor (1)**
49:25
**pre-empt (1)**
139:19
**prefer (2)**
29:9;135:21
**pre-filing (1)**
131:9
**prejudice (7)**
15:15;16:10;
19:20;116:23,25;
117:22;131:24
**preliminary (2)**
8:9;123:24
**pre-mark (1)**
46:19;47:9
**pre-marked (4)**
31:22;33:9;47:20;
186:8
**preparation (4)**
111:20;119:10;
130:17;150:19
**prepare (3)**
115:11;121:6;
147:7
**prepared (6)**
6:19;45:10;54:25;
55:2;106:18;153:6
**preparing (1)**
121:7
**preponderance (1)**

8:21
**prerequisites (1)**
22:6
**presence (1)**
31:3
**present (5)**
7:7;64:20;80:12;
115:24;122:12
**presentation (1)**
188:6
**presented (5)**
5:12;15:24;24:8;
77:1;162:13
**presently (4)**
9:3,4;120:21;
121:11
**presents (2)**
80:11;117:22
**preserving (1)**
43:11
**president (1)**
79:10
**pressure (1)**
60:1
**presumably (1)**
11:16
**pre-trial (6)**
9:5;92:13;99:25;
100:3;108:5;194:17
**pretty (11)**
34:19;59:5;62:12;
64:25;68:3;88:16,
17;107:19;108:3;
169:8;177:12
**prevail (1)**
28:9
**prevented (1)**
157:11
**preventing (1)**
146:14
**previously (7)**
15:21;26:22;
31:23;35:8;122:9;
159:25;195:24
**price (18)**
10:19;41:25;
44:10;50:23;59:25;
60:9;61:1,7,8,9;62:6;
74:4;98:13;102:17,
24;175:20;177:5,6
**prima (1)**
14:25
**primarily (1)**
96:8
**primary (2)**
48:4;197:7
**principal (2)**
42:8;43:14
**principle (4)**
101:11;107:9,13;
108:11
**prior (17)**
6:20,24;28:2,6;

43:4;50:5;59:13;
79:3;111:11;122:3,
25;126:4;131:12;
152:21;191:1;193:4;
198:18
**private (2)**
22:14;145:21
**privilege (1)**
169:24
**Pro (6)**
4:10;5:3;7:14;
31:1;52:25;53:25
**probably (4)**
86:12;107:22;
146:1;162:18
**problem (9)**
19:21;54:15;
65:17;80:15;154:15;
176:24;177:1,3;
189:12
**problems (1)**
151:11
**procedure (4)**
117:14,16;131:9;
159:24
**procedures (1)**
133:4
**proceed (20)**
15:13;16:8,18;
18:3;29:3;34:4;
38:25;49:1;109:24,
25;110:5;113:2,4;
114:3,9,15;115:10,
18;116:3;130:13
**proceeded (2)**
62:10;195:5
**proceeding (2)**
128:9,18
**proceedings (2)**
121:20;199:16
**proceeds (4)**
9:25;10:2,7;33:11
**process (11)**
8:15;9:21;68:11;
112:2;115:3,8;
118:19;130:19;
148:19;179:24;
197:13
**processing (1)**
147:20
**produced (2)**
50:13,16
**product (2)**
98:24;99:2
**professional (2)**
122:6;124:24
**professionally (2)**
110:25;125:3
**proffer (1)**
101:9
**profit (2)**
42:23;162:2
**profits (1)**

9:13
**projectory (1)**
121:15
**projects (2)**
44:20;45:5
**promise (1)**
90:13
**promises (1)**
30:14
**prompting (1)**
94:3
**promptly (1)**
140:13
**proof (7)**
19:3;23:12;57:1;
116:1;167:12;170:7;
174:19
**Proofs (8)**
2:3;28:9;36:5;
39:14;97:17;115:24;
116:3;188:3
**proper (3)**
78:23;112:7,16
**properly (1)**
13:21
**properties (15)**
42:19,20,22,23;
44:11,14,25;47:12;
48:5,9;98:19;99:13;
140:22;144:19;
148:24
**property (117)**
6:3;8:13,16;10:5,
12,13;24:15,18,18,
20,21;25:1;26:18;
42:16;43:7;45:1,4,
11,13;46:3,4,7,9;
47:6,11,15,25;48:11;
49:19;50:14;59:14,
19;60:2,4,6,11,20;
62:11;83:14;84:13,
17,18,19,19;85:3,15,
19;86:1;90:5;98:10,
19;115:15,16,17;
116:21;118:15;
136:11;137:13;
138:3,17,18,20,23;
139:3,7;141:7,21,21;
142:23;143:8;144:2,
2,5,5,18;148:14,19,
20;149:7;153:7,23;
155:13,18,20,23;
156:4,6,9,21,23;
171:11,12,24;172:4,
12;174:10;176:11;
177:2,4;178:13;
181:15,18;183:20;
187:21;189:14,15;
191:11,13;192:8,9;
197:11,13;198:12,
15,19,20,23
**proposal (10)**
99:23;100:10,17;

102:4,7,9,18;165:8;
166:12,14
**proposals (1)**
105:23
**propose (2)**
101:1;191:16
**proposed (7)**
50:21;155:22;
163:14;164:15;
188:13,13;195:13
**prove (7)**
8:14,20;12:11;
24:13;28:9;57:3;
126:8
**proven (1)**
8:23
**provide (11)**
12:21;34:24;
37:11;83:20;117:21;
125:5,14,14;183:4;
198:16,24
**provided (12)**
20:25;35:2,11;
46:14;125:18,23;
142:12;150:18;
152:20;160:22;
163:13;197:16
**provides (1)**
96:18
**proving (1)**
26:2
**provision (4)**
13:3;15:22,24;
58:9
**public (31)**
136:2,9;137:3,10,
11,12,21;138:2,9;
139:22,22,25;140:2,
4,16,19,23;141:6,6;
144:4,18;145:8,19;
146:12;147:21;
152:24;153:10;
157:9;161:11;
180:24;181:1
**publicly (1)**
140:19
**publisher (1)**
137:8
**pull (6)**
29:16;34:18,19;
45:3;80:6;114:8
**pulled (1)**
80:9
**punitive (3)**
8:23;192:22;
195:19
**purchase (21)**
24:18;44:10;49:6;
50:8;52:14;59:3;
62:6;81:4;82:18;
86:1;88:2;99:23;
100:10,17;102:4,7,
10;146:23;165:9;

166:12,14
**purchased (1)**
85:4
**purported (1)**
24:7
**purportedly (1)**
76:9
**purports (2)**
17:5;160:7
**purpose (8)**
55:16,20;56:15;
57:17;91:22;93:12;
132:2;179:23
**purposes (2)**
56:4;131:22
**pursuant (3)**
41:1;159:22,23
**pursuit (1)**
93:6
**push (1)**
140:12
**put (37)**
7:22,24;8:24;9:21;
11:7;15:16;19:14;
21:9;23:12;34:8;
43:18,21;52:23;
53:14;74:1;79:5;
87:15;95:2;105:23;
108:12;127:5,6;
146:8;151:23;152:2;
164:19;168:4,8,9;
170:17;171:15;
174:18;180:22;
187:23;195:17;
196:11;197:22
**puts (3)**
8:1;138:18;153:11
**putting (2)**
107:19;144:3

---

# Q

**qualified (1)**
136:25
**queue (1)**
119:10
**quickly (6)**
74:7;83:22;
106:11;142:24;
149:1;197:23
**quote (1)**
22:22
**quoted (1)**
7:16

---

# R

**raise (8)**
8:5;28:21;34:14,
22,23;43:9;110:9;
134:2
**raised (4)**
47:18,19;123:2,15

**raising (1)**
54:3
**range (2)**
23:4;65:3
**rate (1)**
72:18
**rates (1)**
72:19
**rather (3)**
31:24;48:25;66:5
**re (3)**
2:2;55:19;91:3
**reach (8)**
52:8,13;57:22;
106:16,17;108:11;
172:20;176:10
**reached (2)**
107:8,22
**reaching (1)**
54:9
**read (8)**
5:16,16,18;40:7,8;
56:14;122:24;194:7
**reading (2)**
82:16;92:13
**reads (1)**
161:21
**ready (4)**
7:7;45:11;79:9;
199:11
**real (11)**
9:15;10:7;52:20;
76:17,18;98:7;
110:25;111:9;
144:12;154:13;
156:25
**real-estate (5)**
60:15;74:21;
176:19;190:4,6
**reality (3)**
10:21,22;26:3
**realize (5)**
6:2;45:4;93:23;
176:24;189:16
**realized (4)**
63:21;134:21;
188:10;195:11
**really (9)**
11:6;58:1,2;59:11;
87:2,4;104:23;
106:19;180:20
**realtor (10)**
25:9;44:16;75:10;
77:4;82:4;83:21;
88:16;101:24;
148:18;165:14
**Realtors (5)**
101:25;140:22;
176:15,25;181:4
**realtor's (1)**
165:14
**reason (21)**
11:6;12:4;20:22;

