# In Re:

*RESIDENTIAL CAPITAL, LLC, et al.*
*Case No. 12-12020-mg*

*September 16, 2014*

*eScribers, LLC*
*(973) 406-2250*
*operations@escribers.net*
*www.escribers.net*

*To purchase copies of this transcript, please contact us by phone or email*



**Min-U-Script® with Word Index**

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-12020-mg

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  RESIDENTIAL CAPITAL, LLC, et al.,

9

10             Debtors.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14             United States Bankruptcy Court

15             One Bowling Green

16             New York, New York

17

18             September 16, 2014

19             9:04 AM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

1

2    (CC: Doc#7017) Trial re: ResCap Borrower Claims Trust's

3    Objection to Proofs of Claim Filed by Frank Reed and Christina

4    Reed.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20    Transcribed by:  Aliza Chodoff

21    eScribers, LLC

22    700 West 192nd Street, Suite #607

23    New York, NY 10040

24    (973)406-2250

25    operations@escribers.net

1

2   A P P E A R A N C E S :

3   REED SMITH LLP

4        Attorneys for ResCap Borrower Claims Trust

5        1717 Arch Street

6        Suite 3100

7        Philadelphia, PA 19103

8

9   BY:   BARBARA K. HAGER, ESQ.

10

11

12   MORRISON & FOERSTER LLP

13        Attorneys for ResCap Borrower Claims Trust

14        250 West 55th Street

15        New York, NY 10019

16

17   BY:   JORDAN A. WISHNEW, ESQ.

18        NORMAN S. ROSENBAUM, ESQ. (TELEPHONICALLY)

19

20

21

22

23

24

25

1

2   DUANE MORRIS LLP

3          Attorneys for TD Bank

4          1540 Broadway

5          New York, NY 10036

6

7   BY:   PATRICIA H. HEER, ESQ.

8

9

10  FRANK REED, Pro Se

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        P R O C E E D I N G S

2             THE COURT:  Please be seated.  All right, we're back

3   on the record in Residential Capital, number 12-12020.  This is

4   day 2 of the evidentiary hearing regarding the Reeds' claims.

5             Can somebody advise me where we are with respect to

6   Mr. Curley?

7             MS. HAGER:  Your Honor, Mr. Curley has said counsel,

8   who will arrive this morning, said they could not arrange his

9   appearance.  They brought the certificate, so here you go.

10            THE COURT:  I don't want to hear from counsel for

11   Mr. Curley.

12            MS. HAGER:  Yeah.

13            THE COURT:  Mr. Curley's not here.  I don't need to

14   hear from you.  Is he going to be here today?

15            MS. HEER:  No, Your Honor.  He could not --

16            THE COURT:  Okay.

17            MS. HEER:  Nobody was available, Your Honor.

18            THE COURT:  If he's under subpoena -- I don't know

19   whether he's under subpoena.  If he's under subpoena for this

20   trial and he's not here, there may be consequences.

21            MS. HEER:  Your Honor, the amount of time of notice

22   for this was --

23            THE COURT:  I don't want to hear it today.

24            MS. HEER:  -- over the weekend.

25            THE COURT:  If this issue comes before me, I'll deal

RESIDENTIAL CAPITAL, LLC, et al.                    6

1   with it appropriately.  If he was served with a subpoena and

2   he's not here and the matter comes before me, you'll have an

3   opportunity to defend against any efforts to recover because of

4   his nonappearance.  I'm not dealing with it today.

5           I take it that the Trust has not agreed to withdraw

6   its objection to the Curley documents?

7           MS. HAGER:  That's correct, Your Honor.

8           THE COURT:  Okay.  Let's go, Mr. Reed.  You're on the

9   witness stand.

10          MS. HEER:  Your Honor, can I make a proposition?  Can

11  we make a proposition --

12          THE COURT:  Go ahead and make a proposition --

13          MS. HEER:  -- for --

14          THE COURT:  -- quickly.

15          MS. HEER:  -- to resolve this?

16          THE COURT:  You're taking my time.

17          MS. HEER:  Perhaps we can offer an affidavit to

18  resolve the issues --

19          THE COURT:  No --

20          MS. HEER:  -- the other issues?

21          MR. REED:  -- I don't think we can.  Mr. Curley has to

22  be here to testify.  We tried to resolve the issue about

23  Mr. Curley.  Any witness in this trial has to be here present

24  for cross-examination, so an affidavit doesn't do it.  His

25  physical presence is required.

1          MS. HEER:  Your Honor, the extent of the notification

2    that was received by Mr. Curley as to those specific issues

3    was --

4          THE COURT:  I'm not questioning --

5          MS. HEER:  -- was insufficient.

6          THE COURT:  -- that now.

7          MS. HEER:  Right.

8          THE COURT:  It's just a simple matter of --

9          MS. HEER:  Understood, Your Honor.

10         THE COURT:  I was told at the end of the day yesterday

11   that Mr. Curley had indicated to Mr. Reed he could be here this

12   morning.  He's not here.  I'm not getting into the issue of

13   whether he had to be here, whether he was properly served with

14   the subpoena, whether there was reasonable notice of it.  It's

15   a simple matter for the Court for today.  The trial is going

16   forward; it's ending today.  Mr. Curley is not here.

17         MS. HEER:  Your Honor, if I --

18         THE COURT:  Ms. Hager has not agreed --

19         MS. HEER:  -- if I just can just quickly --

20         THE COURT:  -- to stop -- Ms. Hager has not agreed to

21   withdraw the objections to the Curley documents; that's

22   certainly within the Trust's right to -- so I'm not questioning

23   that either.  It's just a simple matter; Curley is not here.

24         Mr. Reed, take the witness stand.

25         MS. HEER:  Thank you, Your Honor.

RESIDENTIAL CAPITAL, LLC, et al.                                    8

1           THE COURT:  Could you at least identify yourself for

2    the record?  I'm sorry.

3           MS. HEER:  Patricia Heer of Duane Morris, Your Honor,

4    for TD Bank.

5           THE COURT:  Okay.  Thank you very much.

6           MS. HEER:  Yes.  And if I can just quickly, Your

7    Honor; I understand I already took up the Court's time.  But

8    the indication about Mr. Curley's availability, that's

9    questionable.

10          THE COURT:  I'm not getting into it.  It's a simple

11    matter.

12          MS. HEER:  Understood, Your Honor.

13          THE COURT:  He's not here to testify --

14          MS. HEER:  Understood.

15          THE COURT:  -- and I have nothing else to do with it

16    today.

17          MS. HEER:  Understood, Your Honor.

18          THE COURT:  All right?

19          MS. HEER:  Thank you.

20          THE COURT:  All right, Mr. Reed.  You've been

21    testifying in the narrative form.  You indicated at the end of

22    the day yesterday that you intended to testify to give opinion

23    testimony about the value of your property.

24          Ms. Hager, did you file a brief?  I didn't see one.

25          MS. HAGER:  No, Your Honor, we didn't.

1          THE COURT:  Okay.  All right, go ahead, Mr. Reed.  Be

2    mindful, Mr. Reed, that your allotted time is running out.

3        (Pause)

4          MR. REED:  Your Honor, the value of my -- of the

5    property that I own I will discuss and is arrived at from

6    firsthand personal knowledge about my property, our town, my

7    neighbors' homes who have sold that I personally know those

8    properties, the -- viewing the tax records, public records on

9    the sale of those properties, and in the experience I have in

10   selling -- attempting to sell the property.

11          Your Honor said something yesterday about knowing

12   about real estate but not knowing the Moorestown market, and I

13   guess that's my role:  to talk about my house and the Rock --

14   the Moorestown -- Moorestown in general is a desirable town, in

15   my opinion.  In deciding to move there in 2006, we looked at a

16   variety of characteristics, from schooling and physical

17   conditions of the town, as well as, in arriving at the value or

18   the decision to live in our particular neighborhood, the

19   construction methods in -- of the property.

20          Sorry, I want to get these.

21          In regard to Moorestown itself, Moorestown has some

22   bit of notoriety.  It was number-one town in America, according

23   to Money Magazine, in 2006, which in my opinion increased the

24   value of the desirability being there.

25          THE COURT:  Ms. Hager?

1        MS. HAGER:  Objection.  Hearsay.

2        THE COURT:  Overruled.

3        MR. REED:  Our particular neighborhood we found and --

4   to be desirable, and other people do find it desirable, in my

5   opinion, because it has sidewalks; the construction of the

6   houses in particular, as I started to say.  I'm very aware

7   those other neighborhoods in the town are constructed in a way

8   that utilizes pre-fabricated building materials, like trusses;

9   they use joists at wider intervals.  This affects the actual

10  feel of the house.  Something called deflection, for example.

11  When you walk on a floor and you feel it's a little bit of a

12  bounce, the house doesn't feel as solid, is an example of

13  comments that are made about the houses in our neighborhood,

14  and in particular in regard to my house, because I -- there're

15  certain modifications I had made to the property.

16        Our builder, who actually lives in the neighborhood

17  and who I've consulted with even on the construction of his

18  home on our street, has -- is a third-generation builder.  They

19  are well known in the area.  Even the MLS listings list --

20  their last name is Maines, a Maines-built home, because the

21  people in Moorestown know that indicates richer appointments

22  (ph.), moldings, interior architecture features, that aren't

23  necessarily reflected -- those things are not things that are

24  reflected or picked up in appraisals.  The effect of value in

25  the marketability of -- primarily in the marketability, and

1  you'll see it in the pricing differential as a trend in that --

2  like that neighborhood versus another house.

3         To speak about the trusses, for example, in a

4  construction of the roofs, in our house it's what's called

5  stick-built.  So there's actual lumber -- individual lumber

6  pieces that are used in the construction.  That, for example,

7  allowed me to take the house and convert the third floor into

8  real living space.  The staircase -- the staircases in our

9  house go from the basement all the way to the third floor; it's

10  an open foyer all the way down.  So it seamlessly allows you to

11  integrate if you're going to expand.  And I use the same

12  contractors, subcontractors as the builder.  I do -- I did

13  labor myself before I was injured.

14         And we expanded the third floor, I want to say, maybe

15  twenty -- or -- excuse me -- 1,200, 1,300 square feet, two-

16  bedroom suites, two bathrooms on the third floor.  The ceilings

17  we raised -- the cross-members are called collar ties -- up to

18  eleven feet.  Again, some of these features are not what you

19  would see in an appraisal, but they make value.  And the

20  buyers -- potential buyers feel that, and that's what compels

21  them to agree to a higher price.

22         That also has a bad side, as with the Jacobs contract

23  and the appraisal, for their purpose, from Commerce Bank, is

24  those elements don't get counted into the appraisal.  It

25  generates an attractiveness to buy the property.  It -- and it

1  takes the buying ability or power to the -- typically to the

2  high end or to the end or off the scale of the appraisal.

3       (Pause)

4            MR. REED:  Because of the unique nature -- or atypical

5  nature of the construction methods and materials that are used,

6  when you look at the value of the property, you have to look at

7  houses, in my opinion, that were built by the same builder or

8  in the same neighborhood.  The builder -- it's an

9  architecturally controlled neighborhood.  You -- for example, I

10  can't change anything -- or couldn't change anything on the

11  property for ten years.  It was derestricted -- I believe it's

12  filed with part of the public record -- without approval from

13  them.  And this is unlike anything else in the town of

14  Moorestown.

15          Beyond the physical features of the house itself and

16  the town in general, the neighborhood as a microcosm of the --

17  or a smaller market from the town, or specific market of the

18  town in general, there're other elements that go into the value

19  of a property when you're trying to market it.  This is, again,

20  from my experience only on this specific property, multiple

21  contracts and offers on the property itself, but years of

22  experience doing it with other properties and my own.

23          And there're two -- I think at this moment there are

24  two elements that make up value for prospective customers,

25  besides the neighborhood or the town, or the unappraised or

1    unappraisable features like the moldings, the engineering, even

2    the landscaping, of the property, and the overall appearance

3    because of the restrictions and the rules governing the

4    neighborhood and its look itself.  One element that's not

5    physical to the property itself but it determines the value

6    greatly in the property itself, to many customers, in my

7    opinion, in my experience, overwhelming amount of customers, is

8    the ability to set a specific time or date for delivery.  A

9    term -- it's expressed as an actual term in the contract.  It's

10   that important.  Every real-estate contract I've ever been a

11   part of needs to be able to give a fixed date on which the

12   contract must be fulfilled.

13           In my experience, the typical buyers for the family

14   home that I have, or potential buyers, and for other family

15   homes that I have marketed, are moving from one family home to

16   another; they're not a newly constituted entity formed out of

17   thin air.  They want to move a family, in my experience, and

18   they need a firm date to do it.

19           MS. HAGER:  Objection.  Speculative, and he's talking

20   about --

21           THE COURT:  You're overruled.

22           MS. HAGER:  -- what other people's motivations are.

23           MR. REED:  The other day I talked about even the time

24   of the year having an effect on this, because families want to

25   move -- they like to move midyear, in my experience.  They have

1   to move their children into different schools.  They like to

2   move in the summer is another -- it's the most desirable time

3   of the year.  And so one of the first questions upon an

4   inspection of a house or even pre-inspection of a house --

5   you'll see it in MLS listings -- is "available now for closing"

6   or "quick closing" or something like that.  But there's always

7   some idea that you conclude, because a contract has to have

8   that element or it's not a contract; it's an open-ended, okay,

9   you can buy it sometime in the future, but it's not binding,

10  from my experience.  And people can't practically live or make

11  plans like that.

12          And my experience related to that property and my

13  experience with other -- first let me say my experience related

14  to that property, regarding litigation, conflicts and -- is

15  commensurate with my experience with other properties, other

16  litigation experiences that I've had, that conflicts and

17  litigation, in our modern society, take a long time, and not

18  just because I talk slow.  They take a while.  I mean, this has

19  its origins in 2008.

20          I would like to take a moment to tie in the lis

21  pendens issue.  Ms. Hager said the other day a lis pendens is a

22  notice; it's a notice of a potential lien, it's a notice of a

23  conflict.  It's a public record.  People are well aware of it.

24  Our expert states that the real --

25          THE COURT:  Mr. Reed --

1          MR. REED:  -- estate profession --

2          THE COURT:  -- I'm permitting you to give testimony

3     about the value of your property --

4          MR. REED:  Okay.

5          THE COURT:  -- because I believe that the law permits

6     a homeowner to do that.  I'm not going to permit you to give me

7     a lecture about the state of the world or impact of litigation.

8     If you tie it -- I've got -- I'm trying to give you leeway.

9          MR. REED:  Okay.

10          THE COURT:  You're also against the clock.

11          MR. REED:  Okay.

12          THE COURT:  If you want to testify about the value of

13     the property and how you arrived at your estimates of value,

14     I'm going to permit you to do that.

15          (Pause)

16          MR. REED:  Your Honor, the -- my house, in 2008 --

17     I'll speak about the value of the house in 2008, from my

18     perspective.  An indication of that value -- a strong

19     indication of that value, if it was -- is the Jacobs contract.

20     The Jacobses are individuals who live in Moorestown.  As a

21     matter of fact, they live in a more expensive house than I do.

22     And the Jacobses expressed to me their desire to live in our

23     house was because of -- they felt it was better construction --

24          MS. HAGER:  Objection.  Hearsay.

25          THE COURT:  Sustained.

1      MR. REED:  And it was my impression -- because I can't

2   quote them -- that they wanted to live in our neighborhood

3   because it was better than where they lived in Moorestown.  So

4   they agreed to the two-million -- arm's-length transaction for

5   2,040,000 dollars.  To support that value -- in my opinion that

6   that was correct as well -- over a year-plus later, this is the

7   value of the house and the neighborhood together.  The neighbor

8   in my back yard was --

9      THE COURT:  Let me step aside for a second.

10      Ms. Hager, does the Trust contest that the contract

11   price with the Jacobses reflected the fair market value of the

12   property as of the date of the contract?

13      MS. HAGER:  Yes, because there was another appraisal

14   that --

15      THE COURT:  Fine.

16      MS. HAGER:  -- conflicted with that number.

17      THE COURT:  Go ahead, Mr. Reed.

18      MR. REED:  Your Honor, that appraisal, as I

19   understand, is not in evidence.

20      THE COURT:  Just go on with your testimony, Mr. Reed.

21      MR. REED:  Okay.  So the neighbor's house that is

22   similar in size, 6,000 -- I say, within a few hundred square

23   feet of my house.  Mine's 6,700.  They're just over 6,000, or

24   6,400; I can't remember the square feet.  I have seven

25   bedrooms, ten baths.  They have six bedrooms, I think seven or

1    eight baths.  Over a year later when the market was supposedly

2    crashing throughout the country, that house sold in about a

3    week of being on the market, for over two million dollars.

4             I know the Murphys; I've been in their house many

5    times.  Their daughter and son are friends with my children.

6    And so I know what's inside their house, again, because I know

7    the builder.

8             THE COURT:  When you say "the Murphys", is this the

9    same house you're talking about, your neighbor's house?

10            MR. REED:  Yes.  I'm sorry.

11            THE COURT:  Okay.  I just wanted to make sure I was

12   connecting the names --

13            MR. REED:  Yeah, yeah.  Sorry about that.  Sorry.  You

14   don't know the Murphys.

15            In 2010 on my street, it's a house -- wasn't as

16   friendly with those people, but I knew it; same house built --

17   another house built by Rob Maines and his brother, a house I

18   actually helped my cousin put some counter parts in, sold in

19   2010 for close to a million and a half dollars.  It was on the

20   market, again, for about a week, again, at a time where I guess

21   the general feeling in the real-estate world was it was

22   freefalling.

23            2010 is the same year that the Roccisanos made an

24   offer to us for a million-350.  It's particularly interesting,

25   since the house several houses down from 831 Matlack Drive sold

1   for 130,000 more and it's a smaller house.  It's --

2             THE COURT:  130,000 more than what?

3             MR. REED:  A hundred -- excuse me.  130,000 more than

4   the Roccisanos' offer.  So here you have a house on my street

5   selling rapidly for a million-465.  What offer do I get?  A

6   one-350.  And the house is massively different, strikingly

7   different.  My house -- I spoke of the builders' accoutrements

8   (ph.); it's known in our marketplace.  I enhance that.  I

9   design and construct elaborate interior architectural pieces,

10  tray ceilings, coffered ceilings, iron rail stairca -- or

11  spindle staircases, thicker hand-railings, thick marble

12  flooring.  So where the 831 Matlack is a more standard house

13  for the -- built by the Maineses, mine is more enhanced, not in

14  the -- just the nonappraisable features, but the square

15  footage.

16            At the end of 2010, Your Honor -- you asked me when

17  did we delist the house.  It occurred at the end of 2010; I

18  believe, November 2010.  That's when our listing agreement, I

19  believe, with B.T. Edgar expired.  This is over a year after we

20  evicted Mr. Cooper.  There continued to be sales in our

21  neighborhood.  There continued to be relatively speedy sales.

22  And ours did not (sic), although, when the Jacobs contract was

23  put out, very quickly it went under contract, even at the top-

24  value dollar -- top asking price we did.

25            The Cooper contract, despite whatever his motivation

1    may have been or who he was or what he was about, he still had

2    to make a decision if that house was desirable, and he did --

3    Mr. Weaver, Cooper, whatever his name is -- so much so that he

4    even tendered a great deal of money in attempts to obtain that

5    house.

6           At the end of 2010, the Edgar people -- the Edgar Real

7    Estate (sic) did not want to continue our business relationship

8    for listing, at that time.  And my impression, since I will not

9    quote them -- I guess I cannot -- is that it's because the

10   house wasn't going to (a) garner the amount of money they

11   thought it should, (b) ever be able to close unless the

12   conflicts with GMAC were resolved.

13          MS. HAGER:  Objection.  Also speculation.

14          THE COURT:  Sustained.  Testimony's stricken about

15   Edgar's reasons for not wanting to continue with the listing.

16          MR. REED:  So, Your Honor, our house being larger in

17   square footage, over 6,000 square feet, more bedrooms and more

18   baths, even though there was some decline, I think, in the

19   market in 2010, it is my opinion that my house would still have

20   been worth close to the one million eight, maybe one million

21   750, if it had -- if I had had full ability to negotiate a

22   contract and list terms and provide terms, certain terms which

23   I could sell it.

24          I would like to --

25          THE COURT:  Ask you this, Mr. Reed:  do you know what

1    your outstanding -- what the outstanding mortgages, liens, on

2    the property were at the end of 2010?

3              MR. REED:  At the end of 2010, Your Honor?

4              THE COURT:  Yes, because you're giving me an opinion

5    of value of the house, at the end of 2010.  And so my question

6    is what were the existing encumbrances, whether that's

7    mortgages, unpaid property taxes --

8              MR. REED:  Um-hum.  Um-hum.

9              THE COURT:  -- any other liens that may have existed

10   on the property?  Do you know what the amount was?

11             MR. REED:  In 2010 there was the outstanding balance

12   on the note, of nine hundred and, I think, eighty-eight --

13   ninety thousand dollars.  It's close to a million dollars.  If

14   you want to round up to a million dollars, you can round up to

15   a million dollars.

16             The real-estate tax, 2010, say, maybe 70-, 75-, 80,000

17   dollars perhaps, in arrears.

18             THE COURT:  Any other liens or encumbrances that you

19   were aware of at the end of 2010?

20             MR. REED:  No, Your Honor, because I had to pay them

21   off at the -- when I received the money from Mr. Cooper.  I

22   don't know what the interest and penalties on that -- for that

23   mortgage was at that time.  I can't -- I don't know.

24             Are you going to give your opinion of value at any

25   other dates?  I'm really mindful -- I want to hear your

1   testimony, Mr. Reed --

2           MR. REED:  Yeah.  Yeah.

3           THE COURT:  -- but your time is running.

4           MR. REED:  Your Honor, I cannot say, because I

5   don't -- I did not expose the house to the market.  I believe

6   the interference, in my opinion, had its effect then and would

7   continue to have an effect until resolved.  At that point we

8   became, as you know, involved in litigation, and counsel was

9   involved in attempts to resolve the issue.

10           I would like to point out one other thing; I don't

11   know if it's allowed, that it will be objected to if it is

12   not -- I mean if it is.  There's an appraisal that was let in

13   not for the truth of the value.

14           What exhibit was that?  2.

15       (Pause)

16           THE COURT:  Mr. Reed, let me make sure I understand.

17   I've heard you give your opinion of value of your property at

18   two dates:  first, at the time of the Jacobs contract,

19   2,040,000 dollars; and second, at the end of 2010 where you

20   estimate the value at 1.75 to 1.8 million.  Am I correct?

21   That's what I've heard you tell me.

22           MR. REED:  Yes.  And the other value, of course, would

23   be constrained by my agreement to sell that to Mr. Cooper at a

24   million-eight.  I can't -- that's -- I mean, at least that's by

25   default.  I mean, I --

 1                THE COURT:  What was the date of that?

 2                MR. REED:  That was 2008 into -- on track.  Two

 3      thousand -- yes.

 4                THE COURT:  All right.

 5                MR. REED:  But I feel that I let that -- Your Honor, I

 6      let it go for less than what I thought it would -- I mean, I

 7      though it was worth closer to, like, a million-nine.  But I was

 8      under the pressure that I felt.

 9                THE COURT:  All right, so you've given me your

10      estimate of value at three points in time.  Is there any other

11      valuation testimony that you want to give?

12          (Pause)

13                MR. REED:  Again, Your Honor, this is -- I want to be

14      clear for the record.  The values that I state are the values

15      that are -- are the value of the property if I could have

16      delivered it clear without interference, that I could have

17      marketed property.  The values impacted by what I believe

18      impacted it, the time element, show maybe a million-three in

19      2010, but I don't know because we didn't really -- we didn't do

20      a deal -- or an offer I had in twenty -- I think it was 2011

21      from Ms. Singh for a million-one.  And I would have to say, for

22      2011, I have no reason to believe that the value would have

23      declined any further from what I thought it would be in 2010.

24                So to address you, 2011 would be the same value or

25      similar, very similar, to 2010, for the marketable, clear,

1    clean marketability of that property.  But the functional value

2    that I was left with was -- I think, as of the last offer that

3    I received, was a million -- I don't have it in front of me --

4    a million-one from Ms. Singh.

5          So those are the two values.  I just want you to

6    understand my opinion has two values to it.  Prior to this

7    event, I have one opinion of value.  Post the event, I have two

8    opinions of value:  one affected, one unaffected.

9          THE COURT:  All right, are there other areas that you

10   want to testify about other than value?

11         MR. REED:  Yes.

12         THE COURT:  I want to make sure -- let's --

13         MR. REED:  Yeah.  No --

14         THE COURT:  -- get it done, okay?

15         MR. REED:  -- Your Honor, I want to -- I think I said

16   yesterday when I was having a little difficult time, the stress

17   that we felt over this -- course of this extended interaction.

18   I'd also like to move into evidence -- and I don't know if I

19   need to comment about it.  Ms. Hager had said she had no

20   objection to the interagency foreclosure review.

21         THE COURT:  It's in evidence already.

22         MR. REED:  I think it was, right?

23         THE COURT:  It's in evidence.

24         MR. REED:  And then also the testimony of the

25   representative from the Federal Reserve -- or -- oh, excuse me;

 1  this one is for Julie Williams; it's --

 2           THE COURT:  What exhibit number?

 3           MR. REED:  It's Exhibit number 17.

 4           THE COURT:  Ms. Hager, any objections?

 5           MS. HAGER:  No, Your Honor.

 6           THE COURT:  All right, Exhibit 17 is in evidence.

 7  (Testimony of Julie Williams was hereby received into evidence

 8  as Reed's Exhibit 17, as of this date.)

 9           MR. REED:  Exhibit number 4, statement of Scott

10  Alvarez from Federal Reserve, before the USA.

11           THE COURT:  Any objection?

12           MS. HAGER:  No objection, Your Honor.

13           THE COURT:  All right, Exhibit 4, the statement of

14  Scott Alvarez, general counsel of the board of governors of the

15  Federal Reserve System, is in evidence.

16  (Statement of Scott Alvarez was hereby received into evidence

17  as Reed's Exhibit 4, as of this date.)

18           MR. REED:  Exhibit number 6; it's a lis pendens.

19           THE COURT:  Hold on.  It's in evidence under another

20  exhibit number --

21           MR. REED:  Okay.

22           THE COURT:  -- already.

23           But do you have any objection to Exhibit 6?

24           MS. HAGER:  No objection, Your Honor.

25           THE COURT:  All right --

1           MR. REED:  It's number --

2           THE COURT:  -- Exhibit 6, lis pendens, is in evidence.

3   (Lis pendens was hereby received into evidence as Reed's

4   Exhibit 6, as of this date.)

5           MR. REED:  Exhibit number 7.

6           THE COURT:  Any objection, Ms. Hager?

7           MS. HAGER:  No, Your Honor.

8           THE COURT:  All right, it's in evidence.

9   (Notification from 21st Mortgage Corporation was hereby

10  received into evidence as Reed's Exhibit 7, as of this date.)

11          MR. REED:  Exhibit number 8.

12          THE COURT:  Any objection?

13          MS. HAGER:  No objection, Your Honor.

14  (Order was hereby received into evidence as Reed's Exhibit 8,

15  as of this date.)

16          MR. REED:  Your Honor, I'd like to make one statement

17  for the record on Exhibit number 8.  The copy of that order

18  came to me from GMACM's counsel; it was mailed to me.  I didn't

19  get it from the Court.  I recall getting it from GMACM in the

20  mail.

21          THE COURT:  That's because in paragraph 3 on page 2 of

22  the order, it says that "Plaintiff serve a copy of this order

23  on Frank J. Reed, III, defendant, and to counsel for all

24  parties-in-interest, within seven days of Plaintiff's counsel

25  receiving the order."  So they were ordered to do that and I

1  guess they did.

2            MR. REED:  I guess they did.

3            THE COURT:  Okay.

4            MR. REED:  Exhibit number 9.

5            THE COURT:  Ms. Hager, any objections?

6            MS. HAGER:  No objection, Your Honor.

7            THE COURT:  All right, the Delehey declaration and its

8  attachments, which Mr. Reed marked as Exhibit 3, are admitted

9  in evidence.

10 (Delehey declaration and its attachments were hereby received

11 into evidence as Reed's Exhibit 9, as of this date.)

12            MR. REED:  Number 11, Your Honor, I'd like to talk

13 about for a moment.

14            MS. HAGER:  Excuse me, Mr. Reed; I'm sorry.

15            Your Honor, I beg your pardon.  Maybe I misheard.  Did

16 you reference Claimants' Exhibit 3 --

17            THE COURT:  No.

18            MS. HAGER:  -- or was that 9?

19            THE COURT:  Here's what -- it's Exhibit 9 but, when

20 you turn to the first page of Exhibit 9, it says "Exhibit 3 -

21 Delehey Declaration".  So that was what I was reading.  It's

22 Mr. Reed's Exhibit 9.

23            MS. HAGER:  Thank you.

24            THE COURT:  Okay.  And it includes the attachments to

25 it.

1          I'm sorry; your next exhibit was which, Mr. Reed?

2          MR. REED:  Exhibit 11.

3          THE COURT:  For what purpose are you offering Exhibit

4    11?  It's a transcript from a hearing in this court.

5          MS. HAGER:  No objection.

6          THE COURT:  All right, it's in evidence.  There's no

7    objection.

8    (Hearing transcript was hereby received into evidence as Reed's

9    Exhibit 11, as of this date.)

10          MR. REED:  Exhibit 12.

11          THE COURT:  Any objection?

12          MS. HAGER:  No, Your Honor.

13          THE COURT:  All right, Exhibit 12 is the amended

14   complaint for foreclosure, and it's in evidence.

15   (Amended complaint for foreclosure was hereby received into

16   evidence as Reed's Exhibit 12, as of this date.)

17          MR. REED:  I believe Exhibit 13, 14 and 15, Your

18   Honor, we still have an issue with those, and --

19          THE COURT:  We do.

20          MR. REED:  There's an affidavit.  Ms. Hager and I -- I

21   said at the end of the day yesterday I think there's something

22   else we were supposed to talk about besides the TD issue;

23   Ms. Hager couldn't recall what it was, neither did I, and then

24   I did this morning; and to show her the affidavits -- or the

25   declarations from the three attorneys regarding those bills.

1          THE COURT:  Right.  Ms. Hager, do you object to 13, 14

2    and 15?

3          MS. HAGER:  My objections from yesterday remain.  I

4    have not seen those affidavits yet.

5          THE COURT:  I thought he talked -- you --

6          MR. REED:  We forgot to do it at the end -- I can do

7    it right now, Your Honor, if you --

8          THE COURT:  No, let's -- during a recess you'll do

9    that.

10          MR. REED:  I believe that Exhibit 16 was superseded by

11    MM.

12          THE COURT:  Correct, and it's in evidence.

13          MR. REED:  Exhibit 17, did we just admit that?

14          THE COURT:  We did.

15          MR. REED:  Exhibit 19 is an exhibit Ms. Hager agreed

16    pre-trial to allow.

17          THE COURT:  Could somebody tell me what it is?  It's

18    not self-evident to me.

19          MR. REED:  Your Honor, at the same time I had spoken

20    to -- or in the spring before the foreclosure, I'd spoken to

21    another broker -- "a broker" meaning a mortgage lender, an

22    individual who represented himself as such.  The individual

23    took information from me, I believe.  We discussed the value --

24    values of my property.  The intent was, just like the TD issue,

25    to -- TD pursuit, to have some liquidity in a line of credit or

RESIDENTIAL CAPITAL, LLC, et al.                    29

1   a cash-out ref -- excuse me -- a refi.  And the individual had

2   gotten back to me, and this is -- there's not -- I couldn't

3   give you dates and times.

4            THE COURT:  I don't understand what it is, Mr. Reed;

5   that's what --

6            MR. REED:  Oh, it's a letter -- I'm sorry.  It's a

7   letter from an individual who was a -- who represented himself

8   as an employee of a mortgage company, and we discussed

9   borrowing money on 817 Matlack Drive.  I gave the individual

10  the information that I -- I can't tell you the specific

11  information, but I remember him being satisfied with what he

12  wanted.  He got back to me and said we had several options

13  available to me.  I didn't concern myself, as I didn't with TD

14  Bank, as to the details.  If I needed one, I would have

15  selected one and executed it.

16           I was told that that's all that remained to be done.

17  The only verification of this interaction was this

18  correspondence.  Ms. Hager did not object to it like she

19  objected to the TD Bank's letters.  I say -- I suspect, I

20  think, I knew why.  She'll discuss it.  But --

21           THE COURT:  Ms. Hager, you have any objection to

22  Exhibit 19?

23           MS. HAGER:  No, Your Honor.

24           THE COURT:  All right, Exhibit 19, which is the

25  document dated November 20th, 2010, addressed To Whom It May

1  Concern, from Thomas J. Tartamosa, okay, it's in evidence.

2  (Document dated November 20th, 2010, addressed To Whom It May

3  Concern, from Thomas J. Tartamosa, was hereby received into

4  evidence as Reed's Exhibit 19, as of this date.)

5          MR. REED:  Can I know what time I have left?

6          THE COURT:  Let's just -- are you offering any other

7  exhibits --

8          MR. REED:  I may, Your Honor.

9          THE COURT:  So let's get that done, okay?

10          MR. REED:  Exhibit 18.

11          THE COURT:  That's actually the one I was looking at

12  when I said I had no clue what it is.

13          MS. HAGER:  Your Honor, Exhibit 18 is an excerpt from

14  GMAC's servicing notes.  We intend to offer the complete record

15  of the servicing notes.  So I object to 18.  It's hearsay as it

16  is, and incomplete; it's not the best evidence.  We will be

17  offering into evidence a document which actually contains

18  Exhibit 18.

19          THE COURT:  All right, so, Mr. Reed, the entire set of

20  servicing notes are going to come into evidence and, somehow,

21  if something goes awry, we'll come back to this, okay?

22          MR. REED:  Okay.

23          THE COURT:  All right.  Any other exhibits you're

24  offering?

25          MR. REED:  I don't think so.  That's my entire book of

 1  evidence that was filed pre-trial.

 2          THE COURT:  Well, not everything that you have in this

 3  book has been offered, but --

 4          MR. REED:  Let me -- then let's make sure I understand

 5  that.  Let's see.  I thought 1 --

 6          THE COURT:  I'll tell you what:  during a recess you

 7  can speak with Ms. Dabbert and she'll review with you and

 8  Ms. Hager what documents have come into evidence, all right?

 9  Let's not take the time now to do that, unless you know

10  something else you're offering.

11          All right, you'll deal with the -- I'll give you a

12  chance during a break to talk about the exhibits.  And if

13  there're exhibit issues, you can raise that after the break.

14  Is there any other areas to which you wish to provide

15  testimony, Mr. Reed?

16      (Pause)

17          MR. REED:  Your Honor, I'd like to say if I haven't

18  said for the record that in 2010 is when I became aware that

19  there was the lis pendens and the public recordation of

20  litigation regarding the property, the foreclosure action.  I

21  learned that from the realtors.  And it's at -- it's -- I

22  believe it was 2010.

23          I'd like to testify that, Your Honor, it's never been

24  my intent to not mitigate the damages that I'm seeking to

25  recover for, that the damages themselves are not restricted to

 1   just the -- in my opinion, the increase or the carrying or

 2   the -- as I said yesterday, I want to be able to have the money

 3   to pay the current mortgage company.  But for this interference

 4   it would have sold; there would be no continued rule of a bill.

 5   It's been -- I'm sure it's going to be discussed that when I

 6   received monies why didn't I just pay the -- the mortgage

 7   itself.  The mitigation efforts involved trying to sell the

 8   house, discount the house, reaching out, finding counsel,

 9   seeking advice, seeking help.  The money that was received

10   reduced the carrying costs for the house.  If I didn't pay,

11   say, the second mortgage off, I would probably make the

12   argument, but for their bad act, there'd be a -- the second

13   mortgage would not have been paid off, and we'd have the

14   balance that has accrued, going forward, from that second

15   mortgage.  So that ongoing expense was extinguished, just like

16   any expense on carrying the house beyond a point that otherwise

17   would not be my responsibility because it would have been sold.

18   So I point to the fact that we did eliminate carrying costs and

19   accrual of expenses for the property.

20           I'd like to review some papers for a moment.

21       (Pause)

22           MR. REED:  Your Honor, I'd like to point out for the

23   record that if I'd received a notice of intent to foreclose

24   that's required by law and by contract -- I don't know how to

25   quantify this.  I'm going to put it to you as it -- as it has

1    coalesced in my mind.  A significant piece of information

2    required by that law is to say who the actual lender is, not

3    just the servicer but the lender, the noteholder.  The

4    significance of that, especially as we stand here today or sit

5    here today, is that it's been well represented by the Trust

6    that the noteholder, a party to the note contract, counterparty

7    to me in that note, is a nondebtor entity, GMAC Bank, at the

8    time the notice was required, at the time the foreclosure was

9    filed.  The statute of limitations has run --

10            THE COURT:  Let's not make legal arguments --

11            MR. REED:  Okay.

12            THE COURT:  -- Mr. Reed.

13            MR. REED:  Okay.  I don't know what I -- let's why I

14    said, I don't --

15            THE COURT:  This is not the time for legal arguments.

16            MR. REED:  Okay.  So I guess it's just important then

17    to say that that information would have been there for us to

18    see for whatever purpose.  And we, as far as I know, were never

19    provided that information, as evidenced by the fact that when

20    we pursued GMAC, the noteholder was not listed as a -- as a

21    defendant, because we were unaware of it, because the

22    information was not given to us, as required by contract and

23    law.

24            As to what that damage has done, I don't know if this

25    is a legal statement, Your Honor, and you can stop me; I

RESIDENTIAL CAPITAL, LLC, et al.                    34

1  apologize if I fail to recognize the difference.  I spent or

2  accrued tens of thousands of dollars in legal bills in regards

3  to Mr. Walters pursuing the wrong person, or one of the wrong

4  entities, not the correct entity, as asserted by the Trust.

5  They said at the time the proper party -- the proper party to

6  the contract with me was GMAC Bank.  To what result that would

7  have been, if we had contacted GMAC Bank, we served GMAC Bank,

8  we spoke to GMAC Bank, I cannot answer that at this time.  But

9  I know that we spent thousands and thousands of dollars or

10 accrued that money that -- because we were deprived, through an

11 act of omission and a breach -- sorry, maybe that's a con -- it

12 sounds like a legal thing I was about to say -- failure to

13 provide it in the contract.

14         It's my understanding that it was also during the

15 litigation that it was requested if there were any other

16 parties that should be named, and that was not provided at that

17 time either.  Again, I don't know -- in my mind the damage from

18 that is, A, the money I spent chasing the wrong person; B, I

19 even get in a word here --

20         THE COURT:  You say you were chasing the wrong person,

21 but you're chasing the same party now.

22         MR. REED:  No, I'm sorry, one of -- excuse me, not the

23 wrong person, but a -- a missing party, a missing party.

24         THE COURT:  I have your point.  Anything else you want

25 to -- because you're really out of time.  I've let you go on

1  longer than --

2          MR. REED:  Oh.

3          THE COURT:  -- your allotted time.

4          MR. REED:  And then the other -- the other estimation

5  of damage in that regard, Your Honor, would be the missed

6  opportunity to chase a -- a solvent entity for the damages as a

7  codefendant, versus here, in this forum, if indeed I get an

8  award at a reduced amount.  I don't know how to address that

9  either.

10          THE COURT:  Mr. Reed, you were represented by counsel

11  in your action against GMAC in state court.  The arguments

12  you're making now are things that you could have -- your lawyer

13  could have done then, so I'm not making any legal

14  determination, but I hear your argument.

15          Any other additional points you want to make quickly?

16          MR. REED:  I want to be clear about something else,

17  Your Honor.  And this -- this -- I want you to -- I don't know

18  how to say this, but I'm going to and we can -- you can tell me

19  what to do with this.  If I had gotten the money from the house

20  at the sale, unimpeded, sold it, had my equity from it, I would

21  have been in either one of my existing homes or one off the

22  shelf with no mortgage.  Being served with the foreclosure

23  itself blew my mind and my wife's mind.

24          THE COURT:  Mr. Reed, how could it have blown your

25  mind when you hadn't paid your mortgage for months and you

RESIDENTIAL CAPITAL, LLC, et al.                    36

1   haven't paid it since then?  That's what defies belief on my

2   part.  You have not paid a penny since early 2008.  So how you

3   think you're exempt from foreclosure of your home, when you

4   haven't paid your mortgage, is what I have problems with.  I

5   understand your arguments about whether GMACM dotted the i's

6   and crossed the t's and could have or should have filed the

7   foreclosure action that they did file when they did.  But the

8   fact that the mortgagee, the holder of the note, could bring an

9   action to foreclose on your home, is beyond dispute, Mr. Reed.

10   It is simply beyond dispute.

11          Okay.  Is there any last point you want to make

12   quickly?

13          MR. REED:  It is a surprise, as I would have paid it

14   if I had a notice.

15          THE COURT:  Okay.  That's speculation; I'm going to

16   exclude that testimony.

17          Is there any other testimony you wish to give in

18   support of your claim?  Now is the time, because we're breaking

19   for a recess as soon as you finish, and Ms. Hager will commence

20   her cross-examination after the recess.

21          And when I say that the lender or the loan servicer

22   should have dotted the Is and crossed the Ts, it absolutely

23   should have.  There is no doubt in my mind about that; that's

24   what the law requires.  So I'm not suggesting that what they

25   did was correct or proper.  I'm not ruling on that at this

1  point.  But I'm not suggesting at all that they acted

2  appropriately, or not, in bringing the foreclosure action when

3  they did.

4          Okay.  Any last points you wish to testify to?

5          MR. REED:  Sorry if you've made me a little unsettled,

6  Your Honor.

7          THE COURT:  I've been very patient.

8          MR. REED:  You have been.  I -- we're on the record,

9  Your Honor, I think that you have been --

10          THE COURT:  Okay.  Let's just -- is there any last

11  points you wish to make in your testimony, about facts, not

12  argument?

13          MR. REED:  I can't think of them, Your Honor, other

14  than that you said we're going to enter evidence.  You said I

15  could check on that.

16          THE COURT:  Okay.  What we're going to do is we're

17  going to take a half-hour recess.  You don't have to use your

18  whole half hour for that, but I want Mr. Reed and Ms. Hager, or

19  other counsel, to -- there are a couple of specifically open

20  issues, and it's the three Exhibits 13, 14, and 15.  You're

21  going to review with Ms. Hager the additional declarations or

22  affidavits you have, and you're also going to review your

23  documents to see whether there are any others that you wish to

24  offer.

25          Were there any other items, Ms. Hager, that you and

1  Mr. Reed were going to confer about?

2          MS. HAGER:  No, Your Honor.

3          THE COURT:  Okay.  Mr. Reed?

4          MR. REED:  I can't --

5          THE COURT:  All right.  We're going to take --

6          MS. HEER:  Your Honor, if I may, real quick?  Thank

7  you, Your Honor.  I apologize, Your Honor.

8          THE COURT:  Identify yourself for the record again.

9          MS. HEER:  Patricia Heer of Duane Morris, for TD Bank,

10  Your Honor.

11          Again, I understand that the Court has said that the

12  trial is ending today --

13          THE COURT:  I'm not revisiting my ruling.

14          MS. HEER:  If I can just request a short hearing,

15  whenever the Court is available.  And there is -- we have no

16  issue -- Mr. Curley has no issue with coming and testifying.

17          THE COURT:  There's no reason for me to have a short

18  hearing because no one -- Mr. Reed has not sought relief from

19  the Court with respect to Mr. Curley's nonappearance.  If and

20  when such an application is made to the Court, you'll have

21  ample notice of it and an opportunity to appear.

22          MS. HEER:  Thank you, Your Honor.

23          THE COURT:  All right.  We're going to be in recess

24  for a half hour.  Obviously everybody take a break, but part of

25  that half hour is intended to give you a chance -- and maybe

1   what you ought to do is give Ms. Hager those affidavits that

2   you have.  She's entitled to her break too.  I don't expect all

3   of the time to be taken.  But when we resume, we'll resume with

4   your cross-examination.  All right?

5           MS. HAGER:  Thank you, Your Honor.

6       (Recess from 10:20 a.m. until 10:54 a.m.)

7           THE COURT:  All right.  Please be seated.  First, are

8   there any exhibit issues we need to address, Ms. Hager?

9           MS. HAGER:  Yes, Your Honor.  During the break, Mr.

10  Reed handed me three affidavits to attempt to address Exhibits

11  13 through 15.  And our objection remains to 13 through 15.  I

12  don't believe Mr. Reed has copies of the affidavits for Your

13  Honor's review.  But my issue -- and I'll just take them one by

14  one -- with Linda Campbell --

15          THE COURT:  Let me just -- yeah, go ahead.  Yes,

16  please.

17          MS. HAGER:  Sure.  So the objection is that Exhibit 14

18  is hearsay, and Mr. Reed has shown me a declaration from Linda

19  Campbell, whose name does appear on Exhibit 14, but what she

20  says in the declaration is that she provided counsel and legal

21  services to Mr. Reed with respect to the foreclosure lawsuit

22  filed by GMAC Mortgage, and "attached hereto, as Exhibit A, is

23  a true and correct copy of the receipts generated from the

24  firm".  But there isn't actually anything attached as Exhibit

25  A.  So I don't know if Exhibit A is supposed to be what is

 1  Exhibit 14 or not.  So my objection stands on authentication

 2  grounds.

 3          With respect to Exhibit 13, which is Mr. Walters'

 4  bill, Mr. Reed provided me with a declaration of Mr. Walters,

 5  and he states that he represented Mr. Reed in connection with

 6  the foreclosure action.  And he states that his services

 7  included attempting, negotiating and mediating with GMAC and

 8  RFC to resolve the claims, and also the filing of the state

 9  court action in the law division, which Mr. Reed indicated

10  yesterday was by far the bulk of Mr. Walters' work for him.

11  And he goes on to say that "attached hereto, as Exhibit A, is a

12  true and correct copy of the most recent invoice generated by

13  my office".  But again, there's no exhibit A attached, at least

14  to this declaration that I was handed.

15          With respect to Exhibit 15, this is the exhibit that

16  is an e-mail from Barbara Clark to Frank Reed.  I was handed a

17  declaration of Krisden McCrink.  I'm not sure whether this

18  actually relates to Exhibit 15 or not.  But the affiant

19  states -- or the declarant states that the firm offered

20  services in 2008, with respect to a foreclosure lawsuit filed

21  by GMAC Mortgage, and "attached as exhibit A is a copy of our

22  bills".  And they actually are attached.  They don't

23  necessarily reflect what's actually been marked by Mr. Reed as

24  Exhibit 15.  They did attach a detailed bill.  I would say that

25  I believe that their descriptions of time are somewhat vague,

1  but at least there is a description of time.  And from what I

2  can tell --

3          THE COURT:  Does that add up to the same thing?

4          MS. HAGER:  Well, I didn't -- no --

5          THE COURT:  It was slightly under 4,000 dollars.

6          MS. HAGER:  No, it doesn't add up.  The total does not

7  add up.  In Exhibit 15 --

8          THE COURT:  It's 3,983 is the total.

9          MS. HAGER:  -- 3,983.  This bill is higher; it is

10 5,765.  But I will note that this bill includes entries from

11 2008.  It also includes entries -- a number of entries from

12 2012.  So the foreclosure action -- the order dismissing the

13 foreclosure action was February 2009.  So I think, to the

14 extent there are any entries from 2012, they would not be

15 applicable to the foreclosure.

16         And in addition, the entries from 2008, there is an

17 indication at the end of the bill that there is -- there's a

18 reference to Frank Reed v. GMAC.  So I don't know if some of

19 that 2008 time was for the law division case.  There's also a

20 reference to Jacobs -- telephone call with opposing

21 counsel/party Scott Jacobs in 2008.

22         The McCrink law firm represented Mr. Reed in

23 connection with the Jacobs v. Reed lawsuit.  So it's impossible

24 to tell which entries from 2008 were applicable to the

25 foreclosure or the law division case or the Jacobs v. Reed

RESIDENTIAL CAPITAL, LLC, et al.                    42

1    case.  But again, this particular document that I'm talking
2    about now is not the same as what's been marked as Exhibit 15.
3             MR. REED:  Your Honor, I'd like to say for the --
4    Mr. Walters and Ms. Campbell, I provided them a copy of the --
5    what I submitted to the Court, marked Exhibit, I believe, A.
6    And I kept a copy.  In other words, there was two copies.  I
7    went there.  They kept a copy; they gave me back one.  I didn't
8    have my staple -- I mean, my paper clips, and I -- I don't know
9    where it is.  I remember I just -- I did this because I thought
10   after the status meeting that, you know, is there any reason I
11   should do it.  I just started -- I took it on myself to do it.
12            THE COURT:  All right.  Here's what I would like to
13   have happen.  I would like the three declarations or affidavits
14   attached to the respective statements.  So the one to Exhibit
15   13 will be 13A, the one to 14 will be 14A, the one to 15 will
16   be 15A.  And I'm going to overrule the objections to 13, 14,
17   and 15, and indicate I will give those exhibits the weight that
18   I believe they're entitled to, which remains to be seen.
19            From the Court's previous comments at prior hearings,
20   Mr. Reed, there could be no mistake, because I asked you
21   whether you were seeking to recover the legal fees you expended
22   in defending the foreclosure action.  You told me you were.
23   And I made clear that you had to provide evidence of it.
24            So I'm going to overrule the objections and -- but I
25   want -- we'll get -- ordinarily I don't supply copies here, but

1  I want the record complete today, so we'll make copies of them

2  and attach them as 13A, 14A, and 15A, and the Court will give

3  it such weight as it deems appropriate, which I'm uncertain

4  about at this point.

5  (Statement from the Law Offices of Jeffrey S. Walters was

6  hereby received into evidence as Reed's Exhibit 13, as of this

7  date.)

8  (Declaration of Jeffrey S. Walters was hereby received into

9  evidence as Reed's Exhibit 13A, as of this date.)

10  (Linda Campbell's bill was hereby received into evidence as

11  Reed's Exhibit 14, as of this date.)

12  (Declaration of Linda Campbell was hereby received into

13  evidence as Reed's Exhibit 14A, as of this date.)

14  (McCrink law firm bill was hereby received into evidence as

15  Reed's Exhibit 15, as of this date.)

16  (Declaration of Krisden McCrink was hereby received into

17  evidence as Reed's Exhibit 15A, as of this date.)

18          THE COURT:  All right.  Are there any other exhibit

19  issues?

20          MR. REED:  Your Honor, in regard to the Curley

21  matter --

22          THE COURT:  The Curley matter is closed, Mr. Reed.  I

23  gave you -- you told me yesterday that Mr. Curley said he could

24  be here this -- he could be here this morning.  He wasn't

25  listed on your witness list.  I explained yesterday why I would

 1   permit him to testify if he appeared this morning.  He did not

 2   appear this morning.  The matter is closed for now.  If you

 3   seek to obtain some relief, because you believe you timely

 4   served him with reasonable notice of a subpoena to appear, that

 5   will come on at another time.  It won't come on now.

 6              MR. REED:  Okay.

 7              THE COURT:  All right.  Any other exhibit issues?

 8              MR. REED:  Your Honor, I think the only exhibit left

 9   was Exhibit 20.

10              THE COURT:  Do you have an objection to Exhibit 20,

11   Ms. Hager?

12              MS. HAGER:  Yes, Your Honor.  Pursuant to Your Honor's

13   second --

14              THE COURT:  Objection sustained.  All right.  That

15   takes care of the exhibit issues.

16              Cross-examination, please.

17              MS. HAGER:  Your Honor, may I approach the witness to

18   hand him --

19              THE COURT:  Absolutely.

20              MS. HAGER:  -- our exhibits?

21              THE COURT:  Yeah.

22              MS. HAGER:  Thank you.  Would Your Honor kindly

23   instruct the witness to remove any other materials that he has

24   he was using for reference?

25              THE COURT:  Well, what I'll ask him to do is put his

1  materials -- all of his materials to the side.  And if he

2  believes that he needs to review anything else to answer

3  questions, he's going to identify for me and for you what it is

4  he wants to use.

5        Why don't -- you've got additional papers on the

6  witness stand.  Just mover everything to the side, Mr. Reed,

7  and so we don't get the exhibits that Ms. Hager gives you

8  confused.  Okay?

9        MS. HAGER:  And Your Honor, can I also ask that the

10  laptop be closed and put to the side?

11        THE COURT:  Oh, sure.  The screen was blank anyway at

12  this point.

13        MS. HAGER:  I don't know that.

14        THE COURT:  I think it was asleep.

15  CROSS-EXAMINATION

16  BY MS. HAGER:

17  Q.   Mr. Reed, you talked this morning about a house that was

18  on your street that sold in 2010.  Was that 831 Matlack?

19  A.   Yes.

20  Q.   And that sold in 2010 for 1.465, is that correct?

21  A.   Yes.

22  Q.   And do you know when in 2010?

23  A.   I cannot remember.

24  Q.   The Roccisanos has offered you 1,450,000 in June of 2010,

25  right?

1   A.   I think so.

2   Q.   You don't know the listing price of 831 Matlack, do you?

3   A.   No, I cannot say that I do.  I can't remember.

4   Q.   You admitted that the real-estate market declined in 2009

5   and 2010.  In your opinion, did the market continue to decline

6   in 2011?

7   A.   I don't think I admitted that the market declined.  I

8   think I was referencing a national market.  I don't -- can -- I

9   don't believe I rep -- represented that Moorestown or my

10   neighborhood declined.  And so what was the question?

11   Q.   The question was you admitted that the real-estate market

12   declined in 2009 and 2010.  In your opinion, did the market

13   continue to decline in 2011?

14   A.   I can -- I cannot.

15   Q.   Is that a yes or a no?

16   A.   Okay.  I'm sorry.  Say it again more --

17   Q.   In your opinion, did the real-estate market decline in

18   2011?

19   A.   The real est -- can you define the real-estate market?

20        THE COURT:  Come on, Mr. Reed, let's not play games.

21   Q.   Are you not going to answer the question?

22   A.   I don't know if I -- I don't know if our neighborhood

23   continued -- if our neighborhood declined.

24   Q.   So Moorestown operates in a vacuum, unlike any other city

25   in the United States, is that right?

1  A.    I think Moorestown operates like the top of a mounting

2  when a flood comes and may, in my opinion, avoid much of the

3  collateral damage of a flood, if not entirely.

4  Q.    But you stated that your property is unlike any other in

5  Moorestown, is that right?

6  A.    There are many features that are unlike the majority of

7  the homes in Moorestown.

8  Q.    You testified that your property is unlike any other

9  property in Moorestown.  Do you remember testifying to that

10 effect?

11 A.    I testified to that; it is a unique home.

12 Q.    Is it difficult to sell a unique home?

13 A.    No, it -- in my experience, it was not.

14 Q.    Isn't style unique to each individual?

15 A.    I cannot agree with that statement.

16 Q.    Isn't it possible that a potential buyer might not

17 appreciate your particular style?

18 A.    That is in -- that is in a realm of possibility.

19 Q.    Isn't it possible that a buyer was looking for a more

20 standard home?

21 A.    I do not understand the term "standard".

22 Q.    You testified that your house was not like a standard home

23 that was on the market, I think it was 831 Matlack.  Your home

24 is different because you upgraded it.  Isn't it possible that

25 buyers were looking for something that was more standard as

RESIDENTIAL CAPITAL, LLC, et al.                    48

1  opposed to the house that you upgraded?

2  A.    Anything is possible.

3  Q.    Do you have any documents to support how much you owed the

4  mortgage company at any point in 2010?

5  A.    No, I do not.  And by "the mortgage company", do you mean

6  GM -- the -- GMAC or --

7  Q.    Could you turn your attention to Exhibit 13?

8  A.    13?

9  Q.    Yes, 13.  Do you have that in front of you?

10  A.    I believe so.

11  Q.    You testified that Mr. Walters handled some of the

12  foreclosure, but the majority of his work was on the law

13  division case, is that right?

14  A.    That is correct.

15  Q.    It's impossible to know from Exhibit 13 how much of his

16  bill is attributable to the foreclosure, isn't it?

17  A.    That is correct.

18  Q.    And it's impossible to know from Exhibit 13 if any of his

19  bill is attributable to the foreclosure, isn't it?

20  A.    I do not see a breakdown on Exhibit 13.

21  Q.    So it's impossible to know from Exhibit 13 if any of his

22  bill is attributable to the foreclosure, right?

23  A.    I would say no, that is not true.  This is his bill in its

24  entirety.

25  Q.    What on Exhibit 13 indicates that there are any services

1   performed in connection with the foreclosure?

2   A.   It's a matter of deduction.  That is his entire bill for

3   all services rendered.  And he has -- I have testified that he

4   has rendered services on the foreclosure.

5        THE COURT:  Mr. Reed, it's very important that you

6   listen carefully to the question that's asked of you, and that

7   you answer the question that Ms. Hager puts to you.

8        Her question specifically is whether there's anything

9   on Exhibit 13 which indicates that Mr. Walters spent any time

10  on the foreclosure.  That's the substance of her question.

11       Can you tell me whether there's anything on Exhibit 13

12  that would indicate whether he spent time on the foreclosure

13  action?

14       THE WITNESS:  Exhibit 13 --

15       THE COURT:  That's a yes or no.

16       THE WITNESS:  With the affidavit or not?  Or the

17  declaration?

18       THE COURT:  The only thing you have right now is the

19  document that is in front of you.

20       THE WITNESS:  No.

21       THE COURT:  13-A is going to be --

22       THE WITNESS:  The bill itself for Mr. Walters, no.

23       THE COURT:  Yes.  It's a really simple question.

24       THE WITNESS:  I'm nervous, Judged.

25  Q.   So what can be gathered from Exhibit 13 is that you

1  incurred a bill with Mr. Walters' office and you didn't pay it,

2  isn't that correct?

3  A.    That is correct.

4  Q.    And because you didn't pay it, there's interest due,

5  correct?

6  A.    Yes.

7  Q.    Could you please turn to Exhibit 14.  You testified that

8  Ms. Campbell handled an argument in the foreclosure case, is

9  that right?

10  A.    Yes.

11  Q.    In looking at Exhibit 14, it's impossible to know how

12  much, if any, of the bill is attributable to the foreclosure,

13  isn't it?

14  A.    She did no other work for me.

15  Q.    It's impossible to know which services were performed,

16  isn't that right?

17  A.    She provided one service; she went and argued the

18  foreclosure at the hearing.

19  Q.    Where on Exhibit 14 does it indicate what services she

20  provided?

21  A.    I do not see a description of it.

22  Q.    If you could turn to Exhibit 15.  You testified that the

23  information in this e-mail indicates a bill for services in

24  connection with the foreclosure, is that right?

25  A.    Yes.

RESIDENTIAL CAPITAL, LLC, et al.                    51

1  Q.   Isn't it impossible to know from a review of Exhibit 15

2  what services were performed?

3  A.   Services were performed?  Isn't it legal services for the

4  foreclosure matter?

5  Q.   Can you show me anywhere on Exhibit 15 where it indicates

6  which services were performed?

7  A.   I don't -- what services does a lawyer provide on a

8  foreclosure mat --

9          THE COURT:  Mr. Reed, don't argue, okay.  Just answer

10 the question.

11 Q.   Isn't it impossible to know from a review of Exhibit 15

12 who performed the services and when?

13 A.   Who performed and when?  I couldn't tell you which lawyer

14 performed services from this Exhibit.

15 Q.   You testified that this bill is from the first lawyer who

16 represented you in the foreclosure, is that right?

17 A.   I thought so.

18 Q.   And was his name McCrink?

19 A.   Yes.

20 Q.   Isn't it impossible to know from a review of Exhibit 15

21 whether any of the amounts listed in the e-mail were incurred

22 in connection with the foreclosure matter?

23 A.   It says it on the bill, or the document, foreclosure

24 matter.

25 Q.   McCrink was your lawyer in the Jacobs v. Reed matter, is

1    that right?

2    A.    Yes.

3    Q.    And when was that matter pending?

4    A.    It was 2008.

5    Q.    And McCrink also represented you to some extent in your

6    law division case against GMAC Mortgage, is that right?

7    A.    I do not recall him being involved in that.

8    Q.    When you purchased 817 Matlack Drive, you took out a first

9    and a second mortgage, isn't that right?

10   A.    Yes.

11   Q.    If you could turn to what has been pre-marked as Exhibit

12   KK.  Do you have that in front of you?

13   A.    Yes.

14   Q.    Do you recognize --

15            THE COURT:  Just give me a second --

16            MS. HAGER:  Oh, sure.

17            THE COURT:  -- okay.  Okay.

18   Q.    Mr. Reed, do you recognize Exhibit KK?

19   A.    I don't remember it, but I believe I saw it at our

20   deposition.

21   Q.    If you could turn to page 2 of Exhibit KK and let me know

22   if that's your signature and your wife's signature?

23   A.    I believe it is.

24   Q.    And then if you turn to page 4, would you let me know if

25   that's your signature and your wife's signature?

1   A.    It looks like mine.

2   Q.    And your wife's?

3   A.    She signs differently sometimes.  I -- I don't want to

4   comment on her signature.

5   Q.    What are these documents?

6   A.    These are the -- these are the HUD documents, the

7   settlement documents.

8   Q.    And so if you take a look at the first page of Exhibit KK,

9   you'll notice that the settlement date is May 31st, 2006?

10   A.    Okay.

11   Q.    Do you agree that that's the date that you purchased the

12   home?

13   A.    It sounds -- it sounds right.

14   Q.    And according to page 1 of Exhibit KK, the amount of your

15   first mortgage that you took out to buy the home was a million

16   dollars, is that right?

17   A.    Yes.

18   Q.    And page 1 also indicates that the contract price for the

19   purchase of the new home was 1,571,619 dollars, and that's on

20   line 101, do you see that?

21   A.    Yes.

22   Q.    And do you agree that that was the purchase price when you

23   bought the property?

24   A.    I believe it was.

25        MR. HAGER:  Your Honor, I'd like to move Exhibit KK

RESIDENTIAL CAPITAL, LLC, et al.                    54

1  into evidence?

2          THE COURT:  Any objection?

3          MR. REED:  No, no.

4          THE COURT:  Exhibit KK is in evidence.

5          MR. REED:  No.

6  (HUD settlement document was hereby received into evidence as

7  Trust's Exhibit KK, as of this date.)

8  Q.   If you turn to page 3, which is another HUD-1 settlement

9  statement, same date, May 31st, 2006, would you agree that it

10 indicates that there's a second mortgage in the amount of

11 414,000 dollars?

12 A.   Yes.

13 Q.   So, essentially, you borrowed in total 1,414,000 dollars

14 to purchase 817 Matlack, correct?

15 A.   Which line are you looking at for the second?

16 Q.   I'm sorry, that was line 202 on page 3.

17 A.   Okay.

18 Q.   So, Mr. Reed, the question is you paid 1,414,000

19 dollars -- excuse me.  You took out 1,414,000 dollars' worth of

20 mortgages to purchase the property, is that correct?

21 A.   I think so.

22 Q.   Well, looking at the documents --

23 A.   Yes, I believe that's real.

24         THE COURT:  May I ask a question, somebody can

25 enlighten me, Mr. Reed, if you can.  On the first page, on line

1   204, it shows "Proceeds second mortgage 411,947 dollars," is

2   the difference between that and line 203 on the third page?

3          MS. HAGER:  Sure.  If I can ask another question on

4   the third page then --

5          THE COURT:  Go ahead.

6   Q.   Mr. Reed, did you pay any fees in connection with the

7   second mortgage?

8   A.   I don't remember.

9   Q.   If you take a look at page 4, line 1400, does it indicate

10  that there were any settlement charges associated with the

11  second mortgage?

12  A.   I'm sorry, line --

13  Q.   Sure, page 4, line 1400.

14  A.   4, line 14 --

15         THE COURT:  It's the last line.

16  Q.   It indicates total settlement charges of 2,453 dollars,

17  doesn't it?

18  A.   I -- yes.

19  Q.   Okay.

20  A.   That's what that line indicates.

21  Q.   I'm sorry?

22  A.   Yes, that line 1400 settlement charges, page 4 of this

23  exhibit, seems to indicate 2,400 -- did you say 53 dollars,

24  yes.

25  Q.   And then if you turn back to page 3, which is the first

1   page of the HUD-1 for the second mortgage, do you see at the

2   bottom in line 303, it indicates cash to borrower of 411,947

3   dollars, do you see where I am?

4   A.   No, I'm sorry.

5   Q.   All right.  Line 303 on page 3 of the exhibit.

6   A.   Page?

7   Q.   Which is the very last line of page 3.

8   A.   Page 3.  Okay.  303, cash --

9   Q.   Right.  So line 303, which is the last line on page 1 of

10  the HUD-1 for the second mortgage, indicates cash to borrower

11  of 411,947 dollars, would you agree with that?

12  A.   I guess so, yes.  I would -- I guess.  I mean, I didn't

13  take cash that day.  I mean --

14  Q.   Well, I'm just ask -- right.  So you borrowed 414,000

15  dollars, the mortgage company subtracted out the settlement

16  charges, as you can see on lines 301 and 302, and arrived at

17  the total on line 303 of 411,947 dollars, would you agree with

18  that?

19  A.   Okay, I'm sorry, say that -- say that again, I apologize.

20  Q.   You took out a second mortgage for 414,000 dollars, didn't

21  you?

22  A.   That's -- yes.

23  Q.   Okay.

24  A.   I think that's correct.

25  Q.   And there were 2,453 dollars in settlement charges

1  associated with that, right?

2  A.    It appears to be, yes.

3  Q.    And those were paid at closing, right?

4  A.    I believe so.  Well, by this it indicates it, and I don't

5  have a reason to doubt it.

6  Q.    So after the settlement charges were netted out, you were

7  left with a loan -- loan proceeds in the amount of 411,947

8  dollars, which were put towards the total purchase, is that

9  right?

10  A.    Okay.

11  Q.    Do you agree?

12  A.    411,947, yes, I think so, because it's a -- now it appears

13  on the front of the HUD-1.

14  Q.    Right.  So if you look at line 204 on the first page of

15  Exhibit KK, it caries over that amount from page 3.  And you

16  can see the principal amount of the first was a million

17  dollars, and the proceeds from the second were 411,947 dollars,

18  do you agree with that?

19  A.    Yes.

20  Q.    Slightly more than a year after you purchased the

21  property, you put the property on the market, is that correct?

22  A.    I did.

23          THE COURT:  Does it indicate who the mortgagee for the

24  second mortgage is?

25          MS. HAGER:  It does?

1        THE COURT:  Does it?  I'm asking a question.

2        MS. HAGER:  Okay, sure.  On page 3, which is the

3  second HUD-1 settlement statement --

4        THE COURT:  Yes.

5        MS. HAGER:  -- at the top box F, the name and address

6  of the lender.

7        THE COURT:  Okay.  This page just relates to the

8  second mortgage, is what you're telling me?

9        MS. HAGER:  That's right, pages 1 and 2 are -- would

10  be the first, and 3 would be the second.

11        THE COURT:  That's fine, thank you.

12  Q.   So you listed the property at the end of 2007, is that

13  right?

14  A.   Yes.

15  Q.   Do you recall which month that was?

16  A.   I -- fall.  I'm pretty sure it was the fall.

17  Q.   You don't recall the exact month of --

18  A.   No, I think it was -- it was before -- I think it was

19  October.  Just a minute, late September or October.

20  Q.   Well, was it before or after the property went up for tax

21  sale?

22  A.   I am unaware of the property going up for tax sale.

23  Q.   When you first took out the first mortgage, did your

24  monthly payments include escrows for taxes and insurance?

25  A.   I do not remember.

1   Q.   Did there come a time when the servicer, GMAC Mortgage,

2   required you to include escrows for taxes and insurance with

3   your payment?

4   A.   Again, I do not remember.

5   Q.   You were informed by GMAC Mortgage that monthly payments

6   would need to include taxes and insurances starting in February

7   of 2008, is that right?

8   A.   I don't -- I do not remember that.

9   Q.   And you failed to pay the February 2008 payment because of

10  that increase, is that right?

11  A.   I don't know why, if at all, the February payment didn't

12  happen.  That's an issue between my wife and I.

13  Q.   But you're the only one on the note, isn't that right?

14  A.   I believe so.

15  Q.   So in early 2008, you had the agreement of sale with the

16  Jacobses, right?

17  A.   Yes.

18  Q.   And you failed to pay the February 2008 payment because

19  you were anticipating settlement and that the loan would be

20  paid off, isn't that right?

21  A.   I don't -- I -- I cannot answer that question.  I've said

22  that before about the February payment.  I've been consistent

23  about that.

24  Q.   You defaulted on the second mortgage in early 2008 as

25  well, right?

1   A.   I don't know about that.

2   Q.   The reason you used the 400,000 dollars from Weaver to pay

3   off the second in a lump sum was that the mortgage company

4   agreed to accept a reduced payoff, isn't that right?

5   A.   Can you -- can you say that question again?

6   Q.   Sure.  The reason that you used the 400,000 dollars that

7   you received from Mr. Weaver, to pay off the second mortgage in

8   a lump sum, was that the second mortgage company agreed to

9   accept a reduced payoff, correct?

10   A.   The reason I paid -- I paid it was Mr. Weaver wanted it

11   so, and it happened to be during that process that they agreed

12   to take a lower sum.

13   Q.   Why did they agree to take a lower sum?

14   A.   I offered them a lower sum.

15   Q.   Now, how -- the payoff was less than 200,000 dollars to

16   the second mortgage company, is that right?

17   A.   I don't remember what it was.  It was -- it may have been.

18   Q.   You had the means to bring the first mortgage current

19   during that period of time, didn't you?

20          THE COURT:  What period of time are you talking about?

21   Q.   Excuse me, in 2008.

22   A.   I can't recall how much cash I had or what the deficiency

23   was, to answer that question.

24   Q.   You testified yesterday that you made the first payment of

25   3,000 dollars under an agreement that you worked out with GMAC

RESIDENTIAL CAPITAL, LLC, et al.                    61

1    Mortgage after a face-to-face meeting, do you remember that

2    testimony?

3    A.   I do.

4    Q.   And you further testified that you did not make subsequent

5    payments under that agreement for two reasons.  One, that GMAC

6    Mortgage didn't return an executed copy of the agreement; and

7    two, that GMAC Mortgage didn't provide you with a coupon book.

8    Do you remember that testimony?

9    A.   I think I said a coupon book or statement.

10           MS. HAGER:  Your Honor, based on the claimant's

11   testimony yesterday as to there being a requirement in the

12   forbearance agreement for GMAC Mortgage to return a

13   countersigned copy of the agreement and the requirement of GMAC

14   Mortgage to provide a coupon book or a statement, I'd like to

15   show Mr. Reed a copy of the forbearance agreement that he had

16   been discussing yesterday.  It was omitted from the Borrower

17   Trust exhibit lists, because previously there hadn't been a

18   dispute as to its contents.  The testimony yesterday is not an

19   accurate reflection of the terms, so the Borrower Trust

20   respectfully requests leave to question the claimant about the

21   document which was shown to Mr. Reed this morning before the

22   start of the trial.

23           THE COURT:  Mr. Reed, do you have any objection?

24           MR. REED:  I do, Your Honor.  What was shown to me

25   this morning does -- first off, I don't -- as I testified, I

 1  don't recall the terms other than an initial 3,000 dollars.

 2  Secondly, I -- and this document doesn't even mention that

 3  amount of money.  Secondly, the physical form of what I thought

 4  I remembered is nothing -- isn't the same at all.  I don't know

 5  what this document is.  I don't know where it came from.  I

 6  haven't had an opportunity to have discovery on it.  There's a

 7  signature --

 8          THE COURT:  Mr. Reed, you opened the door with respect

 9  to testimony about the modification agreement in your

10  testimony -- in your direct testimony.

11          Ms. Hager, are you going to be able to -- if Mr. Reed

12  does not provide testimony to authenticate the document, are

13  you going to be able to authenticate it through any other

14  witness?

15          MS. HAGER:  Yes, Your Honor.  I can make an offer of

16  proof that Ms. Delehey, when asked, will be able to

17  authenticate the documents as business records.

18          THE COURT:  Okay.  The objection is overruled.  Mr.

19  Reed opened the door to the testimony about the modifi --

20  proposed modification agreement, because in his narrative

21  direct testimony yesterday, he testified specifically about the

22  proposed modification agreement and its terms.

23          MS. HAGER:  Your Honor, I've previously showed Mr.

24  Reed copies and, as a technical matter, will be two exhibits

25  because one is signed and one is not.

1           THE COURT:  Okay.

2           MS. HAGER:  And I've pre-marked them Exhibits YY and

3  Exhibit ZZ.

4           THE COURT:  Okay.

5           MS. HAGER:  And if I may hand up copies --

6           THE COURT:  Please, go ahead.

7           MS. HAGER:  -- to your clerks.

8  BY MS. HAGER:

9  Q.   Mr. Reed, do you have Exhibit ZZ there in front of you?

10 A.   I do.

11 Q.   Okay.  Is that your signature on the document?

12 A.   It appears to be.

13 Q.   Is that your signature?

14 A.   It looks like it.  I don't have a reason to think it is

15 not.

16 Q.   Okay.  And what's the date next to your signature?

17 A.   8/8/08, oddly enough.  August 8th, 2008.

18 Q.   Do you remember signing this particular document?

19 A.   I do not.

20 Q.   If you could take a look at what I had showed you earlier,

21 which is marked as Exhibit YY.  Can you tell me if you

22 recognize that document?

23 A.   As I just said, I did not recognize this document.

24 Q.   You're talking specifically about YY -- Exhibit YY?

25 A.   Well, mostly, yes, about YY.  This is not at all a form

1  that I recall that --

2  Q.   Okay.  Let's take a look at the document.  The date on the

3  document is August 1st, 2008.  Do you agree with me?

4  A.   Okay.

5  Q.   Do you agree with me that that's what the date is?

6  A.   Yes.  8 -- there' a date on it, 8 -- August 1st.

7  Q.   And the title of the document is a "foreclosure repayment

8  agreement".  Do you agree with me that that's what the document

9  says?

10          THE COURT:  It says it.  Ask your next question.

11  A.   Yes, yes; I'm sorry.

12  Q.   And that it's addressed to you, Frank Reed, at 817 Matlack

13  Drive?

14  A.   It is.

15  Q.   Okay.  You testified yesterday that your recollection was

16  you would need to make payments of 7,000 dollars a month.  Do

17  you remember that?

18  A.   I don't remember that.  I thought it was 3,000 dollars and

19  I made a payment for 3,000 dollars.

20  Q.   My apologies if I misstated what you had said yesterday.

21  Do you recall the terms of your forbearance agreement with GMAC

22  Mortgage?

23  A.   The only recollection I had of it was the 3,000 dollars.

24  I wasn't sure how long that was to go on.  I wasn't sure if it

25  was just the one month.  I couldn't remember -- I couldn't

1  remember the contents of it.

2  Q.   If you take a look at the document, Exhibit YY, it doesn't

3  state anywhere in that document, does it, that the servicer

4  would return an executed copy to you?  Does it?

5  A.   I --

6       (Pause)

7            THE COURT:  You represent that it doesn't say that?

8            MS. HAGER:  It doesn't say that.

9            THE COURT:  All right.  Let's move on.

10 Q.   The forbearance agreement does not state that you would be

11 sent a coupon book or a statement.  Does it?

12 A.   This document does not.

13 Q.   Okay.  If you take a look at Exhibit MM, which was the

14 document that was marked yesterday; I think I gave it back to

15 you.

16 A.   Okay.  This was the e-mail exchange between yourself and

17 Mark Folweiler.  You knew in September of 2008 that GMAC

18 Mortgage was not going to return a countersigned agreement to

19 you.  Didn't you?

20 A.   Say that again.

21 Q.   You knew in September 2008 that GMAC Mortgage was not

22 going to return the countersigned agreement to you.  Right?

23 A.   I thought they were.

24 Q.   Well, you received this e-mail from Mark Folweiler on

25 September 22nd, 2008, which is at the top of Exhibit MM, where

1  Mr. Folweiler says to you, "That is great news.  And as far as

2  the docs are concerned, they never send them back."

3        So as of September 22nd, 2008, you knew you were not

4  getting countersigned documents back.  Correct?

5  A.   Oh.  Okay.  Oh, I see what you're saying.  Yes.

6  Q.   And you thought you were going to closing with Weaver in

7  September of 2008.  Right?

8  A.   That is correct.

9  Q.   And you didn't make the September 2008 payment to GMAC

10  Mortgage because you expected the Weaver deal to close.

11  Correct?

12  A.   In my memory, I thought there was still -- not -- I

13  thought there was something coming with his -- a schedule of

14  payments or a book.  I can't tell you why I thought that.  I

15  would be lying if I didn't tell you this.

16  Q.   From the inception of your meeting with Mark Folweiler, it

17  was your intention to delay the foreclosure long enough to get

18  to the Weaver settlement.  Isn't that right?

19  A.   That was not -- that was not true.  We filed a motion to

20  dismiss that was accurate under law, and I expected it to be

21  dismissed when heard.  There was no -- I was not trying to

22  delay the foreclosure action because I was under the full and

23  firm belief that it would be ended.

24  Q.   Well, if you turn to the last page of Exhibit MM, your

25  e-mail to Mr. Folweiler, you state that "the foreclosure law

1    firm was not notified of the agreement to temporarily stay the

2    foreclosure action for three to six months."  Why did you want

3    the foreclosure action to be stayed?

4    A.    Because I have to incur more legal fees.

5    Q.    Well, if you had a motion pending, wouldn't you want that

6    to be heard and get the case over with?

7    A.    And pay someone 2-, 3-, 4-, 5,000 more dollars in legal

8    fees for them to go and show and make the argument and we have

9    a payoff?  I asked for a payoff from Zucker Goldberg.

10   Q.    I'm going to ask you again.  From the inception of your

11   meeting with Mr. Folweiler, it was your intention to delay the

12   foreclosure long enough to get the settlement with Mr. Weaver.

13   Wasn't it?

14   A.    No.

15   Q.    In your experience with real estate, why would a lender

16   agree to accept less than a hundred percent of the principal

17   that's due and owing?

18   A.    If -- from a business perspective, if any of them would

19   want money in one lump sum instead of over time.  It's like

20   selling a note; you take discounts to have it repaid.

21   Q.    Isn't it because the property value doesn't fulfill --

22   doesn't fully satisfy their claim against the property?

23   A.    I don't know what the motivation would be.

24   Q.    How long have you been a real-estate investor?

25   A.    I bought my first house in 1990.

RESIDENTIAL CAPITAL, LLC, et al.                    68

1  Q.   And you've owned multiple properties over the years.  Is

2  that right?

3  A.   Yes.

4  Q.   And for these other properties, over time, were you paying

5  taxes and insurance?

6  A.   Yes.

7  Q.   Are you aware of any reason why you wouldn't have paid

8  taxes and insurance on the Matlack property?

9  A.   No.

10  Q.   You're presently in foreclosure with your current

11  servicer, 21st Mortgage Corporation.  Is that correct?

12  A.   Yes.

13  Q.   If you could turn to Exhibit UU?  Do you have that in

14  front of you?  Do you have that in front of you, Mr. Reed?

15  A.   Yes.  Yes.

16  Q.   Is that a copy of the complaint and foreclosure in the

17  21st Mortgage Corporation v. Frank Reed matter?

18  A.   It appears to be.

19  Q.   And you filed counterclaims in this matter.  Didn't you?

20  A.   I did.

21  Q.   And can you turn to Exhibit VV?

22  A.   Say that again.

23  Q.   VV.  Is Exhibit VV your answer and counterclaims in the

24  foreclosure matters between 21st Mortgage Corporation and

25  yourself?

1  A.   I believe so.  I mean, there's -- it's a long document.  I

2  can't attest to every piece of it here, but it appears to be.

3  Q.   Well, you filed the answer.  Didn't you?

4  A.   I understand that, but I don't know if this is the actual

5  copy of it, and I don't know if it is, but it appears to be.

6  Q.   Why don't you take a minute and take a look at it; there's

7  signatures and time stamps.  Let me know if there's any reason

8  you don't think this is your answer in the foreclosure case.

9  A.   No, it appears to be.

10       MS. HAGER:  Your Honor, I'd like to move in Exhibits

11  UU and VV.

12       THE COURT:  Any objection, Mr. Reed?

13       THE WITNESS:  No, Your Honor.

14       THE COURT:  All right.  UU and VV are in evidence.

15  (Complaint and foreclosure documents was hereby received into

16  evidence as Trust's Exhibit UU, as of this date.)

17  (Answers to counterclaim of Exhibit UU was hereby received into

18  evidence as Trust's Exhibit VV, as of this date.)

19  Q.   Mr. Reed, in your counterclaim, you're seeking to have the

20  mortgage voided or otherwise declared unenforceable.  Aren't

21  you?

22       (Pause)

23  A.   I think that might be one of the --

24  Q.   Well, let me do it this way.  If you could look at your

25  counterclaim first count, the pages aren't numbered but if you

1  turn to page 8 of the exhibit.

2  A.   7, 8.

3  Q.   Do you have page 8?  Okay.  If you look at the bottom in

4  the "wherefore" clause, paragraph (a) states "declaratory" --

5  let me back up.

6  A.   Yes.

7  Q.   "Wherefore, defendant seeks judgment against plaintiff as

8  follows:  a) Declaratory and injunctive relief declaring the

9  mortgage void and unenforceable."  Do you agree with me that

10  that is one of the forms of relief that you're seeking in the

11  foreclosure case with 21st Mortgage Corporation?

12  A.   Yes.

13  Q.   Do you agree with me that you have counterclaims for

14  negligence and breach of contract based on the acts of GMAC

15  Mortgage in the GMAC v. Reed case that you've asserted in the

16  21st Mortgage case?

17  A.   I think -- I believe we've learned -- I've learned that

18  that's incorrectly asserted, that they belong here.

19  Q.   And do you agree with me that you're seeking 3.9 million

20  dollars in damages in your counterclaim based on GMAC

21  Mortgage's actions in the first foreclosure?

22  A.   At the time of filing, yes.

23  Q.   Have you withdrawn this document from the court?

24  A.   The intention is to modify it.

25  Q.   Mr. Reed, could you take a look at what was pre-marked as

1   Exhibit X?  Would you agree with me that this is the agreement

2   between you and your wife and Mr. Weaver?

3   A.   Yes, it appears to be.

4   Q.   And is that your signature and your wife's signature that

5   appear on the last page?

6   A.   I reserve comment about my wife's signature, but it

7   appears to be mine.

8   Q.   What is the date next to your signature?

9   A.   8/25/0 -- August 25th, 2008.

10  Q.   And you recognize this document.  Don't you?

11  A.   I believe -- I believe it's -- I believe it's the contract

12  for sale.

13  Q.   And Mr. Weaver agreed to pay you 1.8 million dollars for

14  the property.  Is that correct?

15  A.   That is correct.

16           MS. HAGER:  Your Honor, I'd like to move in Exhibit X.

17           THE COURT:  Any objection?

18           THE WITNESS:  No, Your Honor.  I'd like to stand for a

19  moment?

20           THE COURT:  Yes.  Exhibit X is in evidence.

21  (Sale agreement between Reed and Weaver was hereby received

22  into evidence as Trust's Exhibit X, as of this date.)

23  Q.   Mr. Reed, if it's possible while you're standing, could

24  you take a look at Exhibit Y?

25  A.   Um-hum.  Exhibit Y.

RESIDENTIAL CAPITAL, LLC, et al.                    72

1    Q.    Yes.

2    A.    Yes.

3    Q.    And do you recognize that document?

4    A.    Yes.  This, I believe, is the addendum to the contract we

5    were just looking at.

6    Q.    Is that your signature that appears on the bottom left?

7    A.    Yes.  It appears to be.

8    Q.    And is that your wife's signature?

9    A.    I believe.  Again, not comment on her signature.

10   Q.    And what's the date that the sellers signed the -- signed

11   the addendum?

12   A.    October 22nd, 2008.

13   Q.    As you stated, this is an addendum that relates to the

14   agreement with Mr. Weaver, which is Exhibit X.  Am I right that

15   you had agreed to extend the settlement date a number of times

16   with Mr. Weaver?

17   A.    Yes, that is correct.

18   Q.    And this addendum, that is Exhibit Y, evidences one of

19   those times that you agreed to extend the settlement.  Right?

20   A.    Yes.

21   Q.    And, in fact, the addendum, in paragraph 1, indicates that

22   the settlement would take place on Friday, November 21st, 2008.

23   Is that right?

24   A.    Yes.

25   Q.    Okay.

RESIDENTIAL CAPITAL, LLC, et al.                    73

1          MS. HAGER:  I'd like to move to admit Exhibit Y.

2          THE COURT:  Any objection?

3          THE WITNESS:  No, Your Honor.

4          THE COURT:  All right.  Exhibit Y is in evidence.

5    (Addendum to sale agreement between Reed and Weaver was hereby

6    received into evidence as Trust's Exhibit Y, as of this date.)

7    Q.   If you could please take a look at Exhibit Z.

8    A.   Yes.

9    Q.   Exhibit Z is the lease agreement with option to purchase

10   between yourself and Mr. Cooper.  Would you agree --

11         THE COURT:  Could you say the exhibit again?

12         MS. HAGER:  I'm sorry.

13         THE COURT:  Which exhibit?

14         MS. HAGER:  Z.

15         THE COURT:  Z.

16         THE WITNESS:  Zebra.

17         THE COURT:  I misheard you.  Just give me a second.

18         MS. HAGER:  Sure.

19         THE COURT:  Okay.  I'm with you.

20   Q.   Okay.  This document, Exhibit Z, is the agreement between

21   yourself and Mr. Cooper.  Is that right?

22   A.   This is the agreement I referenced in yesterday's

23   testimony between Mr. Cooper and I that Mr. Cooper drafted and

24   presented to me.

25   Q.   So you recognize this document.  Right?

RESIDENTIAL CAPITAL, LLC, et al.                    74

1  A.   It appears to be the document I'm talking about, yes.

2  Q.   Okay.  And is that your signature on the second to the

3  last page?

4  A.   Appears to be.

5  Q.   Okay.  And your wife did not sign this agreement.  Is that

6  right?

7  A.   That is correct.

8  Q.   And this is the agreement that you referenced by which Mr.

9  Cooper would pay you 400,000 dollars for the option to move

10  into the property.  Right?

11  A.   That is correct.

12  Q.   And Mr. Cooper further agreed to pay you 25,000 dollars a

13  month in rent.  Isn't that right?

14  A.   That is correct.

15  Q.   Okay.

16         MS. HAGER:  I'd like to move to admit Exhibit Z.

17         THE COURT:  Any objection?

18         THE WITNESS:  No, Your Honor.

19         THE COURT:  All right.  Exhibit Z is in evidence.

20  (Lease agreement between Reed and Cooper was hereby received

21  into evidence as Trust's Exhibit Z, as of this date.)

22  Q.   If you could please take a look at Exhibit AA.  Do you

23  recognize this document?

24  A.   Yes, I do.

25  Q.   What is this document?

1   A.   Can you give me a moment?  I -- there's something -- this

2   is this -- if you go back to -- please go back to Exhibit Z,

3   there's a blank of this and it's -- it is -- the language is

4   the same.  It's an extension for the lease agreement with Mr.

5   Cooper.  I'm just -- I've not -- I don't think I've ever seen a

6   signature on it or I can't remember seeing it on there.

7   Q.   But you don't dispute, do you, that you entered into an

8   agreement to extend the lease agreement.  Right?

9   A.   No.  No, I do not.

10  Q.   And by virtue of this extension, which is Exhibit AA, you

11  had agreed to take the option from February 1st, 2009 until

12  August 1st, 2009.  Correct?

13  A.   That is correct.

14  Q.   Okay.

15       MS. HAGER:  I'd like to move the admission of Exhibit

16  AA.

17       THE COURT:  Any objection?

18       THE WITNESS:  No, Your Honor.  I'm sorry; I forgot

19  that I'm the one who needs to object.

20       THE COURT:  Exhibit AA is in evidence.

21  (Extension of lease agreement was hereby received into evidence

22  as Trust's Exhibit AA, as of this date.)

23  Q.   So the purpose of the extension was to give Weaver more

24  time to purchase the property.  Isn't that right?

25  A.   Yes.

1  Q.   And you had paid off the second mortgage by the time that

2  you agreed to the extension.  Isn't that right?

3  A.   That is correct.

4  Q.   And you testified that paying off the second mortgage was

5  required by Mr. Weaver.  Do you remember that testimony?

6  A.   That is correct.

7  Q.   There's no provision in Exhibit Z requiring you to pay off

8  the second mortgage.  Is that right?  And feel free to take a

9  look through Exhibit Z.

10  A.   Exhibit Z.  I don't remember.  I think --

11       (Pause)

12  A.   No, I don't see it in Z.  I don't even -- I don't think --

13  I don't remember it being actually in there.  So I'm not

14  surprised by that.

15  Q.   If you could take a look at page 5 in the third paragraph,

16  there's a provision stating that Exhibit Z constitutes the

17  entire agreement between the parties.  Would you agree with me?

18  A.   I'm sorry.

19  Q.   Page 5 --

20  A.   Page 5.

21  Q.   -- third paragraph.

22  A.   Um-hum.

23  Q.   There's a provision stating that Exhibit Z constitutes the

24  entire agreement between the parties.  Do you agree with me?

25  A.   Yes.

1  Q.   You don't --

2  A.   It says that -- it says that, yes.

3  Q.   Right.  It says that.  And you don't have anything in

4  writing to show that Weaver required, and you agreed, to pay

5  off the second mortgage with the 400,000 dollar payment.

6  Right?

7  A.    No.  That actually happened orally -- I didn't think it

8  was in this document -- in a Bank of America lobby, at the time

9  of the money transfer.

10  Q.   So it's your testimony that he verbally told you he

11  wouldn't pay you the 400,000 dollars unless you used it to pay

12  off the mortgage?

13  A.   Yes.  I had to do that.  And I felt secure in doing that

14  because it was going towards the equity in -- you know, in the

15  house that I had title to.  It wasn't --

16  Q.   And I'm supposed to believe that Mr. Weaver would care

17  what you did with the 400,000 dollars?

18          THE COURT:  It's argumentative.  Ask another question.

19  Q.   The only provision in Exhibit Z that addresses the 400,000

20  dollars is the eighth paragraph on page 1 of Exhibit Z.  Is

21  that correct?

22  A.   Eighth paragraph -- let me -- page 1?

23  Q.   Yes.

24  A.   One, two, three, four, five, six, seven, eight.  I know

25  the rest of the document but I don't -- briefly scanning it

1  now, I don't see any other dollar amount that draws my

2  attention to it.  And it looks like that's the only paragraph.

3  Q.    Paragraph 8 on page 1 of Exhibit Z states that the 400,000

4  dollars was to be a deposit towards the purchase price.

5  Correct?

6  A.    Okay.  Let me read this again.  Hold on a second.

7        (Pause)

8  A.    Repeat that question.

9  Q.    Sure.  Paragraph 8 on page 1 of Exhibit Z states that the

10  400,000 dollars was to be a deposit towards the purchase price.

11  Correct?

12  A.    Oh, wait a minute.  This -- I got to remember this.

13  Q.    Was --

14        THE COURT:  The document says what it says.  Ask your

15  next question.

16  A.    Yeah, I thought it was --

17        THE COURT:  Stop.  Ask your next question.

18  Q.    You didn't pay any taxes on the 400,000 dollars that you

19  received from Mr. Weaver.  Is that right?

20  A.    That is -- that's correct.

21  Q.    Please take a look at Exhibit BB.

22  A.    And I was advised not to by our accountant.

23  Q.    Have you --

24        THE COURT:  Mr. Reed.  Just answer the questions

25  you're asked.

RESIDENTIAL CAPITAL, LLC, et al.                    79

1   Q.   Have you seen Exhibit BB before today?

2   A.   BB?  I'm -- I probably did.  I don't recall -- I do not

3   remember the document.  But by looking at it, I believe that I

4   did.

5   Q.   So this document is the warrant of removal with regard

6   to -- excuse me -- with regard your matter against Mr. Cooper

7   for purposes of evicting him from 817 Matlack.  You recall the

8   process of attempting to evict him from the house.  Is that

9   right?

10  A.   Yes.

11  Q.   And according to this document, on the second page, do you

12  see where it indicates that Mr. Cooper was required to vacate

13  by September 8th, 2009?

14  A.   I'm sorry.  I'm on the second page.  Where was it?

15  Q.   Right.  Second page towards the bottom.  It says --

16  A.   "Must vacate by September 2009", yes.

17  Q.   September 8th, I think it is, 2009.

18  A.   Um-hum.

19  Q.   Do you recall Mr. Cooper leaving at -- around that time?

20  A.   I believe he did vacate in September.  I don't know.  I

21  was in Virginia when that occurred, so I can't tell you when he

22  actually vacated.

23          MS. HAGER:  I'd like to move to admit Exhibit BB.

24          THE COURT:  Any objection?  Mr. Reed, any objection?

25          MR. REED:  No, Your Honor.  I'm sorry.

1          THE COURT:  All right.  In evidence.

2     (Eviction Letter was hereby received into evidence as Trust's

3     Exhibit BB, as of this date.)

4     Q.   Mr. Reed, you received discovery requests from the

5     Borrower Trust in this matter, correct?

6     A.   I guess I did.

7     Q.   Did you or didn't you?

8     A.   I don't -- I don't remember what I received from them.  I

9     was a little overwhelmed.

10    Q.   Did you respond to any discovery request from the Borrower

11    Trust in connection with this litigation?

12    A.   I don't recall.  I -- the only thing I res -- I remember

13    is bringing documents to a deposition.

14    Q.   Can you take a look at Exhibit OO?

15    A.   Okay.

16    Q.   Can you tell me if you remember receiving that document?

17    A.   I do not remember.

18    Q.   You've received e-mails from my office, haven't you?

19    A.   You have -- I mean I have -- I have, yes.

20    Q.   And if you take a look at Exhibit PP, do you recall

21    receiving that document from my office?

22    A.   I don't remember.  You very well may have sent it to me.

23    Q.   And you've received documents from my office via overnight

24    mail as well.  Is that right?

25    A.   That is correct.

1  Q.   Okay.  And if you could take a look at Exhibit QQ.  Do you

2  recall receiving that from my office?

3  A.   QQ?

4  Q.   Do you have it?

5  A.   I don't have it.

6           MS. HAGER:  If I may, Your Honor, I can show the

7  witness --

8           THE COURT:  Yes, please.

9           MS. HAGER:  -- my copy.

10          THE COURT:  Go ahead.

11  Q.   So the question is, do you remember receiving QQ?

12  A.   I -- I don't remember.

13  Q.   Do you recall me asking you to respond to written

14  discovery requests that we served on you?

15  A.   I remember clearly at the deposition you said, did you

16  bring anything for me here, because I don't remember getting

17  anything from -- requests.

18  Q.   So it's your testimony that you never responded to the

19  requests in Exhibit OO, PP or QQ.  Is that right?

20  A.   I did not.  I think I misunderstood something.  I remember

21  the judge saying something about the requests -- discovery

22  requests were going to be returnable after the hearing date.

23  If I have made a mistake in understanding what would be

24  returnable after the hearing date and -- versus other methods

25  of discovery and it's to my detriment, I don't -- I'm -- I have

1  no other excuse other than just saying that that's the source

2  of not responding to this.

3            MS. HAGER:  In light of the admission that the

4  claimant didn't respond to Exhibit QQ, which are the requests

5  for admissions, I'd like to ask the Court to take judicial note

6  that, by operation of the Federal Rules of Civil Procedure,

7  that the admissions are deemed to be admitted because the

8  claimants failed to provide written responses within thirty

9  days of service.  And for purposes of identification, Exhibit

10  OO --

11            THE COURT:  I thought you said QQ.  QQ is the RFAs.

12            MS. HAGER:  Right.  QQ is the RFAs, and I just don't

13  think I put in the titles of the other documents just for --

14            THE COURT:  Okay.

15            MS. HAGER:  -- reference.

16            OO is the request for the production of documents, and

17  Exhibit PP is the first set of interrogatories.

18            THE COURT:  All right.  With respect to QQ, the

19  request for admissions attached to the request for admissions

20  are an affidavit of service dated July 17, 2014, served via

21  e-mail and overnight mail.  And the court will -- understands

22  the evidence that no response was made, and the effect provided

23  by the Federal Rules of Civil Procedures will be given to them.

24            MS. HAGER:  Your Honor, I'd like to move to admit

25  Exhibits OO, PP and QQ.

RESIDENTIAL CAPITAL, LLC, et al.                    83

1          THE COURT:  Any objection, Mr. Reed?

2          MR. REED:  No.

3          THE COURT:  All right.  OO, PP and QQ are in evidence.

4  (Request for Production of Documents was hereby received into

5  evidence as Trust's Exhibit OO, as of this date.)

6  (First set of interrogatories was hereby received into evidence

7  as Trust's Exhibits PP, as of this date.)

8  (Requests for Admissions were hereby received into evidence as

9  Trust's Exhibits QQ, as of this date.)

10  BY MS. HAGER:

11  Q.   Mr. Reed, could you take a look at Exhibit R?

12  A.   Yes.

13  Q.   Okay.  Have you seen that document before today?

14  A.   I saw it at the deposition, and I believe I saw it prior.

15  Q.   And this is a proposal to purchase by Scott and Tracy

16  Jacobs for your property at 817 Matlack.  Is that correct?

17  A.   That is correct.

18  Q.   And what's the date on this proposal to purchase?

19  A.   The date on the proposal to purchase.  Oh, October 30th,

20  2007.

21  Q.   And the proposal to purchase indicates that the Jacobses

22  were offering you 1.9 million dollars.  Is that right?

23  A.   Yes.

24          THE COURT:  You have to speak up, Mr. Reed.

25          THE WITNESS:  I'm sorry.

 1  A.   Yes.

 2  Q.   Now, eventually, as you discussed at length yesterday, the

 3  Jacobses made a higher offer of 2,040,000 dollars, which you

 4  and your wife accepted, right?

 5  A.   Yes.

 6  Q.   What was the listing price on October 30th, 2007?

 7  A.   I cannot tell you an exact number.  I believe in excess of

 8  2.1 million dollars.

 9  Q.   And ultimately, you failed to close on the Jacobs

10  transaction because the Jacobses' loan with Commerce Bank was

11  denied.  Is that right?

12  A.   That is correct.

13  Q.   And when was that that the Jacobses informed you that they

14  were not going to close?

15  A.   I believe it was very early Jan -- maybe January of 2008.

16  Q.   And is it your recollection that the appraisal that was

17  obtained by Commerce came in below the agreed-upon sales price?

18  A.   Is it my recollection that -- yes, yes.

19          MS. HAGER:  I'd like to move to admit Exhibit R.

20          THE COURT:  Any objection, Mr. Reed?

21          MS. HAGER:  I'm sorry.  Was there an objection?

22          THE COURT:  I'm waiting for him to respond.

23          R.  It's the proposal --

24          MR. REED:  I don't have I if I have an R.

25          MS. HAGER:  You just --

1          THE COURT:  You do.  You just looked at it.  It's the

2    Jacobs proposal of the purchase from October 30th, '07.

3          MR. REED:  Oh, yeah.  Yeah, no objection.

4          THE COURT:  So -- all right.  Exhibit R is in

5    evidence.

6    (Jacobs purchase proposal was hereby received into evidence as

7    Trust's Exhibit R, as of this date.)

8    Q.   Mr. Reed, could you please take a look at Exhibit U?

9    A.   U.

10   Q.   Do you have that document?

11   A.   Yes.

12   Q.   Okay.  Exhibit U is a letter dated January 7th, 2008, from

13   a Mr. Hobatter (ph.) to Rudy Gruenberg (ph.).  Have you ever

14   seen this document before today?

15   A.   I do not remember seeing this document, but it reflects --

16   it reflects facts that I believe are correct.

17   Q.   And was Mr. Gruenberg your lawyer in connection with the

18   Jacobs transaction?

19   A.   Yes.

20   Q.   Now, you didn't agree with the appraised value that was

21   supplied by Mr. Jones, who was the appraiser for Commerce Bank.

22   Is that correct?

23   A.   That is correct.

24   Q.   Because his appraisal came in at 1.95 million, which was

25   less than the 2,040,000 that you had agreed to sell the

1   property for.  Is that right?

2   A.   That is correct.

3   Q.   Okay.  Could you take a look at Exhibit O?

4   A.   You talked yesterday about two different offers from the

5   Roccisanos.  Do you recall that testimony?

6   A.   Yes.

7   Q.   And there was one offer that came in at 1.3 million and

8   then a second that came in at 1.45 million.  Do you remember

9   that?

10      And I can show you documents if you need to see them.

11  A.   Yeah.  Do you say 135?

12  Q.   1.3 was the first --

13  A.   1.3 --

14  Q.   -- and 1.45 was the second.

15  A.   I believe that is correct.

16  Q.   Okay.  What was the listing price when you received the

17  first offer from the Roccisanos?

18  A.   I don't remember.

19  Q.   Well, if you could open up Exhibit O.  Would you agree

20  that the first offer from the Roccisanos was in March of 2010?

21  A.   Yes, yes.

22  Q.   Okay.  So if you turn to page 8 of Exhibit O.

23      (Pause)

24  Q.   You have page 8 now?

25  A.   I am.  Thank you for your patience.

 1  Q.   Oh, no problem.  So the entirety of Exhibit O, actually,

 2  you've seen before, haven't you?

 3  A.   I believe I saw this at the Carter -- this was at the

 4  Carter -- oh, no -- yes -- no -- yes.

 5          THE COURT:  It's marked as an exhibit in your

 6  deposition, Mr. Reed.

 7          MR. REED:  Yeah, mine as well.  I see that, Your

 8  Honor.  And it's obviously in the Carter deposition as well.

 9          THE COURT:  Right.

10  Q.   And looking at page 8, do you know what that document is?

11  A.   It's an MLS listing.

12  Q.   What's an MLS listing?

13  A.   Multiple Listing Service.  It's where realtors list the

14  houses for sale.

15          THE COURT:  Mr. Reed, you got to point --

16          THE WITNESS:  Okay.

17          THE COURT:  -- yourself to the microphone.

18          THE WITNESS:  Sorry about that.

19          THE COURT:  I just want to be sure we have a clear

20  transcript, okay?

21          THE WITNESS:  No problem.  Yes.

22          THE COURT:  You can stand.  I have no problem about

23  that.

24          THE WITNESS:  I forgot.

25          THE COURT:  That's okay.  Go ahead.

1   Q.    And when we went through the entirety of Exhibit O at both

2   Ms. Carter's deposition and your deposition, do you recall that

3   we noticed that the listing price was continuously decreased

4   throughout the duration of the time that the property was on

5   the market?

6   A.    That is correct.

7   Q.    Now, you're familiar, generally, with MLS printouts,

8   right?

9   A.    Generally, yes.

10  Q.    Now, on page 8, you see at the bottom where -- the very

11  bottom where it says "created 5/7/2010"?

12  A.    I -- I must be on the wrong page.

13  Q.    This is the particular page that has some handwriting at

14  the top, and the print's a little smaller than on the other

15  pages.

16  A.    Oh, I'm sorry.  Right.  Okay.  Yes.

17  Q.    You have that?  Okay.

18  A.    Is this the one?

19  Q.    Yes.

20  A.    Okay.

21  Q.    Do you see at the very bottom where it says "created May

22  7th, 2010"?

23  A.    Yes.

24  Q.    And at the top in the right-hand side, there's a price of

25  1,690,000.  Do you see that?

RESIDENTIAL CAPITAL, LLC, et al.                          89

1  A.    Yes.

2  Q.    And does that mean that that's the listing price as of May

3  7th, 2010?

4  A.    I was unsure of that from the Carter deposition, because I

5  don't know enough what the word "created" means.  It appears

6  that it may be.  I don't know.

7  Q.    Do you have any recollection of what the listing price was

8  on May 7th, 2010?

9  A.    If you give me a moment, let me see if I can -- 2010,

10  May -- I remember back -- Roccisanos' offer -- no, but it

11  continually went down.  So I don't know what it was at that

12  time.

13  Q.    Okay.  If you turn the page just to the next page --

14  A.    Um-hum.

15  Q.    -- there's another MLS listing printout.  And do you

16  notice at the bottom, it says "created June 15th, 2010"?

17  A.    June 15th?  Yes.

18  Q.    And at the top, in the right-hand corner, it indicates

19  that the listing price is 1,595,000.  Do you see that?

20  A.    Yes.

21  Q.    Do you recall reducing the list price in the middle of

22  2010?

23  A.    I don't recall it.  But as I testified, I ordered the

24  successive reductions.

25  Q.    Did you reduce the price -- excuse me.  Did you reduce the

RESIDENTIAL CAPITAL, LLC, et al.                    90

1  list price after the Roccisanos made the 1.3-million-dollar

2  offer to try and get them to come up?

3  A.   I don't -- I do not recall specifically targeting a

4  customer with a list price reduction.  A list price reduction

5  would be in the hopes to encourage any or all customers.  I

6  mean, it was -- if it brings in the one that walked in the door

7  before, I'm well open to it.

8          MS. HAGER:  I'd like to move to admit Exhibit O.

9          THE COURT:  Any objection?

10         MR. REED:  No, Your Honor.

11         THE COURT:  All right.  Exhibit O is in evidence.

12  (MLS listings for property were hereby received into evidence

13  as Trust's Exhibit O, as of this date.)

14         THE COURT:  Where are you moving in your examination

15  now?

16         MS. HAGER:  I have some questions to finish up on the

17  Roccisanos.  Twenty minutes, fifteen --

18         MR. REED:  Your Honor --

19         MS. HAGER:  -- minutes.

20         THE COURT:  Let's take our lunch recess now and

21  resume.  It's 12:31 on my watch.  We'll resume at 2 o'clock.

22         Do you have an estimate of how long you think you'll

23  be in cross-examination?

24         MS. HAGER:  No, I -- maybe a half an hour.

25         THE COURT:  Okay.

1        MS. HAGER:  But I don't even think that.

2        THE COURT:  All right.  And then, you're going to call

3   Ms. Delehey?

4        MS. HAGER:  Yes, that's right.

5        THE COURT:  Okay.

6        Do you have a question, Mr. Reed?

7        MR. REED:  Is U in evidence?  I don't remember --

8        THE COURT:  I'm sorry, which --

9        MS. HAGER:  I didn't --

10       THE COURT:  -- exhibit?  No, it was not --

11       MS. HAGER:  I didn't move Exhibit U --

12       THE COURT:  -- introduced in evidence.  It was not

13   offered.

14       Okay.  We're in recess until 2 o'clock.  Thank you.

15       (Recess from 12:31 p.m. until 2:03 p.m.)

16       THE COURT:  Okay, everybody, please be seated.

17   Court's back in session; it's Residential Capital, 12-12020;

18   it's a continuation of the evidentiary hearing regarding the

19   Reeds' claims.

20       Ms. Hager, you want to continue with your cross-

21   examination?

22       MS. HAGER:  Yes, thank you, Your Honor.

23   CROSS-EXAMINATION (RESUMED)

24   BY MS. HAGER:

25   Q.   Before break, Mr. Reed, we were talking about the

1  Roccisanos.  Now, the Roccisanos put in an agreement of sale

2  that you all were negotiating, is that right?

3           THE COURT:  I don't understand your question.

4           MS. HAGER:  Sure.

5  Q.   Well, we had talked before break about two offers that

6  were made by the Roccisanos; one was for 1.3 million.  They

7  then increased that offer to 1.5 million.  Did there come a

8  time when the Roccisanos put in an agreement of sale that was

9  being negotiated?

10 A.   I believe they had a proposed agreement of sale.

11 Q.   Could you take a look at Exhibit EE --

12 A.   Um-hum.

13 Q.   -- please?  Do you recognize this document?

14 A.   This is the e-mail you showed me at our deposition.

15 Q.   So if you turn to the second page of EE, would you agree

16 that that's an e-mail from Kevin Aberant to you?

17 A.   From -- yes.

18 Q.   Do you recall receiving that e-mail from Mr. Aberant?

19 A.   No.

20 Q.   Who is Kevin Aberant?

21 A.   Kevin Aberant is -- or was or -- the attorney for, I

22 think, the Roccisanos.

23 Q.   And the whole document itself is actually then an e-mail

24 chain starting off from that first e-mail from Mr. Aberant to

25 you.  Then there's a responsive e-mail from you back to

RESIDENTIAL CAPITAL, LLC, et al.                    93

1  Mr. Aberant, and then some subsequent e-mails that you're not

2  copied on.

3       But the original e-mail is dated June 30th, 2010.  At that

4  time were you negotiating an agreement of sale with the

5  Roccisanos?

6  A.   I believe so.  I think they made an offer in middle of

7  June, and they wanted us to look at a proposed agreement.

8  Q.   And you had had some conversations with Mr. Aberant about

9  the terms of their proposed agreement, is that right?

10 A.   I don't know if it was one conversation.  I don't -- I

11 don't recall much of a conversation.

12 Q.   In the e-mail from Aberant to Roccisano, which is July

13 1st, 2010, in the middle of the first page of Exhibit EE,

14 Aberant refers to a conversation with you in which you were

15 going to try and find some free time to go over some proposal

16 changes to the contract.  Do you see where I am?

17 A.   Yes.

18 Q.   Now, he's referring to an agreement of sale, is that

19 right?

20 A.   I believe so, yes.

21 Q.   And ultimately the deal never evolved because the

22 Roccisanos moved away from New Jersey, is that right?

23 A.   Yes, I believe that that is correct.

24       MS. HAGER:  I'd like to move to admit Exhibit EE.

25       THE COURT:  Any objection?

RESIDENTIAL CAPITAL, LLC, et al.                    94

1          MR. REED:  No, Your Honor.

2          THE COURT:  All right, Exhibit EE's in evidence.

3    (E-mail chain beginning June 30, 2010, among Kevin Aberant,

4    Frank Reed and others was hereby received into evidence as

5    Trust's Exhibit EE, as of this date.)

6    Q.   Do you still have your exhibits up there, specifically

7    Exhibit 7?  And this is the notification from 21st Mortgage

8    Corporation.

9    A.   Yes.

10   Q.   Okay, this document which you had introduced as Exhibit 7

11   indicates, does it not, that you owe $896,344.03 to bring the

12   mortgage account current as of July 11th, 2014?  Do you agree?

13   A.   Yes.  That's why I brought it to you.

14   Q.   And you have not brought the account current as of today,

15   have you?

16   A.   I have not.

17   Q.   Have you made any payments to 21st Mortgage Corporation?

18   A.   I have not.

19   Q.   And 21st Mortgage Corporation is paying your real-estate

20   taxes, right?

21   A.   I do not know.

22   Q.   21st Mortgage is paying your homeowners' insurance, right?

23   A.   I am unaware of that.

24   Q.   Do you have homeowners' insurance?

25   A.   I cannot answer that.

RESIDENTIAL CAPITAL, LLC, et al.                    95

1   Q.   Are you paying for homeowners' insurance?

2   A.   I am not.  I do not know what my wife is doing.

3   Q.   While Mr. Weaver was living in the property, it wasn't

4   being shown, is that correct?

5   A.   Part of the time Mr. Weaver/Cooper was living there, there

6   was showings; he agreed to them after he bounced checks to us.

7   Q.   When was that?

8   A.   It was after the second check.

9        (Pause)

10  A.   It was early on.  I mean, I -- I think it -- it was either

11  after the first or second check, which would have been in

12  February or March.

13  Q.   So it's your testimony that in February or March there

14  were showings of the property?

15            THE COURT:  Of which year?

16            THE WITNESS:  What was that?  2009.  2009.

17            THE COURT:  Okay.

18  Q.   Were there showings of the property at that time,

19  February/March?

20  A.   I was in Virginia.  I don't know.  I know that we got him

21  to give permission to do that so that I would wait for checks

22  to clear.

23  Q.   You don't know whether any potential buyers ever came

24  through the property at that time, do you?

25  A.   You know, I do not know.  I don't remember, because I was

RESIDENTIAL CAPITAL, LLC, et al.                    96

1   in Virginia.

2   Q.    And specifically, you testified yesterday and earlier this

3   morning about a property right behind your house that had sold

4   during the time that Mr. Weaver was living in the property.  Do

5   you remember that testimony?

6   A.    I do.

7   Q.    So you don't know, do you, whether those buyers ever came

8   through your property?

9   A.    I cannot answer that.

10  Q.    Could you take a look at Exhibit FF, please?

11        So this is an e-mail chain starting from Nina Singh to

12  Louise Carter, but then which is forwarded by Louise Carter to

13  you.  Do you remember receiving this document?

14  A.    Oh, yes.  Yes.  Um-hum.

15  Q.    You've seen this before, right?

16  A.    I have.

17  Q.    And the date on the e-mail from Ms. Singh to Ms. Carter is

18  May 8th, 2011, would you agree?

19  A.    I do.

20  Q.    Okay.  And you received it on May 9th, 2011, is that

21  right?

22  A.    Yes, it looks -- yes.  She forwarded it to me.

23  Q.    Now, in 2011 the property was not on the market, is that

24  correct?

25  A.    I believe that's correct.  I think we -- I think -- I

RESIDENTIAL CAPITAL, LLC, et al.                    97

 1  think the -- as I said earlier, the agency didn't want to keep

 2  it on the market.

 3  Q.   Well -- right.  You've testified that it hadn't been on

 4  the market since late 2010, right?

 5  A.   I believe -- yes.

 6  Q.   Now, you testified yesterday that the Singhs wanted issues

 7  with the mortgage company to be resolved before entering into

 8  an agreement; do you recall that testimony?

 9  A.   Yes.

10  Q.   Now, the Singhs offered 1.1 million and you rejected that,

11  is that right?

12  A.   I had no way to accept it, I think, as I put in my

13  testimony, that I was -- I was aware that it would not provide

14  clear title to the Singhs.

15  Q.   And what the Singhs indicate in their communication to

16  Ms. Carter is that "We would like a full description of what

17  the legal dealings are with the bank and the seller, as this

18  may affect closing."  Would you agree that that's what the

19  Singhs indicate to Ms. Carter?

20  A.   Yes.

21  Q.   And it doesn't say anywhere in the Singhs' e-mail that she

22  wanted issues with the mortgage company to be resolved before

23  she would enter into an agreement, right?

24  A.   That was what Ms. Carter, their agent, told me.

25           MS. HAGER:  I'd like to move Exhibit FF into evidence.

1          THE COURT:  Any objection?

2          MR. REED:  No, Your Honor.

3          THE COURT:  All right, Exhibit FF is in evidence.

4   (E-mail chain forwarding May 8, 2011 e-mail from Nina Singh to

5   Louise Carter, to Frank Reed, was hereby received into evidence

6   as Trust's Exhibit FF, as of this date.)

7   Q.   Mr. Reed, you talked briefly this morning about

8   interactions that you had with Mr. Tartamosa, Allied Mortgage;

9   do you recall that?

10  A.   I do.

11  Q.   Okay.  You don't have any written applications to Allied

12  Mortgage, do you?

13  A.   I do not.

14  Q.   And you don't have any written approvals from Allied

15  Mortgage, is that correct?

16  A.   That is correct.

17  Q.   And there's no written evidence of the loan amount that

18  you allegedly applied for or were approved for, is that right?

19  A.   That is correct.

20  Q.   And there's no evidence of what interest rate you applied

21  for or were approved for, right?

22  A.   That is correct.

23  Q.   And there's no evidence of the amount of liens at the time

24  of the application, is that right?

25  A.   "Time of application".  The only evidence I would say to

RESIDENTIAL CAPITAL, LLC, et al.                    99

1  that would be the contents of the foreclosure action itself,

2  which would indicate the liens as -- the lienholders on the

3  property as co-defendants to the property.

4      When you file a foreclosure action, you name the

5  subordinate lienholders and serve them as well, I believe.  So

6  you would see a list of liens at that same time frame, at that

7  same period of time.  You would see a second mortgage or a tax

8  lien or something like that.  So the foreclosure complaint

9  itself, just like the one that was filed recently, would

10  list -- because they pull title and they --

11  Q.   What --

12  A.   -- and they file it with the --

13  Q.   Sorry.  Excuse me.

14      What loan amount did you apply for with Allied Mortgage?

15  A.   With Allied, I asked them for a cash-out refi; it was -- I

16  understood it to be either an eight-percent LTV or a ninety-

17  percent LTV.  I did -- I believe I sent them -- the fella the

18  appraisal that I had from TD Bank for two million forty, and he

19  orally got back to me and said they could -- they had those

20  options available for me.  I didn't ask for the interest rates.

21  I didn't even ask what the closing costs were, because he

22  knew -- he said that the closing costs would come out of

23  settlement, which was typical practice at that time; I don't

24  know what it is now.  And so there was -- I had asked was there

25  anything else that he needed from me, similar to my situation

1   with TD Bank, and he did not -- he said there was nothing more.

2        And again, the next time -- I think I had said in

3   depositions that I spoke to the gentleman; it was after the

4   foreclosure action, and I asked about exercising those options

5   and coming to closing.  And he got back to me -- I think I

6   spoke to him -- I think it was a voicemail.  And he got back to

7   me and then we played phone tag, and he told me that he would

8   check on it, that he thought it would be okay.  And then I

9   think there was a voicemail that said that it was no -- it's

10  not going to -- it can't happen.  And as I said in depositions,

11  the reason he cited was also the foreclosure action.

12  Q.   You never actually got an approval from Allied Mortgage,

13  did you?

14  A.   I did not get a written approval from Allied.  I only have

15  what I said I had.  I can produce no more than what occurred,

16  and I can only say what has occurred.

17  Q.   Can you turn to Exhibit LL?

18  A.   Um-hum.

19  Q.   You're familiar with this document, is that right?

20  A.   I am.

21  Q.   So LL is an affidavit from Stuart Shilling, who's the vice

22  president of Allied Mortgage Group.  And he gave an affidavit

23  in connection with your Law Division case.  You're familiar

24  with the contents of this affidavit, is that correct?

25  A.   I am.  I am.

1    Q.   And you're familiar with the fact that Mr. Shilling, under

2    oath, indicated that he conducted a search of all business

3    records of Allied Mortgage Group and found that Allied Mortgage

4    Group does not have any record, documentation or correspondence

5    relating to either Frank Reed or Christina Reed?  You're aware

6    of that, right?

7    A.   Yes; that's what the affidavit says.

8    Q.   Right.  And that he further spoke with the corporate

9    operations manager for Allied Mortgage Group and she confirmed

10   that there's no record of any documentation or correspondence

11   relating to either Frank Reed or Christina Reed in the computer

12   system for Allied Mortgage Group?  You're aware of that, right?

13   A.   I am.

14   Q.   And then he goes on to say, "Consequently, Allied Mortgage

15   Group has no documentation or information supporting

16   Mr. Tartamosa's claim that Plaintiff sought financing from

17   Allied Mortgage Group at any time, including March 2008"?

18   You're aware of that, right?

19   A.   Yes.  Yes, I am.

20   Q.   We discussed this previously.

21   A.   Yes.  Oh, absolutely.  Absolutely.

22        MS. HAGER:  I'd like to move Exhibit LL into evidence.

23        THE COURT:  Mr. Reed, any objection?

24        MR. REED:  No objection, Your Honor.  It is what it

25   is.

1          THE COURT:  Okay, it's in evidence.

2     (Affidavit from Stuart Shilling was hereby received into

3     evidence as Trust's Exhibit LL, as of this date.)

4     Q.    Mr. Reed, with respect to TD Bank, you don't have any

5     written applications to TD Bank, is that correct?

6     A.    That is correct.  It was not the custom for us to do so.

7     Q.    And you don't have any written approvals from TD Bank, is

8     that correct?

9     A.    It was, again, also not the custom for them to do so with

10    me.

11    Q.    And there's no written evidence of the particular loan

12    amount that you applied for or were approved for, correct?

13    A.    No.  As I said to you before, even with the loan that I

14    closed a week after the foreclosure with them on my rental

15    properties, there's no approval, there was no written

16    correspondence.  Mr. Curley established the loans, I walked in,

17    settlement was set, I signed the documents, we walked out.

18    Q.    And you don't have --

19    A.    It's --

20    Q.    Sorry.  I'm sorry.  Go ahead.

21    A.    No, so I'm saying that even in June of that year, on the

22    rental properties -- the refi on the rental properties, which

23    you've seen, you -- there's no -- there's no evidence of that.

24    Q.    So there's no written evidence of what interest rate you

25    applied for, correct?

1   A.    No, and there wasn't on those.

2   Q.    And there's no written evidence of the amount of cash out

3   that you were seeking, correct?

4   A.    No.

5   Q.    Is that correct?

6   A.    Oh.  Correct.

7   Q.    There's no written evidence of when you applied with TD

8   Bank, correct?

9   A.    The only written evidence that I tried to demonstrate to

10  the Court is the facial stamp of a -- of the -- on the

11  appraisal.  I mean, that's -- that is the kind of stuff I would

12  get.  I'm sorry to say, and I feel bad for myself and my wife,

13  but that's, I guess, the nature of what happened now.  This

14  is -- there was no document trail till the very end when you

15  closed on the mortgages.

16  Q.    What loan amount did you apply for?

17  A.    As typical with Mr. Curley, I would ask for a high number,

18  whatever you can give me, Rob.  In this case I was looking for,

19  just like with Mr. Tartamosa, an eighty- to ninety-percent LTV,

20  cash-out refi on the property, appraised value of two million

21  forty.  What does that put it at?  A million-eight, million-

22  seven-something.  If it was -- if it was an eighty-percent,

23  it'll be a little different.

24        I would be open to Mr. Curley doing a different amount.

25  We -- he's done different amounts with different terms,

1  different dollar amount, lower interest rate, little shorter
2  payout, timed notes.  It just was a matter of cash management.
3  I -- you know, I regret not doing it all in writing.  I
4  would -- maybe in this day now where I use e-mail much more, I
5  would have a trail of it.
6  Q.   Do you recall being deposed in June 2009 in connection
7  with the Jacobs v. Reed matter?
8  A.   I do.
9  Q.   Do you recall your testimony during that deposition that
10  the amount of the mortgage that you applied for was 250,000
11  dollars?
12  A.   As I think I said to you, I don't remember if -- I didn't
13  think that was what was on the primary residence.  I thought
14  that had to do with the rental properties.  I -- as I also
15  said, it's a -- it would be a fluid thing.  I needed X cash.
16  If he couldn't come up with full amount, then it would be fine.
17        MS. HAGER:  Your Honor, can I just have one moment?  I
18  want to --
19        THE COURT:  Sure.
20        MS. HAGER:  -- pull out --
21        THE COURT:  Go ahead.
22        MS. HAGER:  -- some deposition transcripts.
23        THE COURT:  Yes, go ahead.
24        MS. HAGER:  Your Honor, may I approach the witness --
25        THE COURT:  Yes.  Go ahead.

1        MS. HAGER:  -- and the Court?

2        THE COURT:  Thank you.

3   Q.   Now, having just handed you a binder, Mr. Reed, there are

4   several deposition transcripts in there.  If you could turn

5   specifically to the transcript from -- I think it's the first

6   exhibit in that binder, from the Jacobs v. Reed matter?

7   A.   Um-hum.

8   Q.   You have that?  Is that the first tab --

9   A.   I think so.

10  Q.   -- in the -- okay.

11  A.   Oh.  Wait.  I'm sorry.

12  Q.   I think I have them in a different order --

13  A.   Yes.

14  Q.   -- in my book; that's why I'm --

15  A.   The first one I have is Scott Jacobs --

16  Q.   Right.

17  A.   Um-hum.

18  Q.   Okay.  So if I could direct you to that deposition

19  transcript and, specifically, page 38, starting at line 15.

20  A.   Um-hum.  38, 15.

21  Q.   Let me know when you're there.

22       Did you find that page?

23  A.   Okay.

24  Q.   Okay.  So Ms. Adelsberger, who was doing the questioning,

25  asked the following question:

 1  "Q.  Now, do you know why Commerce ordered a second appraisal?

 2  In other words, was it because of the whole Jacobs-Reed

 3  transaction, or was it because you were now applying for a

 4  loan?

 5  "A.  I contacted Commerce; it could be within days, if I'm not

 6  mistaken, of this withdrawal, because now, as I said to you,

 7  I'm now carrying two homes and I'm not sure how long it's going

 8  to take to resell the house, looking to refinance the house.

 9  "Q.  Refinance Matlack?

10  "A.  Yeah.  I think we were looking to refinance the second

11  mortgage because it was at a higher rate.

12  "Q.  Do you remember what the rate was?

13  "A.  No.  As I said, it was variable.  I just knew my wife was

14  getting a little upset by that, and she said, well, if you can

15  refinance it, maybe we'll stay here instead of going to

16  Virginia, sell Virginia.  We wanted to see -- again, we were at

17  a family nexus, a career nexus, a family nexus in life, to see

18  where we were going to."

19  A.   Um-hum.

20  "Q.  So you decided to apply for a refinance and you believe it

21  was for the second mortgage?

22  "A.  It was.  Or if they --

23  "Q.  Well, if it was for 250,000 dollars, accord" --

24          THE COURT:  No, you misread that.

25          MS. HAGER:  Sorry?

1          THE COURT:  You misread that.

2          MS. HAGER:  Oh, I'm sorry, Your Honor.

3          THE COURT:  At line 12.

4          MS. HAGER:  At line 12.

5    "Q.  Well, it was for 250,000 dollars, according to the

6    documents.  Does that help refresh your memory?

7    "A.  Yeah.  So it could have been -- it could have either been

8    for the second mortgage, because the second mortgage was a line

9    of credit; it could have been the amount that was on that at

10   that time, because that was variable, too; you take it in and

11   out.  That would make sense.

12   "Q.  Well, I'm not trying to convince you of that.

13   "A.  No, that's what I said originally.  I thought it was for

14   the second mortgage, and your statement about the dollar amount

15   would make that correct.

16   "Q.  I'm going to trust that my fellow co-patriots here will

17   correct me if I say any of the numbers wrong.  I think I'm

18   getting them all right.

19          "So you applied for that loan in January, is that correct?

20   "A.  It would have been very much quickly after that."

21   Q.   So with regard to that testimony and the testimony you've

22   given here today, which statement is true:  that you were

23   applying for a 250,000-dollar mortgage to refinance the second,

24   or that you were applying for a cash-out refinance of both?

25   A.   As I said, I would ask Mr. Curley what can we do.  In the

RESIDENTIAL CAPITAL, LLC, et al.                    108

1   first one, I probably asked 250-.  I probably said, hey, Rob,

2   maybe I need 250-.  But in a subsequent conversation, we talked

3   about more.

4   Q.   You --

5   A.   And I understand.  Look, I don't have any evidence to it.

6   If you want to point to something else where I said a different

7   dollar amount or that I just don't have the dollar amount, I

8   don't, because it wasn't done until we sat down.  I'd be

9   willing to take what he gave to me.  He knew that.  It was a

10  course of doing business with him.

11  Q.   I think I should clarify something.  The date of this

12  deposition that I'm reading from is June 29th, 2009, which is

13  well after the time frame that you say you were denied by TD

14  Bank.  And you were under oath when you gave this testimony.

15  And my question is, which statement is true:  that you applied

16  to TD Bank for 250,000 dollars to refinance the second

17  mortgage, which at the time was in default, or did you apply

18  for a loan, as you've testified today, for a cash-out refi in

19  some unknown amount to pay off both the first and the second?

20  A.   It was an open question in Mr. Curley -- if you look at

21  line 23, "looking to refinance the house", I -- look, I'm not

22  trying to be deceptive or illusive.  It -- can I -- even if the

23  judge admitted the letters, they don't have a dollar amount to

24  them.  I don't know what to say about it.  It --

25  Q.   Okay, so if you could turn to page 42 of the same

1  transcript?  Starting at line 14 --

2  A.    Um-hum.

3  "Q.  Do you remember when your loan was approved through

4  Commerce?

5  "A.  It wasn't.  It was not.

6  "Q.  It was not?

7  "A.  No.

8  "Q.  And why not?

9  "A.  The process kind of died.  It wasn't disapproved.  I never

10  got a disapproval letter.  I think, between the conversation

11  with the realtor and my wife, and the showings, we were under

12  the impression that the house was just going to resell, so

13  what's the point?  Again, my wife had said -- and the attorney

14  and the realtor were, like, well, what are you going to do that

15  for, you don't have to refinance, it's going to sell.

16  "Q.  So you never did actually refinance?

17  "A.  I did not, no.

18  "Q.  Well, we wouldn't have known that, obviously.

19  "A.  Again, I don't know.

20  "Q.  You don't know what we know.  Did you at any time actually

21  call the bank and just say forget the refinancing, or do you

22  remember what happened?

23  "A.  No.  They may have requested some more documents.  And

24  then I didn't give them to them or -- I don't know; I just

25  don't remember.  I may have said, listen, I need a little more

RESIDENTIAL CAPITAL, LLC, et al.                    110

1   time to think about it or something like that.  I can't

2   remember.  It was just a nonissue because, again, we thought it

3   was just going to go through."

4   Q.   So which is true, your testimony here in this case or the

5   testimony you gave in this deposition about whether or not the

6   loan to TD Bank was denied or the process just died?

7   A.   The process was -- and in my testimony here I think is

8   consistent with it -- just was not relevant.  And I didn't -- I

9   didn't pursue it.  We started in January.  We had our

10  conversations like we normally did.  I did the same thing at

11  the same time with regard to my three rental properties and the

12  refi.  We wound up doing the refi on the rental properties.  I

13  didn't think that I needed to do anything with the cash-out

14  refi on TD Bank.

15       I have always said I'm not sure when I actually got back

16  with TD Bank, talked to them about cash-out on the house, and

17  then it became an issue with the foreclosure.  But it's a

18  nonquantifiable damage.  I don't -- I don't -- I don't know

19  even if it was -- the letters came in and everything, I don't

20  remember when it happened.  I remember the conversation about

21  it.  I remember I think there was a voice mail back about it.

22  But it -- but it wasn't until later that it became a poignant

23  thing; well, what happened on that issue?

24  Q.   Mr. Reed, you've testified in this case and put in

25  pleadings in this case that indicate that TD Bank denied you

1    for a loan because of the foreclosure.  But in prior testimony,

2    you testified that the loan was for 250,000 dollars, only to

3    pay off the second, and it was not denied.  Which one of those

4    is true?

5    A.    The problem with that is it is not a just simple one

6    application.  That's why there's no application.  It's about

7    getting money out of the property.  What program, what thing,

8    what time?  And that's -- I don't know how else to answer it.

9    The only thing that happened is when we came back to it, to the

10   question, TD would not, you know, do it.  And the reason they

11   wouldn't do it was because of that.  They did the rentals; they

12   wouldn't do that one.  I don't know what more to say about

13   that.

14   Q.    Okay

15          MS. HAGER:  I don't have anything further.

16          THE COURT:  How much did you refinance your rental

17   properties with TD Bank for?

18          MR. REED:  Almost 700,000; it was a cash-out refi.  A

19   couple weeks after the foreclosure.  They just wouldn't touch

20   the house.

21          THE COURT:  Let me just -- when you say "a cash-out

22   refi", it replaced the existing financing?

23          MR. REED:  Yes.

24          THE COURT:  Did you take any cash out above that?

25          MR. REED:  I don't remember what it was, Your Honor,

1  but yes.  It wasn't a lot, but --

2          THE COURT:  No, I'm just trying to understand.  So it

3  was after your efforts to do a refinance on this property --

4          MR. REED:  They occurred simultaneously.

5          THE COURT:  Okay.

6          MR. REED:  And one was kind of tabled, more -- I think

7  Rob said it was going to be more expensive:  I don't know

8  exactly the amount you're going to be able to get, you know --

9  you know -- you know, what do you want me to push for, anything

10  in particular?  I said just do the rental properties; get

11  that -- put that in the bag.

12          THE COURT:  Okay, I'm just trying -- just the last --

13  I asked this question already, but let me - I want to be sure I

14  understand it.  When you refinanced the rental properties, was

15  there any cash-out?  I know you said you couldn't remember the

16  amount.  When I say "cash-out", above the amount that you were

17  refinancing?

18          MR. REED:  Yes.

19          THE COURT:  Okay.  And do you know, were those

20  properties cash flow positive after you refinanced?  In other

21  words, was your -- you were -- they were rented --

22          MR. REED:  Yes.  I rented them for fifteen years to an

23  organization.

24          THE COURT:  And after the refinance, were you still

25  cash flow positive with respect to the rental properties?

 1            MR. REED:  I believe so.

 2            THE COURT:  Okay.

 3            MR. REED:  I believe so.  I think we took them -- it

 4    was just an interest rate change and -- but the difference was

 5    that they wouldn't touch my property because of the issue with

 6    it.

 7            THE COURT:  Let me -- you're finished with your

 8    questions, Ms. Hager?

 9            MS. HAGER:  Yes, Your Honor.

10            THE COURT:  All right.

11            So Mr. Reed, you have an opportunity for redirect

12    testimony.  Again, you can do it in narrative form.  But any

13    additional testimony you give has to be limited to those issues

14    or testimony that Ms. Hager elicited.  You don't have to.  But

15    I'm giving you the same chance that any other lawyer for a

16    witness would have -- for a party would have.  So if there's

17    anything responsive to what Ms. Hager asked you about, now is

18    your opportunity to provide --

19            MR. REED:  Okay.

20            THE COURT:  -- that testimony.

21            MR. REED:  I guess I would like to flip through her

22    exhibits, because that might quickly jog my memory.

23            THE COURT:  Okay, go ahead.

24            MS. HAGER:  Excuse me, Your Honor, just so that we

25    know.  How much time does the plaintiff --

1        THE COURT:  He's out of time.  I'm giving him an

2   opportunity to do a brief --

3        MS. HAGER:  Sure.

4        THE COURT:  -- redirect testimony.

5        MS. HAGER:  Okay, thank you.

6        MR. REED:  Thank you, Your Honor, for being patient.

7        THE COURT:  Okay.

8        MR. REED:  And --

9        THE COURT:  But let's -- we want to get done,

10   Mr. Reed, so --

11       (Pause)

12       THE COURT:  While we're waiting for Mr. Reed to go

13   through the documents, Ms. Hager, yesterday you moved to strike

14   the testimony of Ms. Donati, and I said I would give you a

15   chance to file written papers on that.  When will you be able

16   to do that?  Do you still intend to move to strike her

17   testimony?

18       MS. HAGER:  May I have just one moment?

19       THE COURT:  Yes, you can.

20       Keep looking at your -- the exhibits, Mr. Reed.

21       MS. HAGER:  Your Honor, we're not going to move to

22   strike her testimony.

23       THE COURT:  All right.  Thank you very much.

24       MS. HAGER:  Thank you.

25       (Pause)

1      MR. REED:  Your Honor, the only thing that's troubling

2  me at this moment is the document that was allowed into

3  evidence today.

4      THE COURT:  Which?  You have to give me an exhibit

5  number.

6      MR. REED:  The foreclosure -- oh, Exhibit YY.

7      THE COURT:  Okay.  It's not in evidence yet.  They

8  have to lay a foundation for it.  You had objected to the

9  exhibit.  Do you now recognize it?

10     MR. REED:  No, I'm still having trouble with this.

11     THE COURT:  Right.  So it's marked for identification

12 and there was questioning of you about it.  We'll see whether

13 it comes into evidence.  As of now, it's not in evidence but is

14 there something you want to testify about on the subject?

15     MR. REED:  I don't know if I did when I was being

16 questioned about it.  The -- the physical agreement doesn't

17 look like what I recalled in my mind, as I said.  And then the

18 other element that's striking to me is -- I mean, there are

19 things in here I don't recognize but -- is the dollar amount.

20 I tendered 3,000 dollars.  It's on the record.  I send it in at

21 the time.  This doesn't even mention 3,000 dollars and I don't

22 understand how this could be even related to it.  Why would I

23 write a check for 3,000 dollars and send it to them?  It's why

24 I send it to them because that's what -- that was part of

25 whatever the agreement is.  Is this an additional thing that I

 1   never saw?  Is this something that they had but then sent me

 2   something different?  I can't answer that.  But that's

 3   troubling to me.

 4           THE COURT:  Okay.  Anything else you want to testify

 5   about?

 6           MR. REED:  No.

 7           THE COURT:  All right.  So you're excused.  Why don't

 8   you pick up your papers and head back to the counsel table.

 9           MR. REED:  Your Honor, would you mind if I go to the

10   restroom quickly?

11           THE COURT:  Sure.  Let's take a ten-minute recess and

12   then you'll call your -- well, let me ask, before you take the

13   break, you don't have any other witnesses to call, I take it.

14   It's now.  It's not another day.

15           MR. REED:  Yeah.

16           THE COURT:  Okay.

17           MR. REED:  No, there's no -- no one else on my list.

18           THE COURT:  Okay.  All right.  And you've introduced

19   whatever exhibits you're going to offer, as I understand it?

20           MR. REED:  That's what I -- that's what I have, Your

21   Honor.

22           THE COURT:  Okay.  So what I do at the end of each

23   party's case is I ask whether they rest.  That means that they

24   put in all of the evidence that they intend to offer in support

25   of their case.  That's what it means to rest.  And so my

1  question to you, Mr. Reed, do you rest?

2          MR. REED:  Again, I can only say something about what

3  she asked me about, right?  If I missed something in my

4  original testimony.

5          THE COURT:  Correct.  Your redirect testimony --

6          MR. REED:  Uh-hum.

7          THE COURT:  -- is limited to what Ms. Hager has

8  inquired about.  Is there something that you -- I'm not

9  necessarily going to listen to it but I want to -- is there

10  some other area as to which you want -- I tried to give you

11  some leeway because you're not a lawyer, Mr. Reed.  I do that

12  for any pro se party.  So is there a --

13          MR. REED:  I've seen you do it, Your Honor.

14          THE COURT:  Okay.

15          MR. REED:  I understand.

16          THE COURT:  Is there some other area that you didn't

17  testify about in your direct that you want to testify about

18  now?

19          MR. REED:  I can't recall if I mentioned another house

20  in our neighborhood that -- that recently had a similar

21  situation and how it, in my -- you know, my perception of what

22  took place and how it affected the value and how the sales took

23  place.  Two houses down from us, same builder, house had

24  issues, litigation issues.  Finally, someone bought it for

25  900,000 dollars, investors who waited it out, bought it.  Once

1    that was done, within a couple of months, I think it was, they

2    sold it for a million-three because there was no -- they could

3    put on there a firm closing date, close whenever you need to

4    close.  It was, you know -- and to me it demonstrated exactly

5    the same kind of thing that I was going through when my

6    neighbor had the situation.

7            THE COURT:  All right.

8            MR. REED:  And Munoz (ph.) -- Sharon Munoz was the

9    name of the neighbor.

10           THE COURT:  Ms. Hager, do you want to cross-examine

11   him on the subject?

12           MS. HAGER:  No, Your Honor.

13           THE COURT:  Okay.  All right.  You're excused, Mr.

14   Reed.  So we're going to take a ten-minute recess.  Get

15   yourself re-settled after the break.  Get yourself re-settled

16   at the counsel table.  We're going to start with your -- Mr.

17   Reed, you rest, correct?

18           MR. REED:  Yes, I don't --

19           THE COURT:  Okay.

20           MR. REED:  -- believe there's anything more.

21           THE COURT:  All right.

22           MS. HAGER:  Your Honor?

23           THE COURT:  Yes.

24           MS. HAGER:  I was going to ask if he rested.  In light

25   of the fact that he has, the Borrower Trust moves for judgment

 1 | on the findings.

 2 |          THE COURT:  Denied.  I want to hear your case.

 3 |          MS. HAGER:  Okay.  Just needed to make the motion.

 4 | Thank you, Your Honor.

 5 |          THE COURT:  That's fine.  You made your motion and I

 6 | ruled.

 7 |      (Recess from 2:48 p.m. until 3:04 p.m.)

 8 |          THE COURT:  All right.  Please be seated.  Okay.

 9 |          Are you ready to call your first witness?

10 |          MS. HAGER:  Yes, Your Honor.  Before I do that, can I

11 | move the admission of a few documents?

12 |          THE COURT:  Yes, you can.

13 |          MS. HAGER:  Exhibit G, which is the complaint for

14 | foreclosure.

15 |          THE COURT:  Hang on.  I thought that's already in.

16 |          MS. HAGER:  It is?  I'm sorry.  Maybe as an

17 | attachment.

18 |          THE COURT:  Perhaps.  Okay.  Mr. Reed, this is the

19 | foreclosure complaint that was filed against you in state

20 | court.  Any objections?

21 |          MR. REED:  Which one, Your Honor?

22 |          THE COURT:  Well, it's not the amended complaint.

23 | It's the complaint.  It's the original -- it's the complaint.

24 | It's the GMACM complaint against you.

25 |          MR. REED:  Okay.

1          THE COURT:  I think it's already in as another

2     exhibit.

3          MR. REED:  I think it's under exhibit --

4          THE COURT:  You have no objection?

5          MR. REED:  No.

6     (GMACM foreclosure complaint was hereby received into evidence

7     as Trust's Exhibit G, as of this date.)

8          THE COURT:  All right.  It's in evidence.

9          MS. HAGER:  Exhibit V which is Jacobses' motion for

10    summary judgment.

11         THE COURT:  V as in Victor?

12         MS. HAGER:  Yes.

13         MR. REED:  I don't know how much that I might be able

14    to --

15         THE COURT:  I'm sorry, I can't hear you.

16         MR. REED:  I don't even know how to object to it, Your

17    Honor.  I wouldn't know the contents of it to even --

18         THE COURT:  Well, it was filed in the case that the

19    Jacobses filed against you and it has the official court stamp.

20    You know, it was served on your lawyer, Mr. McCrink and I could

21    grant judicial notice of it since this is an official court

22    pleading in a case in which you were a party.  It's in

23    evidence.  The Court's -- I'm taking it into evidence.  The

24    Court could grant judicial notice to it.

25    (Jacobses' summary judgment motion was hereby received into

1  evidence as Trust's Exhibit V, as of this date.)

2          MS. HAGER:  And lastly, Exhibit W which is the opinion

3  granting summary judgment in favor of the Jacobses in the

4  Jacobs v. Reed case.

5          MR. REED:  If you would like to do the same with that,

6  Your Honor, if it has a court stamp?

7          THE COURT:  Well, why don't you look at it, Mr. Reed?

8  I suspect you've seen it before.

9          MR. REED:  Which one is this?

10          THE COURT:  W.

11          MR. REED:  W.

12          THE COURT:  Mr. Reed?

13          MR. REED:  Yeah, Your Honor.  I don't remember it but

14  I can formulate no objection.

15          THE COURT:  All right.  It's in evidence.

16  (Opinion granting Jacobses' summary judgment was hereby

17  received into evidence as Trust's Exhibit W, as of this date.)

18          MS. HAGER:  Thank you, Your Honor.  The Borrower Trust

19  would like to call its first witness, Lauren Graham Delehey.

20          THE COURT:  All right.  Ms. Delehey, come on up.  If

21  you would come up to the witness stand, raise your right hand.

22      (Witness sworn)

23          THE COURT:  Please have a seat.  I think you've been

24  in this courtroom a lot but never in the witness stand.

25  DIRECT EXAMINATION

 1  BY MS. HAGER:

 2  Q.    Good afternoon, Ms. Delehey.

 3  A.    Good afternoon.

 4  Q.    Ms. Delehey, who is your employer?

 5  A.    ResCap Liquidating Trust.

 6          THE COURT:  Hang on.

 7          THE WITNESS:  I'm sorry.

 8          THE COURT:  You need to get a little closer to the

 9  microphone, okay?  We want to make sure we get your testimony

10  down.

11  Q.    What's your business address?

12  A.    1100 Virginia Drive in Fort Washington, Pennsylvania.

13  Q.    And what is your present job title?

14  A.    I am chief litigation counsel for the ResCap Liquidating

15  Trust.

16  Q.    And can you describe your responsibilities as chief

17  litigation counsel to the Liquidating Trust?

18  A.    Yes, I manage litigation for the Liquidating Trust.  I

19  manage litigated claims for the Liquidating Trust and all

20  through a cooperation agreement between the Liquidating Trust

21  and the Borrower Claims Trust.  I assist in the reconciliation

22  of claims for the Borrower Claims Trust.

23          THE COURT:  Hang on.  Just stop.

24          THE WITNESS:  I'm still not close enough?  I'm sorry.

25          THE COURT:  Okay.

1  A.   Also through a cooperation agreement with the -- between

2  the Liquidating Trust and the Borrower Claims Trust, I assist

3  in the reconciliation of claims for the Borrower Claims Trust

4  and handle litigated claims for the Borrower Claims Trust.

5  Q.   And how long have you held the position of chief

6  litigation counsel to the Liquidating Trust?

7  A.   Since the formation of the Liquidating Trust when the

8  ResCap Chapter 11 plan was -- went effective in January of this

9  year.

10  Q.   And what's the Liquidating Trust's role with respect to

11  the loan made to the Reeds?

12  A.   The Liquidating Trust through this cooperation agreement

13  that I mentioned, with the Borrower Claims Trust, the

14  Liquidating Trust's records are available to the Borrower

15  Claims Trust and also our personnel are available to assist the

16  Borrower Claims Trust in retrieving and reviewing those

17  records.

18  Q.   Who was your prior employer?

19  A.   Residential Capital, LLC.

20  Q.   And what was your job title with Residential Capital, LLC?

21  A.   Most recently, I was also chief litigation counsel for

22  Residential Capital and I held that position from the time that

23  we turned over our servicing platform in the sales through the

24  bankruptcy in early 2013.

25  Q.   And were your responsibilities as chief litigation counsel

1    at Residential Capital, LLC similar to your job function today?

2    A.    Yes, very similar.

3    Q.    Did you hold a prior position at Residential Capital?

4    A.    Yes, I -- I've worked for Residential Capital since August

5    of 2011 as litigation counsel.  In that role, it was slightly

6    different prior to the bankruptcy.  I managed litigation for

7    ResCap, both class action litigation and also individual

8    litigation related to residential mortgages.

9    Q.    And as litigation counsel for the Liquidating Trust, are

10   you generally familiar with the debtors business records and

11   how they're kept?

12   A.    I am.

13   Q.    Do you have access to GMAC Mortgage's records?

14   A.    Yes.

15   Q.    And do you have access to RFC's records?

16   A.    Yes.

17   Q.    And are you generally familiar with how those records are

18   kept?

19   A.    Yes.

20   Q.    What is the name of the computer program on which the

21   computers -- on which the records are kept?

22   A.    We have several different computer programs that we've

23   retrieved records from.  For example, we keep the servicing

24   records on a computer program called Fiserve or Loan Serve.  We

25   maintain imaged records in a program called Looking Glass.  We

1   maintain records of documents that have gone out to borrowers

2   in a program called XNet and XNet also sometimes contains items

3   that came back in from the borrower.

4   Q.    And have you had the opportunity to review the origination

5   records on the Reed loan?

6   A.    Yes.

7   Q.    And have you had the opportunity to review the servicing

8   and collection records for the Reed loan?

9   A.    Yes.

10  Q.    And is the Reed loan presently being serviced by the

11  debtors?

12  A.    No.

13  Q.    I've left some exhibits up there for you and I think I

14  have them in order.  If you could take a look at the first

15  exhibit, that should be Exhibit A --

16  A.    Yes.

17  Q.    -- which is the servicing notes.

18  A.    Uh-hum.

19  Q.    What information is contained in this document?

20  A.    These are the servicing notes maintained by GMAC Mortgage.

21  They are a contemporaneous record of communications with the

22  borrower from the time that GMAC Mortgage took over the

23  servicing in June -- on June 27th of 2006.  And GMAC's portion

24  of these go through the time that we relinquished servicing to

25  Ocwen on February 15th of 2013.

RESIDENTIAL CAPITAL, LLC, et al.                    126

1  Q.   Was this document printed from the debtors system of

2  record?

3  A.   Yes, it was.

4  Q.   And is this a business record that's kept in the ordinary

5  course?

6  A.   Yes, it is.

7  Q.   And were all of the notes made in this document up to

8  February 14th, 2013, made by GMAC Mortgage employees?

9  A.   Yes.

10  Q.   Was it GMAC Mortgage's regular practice to create and

11  maintain this document?

12  A.   Yes.

13          MS. HAGER:  Your Honor, I would like to move to admit

14  Exhibit A into evidence.

15          THE COURT:  Mr. Reed?

16          MR. REED:  I would object but I imagine it's not going

17  to --

18          THE COURT:  What's your objection?  You went to offer

19  a portion of it but that doesn't matter.  But if you have an

20  objection, I'd like to know what it is.

21          MR. REED:  My objection is about the redacted section.

22          THE COURT:  Well, I was going to ask about the

23  redaction.  Maybe -- before I rule, why don't you ask what the

24  redactions are.  Just say --

25          MS. HAGER:  Oh, ask --

1          THE COURT:  Yeah, why don't you ask the witness.

2          MS. HAGER:  Well, the redactions were made by my

3    office that were redactions for attorney-client privilege

4    because the document contains -- contained communications

5    between GMAC Mortgage and its foreclosure attorneys.

6          THE COURT:  So --

7          THE WITNESS:  I could talk about that a little bit.

8          THE COURT:  Yeah, could you.  Please.

9          THE WITNESS:  I -- I don't have what was redacted in

10   front of me and I certainly don't recall what was redacted but

11   when -- we have a system called or we did have a system called

12   LPS Notes which was the system in which the servicing at GMAC

13   Mortgage communicated back and forth with its foreclosure

14   attorneys.  And notes were placed in that system either by the

15   servicing group that the foreclosure attorneys could pull them

16   up and see them or vice versa.  Notes that the foreclosure

17   attorneys placed into our LPS system would be uploaded and

18   entered in this automatically, into the servicing notes.  So I

19   believe that's the source of what was redacted.

20         THE COURT:  Well, somebody's physically stamped

21   redacted on certain pages.  Could you -- the pages aren't

22   numbered, so -- well, the cover page says redacted.  Could you

23   tell me -- do you have any idea what was redacted on the cover

24   page?

25         THE WITNESS:  It was the Social Security number on the

 1  top right was redacted but for the last four numbers.

 2           THE COURT:  Where are the last four numbers?

 3           MS. HAGER:  Top left.

 4           THE COURT:  Top left.

 5           THE WITNESS:  I'm sorry.

 6           MS. HAGER:  That's okay.

 7           THE WITNESS:  Top left.

 8           THE COURT:  All right.

 9           MR. REED:  Your Honor, I don't know if that's truly

10  the basis of the redaction.  I mean, I --

11           THE COURT:  It is.  We have a policy in our court.  We

12  don't want documents coming in with a borrower's Social

13  Security number.

14           MR. REED:  Oh, no, I mean --

15           THE COURT:  And so that --

16           MR. REED:  -- I mean all of the --

17           THE COURT:  Stop.  So with respect to that first

18  redaction, that's consistent with our rules.

19           THE WITNESS:  And --

20           THE COURT:  It's intended to protect borrowers.  But

21  let me just -- let me ask some more questions, Mr. Reed.

22           So go through to the next redacted entry.  I think

23  it's with a date 5/19/2008.

24           THE WITNESS:  Oh, I found -- oh, never mind.

25           THE COURT:  You found something before then?

 1          THE WITNESS:  I'm sorry.  No, I didn't.  I'm sorry.

 2   Yeah, I see that.

 3          THE COURT:  Do you know what that redaction is for?

 4          THE WITNESS:  I don't know what it said.  However, if

 5   you look at the second column at the front, it's labeled

 6   transaction type.  FOR is in that column and that -- that's an

 7   indication of foreclosure notes.  So it leads me to believe

 8   that that would have been something that was either uploaded

 9   for our foreclosure lawyers or from our foreclosure lawyers.

10          THE COURT:  Everything with an FOR entry has been

11   updated -- uploaded for your foreclosure lawyers?

12          THE WITNESS:  That's my understanding.  Everything --

13          THE COURT:  But not everything would be privileged.

14          THE WITNESS:  No, and you'll see that below, like on,

15   you know, lower in 5/19 there are foreclosure notes that are

16   still in there and it's not necessarily -- I'm trying to see --

17   it's not necessarily that it would be -- everything in there

18   would be sort of privileged communications between attorneys

19   and the foreclosure group.  It's just that when it says

20   foreclosure, it's that type of notes.  It's notes relating to

21   the foreclosure.

22          THE COURT:  So let me just understand where the

23   redaction is.  The last column on that page that has the 5/19

24   date at the very bottom, there -- in the last column there are

25   some blank --

 1                THE WITNESS:  Yes.

 2                THE COURT:  -- lines.  Is that where the redactions

 3     have occurred?

 4                THE WITNESS:  Yes, it is.

 5                THE COURT:  If -- absent a redaction, should there be

 6     entries in each of the blanks in the column --

 7                THE WITNESS:  Yes.

 8                THE COURT:  -- the last column?  All right, Ms. Hager,

 9     tell me what counsel -- who redacted this?  Was it done by

10     counsel?  Was it done by ResCap?

11                MS. HAGER:  It was done by counsel in my office, Your

12     Honor.

13                THE COURT:  And we're seeing the redaction on the

14     first page is of a Social Security number.  Are all the other

15     redactions attorney-client privilege?

16                MS. HAGER:  There is another on the first page, Your

17     Honor, that is to account number, just above the Social

18     Security number.

19                THE COURT:  Yes.

20                MS. HAGER:  And my understanding is that the remaining

21     were redacted due to attorney-client privilege, yes.

22                THE COURT:  Did you provide a privilege log?

23                MS. HAGER:  Your Honor, I beg your pardon?

24                THE COURT:  Did you provide a privilege log?

25                MS. HAGER:  We didn't but my colleague has just

1    informed me that the servicing notes were previously shown to

2    the Court in the September 15th and 16th evidentiary hearing,

3    an unredacted version.

4            THE COURT:  Okay.  I have -- one of my law clerks just

5    handed me a binder with supplemental September 15, 16

6    evidentiary hearing materials regarding proofs of claim by

7    Frank and Christina Reed.  And it's provided for in camera

8    review and -- let me see if I can match some of this up.

9        (Pause)

10           THE COURT:  The objection is overruled.  Exhibit A is

11   in evidence.

12   (Servicing notes were hereby received into evidence as Trust's

13   Exhibit A, as of this date.)

14           MS. HAGER:  Thank you, Your Honor.

15   BY MS. HAGER:

16   Q.   Ms. Delehey, could you take a look at the next exhibit

17   that I have up there is your declaration which was already

18   admitted into evidence as Exhibit 9.

19   A.   Yes.

20   Q.   Do you have that?  Okay.  Do you recognize that document?

21   A.   Yes, I do.

22   Q.   And did you swear under oath that the information

23   contained in the declaration is true and correct?

24   A.   I did.

25   Q.   And do you still believe that it's accurate today?

RESIDENTIAL CAPITAL, LLC, et al.                    132

1   A.   I do.

2   Q.   And did you submit a supplemental declaration?

3   A.   I did.

4   Q.   And could you take a look at that?  That has been

5   previously admitted.  It's marked as Exhibit 10.

6   A.   Yes, I have it.

7   Q.   Do you recognize that document?

8   A.   Yes.

9   Q.   And did you swear under oath that the information

10  contained in the supplemental declaration is true and correct?

11  A.   Yes.

12  Q.   And do you still believe that today?

13  A.   Yes.

14  Q.   Did Mr. and Mrs. Reed make all the payments as when due

15  under the note and mortgage?

16  A.   No, they did not.

17  Q.   And in what month and year did the loan become delinquent?

18  A.   If you look at -- at the notes for --

19          THE COURT:  Looking at Exhibit A?  Servicing notes?

20          THE WITNESS:  I'm sorry, yes. I'm on Exhibit A.

21          THE COURT:  Okay.

22  A.   And if you'll look at the notes for March 14th of 2008,

23  you'll --

24          THE COURT:  Just bear me with a second.  Okay?

25          THE WITNESS:  Yup.

1          THE COURT:  Okay.

2    A.    Those indicate that the account is thirty days late at

3    that point and I'm sorry, could -- turn back, in fact, to the

4    previous page, the notes for February 21st, 2008, indicate that

5    there's a request for a pre-thirty contact letter.  That means

6    a contact letter that would go out to the borrower letting them

7    know that their account is nearing thirty days delinquent.

8          THE COURT:  Ms. Delehey, do the servicing notes

9    indicate when GMAC collected principal and interest payments --

10   do the servicing notes show to whom the payments were then

11   made?  Because you collect on behalf of the noteholder and is

12   there anything in the servicing notes that would indicate to

13   whom payments were made from GMACM to the investor or

14   noteholder?

15         THE WITNESS:  Not to my knowledge.

16         THE COURT:  Okay.  Go ahead.

17   Q.    Ms. Delehey, could you take a look please at page 3 of

18   Exhibit A and can you explain the entry on October 18th, 2007?

19   A.    Yes, that is a note from -- put in there by someone in

20   GMAC Mortgage's tax group.  It indicates that they received a

21   report from Moorestown Township, New Jersey, indicating that

22   the taxes on this loan have been delinquent since the fourth

23   quarter of 2006 and that the mortgage was in tax sale.  It

24   indicates also that there have been no taxes paid up until that

25   point in 2007.

1           THE COURT:  Walk me through the notes, so that I
2    understand it.

3           THE WITNESS:  Uh-hum.

4           THE COURT:  Okay.

5           THE WITNESS:  "Received" -- honestly, I don't know
6    what EOC means but --

7           THE COURT:  Okay.

8           THE WITNESS:  -- it's "received report from Moorestown
9    Township, New Jersey."

10          THE COURT:  Right.

11          THE WITNESS:  "Per Dorothy," who I believe was the
12   person who called or -- "delinquent '06" -- that's 2006,
13   "fourth quarter, was in tax sale" -- "was in tax sale on
14   October 11th, 2007."

15          Then it indicates the total redemption amount for that
16   2006 tax issue was $1,892.44.  Then it goes on to say --

17          THE COURT:  What's "GT 10/26"?

18          THE WITNESS:  I -- I am not sure what that means.

19          THE COURT:  All right.  Go ahead.

20          THE WITNESS:  And it goes on to say on the next line,
21   "Also delinquent 2007" and it -- then it lists -- lists the
22   delinquencies, "February 2007, $7,425.68, May 2007, $7,425.68,
23   August, $7,948.71."  These seem to be notes on our -- our
24   principal and interest.  It says, "A delinquency in November
25   2007, $7,948.71."  And it says, "Grand total for 2007 taxes,

1  $32,683.61."

2           THE COURT:  What does the "on a separate check" mean?

3           THE WITNESS:  GMAC Mortgage had to redeem the tax

4  delinquency.

5           THE COURT:  All right.  So do I -- I understand from

6  the note that you've just read that GMAC advanced $32,683.61 to

7  satisfy the delinquency.

8           THE WITNESS:  That's correct.  That amount plus the

9  $1,892.44 from 2006.

10          THE COURT:  Okay.  Go on.

11 BY MS. HAGER:

12 Q.   Prior to -- prior to the tax sale, did the monthly payment

13 include escrows for taxes and insurance?

14 A.   It did not.

15 Q.   And did the monthly payment subsequently include escrows

16 for taxes an insurance?

17 A.   Yes, the notes -- the next -- the next notes that come up

18 and it looks like they're on November 6th of 2000- -- no, wait.

19 Oh, wait.  I see.  I'm sorry.  At the very bottom of the

20 October 18th, 2007, it indicates that we changed the loan to

21 escrow and that would mean that from that point forward or from

22 a defined point forward, we were going to start paying the

23 taxes directly and the borrower would be obligated to pay the

24 taxes in escrow to us.

25 Q.   And why was that change made?

RESIDENTIAL CAPITAL, LLC, et al.                    136

1  A.   Well,  because when, for example, we get -- we have a

2  situation where the borrower's not making their taxes, exactly

3  this can happen.  The property can be subject to a tax sale and

4  that would -- that threatens our collateral.  So it's important

5  to us that the taxes be paid in a timely manner.

6  Q.   Further down on page 3 of Exhibit A, can you explain the

7  entries on December 6th and December 12th, 2007?

8  A.   Yeah, on December 6th, it indicates that we're going to

9  instead of starting immediately on the December 1st, 2007 and

10  January 1st, 2008 payments as escrow, we're going to instead

11  accept those payments as principal and interest only and start

12  the escrow payments on February 1st of 2008.

13  Q.   Were any attempts made to contact the borrowers after the

14  February payment wasn't made?

15  A.   Yes.  When, in fact, you -- in fact, looking back, you can

16  see that we started because -- because we knew that the taxes

17  weren't being paid, we started to try to contact the borrower,

18  for example, on March 5th of 2007 in those -- that second

19  column where it says DMD, that means -- I believe it means

20  delinquency message for dialers but in essence what it is is

21  that when the servicing agents call a borrower, the phone

22  system automatically records in these notes, you know, that

23  there was a call and sort of the physical outcome of the call.

24       So you're seeing in early 2007, they tried to call.  There

25  was no answer.  In April 5th, 2007, they tried to call.  There

1   was -- they left a message on the machine.  After -- and that

2   kind of goes -- goes on.  After the payment wasn't made in

3   February of 2008, you can see that we start with attempts on --

4   a number of attempts on "February 12, 2008, no answer.  Left

5   message.  No answer."  I'm not sure what "par 3 connect" means

6   but, "Left message.  Left message."  Again, some attempts on

7   February 20th.  Some attempts on February 25th.

8        And, in fact, as I was reviewing it last night, I went

9   through and did my best to count the number of attempts and by

10  my count, there were at least thirty attempts to contact the

11  Reeds between the time they stopped -- they didn't make the

12  payment in February of 2008 and January of 2009.

13  Q.   Can you explain the note on April 20th?

14         MR. REED: What was the date?  I'm sorry.

15         MS. HAGER:  April 28, 2008.

16         THE COURT:  28?  You said 20th, but --

17         MS. HAGER:  Oh, I beg your pardon; 28th.

18  A.   Yes, on April 28th of 2008, a HOPE NOW letter was sent to

19  the Reeds.  HOPE NOW -- and this is noted in the notes.  HOPE

20  NOW is a partnership between non-profit housing counselors and

21  the mortgage companies.  GMAC is a member of that partnership

22  and it -- the purpose of it is to try to help borrowers stay

23  out of foreclosure.

24  Q.   And did the Reeds contact GMAC Mortgage in response to the

25  April 2008 HOPE NOW letter?

1  A.   No, they didn't.

2  Q.   Was another -- excuse me, was another HOPE NOW letter

3  subsequently sent out?

4  A.   Yes, in fact, it appears that letters were sent out on a

5  regular basis, basically monthly.  So if you look on May 29th,

6  2008, one goes out and then on June 25th of 2008, one goes out

7  and then on July 23rd of 2008, one goes out.  And I can see

8  when those go out because in the third column, it indicates

9  "HNOW" which means HOPE NOW.

10 Q.   So is each of those letters an attempt to provide

11 assistance to a borrower?

12 A.   Yes, it is.

13 Q.   And can you explain the note on July 26th?

14 A.   Yes, on July 26th, 2008, Mr. Reed attended a face-to-face

15 meeting with HOPE NOW representatives in Camden.

16 Q.   Have Mr. Reed ever taken any action with GMAC Mortgage in

17 response to the May or June HOPE NOW letters?

18 A.   No.

19 Q.   Or did he ever take any action in response to the April

20 HOPE NOW letter?

21 A.   No, there was no contact from him in response to any of

22 those letters or anything else during that time period.

23 Q.   And can you explain the note on July 31st, 2008?

24 A.   Yeah, when Mr. Reed met with the HOPE NOW representative

25 on July 26th, and I'm looking back up at the -- those notes, he

RESIDENTIAL CAPITAL, LLC, et al.                    139

1  indicated that he had breached the contract in December of

2  2007, that he had his home on the market and thought that he

3  might be looking at a potential offer, that he didn't wish to

4  go further into foreclosure and he explained to the HOPE NOW

5  representative that he could afford to pay 7,000 dollars per

6  month for three months.  He told the HOPE NOW representative

7  that he would send him a copy of the listing agreement.

8       And as a result of that interaction, the HOPE NOW

9  representative sort of referred -- they call it referring it to

10 the platform, meaning they referred it to servicing in a --

11 hoped to set up a stop gap agreement.  So the note on July 31st

12 is -- is them forwarding the stop gap request to the servicing

13 group.

14      Let's see if it goes on.  They're indicating what -- what

15 they're indicating in the referral is that they want to do a

16 plan with a 3,000 dollar down payment and 7,000 dollars due on

17 August 30th and September 30th until the house sells.

18      And then it looks like a GMAC representative spoke

19 directly with Mr. Reed about this stop gap on August 1st.

20 Q.   And what does stop gap mean?

21 A.   A stop gap is an arrangement that's designed to allow the

22 borrower time to get the -- get the mortgage -- the loan back

23 into compliance and avoid foreclosure.

24         THE COURT:  What's the first entry on August 1st,

25 2008, "promise broken"?

1              THE WITNESS:  The -- according to the conversations

2       that the borrower had with GMAC Mortgage, GMAC Mortgage's

3       expectation was that the borrower was going to fax the signed

4       agreement and deliver the 3,000 dollar down payment on August

5       1st.  It didn't happen that way.

6       Q.   Is a stop gap the same thing as a loan modification?

7       A.   No, it's not the same thing.  It's not -- it doesn't

8       change the terms of the loan or the -- the maturity date of the

9       loan or anything like that.  It just -- it just allows the

10      borrower time to bring the loan back current.  There aren't --

11      there aren't any sort of grace periods in it or anything like

12      that.  It's just set up to get things done on an exact schedule

13      and if things are done on that exact schedule, then the

14      foreclosure is stalled.  It's not -- we don't withdraw the

15      foreclosure or stop it but we'll hold off -- hold off on it,

16      while they -- while the borrower is making payments in

17      accordance with the strict agreement.

18              THE COURT:  Let me ask you, on the entries for July

19      31st, 2008 --

20              THE WITNESS:  Uh-hum.

21              THE COURT:  -- so I see the "Please see e-mail

22      referencing this loan number for a stop gap plan with 3,000

23      down today via WUQC."  Do you know what the WUQC is?

24              THE WITNESS:  I do not.  I don't know off the top of

25      my head.

1      THE COURT:  And then it says, "7K" -- 7,000 -- "on

2  August 30th and September 30th until house sells."

3      THE WITNESS:  Uh-hum.

4      THE COURT:  Is it your understanding from this that

5  the Reeds were supposed to pay 7,000 dollars on August 30th and

6  September 30th in lieu of whatever regular mortgage payments

7  that were due?

8      THE WITNESS:  Yes.  And it really was -- in fact, if

9  you'll look one day forward on the notes that were reflecting

10  the actual conversation with the borrower, it's not just -- it

11  wasn't just until the house sells, it was that he was supposed

12  to pay the 3,000 dollars immediately and installment amounts of

13  7,000 dollars for six months.

14      And on that day when he talked with the GMAC

15  representatives, the notes indicate that they proposed to go

16  over the financials of it and essentially discuss, you know,

17  whether he could afford it, what kinds of resources he had but

18  that he indicated that because he was trying to sell the house,

19  he had no need to go over the financials.  He just wanted time

20  for a sale that was in progress to get finalized.

21      THE COURT:  Where do you see that?

22      THE WITNESS:  Late in the -- towards the bottom of

23  the -- I'm sorry, August 1st notes it says, "Justification for

24  resolution chosen is able to provide listen agreement that

25  qualify for one month plan to give time for sale" -- I don't

1  know what SPO but they mean sale -- maybe it means sale

2  proposed or something like that -- "to get finalized."

3         Up towards the top, it indicate -- like the -- I guess

4  it's -- the first note that has -- that says note in the third

5  column, the last column says, "Ask customer about resources,

6  savings, 401(k), IRA, family, friends, church group.  Customer

7  stated no resources available to reinstate the account."  It

8  indicates that, "We advised of the terms and the payment

9  options, that there's no grace period in this agreement, late

10  fees and talked to him about credit implications and what a

11  potential future breach would mean for the foreclosure

12  process."

13         Then it -- further down it talks about that we took

14  the borrower's financials, that the deposit amount would be

15  3,000 dollars, that the installment amount would be 7,000

16  dollars, that the term of the plan would be six months.

17         And this note that says, "Surplus is 125 dollars," my

18  understanding is that means that if he made the -- all of the

19  required payments, the 3,000 and all of the 7,000 dollar

20  payments, he would have an excess of 125,000 dollars over what

21  was required to make up the total of what's due at this point.

22         THE COURT:  Okay.  Go ahead.  Ms. Hager, go ahead.

23         MS. HAGER:  Yes.

24  BY MS. HAGER:

25  Q.   And was a forbearance agreement generated and sent to the

1   borrower?

2   A.   It was.

3   Q.   And can you take a look at what was marked as Exhibit YY?

4   A.   Yes.

5   Q.   Do you recognize that document?

6   A.   Yes.  This --

7   Q.   Was --

8   A.   I'm sorry.

9   Q.   Was this a document that was printed from the debtors

10  system of record?

11  A.   It was.  This was -- this is called a foreclosure

12  repayment agreement.  It would have -- it was faxed to the

13  borrower -- sent to the borrower after this conversation on

14  August 1st where all of the terms are laid out.

15          THE COURT:  How do you know it was faxed to him on

16  August 1st?

17          THE WITNESS:  Because it's dated August 1st up here.

18  And this is a letter that would be automatically generated by

19  the system based on the notes that the servicing representing

20  is entering into the system on August 1st.

21  Q.   Is this a business record that's kept in the ordinary

22  course?

23  A.   Yes, it is.  This was pulled from our XNet system that

24  keeps copies of correspondence that goes out to borrowers.

25  Q.   And was it GMAC Mortgage's regular practice to create and

RESIDENTIAL CAPITAL, LLC, et al.                144

1  maintain this document?

2  A.   Yes.

3        MS. HAGER:  Your Honor, I would like to move the

4  admission of Exhibit YY.

5        MR. REED:  Your Honor, I object.

6        THE COURT:  Overruled.  Document -- Exhibit YY is in

7  evidence.

8  (Foreclosure Repayment Agreement was hereby received into

9  evidence as Trust's Exhibit YY, as of this date.)

10  Q.   If you could turn to Exhibit ZZ.

11  A.   Yes.

12  Q.   Do you recognize this document?

13  A.   I do.  This is the last -- this is what is the same thing

14  as the last page of Exhibit YY, only this is the signature page

15  that Mr. Reed signed on August -- it looks like August 8th,

16  2008 and returned to GMAC Mortgage.  And simultaneously or

17  almost simultaneously, he would have -- he returned the 3,000

18  payment -- down payment.

19  Q.   And for our purposes today, was this document printed from

20  the debtors system of record?

21  A.   Yes, this came out of our imaging system which is called

22  Looking Glass and that's the system that actually saves things

23  that we scan an image into the system.  So when this came in

24  from Mr. Reed, we did countersign it and scan it into our

25  system.

1  Q.   And is this a business record that's kept in the ordinary

2  course?

3  A.   Yes, it is.

4  Q.   Was it GMAC Mortgage's regular practice to create and

5  maintain this document?

6  A.   Yes, it was.

7  Q.   And it was GMAC Mortgage's practice to maintain the

8  signature page in its system of record, is that right?

9  A.   Yes.

10  Q.   Okay.

11        MS. HAGER:  I'd like to move the admission of Exhibit

12  ZZ.

13        MR. REED:  I object.

14        THE COURT:  Overruled.  Exhibit ZZ is in evidence.

15  (Signature page of Foreclosure Repayment Agreement was hereby

16  received into evidence as Trust's Exhibit ZZ, as of this date.)

17        THE COURT:  Let me ask a couple of questions.

18        THE WITNESS:  Uh-hum.

19        THE COURT:  In the upper right portion of Exhibit ZZ

20  or -- is some handwriting.  It looks like "Received 8/8/08."

21        THE WITNESS:  Yes.

22        THE COURT:  "Mailed from GMAC 8/4/08."  Do you know

23  who that handwriting is?

24        THE WITNESS:  I don't know but I would think that it

25  would be the person who scanned it into the system.

1        THE COURT:  All right.  And there is a completed

2    signature on the servicer line with a date of 9/4/08.  Do you

3    know who that is?

4        THE WITNESS:  I don't know the name and it's a little

5    hard to read but it should be -- it's a GMAC employee.

6        THE COURT:  Do you know whether the countersigned

7    agreements or YY is the agreement and ZZ is the signature page,

8    it shows two signatures on it.  Do you know whether a copy of

9    the fully signed agreement or at least of the signature page

10   was returned to the Reeds?

11       THE WITNESS:  No, it wouldn't have been our practice

12   to do that.

13       THE COURT:  Well, when I read the above the servicer

14   signature line, "Upon receipt of the signed agreement, we as

15   the servicer will also execute to indicate our concurrence with

16   this agreement."  If a copy of it isn't mailed to the borrower

17   how are they supposed to know that GMAC has concurred with the

18   agreement?

19       THE WITNESS:  Well, my understanding is that based on

20   the telephone conversations that they have, the terms of the

21   agreement are fully laid out in the telephone conversations,

22   the dates and all of the implications of not meeting those

23   dates.

24       If the borrower were to call and ask for a copy of YY,

25   after it was sent to them or ask for a copy of YY and ZZ after

1    we had it, we certainly would have sent it back to him but it

2    wasn't the regular practice of GMAC to mail those back.

3              So when we received the document and countersigned it

4    and put it into our system, we immediately stopped the

5    foreclosure efforts in the anticipation of receiving the

6    payments according to the agreement.

7              THE COURT:  Okay, go ahead.

8    BY MS. HAGER:

9    Q.    Does it state anywhere in Exhibit YY that statements or a

10   coupon book would be sent?

11   A.    No, and I have no knowledge of any kind of coupons being

12   mailed out on any of the -- that type of item and it -- it

13   really wouldn't be a coupon situation because it's not changing

14   the terms of the loan.  It's a very short-term thing.  It's

15   just trying to help a person regain their compliance with the

16   loan.

17   Q.    And can you explain the note on August 11th, 2008, the

18   last line of the notes on that date?

19   A.    Where it says "Repaid plan late, phoned" or "Plan grace

20   extended"?

21   Q.    Sorry, on the August 11th --

22   A.    Oh, I'm sorry, I went to 13th.

23   Q.    Right, August 11th, the last line, "Plan grace".

24   A.    Yeah, as I said before, the expectation was when -- when

25   the GMAC representative spoke with Mr. Reed on the 1st, the

1  expectation was that the funds were to be immediately forwarded

2  to GMAC.  Essentially, we would have expected to get them on

3  the 1st.  That didn't happen, and so we followed up with a

4  phone call to say what's happening with that payment, we're

5  expecting that payment, can -- you know, basically, can we go

6  forward with this forbearance agreement.

7            THE COURT:  When was the phone call?

8            THE WITNESS:  August 13th.

9            THE COURT:  Okay.  And what is -- for the last August

10 11th entry, in the second column, the code RPE?

11           THE WITNESS:  I -- I am not certain.  Oh, but I'm

12 guessing now.

13           THE COURT:  Don't guess.  We don't want guesses.

14           THE WITNESS:  Okay.

15           THE COURT:  I can guess too.

16           THE WITNESS:  But the note says "Plan grace extended

17 to August 18th", so we essentially said -- you know, we called

18 the next day and we said we haven't gotten this 3,000-dollar

19 payment, are you going to send it; we'll accept it up till

20 August 18th.

21           THE COURT:  Okay.

22 Q.   And on August 18th, were the documents received from the

23 Reeds?

24 A.   They were, and the note says "Received executed documents,

25 completed August 18th".

1  Q.   And was the required down payment of 3,000 dollars made?

2  A.   Yes, it was.   It -- and right above that it says "Repay

3  deposit received".

4              THE COURT:   Where was that?   I'm sorry.

5              THE WITNESS:   On August 18th.

6  Q.   On August 20th --

7              THE COURT:   Hold on; I don't see that --

8              MS. HAGER:   I'm sorry.

9              THE COURT:   -- yet.   I want --

10             THE WITNESS:   Oh, there are a lot of notes on --

11             THE COURT:   There are, and we're roughly how many

12  lines from the bottom, on August 18th?

13             THE WITNESS:   It's about eight lines from the bottom

14  on August 18th, and it happens to be in capital letters, so it

15  kind of stands out, "Received executed documents, completed

16  August 18th, 2008".

17             THE COURT:   Okay.   I see that.

18             THE WITNESS:   And right above that it indicates "Repay

19  deposit received", and that -- that means the 3,000 dollars.

20             THE COURT:   All right.   Do you know what the next

21  August 18th entry means?

22             THE WITNESS:   It -- it means that there's a Social

23  Security change -- number change.   And a little bit further

24  down it says "Advised by borrower 1", and that would be Mr.

25  Reed, "Social Security number incorrect, updated per credit

1  report".  So it seems like somewhere, either on -- somewhere we

2  had indicated an incorrect Social Security number and corrected

3  it.

4          THE COURT:  All right.  Go ahead, Ms. Hager.

5  BY MS. HAGER:

6  Q.   On August 20th, on the next page, six lines down, can you

7  explain that note that starts with "Reason"?

8  A.   That is -- you can see it's a fore -- it's reporting about

9  foreclosure activity.  And it says that the motion for summary

10 judgment was -- has been adjourned.

11 Q.   And on September 1st, can you explain that note?

12 A.   "Promise broken, September 1st, 2008"; that -- that means

13 that the scheduled payment on the repayment plan that had been

14 due on September 1st was not made.

15 Q.   So what happened to the forbearance agreement at that

16 point?

17 A.   Well, we reached out to him on September 3rd.  It

18 indicates "Called, delinquent repay".  And then there's the

19 note that we received, the sign agreement -- the signed

20 agreement.  But there were no further payments made on -- on

21 this repayment agreement.

22 Q.   Now, in May -- on May 10th, 2009, can you explain the

23 first entry?

24 A.   Yes.

25          THE COURT:  Can you hold on a second?  Where is it?

RESIDENTIAL CAPITAL, LLC, et al.                    151

1          MS. HAGER:  May 10th, 2009.

2          THE COURT:  All right.  Are you ready, Mr. Reed?

3          MR. REED:  I am getting there.  Okay.

4          THE COURT:  All right.  Go ahead.

5   A.   On May 10th, he was -- and you'll see that he's still

6   delinquent; we're getting ready to start a foreclosure again.

7   But he was approved for a permanent loan modification on -- on

8   May 10th, 2009.  And then -- and the note goes on to explain

9   the exact terms of it.  There was a contribution of 310 dollars

10  due on May 25th.  The -- the unpaid balance was adjusted.

11  The -- it looks like the escrow -- it looks like the escrow was

12  adjusted as well.  The interest rate was reduced from 6.375 to

13  4.375.  The term was extended so that the maturity date would

14  now be out to 2049.  The payments went down a little bit, the

15  principal and interest payments.  The principal interest taxes

16  and -- and insurance also went down by, it looks like, about

17  3,000 dollars, 3,200 dollars.  So it indicates that we tried to

18  contact him.  We weren't able to contact him, but the -- the

19  loan mod was approved.  So it was sent out to him and -- and he

20  was approved for it.

21  Q.   Can you explain the note on July 9th, 2009?

22  A.   That indicates that we never received the executed loan

23  mod docs back.

24          THE COURT:  Looking back to the May 10th, 2009 --

25          THE WITNESS:  Um-hum.

1        THE COURT:  -- the entries about the loan

2   modification.  Are there entries before that about negotiations

3   or discussion about loan modification with Mr. Reed?

4        THE WITNESS:  Let me see.

5        THE COURT:  I mean, I see the entry for May 7th,

6   "LMT"; I assume that's a loan modification.

7        THE WITNESS:  Well, I -- you know --

8        THE COURT:  "Solution pursued; completed 5/7".

9        THE WITNESS:  Oh, yeah, and -- and it also indicates

10  that we received a completed financial package from the

11  borrower on --

12       THE COURT:  Okay.

13       THE WITNESS:  -- May 7th.

14       THE COURT:  Are there any entries before May 7th to

15  indicate that a loan modification was proposed, applied for,

16  discussed, anything of that sort?

17       THE WITNESS:  You know, the earlier ones on May 7th

18  are indicating that -- that we're -- that we want to consider

19  it.

20     (Pause)

21       MS. HAGER:  If I could direct the witness' attention

22  to two different entries; one is on March 31st, 2009, and the

23  other April 7th, 2009.  Are either of those helpful in

24  answering the Judge's question?

25       THE COURT:  Well, I see the April 7th entry, "Home

1  affordable modification program sent to borrower".  That's on

2  April 7th.

3           THE WITNESS:  Yeah, I can't tell, honestly, from the

4  later notes, why, specifically, the borrower sent in a

5  financial package.  But it's clear that we received a financial

6  package and therefore approved him for -- for a permanent loan.

7           THE COURT:  So this was a HAMP modification?

8           THE WITNESS:  I -- actually, if I recall, I think it

9  was not --

10          THE COURT:  Okay.

11          THE WITNESS:  -- a HAMP modification.  I think -- I

12  have to find the notes, because my memory was that it wasn't a

13  HAMP modification.  But --

14          THE COURT:  Okay.

15          THE WITNESS:  -- I'm not reading that in the notes so

16  much.

17          THE COURT:  Is there a written agreement that reflects

18  an agreement between GMAC and the Reeds for a loan modification

19  on the terms you've identified?

20          THE WITNESS:  No, there's not, because we received a

21  financial package and we -- we would have sent -- sent a loan

22  modification offer out to him.  We never received anything

23  executed back from him.

24          THE COURT:  Are there any -- are there exhibits that

25  reflect the proposed loan modification that was sent to the

1    Reeds?  In other words, these notes reflect terms.  One would

2    presume they were set forth in a writing that was sent to the

3    Reeds.  Is that correct or incorrect?

4            THE WITNESS:  One would presume, but I do not have

5    that document with me.  I'm not saying that it -- that it

6    doesn't exist, but I -- I haven't pulled that document.

7            THE COURT:  So for April -- excuse me, May 10th, 2009,

8    there are some entries that are all caps, maybe eight, nine

9    lines from the bottom.

10           THE WITNESS:  Um-hum.

11           THE COURT:  "Modification approved".  I don't know

12   what INV is.

13           THE WITNESS:  By investor.

14           THE COURT:  Okay.  "Completed 5/10/09".

15           THE WITNESS:  Um-hum.

16           THE COURT:  Is there any indication who the investor

17   is?

18           THE WITNESS:  No, not in these notes.

19           THE COURT:  Where would one look if you wanted to see

20   who the investor was?

21           THE WITNESS:  If I wanted to see who the investor was

22   at that time, I would be able to pull up the screen on -- on

23   our search system and see it.  I don't have that in front of me

24   today.

25           THE COURT:  Go ahead, Ms. Hager.

1          Do you know who owned the loan in May 2009?

2          THE WITNESS:  I would have to -- I -- I think I might

3    have -- have indicated that in my declaration, because I -- I

4    know that at some point in 2009 RFC started to own the loan,

5    but I -- off the top of my head I don't know the answer.

6          THE COURT:  Okay.  Go ahead, Ms. Hager.

7    BY MS. HAGER:

8    Q.   The loan modification that you were just discussing, for

9    May of 2009, that was never effectuated at that rate?

10   A.   No.

11   Q.   And could you explain the note on July 13th, 2009,

12   relating to the loan modification?

13   A.   Yes.  Because we didn't receive the documents or the

14   funds, we denied the loan modification.

15   Q.   Was another forbearance agreement subsequently offered to

16   Mr. Reed?

17   A.   Yes.

18   Q.   And can you explain the note on July 31st, 2009?

19   A.   Yes.  At that point, Mr. Reed -- the Reeds were approved

20   for what -- what we're calling a thirty percent payment

21   reduction campaign, and -- and we sent out a solicitation

22   inviting them to participate in that campaign.  Now --

23   Q.   And that was -- I'm sorry.

24   A.   I'm sorry.  The thirty -- I don't know -- off the top of

25   my head, what the exact terms of this thirty percent payment

RESIDENTIAL CAPITAL, LLC, et al.                    156

1   reduction campaign were, but it would have been -- it was a

2   program that GMAC would have, sort of, gone through its loans

3   and -- and chosen people who were struggling to keep up with

4   their loan, and -- and offered it to them.  It didn't require

5   any kind of request from the borrower.

6   Q.   And that kind of program that you just described, that's

7   not a loan modification, is that right?

8   A.   No, it's not a loan modification.

9            THE COURT:  So on August 3rd, 2009, among the entries

10  is "BPO obtained".

11           THE WITNESS:  Um-hum.

12           THE COURT:  Is that a broker price opinion?

13           THE WITNESS:  Yes.

14  Q.   Were the Reeds approved for the thirty percent reduction

15  plan?

16  A.   Yes, they were.

17  Q.   And was that ever finalized?

18  A.   It -- it wasn't.  And I have to find the exact entry, but

19  my recollection is that they called -- that Mr. Reed called and

20  indicated that he couldn't make a payment until the end of the

21  month.

22  Q.   If you could look at the note on August the 6th, 2009, can

23  you explain that note?

24  A.   Yes.  "Frank", meaning Frank Reed, "called to advise that

25  they cannot make a payment.  But at the end of the month,

1    that's when he gets paid."  So because -- and then it indicates

2    that the borrower was already set up on a stop gap, referring

3    to this stop gap we had set up.  When we solicited him for

4    the -- the payment reduction, we -- we did a stop gap just

5    to -- to hold on to the foreclosure while we waited for him to

6    respond.  When -- so when he did that, when he called in, we

7    couldn't go forth with the -- the one that we had originally

8    solicited him for.  But I believe that we -- yeah, if you look

9    down at the -- the third line from the bottom on that page, he

10   was -- oh, it wasn't.  We -- I believe we tried to get him into

11   a non-HAMP trial modification.  That was -- he was approved for

12   that.  And if you go on to the next page, it indicates that he

13   was approved for that on August 13th of 2009.

14   Q.    And was that trial plan ever completed?

15   A.    No.  No, it wasn't, because the payments weren't made.

16             THE COURT:  Were any payments made?

17             THE WITNESS:  No.

18   Q.    And can you explain the notes on August 31st, 2009?

19   A.    "Repayment plan cancelled automatic".  Not only the

20   borrowers didn't make the payments, but instead, on the date we

21   would have been expecting a payment, he sent a fax asking if we

22   could accept a short payoff of 480,000 dollars and release the

23   lien in full, and we didn't accept that.

24   Q.    Was the 3,000 dollars that was paid by Mr. Reed, in

25   connection with the forbearance agreement, applied to his

1  account?

2  A.    No, the -- the way the forbearance agreement was set up,

3  when we received the 3,000 dollars, it didn't equal one -- one

4  monthly payment.  So it -- it couldn't be credited to the

5  monthly payment.  Had he sent in the next 7,000 dollars, we

6  would have credited one monthly payment, and then he would have

7  had some more.  And each time he sent it in, when it added up

8  to a monthly payment, we would have credited that monthly

9  payment.  But because he never sent in the first 7,000-dollar

10 payment, he never reached on full monthly payment.  So that

11 3,000 dollars was placed in a suspense account.  And there were

12 never any additional payments made on the loan, so it never got

13 out of the suspense account, and the suspense account is now

14 with the current servicer.

15         THE COURT:  So September 9th, 2009, entry "LMT

16 BPO/Appraisal RAC Added", tell me what that means?

17         THE WITNESS:  It's -what's -- I'm sorry, what's the

18 date?

19         THE COURT:  September 9th, 2009.  The code in the

20 second column is LMT.

21         THE WITNESS:  Oh, I see, okay.

22         THE COURT:  And the entry, in all caps is with a

23 BPO -- which I understand to be broker price opinion -- slash,

24 Appraisal.

25         THE WITNESS:  It indicates that we received the broker

 1  price opinion.

 2          THE COURT:  Was it an appraisal or broker price

 3  opinion?

 4          THE WITNESS:  I'm not sure that there's a difference.

 5          THE COURT:  Oh, there is.

 6          THE WITNESS:  Well, then, I'm not sure which it is.

 7          THE COURT:  Do you know -- do you know what value was

 8  placed on the property through the BPO or the appraisal in

 9  September of 2009?

10          THE WITNESS:  Not off the top of my head.

11          THE COURT:  Where would you look for that?

12          THE WITNESS:  We would -- we would have a copy of the

13  BPO in our system.

14          THE COURT:  How often do you get a BPO or an

15  appraisal?  I asked you about a prior entry on a BPO.

16          THE WITNESS:  I don't know -- I don't know that it's

17  necessarily done at a specific interval.  It would be done, I

18  think, if it's -- if it's considered to be stale when we're

19  making a new loss mitigation attempt.  And I -- I just -- I

20  don't know at what point they consider it to be stale.

21          THE COURT:  So the criteria for a HAMP modification,

22  the last step of the test is to compare the net present value

23  of the modified loan against the proceeds that could be

24  expected in a foreclosure.  Is that why a BPO or an appraisal

25  is obtained when you're doing a possible modification to see

RESIDENTIAL CAPITAL, LLC, et al.                    160

 1  what the value of the property is?

 2          THE WITNESS:  Right, to be sure that you're not --

 3  you're not extending beyond the value of the property.

 4  BY MS. HAGER:

 5  Q.   Can you explain the FRB consent order?

 6          THE COURT:  Are we moving away from the servicing

 7  notes?

 8          MS. HAGER:  I am.

 9  A.   Yes.  In 2011, GMAC Mortgage, ResCap and Ally Financial,

10  and actually other servicers as well, were under investigation

11  by federal regulators, including the Federal Reserve Board and

12  entered into -- the debtors and Ally entered into a consent

13  order in 2011 that basically the debtors agreed to set up

14  certain procedures that were designed to ensure future

15  compliance with servicing and foreclosure rules and

16  regulations.

17  Q.   And can you explain GMAC Mortgage's involvement with the

18  FRB foreclosure review process?

19  A.   Yes.  GMAC -- our involvement essentially was to provide

20  to an independent reviewer data from our servicing system.  So

21  we -- under the consent order, we were obligated to pay for

22  what was called an independent foreclosure review.  We hired

23  and paid for an independent reviewer and provided the servicing

24  data to them for the reviewer to review the files.

25  Q.   Did GMAC Mortgage come to an agreement with the consent

 1  order regulators?

 2  A.   Yes, eventually.  In I believe it was June of 2013, we

 3  entered -- executed a term sheet with the regulators that at

 4  that point the independent foreclosure review was halted; there

 5  were no additional individual file reviews.  Money was placed

 6  in escrow that was intended to be for settlement funds.  And

 7  the independent foreclosure reviewer and the Federal Reserve

 8  Board looked at -- well, the independent consultant provided

 9  what they call a waterfall, which was basically identifying

10  where the -- where the borrowers who were in the eligible

11  population would be placed in the waterfall to identify the

12  payments they would receive.

13  Q.   And --

14          THE COURT:  Let me -- I'm going to put a stop to the

15  questioning about the independent foreclosure review.  During

16  the course of the debtors' Chapter 11 case, I became quite

17  familiar with the consent order.  And indeed, when the

18  modification to the consent order was negotiated, I had to

19  approve it on behalf of the debtor.

20          Based on the Court's prior order, the independent

21  foreclosure review or the modified consent order which was

22  approved for payment of a lump sum, has absolutely no bearing

23  on the issues in this proceeding.

24          The debtor and Ally entered into it without admitting

25  or denying any of the allegations.  The waterfall procedures

1    that were set up under the modified consent order under which

2    payments were made have no bearing on any of the issues here.

3    So we can shorten this proceeding.  I'm not going to -- I don't

4    want any more questions from you, and I'm not going to permit

5    any questions from Mr. Reed with respect to the Federal Reserve

6    Board consent orders, the original or the modified order.

7              MS. HAGER:  I only had two more questions relating to

8    that, and that being the case, I have nothing further.

9              THE COURT:  Okay.

10             MS. HAGER:  Thank you, Your Honor.

11             THE COURT:  Mr. Reed, cross-examination?

12             MR. REED:  Your Honor, I'm trying to find a document

13   to --

14        (Pause)

15             MS. HAGER:  Your Honor, if Mr. Reed lets us know what

16   he's looking for, we could --

17             MR. REED:  I'm trying to find the copy -- I thought it

18   was -- I thought it was in here -- of the complaint against

19   GMAC Mortgage that I filed in the state court action.  I

20   thought it was in with the --

21             I'm trying to find the date it was filed.

22             MS. HAGER:  I -- if I may?  I think that might have

23   been included with the proof of claim.  Do you have that, Mr.

24   Reed?

25             MR. REED:  I don't.  I don't.  I'm sorry.

RESIDENTIAL CAPITAL, LLC, et al.                    163

1          THE COURT:  Mr. Reed, you filed your complaint against

2    GMAC Mortgage on May 10th, 2010.  It's Exhibit D to your proof

3    of claim.

4          MR. REED:  Okay.

5          THE COURT:  And you filed your amended complaint on

6    January 6th, 2012, and that's Exhibit E to your claims.

7    CROSS-EXAMINATION

8    BY MR. REED:

9    Q.   Good afternoon, Ms. Delehey.  We've seen each other an

10   awful lot, but never spoken.

11   A.   Good afternoon.

12         MR. REED:  What was the date, Your Honor, that that

13   action was filed?

14         THE COURT:  May 10th, 2010.

15      (Pause)

16   Q.   In your testimony you said you had to -- I can't remember

17   exactly what the question was, but your answer was you had to

18   take action for collateral that would be -- that GMAC's

19   collateral would be threatened.  Is that GMAC's collateral?

20   And what is the collateral?

21         MS. HAGER:  Objection to form.  And mischaracterizes

22   her testimony.

23         THE COURT:  Well, I think Ms. Delehey can handle it.

24   Overruled.

25   A.   Well, GMAC Mortgage is the servicer, so the investor's

1  collateral would be threatened.  We're -- as the servicer,

2  that's our responsibility.

3  Q.   Okay.  Can you show me in the notes any address or

4  telephone number that you would have for me on or before -- two

5  dates I'm trying to find:  before November of 2008 and after

6  2008?

7  A.   No, sir, I don't have those in the notes.  If I needed to

8  get an address, what I would do is look it up on our Fiserv

9  LoanServ system, and it would be in there.  It would indicate

10  the current address if I pulled it up.

11  Q.   Are you aware of any of the exhibits that have been

12  proposed to the Court that would indicate, at various points in

13  time, the telephone numbers or addresses that you had on record

14  for myself?

15  A.   Is there any way that --

16        THE COURT:  Answer that yes or no.  I mean -- it's not

17  a trick question.

18  A.   I mean, I don't have very many exhibits in front of me.

19  But we sent your foreclosure repayment agreement to an address

20  817 Matlack Drive, Morristown, New Jersey, on August 1st of

21  2008.  So that would have reflected our understanding of your

22  address at that date.

23  Q.   And that date was, again?  Could you repeat that?

24  A.   August 1st, 2008.

25        (Pause)

1  Q.   Do you have any other address in the records here in the

2  court or in the notes that --

3  A.   Not to my -- not to my knowledge because I don't -- I'm

4  not aware that the notes would specifically have the address.

5  Like I said, it would be in our system, but I don't have our

6  system in front of me.

7  Q.   Or phone number?

8  A.   That would be in our system on any given date.

9  Q.   Um-hum.

10 A.   Not today because we're not the servicer.

11 Q.   So the loan modification that was approved by the servicer

12 notes -- indicated by the servicer's notes 5/10/2009 --

13 A.   Yes.

14 Q.   -- I believe you testified that you sent -- or that the

15 company sent out the documents to be executed?

16 A.   Yes.  That's my understanding.

17 Q.   Is there anything in the notes that indicate telephone

18 contact about this particular transaction or proposed

19 transaction?

20 A.   I cannot find -- I don't see that.  Well, although it says

21 on May 15th of 2009 there's a note that says, "Send execution

22 documents completed 5/15/2009."  So that would indicate that we

23 had sent the documents out for execution.

24 Q.   But we don't know where.  There's nothing here --

25 A.   Not by looking at these notes, we don't, no, but we would

 1  be able to tell that from looking at our system.

 2          MR. REED:  It's important, Your Honor, because I

 3  didn't live in that house.

 4          THE COURT:  Don't testify.  Ask your questions.

 5          MR. REED:  Okay.

 6  Q.   Do you know who Bernadette Daddazio (ph.) is?

 7  A.   I believe Bernadette Daddazio was a servicing -- an

 8  employee in GMAC Mortgage's servicing group or loss mitigation

 9  group, probably.

10  Q.   And is it your understanding Ms. Daddazio had the

11  authority to bind GMAC in a modification agreement on behalf of

12  an investor?

13  A.   I don't know exactly how to answer that.  I mean,

14  Bernadette Daddazio, her name is in here.  If you have a

15  particular entry you're talking about?  I see --

16  Q.   5/10/2009 seems to indicate it was approved by Ms.

17  Daddazio.

18  A.   I believe that that was sort of a -- there are also notes

19  that talk about submitted to the investor.  And so I can't

20  answer you today that Bernadette Daddazio made the decision on

21  behalf of the investor, 'cause there are things that say

22  "improved by investor," "recommended to investor".  So I

23  don't -- I just -- I don't necessarily know that she did

24  anything on behalf of the investor.

25  Q.   But it's your understanding that this -- this modification

1    was a valid offer to be accepted by me and bind the company to

2    it?

3    A.    Yes.  In response to a package that was sent in by you.

4    Q.    But, again, we don't have any knowledge of where that

5    package was sent?

6          THE COURT:  She referred to a package sent in by you.

7    A.    Um-hum.  We received a financial package from you.

8    Q.    Oh, I'm sorry.

9    A.    And that was what set off the loan mod application.

10         (Pause)

11   Q.    Would you look at the entry for May 15th, 2009; "Send

12   execution documents and then completed 5/15/09."  What is the

13   "completed 5/15/09"?

14   A.    It means that we sent the documents out for execution.  In

15   other words, that we sent them to the Reeds.

16   Q.    Because first -- the first entry then is "uncompleted" and

17   then below that "completed."

18   A.    Well, I guess that these are checklists that they have to

19   check off.  So, I guess, early in the day it was uncompleted

20   and then it was completed.

21   Q.    All right.

22         (Pause)

23   Q.    So in going back -- I think you -- this is your test -- on

24   May 7th, 2009 --

25   A.    Um-hum.

RESIDENTIAL CAPITAL, LLC, et al.                    168

1   Q.   -- "completed financial package received".

2   A.   Yes.

3   Q.   What does that mean?

4   A.   That's -- that's what I meant that we received a financial

5   package from the Reeds.

6   Q.   Do you approve a loan modification without having received

7   a financial package?

8   A.   No.  Not unless it's a particular program like, for

9   example, that thirty percent reduction that we would solicit.

10  Q.   August 31st, 2009, the servicing notes, it indicates, and

11  I believe you testified that there was a fax sent in if you

12  would take a payoff for 480,000 dollars to release the lien.

13  Is there any record of where that -- the phone number or the

14  fax number that it was sent from?  Was there a cop -- and is

15  there a copy of that fax?

16  A.   There's no record of that here in these notes, but it may

17  be in our -- in our Looking Glass system.  It may be imaged in

18  there.  I don't know because I didn't look for that.

19  Q.   So the only date -- or, excuse me -- the only address of

20  contact that we have in the servicing notes is the 817 Matlack

21  Drive?

22  A.   Well, as I said, the servicing notes don't maintain a

23  record of -- of the address.  That's just not where they're

24  kept.  If a borrower notifies us that there's a change in

25  address, then we would change the address in our system and it

1   would be in our system.  It wouldn't -- the address wouldn't be

2   entered into the servicing notes.

3   Q.   So is there any proof, or record, that indicates a

4   specific telephone number or my address that a communication

5   took place that ties me to after No -- after November 2008?  In

6   other words, like, you -- when you look at the business

7   records, you see an address, unless there's other evidence,

8   that says 817 Matlack Drive.  After November 2008, you can't

9   say whether or not these correspondences were sent to any other

10  address or continued to stay -- being sent to 817 Matlack

11  Drive?

12          MS. HAGER:  Objection.

13          THE COURT:  Overruled.

14  A.   Well, look, as I've said, I -- the servicing notes are not

15  the source of the addresses where things were sent.  Anything

16  that was sent would be sent to the address of record.  There

17  are indications in the servicing notes that we received things

18  back from you at various times.  So that would suggest to me

19  that you received them from us and, therefore, that we sent

20  them to an address that worked.

21  Q.   I'm not quite sure they came from me.

22          THE COURT:  Don't interrupt, Mr. Reed.

23  A.   If you had made an inquiry about the -- you know, a

24  specific record of what addresses were on file for you in our

25  system over the years, we could have responded to that. But I

1  can't do it today off the top of my head or through these

2  servicing notes.

3           MR. REED:  Your Honor, I don't have anything further.

4           THE COURT:  All right.  Any further questions, Ms.

5  Hager?

6           MS. HAGER:  Yes, Your Honor.

7           MR. REED:  And these are -- her questions are within

8  my --

9           THE COURT:  Yes.  Just within the scope of what you

10  ask about.

11  REDIRECT EXAMINATION

12  BY MS. HAGER:

13  Q.   Was it GMAC Mortgage's practice to send correspondence to

14  homeowners at their residence?

15  A.   We would send it to them at their residence unless they

16  advised us that we were to send it to them at a different

17  address.

18  Q.   And if the borrower contacted GMAC Mortgage to indicate a

19  change of address or change of phone number, that would be

20  reflected somewhere in the records?

21  A.   It would be reflected in the servicing notes.

22  Q.   If GMAC Mortgage received correspondence back that was

23  marked "return to sender", would that be indicated somewhere in

24  the servicing notes?

25  A.   I believe it would, yes.

1    Q.    In your review, did you notice any such entries?

2    A.    No.  I didn't notice that.  And, in fact, I looked for

3    that because I noticed that there was -- there were a lot of

4    entries where we had sent out letters and received no

5    responses.  So I specifically looked to see whether there was

6    some indication that those were being returned unread.  And I

7    see no indication that that happened.

8    Q.    Okay, thank you.

9           THE COURT:  All right, you're excused.

10          THE WITNESS:  Thank you.

11          THE COURT:  Does the Trust have any other witnesses?

12          MS. HAGER:  No, Your Honor.  Borrower Trust rests.

13          THE COURT:  All right.  Mr. Reed, you have an

14   opportunity briefly to present any rebuttal evidence that you

15   wish.  So that would have to respond to -- for example, since

16   they only had one witness, if there's evidence you want to give

17   in response to what Ms. Delehey said, you can do that now.  You

18   don't have to, but I just want to make clear to you, you have

19   that right.

20          MR. REED:  Your Honor, the first piece of evidence

21   that I would --

22          THE COURT:  If you're going to give evidence, you got

23   to do it --

24          MR. REED:  Oh.  Yes.

25          THE COURT:  -- from the witness stand.

RESIDENTIAL CAPITAL, LLC, et al.                          172

1          MR. REED:  Sorry.  Um-hum.

2      (Pause)

3          THE COURT:  And you're still under oath, so you don't

4  get sworn again.

5          MR. REED:  The piece of evidence that I wanted to

6  refer to and testify about is not here; it's in the -- it's the

7  complaint that was filed in New Jersey, May 10th complaint.

8          THE COURT:  Your complaint?

9          MR. REED:  Yes, Your Honor.

10         THE COURT:  I'm going to have our reporter hand you a

11  copy of the complaint that you filed on May 10th, 2010; it's

12  printed both sides of the page, so you have to look at the

13  other side.  So, what, Exhibit D to the proof of claim.

14         MR. REED:  For the record, I'd like to point out, Your

15  Honor, that the complaint was filed May 10th.  I had retained

16  counsel regard (sic) my relationship with GMAC, prior to May

17  10th, as you must realize that drafting and filing a complaint

18  doesn't happen in the same day.

19         I'm confused about the testimony in the record,

20  because, as you indicated yourself yesterday, when you retain

21  an attorney, you typically stop communicating with the mortgage

22  company, which I -- from my recollection, I did.

23         Mr. Walters took over the representation from me

24  earlier than May.  In the complaint, I can only say that the

25  address of our house where I was living in Virginia is on the

1 complaint, and it was given to GMAC; I at least would know by

2 service for Mr. Walters.

3          But I am -- I'm confused, and I have to say it for the

4 record, by the offer for 480,000 dollars.

5          THE COURT:  No, that note suggests that you made an

6 offer --

7          MR. REED:  I understand that.

8          THE COURT:  -- not that they made an offer.

9          MR. REED:  I understand that --

10          THE COURT:  Okay?

11          MR. REED:  -- Your Honor  What I'm -- I cannot

12 explain -- they say on the record that I submitted a financial

13 package to the mortgage company.  Whether this weighs against

14 me or not -- I don't know what to tell you.  I don't recall

15 submitting a financial package to the mortgage company.  I

16 don't recall having communications with the mortgage company.

17 After the dismissal in 2009, I received a letter of dismissal

18 from the mortgage company, in the mail sent to me in Virginia.

19 I don't recall ever receiving any documents whatsoever, or

20 phone calls.  And I don't know what to make of it.

21          Your Honor knows that there was an individual in my

22 home, from November on, who was -- I don't know how to describe

23 him, and I never could divine the intentions on my property

24 clearly.  I believe, if I would have known about a

25 modification, that we would have worked towards it and accepted

1  it.  I do not understand it.  I don't -- this is the first I'm

2  aware of it.

3          If it was sent to me in Virginia and I didn't see it,

4  I don't know what to say.  I just -- today as I sit here right

5  now, I'm surprised by it, especially in light of the fact that

6  I had Mr. Walters involved.  That's it, Your Honor.  And I

7  don't --

8          THE COURT:  Okay.  Anything else you want to add?

9          MR. REED:  I don't think so.

10         THE COURT:  All right.  Cross-examination?

11 CROSS-EXAMINATION

12 BY MS. HAGER:

13 Q.  Mr. Reed, during the time you were living in Virginia, was

14 your mail being forwarded from Matlack to your residence in

15 Virginia?

16 A.  I don't know.

17 Q.  And on August 6th, 2009, among other times, there are

18 entries that you called and spoke with GMAC or that GMAC called

19 and spoke with you.  Do you deny having any telephone

20 conversations with GMAC Mortgage --

21 A.  I don't --

22 Q.  -- during this particular time period?

23 A.  Yeah, I don't remember them, and that's the truth.  I

24 don't remember them.

25 Q.  All right.  Thank you.

1          THE COURT:  All right.  Okay, you're excused as a

2  witness.

3          All right.  I have to ask you again, do you rest?

4          MR. REED:  Yes.

5          THE COURT:  Okay.  All right, I'm not sure that the

6  recording picked it up, but I asked Mr. Reed whether he --

7          Why don't you go back to your other place at the

8  counsel table there and I'll ask you again.

9          All right, Mr. Reed, do you rest?

10          MR. REED:  Yes, Your Honor.

11          THE COURT:  All right, thank you.

12          All right, both sides have rested.

13          I have a lot of evidence and material to consider.

14  We've had a two-day evidentiary hearing.  I don't believe I

15  would benefit from having closing argument now.  There was

16  quite extensive briefing before the hearing, opening statements

17  by Mr. Reed and Ms. Hagerty (sic).  So I don't feel the need to

18  have closing statements, but what I will do -- what I'm

19  prepared to do, if the parties desire it, is listen to no more

20  than ten minutes from each of you.  I think I have quite

21  extensive notes and I've got to review a lot of these exhibits

22  more closely.

23          But, Mr. Reed, and you could do it right from where

24  you're sitting, if you want to speak for up to ten minutes,

25  I'll permit you to do that.

1          MR. REED:  I won't burden you with nearly that, Your

2     Honor.

3          THE COURT:  Okay.

4          MR. REED:  Just a few comments.  I believe that there

5     are two wrongful -- distinct wrongful occurrences that have

6     harmed me:  the first one is the foreclosure filing itself, and

7     the second is the -- I guess, the lingering of the lis pendens

8     on the public record, beyond the dismissal of the foreclosure.

9     We've discussed extensively, as you indicate, the various

10    theories and proofs relating to those wrongful -- or, I

11    believe, wrongful occurrences.  I also believe we attempted to

12    put in the record that there were significant efforts to

13    mitigate and manage all the circumstances surrounding the

14    occurrences and subsequent to them, in good faith.

15         Until moments ago I was under the impression that

16    there was no attempts beyond our original meeting with the

17    individual, Mr. Folweiler, and the communications that took

18    place at that time.  Perhaps it has come after I vacated the

19    property; cannot say.  But perhaps it compounded the situation.

20         Your Honor, I've been as forthright and honest as I

21    can be, at times aggravating this Court with the slowness,

22    even, of my thoughts and searching through my documents for

23    either proofs or things that I relied on in my understanding of

24    the situation as I experienced it, because I wanted to convey

25    to the Court, for whatever end result you judge, what I believe

RESIDENTIAL CAPITAL, LLC, et al.                          177

1    to have been the truth of the matter, for your sincere and

2    honest and professional consideration.

3            I'd like to thank the Court for its consideration and

4    patience with me, except for when you yell at me.  And

5    hopefully I will never see the inside of a bankruptcy court

6    again, which is part of the reasons I'm here, Your Honor:  so

7    that I personally don't need to appear before a bankruptcy

8    judge.

9            Thank you for your consideration.

10           THE COURT:  All right, thank you.

11           Ms. Hager, I misspoke your name the last time I

12   addressed you, and I apologize --

13           MS. HAGER:  Yeah, but I'll let --

14           THE COURT:  -- for that.

15           MS. HAGER:  -- that go.

16           THE COURT:  Okay..

17           MS. HAGER:  Thank you.  It was better than my maiden

18   name, whichever one you so mispronounced.

19           Your Honor, at the outset of this two-day hearing, I

20   stood up here and did my opening and talked about the burden of

21   proof being on Mr. Reed to prove his claims by a preponderance

22   of the evidence, except for the singular claim for punitives,

23   which must be proven by the higher clear-and-convincing

24   standard.  Simply, he had the burden.  He hasn't met that

25   burden.  He hasn't shown GMAC Mortgage's responsibility through

1   admissible evidence or witness testimony.  There's insufficient

2   proofs to warrant an allowable claim versus GMAC Mortgage or

3   RFC.  Therefore, Mr. Reed's demand for any, let alone

4   extraordinary, damages against GMAC Mortgage or RFC must be

5   denied on account of substantial lack of proof.  Thank you.

6           THE COURT:  Okay.  Thank you very much.

7           All right, we're adjourned.  I'm obviously taking the

8   matter under submission and in due course will issue a written

9   order or decision.  Just so we're clear, I mean, what this

10  proceeding was about, in the prior ruling of the Court, I

11  determined that the Reeds' claims and the Trust's objections

12  raised a contested matter.  I sustained the objection in part,

13  overruled it in part.  And the purpose of this proceeding --

14  and there were pre-trial orders that were entered permitting

15  discovery -- was to have an evidentiary hearing to fix the

16  amount of the Reeds' claims.  And that is what I view the task

17  before me.

18          I appreciate the efforts of all the counsel and

19  Mr. Reed.  And I recognize that it's difficult for any pro se

20  party, but you still -- given some leeway, still have to abide

21  by the Rules of the Court.

22          So, thank you all.  And in due course I will have a

23  ruling.  We're adjourned.

24          MS. HAGER:  Thank you, Your Honor.

25          (Whereupon these proceedings were concluded at 5:06 PM)

1

2                          **I N D E X**

3

4    WITNESS                 EXAMINATION BY        PAGE

5    Frank Reed              (Self, in narrative)     9

6    Frank Reed             Ms. Hager               45

7    Lauren G. Delehey      Ms. Hager              122

8    Lauren G. Delehey      Mr. Reed               163

9    Lauren G. Delehey      Ms. Hager              170

10   Frank Reed             (Self, in narrative)   172

11   Frank Reed             Ms. Hager              174

12

13

14                       **E X H I B I T S**

15   REED'S    DESCRIPTION                  PAGE

16   4        Statement of Scott Alvarez    24

17   6        Lis pendens                   25

18   7        Notification from 21st        25

19            Mortgage Corporation

20   8        Order                         25

21   9        Delehey declaration and       26

22            attachments

23   11       Hearing transcript            27

24   12       Amended complaint for         27

25            foreclosure

```
 1
 2                    E X H I B I T S (cont'd.)
 3   REED'S      DESCRIPTION                    PAGE
 4   13          Statement from Law Offices      43
 5               of Jeffrey S. Walters
 6   13A         Declaration of Jeffrey          43
 7               Walters
 8   14          Linda Campbell's bill           43
 9   14A         Declaration of Linda            43
10               Campbell
11   15          McCrink law firm bill           43
12   15A         Declaration of Krisden          43
13               McCrink
14   17          Testimony of Julie Williams     24
15   19          Document dated November 20,     30
16               2010, addressed To Whom It
17               May Concern, from Thomas J.
18               Tartamosa
19
20
21                       E X H I B I T S
22   TRUST'S     DESCRIPTION                    PAGE
23   A           Servicing notes                131
24   G           GMACM foreclosure complaint    120
25   R           Jacobs purchase proposal        85
```

1

2                          E X H I B I T S (cont'd.)

3   TRUST'S     DESCRIPTION                    PAGE

4   O           MLS listings for property       90

5   V           Jacobses' summary judgment     120

6               motion

7   W           Opinion granting Jacobses'     121

8               summary judgment

9   X           Sale agreement between          71

10              Reed and Weaver

11  Y           Addendum to sale agreement      73

12              between Reed and Weaver

13  Z           Lease agreement between         74

14              Reed and Cooper

15  AA          Extension of lease agreement    75

16  BB          Eviction Letter                 80

17  EE          E-mail chain beginning          34

18              June 30, 2010, among Kevin

19              Aberant, Frank Reed and

20              others

21  FF          E-mail chain forwarding         38

22              May 8, 2011 e-mail from

23              Nina Singh to Louise Carter,

24              to Frank Reed

25

```
1                    E X H I B I T S (cont'd.)

2   TRUST'S    DESCRIPTION                    PAGE

3   KK         HUD settlement documents        54

4   LL         Affidavit from Stuart           42

5              Shilling

6   OO         Request for production of       83

7              documents

8   PP         First set of interrogatories    83

9   QQ         Requests for admissions         83

10  UU         Complaint and foreclosure       69

11             documents

12  VV         Answers to counterclaim of      69

13             Exhibit UU

14  YY         Foreclosure Repayment          144

15             Agreement

16  ZZ         Signature page of              145

17             Foreclosure Repayment

18             Agreement

19

20

21

22

23

24

25
```

1

2                         C E R T I F I C A T I O N

3

4   I, Aliza Chodoff, certify that the foregoing transcript is a

5   true and accurate record of the proceedings.

6

7

8

9

10

11   _____

12   ALIZA CHODOFF

13   AAERT Certified Electronic Transcriber CET**D 569

14

15   eScribers

16   700 West 192nd Street, Suite #607

17   New York, NY 10040

18

19   Date:   September 17, 2014

20

21

22

23

24

25

# #

**#607 (1)**
2:22

# $

**$1,892.44 (2)**
134:16;135:9
**$32,683.61 (2)**
135:1,6
**$7,425.68 (2)**
134:22,22
**$7,948.71 (2)**
134:23,25
**$896,344.03 (1)**
94:11

# A

**AA (5)**
74:22;75:10,16,20,
22
**Aberant (10)**
92:16,18,20,21,24;
93:1,8,12,14;94:3
**abide (1)**
178:20
**ability (3)**
12:1;13:8;19:21
**able (13)**
13:11;19:11;32:2;
62:11,13,16;112:8;
114:15;120:13;
141:24;151:18;
154:22;166:1
**above (6)**
111:24;112:16;
130:17;146:13;
149:2,18
**absent (1)**
130:5
**absolutely (5)**
36:22;44:19;
101:21,21;161:22
**accept (8)**
60:4,9;67:16;
97:12;136:11;
148:19;157:22,23
**accepted (3)**
84:4;167:1;173:25
**access (2)**
124:13,15
**accord (1)**
106:23
**accordance (1)**
140:17
**according (6)**
9:22;53:14;79:11;
107:5;140:1;147:6
**account (11)**
94:12,14;130:17;

133:2,7;142:7;158:1,
11,13,13;178:5
**accountant (1)**
78:22
**accoutrements (1)**
18:7
**accrual (1)**
32:19
**accrued (3)**
32:14;34:2,10
**accurate (3)**
61:19;66:20;
131:25
**act (2)**
32:12;34:11
**acted (1)**
37:1
**action (24)**
31:20;35:11;36:7,
9;37:2;40:6,9;41:12,
13;42:22;49:13;
66:22;67:2,3;99:1,4;
100:4,11;124:7;
138:16,19;162:19;
163:13,18
**actions (1)**
70:21
**activity (1)**
150:9
**acts (1)**
70:14
**actual (6)**
10:9;11:5;13:9;
33:2;69:4;141:10
**actually (20)**
10:16;17:18;
30:11,17;39:24;
40:18,22,23;76:13;
77:7;79:22;87:1;
92:23;100:12;
109:16,20;110:15;
144:22;153:8;
160:10
**add (4)**
41:3,6,7;174:8
**added (2)**
158:7,16
**addendum (6)**
72:4,11,13,18,21;
73:5
**addition (1)**
41:16
**additional (7)**
35:15;37:21;45:5;
113:13;115:25;
158:12;161:5
**address (26)**
22:24;35:8;39:8,
10;58:5;122:11;
164:3,8,10,19,22;
165:1,4;168:19,23,
25,25;169:1,4,7,10,
16,20;170:17,19;

172:25
**addressed (4)**
29:25;30:2;64:12;
177:12
**addresses (4)**
77:19;164:13;
169:15,24
**Adelsberger (1)**
105:24
**adjourned (3)**
150:10;178:7,23
**adjusted (2)**
151:10,12
**admissible (1)**
178:1
**admission (5)**
75:15;82:3;
119:11;144:4;
145:11
**admissions (5)**
82:5,7,19,19;83:8
**admit (9)**
28:13;73:1;74:16;
79:23;82:24;84:19;
90:8;93:24;126:13
**admitted (8)**
26:8;46:4,7,11;
82:7;108:23;131:18;
132:5
**admitting (1)**
161:24
**advanced (1)**
135:6
**advice (1)**
32:9
**advise (2)**
5:5;156:24
**advised (4)**
78:22;142:8;
149:24;170:16
**affect (1)**
97:18
**affected (2)**
23:8;117:22
**affects (1)**
10:9
**affiant (1)**
40:18
**affidavit (10)**
6:17,24;27:20;
49:16;82:20;100:21,
22,24;101:7;102:2
**affidavits (7)**
27:24;28:4;37:22;
39:1,10,12;42:13
**afford (2)**
139:5;141:17
**affordable (1)**
153:1
**afternoon (4)**
122:2,3;163:9,11
**Again (37)**
11:18;12:19;17:6,

20,20;22:13;34:17;
38:8,11;40:13;42:1;
46:16;56:19;59:4;
60:5;65:20;67:10;
68:22;72:9;73:11;
78:6;100:2;102:9;
106:16;109:13,19;
110:2;113:12;117:2;
137:6;151:6;164:23;
167:4;172:4;175:3,
8;177:6
**against (15)**
6:3;15:10;35:11;
52:6;67:22;70:7;
79:6;119:19,24;
120:19;159:23;
162:18;163:1;
173:13;178:4
**agency (1)**
97:1
**agent (1)**
97:24
**agents (1)**
136:21
**aggravating (1)**
176:21
**ago (1)**
176:15
**agree (27)**
11:21;47:15;
53:11,22;54:9;56:11,
17;57:11,18;60:13;
64:3,5,8;67:16;70:9,
13,19;71:1;73:10;
76:17,24;85:20;
86:19;92:15;94:12;
96:18;97:18
**agreed (18)**
6:5;7:18,20;16:4;
28:15;60:4,8,11;
71:13;72:15,19;
74:12;75:11;76:2;
77:4;85:25;95:6;
160:13
**agreed-upon (1)**
84:17
**agreement (78)**
18:18;21:23;
59:15;60:25;61:5,6,
12,13,15;62:9,20,22;
64:8,21;65:10,18,22;
67:1;71:1,21;72:14;
73:5,9,20,22;74:5,8,
20;75:4,8,8,21;
76:17,24;92:1,8,10;
93:4,7,9,18;97:8,23;
115:16,25;122:20;
123:1,12;139:7,11;
140:4,17;141:24;
142:9,25;143:12;
144:8;145:15;146:7,
9,14,16,18,21;147:6;
148:6;150:15,19,20,

21;153:17,18;
155:15;157:25;
158:2;160:25;
164:19;166:11
**agreements (1)**
146:7
**ahead (22)**
6:12;9:1;16:17;
39:15;55:5;63:6;
81:10;87:25;102:20;
104:21,23,25;
113:23;133:16;
134:19;142:22,22;
147:7;150:4;151:4;
154:25;155:6
**air (1)**
13:17
**Aliza (1)**
2:20
**allegations (1)**
161:25
**allegedly (1)**
98:18
**Allied (14)**
98:8,11,14;99:14,
15;100:12,14,22;
101:3,3,9,12,14,17
**allotted (2)**
9:2;35:3
**allow (2)**
28:16;139:21
**allowable (1)**
178:2
**allowed (3)**
11:7;21:11;115:2
**allows (2)**
11:10;140:9
**Ally (3)**
160:9,12;161:24
**Almost (2)**
111:18;144:17
**alone (1)**
178:3
**although (2)**
18:22;165:20
**Alvarez (3)**
24:10,14,16
**always (2)**
14:6;110:15
**amended (4)**
27:13,15;119:22;
163:5
**America (2)**
9:22;77:8
**among (3)**
94:3;156:9;174:17
**amount (37)**
5:21;13:7;19:10;
20:10;35:8;53:14;
54:10;57:7,15,16;
62:3;78:1;98:17,23;
99:14;102:12;103:2,
16,24;104:1,10,16;

107:9,14;108:7,7,19,
23;112:8,16,16;
115:19;134:15;
135:8;142:14,15;
178:16
**amounts (3)**
51:21;103:25;
141:12
**ample (1)**
38:21
**anticipating (1)**
59:19
**anticipation (1)**
147:5
**apologies (1)**
64:20
**apologize (4)**
34:1;38:7;56:19;
177:12
**appear (6)**
38:21;39:19;44:2,
4;71:5;177:7
**appearance (2)**
5:9;13:2
**appeared (1)**
44:1
**appears (15)**
57:2,12;63:12;
68:18;69:2,5,9;71:3,
7;72:6,7;74:1,4;
89:5;138:4
**applicable (2)**
41:15,24
**application (6)**
38:20;98:24,25;
111:6,6;167:9
**applications (2)**
98:11;102:5
**applied (10)**
98:18,20;102:12,
25;103:7;104:10;
107:19;108:15;
152:15;157:25
**apply (4)**
99:14;103:16;
106:20;108:17
**applying (3)**
106:3;107:23,24
**appointments (1)**
10:21
**appraisal (17)**
11:19,23,24;12:2;
16:13,18;21:12;
84:16;85:24;99:18;
103:11;106:1;
158:24;159:2,8,15,
24
**appraisals (1)**
10:24
**appraised (2)**
85:20;103:20
**appraiser (1)**
85:21

**appreciate (2)**
47:17;178:18
**approach (2)**
44:17;104:24
**appropriate (1)**
43:3
**appropriately (2)**
6:1;37:2
**approval (4)**
12:12;100:12,14;
102:15
**approvals (2)**
98:14;102:7
**approve (2)**
161:19;168:6
**approved (16)**
98:18,21;102:12;
109:3;151:7,19,20;
153:6;154:11;
155:19;156:14;
157:11,13;161:22;
165:11;166:16
**April (10)**
136:25;137:13,15,
18,25;138:19;
152:23,25;153:2;
154:7
**architectural (1)**
18:9
**architecturally (1)**
12:9
**architecture (1)**
10:22
**area (3)**
10:19;117:10,16
**areas (2)**
23:9;31:14
**argue (1)**
51:9
**argued (1)**
50:17
**argument (6)**
32:12;35:14;
37:12;50:8;67:8;
175:15
**argumentative (1)**
77:18
**arguments (4)**
33:10,15;35:11;
36:5
**arm's-length (1)**
16:4
**around (1)**
79:19
**arrange (1)**
5:8
**arrangement (1)**
139:21
**arrears (1)**
20:17
**arrive (1)**
5:8
**arrived (3)**

9:5;15:13;56:16
**arriving (1)**
9:17
**aside (1)**
16:9
**asleep (1)**
45:14
**asserted (3)**
34:4;70:15,18
**assist (3)**
122:21;123:2,15
**assistance (1)**
138:11
**associated (2)**
55:10;57:1
**assume (1)**
152:6
**attach (2)**
40:24;43:2
**attached (8)**
39:22,24;40:11,13,
21,22;42:14;82:19
**attachment (1)**
119:17
**attachments (3)**
26:8,10,24
**attempt (3)**
39:10;138:10;
159:19
**attempted (1)**
176:11
**attempting (3)**
9:10;40:7;79:8
**attempts (10)**
19:4;21:9;136:13;
137:3,4,6,7,9,10;
176:16
**attended (1)**
138:14
**attention (3)**
48:7;78:2;152:21
**attest (1)**
69:2
**attorney (3)**
92:21;109:13;
172:21
**attorney-client (3)**
127:3;130:15,21
**Attorneys (7)**
4:3;27:25;127:5,
14,15,17;129:18
**attractiveness (1)**
11:25
**attributable (4)**
48:16,19,22;50:12
**atypical (1)**
12:4
**August (44)**
63:17;64:3,6;71:9;
75:12;124:4;134:23;
139:17,19,24;140:4;
141:2,5,23;143:14,
16,17,20;144:15,15;

147:17,21,23;148:8,
9,17,20,22,25;149:5,
6,12,14,16,21;150:6,
156:9,22;157:13,18;
164:20,24;168:10;
174:17
**authenticate (3)**
62:12,13,17
**authentication (1)**
40:1
**authority (1)**
166:11
**automatic (1)**
157:19
**automatically (3)**
127:18;136:22;
143:18
**availability (1)**
8:8
**available (8)**
5:17;14:5;29:13;
38:15;99:20;123:14,
15;142:7
**avoid (2)**
47:2;139:23
**award (1)**
35:8
**aware (12)**
10:6;14:23;20:19;
31:18;68:7;97:13;
101:5,12,18;164:11;
165:4;174:2
**away (2)**
93:22;160:6
**awful (1)**
163:10
**awry (1)**
30:21

**B**

**back (39)**
5:2;16:8;29:2,12;
30:21;42:7;55:25;
65:14;66:2,4;70:5;
75:2,2;89:10;91:17;
92:25;99:19;100:5,
6;110:15,21;111:9;
116:8;125:3;127:13;
133:3;136:15;
138:25;139:22;
140:10;147:1,2;
151:23,24;153:23;
167:23;169:18;
170:22;175:7
**bad (3)**
11:22;32:12;
103:12
**bag (1)**
112:11
**balance (3)**
20:11;32:14;
151:10

**Bank (28)**
4:3;8:4;11:23;
29:14;33:7;34:6,7,7,
8;38:9;77:8;84:10;
85:21;97:17;99:18;
100:1;102:4,5,7;
103:8;108:14,16;
109:21;110:6,14,16,
25;111:17
**bankruptcy (4)**
123:24;124:6;
177:5,7
**Bank's (1)**
29:19
**Barbara (1)**
40:16
**based (6)**
61:10;70:14,20;
143:19;146:19;
161:20
**basement (1)**
11:9
**basically (4)**
138:5;148:5;
160:13;161:9
**basis (2)**
128:10;138:5
**bathrooms (1)**
11:16
**baths (3)**
16:25;17:1;19:18
**BB (5)**
78:21;79:1,2,23;
80:3
**bear (1)**
132:24
**bearing (2)**
161:22;162:2
**became (5)**
21:8;31:18;
110:17,22;161:16
**become (1)**
132:17
**bedroom (1)**
11:16
**bedrooms (3)**
16:25,25;19:17
**beg (3)**
26:15;130:23;
137:17
**beginning (1)**
94:3
**behalf (5)**
133:11;161:19;
166:11,21,24
**behind (1)**
96:3
**belief (2)**
36:1;66:23
**believes (1)**
45:2
**belong (1)**
70:18

**below (3)**
84:17;129:16;
167:17
**benefit (1)**
175:15
**Bernadette (4)**
166:6,7,14,20
**besides (2)**
12:25;27:22
**best (2)**
30:16;137:9
**better (3)**
15:23;16:3;177:17
**Beyond (7)**
12:15;32:16;36:9,
10;160:3;176:8,16
**bill (19)**
32:4;40:4,24;41:9,
10,17;43:10,14;
48:16,19,22,23;49:2,
22;50:1,12,23;51:15,
23
**bills (3)**
27:25;34:2;40:22
**bind (2)**
166:11;167:1
**binder (3)**
105:3,6;131:5
**binding (1)**
14:9
**bit (5)**
9:22;10:11;127:7;
149:23;151:14
**blank (3)**
45:11;75:3;129:25
**blanks (1)**
130:6
**blew (1)**
35:23
**blown (1)**
35:24
**board (4)**
24:14;160:11;
161:8;162:6
**book (9)**
30:25;31:3;61:7,9,
14;65:11;66:14;
105:14;147:10
**borrowed (2)**
54:13;56:14
**Borrower (44)**
2:2;56:2,10;61:16,
19;80:5,10;118:25;
121:18;122:21,22;
123:2,3,4,13,14,16;
125:3,22;133:6;
135:23;136:17,21;
138:11;139:22;
140:2,3,10,16;
141:10;143:1,13,13;
146:16,24;149:24;
152:11;153:1,4;
156:5;157:2;168:24;

170:18;171:12
**borrowers (7)**
125:1;128:20;
136:13;137:22;
143:24;157:20;
161:10
**borrower's (3)**
128:12;136:2;
142:14
**borrowing (1)**
29:9
**both (6)**
88:1;107:24;
108:19;124:7;
172:12;175:12
**bottom (15)**
56:2;70:3;72:6;
79:15;88:10,11,21;
89:16;129:24;
135:19;141:22;
149:12,13;154:9;
157:9
**bought (4)**
53:23;67:25;
117:24,25
**bounce (1)**
10:12
**bounced (1)**
95:6
**box (1)**
58:5
**BPO (7)**
156:10;158:23;
159:8,13,14,15,24
**BPO/Appraisal (1)**
158:16
**breach (3)**
34:11;70:14;
142:11
**breached (1)**
139:1
**break (9)**
31:12,13;38:24;
39:2,9;91:25;92:5;
116:13;118:15
**breakdown (1)**
48:20
**breaking (1)**
36:18
**brief (2)**
8:24;114:2
**briefing (1)**
175:16
**briefly (3)**
77:25;98:7;171:14
**bring (5)**
36:8;60:18;81:16;
94:11;140:10
**bringing (1)**
37:2;80:13
**brings (1)**
90:6
**Broadway (1)**

4:4
**broken (2)**
139:25;150:12
**broker (6)**
28:21,21;156:12;
158:23,25;159:2
**brother (1)**
17:17
**brought (3)**
5:9;94:13,14
**BT (1)**
18:19
**builder (7)**
10:16,18;11:12;
12:7,8;17:7;117:23
**builders' (1)**
18:7
**building (1)**
10:8
**built (4)**
12:7;17:16,17;
18:13
**bulk (1)**
40:10
**burden (4)**
176:1;177:20,24,
25
**business (11)**
19:7;62:17;67:18;
101:2;108:10;
122:11;124:10;
126:4;143:21;145:1;
169:6
**buy (3)**
11:25;14:9;53:15
**buyer (2)**
47:16,19
**buyers (7)**
11:20,20;13:13,
14;47:25;95:23;96:7
**buying (1)**
12:1

## C

**call (17)**
41:20;91:2;
109:21;116:12,13;
119:9;121:19;
136:21,23,23,24,25;
139:9;146:24;148:4,
7;161:9
**called (20)**
10:10;11:4,17;
124:24,25;125:2;
127:11,11;134:12;
143:11;144:21;
148:17;150:18;
156:19,19,24;157:6;
160:22;174:18,18
**calling (1)**
155:20
**calls (1)**

173:20
**Camden (1)**
138:15
**came (14)**
25:18;62:5;84:17;
85:24;86:7,8;95:23;
96:7;110:19;111:9;
125:3;144:21,23;
169:21
**camera (1)**
131:7
**campaign (3)**
155:21,22;156:1
**Campbell (5)**
39:14,19;42:4;
43:12;50:8
**Campbell's (1)**
43:10
**Can (90)**
5:5;6:10,10,17,21;
7:19;8:6;14:9;20:14;
28:6;30:5;31:7,13;
33:25;35:18,18;
38:14;41:2;45:9;
46:8,14,19;49:11,25;
51:5;54:24,25;55:3;
56:16;57:16;60:5,5;
62:15;63:21;68:21;
75:1;80:14,16;81:6;
86:10;87:22;89:9;
100:15,16,17;
103:18;104:17;
106:14;107:25;
108:22;113:12;
114:19;117:2;
119:10,12;121:14;
122:16;131:8;
133:18;136:3,3,6,15;
137:3,13;138:7,13,
23;143:3;147:17;
148:5,5,15;150:6,8,
11,22,25;151:21;
155:18;156:22;
157:18;160:5,17;
162:3;163:23;164:3;
171:17;172:24;
176:21
**cancelled (1)**
157:19
**Capital (9)**
5:3;91:17;123:19,
20,22;124:1,3,4;
149:14
**caps (2)**
154:8;158:22
**care (2)**
44:15;77:16
**career (1)**
106:17
**carefully (1)**
49:6
**caries (1)**
57:15

**carrying (5)**
32:1,10,16,18;
106:7
**Carter (11)**
87:3,4,8;89:4;
96:12,12,17;97:16,
19,24;98:5
**Carter's (1)**
88:2
**case (24)**
41:19,25;42:1;
48:13;50:8;52:6;
67:6;69:8;70:11,15,
16;100:23;103:18;
110:4,24,25;116:23,
25;119:2;120:18,22;
121:4;161:16;162:8
**cash (21)**
56:2,8,10,13;
60:22;103:2;104:2,
15;111:24;112:20,25
**cash-out (11)**
29:1;99:15;
103:20;107:24;
108:18;110:13,16;
111:18,21;112:15,16
**cause (1)**
166:21
**CC (1)**
2:2
**ceilings (3)**
11:16;18:10,10
**certain (5)**
10:15;19:22;
127:21;148:11;
160:14
**certainly (3)**
7:22;127:10;147:1
**certificate (1)**
5:9
**chain (4)**
92:24;94:3;96:11;
98:4
**chance (4)**
31:12;38:25;
113:15;114:15
**change (11)**
12:10,10;113:4;
135:25;140:8;
149:23,23;168:24,
25;170:19,19
**changed (1)**
135:20
**changes (1)**
93:16
**changing (1)**
147:13
**Chapter (2)**
123:8;161:16
**characteristics (1)**
9:16
**charges (6)**
55:10,16,22;56:16,

25;57:6

**chase (1)**
35:6

**chasing (3)**
34:18,20,21

**check (7)**
37:15;95:8,11;
100:8;115:23;135:2;
167:19

**checklists (1)**
167:18

**checks (2)**
95:6,21

**chief (5)**
122:14,16;123:5,
21,25

**children (2)**
14:1;17:5

**Chodoff (1)**
2:20

**chosen (2)**
141:24;156:3

**Christina (4)**
2:3;101:5,11;
131:7

**church (1)**
142:6

**circumstances (1)**
176:13

**cited (1)**
100:11

**city (1)**
46:24

**Civil (2)**
82:6,23

**Claim (10)**
2:3;36:18;67:22;
101:16;131:6;
162:23;163:3;
172:13;177:22;
178:2

**claimant (2)**
61:20;82:4

**claimants (1)**
82:8

**Claimants' (1)**
26:16

**claimant's (1)**
61:10

**Claims (20)**
2:2;5:4;40:8;
91:19;122:19,21,22,
22;123:2,3,3,4,4,13,
15,16;163:6;177:21;
178:11,16

**clarify (1)**
108:11

**Clark (1)**
40:16

**class (1)**
124:7

**clause (1)**
70:4

**clean (1)**
23:1

**clear (11)**
22:14,16,25;
35:16;42:23;87:19;
95:22;97:14;153:5;
171:18;178:9

**clear-and-convincing (1)**
177:23

**clearly (2)**
81:15;173:24

**clerks (2)**
63:7;131:4

**clips (1)**
42:8

**clock (1)**
15:10

**close (10)**
17:19;19:11,20;
20:13;66:10;84:9,
14;118:3,4;122:24

**closed (5)**
43:22;44:2;45:10;
102:14;103:15

**closely (1)**
175:22

**closer (2)**
22:7;122:8

**closing (7)**
14:5,6;57:3;66:6;
97:18;99:21,22;
100:5;118:3;175:15,
18

**clue (1)**
30:12

**coalesced (1)**
33:1

**code (2)**
148:10;158:19

**codefendant (1)**
35:7

**co-defendants (1)**
99:3

**coffered (1)**
18:10

**collar (1)**
11:17

**collateral (13)**
47:3;136:4;
163:18,19,19,20;
164:1

**colleague (1)**
130:25

**collect (1)**
133:11

**collected (1)**
133:9

**collection (1)**
125:8

**column (12)**
129:5,6,23,24;
130:6,8;136:19;
138:8;142:5,5;

148:10;158:20

**coming (4)**
38:16;66:13;
100:5;128:12

**commence (1)**
36:19

**commensurate (1)**
14:15

**comment (4)**
23:19;53:4;71:6;
72:9

**comments (3)**
10:13;42:19;176:4

**Commerce (7)**
11:23;84:10,17;
85:21;106:1,5;109:4

**communicated (1)**
127:13

**communicating (1)**
172:21

**communication (2)**
97:15;169:4

**communications (5)**
125:21;127:4;
129:18;173:16;
176:17

**companies (1)**
137:21

**company (17)**
29:8;32:3;48:4,5;
56:15;60:3,8,16;
97:7,22;165:15;
167:1;172:22;
173:13,15,16,18

**compare (1)**
159:22

**compels (1)**
11:20

**complaint (23)**
27:14,15;68:16;
69:15;99:8;119:13,
19,22,23,23,24;
120:6;162:18;163:1,
5;172:7,7,8,11,15,17,
24;173:1

**complete (2)**
30:14;43:1

**completed (13)**
146:1;148:25;
149:15;152:8,10;
154:14;157:14;
165:22;167:12,13,
17,20;168:1

**compliance (3)**
139:23;147:15;
160:15

**compounded (1)**
176:19

**computer (4)**
101:11;124:20,22,
24

**computers (1)**
124:21

**con (1)**
34:11

**concern (3)**
29:13;30:1,3

**concerned (1)**
66:2

**conclude (1)**
14:7

**concluded (1)**
178:25

**concurred (1)**
146:17

**concurrence (1)**
146:15

**conditions (1)**
9:17

**conducted (1)**
101:2

**confer (1)**
38:1

**confirmed (1)**
101:9

**conflict (1)**
14:23

**conflicted (1)**
16:16

**conflicts (3)**
14:14,16;19:12

**confused (3)**
45:8;172:19;173:3

**connect (1)**
137:5

**connecting (1)**
17:12

**connection (11)**
40:5;41:23;49:1;
50:24;51:22;55:6;
80:11;85:17;100:23;
104:6;157:25

**consent (9)**
160:5,12,21,25;
161:17,18,21;162:1,
6

**consequences (1)**
5:20

**Consequently (1)**
101:14

**consider (3)**
152:18;159:20;
175:13

**consideration (3)**
177:2,3,9

**considered (1)**
159:18

**consistent (3)**
59:22;110:8;
128:18

**constituted (1)**
13:16

**constitutes (2)**
76:16,23

**constrained (1)**
21:23

**construct (1)**
18:9

**constructed (1)**
10:7

**construction (7)**
9:19;10:5,17;11:4,
6;12:5;15:23

**consultant (1)**
161:8

**consulted (1)**
10:17

**contact (11)**
133:5,6;136:13,
17;137:10,24;
138:21;151:18,18;
165:18;168:20

**contacted (3)**
34:7;106:5;170:18

**contained (4)**
125:19;127:4;
131:23;132:10

**contains (3)**
30:17;125:2;127:4

**contemporaneous (1)**
125:21

**contents (5)**
61:18;65:1;99:1;
100:24;120:17

**contest (1)**
16:10

**contested (1)**
178:12

**continually (1)**
89:11

**continuation (1)**
91:18

**continue (6)**
19:7,15;21:7;46:5,
13;91:20

**continued (5)**
18:20,21;32:4;
46:23;169:10

**continuously (1)**
88:3

**contract (25)**
11:22;13:9,10,12;
14:7,8;15:19;16:10,
12;18:22,23,25;
19:22;21:18;32:24;
33:6,22;34:6,13;
53:18;70:14;71:11;
72:4;93:16;139:1

**contractors (1)**
11:12

**contracts (1)**
12:21

**contribution (1)**
151:9

**controlled (1)**
12:9

**conversation (8)**
93:10,11,14;
108:2;109:10;

110:20;141:10;
143:13
**conversations (6)**
93:8;110:10;
140:1;146:20,21;
174:20
**convert (1)**
11:7
**convey (1)**
176:24
**convince (1)**
107:12
**Cooper (16)**
18:20,25;19:3;
20:21;21:23;73:10,
21,23,23;74:9,12,20;
75:5;79:6,12,19
**cooperation (3)**
122:20;123:1,12
**cop (1)**
168:14
**co-patriots (1)**
107:16
**copied (1)**
93:2
**copies (7)**
39:12;42:6,25;
43:1;62:24;63:5;
143:24
**copy (24)**
25:17,22;39:23;
40:12,21;42:4,6,7;
61:6,13,15;65:4;
68:16;69:5;81:9;
139:7;146:8,16,24,
25;159:12;162:17;
168:15;172:11
**corner (1)**
89:18
**corporate (1)**
101:8
**Corporation (8)**
25:9;68:11,17,24;
70:11;94:8,17,19
**corrected (1)**
150:2
**correspondence (7)**
29:18;101:4,10;
102:16;143:24;
170:13,22
**correspondences (1)**
169:9
**costs (4)**
32:10,18;99:21,22
**counsel (26)**
5:7,10;21:8;24:14;
25:18,23,24;32:8;
35:10;37:19;39:20;
116:8;118:16;
122:14,17;123:6,21,
25;124:5,9;130:9,10,
11;172:16;175:8;
178:18

**counsel/party (1)**
41:21
**counselors (1)**
137:20
**count (3)**
69:25;137:9,10
**counted (1)**
11:24
**counter (1)**
17:18
**counterclaim (4)**
69:17,19,25;70:20
**counterclaims (3)**
68:19,23;70:13
**counterparty (1)**
33:6
**countersign (1)**
144:24
**countersigned (6)**
61:13;65:18,22;
66:4;146:6;147:3
**country (1)**
17:2
**couple (4)**
37:19;111:19;
118:1;145:17
**coupon (6)**
61:7,9,14;65:11;
147:10,13
**coupons (1)**
147:11
**course (9)**
21:22;23:17;
108:10;126:5;
143:22;145:2;
161:16;178:8,22
**COURT (465)**
5:2,10,13,16,18,
23,25;6:8,12,14,16,
19;7:4,6,8,10,15,18,
20;8:1,5,10,13,15,18,
20;9:1,25;10:2;
13:21;14:25;15:2,5,
10,12,25;16:9,15,17,
20;17:8,11;18:2;
19:14,25;20:4,9,18;
21:3,16;22:1,4,9;
23:9,12,14,21,23;
24:2,4,6,11,13,19,22,
25;25:2,6,8,12,19,
21;26:3,5,7,17,19,
24;27:3,4,6,11,13,
19;28:1,5,8,12,14,
17;29:4,21,24;30:6,
9,11,19,23;31:2,6;
33:10,12,15;34:20,
24;35:3,10,11,24;
36:15;37:7,10,16;
38:3,5,8,11,13,15,17,
19,20,23;39:7,15;
40:9;41:3,5,8;42:5,
12;43:2,18,22;44:7,
10,14,19,21,25;

45:11,14;46:20;49:5,
15,18,21,23;51:9;
52:15,17;54:2,4,24;
55:5,15;57:23;58:1,
4,7,11;60:20;61:23;
62:8,18;63:1,4,6;
64:10;65:7,9;69:12,
14;70:23;71:17,20;
73:2,4,11,13,15,17,
19;74:17,19;75:17,
20;77:18;78:14,17,
24;79:24;80:1;81:8,
10;82:5,11,14,18,21;
83:1,3,24;84:20,22;
85:1,4;87:5,9,15,17,
19,22,25;90:9,11,14,
20,25;91:2,5,8,10,12,
16;92:3;93:25;94:2;
95:15,17;98:1,3;
101:23;102:1;
103:10;104:19,21,
23,25;105:1,2;
106:24;107:1,3;
111:16,21,24;112:2,
5,12,19,24;113:2,7,
10,20,23;114:1,4,7,9,
12,19,23;115:4,7,11;
116:4,7,11,16,18,22;
117:5,7,14,16;118:7,
10,13,19,21,23;
119:2,5,8,12,15,18,
20,22;120:1,4,8,11,
15,18,19,21,24;
121:6,7,10,12,15,20,
23;122:6,8,23,25;
126:15,18,22;127:1,
6,8,20;128:2,4,8,11,
11,15,17,20,25;
129:3,10,13,22;
130:2,5,8,13,19,22,
24;131:2,4,10;
132:19,21,24;133:1,
8,16;134:1,4,7,10,17,
19;135:2,5,10;
137:16;139:24;
140:18,21;141:1,4,
21;142:22;143:15;
144:6;145:14,17,19,
22;146:1,6,13;147:7;
148:7,9,13,15,21;
149:4,7,9,11,17,20;
150:4,25;151:2,4,24;
152:1,5,8,12,14,25;
153:7,10,14,17,24;
154:7,11,14,16,19,
25;155:6;156:9,12;
157:16;158:15,19,
22;159:2,5,7,11,14,
21;160:6;161:14;
162:9,11,19;163:1,5,
14,23;164:12,16;
165:2;166:4;167:6;
169:13,22;170:4,9;

171:9,11,13,22,25;
172:3,8,10;173:5,8,
10;174:8,10;175:1,5,
11;176:3,21,25;
177:3,5,10,14,16;
178:6,10,21
**courtroom (1)**
121:24
**Court's (5)**
8:7;42:19;91:17;
120:23;161:20
**cousin (1)**
17:18
**cover (2)**
127:22,23
**crashing (1)**
17:2
**create (3)**
126:10;143:25;
145:4
**created (4)**
88:11,21;89:5,16
**credit (4)**
28:25;107:9;
142:10;149:25
**credited (3)**
158:4,6,8
**criteria (1)**
159:21
**cross- (1)**
91:20
**crossed (2)**
36:6,22
**cross-examination (11)**
6:24;36:20;39:4;
44:16;45:15;90:23;
91:23;162:11;163:7;
174:10,11
**cross-examine (1)**
118:10
**cross-members (1)**
11:17
**Curley (20)**
5:6,7,11;6:6,21,23;
7:2,11,16,21,23;
38:16;43:20,22,23;
102:16;103:17,24;
107:25;108:20
**Curley's (2)**
5:13;8:8;38:19
**current (8)**
32:3;60:18;68:10;
94:12,14;140:10;
158:14;164:10
**custom (2)**
102:6,9
**customer (3)**
90:4;142:5,6
**customers (4)**
12:24;13:6,7;90:5

**D**

**Dabbert (1)**
31:7
**Daddazio (6)**
166:6,7,10,14,17,
20
**damage (5)**
33:24;34:17;35:5;
47:3;110:18
**damages (5)**
31:24,25;35:6;
70:20;178:4
**data (2)**
160:20,24
**date (74)**
13:8,11,18;16:12;
22:1;24:8,17;25:4,
10,15;26:11;27:9,16;
30:4;43:7,9,11,13,
15,17;53:9,11;54:7,
9;63:16;64:2,5,6;
69:16,18;71:8,22;
72:10,15;73:6;
74:21;75:22;80:3;
81:22,24;83:5,7,9,
18,19;85:7;90:13;
94:5;96:17;98:6;
102:3;108:11;118:3;
120:7;121:1,17;
128:23;129:24;
131:13;137:14;
140:8;144:9;145:16;
146:2;147:18;
151:13;157:20;
158:18;162:21;
163:12;164:22,23;
165:8;168:19
**dated (6)**
29:25;30:2;82:20;
85:12;93:3;143:17
**dates (6)**
20:25;21:18;29:3;
146:22,23;164:5
**daughter (1)**
17:5
**day (14)**
5:4;7:10;8:22;
13:23;14:21;27:21;
56:13;104:4;116:14;
141:9,14;148:18;
167:19;172:18
**days (5)**
25:24;82:9;106:5;
133:2,7
**deal (6)**
5:25;19:4;22:20;
31:11;66:10;93:21
**dealing (1)**
6:4
**dealings (1)**
97:17
**debtor (2)**
161:19,24
**debtors (7)**

124:10;125:11;
126:1;143:9;144:20;
160:12,13
**debtors' (1)**
161:16
**December (5)**
136:7,7,8,9;139:1
**deceptive (1)**
108:22
**decided (1)**
106:20
**deciding (1)**
9:15
**decision (4)**
9:18;19:2;166:20;
178:9
**declarant (1)**
40:19
**declaration (17)**
26:7,10,21;39:18,
20;40:4,14,17;43:8,
12,16;49:17;131:17,
23;132:2,10;155:3
**declarations (3)**
27:25;37:21;42:13
**declaratory (2)**
70:4,8
**declared (1)**
69:20
**declaring (1)**
70:8
**decline (4)**
19:18;46:5,13,17
**declined (6)**
22:23;46:4,7,10,
12,23
**decreased (1)**
88:3
**deduction (1)**
49:2
**deemed (1)**
82:7
**deems (1)**
43:3
**default (2)**
21:25;108:17
**defaulted (1)**
59:24
**defend (1)**
6:3
**defendant (3)**
25:23;33:21;70:7
**defending (1)**
42:22
**deficiency (1)**
60:22
**defies (1)**
36:1
**define (1)**
46:19
**defined (1)**
135:22
**deflection (1)**

10:10
**delay (3)**
66:17,22;67:11
**Delehey (15)**
26:7,10,21;62:16;
91:3;121:19,20;
122:2,4;131:16;
133:8,17;163:9,23;
171:17
**delinquencies (1)**
134:22
**delinquency (4)**
134:24;135:4,7;
136:20
**delinquent (7)**
132:17;133:7,22;
134:12,21;150:18;
151:6
**delist (1)**
18:17
**deliver (1)**
140:4
**delivered (1)**
22:16
**delivery (1)**
13:8
**demand (1)**
178:3
**demonstrate (1)**
103:9
**demonstrated (1)**
118:4
**denied (8)**
84:11;108:13;
110:6,25;111:3;
119:2;155:14;178:5
**deny (1)**
174:19
**denying (1)**
161:25
**deposed (1)**
104:6
**deposit (5)**
78:4,10;142:14;
149:3,19
**deposition (16)**
52:20;80:13;
81:15;83:14;87:6,8;
88:2,2;89:4;92:14;
104:9,22;105:4,18;
108:12;110:5
**depositions (2)**
100:3,10
**deprived (1)**
34:10
**derestricted (1)**
12:11
**describe (2)**
122:16;173:22
**described (1)**
156:6
**description (3)**
41:1;50:21;97:16

**descriptions (1)**
40:25
**design (1)**
18:9
**designed (2)**
139:21;160:14
**desirability (1)**
9:24
**desirable (5)**
9:14;10:4,4;14:2;
19:2
**desire (2)**
15:22;175:19
**despite (1)**
18:25
**detailed (1)**
40:24
**details (1)**
29:14
**determination (1)**
35:14
**determined (1)**
178:11
**determines (1)**
13:5
**detriment (1)**
81:25
**dialers (1)**
136:20
**died (2)**
109:9;110:6
**difference (4)**
34:1;55:2;113:4;
159:4
**different (17)**
14:1;18:6,7;47:24;
86:4;103:23,24,25,
25;104:1;105:12;
108:6;116:2;124:6,
22;152:22;170:16
**differential (1)**
11:1
**differently (1)**
53:3
**difficult (3)**
23:16;47:12;
178:19
**direct (6)**
62:10,21;105:18;
117:17;121:25;
152:21
**directly (2)**
135:23;139:19
**disapproval (1)**
109:10
**disapproved (1)**
109:9
**discount (1)**
32:8
**discounts (1)**
67:20
**discovery (7)**
62:6;80:4,10;

81:14,21,25;178:15
**discuss (3)**
9:5;29:20;141:16
**discussed (7)**
28:23;29:8;32:5;
84:2;101:20;152:16;
176:9
**discussing (2)**
61:16;155:8
**discussion (1)**
152:3
**dismiss (1)**
66:20
**dismissal (3)**
173:17,17;176:8
**dismissed (1)**
66:21
**dismissing (1)**
41:12
**dispute (4)**
36:9;10;61:18;
75:7
**distinct (1)**
176:5
**divine (1)**
173:23
**division (6)**
40:9;41:19,25;
48:13;52:6;100:23
**DMD (1)**
136:19
**Doc#7017 (1)**
2:2
**docs (2)**
66:2;151:23
**document (70)**
29:25;30:2,17;
42:1;49:19;51:23;
54:6;61:21;62:2,5,
12;63:11,18,22,23;
64:2,3,7,8;65:2,3,12,
14;69:1;70:23;
71:10;72:3;73:20,
25;74:1,23,25;77:8,
25;78:14;79:3,5,11;
80:16,21;83:13;
85:10,14,15;87:10;
92:13,23;94:10;
96:13;100:19;
103:14;115:2;
125:19;126:1,7,11;
127:4;131:20;132:7;
143:5,9;144:1,6,12,
19;145:5;147:3;
154:5,6;162:12
**documentation (3)**
101:4,10,15
**documents (36)**
6:6,7;21;31:8;
37:23;48:3;53:5,6,7;
54:22;62:17;66:4;
69:15;80:13,23;
82:13,16;83:4;

86:10;102:17;107:6;
109:23;114:13;
119:11;125:11;
128:12;148:22,24;
149:15;155:13;
165:15,22,23;
167:12,14;173:19;
176:22
**dollar (12)**
18:24;77:5;78:1;
104:1;107:14;108:7,
7,23;115:19;139:16;
140:4;142:19
**dollars (82)**
16:5;17:3,19;
20:13,13,14,15,17;
21:19;34:2,9;41:5;
53:16,19;54:11,13,
19;55:1,16,23;56:3,
11,15,17,20,25;57:8,
17,17;60:2,6,15,25;
62:1;64:16,18,19,23;
67:7;70:20;71:13;
74:9,12;77:11,17,20;
78:4,10,18;83:22;
84:3,8;104:11;
106:23;107:5;
108:16;111:2;
115:20,21,23;
117:25;139:5,16;
141:5,12,13;142:15,
16,17,20;149:1,19;
151:9,17,17;157:22,
24;158:3,5,11;
168:12;173:4
**dollars' (1)**
54:19
**Donati (1)**
114:14
**done (16)**
23:14;29:16;30:9;
33:24;35:13;103:25;
108:8;114:9;118:1;
130:9,10,11;140:12,
13;159:17,17
**door (3)**
62:8,19;90:6
**Dorothy (1)**
134:11
**dotted (2)**
36:5,22
**doubt (2)**
36:23;57:5
**down (18)**
11:10;17:25;
89:11;108:8;117:23;
122:10;136:6;
139:16;140:4,23;
142:13;144:18;
149:1,24;150:6;
151:14,16;157:9
**drafted (1)**
73:23

**drafting (1)**
172:17

**draws (1)**
78:1

**Drive (9)**
17:25;29:9;52:8;
64:13;122:12;
164:20;168:21;
169:8,11

**DUANE (3)**
4:2;8:3;38:9

**due (11)**
50:4;67:17;
130:21;132:14;
139:16;141:7;
142:21;150:14;
151:10;178:8,22

**duration (1)**
88:4

**during (13)**
28:8;31:6,12;
34:14;39:9;60:11,
19;96:4;104:9;
138:22;161:15;
174:13,22

## E

**earlier (5)**
63:20;96:2;97:1;
152:17;172:24

**early (8)**
36:2;59:15,24;
84:15;95:10;123:24;
136:24;167:19

**Edgar (3)**
18:19;19:6,6

**Edgar's (1)**
19:15

**EE (5)**
92:11,15;93:13,
24;94:5

**EE's (1)**
94:2

**effect (6)**
10:24;13:24;21:6,
7;47:10;82:22

**effective (1)**
123:8

**effectuated (1)**
155:9

**efforts (6)**
6:3;32:7;112:3;
147:5;176:12;
178:18

**eight (5)**
17:1;19:20;77:24;
149:13;154:8

**eighth (2)**
77:20,22

**eight-percent (1)**
99:16

**eighty- (1)**

103:19

**eighty-eight (1)**
20:12

**eighty-percent (1)**
103:22

**either (14)**
7:23;34:17;35:9,
21;95:10;99:16;
101:5,11;107:7;
127:14;129:8;150:1;
152:23;176:23

**elaborate (1)**
18:9

**element (4)**
13:4;14:8;22:18;
115:18

**elements (3)**
11:24;12:18,24

**eleven (1)**
11:18

**elicited (1)**
113:14

**eligible (1)**
161:10

**eliminate (1)**
32:18

**else (14)**
8:15;12:13;27:22;
31:10;34:24;35:16;
45:2;99:25;108:6;
111:8;116:4,17;
138:22;174:8

**e-mail (23)**
40:16;50:23;
51:21;65:16,24;
66:25;82:21;92:14,
16,18,23,24,25;93:3,
12;94:3;96:11,17;
97:21;98:4,4;104:4;
140:21

**e-mails (2)**
80:18;93:1

**employee (3)**
29:8;146:5;166:8

**employees (1)**
126:8

**employer (2)**
122:4;123:18

**encourage (1)**
90:5

**encumbrances (2)**
20:6,18

**end (21)**
7:10;8:21;12:2,2;
18:16,17;19:6;20:2,
3,5,19;21:19;27:21;
28:6;41:17;58:12;
103:14;116:22;
156:20,25;176:25

**ended (1)**
66:23

**ending (2)**
7:16;38:12

**engineering (1)**
13:1

**enhance (1)**
18:8

**enhanced (1)**
18:13

**enlighten (1)**
54:25

**enough (5)**
63:17;66:17;
67:12;89:5;122:24

**ensure (1)**
160:14

**enter (2)**
37:14;97:23

**entered (8)**
75:7;127:18;
160:12,12;161:3,24;
169:2;178:14

**entering (2)**
97:7;143:20

**entire (5)**
30:19,25;49:2;
76:17,24

**entirely (1)**
47:3

**entirety (3)**
48:24;87:1;88:1

**entities (1)**
34:4

**entitled (2)**
39:2;42:18

**entity (4)**
13:16;33:7;34:4;
35:6

**entries (18)**
41:10,11,11,14,16,
24;130:6;136:7;
140:18;152:1,2,14,
22;154:8;156:9;
171:1,4;174:18

**entry (16)**
128:22;129:10;
133:18;139:24;
148:10;149:21;
150:23;152:5,25;
156:18;158:15,22;
159:15;166:15;
167:11,16

**EOC (1)**
134:6

**equal (1)**
158:3

**equity (2)**
35:20;77:14

**eScribers (1)**
2:21

**escrow (7)**
135:21,24;136:10,
12;151:11,11;161:6

**escrows (4)**
58:24;59:2;
135:13,15

**engineering (1)**

**especially (2)**
33:4;174:5

**ESQ (1)**
4:7

**essence (1)**
136:20

**essentially (5)**
54:13;141:16;
148:2,17;160:19

**est (1)**
46:19

**established (1)**
102:16

**estate (4)**
9:12;15:1;19:7;
67:15

**estimate (3)**
21:20;22:10;90:22

**estimates (1)**
15:13

**estimation (1)**
35:4

**even (22)**
10:17,19;13:1,23;
14:4;18:23;19:4,18;
34:19;62:2;76:12;
91:1;99:21;102:13,
21;108:22;110:19;
115:21,22;120:16,
17;176:22

**event (2)**
23:7,7

**eventually (2)**
84:2;161:2

**everybody (2)**
38:24;91:16

**evict (1)**
79:8

**evicted (1)**
18:20

**evicting (1)**
79:7

**Eviction (1)**
80:2

**evidence (111)**
16:19;23:18,21,
23;24:6,7,15,16,19;
25:2,3,8,10,14;26:9,
11;27:6,8,14,16;
28:12;30:1,4,16,17,
20;31:1,8;37:14;
42:23;43:6,9,10,13,
14,17;54:1,4,6;
69:14,16,18;71:20,
22;73:4,6;74:19,21;
75:20,21;80:1,2;
82:22;83:3,5,6,8;
85:5,6;90:11,12;
91:7,12;94:2,4;
97:25;98:3,5,17,20,
23,25;101:22;102:1,
3,11,23,24;103:2,7,
9;108:5;115:3,7,13,

13;116:24;120:6,8,
23,23;121:1,15,17;
126:14;131:11,12,
18;144:7,9;145:14,
16;169:7;171:14,16,
20,22;172:5;175:13;
177:22;178:1

**evidenced (1)**
33:19

**evidences (1)**
72:18

**evidentiary (6)**
5:4;91:18;131:2,6;
175:14;178:15

**evolved (1)**
93:21

**exact (7)**
58:17;84:7;
140:12,13;151:9;
155:25;156:18

**exactly (5)**
112:8;118:4;
136:2;163:17;
166:13

**examination (4)**
90:14;91:21;
121:25;170:11

**example (10)**
10:10,12;11:3,6;
12:9;124:23;136:1,
18;168:9;171:15

**except (2)**
177:4,22

**excerpt (1)**
30:13

**excess (2)**
84:7;142:20

**exchange (1)**
65:16

**exclude (1)**
36:16

**excuse (16)**
11:15;18:3;23:25;
26:14;29:1;34:22;
54:19;60:21;79:6;
82:1;89:25;99:13;
113:24;138:2;154:7;
168:19

**excused (4)**
116:7;118:13;
171:9;175:1

**execute (1)**
146:15

**executed (9)**
29:15;61:6;65:4;
148:24;149:15;
151:22;153:23;
161:3;165:15

**execution (4)**
165:21,23;167:12,
14

**exempt (1)**
36:3

**exercising (1)**
100:4
**exhibit (237)**
21:14;24:2,3,6,8,9,
13,17,18,20,23;25:2,
4,5,10,11,14,17;26:4,
8,11,16,19,20,20,22;
27:1,2,3,9,10,13,16,
17;28:10,13,15,15;
29:22,24;30:4,10,13,
18;31:13;39:8,17,19,
22,24,25;40:1,3,11,
13,15,15,18,21,24;
41:7;42:2,5,14;43:6,
9,11,13,15,17,18;
44:7,8,9,10,15;48:7,
15,18,20,21,25;49:9,
11,14,25;50:7,11,19,
22;51:1,5,11,14,20;
52:11,18,21;53:8,14,
25;54:4,7;55:23;
56:5;57:15;61:17;
63:3,9,21,24;65:2,
13,25;66:24;68:13,
21,23;69:16,17,18;
70:1;71:1,16,20,22,
24,25;72:14,18;73:1,
4,6,7,9,11,13,20;
74:16,19,21,22;75:2,
10,15,20,22;76:7,9,
10,16,23;77:19,20;
78:3,9,21;79:1,23;
80:3,14,20;81:1,19;
82:4,9,17;83:5,11;
84:19;85:4,7,8,12;
86:3,19,22;87:1,5;
88:1;90:8,11,13;
91:10,11;92:11;
93:13,24;94:2,5,7,
10;96:10;97:25;
98:3,6;100:17;
101:22;102:3;105:6;
115:4,6,9;119:13;
120:2,3,7,9;121:1,2,
17;125:15,15;
126:14;131:10,13,
16,18;132:5,19,20;
133:18;136:6;143:3;
144:4,6,9,10,14;
145:11,14,16,19;
147:9;163:2,6;
172:13
**exhibits (23)**
30:7,23;31:12;
37:20;39:10;42:17;
44:20;45:7;62:24;
63:2;69:10;82:25;
83:7,9;94:6;113:22;
114:20;116:19;
125:13;153:24;
164:11,18;175:21
**exist (1)**
154:6

**existed (1)**
20:9
**existing (3)**
20:6;35:21;111:22
**expand (1)**
11:11
**expanded (1)**
11:14
**expect (1)**
39:2
**expectation (3)**
140:3;147:24;
148:1
**expected (4)**
66:10,20;148:2;
159:24
**expecting (2)**
148:5;157:21
**expended (1)**
42:21
**expense (2)**
32:15,16
**expenses (1)**
32:19
**expensive (2)**
15:21;112:7
**experience (14)**
9:9;12:20,22;13:7,
13,17,25;14:10,12,
13,13,15;47:13;
67:15
**experienced (1)**
176:24
**experiences (1)**
14:16
**expert (1)**
14:24
**expired (1)**
18:19
**explain (18)**
133:18;136:6;
137:13;138:13,23;
147:17;150:7,11,22;
151:8,21;155:11,18;
156:23;157:18;
160:5,17;173:12
**explained (2)**
43:25;139:4
**expose (1)**
21:5
**expressed (2)**
13:9;15:22
**extend (3)**
72:15,19;75:8
**extended (4)**
23:17;147:20;
148:16;151:13
**extending (1)**
160:3
**extension (5)**
75:4,10,21,23;76:2
**extensive (2)**
175:16,21

**extensively (1)**
176:9
**extent (3)**
7:1;41:14;52:5
**extinguished (1)**
32:15
**extraordinary (1)**
178:4

**F**

**face-to-face (2)**
61:1;138:14
**facial (1)**
103:10
**fact (15)**
15:21;32:18;
33:19;36:8;72:21;
101:1;118:25;133:3;
136:15,15;137:8;
138:4;141:8;171:2;
174:5
**facts (2)**
37:11;85:16
**fail (1)**
34:1
**failed (4)**
59:9,18;82:8;84:9
**failure (1)**
34:12
**fair (1)**
16:11
**faith (1)**
176:14
**fall (2)**
58:16,16
**familiar (7)**
88:7;100:19,23;
101:1;124:10,17;
161:17
**families (1)**
13:24
**family (7)**
13:13,14,15,17;
106:17,17;142:6
**far (3)**
33:18;40:10;66:1
**favor (1)**
121:3
**fax (5)**
140:3;157:21;
168:11,14,15
**faxed (2)**
143:12,15
**features (6)**
10:22;11:18;
12:15;13:1;18:14;
47:6
**February (20)**
41:13;59:6,9,11,
18,22;75:11;95:12,
13;125:25;126:8;
133:4;134:22;

136:12,14;137:3,4,7,
7,12
**February/March (1)**
95:19
**Federal (9)**
23:25;24:10,15;
82:6,23;160:11,11;
161:7;162:5
**feel (8)**
10:10,11,12;
11:20;22:5;76:8;
103:12;175:17
**feeling (1)**
17:21
**fees (5)**
42:21;55:6;67:4,8;
142:10
**feet (5)**
11:15,18;16:23,
24;19:17
**fella (1)**
99:17
**fellow (1)**
107:16
**felt (4)**
15:23;22:8;23:17;
77:13
**few (3)**
16:22;119:11;
176:4
**FF (4)**
96:10;97:25;98:3,
6
**fifteen (2)**
90:17;112:22
**file (7)**
8:24;36:7;99:4,12;
114:15;161:5;
169:24
**Filed (22)**
2:3;12:12;31:1;
33:9;36:6;39:22;
40:20;66:19;68:19;
69:3;99:9;119:19;
120:18,19;162:19,
21;163:1,5,13;172:7,
11,15
**files (1)**
160:24
**filing (4)**
40:8;70:22;
172:17;176:6
**finalized (3)**
141:20;142:2;
156:17
**Finally (1)**
117:24
**financial (11)**
152:10;153:5,5,
21;160:9;167:7;
168:1,4,7;173:12,15
**financials (3)**
141:16,19;142:14

**financing (2)**
101:16;111:22
**find (10)**
10:4;93:15;
105:22;153:12;
156:18;162:12,17,
21;164:5;165:20
**finding (1)**
32:8
**findings (1)**
119:1
**Fine (4)**
16:15;58:11;
104:16;119:5
**finish (2)**
36:19;90:16
**finished (1)**
113:7
**firm (8)**
13:18;39:24;
40:19;41:22;43:14;
66:23;67:1;118:3
**first (50)**
14:3,13;21:18;
26:20;39:7;51:15;
52:8;53:8,15;54:25;
55:25;57:14,16;
58:10,23,23;60:18,
24;61:25;67:25;
69:25;70:21;82:17;
83:6;86:12,17,20;
92:24;93:13;95:11;
105:5,8,15;108:1,19;
119:9;121:19;
125:14;128:17;
130:14,16;139:24;
142:4;150:23;158:9;
167:16,16;171:20;
174:1;176:6
**firsthand (1)**
9:6
**Fiserv (1)**
164:8
**Fiserve (1)**
124:24
**five (1)**
77:24
**fix (1)**
178:15
**fixed (1)**
13:11
**flip (1)**
113:21
**flood (2)**
47:2,3
**floor (5)**
10:11;11:7,9,14,16
**flooring (1)**
18:12
**flow (2)**
112:20,25
**fluid (1)**
104:15

**followed (1)**
148:3

**following (1)**
105:25

**follows (1)**
70:8

**Folweiler (7)**
65:17,24;66:1,16,
25;67:11;176:17

**footage (2)**
18:15;19:17

**forbearance (10)**
61:12,15;64:21;
65:10;142:25;148:6;
150:15;155:15;
157:25;158:2

**fore (1)**
150:8

**foreclose (2)**
32:23;36:9

**foreclosure (98)**
23:20;27:14,15;
28:20;31:20;33:8;
35:22;36:3,7;37:2;
39:21;40:6,20;41:12,
13,15,25;42:22;
48:12,16,19,22;49:1,
4,10,12;50:8,12,18,
24;51:4,8,16,22,23;
64:7;66:17,22,25;
67:2,3,12;68:10,16,
24;69:8,15;70:11,21;
99:1,4,8;100:4,11;
102:14;110:17;
111:1,19;115:6;
119:14,19;115:6;
127:5,13,15,16;
129:7,9,9,11,15,19,
20,21;137:23;139:4,
23;140:14,15;
142:11;143:11;
144:8;145:15;147:5;
150:9;151:6;157:5;
159:24;160:15,18,
22;161:4,7,15,21;
164:19;176:6,8

**forget (1)**
109:21

**forgot (3)**
28:6;75:18;87:24

**form (5)**
8:21;62:3;63:25;
113:12;163:21

**formation (1)**
123:7

**formed (1)**
13:16

**forms (1)**
70:10

**formulate (1)**
121:14

**Fort (1)**
122:12

**forth (3)**
127:13;154:2;
157:7

**forthright (1)**
176:20

**forty (2)**
99:18;103:21

**forum (1)**
35:7

**forward (6)**
7:16;32:14;
135:21,22;141:9;
148:6

**forwarded (4)**
96:12,22;148:1;
174:14

**forwarding (2)**
98:4;139:12

**found (4)**
10:3;101:3;
128:24,25

**foundation (1)**
115:8

**four (3)**
77:24;128:1,2

**fourth (2)**
133:22;134:13

**foyer (1)**
11:10

**frame (2)**
99:6;108:13

**Frank (14)**
2:3;4:10;25:23;
40:16;41:18;64:12;
68:17;94:4;98:5;
101:5,11;131:7;
156:24,24

**FRB (2)**
160:5,18

**free (2)**
76:8;93:15

**freefalling (1)**
17:22

**Friday (1)**
72:22

**friendly (1)**
17:16

**friends (2)**
17:5;142:6

**front (13)**
23:3;48:9;49:19;
52:12;57:13;63:9;
68:14,14;127:10;
129:5;154:23;
164:18;165:6

**fulfill (1)**
67:21

**fulfilled (1)**
13:12

**full (6)**
19:21;66:22;
97:16;104:16;
157:23;158:10

**fully (3)**
67:22;146:9,21

**function (1)**
124:1

**functional (1)**
23:1

**funds (3)**
148:1;155:14;
161:6

**further (13)**
22:23;61:4;74:12;
101:8;111:15;136:6;
139:4;142:13;
149:23;150:20;
162:8;170:3,4

**future (3)**
14:9;142:11;
160:14

---

## G

**games (1)**
46:20

**gap (10)**
139:11,12,19,20,
21;140:6,22;157:2,3,
4

**garner (1)**
19:10

**gathered (1)**
49:25

**gave (8)**
29:9;42:7;43:23;
65:14;100:22;108:9,
14;110:5

**general (5)**
9:14;12:16,18;
17:21;24:14

**generally (4)**
88:7,9;124:10,17

**generated (4)**
39:23;40:12;
142:25;143:18

**generates (1)**
11:25

**gentleman (1)**
100:3

**gets (1)**
157:1

**given (7)**
22:9;33:22;82:23;
107:22;165:8;173:1;
178:20

**gives (1)**
45:7

**giving (3)**
20:4;113:15;114:1

**Glass (3)**
124:25;144:22;
168:17

**GM (1)**
48:6

**GMAC (78)**

**GMACM (5)**
25:19;36:5;
119:24;120:6;
133:13

**GMACM's (1)**
25:18

**GMAC's (4)**
30:14;125:23;
163:18,19

**goes (13)**
30:21;40:11;
101:14;134:16,20;
137:2,2;138:6,6,7;
139:14;143:24;
151:8

**Goldberg (1)**
67:9

**Good (5)**
122:2,3;163:9,11;
176:14

**governing (1)**
13:3

**governors (1)**
24:14

**grace (5)**
140:11;142:9;
147:19,23;148:16

**Graham (1)**
121:19

**Grand (1)**
134:25

**grant (2)**
120:21,24

**granting (2)**
121:3,16

**great (2)**
19:4;66:1

**greatly (1)**
13:6

**grounds (1)**
40:2

**Group (14)**
100:22;101:3,4,9,
12,15,17;127:15;
129:19;133:20;
139:13;142:6;166:8,
9

**Gruenberg (2)**
85:13,17

**GT (1)**
134:17

**guess (17)**
9:13;17:20;19:9;
26:1,2;33:16;56:12,
12;80:6;103:13;
113:21;142:3;
148:13,15;167:18,
19;176:7

**guesses (1)**
148:13

**guessing (1)**
148:12

---

## H

**HAGER (197)**
5:7,12;6:7;7:18,
20;8:24,25;9:25;
10:1;13:19,22;
14:21;15:24;16:10,
13,16;19:13;23:19;
24:4,5,12,24;25:6,7,
13;26:5,6,14,18,23;
27:5,12,20,23;28:1,
3,15;29:18,21,23;
30:13;31:8;36:19;
37:18,21,25;38:2;
39:1,5,8,9,17;41:4,6,
9;44:11,12,17,20,22;
45:7,9,13,16;49:7;
52:16;53:25;55:3;
57:25;58:2,5,9;
61:10;62:11,15,23;
63:2,5,7,8;65:8;
69:10;71:16;73:1,12,
14,18;74:16;75:15;
79:23;81:6,9;82:3,
12,15,24;83:10;
84:19,21,25;90:8,16,
19,24;91:1,4,9,11,20,
22,24;92:4;93:24;
97:25;101:22;
104:17,20,22,24;
105:1;106:25;107:2,
4;111:15;113:8,9,14,
17,24;114:3,5,13,18,
21,24;117:7;118:10,
12,22,24;119:3,10,
13,16;120:9,12;
121:2,18;122:1;
126:13,25;127:2;
128:3,6;130:8,11,16,
20,23,25;131:14,15;
135:11;137:15,17;

142:22,23,24;144:3;
145:11;147:8;149:8;
150:4,5;151:1;
152:21;154:25;
155:6,7;160:4,8;
162:7,10,15,22;
163:21;169:12;
170:5,6,12;171:12;
174:12;177:11,13,
15,17;178:24
**Hagerty (1)**
175:17
**half (5)**
17:19;37:18;
38:24,25;90:24
**half-hour (1)**
37:17
**halted (1)**
161:4
**HAMP (4)**
153:7,11,13;
159:21
**hand (4)**
44:18;63:5;
121:21;172:10
**handed (5)**
39:10;40:14,16;
105:3;131:5
**handle (2)**
123:4;163:23
**handled (2)**
48:11;50:8
**hand-railings (1)**
18:11
**handwriting (3)**
88:13;145:20,23
**Hang (3)**
119:15;122:6,23
**happen (7)**
42:13;59:12;
100:10;136:3;140:5;
148:3;172:18
**happened (9)**
60:11;77:7;
103:13;109:22;
110:20,23;111:9;
150:15;171:7
**happening (1)**
148:4
**happens (1)**
149:14
**hard (1)**
146:5
**harmed (1)**
176:6
**head (6)**
116:8;140:25;
155:5,25;159:10;
170:1
**hear (7)**
5:10,14,23;20:25;
35:14;119:2;120:15
**heard (4)**

21:17,21;66:21;
67:6
**hearing (15)**
5:4;27:4,8;38:14,
18;50:18;81:22,24;
91:18;131:2,6;
175:14,16;177:19;
178:15
**hearings (1)**
42:19
**Hearsay (4)**
10:1;15:24;30:15;
39:18
**HEER (29)**
4:7;5:15,17,21,24;
6:10,13,15,17,20;
7:1,5,7,9,17,19,25;
8:3,3,6,12,14,17,19;
38:6,9,9,14,22
**held (2)**
123:5,22
**help (4)**
32:9;107:6;
137:22;147:15
**helped (1)**
17:18
**helpful (1)**
152:23
**hereby (37)**
24:7,16;25:3,9,14;
26:10;27:8,15;30:3;
43:6,8,10,12,14,16;
54:6;69:15,17;
71:21;73:5;74:20;
75:21;80:2;83:4,6,8;
85:6;90:12;94:4;
98:5;102:2;120:6,
25;121:16;131:12;
144:8;145:15
**Here's (2)**
26:19;42:12
**hereto (2)**
39:22;40:11
**hey (1)**
108:1
**high (2)**
12:2;103:17
**higher (5)**
11:21;41:9;84:3;
106:11;177:23
**himself (2)**
28:22;29:7
**hired (1)**
160:22
**HNOW (1)**
138:9
**Hobatter (1)**
85:13
**Hold (8)**
24:19;78:6;124:3;
140:15,15;149:7;
150:25;157:5
**holder (1)**

36:8
**home (17)**
10:18,20;13:14,
15;36:3,9;47:11,12,
20,22,23;53:12,15,
19;139:2;152:25;
173:22
**homeowner (1)**
15:6
**homeowners (1)**
170:14
**homeowners' (3)**
94:22,24;95:1
**homes (5)**
9:7;13:15;35:21;
47:7;106:7
**honest (1)**
176:20;177:2
**honestly (2)**
134:5;153:3
**Honor (138)**
5:7,15,17,21;6:7,
10;7:1,9,17,25;8:3,7,
12,17,25;9:4,11;
15:16;16:18;18:16;
19:16;20:3,20;21:4;
22:5,13;23:15;24:5,
12,24;25:7,13,16;
26:6,12,15;27:12,18;
28:7,19;29:23;30:8,
13;31:17,23;32:22;
33:25;35:5,17;37:6,
9,13;38:2,6,7,7,10,
22;39:5,9;42:3;
43:20;44:8,12,17,22;
45:9;53:25;61:10,
24;62:15,23;69:10,
13;71:16,18;73:3;
74:18;75:18;79:25;
81:6;82:24;87:8;
90:10,18;91:22;
94:1;98:2;101:24;
104:17,24;107:2;
111:25;113:9,24;
114:6,21;115:1;
116:9,21;117:13;
118:12,22;119:4,10,
21;120:17;121:6,13,
18;126:13;128:9;
130:12,17,23;
131:14;144:3,5;
162:10,12,15;
163:12;166:2;170:3,
6;171:12,20;172:9,
15;173:11,21;174:6;
175:10;176:2,20;
177:6,19;178:24
**Honor's (2)**
39:13;44:12
**HOPE (13)**
137:18,19,19,25;
138:2,9,15,17,20,24;
139:4,6,8

**hoped (1)**
139:11
**hopefully (1)**
177:5
**hopes (1)**
90:5
**hour (4)**
37:18;38:24,25;
90:24
**house (67)**
9:13;10:10,12,14;
11:2,4,7,9;12:15;
14:4,4;15:16,17,21,
23;16:7,21,23;17:2,
4,6,9,9,15,16,17,17,
25;18:1,4,6,7,12,17;
19:2,5,10,16,19;
20:5;21:5;32:8,8,10,
16;35:19;45:17;
47:22;48:1;67:25;
77:15;79:8;96:3;
106:8,8;108:21;
109:12;110:16;
111:20;117:19,23;
139:17;141:2,11,18;
166:3;172:25
**houses (6)**
10:6,13;12:7;
17:25;87:14;117:23
**housing (1)**
137:20
**HUD (2)**
53:6;54:6
**HUD-1 (5)**
54:8;56:1,10;
57:13;58:3
**hundred (4)**
16:22;18:3;20:12;
67:16

## I

**idea (2)**
14:7;127:23
**identification (2)**
82:9;115:11
**identified (1)**
153:19
**identify (4)**
8:1;38:8;45:3;
161:11
**identifying (1)**
161:9
**III (1)**
25:23
**illusive (1)**
108:22
**image (1)**
144:23
**imaged (2)**
124:25;168:17
**imagine (1)**
126:16

**imaging (1)**
144:21
**immediately (4)**
136:9;141:12;
147:4;148:1
**impact (1)**
15:7
**impacted (2)**
22:17,18
**implications (2)**
142:10;146:22
**important (5)**
13:10;33:16;49:5;
136:4;166:2
**impossible (9)**
41:23;48:15,18,
21;50:11,15;51:1,11,
20
**impression (4)**
16:1;19:8;109:12;
176:15
**improved (1)**
166:22
**inception (2)**
66:16;67:10
**include (5)**
58:24;59:2,6;
135:13,15
**included (2)**
40:7;162:23
**includes (3)**
26:24;41:10,11
**including (2)**
101:17;160:11
**incomplete (1)**
30:16
**incorrect (3)**
149:25;150:2;
154:3
**incorrectly (1)**
70:18
**increase (2)**
32:1;59:10
**increased (2)**
9:23;92:7
**incur (1)**
67:4
**incurred (2)**
50:1;51:21
**indeed (1)**
35:7;161:17
**independent (8)**
160:20,22,23;
161:4,7,8,15,20
**indicate (25)**
42:17;49:12;
50:19;55:9,23;
57:23;97:15,19;
99:2;110:25;133:2,4,
9,12;141:15;142:3;
146:15;152:15;
164:9,12;165:17,22;
166:16;170:18;

176:9

**indicated (12)**
7:11;8:21;40:9;
101:2;139:1;141:18;
150:2;155:3;156:20;
165:12;170:23;
172:20

**indicates (34)**
10:21;48:25;49:9;
50:23;51:5;53:18;
54:10;55:16,20;56:2,
10;57:4;72:21;
79:12;83:21;89:18;
94:11;133:20,24;
134:15;135:20;
136:8;138:8;142:8;
149:18;150:18;
151:17,22;152:9;
157:1,12;158:25;
168:10;169:3

**indicating (4)**
133:21;139:14,15;
152:18

**indication (8)**
8:8;15:18,19;
41:17;129:7;154:16;
171:6,7

**indications (1)**
169:17

**individual (11)**
11:5;28:22,22;
29:1,7,9;47:14;
124:7;161:5;173:21;
176:17

**individuals (1)**
15:20

**information (12)**
28:23;29:10,11;
33:1,17,19,22;50:23;
101:15;125:19;
131:22;132:9

**informed (3)**
59:5;84:13;131:1

**initial (1)**
62:1

**injunctive (1)**
70:8

**injured (1)**
11:13

**inquired (1)**
117:8

**inquiry (1)**
169:23

**inside (2)**
17:6;177:5

**inspection (1)**
14:4

**installment (2)**
141:12;142:15

**instead (5)**
67:19;106:15;
136:9,10;157:20

**instruct (1)**

44:23

**insufficient (2)**
7:5;178:1

**insurance (10)**
58:24;59:2;68:5,8;
94:22,24;95:1;
135:13,16;151:16

**insurances (1)**
59:6

**integrate (1)**
11:11

**intend (3)**
30:14;114:16;
116:24

**intended (4)**
8:22;38:25;
128:20;161:6

**intent (3)**
28:24;31:24;32:23

**intention (3)**
66:17;67:11;70:24

**intentions (1)**
173:23

**interaction (3)**
23:17;29:17;139:8

**interactions (1)**
98:8

**interagency (1)**
23:20

**interest (13)**
20:22;50:4;98:20;
99:20;102:24;104:1;
113:4;133:9;134:24;
136:11;151:12,15,15

**interesting (1)**
17:24

**interference (3)**
21:6;22:16;32:3

**interior (2)**
10:22;18:9

**interrogatories (2)**
82:17;83:6

**interrupt (1)**
169:22

**interval (1)**
159:17

**intervals (1)**
10:9

**into (74)**
7:12;8:10;11:7,24;
12:18;14:1;22:2;
23:18;24:7,16;25:3,
10,14;26:11;27:8,15;
30:3,17,20;31:8;
43:6,8,10,12,14,16;
54:1,6;69:15,17;
71:22;73:6;74:10,
21;75:7,21;80:2;
83:4,6,8;85:6;90:12;
94:4;97:7,23,25;
98:5;101:22;102:2;
115:2,13;120:6,23,
25;121:17;126:14;

127:17,18;131:12,
18;139:4,23;143:20;
144:8,23,24;145:16,
25;147:4;157:10;
160:12,12;161:24;
169:2

**introduced (3)**
91:12;94:10;
116:18

**INV (1)**
154:12

**investigation (1)**
160:10

**investor (12)**
67:24;133:13;
154:13,16,20,21;
166:12,19,21,22,22,
24

**investors (1)**
117:25

**investor's (1)**
163:25

**inviting (1)**
155:22

**invoice (1)**
40:12

**involved (5)**
21:8,9;32:7;52:7;
174:6

**involvement (2)**
160:17,19

**IRA (1)**
142:6

**iron (1)**
18:10

**i's (1)**
36:5

**issue (17)**
5:25;6:22;7:12;
14:21;21:9;27:18,
22;28:24;38:16,16;
39:13;59:12;110:17,
23;113:5;134:16;
178:8

**issues (16)**
6:18,20;7:2;31:13;
37:20;39:8;43:19;
44:7,15;97:6,22;
113:13;117:24,24;
161:23;162:2

**item (1)**
147:12

**items (2)**
37:25;125:2

## J

**Jacobs (18)**
11:22;15:19;
18:22;21:18;41:20,
21,23,25;51:25;
83:16;84:9;85:2,6,
18;104:7;105:6,15;

121:4

**Jacobses (9)**
15:20,22;16:11;
59:16;83:21;84:3,
13;120:19;121:3

**Jacobses' (4)**
84:10;120:9,25;
121:16

**Jacobs-Reed (1)**
106:2

**Jan (1)**
84:15

**January (8)**
84:15;85:12;
107:19;110:9;123:8;
136:10;137:12;
163:6

**Jeffrey (2)**
43:5,8

**Jersey (5)**
93:22;133:21;
134:9;164:20;172:7

**job (3)**
122:13;123:20;
124:1

**jog (1)**
113:22

**joists (1)**
10:9

**Jones (1)**
85:21

**judge (4)**
81:21;108:23;
176:25;177:8

**Judged (1)**
49:24

**Judge's (1)**
152:24

**judgment (7)**
70:7;118:25;
120:10,25;121:3,16;
150:10

**judicial (3)**
82:5;120:21,24

**Julie (2)**
24:1,7

**July (13)**
82:20;93:12;
94:12;138:7,13,14,
23,25;139:11;
140:18;151:21;
155:11,18

**June (14)**
45:24;89:16,17;
93:3,7;94:3;102:21;
104:6;108:12;
125:23,23;138:6,17;
161:2

**Justification (1)**
141:23

## K

**keep (4)**
97:1;114:20;
124:23;156:3

**keeps (1)**
143:24

**kept (9)**
42:6,7;124:11,18,
21;126:4;143:21;
145:1;168:24

**Kevin (4)**
92:16,20,21;94:3

**kind (9)**
103:11;109:9;
112:6;118:5;137:2;
147:11;149:15;
156:5,6

**kindly (1)**
44:22

**kinds (1)**
141:17

**KK (9)**
52:12,18,21;53:8,
14,25;54:4,7;57:15

**knew (9)**
17:16;29:20;
65:17,21;66:3;
99:22;106:13;108:9;
136:16

**knowing (2)**
9:11,12

**knowledge (5)**
9:6;133:15;
147:11;165:3;167:4

**known (4)**
10:19;18:8;
109:18;173:24

**knows (1)**
173:21

**Krisden (2)**
40:17;43:16

## L

**labeled (1)**
129:5

**labor (1)**
11:13

**lack (1)**
178:5

**laid (2)**
143:14;146:21

**landscaping (1)**
13:2

**language (1)**
75:3

**laptop (1)**
45:10

**larger (1)**
19:16

**last (26)**
10:20;23:2;36:11;
37:4,10;55:15;56:7,
9;66:24;71:5;74:3;

12-12020-mg    Doc 7766-26    Filed 11/17/14    Entered 11/17/14 19:14:16    Sept. 16
RESIDENTIAL CAPITAL, LLC, et al.
2014 Hearing Transcript    Pg 196 of 209

Case No. 12-12020-mg                                                      September 16, 2014

112:12;128:1,2;
129:23,24;130:8;
137:8;142:5;144:13,
14;147:18,23;148:9;
159:22;177:11
**lastly (1)**
121:2
**late (6)**
58:19;97:4;133:2;
141:22;142:9;
147:19
**later (4)**
16:6;17:1;110:22;
153:4
**Lauren (1)**
121:19
**law (17)**
15:5;32:24;33:2,
23;36:24;40:9;
41:19,22,25;43:5,14;
48:12;52:6;66:20,
25;100:23;131:4
**lawsuit (3)**
39:21;40:20;41:23
**lawyer (9)**
35:12;51:7,13,15,
25;85:17;113:15;
117:11;120:20
**lawyers (3)**
129:9,9,11
**lay (1)**
115:8
**leads (1)**
129:7
**learned (3)**
31:21;70:17,17
**lease (5)**
73:9;74:20;75:4,8,
21
**least (7)**
8:1;21:24;40:13;
41:1;137:10;146:9;
173:1
**leave (1)**
61:20
**leaving (1)**
79:19
**lecture (1)**
15:7
**leeway (3)**
15:8;117:11;
178:20
**left (13)**
23:2;30:5;44:8;
57:7;72:6;125:13;
128:3,4,7;137:1,4,6,
6
**legal (12)**
33:10,15,25;34:2,
12;35:13;39:20;
42:21;51:3;67:4,7;
97:17
**lender (6)**

28:21;33:2,3;
36:21;58:6;67:15
**length (1)**
84:2
**less (4)**
22:6;60:15;67:16;
85:25
**lets (1)**
162:15
**letter (13)**
29:6,7;80:2;85:12;
109:10;133:5,6;
137:18,25;138:2,20;
143:18;173:17
**letters (9)**
29:19;108:23;
110:19;138:4,10,17,
22;149:14;171:4
**letting (1)**
133:6
**lien (4)**
14:22;99:8;
157:23;168:12
**lienholders (2)**
99:2,5
**liens (5)**
20:1,9,18;98:23;
99:2,6
**lieu (1)**
141:6
**life (1)**
106:17
**light (3)**
82:3;118:24;174:5
**limitations (1)**
33:9
**limited (2)**
113:13;117:7
**Linda (4)**
39:14,18;43:10,12
**line (32)**
28:25;53:20;
54:15,16,25;55:2,9,
12,13,14,15,20,22;
56:2,5,7,9,9,17;
57:14;105:19;107:3,
4,8;108:21;109:1;
134:20;146:2,14;
147:18,23;157:9
**lines (6)**
56:16;130:2;
149:12,13;150:6;
154:9
**lingering (1)**
176:7
**Liquidating (13)**
122:5,14,17,18,19,
20;123:2,6,7,10,12,
14;124:9
**liquidity (1)**
28:25
**lis (7)**
14:20,21;24:18;

25:2,3;31:19;176:7
**list (11)**
10:19;19:22;
43:25;87:13;89:21;
90:1,4,4;99:6,10;
116:17
**listed (4)**
33:20;43:25;
51:21;58:12
**listen (5)**
49:6;109:25;
117:9;141:24;
175:19
**listing (15)**
18:18;19:8,15;
46:2;84:6;86:16;
87:11,12,13;88:3;
89:2,7,15,19;139:7
**listings (3)**
10:19;14:5;90:12
**lists (3)**
61:17;134:21,21
**litigated (2)**
122:19;123:4
**litigation (20)**
14:14,16,17;15:7;
21:8;31:20;34:15;
80:11;117:24;
122:14,17,18;123:6,
21,25;124:5,6,7,8,9
**little (14)**
10:11;23:16;37:5;
80:9;88:14;103:23;
104:1;106:14;
109:25;122:8;127:7;
146:4;149:23;
151:14
**live (7)**
9:18;14:10;15:20,
21,22;16:2;166:3
**lived (1)**
16:3
**lives (1)**
10:16
**living (6)**
11:8;95:3,5;96:4;
172:25;174:13
**LL (4)**
100:17,21;101:22;
102:3
**LLC (4)**
2:21;123:19,20;
124:1
**LLP (1)**
4:2
**LMT (3)**
152:6;158:15,20
**loan (57)**
36:21;57:7,7;
59:19;84:10;98:17;
99:14;102:11,13;
103:16;106:4;
107:19;108:18;

109:3;110:6;111:1,
2;123:11;124:24;
125:5,8,10;132:17;
133:22;135:20;
139:22;140:6,8,9,10,
22;147:14,16;151:7,
19,22;152:1,3,6,15;
153:6,18,21,25;
155:1,4,8,12,14;
156:4,7,8;158:12;
159:23;165:11;
167:9;168:6
**loans (2)**
102:16;156:2
**LoanServ (1)**
164:9
**lobby (1)**
77:8
**log (2)**
130:22,24
**long (9)**
14:17;64:24;
66:17;67:12,24;
69:1;90:22;106:7;
123:5
**longer (1)**
35:1
**look (54)**
12:6,6;13:4;53:8;
55:9;57:14;63:20;
64:2;65:2,13;69:6,
24;70:3,25;71:24;
73:7;74:22;76:9,15;
78:21;80:14,20;
81:1;83:11;85:8;
86:3;92:11;93:7;
96:10;108:5,20,21;
115:17;121:7;
125:14;129:5;
131:16;132:4,18,22;
133:17;138:5;141:9;
143:3;154:19;
156:22;157:8;
159:11;164:8;
167:11;168:18;
169:6,14;172:12
**looked (5)**
9:15;85:1;161:8;
171:2,5
**looking (25)**
30:11;47:19,25;
50:11;54:15,22;
72:5;79:3;87:10;
103:18;106:8,10;
108:21;114:20;
124:25;132:19;
136:15;138:25;
139:3;144:22;
151:24;162:16;
165:25;166:1;
168:17
**looks (11)**
53:1;63:14;78:2;

96:22;135:18;
139:18;144:15;
145:20;151:11,11,16
**loss (2)**
159:19;166:8
**lot (7)**
112:1;121:24;
149:10;163:10;
171:3;175:13,21
**Louise (3)**
96:12,12;98:5
**lower (5)**
60:12,13,14;
104:1;129:15
**LPS (2)**
127:12,17
**LTV (3)**
99:16,17;103:19
**lumber (2)**
11:5,5
**lump (3)**
60:3,8;67:19;
161:22
**lunch (1)**
90:20
**lying (1)**
66:15

## M

**machine (1)**
137:1
**Magazine (1)**
9:23
**maiden (1)**
177:17
**mail (7)**
25:20;80:24;
82:21;110:21;147:2;
173:18;174:14
**mailed (4)**
25:18;145:22;
146:16;147:12
**Maines (2)**
10:20;17:17
**Maines-built (1)**
10:20
**Maineses (1)**
18:13
**maintain (7)**
124:25;125:1;
126:11;144:1;145:5,
7;168:22
**maintained (1)**
125:20
**majority (2)**
47:6;48:12
**making (5)**
35:12,13;136:2;
140:16;159:19
**manage (3)**
122:18,19;176:13
**managed (1)**

124:6
**management (1)**
104:2
**manager (1)**
101:9
**manner (1)**
136:5
**many (5)**
13:6;17:4;47:6;
149:11;164:18
**marble (1)**
18:11
**March (7)**
86:20;95:12,13;
101:17;132:22;
136:18;152:22
**Mark (3)**
65:17,24;66:16
**marked (11)**
26:8;40:23;42:2,5;
63:21;65:14;87:5;
115:11;132:5;143:3;
170:23
**market (25)**
9:12;12:17,17,19;
16:11;17:1,3,20;
19:19;21:5;46:4,5,7,
8,11,12,17,19;47:23;
57:21;88:5;96:23;
97:2,4;139:2
**marketability (1)**
10:25,25;23:1
**marketable (1)**
22:25
**marketed (2)**
13:15;22:17
**marketplace (1)**
18:8
**massively (1)**
18:6
**mat (1)**
51:8
**match (1)**
131:8
**material (1)**
175:13
**materials (6)**
10:8;12:5;44:23;
45:1,1;131:6
**Matlack (18)**
17:25;18:12;29:9;
45:18;46:2;47:23;
52:8;54:14;64:12;
68:8;79:7;83:16;
106:9;164:20;
168:20;169:8,10;
174:14
**matter (27)**
6:2;7:8,15,23;
8:11;15:21;43:21,
22;44:2;49:2;51:4,
22,24,25;52:3;62:24;
68:17,19;79:6;80:5;

104:2,7;105:6;
126:19;177:1;178:8,
12
**matters (1)**
68:24
**maturity (2)**
140:8;151:13
**may (59)**
5:20;19:1;20:9;
29:25;30:2,8;38:6;
44:17;47:2;53:9;
54:9,24;60:17;63:5;
80:22;81:6;88:21;
89:2,6,8,10;96:18,
20;97:18;98:4;
104:24;109:23,25;
114:18;134:22;
138:5,17;150:22,22;
151:1,5,8,10,24;
152:5,13,14,17;
154:7;155:1,9;
162:22;163:2,14;
165:21;167:11,24;
168:16,17;172:7,11,
15,16,24
**maybe (16)**
11:14;19:20;
20:16;22:18;26:15;
34:11;38:25;84:15;
90:24;104:4;106:15;
108:2;119:16;
126:23;142:1;154:8
**McCrink (8)**
40:17;41:22;
43:14,16;51:18,25;
52:5;120:20
**mean (30)**
14:18;21:12,24,
25;22:6;42:8;48:5;
56:12,13;69:1;
80:19;89:2;90:6;
95:10;103:11;
115:18;128:10,14,
16;135:2,21;139:20;
142:1,11;152:5;
164:16,18;166:13;
168:3;178:9
**meaning (3)**
28:21;139:10;
156:24
**means (19)**
60:18;89:5;
116:23,25;133:5;
134:6,18;136:19,19;
137:5;138:9;142:1,
18;149:19,21,22;
150:12;158:16;
167:14
**meant (1)**
168:4
**mediating (1)**
40:7
**meeting (7)**

42:10;61:1;66:16;
67:11;138:15;
146:22;176:16
**member (1)**
137:21
**memory (4)**
66:12;107:6;
113:22;153:12
**mention (2)**
62:2;115:21
**mentioned (2)**
117:19;123:13
**message (5)**
136:20;137:1,5,6,6
**met (2)**
138:24;177:24
**methods (3)**
9:19;12:5;81:24
**microcosm (1)**
12:16
**microphone (2)**
87:17;122:9
**middle (3)**
89:21;93:6,13
**midyear (1)**
13:25
**might (7)**
47:16;69:23;
113:22;120:13;
139:3;155:2;162:22
**million (23)**
17:3,19;19:20,20;
20:13,14,15;21:20;
23:3;53:15;57:16;
70:19;71:13;83:22;
84:8;85:24;86:7,8;
92:6,7;97:10;99:18;
103:20
**million- (1)**
103:21
**million-350 (1)**
17:24
**million-465 (1)**
18:5
**million-eight (2)**
21:24;103:21
**million-nine (1)**
22:7
**million-one (2)**
22:21;23:4
**million-three (2)**
22:18;118:2
**mind (9)**
33:1;34:17;35:23,
23,25;36:23;115:17;
116:9;128:24
**mindful (2)**
9:2;20:25
**mine (4)**
18:13;53:1;71:7;
87:7
**Mine's (1)**
16:23

**minute (3)**
58:19;69:6;78:12
**minutes (4)**
90:17,19;175:20,
24
**mischaracterizes (1)**
163:21
**misheard (2)**
26:15;73:17
**mispronounced (1)**
177:18
**misread (2)**
106:24;107:1
**missed (2)**
35:5;117:3
**missing (2)**
34:23,23
**misspoke (1)**
177:11
**misstated (1)**
64:20
**mistake (2)**
42:20;81:23
**mistaken (1)**
106:6
**misunderstood (1)**
81:20
**mitigate (2)**
31:24;176:13
**mitigation (3)**
32:7;159:19;166:8
**MLS (7)**
10:19;14:5;87:11,
12;88:7;89:15;90:12
**MM (4)**
28:11;65:13,25;
66:24
**mod (3)**
151:19,23;167:9
**modern (1)**
14:17
**modifi (1)**
62:19
**modification (31)**
62:9,20,22;140:6;
151:7;152:2,3,6,15;
153:1,7,11,13,18,22,
25;154:11;155:8,12,
14;156:7,8;157:11;
159:21,25;161:18;
165:11;166:11,25;
168:6;173:25
**modifications (1)**
10:15
**modified (4)**
159:23;161:21;
162:1,6
**modify (1)**
70:24
**moldings (2)**
10:22;13:1
**moment (10)**
12:23;14:20;

26:13;32:20;71:19;
75:1;89:9;104:17;
114:18;115:2
**moments (1)**
176:15
**Money (15)**
9:23;19:4,10;
20:21;29:9;32:2,9;
34:10,18;35:19;
62:3;67:19;77:9;
111:7;161:5
**monies (1)**
32:6
**month (10)**
58:15,17;64:16,
25;74:13;132:17;
139:6;141:25;
156:21,25
**monthly (11)**
58:24;59:5;
135:12,15;138:5;
158:4,5,6,8,8,10
**months (6)**
35:25;67:2;118:1;
139:6;141:13;
142:16
**Moorestown (17)**
9:12,14,14,21,21;
10:21;12:14;15:20;
16:3;46:9,24;47:1,5,
7,9;133:21;134:8
**more (31)**
15:21;18:1,2,3,12,
13;19:17,17;46:16;
47:19,25;57:20;67:4,
7;75:23;100:1,15;
104:4;108:3;109:23,
25;111:12;112:6,7;
118:20;128:21;
158:7;162:4,7;
175:19,22
**morning (11)**
5:8;7:12;27:24;
23;342:44:1,2;45:17;
61:21,25;96:3;98:7
**MORRIS (3)**
4:2;8:3;38:9
**Morristown (1)**
164:20
**mortgage (118)**
20:23;25:9;28:21;
29:8;32:3,6,11,13,
15;35:22,25;36:4;
39:22;40:21;48:4,5;
52:6,9;53:15;54:10;
55:1,7,11;56:1,10,
15,20;57:24;58:8,23;
59:1,5,24;60:3,7,8,
16,18;61:1,6,7,12,
14;64:22;65:18,21;
66:10;68:11,17,24;
69:20;70:9,11,15,16;
76:1,4,8;77:5,12;

94:7,12,17,19,22;
97:7,22;98:8,12,15;
99:7,14;100:12,22;
101:3,3,9,12,14,17;
104:10;106:11,21;
107:8,8,14,23;
108:17;125:20,22;
126:8;127:5,13;
132:15;133:23;
135:3;137:21,24;
138:16;139:22;
140:2;141:6;144:16;
160:9,25;162:19;
163:2,25;170:18,22;
172:21;173:13,15,
16,18;174:20;178:2,
4

**mortgagee (2)**
36:8;57:23

**mortgages (5)**
20:1,7;54:20;
103:15;124:8

**Mortgage's (12)**
70:21;124:13;
126:10;133:20;
140:2;143:25;145:4,
7;160:17;166:8;
170:13;177:25

**most (3)**
14:2;40:12;123:21

**mostly (1)**
63:25

**motion (7)**
66:19;67:5;119:3,
5;120:9,25;150:9

**motivation (2)**
18:25;67:23

**motivations (1)**
13:22

**mounting (1)**
47:1

**move (29)**
9:15;13:17,25,25;
14:1,2;23:18;53:25;
65:9;69:10;71:16;
73:1;74:9,16;75:15;
79:23;82:24;84:19;
90:8;91:11;93:24;
97:25;101:22;
114:16,21;119:11;
126:13;144:3;
145:11

**moved (2)**
93:22;114:13

**mover (1)**
45:6

**moves (1)**
118:25

**moving (3)**
13:15;90:14;160:6

**Mrs (1)**
132:14

**much (16)**

8:5;19:3;47:2;
48:3,15;50:12;
60:22;93:11;104:4;
107:20;111:16;
113:25;114:23;
120:13;153:16;
178:6

**multiple (3)**
12:20;68:1;87:13

**Munoz (2)**
118:8,8

**Murphys (3)**
17:4,8,14

**must (6)**
13:12;79:16;
88:12;172:17;
177:23;178:4

**myself (5)**
11:13;29:13;
42:11;103:12;
164:14

## N

**name (12)**
10:20;19:3;39:19;
51:18;58:5;99:4;
118:9;124:20;146:4;
166:14;177:11,18

**named (1)**
34:16

**names (1)**
17:12

**narrative (3)**
8:21;62:20;113:12

**national (1)**
46:8

**nature (3)**
12:4,5;103:13

**nearing (1)**
133:7

**nearly (1)**
176:1

**necessarily (7)**
10:23;40:23;
117:9;129:16,17;
159:17;166:23

**need (14)**
5:13;13:18;23:19;
39:8;59:6;64:16;
86:10;108:2;109:25;
118:3;122:8;141:19;
175:17;177:7

**needed (6)**
29:14;99:25;
104:15;110:13;
119:3;164:7

**needs (3)**
13:11;45:2;75:19

**negligence (1)**
70:14

**negotiate (1)**
19:21

**negotiated (2)**
92:9;161:18

**negotiating (3)**
40:7;92:2;93:4

**negotiations (1)**
152:2

**neighbor (3)**
16:7;118:6,9

**neighborhood (17)**
9:18;10:3,13,16;
11:2;12:8,9,16,25;
13:4;16:2,7;18:21;
46:10,22,23;117:20

**neighborhoods (1)**
10:7

**neighbors' (1)**
9:7

**neighbor's (2)**
16:21;17:9

**neither (1)**
27:23

**nervous (1)**
49:24

**net (1)**
159:22

**netted (1)**
57:6

**New (9)**
2:23;4:5;53:19;
93:22;133:21;134:9;
159:19;164:20;
172:7

**newly (1)**
13:16

**news (1)**
66:1

**next (18)**
27:1;63:16;64:10;
71:8;78:15,17;
89:13;100:2;128:22;
131:16;134:20;
135:17,17;148:18;
149:20;150:6;
157:12;158:5

**nexus (3)**
106:17,17,17

**night (1)**
137:8

**Nina (2)**
96:11;98:4

**nine (2)**
20:12;154:8

**ninety (1)**
20:13

**ninety- (1)**
99:16

**ninety-percent (1)**
103:19

**Nobody (1)**
5:17

**nonappearance (2)**
6:4;38:19

**nonappraisable (1)**

18:14

**nondebtor (1)**
33:7

**non-HAMP (1)**
157:11

**nonissue (1)**
110:2

**non-profit (1)**
137:20

**nonquantifiable (1)**
110:18

**normally (1)**
110:10

**note (32)**
20:12;33:6,7;36:8;
41:10;59:13;67:20;
82:5;132:15;133:19;
135:6;137:13;
138:13,23;139:11;
142:4,4,17;147:17;
148:16,24;150:7,11,
19;151:8,21;155:11,
18;156:22,23;
165:21;173:5

**noted (1)**
137:19

**noteholder (5)**
33:3,6,20;133:11,
14

**notes (64)**
30:14,15,20;
104:2;125:17,20;
126:7;127:12,14,16,
18;129:7,15,20,20;
131:1,12;132:18,19,
22;133:4,8,10,12;
134:1,23;135:17,17;
136:22;137:19;
138:25;141:9,15,23;
143:19;147:18;
149:10;153:4,12,15;
154:1,18;157:18;
160:7;164:3,7;165:2,
4,12,12,17,25;
166:18;168:10,16,
20,22;169:2,14,17;
170:2,21,24;175:21

**notice (16)**
5:21;7:14;14:22,
22,22;32:23;33:8;
36:14;38:21;44:4;
53:9;89:16;120:21,
24;171:1,2

**noticed (2)**
88:3;171:3

**notification (3)**
7:1;25:9;94:7

**notified (1)**
67:1

**notifies (1)**
168:24

**notoriety (1)**
9:22

**November (10)**
18:18;29:25;30:2;
72:22;134:24;
135:18;164:5;169:5,
8;173:22

**number (35)**
5:3;16:16;24:2,3,
9,18,20;25:1,5,11,
17;26:4,12;41:11;
72:15;84:7;103:17;
115:5;127:25;
128:13;130:14,17,
18;137:4,9;140:22;
149:23,25;150:2;
164:4;165:7;168:13,
14;169:4;170:19

**numbered (2)**
69:25;127:22

**number-one (1)**
9:22

**numbers (4)**
107:17;128:1,2;
164:13

**NY (2)**
2:23;4:5

## O

**oath (5)**
101:2;108:14;
131:22;132:9;172:3

**object (8)**
28:1;29:18;30:15;
75:19;120:16;
126:16;144:5;
145:13

**objected (3)**
21:11;29:19;115:8

**Objection (52)**
2:3;6:6;10:1;
13:19;15:24;19:13;
23:20;24:11,12,23,
24;25:6,12,13;26:6;
27:5,7,11;29:21;
39:11,17;40:1;44:10,
14;54:2;61:23;
62:18;69:12;71:17;
73:2;74:17;75:17;
79:24,24;83:1;84:20,
21;85:3;90:9;93:25;
98:1;101:23,24;
120:4;121:14;
126:18,20,21;
131:10;163:21;
169:12;178:12

**objections (9)**
7:21;24:4;26:5;
28:3;42:16,24;
119:20;178:11

**obligated (2)**
135:23;160:21

**obtain (2)**
19:4;44:3

**obtained (3)**
84:17;156:10;
159:25

**Obviously (4)**
38:24;87:8;
109:18;178:7

**occurred (6)**
18:17;79:21;
100:15,16;112:4;
130:3

**occurrences (3)**
176:5,11,14

**o'clock (2)**
90:21;91:14

**October (9)**
58:19,19;72:12;
83:19;84:6;85:2;
133:18;134:14;
135:20

**Ocwen (1)**
125:25

**oddly (1)**
63:17

**off (26)**
12:2;20:21;32:11,
13;35:21;59:20;
60:3,7;61:25;76:1,4,
7;77:5,12;92:24;
108:19;111:3;
140:15,15,24;155:5,
24;159:10;167:9,19;
170:1

**offer (26)**
6:17;17:24;18:4,5;
22:20;23:2;30:14;
37:24;62:15;84:3;
86:7,17,20;89:10;
90:2;92:7;93:6;
116:19,24;126:18;
139:3;153:22;167:1;
173:4,6,8

**offered (8)**
31:3;40:19;45:24;
60:14;91:13;97:10;
155:15;156:4

**offering (6)**
27:3;30:6,17,24;
31:10;83:22

**offers (3)**
12:21;86:4;92:5

**office (8)**
40:13;50:1;80:18,
21,23;81:2;127:3;
130:11

**Offices (1)**
43:5

**official (2)**
120:19,21

**often (1)**
159:14

**omission (1)**
34:11

**omitted (1)**

**Once (1)**
61:16

**Once (1)**
117:25

**one (72)**
8:24;13:4,15;14:3;
19:20,20;21:10;23:7,
8,8;24:1;25:16;
29:14,15;30:11;34:3,
22;35:21,21;38:18;
39:13,14;42:7,14,15,
15;50:17;59:13;
61:5;62:25,25;
64:25;67:19;69:23;
70:10;72:18;75:19;
77:24;86:7;88:18;
90:6;92:6;93:10;
99:9;104:17;105:15;
108:1;111:3,5,12;
112:6;114:18;
116:17;119:21;
121:9;131:4;138:6,6,
7;141:9,25;152:22;
154:1,4,19;157:7;
158:3,3,6;171:16;
176:6;177:18

**one-350 (1)**
18:6

**ones (1)**
152:17

**ongoing (1)**
32:15

**only (25)**
12:20;29:17;44:8;
49:18;59:13;64:23;
77:19;78:2;80:12;
98:25;100:14,16;
103:9;111:2,9;
115:1;117:2;136:11;
144:14;157:19;
162:7;168:19,19;
171:16;172:24

**OO (7)**
80:14;81:19;
82:10,16,25;83:3,5

**open (6)**
11:10;37:19;
86:19;90:7;103:24;
108:20

**opened (2)**
62:8,19

**open-ended (1)**
14:8

**opening (2)**
175:16;177:20

**operates (2)**
46:24;47:1

**operation (1)**
82:6

**operations (1)**
101:9

operations@escribersnet (1)
2:25

**opinion (25)**

**8:22;9:15,23;10:5;**
12:7;13:7;16:5;
19:19;20:4,24;21:6,
17;23:6,7;32:1;46:5,
12,17;47:2;121:2,16;
156:12;158:23;
159:1,3

**opinions (1)**
23:8

**opportunity (10)**
6:3;35:6;38:21;
62:6;113:11,18;
114:2;125:4,7;
171:14

**opposed (1)**
48:1

**opposing (1)**
41:20

**option (3)**
73:9;74:9;75:11

**options (4)**
29:12;99:20;
100:4;142:9

**orally (2)**
77:7;99:19

**Order (19)**
25:14,17,22,22,25;
41:12;105:12;
125:14;160:5,13,21;
161:1,17,18,20,21;
162:1,6;178:9

**ordered (3)**
25:25;89:23;106:1

**orders (2)**
162:6;178:14

**ordinarily (1)**
42:25

**ordinary (3)**
126:4;143:21;
145:1

**organization (1)**
112:23

**original (5)**
93:3;117:4;
119:23;162:6;
176:16

**originally (2)**
107:13;157:7

**origination (1)**
125:4

**origins (1)**
14:19

**others (2)**
37:23;94:4

**otherwise (2)**
32:16;69:20

**ought (1)**
39:1

**ours (1)**
18:22

**out (50)**
9:2;13:16;18:23;
21:10;32:8,22;

**34:25;52:8;53:15;**
54:19;56:15,20;
57:6;58:23;60:25;
99:22;102:17;103:2;
104:20;107:11;
111:7,24;114:1;
117:25;125:1;133:6;
137:23;138:3,4,6,6,
7,8;143:14,24;
144:21;146:21;
147:12;149:15;
150:17;151:14,19;
153:22;155:21;
158:13;165:15,23;
167:14;171:4;
172:14

**outcome (1)**
136:23

**outset (1)**
177:19

**outstanding (3)**
20:1,1,11

**over (21)**
5:24;16:6,23;17:1,
3;18:19;19:17;
23:17;57:15;67:6,
19;68:1,4;93:15;
123:23;125:22;
141:16,19;142:20;
169:25;172:23

**overall (1)**
13:2

**overnight (2)**
80:23;82:21

**overrule (2)**
42:16,24

**Overruled (9)**
10:2;13:21;62:18;
131:10;144:6;
145:14;163:24;
169:13;178:13

**overwhelmed (1)**
80:9

**overwhelming (1)**
13:7

**owe (1)**
94:11

**owed (1)**
48:3

**owing (1)**
67:17

**own (3)**
9:5;12:22;155:4

**owned (2)**
68:1;155:1

---

**P**

---

**package (13)**
152:10;153:5,6,
21;167:3,5,6,7;
168:1,5,7;173:13,15

**page (72)**

**25:21;26:20;**
52:21,24;53:8,14,18;
54:8,16,25;55:2,4,9,
13,22,25;56:1,5,6,7,
8,9;57:14,15;58:2,7;
66:24;70:1,3;71:5;
74:3;76:15,19,20;
77:20,22;78:3,9;
79:11,14,15;86:22,
24;87:10;88:10,12,
13;89:13,13;92:15;
93:13;105:19,22;
108:25;127:22,24;
129:23;130:14,16;
133:4,17;136:6;
144:14,14;145:8,15;
146:7,9;150:6;157:9,
12;172:12

**pages (5)**
58:9;69:25;88:15;
127:21,21

**paid (19)**
32:13;35:25;36:1,
2,4,13;54:18;57:3;
59:20;60:10,10;
68:7;76:1;133:24;
136:5,17;157:1,24;
160:23

**paper (1)**
42:8

**papers (4)**
32:20;45:5;
114:15;116:8

**par (1)**
137:5

**paragraph (10)**
25:21;70:4;72:21;
76:15,21;77:20,22;
78:2,3,9

**pardon (3)**
26:15;130:23;
137:17

**part (9)**
12:12;13:11;36:2;
38:24;95:5;115:24;
177:6;178:12,13

**participate (1)**
155:22

**particular (14)**
9:18;10:3,6,14;
42:1;47:17;63:18;
88:13;102:11;
112:10;165:18;
166:15;168:8;
174:22

**particularly (1)**
17:24

**parties (4)**
34:16;76:17,24;
175:19

**parties-in-interest (1)**
25:24

**partnership (2)**

137:20,21

**parts (1)**
17:18
**party (10)**
33:6;34:5,5,21,23,
23;113:16;117:12;
120:22;178:20
**party's (1)**
116:23
**patience (2)**
86:25;177:4
**patient (2)**
37:7;114:6
**PATRICIA (3)**
4:7;8:3;38:9
**Pause (23)**
9:3;12:3;15:15;
21:15;22:12;31:16;
32:21;65:6;69:22;
76:11;78:7;86:23;
95:9;114:11,25;
131:9;152:20;
162:14;163:15;
164:25;167:10,22;
172:2
**pay (27)**
20:20;32:3,6,10;
50:1,4;55:6;59:9,18;
60:2,7;67:7;71:13;
74:9,12;76:7;77:4,
11,11;78:18;108:19;
111:3;135:23;139:5;
141:5,12;160:21
**paying (6)**
68:4;76:4;94:19,
22;95:1;135:22
**payment (38)**
59:3,9,11,18,22;
60:24;64:19;66:9;
77:5;135:12,15;
136:14;137:2,12;
139:16;140:4;142:8;
144:18,18;148:4,5,
19;149:1;150:13;
155:20,25;156:20,
25;157:4,21;158:4,5,
6,8,9,10,10;161:22
**payments (27)**
58:24;59:5;61:5;
64:16;66:14;94:17;
132:14;133:9,10,13;
136:10,11,12;
140:16;141:6;
142:19,20;147:6;
150:20;151:14,15;
157:15,16,20;
158:12;161:12;
162:2
**payoff (7)**
60:4,9,15;67:9,9;
157:22;168:12
**payout (1)**
104:2

**penalties (1)**
20:22
**pendens (7)**
14:21,21;24:18;
25:2,3;31:19;176:7
**pending (2)**
52:3;67:5
**Pennsylvania (1)**
122:12
**penny (1)**
36:2
**people (7)**
10:4,21;14:10,23;
17:16;19:6;156:3
**people's (1)**
13:22
**Per (3)**
134:11;139:5;
149:25
**percent (6)**
67:16;99:17;
155:20,25;156:14;
168:9
**perception (1)**
117:21
**performed (8)**
49:1;50:15;51:2,3,
6,12,13,14
**Perhaps (5)**
6:17;20:17;
119:18;176:18,19
**period (6)**
60:19,20;99:7;
138:22;142:9;
174:22
**periods (1)**
140:11
**permanent (2)**
151:7;153:6
**permission (1)**
95:21
**permit (5)**
15:6,14;44:1;
162:4;175:25
**permits (1)**
15:5
**permitting (2)**
15:2;178:14
**person (7)**
34:3,18,20,23;
134:12;145:25;
147:15
**personal (1)**
9:6
**personally (2)**
9:7;177:7
**personnel (1)**
123:15
**perspective (2)**
15:18;67:18
**ph (6)**
10:22;18:8;85:13,
13;118:8;166:6

**phone (8)**
100:7;136:21;
148:4,7;165:7;
168:13;170:19;
173:20
**phoned (1)**
147:19
**physical (7)**
6:25;9:16;12:15;
13:5;62:3;115:16;
136:23
**physically (1)**
127:20
**pick (1)**
116:8
**picked (2)**
10:24;175:6
**piece (4)**
33:1;69:2;171:20;
172:5
**pieces (2)**
11:6;18:9
**place (6)**
72:22;117:22,23;
169:5;175:7;176:18
**placed (6)**
127:14,17;158:11;
159:8;161:5,11
**Plaintiff (4)**
25:22;70:7;
101:16;113:25
**Plaintiff's (1)**
25:24
**plan (13)**
123:8;139:16;
140:22;141:25;
142:16;147:19,19,
23;148:16;150:13;
156:15;157:14,19
**plans (1)**
14:11
**platform (2)**
123:23;139:10
**play (1)**
46:20
**played (1)**
100:7
**pleading (1)**
120:22
**pleadings (1)**
110:25
**Please (20)**
5:2;39:7,16;44:16;
50:7;63:6;73:7;
74:22;75:2;78:21;
81:8;85:8;91:16;
92:13;96:10;119:8;
121:23;127:8;
133:17;140:21
**plus (1)**
135:8
**pm (5)**
91:15,15;119:7,7;

178:25
**poignant (1)**
110:22
**point (25)**
21:7,10;32:16,18,
22;34:24;36:11;
37:1;43:4;45:12;
48:4;87:15;108:6;
109:13;133:3,25;
135:21,22;142:21;
150:16;155:4,19;
159:20;161:4;
172:14
**points (5)**
22:10;35:15;37:4,
11;164:12
**policy (1)**
128:11
**population (1)**
161:11
**portion (3)**
125:23;126:19;
145:19
**position (3)**
123:5,22;124:3
**positive (2)**
112:20,25
**possibility (1)**
47:18
**possible (6)**
47:16,19,24;48:2;
71:23;159:25
**Post (1)**
23:7
**potential (7)**
11:20;13:14;
14:22;47:16;95:23;
139:3;142:11
**power (1)**
12:1
**PP (6)**
80:20;81:19;
82:17,25;83:3,7
**practically (1)**
14:10
**practice (8)**
99:23;126:10;
143:25;145:4,7;
146:11;147:2;
170:13
**pre-fabricated (1)**
10:8
**pre-inspection (1)**
14:4
**pre-marked (3)**
52:11;63:2;70:25
**prepared (1)**
175:19
**preponderance (1)**
177:21
**presence (1)**
6:25
**present (4)**

6:23;122:13;
159:22;171:14
**presented (1)**
73:24
**presently (2)**
68:10;125:10
**president (1)**
100:22
**pressure (1)**
22:8
**presume (2)**
154:2,4
**pre-thirty (1)**
133:5
**pre-trial (3)**
28:16;31:1;178:14
**pretty (1)**
58:16
**previous (2)**
42:19;133:4
**previously (5)**
61:17;62:23;
101:20;131:1;132:5
**price (25)**
11:21;16:11;
18:24;46:2;53:18,
22;78:4,10;84:6,17;
86:16;88:3,24;89:2,
7,19,21,25;90:1,4,4;
156:12;158:23;
159:1,2
**pricing (1)**
11:1
**primarily (1)**
10:25
**primary (1)**
104:13
**principal (7)**
57:16;67:16;
133:9;134:24;
136:11;151:15,15
**printed (4)**
126:1;143:9;
144:19;172:12
**printout (1)**
89:15
**printouts (1)**
88:7
**print's (1)**
88:14
**Prior (13)**
23:6;42:19;83:14;
111:1;123:18;124:3,
6;135:12,12;159:15;
161:20;172:16;
178:10
**privilege (5)**
127:3;130:15,21,
22,24
**privileged (2)**
129:13,18
**Pro (3)**
4:10;117:12;

178:19

**probably (5)**
32:11;79:2;108:1,
1;166:9

**problem (4)**
87:1,21,22;111:5

**problems (1)**
36:4

**Procedure (1)**
82:6

**Procedures (3)**
82:23;160:14;
161:25

**proceeding (4)**
161:23;162:3;
178:10,13

**proceedings (1)**
178:25

**Proceeds (4)**
55:1;57:7,17;
159:23

**process (7)**
60:11;79:8;109:9;
110:6,7;142:12;
160:18

**produce (1)**
100:15

**production (2)**
82:16;83:4

**profession (1)**
15:1

**professional (1)**
177:2

**program (9)**
111:7;124:20,24,
25;125:2;153:1;
156:2,6;168:8

**programs (1)**
124:22

**progress (1)**
141:20

**promise (2)**
139:25;150:12

**proof (7)**
62:16;162:23;
163:2;169:3;172:13;
177:21;178:5

**Proofs (5)**
2:3;131:6;176:10,
23;178:2

**proper (3)**
34:5,5;36:25

**properly (1)**
7:13

**properties (17)**
9:8,9;12:22;14:15;
68:1,4;102:15,22,22;
104:14;110:11,12;
111:17;112:10,14,
20,25

**property (70)**
8:23;9:5,6,10,19;
10:15;11:25;12:6,11,

19,20,21;13:2,5,6;
14:12,14;15:3,13;
16:12;20:2,7,10;
21:17;22:15,17;
23:1;28:24;31:20;
32:19;47:4,8,9;
53:23;54:20;57:21,
21;58:12,20,22;
67:21,22;68:8;
71:14;74:10;75:24;
83:16;86:1;88:4;
90:12;95:3,14,18,24;
96:3,4,8,23;99:3,3;
103:20;111:7;112:3;
113:5;136:3;159:8;
160:1,3;173:23;
176:19

**proposal (8)**
83:15,18,19,21;
84:23;85:2,6;93:15

**proposed (11)**
62:20,22;92:10;
93:7,9;141:15;
142:2;152:15;
153:25;164:12;
165:18

**proposition (3)**
6:10,11,12

**prospective (1)**
12:24

**protect (1)**
128:20

**prove (1)**
177:21

**proven (1)**
177:23

**provide (16)**
19:22;31:14;
34:13;42:23;51:7;
61:7,14;62:12;82:8;
97:13;113:18;
130:22,24;138:10;
141:24;160:19

**provided (11)**
33:19;34:16;
39:20;40:4;42:4;
50:17,20;82:22;
131:7;160:23;161:8

**provision (4)**
76:7,16,23;77:19

**public (5)**
9:8;12:12;14:23;
31:19;176:8

**pull (4)**
99:10;104:20;
127:15;154:22

**pulled (3)**
143:23;154:6;
164:10

**punitives (1)**
177:22

**purchase (15)**
53:19,22;54:14,

20;57:8;73:9;75:24;
78:4,10;83:15,18,19,
21;85:2,6

**purchased (3)**
52:8;53:11;57:20

**purpose (6)**
11:23;27:3;33:18;
75:23;137:22;
178:13

**purposes (3)**
79:7;82:9;144:19

**Pursuant (1)**
44:12

**pursue (1)**
110:9

**pursued (2)**
33:20;152:8

**pursuing (1)**
34:3

**pursuit (1)**
28:25

**push (1)**
112:9

**put (20)**
17:18;18:23;
32:25;44:25;45:10;
57:8,21;82:13;92:1,
8;97:12;103:21;
110:24;112:11;
116:24;118:3;
133:19;147:4;
161:14;176:12

**puts (1)**
49:7

## Q

**QQ (12)**
81:1,3,11,19;82:4,
11,11,12,18,25;83:3,
9

**qualify (1)**
141:25

**quantify (1)**
32:25

**quarter (2)**
133:23;134:13

**questionable (1)**
8:9

**quick (2)**
14:6;38:6

**quickly (9)**
6:14;7:19;8:6;
18:23;35:15;36:12;
107:20;113:22;
116:10

**quite (4)**
161:16;169:21;
175:16,20

**quote (2)**
16:2;19:9

## R

**RAC (1)**
158:16

**rail (1)**
18:10

**raise (2)**
31:13;121:21

**raised (2)**
11:17;178:12

**rapidly (1)**
18:5

**rate (8)**
98:20;102:24;
104:1;106:11,12;
113:4;151:12;155:9

**rates (1)**
99:20

**re (1)**
2:2

**reached (2)**
150:17;158:10

**reaching (1)**
32:8

**read (3)**
78:6;135:6;146:5,
13

**reading (3)**
26:21;108:12;
153:15

**ready (3)**
119:9;151:2,6

**real (8)**
9:12;11:8;14:24;
19:6;38:6;46:19;
54:23;67:15

**real-estate (9)**
13:10;17:21;
20:16;46:4,11,17,19;
67:24;94:19

**realize (1)**
172:17

**really (6)**
20:25;22:19;
34:25;49:23;141:8;
147:13

**realm (1)**
47:18

**realtor (2)**
109:11,14

**realtors (2)**
31:21;87:13

**reason (3)**
22:22;38:17;
42:10;57:5;60:2,6,
10;63:14;68:7;69:7;
100:11;111:10;
150:7

**reasonable (2)**
7:14;44:4

**reasons (3)**
19:15;61:5;177:6

**rebuttal (1)**
171:14

**recall (33)**
25:19;27:23;52:7;
58:15,17;60:22;
62:1;64:1,21;79:2,7,
19;80:12,20;81:2,13;
86:5;88:2;89:21,23;
90:3;92:18;93:11;
97:8;98:9;104:6,9;
117:19;127:10;
153:8;173:14,16,19

**recalled (1)**
115:17

**receipt (1)**
146:14

**receipts (1)**
39:23

**receive (2)**
155:13;161:12

**received (79)**
7:2;20:21;23:3;
24:7,16;25:3,10,14;
26:10;27:8,15;30:3;
32:6,9,23;43:6,8,10,
12,14,16;54:6;60:7;
65:24;69:15,17;
71:21;73:6;74:20;
75:21;78:19;80:2,4,
8,18,23;83:4,6,8;
85:6;86:16;90:12;
94:4;96:20;98:5;
102:2;120:6,25;
121:17;131:12;
133:20;134:5,8;
144:8;145:16,20;
147:3;148:22,24;
149:3,15,19;150:19;
151:22;152:10;
153:5,20,22;158:3,
25;167:7;168:1,4,6;
169:17,19;170:22;
171:4;173:17

**receiving (9)**
25:25;80:16,21;
81:2,11;92:18;
96:13;147:5;173:19

**recent (1)**
40:12

**recently (3)**
99:9;117:20;
123:21

**recess (13)**
28:8;31:6;36:19,
20;37:17;38:23;
39:6;90:20;91:14,
15;116:11;118:14;
119:7

**recognize (17)**
34:1;52:14,18;
63:22,23;71:10;
72:3;73:25;74:23;
92:13;115:9,19;

131:20;132:7;143:5;
144:12;178:19
**recollection (7)**
64:15,23;84:16,
18;89:7;156:19;
172:22
**recommended (1)**
166:22
**reconciliation (2)**
122:21;123:3
**record (36)**
5:3;8:2;12:12;
14:23;22:14;25:17;
30:14;31:18;32:23;
37:8;38:8;43:1;
101:4,10;115:20;
125:21;126:2,4;
143:10,21;144:20;
145:1,8;164:13;
168:13,16,23;169:3,
16,24;172:14,19;
173:4,12;176:8,12
**recordation (1)**
31:19
**recording (1)**
175:6
**records (21)**
9:8,8;62:17;101:3;
123:14,17;124:10,
13,15,17,21,23,24,
25;125:1,5,8;136:22;
165:1;169:7;170:20
**recover (3)**
6:3;31:25;42:21
**redacted (11)**
126:21;127:9,10,
19,21,22,23;128:1,
22;130:9,21
**redaction (7)**
126:23;128:10,18;
129:3,23;130:5,13
**redactions (5)**
126:24;127:2,3;
130:2,15
**redeem (1)**
135:3
**redemption (1)**
134:15
**redirect (4)**
113:11;114:4;
117:5;170:11
**reduce (2)**
89:25,25
**reduced (5)**
32:10;35:8;60:4,9;
151:12
**reducing (1)**
89:21
**reduction (7)**
90:4,4;155:21;
156:1,14;157:4;
168:9
**reductions (1)**

89:24
**Reed (311)**
2:3,4;4:10;6:8,21;
7:11,24;8:20;9:1,2,4;
10:3;12:4;13:23;
14:25;15:1,4,9,11,
16;16:1,17,18,20,21;
17:10,13;18:3;19:16,
25;20:3,8,11,20;
21:1,2,4,16,22;22:2,
5,13;23:11,13,15,22,
24;24:3,9,18,21;
25:1,5,11,16,23;
26:2,4,8,12,14;27:1,
2,10,17,20;28:6,10,
13,15,19;29:4,6;
30:5,8,10,19,22,25;
31:4,15,17;32:22;
33:11,12,13,16;
34:22;35:2,4,10,16,
24;36:9,13;37:5,8,
13,18;38:1,3,4,18;
39:10,12,18,21;40:4,
5,9,16,23;41:18,22,
23,25;42:3,20;43:20,
22;44:6,8;45:6,17;
46:20;49:5;51:9,25;
52:18;54:3,5,18,25;
55:6;61:15,21,23,24;
62:8,11,19,24;63:9;
64:12;68:14,17;
69:12,19;70:15,25;
71:21,23;73:5;
74:20;78:24;79:24,
25;80:4;83:1,2,11,
24;84:20,24;85:3,8;
87:6,7,15;90:10,18;
91:6,7,25;94:1,4;
98:2,5,7;101:5,5,11,
11,23,24;102:4;
104:7;105:3,6;
110:24;111:18,23,
25;112:4,6,18,22;
113:1,3,11,19,21;
114:6,8,10,12,20;
115:1,6,10,15;116:6,
9,15,17,20;117:1,2,6,
11,13,15,19;118:8,
14,17,18,20;119:18,
21,25;120:3,5,13,16;
121:4,5,7,9,11,12,13;
125:5,8,10;126:15,
16,21;128:9,14,16,
21;131:7;132:14;
137:14;138:14,16,
24;139:19;144:5,15,
24;145:13;147:25;
149:25;151:2,3;
152:3;155:16,19;
156:19,24;157:24;
162:5,11,12,15,17,
24,25;163:1,4,8,12;
166:2,5;169:22;

170:3,7;171:13,20,
24;172:1,5,9,14;
173:7,9,11;174:9,13;
175:4,6,9,10,17,23;
176:1,4;177:21;
178:19
**Reeds (14)**
123:11;137:11,19,
24;141:5;146:10;
148:23;153:18;
154:1,3;155:19;
156:14;167:15;
168:5
**Reeds' (4)**
5:4;91:19;178:11,
16
**Reed's (17)**
24:8,17;25:3,10,
14;26:11,22;27:8,16;
30:4;43:6,9,11,13,
15,17;178:3
**ref (1)**
29:1
**refer (1)**
172:6
**reference (5)**
26:16;41:18,20;
44:24;82:15
**referenced (2)**
73:22;74:8
**referencing (2)**
46:8;140:22
**referral (1)**
139:15
**referred (3)**
139:9,10;167:6
**referring (3)**
93:18;139:9;157:2
**refers (1)**
93:14
**refi (10)**
29:1;99:15;
102:22;103:20;
108:18;110:12,12,
14;111:18,22
**refinance (14)**
106:8,9,10,15,20;
107:23,24;108:16,
21;109:15,16;
111:16;112:3,24
**refinanced (2)**
112:14,20
**refinancing (2)**
109:21;112:17
**reflect (3)**
40:23;153:25;
154:1
**reflected (6)**
10:23,24;16:11;
164:21;170:20,21
**reflecting (1)**
141:9
**reflection (1)**

61:19
**reflects (3)**
85:15,16;153:17
**refresh (1)**
107:6
**regain (1)**
147:15
**regard (9)**
9:21;10:14;35:5;
43:20;79:5,6;
107:21;110:11;
172:16
**regarding (6)**
5:4;14:14;27:25;
31:20;91:18;131:6
**regards (1)**
34:2
**regret (1)**
104:3
**regular (6)**
126:10;138:5;
141:6;143:25;145:4;
147:2
**regulations (1)**
160:16
**regulators (3)**
160:11;161:1,3
**reinstate (1)**
142:7
**rejected (1)**
97:10
**related (4)**
14:12,13;115:22;
124:8
**relates (3)**
40:18;58:7;72:13
**relating (6)**
101:5,11;129:20;
155:12;162:7;
176:10
**relationship (2)**
19:7;172:16
**relatively (1)**
18:21
**release (2)**
157:22;168:12
**relevant (1)**
110:8
**relied (1)**
176:23
**relief (4)**
38:18;44:3;70:8,
10
**relinquished (1)**
125:24
**remain (1)**
28:3
**remained (1)**
29:16
**remaining (1)**
130:20
**remains (2)**
39:11;42:18

**remember (58)**
16:24;29:11;42:9;
45:23;46:3;47:9;
52:19;55:8;58:25;
59:4,8;60:17;61:1,8;
63:18;64:17,18,25;
65:1;75:6;76:5,10,
13;78:12;79:3;80:8,
12,16,17,22;81:11,
12,15,16,20;85:15;
86:8,18;89:10;91:7;
95:25;96:5,13;
104:12;106:12;
109:3,22,25;110:2,
20,20,21;111:25;
112:15;121:13;
163:16;174:23,24
**remembered (1)**
62:4
**removal (1)**
79:5
**remove (1)**
44:23
**rendered (2)**
49:3,4
**rent (1)**
74:13
**rental (10)**
102:14,22,22;
104:14;110:11,12;
111:16;112:10,14,25
**rentals (1)**
111:11
**rented (2)**
112:21,22
**rep (1)**
46:9
**repaid (2)**
67:20;147:19
**Repay (3)**
149:2,18;150:18
**repayment (8)**
64:7;143:12;
144:8;145:15;
150:13,21;157:19;
164:19
**Repeat (2)**
78:8;164:23
**replaced (1)**
111:22
**report (3)**
133:21;134:8;
150:1
**reporter (1)**
172:10
**reporting (1)**
150:8
**represent (1)**
65:7
**representation (1)**
172:23
**representative (7)**
23:25;138:24;

139:5,6,9,18;147:25
**representatives (2)**
138:15;141:15
**represented (9)**
28:22;29:7;33:5;
35:10;40:5;41:22;
46:9;51:16;52:5
**representing (1)**
143:19
**request (9)**
38:14;80:10;
82:16,19,19;83:4;
133:5;139:12;156:5
**requested (2)**
34:15;109:23
**requests (9)**
61:20;80:4;81:14,
17,19,21,22;82:4;
83:8
**require (1)**
156:4
**required (12)**
6:25;32:24;33:2,8,
22;59:2;76:5;77:4;
79:12;142:19,21;
149:1
**requirement (2)**
61:11,13
**requires (1)**
36:24
**requiring (1)**
76:7
**res (1)**
80:12
**ResCap (7)**
2:2;122:5,14;
123:8;124:7;130:10;
160:9
**resell (2)**
106:8;109:12
**Reserve (7)**
23:25;24:10,15;
71:6;160:11;161:7;
162:5
**re-settled (2)**
118:15,15
**residence (4)**
104:13;170:14,15;
174:14
**Residential (9)**
5:3;91:17;123:19,
20,22;124:1,3,4,8
**resolution (1)**
141:24
**resolve (5)**
6:15,18,22;21:9;
40:8
**resolved (4)**
19:12;21:7;97:7,
22
**resources (3)**
141:17;142:5,7
**respect (13)**

5:5;38:19;39:21;
40:3,15,20;62:8;
82:18;102:4;112:25;
123:10;128:17;
162:5
**respectfully (1)**
61:20
**respective (1)**
42:14
**respond (6)**
80:10;81:13;82:4;
84:22;157:6;171:15
**responded (2)**
81:18;169:25
**responding (1)**
82:2
**response (7)**
82:22;137:24;
138:17,19,21;167:3;
171:17
**responses (2)**
82:8;171:5
**responsibilities (2)**
122:16;123:25
**responsibility (3)**
32:17;164:2;
177:25
**responsive (2)**
92:25;113:17
**rest (7)**
77:25;116:23,25;
117:1;118:17;175:3,
9
**rested (2)**
118:24;175:12
**restricted (1)**
31:25
**restrictions (1)**
13:3
**restroom (1)**
116:10
**rests (1)**
171:12
**result (3)**
34:6;139:8;176:25
**resume (4)**
39:3,3;90:21,21
**RESUMED (1)**
91:23
**retain (1)**
172:20
**retained (1)**
172:15
**retrieved (1)**
124:23
**retrieving (1)**
123:16
**return (6)**
61:6,12;65:4,18,
22;170:23
**returnable (2)**
81:22,24
**returned (4)**

144:16,17;146:10;
171:6
**review (21)**
23:20;31:7;32:20;
37:21,22;39:13;
45:2;51:1,11,20;
125:4,7;131:8;
160:18,22,24;161:4,
15,21;171:1;175:21
**reviewer (4)**
160:20,23,24;
161:7
**reviewing (2)**
123:16;137:8
**reviews (1)**
161:5
**revisiting (1)**
38:13
**RFAs (2)**
82:11,12
**RFC (4)**
40:8;155:4;178:3,
4
**RFC's (1)**
124:15
**richer (1)**
10:21
**right (180)**
5:2;7:7,22;8:18,
20;9:1;22:4,9;23:9,
22;24:6,13,25;25:8;
26:7;27:6,13;28:1,7;
29:24;30:19,23;31:8,
11;38:5,23;39:4,7;
42:12;43:18;44:7,
14;45:25;46:25;
47:5;48:13,22;
49:18;50:9,16,24;
51:16;52:1,6,9;
53:13,16;56:5,9,14;
57:1,3,9,14;58:9,13;
59:7,10,13,16,20,25;
60:4,16;65:9,22;
66:7,18;68:2;69:14;
72:14,19,23;73:4,21,
25;74:6,10,13,19;
75:8,24;76:2,8;77:3,
6;78:19;79:9,15;
80:1,24;81:19;82:12,
18;83:3,22;84:4,11;
85:4;86:1;87:9;88:8,
16;90:11;91:2,4;
92:2;93:9,19,22;
94:2,20,22;96:3,15,
21;97:3,4,11,23;
98:3,18,21,24;
100:19;101:6,8,12,
18;105:16;107:18;
113:10;114:23;
115:11;116:7,18;
117:3;118:7,13,21;
119:8;120:8;121:15,
20,21;128:1,8;130:8;

134:10,19;135:5;
145:8,19;146:1;
147:23;149:2,18,20;
150:4;151:2,4;
156:7;160:2;167:21;
170:4;171:9,13,19;
174:4,10,25;175:1,3,
5,9,11,12,23;177:10;
178:7
**right-hand (2)**
88:24;89:18
**Rob (4)**
17:17;103:18;
108:1;112:7
**Roccisano (1)**
93:12
**Roccisanos (14)**
17:23;45:24;86:5,
17,20;90:1,17;92:1,
1,6,8,22;93:5,22
**Roccisanos' (2)**
18:4;89:10
**Rock (1)**
9:13
**role (3)**
9:13;123:10;124:5
**roofs (1)**
11:4
**roughly (1)**
149:11
**round (2)**
20:14,14
**RPE (1)**
148:10
**Rudy (1)**
85:13
**rule (2)**
32:4;126:23
**ruled (1)**
119:6
**rules (6)**
13:3;82:6,23;
128:18;160:15;
178:21
**ruling (4)**
36:25;38:13;
178:10,23
**run (1)**
33:9
**running (2)**
9:2;21:3

---

### S

**sale (23)**
9:9;35:20;58:21,
22;59:15;71:12,21;
73:5;87:14;92:1,8,
10;93:4,18;133:23;
134:13,13;135:12;
136:3;141:20,25;
142:1,1
**sales (5)**

18:20,21;84:17;
117:22;123:23
**same (27)**
11:11;12:7,8;17:9,
16,23;22:24;28:19;
34:21;41:3;42:2;
54:9;62:4;75:4;99:6,
7;108:25;110:10,11;
113:15;117:23;
118:5;121:5;140:6,
7;144:13;172:18
**sat (1)**
108:8
**satisfied (1)**
29:11
**satisfy (2)**
67:22;135:7
**saves (1)**
144:22
**savings (1)**
142:6
**saw (5)**
52:19;83:14,14;
87:3;116:1
**saying (5)**
66:5;81:21;82:1;
102:21;154:5
**scale (1)**
12:2
**scan (1)**
144:23,24
**scanned (1)**
145:25
**scanning (1)**
77:25
**schedule (3)**
66:13;140:12,13
**scheduled (1)**
150:13
**schooling (1)**
9:16
**schools (1)**
14:1
**scope (1)**
170:9
**Scott (6)**
24:9,14,16;41:21;
83:15;105:15
**screen (2)**
45:11;154:22
**Se (3)**
4:10;117:12;
178:19
**seamlessly (1)**
11:10
**search (2)**
101:2;154:23
**searching (1)**
176:22
**seat (1)**
121:23
**seated (4)**
5:2;39:7;91:16;

119:8

**second (59)**
16:9;21:19;32:11,
12,14;44:13;52:9,15;
54:10,15;55:1,7,11;
56:1,10,20;57:17,24;
58:3,8,10;59:24;
60:3,7,8,16;73:17;
74:2;76:1,4,8;77:5;
78:6;79:11,14,15;
86:8,14;92:15;95:8,
11;99:7;106:1,10,21;
107:8,8,14,23;
108:16,19;111:3;
129:5;132:24;
136:18;148:10;
150:25;158:20;
176:7

**Secondly (2)**
62:2,3

**section (1)**
126:21

**secure (1)**
77:13

**Security (7)**
127:25;128:13;
130:14,18;149:23,
25;150:2

**seeing (4)**
75:6;85:15;
130:13;136:24

**seek (1)**
44:3

**seeking (8)**
31:24;32:9,9;
42:21;69:19;70:10,
19;103:3

**seeks (1)**
70:7

**seem (1)**
134:23

**seems (3)**
55:23;150:1;
166:16

**selected (1)**
29:15

**self-evident (1)**
28:18

**sell (9)**
9:10;19:23;21:23;
32:7;47:12;85:25;
106:16;109:15;
141:18

**seller (1)**
97:17

**sellers (1)**
72:10

**selling (3)**
9:10;18:5;67:20

**sells (3)**
139:17;141:2,11

**send (11)**
66:2;115:20,23,

24;139:7;148:19;
165:21;167:11;
170:13,15,16

**sender (1)**
170:23

**sense (1)**
107:11

**sent (44)**
65:11;80:22;
99:17;116:1;137:18;
138:3,4;142:25;
143:13;146:25;
147:1,10;151:19;
153:1,4,21,21,25;
154:2;155:21;
157:21;158:5,7,9;
164:19;165:14,15,
23;167:3,5,6,14,15;
168:11,14;169:9,10,
15,16,16,19;171:4;
173:18;174:3

**separate (1)**
135:2

**September (23)**
58:19;65:17,21,
25;66:3,7,9;79:13,
16,17,20;131:2,5;
139:17;141:2,6;
150:11,12,14,17;
158:15,19;159:9

**serve (3)**
25:22;99:5;124:24

**served (8)**
6:1;7:13;34:7;
35:22;44:4;81:14;
82:20;120:20

**service (5)**
50:17;82:9,20;
87:13;173:2

**serviced (1)**
125:10

**servicer (13)**
33:3;36:21;59:1;
65:3;68:11;146:2,13,
15;158:14;163:25;
164:1;165:10,11

**servicers (1)**
160:10

**servicer's (1)**
165:12

**services (16)**
39:21;40:6,20;
48:25;49:3,4;50:15,
19,23;51:2,3,3,6,7,
12,14

**servicing (5)**
30:14,15,20;
123:23;124:23;
125:7,17,20,23,24;
127:12,15,18;131:1,
11;132:19;133:8,10,
12;136:21;139:10,
12;143:19;160:6,15,

20,23;166:7,8;
168:10,20,22;169:2,
14,17;170:2,21,24

**session (1)**
91:17

**set (14)**
13:8;30:19;82:17;
83:6;102:17;139:11;
140:12;154:2;157:2,
3;158:2;160:13;
162:1;167:9

**settlement (20)**
53:7,9;54:6,8;
55:10,16,22;56:15,
25;57:6;58:3;59:19;
66:18;67:12;72:15,
19,22;99:23;102:17;
161:6

**seven (4)**
16:24,25;25:24;
77:24

**seven-something (1)**
103:22

**several (4)**
17:25;29:12;
105:4;124:22

**Sharon (1)**
118:8

**sheet (1)**
161:3

**shelf (1)**
35:22

**Shilling (3)**
100:21;101:1;
102:2

**short (3)**
38:14,17;157:22

**shorten (1)**
162:3

**shorter (1)**
104:1

**short-term (1)**
147:14

**show (10)**
22:18;27:24;51:5;
61:15;67:8;77:4;
81:6;86:10;133:10;
164:3

**showed (3)**
62:23;63:20;92:14

**showings (4)**
95:6,14,18;109:11

**shown (6)**
39:18;61:21,24;
95:4;131:1;177:25

**shows (2)**
55:1;146:8

**sic (4)**
18:22;19:7;
172:16;175:17

**side (6)**
11:22;45:1,6,10;
88:24;172:13

**sides (2)**
172:12;175:12

**sidewalks (1)**
10:5

**sign (2)**
74:5;150:19

**signature (25)**
52:22,22,25,25;
53:4;62:7;63:11,13,
16;71:4,4,6,8;72:6,8,
9;74:2;75:6;144:14;
145:8,15;146:2,7,9,
14

**signatures (2)**
69:7;146:8

**signed (9)**
62:25;72:10,10;
102:17;140:3;
144:15;146:9,14;
150:19

**significance (1)**
33:4

**significant (2)**
33:1;176:12

**signing (1)**
63:18

**signs (1)**
53:3

**similar (7)**
16:22;22:25,25;
99:25;117:20;124:1,
2

**simple (6)**
7:8,15,23;8:10;
49:23;111:5

**simply (2)**
36:10;177:24

**simultaneously (3)**
112:4;144:16,17

**sincere (1)**
177:1

**Singh (5)**
22:21;23:4;96:11,
17;98:4

**Singhs (5)**
97:6,10,14,15,19

**Singhs' (1)**
97:21

**singular (1)**
177:22

**sit (2)**
33:4;174:4

**sitting (1)**
175:24

**situation (7)**
99:25;117:21;
118:6;136:2;147:13;
176:19,24

**six (6)**
16:25;67:2;77:24;
141:13;142:16;
150:6

**size (1)**

16:22

**slash (1)**
158:23

**slightly (3)**
41:5;57:20;124:5

**slow (1)**
14:18

**slowness (1)**
176:21

**smaller (3)**
12:17;18:1;88:14

**Social (7)**
127:25;128:12;
130:14,17;149:22,
25;150:2

**society (1)**
14:17

**sold (11)**
9:7;17:2,18,25;
32:4,17;35:20;45:18,
20;96:3;118:2

**solicit (1)**
168:9

**solicitation (1)**
155:21

**solicited (2)**
157:3,8

**solid (1)**
10:12

**Solution (1)**
152:8

**solvent (1)**
35:6

**somebody (3)**
5:5;28:17;54:24

**somebody's (1)**
127:20

**somehow (1)**
30:20

**someone (3)**
67:7;117:24;
133:19

**sometime (1)**
14:9

**sometimes (2)**
53:3;125:2

**somewhat (1)**
40:25

**somewhere (4)**
150:1,1;170:20,23

**son (1)**
17:5

**soon (1)**
36:19

**sorry (58)**
8:2;9:20;17:10,13,
13;26:14;27:1;29:6;
34:11,22;37:5;
46:16;54:16;55:12,
21;56:4,19;64:11;
73:12;75:18;76:18;
79:14,25;83:25;
84:21;87:18;88:16;

91:8;99:13;102:20,
20;103:12;105:11;
106:25;107:2;
119:16;120:15;
122:7,24;128:5;
129:1,1;132:20;
133:3;135:19;
137:14;141:23;
143:8;147:21,22;
149:4,8;155:23,24;
158:17;162:25;
167:8;172:1
**sort (7)**
129:18;136:23;
139:9;140:11;
152:16;156:2;
166:18
**sought (2)**
38:18;101:16
**sounds (3)**
34:12;53:13,13
**source (3)**
82:1;127:19;
169:15
**space (1)**
11:8
**speak (5)**
11:3;15:17;31:7;
83:24;175:24
**specific (8)**
7:2;12:17,20;13:8;
29:10;159:17;169:4,
24
**specifically (12)**
37:19;49:8;62:21;
63:24;90:3;94:6;
96:2;105:5,19;
153:4;165:4;171:5
**speculation (2)**
19:13;36:15
**Speculative (1)**
13:19
**speedy (1)**
18:21
**spent (5)**
34:1,9,18;49:9,12
**spindle (1)**
18:11
**SPO (1)**
142:1
**spoke (9)**
18:7;34:8;100:3,6;
101:8;139:18;
147:25;174:18,19
**spoken (3)**
28:19,20;163:10
**spring (1)**
28:20
**square (6)**
11:15;16:22,24;
18:14;19:17,17
**stairca (1)**
18:10

**staircase (1)**
11:8
**staircases (2)**
11:8;18:11
**stale (2)**
159:18,20
**stalled (1)**
140:14
**stamp (3)**
103:10;120:19;
121:6
**stamped (1)**
127:20
**stamps (1)**
69:7
**stand (9)**
6:9;7:24;33:4;
45:6;71:18;87:22;
121:21,24;171:25
**standard (6)**
18:12;47:20,21,22,
25;177:24
**standing (1)**
71:23
**stands (2)**
40:1;149:15
**staple (1)**
42:8
**start (6)**
61:22;118:16;
135:22;136:11;
137:3;151:6
**started (6)**
10:6;42:11;110:9;
136:16,17;155:4
**starting (6)**
59:6;92:24;96:11;
105:19;109:1;136:9
**starts (1)**
150:7
**state (10)**
15:7;22:14;35:11;
40:8;65:3,10;66:25;
119:19;147:9;
162:19
**stated (3)**
47:4;72:13;142:7
**statement (15)**
24:9,13,16;25:16;
33:25;43:5;47:15;
54:9;58:3;61:9,14;
65:11;107:14,22;
108:15
**statements (4)**
42:14;147:9;
175:16,18
**states (9)**
14:24;40:5,6,19,
19;46:25;70:4;78:3,
9
**stating (2)**
76:16,23
**status (1)**

42:10
**statute (1)**
33:9
**stay (4)**
67:1;106:15;
137:22;169:10
**stayed (1)**
67:3
**step (2)**
16:9;159:22
**stick-built (1)**
11:5
**still (16)**
19:1,19;27:18;
66:12;94:6;112:24;
114:16;115:10;
122:24;129:16;
131:25;132:12;
151:5;172:3;178:20,
20
**stood (1)**
177:20
**stop (18)**
7:20;33:25;78:17;
122:23;128:17;
139:11,12,19,20,21;
140:6,15,22;157:2,3,
4;161:14;172:21
**stopped (2)**
137:11;147:4
**Street (5)**
2:22;10:18;17:15;
18:4;45:18
**stress (1)**
23:16
**stricken (1)**
19:14
**strict (1)**
140:17
**strike (3)**
114:13,16,22
**striking (1)**
115:18
**strikingly (1)**
18:6
**strong (1)**
15:18
**struggling (1)**
156:3
**Stuart (2)**
100:21;102:2
**stuff (1)**
103:11
**style (2)**
47:14,17
**subcontractors (1)**
11:12
**subject (3)**
115:14;118:11;
136:3
**submission (1)**
178:8
**submit (1)**

132:2
**submitted (3)**
42:5;166:19;
173:12
**submitting (1)**
173:15
**subordinate (1)**
99:5
**subpoena (6)**
5:18,19,19;6:1;
7:14;44:4
**subsequent (4)**
61:4;93:1;108:2;
176:14
**subsequently (3)**
135:15;138:3;
155:15
**substance (1)**
49:10
**substantial (1)**
178:5
**subtracted (1)**
56:15
**successive (1)**
89:24
**suggest (1)**
169:18
**suggesting (2)**
36:24;37:1
**suggests (1)**
173:5
**Suite (1)**
2:22
**suites (1)**
11:16
**sum (7)**
60:3,8,12,13,14;
67:19;161:22
**summary (5)**
120:10,25;121:3,
16;150:9
**summer (1)**
14:2
**superseded (1)**
28:10
**supplemental (3)**
131:5;132:2,10
**supplied (1)**
85:21
**supply (1)**
42:25
**support (4)**
16:5;36:18;48:3;
116:24
**supporting (1)**
101:15
**supposed (6)**
27:22;39:25;
77:16;141:5,11;
146:17
**supposedly (1)**
17:1
**sure (34)**

17:11;21:16;
23:12;31:4;32:5;
39:17;40:17;45:11;
52:16;55:3,13;58:2,
16;60:6;64:24,24;
73:18;78:9;87:19;
92:4;104:19;106:7;
110:15;112:13;
114:3;116:11;122:9;
134:18;137:5;159:4,
6;160:2;169:21;
175:5
**Surplus (1)**
142:17
**surprise (1)**
36:13
**surprised (2)**
76:14;174:5
**surrounding (1)**
176:13
**suspect (2)**
29:19;121:8
**suspense (1)**
158:11,13,13
**Sustained (4)**
15:25;19:14;
44:14;178:12
**swear (2)**
131:22;132:9
**sworn (2)**
121:22;172:4
**System (33)**
24:15;101:12;
126:1;127:11,11,12,
14,17;136:22;
143:10,19,20,23;
144:20,21,22,23,25;
145:8,25;147:4;
154:23;159:13;
160:20;164:9;165:5,
6,8;166:1;168:17,25;
169:1,25

---

**T**

---

**tab (1)**
105:8
**table (3)**
116:8;118:16;
175:8
**tabled (1)**
112:6
**tag (1)**
100:7
**talk (7)**
9:13;14:18;26:12;
27:22;31:12;127:7;
166:19
**talked (11)**
13:23;28:5;45:17;
86:4;92:5;98:7;
108:2;110:16;
141:14;142:10;

177:20

**talking (8)**
13:19;17:9;42:1;
60:20;63:24;74:1;
91:25;166:15

**talks (1)**
142:13

**targeting (1)**
90:3

**Tartamosa (4)**
30:1,3;98:8;
103:19

**Tartamosa's (1)**
101:16

**task (1)**
178:16

**tax (13)**
9:8;20:16;58:20,
22;99:7;133:20,23;
134:13,13,16;135:3,
12;136:3

**taxes (19)**
20:7;58:24;59:2,6;
68:5,8;78:18;94:20;
133:22,24;134:25;
135:13,16,23,24;
136:2,5,16;151:15

**TD (22)**
4:3;8:4;27:22;
28:24,25;29:13,19;
38:9;99:18;100:1;
102:4,5,7;103:7;
108:13,16;110:6,14,
16,25;111:10,17

**technical (1)**
62:24

**telephone (8)**
41:20;146:20,21;
164:4,13;165:17;
169:4;174:19

**telling (1)**
58:8

**temporarily (1)**
67:1

**ten (4)**
12:11;16:25;
175:20,24

**tendered (2)**
19:4;115:20

**ten-minute (2)**
116:11;118:14

**tens (1)**
34:2

**term (6)**
13:9,9;47:21;
142:16;151:13;
161:3

**terms (18)**
19:22,22,22;
61:19;62:1,22;
64:21;93:9;103:25;
140:8;142:8;143:14;
146:20;147:14;

151:9;153:19;154:1;
155:25

**test (2)**
159:22;167:23

**testified (23)**
47:8,11,22;48:11;
49:3;50:7,22;51:15;
60:24;61:4,25;
62:21;64:15;76:4;
89:23;96:2;97:3,6;
108:18;110:24;
111:2;165:14;
168:11

**testify (14)**
6:22;8:13,22;
15:12;23:10;31:23;
37:4;44:1;115:14;
116:4;117:17,17;
166:4;172:6

**testifying (3)**
8:21;38:16;47:9

**testimony (53)**
8:23;15:2;16:20;
21:1;22:11;23:24;
24:7;31:15;36:16,
17;37:11;61:2,8,11,
18;62:9,10,10,12,19,
21;73:23;76:5;
77:10;81:18;86:5;
95:13;96:5;97:8,13;
104:9;107:21,21;
108:14;110:4,5,7;
111:1;113:12,13,14,
20;114:4,14,17,22;
117:4,5;122:9;
163:16,22;172:19;
178:1

**Testimony's (1)**
19:14

**theories (1)**
176:10

**there' (1)**
64:6

**there'd (1)**
32:12

**therefore (3)**
153:6;169:19;
178:3

**there're (4)**
10:14;12:18,23;
31:13

**thick (1)**
18:11

**thicker (1)**
18:11

**thin (1)**
13:17

**third (11)**
11:7,9,14,16;55:2,
4;76:15,21;138:8;
142:4;157:9

**third-generation (1)**
10:18

thirty (9)
82:8;133:2,7;
137:10;155:20,24,
25;156:14;168:9

**Thomas (2)**
30:1,3

**though (2)**
19:18;22:7

**thought (25)**
19:11;22:6,23;
28:5;31:5;42:9;
51:17;62:3;64:18;
65:23;66:6,12,13,14;
78:16;82:11;100:8;
104:13;107:13;
110:2;119:15;139:2;
162:17,18,20

**thoughts (1)**
176:22

**thousand (2)**
20:13;22:3

**thousands (3)**
34:2,9,9

**threatened (2)**
163:19;164:1

**threatens (1)**
136:4

**three (9)**
22:10;27:25;
37:20;39:10;42:13;
67:2;77:24;110:11;
139:6

**throughout (2)**
17:2;88:4

**tie (2)**
14:20;15:8

**ties (2)**
11:17;169:5

**till (2)**
103:14;148:19

**timed (1)**
104:2

**timely (2)**
44:3;136:5

**times (7)**
17:5;29:3;72:15,
19;169:18;174:17;
176:21

**title (6)**
64:7;77:15;97:14;
99:10;122:13;
123:20

**titles (1)**
82:13

**today (27)**
5:14,23;6:4;7:15,
16;8:16;33:4,5;
38:12;43:1;79:1;
83:13;85:14;94:14;
107:22;108:18;
115:3;124:1;131:25;
132:12;140:23;
144:19;154:24;

165:10;166:20;
170:1;174:4

**together (1)**
16:7

**told (8)**
7:10;29:16;42:22;
43:23;77:10;97:24;
100:7;139:6

**took (16)**
8:7;28:23;42:11;
52:8;53:15;54:19;
56:20;58:23;113:3;
117:22,22;125:22;
142:13;169:5;
172:23;176:17

**top (17)**
18:24;47:1;58:5;
65:25;88:14,24;
89:18;128:1,3,4,7;
140:24;142:3;155:5,
24;159:10;170:1

**top- (1)**
18:23

**total (9)**
41:6,8;54:13;
55:16;56:17;57:8;
134:15,25;142:21

**touch (2)**
111:19;113:5

**towards (8)**
57:8;77:14;78:4,
10;79:15;141:22;
142:3;173:25

**town (10)**
9:6,14,17,22;10:7;
12:13,16,17,18,25

**Township (2)**
133:21;134:9

**track (1)**
22:2

**Tracy (1)**
83:15

**trail (2)**
103:14;104:5

**transaction (7)**
16:4;84:10;85:18;
106:3;129:6;165:18,
19

**Transcribed (1)**
2:20

**transcript (6)**
27:4,8;87:20;
105:5,19;109:1

**transcripts (2)**
104:22;105:4

**transfer (1)**
77:9

**tray (1)**
18:10

**trend (1)**
11:1

**Trial (8)**
2:2;5:20;6:23;

7:15;38:12;61:22;
157:11,14

**trick (1)**
164:17

**tried (7)**
6:22;103:9;
117:10;136:24,25;
151:17;157:10

**trouble (1)**
115:10

**troubling (2)**
115:1;116:3

**true (10)**
39:23;40:12;
48:23;66:19;107:22;
108:15;110:4;111:4;
131:23;132:10

**truly (1)**
128:9

**trusses (2)**
10:8;11:3

**Trust (32)**
6:5;16:10;33:5;
34:4;61:17,19;80:5,
11;107:16;118:25;
121:18;122:5,15,17,
18,19,20,21,22;
123:2,2,3,4,6,7,12,
13,15,16;124:9;
171:11,12

**Trust's (27)**
2:2;7:22;54:7;
69:16,18;71:22;
73:6;74:21;75:22;
80:2;83:5,7,9;85:7;
90:13;94:5;98:6;
102:3;120:7;121:1,
17;123:10,14;
131:12;144:9;
145:16;178:11

**truth (3)**
21:13;174:23;
177:1

**try (4)**
90:2;93:15;
136:17;137:22

**trying (15)**
12:19;15:8;32:7;
66:21;107:12;
108:22;112:2,12;
129:16;141:18;
147:15;162:12,17,
21;164:5

**Ts (1)**
36:22

**t's (1)**
36:6

**turn (21)**
26:20;48:7;50:7,
22;52:11,21,24;54:8;
55:25;66:24;68:13,
21;70:1;86:22;
89:13;92:15;100:17;

105:4;108:25;133:3;
144:10
**turned (1)**
123:23
**twenty (3)**
11:15;22:20;90:17
**two (25)**
11:16;12:23,24;
17:3;21:18;22:2;
23:5,6,7;42:6;61:5,7;
62:24;77:24;86:4;
92:5;99:18;103:20;
106:7;117:23;146:8;
152:22;162:7;164:4;
176:5
**two- (1)**
11:15
**two-day (2)**
175:14;177:19
**two-million (1)**
16:4
**type (3)**
129:6,20;147:12
**typical (3)**
13:13;99:23;
103:17
**typically (2)**
12:1;172:21

**U**

**Uh-hum (6)**
117:6;125:18;
134:3;140:20;141:3;
145:18
**ultimately (2)**
84:9;93:21
**Um-hum (22)**
20:8,8;71:25;
76:22;79:18;89:14;
92:12;96:14;100:18;
105:7,17,20;106:19;
109:2;151:25;
154:10,15;156:11;
165:9;167:7,25;
172:1
**unaffected (1)**
23:8
**unappraisable (1)**
13:1
**unappraised (1)**
12:25
**unaware (3)**
33:21;58:22;94:23
**uncertain (1)**
43:3
**uncompleted (2)**
167:16,19
**under (25)**
5:18,19,19;18:23;
22:8;24:19;41:5;
60:25;61:5;66:20,
22;101:1;108:14;

109:11;120:3;
131:22;132:9,15;
160:10,21;162:1,1;
172:3;176:15;178:8
**understands (1)**
82:21
**Understood (5)**
7:9;8:12,14,17;
99:16
**unenforceable (2)**
69:20;70:9
**unimpeded (1)**
35:20
**unique (4)**
12:4;47:11,12,14
**United (1)**
46:25
**unknown (1)**
108:19
**unless (6)**
19:11;31:9;77:11;
168:8;169:7;170:15
**unlike (5)**
12:13;46:24;47:4,
6,8
**unpaid (2)**
20:7;151:10
**unread (1)**
171:6
**unredacted (1)**
131:3
**unsettled (1)**
37:5
**unsure (1)**
89:4
**up (51)**
8:7;10:24;11:17;
12:24;20:14,14;41:3,
6,7;58:20,22;63:5;
70:5;83:24;86:19;
90:2,16;94:6;
104:16;110:12;
116:8;121:20,21;
125:13;126:7;
127:16;131:8,17;
133:24;135:17;
138:25;139:11;
140:12;142:3,21;
143:17;148:3,19;
154:22;156:3;157:2,
3;158:2,7;160:13;
162:1;164:8,10;
175:6,24;177:20
**updated (2)**
129:11;149:25
**upgraded (2)**
47:24;48:1
**uploaded (3)**
127:17;129:8,11
**upon (2)**
14:3;146:14
**upper (1)**
145:19

**upset (1)**
106:14
**USA (1)**
24:10
**use (5)**
10:9;11:11;37:17;
45:4;104:4
**used (5)**
11:6;12:5;60:2,6;
77:11
**using (1)**
44:24
**utilizes (1)**
10:8
**UU (5)**
68:13;69:11,14,16,
17

**V**

**vacate (3)**
79:12,16,20
**vacated (2)**
79:22;176:18
**vacuum (1)**
46:24
**vague (1)**
40:25
**valid (1)**
167:1
**valuation (1)**
22:11
**value (43)**
8:23;9:4,17,24;
10:24;11:19;12:6,18,
24;13:5;15:3,12,13,
17,18,19;16:5,7,11;
18:24;20:5,24;21:13,
17,20,22;22:10,15,
22,24;23:1,7,8,10;
28:23;67:21;85:20;
103:20;117:22;
159:7,22;160:1,3
**values (6)**
22:14,14,17;23:5,
6;28:24
**variable (2)**
106:13;107:10
**variety (1)**
9:16
**various (3)**
164:12;169:18;
176:9
**verbally (1)**
77:10
**verification (1)**
29:17
**versa (1)**
127:16
**version (1)**
131:3
**versus (4)**
11:2;35:7;81:24;

178:2
**via (3)**
80:23;82:20;
140:23
**vice (2)**
100:21;127:16
**Victor (1)**
120:11
**view (1)**
178:16
**viewing (1)**
9:8
**Virginia (11)**
79:21;95:20;96:1;
106:16,16;122:12;
172:25;173:18;
174:3,13,15
**virtue (1)**
75:10
**voice (1)**
110:21
**voicemail (2)**
100:6,9
**void (1)**
70:9
**voided (1)**
69:20
**VV (6)**
68:21,23,23;69:11,
14,18

**W**

**wait (5)**
78:12;95:21;
105:11;135:18,19
**waited (2)**
117:25;157:5
**waiting (2)**
84:22;114:12
**walk (2)**
10:11;134:1
**walked (3)**
90:6;102:16,17
**Walters (11)**
34:3;40:4;42:4;
43:5,8;48:11;49:9,
22;172:23;173:2;
174:6
**Walters' (3)**
40:3;10;50:1
**wants (1)**
45:4
**warrant (2)**
79:5;178:2
**Washington (1)**
122:12
**watch (1)**
90:21
**waterfall (3)**
161:9,11,25
**way (8)**
10:7;11:9,10;

69:24;97:12;140:5;
158:2;164:15
**Weaver (21)**
19:3;60:2,7,10;
66:6,10,18;67:12;
71:2,13,21;72:14,16;
73:5;75:23;76:5;
77:4,16;78:19;95:3;
96:4
**Weaver/Cooper (1)**
95:5
**week (3)**
17:3,20;102:14
**weekend (1)**
5:24
**weeks (1)**
111:19
**weighs (1)**
173:13
**weight (2)**
42:17;43:3
**weren't (3)**
136:17;151:18;
157:15
**West (1)**
2:22
**what's (18)**
11:4;17:6;40:23;
42:2;63:16;72:10;
83:18;87:12;109:13;
122:11;123:10;
126:18;134:17;
139:24;142:21;
148:4;158:17,17
**whatsoever (1)**
173:19
**whenever (2)**
38:15;118:3
**wherefore (2)**
70:4,7
**Whereupon (1)**
178:25
**whichever (1)**
177:18
**whole (3)**
37:18;92:23;106:2
**who's (1)**
100:21
**whose (1)**
39:19
**wider (1)**
10:9
**wife (9)**
59:12;71:2;74:5;
84:4;95:2;103:12;
106:13;109:11,13
**wife's (7)**
35:23;52:22,25;
53:2;71:4,6;72:8
**Williams (1)**
24:1,7
**willing (1)**
108:9

wish (7)
31:14;36:17;37:4,
11,23;139:3;171:15
withdraw (3)
6:5;7:21;140:14
withdrawal (1)
106:6
withdrawn (1)
70:23
within (8)
7:22;16:22;25:24;
82:8;106:5;118:1;
170:7,9
without (4)
12:12;22:16;
161:24;168:6
witness (118)
6:9,23;7:24;43:25;
44:17,23;45:6;49:14,
16,20,22,24;62:14;
69:13;71:18;73:3,
16;74:18;75:18;
81:7;83:25;87:16,18,
21,24;95:16;104:24;
113:16;119:9;
121:19,21,22,24;
122:7,24;127:1,7,9,
25;128:5,7,19,24;
129:1,4,12,14;130:1,
4,7;132:20,25;
133:15;134:3,5,8,11,
18,20;135:3,8;140:1,
20,24;141:3,8,22;
143:17;145:18,21,
24;146:4,11,19;
148:8,11,14,16;
149:5,10,13,18,22;
151:25;152:4,7,9,13,
17;153:3,8,11,15,20;
154:4,10,13,15,18,
21;155:2;156:11,13;
157:17;158:17,21,
25;159:4,6,10,12,16;
160:2;171:10,16,25;
175:2;178:1
witness' (1)
152:21
witnesses (2)
116:13;171:11
word (2)
34:19;89:5
words (6)
42:6;106:2;
112:21;154:1;
167:15;169:6
work (3)
40:10;48:12;50:14
worked (4)
60:25;124:4;
169:20;173:25
world (2)
15:7;17:21
worth (3)

19:20;22:7;54:19
wound (1)
110:12
write (1)
115:23
writing (3)
77:4;104:3;154:2
written (17)
81:13;82:8;98:11,
14,17;100:14;102:5,
7,11,15,24;103:2,7,
9;114:15;153:17;
178:8
wrong (7)
34:3,3,18,20,23;
88:12;107:17
wrongful (4)
176:5,5,10,11
WUQC (2)
140:23,23

## X

XNet (3)
125:2,2;143:23

## Y

yard (1)
16:8
year (10)
13:24;14:3;17:1,
23;18:19;57:20;
95:15;102:21;123:9;
132:17
year-plus (1)
16:6
years (5)
12:11,21;68:1;
112:22;169:25
yell (1)
177:4
yesterday (24)
7:10;8:22;9:11;
23:16;27:21;28:3;
32:2;40:10;43:23,
25;60:24;61:11,16,
18;62:21;64:15,20;
65:14;84:2;86:4;
96:2;97:6;114:13;
172:20
yesterday's (1)
73:22
York (2)
2:23;4:5
Yup (1)
132:25
YY (16)
63:2,21,24,24,25;
65:2;115:6;143:3;
144:4,6,9,14;146:7,
24,25;147:9

134:17
10:20 (1)
39:6
10:54 (1)
39:6
10036 (1)
4:5
10040 (1)
2:23
101 (1)
53:20
10th (12)
150:22;151:1,5,8,
24;154:7;163:2,14;
172:7,11,15,17
11 (6)
26:12;27:2,4,9;
123:8;161:16
1100 (1)
122:12
11th (6)
94:12;134:14;
147:17,21,23;148:10
12 (6)
27:10,13,16;107:3,
4;137:4
12:31 (2)
90:21;91:15
12-12020 (2)
5:3;91:17
125 (1)
142:17
125,000 (1)
142:20
12th (1)
136:7
13 (21)
27:17;28:1;37:20;
39:11,11;40:3;42:15,
16;43:6;48:7,8,9,15,
18,20,21,25;49:9,11,
14,25
130,000 (3)
18:1,2,3
135 (1)
86:11
13A (3)
42:15;43:2,9
13-A (1)
49:21
13th (4)
147:22;148:8;
155:11;157:13
14 (14)
27:17;28:1;37:20;
39:17,19;40:1;42:15,
16;43:11;50:7,11,19;
55:14;109:1
1400 (3)
55:9,13,22
14A (3)
42:15;43:2,13
14th (2)

126:8;132:22
15 (21)
27:17;28:2;37:20;
39:11,11;40:15,18,
24;41:7;42:2,15,17;
43:15;50:22;51:1,5,
11,20;105:19,20;
131:5
1540 (1)
4:4
15A (3)
42:16;43:2,17
15th (6)
89:16,17;125:25;
131:2;165:21;
167:11
16 (2)
28:10;131:5
16th (1)
131:2
17 (5)
24:3,6,8;28:13;
82:20
18 (4)
30:10,13,15,18
18th (11)
133:18;135:20;
148:17,20,22,25;
149:5,12,14,16,21
19 (4)
28:15;29:22,24;
30:4
192nd (1)
2:22
1990 (1)
67:25
1st (23)
64:3,6;75:11,12;
93:13;136:9,10,12;
139:19,24;140:5;
141:23;143:14,16,
17,20;147:25;148:3;
150:11,12,14;
164:20,24

## 2

2 (7)
5:4;21:14;25:21;
52:21;58:9;90:21;
91:14
2- (1)
67:7
2,040,000 (4)
16:5;21:19;84:3;
85:25
2,400 (1)
55:23
2,453 (2)
55:16;56:25
2.1 (1)
84:8
2:03 (1)

## Z

Zebra (1)
73:16
Zucker (1)
67:9
ZZ (9)
63:3,9;144:10;
145:12,14,16,19;
146:7,25

## 0

06 (1)
134:12
07 (1)
85:2

## 1

1 (11)
31:5;53:14,18;
56:9;58:9;72:21;
77:20,22;78:3,9;
149:24
1,200 (1)
11:15
1,300 (1)
11:15
1,414,000 (3)
54:13,18,19
1,450,000 (1)
45:24
1,571,619 (1)
53:19
1,595,000 (1)
89:19
1,690,000 (1)
88:25
1.1 (1)
97:10
1.3 (4)
86:7,12,13;92:6
1.3-million-dollar (1)
90:1
1.45 (2)
86:8,14
1.465 (1)
45:20
1.5 (1)
92:7
1.75 (1)
21:20
1.8 (2)
21:20;71:13
1.9 (1)
83:22
1.95 (1)
85:24
10 (1)
132:5
10/26 (1)

91:15
**2:48 (1)**
  119:7
**20 (2)**
  44:9,10
**200,000 (1)**
  60:15
**2000- (1)**
  135:18
**2006 (9)**
  9:15,23;53:9;54:9;
  125:23;133:23;
  134:12,16;135:9
**2007 (18)**
  58:12;83:20;84:6;
  133:18,25;134:14,
  21,22,22,25,25;
  135:20;136:7,9,18,
  24,25;139:2
**2008 (59)**
  14:19;15:16,17;
  22:2;36:2;40:20;
  41:11,16,19,21,24;
  52:4;59:7,9,15,18,
  24;60:21;63:17;
  64:3;65:17,21,25;
  66:3,7,9;71:9;72:12,
  22;84:15;85:12;
  101:17;132:22;
  133:4;136:10,12;
  137:3,4,12,15,18,25;
  138:6,6,7,14,23;
  139:25;140:19;
  144:16;147:17;
  149:16;150:12;
  164:5,6,21,24;169:5,
  8
**2009 (39)**
  41:13;46:4,12;
  75:11,12;79:13,16,
  17;95:16,16;104:6;
  108:12;137:12;
  150:22;151:1,8,21,
  24;152:22,23;154:7;
  155:1,4,9,11,18;
  156:9,22;157:13,18;
  158:15,19;159:9;
  165:21;167:11,24;
  168:10;173:17;
  174:17
**2010 (43)**
  17:15,19,23;18:16,
  17,18;19:6,19;20:2,
  3,5,11,16,19;21:19;
  22:19,23,25;29:25;
  30:2;31:18,22;45:18,
  20,22,24;46:5,12;
  48:4;86:20;88:22;
  89:3,8,9,16,22;93:3,
  13;94:3;97:4;163:2,
  14;172:11
**2011 (13)**
  22:20,22,24;46:6,

13,18;96:18,20,23;
98:4;124:5;160:9,13
**2012 (3)**
  41:12,14;163:6
**2013 (4)**
  123:24;125:25;
  126:8;161:2
**2014 (2)**
  82:20;94:12
**202 (1)**
  54:16
**203 (1)**
  55:2
**204 (2)**
  55:1;57:14
**2049 (1)**
  151:14
**20th (7)**
  29:25;30:2;137:7,
  13,16;149:6;150:6
**21st (12)**
  25:9;68:11,17,24;
  70:11,16;72:22;94:7,
  17,19,22;133:4
**22nd (3)**
  65:25;66:3;72:12
**23 (1)**
  108:21
**23rd (1)**
  138:7
**25,000 (1)**
  74:12
**250- (2)**
  108:1,2
**250,000 (5)**
  104:10;106:23;
  107:5;108:16;111:2
**250,000-dollar (1)**
  107:23
**25th (4)**
  71:9;137:7;138:6;
  151:10
**26th (3)**
  138:13,14,25
**27th (1)**
  125:23
**28 (2)**
  137:15,16
**28th (2)**
  137:17,18
**29th (2)**
  108:12;138:5

**3**

**3 (16)**
  25:21;26:8,16,20;
  54:8,16;55:25;56:5,
  7,8;57:15;58:2,10;
  133:17;136:6;137:5
**3- (1)**
  67:7
**3,000 (21)**

60:25;62:1;64:18,
19,23;115:20,21,23;
139:16;140:4,22;
141:12;142:15,19;
144:17;149:1,19;
151:17;157:24;
158:3,11
**3,000-dollar (1)**
  148:18
**3,200 (1)**
  151:17
**3,983 (2)**
  41:8,9
**3.9 (1)**
  70:19
**3:04 (1)**
  119:7
**30 (1)**
  94:3
**301 (1)**
  56:16
**302 (1)**
  56:16
**303 (5)**
  56:2,5,8,9,17
**30th (10)**
  83:19;84:6;85:2;
  93:3;139:17,17;
  141:2,2,5,6
**310 (1)**
  151:9
**31st (9)**
  53:9;54:9;138:23;
  139:11;140:19;
  152:22;155:18;
  157:18;168:10
**38 (2)**
  105:19,20
**3rd (2)**
  150:17;156:9

**4**

**4 (8)**
  24:9,13,17;52:24;
  55:9,13,14,22
**4- (1)**
  67:7
**4,000 (1)**
  41:5
**4.375 (1)**
  151:13
**400,000 (10)**
  60:2,6;74:9;77:5,
  11,17,19;78:3,10,18
**401k (1)**
  142:6
**411,947 (7)**
  55:1;56:2,11,17;
  57:7,12,17
**414,000 (3)**
  54:11;56:14,20
**42 (1)**

108:25
**480,000 (3)**
  157:22;168:12;
  173:4

**5**

**5 (3)**
  76:15,19,20
**5,000 (1)**
  67:7
**5,765 (1)**
  41:10
**5/10/09 (1)**
  154:14
**5/10/2009 (2)**
  165:12;166:16
**5/15/09 (2)**
  167:12,13
**5/15/2009 (1)**
  165:22
**5/19 (2)**
  129:15,23
**5/19/2008 (1)**
  128:23
**5/7 (1)**
  152:8
**5/7/2010 (1)**
  88:11
**5:06 (1)**
  178:25
**53 (1)**
  55:23
**5th (2)**
  136:18,25

**6**

**6 (4)**
  24:18,23;25:2,4
**6,000 (3)**
  16:22,23;19:17
**6,400 (1)**
  16:24
**6,700 (1)**
  16:23
**6.375 (1)**
  151:12
**6th (6)**
  135:18;136:7,8;
  156:22;163:6;
  174:17

**7**

**7 (5)**
  25:5,10;70:2;94:7,
  10
**7,000 (9)**
  64:16;139:5,16;
  141:1,5,13;142:15,
  19;158:5
**7,000-dollar (1)**

158:9
**70- (1)**
  20:16
**700 (1)**
  2:22
**700,000 (1)**
  111:18
**75- (1)**
  20:16
**750 (1)**
  19:21
**7K (1)**
  141:1
**7th (12)**
  85:12;88:22;89:3,
  8;152:5,13,14,17,23,
  25;153:2;167:24

**8**

**8 (15)**
  25:11,14,17;64:6,
  6;70:1,2,3;78:3,9;
  86:22,24;87:10;
  88:10;98:4
**8/25/0 (1)**
  71:9
**8/4/08 (1)**
  145:22
**8/8/08 (2)**
  63:17;145:20
**80,000 (1)**
  20:16
**817 (10)**
  29:9;52:8;54:14;
  64:12;79:7;83:16;
  164:20;168:20;
  169:8,10
**831 (5)**
  17:25;18:12;
  45:18;46:2;47:23
**8th (5)**
  63:17;79:13,17;
  96:18;144:15

**9**

**9 (7)**
  26:4,11,18,19,20,
  22;131:18
**9/4/08 (1)**
  146:2
**900,000 (1)**
  117:25
**973406-2250 (1)**
  2:24
**9th (4)**
  96:20;151:21;
  158:15,19