# **Exhibit 5**

# Interagency Review of Foreclosure Policies and Practices

Federal Reserve System

Office of the Comptroller of the Currency

Office of Thrift Supervision

  

WASHINGTON, D.C. • APRIL 2011

EXHIBIT 5

# Interagency Review of Foreclosure Policies and Practices

Federal Reserve System

Office of the Comptroller of the Currency

Office of Thrift Supervision

  

WASHINGTON, D.C.   •   APRIL 2011

# Contents

Executive Summary ........................................................................................................... 1
    Review Scope and Objectives ........................................................................................ 1
    Summary of Review Findings ........................................................................................ 2
    Summary of Supervisory Response ............................................................................... 4

Part 1: Background and Risks Associated
with Weak Foreclosure Process and Controls ................................................................. 5
    Impact on Borrowers ...................................................................................................... 5
    Impact on the Industry and Investors ............................................................................. 6
    Impact on the Judicial Process ....................................................................................... 6
    Impact on the Mortgage Market and Communities ....................................................... 6

Part 2: Review Findings ..................................................................................................... 7
    Foreclosure Process Governance ................................................................................... 7
    Organizational Structure and Availability of Staffing .................................................... 8
    Affidavit and Notarization Practices .............................................................................. 8
    Documentation Practices ............................................................................................... 8
    Third-party Vendor Management .................................................................................. 9
        Arrangements with Outside Law Firms ................................................................... 9
        Arrangements with Default Management Service Providers (DMSPs) ................ 10
        Arrangements with Mortgage Electronic Registration Systems, Inc. .................... 10
    Ineffective Quality Control (QC) and Audit ............................................................... 11

Part 3: Supervisory Response ......................................................................................... 13

Part 4: Industry Reforms ................................................................................................. 15
    Governance and Oversight .......................................................................................... 15
    Organizational Structure, Staffing, and Technology ................................................... 15
    Accountability and Responsiveness Dealing with Consumers ................................... 15

# Executive Summary

The Federal Reserve System, the Office of the Comptroller of the Currency (OCC), the Federal Deposit Insurance Corporation (FDIC), and the Office of Thrift Supervision (OTS), referred to as the agencies, conducted on-site reviews of foreclosure processing at 14 federally regulated mortgage servicers during the fourth quarter of 2010.[1]

This report provides a summary of the review findings and an overview of the potential impacts associated with instances of foreclosure-processing weaknesses that occurred industrywide. In addition, this report discusses the supervisory response made public simultaneous with the issuance of this report, as well as expectations going forward to address the cited deficiencies. The supervisory measures employed by the agencies are intended to ensure safe and sound mortgage-servicing and foreclosure-processing business practices are implemented. The report also provides an overview of how national standards for mortgage servicing can help address specific industrywide weaknesses identified during these reviews.

## Review Scope and Objectives

The primary objective of each review was to evaluate the adequacy of controls and governance over servicers' foreclosure processes and assess servicers' authority to foreclose. The reviews focused on issues related to foreclosure-processing functions. While the reviews uncovered significant problems in foreclosure processing at the servicers included in the report, examiners reviewed a relatively small number of files from among the volumes of foreclosures processed by the servicers. Therefore, the reviews could not provide a reliable estimate of the number of foreclosures that should not have proceeded. The agencies, therefore, are requiring each servicer to retain an independent firm to conduct a thorough review of foreclosure actions that were pending at any time from January 1, 2009, through December 31, 2010, to, among other things, 1) identify borrowers that have been financially harmed by deficiencies identified in the independent review and 2) provide remediation to those borrowers where appropriate. These independent reviews will be subject to supervisory oversight to ensure that the reviews are comprehensive and the results are reliable.

For the reviews discussed in this report, examiners evaluated each servicer's self-assessments of their foreclosure policies and processes; assessed each servicer's foreclosure operating procedures and controls; interviewed servicer staff involved in the preparation of foreclosure documents; and reviewed, collectively for all servicers, approximately 2,800 borrower foreclosure files that were in various stages of the foreclosure process between January 1, 2009, and December 31, 2010.[2]

Examiners focused on foreclosure policies and procedures; quality control and audits; organizational structure and staffing; and vendor management,

---

[1] Agencies conducted foreclosure-processing reviews at Ally Bank/GMAC, Aurora Bank, Bank of America, Citibank, EverBank, HSBC, JPMorgan Chase, MetLife, OneWest, PNC, Sovereign Bank, SunTrust, U.S. Bank, and Wells Fargo. The reviews included mortgage-servicing activities conducted by insured banks and thrifts, as well as by several nonbank affiliates of these organizations. The 14 servicers were selected based on the concentration of their mortgage-servicing and foreclosure-processing activities. The agencies typically do not disclose examinations or examination findings regarding particular institutions. In light of the formal enforcement actions entered into by these 14 servicers, which are being made public, the agencies have determined that it is appropriate to identify the servicers (whether a bank or a bank affiliate) that were reviewed. The bank and thrift holding company parents of Ally Bank/GMAC, Bank of America, Citibank, Everbank, HSBC, JPMorgan Chase, MetLife, OneWest, PNC, SunTrust, U.S. Bank, and Wells Fargo also entered into formal enforcement actions.

