## Exhibit 17

For Release Upon Delivery
2:30 p.m., December 13, 2011

**TESTIMONY OF**

**JULIE L. WILLIAMS**
**FIRST SENIOR DEPUTY COMPTROLLER AND CHIEF COUNSEL**
**OFFICE OF THE COMPTROLLER OF THE CURRENCY**

**Before the**

**SUBCOMMITTEE ON HOUSING, TRANSPORTATION, AND COMMUNITY**
**DEVELOPMENT**

**Of the**

**COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS**

**UNITED STATES SENATE**

**DECEMBER 13, 2011**

Statement Required by U.S.C § 250:

The views expressed here in are those of the Office of the Comptroller of the Currency and do not necessarily represent the views of the President.

EXHIBIT

tabbies

17

Chairman Menendez, Ranking Member DeMint, and members of the Subcommittee, I appreciate the opportunity to appear before you this afternoon. My testimony provides information on the status of the OCC's implementation of enforcement actions that direct the country's largest mortgage servicers to correct deficient and unsafe or unsound mortgage servicing and foreclosure processing practices and to provide remediation to borrowers who were financially harmed by those practices.[1]

The OCC appreciates the committee's concerns regarding transparency and accountability throughout this process and my testimony provides up-to-date information in three main areas. First, I describe the independent foreclosure review process required by our enforcement actions, which will provide financial remediation to borrowers financially harmed by servicing and foreclosure process defects identified in our enforcement actions. Second, I describe other comprehensive actions under way required by our actions to correct deficient and unsafe or unsound practices in mortgage servicing and foreclosure processing. Third, I summarize initiatives stemming from the foreclosure crisis that will affect mortgage servicing standards and practices and enhance protections for borrowers in other important respects.

## I.   **Background**

Before addressing these three areas, it is useful to provide a brief background.

In the fall of 2010, following reports of irregularities in the foreclosure processes of several major mortgage servicers, the OCC directed the largest national bank servicers to

---

[1] Eight national bank servicers were examined by the OCC: Bank of America, Citibank, HSBC, JPMorgan Chase, MetLife Bank, PNC, U.S. Bank, and Wells Fargo. The OTS also examined four federal savings association servicers and two holding companies: Aurora Bank, FSB; EverBank (and the thrift holding company, EverBank Financial Corp.); OneWest Bank, FSB (and its holding company IMB HoldCo LLC); and Sovereign Bank. On July 21, 2011, regulatory responsibility for federal savings associations transferred from the OTS to the OCC under the Dodd-Frank Wall Street Reform and Consumer Protection Act. Consent orders taken by the OTS prior to the transfer against federal savings associations remain in effect and enforceable by the OCC. Consent orders taken by the OTS against thrift holding companies remain in effect and enforceable by the Board of Governors of the Federal Reserve System.

conduct self-assessments to identify problems related to foreclosure processing. Concurrently, the OCC, the Board of Governors of the Federal Reserve System (FRB), the Federal Deposit Insurance Corporation, and the Office of the Thrift Supervision (OTS) coordinated efforts to conduct "horizontal" examinations of foreclosure processing at 14 large federally regulated mortgage servicers during fourth quarter 2010.[2]

The examinations evaluated controls and governance over bank foreclosure processes, including compliance with applicable federal and state law. Examiners evaluated bank self-assessments and remedial actions, assessed foreclosure operating procedures and controls, interviewed bank staff, and conducted an in-depth review of approximately 2,800 borrower foreclosure cases in various stages of foreclosure, spanning the 2009-2010 period. Examiners focused on foreclosure policies and procedures, organizational structure and staffing, third party management, quality control and audits, accuracy and appropriateness of foreclosure filings, and loan document control, endorsement, and assignment. When reviewing individual foreclosure files, examiners checked for evidence that servicers were in contact with borrowers and had considered alternate loss mitigation efforts, including loan modifications.

In general, the examinations found the loans in the sample were seriously delinquent. However, the examinations also found critical deficiencies in foreclosure governance processes, document preparation processes, and oversight and monitoring of third parties. These deficiencies constituted unsafe and unsound banking practices, which also resulted in violations of certain laws, regulations, or rules. All servicers exhibited similar deficiencies, although the number, nature, and severity of deficiencies varied by servicer.

---

[2] See "Interagency Review of Foreclosure Policies and Practices" (http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47a.pdf), April 13, 2011.

The sample of foreclosures reviewed as part of the interagency examination provided a basis for enforcement action; however, it is important to recognize that, due to the limited number of files that were reviewed, this process could not have identified the universe of borrowers who might have been financially harmed by those deficiencies.

On April 13, 2011, the OCC, the FRB, and OTS announced the issuance of cease and desist orders against each of the 14 servicers subject to our respective jurisdictions, and two service providers reviewed as part of the examinations. Crucial components of these enforcement actions are processes to identify borrowers who suffered financial injury as a result of the practices identified in the orders, and to provide financial remediation to them through an independent foreclosure review process.

