## Exhibit 2

**Farley Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------

| | ) | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |

---------------------------------------------------------------

**DECLARATION OF TERESA RAE FARLEY IN SUPPORT OF THE RESCAP
LIQUIDATING TRUST'S OBJECTION TO PROOFS OF CLAIM NOS. 5853 AND 5856
FILED BY CONNECTICUT HOUSING FINANCE AUTHORITY**

I, Teresa Rae Farley, hereby declare as follows:

1. I am the Senior Director of Asset Disposition for The ResCap Liquidating

Trust (the "Liquidating Trust"), and previously served as the Senior Director of Asset

Disposition for Residential Capital, LLC ("ResCap"), a limited liability company organized

under the laws of the state of Delaware and the parent of the other debtors in the above-captioned

Chapter 11 Cases (collectively, the "Debtors"). I was employed by ResCap at almost all times

since 2008, either as a consultant or an employee. In November 2012, I became a full time

employee. I assumed my current position with the Liquidating Trust as of Plan Effective Date.

2. I am authorized to submit this declaration (the "Declaration") in support of

*The ResCap Liquidating Trust's Objection To Proofs of Claim Nos. 5853 and 5856 Filed by*

*Connecticut Housing Finance Authority* (the "Objection").[1]

3. I have more than 25 years of corporate finance and mortgage-related work

experience. I began my career as an associate in the Corporate Department at Dorsey &

Whitney, after graduating from law school at the University of Minnesota in 1985.

---

[1] Defined terms used but not defined herein shall have the meanings ascribed to such terms in the Objection.

4.     In 1989, I joined Residential Funding Corporation and rose to the level of Managing Director.  In that role, among other things, I led the Structured Finance/Securitization, Investor Relations, and portions of the Master Servicing Groups and participated on various board committees.  I left Residential Funding Corporation in 2000 and, until late 2007, I worked in key executive positions for various major financial institutions, including Merrill Lynch and Credit Suisse First Boston, in corporate finance and mortgage-related businesses.

5.     In 2008, I was engaged by ResCap was as a consultant.  My duties included, among others, working with senior management on treasury and liquidity strategies, including negotiating, implementing and managing a bond exchange, various funding facilities and various other sale and international tax strategies, managing treasury and compliance, and working with various operations and servicing groups. In my capacities as an employee of and consultant for the Debtors, I became generally familiar with the Debtors' various loan servicing functions, including applicable standards, servicing processes, reporting and quality control.

6.     During the administration of the Chapter 11 cases, I was responsible for, among other matters, asset dispositions, including the management and liquidation of certain non-debtor entities.  In addition, after the sale of the servicing platform to Ocwen on February 15, 2013, I had primary responsibility for addressing objections and issues raised by several counter-parties to the mortgage loan servicing agreements that were the subject of the sale, including efforts to resolve matters that remained outstanding following the closing of the sale. Specifically, I managed the Debtors' and Liquidating Trusts' sustained effort to resolve the assignment of the servicing of the CTHFA Loan Portfolio.

7.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned

2

from my review of relevant documents and information I have received through my discussions

with other former members of the Debtors' management and the Liquidating Trust and with

associates of Ocwen. I have reviewed and analyzed the Claim filed by CTHFA and the related

documentation and am familiar with the Debtors' and Liquidating Trust's relationship with

CTHFA.  If I were called upon to testify, I could and would testify competently to the facts set

forth herein in on that basis.

### **Relationship between Debtors and CTHFA**

8.      I understand that GMACM had a long-standing relationship with CTHFA

that spanned over 20 years prior to the Petition Date.  Pursuant to agreements between certain of

the Debtors and their predecessors in interest and CTHFA, the Debtors facilitated the origination

of mortgage loans to Connecticut residents through direct loan purchase agreements with

CTHFA.  GMACM and its predecessors in interest also serviced loans in the CTHFA portfolio

on behalf of CTHFA in accordance with specific servicing agreements and CTHFA's applicable

guides in effect from time to time.

9.      A predecessor-in-interest to GMACM, GMAC Mortgage Corporation of

PA, and CTHFA are parties to a loan servicing dated July 15, 1987, entitled Connecticut

Housing Finance Authority Home Mortgage Servicing Agreement (the "Servicing Agreement").

A copy of the Servicing Agreement is annexed here as Exhibit "A".  The Servicing Agreement

references a Master Commitment Agreement for Mortgage Purchases (the "Master Purchase

Agreement").  A copy of the Master Purchase Agreement dated July 15, 1987 is annexed hereto

as Exhibit "B." Under the Master Purchase Agreement, GMACM sold mortgages to CTHFA that

either were insured by the Federal Housing Administration, insured through private mortgage

insurance or backed by Veterans Administration guarantees.

10.    As of the Petition Date, CTHFA and GMACM were performing under the Servicing Agreement as if it was in effect between the parties.

11.    Pursuant to the Servicing Agreement, GMACM agreed to service loans purchased by CTHFA from GMACM or from other lending institutions and referred to and accepted by GMACM (the "<u>CTHFA Loan Portfolio</u>").

12.    I understand that in connection with discussions between outside counsel to the Debtors and GMACM that took place in November of 2012, counsel to CTHFA furnished the Debtors' counsel with a copy of correspondence dated September 18, 2008, from GMACM to CTHFA, which purported to terminate the Servicing Agreement in connection with the termination of the Master Purchase Agreement (the "<u>Termination Letter</u>").    A copy of the Termination Letter furnished by counsel to CTHFA is annexed hereto as Exhibit C.    The Termination Letter states that the decision to terminate the Master Purchase Agreement and Servicing Agreement was precipitated by an institutional decision to exit the retail mortgage lending business.    Section 5.C of the Servicing Agreement permitted GMACM to terminate the agreement on 60-days' advance notice.    <u>See</u> Servicing Agreement at ¶ 5.C.

13.    The Master Purchase Agreement was terminated. However, GMACM continued to service the CTHFA Loan Portfolio. Neither the Debtors nor the Liquidating Trust are aware of any written agreement among the parties by which they memorialized their understanding that GMACM would continue in its role as servicer for the CTHFA Loan Portfolio.    Notwithstanding, since September 18, 2008, and through the date hereof, both parties have continued to render performance to each other in conformity with the terms of the Servicing Agreement.

14.    During the course of the relationship and through the Petition Date,
GMACM serviced the CTHFA Loan Portfolio in accordance with the standards imposed by the
Servicing Agreement and the applicable CTHFA guides.  The servicing was performed in an
acceptable manner.  I understand that the Debtors serviced the CTHFA Loan Portfolio under the
supervision of experienced personnel in an area of their servicing group that specialized in
negotiated servicing arrangements for third parties.  The servicing personnel responsible for
CTHFA transactions on a day-to-day basis had a great deal of familiarity with the CTHFA Loan
Portfolio and the servicing thereof, and these personnel were managed by experienced servicing
personnel. Likewise, CTHFA designated staff served as point persons for the servicing of the
CTHFA Loan Portfolio with whom GMACM personnel maintained regular communication on
both a formal and informal basis over the course of the relationship.  Monthly certificate holder
reports were furnished by GMACM to CTHFA which provided updates on the CTHFA Loan
Portfolio, and GMACM personnel were available in the event that CTHFA had any questions or
concerns.

