**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## AMENDED ORDER SUSTAINING RESCAP BORROWER CLAIMS TRUST'S OBJECTION TO CLAIM NUMBER 1574 FILED BY RAINER P. WARNER

Pending before the Court is the *ResCap Borrower Claims Trust's Seventy-Fifth Omnibus Objection to Claims (No Liability Borrower Claims)* (the "Objection," ECF Doc. # 7552). It is supported by the declarations of Deanna Horst ("Horst Declaration," ECF Doc. # 7552-3) and Norman S. Rosenbaum (ECF Doc. # 7552-4). The Objection addresses 26 claims (*see* Obj. Ex. A), including Proof of Claim Number 1574 filed by Rainer P. Warner (the "Claim"). Warner filed an opposition to the Objection on October 14, 2014 (the "Opposition," ECF Doc. # 7722). The Trust filed a reply to several claims including the Claim on November 7, 2014, (the "Reply," ECF Doc. # 7727), supported by a supplemental declaration of Ms. Horst ("Supplemental Horst Declaration," ECF Doc. # 7727-1). The Court held a hearing on November 13, 2014 and took the Objection to the Claim under submission. On November 25, 2014, the Court entered an order sustaining the Objection with respect to Warner's Claim (ECF Doc. # 7800). This Order amends the prior order to correct the address of the property securing the relevant loan.

### A.    The Claim

In his timely filed Proof of Claim, Warner asserts a $207,947.59 secured claim and a $292,052.41 unsecured claim against Debtor Residential Capital, LLC ("ResCap") on the grounds that the Debtors (1) wrongfully denied loan modifications despite Warner's eligibility; (2) improperly assessed certain fees and charges; (3) wrongfully foreclosed on Warner's

property; and (4) failed to conduct property inspections.  (Horst Supp. Ex. A.)  The relevant property is located at 520 Se Entrada Street, Palm Bay, Florida 32909 (the "Property").  (Horst Supp. Ex. B.)  Warner's Proof of Claim attaches an answer and cross-claim he filed against Deutsche Bank Trust Company Americas ("Deutsche Bank") and Homecomings Financial, LLC ("Homecomings") in a foreclosure proceeding initiated by Deutsche Bank.  The answer and cross-claim assert that Deutsche Bank and Homecomings failed to modify Warner's mortgage despite hardship and changes in his medical condition.  The cross-claim also alleges that Deutsche Bank and Homecomings were wrongfully forcing foreclosure of Warner's home.

Aside from the answer and cross-claim, Warner's Proof of Claim also attaches (1) an order setting Warner's foreclosure case for trial,[1] (2) a letter from Homecomings informing Warner that his loan modification was approved pending fulfillment of certain conditions, (3) two pages from Warner's original note, and (4) two pages from Warner's loan modification agreement.  On the pages from the original note and loan modification agreement, Warner circled the original loan amount ($208,000), the original amount of his initial interest-only payments ($1,235.00), which were subject to change, and the modified loan amount ($220,228.03).

The Trust previously objected to Warner's Claim in its 50th Omnibus Objection (ECF Doc. # 5162).  The Court overruled the objection to Warner's Claim without prejudice on January 8, 2014 (ECF Doc. # 6236).  In the original objection, the Debtors did not specifically discuss the Claim, but instead stated that the Claim fell in a category of claims for which the Debtors determined that they bear no liability based on a review of their books and records, including payment histories, loan modification documents, foreclosure related documents, and

---

[1] The state court entered a final judgment of foreclosure in August 2012.

2

internal servicing notes. In his original response, Warner asserted that ownership of his note was not properly established before foreclosure. Warner also argued that the Debtors could not locate his note during the foreclosure proceeding, so the Court should not consider the Debtors' review of their books and records reliable. The Debtors' reply and supplemental declaration contained explicit discussions of Warner's Claim and provided new reasons not stated in the Objection for disallowing the Claim. For example, the Debtors (1) detailed Warner's loan modification requests and the bases for the Debtors' determinations regarding those requests, (2) explained the reasons for the fees and charges that Warner contests, (3) argued that ownership of Warner's note was properly established in the foreclosure proceeding, and (4) asserted that all necessary property inspections were conducted. Because Warner did not have an opportunity to respond to these new arguments and factual allegations, the Court concluded that the original objection failed to rebut the *prima facie* validity of the Proof of Claim and, in turn, failed to shift the burden to Warner. When the Trust's reply offered evidence and argument that shifted the burden to Warner, Warner did not have the opportunity to respond; therefore, the Court concluded that it would have been improper to sustain the objection. (Order at 2–3.)

