# Exhibit A



**WACHOVIA**

## COMMERCIAL DEPOSIT AGREEMENT FOR
## LARGE CORPORATE CUSTOMERS

### [Modified 12.21.11 for each of the entities listed on Exhibit A]

### VERSION 1.0 EFFECTIVE AS OF March 20, 2010

**GENERAL PROVISIONS AND LEGAL EFFECT OF AGREEMENT.** Wachovia Bank, and Wachovia Bank of Delaware, as applicable, offer a full range of commercial deposit account and treasury management services to you under the terms and conditions set forth in this deposit agreement and the other documents described below.

Throughout this deposit agreement, Wachovia Bank and Wachovia Bank of Delaware, each a division of Wells Fargo Bank, N.A., as applicable, are referred to as "we" or "us," the commercial deposit accounts we offer are referred to as the "accounts," the treasury management services that we offer are referred to as the "treasury services," this deposit agreement and the other documents described below are together referred to as the "agreement;" and: 1) each entity maintaining an account or using any of the services is listed on Exhibit A hereto; and 2) each such entity is individually referred to herein as "you."

Certain defined terms are used in this agreement. Some are defined in the context used while others are defined in the section labeled Defined Terms on page 16 of this agreement.

This agreement also contains certain regulatory disclosures we are required by law to provide to you or which are important for you to understand. Where such disclosures occur in this agreement they are often set off by the words, "We are required to inform you that," or alternatively, "we would like to inform you that".

If you do not understand the legal effect of such disclosures or of any aspect of this agreement or your rights and obligations under it, you are encouraged to consult with your legal counsel. Our personnel and our attorneys are not allowed to provide you legal advice or interpretations of the legal effect of this document or relevant law.

When you open an account and accept services from us, you agree to be bound by the terms and conditions of the agreement.

This is a legally binding agreement between us and you. No employee of ours, including any sales person or relationship manager, has authority to modify the terms of this agreement by altering it or by entering into or altering any other document or agreement that is intended to have the effect of altering this agreement unless such alteration or other document is authorized in writing by one of our in-house attorneys or one of our senior risk management officers. .

We may amend this agreement and any documentation referred to herein and the rules related to your account at any time. We will provide you 30 days prior notice of any such changes or amendments if they are not in your favor. If you continue to use such services after such notice you will be deemed to have accepted such changes. Notwithstanding the forgoing, we may make such changes immediately where required to do so including amendments required by changes in law, regulation, applicable clearinghouse rule or in any other circumstance that prohibits the giving of such prior notice.

We are not responsible or liable for the acts, omissions, errors or delays of any entity or person not under our direct control including any Federal Reserve Bank, any correspondent bank, or any transmission or communication facility including, by way of example, the National Automated Clearing House Association (NACHA), and no such entity or person will be deemed to be our agent.

In providing services pursuant to this agreement you agree that we are not acting in a fiduciary capacity on your behalf or creating a special relationship of any kind. Our deposit relationship with you is that of debtor and creditor.

1.     **DEPOSITS.** You may make deposits to your account in person at our financial centers, by mail, by incoming funds transfers and Automated Clearing House (ACH) credit entries or by any other method we make available such as at Wachovia Automated Teller Machines (ATMs).

You agree that we may accept a check or other item for deposit to your account from any person or source and that we are not required to question the authority of the person making the deposit.

Funds from deposited items may not be available for immediate withdrawal. We are not responsible for crediting deposits made to your account by mail, night depository or other outside depository method until we actually record the receipt of those deposits in our books and records. Our count of any coins and currency in any deposit is conclusive as to amount. We will make any necessary adjustments to your account for any discrepancies and notify you.

We have the right to limit, refuse, hold, or return any deposit.

Unless we have given you our prior written consent, you agree not to: deposit unsigned demand drafts; deposit any item in a check carrier, or any paper or electronic replacement for the original item including, without limitation, any "substitute check" that has not previously been endorsed by a bank. Except to the extent our failure to exercise ordinary care or our intentional misconduct in our handling of an item to be deposited contributes to a loss, you agree to reimburse us for any loss, expense or liability we may incur — and we may debit your account for the amount of any such loss, expense or liability — if: (a) you deposit any such item; (b) you fail to endorse an item exactly as drawn, (c) you deposit an item with a missing endorsement; (d) you fail to use personalized deposit slips; or (e) any item is returned, or a claim is made with respect to, any deposited item for any other reason.

**2.    COLLECTION OF ITEMS.** In receiving items for deposit or collection, we act only as your collection agent. We have a responsibility only to exercise ordinary care as your agent. As such, we are not responsible for errors or delays caused by collecting banks or others in the collection process or for items that are lost or delayed in the collection process. All deposited items including those drawn on another account that you or a third party maintain with us are credited to your account subject to final payment and our receipt of the cash proceeds of the items.

You are responsible for reconstruction and proof of loss of any item included in a deposit that is lost or stolen in transit before we receive and accept it for deposit. You also agree to cooperate and assist in the reconstruction of any item included in a deposit that is lost or stolen in transit after we have received and accepted it for deposit.

Without prior notice to you, we may charge back your account for any deposited item at any time before we have received final payment for that item, whether returned to us or not, and we may also charge back your account for any deposited item that is drawn on an account that you or a third party maintains with us if the item cannot be honored against the drawer's account.

We may handle items and their proceeds in accordance with contractual arrangements we have with other financial institutions. You authorize us to pursue collection of previously dishonored items, and in doing so we may permit the bank on which the item is drawn to hold the item beyond its applicable deadline.

If any item deposited to your account is returned to us by the bank on which it was drawn including return through the Federal Reserve, a clearing house or other normal return channel, we may accept that return and charge the item back to your account without regard to whether the bank on which the item was drawn returned the item before or after its required deadline.

In addition, if a deposited item is returned to us by the bank on which it was drawn after being finally paid because someone has made a claim that item was altered, forged, unauthorized, or should not have been paid for some other reason, we may debit your account for the amount of the item. We may also debit your account for the amount of the item, if a deposited item is drawn on an account maintained with us and someone has made a claim that the item was altered or forged, unauthorized, or should not have been paid for some other reason.

If you have insufficient funds in your account to cover a returned item, we may overdraw your account in an amount not to exceed the amount of such item and any applicable fee.

You agree that we may convert any item you cash or deposit with us for collection that is returned to us unpaid to an electronic transaction in an effort to expedite collection of that item.

If you expect to give us special instructions for handling an item you must do so in writing and give them to us along with the item in question.

By entering into this deposit agreement or using treasury services, you waive certain rights you would otherwise have at law including under the Uniform Commercial Code and Federal Reserve Regulation, including notice of nonpayment and notice of dishonor or protest regarding any item that may be credited to or charged against your account. For example, if an item deposited to your account is dishonored and returned to us, we are not required to notify you of the dishonor. This waiver is necessary to facilitate the high speed processing of items. However, you will receive information regarding unpaid or dishonored items through our standard account statement reporting.

3. **PAYMENT OF ITEMS AND OTHER WITHDRAWALS.** Subject to the generally available funds first from finally collected funds and, unless prohibited by law or by our Schedule of Fees and Funds Availability for Commercial Accounts policy, we may refuse to pay any item drawn against uncollected funds, impose a special fee for each such item, or both. We may pay items drawn on your account (including those payable to us or on which we may be liable) in any order including highest to lowest or lowest to highest and without regard to the impact such order may have on the number of items that clear the account or any fees charged to you and we may change such order at any time without notice to you. We reserve the right to limit the amount of funds that may be withdrawn from your account in cash. Specific terms and conditions on disbursement of funds from your account by funds transfers or ACH entries are described below and in the, "Other Matters" section of this deposit agreement.

4. **INSUFFICIENT FUNDS AND OVERDRAFTS.** We may determine whether your account contains sufficient funds to pay an item or cover a transaction at any time between the time we receive the item or transaction authorization request and our return deadline and only one determination of the account balance is required. If we determine that your account does not contain sufficient available funds, we may return the item or decline the requested transaction. Alternatively, we may honor the item or the requested transaction and create an overdraft in your account. Where an overdraft is created, you agree to promptly deposit sufficient funds into your account to cover the overdraft and any related service charge upon receiving a notice of the overdraft from us and to reimburse us if you fail to do so. Honoring one or more overdrafts does not obligate us to honor any future overdraft.

5. **STOP PAYMENT.** You may ask us to stop payment on any check drawn on your account that we have not paid or certified. You must tell us the exact amount, number, date and payee of the check and the number of the account on which the check was drawn. If the information you give us is not correct or if you do not give us other information we request concerning the check, or if you do not produce checks which contain MICR encoded information, i.e., machine readable account and check numbers, or if you produce checks with duplicate check numbers, we are not liable if we are not able to effect the stop payment.

We are entitled to a reasonable time to notify our employees of your stop payment order. For purposes of this deposit agreement, a "reasonable time" means until the end of the business day following the day on which we receive a stop payment order.

We are not obligated to recredit your account over a valid and timely stop payment order unless you are able to demonstrate that you were not otherwise obligated to pay the check or satisfy the underlying obligation to which the payment relates. By way of example, a stop payment order does not relieve you of your obligation on an item that has been negotiated to a holder in due course.

If we agree to provide you credit, you agree to assist us in recovery of any funds which are paid on an item despite the presence of a valid stop payment order and, if requested by us, to transfer any rights and claims you have against any third party to recover the funds paid on such an item.

Any authorized individual may give us a release or cancellation of a stop payment order.

Stop payment orders (both verbal and written) are effective for six (6) months unless you designate a longer period of time when the order is placed subject to our right to charge an alternative fee for such longer period.

You may extend a stop payment order by calling or writing to us prior to the expiration of the existing stop payment order, subject to our right to charge an additional fee for any such extension.

Stop payment orders are not permitted on official checks, cashier's checks or money orders. If an official check, cashier's check, or similar item has been lost, stolen or destroyed, you may provide us with a declaration of loss and affidavit and request that we reissue the check or reimburse you. We may require that you wait 90-days or provide a bond where permitted by law before honoring such request.

From time to time, we may receive ACH debits to your account from senders you previously authorized to debit your account. You may ask us to stop payment on a future ACH debit to your account if the item has not already been paid. You are responsible for notifying your sender that you have revoked your previous authorization for ACH debits.

Contact your account executive for assistance stopping ACH payments. You must notify us in time for us to receive your request three business days or more before the payment is scheduled to be made. If you call, we may also require you to put your request in writing and get it to us within 14 days after your call. You must tell us the exact amount of the payment you have stopped, as well as other identifying information which we will request. We may charge you a fee for each stop payment order you give.

12-12020-mg    Doc 3892-1    Filed 11/20/13    Entered 11/20/13 17:53:30    Exhibit A to
Stipulation    Pg 5 of 27

For an ACH stop payment order, we generally need the information described above in this section 5. We may need the date the prior ACH debit from this sender posted to your account so that we can obtain the company name and company identification number used by your sender and printed on your statement. Otherwise, you must provide us with the company name and company identification number.

