**<u>Exhibit 5-B</u>**

**Silver Preliminary Injunction Motion**

EHUD GERSTEN, SBN 236159
Gersten Law Group
3115 Fourth Avenue
San Diego, CA 92103
Telephone: 619-600-0098
egersten@gerstenlaw.com

Attorneys for Plaintiff Francine Silver

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| FRANCINE SILVER, | Case No. SC 118412 |
| Plaintiff, | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION |
| v. | |
| GMAC MORTGAGE, LLC, a limited liability company, | Date: November 30 2012 |
| Defendant. | Time: 9:00am |
| | Dept: N |
| | Location: 1725 Main Street, Santa Monica, CA 90401 |

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiff's residence is in non-judicial foreclosure under a deed of trust with a power of sale. The sale is presently scheduled to take place on November 5, 2012.

The deed of trust's alleged beneficiary, by assignment from Mortgage Electronic Registration System, Inc. ("MERS"), is defendant Gmac Mortgage, LLC ("GMAC"). In her complaint, plaintiff seeks declaratory and injunctive relief on the ground that GMAC is not the deed of trust's true beneficiary and, therefore, not a proper party to foreclose.

1

1    There is reason to doubt the validity of the written assignment because the signature

2    it bears has likely been forged. Further, plaintiff's loan appears to be an asset of a

3    securitization trust, from which it could not have been validly assigned. Furthermore, there

4    is reason to believe that MERS did not know the identity of the true owner of plaintiff's

5    loan at the time of the purported assignment. Rather, the assignment's supposed signatory

6    was merely a GMAC employee, purporting to assign the loan to itself. In addition, GMAC

7    failed to disclose the purported assignment, as an assignee is obligated to do by Regulation

8    Z under the Truth in Lending Act (15 U.S.C. § 1601 et seq.), 12 C.F.R. Pt 226.39.

9    Foreclosure would also be improper because the notice of default overstated the

10   amount plaintiff would have to pay to reinstate the loan; because GMAC obtained

11   overpayments before plaintiff's default by means of fraud; and because GMAC did not

12   contact or attempt to contact plaintiff to assess her financial situation and explore options

13   for her to avoid foreclosure before serving the notice of default, in violation of Civil Code

14   § 2923.5.

15   A preliminary injunction is necessary in order to preserve the status quo pending

16   trial of this matter.

17

18   **FACTS**

19   **A.    Uncertainty as to Ownership of the Loan**

20   In 2006, plaintiff refinanced her primary residence with a loan from Nationwide

21   Lending Group ("Nationwide"; the "Loan"). Silver Decl., ¶ 3. The deed of trust's

22   beneficiary was MERS, "solely as nominee for Lender, its successors and assigns." Id., ¶

23   5. MERS holds itself out as an electronic registry that tracks the beneficial ownership of

24   residential mortgage loans and servicing rights. Id., ¶ 6. MERS maintains a publicly

25   searchable database of current investors and servicers of loans it registers. The database

26   currently identifies GMAC as the Loan's investor. But as of February 16, 2012, MERS had

27   no record of the Loan in the database. Id., ¶ 9.

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR ORDER TO
SHOW CAUSE RE PRELIMINARY INJUNCTION

1    It appears that Nationwide sold the Loan to the sponsor of a securitization trust,

2    Greenpoint Mortgage Funding Trust 2006–AR7 (the "Trust"). The Trust issued securities

3    for sale to investors, representing shares in the rights to proceeds from the loans that were

4    pooled as trust assets. Gersten Decl., ¶ 4. Under the terms of the Trust, the Loan could not

5    be reassigned but would remain in the Trust's pool of loans until the Trust terminated. Id.,

6    ¶ 5

7    In January 2011, GMAC identified the Loan's current owner as US Bank, "as

8    trustee." Plaintiff asked for proof, but GMAC provided only a copy of the promissory note,

9    which showed no endorsements. Silver Decl., ¶ 8

10    On July 5, 2011, MERS purported to assign the Loan to GMAC and, on the

11    following day, GMAC purported to execute a substitution of trustee naming Executive

12    Trust Services. Both the assignment and the substitution bore the name "Jacqueline

13    Keeley," the first as an officer of MERS and the second as an officer of GMAC. But two

14    different persons had signed the two documents. Gersten Decl., ¶¶ 7 and 8.

15    As the Loan's purported assignee, GMAC was obligated by law to disclose the

16    assignment to plaintiff within 30 days. Truth in Lending Act, Regulation Z,12 C.F.R. Pt

17    226.39. Plaintiff did not receive such disclosure. Silver Decl., ¶ 10.

18    GMAC's fraud in documenting residential loan assignments during the year 2011

19    has been reported by ProPublica, an independent investigative journalism organization.

20    Gersten Decl., ¶ 9. In addition, a report published by the Assessor-Recorder of the City and

21    County of San Francisco documented high proportions of foreclosure sales where the

22    identity of the proper party to foreclose was questionable. Id., ¶ 10.

23

24    **B.    Fraud in servicing, overstatement of the amount due to reinstate the loan**

25    The Loan terms provided for an option to pay interest only until May 1, 2012, or the

26    loan balance exceeded 110% of the original amount. As of the date of the Notice of

27    Default, neither event had occurred. Silver Decl, ¶ 3. But from May 2009, GMAC's loan

28

**3**

statements deleted the interest-only option. GMAC failed to explain the change, although repeatedly asked to do so. Id., ¶ 8. As a result, for many months plaintiff paid more than the amount due, and the amount the Notice of Default stated to reinstate the loan significantly exceeded the amount of the default.

### C.    Violation of Civil Code § 2923.5

By statute, GMAC was required to contact plaintiff, or attempt to do so, at least 30 days before serving the Notice of Default to assess her financial status and explore ways she could avoid foreclosure. Civ. Code § 2923.5. GMAC never did so, even though plaintiff, through her agent, offered in May 2011 to bring the loan current if GMAC would credit plaintiff with amounts overbilled and provide proof of ownership. Silver Decl., ¶ 10.

### ARGUMENT

### 1.    Standards for issuing a preliminary injunction

In deciding whether to issue a preliminary injunction, the court must weigh two interrelated factors: (1) the likelihood that the moving party will ultimately prevail on the merits and (2) the relative interim harm to the parties from issuance or nonissuance of the injunction. *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 441-442. Appellate review is limited to whether the trial court's decision was an abuse of discretion. *Cohen v. Board of Supervisors* (1985) 40 Cal.3d 277, 286.

The relationship between the potential-merit and interim-harm factors is a sliding scale, or a "mix":

> The trial court's determination must be guided by a "mix" of the potential-merit and interim-harm factors; the greater the plaintiff's showing on one, the less must be shown on the other to support an injunction. [Citation.] .... A trial court may not grant a preliminary injunction, regardless of the balance of interim harm, unless there is some possibility that the plaintiff would ultimately prevail on the merits of the claim. [Citation.]
>
> *Butt v. State of California* (1995) 4 Cal.4th 668, 677-678.

In other words, the trial court should issue a preliminary injunction if the balance of interim harm tips sharply toward the plaintiff and there is at least "some possibility" that

1  she will ultimately prevail at trial. *Id.*

2

3  **2.    The Court should issue a preliminary injunction in this case.**

4  **A.    Plaintiff has a reasonable possibility of prevailing on her claim that GMAC is**

5  **not a proper party to foreclose because it is not a valid assignee of her loan.**

6    As shown above, the validity of MERS's assignment of the loan to GMAC and the

7  subsequent notice of sale are in doubt for many reasons. First, there is evidence that the

8  signature of "Jacqueline Keeley" on the assignment instrument was forged. At the very

9  least, there is evidence that either the signature on that instrument or on the substitution of

10  trustee was false. Both were signed over the same name (in different capacities), but they

11  were not signed by the same person.

12    If the signature on the assignment was false, the assignment is invalid. If the

13  signature on the substitution of trustee is false, the substitution is invalid and any acts

14  purportedly done by ETS, as substituted trustee, including recordation of the Notice of

15  Sale, are likewise invalid. Furthermore, if the assignment is invalid, then the substitution of

16  trustee is also invalid, because GMAC would have had no power to substitute a trustee in

17  the first place.

18    Next, there is evidence that MERS did not know who the beneficial owner of the

19  loan was before the purported assignment. A search of the MERS database a few months

20  earlier disclosed no record of the loan, showing that MERS was not in fact tracking the

21  loan's beneficial ownership at all. There is evidence that "Jacqueline Keeley," if she

22  existed at all, purported to be both an officer of MERS and an officer of GMAC. If so, it

23  would appear that GMAC derived no interest in the loan from MERS (acting on behalf of a

24  principal it did not know) but was in reality simply assigning the loan to itself.

25    Further, there is evidence that the loan was securitized and was owned by US Bank

26  as trustee on behalf of investors in a pool of securitized loans. The purported assignment to

27  GMAC occurred long after the closing date of the mortgage-backed security pool, "giving

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR ORDER TO
SHOW CAUSE RE PRELIMINARY INJUNCTION

1   rise to a plausible inference that at least some part of the recorded assignment was

2   fabricated." *Vogan v. Wells Fargo Bank, N.A.* (E.D.Cal.) 2011 US Dist LEXIS 132944 at

3   *17. See also *Johnson v. HSBC Bank USA* (S.D. Cal.) 2012 US Dist LEXIS 36798.

4        In *Vogan, supra,* the plaintiff, facing foreclosure, sought a declaratory judgment to

5   determine who owned his mortgage loan. Wells Fargo Bank, the original lender, claimed

6   that it had sold the loan to US Bank as Trustee for a mortgage-backed securitization trust,

7   and had recorded the assignment of the deed of trust, in 2011. But the plaintiff alleged that

8   the securitization trust had a closing date in 2005, after which, under the terms of the

9   Pooling and Service Agreement ("PSA"), no more property could be transferred to it.

10  According to the plaintiff, the purported assignment had been fabricated to deceive him as

11  to his creditor's actual identity. Based on these allegations, the court denied Wells Fargo's

12  motion to dismiss the complaint. *Id.* at *20-21.

13       Similarly in *Johnson, supra,* the plaintiff sought a declaratory judgment as to who

14  owned his loan. The original lender was Fremont Investment & Loan. MERS was the

15  nominee beneficiary. In 2008, HSBC, as trustee for a mortgage-backed securitization trust,

16  recorded a purported assignment from MERS. The plaintiff alleged, however, that the

17  document was fraudulent, in part because it was executed after the closing date of the trust.

18  The plaintiff also alleged that the MERS board of directors had not authorized the

19  purported MERS officer who executed the document to make such assignments, and that

20  thousands of property record documents had been signed without any authority. *Id.*, 2012

21  US Dist LEXIS 36798, pp. *7-*8. The court held that these allegations stated a viable

22  claim for declaratory relief. *Id.* at 11.

23       Here too, as in *Vogan* and *Johnson*, plaintiff alleges that the purported assignment

24  of her loan that had apparently been securitized, was fraudulent, and she bases this claim in

25  part on the fact that the assignment was executed long after the closing date for the trust,

26  violating the PSA.

27       Here, however, plaintiff does not claim that a purported assignment to a trust was

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR ORDER TO
SHOW CAUSE RE PRELIMINARY INJUNCTION

1    fraudulent, but rather the opposite: that a purported assignment *from* an unknown

2    successor mortgagee, by way of MERS, was fraudulent and did not in fact occur. If her

3    loan was securitized, as it appears to have been, a sale or transfer to another entity (to

4    GMAC, or a predecessor) would have violated the PSA and therefore would have been

5    invalid. A potential assignee who checked the chain of title would have known that the

6    PSA would bar the assignment, and so would not have given value for it. Thus the fact that

7    the purported assignment to GMAC was not made until well after the trust closed supports

8    an inference that the assignment was fraudulent and never occurred.

9        The inference that the recorded assignment is fraudulent is further supported by

10    other facts noted above. MERS apparently had no record of the loan's ownership until long

11    after the loan was made and it became the nominee beneficiary. The purported MERS

12    officer who signed the assignment was apparently also a GMAC officer, which meant that

13    GMAC executed the assignment to itself. And the purported signatures on the assignment

14    and the substitution of trustee were either outright forgeries or robo-signed by persons

15    without knowledge of any assignment.

16        If the purported assignment is fraudulent, as these several pieces of evidence

17    suggest, then GMAC is a stranger to plaintiff's loan and has no right to substitute a trustee

18    or to order a foreclosure.

19        In sum, plaintiff has shown a reasonable possibility of prevailing on the merits of

20    her claim for declaratory and injunctive relief based on wrongful foreclosure.

21

22    **B.    Plaintiff has a reasonable probability of prevailing on her request for**

23    **injunctive relief on additional grounds.**

24        As set forth in the Statement of Facts above, plaintiff's evidence shows:

25        (1) GMAC violated Civil Code § 2923.5 by failing to contact or attempt to contact

26    plaintiff before commencing foreclosure. This violation voids the Notice of Default. "The

27    right conferred by section 2923.5 is a right to be contacted to 'assess' and 'explore'

28

1  alternatives to foreclosure prior to a notice of default. It is enforced by the postponement of

2  a foreclosure sale." *Mabry v. Superior Court* (2010) 185 Cal.App.4th 208, 225.

3      (2) GMAC overbilled plaintiff by denying her the contractual right to make interest-

4  only payments and thereby overstated the amount required to reinstate her loan after

5  default. To be valid, a notice of default must state the correct amount. "The obligation of

6  the beneficiary to provide the trustor with an accurate accounting of the amounts due to

7  cure a default is governed by statute." *Anderson v. Heart Fed. Sav. & Loan Ass'n* (1989)

8  208 Cal. App. 3d 202, 215. Section 2924c specifies that trustor may have "the legal right to

9  bring [her] account in good standing by paying all of [her] past due payments plus

10  permitted costs and expenses within the time permitted by law." § 2924c(b)(1).

11  "Compliance with this provision necessarily requires that the beneficiary provide accurate

12  information in response to an inquiry by the trustor." *Anderson*, 208 Cal. App. 3d at 216.

13      (3) Plaintiff is entitled to an offset of her indebtedness in the amount of the

14  overpayments and the penalties added to her account as a result of GMAC's overbilling.

15

16  **C.     The balance of interim harm tips sharply toward plaintiff.**

17      "The loss of one's home through foreclosure generally is considered sufficient to

18  establish irreparable harm." *Saba v. Caplan* (N.D. Cal.) 2010 U.S. Dist. LEXIS 76790, p.

19  13. Such harm is increased by plaintiff's advanced age.

20      By contrast, the potential interim harm to GMAC if preliminary relief is granted is

21  the impairment of its purported security.

22

23  **3.     Plaintiff is not required to tender payment as a condition for a**

24  **preliminary injunction.**

25      The so-called "tender rule" does not apply to this case. As the Court of Appeal

26  explained in the context of a claim based on Civil Code § 2923.5,

27      The right conferred by section 2923.5 is a right to be contacted to "assess" and "explore"
       alternatives to foreclosure prior to a notice of default. It is enforced by the postponement of
       a foreclosure sale. Therefore it would defeat the purpose of the statute to require the

28

8

borrower to tender the full amount of the indebtedness prior to any enforcement of the right to—and that's the point—the right to be contacted prior to the notice of default. Case law requiring payment or tender of the full amount of payment before any foreclosure sale can be postponed [citation] arises out of a paradigm where, by definition, there is no way that a foreclosure sale can be avoided absent payment of all the indebtedness. Any irregularities in the sale would necessarily be harmless to the borrower if there was no full tender. (See 4 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 9:154, pp. 507–508.) By contrast, the whole point of section 2923.5 is to create a new, even if limited, right to be contacted about the possibility of alternatives to full payment of arrearages. It would be contradictory to thwart the very operation of the statute if enforcement were predicated on full tender.

*Mabry v. Superior Court* (2010) 185 Cal. App. 4th 208, 225.

Thus plaintiff's claim to relief under § 2923.5 blocks the tender rule as it applies to that claim.

More broadly, the tender rule does not apply to cases, such as this one, where plaintiff is challenging defendant's very ownership of the loan that is in foreclosure. As in *Mabry*, this is not a case "where, by definition, there is no way that a foreclosure sale can be avoided absent payment of all the indebtedness. Any irregularities in the sale would necessarily be harmless to the borrower if there was no full tender." *Id.* On the contrary, plaintiff here challenges GMAC's right to foreclose in the first place. If it were found that GMAC did not in fact own plaintiff's loan, any sale that might occur would be totally void. When a sale is void, rather than simply voidable, tender is not required to avoid it. *Tamburri v. Suntrust Mortgage, et al.* (N.D.Cal.) 2011 US Dist. LEXIS 144442, p.*4; Miller & Starr, CALIFORNIA REAL ESTATE 3D, § 10:212. To put it another way, to require tender in a wrongful foreclosure case "would permit entities to foreclose on properties with impunity." *Sacchi v. Mortgage Electronic Systems, Inc.* (C.D. Cal.) 2011 US Dist. LEXIS 68007 at *9-10.

More broadly still, the holdings in *Tamburri* and *Sacchi* are specific examples of a general equitable exception to applying the tender rule where "it would be inequitable to do so." *Onofrio v. Rice* (1997) 55 Cal.App.4th 413, 424 (internal citations and quotations omitted). To apply the tender rule here would be inequitable indeed.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

1    **CONCLUSION**

2    As in any residential foreclosure case, and even more when the resident is elderly,

3    the balance of interim harm tips sharply toward plaintiff. Accordingly, her burden is less

4    than it would otherwise be. Plaintiff has carried this burden as to her claim that GMAC is

5    not a proper party to foreclose on her home, entitling her to trial on the merits of the claim,

6    by establishing at least a reasonable possibility that she will ultimately prevail at trial.

7    Plaintiff has also shown grounds for enjoining the foreclosure sale that involve

8    defects in the Notice of Default: violation of Civil Code § 2923.5 and overstatement of the

9    amount due to reinstate her loan.

10    The Court should therefore issue a preliminary injunction as requested.

11

12    Dated: November 2, 2012                    Respectfully submitted,

13                                               Gersten Law Group

14

15

16    _____

17    EHUD GERSTEN
      Attorney for Plaintiff, Francine Silver

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR ORDER TO
SHOW CAUSE RE PRELIMINARY INJUNCTION

1  EHUD GERSTEN, SBN 236159
2  Gersten Law Group
   3115 Fourth Avenue
3  San Diego, CA 92103
   Telephone: 619-600-0098
4  egersten@gerstenlaw.com
5
   Attorneys for Plaintiff Francine Silver
6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      COUNTY OF LOS ANGELES

10

| | |
|---|---|
| FRANCINE SILVER, | Case No. SC 118412 |
| Plaintiff, | DECLARATION OF MARCUS SILVER IN SUPPORT OF APPLICATION FOR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION |
| v. | |
| GMAC MORTGAGE, LLC, a limited liability company, | Date: October 25 2012 |
| Defendant. | Time: 8:30am |
| | Dept: M |
| | Location: 1725 Main Street, Santa Monica, CA 90401 |

11

12

13

14

15

16

17

18

19

20  I, Marcus Silver, declare:

21  1.    I am the son of Francine Silver, the plaintiff in this matter, with a general power of

    attorney. [Copy attached as Exhibit 1]
22
    2.    The plaintiff is 87 years of age and in uncertain health. At all relevant times, I have
23
    assisted her in her dealings with GMAC Mortgage, LLC ("GMAC") and in these
24
    proceedings, and I make this declaration at her request.
25
    3.    In 2006, the plaintiff refinanced her primary residence with a $1,300,000 five-year
26
    Interest-Only Option Adjustable Rate loan (the "Loan"). The Loan was obtained from
27
    Nationwide Lending Group, a corporation based in Temecula, California ("Nationwide").
28

                                              1

──────────────────────────────────────────────
DECLARATION OF MARCUS SILVER IN SUPPORT OF APPLICATION FOR ORDER TO SHOW
CAUSE RE PRELIMINARY INJUNCTION

From: Elrud Gersten    Fax: (619) 600-0088          To: Robert Gandy       Fax: +1 (858) 442-7118       Page 18of 13:10/24/2012 9:30

1   A copy of the note that evidences the Loan (the "Note"), is attached as Exhibit 2. The Note

2   provides that the option to make payments of interest is to continue until the fifth

3   "Payment Change Date," which is May 1, 2011, or the loan balance exceeds 110 % of the

4   original amount. As of the time that GMAC declared plaintiff to be in default, neither

5   event had occurred.

6   4.      The Loan was secured by a deed of trust (the "Deed of Trust") identifying the

7   lender as Nationwide, the trustee as "Land America Commonwealth", and Mortgage

8   Electronic Registration Systems, Inc. ("MERS") as "a separate corporation acting solely as

9   nominee for Lender and Lender's successors and assigns." The deed of trust further states:

10  "MERS is the beneficiary under this Security Instrument." A copy of the Deed of Trust is

11  attached as Exhibit 3.

12  5.      MERS holds itself out as an electronic registry that tracks the beneficial ownership

13  of mortgage loans and servicing rights. MERS also acts as "nominee" beneficiary on deeds

14  of trust for loans it tracks, so that later assignments need not be recorded.

15  6.      The Loan was almost immediately transferred to GreenPoint Mortgage for

16  servicing. GMAC later took over servicing it.

17  7.      Starting in May 2009, GMAC's loan statements began to delete the interest-only

18  payment option, contrary to the terms of the Note. GMAC failed to explain this change. In

19  December 2010, this issue led me to ask GMAC to identify the loan's current owner and to

20  provide proof of ownership. GMAC responded in January 2011 that the current owner was

21  U.S. Bank, "as Trustee," and that Aurora Loan Services was the "master servicer," but

22  GMAC was currently servicing the account. As proof of ownership, GMAC provided only

23  a copy of the Note, which showed no endorsements to U.S. Bank, or indeed any

24  endorsements at all. A copy of GMAC's response is attached as Exhibit 4.

25  8.      To verify who actually owned the loan, I searched the MERS Servicer ID website

26  on January 16, 2011 and again on February 11, 2011. These searches found a total of three

27  other loans in plaintiff's name, but not the Loan. Copies of these search results (marked for

28

2

DECLARATION OF MARCUS SILVER IN SUPPORT OF APPLICATION FOR ORDER TO SHOW
CAUSE RE PRELIMINARY INJUNCTION

From: Ehud Gersten    Fax: (619) 606-0009    To: Robert Gandy    Fax: +1 (949) 442-7118    Page 19of 13:10/24/2012 9:30

clarity) are attached as Exhibit 5. These results show that the Loan was not in fact registered with MERS until some time after February 16, 2011.

9.    In May 2011, I wrote to GMAC offering to bring the loan current if GMAC would credit the borrower (plaintiff) with amounts overbilled and provide proof of ownership. A copy of my letter is attached as Exhibit 6. GMAC did not respond and did not again contact plaintiff until July 21, 2011, when it caused her to be served with a Notice of Default. A copy is attached as Exhibit 7.

10.    Ninety days after the Notice of Default, plaintiff was served with a Notice of Sale, which in turn was set for 30 days later, November 21, 2011. A copy is attached as Exhibit 8. Plaintiff petitioned for Chapter 7 bankruptcy protection before the sale date, resulting in a stay of the sale.