25:17;37:3;49:15,
20;59:25;93:24;
117:4;119:19;131:23;
154:6;156:25;
162:17;179:17,18;
191:10;197:7,11;
198:3
**reasonably (2)**
23:3;143:25
**reasons (5)**
6:1;11:2;195:25;
196:13;197:3
**recall (4)**
30:13;169:5;
172:14;181:25
**receipt (5)**
24:14;83:21;
120:6;127:25;
170:18
**receipts (1)**
92:4
**receive (6)**
40:25;69:1;
128:10,19;182:14,23
**received (32)**
35:13,20;38:22;
41:1;48:24;53:12;
54:20;55:7,13,19;
71:5;80:24;99:16;
102:7;115:13;
118:21;119:4;
128:20,20,22;
130:12;145:8;
150:13;165:10;
166:15;170:24;
171:3,22;182:9;
189:10;193:11,21
**receiving (2)**
68:4;171:8
**recent (2)**
28:2;163:9
**recently (1)**
41:23
**recess (16)**
33:19;34:5,11;
49:1;92:8;93:20;
103:8,10;105:1,3,4;
109:14;158:11,16,
17;163:13
**recklessly (2)**
149:10,14
**recognize (1)**
31:1
**recognized (2)**
8:17;162:23
**recollect (1)**
79:6
**recollection (5)**
46:15;165:13;
172:21;176:1;197:6
**record (36)**
21:9;29:20;43:2,8,
11;47:22;58:21;

71:20;79:3;105:6;
108:18;109:16;
110:13;115:14;
136:9;137:21;138:2,
9;139:22,25;140:2,
11;141:6;146:2,12;
157:9;161:22,23,25;
162:2,8;180:25;
181:1;186:13;196:4,
5
**recordation (2)**
141:4;148:20
**recorded (5)**
118:14;126:12;
128:6;140:23;
162:17
**recorder (1)**
128:13
**records (26)**
45:20,21;50:20;
53:17;54:18;69:2;
118:15;128:6;136:2;
137:4,10,12,13;
140:4,23;144:19;
145:20;147:21;
152:24;159:20,22;
161:1,21;162:10,19;
186:19
**recover (7)**
93:1,3;146:20;
187:15,18;192:21;
194:16
**red-covered (1)**
134:25
**REDIRECT (3)**
130:9;132:21;
155:4
**reduce (3)**
50:23;88:2;195:9
**reduced (4)**
10:19;61:11;
98:16,17
**reduction (1)**
6:2
**Reed (610)**
2:3,4;4:10;5:3,4,7,
11,20;6:12,17,23;
7:9,10,12,22;8:11;
9:6,9;10:1;11:11,21;
12:14,19,23;14:14;
15:5;18:7;19:24;
20:4,21;25:14,21;
28:13,14,17,25;29:1,
4,13,14,18,20,24;
30:2,25;31:6,8,10,
16;33:15;34:7,10,13,
17,21,24,25;35:3,9,
22,25;36:13,22;37:6,
9,15;38:3,7,9,17,21,
25;39:19,24;40:1,3,
6,9,13,15,20,25;
41:11,15,17,20;42:5,
7,10,12,14,19;43:13,

16,18;44:2,7,9;
45:14,16,22;46:1,6,
10,12,17,22;47:1,3,7,
12,14,16;48:1,4,14,
17,23;49:2,8,12,25;
50:3,8;51:24;52:1,2,
3,6,9,15,17,22;53:5,
7,13,16;54:2,11,13,
17;55:2,4,9,14,16,19,
24;56:19,21,23;
57:10,12,13,24;58:5,
16,21;59:5;60:14,16,
21,23;61:1,5,7,9,12,
14,19,22;62:1,5,8,10,
21;63:15;64:24;
65:6,8,13,14,23,25;
66:1,4,7,10,15,18,20,
24;67:5,7,15,17,20,
23,25;68:14,23;
69:13,17,22,24;70:7,
12,15,19,24;71:4,7,
10,15;72:1,6,9,13,
15;73:3,6,8,10,12,15,
23;74:10,14,16,23,
25;75:10,12,14,16,
18,20,22;76:1,4,6,9,
14;77:13,17,24;78:4,
8,11,13;81:5,8,16,
25;82:3,10,14,19,22,
24;83:1,19;84:1,5,
11,18,22;85:5,7,17,
21,24;86:5,9,18,20;
87:11;88:9,15,25;
89:3,5,8,16,20,25;
90:3,6,11,21;91:3,6,
11,19;92:10,18,23;
93:5,9,23;94:23;
95:12,17,19,22,25;
96:2,4,10,12,22;
97:3,5,8,11,18;98:3,
5,7,14,16;99:2,17,20,
24;100:11,22,24;
101:1,4,16,18,20;
102:12,15,20;103:1,
6,12,16,22,24;104:2,
6;105:1;109:18,19,
22;110:3,7,19,21,23;
111:17;112:13;
113:10,11,25;116:9;
118:17,18;119:1;
120:5,13,14;122:22;
123:21,22;125:11,
12,14;127:11;130:8,
10,16;131:14,15,18,
21;132:3,6,17,24;
133:3,9,19,21,24;
134:12,15,16,18,20;
135:2,11,14,17;
136:19,21;137:25;
139:1,4;141:11,12,
19;142:20;143:14,
15,21,23,25;145:8,
10,23;146:1,19,21,

25;147:10,21;148:5,
8,9,11,15;149:21,22,
23,24;150:7,15,18,
22,24;151:1,2,21;
152:2,8,12,19;155:1,
3,5,21;157:15,16;
158:4,6,11,19,20,22,
24;159:3,4,7,8,17;
160:8;162:12;163:2,
3,12,21,23;164:1,5,
13;165:4,5,7,12,19,
21;166:1,3,6,18,23;
167:2,6,9,11,13,18;
169:12,19,21;170:1,
8,17,25;171:5,7,13,
17,19,25;172:5,13,
21;174:3,7,9,12,21,
23;175:1,7,12,14,25;
176:2,5,12;177:15;
178:1,9,14,19;179:9,
12,14,17;180:6,8,17,
24;181:4,11,19,21;
182:2,4,7,11,16,22,
25;183:6,23,24;
184:1,2,3,4,8,11,13,
16,18,24;185:3,6,12,
14,16;186:1,4,6,10,
22,23,25;187:2,9,10,
16,19;188:15,22,24;
189:1,20,23,25;
190:3,5,10,12,14,18,
21;191:16;192:5,12,
13,17,22;193:9,17,
22;194:7,8,10,13,15,
17,20;195:18,23;
196:5,11,14;197:17,
19;198:9;199:3,5
**Reeds (11)**
11:1;15:18;16:19;
23:20;24:17;25:4;
26:19;53:11;123:13;
126:4;145:14
**Reeds' (1)**
128:24
**Reed's (26)**
6:21;11:20;13:10,
13;14:1;36:20;
38:23;43:8;51:20;
53:12;54:24;55:21;
102:8;104:10,17;
109:17;111:15;
142:12;148:2;
150:13;152:17;
161:16;164:25;
197:8;198:15,25
**refer (9)**
32:20,25;33:1,2,
21;46:8;53:20;
114:7;166:19
**reference (2)**
59:21;134:21
**references (1)**
118:13

**referral (1)**
115:10
**referred (2)**
31:24;179:4
**referring (4)**
151:3;164:25;
165:6;179:5
**refers (1)**
151:16
**refi (3)**
45:11;46:12;49:22
**refiled (1)**
117:4
**refinance (18)**
8:13;9:14;46:19;
47:5,11,25;48:21;
49:5;50:9;54:19;
55:19;145:24;147:2,
25;162:17;196:1,13;
197:4
**refinanced (1)**
10:2
**refinanced-loan (1)**
46:20
**refinancing (2)**
48:11;160:8
**reflect (3)**
10:20;67:9;78:19
**reflected (3)**
118:7;185:10;
187:13
**reflects (1)**
70:5
**refresh (1)**
164:17
**refreshes (1)**
176:1
**refusing (1)**
196:15
**regard (2)**
119:3;136:23
**Regarding (12)**
2:6;49:13;57:6;
58:24;111:19;129:3,
7;155:16;163:5,14;
164:16;191:23
**regards (2)**
54:19;155:13
**regime (4)**
145:20;146:12;
147:22;157:9
**regimes (1)**
145:6
**registered (1)**
82:6
**registration (1)**
63:16
**regrouped (1)**
32:11
**regular (3)**
54:19;139:23;
162:2
**regularly (2)**