[2] Foreclosure files at each servicer were selected from the population of in-process and completed foreclosures during 2010. The foreclosure file sample at each servicer included foreclosures from both judicial states and nonjudicial states. Review teams independently selected foreclosure file samples based on pre-established criteria (such as files for which consumer complaints had been raised, or those in geographic areas with high volumes of foreclosures) with the balance of the files selected based on examiner judgment.

including use of third-party vendors such as foreclosure attorneys, Lender Processing Services (LPS) and other default-service providers, and MERSCORP and its wholly owned subsidiary, Mortgage Electronic Registration Systems, Inc. (MERS). Based on their reviews of the limited number of foreclosure-file samples, examiners also assessed the accuracy of foreclosure-related documentation, including note endorsements and the assignments of mortgages and deeds of trust, and loan document control.[3] With respect to those files, examiners also assessed whether fees charged in connection with the foreclosures exceeded the amounts reflected in the servicers' internal records. In addition, the Federal Reserve and the OCC solicited views from consumer groups to help detect problems at specific servicers, and the Federal Reserve expanded the file sample to include borrowers who were delinquent, but not yet in foreclosure.

The file reviews did not include a complete analysis of the payment history of each loan prior to foreclosure or potential mortgage-servicing issues outside of the foreclosure process. Accordingly, examiners may not have uncovered cases of misapplied payments or unreasonable fees, particularly when these actions occurred prior to the default that led to the foreclosure action. The foreclosure-file reviews also may not have uncovered certain facts related to the processing of a foreclosure that would lead an examiner to conclude that a foreclosure otherwise should not have proceeded, such as undocumented communications between a servicer employee and the borrower in which the employee told the borrower he or she had to be delinquent on the loan to qualify for a modification. In addition, the reviews did not focus on loan-modification processes, but when reviewing individual foreclosure files, examiners checked for evidence that servicers were in contact with borrowers and had considered alternative loss-mitigation efforts, including loan modifications.

To ensure consistency in the reviews, the agencies used standardized work programs to guide the assessment and to document findings pertaining to each servicer's corporate governance process and the individual foreclosure-file reviews. The work programs were organized into the following categories:

- **Policies and procedures**. Examiners reviewed the servicers' policies and procedures to see if they provided adequate controls over the foreclosure process and whether those policies and procedures were sufficient for compliance with applicable laws and regulations.

- **Organizational structure and staffing**. Examiners reviewed the functional unit(s) responsible for foreclosure processes, including their staffing levels, their staff's qualifications, and their training programs.

- **Management of third-party service providers**. Examiners reviewed the servicers' oversight of key third parties used throughout the foreclosure process, with a focus on foreclosure attorneys, MERS, and default-service providers such as LPS.

- **Quality control and internal audits**. Examiners assessed quality-control processes in foreclosures. Examiners also reviewed internal and external audit reports, including government-sponsored enterprise (GSE) and investor audits and reviews of foreclosure activities as well as servicers' self-assessments.

- **Compliance with applicable laws**. Examiners checked the adequacy of the governance, audits, and controls that servicers had in place to ensure compliance with applicable laws.

- **Loss mitigation**. Examiners determined if servicers were in direct communication with borrowers and whether loss-mitigation actions, including loan modifications, were considered as alternatives to foreclosure.

- **Critical documents**. Examiners evaluated servicers' control over critical documents in the foreclosure process, including the safeguarding of original loan documentation. Examiners also determined whether critical foreclosure documents were in the foreclosure files that they reviewed, and whether notes were endorsed and mortgages assigned.

- **Risk management**. Examiners assessed whether servicers appropriately identified financial, reputational, and legal risks and whether these risks were communicated to the board of directors and senior management of the servicer.

## Summary of Review Findings

The reviews found critical weaknesses in servicers' foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys. While it is important to note that findings

---

[3] For purposes of this report, default management services generally include administrative support and services provided to the servicers by third-party vendors to manage and perform the tasks associated with foreclosures.

varied across institutions, the weaknesses at each servicer, individually or collectively, resulted in unsafe and unsound practices and violations of applicable federal and state law and requirements.[4] The results elevated the agencies' concern that widespread risks may be presented—to consumers, communities, various market participants, and the overall mortgage market. The servicers included in this review represent more than two-thirds of the servicing market. Thus, the agencies consider problems cited within this report to have widespread consequences for the national housing market and borrowers.

Based on the deficiencies identified in these reviews and the risks of additional issues as a result of weak controls and processes, the agencies at this time are taking formal enforcement actions against each of the 14 servicers subject to this review to address those weaknesses and risks. The enforcement actions require each servicer, among other things, to conduct a more complete review of certain aspects of foreclosure actions that occurred between January 1, 2009, and December 31, 2010. The specific supervisory responses are summarized in Part 3 of this report.

The loan-file reviews showed that borrowers subject to foreclosure in the reviewed files were seriously delinquent on their loans. As previously stated, the reviews conducted by the agencies should not be viewed as an analysis of the entire lifecycle of the borrowers' loans or potential mortgage-servicing issues outside of the foreclosure process. The reviews also showed that servicers possessed original notes and mortgages and, therefore, had sufficient documentation available to demonstrate authority to foreclose. Further, examiners found evidence that servicers generally attempted to contact distressed borrowers prior to initiating the foreclosure process to pursue loss-mitigation alternatives, including loan modifications. However, examiners did note cases in which foreclosures should not have proceeded due to an intervening event or condition, such as the borrower (a) was covered by the Servicemembers Civil Relief Act, (b) filed for bankruptcy shortly before the foreclosure action, or (c) qualified for or was paying in accordance with a trial modification.[5]

The interagency reviews identified significant weaknesses in several areas.