## II.    **Independent Foreclosure Review**

The consent orders required the servicers to retain independent consultants to conduct comprehensive independent reviews of foreclosure activities in 2009 and 2010. The scope of work to be undertaken by the independent consultants was set out in engagement letters between each servicer and its consultant. The OCC reviewed these letters and required changes to ensure compliance with the intent of our orders and a level of consistency across the servicers. The OCC accepted the letters in late September, and made them publicly available on November 22, 2011.[3]

Since the acceptance of the letters in September 2011, the independent consultants have refined and adjusted processes, procedures, and methods outlined in the letters in consultation with OCC staff. In many cases, some details of the processes being implemented differ from

---

[3] See http://www.occ.gov/topics/consumer-protection/foreclosure-prevention/independent-review-foreclosure-letters.html. Some proprietary and personal information was redacted from the engagement letters prior to their release. Examples of redacted information include: names, titles, and biographies; proprietary systems information; references to specific bank policy; fees and costs associated with the engagement; and descriptions of past work performed by the independent consultants.

those described in the letters because of subsequent direction from the OCC. Most notably, the

OCC required changes to ensure a uniform and coordinated claims process among the servicers.

The independent consultants retained by each servicer to conduct these reviews of

national banks and federal savings associations are:

- AllonHill, LLC, for Aurora Bank;

- Clayton Services, LLC, for EverBank;

- Deloitte & Touche, LLP, for JPMorgan Chase;

- Ernst & Young, LLP, for HSBC and MetLife Bank;

- Navigant Consulting, Inc., for OneWest;

- PricewaterhouseCoopers, LLC, for Citibank and U.S. Bank;

- Promontory Financial Group, LLC, for Bank of America, PNC, and Wells Fargo Bank; and

- Treliant Risk Advisors, LLC, for Sovereign Bank.

The OCC required independence of the consultants and the law firms hired by the

consultants. During the selection process, we rejected some proposed consultants and law firms

to prevent conflicts of interest. We focused particularly on situations where consultants and law

firms may have previously expressed positions on the issues on which they would be called upon

to express independent judgment in the foreclosure review process. To formalize our

expectations for independence from the servicers, the OCC required engagement letters to

contain specific language stipulating that consultants would take direction from the OCC and

prohibiting servicers from overseeing, directing, or supervising any of the reviews. The OCC

specifically required each consultant to:

- Comply with requirements of the order and conduct each foreclosure review as
  independent from any review, study, or other work performed by the servicer or its

contractors or agents with respect to the servicer's mortgage servicing portfolio or the servicer's compliance with other requirements of the consent order.

- Ensure its work under the foreclosure review would not be subject to direction, control, supervision, oversight, or influence by the servicer, its contractors, or agents.

- Require immediate notification to the OCC of any effort by the servicer, directly or indirectly, to exert any such direction, control, supervision, oversight, or influence over the independent consultant, its contractors, or agents.

- Agree that the independent consultant is solely responsible for the conduct and results of the foreclosure review, in accordance with the requirements of article VII of the order.

- Pursuant to the monitoring, oversight, and direction of the OCC: 1) promptly comply with all written comments, directions, and instructions of the OCC concerning the conduct of the review, and 2) promptly provide any documents, work papers, materials or information requested by the OCC, regardless of any claim of privilege or confidentiality.

- Agree to provide regular progress reports, updates and information concerning the conduct of the foreclosure review to the OCC, as directed.

- Conduct the review using only personnel employed or retained by the independent consultant to perform the work required and not to employ services provided by the servicer's employees, contractors, or agents unless the OCC provides written approval.

- Adhere to requirements with respect to communication with the servicer, which provide for the independent consultant to use documents, materials, or information provided by the servicer, and to communicate with the servicer, its contractors, or agents, to conduct the review. Within these limits, agree that servicer's employees may not influence or attempt to influence determinations of the consultant's findings or recommendations.

- Agree that legal advice needed in conducting the review shall be obtained from the outside law firm whose retention to advise the independent consultants has been approved by the OCC and not to obtain legal advice (or other professional services) in conducting the review from the servicer's inside counsel, or from outside counsel retained by the servicer or its affiliates to provide legal advice concerning the order, or matters contained in the order.

- Require the servicer to agree that if the OCC determines that the consultant has not fully complied with the standards for independence, the OCC may direct the servicer to dismiss the consultant and retain a successor consultant.

These standards and oversight by the OCC are aimed at ensuring that the end result of the

review, the findings and recommendations of the independent consultants, will be the product and

opinion of those consultants, not of the servicers, their directors, their managers, or their attorneys.

The independent foreclosure review process includes two components—a coordinated claims process that will review cases based on borrowers' requests, and a "look-back" review that will examine cases identified by the independent consultants.

### *The Coordinated Claims Process*

The coordinated claims process provides the opportunity for borrowers to request a review of their case if they believe they suffered financial injury as a result of errors, misrepresentations, or other deficiencies in foreclosure actions pertaining to their primary residence, between January 1, 2009, and December 31, 2010. For any financial injury that the reviews identify, the consent orders require financial remediation.

On November 1, 2011, outreach efforts began to inform "in-scope" borrowers of the review process. As described below, these efforts are multi-faceted, and we are continuing to make adjustments to improve the scope and effectiveness of the borrower outreach efforts.