15.    As of September 30, 2012, the CTHFA Loan Portfolio serviced by
GMACM consisted of approximately 880 residential mortgage loans with a total unpaid
principal balance of approximately $83,981,213.46.  As of August 31, 2014, the CTHFA Loan
Portfolio consisted of approximately 831 residential mortgage loans with a total unpaid principal
balance as of August 31, 2014, of approximately $66,098,235.65.

16.    GMACM's day-to-day duties under the Servicing Agreement generally
involved routine loan servicing functions including collecting payments from borrowers,
submitting monthly remittances to CTHFA of collections, monthly loan level reporting,
maintenance of accounts for each mortgage loan, maintenance of escrows, managing collections

ny-1163410

for delinquent accounts, coordinating actions with CTHFA in instances of mortgagor defaults, including foreclosure actions and assisting foreclosure counsel, and to the extent applicable, recovering insurance proceeds.  In return, GMACM received a monthly fee assessed against principal payments and other fees as set forth in the Servicing Agreement.  GMACM also remained in compliance with the Servicing Agreement in all material respects.  For example, GMACM in its role as servicer continued to make advances for interest, insurance, and taxes for borrowers who were delinquent in satisfying their obligations under their respective mortgage loans.  As of August 31, 2014, approximately $1,784,731.26 of servicing advances are outstanding for which the Liquidating Trust in entitled to reimbursement.

**Efforts to Assume and Assign Servicing Agreement
in Connection with Sale of Servicing Platform**

17.    In response to the Limited Objection filed by CTHFA to the Sale Motion, counsel to the Debtors and CTHFA engaged in discussions in an effort to understand and address CTHFA's concerns.  Eventually, the parties confirmed that the contracts listed on the Assigned Contracts List were no longer in-force between the parties and the only agreement in issue was the Servicing Agreement.  After engaging in further discussions and exchange of information, the September 2008 Termination Letter came to light. Neither party disputed that the termination notice has been delivered and received, likewise each acknowledged that since the purported termination, both parties continued to perform in conformity with the terms of the Servicing Agreement.

18.    Following the filing of the Limited Objection, the parties continued their discussions and engaged counsel to Ocwen in an effort to arrive at mutually acceptable terms for GMACM's assumption and assignment of the servicing of the CTHFA Loan Portfolio to Ocwen

6

in accordance with the APA.  Despite GMACM's diligent efforts, the parties were unable to

come to resolution in advance of the November 20, 2012 hearing to consider approval of the sale

of the Debtors' servicing platform.  In advance of the sale hearing, the Debtors elected not to

challenge CTHFA's position that the Servicing Agreement had been terminated and did not

include the Servicing Agreement on the list of contracts to be assumed and assigned to Ocwen.  I

was advised that at that time, each of the Debtors, CTHFA and Ocwen agreed that they would

continue their dialogue in an effort to reach acceptable terms for the assignment to Ocwen of the

servicing of the CTHFA Loan Portfolio.  Although it remained amenable to considering a

transaction with CTHFA, I understand that Ocwen contended that it was not required to accept

an assignment of the CTHFA portfolio given the purported termination of the Servicing

Agreement.

19.    The sale to Ocwen of the servicing platform closed on February 15, 2013.

Prior to the closing of the sale, GMACM continued to service the CTHFA Loan Portfolio in

conformity with the terms of the Servicing Agreement.  Pursuant to the APA, Ocwen and

GMACM, among other Debtor parties, entered into a subservicing agreement (the "Ocwen

Subservicing Agreement").  Pursuant to the Ocwen Subservicing Agreement, since the closing of

the APA, Ocwen has serviced the CTHFA Loan Portfolio (as well as the Debtors' other servicing

rights not assigned to Ocwen) on behalf of the Debtors and, subsequent to the Plan Effective

Date, the Liquidating Trust.

20.    Following the closing of the APA, the Debtors and subsequent to the Plan

Effective Date, the Liquidating Trust, and CTHFA, primarily through counsel, attempted to

reach an agreement which would have allowed for the transfer of the servicing of the CTHFA

Loan Portfolio from GMACM to Ocwen.  The Debtors, and the Liquidating Trust, working

7

cooperatively with CTHFA (primarily through their respective counsel), attempted to broker a mutually acceptable transaction with Ocwen governed largely by the terms of the APA.  The Debtors and the Liquidating Trust made extensive efforts to understand and address the concerns raised by Ocwen and CTHFA and, primarily through counsel, remained in constant communication with the parties over the course of many months.  Despite the Debtors' and Liquidating Trust's prolonged efforts to forge a consensus that in the view of the Liquidating Trust would have benefited each of the parties and allowed for the seamless transfer of servicing of the CTHFA Loan Portfolio, after over twenty months of servicing the CTHFA Loan Portfolio, Ocwen declined to acquire the servicing rights (including payment for advances in accordance with the terms of the APA) to the CTHFA Loan Portfolio on any terms.

21.    Throughout this entire period–approximately 20 months since the closing of the APA–the CTHFA Loan Portfolio has been serviced under the Subservicing Agreement. The Liquidating Trust has repeatedly apprised CTHFA that it is prepared to work with CTHFA to implement a service transfer of the CTHFA Loan Portfolio to a third-party servicer or to CTHFA, in accordance with standard procedures and applicable law.  In fact, in response to a query from CTHFA, the Liquidating Trust identified a potential new servicer.

22.    The Liquidating Trust is not aware of any material claims raised by CTHFA prior to the Petition Date, nor specific facts that would give rise to the existence of any such claims.  The Liquidating Trust has made inquiries of Ocwen in its capacity as subservicer as to whether it is aware of the existence of any such claims, and similarly, Ocwen has advised the Liquidating Trust that it is not aware of any such claims.  The Liquidating Trust does not believe that any act or omission on the part of GMACM would have given rise to material servicing-related claims that accrued prior to the Petition Date.  Indeed, prior to the Petition Date,

GMACM serviced the CTHFA Loan Portfolio with an appropriate level of care and in accordance with both the terms set forth in Servicing Agreement and its standard and customary practices. The Debtors continued to service the CTHFA Portfolio through the closing of the APA in accordance with their prior practices and standards.