The Trust now submits this second Objection to the Claim seeking an order disallowing and expunging the Claim supported by substantial evidence and legal argument to which Warner was able to respond. The matter is therefore ripe for decision.

### B. Warner's Loan History

Home Loan Corporation d/b/a Expanded Mortgage Credit ("Home Loan") originated the loan to Warner on June 29, 2006 (the "Loan"). (Obj. Ex. A at 23; Horst Supp. Ex. B.) Warner executed a promissory note in the amount of $208,000.00 (the "Note"). (Horst Supp. Ex. B.) Home Loan endorsed the Note in blank; the endorsement is undated. (*Id*.) The Trust provides evidence that RFC purchased the Note from Home Loan and then transferred its interest in the

3

Note to Deutsche Bank as trustee when the Note was securitized on November 1, 2006. (Obj. Ex. A at 23; Horst Supp. ¶ 18.) Homecomings serviced the Loan from October 13, 2006 until servicing was transferred to GMACM on July 1, 2009. (Obj. Ex. A at 23.) GMACM serviced the loan until the Property was sold via foreclosure sale on November 28, 2012. (*Id*.)

On December 3, 2008, the Debtors mailed Warner a breach of contract letter because Warner had not made the October through December 2008 monthly payments on the Loan. (*Id*. at 24.) On December 31, 2008, the Debtors received a workout packaged from Warner for loan modification review. (*Id*.) On January 8, 2009, the Debtors referred the account to foreclosure because Warner had not made arrangements to bring the account current. (*Id*.) On February 2, 2009, however, the Debtors set up a foreclosure repayment plan. (*Id*.) This repayment plan was cancelled on February 4, 2009 because Warner requested different terms and a modification. (*Id*.) The Debtors then set up a traditional modification trial plan on February 19, 2009 requiring monthly payments of approximately $2,190 due on February 19, March 19, and April 19, 2008. (*Id*.) On March 31, 2009, the Debtors approved a permanent traditional modification, but this modification was not completed because Warner failed to sign the agreement or provide the initial contribution. (*Id*.) As a result, the Debtors mailed a denial letter to Warner on June 1, 2009. (*Id*.)

On November 22, 2009, the Debtors received a new workout package from Warner requesting a short sale option. (*Id*. at 24–25; Horst Supp. Ex. D.) On January 27, 2010 the Debtors spoke with Warner over the telephone; at the time there were no offers to buy the Property and Warner was advised to talk with the realtor about lowering the asking price. (Obj. Ex. A at 25.) On March 23, 2010, the Debtors received a new workout package from Warner.

4

(*Id.*) This short sale review was closed by the Debtors on August 6, 2010, however, because no authorization form was received from Warner's realtor. (*Id.*)

On January 27, 2011, the Debtors again spoke with Warner by telephone; Warner advised that the Property was still listed for sale. The Debtors responded that Warner should re-submit the listing agreement and short sale package and they would re-open it for review. (*Id.*) The Debtors then mailed the new short sale package to Warner, but the Debtors did not receive any information in response from Warner. (*Id.*)

Instead, on November 7, 2011, the Debtors received a modification referral from a HOPE representative. (*Id.*; Horst Supp. Ex E.) The Debtors mailed a missing items letter to Warner on November 17, 2011. (Obj. Ex. A at 25.) On November 21, 2011, the Debtors spoke with Warner by telephone at which time the Debtors advised of the missing documents needed for modification review. (*Id.*) On November 25, 2011, the Debtors received some, but not all, of the missing documentation. (*Id.*) The Debtors and Warner again spoke by telephone on November 29, 2011, at which time the Debtors again advised Warner of the remaining outstanding items preventing their completion of the review. (*Id.*) On December 13, 2011, the Debtors denied the Home Affordable Modification Program ("HAMP") modification because Warner's income was insufficient—modification would not aid in making it affordable for Warner. (*Id.*) On December 30, 2011, the Debtors also denied a traditional modification of the Loan because Warner's income was similarly insufficient to support the modification. (*Id.*) The Debtors mailed the letter denying the traditional loan modification on January 3, 2012. (*Id.*) According to the Debtors' books and records, Warner's November 2011 workout package showed a monthly income of $985.00 in disability income and $341.25 in food stamps,