The ACH stop payment takes effect within three business days of our receipt of notice from you. If you give us oral instructions, we may require you to confirm them in writing.

6.    **TREASURY SERVICES.** Many of our treasury services impact the collection and receipt of funds deposited into your accounts, the management and movement of funds within your accounts and the disbursement of funds from your accounts. When you utilize any of our treasury services, your selection and use of those treasury services are subject to the terms and conditions described in this deposit agreement and the service description for the applicable treasury service. Please ask your account executive to provide you with the service description for each treasury service in which you are interested.

If any terms or conditions of any service description conflict with the terms and conditions of this deposit agreement, the terms and conditions of the applicable service description will govern.

We reserve the right to determine the adequacy of the documents and instruments you give us in connection with requesting treasury services and we may delay implementation of treasury services until we receive documents and instruments acceptable to us.

You must promptly notify our treasury services division in writing of any changes in the information contained in any documentation you give us, and you must execute and give us new documentation if we request it. Until we have received that new documentation and have had a reasonable time to act on it, we are not liable for any action we take in reliance on the existing documentation and authorizations.

Providing treasury services can expose us to potentially significant operational risk and financial exposure. Accordingly, we reserve the right to request financial statements and other information from you prior to performing or continuing to perform certain treasury services or other depository services even in situations where you may have negotiated for specific services for specific periods of time.

7.    **FRAUD DETECTION/DETERRENCE AND SAFEGUARDING YOUR ACCOUNT.** Whenever you report missing, stolen, or unauthorized checks to us, we may recommend that any account that has been compromised by unauthorized or fraudulent activity be closed or that you implement certain fraud detection and prevention measures such as our Positive Pay service.

If you choose not to close the relevant account or to implement the recommended measures, we are not liable for subsequent losses you may incur due to unauthorized or fraudulent activity.

In addition, regardless of whether you've suffered a loss, the following are some standard fraud prevention measures we suggest you use:

- Safeguard your account number(s) and account information and account access information including your checkbook, blank or unused checks, electronic access devices including ATM cards, personal identification numbers, and any passwords or other access-related information;

- Call us immediately at 1-800-275-3862 if you suspect any problem with your account or unauthorized activity, or your checkbook or unused checks are lost, stolen or misplaced;

- Review your checkbook and unused checks for unauthorized activity if you suspect that any of these items may have been stolen or tampered with, or if you are the victim of theft or your property is burglarized;

- Promptly and carefully reviewing your statement each month for unauthorized activity or missing deposits;

- Limit telephone transactions with us to landline telephones. Cordless or cellular phone conversations can be intercepted without your knowledge or authorization;

- Maintain close control over your facsimile signature devices to immediately detect any unauthorized use of those devices; and

• Issue checks with care to avoid alterations for forgeries. Use dark colored permanent ink to write your checks, make sure the numeric and written amounts match and are readable. make sure there are no blank or open spaces in the body of the instrument where words or figures are to be inserted.

We also encourage you to speak with your account executive about fraud detection measures that are readily available in the industry and which we offer that have proven effective in minimizing fraud losses.

If we advise you of the availability of such measures and you decline them, you assume the risk for any losses you later incur which are of the type such measures prevent.

**8.** **AUTHORIZED SIGNATURES.** We will not be liable to you for refusing to honor an item or signed instruction if we believe that the signature appearing on that item or instruction is not the genuine original or facsimile signature of an authorized individual.

**9.** **FACSIMILE SIGNATURES.** We are not liable for your use of a facsimile signature or endorsement device. If you use a facsimile signature or endorsement device, you bear the risk of any unauthorized use of your facsimile method or the use of fake facsimiles that may appear to be authorized facsimiles from you. If you use a facsimile signature or endorsement on any item, we may pay and charge your account for an item bearing or purporting to bear the facsimile signature or endorsement of any authorized individual regardless of by whom or by what means such signature or endorsement may have been affixed (whether or not authorized) and regardless of by whom or by what means the item may have been created.

**10.** **ACCOUNT STATEMENTS.** We will mail or make available electronically your account statement monthly, quarterly or annually, depending on the types of accounts and services you utilize. If you elect to have statements mailed to or made available to a third party instead of to yourself, you are still responsible for carefully and promptly examining each statement and promptly reporting any problems or unauthorized transactions to us as outlined below.

If any statement is returned to us because of an incorrect postal or electronic address, we will make reasonable efforts to examine or our records to ascertain your current address. However if we are unable to ascertain your correct address, we may stop sending statements to you, but we will be deemed to have made your statement available to you as of the statement date.

You must notify us promptly if you change your address or you do not receive your statement(s). If you do not provide us notice of such change we may change your address in reliance upon information provided by the United States Postal Service or any of its agents and subsequent statements sent to such address shall be deemed to be received by you at such address. If you do not receive your statement contents or images of checks with your statement or if you receive copies or substitute checks with an illegible image, we will provide you the legible copies of the imaged checks within a reasonable time after we receive your written request for those items sufficiently identifying them. If mailed to you, your statement will be deemed to have been mailed on the next business day after the statement date and received by you five (5) calendar days after the statement date.

**11.** **REVIEW OF ACCOUNT INFORMATION / UNAUTHORIZED ACH TRANSACTIONS.** You agree to promptly review each written or electronic confirmation, statement or other report and any accompanying items when received or otherwise made available to you. You must notify us immediately of any error, discrepancy or unauthorized transactions shown in such statement, confirmation or other report. Such errors include (a) suspected fraud, (b) counterfeit items, (c) forged, unauthorized or missing signature(s), endorsement(s) or items, (d) any illegible image or alteration of an item (e) a missing or diverted deposit or (f) any other error or discrepancy relating to a deposit or to any other credit or debit entry to your account.

If you do not report a "front of the item problem", i.e., a problem related to the face of an item to us in writing within sixty (60) calendar days of the date on which such statement, confirmation or other report was made available to you, you may not assert that problem against us regardless of whether we exercised ordinary care.

If you do not report a "back of the item problem", i.e , an endorsement problem to us in writing within one hundred eighty (180) calendar days of the  date on which such statement, confirmation or other report was made available to you, you may not assert that problem against us regardless of whether we exercised ordinary care.

Notwithstanding the forgoing, you are barred from reporting a back of the item problem if you could have reported, but failed to report, a front of the item problem on the same item within the required sixty (60) day time frame. In other words, you must report all problems with an item at your earliest opportunity.

In addition, if you do not provide written notice of any problem or unauthorized transaction committed by the same wrongdoer within thirty (30) calendar days of the date the statement, confirmation or other report containing or reflecting the first transaction involving such wrongdoer was made available to you, we will not be liable for the payment of any subsequent items involving such wrongdoer, until we actually receive notice of the problem from you.

For problems that you report within the above time periods, we will be given a reasonable period of time to investigate the claimed loss or problem, and you agree to cooperate in our investigation, provide requested affidavits related to the facts and circumstances of the loss, provide information on insurance coverage available to you to cover such loss and to assist in prosecution of offenders. You also agree that we are not required to provisionally credit your account and will have no liability for additional losses if we recommend that you close your account and you fail to do so.

When liable, our maximum liability for problems reported during the above time periods will be the lesser of (a) your proven damages or (b) the amount of the unauthorized transaction or error, reduced in all cases by (1) the amount of the loss that could have been avoided by your use of ordinary care and (2) the amount of insurance proceeds you are entitled to receive from your insurance carriers for any such losses.

You agree that we have not failed to exercise ordinary care if items are forged or altered so cleverly — as, for example, by use of a facsimile machine, photocopy machine, computer equipment or otherwise — that a reasonable person would not detect the forgery or alteration.

If you choose to pursue legal action against us with respect to any of the kinds of losses referred to above you must have provided notice of the problem to us as described above and, unless prohibited by applicable law, you must commence your action within one year of the date of the statement containing the unauthorized transaction, error or discrepancy.

Notwithstanding the foregoing, if an unauthorized ACH entry is posted to your Account, you must notify us to return that entry through the ACH system by 2:00 PM (Eastern Time) on the banking day after the item was posted. We will not be able to return the item after that time without the cooperation and agreement of the originating bank and the originating company. Any other action must be conducted between you and the originator of the transaction.

## 12.    FEES AND CHARGES.

When you open, use and/or maintain an account with us, you are agreeing to the fees and charges listed in the Schedule of Fees and Funds Availability for Commercial Accounts disclosure which is incorporated herein by reference.

You agree to pay us, when due, all service fees and charges that apply to your account from time-to-time and to the treasury services you use.    You also agree to reimburse us for any actual expenses we may incur in order to execute, cancel or amend any payment order or ACH entry, or perform any related act at your request.

Our current Schedule of Fees and Funds Availability for Commercial Accounts disclosure and the Schedule(s) of Fees for applicable Service Descriptions specify all such amounts.

These fees and charges may be automatically debited to your account, offset against any earnings credits related to your accounts or we may invoice you for such fees and charges. We are not liable to you for adverse results such as failure of items you have written to clear your account that may result from proper deduction of fees and expenses owed to us. If any taxes are imposed upon the services you are responsible to reimburse us for any such taxes we are required to pay and we may debit your account for such taxes.

Our fee schedules are provided to you when you open your account If you do not have a copy of these fees, or one is not attached, please request one from your account executive. If you have negotiated a fee schedule based on anything other than our standard fees, that negotiated schedule must be attached to this deposit agreement to be enforceable against us.

We may change our service fees and charges from time to time in our discretion. Notice of any changes to standard published fees and charges will be sent to you via mail or e-mail at the physical address and e-mail address shown on our records. A reasonable period of time will be given before any such changes will become effective.

Your account fees and terms may differ from those of other customers with the same type of account based on our assessment of your overall relationship with us. We will send you notice if your account fees or terms vary from the information described in this agreement.

## 13.    TERMINATING THIS AGREEMENT OR SPECIFIC TREASURY SERVICES AND CLOSING YOUR ACCOUNT.

Either you or we may terminate some or all of the specified treasury services that we provide to you or terminate this deposit agreement in its entirety for any reason by giving the other party at least thirty (30) calendar days prior written

notice. If we give you notice based on any failure or default such as this, under the agreement, you may cure that default during such thirty (30) calendar day period. However, during that cure period we may modify or suspend specific deposit services and treasury services, require minimum balances or security from you, or impose additional conditions prior to continuing to provide certain services.

Notwithstanding the foregoing, we reserve the right to terminate this deposit agreement and all treasury services and to close your account(s) immediately and without advance notice to you if a.) required by law or regulation or b.) if we reasonably believe your activities may expose us to legal, regulatory, financial or reputational risks or c.) you commence an action in bankruptcy or one is commenced against you and we do not feel you can provide assurances of performance satisfactory to us or d.) a change in law or regulation has made it impracticable for us to perform. If we close your account(s), we may send the collected balance on deposit in your account(s) by ordinary mail to your most recent address shown on our account records. You agree to maintain on deposit in your account(s) sufficient funds to cover outstanding amounts owed to us to be paid from your account(s), including without limitation, charge backs, return deposited items and our fees and expenses.