11.    Thereafter, plaintiff's bankruptcy was discharged and she was served with a new Notice of Trustee's Sale, with a sale date of November 5, 2012. A copy is attached as Exhibit 9.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: October 22, 2012

MARCUS SILVER

3

DECLARATION OF MARCUS SILVER IN SUPPORT OF APPLICATION FOR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

# Exhibit 1

# Durable Power of Attorney

I, Francine Silver, an unmarried woman who resides at 8613 Franklin Ave L.A. CA 90069, designate Marcus Silver as my attorney in fact (the agent) to act for me immediately. This agreement shall not terminate in the event that I should become disabled or legally incapacitated.

1. **Authority to Act.** This power of attorney is effective immediately and will continue in the event that I become disabled or legally incapacitated. My agent is authorized to act as indicated below in my name, place and stead in any way which I myself could do if I were personally present, to the full extent that I am permitted by law to act through an agent.

2. **Powers of Agent.** The Agent shall have the full power and authority to manage and conduct all of my affairs, and to exercise my legal rights and powers, including those rights and powers that I may acquire in the future, including the following:

   A. **Collect and Manage.** To collect, hold, maintain, improve, invest, lease, or otherwise manage any or all of my real or personal property or any interest therein;

   B. **Buy and Sell.** To purchase, sell, mortgage, grant options, or otherwise deal in any way in any real property or personal property, tangible or intangible, or any interest therein, upon such terms as the Agent considers proper, including the power to buy United States Treasury Bonds that may be redeemed at par to pay federal estate tax and to sell or transfer Treasury securities;

   C. **Borrow.** To borrow money, to execute promissory notes therefor for borrowed money, and to secure any obligation by mortgage or pledge;

   D. **Business and Banking.** To conduct and participate in any kind of lawful business of any nature or kind, including the right to sign partnership agreements, continue, reorganize, merge, consolidate, recapitalize, close, liquidate, sell, or dissolve any business and to vote stock, including the exercise of any stock options and the carrying out of any buy sell agreement; to receive and endorse checks and other negotiable paper, deposit and withdraw funds (by check or withdrawal slips) that I now have on deposit or to which I may be entitled in the future in or from any bank, savings and loan, or other institution;

   E. **Tax Returns and Reports.** To prepare, sign, and file separate or joint income, gift, and other tax returns and other governmental reports and documents; to consent to any gift; to file any claim for tax refund; and to represent me in all matters before the Internal Revenue Service;

   F. **Safe Deposit Boxes.** To have access to any safety deposit box registered in my name alone or jointly with others, and to remove any property or papers located therein;

   G. **Proxy Rights.** To act as my agent or proxy for any stocks, bonds, shares, or other investments, rights, or interests I may now or hereafter hold;

   H. **Legal and Administrative Proceedings.** To engage in any administrative or legal proceedings or lawsuits in connection with any matter herein;

   I. **Transfers in Trust.** To transfer any interest I may have in property, whether real or personal, tangible or intangible, to the trustee of any trust that I have created for my benefit;

   J. **Delegation of Authority.** To engage and dismiss agents, counsel, and employees, in connection with any matter, upon such terms as my agent determines;

   K. **Other Matters.**

From: Ehud Gersten    Fax: (819) 800-0088    To: Robert Ganz    Fax: (949) 442-7118    Page 22of 13:10/24/2012 0:30
Oct 17 2011 0:38    LAW OFFICES FAX    6192975808    p.2

3. **Restrictions on Agent's Powers.** Regardless of the above statements, my agent:

   A. Cannot execute a will, a codicil, or any will substitute on my behalf;

   B. Cannot change the beneficiary on any life insurance policy that I own;

   C. Cannot make gifts on my behalf;

   D. Cannot exercise any powers that would cause assets of mine to be considered taxable to my agent or to my agent's estate for purposes of any income, estate, or inheritance tax; and

   E. Cannot contravene any medical power of attorney I have executed whether prior or subsequent to the execution of this Power of Attorney.

4. **Durability.** The Agent shall be under no duty to act on my behalf and shall incur no liability to me or to my estate for failing to take any action under this power of attorney before receiving written notice from two licensed physicians that, because of either disability or incapacity, I am unable to attend to financial matters, in which case the agent shall immediately begin to act for me.

5. **Reliance by Third Parties.** Third parties may rely upon the representations of the Agent as to all matters regarding powers granted to the Agent. No person who acts in reliance on the representations of the Agent or the authority granted under this Power of Attorney shall incur any liability to me or to my estate for permitting the Agent to exercise any power prior to actual knowledge that the Power of Attorney has been revoked or terminated by operation of law or otherwise.

6. **Indemnification of Agent.** No agent named or substituted in this power shall incur any liability to me for acting or refraining from acting under this power, except for such agent's own misconduct or negligence.

7. **Original Counterparts.** Photocopies of this signed Power of Attorney shall be treated as original counterparts.

8. **Revocation.** I hereby revoke any previous Power of Attorney that I may have given to deal with my property and affairs as set forth herein.

9. **Compensation.** The Agent shall be reimbursed for reasonable expenses incurred while acting as Agent and may receive reasonable compensation for acting as Agent.

10. **Substitute Agent.** If [NAME] is, at any time, unable or unwilling to act, I then appoint [NAME2], presently residing at [ADDRESS] as my Agent to serve with the same powers.

11. **Appointment of Guardian or Conservator.** In the event that a court decides that it is necessary to appoint a guardian or conservator for me, I hereby nominate [Name], presently residing at [Address], to be considered by the court for appointment to serve as my guardian or conservator, or in any similar representative capacity.

12. **Choice of Law.** All questions concerning the validity and construction of this Durable Power of Attorney shall be determined under the laws of California

From: Ehud Gersten    Fax: (619) 600-0009    To: Robert Geney    Fax: +1 (949) 442-7118    Page 23of 13;10/24/2012 9:30
Oct 17 2011 01:38    LAW OFFICES FAX                6192975909                    p.3

Francine Silver,

Date __OCT 13 2011__

## Notarization

State of California.

County of Los Angeles.

On October 13th, 2011, Francine Silver appeared before me and proved to my satisfaction that she is the person whose name is subscribed to this Durable Power of Attorney, and acknowledged the due execution of the foregoing instrument.

RODHOLLAH SADIGHIM
Commission # 1823769
Notary Public - California
Los Angeles County
My Comm. Expires Nov 21, 2012

Notary Public, State of CA, County of Los Angeles

My commission expires 11/21/2012

# Exhibit 2

From: Ehud Gersten    Fax: (619) 600-0008    To: Robert Gandy    Fax: +1 (949) 442-7118    Page 26 of 13:10/24/2012 9:30

CERTIFIED TO BE A TRUE AND EXACT
COPY OF THE ORIGINAL

BY:

COMMONWEALTH LAND TITLE CO.

MIN:    [redacted]083-3        Loan Number:    [redacted]083

# ADJUSTABLE RATE NOTE
### (Monthly Treasury Average Index - Payment and Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES MAY BE LIMITED AND MY INTEREST RATE INCREASES ARE LIMITED.**

MARCH 15, 2006            TEMECULA            CALIFORNIA
[Date]                              [City]                      [State]

8613 FRANKLIN AVENUE, LOS ANGELES, CALIFORNIA 90069
[Property Address]

## 1.    BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 1,300,000.00    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is NATIONWIDE LENDING GROUP, A CORPORATION (CFL # 01326073)

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.    INTEREST

**(A) Interest Rate**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    1.000 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B) Interest Change Dates**

The interest rate I will pay may change on the 1st    day of MAY, 2006                , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date."

The new rate of interest will become effective on each Interest Change Date.

**(C) Interest Rate Limit**

My interest rate will never be greater than    9.950 %.

**(D) The Index**

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the Twelve Month Average of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates" (H.15) (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12, plus our margin rounded to the nearest one-eighth of one percent (0.125%).

The most recent Index figure available as of the date 15 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new Index which is based upon comparable information. The Note Holder will give me notice of this choice.

Multistate Adjustable Rate Note (Monthly Treasury Average Index) - Single Family - Freddie Mac UNIFORM INSTRUMENT
GreenPoint Mortgage Funding                                    Modified By GreenPoint Mortgage Funding HB4854MU 07/04
Modified Form 3525 07/01

Page 1 of 9

Form Filled Using  DocMagic
800-649-1362  www.docmagic.com

12-12020-mg    Doc 8019-17    Filed 01/22/15    Entered 01/22/15 18:14:28    Exhibit 5-B

From: Ehud Gersten    Fax: (619) 600-0098    To: Robert Gandy    Pg 21 of 124    Fax: +1(949) 442-7118    Page 28 of 13:10/24/2012 9:30

**(B) Calculation of Interest Rate Changes**

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **TWO AND 875/1000** percentage point(s) ( **2.875 %** ) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the rounded amount will be my new interest rate until the next Interest Change Date.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month. I will make my monthly payments on the **1st** day of each month beginning on **MAY 1, 2006** . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **APRIL 1, 2036** , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **41911 5TH STREET, SUITE 302, TEMECULA, CALIFORNIA 92592**

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. **$ 4,151.31** . This amount may change.

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the **1st** day of **MAY, 2007** , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay the Full Payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." The Note Holder will then calculate the amount of my monthly payment due the month preceding the Payment Change Date multiplied by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, I may choose to pay the Limited Payment.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder will also add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to one hundred ten percent (110%) of the Principal amount I originally borrowed. My unpaid principal could exceed that maximum amount due to the Limited Payments and interest rate increases. If so, on the date that my paying any monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount which

Multistate Adjustable Rate Note (Monthly Treasury Average Index) - Single Family - Freddie Mac UNIFORM INSTRUMENT
GreenPoint Mortgage Funding    Modified by GreenPoint Mortgage Funding H34884MU 07/04
Modified Form 3805 01/01

Page 2 of 5

Form Filled Using **DocMagic**
800-649-1362 www.docmagic.com

From: Ehud Gersten    Fax: (818) 600-0098    To: Robert Gandy    Fax: +1(646)442-7118    Page 27 of 13(10/24/2012 9:30

would be sufficient to repay my then unpaid principal in full on the Maturity Date at my current interest rate in substantially equal payments.

(G) Required Full Payment

On the 5th Payment Change Date and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I will also begin paying the Full Payment as my monthly payment on the final Payment Change Date.

## 4.    NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will contain the interest rate or rates applicable to my loan for each month since the prior notice or, for the first notice, since the date of this Note. The notice will also include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5.    BORROWER'S RIGHT TO PREPAY ** See attached Prepayment Note Addendum.

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6.    LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7.    BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

Multistate Adjustable Rate Note (Monthly Treasury Average Index) - Single Family - Freddie Mac UNIFORM INSTRUMENT
GreenPoint Mortgage Funding    Modified By GreenPoint Mortgage Funding H6465(MN) 07/04
Modified Form 3802 01/01

Page 3 of 5

Form Filed Using DocMagic
800-649-1362 www.docmagic.com

From: Elvid Gestion        Fax: (919) 600-0098        To: Robert Gandy        Fax: +1 (949) 442-7118        Page 26 of 131 04/24/2012 09:30

**8.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.    WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.    UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

"Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

**(D)    No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)    Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

MULTISTATE ADJUSTABLE RATE NOTE (Monthly Treasury Average Index) - Single Family - Freddie Mac UNIFORM INSTRUMENT
GreenPoint Mortgage Funding
Modified Form MDE 07/01    Modified by GreenPoint Mortgage Funding

Form Filled Using DocMagic
800-649-1362  www.docmagic.com

Page 4 of 5

From: Ehud Gersten    Fax: (619) 600-0098    To: Robert Gandy    619-442-7118    Page 29 of 13:10/24/2012 9:30

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
FRANCINE SILVER          -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                  -Borrower

[Sign Original Only]

Multistate Adjustable Rate Note (Monthly Treasury Average Index) - Single Family - Freddie Mac UNIFORM INSTRUMENT
GreenPoint Mortgage Funding          Modified By GreenPoint Mortgage Funding N04864NU 07/04
Modified Form 3502 01/01
                                                                         Form Filed Using DocMagic
                                                                         800-649-1362  www.docmagic.com
Page 5 of 5

From: Ehud Gersten    Fax: (619) 600-0098    To: Robert Gary    Fax: (949) 442-7118    Page  30 of 13;10/24/2012 0:30

# Exhibit 3

From: Ehud Gersten    Fax: (619) 600-0098    To: Robert Gandy Fax: (   ) 442-7118    Page 31 of 13/10/24/2012 9:30

Recording Requested By:
NATIONWIDE LENDING GROUP

And After Recording Return To:
NATIONWIDE LENDING GROUP
41911 5TH STREET, SUITE 302
TEMECULA, CALIFORNIA 92592
Loan Number: 2006083



[Space Above This Line For Recording Data]

# DEED OF TRUST

MIN: ███████083-3

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated MARCH 15, 2006, together with all Riders to this document.
(B) "Borrower" is FRANCINE SILVER, AN UNMARRIED WOMAN

Borrower is the trustor under this Security Instrument.
(C) "Lender" is NATIONWIDE LENDING GROUP

Lender is a CORPORATION                                                    organized
and existing under the laws of CALIFORNIA
Lender's address is 41911 5TH STREET, SUITE 302, TEMECULA, CALIFORNIA
92592

(D) "Trustee" is LAND AMERICA COMMONWEALTH

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated MARCH 15, 2006
The Note states that Borrower owes Lender ONE MILLION THREE HUNDRED THOUSAND AND
00/100                                    Dollars (U.S. $ 1,300,000.00    ) plus interest.

From: Ehud Gersten    Fax: (619) 600-0098    To: Robert Gandy    (    ) 442-7118    Page 32of 13/10/24/2012 9:30

Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **APRIL 1, 2036**

(G)  "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

(H)  "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I)  "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [X] Other(s) [specify] |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | PREPAYMENT RIDER |

(J)  "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K)  "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L)  "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M)  "**Escrow Items**" means those items that are described in Section 3.

(N)  "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O)  "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P)  "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q)  "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R)  "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY of                    LOS ANGELES                    :
[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

From: Ehud Gershan

Fax: (819) 600-0098

To: Robert Gandy

Fax: +1 (949) 442-7118

Page 33 of 13 10/24/2012 8:30

ALL THAT CERTAIN REAL PROPERTY SITUATED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:
LOT(S) 188 OF TRACT NO. 8500, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 94, PAGE(S) 88 AND 89 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.
A.P.N.: 5555-021-013

which currently has the address of 8613 FRANKLIN AVENUE
[Street]

LOS ANGELES , California 90069 ("Property Address"):
[City] [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder, or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not

From: Ehud Gersten    Fax: (619) 600-0008    To: Robert Gandy    Fax: 1 (619) 442-7118    Page 34 of 13 10/24/2012 9:30

obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender

shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01        Page 5 of 14        DocMagic eForms 800-649-1362
www.docmagic.com

From: Ehud Gersten    Fax: (619) 600-0098    To: Robert Gandy    442-7116    Page 36 of 13 10/24/2012 9:30

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  Occupancy.  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  Preservation, Maintenance and Protection of the Property; Inspections.  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

From: Ehud Gersten        Fax: (619) 600-0008        To: Robert Gandy        Fax: +1 (619) 442-7118        Page 37 of 13 10/24/2012 9:30

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These

From: Elhud Gerston    Fax: (818) 600-0098    To: Robert Gandy    Fax: +1 (646) 442-7118    Page 38 of 131    10/24/2012 9:30

From: Ehud Gersten    Fax: (818) 600-0098    To: Robert Gandy    Page 39 of 13(10/24/2012 9:30

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01    Page 9 of 14    DocMagic eForms 800.649.1362
www.docmagic.com

specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16.  **Governing Law; Severability; Rules of Construction.**  This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located.  All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law.  Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract.  In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17.  **Borrower's Copy.**  Borrower shall be given one copy of the Note and of this Security Instrument.

18.  **Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19.  **Borrower's Right to Reinstate After Acceleration.**  If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of:  (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument.  Those conditions are that Borrower:  (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender:  (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.  Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred.  However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20.  **Sale of Note; Change of Loan Servicer; Notice of Grievance.**  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note

From: Ehud Gaelan

Fax: (818) 600-0098

To: Robert Gandy

Fax: +1 (846) 442-7118

Page 41 of 13(10/24/2012 8:30

From: Ehud Gersten

Fax: (619) 600-0098

To: Robert Genoly

Fax: +1 (949) 442-7118

Page 42 of 13/02/24/2012 9:30

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01
Page 12 of 14

Docmagic.com 800-649-1362
www.docmagic.com

From: Ehud Gersten      Fax: (619) 600-0098          To: Robert Gandy      Fax: +1 (646) 442-7119      Page 43 of 13/10/24/2012 9:30

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_Francine Silver_ _____ (Seal)                    _____ (Seal)
FRANCINE SILVER              -Borrower                                              -Borrower


_____ (Seal)                    _____ (Seal)
                            -Borrower                                              -Borrower


_____ (Seal)                    _____ (Seal)
                            -Borrower                                              -Borrower


Witness:                                    Witness:


_____            _____

From: Ehud Gersten     Fax: (818) 600-0088     To: Robert Gandy     Fax: +1 (949) 442-7118     Page 44 of 13:10/24/2012 9:30

State of California          )
                            ) ss.
County of LOS ANGELES       )

On MARCH 17, 2000      before me, BETH E. DOLAND, NOTARY PUBLIC

personally appeared  FRANCINE SILVER

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.



                                        Beth E. Deland
                                        NOTARY SIGNATURE


                                        _____
                                        (Typed Name of Notary)

           NOTARY SEAL

# Exhibit 4

From: Elud Gersten    Fax: (619) 600-0098    To: Robert Gardd    Fax: 24 (849) 442-7118    Page 46 of 13:10/24/2012 9:30



ary 7, 2011

Francine Silver
8613 Franklin Ave
Los Angeles CA 90069

RE:    Account Number         8858
       Property Address    8613 Franklin Ave
                           Los Angeles CA 90069

Dear Francine Silver:

This letter is in response to your inquiry regarding the above-referenced account.

For the terms of your account, your interest rate may change monthly. Each month you are only required to make the minimum payment. If the interest only payment is less than the minimum payment amount, the interest only payment will not be an option. If the payment received does not satisfy the total amount of interest due, negative amortization will occur and the remaining interest amount will be added to your principal balance.

If the payment received is less than the fully amortizing payment due for the month, we will apply your minimum payment first. The remaining interest due for your payment will then be added to your principal balance. Any additional payment received greater than the minimum payment, but less than the fully amortizing payment, will be applied to interest. Your interest payments are applied after the remaining interest due for the month has been added to your principal balance. Therefore on your Mortgage Account Statement, your additional interest payments will appear as principal curtailments.

Your minimum payment may change every twelve months. Your new minimum payment may not increase more than 9.950% with each change. However, if your principal balance exceeds 110% of your original loan amount of $1,300,000.00, your minimum payment will be adjusted each month to a fully amortizing payment. A fully amortizing payment is equal to the amount that would be sufficient to repay your unpaid principal balance in full on your maturity date in equal payments based on the current interest rate. A copy of the Adjustable Rate Note and the payment history has been enclosed for your review.

The current master servicer is Aurora Loan Services. The current owner of your loan is US Bank N.A., as Trustee, 60 Livingston Ave, 4th Floor, St Paul, MN 55107, phone number 800-236-3488. However, GMAC Mortgage, LLC is currently servicing your account, and all inquiries should be directed to our office.

A copy of the loan documents and a payment history confirming Validation of Debt reported to the four major credit reporting agencies are enclosed. GMAC Mortgage is unable to comply with your request to make changes to your credit file based on the information you have provided. GMAC Mortgage makes every effort to report true and accurate information to the bureaus.

www.gmacmortgage.com
3451 Hammond Ave
Waterloo, IA 50702

# Exhibit 5

From: Ehud Gersten    Fax: (619) 800-0098    To: Robert Early    Fax: +1 (949) 442-7118    Page 48 of 1310/24/2012 9:30

...h Results - 'att.net Mail'    http://us.mc808.mail.yahoo.com/mc/welcome?.partner=sp...

Hi, MARCUS    Sign Out   All-New Mail   Help

Search

H.alexander

| **Mail** | Contacts | Calendar | Notepad | | What's New? | Mobile Mail | Options |

Check Mail    New

Folders

Inbox (16897)
Drafts (48)
Sent
Spam (862)    [Empty]
Trash    [Empty]

My Photos
My Attachments

**Chat & Mobile Text**    [Hide]
I am    Available

0 Online Contacts    [Add]
No contacts online right now.

0 Mobile Contacts    [Add]
You don't have any Mobile Text contacts yet.

Settings

**My Folders**    [Add - Edit]
Guitar Jackets
Models
Silver/Steel
Villa Group (280)
Windsor (2)

Previous | Next | Back to Search Results    Delete Message |

Delete    Reply    Forward    Spam    Move...

MERS    Friday, February 11, 2011 11:17 AM
From: "MARCUS SILVER" <marcussilver@sbcglobal.net>
To: marcussilver@sbcglobal.net

MIN: ____762-1    Note Date:02/07/2005    MIN Status:Active
Servicer: GMAC Mortgage, LLC    Phone:(800) 766-4622
Waterloo, IA
Investor: Nomura Credit Capital Inc.    Phone:(716) 204-3698
Depew, NY
MIN: ____019-7    Note Date:09/08/2005    MIN Status:Inactive
Servicer: America's Servicing Company    Phone:(651) 605-3711
Minneapolis, MN
Investor: This investor has chosen not to display their information. For assistance, please contact the servicer.
MIN: ____763-9    Note Date:02/07/2005    MIN Status:Inactive
Servicer: GMAC Mortgage, LLC    Phone:(800) 766-4622
Waterloo, IA
Investor: Nomura Credit Capital Inc.    Phone:(716) 204-3698
Depew, NY
Return to Search
For more information about MERS please go to www.mersinc.org
Copyright© 2008 by MERSCORP, Inc.

From: Ehud Gersten    Fax: (619) 600-0099    To: Robert Gaing    Fax: (949) 442-7118    Page 49 of 13:10/24/2012 9:30

Process Loans, not Paperwork™

www.mers-servicerid.org

1 record matched your search

**MIN:** ████████019-7    **Note Date:** 09/08/2005    **MIN Status:** Inactive

**Servicer:** America's Servicing Company    **Phone:** (651) 605-3711
Minneapolis, MN

**Investor:** This investor has chosen not to display their information. For assistance, please contact the servicer.

Return to Search

For more information about MERS please go to www.mersinc.org

Copyright© 2006 by MERSCORP, Inc.

From: Ehud Gersten    Fax: (619) 600-0098    To: Robert Geng    Fax: +1 (849) 442-7118    Page 60 of 13 10/24/2012 8:30

MERSsearch.html info

## MERSsearch.html
Modified: Today at 10.11 AM

### General:
Kind: HTML Document
Size: 5 KB on disk (4,135 bytes)
Where: /Users/andrewss.ss/Desktop
Created: Sunday, January 16, 2011 9:19 PM
Modified: Today at 10.11 AM

Label:

Stationery Pad
Locked

### More Info:
Title: MERS® Servicer Identification System - Results
Content created: Sunday, January 16, 2011 9:19 PM
Content modified: Sunday, January 16, 2011 9:19 PM
Last opened: Today at 9.19 AM

### Name & Extension:

### Open with...

Microsoft Word

Use this application to open all documents like this.