161:21,25
**relate (3)**
39:14;70:17;155:2
**related (4)**
121:9;122:8;
146:24;152:22
**relates (3)**
71:3;94:19;104:24
**relating (7)**
43:4;110:25;
122:14,18;130:20;
162:7;194:23
**relation (3)**
99:7;132:8;136:12
**relations (3)**
50:10;54:19,21
**relationship (4)**
46:22;48:5,7;
152:18
**relatively (1)**
61:1
**relaxing (1)**
80:4
**relay (2)**
110:24;111:18
**release (2)**
88:4;120:8
**released (2)**
88:8;155:25
**relevancy (2)**
72:2;98:25
**relevant (13)**
25:17;28:6;32:2;
36:2;37:20,21;43:6;
58:1,2;59:11;67:8;
111:19;197:5
**reliance (1)**
16:12
**relief (1)**
88:10
**relist (4)**
59:1,14,19;60:20
**relisted (4)**
59:10,24;61:5;
168:18
**reluctant (2)**
62:23,24
**remain (1)**
24:20
**remainder (2)**
84:11;102:3
**remaining (2)**
5:21;108:4
**remains (2)**
129:10;151:20
**remarks (1)**
41:24
**remedied (1)**
16:7
**remedies (2)**
190:22;191:4
**remedy (2)**
189:11;195:13

**remember (29)**
41:20;44:3;61:10,
15;62:6;63:12;68:1,
4,11;72:17;73:20;
77:20;81:17;84:7;
91:3;96:13,14,22;
97:16,22;98:14;
153:4;165:24;
167:21;168:20,22;
175:15,22;194:22
**reminded (1)**
63:15
**removal (1)**
111:22
**renovate (1)**
84:23
**renovation (1)**
45:7
**rent (9)**
85:23;86:7,8,17;
87:25;88:3,14;89:18,
24
**rental (1)**
42:20
**rented (1)**
42:22
**rents (1)**
86:12
**rep (1)**
170:11
**repeat (3)**
18:5;124:18;
187:16
**rephrase (2)**
129:6;141:12
**report (17)**
55:18;125:5;
140:3;151:3,7,7,11,
14,16,17,18,23;
152:2,4,8;157:21,22
**reporting (5)**
104:3;119:12;
137:16,20;152:23
**reports (4)**
104:3;151:6;
152:22,24
**represent (5)**
70:3;121:23,25;
122:7,20
**representation (4)**
57:6;122:3,14,18
**representative (8)**
63:13;64:13,15;
66:23;69:14,15;
163:10;197:1
**representatives (2)**
64:1;177:18
**represented (11)**
7:14;96:16,25;
98:9;121:17;122:10,
12,13;123:5;170:7;
177:19
**representing (3)**

21:9;114:1;184:22

**represents (1)**
111:13
**repudiated (1)**
42:1
**request (1)**
57:5
**require (7)**
12:19;18:1;32:1;
46:23;47:7;72:8;
122:16
**required (14)**
20:10,21;47:8;
68:15;83:10,17,20;
92:10;117:23;131:6;
145:9;156:22;171:1;
194:9
**requirement (9)**
13:1,14;14:8,14;
24:3;40:15;58:13;
161:15;196:4
**requirements (2)**
20:15;40:16
**requires (3)**
12:10,12;40:9
**requiring (3)**
13:4;36:24;58:9
**resales (1)**
98:11
**ResCap (11)**
2:2,6;36:4;63:20,
21;69:14;84:1;
91:15;103:11;
105:10;185:19
**researched (1)**
101:6
**Reserve (2)**
26:13;150:9
**re-served (1)**
169:15
**resettled (1)**
34:6
**residence (4)**
38:21;42:9;43:14;
135:15
**residences (1)**
48:4
**Residential (12)**
105:6;109:16;
111:13,19;112:2;
113:21;121:25;
122:20;123:10;
144:12;155:19,20
**resistance (1)**
59:15
**resolution (3)**
26:5;169:13;
183:19
**resolve (5)**
64:11;177:8;
180:10,10,18
**resolved (8)**
108:3;142:24;

155:8;172:17;175:3;
181:6;197:3;199:4
**respect (25)**
9:19;12:9,11;
15:10;16:8;24:25;
46:3;60:15;101:22;
103:18;105:7;
109:16;113:16;
122:16;123:12,12;
129:15;132:12;
133:4;156:9;160:6,
18;161:5;162:21;
186:17
**respond (2)**
72:22;100:11
**responds (1)**
194:2
**response (5)**
69:20;98:20;99:5;
115:20;134:3
**responses (1)**
126:15
**responsibility (1)**
23:22
**responsible (4)**
7:6,18;9:11;112:2
**rest (4)**
7:25;8:1;56:14;
158:13
**result (5)**
26:18;32:7;89:16;
116:15;144:6
**resulted (2)**
44:3;50:12
**resulting (1)**
9:20
**results (1)**
178:20
**resume (5)**
104:21;158:12,19,
22;163:2
**resumes (1)**
151:22
**retain (3)**
73:4;91:10;189:9
**retained (3)**
125:5,10;165:15
**retrieved (1)**
45:18
**return (1)**
25:5
**returned (2)**
193:7,10
**reveal (1)**
122:17
**reverse (1)**
155:15
**review (8)**
26:13;114:17;
121:7;150:8,12,16;
163:17;192:25
**reviewed (2)**
113:2;151:6

**reviewing (9)**
112:3,4,5,5,5,6,7,
22;132:14
**revolving (1)**
175:3
**rework (2)**
74:7;180:12
**reworked (1)**
170:11
**RFC (3)**
18:25;122:4;123:1
**rid (1)**
189:13
**rider (2)**
38:21;39:7
**riders (1)**
38:14
**right (171)**
5:2;13:2;18:3;
22:14;25:2;26:16;
27:2,18,25;28:4,21,
23,25;29:3,13;31:12,
14,20;34:12,14,17,
21,23;38:20;41:10,
16;48:2;50:6;52:16;
55:7,15;57:9,20;
58:14;60:19,23;
61:3;62:3;67:13,21;
70:20;71:2,15;
72:11;73:2,9,14;
74:15,24;75:11;
76:14;82:7,15;
84:21;85:6,18,24;
86:18;88:13;89:6;
90:1;93:22;95:13,
22;97:10,11;98:2,12;
102:9,23;103:7,13;
104:4,9,25;105:3,5,
16;106:15;108:20,
23;109:11,13,15;
110:5,10,12,19;
111:25;113:24;
120:4,22;121:1,9,18,
21;123:4;124:22;
125:25;126:21;
128:7;133:13,17,25;
134:2,3,5;135:1,25;
136:16;137:24;
138:21,24;139:17;
142:11;145:18;
146:10,11;150:7,23;
152:22;153:12,20;
154:10,12,17,24;
155:17,19;156:19;
157:10,13,17,24;
158:1,4,10,15,18,25;
161:4;166:4,9,11;
167:14;169:6,6;
172:1,10;174:11;
175:7;178:16;
180:15,17;182:19;
185:24;186:2,3,4;
187:4,7,11;190:21;

191:21;192:20;
194:21;195:18,22;
199:9,10,11
**right-hand (1)**
56:13
**rights (1)**
139:20
**rises (1)**
34:22
**Robin (1)**
29:10
**ROBINSON (14)**
4:7;105:13,14,19,
23;106:6,7,12,14;
107:3,4;108:14,24;
109:5
**robo-signer (1)**
21:2
**Rocci (1)**
175:14
**Roccisano (6)**
99:18,23;100:18;
164:7;175:15;
181:24
**Roccisanos (18)**
101:10,11,13,15;
102:4,10;164:8,23;
165:9,11;166:12;
167:15;169:10;
172:2,15,20;174:13;
175:11
**Roccisanos' (1)**
166:14
**role (6)**
6:9;52:24;93:10;
139:8;146:13;
175:19
**roof (1)**
84:14
**room (5)**
79:19;80:7;85:12;
86:15;192:7
**ROSENBAUM (14)**
105:9,10,16,18;
106:11;107:5;
108:15,16,19,25;
109:2,7,9,13
**routine (1)**
114:21
**routinely (2)**
130:19;170:10
**RPC (1)**
122:6
**rule (14)**
16:25;33:8;34:2;
54:8;128:3,4;129:2,
7;139:18,18;161:8,
20;162:10;198:22
**ruled (2)**
198:13,17
**Rules (10)**
6:8;122:5,15,19;
126:18;139:15,17;