- **Foreclosure process governance.** Foreclosure governance processes of the servicers were underdeveloped and insufficient to manage and control operational, compliance, legal, and reputational risk associated with an increasing volume of foreclosures. Weaknesses included:
  - inadequate policies, procedures, and independent control infrastructure covering all aspects of the foreclosure process;
  - inadequate monitoring and controls to oversee foreclosure activities conducted on behalf of servicers by external law firms or other third-party vendors;
  - lack of sufficient audit trails to show how information set out in the affidavits (amount of indebtedness, fees, penalties, etc.) was linked to the servicers' internal records at the time the affidavits were executed;
  - inadequate quality control and audit reviews to ensure compliance with legal requirements, policies and procedures, as well as the maintenance of sound operating environments; and
  - inadequate identification of financial, reputational, and legal risks, and absence of internal communication about those risks among boards of directors and senior management.

- **Organizational structure and availability of staffing.** Examiners found inadequate organization and staffing of foreclosure units to address the increased volumes of foreclosures.

- **Affidavit and notarization practices.** Individuals who signed foreclosure affidavits often did not personally check the documents for accuracy or possess the level of knowledge of the information that they attested to in those affidavits. In addition, some foreclosure documents indicated they were executed under oath, when no oath was administered. Examiners also found that the majority of the servicers had improper notary practices which failed to conform to state legal requirements. These determinations were based primarily on servicers' self-assessments of their foreclosure processes and examiners' interviews of servicer staff involved in the preparation of foreclosure documents.

- **Documentation practices.** Examiners found some—but not widespread—errors between actual fees charged and what the servicers' internal records indicated, with servicers undercharging fees as frequently as overcharging them. The dollar amount

---
[4] This report captures only the significant issues found across the servicers reviewed, not necessarily findings at each servicer.
[5] Servicemembers Civil Relief Act, 50 USC App. sections. 501–596, Public Law 108-189.

of overcharged fees as compared with the servicers' internal records was generally small.

- **Third-party vendor management.** Examiners generally found adequate evidence of physical control and possession of original notes and mortgages. Examiners also found, with limited exceptions, that notes appeared to be properly endorsed and mortgages and deeds of trust appeared properly assigned.[6] The review did find that, in some cases, the third-party law firms hired by the servicers were nonetheless filing mortgage foreclosure complaints or lost-note affidavits even though proper documentation existed.

- **Quality control (QC) and audit.** Examiners found weaknesses in quality control and internal auditing procedures at all servicers included in the review.

## Summary of Supervisory Response

The agencies recognize that a number of supervisory actions and industry reforms are required to address these weaknesses in a way that will hold servicers accountable for establishing necessary governance and controls. Measures that the servicers are being required to implement are designed to ensure compliance with applicable laws, promote foreclosure processing in a safe and sound manner, and establish responsible business practices that provide accountability and appropriate treatment to borrowers.

At this time, the agencies are taking formal enforcement action against each of the 14 servicers and parent bank holding companies because the deficiencies and weaknesses identified during the reviews represent unsafe or unsound practices and violations of applicable law. The foreclosure-file reviews showed that borrowers in the sampled pool were seriously delinquent. The reviews also showed that the appropriate party brought the foreclosure action. However, a limited number of mortgages should not have proceeded to foreclosure because of an intervening event or condition. Nevertheless, the weaknesses in servicers' foreclosure processes, as confirmed by the reviews, present significant risk to the safety and soundness of mortgage activities. The failures and deficiencies identified as part of the reviews must be remedied swiftly and comprehensively.

The agencies will continue to assess and monitor corrective actions and will address servicers' failures to correct identified deficiencies where necessary.

Going forward, servicers must develop and demonstrate effective risk management of servicing operations to prevent a recurrence of deficiencies cited in this report. The agencies are currently engaged in an effort to establish national mortgage-servicing standards to promote the safe and sound operation of mortgage-servicing and foreclosure processing, including standards for accountability and responsiveness to borrower concerns. Such an effort will include engaging the Government Sponsored Enterprises, private investors, consumer groups, the servicing industry, and other regulators. Part 4 of this report provides a general overview of the core principles that should be included in future national mortgage-servicing standards.

---

[6] The agencies expect federally regulated servicers to have the necessary policies and procedures in place to ensure that notes are properly endorsed and mortgages are properly assigned, so that ownership can be determined at the time of foreclosure. Where federally regulated servicers serve as document custodians for themselves or other investors, the agencies require controls and tracking systems to properly safeguard the physical security and maintenance of critical loan documents.

# Part 1: Background and Risks Associated with Weak Foreclosure Process and Controls

Mortgage servicing plays a central role in the management of mortgage loans from origination to final disposition. The mortgage servicer is the intermediary between borrowers and their lenders. When the borrower is paying as agreed, the servicer's duties are ministerial: collecting payments, distributing payments to investors, managing cash and administering funds in escrow, and reporting to investors. When a loan is in default, the demands on the servicer necessarily expand, requiring additional resources and much more sophisticated risk management. A necessary consequence of the growth in foreclosures since 2007 is increased demands on servicers' foreclosure processes.