To be "in scope" and eligible for review, a borrower's loan must have been active in the foreclosure process between January 1, 2009 and December 31, 2010; the property must have been the primary residence; and the loan must have been serviced by one of the servicers below:

| | | |
|---|---|---|
| America's Servicing Company | Countrywide | National City |
| Aurora Loan Services | EMC | PNC |
| Bank of America | Everbank/Everhome | Sovereign Bank |
| Beneficial | GMAC Mortgage | SunTrust Mortgage |
| Chase | HFC | U.S. Bank |
| Citibank | HSBC | Wachovia |
| CitiFinancial | IndyMac Mortgage Services | Washington Mutual |
| CitiMortgage | Metlife Bank | Wells Fargo |

A loan is considered active in the foreclosure process if:

- The property was sold due to a foreclosure judgment.

- The loan was referred into the foreclosure process, in which case the borrower may have been notified in writing, but was removed from the process because payments were brought up-to-date or the borrower entered a payment plan or modification program.

- The loan was referred into the foreclosure process, but the home was sold or the borrower participated in a short sale or chose a deed-in-lieu-of-foreclosure action.

- The loan was referred into foreclosure and remains delinquent but a foreclosure sale has not taken place.

To inform borrowers of the coordinated claims process, the OCC has required direct mail, a Web site, a toll-free number, advertising, and other outreach.

Direct mail began on November 1, 2011, with an integrated claims processor, which all servicers are using, starting the process of mailing a request for review form to more than four million borrowers with instructions on how to fill out and return that form to request an independent review. The form walks borrowers through examples of situations that would be likely examples of financial injury, but it also allows borrowers to simply tell their story. The crucial objective is to get as much information as possible into the pipeline for an independent foreclosure review. Borrowers must return the form by April 30, 2012.

The direct mail effort includes use of address tracing methods to locate borrowers who lost their home to foreclosure. If an address is not current, the integrated claims processor will run the borrower data through a national change-of-address database to find a current address. Returned mail will be processed through a third-party consumer database using information from credit bureaus, public records and registrations, utilities, phone number databases, etc., to determine most likely current addresses. Mail will be processed three times in an attempt to determine the most likely address. As of December 9, less than five percent of mailings have

8

been returned undeliverable, and secondary addresses have been found for 57 percent of those where the tracing process has been completed.

As of December 9, 2011, more than 2.7 million letters have been sent, nearly 15,000 claims forms have been received, and the rate of completed forms returned for processing has increased significantly each week so far.

A Web site—www.IndependentForeclosureReview.com—and toll-free phone number—1-888-952-9105—were also launched on November 1, 2011. Both provide information about the review process. Assistance is available from the toll-free number Monday through Friday from 8 a.m. to 10 p.m., and Saturday from 8 a.m. to 5 p.m. (Eastern time). As of December 9, the Web site has been visited 280,643 times since its launch, an average of 7,385 visits per day. During that same period, the toll-free number has received 48,679 calls, an average of 1,281 per day, and over 3,317 callers have requested forms to be sent to them.

The outreach effort also will include print and online advertising. The print advertising includes full-page advertisements in widely read national publications (e.g. *Parade Magazine, People, TV Guide*). Additional publications that serve minority and underserved audiences also are being identified. The presently proposed print advertising outlets have a combined circulation in excess of 60.5 million. The audience and reach of these advertisements include saturation in geographic and demographic sectors most affected by foreclosure. The first advertisements will appear in January.

The online advertising includes purchasing keywords (e.g. "foreclosure review") on major search engines (e.g. Google, Bing) to allow people to find information about the review more easily. By purchasing keywords associated with the foreclosure review, these efforts will redirect significant numbers of people to the independent foreclosure review Web site.

In addition to the mailings, Web site, phone number, and advertising by the servicers, other OCC outreach efforts include making housing counselors and community organizations aware of the independent foreclosure review through our electronic communications network and discussions with these groups. The announcement of the kickoff of the foreclosure reviews and the subsequent release of the interim report were distributed to more than 32,000 subscribers to our e-mail information service. This electronic distribution network will be used to share additional communications about these reviews with interested community and consumer organizations as well as others who subscribe to this service.

The OCC is working with a number of public interest organizations involved in housing counseling to explain the foreclosure review process, and we have undertaken an ongoing dialogue with a number of groups regarding their concerns about the scope and effectiveness of the outreach program. These conversations have included constructive comments and suggestions, and will result in improvements to the outreach program. The outreach program is a work in process, and we continue our dialogue with these important organizations.

The OCC has also determined to offer a series of public service announcements in January 2012 which will include both print and radio spots in English and Spanish. The print items will be distributed to more than 7,000 local newspapers and publications. The 30-second radio items will be distributed to more than 6,500 small radio stations throughout the country. Spanish items are distributed to more than 700 Spanish-language newspapers and 500 Spanish-language radio stations. The public service items will highlight the toll-free number, the Web site, eligibility, and the deadline for action. Based on OCC's experience with similar public service placements, we expect the items to appear in radio and print more than 1,200 times in 40 states during January, February, and March.

*"Look-Back" Reviews*

In addition to the coordinated claims process, a "look-back" file review supplements the coordinated claims process to further identify deficiencies, errors, or misrepresentations that may have caused financial injury. In October, the independent consultants began selecting files for reviews, in accordance with plans contained in engagement letters submitted to, and accepted by, the OCC.