23.    CTHFA is provided monthly remittance and complete reporting on the status of the CTHFA Loan Portfolio.

24.    The Liquidating Trust remains prepared to work with CTHFA to accomplish an efficient service transfer of the CTHFA Loan Portfolio in an expedient fashion in exchange for repayment of its advances and interest thereon.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  December 16, 2014

/s/ Teresa Rae Farley
Teresa Rae Farley

ny-1163410

## Exhibit A to Farley Declaration

CONNECTICUT HOUSING FINANCE AUTHORITY

HOME MORTGAGE SERVICING AGREEMENT

AGREEMENT, made by and between the Connecticut Housing Finance
Authority, a public body corporate and politic of the State of
Connecticut, (hereafter "CHFA") and GMAC Mortgage Corporation of PA
(hereafter "Servicer").

Servicer and CHFA agree as follows:

1. This Agreement shall be subject to applicable provisions of
Chapter 134 of the Connecticut General Statutes, as amended, the
regulations promulgated thereunder, the CHFA Master Commitment
Agreement for Mortgage Purchases, as amended, and the CHFA Home
Mortgage Programs Operating Manual, including supplements thereto.

2. Upon the terms and conditions of this Agreement Servicer will
service CHFA home mortgages (hereafter "Mortgages") which are
currently being serviced by Servicer, or which are purchased by CHFA
from Servicer, or which are purchased by CHFA from another lending
institution and referred to and accepted by Servicer.

3. Servicing Requirements.

   A. Collection and Remittance.

      (1) Servicer shall collect all payments due under
Mortgages as and when the same shall become due
and payable until the interest and principal due
thereunder have been paid in full, or servicing
duties are terminated as hereafter set forth.

      (2) Servicer shall send all remittances by wire
transfer or deposit to Connecticut National Bank,
Hartford, Connecticut, for credit to CHFA Pledged
Account #30697-6, Attn: Bond & Trustee
Administration (hereafter "Pledged Account").

      (3) Scheduled Payments.

         (a) Servicer shall remit to the Pledged Account,
to be received on or before 2:00 P.M. on the
15th day of each month, at least 70% of the
total amount of scheduled monthly principal
and interest payments due on Mortgages as
shown on CHFA's Level Payment Billing Report
(hereafter "Mid-Month Payment").
Notwithstanding the foregoing, in the event
Servicer's actual collections up to and
including the 14th day of the month are less
than such 70% amount, Servicer need only
remit such lesser amount with written
indication that such is the case.

         (b) Servicer shall remit to the Pledged Account,
to be received on or before 2:00 P.M. on the
tenth day of the following month, the total
amount of scheduled Mortgage payments
(exclusive of escrow payments) and Mortgage
loan curtailment payments collected through
the monthly Servicing Report date (see
Section 3.B.(1) below), less the monthly
mortgage servicing fee and less the Mid-Month
Payment.

           (i) Except for Mortgage loan curtailment
payments, Servicer shall remit to the
Pledged Account only full scheduled
monthly principal and interest
payments. Partial payments shall not be
remitted.

February, 1985

Connecticut Housing Finance Authority
40 Cold Spring Road

        (ii) Curtailment payments on delinquent
            Mortgage loans shall not be accepted or
            remitted.

  (4)   Loan Payoffs.

     (a)  Servicer shall remit to the Pledged Account,
        within four business days after receipt, the
        amount of any Mortgage loan payoff, together
        with interest collected, less a pro-rata
        portion of the monthly mortgage servicing fee.

     (b)  Servicer shall mail to CHFA concurrent
        written notification of each such remittance
        on a CHFA form and include the following
        information for each Mortgage loan:

           CHFA Loan Number
           Mortgagor Name
           Paid to Date of Loan Before Payoff
           Date of Loan Payoff
           Principal Paid
           Interest Paid
           Servicing Fee
           Net Amount Remitted

  (5)   Late Remittances.  Servicer shall pay a late
charge billed by CHFA at CHFA's current earnings
rate on temporary investments for the period of
lateness for any late remittances under (3) or
(4) above.

B.   Servicer Reporting.

  (1)   Servicer shall cut off its monthly collection and
reporting period on the last business day of the
month and the Servicing Report must reach CHFA on
or before the tenth day of the following month.

  (2)   Servicer shall send a monthly Servicing Report,
using exception reporting on CHFA forms.

  (3)   The monthly Servicing Report shall reconcile on an
exception reporting basis the monthly remittance
amount to the forecasted amount billed by CHFA,
detailing by Mortgage loan the following exception
items:

           Prepayments
           Curtailments
           Delinquencies
           Payment Reversals
           Scheduled Payments on Loan Payoffs or
             Foreclosures
           Other Adjustments

C.   Servicer Loan Accounting.

  (1)   Servicer shall maintain accurate outstanding
balances on each Mortgage loan.

     (a)  Each scheduled payment, whether collected
        singly or together with other monthly
        payments on the same Mortgage loan, shall be
        applied first to interest and then to
        principal as if according to a predetermined
        amortization schedule.

     (b)  Payments and/or delinquencies must not be
        capitalized into the Mortgage loan balance.

                  February, 1985

    (2)    CHFA shall independently calculate outstanding
Mortgage loan balances and periodically furnish
them to Servicer.  Servicer shall periodically
reconcile its Mortgage loan balances with those
furnished by CHFA and adjust all its Mortgage loan
balances which differ by more than $1.00 from
those maintained by CHFA except in those cases in
which Servicer demonstrates that CHFA's loan
balance is incorrect.

D.    <u>Separate Account</u>.  All funds representing principal and
interest collected by Servicer for CHFA shall be held by
Servicer in a separate account, or, in the case of a
Servicer which is a bank or a savings and loan associa-
tion, may be accounted for separately on Servicer's
books, until remitted to CHFA.

E.    <u>Escrow Responsibilities</u>.  Servicer shall escrow for real
estate taxes, mortgage insurance premiums and hazard
insurance premiums (when hazard insurance premiums are
required to be escrowed by the mortgage insurer or
guarantor).  Servicer shall pay interest on escrow
deposits at a rate of not less than four percent (4%)
per annum.  CHFA does not prohibit reasonable and
prudent investment of such escrow funds.

F.    <u>Insurance</u>.

    (1)    Servicer, during the terms of the Mortgages, shall
require mortgagors to keep in force hazard insur-
ance of a type at least as protective as fire and
extended coverage upon the mortgaged properties.
Said coverage shall be with insurers licensed to
do business in the State of Connecticut, in an
amount sufficient to cover the outstanding
principal balance of the Mortgage or the full
insurable value of the improvements on the
mortgaged property, whichever is less.  In no
event shall the amount of coverage be less than
the amount required by the mortgage insurer or
guarantor.

    All such policies shall contain a standard
mortgagee clause in favor of CHFA.  In the case of
a mortgaged property subject to multi-unit master
hazard insurance coverage where it is impossible
to obtain a standard mortgagee clause in favor of
CHFA, the Servicer shall notify the insurer of
each individual mortgage and obtain a certificate
which shows CHFA as a general loss payee.  In the
event of failure of the mortgagor to maintain such
insurance in full force and effect, such insurance
shall be maintained by Servicer at the expense
of CHFA.