5

providing him a gross monthly income of $1,572.50.[2]  (Horst Supp. Decl. ¶ 10.)  Warner's monthly mortgage payment at the time was $1,955.57, placing his debt-to-income ratio ("DTI") at 124%.  (*Id*.)  HAMP and traditional guidelines required a DTI of no greater than 31%.  (*Id*.)  On December 14, 2011, the Debtors mailed Warner a letter denying the HAMP modification.  (*Id*.)  Under HAMP guidelines and traditional modification guidelines, Warner's modified monthly payments could not be reduced below $956.27 for a HAMP modification and $1,207.82 under traditional guidelines, both of which still would have resulted in a DTI above 31%.  (*Id*.)

On February 23, 2012, the Debtors spoke with Warner by telephone.  (Obj. Ex. A at 26.)  Warner advised that he wanted to be considered for a short sale again and was in the process of listing the Property for sale again.  (*Id*.)  On April 4, 2012, the Debtors and Warner spoke again, at which time Warner stated that the realtor would be sending the listing agreement to the Debtors.  (*Id*.)  On May 4, 2012, the Debtors advised Warner that they still had not received the listing agreement from the realtor.  (*Id*.)  Ten days later on May 14, 2012, the Debtors advised Warner again that the listing agreement still had not been received.  (*Id*.)  On June 18, 2012, as a result of not receiving the required information needed for the short sale review, the Debtors closed the review.  (*Id*.)

The Trust next alleges that on July 12, 2012, Warner advised the Debtors by telephone that he still wanted to pursue a short sale; the Debtors responded that to do so they needed to receive the listing agreement.  (*Id*.)  On August 1, 2012, the Debtors received a short sale workout package from Warner.  (*Id*.)  On August 9, 2012, the Debtors sent Warner a letter requesting missing items necessary for the short sale review.  (*Id*.)  On the same day, Warner

---

[2]   HAMP and traditional guidelines require monthly disability income to be multiplied by a factor of 1.25 as disability income is not taxed.

6

advised the Debtors that there were no offers to buy the Property. (*Id.*) On September 20, 2012, Warner again advised the Debtors that there were no offers to buy the Property; the Debtors advised Warner in response that a foreclosure sale was scheduled for November 28, 2012, and that if no offer on the Property was made before then, the sale would commence. (*Id.*) On October 16, 2012, the Debtors denied the short sale due to the missing information they needed but never received from Warner. (*Id.*)

On October 17, 2012, the Debtors received a new workout package from Warner requesting a short sale. (*Id.*; Horst Supp. Ex. F.) On November 1, 2012, a missing items letter was mailed to Warner. (Obj. Ex. A at 26.) On November 7, 2012, the Debtors advised Warner of the missing items they needed for review of the short sale. (*Id.* at 26–27.)

On November 12, 2012, the Debtors received additional workout package information from Warner. (*Id.* at 27.) On November 20, 2012, the Debtors denied HAMP modification because Warner's income was again insufficient to support the modification; the Debtors would have had to reduce the unpaid principal to less than the market value of the property. (*Id.*) On November 21, 2012, the Debtors advised Warner of the denial of the HAMP modification and that the Loan was currently under review for traditional loan modification options. (*Id.*) The Debtors then reviewed Warner's Loan and denied the traditional modification option due to forbearance below fair market value. (*Id.*) According to the Trust, the required unpaid principal balance to reach the affordable payment was less than the market value of the property and therefore the Loan could not be modified. (*Id.*) Warner indicated in the workout package that his monthly income was $1,021.00 from disability income, which calculated to a gross monthly income of $1,276.25. (Horst Supp. ¶ 23 n.7.) At the time, Warner's monthly mortgage payment was $1,740.99, translating to a 136% DTI. (*Id.*) The lowest the Debtors could have modified