Termination of this deposit agreement does not release you from liability for any unpaid fees or charges, or from liability for outstanding items or other obligations which have been incurred by you or accrued to you or your account under this deposit agreement or which may be incurred or may accrue as a result of closure of your account(s). All amounts you owe us will be immediately due and payable upon termination of this deposit agreement or a specific treasury service to which such fees relate. Where applicable, you may lose interest in the event of a termination.

14.     **LEGAL PROCESS, ADVERSE CLAIMS AND CONFLICTS AFFECTING ACCOUNTS.** If legal action or judicial or regulatory process ("legal process") is brought against your account or the funds in it or we receive notice of a third party claim against your account or there is ever a dispute over your account or the funds in it or disputes between authorized signers on the account, we may refuse to permit — or we may limit — withdrawals or transfers from your account, i.e., "freeze" your account until the legal process, third-party claim or dispute has been satisfied, dismissed or otherwise settled or a bond required by law has been posted or other requirements of applicable law have been satisfied.

We may also: (a) continue to follow any instruction we receive from one or more authorized individuals; (b) honor any claim made by legal process on your account; (c) interplead the funds into an appropriate court for resolution; or (d) choose not to pay out any money from your account until we receive consistent instructions from all parties or a court order.

You agree to reimburse us for — and we may charge your account for   — expenses and fees we may incur in connection with addressing such actions, claims and disputes. We may take action we determine to be appropriate without incurring any liability to you, even if that action leaves insufficient available funds in your account to pay items or honor other transaction authorizations you may have issued.

You authorize us to accept and comply with any document that purports to be legal process issued by any court or governmental agency, regardless of how or in what state or jurisdiction it is issued or we receive it.

15.     **WAIVER OF RIGHTS.** We reserve the right to waive enforcement of any provision of the agreement with respect to any transaction or series of transactions. If we do so, that waiver does not modify the terms of the agreement or affect our ability to enforce our rights with respect to other customers or to enforce any of our rights with respect to any subsequent transaction with you.

16.     **INVALIDITY OF CONTRACT PROVISIONS.** In the event that any provision of the agreement is held to be invalid, illegal or unenforceable for any reason, the remaining provisions of the agreement will remain in full force and effect.

17.     **FORCE MAJEURE.** You agree that we will not be responsible or liable to you or any third party for any losses resulting from any failure or delay in our performance under the agreement or applicable law due to any cause or condition beyond our control including, without limitation, any delay and/or interruption of business due to any act of God, act of terrorism, natural disaster, fire, act of government authority, act of public enemy, war, riot, civil disturbance, insurrection, labor difficulty, power failure, telecommunications failure or severe weather condition. The time, if any, otherwise required for our performance under the agreement or applicable law will be extended by the period of such delay or interruption.

18.     **APPLICABLE LAW.** Our relationship with you is governed primarily by the agreement. However, it is also governed by the laws of The United States of America; applicable state law, the rules and regulations of the Board of Governors of the Federal Reserve System and various Federal Reserve Banks; and the rules and regulations of other bank supervisory authorities and other governmental agencies having jurisdiction over us. To the extent that State law applies to our relationship with you, the applicable law is the law of the State in which your account was opened as

identified in our records. If this agreement violates any applicable Federal or State law, the agreement will be considered changed to the extent necessary to comply with the law.

**19.** ARBITRATION / WAIVER OF JURY TRIAL AND CLASS ACTIONS. If there is ever a dispute or claim regarding the agreement, your account, the treasury services or any other aspect of your relationship with us, you and we will try to settle that dispute or claim amicably via informal dispute resolution methods. If those settlement efforts fail then, if we mutually agree to be bound by arbitration, either you or we may submit the dispute or claim to binding arbitration in the interest of reaching rapid resolution and preserving the business relationship we have with you. That arbitration will be conducted under the expedited procedures of the Commercial Financial Disputes Arbitration Rules of the American Arbitration Association (AAA), and Title 9 of the United States Code. Arbitration hearings will be held in the city in which the dispute occurred or where you and we mutually agree. A single arbitrator will be appointed by agreement of the parties or, if you and we are unable to agree, then by the AAA or other arbitration group or association agreed to by the parties to resolve the matter. The Arbitrator will be a retired judge or attorney with experience or knowledge in banking transactions.

You and we will pay our respective costs and attorneys' fees incurred in connection with the arbitration. A court having proper jurisdiction may enter a judgment on the award.

Any statute of repose or limitations period which would provide a defense to a claim brought in a lawsuit in State or Federal court will also apply with equal force and effect to any arbitration brought pursuant to this section.

To the extent permitted by law, if any dispute or claim results in a lawsuit you and we knowingly and voluntarily agree that a judge, without a jury, will decide the case and we and you each waive our respective right to trial by jury.

Any arbitration or trial will be brought individually and not as part of a class action. If it is brought as a class action, it must proceed on an individual (non-class, non-representative) basis and we and you each waive our respective right to class actions other than on the basis stated herein.

**20.** LIMITS ON DAMAGES. EVEN IF WE ARE HELD LIABLE FOR ACTUAL DAMAGES, YOU AGREE THAT, TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL WE BE LIABLE TO YOU FOR SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES RESULTING FROM OR IN CONNECTION WITH THE FURNISHING, PERFORMANCE OR USE OF ANY OF THE SERVICES PROVIDED BY US, OR ON OUR BEHALF, UNDER THIS AGREEMENT, REGARDLESS OF WHETHER WE OR YOU MAY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

The limitations and exclusions in this paragraph apply to all claims of every kind, nature and description at law or in equity, whether for breach of contract, breach of warranty, negligence or other tort, and will survive the termination of any treasury services in whole or in part or the termination of the agreement.

**21.** INDEMNIFICATION AND REIMBURSEMENT OBLIGATIONS. Except as may be limited by applicable law and except to the extent losses, claims, and expenses are finally determined by a court or arbitrator having proper jurisdiction to have been caused by our negligence or our willful misconduct or by our breach of our obligations under the agreement, you agree to indemnify and hold us and our officers, employees and agents harmless from (or at our election and where appropriate to reimburse us for) any and all losses, costs and expenses (including attorneys' reasonable fees and costs) resulting from:

(a) claims brought against us by any person or entity arising in connection with any of the services or treasury services provided under the agreement or pursuant to any applicable Service Description or agreement;

(b) claims from any third-party arising out of actions we took or omitted based upon instructions from you or your agents;

(c) claims made directly against you by us stemming from losses we incur from any breach of your obligations or representations and warranties hereunder regardless of whether a claim has been asserted by a third-party against you or us;

(d) obligations, losses or expenses we incurred in connection with any legal process, dispute or third-party claim related to you or your accounts;

(e) losses we suffer related to returned items, overdrafts or collection efforts related to any of the foregoing;

(f) losses we suffer related to the expense of responding to subpoenas or court orders; or

(g) losses or delays in processing related to improper use of the envelope or on the reverse side of an item or extending outside such space.

These indemnification obligations will survive the termination of any treasury services in whole or in part or the termination of the agreement.

22.   **YOUR REPRESENTATIONS, WARRANTIES AND COVENANTS.**   You represent and warrant to us upon your execution of this deposit agreement and continually during the term of the agreement that: (a) you have taken all corporate or other governance actions necessary or required to open and maintain your account(s); (b) all authorizations and documentation you have given or caused to be given to us are true, accurate and complete in all material respects; (c) any assumed or fictitious names you use have been duly registered or filed with the applicable governmental authorities; (d) each authorized individual has authority to bind you to all transactions involving any account for which that person is authorized; (e) all financial information you give us is true, correct and complete, and accurately reflects your financial condition as of the date(s) stated in such documentation; (f) you are not insolvent within the meaning of 11 U.S.C. Section 101, (g) you are in compliance with all federal, state and local laws applicable to your properties, operations, business and finances, except where any such failure to be in compliance would not have a material adverse impact on your ability to perform your obligations — or our ability to enforce our rights — under the agreement; (h) you are duly organized and, where applicable, in good standing under the laws of the State of your organization, and you have all powers, licenses, authorizations and approvals to operate your business as now conducted, except where any such failure to be in compliance would not have a material adverse impact on your ability to perform your obligations — or our ability to enforce our rights — under the agreement; (i) if you are entering into the agreement on your own behalf and on behalf of another entity — whether or not affiliated with you — you have all necessary authorization and powers of attorney from each of such other entity and you have full power and authority to bind all such entities to the terms of the agreement; (j) you will notify us promptly of the existence of any condition or event which may constitute a breach of, or default under, the agreement or which would cause any of the foregoing representations and warranties to be untrue in any material respect; (k) you will notify us promptly in writing of any change in your name or address; any publicly disclosed change in either your business structure, ownership or organization; any material change in any other information you have provided to us in connection with opening your account; or any litigation affecting you which could reasonably be expected to affect your ability to perform your obligations — or our ability to enforce our rights — under the agreement; and (l) upon our request, you will promptly give us true and correct copies of your publicly available financial statements, reports, notices, and proxy statements sent to shareholders, and such other information regarding your operations, business affairs and operations including, but not limited to, income statements, balance sheets and statements of cash flows that we may reasonably request   You further represent and warrant that: (i) you are not a person named on the list of Specially Designated Nationals or Blocked Persons maintained by The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) as published from time to time; (ii) you are not an agency of the government of a country, an organization controlled by a country, or a person resident in a country that is subject to a sanctions program identified on such OFAC list; and (iii) you do not transact business in any such country or with any such agency, organization or person in violation of the economic sanctions of The United States of America as administered by OFAC.

23.   **CONSENT TO RECORDING, MONITORING AND USE OF AUTOMATED COMMUNICATIONS.**   You agree that your telephone communications with us, our affiliates and/or service providers may be monitored and/or recorded to assure the quality of our service.   You authorize us and our service providers to make calls and/or send text messages to you at any telephone number(s) you have provided to us and/or our service providers, including a wireless telephone number that could result in charges to you, for all purposes related to the servicing of your account or to collect any amounts you owe.   You understand that these calls and/or text messages may be made to you using technologies including, but not limited to, automatic telephone dialing systems or artificial or prerecorded voice messages.

24.   **ENTIRE AGREEMENT.**   The agreement — including the provisions in the Other Matters section of the agreement applicable to your relationship with us based on the services you receive   and the documents referenced herein and in the Other Matters section of the agreement applicable to your relationship with us based on the services you receive — constitutes your entire agreement and understanding with us with respect to the subject matter it addresses, and replaces all prior agreements and understandings that may have existed between you and us concerning any subject matter in the agreement.   You also agree that no other documents or other terms or conditions that you or we may have given each other have any bearing upon the rights or obligations that you or we have with respect to the subject matter of the agreement.

25.   **OTHER MATTERS**

**ABANDONED AND DORMANT ACCOUNTS.**   We are required to inform you that:  Unclaimed property laws of various states require us to turn over abandoned accounts to the applicable state. Balances in accounts that we deem to be

abandoned due to inactivity in accordance with such law will be surrendered to the applicable state in accordance with such law. Dormant accounts are subject to the same service charges imposed on active accounts. If your account is deemed to be abandoned, your account will incur certain dormant status fees and may continue to accrue other maintenance fees and we may also refuse to pay items drawn on the account or refuse other requested withdrawals.