### Preview:

HTML

### Sharing & Permissions:

# Exhibit 6

Francine Silver
8613 Franklin Avenue, Los Angeles CA 90069


GMAC Mortgage
3451 Hammond Ave
PO BOX 780
Waterloo, IA 50704-0780


RE: LOAN # ███████8858

Monday, May 16, 2011


To whom it may concern:

You have been billing me incorrectly and breaching the terms of the loan agreement. My loan was supposed to have an Interest Only Option until May 2011. You violated the terms of the loan by suspending the Interest Only Option without due cause.

I would like you to correct your billing error so that I can bring the loan current.

Please recalculate the loan at the amount it should have been allowed to reach had you not breached the agreement and suspended the I.O. option. This would be 110% of the original $1.3 Million loan amount for a total balance of $1,430,000. This amount is $36,000 higher than my loan amount was allowed to reach!

Please remove the late charges and apply the $36,000 I was over-billed to the payments due from November to May 2011. I will then pay the balance of May and bring the loan current in June.

Also, as there is now some question as to your legitimate ownership of the loan and right to be collecting payment, please provide proof of ownership of the loan or right to collect payment. I want to be sure that I am paying the right party and that you will be in a position to re-convey title once the loan is paid off. My payment history and copy of the original mortgage note listing Nationwide but making no mention of GMAC is not acceptable proof. Any rights or transfers by MERS are also not acceptable as outlined in the Rickie Walker case and previous correspondence. Any documentation from MERS will be regarded as fabricated and without legal merit in California.

Thanks for your help in resolving this matter.

Sincerely,



Francine Silver

# Exhibit 7

RECORDING REQUESTED BY:

LSI TITLE COMPANY, INC.

WHEN RECORDED MAIL TO:
Executive Trustee Services, LLC
dba ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, CA 91504-3120
APN: 6558-021-013



TS No.: CA1100038124    Loan No.: ████8558    SPACE ABOVE THIS LINE FOR RECORDER'S USE

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

### IMPORTANT NOTICE

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION,** and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is $68,595.72 as of Jul 21, 2011, and will increase until your account becomes current. While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the three month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor. To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact, GMAC Mortgage, LLC FKA GMAC Mortgage Corporation.
C/O Executive Trustee Services, LLC dba ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, CA 91504-3120
800.665.3932 phone

From: Ehud Gersten      Fax: (818) 600-0098          To: Robert Gen...   (fx.12...)(449) 442-7118       Page 65 of 13 10/24/2012 9:30

TS NO.: CA1100036124          LOAN NO.: ████ 8853

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST 

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.

## Remember, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.

NOTICE IS HEREBY GIVEN: That Executive Trustee Services, LLC dba ETS Services, LLC is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary under a Deed of Trust dated 03/15/2006, executed by FRANCINE SILVER, AN UNMARRIED WOMAN, as Trustor, to secure certain obligations in favor of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR NATIONWIDE LENDING GROUP A CORPORATION, as beneficiary, recorded 03/23/2006, as Instrument No. 06 0619786, in Book XX , Page XX, of Official Records in the Office of the Recorder of Los Angeles County, California describing land therein as:

AS MORE FULLY DESCRIBED IN SAID DEED OF TRUST

Including ONE NOTE FOR THE ORIGINAL sum of $1,300,000.00; that the beneficial interest under such Deed of Trust and the obligations secured thereby are presently held by the undersigned; that a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:

Installment of Principal and Interest plus impounds and/or advances which became due on 11/1/2010 plus late charges, and all subsequent installments of principal, interest, balloon payments, plus impounds and/or advances and late charges that become payable.

That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

The undersigned declares that the beneficiary or its authorized agent has declared that they have complied with California Civil code Section 2923.5 by making contact with the borrower or tried with due diligence to contact the borrower as required by California Civil Code Section 2923.5

Dated: Jul 21, 2011

ETS Services, LLC as Agent for Beneficiary

BY: _____

Edward Biriwan
TRUSTEE SALE OFFICER

From: Ehud Gersten        Fax: (619) 600-0008                To: Robert Ganem        Fax: 1-2(619) 442-7118        Page  68 of 13;10/24/2012 9:30

# Exhibit 8

From: Ehud Gersten    Fax: (619) 600-0098    To: Robert Gerry (949) 442-7118    Page 57 of 13;10/24/2012 9:30

RECORDING REQUESTED BY
Executive Trustee Services, LLC dba ETS Services, LLC

AND WHEN RECORDED MAIL TO:
Executive Trustee Services, LLC dba ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, CA 91504-3120

T.S. No. CA1100036124
Loan No.        8958
Insurer No.

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 03/15/2006. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

A public auction sale to the highest bidder for cash, cashier's check drawn on a state or national bank, check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, or savings association, or savings bank specified in Section 5102 of the Financial Code and authorized to do business in this state, will be held by the duly appointed trustee. The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to satisfy the obligation secured by said Deed of Trust. The undersigned Trustee disclaims any liability for any incorrectness of the property address or other common designation, if any, shown herein.

**TRUSTOR: FRANCINE SILVER, AN UNMARRIED WOMAN**
Recorded 03/23/2006 as Instrument No. 06 0619768 in Book XX, page XX of Official Records in the office of the Recorder of Los Angeles County, California;
Date of Sale: 11/21/2011 at 10:30 A.M.
Place of Sale:    At the West side of the Los Angeles County Courthouse, directly facing Norwalk
                 Blvd., 12720 Norwalk Blvd., Norwalk, CA 90650
Property Address is purported to be:    8613 FRANKLIN AVENUE
                                        LOS ANGELES, CA 90069
APN #: 5558-021-013

The total amount secured by said instrument as of the time of initial publication of this notice is $1,466,220.09, which includes the total amount of the unpaid balance (including accrued and unpaid interest) and reasonable estimated costs, expenses, and advances at the time of initial publication of this notice.

Date: 10/21/2011

Executive Trustee Services, LLC dba ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, CA 91504-3120
Sale Line: 714-730-2727

Omar Solorzano, TRUSTEE SALE OFFICER

# Exhibit 9

From: Ehud Gersten    Fax: (819) 600-0098    To: Robert Gaoig    Fax: (949) 442-7118    Page 58 of 13:10/24/2012 8:30

RECORDING REQUESTED BY
Executive Trustee Services, LLC dba ETS Services, LLC

AND WHEN RECORDED MAIL TO:
Executive Trustee Services, LLC dba ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, CA 91504-3120

Loan Number: ████ 8858    Trustee Sale Number: CA1100038124  APN: 5558-021-013  Title Order No. 110221222-CA-MSI

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 03/15/2008. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

A public auction sale to the highest bidder for cash, cashier's check drawn on a state or national bank, check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, or savings association, or savings bank specified in Section 5102 of the Financial Code and authorized to do business in this state, will be held by the duly appointed trustee. The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to satisfy the obligation secured by said Deed of Trust. The undersigned Trustee disclaims any liability for any incorrectness of the property address or other common designation, if any, shown herein.

**TRUSTOR: FRANCINE SILVER, AN UNMARRIED WOMAN**
Recorded 03/23/2008 as Instrument No. 08 0518788 in Book XX , page  XX  of Official Records in the office of the Recorder of Los Angeles County, California
Date of Sale: 11/05/2012 at 11:00 A.M.
Place of Sale:    By the fountain located at 400 Civic Center Plaza, Pomona, CA 91766
Property Address is purported to be:    8613 FRANKLIN AVE
                                        LOS ANGELES, CA 90069

APN #:  5558-021-013

The total amount of the unpaid balance of the obligation secured by the property to be sold and reasonable estimated costs, expenses and  advances at  the time of the initial  publication of the Notice of Sale is **$1,524,730.70.**

If the sale is set aside for any reason, the purchaser at the sale shall be entitled only to a return of the deposit paid, plus interest.  The purchaser shall have no further recourse against the beneficiary, the Trustor or the trustee.



Z266393238

From: Ehud Geisten    Fax: (619) 600-0008    To: Robert Ging    Fax: (949) 442-7118    Page 60 of 13:10/24/2012 9:30

T.S. No. CA1100036124
Loan No. ███████3858
Insurer No.

NOTICE TO POTENTIAL BIDDERS: If you are considering bidding on this property lien, you should understand that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the property itself. Placing the highest bid at a trustee auction does not automatically entitle you to free and clear ownership of the property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off, before you can receive clear title to the property. You are encouraged to investigate the existence, priority, and size of outstanding liens that may exist on this property by contacting the county recorder's office or a title insurance company, either of which may charge you a fee for this information. If you consult either of these resources, you should be aware that the same lender may hold more than one mortgage or deed of trust on the property.

NOTICE TO PROPERTY OWNER: The sale date shown on this notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of the California Civil Code. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale. If you wish to learn whether your sale date has been postponed, and, if applicable, the rescheduled time and date for the sale of this property, you may call 714-730-2727 or visit this www.lpsasap.com Internet Web site address for information regarding the sale of this property, using the file number assigned to this case file number. Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the Internet Web site. The best way to verify postponement information is to attend the scheduled sale.

Date: 10/03/2012

Executive Trustee Services, LLC dba ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, CA 91504-3120
Sale Line: 714-730-2727
Reinstatement and Payoff Requests: 800.665.3932

Ileanne Petersen, Authorized Signatory

Sale Info Website: www.lpsasap.com
Automated Sales Line: 714-730-2727
Reinstatement and Payoff Requests: (800)-665-3932

THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE

1  EHUD GERSTEN, SBN 236159
2  Gersten Law Group
   3115 Fourth Avenue
3  San Diego, CA 92103
   Telephone: 619-600-0098
4  egersten@gerstenlaw.com

5  Attorneys for Plaintiff Francine Silver
6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      COUNTY OF LOS ANGELES

10 FRANCINE SILVER,                    Case No. SC 118412
11
              Plaintiff,              DECLARATION OF EHUD GERSTEN IN
12                                    SUPPORT OF APPLICATION FOR
                                      ORDER TO SHOW CAUSE RE
13 v.                                 PRELIMINARY INJUNCTION

14 GMAC MORTGAGE, LLC, a limited
15 liability company,                 Date: October 25 2012
                                      Time: 8:30am
16            Defendant.              Dept: M
                                      Location: 1725 Main Street, Santa Monica,
17                                    CA 90401

18

19 I, Ehud Gersten, declare:

20 1.      I am an active member of the California State Bar and am the attorney of record for

21 Francine Silver, the plaintiff in this case and the movant in this proceeding.

22 2.      On January 31, 2012, I caused a search to be made in the Secretary of State's

23 business search databases under the name "Nationwide Lending Group" ("Nationwide").

24 The results showed that a corporation called "Nationwide Mortgage Lending Group"

25 forfeited its corporate license on May 31, 2007. The search found no other entity with a

26 name so closely similar to Nationwide's, and no other entity with a similar name that had

27 an active license after 2006. From this search, I infer that Nationwide went out of business

28
                                         1

1    in 2007.

2    3.    Plaintiff believes that Nationwide sold or resold her loan into the secondary

3    mortgage market in a series of transactions known as "securitization." In recent years,

4    securitization has greatly expanded the capital available for residential mortgage loans and

5    has become the most common source of capital to fund the loans.

6    4.    As part of my investigation for this case, I caused a securitization audit of plaintiff's

7    loan by the firm Certified Forensic Loan Auditors, LLC ("CFLA"). The audit showed that

8    the loan became, through securitization, an asset of Greenpoint Mortgage Funding Trust

9    2006-AR7 (the "Trust"); that the trust was formed under a "Pooling and Service

10    Agreement ('PSA')"; that the trustee was US Bank, N.A.; that the Trust was formed under

11    and to be governed by the laws of the State of New York; and that the Trust's closing date

12    was November 30, 2006. A copy of the CFLA audit is attached as Exhibit A to this

13    declaration.

14    5.    Under the terms of the Pooling and Service Agreement, US Bank, N.A., would have

15    had no power to transfer a loan after the Trust's closing date.

16    6.    GMAC's claim to the beneficial interest in plaintiff's loan is based on MERS's

17    purported assignment by MERS on July 5, 2011.

18    7.    On or about December 1, 2011, I submitted scanned copies of two documents in

19    this case to Sheila Lowe, a qualified handwriting analyst, for a comparison of signatures.

20    One document, dated July 5, 2011, is the "Assignment of Deed of Trust" from Mortgage

21    Electronic Registration System ("MERS") to GMAC Mortgage, LLC ("GMAC") and

22    bears the signature of "Jacqueline Keeley," Assistant Secretary for Mortgage Electronic

23    Registration Systems, Inc. The other document, dated July 6, 2011, is a Substitution of

24    Trustee and bears the signature "Jacqueline Keeley", Authorized Officer of GMAC

25    Mortgage, LLC. Ms. Lowe concluded that the two signatures were probably written by two

26    different people. A copy of Ms. Lowe's report is attached as Exhibit B to this declaration.

27    8.    Plaintiff's petition for bankruptcy protection triggered an automatic stay of the

28

2

DECLARATION OF EHUD GERSTEN IN SUPPORT OF APPLICATION FOR ORDER TO SHOW
CAUSE RE PRELIMINARY INJUNCTION

1  foreclosure sale that had been scheduled for November 21, 2011. GMAC moved for relief

2  from the automatic stay on the ground that its alleged interest in the property was not

3  adequately protected. The bankruptcy court denied the motion on the ground that GMAC

4  had failed to prove its interest in the property. Specifically, the court found that

5  "Jacqueline Keeley's" two signatures had not been written by the same person, and that

6  "either someone is forging signatures or this is a blatant example of robo-signing."

7  Transcript of hearing on GMAC's motion for relief from stay, February 23, 2012, pp. 2:13

8  to 3:9.

9      9.    GMAC fraud in documenting residential loan assignments has been reported. An

10  examination of New York court records by the investigative journalism bureau ProPublica

11  found hundreds of assignment documents that were filed in the name of Ameriquest

12  Mortgage Company by GMAC and other mortgage servicers years after Ameriquest had

13  ceased to exist. In at least one incident, in June 2011, a GMAC employee reportedly

14  proposed filling the gap left by a defunct lender by filing a false "lost assignment"

15  affidavit. (ProPublica's report can be found at <http://www.propublica.org/article/gmac-

16  mortgage-whistleblower-foreclosure>.

17  10.    In late 2011, Phil Ting, Assessor-Recorder of the City and County of San Francisco,

18  retained Aequitas Compliance Solutions, Inc., a mortgage regulatory compliance and

19  consulting firm, to review 382 residential loan transactions that resulted in foreclosure

20  sales in San Francisco from January 2009 through October 2011. The loans reviewed were

21  about 16% of all the loans that resulted in foreclosure sales. Phil Ting published the

22  Aequitas report in February 2012. Among the findings:

23      a.    In 23% of the loans, the foreclosure documents filed at the county recorder's

24  office contradict the findings of a securitization audit as to who is the true, current owner

25  of the loan. Report, p. 6.

26      b.    In 45% of the loans, the property was sold to an entity purporting to be the

27  beneficiary of the deed of trust when that entity was not the original beneficiary and either

28

3

DECLARATION OF EHUD GERSTEN IN SUPPORT OF APPLICATION FOR ORDER TO SHOW
CAUSE RE PRELIMINARY INJUNCTION

1   (1) no assignment of a beneficial interest in the loan was *ever* recorded, or (2) such an

2   assignment was recorded only *after* the sale. *Id.*, p. 12.

3         c.     The MERS database identified an investor in 192 loans. In 58% of those

4   loans, the investor in the MERS database was not the foreclosing beneficiary as named in

5   the trustee's deed upon sale. *Id.*, p. 13.

6         I declare under penalty of perjury under the laws of the State of California that the

7   foregoing is true and correct.

8

9   Dated: October 24, 2012

10

11

12            EHUD GERSTEN

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

DECLARATION OF EHUD GERSTEN IN SUPPORT OF APPLICATION FOR ORDER TO SHOW
CAUSE RE PRELIMINARY INJUNCTION

# Exhibit A



Certified Forensic Loan Auditors

# CERTIFIED FORENSIC LOAN AUDITORS, LLC

13101 West Washington Blvd., Suite 140, Los Angeles, CA 90066

Phone: 310-432-6304;  Sales@CertifiedForensicLoanAuditors.com

www.CertifiedForensicLoanAuditors.com

## *PROPERTY*
## *SECURITIZATION ANALYSIS REPORT*™

**"This is a Securitization Analysis Report and not a Forensic Audit Report"**

*Prepared for:*

*Prepared on behalf of:*

## FRANCINE SILVER
## 8613 FRANKLIN AVENUE
## LOS ANGELES, CA 90069

Disclosure: You have engaged Certified Forensic Loan Auditors, LLC to examine your real estate documents. This information is not to be construed as legal advice or the practice of law, pursuant to *Business and Professions Code § 6125 et seq.* it is the intent of CFLA, its members, auditors and independent contractors, not to engage in activities that could be considered the practice of law by conduct exhibiting any of the following practices: "*...the doing and/or performing of services in a court of justice in any matter depending therein throughout the various stages and in conformity with the adopted rules of procedure. It includes legal advice and counsel and the preparation of legal instruments and contracts by which the legal rights are secured although such matter may or may not be depending in a court.*"

*COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011*
*-All Rights Reserved-*



Certified Forensic Loan Auditors

# I.   TRANSACTION DETAILS

## BORROWER & CO-BORROWER:

| BORROWER | CO-BORROWER |
|---|---|
| FRANCINE SILVER | N/A |
| **CURRENT ADDRESS** | **SUBJECT ADDRESS** |
| 8613 FRANKLIN AVENUE<br>LOS ANGELES, CA 90069 | 8613 FRANKLIN AVENUE<br>LOS ANGELES, CA 90069 |

## TRANSACTION PARTICIPANTS

| MORTGAGE BROKER | MORTGAGE SERVICER | MORTGAGE NOMINEE/BENEFICIARY |
|---|---|---|
| UNKNOWN | GMAC MORTGAGE, LLC | MERS FOR NATIONWIDE LENDING GROUP<br>PO BOX 2026<br>FLINT, MICHIGAN 48501-2026<br>888-679-MERS<br>MIN# ████████083-3 |
| **ORIGINAL MORTGAGE LENDER** | **MORTGAGE TRUSTEE** | **TITLE COMPANY** |
| NATIONWIDE LENDING GROUP | LAND AMERICA COMMONWEALTH | UNKNOWN |

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-



**Certified Forensic Loan Auditors**

## LOAN TRANSACTION SUMMARY:

| | | | |
|---|---|---|---|
| **Close Date:** | MARCH 15, 2006 | **Starting Interest Rate:** | 1.000% |
| **Loan Amount:** | $1,300,000.00 | **Starting Mortgage Payment:** | $4,181.31 |
| **Occupancy:** | Owner occupied | **Transaction Type:** | REFINANCE |
| **Loan Program:** | 30 YEAR ARM | **Loan Number:** | ▮6083 (DOT) ▮3858 (AOM) |

# II.    SECURITIZATION

# SECURITIZATION PARTICIPANTS:

| ORIGINATOR/ LENDER | SPONSOR/SELLER | DEPOSITOR |
|---|---|---|
| NATIONWIDE LENDING GROUP | LEHMAN BROTHERS HOLDINGS INC | STRUCTURED ASSET SECURITIES CORP |
| **ISSUING ENTITY** | **TRUSTEE** | **MASTER SERVICER/ SERVICER** |
| GREENPOINT MORTGAGE FUNDING TRUST SERIES 2006-AR7 | U.S. BANK, N.A. | AURORA LOAN SERVICING |
| **CUSTODIAN** | **CUT – OFF DATE** | **CLOSING DATE** |
| U.S. BANK, N.A. | NOVEMBER 1, 2006 | NOVEMBER 30, 2006 |

*COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-



**Certified Forensic Loan Auditors**

*(The following language has been extracted "in part" from the 424b5 Prospectus as well as the Pooling and Servicing Agreement of the above referenced R.E.M.I.C Trust.)*

<div align="center">

PROSPECTUS SUPPLEMENT
(To Prospectus dated November 13, 2006)
### $1,175,972,000 (Approximate)
# GREENPOINT MORTGAGE FUNDING TRUST
**Mortgage Pass-Through Certificates, Series 2006-AR7**
**Lehman Brothers Holdings Inc.**
Sponsor and Seller
**Aurora Loan Services LLC**
Master Servicer
**Structured Asset Securities Corporation**
Depositor
**GreenPoint Mortgage Funding Trust,**
**Series 2006-AR7**
Issuing Entity
*Underwriter*:
## Lehman Brothers


**Description of the Mortgage Pools**

</div>

**General**

Except where otherwise specifically indicated, the discussion that follows and the statistical information presented therein are derived solely from the characteristics of the Mortgage Loans as of the Cut-off Date. Whenever reference is made herein to the characteristics of the Mortgage Loans or to a percentage of the Mortgage Loans, unless otherwise specified, that reference is based on the Cut-off Date Balance.

The Trust Fund will consist of approximately 3,341 conventional, adjustable rate, fully amortizing, negative amortization Mortgage Loans, having a Cut-off Date Balance (after giving effect to Scheduled Payments due on such date) of approximately $1,183,611,773. The Mortgage Loans in each pool have original terms to maturity from the first due date of the Scheduled Payment of 30 or 40 years. The Mortgage Loans generally provide for adjustment of the applicable Mortgage Rate, as specified in the related Mortgage Note, based on the 1-Year MTA Index or the 1-Month LIBOR Index and for corresponding adjustments to the monthly payment amount due thereon, in each case as specified in the

Page | 4

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-

Certified Forensic Loan Auditors

related Mortgage Note and subject to the limitations described below. The Mortgage Loans have Mortgage Rates that provide for adjustments to the Mortgage Rates on a monthly basis (after the initial fixed interest rate period).

All of Mortgage Loans were originated by GreenPoint. The Mortgage Loans were acquired by the Seller from the originator, as described under *"Origination of Mortgage Loans and Underwriting Guidelines"* and *"Trust Agreement—Assignment of Mortgage Loans"* herein.

Certain documentation with respect to some Mortgage Loans, including in some cases, the related Mortgage Note, Mortgage or title insurance policy, is unavailable. Except as otherwise noted below, the Seller will make only limited representations and warranties with respect to the Mortgage Loans. See *"Trust Agreement—Assignment of Mortgage Loans"* herein.

All of the Mortgage Loans are adjustable rate, negative amortization mortgage loans, as described in more detail below. Interest on the Mortgage Loans accrues on the basis of a 360-day year consisting of twelve 30-day months.

Initially on the fifth anniversary of the first payment date of a Mortgage Loan and every fifth payment adjustment date thereafter and the last payment adjustment date prior to the Mortgage Loan's maturity, the monthly payment due on that Mortgage Loan will be recast without regard to the related Payment Cap in order to provide for the outstanding balance of the Mortgage Loan to be paid in full at its maturity by the payment of equal monthly installments.

All of the Mortgage Loans are secured by first mortgages or deeds of trust or other similar security instruments creating first liens on one- to four-family residential properties consisting primarily of one- to four-family dwelling units, individual condominium units, cooperatives or individual units in planned unit developments.

Pursuant to its terms, each Mortgage Loan, other than a cooperative loan or a loan secured by a condominium unit, is required to be covered by a standard hazard insurance policy in an amount equal to the lower of the unpaid principal amount thereof or the replacement value of the improvements on the Mortgaged Property. Generally, a cooperative housing corporation or a condominium association is responsible for maintaining hazard insurance covering the entire building. See *"Description of Mortgage and Other Insurance—Hazard Insurance on the Loans—Standard Hazard Insurance Policies"* in the prospectus.