159:24;162:23;
192:14
**ruling (13)**
32:9;53:21;56:22;
64:19;108:13;
113:11;123:9,14;
187:5;195:23;
196:15;198:6,7
**rulings (1)**
198:19
**run (3)**
7:24;131:11;
167:22
**runs (1)**
160:10

**S**

**saga (1)**
94:7
**sale (29)**
9:14;10:23,25;
24:25;25:13;44:6;
51:11,16;59:1;69:7,
8;71:14;74:9,22;
103:5;112:10;
116:20;144:18;
146:25;148:19;
155:22;167:20;
180:22;188:8,10,13;
190:25;195:1,12
**sales (4)**
41:25;56:2;
168:21;188:13
**salvage (1)**
24:9
**same (21)**
9:4;25:24;50:9,14;
58:7,9;62:12,12;
70:17;81:19;98:4;
99:8;114:11;122:8;
148:24;154:16,20;
159:10;160:13;
168:11;175:16
**satisfied (9)**
58:12;59:2,8;74:2;
155:25;156:13,15;
162:20;196:3
**satisfies (2)**
161:14;162:9
**satisfy (8)**
20:15;94:18;
142:5;156:22;
161:20;171:1;
172:11;196:4
**savings (1)**
8:17
**saw (5)**
16:12;20:24;
49:23;92:14;190:25
**saying (6)**
61:5;179:15;
191:23;193:23;

194:3,11

**scared (1)**
41:22

**scarlet (2)**
138:12;139:3

**scenario (1)**
155:15

**schedule (6)**
71:23;106:3,23;
108:3,5;116:20

**scheduled (3)**
77:19,21;80:16

**Schmieg (3)**
121:13,16;124:21

**school (4)**
63:17;80:9;124:9;
162:12

**scope (4)**
130:22;132:22;
133:2;149:20

**Se (6)**
4:10;5:3;7:14;
31:1;52:25;54:1

**searches (1)**
148:23

**seat (5)**
5:10;28:23;34:17;
110:12;134:5

**seated (4)**
5:2;34:12;109:15;
158:18

**second (18)**
19:11;40:20;
46:14;77:5;83:13,18,
25;92:24;99:20;
100:13,25;101:25;
119:22;146:21,22;
166:10;171:1;
196:25

**section (3)**
40:20,21;127:5

**sector (1)**
145:21

**secure (2)**
44:23;86:2

**secured (1)**
197:10

**security (1)**
88:2

**seeing (3)**
23:7;168:18;
176:16

**seeking (8)**
169:13;183:19;
187:12,15,18,20;
192:21;194:16

**seem (1)**
14:10

**seemed (6)**
51:14;59:18;
73:18,25;74:1;181:7

**seems (6)**
12:8;13:2;22:14;

23:16;40:15;102:1

**sell (25)**
8:13;10:12;24:15;
26:18;41:23;42:11;
44:23;45:4;51:17,
18;60:1;76:18;
98:17;136:14;142:3,
5,10;154:4;176:11;
177:2,4;178:18;
180:11,12;187:21

**seller (1)**
191:19

**sellers (1)**
62:16

**selling (6)**
45:1;76:17;90:18;
138:3;177:6;189:14

**Senator (2)**
62:15,15

**send (10)**
14:22;67:24;72:3,
5,5;141:5,5;194:4,9,
12

**sent (14)**
35:1;40:16;67:25;
68:7,15,20;71:17,18,
18;119:12;131:4,11;
193:18,24

**sentence (1)**
43:10

**separate (12)**
11:24;36:24,24;
37:1,2,2;38:9;50:2;
60:8;117:18;118:5;
178:5

**separately (1)**
37:2

**Septem (1)**
124:12

**September (18)**
43:20;45:19;
69:19,21;74:10,12,
12;75:15;77:19;
80:14;95:20;97:24;
106:25;107:11;
108:2,17;193:22;
194:2

**serve (5)**
16:15;23:25;90:6;
132:2;137:14

**served (6)**
39:19;40:9;41:3,5,
18;159:23

**serves (1)**
62:24

**service (2)**
115:18,20

**serviced (1)**
11:9

**servicer (14)**
9:4;11:5,10;12:25;
14:17;20:2,9;23:21;
27:8,24;28:2,6;

62:21;170:6

**Services (9)**
120:23;121:17;
138:10;140:3,7,12,
15,21;183:4

**servicing (1)**
149:5

**sessions (1)**
177:11

**set (4)**
63:18;67:10;
72:15;108:3

**settle (2)**
107:13;179:20

**settled (1)**
25:14

**settlement (14)**
67:10;74:18;
76:20,21;77:20,22;
78:18;79:9;81:16;
105:20,25;106:4,17,
18

**settlements (1)**
25:16

**settling (1)**
78:21

**seven (1)**
86:21

**seven-bedroom (1)**
86:14

**several (9)**
6:21;9:2;19:24;
42:12;51:14;72:10;
98:21;172:9;192:8

**shall (2)**
122:7,13

**share (2)**
93:12;136:1

**shared (1)**
113:11

**sharply (1)**
199:12

**sheriff's (1)**
116:20

**Shocking (1)**
106:12

**short (4)**
33:19;65:5;94:2;
168:13

**shorthand (1)**
14:12

**shortly (4)**
29:2;30:7;60:23;
110:4

**show (12)**
8:15;24:5;32:8,15;
60:17;92:8;94:1,24;
104:19;148:25;
187:5,6

**showed (1)**
79:9

**showing (2)**
76:10;99:15

**showings (1)**
43:19

**shown (2)**
35:7;195:4

**shows (5)**
10:8;27:15;43:23;
92:20;99:5

**sic (9)**
18:14;29:2;52:20;
69:21;85:22;101:24;
128:13;175:3;
190:25

**side (9)**
7:2,25;37:11;66:2;
93:25;107:25;108:4;
132:20;179:19

**sign (1)**
17:17

**signatures (1)**
69:3

**signed (20)**
11:11;16:13;17:4,
11;21:4;23:9;24:4;
37:2,25;38:1;39:5,7,
9;69:1;72:7;92:6;
100:14;184:20;
193:10;194:11

**significance (1)**
78:1

**significant (1)**
86:11

**significantly (1)**
44:9

**signifies (2)**
139:6;155:12

**signify (1)**
148:18

**signing (2)**
17:13;23:9

**similar (7)**
99:8,9;168:7,13,
13;176:17;198:13

**simple (3)**
22:10;59:25;
155:15

**simpler (1)**
93:5

**simplify (1)**
47:17

**simply (9)**
14:3;26:17;99:12;
138:21;144:21;
153:9,14;154:14;
177:2

**simultaneous (1)**
199:6

**simultaneously (1)**
115:18

**Singh (4)**
174:21;176:9;
182:9,12

**Singhs (1)**
175:6

**single (1)**
98:10

**single-family (1)**
42:20

**singular (1)**
93:6

**sit (3)**
34:14;65:18;
181:25

**sitting (5)**
5:9;65:9;80:20;
90:7;101:13

**situated (1)**
33:20

**situation (11)**
62:19;63:23;
76:24;79:22;80:2;
101:5;148:25;169:4;
180:11;182:17;
192:24

**six (9)**
7:2;9:12;10:19;
43:22;68:12;89:9;
90:12;93:25;194:15

**six-minute (1)**
34:5

**sixty (3)**
86:5,6;97:23

**skip (1)**
111:2

**slide (1)**
66:6

**slightly (1)**
169:9

**slips (1)**
54:13

**small (1)**
183:6

**smaller (1)**
76:23

**Smith (1)**
6:17

**smoothness (1)**
44:25

**sold (13)**
10:13;42:22;98:8,
10;168:8,13,22;
187:24;188:2;
189:10;190:24;
191:6,7

**sole (2)**
80:23;162:13

**solely (4)**
20:20;23:22;56:9,
15

**solicitous (1)**
95:4

**somebody (5)**
51:22;81:21;
117:22;133:18;
185:23

**someone (8)**
35:16;91:8;94:14;

141:3;158:7;161:24;
162:9;179:10
**someone's (1)**
137:5
**sometime (2)**
17:4;178:14
**sometimes (2)**
53:19;119:13
**somewhat (1)**
88:10
**somewhere (2)**
51:15;140:11
**Sons (1)**
101:24
**soon (3)**
76:11;107:11;
138:10
**sore (1)**
65:17
**sorry (24)**
18:5;27:5;50:3;
65:14;83:3;87:5;
91:16;109:2;124:16;
129:6;131:1;135:8;
139:5;141:25;
142:16;146:7;157:6;
164:1;165:5;172:22;
176:15;186:24;
192:23;197:8
**sort (14)**
26:5;39:9;87:14;
102:1;106:7;138:8,
9;139:2;140:2;
141:1,2;147:3,20;
149:5
**sorted (1)**
181:11
**sorts (1)**
151:9
**sought (2)**
23:25;49:21
**sound (1)**
150:23
**Southern (1)**
75:1
**space (1)**
44:12
**speak (9)**
29:21,22;48:10;
63:1,9;76:19;80:2;
96:17;179:19
**speaking (1)**
6:14
**special (1)**
139:2
**specialized (5)**
137:6,8,13,14;
144:17
**specific (16)**
10:4;11:17;12:16;
13:14;43:7;46:3,4;
83:11,12;117:1;
127:5;132:10;153:3;