The residential mortgage-servicing market is highly concentrated among a few servicers. The five largest mortgage servicers by activity volume—included among the 14 servicers subject to the reviews addressed in this report—account for 60 percent of the industry's total servicing volume.[7] The 14 servicers included in the interagency review collectively represent more than two-thirds of the servicing industry (see **figure 1**), or nearly 36.7 million mortgages.[8]

At the end of the fourth quarter of 2010, nearly 54 million first-lien mortgage loans were outstanding, 2.4 million of which were at some point in the foreclosure process. Additionally, two million mortgages were 90 or more days past due and at an elevated risk of foreclosure. New foreclosures are on pace to approach 2.5 million by the end of 2011. In light of the number of foreclosures and continued weakness in overall mortgage performance, the agencies are concerned that the deficiencies in foreclosure



Figure 1. Concentration of the mortgage-servicing Industry

Source: Federal Reserve staff estimates of the concentration of servicing volume, based on data from Inside Mortgage Finance.

processing observed among these major servicers may have widespread consequences for the housing market and borrowers.

## Impact on Borrowers

Weaknesses in foreclosure processes and controls present the risk of foreclosing with inaccurate documentation, or foreclosing when another intervening circumstance should intercede. Even if a foreclosure action can be completed properly, deficiencies can result (and have resulted) in violations of state foreclosure laws designed to protect consumers. Such weaknesses may also result in inaccurate fees and charges assessed against the borrower or property, which may make it more difficult for borrowers to bring their loans current. In addition, borrowers can find their loss-mitigation options curtailed because of dual-track processes that result in foreclosures even when a borrower has been approved for a loan modification. The risks presented by weaknesses in foreclosure processes are more acute when those processes are aimed at speed and quantity instead of quality and accuracy.

---

[7] The five largest mortgage servicers in order are Bank of America, Wells Fargo, JPMorgan Chase, Citibank, and Ally Bank/GMAC.

[8] Federal Reserve staff estimates 54 million first-lien mortgages outstanding as of December 31, 2010.

## Impact on the Industry and Investors

Weaknesses in foreclosure processes pose a variety of risks to the financial services industry and investors. These risks extend beyond the financial cost of remedying procedural errors and re-filing affidavits and other foreclosure documents. Servicers may also bear legal costs related to disputes over note ownership or authority to foreclose, and to allegations of procedural violations through the use of inaccurate affidavits and improper notarizations. Servicers may be subject to claims by investors as a result of delays or other damages caused by the weaknesses. Furthermore, concerns about the prevalence of irregularities in the documentation of ownership may cause uncertainty for investors of securitized mortgages. Servicers and their affiliates also face significant reputational risk with their borrowers, with the court system, and with regulators.

## Impact on the Judicial Process

Weaknesses in foreclosure processes have resulted in increased demands on judicial resources to resolve a variety of foreclosure-related matters, including note ownership. In addition, courts rely extensively on affidavits (usually affidavits of indebtedness) submitted by servicers to decide foreclosure actions on a summary basis without requiring in-person testimony.[9] If such affidavits were not properly prepared or executed, courts may lose confidence in the reliability of the affidavits as persuasive evidence filed on behalf of servicers.[10]

## Impact on the Mortgage Market and Communities

Weaknesses in foreclosure processes led several servicers to slow, halt, or suspend foreclosure proceedings in late 2010, and, in many cases, re-file foreclosure documents. Delays in foreclosure processing, which averaged 450 days in the fourth quarter of 2010, slow the clearing of excess inventory of foreclosed properties and lead to extended periods of depressed home prices.[11] Such delays also impede the efficient disposition of foreclosed homes and the clearing of seriously delinquent mortgages, particularly in geographic regions with greater concentrations of vacant and abandoned properties. This outcome acts as an impediment for communities working to stabilize local neighborhoods and housing markets.[12]

Moreover, local property values may be adversely affected if foreclosed homes remain vacant for extended periods, particularly if such homes are not properly maintained.[13] Widely publicized weaknesses in foreclosure processes also adversely affect home buyer and investor confidence. Assuring robust and credible remedial programs for mortgage servicers so that foreclosure processes can operate and markets can clear without impediments or interventions contributes to attaining a stable national housing market.

---

[9] The basic affidavit of indebtedness typically sets forth the name of the party that owns the loan, the default status, and the amounts due for principal, interest, penalties (such as late charges), and fees. This affidavit is frequently the principal basis upon which a court is permitted to order a foreclosure without requiring in-person testimony. Similar documentation may be required in bankruptcy proceedings.

[10] Mortgage foreclosures occur under either a judicial or a nonjudicial process. Judicial foreclosures are court-supervised and require the lender to bring a court action to foreclose. Nonjudicial foreclosures (also known as "power of sale") involve little or no court oversight and generally are governed by state statutes. Even foreclosures that are instituted outside the judicial process can be challenged in court, however, and then become subject to court actions.

[11] See *Lender Processing Services Applied Analytics* (December 2010, www.lpsvcs.com/RiskMgmt). Current time frames to move a property to foreclosure sale have increased from an average of 250 days in first quarter 2008 to 450 days by fourth quarter 2010.

[12] Industry data show approximately four million properties currently listed that have been foreclosed in the past few years. See Mortgage Bankers Association, *National Delinquency Survey*, (November 18, 2010, www.mbaa.org/NewsandMedia/PressCenter/74733.htm).

[13] Campbell, John Y., Stefano Giglio and Parag Pathak (July 2010) *Forced Sales and House Prices Manuscript*, Harvard University Department of Economics (kuznets.fas.harvard.edu/~campbell/papers/forcedsales072410.pdf).

# Part 2: Review Findings

The reviews found critical weaknesses in foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party law firms and other vendors. These weaknesses involve unsafe and unsound practices and violations of applicable federal and state laws and requirements, and they have had an adverse effect on the functioning of the mortgage markets. By emphasizing speed and cost efficiency over quality and accuracy, examined servicers fostered an operational environment contrary to safe and sound banking practices.