The consent orders allow the consultants to use sampling and other tools to identify certain types of files for review. Guidance from the OCC described methods and controls to ensure that samples are representative of the in-scope mortgages. The engagement letters contain descriptions of the statistical basis for the sampling methods used as approved by the OCC.

Some segments require 100 percent review, including cases involving the Servicemembers Civil Relief Act (SCRA), certain bankruptcy cases facing foreclosure in 2009 and 2010, cases referred by state or federal agencies, and reviews requested through the coordinated claims process described above. With respect to SCRA cases, I would like to offer particular thanks to the Defense Manpower Data Center of the Department of Defense and the Department of Justice (DOJ). We reached out to both to explore how to effectively identify servicemembers whose cases should be reviewed as part of the 100 percent review. The result of that collaboration is that processes have been developed that will enable the names of all identified in-scope borrowers for each servicer to be batched-checked against servicemember information relevant to the in-scope period. This is an invaluable step to ensure that all eligible servicemembers are included in the 100 percent file review.

11

Mortgages in the sampling population may be segmented based on characteristics that include geography, third-party attorney, types of borrower history in paying mortgages, prior customer complaints, and participation in modification programs, such as the federal Home Affordable Modification Program (HAMP). The segments and sizes of the samples selected for review were determined by the consultants, based on guidance from the OCC and in consultation with the servicers, but not determined or dictated by servicers.

In some cases, sampling may be appropriate at the outset, but initial results may lead to more in-depth review. These second-level reviews are subject to OCC oversight to ensure they are appropriately structured and implemented. The OCC expects the consultants to assess the results of the ongoing reviews continuously to identify potential "pockets" or systemic instances of financial harm and adapt the review plan accordingly. The tolerance for error is low—reliability, or confidence level, should not be less than 95 percent.

During the "look-back" reviews, the independent consultants must assess:

- Whether the foreclosing party had properly documented ownership or was otherwise a proper party to the action;

- Whether the foreclosure was in accordance with applicable state and federal law;

- Whether the foreclosure sale occurred when a loan modification or other loss mitigation request was under consideration, or when the loan was performing in accordance with a trial or permanent loan modification, or when the loan had not been in default for a sufficient period to authorize foreclosure;

- Whether, for any non-judicial foreclosure, the foreclosure sale and post-sale confirmations were in accordance with the mortgage loan and state law requirements;

- Whether a borrower's account was charged only fees or penalties permissible under the terms of the loan, applicable state and federal law, and were reasonable and customary;

- Whether the frequency of fees assessed was excessive under the terms of the loan or applicable state and federal law;

- Whether the requirements of HAMP and proprietary loss mitigation programs were followed; and

- Whether any errors, misrepresentations, or other deficiencies identified in the review resulted in financial injury to any borrower or mortgagee.

As of December 9, more than 56,000 files are actively under review.

### *Financial Injury and Remediation*

When independent consultants find errors, misrepresentations, or other deficiencies, their next steps are to determine whether financial injury occurred and to recommend remediation when it does. Financial injury is defined as monetary harm directly caused by a servicer error.

Examples of financial injury identified in joint OCC-Federal Reserve guidance that was provided to the independent consultants include, but are not limited to, the following:

1. The borrower was not in default pursuant to the terms of the note and mortgage at the time the servicer initiated the foreclosure action.

2. The servicer initiated foreclosure or conducted a foreclosure sale in advance of the time allowed for foreclosure under the terms of the note and mortgage or applicable state law.

3. The borrower submitted payment to the servicer sufficient to cure the default pursuant to the terms of the note and mortgage, but the servicer returned the payment in contravention of the terms of the note or mortgage, state or federal law, or the servicer's stated policy covering payments when in default.

4. The servicer misapplied borrower payments, did not timely credit borrower payments (including failure to properly account for funds in suspense), or did not correctly calculate the amount actually due from the borrower, in contravention of the terms of the note and mortgage, state or federal law, investor requirements, or the servicer's stated policy covering application of payments.

5. The borrower paid a fee or penalty that was impermissible.

6. A deficiency judgment was obtained against the borrower that included the assessment of a fee or penalty that was impermissible.

7. The servicer placed an escrow account on the mortgage and the placement resulted in monies paid by the borrower into escrow in contravention of the terms of the note or mortgage, state or federal law, or the servicer's stated policy covering escrow accounts.

8.  The servicer placed insurance on the mortgage and the placement resulted in monies paid by the borrower towards insurance in contravention of the terms of the note or mortgage, state or federal law, or the servicer's stated policy covering placed insurance.

9.  The servicer miscalculated the amount due on the mortgage and secured a judgment against the borrower for an amount greater than the borrower owed.

10. A borrower's remittance of funds to a third party acting on behalf of the servicer was not credited to the borrower's account.

11. The borrower was performing under the terms of an approved trial loan modification or an approved permanent loan modification, but the servicer proceeded to foreclosure in contravention of the terms of the modification offered by the servicer to the borrower.

12. A borrower was denied a modification in contravention of the terms of the governing modification program or the servicer's stated policy covering modifications.