    (2)    The physical possession of such policies is not
required so long as Servicer maintains mortgage
loan impairment insurance naming as an additional
named insured "Connecticut Housing Finance
Authority and/or its successors and assigns as
their interests may appear".  In such case,
Servicer shall cause a certificate to be furnished
to CHFA which verifies such coverage and expressly
affirms that ten (10) days' written notice of
change or cancellation will be given to CHFA.

    (3)    Servicer shall maintain at all times during the
existence of this agreement at its own expense an
adequate blanket fidelity bond on all employees
handling CHFA funds, monies, documents and papers,
which bond shall protect Servicer against losses,
including but not limited to dishonesty, theft,
forgery, larceny, fraud and misappropriation.

    February, 1985

G. **Inspections.** Servicer shall make an inspection of the mortgaged properties in the event of any of the following:

   (1)   Loan delinquency of ninety (90) days; or

   (2)   Loss claim for damage to the mortgaged property over $1,000; or

   (3)   Receipt of notification or indication of the vacancy, abandonment or deterioration of the mortgaged property.

H. **Notification by Servicer.** Servicer shall promptly notify CHFA of any of the following which come to Servicer's attention:

   (1)   Loss or damage by fire or other hazard to the mortgaged property in excess of $2,500;

   (2)   Sale or transfer of the legal or equitable title to the mortgaged property or any part thereof and the date of the instrument transferring the title thereto;

   (3)   Vacancy by the mortgagor continuing for more than one month;

   (4)   Abandonment of the mortgaged property; or

   (5)   Deterioration or waste of the mortgaged property.

I. **Delinquencies and Defaults.** Servicer shall maintain a sound, effective collection program adequately staffed by qualified personnel to minimize delinquencies, foreclosures and foreclosure expenses.

Servicer shall take prompt action to collect all sums past due utilizing telephone, notices and letters, field visits and personal interviews, and, shall also act to cure any other mortgage defaults which come to the attention of the Servicer.

Servicer shall assess late charges in accordance with the terms of the Mortgages.

J. **90-Day Delinquencies.** Servicer shall:

   (1)   report defaults and file foreclosure intent notices with insurers and guarantors as required;

   (2)   inspect mortgaged properties, verify owner-occupancy, secure and maintain vacant or abandoned properties as necessary;

   (3)   submit individual 90-day default reports to CHFA on CHFA forms summarizing reasons for default, remedial action taken and inspection findings, continuing to report on these loans monthly thereafter until they become current or until foreclosure is initiated; and

   (4)   send 30-day demand notices to mortgagors, as required by law, advising them of CHFA's intent to foreclose, and thereafter refuse to accept any payment less than the total arrearage, or, less than one-half the total arrearage under written forebearance agreements signed by the mortgagors. Such forebearance agreements shall not exceed six months.

Any variations to the above procedures must be approved by CHFA's Loan Portfolio Manager.

February, 1985

K. **Foreclosures.**

(1)   Once a Mortgage becomes 120 days delinquent, or, upon determination by Servicer that a Mortgage is otherwise in default and that it should be foreclosed due to said default, Servicer shall forward a written foreclosure recommendation to CHFA together with a copy of the foreclosure intent notice to insurer/guarantor and a copy of the 30-day demand letter to mortgagor. CHFA will review the recommendation and if in concurrence, will authorize foreclosure proceedings to commence.

(a)   CHFA's Foreclosure Responsibilities:

(i)   Designate a foreclosure attorney and issue a written foreclosure order.

(ii)   Promptly notify Servicer by copy of the order.

(iii)   Assist the foreclosure attorney in matters of a legal nature.

(iv)   Consult with Servicer in matters relating to subsequent forebearance, reinstatement, care and management of the security.

(v)   Promptly reimburse Servicer for legal fees and expenses and for Servicer's out-of-pocket expenses reasonably incurred during foreclosure.

(b)   Servicer's Foreclosure Responsibilities:

(i)   Pay all taxes and insurance premiums when due and pay any other municipal assessments (including non-escrow items) to avoid prior liens.

(ii)   Continue to service the Mortgage as required by this Agreement to the extent compatible with mortgage foreclosure proceedings.

(iii)   Assist the foreclosure attorney by providing all relevant information including delinquent amounts, reinstatement agreements and loan payoff amounts.

(iv)   Ensure that foreclosure documentation is sent to mortgage insurer or guarantor as required.

(v)   Preserve CHFA's rights under the terms of mortgage insurance or guarantee conveyance or assignment procedures and comply with documentation requirements.

(vi)   Maintain insurance coverage and take such steps as are reasonable to protect the mortgaged property from vandalism, deterioration or waste.

(vii)   Pay all known expenses before submitting claim to insurer or guarantor.

(viii)   Submit completed claim to insurer or guarantor.

(2)   In the event that the foreclosure action is discontinued, Servicer shall recommence all regular servicing under the terms of this Agreement.

L.   **Change of Mortgagee.**   CHFA may transfer, assign or otherwise dispose of its mortgagee interest in any Mortgage without the consent of Servicer, but in such event, written notice thereof will be mailed to Servicer giving the name and address of any assignee, and until such notice is received by Servicer, CHFA shall for the

February, 1985

purposes of this Agreement continue to be the owner of the Mortgage. Upon notification of the transfer or assignment of any Mortgage, Servicer will remit to CHFA all funds collected on said Mortgage less any servicing fee due to the date of receipt of said notice and thereupon its obligation to service such Mortgage and its right to receive fees and compensation for such servicing shall cease and terminate.

M.   **Change of Servicer.** CHFA shall have the right to terminate this Agreement as to any Mortgage serviced hereunder and to refer said Mortgage to another Servicer.

Such individual change shall not occur except upon thirty (30) days' written notice to Servicer and, if said change is without cause, the payment of a termination fee to Servicer of one percent (1%) of the outstanding unpaid principal amount of the Mortgage being referred.

N.   **Assumptions.**

(1)   A Mortgage insured or guaranteed by FHA or VA may be assumed pursuant to applicable federal requirements provided that the Mortgage was originally committed by CHFA prior to January 1, 1982.

(2)   A Mortgage committed by CHFA after January 1, 1982 or a Mortgage insured by a private mortgage insurer, regardless of when committed, may not be assumed without prior written approval from CHFA. Servicer shall promptly notify CHFA in the event that the Servicer becomes aware of any facts or circumstances indicating that a Mortgage may have been assumed without the prior approval of CHFA (e.g., check received from other than the original borrower, change in hazard insurance policy).

(3)   Mortgage assumptions must be carried out in accordance with the requirements of Section 7.4 of the Home Mortgage Programs Operating Manual.

4.   **Servicer's Compensation.**

A.   Servicer shall retain from each complete monthly payment collected a servicing fee at the rate of three-eighths of one percent (3/8%) per annum, computed on the unpaid principal balance prior to the monthly payment.