7

Warner's monthly mortgage payment to was approximately $751.11 under HAMP guidelines and $1,000.99 under traditional guidelines. (*Id.*) Both of these figures translate to a DTI over 31%. (*Id.*) On November 23, 2012, the Debtors advised Warner of the denial of the traditional modification and that the foreclosure sale scheduled for November 28, 2012 would go forward and could not be postponed due to the fact that Warner failed to obtain an approved modification or short sale option. (Obj. Ex. A at 36.) On November 28, 2012, the foreclosure sale was conducted and the Property was sold to a third party. (*Id.*)

Between March 2009 and August 2012, nine property valuations ("BPOs") were completed on the Warner Property, pursuant to the Debtors' servicing guidelines, which require a BPO to be completed when a loan is being reviewed for loss mitigation options and when an account is delinquent for more than forty-five days. (Reply ¶ 24; Horst Supp. Ex. G.)

### C.    The Parties' Arguments

In its Objection, the Trust argues that the Debtors are not liable for improper foreclosure on the basis that the Debtors improperly handled Warner's requests for loss mitigation options, including short sale and loan modification options, because (1) the Debtors acted appropriately and in accordance with the Note and mortgage as the account was delinquent and owing for December 1, 2008 through November 1, 2012 at the time of the foreclosure sale, and (2) the Debtors correctly reviewed the account several times for both short sale and modification options, but each time Warner failed to meet necessary criteria for approval. (*Id.*)

In the Opposition, Warner responds to several of the Trust's specific allegations in its Objection. Warner attempts to shift the blame to the Debtors, arguing that he tried to reach out several times to the Debtors to obtain a loan modification or a short sale deal, but the Debtors (1) approved a modification, under which Warner made payments, but the Debtor then wrongfully revoked, (Opp. at 4), (2) wrongfully denied the modifications after forging figures on his

8

workout packages that would require denial, (*id*. at 6), (3) wrongfully denied the short sale proposals by ignoring offers to purchase the Property that McDougal provided to the Debtors, (*id*. at 8 (citing Opp. Ex. F)), and/or (4) wrongfully denied the short sale proposals or loan modifications because they were negligent in their recordkeeping, losing the alleged "missing" documents from his submissions, (*id*. at 3–5, 7 (citing Exs. A, B, D)). Warner also argues that the Debtors did not complete as many BPOs and inspections of the Property as they allege they did. (*Id*. at 10.) Warner further asserts that the Debtors manufactured misleadingly optimistic real estate valuations that induced him and borrowers like him to enter into larger loans with higher interest rates that they could not reasonably afford. (*Id*. at 10–11.)

The Trust replied to each of Warner's arguments in its Reply. First, the Debtors admit that they approved a trial modification for Warner's Loan in 2009 and that Warner made payments pursuant to its terms. (Reply at 21.) The Debtor's approved Warner for a permanent modification on March 31, 2009, but the modification was never completely processed and later denied not due to the Debtors' fault, but rather due to Warner's failure to return an executed copy of the modification agreement or the initial contribution under its terms. (*Id*.) Second, the Trust argues that it never altered any of the financial figures on Warner's workout packages, and even provides copies of certain of Warner's workout packages and calculations pursuant to HAMP and traditional guidelines demonstrating the appropriateness of the denials of those modifications. (*Id*. at 22; Horst Supp. ¶¶ 10, 23 n.7; *see also* Horst Supp. Exs. D–F.) Third, the Trust argues that the only evidence Warner submitted supporting the allegation that offers were made to purchase the Property is a letter stating Warner had spoken with his realtor and there was an offer to purchase in January 2012. (Reply. At 22 (citing Opp. Ex. F).) According to the Trust's books and records, upon receipt of this letter in February 2012, the Debtors opened a