**AUTHORIZED INDIVIDUALS.** The individuals who have authority to give us instructions, access information and accounts and use treasury services on your behalf are individuals: a.) whose names and signatures appear on the signature card or b.) whose names appear in any other document that we agree in writing to accept from you in lieu of or in addition to the signature card, such as applicable wire transfer authorization forms or our Depository Authorization and Agreement Certificate or c.) whom you have authorized to perform transactions through electronic media including having been granted access to our internet portal known as Wachovia Connection at your request.

Each of these individuals shall be considered and is referred to as an "authorized individual".

With the exception of making deposits, only authorized individuals may transact business on your accounts, whether in person or by telephone, fax, internet or other electronic access such as Wachovia Connection. Any transaction your authorized individuals undertake through us will not be deemed completed until we have processed or implemented that transaction in accordance with our applicable protocols and procedures.

In addition, if you use a service that involves authorization codes, any person giving us an appropriate authorization code will be deemed to be an authorized individual having authority to give us instructions, transfer funds, access information and use all such services on your behalf, even if he or she is not otherwise designated as having authority to do so and regardless of whether such person's name appears on the signature card.

You may also authorize third party processors and other agents to give us instructions, access information and use services, on your behalf and all such persons and entities shall be deemed authorized individuals. We may act upon any oral or written instructions we receive that we believe in good faith to have been given by an authorized individual including instructions sent by facsimile or other electronic method or authorization code. We are authorized to follow the instructions of (and may rely on any information given by) any person designated as having authority to act on your behalf (or that gives us or uses an appropriate authorization code) until we receive written notice that his or her authority (or authorization code) has been terminated and we have had a reasonable time to act upon that notice. At our option, we may require written confirmation of instructions that are given orally or by facsimile.

For your protection, we recommend that all initial authorizations and any subsequent revocations of or changes to the authority of any authorized individual should be given to us by one of your senior treasury or financial officers and should be certified by your corporate secretary or an assistant secretary. We are not responsible if you fail to follow these recommended procedures.

If we accept certified resolutions or corporate secretarial certificates of incumbency from you, it is for the sole purpose of determining the identity of authorized individuals. Those documents have no other legal effect on us or in any way limit our authority to act. Nor do they place any specific performance obligations on us by contract or by agency principles or under any other legal or equitable theory.

**AUTOMATED PROCESSING OF ITEMS.**

As is common in the banking industry, we have adopted automated collection and payment procedures so that we can process the greatest volume of items at the lowest possible cost to all customers. These automated procedures involve high-speed automated processing machines that read information encoded onto each item in magnetic ink. In recognition of this fact, you agree that in paying or taking an item for collection, we may disregard all information on the item other than information encoded onto the item in magnetic ink according to general banking standards, whether or not that information is consistent with other information on the item. For example, we may rely on the amount of an item as encoded in magnetic ink, even if that encoded amount is greater than the face amount of the item. Similarly, you agree that our automated procedures do not involve a visual examination or verification of signatures on any items, nor do they involve verification that the date or amount of an item is within a range of permissible dates or amounts that may be stated on its face. Finally, such procedures do not involve screening for and rejection of items containing language intended to have legal effect such as accord and satisfaction language, e.g., "paid in full".

In addition, our automated processing of items does not accommodate dual signature verification. Therefore we do not offer accounts or services that require two or more signatures to be present on an item. You agree that any such requirement contained in any documentation you give us is, as between you and us, solely a statement of your own intended internal control procedures and objectives and is not binding on us and you agree that we may pay checks against your account without regard to your desired number of signatures.

Items you write or deposit may be automatically processed and encoded into electronic images (truncated) during the collection and return process. If you elect to have your documents printed by a vendor that we have not approved, or if you elect to use stock or features (e.g., security features) that cause critical data on an item to disappear or be obscured upon truncation, or you prepare an item in such a way (e.g., using a lightly colored ink) that causes critical data to disappear upon truncation, you do so at your own risk. We are not liable — and you must reimburse us for — processing errors or delays, losses or our failure to process any of the foregoing items or due to: printing inaccuracies; faulty magnetic ink encoding; the failure of data printed or written on the item or security features of the item to survive truncation or to be successfully imaged; the use of check carriers; issuance or deposit an item (1) containing extra information such as, but not limited to, maximum amount limitations, date limitations, two signature requirements.

**AUTOMATED CLEARING HOUSE (ACH) TRANSACTIONS.** If you use our ACH service, the following provisions govern such service.

(a) **Services.** The ACH service requested by you and performed by us will be in accordance with the Rules of the National Automated Clearing House Association ("NACHA") (which we referred to as, the "Rules"), as such Rules may be amended from time to time, and includes the transmission of electronic credit and/or debit entries (which we referred to as, "Entries") initiated by you and processed through us from the demand deposit account(s) you maintain with us (each an "Account") to other deposit accounts maintained with us and at other banks and financial institutions by means of the ACH network (the " ACH Services").

With respect to such Entries, we will act as an Originating Depository Financial Institution and you will act as Originator, as such terms are defined in the Rules. As Originator, you are bound by the Rules and you must handle all aspects relating to the processing of an Entry in a commercially reasonable manner. If you are deemed a Third-Party Sender under the Rules you agree to abide by the Rules as they relate to such senders and to enter into additional agreements that are required by the Rules.

You acknowledge that an Entry may not be initiated that could violate the laws of The United States of America including, but not limited to, regulations promulgated by the Office of Foreign Asset Control (OFAC). Any liability for any failure on your part to comply with the Rules or applicable law will be borne by you to the extent that your failure results in any liability to you or to us or to any third-party. Capitalized terms used but not defined in this section have the meanings given them in the adoption of Article 4A of the Uniform Commercial Code in the State in which your Account is maintained or in the Rules.

(b) **Exposure Limits.** In accordance with the Rules and banking regulatory guidelines, companies using ACH Services must be assigned exposure limits and meet minimum credit standards. These exposure limits represent the maximum ACH Dollar volume that can be originated and await final settlement over any three (3) banking day period. Specific exposure limits will be specific to a settlement deposit account. We will attempt to assign you exposure limits that are consistent with your historical ACH origination activity. We may change or suspend these limits at any time in our sole reasonable discretion. If you fail to comply with such conditions and procedures, we may require certain credit enhancement or security before you may continue using our ACH Services, or we may terminate your ACH Services.

(c) **Pre-notification.** While pre-notification is no longer required by the Rules, if possible and where feasible, we encourage, but do not require, you to give us pre-notification information for all Entries that you intend to institute.

(d) **Services Performed.** You will give us written or oral instructions detailing those ACH Services to be performed by us on your behalf (your "Instructions"). You may change those Instructions from time to time upon written or oral notice to and acceptance and implementation by us.

(e) **Rules and Verification of Entries.** We will transmit Entries by means of the ACH Operator in accordance with the Rules. We may assume that the information you give us is authentic, accurate and conforms to the Rules.

(f) **Rejection of Entries.** We may reject any Entry file or Entry and we may, at our option, reject any Entry file or Entry that is in excess of the collected balance in the Authorized Account(s) or based on customer file limits. We will notify you via automatic e-mail notification of rejected Entry files or Entries that are pre-funded. We will use commercially reasonable efforts to notify you through e-mail or oral communication of all other rejections as soon as reasonably possible. We are not liable for any losses relating to the rejection of any Entry file or Entry or by virtue of the fact that such notice was not actually given or was not given in a timely manner.

(g) **Authorizations.** You must retain an original or copy of each authorization for six (6) years after the date of termination or revocation of such authorization. You agree to give us any such information or authorization that we request.

**(h) Inconsistency of Name and Account Number.** You acknowledge and agree that if an Entry describes its Receiver inconsistently by name and account number, payment to or by you of the Entry transmitted by us may be made on the basis of the account number even if the identifying number identifies a person or entity different from the named Receiver, and that your obligation to us for the amount of the Entry will not be excused in such circumstance.

**(i) Security Procedures.** You acknowledge that you and we have agreed to certain confidential security procedures (hereinafter "Security Procedures") that we have previously provided to you or have described to you that will be used to verify the authenticity of the sender of the Entry. You agree that such Security Procedures are commercially reasonable in light of your circumstances and the type, value and frequency of the Entries you will initiate. For Electronic Data Transmission of any ACH Entry file to us by you and for Electronic Data Transmission of ACH files to us from you when we are retrieving any file, you must utilize the Security Procedures that have been provided by us. If our transmission software accepts a file or successfully retrieve a file based on these Security Procedures and the file(s) are in ACH system readable format, you agree that acceptance of the ACH file(s) will have occurred and that we may process the file(s) accordingly. You agree that you will not disclose the Security Procedures to anyone except your authorized individuals. If any of your authorized individuals or anyone within your company has reason to believe that any of the Security Procedures may have been compromised, you agree to notify us immediately. You must provide all modifications and additions to the Security Procedures or your authorized individuals to us in writing unless you instruct us verbally to delete an authorized individual, in which event you must immediately send us written confirmation of such deletion instruction.

**(j) Returned Entries.** We will use reasonable means to notify you if we receive a returned Entry. We have no obligation to re-transmit a returned Entry, unless we have agreed otherwise with you. We will credit or debit your Account(s) for any amount we receive by reason of the return of any Entry we transmitted for which we have previously received payment from you settled through your account.

**(k) On-Us Entries.** Except as provided in the Rules and this deposit agreement, in the case of an On-Us Entry received by us for transmittal, we will credit or debit the Receiver's account in the amount of such Entry on the Effective Date contained in such Entry provided the requirements of your Instructions and the Security Procedures have been met. If any such requirements have not been met, we will use reasonable efforts to credit or debit the Receiver's account in the amount of such Entry on the next business day following the business day on which such requirements are met.

**(l) Provisional Payment.** Payment of an Entry by the Receiver's bank to the Receiver will be provisional until receipt by the Receiver's bank of final settlement for such Entry. You specifically acknowledge that you have received notice of such settlement rule and the fact that, if any such settlement were not received, the Receiver's bank would be entitled to a refund from the Receiver of the amount credited, and you will not be deemed to have paid the Receiver the amount of the Entry.

**(m) Collected Funds.**

    **(i)    Credit Entries.** Whenever you initiate a credit Entry, you must provide good collected funds in the Authorized Account(s) to cover any credit Entry initiated by us no later than the time the Entry settles to the appropriate Authorized Account on the Effective Date. "Good collected funds" means funds available for immediate withdrawal.

    **(ii)    Debit Entries.** Whenever you initiate a debit Entry, you will receive immediately available funds in the Authorized Account(s) for any debit Entry initiated by you on the applicable Effective Date or the next banking day after we receive the debit Entry information from you. You will promptly provide good collected funds into the affected Authorized Account to indemnify us if any debit Entry is returned after we have permitted you to withdraw funds from the Account in the amount thereof.