The Mortgage Loans generally provide for a monthly adjustment of the related Mortgage Rate, as specified in the related Mortgage Note, based on the 1-Year MTA Index or the 1-

*COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-

**Certified Forensic Loan Auditors**

Month LIBOR Index, in each case on each Adjustment Date applicable thereto provided that the first such adjustment of the Mortgage Loans will occur after an initial period of approximately one month following origination. On each Adjustment Date for each Mortgage Loan, the Mortgage Rate thereon will be adjusted to equal the sum, rounded generally to the next highest or nearest multiple of 1/8%, of the applicable index (as described below) and the Gross Margin, provided that the Mortgage Rate on each such Mortgage Loan will not be more than the Maximum Rate or be less than the Minimum Rate. Due to the application of the Maximum Rates, the Mortgage Rate on each Mortgage Loan, as adjusted on any related Adjustment Date, may be less than the sum of the applicable index and the related Gross Margin, rounded as described herein. See *"—The Indices"* below. The Mortgage Loans generally do not permit the related mortgagor to convert the adjustable Mortgage Rate thereon to a fixed mortgage rate.

## Assignment of Mortgage Loans

The Mortgage Loans will be assigned by the Depositor to the Trustee, together with all principal and interest received with respect to the Mortgage Loans on and after the Cut-off Date (other than Scheduled Payments due on that date). The Trustee will, concurrently with such assignment, authenticate and deliver the Certificates. Each Mortgage Loan will be identified in a schedule appearing as an exhibit to the Trust Agreement which will specify with respect to each Mortgage Loan, among other things, the original principal balance and the Scheduled Principal Balance as of the close of business on the Cut-off Date, the Mortgage Rate, the Scheduled Payment, the maturity date, the Servicer and the Custodian of the mortgage file.

As to each Mortgage Loan, the following documents are generally required to be delivered to the Custodian on behalf of the Trustee in accordance with the Trust Agreement: (1) the related original Mortgage Note endorsed without recourse to the Trustee or in blank, (2) the original Mortgage with evidence of recording indicated thereon (or, if such original recorded Mortgage has not yet been returned by the recording office, a copy thereof certified to be a true and complete copy of such Mortgage sent for recording), or, in the case of a cooperative loan, the original security agreement and related documents (3) an original assignment of the Mortgage to the Trustee or in blank in recordable form (except as described below), or, in the case of a cooperative loan, the original assignment of security agreement and related documents (4) the policies of title insurance issued with respect to each Mortgage Loan and (5) the originals of any assumption, modification, extension or guaranty agreements. With respect to each Servicer, it is expected that the Mortgages or assignments of Mortgage with respect to each Mortgage Loan will have been recorded in the name of an agent on behalf of the holder of the related mortgage note. In that case, no Mortgage assignment in favor of the Trustee will be required to be prepared, delivered or

Page | 6

*COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-



Certified Forensic Loan Auditors

recorded. Instead, the related Servicer will be required to take all actions as are necessary to cause the Trustee to be shown as the owner of the related Mortgage Loan on the records of the agent for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by the agent.

Each transfer of a Mortgage Loan from the Seller to the Depositor and from the Depositor to the Trustee will be intended to be a sale of that Mortgage Loan and will be reflected as such in the Sale and Assignment Agreement and the Trust Agreement, respectively. However, in the event of insolvency of a prior owner of a Mortgage Loan, a trustee in bankruptcy or a receiver or creditor of the insolvent party could attempt to recharacterize the sale of that Mortgage Loan by the insolvent party as a financing secured by a pledge of the Mortgage Loan. The Trustee's security interest will be perfected by delivery of the Mortgage Notes to the Custodian on behalf of the Trustee.

**424b5 Prospectus** http://www.secinfo.com/d12TC3.viHQa.htm

<div align="center">

LEHMAN BROTHERS HOLDINGS INC.,
SELLER
and
STRUCTURED ASSET SECURITIES CORPORATION,
DEPOSITOR
MORTGAGE LOAN SALE AND ASSIGNMENT AGREEMENT
Dated as of November 1, 2006
GreenPoint Mortgage Funding Trust
(Mortgage Pass-Through Certificates, Series 2006-AR7)

ARTICLE I

CONVEYANCE OF MORTGAGE LOANS

</div>

**Section 1.01.** **Mortgage Loans.**

(a)      **Sale of Mortgage Loans.** Concurrently with the execution and delivery of this Agreement, the Seller does hereby transfer, assign, set over, deposit with and otherwise convey to the Depositor, without recourse, subject to Sections 1.03 and 1.04, all the right, title and interest of the Seller in and to the Mortgage Loans (exclusive of any Retained Interest on such Mortgage Loans, if any) identified on Schedule A-1 and Schedule A-2 hereto, having an aggregate principal balance as of the Cut-off Date of $1,183,611,773.88. Such conveyance includes, without limitation, the right to all distributions of principal and

Page | 7

*COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-

Certified Forensic Loan Auditors

interest received on or with respect to the Mortgage Loans on or after November 1, 2006 other than (i) any amounts representing Retained Interest, if any, and (ii) payments of principal and interest due on or before such date, and all such payments due after such date but received prior to such date and intended by the related Mortgagors to be applied after such date, together with all of the Seller's right, title and interest in and to each related account and all amounts from time to time credited to and the proceeds of such account, any REO Property and the proceeds thereof, the Seller's rights under any Insurance Policies relating to the Mortgage Loans, the Seller's security interest in any collateral pledged to secure the Mortgage Loans, including the Mortgaged Properties, and any proceeds of the foregoing.

(b)      Concurrently with the execution and delivery of this Agreement, the Seller hereby assigns to the Depositor all of its rights and interest under the Transfer Agreement and the Servicing Agreements except for (A) any rights against the Transferor with respect to (i) first payment date defaults or early payment date defaults or (ii) reimbursement of any amount in excess of the Purchase Price for a breach of a representation or warranty and (B) any right to receive Retained Interest if any, and any servicing rights retained thereunder, and delegates to the Depositor all of its obligations thereunder, to the extent relating to the Mortgage Loans. The Seller and the Depositor further agree that this Agreement incorporates the terms and conditions of any assignment and assumption agreement or other assignment document required to be entered into under the Transfer Agreement (any such document an *"Assignment Agreement"*) and this Agreement constitutes an Assignment Agreement under such Transfer Agreement, and the Depositor hereby assumes the obligations of the assignee under each such Assignment Agreement. Concurrently with the execution hereof, the Depositor tenders the purchase price of $1,183,611,773.88. The Depositor hereby accepts such assignment and delegation, and shall be entitled to exercise all the rights of the Seller under the Transfer Agreement and each Servicing Agreement, other than any servicing rights thereunder, as if the Depositor had been a party to each such agreement.

(c)      Schedules of Mortgage Loans. The Depositor and the Seller have agreed upon which of the Mortgage Loans owned by the Seller are to be purchased by the Depositor pursuant to this Agreement and the Seller will prepare on or prior to the Closing Date a final schedule describing such Mortgage Loans (the *"Mortgage Loan Schedule"*). The Mortgage Loan Schedule shall conform to the requirements of the Depositor as set forth in this Agreement and to the definition of *"Mortgage Loan Schedule"* under the Trust Agreement. The Mortgage Loan Schedule attached hereto as Schedule A-1 specifies those Mortgage Loans that are Transferred Mortgage Loans and the Mortgage Loan Schedule attached hereto as Schedule A-2 specifies those Mortgage Loans that are Bank Originated Mortgage Loans.

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-



Certified Forensic Loan Auditors

**Section 1.02.**          **Delivery of Documents.**

(a)          In connection with such transfer and assignment of the Mortgage Loans hereunder, the Seller, shall, at least three (3) Business Days prior to the Closing Date, deliver, or cause to be delivered, to the Depositor (or its designee) the documents or instruments with respect to each Mortgage Loan (each a *"Mortgage File"*) so transferred and assigned, as specified in the related Transfer Agreement or Servicing Agreements.

(b)          For Mortgage Loans (if any) that have been prepaid in full on or after the Cut-off Date and prior to the Closing Date, the Seller, in lieu of delivering the related Mortgage Files, herewith delivers to the Depositor an Officer's Certificate which shall include a statement to the effect that all amounts received in connection with such prepayment that are required to be deposited in the Collection Account maintained by the Master Servicer for such purpose have been so deposited.

Section 1.03.          Review of Documentation. The Depositor, by execution and delivery hereof, acknowledges receipt of the Mortgage Files pertaining to the Mortgage Loans listed on the Mortgage Loan Schedule, subject to review thereof by the custodian, U.S. Bank National Association (the *"Custodian"*), for the Depositor. The Custodian is required to review, within 45 days following the Closing Date, each applicable Mortgage File. If in the course of such review the Custodian identifies any Material Defect, the Seller shall be obligated to cure such Material Defect or to repurchase the related Mortgage Loan from the Depositor (or, at the direction of and on behalf of the Depositor, from the Trust Fund), or to substitute a Qualifying Substitute Mortgage Loan therefor, in each case to the same extent and in the same manner as the Depositor is obligated to the Trustee and the Trust Fund under Section 2.02(c) of the Trust Agreement.

**Mortgage loan sale and assignment agreement** http://www.secinfo.com/d12TC3.v1JXa.b.htm

STRUCTURED ASSET SECURITIES CORPORATION,
as Depositor,
AURORA LOAN SERVICES LLC,
as Master Servicer,
and

*COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011*
*-All Rights Reserved-*



Certified Forensic Loan Auditors

U.S. BANK NATIONAL ASSOCIATION,
as Trustee
TRUST AGREEMENT
Dated as of November 1, 2006
GREENPOINT MORTGAGE FUNDING TRUST
MORTGAGE PASS-THROUGH CERTIFICATES,
SERIES 2006-AR7

## ARTICLE II.

## DECLARATION OF TRUST;
## ISSUANCE OF CERTIFICATES

**Section 2.01.      Creation and Declaration of Trust Fund; Conveyance of Mortgage Loans**

(a)      Concurrently with the execution and delivery of this Agreement, the Depositor does hereby transfer, assign, set over, deposit with and otherwise convey to the Trustee, without recourse, subject to Sections 2.02, 2.04, 2.05 and 2.06, in trust, all the right, title and interest of the Depositor in and to the Mortgage Loans. Such conveyance includes, without limitation, the right to all payments of principal and interest received on or with respect to the Mortgage Loans on and after the Cut-off Date (other than payments of principal and interest due on or before such date), and all such payments due after such date but received prior to such date and intended by the related Mortgagors to be applied after such date together with all of the Depositor's right, title and interest in and to the Collection Account, the Deferred Interest Cap Accounts, the Certificate Account, the Grantor Trust Certificate Account and all amounts from time to time credited to and the proceeds of the Certificate Account, the Grantor Trust Certificate Account, any Custodial Accounts, any Escrow Account established pursuant to Section 9.06, the Basis Risk Reserve Fund established pursuant to Section 5.06 and all amounts from time to time credited to and the proceeds of each such account, the Class X Account established pursuant to Section 5.12 and all amounts from time to time credited to and the proceeds of each such account, any REO Property and the proceeds thereof, the Depositor's rights under any Insurance Policies related to the Mortgage Loans, the Depositor's security interest in any collateral pledged to secure the Mortgage Loans, including the Mortgaged Properties, and any proceeds of the foregoing, to have and to hold, in trust; and the Trustee declares that, subject to the review provided for in Section 2.02, it has received and shall hold the Trust Fund, as trustee, and the Grantor Trusts established pursuant to Section 5.02(g), as grantor trustee, in trust, for the benefit and use of the Holders of the related Certificates and for the purposes and subject to

Page | 10

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-

**Certified Forensic Loan Auditors**

the terms and conditions set forth in this Agreement, and, concurrently with such receipt, has caused to be executed, authenticated and delivered to or upon the order of the Depositor, in exchange for the Trust Fund and Grantor Trusts established pursuant to Section 5.02(g), Certificates in the authorized denominations evidencing the entire ownership of the Trust Fund. or the Grantor Trusts established pursuant to Section 5.02(g), as applicable. In addition, the Trustee shall hold the Certificate Insurance Policy and the Policy Payments Account in trust for the benefit of the Holders of the Guaranteed Certificates.

Concurrently with the execution and delivery of this Agreement, the Depositor does hereby assign to the Trustee all of its rights and interest under the Mortgage Loan Sale Agreement, including all rights of the Seller under the Servicing Agreements and each related Transfer Agreement (other than first payment date default or early payment date default rights against the Transferor) but, in each case, only to the extent assigned under the Mortgage Loan Sale Agreement. The Trustee hereby accepts such assignment and delegation, and shall be entitled to exercise all the rights of the Depositor under the Mortgage Loan Sale Agreement as if, for such purpose, it were the Depositor. The foregoing sale, transfer, assignment, set-over, deposit, delegation and conveyance does not and is not intended to result in the creation or assumption by the Trustee of any obligation of the Depositor, the Sellers or any other Person in connection with the Mortgage Loans or any other agreement or instrument relating thereto except as specifically set forth herein.

Concurrently with the execution of this Agreement, the Certificate Insurance Policy shall be delivered to the Trustee.

(b)        In connection with such transfer and assignment, the Depositor does hereby deliver to, and deposit with, or cause to be delivered to and deposited with, the Trustee, and/or a Custodian acting on the Trustee's behalf, the following documents or instruments with respect to each Mortgage Loan (each a *"Mortgage File"*) so transferred and assigned:

(i)        with respect to each Mortgage Loan, the original Mortgage Note endorsed without recourse in proper form to the order of the Trustee, as shown on Exhibit B-4 hereto, or in blank (in each case, with all necessary intervening endorsements, as applicable) or with respect to any lost Mortgage Note, a lost note affidavit stating that the original Mortgage Note was lost, misplaced or destroyed, together with a copy of the related Mortgage Note;

(ii)        if applicable, the original of any guarantee, security agreement or pledge agreement executed in connection with the Mortgage Note, assigned to the Trustee;

Page | 11

*"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011*
*-All Rights Reserved-*

**Certified Forensic Loan Auditors**

(iii)       with respect to any Mortgage Loan other than a Cooperative Loan, the original recorded Mortgage with evidence of recording indicated thereon and the original recorded power of attorney, with evidence of recording thereon. If, in connection with any Mortgage Loan, the Depositor cannot deliver the Mortgage or power of attorney with evidence of recording thereon on or prior to the Closing Date because of a delay caused by the public recording office where such Mortgage has been delivered for recordation or because such Mortgage or power of attorney has been lost, the Depositor shall deliver or cause to be delivered to the Trustee (or the Custodian), in the case of a delay due to recording, a true copy of such Mortgage or power of attorney, pending delivery of the original thereof, together with an Officer's Certificate of the Depositor certifying that the copy of such Mortgage or power of attorney delivered to the Trustee (or its Custodian) is a true copy and that the original of such Mortgage or power of attorney has been forwarded to the public recording office, or, in the case of a Mortgage or power of attorney that has been lost, a copy thereof (certified as provided for under the laws of the appropriate jurisdiction) and a written Opinion of Counsel delivered to the Trustee and the Depositor that an original recorded Mortgage or power of attorney is not required to enforce the Trustee's interest in the Mortgage Loan;

(iv)       the original of each assumption, modification or substitution agreement, if any, relating to the Mortgage Loans, or, as to any assumption, modification or substitution agreement which cannot be delivered on or prior to the Closing Date because of a delay caused by the public recording office where such assumption, modification or substitution agreement has been delivered for recordation, a photocopy of such assumption, modification or substitution agreement, pending delivery of the original thereof, together with an Officer's Certificate of the Depositor certifying that the copy of such assumption, modification or substitution agreement delivered to the Trustee (or the Custodian) is a true copy and that the original of such agreement has been forwarded to the public recording office;

(v)       with respect to each Non-MERS Mortgage Loan, an original Assignment of Mortgage, in form and substance acceptable for recording. The related Mortgage shall be assigned either (A) in blank, without recourse or (B) to *"U.S. Bank National Association, as Trustee of the GreenPoint Mortgage Funding Trust Mortgage Pass-Through Certificates, Series 2006-AR7,"* without recourse;

(vi)       if applicable, such original intervening assignments of the Mortgage, notice of transfer or equivalent instrument (each, an *"Intervening Assignment"*), as may be necessary to show a complete chain of assignment from the originator, or, in the case of an Intervening Assignment that has been lost, a written Opinion of Counsel delivered to the Trustee that such original Intervening Assignment is not required to enforce the Trustee's interest in the

*COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-

**Certified Forensic Loan Auditors**

Mortgage Loans;

(vii)     with respect to any Mortgage Loan other than a Cooperative Loan, the original mortgagee title insurance policy or attorney's opinion of title and abstract of title, and, if applicable, the original Primary Mortgage Insurance Policy or certificate;

(viii)     the original of any security agreement, chattel mortgage or equivalent instrument executed in connection with the Mortgage or as to any security agreement, chattel mortgage or their equivalent instrument that cannot be delivered on or prior to the Closing Date because of a delay caused by the public recording office where such document has been delivered for recordation, a photocopy of such document, pending delivery of the original thereof, together with an Officer's Certificate of the Depositor certifying that the copy of such security agreement, chattel mortgage or their equivalent instrument delivered to the Trustee (or the Custodian) is a true copy and that the original of such document has been forwarded to the public recording office;

(ix)     with respect to any manufactured housing contract, any related manufactured housing sales contract, installment loan agreement or participation interest; and

(x)     with respect to any Cooperative Loan, the Cooperative Loan Documents.

The parties hereto acknowledge and agree that the form of endorsement attached hereto as Exhibit B-4 is intended to effect the transfer to the Trustee, for the benefit of the Certificateholders, of the Mortgage Notes and the Mortgages.

(c)     (i)     Assignments of Mortgage with respect to each Non-MERS Mortgage Loan other than a Cooperative Loan shall be recorded; provided, however, that such Assignments need not be recorded if, on or prior to the Closing Date, the Depositor delivers, at its own expense, an Opinion of Counsel addressed to the Trustee (which must be Independent counsel) acceptable to the Trustee, the Rating Agencies and any NIMS Insurer, to the effect that recording in such states is not required to protect the Trustee's interest in the related Non-MERS Mortgage Loans; provided, further, that notwithstanding the delivery of any Opinion of Counsel, the Master Servicer shall cause the Servicer to submit each Assignment of Mortgage for recording upon the occurrence of a bankruptcy, insolvency or foreclosure relating to the Mortgagor under the related Mortgage. Subject to the preceding sentence, as soon as practicable after the Closing Date (but in no event more than three months thereafter except to the extent delays are caused by the applicable recording office), the Master Servicer, at the expense of the Depositor and with the cooperation of the

Page | 13

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-

Certified Forensic Loan Auditors

applicable Servicer, shall cause to be properly recorded by such Servicer in each public recording office where the related Mortgages are recorded each Assignment of Mortgage referred to in subsection (b)(v) above with respect to each Non-MERS Mortgage Loan. With respect to each Cooperative Loan, the Master Servicer, at the expense of the Depositor and with the cooperation of the applicable Servicer, shall cause such Servicer to take such actions as are necessary under applicable law in order to perfect the interest of the Trustee in the related Mortgaged Property.

(ii)      With respect to each MERS Mortgage Loan, the Master Servicer, at the expense of the Depositor and with the cooperation of the Servicer, shall cause the Servicer to take such actions as are necessary to cause the Trustee to be clearly identified as the owner of each such Mortgage Loan on the records of MERS for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by MERS.

(d)      In instances where a Title Insurance Policy is required to be delivered to the Trustee or the Custodian on behalf of the Trustee under clause (b)(vii) above and is not so delivered, the Depositor will provide a copy of such Title Insurance Policy to the Trustee, or to the Custodian on behalf of the Trustee, as promptly as practicable after the execution and delivery hereof, but in any case within 180 days of the Closing Date.

(e)      For Mortgage Loans (if any) that have been prepaid in full after the Cut-off Date and prior to the Closing Date, the Depositor, in lieu of delivering the above documents, herewith delivers to the Trustee, or to the Custodian on behalf of the Trustee, an Officer's Certificate which shall include a statement to the effect that all amounts received in connection with such prepayment that are required to be deposited in the Collection Account pursuant to Section 4.01 have been so deposited. All original documents that are not delivered to the Trustee or the Custodian on behalf of the Trustee shall be held by the Master Servicer or the applicable Servicer in trust for the benefit of the Trustee, the Certificateholders and the Certificate Insurer.

**Section 2.02.      Acceptance of Trust Fund by Trustee: Review of Documentation for Trust Fund**

(a)      The Trustee, by execution and delivery hereof, acknowledges receipt by it or by the Custodian on its behalf of the Mortgage Files pertaining to the Mortgage Loans listed on the Mortgage Loan Schedule, subject to review thereof by the Trustee, or by the Custodian on behalf of the Trustee, under this Section 2.02. The Trustee, or the Custodian on behalf of the Trustee, will execute and deliver to the Trustee, the Depositor, the Master Servicer, the

Page | 14

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-



Certified Forensic Loan Auditors

Certificate Insurer and any NIMS Insurer on the Closing Date an Initial Certification in the form annexed hereto as Exhibit B-1 (or in the form annexed to the Custodial Agreement as Exhibit B-1, as applicable).

(b)    Within 45 days after the Closing Date, the Trustee or the Custodian on behalf of the Trustee, will, for the benefit of Holders of the Certificates, the Certificate Insurer and any NIMS Insurer, review each Mortgage File to ascertain that all required documents set forth in Section 2.01 have been received and appear on their face to contain the requisite signatures by or on behalf of the respective parties thereto, and shall deliver to the Trustee, the Depositor, the Master Servicer, the Certificate Insurer and any NIMS Insurer an Interim Certification in the form annexed hereto as Exhibit B-2 (or in the form annexed to the applicable Custodial Agreement as Exhibit B-2, as applicable) to the effect that, as to each Mortgage Loan listed in the Mortgage Loan Schedule (other than any Mortgage Loan prepaid in full or any specifically identified in such certification as not covered by such certification), (i) all of the applicable documents specified in Section 2.01(b) are in its possession and (ii) such documents have been reviewed by it and appear to relate to such Mortgage Loan. The Trustee, or the Custodian on behalf of the Trustee, shall determine whether such documents are executed and endorsed, but shall be under no duty or obligation to inspect, review or examine any such documents, instruments, certificates or other papers to determine that the same are valid, binding, legally effective, properly endorsed, genuine, enforceable or appropriate for the represented purpose or that they have actually been recorded or are in recordable form or that they are other than what they purport to be on their face. Neither the Trustee nor the Custodian shall have any responsibility for verifying the genuineness or the legal effectiveness of or authority for any signatures of or on behalf of any party or endorser.