157:22;160:17;
191:13
**specifically (15)**
6:22;7:5;9:2;
14:21;15:20;24:16;
103:18;104:24;
122:6;136:10;
137:21;151:8,17;
159:16;170:4
**speculation (4)**
119:6;141:9;
143:2;148:21
**speculative (2)**
9:19;10:10
**speed (2)**
33:17;93:22
**spell (2)**
110:13;134:7
**spending (1)**
48:20
**spent (2)**
63:25;85:9
**spoke (7)**
12:7;63:10,11;
79:16;81:9;101:9;
138:16
**spoken (3)**
63:7;125:3,12
**sponsored (1)**
62:14
**square (3)**
51:5;147:11;168:7
**squared (1)**
166:19
**stage (2)**
73:13;108:10
**stakeholders (1)**
145:21
**stalemated (1)**
59:17
**stamp (4)**
56:25;57:4,9;
102:5
**stand (26)**
13:23;18:13;27:2;
28:16;31:21;32:10,
23;33:12,20;34:13;
65:2,3,4,18;104:20,
21;105:17;110:9;
134:1;151:19;
158:12,19,23;163:2;
192:12;197:15
**standard (1)**
140:6
**standing (24)**
5:9;6:1;15:16,17;
16:9,18,21;19:5,7,
12,21;20:3,5;23:18;
24:4;65:9,16;66:3;
112:16,16;113:4;
126:8;137:2;158:25
**standpoint (1)**
51:8

**stands (1)**
101:10
**start (5)**
6:20;42:11;97:22;
124:11;199:12
**started (5)**
6:19;66:22;
176:24;183:16;
184:4
**starts (1)**
7:22
**state (17)**
16:3;20:21,22;
40:17;80:13;84:16;
110:13;117:13,16;
134:7;135:12;137:1;
139:15,16,18;
166:21;175:22
**stated (3)**
15:22;196:7;197:9
**statement (14)**
5:4,6;6:11;8:6,7;
15:6;21:6;22:21;
31:2;32:6;46:18;
182:6,20;197:3
**statements (1)**
72:12
**states (1)**
16:25
**static (1)**
18:14
**stating (1)**
193:17
**status (3)**
91:23;106:24;
189:2
**statute (2)**
20:21;145:9
**statutes (1)**
126:18
**statutory (2)**
22:17;127:5
**stay (1)**
134:23
**stays (2)**
116:5;118:4
**stemmed (1)**
25:1
**stemming (3)**
5:23;8:12;151:13
**step (2)**
15:20;136:16
**step-by-step (3)**
115:2,4,8
**Stephan (10)**
16:13;17:4,8,9;
21:1,4;23:9,11;24:5,
7
**steps (2)**
64:7;68:1
**sticky (1)**
53:14
**still (20)**

11:12;24:1;25:24;
26:22;41:11;49:14;
58:18;59:17;76:25;
83:7;87:21;89:11;
117:5;156:20;
159:10;176:20;
177:6;181:6;189:2;
191:25
**stipulated (1)**
145:4
**stop (16)**
28:18;34:22;46:1;
52:6;70:13;77:5;
92:24;101:17,21;
112:23,25,25;127:4,
4;194:14;195:22
**stopgap (1)**
193:19
**stopped (1)**
170:5
**story (11)**
39:1;54:6;58:15;
85:18;94:5,6,19;
95:7;97:14,14;
165:23
**strayed (1)**
149:21
**Street (2)**
2:22;135:24
**stricken (3)**
149:19,23,24
**strike (1)**
32:8
**striking (1)**
32:7
**stuck (1)**
21:19
**study (1)**
153:6
**stuff (3)**
71:24;72:4;80:8
**subdivision (2)**
98:9;168:11
**subject (12)**
65:22;66:14;
91:19;107:9;136:8;
140:23;149:12;
155:2;156:6,14;
171:8;187:22
**subjects (1)**
163:16
**submissions (1)**
9:5
**submitted (1)**
19:4
**subpoena (3)**
45:20;58:22;
159:23
**subscribe (1)**
140:7
**subsections (1)**
162:4
**subsequent (2)**

23:25;193:4
**subsequently (6)**
18:16,17;19:18;
24:19,23;78:7
**substantial (1)**
24:14
**substantially (1)**
122:8
**substantive (1)**
165:23
**successful (1)**
108:22
**successfully (2)**
28:8;175:6
**successor (3)**
14:12;21:10;26:7
**sue (1)**
12:2
**suffer (1)**
65:15
**suffered (2)**
26:25;74:5
**sufficient (4)**
54:24;167:19;
172:2;174:24
**suggest (3)**
21:17;97:4;189:22
**suggesting (1)**
97:14
**suggestion (1)**
66:1
**suing (1)**
25:7
**Suite (1)**
2:22
**Suites (2)**
85:11,11
**sum (3)**
26:23;28:8;102:23
**summary (1)**
184:7
**summer (2)**
30:6,15
**sup (1)**
68:24
**supervised (1)**
179:13
**Supervision (1)**
150:10
**supplement (1)**
139:18
**supplemental (3)**
36:15,19;37:23
**supplements (1)**
151:10
**supplied (1)**
11:16
**support (3)**
36:4;39:16;194:10
**suppose (1)**
154:10
**supposed (21)**
7:15;68:11,24;

71:16;72:5,9,13,18;
74:8;78:14,17;79:8;
83:1;85:22,25;
104:7;126:10;
127:18,25;193:5;
197:20
**supposedly (4)**
50:10;80:20;
93:25;170:14
**Supreme (1)**
22:25
**sure (73)**
7:3;21:7,20,24,25;
27:3;28:20;29:20;
31:16;34:18;37:21;
47:22;48:18;52:17,
18,18;57:25;59:6,7,
20;62:12;64:25;
66:11,17;67:2,13;
68:3;73:24;78:5;
79:4;86:24;88:16,
17;97:11;104:18;
112:6,7;113:3;114:2,
10;115:5;119:15;
124:7,17;125:7;
127:8,16;131:10;
134:2;136:3,5;
140:18;150:17,21;
154:2,19;156:12,14;
159:18;166:3,18;
169:8;170:23;
171:20;174:17;
177:12;180:6;185:6;
194:18,20,21,21;
197:17
**surprise (4)**
41:5;96:24;
140:21,24
**surprised (3)**
40:25;88:20,22
**surprising (1)**
183:15
**surrounding (1)**
154:1
**suspect (1)**
160:23
**sustain (1)**
34:2
**sustained (15)**
28:10;30:20,21;
31:4,9;51:21;89:15;
102:2;118:25;
141:10;143:3,11;
149:18;152:1;196:1
**sustaining (2)**
107:15;152:6
**sworn (10)**
28:16,22;32:23;
33:13;34:15,16;
110:10,11;134:1,4
**System (2)**
150:9,23
**systematic (1)**