In connection with the reviews of sampled files and assessments of servicers' custodial activities, examiners found that borrowers whose files were reviewed were seriously delinquent on their mortgage payments at the time of foreclosure and that servicers generally had sufficient documentation available to demonstrate authority to foreclose on those borrowers' mortgages.[14] Nevertheless, examiners noted instances where documentation in the foreclosure file alone may not have been sufficient to prove ownership of the note at the time the foreclosure action commenced without reference to additional information. When additional information was requested and provided to examiners, it generally was sufficient to determine ownership.

In addition, review of the foreclosure files showed that servicers were in contact with the delinquent borrowers and had considered loss-mitigation alternatives, including loan modifications. Examiners also noted a small number of foreclosure sales, however, that should not have proceeded because of an intervening event or condition, such as the borrower: (a) was covered by the Servicemembers Civil Relief Act, (b) filed bankruptcy shortly before the foreclosure action, or (c) was approved for a trial modification.

A summary of the major findings identified during the reviews is set forth below.

## Foreclosure Process Governance

Examiners found governance at each examined servicer in need of substantial improvement, and often cited the absence of sound controls and ineffective management of foreclosure processes. Foreclosure policies and procedures at many of the servicers were either weak or needed substantial expansion to provide effective guidance, control, and ongoing monitoring. As noted above, examiners concluded that the majority of servicers reviewed had inadequate affidavit and notary-signing processes that did not ensure proper attestation (or verification) of the underlying documents.

Examiners found that most servicers had inadequate staffing levels and training programs throughout the foreclosure-processing function and that a large percentage of the staff lacked sufficient training in their positions. The reviews also revealed that all of the servicers relied heavily on outsourcing arrangements with outside counsel and other third-party vendors to carry out foreclosure processes without adequate oversight of those arrangements. Some servicers failed to enter into contracts with the foreclosure law firms performing critical steps in the foreclosure process, including affidavit- and notary-preparation and signing processes. Audit and quality-assurance controls and self-assessment reviews at all of the examined servicers lacked comprehensiveness and failed to identify specific weaknesses and process gaps. Details on these areas of weakness are included below.

---

[14] As previously noted, examiners were limited to the documents in the foreclosure files. Those documents may not have disclosed certain facts that might have led examiners to conclude that a foreclosure should not have proceeded, such as misapplication of payments that could have precipitated a foreclosure action or oral communications between the borrower and servicer staff that were not documented in the foreclosure file.

8    April 2011

## Organizational Structure and Availability of Staffing

At the time of the review, a majority of the servicers had inadequate staffing levels or had recently added staff with limited servicing experience. In most instances, servicers maintained insufficient staff to appropriately review documents for accuracy, and provided inadequate training for affidavit signers, notaries, and quality-control staff. Examiners also noted weak controls, undue emphasis on quantitative production and timelines, and inadequate workload monitoring.

## Affidavit and Notarization Practices

Deficiencies in servicers' processes, procedures, controls, and staffing resulted in numerous inaccurate affidavits and other foreclosure-related documents. Examiners found that most servicers had affidavit signing protocols that expedited the processes for signing foreclosure affidavits without ensuring that the individuals who signed the affidavits personally conducted the review or possessed the level of knowledge of the information that they attested to in those affidavits. Examiners confirmed these deficiencies through interviews with individuals who signed documents, as well as through a review of servicers' self-assessments. Examiners also found the majority of the servicers had improper notary practices that failed to conform to state legal requirements. Examiners noted some servicers failed to maintain an accurate list of approved and acceptable notaries that individuals signing documents did not do so in the presence of a notary when required, and that documents often were executed in a manner contrary to the notary's acknowledgement and verification of those documents. In addition, some foreclosure documents indicated they were executed under oath when no oath was administered. Again, examiners confirmed these deficiencies by interviewing notaries and reviewing servicers' self-assessments.

At the examined servicers, anywhere from 100 to more than 25,000 foreclosure actions occurred per month between January 1, 2009, and December 31, 2010, with the quantity depending upon the size of the servicer's operations. It was common to find an insufficient number of staff assigned to review, sign, and notarize affidavits. At some of the servicers, examiners found that insufficient staff—or the lack of specified guidance to staff or external law firms on affidavit completion—contributed to the preparation and filing of inaccurate affidavits. In the sample of foreclosure files reviewed, examiners compared the accuracy of the amounts listed on affidavits of indebtedness to the documentation in the paper foreclosure file or computerized loan servicing systems. Although borrowers whose foreclosure files were reviewed were seriously in default at the time of the foreclosure action, some servicers failed to accurately complete or validate itemized amounts owed by those borrowers. At those servicers, this failure resulted in differences between the figures in the affidavit and the information in the servicing system or paper file. In nearly half of those instances, the differences—which were typically less than $500—were adverse to the borrower. While the error rates varied among the servicers, the percentage of errors at some servicers raises significant concerns regarding those servicers' internal controls governing foreclosure-related documentation.