13. There is evidence that the borrower provided or made efforts to provide complete documentation necessary to qualify for a modification within the period such documentation was required to be provided by the governing modification program and the servicer denied the loan modification in contravention of the terms of the governing modification program or the servicer's stated policy covering modifications.

14. The servicer initiated foreclosure or completed a foreclosure sale without providing adequate notice as required under applicable state law.

15. The servicer foreclosed on or sold real property owned by an active military servicemember in violation of SCRA.

16. The servicer did not lower the interest rate on a mortgage loan entered into by a military servicemember, or by the servicemember and his or her spouse jointly, in accordance with the requirements of SCRA.

17. The servicer failed to honor a borrower's bona fide efforts to redeem a sale under applicable state law during the redemption period.

18. The borrower was protected by the automatic stay under the bankruptcy code and a court had not granted a request for relief from the automatic stay or other appropriate exception under the bankruptcy code.

19. The borrower was making timely pre-petition arrearage payments required under an approved bankruptcy plan and was current with their post-petition payments.

20. The borrower purchased a payment protection plan; was or should have been receiving benefits under the plan; and those benefits were not applied pursuant to the contract.

21. The servicer was not the proper party, or authorized to act on behalf of the proper party, under the applicable state law to foreclose on the borrower's home, and this resulted in or may result in multiple foreclosure actions or proceedings.

22. The servicer failed to comply with applicable legal requirements, including those governing the form and content of affidavits, pleadings, or other foreclosure-related documents, where such failure directly contributed to: (a) the borrower paying fees, charges, or costs, or making other expenditures that otherwise would not have been paid or made; or (b) the initiation of a foreclosure action or proceeding against a borrower who otherwise would not have met the requirements for initiating such an action.

If the independent consultants determine that financial injury occurred as a result of errors, misrepresentations, or other deficiencies, they will develop recommendations for remediating that injury. In addition to providing guidance in the form of 22 scenarios where financial injury might be present, we are also considering guidance that will clarify expectations as to the amount and type of compensation recommended for certain categories of harm. Any such baseline expectations would not, however, override the independent judgment of the independent consultants. Rather the objective would be to help ensure remediation recommendations are consistent across the twelve OCC-supervised servicers for similarly situated borrowers who suffered similar harms. The independent consultants will always have the flexibility to take account of the facts and circumstances of individual borrowers to arrive at compensation tailored to the borrower's individual situation where the independent consultants determines a different amount of compensation is appropriate.

The reviews are expected to take several months to complete. However, independent consultants and servicers have implemented a process to escalate the review of borrowers' cases where foreclosure sale is imminent. The independent consultants and servicers have identified loans that have been scheduled for near term foreclosure sale. Requests for review from in-scope borrowers in those cases are subject to special processes: prioritized review by the independent consultant and concurrent review by the servicer focused on rapid identification of bases to

postpone the foreclosure action. To assure speed and consistency in the servicers review, we plan to provide direction on minimum criteria for this review.

**III.    Other Actions Required by OCC Consent Orders**

In addition to the independent foreclosure review, our consent orders direct other work to correct unsafe and unsound practices in mortgage servicing and foreclosure processing. Work includes efforts to correct deficiencies in mortgage servicing activities, oversight and management of third-party service providers, activities related to Mortgage Electronic Registration Systems (MERS), management information systems, risk assessment and management, and compliance oversight.

*Mortgage Servicing*

The consent orders require servicers to correct deficiencies in mortgage servicing. Plans submitted by the servicers include:

- Measures to ensure that staff members handling loss mitigation and loan modification requests routinely communicate and coordinate with staff members processing foreclosures on the borrowers' properties;

- Deadlines for responding to requests for loan modifications and other communications from borrowers as well as deadlines for making final decisions on loan modification requests; deadlines must be at least as responsive as the timelines under HAMP;

- An easily accessible and reliable single point of contact established for each borrower throughout loan modification and foreclosure processes;

- A requirement for written communications to each borrower identifying the single point of contact and specifying how a borrower can communicate with the contact;

- A requirement that each single point of contact have access to data necessary to provide borrowers with timely, accurate, and complete information about the status of their loan modification requests and foreclosure cases;

- Measures to ensure that staff members are trained adequately about handling mortgage delinquencies, loss mitigation, and loan modifications;

- Procedures and controls to ensure that, before a foreclosure sale occurs, a final decision regarding a borrower's loan modification request (either on a trial or permanent basis) is communicated in writing to the borrower within a reasonable period and explains the reasons why the borrower did not qualify for the trial or permanent modification;

- Procedures and controls to ensure that, when a loan has been approved for modification on a trial or permanent basis, no foreclosure or further action preceding foreclosure occurs, unless the borrower defaults on the terms of the trial or permanent modification;

- Policies and procedures to enable borrowers to submit complaints about the loan modification process, denial of modification requests, the foreclosure process, or foreclosure activities that impede the pursuit of foreclosure prevention options, as well as a process for making borrowers aware of the complaint procedures;

- Procedures for promptly considering and resolving borrowers' complaints, including a process for timely communication of the resolutions;

- Policies and procedures to ensure that payments are credited promptly; that payments, including partial payments to the extent permissible under the terms of applicable legal instruments, are applied to scheduled principal, interest, and escrow before fees, and that any misapplication of borrowers' funds is corrected promptly;

- Policies and procedures to ensure that timely information about foreclosure prevention options is sent to borrowers in the event of delinquencies or defaults, including plain language notices about loan modifications and foreclosures;

- Policies and procedures to ensure that servicers properly maintain and track documents related to foreclosures and loan modifications, so that borrowers are not required to resubmit the same documents already provided, and that borrowers are notified promptly of the need for additional information; and

- Policies and procedures to consider loan modifications or other foreclosure prevention activities with respect to junior lien loans, and to factor the risks associated with such junior lien loans into loan loss reserving practices.