B.   Servicer shall be entitled to retain all late charges payable and collected under the terms of the Mortgages.

C.   Servicer's right to compensation for servicing a CHFA Mortgage shall cease upon the occurrence of any of the following:

(1)   prepayment of the Mortgage loan in full;

(2)   receipt of CHFA's written authorization to commence foreclosure, or to assign the Mortgage to an insurer or guarantor, except as to payments thereafter validly received from the mortgagor by Servicer and remitted to CHFA;

(3)   acquisition of the mortgaged property by CHFA without foreclosure;

-6-                                        February, 1985

    (4)    termination as hereinafter set forth; or

    (5)    cessation of duties and obligations under
          Section 3.L. (Change of Mortgagee) above.

5.   <u>Termination.</u>

A.   This Agreement may be terminated by mutual consent.

B.   CHFA shall have the right to terminate this Agreement by
notice in writing to Servicer, in the event of any of
the following:

    (1)    Servicer fails to perform its obligations here-
          under; or

    (2)    Servicer assigns or attempts to assign this Agree-
          ment without the approval of CHFA; or

    (3)    Servicer shall initiate or suffer any proceedings
          of insolvency or reorganization under the Bank-
          ruptcy Act, or other federal or state receivership
          laws or make any common law assignment for the
          benefit of creditors; or

    (4)    any change in Servicer's financial status which,
          in CHFA's opinion, materially affects Servicer's
          ability to provide satisfactory servicing of the
          Mortgages; or

    (5)    without cause, upon thirty (30) days' written
          notice to Servicer and the payment of a termina-
          tion fee to Servicer of one percent (1%) of the
          aggregate unpaid principal amounts of all Mortgages
          subject hereto at the time of such termination.

C.   Servicer shall have the right to terminate this
Agreement upon sixty (60) days' written notice to CHFA.

D.   If any such event of termination should occur, no
interest in this Agreement shall be deemed an asset or
liability of Servicer or Servicer's successors or as-
signs, nor shall any interest in this Agreement pass by
operation of law without the consent of CHFA.

E.   From and after the effective date of termination of this
Agreement pursuant to any provision hereof, Servicer
shall be relieved of further rights and
responsibilities in connection with servicing
Mortgages.  Servicer forthwith upon such termination
shall promptly:

    (1)    pay to CHFA all monies collected and held by it,
          less any servicing fees to which it is entitled,
          pursuant to this Agreement or pursuant to any
          Agreement or letter of arrangement relating to the
          Mortgages,

    (2)    deliver to CHFA all Mortgage loan documents,
          insurance policies, and records in connection
          therewith, and

    (3)    deliver to CHFA a full accounting, including a
          statement showing the monthly payments collected
          by it and a statement of monies held in trust by
          it for the payment of maintenance or other charges
          with respect to Mortgages.

    6.   <u>Duration of Agreement.</u>  Unless sooner terminated as herein
provided or by mutual agreement, this Agreement shall continue from
the date hereof until the principal and interest of all Mortgages are
paid in full and remitted to CHFA.

                        February, 1985

7. Warranties of the Servicer. As to each Mortgage originated by Servicer and retained under this Agreement for servicing, the warranties and covenants of the CHFA Master Commitment Agreement for Mortgage Purchases are hereby incorporated by reference.

8. Compliance With Applicable Laws. Servicer shall be in compliance with all requirements of all federal and state laws, rules and regulations applicable to CHFA Mortgages.

9. Agency.

A. No Implied Agency. Servicer is not an agent or partner of CHFA and has no authority and is intended to have no power to waive or vary the terms of any Mortgage or in any other respect create, extinguish or modify any right, obligation or liability of CHFA to any person whatsoever, except as such rights, obligations or liabilities of CHFA may incidentally be affected by the discharge by Servicer of its contractual obligations to CHFA hereunder.

B. Limited Agency.

(1) Servicer, on behalf of CHFA, may endorse insurance checks for any amount up to $2,500 without prior approval of CHFA.

(2) Servicer, on behalf of CHFA, may submit claims to FHA, VA or private mortgage insurers.

(3) This limited agency is specifically granted for purposes of this Section 9.B. and for no other purpose.

10. Waiver. Except as permitted under Section 3.J.(4), Servicer will not waive or allow any mortgagor to postpone compliance with any terms or provisions of any Mortgage. Servicer may receive and accept any payments made by a mortgagor in whole or in part on account of any default in the Mortgage obligations of such Mortgage until the principal indebtedness has been declared due, or until written notice is received from CHFA that no payments are to be received or accepted following a default in the Mortgage obligations.

11. Indemnification by Servicer. Servicer hereby agrees that it shall indemnify CHFA and hold CHFA harmless against any and all losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees and expenses that CHFA may sustain as a result of any failure on the part of Servicer to perform its services and duties under this Agreement and documents therein incorporated.

12. Examination of Accounts and Mortgage Records. Servicer shall permit any designated employee or representative of CHFA, at any reasonable time during regular business hours, to examine and make audits of any of the accounts, Mortgage records and procedures of Servicer under the provisions of this Agreement and to reproduce and make copies of such items.

13. Prior Agreements. This Agreement supersedes any prior agreements and understandings between CHFA and Servicer governing the servicing of Mortgages by Servicer for CHFA; provided, however, that the provisions of this paragraph shall not operate to release Servicer from any responsibility or liability that may have arisen under such agreements and understandings.

14. Severability. The invalidity of any clause, part or provision of this Agreement shall not affect the validity of the remaining portions.

-8-                                  February, 1985

15. <u>Assignment</u>. This Agreement shall not be assigned, whether by operation of law or otherwise, by Servicer or its successors or assigns without the written consent of CHFA.

16. <u>Notices</u>. All notices from Servicer to CHFA shall be sent by mail addressed to Loan Portfolio Manager, Connecticut Housing Finance Authority, 40 Cold Spring Road, Rocky Hill, Connecticut 06067, and all notices from CHFA to Servicer shall be sent by mail addressed to Servicer at the address herein specified unless another address is designated in writing by Servicer.

17. <u>Governing Law</u>. This Agreement shall be governed by the laws of the State of Connecticut.

IN WITNESS WHEREOF, each party hereto has caused this Agreement to be executed by its duly authorized officer and their seals to be affixed this __15__ day of __July__, 198_7_.

GMAC Mortgage Corporation of PA
SERVICER (Type Name)

10 Commerce Park Road
ADDRESS (Type Address)

Milford, CT   06460

WITNESS:

BY _____
(Signature)

Its  Vice President
(Title)

WITNESS:

Shelly A. Arbo

Connecticut Housing Finance Authority

BY _____
OREST T. DUBNO
Its:  Executive Director

February, 1985

## Exhibit B to Farley Declaration

CONNECTICUT HOUSING FINANCE AUTHORITY

MASTER COMMITMENT AGREEMENT
FOR
MORTGAGE PURCHASES

AGREEMENT, made by and between the Connecticut Housing Finance
Authority, a public body corporate and politic of the State of Connecticut,
(hereafter "CHFA") and   GMAC Mortgage Corporation of PA
(hereafter "Participating Lender").