9

short sale review. (*Id*. (citing Horst Supp. Ex. MM).) This short sale review was closed on June 18, 2012, because the Debtors did not receive information from Warner it needed to process the short sale and as a result, the offer could not be accepted. (*Id*.) The Trust also points to another email submitted by Warner dated September 8, 2012, in which Warner advises the Debtors that no offers were received as of that date. (*Id*. (citing Opp. Ex. B).) Fourth, the Trust asserts that Warner failed to produce evidence that supports the allegation that the Debtors were negligent in their record keeping and that they lost documents submitted by Warner and his realtors. (*Id*. at 24.) The Trust argues that the Debtors' servicing notes for Warner's account indicate that the Debtors consistently contacted Warner to inquire about missing documents, evincing their diligence and negating any negligence on their part. (*Id*.; *see also* Horst Supp. Ex. MM.) With respect to the BPOs, the Trust provides documentation of the Property inspections performed on Warner's home and argues that the number of inspections was not "excessive," but in accordance with their guidelines. (*Id*. at 23 (citing Horst Supp. Ex G).) The Trust further argues that any allegations with respect to inducing him into a loan with unreasonable terms are irrelevant because the Debtors were not involved in the origination of Warner's Loan. (*Id*.)

    **D.**    **The Objection to the Claim is Sustained**

Correctly filed proof of claims "constitute prima facie evidence of the validity and amount of the claim . . . . To overcome this prima facie evidence, an objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim." *Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (2d Cir. B.A.P. 2000). By producing "evidence equal in force to the prima facie case," an objector can negate a claim's presumptive legal validity, thereby shifting the burden back to the claimant to "prove by a preponderance of the evidence that under applicable law the claim should be allowed." *Creamer v. Motors Liquidation Co. GUC Trust (In re Motors Liquidation Co.)*, No. 12 Civ. 6074 (RJS),

10

2013 WL 5549643, at *3 (S.D.N.Y. Sept. 26, 2013) (internal quotation marks omitted).  If the objector does not "introduce[] evidence as to the invalidity of the claim or the excessiveness of its amount, the claimant need offer no further proof of the merits of the claim."  4 COLLIER ON BANKRUPTCY ¶ 502.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014).

Bankruptcy Code section 502(b)(1) provides that claims may be disallowed if "unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b)(1).  To determine whether a claim is allowable by law, bankruptcy courts look to "applicable nonbankruptcy law." *In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del. 2006).

In this second Objection to Warner's Claim, the Trust shifted the burden to Warner; the Trust provided a detailed recitation of Warner's Loan history and refuted all of the material allegations in Warner's Proof of Claim.  With the burden shifted back to Warner, he failed to carry his Claim by a preponderance of the evidence.  The record establishes beyond any doubt that the Debtors bent over backwards to consider and evaluate Warner's new requests for consideration of a loan modification or short sale.  Warner was given a full and fair opportunity to provide evidence and respond to each of the Trust's arguments.

It is clear from the record that the Debtors did not improperly deny Warner's proposed short sales or loan modifications.  Additionally, Warner has not offered any evidence that the Debtors were negligent in their record keeping such that documents submitted by Warner or his realtors were lost or misplaced. (Horst Supp. ¶¶ 18–24.)  The servicing notes provided by the Trust indicate that the Debtors were vigilant in trying to track down documentation from Warner, rather than vice versa as Warner purports.  (Horst Supp. Ex. MM.)  The record also supports the Trust's Objection to Warner's arguments relating to the BPOs and property inspections; the

11

Debtors appear to have properly conducted the necessary inspections in substance and amount on Warner's Property as was required for the numerous loss mitigation proposals Warner's submissions prompted. (Horst Supp. Ex. G.) The Debtors also are not at fault for the original terms of the Loan, as the Loan was originated by a non-debtor. (Horst Supp. Ex. B.) Warner therefore fails to establish that the Debtors are liable for any unlawful conduct.

*************************************

For the foregoing reasons, the Court **SUSTAINS** the Objection with respect to Warner's Claim in its entirety and the Claim is hereby **DISALLOWED** and **EXPUNGED**.

**IT IS SO ORDERED.**

Dated:   December 16, 2014
         New York, New York

                                                _____/s/Martin Glenn_____
                                                    MARTIN GLENN
                                                United States Bankruptcy Judge