**(n) Authorization Warranty.** With respect to each Entry that you send us, you represent and warrant to us at the time of such submission that: (i) the employee or other person or entity to whom such Entry pertains is an authorized individual who authorized such Entry, as and how required by the Rules, prior to the submission of it to us, and that such authorization is effective at the time of delivery or transmittal of such Entry, and will so remain until acceptance of the Entry by the Receiver's bank; you will maintain written evidence of such authorizations in accordance with all applicable laws, rules and regulations and will furnish us with a copy if requested; and (ii) the Entry is accurate, in proper form, timely and conforms to all obligations owed by you to the applicable Receiver. In addition, with regard to any entries, you will be deemed to have made the representations and warranties to us that are required of you under the then current Rules or which we are required to provide on your behalf by us to the Receiving Depositary Financial Institution (RDFI) and you agree that you shall, among other things, submit to audits and comply with the operational requirements of each such entry.

---

(o) **Telephone-Initiated Entries.** With respect to telephone-initiated entries, you acknowledge and agree that you assume at all times the following additional obligations: you will disclose all information required by the Rules to any consumer during the telephone call; you will tape record the telephone conversation authorizing the Entry or you will provide written confirmation promptly of the consumer's authorization as required by the Rules; and you will verify the consumer's identity and routing number as well as the Receiver's identity and routing number. You will be deemed to have made the representations and warranties to us that are required of you under the then current NACHA rules or which we are required to provide on your behalf by us to the (RDFI) and you agree that you shall, among other things, submit to audits and comply with the operational requirements of each such entry.

(p) **Internet-Initiated Entries.** With respect to Internet-initiated Entries ("WEB Entries"), you agree that you will maintain an annual security audit as required by the Rules. You also agree that only authorized individuals will initiate such entries. You will be deemed to have made the representations and warranties to us that are required of you under the then current Rules or which we are required to provide on your behalf by us to the RDFI and you agree that you shall, among other things, submit to audits and comply with the operational requirements of each such entry.

(q) **Your Additional Responsibilities.** You agree to reimburse us pursuant to the indemnification provisions stated in **Section 22** of this agreement in connection with your failure to obtain the correct identity, proper authorization (by provision of prior notice, if applicable, to the Receiver, and other appropriate authorization and documentation, if applicable) and other information regardless of the reasonableness of any procedures employed by you, as well as in connection with any failure by you to provide timely copies of documentation when requested by us with regard to any ACH transaction involving you.

**BUSINESS DAYS AND "CUT-OFF" TIMES.**  Our business days and "cut-off" hours are disclosed in our Schedule of Fees and Funds Availability disclosure. Our ATM cut-off hours are displayed on the ATM deposit screen. Each are subject to change from time to time at our discretion. If we receive an item on a day that is not a business day or after our "cut-off" hour on a business day, the item is deemed to have been received on our next business day. Business day means a calendar day other than Saturday, Sunday or a holiday.

**"CHECK 21" AND ISSUES RELATED TO SUBSTITUTE AND REPLACEMENT DOCUMENTS.** Items are sometimes lost or truncated (i.e., converted into electronic images) during the collection process. Items that have been truncated may also be reconverted into substitute checks or other replacement documents. Under federal law, we are required to accept substitute checks with warranties as the legal equivalent of the original and we will pay and charge such substitute checks against your account. Moreover, you agree that we may at our discretion pay and charge against your account photocopies, image replacement documents, electronic checks or other paper or electronic replacements of the original item that do not constitute substitute checks, if they appear to be replacements for properly drawn and authorized items. You agree to allow any imaged document or copy to serve as the original for all purposes, including charging your account or determining validity of signature, etc.

**CHECK CASHING BY NON-CUSTOMERS AT OUR FINANCIAL CENTERS.** From time to time, a person who is not our customer may try to cash a check that is drawn on your account. Cashing an item for a non-customer exposes us to certain risks that are not present if the item is deposited at another financial institution and presented to us through the check collection system. As a result, you agree that we may charge a non-customer a fee to cash an item (including a payroll check) that is drawn on your account unless prohibited by applicable law. You also agree that we may impose additional identification, security and other requirements on a non-customer seeking to cash an item. These requirements may include, without limitation, submitting one or more forms of identification, providing thumbprints or other identifiers, and using specified teller lines that may only be available at specially designated locations. You agree that we will not be liable for wrongful dishonor for refusing to cash an item drawn on your account if the payee refuses to comply with such reasonable security measures or fails to pay any fee.

**DEFINED TERMS.** Depending on the context in which it is used, the term "item" means a check, draft, demand draft, preauthorized draft, remotely created check or other written order or instruction for the payment, transfer or withdrawal of money or a point-of-sale authorization request, ATM withdrawal, ACH entry, payment order or other electronic transaction and automatic transfers. Item also includes any writing created or authorized by you that would be a check or draft but for the fact that it has not been signed. "Signature card" refers to the deposit account application or any other account opening documents that you completed when establishing your account. "Including" means "including but not limited to". "Check Carrier" means a device that is used to contain a mutilated or deformed item. Use of the word "may" in the context of our stated rights means that we may take an action but are not obligated to take an action. "Service" means a deposit service, a treasury service, a funds transfer service or an ACH service or any other service provided under or incorporated by reference into this agreement. "Banking Day" means with reference to a Participating DFI, any day on which such DFI is open to the public during any part of such day for carrying on substantially all of its banking functions, and, with reference to an ACH Operator, any day on which the appropriate facility of such ACH Operator is being operated.

Version 1.0                                                                                                                    Page 13

**FOREIGN CURRENCY DEPOSITS.** If foreign currency or an item payable in foreign currency is deposited to your account, the final credit to your account — and the amount of any return to be charged against your account if the item is subsequently returned — will be based on the exchange rate in effect at the time we receive final payment for that item in United States Dollars or such item is returned.

**FUNDS TRANSFERS.** If you use our funds transfer service, the following provisions govern all transactions for our acceptance and processing of your payment orders, credits and related requests. If a discrepancy is determined to exist between the following provisions and other provisions of this deposit agreement, then the following provisions will control but only to the extent necessary to address the discrepancy.

Unless otherwise defined below, the terms used in this section have the same meaning as set forth in Article 4A of the Uniform Commercial Code of the State in which your account is maintained.

In performing funds transfer services for you or on your behalf, you agree that we do not assume any liability beyond that imposed on us by Article 4A of the Uniform Commercial Code of the State in which your account is maintained.

(a) **Authorization and Security Procedure.** We have established operating rules and security procedures for you to initiate and receive funds transfers to or from your account(s), which rules and procedures include a requirement for you to sign a, "Wire Transfer of Funds – Standard Setup," or such other documents as we may require, the terms of which are incorporated by reference and made part of this deposit agreement. Such Wire Transfer of Funds Setup describes some of the rules and procedures ("Security Procedures") that you and we will use to process payment orders initiated by you. By your execution of such Wire Transfer of Funds Setup you agree that the Security Procedures are commercially reasonable in light of your circumstances and the type, value and frequency of the payment orders you will request. You also agree to keep the Security Procedures confidential and not to disclose the Security Procedures to anyone, except authorized individuals. If you, or any of your authorized individuals believe that an unauthorized person may have learned a Security Procedure, you must notify us immediately. If we receive a payment order (or related request) in accordance with your Security Procedures, it will be conclusively deemed authentic and we are entitled to rely thereon. You are responsible for the accuracy of the initial communication of the payment order as well as the accuracy of any documentation or information provided to us during any verification of the payment order made by us. You agree that we may record any telephone conversation between any authorized individual and us. We are not liable for our refusal to honor any request if we, in good faith, are unable to determine to our satisfaction that such request is valid based upon our adherence to the Security Procedures.

(b) **Execution of Payment Orders.** If we receive a payment order that has been verified according to the Security Procedures, you authorize and direct us to debit your account(s) as listed on the Authorization Schedule and to transfer the funds accordingly. We are also authorized to implement any instructions, including amendments or cancellations of prior payment orders, upon our verification of such instructions. We are also authorized to rely on any payment order believed by us in good faith to have been given by an authorized individual. We may handle payment orders received from you and other customers in any order selected by us and, unless we have otherwise been instructed by you, we may use any means, intermediaries or funds transfer systems which may have operating rules governing the execution of payment orders to effect the transfer.

(c) **Cut-Off Times.** We must receive all payment orders on a business day before the cut-off time for funds transfers established by us from time to time. Any payment order or related request that is received by us after such deadlines or on a day that is not a business day for us or a business day for the funds transfer system or the bank or institution to receive the transfer to be used to effect the funds transfer will be treated as received by us on our next business day.

(d) **Advice of Funds Transfers.** We will notify you of wire transfer receipts and payments electronically or by mail. When you receive such notification you agree to examine it promptly upon receipt and to notify us immediately and in any event no later than 60 days of any discrepancies between such notification and your records. Where computation of interest is otherwise applicable, we are not liable for lost interest compensation unless we have been notified of the discrepancy within sixty (60) days after the date of such notification indicating the debit for the payment order in question and furthermore we assume no liability for any error if you do not notify us within 60 days after the date of such notification. You agree that your right to assert a claim against us with respect to any transaction reasonably identified on such notification and identified to us within such sixty (60) days expires one (1) year after the date of the transaction that is the basis for such a claim. The time limit for such notifications to us shall be deemed to run from the time of your receipt of the first applicable notification. Unless we have otherwise agreed with you in writing, we will not provide you a next-day wire transfer summary statement or confirmation.

(e) **Use of Identifying Numbers.** In the event a payment or payment order identifies a beneficiary, a beneficiary's bank or intermediary bank inconsistently by name and an identifying number (such as an account number,

S.W.I.F.T. address or universal identification number), payment may be made by the intermediary or beneficiary bank on the basis of the identifying number even if the identifying number identifies a person or entity different from the named person or entity in your payment order. Your obligation to pay the payment order is not excused by your error. We are entitled to and will rely on the identifying number as proper identification of a beneficiary.

(f) **Interest Compensation.** In the event that we become liable to you for interest compensation under this deposit agreement or under applicable law in connection with providing funds transfer services, interest will be calculated on the basis of the average Federal Funds rate for the period involved. You agree that we may, at our sole option, pay interest compensation as follows: (a) by a lump sum payment to you in cash, or (b) by providing a credit to your account with us.

(g) **International Payments.** Payment orders for the transfer of U.S. Dollars shall be paid in U.S. Dollars if the funds shall be transferred to a beneficiary account located in the United States or its protectorates or territories. If a payment order requires U.S. Dollars to be transferred to a beneficiary account located outside of the United States or its protectorates or territories, we or the beneficiary's bank may elect to pay the beneficiary in non-U.S. Dollar currency at our or the beneficiary bank's buying rate of currency exchange for wire transfers. It is your responsibility to advise the beneficiary of this possibility. We may send any message relative to an international payment order in explicit language, code or cipher. International transfer payment orders are final when delivered to us. However, pursuant to the request of the originator, and only if we may determine it to be possible, we may cancel or amend the originator's payment order before the wire transfer of funds shall be effected. We shall not incur any liability if we are unable, for any reason, to cancel or amend any payment order. Refunds of U.S. Dollar payment orders shall be in U.S. Dollars in the amount of U.S. Dollars that we shall receive from the bank that shall be returning the transferred funds to us at such bank's rate of currency exchange, less any fees therefore. Refunds of non-U.S. Dollar currency payment orders shall be in the amount of U.S. Dollars that can be bought by us for the applicable non-U.S. Dollar currency amount at our then current rate of currency exchange. The originator bears all risk of loss due to fluctuation in the rate of currency exchange. No wire transfer fee shall be refunded.,.