(c)    If in the course of the review described in paragraph (b) above the Trustee or the Custodian discovers any document or documents constituting a part of a Mortgage File that is missing, does not appear regular on its face (i.e., is mutilated, damaged, defaced, torn or otherwise physically altered) or appears to be unrelated to the Mortgage Loans identified in the Mortgage Loan Schedule (each, a *"Material Defect"*), the Trustee, or the Custodian on behalf of the Trustee, discovering such Material Defect shall promptly identify the Mortgage Loan to which such Material Defect relates in the Interim Certification delivered to the Trustee, the Depositor, the Master Servicer, the Certificate Insurer and any NIMS Insurer. Within 90 days of its receipt of such notice, the Transferor, or, if the Transferor does not do so, the Depositor shall be required to cure such Material Defect (and, in such event, the Depositor shall provide the Trustee with an Officer's Certificate confirming that such cure has been effected). If the applicable Transferor or the Depositor, as applicable, does not so cure such Material Defect, the Transferor, or, if the Transferor does not do so, the Depositor, shall, if a loss has been incurred with respect to such Mortgage Loan that would, if such

Page | 15

*COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-

Certified Forensic Loan Auditors

Mortgage Loan were not purchased from the Trust Fund, constitute a Realized Loss, and such loss is attributable to the failure of the Depositor to cure such Material Defect, repurchase the related Mortgage Loan from the Trust Fund at the Purchase Price. A loss shall be deemed to be attributable to the failure of the Depositor to cure a Material Defect if, as determined by the Depositor, upon mutual agreement with the Trustee each acting in good faith, absent such Material Defect, such loss would not have been incurred. Within the two-year period following the Closing Date, the Depositor may, in lieu of repurchasing a Mortgage Loan pursuant to this Section 2.02, substitute for such Mortgage Loan a Qualifying Substitute Mortgage Loan subject to the provisions of Section 2.05. The failure of the Trustee or the Custodian to give the notice contemplated herein within 45 days after the Closing Date shall not affect or relieve the Depositor of its obligation to repurchase any Mortgage Loan pursuant to this Section 2.02 or any other Section of this Agreement requiring the repurchase of Mortgage Loans from the Trust Fund.

(d)      Within 180 days following the Closing Date, the Trustee, or the Custodian, shall deliver to the Trustee, the Depositor, the Master Servicer, the Certificate Insurer and any NIMS Insurer a Final Certification substantially in the form attached as Exhibit B-3 (or in the form annexed to the Custodial Agreement as Exhibit B-3, as applicable) evidencing the completeness of the Mortgage Files in its possession or control, with any exceptions noted thereto.

(e)      Nothing in this Agreement shall be construed to constitute an assumption by the Trust Fund, the Trustee, the Certificate Insurer, any Custodian or the Certificateholders of any unsatisfied duty, claim or other liability on any Mortgage Loan or to any Mortgagor.

(f)      Each of the parties hereto acknowledges that the Custodian shall perform the applicable review of the Mortgage Loans and respective certifications thereof as provided in this Section 2.02 and in the Custodial Agreement.

(g)      Upon execution of this Agreement, the Depositor hereby delivers to the Trustee and the Trustee acknowledges a receipt of the Mortgage Loan Sale Agreement and the Servicing Agreement.

## ARTICLE VI.

### CONCERNING THE TRUSTEE; EVENTS OF DEFAULT

Section 6.01.      __Duties of Trustee__

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-



Certified Forensic Loan Auditors

(a)     The Trustee, except during the continuance of an Event of Default of which a Responsible Officer of the Trustee shall have actual knowledge, undertakes to perform such duties and only such duties as are specifically set forth in this Agreement. Any permissive right of the Trustee provided for in this Agreement shall not be construed as a duty of the Trustee. If an Event of Default (of which a Responsible Officer of the Trustee shall have actual knowledge) has occurred and has not otherwise been cured or waived, the Trustee shall exercise such of the rights and powers vested in it by this Agreement and use the same degree of care and skill in their exercise as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs, unless the Trustee is acting as Master Servicer, in which case it shall use the same degree of care and skill as the Master Servicer hereunder.

(b)     The Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Trustee which are specifically required to be furnished pursuant to any provision of this Agreement, shall examine them to determine whether they are, on their face, in the form required by this Agreement; provided, however, that the Trustee shall not be responsible for the accuracy or content of any such resolution, certificate, statement, opinion, report, document, order or other instrument furnished by the Master Servicer, the Cap Provider or any Servicer to the Trustee pursuant to this Agreement, and shall not be required to recalculate or verify any numerical information furnished to the Trustee pursuant to this Agreement. Subject to the immediately preceding sentence, if any such resolution, certificate, statement, opinion, report, document, order or other instrument is found not to conform on its face to the form required by this Agreement in a material manner the Trustee shall notify the Person providing such resolutions, certificates, statements, opinions, reports or other documents of the non-conformity, and if the instrument is not corrected to the Trustee's satisfaction, the Trustee will provide notice thereof to the Certificateholders, the Certificate Insurer and any NIMS Insurer and will, at the expense of the Trust Fund, which expense shall be reasonable given the scope and nature of the required action, take such further action as directed by the Certificateholders, the Certificate Insurer and any NIMS Insurer.

(c)     The Trustee shall not have any liability arising out of or in connection with this Agreement, except for its negligence or willful misconduct. Notwithstanding anything in this Agreement to the contrary, the Trustee shall not be liable for special, indirect or consequential losses or damages of any kind whatsoever (including, but not limited to, lost profits). No provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct; provided, however, that:

Page | 17

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-

Certified Forensic Loan Auditors

(i)      The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the consent or direction of the Holders of Certificates as provided in Section 6.18 hereof;

(ii)      For all purposes under this Agreement, the Trustee shall not be deemed to have notice of any Event of Default (other than resulting from a failure by the Master Servicer to remit funds or to furnish information to the Trustee when required to do so) unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a default is received by the Trustee at the address provided in Section 11.07, and such notice references the Holders of the Certificates and this Agreement; and

(iii)      The Trustee shall not be responsible for the acts or omissions of any Servicer, Custodian, the Certificate Insurer or the Master Servicer, it being understood that this Agreement shall not be construed to render any of them agents of one another.

(d)      The Trustee shall have no duty hereunder with respect to any complaint, claim, demand, notice or other document it may receive or which may be alleged to have been delivered to or served upon it by the parties as a consequence of the assignment of any Mortgage Loan hereunder; provided, however, that the Trustee shall promptly remit to the Master Servicer upon receipt any such complaint, claim, demand, notice or other document (i) which is delivered to the Corporate Trust Office of the Trustee and makes reference to this series of Certificate or this Agreement, (ii) of which a Responsible Officer has actual knowledge, and (iii) which contains information sufficient to permit the Trustee to make a determination that the real property to which such document relates is a Mortgaged Property.

(e)      The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of any NIMS Insurer, the Certificate Insurer or the Certificateholders of any Class holding Certificates which evidence, as to such Class, Percentage Interests aggregating not less than 25% as to the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred upon the Trustee under this Agreement.

(f)      The Trustee shall not be required to perform services under this Agreement, or to expend or risk its own funds or otherwise incur financial liability for the performance of any

Page | 18

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-



Certified Forensic Loan Auditors

of its duties hereunder or the exercise of any of its rights or powers if there is reasonable ground for believing that the timely payment of its fees and expenses or the repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it, and none of the provisions contained in this Agreement shall in any event require the Trustee to perform, or be responsible for the manner of performance of, any of the obligations of the Master Servicer or any Servicer under this Agreement or any Servicing Agreement except during such time, if any, as the Trustee shall be the successor to, and be vested with the rights, duties, powers and privileges of, the Master Servicer in accordance with the terms of this Agreement, except with respect to the Trustee, during such time, if any, as the Trustee shall be the successor to, and be vested with the rights, duties, powers and privileges of, the Master Servicer in accordance with the terms of this Agreement.

(g)    The Trustee shall not be held liable by reason of any insufficiency in any account (including without limitation the Collection Account and the Certificate Account) held by or on behalf of the Trustee resulting from any investment loss on any Eligible Investment included therein (except to the extent that the Trustee is the obligor and has defaulted thereon).

(h)    Except as otherwise provided herein, the Trustee shall not have any duty (A) to see to any recording, filing, or depositing of this Agreement or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recording or filing or depositing or to any rerecording, refiling or redepositing of any thereof, (B) to see to any insurance, (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Trust Fund other than from funds available in the Collection Account or the Certificate Account, or (D) to confirm or verify the contents of any reports or certificates of the Master Servicer, any Servicer, the Cap Provider or the Depositor delivered to the Trustee pursuant to this Agreement believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties.

(i)    The Trustee shall not be liable in its individual capacity for an error of judgment made in good faith by a Responsible Officer or other officers of the Trustee unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts.

(j)    Notwithstanding anything in this Agreement to the contrary, the Trustee shall not be liable for special, indirect or consequential losses or damages of any kind whatsoever (including, but not limited to, lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-

Certified Forensic Loan Auditors

(k)     This Agreement shall not be construed to render the Trustee an agent of the Master Servicer or any Servicer.

(l)     For so long as the Depositor is subject to Exchange Act reporting requirements for the GreenPoint Mortgage Funding Trust Mortgage Pass-Through Certificates, Series 2006-AR7 transaction, the Trustee shall give prior written notice to the Sponsor, the Master Servicer and the Depositor of the appointment of any Subcontractor by it and a written description (in form and substance satisfactory to the Sponsor and the Depositor) of the role and function of each Subcontractor utilized by the Trustee, specifying (A) the identity of each such Subcontractor and (B) which elements of the servicing criteria set forth under Item 1122(d) of Regulation AB will be addressed in assessments of compliance provided by each such Subcontractor.

(m)     The Trustee shall notify the Sponsor, the Master Servicer, the Certificate Insurer and the Depositor within five (5) calendar days of knowledge thereof (i) of any legal proceedings pending against the Trustee, of the type described in Item 1117 (§ 229.1117) of Regulation AB, (ii) of any merger, consolidation or sale of substantially all of the assets of the Trustee and (iii) if the Trustee shall become (but only to the extent not previously disclosed) at any time an affiliate of any of the parties listed on Exhibit S hereto or any of their affiliates. On or before March 1st of each year, the Depositor shall distribute the information in Exhibit S to the Trustee.

## ARTICLE X.

## REMIC ADMINISTRATION

**Section 10.01.    REMIC Administration**

(a)     REMIC elections as set forth in the Preliminary Statement and this Section 10.01 shall be made on Forms 1066 or other appropriate federal tax or information return for the taxable year ending on the last day of the calendar year in which the Certificates are issued. The regular interests and residual interest in each REMIC shall be as designated in the Preliminary Statement and this Section 10.01. For purposes of such designations, the interest rate of any regular interest that is computed by taking into account the weighted average of the Net Mortgage Rates of the Mortgage Loans shall be reduced to take into account any expense paid by the Trust to the extent that (i) such expense was not taken into account in computing the Net Mortgage Rate of any Mortgage Loan or any Net Funds Cap,

Page | 20

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-

Certified Forensic Loan Auditors

(ii) such expense does not constitute an *"unanticipated expense"* of a REMIC within the meaning of Treasury Regulation Section 1.860G-1(b)(3)(ii) and (iii) the amount of such expense was not taken into account in computing the interest rate of a more junior Class of regular interests.

(b)       The Closing Date is hereby designated as the *"Startup Day"* of each REMIC within the meaning of section 860G(a)(9) of the Code. The latest possible maturity date for purposes of Treasury Regulation 1.860G-1(a)(4) will be the Latest Possible Maturity Date.

(c)       The Trustee shall represent the Trust Fund in any administrative or judicial proceeding relating to an examination or audit by any governmental taxing authority with respect thereto. The Trustee shall pay any and all tax related expenses (not including taxes) of each REMIC and Grantor Trust, including but not limited to any professional fees or expenses related to audits or any administrative or judicial proceedings with respect to such REMIC or Grantor Trust that involve the Internal Revenue Service or state tax authorities, but only to the extent that (i) such expenses are ordinary or routine expenses, including expenses of a routine audit but not expenses of litigation (except as described in (ii)); or (ii) such expenses or liabilities (including taxes and penalties) are attributable to the negligence or willful misconduct of the Trustee in fulfilling its duties hereunder (including its duties as tax return preparer). The Trustee shall be entitled to reimbursement from the Certificate Account of the expenses to the extent (x) provided in clause (i) above and (y) with respect to each REMIC, such expenses are *"unanticipated expenses"* within the meaning of Treasury Regulation Section 1.860G-1(b)(3)(ii). Any reimbursement described in the preceding sentence shall be allocated and limited to collections or other recoveries on the related Mortgage Pool and shall be accounted for in such manner.

(d)       The Trustee shall prepare, the Trustee shall sign, and the Trustee will file, all of each REMIC's federal and state tax and information returns as such REMIC's direct representative. The Trustee shall prepare, sign and file all of the tax or information returns in respect of each Grantor Trust. The Trustee shall comply with such requirement by filing Form 1041. The expenses of preparing and filing such returns shall be borne by the Trustee.

(e)       The Trustee or its designee shall perform on behalf of the Trust Fund and each REMIC and Grantor Trust all reporting and other tax compliance duties that are the responsibility of the Trust Fund or such REMIC or Grantor Trust under the Code, the REMIC Provisions, or other compliance guidance issued by the Internal Revenue Service or any state or local taxing authority. Among its other duties, if required by the Code, the REMIC Provisions, or other such guidance, the Trustee shall provide (i) to the Treasury or other governmental authority such information as is necessary for the application of any tax

Page | 21

*COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011*
*-All Rights Reserved-*

Certified Forensic Loan Auditors

relating to the transfer of a Residual Certificate to any disqualified person or organization pursuant to Treasury Regulation 1.860E-2(a)(5) and any person designated in Section 860E(e)(3) of the Code and (ii) to the Certificateholders such information or reports as are required by the Code or REMIC Provisions.

(f)    The Trustee, the Master Servicer and the Holders of Certificates shall take any action, within their respective control and scope of their duties, or cause any REMIC to take any action necessary to create or maintain the status of any REMIC as a REMIC under the REMIC Provisions and shall assist each other as necessary to create or maintain such status. Neither the Trustee, the Master Servicer nor the Holder of any Residual Certificate shall knowingly take any action, cause any REMIC to take any action or fail to take (or fail to cause to be taken) any action, within their respective control and scope of their duties, that, under the REMIC Provisions, if taken or not taken, as the case may be, could result in an Adverse REMIC Event unless the Trustee, the NIMS Insurer and the Master Servicer have received an Opinion of Counsel (at the expense of the party seeking to take such action) to the effect that the contemplated action will not result in an Adverse REMIC Event. In addition, prior to taking any action with respect to any REMIC or the assets therein, or causing any REMIC to take any action, which is not expressly permitted under the terms of this Agreement, any Holder of a Residual Certificate will consult with the Trustee, the NIMS Insurer, the Master Servicer or their respective designees, in writing, with respect to whether such action could cause an Adverse REMIC Event to occur with respect to any REMIC, and no such Person shall take any such action or cause any REMIC to take any such action as to which the Trustee, the NIMS Insurer or the Master Servicer has advised it in writing that an Adverse REMIC Event could occur.

(g)    Each Holder of a Residual Certificate shall pay when due any and all taxes imposed on the related REMIC by federal or state governmental authorities. To the extent that such taxes are not paid by a Residual Certificateholder, the Trustee shall pay any remaining REMIC taxes out of current or future amounts otherwise distributable to the Holder of the Residual Certificate in any such REMIC or, if no such amounts are available, out of other amounts held in the Collection Account, and shall reduce amounts otherwise payable to holders of regular interests in any such REMIC, as the case may be.

(h)    The Trustee shall, for federal income tax purposes, maintain books and records with respect to each REMIC on a calendar year and on an accrual basis.

(i)    No additional contributions of assets shall be made to any REMIC, except as expressly provided in this Agreement with respect to Qualifying Substitute Mortgage Loans.

Page | 22

*COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
·All Rights Reserved·

Certified Forensic Loan Auditors

(j)        Neither the Trustee nor the Master Servicer shall enter into any arrangement by which any REMIC will receive a fee or other compensation for services.

(k)        Upon the request of any Rating Agency or any NIMS Insurer, the Trustee shall deliver an Officer's Certificate to the Rating Agency and to the NIMS Insurer stating, without regard to any actions taken by any party other than the Trustee, the Trustee's compliance with provisions of this Section 10.01.

(l)        The Class P Certificates shall be neither regular interests nor residual interests in any REMIC created hereunder. It is the intention of the parties hereto that the segregated pool of assets consisting of any collections of Prepayment Premiums related to the Mortgage Loans distributable to the Class P Certificates shall constitute a grantor trust for federal income tax purposes. The Trustee, by its execution and delivery hereof, acknowledges the assignment to it of the rights to receive such Prepayment Premiums and declares that it holds and will hold such assets in trust for the exclusive use and benefit of all present and future Holders of the Class P Certificates. The rights of Holders of the Class P Certificates to receive distributions from the proceeds of such Prepayment Premiums, and all ownership interests of such Holders in and to such distributions, shall be as set forth in this Agreement.

(m)        REMIC 1 shall consist of all of the assets of the Trust Fund (other than (i) the Lower Tier Interests, (ii) the grantor trusts described in Section 10.01 hereof, (iii) the Basis Risk Reserve Fund, (iv) the rights to receive Prepayment Premiums distributable to the Class P Certificates, (v) the Class X Account and (vi) the assets of the Grantor Trusts established pursuant to Section 5.02(g). The REMIC 1 Regular Interests shall be designated as the regular interests in REMIC 1, and the Class LT1-R Interest shall be designated as the sole class of residual interest in REMIC 1. Each of the REMIC 1 Regular Interests shall have the characteristics set forth in the Preliminary Statement.

The assets of REMIC 2 shall be the REMIC 1 Regular Interests. The REMIC 2 Regular Interests shall be designated as the regular interests in REMIC 2 and the Residual Interest shall be designated as the sole class of residual interest in REMIC 2. For federal income tax purposes, the interest rate on each REMIC 2 Regular Interest (other than the Uncertificated Class X Interest) shall be subject to a cap equal to the REMIC Pass-Through Rate.

The beneficial ownership of the Class LT1-R Interest and the Residual Interest shall be represented by the Class R Certificate. Neither the Class LT1-R Interest nor the Residual

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-

**Certified Forensic Loan Auditors**

Interest shall have a principal balance or bear interest.

(n)      It is intended that the rights of each Class of LIBOR Certificates to receive payments in respect of Excess Interest shall be treated as a right in interest rate cap contracts written by the holders of the Class X Certificates in favor of the holders of each Class of the LIBOR Certificates and such shall be accounted for as property held separate and apart from the regular interests in REMIC 2 held by the holders of the LIBOR Certificates. This provision is intended to satisfy the requirements of Treasury Regulations Section 1.860G-2(i) for the treatment of property rights coupled with REMIC interests to be separately respected and shall be interpreted consistently with such regulation. On each Distribution Date, to the extent that any of the LIBOR Certificates receive payments in respect of Excess Interest, such amounts, to the extent not derived from payments in respect of Class X Shortfalls as set forth in Section 10.01(p), will be treated as distributed by REMIC 2 to the Class X Certificates in respect of the Uncertificated Class X Interest *pro rata* and then paid to the relevant Class of LIBOR Certificates pursuant to the related interest cap agreement. The Trustee is hereby directed to perform its duties and obligations in accordance with this Section 10.01(n).

(o)      The parties hereto intend that the Uncertificated Class X Interest, the Basis Risk Reserve Fund, the right to receive payments in respect of Class X Shortfalls as set forth in Section 10.01(p) and the obligation of the holders of the Class X Certificates to pay amounts of Excess Interest to the holders of the LIBOR Certificates shall be treated as a *"grantor trust"* under the Code, and the provisions hereof shall be interpreted consistently with this intention. In furtherance of such intention, the Trustee shall (i) furnish or cause to be furnished to the holders of the Class X Certificates information regarding their allocable share, if any, of the income with respect to such grantor trust, (ii) file or cause to be filed with the Internal Revenue Service Form 1041 (together with any necessary attachments) and such other forms as may be applicable and (iii) comply with such information reporting obligations with respect to payments from such grantor trust to the holders of LIBOR Certificates as may be applicable under the Code. The Trustee is hereby directed to perform its duties and obligations in accordance with this Section 10.01(o).

(p)      The excess, if any, of amounts payable with respect to the REMIC regular interests held by REMIC 2 over the amounts payable with respect to the REMIC 2 Regular Interests with respect to each Accrual Period shall, solely for purposes of the REMIC Provisions, be deemed earned by the Master Servicer as an additional fee, which amount shall be deemed paid by the Master Servicer to the holders of the Class X Certificates. It is intended that the rights of the holders of the Class X Certificates to receive such deemed payments (*"Class X Shortfalls"*) shall be treated as rights in respect of an interest rate cap

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
·All Rights Reserved·



Certified Forensic Loan Auditors

contract written by the Master Servicer in favor of the holders of the Class X Certificates and shall be accounted for as property separate and apart from the REMIC regular interest represented by the Class X Certificates. This provision is intended to comply with the requirements of Treasury Regulations Section 1.860G-2(i) for the treatment of property rights coupled with regular interests to be separately respected and shall be interpreted consistently with such regulation. The holders of the Class X Certificates agree by their acceptance of such Certificates, that they will take tax reporting positions that allocate no more than a nominal value to the right to receive deemed payments in respect of Class X Shortfalls. The Master Servicer and Trustee shall agree to take tax reporting positions consistent with the allocations by the holders of the Class X Certificates of no more than a nominal value to the right to receive deemed payments in respect of Class X Shortfalls. For information reporting purposes, it will be assumed that such rights have no value. Each payment deemed made to the Class X Certificates in respect of Class X Shortfalls shall be treated for federal income tax purposes or having been paid to the Master Servicer as an additional servicing fee and then paid by the Master Servicer to the Holders of the Class X Certificates. The Trustee and Master Servicer agree and each holder or beneficial owner of a Class X Certificate agrees, by virtue of its acquisition of such Certificate or beneficial interest, to adopt tax reporting positions consistent with the payments deemed made to the Class X Certificates in respect of Class X Shortfalls as payments in respect of interest rate cap agreements written by the Master Servicer. The Trustee is hereby directed to perform its duties and obligations in accordance with this Section 10.01(p).

(q)    Payments in the nature of expenses, reimbursements and indemnifications made from the Trust Fund shall be allocated and limited to collections or other recoveries on the related Mortgage Pool or Mortgage Pools (if applicable) and shall be accounted for in such manner.

(r)    The Trustee shall treat the Class X Account as an outside reserve fund within the meaning of Treasury Regulation 1.860G-2(h) that is owned by the Holder of the Class C Certificates and that is not an asset of any REMIC.

(s)    On each Distribution Date, the Trustee shall first pay or charge as an expense of REMIC 1 all expenses of the Trust Fund for such Distribution Date. All payments of principal and interest at the Net Mortgage Rate on each of the Mortgage Loans received with respect to the Mortgage Loans (net of payments in the nature of expenses, reimbursements and indemnifications related to such Mortgage Pool made from the Trust Fund (which payments shall be limited to collections or other recoveries on such Mortgage Loans and shall be accounted for in such manner)) shall be paid to the REMIC 1 Regular Interests until the principal balance of all such interests have been reduced to zero and any

Page | 25

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-

Certified Forensic Loan Auditors

losses allocated to such interests have been reimbursed. Any excess amounts shall be distributed to the Class LT1-R Interest.