44:12

---

# T

**tables (1)**
63:18
**tabs (1)**
53:14
**talk (23)**
9:15;38:4;45:8;
48:25;51:22;62:24;
66:23;80:1;94:12;
96:25;106:2;123:16;
132:9;136:22;
137:20;145:3;
159:14;164:14;
176:23;177:20;
188:2;196:17;199:3
**talked (9)**
52:25;54:4;73:10,
11;123:10;159:13;
177:19,22,23
**talking (13)**
15:4,7;39:23;46:1,
4;57:9;62:18;66:24;
77:22;137:19;
176:14;179:1,6
**talks (1)**
107:24
**tax (1)**
137:4
**taxes (6)**
171:11,12,24;
172:7,9,9
**TD (52)**
25:9,16;35:1,5,12,
21;45:8,9,19,20;
46:3,22;47:5,10,21,
24;48:8,10,20,24;
49:21,25;50:13,15,
15,16,17;56:10,17,
25;57:18;80:19;
109:20;147:4,19,21,
23;148:3;152:18;
157:2;158:20;159:1,
7,10,20;162:15,16;
163:10;188:4;
195:25;197:1,10
**TD's (1)**
35:10
**telephone (5)**
105:7;106:24;
107:11;108:1,17
**TELEPHONICALLY (1)**
4:7
**telling (9)**
20:1;54:6;64:9;
66:22;71:19;143:22;
165:23;178:23
**tells (1)**
89:8
**ten (1)**
87:12

---

**ten-bath (1)**
86:14
**tendered (5)**
90:12,13;168:16;
170:12,21
**tens (1)**
93:13
**term (3)**
51:3;138:21;
188:14
**terminate (1)**
49:16
**terminology (1)**
130:11
**terms (10)**
9:24;12:21;31:7;
68:14;103:6;105:24;
106:4;153:3;172:15;
191:19
**Terrace (1)**
22:17
**terrible (1)**
94:13
**test (2)**
23:1;171:16
**testified (16)**
26:15;56:16;
57:18;125:21;
132:11,16;136:23;
137:1;154:4;155:11;
160:10;170:23;
181:13,16;183:2;
194:10
**testify (28)**
7:7;19:15;31:19,
23;32:2,10,22,25;
33:14;101:12,15;
103:21;110:2;
113:14,20;133:2;
136:7;138:5;153:24;
159:9;170:9;175:24;
180:5;196:7,10;
197:22,23;198:23
**testifying (11)**
32:5,17,19,21;
51:20;56:5;64:13;
77:8;134:16;147:7;
196:8
**testimony (59)**
7:8;10:11,18;32:8,
14;33:22;34:24;
35:23,24;41:4;
54:24;65:21;66:12;
67:2;93:22;94:25;
103:25;104:11,17,
22;112:19;113:13,
16;119:16,17;122:4,
25;123:9,18;125:23;
131:20;133:16;
134:13;146:15,18,
22,22;147:19;148:2;
149:16,18;151:13;
152:21;158:4,13;

---

163:13,14,16,19;
191:20;193:8,9;
194:5;198:9,11,15,
20,22,25
**thankful (1)**
52:3
**Thanks (2)**
135:8;158:2
**Thanksgiving (7)**
78:13,17;79:23;
82:8;96:2;174:5;
178:17
**That'll (2)**
76:14;103:17
**theoretical (1)**
9:24
**theoretically (1)**
156:24
**thereafter (1)**
122:14
**therefore (3)**
17:23;28:3;162:7
**There'll (2)**
9:23;60:17
**there're (2)**
7:14;39:9
**thinking (4)**
69:6;71:21;77:20;
147:15
**third (3)**
60:9;153:9;193:23
**thirty (7)**
12:19;13:4;14:9;
131:7,11,12;145:9
**thirty-five (1)**
131:13
**thirty-three (1)**
137:9
**though (8)**
8:9;60:16;70:23;
100:9;126:24;
160:21;189:16;
193:23
**thought (12)**
49:23;51:2;52:9;
68:5;74:10;76:15;
80:14;81:11;90:18;
147:6;189:3;192:17
**thoughts (1)**
51:20
**thousand (1)**
84:9
**thousands (3)**
74:19;93:13;
112:12
**three (15)**
8:20;30:5;38:13;
67:25;70:16;71:2;
88:6;102:6;161:6,
16;165:19;167:19,
25;185:16;187:13
**Thrift (1)**
150:10

---

**throughout (2)**
8:15;10:20
**throws (1)**
138:14
**tied (4)**
87:21,22;89:10;
191:23
**ties (5)**
139:3;141:25;
142:2
**tight (1)**
108:3
**till (2)**
94:21;114:16
**timeline (1)**
77:18
**times (12)**
10:20;28:1,6;
59:20;65:16;97:12;
98:17;136:25;
137:16;166:19;
168:3;188:21
**time's (1)**
5:13
**timing (3)**
10:8;19:17;25:18
**tired (1)**
194:13
**Title (21)**
75:2;79:6,10,11,
19,21;82:3;83:21;
87:24;88:4;112:6;
114:17;121:7,7;
139:7;142:23;
148:23;155:16;
167:25;169:5;175:1
**today (22)**
6:22;7:15,19;
13:18,23;18:13,16;
27:2,23;28:6;35:8,
21;58:22;106:24;
137:20;159:19;
170:8;181:25;192:6,
10,23;198:8
**together (1)**
60:8
**told (25)**
57:21;73:15;
75:22,25;76:3;77:1;
79:12,21;87:21;
88:21;91:21;94:19;
146:3,5;159:7;
162:14;164:7;169:8,
8;171:20;172:22;
174:6;181:15;
188:16,20
**tomorrow (10)**
6:24;7:3,16;147:7;
163:4;196:6,10,24;
198:17,24
**tongue (1)**
191:23
**tonight (1)**

187:4

took (9)
5:16;35:12,22;
43:24;95:16;164:23;
166:24;169:22;
183:17

top (5)
56:25;69:6;71:18;
126:17;129:9

totally (3)
94:15;100:16;
101:7

towards (2)
85:25;150:19

town (5)
44:17;63:5;77:3,4;
176:20

track (1)
146:2

tractor-trailers (1)
86:21

trading (1)
183:10

traditional (1)
146:1

traffic (2)
99:15;176:17

train (1)
135:9

transaction (27)
41:25;59:2;60:7,
10;74:19;137:5,22;
138:6,8,19,22;141:3;
142:12;146:14;
148:25;149:8;154:6,
7;155:20,22;156:1,8,
15;157:12;163:14,
15;175:6

transactions (5)
75:3;79:12;99:14;
137:10;146:19

Transcribed (1)
2:20

transcript (1)
32:8

transf (1)
172:8

transfer (2)
27:16;172:9

transferred (1)
145:20

transmission (1)
199:6

transmitted (2)
159:22;161:24

transpired (2)
66:18;162:7

trap (2)
53:19,23

traveled (1)
139:15

Treasury (2)
149:12;151:9

treat (1)
120:10

tremendous (1)
98:20

Trenton (1)
115:12

Trial (13)
2:2;7:1,2,17,22;
8:25;11:17;33:11;
35:11;37:10;43:24;
53:21;108:6

trials (2)
7:13;8:2

trial's (1)
7:15

trick (2)
97:2;180:20

tried (4)
132:25;174:3,9;
178:18

trier (1)
22:19

tries (1)
160:14

trigger (1)
120:7

troubled (1)
158:20

troubling (2)
21:5;50:12

Trucking (1)
78:22

trucks (6)
74:17;75:18;78:2,
22;79:13;83:6

true (4)
8:15;13:3;27:23;
165:21

trump (1)
139:19

Trust (25)
6:18;9:6,10;11:5,
8,13,22;12:5;14:11;
21:3,10;24:13;70:1,
22;105:11,22;
113:12;131:21;
164:16;165:13;
171:9;186:11;194:6;
196:11;198:12

Trust's (10)
2:2,7;70:16;71:5;
92:13,25;107:16;
166:15;174:18;
193:16

truth (10)
55:17,21,25;56:4,
8,18;57:15;75:25;
77:10;191:14

try (15)
36:7;39:11;42:11;
53:22;65:4;66:4;
90:15;94:20;97:11;
98:17;106:19;108:7;

119:15;178:11;
194:21

trying (37)
24:21;37:18;
38:10,24;41:6;
43:10;47:17,21;
52:17;59:22;71:12;
81:21;86:23;94:2;
97:5,5;101:4;
130:11;132:9;
141:12;143:15,16,
16,20;148:9;163:23;
166:20,20;167:21;
168:3;171:15;
176:15,15;178:2,7;
181:21;197:24