## Documentation Practices

During the foreclosure-file reviews, examiners compared the accuracy of amounts listed on the servicers' affidavits of indebtedness with documentation on file or maintained within the electronic servicing system of record. For most of the servicers, examiners cited the lack of a clear auditable trail in reconciling foreclosure filings to source systems of record. In some cases, examiners directed servicers to further audit foreclosure filings to verify the accuracy of information and compliance with legal requirements. Likewise, in connection with the file review, examiners also determined whether critical foreclosure documents were in the foreclosure files, and whether notes appeared properly endorsed and mortgages appeared properly assigned. Examiners noted instances where documentation in the foreclosure file alone may not have been sufficient to prove authority to foreclose without reference to additional information.[15] When more information was requested and provided, it generally was sufficient to determine authority. With some exceptions, examiners found that notes appeared properly endorsed, and mortgages appeared properly assigned.[16] Examiners also trav-

---

[15] Servicers frequently maintained custody of original mortgage documents, although in some cases third-party trustees or custodians held original documents. Custodians are entrusted to manage the original documents that establish note ownership, and, when necessary, produce the original documents for a foreclosure action.

[16] Only in rare instances were custodians unable to produce origi-

eled to servicers' document repository locations to assess custodial activities. Examiners found that servicers generally had possession and control over critical loan documents such as the promissory notes and mortgages. The review did find that, in some cases prior to 2010, the third-party law firms hired by the servicers were nonetheless filing lost-note affidavits or mortgage foreclosure complaints in which they claimed that the mortgage note had either been lost or destroyed, even though proper documentation existed.

## Third-party Vendor Management

The agencies found that the servicers reviewed generally did not properly structure, carefully conduct, or prudently manage their third-party vendor relationships with outside law firms and other third-party foreclosure services providers. Failure to effectively manage third-party vendors resulted in increased reputational, legal, and financial risks to the servicers.

### Arrangements with Outside Law Firms

Servicers typically used third-party law firms to prepare affidavits and other legal documents, to file complaints and other pleadings with courts, and to litigate on their behalf in connection with foreclosure and foreclosure-related bankruptcy proceedings. The servicers reviewed generally showed insufficient guidance, policies, or procedures governing the initial selection, management, or termination of the law firms that handled their foreclosures. Many servicers, rather than conducting their own due diligence, relied on the fact that certain firms had been designated as approved or accepted by investors. Servicers often did not govern their relationships with these law firms by formal contracts. Instead, servicers frequently relied on informal engagements with law firms, at times relying on investors' business relationships with the law firms or the law firms' contractual relationships with default management service providers.

*Inadequate Oversight*
Servicers also did not provide adequate oversight of third-party vendor law firms, including monitoring for compliance with the servicers' standards. Several

---

nal loan documentation, and in those instances the servicers generally were able to provide adequate explanations, including that copies in the possession of the custodian were acceptable under applicable law.

servicers exempted third-party law firms from the servicers' vendor management programs or did not identify them as third-party vendors subject to those programs. In some cases, servicers assumed that investors performed such oversight, in which case oversight was limited to ensuring that the law firms were on the investors' lists of approved or accepted providers. Where monitoring of law firms was conducted, it was often limited to things such as responsiveness and timeliness, checking for liability insurance, or determining if any power of attorney given to the firm remained valid rather than assessing the accuracy and adequacy of legal documents or compliance with state law or designated fee schedules.

*Document Retention Weaknesses*
Examiners also found that the servicers did not always retain originals or copies of the documents maintained by the third-party law firms that conducted their foreclosures. Instead, the servicers relied on the firms to maintain those documents. The absence of central and well-organized foreclosure files by the servicers and the consequent need for the examiners to collect foreclosure documentation derived from numerous sources made it difficult at times for examiners to conduct full foreclosure-file reviews while on-site.

*Inadequate guidance, policies, procedures, and contracts*
In addition, examiners generally found an absence of formal guidance, policies, or procedures governing the selection, ongoing management, and termination of law firms used to handle foreclosures. This deficiency resulted in a lack of clarity regarding roles, responsibilities, and performance parameters. Examiners also observed an absence of written contracts between certain servicers and law firms, which left those servicers with no contractual recourse for liability against the firms for performance issues. These deficiencies, coupled with the overall lack of adequate oversight, contributed to instances in which servicers and law firms failed to identify problems with the firms' foreclosure practices, thereby exposing the servicers to a variety of significant risks.

Those problems include instances in which law firms signed documents on behalf of servicers without having the authority to do so, or they changed the format and content of affidavits without the knowledge of the servicers. These defects could, depending upon the circumstances, raise concerns regarding the legality and propriety of the foreclosure even if the ser-

10    April 2011

vicer had sufficient documentation available to demonstrate authority to foreclose.

## Arrangements with Default Management Service Providers (DMSPs)

In connection with the on-site reviews of servicers, the agencies also conducted an on-site review of Lender Processing Services, Inc. (LPS), which provides significant services to support mortgage-servicing and foreclosure processing across the industry. The review of LPS involved a number of issues that are similar to those raised in the reviews of the servicers, and the LPS review covered issues that are unique to the operations, structure and corporate governance of LPS. During the review of LPS, the agencies found deficient practices related primarily to the document execution services that LPS, through its DocX, LLC, and LPS Default Solutions, Inc. subsidiaries had provided to servicers in connection with foreclosures. To address these issues, the agencies are taking formal enforcement action against LPS under section 7(d) of the Bank Service Company Act, 12 USC § 1867(d), and section 8(b) of the Federal Deposit Insurance Act, 12 USC § 1818(b).

### *Inadequate Contracts*

During the review of servicers, examiners assessed servicers' relationships with third-party vendor DMSPs, focusing primarily on DMSPs that supported the execution of foreclosure-related documents, such as affidavits of indebtedness, lost-note affidavits, and assignments of mortgages.[17] Examiners found that contracts between the servicers and DMSPs generally were inadequate, often omitting significant matters such as service-level agreements. Contracts did not provide for an appropriate level of oversight of third-party vendor law firms in situations where the servicers relied on the DMSPs to conduct such oversight.