Each servicer has established policies and procedures for providing single points of contact to assist borrowers throughout the loan modification and foreclosure processes. Actions include the establishment of procedures for communicating information about the single points of contact to the borrowers including direct ways to reach these contacts; creation of training programs to instruct single points of contact about their responsibilities; establishment of specific organizational structures to perform these duties; and the creation of standard communication

17

strategies for conveying information to and from borrowers. Servicers are required to initiate processes for establishing single points of contact and supporting procedures by the end of 2011.

All servicers have implemented controls to prevent "dual-tracking" of loans to ensure no foreclosure or further legal action relating to foreclosure occurs when a borrower's loan has been approved for modification on a trial or permanent basis. Specific actions related to "dual tracking" vary from servicer to servicer but include review at designated points before the foreclosure sale, enhanced communication between loss mitigation and foreclosure processing staff, and development and use of matrices or checklists to ensure appropriate holds are placed on further foreclosure processing when appropriate.

### *Third-Party Management*

The consent orders require servicers to improve oversight of third-party service providers that support mortgage servicing and foreclosure activities. The servicers submitted plans in July and work is under way to establish processes for appropriate due diligence in evaluating the qualifications of potential third-party service providers before entering into new contractual arrangements. The plans also provide for regular reviews of third-party service providers and assessment of their performance based on qualitative standards for competence, completeness, and legal compliance rather than standards based solely on the volume of foreclosures processed or the speed of processing. Additionally, the plans provide for the secure custody and accuracy of records transferred to these third parties during the foreclosure process.

Specific actions vary from servicer to servicer. Examples of actions include:

- Assessing risks associated with third-party activities to determine specific levels of oversight and activities based on identified risks.

- Establishing new policies, or enhancing existing policies, for oversight of third parties.

- Enhancing due diligence in assessing the capabilities of potential third parties.

- Establishing oversight committees to monitor the practices and activities of third parties, to implement processes to assure the quality of their work, and, if necessary, to terminate underperforming or noncompliant third parties.

- Creating procedures to track complaints about third party activities and performance.

- Scheduling and conducting on-site audits and quality assurance processes of third parties.

- Including language in service contracts with third parties setting specific work standards.

- Periodically assessing the performance of third-party service providers, including attorneys and law firms providing foreclosure counsel, and the discontinuation of servicing contracts and agreements when appropriate.

- Improving management information systems used by third parties to ensure accuracy of records contained in, and transmitted by, those systems.

### *MERS*

The consent orders require servicers to ensure appropriate oversight and controls of their activities with respect to MERS and compliance with MERSCORP's membership rules, terms, and conditions. Servicers' action plans submitted in July required, at a minimum:

- Processes to ensure that all mortgage assignments, endorsements, and all other actions with respect to mortgage loans serviced or owned by the servicer out of MERS' name are executed only by a certifying officer authorized by MERS and approved by the servicer;

- Processes to ensure that the servicer maintains up-to-date corporate resolutions from MERS for all servicer employees and third parties who are certifying officers authorized by MERS, and up-to-date lists of MERS certifying officers;

- Processes to ensure compliance with all MERS requirements and with the requirements of the MERS Corporate Resolution Management System;

- Processes to ensure the accuracy and reliability of data reported to MERSCORP, including monthly system-to-system reconciliations and daily capture of all reports of problems with registrations, transfers, and status updates on open-item aging reports; and

- An appropriate MERS quality assurance work plan and annual independent tests of the control structure of the system-to-system reconciliation process, the error correction process, and adherence to the servicer's MERS Plan.

Work is under way to implement these plans and includes:

19

- Incorporating MERS into servicers' third-party oversight programs, including periodic review, quality assurance, and independent audits.

- Enhancing controls and standardizing processes for executing mortgage assignments by MERS certifying officers.

- Establishing training, certification, and assignments and endorsements related to MERS.

- Improving processes for controlling data quality.

- Creating and executing quality assurance work plans to ensure accuracy and compliance with MERS-related procedures.

- Establishing periodic—in some cases daily—reconciliations of key reports and data to ensure compliance with MERS requirements and prompt resolution of discrepancies.

- Increasing the number of staff members dedicated to overseeing MERS-related activities.

Corrective actions to enhance oversight and controls of activities related to MERS are expected to be in effect by the end of the first quarter of 2012.