Participating Lender and CHFA agree as follows:

1.    This Agreement shall be subject to the provisions of Chapter 134
of the Connecticut General Statutes, as now or hereafter amended, the
regulations promulgated thereunder, and the requirements and guidelines
established by CHFA as contained in the CHFA Home Mortgage Programs
Operating Manual.  The term "Manual" as used herein shall be construed to
mean the CHFA Home Mortgage Programs Operating Manual and all memoranda and
bulletins issued and delivered to the Participating Lenders participating
in the mortgage programs offered by CHFA.

2.    Participating Lender may from time to time submit mortgages
forpurchase by CHFA, provided such mortgages are insured by the Federal
Housing Administration (hereafter "FHA") or by a private mortgage insurer
(hereafter "PMI") or guaranteed by the Veterans Administration (hereafter
"VA") and have been committed for purchase by CHFA.

3.    Mortgages submitted by Participating Lender for sale to CHFA
shall be originated in accordance with the CHFA rules and regulations in
force on the date of the written Commitment for Mortgage Purchase
(hereafter "Commitment").

4.    CHFA's Commitment shall expire on the termination date recited in
the Commitment (no earlier than ninety (90) days after issuance) and shall
be subject to the terms and conditions of this Agreement.  In the event a
Participating Lender shall fail to submit the mortgage for purchase before
the termination of the Commitment, CHFA thereafter shall have no obligation
whatsoever to purchase the mortgage, unless an extension of the termination
date has been requested by the Participating Lender and approved by CHFA.

5.    The purchase price of a mortgage shall be equal to the
outstanding principal balance of the mortgage without any adjustment for
interest.  Mortgage loans shall be purchased by CHFA pursuant to Section 7
of the Manual.  Participating Lender shall not offer any mortgage to CHFA
for purchase prior to loan closing.

6.    Participating Lender shall be fully liable for all warranties and
representations made to CHFA hereunder by it or any person, firm, or
corporation acting on its behalf, in accepting and reviewing the
application for or the making of any mortgage sold to CHFA.

7.    CHFA reserves the right to require repurchase of any mortgage
submitted by Participating Lender if Participating Lender is not in full
compliance with the terms, covenants and conditions of this Agreement, if
any warranty or representation is untrue with respect to the mortgage, if
the mortgage does not qualify as a mortgage loan of the CHFA Home Mortgage
Purchase Program in accordance with the Manual, if the borrower or the
dwelling is not fully qualified as an Eligible Borrower or an Eligible
Dwelling in accordance with federal and state laws rules and regulations in
effect at the time, or if Participating Lender is in breach of any other
agreement between CHFA and Participating Lender (hereafter "Repurchase").

February, 1985

Connecticut Housing Finance Authority
40 Cold Spring Road
Rocky Hill, CT  06067

8.    CHFA shall incur no obligation to purchase a mortgage submitted
to it by Participating Lender by virtue of the fact that a Participating
Lender has recorded an assignment of said mortgage to CHFA.  In the event
CHFA requires Repurchase of a mortgage for which an assignment has been
recorded, CHFA shall execute another assignment of the mortgage to
Participating Lender to be recorded by Participating Lender at its cost.

9.    As to each mortgage submitted to CHFA for purchase, Participating
Lender warrants, represents and agrees that as of the date of closing:

a.    The mortgage was duly executed, acknowledged, delivered and
recorded, and an assignment of the mortgage deed to CHFA was duly
executed, acknowledged, delivered and recorded.

b.    The mortgage is a valid first lien on the mortgaged premises
(subject only to the exceptions set forth in paragraph 9.g
hereof); the mortgaged premises are free and clear of all liens
prior to the first lien of the mortgage and no rights are
outstanding that could give rise to such liens, subject only to
liens for taxes and special assessments not yet due and payable;
the mortgage and note secured thereby are legal, valid, and
binding obligations of the mortgagor enforceable in accordance
with their terms and conditions, and free from any right of set
off, counterclaim or other claim or defense; neither the mortgage
deed or note is in default; no part of the mortgaged premises has
been released from the mortgage; the terms of the mortgage have
not been modified, amended, or in any way waived or changed; and,
if a valid first lien is required on any equipment or items of
personal property by the VA, FHA, or PMI, such lien has been
perfected.

c.    The full principal amount of the mortgage has been advanced to
the mortgagor or advanced in accordance with the direction of the
mortgagor; the mortgagor has no option under the mortgage to
borrow from Participating Lender, or any other person, additional
funds to be secured by the mortgage without the consent of
Participating Lender; and the outstanding balance is as
represented by Participating Lender to CHFA, and is fully secured
by the mortgage.

d.    The mortgage was closed in accordance with the Manual
requirements and with the applicable VA, FHA or PMI requirements
for guaranty or insurance of said mortgage loan.

e.    All requirements of federal and state law, and rules or
regulations applicable to the mortgage and the mortgage loan
transaction, including without limitation, Section 103A of the
Internal Revenue Code of 1954, as amended, the Truth-in-Lending
Act, the Equal Credit Opportunity Act, the Fair Credit Reporting
Act, the Home Mortgage Disclosure Act, and related acts now or
hereafter enacted, have been fully complied with; no such laws,
rules or regulations promulgated thereunder are in any way
violated by the mortgage loan transaction; and any right of
rescission in relation to the mortgage under such laws, rules or
regulations has been disclosed to the mortgagor and has expired.
Participating Lender shall deliver to CHFA with the mortgage such
assurances and information, including, without limitation, copies
of application forms and loan documents, as CHFA may reasonably
require with respect to Participating Lender's compliance with
regard to the above laws, rules and regulations.

f.    Participating Lender is the sole owner of the mortgage; it has
full legal authority to, has duly taken all corporate action
necessary to, and has obtained any consents required to sell,
transfer, and assign the mortgage to CHFA free and clear of all
claims or encumbrances of any type except as provided in
paragraph 9.g hereof.

February, 1985

g.  The mortgaged premises are covered by a mortgagee's title
insurance policy in an amount at least equal to the outstanding
principal balance of the mortgage, and which names CHFA as the
insured in the following manner:  Participating Lender and
"Connecticut Housing Finance Authority and/or its successors and
assigns as their interest may appear."  The policy shall be on a
form consistent with the standard form of the American Land Title
Association and the premiums for the policy shall be fully paid.