**AS PERMITTED BY PROVISIONS OF APPLICABLE LAW ON FUNDS TRANSFERS, INCLUDING ARTICLE 4A OF THE UNIFORM COMMERCIAL CODE OF THE STATE IN WHICH YOUR ACCOUNT IS MAINTAINED, IN NO EVENT WILL WE BE LIABLE TO YOU FOR SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES RESULTING FROM OR IN CONNECTION WITH THE FURNISHING, PERFORMANCE OR USE OF THE SERVICES PROVIDED BY US, OR ON OUR BEHALF, UNDER THIS AGREEMENT, REGARDLESS OF WHETHER WE OR YOU MAY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**

**NIGHT DEPOSIT SERVICES.** Use of our night depository services is subject to the terms and provisions contained in the Night Depository Services Description, the text of which is incorporated into this deposit agreement. Your account executive will give you a copy of our night depository services description upon request.

**NOTICES.** Notices we give you will be considered effective when deposited in the U.S. Mail to your most recent address reflected in our records. Notice you give us will be considered effective when deposited in the U.S. Mail to us.

**OFFSET AND CASH MANAGEMENT AGREEMENTS.** In offset relationships, as a cash management convenience to you, you and entities in the same affiliated group of companies (e.g., subsidiaries and affiliates controlling, controlled by or under common control with a parent company) that are also our customers understand and agree that we will honor payments made from the participating accounts of any such participating affiliates, so long as the participating accounts of the participating affiliates have an aggregate net credit balance. In such situations, the debit balances of the listed accounts of one affiliate are offset against the credit balances of the listed accounts of one or more affiliates. Regulatory authorities require banks to document offset and cash management arrangements with their customers. If you and your affiliates have an interest in pursuing an offset structure for multiple entities or a cash management structure for a single legal entity, please ask your account executive for the proper documentation for a cash management agreement or an offset agreement.

**OVERDRAFT CHECKING PROTECTION.** If overdraft checking protection is available and you elect that option, we will automatically transfer funds sufficient to cover the amount of any overdraft (and the related service charge) to your primary checking account from any other eligible secondary deposit account (checking, savings or money market) or credit account (commercial credit card or line of credit) you have selected. One transfer will be made at the end of the banking day during which an overdraft occurs as follows:

(a) **Overdraft transfers made from a deposit account.** Funds will be transferred in the next largest full U.S. Dollar amount. You agree to pay an overdraft protection service charge for each daily transfer as provided in our Schedule of Fees and Funds Availability for Commercial Accounts, which will be deducted from your primary account. This overdraft protection service does not constitute an extension of credit to you. If your secondary account does not

contain sufficient available funds to cover the overdraft in your primary checking account, no transfer will be made and you agree to pay an insufficient funds fee in accordance with the Schedule of Fees and Funds Availability for Commercial Accounts, which will be debited from your primary or secondary account. If your secondary account is a savings or money market account, transfers from such accounts are pre-authorized transfers and, under Federal regulation, you may not make more than six (6) pre-authorized transfers (including telephone transfers) each statement period.

(b) **Overdraft transfers made from a credit account.** Funds will be transferred in amounts rounded up to the next one hundred dollar ($100) increment, subject to your available credit limit. An overdraft transfer from a credit account is treated as a cash advance and is subject to the terms of the relevant credit agreement, including any applicable transaction fee or other fees. If you do not have sufficient available credit limit to cover an overdraft in your primary checking account, no transfer will be made and you agree to pay an insufficient funds fee in accordance with the Schedule of Fees and Funds Availability for Commercial Accounts, which will be deducted from your primary account.

**PAYMENT LIMITATIONS, RESTRICTIONS, FEES AND DUPLICATE SERIAL NUMBERS.**  We may refuse to pay and/or we may impose a special fee for any item drawn against your account or used to withdraw funds from your account if that item is not on a form we have approved. We also reserve the right to refuse to pay and/or we may impose a special fee for any item drawn against your account or used to withdraw funds from your account if the transaction is made in a manner not specifically authorized for your account, if made more frequently or in a greater number than specifically permitted for your account, or if made in an amount less than the minimum withdrawal or transfer specifically permitted for your account. If you issue items for payment with duplicate serial numbers, this impairs our ability to protect your account including the ability to effect a stop payment on an item. As a result, you agree not to issue such items, and, if you do so, you issue such items at your own risk and agree that we are not liable for such items or transactions.

**PLACEMENT OF ENDORSEMENTS.**     You agree not to issue a check that contains a carbon band, printing, endorsements or other material on the back of the check outside of the area extending 1¼ inches from the trailing edge of the check, because that material could interfere with endorsements by banks and cause delays in returning the check. Similarly, if you or a prior endorser has signed, stamped or affixed an endorsement to a check for deposit which is outside of the area extending 1½ inches from the trailing edge of a check, that endorsement could interfere with endorsements by banks and cause delays in returning the check and you are therefore liable for such stamps and marks. Also you agree we will not be liable to you because an item you deposit in your account is returned after the time set by applicable law if the delay in returning the item is caused by markings on the item made by you or a prior endorser in the space reserved for the depositary bank's endorsement. The trailing edge is the left side of the check when viewing it from the front.

**PRIVACY AND REPORTING OF INFORMATION.**  We will use information we receive and provide it to our agents, affiliates and subcontractors for the purpose of providing the services under the agreement and to analyze data to determine other services that may be beneficial to you. We may report information about you or your account to any credit reporting agency or to anyone you list as a reference. You also authorize us to tell the payee of an item drawn against your account whether sufficient funds are available in your account to pay that item.

**REGULATORY DISCLOSURES.**

We would like to inform you that:

> **BUSINESS SAVINGS ACCOUNTS.** Your balance(s) will earn interest at our current Business Savings interest rate. Please refer to your Schedule of Fees and Funds Availability for Commercial Accounts to confirm tiers for earning higher rates of interest (may not be applicable in all states).

> **BUSINESS SAVINGS ACCOUNT TRANSACTION LIMITATIONS.** You may make unlimited withdrawals in person from your Business Savings Account; however, federal regulations limit the total of third-party transfers (such as automatic drafts and debit card purchases), pre authorized transfers (including overdraft transfers), and on-line or telephone transfers to six per statement period. If this limitation were exceeded on a regular basis, we would be required to close your account and to open another account that permits unlimited check writing privileges.

> **COMMERCIAL MONEY MARKET ACCOUNTS.** You will earn our current applicable commercial money market account interest rate if you maintain a daily collected balance of the minimum amount. Please refer to your Schedule of Fees and Funds Availability for Commercial Accounts to confirm threshold balances for earning higher rates of interest.

> **COMMERCIAL MONEY MARKET ACCOUNT TRANSACTION LIMITATIONS.** You may make unlimited withdrawals in person from your Commercial Money Market Account. However, federal regulations limit the total of third party transfers (such as checks, automatic drafts and debit card purchases), pre-authorized transfers

(including overdraft transfers) and online or telephone transfers during per statement cycle period. If this limitation were exceeded on a regular basis, we would be required to convert your account to another account that permits unlimited check writing privileges. A fee will be imposed for items posted during a statement period in excess of this limit (see the Schedule of Fees for the amount of the fee). We will determine the number of third party checks for your statement period based on the posted date of the third party checks.

**INTERNAL MONEY MANAGEMENT ACCOUNTING.** For regulatory and accounting purposes, your account will consist of two "sub-accounts" on our books: (1) either a non-interest-bearing (demand) account or an interest bearing (NOW) sub-account (either of which is referred to as the "checking sub-account"), and (2) a money market sub-account. These sub-accounts are treated as a single account for statements and daily use of your account. No interest will be earned on either sub-account for non-interest bearing accounts. On interest-bearing accounts, the same interest rate may be paid on both sub-accounts, and your periodic statement will reflect a single blended annual percentage yield (APY) earned. Whenever your checking sub-account balance exceeds a threshold amount (which we may set and change at our discretion), we may transfer funds above that amount to the money market sub-account. As these funds are needed to pay items presented against your account, we will transfer funds from the money market sub-account to the checking sub-account, up to six (6) times per statement month. If a sixth transfer is needed, the entire balance in the money market sub-account will be transferred into the checking sub-account. This process may be repeated each statement month. This internal accounting process has no effect on daily use of your account, on how checks are paid, or on how account activity appears on your account statement.

**INTEREST-BEARING ACCOUNT LIMITATIONS.** We are required under federal regulation to retain the right to ask for seven (7) days' written notice before you withdraw money from any interest-bearing accounts. Unless you receive different instructions from us, you can make withdrawals by writing a check on the applicable account, except on Business Savings accounts.

**PAYMENT OF INTEREST ON COLLECTED BALANCES.** Interest begins to accrue on interest bearing deposit accounts no later than the business day we receive credit for the deposit of noncash items deposited to your account. We receive credit for checks drawn on other financial institutions based on the availability schedule established by the applicable branch of the Federal Reserve Bank and other correspondent banks. The balance in interest bearing deposit accounts for which we have received credit is called the collected balance. Interest is paid on the net amount of the collected balance less applicable reserves.

**SECURITY PROCEDURES AND AUTHORIZATION CODES.** We have developed certain security procedures that we will ask you to implement with respect to your account and certain treasury services. These security procedures are designed to verify the authenticity of instructions that we receive and to control access to information and treasury services. They are not designed to detect errors in the content or transmission of instructions or information. We may rely on the security procedures to control access to information and treasury services and to determine whether any instructions we receive are authorized. You will be bound by all instructions issued in your name and accepted by us in compliance with the applicable security procedures, whether or not you or one of your authorized individuals actually authorized those instructions. The security procedures may require the use of PINs, user ID numbers, passwords, test keys, algorithms or other codes, all of which are referred to as "authorization codes." You are responsible for controlling access to and maintaining the confidentiality of the security procedures and authorization codes and you must promptly report any breach of that confidentiality to us. You are also responsible for the actions of any users to whom you or we have provided authorization codes and any other person who has obtained access to your authorization codes. By using any of our treasury services and by using our security procedures to engage in transactions, you agree that those security procedures are commercially reasonable.

**SETOFF.** If you ever owe us money as a customer, borrower, guarantor or otherwise including any obligation owed to us for services provided pursuant to this agreement or owed to a financial institution that we acquire, then you agree that, in addition to any other remedies we may have, we have the right to deduct and set off amounts you owe us from any accounts you hold with us or our affiliates.