On each Distribution Date,

(i)      interest shortfalls with respect to the Mortgage Loans (other than interest shortfalls attributable to Negative Amortization) shall be allocated to the REMIC 1 Regular Interests *pro rata* based on the interest otherwise accrued thereon;

(ii)      the principal balance of each REMIC 1 Regular Interest shall be increased by the amount of interest accrued thereon (net of interest shortfalls allocated thereto pursuant to the immediately preceding clause (i));

(iii)      50% of the cash received by REMIC 1 shall be distributed to, and 50% of losses with respect to the Mortgage Loans shall be allocated to the REMIC 1-II Marker Classes and the Class LT1-XII Interest in reduction of their principal amounts as follows:

*first*, to each of the REMIC 1-II Marker Classes ending with the designation *"B"*, so that its principal balance is as close as possible to .0005% of the aggregate Scheduled Principal Balance of the Mortgage Loans in the Related Mortgage Pool;

*second*, to each of the REMIC 1-II Marker Classes ending with the designation *"A"*, so that its principal balance is as close as possible to .0005% of the excess of (x) the aggregate Scheduled Principal Balance of the Mortgage Loans in the Related Mortgage Pool over (y) the aggregate principal amounts of the Classes of Related Senior Certificates after giving effect to distributions and allocations on such Distribution Date (provided that the REMIC 1 Subordinated Balance Ratio is maintained); and

*third*, to the Class LT1-XII Interest, all remaining amounts;

(iv)      50% of the cash received by REMIC 1 with respect to the Mortgage Loans shall be distributed to, and losses with respect to the Mortgage Loans shall be allocated to, the REMIC 1-I Marker Classes and the Class LT1-XI Interest in reduction of their principal amounts sequentially as follows:

Page | 26

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
·All Rights Reserved·

Certified Forensic Loan Auditors

(a)      to the Class LT1-M10 Interest in reduction of its principal balance so that its principal balance is as close as possible to 25% of the principal balance of its Corresponding Class;

(b)      to the Class LT1-M9 Interest in reduction of its principal balance so that its principal balance is as close as possible to 25% of the principal balance of its Corresponding Class;

(c)      to the Class LT1-M8 Interest in reduction of its principal balance so that its principal balance is as close as possible to 25% of the principal balance of its Corresponding Class;

(d)      to the Class LT1-M7 Interest in reduction of its principal balance so that its principal balance is as close as possible to 25% of the principal balance of its Corresponding Class;

(e)      to the Class LT1-M6 Interest in reduction of its principal balance so that its principal balance is as close as possible to 25% of the principal balance of its Corresponding Class;

(f)      to the Class LT1-M5 Interest in reduction of its principal balance so that its principal balance is as close as possible to 25% of the principal balance of its Corresponding Class;

(g)      to the Class LT1-M4 Interest in reduction of its principal balance so that its principal balance is as close as possible to 25% of the principal balance of its Corresponding Class;

(h)      to the Class LT1-M3 Interest in reduction of its principal balance so that its principal balance is as close as possible to 25% of the principal balance of its Corresponding Class;

(i)      to the Class LT1-M2 Interest in reduction of its principal balance so that its principal balance is as close as possible to 25% of the principal balance of its Corresponding Class;

(j)      to the Class LT1-M1 Interest in reduction of its principal balance so that its

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-



Certified Forensic Loan Auditors

principal balance is as close as possible to 25% of the principal balance of its Corresponding Class;

(k)    to the Class LT1-2A2 Interest in reduction of its principal balance so that its principal balance is as close as possible to 25% of the principal balance of its Corresponding Class;

(l)    to the Class LT1-1A3A1 Interest in reduction of its principal balance so that its principal balance is as close as possible to 25% of the principal balance of its Corresponding Class;

(m)    to the Class LT1-2A1 Interest in reduction of its principal balance so that its principal balance is as close as possible to 25% of the principal balance of its Corresponding Class;

(n)    to the Class LT1-1A3A2 Interest in reduction of its principal balance so that its principal balance is as close as possible to 25% of the principal balance of its Corresponding Class;

(o)    to the Class LT1-1A2A1 Interest in reduction of its principal balance so that its principal balance is as close as possible to 25% of the principal balance of its Corresponding Class;

(p)    to the Class LT1-1A3B Interest in reduction of its principal balance so that its principal balance is as close as possible to 25% of the principal balance of its Corresponding Class;

(q)    to the Class LT1-1A2A2 Interest in reduction of its principal balance so that its principal balance is as close as possible to 25% of the principal balance of its Corresponding Class;

(r)    to the Class LT1-1A1B Interest in reduction of its principal balance so that its principal balance is as close as possible to 25% of the principal balance of its Corresponding Class;

(s)    to the Class LT1-1A1A Interest in reduction of its principal balance so that its

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-

Certified Forensic Loan Auditors

principal balance is as close as possible to 25% of the principal balance of its Corresponding Class; and

(t)        to the Class LT1-XI Interest in reduction of its principal balance so that its principal balance is as close as possible to the sum of (x) 25% of the aggregate Scheduled Principal Balance of the Mortgage Loans and (y) 25% of the Overcollateralization Amount.

If on any Distribution Date there is an increase in the Certificate Principal Amount of any LIBOR Certificate as a result of the proviso in the definition of Certificate Principal Amount, then there shall be a corresponding increase in the principal amount of the REMIC 1 Regular Interests allocated as follows:

(a)        50% of such increase shall be allocated among the REMIC 1-II Marker Classes and the Class LT1-XII Interest as follows:

*first*, to each of the REMIC 1-II Marker Classes ending with the designation *"B"* so that its principal balance is as close as possible to .0005% of the aggregate Schedule Principal Balance of the Mortgage Loans in the Related Mortgage Pool;

*second*, to each of the REMIC 1-II Marker Classes ending with the designation *"A"*, so that its principal balance is as close as possible to .0005% of the excess of (x) the aggregate Scheduled Principal Balance of the Mortgage Loans in the Related Mortgage Pool over (y) the aggregate principal amounts of the Classes of Related Senior Certificates after giving effect to distributions and allocations on such Distribution Date (provided that the REMIC I Subordinated Balance Ratio is maintained; and

*third*, to the Class LT1-XII Interest all remaining amounts; and

(b)        50% of such increase shall be allocated among the REMIC 1-I Marker Classes and the Class LT1-XI Interest as follows:

*first*, to each of the REMIC 1-I Marker Classes so that the principal balance of each such interest is as close as possible to 25% of the principal balance of its Corresponding Class; and

*second*, to the Class LT1-XI Interest so that the principal balance of such interest is as close as possible to the sum of (x) 25% of the aggregate Scheduled Principal Balance of the Mortgage Loans and (y) 25% of the Overcollateralization Amount.

Page | 29

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-



Certified Forensic Loan Auditors

(t)        Notwithstanding the priority and sources of payments set forth in Article 5 hereof or otherwise, the Trustee shall account for all distributions with respect to a Class of Certificates in amounts that differ from those payable pursuant to the regular interest in REMIC 2 corresponding to such Class as amounts paid or received (as appropriate) pursuant to the interest rate cap contracts or notional principal contracts provided for in this Section. In no event shall any such amounts be treated as payments with respect to a *"regular interest"* in a REMIC within the meaning of Code Section 860G(a)(1).

**Section 11.06.**        <u>**Governing Law**</u>

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW) AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

**Pooling and Servicing Agreement (PSA)** http://www.secinfo.com/d12TC3.v1JXa.c.htm

<u>**NEW YORK STATE TRUST LAW STATUTES STATES:**</u>

*"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011*
*-All Rights Reserved-*

Certified Forensic Loan Auditors

**NY Estates, Powers and Trust Law § 7-1.18**
Unless an asset is transferred into a lifetime trust, the asset does not become trust property.

**NY Estates, Powers and Trust Law § 7-2.4.**
A trustee's act that is contrary to the trust agreement is void.

**NY Estates, Powers and Trust Law § 5-1401. Choice of law.**
1. The parties to any contract, agreement or undertaking, contingent or otherwise, in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate not less than two hundred fifty thousand dollars, including a transaction otherwise covered by subsection one of section 1-105 of the uniform commercial code, may agree that the law of this state shall govern their rights and duties in whole or in part, whether or not such contract, agreement or undertaking bears a reasonable relation to this state. This section shall not apply to any contract, agreement or undertaking (a) for labor or personal services, (b) relating to any transaction for personal, family or household services, or (c) to the extent provided to the contrary in subsection two of section 1-105 of the uniform commercial code.

2. Nothing contained in this section shall be construed to limit or deny the enforcement of any provision respecting choice of law in any other contract, agreement or undertaking.

**NY Estates, Powers and Trust Law § 5-1402. Choice of forum.**
1. Notwithstanding any act which limits or affects the right of a person to maintain an action or proceeding, including, but not limited to, paragraph (b) of section thirteen hundred fourteen of the business corporation law and subdivision two of section two hundred-b of the banking law, any person may maintain an action or proceeding against a foreign corporation, non-resident, or foreign state where the action or proceeding arises out of or relates to any contract, agreement or undertaking for which a choice of New York law has been made in whole or in part pursuant to section 5-1401 and which (a) is a contract, agreement or undertaking, contingent or otherwise, in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate, not less than one million dollars, and (b) which contains a provision or provisions whereby such foreign corporation or non-resident agrees to submit to the jurisdiction of the courts of this state.

2. Nothing contained in this section shall be construed to affect the enforcement of any provision respecting choice of forum in any other contract, agreement or undertaking.

**THE CORRECT PROCESS OF SECURITIZATION**

Page | 31

*COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-



**Certified Forensic Loan Auditors**

**PARTY A**
ORIGINATOR/LENDER

NATIONWIDE LENDING
GROUP

**PARTY B**
SPONSOR/SELLER

LEHMAN BROTHERS
HOLDING INC

**TRUE SALE**
1)  LEGAL OPINIONS
2)  ASSET PURCHASE / SALE
    AGREEMENTS
3)  DELIVERY &
    ACCEPTANCE RECEIPTS
4)  COMPENSATION /
    MONEY
5)  CAPACITY OF PARTIES
    TO BUY AND SELL

**PARTY D**
ISSUING ENTITY

GREENPOINT MORTGAGE
FUNDING 2006-AR7

**PARTY C**
DEPOSITOR

STRUCTURED ASSET
SECURITIES CORP

---

### HOW LENDERS "SIDE-STEPPED" THE PROCESS

**PARTY A**
LENDER

NATIONWIDE LENDING
GROUP

**PARTY B**
SPONSOR/SELLER

LEHMAN BROTHERS
HOLDING INC

**TRUE SALE**
1)  LEGAL OPINIONS
2)  ASSET PURCHASE / SALE
    AGREEMENTS
3)  DELIVERY &
    ACCEPTANCE RECEIPTS
4)  COMPENSATION / MONEY
5)  CAPACITY OF PARTIES
    TO BUY AND SELL

**PARTY D**
ISSUING ENTITY

HOME GREENPOINT
MORTGAGE FUNDING 2006-
AR7

**PARTY C**
DEPOSITOR

STRUCTURED ASSET
SECURITIES CORP

---

## III.  FORECLOSURE
### Chain of Title and Chain of Note

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-



**Certified Forensic Loan Auditors**

## Recorded Events on the Loan Including Foreclosure Issues and Securitization

| Recorded Chain of Deed Possession | | Chain of Note Possession | |
|---|---|---|---|
| **Date** | **Original Mortgage** | **Date** | **Note Holder** |
| **ORIGINATION DATE:** MARCH 15, 2006 Instrument # 0606 18788 RECORDED: MAR 23, 2006 Official Records: Los Angeles County California | **BORROWER:** FRANCINE SILVER. **LENDER:** NATIONWIDE LENDING GROUP MIN # ▇▇▇083-3 | **ORIGINATION DATE:** MARCH 15, 2006 | **LENDER:** NATIONWIDE LENDING GROUP **PRINCIPAL AMOUNT:** $1,300,000.00 MIN # ▇▇▇083-3 |
| **DATE:** July 5, 2011 recorded on July 13, 2011 Instrument # 20110937251 Official Records: Los Angeles County California | **ASSIGNMENT OF DEED OF TRUST** **Executed by:** MORTGAGE ELECTRONIC REGISRATION SYSTEMS, INC., **Assignee:** GMAC Mortgage, LLC FKA GMAC Mortgage Corporation **Signed by:** Jacqueline Keeley, Assistant Secretary | **CLOSING DATE:** NOVEMBER 30, 2006 *(REMIC)* | **SPONSOR/SELLER:** LEHMAN BROTHERS HOLDING, INC *(SIDE-STEPPED)* |
| **DATE:** October 24, 2011 Instrument # 20111434241 Official Records: Los Angeles County California | **NOTICE OF TRUSTEE'S SALE** **Executed by:** Executive trustee Services, LLC dba ETS servicers, LLC , as Trustee **Beneficiary:** GMAC Mortgage, LLC FKA GMAC Mortgage Corporation **Signed by:** Omar Solorzana, as Trustee Sale Officer | **CLOSING DATE:** F NOVEMBER 30, 2006 *(REMIC)* | **DEPOSITOR:** STRUCTURED ASSET SECURITIES CORP *(SIDE-STEPPED)* |
| | | **CLOSING DATE:** NOVEMBER 30, 2006 *(REMIC)* | **ISSUING ENTITY:** GPMF 2006-AR7 |
| | | | |

# IV.  REPORT SUMMARY

*COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011*
*-All Rights Reserved-*



Certified Forensic Loan Auditors

## Deed of Trust:

On March 15, 2006 borrowers Francine Silver, executed a negotiable promissory note and a security interest in the form of a Deed of Trust in the amount of $1,300,000.00. This Deed of Trust was recorded in the Official Records, Los Angeles County, California, on March 23, 2006, with a file number of 060681788. The *original lender of the promissory note is Nationwide Lending Group . Mortgage Electronic Registration Systems, Inc. (hereafter "MERS") is named as the beneficiary of the Deed of Trust. The Original Trustee of this Deed of Trust is LAND AMERICA COMMONWEALTH.* Following Paragraph (R) TRANSFER OF RIGHTS IN THE PROPERTY of the Deed of Trust provides in part "This Security Instrument secures to Lender: (i) the repayment of the Loan..." Paragraph 20 of the Deed of Trust provides *"The Note or a partial interest in the Note (together with this Security Instrument)* can be sold one or more times without prior notice to Borrower. Exhibit A

## Securitization (The Note):

The NOTE was sold, transferred, assigned and securitized into the GPMF 2006-AR7 TRUST with a Closing Date of NOVEMBER 30, 2006. The copy of the note did not have an endorsement nor an allonge affixed to it showing a complete chain of title.

## Assignment of Deed of Trust:

An Assignment of Deed of Trust was provided for review. This assignment was executed on July 5, 2011 and recorded on July 13, 2011 by MERS. The instrument number is 20110937251 and was recorded in the Official Records of Los Angeles County, California. The document was signed on June 12, 2011 by Jacqueline Keeley, Assistant Secretary. This document grants, assigns and transfers all beneficial interest to GMAC Mortgage, LLC FKA GMAC Mortgage Corporation.

Examiner questions the validity of this assignment because it should have been executed within 90 days of the closing of the loan and not 5 years after the fact. *"All REMIC loans must be acquired on the startup day of the REMIC or within 3 months thereafter,"* according to the IRS Code 860G. Any contribution of an asset other than cash to the REMIC after the startup day or within the 3 months is deemed "unqualified or prohibited contribution" and will cause the REMIC trust to lose its tax-free status which would be catastrophic to the Trust because the Trust cash flow would be subjected to double-taxation or at a minimum, the prohibited transaction is taxed 100% to the Trust.

There are no interim assignments recorded at the Los Angeles County Recorders Office from the originator and sponsor, sponsor to depositor and depositor to issuing entity. This a direct violation of California Civil Code Section 2932.5

2932.5. Where a power to sell real property is given to a mortgagee, or other encumbrancer, in an instrument intended to secure the payment of money, the power is part of the security and vests in any person who by assignment becomes

Page | 34

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-



**Certified Forensic Loan Auditors**

entitled to payment of the money secured by the instrument. The power of sale / may be exercised by the assignee if the assignment is duly acknowledged and recorded.

Examiner also has reason to believe that MERS Authorized Signer, David Seybold, Assistant Secretary may be a robo signer. Examiner recommends borrower or borrowers legal counsel move for discovery to subpeona the documents that give the signer authority to sign on behalf of MERS.

### Notice of Trustee's Sale:

A Notice of Trustee's Sale document was executed on October 21, 2011 and recorded in the Official Records of Los Angeles, California on October 24, 2011 with an instrument number of 20111434241 by Executive trustee Services, LLC dbs ETS servicers, LLC, as Trustee. The document was signed by Omar Solorzana, as Trustee Sale Officer. This document states that a trustee sale will take place by Executive trustee Services, LLC dbs ETS servicers, LLC on November 21, 2011 at 10:30 AM.    Based on the research uncovered by the examiner, any sale, transfer or assignment of this property may be illegal, null and void ab initio.

# MORTGAGE ELECTRONIC REGISTRATION SYSTEMS (MERS) ANALYSIS

*COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-



**Certified Forensic Loan Auditors**

- The Mortgage shows MIN # ██████████0083-3 and MERS SERVICER ID website https://www.mers-servicerid.org/sis/search indicates that GMAC MORTGAGE, LLC is the Servicer and GMAC MORTGAGE, LLC is the investor, Exhibit "C."

- Although MERS records an assignment in the real property records, the promissory note which creates the legal obligation to repay the debt is not negotiated to MERS.

- MERS is never entitled to receive a borrower's monthly payments, nor is MERS ever entitled to receive the proceeds of a foreclosure or deed of trust sale.

- MERS is never the owner of the promissory note for which it seeks foreclosure.

- MERS has no legal or beneficial interest in the loan instrument underlying the security instrument for which it serves as "nominee".

- MERS has no legal or beneficial interest in the mortgage indebtedness underlying the security instrument for which it serves as "nominee".

- MERS has no interest at all in the promissory note evidencing the mortgage indebtedness.

- MERS is not a party to the alleged mortgage indebtedness underlying the security instrument for which it serves as "nominee".

- MERS has no financial or other interest in whether or not a mortgage loan is repaid.

*(This area was intentionally left blank)*



*Process Loans, Not Paperwork™*

**1 record matched your search:**

Need help? ❓



**Certified Forensic Loan Auditors**

Select borrower type and enter borrower information to see Investor for MIN 1003643-2006000083-3.

⊙ **Investor for Individual Borrower**

Your entries may be either upper or lower case.

Fields marked ✱ are required.

**Last Name:** SILVER ✱

**SSN:**

☐ By checking this box, the borrower or borrower's authorized representative is attesting to the fact that he or she is in fact the borrower or borrower's authorized representative for the loan in question. Additionally, borrowers wishing to learn the identity of their loan's investor must confirm their identity by entering their last name or corporation name as well as their SSN or TIN. If this information does not match the information contained in the MERS® System for the borrower of the loan, the investor information will not be displayed. Borrowers should verify the results with their loan servicer.

( Submit )

○ **Investor for Corporation/Non-Person Entity Borrower**

**Servicer:** GMAC Mortgage, LLC          **Phone: (800) 766-4622**
         **Waterloo, IA**

**Investor:** GMAC Mortgage, LLC

## BENEFICIARY- MERS (MORTGAGE ELECTRONIC REGISTRATION SYSTEM)



California Secretary of State Debra Bowen

Secretary of State   Administration   Elections   **Business Programs**   Political Reform   Archives   Registries   Other Services

**Business Search - Results**

Business Entities (BE)
- Business Search
- Disclosure Search
- E-File Statements
- Processing Times

Data is updated weekly and is current as of Friday, March 30, 2012. It is not a complete or certified record of the entity.

• Select an entity name below to view additional information. Results are listed alphabetically in ascending order by entity name.



Certified Forensic Loan Auditors

MORTGAGE ELECTRONIC REGISTRATION SYSTEM (MERS) has not been registered with the Secretary of State of California, nor Has MERS paid any taxes to the California Franchise Tax Board prior to July 21, 2010. MERS never possessed the power to conduct business in California prior to that date. MERS does not qualify for any exemption under California State Law.  In addition California Corporations Code Section 2258 and 2259 states as follows;

2258.   Any foreign corporation subject to the provisions of Chapter 21 which transacts intrastate business without complying therewith is guilty of a misdemeanor, punishable by fine of not less than five hundred dollars ($500) nor more than one thousand dollars ($1,000), to be recovered in any court of competent jurisdiction.

Prosecution under this section may be brought by the Attorney General or by any district attorney. If brought by the latter, one-half of the fine collected shall be paid to the treasurer of the county in which the conviction was had and one-half to the State Treasurer. If brought by the Attorney General the entire amount of fine collected shall be paid to the State Treasurer to the credit of the General Fund of the state.

2259.   Any person who transacts intrastate business on behalf of a foreign corporation which is not authorized to transact such business in this state, knowing that it is not so authorized, is guilty of a misdemeanor punishable by fine of not less than fifty dollars ($50) nor more than six hundred dollars ($600).

MERS does not have a "beneficial interest" in the deeds of trust as that term is used in California Civil Code Sect. 2934(a). The term "beneficiary" or "beneficial interest" means the person who actually loses money if the loan is not paid.

### *ABOUT MERS*

Page | 38

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-



**Certified Forensic Loan Auditors**

The creation of MERS changed the lending process. Instead of the lender being the Beneficiary on the Deed of Trust, MERS was now named as either the "Beneficiary" or the "Nominee for the Beneficiary" on the Deed of Trust. The concept was that with MERS assuming this role, there would be no need for Assignments of the Deed of Trust, since MERS would be given the "power of sale" through the Deed of Trust.

The naming of MERS as the Beneficiary meant that certain other procedures had to change. This was a result of the Note actually being made out to the lender, and not to MERS. Before explaining this change, it would be wise to explain the Securitization process.

As mentioned previously, Securitization and MERS required many changes in established practices. These practices were not and have not been codified, so they are major points of contention today.

One of the first issues to be addressed is the process by which MERS would foreclose on a property. This was "solved" through an "unusual" practice.

MERS has only 44 employees. They are all "overhead", administrative or legal personnel. How could they handle the load of foreclosures, Assignments, etc to be expected of a company with their duties and obligations? When a lender, title company, foreclosure company, or other firm signed up to become a member of MERS, one or more of their people were designated as "Corporate Officers" of MERS and given the title of either Assistant Secretary or Vice President. These personnel were not employed by MERS, nor received income from MERS. They were being named "Officers" solely for the purpose of signing foreclosure and other legal documents in the name of MERS. (Apparently, there are some agreements which "authorize" these people to act in an Agency manner for MERS.)

This "solved" the issue of not having enough personnel to conduct necessary actions. It would be the Servicers, Trustees and Title Companies conducting the day-to-day operations needed for MERS to function as the foreclosing party. It was thought that this would provide MERS and their "Corporate Officers" with the "legal standing" to foreclose.

However, this brought up another issue that now needed addressing:

When a Note is transferred, it must be endorsed and signed, in the manner of a person signing his paycheck over to another party. Customary procedure was to endorse it as "Pay to the Order of" and the name of the party taking the Note and then signed by the endorsing party. With a new party holding the Note, there would now need to be an Assignment of the Debt. This could not work if MERS was to be the foreclosing party.

In this particular instance the promissory note was made payable to FREMONT INVESTMENT & LOAN. No recorded document suggests that it has been indorsed to MERS or any other named entity.