Tuesday (1)
83:4

turn (2)
40:10;150:2

turned (4)
50:25;79:16;84:6;
168:2

turns (4)
44:16;67:11;
77:13;84:12

twenty (1)
136:25

twenty-five (2)
88:9;111:4

two (52)
10:22;16:20;
24:20;29:4;30:3;
36:11;38:5,9,13;
41:25;44:2,3;49:16;
50:18;55:9;60:2,8;
64:7;68:1,1;69:2;
85:1,11;87:25;91:6;
100:23;101:22;
102:2;106:19,24;
108:7;140:8;147:14,
16;154:10;159:10;
162:5;168:8,14;
172:22;175:16;
177:10;179:9;
187:14;190:21,21,
22,24;191:4;196:16,
18;197:5

two-day (1)
7:2

two-step (1)
68:10

type (1)
190:25

types (1)
192:20

typical (1)
155:19

typically (3)
76:19;142:24;
155:11

U

Um-hum (5)
36:13;46:10;
68:23;143:23;192:5

un (1)
112:1

unable (3)
20:20;23:12;28:8

unclear (1)
174:8

uncomfortable (2)
52:23;65:19

uncontested (1)
118:3

uncovered (1)
197:13

under (13)
16:15,17;22:15;
44:22;45:7;64:17;
100:5;123:17;
130:20;151:4;
161:13;169:4;178:3

underst (1)
55:23

understood (7)
31:6;154:19;
155:11;162:13;
175:10,19;176:18

undertaking (1)
78:24

underwater (1)
167:23

underwrite (1)
143:8

underwriter (2)
153:22;154:7

underwriting (1)
197:13

undisputed (2)
145:10,12

undoubtedly (1)
33:6

unique (1)
117:2

unit (7)
116:5,14,17;
117:19;118:4,6;
119:21

University (1)
124:10

unknown (1)
9:14

unless (7)
18:7;24:5;96:18;
109:1;156:13,13;
178:22

unlike (1)
76:23

unpaid (2)
156:3;171:24

unreliable (1)

94:15

unsuccessful (1)
182:8

unsure (1)
149:23

unusual (1)
117:3

unwary (2)
53:19,23

up (73)
16:13;24:1,23;
25:6,10;28:15,20;
32:11,23;33:12,18,
20;34:6,13,14;50:17;
51:15;52:10;53:17;
57:23;58:3,4,4,14;
63:18;65:2,16;
66:12;71:8;72:23;
79:10;84:3;85:10;
87:3,10,18,21,23;
88:16;89:10;93:22;
94:1,24;95:8;97:13,
15,16;104:17,19;
105:22;108:8;110:8,
9;120:12;134:1,1,3;
137:7;138:18;139:3;
141:25;142:2;143:6;
163:18;164:11;
165:22;167:25;
176:7,7;182:13;
184:18;185:17;
199:14

update (1)
105:16

upon (4)
107:25;126:1;
127:25;199:6

upped (1)
167:17

upset (1)
79:14

usage (3)
113:14,21;123:10

use (18)
25:22;26:19;
31:22;32:12,13,14;
33:23;51:3;83:11,11,
13;122:14;137:10;
138:10;141:1;
152:24;171:23;
188:14

used (10)
10:24;50:17;
80:20;83:17;138:22;
140:10,22;176:17;
198:10;199:14

useful (1)
105:21

using (3)
33:1;97:15;140:17

usually (6)
7:20;53:24;
131:13;139:19,20;

12-12020-mg    Doc 7766-25    Filed 11/17/14    Entered 11/17/14 19:14:16    Sept. 15
RESIDENTIAL CAPITAL, LLC
2014 Hearing Transcript    Pg 230 of 232
Case No. 12-12020-mg

September 15, 2014

142:1
**utterly (2)**
  13:5;14:15

## V

**vacate (1)**
  84:12
**vacated (1)**
  21:4
**vacation (3)**
  76:23;106:10,13
**vacuum (1)**
  144:9
**valid (2)**
  115:10;142:8
**value (34)**
  6:3;44:13;49:18;
  51:5;55:21;56:2,9,
  19,20;57:16;76:19;
  84:24;98:23;144:2,
  12;153:7;181:14,18;
  188:3,4;191:12,16,
  18,20;192:2,8,18,18,
  19;198:12,15,20,23;
  199:1
**values (1)**
  176:17
**variable (1)**
  72:18
**variety (1)**
  5:25
**various (3)**
  10:2;32:3;198:16
**Vegas (1)**
  83:23
**vehicle (1)**
  115:15
**verbal (1)**
  61:16
**verified (1)**
  114:4
**versus (1)**
  92:21
**vice (1)**
  79:10
**View (1)**
  38:25
**violated (1)**
  22:9
**violates (1)**
  122:5
**violation (5)**
  8:22;15:11;22:16,
  17;24:3
**violence (1)**
  87:7
**Virginia (3)**
  85:11,16;86:24
**virtue (4)**
  14:1,4,5;16:6
**visited (1)**
  30:14

**voice (1)**
  65:3
**volumes (1)**
  84:24
**voluntar (1)**
  117:11
**voluntarily (2)**
  117:11;119:9
**voluntary (1)**
  120:10

## W

**wait (8)**
  26:4;27:9,9;99:20;
  114:16;134:15;
  170:22;181:9
**waited (1)**
  174:3
**waiting (3)**
  80:20;188:17;
  193:18
**waive (1)**
  169:24
**walk (3)**
  64:2;94:10;97:22
**walked (3)**
  79:15;81:5,12
**walking (1)**
  87:18
**Walters (12)**
  91:12,13;93:9;
  168:3;182:21,24;
  183:4,12,22;185:17;
  186:23,25
**wants (7)**
  11:13;32:15;58:1;
  80:2;89:9;156:12,14
**water (3)**
  34:9;135:6;158:2
**way (17)**
  7:12,13;19:11;
  44:12;48:6;65:5;
  67:9;93:16;94:8;
  127:14;128:2,3,7;
  143:16;144:3;
  159:23;163:10
**ways (2)**
  16:20;137:7
**Weaver (35)**
  10:24;61:17,18,19,
  20;62:10;65:21;
  66:13,22;67:3,7,10,
  11;69:8;71:14;74:9,
  17,22;75:22;76:1,9,
  15;77:14;78:19;
  81:4,6,10,11,13,15,
  20,23;85:22;94:12;
  164:1
**Weaver/Cooper (6)**
  67:14;90:19;94:7;
  163:15;188:13,15
**Weaver-cum-whatever (1)**

77:11
**Weavers (3)**
  61:24;62:4;65:21
**Weaver's (1)**
  90:16
**week (6)**
  75:6;78:13;79:23;
  105:21;106:1,1
**weeks (9)**
  43:21,22,22;
  86:21;105:19;
  106:19,24;108:7;
  119:14
**weight (2)**
  151:20;198:21
**welcome (2)**
  110:18;158:3
**weren't (6)**
  21:11;25:3;71:13;
  169:17;176:16,16
**West (1)**
  2:22
**what'd (1)**
  28:25
**what's (17)**
  31:24;35:18;
  51:12,22;53:25,25;
  79:20,23;81:1;
  85:19;99:14;143:24;
  144:15;147:17;
  180:3,3;192:3
**whenever (1)**
  156:6
**when's (1)**
  81:14
**Whereupon (1)**
  199:16
**whichever (2)**
  29:9;135:21
**whisked (1)**
  79:19
**whole (10)**
  26:6;70:22;86:22;
  88:8;98:9;117:18;
  145:19;149:24;
  176:18;179:23
**who's (5)**
  6:13;73:11;76:8;
  94:4;103:21
**whose (2)**
  122:10,12
**Why's (1)**
  11:23
**Widener (1)**
  124:10
**wife (18)**
  5:22;8:12;30:8,14;
  36:25;38:1;39:5,7,9;
  41:11;42:15;48:20;
  77:14;78:24;80:8;
  85:14;88:18;170:10
**willing (3)**
  5:13;50:25;83:7

**willingness (1)**
  177:4
**wind (3)**
  65:16;87:18;
  120:12
**wire (4)**
  76:2;79:12,21;
  80:3
**wish (7)**
  5:4,9;31:21;
  123:20,23;127:4;
  147:19
**wishes (3)**
  34:2;107:25;108:4
**withdraw (2)**
  26:5;196:23
**withdrawing (1)**
  117:12
**withdraws (4)**
  196:18,21;197:24,
  25
**withdrew (2)**
  12:3;26:12
**withhold (1)**
  187:5
**within (8)**
  43:21;55:18;65:3;
  89:14;106:1;162:23;
  167:6;194:15
**without (18)**
  7:7,8;15:15;16:9;
  19:20;31:1;95:5;
  100:22;106:4;116:3,
  23,24;117:22;
  131:24;179:20;
  180:4;187:21;
  188:10
**witness (131)**
  19:14;28:13,16,
  22;29:7,10;30:23;
  31:11,15,17,21;
  32:10,23;33:12,20;
  34:13,16;56:6,6;
  58:22;94:4;101:14;
  104:20,21;109:25;
  110:6,9,11,15,18;
  111:4,6,9;112:14,24;
  113:23;115:5,9;
  116:11,13,19,24;
  117:8,10,15,18;
  118:1,9,12;119:20;
  120:1;122:3,23;
  124:16,19;127:6;
  129:17,23;130:6,16;
  131:1,3;132:19;
  133:17,23;134:4,6,9,
  19;135:5,8,19,22,24;
  136:2,5,9,18;137:19;
  138:25;139:2,5;
  142:7,11,15,18;
  144:13,16,23;145:1,
  3,17,19,25;146:7,10,
  12,17;147:2,6,11,14,