### *Inadequate Oversight*

Examiners also observed that servicers generally demonstrated an overall lack of adequate oversight of DMSPs. At times, the servicers failed to identify DMSPs as vendors subject to the servicers' vendor management programs and demonstrated an inability to provide the examiners with sufficient evidence of due diligence. Examiners found no evidence that servicers conducted audits of the document execution operations of their DMSPs.

---

[17] Not all of the servicers engaged the services of third-party vendor DMSPs to perform document execution services.

The lack of sufficient oversight of DMSPs, coupled with the contractual deficiencies, led to instances in which employees of those DMSPs signed foreclosure affidavits without personally conducting the review or possessing the level of knowledge of information that they attested to in those affidavits. Employees of DMSPs, like the employees of the servicers themselves, executed documents in a manner contrary to the notary's acknowledgement and verification of those documents. In addition, in limited instances, employees of DMSPs signed foreclosure-related documents on behalf of servicers without proper authority. Because some of the servicers relied on DMSPs to oversee their third-party vendor law firms, the contractual deficiencies and lack of oversight of DMSPs contributed to the weaknesses identified above regarding the oversight of third-party vendor law firms.

## Arrangements with Mortgage Electronic Registration Systems, Inc.

In connection with the on-site reviews of servicers, the agencies, together with the Federal Housing Finance Agency (FHFA), also conducted an on-site review of MERSCORP and its wholly owned subsidiary, Mortgage Electronic Registration Systems, Inc. (collectively, MERS), which, as detailed below, provides significant services to support mortgage-servicing and foreclosure processing across the industry. The review of MERS involved a number of issues that are similar to those raised in the reviews of the servicers, and the MERS review covered issues that are unique to the operations, structure and corporate governance of MERS. During the review of MERS, the agencies and FHFA found significant weaknesses in, among other things, oversight, management supervision and corporate governance. To address these issues, the agencies, together with FHFA, are taking formal enforcement action against MERS under section 7(d) of the Bank Service Company Act, 12 USC § 1867(d), and section 8(b) of the Federal Deposit Insurance Act, 12 USC § 1818(b).

MERS streamlines the mortgage recording and assignment process in two ways. First, it operates a centralized computer database or registry of mortgages that tracks the servicing rights and the beneficial ownership of the mortgage note. Each mortgage registered in the database is assigned a Mortgage Identification Number (MIN). Second, MERS can be designated by a member (and its subsequent assignees) to serve in a nominee capacity as the mortgagee of record in public land records. Designating

MERS as the mortgagee is intended to eliminate the need to prepare and record successive assignments of mortgages each time ownership of a mortgage is transferred. Rather, changes in beneficial ownership of the mortgage note (and servicing rights) are tracked in the MERS registry using the MIN.[18] All of the examined servicers had relationships with MERS.

### Inadequate Oversight

Servicers exercised varying levels of oversight of the MERS relationship, but none to a sufficient degree. Several of the servicers did not include MERS in their vendor management programs. In these instances, the servicers failed to conduct appropriate due diligence assessments and failed to monitor, evaluate, and appropriately manage the MERS contractual relationship. Deficiencies included failure to assess the internal control processes at MERS, failure to ensure the accuracy of servicing transfers, and failure to ensure that servicers' records matched MERS' records.

### Inadequate Quality Control

Examiners also determined that servicers' quality-control processes pertaining to MERS were insufficient. In some cases, servicers lacked any quality-assurance processes and relied instead on the infrequent and limited audits that MERS periodically conducted. Other deficiencies included the failure to conduct audit reviews to independently verify the adequacy of and adherence to quality-assurance processes by MERS, and the need for more frequent and complete reconciliation between the servicers' systems and the MERS registry. Several servicers did not include MERS activities in the scope of their audit coverage.

## Ineffective Quality Control (QC) and Audit

Examiners found weaknesses in quality-control procedures at all servicers, which resulted in servicers not performing one or more of the following functions at a satisfactory level:

- ensuring accurate foreclosure documentation, including documentation pertaining to the fees assessed;
- incorporating mortgage-servicing activities into the servicers' loan-level monitoring, testing, and validation programs;
- evaluating and testing compliance with applicable laws and regulations, court orders, pooling and servicing agreements, and similar contractual arrangements; and
- ensuring proper controls to prevent foreclosures when intervening events or conditions occur that warrant stopping the foreclosure process (e.g., bankruptcy proceedings, applicability of the Servicemembers Civil Relief Act, or adherence to a trial or permanent loan modification program).

Examiners also found weaknesses in internal auditing procedures at all the servicers included in the review. When performed, the few internal audits conducted by servicers failed to identify fundamental control issues that led to the foreclosure process breakdowns. Failures to perform internal audits effectively resulted in servicers' inability to identify, address, and internally communicate foreclosure-processing risks. The failures to identify and communicate these risks resulted in servicers not strengthening the quality of risk-management processes to a level consistent with the nature, increasing size, and complexity of the servicer's foreclosure activities. Moreover, failure to conduct comprehensive audits to identify weaknesses in foreclosure processes resulted in servicers not taking sufficient corrective action to strengthen policy and procedural gaps, increase staffing levels, and improve training in response to sharply rising foreclosure volumes prior to the agencies' foreclosure reviews. The failure to identify the risks associated with foreclosure processing also resulted in servicers not taking action to improve foreclosure documentation-related processes ranging from custody and control of documents to proper notarization processes, or to enhance oversight of third parties managing foreclosure activities on their behalf.