***Management Information Systems***

The consent orders require the servicers to improve management information systems that support mortgage servicing and foreclosure processing. Each servicer has submitted a plan for the operation of its management information systems for foreclosure and loss mitigation to ensure the timely delivery of complete and accurate information to permit effective decision making regarding foreclosure, loan modification, or loss mitigation. The plans include descriptions of systems used by servicers for foreclosure and loss mitigation purposes. They also include timetables for changes or upgrades necessary to monitor compliance with legal requirements, servicing guidelines of government-sponsored enterprises (GSE), and requirements of the consent orders. Improvements to management information systems will ensure accuracy of records and provide staffs working on foreclosures and loss mitigation efforts access to necessary and timely information provided by the borrowers.

Work is under way and includes:

- Consolidation of mortgage servicing platforms.

- Standardized and automated workflows to assist personnel with loan modification and foreclosure decisions and processing.

- Development of standardized reporting and improved quality controls.

- Implementation of case management software to provide better access to single points of contact interacting with borrowers.

- Periodic audits.

- Evaluation of requirements and documentation to ensure that management information systems meet the needs of stakeholders from mortgage servicing, loss mitigation, foreclosure processing, and MERS-related activities.

- Escalation and enhanced reporting to executives and boards of directors.

Enhancing management information systems is a continuous process. Substantive improvements have been made and will continue throughout the next year.

### *Risk Assessment and Risk Management*

The consent orders require the servicers to assess risks posed by their mortgage servicing operations and develop plans to manage those risks. Servicers have conducted their assessments and developed specific action plans to effectively mitigate or manage identified risks on an ongoing basis. Work on those plans is under way and includes:

- Conduct periodic third-party audits or self evaluation of risks associated with mortgage servicing and foreclosure processing.

- Conduct periodic assessment of risks and develop action plans to reduce risks from specific functional areas, including loan modifications, disposition of bank-owned real estate, bankruptcy, and compliance with SCRA.

- Strengthen policy and internal guidance concerning foreclosure and loss mitigation.

- Identify specific individuals or groups accountable for compliance and operational risk associated with mortgage servicing and foreclosure practices.

- Integrate key processes to ensure consistency of policy and procedures related to foreclosure and loss mitigation activities.

- Establish additional training associated with foreclosure and loss mitigation risks.

- Develop and report key indicators to support monitoring and evaluating risk.

- Use compliance testing on a regular basis.

Implementation of risk management plans is expected to be in effect during the first quarter of 2012. Assessment and monitoring will be an ongoing servicer activity.

***Compliance Committees, Compliance Programs***

The consent orders require a number of actions to ensure compliance with the orders and with applicable laws and regulations. As a result during the third quarter of 2011, the servicers set up compliance committees responsible for the development and implementation of compliance programs, action plans, policies and procedures, and strengthened operating processes to correct the deficiencies cited by the enforcement actions. At a minimum, each committee includes three members of the institution's boards of directors. The compliance committees are also responsible for reporting actions required by the enforcement orders, and for taking corrective action for any ongoing or repeated non-compliance.

The consent orders required comprehensive action plans to address compliance. Servicers submitted those plans in July, and work is under way to implement the plans. Plans addressed financial and personnel resources, organizational structure, and specific controls to ensure the affidavit, declarations, and notarization processes comply with applicable laws and regulations.

Actions vary by servicers and include:

- Changed management and leadership to ensure accountability and clarify responsibilities for mortgage servicing, foreclosure, and loss mitigation.

- Changed reporting structures to centralize oversight of mortgage servicing, foreclosure, and loss mitigation functions.

- Increased number of personnel responsible for conducting audits and dedicated to ensuring compliance, as well as for mortgage servicing, foreclosure, loss mitigation, and information technology supporting these functions.

- Implemented training programs for signers of sworn documents and notaries to emphasize the personal knowledge required and specific requirements of state law.

- Increased training requirements for customer assistance specialists, single points of contact, and compliance personnel.

- Brought previously outsourced preparation of sworn documents in-house.

- Created or revised templates for sworn documents to conform more closely with state and local laws, in judicial and non-judicial foreclosure states.

- Implemented quality control processes to ensure proper completion of sworn documents, including, at some servicers, real-time monitoring by dedicated quality assurance staff.

- Established foreclosure referral checklists to verify loss mitigation efforts, bankruptcy status, and the borrower's status related to the SCRA.

- Established dedicated units to specialize in SCRA and to correct SCRA-related issues.

- Established testing of loan modification denials, sworn document completion, and regulatory compliance, as part of quality control initiatives to verify compliance with loan modification program requirements, GSE loan servicing guidelines, and federal laws including SCRA and bankruptcy.

- Established periodic evaluations by senior managers of policies, staffing, and functional performance related to mortgage servicing, foreclosure, and loss mitigation.

As work continues to improve compliance controls across the servicers, the OCC expects the servicers to complete the implementation of new processes, policies, and enhanced controls during the first part of 2012.

## IV.    Other Efforts to Enhance Mortgage Servicing Standards and Practices

While the actions taken under our consent orders are significant, there are a variety of other efforts, stemming from the foreclosure crisis, that are underway at the federal and state

levels that will affect mortgage servicing standards and practices and enhance borrower protections. The following summarizes some of those efforts.