Said title insurance policy is not subject to any exceptions
other than those exceptions which have been previously approved
by CHFA which do not detract from the value of, interfere with
the intended use of, or affect the marketability of the mortgage
or the mortgaged premises, unless otherwise waived by CHFA.  All
reservations, restrictions, covenants, rights of way, leases, and
other encumbrances, when applicable, must be identified by
recording date reference and the policy must state affirmatively
that said restrictions and covenants have not been violated and
that such restrictions and covenants do not provide for
forfeiture or reversion of title.

h.  There is in full force and effect insurance on the mortgaged
premises against fire and other risks, including flood hazard
insurance where required, issued by insurers acceptable to CHFA,
containing proper mortgagee clauses, and meeting all requirements
as set forth in the Manual.

i.  On the date of closing, there is of record no proceeding for
condemnation of all or any part of the mortgaged premises.  For
PMI-insured loans:  that the mortgaged premises are in good
condition, not damaged by fire, windstorm, or other casualty, and
expected to be suitable for occupancy as a principal residence as
of the date of the Participating Lender's appraisal.  The credit
standing of the mortgagor has been verified in accordance with
normal banking practices.

j.  The warranties and representations contained in or made pursuant
to this Agreement with respect to the mortgage shall survive
payment by CHFA of the purchase price therefor.  No review of any
documents or of any other matter relating to the mortgage made by
or on behalf of CHFA shall be construed in any way to waive,
modify or qualify said warranties and representations.

10.  CHFA reserves the right to require Repurchase of any mortgage in
connection with which CHFA in its sole discretion determines that there has
been a failure to comply with Section 103A of the Internal Revenue Code, as
amended, and rulings and regulations thereunder and such other applicable
laws, rules and regulations with respect to the mortgage loan, without
regard to whether the Participating Lender may be at fault.

11.  Participating Lender warrants and guarantees that the following
original documents, in addition to such other documents as CHFA may
reasonably require, will be delivered to CHFA within 120 days after the
date of the loan closing unless prevented by circumstances beyond the
Participating Lender's control, in which event, upon notice to CHFA,
Participating Lender shall deliver the same as soon as possible:

a.  Promissory Note
b.  Mortgage Deed with CHFA Uniform Mortgage Rider
c.  Veteran's Statement re:  due-on-sale for VA-guaranteed loans
d.  Assignment of Mortgage
e.  Title Insurance Policy
f.  Certificate of Mortgage Insurance or Guaranty
g.  Certificate of Occupancy, if applicable
h.  Hazard Insurance Certificate
i.  HUD Form 1, loan settlement statement
j.  CHFA Owner-Occupancy Certificate
k.  Borrower Affidavit
l.  Participating Lender Mortgage Loan Closing Certificate
m.  Participating Lender Mortgage Loan Post-Closing Certificate
n.  CHFA conditions satisfied, if applicable

12.  Escrow funds held by the Participating Lender for taxes,
insurance premiums, and other charges and for on-site and off-site
improvements shall be retained and administered by the Participating Lender
on behalf of CHFA if the Participating Lender is the mortgage servicer, in
accordance with the requirements of the CHFA Home Mortgage Servicing
Agreement and all applicable laws, rules and regulations; or, if
Participating Lender is not the mortgage servicer, said funds shall be
transferred to another servicer, at the direction of CHFA.

13.  CHFA, at its sole option, may elect to purchase mortgages only
after the original documents listed in paragraph 11 of this Agreement have
been received and approved by CHFA.  In the event of such a purchase, the
purchase price of a mortgage shall be computed as of the end of the day
immediately preceding the date of the acceptance of the mortgage by CHFA,
which is the date that the purchase price is disbursed to the Participating
Lender, and shall be equal to the outstanding principal balance of the
mortgage, increased by the amount of any interest on said principal balance
which is accrued and unpaid, and decreased by the amount of any interest
which shall have been prepaid.

14.  Participating Lender agrees that if it breaches any term,
covenant or condition of this Agreement, or if any warranty or
representation made by Participating Lender or the mortgagor is untrue in
any material respect with respect to any mortgage purchased by CHFA, CHFA
may at its option and in its sole discretion, require Participating Lender
to Repurchase such mortgage, without regard as to whether Participating
Lender may be at fault.  In that event, Participating Lender shall
indemnify CHFA and hold it harmless for any loss, damage, expenses or
attorney's fees that CHFA may sustain as a result of such breach.  The
Repurchase price of any mortgage shall be computed as of the day
immediately preceding the date of Repurchase and shall be equal to the
outstanding principal balance of the mortgage, increased by the amount of
any accrued and unpaid interest on said balance and decreased by the amount
of any interest which shall have been prepaid.  Upon any Repurchase, Cshall
deliver and return to the Participating Lender all documents delivered to
CHFA by Participating Lender in connection with the sale, including the
note, endorsed to the Participating Lender without recourse, and a proper
assignment of mortgage.

15.  The Participating Lender shall permit CHFA to inspect all records
of the Participating Lender which pertain to the CHFA Home Mortgage
Purchase Program.

16.  All expenses necessary to the closing of a mortgage and incurred
by the Participating Lender in respect thereof shall be the responsibility
of the Participating Lender.

17.  The Participating Lender agrees and warrants that in the
performance of this Agreement it will not discriminate or permit
discrimination against any person or group of persons on the grounds of
race, color, creed, national origin and ancestry, religion, sex, marital
status, or physical or mental disability, or in any manner prohibited by
the laws of the United States or the State of Connecticut.  CHFA may not
require a Repurchase for the violation of this paragraph 17.

18.  This Agreement and Participating Lender's rights herein may not
be assigned without the express written consent of CHFA.

19.  No person (or any related person as defined in Section
103(c)(6)(C) of the Internal Revenue Code of 1954, as amended) from whom
the Authority may acquire mortgage loans shall, pursuant to any

-4-                          February, 1985

arrangement, formal or informal, purchase bonds or any other obligations effected by CHFA in an amount related to the principal amount of mortgage loans to be acquired from such person by CHFA.

20.   CHFA and the Participating Lender shall each have the right to terminate this Agreement upon at least thirty (30) days' written notice to the other.   Such a termination shall not affect loan commitments or loan funds reserved prior to the expiration of said notice period.

IN WITNESS WHEREOF, each party hereto has caused this Agreement to be executed by its duly authorized officer and their seals to be affixed this __15__ day of __July__, 198_7_.

GMAC Mortgage Corporation of PA
PARTICIPATING LENDER (Type Name)

10 Commerce Park Road
ADDRESS (Type Address)

Milford, CT  06460

WITNESS:

BY _____
(Signature)
Its Vice President
(Title)

WITNESS:

BY _____
OREST T. DUBNO
Its:  Executive Director

Connecticut Housing Finance Authority

February, 1985

# CONNECTICUT HOUSING FINANCE AUTHORITY

**OREST T. DUBNO**
*Executive Director*

July 13, 1988

Dear Participating Lender:

Changes in federal tax law, as well as the recent adoption of the CHFA mortgage insurance program, have made it necessary to make certain modifications to the Master Commitment Agreement for Mortgage Purchases and to the Home Mortgage Servicing Agreement.  These modifications will be accomplished by your signing this letter in the space indicated and returning it to CHFA.  Both Agreements shall remain in full force and effect and unmodified except as explicitly set forth herein.