By accepting services, you also grant us a consensual security interest in your accounts and to the funds held in them as collateral to secure your present and future obligations to us.

With the exception of charging an account for items that may be returned against it, we will not set-off against — and you do not grant us a security interest in — any account for money owed us where the account name indicates, and you actually do, hold the funds in such account in a representative capacity.

**SIGNATURES RECEIVED BY FACSIMILE (FAX).** If you fax any signed document to us, you agree that it is your intention that: (i) your fax signature is an electronic signature under applicable Federal and State law, (ii) the fax will be deemed to be an original document, (iii) you intend to conduct business with us by electronic records and electronic signatures, and (iv) your consent under subsection (iii) immediately preceding will be deemed to have been given electronically under applicable federal and state law.

**STALE, TIME-DATED AND POST-DATED ITEMS.** We maintain the option either to pay or to dishonor any stale check (i.e., a check that is more than six (6) months old) when it is presented to us. Our check processing equipment is unable to detect time-dated checks i.e., checks stating that they are not valid after a certain date or beyond a certain period of time. As a result, you agree that we will not be liable to you for charging your account after the date or period stated on an otherwise properly payable time-dated check, and you further agree that we are not bound by any time limitation or restriction you may place on any item presented for payment against your account. If any item has not been paid within the time you want, you agree that your sole method to prevent its payment is to place and thereafter maintain a stop payment order on such item. Similarly, our check processing equipment cannot detect a post-dated check i.e., a check bearing a date later than the actual calendar date. Therefore, we recommend that you do not issue post-dated checks. You also agree that we are not responsible for charging your account before the indicated date on a properly payable but post-dated check.

**TIME DEPOSITS.** At the Bank's option, time deposits may be issued in the form of a Certificate of Deposit (no longer issued) or a time deposit for which no certificate is issued. On the initial or any subsequent maturity date, you may present your properly endorsed Certificate (for accounts where Certificates were issued), or sign a receipt form (for accounts with no certificate issued) at any financial center and you will be paid the amount due. The certificate will serve as evidence of your account. If a time deposit certificate is lost or destroyed, we must be notified immediately in writing. Upon receipt of satisfactory indemnity and an affidavit to the effect that the certificate has been lost or destroyed and has not been pledged or assigned, we will close the account and reissue a Time Deposit Receipt. To the extent required to begin the running of the applicable statute of limitations, you will be deemed to have demanded payment of any time deposit that does not automatically renew for another term on the 31st day after its last maturity date.

      A.  **Redemption.** We may redeem the Time Deposit on the initial or any subsequent maturity date, and we may accelerate maturity if you default in the payment of money owed to us, applying the redemption proceeds against such obligations.

      B.  **Interest Calculation.** We use the daily balance method to calculate interest on your account. This method applies a daily periodic rate to the ledger balance in your account each day and to any interest you've earned that has not been credited to your account. The daily rate is 1/365 of the interest rate. Interest is compounded at the frequency indicated on the Rate Disclosure provided from the opening date. Interest is paid from the date of deposit through the day prior to the maturity date, and begins to accrue on the business day you deposit non-cash items. The Annual Percentage Yield (APY) assumes that interest will remain on deposit for the term of the account. A withdrawal of interest will reduce earnings. Interest is credited in accordance with the terms of the Time Deposit Receipt provided to the customer.

      C.  **Interest Rates.** The interest rate for your deposit is established based upon the amount of deposit, the type of product, and the term you select. The interest rate is fixed for the term of the account.

      D.  **Receiving Interest.** If you request at the time of purchase, earned interest may be withdrawn at intervals (specified by us) during the term of the Time Deposit without penalty. Methods of interest payments may be limited.

      E.  **Automatically Renewable Time Deposits.** If "Automatically Renewable" is indicated on your account opening documents, the following terms apply:

           1.  **Grace Period.** For time deposit accounts with a maturity of 7 through 31 days, you have one calendar day after the maturity date to withdraw funds without penalty. For all other time deposit accounts, you have 7 days after the maturity date to withdraw funds without penalty. This time period is known as a grace period.

           2  **Automatic Renewal.** Unless your time deposit account is closed on the initial or any subsequent maturity date or within the grace period, the account will automatically be extended for a time period equal to the initial term beginning at the initial maturity date or at each

subsequent maturity date. The interest rate on the renewal term will be the currently offered rate in effect on the maturity date for the term just ended.

3. **Withdrawal of Principal.** If any principal is withdrawn within the grace period, interest will NOT be paid on the amount of principal withdrawn from the date of maturity through the date of withdrawal.

F. **Withdrawal of Interest.** As long as the principal is not reduced, interest earned during the initial or subsequent term may be withdrawn without penalty.

G. **Additional Deposits.** Additional deposits to your time deposit account are not permitted during the term of your account.

H. **Interest Added to Principal.** If the interest earned during the initial or subsequent term is not withdrawn or credited to another account on the maturity date or within the grace period after the term when earned, it will be added to and made part of the principal amount.

I. **Partial Withdrawals.** You are permitted to make partial withdrawals, $500 minimum, during the initial or any subsequent renewal term of your account, as long as the minimum amount required to open a time deposit account of that type remains on deposit. The partial withdrawal will be subject to early withdrawal penalties.

J. **Early Withdrawal Penalties.** If you make any withdrawal from or close your time deposit account before the maturity date, you may be subject to an early withdrawal penalty as described below:

If any of the time deposit is withdrawn before the initial or any subsequent maturity date, an early withdrawal penalty as shown below will be imposed on the amount withdrawn:

| Maturity Term | Early Withdrawal Penalty |
|---|---|
| 7 days through 90 days | All interest that would have been earned in the maturity period. |
| 91 days through 364 days | Amount equal to 90 days' simple interest. |
| 365 days and greater | Amount equal to 180 days' simple interest. |

**TRANSFER OF ACCOUNTS/ASSIGNMENT OF DEPOSITS:** Deposit accounts are not transferable or assignable without our prior written consent. Even if we give our consent, the assignment must be made by using documentation that is acceptable to us and will not become effective until we have documented it in our records. You may not pledge a deposit account as collateral to your creditors without our prior written consent. Even if we give our consent, the pledge must be made by using documentation that is acceptable to us.

**UNLAWFUL INTERNET GAMBLING.** Effective December 1, 2009, you acknowledge and agree that "restricted transactions" as defined in the Unlawful Internet Gambling Enforcement Act of 2006 and Regulation GG issued there under are prohibited from being processed through your Account or any relationship between you and the Bank. In the event we identify a suspected restricted transaction, we may block or otherwise prevent or prohibit such transaction and further we may close the Account or end the relationship. Acknowledge and agree that "restricted transactions" as defined in the Unlawful Internet Gambling Enforcement Act of 2006 and Regulation GG issued there under are prohibited from being processed through your Account or any relationship between you and the Bank. In the event we identify a suspected restricted transaction, you also acknowledge and agree we are permitted to block or otherwise prevent or prohibit such transaction and further we are permitted to close the Account or end the relationship.

**PRIVACY POLICY FOR WELLS FARGO AND WACHOVIA COMPANIES**

**Keeping Your Information Safe and Secure**

12-12020-mg    Doc 3892-1    Filed 12/17/14    Entered 12/17/14 20:44:45    Exhibit A to
12-12020-mg    Doc 5912-2    Filed 11/20/13    Entered 11/20/13 17:33:30    Exhibit A to
Stipulation    Pg 21 of 22
Pg 21 of 27

**Highlights of Our Commitment to You**

- We do not sell customer information to third parties.
- We do not share customer information with outside parties who may wish to market their products to you.
- We safeguard your customer information carefully.
- We are committed to protecting your customer information in every transaction, at every level of our organization.
- We are committed to helping you protect your privacy every day.

You have choices about how we share your information within Wells Fargo and Wachovia and how we contact you for marketing purposes. See inside for information about how to contact us and record your preferences.

*This brochure includes the Privacy Policy for Wells Fargo and Wachovia Companies. For consumer accounts, this Policy describes how we use and protect customer information. This Policy also describes how we use and protect information provided by individuals in connection with business accounts, loans and leasing programs and provided by individuals associated with dealers participating in sales finance programs (called "customers" for purposes of this brochure). We believe that protecting your privacy is an integral part of the customer service we provide to you.*

How We Protect And Use Customer Information

**1. We are committed to protecting the security and integrity of customer information through procedures and technology designed for this purpose.**

- We limit employee access to customer information to those who have a business reason to know. Employees are required to honor our code of conduct, which includes standards for protecting customer confidentiality.
- We maintain policies and procedures covering the proper physical security of workplaces and records.
- Our physical, electronic, and procedural safeguards meet or exceed federal standards regarding the protection of customer information.
- We require contractors and outside companies who work with us to adhere to strict privacy standards through their contracts with us.

**2. We collect and maintain customer information as part of servicing your account and your customer relationship.**
In the course of serving you, we collect information about you from a variety of sources, such as:

- Information you provide to us on applications or forms, such as your income and accounts with others;
- Information we receive from an outside company, such as a credit bureau, regarding your credit history or employment status; or
- Information about your transactions or experiences with companies affiliated with Wells Fargo & Company (these include Wells Fargo and Wachovia companies).

**3. The customer information we collect is used to service your accounts and meet your financial needs.**
Information may be used among the Wells Fargo and Wachovia companies, as well as with authorized third parties (described in section 4), for a number of purposes, such as:

- To protect your accounts from unauthorized access or identity theft.
- To process your requests such as loan applications, purchases, and ATM withdrawals.
- To service your accounts by issuing checks, ATM cards, and account statements.
- To keep you informed about financial services of interest to you.

**4. We do not share customer information with outside parties who may wish to market their products to you.**
We may disclose the information we collect to non-affiliated third parties that are acting on our behalf, or as permitted or required by law, including:

- Companies that perform support services for us, such as data processors, technical systems consultants, or check printers.
- Companies that help us market products and services to you conduct surveys or provide marketing research.
- Government entities, courts or other entities (in response to subpoenas and other legal processes), or those with whom you have requested us to share information.

- **Important Notice about Credit Reporting:** We may report information about your account(s) to credit bureaus and/or consumer reporting agencies. Late payments, missed payments, or other defaults on your account(s) may be reflected in your credit report and/or consumer report.