Once a name is placed into the endorsement of the Note, then that person has the beneficial interest in the Note. Any attempt by MERS to foreclose in the MERS name would result in a challenge to the foreclosure since the Note was owned by "ABC" and MERS was the "Beneficiary". MERS would not have the legal standing to foreclose, since only the "person of interest" would have such authority. So, it

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
·All Rights Reserved·

Certified Forensic Loan Auditors

was decided that the Note would be endorsed "in blank", which effectively made the Note a "Bearer Bond", and anyone holding the Note would have the "legal standing" to enforce the Note under Uniform Commercial Code. This would also suggest that Assignments would not be necessary.

MERS has recognized the Note Endorsement problem and on their website and stated that they could only be the foreclosing party if the Note was endorsed in blank. If it was endorsed to another party, then that party would be the foreclosing party.

As is readily apparent, the above statute would suggest that an Assignment is a requirement for enforcing foreclosure.

The question now becomes as to whether a Note Endorsed in Blank and transferred to different entities as indicated previously does allow for foreclosure. If MERS is the foreclosing authority but has no entitlement to payment of the money, how could they foreclose? *This is especially true if the true beneficiary is not known. Why raise the question of who the true beneficiary is? Again, from the MERS website........*

"On MERS loans, MERS will show as the beneficiary of record. Foreclosures should be commenced in the name of MERS. To effectuate this process, MERS has allowed each servicer to choose a select number of its own employees to act as officers for MERS. Through this process, appropriate documents may be executed at the servicer's site on behalf of MERS by the same servicing employee that signs foreclosure documents for non-MERS loans. Until the time of sale, the foreclosure is handled in the same manner as non-MERS foreclosures. At the time of sale, if the property reverts, the Trustee's Deed Upon Sale will follow a different procedure. Since MERS acts as nominee for the true beneficiary, it is important that the Trustee's Deed Upon Sale be made in the name of the true beneficiary and not MERS. *Your title company or MERS officer can easily determine the true beneficiary.* Title companies have indicated that they will insure subsequent title when these procedures are followed."

There, you have it direct from the MERS website. They admit that they name people to sign documents in the name of MERS. Often, these are Title Company employees or others that have no knowledge of the actual loan and whether it is in default or not.

Even worse, MERS admits that they are not the true beneficiary of the loan. In fact, it is likely that MERS has no knowledge of the true beneficiary of the loan for whom they are representing in an "Agency" relationship. They admit to this when they say *"Your title company or MERS officer can easily determine the true beneficiary.*

To further reinforce that MERS is not the true beneficiary of the loan, one need only look at the following Nevada Bankruptcy case, Hawkins, Case No. BK-S-07-13593-LBR (Bankr.Nev. 3/31/2009) (Bankr.Nev., 2009) – "A "beneficiary" is defined as "one designated to benefit from an appointment, disposition, or assignment . . . or to receive something as a result of a legal arrangement or instrument." BLACK'S LAW DICTIONARY 165 (8th ed. 2004). But it is obvious from the MERS' "Terms and Conditions" that MERS is not a beneficiary as it has no rights whatsoever to any payments, to any servicing rights, or to any of the properties secured by the

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-

**Certified Forensic Loan Auditors**

loans. To reverse an old adage, if it doesn't walk like a duck, talks like a duck, and quacks like a duck, then it's not a duck."

In the case of MERS, the Note and the Deed of Trust are held by separate entities. This can pose a unique problem dependent upon the court. There are many court rulings based upon the following:

"**The Deed of Trust is a mere incident of the debt it secures and an assignment of the debt carries with it the security instrument. Therefore, a Deed Of Trust is inseparable from the debt and always abides with the debt. It has no market or ascertainable value apart from the obligation it secures.**

**A Deed of Trust has no assignable quality independent of the debt, it may not be assigned or transferred apart from the debt, and an attempt to assign the Deed of Trust without a transfer of the debt is without effect."**

This very "simple" statement poses major issues. *To easily understand, if the Deed of Trust and the Note are not together with the same entity, then there can be no enforcement of the Note. The Deed of Trust enforces the Note. It provides the capability for the lender to foreclose on a property. If the Deed is separate from the Note, then enforcement, i.e. foreclosure cannot occur.* The following ruling summarizes this nicely.

In Saxon vs Hillery, Dec 2008, Contra Costa County Superior Court, an action by Saxon to foreclose on a property by lawsuit was dismissed due to lack of legal standing. This was because the Note and the Deed of Trust were "owned" by separate entities. The Court ruled that when the Note and Deed of Trust were separated, the enforceability of the Note was negated until rejoined.

The mortgage securing the note, while naming FREMONT INVESTMENT & LOAN as "Lender," separately names the Mortgage Electronic Registration Systems, Inc. (MERS) as the "Mortgagee." The conveyancing language granted the mortgage to MERS "solely as nominee for Lender and Lender's successor's and assigns."

FREMONT INVESTMENT & LOAN was a "correspondent lender" that originated mortgage loan which in turn, was sold and transferred into a "federally-approved securitization" trust named HELT SERIES ACE 2006-HE1 TRUST. It becomes readily clear that the Note and Deed have taken two distinctly different paths.

The written agreement that created the HELT SERIES ACE 2006-HE1 TRUST is a "Pooling and Servicing Agreement" (PSA), and is a matter of public record, available on the website of the Securities Exchange Commission. The Trust is also described in a "Prospectus Supplement," which is available on the SEC website as well. The Trust by its terms set a "CLOSING DATE" of FEBRUARY 28, 2006. Based on the documents received, it appears as though the promissory note in this case did not become trust property in compliance with the requirement set forth in the PSA. The Trust agreement is filed under oath with the Securities and Exchange Commission. The acquisition of the assets of the subject Trust and the PSA are governed under New York State trust law.

Page | 41

*COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-



**Certified Forensic Loan Auditors**

*In view of the foregoing, all assignments of Deed of Trust occurred after 90 Days after the Trust's Closing Date would be void out for the reason that it defeated the express terms of the Trust instrument.*

The loan was originally made to FREMONT INVESTMENT & LOAN and was sold and transferred to HELT SERIES ACE 2006-HE1 TRUST. There is no record of Assignments to either the Sponsor or Depositor as required by the Pooling and Servicing Agreement.

In *Carpenter v. Longan* 16 Wall. 271,83 U.S. 271, 274, 21 L.Ed. 313 (1872), *the U.S. Supreme Court stated "The note and mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while assignment of the latter alone is a nullity."*

An obligation can exist with or without security. With no security, the obligation is unsecured but still valid. A security interest, however, cannot exist without an underlying existing obligation. It is impossible to define security apart from its relationship to the promise or obligation it secures. The obligation and the security are commonly drafted as separate documents – typically a promissory note and a deed of trust. If the creditor transfers the note but not the deed of trust, the transferee receives a secured note; the security follows the note, legally if not physically. If the transferee is given the deed of trust without the note accompanying it, the transferee has no meaningful rights except the possibility of legal action to compel the transferor to transfer the note as well, if such was the agreement. (Kelley v. Upshaw 91952) 39 C.2d 179, 246 P.2d 23; Polhemus v. Trainer (1866) 30C 685)

"Where the mortgagee has "transferred" only the mortgage, the transaction is a nullity and his "assignee" having received no interest in the underlying debt or obligation, has a worthless piece of paper (4 Richard R. Powell), Powell on Real Property, § 37.27 [2] (2000)

By statute, assignment of the mortgage carries with it the assignment of the debt. . . Indeed, in the event that a mortgage loan somehow separates interests of the note and the deed of trust, with the deed of trust lying with some independent entity, the mortgage may become unenforceable. *The practical effect of splitting the deed of trust from the promissory note is to make it impossible for the holder of the note to foreclose,* unless the holder of the deed of trust is the agent of the holder of the note. Without the agency relationship, the person holding only the note lacks the power to foreclose in the event of default. The person holding only the deed of trust will never experience default because only the holder of the note is entitled to payment of the underlying obligation. *The mortgage loan becomes ineffectual when the note holder did not also hold the deed of trust."*

*(This area was intentionally left blank)*

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-



Certified Forensic Loan Auditors

# FANNIE MAE LOAN LOOK UP
## Does Fannie Mae Own My Loan?

### YES/NO

### BASED ON RESEARCH DOCUMENT BELOW

#### Who Is Fannie Mae And What Do They Do?

Fannie Mae is a government-chartered company with a mission to provide a stable source of funding to the U.S. housing and mortgage markets. The company purchases and securitizes mortgage loans to ensure that money is consistently available to financial institutions that lend money to homebuyers.

FANNIE MAE SEARCH RESULTS



About Us | Fannie Mae Help | Loan Lookup | Questions | En Español

Home › Loan Lookup › Fannie Mae Loan Lookup Results No Match Found

### Fannie Mae Loan Lookup Results: No Match Found

It appears that Fannie Mae does not own your loan, based on the information you entered:

FRANCINE SILVER
8613 FRANKLIN AVENUE
LOS ANGELES, CA 00069
Last 4 Digits of Social Security Number: ****



GO TO OUR FORECLOSURE PAGE

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-



Certified Forensic Loan Auditors

## Fannie Mae Legal Disclosure

**IMPORTANT LEGAL INFORMATION REGARDING THIS FANNIE MAE WEB SITE**
Your use of this Fannie Mae Web site is subject to the conditions and qualifications described below. By using this Fannie Mae Web site, you agree to accept such conditions and qualifications.

**No Warranties; Limitation of Liability.** This Web site includes information, documents, tools, and materials (collectively, the "Contents") that are subject to change without notice. Fannie Mae expressly disclaims any obligation to keep Contents up to date or free of errors or viruses, or to maintain uninterrupted access to this Web site. **This Web site (including all Contents) is provided "AS IS."** Users of this Web site should understand that some Contents have been electronically converted from the media from which originals were produced. Fannie Mae has not tested or verified the accuracy or completeness of the conversion process.

**Fannie Mae assumes no responsibility for errors or omissions in any Contents, including Contents that are referenced by or linked (by hypertext links) to third party Web sites. FANNIE MAE MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER FOR THE CONTENTS OR THIRD PARTY WEB SITES OR FOR ANY PRODUCTS, SERVICES OR PROPERTIES MENTIONED OR OFFERED IN THE CONTENTS OR IN THIRD PARTY WEB SITES.**

**Fannie Mae disclaims any express or implied warranties related to the use of this Web site (including all Contents and third party Web sites), including, without limitation, merchantability, suitability, noninfringement, or fitness for any particular purpose.**

**Fannie Mae shall not be liable for any errors contained herein or for any damages whatsoever arising out of or related to the use of this Web site (including all Contents), including, without limitation, direct, indirect, incidental, special, consequential, or punitive damages, whether under a contract, tort, or any other theory of liability, even if Fannie Mae is aware of the possibility of such errors or damages.**

## Summary: Fannie Mae reports that they do not own your loan.

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-



**Certified Forensic Loan Auditors**

# FREDDIE MAC
## Does Freddie Mac Own My Loan?

### Yes/No

---

**Freddie Mac**
How to Get Help with Your Mortgage

**Does Freddie Mac Own Your Mortgage?**

To understand the options available for getting help with your mortgage – including the Administration's Home Affordable Refinance and Modification Programs – it's important for you to know who owns your loan.

Using the secured look-up below, you can quickly find out if Freddie Mac owns your loan. Please enter your information carefully – a spelling error or small mistake could cause an inaccurate result. Abbreviations, typos, or including the 'Street Type' in the 'Street Name' field can also lead to inaccurate results.

**Self-Service Lookup**

* Indicates required fields

First Name *

Last Name *

House Number *

Street Name *          Do not include 'Street', 'Avenue', 'Drive', etc. in this form field.

Street Suffix *

Unit Number

City *

State *

Zip Code *

Last 4 Digits of
Social Security
Number *

Verification *    ☑ By checking this box and clicking on the button below to submit this information, I confirm I am the owner of this property or have the consent of the owner to lookup this information.

---

**FREDDIE MAC SEARCH RESULTS**

**Freddie Mac**
How to Get Help with Your Mortgage

No. Our records show that Freddie Mac is not the owner of your mortgage.

**What to do next:**

1. Try our lookup tool again. Abbreviations or typos can cause an incorrect result. Be sure detailed information entered in the lookup tool is typed completely and accurately and reflects the information from your original loan documents.

2. Contact Freddie Mac at 1-800-FREDDIE (1-800-373-3343) or 1-800-7Fannie to see if they own your loan.

3. Call your lender for assistance with your mortgage. Learn how to approach your lender about your options.

4. If neither Freddie Mac nor Fannie Mae owns your loan, ask your lender if they participate in the federal Making Home Affordable program. If so, they can help you determine your eligibility.

   a. If you are eligible for the Making Home Affordable program, there are several options available to you:

      • A Home Affordable Modification can help you obtain more affordable mortgage payments if you're behind or making your mortgage payments or believe you may be soon.

      • A Home Affordable Refinance can better position you for a more stable relationship success if you have been making timely mortgage payments but have open, unable to refinance due to declining property values.

      • A short sale or "deed-in-lieu of foreclosure" to transfer or to more affordable housing if it's not realistic for you to keep your home.

   b. If you are not eligible for the Making Home Affordable program, don't give up! Ask your lender about other options to make your payments more affordable or to avoid foreclosure.

5. If you're still frustrated or confused, reach out – there are many organizations that can help you, free of charge.

   • Call the U.S. Department of Housing & Urban Development (HUD) at (800) 569-4287 or visit the HUD site for a list of approved housing counselors. Housing counselors can help you contact and work with your lender to get help with your mortgage – free of charge.

   • Call the Homeowner's HOPE™ hot-line at (888) 995-HOPE to reach trained housing counselors who can provide advice and help you develop a plan to avoid foreclosure.

**Summary: Freddie Mac reports that Freddie Mac is not the owner of your mortgage.**

Page | 45

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-



Certified Forensic Loan Auditors

# V. CONCLUSION

## CHAIN OF TITLE

**ARROW LEGEND**

PURPLE – MORTGAGE DOCUMENTS
BLUE – SECURITIES CERTIFICATES
RED – INVESTOR FUNDS
GREEN – BORROWER FUND

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-

Certified Forensic Loan Auditors

# Notification of Assignment, Sale or Transfer of Mortgage Loan

### Section 131(g) of the Truth in Lending Act (15 USC § 1641)(TILA)

This section was amended on May 19, 2009, to include a new provision requiring the assignee of a mortgage loan to notify a consumer borrower that the loan has been transferred. Section 131(g) requires the new owner or assignee of a mortgage loan to notify the borrower in writing within 30 days after the mortgage loan is sold or otherwise transferred. This notification must include the following:

- 1. The assignee's identity, address and phone number;

- 2. The date of transfer;

- 3. Contact information for an agent or party having authority to act on behalf of the assignee;

- 4. The location or the place where transfer of ownership of the debt is recorded; and,

- 5. Any other relevant information regarding the assignee.

An Assignee that violates this notice requirement is subject to civil penalties under Section 130(a) of TILA. Further, effective July 31, 2009, the maximum penalty increased from $2000.00 to $4000.00 that an individual consumer may recover for each TILA violation in connection with a closed-end loan secured by real property or a dwelling increased. Additionally, TILA's Section 108 provides that "a violation of any requirement imposed under TILA shall be deemed a violation of a requirement imposed under [the FTC's Act]," regardless of whether a person committing a violation otherwise comes under the FTC's jurisdiction. For willful or knowing violations, a person may be fined up to $5,000 and/or imprisoned for up to one year, in accordance with Section 112 of TILA.

There appears to be at least two (2) assignments missing within the chain of title. The borrower may want to explore the option of pursuing NATIONWIDE LENDING GROUP or their successors for monetary damages for the lack of these assignments pursuant to violations of the TILA and FTC Acts.

*(This area was intentionally left blank)*

Page | 47

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-

**Certified Forensic Loan Auditors**

## CONCLUDING REMARKS

### SPLIT TITLE SYSTEM

We currently live in a split title system where the Deed/Mortgage is filed on the county level as a lien representing legal title and the note is held by the owner/investor/Note Holder as representation of equitable title. Together the Deed/Mortgage and Note (Legal and Equitable title) represent a perfect title or "Fee Simple" title. As a result of the split title system the Note and the Deed/Mortgage have been separated. Therefore, there is no ability to foreclose on the property until the Note and Deed/Mortgage are re-united. (Examiners had no Assignment of Beneficiary for review to determine whether or not any attempt to reunite the Note with the Deed/Mortgage had occurred.)

### NOTE AND DEED ON 2 DIFFERENT PATHS

As previously mentioned, it appears that the Note and Mortgage have taken two distinctly different paths. The Note was securitized into the GPMF SERIES 2006-AR7 TRUST. The TRUST was formed by the execution of a trust agreement referred to in the finance and securitization industry as a "Pooling and Servicing Agreement" or in the case of this transaction the "Pooling and Servicing Agreement". The trust agreement is filed under oath with the Securities and Exchange Commission. The acquisition of the assets of the subject Trust and the Pooling and Servicing Agreement are governed under Federal Securities laws.

### REMIC CLOSING DATE

The TRUST was created on or about NOVEMBER 1, 2006. The Trust by its terms set a "CLOSING DATE" of on or about NOVEMBER 30, 2006. The promissory note in this case became trust property in compliance with the requirement set forth in the Pooling and Servicing Agreement.

Any assignment after the Trust closing date of NOVEMBER 30, 2006 would be a void act because it would violate the express terms of the Trust instrument.

### NO RECORD OF ASSIGNMENT ON THE COUNTY LEVEL

The loan was originally made by NATIONWIDE LENDING GROUP on MARCH 15, 2006. It was sold and transferred to the GPMF SERIES 2006-AR7 TRUST. There is no record of Assignments to either the Sponsor or Depositor as required by the Pooling and Servicing Agreement.

### ASSIGNMENT CODE FOR CALIFORNIA (WORTHLESS PIECE OF PAPER)

CA Civil Code 2932.5 – Assignment "Where the mortgagee has "transferred" only the mortgage, the transaction is a nullity and his "assignee" having received no interest in the underlying debt or obligation, has a worthless piece of paper (4 Richard R. Powell), Powell on Real Property, § 37.27 [2] (2000)

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-

Certified Forensic Loan Auditors

## FIDUCIARY DUTIES OF PARTIES PER THE PSA

To further address this point, the provisions of the Pooling and Servicing Agreement clearly stipulate procedures and requirements for Assignments to be obtained for each individual Mortgage Loan pooled into the Trust. The responsible parties named in the Trust and Pooling and Servicing Agreements clearly have not fulfilled their fiduciary responsibilities to both the Homeowners, and the Certificate holders of the Trust.

## PERFECT CHAIN OF TITLE

Traditionally, when a loan was executed, the beneficiary of the loan on the Deed of Trust was the lender. Once the loan was funded, the Deed of Trust and the Note would be recorded with the local County Recorder's office. The recording of the Deed and the Note created a Public Record of the transaction. All future Assignments of the Notes and Deed of Trust were expected to be recorded as ownership changes occurred. The recording of the Assignments created a "Perfected Chain of Title" of ownership of the Note and the Deed of Trust. This allowed interested or affected parties to be able to view the lien holders and if necessary, be able to contact the parties. The recording of the document also set the "priority" of the lien. The priority of the lien would be dependent upon the date that the recording took place.

## BENEFICIAL INTEREST

Recordings of the document also determined who had the "beneficial interest" in the Note. An interested party simply looked at the Assignments, and knew who held the Note and who the legal party of beneficial interest.

## SECURITIZED LOAN

This loan was securitized. Due to the spilt title system, it is unlikely that a legal foreclosure is possible. California State code and case law precedent supports this in: Cal. Civ. Code § 2936 ("The assignment of a debt secured by mortgage carries with it the security"); in re Staff mortgage & invest. Corp., 625 F.2d 281, 284 (9th Cir. 1980) (in California, "[A] deed of trust is a mere incident of the debt it secures and . . . an assignment of the debt 'carries with it the security." (internal quotation omitted)).

Examiner notes: It's not possible that the Mortgage Lenders and Wall Street investors simultaneously own the same mortgage when the mortgage has already been converted into investment grade securities, and the investors have already paid for it. Further, these securities are no longer governed by the Uniform Commercial Code under Article 3 negotiable instruments, as securities, they are now governed by UCC Article 8, securities, which carry a whole different set of rules and regulations that must be followed to make the transaction valid, including but not limited to informing the property owner that they are entering into a third party transaction with said investors, in which they should be designated as a beneficiary of said transaction.

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-



**Certified Forensic Loan Auditors**

This report was based exclusively on the documentation provided. It also required that we make reasonable assumptions respecting disclosures and certain loan terms that, if erroneous, may result in material differences between our findings and the loan's actual compliance with applicable regulatory requirements. While we believe that our assumptions provide a reasonable basis for the review results, we make no representations or warranties respecting the appropriateness of our assumptions, the completeness of the information considered, or the accuracy of the findings.

The contents of this report are being provided with the understanding that we are not providing legal advice, nor do we have any relationship, contractual or otherwise, with anyone other than the recipient. We do not, in providing this report, accept or assume responsibility for any other purpose.

Sincerely,

N. GRAY
**CERTIFIED FORENSIC LOAN AUDITOR**
13101 West Washington Blvd., Suite 140
Los Angeles, CA 90066
310-432-6304

Page | 50

"COPYRIGHT 2011 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2011
-All Rights Reserved-

# Exhibit B



The Write Choice

# SHEILA LOWE & ASSOCIATES

170 Dahlia Way ; Ventura CA 93004
Phone: (805) 658-0109 Fax: (805) 658-1013 sheila@sheilalowe.com www.sheilalowe.com

December 16, 2011

Gersten Law Group
Ehud Gersten
3115 4th Ave
San Diego, CA 92103

Re: Handwriting Analysis Report – in the matter of Francine Silver

Dear Mr. Gersten:

You have submitted to me certain signature samples, herein identified as K1 and K2 in the
above-captioned matter. My assignment was to perform an examination in this regard and offer
an opinion as to whether or not the two signatures were written by the same person.

Common reference designations in the field are: (1) Documents challenged as to authenticity are
referenced as questioned documents and designated by the letter "Q," followed by a number; (2)
authenticated, or undisputed, writings such as cancelled checks, bills of sale, etc., are referenced
as "known" documents and designated by the letter "K," also followed by a number; and, (3)
handwriting of a particular individual acquired for comparison purposes is referenced as Request
Writing, and designated by the letters, "RW." All "K" and "RW" writings are categorized as
comparison documents.

Following are the documents that were examined in this case.

## DOCUMENTS EXAMINED

Q1    Scanned copy of a document titled Assignment of deed of trust bearing the signature
      "Jacqueline Keeley," Assistant Secretary for Mortgage Electronic Registration Systems,
      Inc., dated 7/5/11.

Q2    Scanned copy of a document titled Substitution of Trustee bearing the signature
      "Jacqueline Keeley," Assistant Secretary for Mortgage Electronic Registration Systems,
      Inc., dated 7/6/11.