18;148:1;150:15,18,
  25;156:2,11,17,24;
  157:6,9,11,18,20,25;
  158:2,12,19,23;
  163:2,5,7,9,9;
  192:11;196:8,25;
  198:2;199:8
**witness' (1)**
  149:16
**witnesses (17)**
  6:21,25;7:3,7,17,
  21,23,24,25;8:1;
  94:22;104:10,12,19;
  109:18;134:14;
  158:5
**wondering (1)**
  77:25
**word (2)**
  80:3,5
**words (1)**
  144:6
**work (16)**
  7:12,13;11:17,18;
  62:17;92:15;120:23;
  121:7;122:25;
  179:17,18,18;180:2;
  183:13,16,22
**worked (9)**
  91:6,12,14,20;
  93:6;98:19;102:12;
  111:25;118:20
**workers (1)**
  78:22
**working (5)**
  91:15;142:13;
  146:2;147:4;158:7
**workout (2)**
  193:2,4
**work-out (3)**
  71:12;195:2,4
**world (5)**
  60:14,15;74:5;
  154:13;156:25
**worry (1)**
  64:8
**worse (2)**
  189:16,18
**worth (1)**
  60:4
**wound (9)**
  52:10;57:23;58:4;
  85:10;176:7,7;
  182:13;184:18;
  185:17
**wrapped (1)**
  108:8
**write (2)**
  53:15;83:5
**writing (3)**
  61:17;107:18;
  113:18
**written (14)**
  23:14;49:16;

61:20,21,24,25;64:1,
2;83:16;107:15;
108:12;125:3;
182:14;193:25
**wrong (1)**
101:7
**wrongful (5)**
5:23,24,24;6:7;
23:3
**wrongful-foreclosure (1)**
24:2
**wrote (1)**
130:2

## Y

**yacht (1)**
83:24
**year (6)**
25:23;111:11;
124:11;174:3,4;
182:25
**years (16)**
9:12;12:3;26:21;
45:10;74:25;77:3,4;
111:4,25;126:16,17;
129:12;130:3;137:9;
160:9,9
**York (1)**
2:23

## Z

**zero (1)**
89:4
**Zoltun (1)**
110:15
**Z-O-L-T-U-N (1)**
110:16
**Zucker (1)**
183:9

## 0

**08 (1)**
183:10
**08330 (1)**
29:11
**09 (1)**
168:18

## 1

**1 (4)**
53:3,3,12;122:14
**1,000 (1)**
93:12
**1,040,000 (1)**
102:18
**1,300,000-dollar (1)**
172:2
**1.8 (2)**
61:16;62:8

**1.8-something (1)**
61:12
**1.9 (1)**
122:6
**1.97 (1)**
50:20
**1:30 (3)**
103:10;105:2,4
**1:36 (1)**
109:14
**10 (8)**
33:19;36:8,11,20;
38:15,20,23;174:3
**10:03 (1)**
34:11
**10:09 (1)**
69:20
**10040 (1)**
2:23
**10th (2)**
167:10,11
**11:29 (1)**
69:21
**12 (2)**
45:19;166:14
**12:15 (1)**
93:17
**12:30 (4)**
93:19;94:21;
103:9;105:4
**12-12020 (2)**
105:6;109:16
**12th (2)**
165:10;166:11
**13 (7)**
182:20;183:5;
186:5,9,16,17;187:6
**14 (5)**
186:5,9,16,17;
187:6
**15 (8)**
40:4,7;184:16;
186:5,9,12,18;187:6
**15-11 (1)**
126:20
**16 (4)**
69:10,12,18,23
**192nd (1)**
2:22
**1982 (1)**
23:1
**1990 (1)**
42:15
**1992 (1)**
48:8

## 2

**2 (10)**
54:14,16;55:15,
22;56:1;69:21;
103:10;104:7;105:1;
122:17

**2,040,000 (2)**
49:4;56:3
**2:02 (1)**
109:14
**20 (4)**
40:17;159:2,17;
197:9
**2006 (1)**
124:12
**2007 (4)**
42:12;43:18;50:4;
190:25
**2008 (41)**
8:19;9:8;12:16;
18:17;25:19;30:6,
15;39:19;50:4;
60:14,15,17;69:20,
21;74:13;75:17;
77:18;78:14,17;
102:5;125:20;143:4;
145:11,16;152:4,5;
162:7,16;169:20;
170:6;171:11;
181:13,15,16;182:5;
190:25;191:7,11,13;
193:17;197:11
**2009 (16)**
90:11;95:17,19;
96:7;124:13;129:19;
143:4;168:5,5,6,17;
174:2;189:19;190:7,
23;191:7
**200-and-some- (1)**
84:8
**2010 (15)**
96:2;111:14;
164:9;165:10,16;
166:11,14;167:10,
11;174:2,5;178:17;
189:19;190:7;191:7
**2011 (3)**
150:11;152:3,4
**2012 (15)**
100:16;101:23;
159:2,3,17;160:15,
16;161:17,17;162:6;
196:19,20;197:5,9,9
**2013 (2)**
129:21,25
**2014 (11)**
36:14,16;45:19;
111:14;121:4;125:8;
159:4;160:13;
161:18;162:6;
196:19
**20th (10)**
159:3;160:16;
161:17,17;162:6;
164:9;196:19,20;
197:5,8
**21703 (1)**
4:5
**21st (2)**

11:10;195:16
**22 (1)**
40:10
**22,500 (2)**
25:16,23
**22nd (4)**
7:5;69:20;193:22;
194:2
**25 (1)**
101:23
**25,000 (5)**
86:10;88:3,3;89:1,
10
**27 (2)**
102:5,5
**27th (1)**
145:16
**29th (7)**
36:14;75:14;
106:25;107:6,11;
108:2,17
**2A15-14 (1)**
126:20

## 3

**3 (15)**
33:6;36:16;79:10,
12;99:19,22;100:3,
10,14;101:22;102:8;
164:4,5;166:3;
167:10
**3,000 (3)**
68:22;72:21;
170:21
**3,000-dollar (3)**
68:15;72:7;193:10
**3,983 (1)**
185:7
**3:42 (1)**
158:17
**3:59 (1)**
158:17
**30,000 (1)**
85:10
**31 (1)**
193:17
**392 (1)**
105:7

## 4

**4 (6)**
15:22;16:3;107:1,
6;158:11,16
**4- (1)**
46:16
**4,000 (3)**
184:21;185:2,8
**400 (2)**
21:3;85:25
**400- (1)**
84:6

**400,000 (9)**
25:18;82:16,17,
23;83:7,17,23;
170:23;195:6
**400,000-dollar (3)**
24:16;171:3,22
**450,000 (1)**
24:24
**45a4 (1)**
159:24
**472,500 (1)**
8:17

## 5

**5 (5)**
150:3,7,13,24;
182:13
**5:30 (1)**
186:3
**5:35 (1)**
199:16
**50,000 (9)**
24:19;25:6,18;
51:10;79:5;82:17,
19;87:15,23
**500 (1)**
93:12
**500,000 (1)**
46:16
**5500 (1)**
4:4

## 6

**6 (2)**
56:1;129:19
**6,000 (1)**
86:12
**600,000 (1)**
195:7
**6166 (1)**
29:10

## 7

**7,000 (1)**
86:12
**7,000-dollar (1)**
194:9
**70,000 (1)**
51:9
**700 (1)**
2:22

## 8

**8036 (1)**
161:21
**817 (4)**
6:3;8:13;45:14;
194:24
**850 (4)**

48:20;56:11,13;
181:13
**8th (7)**
159:4;160:13,18,
22;161:18;162:6;
196:19

**9**

**9 (7)**
36:8,11;196:11;
197:22;198:17,24;
199:12
**9:52 (1)**
34:11
**900,000 (1)**
8:18
**9028 (1)**
161:8
**93 (1)**
48:9
**973406-2250 (1)**
2:24
**9th (2)**
129:21,25