---

[18] While MERS maintains a registry of the beneficial ownership of the mortgage note, this registry is not a system of legal record. The ownership of the note is determined by the Uniform Commercial Code, and, if a change in ownership of a note is not recorded in MERS or is recorded incorrectly, the transfer is still valid.

This page left intentionally blank.

# Part 3: Supervisory Response

At this time, the agencies are taking formal enforcement actions against each of the 14 servicers under the authority of section 8(b) of the Federal Deposit Insurance Act, 12 USC § 1818(b). The deficiencies and weaknesses identified by examiners during their reviews involved unsafe or unsound practices and violations of law, which have had an adverse impact on the functioning of the mortgage markets. Furthermore, the mortgage servicers' deficient foreclosure processes confirmed during the reviews have compromised the public trust and confidence in mortgage servicing and have consequences for the housing market and borrowers. The formal enforcement actions will require servicers, among other things, to:

- **Compliance program:** Establish a compliance program to ensure mortgage-servicing and foreclosure operations, including loss mitigation and loan modification, comply with all applicable legal requirements and supervisory guidance, and assure appropriate policies and procedures, staffing, training, oversight, and quality control of those processes.

- **Foreclosure review:** Retain an independent firm to conduct a review of residential foreclosure actions that were pending at any time from January 1, 2009, through December 31, 2010, to determine any financial injury to borrowers caused by errors, misrepresentations, or other deficiencies identified in the review, and to remediate, as appropriate, those deficiencies.

- **Dedicated resources for communicating with borrowers/single point of contact:** Ensure the following: effective coordination of communication with borrowers related to foreclosure, loss mitigation, and loan modification activities; assurance that communications are timely and appropriate and designed to avoid borrower confusion; continuity in the handling of borrower cases during the loan modification and foreclosure processes; reasonable and good faith efforts, consistent with applicable law and contracts, to engage in loss mitigation and foreclosure prevention for delinquent loans where appropriate; and assurances that decisions concerning loss mitigation or loan modifications will be made and communicated in a timely manner.

- **Third-party management:** Establish policies and procedures for outsourcing foreclosure or related functions to ensure appropriate oversight and that activities comply with all applicable legal requirements, supervisory guidance, and the servicer's policies and procedures, including the appropriate selection and oversight of all third-party service providers, including external legal counsel, DMSPs, and MERS.

- **Management information systems:** Improve management information systems for foreclosure, loss mitigation, and loan modification activities that ensure timely delivery of complete and accurate information to facilitate effective decision making.

- **Risk assessment:** Retain an independent firm to conduct a written, comprehensive assessment of risks in servicing operations, particularly in the areas of foreclosure, loss mitigation, and the administration and disposition of other real estate owned, including but not limited to operational, compliance, transaction, legal, and reputational risks.

In addition to the actions against the servicers, the Federal Reserve and the OTS have issued formal enforcement actions against the parent holding companies to require that they enhance on a consolidated basis their oversight of mortgage-servicing activities, including compliance, risk management, and audit.

The agencies will monitor and assess, on an ongoing basis, the corrective actions taken by the servicers and holding companies that are required by the enforcement actions and take further action, when necessary, to address failures. Enforcement actions and more frequent monitoring will remain in place at each servicer until that servicer has demonstrated that its weaknesses and deficiencies have been cor-

rected, including that adequate policies, procedures, and controls are in place. The agencies will continue to explore ways to improve their supervisory frameworks to identify more promptly and effectively the potential risks in mortgage-servicing and other banking operations.

# Part 4: Industry Reforms

Financial regulatory agencies are developing standards within their authority to improve the transparency, oversight, and regulation of mortgage-servicing and foreclosure processing and to set additional thresholds for responsible management and operation of mortgage-servicing activities. Moreover, a uniform set of national mortgage-servicing and foreclosure-processing standards would help promote accountability and appropriateness in dealing with consumers and strengthen the housing finance market.

Industry reforms that could improve the oversight and regulation of mortgage-servicing and foreclosure processing should generally include standards that require servicers to address major areas of weaknesses highlighted in the review, including in the following general areas:

## Governance and Oversight

- implement and routinely audit sound enterprise-wide policies and procedures to govern and control mortgage-servicing and foreclosure processes
- develop quality controls for effective management of third-party vendors who support mortgage-servicing and foreclosure processing
- strengthen the governance standards intended to ensure compliance with applicable federal and state laws and company policies and procedures
- develop company standards that emphasize accuracy and quality in the processing and validation of foreclosure and other servicing-related documents throughout the entire foreclosure process

## Organizational Structure, Staffing, and Technology

- increase staffing to adequate levels and provide them with requisite training to effectively manage the volume of default loans and foreclosures
- upgrade information systems and practices to better store, track, and retrieve mortgage-related documents

## Accountability and Responsiveness Dealing with Consumers

- ensure borrowers are offered appropriate loss-mitigation options
- ensure proper custody and control of borrower documents related to the servicing of the mortgage
- increase coordination between loss mitigation and foreclosure-processing units to prevent inappropriate foreclosures
- improve communication with borrowers and establish measurable goals and incentives for delivering accurate information and responsive assistance
- develop complaint-resolution processes that are routinely monitored and measured for quality assurance