### *Interagency Effort to Establish Uniform Mortgage Servicing Standards*

Staff from the OCC, FRB, Federal Deposit Insurance Corporation, Consumer Financial Protection Bureau (CFPB_, and other participating agencies are working to develop proposed national standards to address all aspects of mortgage servicing. Ideally, key requirements would be in the form of enforceable regulations, supplemented with compliance guidelines that can be used to fill in details and provide illustrations of practices that comply with the regulatory standards. The objective is to achieve rigorous, uniform "rules of the road" for responsible servicer conduct. It is vital that any standards that the agencies adopt apply to, and are implemented by, all firms engaged in mortgage servicing—not just federally regulated depository institutions—and that there is strong oversight of all servicers' compliance.

### *Other Federal and State Attorneys General Settlement Activities*

For well over a year, the OCC has been in regular communication with the DOJ and other federal agencies regarding our foreclosure-related enforcement actions and how those actions relate to other federal and state enforcement and settlement activities that may pertain to the types of activities covered by our orders. For example, we discussed with the DOJ how the detailed action plans required by the orders, particularly for mortgage servicing and foreclosure procedures, had the potential to synchronize with the terms of the settlement under discussion with the same mortgage servicers, state attorneys general, DOJ, and certain other federal agencies. On June 13, 2011, the OCC, the FRB, and the OTS announced a 30-day extension of certain timelines under the orders—at the request of the DOJ—to facilitate that process of

24

coordination of servicer actions. We continue a constructive dialogue with the DOJ on all these subjects.

### Changes in Federal Law: Dodd-Frank Act

The Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank) has several provisions that affect mortgage servicing. It amended the Truth-in-Lending Act (TILA) and the Real Estate Settlement Procedures Act (RESPA) and granted authority for these and other "enumerated consumer protection laws" to the CFPB on July 21, 2011.

The amendments to TILA require periodic notices to borrowers disclosing information related to the servicing of the loan and prohibit fees for providing a statement of balance or for modifying a high cost mortgage; impose requirements for establishing and disclosing escrow accounts for a variety of mortgages; and require timely payoff notices and payments be credited on the date of receipt. The amendments to RESPA regulate the force-placement of hazard insurance, and require timely response to borrower complaints, contact information for the owner or assignee of the mortgage; and compliance with "any obligation found by the [CFPB] to be appropriate to carry out the consumer protection purposes of [RESPA]."

The Dodd-Frank Act also requires the Secretary of the Department of Housing and Urban Development (HUD) and the Director of the CFPB, in consultation with the federal banking agencies, to create a database with information on delinquent loans and foreclosures. Finally, the Dodd-Frank Act authorizes the CFPB to issue regulations that identify as unlawful "unfair, deceptive, or abusive" practices in connection with mortgage servicing.

### Changes in GSE Guidelines

In addition to these new requirements under federal laws, Fannie Mae and Freddie Mac announced two initiatives related to servicing that could have widespread impact. The first,

25

announced with the Federal Housing Finance Agency (FHFA) and HUD in January 2011, would lead to new compensation structures that determine how servicers of single-family loans in mortgage-backed securities pools are paid. This initiative would align compensation structures with the objective of improving service for borrowers, providing flexibility in servicing non-performing loans, and promoting liquidity in the mortgage securities market. On September 27, 2011, at the direction of the FHFA, the GSEs' issued a discussion paper, "Alternative Mortgage Servicing Compensation," setting forth a series of potential approaches and inviting public comment.

The second GSE initiative, announced in June, is to develop uniform policies for servicing delinquent loans that will enhance and streamline outreach to delinquent borrowers and establish performance-based monetary incentives for compliance. Under these guidelines, which largely took effect October 1, 2011, a foreclosure will not be permitted on a mortgage owned or guaranteed by Fannie Mae or Freddie Mac until the servicer has conducted a formal review of the borrower's eligibility under all available foreclosure alternatives, including loan modifications, short sales, and deeds in lieu of foreclosure. Servicers will be expected to continue to help these borrowers qualify for a foreclosure alternative. Given the significance of the GSEs to the mortgage market, these new standards will act as the catalyst for conforming changes nationwide.

## V.  Conclusion

The consent orders issued by the OCC, the FRB, and the OTS in April were significant steps toward ensuring this country's mortgage servicing industry operates in a safe and sound manner and borrowers are treated fairly. As a result of these actions more than four million borrowers involved in the foreclosure process in 2009 and 2010 have the opportunity to receive

free, independent reviews of their cases.  Where wrongful financial injury is identified, our consent orders require remediation.  We expect to issue a report on the results of the independent foreclosure review at the conclusion of that effort.  In addition to the independent foreclosure review, other efforts required by our orders are well under way to correct deficiencies in mortgage servicing and foreclosure processing that our examiners identified in their reviews during the fourth quarter of 2010.  Much of the work to correct identified weaknesses in policies, operating procedures, control functions, and audit processes will be substantially complete in the first part of 2012; other initiatives will continue through the balance of 2012.  OCC examiners provide ongoing oversight to this process and will continue to monitor efforts to ensure compliance with our consent orders.

I appreciate the opportunity to appear before the Subcommittee this afternoon, and look forward to addressing your questions.