1.  Changes to the Master Commitment Agreement for Mortgage Purchases

    a.  Numbered paragraph 2 on page 1 is changed, in relevant part, from "...or by a private mortgage insurer (hereafter "PMI") or guaranteed by the Veterans Administration..." to "...or by a private mortgage insurer (hereafter "PMI") or by the CHFA mortgage insurance program or guaranteed by the Veterans Administration..."

    b.  Numbered paragraph 9(b) on page 2 is changed, in relevant part, from "...or items of personal property by the VA, FHA, or PMI, such lien has been perfected." to "...or items of personal property by the VA, FHA, the CHFA mortgage insurance program, or PMI, such lien has been perfected."

    c.  Numbered paragraph 9(d) on page 2 is changed, in relevant part, from "...with the applicable VA, FHA, or PMI requirements..." to "...with the applicable VA, FHA, CHFA, or PMI requirements..."

    d.  Numbered paragraph 9(e) on page 2 is changed, in relevant part, from "...including without limitation, Section 103A of the Internal Revenue Code of 1954, as amended, the Truth-in-Lending Act..." to "...including without limitation, relevant sections of the Internal Revenue Code of 1986, as amended, the Truth-in-Lending Act..."

    e.  Numbered paragraph 9(i) on page 3 is changed, in relevant part, from "...For PMI-insured loans: that the mortgaged premises..." to "...For PMI or CHFA-insured loans: that the mortgaged premises..."



*40 Cold Spring Road / Rocky Hill, Connecticut 06067-4005 / 203-721-9501*

Participating Lender                                                    Page 2.

    f.   Numbered paragraph 10 on page 3 is changed, in relevant part, from
        "...a failure to comply with Section 103A of the Internal Revenue
        Code, as amended... " to "...a failure to comply with applicable
        sections of the Internal Revenue Code of 1986, as amended..."

    g.   Numbered paragraph 19 on page 4 is changed, in relevant part, from
        "...as defined in Section 103(c)(b)(c) of the Internal Revenue Code of
        1954, as amended..." to "...as defined in any applicable section of
        the Internal Revenue Code of 1986, as amended..."

2.   Change to the Home Mortgage Servicing Agreement Paragraph (e) on page 3 is
    changed, in relevant part from "...at a rate of not less than four percent
    (4%) per annum..." to "...at a rate not less than the minimum set forth in
    applicable statues or regulations..."

                        Sincerely,

                        O. T. Dubno

OTD:PR:djh


Accepted
Date:   8/9/88

By:                     GMAC Mortgage Corp. of PA.
                        Participating Lender and/or
                        Servicer Name

# A.AENDMENT TO MASTER COMMITMENT
# AGREEMENT FOR MORTGAGE PURCHASES

The Master Commitment Agreement for Mortgage Purchases by and between the Connecticut Housing Finance Authority, a quasi-public agency of the State of Connecticut ("CHFA"), and GMAC Mortgage Corporation ("Participating Lender"), in regard to CHFA's Home Mortgage Program, is amended as follows:

1. After each loan closing, Participating Lender shall provide CHFA (or its designee) with those loan closing documents as required by the Manual. If Participating Lender is not a CHFA mortgage servicer, it shall provide the remainder of the loan closing documents (not provided to CHFA) to a master servicer as specified by CHFA.

2. If Participating Lender is a mortgage servicer of CHFA home mortgage loans, Participating Lender shall retain in its files those loan closing documents, as required by the Manual, not provided to CHFA. Participating Lender shall retain said documents in accordance with the "Required Minimum Standards for Public Records Storage Facilities" of the Connecticut State Library Office of the Public Records Administrator and State Archives, attached hereto and made a part hereof. Participating Lender shall make such documents available to CHFA for review and inspection as CHFA reasonably requests. Participating Lender shall retain such documents in accordance with the aforesaid Standards for that length of time consistent with the retention schedule promulgated by CHFA. Also, Participating Lender shall not destroy any of such documents unless consistent with said retention schedule.

3. If Participating Lender is a mortgage servicer of CHFA home mortgage loans, it shall prepare and execute a release of mortgage, pursuant to a Limited Power of Attorney provided to it by CHFA, for each and every home mortgage loan it services that pays off in full. Participating Lender shall fully comply with the requirements of Connecticut General Statutes Section 49-8 in regard to the delivery of releases in a timely manner. Participating Lender shall indemnify CHFA and hold it harmless for any loss, damage, expenses or attorney's fees that CHFA may sustain as a result of Participating Lender's failure to comply with the terms of this paragraph.

IN WITNESS WHEREOF, each party hereto has caused this Amendment to be executed by its duly authorized officer as of the dates written below.

Witness:                              Participating Lender

Barbara Tschanz                       By: _____
Date: 1/2/2002                        Name: Nora Pio
                                      Title: Assistant Vice President


Witness:                              Connecticut Housing Finance Authority

MARY BRYANT                           By: _____
Date: 2-4-02                          Gary E. King
                                      President - Executive Director

\\NT1\X\WORD\LEGAL\SINGLE\AMENDMENT TO MASTER COMMITMENT.doc
rev. 12/10/01

## Exhibit C to Farley Declaration

**GMAC ResCap**

VIA CERTIFIED MAIL

September 18, 2008

RECEIVED

SEP 2 3 2008

Connecticut Housing Finance Authority
999 West St.
Rocky Hill, CT 06067-4005
Attn: Toni Dellert

Re:   **Notice of Termination**

Dear Ms. Dellert:

GMAC Residential Capital, LLC ("ResCap") has decided to exit the Retail mortgage
lending business. ResCap has made this decision in response to the persistent challenges
in the mortgage market and as part of our ongoing efforts to structure operations to be
most efficient in this business climate.

In connection with that decision, and pursuant to (i) Section 20 of the Master
Commitment Agreement for Mortgage Purchases by and between GMAC Mortgage,
LLC f/k/a GMAC Mortgage Corporation of PA ("GMACM") and the Connecticut
Housing Finance Authority ("Authority") dated July 15, 1987, as amended (the
"Commitment Agreement"), (ii) Section 5.C of the Home Mortgage Servicing Agreement
by and between GMACM and the Authority dated July 15, 1987 (the "Servicing
Agreement"), and (iii) the Downpayment Assistance Program Participating Lender
Agreement by and between GMACM and the Authority (the "DAP Agreement" and
collectively with the Commitment Agreement and the Servicing Agreement, the
"Agreements"), this letter shall serve as GMACM's notice of termination of the
Agreements. Please note that this termination notice does not apply to the Purchase and
Servicing Agreement by and between GMACM and the Authority dated August 6, 2001,
which remains in full force and effect.

Please be assured that all pending loan requests will continue to be processed and all
approved loans will be closed and funded in accordance with the terms of any written
commitment. Our loan servicing operations are unaffected by this change and we will
continue to provide dedicated service and commitment to our customers.

Sincerely,



Jim Ferriter
Residential Capital, LLC
Head of US Lending Retail Administration