## 5. Your choices for Information sharing and marketing.

- We may disclose all of the information we collect, as described above, within the affiliated Wells Fargo and Wachovia companies, which include administrative and service units, consumer bankers, mortgage lenders, consumer lenders, securities broker-dealers, insurance agencies, and real estate brokerage companies. These companies include Wells Fargo Bank, N.A., Wachovia Bank, N.A., Wells Fargo Insurance, Inc., Wells Fargo Insurance Services, Inc., Wells Fargo Investments, L.L.C. and Wells Fargo Advisors, L.L.C.
- **BY LAW, INFORMATION THAT IS DERIVED FROM YOUR TRANSACTIONS AND EXPERIENCES WITH US MAY BE SHARED AMONG THE WELLS FARGO AND WACHOVIA COMPANIES (A) FOR PURPOSES OTHER THAN DIRECT MARKETING, AND (B) UNLESS YOU INSTRUCT US OTHERWISE, FOR DIRECT MARKETING PURPOSES.**

  - If you choose to limit information sharing, we will not share personal financial information about you among affiliates (other than information derived from your transactions and experiences with Wells Fargo and Wachovia companies) for any purpose, except as permitted by law. In addition, if you select that option, we will limit affiliates' use of transaction, experience and other personal financial information about you for direct marketing purposes. However, your choice regarding the use of certain information for marketing purposes does not apply to any Wells Fargo or Wachovia company that has an existing business relationship with you or where the use is otherwise permitted by law. To opt out of information sharing and marketing, use one of the methods described below. Your election will apply until you tell us to change your choice.
  - **Telephone and mail preferences.**
    In addition to information sharing preferences, you may request that we not contact you for marketing purposes by telephone. For consumer accounts, this election will be effective while you are an active customer or a minimum of five years. For business accounts, this election will be effective for five years from the date the election is received. You may also request that we not contact you for marketing purposes by mail. For all accounts, this election will be effective for three years.
  - **Communicate your information sharing, telephone and mail preferences in any of the following ways:**
    Wells Fargo customers
    - Call 1-888-528-8460
    - Online banking customers log on to a secure session at wellsfargo.com, and choose "Change Privacy Preferences" under the "Account Services" tab.

    Wachovia customers
    - Call 1-866-203-5722 (Command Asset Program, IRA, Brokerage and Insurance customers call 1-877-358-1114).
    - Complete the Consumer Privacy Preference Form at wachovia.com/privacy.

Customers with accounts at both Wells Fargo and Wachovia may call either Wells Fargo or Wachovia. Your preference will apply to all consumer accounts linked to your personal record. For joint accounts, any account holder may express a privacy preference on behalf of the other joint account holders.

  - **Do Not Call Policy:** This Privacy Policy constitutes Wells Fargo and Wachovia's Do Not Call Policy under the Telephone Consumer Protection Act for all consumers. Wells Fargo and Wachovia maintain an internal Do Not Call preference list. Do Not Call requests will be honored within 30 days and will be effective for at least five years from the date of request. No telemarketing calls will be made to residential or cellular phone numbers that appear on the Wells Fargo and Wachovia Do Not Call list.
  - **AS A CUSTOMER, PLEASE NOTE THAT IF YOU CHOOSE NOT TO RECEIVE SOLICITATIONS BY MAIL OR ANY OTHER CHANNEL, YOU MAY CONTINUE TO RECEIVE MARKETING INFORMATION ABOUT WELLS FARGO AND WACHOVIA PRODUCTS OR SERVICES IN REGULAR ACCOUNT MAILINGS AND STATEMENTS, WHEN YOU VISIT US ONLINE OR AT AN ATM. YOU MAY ALSO RECEIVE SURVEY CALLS.**

## 6. State Laws, Trust Accounts.
Some state laws may impose additional restrictions on disclosure of information on customers for certain purposes in those states.

  - **Nevada Residents** – Nevada Statute Section 228.600(3) allows marketing calls to our existing customers listed on the National Do Not Call Registry. If you prefer not to receive marketing calls from us, you may be placed on

our Internal Do Not Call list by following the instructions in the above-noted section 5 above, or writing to Wells
Fargo Operations, P.O. Box 5277, Sioux Falls, SD 57117-5277.

For more information contact us at the address above, or email: customerservice@wellsfargo.com., with "Nevada
Annual Notice" in the subject line. You may also contact the Nevada Attorney General's office:

Bureau of Consumer Protection
Office of the Nevada Attorney General
555 E. Washington Street, Suite 3900
Las Vegas, NV 89101
Phone: (702) 486-3132
Email: BCPINFO@ag.state.nv.us

- Vermont Residents – In accordance with Vermont law, we will not share personal financial information about you,
  other than transaction and experience information, with other Wells Fargo and Wachovia companies for any
  purpose, nor will we share any personal financial information about you with other Wells Fargo and Wachovia
  companies for marketing purposes.

- Trust accounts, for which Wells Fargo or Wachovia is the trustee, are protected under special rules of
  confidentiality, and trust account information is not shared for marketing purposes without specific consent.

## Tips To Help You Protect Your Personal Information

- Carry only necessary information with you. Leave your Social Security card and unused credit cards at home in a
  safe location.
- Make photocopies of vital information you carry regularly and store them in a secure place, such as a safe deposit
  box.
- Do not provide your Social Security Number unless absolutely necessary.
- Shred documents containing personal or financial information before discarding. Fraud and identity theft often
  occurs as a result of mail and garbage theft.
- Place outgoing mail in a U.S. Postal Service mailbox to reduce the chance of mail theft. · Promptly retrieve
  incoming mail to reduce the opportunity for theft.
- Monitor your credit report for accuracy. By law. you are entitled to receive one free credit file disclosure every 12
  months from each of the nationwide consumer credit reporting companies. To learn more or request a copy of
  your credit report, visit annualcreditreport.com or call 1-877-322-8228.

## Assistance To Victims Of Identity Theft

Contact us immediately if you suspect that someone has had unauthorized access to your Wells Fargo or Wachovia
account, or access to your personal identifying information such as your Social Security Number or credit card
information. We will take action to protect your accounts. Wells Fargo customers call 1-800-TO-WELLS (1-800-869-
3557), notify us online at wellsfargo.com, or visit us at your nearest Wells Fargo location. Wachovia customers please call
1-888-647-3648.

In addition, you should also report the crime to your local law enforcement agency and to the Federal Trade Commission
(FTC). To speak with a trained FTC telephone counselor, call toll-free at 1-877-IDTHEFT (1-877-438-4338). To enter
information about your complaint into a secure FTC online database, sign onto www.ftc.gov/idtheft. The site also provides
links to numerous consumer education materials.

## Unsolicited Credit Offers

If you want to reduce the number of credit offers you receive, contact the National Consumer Credit Reporting Agencies at
1-888-567-8688 (1-888-5-OPTOUT) or visit www.optoutprescreen.com for details. Financial institutions and other
companies provide information to the Credit Bureaus for credit verification, fraud control purposes, and prevention of
identity theft. You may direct these agencies not to sell or share this information about you for marketing purposes.

## Customer Service

If you have questions about your account or would like more information about Wells Fargo products and services please
call us at 1-800-TO-WELLS (1-800-869-3557), or write to the address listed on your account statement. More information

is available at wellsfargo.com. You may also write to us at Wells Fargo Operations Center, MAC #N9777-111, P.O. Box 5277, Sioux Falls, SD 57117-5277

Wachovia customers please visit the web site at wachovia.com/privacy, or call 1-866-203-5722 to speak to a representative. Command Asset Program, IRA, Brokerage and Insurance customers please call 1-877-358-1114.

This document applies to (1) consumers who have, or have had, a customer relationship or have made an inquiry or application, and (2) individuals who have provided personal information in connection with business accounts, loans, and leasing programs or individuals associated with dealers participating in sales finance programs; and where the consumer relationship, inquiry, application, or personal information is provided to one or more of the banks and companies with "Wells Fargo" or "Wachovia" in their names, as well as: WF National Bank South Central; Norwest Auto Finance, Inc.; Wells Fargo Investments doing business as Ragen MacKenzie; Flatiron Capital Corp., NowLine and Tower Pension Specialists, Inc.; American Mortgage Network, Inc., doing business as Vertice, but NOT including (a) any non-bank company with "Wells Fargo Financial" in its name, (b) Wells Fargo Financial National Bank, (c) Wells Fargo Advisors, the Wells Fargo Advantage Funds and the Evergreen Funds, or (d) any insurance company, insurance agency, or insurance brokerage or other company, which has its own privacy disclosures. Effective March 20, 2010, Wachovia Bank, N.A. and Wachovia Bank of Delaware, N.A. will become Wachovia Bank and Wachovia Bank of Delaware, divisions of Wells Fargo Bank, N.A.

Additional privacy provisions apply to the use of Wells Fargo's and Wachovia's online services. See wellsfargo.com/privacy_security and wachovia.com/privacyandsecurity for more information.

The policies and practices described in this disclosure are subject to change, but we will communicate any significant changes to you as required by law. The policies and practices described in this disclosure replace all previous notices or statements regarding this subject.

Si usted desea una traducción completa en español de las Normas de Privacidad de Wells Fargo, por favor pida una copia en su sucursal local de Wells Fargo o escriba a: Wells Fargo Operations Center, MAC #N9777-111, P.O. Box 5277, Sioux Falls, SD 57117-5277.

Customer Name: Each customer is listed on the attached Exhibit A

**ALLY Financial Inc**
By:
Title: **Authorized Persons**
Date: **1/3/2012**

**ALLY SERVICING LLC**
By:
Title:
Date:

**MOTORS INSURANCE CORP**
By:
Title:
Date:

**RESIDENTIAL CAPITAL, LLC**
By:
Title:
Date:

---

Version 1.0

**RESIDENTIAL FUNDING CO., LLC**

By: _____
Title: _____
Date: _____

**PASSIVE ASSET TRANSACTIONS LLC**

By: _____
Title: _____
Date: _____

**RFC ASSET HOLDING II, LLC**

By: _____
Title: _____
Date: _____

**RESIDENTIAL MORTGAGE REAL ESTATE HOLDINGS, LLC**

By: _____
Title: _____
Date: _____

**RESIDENTIAL FUNDING REAL ESTATE HOLDINGS**

By: _____
Title: _____
Date: _____

**HOMECOMING FINANCIAL REAL ESTATE HOLDING**

By: _____
Title: _____
Date: _____

**GMAC MORTGAGE, LLC**

By: _____
Title: _____
Date: _____

**DITECH, LLC**

By: _____
Title: _____
Date: _____

**RESIDENTIAL CONSUMER SERVICES, LLC**
By: _Mark C. Herring_
Title: _Authorized Officer_
Date: _1-3-12_

**Wachovia Bank, a division of Wells Fargo Bank, N.A.**
By: _____
Title: _____
Date: _____

**WACHOVIA**

Wachovia Bank and Wachovia Bank of Delaware
each divisions of Wells Fargo Bank, N.A.,
Member FDIC.
©—————
All rights reserved.

EQUAL HOUSING LENDER

Version 1.0

Page 25

**EXHIBIT A**

| Entity Name | Tax ID |
|---|---|
| Ally Financial Inc | 2512 |
| Ally Servicing LLC | 6579 |
| Motors Insurance Corp | 5585 |
| Residential Capital, LLC | 0738 |
| Residential Funding Co., LLC | 1336 |
| Passive Asset Transactions LLC | 4130 |
| RFC Asset Holding II, LLC | 4034 |
| Residential Mortgage Real Estate Holdings, LLC | 7180 |
| Residential Funding Real Estate Holdings | 6505 |
| Homecoming Financial Real Estate Holding | 6869 |
| GMAC Mortgage, LLC | 4840 |
| Ditech, LLC | 7228 |
| Residential Consumer Services, LLC | 2167 |

Version 1.0