Court Qualified Handwriting Examiner
Member: National Association of Document Examiners

Page 2
December 16, 2011
Re: Francine Silver

## METHODOLOGY

Common practice in the field of document examination includes recording the documents and viewing original documents with a stereo microscope when available, and/or other visual enhancement devices, and scanning same for subsequent enlargement and comparison. In connection with the examination process, I created the hypothesis: *"There is common authorship between the two documents."*

Thereafter, tested the hypothesis by following professional and scientific standards of methodology applicable to the discipline of handwriting examination, including: evaluating the writing, establishing a *range of variation,* analyzing, and comparing the known and questioned writing, in order to formulate an opinion.

## EXAMINATION

I examined the two signatures "Jacqueline Keeley" in order to identify their common, dominant, and unique features and irregularities. Many aspects of handwriting were considered, including the general pictorial aspect of the writing and other factors such as:

- literacy, legibility, rhythm, and fluency;
- spatial arrangement: spacing between letters and names;
- form: overall style and individual letter forms;
- malformed letters;
- proportions between writing zones;
- baseline alignment and baseline slant;
- slant of letters;
- placement of the signature on the signature line;
- writing pressure (if originals are available) and speed;
- pressure patterns (distribution of light/dark strokes);
- margins;
- initial and terminal strokes

Page 3
December 16, 2011
Re: Francine Silver

## EVALUATION

In the initial phase of the evaluation, I made preliminary observations of the two signatures in order to gain an overall perception of the dominant writing features and characteristics, and to identify and categorize any significant variations and disparities. I enlarged the signatures using graphics software and made a direct comparison between them.

## CONCLUSIONS AND OPINION

I found that although there are some overall pictorial similarities, significant *differences* exist between the two signatures, which call into question their authorship. In other words, it is my opinion that the signatures were probably written by two different people.

## BASIS FOR OPINION

1. Recognizing that the questioned documents made available for this examination are reproductions, and that in the reproduction process there is always some degree of degradation, which could alter certain aspects of the handwriting, my opinion in this matter is qualified pending examination of the originals.

2. The foregoing notwithstanding, the disparities between the signatures is significant, and it is my opinion to a reasonable degree of professional certainty that the evidence does not support the examination hypothesis. Therefore, based on my training, experience, and special knowledge in the field of signature authentication, combined with my observations, examination, and comparisons of the questioned signature, in my opinion, a probability exists that the signatures are not of common authorship.

3. Any similarities between these two signatures may be explained by an attempt to simulate.

Page 4
December 16, 2011
Re: Francine Silver

## ADDITIONAL NOTE

In addition to the above, I compared the signatures of Mary Lynch and Nikole Shelton to
examples of their known signatures and found them to be of common authorship. In other words,
one person wrote all of the Mary Lynch signatures and one person wrote all of the Nikole Shelton
signatures.

## DECLARATION

I declare under penalty of perjury that I am a court-qualified examiner of questioned documents
in the state of California. The document examination information published herein, along with
the information in the comparison charts, and my curriculum vitae, transmitted herewith, is, to
the best of my knowledge and belief, true and accurate. The foregoing notwithstanding, I reserve
the right to re-evaluate my opinion if presented with new or previously unavailable evidence.

Sheila R. Lowe
Handwriting Examiner

Enclosures:

    Documents examined

    Curriculum Vitae of Sheila Lowe

2

Requested and Prepared by:
Executive Trustee Services, LLC

When Recorded Mail To:
Executive Trustee Services, LLC
2255 North Ontario Street, Suite 400
Burbank, CA 91504-3120

11622222

Loan No.:        8858
TS NO:  CA1100036124

## ASSIGNMENT OF DEED OF TRUST

For Value Received, the undersigned corporation hereby grants, assigns, and transfers to:

GMAC Mortgage, LLC FKA GMAC Mortgage Corporation

all beneficial interest under that certain Deed of Trust dated:  03/15/2006 executed by FRANCINE
SILVER, AN UNMARRIED WOMAN, as Trustor(s), to LAND AMERICA COMMONWEALTH, as
Trustee, and recorded as Instrument No. 06 0618788, on 03/23/2006, in Book XX , Page XX  of
Official Records, in the office of the County Recorder of Los Angeles County, CA together with the
Promissory Note secured by said Deed of Trust and also all rights accrued or to accrue under said
Deed of Trust.

DATE: 7/5/11

MERS MIN #        0833        MORTGAGE ELECTRONIC REGISTRATION
MERS PHONE #888 679 6377        SYSTEMS, INC.

Jacqueline Keeley
Assistant Secretary

State of pennsylvania SS.
County of montgomery    }

On 7/5/11         before me,    Mary Lynch    Notary Public, personally appeared
jacqueline keeley    who proved to me on the basis of satisfactory evidence to be the
person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed the instrument.

I certify under penalty of perjury under the laws of the State of    pennsylvania        that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Mary Lynch, Notary Public
Upper Bublin Twp., Montgomery County
My Commission Expires Nov. 3, 2014
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

9

RECORDING REQUESTED BY:

LSI TITLE COMPANY, INC.

Executive Trustee Services, LLC
2255 North Onterio Street, Suite 400
Burbank, CA 91504-3120
(800)-665-3932



07/22/2011

*20110961264*

TS NO : CA1100036124
LOAN NO :  ████████ 858

SPACE ABOVE THIS LINE FOR RECORDER'S USE

# SUBSTITUTION OF TRUSTEE

**WHEREAS, FRANCINE SILVER, AN UNMARRIED WOMAN** was the original Trustor, **LAND AMERICA COMMONWEALTH** was the original Trustee, and **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR NATIONWIDE LENDING GROUP A CORPORATION** was the original Beneficiary under that certain Deed of Trust dated **03/15/2006** and recorded on **03/23/2006** as Instrument No. **06 0619788**, in Book XX , Page  XX  of Official Records of Los Angeles County, California; and

**WHEREAS**, the undersigned is the present Beneficiary under said Deed of Trust, and

**WHEREAS**, the undersigned desires to substitute a new Trustee under said Deed of Trust in place and instead of said original Trustee, or Successor Trustee, thereunder, in the manner in said Deed of Trust provided,

**NOW, THEREFORE**, the undersigned desires to substitute Executive Trustee Services, LLC dba ETS Services, LLC, as Trustee under said Deed of Trust.

Whenever the context hereof so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

**Dated:**  7/6/11

GMAC Mortgage, LLC FKA GMAC Mortgage Corporation

Jacqueline Keeley
Authorized Officer

State of pennsylvania  } ss.
County of montgomery   }

On 7/6/11        before me,  **Nikole Shelton**        Notary Public, personally appeared jacqueline keele who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under penalty of perjury under the laws of the State of pennsylvania hat the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Nikole Shelton, Notary Public
Upper Dublin Twp., Montgomery County
My Commission Expires Aug. 11, 2014
Member, Pennsylvania Association of Notaries

3B



# SHEILA LOWE & ASSOCIATES

170 Dahlia Way  Ventura  CA  93004
(805) 658-0109 Fax: (805) 658-1013 sheila@sheilalowe.com; www.sheilalowe.com

## CURRICULUM VITAE

### PROFESSIONAL MEMBERSHIPS & AFFILIATIONS

*ASTM International.* Forum to establish standards for testing and measurements. Voting member of Forensic Sciences subgroup Document Examination (E30.02).

*National Association of Document Examiners.* Member (also NADE Forum Online member). Membership is by recommendation. Member, Professional Development Committee.

*State of California Board of Behavioral Sciences.* Approved Continuing Education Provider, Approval No. PCE 3603.

*Los Angeles County Panel of Experts* (by appointment, Judge Henry Hall)

*American Handwriting Analysis Foundation*
Certified 1982
Member, board of directors, 1984-1994
Editor of *AHAF Journal,* 1984-1992
National Chapter Coordinator, 1992-1994
Judge and consultant for the Certification Committee, 1984-1994
National conference program chairperson, 1986, 1993
Los Angeles Chapter of AHAF (Founding member)
    Membership chairman 1985-1993
    Chapter secretary 1982-1985, president, 1985 and 1994
*Ventura County Professional Women's Network*, Membership Committee; Board of Directors as *Focal Points* Editor, 2005-2008.
*Qualified as a Handwriting Expert since 1985*
*Court appointed Handwriting Expert*
*Society of Handwriting Analysts of Washington, DC.* Certified 1985.
*College of the Canyons,* Instructor (extension program for adult ed.) – Introduction to Handwriting Psychology 1997, 1998, 2003.
*University of California at Riverside Extension,* CSI Certificate program instructor in Forensic Document Examination 2008, 2009 (20-hour course, 2 university credits)

### PROFESSIONAL EDUCATION AND TRAINING

*Handwriting Examination & Roman-Staempfli Courses, 1977* - Handwriting Analysis Workshop Unlimited (Charlie Cole, handwriting examiner).
*Handwriting Examination Workshop, 1988, and one-on-one mentorship/peer review* - Judith Housley, Document Examiner
*Handwriting Examination Course, 1992* - Paul Weast, handwriting examiner.
*West Los Angeles College, 1990* - Abnormal Psychology
*Scientific Content Analysis course, Seattle, 1995* - Through the Seattle Police Department, with Mr. Avinoam Sapir (Laboratory for Scientific Interrogation).

*Bachelor of Science, Psychology, California Coast University, 2005*
*SignaScan Laboratory, 2006* - Special training in identification of synchronous writing and ink striation analysis.
*Master of Science, Psychology, California Coast University* – *currently enrolled.*
*AFDE Conference October 17-20, 2008 – Albuquerque, New Mexico – 20 hours*
" Handwriting Movement Control Research for Document Examiners, Hans-Leo Teulings, Ph.D. & Heidi Harralson, MA, BC-BFDE
" Restricted Assignments: Considerations and Ethics, Robert Cole, Esq.
" Presenting Evidentiary Proof of Page Substitution in a Multi-page Document, and Demonstrating How Critical Evidence Can be Overlooked by FDEs, Andrew Sumner
" Latent Images: Interpreting the results and demonstrating the opinion, Emily Will, BC-BFDE
" The Graphite Pencil: Historical Perspective and Analytical Approaches, Joseph Barbabe, Senior Microscopist
" DART Mass Spectrometry for Handwriting-Ink Analysis, Dr. Roger Jones
" Evaluating Line Quality Distortion, Larry Miller, Ph.D., H. Harralson, M.A.
" An Overview of the ASTM: how standards are developed, Vickie Willard, BC-BFDE
" WEB Site Strategies: How to be listed in search engines successfully, Steve Cain, BC-AFDE
" A Case of Murder, Allan Known, BC-AFDE
" An Overview of ST2AR's Skill Task Assessment (STA) Program, Derek Hammon, BA
" New Ideas for Latent Imaging, J. Michael Weldon, BC-BFDE
" Cautions – Using Grids in Document Examination, Dick McEvoy, Charla Janney
*NADE Conference May 16-20, 2007 – Tucson, Arizona – 25 ½ hours*
" Introduction to Print Identification, Joe Barabe
" Art and Artefacts Forgery Identification, Graham Ospreay
" Decoding Identifying Printer Information, Seth Schoen
" Forgery Science, An Interactive Workshop, Dr. Bryan Found
" Assessing Dynamic Features From Handwriting, Dr. Hans-Leo Teulings & H. Harralson, CDE
" Conducting An Observed Document Examination, Larry Liebscher, CDE
" Extreme Grips, Jacqueline Joseph, CDE
" An Introduction to Solid Ink Printers, Cina Wong, CDE
" Working with the Media, Ruth Holmes, CDE
*AHAF/AAHA Conference July 26-29, 2007 – Santa Clara, California – 20 hours*
" Handwriting Analysis Research Library, video presentation
" Early Memories and Handwriting, Linda Larson
" Physiology and Handwriting, Marcel Matley
" Personality Styles Seen with NLP and Handwriting Analysis, Danny Burton
" The Persona and Handwriting, Debby Peddy
" From Mind to Hand–Artists and their Handwriting, Susanne Shapiro
" Print v. Cursive Handwriting in School, Graziella Petinatti

" Comparative Analysis (presenter)
" Alpha Beta Workshop, Heidi Harralson, Tricia Clapp
" The New American Alphabet Model, Iris Hatfield
" An Introduction to the Moretti Method, Claudio Garibaldi
" Bringing Handwriting Analysis to the Mental Health Professional (Sheila Lowe, presenter)
" A Case of Borderline Personality Disorder Seen in Handwriting, Jeanette Farmer

## A SELECTION OF SOME HANDWRITING SEMINARS AND WORKSHOPS ATTENDED SINCE 1994:

National Association of Document Examiners National Conference, Tucson, AZ 2007
Forensic Expert Witness Association Expert Witness Summit, Newport Beach, CA 2006
AHAF/AAHA National Conference, Tucson, AZ, 2005
National Association of Document Examiners National Conference, Anaheim, CA 2004
American Handwriting Analysis Foundation National Conference, Costa Mesa, CA, 2003
National Association of Document Examiners National Conference, Albuquerque NM, 2000
Vanguard Regional Seminar, Defense Mechanisms, Linda Larson, MA, Studio City, CA 1999
Association of Forensic Document Examiners National Conference, Scottsdale AZ, 1999
Behavioral Profiling, Vanguard Conference, Oxnard CA, 1998
American College of Forensic Examiners Scientific Academy and Retreat, Naples FL, 1998
Behavioral Profiling, Vanguard Conference, Asilomar CA, 1997
American College of Forensic Examiners Scientific Academy and Retreat, San Diego CA, 1997
Introduction to Criminal Profiling Course, 4 weeks (12 hours), Instructor: Brent Turvey, MS, 1997
Behavioral Profiling, Vanguard Conference, Tucson AZ, 1996
American College of Forensic Examiners Scientific Academy and Retreat, San Diego CA, 1996
Doc. Examination for the Graphologist, Katherine Koppenhaver, CDE, Beverly Hills CA, 1995
Vanguard Conference, Behavioral Profiling, Los Angeles CA, 1995
Adler's Typologies and Handwriting, Roger Rubin, Los Angeles CA, 1995
Dishonesty as Seen in Handwriting, Reed Hayes, San Diego CA, 1995
Handwriting Examination Conference, Institute of Graphological Sciences Conference, Dallas Tx, 1995
Handwriting & Personality Structure & Developmental Stages, Kay Talley, MA, San Diego Ca, 1995
National Association of Document Examiners Conference, Concord MA, 1994

## A SMALL SELECTION OF LECTURES PRESENTED SINCE 1995:

University of California, Riverside Campus – Introduction to Handwriting Examination, 2008
IGAS South Carolina, Marriage & Family Therapists CEU, 2007 for CEU
Ventura County Bar Association; 2006 for MCLE
Kern County Bar Association; 2006 for MCLE
Home Savings assistant bank managers – Preventing Signature Fraud; 2006
American Handwriting Analysis Foundation National Conference; 2005

Kern County Paralegal Association; 2003, 2004 for MCLE
American Handwriting Analysis Foundation National Conference; 2003
Handwriting Examination Workshop; 2003
Graphodigest 2nd Virtual Conference for Graphology; 2001
National Association of Document Examiners, National Conference, 2000, Albuquerque NM
National Association of Document Examiners, National Conference, 1994, Boston MA;
American Association of Handwriting Analysts Regional Seminar, Detroit MI, 1999
American Handwriting Analysis Foundation Regional Seminar, Tucson AZ, 1999
International Graphological Colloquium, 1998 Montreal Canada
American College of Forensic Examiners Conference, 1998, Naples FL
Vanguard Regional Seminar, 1998, Dallas TX
International Graphological Society, 1998, London England
American College of Forensic Examiners Conference, 1996, San Diego CA
Pacific Union Club, 1996, San Francisco CA
Vanguard National Conference, Tucson 1996, Asilomar 1997, Oxnard 1998
Institute of Graphological Sciences, National Conference, 1995, Dallas TX
National Society for Graphology, 1995, New York NY
Numerous civic and business organizations

## PUBLICATIONS
Spirit, Southwest Airlines in-flight magazine (January, 2008)
San Fernando Valley Bar Association Magazine part II (July/Aug 2007)
San Fernando Valley Bar Association Magazine part I (Sept/Oct, 2006)
Santa Barbara County Bar Association Magazine (2006)
San Luis Obispo County Bar Association Magazine: *Bar Bulletin*: Personality Profiling and Handwriting
   Analysis for the Attorney (May, 2006)
*PI magazine*: Handwriting Analysis for the Private Investigator (April, 2006)
SOBRAG, national journal of the Graphological Society of Brazil (2006)
Clark County NV Bar Association Magazine: *Communique*: Handwriting Analysis in Employment
   Screening (July, 2006)
*Teen* magazine article (July, 2006)
San Luis Obispo County Bar Association Magazine: *Bar Bulletin*: Forgery and the Handwriting Expert
   (January, 2006)
San Bernardino County Bar Association Magazine: *Bar Bulletin*: Forgery and the Handwriting Expert
   (October, 2005)
San Bernardino County Bar Association Magazine: *Bar Bulletin:* Personality Profiling and Handwriting
   Analysis for the Attorney (September, 2005)
Ventura County Bar Association Magazine: *Citations*: Forgery and the Handwriting Expert (April, 2005)
Orange County Bar Association Magazine: *Orange County Lawyer*: Personality Profiling and Handwriting

Analysis for the Attorney (January, 2005)

Orange County Bar Association Magazine: *Orange County Lawyer*: Forgery and the Handwriting Expert – What Attorneys Need to Know (September, 2004)

*Handwriting of the Famous & Infamous* (Metro Books, 2001, 2008)

*NADE Journal* (National Association of Document Examiners ) article, February-March, 2000

*Time* magazine article (analysis of G8 Summit Leaders, August, 2000)

*Complete Idiot's Guide to Handwriting Analysis* (Macmillan, 1999, second ed. Penguin, 2007)

*Sheila Lowe's Handwriting Analyzer* software (RI Software, 1997)

NADE Journal (National Association of Document Examiners), 2000, 2009

Monographs on the subject of handwriting and behavior, which include:

*Character Structure & Handwriting; Coping & Defense Mechanisms in Handwriting; Jung's Typologies & Handwriting; Serial Killers, The Face of Evil; Answers to Legal Questions for Handwriting Analysts* (with David Robinson, Esq.); *Looking at the Big Picture; Graphology in Business; Marketing Tools for the Handwriting Professional; Introduction to Gestalt Graphology; Professional Graphology, the Next Step; Lectures that Sell; Compendium of Descriptive Paragraphs; Beneath it All; Jung's Typologies Applied to Handwriting*

Editor and Publisher of *The Vanguard*, a periodical for handwriting professionals since 1992

Articles for newsletters and handwriting analysis journals, which include: *AAHA Dialogue, AHAF Journal, Write-Up, The Graphologist* (Journal of the British Institute of Graphology) as well as journals of handwriting analysis in Switzerland, Brazil, Canada.

### RESEARCH:

Participated in study on Multiple Personality Disorder, Sperry Lab, Calif. Polytechnic Institute

Presented original research on left-handedness at 1984 AHAF Annual Conference

Presented original research on personal pronoun I at 1990 AHAF Annual Conference

### AWARDS & HONOR SOCIETY MEMBERSHIPS:

International Honor Society, Delta Epsilon Tau – Gamma of California.

Recipient, AHAF President's Award for *Outstanding Achievement and Accomplishment in the Field of Handwriting*, Tucson, 1991.

### EQUIPMENT USED:

Stereo microscope; portable monocular macroscope, transmitted light apparatus, Hewlett Packard 7410 scanner and Canon iDE90 scanner, measuring calipers and other measurement tools. Sony Mavica digital camera, Olympus FE20 digital camera.

Page 6 of 7
Sheila Lowe
Curriculum Vitae
June 8, 2009

## SOME MEDIA APPEARANCES SINCE 1994
### *Television & Radio Interviews*
Hard Copy, CBS Network Television (Susan Smith confession letter) (10/94)
Hard Copy, CBS Network Television (O.J. Simpson case 1994)
Full Disclosure Washington, DC television show (Bill Clinton 1/96)
KABC TalkRadio with Mario Machado (2/96)
ABC Television 11:00 News (Florio-Buntin letter, re: Simpson case 3/96)
NBC Television 5:00 & 6:00 feature story with Paul Moyer(4/96)
KLSX Radio 97.1, Ricky Rackman Show (8/96)
NHK Japan interview with Mark Joseph (10/96)
UPN Strange Universe interview with Stacy Gualandi (10/96)
KFWB radio interview with John McDevitt (10/96)
KABC TalkRadio w/Doug Stephan (11/96)
NBC Rolonda Show interview re profiling of criminals (Jon Benet Ramsey) (2/97)
Victoria Jones syndicated radio show (Jon Benet Ramsey) (5/97)
KNBC News w/Diane Diaz (10/98)
KCBS News w/Kyra Phyllips (11/98)
KPFK radio Nita Vallens, Inner Vision (8/99)
Cyberradiotv.com Ginny Harman live Internet show (8/99)
Fox Family Channel - Exploring the Unknown (11/99)
KABC Eyewitness News w/Lora McLaughlin (2/00)
Extra! (4/00)
KABC Eyewitness News - Anthrax letters (10/01)
ESPN, Unscripted with Chris Connelly - interview (11/01, 2/02, 4/02)
ABC (Australia) Radio Life Matters - interview (12/02)
A&E - Between the Lines - interview re handwriting of serial killers (2/04)
KVTA radio 1520, Bob & Dave Show (10/04)
Internet Podcast interview, www.lineofduty.com (1/06)
Good Day Arizona (5/07)
Dateline NBC - Clark Rockefeller case (6/09)

### *Some print interviews since 1996*
L.A. Times, Life & Style, Beverly Beyette (2/96)
Cosmopolitan Magazine (3/96)
Article for The Globe (OJ Simpson Suicide letter, 9/96)
Interview for The Daily News (8/98)
Article for New Woman magazine (10/98)
L.A. Times, Beverly Beyette (Penmanship, 8/99)

Page 7 of 7
Sheila Lowe
Curriculum Vitae
June 8, 2009

Newhall Signal, Norinne De Gal (Book signing, 10/99)
National Enquirer (Jon Benet Ramsey, 10/00)
CLEARS (Law Enforcement magazine, graphology, 10/00)
Mademoiselle magazine (Dating, 12/00)
Woman's Day (for 4/02 issue)
Maxim (5/02?)
Esquire interview (2002)
Country Weekly (May, October, 2002)
Woman's World (Relationships, 10/8/02)
National Enquirer (Ramsey, 10/02)
Richmond Times Dispatch (VA Sniper, 10/23/02)
Teen People (5/03, 8/03, 9/03)
Herald Republic newspaper (IN, 6/11/03)
Ottawa Citizen newspaper (6/03)
Home.Com Russian magazine (Software review 6/03)
Tiger Beat magazine (6/04)
Us Magazine (6/04)
Us Magazine (12/05)
National Geographic for Kids (5/06)
National Enquirer regarding John Mark Karr and Ramsey Ransom Note (8/06)
Plain Dealer newspaper (OH 1/7/06)
National Law Journal (2/07)
Ventura County Star (3/07)
Philadelphia City Newspaper (4/07)
Plain and Simple magazine (5/07)


**BASIC FEE SCHEDULE**

| | |
|---|---|
| Retainer | $1000 |
| Hourly rate | $200 |
| Deposition | $700 up to two hours; $87 per 15 minute increment thereafter (local) |
| | $2200/full day (6 hours) plus expenses more than 100 miles each way |
| Court Appearance | $1800/day local or $2200/day plus expenses more than 100 miles each way |

*See retainer agreement for additional fee details.*